# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | |
|---|---|
| ------------------------------------------------------- ) | |
| ) | |
| In re FEDEX GROUND PACKAGE ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL 1700) |
| PRACTICES LITIGATION ) | |
| ) | |
| ------------------------------------------------------- ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL ACTIONS ) | |
| ------------------------------------------------------- ) | |

## CERTIFICATE OF SERVICE

I, Susan E. Ellingstad, hereby certify that on April 30, 2010, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |

| | |
|---|---|
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; egordon@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; aahn@leonardcarder.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Clayton D. Halunen** | halunen@halunenlaw.com |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Chris A. Hollinger** | chollinger@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |

| | |
|---|---|
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | jmarshall@marshallandmorrow |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Eleanor I. Morton** | emorton@leonardcarder.com; aahn@leonardcarder.com |
| **James Mulroy, II** | mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Ian Otto** | iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Lesley A. Pate** | lapate@venable.com |
| **Mary Donne Peters** | mpeters@gorbypeters.com; mmcgee@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Nora M. Puckett** | npuckett@omm.com |
| **Charles Victor Pyle, III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; stefanie.hebig@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; jwoolley@scopelitis.com |
| **Joni M. Thome** | thome@halunenlaw.com |
| **Matthew T. Tobin** | matt@sdtrustco.com; lenandlaura@iw.net |

| Jeffrey A. Trimarchi | jtrimarchi@omm.com |
| Scott Voelz | svoelz@omm.com |
| Mary D. Walsh-Dempsey | mdempsey@omalleylangan.com |
| Michael J. Watton | jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com |
| Peter D. Winebrake | pwinebrake@winebrakelaw.com |

I also certify that on April 30, 2010, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Steve Dennis
REID & DENNIS
Providence Tower
5001 Spring Valley Road, Suite 255W
Dallas, TX 75244

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921

Dated: April 30, 2010                                      Respectfully submitted,

                                                           LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                                           ___**s/Susan E. Ellingstad**_____
                                                           Susan E. Ellingstad
                                                           100 Washington Avenue South
                                                           Suite 2200
                                                           Minneapolis, MN  55401
                                                           Tel:    (612) 339-6900
                                                           Fax:    (612) 339-0981
                                                           Email:  seellingstad@locklaw.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

----------------------------------------------------

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Cause No. 3:05-MD-527-RM (MDL 1700) |

---------------------------------------------------- )

| THIS DOCUMENT RELATES TO: | ) ) | |
|---|---|---|
| ALL ACTIONS | ) ) | Chief Judge Miller Magistrate Judge Nuechterlein |

----------------------------------------------------

## SUPPLEMENTAL DECLARATION OF
## MATTHEW M. HOUSTON CONCERNING
## COMPLETION OF THE NOTICE PROCESS FOR
## CLASS CERTIFICATION (WAVES ONE THROUGH FIVE)

I, MATTHEW M. HOUSTON, hereby declare as follows:

1.      I am a partner with the law firm of Harwood Feffer LLP, one of the firms serving as co-lead counsel for plaintiffs in this action.

2.      I respectfully submit this supplemental declaration to advise the Court of changes to certain class and opt-out lists that have been made subsequent to the prior declaration concerning completion of the class notice process following class certification of the national ERISA class and 28 state actions in Waves 1 through 5. (Doc. No. 1988)

3.      Subsequent to the January 2010 completion of the class notice process, it has been determined that four individuals were incorrectly listed on or omitted from certain class and opt-out lists that were filed with the Court on January 4, 2010. Plaintiffs' Notice Administrator will file under seal a supplemental exhibit listing the corrections to the impacted

lists, which include the ERISA noticed Class and Opt-Out Lists, the Arkansas noticed Class list, the Pennsylvania noticed Class and Opt-out lists, and the Texas noticed Class and Opt-Out lists.

4.      Additionally, the noticed class and opt-out lists previously provided to the Court on January 4, 2010 included a group of 81 individuals who were properly noticed, pursuant to the first supplemental notice process approved by the Court on December 23, 2008 (Doc. No. 154), and who were accounted for on the appropriate lists previously provided to the Court, but who were incorrectly listed on several of those lists.  Specifically, the references to most of these individuals on the filed lists failed to include the first names of the individuals.[1] According, the above-referenced supplemental exhibit that will be filed by the Notice Administrator under seal will also include a corrected listing of these individuals and the class and opt-out lists with which they are associated.

5.      The corrected results of the notice process are summarized as follows:

| Class | Individuals To Whom Class Notices Were Mailed Who Did Not Opt Out | Opt-outs | Exhibit[2] |
|---|---|---|---|
| ERISA | 27,181 | 151 | A |
| Individual States (Total) | 20,193 | 247 | -- |
| Alabama | 425 | 2 | C |
| Arizona | 396 | 5 | V |
| Arkansas | 291 | 4 | D |
| California | 2,374 | 20 | E |
| Florida | 1,616 | 27 | F |

---

[1] A list of the full names and addresses of these individuals has always been properly reflected in the databases maintained by U.S. Bank's Information Consulting Group.

[2] "Exhibit" references the exhibit letter used in the Declarations of Stephanie Moore Concerning Class Notification (Docs. 1957 and 1980) previously filed with the Court under seal.  These exhibits include the names and addresses of all individuals on the class and opt-out lists.

| | | | |
|---|---|---|---|
| Georgia | 974 | 24 | W |
| Indiana | 898 | 10 | G |
| Kansas | 479 | 5 | B |
| Kentucky | 311 | 2 | H |
| Louisiana | 345 | 16 | X |
| Maryland | 579 | 11 | I |
| Minnesota | 528 | 4 | J |
| Nevada | 275 | 2 | Z |
| New Hampshire | 213 | 2 | K |
| New Jersey | 968 | 3 | L |
| New York | 1,766 | 14 | M |
| North Carolina | 785 | 12 | Y |
| Ohio | 889 | 19 | AA |
| Oregon (*Slayman*) | 371 | 2 | N |
| Oregon (*Leighter*) | 373 | 9 | BB |
| Pennsylvania | 1,369 | 12 | O |
| Rhode Island | 120 | 1 | P |
| South Carolina | 331 | 3 | Q |
| Tennessee | 809 | 4 | R |
| Texas | 1,727 | 21 | S |
| Utah | 182 | 6 | CC |
| West Virginia | 120 | 3 | T |
| Wisconsin | 677 | 6 | U |

6.     The opt-outs for the noticed ERISA class represent approximately 0.55 of 1 percent of all individuals to whom ERISA class notices were mailed. The opt-outs for all of the state classes represent 1.22 percent of all individuals to whom state class notices were mailed. These percentages have not changed as a result of the corrections referred to herein.

7.     Plaintiffs' counsel, with the assistance of U.S. Bank, continues to monitor and work with the class lists to update the contact information on these lists as needed. Likewise, U.S. Bank continues to maintain the fedexclassactionlawsuit.com website to provide a contact point for individuals on the class lists and the public at large.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of May 2010 at New York, New York.

Matthew M. Houston

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____

In re FEDEX GROUND PACKAGE            )        CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC. EMPLOYMENT               )             (MDL-1700)
PRACTICES LITIGATION                  )
-----------------------------------------------        )
THIS DOCUMENT RELATES TO:             )
                                      )
ALL CASES                             )
_____       )

OPINION AND ORDER

This matter is before the court on FedEx Ground Package System, Inc.'s

motion to exclude the expert testimony and report of Robert Wood (doc. # 1363).

The plaintiffs retained Mr. Wood, a tax attorney in private practice and the author

of a treatise on independent contractors, to apply his legal expertise to render an

opinion on the "proper classification of workers as employees or independent

contractors." The plaintiffs rely on Mr. Wood's report in their summary judgment

motions and memoranda in opposition to summary judgment to support their

legal argument that FedEx, through the terms in the Operating Agreement, has

retained the right to control its drivers. FedEx moves to strike the report, arguing

that it's essentially a supplemental legal brief laden with legal conclusions that

will determine the outcome of the case. As such, FedEx maintains that the report

doesn't provide any specialized knowledge that will help this court or any trier of

fact better understand the facts in issue. FedEx presents other arguments in

support of its motion to strike, but the court needn't address those arguments

1

because it agrees that Mr. Wood's report impermissibly contains legal conclusions throughout, including those portions relied upon by the plaintiffs in their summary judgment briefing. The court therefore grants FedEx's motion to strike reference to the report in the plaintiffs' summary judgment motions, statement of undisputed facts, and memoranda in opposition to FedEx's motion for summary judgment. The reasoning for exclusion in this order effectively prevents Mr. Wood from offering a majority of the opinions in his report at trial, except to the extent Mr. Wood's testimony would be admissible as rebuttal evidence.

## I. BACKGROUND

The plaintiffs' expert, Robert Wood, is an attorney and a certified specialist in taxation. He is the author of *Legal Guide to Independent Contractor Status* (4th Ed., Tax Inst. 2007). During his twenty-eight years of practice, Mr. Wood has advised companies and assisted them in establishing independent contractor arrangements and has represented companies defending independent contractor arrangements before taxing and administrative bodies. Mr. Wood testified as an expert witness on rebuttal in <u>Estrada v. FedEx Ground Package System, Inc.</u>, Case No. BC210130 (Cal. Super. Ct. 2004). The plaintiffs retained Mr. Wood on the assumption that, at trial, FedEx intends to offer the testimony of lawyers and executives who will testify regarding the meaning of the various sections of the Operating Agreement, the interplay between the Operating Agreement and the policies and procedures, the changes made to the policies and procedures, and

2

FedEx's intent to create a true independent contractor relationship. The plaintiffs reference Mr. Wood's report in one paragraph of the statement of undisputed facts (¶ 65), in footnotes in several of their memorandum of law in support of summary judgment, and in a few instances in opposition to FedEx's summary judgment motions.

In paragraph 65 of their SUF, the plaintiffs rely on Mr. Wood's report in support of their request to give the Estrada judgment preclusive effect. Paragraph 65 states: "The re-engineered policies and procedures may have changed cosmetically, but to the drivers, little has changed. . . . The policies and procedures evidence the same degree of control at issue in the Estrada litigation." The court already has ruled on the plaintiffs' request that the Estrada judgment be given preclusive effect. The court didn't address the plaintiffs' motion to strike Mr. Wood's report at that time because instead of relying on his report, the court relied on the policies and testimony presented to determine if the changes FedEx made were substantive.

In several of their memoranda in support of summary judgment and in opposition to FedEx's motions for summary judgment, the plaintiffs direct the court's attention to Mr. Wood's opinion that:

- The Operating Agreement Section 1.15's general "prohibition" against directing the manner and means is meaningless in light of the (at least 18) specific and express provisions which reserve rights of control to FedEx; express provisions which Mr. Wood opined, in his experience, he would not expect to see in

3

a true independent contractor arrangement.

- There are myriad specific reservations of control over the drivers which can also be found in the policies and procedures which, despite the purported "reengineering" have changed little since [Mr. Wood] testified about them in the <u>Estrada</u> trial.

- FedEx's Operating Agreement contains numerous provisions inconsistent with a true independent contractor agreement.

- FedEx's plethora of rules for every step, from check-out to check-in, to scanning, to approval of truck and vans, to dress, to shaving, to hours, to hats worn during lunch, are entirely inconsistent with the independence necessary to independent contractor status.

- The Operating Agreement contains no fewer than 18 separate provisions that are inconsistent with a true independent contractor arrangement because they retain to FedEx the right to control every aspect of the drivers' work in "exquisite detail."

Accordingly, the plaintiffs only used limited portions of Mr. Wood's Report in moving for or opposing summary judgment.

The court has reviewed Mr. Wood's report in its entirety to place those statements in context. In his report, he opines that "plainly, unequivocally, and without qualification, the P&D drivers do not (and cannot) constitute *bona fide* independent contractors under any existing test for assessing worker status." Wood Report, p. 9, ¶ 1. It's the employer's right to control, Mr. Woods states, not the employer's actual exercise of that control that defines an employment relationship. Wood Report, p. 9, ¶ 2. Mr. Wood explains:

In a case where the employer's contractual rights manifest the unequivocal right to control the method, manner and means by which the workers go about their daily tasks, it is not necessary to evaluate the extent to which the contractual right to control is

4

> actually exercised on a day to day basis  to determine the worker's
> status. . . . In my opinion, FXG's reserved contractual rights over its
> P&D drivers obviate reference to FXG's actual patterns of practice.

Wood Report, p. 9, ¶ 3. The drivers' employment status, according to Mr. Wood,

is "confirmed by both FXG's express contract rights, and by FXG's nationwide and

uniform practices, although either one alone would be sufficient." Wood Report,

p. 10, ¶ 6.

Based on a review of the facts presented in this litigation, Mr. Wood opines

that the P&D drivers are employees regardless of which test — the common law

approach, the economic realities test, a hybrid analysis, or any other prevailing

test — this court applies. Wood Report, p. 12. Mr. Wood reasons that "the

defendant's voluminous business records themselves are an overwhelming,

incontrovertible and unequivocal testament to the employee status of these P&D

drivers under any applicable legal standard." Wood Report, p. 11.

Mr. Wood discusses FedEx's retention of control in the operating agreement:

"This reserved control is so strong that, in my opinion, whether FXG or FHD ever

exercises it is unimportant." Wood Report, p. 15. Reiterating his testimony in

Estrada, Mr. Wood indicates that the vague and ambiguous terms and phrases

throughout the Operating Agreement provide FedEx with "tremendous latitude in

controlling the method, manner, and means by which each P&D drivers goes

about his work." Wood Report, pp. 17-18. The Operating Agreement, Mr. Wood

states, "unambiguously reflect[s] employment." Wood Report, p. 18. Mr. Wood

discusses FedEx's policies and procedures and presents examples of the right to

case 3:05-mc-00527-RLM -CAN   document 2050   filed 05/04   page 6 of 11

control that FedEx has reserved, including: check-out, check-in and completion procedures; uniform and vehicle appearance; customer service rides; driver release audits; and approval of all replacement drivers. Wood Report, pp. 20-25.

Mr. Wood reasons that a review of FedEx manuals, P&D driver checklists, DVDs and driving training courses "leads inevitably to employee/employer status" because the material demonstrates that FedEx "retains the right to control the method, manner and means of daily driver performance." Wood Report, pp. 28, 33. Mr. Wood further opines that the business discussions conducted by FedEx employees and used to support termination "bespeaks employment." Wood Report, p. 28. FedEx's right to control and exercise of control, according to Mr. Wood, "is consistently evidenced in its Business Discussions with its P&D drivers." Wood Report, p. 28. Mr. Wood also discusses FedEx's method of payment, right to control vehicles, right to control routes and assignments, right to control hours, and right to terminate at will. Wood Report, pp. 37-49.

FedEx doesn't challenge either Mr. Wood's qualifications or the reliability of his expert report and methods. FedEx contends that Mr. Wood's opinions on the legal standards used to classify independent contractors improperly tread on the province of the judge as the sole arbiter of the law, and would confuse the relevant law. FedEx further argues that Mr. Wood assumes the role of the fact-finder by applying his interpretation of the law to his interpretation of the facts to determine the outcome of the case. The plaintiffs respond by contending that Mr. Wood's opinions cited in support of their summary judgment memoranda aren't outcome-

6

determinative legal conclusions and the opinions don't attempt to interpret the Operating Agreement. Instead, Mr. Wood's opinion is merely cited for the proposition that the controls reserved to FedEx in the Operating Agreement are entirely inconsistent with independent contractor status.

## II. DISCUSSION

Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of the case. Good Shepherd Manor Found. v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003) (affirming district court's ruling that a law professor couldn't testify to conclusions that the city's actions violated FHAA). Expert witnesses can't testify about legal issues on which the judge will instruct the jury. United States v. Sinclair, 74 F.3d 753, 758 n. 1 (7th Cir. 1996). In RLJCS Enter. Inc. v. Prof. Benefit Trust Multiple Employer Welfare Benefit Plan and Trust, the court ruled that the expert's testimony about trust indentures, contracts, and mutual-to-stock conversions belonged in the parties' briefs, not the expert's reports. 487 F.3d 494, 498 (7th Cir. 2007). The court explained:

> Legal arguments are costly enough without being the subjects of experts' depositions and extensive debates in discovery, in addition to presentations made directly to the judge. If specialized knowledge about tax or demutualization would assist the judge, the holders of that knowledge can help counsel write the briefs and present oral argument. In this court each side is represented by two law firms, and a professor of law also has signed plaintiffs' briefs. Enough!

Id. (citations omitted). "There being only one applicable legal rule for each dispute

7

or issue, it requires only one spokesman of the law, who of course is the judge." Specht v. Jenson, 853 F.2d 805, 807 (10th Cir. 1988).

"[E]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact" either in understanding the evidence or determining a fact in issue. Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997). If an expert witness were permitted to testify to legal questions, then each side would find an expert who reads the law most favorably to its position and, such differing opinions regarding the applicable law would serve only to confuse the jury. Specht v. Jenson, 853 F.2d at 809. Although Rule 704 allows an expert to testify as to "an ultimate issue to be decided by the trier of fact," the advisory committee's notes state:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . .

FED R. EVID. 704, Advisory Committee Notes (1972) (citation omitted). Rule 704 requires that an expert opinion, notwithstanding that it may reach an "ultimate issue," be "otherwise admissible." FED. R. EVID. 704. An expert's opinion must, among other things, "assist the trier of fact to understand the evidence or to determine a fact in issue," within the meaning of Rule 702. FED. R. EVID. 702.

"Courts have historically refused to admit expert testimony explaining matters of domestic law, including the interpretation of contracts." Landmark

8

<u>Builders, Inc. v. Cottages of Anderson, LP</u>, No. IP 01-C-1592-C-M/S, 2003 WL 21508118, *2 (S.D. Ind. May 20, 2003) (citing cases). "The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." <u>Landmark Builders, Inc. v. Cottages of Anderson, LP</u>, 2003 WL 21508118, *2-3 (prohibiting expert from opining how to interpret "substantial completion" as defined in the parties' contract) (citations omitted).

Mr. Wood's opinions, including his opinion that the Operating Agreement contains numerous provisions inconsistent with a true independent contractor agreement, are offered on an ultimate question of law that will determine the outcome of the MDL cases. His opinions invade the province of this court to determine as a matter of law whether the Operating Agreement provides FedEx with the right to control the plaintiffs. Expert testimony may be used to establish the meaning of an ambiguous contract term in light of the industry's custom and practice. <u>WH Smith Hotel Serv., Inc. v. Wendy's Int'l, Inc.</u>, 25 F.3d 422, 429 (7th Cir. 1994) (finding no error in admitting expert testimony regarding customary and usual meaning of rent provisions in the commercial real estate industry). Mr. Wood, however, doesn't offer explanations of ambiguous contract terms in light of a specific industry's custom or practice. Instead, he has opined that even though Section 1.15 of the Operating Agreement prohibits FedEx from directing the manner or means of the contractor's work, the clause is meaningless because the other provisions expressly reserve to FedEx the right to control the

9

contractor's work. Mr. Wood bases his opinion on his legal experience and his interpretation of the law on independent contractor status as applied to the facts presented in this case.

Whether the contract allows FedEx to control the manner and means of the work is a legal question for the court and isn't the proper subject of expert testimony. If the court finds that the parties' summary judgment motions can't be determined as a matter of law, Mr. Wood's legal conclusions, which comprise a majority of his expert report, wouldn't assist the jury in understanding the evidence or in determining the facts at issue because they simply tell the jury what result to reach. Further, and independently, the potential for jury confusion attendant to such testimony warrants exclusion pursuant to Federal Rule of Evidence 403. This is evident from a general review of Mr. Wood's report, which essentially echoes the plaintiffs' briefs. Mr. Wood's interpretation of the law on independent contractor status and conclusion that FedEx drivers aren't employees isn't a proper subject for expert testimony.


III. CONCLUSION

The court GRANTS FedEx's motion to exclude Mr. Wood's report for summary judgment purposes. This decision is without prejudice to the possibility that the court could revisit the admissibility of limited portions of his report if the plaintiffs believe they are essential at later stages of this case, keeping in mind the court's reasoning in excluding his report at this stage in the proceeding.

10

SO ORDERED.

ENTERED:  May 4, 2010 

           /s/ Robert L. Miller, Jr. 
Robert L. Miller, Jr., Judge
United States District Court

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____
                                        )
In re FEDEX GROUND PACKAGE             )        Cause No. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT               )             (MDL-1700)
PRACTICES LITIGATION                   )
-------------------------------------- )
THIS DOCUMENT RELATES TO:              )
                                        )
ALL ACTIONS                            )
                                        )
                                        )
_____        )

AMENDED ORDER

The court issues this order to clarify its April 21, 2010 order on collateral estoppel (doc. # 2029). On page 21, the first sentence of the first paragraph is amended to read: "When the changed circumstances are **material**, collateral estoppel won't apply. Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 90 (1st Cir. 2007)." (emphasis added). This clarification does not affect the court's analysis or ruling.


SO ORDERED.

ENTERED:   May 18, 2010


_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____ )
In re FEDEX GROUND PACKAGE            )      CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC. EMPLOYMENT               )            (MDL-1700)
PRACTICES LITIGATION                  )
---------------------------------------------   )
THIS DOCUMENT RELATES TO:             )
                                      )
3:05-cv-529 (*Fluegel* - Illinois)         )
3:06-cv-393(*Carlson* - Montana)           )
3:05-cv-531 (*Sheehan* - Massachusetts)    )
3:05-cv-539 (*Bunger* - South Dakota)      )
3:07-cv-478 (*Flores* - Colorado)          )
3:07-cv-322 (*Magno* - Connecticut)        )
3:07-cv-412 (*Gruhn* - Vermont)            )
3:05-cv-541 (*Gregory* - Virginia)         )
3:06-cv-337 (*Gray* - Missouri)            )
_____ )

OPINION AND ORDER

The court, in its March 2010 order (doc. # 2018), denied the Michigan

plaintiffs' motion to amend class certification order. The court examined the

evidence submitted in support of the Michigan plaintiffs' summary judgment

motion and in light of that state's emphasis on actual control, decided that the

liability issues aren't subject to class-wide proof, but instead require

individualized and fact intensive determinations. The court instructed the parties

that had filed briefs on motions to amend class certification on the ground

addressed in the Michigan order to file a supplemental statement indicating how

their position differs from the Michigan plaintiffs' position. The plaintiffs and

FedEx have filed their supplemental statements, and for the reasons stated below, the court denies the plaintiffs' motions.

<div align="center">ILLINOIS</div>

The named Illinois plaintiffs have asserted claims for violations arising under the Illinois Wage Act, 820 ILL. COMP. STAT. 115/1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1, *et seq.*, and claims for rescission, declaratory judgment, and injunctive relief. The plaintiffs ask the court to reconsider its class certification denial based on arguments and evidence presented in their summary judgment motion. The plaintiffs contend the court can decide these claims by common evidence and that any individualized evidence offered by FedEx won't change the court's determination of employment status.

The Illinois plaintiffs' claims relying on the state's common law definition of employee require the court to determine not only right to control, but also actual exercise of control. "Common-law factors to consider in examining a worker's potential status as an employee include 'the amount of control and supervision, the right of discharge, the method of payment, the skill required in the work to be done, the source of tools, material or equipment, and the work schedule.' Of these, control of the manner in which work is done is considered the most important." Mitchell v. Department of Corr., 856 N.E.2d 593, 598 (Ill. App. Ct. 2006) (internal citations omitted). This court found that Illinois law contemplates "that even when

2

the 'employment' agreement vests enough control in the hiring party to create an employment relationship, the inquiry still must extend into the parties' extracontractual relationship." Doc. # 1119, p. 142.

In the Michigan order denying reconsideration of class certification, the court held that a determination of FedEx's actual exercise of control required the court to review individualized evidence, so questions of law or fact common to the members of the class don't predominate over questions affecting only individual members. The plaintiffs acknowledge that the court's Michigan order applies to their common law claims, and on that ground, Illinois plaintiffs' position doesn't differ materially from the Michigan plaintiffs' position. For the reasons stated in the Michigan order, the court denies the plaintiffs' request to reconsider class certification as to the Illinois plaintiffs' common law claims.

As this court explained when denying class certification, the Illinois Wage Act contains its own definition of employee. Doc. # 1119, p. 139. That Act provides that "any individual permitted to work by an employer in an occupation" is an employee, and then creates an exemption to the Act's coverage for any person who is free — both under the contract and in practice — from control and direction over the work's performance, whose work is performed either outside the employer's usual course of business or outside the employer's places of business, and who is in an independently established business. 820 ILL. COMP. STAT. 115/2. This three-prong test is known as the "ABC test". Each element of the exemption must be present for the service provider to be an independent contractor for

3

purpose of the Wage Act. Novakovic v. Samutin, 820 N.E.2d 967, 973 (Ill. App. Ct. 2004); Byung Moo Soh v. Target Mktg. Sys., Inc., 817 N.E.2d 1105, 1109 (Ill. App. Ct. 2004). Because the putative employer must demonstrate the exemption's applicability, the Wage Act creates a near-presumption that a worker is an employee rather than an independent contractor. See Adams v. Catrambone, 359 F.3d 858, 864 (7th Cir. 2004). This same three-part test is also found in the Illinois Unemployment Insurance Act, 820 ILL. COMP. STAT. 405/212. Illinois courts rely on interpretations of the test under the Unemployment Insurance Act to guide their application of the Wage Act exemption. See e.g., Novakovic v. Samutin, 820 N.E.2d at 974.

This court ruled that because the Wage Act places the burden on FedEx to establish that all three prongs of the ABC test are met, FedEx must be given a chance to rebut the presumption by presenting both common and individualized evidence. For example, to establish that its drivers are independent contractors, FedEx will be required to prove its drivers' freedom from control, not only under the Operating Agreement, but also "in fact." In addressing a similar test under Massachusetts law, the court noted that "FedEx Ground will need to prove freedom from control in practice, as well as freedom from control under the Operating Agreement." Doc. 1119, p. 60. The Massachusetts plaintiffs argued that freedom in fact need never be reached because FedEx won't be able to carry its burden of showing freedom from control under the Operating Agreement, making the plaintiffs employees. The court responded, "Perhaps so, but this is not the

4

time for decision on the merits." Doc. # 1119, p. 60. This court further noted that the facts needed to rebut the presumption "include the nature of the hired party's business or profession, which is unlikely to be determined by the contract itself." Doc. # 1119, p. 143. Accordingly, the court ruled that Illinois law "poses questions upon which FedEx Ground must be allowed to present driver-by-driver evidence." Doc. # 1119, p. 143.

The plaintiffs ask the court to reconsider its denial of class certification because the fully briefed Illinois summary judgment motion establishes that all three prongs of the ABC test can be determined by reference to common evidence. FedEx can't meet the second prong of the test, the plaintiffs argue, because common evidence shows that the drivers' work is a regular part of FedEx's business and material parts of the drivers' work occur within FedEx's terminals and the geographic area in which FedEx conducts business. As to the third factor, the plaintiffs argue that common evidence shows the Illinois plaintiffs wouldn't be able to operate a delivery business without dependency upon FedEx, so FedEx can't show that the drivers have independently established businesses. The plaintiffs further contend that even if the court were to find it necessary to examine the first prong of the test, common evidence demonstrates that FedEx reserved the right to control the drivers' work, making is unnecessary to examine actual control. Accordingly, the plaintiffs conclude that FedEx hasn't offered any individualized evidence that can possibly rebut the presumption of employee status.

At the time of class certification, the court couldn't say whether the question of employment status under the Wage Act could be decided based on common evidence because FedEx needed to be given the opportunity to present individualized evidence to rebut the presumption. To prove the drivers were independent contractors, FedEx must show that it didn't retain the right to control and didn't actually exercise control. *See* <u>Carpetland U.S.A., Inc. v. Illinois Dep't of Employment Security</u>, 776 N.E.2d 166, 180-185 (Ill. 2002) (listing twenty-five factors to examine whether direction or control exists under same test used for Unemployment Insurance Act). A determination that FedEx would be unable to rebut the right to control, making FedEx's exercise of actual control irrelevant, would have been a decision on the merits. *See* <u>Carpetland v. Illinois Dep't of Employment Sec.</u>, 776 N.E.2d at 179 ("'Direction or control' . . . means that an employing unit has the right to control and direct the worker, not only as to the work to be done but also how it should be done, whether or not that control is exercised." (citation omitted)).

The third factor applies when "the individual has a proprietary interest in the business which he can sell, give away, or operate without any hindrance from any other party." <u>Novakovic v. Samutin</u>, 820 N.E.2d at 975 (*citing* 56 Ill. Adm. Code § 2732.200(e) (2001)). This inquiry "requires that the individual's entrepreneurial enterprise must enjoy a degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services." <u>Carpetland v. Illinois Dep't of Employment Sec.</u>, 776

N.E.2d at 190 (internal quotations and citations omitted). The court in <u>AFM Messenger Serv., Inc. v. Department of Employment Sec.</u>, 763 N.E.2d 272, 285 (Ill. 2002), held that AFM delivery drivers weren't independent contractors because the evidence didn't demonstrate they were able to operate their "delivery businesses" without the benefit of a relationship with AFM or another messenger service company like AFM. <u>Id.</u> Courts have also examined thirteen factors relevant to the determination of this inquiry. <u>Carpetland v. Illinois Dep't of Employment Sec.</u>, 776 N.E.2d at 190; *see also* <u>Novakovic v. Samutin</u>, 820 N.E.2d at 975. These thirteen factors and some of the facts taken into consideration in <u>AFM Messenger Serv.</u> and <u>Carpetland</u> require that FedEx be given the opportunity to present individualized evidence to rebut the independent business factor.

Even though the second prong of the ABC test can be decided on common evidence, a determination that FedEx can't rebut this prong of the test, obviating the need to determine the other two elements, would be a decision on the merits, which is improper at the class certification stage. This court acknowledges that in <u>De Giovanni v. Jani-King Int'l, Inc.</u>, 262 F.R.D. 71, 84-85 (D. Mass. 2009), the court addressed this same test under Massachusetts law and found that all three factors could be analyzed based on common evidence and did so without addressing the merits of the plaintiffs' claim. But this court isn't similarly convinced that in this case review of the three-prong test can be limited to common evidence, at least not without effectively determining the merits of the plaintiffs' claim.

A class certification decision isn't tied to the merits of the claim. *See* Szabo v. Bridgeport Mach., Inc., 249 F.3d 672, 677 (7th Cir. 2001) ("The success of [Rule 23] depends on making a definitive class certification decision before deciding the case on the merits, and on judicial willingness to certify classes that have weak claims as well as strong ones."). "A court may not say something like 'let's resolve the merits first and worry about the class later.'" Id. The court can, though, look beneath the surface of a complaint to determine whether the Rule 23 factors are met. Id. When the question of suitability for class treatment overlaps with a question related to the merits, the district judge "must make a preliminary inquiry into the merits." Id. (finding that when deciding whether to grant class certification, the district court wasn't required to accept the allegations in the complaint as true, but rather had to make whatever factual and legal inquiries as necessary to ensure that the requirements for class certification were satisfied, even if underlying considerations overlapped with the merits of the case); *see also* American Honda Motor Co., Inc. v. Allen, 600 F.3d 813, 816-817 (7th Cir. 2010) (finding the district court should have concluded Daubert analysis of expert to determine appropriateness of class certification where the expert's testimony was necessary to show whether plaintiffs' claims were capable of resolution on a class-wide basis).

The "'preliminary inquiry into the merits' discussed in Szabo is a . . . limited one, that has at its focus not the substantive strength or weakness of the plaintiffs' claims but rather the merits of those allegations that bear on the

8

suitability of a case for class treatment under Rule 23(a) and (b)." <u>Rahim v.</u>
<u>Sheahan</u>, No. 99-C-0395, 2001 WL 1263493, at *10 (N.D. Ill. Oct. 19, 2001).

Ruling on the merits before deciding class certification also would run afoul
of the rule against one-way intervention. This "rule bars potential class members
from waiting on the sidelines to see how the lawsuit turns out and, if a judgment
for the class is entered, intervening to take advantage of the judgment." <u>Amati v.</u>
<u>City of Woodstock</u>, 176 F.3d 952, 957 (7th Cir. 1999). "Rule 23(c) prohibits this
practice . . . by requiring the district judge to make an early determination
whether the suit is to proceed as a class action." <u>Id.</u> "[T]reatment of plaintiffs and
defendants is supposed to be symmetric, which is possible only if a class is
certified (or not) before decision on the merits." <u>Bertrand ex rel. Bertrand v.</u>
<u>Maram</u>, 495 F.3d 452, 455 (7th Cir. 2007). "[A]n evaluation of the probable
outcome on the merits is not properly part of the certification decision." <u>Bickel v.</u>
<u>Sheriff of Whitley County</u>, Cause No. 1:08-CV-102-TS, 2010 WL 883654, at *3
(N.D. Ind. Mar. 5, 2010) (*citing* FED. R. CIV. P. 23(c), Advisory Notes to 2003
Amendments).

The plaintiffs have asked that this court certify the class and then wait for
the opt-out period to expire before ruling on their summary judgment motion. But
deciding whether the plaintiffs can succeed on any one of the elements in the ABC
test by presenting common evidence, rendering the remaining two elements
irrelevant, effectively decides the merits of the claim. The court declines to

reconsider class certification based on a merits determination at the summary judgment stage.

The court won't delay this matter further. The summary judgment motions are ripe and the named plaintiffs in the Illinois litigation (as well as FedEx) are entitled to a ruling on their claims without additional delay. Accordingly, while the court of appeals has recognized that in certain situations it might be appropriate to rule on a summary judgment motion before ruling on a class motion, <u>Chavez v. Illinois State Police</u>, 251 F.3d 612, 629-630 (7th Cir. 2001), such circumstances don't exist here. The court therefore DENIES the Illinois plaintiffs' motion to amend the class certification order (doc. # 1339).


<center>MONTANA</center>

The Montana plaintiffs ask the court to amend its class certification order pursuant to Rule 23(c)(1)(C) (doc. # 1340) based on the arguments and evidence presented in the plaintiffs' motion for summary judgment. The plaintiffs contend employment status can be resolved by common evidence and that any individualized evidence offered by FedEx will not change the court's determination. As this court explained when denying class certification, "Montana law places a burden of proof on the party claiming an independent contractor relationship to prove both prongs of what the Montana courts call the "AB test"". Doc. # 1119, p. 18. The AB test requires FedEx to show that the hired party "(i) . . . has been and will continue to be free from control or direction over the performance of the

<center>10</center>

person's own services, both under a contract and in fact; and (ii) . . . is engaged

in an independently established trade, occupation, profession, or business . . . ."

MONT. CODE ANN. § 39-71-417(4)(a). Under this AB test, the party claiming an

independent contractor relationship must show not only that no contract vested

the hiring party with the right to control the details of the contracted work, but

also that the hiring party did not in fact control the details of the contracted work.

*See e.g.,* Walling v. Hardy Constr., 807 P.2d 1335 (Mont. 1991). The hired party

"must be free from the control of his employer, under his contract and in fact, in

the performance of his services." Sharp v. Horner Waldorf Corp., 584 P.2d 1289,

1301 (Mont. 1978).

This court denied class certification because to establish that its drivers are

independent contractors, FedEx will be required to prove its drivers' freedom from

control, not only under the Operating Agreement, but also "in fact." FedEx needed

to be given the opportunity to present individualized evidence to rebut the

presumption of employee status. This court explained:

> If the Montana plaintiffs are correct about the import of the control
> reserved to FedEx Ground under the Operating Agreement, it will be
> unnecessary to look beyond the Operating Agreement. But if the
> Montana plaintiffs are incorrect, FedEx Ground is entitled to an
> opportunity to meet the rest of its burden under the "AB test" by
> proving that it didn't control the details of the drivers' work
> sufficiently.

Doc. # 1119, p. 19. In the event the analysis reached the actual control issue, the

court stated that "[s]omething very close to a driver-by-driver analysis will be

needed." Doc. 1119, p. 19. This court found that even though "the effect of the

Operating Agreement is a question common to the entire proposed class, that question does not predominate over the remaining issues under Montana law." Doc. # 1119, pp. 19-20.

The plaintiffs request the court to reconsider its denial of class certification because, they argue, the fully briefed summary judgment motion in Montana establishes that both prongs of the AB test can be determined by reference to common evidence. Essentially, the plaintiffs contend that the common evidence set forth in their summary judgment brief shows that prong B is established, making analysis of prong A unnecessary. Even if prong B isn't met, the plaintiffs argue that common evidence establishes that prong A is met because FedEx has reserved the right to control in the Operating Agreement and commonly applicable policies, making it unnecessary to determine whether FedEx exercised actual control. Finally, even if the court must consider actual exercise of control, the plaintiffs argue that they have shown that actual control can be established with common proof.

The Montana plaintiffs' arguments are similar to those raised and rejected in Illinois and Michigan and for the reasons stated above and in the Michigan order (doc. # 2018), the court DENIES the Montana plaintiffs' motion to amend (doc. # 1340).

MASSACHUSETTS

Similar to Illinois, Massachusetts uses the "ABC test" to determine whether workers are employees or independent contractors. Under the Massachusetts ABC test, as in Illinois, the alleged employer has the burden of proving independent contractor status by showing that all three prongs of the ABC test are met. The Massachusetts plaintiffs ask the court to reconsider its denial of class certification after reviewing their summary judgment motion because, they contend, the facts relevant to this determination don't vary from driver to driver. The plaintiffs argue that a review of the common evidence presented by the parties establishes that FedEx can't establish any of the prongs in the ABC test and any individualized evidence offered by FedEx is irrelevant.

Massachusetts' ABC test requires the putative employer to prove three things:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service [and in fact]; and

> (2) the service is performed outside the usual course of business of the employer [or is performed outside of all places of business of the enterprise]; and

> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

MASS. GEN. LAWS ch. 149, § 148B(a)(1-3). The "in fact" language in (1) was added as part of the 2004 amendments. The bracketed phrase in (3) was deleted as part of the 2004 amendments. This court denied the Massachusetts plaintiffs' motion for class certification because under the Massachusetts ABC test, FedEx has the

burden to prove all three elements of the test; "[o]f necessity, then, FedEx Ground will be required to prove its drivers' freedom from control, not only under the drivers' contract, but also 'in fact.'" Doc. # 1119, p. 60. The court explained that "[w]hether the Operating Agreement vests too much control in FedEx Ground is a common question, but is just one of several." Doc. # 1119, p. 61. Although freedom from actual control might not need to be decided if FedEx can't carry its burden of showing freedom from control under the Operating Agreement, the court reasoned that "this is not the time for decision on the merits." Doc. # 1119, p. 60. The plaintiffs contend that a time for a decision on the merits has now come because the undisputed facts presented in support of their motion for summary judgment shows that FedEx presents no individualized evidence that can rebut employment status.

The plaintiffs' arguments to amend this court's denial of class certification mimic those set forth and rejected in Illinois and for the reasons already explained, the court DENIES the Massachusetts plaintiffs' motion to amend (doc. # 1341).

SOUTH DAKOTA

Like Montana, South Dakota sets forth an "AB test" to distinguish employees from independent contractors. This two-part test requires that the worker be free, both under any contract and in fact, from control or direction over how the services are performed and be customarily engaged in an independently

14

established trade, occupation, profession, or business. <u>Egemo v. Flores</u>, 470 N.W.2d 817, 821-822 (S.D. 1991). This court held that the independent business factor can't be resolved on a class-wide basis, but requires individualized evidence. Doc. # 1119, p. 1113.  At the class certification stage, the court couldn't determine that the plaintiffs would succeed on the right to control, thereby obviating FedEx's need to show freedom from actual control or that the drivers are engaged in an independently established business.

The South Dakota plaintiffs argue that since the court's order denying class certification, they have had an opportunity to develop fully and brief the facts relevant to the test for employment status. They contend that the undisputed facts submitted in support of summary judgment show conclusively that FedEx can't meet its burden under either prong of the AB test. According to the plaintiffs, common evidence shows that FedEx retains the right to control its drivers, so the court needn't address whether FedEx exercised actual control or whether the drivers are customarily engaged in an independently established business. Even if the court must look to the second prong of the test, the plaintiffs say that this can be established by common evidence because FedEx drivers have no relationship with an economic enterprise that is independent of the relationship they have with FedEx. Finally, the South Dakota plaintiffs argue that even if the court must determine whether FedEx actually controlled the drivers, the summary judgment record shows that FedEx's actual exercise of control can be established by common evidence.

15

As already explained, the plaintiffs essentially ask this court to make a merits determination before deciding class certification. If the court determines that FedEx cannot show freedom from control under the Operating Agreement, a merits determination in the plaintiffs' favor would result. If the court decides that FedEx cannot show that the drivers were independently established businesses, a merits determination for the plaintiffs would result. The court declines to make such a determination for purposes of deciding suitability of class certification. Further, after reviewing the parties' summary judgment briefing, the court finds that a determination of whether FedEx actually exercises control over its drivers requires individualized evaluations. Accordingly, for the same reasons set forth in the Illinois and Michigan rulings, the court DENIES the South Dakota plaintiffs' motion to amend (doc. # 1342).

<div align="center">COLORADO</div>

Colorado also uses an "AB test" to determine employment status under the Colorado Wage Act. Colorado Revised Statute § 8-4-101(4) creates a presumption that one who performs services for another is an employee. Carpet Exchange of Denver, Inc. v. Industrial Claim Appeals Office, 859 P.2d 278, 281 (Colo. Ct. App. 1993). To overcome this presumption, the principal must prove that (1) the worker is free from the principal's control under the agency agreement and in fact, and (2) the worker is customarily engaged in [an independent] trade or business

<div align="center">16</div>

related to the service performed. <u>Speedy Messenger Delivery Servs. v. Industrial Claim Appeals Office</u>, 129 P.3d 1094, 1096 (Colo. Ct. App. 2005).

This court denied class certification noting that "[a]s under Massachusetts law . . ., Colorado law places a burden of proof on FedEx that the plaintiffs see as insurmountable." Doc. # 1770, p. 6. This court noted that FedEx might even bear a higher burden to prove employment status in Colorado because, "as the plaintiffs understand it, [Colorado law] will require FedEx to prove that it doesn't command when, where, and how much labor or services shall be performed." Doc. # 1770, p. 6. This court reasoned: "The Colorado plaintiffs might be right that FedEx won't be able to manage such a showing, but the court can't decide that issue at this stage of the proceedings." Doc. # 1770, p. 6. The court instead focused on what would happen if FedEx makes that showing — "which would result in two additional hurdles for FedEx, both of which would require proof outside the Operating Agreement and commonly applicable policies." Doc. # 1770, p. 6. FedEx needs to be given the opportunity, the court explained, to present individualized evidence to prove that the drivers are free from control in fact and whether a driver is (or was) customarily engaged in an independent business related to the drivers' work for FedEx.

Summary adjudication of this issue is now fully briefed and the Colorado plaintiffs contend their briefing shows that FedEx can't meet either prong of the Colorado AB test. The plaintiffs maintain that because the Colorado plaintiffs didn't engage in a meaningful, sustained, related business venture at the time

17

they delivered packages for FedEx, there is no individualized proof that FedEx could offer to rebut prong two of the test. Further, even if FedEx could show this prong, the plaintiffs claim the court can decide that FedEx has retained the right to control based on common evidence, making an evaluation of actual control unnecessary. Finally, even if FedEx might rebut the right to control and show that the drivers are independently established businesses, the plaintiffs say the common evidence in the summary judgment record establishes that FedEx has exercised actual control.

The court isn't convinced that the independently established business factor can be determined based on common evidence alone. Even if it could be, the court can't determine that FedEx will be unable to show this prong or rebut the right to control, obviating the need to demonstrate lack of control in fact. The court declines to make a merits determination for purposes of class certification, so, at this stage, the court assumes that FedEx will need to present individualized evidence to show that it didn't exercise actual control to rebut the presumption of employment. Further, after reviewing the Colorado parties' summary judgment briefs, the court finds a determination of whether FedEx exercised actual control over its drivers requires individualized evaluations. Accordingly, for the same reasons set forth in the Illinois and Michigan rulings, the court DENIES the Colorado plaintiffs' motion to amend (doc. # 1855).

CONNECTICUT

18

The Connecticut plaintiffs ground their motion to amend on that state's "ABC test," which test is applicable to the plaintiffs' claims under the state's minimum wage act, CONN. GEN. STAT. §§ 31-71a through 31-71i. Under Connecticut's ABC test, the putative employer must prove that (a) the hired party has been and will continue to be free from the principal's control and direction in the performance of duties, both under the contract and in fact; (b) the service is performed either outside the usual course of the principal's business or outside all the principal's places of business; and (c) the hired party is customarily engaged in an independently established trade occupation, profession, or business of a sort that is involved in the service provided. Tianti v. William Raveis Real Estate, Inc., 651 A.2d 1286, 1290 n.8 (Conn. 1995).

The court denied the Connecticut plaintiffs' motion for class certification because "FedEx will have to prove much more than simply lack of contractual control, including lack of control in fact and the nature of each driver's customary work." Doc. # 1770, p. 9. Again, while "[t]he plaintiffs might be correct that FedEx can't prove lack of control under the contract, and so will fail in its ultimate burden of proof, . . . the plaintiffs may be wrong." Doc. # 1770, p. 9. The court concluded: "Today is not, however, the occasion to evaluate the sufficiency of FedEx's ultimate proof." Doc. # 1770, p. 9.

The Connecticut plaintiffs have fully briefed the merits of the employment status and ask the court to review their filings to find that the ABC test can be determined by reference to common proof. This is so, the plaintiffs contend,

because the undisputed facts show conclusively that FedEx can't meet its burden on a single factor under the ABC test, so individualized evidence isn't implicated. The class certification phase, however, is to take place before a merits determination, not at the same time. A determination that FedEx can't rebut one or more prongs of the ABC test is a determination on the merits. For the reasons already discussed, the court declines the plaintiffs' request to make such a determination for purposes of evaluating the appropriateness of class certification. The court therefore DENIES the Connecticut plaintiffs' motion to amend the class certification order (doc. # 1861).

## VERMONT

The Vermont plaintiffs requested class certification on their claim that FedEx violated the Vermont Independent Contractor Law, VT. STAT. ANN. tit. 21, §§ 341, 601(3), and the Vermont Wage Laws, VT. STAT. ANN. tit. 21, §§ 342. They also sought class certification on their common law claims of rescission, unjust enrichment, and quantum merit. The statutory claims are grounded on Vermont's ABC test. The parties agree that under the ABC test, FedEx has the burden to establish that the drivers are not employees. VT. STAT. ANN. tit. 21, § 341. FedEx must prove:

> (1) the individual has been and will continue to be free from control or direction over the performance of such services, both under the contract of services and in fact; and

20

(2) the service is either outside all the usual course of business for which such service is performed, or outside all the places of business of the enterprise for which such service is performed; and

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business.

VT. STAT. ANN. tit. 21, § 341(1-3). This court explained in its denial of class certification that "[a]s with Massachusetts, Illinois, and Colorado, Vermont law places burdens on FedEx to prove things that cannot all be determined simply by examination of the Operating Agreement and common applicable policies." Doc. # 1770, p. 78. To succeed, "FedEx must prove that each driver was free from control or direction over the performance of the driver's services in fact as well as under the contract, and that each driver is customarily engaged in an independently established calling." Doc. # 1770, p. 78. The Vermont plaintiffs argued that "FedEx will fail because it can't prove the drivers' freedom from control or direction under the Operating Agreement," but the court informed the parties that "this is not the stage of proceedings to decide that issue." Doc. # 1770, p. 78. The Vermont plaintiffs' arguments to amend the court's class certification order of their statutory claims already has been addressed in this opinion, and the court denies the Vermont plaintiffs' request for those reasons.

The plaintiffs also assert that the court should amend class certification as to their claims for rescission, unjust enrichment, and quantum merit. The court didn't specifically address the plaintiffs' common law claims in its order denying class certification. The plaintiffs argue that these claims are governed by the right

to control test, so they can be decided based on common evidence. As FedEx points out, though, these claims are grounded in part on the plaintiffs' statutory claims that rely on the ABC test. The court addressed a similar argument when denying class certification in Colorado, explaining that when plaintiffs' primary claim is a statutory cause of action for wage deductions, plaintiffs' claims for rescission and declaratory and injunctive relief flow from the same standard and should similarly be denied certification. Doc. # 1770, p. 7. The court stated: "The Colorado plaintiffs' remaining claims flow from the contention that the Operating Agreement's description of the drivers as independent contractors is, given the Agreement's other terms, false or against public policy. Given the centrality of the Wage Act claim to those arguments, the same analysis applies." Doc. # 1770, p. 7. In this case, too, the Vermont plaintiffs' claims for rescission, unjust enrichment, and quantum merit are based in part on their statutory claims. Because the statutory claims rest on application of the ABC test, the court declines to certify the plaintiffs' non-statutory claims. The court therefore DENIES the plaintiffs' motion to amend the court's denial of class certification (doc. # 1866).

## VIRGINIA

The Virginia plaintiffs ask the court to amend its order denying class certification based on their claim that their summary judgment briefing shows that employment status can be determined from contractual documents or

22

employment manuals alone. The plaintiffs explain that "[w]hile this Court found that some Virginia cases analyze 'extra-contractual evidence', the record now offers common proof of FXG's power to implement its contractual rights."' Doc. 2043, p. 2. Each of the specific facts noted by the court in its certification order, the plaintiffs argue, is now shown using common evidence applicable to all Virginia drivers. The Virginia plaintiffs contend that the court's analysis should differ from the analysis in its order denying the Michigan plaintiffs' motion to amend class certification because the determinative inquiry in Virginia is the "power of control" and in Michigan the analysis turns on "the realities of the work performed" and "control is but one factor." Unlike in Michigan, the plaintiffs say the Virginia control test can be conclusively determined through the undisputed evidence of FedEx's policies and procedures, systematic practices, the Operating Agreement, and the admissions of FedEx's executives and managers.

While the Virginia courts look at four factors to resolve employment issues, "(1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power to control the work of the individual," the "fourth factor, the power of control, is determinative." Atkinson v. Sachno, 541 S.E.2d 902, 905 (Va. 2001) (citing Hadeed v. Medic-24, Ltd., 377 S.E.2d 589, 594-595 (Va. 1989)).

In denying class certification, this court reviewed several Virginia cases in which the contract wasn't dispositive. Doc. # 1119, pp. 134-135. This court noted that in Richmond Newspapers, Inc. v. Gill, 294 S.E.2d 840, 845 (Va. 1982), even though the contract was indicative of the newspaper's power to control the result

23

sought to be accomplished, the court concluded that the circumstances surrounding the parties' actual conduct revealed that the newspaper exercised virtually no control over the means and methods employed by the route carrier . The court in <u>Atkinson v. Sachno</u> stated that "[i]t is only by consideration of all the facts pertaining to the relationship in any case, including provisions of the contract, the actual conduct of the parties, and the conditions of the business in which they are engaged, that it can be determined whether the [individual] is endowed with that control over his own methods and means of doing work which is the test of an independent contractor." 541 S.E.2d at 906. The Virginia Supreme Court recently reiterated "that there are abundant tests and criteria that can be used to determine whether the relationship between the individual and [the alleged employer] is that of an independent contractor or an employee." <u>Ogunde v. Prison Health Servs., Inc.</u>, 645 S.E.2d 520, 523 (Va. 2007) (<i>citing</i> <u>Atkinson v. Sachno</u>, 541 S.E.2d at 905)).

This court concluded that "[w]hile a determination of employment status could be made solely on the basis of the standard Operating Agreement, Virginia law requires a driver-by-driver examination in light of the circumstances of the particular case — an examination that cannot be resolved on a class-wide basis." Doc. # 1991, p. 135. The court explained that "[u]nder the Virginia standard, FedEx Ground must be allowed to present evidence of who sets the drivers' schedules, ownership of equipment, and so on, which may necessitate the use of extrinsic evidence." Doc. # 1991, p. 136. Class certification was improper, the

court ruled, because the right to control drivers' work doesn't predominate over other questions affecting members of the class within the meaning of Rule 23(b)(3). Doc. # 1991, p. 136.

In their motion to amend, the plaintiffs first contend that it is the "right to control" and not actual control that is determinative under Virginia law. This same argument was raised and addressed in connection with the plaintiffs' motion for class certification. A party seeking reconsideration can't simply rehash previously rejected arguments. Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1270 (7th Cir.1996). As this court previously found, FedEx must be given the opportunity to present individualized evidence to show it didn't assert control over the drivers' work.

The Virginia plaintiffs' arguments for amending class certification don't differ materially from the arguments addressed and rejected in Michigan. The court has reviewed the parties' summary judgment briefs and finds that employment status can't be resolved by examining only common evidence. The plaintiffs present significant evidence that tends to show FedEx's supervision over all Virginia drivers' means and methods of carrying out their work, but before the court can decide employee status of the proposed putative class members, the court must examine the individual circumstances of those class members. FedEx's actual exercise of control might vary from driver to driver, and the court can't determine based on the evidence presented by the plaintiffs that all the class members should be treated alike. Similar individualized issues noted in the

25

Michigan order will be pertinent to a determination of whether Virginia drivers are employees or independent contractors. Accordingly, for the same reasons addressed in the Michigan order (doc. # 2018), the court DENIES the Virginia plaintiffs' motion to amend the class certification order (doc. # 1333).

<div align="center">MISSOURI</div>

The Missouri plaintiffs sought class certification of their statutory claim for unauthorized wage deductions, MO. REV. STAT. § 290.010, their common law claims for rescission and unjust enrichment, and their claim for declaratory relief. The court denied class certification, finding that even though it appears that the right to control determines whether one is an employee or independent contractor, the concept of the "right to control" is more intricate in Missouri than most other states. Doc. # 1991, p. 104. The court ruled that whether the "right to control" exists in Missouri requires consideration of the following eight factors:

> The factors to consider in determining whether or not the requisite right to control exists are: "(1) the extent of control, (2) the actual exercise of control, (3) the duration of the employment, (4) the right to discharge, (5) the method of payment, (6) the degree to which the alleged employer furnished equipment, (7) the extent to which the work is the regular business of the employer, and (8) the employment contract."

Doc. # 1991, p. 104 (*quoting* Leach v. Board of Police Comm'rs, 118 S.W.3d 646, 649 (Mo. Ct. App. 2003)).

This court noted that in Nunn v. C.C. Midwest, 151 S.W.3d 388, 400-402 (Mo. Ct. App. 2004), a written contract established a right to control, but the court

<div align="center">26</div>

analyzed each of the eight factors, including actual exercise of control. Doc. # 1119, p. 105. And, "despite having found both a contractual right to control and the actual exercise of control — which would end the inquiry in most states — the court went on to evaluate the remaining factors." Id. This court held that because Missouri defines the "right to control" with reference to the actual exercise of control, Leach v. Board of Police Comm'rs, 118 S.W.3d at 649, requiring a driver-by-driver, terminal-by-terminal, supervisor-by-supervisor analysis that is unnecessary in most other states, class certification was improper. Doc. # 1119, pp. 105-106.

The Missouri plaintiffs say they have now demonstrated in their motion for summary judgment that FedEx not only reserves the right to control, but routinely exercises control throughout its network of Missouri drivers. The Missouri plaintiffs also point to a recent Eighth Circuit case, Huggins v. FedEx Ground Package Sys., Inc., 592 F.3d 853, 858 (8th Cir. 2010), in which the court used the Restatement (Second) of Agency to determine employment status, noting that the "right to control" was the "touchstone" for determining employment status. Id. The plaintiffs argue that in Huggins v. FedEx, the court relied primarily on the parties' agreement in holding that a reasonable jury could find that FedEx retained the right to control the method and means of the driver's work, and similar common evidence in this case shows that the plaintiffs are employees.

In Huggins v. FedEx, the issue was whether the plaintiff, who was riding with Esteban Gutierrez, a driver of a FedEx line haul truck, could recover against

FedEx for injuries sustained in a car accident under respondeat superior liability. The court noted that "[t]he 'principal factors' that Missouri courts routinely consider in determining whether one acting for another is an employee or an independent contractor for purposes of respondeat superior liability are set out in § 220(2) of the Restatement (Second) of Agency." 592 F.3d at 858 (*citing* Lee v. Pulitzer Pub. Co., 81 S.W.3d 625, 631 (Mo. Ct. App. 2002) (respondeat superior); Johnson v. Pacific Intermountain Exp. Co., 662 S.W.2d 237, 242 n.9 (respondeat superior); Dean v. Young, 396 S.W.2d 549, 553 (Mo. 1965) (respondeat superior)). The court explained that the first consideration is "the extent of control which, by the [relevant] agreement, the master may exercise over the details of the work." 592 F.3d at 858. This is the touchstone for determining whether a master-servant relationship exists. Id.

FedEx moved for summary judgment in Huggins, arguing that the relevant contract at issue — the "Linehaul Contractor Operating Agreement" — established that FedEx didn't retain a right to control the "means and methods" of the contractor's work. 592 F.3d at 858. The district agreed, reasoning that the contract supported the conclusion that Mr. Gutierrez was an independent contractor as a matter of law. The appellate court reversed after examining the agreement and determining that FedEx retained the right to control at least some of the "means and methods" of the work. Id. at 859. In concluding that a reasonable jury could find that FedEx had a right to control Mr. Gutierrez's performance and was his employer for respondeat superior purposes, the court

28

of appeals focused on FedEx's retained right to control in the contract and other evidence offered by Mr. Huggins that supported an employment relationship. <u>Id.</u> at 861.

The plaintiffs point to the court's decision in <u>Huggins v. FedEx</u> to argue that the applicable test is the Restatement (Second) of Agency and the employment determination can be made based on a review of the contract alone. But, in their motion to amend class certification, the plaintiffs argued that "[a]bsent an applicable statutory definition in the wage statute, the term 'employee' is defined, for purposes of the wage-protection statutes, according to the common-law 'right to control' test." Doc. # 577-2, pp. 6-7 (footnote omitted); *see also* Doc. 747, pp. 2-3. The applicable test, according to the Missouri plaintiffs, was the eight factor test set forth in <u>Phillips v. Par Elec. Contractors</u>, 92 S.W.3d 278, 282 (Mo. Ct. App. 2002) (workers' compensation), and <u>Leach v. Board of Police Comm'rs</u>, 118 S.W.3d 646, 649 (Mo. Ct. App. 2003) (worker's compensation). Doc. # 577-2, p. 7. FedEx and this court agreed.

The plaintiffs now contend that the applicable test for their statutory wage claim is the Restatement test based on the holding in <u>Huggins v. FedEx</u>. But <u>Huggins</u> didn't address MO. REV. STAT. § 290.010; it addressed a respondeat superior claim. Missouri courts have consistently held that the Restatement test applies to claims based on respondeat superior, *see* <u>Lee v. Pulitzer Pub.</u>, 81 S.W.3d at 631; <u>Johnson v. Pacific Intermountain Exp.</u>, 662 S.W.2d at 242 n.9; and <u>Dean v. Young</u>, 396 S.W.2d at 553, so it's unclear why the plaintiffs make this

29

argument for the first time in their motion to amend class certification. In any event, the eight factor test is the appropriate test for analyzing the plaintiffs' statutory wage claim, even though the cases utilizing that test have involved workers' compensation.

Further, Huggins v. FedEx doesn't stand for the proposition that evidence of the putative employer's exercise of actual control is irrelevant when the right to control can be established by the contract. In Huggins, FedEx moved for summary judgment, arguing that the contract established an independent contractor relationship. The court disagreed and held that a reasonable jury could find that through the line haul agreement FedEx retained at least some right to control the means and methods of the contractor's work, making summary judgment inappropriate. Unlike this case, the Huggins plaintiff didn't move for summary judgment and FedEx didn't present evidence of lack of actual exercise of control to defeat summary judgment. It therefore wasn't necessary for the Huggins court to determine whether lack of actual control is relevant in determining employment status.

As this court previously determined, Missouri defines the "right to control" with reference to the actual exercise of control. Similar to its reasoning in the Michigan order (doc. # 2018), this court holds, after reviewing the Missouri plaintiffs' motion for summary judgment and supporting evidence, the issue of actual control will require a driver-by-driver analysis and cannot be determined

30

based on common evidence alone. The court therefore DENIES the Missouri plaintiffs' motion to amend the class certification order (doc. # 1326).

<div align="center">CONCLUSION</div>

For the foregoing reasons, the court DENIES the plaintiffs' motions to amend the court's denial of the class certification orders [Doc. nos. 1326, 1333, 1339, 1340, 1341, 1342, 1855, 1861, 1866].

SO ORDERED.

ENTERED:   May 19, 2010

　　　　　　　　　　　/s/ Robert L. Miller, Jr.
Judge, United States District Court
Northern District of Indiana

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

```
-------------------------------------------------)
                                                  )
In re FEDEX GROUND PACKAGE                        )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                          )        (MDL 1700)
PRACTICES LITIGATION                              )
                                                  )
-------------------------------------------------)
                                                  )
THIS DOCUMENT RELATES TO:                         )
                                                  )
ALL ACTIONS                                       )
-------------------------------------------------)
```

**PLAINTIFFS' SECOND MOTION TO SUPPLEMENT THE RECORD IN SUPPORT OF
THEIR MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS
AND OPPOSITION TO FEDEX GROUND'S MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs respectfully move this Court for an order permitting them to offer the following

supplemental materials in support of Plaintiffs' Motions for Summary Adjudication of

Employment Status,[1] and in opposition to FedEx Ground Package System, Inc's (FXG) Motions

for Summary Judgment.[2] These materials, addressed to all FXG "contractors" were produced

yesterday – May 20, 2010 – to all FXG drivers and to Plaintiffs' co-lead counsel and provide

additional material evidence for the Court to consider in evaluating whether FXG drivers are

employees or independent contractors.

Exhibit A: Contractor Incorporation & Compliance Disclosure Announcement, dated
May 20, 2010.

Exhibit B: Letter from President with five-page attachment, dated May 20, 2010.

---

[1] Plaintiffs' motions for summary adjudication and supporting memoranda: Docs. 1153-1192 (filed April 25, 2008);
Docs. 1295, 1299, 1303, 1307, 1313-14, 1320-21, 1328-29, 1335-1338 (filed June 2, 2008); Docs. 1792-1807 (filed
Sept. 28, 2009); Doc. 1872-1873 (filed Oct. 30, 2009); Doc. 1971 (filed Jan. 13, 2010).

[2] Plaintiffs' briefs in opposition to FXG's motions for summary judgment: Docs. 1360-1362, 1364-1365, 1367-1374
(filed June 9, 2008); Docs. 1510-1513, 1515, 1517 (filed July 17, 2008); Docs. 1690-1691 (filed Dec. 22, 2008);
Docs. 1888-1890 (filed Nov. 12, 2009); Docs. 1915 (filed Dec. 14, 2009).

(Attached hereto as Exhibits A and B, respectively.)

On May 20, 2010, FXG produced to every FedEx Ground driver a **"Contractor Incorporation & Compliance Disclosure Announcement"** (Exhibit A) in which it states, *inter alia*:

- FedEx Ground will contract <u>only</u> with entities that:
  - o Are corporations established under state law (not entities such as LLCs, LLPs, partnerships and sole proprietorships).
  - o Are registered and in "good standing" with the state or states in which they do business.
  - o Treat all personnel who provide services under the Operating Agreement as employees.
  - o Agree to provide proof of corporate status and proof contractor is treating personnel as employees.
  - o Sign and submit a new addendum once FedEx Ground confirms the standards have been satisfied. (Exhibit A, p. 3, emphasis in original)
- All Operating Agreements will be non-renewed, but all contractors fulfilling the terms of the Agreement will be **eligible** to continue a relationship with FedEx Ground. (Exhibit A, p. 5, bold added)
- Contractors will have at least 180 days from today to satisfy the standards if they are interested in continuing to contract with FedEx Ground. (*Id.*)
- Only contractors that demonstrate they have satisfied the standards at least 30 days <u>prior</u> to their contract extension or expiration date will be **eligible** to

continue their contractual relations with FedEx Ground. (*Id.*, p. 6, underline in original, bold added)

Exhibit B states: "NOTE: THE ABOVE SCHEDULE SERVES AS YOUR NOTICE OF NONRENEWAL. Only Contractors that satisfy the standards at least 30 days prior to their contract extension date will be eligible to continue their contractual relationship with FedEx Ground. . . ." (Exhibit B, p. 3, caps in original)

This new unilateral contract modification is relevant to determining FXG's right to control the manner and means of the drivers' work – the critical indicator of employee status in most of the cases in this MDL and a material consideration in every MDL case. FXG's new requirements that drivers adopt a particular business form and its requirements as to how the drivers must treat helpers or assistants are especially significant to the pending motions because FXG has argued that FXG drivers are independent contractors because of their alleged ability to make their own "business decisions." Now, in its new attempt to show that the drivers have some separate business (by forcing them to incorporate), FXG has proven just the opposite –that it controls even the form the drivers' operations must take in order to be "eligible" to continue to provide service to FXG's customers.

In addition to showing that FXG retains to itself the right to control virtually every aspect of the drivers' performance -- down to dictating the form of its so-called business, this new evidence shows that FXG retains the right to terminate at will thousands of contracts – in fact, all contracts – unless and until the "contractor" conforms to FXG's latest business edict. FXG's unilateral, at-will "non-renewal" – or termination – of all contracts further demonstrates employee status and supports Plaintiffs' motions for summary judgment.

///

Dated: May 21, 2010

Respectfully submitted,

LEONARD CARDER, LLP

_____/s/ **Lynn Rossman Faris**_____

LYNN ROSSMAN FARIS
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:   (212) 935-7400
Fax:   (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:   (574) 288-1510
Fax:   (574) 288-1650
**PLAINTIFFS' LIAISON COUNSEL**

# CERTIFICATE OF SERVICE

I am a citizen of the United States and am employed in San Francisco County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1188 Franklin Street, Suite 201, San Francisco, CA 94109. I, hereby certify that on **May 21, 2010**, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

1. **PLAINTIFFS' SECOND MOTION TO SUPPLEMENT THE RECORD IN SUPPORT OF THEIR MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS AND OPPOSITION TO FEDEX GROUND'S MOTIONS FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Peter J. Agostino | agostino@aaklaw.com; trybula@aaklaw.com |
| Robert G. Ames | rgames@venable.com |
| George A. Barton | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com |
| Jeffrey A. Bartos | jbartos@geclaw.com |
| Evelyn L. Becker | ebecker@omm.com |
| Kenneth Lee Blalack II | lblalack@omm.com |
| Darcie R. Brault | dbrault@dibandfagan.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J. Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; |
| David M. Cialkowski | dmc@zimmreed.com |
| Jerald R. Cureton | jcureton@curetonclark.com |
| Ginger A. DeGroff | degrofflaw@yahoo.com |
| Robert E. DeRose, II | bderose@bnhmlaw.com; ameige@bnhmlaw.com; egordon@bnhmlaw.com; sbaith@bnhmlaw.com |
| Robin Dean | rdean@omm.com |
| Edward J. Efkeman | eefkeman@fedex.com |
| Barry S. Fagan | bfagan@dibandfagan.com |
| Lynn Rossman Faris | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; |
| Robert K. Firsten | rfirsten@abbottnicholson.com |
| Edward R. Forman | eforman@marshallandmorrow.com |
| Wood R. Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G. Fox | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com |
| Mark A. Friel | mfriel@stollberne.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S. Garfinkel | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| Michael W. Garrison, Jr. | mgarrison@omm.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Larry A. Golston, Jr. | larry.goldston@beasleyallen.com |

Eileen S. Goodin                    egoodin@bnhmlaw.com
Michael Gorby                       mgorby@gorbypeters.com
Deborah R. Grayson                  drgrayson@fuse.net
Clayton D. Halunen                  halunen@halunenlaw.com
Robert K. Handelman                 rhandelman@bnhmlaw.com
Robert I. Harwood                   rharwood@hfesq.com
Chris A. Hollinger                  chollinger@omm.com
Matthew M. Houston                  mhouston@hfesq.com
Dmitri Iglitzin                     iglitzin@workerlaw.com
Tom A. Jerman                       tjerman@omm.com
Victor H. Jih                       vjih@omm.com
Aparna B. Joshi                     ajoshi@omm.com
Soye Kim s                          kim@geclaw.com
Steve D. Larson                     slarson@stollberne.com; dcerdas@stollberne.com;
                                    kdunn@stollberne.com
Jordan M. Lewis                     jordanlewis@sbgdf.com
Shannon Liss-Riordan               sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com
Gary F. Lynch                       glynch@carlsonlynch.com
John S. Marshall                    jmarshall@marshallandmorrow.com
Michael G. McGuinness               mmcguinness@omm.com
Bruce H. Meizlaw                    brucelaw@fuse.net
Sanford A. Meizlish                 smeizlish@bnhmlaw.com
Jennifer Lee Merzon                 jmerzon@omm.com
Eleanor I. Morton                   emorton@leonardcarder.com; aahn@leonardcarder.com
James Mulroy, II                    mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com
Daniel O. Myers                     dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com;
                                    mbrown@rpwb.com
Jeffrey S. Nestler                  jnestler@omm.com
Ian Otto                            iotto@straus-boies.com; cle@straus-boies.com;
                                    ecf@straus-boies.com
Peter W. Overs Jr.                  povers@hfesq.com
Lesley A. Pate                      lapate@venable.com
Mary Donne Peters                   mpeters@gorbypeters.com; mmcgee@gorbypeters.com
Richard T. Phillips                 flip@smithphillips.com; tresahharden@smithphillips.com
D. Lucetta Pope                     Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com;
                                    Melissa.bozzuto@bakerd.com
Nora M. Puckett                     npuckett@omm.com
Charles Victor Pyle, III            victor.pyle@ogletreedeakins.com;
                                    Meredith.smith@ogletreedeakins.com;
                                    ted.speth@ogletreedeakins.com;
                                    Linda.lyday@ogletreedeakins.com
Anne T. Regan                       atr@zimmreed.com; stefanie.hebig@zimmreed.com
Beth A. Ross                        bross@leonardcarder.com; ksangren@leonardcarder.com;
J. Gordon Rudd                      jgr@zimmreed.com
Robert M. Schwartz                  rschwartz@omm.com
James A. Staack                     jims@staack-firm.com

R. Jay Taylor Jr.         jtaylor@scopelitis.com; jwoolley@scopelitis.com
Joni M. Thome         thome@halunenlaw.com
Matthew T. Tobin      matt@sdtrustco.com; lenandlaura@iw.net
Jeffrey A. Trimarchi    jtrimarchi@omm.com
Scott Voelz          svoelz@omm.com
Mary D. Walsh-Dempsey  mdempsey@omalleylangan.com
Michael J. Watton     jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com
Peter D. Winebrake    pwinebrake@winebrakelaw.com

     I also certify that on **May 21, 2010,** I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

| | |
|---|---|
| J. Allen Brinkley<br>John A. Brinkley, Jr.<br>BRINKLEY & CHESNUT<br>P.O. Box 2026<br>Huntsville, AL 35804 | R Bruce Carlson<br>CARLSON LYNCH LTD<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143 |
| Robert J. Penny<br>WICK BRAMER UKASICK &<br>TRAUTWEIN LLC<br>323 South College Avenue<br>PO Box 2166<br>Fort Collins, CO 80522 | Salvatore G. Gangemi<br>GANGEMI LAW FIRM, P.C.<br>82 Wall Street, Suite 300<br>New York, NY 10005 |
| Steve Dennis<br>REID & DENNIS<br>Providence Tower<br>5001 Spring Valley Road, Suite 255W<br>Dallas, TX 75244 | Robert A. Garcin<br>LAW OFFICES OF ROBERT A. GARCIN<br>210 East 29th Street, #A<br>Loveland, CO 80538 |
| William S. Hommel, Jr.<br>WILLIAM S. HOMMEL, JR., PC<br>1402 Rice Road, Suite 200<br>Tyler, TX 75703-3230 | Todd O'Malley<br>O'MALLEY & LANGAN, P.C.<br>426 Mulberry Street, Suite 104<br>Scranton, PA 18503 |
| Jack D Hilmes<br>Kevin J Driscoll<br>FINLEY ALT SMITH SCHARNBERT<br>CRAIG HILMES & GAFFNEY PC<br>699 Walnut Street<br>1900 Hub Tower<br>Des Moines, IA 50309 | Andrew J. Kahn<br>MCCRACKEN, STEMERMAN &<br>HOLSBERRY<br>1630 S. Commerce Street, Suite A-1<br>Las Vegas, NV 89102 |
| Richard Tanenbaum<br>1131 McDonald Avenue<br>Brooklyn, NY 11230 | Steven M. Kelso<br>WHEELER TRIGG KENNEDY LLP<br>1801 California Street, #3600<br>Denver, CO 80202 |

| | |
|---|---|
| Paula R Markowitz<br>MARKOWITZ & RICHMAN<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 | Carla D Macaluso<br>JACKSON LEWIS LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 |
| William T Fiala<br>LEWIS FISHER HENDERSON<br>CLAXTON & MULROY<br>6410 Poplar Ave, Suite 300<br>Memphis, TN 38119 | Kenneth E Milam<br>WATKINS & EAGER<br>PO Box 650<br>Jackson, MS 39205-0650 |
| Jennifer Rygiel Boyd<br>OGLETREE DEAKINS NASH<br>SMOAK & STEWART PC<br>10 Madison Avenue, Suite 402<br>Morristown, NJ 07960 | Aaron Roblan<br>Karen P Kruse<br>JACKSON LEWIS LLP<br>One Union Square<br>600 University Street, Suite 2900<br>Seattle, WA 98101 |
| Donald R. Taylor<br>TAYLOR DUNHAM AND BURGESS LLP<br>301 Congress Avenue, Suite 1050<br>Austin, TX 78701 | Charles W Whetstone Jr.<br>Cheryl F Perkins<br>WHETSTONE MYERS PERKINS<br>AND YOUNG LLC<br>PO Box 8086<br>Columbia, SC 29202 |
| B. James Fitzpatrick<br>FITZPATRICK SPINI & SWANSTON<br>838 S. Main Street, Suite E<br>Salinas, CA 93901 | Patricia A Sullivan<br>EDWARDS ANGELL PALMER<br>& DODGE LLP<br>2800 Financial Plaza<br>Providence, RI 02903 |
| Peter N Wasylyk<br>LAW OFFICES OF PETER N. WASYLYK<br>1307 Chalkstone Avenue<br>Providence, RI 02908 | Michael J. Puma<br>MORGAN LEWIS & BOCKIUS LLP<br>1701 Market Street<br>Philadelphia, PA 19103-2921 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on **May 21, 2010**.

/s/ Angela Ahn Menton

Angela Ahn Menton

# EXHIBIT A



# Contractor Incorporation & Compliance Disclosure Announcement

Important Notice for all
FedEx Ground Contractors in the U.S.



May 20, 2010

1



## About the Decision

- FedEx Ground has made a business decision about with whom it will contract in the U.S.

- This decision is in response to recent concerns by several states.

- Contracting exclusively with corporations that are registered with state authorities helps ensure contractors are complying with laws concerning the proper treatment of workers.

- The current length and terms of Operating Agreements are not affected until Operating Agreement expiration dates.



2

## What the Decision Means for Contractors



FedEx Ground will contract <u>only</u> with entities that:

- Are corporations established under state law (not entities such as LLCs, LLPs, partnerships and sole proprietorships).
- Are registered and in "good standing" with the state or states in which they do business.
- Treat all personnel who provide services under the Operating Agreement as employees.
- Agree to provide proof of corporate status and proof contractor is treating personnel as employees.
- Sign and submit a new addendum once FedEx Ground confirms the standards have been satisfied.

3



## Impacted Contractors

- The contracting standards apply to all U.S. contractors including:
  - Home Delivery contractors
  - P&D contractors
  - Linehaul contractors

- This decision does not impact contractors in Canada or Independent Service Providers.



4

# Timeline for Implementation

 **FedEx** ®
Ground

- All Operating Agreements will be non-renewed, but all contractors fulfilling the terms of the Agreement will be eligible to continue a relationship with FedEx Ground.

- Contractors will have at least 180 days from today to satisfy the standards if they are interested in continuing to contract with FedEx Ground

- Regarding expiration/extension dates, Operating Agreements that expire:

  - **in May and June, 2010** will be eligible* for renewal per standard contract terms and will need to comply with the standards on next agreement.

  - **between July 1, 2010 and December 31, 2010** will be eligible* for a 180-day extension before needing to comply with the standards.

  - after December 31, 2010 will need to comply with the standards based on existing agreement expiration dates.

  *Contractors that continue to fulfill the terms of current Operating Agreements are considered eligible for renewal or extension.*

  ***While exact timing varies from state to state, the process of incorporation and registration typically takes 30-75 days.***

5

## Timeline for Implementation – Cont'd


FedEx® Ground

- Only contractors that demonstrate they have satisfied the standards at least 30 days <u>prior</u> to their contract extension or expiration date will be eligible to continue their contractual relationship with FedEx Ground.

| Current Contract Expiration Date | Projected Contract Extension/Renewal Date | Projected Date to Meet Standards |
|---|---|---|
| May 2010 | May 2011 | April 2011 |
| June 2010 | June 2011 | May 2011 |
| July 2010 | January 2011 | December 2010 |
| August 2010 | February 2011 | January 2011 |
| September 2010 | March 2011 | February 2011 |
| October 2010 | April 2011 | March 2011 |
| November 2010 | May 2011 | April 2011 |
| December 2010 | June 2011 | May 2011 |
| January 2011 | Expiration date remains in January 2011 | December 2010 |
| February 2011 | Expiration date remains in February 2011 | January 2011 |
| March 2011 | Expiration date remains in March 2011 | February 2011 |
| April 2011 | Expiration date remains in April 2011 | March 2011 |
| May 2011 | Expiration date remains in May 2011 | April 2011 |
| June 2011 | Expiration date remains in June 2011 | May 2011 |

6



# Early Adoption Incentive

- An early adoption incentive will be provided to contractors that demonstrate they have satisfied the standards before February 28, 2011. Early adoption will help facilitate internal processing at FedEx Ground.

- In order to receive the incentive, contractors must demonstrate they have satisfied the standards. The contractor must then sign and submit incorporation and compliance addenda.

  – Contractors currently meeting standards are eligible to receive the incentive.

- A contractor that signs and submits the new incorporation and compliance addenda between:



  • October 1, 2010 – January 8, 2011 will receive $750

  • January 9 – February 28, 2011 will receive $500

7

# Next Steps



- A packet will be provided with additional details.

- Consider consulting a legal or financial advisor.

- Begin the incorporation/registration process should you wish to continue your relationship beyond your contract expiration date and receive the incentive.

  – FedEx Ground will have electronic capability to begin reviewing incorporation and compliance paperwork in September 2010.

- In the future, you will receive more information, which will also be available on mygroundbiz.com.

- Information regarding the FY11 settlement enhancement details will be coming soon.



8

# Resources



For additional details:

- Speak with a Senior Manager or Contractor Resources Representative.

- Visit mygroundbiz.com for updates and more information.



9

case 3:05-md-00527-RLM -CAN   document 2064   filed 05/21/09   page 19 of 25

# EXHIBIT B

David F. Rebholz
*President and Chief Executive Officer*

1000 FedEx Drive
Pittsburgh, PA 15108

Telephone 412.269.1000
Fax 412.859.5687



May 20, 2010

A letter from the President:

FedEx Ground is announcing a business decision about with whom it will contract in the U.S. The company will contract only with entities that:

- Are corporations established under state law and not, for example, an LLC, LLP, partnership or sole proprietorship
- Are registered and in "good standing" with the state or states in which they do business
- Treat personnel who provide services under the Agreement as employees
- Agree to provide proof of corporate status and regulatory compliance upon request
- Sign and submit an addendum that certifies compliance

Many FedEx Ground contractors are currently satisfying these standards and the decision to implement the standards nationwide is in response to recent concerns by several states. Contractors that choose to satisfy these standards will have ample time – at least 180 days – to do so. In addition, FedEx Ground is offering an early adoption monetary incentive for contractors that demonstrate they meet these standards by the end of February, 2011.

The senior manager in your facility will provide additional information regarding this announcement and the incentive, and I encourage contractors to thoroughly review the contents of the attached guide for more details. Additionally, contractors that choose to satisfy these standards are encouraged to consult the appropriate legal and financial advisors to counsel them throughout the process.

It is our hope that this decision will better position our businesses for continued success and growth under the current Operating Agreement. There will be much more communication and opportunity for discussion in the coming weeks and months as we begin to navigate this change together. Thank you.

Dave Rebholz
President and CEO

## What are the contracting standards?

In response to recent concerns by several states, FedEx Ground has made the business decision to only contract with entities that have satisfied certain contracting standards. Specifically, FedEx Ground will contract only with entities that:

- **Are established under state law as corporations**
  - FedEx Ground will contract only with corporations but, not, for example, with LLCs, LLPs, partnerships or sole proprietorships. Contractors have the option to incorporate in any state.
- **Are registered and in "good standing" with the state(s) in which they do business**
  - Contractors should contact the appropriate state agency for the definition of "good standing" in the state(s) in which they operate.
- **Treat personnel who provide services under the Operating Agreement as employees**
  - Contractors must be able to demonstrate compliance with state and federal laws applicable to employers.
- **Agree to provide proof of corporate status and regulatory compliance upon request**
  - Contractors would sign a new Compliance Disclosure Addendum and agree to provide proof of compliance upon request. Contractors that signed the previous version of this addendum (Addendum 10) will still need to sign the new addendum.
- **Sign and submit a new incorporation addendum once FedEx Ground confirms the standards have been satisfied.**
  - Contractors would sign and submit a new incorporation addendum.

These standards apply to all HD, P&D and linehaul contractors nationwide. They do not affect independent contractors operating in Canada or Independent Service Providers.

Regular updates and additional information regarding the process for confirming that a business satisfies these standards will be provided over the coming weeks and months.

## How long will I have to complete this process?

All Operating Agreements will be non-renewed, but all contractors fulfilling the terms of the Agreement will be eligible to continue a relationship with FedEx Ground.

Contractors will have at least 180 days from today to satisfy the standards providing they are: 1) eligible by continuing to fulfill the terms of the existing Operating Agreements and, 2) are interested in continuing to contract with FedEx Ground.

Time frames for contractor expiration/extension dates are as follows:

- May and June, 2010 expiration will be renewed per standard contract terms and will need to comply with contracting standards based on next agreement expiration date.
- July 1, 2010 and December 31, 2010 expiration will be eligible for a 180-day extension before needing to comply with the standards.
- December 31, 2010 expiration will need to comply with the standards based on the existing agreement expiration dates.

Contractors that demonstrate they have satisfied the standards at least 30 days prior to their contract extension or expiration date will be eligible to continue their contractual relationship with FedEx Ground. The certification process is slated to begin in September.

See the chart below for greater detail on when current Operating Agreements expire.

| Current Contract Expiration Date | Projected Contract Extension/Renewal Date | Date to Meet Standards |
|---|---|---|
| May 2010 | May 2011 | April 2011 |
| June 2010 | June 2011 | May 2011 |
| July 2010 | January 2011 | December 2010 |
| August 2010 | February 2011 | January 2011 |
| September 2010 | March 2011 | February 2011 |
| October 2010 | April 2011 | March 2011 |
| November 2010 | May 2011 | April 2011 |
| December 2010 | June 2011 | May 2011 |
| January 2011 | Expiration date remains in January 2011 | December 2010 |
| February 2011 | Expiration date remains in February 2011 | January 2011 |
| March 2011 | Expiration date remains in March 2011 | February 2011 |
| April 2011 | Expiration date remains in April 2011 | March 2011 |
| May 2011 | Expiration date remains in May 2011 | April 2011 |
| June 2011 | Expiration date remains in June 2011 | May 2011 |

**NOTE: THE ABOVE SCHEDULE SERVES AS YOUR NOTICE OF NONRENEWAL.**

Only contractors that satisfy the standards at least 30 days prior to their contract extension date will be eligible to continue their contractual relationship with FedEx Ground. If you have additional questions or concerns, please contact a Senior Manager, a Contractor Resources representative, or visit mygroundbiz.com

## FAQs

**What is FedEx Ground announcing?**
- FedEx Ground is announcing that it will contract only with entities that incorporate, register and are in good standing in the state(s) in which they operate and treat personnel who provide services under the Agreement as employees. Additionally, contractors will agree to provide proof of corporate status and regulatory compliance. Additional information regarding the certification process and specific documentation will be forthcoming.

**Why is this happening now?**
- This decision is in response to recent concerns by several states. Contracting exclusively with corporations that are registered with state authorities helps to ensure that contractors are complying with laws concerning the proper treatment of workers.

**Does this announcement apply to New Hampshire and Maryland?**
- No. As part of the ISP transition, the contracting standards outlined in this announcement were already fulfilled.

**Do these changes affect linehaul contractors?**
- Yes, today's announcement affects linehaul contractors in the U.S.

**Will these standards change the way I am compensated by FedEx Ground?**
- No, this announcement will not change the way contractors are compensated. FedEx Ground is providing a one-time early adoption incentive to contractors that demonstrate they have satisfied the standards before February 28, 2011. Early adoption helps facilitate internal processing at FedEx Ground.

**What is the early adoption incentive?**
- FedEx Ground will offer early adoption incentives to independent contractors that fulfill the standards and execute new incorporation and compliance addenda within the defined periods.

  There are two different incentives available to contractors depending on when they sign and submit the new incorporation and compliance addenda. If the addenda are signed and submitted between October 1, 2010 and January 8, 2011, the contractor will receive $750. If signed and submitted between January 9 and February 28, the contractor will receive $500.

  Please note that the process of confirming incorporation and compliance may take up to 14 days; please factor this into the time frames for the incentive availability periods. For example, paperwork that is submitted on January 5 may not be confirmed by FedEx Ground until Jan. 19, at which time an incorporation addendum will be generated. The contractor will receive early adoption incentive based on the date that the addendum is signed. In this example, because the addendum will be signed after January 8, the contractor will receive $500, not $750.

**How long will I have to satisfy the standards?**
- Contractors will have at least 180 days from today to satisfy the standards providing they are: 1) eligible by continuing to fulfill the terms of current Operating Agreements, 2) interested in continuing to contract with FedEx Ground.

**What have some contractors reported as benefits to incorporating?**
- Contractors should consider consulting a legal or financial advisor for further information regarding the advantages of satisfying these standards.

**Will this decision affect route sales?**
- A contractor does not need to satisfy the standards in order to purchase a new route as part of its existing Operating Agreement. New Operating Agreements entered into after October 1, 2010 will contain the standards.

**What if contractors want to demonstrate they have met the standards before October?**
- Contractors can incorporate at any time. FedEx Ground will not begin confirming incorporation and compliance until September, 2010.

**How much will it cost to incorporate?**
- Costs for incorporation vary from state to state but often the cost is less than $500. Contractors are encouraged to consult with legal and financial advisors.

**How long does it take to incorporate?**
- While exact timing varies from state to state, the process of incorporation and registration typically takes between 30 and 75 days.

**What does a contractor need to do to file for incorporation?**
- The process varies from state to state. Links to appropriate state agency Web sites will be made available on mygroundbiz.com. Contractors are encouraged to consult with legal and financial advisors.

**Will LLC entities be recognized?**
- No. FedEx Ground will contract only with state law corporations – and not, for example with LLCs, LLPs, partnerships, sole proprietorships.

**Can a contractor incorporate in any state?**
- Contractors may incorporate in any state they choose but they will need to register in the state(s) in which they do business.

**What if a contractor is already incorporated?**
- Contractors already incorporated that choose to continue contracting with FedEx Ground will need to demonstrate they satisfy the standards. Additional information regarding the certification process and specific documentation will be forthcoming.

**Are contractors that already satisfy the standards eligible to receive the incentive?**
- Yes. Contractors that have already satisfied the standards must sign and submit the new incorporation and compliance addenda to receive the incentive.

**What about a contractor that operates multiple businesses with multiple contracts with FedEx Ground?**
- The standards must be satisfied for each business that contracts with FedEx Ground.

**How is in "good standing" defined?**
- The definition varies depending on the state. FedEx Ground encourages contractors to consult the appropriate state agency for the definition in the state(s) in which they do business.

**How does incorporating affect a contractor's Work Accident / Workers Compensation insurance coverage?**
- For contractors that obtain insurance through Marsh, Marsh will make materials available that address this issue.

**Will the company enter into new agreements with entities that do not satisfy the standards?**

- Until September 30, 2010, new entities will be issued short-term agreements and will have approximately 180 days to satisfy the standards. Beginning in October, FedEx Ground will only enter into new Operating Agreements with entities that meet the standards.

**What happens if I do not choose to satisfy these standards?**
- FedEx Ground will only contract with contractors that satisfy these standards.

**How frequently will compliance checks be conducted?**
- After the initial certification takes place, contractors will certify compliance at least once annually and provide documentation upon request in order to continue contracting with FedEx Ground.

**Does this decision guarantee that there will be no further changes to the independent contractor model?**
- We cannot guarantee that further changes to the model will not be necessary.

**Will the use of temporary personnel, i.e., individuals employed by another company, be permitted under the standards?**
- If the individuals providing services under the Operating Agreement are treated as employees and the appropriate proof can be provided upon request, this practice is acceptable.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

|  |  |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | JUDGE MILLER |
| *ALL ACTIONS* |  |

---

### DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' SECOND MOTION TO SUPPLEMENT THE RECORD IN SUPPORT OF THEIR MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS AND OPPOSITION TO FEDEX GROUND'S MOTIONS FOR SUMMARY JUDGMENT

---

Defendant FedEx Ground Package System, Inc. ("FXG") hereby opposes Plaintiffs'

Motion to Supplement the Record in Support of Their Motions for Summary Adjudication of

Employment Status and Opposition to FXG's Motions for Summary Judgment (Doc. No. 2064).

Through their motion to supplement the record, plaintiffs seek to introduce: (1) Exhibit

A, a Contractor Incorporation & Compliance Disclosure Announcement, dated May 20, 2010;

and (2) Exhibit B, a Letter from FXG's President with a five-page attachment, dated May 20,

2010. These documents were provided to contractors nationwide (except for those in New

Hampshire and Maryland) in conjunction with FXG's decision to contract in the future with only

incorporated entities that are in good standing and can demonstrate compliance with state law.

As explained in the two Exhibits, this decision was made in response to the concerns of a

growing number of state regulatory authorities. Recently, state authorities have looked to FXG

to take proactive steps to help states ensure that FXG's contractors are themselves legally compliant. (Ex. A at 2; Ex. B at 1, 4.) Incorporation requires a contractor to register with a state, increasing the transparency of its operations to the state to help ensure compliance with state law.

Plaintiffs mischaracterize the content of the documents. And the contention that they support plaintiffs' summary judgment arguments and demonstrate employee status is incorrect. First, the documents neither reflect nor create any right to control over the method and manner of performing the work. Second, the documents concern contract *renewals* only. Contrary to the gloss plaintiffs put on the documents—something a party moving for summary judgment cannot do—no contract is being "terminated," either prematurely or at all. Exhibit A states that the "current length and terms of Operating Agreements are not affected until Operating Agreement expiration dates." (Ex. A at 2.)

Accordingly, the motion to supplement should be denied. The documents plaintiffs seek to add to the record are immaterial to the Court's consideration of the pending summary judgment motions. If, however, the record is supplemented, FXG requests an opportunity to respond with additional evidence to provide their proper context.

### A. The Choice of Who to Contract With Does Not Indicate a Right to Control.

Plaintiffs contend that FXG's recent decision "is relevant to determining FXG's right to control the manner and means of the drivers' work—the critical indicator of employee status in most of the cases in this MDL and a material consideration in every MDL case." (Pls.' Mot. at 3.) Choosing to contract with only incorporated entities does not, however, constitute any control over *how* a particular contractor picks up or delivers packages on a day-to-day basis. Similarly, by choosing to contract with entities that use employees, FXG does not assume the right to control *how* the work is done or what those employees do.

Moreover, FXG's recent decision is not indicative of a right to control its contractors but simply of its right to contract with entities of its choosing. The fact FXG must wait until a given contractor's OA expires—a fact that plaintiffs appear not to appreciate—indicates a *lack* of control. Far from being a "unilateral contract modification" that forces the contractors to incorporate, nothing in the attached materials changes the "current length and terms of Operating Agreements." (Ex. A at 2.) *After* each contract *expires* on its own *existing* terms, both FXG and a contractor must agree before any new contractual period begins or any obligations attach. Entering into a new contract is voluntary. It is not proof of control. As the Exhibits make clear, existing contractors have ample time to decide if they want to extend their business relationship with FXG after their current contracts expire. Each contractor will have at least 180 days and, in most cases, significantly longer than that, to determine whether or not they wish to continue contracting. (Ex. A at 5-6.) The choice throughout is the contractor's.

**B.      FXG Has No "Right to Terminate At Will."**

Contrary to plaintiffs' assertion, the Exhibits also do not evidence that FXG "retain[s] the right to terminate at will thousands of contractors." (Pls.' Mot. at 3.) Rather than "terminating at will," FXG is exercising only its contractual right to not *renew* the contract—a right that the contractors share. (*See* OA § 11.2.) FXG's decision to exercise this right, by providing ample notice prior to the anniversary date of these contracts in accordance with their express terms, cannot reasonably be construed as "termination at will." *See Hopkins v. Duckett*, No. 02-5589, 2006 U.S. Dist. LEXIS 84559, *12 (D.N.J. Nov. 21, 2006) (one-year contract subject to annual automatic renewal was not terminable at will); *Vulcan Materials Co. v. Atofina Chem. Inc.*, 355 F. Supp. 2d 1214, 1242 (D. Kan. 2005) (where contract automatically renewed for a definite term in the absence of notice to terminate, the contract was "not terminable 'at will,' as that term is

generally understood in the law, meaning a relationship which can be ended immediately without notice or other continuing duties").  Just as this Court recognized when it denied plaintiffs' request to enjoin FXG's transition in California to "MWA" contractors, FXG "didn't terminate any existing contracts."  (10/12/07 Order at 3.)  Rather, "the contracts simply will not be renewed pursuant to the automatic renewal provision."  (*Id.*)[1]

For the foregoing reasons, FedEx Ground respectfully requests that this Court deny plaintiffs' motion to supplement the summary judgment record or, if plaintiffs are permitted to supplement, to respond with additional evidence concerning the matters raised in the documents.

Dated:  May 24, 2010.

Respectfully submitted,

By:  /s/Robert M. Schwartz
Robert M. Schwartz

| | |
|---|---|
| Thomas J. Brunner | Robert M. Schwartz |
| Alison G. Fox | Chris A. Hollinger |
| BAKER & DANIELS LLP | Victor Jih |
| 202 S. Michigan St. | O'MELVENY & MYERS LLP |
| South Bend, IN 46601 | 1999 Avenue of the Stars, Suite 700 |
| Tel:  (574) 234-4149 | Los Angeles, CA 90067-6035 |
| Fax:  (574) 239-1900 | Tel: (310) 553-6700 |
| | Fax: (310) 246-6779 |

*Defendant's Lead and Liaison Counsel*

---

[1] To the extent plaintiffs contend the Exhibits are "relevant" to the pending summary judgment motions, there is no common record that can be applied to all of the contractors.  Not only does the recent announcement not apply to contractors in New Hampshire and Maryland (*see* Exhibit B at 4), but FXG's decision to contract with only incorporated entities affects current contractors, but only to the extent they seek a new contract term, and not any of the former contractors in the pending cases or classes.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 24th day of May, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

```
-------------------------------------------------------)
                                                       )
In re FEDEX GROUND PACKAGE          )      Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT            )      (MDL 1700)
PRACTICES LITIGATION               )
                                                       )
-------------------------------------------------------)
THIS DOCUMENT RELATES TO:            )
                                                       )
ALL ACTIONS                                     )
-------------------------------------------------------)
```

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY
### (*Narayan v. EGL, Inc.*, 9th Circuit, July 13, 2010)

In support of their Motions for Summary Adjudication of Employment Status and in opposition to FedEx Ground Package System, Inc's (FXG) Motions for Summary Judgment, Plaintiffs respectfully submit the attached decision of the U.S. Court of Appeals for the Ninth Circuit, *Narayan v. EGL Inc.*, Case No. 07-16487 (9th Cir. Jul. 13, 2010), reversing the decision of the district court which had found a class of pickup and delivery drivers to be independent contractors. This decision is relevant to the pending motions in the following respects:

**The decision reverses and discredits authority relied upon by FXG.**

- FXG expressly relied upon and cited the now reversed District Court decision in *Narayan* repeatedly in support of its motion for summary judgment in California and in opposition to the Texas, California and Pennsylvania Plaintiffs' motions for summary adjudication of employment status.

- The Ninth Circuit's analysis and holding are at odds with *Ruiz v. Affinity Logistics Corp.*, 2010 U.S. Dist. LEXIS 26765 (S.D. Cal. Mar. 22, 2010), a district court decision pending

before the Ninth Circuit which FXG recently offered as supplemental authority, and indicates that *Ruiz* too will be reversed.

**The decision explains the role of the contract in determining employment status.**

- The court explains:

  > While the contracts will likely be used as evidence to prove or disprove the statutory claims, the claims do not arise out of the contract, involve interpretation of any contract terms or otherwise require there to be a contract. *Id.* at 7.

- Language in the contracts expressly stating that the drivers are independent contractors and "'shall exercise independent discretion and judgment to determine the method, manner and means of its contractual performance'" is merely a label and "simply not significant under California's test of employment status." *Id.* at 15.

- A choice of law provision in an independent contractor agreement is irrelevant to a determination of whether the plaintiffs are employees or independent contractors for purposes of state-law statutory claims. *Id.* at 6-7.

**The decision describes the burden of proof for establishing employment.**

- Under California law, a worker need only "come forward with evidence that he provided services for an employer" in order to establish a prima facie case of an employment relationship. Then, the burden shift to the employer to "prove, if it can, that the presumed employee was an independent contractor." *Id.* at 8.

**The decision finds that substantially similar facts are consistent with employee status.**

- Like FXG drivers, EGL drivers, among other things, have to conform to the company's procedures for how to deliver, buy trucks that meet EGL's standards, meet EGL's appearance standards and their contracts automatically renew from one year to the next.

In addition, they can hire others and select their own routes.  These facts were not

sufficient to entitle the company to summary judgment.  *Id.* at 11-16.

Dated: July 16, 2010                            Respectfully submitted,

                                                LEONARD CARDER, LLP

                                                _____/s/ **Eleanor I. Morton**
                                                ELEANOR I. MORTON, ESQ.
                                                1188 Franklin St., Suite 201
                                                San Francisco, CA 94109
                                                Tel: (415) 771-6400
                                                Fax: (415) 771-7010

Susan E. Ellingstad                             Robert I. Harwood
LOCKRIDGE GRINDAL NAUEN P.L.L.P.                HARWOOD FEFFER LLP
100 Washington Avenue South, Suite 2200         488 Madison Avenue, 8th Floor
Minneapolis, MN  55401                          New York, NY  10022
Tel:   (612) 339-6900                           Tel:    (212) 935-7400
Fax:   (612) 339-0981                           Fax:    (212) 753-3630

### PLAINTIFFS' CO-LEAD COUNSEL

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

### PLAINTIFFS' LIAISON COUNSEL

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Mohit Narayan; Hannah Rahawi; and Thomas Heath,
*Plaintiffs-Appellants,*

v.

EGL, Inc.; Eagle Freight Systems, Inc.; and Does 1-10,
*Defendants-Appellees.*

No. 07-16487

D.C. No.
CV-05-04181-RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, United States District Judge, Presiding

Argued and Submitted
November 4, 2009—San Francisco, California

Filed July 13, 2010

Before: Michael Daly Hawkins and Sidney R. Thomas,
Circuit Judges, and Edward R. Korman,* District Judge.

Opinion by Judge Korman

---

*The Honorable Edward R. Korman, Senior United States District
Judge for the Eastern District of New York, sitting by designation.

10069

---

**COUNSEL**

Stacey Leyton (argued) and Michael Rubin (briefed), Altshuler Berzon, LLP, San Francisco, California, for the plaintiffs-appellants.

R. Ted Cruz (argued), Morgan, Lewis & Bockius, LLP, Houston, Texas, and Y. Anna Suh (briefed), Hunton & Williams LLP, San Francisco, California, for the defendants-appellees.

Robert R. Roginson, Division of Labor Standards Enforcement, Department of Industrial Relations, State of California,

San Francisco, California, Amicus Curiae in support of the plaintiffs-appellants.

Matthew Goldberg, The Legal Aid Society — Employment Law Center, San Francisco, California, and Cynthia Rice, California Rural Legal Assistance Foundation, Sacramento, California, Amici Curiae in support of the plaintiffs-appellants.

---

## OPINION

KORMAN, District Judge:

The California Labor Code ("Labor Code") confers certain benefits on employees that it does not afford independent contractors. Of particular relevance here are the provisions that, *inter alia*, require employers to pay overtime compensation, Cal. Lab. Code §§ 510 & 1194, prohibit employers from making certain improper deductions from wages, Cal. Lab. Code § 221, reimburse employees for necessary business expenses, Cal. Lab. Code § 2802, and provide off-duty meal periods, Cal. Lab. Code §§ 226.7 & 512. These provisions are part of a broad regulatory policy defining the obligations that " 'the law places on an employer without regard to the substance of its contractual obligations to its employee.' " *Nedlloyd Lines B.V. v. Super. Ct.*, 834 P.2d 1148, 1153 (Cal. 1992) (quoting *Foley v. Interactive Data Corp.*, 765 P.2d 373, 394 (Cal. 1988)). As Judge Easterbrook observed in a closely analogous context, statutes enacted to confer special benefits on workers are "designed to defeat rather than implement contractual arrangements." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1545 (7th Cir. 1987) (Easterbook, J., concurring).

This appeal from a judgment of the United States District Court for the Northern District of California granting the motion of an employer for summary judgment dismissing

claims for benefits under the Labor Code principally presents the issue whether, assuming the existence of an employer-employee relationship in California, the employer may avoid its obligations under the Labor Code by inserting a clause in an employer-drafted pre-printed form contract in which: (1) the employee acknowledges that he is an independent contractor and (2) agrees that the contract would be interpreted in accordance with the laws of another jurisdiction where such an agreement is generally enforceable.

## BACKGROUND

EGL, the employer, is a global transportation, supply chain management and information services company incorporated under the laws of Texas and headquartered in Texas.[1] EGL's services include, *inter alia*, "air and ocean freight forwarding, customs brokerage, [and] local pickup and delivery service." EGL operates through a network of over 400 facilities located in over 100 countries. One of the many aspects of EGL's business is domestic delivery services. Such services may be provided either as part of EGL's freight-forwarding operations or for customers requiring local pick-up and delivery services.

Mohit Narayan, Hanna Rahawi and Thomas Heath (the "Drivers") were residents of California who were engaged to provide freight pick-up and delivery services for EGL in California. All three Drivers signed agreements with EGL for "Leased Equipment and Independent Contractor Services" (the "Agreements"). The Agreements provided that the "intention of the parties is to . . . create a vendor/vendee relationship between Contractor and [EGL]," and acknowledged that "[n]either Contractor nor any of its employees or agents shall be considered to be employees of" EGL. The terms of the

---

[1]The complaint was originally filed against EGL and Eagle Freight Services, a subsidiary of EGL. After the district court entered final judgment in this case, EGL was purchased by CEVA Logistics U.S. Holdings, Inc.

Agreements provide, *inter alia*, that the Drivers "shall exercise independent discretion and judgment to determine the method, manner and means of performance of its contractual obligations," although EGL retained the right to "issue reasonable and lawful instructions regarding the results to be accomplished."

Notwithstanding the terms of the Agreements, the Drivers filed a complaint in California against EGL and one of its subsidiaries, Eagle Freight Services (collectively, "EGL"), alleging that they were EGL employees who were deprived of benefits conferred upon them by the Labor Code. They sought money damages for unpaid overtime wages, business expenses, meal compensation and unlawful deductions from wages as well as other relief, including statutory penalties.

After the case was removed pursuant to 28 U.S.C. § 1332, EGL moved for summary judgment arguing that, under the terms of the Agreements, the Drivers were not employees. Instead they were independent contractors who were not entitled to the benefits conferred upon employees by the Labor Code. Relying on a choice-of-law clause in the Agreements, the district court held that the law of Texas applied, and that declarations in the Agreements that the Drivers were independent contractors rather than employees, compelled the holding that they were independent contractors as a matter of law. Moreover, although California does not regard such declarations as controlling, and applies a multi-factor analysis in which the intent of the parties is one of over a dozen and a half factors, the district court held, without undertaking any analysis of the relevant factors, that the result would be the same under California law. *Narayan v. EGL, Inc.*, No. CV-05-04181-RMW, 2007 WL 2021809, at *9 n.12 (N.D. Cal. July 10, 2007). Consequently, the district court granted EGL's motion for summary judgment.

## DISCUSSION

### I.  Choice-of-Law

EGL argues that the choice-of-law clause in the Agreements, which provides that the contracts "shall be interpreted under the laws of the State of Texas," applies to the current dispute. The district court agreed. We review questions regarding choice of law de novo. *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1072 (9th Cir. 2009).

[1] To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). California, the forum state, ordinarily examines the scope of a choice-of-law provision in a contract under the law designated in that contract. *Wash. Mut. Bank, FA v. Super. Ct.*, 15 P.3d 1071, 1078 n.3 (Cal. 2001). In this case, that is Texas law.

[2] Under Texas law, similarly narrow choice-of-law clauses, providing under what law an agreement "shall be interpreted and enforced," apply only to the interpretation and enforcement of the contract itself; they do not "encompass all disputes between the parties." *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999); *accord Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 727 (5th Cir. 2003) (calling similar provision "narrow"). They govern claims that "rise or fall on the interpret[ation] and enforce[ment] of any contractual provision." *Stier*, 992 S.W.2d at 434 (internal quotations omitted) (alterations in original); *see also Busse v. Pac. Cattle Feeding Fund # 1, Ltd.*, 896 S.W.2d 807, 812-13 (Tex. App. 1995) ("The rights, obligations, and cause of action do not arise from the contracts but from the Deceptive Trade Practices Act, the Texas Securities Act, and the common law.").

The Drivers' claims involve entitlement to benefits under the California Labor Code. Whether the Drivers are entitled

to those benefits depends on whether they are employees of EGL, which in turn depends on the definition that the otherwise governing law—not the parties—gives to the term "employee." While the contracts will likely be used as evidence to prove or disprove the statutory claims, the claims do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract. *See S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 403-07 (Cal. 1989) (listing over one dozen factors "logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor").

**[3]** *CBS Corp. v. FCC*, 535 F.3d 167 (3d Cir. 2008), *vacated on other grounds*, 129 S. Ct. 2176 (2009), is instructive. There, the Third Circuit held that federal rather than New York law governed the question of whether performers were independent contractors or employees despite the presence of a choice-of-law clause in a contract defining performers as "independent contractors" because the claims arose under a federal regulatory scheme, and "defining the boundaries of permissible vicarious liability under that scheme is . . . a federal matter." *Id.* at 190-92. Similarly here, appellants claims arose under the Labor Code, a California regulatory scheme, and consequently, California law should apply to define the boundaries of liability under that scheme.

## II. Propriety of Summary Judgment Under California Law

Although the district judge applied Texas law to determine that the Drivers were independent contractors as a matter of law, he observed in a conclusory footnote that "[t]he result would be no different if California law governed." *Narayan*, 2007 WL 2021809, at *9 n.12. This conclusion is erroneous. We review a district court's grant of summary judgment *de novo. Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In doing so, we determine, "viewing the evidence in the light

most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law." *Id.* Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A 'justifiable inference' is not necessarily the most likely inference or the most persuastive inference. Rather, 'an inference as to another material fact may be drawn in favor of the nonmoving party . . . if it is 'rational' or 'reasonable.' " *United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (internal citation omitted).

**[4]** There are two special circumstances that are relevant to the application of this standard here. First, under California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee. *Robinson v. George*, 105 P.2d 914, 917 (Cal. 1940). As the Supreme Court of California has held, "[t]he rule . . . is that the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary." *Id.* at 916; *see also Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 83 (Ct. App. 2009). Once the employee establishes a prima facie case, the burden shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor. *Cristler*, 171 Cal. App. 4th at 84 (approving a jury instruction that "[t]he Defendant has the obligation to prove that the Plaintiffs were independent contractors"); *Bemis v. People*, 240 P.2d

638, 644 (Cal. Ct. App. 1952) ("It is also the law that, generally speaking, the burden of proof is on the party attacking the employment relationship.").

**[5]** The Drivers here have established a prima facie case. This means that, in order to prevail on its motion for summary judgment, drawing all justifiable inferences from the uncontroverted evidence, EGL would have to establish that a jury would be compelled to find that it had established by a preponderance of the evidence that the Drivers were independent contractors. This hurdle is particularly difficult for EGL to overcome in light of the second special consideration in this case, namely, the multi-faceted test that applies in resolving the issue whether the Drivers are employees.

**[6]** The Supreme Court of California has enumerated a number of indicia of an employment relationship, the most important of which is the "right to discharge at will, without cause." *Borello*, 769 P.2d at 404 (quoting *Tieberg v. Unemployment Ins. App. Bd.*, 471 P.2d 975, 979 (Cal. 1970)). *Borello* endorsed other factors derived from the Restatement (Second) of Agency that may point to an employment relationship:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not

the parties believe they are creating the relationship of employer-employee.

*Id.* at 404. *Borello* also approvingly cited five factors adopted by cases in other jurisdictions. These include:

> (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 407. Moreover, it characterized as "helpful" the standards set forth in Labor Code Section 2750.50, *id.*, which provide "extensive guidelines for determining whether one who operates under a required contractor's license is an independent contractor or employee." *Id.* at 404 n.5.

All factors were held to be "logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor." *Id.* at 407. Nevertheless, "the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends on particular combinations." *Id.* at 404 (internal citation and quotations omitted). "We must assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive, and that it is the rare case where the various factors will point with unanimity in one direction or the other." *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1097 (9th Cir. 2007) (internal citation and quotations omitted).

**[7]** Judge Easterbrook has keenly observed in a case under the Fair Labor Standards Act that:

[i]f we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.

*Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir. 1987) (Easterbook, J., concurring) (internal citations omitted). Under these circumstances, "we cannot readily say . . . that the 'ultimate conclusion as to whether the workers are employees or independent contractors' is one of law. The drawing of inferences from subordinate to 'ultimate' facts is a task for the trier of fact—if, under the governing legal rule, the inferences are subject to legitimate dispute." *Id.* at 1543.

**[8]** The inferences here are subject to legitimate dispute. The delivery services provided by the EGL drivers were an essential part of the regular business of EGL. Indeed, EGL's instructional video shown to the drivers advises them that "as an [EGL] pickup and delivery driver, you have the key role in the shipping process . . . The [EGL pickup and delivery] driver is the eyes of a dispatcher. You can identify shipments that are potential claims before they are put into our system and you ensure our customers' freight is protected by using proper loading work method techniques." More than that, "[y]ou are a vital source for shipping leads and competitor information at the actual shipping points, and you are a source of traffic and road condition information for dispatch and other [EGL] drivers to be able to avoid unnecessary delays on critical shipments." The video goes on to describe the drivers as "our company's largest sales force," because "[t]hrough your interactions with the customer, you communicate [EGL's] commitment to excellence." Indeed, the video acknowledges that "for our company to continue to grow,

NARAYAN v. EGL, INC.

every [EGL] driver must understand the critical importance of the job they do."

Consequently, EGL's Safety and Compliance Manual and Drivers' Handbook instructed the EGL drivers on, *inter alia*, how to conduct themselves when receiving assignments and packages, responding to customer complaints and handling damaged freight. The drivers used EGL-supplied forms, received company memoranda and attended meetings on company policies. The Handbook also provided guidelines on how to communicate with EGL's dispatch, instructing drivers to notify the dispatcher before leaving EGL's facility dock, to contact the dispatcher after each delivery stop to report that the delivery was completed, and to immediately report any traffic delays. Indeed, the EGL drivers were told that "[c]ommunicating with dispatch is the single most important aspect of the services drivers are paid for. It is not enough to get the freight picked up or delivered. To be competitive in today's market, the team must be able to identify at a moment's notice exactly where a shipment is in the course of transit." The EGL drivers were also instructed "never [to] wait at a stop without notifying the dispatcher first" and "allow[ing the] dispatcher to make the service decisions." Similarly, EGL's drivers were told that, if they cannot find a pickup or delivery site, "Don't ride around for 15 or 30 minutes, radio in and ask for help!"

Moreover, there was evidence that EGL's drivers were ordered to report to the EGL station at a set time each morning—whether or not packages were available to be delivered. Indeed, one of EGL's dispatchers testified that one of the plaintiff Drivers was subject to disciplinary action for showing up late. Similarly, the record indicates that the drivers had to submit advance notice of vacation days. The plaintiff Drivers also submitted evidence that, although their contracts purportedly gave them the right to pick and choose assignments, in practice, EGL presented them with batches of deliveries that they generally had to accept as an all-or-

nothing proposition. In some circumstances, standard operating procedure agreements between EGL and many of its customers determined the manner in which drivers made deliveries. Moreover, the plaintiff Drivers drove exclusively for EGL during their period of employment, and there is at least a material issue of fact as to whether they could have driven for other delivery companies because EGL required them to affix EGL logos to their trucks, which the plaintiff Drivers allege could not practically be covered up.

[9] The record also shows that EGL controlled many other details of their drivers' performance. EGL regulated their drivers' appearance—requiring them to wear EGL-branded shirts, safety boots and an EGL identification card. Although their drivers owned their own trucks or vans as noted above, EGL required that they affix EGL logos to the outside of their vehicles. This requirement was "established due to government regulations, customer requests, and for security purposes." EGL imposed requirements on their drivers' vehicles —in particular, that they be painted white and less than five years old, although EGL disputes whether these requirements were enforced. This requirement was imposed to meet "the industry standard, the DOT regulation, and . . . customer's requirements."

EGL's drivers supplied some of the equipment used to deliver packages (*e.g.*, hand trucks, lift gates, etc.), but EGL provided other supplies such as EGL-branded boxes and packing tape to their drivers for package pick-ups. While EGL's drivers retained the right to employ others to assist in performing their contractual obligations, EGL required all helpers to be approved by it. The same rule applied to passengers. This requirement was imposed "to safeguard EGL employees, contractors, . . . customers, and the general public from unsafe and unlawful actions" by a helper or passenger. Nonetheless, none of the plaintiff Drivers hired helpers to perform their duties for EGL.

[**10**] Significantly, the contracts signed by the plaintiff Drivers contained automatic renewal clauses and could be terminated by either party upon thirty-days notice or upon breach of the agreement. Such an agreement is a substantial indicator of an at-will employment relationship. *See Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 6, 11 (Ct. App. 2007) (agreement providing for termination with thirty-day notice is evidence of at-will employment); *Gonzalez v. Workers' Comp. App. Bd.*, 46 Cal. App. 4th 1584, 1593 (Ct. App. 1996) (contract with two-week notice termination provision constituted at-will employment where contract provided no consequences for employers' failure to give notice); *Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 854 (Ct. App. 2008) (termination with thirty-day notice requirement "clearly" gives employer the right to discharge at-will without cause). *But see State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 203 (Ct. App. 1995) (termination provision with fourteen-day notice requirement was "consistent either with an employment-at-will relationship or parties in a continuing contractual relationship"). This is not all.

Moreover, the occupation that the plaintiff Drivers were engaged in did not require a high level of skill. Drivers were not required to possess any special license beyond a normal driver's license, and no skills beyond the ability to drive. *Estrada*, 154 Cal. App. 4th at 12; *JKH Enters., Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046, 1064 (Ct. App. 2006) (courier service drivers did not require a high level of skill); *cf. Brown*, 32 Cal. App. 4th at 202-03 (commercial truck drivers require "abilities beyond those possessed by a general laborer (or, indeed, possessors of ordinary driver's licenses)"); *Gonzalez*, 46 Cal. App. 4th at 1592 (distinguishing between truckers in *Brown*, who require a special driver's license and must learn special driving skills, from individuals who deliver newspapers in cars).

[**11**] Finally, the length and indefinite nature of the plaintiff Drivers' tenure with EGL also point toward an employ-

ment relationship. Here, the plaintiff Drivers worked at EGL for several years, and their Agreements were automatically renewed. This was not a circumstance where a contractor was hired to perform a specific task for a defined period of time. There was no contemplated end to the service relationship at the time that the plaintiff Drivers began working for EGL.

The district court, as we have previously observed, did not apply the relevant factors identified by the Supreme Court of California to the facts in this case. The only reference to factors that were arguably relevant were addressed in the context of distinguishing a California case that found an employee-employer relationship in closely analogous circumstances. *See Air Couriers Int'l v. Employ. Dev. Dep't*, 150 Cal. App. 4th 923 (Ct. App. 2007). Thus, the district judge observed that "in *Air Couriers*, the drivers did not have written contracts, as here, expressly acknowledging that they were independent contractors. Further, in *Air Couriers*, the drivers drove regular routes, worked regular schedules, and were paid on regularly scheduled paydays." *Narayan*, 2007 WL 2021809, at *9 n.12. By contrast, he found that the instant case was distinguishable because "the drivers were not required to work regular schedules, were paid on a per job basis, and determined their own routes." *Id.* These distinctions are neither dispositive nor the subject of factual disputes suitable for resolution by summary judgment.

[12] The fact that the Drivers here had contracts "expressly acknowledging that they were independent contractors" is simply not significant under California's test of employment. *Borello*, 769 P.2d at 403 ("The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced.") Moreover, there is an issue of fact over whether the plaintiff Drivers were required to work regular schedules. Contrary to the district judge's suggestion, they were paid on a regular basis, although their salary was based on a percentage of each delivery. Nevertheless, the fact that their salary was determined in this way is equally consistent

with an employee relationship, particularly where other indicia of employment are present. *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1485 (Ct. App. 2003) (that reporter was paid by the article is indicative of an independent contractor relationship, but that fact alone is not dispositive if other indicia of employment are present); *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 877 (Ct. App. 1990) (the fact that worker was paid on a commission basis is consistent with employee status).

Similarly, setting aside evidence that the plaintiff Drivers did not, as a practical matter, determine their own routes, the ability to determine a driving route is "simply a freedom inherent in the nature of the work and not determinitive of the employment relation." *Toyota*, 220 Cal. App. 3d at 876; *see also Home Interior & Gifts, Inc. v. Veliz*, 695 S.W.2d 35, 40-41 (Tex. App. 1985) (finding employee-employer relationship although drivers generally determined how to get to their destinations). These cases simply reflect the common-sense rule that, "[i]f an employment relationship exists, the fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision and control." *Air Couriers*, 150 Cal. App. 4th at 934 (quoting *Grant v. Woods*, 71 Cal. App. 3d 647, 653 (Ct. App. 1977)).

[13] Ultimately, under California's multi-faceted test of employment, there existed at the very least sufficient indicia of an employment relationship between the plaintiff Drivers and EGL such that a reasonable jury could find the existence of such a relationship. Indeed, although it plays no role in our decision to deny summary judgment, it is not without significance that, applying comparable factors to those that we apply here, the Internal Revenue Service (at EGL's request) and the Employment Development Department of California (at Narayan's request) have determined that Narayan was an employee for federal tax purposes (applying federal law) and

California Unemployment or Disability Insurance (applying California law), respectively.

## CONCLUSION

The judgment of the district court granting EGL's motion for summary judgment is REVERSED and REMANDED.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

-------------------------------------------------------)
                                                )

In re FEDEX GROUND PACKAGE     )     Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT     )     (MDL 1700)
PRACTICES LITIGATION           )
                                                )
-------------------------------------------------------)
THIS DOCUMENT RELATES TO:     )
                                                 )
ALL ACTIONS                            )
-------------------------------------------------------)

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY
### (*Narayan v. EGL, Inc.*, 9th Circuit, July 13, 2010)

In support of their Motions for Summary Adjudication of Employment Status and in

opposition to FedEx Ground Package System, Inc's (FXG) Motions for Summary Judgment,

Plaintiffs respectfully submit the attached decision of the U.S. Court of Appeals for the Ninth

Circuit, *Narayan v. EGL Inc.*, Case No. 07-16487 (9th Cir. Jul. 13, 2010), reversing the decision

of the district court which had found a class of pickup and delivery drivers to be independent

contractors.  This decision is relevant to the pending motions in the following respects:

**The decision reverses and discredits authority relied upon by FXG.**

- FXG expressly relied upon and cited the now reversed District Court decision in *Narayan*

  repeatedly in support of its motion for summary judgment in California and in opposition

  to the Texas, California and Pennsylvania Plaintiffs' motions for summary adjudication

  of employment status.

- The Ninth Circuit's analysis and holding are at odds with *Ruiz v. Affinity Logistics Corp*.,

  2010 U.S. Dist. LEXIS 26765 (S.D. Cal. Mar. 22, 2010), a district court decision pending

1

before the Ninth Circuit which FXG recently offered as supplemental authority, and

indicates that *Ruiz* too will be reversed.

**The decision explains the role of the contract in determining employment status.**

- The court explains:

    While the contracts will likely be used as evidence to prove or disprove the statutory claims, the claims do not arise out of the contract, involve interpretation of any contract terms or otherwise require there to be a contract. *Id.* at 7.

- Language in the contracts expressly stating that the drivers are independent contractors

    and "'shall exercise independent discretion and judgment to determine the method,

    manner and means of its contractual performance'" is merely a label and "simply not

    significant under California's test of employment status." *Id.* at 15.

- A choice of law provision in an independent contractor agreement is irrelevant to a

    determination of whether the plaintiffs are employees or independent contractors for

    purposes of state-law statutory claims. *Id.* at 6-7.

**The decision describes the burden of proof for establishing employment.**

- Under California law, a worker need only "come forward with evidence that he provided

    services for an employer" in order to establish a prima facie case of an employment

    relationship. Then, the burden shift to the employer to "prove, if it can, that the presumed

    employee was an independent contractor." *Id.* at 8.

**The decision finds that substantially similar facts are consistent with employee status.**

- Like FXG drivers, EGL drivers, among other things, have to conform to the company's

    procedures for how to deliver, buy trucks that meet EGL's standards, meet EGL's

    appearance standards and their contracts automatically renew from one year to the next.

In addition, they can hire others and select their own routes.  These facts were not sufficient to entitle the company to summary judgment.  *Id.* at 11-16.

Dated: July 16, 2010                    Respectfully submitted,

                                        LEONARD CARDER, LLP


                                        _____ /s/ **Eleanor I. Morton**
                                        ELEANOR I. MORTON, ESQ.
                                        1188 Franklin St., Suite 201
                                        San Francisco, CA 94109
                                        Tel: (415) 771-6400
                                        Fax: (415) 771-7010


Susan E. Ellingstad                     Robert I. Harwood
LOCKRIDGE GRINDAL NAUEN P.L.L.P.        HARWOOD FEFFER LLP
100 Washington Avenue South, Suite 2200  488 Madison Avenue, 8th Floor
Minneapolis, MN  55401                  New York, NY  10022
Tel:   (612) 339-6900                   Tel:   (212) 935-7400
Fax:   (612) 339-0981                   Fax:   (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MOHIT NARAYAN; HANNAH RAHAWI;
and THOMAS HEATH,
                   *Plaintiffs-Appellants,*

                v.

EGL, INC.; EAGLE FREIGHT SYSTEMS,
INC.; and DOES 1-10,
                   *Defendants-Appellees.*

No. 07-16487

D.C. No.
CV-05-04181-RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, United States District Judge, Presiding

Argued and Submitted
November 4, 2009—San Francisco, California

Filed July 13, 2010

Before: Michael Daly Hawkins and Sidney R. Thomas,
Circuit Judges, and Edward R. Korman,* District Judge.

Opinion by Judge Korman

---

*The Honorable Edward R. Korman, Senior United States District
Judge for the Eastern District of New York, sitting by designation.

10069

## COUNSEL

Stacey Leyton (argued) and Michael Rubin (briefed), Altshuler Berzon, LLP, San Francisco, California, for the plaintiffs-appellants.

R. Ted Cruz (argued), Morgan, Lewis & Bockius, LLP, Houston, Texas, and Y. Anna Suh (briefed), Hunton & Williams LLP, San Francisco, California, for the defendants-appellees.

Robert R. Roginson, Division of Labor Standards Enforcement, Department of Industrial Relations, State of California,

San Francisco, California, Amicus Curiae in support of the plaintiffs-appellants.

Matthew Goldberg, The Legal Aid Society — Employment Law Center, San Francisco, California, and Cynthia Rice, California Rural Legal Assistance Foundation, Sacramento, California, Amici Curiae in support of the plaintiffs-appellants.

---

## OPINION

KORMAN, District Judge:

The California Labor Code ("Labor Code") confers certain benefits on employees that it does not afford independent contractors. Of particular relevance here are the provisions that, *inter alia*, require employers to pay overtime compensation, Cal. Lab. Code §§ 510 & 1194, prohibit employers from making certain improper deductions from wages, Cal. Lab. Code § 221, reimburse employees for necessary business expenses, Cal. Lab. Code § 2802, and provide off-duty meal periods, Cal. Lab. Code §§ 226.7 & 512. These provisions are part of a broad regulatory policy defining the obligations that " 'the law places on an employer without regard to the substance of its contractual obligations to its employee.' " *Nedlloyd Lines B.V. v. Super. Ct.*, 834 P.2d 1148, 1153 (Cal. 1992) (quoting *Foley v. Interactive Data Corp.*, 765 P.2d 373, 394 (Cal. 1988)). As Judge Easterbrook observed in a closely analogous context, statutes enacted to confer special benefits on workers are "designed to defeat rather than implement contractual arrangements." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1545 (7th Cir. 1987) (Easterbook, J., concurring).

This appeal from a judgment of the United States District Court for the Northern District of California granting the motion of an employer for summary judgment dismissing

claims for benefits under the Labor Code principally presents the issue whether, assuming the existence of an employer-employee relationship in California, the employer may avoid its obligations under the Labor Code by inserting a clause in an employer-drafted pre-printed form contract in which: (1) the employee acknowledges that he is an independent contractor and (2) agrees that the contract would be interpreted in accordance with the laws of another jurisdiction where such an agreement is generally enforceable.

## BACKGROUND

EGL, the employer, is a global transportation, supply chain management and information services company incorporated under the laws of Texas and headquartered in Texas.[1] EGL's services include, *inter alia*, "air and ocean freight forwarding, customs brokerage, [and] local pickup and delivery service." EGL operates through a network of over 400 facilities located in over 100 countries. One of the many aspects of EGL's business is domestic delivery services. Such services may be provided either as part of EGL's freight-forwarding operations or for customers requiring local pick-up and delivery services.

Mohit Narayan, Hanna Rahawi and Thomas Heath (the "Drivers") were residents of California who were engaged to provide freight pick-up and delivery services for EGL in California. All three Drivers signed agreements with EGL for "Leased Equipment and Independent Contractor Services" (the "Agreements"). The Agreements provided that the "intention of the parties is to . . . create a vendor/vendee relationship between Contractor and [EGL]," and acknowledged that "[n]either Contractor nor any of its employees or agents shall be considered to be employees of" EGL. The terms of the

---

[1]The complaint was originally filed against EGL and Eagle Freight Services, a subsidiary of EGL. After the district court entered final judgment in this case, EGL was purchased by CEVA Logistics U.S. Holdings, Inc.

Agreements provide, *inter alia*, that the Drivers "shall exercise independent discretion and judgment to determine the method, manner and means of performance of its contractual obligations," although EGL retained the right to "issue reasonable and lawful instructions regarding the results to be accomplished."

Notwithstanding the terms of the Agreements, the Drivers filed a complaint in California against EGL and one of its subsidiaries, Eagle Freight Services (collectively, "EGL"), alleging that they were EGL employees who were deprived of benefits conferred upon them by the Labor Code. They sought money damages for unpaid overtime wages, business expenses, meal compensation and unlawful deductions from wages as well as other relief, including statutory penalties.

After the case was removed pursuant to 28 U.S.C. § 1332, EGL moved for summary judgment arguing that, under the terms of the Agreements, the Drivers were not employees. Instead they were independent contractors who were not entitled to the benefits conferred upon employees by the Labor Code. Relying on a choice-of-law clause in the Agreements, the district court held that the law of Texas applied, and that declarations in the Agreements that the Drivers were independent contractors rather than employees, compelled the holding that they were independent contractors as a matter of law. Moreover, although California does not regard such declarations as controlling, and applies a multi-factor analysis in which the intent of the parties is one of over a dozen and a half factors, the district court held, without undertaking any analysis of the relevant factors, that the result would be the same under California law. *Narayan v. EGL, Inc.*, No. CV-05-04181-RMW, 2007 WL 2021809, at *9 n.12 (N.D. Cal. July 10, 2007). Consequently, the district court granted EGL's motion for summary judgment.

## DISCUSSION

### I. Choice-of-Law

EGL argues that the choice-of-law clause in the Agreements, which provides that the contracts "shall be interpreted under the laws of the State of Texas," applies to the current dispute. The district court agreed. We review questions regarding choice of law de novo. *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1072 (9th Cir. 2009).

[1] To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). California, the forum state, ordinarily examines the scope of a choice-of-law provision in a contract under the law designated in that contract. *Wash. Mut. Bank, FA v. Super. Ct.*, 15 P.3d 1071, 1078 n.3 (Cal. 2001). In this case, that is Texas law.

[2] Under Texas law, similarly narrow choice-of-law clauses, providing under what law an agreement "shall be interpreted and enforced," apply only to the interpretation and enforcement of the contract itself; they do not "encompass all disputes between the parties." *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999); *accord Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 727 (5th Cir. 2003) (calling similar provision "narrow"). They govern claims that "rise or fall on the interpret[ation] and enforce[ment] of any contractual provision." *Stier*, 992 S.W.2d at 434 (internal quotations omitted) (alterations in original); *see also Busse v. Pac. Cattle Feeding Fund # 1, Ltd.*, 896 S.W.2d 807, 812-13 (Tex. App. 1995) ("The rights, obligations, and cause of action do not arise from the contracts but from the Deceptive Trade Practices Act, the Texas Securities Act, and the common law.").

The Drivers' claims involve entitlement to benefits under the California Labor Code. Whether the Drivers are entitled

to those benefits depends on whether they are employees of EGL, which in turn depends on the definition that the otherwise governing law—not the parties—gives to the term "employee." While the contracts will likely be used as evidence to prove or disprove the statutory claims, the claims do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract. *See S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 403-07 (Cal. 1989) (listing over one dozen factors "logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor").

**[3]** *CBS Corp. v. FCC*, 535 F.3d 167 (3d Cir. 2008), *vacated on other grounds*, 129 S. Ct. 2176 (2009), is instructive. There, the Third Circuit held that federal rather than New York law governed the question of whether performers were independent contractors or employees despite the presence of a choice-of-law clause in a contract defining performers as "independent contractors" because the claims arose under a federal regulatory scheme, and "defining the boundaries of permissible vicarious liability under that scheme is . . . a federal matter." *Id.* at 190-92. Similarly here, appellants claims arose under the Labor Code, a California regulatory scheme, and consequently, California law should apply to define the boundaries of liability under that scheme.

## II. Propriety of Summary Judgment Under California Law

Although the district judge applied Texas law to determine that the Drivers were independent contractors as a matter of law, he observed in a conclusory footnote that "[t]he result would be no different if California law governed." *Narayan*, 2007 WL 2021809, at *9 n.12. This conclusion is erroneous. We review a district court's grant of summary judgment *de novo. Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In doing so, we determine, "viewing the evidence in the light

most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law." *Id.* Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A 'justifiable inference' is not necessarily the most likely inference or the most persuastive inference. Rather, 'an inference as to another material fact may be drawn in favor of the nonmoving party . . . if it is 'rational' or 'reasonable.' " *United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (internal citation omitted).

**[4]** There are two special circumstances that are relevant to the application of this standard here. First, under California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee. *Robinson v. George*, 105 P.2d 914, 917 (Cal. 1940). As the Supreme Court of California has held, "[t]he rule . . . is that the fact that one is performing work and labor for another is prima facie evidence of employment and such person is presumed to be a servant in the absence of evidence to the contrary." *Id.* at 916; *see also Cristler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72, 83 (Ct. App. 2009). Once the employee establishes a prima facie case, the burden shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor. *Cristler*, 171 Cal. App. 4th at 84 (approving a jury instruction that "[t]he Defendant has the obligation to prove that the Plaintiffs were independent contractors"); *Bemis v. People*, 240 P.2d

638, 644 (Cal. Ct. App. 1952) ("It is also the law that, generally speaking, the burden of proof is on the party attacking the employment relationship.").

**[5]** The Drivers here have established a prima facie case. This means that, in order to prevail on its motion for summary judgment, drawing all justifiable inferences from the uncontroverted evidence, EGL would have to establish that a jury would be compelled to find that it had established by a preponderance of the evidence that the Drivers were independent contractors. This hurdle is particularly difficult for EGL to overcome in light of the second special consideration in this case, namely, the multi-faceted test that applies in resolving the issue whether the Drivers are employees.

**[6]** The Supreme Court of California has enumerated a number of indicia of an employment relationship, the most important of which is the "right to discharge at will, without cause." *Borello,* 769 P.2d at 404 (quoting *Tieberg v. Unemployment Ins. App. Bd.*, 471 P.2d 975, 979 (Cal. 1970)). *Borello* endorsed other factors derived from the Restatement (Second) of Agency that may point to an employment relationship:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not

the parties believe they are creating the relationship of employer-employee.

*Id.* at 404. *Borello* also approvingly cited five factors adopted by cases in other jurisdictions. These include:

> (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 407. Moreover, it characterized as "helpful" the standards set forth in Labor Code Section 2750.50, *id.*, which provide "extensive guidelines for determining whether one who operates under a required contractor's license is an independent contractor or employee." *Id.* at 404 n.5.

All factors were held to be "logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor." *Id.* at 407. Nevertheless, "the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends on particular combinations." *Id.* at 404 (internal citation and quotations omitted). "We must assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive, and that it is the rare case where the various factors will point with unanimity in one direction or the other." *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1097 (9th Cir. 2007) (internal citation and quotations omitted).

**[7]** Judge Easterbrook has keenly observed in a case under the Fair Labor Standards Act that:

[i]f we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.

*Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir. 1987) (Easterbook, J., concurring) (internal citations omitted). Under these circumstances, "we cannot readily say . . . that the 'ultimate conclusion as to whether the workers are employees or independent contractors' is one of law. The drawing of inferences from subordinate to 'ultimate' facts is a task for the trier of fact—if, under the governing legal rule, the inferences are subject to legitimate dispute." *Id.* at 1543.

**[8]** The inferences here are subject to legitimate dispute. The delivery services provided by the EGL drivers were an essential part of the regular business of EGL. Indeed, EGL's instructional video shown to the drivers advises them that "as an [EGL] pickup and delivery driver, you have the key role in the shipping process . . . The [EGL pickup and delivery] driver is the eyes of a dispatcher. You can identify shipments that are potential claims before they are put into our system and you ensure our customers' freight is protected by using proper loading work method techniques." More than that, "[y]ou are a vital source for shipping leads and competitor information at the actual shipping points, and you are a source of traffic and road condition information for dispatch and other [EGL] drivers to be able to avoid unnecessary delays on critical shipments." The video goes on to describe the drivers as "our company's largest sales force," because "[t]hrough your interactions with the customer, you communicate [EGL's] commitment to excellence." Indeed, the video acknowledges that "for our company to continue to grow,

every [EGL] driver must understand the critical importance of
the job they do."

Consequently, EGL's Safety and Compliance Manual and
Drivers' Handbook instructed the EGL drivers on, *inter alia*,
how to conduct themselves when receiving assignments and
packages, responding to customer complaints and handling
damaged freight. The drivers used EGL-supplied forms,
received company memoranda and attended meetings on
company policies. The Handbook also provided guidelines on
how to communicate with EGL's dispatch, instructing drivers
to notify the dispatcher before leaving EGL's facility dock, to
contact the dispatcher after each delivery stop to report that
the delivery was completed, and to immediately report any
traffic delays. Indeed, the EGL drivers were told that
"[c]ommunicating with dispatch is the single most important
aspect of the services drivers are paid for. It is not enough to
get the freight picked up or delivered. To be competitive in
today's market, the team must be able to identify at a
moment's notice exactly where a shipment is in the course of
transit." The EGL drivers were also instructed "never [to]
wait at a stop without notifying the dispatcher first" and "al-
low[ing the] dispatcher to make the service decisions." Simi-
larly, EGL's drivers were told that, if they cannot find a
pickup or delivery site, "Don't ride around for 15 or 30 min-
utes, radio in and ask for help!"

Moreover, there was evidence that EGL's drivers were
ordered to report to the EGL station at a set time each
morning—whether or not packages were available to be deliv-
ered. Indeed, one of EGL's dispatchers testified that one of
the plaintiff Drivers was subject to disciplinary action for
showing up late. Similarly, the record indicates that the driv-
ers had to submit advance notice of vacation days. The plain-
tiff Drivers also submitted evidence that, although their
contracts purportedly gave them the right to pick and choose
assignments, in practice, EGL presented them with batches of
deliveries that they generally had to accept as an all-or-

nothing proposition. In some circumstances, standard operating procedure agreements between EGL and many of its customers determined the manner in which drivers made deliveries. Moreover, the plaintiff Drivers drove exclusively for EGL during their period of employment, and there is at least a material issue of fact as to whether they could have driven for other delivery companies because EGL required them to affix EGL logos to their trucks, which the plaintiff Drivers allege could not practically be covered up.

[9] The record also shows that EGL controlled many other details of their drivers' performance. EGL regulated their drivers' appearance—requiring them to wear EGL-branded shirts, safety boots and an EGL identification card. Although their drivers owned their own trucks or vans as noted above, EGL required that they affix EGL logos to the outside of their vehicles. This requirement was "established due to government regulations, customer requests, and for security purposes." EGL imposed requirements on their drivers' vehicles —in particular, that they be painted white and less than five years old, although EGL disputes whether these requirements were enforced. This requirement was imposed to meet "the industry standard, the DOT regulation, and . . . customer's requirements."

EGL's drivers supplied some of the equipment used to deliver packages (*e.g.*, hand trucks, lift gates, etc.), but EGL provided other supplies such as EGL-branded boxes and packing tape to their drivers for package pick-ups. While EGL's drivers retained the right to employ others to assist in performing their contractual obligations, EGL required all helpers to be approved by it. The same rule applied to passengers. This requirement was imposed "to safeguard EGL employees, contractors, . . . customers, and the general public from unsafe and unlawful actions" by a helper or passenger. Nonetheless, none of the plaintiff Drivers hired helpers to perform their duties for EGL.

**[10]** Significantly, the contracts signed by the plaintiff Drivers contained automatic renewal clauses and could be terminated by either party upon thirty-days notice or upon breach of the agreement. Such an agreement is a substantial indicator of an at-will employment relationship. *See Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 6, 11 (Ct. App. 2007) (agreement providing for termination with thirty-day notice is evidence of at-will employment); *Gonzalez v. Workers' Comp. App. Bd.*, 46 Cal. App. 4th 1584, 1593 (Ct. App. 1996) (contract with two-week notice termination provision constituted at-will employment where contract provided no consequences for employers' failure to give notice); *Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 854 (Ct. App. 2008) (termination with thirty-day notice requirement "clearly" gives employer the right to discharge at-will without cause). *But see State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 203 (Ct. App. 1995) (termination provision with fourteen-day notice requirement was "consistent either with an employment-at-will relationship or parties in a continuing contractual relationship"). This is not all.

Moreover, the occupation that the plaintiff Drivers were engaged in did not require a high level of skill. Drivers were not required to possess any special license beyond a normal driver's license, and no skills beyond the ability to drive. *Estrada*, 154 Cal. App. 4th at 12; *JKH Enters., Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046, 1064 (Ct. App. 2006) (courier service drivers did not require a high level of skill); *cf. Brown*, 32 Cal. App. 4th at 202-03 (commercial truck drivers require "abilities beyond those possessed by a general laborer (or, indeed, possessors of ordinary driver's licenses)"); *Gonzalez*, 46 Cal. App. 4th at 1592 (distinguishing between truckers in *Brown*, who require a special driver's license and must learn special driving skills, from individuals who deliver newspapers in cars).

**[11]** Finally, the length and indefinite nature of the plaintiff Drivers' tenure with EGL also point toward an employ-

ment relationship. Here, the plaintiff Drivers worked at EGL for several years, and their Agreements were automatically renewed. This was not a circumstance where a contractor was hired to perform a specific task for a defined period of time. There was no contemplated end to the service relationship at the time that the plaintiff Drivers began working for EGL.

The district court, as we have previously observed, did not apply the relevant factors identified by the Supreme Court of California to the facts in this case. The only reference to factors that were arguably relevant were addressed in the context of distinguishing a California case that found an employee-employer relationship in closely analogous circumstances. *See Air Couriers Int'l v. Employ. Dev. Dep't*, 150 Cal. App. 4th 923 (Ct. App. 2007). Thus, the district judge observed that "in *Air Couriers*, the drivers did not have written contracts, as here, expressly acknowledging that they were independent contractors. Further, in *Air Couriers*, the drivers drove regular routes, worked regular schedules, and were paid on regularly scheduled paydays." *Narayan*, 2007 WL 2021809, at *9 n.12. By contrast, he found that the instant case was distinguishable because "the drivers were not required to work regular schedules, were paid on a per job basis, and determined their own routes." *Id.* These distinctions are neither dispositive nor the subject of factual disputes suitable for resolution by summary judgment.

**[12]** The fact that the Drivers here had contracts "expressly acknowledging that they were independent contractors" is simply not significant under California's test of employment. *Borello*, 769 P.2d at 403 ("The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced.") Moreover, there is an issue of fact over whether the plaintiff Drivers were required to work regular schedules. Contrary to the district judge's suggestion, they were paid on a regular basis, although their salary was based on a percentage of each delivery. Nevertheless, the fact that their salary was determined in this way is equally consistent

with an employee relationship, particularly where other indicia of employment are present. *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1485 (Ct. App. 2003) (that reporter was paid by the article is indicative of an independent contractor relationship, but that fact alone is not dispositive if other indicia of employment are present); *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 877 (Ct. App. 1990) (the fact that worker was paid on a commission basis is consistent with employee status).

Similarly, setting aside evidence that the plaintiff Drivers did not, as a practical matter, determine their own routes, the ability to determine a driving route is "simply a freedom inherent in the nature of the work and not determinitive of the employment relation." *Toyota*, 220 Cal. App. 3d at 876; *see also Home Interior & Gifts, Inc. v. Veliz*, 695 S.W.2d 35, 40-41 (Tex. App. 1985) (finding employee-employer relationship although drivers generally determined how to get to their destinations). These cases simply reflect the common-sense rule that, "[i]f an employment relationship exists, the fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision and control." *Air Couriers*, 150 Cal. App. 4th at 934 (quoting *Grant v. Woods*, 71 Cal. App. 3d 647, 653 (Ct. App. 1977)).

[13] Ultimately, under California's multi-faceted test of employment, there existed at the very least sufficient indicia of an employment relationship between the plaintiff Drivers and EGL such that a reasonable jury could find the existence of such a relationship. Indeed, although it plays no role in our decision to deny summary judgment, it is not without significance that, applying comparable factors to those that we apply here, the Internal Revenue Service (at EGL's request) and the Employment Development Department of California (at Narayan's request) have determined that Narayan was an employee for federal tax purposes (applying federal law) and

California Unemployment or Disability Insurance (applying California law), respectively.

## CONCLUSION

The judgment of the district court granting EGL's motion for summary judgment is REVERSED and REMANDED.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| --------------------------------------------------) | | |
| | ) | |
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| | ) | |
| --------------------------------------------------) | | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| --------------------------------------------------) | | |

## PLAINTIFFS' THIRD MOTION TO AUGMENT THE RECORD WITH NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS

Plaintiffs respectfully move this Court for an order permitting them to augment the record with:

1) the Decision of the Tennessee Department of Labor and Workforce Development, dated February 2, 2010 (produced to Plaintiffs on June 29, 2010)(filed under seal as Exhibit 1 to Declaration of Lynn Rossman Faris In Support of Plaintiffs' Third Motion to Augment, filed herewith "Faris Dec.");

2) the Settlement Agreement between FedEx Ground Package System Inc. and the Tennessee Department of Labor and Workforce Development, dated June 2, 2010 (Exhibit 2 to Faris Dec.);

3) the "Tennessee Transition" Announcement (including Huntsville, AL and Olive Branch, MS) and ISP Transition Guide, provided to all Tennessee drivers on June 16, 2010, (as described in the aforesaid Settlement Agreement)(Exhibit 3 to Faris Dec.);

1

4) announcement of Settlement between State of Massachusetts and FedEx Ground, dated July 15, 2010 and Settlement Agreement between them and certain departments within the State of Massachusetts (Exh. 4 to Faris Dec.);

5) the Massachusetts Transition Announcement(including drivers providing service to Massachusetts from FXG terminals in Albany, NY) and ISP Transition Guide, dated July 15, 2010 (and described in the aforesaid Settlement Agreement)(Exh. 5 to Faris Dec.);

6) the Rhode Island Transition Annnouncement and Transition Guide, dated July 15, 2010 (Exh. 6 to Faris Dec.);

7) The Vermont Transition Announcement and ISP Transition Guide, dated July 15, 2010 (Exh. 7 to Faris Dec.);

8) The Illinois Transition Announcement (including drivers providing service in Illinois from FXG terminals in St. Louis, MO; Dubuque, IO; Hammond, IN; and Milwaukee, WI) and ISP Transition Guide, dated July 15, 2010 (Exh. 8 to Faris Dec.);

9) The Minnesota Transition Announcement (including drivers providing service in Minnesota from FXG terminals in Mason City, IO; Spencer, IO; Sioux Falls, SD; La Crosse, WI; Watertown, SD; and Duluth and Superior, WI,) and ISP Transition Guide, dated July 15, 2010 (Exh. 9 to Faris Dec).

Plaintiffs request permission to augment the record with these supplemental materials in support of Plaintiffs' Motions for Summary Adjudication of Employment Status,[1] and in

---

[1]Plaintiffs' motions for summary adjudication and supporting memoranda: Docs. 1153-1192 (filed April 25, 2008); Docs. 1295, 1299, 1303, 1307, 1313-14, 1320-21, 1328-29, 1335-1338 (filed June 2, 2008); Docs. 1792-1807 (filed Sept. 28, 2009); Doc. 1872-1873 (filed Oct. 30, 2009); Doc. 1971 (filed Jan. 13, 2010).

opposition to FedEx Ground Package System, Inc's (FXG) Motions for Summary Judgment,[2] without further briefing.

These materials were all produced in the last month, substantially **after** briefing was concluded with regard to the pending motions in all cases, and they represent relevant developments with regard to the drivers' classification and FedEx Ground's virtual abandonment of its "independent contractor" model at issue in this case.  At a minimum, the documents contain critical evidence for the Court to consider in evaluating whether FXG drivers are employees or independent contractors under the current FXG Operating Agreement and business model in Tennessee, Massachusetts, Vermont, Rhode Island, Illinois, and Minnesota.

Courts have wide discretion to permit Plaintiffs to supplement the summary adjudication/ judgment record.  E.g., *Wren v. McCain*, 23 F.3d 411, Case No. 93-2183, 1994 WL 142884, *2 (7th Cir. Apr. 20, 1994) (affirming district court decision permitting party to supplement summary judgment record after motion had been filed) (unpublished order).  Plaintiffs respectfully request permission to add these materials to the record.   The Tennessee Determination and the Tennessee and Massachusetts settlement agreements (Exhibits 1A (sealed), 1B, and 2B to Faris Dec.) may be judicially noticed pursuant to Federal Rule of Evidence 201(b) as they are public documents which are "not subject to reasonable dispute" and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir.2004); *Opoka v. Immigration and Naturalization Serv.*, 94 F.3d 392, 394.  The additional documents regarding the FXG "transitions" in six states are new documents produced by FedEx of direct relevance and therefore are properly augmented to the record currently before the court.

---

[2] Plaintiffs' briefs in opposition to FXG's motions for summary judgment: Docs. 1360-1362, 1364-1365, 1367-1374 (filed June 9, 2008); Docs. 1510-1513, 1515, 1517 (filed July 17, 2008); Docs. 1690-1691 (filed Dec. 22, 2008); Docs. 1888-1890 (filed Nov. 12, 2009); Docs. 1915 (filed Dec. 14, 2009).

**A. The Tennessee Department of Labor and Workforce Development Agency Decision & Settlement Agreements In Tennessee and Massachusetts Demonstrate That FXG Drivers Are Employees, Not Independent Contractors**

The State of Tennessee Department of Labor and Workforce Development determined that, under the Tennessee Employment Security law, FedEx Ground drivers were employees for certain purposes under Tennessee law; FXG appealed. In response to this audit finding, the Department and FedEx Ground entered into a Settlement Agreement, signed on June 2, 2010, resolving the dispute regarding unemployment and workers compensation reporting and tax obligations. Under the settlement agreement, FXG agrees to pay $875,000 to the Department and agrees not to contest unemployment or workers compensation claims on the basis that the drivers are "independent contractors;" while the agreement contains boilerplate non-admission language, it is also expressly conditioned on FedEx's representations that it would change its "operations in Tennessee" to "ensure compliance with the Tennessee Employment Security Law." (Faris Dec., Exh. 1B, at p. 5) (The operational "changes" are represented by the "Tennessee Transition" to FXG's new contract and business model.)

Similarly, FedEx's agreement, in response to an administrative findings that the drivers were employees under Massachusetts law, to pay $3 million to the State of Massachusetts in back payroll taxes, unemployment and workers compensation its pickup and delivery and for awards to thirteen drivers who had filed complaints is also conditioned on FedEx changing its business model and adopting its new and "substantially different" business model, under the "Independent Service Provider Agreement."

Both of these settlement agreements reflect FedEx's abandonment of its current business model and the introduction of its "Independent Service Provider Agreement," including the

simultaneous non-renewal of all Operating Agreements in these states and the refusal of the FXG

to enter into pickup and delivery contracts with drivers who have fewer than three routes, have

not both incorporated and registered with the state in which they provide service and myriad

other requirements relating to the method, manner and means of pickup and delivery work.[3]

**B. FedEx's Recent Announcements Of its "Fundamental Change" From Its Current Business Model To Its "Independent Service Provider" Business Model In Tennessee, Massachusetts, Illinois, Minnesota, Rhode Island, Vermont and Albany, New York Shows That FXG 1) Has Abandoned The OA And Its Existing Business Model In Response To Legitimate Challenges To Its Sham Independent Contractor Model, 2) Controls Every Aspect of The Drivers' Work and 3) Can Terminate or Non-Renew Thousands of Contracts At Will As Part of Its Litigation Strategy**

**1. FXG's Admission That It is Fundamentally Changing Its Model Represents Abandonment Of Its Operating Agreement and Current Relationship Due To Myriad Legitimate Challenges To The Current Model**

On July 15, 2010, in five states (and assorted cities that service those states), FedEx

provided a document introducing its transition to its "Independent Service Provider Model" in

which it expressly states that, ""The ISP model will bring **fundamental changes** to the manner

in which FedEx Ground operates in the state." (Faris Dec., Exh. 3, at p. 7 "What is Different

About the ISP Model?" According to a DVD presentation introducing these "Transitions,"

FXG's Executive Vice President and Chief Operating Officer, Michael Mannion, states:

> **Because of the recent challenges to our independent contractor model in your state,** I have some important news to share with you regarding a **significant change** we are making to the way we do business. Today we are announcing a transition to the independent service provider model for FedEx Ground and FedEx Home Delivery contractors operating P&D work areas in your state. The ISP model is a new contractual relationship patterned after one recently introduced in other states.

---

[3] While this new contract mirrors much in the OA, the key similarity to the old business model is FXG's continuing attempt to foist its legal responsibilities as the drivers' true employer onto the newly-titled ISP yet again. However, since the MDL does not currently involve any cases challenging FedEx Ground's "ISP" contract or relationship and thus, the content of the ISP agreement is not directly relevant to this proceeding. For that reason, Plaintiffs have not offered the "Sample" ISP contracts that were attached to the Transition Guides.

The transition documents in each of the five states (and neighboring cities servicing them) and the Tennessee transition announced a month ago, are substantially the same, except for the deadlines imposed by which the drivers must take certain required actions.  All demonstrate the following facts, which are relevant to Plaintiffs' Motions for Summary Adjudication of Employment Status:

- To continue to as a pickup and delivery driver at FXG, each driver is required to incorporate (no other business form is acceptable) by a date certain, acquire a minimum of three Primary Service Areas within one terminal by a date certain (and avoid exceeding "state guidelines" on maximum number of PSAs ("Q&As" at p. 30 at Q.4)), register with the State in which they provide service, execute forms, including a "Notice of Intent" as to whether the driver intends to attempt to become and ISP, intends to sell his/her route and work for an ISP or intends to "exit the network" and an "Initial Compliance Disclosure Form;"  (pp. 11-12, 19, 28-29)

- All Operating Agreements are non-renewed.  (P. 12)

- All Swing Routes "cease to exist" on a date certain irrespective of contract expiration date.  (P. 31, 11)

- FXG provides payments in return for signing a limited waiver of claims related to the transition and provides between $10,000 and $100,000 in "Growth Incentives" for "acquiring" additional routes and vehicles.

FXG's decision to fundamentally change its business model, re-write its Operating Agreement and create a raft of new requirements to try to create an "independent contractor model" that can pass muster under state laws shows the weakness of its position, maintained in

the current litigation, that its drivers are independent contractors under its existing Operating
Agreement, rather than employees under the various state laws at issue in this case.

### 2. FXG Controls All Aspects Of The Drivers' Work Including The Form the Drivers' "Business" Must Take

By **requiring** that each current pickup and delivery driver acquire two additional routes
in order to continue to provide service and meet a host of other new requirements, FXG is
dictating the most fundamental aspect of the how the drivers provide pickup and delivery
service. This demonstrates that FXG has the right to control the drivers with regard to the
method of their performance and hence the drivers are employees. The Transition document
makes clear that FXG makes key choices that are foisted on the drivers, including whether and
when the drivers change their relationship with FXG. By providing funds to the drivers to
purchase additional routes, FXG is also subsidizing and essentially investing its corporate funds
in the "business" of its drivers, in order to satisfy its own legal obligations. These are not the
actions of an unrelated business, but rather are the actions of an employer with the right to
control all aspects of the relationship.

### 3. FXG Can Terminate Hundred of Drivers At Will -- To Advance Its Litigation Strategy Without Legal Consequence

The Transition documents make clear that FXG has the right to terminate and non-renew
at will. All swing drivers lose their contractual right to provide service on a date set by FXG
irrespective of the expiration date of their contract. All single work area drivers and multiple
work area drivers with two routes who are providing pickup and delivery services become
**ineligible** to even be considered for renewal unless they transform into "ISPs" with three routes.
The right to terminate at will is a key indicia of employment status. Providing the drivers with
the Hobson's choice of investing more money or "exiting" the FXG network is no choice at all

and demonstrates the absolute and complete control FXG has over the so-called businesses of its

current driver workforce, irrespective of whether they are single work area drivers of have a

second route, vehicle and driver.

Because these recent documents are directly relevant to the "right to control" test at issue

in the summary adjudication motions identified above, Plaintiffs' respectfully request that the

court permit them to augment the record with these newly acquired documents.

Dated:  July 19, 2010                    Respectfully submitted,

                                         LEONARD CARDER, LLP

                                         _____/s/ **Lynn Faris**_____
                                         LYNN FARIS, ESQ.
                                         1330 Broadway, Suite 1450
                                         Oakland, CA 94612
                                         Telephone: (510) 272-0169
                                         Fax: (510) 272-0174

Susan E. Ellingstad                      Robert I. Harwood
LOCKRIDGE GRINDAL NAUEN P.L.L.P.         HARWOOD FEFFER LLP
100 Washington Avenue South, Suite 2200  488 Madison Avenue, 8th Floor
Minneapolis, MN  55401                   New York, NY  10022
Tel:    (612) 339-6900                   Tel:    (212) 935-7400
Fax:    (612) 339-0981                   Fax:    (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

```
-------------------------------------------------- )
In re FEDEX GROUND PACKAGE              )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT               )        (MDL 1700)
PRACTICES LITIGATION                   )
-------------------------------------------------- )
THIS DOCUMENT RELATES TO:              )
ALL ACTIONS                            )
-------------------------------------------------- )
```

## CERTIFICATE OF SERVICE

I am a citizen of the United States and am employed in Alameda County.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 1330 Broadway, Suite 1450, Oakland, CA  94612.  I, hereby certify that on **July 19, 2010**, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

1. **PLAINTIFFS' THIRD MOTION TO AUGMENT THE RECORD WITH NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

2. **DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' THIRD MOTION TO AUGMENT THE RECORD WITH NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION**

| | |
|---|---|
| Peter J. Agostino | agostino@aaklaw.com; trybula@aaklaw.com |
| Robert G. Ames | rgames@venable.com |
| George A. Barton | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com |
| Jeffrey A. Bartos | jbartos@geclaw.com |
| Evelyn L. Becker | ebecker@omm.com |
| Kenneth Lee Blalack II | lblalack@omm.com |
| Darcie R. Brault | dbrault@dibandfagan.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J. Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; |
| David M. Cialkowski | dmc@zimmreed.com |
| Jerald R. Cureton | jcureton@curetonclark.com |
| Ginger A. DeGroff | degrofflaw@yahoo.com |
| Robert E. DeRose, II | bderose@bnhmlaw.com; ameige@bnhmlaw.com; egordon@bnhmlaw.com; sbaith@bnhmlaw.com |
| Robin Dean | rdean@omm.com |
| Edward J. Efkeman | eefkeman@fedex.com |

| | |
|---|---|
| Barry S. Fagan | bfagan@dibandfagan.com |
| Lynn Rossman Faris | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; |
| Robert K. Firsten | rfirsten@abbottnicholson.com |
| Edward R. Forman | eforman@marshallandmorrow.com |
| Wood R. Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G. Fox | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com |
| Mark A. Friel | mfriel@stollberne.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S. Garfinkel | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| Michael W. Garrison, Jr. | mgarrison@omm.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Larry A. Golston, Jr. | larry.goldston@beasleyallen.com |
| Eileen S. Goodin | egoodin@bnhmlaw.com |
| Michael Gorby | mgorby@gorbypeters.com |
| Deborah R. Grayson | drgrayson@fuse.net |
| Clayton D. Halunen | halunen@halunenlaw.com |
| Robert K. Handelman | rhandelman@bnhmlaw.com |
| Robert I. Harwood | rharwood@hfesq.com |
| Chris A. Hollinger | chollinger@omm.com |
| Matthew M. Houston | mhouston@hfesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A. Jerman | tjerman@omm.com |
| Victor H. Jih | vjih@omm.com |
| Aparna B. Joshi | ajoshi@omm.com |
| Soye Kim s | kim@geclaw.com |
| Steve D. Larson | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |
| Jordan M. Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com |
| Gary F. Lynch | glynch@carlsonlynch.com |
| John S. Marshall | jmarshall@marshallandmorrow.com |
| Michael G. McGuinness | mmcguinness@omm.com |
| Bruce H. Meizlish | brucelaw@fuse.net |
| Sanford A. Meizlish | smeizlish@bnhmlaw.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Eleanor I. Morton | emorton@leonardcarder.com; aahn@leonardcarder.com |
| James Mulroy, II | mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com |
| Daniel O. Myers | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| Jeffrey S. Nestler | jnestler@omm.com |
| Ian Otto | iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com |
| Peter W. Overs Jr. | povers@hfesq.com |
| Lesley A. Pate | lapate@venable.com |
| Mary Donne Peters | mpeters@gorbypeters.com; mmcgee@gorbypeters.com |

| | |
|---|---|
| Richard T. Phillips | flip@smithphillips.com; tresahharden@smithphillips.com |
| D. Lucetta Pope | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| Nora M. Puckett | npuckett@omm.com |
| Charles Victor Pyle, III | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T. Regan | atr@zimmreed.com; stefanie.hebig@zimmreed.com |
| Beth A. Ross | bross@leonardcarder.com; ksangren@leonardcarder.com; |
| J. Gordon Rudd | jgr@zimmreed.com |
| Robert M. Schwartz | rschwartz@omm.com |
| James A. Staack | jims@staack-firm.com |
| R. Jay Taylor Jr. | jtaylor@scopelitis.com; jwoolley@scopelitis.com |
| Joni M. Thome | thome@halunenlaw.com |
| Matthew T. Tobin | matt@sdtrustco.com; lenandlaura@iw.net |
| Jeffrey A. Trimarchi | jtrimarchi@omm.com |
| Scott Voelz | svoelz@omm.com |
| Mary D. Walsh-Dempsey | mdempsey@omalleylangan.com |
| Michael J. Watton | jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com |
| Peter D. Winebrake | pwinebrake@winebrakelaw.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at Oakland, California, on **July 19, 2010**.

/s/ Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 93:05-MD-527 RM (MDL 1700) CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| _____ THIS DOCUMENT RELATES TO: ALL CASES _____ | ) ) ) ) ) ) ) ) ) ) ) ) | **DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' THIRD MOTION TO AUGMENT THE RECORD WITH NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS** |

I, Lynn Rossman Faris, hereby declare as follows:

1.  I am an attorney licensed to practice law in the State of California and I am a partner in the law firm Leonard Carder, LLP. I am co-lead counsel in this case. I have personal knowledge of the facts set forth below and I could and would testify competently about them if called as a witness in this matter.

2.  Plaintiffs received the following materials on or after June 16, 2010 from FedEx or other sources:

1

- **Exhibit 1**:  The Decision of the Tennessee Department of Labor and Workforce Development, dated February 2, 2010 (produced to Plaintiffs on June 29, 2010) that the drivers of FedEx Ground Package System are employees, not independent contractors (attached separately, filed under seal);

- **Exhibit 2**:  The Settlement Agreement between FedEx Ground Package System Inc. and the Tennessee Department of Labor and Workforce Development, dated June 2, 2010;

- **Exhibit 3**:  The "Tennessee Transition" Announcement (including Huntsville, AL and Olive Branch, MS) and ISP Transition Guide, provide to all Tennessee drivers on June 15, 2010, (as described in the aforesaid Settlement Agreement);

- **Exhibit 4**:  Announcement of Settlement between State of Massachusetts and FedEx Ground, dated July 15, 2010 and Settlement Agreement between them and certain departments within the State of Massachusetts;

- **Exhibit 5**:  The Massachusetts Transition Announcement (including drivers providing service to Massachusetts from FXG terminals in Albany, NY) and ISP Transition Guide, dated July 15, 2010 (and described in the aforesaid Settlement Agreement);

- **Exhibit 6**:  The Rhode Island Transition Announcement, dated July 15, 2010;

- **Exhibit 7**:  The Vermont Transition Announcement and ISP Transition Guide, dated July 15, 2010;

- **Exhibit 8**:  The Illinois Transition Announcement (including drivers providing service in Illinois from FXG terminals in St. Louis, MO; Dubuque, IO; Hammond, IN; and Milwaukee, WI), dated July 15, 2010; and

- **Exhibit 9**: The Minnesota Transition Announcement (including drivers providing service in Minnesota from FXG terminals in Mason City, IO; Spencer, IO; Sioux Falls, SD; La Crosse, WI; Watertown, SD; and Duluth and Superior, WI, dated July 15, 2010.

3.      On July 15, 2010, FedEx produced to the co-lead counsel in this case letters and attachments regarding its imposition, in five states (and some cities providing service in those states), of its new business model.  The materials produced included a document introducing its transition to its "Independent Service Provider Model" in which the company expressly states that, ""The ISP model will bring **fundamental changes** to the manner in which FedEx Ground operates in the state." (Faris Dec., Exh. 3, at p. 7 "What is Different About the ISP Model?" Also including among the materials was a  DVD presentation introducing these "Transitions," in which FXG's Executive Vice President and Chief Operating Officer, Michael Mannion, states:

> **Because of the recent challenges to our independent contractor model in your state,** I have some important news to share with you regarding a **significant change** we are making to the way we do business. Today we are announcing a transition to the independent service provider model for FedEx Ground and FedEx Home Delivery contractors operating P&D work areas in your state.  The ISP model is a new contractual relationship patterned after one recently introduced in other states.

4.      The transition documents in Tennesse and each of the additional five states (and neighboring cities servicing them) are substantially the same, except for the deadlines imposed by which the drivers must take certain required actions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct of my personal knowledge.

Executed on July 19, 2010 at Oakland, California.

<div style="margin-left:40%">

_____/s/  Lynn Rossman Faris_____
Lynn Rossman Faris

</div>

# EXHIBIT 1
# (Sealed Document
# Filed Separately)

# EXHIBIT 2

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into this 2<u>nd</u> day of June 2010 by and between the Tennessee Department of Labor and Workforce Development (the "Department") and FedEx Ground Package System Inc. ("FedEx Ground").

WHEREAS, on February 2, 2010, the Department issued an Agency Decision concluding that individuals that performed package pickup, transportation and delivery services for FedEx Ground during the years 2004 through 2008 should have been considered employees of FedEx Ground and that remuneration for services performed by such workers was taxable for Tennessee unemployment compensation purposes (the "Agency Decision"), and the Department, acting on the basis of the Agency Decision, issued an assessment (the "Assessment");

WHEREAS, on March 3, 2010, FedEx Ground submitted an Application for Review and Redetermination of the Assessment because (1) FedEx Ground maintains that it did correctly classify, and continues to correctly classify, individuals who contract with FedEx Ground to provide package transportation and pick-up and delivery services in Tennessee as independent contractors; and (2) the number of workers at issue, as estimated by the Department, and the amount assessed is far in excess of the amount that would be owed if individuals who contracted with FedEx Ground to provide package transportation and pickup and delivery services in

SETTLEMENT AGREEMENT

Tennessee were classified as employees.

**WHEREAS,** the Department has agreed to withdraw the portion of the Assessment that relates to compensation paid to (1) corporations or other legal entities; and (2) individuals who contract with FedEx Ground to provide linehaul services between FedEx Ground facilities.

**WHEREAS,** the Department and FedEx Ground have agreed to also resolve any potential assessment related to workers' compensation.

**NOW, THEREFORE,** the **DEPARTMENT AND FEDEX GROUND AGREE** to **SETTLE** and **RESOLVE** the pending dispute concerning FedEx Ground's unemployment compensation tax reporting and payment obligations and any potential dispute concerning workers' compensation by entering into this Agreement on the following terms and conditions:

1.    DEFINITIONS. "Drivers" means all individuals who have contracted with FedEx Ground to provide package pickup and delivery services for FedEx Ground in Tennessee (including individuals who provide Home Delivery services).   For the avoidance of doubt, "Drivers" does not include legal entities that contract with FedEx Ground or individuals retained by such entities to perform services.

2.    PURPOSE OF AGREEMENT.  The Department and FedEx Ground agree and intend to resolve the dispute concerning the Assessment without resolving the parties' disagreement concerning the proper classification of individuals who provide package pickup and delivery services to FedEx Ground in Tennessee.  The parties agree

2

that this Agreement is intended to eliminate the expense and uncertainty of litigation, and recognize and agree this Agreement is in settlement and is in no way an admission by FedEx Ground of improper classification of any individuals.

3.   VOLUNTARY PAYMENT OF AMOUNTS RELATED TO PRIOR PERIODS.   Without conceding that the Drivers should have been classified as employees, to settle any potential liability of FedEx Ground for unemployment compensation or workers' compensation taxes, interest, fees and/or other charges arising from compensation paid by FedEx Ground to Drivers and workers retained by Drivers for all periods through and including December 31, 2011, FedEx Ground agrees to pay, and the Department agrees to accept, $875,000.00.   This payment, which will be made within forty (40) days of the date on which this Agreement is fully executed, will serve to resolve all claims, including the Assessment, the Department has asserted, or could assert, against either FedEx Ground or any Driver for unemployment compensation or workers compensation taxes, interest, fees and/or other charges due for periods ending on or before December 31, 2011.   The Department will allocate $400,000 of the payment to unemployment insurance taxes, $300,000 to interest on unpaid unemployment insurance taxes, and $175,000 to workers' compensation.   If the payment is received by the Department on or before June 30, 2010, $400,000 will be applied to FedEx Ground's account for the purpose of computing the unemployment insurance tax rate that will go into effect on July 1, 2010.

4.   BENEFITS CLAIMS.   So long as this Agreement remains in effect, FedEx

3

Ground agrees that it will not contest a claim for Tennessee unemployment or workers' compensation benefits filed by any Driver or by any worker retained by a Driver on the basis that the Driver was an independent contractor and not an employee. In the event a Driver files a claim asserting base year "wages" paid prior to April 1, 2011, FedEx Ground will cooperate with the Department's wage investigation., The Department will not assert that any decision with respect to a claim for unemployment or workers' compensation benefits issued with respect to any such Driver or worker retained by a Driver will be binding on FedEx Ground with respect to the question of whether other Drivers or workers retained by Drivers are employees of FedEx Ground. FedEx Ground expressly retains the right to contest a claim for unemployment benefits or workers' compensation by a Driver or worker retained by a Driver on any other ground, and any failure to contest a claim shall not be deemed for any purpose as an admission that such Driver or worker retained by a Driver was an employee of FedEx Ground and not an independent contractor (with respect to a claim filed by a Driver) or an employee of a Driver (with respect to a claim filed by a worker retained by a Driver).

     5.    <u>NO ADMISSION OF LIABILITY OR WAIVER OF DEFENSES</u>. The Department and FedEx Ground agree that nothing in this Agreement shall operate as an admission of liability, or non-liability, or shall constitute a waiver of any position or defense, or admission of any facts that may be raised by either the Department or FedEx Ground in any future proceeding. So long as this Agreement remains in effect, the Department will not consider FedEx Ground to be misclassifying Drivers or workers

<div align="center">4</div>

retained by Drivers for purposes of Tennessee law provided FedEx Ground maintains compliance with all terms and conditions of this Agreement.

6.     DURATION OF AGREEMENT AND AGREEMENT TO MEET AND CONFER. This Agreement will remain in effect until December 31, 2011. However, FedEx Ground and the Department agree to meet no later than September 30, 2011, to review progress and to discuss whether this Agreement should be extended beyond December 31, 2011. For the duration of this Agreement, at the request of either party, the parties agree to meet and discuss any issues that may arise under this Agreement.

7.     FUTURE COMPLIANCE.   FedEx Ground has advised the Department that it is considering implementing changes to its operations in Tennessee as outlined in Exhibit A attached to this Agreement.  The Department acknowledges that these potential changes are intended to ensure compliance with the Tennessee Employment Security Law and, absent a change in the law, the corporate entities with which FedEx Ground would contract if the described changes were implemented would be considered to be employing units under the Tennessee Employment Security Law and agrees to provide written guidance to that effect if requested by FedEx Ground.

8.     NOTICE.   Any notice required to be given by this Agreement shall be given in writing, by mail, fax or email, to the following:

To the Department:

Daniel A. Bailey
General Counsel
Workforce Development

5

220 French Landing Drive
Nashville, TN 37243
615.741.9550
Daniel.A.Bailey@.tn.gov

To FedEx Ground:

Richard G. Murphy, Jr.
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202.383.0635
Facsimile: 202.637.3593
rick.murphy@sutherland.com

and

Vice President of Legal – Tax
FedEx Corporation
942 South Shady Grove Road
Memphis, TN 38120
Facsimile: 901.818.7449

and

General Counsel
FedEx Ground Package System, Inc.
1000 FedEx Drive
Moon Township, PA 15108
Facsimile: 412.262.7344

9.     MERGER CLAUSE.  This Agreement contains the entire agreement

between the parties hereto with respect to the subject matter hereof, and supersedes all

prior agreements and negotiations relating to the subject matter hereof.  There are no

6

understandings, promises, or agreements, express or implied, other than those set out in this Agreement.

10.    MODIFICATION ONLY IN WRITING. This Agreement may be amended, modified or waived only by a written instrument executed and agreed to by all parties hereto.

11.    EXECUTION IN COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement.

12.    CONFIDENTIALITY.    The Department agrees to maintain the confidentiality of the terms of this Settlement Agreement, except to the extent disclosure is required by law. If disclosure is required by law, the Department agrees to give three (3) business days notice via facsimile transmission to FedEx Ground before making such disclosure.

DATED as of the 2nd day of June, 2010.

Tennessee Department of Labor and
Workforce Development

By: _James G. Neeley_____
    James G. Neeley, Commissioner

FedEx Ground Package System, Inc.

By: _Robert L. Brown, Jr._____
    Assistant Treasurer

7

EXHIBIT A TO SETTLEMENT AGREEMENT

Key points of Potential Changes to the Model

1.  FedEx Ground would contract with only incorporated entities, registered to do business in the State of Tennessee and registered with the Tennessee Department of Labor and Workforce Development (the "Department") as employing units under the Tennessee Employment Security Law. As a condition of each corporation's contract with FedEx Ground, it must confirm annually that it has fulfilled its unemployment tax reporting obligations.

2.  Each corporation would agree to provide services in a substantial geographic area that would require the contractor to own or lease multiple vehicles and employ multiple workers. The corporation would be responsible for the pick-up and delivery of all packages within the given geographic area, subject to certain pick-ups and deliveries that the corporation can contractually decline to perform. In all circumstances, the corporation determines how to achieve the contracted-for result.

3.  Each corporation would have a significant opportunity for profit and loss. The corporation would be responsible for all significant business decisions, including the selection and training of its workforce, the acquisition and maintenance of its equipment, and expenses necessary to handle surges in daily package volume, which can be significant.

4.  Key financial elements and the term of the agreement would be negotiable between FedEx Ground and the corporation.

5.  Each corporation can choose whether to have the corporation's workers wear a FedEx Ground uniform and whether to have the corporation's vehicles display large FedEx Ground logos. The corporations that elect to have their workforces wear a uniform and drive vehicles with FedEx Ground logos can negotiate with FedEx Ground to receive a fee in exchange for this election. In any event, all vehicles will comply with the U.S. Department of Transportation's requirement that vehicles be identified as operating under FedEx Ground's operating authority when FedEx Ground packages are on board.

6.  The corporation would be free, subject to any regulatory constraints, to operate other businesses.

9108263.1

# EXHIBIT 3

# O'MELVENY & MYERS LLP

CENTURY CITY

IRVINE SPECTRUM

NEWPORT BEACH

NEW YORK

SAN FRANCISCO

SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER

WASHINGTON, D.C.

HONG KONG

LONDON

SHANGHAI

TOKYO

OUR FILE NUMBER
259,075-208

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

June 17, 2010

**VIA HAND DELIVERY**

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re:  *FedEx Ground Package System, Inc. Employment Practices Litig.*; No.
     *3:05-MD-527-RM (MDL 1700) (N.D. Ind)*

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On June 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (Independent Service Provider Model or "ISP") in Tennessee. As part of that announcement, FedEx Ground is offering an ISP transition incentive to each Tennessee contractor, provided the contractor signs a limited release with respect to the transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground provided today to its Tennessee-based contractors listed in the attachment to this letter:

1.  Tennessee Transition Information;

2.  Questions & Answers Regarding the Tennessee Transition;

3.  Sample Contractor Limited Release and Operating Agreement Modification

4.  Illustrative ISP Agreements;

5.  DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement.

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  June 17, 2010 - Page 2

     This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Smith v. FedEx Ground Package Sys.*, Civil No. 3:05-CV-600-RLM-CAN (TN), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), and/or *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

     Thank you for your time and attention.

                         Very truly yours,

                         Matthew P. Eastus
                         for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq. June 17, 2010 - Page 3

| | |
|---|---|
| Akoto, Nelson Kofi | Chupp, Chaz Braden |
| Allison, Rodney L. | Clark, Jason |
| Anderson, Christopher | Clifton, David |
| Anderson, Christopher Lee | Clifton, William Steve |
| Anderson, Matthew | Cline, Jeffrey Dwayne |
| Apodaca, James | Cole Sr., Roger Allen |
| Armstrong, Frederick Jermaine | Compton, Brian |
| Bailey, Sheryl Lynn | Cothron, Lon Allen |
| Barber, Steven | Cravens, Jaimie |
| Bazemore, Phillip Allan | Cruz, James |
| Bean, Bradley | Delaney, Andrew J. |
| Beard, Lacy Lee | Dent, Rodney |
| Beasley, Charles E. | Dickens, Charles |
| Beck, John | Dixon, Jonathan R. |
| Bell, Deborah Jerome | Doane, Raymond Keith |
| Bernard, Roger F. | Dotson, Joel |
| Billington, Philip S. | Dreher, Scott |
| Bishop, Roy | Ellis III, Oscar Leo |
| Bishop, Wayne Thomas | Ellis, Bruce Lee |
| Bloomfield, Greg | Ensey, David W. |
| Bonner, Mark | Evans, Amanda Joyce |
| Brandon, Phillip Jay | Farrell, Ronald |
| Breedlove, Gary | Fletcher, Dale A. |
| Brewer, Colby Burke | Ford, James Keith |
| Brewer, Kevin D. | Garrett, Darrell Ray |
| Brodowsky, Barry Steven | Gibson, Jason Douglas |
| Brown, Nathan | Glasco, Michael D. |
| Brown, Wesley Eric | Goins, Hobert Dwight |
| Brownlee, Ralph | Golden, Brandon Dewayne |
| Bryant, Donte Lamar | Goodman, Johnny |
| Buchanan, Robert | Goodwin, Brian Gordon |
| Bull, Robert L. | Griffin, Jason Timothy |
| Burchell, Gene | Gulley, Anthony |
| Butterbaugh, Brion K. | Guy Jr., Johnny Lee |
| Call, Robert W. | Hall, John Richard |
| Cartwright, William Paul | Halloran, Ashley Eugene |
| Castleberry, Chad Edward | Hamilton, Cecil |
| Catron, Michael | Hamilton, Sam |
| Chandler, Kimberly Dawn | Haney, Kenneth Eric |

| | |
|---|---|
| Chestnutt, Paul C. | Hargrove, Jerry Dean |
| Choate, John Brian | Lejeune, Jeffrey Dean |
| Harold, Casey Dean | Lemmings, Emily |
| Harris, Tamatha Susan | Lenzen, Michael Dean |
| Hart, Henry Edward | Leonnig, Glenn |
| Harvell, Emmett | Leturmy, Gary Louis |
| Hatfield, Artie | Lomenick, William Gary |
| Hayes, Stephen Michael | Lopez, Carlo Suria |
| Headrick, David A. | Luther, Sheila Paschall |
| Hendrix, Jerry | Malsy, Kristie Lynn |
| Herren, Martin Kyle | Martin, Brandy R. |
| Hickman, Lester Edward | Masyan, Robert Henry |
| Hill, Benjamin Larry | McCann, Phillip Alan |
| Hill, Chris Ray | McConnell III, Thomas Grant |
| Hill, Jeremiah | McCrea, John Ewing |
| Hillard, David | McDaniel, Robert Brannon |
| Hodgson, Brian | McGee, Robert |
| Holman, Kim | McKinney, Chris |
| Holmes Jr., Charles | McReynolds, Jason C. |
| Hopkins, John M. | Meredith, Teresa P. |
| Howell, David | Miller, Brian Keith |
| Hughes, Carole Ann | Montgomery, Kevin C. |
| Hughes, Ronald | Moore, Cedrick |
| Hughes, Timothy G. | Moore, Jeff |
| Hull, Joseph L. | Moore, Sallie |
| Hutcheson, Sam C. | Morgan, Jeffrey Wayne |
| Ingle, Nicholas | Mowry, Bryan |
| Jackson, Jim Ethon | Mowry, Mike Alan |
| Jamison, Danielle | Mullins, Aaron |
| Jeffries, Paul Eugene | Nichols, Gary Staley |
| Jester, Ronald | Niggl, Brian Keith |
| Johnson Jr., Mark Steven | Nolan, Kenneth Wayne |
| Johnston, Nathan | Norful, Lewie |
| Jones, Edward Scott Terry | Norris, William |
| King, Carey Michael | O'Quinn, Bobby |
| Kriminger, Darrell | Osadzinski, Frank |
| Lafever, David Lee | Palmer, Mark F. |
| Larson, Siri Suzanne | Palmer, Tony |
| Larue, Scottie Jo | Patty, Bryan |
| Lawrence, James | Peace, Sherry Lynn |

| | |
|---|---|
| Lawrence, Joel M. | Peele, Jeffrey Lawrence |
| Lawson, Timothy T. | Pell Jr., Donnie Warren |
| Lefever, Chad | Shearon, Mark |
| Pendergerass, Dennis C. | Sheehan, James |
| Perry, Timothy Wayne | Sierra, Pedro |
| Peters, Jeremy | Sills, Christopher Lynn |
| Pharris, Troy | Simpson, George H. |
| Phillips, Jacob Tyler | Slater, Eric |
| Pierce, James | Smith Jr., Richard Lawrence |
| Pitman, Jason | Smith, Brandon |
| Plunk, Greg | Smith, Gregory Allen |
| Poteete III, Andrew Crusoe | Smith, Joshua Andrew |
| Potts, Dorris E. | Smithson, Bill |
| Rampaul, Timothy Dale | South, Stephen Eric |
| Ray, Brenton Keith | Spencer, MacArthur M. |
| Ray, Joel Dewayne | Spivey, Jeremy Wayne |
| Ray, Ronald | Sprinkles, Andrew |
| Reed, Robert L. | Stanley, Clifford Eugene |
| Reed, Robert Lee | Steelman, Chad Michael |
| Reeves, Robert | Stephens, Jacob Douglas |
| Rehberg, Gary | Stohr, Kurtis A. |
| Richie, Randy | Stone, Mark Matthew |
| Ridings, Jeffrey Scott | Stout, Frank Edward |
| Riggs, Jeremiah Robert | Stout, Frankin Shea |
| Ritchie, James David | Stripling, Scott Sterling |
| Ritter, Larry | Sturm, Jonathan Lance |
| Roberts, Stephen David | Swann, Chris D. |
| Rodriguez, Juan Jose | Sykes, Terry |
| Rogers, Roy Micheal | Tamboli, Donald |
| Rogers, Terry | Taylor, Anthony Arron |
| Russell, Michael Cory | Taylor, Durwin |
| Sabo, Joseph George | Thomas, Christopher Dion |
| Salansky, Jeffrey Ted | Thomas, Jerry Glenn |
| Sampson, Anita Rose | Vaughn, Charles R. |
| Sanders Jr., Jefferson Devon | Vaughn, Shane |
| Sanford, Billy Noel | Wachsmuth, Bryan Keith |
| Schoonover, Greg | Walker, Joe |
| Scott, Earl | Walker, Richard Brent |
| Scott, Quincy | Wall, Todd E. |
| Seay, Charles Jeffrey | Wallace, Tony Michael |

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.   June 17, 2010 - Page 6

| | |
|---|---|
| Sebring, Terry R. | Waller, Jason Harlan |
| Seghers, Kerry | Waller, Paul |
| Seiber, Chad | Wanamaker, David Richard |
| Seigenthaler, Robert Steven | Warfield, David |
| Sells, Michael Terry | |
| Warren, Trinia Ann | |
| Washington, Karla Michelle | |
| Watkins, Benjamin Edward | |
| Waugh Sr., Dustin Wesley | |
| Webster III, Robert Thomas | |
| Westmoreland, Jason Edward | |
| Widener, Rick | |
| Wiesner, Rebecca Marie | |
| Williams Jr., Herbert | |
| Winnie, Gary D. | |
| Woodard, Glen Edward | |
| Wright, Mickey | |
| Wyatt, Robert Wesley | |

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-208

June 17, 2010

**VIA HAND DELIVERY**

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re:     *FedEx Ground Package System, Inc. Employment Practices Litig.*; No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind)

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On June 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Olive Branch, Mississippi co-location, which provides service to Tennessee. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Olive Branch contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Olive Branch-based contractors listed in the attachment to this letter:

1.      Olive Branch Transition Information;

2.      Questions & Answers Regarding the Olive Branch Transition;

3.      Sample Contractor Limited Release and Operating Agreement Modification

4.      Illustrative ISP Agreements;

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq. June 17, 2010 - Page 2

5.    DVD from FedEx Ground Executive Vice President and COO Michael
      Mannion, concerning the announcement.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Fleming v. FedEx Ground Package Sys.*, Civil No. 3:05-CV-593-RLM-CAN (MS), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), and/or *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  June 17, 2010 - Page 3

| | |
|---|---|
| Andreas, Craig, Stephen | Humphrey, Herbert |
| Barrett, L. Wayne | Mabone, Mitchell |
| Bolen, Marvin Quay | McCollum, Dale M. |
| Bolen, Renita Lynn | Mulins, William Kendall |
| Chandler Jr., Marvin | Poe, James |
| Deegan, James Michael | Potts, Kenneth |
| Dorse, Wallace | Samples Jr., Tommy Wayne |
| Forkum, Aaron | Umphries, Horace Rick |
| Gladney, Michael | Whalen III, Daniel |
| Hawkins, Kevin | Wilson, Wontina Tajuan |
| Hill, John David | Wylie, Brandon Michael |

LA3:1167283.3

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-208

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

June 17, 2010

## VIA HAND DELIVERY

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

> Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.; No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind)***

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On June 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Huntsville, Alabama facilities with regard to contractors who provide service to Tennessee. As part of that announcement, FedEx Ground is offering an ISP transition incentive to some Huntsville contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Huntsville-based contractors listed in the attachment to this letter:

1. Huntsville Transition Information;

2. Questions & Answers Regarding the Huntsville Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. Illustrative ISP Agreements;

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  June 17, 2010 - Page 2

5.   DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Floyd v. FedEx Ground Package Sys.*, Civil No. 3:06-CV-428-RLM-CAN (AL), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), and/or *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

Enclosures

cc:   Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  June 17, 2010 - Page 3

| Blackwell, Scottie Lynn |
| Dew, Palmer |
| Gambill, Charles Randall |
| Gilley, Robert |
| Guthrie, Phillip |
| Henry, Alan Michael |
| Meeks, Johnny |
| Pirtle, Brian |
| Reagan, Jr., James Edwin |
| Wallace, Michael |
| Whisante, Roger |

LA3:1167285.3

# Tennessee
# ISP Transition Guide

Tennessee

**David F. Rebholz**
*President and Chief Executive Officer*

1000 FedEx Drive
Pittsburgh, PA  15108

Telephone 412.269.1000
Fax 412.859.5687


Ground

A letter from the President:

As a result of discussions with the state of Tennessee, FedEx Ground has made the decision to transition to the Independent Service Provider (ISP) Model in Tennessee and in those stations that provide service to Tennessee. This change applies to all P&D contractors domiciled in Tennessee and all contractors domiciled in Olive Branch, Mississippi co-location as well as those P&D contractors domiciled in the Huntsville, Alabama Ground and Home Delivery stations with primary service areas that provide service in Tennessee. Linehaul contractors are not affected by this announcement.

This transition is an important step in meeting the needs of contractors, our customers and the Company in the state of Tennessee and will ensure that P&D contractors will continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

This announcement to transition to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. Also, the 180-day contract extension previously offered to contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 remains available.

Although the incentive and incorporation timelines associated with the May 20 announcement no longer apply, all affected contractors will receive the $750 early adoption incentive. This $750 payment is a good-will gesture on the part of the company and will be paid to all affected contractors, regardless of whether they incorporate or pursue ISP candidacy. As linehaul contractors are not affected by this ISP transition, the May 20, 2010 announcement still applies to them.

As with New Hampshire and Maryland, the transition to the ISP Model will involve important decisions and actions on the part of all affected P&D contractors. To facilitate the transition, FedEx Ground is offering eligible contractors various options, ample time to consider them and financial incentives, which are discussed in the Transition Guide and will be further explained in additional communications.

The senior manager of your station will review all the pertinent details of the transition and ensure you receive the information you need throughout this process to make the best decisions for you and your business. I encourage you to thoroughly review the contents of the attached ISP Transition Guide with your legal and/or business advisors and to keep it on hand throughout the transition as a ready resource.

I am confident this is the most prudent course of action for our operations in these states. Many contractors have already successfully transitioned their businesses to the ISP Model in New Hampshire and Maryland. Based on our experiences in these two states, I believe the transition to the ISP Model in Tennessee will be equally successful.

We look forward to working with each contractor throughout this transition. There will be much more communication and opportunity for discussion as we begin to navigate this change together.

*Dave F. Rebholz*

Dave Rebholz
President and CEO

Tennessee

3

Tennessee

4

## What is the ISP Model?

The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent businesses that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs). In these states, FedEx Ground and ISPs enter into ISP Agreements, rather than the current Operating Agreement ("OA").

Under an ISP Agreement, ISPs agree to provide service within typically larger geographic service areas called Contracted Service Areas (CSAs). ISPs manage all aspects of the pick-up and delivery of packages within a CSA.

Under the ISP Model, ISPs negotiate a range of financial and non-financial terms on a multi-year basis according to the unique needs of the business and CSA. For example, ISPs have the ability to negotiate a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase.

The ISP Model is appealing to entrepreneurs wanting to focus on the management and administrative responsibilities of running a sizable pick-up and delivery company, and wanting to oversee significant business responsibilities that may lead to profitable growth opportunities.

### FedEx Ground Independent Service Provider Responsibilities

Under an ISP Agreement, an ISP agrees to provide pick-up and delivery services through its employees. ISPs have the flexibility to conduct business operations and make all decisions related to vehicles, service areas, staffing and scheduling. These include the following:

**Vehicles**
- Choosing vehicles that best fit an ISP's unique operations, with FedEx Ground only establishing minimum standards for vehicles
- Incurring the costs of operating vehicles, including maintenance, repairs, fuel, tolls, taxes, registration fees and licenses
- Complying with the U.S. Department of Transportation (DOT) requirements for ISP employee-drivers since ISPs operate under FedEx Ground's DOT operating authority

**Contracted Service Areas (CSA)**
- Negotiating terms for the CSA, which provides the ISP with exclusive service rights
- Deciding how best to provide service over the CSA

**Staffing**
- Managing a team of ISP employee-drivers and potentially other workers (such as a Key Contact or helper) to perform the work
- Assigning work and determining when and on what terms it will be completed
- Supervising employees
- Recruiting and training staff
- Determining compensation and benefits for employees
- Complying with all state and federal employment laws

**Scheduling**
- Establishing work, leave and vacation schedules for all ISP employees

**Business Operations**
- Deciding whether to expand the business by acquiring additional CSAs
- Incorporating (and not operating in some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), or similar entity), unless already incorporated
- Registering as a corporation in good standing and as an employer in the states in which the ISP does business. Note: If a contractor has previously incorporated, then that corporate entity likely has already registered in at least one state, but proof of current registration and good standing will nevertheless need to be shown. Contractors should consult their own legal, financial or tax advisors to determine if they need to be registered in any additional states.

**ISP Agreement**

Central to the ISP Model is an ISP Agreement, which is a legally-binding contract by which ISP Candidates (businesses seeking to enter into an ISP Agreement) have the opportunity to define their unique business relationship with FedEx Ground. An ISP Agreement outlines the service-level results expected and regulatory compliance requirements that ISPs have agreed to meet during the Negotiations Process for the term of the ISP Agreement.

The following represents a list of some, though not all, of the financial and non-financial terms and elections that may be negotiated in an ISP Agreement:

**Key Financial Terms**
- **Annual Service Charge** — A fixed charge paid weekly to an ISP for providing service to FedEx Ground
- **Stop Charge** — A charge paid to an ISP for each stop to a customer location where a package is picked up or delivered
- **Per Stop Fuel Surcharge** – A surcharge, indexed to the price of fuel, paid for each daily stop where a package is picked up or delivered
- **Surge Stop Charge** – A charge paid for any stop above the negotiated "Daily Stop Threshold"
- **Package Charge** — A charge paid to an ISP for each package that is picked up or delivered when an ISP makes a stop
- **Period Safety Incentive** — An incentive paid to an ISP following a 4-week Safety Period. The payment amount is based on a ratio of the number of preventable accidents during the Safety Period and the total number of vehicles the ISP utilizes during that period. If a preventable accident is recorded during a period, the incentive payment for the involved vehicle for that period, plus the next two periods (for a total of 3 periods), is affected
- **New Account Start-Up** ('Meet-and-Greet') — A fee paid to an ISP for an initial visit to a new customer that has been arranged by FedEx Ground
- **Spotted Trailer Charges** — A charge paid to an ISP for providing "Spotted Trailer" service at a customer's request

**Key Non-Financial Terms**
- **Length of Agreement** — The length of an ISP Agreement typically will be between three to five years, but an ISP Candidate may propose a shorter or longer term for its ISP Agreement
- **Expiration Date** — The end date of the ISP Agreement, as determined by the negotiated length of term
- **Number of Load Positions by Year** — A fixed number of dedicated load positions that will be available each year in the ISP's associated station
- **Daily Stop Threshold** — The number of combined pick-up and delivery stops, above which the Surge Stop Charge is triggered and the ISP is able to invoke the Right to Decline

**Elections**
- **Equipment Registration** — ISP Candidates may elect to register certain equipment in FedEx Ground's name under the International Registration Plan (IRP) for base plates
- **Customer Service Incentive** – A negotiable incentive paid to an ISP. The final amount of the payment is based on the ISPs customer service record during the 4-week reporting period
- **Periodic Maintenance Schedule** — ISP Candidates may elect to use the manufacturers' Periodic Maintenance Schedule or elect an alternative Periodic Maintenance Schedule

Tennessee                                                                                                      6

- **Fuel Tax Reporting** — ISP Candidates may elect to have FedEx Ground report and pay its fuel tax liability on the ISP's behalf
- **Facilitated Insurance Coverage** — ISP Candidates may elect to have FedEx Ground facilitate the procurement of required insurance for the ISP and pay the premiums on the ISP's behalf
- **Brand Promotion Programs** — A fee paid by FedEx Ground if an ISP elects to have its ISP employee-drivers or employee-helpers wear FedEx Ground-approved uniforms and/or have some or all of its vehicles display FedEx Ground approved logos; the fee is paid weekly by FedEx Ground to the ISP
- **Arbitration** — If an ISP elects the arbitration provision of the ISP Agreement, FedEx Ground will pay all arbitrator costs and court reporter fees associated with the arbitration hearing subject to future allocation

### ISP Agreement Negotiations

The ISP Agreement Negotiations Process provides each ISP Candidate the opportunity to negotiate an ISP Agreement with FedEx Ground for a specific CSA.

During negotiations, ISP Candidates have the ability to define their unique business relationship with FedEx Ground. Depending on the ISP Candidate's business needs and desires, an ISP Candidate may choose to pursue an agreement with a higher contract fee to achieve a higher percentage of fixed income. Alternatively, an ISP Candidate may want to pursue higher package or stop rates to increase variable income potential if volumes increase. Individualized negotiations will allow each ISP Candidate to pursue an agreement that is best suited for its business.

ISP Agreement negotiations are conducted electronically, and by phone, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals.

### What is Different About the ISP Model?

The ISP Model will bring fundamental changes to the manner in which FedEx Ground operates in the state. There will be changes made to the definition of service areas, the structure of the working relationship between FedEx Ground and independent business owners, and the manner in which contractual agreements are reached with independent businesses to provide pick-up and delivery services.

The following provides an overview of these changes and a preview of the decisions contractors must make during the transition.

### The ISP – FedEx Ground Relationship

Under the ISP Model, FedEx Ground will contract through a negotiated ISP Agreement with only larger businesses that operate as corporations and not some other form of business, such as a LLP, LLC, or similar entity.

Once the ISP Model is in place, FedEx Ground generally will limit its dealings to the individual selected by an ISP to represent the ISP, known as the "ISP Key Contact." The ISP Key Contact alone will deal with FedEx Ground and receive all written and verbal communication from FedEx Ground, except in limited circumstances. The ISP Key Contact then deals with ISP employees, including drivers and helpers, as the ISP Key Contact deems appropriate.

### Contracted Service Areas

A significant change under the ISP Model is the elimination of traditional PSAs in favor of larger geographic service areas – or CSAs. A CSA may comprise any combination of at least three Ground and/or Home Delivery PSAs in a single station. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location. While a CSA may include non-contiguous (non-adjoining) work areas, a higher level of operational efficiency will likely be achieved through contiguous work areas.

Tennessee

**Existing Operating Model
of a Contractor's Separate PSAs**

**Tennessee Model of an
Independent Service Provider's CSA**





CSAs will be defined as the combination of the PSAs operated by the ISP Candidate at the time negotiations begin. FedEx Ground PSAs are defined by Addendum 4 of the Ground OA and FedEx Home Delivery PSAs are defined by the proprietary ZIP Code listed in Addendum 4 of the Home Delivery OA. FedEx Ground will work with Home Delivery contractors to allocate non-proprietary areas based on data in the Home Delivery Vehicle Route Planning (VRP) PC. The ISP Agreement Addendum 4 will list entire ZIP Codes that are complete within a single CSA, as well as details of street address ranges where a ZIP Code is split among multiple CSAs.

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. FedEx Ground may seek multiple bids for the same CSA only in the event that the ISP Candidate's and FedEx Ground's negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

Once a negotiated ISP Agreement is signed, an ISP may trade or sell portions of its CSA, such as ZIP Codes, for the remaining term of the ISP Agreement, subject to the terms of the ISP Agreement. Additional negotiations may occur during the term of an ISP Agreement based on mutual agreement between FedEx Ground and the ISP. Changes to the CSA are one of the limited scenarios under which negotiations may occur. Modifications to a CSA will be documented on a schedule in the ISP Agreement. As an alternative, two ISPs can informally agree to sub-contract P&D work in the respective CSAs. However, the ISP that originally contracted for the P&D work will ultimately remain responsible for that work.

<u>Notable Provisions of an ISP Agreement</u>

There are many provisions that are different from the existing OA. Some of the notable provisions as follows:

**Right to Decline** – The contractual right to decline certain requests, such as delayed-sort packages, pick-ups after 6:30 P.M. and stops above the negotiated Daily Stop Threshold.

**Service Expectations** – ISPs will maintain service levels agreed to in the ISP Agreement such as: service days, pick-up and delivery services, collection and return of COD charges; service results (meet customer expectations, achieve inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher, avoid theft, loss, damage and delays, and conduct all business with honesty and integrity).

**Flexing** -- FedEx Ground will not offer company-coordinated flexing, meaning ISPs will need to ensure resources are in place to handle surges and variances in daily package volumes (such as Peak), whether by sub-contracting with other ISPs or by other means.

## Other Notable Provisions

**Vehicles** – An ISP Agreement will require only that ISP vehicles meet government requirements, be white, have a height that is flush with conveyor walkways in the station, be of a size that allows for the station doors to close and maneuverability in the station.

**Service Account** – An ISP Agreement will not provide for a service account. Contractors will be paid the balance of their service accounts when the current OA expires or is terminated by agreement.

**Escrow** – FedEx Ground will discontinue the Escrow Program.

**Business Support Package** – FedEx Ground will discontinue the Business Support Package. ISPs will be able to select business support services from any provider.

**Scanners** – Scanners may be leased from FedEx Ground or leased or purchased from an outside provider.

**Additional details can be found in the Illustrative ISP Agreements**

## Illustrative Examples

Given the range of negotiable features contained in an ISP Agreement, and the differences from the existing OA, FedEx Ground is providing illustrative examples of the components of the ISP Agreement. The chart below sets forth **hypothetical** scenarios illustrating the significant flexibility ISP Candidates have in negotiating an ISP Agreement. For example, many revenue components are negotiable. The chart provided illustrates hypothetical revenue scenarios different ISP Candidates might negotiate in an ISP Agreement, such as Stop Charge, Package Charge and Surge Stop Charge.

In these hypothetical scenarios, some ISP Candidates elect to participate in the Optional Brand Promotion Programs, which includes the uniform program for ISP employee-drivers or employee-helpers and the vehicle program for some or all of the ISP's vehicles. In "Scenario 1," the ISP Candidate declines to participate in the Uniform Brand Promotion Program. The illustrative scenarios also reflect how ISP Candidates can negotiate a fee to be paid each time a "Meet-and-Greet" is performed with prospective new customers within the ISP's CSA.

Also, the chart illustrates a hypothetical range of business expenses such as employee wages and benefits, staffing and overtime expectations, vehicle choices and other needs, all of which are determined by the ISP Candidate. Actual costs and potential revenue will depend on how a particular ISP structures and operates its business.

As illustrated by the following chart, the **potential** for greater profit exists depending on an ISP's individualized revenue and cost decisions. The chart sets forth **potential** ranges of revenue, costs and hypothetical earnings that might result based on the characteristics of an ISP's CSA and individualized business decisions.

*The chart is for illustrative purposes only and should not set the terms of negotiation between ISP Candidates and FedEx Ground. The chart does not promise any particular range of outcomes.*

Tennessee

9

> **NOTE:** Please refer to the **Illustrative ISP Agreements** to see how the scenarios shown here might correspond with an actual ISP Agreement.

| | | Scenario 1 Low | Scenario 1 High | Scenario 2 Low | Scenario 2 High | Scenario 3 Low | Scenario 3 High |
|---|---|---|---|---|---|---|---|
| **Daily Route Dynamics** | Stops | 255 - 580 | | 450 - 900 | | 560 - 1800 | |
| | Stop Surge Threshold | 400 - 800 | | 500 - 1000 | | 1000 - 2000 | |
| | Packages | 750 - 1400 | | 1450 - 2220 | | 1575 - 2600 | |
| **Business Resources** | Vehicles | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Drivers | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Helpers | 0 | | 0 - 1 | | 0 - 1 | |
| **Key ISP Agreement Terms** | Annual Service Charge | $23K - $ 45K | | $35K - $40K | | $94K - $120K | |
| | Stop Charge | $1.24 - $2.85 | | $1.65 - $2.62 | | $1.43 - $2.60 | |
| | Per-stop Fuel Surcharge | $0.25 - $0.27 | | $0.24 - $0.25 | | $0.11 - $0.15 | |
| | Surge Stop Charge | $0.50 - $1.50 | | $0.49 - $1.48 | | $0.50 - $1.89 | |
| | Package Charge | $.05 - $0.15 | | $0.05 - $0.15 | | $0.10 - $0.15 | |
| | Period Safety Incentive | $2330 - $3160 | | $2700 - $2800 | | $3960 - $5250 | |
| | Period Customer Service Incentive | $710 - $1,803 | | $1,156 - $2,798 | | $1,623 - $3,676 | |
| | New Account Start-Up | $8.00 - $10.00 | | $10.00 - $14.00 | | $8.00 - $12.00 | |
| | Uniform Brand Promotion (Weekly) | $0.00 | | $54 - $103 | | $69 - $264 | |
| | Vehicle Brand Promotion Charge[5] (Weekly) | $32 - $56 (All vehicles) | | $32 - $56 (3 to 4 vehicles) | | $32 - $56 (6 to 7 vehicles) | |
| **Revenue** | Revenue | $280K - $401K | | $462K - $675K | | $628K - $852K | |
| **Costs** | Employee Expenses and Benefits[1] | $152K - $213K | | $252K - $349K | | $354K - $465K | |
| | Vehicles[2] | $52K - $69K | | $86K - $103K | | $121K - $138K | |
| | Payroll Taxes[3] | $20K - $29K | | $34K - $48K | | $48K - $64K | |
| | Administration[4] | $6.5K - $8.5K | | $11K - $13K | | $15K - $17K | |
| **Hypothetical Pre-Tax Operating Income[6]** | | $49K - $81K | | $79K - $162K | | $90K - $168K | |
| **Hypothetical Pre-Tax Operating Margin** | | 12% - 29% | | 12% - 35% | | 11% - 27% | |

1) These costs could include payroll expenses and similar employee expenses such as wages, healthcare benefits, paid sick leave and vacation.
2) These costs could include vehicle purchase or lease payments, maintenance, insurance, and fuel, and will vary based on, for example, the number and types of vehicles ISPs choose to operate.
3) Includes workers compensation, unemployment insurance and self-employment tax. These costs represent a national average and are not specific to any state. These costs do not include personal income tax.
4) These costs could include other administrative expenses associated with running a business, for example, recruiting, training and bookkeeping costs.
5) In scenarios 2 and 3, the ISP elected to include some, but not all vehicles in the Optional Brand Promotion Program.
6) Prior to the ISP's corporate or personal income tax.

Tennessee

10

## Contractor Options

Contractors affected by this transition have several options to choose from before October 8, 2010.

### 1. Pursue an ISP Agreement

Pursuing an ISP Agreement is an important decision that may require an investment, such as buying the necessary PSA(s) to achieve "scale," no later than October 8, 2010. If a contractor pursuing an ISP Agreement fails to do so by that date, the OA will expire according to its terms. There are additional deadlines that also must be completed by October 8, 2010, such as incorporating the business, and not some other form of business, such as a LLP, LLC, or other similar entity, and establishing an Entity Profile on *MyGroundBizAccount*. If an ISP Candidate does not complete these two steps before October 8, 2010, FedEx Ground and the Candidate may still negotiate an ISP Agreement, although FedEx Ground may also consider negotiations with alternative candidates as well.

ISP Candidates are entrepreneurial and understand the risk/reward of investing time and resources to position the business for the future. These candidates see the benefits of focusing on managing and growing the business. Pursuing an ISP Agreement should appeal to those eager to take advantage of the opportunity to operate businesses more efficiently utilizing economies-of-scale, which could lead to higher earnings.

> **Steps to take:**
>
> - Decide whether to sign and return the Contractor Limited Release and Operating Agreement Modification no later than The date the Limited Contractor Release and Operating Agreement Modification is due (signing this document is not required, but doing so makes contractors eligible to receive the transition incentive).
> - Decide whether to sign and return the Non-Binding Notice of Intent, which FedEx Ground uses for planning purposes only.
> - Incorporate the business no later than October 8, 2010.*
> - Establish an Entity Profile on *MyGroundBiz Account* no later than October 8, 2010.*
> - Operate a minimum of three PSAs in the same station no later than October 8, 2010.*
>
> **\* These steps may be initiated immediately**

### Additional Circumstances:

**P&D Tractor Contractors** (P&D tractor contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible P&D routes and vehicles. P&D tractor contractors are <u>not</u> eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three non-P&D tractor PSAs in the same station no later than October 8, 2010 and operate the P&D tractor under the ISP Agreement, or
- Convert current OA to a Linehaul Agreement no later than October 8, 2010. P&D tractor contractors choosing this option are not eligible for the transition incentive.

**Swing Contractors** (Swing contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible non-swing P&D routes and vehicles; full-time swing contractors are eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three <u>non-swing PSAs</u> in the same station no later than October 8, 2010. Note: Swing work areas <u>do not</u> count toward the three PSA minimum and a contract for these swing work areas will expire on its termination date.

*The Time-off Program ends on October 8, 2010. All swing PSAs in Tennessee go inactive on October 8, 2010.*

## 2. Seek Employment with an ISP

Being an employee of an ISP means all terms of employment, including hours, compensation and benefits, must be worked out with the ISP. Discussions regarding employment terms are solely between ISPs and contractors seeking to become drivers. FedEx Ground will not participate or intervene in employment discussions and will not set compensation or benefit terms that ISPs are required to meet. Employee-drivers and employee-helpers of an ISP will not have a direct relationship with FedEx Ground.  Aside from casual interactions at the station, these employees will need to direct all questions and concerns to their employers.

Becoming an employee-driver for an ISP should appeal to those who enjoy driving a delivery vehicle and personally performing package pick-up and delivery services rather than the responsibilities of running a larger business.

**Steps to take:**
- Decide whether to sign and return the optional Contractor Limited Release and Operating Agreement Modification no later than the date the Limited Contractor Release and Operating Agreement Modification is due.
- Decide whether to sign and return the Non-Binding Notice of Intent, which FedEx Ground uses for planning purposes only.
- Sell or transfer PSA(s) no later than the Operating Agreement's expiration date.
- If the contractor has signed the Contractor Limited Release and Operating Agreement Modification, the Supplemental Limited Release of Claims will need to be signed and submitted on or after the effective date of termination of the current Operating Agreement in order to receive the remaining $5,000 payment of the transition incentive.

## 3. Exit the network

Contractors not interested in pursuing an ISP Agreement or seeking employment with ISPs may choose to exit the network and pursue other opportunities.  Contractors wishing to leave the network may sell their PSA(s) or simply continue to provide service under their OAs until the agreements expire or are non-renewed (all OAs were non-renewed on May 20, 2010 and remain non-renewed).

**Special Note:**  By signing and returning the Contractor Limited Release and Operating Agreement Modification, contractors agree that the current Operating Agreement will expire on October 8, 2010.  If contractors choose not to sign the Contractor Limited Release and Operating Agreement Modification, the expiration date of the current Operating Agreement will serve as the expiration date, absent an extension.

## Review of Contractor Options

1. Seek to transition business to become an Independent Service Provider ("ISP");
2. Sell/transfer PSA(s) and seek to become an employee for an ISP;
3. Sell/transfer PSA(s) or take no action and serve out the remainder of the Operating Agreement and exit the network;

<u>**Contractor Incentives**</u>

FedEx Ground is offering several financial incentives to assist eligible contractors that are affected by the transition to the ISP Model in Tennessee.

**Transition Incentive**

In addition to growth and vehicle incentives detailed below, FedEx Ground is offering a transition incentive of $10,000 to all current P&D contractors operating routes in Tennessee and those domiciled in a Tennessee station as of June 11, 2010 that elect to sign a Contractor Limited Release and Operating Modification Agreement, which includes a limited release of claims involving the transition and an agreement to terminate the existing OAs by October 8, 2010. See the Sample Contractor Limited Release and Operating Agreement Modification in this guide.

Payment of the transition incentive will be issued in two installments as follows:

<u>Initial $5,000 Transition Payment:</u>

P&D contractors operating routes in Tennessee, and those contractors domiciled in Tennessee, that are active as of June 11, 2010 and request the transition incentive, are eligible to receive $5,000 of the payment within 15 business days of submitting to station management a signed Contractor Limited Release and Operating Agreement Modification, which includes a limited release and agreement to end the current Operating Agreement no later than October 8, 2010 (absent a further written contract extension).

<u>A signed agreement must be submitted from the date the Contractor Limited Release and Operating Agreement Modification is distributed to the date the Contractor Limited Release and Operating Agreement Modification is due to receive this transition incentive.</u>

<u>Remaining $5,000 Transition Payment:</u>

After receiving initial payment:

- **P&D contractors that sell/transfer all PSAs** in Tennessee by October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs;

- **P&D contractors that are operating three or more PSAs** in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs. (Note that for ISP Candidates successfully negotiating an ISP Agreement, the OAs will not terminate until the effective date of the ISP Agreement.)

- **P&D contractors continuing to operate fewer than three PSAs** in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

Independent contractors that do not request the transition incentive or do not submit the limited release by October 8, 2010 will not receive the transition incentive. These contractors have all of the same options available as do contactors that have signed the limited release and received the transition incentive.

**Important Legal Note**

In exchange for the transition incentive, FedEx Ground is asking P&D contractors domiciled in a Tennessee station for a release of certain potential claims related to this transition. Sample release documents are contained in this ISP Model Transition Guide. Actual release documents can be obtained from station management beginning the date the Contractor Limited Release and Operating Agreement Modification is distributed. The release is not intended to settle all claims a contractor may have against FedEx Ground. The release is limited to potential claims concerning FedEx Ground's announcement of this transition, the termination, non-renewal or assignment of the current OA, and any sale, assignment, loss or other disposition of PSA(s). FedEx Ground cannot advise contractors on individual circumstances.

Pending lawsuits include *Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Smith v. FedEx Ground Package Sys.*, Civil No. 3:05-CV-600-RLM-CAN (TN), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.).

**Contractors are not obligated to sign the release of claims documents.** Deciding whether to sign these documents is completely up to each contractor. If a contractor chooses to accept the transition incentive, a signed agreement and limited release needs to be submitted no later than the date the Contractor Limited Release and Operating Agreement Modification is due. If a contractor chooses not to sign the agreement and limited release, the contractor will not receive the transition incentive and will have the same options available to those contractors that have signed the agreement and limited release:

- Continue operating under the current agreement (which will not be renewed) until the date of its expiration;
- Sell or transfer PSAs to other contractors; or
- Operate at least three PSAs in an affected station by October 8, 2010 to become an ISP Candidate.

**Contract Renewals and Extensions**

All OAs remain non-renewed as a result of the May 20, 2010 Incorporation and Compliance Disclosure announcement. As indicated in the May 20, 2010 announcement, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

**Non-Binding Notice of Intent**

For FedEx Ground's planning purposes, contractors are asked to submit a non-binding notice of intent to the Senior Manager no later than the date the Contractor Limited Release and Operating Agreement Modification is due. The document asks whether contractors are interested in pursuing an ISP Agreement with FedEx Ground or whether they plan to sell or transfer PSAs to other P&D contractors (and, in this case, whether they intend to remain with FedEx Ground as an employee for another contractor). While FedEx Ground asks that contractors accurately state their intentions, the notice of intent is non-binding. Contractors are free to reconsider until October 8, 2010.

## Growth Incentives

In addition to the transition incentive available to all P&D contractors domiciled in a Tennessee station, growth incentives of up to $100,000 are available to those choosing to grow the business by acquiring eligible PSAs and vehicles between announcement day and October 8, 2010, for <u>total potential incentives of $110,000, depending on station contractor size guidelines.</u>

<u>Eligible PSAs are Ground or Home Delivery P&D routes servicing Tennessee or domiciled in Tennessee currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of June 11, 2010.</u> PSAs transferred or sold by Tennessee P&D contractors operating three or more PSAs are not eligible for growth incentives. For this transition, size of active contractors is determined as of June 11, 2010.

Contractors acquiring eligible PSAs in the same Tennessee station can receive up to $100,000 in potential growth incentives, subject to station contractor size guidelines. Growth incentives do not apply unless the PSA that is acquired gets the contractor to at least minimum scale (three PSAs in the same station); contractors that are already at or above scale are eligible to receive growth incentives for acquiring up to five eligible PSAs.

<u>Each growth incentive will be reduced by $5,000 if a vehicle for that PSA is not acquired by the purchasing contractor from the selling contractor.</u>

The following is an illustration of how the growth incentives would be calculated:

- $10,000  growth incentive for acquiring the first Ground or Home Delivery PSA and vehicle that results in achieving minimum scale; plus
- $15,000 for the second PSA and vehicle; plus
- $20,000 for the third PSA and vehicle; plus
- $25,000 for the fourth PSA and vehicle; plus
- $30,000 for the fifth PSA and vehicle.

These growth incentives are <u>available to existing FedEx Ground contractors</u> that acquire eligible routes and vehicles in the same Tennessee station (a Ground station, Home Delivery station or co-location) by October 8, 2010. Note that a contractor's status for the growth incentives is based on the number of <u>PSAs operated within the same station and is subject to station contractor size guidelines</u>. For example, if a contractor operates two PSAs in the Memphis Ground station, growth incentives will be available only for eligible routes acquired in the Memphis Ground station. <u>Supplemental, swing and P&D tractor PSAs are not eligible for growth incentives and will not be counted toward the 3-PSA minimum needed to be eligible for ISP Agreement Negotiations</u>.

Tennessee

15

As the chart below illustrates, a variety of options are available if choosing to acquire eligible PSAs in the same station. For example:

- A single work area contractor in Tennessee would receive $10,000 in growth incentives for acquiring its second eligible route (that results in achieving minimum scale) and vehicle in the same station, plus the additional $10,000 transition incentive – totaling $20,000.

- A contractor with three PSAs would receive $10,000 in growth incentives if acquiring one more eligible PSA and vehicle in the same station. With the $10,000 transition incentive, incentives would total $20,000.

- A contractor with two PSAs in a Tennessee station would receive $45,000 in growth incentives if acquiring three more eligible PSAs and vehicles in that same station. With the $10,000 transition incentive, this would provide the contractor with $55,000.

| Contractor Status as of June 11, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SWA | MWA-2 | MWA-3 | MWA-4 | MWA-5 | MWA-6 | MWA-7 | MWA-8 |
| Total growth incentive for acquiring one (1) eligible PSA and vehicle | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Total growth incentive for acquiring two (2) eligible PSAs and vehicles | $10,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Total growth incentive for acquiring three (3) eligible PSAs and vehicles | $25,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 |
| Total growth incentive for acquiring four (4) eligible PSAs and vehicles | $45,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Total growth incentive for acquiring five (5) eligible PSAs and vehicles | $70,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring six (6) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring seven (7) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Available Growth Incentives | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Transition Incentive | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Maximum Available Incentives | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 |

Note: Growth incentives shown here, which are subject to station contractor size guidelines, are contingent on the purchasing contractor's acquisition of the vehicle associated with the acquired PSA. Without such vehicle acquisition, each growth incentive is $5,000 less per PSA than shown above.

Tennessee

16

Contractors acquiring eligible PSAs will be notified by station management of the amount of the growth incentive(s). **Payment of the growth incentive(s) will be made within 15 business days of completion of the PSA acquisition in CDAS. All acquisitions of eligible PSAs and vehicles must be completed and approved no later than October 8, 2010 to receive growth incentives.**

## Vehicle Incentive Program

SWA or MWA-2 contractors that are not pursuing an ISP Agreement and that do not sell or transfer vehicle(s) along with the PSA(s), to the acquiring contractor, may be eligible for a vehicle incentive up to $5,000. This amount applies to only one delivery vehicle per PSA, and applies only if the vehicle is not acquired by the contractor that purchases the associated PSA and if it is disposed of through a FedEx Ground designated third-party vendor.

Full-time swing contractors in Tennessee not pursuing an ISP Agreement may also be eligible for a vehicle incentive of up to $5,000. This payment will cover one delivery vehicle currently operated by the full-time swing contractor.

The amount of the vehicle incentive, up to $5,000, is determined by the excess, if any, of the contractor's remaining balance due on the vehicle as determined by the lease holder or lender over the vehicle's fair market value. Fair market value will be determined by the designated third party vendor.

The vehicle incentive applies to those vehicles that are either owned or leased by a FedEx Ground or Home Delivery SWA, MWA-2 or full-time swing contractor in Tennessee for use in the contractor's applicable PSA(s). **To be eligible for this incentive, contractors must sell or transfer their PSA(s) by October 8, 2010. Contractors may elect to retain or dispose of the vehicles in any manner the contractors choose, though these contractors will then not be eligible for the vehicle incentive.**

Contact information for the third party vendor will be provided by station management.

## Incorporation and Compliance Disclosure Requirement and the ISP Model Announcement

This announcement to transition Tennessee, Olive Branch and certain contractors in Huntsville to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and legal compliance. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines established within this ISP Transition Guide apply, and not those associated with the Incorporation and Compliance Disclosure Announcement.

**Contractors should note that all non-renewals and extensions associated with the Incorporation and Compliance Disclosure announcement on May 20, 2010 remain in effect.** Contractors that sign the Contractor Limited Release and Operating Agreement Modification agree to a new expiration date of October 8, 2010. For contractors that do not sign the limited release, the current expiration date remains unchanged. Contractors with expiration dates between July 1, 2010 and December 31, 2010 that do not sign the limited release are eligible to receive a 180-day extension.

Additionally, although affected P&D contractors are technically no longer eligible to receive the early adoption incentives described in the May 20 Incorporation and Compliance Disclosure Announcement, FedEx Ground has decided, as a good-will gesture to pay all affected P&D contractors the $750, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More information will be available in the coming weeks.

## Transition Timelines by Wave

Every contractor in Tennessee will have the same amount of time to decide whether to sign the Contractor Limited Release and Operating Agreement Modification and choose which contractor option to pursue. However, in order to facilitate a smooth transition to the ISP Model in Tennessee, FedEx Ground is implementing station-specific dates for the Negotiations Process which will be grouped in two waves.

Stations in Wave 1 include: Nashville Ground and Home Delivery, Johnson Ground and Home Delivery, Lawrenceburg Ground, Jackson Ground and Home Delivery, Memphis Ground and Home Delivery

Stations in Wave 2 include: Chattanooga Ground and Home Delivery, Knoxville Ground and Home Delivery, Cookville Ground and Home Delivery, Huntsville Ground and Home Delivery, and Olive Branch co-location

See the charts below for additional details on the dates that affect your station.

### Wave 1

| June 2010 – November 2010 | January 2011 – April 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | January 21, 2011 – First proposal due |
| Signed Contractor Limited Release and Operating Agreement Modification due | March 19, 2011 – ISP Agreement negotiations end |
| October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | April 2, 2011 – ISP Agreements go into effect |
| October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount, and achieved "scale" | |
| November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s) and submit the Initial Compliance Disclosure Form | |
| November 19, 2010 – Date by which CSA definition is finalized and RFI Response submitted | |

Tennessee

18

**Wave 2**

| June 2010 – February 2011 | February 2011 – May 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | February 25, 2011 – First proposal due |
| | April 23, 2011 – ISP Agreement negotiations end |
| Signed Contractor Limited Release and Operating Agreement Modification due | May 7, 2011 – ISP Agreements go into effect |
| October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | |
| October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount, and achieved 'scale' | |
| November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s) and submit the Initial Compliance Disclosure Form | |
| February 11, 2011 – Date by which CSA definition is finalized and RFI Response submitted | |

## Contract Extensions

An extension to the station-specific date of when the ISP Agreement goes into effect (see charts above) is available to any Tennessee contractor that is operating three or more PSAs in the same station by October 8, 2010.

## Request for Information Process

The FedEx Ground Request for Information (RFI) Process helps the company assess whether an ISP Candidate has the ability to fulfill the obligations of an ISP Agreement. In order to begin the RFI Process, an ISP Candidate must be a corporation and not some other form of business, such as a LLP, LLC, or similar entity, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale by October 8, 2010.

In order to give ISP Candidates the opportunity to get through the transition in sufficient time to protect against service disruptions, an ISP needs to register with the state(s) in which it does business and be in good standing with those state(s) by November 19, 2010. Contractors will need to finalize the definition of their CSA and submit a Response to FedEx Ground's RFI by the station-specific deadline. If these steps are not completed by the associated deadline, an ISP Candidate may still be eligible to submit a Response to FedEx Ground's RFI and possibly advance to negotiations. However, FedEx Ground may negotiate with alternate candidates as well for the CSA.

FedEx Ground will evaluate the RFI Response based on the areas listed here:

- Business Experience
  - o Including references and relevant experience in the transportation industry
- Financial Viability
  - o Such as bank references and annual sales
- Customer Service Approach
  - o Plans for meeting customer needs and address customer concerns
- Driver Recruitment and Retention
  - o Goals for recruiting employees, historical turnover rates

- Skills and Knowledge of the ISP's Workforce
  - o Plans for ensuring employee knowledge of FedEx Ground's services
- Safety Commitment and History
  - o Injury and accident history, vehicle maintenance plan and history
- Security (Loss and Damage Avoidance)
  - o Plans for minimizing package damage and loss, historical damage trends
- Contingency Situations
  - o Ability to provide consistent customer service despite volume surge, employee absenteeism and/or equipment failures

An ISP Candidate should provide any additional information it considers important for FedEx Ground to review in evaluating its response. While ISP Candidates can submit an RFI Response on *MyGroundBizAccount*, the response can be submitted in any written format to FedEx Ground.

Once the RFI Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions:

- **Advance to Negotiations**
  Senior Manager determines the ISP Candidate has the ability to fulfill the obligations of the vendor relationship.

- **Clarification/Questions**
  Senior Manager determines further clarification will help determine if the ISP Candidate is capable of fulfilling the vendor relationship.

- **Does Not Advance to Negotiations**
  Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations of the vendor relationship.

After advancing through the RFI Process and onto the Negotiations Process, **certain qualifications must be met before entering into an ISP Agreement**. Some of these administrative tasks will take several weeks to complete and documentation must be in order before the ISP Agreement Signatory is permitted to electronically sign an ISP Agreement. If these tasks are not completed and an agreement cannot be reached, these contractors run the risk of having their OAs expire without an agreement in place.

For a complete list of qualifications, see the Qualification Steps for Pursuing an ISP Agreement section of this Guide.

Drivers and certain other employees of the ISP Candidate will need to pass a criminal background check prior to the effective date of the ISP Agreement. These background checks will be arranged and paid for by FedEx Ground through a third-party vendor.

Tennessee

## Negotiations and Execution Processes

### Negotiations Process

The first step in the Negotiations Process is the preparation and submission of a Proposal to FedEx Ground. The Proposal is an initial offer on the key financial, non-financial, and elective components of the ISP Agreement and any other terms the ISP Candidate wishes to propose. The deadline for submitting the first Proposal is based on which wave a contractor's station falls. If a Proposal is not submitted by the dates listed above, an ISP Candidate may still be eligible to submit a first proposal and negotiate an ISP Agreement. However, FedEx Ground may consider proposals and negotiate with alternate candidates as well for the CSA. For additional information, see Transition Timeline by Wave section of this Guide.

FedEx Ground and the ISP Negotiator (an officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate) will negotiate an ISP Agreement regarding terms for the proposed CSA. This provides ISP Candidates the flexibility to negotiate contract terms that best fit the particular business needs and unique service area the ISP Candidate is pursuing.

For example, an ISP Agreement may be negotiated with a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase – depending on business needs and desires. ISP Candidates can also choose whether to utilize FedEx Ground logos on all or some of their vehicles, and whether to outfit employees in FedEx Ground uniforms in exchange for negotiated brand promotion fees.

The following represents a list of some, though not all, of the key financial and non-financial terms, as well as elections that may be negotiated.

| Negotiable Financial Terms: | Negotiable Non-Financial Terms: | Elections: |
|---|---|---|
| ~ Annual Service Charge<br>~ Stop Charge<br>~ Fuel Charge<br>~ Surge Stop Charge<br>~ Package Charge<br>~ Period Safety Incentive<br>~ New Account Start-Up ("Meet-and-Greets")<br>~ Spotted Trailer Charges (if applicable)<br>~ Customer Service Incentive | ~ Length of Term<br>~ Expiration Date<br>~ Load Positions by Year<br>~ Daily Stop Threshold | ~ Additional Services<br>~ Scanner Leasing Program<br>~ Equipment Registration (on certain vehicles)<br>~ Periodic Maintenance Schedule<br>~ Fuel Tax Reporting<br>~ Facilitated Insurance Coverage and Billing<br>~ Brand Promotion Program (Vehicles and Uniforms)<br>~ Arbitration<br>~ Alternative Maintenance Program |

### Proposal Capture & Analysis Tool (PCAT)

The Proposal Capture and Analysis Tool, or PCAT, will be used by FedEx Ground to evaluate Proposals during the Negotiations Process. To facilitate negotiations, this optional tool is available to ISP Candidates for the preparation of the RFI Response and/or a Proposal. The PCAT will be available to ISP Candidates on *MyGroundBizAccount* and can be used to calculate estimated revenues for multiple scenarios based on inputs by the ISP Candidate.

Inputs include variable components such as Per Stop Charge, Fuel Surcharge and forecasted volume, as well as fixed financial components such as Annual Service Charge and the optional Brand Promotion Program.

Tennessee

Historical pick-up and delivery volume data for the proposed CSA, as well as individual PSA historical data and Spot information, will be made available on *MyGroundBizAccount*. This data may help in evaluating future business strategies, though past performance is not necessarily an indicator of future performance or volume. FedEx Ground cannot guarantee that the historical data supplied will be available for a CSA's predecessor PSAs, or that the data is an exact match to the geographic scope of a CSA, since it is a new area.

Using the PCAT is one way to ensure negotiable elements of the ISP Agreement are included in the Proposal that an ISP Candidate submits. However, Proposals may contain additional terms beyond those listed in the PCAT and can be submitted in any written format to FedEx Ground.

## Submitting a Proposal

Once a Proposal is submitted, a Pittsburgh-based, FedEx Ground Negotiator will be assigned and will contact the ISP Candidate to confirm receipt of the Proposal.

Negotiations will be conducted electronically and by phone over the course of several weeks, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals. The parties may submit several offers and counteroffers until an agreement is reached or there is an impasse.

Initially, the ISP Candidate that is currently operating the CSA will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. Furthermore, if certain transition deadlines are not reached, as detailed above, FedEx Ground may seek multiple bids for the same CSA even during the transition to the ISP Model. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

The first offer submitted by an ISP Candidate may not be the final offer. The first counteroffer submitted by FedEx Ground to the ISP Candidate may also not be a final offer. The Negotiator will continue working with the ISP Candidate in this manner until an agreement is reached or an impasse occurs.

| What to Expect: | What Not to Expect: |
|---|---|
| ~ FedEx Ground seeks proposals in line with market values | ~ Negotiator guidance on the "right" answer because there is not just one acceptable approach |
| ~ The need to set aside dedicated time to complete negotiations | ~ Negotiator guidance on volume forecasts |
| ~ Interactive process between ISP Candidates and Negotiators | ~ SRM participation in the process |

## The Negotiations Process will conclude in one of two ways:

1) If an agreement is reached, the ISP Candidate will be able to review and sign the ISP Agreement

2) If the ISP Candidate and FedEx Ground cannot agree on terms for an ISP Agreement, the process will end, and station management will be notified. If an ISP Candidate has a current OA with FedEx Ground, it will expire according to its terms. It is in FedEx Ground's best interest to consider all of the terms put forward in order to reach an agreement that will meet the ISP Candidate's business needs, while providing the highest level of customer service possible.

Tennessee

## ISP Agreement Execution

Once the terms of an ISP Agreement with FedEx Ground have been reached, there are additional steps to complete before a final agreement can be signed, electronically, on *MyGroundBizAccount*.

Additional steps will need to be completed **prior to** the final signing. For a complete list of these steps, see the "Qualification Steps for Pursuing an ISP Agreement" section of this Guide.

Please note: Drivers and certain members of the ISP Candidate's Workforce will need to pass a criminal background check **before** the ISP Agreement effective date; these criminal background checks may take several weeks to complete.

Once the above steps are completed, the ISP Agreement Signatory will be able to print out and review the entire ISP Agreement. If the ISP Agreement Signatory accepts all of the terms as outlined in the ISP Agreement, he/she will need to log on to *MyGroundBizAccount* and digitally sign the agreement via an electronic signature. The final agreement will reside on *MyGroundBizAccount* until it expires. Both the ISP and station management will be able to reference it online.

## Operating as an ISP

While some contractual obligations under the ISP Agreement will remain the same, others will be substantially different.

### Service Results Expectations

The following Service Results Expectations are detailed in the ISP Agreement:

#### Service Days

Service Days remain consistent: Monday through Friday for FedEx Ground; Tuesday through Saturday for Home Delivery. FedEx Ground reserves the right to modify these days should customer demands and/or competitive advantage require changes. The three Saturdays and Mondays immediately preceding Christmas Day are considered Service Days for both FedEx Ground and FedEx Home Delivery.

#### Services

Under the terms of an ISP Agreement, ISPs agree to provide a range of pick-up and delivery services to customers, including:

- Collection and loading, if necessary, of packages for delivery in a CSA.

- Transportation of packages from a domiciled station and delivery in a CSA consistent with customer-selected service offerings and subject to the ISP's Right to Decline.

- Timely collection and transmission of customer signatures, scanning results and package tracking data.

- Collection of COD charges and return of COD charges to FedEx Ground at the end of the Service Day.

- Pick-up of customer packages in a CSA and delivery of the packages to a domiciled station in time to meet service commitments, subject to the ISP's Right to Decline.

- Return of undelivered packages to the domiciled station, according to agreed-upon terms by FedEx Ground and the ISP.

- Additional services described and mutually agreed upon in the Additional Services Schedule, which may include services such as administrative support and shuttle loading and/or unloading.

- Preparation of any legally-required documents (driver logs, vehicle inspection reports, etc.) and submission to FedEx Ground at the end of each service day (or for FedEx Home Delivery the next business day, unless otherwise agreed upon by the ISP and FedEx Ground).

**Service Results**

Measurements of "Inbound Local Service" performance will be provided electronically to an ISP. These numbers will also be posted at the FedEx Ground station. The following service results are the minimum standard outlined in the ISP Agreement:

- Provide services to the customers that are compatible with customers' schedules, expectations and pick-up and delivery requirements (subject to the ISP's Right to Decline).

- Achieve a daily inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher.

- Provide the "Service Offerings" detailed in Schedule E of the ISP Agreement (commercial deliveries, residential deliveries, alcohol deliveries, attempted deliveries and pick-ups, delivery signatures, driver release and indirect delivery, premium services, and package tracking information).

- Take reasonable measures to avoid theft, loss, damage, destruction, delay in the handling, loading, unloading, transporting and pick-up and delivery of packages in the CSA.

- Conduct all business activities with honesty and integrity and in a safe and professional manner.

**Service Failure**

The Senior Manager will monitor Service Results to assess adherence to the terms of the ISP Agreement. The Senior Manager will document any Service Failure by an ISP (those involving Service, Professionalism or Safety) and will schedule an ISP Discussion with the ISP Key Contact to discuss the Service Failure. The ISP will have an opportunity to correct any Service Failure.

If Service Failures continue, the ISP may be in breach of contract with the terms of the ISP Agreement; such a breach may result in termination of the ISP Agreement, depending upon the circumstances.

**Right to Decline & Right to Ensure**

Under an ISP Agreement, an ISP has the Right to Decline services in certain situations without impacting service results. In instances when an ISP exercises the Right to Decline, FedEx Ground has the Right to Ensure that customers within a CSA are properly serviced.

The activities that can be declined under an ISP Agreement are contained in the Agreement. Some instances include: stops over 200 packages, pickups scheduled after 6:30 p.m., spotted trailers, customer requests requiring special modifications to equipment, and stops over the negotiated Daily Stop Threshold.

**Subcontracting**

ISPs will have the opportunity to subcontract any services within its CSA to other ISPs. In these situations, FedEx Ground will attempt to accommodate any ISP-directed Load Plan changes that are submitted by ISP Key Contacts in advance of implementation.

ISPs that subcontract work to another ISP will remain responsible for maintaining service levels as well as any claims that may arise. However, only the ISP performing the work will receive payment of charges for this activity, and the packages making up this activity will count toward the inbound local service of only the ISP performing the work.

## Driver Data Collection Process and ISP Data Review

The Driver Data Collection Process and ISP Data Review will replace the existing Check-In Process (including the Revised Daily Settlement Report and the Revised Consolidated Daily Settlement Report, respectively) as summarized below:

**Driver Data Collection Process**

This process is similar to the current Check-In Process and occurs when ISP employee-drivers return to the station. The collection of this information (scanner data, paperwork completed by the ISP employee-driver, and P&D activity captured in the FedEx Ground system) will be input by FedEx Ground personnel. Once FedEx Ground has input the data, FedEx Ground will generate an *ISP Driver Data Collection Report* that contains "driver-level pick-up and delivery activity" and will be shared with the ISP employee-driver. The ISP employee-driver will need to review and sign the report, confirming that it is accurate. FedEx Ground management will hold any data discrepancies or service-related issues for the following morning, and these issues will only be addressed with ISP Key Contacts, rather than individually with any ISP employee-drivers.

In the case of FedEx Ground, the information mentioned above should be submitted in the evening of the return to the station, unless otherwise agreed. For FedEx Home Delivery, the information should be submitted on the morning of the return to the station, unless otherwise agreed.

**ISP Data Review**

Information submitted, reviewed, and signed by an ISP's employee-drivers will generate an *ISP Data Confirmation Report* which will be reviewed on a regular basis with the ISP Key Contact. This report will contain "CSA-level data" and will be provided only to the ISP Key Contact. It will be used to address any operational or contractual issues that arose on the previous day and will be discussed only with the ISP Key Contact. These meetings can occur as needed, either at the request of FedEx Ground or the ISP, and will optimally be conducted in person after morning dispatch, but they may take place in other formats or times as mutually agreed upon.

The *ISP Data Review* process will be used to cover prior day issues with the ISP, such as: the *ISP Daily Confirmation Report*, P&D Quality Reports, local inbound service, Claims Investigation, Complaints, Branding (if ISP is participating in the Brand Promotion Program) and scanning. The meeting may also be used to address any future ISP requests, such as ISP Load Plan changes and New Pick-up Start-ups, which include ISP-directed vehicle assignment.

The *ISP Data Collection Report*, as mentioned above, contains driver-level data only. It will not contain items such as: non-delivered packages, premium service failures, high profile van scans, uncollected COD monies, and open tracer reports. This information will be contained in the *ISP Data Confirmation Report* and will be sent to ISPs via *MyGroundBizAccount*.

Other daily reports and data will be shared directly with ISP Key Contacts and/or sent electronically to ISPs via *MyGroundBizAccount*.

**Peak Planning**

ISPs are responsible for planning Peak operations within a CSA. FedEx Ground will offer its best projections of anticipated Peak volume in a given CSA and will work with the ISP to identify the ISP's anticipated service constraints and plan contingency operations.

Tennessee

25

## Scanner and Vehicle Usage

In co-locations, ISPs will have a choice to use either FedEx Ground or FedEx Home Delivery scanners, depending on the functionality preferred by the ISP. FedEx Ground will also work with ISPs to group an ISP's vehicles together on FedEx Ground docks, even across van lines that were previously dedicated to FedEx Ground or FedEx Home Delivery vehicles. Any operational changes will be discussed between the ISP and FedEx Ground and will be made after mutual agreement.

## Brand Promotion Program

Participation in the Uniform and/or Vehicle Brand Promotion is optional. A Uniform Brand Promotion charge and a Vehicle Brand Promotion charge may be negotiated if an ISP Candidate decides to participate in either program. Minimum vehicle specifications for vehicles in the Vehicle Brand Promotion program and vehicles not in the program are posted on *MyGroundBiz*.

Any vehicle may be utilized in non-FedEx Ground related activity as long as any FedEx Ground logos are removed or covered.

## ISP Charge Statement

The ISP Charge Statement contains an itemized list of compensation elements that are based on the individual terms agreed to in the ISP Agreement. Examples of terms could include: Package and Stop Charges, Annual Service Charge, Period Safety Incentive, Brand Promotion Program (if elected), Surge Stop Charge and Fuel Surcharge.

Unlike the current settlement statement, the ISP Charge Statement will detail any discrepancies between scanned packages and stops versus summed totals used for ISP Charge purposes. Discrepancies may include hand-sheet totals updated during the Driver Data Collection Process or double stops reversed as part of ISP Charge calculations.

In addition to existing itemized charge backs and deductions (such as physical damage insurance, work accident insurance, workers' compensation insurance, and non-trucking liability), the ISP Charge Statement may also include weekly scanner lease and network access fees (including any additional scanners), claims, equipment registration, fuel tax, expenses and fees, and the current price of fuel within the CSA as indexed weekly by OPIS.

Accessing the ISP Charge Statement is a 100% digital process. All related payments will be **made each Friday** (or on the preceding Thursday if Friday is a bank holiday) via Electronic Funds Transfer (EFT). *MyGroundBizAccount* may be used to view an ISP Charge Statement, which is available in .PDF and/or .CSV formats.

## Availability of Electronic Tools

In addition to offering ISP Charge Statements through *MyGroundBizAccount*, FedEx Ground has developed and is rolling out web-based reports, workforce and fleet management capabilities, CSA operational planning tools and communication methods which will be made available to ISPs.

## Rentals & Spares, Van Washing

FedEx Ground will not arrange for third-party vehicles or use of spare vehicles.

Any van washing vendor may be used, subject to the vendor's compliance with FedEx Ground's insurance and environmental standards.

## Locks

The ISP Agreement does not require the use of high-security locks; however, use of high-security locks will result in diminished liability for claims resulting from vehicle break-ins.

Tennessee

26

## Safety Terms & Requirements

Schedule I, Safe Operating Practices, covers driver and non-driver qualification criteria, background qualification criteria, training responsibilities on the part of an ISP and an ISP's safety responsibilities. FedEx Ground is currently working on revising this Schedule and the requirements should be substantially similar to what contractors operate under today. A sample Schedule I will be sent out over the next coming weeks.

## Period Safety Incentive

FedEx Ground will pay ISPs a negotiated Period Safety Incentive payment for each completed 4-week Safety Period.

The amount of the payment, negotiated in the ISP Agreement, is based on the number of preventable accidents the ISP's employee-drivers are charged with and the number of vehicles the ISP operates during the Safety Period. The incentive will be paid to the ISP two periods, or eight weeks, following the close of the qualifying Safety Period.

## ISP Safety Results

FedEx Ground will provide electronic notification to an ISP if an ISP employee-driver is disqualified. This does not affect an ISP's right to disqualify their employee-drivers. SRMs will be given a monthly report of disqualified drivers.

## Driver Safety Violations

Any driver safety violation will be communicated by the SRM to the ISP, not the ISP employee-driver. As an exception, unsafe behavior on FedEx Ground property may be handled directly with the ISP employee-driver by station management. Any such exception will be subsequently communicated by FedEx Ground to the ISP.

## Controlled Substance Collection & Testing

All ISP employee-drivers need to pass a pre-qualification controlled substance screen to satisfy DOT qualification requirements. When a FedEx Ground approved collection site is utilized, FedEx Ground will pay for screenings. ISP employee-drivers are subject to random controlled substance testing.

## Physical / Medical Exam

All ISP employee-drivers must have a current DOT-compliant medical physical examination. When a FedEx Ground approved physician is utilized, FedEx Ground will pay for the exam. When the physical expires (the term of the physical will be determined by the physician), additional exams and the related costs are the responsibility of the ISP.

## Maintenance

An ISP Agreement will set forth ISP maintenance obligations. Pursuant to DOT requirements, production of monthly maintenance records and annual inspections will continue.

## Claims for Liability to the Public

The ISP Agreement sets forth graduated amounts that will be charged back to, or deducted from, an ISP for any claims brought against FedEx Ground for bodily injury and/or property damage caused by an ISP employee, agent or subcontractor. The amounts to be charged back or deducted will be the actual amount incurred by FedEx Ground up to $1,000 for the first claim, up to $2,000 for the second claim, up to $3,000 for the third claim and up to $4,000 for the fourth and subsequent claims arising out of incidents occurring in any rolling 52-week period.

Tennessee

## Qualification Steps for Pursing an ISP Agreement

An ISP Candidate must take several steps to negotiate, enter into and operate under an ISP Agreement. Some are one-time occurrences and some must be completed on an annual basis. Most require several weeks to complete and should be completed well in advance of entering negotiations.

These steps ensure ISP Candidates meet the terms of the ISP Agreement and continue to comply with all state and federal laws and regulations.

- **Incorporate the business, if not incorporated already**
  - While ISP Candidates can begin this process immediately, articles of incorporation must be submitted no later than October 8, 2010 to advance to the RFI Process

- **Establish an Entity Profile on *MyGroundBizAccount***
  - While ISP Candidates can establish an Entity Profile once incorporated, the Entity Profile must be established no later than October 8, 2010 to advance to the RFI Process
  - ISP Candidates will be asked, among other questions, to disclose direct or indirect ownership interest and/or participation in other ISP entities to determine if the ISP Candidate has exceeded station guidelines

- **Register the business in the state(s) in which it does business, if not registered already and be in good standing with those state(s)**
  - While ISP Candidates can begin this process as soon as the business is incorporated, all ISP Candidates must be registered with the state(s) in which they do business and be in good standing by November 19, 2010

- **Submit Initial Compliance Disclosure Form**
  - ISP Candidates certify compliance with federal and state independent business reporting and filing laws.
  - The Initial Compliance Certification Form illustrates the compliance activities performed by the ISP Candidate and must be signed by the ISP Candidate and the ISP Candidate's accountant
  - While this form can be submitted at any time, the Initial Compliance Disclosure must be completed and submitted by November 19, 2010
  - ISPs will be contractually obligated to file an Annual Compliance Certification form each succeeding calendar year that the ISP Agreement is in effect

If an ISP Candidate does not complete all four of these steps by the deadlines stated above, FedEx Ground may still negotiate an ISP Agreement with the ISP Candidate. However, FedEx Ground may also consider negotiations with alternative contractors as well.

- **Identify an ISP Agreement Signatory that submits to and passes a criminal background check**
  - The ISP Agreement Signatory must pass a criminal background check before signing an ISP Agreement. Should that person fail the criminal background check, another ISP Agreement Signatory must be identified and pass the criminal background check before the ISP Agreement can be signed

- **Secure insurance coverage**
  - ISP Candidates must acquire insurance coverage, including Non-Trucking Liability and Physical Damage (for vehicles included on Schedule B of the ISP Agreement) as well as workers' compensation and work accident insurance (as required by state law and the ISP Agreement)
  - ISP Candidates may secure insurance coverage from the provider of their choice though FedEx Ground will verify with Marsh that proper insurance has been secured
  - ISP Candidates must secure coverage prior to the ISP Agreement effective date.

Tennessee

- **Provide a W-9 business tax form**
  - All ISP Candidates, regardless of whether they were previously incorporated or not, must submit a W-9 business tax form indicating the name of the incorporated entity

- **Establish an Electronic Funds Transfer (EFT) Account**
  - If an ISP Candidate has a new corporate name and/or a new EFT account number, an updated authorization agreement for EFTs must be provided to FedEx Ground before the ISP Agreement effective date
  - ISP Candidates should note this process can take up to three weeks to complete

- **Ensure qualified personnel pass criminal background checks**
  - ISP employees who have access to FedEx Ground systems and/or FedEx Ground property, interact with FedEx Ground customers, or handle FedEx Ground packages must pass a criminal background check before performing these duties for an ISP
  - ISP Candidates should note this process can take several weeks to complete

- **Ensure workforce compliance**
  - Per the ISP Agreement, ISPs may only employ persons who are legally authorized to work in the United States
  - Maintain an I-9 employment authorization form for each employee
  - Provide evidence of compliance at the request of FedEx Ground
  - These steps must be completed before the ISP Agreement effective date
  - ISP Candidates should note these steps can take several weeks to complete

## ISP Model Key Terms & Definitions

**Contracted Service Area (CSA)** – A geographical area, defined in the ISP Agreement, in which an ISP is contractually obligated to provide pick-up and delivery services

**Driver Data Collection Process** – Daily collection of information from an ISP employee which is then inputted by FedEx Ground personnel into FedEx Ground's system

**Independent Service Provider (ISP)** – An independent business entity that contracts with FedEx Ground to provide pick-up and delivery services under an ISP Agreement

**ISP Agreement** – A legal contract negotiated between an ISP and FedEx Ground

**ISP Agreement Signatory** – An individual who signs the ISP Agreement on behalf of the ISP

**ISP Candidate** – An independent business entity that desires to become an ISP for a particular CSA, but has not yet executed an ISP Agreement for that CSA

**ISP Charge Statement** – A weekly statement detailing the ISP's financial earnings and CSA volumes

**ISP Data Collection Report** – A daily report that details package data for each ISP employee-driver. The ISP Data Collection Report is reviewed each afternoon for Ground and the next morning for Home Delivery

**ISP Data Confirmation Report** – A daily report that details package data for each CSA. The ISP Data Confirmation Report is reviewed with the ISP Key Contact each morning

**ISP Data Review** – A daily assessment between FedEx Ground and the ISP Key Contact of the prior day's activities and issues, as well as any future operational plans

Tennessee

**ISP Electronic Funds Transfer (EFT)** – A weekly payment provided to ISPs for work performed in the ISP's CSA. The ISP EFT replaces the settlement check

**ISP Employee** – An individual employed by the ISP. ISP Employees may include Key Contacts, P&D drivers, helpers and office support

**ISP Key Contact** – An individual employee of the ISP responsible for administering the ISP Agreement, including day-to-day operations

**ISP Negotiator** – An officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate

**Negotiations** – A process during which FedEx Ground and ISP Candidates attempt to work out various mutually acceptable financial and non-financial terms as well as elections of the ISP Agreement

**Negotiator** – A FedEx Ground employee who negotiates with the ISP Candidate on behalf of FedEx Ground.

**Proposal** – An ISP Candidate's offer on the key financial and non-financial terms as well as elections included in an ISP Agreement

**Request for Information (RFI)** – A request, issued to ISP Candidates by FedEx Ground, which seeks to ascertain the capabilities of prospective ISPs

**RFI Response** – An ISP Candidate's reply to FedEx Ground's RFI, that outlines the ISP Candidate's capabilities relative to the contractual obligations

## Q&As

**1. Which contractors are affected by this announcement?**
This announcement impacts all P&D contractors domiciled in Tennessee, all contractors domiciled in the Olive Branch, Mississippi Ground and Home Delivery co-location, as well as those contractors in the Huntsville Ground and Home Delivery stations providing P&D services within Tennessee. Linehaul contractors are not affected.

**2. Why implement a new contract and operational changes in Tennessee?**
This transition was the result of discussions with state officials in Tennessee. This transition is an important step in meeting the needs of contractors, our customers and the Company. Transitioning to the ISP Model will also ensure that P&D contractors continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

**3. If a contractor acquires additional routes, is that contractor guaranteed an ISP Agreement?**
No. Negotiating an ISP Agreement is an individualized negotiation between ISP Candidates and FedEx Ground. ISP Candidates will negotiate key financial and non-financial terms, as well as make elections, according to the unique business needs of the service area. The process will also involve a response to a Request for Information (RFI) so that ISP Candidates can demonstrate the ability to provide the level of service required. Participating in this process does not automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement.

**4. How many PSAs can an ISP Candidate acquire in Tennessee?**
There is no statewide limit on how many PSAs an ISP Candidate can acquire in Tennessee. There are, however, station-specific guidelines in place to avoid excessive dependence for network service on any one contractor in a particular station. Station management can provide additional details regarding the guidelines for your station.

**5. What happens once an ISP Agreement goes into effect?**
The ISP Model is intended to provide the potential for higher earnings by maximizing economies-of-scale, as well as other operating efficiencies of a larger, multi-vehicle operation. Under an ISP Agreement, ISPs are responsible for

Tennessee

planning all P&D activity within the Contracted Service Area (CSA). This includes driver recruitment, training and staffing; vehicle fleet size selection, acquisition and maintenance; peak planning; and complying with all applicable laws and regulations. ISPs will have significant flexibility in allocating staff and vehicles as ISPs see fit to meet the unique and changing business needs of their CSAs.

**6. Can an ISP Candidate operate both Ground and Home Delivery routes?**
Yes. ISP Candidates may operate any combination of at least three Ground and/or Home Delivery PSAs in the same station by October 8, 2010 to begin the RFI and Negotiations Processes for a new agreement. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location.

**7. Will ISPs continue to operate under FedEx Ground's operating authority?**
Yes. ISPs will continue to operate under FedEx Ground's operating authority.

**8. What happens to the swing routes currently operated by contractors?**
Swing routes will cease to exist upon the expiration of the applicable Operating Agreement (OA). Swing contractors that acquire and operate at least three non-swing PSAs in the same Tennessee station, incorporate as a corporation, and not some other form of business, such as an LLP or LLC, and establish an Entity Profile through *MyGroundBizAccount* by October 8, 2010 and that register with Tennessee, be in good standing, define a CSA, and respond to FedEx Ground's RFI will be eligible to submit a first proposal and begin negotiations for an ISP Agreement. Swing PSAs will not count toward the three PSA minimum needed to be eligible for ISP Agreement negotiations.

**9. How quickly will FedEx Ground make the transition incentive payments?**
- The first $5,000 of the transition incentive will be paid within 15 business days of submitting a signed Contractor Limited Release and Operating Modification Agreement. The remaining $5,000 of the transition incentive will be paid as follows:
- Contractors that sell/transfer PSAs and sign the supplemental limited release will receive a check within 15 business days at the station for the remaining $5,000 of the transition incentive once the current OA terminate and proof of sale or transfer of the routes is submitted to station management;
- P&D contractors operating fewer than three PSAs in a single Tennessee station as of October 8, 2010 will receive the remaining $5,000 of the voluntary transition payment within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of the OA; or
- P&D contractors operating three or more PSAs in the same station in Tennessee as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of their OA.

**10. Are contractors eligible for the $10,000 transition incentive even if they choose to sell their routes?**
Yes. These contractors will need to sign and timely submit a Contractor Limited Release and Operating Modification Agreement. They will also need to submit proof of their transition and sign the supplemental limited release.

**11. Is the transition incentive taxable?**
Contractors should consult with tax advisors as to the tax status of the transition incentive. The transition incentive will be reported by FedEx Ground on a Form 1099 for the year in which the amount is received.

**12. What happens if a contractor decides not to sign the Contractor Limited Release and Operating Agreement Modification?**
Contractors are not required to sign the optional limited release. If a contractor decides not to sign the limited release, that contractor will not receive the transition incentive described in this Guide and will continue operating under the terms of their OA until its current expiration date, absent any further extension. This contractor can still pursue an ISP Agreement if it meets all requirements set in this Guide.

**13. Are extensions still available for contractors that do not sign the Contractor Limited Release and Operating Agreement Modification?**
Yes. As previously announced on May 20, 2010, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available,

even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

**14. Why are growth incentives tied to the acquisition of the vehicle and the PSA?**
By acquiring a vehicle that is already in service in a particular PSA, the ISP will have a vehicle that necessarily qualifies for service under the ISP Agreement.

**15. Are growth incentives available for eligible PSAs acquired after October 8, 2010?**
No. All acquisitions of eligible PSAs, by eligible contractors, must be completed by October 8, 2010 in order to be eligible for growth incentive payments.

**16. Do ISP Candidates have to compete with other vendors from outside the network for the CSAs?**
Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground and, if operating three or more PSAs in the same station by October 8, 2010, will have an opportunity to extend a current Operating Agreement to do so. Should an impasse be reached, multiple candidates may be engaged in the process. FedEx Ground may also seek multiple bids for the same CSA in the event that certain transition deadlines are not met. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions. When the multi-year ISP Agreements expire, there is no automatic renewal. At that point, the existing ISP can bid for the CSA again, though FedEx Ground may also consider external candidates in order to contract with the best candidate in terms of experience, ability to provide service, cost, as well as other factors.

**17. Can a Ground contractor acquire a Home Delivery (HD) route (or vice versa) as part of the Tennessee transition?**
Yes, but a new OA will need to be signed for the HD (or Ground) route. This new contract will expire on October 8, 2010, though an extension will be granted if the contractor is at scale.

**18. How does the transition to the ISP Model affect contractors operating PSAs in different Tennessee stations?**
FedEx Ground is willing to consider the particular circumstances and make a decision as to whether these contractors are considered to be at scale to negotiate an ISP Agreement. Station management can discuss potential options.

**19. Can a Tennessee ISP still flex to contractors based in adjacent states?**
No, unless that contractor is an ISP. All Tennessee packages must be delivered by an ISP that is in compliance with all laws.

**20. With whom will ISP Candidates negotiate?**
While Senior Managers are an important part of the process for identifying ISP Candidates, Pittsburgh-based FedEx Ground employees will serve as Negotiators on behalf of the Company.

**21. Is negotiating an ISP Agreement for a one-year term an option?**
Generally, ISP Agreements will be negotiated for a three-to-five year period; however, shorter or longer contract periods will be subject to the parties' negotiations.

**22. What impact will FedEx Ground's ISP Model announcement have on the Company's Incorporation and Compliance Disclosure announcement made on May 20, 2010? Does the non-renewal notice on May 20, 2010 still remain in effect?**
The ISP Model announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines set forth in the ISP Transition Guide apply. The non-renewal notice on May 20, 2010 remains in effect.

**23. If a contractor already received an extension as a result of the Company's Incorporation and Compliance Disclosure announcement, what happens to that extension?**

Any extension a contractor has already received remains in effect, unless they sign the Contractor Limited Release and Operating Agreement Modification, which will change the termination date of any Operating Agreement to October 8, 2010. If a contractor does not sign the Contractor Limited Release and Operating Agreement Modification, then the Operating Agreement will expire at the end of any extension the contractor already received as a result of the Company's Incorporation and Compliance Disclosure announcement

**24. Will contractors affected by the ISP Model announcement still receive the $750 early adoption incentive that FedEx Ground announced on May 20, 2010?**

Yes. As a good-will gesture on the part of the company, all affected P&D contractors will receive the $750 early adoption incentive associated with the May 20, 2010 announcement, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More details will be available in the coming weeks.


*A Comprehensive Q&A List can be found on www.mygroundbiz.com.*


Tennessee

33

# EXHIBIT 4



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

**FOR IMMEDIATE RELEASE**
**July 15, 2010**

**MEDIA CONTACT:**
**Melissa Karpinsky**
**Harry Pierre**
**(617) 727-2543**

## AG COAKLEY'S OFFICE RECOVERS OVER $3 MILLION IN TAXPAYER FUNDS BACK TO COMMONWEALTH IN SETTLEMENT WITH FEDEX GROUND

*Company's Alleged Misclassification Of Workers Led To Underpayment To Commonwealth For Payroll Taxes, Worker's Compensation, and Unemployment Insurance*

**BOSTON** – Attorney General Martha Coakley's Office has entered into a multi-million dollar agreement with Pittsburgh-based FedEx Ground to settle claims the company misclassified its drivers as independent contractors. Pursuant to the settlement, FedEx Ground agreed to pay more than $3 million back to the Commonwealth's general fund. The Attorney General's Office alleged that FedEx Ground's failure to properly classify drivers had led the Company to make lesser payments to the Commonwealth for payroll taxes, worker's compensation and unemployment assistance.

"We have made enforcement against employer misclassification a priority because employers who misclassify workers are gaining an unfair advantage over their competitors and unfairly depriving the Commonwealth of tax and other revenues," AG Coakley said. "With today's agreement, we have recovered $3 million owed to taxpayers and taken a step to level the playing field for businesses. I want to thank Governor Patrick and his Executive Office of Labor and Workforce Development and the Department of Revenue for assisting in the investigation and resolution of this matter."

In 2007, the Attorney General's Office cited FedEx Ground for violation of the Independent Contractor Law, by misclassifying its drivers, failing to provide a proper paystub, failing to provide workers' compensation, not paying overtime to certain drivers, and neglecting to deduct and withhold state income taxes. FedEx Ground appealed the matter to the Division of Administrative Law Appeals (DALA). The Attorney General's Office citations against Fed Ex Ground included penalties of more than $190,000.

While FedEx Ground's appeal was pending before DALA, the Attorney General's Office coordinated further investigation with the Executive Office of Labor and Workforce Development and the Department of Revenue into FedEx Ground's business practices. The joint investigation revealed that FedEx Ground's misclassification of employees had resulted in significant underpayments to the Department of Revenue, Division of Industrial Accidents and

Department of Unemployment Assistance.

The settlement amount includes these significant underpayments. The settlement also provides for a payment for the 13 drivers named in the Attorney General's citation. FedEx Ground drivers in Massachusetts have brought their own lawsuit against FedEx Ground that remains pending and is not affected by this settlement. FedEx Ground denies liability in the settlement.

The Massachusetts Independent Contractor <u>Law</u> provides that an individual performing any service shall be considered to be an employee unless: (1) the individual is free from control and direction in connection with the performance of the service, both under his or her contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

#########

## AGREEMENT

This Agreement ("Agreement") is entered into this ___ day of _____, 2010 by and between the Attorney General for the Commonwealth of Massachusetts (hereinafter "Attorney General"), the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance (hereinafter referred to collectively under this Agreement as the "Commonwealth"), on the one hand, and FedEx Ground Package System, Inc. (hereinafter "FedEx Ground"), on the other hand.

## I.   DEFINITIONS AND IDENTIFICATION OF PARTIES

A.   "FedEx Ground" shall mean FedEx Ground Package System, Inc., and its successors, assigns, subsidiaries and divisions, and including any of their officers, agents, directors, and employees; FedEx Ground is a national package delivery service provider which at all relevant times has operated, and continues to operate, in the Commonwealth of Massachusetts.

B.   The Attorney General is charged with enforcement of various Wage and Hours Laws, including but not limited to G.L. c. 149, § 148B, the Independent Contractor Misclassification Act, and other related statutes and regulations.

C.   The Commonwealth's Department of Revenue is responsible for the administration of tax matters, including but not limited to the administration of employers' obligations to withhold taxes on wages paid to employees. G. L. c. 62B, § 2; G. L. c. 62C, § 10.

D.   The Commonwealth's Department of Industrial Accidents is responsible for the administration and enforcement of the Massachusetts workers compensation system, including but not limited to the administration of the Workers' Compensation Trust Fund ("Trust Fund"),

1

which provides workers compensation benefits on approved claims to injured employees of uninsured employers. G.L. c. 152, §§ 25C and 65.

    E.    The Commonwealth's Division of Unemployment Assistance administers the unemployment insurance program in the Massachusetts, which provides eligible unemployed workers with temporary income replacement, as provided by G.L. c. 151A.

    F.    "Contractor(s)" shall mean individuals and entities that have contracted with, and been engaged by, FedEx Ground to provide package pick-up and delivery services in Massachusetts or from a Massachusetts terminal pursuant to either a FedEx Ground Pick-Up and Delivery Contractor Operating Agreement or a FedEx Home Delivery Standard Contractor Operating Agreement.

    G.    "Driver(s)" shall mean Contractors, entities, or individuals including Contractor Retained Drivers who have provided package pick-up and delivery services in Massachusetts or from a Massachusetts terminal for FedEx Ground.

    H.    "ISP Model" shall mean a business model substantially similar to the Independent Service Provider model previously implemented in New Hampshire by FedEx Ground and currently being implemented in Maryland, as described in the materials which FedEx Ground has provided to the Commonwealth, and illustrated in the document attached hereto as Exhibit A (sample Maryland ISP Agreement).

    I.    "ISP" shall mean an "Independent Service Provider," an independent incorporated business that contracts with FedEx Ground for the pick-up and delivery of packages, and takes responsibility for hiring, training, and supervising its own employees and ensuring compliance with the Commonwealth's laws with respect to those employees.

2

J.     "Effective Date" shall mean the date on which this Agreement has been fully executed by each of the Parties.

## II. RECITALS

WHEREAS, on December 19, 2007, the Attorney General issued thirteen citations to FedEx Ground, ## WH070113-125, arising from the Attorney General's findings that FedEx misclassified certain package delivery Drivers as independent contractors, in violation of G.L. c. 149, § 148B, and that as a result of that misclassification, FedEx Ground violated other labor and employment laws, including the failure to provide workers compensation (G.L. c. 152, §§ 25A and 25C) and failure to remit employee wage withholding taxes (G.L. c. 62B, § 2; G.L. c. 62C, § 10), as well as the failure to provide suitable pay stubs and to pay overtime, in violation of G.L. c. 149, § 148 and G.L. c. 151, §§ 1A and 1B (the "Citations");

WHEREAS, FedEx Ground's appeal from the Citations to the Commonwealth's Division of Administrative Law Appeals ("DALA"), under G.L. c. 149, § 27C (b)(4), remains pending before DALA, Docket Numbers LB-08-1 through LB-8-13;

WHEREAS, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance have each undertaken their own investigations of FedEx Ground's treatment and classification of its Drivers as independent contractors under Massachusetts law;

WHEREAS, the Attorney General, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance have each determined that it is in the public interest to enter into this Agreement at this time;

3

WHEREAS, FedEx Ground and the Commonwealth wish to settle and resolve all pending disputes, investigations, audits, and appeals as described above with the Commonwealth regarding FedEx Ground's alleged misclassification and/or treatment of Drivers under Massachusetts law;

WHEREAS, the Commonwealth has had the opportunity to review documentation that FedEx Ground has provided regarding FedEx Ground's Independent Service Provider model ("ISP Model");

WHEREAS, FedEx Ground seeks to implement its ISP model in Massachusetts no later than July 1, 2011, and seeks to defer any enforcement action which may be undertaken by the Commonwealth arising under the ISP model for twelve (12) months after the Effective Date of this Agreement, as defined below;

WHEREAS, after the expiration of the twelve month period, the Attorney General, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance may each evaluate and undertake any enforcement action as permitted by law, and in their sole discretion, to ensure that FedEx Ground's business practices arising under the ISP model are in conformity with Massachusetts law;

NOW, THEREFORE, in consideration of their mutual agreement to the terms of this Agreement, and such other consideration as described herein, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## III. PAYMENT TO BE MADE BY FEDEX GROUND PURSUANT TO THIS AGREEMENT

A. Without conceding liability, FedEx Ground agrees to pay to the Attorney General a total amount of $3,050,000.00, subject to Paragraph III B below, within five business days of the Effective Date, to be distributed as follows:

4

| | |
|---|---|
| Attorney General's Trust Fund<br>for educational initiatives to reduce employee misclassification | $ 200,000.00 |
| Joint Task Force on the Underground Economy<br>and Employee Misclassification Expendable Trust | $ 200,000.00 |
| The Commonwealth's General Fund | $ 190,000.00 |
| Department of Revenue | $1,329,000.00 |
| Workers' Compensation Trust Fund | $ 442,000.00 |
| Division of Unemployment Assistance | $ 689,000.00 |

The funds shall be remitted by electronic transfer to the Commonwealth of Massachusetts, the Office of the Attorney General, "ABA #011075150," Account Number 00088882022, located at Sovereign Bank, 78 State Street, Boston, MA 02109.

The $200,000 distributed to the Attorney General's Trust Fund shall be expended by the Attorney General's Office for purposes of educating employers and members of the public about compliance with the Massachusetts Wage and Hour Laws and including the Independent Misclassification Statute, G.L. c. 149, § 148B. In the event that the Attorney General has not expended all of the $200,000 within two years of receipt of the funds, the Attorney General shall transfer any unexpended funds to the General Fund.

The $200,000 distributed to the Joint Task Force on the Underground Economy and Employee Misclassification Expendable Trust ("the Trust") shall be expended for the purposes of implementing and administering Executive Order No. 499. In the event that the Trust has not expended all of the $200,000 within two years of receipt of the funds, the Task Force shall transfer any unexpended funds to the General Fund.

The $689,000 distributed to the Division of Unemployment Assistance shall be credited to the solvency account established pursuant to M.G.L. c. 151A, § 14(e).

B.   Payment to the Attorney General of $300,000 of the total payment of $3,050,000.00 referenced above shall be deferred until a time not later than September 1, 2011, when the Attorney General, having had an opportunity to determine to her satisfaction that FedEx Ground has made no material change in the operation of its current Contractor model between the Effective Date and the ISP Launch Date, shall accept the $300,000 deferred portion of the payment in exchange for a fully executed Supplemental Release of FedEx Ground for the period from Effective Date to ISP Launch Date (defined below), in the form attached hereto as Exhibit B. These funds shall be allocated to the Department of Revenue and shall be remitted by electronic transfer to the Commonwealth of Massachusetts, the Office of the Attorney General, "ABA #011075150," Account Number 00088882022, located at Sovereign Bank, 78 State Street, Boston, MA 02109.

C.   As further consideration for the Commonwealth's entering into this Agreement, FedEx Ground will pay an additional $195,000, representing payment of $15,000 to each of the thirteen Contractors identified in the Citations, and only to those thirteen Contractors. FedEx Ground shall transmit this payment to the Attorney General, for the benefit of the Contractors, within five business days of the Effective Date. The Parties agree that these payments are not related to claims pending in court by these thirteen Contractors relating to their classification as independent contractors and that these payments will not affect any claims these thirteen Contractors, or any Drivers, are asserting, or may assert in the future, in any forum(s) relating to their classification.

D.   FedEx Ground agrees not to further appeal or to otherwise dispute the Citations now pending before DALA, Docket Numbers LB-08-1 through LB-8-13, and shall withdraw the appeal with prejudice contemporaneously with the signing of this Agreement. The Attorney

6

General agrees to withdraw and dismiss the Citations with prejudice within ten days of receiving notice that FedEx Ground has withdrawn its appeal.

E.    FedEx Ground further agrees not to further appeal or to otherwise dispute its consolidated appeals from certain determinations made by the Division of Unemployment Assistance, now pending before the Division's Boston Hearings Region, including Docket Numbers 494708, 494709, and 500067 (formerly 490226), and an undocketed appeal involving FedEx Home Delivery, and shall withdraw the appeals with prejudice contemporaneously with the signing of this Agreement. The Division of Unemployment Assistance agrees not to use such determinations as a basis for initiating any legal or administrative proceeding under M.G.L. c. 151A against FedEx Ground, provided that it has received notice that FedEx Ground has withdrawn its appeals, provided further that the pending individual claim of Donna Eickhorst is exempted from this provision.

F.    FedEx Ground agrees that the $1,029,000.00 payment allocated to the Department of Revenue under Paragraph III. A - shall be applied by the Department of Revenue to withholding tax periods that precede the Effective Date; and that the deferred $300,000.00 payment allocated to the Department of Revenue under Paragraph III. B shall, upon receipt, be applied to withholding tax periods between the Effective Date and the ISP Launch Date. FedEx Ground further agrees not file any tax abatement claims, appeals or otherwise dispute the Department of Revenue's right to retain the payments allocated hereunder. The Parties further agree to accept the terms of this Agreement as full and final settlement and release of any and all withholding tax claims arising out of independent contractor classification issues related to drivers for the withholding tax periods to which the allocated payments are applied.

## IV. ASSURANCES REGARDING IMPLEMENTATION OF ISP MODEL

A.     FedEx Ground's Assurance to the Commonwealth.

    1.     Transition to ISP Model.  FedEx Ground will transition from a Contractor model to an ISP Model in Massachusetts, and anticipates that this transition will be completed by no later than July 1, 2011.  The date that FedEx Ground completes the transition to the ISP Model in Massachusetts shall be called the "ISP Launch Date."

    2.     Documentation of Transition.  FedEx Ground will provide the Attorney General with copies of the initial ISP announcement packet provided to Contractors regarding the transition to the ISP Model, no later than one week after the ISP announcement.

    3.     Additional Documentation to be submitted to the Attorney General. FedEx Ground will provide the Attorney General with copies of the signed contracts between FedEx Ground and the ISPs that have been entered into as of three months after the ISP Launch and those contracts entered into thereafter, until twelve months following the ISP Launch Date.

B.     Failure by FedEx Ground to fully comply with any of the terms of Sections III A-E, IV A and C, and VI A.1 – A.2 of this Agreement shall constitute a material breach.  The Parties agree that, upon breach, this Agreement may be voidable by the Commonwealth, and that the Commonwealth may pursue any and all enforcement action and remedies available at law and in equity.

C.     The Commonwealth's Assurance to FedEx Ground.  For a period of time from the Effective Date until twelve (12) months thereafter, the Commonwealth will not initiate any legal or administrative proceeding against FedEx Ground, either on behalf of the Commonwealth or any individual or entity, arising from FedEx Ground's classification or treatment of any Drivers, ISPs, or of the ISPs' employees; provided, however, that the Attorney General's issuance of private right-of-action letters shall not be considered to be a violation of this provision; and further provided that DUA may fully participate in the processing and adjudication of any claims, and appeals from determinations and decisions on those claims, that were initiated by an individual claimant filing a claim for unemployment compensation.  The Commonwealth expressly reserves the right to evaluate whether the ISP Model in practice operates in conformity to the documentation supplied by FedEx Ground and with Massachusetts law at the expiration of this twelve (12) month period after the Effective Date.  The statute of limitations for any and all causes of action, including any and all statutory agency action, which the Commonwealth may have against FedEx Ground for the misclassification of ISPs or ISPs' employees shall be tolled during this twelve (12) month period after the Effective Date.  Furthermore, the Commonwealth reserves the right to audit, investigate, and to take enforcement action against any ISP at any time.  FedEx Ground agrees to preserve and maintain all records of the same type, nature or category as is currently maintained in New Hampshire and Maryland with respect to its ISPs for a period of three years from the Effective Date.  FedEx Ground further agrees not to implement or execute any document destruction or deletion policies during this three-year time period with respect to ISP records.  FedEx Ground further agrees to fully cooperate in any investigation undertaken of ISPs by the Commonwealth and to provide any such requested records to the Commonwealth within 20 business days of any request for production.

## V. **ENFORCEMENT**

A.     <u>Enforceable Under Massachusetts Law</u>.  The Parties agree that this Agreement constitutes a legally enforceable agreement.  This Agreement shall be governed by the laws of the Commonwealth of Massachusetts for all purposes, including enforcement, and may be amended or modified only in writing executed by the Parties.  The parties agree that any disputes or claims arising from this agreement shall be submitted to the Superior Court. The terms of this final settlement between the Parties shall not be subject to appeal in any forum.

B.     <u>Authority</u>.  The parties executing this document represent and warrant that they have the full legal power, capacity, and authority to bind the parties for whom they are acting and to perform all specified obligations arising hereunder, and that this Agreement constitutes a legal, binding obligation of each party hereto, enforceable in accordance with its terms.

C.     <u>Enforceable By Parties Only</u>.  This Agreement may be enforced only by FedEx Ground and the Attorney General, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance.  Nothing in this Agreement shall permit or provide any rights to any person or entity not a party hereto to enforce any provision of this Agreement.  No person or entity not a signatory hereto is a third-party beneficiary of this Agreement.  Nothing in this Agreement shall be construed to affect, limit, alter, or assist any private right of action that a third party may hold against FedEx Ground.

D.     <u>Application</u>.

1.     <u>Application to FedEx Ground</u>.  This Agreement shall be binding on FedEx Ground, its subsidiaries and divisions, its successors and assigns, and its officers, managers, directors, and employees.

10

2.  <u>Application to the Commonwealth</u>.  This Agreement shall be binding on the Attorney General, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance and each of their employees and agents.

## VI. **GENERAL PROVISIONS**

A.  <u>Release</u>.  This Agreement, except as set forth in Paragraph VI A.1 and A.2 below, constitutes a full and final settlement and release by the Attorney General, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance from any and all claims, assessments, determinations and causes of action against FedEx Ground and its successors, assigns, subsidiaries and divisions, their officers, agents, directors, and employees, solely arising out of the alleged misclassification and related alleged violations of G.L. c. 149, Section 148B, which were or could have been asserted by the Commonwealth up to the Effective Date of this Agreement (the "Released Claims").

A.1.  While not admitting liability, FedEx Ground will not dispute any unemployment insurance benefit claims that have been filed and/or may be filed by any Driver, for claims arising up to the ISP Launch Date, on the ground that the individual is ineligible to receive unemployment benefits based upon independent contractor status.  FedEx Ground expressly reserves the right to dispute the claimed entitlement to unemployment insurance benefits based upon all factors other than classification, as permitted by Massachusetts law.  Subject to FedEx Ground's right to appeal a DUA finding on factors other than classification, FedEx Ground agrees to pay legally required contributions, interest, and penalties arising from a DUA finding that an individual Driver is eligible for unemployment benefits.  FedEx Ground further agrees that during the transition period from the Effective Date until the ISP Launch Date, if a Driver fails to file contribution reports and/or fails to pay unemployment contributions for either him or herself or for any other Driver hired by him or her, and that deficiency has not been corrected

11

thirty (30) days after proper written notice from the DUA has been issued to both the Driver and FedEx Ground, FedEx Ground will be notified in writing by the DUA to the address set forth below in Paragraph VI I.2 and FedEx Ground will pay to the DUA as a further settlement payment under this Agreement amounts equal to any unpaid unemployment contributions, interest, and penalties for the Driver(s) in question.

A.2.    While not admitting liability, FedEx Ground will not dispute any workers compensation benefit claims that have been filed and/or may be filed by any Driver, for any claims arising up to the ISP Launch Date on the ground that the individual Driver is ineligible to receive workers compensation benefits based upon independent contractor status. FedEx Ground expressly reserves the right to dispute the claimed entitlement to workers compensation benefits based upon all factors other than classification, as permitted by Massachusetts law. FedEx Ground agrees, however, not to dispute and to fully reimburse, the Department of Industrial Accident's Trust Fund, upon demand, for any such uninsured claims for benefits brought by or on behalf of Drivers that have been accepted or may be accepted by the Trust Fund up to the ISP Launch Date.

A.3.    The Parties agree that neither FedEx Ground's failure to contest benefit claims, under Paragraphs A.1 or A.2 above, nor any administrative or judicial decision resulting from any such claims on the basis of independent contractor status, will be treated as an admission or a finding that any FedEx Ground Driver was improperly classified at any time covered by this Agreement.

B.    No Admissions. FedEx Ground expressly denies any liability or wrongdoing, and this Agreement is not intended to be and shall not in any event be construed or deemed to be, or represented or caused to be represented as such by any party hereto, an admission or concession

or evidence of any liability or wrongdoing whatsoever on the part of FedEx Ground or of any fact or any violation of any law, rule, or obligation. The Parties agree that nothing in this Agreement will be treated as assent by the Commonwealth to FedEx Ground's classification of the Drivers and further that nothing in this Agreement constitutes assent or agreement by the Commonwealth that the ISP Model is in conformity with Massachusetts laws. This Agreement is made without trial or adjudication of any alleged issue of fact or law and without any finding of liability of any kind.

C.    No Limitation of Claims or Defenses. This Agreement shall not be construed or used as a waiver or any limitation of any claim, allegation or defense otherwise available to FedEx Ground or the Commonwealth in any pending or future legal or administrative action or proceeding relating to FedEx Ground's conduct prior to the Effective Date of this Agreement or of FedEx Ground's right to defend itself from, or make any arguments in, any individual or class claims or suits relating to the existence, subject matter, or terms of this Agreement.

D.    Settlement Communications. The settlement negotiations resulting in this Agreement have been undertaken by FedEx Ground and the Attorney General, on behalf of the Commonwealth, in good faith and for settlement purposes only, and no evidence of negotiations or communications underlying this Agreement shall be offered into evidence by the parties in any action or proceeding for any purpose. Neither this Agreement nor any public discussions, statements, or comments with respect to this Agreement by the Commonwealth or FedEx Ground shall be offered by the parties in evidence in any action or proceeding for any purpose other than in an action or proceeding between the parties arising under this Agreement or to rebut an allegation relating to the Agreement or that a party has not acted in good faith. The parties agree further that communications between the parties made in furtherance of this Agreement

shall be kept confidential to the fullest extent permitted by law and publicly disclosed only as required by law, except that such information, records, or documents may be used by the Commonwealth in investigation of, or proceedings resulting from, possible violation of this Agreement.

E.     Entire Agreement.  This Agreement is entered into by the Parties as their own free and voluntary act and with full knowledge and understanding of the nature of the proceedings and the obligations and duties imposed by this Agreement.  This Agreement sets forth the entire agreement between the Parties with respect to the matters discussed herein only, and it shall not bind any other private party or governmental entity, nor release FedEx Ground from liability for any other conduct not identified or described herein.  There are no representations, agreements, arrangements, or understandings, oral or written, between the Parties relating to the subject matter of this Agreement that are not fully expressed herein or attached hereto.  FedEx further agrees that it will not construe this Agreement against any Drivers in their private lawsuits against the company.

F.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

G.     Mutually Drafted.  This Agreement shall be deemed to have been mutually drafted by the Parties and shall not be construed against any Party as the author thereof.

H.     Titles and Headings.  The titles and headings in this Agreement are for convenience purposes only and are not intended by the parties to lend meaning to the actual provisions of the Agreement.

I.  Notices/Delivery of Documents.

1.  Notice to the Commonwealth or Attorney General.  Any notices or other

documents sent to the Commonwealth or the Attorney General pursuant to this

Agreement shall be sent to:

Assistant Attorney General Karla E. Zarbo
Office of the Attorney General
Fair Labor Division
1 Ashburton Place, 18th Floor
Boston, MA 02108

2.  Notice to FedEx Ground.  Any notices or other documents sent to FedEx

Ground pursuant to this Agreement shall be sent to:

Clifford P. Johnson, Senior Vice President and General Counsel, or his successor.
FedEx Ground Package System, Inc.
1000 FedEx Drive
Moon Township, PA 15108
Fax Number - 412 859-5450
Telephone number - 412 262-6290

3.  Mailing of Notices.  All notices or other documents to be provided under

this Agreement shall be sent by United States mail, certified mail, return receipt

requested, or other nationally recognized courier service that provides for tracking

services and identification of the person signing for the notice or document, and

shall be deemed sent upon mailing.  Any party may update its address by sending

written notice to the other parties.

IN WITNESS WHEREOF, the Parties, through their fully authorized representatives, have agreed to this Agreement.

**FedEx Ground Package System, Inc.**

By: _MP Mannion_

Name: _MIKE MANNION_

Title: _EVP and COO_

Date: _7/14/10_

**Massachusetts Department of Revenue**

By: _K. W. B_

Name: _KEVIN W. BROWN_

Title: _GENERAL COUNSEL_

Date: _7/13/2010_

**Massachusetts Division of Unemployment Assistance**

By: _Judith Cicatello_

Name: _Judith Cicatello_

Title: _Director_

Date: _7-13-10_

**Attorney General for the Commonwealth of Massachusetts**

By: _K_

Name: _Kevin Conroy_

Title: _Deputy Second Assistant_

Date: _7/14/10_

**Massachusetts Department of Industrial Accidents**

By: _William C. Tattan_

Name: _William C. TATTAN_

Title: _GENERAL COUNSEL_

Date: _7-13-10_

16

**EXHIBIT B**

**SUPPLEMENTAL RELEASE**

  This Supplemental Release constitutes a full and final release by the Attorney General, the Department of Revenue, the Department of Industrial Accidents, and the Division of Unemployment Assistance from any and all claims, assessments, determinations and causes of action against FedEx Ground and its successors, assigns, subsidiaries and divisions, their officers, agents, directors, and employees, solely arising out of the alleged misclassification and related alleged violation of G.L. c. 149, § 148B, which were or could have been asserted by the Commonwealth between the Effective Date and the ISP Launch Date, as defined in Paragraphs IJ and IVA.1 of the Agreement to which this Supplemental Release is attached as Exhibit B ("the Agreement"). This Supplemental Release supplements and incorporates by reference the terms of the Agreement as if fully set forth herein.

  **IN WITNESS WHEREOF**, the Parties, through their fully authorized representatives, have agreed to this Agreement.

**FedEx Ground Package System, Inc.**

By:_____

Name:_____

Title:_____

Date:_____

**Attorney General for**
**the Commonwealth of Massachusetts**

By:_____

Name:_____

Title:_____

Date:_____

**Massachusetts Department of Revenue**

By:_____

Name:_____

Title:_____

Date:_____

**Massachusetts Department of**
**Industrial Accidents**

By:_____

Name:_____

Title:_____

Date:_____

**Massachusetts Division of Unemployment Assistance**

By:_____

Name:_____

Title:_____

Date:_____

# EXHIBIT 5

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California  90071-2899

TELEPHONE  (213) 430-6000
FACSIMILE  (213) 430-6407
INTERNET  www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

July 15, 2010

OUR FILE NUMBER
259,075-208

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA FEDEX**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge St., 20th Fl.
Boston, Massachusetts 02114

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California  94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota  55401

Re:     *FedEx Ground Package System, Inc. Employment Practices Litig.*; No.
         **3:05-MD-527-RM, MDL 1700 (N.D. Ind)**

Dear Mr. Harwood, Ms. Faris, Ms. Ellingstad and Ms. Liss-Riordan:

Today, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor workforce model ("Independent Service Provider") in Massachusetts. As part of that announcement, FedEx Ground is offering an ISP transition incentive to each Massachusetts contractor, provided the contractor signs a limited release with respect to the transition.

As a courtesy, please find enclosed the following documents and information, which FedEx Ground has made available to its contractors who presently service primary service areas ("PSAs") in Massachusetts and/or are domiciled in a Massachusetts facility:

1.     Massachusetts Transition Information;

2.     Questions & Answers Regarding the Massachusetts Transition;

3.     Sample Contractor Limited Release and Operating Agreement Modification

4.     Illustrative Independent Service Provider (ISP) Agreements;

5.     DVD from FedEx Ground Executive Vice President and COO Michael
Mannion, concerning today's announcement;

6.     ISP Transition Timeline.

This information is being provided to you in case you receive questions from contractors
who are class members in the *Craig v. FedEx Ground Package System, Inc.*, No. 3:05-cv-00530
RLM CAN (N.D. Ind.); *Sheehan v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00531-
RLM-CAN (MA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Urbank/Somers v.
FedEx Ground Package Sys.*, Civil No. 3:08-cv-00575-RLM-CAN (MA), Case No. 3:05-MD-
527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-
00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v.
FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM
(MDL 1700) (N.D. Ind.); and/or *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-
GAO (D. Mass.) cases that are part of the multi-district litigation (MDL) involving FedEx
Ground and/or Massachusetts-based actions involving FedEx Ground contractors. The foregoing
is without prejudice to FedEx Ground's rights, remedies and defenses. Please call me if you
have any questions.

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

Enclosures

cc:  Massachusetts contractors

LA3:1167162.1

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-208

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA FEDEX**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: ___FedEx Ground Package System, Inc. Employment Practices Litig.__; No.
___3:05-MD-527-RM, MDL 1700 (N.D. Ind)___

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

Today, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor workforce model ("Independent Service Provider") in its Albany, New York facilities with regard to contractors who provide service to Massachusetts. As part of that announcement, FedEx Ground is offering an ISP transition incentive to some Albany contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, please find enclosed the following documents and information, which FedEx Ground has made available to Albany pickup and delivery contractors who have primary service areas ("PSAs") that provide service in Massachusetts:

1. Albany Transition Information;

2. Questions & Answers Regarding the Albany Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. Illustrative Independent Service Provider (ISP) Agreements;

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., and Susan Ellingstad, Esq. July 15, 2010 - Page 2

> 5. DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning today's announcement.

This information is being provided to you in case you receive questions from contractors who are class members in the *Craig v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Louzau v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00538-RLM-CAN (NY), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), and/or *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-GAO (D. Mass.) cases that are part of the multi-district litigation (MDL) involving FedEx Ground. The foregoing is without prejudice to FedEx Ground's rights, remedies and defenses. Please call me if you have any questions.

Thank you for your time and attention.

> Very truly yours,
>
> Matthew P. Eastus
> for O'MELVENY & MYERS LLP

Enclosures

cc: Albany contractors

LA3:1167161.2

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

July 15, 2010

OUR FILE NUMBER
259,075-208

**VIA U.S. MAIL**

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge St., 20th Fl.
Boston, Massachusetts 02114

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: *FedEx Ground Package System, Inc. Employment Practices Litig.*; No. **3:05-MD-527-RM, MDL 1700 (N.D. Ind)**

Dear Mr. Harwood, Ms. Faris, Ms. Ellingstad and Ms. Liss-Riordan:

This is a follow up to my letter dated today concerning FedEx Ground Package System, Inc.'s announcement of its intention to transition to a new contractor workforce model (Independent Service Provider) in Massachusetts. The Massachusetts pickup and delivery contractors to whom the information listed in my prior letter was provided are listed below:

| | |
|---|---|
| Almeida, Alexandre Dias | Beaudreau, Paul |
| Adams, Lawrence | Benjamin, Eric Scott |
| Levesque, Adam Ryan | Berch, Leonard W. |
| Almeida, Digenario T. | Bergstrom, Elizabeth M. |
| Almelda, Louis | Bernat, Edward M. |
| Amezian, Zinse | Dos Santos, Damvian |
| Andersen, Mark | Ferreira, Gil |
| Moraes, Arlindo Marcio | Figueiredo, Bruno Lima |
| Henderson, Arlynn | Bonilla, Ricardo |
| Asiedu, Kwabena | Borchers, William R. |
| Awatin, Engracio | Boulet, Roger David |
| Babcock, Ralph | Brunache, Jean R. |
| Barbour, Anthony Durmond | Buitrago, Jairo |
| Barker, George | Butler, David J. |
| Baylies, Jeff | Knowlton, Craig |

Calnan, Michael Brandon
De Camargo, Antonio
Campos, Evaldo
Carlson, Steven
Carpentieri, Michael
Carvalho, Alvaro Fernando
Carvalho, Denis F.
Case, Randall
Chatman, Terry
Chonmany, Konchanh
Cofran, Keith
Collman, Christopher
Constantino, Anthony
Cosgrove, Michael
Costa, Carlos
Cotter, Daniel
Courtemanche, Craig
Knowlton, Craig
Dartt, Judith
DaSilva, Douglas
Davis, Jeffrey
DeMelo, Fernando
Adilson, Diana
Doering, John
Straube, Donnalee
Downs, James
Duval, David J.
Oliveira, Flaviano
Abreu, Edivania
Nascimento, Eduardo
Estes, Don Eugene
Soares, Steve
Henrique, Fabiana
Faherty, Thomas
Faria, Michael
Farr, Brian
Fernandes, Jose
Fernandes, Servolo
Fortin, Rock
Franco, Marco
Munroe, Ronald
Therrien, George
Gallivan, Walter
Joseph, Gary
Gately, Michael

Ghiraldelli, Roberto
Marois, Glenn Michael
Martin, Glen
Speller, Gerald
Haley, Mark J.
Harrington, John
Hayes, Steven
Haynes, Marc
Healy, Renee
Hemingawy, Jeffrey
De-Oliveira, Paulo
Hrye, Cecil
Iadonisi, Joseph
LaChance, Thomas
Ivenco, Eugen
Manoukian, James
Barrios, Svetlana
Riley, James K.
Croteau, James
Phelps, James
Jaro, Eduardo
LaRoche, Jason
Applin, John
Stevens, John
Johnson, Chris
Hernandez, Jose
Paniagua, Jose
Berger, Amy
Ruiz, Julio
Hay, Karen
Kay, Keith
Kirata, Zaid
Kiritsy, Peter
Kornn, Matthew
Colon, Luis Luna
Ladago, Thomas
Lamarca, Carmen James
Lamarre, Gardy
Leahy, David
Leandres, Dennis
Leduc, Thomas
Lenihan, Daniel
Luz, Andre
Figueiredo, Gustavo Lima
Lott, Michael

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq., and Shannon Liss-Riordan, Esq.   July 15, 2010 -
Page 3

Lott, Sara
Luce, David
MacDonald, Brian
MacFarlane, Michael
Mack, Charles M
Martineau, Jason
Santos, Temistocles
Duggan, James
Vaillancourt, Michael
McFadries, Steven
McGhee, Earl William
McGinn, Edward John
McIntire, Patrick
Drossos, Mark
Brennan, Michael
Miedema, Charles R.
Mingace, David
Moadarres, Morteza
Montrond, Manuel
Moore, Andre
Moraes, Arlindo Marcio
Moulton, Donald H.
Muchirahondo, Phinias
Mulvey, John Joseph
Mupazvirihwo, Raymond Chatambudza
Muratore, Paul Joseph
Nelson, Jonathan
Okoh, Dominic
Norton, William Bernard
Nosel, Thomas
Moore, Elizabeth
Pady, Fritz
Paterni, Robert
Martin, Patrick
Pepino, Enrique
Pepino, Rafael
Perez, Hector
Peverada, Lawrence P
Currant, Phil
Carpenter, Juliana
Proctor, Ryan Eric
Araujo, Robson
Fonseca, Robert
Heleodoro, Ramon
Valchev, Ivo V.

Bernard, Richard Brown
Rego, Randal
Rigonato, Carlos Eduardo
Riley, James K.
Ripley, Michael
Ripley, Stephen
Morgan, Robert
Ruiz, Robert
Robidoux, Neil Alfred
Romulo, Florencio
Rosa, Edwin
Samuel, Edmond
Amoros, Rudy
Pinto, Sam
Pelmas, John
Pelmas, John
Sangster, Robert A.
Santiago, Jose L.
Kouame, Amani
Sasseville, Mark R.
Sathler, Hiran Abiff
Sauveur, Ston
Scheip, Anthony
Schwann, Clayton
Sexton, Randall
Hefner, Shawn
Abdullah, Roslan
Silva, Vinicius Barbosa
Foulds, Samuel
Barros, Alessandro Fernandes
Souza, Sheslei
Silva, Stenio
Stewart, Kevin
Stojanovic, Zivorad
Sutherlin, James
Svenson, Richard
Swan, Jeremy
Swan, Jr., Jeremy C.
Taborda, Fernando
Zereit, Ted
Todoroff, Andrew
Urbank, Dale
Noureddine, Lahyani
Silva, Ricardo Nunes
Wetterberg, Ronald P.

case 3:05-md-00927-RLM -CAN document 2088 filed 07/19/06 page 3 of 44

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq., and Shannon Liss-Riordan, Esq.  July 15, 2010 -
Page 4

Valerio, Duarte Manuel                    Meehan, William
Vilomar, Alexander                        Wheeler, Shelley
Vitale, Eric                              White, David E.
Almeida, Walker Lopes                     Pereira, Peterson Souza
Wendell, Donnell

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

LA3:1168111.1

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D C
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-208

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

## VIA U.S. MAIL

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re:     ***FedEx Ground Package System, Inc. Employment Practices Litig.; No.
3:05-MD-527-RM, MDL 1700 (N.D. Ind)***

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

This is a follow up to my letter dated today concerning FedEx Ground Package System, Inc.'s announcement of its intention to transition to a new contractor workforce model (Independent Service Provider) in its Albany, New York facilities with regard to contractors who provide service to Massachusetts. The Albany pickup and delivery contractors to whom the information listed in my prior letter was provided are listed below:

Clark, Allison
Amiri, David
Bellinghausen, Robert
D'Avella, Eugene
Giuliano, Vincent
Hoffay, Brett
Clark, Jeffrey
Barger, Jason
Lackey, Bruce
Lontrato, Anthony J.
Mallett, Larry R.
Romanzo, Sam
Stratton, Tighe

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., and Susan Ellingstad, Esq.  July 15, 2010 - Page 2

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

LA3:1168114.1

# Massachusetts
# ISP Transition Guide

Massachusetts

2

David F. Rebholz
President and Chief Executive Officer

1000 FedEx Drive
Pittsburgh, PA  15108

Telephone 412.269.1000
Fax 412.859.5687



Ground

A letter from the President:

As a result of discussions with the Commonwealth of Massachusetts, FedEx Ground has made the decision to transition to the Independent Service Provider (ISP) Model in Massachusetts and Rhode Island.  This change applies to all P&D contractors domiciled in Massachusetts and in Rhode Island as well as all P&D contractors domiciled in Albany, New York with primary service areas that provide service in Massachusetts.

This transition in Massachusetts is a necessary step in reaching an agreement that meets the needs of the state, contractors, our customers, and the Company.  Most importantly, it will ensure that P&D contractors will continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

The transition to the ISP Model affects only P&D contractors domiciled in Massachusetts and Rhode Island, along with Albany P&D contractors with routes that have service areas in Massachusetts.  Linehaul contractors are not affected.

This announcement to transition to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect.  Also, the 180-day contract extension previously offered to contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 remains available.

Although the incentive and incorporation timelines associated with the May 20 announcement no longer apply, all affected contractors will receive the $750 early adoption incentive. This $750 payment is a good-will gesture on the part of the company and will be paid to all affected contractors, regardless of whether they incorporate or pursue ISP candidacy.  Because linehaul contractors are not impacted by this ISP transition, the May 20, 2010 announcement still applies to them.

As with New Hampshire and Maryland, the transition to the ISP Model will involve important decisions and actions on the part of all affected P&D contractors.  To facilitate the transition, FedEx Ground is offering eligible contractors various options, ample time to consider them and financial incentives, which are discussed in this Transition Guide and will be further explained in additional communications.

The senior manager of your station will review all the pertinent details of the transition and ensure you receive the information you need throughout this process to make the best decisions for you and your business.  I encourage you to thoroughly review the contents of the attached ISP Transition Guide with your legal, business and financial advisors and to keep it on hand throughout the transition as a ready resource.

I am confident this is the most prudent course of action for our operations in these states.  Many contractors have already successfully transitioned their businesses to the ISP Model in New Hampshire and Maryland. Based on our experiences in these two states, I believe the transition to the ISP Model in Massachusetts, Rhode Island and Albany will be equally successful.

We look forward to working with each contractor throughout this transition. There will be much more communication and opportunity for discussion as we begin to navigate this change together.

Dave Rebholz
President and CEO

Massachusetts                                                                                                                                                    3

case 3:08-mc-00527-RLM -CAN document 2088-6 filed 07/19/10 page 15 of 44

Massachusetts

## What is the ISP Model?

The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent businesses that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs). In these states, FedEx Ground and ISPs enter into ISP Agreements, rather than the current Operating Agreement ("OA").

Under an ISP Agreement, ISPs agree to provide service within typically larger geographic service areas called Contracted Service Areas (CSAs). ISPs manage all aspects of the pick-up and delivery of packages within a CSA.

Under the ISP Model, ISPs negotiate a range of financial and non-financial terms on a multi-year basis according to the unique needs of the business and CSA. For example, ISPs have the ability to negotiate a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase.

The ISP Model is appealing to entrepreneurs wanting to focus on the management and administrative responsibilities of running a sizable pick-up and delivery company, and wanting to oversee significant business responsibilities that may lead to profitable growth opportunities.

<u>FedEx Ground Independent Service Provider Responsibilities</u>

Under an ISP Agreement, an ISP agrees to provide pick-up and delivery services through its employees. ISPs have the flexibility to conduct business operations and make all decisions related to vehicles, service areas, staffing and scheduling. These include the following:

**Vehicles**
- Choosing vehicles that best fit an ISP's unique operations, with FedEx Ground only establishing minimum standards for vehicles
- Incurring the costs of operating vehicles, including maintenance, repairs, fuel, tolls, taxes, registration fees and licenses
- Complying with the U.S. Department of Transportation (DOT) requirements for ISP employee-drivers since ISPs operate under FedEx Ground's DOT operating authority

**Contracted Service Areas (CSA)**
- Negotiating terms for the CSA, which provides the ISP with exclusive service rights
- Deciding how best to provide service over the CSA

**Staffing**
- Managing a team of ISP employee-drivers and potentially other workers (such as a Key Contact or helper) to perform the work
- Assigning work and determining when and on what terms it will be completed
- Supervising employees
- Recruiting and training staff
- Determining compensation and benefits for employees
- Complying with all state and federal employment laws

**Scheduling**
- Establishing work, leave and vacation schedules for all ISP employees

Massachusetts

5

**Business Operations**

- Deciding whether to expand the business by acquiring additional CSAs
- Incorporating (and not operating in some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), or similar entity), unless already incorporated
- Registering as a corporation in good standing and as an employer in the states in which the ISP does business. Note: If a contractor has previously incorporated, then that corporate entity likely has already registered in at least one state, but proof of current registration and good standing will nevertheless need to be shown. Contractors should consult their own legal, financial or tax advisors to determine if they need to be registered in any additional states.

<u>ISP Agreement</u>

Central to the ISP Model is an ISP Agreement, which is a legally-binding contract by which ISP Candidates (businesses seeking to enter into an ISP Agreement) have the opportunity to define their unique business relationship with FedEx Ground. An ISP Agreement outlines the service-level results expected and regulatory compliance requirements that ISPs have agreed to meet during the Negotiations Process for the term of an ISP Agreement.

The following represents a list of some, though not all, of the financial and non-financial terms and elections that may be negotiated in an ISP Agreement:

**Key Financial Terms**

- **Annual Service Charge** — A fixed charge paid weekly to an ISP for providing service to FedEx Ground
- **Stop Charge** – A charge paid to an ISP for each stop to a customer location where a package is picked up or delivered
- **Per Stop Fuel Surcharge** – A surcharge, indexed to the price of fuel, paid for each daily stop where a package is picked up or delivered
- **Surge Stop Charge** – A charge paid for any stop above the negotiated "Daily Stop Threshold"
- **Package Charge** — A charge paid to an ISP for each package that is picked up or delivered when an ISP makes a stop
- **Period Safety Incentive** — An incentive paid to an ISP following a 4-week Safety Period. The payment amount is based on a ratio of the number of preventable accidents during the Safety Period and the total number of vehicles the ISP utilizes during that period. If a preventable accident is recorded during a period, the incentive payment for the involved vehicle for that period, plus the next two periods (for a total of 3 periods), is affected
- **New Account Start-Up** ('Meet-and-Greet') — A fee paid to an ISP for an initial visit to a new customer that has been arranged by FedEx Ground
- **Spotted Trailer Charges** — A charge paid to an ISP for providing "Spotted Trailer" service at a customer's request

**Key Non-Financial Terms**

- **Length of Agreement** — The length of an ISP Agreement typically will be between three to five years, but an ISP Candidate may propose a shorter or longer term for its ISP Agreement
- **Expiration Date** — The end date of an ISP Agreement, as determined by the negotiated length of term
- **Number of Load Positions by Year** — A fixed number of dedicated load positions that will be available each year in the ISP's associated station
- **Daily Stop Threshold** — The number of combined pick-up and delivery stops, above which the Surge Stop Charge is triggered and the ISP is able to invoke the Right to Decline

**Elections**

- **Equipment Registration** — ISP Candidates may elect to register certain equipment in FedEx Ground's name under the International Registration Plan (IRP) for base plates
- **Customer Service Incentive** – A negotiable incentive paid to an ISP. The final amount of the payment is based on the ISPs customer service record during the 4-week reporting period
- **Periodic Maintenance Schedule** — ISP Candidates may elect to use the manufacturers' Periodic Maintenance Schedule or elect an alternative Periodic Maintenance Schedule
- **Fuel Tax Reporting** — ISP Candidates may elect to have FedEx Ground report and pay its fuel tax liability on the ISP's behalf
- **Facilitated Insurance Coverage** — ISP Candidates may elect to have FedEx Ground facilitate the procurement of required insurance for the ISP and pay the premiums on the ISP's behalf

Massachusetts

6

- **Brand Promotion Programs** — A fee paid by FedEx Ground if an ISP elects to have its ISP employee-drivers or employee-helpers wear FedEx Ground-approved uniforms and/or have some or all of its vehicles display FedEx Ground approved logos; the fee is paid weekly by FedEx Ground to the ISP
- **Arbitration** — An ISP can elect binding arbitration of disputes with FedEx Ground, if any, as detailed in an ISP Agreement

## ISP Agreement Negotiations

The ISP Agreement Negotiations Process provides each ISP Candidate the opportunity to negotiate an ISP Agreement with FedEx Ground for a specific CSA.

During negotiations, ISP Candidates have the ability to define their unique business relationship with FedEx Ground. Depending on the ISP Candidate's business needs and desires, an ISP Candidate may choose to pursue an agreement with a higher contract fee to achieve a higher percentage of fixed income. Alternatively, an ISP Candidate may want to pursue higher package or stop rates to increase variable income potential if volumes increase. Individualized negotiations will allow each ISP Candidate to pursue an agreement that is best suited for its business.

ISP Agreement negotiations are conducted electronically, and by phone, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals.

## What is Different About the ISP Model?

The ISP Model will bring fundamental changes to the manner in which FedEx Ground operates in the state. There will be changes made to the definition of service areas, the structure of the working relationship between FedEx Ground and independent business owners, and the manner in which contractual agreements are reached with independent businesses to provide pick-up and delivery services.

The following provides an overview of these changes and a preview of the decisions contractors must make during the transition.

### The ISP – FedEx Ground Relationship

Under the ISP Model, FedEx Ground will contract through a negotiated ISP Agreement with only larger businesses that operate as corporations and not some other form of business, such as a LLP, LLC, or similar entity.

Once the ISP Model is in place, FedEx Ground generally will limit its dealings to the individual selected by an ISP to represent the ISP, known as the "ISP Key Contact." The ISP Key Contact alone will deal with FedEx Ground and receive all written and verbal communication from FedEx Ground, except in limited circumstances. The ISP Key Contact then deals with ISP employees, including drivers and helpers, as the ISP Key Contact deems appropriate.

### Contracted Service Areas

A significant change under the ISP Model is the elimination of traditional PSAs in favor of larger geographic service areas – or CSAs. A CSA may comprise any combination of at least three Ground and/or Home Delivery PSAs in a single station. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location. While a CSA may include non-contiguous (non-adjoining) work areas, a higher level of operational efficiency will likely be achieved through contiguous work areas.

Massachusetts                                                                                                 7

<div align="center">

**Existing Operating Model
of a Contractor's Separate PSAs**



**Independent Service Provider
Model of an CSA**



</div>

CSAs will be defined as the combination of the PSAs operated by the ISP Candidate at the time negotiations begin. FedEx Ground PSAs are defined by Addendum 4 of the Ground OA and FedEx Home Delivery PSAs are defined by the proprietary ZIP Code listed in Addendum 4 of the Home Delivery OA. FedEx Ground will work with Home Delivery contractors to allocate non-proprietary areas based on data in the Home Delivery Vehicle Route Planning (VRP) PC. The ISP Agreement Addendum 4 will list entire ZIP Codes that are complete within a single CSA, as well as details of street address ranges where a ZIP Code is split among multiple CSAs.

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. FedEx Ground may seek multiple bids for the same CSA only in the event that the ISP Candidate's and FedEx Ground's negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

Once a negotiated ISP Agreement is signed, an ISP may trade or sell portions of its CSA, such as ZIP Codes, for the remaining term of the ISP Agreement, subject to the terms of the ISP Agreement. Additional negotiations may occur during the term of an ISP Agreement based on mutual agreement between FedEx Ground and the ISP. Changes to the CSA are one of the limited scenarios under which negotiations may occur. Modifications to a CSA will be documented on a schedule in an ISP Agreement. As an alternative, two ISPs can informally agree to sub-contract P&D work in the respective CSAs. However, the ISP that originally contracted for the P&D work will ultimately remain responsible for that work.

<u>Notable Provisions of an ISP Agreement</u>

There are many provisions that are different from the existing OA. Some of the notable provisions as follows:

**Right to Decline** -- The contractual right to decline certain requests, such as delayed-sort packages, pick-ups after 6:30 P.M. and stops above the negotiated Daily Stop Threshold.

**Service Expectations** -- ISPs will maintain service levels agreed to in an ISP Agreement such as: service days, pick-up and delivery services, collection and return of COD charges; service results (meet customer expectations, achieve inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher, avoid theft, loss, damage and delays, and conduct all business with honesty and integrity).

**Flexing** -- FedEx Ground will not offer company-coordinated flexing, meaning ISPs will need to ensure resources are in place to handle surges and variances in daily package volumes (such as Peak), whether by sub-contracting with other ISPs or by other means.

Massachusetts

8

## Other Notable Provisions

**Vehicles** – An ISP Agreement will require only that ISP vehicles meet government requirements, be white, have a height that is flush with conveyor walkways in the station, be of a size that allows for the station doors to close and maneuverability in the station.

**Service Account** – An ISP Agreement will not include a service account. Contractors will be paid the balance of their service accounts when the current OA expires or is terminated by agreement.

**Escrow** – An ISP Agreement will not provide for an Escrow Program. Contractors will be paid the balance of their Escrow Accounts when the current OA expires or is terminated by agreement.

**Business Support Package** – **Business Support Package** – FedEx Ground will not offer a Business Support Package in an ISP Agreement. ISPs will be able to seek business support services from any provider they choose.

**Scanners** – Scanners may be leased from FedEx Ground or leased or purchased from an outside provider.

**Additional details can be found in the Illustrative ISP Agreements**

## Illustrative Examples

Given the range of negotiable features contained in an ISP Agreement, and the differences from the existing OA, FedEx Ground is providing illustrative examples of the components of an ISP Agreement. The chart below sets forth **hypothetical** scenarios illustrating the significant flexibility ISP Candidates have in negotiating an ISP Agreement. For example, many revenue components are negotiable. The chart provided illustrates hypothetical revenue scenarios different ISP Candidates might negotiate in an ISP Agreement, such as Stop Charge, Package Charge and Surge Stop Charge.

In these hypothetical scenarios, some ISP Candidates elect to participate in the Optional Brand Promotion Programs, which includes the uniform program for ISP employee-drivers or employee-helpers and the vehicle program for some or all of the ISP's vehicles. In "Scenario 1," the ISP Candidate declines to participate in the Uniform Brand Promotion Program. The illustrative scenarios also reflect how ISP Candidates can negotiate a fee to be paid each time a "Meet-and-Greet" is performed with prospective new customers within the ISP's CSA.

Also, the chart illustrates a hypothetical range of business expenses such as employee wages and benefits, staffing and overtime expectations, vehicle choices and other needs, all of which are determined by the ISP Candidate. Actual costs and potential revenue will depend on how a particular ISP structures and operates its business.

As illustrated by the following chart, the **potential** for greater profit exists depending on an ISP's individualized revenue and cost decisions. The chart sets forth **potential** ranges of revenue, costs and hypothetical earnings that might result based on the characteristics of an ISP's CSA and individualized business decisions.

*The chart is for illustrative purposes only and should not set the terms of negotiation between ISP Candidates and FedEx Ground. The chart does not promise any particular range of outcomes.*

Massachusetts

9

**NOTE:** Please refer to the <u>Illustrative ISP Agreements</u> to see how the scenarios shown here might correspond with an actual ISP Agreement.

| | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| **Daily Route Dynamics** | Stops | 255 - 580 | | 450 - 900 | | 560 - 1800 | |
| | Stop Surge Threshold | 400 - 800 | | 500 - 1000 | | 1000 - 2000 | |
| | Packages | 750 - 1400 | | 1450 - 2220 | | 1575 - 2600 | |
| **Business Resources** | Vehicles | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Drivers | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Helpers | 0 | | 0 - 1 | | 0 - 1 | |
| **Key ISP Agreement Terms** | Annual Service Charge | $23K - $ 45K | | $35K - $40K | | $94K - $120K | |
| | Stop Charge | $1.24 - $2.85 | | $1.65 - $2.62 | | $1.43 - $2.60 | |
| | Per-stop Fuel Surcharge | $0.25 - $0.27 | | $0.24 - $0.25 | | $0.11 - $0.15 | |
| | Surge Stop Charge | $0.50 - $1.50 | | $0.49 - $1.48 | | $0.50 - $1.89 | |
| | Package Charge | $.05 - $0.15 | | $0.05 - $0.15 | | $0.10 - $0.15 | |
| | Period Safety Incentive | $2330 - $3160 | | $2700 - $2800 | | $3960 - $5250 | |
| | Period Customer Service Incentive | $710 - $1,803 | | $1,156 - $2,798 | | $1,623 - $3,676 | |
| | New Account Start-Up | $8.00 - $10.00 | | $10.00 - $14.00 | | $8.00 - $12.00 | |
| | Uniform Brand Promotion (Weekly) | $0.00 | | $54 - $103 | | $69 - $264 | |
| | Vehicle Brand Promotion Charge[5] (Weekly) | $32 - $56 (All vehicles) | | $32 - $56 (3 to 4 vehicles) | | $32 - $56 (6 to 7 vehicles) | |
| **Revenue** | Revenue | $280K - $401K | | $462K - $675K | | $628K - $852K | |
| **Costs** | Employee Expenses and Benefits[1] | $152K - $213K | | $252K - $349K | | $354K - $465K | |
| | Vehicles[2] | $52K - $69K | | $86K - $103K | | $121K - $138K | |
| | Payroll Taxes[3] | $20K - $29K | | $34K - $48K | | $48K - $64K | |
| | Administration[4] | $6.5K - $8.5K | | $11K - $13K | | $15K - $17K | |
| Hypothetical Pre-Tax Operating Income[6] | | $49K - $81K | | $79K - $162K | | $90K - $168K | |
| Hypothetical Pre-Tax Operating Margin | | 12% - 29% | | 12% - 35% | | 11% - 27% | |

1) These costs could include payroll expenses and similar employee expenses such as wages, healthcare benefits, paid sick leave and vacation.
2) These costs could include vehicle purchase or lease payments, maintenance, insurance, and fuel, and will vary based on, for example, the number and types of vehicles ISPs choose to operate.
3) Includes workers compensation, unemployment insurance and self-employment tax. These costs represent a national average and are not specific to any state. These costs do not include personal income tax.
4) These costs could include other administrative expenses associated with running a business, for example, recruiting, training and bookkeeping costs.
5) In scenarios 2 and 3, the ISP elected to include some, but not all vehicles in the Optional Brand Promotion Program.
6) Prior to the ISP's corporate or personal income tax.

Massachusetts

10

## Contractor Options

Contractors affected by this transition have several options to choose from before October 8, 2010.

### 1. Pursue an ISP Agreement

Pursuing an ISP Agreement is an important decision that may require an investment, such as buying the necessary PSA(s) to achieve "scale," no later than October 8, 2010. If a contractor pursuing an ISP Agreement fails to do so by that date, the OA will expire according to its terms. There are additional deadlines that also must be completed by October 8, 2010, such as incorporating the business, and not some other form of business, such as a LLP, LLC, or other similar entity, and establishing an Entity Profile on *MyGroundBizAccount*. If an ISP Candidate does not complete these two steps before October 8, 2010, FedEx Ground and the Candidate may still negotiate an ISP Agreement, although FedEx Ground may also consider negotiations with alternative candidates as well.

ISP Candidates are entrepreneurial and understand the risk/reward of investing time and resources to position the business for the future. These candidates see the benefits of focusing on managing and growing the business. Pursuing an ISP Agreement should appeal to those eager to take advantage of the opportunity to operate businesses more efficiently utilizing economies-of-scale, which could lead to higher earnings.

**Steps to take:**

- Decide whether to sign and return the Contractor Limited Release and Operating Agreement Modification no later than August 6, 2010 (signing this document is not required, but doing so makes contractors eligible to receive the transition incentive).
- Incorporate the business no later than October 8, 2010.*
- Establish an Entity Profile on *MyGroundBiz Account* no later than October 8, 2010.*
- Operate a minimum of three PSAs in the same station no later than October 8, 2010.*

\* These steps can be initiated immediately

**Additional Circumstances:**

**P&D Tractor Contractors** (P&D tractor contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible P&D routes and vehicles. P&D tractor contractors are <u>not</u> eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three non-P&D tractor PSAs in the same station no later than October 8, 2010 and operate the P&D tractor under an ISP Agreement, or
- Convert current OA to a Linehaul Agreement no later than October 8, 2010. P&D tractor contractors choosing this option are eligible for the transition incentive if they sign and submit a Contractor Limited Release and Operating Agreement Modification by August 6, 2010.

**Swing Contractors** (Swing contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible non-swing P&D routes and vehicles; full-time swing contractors are eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three <u>non-swing PSAs</u> in the same station no later than October 8, 2010. Note: Swing work areas <u>do not</u> count toward the three PSA minimum and a contract for these swing work areas will expire on its termination date.

*The Time-off Program ends on October 8, 2010. All swing PSAs in Massachusetts go inactive on October 8, 2010.*

Massachusetts

11

## 2. Seek Employment with an ISP

Being an employee of an ISP means all terms of employment, including hours, compensation and benefits, must be worked out with the ISP. Discussions regarding employment terms are solely between ISPs and contractors seeking to become drivers. FedEx Ground will not participate or intervene in employment discussions and will not set compensation or benefit terms that ISPs are required to meet. Employee-drivers and employee-helpers of an ISP will not have a direct relationship with FedEx Ground. Aside from casual interactions at the station, these employees will need to direct all questions and concerns to their employers.

Becoming an employee-driver for an ISP should appeal to those who enjoy driving a delivery vehicle and personally performing package pick-up and delivery services rather than the responsibilities of running a larger business.

**Steps to take:**

- Decide whether to sign and return the optional Contractor Limited Release and Operating Agreement Modification no later than August 6, 2010.
- Sell or transfer PSA(s) no later than the Operating Agreement's expiration date.
- If the contractor has signed the Contractor Limited Release and Operating Agreement Modification, the Supplemental Limited Release of Claims will need to be signed and submitted on or after the effective date of termination of the current Operating Agreement in order to receive the remaining $5,000 payment of the transition incentive.

## 3. Exit the network

Contractors not interested in pursuing an ISP Agreement or seeking employment with ISPs may choose to exit the network and pursue other opportunities. Contractors wishing to leave the network may sell their PSA(s) or simply continue to provide service under their OAs until the agreements expire (all OAs were non-renewed on May 20, 2010, and remain non-renewed).

**Special Note:** By signing and returning the Contractor Limited Release and Operating Agreement Modification, contractors agree that the current Operating Agreement will expire on October 8, 2010. If contractors choose not to sign the Contractor Limited Release and Operating Agreement Modification, the termination date of the current Operating Agreement will serve as the expiration date, absent an extension.

Massachusetts

## Contractor Incentives

FedEx Ground is offering several financial incentives to assist eligible contractors that are affected by the transition to the ISP Model in Massachusetts.

## Transition Incentive

In addition to growth and vehicle incentives detailed below, FedEx Ground is offering a transition incentive of $10,000 to all current P&D contractors operating routes in Massachusetts and those domiciled in a Massachusetts station as of June 30, 2010 that elect to sign a Contractor Limited Release and Operating Modification Agreement, which includes a limited release of claims involving the transition and an agreement to terminate the existing OAs by October 8, 2010. See the Sample Contractor Limited Release and Operating Agreement Modification in this guide.

Payment of the transition incentive will be issued in two installments as follows:

### Initial $5,000 Transition Payment:

P&D contractors operating routes in Massachusetts, and those contractors domiciled in Massachusetts, that are active as of June 30, 2010 and request the transition incentive, are eligible to receive $5,000 of the payment within 15 business days of submitting to station management a signed Contractor Limited Release and Operating Agreement Modification, which includes a limited release and agreement to end the current Operating Agreement no later than October 8, 2010 (absent a further written contract extension).

**A signed agreement must be submitted from the date the Contractor Limited Release and Operating Agreement Modification is distributed to August 6, 2010 to receive this transition incentive.**

### Remaining $5,000 Transition Payment:

After receiving initial payment:

- P&D contractors that sell/transfer all PSAs in Massachusetts by October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs;

- P&D contractors that are operating three or more PSAs in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs. (Note that for ISP Candidates successfully negotiating an ISP Agreement, the OAs will not terminate until the effective date of the ISP Agreement.)

- P&D contractors continuing to operate fewer than three PSAs in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

Independent contractors that do not request the transition incentive or do not submit the limited release by August 6, 2010 will not receive the transition incentive. These contractors have all of the same options available as do contractors that have signed the limited release and received the transition incentive.

Massachusetts

13

## Important Legal Note

In exchange for the transition incentive, FedEx Ground is asking P&D contractors domiciled in a Massachusetts station for a release of certain potential claims related to this transition. Sample release documents are contained in this ISP Model Transition Guide.  Actual release documents can be obtained from station management beginning the date the Contractor Limited Release and Operating Agreement Modification is distributed. The release is not intended to settle all claims a contractor may have against FedEx Ground. The release is limited to potential claims concerning FedEx Ground's announcement of this transition, the termination, non-renewal or assignment of the current OA, and any sale, assignment, loss or other disposition of PSA(s).  FedEx Ground cannot advise contractors on individual circumstances.

Pending lawsuits include *Craig v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Sheehan v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00531-RLM-CAN (MA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Urbank/Somers v. FedEx Ground Package Sys.*, Civil No. 3:08-cv-00575-RLM-CAN (MA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), and *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-GAO (D. Mass.).

**Contractors are not obligated to sign the release of claims documents.**  Deciding whether to sign these documents is completely up to each contractor.  If a contractor chooses to accept the transition incentive, a signed agreement and limited release needs to be submitted no later than August 6, 2010. If a contractor chooses not to sign the agreement and limited release, the contractor will not receive the transition incentive and will have the same options available to those contractors that have signed the agreement and limited release:

- Continue operating under the current agreement (which will not be renewed) until the date of its expiration;
- Sell or transfer PSAs to other contractors; or
- Operate at least three PSAs in an affected station by October 8, 2010 to become an ISP Candidate.

## Contract Renewals and Extensions

All OAs remain non-renewed as a result of the May 20, 2010 Incorporation and Compliance Disclosure announcement. As indicated in the May 20, 2010 announcement, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension.  This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification.  If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

## Growth Incentives

In addition to the transition incentive available to all P&D contractors domiciled in a Massachusetts station, growth incentives of up to $100,000 are available to those choosing to grow the business by acquiring eligible PSAs and vehicles between announcement day and October 8, 2010, for total potential incentives of $110,000, depending on station-specific contractor volume guidelines.

**Eligible PSAs are Ground or Home Delivery P&D routes servicing Massachusetts or domiciled in Massachusetts currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of June 30, 2010.** PSAs transferred or sold by Massachusetts P&D contractors operating three or more PSAs are not eligible for growth incentives. For this transition, the size of active contractors is determined as of June 30, 2010.

Contractors acquiring eligible PSAs in the same Massachusetts station can receive up to $100,000 in potential growth incentives, subject to station contractor size guidelines. Growth incentives do not apply unless the PSA that is acquired gets the contractor to at least minimum scale (three PSAs in the same station); contractors that are already at or above scale are eligible to receive growth incentives for acquiring up to five eligible PSAs.

**Each growth incentive will be reduced by $5,000 if a vehicle for that PSA is not acquired by the purchasing contractor from the selling contractor.**

The following is an illustration of how the growth incentives would be calculated:

- $10,000 growth incentive for acquiring the first Ground or Home Delivery PSA and vehicle that results in achieving minimum scale; plus
- $15,000 for the second PSA and vehicle; plus
- $20,000 for the third PSA and vehicle; plus
- $25,000 for the fourth PSA and vehicle; plus
- $30,000 for the fifth PSA and vehicle.

These growth incentives are **available to existing FedEx Ground contractors** that acquire eligible routes and vehicles in the same Massachusetts station (a Ground station, Home Delivery station or co-location) by October 8, 2010. Note that a contractor's status for the growth incentives is based on the number of **PSAs operated within the same station and is subject to station contractor size guidelines.** For example, if a contractor operates two PSAs in the Boston Ground station, growth incentives will be available only for eligible routes acquired in the Boston Ground station. **Supplemental, swing and P&D tractor PSAs are not eligible for growth incentives and will not be counted toward the 3-PSA minimum needed to be eligible for ISP Agreement Negotiations.**

Massachusetts

15

As the chart below illustrates, a variety of options are available if choosing to acquire eligible PSAs in the same station. For example:

- A single work area contractor in Massachusetts would receive $10,000 in growth incentives for acquiring its second eligible route (that results in achieving minimum scale) and vehicle in the same station, plus the additional $10,000 transition incentive – totaling $20,000.

- A contractor with three PSAs would receive $10,000 in growth incentives if acquiring one more eligible PSA and vehicle in the same station. With the $10,000 transition incentive, incentives would total $20,000.

- A contractor with two PSAs in a Massachusetts station would receive $45,000 in growth incentives if acquiring three more eligible PSAs and vehicles in that same station. With the $10,000 transition incentive, this would provide the contractor with $55,000.

| Contractor Status as of June 30, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SWA | MWA-2 | MWA-3 | MWA-4 | MWA-5 | MWA-6 | MWA-7 | MWA-8 |
| Total growth incentive for acquiring one (1) eligible PSA and vehicle | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Total growth incentive for acquiring two (2) eligible PSAs and vehicles | $10,000 | $25,000 | $25,000 | $25,000 | | $25,000 | $25,000 | $25,000 |
| Total growth incentive for acquiring three (3) eligible PSAs and vehicles | $25,000 | $45,000 | $45,000 | $45,000 | | $45,000 | $45,000 | $45,000 |
| Total growth incentive for acquiring four (4) eligible PSAs and vehicles | $45,000 | $70,000 | $70,000 | $70,000 | | $70,000 | $70,000 | $70,000 |
| Total growth incentive for acquiring five (5) eligible PSAs and vehicles | $70,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring six (6) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring seven (7) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Available Growth Incentives | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Transition Incentive | $10,000 | $10,000 | $10,000 | $10,000 | | $10,000 | $10,000 | $10,000 |
| Maximum Available Incentives | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 |

Note: Growth incentives shown here, which are subject to station contractor size guidelines, are contingent on the purchasing contractor's acquisition of the vehicle associated with the acquired PSA. Without such vehicle acquisition, each growth incentive is $5,000 less per PSA than shown above.

Massachusetts

16

Contractors acquiring eligible PSAs will be notified by station management of the amount of the growth incentive(s). **Payment of the growth incentive(s) will be made within 15 business days of completion of the PSA acquisition in CDAS. All acquisitions of eligible PSAs and vehicles must be completed and approved no later than October 8, 2010 to receive growth incentives.**

## Vehicle Incentive Program

SWA or MWA-2 contractors that are not pursuing an ISP Agreement and that do not sell or transfer vehicle(s) along with the PSA(s), to the acquiring contractor, may be eligible for a vehicle incentive up to $5,000. This amount applies to only one delivery vehicle per PSA, and applies only if the vehicle is not acquired by the contractor that purchases the associated PSA and if it is disposed of through a FedEx Ground designated third-party vendor.

Full-time swing contractors in Massachusetts not pursuing an ISP Agreement may also be eligible for a vehicle incentive of up to $5,000. This payment will cover one delivery vehicle currently operated by the full-time swing contractor.

The amount of the vehicle incentive, up to $5,000, is determined by the excess, if any, of the contractor's remaining balance due on the vehicle as determined by the lease holder or lender over the vehicle's fair market value. Fair market value will be determined by the designated third party vendor.

The vehicle incentive applies to those vehicles that are either owned or leased by a FedEx Ground or Home Delivery SWA, MWA-2 or full-time swing contractor in Massachusetts for use in the contractor's applicable PSA(s). **To be eligible for this incentive, contractors must sell or transfer their PSA(s) by October 8, 2010. Contractors may elect to retain or dispose of the vehicles in any manner the contractors choose, though these contractors will then not be eligible for the vehicle incentive.**

Contact information for the third party vendor will be provided by station management.

## Incorporation and Compliance Disclosure Requirement and the ISP Model Announcement

This announcement to transition Massachusetts, Rhode Island and certain contractors in Albany to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and legal compliance. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines established within this ISP Transition Guide apply, and not those associated with the Incorporation and Compliance Disclosure Announcement.

**Contractors should note that all non-renewals and extensions associated with the Incorporation and Compliance Disclosure announcement on May 20, 2010 remain in effect.** Contractors that sign the Contractor Limited Release and Operating Agreement Modification agree to a new expiration date of October 8, 2010. For contractors that do not sign the limited release, the current expiration date remains unchanged. Contractors with expiration dates between July 1, 2010 and December 31, 2010 that do not sign the limited release are eligible to receive a 180-day extension.

Additionally, although affected P&D contractors are technically no longer eligible to receive the early adoption incentives described in the May 20 Incorporation and Compliance Disclosure Announcement, FedEx Ground has decided, as a good-will gesture, to pay all affected P&D contractors the $750, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More information will be available in the coming weeks.

**Transition Timelines by Wave**

Every contractor in Massachusetts will have the same amount of time to decide whether to sign the Contractor Limited Release and Operating Agreement Modification and choose which contractor option to pursue. However, in order to facilitate a smooth transition to the ISP Model in Massachusetts, FedEx Ground is implementing station-specific dates for the Negotiations Process which will be grouped in three waves.

Stations in Wave 1 include: Springfield co-location and Cape Cod co-location (including Nantucket and Martha's Vineyard).

Stations in Wave 2 include: Providence Ground and Home Delivery and Albany Ground and Home Delivery.

Stations in Wave 3 include: Boston Ground and Home Delivery, Worcester Ground and Home Delivery, Brockton Ground and Home Delivery, and Wilmington Home Delivery

See the charts below for additional details on the dates that affect your station.

<u>Wave 1</u>

| July 2010 – November 2010 | January 2011 – April 2011 |
| --- | --- |
| Optional Contractor Limited Release and Operating Agreement Modification distributed | January 21, 2011 – First proposal due |
| August 6, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due | March 19, 2011 – ISP Agreement negotiations end |
| October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | April 2, 2011 – ISP Agreements go into effect |
| October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to have incorporated, have established an Entity Profile on MyGroundBizAccount and achieved scale | |
| November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s) and submit the Initial Compliance Disclosure Form | |
| November 19, 2010 – Date by which CSA definition is finalized and RFI Response submitted | |

Massachusetts

18

**Wave 2**

| July 2010 – February 2011 | February 2011 – May 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed.

August 6, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due.

October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification.

October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount, and achieved "scale".

November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s) and submit the Initial Compliance Disclosure Form.

February 1, 2011 – Date by which CSA definition is finalized and RFI Response submitted. | February 25, 2011 – First proposal due.

April 23, 2011 – ISP Agreement negotiations end.

May 7, 2011 – ISP Agreements go into effect. |

**Wave 3**

| July 2010 – March 2011 | March 2011 – June 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed.

August 6, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due.

October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification.

October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount, and achieved "scale".

November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s) and submit the Initial Compliance Disclosure Form.

March 1, 2011 – Date by which CSA definition is finalized and RFI Response submitted. | March 25, 2011 – First proposal due.

May 20, 2011 – ISP Agreement negotiations end.

June 4, 2011 – ISP Agreements go into effect. |

Massachusetts

19

## Contract Extensions

An extension to the station-specific date of when an ISP Agreement goes into effect (see charts above) is available to any Massachusetts contractor that is operating three or more PSAs in the same station by October 8, 2010.

## Request for Information Process

The FedEx Ground Request for Information (RFI) Process helps the company assess whether an ISP Candidate has the ability to fulfill the obligations of an ISP Agreement. In order to begin the RFI Process, an ISP Candidate must be a corporation and not some other form of business, such as a LLP, LLC, or similar entity, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale by October 8, 2010.

In order to give ISP Candidates the opportunity to get through the transition in sufficient time to protect against service disruptions, an ISP needs to register with the state(s) in which it does business and be in good standing with those state(s) by November 19, 2010. Contractors will need to finalize the definition of their CSA and submit a Response to FedEx Ground's RFI by the station-specific deadline. If these steps are not completed by the associated deadline, an ISP Candidate may still be eligible to submit a Response to FedEx Ground's RFI and possibly advance to negotiations. However, FedEx Ground may negotiate with alternate candidates as well for the CSA.

FedEx Ground will evaluate the RFI Response based on the areas listed here:

- Business Experience
  - Including references and relevant experience in the transportation industry
- Financial Viability
  - Such as bank references and annual sales
- Customer Service Approach
  - Plans for meeting customer needs and address customer concerns
- Driver Recruitment and Retention
  - Goals for recruiting employees, historical turnover rates

- Skills and Knowledge of the ISP's Workforce
  - Plans for ensuring employee knowledge of FedEx Ground's services
- Safety Commitment and History
  - Injury and accident history, vehicle maintenance plan and history
- Security (Loss and Damage Avoidance)
  - Plans for minimizing package damage and loss, historical damage trends
- Contingency Situations
  - Ability to provide consistent customer service despite volume surge, employee absenteeism and/or equipment failures

An ISP Candidate should provide any additional information it considers important for FedEx Ground to review in evaluating its response. While ISP Candidates can submit an RFI Response on *MyGroundBizAccount*, the response can be submitted in any written format to FedEx Ground.

Once the RFI Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions:

- **Advance to Negotiations**
  Senior Manager determines the ISP Candidate has the ability to fulfill the obligations of the vendor relationship.

- **Clarification/Questions**
  Senior Manager determines further clarification will help determine if the ISP Candidate is capable of fulfilling the vendor relationship.

- **Does Not Advance to Negotiations**
  Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations of the vendor relationship.

After advancing through the RFI Process and onto the Negotiations Process, **certain qualifications must be met before entering into an ISP Agreement**. Some of these administrative tasks will take several weeks to complete and documentation must be in

Massachusetts

20

order before an ISP Agreement Signatory is permitted to electronically sign an ISP Agreement. If these tasks are not completed and an agreement cannot be reached, these contractors run the risk of having their OAs expire without an agreement in place.

For a complete list of qualifications, see the Qualification Steps for Pursuing an ISP Agreement section of this Guide.

Drivers and certain other employees of the ISP Candidate will need to pass a criminal background check prior to the effective date of an ISP Agreement. These background checks will be arranged and paid for by FedEx Ground through a third-party vendor.

## Negotiations and Execution Processes

### Negotiations Process

The first step in the Negotiations Process is the preparation and submission of a Proposal to FedEx Ground. The Proposal is an initial offer on the key financial, non-financial, and elective components of an ISP Agreement and any other terms the ISP Candidate wishes to propose. The deadline for submitting the first Proposal is based on which wave an ISP Candidate's station falls. If a Proposal is not submitted by the dates listed above, an ISP Candidate may still be eligible to submit a first proposal and negotiate an ISP Agreement. However, FedEx Ground may consider proposals and negotiate with alternate candidates as well for the CSA. For additional information, see Transition Timeline by Wave section of this Guide.

FedEx Ground and the ISP Negotiator (an officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate) will negotiate an ISP Agreement regarding terms for the proposed CSA. This provides ISP Candidates the flexibility to negotiate contract terms that best fit the particular business needs and unique service area the ISP Candidate is pursuing.

For example, an ISP Agreement may be negotiated with a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase – depending on business needs and desires. ISP Candidates can also choose whether to utilize FedEx Ground logos on all or some of their vehicles, and whether to outfit employees in FedEx Ground uniforms in exchange for negotiated brand promotion fees.

The following represents a list of some, though not all, of the key financial and non-financial terms, as well as elections that may be negotiated:

| Negotiable Financial Terms: | Negotiable Non-Financial Terms: | Elections: |
|---|---|---|
| ~ Annual Service Charge | ~ Length of Term | ~ Additional Services |
| ~ Stop Charge | ~ Expiration Date | ~ Scanner Leasing Program |
| ~ Fuel Charge | ~ Load Positions by Year | ~ Equipment Registration (on certain vehicles) |
| ~ Surge Stop Charge | ~ Daily Stop Threshold | ~ Periodic Maintenance Schedule |
| ~ Package Charge | | ~ Fuel Tax Reporting |
| ~ Period Safety Incentive | | ~ Facilitated Insurance Coverage and Billing |
| ~ New Account Start-Up ("Meet-and-Greets") | | ~ Brand Promotion Program (Vehicles and Uniforms) |
| ~ Spotted Trailer Charges (if applicable) | | ~ Arbitration |
| ~ Customer Service Incentive | | ~ Alternative Maintenance Program |

### Proposal Capture & Analysis Tool (PCAT)

The Proposal Capture and Analysis Tool, or PCAT, will be used by FedEx Ground to evaluate Proposals during the Negotiations Process. To facilitate negotiations, this optional tool is available to ISP Candidates for the preparation of the RFI Response and/or a

Proposal. The PCAT will be available to ISP Candidates on *MyGroundBizAccount* and can be used to calculate estimated revenues for multiple scenarios based on inputs by the ISP Candidate.

Inputs include variable components such as Per Stop Charge, Fuel Surcharge and forecasted volume, as well as fixed financial components such as Annual Service Charge and the optional Brand Promotion Program.

Historical pick-up and delivery volume data for the proposed CSA, as well as individual PSA historical data and Spot information, will be made available on *MyGroundBizAccount*. This data may help in evaluating future business strategies, though past performance is not necessarily an indicator of future performance or volume. FedEx Ground cannot guarantee that the historical data supplied will be available for a CSA's predecessor PSAs, or that the data is an exact match to the geographic scope of a CSA, since it is a new area.

Using the PCAT is one way to ensure negotiable elements of an ISP Agreement are included in the Proposal that an ISP Candidate submits. However, Proposals may contain additional terms beyond those listed in the PCAT and can be submitted in any written format to FedEx Ground.

<u>Submitting a Proposal</u>

Once a Proposal is submitted, a Pittsburgh-based, FedEx Ground Negotiator will be assigned and will contact the ISP Candidate to confirm receipt of the Proposal.

Negotiations will be conducted electronically and by phone over the course of several weeks, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals. The parties may submit several offers and counteroffers until an agreement is reached or there is an impasse.

Initially, the ISP Candidate that is currently operating the CSA will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. Furthermore, if certain transition deadlines are not reached, as detailed above, FedEx Ground may seek multiple bids for the same CSA even during the transition to the ISP Model. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

The first offer submitted by an ISP Candidate may not be the final offer. The first counteroffer submitted by FedEx Ground to the ISP Candidate may also not be a final offer. The Negotiator will continue working with the ISP Candidate in this manner until an agreement is reached or an impasse occurs.

| What to Expect: | What Not to Expect: |
|---|---|
| ~ FedEx Ground seeks proposals in line with market values | ~ Negotiator guidance on the "right" answer because there is not just one acceptable approach |
| ~ The need to set aside dedicated time to complete negotiations | ~ Negotiator guidance on volume forecasts |
| ~ Interactive process between ISP Candidates and Negotiators | ~ SRM participation in the process |

The Negotiations Process will conclude in one of two ways:

1) If an agreement is reached, the ISP Candidate will be able to review and sign an ISP Agreement

2) If the ISP Candidate and FedEx Ground cannot agree on terms for an ISP Agreement, the process will end, and station management will be notified. If an ISP Candidate has a current OA with FedEx Ground, it will expire according to its terms. It is in FedEx Ground's best interest to consider all of the terms put forward in order to reach an agreement that will meet the ISP Candidate's business needs, while providing the highest level of customer service possible.

Massachusetts

22

## ISP Agreement Execution

Once the terms of an ISP Agreement with FedEx Ground have been reached, a draft of the agreement is available for review. There are additional steps to complete before a final agreement can be signed, electronically, on *MyGroundBizAccount.*

Additional steps will need to be completed **prior to** the final signing. For a complete list of these steps, see the "Qualification Steps for Pursuing an ISP Agreement" section of this Guide.

Please note: Drivers and certain members of the ISP Candidate's Workforce will need to pass a criminal background check **before** an ISP Agreement effective date; these criminal background checks may take several weeks to complete.

Once the above steps are completed, an ISP Agreement Signatory will be able to print out and review the entire ISP Agreement. If an ISP Agreement Signatory accepts all of the terms as outlined in the ISP Agreement, he/she will need to log on to *MyGroundBizAccount* and digitally sign the agreement via an electronic signature. The final agreement will reside on *MyGroundBizAccount* until it expires. Both the ISP and station management will be able to reference it online.

## Operating as an ISP

While some contractual obligations under an ISP Agreement will remain the same, others will be substantially different.

### Service Results Expectations

The following Service Results Expectations are detailed in an ISP Agreement:

### Service Days

Service Days remain consistent: Monday through Friday for FedEx Ground; Tuesday through Saturday for Home Delivery. FedEx Ground reserves the right to modify these days should customer demands and/or competitive advantage require changes. The three Saturdays and Mondays immediately preceding Christmas Day are considered Service Days for both FedEx Ground and FedEx Home Delivery.

### Services

Under the terms of an ISP Agreement, ISPs agree to provide a range of pick-up and delivery services to customers, including:

- Collection and loading, if necessary, of packages for delivery in a CSA.

- Transportation of packages from a domiciled station and delivery in a CSA consistent with customer-selected service offerings and subject to the ISP's Right to Decline.

- Timely collection and transmission of customer signatures, scanning results and package tracking data.

- Collection of COD charges and return of COD charges to FedEx Ground at the end of the Service Day.

- Pick-up of customer packages in a CSA and delivery of the packages to a domiciled station in time to meet service commitments, subject to the ISP's Right to Decline.

- Return of undelivered packages to the domiciled station, according to agreed-upon terms by FedEx Ground and the ISP.

- Additional services described and mutually agreed upon in the Additional Services Schedule, which may include services such as administrative support and shuttle loading and/or unloading.

Massachusetts

23

- Preparation of any legally-required documents (driver logs, vehicle inspection reports, etc.) and submission to FedEx Ground at the end of each service day (or for FedEx Home Delivery the next business day, unless otherwise agreed upon by the ISP and FedEx Ground).

## Service Results

Measurements of "Inbound Local Service" performance will be provided electronically to an ISP. These numbers will also be posted at the FedEx Ground station. The following service results are the minimum standard outlined in an ISP Agreement:

- Provide services to the customers that are compatible with customers' schedules, expectations and pick-up and delivery requirements (subject to the ISP's Right to Decline).

- Achieve a daily inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher.

- Provide the "Service Offerings" detailed in Schedule E of an ISP Agreement (commercial deliveries, residential deliveries, alcohol deliveries, attempted deliveries and pick-ups, delivery signatures, driver release and indirect delivery, premium services, and package tracking information).

- Take reasonable measures to avoid theft, loss, damage, destruction, delay in the handling, loading, unloading, transporting and pick-up and delivery of packages in the CSA.

- Conduct all business activities with honesty and integrity and in a safe and professional manner.

## Service Failure

The Senior Manager will monitor Service Results to assess adherence to the terms of the ISP Agreement. The Senior Manager will document any Service Failure by an ISP (those involving Service, Professionalism or Safety) and will schedule an ISP Discussion with the ISP Key Contact to discuss the Service Failure. The ISP will have an opportunity to correct any Service Failure.

If Service Failures continue, the ISP may be in breach of contract with the terms of the ISP Agreement; such a breach may result in termination of the ISP Agreement, depending upon the circumstances.

## Right to Decline & Right to Ensure

Under an ISP Agreement, an ISP has the Right to Decline services in certain situations without impacting service results. In instances when an ISP exercises the Right to Decline, FedEx Ground has the Right to Ensure that customers within a CSA are properly serviced.

The activities that can be declined under an ISP Agreement are contained in the Agreement. Some instances include: stops over 200 packages, pickups scheduled after 6:30 p.m., spotted trailers, customer requests requiring special modifications to equipment, and stops over the negotiated Daily Stop Threshold.

## Subcontracting

ISPs will have the opportunity to subcontract any services within its CSA to other ISPs. In these situations, FedEx Ground will attempt to accommodate any ISP-directed Load Plan changes that are submitted by ISP Key Contacts in advance of implementation.

ISPs that subcontract work to another ISP will remain responsible for maintaining service levels as well as any claims that may arise. However, only the ISP performing the work will receive payment of charges for this activity, and the packages making up this activity will count toward the inbound local service of only the ISP performing the work.

Massachusetts

24

## Driver Data Collection Process and ISP Data Review

The Driver Data Collection Process and ISP Data Review will replace the existing Check-In Process (including the Revised Daily Settlement Report and the Revised Consolidated Daily Settlement Report, respectively) as summarized below:

### Driver Data Collection Process

This process is similar to the current Check-In Process and occurs when ISP employee-drivers return to the station. The collection of this information (scanner data, paperwork completed by the ISP employee-driver, and P&D activity captured in the FedEx Ground system) will be input by FedEx Ground personnel. Once FedEx Ground has input the data, FedEx Ground will generate an *ISP Driver Data Collection Report* that contains "driver-level pick-up and delivery activity" and will be shared with the ISP employee-driver. The ISP employee-driver will need to review and sign the report, confirming that it is accurate. FedEx Ground management will hold any data discrepancies or service-related issues for the following morning, and these issues will only be addressed with ISP Key Contacts, rather than individually with any ISP employee-drivers.

In the case of FedEx Ground, the information mentioned above should be submitted in the evening of the return to the station, unless otherwise agreed. For FedEx Home Delivery, the information should be submitted on the morning of the return to the station, unless otherwise agreed.

### ISP Data Review

Information submitted, reviewed, and signed by an ISP's employee-drivers will generate an *ISP Data Confirmation Report* which will be reviewed on a regular basis with the ISP Key Contact. This report will contain "CSA-level data" and will be provided only to the ISP Key Contact. It will be used to address any operational or contractual issues that arose on the previous day and will be discussed only with the ISP Key Contact. These meetings can occur as needed, either at the request of FedEx Ground or the ISP, and will optimally be conducted in person after morning dispatch, but they may take place in other formats or times as mutually agreed upon.

The *ISP Data Review* process will be used to cover prior day issues with the ISP, such as: the *ISP Daily Confirmation Report*, P&D Quality Reports, local inbound service, Claims Investigation, Complaints, Branding (if ISP is participating in the Brand Promotion Program) and scanning. The meeting may also be used to address any future ISP requests, such as ISP Load Plan changes and New Pick-up Start-ups, which include ISP-directed vehicle assignment.

The *ISP Data Collection Report*, as mentioned above, contains driver-level data only. It will not contain items such as: non-delivered packages, premium service failures, high profile van scans, uncollected COD monies, and open tracer reports. This information will be contained in the *ISP Data Confirmation Report* and will be sent to ISPs via *MyGroundBizAccount*.

Other daily reports and data will be shared directly with ISP Key Contacts and/or sent electronically to ISPs via *MyGroundBizAccount*.

### Peak Planning

ISPs are responsible for planning Peak operations within a CSA. FedEx Ground will offer its best projections of anticipated Peak volume in a given CSA and will work with the ISP to identify the ISP's anticipated service constraints and plan contingency operations.

### Scanner and Vehicle Usage

In co-locations, ISPs will have a choice to use either FedEx Ground or FedEx Home Delivery scanners, depending on the functionality preferred by the ISP. FedEx Ground will also work with ISPs to group an ISP's vehicles together on FedEx Ground docks, even across van lines that were previously dedicated to FedEx Ground or FedEx Home Delivery vehicles. Any operational changes will be discussed between the ISP and FedEx Ground and will be made after mutual agreement.

### Brand Promotion Program

Massachusetts

25

Participation in the Uniform and/or Vehicle Brand Promotion is optional. A Uniform Brand Promotion charge and a Vehicle Brand Promotion charge may be negotiated if an ISP Candidate decides to participate in either program. Minimum vehicle specifications for vehicles in the Vehicle Brand Promotion program and vehicles not in the program are posted on *MyGroundBiz.*

Any vehicle may be utilized in non-FedEx Ground related activity as long as any FedEx Ground logos are removed or covered.

### ISP Charge Statement

The ISP Charge Statement contains an itemized list of compensation elements that are based on the individual terms agreed to in the ISP Agreement. Examples of terms could include: Package and Stop Charges, Annual Service Charge, Period Safety Incentive, Brand Promotion Program (if elected), Surge Stop Charge and Fuel Surcharge.

Unlike the current settlement statement, the ISP Charge Statement will detail any discrepancies between scanned packages and stops versus summed totals used for ISP Charge purposes. Discrepancies may include hand-sheet totals updated during the Driver Data Collection Process or double stops reversed as part of ISP Charge calculations.

In addition to existing itemized charge backs and deductions (such as physical damage insurance, work accident insurance, workers' compensation insurance, and non-trucking liability), the ISP Charge Statement may also include weekly scanner lease and network access fees (including any additional scanners), claims, equipment registration, fuel tax, expenses and fees, and the current price of fuel within the CSA as indexed weekly by OPIS.

Accessing the ISP Charge Statement is a 100% digital process. Printed statements will not be provided. All related payments will be **made each Friday** (or on the preceding Thursday if Friday is a bank holiday) via Electronic Funds Transfer (EFT). *MyGroundBizAccount* may be used to view an ISP Charge Statement, which is available in .PDF and/or .CSV formats.

### Availability of Electronic Tools

In addition to offering ISP Charge Statements through *MyGroundBizAccount*, FedEx Ground has developed and is rolling out web-based reports, workforce and fleet management capabilities, CSA operational planning tools and communication methods which will be made available to ISPs.

### Rentals & Spares, Van Washing

FedEx Ground will not arrange for third-party vehicles or use of spare vehicles. ISPs will be responsible for washing their vehicles. If desired, ISPs may select a van washing vendor and have the washing performed on FedEx Ground's property. Any van washing vendor may be used, subject to the vendor's agreement to comply, and compliance with, FedEx Ground's insurance and environmental standards.

### Locks

The ISP Agreement does not require the use of high-security locks; however, use of high-security locks will result in diminished liability for claims resulting from vehicle break-ins.

## Safety Terms & Qualifications

### Contractual Safety Standards

Schedule I, Safe Operating Practices, covers driver and non-driver qualification criteria, background qualification criteria, and the training and safety responsibilities an ISP agrees to assume. A sample Schedule I will be sent out over the next several weeks.

### Period Safety Incentive

FedEx Ground will pay ISPs a negotiated Period Safety Incentive payment for each completed 4-week Safety Period.

The amount of the payment, negotiated in an ISP Agreement, is based on the number of preventable accidents the ISP's employee-drivers are charged with and the number of vehicles the ISP operates during the Safety Period. The incentive will be paid to the ISP two periods, or eight weeks, following the close of the qualifying Safety Period.

## ISP Safety Results

FedEx Ground will provide electronic notification to an ISP if an ISP employee-driver is disqualified. This does not affect an ISP's right to disqualify their employee-drivers. SRMs will be given a monthly report of disqualified drivers.

## Driver Safety Violations

Any driver safety violation will be communicated by the SRM to the ISP, not the ISP employee-driver. As an exception, unsafe behavior on FedEx Ground property may be handled directly with the ISP employee-driver by station management. Any such exception will be subsequently communicated by FedEx Ground to the ISP.

## Controlled Substance Collection & Testing

All ISP employee-drivers need to pass a pre-qualification controlled substance screen to satisfy DOT qualification requirements. When a FedEx Ground approved collection site is utilized, FedEx Ground will pay for screenings. ISP employee-drivers are subject to random controlled substance testing.

## Physical / Medical Exam

All ISP employee-drivers must have a current DOT-compliant medical physical examination. When a FedEx Ground approved physician is utilized, FedEx Ground will pay for the exam. When the physical expires (the term of the physical will be determined by the physician), additional exams and the related costs are the responsibility of the ISP.

## Maintenance

An ISP Agreement will set forth ISP maintenance obligations. Pursuant to DOT requirements, production of monthly maintenance records and annual inspections will continue.

## Claims for Liability to the Public

The ISP Agreement sets forth graduated amounts that will be charged back to, or deducted from, an ISP for any claims brought against FedEx Ground for bodily injury and/or property damage caused by an ISP employee, agent or subcontractor. The amounts to be charged back or deducted will be the actual amount incurred by FedEx Ground up to $1,000 for the first claim, up to $2,000 for the second claim, up to $3,000 for the third claim and up to $4,000 for the fourth and subsequent claims arising out of incidents occurring in any rolling 52-week period.

## Qualification Steps for Pursuing an ISP Agreement

An ISP Candidate must take several steps to negotiate, enter into and operate under an ISP Agreement. Some are one-time occurrences and some must be completed on an annual basis. Most require several weeks to complete and should be completed well in advance of entering negotiations.

These steps ensure ISP Candidates meet the terms of an ISP Agreement and continue to comply with all state and federal laws and regulations.

- **Incorporate the business, if not incorporated already**
  - While ISP Candidates can begin this process immediately, articles of incorporation must be submitted no later than October 8, 2010 to advance to the RFI Process

- **Establish an Entity Profile on *MyGroundBizAccount***

Massachusetts

27

- While ISP Candidates can establish an Entity Profile once incorporated, the Entity Profile must be established no later than October 8, 2010 to advance to the RFI Process
- ISP Candidates will be asked, among other questions, to disclose direct or indirect ownership interest and/or participation in other ISP entities to determine if the ISP Candidate has exceeded station guidelines

- **Register the business in the state(s) in which it does business, if not registered already and be in good standing with those state(s)**
  - While ISP Candidates can begin this process as soon as the business is incorporated, all ISP Candidates must be registered with the state(s) in which it does business and be in good standing by November 19, 2010

- **Submit Initial Compliance Disclosure Form**
  - ISP Candidates certify compliance with federal and state independent business reporting and filing laws.
  - The Initial Compliance Certification Form illustrates the compliance activities performed by the ISP Candidate and must be signed by the ISP Candidate and the ISP Candidate's accountant
  - While this form can be submitted at any time, the Initial Compliance Disclosure must be completed and submitted by November 19, 2010
  - ISPs will be contractually obligated to file an Annual Compliance Certification form each succeeding calendar year that an ISP Agreement is in effect

If an ISP Candidate does not complete all four of these steps by the deadlines stated above, FedEx Ground may still negotiate an ISP Agreement with the ISP Candidate. However, FedEx Ground may also consider negotiations with alternative contractors as well.

- **Identify an ISP Agreement Signatory that submits to and passes a criminal background check**
  - The ISP Agreement Signatory must pass a criminal background check before signing an ISP Agreement. Should that person fail the criminal background check, another ISP Agreement Signatory must be identified and pass the criminal background check before an ISP Agreement can be signed

- **Secure insurance coverage**
  - ISP Candidates must acquire insurance coverage, including Non-Trucking Liability and Physical Damage (for vehicles included on Schedule B of the ISP Agreement) as well as workers' compensation and work accident insurance (as required by state law and an ISP Agreement)
  - ISP Candidates may secure insurance coverage from the provider of their choice though FedEx Ground will verify with Marsh that proper insurance has been secured
  - ISP Candidates must secure coverage prior to an ISP Agreement effective date.

- **Provide a W-9 business tax form**
  - All ISP Candidates, regardless of whether they were previously incorporated or not, must submit a W-9 business tax form indicating the name of the incorporated entity

- **Establish an Electronic Funds Transfer (EFT) Account**
  - If an ISP Candidate has a new corporate name and/or a new EFT account number, an updated authorization agreement for EFTs must be provided to FedEx Ground before an ISP Agreement effective date
  - ISP Candidates should note this process can take up to three weeks to complete

Massachusetts

28

- **Ensure qualified personnel pass criminal background checks**
  - ○ ISP employees who have access to FedEx Ground systems and/or FedEx Ground property, interact with FedEx Ground customers, or handle FedEx Ground packages must pass a criminal background check before performing these duties for an ISP
  - ○ ISP Candidates should note this process can take several weeks to complete

- **Ensure workforce compliance**
  - ○ Per an ISP Agreement, ISPs may only employ persons who are legally authorized to work in the United States
  - ○ Maintain an I-9 employment authorization form for each employee
  - ○ Provide evidence of compliance at the request of FedEx Ground
  - ○ These steps must be completed before an ISP Agreement effective date
  - ○ ISP Candidates should note these steps can take several weeks to complete

## ISP Model Key Terms & Definitions

**Contracted Service Area (CSA)** – A geographical area, defined in an ISP Agreement, in which an ISP is contractually obligated to provide pick-up and delivery services

**Driver Data Collection Process** – Daily collection of information from an ISP employee which is then inputted by FedEx Ground personnel into FedEx Ground's system

**Independent Service Provider (ISP)** – An independent business entity that contracts with FedEx Ground to provide pick-up and delivery services under an ISP Agreement

**ISP Agreement** – A legal contract negotiated between an ISP and FedEx Ground

**ISP Agreement Signatory** – An individual who signs an ISP Agreement on behalf of the ISP

**ISP Candidate** – An independent business entity that desires to become an ISP for a particular CSA, but has not yet executed an ISP Agreement for that CSA

**ISP Charge Statement** – A weekly statement detailing the ISP's financial earnings and CSA volumes

**ISP Data Collection Report** – A daily report that details package data for each ISP employee-driver. The ISP Data Collection Report is reviewed each afternoon for Ground and the next morning for Home Delivery

**ISP Data Confirmation Report** – A daily report that details package data for each CSA. The ISP Data Confirmation Report is reviewed with the ISP Key Contact each morning

**ISP Data Review** – A daily assessment between FedEx Ground and the ISP Key Contact of the prior day's activities and issues, as well as any future operational plans

**ISP Electronic Funds Transfer (EFT)** – A weekly payment provided to ISPs for work performed in the ISP's CSA. The ISP EFT replaces the settlement check

**ISP Employee** – An individual employed by the ISP. ISP Employees may include Key Contacts, P&D drivers, helpers and office support

**ISP Key Contact** – An individual employee of the ISP responsible for administering an ISP Agreement, including day-to-day operations

**ISP Negotiator** – An officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate

Massachusetts

29

**Negotiations** – A process during which FedEx Ground and ISP Candidates attempt to work out various mutually acceptable financial and non-financial terms as well as elections of an ISP Agreement

**Negotiator** – A FedEx Ground employee who negotiates with the ISP Candidate on behalf of FedEx Ground.

**Proposal** – An ISP Candidate's offer on the key financial and non-financial terms as well as elections included in an ISP Agreement

**Request for Information (RFI)** – A request, issued to ISP Candidates by FedEx Ground, which seeks to ascertain the capabilities of prospective ISPs

**RFI Response** – An ISP Candidate's reply to FedEx Ground's RFI, that outlines the ISP Candidate's capabilities relative to the contractual obligations

## Q&As

1. **Which contractors are affected by this announcement?**
This announcement impacts all P&D contractors domiciled in Massachusetts and Rhode Island as well as those Albany contractors providing P&D services within Massachusetts. Linehaul contractors are not affected.

2. **Why implement a new contract and operational changes in Massachusetts?**
The Company believes these operational changes are necessary so that contractors will continue to have the opportunity of owning and growing an independent business in Massachusetts and so that the company can strengthen its independent contractor model in Massachusetts and continue to provide P&D services through the independent contractor model. While a transition in Massachusetts was necessary given the recent changes in state law, regulatory decisions, and enforcement actions that have made it more difficult for independent contractors to operate in Massachusetts, we believe the features of the new relationship will provide an attractive option for business-minded entrepreneurs.

3. **If a contractor acquires additional routes, is that contractor guaranteed an ISP Agreement?**
No. Negotiating an ISP Agreement is an individualized negotiation between ISP Candidates and FedEx Ground. ISP Candidates will negotiate key financial and non-financial terms, as well as make elections, according to the unique business needs of the service area. The process will also involve a response to a Request for Information (RFI) so that ISP Candidates can demonstrate the ability to provide the level of service required. Participating in this process does not automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement.

4. **How many PSAs can an ISP Candidate acquire in Massachusetts?**
There is no statewide limit on how many PSAs an ISP Candidate can acquire in Massachusetts. There are, however, station-specific guidelines in place to avoid excessive dependence for network service on any one contractor in a particular station. Station management can provide additional details regarding the guidelines for your station.

5. **What happens once an ISP Agreement goes into effect?**
The ISP Model is intended to provide the potential for higher earnings by maximizing economies-of-scale, as well as other operating efficiencies of a larger, multi-vehicle operation. Under an ISP Agreement, ISPs are responsible for planning all P&D activity within the Contracted Service Area (CSA). This includes driver recruitment, training and staffing; vehicle fleet size selection, acquisition and maintenance; peak planning; and complying with all applicable laws and regulations. ISPs will have significant flexibility in allocating staff and vehicles as ISPs see fit to meet the unique and changing business needs of their CSAs.

6. **Can an ISP Candidate operate both Ground and Home Delivery routes?**
Yes. ISP Candidates may operate any combination of at least three Ground and/or Home Delivery PSAs in the same station by October 8, 2010 to begin the RFI and Negotiations Processes for a new agreement. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location.

7. **Will ISPs continue to operate under FedEx Ground's operating authority?**
Yes. ISPs will continue to operate under FedEx Ground's operating authority.

Massachusetts

30

8. **What happens to the swing routes currently operated by contractors?**

Swing routes will cease to exist upon the expiration of the applicable Operating Agreement (OA). Swing contractors that acquire and operate at least three non-swing PSAs in the same Massachusetts station, incorporate as a corporation, and not some other form of business, such as an LLP or LLC, and establish an Entity Profile through *MyGroundBizAccount* by October 8, 2010 and that register with Massachusetts, be in good standing, define a CSA, and respond to FedEx Ground's RFI will be eligible to submit a first proposal and begin negotiations for an ISP Agreement. Swing PSAs will not count toward the three PSA minimum needed to be eligible for ISP Agreement negotiations.

9. **How quickly will FedEx Ground make the transition incentive payments?**
- The first $5,000 of the transition incentive will be paid within 15 business days of submitting a signed Contractor Limited Release and Operating Modification Agreement. The remaining $5,000 of the transition incentive will be paid as follows:
- Contractors that sell/transfer PSAs and sign the supplemental limited release will receive a check within 15 business days at the station for the remaining $5,000 of the transition incentive once the current OA terminate and proof of sale or transfer of the routes is submitted to station management;
- P&D contractors operating fewer than three PSAs in a single Massachusetts station as of October 8, 2010 will receive the remaining $5,000 of the voluntary transition payment within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of the OA; or
- P&D contractors operating three or more PSAs in the same station in Massachusetts as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of their OA.

10. **Are contractors eligible for the $10,000 transition incentive even if they choose to sell their routes?**

Yes. These contractors will need to sign and timely submit a Contractor Limited Release and Operating Modification Agreement. They will also need to submit proof of their transition and sign the supplemental limited release.

11. **Is the transition incentive taxable?**

Contractors should consult with tax advisors as to the tax status of the transition incentive. The transition incentive will be reported by FedEx Ground on a Form 1099 for the year in which the amount is received.

12. **What happens if a contractor decides not to sign the Contractor Limited Release and Operating Agreement Modification?**

Contractors are not required to sign the optional limited release. If a contractor decides not to sign the limited release, that contractor will not receive the transition incentive described in this Guide and will continue to operating under the terms of their OA until its current expiration date, absent any further extension. This contractor can still pursue an ISP Agreement if it meets all the terms set forth in this Guide.

13. **Are extensions still available for contractors that do not sign the Contractor Limited Release and Operating Agreement Modification?**

Yes. As previously announced on May 20, 2010, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

14. **Why are growth incentives tied to the acquisition of the vehicle and the PSA?**

By acquiring a vehicle that is already in service in a particular PSA, the ISP will have a vehicle that necessarily qualifies for service under an ISP Agreement.

15. **Are growth incentives available for eligible PSAs acquired after October 8, 2010?**

No. All acquisitions of eligible PSAs, by eligible contractors, must be completed by October 8, 2010 in order to be eligible for growth incentive payments.

16. **Do ISP Candidates have to compete with other vendors from outside the network for the CSAs?**

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground and, if operating three or more PSAs in the same station by October 8, 2010, will have an opportunity to extend a current Operating Agreement to do so. Should an impasse be reached, multiple candidates may be engaged in the process. FedEx Ground may also seek multiple bids for the same CSA in the event that certain transition deadlines are not met. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions. When the multi-year ISP Agreements expire, there is no automatic renewal. At that point, the existing ISP can bid for the CSA again, though FedEx Ground may also consider external candidates in order to contract with the best candidate in terms of experience, ability to provide service, cost, as well as other factors.

**17. Can a Ground contractor acquire a Home Delivery (HD) route (or vice versa) as part of the Massachusetts transition?**
Yes, but a new OA will need to be signed for the HD (or Ground) route. This new contract will expire on October 8, 2010, though an extension will be granted if the contractor is at scale.

**18. How does the transition to the ISP Model affect contractors operating PSAs in different Massachusetts stations?**
FedEx Ground is willing to consider the particular circumstances and make a decision as to whether these contractors are considered to be at scale to negotiate an ISP Agreement. Station management can discuss potential options.

**19. Can a Massachusetts ISP subcontract to contractors based in adjacent states?**
No, unless that contractor is an ISP. Once the transition to the ISP Model is complete, all Massachusetts packages must be delivered by an ISP that is in compliance with all laws.

**20. With whom will ISP Candidates negotiate?**
While Senior Managers are an important part of the process for identifying ISP Candidates, Pittsburgh-based FedEx Ground employees will serve as Negotiators on behalf of the Company.

**21. Is negotiating an ISP Agreement for a one-year term an option?**
Generally, ISP Agreements will be negotiated for a three-to-five year period; however, shorter or longer contract periods will be subject to the parties' negotiations.

**22. What impact will FedEx Ground's ISP Model announcement have on the Company's Incorporation and Compliance Disclosure announcement made on May 20, 2010? Does the non-renewal notice on May 20, 2010 remain in effect?**
The ISP Model announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines set forth in the ISP Transition Guide apply. The non-renewal notice on May 20, 2010 remains in effect.

**23. If a contractor already received an extension as a result of the Company's Incorporation and Compliance Disclosure announcement, what happens to that extension?**
Any extension a contractor has already received remains in effect, unless they sign the Contractor Limited Release and Operating Agreement Modification, which will change the termination date of any Operating Agreement to October 8, 2010. If a contractor does not sign the Contractor Limited Release and Operating Agreement Modification, then the Operating Agreement will expire at the end of any extension the contractor already received as a result of the Company's Incorporation and Compliance Disclosure announcement.

**24. Will contractors affected by the ISP Model announcement still receive the $750 early adoption incentive that FedEx Ground announced on May 20, 2010?**
Yes. As a good-will gesture on the part of the company, all affected P&D contractors will receive the $750 early adoption incentive associated with the May 20, 2010 announcement, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More details will be available in the coming weeks.

Massachusetts

32

*In the future, additional Q&A can be found on <u>www.mygroundbiz.com</u>.

Massachusetts

# EXHIBIT 6

# O'MELVENY & MYERS LLP

CENTURY CITY

IRVINE SPECTRUM

NEWPORT BEACH

NEW YORK

SAN FRANCISCO

SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET WWW.OMM.COM

TYSONS CORNER

WASHINGTON, D.C.

HONG KONG

LONDON

SHANGHAI

TOKYO

OUR FILE NUMBER
259,075-208

July 15, 2010

**VIA FEDEX**

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge St., 20th Fl.
Boston, Massachusetts 02114

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

> **Re:** *FedEx Ground Package System, Inc. Employment Practices Litig.*; No.
> **3:05-MD-527-RM, MDL 1700 (N.D. Ind)**

Dear Mr. Harwood, Ms. Faris, Ms. Ellingstad and Ms. Liss-Riordan:

Today, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor workforce model ("Independent Service Provider") in Rhode Island. As part of that announcement, FedEx Ground is offering an ISP transition incentive to each Rhode Island contractor, provided the contractor signs a limited release with respect to the transition.

As a courtesy, please find enclosed the following documents and information, which FedEx Ground has made available to its contractors who presently service primary service areas ("PSAs") in Rhode Island and/or are domiciled in a Rhode Island facility:

1. Rhode Island Transition Information;

2. Questions & Answers Regarding the Rhode Island Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. Illustrative Independent Service Provider (ISP) Agreements;

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq., and Shannon Liss-Riordan, Esq.  July 15, 2010 - Page 2

5.  DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning today's announcement.

This information is being provided to you in case you receive questions from contractors who are class members in the *Craig v. FedEx Ground Package System, Inc.*, No. 3:05-cv-00530 RLM CAN (N.D. Ind.); *Tierney v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00599-RLM-CAN (RI), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and/or *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-GAO (D. Mass.) cases that are part of the multi-district litigation (MDL) involving FedEx Ground and/or Rhode Island-based actions involving FedEx Ground contractors. The foregoing is without prejudice to FedEx Ground's rights, remedies and defenses. Please call me if you have any questions.

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

Enclosures

cc:  Rhode Island contractors

LA3:1167163.2

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON D C
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-208

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

**VIA U.S. MAIL**

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge St., 20th Fl.
Boston, Massachusetts 02114

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: **_FedEx Ground Package System, Inc. Employment Practices Litig._; No.
3:05-MD-527-RM, MDL 1700 (N.D. Ind)**

Dear Mr. Harwood, Ms. Faris, Ms. Ellingstad and Ms. Liss-Riordan:

This is a follow up to my letter dated today concerning FedEx Ground Package System,
Inc.'s announcement of its intention to transition to a new contractor workforce model
(Independent Service Provider) in Rhode Island. The Rhode Island pickup and delivery
contractors to whom the information listed in my prior letter was provided are listed below:

Goulart, Antonio
Albernaz, Richard Teves
Cortinheiro, Steven
Asante, Kwasi
Calado, Manuel E.
Chouinard, Brian
Constantino, Carlos M.
Coray, John
Correia, William
Dean, Ronald L.
DeSorcy, Ronald Albert
Difo, Rafael A.
Dimitrov, Rumen
Duarte, Jose C.

O'MELVENY & MYERS LLP
Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq., and Shannon Liss-Riordan, Esq.  July 15, 2010 -
Page 2


Enes, Leonel Amorim
Fonseca, Anibal S.
Fortin, Ronald P.
Gemma, Richard Anthony
Danho, Gabriel
Golden, Raymond
Hamel, Steve
Henderson, Jose G.
Mourao, John
Fidalgo, John
Santos, John
Guthrie, Joshua Paul
Julio, Roberto
Lake, Jeffrey
Michaud, Kristine Marie
Moss, Eric
Oldfield, Jacqueline Ann
Ozvan, Sedat
Pacheco, Joseph
Palmer, Bobbie Joe
Pereira, Donald
Phelan, Matthew David
Prescott, Kenneth Hamilton
Silva, Roberto
Cordeiro, Richard
Rodriguez, Rommel
Barboza, Wayne
Scholes, Timothy James
Sequeira, Jeffrey
Silva, Anthony
Silvia, Michael A.
Skillin, Mark Corson
Smith, John L.
St. Pierre, Rodney
Thomas, William R.
Vecchio, Richard A.
Walsh, Shawn Patrick
Barber, Wayne
Cordeiro, Edward

O'MELVENY & MYERS LLP
Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq., and Shannon Liss-Riordan, Esq.  July 15, 2010 -
Page 3

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

LA3:1168112.1

# Rhode Island
# ISP Transition Guide

Rhode Island



David F. Rebholz
*President and Chief Executive Officer*

1000 FedEx Drive
Pittsburgh, PA  15108

Telephone 412.269.1000
Fax 412.859.5687

A letter from the President:

As a result of discussions with the Commonwealth of Massachusetts, FedEx Ground is announcing today the transition to the Independent Service Provider (ISP) Model in Massachusetts and Rhode Island. This change applies to all P&D contractors domiciled in Massachusetts and in Rhode Island as well as all P&D contractors domiciled in Albany, New York with primary service areas that provide service in Massachusetts.

We are transitioning the contractors in Rhode Island based on the large number of contractors that provide service in Massachusetts, the practicalities of business operations in those stations, and the legal and regulatory environments in both Rhode Island and Massachusetts. All P&D Contractors domiciled in Rhode Island, regardless of whether they provide service in Massachusetts, will transition to the ISP Model. The transition makes the most sense for contractors, our customers, and the Company. Most importantly, it will ensure that P&D contractors will continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

The transition to the ISP Model affects only P&D contractors domiciled in Massachusetts and Rhode Island, and Albany P&D contractors with routes that have service areas in Massachusetts. Linehaul contractors are not affected.

The transition process in Massachusetts, Rhode Island and Albany will be conducted over the next 12 months. Please note that for affected P&D contractors in Massachusetts, Rhode Island and Albany, the associated timelines and deadlines established within this guide will supersede all deadlines communicated in the incorporation and compliance disclosure announcement made on May 20, 2010. However, affected Massachusetts, Rhode Island and Albany P&D contractors will receive the $750 incentive for early action, because they are no longer eligible to receive the incentives described in the May 20 announcement.

As with New Hampshire and Maryland, the transition to the ISP Model will involve important decisions and actions on the part of all affected P&D contractors. To facilitate the transition, FedEx Ground is offering eligible contractors various options, ample time to consider them and financial incentives.

The senior manager of your station will review all the pertinent details of the transition and ensure you receive the information you need throughout this process to make the best decisions for you and your business. I encourage you to thoroughly review the contents of the attached transition guide with your business advisors and to keep it on hand throughout the transition as a ready resource.

I am confident this is the most prudent course of action for our operations in these states. Many contractors have already successfully transitioned their businesses to the ISP Model in New Hampshire and Maryland. Based on our experiences in these two states, I believe the transition to the ISP Model in Massachusetts, Rhode Island and Albany will be equally successful.

We look forward to working with each contractor throughout this transition. There will be much more communication and opportunity for discussion as we begin to navigate this change together.

Dave Rebholz
President and CEO

Rhode Island

3

case 3:08-mc-00527-RLM - CAN - document 2088-6 - filed 07/15/10 - page 101 of 39

Rhode Island

4

## What is the ISP Model?

The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent businesses that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs). In these states, FedEx Ground and ISPs enter into ISP Agreements, rather than the current Operating Agreement ("OA").

Under an ISP Agreement, ISPs agree to provide service within typically larger geographic service areas called Contracted Service Areas (CSAs). ISPs manage all aspects of the pick-up and delivery of packages within a CSA.

Under the ISP Model, ISPs negotiate a range of financial and non-financial terms on a multi-year basis according to the unique needs of the business and CSA. For example, ISPs have the ability to negotiate a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase

The ISP Model is appealing to entrepreneurs wanting to focus on the management and administrative responsibilities of running a sizable pick-up and delivery company, and wanting to oversee significant business responsibilities that may lead to profitable growth opportunities.

### FedEx Ground Independent Service Provider Responsibilities

Under an ISP Agreement, an ISP agrees to provide pick-up and delivery services through its employees. ISPs have the flexibility to conduct business operations and make all decisions related to vehicles, service areas, staffing and scheduling. These include the following:

**Vehicles**
- Choosing vehicles that best fit an ISP's unique operations, with FedEx Ground only establishing minimum standards for vehicles
- Incurring the costs of operating vehicles, including maintenance, repairs, fuel, tolls, taxes, registration fees and licenses
- Complying with the U.S. Department of Transportation (DOT) requirements for ISP employee-drivers since ISPs operate under FedEx Ground's DOT operating authority

**Contracted Service Areas (CSA)**
- Negotiating terms for the CSA, which provides the ISP with exclusive service rights
- Deciding how best to provide service over the CSA

**Staffing**
- Managing a team of ISP employee-drivers and potentially other workers (such as a Key Contact or helper) to perform the work
- Assigning work and determining when and on what terms it will be completed
- Supervising employees
- Recruiting and training staff
- Determining compensation and benefits for employees
- Complying with all state and federal employment laws

**Scheduling**
- Establishing work, leave and vacation schedules for all ISP employees

Rhode Island

5

## Business Operations
- Deciding whether to expand the business by acquiring additional CSAs
- Incorporating (and not operating in some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), or similar entity), unless already incorporated
- Registering as a corporation in good standing and as an employer in the states in which the ISP does business. Note: If a contractor has previously incorporated, then that corporate entity likely has already registered in at least one state, but proof of current registration and good standing will nevertheless need to be shown. Contractors should consult their own legal, financial or tax advisors to determine if they need to be registered in any additional states.

## ISP Agreement

Central to the ISP Model is an ISP Agreement, which is a legally-binding contract by which ISP Candidates (businesses seeking to enter into an ISP Agreement) have the opportunity to define their unique business relationship with FedEx Ground. An ISP Agreement outlines the service-level results expected and regulatory compliance requirements that ISPs have agreed to meet during the Negotiations Process for the term of an ISP Agreement.

The following represents a list of some, though not all, of the financial and non-financial terms and elections that may be negotiated in an ISP Agreement:

## Key Financial Terms
- **Annual Service Charge** — A fixed charge paid weekly to an ISP for providing service to FedEx Ground
- **Stop Charge** — A charge paid to an ISP for each stop to a customer location where a package is picked up or delivered
- **Per Stop Fuel Surcharge** – A surcharge, indexed to the price of fuel, paid for each daily stop where a package is picked up or delivered
- **Surge Stop Charge** – A charge paid for any stop above the negotiated "Daily Stop Threshold"
- **Package Charge** — A charge paid to an ISP for each package that is picked up or delivered when an ISP makes a stop
- **Period Safety Incentive** — An incentive paid to an ISP following a 4-week Safety Period. The payment amount is based on a ratio of the number of preventable accidents during the Safety Period and the total number of vehicles the ISP utilizes during that period. If a preventable accident is recorded during a period, the incentive payment for the involved vehicle for that period, plus the next two periods (for a total of 3 periods), is affected
- **New Account Start-Up** ('Meet-and-Greet') — A fee paid to an ISP for an initial visit to a new customer that has been arranged by FedEx Ground
- **Spotted Trailer Charges** — A charge paid to an ISP for providing "Spotted Trailer" service at a customer's request

## Key Non-Financial Terms
- **Length of Agreement** — The length of an ISP Agreement typically will be between three to five years, but an ISP Candidate may propose a shorter or longer term for its ISP Agreement
- **Expiration Date** — The end date of an ISP Agreement, as determined by the negotiated length of term
- **Number of Load Positions by Year** — A fixed number of dedicated load positions that will be available each year in the ISP's associated station
- **Daily Stop Threshold** — The number of combined pick-up and delivery stops, above which the Surge Stop Charge is triggered and the ISP is able to invoke the Right to Decline

## Elections
- **Equipment Registration** — ISP Candidates may elect to register certain equipment in FedEx Ground's name under the International Registration Plan (IRP) for base plates and elect to have the associated amounts deducted from the ISP's Charge Statement
- **Customer Service Incentive** – A negotiable incentive paid to an ISP. The final amount of the payment is based on the ISPs customer service record during the 4-week reporting period

Rhode Island

6

- **Periodic Maintenance Schedule** — ISP Candidates may elect to use the manufacturers' Periodic Maintenance Schedule or elect an alternative Periodic Maintenance Schedule
- **Fuel Tax Reporting** — ISP Candidates may elect to have FedEx Ground report and pay its fuel tax liability and have that amount deducted from the ISP's Charge Statement
- **Facilitated Insurance Coverage** — ISP Candidates may elect to have FedEx Ground facilitate the procurement of required insurance for the ISP and have the premiums deducted from the ISP's Charge Statement
- **Brand Promotion Programs** — A fee paid by FedEx Ground if an ISP elects to have its ISP employee-drivers or employee-helpers wear FedEx Ground-approved uniforms and/or have some or all of its vehicles display FedEx Ground approved logos; the fee is paid weekly by FedEx Ground to the ISP
- **Arbitration** — An ISP can elect binding arbitration of disputes with FedEx Ground, if any, as detailed in an ISP Agreement

## ISP Agreement Negotiations

An ISP Agreement Negotiations Process provides each ISP Candidate the opportunity to negotiate an ISP Agreement with FedEx Ground for a specific CSA.

During negotiations, ISP Candidates have the ability to define their unique business relationship with FedEx Ground. Depending on the ISP Candidate's business needs and desires, an ISP Candidate may choose to pursue an agreement with a higher contract fee to achieve a higher percentage of fixed income. Alternatively, an ISP Candidate may want to pursue higher package or stop rates to increase variable income potential if volumes increase. Individualized negotiations will allow each ISP Candidate to pursue an agreement that is best suited for its business.

ISP Agreement negotiations are conducted electronically and by phone, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals.

## What is Different About the ISP Model?

The ISP Model will bring fundamental changes to the manner in which FedEx Ground operates in the state. There will be changes made to the definition of service areas, the structure of the working relationship between FedEx Ground and independent business owners and the manner in which contractual agreements are reached with independent businesses to provide pick-up and delivery services.

The following provides an overview of these changes and a preview of the decisions contractors must make during the transition.

### The ISP – FedEx Ground Relationship

Under the ISP Model, FedEx Ground will contract through a negotiated ISP Agreement with only larger businesses that operate as corporations and not some other form of business, such as a LLP, LLC, or similar entity.

Once the ISP Model is in place, FedEx Ground generally will limit its dealings to the individual selected by an ISP to represent the ISP, known as the "ISP Key Contact." The ISP Key Contact alone will deal with FedEx Ground and receive all written and verbal communication from FedEx Ground, except in limited circumstances. The ISP Key Contact then deals with ISP employees, including drivers and helpers, as the ISP Key Contact deems appropriate.

### Contracted Service Areas

A significant change under the ISP Model is the elimination of traditional PSAs in favor of larger geographic service areas – or CSAs. A CSA may comprise any combination of at least three Ground and/or Home Delivery PSAs in a single station. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-

Rhode Island

location. While a CSA may include non-contiguous (non-adjoining) work areas, a higher level of operational efficiency will likely be achieved through contiguous work areas.

**Existing Operating Model**
**of a Contractor's Separate PSAs**



**Independent Service Provider**
**Model of an CSA**



CSAs will be defined as the combination of the PSAs operated by the ISP Candidate at the time negotiations begin. FedEx Ground PSAs are defined by Addendum 4 of the Ground OA and FedEx Home Delivery PSAs are defined by the proprietary ZIP Code listed in Addendum 4 of the Home Delivery OA. FedEx Ground will work with Home Delivery contractors to allocate non-proprietary areas based on data in the Home Delivery Vehicle Route Planning (VRP) PC. An ISP Agreement Addendum 4 will list entire ZIP Codes that are complete within a single CSA, as well as details of street address ranges where a ZIP Code is split among multiple CSAs.

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. FedEx Ground may seek multiple bids for the same CSA only in the event that the ISP Candidate's and FedEx Ground's negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

Once a negotiated ISP Agreement is signed, an ISP may trade or sell portions of its CSA, such as ZIP Codes, for the remaining term of an ISP Agreement, subject to the terms of an ISP Agreement. Additional negotiations may occur during the term of an ISP Agreement based on mutual agreement between FedEx Ground and the ISP. Changes to the CSA are one of the limited scenarios under which negotiations may occur. Modifications to a CSA will be documented on a schedule in an ISP Agreement. As an alternative, two ISPs can informally agree to sub-contract P&D work in the respective CSAs. However, the ISP that originally contracted for the P&D work will ultimately remain responsible for that work.

<u>Notable Provisions of an ISP Agreement</u>

There are many provisions that are different from the existing OA. Some of the notable provisions as follows:

**Right to Decline** – The contractual right to decline certain requests, such as delayed-sort packages, pick-ups after 6:30 P.M. and stops above the negotiated Daily Stop Threshold.

**Service Expectations** – ISPs will maintain service levels agreed to in an ISP Agreement such as: service days, pick-up and delivery services, collection and return of COD charges; service results (meet customer expectations, achieve inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher, avoid theft, loss, damage and delays, and conduct all business with honesty and integrity).

**Flexing** – FedEx Ground will not offer company-coordinated flexing, meaning ISPs will need to ensure resources are in place to handle surges and variances in daily package volumes (such as Peak), whether by sub-contracting with other ISPs or by other means.

## Other Notable Provisions

**Vehicles** – An ISP Agreement will require only that ISP vehicles meet government requirements, be white, have a height that is flush with conveyor walkways in the station, be of a size that allows for the station doors to close and maneuverability in the station.

**Service Account** – An ISP Agreement will not provide for a service account. Contractors will be paid the balance of their service accounts when the current OA expires or is terminated by agreement.

**Escrow** – An ISP Agreement will not include an Escrow Program. Contractors will be paid the balance of their Escrow Accounts when the current OA expires or is terminated by agreement.

**Business Support Package** – FedEx Ground will not offer a Business Support Package in an ISP Agreement. ISPs will be able to seek business support services from any provider they choose

**Scanners** – Scanners may be leased from FedEx Ground or leased or purchased from an outside provider.

**Additional details can be found in the Illustrative ISP Agreements**


## Illustrative Examples

Given the range of negotiable features contained in an ISP Agreement, and the differences from the existing OA, FedEx Ground is providing illustrative examples of the components of an ISP Agreement. The chart below sets forth **hypothetical** scenarios illustrating the significant flexibility ISP Candidates have in negotiating an ISP Agreement. For example, many revenue components are negotiable. The chart provided illustrates hypothetical revenue scenarios different ISP Candidates might negotiate in an ISP Agreement, such as Stop Charge, Package Charge and Surge Stop Charge.

In these hypothetical scenarios, some ISP Candidates elect to participate in the Optional Brand Promotion Programs, which includes the uniform program for ISP employee-drivers or employee-helpers and the vehicle program for some or all of the ISP's vehicles. In "Scenario 1," the ISP Candidate declines to participate in the Uniform Brand Promotion Program. The illustrative scenarios also reflect how ISP Candidates can negotiate a fee to be paid each time a "Meet-and-Greet" is performed with prospective new customers within the ISP's CSA.

Also, the chart illustrates a hypothetical range of business expenses such as employee wages and benefits, staffing and overtime expectations, vehicle choices and other needs, all of which are determined by the ISP Candidate. Actual costs and potential revenue will depend on how a particular ISP structures and operates its business.

As illustrated by the following chart, the **potential** for greater profit exists depending on an ISP's individualized revenue and cost decisions. The chart sets forth **potential** ranges of revenue, costs and hypothetical earnings that might result based on the characteristics of an ISP's CSA and individualized business decisions.

*The chart is for illustrative purposes only and should not set the terms of negotiation between ISP Candidates and FedEx Ground. The chart does not promise any particular range of outcomes.*

Rhode Island

9

NOTE: Please refer to the **Illustrative ISP Agreements** to see how the scenarios shown here might correspond with an actual ISP Agreement.

| | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| **Daily Route Dynamics** | Stops | 255 - 580 | | 450 - 900 | | 560 - 1800 | |
| | Stop Surge Threshold | 400 - 800 | | 500 - 1000 | | 1000 - 2000 | |
| | Packages | 750 - 1400 | | 1450 - 2220 | | 1575 - 2600 | |
| **Business Resources** | Vehicles | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Drivers | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Helpers | 0 | | 0 - 1 | | 0 - 1 | |
| **Key ISP Agreement Terms** | Annual Service Charge | $23K - $45K | | $35K - $40K | | $94K - $120K | |
| | Stop Charge | $1.24 - $2.85 | | $1.65 - $2.62 | | $1.43 - $2.60 | |
| | Per-stop Fuel Surcharge | $0.25 - $0.27 | | $0.24 - $0.25 | | $0.11 - $0.15 | |
| | Surge Stop Charge | $0.50 - $1.50 | | $0.49 - $1.48 | | $0.50 - $1.89 | |
| | Package Charge | $.05 - $0.15 | | $0.05 - $0.15 | | $0.10 - $0.15 | |
| | Period Safety Incentive | $2330 - $3160 | | $2700 - $2800 | | $3960 - $5250 | |
| | Period Customer Service Incentive | $710 - $1,803 | | $1,156 - $2,798 | | $1,623 - $3,676 | |
| | New Account Start-Up | $8.00 - $10.00 | | $10.00 - $14.00 | | $8.00 - $12.00 | |
| | Uniform Brand Promotion (Weekly) | $0.00 | | $54 - $103 | | $69 - $264 | |
| | Vehicle Brand Promotion Charge[5] (Weekly) | $32 - $56 (All vehicles) | | $32 - $56 (3 to 4 vehicles) | | $32 - $56 (6 to 7 vehicles) | |
| **Revenue** | Revenue | $280K - $401K | | $462K - $675K | | $628K - $852K | |
| **Costs** | Employee Expenses and Benefits[1] | $152K - $213K | | $252K - $349K | | $354K - $465K | |
| | Vehicles[2] | $52K - $69K | | $86K - $103K | | $121K - $138K | |
| | Payroll Taxes[3] | $20K - $29K | | $34K - $48K | | $48K - $64K | |
| | Administration[4] | $6.5K - $8.5K | | $11K - $13K | | $15K - $17K | |
| **Hypothetical Pre-Tax Operating Income[6]** | | $49K - $81K | | $79K - $162K | | $90K - $168K | |
| **Hypothetical Pre-Tax Operating Margin** | | 12% - 29% | | 12% - 35% | | 11% - 27% | |

1) These costs could include payroll expenses and similar employee expenses such as wages, healthcare benefits, paid sick leave and vacation.
2) These costs could include vehicle purchase or lease payments, maintenance, insurance, and fuel, and will vary based on, for example, the number and types of vehicles ISPs choose to operate.
3) Includes workers compensation, unemployment insurance and self employment tax. These costs represent a national average and are not specific to any state. These costs do not include personal income tax.
4) These costs could include other administrative expenses associated with running a business, for example, recruiting, training and bookkeeping costs.
5) In scenarios 2 and 3, the ISP elected to include some, but not all vehicles in the Optional Brand Promotion Program.
6) Prior to the ISP's corporate or personal income tax.

Rhode Island

## Contractor Options

Contractors affected by this transition have several options to choose from before October 8, 2010.

### 1. Pursue an ISP Agreement

Pursuing an ISP Agreement is an important decision that may require an investment, such as buying the necessary PSA(s) to achieve "scale," no later than October 8, 2010. If a contractor pursuing an ISP Agreement fails to do so by that date, the OA will expire according to its terms. There are additional deadlines that also must be completed by October 8, 2010, such as incorporating the business, and not some other form of business, such as a LLP, LLC, or other similar entity, and establishing an Entity Profile on *MyGroundBizAccount*. If an ISP Candidate does not complete these two steps before October 8, 2010, FedEx Ground and the Candidate may still negotiate an ISP Agreement, although FedEx Ground may also consider negotiations with alternative candidates as well.

**Steps to take:**

- Decide whether to sign and return the Contractor Limited Release and Operating Agreement Modification no later than August 6, 2010 (signing this document is not required, but doing so makes contractors eligible to receive the transition incentive).
- Incorporate the business no later than October 8, 2010.*
- Establish an Entity Profile on *MyGroundBiz Account* no later than October 8, 2010.*
- Operate a minimum of three PSAs in the same station no later than October 8, 2010.*

\* These steps may be initiated immediately

ISP Candidates are entrepreneurial and understand the risk/reward trade-off of investing time and resources to position the business for the future. These candidates see the benefits of focusing on managing and growing the business. Pursuing an ISP Agreement should appeal to those eager to take advantage of the opportunity to operate businesses more efficiently utilizing economies-of-scale, which could lead to higher earnings.

**Additional Circumstances:**

**P&D Tractor Contractors** (P&D tractor contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible P&D routes and vehicles. P&D tractor contractors are <u>not</u> eligible for the vehicle incentive program.)

- Acquire and operate a minimum of three non-P&D tractor PSAs in the same station no later than October 8, 2010 and operate the P&D tractor under an ISP Agreement, or
- Convert current OA to a Linehaul Agreement no later than October 8, 2010. P&D tractor contractors choosing this option are eligible for the transition incentive if they sign and submit a Contractor Limited Release and Operating Agreement Modification by August 6, 2010.

**Swing Contractors** (Swing contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible non-swing P&D routes and vehicles; full-time swing contractors are eligible for the vehicle incentive program.)

- Acquire and operate a minimum of three <u>non-swing PSAs</u> in the same station no later than October 8, 2010. Note: Swing work areas <u>do not</u> count toward the three PSA minimum and a contract for these swing work areas will expire on its termination dates

*The Time-off Program ends on October 8, 2010. All swing PSAs in Rhode Island go inactive on October 8, 2010.*

Rhode Island

11

## 2. Seek Employment with an ISP

Being an employee of an ISP means all terms of employment, including hours, compensation and benefits, must be worked out with the ISP. Discussions regarding employment terms are solely between ISPs and contractors seeking to become drivers. FedEx Ground will not participate or intervene in employment discussions and will not set compensation or benefit terms that ISPs are required to meet. Employee-drivers and employee-helpers of an ISP will not have a direct relationship with FedEx Ground. Aside from casual interactions at the station, these employees will need to direct all questions and concerns to their employers.

Becoming an employee-driver for an ISP should appeal to contractors that enjoy driving a delivery vehicle and personally performing package pick-up and delivery services rather than the responsibilities of running a larger business.

**Steps to take:**

- Decide whether to sign and return the optional Contractor Limited Release and Operating Agreement Modification no later than August 6, 2010.
- Sell or transfer PSA(s) no later than the Operating Agreement's expiration date.
- If the contractor has signed the Contractor Limited Release and Operating Agreement Modification, the Supplemental Limited Release of Claims will need to be signed and submitted on or after the effective date of termination of the current Operating Agreement in order to receive the remaining $5,000 payment of the transition incentive.

## 3. Exit the network

Contractors not interested in pursuing an ISP Agreement or seeking employment with ISPs may choose to exit the network and pursue other opportunities. Contractors wishing to leave the network may sell their PSA(s) or simply continue to provide service under their OAs until the agreements expire (all OAs were non-renewed on May 20, 2010, and remain non-renewed).

**Special Note:** By signing and returning the Contractor Limited Release and Operating Agreement Modification, contractors agree that the current Operating Agreement will expire on October 8, 2010. If contractors choose not to sign the Contractor Limited Release and Operating Agreement Modification, the termination date of the current Operating Agreement will serve as the expiration date, absent an extension.

Rhode Island

## Contractor Incentives

FedEx Ground is offering several financial incentives to assist eligible contractors that are affected by the transition to the ISP Model in Rhode Island.


## Transition Incentive

In addition to growth and vehicle incentives detailed below, FedEx Ground is offering a transition incentive of $10,000 to all current P&D contractors operating routes in Massachusetts and those domiciled in a Massachusetts station as of June 30, 2010 that elect to sign a Contractor Limited Release and Operating Modification Agreement, which includes a limited release of claims involving the transition and an agreement to terminate the existing OAs by October 8, 2010. See the Sample Contractor Limited Release and Operating Agreement Modification in this guide.

Payment of the transition incentive will be issued in two installments as follows:

Initial $5,000 Transition Payment:

P&D contractors operating routes in Massachusetts, and those contractors domiciled in Massachusetts, that are active as of June 30, 2010 and request the transition incentive, are eligible to receive $5,000 of the payment within 15 business days of submitting to station management a signed Contractor Limited Release and Operating Agreement Modification, which includes a limited release and agreement to end the current Operating Agreement no later than October 8, 2010 (absent a further written contract extension).

A signed agreement must be submitted from the date the Contractor Limited Release and Operating Agreement Modification is distributed to August 6, 2010 due to receive this transition incentive.

Remaining $5,000 Transition Payment:

After receiving initial payment:

- P&D contractors that sell/transfer all PSAs in Rhode Island by October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs;

- P&D contractors that are operating three or more PSAs in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs. (Note that for ISP Candidates successfully negotiating an ISP Agreement, the OAs will not terminate until the effective date of an ISP Agreement.)

- P&D contractors continuing to operate fewer than three PSAs in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

Independent contractors that do not request the transition incentive or do not submit the limited release by August 6, 2010 will not receive the transition incentive. These contractors have all of the same options available as do contractors that have signed the limited release and received the transition incentive.

**Important Legal Note**

In exchange for the transition incentive, FedEx Ground is asking P&D contractors domiciled in a Rhode Island station for a release of certain potential claims related to this transition. Sample release documents are contained in this ISP Model Transition Guide. Actual release documents can be obtained from station management beginning the date the Contractor Limited Release and Operating Agreement Modification is distributed. The release is not intended to settle all claims a contractor may have against FedEx Ground. The release is limited to potential claims concerning FedEx Ground's announcement of this transition, the termination, non-renewal or assignment of the current OA, and any sale, assignment, loss or other disposition of PSA(s). FedEx Ground cannot advise contractors on individual circumstances.

Pending lawsuits include *Craig v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Sheehan v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00531-RLM-CAN (MA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Urbank/Somers v. FedEx Ground Package Sys.*, Civil No. 3:08-cv-00575-RLM-CAN (MA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), and *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-GAO (D. Mass.).

**Contractors are not obligated to sign the release of claims documents.** Deciding whether to sign these documents is completely up to each contractor. If a contractor chooses to accept the transition incentive, a signed agreement and limited release needs to be submitted no later than August 6, 2010. If a contractor chooses not to sign the agreement and limited release, the contractor will not receive the transition incentive and will have the same options available to those contractors that have signed the agreement and limited release:

- Continue operating under the current agreement (which will not be renewed) until the date of its expiration;
- Sell or transfer PSAs to other contractors; or
- Operate at least three PSAs in an affected station by October 8, 2010 to become an ISP Candidate.

**Contract Renewals and Extensions**

All OAs remain non-renewed as a result of the May 20, 2010 Incorporation and Compliance Disclosure announcement. As indicated in the May 20, 2010 announcement, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

**Growth Incentives**

In addition to the transition incentive available to all P&D contractors domiciled in a Rhode Island station, growth incentives of up to $100,000 are available to those choosing to grow the business by acquiring eligible PSAs and vehicles between announcement day and October 8, 2010, for total potential incentives of $110,000, depending on station-specific contractor volume guidelines.

**Eligible PSAs are Ground or Home Delivery P&D routes servicing Rhode Island or domiciled in Rhode Island currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of June 30, 2010.** PSAs transferred or sold by Rhode Island P&D contractors operating three or more PSAs are not eligible for growth incentives. For this transition, size of active contractors is determined as of June 30, 2010.

Rhode Island                                                                                                  14

Contractors acquiring eligible PSAs in the same Rhode Island station can receive up to $100,000 in potential growth incentives, subject to station contractor size guidelines. Growth incentives do not apply unless the PSA that is acquired gets the contractor to at least minimum scale (three PSAs in the same station); contractors that are already at or above scale are eligible to receive growth incentives for acquiring up to five eligible PSAs.

**Each growth incentive will be reduced by $5,000 if a vehicle for that PSA is not acquired by the purchasing contractor from the selling contractor.**

The following is an illustration of how the growth incentives would be calculated:

- $10,000 growth incentive for acquiring the first Ground or Home Delivery PSA and vehicle that results in achieving minimum scale; plus
- $15,000 for the second PSA and vehicle; plus
- $20,000 for the third PSA and vehicle; plus
- $25,000 for the fourth PSA and vehicle; plus
- $30,000 for the fifth PSA and vehicle.

These growth incentives are **available to existing FedEx Ground contractors** that acquire eligible routes and vehicles in the same Rhode Island station (a Ground station, Home Delivery station or co-location) by October 8, 2010. Note that a contractor's status for the growth incentives is based on the number of **PSAs operated within the same station and is subject to station contractor size guidelines**. For example, if a contractor operates two PSAs in the Providence Ground station, growth incentives will be available only for eligible routes acquired in the Providence Ground station. **Supplemental, swing and P&D tractor PSAs are not eligible for growth incentives and will not be counted toward the 3-PSA minimum needed to be eligible for ISP Agreement Negotiations.**

As the chart below illustrates, a variety of options are available if choosing to acquire eligible PSAs in the same station. For example:

- A single work area contractor in Rhode Island would receive $10,000 in growth incentives for acquiring its second eligible route (that results in achieving minimum scale) and vehicle in the same station, plus the additional $10,000 transition incentive – totaling $20,000.

- A contractor with three PSAs would receive $10,000 in growth incentives if acquiring one more eligible PSA and vehicle in the same station. With the $10,000 transition incentive, incentives would total $20,000.

- A contractor with two PSAs in a Rhode Island station would receive $45,000 in growth incentives if acquiring three more eligible PSAs and vehicles in that same station. With the $10,000 transition incentive, this would provide the contractor with $55,000.

| Contractor Status as of June 30, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SWA | MWA-2 | MWA-3 | MWA-4 | MWA-5 | MWA-6 | MWA-7 | MWA-8 |
| Total growth incentive for acquiring one (1) eligible PSA and vehicle | | $10,000 | $10,000 | $10,000 | | $10,000 | $10,000 | $10,000 |
| Total growth incentive for acquiring two (2) eligible PSAs and vehicles | $10,000 | $25,000 | $25,000 | $25,000 | | $25,000 | $25,000 | $25,000 |
| Total growth incentive for acquiring three (3) eligible PSAs and vehicles | $25,000 | $45,000 | $45,000 | $45,000 | | $45,000 | $45,000 | $45,000 |
| Total growth incentive for acquiring four (4) eligible PSAs and vehicles | $45,000 | $70,000 | $70,000 | $70,000 | | $70,000 | $70,000 | $70,000 |
| Total growth incentive for acquiring five (5) eligible PSAs and vehicles | $70,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring six (6) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring seven (7) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Available Growth Incentives | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Transition Incentive | $10,000 | $10,000 | $10,000 | $10,000 | | $10,000 | $10,000 | $10,000 |
| Maximum Available Incentives | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 |

Rhode Island

16

Note: Growth incentives shown here, which are subject to station contractor size guidelines, are contingent on the purchasing contractor's acquisition of the vehicle associated with the acquired PSA. Without such vehicle acquisition, each growth incentive is $5,000 less per PSA than shown above.

Contractors acquiring eligible PSAs will be notified by station management of the amount of the growth incentive(s). **Payment of the growth incentive(s) will be made within 15 business days of completion of the PSA acquisition in CDAS. All acquisitions of eligible PSAs and vehicles must be completed and approved no later than October 8, 2010 to receive growth incentives.**

## Vehicle Incentive Program

SWA or MWA-2 contractors that are not pursuing an ISP Agreement and that do not sell or transfer vehicle(s) along with the PSA(s) to the acquiring contractor, may be eligible for a vehicle incentive up to $5,000. This amount applies to only one delivery vehicle per PSA, and applies only if the vehicle is not acquired by the contractor that purchases the associated PSA and if it is disposed of through a FedEx Ground designated third-party vendor.

Full-time swing contractors in Rhode Island not pursuing an ISP Agreement may also be eligible for a vehicle incentive of up to $5,000. This payment will cover one delivery vehicle currently operated by the full-time swing contractor.

The amount of the vehicle incentive, up to $5,000, is determined by the excess, if any, of the contractor's remaining balance due on the vehicle as determined by the lease holder or lender over the vehicle's fair market value. Fair market value will be determined by a third party vendor.

The vehicle incentive applies to those vehicles that are either owned or leased by a FedEx Ground or Home Delivery SWA, MWA-2 or full-time swing contractor in Rhode Island for use in the contractor's applicable PSA(s). **To be eligible for this incentive, contractors must sell or transfer their PSA(s) by October 8, 2010. Contractors may elect to retain or dispose of the vehicles in any manner the contractors choose, though these contractors will then not be eligible for the vehicle incentive.**

Contact information for the third party vendor will be provided by station management.

## Incorporation and Compliance Disclosure Requirement and the ISP Model Announcement

This announcement to transition Massachusetts, Rhode Island and certain contractors in Albany to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and legal compliance. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines established within this ISP Transition Guide apply, and not those associated with the Incorporation and Compliance Disclosure Announcement.

**Contractors should note that all non-renewals and extensions associated with the Incorporation and Compliance Disclosure announcement on May 20, 2010 remain in effect.** Contractors that sign the Contractor Limited Release and Operating Agreement Modification agree to a new expiration date of October 8, 2010. For contractors that do not sign the limited release, the current expiration date remains unchanged. Contractors with expiration dates between July 1, 2010 and December 31, 2010 that do not sign the limited release are eligible to receive a 180-day extension.

Additionally, although affected P&D contractors are technically no longer eligible to receive the early adoption incentives described in the May 20 Incorporation and Compliance Disclosure Announcement, FedEx Ground has decided, as a good-will gesture, to pay all affected P&D contractors the $750, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More information will be available in the coming weeks.

Rhode Island

17

## Transition Timelines by Wave

Every contractor in Rhode Island will have the same amount of time to decide whether to sign the Limited Release and Operating Agreement Modification and choose which contractor option to pursue. However, in order to facilitate a smooth transition to the ISP Model in Rhode Island, FedEx Ground is implementing station-specific dates for the Negotiations Process which will be grouped in two waves.

Stations in Wave 1 include: Springfield Ground and Home Delivery, Worcester Ground and Home Delivery, Cape Cod co-location (including Nantucket and Martha's Vineyard), and Brockton Ground and Home Delivery.

Stations in Wave 2 include: Boston Ground and Home Delivery, **Providence Ground and Home Delivery**, Wilmington Home Delivery, and Albany Ground and Home Delivery.

See the charts below for additional details on the dates that affect your station.

<u>Wave 1</u>

| July 2010 – November 2010 | January 2011 – April 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | January 21, 2011 – First proposal due |
| August 6, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due | March 19, 2011 – ISP Agreement negotiations end |
| October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | April 2, 2011 – ISP Agreements go into effect |
| October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount, and achieved "scale" | |
| November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s) and submitted the Initial Compliance Disclosure Form | |
| November 19, 2010 – Date by which CSA definition is finalized and RFI Response submitted | |

Rhode Island

18

## Wave 2

| July 2010 – February 2011 | February 2011 – May 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed. | February 25, 2011 – First proposal due. |
| August 6, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due. | April 23, 2011 – ISP Agreement negotiations end. |
| October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification. | May 7, 2011 – ISP Agreements go into effect. |
| October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale. | |
| November 19, 2010 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s), and submit the Initial Compliance Disclosure Form. | |
| February 11, 2011 – Date by which CSA definition is finalized and RFI Response submitted. | |

## Contract Extensions

An extension to the station-specific date of when an ISP Agreement goes into effect (see charts above) is available to any Rhode Island contractor that is operating three or more PSAs in the same station by October 8, 2010.

## Request for Information Process

The FedEx Ground Request for Information (RFI) Process helps the company assess whether an ISP Candidate has the ability to fulfill the obligations of an ISP Agreement. In order to begin the RFI Process, an ISP Candidate must be a corporation and not some other form of business, such as a LLP, LLC, or similar entity, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale by October 8, 2010.

In order to give ISP Candidates the opportunity to get through the transition in sufficient time to protect against service disruptions, an ISP needs to register with the state(s) in which it does business and be in good standing with those state(s) by November 19, 2010. Contractors will need to finalize the definition of their CSA and submit a Response to FedEx Ground's RFI by the station-specific deadline. If these steps are not completed by the associated deadline, an ISP Candidate may still be eligible to submit a Response to FedEx Ground's RFI and possibly advance to negotiations. However, FedEx Ground may negotiate with alternate candidates as well for the CSA.

FedEx Ground will evaluate the RFI Response based on the areas listed here:

- Business Experience
  - Including references and relevant experience in the transportation industry
- Financial Viability
  - Such as bank references and annual sales
- Customer Service Approach
  - Plans for meeting customer needs and address customer concerns
- Driver Recruitment and Retention
  - Goals for recruiting employees, historical turnover rates

- Skills and Knowledge of the ISP's Workforce
  - Plans for ensuring employee knowledge of FedEx Ground's services
- Safety Commitment and History
  - Injury and accident history, vehicle maintenance plan and history
- Security (Loss and Damage Avoidance)
  - Plans for minimizing package damage and loss, historical damage trends
- Contingency Situations
  - Ability to provide consistent customer service despite volume surge, employee absenteeism and/or equipment failures

An ISP Candidate should provide any additional information it considers important for FedEx Ground to review in evaluating its response. While ISP Candidates can submit an RFI Response on *MyGroundBizAccount*, the response can be submitted in any written format to FedEx Ground.

Once the RFI Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions:

- **Advance to Negotiations**
  Senior Manager determines the ISP Candidate has the ability to fulfill the obligations of the vendor relationship.

- **Clarification/Questions**
  Senior Manager determines further clarification will help determine if the ISP Candidate is capable of fulfilling the vendor relationship.

- **Does Not Advance to Negotiations**
  Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations of the vendor relationship.

After advancing through the RFI Process and onto the Negotiations Process, **certain qualifications must be met before entering into an ISP Agreement**. Some of these administrative tasks will take several weeks to complete and documentation must be in order before an ISP Agreement Signatory is permitted to electronically sign an ISP Agreement. If these tasks are not completed and an agreement cannot be reached, these contractors run the risk of having their OAs expire without an agreement in place.

For a complete list of qualifications, see the Qualification Steps for Pursuing an ISP Agreement section of this Guide.

Drivers and certain other employees of the ISP Candidate will need to pass a criminal background check prior to the effective date of an ISP Agreement. These background checks will be arranged and paid for by FedEx Ground through a third-party vendor.

**Negotiations and Execution Processes**

## Negotiations Process

The first step in the Negotiations Process is the preparation and submission of a Proposal to FedEx Ground. The Proposal is an initial offer on the key financial, non-financial, and elective components of an ISP Agreement and any other terms the ISP Candidate wishes to propose. The deadline for submitting the first Proposal is based on which wave an ISP Candidate's station falls. If a Proposal is not submitted by the dates listed above, an ISP Candidate may still be eligible to submit a first proposal and negotiate an ISP Agreement, but FedEx Ground may consider proposals and negotiate with alternate candidates as well for the CSA. For additional information, see Transition Timeline by Wave section of this Guide.

FedEx Ground and the ISP Negotiator (an officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate) will negotiate an ISP Agreement regarding terms for the proposed CSA. This provides ISP Candidates the flexibility to negotiate contract terms that best fit the particular business needs and unique service area the ISP Candidate is pursuing.

For example, an ISP Agreement may be negotiated with a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase – depending on business needs and desires. ISP Candidates can also choose whether to utilize FedEx Ground logos on all or some of their vehicles, and whether to outfit employees in FedEx Ground uniforms in exchange for negotiated brand promotion fees.

The following represents a list of some, though not all, of the key financial and non-financial terms, as well as elections that may be negotiated.

| Negotiable Financial Terms: | Negotiable Non-Financial Terms: | Elections: |
|---|---|---|
| ~ Annual Service Charge<br>~ Stop Charge<br>~ Fuel Charge<br>~ Surge Stop Charge<br>~ Package Charge<br>~ Period Safety Incentive<br>~ New Account Start-Up ("Meet-and-Greets")<br>~ Spotted Trailer Charges (if applicable)<br>~ Customer Service Incentive | ~ Length of Term<br>~ Expiration Date<br>~ Load Positions by Year<br>~ Daily Stop Threshold | ~ Additional Services<br>~ Scanner Leasing Program<br>~ Equipment Registration (on certain vehicles)<br>~ Periodic Maintenance Schedule<br>~ Fuel Tax Reporting<br>~ Facilitated Insurance Coverage and Billing<br>~ Brand Promotion Program (Vehicles and Uniforms)<br>~ Arbitration<br>~ Alternative Maintenance Program |

## Proposal Capture & Analysis Tool (PCAT)

The Proposal Capture and Analysis Tool, or PCAT, will be used by FedEx Ground to evaluate Proposals during the Negotiations Process. To facilitate negotiations, this optional tool is available to ISP Candidates for the preparation of the RFI Response and/or a Proposal. The PCAT will be available to ISP Candidates on *MyGroundBizAccount* and can be used to calculate estimated revenues for multiple scenarios based on inputs by the ISP Candidate.

Inputs include variable components such as Per Stop Charge, Fuel Surcharge and forecasted volume, as well as fixed financial components such as Annual Service Charge and the optional Brand Promotion Program.

Rhode Island

21

Historical pick-up and delivery volume data for the proposed CSA as well as individual PSA historical data and Spot information will be made available on *MyGroundBizAccount*. This data may help in evaluating future business strategies, though past performance is not necessarily an indicator of future performance or volume. FedEx Ground cannot guarantee that the historical data supplied will be available for a CSA's predecessor PSAs, or that the data is an exact match to the geographic scope of a CSA, since it is a new area.

Using the PCAT is one way to ensure negotiable elements of an ISP Agreement are included in the Proposal that an ISP Candidate submits. However, Proposals may contain additional terms beyond those listed in the PCAT and can be submitted in any written format to FedEx Ground.

<u>Submitting a Proposal</u>

Once a Proposal is submitted, a Pittsburgh-based FedEx Ground Negotiator will be assigned and will contact the ISP Candidate to confirm receipt of the Proposal.

Negotiations will be conducted electronically and by phone over the course of several weeks, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals. The parties may submit several offers and counteroffers until an agreement is reached or there is an impasse.

Initially, the ISP Candidate that is currently operating the CSA will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. Furthermore, if certain transition deadlines are not reached, as detailed above, FedEx Ground may seek multiple bids for the same CSA even during the transition to the ISP Model. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

The first offer submitted by an ISP Candidate may not be the final offer. The first counteroffer submitted by FedEx Ground to the ISP Candidate may also not be a final offer. The Negotiator will continue working with the ISP Candidate in this manner until an agreement is reached or an impasse occurs.

| What to Expect: | What Not to Expect: |
|---|---|
| ~ FedEx Ground seeks proposals in line with market values | ~ Negotiator guidance on the "right" answer because there is not just one acceptable approach |
| ~ The need to set aside dedicated time to complete negotiations | ~ Negotiator guidance on volume forecasts |
| ~ Interactive process between ISP Candidates and Negotiators | ~ SRM participation in the process |

The Negotiations Process will conclude in one of two ways:

1) If an agreement is reached, the ISP Candidate will be able to review and sign an ISP Agreement

2) If the ISP Candidate and FedEx Ground cannot agree on terms for an ISP Agreement, the process will end, and station management will be notified. If an ISP Candidate has a current OA with FedEx Ground, it will expire according to its terms. It is in FedEx Ground's best interest to consider all of the terms put forward in order to reach an agreement that will meet the ISP Candidate's business needs, while providing the highest level of customer service possible.

## ISP Agreement Execution

Once the terms of an ISP Agreement with FedEx Ground have been reached, a draft of the agreement is available for review. There are additional steps to complete before a final agreement can be signed, electronically, on *MyGroundBizAccount*.

Additional steps will need to be completed **prior to** the final signing. For a complete list of these steps, see the "Qualification Steps for Pursuing an ISP Agreement" section of this Guide.

Please note: Drivers and certain members of the ISP Candidate's Workforce will need to pass a criminal background check **before** an ISP Agreement effective date; these criminal background checks may take several weeks to complete.

Once the above steps are completed, an ISP Agreement Signatory will be able to print out and review the entire ISP Agreement. If an ISP Agreement Signatory accepts all of the terms as outlined in an ISP Agreement, he/she will need to log on to *MyGroundBizAccount* and digitally sign the agreement via an electronic signature. The final agreement will reside on *MyGroundBizAccount* until it expires. Both the ISP and station management will be able to reference it online.

## Operating as an ISP

While some contractual obligations under an ISP Agreement will remain the same, others will be substantially different.

## Service Results Expectations

The following Service Results Expectations are detailed in an ISP Agreement:

### Service Days

Service Days remain consistent: Monday through Friday for FedEx Ground; Tuesday through Saturday for Home Delivery. FedEx Ground reserves the right to modify these days should customer demands and/or competitive advantage require changes. The three Saturdays and Mondays immediately preceding Christmas Day are considered Service Days for both FedEx Ground and FedEx Home Delivery.

### Services

Under the terms of an ISP Agreement, ISPs agree to provide a range of pick-up and delivery services to customers, including:

- Collection and loading, if necessary, of packages for delivery in a CSA.

- Transportation of packages from a domiciled station and delivery in a CSA consistent with customer-selected service offerings and subject to the ISP's Right to Decline.

- Timely collection and transmission of customer signatures, scanning results and package tracking data.

- Collection of COD charges and return of COD charges to FedEx Ground at the end of the Service Day.

- Pick-up of customer packages in a CSA and delivery of the packages to a domiciled station in time to meet service commitments, subject to the ISP's Right to Decline.

- Return of undelivered packages to the domiciled station, according to agreed-upon terms by FedEx Ground and the ISP.

Rhode Island

23

- Additional services described and mutually agreed upon in the Additional Services Schedule, which may include services such as administrative support and shuttle loading and/or unloading.

- Preparation of any legally-required documents (driver logs, vehicle inspection reports, etc.) and submission to FedEx Ground at the end of each service day (or for FedEx Home Delivery the next business day, unless otherwise agreed upon by the ISP and FedEx Ground).

## Service Results

Measurements of "Inbound Local Service" performance will be provided electronically to an ISP. These numbers will also be posted at the FedEx Ground station. The following service results are the minimum standard outlined in an ISP Agreement:

- Provide services to the customers that are compatible with customers' schedules, expectations and pick-up and delivery requirements (subject to the ISP's Right to Decline).

- Achieve a daily inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher.

- Provide the "Service Offerings" detailed in Schedule E of an ISP Agreement (commercial deliveries, residential deliveries, alcohol deliveries, attempted deliveries and pick-ups, delivery signatures, driver release and indirect delivery, premium services, and package tracking information).

- Take reasonable measures to avoid theft, loss, damage, destruction, delay in the handling, loading, unloading, transporting and pick-up and delivery of packages in the CSA.

- Conduct all business activities with honesty and integrity and in a safe and professional manner.

## Service Failure

The Senior Manager will monitor Service Results to assess adherence to the terms of an ISP Agreement. The Senior Manager will document any Service Failure by an ISP (those involving Service, Professionalism or Safety) and will schedule an ISP Discussion with the ISP Key Contact to discuss the Service Failure. The ISP will have an opportunity to correct any Service Failure.

If Service Failures continue, the ISP may be in breach of contract with the terms of an ISP Agreement; such a breach may result in termination of an ISP Agreement, depending upon the circumstances.

## Right to Decline & Right to Ensure

Under an ISP Agreement, an ISP has the Right to Decline services in certain situations without impacting service results. In instances when an ISP exercises the Right to Decline, FedEx Ground has the Right to Ensure that customers within a CSA are properly serviced.

The activities that can be declined under an ISP Agreement are contained in the Agreement. Some instances include: stops over 200 packages, pickups scheduled after 6:30 p.m., spotted trailers, customer requests requiring special modifications to equipment, and stops over the negotiated Daily Stop Threshold.

## Subcontracting

ISPs will have the opportunity to subcontract any services within its CSA to other ISPs. In these situations, FedEx Ground will attempt to accommodate any ISP-directed Load Plan changes that are submitted by ISP Key Contacts in advance of implementation.

Rhode Island

ISPs that subcontract work to another ISP will remain responsible for maintaining service levels as well as any claims that may arise. However, only the ISP performing the work will receive payment of charges for this activity, and the packages making up this activity will count toward the inbound local service of only the ISP performing the work.

### Driver Data Collection Process and ISP Data Review

The Driver Data Collection Process and ISP Data Review will replace the existing Check-In Process (including the Revised Daily Settlement Report and the Revised Consolidated Daily Settlement Report, respectively) as summarized below:

**Driver Data Collection Process**

This process is similar to the current Check-In Process and occurs when ISP employee-drivers return to the station. The collection of this information (scanner data, paperwork completed by the ISP employee-driver, and P&D activity captured in the FedEx Ground system) will be input by FedEx Ground personnel. Once FedEx Ground has input the data, FedEx Ground will generate an *ISP Driver Data Collection Report* that contains "driver-level pick-up and delivery activity" and will be shared with the ISP employee-driver. The ISP employee-driver will need to review and sign the report, confirming that it is accurate. FedEx Ground management will hold any data discrepancies or service-related issues for the following morning, and these issues will only be addressed with ISP Key Contacts, rather than individually with any ISP employee-drivers.

In the case of FedEx Ground, the information mentioned above should be submitted in the evening of the return to the station, unless otherwise agreed. For FedEx Home Delivery, the information should be submitted on the morning of the return to the station, unless otherwise agreed.

**ISP Data Review**

Information submitted, reviewed, and signed by an ISP's employee-drivers will generate an *ISP Data Confirmation Report* which will be reviewed on a regular basis with the ISP Key Contact. This report will contain "CSA-level data" and will be provided only to the ISP Key Contact. It will be used to address any operational or contractual issues that arose on the previous day and will be discussed only with the ISP Key Contact. These meetings can occur as needed, either at the request of FedEx Ground or the ISP, and will optimally be conducted in person after morning dispatch, but they may take place in other formats or times as mutually agreed upon.

The *ISP Data Review* process will be used to cover prior day issues with the ISP, such as: the *ISP Daily Confirmation Report*, P&D Quality Reports, local inbound service, Claims Investigation, Complaints, Branding (if ISP is participating in the Brand Promotion Program) and scanning. The meeting may also be used to address any future ISP requests, such as ISP Load Plan changes and New Pick-up Start-ups, which include ISP-directed vehicle assignment.

The *ISP Data Collection Report*, as mentioned above, contains driver-level data only. It will not contain items such as: non-delivered packages, premium service failures, high profile van scans, uncollected COD monies, and open tracer reports. This information will be contained in the *ISP Data Confirmation Report* and will be sent to ISPs via *MyGroundBizAccount*.

Other daily reports and data will be shared directly with ISP Key Contacts and/or sent electronically to ISPs via *MyGroundBizAccount*.

**Peak Planning**

ISPs are responsible for planning Peak operations within a CSA. FedEx Ground will offer its best projections of anticipated Peak volume in a given CSA and will work with the ISP to identify the ISP's anticipated service constraints and plan contingency operations.

### Scanner and Vehicle Usage

In co-locations, ISPs will have a choice to use either FedEx Ground or FedEx Home Delivery scanners, depending on the functionality preferred by the ISP. FedEx Ground will also work with ISPs to group an ISP's vehicles together on FedEx Ground docks, even across van lines that were previously dedicated to FedEx Ground or FedEx Home Delivery vehicles. Any operational changes will be discussed between the ISP and FedEx Ground and will be made after mutual agreement.

### Brand Promotion Program

Participation in the Uniform and/or Vehicle Brand Promotion is optional. A Uniform Brand Promotion charge and a Vehicle Brand Promotion charge may be negotiated if an ISP Candidate decides to participate in either program. Minimum vehicle specifications for vehicles in the Vehicle Brand Promotion program and vehicles not in the program are posted on *MyGroundBiz.*

Any vehicle may be utilized in non-FedEx Ground related activity as long as any FedEx Ground logos are removed or covered.

### ISP Charge Statement

The ISP Charge Statement contains an itemized list of compensation elements that are based on the individual terms agreed to in an ISP Agreement. Examples of terms could include: Package and Stop Charges, Annual Service Charge, Period Safety Incentive, Brand Promotion Program (if elected), Surge Stop Charge and Fuel Surcharge.

Unlike the current settlement statement, the ISP Charge Statement will detail any discrepancies between scanned packages and stops versus summed totals used for ISP Charge purposes. Discrepancies may include hand-sheet totals updated during the Driver Data Collection Process or double stops reversed as part of ISP Charge calculations.

In addition to existing itemized charge backs and deductions (such as physical damage insurance, work accident insurance, workers' compensation insurance, and non-trucking liability), the ISP Charge Statement may also include weekly scanner lease and network access fees (including any additional scanners), claims, equipment registration, fuel tax, expenses and fees, and the current price of fuel within the CSA as indexed weekly by OPIS.

Accessing the ISP Charge Statement is a 100% digital process. Printed statements will not be provided. All related payments will be **made each Friday** (or on the preceding Thursday if Friday is a bank holiday) via Electronic Funds Transfer (EFT). *MyGroundBizAccount* may be used to view an ISP Charge Statement, which is available in .PDF and/or .CSV formats.

### Availability of Electronic Tools

In addition to offering ISP Charge Statements through *MyGroundBizAccount,* FedEx Ground has developed and is rolling out web-based reports, workforce and fleet management capabilities, CSA operational planning tools and communication methods which will be made available to ISPs.

### Rentals & Spares, Van Washing

FedEx Ground will not arrange for third-party vehicles or use of spare vehicles. ISPs will be responsible for washing their vehicles. If desired, ISPs may select a van washing vendor and have the washing performed on FedEx Ground's property. Any van washing vendor may be used, subject to the vendor's agreement to comply, and compliance with, FedEx Ground's insurance and environmental standards.

Locks

An ISP Agreement does not require the use of high-security locks; however, use of high-security locks will result in diminished liability for claims resulting from vehicle break-ins.

## Safety Terms & Qualifications

**Contractual Safety Standards**

Schedule I, Safe Operating Practices, covers driver and non-driver qualification criteria, background qualification criteria, and the training and safety responsibilities an ISP agrees to assume. A sample Schedule I will be sent out over the next several weeks.

**Period Safety Incentive**

FedEx Ground will pay ISPs a negotiated Period Safety Incentive payment for each completed 4-week Safety Period.

The amount of the payment, negotiated in an ISP Agreement, is based on the number of preventable accidents the ISP's employee-drivers are charged with and the number of vehicles the ISP operates during the Safety Period. The incentive will be paid to the ISP two periods, or eight weeks, following the close of the qualifying Safety Period.

**Maintenance**

An ISP Agreement will set forth ISP maintenance obligations. Pursuant to DOT requirements, production of monthly maintenance records and annual inspections will continue.

**Claims for Liability to the Public**

An ISP Agreement sets forth graduated amounts that will be charged back to, or deducted from, an ISP for any claims brought against FedEx Ground for bodily injury and/or property damage caused by an ISP employee, agent or subcontractor. The amounts to be charged back or deducted will be the actual amount incurred by FedEx Ground up to $1,000 for the first claim, up to $2,000 for the second claim, up to $3,000 for the third claim and up to $4,000 for the fourth and subsequent claims arising out of incidents occurring in any rolling 52-week period.

## Qualification Steps for Pursuing an ISP Agreement

An ISP Candidate must take several steps to negotiate, enter into and operate under an ISP Agreement. Some are one-time occurrences and some must be completed on an annual basis. Most require several weeks to complete and should be completed well in advance of entering negotiations.

These steps ensure ISP Candidates meet the terms of an ISP Agreement and continue to comply with all state and federal laws and regulations.

- **Incorporate the business, if not incorporated already**
  - While ISP Candidates can begin this process immediately, articles of incorporation must be submitted no later than October 8, 2010 to advance to the RFI Process

- **Establish an Entity Profile on *MyGroundBizAccount***
  - While ISP Candidates can establish an Entity Profile once incorporated, and not some other entity, such as an LLC or LLP, the Entity Profile must be established no later than October 8, 2010 to advance to the RFI Process

Rhode Island                                                                                                           27

- o ISP Candidates will be asked, among other questions, to disclose direct or indirect ownership interest and/or participation in other ISP entities to determine if the ISP Candidate has exceeded station guidelines

- **Register the business in the state(s) in which it does business, if not registered already and be in good standing with those state(s)**
  - o While ISP Candidates can begin this process as soon as the business is incorporated, and not some other entity, such as an LLC or LLP, all ISP Candidates must be registered with the state(s) in which it does business and be in good standing by November 19, 2010

- **Submit Initial Compliance Disclosure Form**
  - o ISP Candidates certify compliance with federal and state independent business reporting and filing laws
  - o The Initial Compliance Certification Form illustrates the compliance activities performed by the ISP Candidate and must be signed by the ISP Candidate and the ISP Candidate's accountant
  - o While this form can be submitted at any time, the Initial Compliance Disclosure must be completed and submitted by November 19, 2010
  - o ISPs will be contractually obligated to file an Annual Compliance Certification form each succeeding calendar year that an ISP Agreement is in effect

If an ISP Candidate does not complete all four of these steps by the deadlines stated above, FedEx Ground may still negotiate an ISP Agreement with the ISP Candidate. However, FedEx Ground may also consider negotiations with alternative contractors as well.

- **Identify an ISP Agreement Signatory that submits to and passes a criminal background check**
  - o An ISP Agreement Signatory must pass a criminal background check before signing an ISP Agreement. Should that person fail the criminal background check, another ISP Agreement Signatory must be identified and pass the criminal background check before an ISP Agreement can be signed

- **Secure insurance coverage**
  - o ISP Candidates must acquire insurance coverage, including Non-Trucking Liability and Physical Damage (for vehicles included on Schedule B of an ISP Agreement) as well as workers' compensation and work accident insurance (as required by state law and an ISP Agreement)
  - o ISP Candidates may secure insurance coverage from the provider of their choice though FedEx Ground will verify with Marsh that proper insurance has been secured
  - o ISP Candidates must secure coverage prior to an ISP Agreement effective date

- **Provide a W-9 business tax form**
  - o All ISP Candidates, regardless of whether they were previously incorporated or not, must submit a W-9 business tax form indicating the name of the incorporated entity

- **Establish an Electronic Funds Transfer (EFT) Account.**
  - o If an ISP Candidate has a new corporate name and/or a new EFT account number, an updated authorization agreement for EFTs must be provided to FedEx Ground before an ISP Agreement effective date
  - o ISP Candidates should note this process can take up to three weeks to complete

- **Ensure qualified personnel pass criminal background checks**
  - o ISP employees who have access to FedEx Ground systems and/or FedEx Ground property, interact with FedEx Ground customers, or handle FedEx Ground packages must pass a criminal background check before performing these duties for an ISP
  - o ISP Candidates should note this process can take several weeks to complete

Rhode Island

28

- **Ensure workforce compliance**
  - o Per an ISP Agreement, ISPs may only employ persons who are legally authorized to work in the United States
  - o Maintain an I-9 employment authorization form for each employee
  - o Provide evidence of compliance at the request of FedEx Ground
  - o These steps must be completed before an ISP Agreement effective date
  - o ISP Candidates should note these steps can take several weeks to complete

## ISP Model Key Terms & Definitions

**Contracted Service Area (CSA)** – A geographical area, defined in an ISP Agreement, in which an ISP is contractually obligated to provide pick-up and delivery services

**Driver Data Collection Process** – Daily collection of information from an ISP employee which is then inputted by FedEx Ground personnel into FedEx Ground's system

**Independent Service Provider (ISP)** – An independent business entity that contracts with FedEx Ground to provide pick-up and delivery services under an ISP Agreement

**ISP Agreement** – A legal contract negotiated between an ISP and FedEx Ground

**ISP Agreement Signatory** – An individual who signs an ISP Agreement on behalf of the ISP

**ISP Candidate** – An independent business entity that desires to become an ISP for a particular CSA, but has not yet executed an ISP Agreement for that CSA

**ISP Charge Statement** – A weekly statement detailing the ISP's financial earnings and CSA volumes

**ISP Data Collection Report** – A daily report that details package data for each ISP employee-driver. The ISP Data Collection Report is reviewed each afternoon for Ground and the next morning for Home Delivery

**ISP Data Confirmation Report** – A daily report that details package data for each CSA. The ISP Data Confirmation Report is reviewed with the ISP Key Contact each morning

**ISP Data Review** – A daily assessment between FedEx Ground and the ISP Key Contact of the prior day's activities and issues, as well as any future operational plans

**ISP Electronic Funds Transfer** – A weekly payment provided to ISPs for work performed in the ISP's CSA. The ISP EFT replaces the settlement check

**ISP Employee** – An individual employed by the ISP. ISP Employees may include Key Contacts, P&D drivers, helpers and office support

**ISP Key Contact** – An individual employee of the ISP responsible for administering an ISP Agreement, including day-to-day operations

**ISP Negotiator** – An officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate

**Negotiations** – A process during which FedEx Ground and ISP Candidates attempt to work out various mutually acceptable financial and non-financial terms as well as elective programs of an ISP Agreement

Rhode Island

29

**Negotiator** – A FedEx Ground employee who negotiates with the ISP Candidate on behalf of FedEx Ground

**Proposal** – An ISP Candidate's offer on the key financial and non-financial terms as well as elective programs included in an ISP Agreement

**Request for Information (RFI)** – A request, issued to ISP Candidates by FedEx Ground, which seeks to ascertain the capabilities of prospective ISPs

**RFI Response** – An ISP Candidate's reply to FedEx Ground's RFI, that outlines the ISP Candidate's capabilities relative to the contractual obligations

## Q&As

**1. Which contractors are affected by this announcement?**
This announcement impacts contractors domiciled in Rhode Island and Massachusetts as well as those Albany contractors providing P&D services within Massachusetts. Linehaul contractors in Rhode Island are not affected.

**2. Why implement a new contract and operational changes in Rhode Island?**
The Company believes these detailed operational changes are necessary due to the large number of contractors providing service in Massachusetts, the practicalities of business operations in Rhode Island, and the legal and regulatory environments. We believe the features of the new model will provide an attractive option for business-minded entrepreneurs.

**3. Why aren't Rhode Island contractors being given the same option that Albany contractors to eliminate all P&D activity in Massachusetts?**
Given the large number of Rhode Island contractors providing service in Massachusetts, the need to maintain business operations in the state, and the legal and regulatory environments in Rhode Island, the Company believes transitioning all Rhode Island contractors to the ISP Model makes sense for contractors, our customers, and the Company.

**4. If a contractor acquires additional routes, is that contractor guaranteed an ISP Agreement?**
No. Negotiating an ISP Agreement is an individualized negotiation between ISP Candidates and FedEx Ground. ISP Candidates will negotiate key financial and non-financial terms, as well as make elections, according to the unique business needs of the service area. The process will also involve a response to a Request for Information (RFI) so that ISP Candidates can demonstrate the ability to provide the level of service required. Participating in this process does not automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement.

**5. How many PSAs can an ISP Candidate acquire in Rhode Island?**
There is no statewide limit on how many PSAs an ISP Candidate can acquire in Rhode Island. There are, however, station-specific guidelines in place to avoid excessive dependence for network service on any one contractor in a particular station. Station management can provide additional details regarding the guidelines for your station.

**6. What happens once an ISP Agreement goes into effect?**
The ISP Model is intended to provide the potential for higher earnings by maximizing economies-of-scale, as well as other operating efficiencies of a larger, multi-vehicle operation. Under an ISP Agreement, ISPs are responsible for planning all P&D activity within the Contracted Service Area (CSA). This includes driver recruitment, training and staffing; vehicle fleet size selection, acquisition and maintenance; peak planning; and complying with all applicable laws and regulations. ISPs will have significant flexibility in allocating staff and vehicles as ISPs see fit to meet the unique and changing business needs of their CSAs.

**7. Can an ISP Candidate operate both Ground and Home Delivery routes?**
Yes. ISP Candidates may operate any combination of at least three Ground and/or Home Delivery PSAs in the same station by October 8, 2010 to begin the RFI and Negotiations Processes for a new agreement. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location.

**8. Will ISPs continue to operate under FedEx Ground's operating authority?**
Yes. ISPs will continue to operate under FedEx Ground's operating authority.

**9. What happens to the swing routes currently operated by contractors?**
Swing routes will cease to exist upon the expiration of the applicable Operating Agreement (OA). Swing contractors that acquire and operate at least three non-swing PSAs in the same Rhode Island station, incorporate as a corporation, and not some other form of business, such as an LLP or LLC, establish an Entity Profile through *MyGroundBizAccount* by October 8, 2010 and that register with Rhode Island, be in good standing, define a CSA, and respond to FedEx Ground's Request for Information (RFI) will be eligible to submit a first proposal and begin negotiations for an ISP Agreement. Swing PSAs will not count toward the three PSA minimum needed to be eligible for ISP Agreement negotiations.

**10. How quickly will FedEx Ground make the transition incentive payments?**
The first $5,000 of the transition incentive will be paid within 15 business days of submitting a signed Contractor Limited Release and Operating Modification Agreement. The remaining $5,000 of the transition incentive will be paid as follows:

- Contractors that sell/transfer PSAs and sign the supplemental limited release will receive a check within 15 business days at the station for the remaining $5,000 of the transition incentive once the current OAs terminate and proof of sale or transfer of the routes is submitted to station management;
- P&D contractors operating fewer than three PSAs in a single Rhode Island station as of October 8, 2010 will receive the remaining $5,000 of the voluntary transition payment within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of the OAs; or
- P&D contractors operating three or more PSAs in the same station in Rhode Island as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of their OAs.

**11. Are contractors eligible for the $10,000 transition incentive even if they choose to sell their routes?**
Yes. These contractors will need to sign and timely submit a Contractor Limited Release and Operating Modification Agreement. They will also need to submit proof of their transition and sign the supplemental limited release.

**12. Is the transition incentive taxable?**
Contractors should consult with tax advisors as to the tax status of the transition incentive. The transition incentive will be reported by FedEx Ground on a Form 1099 for the year in which the amount is received.

**13. What happens if a contractor decides not to sign the Contractor Limited Release and Operating Agreement Modification?**
Contractors are not required to sign the optional limited release. If a contractor decides not to sign the limited release, that contractor will not receive the transition incentive described in this Guide and will continue to operating under the terms of their OA until its current expiration date, absent any further extension. This contractor can still pursue an ISP Agreement if it meets all terms set forth in this Guide.

**14. Are extensions still available for contractors that do not sign the Contractor Limited Release and Operating Agreement Modification?**
Yes. As previously announced on May 20, 2010, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

**15. Why are growth incentives tied to the acquisition of the vehicle and the PSA?**
By acquiring a vehicle that is already in service in a particular PSA, the ISP will have a vehicle that necessarily qualifies for service under an ISP Agreement.

**16. Are growth incentives available for eligible PSAs acquired after October 8, 2010?**
No. All acquisitions of eligible PSAs, by eligible contractors, must be completed by October 8, 2010 in order to be eligible for growth incentive payments.

**17. Do ISP Candidates have to compete with other vendors from outside the network for the CSAs?**
Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. FedEx Ground may also seek multiple bids for the same CSA in the event that certain transition deadlines are not met. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions. Additionally, when ISP Agreements expire, there is no automatic renewal. Thus, FedEx Ground may consider external candidates and contract with the best candidate in terms of experience, ability to provide service, cost, as well as other factors.

**18. Can a Ground contractor acquire a Home Delivery (HD) route (or vice versa) as part of the Rhode Island transition?**
Yes, but a new OA will need to be signed for the HD (or Ground) route. This new contract will expire on October 8, 2010, though an extension will be granted if the contractor is at scale.

**19. How does the transition to the ISP Model affect contractors operating PSAs in different Rhode Island stations?**
FedEx Ground is willing to consider the particular circumstances and make a decision as to whether these contractors are considered to be at scale to negotiate an ISP Agreement. Station management can discuss potential options.

**20. Can a Rhode Island ISP subcontract to non-ISP contractors in adjacent states?**
No. All Rhode Island packages must be delivered by an ISP. Once transition to the ISP Model is complete, all Rhode Island packages must be delivered by an ISP that is in compliance with all laws.

**21. With whom will ISP Candidates negotiate?**
While Senior Managers are an important part of the process for identifying ISP Candidates, Pittsburgh-based FedEx Ground employees will serve as Negotiators on behalf of the Company.

**22. Is negotiating an ISP Agreement for a one-year term an option?**
Generally, ISP Agreements will be negotiated for a three-to-five year period; however, shorter or longer contract periods will be subject to the parties' negotiations.

**23. If a contractor already received an extension as a result of the Company's Incorporation and Compliance Disclosure announcement, what happens to that extension?**
Any extension a contractor has already received remains in effect, unless they sign the Contractor Limited Release and Operating Agreement Modification, which will change the termination date of any Operating Agreement to October 8, 2010. If a contractor does not sign the Contractor Limited Release and Operating Agreement Modification, then the Operating Agreement will expire at the end of any extension the contractor already received as a result of the Company's Incorporation and Compliance Disclosure announcement.

**24. What impact will FedEx Ground's ISP Model announcement have on the Company's Incorporation and Compliance Disclosure announcement made on May 20, 2010? Does the non-renewal notice on May 20, 2010 remain in effect?**
The ISP Model announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines set forth in the ISP Transition Guide apply. The non-renewal notice on May 20, 2010 remains in effect.

Rhode Island

**25. Will contractors affected by the ISP Model announcement still receive the $750 early adoption incentive that FedEx Ground announced on May 20, 2010?**

Yes. As a good-will gesture on the part of the company, all affected P&D contractors will receive the $750 early adoption incentive associated with the May 20, 2010 announcement, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More details will be available in the coming weeks.

*In the future, additional Q&A can be found on www.mygroundbiz.com.

# EXHIBIT 7

# O'MELVENY & MYERS LLP

CENTURY CITY       400 South Hope Street       TYSONS CORNER

IRVINE SPECTRUM    Los Angeles, California 90071-2899    WASHINGTON, D.C.

NEWPORT BEACH                             HONG KONG

NEW YORK           TELEPHONE (213) 430-6000       LONDON

SAN FRANCISCO      FACSIMILE (213) 430-6407       SHANGHAI

SILICON VALLEY      INTERNET www.omm.com        TOKYO

OUR FILE NUMBER
259,075-208

July 15, 2010

**VIA FEDEX**

WRITER'S DIRECT DIAL
(213) 430-6679

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Lynn Faris, Esq.           Susan E. Ellingstad, Esq.
Leonard Carder, LLP       Lockridge Grindal Nauen, PLLP
1330 Broadway Avenue, Suite 1450    100 Washington Avenue, South
Oakland, California 94612      Suite 2200
                                  Minneapolis, Minnesota 55401

Re:    ***FedEx Ground Package System, Inc. Employment Practices Litig.; No.
3:05-MD-527-RM, MDL 1700 (N.D. Ind)***

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

Today, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor workforce model ("Independent Service Provider") in Vermont. As part of that announcement, FedEx Ground is offering an ISP transition incentive to each Vermont contractor, provided the contractor signs a limited release with respect to the transition.

As a courtesy, please find enclosed the following documents and information, which FedEx Ground has made available to its contractors who presently service primary service areas ("PSAs") in Vermont and/or are domiciled in a Vermont facility:

1.      Vermont Transition Information;

2.      Questions & Answers Regarding the Vermont Transition;

3.      Sample Contractor Limited Release and Operating Agreement Modification

4.      Illustrative Independent Service Provider (ISP) Agreements;

5.      DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning today's announcement.

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq. July 15, 2010 - Page 2

     This information is being provided to you in case you receive questions from contractors who are class members in the *Craig v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-GAO (D. Mass.), and *Gruhn v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-412-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation (MDL) involving FedEx Ground and/or are Vermont-related actions involving FedEx Ground contractors. The foregoing is without prejudice to FedEx Ground's rights, remedies and defenses. Please call me if you have any questions.

     Thank you for your time and attention.

                    Very truly yours,

                    Matthew P. Eastus

                    for O'MELVENY & MYERS LLP

Enclosures

cc: Vermont contractors

LA3:1168077.1

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D C
HONG KONG
LONDON
SHANGHAI
TOKYO

July 15, 2010

OUR FILE NUMBER
259,075-212

**VIA U.S. MAIL**

WRITER'S DIRECT DIAL
(213) 430-6679

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
tneastus@omm.com

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California  94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota  55401

Re:  *FedEx Ground Package System, Inc. Employment Practices Litig.*; No. 3:05-MD-527-RM, MDL 1700 (N.D. Ind)

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

This is a follow up to my letter dated today concerning FedEx Ground Package System, Inc.'s announcement of its intention to transition to a new contractor workforce model (Independent Service Provider) in Vermont.  The pickup and delivery contractors domiciled in or who provide service to Vermont to whom the information listed in my prior letter was provided are listed below:

Bevins, Larry
Borman, Pete
Cronin, Gary
Davis, Greg
Dumas, Adam Lee
English Jr., Frank
Fantini, Mark
Frimodig, David
Gokee, Terry Lee
Jurgenson, Dustin Lee
McGovern, Thomas J.
Michaud, Jay Paul
Murtaugh, Jamison E.
O'Leary, Danny

O'MELVENY & MYERS LLP

Robert Harwood, Esq., Lynn Faris, Esq., Susan Ellingstad, Esq.   July 15, 2010 - Page 2

Porter, Patrick
Reardon, Paul David
Roell, Loran
Skjetne III, Bjarne
Stearns, Robert
Stender, Carroll Bruce
Tessier, Jeremy
Ward, Ryan Parker
Whittemore, Edward D.
Wiggett, Adam Arnold
D'Avella, Eugene
Lackey, Bruce
Stratton, Tighe

   Thank you for your time and attention.

                                   Very truly yours,

                                   Matthew P. Eastus
                                   for O'MELVENY & MYERS LLP

LA3:1168113.1

# Vermont
# ISP Transition Guide

Vermont

David F. Rebholz
President and Chief Executive Officer

1000 FedEx Drive
Pittsburgh, PA 15108

Telephone 412.269.1000
Fax 412.859.5687


Ground

A letter from the President:

As a result of discussions with Vermont state officials, FedEx Ground has decided to transition to the Independent Service Provider (ISP) Model in Vermont. This change applies to all P&D contractors domiciled in Vermont, as well as all P&D contractors domiciled in Albany, New York with primary service areas that provide service in Vermont.

This transition in Vermont is a necessary step in meeting the needs of regulators, contractors, our customers, and the Company. Most importantly, it will ensure that P&D contractors will continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

This announcement to transition to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. Also, the 180-day contract extension previously offered to contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 remains available.

Although the incentive and incorporation timelines associated with the May 20 announcement no longer apply, all affected contractors will receive the $750 early adoption incentive. This $750 payment is a good-will gesture on the part of the company and will be paid to all affected contractors, regardless of whether they incorporate or pursue ISP candidacy. Because linehaul contractors are not impacted by this ISP transition, the May 20, 2010 announcement still applies to them.

As with New Hampshire and Maryland, the transition to the ISP Model in Vermont will involve important decisions and actions on the part of all affected P&D contractors. To facilitate the transition, FedEx Ground is offering eligible contractors various options, ample time to consider them and financial incentives, which are discussed in the Transition Guide and will be further explained in additional communications.

The senior manager of your station will review all the pertinent details of the transition and ensure you receive the information you need throughout this process to make the best decisions for you and your business. I encourage you to thoroughly review the contents of the attached ISP Transition Guide with your legal and/or business advisors and to keep it on hand throughout the transition as a ready resource.

I am confident this is the most prudent course of action for our operations in these states. Many contractors have already successfully transitioned their businesses to the ISP Model in New Hampshire and Maryland. Based on our experiences in these two states, I believe the transition to the ISP Model in Vermont will be equally successful.

We look forward to working with each contractor throughout this transition. There will be much more communication and opportunity for discussion as we begin to navigate this change together.

Dave Rebholz
President and CEO

Vermont

3

Vermont

## What is the ISP Model?

The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent businesses that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs). In these states, FedEx Ground and ISPs enter into ISP Agreements, rather than the current Operating Agreements ("OA").

Under an ISP Agreement, ISPs agree to provide service within typically larger geographic service areas called Contracted Service Areas (CSAs). ISPs manage all aspects of the pick-up and delivery of packages within a CSA.

Under the ISP Model, ISPs negotiate a range of financial and non-financial terms on a multi-year basis according to the unique needs of the business and CSA. For example, ISPs have the ability to negotiate a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase.

The ISP Model is appealing to entrepreneurs wanting to focus on the management and administrative responsibilities of running a sizable pick-up and delivery company and wanting to oversee significant business responsibilities that may lead to profitable growth opportunities.

### FedEx Ground Independent Service Provider Responsibilities

Under an ISP Agreement, an ISP agrees to provide pick-up and delivery services through its employees. ISPs have the flexibility to conduct business operations and make all decisions related to vehicles, service areas, staffing and scheduling. These include the following:

**Vehicles**
- Choosing vehicles that best fit an ISP's unique operations, with FedEx Ground only establishing minimum standards for vehicles
- Incurring the costs of operating vehicles, including maintenance, repairs, fuel, tolls, taxes, registration fees and licenses
- Complying with the U.S. Department of Transportation (DOT) requirements for ISP employee-drivers since ISPs operate under FedEx Ground's DOT operating authority

**Contracted Service Areas (CSA)**
- Negotiating terms for the CSA, which provides the ISP with exclusive service rights
- Deciding how best to provide service over the CSA

**Staffing**
- Managing a team of ISP employee-drivers and potentially other workers (such as a Key Contact or helper) to perform the work
- Assigning work and determining when and on what terms it will be completed
- Supervising employees
- Recruiting and training staff
- Determining compensation and benefits for employees
- Complying with all state and federal employment laws

**Scheduling**
- Establishing work, leave and vacation schedules for all ISP employees

Vermont                                                                                                    5

**Business Operations**
- Deciding whether to expand the business by acquiring additional CSAs
- Incorporating (and not operating in some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), or similar entity), unless already incorporated
- Registering as a corporation in good standing and as an employer in the states in which the ISP does business. Note: If a contractor has previously incorporated, then that corporate entity likely has already registered in at least one state, but proof of current registration and good standing will nevertheless need to be shown. Contractors should consult their own legal, financial or tax advisors to determine if they need to be registered in any additional states.

## ISP Agreement

Central to the ISP Model is an ISP Agreement, which is a legally-binding contract by which ISP Candidates (businesses seeking to enter into an ISP Agreement) have the opportunity to define their unique business relationship with FedEx Ground. An ISP Agreement outlines the service-level results expected and regulatory compliance requirements that ISPs have agreed to meet during the Negotiations Process for the term of an ISP Agreement.

The following represents a list of some, though not all, of the financial and non-financial terms and elections that may be negotiated in an ISP Agreement:

**Key Financial Terms**
- **Annual Service Charge** — A fixed charge paid weekly to an ISP for providing service to FedEx Ground
- **Stop Charge** — A charge paid to an ISP for each stop to a customer location where a package is picked up or delivered
- **Per Stop Fuel Surcharge** – A surcharge, indexed to the price of fuel, paid for each daily stop where a package is picked up or delivered
- **Surge Stop Charge** – A charge paid for any stop above the negotiated "Daily Stop Threshold"
- **Package Charge** — A charge paid to an ISP for each package that is picked up or delivered when an ISP makes a stop
- **Period Safety Incentive** — An incentive paid to an ISP following a 4-week Safety Period. The payment amount is based on a ratio of the number of preventable accidents during the Safety Period and the total number of vehicles the ISP utilizes during that period. If a preventable accident is recorded during a period, the incentive payment for the involved vehicle for that period, plus the next two periods (for a total of 3 periods), is affected
- **New Account Start-Up** ('Meet-and-Greet') — A fee paid to an ISP for an initial visit to a new customer that has been arranged by FedEx Ground
- **Spotted Trailer Charges** — A charge paid to an ISP for providing "Spotted Trailer" service at a customer's request

**Key Non-Financial Terms**
- **Length of Agreement** — The length of an ISP Agreement typically will be between three to five years, but an ISP Candidate may propose a shorter or longer term for its ISP Agreement
- **Expiration Date** — The end date of an ISP Agreement, as determined by the negotiated length of term
- **Number of Load Positions by Year** — A fixed number of dedicated load positions that will be available each year in the ISP's associated station
- **Daily Stop Threshold** — The number of combined pick-up and delivery stops, above which the Surge Stop Charge is triggered and the ISP is able to invoke the Right to Decline

**Elections**
- **Equipment Registration** — ISP Candidates may elect to register certain equipment in FedEx Ground's name under the International Registration Plan (IRP) for base plates
- **Customer Service Incentive** – A negotiable incentive paid to an ISP. The final amount of the payment is based on the ISP's customer service record during the 4-week reporting period
- **Periodic Maintenance Schedule** — ISP Candidates may elect to use the manufacturers' Periodic Maintenance Schedule or elect an alternative Periodic Maintenance Schedule

- **Fuel Tax Reporting** — ISP Candidates may elect to have FedEx Ground report and pay its fuel tax liability on the ISP's behalf
- **Facilitated Insurance Coverage** — ISP Candidates may elect to have FedEx Ground facilitate the procurement of required insurance for the ISP and pay the premiums on the ISP's behalf
- **Brand Promotion Programs** — A fee paid by FedEx Ground if an ISP elects to have its ISP employee-drivers or employee-helpers wear FedEx Ground-approved uniforms and/or have some or all of its vehicles display FedEx Ground approved logos; the fee is paid weekly by FedEx Ground to the ISP
- **Arbitration** — An ISP can elect binding arbitration of disputes with FedEx Ground, if any, as detailed in an ISP Agreement

## ISP Agreement Negotiations

The ISP Agreement Negotiations Process provides each ISP Candidate the opportunity to negotiate an ISP Agreement with FedEx Ground for a specific CSA.

During negotiations, ISP Candidates have the ability to define their unique business relationship with FedEx Ground. Depending on the ISP Candidate's business needs and desires, an ISP Candidate may choose to pursue an agreement with a higher contract fee to achieve a higher percentage of fixed income. Alternatively, an ISP Candidate may want to pursue higher package or stop rates to increase variable income potential if volumes increase. Individualized negotiations will allow each ISP Candidate to pursue an agreement that is best suited for its business.

ISP Agreement negotiations are conducted electronically, and by phone, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals.

## What is Different About the ISP Model?

The ISP Model will bring fundamental changes to the manner in which FedEx Ground operates in the state. There will be changes made to the definition of service areas, the structure of the working relationship between FedEx Ground and independent business owners, and the manner in which contractual agreements are reached with independent businesses to provide pick-up and delivery services.

The following provides an overview of these changes and a preview of the decisions contractors must make during the transition.

## The ISP – FedEx Ground Relationship

Under the ISP Model, FedEx Ground will contract through a negotiated ISP Agreement with only larger businesses that operate as corporations and not some other form of business, such as a LLP, LLC, or similar entity.

Once the ISP Model is in place, FedEx Ground generally will limit its dealings to the individual selected by an ISP to represent the ISP, known as the "ISP Key Contact." The ISP Key Contact alone will deal with FedEx Ground and receive all written and verbal communication from FedEx Ground, except in limited circumstances. The ISP Key Contact then deals with ISP employees, including drivers and helpers, as the ISP Key Contact deems appropriate.

## Contracted Service Areas

A significant change under the ISP Model is the elimination of traditional PSAs in favor of larger geographic service areas – or CSAs. A CSA may comprise any combination of at least three Ground and/or Home Delivery PSAs in a single station. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location. While a CSA may include non-contiguous (non-adjoining) work areas, a higher level of operational efficiency will likely be achieved through contiguous work areas.

Vermont

7

<table>
<tr><td style="text-align:center"><strong>Existing Operating Model</strong><br><strong>of a Contractor's Separate PSAs</strong></td><td style="text-align:center"><strong>Independent Service Provider</strong><br><strong>Model of a CSA</strong></td></tr>
</table>





CSAs will be defined as the combination of the PSAs operated by the ISP Candidate at the time negotiations begin. FedEx Ground PSAs are defined by Addendum 4 of the Ground OA and FedEx Home Delivery PSAs are defined by the proprietary ZIP Code listed in Addendum 4 of the Home Delivery OA. FedEx Ground will work with Home Delivery contractors to allocate non-proprietary areas based on data in the Home Delivery Vehicle Route Planning (VRP) PC. The ISP Agreement Addendum 4 will list entire ZIP Codes that are complete within a single CSA, as well as details of street address ranges where a ZIP Code is split among multiple CSAs.

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. FedEx Ground may seek multiple bids for the same CSA only in the event that the ISP Candidate's and FedEx Ground's negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

Once a negotiated ISP Agreement is signed, an ISP may trade or sell portions of its CSA, such as ZIP Codes, for the remaining term of the ISP Agreement, subject to the terms of the ISP Agreement. Additional negotiations may occur during the term of an ISP Agreement based on mutual agreement between FedEx Ground and the ISP. Changes to the CSA are one of the limited scenarios under which negotiations may occur. Modifications to a CSA will be documented on a schedule in an ISP Agreement. As an alternative, two ISPs can informally agree to sub-contract P&D work in the respective CSAs. However, the ISP that originally contracted for the P&D work will ultimately remain responsible for that work.

<u>**Notable Provisions of an ISP Agreement**</u>

There are many provisions that are different from the existing OA. Some of the notable provisions as follows:

**Right to Decline** – The contractual right to decline certain requests, such as delayed-sort packages, pick-ups after 6:30 P.M. and stops above the negotiated Daily Stop Threshold.

**Service Expectations** – ISPs will maintain service levels agreed to in an ISP Agreement such as: service days, pick-up and delivery services, collection and return of COD charges; service results (meet customer expectations, achieve inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher, avoid theft, loss, damage and delays, and conduct all business with honesty and integrity).

**Flexing** – FedEx Ground will not offer company-coordinated flexing, meaning ISPs will need to ensure resources are in place to handle surges and variances in daily package volumes (such as Peak), whether by sub-contracting with other ISPs or by other means.

Vermont

8

Other Notable Provisions

**Vehicles** – An ISP Agreement will require only that ISP vehicles meet government requirements, be white, have a height that is flush with conveyor walkways in the station, be of a size that allows for the station doors to close and maneuverability in the station.

**Service Account** – An ISP Agreement will not provide for a service account. Contractors will be paid the balance of their service accounts when the current OA expires or is terminated by agreement.

**Escrow** – An ISP Agreement will not include an Escrow Program. Contractors will be paid the balance of their Escrow Accounts when the current OA expires or is terminated by agreement.

**Business Support Package** – FedEx Ground will not offer a Business Support Package in an ISP Agreement. ISPs will be able to seek business support services from any provider they choose.

**Scanners** – Scanners may be leased from FedEx Ground or leased or purchased from an outside provider.

**Additional details can be found in the Illustrative ISP Agreements**

Illustrative Examples

Given the range of negotiable features contained in an ISP Agreement, and the differences from the existing OA, FedEx Ground is providing illustrative examples of the components of an ISP Agreement. The chart below sets forth **hypothetical** scenarios illustrating the significant flexibility ISP Candidates have in negotiating an ISP Agreement. For example, many revenue components are negotiable. The chart provided illustrates hypothetical revenue scenarios different ISP Candidates might negotiate in an ISP Agreement, such as Stop Charge, Package Charge and Surge Stop Charge.

In these hypothetical scenarios, some ISP Candidates elect to participate in the Optional Brand Promotion Programs, which includes the uniform program for ISP employee-drivers or employee-helpers and the vehicle program for some or all of the ISP's vehicles. In "Scenario 1," the ISP Candidate declines to participate in the Uniform Brand Promotion Program. The illustrative scenarios also reflect how ISP Candidates can negotiate a fee to be paid each time a "Meet-and-Greet" is performed with prospective new customers within the ISP's CSA.

Also, the chart illustrates a hypothetical range of business expenses such as employee wages and benefits, staffing and overtime expectations, vehicle choices and other needs, all of which are determined by the ISP Candidate. Actual costs and potential revenue will depend on how a particular ISP structures and operates its business.

As illustrated by the following chart, the **potential** for greater profit exists depending on an ISP's individualized revenue and cost decisions. The chart sets forth **potential** ranges of revenue, costs and hypothetical earnings that might result based on the characteristics of an ISP's CSA and individualized business decisions.

*The chart is for illustrative purposes only and should not set the terms of negotiation between ISP Candidates and FedEx Ground. The chart does not promise any particular range of outcomes.*

Vermont                                                                                                                            9

**NOTE:** Please refer to the <u>Illustrative ISP Agreements</u> to see how the scenarios shown here might correspond with an actual ISP Agreement.

| | | Scenario 1 Low – High | Scenario 2 Low – High | Scenario 3 Low – High |
|---|---|---|---|---|
| **Daily Route Dynamics** | Stops | 255 - 580 | 450 - 900 | 560 - 1800 |
| | Stop Surge Threshold | 400 - 800 | 500 - 1000 | 1000 - 2000 |
| | Packages | 750 - 1400 | 1450 - 2220 | 1575 - 2600 |
| **Business Resources** | Vehicles | 3 - 4 | 5 - 6 | 7 - 8 |
| | Drivers | 3 - 4 | 5 - 6 | 7 - 8 |
| | Helpers | 0 | 0 - 1 | 0 - 1 |
| **Key ISP Agreement Terms** | Annual Service Charge | $23K - $45K | $35K - $40K | $94K - $120K |
| | Stop Charge | $1.24 - $2.85 | $1.65 - $2.62 | $1.43 - $2.60 |
| | Per-stop Fuel Surcharge | $0.25 - $0.27 | $0.24 - $0.25 | $0.11 - $0.15 |
| | Surge Stop Charge | $0.50 - $1.50 | $0.49 - $1.48 | $0.50 - $1.89 |
| | Package Charge | $.05 - $0.15 | $0.05 - $0.15 | $0.10 - $0.15 |
| | Period Safety Incentive | $2330 - $3160 | $2700 - $2800 | $3960 - $5250 |
| | Period Customer Service Incentive | $710 - $1,803 | $1,156 - $2,798 | $1,623 - $3,676 |
| | New Account Start-Up | $8.00 - $10.00 | $10.00 - $14.00 | $8.00 - $12.00 |
| | Uniform Brand Promotion (Weekly) | $0.00 | $54 - $103 | $69 - $264 |
| | Vehicle Brand Promotion Charge[5] (Weekly) | $32 - $56 (All vehicles) | $32 - $56 (3 to 4 vehicles) | $32 - $56 (6 to 7 vehicles) |
| **Revenue** | Revenue | $280K - $401K | $462K - $675K | $628K - $852K |
| **Costs** | Employee Expenses and Benefits[1] | $152K - $213K | $252K - $349K | $354K - $465K |
| | Vehicles[2] | $52K - $69K | $86K - $103K | $121K - $138K |
| | Payroll Taxes[3] | $20K - $29K | $34K - $48K | $48K - $64K |
| | Administration[4] | $6.5K - $8.5K | $11K - $13K | $15K - $17K |
| **Hypothetical Pre-Tax Operating Income[6]** | | $49K - $81K | $79K - $162K | $90K - $168K |
| **Hypothetical Pre-Tax Operating Margin** | | 12% - 29% | 12% - 35% | 11% - 27% |

1) These costs could include payroll expenses and similar employee expenses such as wages, healthcare benefits, paid sick leave and vacation.
2) These costs could include vehicle purchase or lease payments, maintenance, insurance, and fuel, and will vary based on, for example, the number and types of vehicles ISPs choose to operate.
3) Includes workers compensation, unemployment insurance and self-employment tax. These costs represent a national average and are not specific to any state. These costs do not include personal income tax.
4) These costs could include other administrative expenses associated with running a business, for example, recruiting, training and bookkeeping costs.
5) In scenarios 2 and 3, the ISP elected to include some, but not all vehicles in the Optional Brand Promotion Program.
6) Prior to the ISP's corporate or personal income tax.

Vermont

10

## Contractor Options

Contractors affected by this transition have several options to choose from before October 8, 2010.

### 1. Pursue an ISP Agreement

Pursuing an ISP Agreement is an important decision that may require an investment, such as buying the necessary PSA(s) to achieve "scale," no later than October 8, 2010. If a contractor pursuing an ISP Agreement fails to do so by that date, the OA will expire according to its terms. There are additional deadlines that also must be completed by October 8, 2010, such as incorporating the business, and not some other form of business, such as a LLP, LLC, or other similar entity, and establishing an Entity Profile on *MyGroundBizAccount*. If an ISP Candidate does not complete these two steps before October 8, 2010, FedEx Ground and the Candidate may still negotiate an ISP Agreement, although FedEx Ground may also consider negotiations with alternative candidates as well.

> **Steps to take:**
>
> - Decide whether to sign and return the Contractor Limited Release and Operating Agreement Modification no later than August 6, 2010 (signing this document is not required, but doing so makes contractors eligible to receive the transition incentive).
> - Incorporate the business no later than October 8, 2010.*
> - Establish an Entity Profile on *MyGroundBiz Account* no later than October 8, 2010.*
> - Operate a minimum of three PSAs in the same station no later than October 8, 2010.*
>
> * These steps may be initiated immediately

ISP Candidates are entrepreneurial and understand the risk/reward of investing time and resources to position the business for the future. These candidates see the benefits of focusing on managing and growing the business. Pursuing an ISP Agreement should appeal to those eager to take advantage of the opportunity to operate businesses more efficiently utilizing economies-of-scale, which could lead to higher earnings.

### Additional Circumstances:

**P&D Tractor Contractors** (P&D tractor contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible P&D routes and vehicles. P&D tractor contractors are <u>not</u> eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three non-P&D tractor PSAs in the same station no later than October 8, 2010 and operate the P&D tractor under an ISP Agreement, or
- Convert current OA to a Linehaul Agreement no later than October 8, 2010. P&D tractor contractors choosing this option are eligible for the transition incentive if they sign and submit a Contractor Limited Release and Operating Agreement Modification by August 6, 2010.

**Swing Contractors** (Swing contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible non-swing P&D routes and vehicles; full-time swing contractors are eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three <u>non-swing PSAs</u> in the same station no later than October 8, 2010. Note: Swing work areas <u>do not</u> count toward the three PSA minimum and a contract for these swing work areas will expire on its termination date.

*The Time-off Program ends on October 8, 2010. All swing PSAs in Vermont go inactive on October 8, 2010.*

## 2. Seek Employment with an ISP

Being an employee of an ISP means all terms of employment, including hours, compensation and benefits, must be worked out with the ISP. Discussions regarding employment terms are solely between ISPs and contractors seeking to become employees. FedEx Ground will not participate or intervene in employment discussions and will not set compensation or benefit terms that ISPs are required to meet. Employee-drivers and employee-helpers of an ISP will not have a direct relationship with FedEx Ground. Aside from casual interactions at the station, these employees will need to direct all questions and concerns to their employers.

Becoming an employee-driver for an ISP should appeal to those who enjoy driving a delivery vehicle and personally performing package pick-up and delivery services rather than the responsibilities of running a larger business.

> **Steps to take:**
>
> - Decide whether to sign and return the optional Contractor Limited Release and Operating Agreement Modification no later than August 6, 2010.
> - If the contractor has signed the Contractor Limited Release and Operating Agreement Modification, the Supplemental Limited Release of Claims will need to be signed and submitted on or after the effective date of termination of the current Operating Agreement in order to receive the remaining $5,000 payment of the transition incentive.

## 3. Exit the network

Contractors not interested in pursuing an ISP Agreement or seeking employment with ISPs may choose to exit the network and pursue other opportunities. Contractors wishing to leave the network may sell their PSA(s) or simply continue to provide service under their OAs until the agreements expire or are non-renewed (all OAs were non-renewed on May 20, 2010 and remain non-renewed).

**Special Note:** By signing and returning the Contractor Limited Release and Operating Agreement Modification, contractors agree that the current Operating Agreement will expire on October 8, 2010. If contractors choose not to sign the Contractor Limited Release and Operating Agreement Modification, the expiration date of the current Operating Agreement will serve as the expiration date, absent an extension.

### Review of Contractor Options

> 1. Seek to transition business to become an Independent Service Provider ("ISP");
> 2. Sell/transfer PSA(s) and seek to become an employee for an ISP;
> 3. Sell/transfer PSA(s) or take no action and serve out the remainder of the Operating Agreement and exit the network;

Vermont

<u>Contractor Incentives</u>

FedEx Ground is offering several financial incentives to assist eligible contractors that are affected by the transition to the ISP Model in Vermont.

**Transition Incentive**

In addition to growth and vehicle incentives detailed below, FedEx Ground is offering a transition incentive of $10,000 to all current P&D contractors operating routes in Vermont and those domiciled in a Vermont station as of June 30, 2010 that elect to sign a Contractor Limited Release and Operating Modification Agreement, which includes a limited release of claims involving the transition and an agreement to terminate the existing OAs by October 8, 2010. See the Sample Contractor Limited Release and Operating Agreement Modification in this guide.

Payment of the transition incentive will be issued in two installments as follows:

<u>Initial $5,000 Transition Payment:</u>

P&D contractors operating routes in Vermont, and those contractors domiciled in Vermont, that are active as of June 30, 2010 and request the transition incentive, are eligible to receive $5,000 of the payment within 15 business days of submitting to station management a signed Contractor Limited Release and Operating Agreement Modification, which includes a limited release and agreement to end the current Operating Agreement no later than October 8, 2010 (absent a further written contract extension).

<u>A signed agreement must be submitted from the date the Contractor Limited Release and Operating Agreement Modification is distributed to August 6, 2010 to receive this transition incentive.</u>

<u>Remaining $5,000 Transition Payment:</u>

After receiving initial payment:

- P&D contractors that sell/transfer all PSAs in Vermont by October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

- P&D contractors that are operating three or more PSAs in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs. (Note that for ISP Candidates successfully negotiating an ISP Agreement, the OAs will not terminate until the effective date of the ISP Agreement.)

- P&D contractors continuing to operate fewer than three PSAs in the same station as of October 8, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

Independent contractors that do not request the transition incentive or do not submit the limited release by August 6, 2010 will not receive the transition incentive. These contractors have all of the same options available as do contactors that have signed the limited release and received the transition incentive.

**ISPs currently domiciled or providing service in Vermont <u>are not eligible</u> to receive the transition incentive.**

Vermont

13

Important Legal Note

In exchange for the transition incentive, FedEx Ground is asking P&D contractors domiciled in a Vermont station for a release of certain potential claims related to this transition. Sample release documents are contained in this ISP Model Transition Guide. Actual release documents can be obtained from station management beginning the date the Contractor Limited Release and Operating Agreement Modification is distributed. The release is not intended to settle all claims a contractor may have against FedEx Ground. The release is limited to potential claims concerning FedEx Ground's announcement of this transition, the termination, non-renewal or assignment of the current OA, and any sale, assignment, loss or other disposition of PSA(s). FedEx Ground cannot advise contractors on individual circumstances.

Pending lawsuits include *Craig v. FedEx Ground Package Sys.*, Civil No. 3:05-cv-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Vargas v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00325-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.), *Tidd v. FedEx Ground Package Sys.*, Civil No. 1:07-cv-11214-GAO (D. Mass.), and *Gruhn v. FedEx Ground Package Sys.*, Civil No. 3:07-cv-412-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.).

Contractors are not obligated to sign the release of claims documents. Deciding whether to sign these documents is completely up to each contractor. If a contractor chooses to accept the transition incentive, a signed agreement and limited release needs to be submitted no later than August 6, 2010. If a contractor chooses not to sign the agreement and limited release, the contractor will not receive the transition incentive and will have the same options available to those contractors that have signed the agreement and limited release:

- Continue operating under the current agreement (which will not be renewed) until the date of its expiration;
- Sell or transfer PSAs to other contractors; or
- Operate at least three PSAs in an affected station by October 8, 2010 to become an ISP Candidate.

## Contract Renewals and Extensions

All OAs remain non-renewed as a result of the May 20, 2010 Incorporation and Compliance Disclosure announcement. As indicated in the May 20, 2010 announcement, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

## Growth Incentives

In addition to the transition incentive available to all P&D contractors domiciled in a Vermont station, growth incentives of up to $100,000 are available to those choosing to grow the business by acquiring eligible PSAs and vehicles between announcement day and October 8, 2010, for <u>total potential incentives of $110,000, depending on</u> station-specific contractor volume guidelines.

<u>Eligible PSAs are Ground or Home Delivery P&D routes servicing Vermont or domiciled in Vermont currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of June 30, 2010.</u> PSAs transferred or sold by Vermont P&D contractors operating three or more PSAs are not eligible for growth incentives. For this transition, the size of active contractors is determined as of June 30, 2010.

Contractors acquiring eligible PSAs in the same Vermont station can receive up to $100,000 in potential growth incentives, subject to station contractor size guidelines. Growth incentives do not apply unless the PSA that is acquired gets the contractor to at least minimum scale (three PSAs in the same station); contractors that are already at or above scale are eligible to receive growth incentives for acquiring up to five eligible PSAs. ISPs that are domiciled or providing services to Vermont are also eligible to receive growth incentives for acquiring eligible routes and vehicles subject to station guidelines.

<u>Each growth incentive will be reduced by $5,000 if a vehicle for that PSA is not acquired by the purchasing contractor from the selling contractor.</u>

The following is an illustration of how the growth incentives would be calculated:

- $10,000 growth incentive for acquiring the first Ground or Home Delivery PSA and vehicle that results in achieving minimum scale; plus
- $15,000 for the second PSA and vehicle; plus
- $20,000 for the third PSA and vehicle; plus
- $25,000 for the fourth PSA and vehicle; plus
- $30,000 for the fifth PSA and vehicle.

These growth incentives are <u>available to existing FedEx Ground contractors</u> that acquire eligible routes and vehicles in the same Vermont station (a Ground station, Home Delivery station or co-location) by October 8, 2010. Note that a contractor's status for the growth incentives is based on the number of <u>PSAs operated within the same station and is subject to station contractor size guidelines</u>. For example, if a contractor operates two PSAs in the Burlington Ground station, growth incentives will be available only for eligible routes acquired in the Burlington Ground station. <u>Supplemental, swing and P&D tractor PSAs are not eligible for growth incentives and will not be counted toward the 3-PSA minimum needed to be eligible for ISP Agreement Negotiations.</u>

As the chart below illustrates, a variety of options are available if choosing to acquire eligible PSAs in the same station. For example:

- A single work area contractor in Vermont would receive $10,000 in growth incentives for acquiring its second eligible route (that results in achieving minimum scale) and vehicle in the same station, plus the additional $10,000 transition incentive – totaling $20,000.

- A contractor with three PSAs would receive $10,000 in growth incentives if acquiring one more eligible PSA and vehicle in the same station. With the $10,000 transition incentive, incentives would total $20,000.

- A contractor with two PSAs in an Vermont station would receive $45,000 in growth incentives if acquiring three more eligible PSAs and vehicles in that same station. With the $10,000 transition incentive, this would provide the contractor with $55,000.

| Contractor Status as of June 30, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SWA | MWA-2 | MWA-3 | MWA-4 | MWA-5 | MWA-6 | MWA-7 | MWA-8 |
| Total growth incentive for acquiring one (1) eligible PSA and vehicle | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Total growth incentive for acquiring two (2) eligible PSAs and vehicles | $10,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Total growth incentive for acquiring three (3) eligible PSAs and vehicles | $25,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 |
| Total growth incentive for acquiring four (4) eligible PSAs and vehicles | $45,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Total growth incentive for acquiring five (5) eligible PSAs and vehicles | $70,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring six (6) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring seven (7) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Available Growth Incentives | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Transition Incentive | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Maximum Available Incentives | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 |

Note: Growth incentives shown here, which are subject to station contractor size guidelines, are contingent on the purchasing contractor's acquisition of the vehicle associated with the acquired PSA. Without such vehicle acquisition, each growth incentive is $5,000 less per PSA than shown above.

Vermont

16

Contractors acquiring eligible PSAs will be notified by station management of the amount of the growth incentive(s). Payment of the growth incentive(s) will be made within 15 business days of completion of the PSA acquisition in CDAS. All acquisitions of eligible PSAs and vehicles must be completed and approved no later than October 8, 2010 to receive growth incentives.

## Vehicle Incentive Program

SWA or MWA-2 contractors that are not pursuing an ISP Agreement and that do not sell or transfer vehicle(s) along with the PSA(s), to the acquiring contractor, may be eligible for a vehicle incentive up to $5,000. This amount applies to only one delivery vehicle per PSA, and applies only if the vehicle is not acquired by the contractor that purchases the associated PSA and if it is disposed of through a FedEx Ground designated third-party vendor.

Full-time swing contractors in Vermont not pursuing an ISP Agreement may also be eligible for a vehicle incentive of up to $5,000. This payment will cover one delivery vehicle currently operated by the full-time swing contractor.

The amount of the vehicle incentive, up to $5,000, is determined by the excess, if any, of the contractor's remaining balance due on the vehicle as determined by the lease holder or lender over the vehicle's fair market value. Fair market value will be determined by the designated third party vendor.

The vehicle incentive applies to those vehicles that are either owned or leased by a FedEx Ground or Home Delivery SWA, MWA-2 or full-time swing contractor in Vermont for use in the contractor's applicable PSA(s). **To be eligible for this incentive, contractors must sell or transfer their PSA(s) by October 8, 2010. Contractors may elect to retain or dispose of the vehicles in any manner the contractors choose, though these contractors will then not be eligible for the vehicle incentive.**

Contact information for the third party vendor will be provided by station management.

## Incorporation and Compliance Disclosure Requirement and the ISP Model Announcement

This announcement to transition Vermont to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and legal compliance. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines established within this ISP Transition Guide apply, and not those associated with the Incorporation and Compliance Disclosure Announcement.

**Contractors should note that all non-renewals and extensions associated with the Incorporation and Compliance Disclosure announcement on May 20, 2010 remain in effect.** Contractors that sign the Contractor Limited Release and Operating Agreement Modification agree to a new expiration date of October 8, 2010. For contractors that do not sign the limited release, the current expiration date remains unchanged. Contractors with expiration dates between July 1, 2010 and December 31, 2010 that do not sign the limited release are eligible to receive a 180-day extension.

Additionally, although affected P&D contractors are technically no longer eligible to receive the early adoption incentives described in the May 20 Incorporation and Compliance Disclosure Announcement, FedEx Ground has decided, as a good-will gesture, to pay all affected P&D contractors the $750, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More information will be available in the coming weeks.

## Transition Timelines by Wave

Every contractor in Vermont will have ample amount of time to decide whether to sign the Contractor Limited Release and Operating Agreement Modification and choose which contractor option to pursue. The chart below contains additional details on the ISP Transition dates that affect the Burlington co-location and Lebanon Ground stations.

| July 2010 – February 2011 | February 2011 – May 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | February 25, 2011 – First proposal due |
| | April 23, 2011 – ISP Agreement negotiations end |
| August 6, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due | May 7, 2011 – ISP Agreements go into effect |
| October 8, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | |
| October 8, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on *MyGroundBizAccount*, and achieved "scale" | |
| November 19, 2011 – Date by which an ISP Candidates will need to be registered and in good standing in the state(s) and submit their Initial Compliance Disclosure Form | |
| February 11, 2011 – Date by which CSA definition is finalized and RFI Response submitted | |

## Contract Extensions

An extension to the station-specific date of when an ISP Agreement goes into effect (see charts above) is available to any Vermont contractor that is operating three or more PSAs in the same station by October 8, 2010.

## Request for Information Process

The FedEx Ground Request for Information (RFI) Process helps the company assess whether an ISP Candidate has the ability to fulfill the obligations of an ISP Agreement. In order to begin the RFI Process, an ISP Candidate must be a corporation and not some other form of business, such as a LLP, LLC, or similar entity, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale by October 8, 2010.

In order to give ISP Candidates the opportunity to get through the transition in sufficient time to protect against service disruptions, an ISP needs to register with the state(s) in which it does business and be in good standing with those state(s) by November 19, 2010. ISP Candidates will need to finalize the definition of their CSA and submit a Response to FedEx Ground's RFI by the station-specific deadline. If these steps are not completed by the associated deadline, an ISP Candidate may still be eligible to submit a Response to FedEx Ground's RFI and possibly advance to negotiations. However, FedEx Ground may negotiate with alternate candidates as well for the CSA.

FedEx Ground will evaluate the RFI Response based on the areas listed here:

- Business Experience
  - Including references and relevant experience in the transportation industry
- Financial Viability
  - Such as bank references and annual sales
- Customer Service Approach
  - Plans for meeting customer needs and address customer concerns
- Driver Recruitment and Retention
  - Goals for recruiting employees, historical turnover rates

- Skills and Knowledge of the ISP's Workforce
  - Plans for ensuring employee knowledge of FedEx Ground's services
- Safety Commitment and History
  - Injury and accident history, vehicle maintenance plan and history
- Security (Loss and Damage Avoidance)
  - Plans for minimizing package damage and loss, historical damage trends
- Contingency Situations
  - Ability to provide consistent customer service despite volume surge, employee absenteeism and/or equipment failures

An ISP Candidate should provide any additional information it considers important for FedEx Ground to review in evaluating its response. While ISP Candidates can submit an RFI Response on *MyGroundBizAccount*, the response can be submitted in any written format to FedEx Ground.

Once the RFI Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions:

- **Advance to Negotiations**
  Senior Manager determines the ISP Candidate has the ability to fulfill the obligations of the vendor relationship.

- **Clarification/Questions**
  Senior Manager determines further clarification will help determine if the ISP Candidate is capable of fulfilling the vendor relationship.

- **Does Not Advance to Negotiations**
  Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations of the vendor relationship.

After advancing through the RFI Process and onto the Negotiations Process, **certain qualifications must be met before entering into an ISP Agreement**. Some of these administrative tasks will take several weeks to complete and documentation must be in order before an ISP Agreement Signatory is permitted to electronically sign an ISP Agreement. If these tasks are not completed and an agreement cannot be reached, these contractors run the risk of having their OAs expire without an agreement in place.

For a complete list of qualifications, see the Qualification Steps for Pursuing an ISP Agreement section of this Guide.

Drivers and certain other employees of the ISP Candidate will need to pass a criminal background check prior to the effective date of an ISP Agreement. These background checks will be arranged and paid for by FedEx Ground through a third-party vendor.

## Negotiations and Execution Processes

### Negotiations Process

The first step in the Negotiations Process is the preparation and submission of a Proposal to FedEx Ground. The Proposal is an initial offer on the key financial, non-financial, and elective components of an ISP Agreement and any other terms the ISP Candidate wishes to propose. The deadline for submitting the first Proposal is based on which wave a contractor's station falls. If a Proposal is not submitted by the dates listed above, an ISP Candidate may still be eligible to submit a first proposal

and negotiate an ISP Agreement. However, FedEx Ground may consider proposals and negotiate with alternate candidates as well for the CSA. For additional information, see Transition Timeline by Wave section of this Guide.

FedEx Ground and the ISP Negotiator (an officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate) will negotiate an ISP Agreement regarding terms for the proposed CSA. This provides ISP Candidates the flexibility to negotiate contract terms that best fit the particular business needs and unique service area the ISP Candidate is pursuing.

For example, an ISP Agreement may be negotiated with a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase – depending on business needs and desires. ISP Candidates can also choose whether to utilize FedEx Ground logos on all or some of their vehicles, and whether to outfit employees in FedEx Ground uniforms in exchange for negotiated brand promotion fees.

The following represents a list of some, though not all, of the key financial and non-financial terms, as well as elections that may be negotiated.

| Negotiable Financial Terms: | Negotiable Non-Financial Terms: | Elections: |
|---|---|---|
| ~ Annual Service Charge | ~ Length of Term | ~ Additional Services |
| ~ Stop Charge | ~ Expiration Date | ~ Scanner Leasing Program |
| ~ Fuel Charge | ~ Load Positions by Year | ~ Equipment Registration (on certain vehicles) |
| ~ Surge Stop Charge | ~ Daily Stop Threshold | ~ Periodic Maintenance Schedule |
| ~ Package Charge | | ~ Fuel Tax Reporting |
| ~ Period Safety Incentive | | ~ Facilitated Insurance Coverage and Billing |
| ~ New Account Start-Up ("Meet-and-Greets") | | ~ Brand Promotion Program (Vehicles and Uniforms) |
| ~ Spotted Trailer Charges (if applicable) | | ~ Arbitration |
| ~ Customer Service Incentive | | ~ Alternative Maintenance Program |

## Proposal Capture & Analysis Tool (PCAT)

The Proposal Capture and Analysis Tool, or PCAT, will be used by FedEx Ground to evaluate Proposals during the Negotiations Process. To facilitate negotiations, this optional tool is available to ISP Candidates for the preparation of the RFI Response and/or a Proposal. The PCAT will be available to ISP Candidates on *MyGroundBizAccount* and can be used to calculate estimated revenues for multiple scenarios based on inputs by the ISP Candidate.

Inputs include variable components such as Per Stop Charge, Fuel Surcharge and forecasted volume, as well as fixed financial components such as Annual Service Charge and the optional Brand Promotion Program.

Historical pick-up and delivery volume data for the proposed CSA, as well as individual PSA historical data and Spot information, will be made available on *MyGroundBizAccount*. This data may help in evaluating future business strategies, though past performance is not necessarily an indicator of future performance or volume. FedEx Ground cannot guarantee that the historical data supplied will be available for a CSA's predecessor PSAs, or that the data is an exact match to the geographic scope of a CSA, since it is a new area.

Using the PCAT is one way to ensure negotiable elements of an ISP Agreement are included in the Proposal that an ISP Candidate submits. However, Proposals may contain additional terms beyond those listed in the PCAT and can be submitted in any written format to FedEx Ground.

## Submitting a Proposal

Once a Proposal is submitted, a Pittsburgh-based, FedEx Ground Negotiator will be assigned and will contact the ISP Candidate to confirm receipt of the Proposal.

Negotiations will be conducted electronically and by phone over the course of several weeks, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals. The parties may submit several offers and counteroffers until an agreement is reached or there is an impasse.

Initially, the ISP Candidate that is currently operating the CSA will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. Furthermore, if certain transition deadlines are not reached, as detailed above, FedEx Ground may seek multiple bids for the same CSA even during the transition to the ISP Model. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

The first offer submitted by an ISP Candidate may not be the final offer. The first counteroffer submitted by FedEx Ground to the ISP Candidate may also not be a final offer. The Negotiator will continue working with the ISP Candidate in this manner until an agreement is reached or an impasse occurs.

| What to Expect: | What Not to Expect: |
|---|---|
| ~ FedEx Ground seeks proposals in line with market values | ~ Negotiator guidance on the "right" answer because there is not just one acceptable approach |
| ~ The need to set aside dedicated time to complete negotiations | ~ Negotiator guidance on volume forecasts |
| ~ Interactive process between ISP Candidates and Negotiators | ~ SRM participation in the process |

**The Negotiations Process will conclude in one of two ways:**

1) If an agreement is reached, the ISP Candidate will be able to review and sign an ISP Agreement

2) If the ISP Candidate and FedEx Ground cannot agree on terms for an ISP Agreement, the process will end, and station management will be notified. If an ISP Candidate has a current OA with FedEx Ground, it will expire according to its terms. It is in FedEx Ground's best interest to consider all of the terms put forward in order to reach an agreement that will meet the ISP Candidate's business needs, while providing the highest level of customer service possible.

## ISP Agreement Execution

Once the terms of an ISP Agreement with FedEx Ground have been reached, a draft of the agreement is available for review. There are additional steps to complete before a final agreement can be signed, electronically, on *MyGroundBizAccount*.

Additional steps will need to be completed **prior to** the final signing. For a complete list of these steps, see the "Qualification Steps for Pursuing an ISP Agreement" section of this Guide.

Please note: Drivers and certain members of the ISP Candidate's Workforce will need to pass a criminal background check **before** an ISP Agreement effective date; these criminal background checks may take several weeks to complete.

Once the above steps are completed, an ISP Agreement Signatory will be able to print out and review an entire ISP Agreement. If an ISP Agreement Signatory accepts all of the terms as outlined in the ISP Agreement, he/she will need to log on to *MyGroundBizAccount* and digitally sign the agreement via an electronic signature. The final agreement will reside on *MyGroundBizAccount* until it expires. Both the ISP and station management will be able to reference it online.

**Operating as an ISP**

While some contractual obligations under an ISP Agreement will remain the same, others will be substantially different.

### Service Results Expectations

The following Service Results Expectations are detailed in an ISP Agreement:

**Service Days**

Service Days remain consistent: Monday through Friday for FedEx Ground; Tuesday through Saturday for Home Delivery. FedEx Ground reserves the right to modify these days should customer demands and/or competitive advantage require changes. The three Saturdays and Mondays immediately preceding Christmas Day are considered Service Days for both FedEx Ground and FedEx Home Delivery.

**Services**

Under the terms of an ISP Agreement, ISPs agree to provide a range of pick-up and delivery services to customers, including:

- Collection and loading, if necessary, of packages for delivery in a CSA.

- Transportation of packages from a domiciled station and delivery in a CSA consistent with customer-selected service offerings and subject to the ISP's Right to Decline.

- Timely collection and transmission of customer signatures, scanning results and package tracking data.

- Collection of COD charges and return of COD charges to FedEx Ground at the end of the Service Day.

- Pick-up of customer packages in a CSA and delivery of the packages to a domiciled station in time to meet service commitments, subject to the ISP's Right to Decline.

- Return of undelivered packages to the domiciled station, according to agreed-upon terms by FedEx Ground and the ISP.

- Additional services described and mutually agreed upon in the Additional Services Schedule, which may include services such as administrative support and shuttle loading and/or unloading.

- Preparation of any legally-required documents (driver logs, vehicle inspection reports, etc.) and submission to FedEx Ground at the end of each service day (or for FedEx Home Delivery the next business day, unless otherwise agreed upon by the ISP and FedEx Ground).

**Service Results**

Measurements of "Inbound Local Service" performance will be provided electronically to an ISP. These numbers will also be posted at the FedEx Ground station. The following service results are the minimum standard outlined in an ISP Agreement:

- Provide services to the customers that are compatible with customers' schedules, expectations and pick-up and delivery requirements (subject to the ISP's Right to Decline).

Vermont

22

- Achieve a daily inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher.

- Provide the "Service Offerings" detailed in Schedule E of an ISP Agreement (commercial deliveries, residential deliveries, alcohol deliveries, attempted deliveries and pick-ups, delivery signatures, driver release and indirect delivery, premium services, and package tracking information).

- Take reasonable measures to avoid theft, loss, damage, destruction, delay in the handling, loading, unloading, transporting and pick-up and delivery of packages in the CSA.

- Conduct all business activities with honesty and integrity and in a safe and professional manner.

## Service Failure

The Senior Manager will monitor Service Results to assess adherence to the terms of an ISP Agreement. The Senior Manager will document any Service Failure by an ISP (those involving Service, Professionalism or Safety) and will schedule an ISP Discussion with the ISP Key Contact to discuss the Service Failure. The ISP will have an opportunity to correct any Service Failure.

If Service Failures continue, the ISP may be in breach of contract with the terms of the ISP Agreement; such a breach may result in termination of the ISP Agreement, depending upon the circumstances.

## Right to Decline & Right to Ensure

Under an ISP Agreement, an ISP has the Right to Decline services in certain situations without impacting service results. In instances when an ISP exercises the Right to Decline, FedEx Ground has the Right to Ensure that customers within a CSA are properly serviced.

The activities that can be declined under an ISP Agreement are contained in the Agreement. Some instances include: stops over 200 packages, pickups scheduled after 6:30 p.m., spotted trailers, customer requests requiring special modifications to equipment, and stops over the negotiated Daily Stop Threshold.

## Subcontracting

ISPs will have the opportunity to subcontract any services within its CSA to other ISPs. In these situations, FedEx Ground will attempt to accommodate any ISP-directed Load Plan changes that are submitted by ISP Key Contacts in advance of implementation.

ISPs that subcontract work to another ISP will remain responsible for maintaining service levels as well as any claims that may arise. However, only the ISP performing the work will receive payment of charges for this activity, and the packages making up this activity will count toward the inbound local service of only the ISP performing the work.

## Driver Data Collection Process and ISP Data Review

The Driver Data Collection Process and ISP Data Review will replace the existing Check-In Process (including the Revised Daily Settlement Report and the Revised Consolidated Daily Settlement Report, respectively) as summarized below:

## Driver Data Collection Process

This process is similar to the current Check-In Process and occurs when ISP employee-drivers return to the station. The collection of this information (scanner data, paperwork completed by the ISP employee-driver, and P&D activity captured in the FedEx Ground system) will be input by FedEx Ground personnel. Once FedEx Ground has input the data, FedEx Ground will generate an *ISP Driver Data Collection Report* that contains "driver-level pick-up and delivery activity" and will

be shared with the ISP employee-driver. The ISP employee-driver will need to review and sign the report, confirming that it is accurate. FedEx Ground management will hold any data discrepancies or service-related issues for the following morning, and these issues will only be addressed with ISP Key Contacts, rather than individually with any ISP employee-drivers.

In the case of FedEx Ground, the information mentioned above should be submitted in the evening of the return to the station, unless otherwise agreed. For FedEx Home Delivery, the information should be submitted on the morning of the return to the station, unless otherwise agreed.

### ISP Data Review

Information submitted, reviewed, and signed by an ISP's employee-drivers will generate an *ISP Data Confirmation Report* which will be reviewed on a regular basis with the ISP Key Contact. This report will contain "CSA-level data" and will be provided only to the ISP Key Contact. It will be used to address any operational or contractual issues that arose on the previous day and will be discussed only with the ISP Key Contact. These meetings can occur as needed, either at the request of FedEx Ground or the ISP, and will optimally be conducted in person after morning dispatch, but they may take place in other formats or times as mutually agreed upon.

The *ISP Data Review* process will be used to cover prior day issues with the ISP, such as: the *ISP Daily Confirmation Report*, P&D Quality Reports, local inbound service, Claims Investigation, Complaints, Branding (if ISP is participating in the Brand Promotion Program) and scanning. The meeting may also be used to address any future ISP requests, such as ISP Load Plan changes and New Pick-up Start-ups, which include ISP-directed vehicle assignment.

The *ISP Data Collection Report*, as mentioned above, contains driver-level data only. It will not contain items such as: non-delivered packages, premium service failures, high profile van scans, uncollected COD monies, and open tracer reports. This information will be contained in the *ISP Data Confirmation Report* and will be sent to ISPs via *MyGroundBizAccount*.

Other daily reports and data will be shared directly with ISP Key Contacts and/or sent electronically to ISPs via *MyGroundBizAccount*.

### Peak Planning

ISPs are responsible for planning Peak operations within a CSA. FedEx Ground will offer its best projections of anticipated Peak volume in a given CSA and will work with the ISP to identify the ISP's anticipated service constraints and plan contingency operations.

### Scanner and Vehicle Usage

In co-locations, ISPs will have a choice to use either FedEx Ground or FedEx Home Delivery scanners, depending on the functionality preferred by the ISP. FedEx Ground will also work with ISPs to group an ISP's vehicles together on FedEx Ground docks, even across van lines that were previously dedicated to FedEx Ground or FedEx Home Delivery vehicles. Any operational changes will be discussed between the ISP and FedEx Ground and will be made after mutual agreement.

### Brand Promotion Program

Participation in the Uniform and/or Vehicle Brand Promotion is optional. A Uniform Brand Promotion charge and a Vehicle Brand Promotion charge may be negotiated if an ISP Candidate decides to participate in either program. Minimum vehicle specifications for vehicles in the Vehicle Brand Promotion program and vehicles not in the program are posted on *MyGroundBiz*.

Any vehicle may be utilized in non-FedEx Ground related activity as long as any FedEx Ground logos are removed or covered.

**ISP Charge Statement**

The ISP Charge Statement contains an itemized list of compensation elements that are based on the individual terms agreed to in the ISP Agreement. Examples of terms could include: Package and Stop Charges, Annual Service Charge, Period Safety Incentive, Brand Promotion Program (if elected), Surge Stop Charge and Fuel Surcharge.

Unlike the current settlement statement, the ISP Charge Statement will detail any discrepancies between scanned packages and stops versus summed totals used for ISP Charge purposes. Discrepancies may include hand-sheet totals updated during the Driver Data Collection Process or double stops reversed as part of ISP Charge calculations.

In addition to existing itemized charge backs and deductions (such as physical damage insurance, work accident insurance, workers' compensation insurance, and non-trucking liability), the ISP Charge Statement may also include weekly scanner lease and network access fees (including any additional scanners), claims, equipment registration, fuel tax, expenses and fees, and the current price of fuel within the CSA as indexed weekly by OPIS.

Accessing the ISP Charge Statement is a 100% digital process. Printed statements will not be provided. All related payments will be **made each Friday** (or on the preceding Thursday if Friday is a bank holiday) via Electronic Funds Transfer (EFT). *MyGroundBizAccount* may be used to view an ISP Charge Statement, which is available in .PDF and/or .CSV formats.

**Availability of Electronic Tools**

In addition to offering ISP Charge Statements through *MyGroundBizAccount*, FedEx Ground has developed and is rolling out web-based reports, workforce and fleet management capabilities, CSA operational planning tools and communication methods which will be made available to ISPs.

**Rentals & Spares, Van Washing**

FedEx Ground will not arrange for third-party vehicles or use of spare vehicles. ISPs will be responsible for washing their vehicles. If desired, ISPs may select a van washing vendor and have the washing performed on FedEx Ground's property. Any van washing vendor may be used, subject to the vendor's agreement to comply, and compliance with, FedEx Ground's insurance and environmental standards.

**Locks**

The ISP Agreement does not require the use of high-security locks; however, use of high-security locks will result in diminished liability for claims resulting from vehicle break-ins.

## Safety Terms & Qualifications

**Contractual Safety Standards**

Schedule I, Safe Operating Practices, covers driver and non-driver qualification criteria, background qualification criteria, and the training and safety responsibilities an ISP agrees to assume. A sample Schedule I will be sent out over the next several weeks.

**Period Safety Incentive**

FedEx Ground will pay ISPs a negotiated Period Safety Incentive payment for each completed 4-week Safety Period.

The amount of the payment, negotiated in an ISP Agreement, is based on the number of preventable accidents the ISP's employee-drivers are charged with and the number of vehicles the ISP operates during the Safety Period. The incentive will be paid to the ISP two periods, or eight weeks, following the close of the qualifying Safety Period.

**ISP Safety Results**

FedEx Ground will provide electronic notification to an ISP if an ISP employee-driver is disqualified. This does not affect an ISP's right to disqualify their employee-drivers. SRMs will be given a monthly report of disqualified drivers.

**Driver Safety Violations**

Any driver safety violation will be communicated by the SRM to the ISP, not the ISP employee-driver. As an exception, unsafe behavior on FedEx Ground property may be handled directly with the ISP employee-driver by station management. Any such exception will be subsequently communicated by FedEx Ground to the ISP.

**Controlled Substance Collection & Testing**

All ISP employee-drivers need to pass a pre-qualification controlled substance screen to satisfy DOT qualification requirements. When a FedEx Ground approved collection site is utilized, FedEx Ground will pay for screenings. ISP employee-drivers are subject to random controlled substance testing.

**Physical / Medical Exam**

All ISP employee-drivers must have a current DOT-compliant medical physical examination. When a FedEx Ground approved physician is utilized, FedEx Ground will pay for the exam. When the physical expires (the term of the physical will be determined by the physician), additional exams and the related costs are the responsibility of the ISP.

**Maintenance**

An ISP Agreement will set forth ISP maintenance obligations. Pursuant to DOT requirements, production of monthly maintenance records and annual inspections will continue.

**Claims for Liability to the Public**

The ISP Agreement sets forth graduated amounts that will be charged back to, or deducted from, an ISP for any claims brought against FedEx Ground for bodily injury and/or property damage caused by an ISP employee, agent or subcontractor. The amounts to be charged back or deducted will be the actual amount incurred by FedEx Ground up to $1,000 for the first claim, up to $2,000 for the second claim, up to $3,000 for the third claim and up to $4,000 for the fourth and subsequent claims arising out of incidents occurring in any rolling 52-week period.

## Qualification Steps for Pursuing an ISP Agreement

An ISP Candidate must take several steps to negotiate, enter into and operate under an ISP Agreement. Some are one-time occurrences and some must be completed on an annual basis. Most require several weeks to complete and should be completed well in advance of entering negotiations.

These steps ensure ISP Candidates meet the terms of an ISP Agreement and continue to comply with all state and federal laws and regulations.

- **Incorporate the business, if not incorporated already**
  - While ISP Candidates can begin this process immediately, articles of incorporation must be submitted no later than October 8, 2010 to advance to the RFI Process

- **Establish an Entity Profile on *MyGroundBizAccount***
  - While ISP Candidates can establish an Entity Profile once incorporated, the Entity Profile must be established no later than October 8, 2010 to advance to the RFI Process

Vermont

- ISP Candidates will be asked, among other questions, to disclose direct or indirect ownership interest and/or participation in other ISP entities to determine if the ISP Candidate has exceeded station guidelines

- **Register the business in the state(s) in which it does business, if not registered already and be in good standing with those state(s)**
  - While ISP Candidates can begin this process as soon as the business is incorporated, all ISP Candidates must be registered with the state(s) in which they do business and be in good standing by November 19, 2010

- **Submit Initial Compliance Disclosure Form**
  - ISP Candidates certify compliance with federal and state independent business reporting and filing laws.
  - The Initial Compliance Certification Form illustrates the compliance activities performed by the ISP Candidate and must be signed by the ISP Candidate and the ISP Candidate's accountant
  - While this form can be submitted at any time, the Initial Compliance Disclosure must be completed and submitted by November 19, 2010
  - ISPs will be contractually obligated to file an Annual Compliance Certification form each succeeding calendar year that an ISP Agreement is in effect

If an ISP Candidate does not complete all four of these steps by the deadlines stated above, FedEx Ground may still negotiate an ISP Agreement with the ISP Candidate. However, FedEx Ground may also consider negotiations with alternative contractors as well.

- **Identify an ISP Agreement Signatory that submits to and passes a criminal background check**
  - An ISP Agreement Signatory must pass a criminal background check before signing an ISP Agreement. Should that person fail the criminal background check, another ISP Agreement Signatory must be identified and pass the criminal background check before an ISP Agreement can be signed

- **Secure insurance coverage**
  - ISP Candidates must acquire insurance coverage, including Non-Trucking Liability and Physical Damage (for vehicles included on Schedule B of an ISP Agreement) as well as workers' compensation and work accident insurance (as required by state law and an ISP Agreement)
  - ISP Candidates may secure insurance coverage from the provider of their choice though FedEx Ground will verify with Marsh that proper insurance has been secured
  - ISP Candidates must secure coverage prior to an ISP Agreement effective date.

- **Provide a W-9 business tax form**
  - All ISP Candidates, regardless of whether they were previously incorporated or not, must submit a W-9 business tax form indicating the name of the incorporated entity

- **Establish an Electronic Funds Transfer (EFT) Account**
  - If an ISP Candidate has a new corporate name and/or a new EFT account number, an updated authorization agreement for EFTs must be provided to FedEx Ground before an ISP Agreement effective date
  - ISP Candidates should note this process can take up to three weeks to complete

- **Ensure qualified personnel pass criminal background checks**
  - ISP employees who have access to FedEx Ground systems and/or FedEx Ground property, interact with FedEx Ground customers, or handle FedEx Ground packages must pass a criminal background check before performing these duties for an ISP
  - ISP Candidates should note this process can take several weeks to complete

- **Ensure workforce compliance**
  - Per an ISP Agreement, ISPs may only employ persons who are legally authorized to work in the United States

Vermont

27

- o  Maintain an I-9 employment authorization form for each employee
- o  Provide evidence of compliance at the request of FedEx Ground
- o  These steps must be completed before an ISP Agreement effective date
- o  ISP Candidates should note these steps can take several weeks to complete

## ISP Model Key Terms & Definitions

**Contracted Service Area (CSA)** – A geographical area, defined in an ISP Agreement, in which an ISP is contractually obligated to provide pick-up and delivery services

**Driver Data Collection Process** – Daily collection of information from an ISP employee which is then inputted by FedEx Ground personnel into FedEx Ground's system

**Independent Service Provider (ISP)** – An independent business entity that contracts with FedEx Ground to provide pick-up and delivery services under an ISP Agreement

**ISP Agreement** – A legal contract negotiated between an ISP and FedEx Ground

**ISP Agreement Signatory** – An individual who signs an ISP Agreement on behalf of the ISP

**ISP Candidate** – An independent business entity that desires to become an ISP for a particular CSA, but has not yet executed an ISP Agreement for that CSA

**ISP Charge Statement** – A weekly statement detailing the ISP's financial earnings and CSA volumes

**ISP Data Collection Report** – A daily report that details package data for each ISP employee-driver. The ISP Data Collection Report is reviewed each afternoon for Ground and the next morning for Home Delivery

**ISP Data Confirmation Report** – A daily report that details package data for each CSA. The ISP Data Confirmation Report is reviewed with the ISP Key Contact each morning

**ISP Data Review** – A daily assessment between FedEx Ground and the ISP Key Contact of the prior day's activities and issues, as well as any future operational plans

**ISP Electronic Funds Transfer (EFT)** – A weekly payment provided to ISPs for work performed in the ISP's CSA. The ISP EFT replaces the settlement check

**ISP Employee** – An individual employed by the ISP. ISP Employees may include Key Contacts, P&D drivers, helpers and office support

**ISP Key Contact** – An individual employee of the ISP responsible for administering an ISP Agreement, including day-to-day operations

**ISP Negotiator** – An officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate

**Negotiations** – A process during which FedEx Ground and ISP Candidates attempt to work out various mutually acceptable financial and non-financial terms as well as elections of an ISP Agreement

**Negotiator** – A FedEx Ground employee who negotiates with the ISP Candidate on behalf of FedEx Ground.

**Proposal** – An ISP Candidate's offer on the key financial and non-financial terms as well as elections included in an ISP Agreement

Vermont

28

**Request for Information (RFI)** – A request, issued to ISP Candidates by FedEx Ground, which seeks to ascertain the capabilities of prospective ISPs

**RFI Response** – An ISP Candidate's reply to FedEx Ground's RFI, that outlines the ISP Candidate's capabilities relative to the contractual obligations

## Q&As

**1. Which contractors are affected by this announcement?**
This announcement impacts all P&D contractors domiciled in Vermont as well as those P&D contractors that provide service in Vermont. Linehaul contractors are not affected.

**2. Why implement a new contract and operational changes in Vermont?**
This transition was necessary given the current legal and regulatory environment in Vermont. Additionally, this transition is an important step in meeting the needs of contractors, our customers and the Company. Transitioning to the ISP Model will also ensure that P&D contractors continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

**3. If a contractor acquires additional routes, is that contractor guaranteed an ISP Agreement?**
No. Negotiating an ISP Agreement is an individualized negotiation between ISP Candidates and FedEx Ground. ISP Candidates will negotiate key financial and non-financial terms, as well as make elections, according to the unique business needs of the service area. The process will also involve a response to a Request for Information (RFI) so that ISP Candidates can demonstrate the ability to provide the level of service required. Participating in this process does not automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement.

**4. How many PSAs can an ISP Candidate acquire in Vermont?**
There is no statewide limit on how many PSAs an ISP Candidate can acquire in Vermont. There are, however, station-specific guidelines in place to avoid excessive dependence for network service on any one contractor in a particular station. Station management can provide additional details regarding the guidelines for your station.

**5. What happens once an ISP Agreement goes into effect?**
The ISP Model is intended to provide the potential for higher earnings by maximizing economies-of-scale, as well as other operating efficiencies of a larger, multi-vehicle operation. Under an ISP Agreement, ISPs are responsible for planning all P&D activity within the Contracted Service Area (CSA). This includes driver recruitment, training and staffing; vehicle fleet size selection, acquisition and maintenance; peak planning; and complying with all applicable laws and regulations. ISPs will have significant flexibility in allocating staff and vehicles as ISPs see fit to meet the unique and changing business needs of their CSAs.

**6. Can an ISP Candidate operate both Ground and Home Delivery routes?**
Yes. ISP Candidates may operate any combination of at least three Ground and/or Home Delivery PSAs in the same station by October 8, 2010 to begin the RFI and Negotiations Processes for a new agreement. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location.

**7. Will ISPs continue to operate under FedEx Ground's operating authority?**
Yes. ISPs will continue to operate under FedEx Ground's operating authority.

**8. What happens to the swing routes currently operated by contractors?**
Swing routes will cease to exist upon the expiration of the applicable Operating Agreement (OA). Swing contractors that acquire and operate at least three non-swing PSAs in the same Vermont station, incorporate as a corporation, and not some other form of business, such as an LLP or LLC, and establish an Entity Profile through *MyGroundBizAccount* by October 8, 2010 and that register with Vermont, be in good standing, define a CSA, and respond to FedEx Ground's RFI will be eligible to submit a first proposal and begin negotiations for an ISP Agreement. Swing PSAs will not count toward the three PSA minimum needed to be eligible for ISP Agreement negotiations.

9. **How quickly will FedEx Ground make the transition incentive payments?**
- The first $5,000 of the transition incentive will be paid within 15 business days of submitting a signed Contractor Limited Release and Operating Modification Agreement. The remaining $5,000 of the transition incentive will be paid as follows:
- Contractors that sell/transfer PSAs and sign the supplemental limited release will receive a check within 15 business days at the station for the remaining $5,000 of the transition incentive once the current OA terminate and proof of sale or transfer of the routes is submitted to station management;
- P&D contractors operating fewer than three PSAs in a single Vermont station as of October 8, 2010 will receive the remaining $5,000 of the voluntary transition payment within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of the OA; or
- P&D contractors operating three or more PSAs in the same station in Vermont as of October 8, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of their OA.

10. **Are contractors eligible for the $10,000 transition incentive even if they choose to sell their routes?**
Yes. These contractors will need to sign and timely submit a Contractor Limited Release and Operating Modification Agreement. They will also need to submit proof of their transition and sign the supplemental limited release.

11. **Is the transition incentive taxable?**
Contractors should consult with tax advisors as to the tax status of the transition incentive. The transition incentive will be reported by FedEx Ground on a Form 1099 for the year in which the amount is received.

12. **What happens if a contractor decides not to sign the Contractor Limited Release and Operating Agreement Modification?**
Contractors are not required to sign the optional limited release. If a contractor decides not to sign the limited release, that contractor will not receive the transition incentive described in this Guide and will continue operating under the terms of their OA until its current expiration date, absent any further extension. This contractor can still pursue an ISP Agreement if it meets all terms set forth in this Guide.

13. **Are current ISPs that are domiciled or providing services in Vermont eligible to receive the transition incentive?**
No. Current ISPs that are domiciled or providing services to Vermont are not eligible to receive the transition incentive.

14. **Are extensions still available for contractors that do not sign the Contractor Limited Release and Operating Agreement Modification?**
Yes. As previously announced on May 20, 2010, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to October 8, 2010 regardless of any prior extension.

15. **Why are growth incentives tied to the acquisition of the vehicle and the PSA?**
By acquiring a vehicle that is already in service in a particular PSA, the ISP will have a vehicle that necessarily qualifies for service under an ISP Agreement.

16. **Are current ISPs that are domiciled or providing services in Vermont eligible to receive the growth incentives?**
Yes. Current ISPs that are domiciled or providing services to Vermont are eligible to receive growth incentives for acquiring eligible routes and vehicles subject to station-specific guidelines.

17. **Are growth incentives available for eligible PSAs acquired after October 8, 2010?**
No. All acquisitions of eligible PSAs, by eligible contractors, must be completed by October 8, 2010 in order to be eligible for growth incentive payments.

Vermont                                                                                         30

**18. Do ISP Candidates have to compete with other vendors from outside the network for the CSAs?**

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground and, if operating three or more PSAs in the same station by October 8, 2010, will have an opportunity to extend a current Operating Agreement to do so. Should an impasse be reached, multiple candidates may be engaged in the process. FedEx Ground may also seek multiple bids for the same CSA in the event that certain transition deadlines are not met. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions. When the multi-year ISP Agreements expire, there is no automatic renewal. At that point, the existing ISP can bid for the CSA again, though FedEx Ground may also consider external candidates in order to contract with the best candidate in terms of experience, ability to provide service, cost, as well as other factors.

**19. Can a Ground contractor acquire a Home Delivery (HD) route (or vice versa) as part of the Vermont transition?**

Yes, but a new OA will need to be signed for the HD (or Ground) route. This new contract will expire on October 8, 2010, though an extension will be granted if the contractor is at scale.

**20. How does the transition to the ISP Model affect contractors operating PSAs in different Vermont stations?**

FedEx Ground is willing to consider the particular circumstances and make a decision as to whether these contractors are considered to be at scale to negotiate an ISP Agreement. Station management can discuss potential options.

**21. Can an Vermont ISP subcontract to contractors based in adjacent states?**

No, unless that contractor is an ISP. Once transition to the ISP model is complete, all Vermont packages must be delivered by an ISP that is in compliance with all laws.

**22. With whom will ISP Candidates negotiate?**

While Senior Managers are an important part of the process for identifying ISP Candidates, Pittsburgh-based FedEx Ground employees will serve as Negotiators on behalf of the Company.

**23. Is negotiating an ISP Agreement for a one-year term an option?**

Generally, ISP Agreements will be negotiated for a three-to-five year period; however, shorter or longer contract periods will be subject to the parties' negotiations.

**24. What impact will FedEx Ground's ISP Model announcement have on the Company's Incorporation and Compliance Disclosure announcement made on May 20, 2010? Does the non-renewal notice on May 20, 2010 still remain in effect?**

The ISP Model announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines set forth in the ISP Transition Guide apply. The non-renewal notice given on May 20, 2010 remains in effect.

**25. If a contractor already received an extension as a result of the Company's Incorporation and Compliance Disclosure announcement, what happens to that extension?**

Any extension a contractor has already received remains in effect, unless they sign the Contractor Limited Release and Operating Agreement Modification, which will change the termination date of any Operating Agreement to October 8, 2010. If a contractor does not sign the Contractor Limited Release and Operating Agreement Modification, then the Operating Agreement will expire at the end of any extension the contractor already received as a result of the Company's Incorporation and Compliance Disclosure announcement

**26. Will contractors affected by the ISP Model announcement still receive the $750 early adoption incentive that FedEx Ground announced on May 20, 2010?**

Yes. As a good-will gesture on the part of the company, all affected P&D contractors will receive the $750 early adoption incentive associated with the May 20, 2010 announcement, which is in addition to incentives that will be

Vermont

available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy.  More details will be available in the coming weeks.

*In the future, additional Q&A can be found on www.mygroundbiz.com.

# EXHIBIT 8

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-216

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

July 15, 2010

**VIA HAND DELIVERY**

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.;
No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)***

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model) in Illinois. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Illinois contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Illinois-based contractors listed in the attachment to this letter:

1. Illinois Transition Information;

2. Questions & Answers Regarding the Illinois Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

5. ISP Transition Timeline;

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq., July 15, 2010 - Page 2

      6.     Illinois Transition Update.

     This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys. Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys., Inc*, Civil No. 1:07-CV-10876-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Fluegel/Griffin v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00529-RLM-CAN (IL), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. Additional materials will be forthcoming when they are provided to the Illinois contractors. The foregoing is without prejudice to FedEx Ground's rights and defenses.

     Please call me if you have any questions. Thank you for your time and attention.

                    Very truly yours,

                    Matthew P. Eastus
                    for O'MELVENY & MYERS LLP

Enclosures

cc:     Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.,  July 15, 2010 - Page 3

| | |
|---|---|
| Abazoski, Daut | Brady, Steven C. |
| Abdic, Hasim | Brocato, Marcus |
| Abney, Lawrence | Broughton, Mark |
| Acuff, Laurie | Brown, David Wayne |
| Addis, Josh L. | Brown, Taron |
| Agbana, Michael A. | Bucko, Marek |
| Akman, Huseyin Emre | Butler, Jerome |
| Alexander, Samuel Demond | Camacho, Juan A. |
| Aliaksandrau, Aliaksei | Campbell, Dennis |
| Allen, Alune | Campbell, Kyle Steven |
| Alshair, Mousa | Cardenas, Arnold |
| Alvarez, Andres | Catcott, Jacquelyn |
| Appl, Charles D. | Cerutti, Robert J. |
| Arabadzhiev, Dimitar Chavdarov | Childers II, Clayton alexander |
| Ardzeck, James | Chladek, William E. |
| Arenas, Cesar | Choi, Chong I. |
| Arnold, Travis | Clark, John |
| Asenov, Stefan | Clemons, Stephen D. |
| Avis, Troy | Clinton, Robert J. |
| Baer Jr., William Joseph | Clutter, Thomas G. |
| Baetke, Rex | Coe, Rodney |
| Bains, Pummy | Coleman, Lon |
| Balbuena, Rafael | Coley, Tom |
| Barrios, Orlando | Compton, Scott |
| Bartlett, Thomas E. | Cooper, Gerald Louis |
| Basic, Damir | Copeland, Randy |
| Battle, Anthony | Corradin, Thomas |
| Baum, Gerard | Creghin, Mark |
| Bauman, William | Cripps, David |
| Beach, Jeramy | Crowell, Ryan M. |
| Bender, Jay | Cunningham, Michael |
| Benson, William F. | Dailey, Michael |
| Biggerstaff, Jarrett L. | Daluga, Douglas |
| Birchfield, Don Jens | Darvidas, Aidas |
| Bitter, Gary E. | Dear, Lance |
| Blair, Chad | DeBrackeleire, Mauriece Ray |
| Bloom, Gerald S. | DeJesus, Bayoan Pedro |
| Bochucinski, Mark | Dellibovi, Emil |
| Boler, Michael | Delong, Daniel |
| Boone, Durwin D. | Demirovski, Barvim |
| Borbely, Dennis | Denniston, Jim L. |
| Boyd, Willie Ed | Deters, Ted |
| Boykin, Eddie H. | Devries, Steve |

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.,  July 15, 2010 - Page 4

| | |
|---|---|
| Diaz, Antonio | Hansen, Steve |
| Diaz, Jose | Harmon, James |
| Dickerson, Stephen P. | Harmon, William |
| DiFiglio, James M. | Harris, Thomas R. |
| Dimitrov, Dimitare Drajev | Hartwell, Ryan |
| Dinger, David H. | Heath, Nancy J. |
| Donahoe, Michael J. | Heinz, David |
| Dressler, Kenneth Duncan | Hengels, Steven |
| Durand, Donald | Hensel, Tim |
| Durmic, Zinet | Hernandez, Pablo |
| Earnisse, James | Herrera, Cesar Roel |
| Eddleman, Clint Michael | Hinton, Aaron |
| Edmonds, Fredrick Nathan Arjay | Hoagland, Christopher |
| Eguchi, Darrin | Hopkins, David |
| Enriquez, Gilbert | Hoppa, Christopher |
| Fabian, Jesus | Hopson, Ellery |
| Fanning, Christy J. | Houser, Andy J. |
| Fanning, Rodney | Housmah, Shannon |
| Farmer, Tarek Lynn | Huddleston, Clair |
| Farrell, Robert W. | Hunt, Dennis M. |
| Fejes, Luke | Hurd, Paul |
| Fikejs, Rich | Ignarski, Marek |
| Fitzgerald, Michael | Iordanov, Daniel |
| Flack II, Max LeRoy | Isaza, Andres |
| Flores, Sergio | Iswekowa, Edmond |
| Folk, Gregory Alan | Jacobsen, Michael |
| Garnello, Anthony | Jakschik, Paul |
| Garner IV, Emmett | Jester, Todd A. |
| Gaska, Paul | Johnson, Jamey L. |
| Godoy, Fernando A. | Johnson, Scott |
| Golub, Bojan | Jones, Sean P. |
| Gomez, Roberto | Joyce, Tom |
| Grimes, Rick | Juzkiw, Joseph |
| Grimm, Joel | Kacker, Craig |
| Guelev, Anastas Assenov | Kapoun, Kirk Joseph |
| Guerrieri, Anthony P. | Kasak, Stephen |
| Guise, Phillip | Keblusek, Ken |
| Gulczynski, Michael L. | Kelly, James R. |
| Gulliford, Scott Ian | Kelly, Joseph |
| Gustafson, Ferdinand | Kendall, Willard S. |
| Gutierrez, Victor | Khan, Amir |
| Habdas, David | Kich, James |
| Halcarz, Jennifer Gale | Kirkpatrick, Randall |
| Handzel, Anna Marie | Krassoi, William |

| | |
|---|---|
| Krstic, Slobodan | Morden, Jerry |
| Krstic, Zoran | Morgan, Kevin |
| Krutsinger, Robbin L. | Mossa, Dominic |
| Lagunas, Federico | Mountain, Lawrence |
| Lahucik, James | Murtz, Michael |
| Land, Tracey | Muszynski, Piotr |
| Lang, Arthur | Nava, Shawn |
| LaRue, Jeremy Allan | Nellessen, George |
| Latigo, Joyce Irene | Nelson, Robert |
| Lechuga, Joel | Nemtuc, Cristian |
| Lee, Rack | Newton, Doug |
| Lemmel, Jerry | Nielsen, David |
| Leong, David | Norris, Jason |
| Lewis, Debra A. | Norton, William L |
| Liakh, Vadim Leonidovich | Noto, Richard L. |
| Libreros, Luis A. | Nudd, David Scott |
| Lloyd, Barry | Obradovic, Admir |
| Lough, Jason | Ocampo, Hector |
| Lozano, Jose | O'Haver, Darci Ann |
| Luecke, Kurt | Olague, Ricardo |
| Machnik, John | Olan, Eric |
| Maldonado, Carmen M. | Oliver, Javier |
| Manning, Robert | Ortega, Alfredo |
| Manseau, Michael Leonard | Paetschow, Kenneth |
| Marchiori, Attilio | Pagakys, Mantas |
| Marsteller, Doug | Palaima, Mindaugas |
| Martin, Cynthia D. | Papaleka, Elvis |
| Martinez, David | Parks, Jeff |
| McCollum, Jeffery | Parrish, Richard H. |
| McDaniel, Brian S. | Parsons, Brandon Ronald |
| McDermott, Brian Patrick | Pasierbowicz, Richard M. |
| McGowen, Wesley | Patel, Bhartendu N |
| McKinney, Lisa Ann | Patel, Mannish B. |
| McWilliams, Ronald James | Patel, Rimal M. |
| Medez, Julius | Perez Jr., Pedro F. |
| Melendez, Arturo | Perkins, Beth |
| Melvin, William Michael | Peterson, Lee |
| Mette, Stephen | Petit, Kerry |
| Meyer, Stephen | Phillips, Mark |
| Miggins, Allen | Pineda, Angel |
| Miller, Timothy P. | Platt, David M. |
| Mills, Jeffery W. | Polk, Brenda J. |
| Mitrev, Iakim | Popov, Alexander |
| Moore, Thomas Lewis | Powell, Sylvester |

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.,  July 15, 2010 - Page 6

| | |
|---|---|
| Powell, William | Snarski, Diana |
| Power, Thomas D. | Solaja, Ile |
| Priakhine, Pavel Vladimirovich | Sollis, Gene |
| Pruett, Greg A. | Solorio, John |
| Ragusa, Joseph | Soto, Carmelo A. |
| Raitano, Michael | Stackowicz, Paul P. |
| Ranieri, Debra | Stanimirov, Stanimir Nikiforov |
| Reed, Blake Joseph | Stefanski, Richard |
| Reeverts, George | Steinmetz, Heath |
| Revord, Pat | Stenson, Stacey Durant |
| Reyna, John | Stephens, Ralph |
| Reynolds, James | Stinson, Brad |
| Rhoades, George Lorion | Stradt, John |
| Rivera, Edwin | Sullivan, Richard M. |
| Rivera, Luis | Sullivan, Timothy |
| Robinson II, James Michael | Szpak, Slawomir |
| Rocha, Carlos | Tabert, Steve |
| Rodriguez, Jimmy | Tadder, Robert |
| Roepke, Gregory Thomas | Taylor, Greg |
| Roney, Jared | Tchirpanliev, Vassil |
| Ruffin, Danny | Teehan, Daniel |
| Ruiz, Daniel | Thomas, Leroy |
| Runyon, Darwin | Thomas, Timothy Eugene |
| Rush, Lloyd | Thullen, John |
| Salihovski, Rakip | Tiethoff, John M. |
| Samuelson, Brad | Tinch, Steve |
| Sandoval, Jose | Todorova, Miglena P. |
| Schauer, Steven | Treysman, Gregori |
| Schmerse, Tom | Trychta, Laddie |
| Schmidt, Robert | Twardowski, Andrzej |
| Schroeder, Steve Craig | Varagic, Nemanja |
| Schwartz, Lisa L. | Vasilev, Andrey Detelinov |
| Senese, David | Vaughn, Kerry Dale |
| Sevilla, Moises | Vazquez, Luis A. |
| Shill, James Alan | Velazquez, Alejandro |
| Shlomo, Liad | Velez, Baldo |
| Shroka, Robert Joseph | Vercande, Steve |
| Siergiej, Henry | Vidovic, Predrag |
| Sierra, Alejandro | Vilchis, Jorge |
| Siler, Cedric | Villarreal, Rogelio |
| Singleton, Kenneth | Vince, Michael A. |
| Sloan, Timothy James | Visnjevac, Arsen |
| Smith, James Sinclair | Volpentesta, James A |
| Smith, Ralph | Von Oesen, Thomas |

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq., July 15, 2010 - Page 7

| | |
|---|---|
| Voyles, Richard W. | |
| Wadman, Kenneth | |
| Ward, Scott | |
| Warner, Matthew R. | |
| Warren, Brad | |
| Watychowicz, Jan Marian | |
| Waugaman, Kevin | |
| Weatherford, James G. | |
| Webb, Chris | |
| Wendt, Wayne A. | |
| West, Michael V. | |
| Whitten, Robert | |
| Wilkey, David Michael | |
| Williams, Darren L. | |
| Wilson, Derek Lee | |
| Woods, Richard | |
| Yanev, Nikolay Dimitrov | |
| Yarger, Gregory | |
| York, Everick | |
| York, Rockie Joe | |
| Zilanis, Jason A. | |

LA3:1168027.1

## O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-216

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

July 15, 2010

**VIA HAND DELIVERY**

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

> Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.;***
> **No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its St. Louis, Missouri stations, with regard to contractors who provide service to Illinois. As part of that announcement, FedEx Ground is offering an ISP transition incentive to some St. Louis contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the St. Louis-based contractors listed in the attachment to this letter:

1. St. Louis Transition Information;

2. Questions & Answers Regarding the St. Louis Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq. July 15, 2010 - Page 2

      4.     DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

      5.     ISP Transition Timeline.

      This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys., Inc.*, Civil No. 1:07-CV-10876-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Gray v. FedEx Ground Package Sys., Inc.*, Civil No. 3:06-CV-00337-RLM-CAN (MO), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. Additional materials will be forthcoming when they are provided to the St. Louis contractors. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

      Thank you for your time and attention.

              Very truly yours,

              Matthew P. Eastus
              for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Anderson, Leonard Cornel |
| Brooks, Jackie J. |
| Burrage, Kurt |
| Cool, James Francis |
| Cool, Joseph James |
| Diesel, John |
| Fife, Claudia B. |
| Giaccotto, Joseph C. |
| Hayden, Michael Joseph |
| Helton, Darren Lee |
| Karban, Daniel Wayne |
| Karban, Michael |
| Meissbach, Dale L. |
| Mhoon-Venable, Dennis |
| O'Dell, Brian Lee |
| Paulsmeyer, Owen |
| Remiger, Larry R. |
| Ruffin, Wanda Louise |
| Schroeder, Claus |
| Sturm, Steven |
| Watts, Mike |
| Whitenack, Leann |

LA3:1168019.1

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-216

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

> Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.***;
> ***No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)***

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Dubuque, Iowa co-location, which provides service to Illinois. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Dubuque contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Dubuque-based contractors listed in the attachment to this letter:

1. Dubuque Transition Information;

2. Questions & Answers Regarding the Dubuque Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

     5.    ISP Transition Timeline.

    This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Johnson v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00652-RLM-CAN (IA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. Additional materials will be forthcoming when they are provided to the Dubuque contractors. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

    Thank you for your time and attention.

                  Very truly yours,

                  Matthew P. Eastus
                  for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Blackburn, Darb Michael |
| Federspiel, Daniel |
| Hager, Kevin |
| Kass, Chuck |
| Reeg, Ricky |
| Smith, Jake David |
| Uptegraph, Adam |
| Waller, Drew Daniel |
| Wetter, David |



# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| CENTURY CITY | 400 South Hope Street | TYSONS CORNER |
| IRVINE SPECTRUM | Los Angeles, California 90071-2899 | WASHINGTON, D.C. |
| NEWPORT BEACH | | HONG KONG |
| NEW YORK | TELEPHONE (213) 430-6000 | LONDON |
| SAN FRANCISCO | FACSIMILE (213) 430-6407 | SHANGHAI |
| SILICON VALLEY | INTERNET www.omm.com | TOKYO |

OUR FILE NUMBER
259,075-216

July 15, 2010

**VIA HAND DELIVERY**

WRITER'S DIRECT DIAL
(213) 430-6679

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

> Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.***;
> **No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Hammond, Indiana stations, which provide service to Illinois. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Hammond contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Hammond-based contractors listed in the attachment to this letter:

1. Hammond Transition Information;

2. Questions & Answers Regarding the Hammond Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

     5.     ISP Transition Timeline.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Riewe v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00390-RLM-CAN (IN), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. Additional materials will be forthcoming when they are provided to the Hammond contractors. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

Thank you for your time and attention.

                    Very truly yours,

                    Matthew P. Eastus
                    for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| | |
|---|---|
| Abramson, James | O'Leary, Thomas |
| Abusaad, Tareq | Orr, Rodger |
| Akinsola, Omotayo O. | Perry, Anthony |
| Bandy, William | Pravecek, Allison Renee |
| Chnupa, Karly Marie | Ratajczak, Joe |
| Coffey, David | Reynolds, Scott David |
| Cook, Christopher S. | Rodriguez, David |
| Cooper, James | Ruffin, Danny |
| Dahlberg, Charles E. | Sabo, Jonathan Andrew |
| Ellis, Keith | Schneider, Roger |
| Gill-Wynn, Valencia | Schoon, Jason N. |
| Harley, Donald D. | Skordilis, Antonios |
| Hicks, Robert | St. Martin, Gordon |
| Jazyk, David | Stephen, William |
| Jensen, William O. | Taylor, Charles B. |
| Jones, Kevin Maurice | Thorne, John |
| Knight, Matthew David | Tinman, Jason |
| Leavell, Barry | Vukin, Allen |
| Martinez, Ignacio | Washington, Jason |
| McDonald, James D. | Young, Ricardo Dennis Alan |
| Mierzejewski, Ireneusz | |

LA3:1168015.1

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-216

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.***;
**No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Milwaukee, Wisconsin stations, with regard to contractors who provide service to Illinois. As part of that announcement, FedEx Ground is offering an ISP transition incentive to some Milwaukee contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Milwaukee-based contractors listed in the attachment to this letter:

  1.  Milwaukee Transition Information;

  2.  Questions & Answers Regarding the Milwaukee Transition;

  3.  Sample Contractor Limited Release and Operating Agreement Modification

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq. July 15, 2010 - Page 2

      4.     DVD from FedEx Ground Executive Vice President and COO Michael
               Mannion, concerning the announcement;

      5.     ISP Transition Timeline.

     This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys., Inc.*, Civil No. 1:07-CV-10876-RLM-CAN (MA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Larson v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00601-RLM-CAN (WI), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. Additional materials will be forthcoming when they are provided to the Milwaukee contractors. The foregoing is without prejudice to FedEx Ground's rights and defenses. Please call me if you have any questions.

     Thank you for your time and attention.

                        Very truly yours,

                        Matthew P. Eastus
                        for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 – Page 3

| Birkett, Mark |
| Dawicki, Donna Eileen |
| Dawicki, Michael |
| DeWitt, Daniel Keith |
| Forbes, Chad William |
| Mastilovic, Predrag |
| Meomartino, James |
| Park, Thomas Charles |
| Stenberg, Robert James |
| Torruella, Anthony Osvaldo |
| Woods, William |
| Yang, Mong Teng |

LA3:1168022.1

# Illinois
# ISP Transition Guide

Illinois

2



Due to the Legal and Regulatory environment in the State of Illinois, FedEx Ground is announcing today the transition to the Independent Service Provider (ISP) Model in Illinois. This change applies to all P&D contractors domiciled in Illinois, all P&D contractors domiciled in the Dubuque, Iowa co-location, all P&D contractors domiciled in the Hammond, Indiana Ground and Home Delivery stations as well as those P&D contractors domiciled in the St. Louis, Missouri Ground and Home Delivery stations that provide service in Illinois, and P&D contractors domiciled in the Milwaukee Ground and Home Delivery stations whose PSAs will be moving to the new North Chicago station in Grayslake, Illinois. Linehaul contractors are not affected.

This transition in Illinois is a necessary step in meeting the needs of regulators, contractors, our customers, and the Company. Most importantly, it will ensure that P&D contractors will continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

This announcement to transition to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. Also, the 180-day contract extension previously offered to contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 remains available.

Although the incentive and incorporation timelines associated with the May 20 announcement no longer apply, all affected contractors will receive the $750 early adoption incentive. This $750 payment is a good-will gesture on the part of the company and will be paid to all affected contractors, regardless of whether they incorporate or pursue ISP candidacy. As linehaul contractors are not affected by this ISP transition, the May 20, 2010 announcement still applies to them.

The transition to the ISP Model will involve important decisions and actions on the part of all affected P&D contractors. To facilitate the transition, FedEx Ground is offering eligible contractors various options, ample time to consider them and financial incentives, which are discussed in the attached Transition Guide and will be further explained in additional communications.

The senior manager of your station will review all the pertinent details of the transition and ensure you receive the information you need throughout this process to make the best decisions for you and your business. I encourage you to thoroughly review the contents of the attached ISP Transition Guide with your legal and/or business advisors and to keep it on hand throughout the transition as a ready resource.

I am confident this is the most prudent course of action for our operations in Illinois. Many contractors have already successfully transitioned their businesses to the ISP Model in New Hampshire and Maryland. Based on our experiences in these two states, I believe the transition to the ISP Model in Illinois will be equally successful.

We look forward to working with each contractor throughout this transition. There will be much more communication and opportunity for discussion as we begin to navigate this change together.

Scott Ray
Senior Vice President Station Operations

Illinois

## What is the ISP Model?

The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent businesses that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs). In these states, FedEx Ground and ISPs enter into ISP Agreements, rather than the current Operating Agreement ("OA").

Under an ISP Agreement, ISPs agree to provide service within typically larger geographic service areas called Contracted Service Areas (CSAs). ISPs manage all aspects of the pick-up and delivery of packages within a CSA.

Under the ISP Model, ISPs negotiate a range of financial and non-financial terms on a multi-year basis according to the unique needs of the business and CSA. For example, ISPs have the ability to negotiate a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase.

The ISP Model is appealing to entrepreneurs wanting to focus on the management and administrative responsibilities of running a sizable pick-up and delivery company, and wanting to oversee significant business responsibilities that may lead to profitable growth opportunities.

### FedEx Ground Independent Service Provider Responsibilities

Under an ISP Agreement, an ISP agrees to provide pick-up and delivery services through its employees. ISPs have the flexibility to conduct business operations and make all decisions related to vehicles, service areas, staffing and scheduling. These include the following:

**Vehicles**
- Choosing vehicles that best fit an ISP's unique operations, with FedEx Ground only establishing minimum standards for vehicles
- Incurring the costs of operating vehicles, including maintenance, repairs, fuel, tolls, taxes, registration fees and licenses
- Complying with the U.S. Department of Transportation (DOT) requirements for ISP employee-drivers since ISPs operate under FedEx Ground's DOT operating authority

**Contracted Service Areas (CSA)**
- Negotiating terms for the CSA, which provides the ISP with exclusive service rights
- Deciding how best to provide service over the CSA

**Staffing**
- Managing a team of ISP employee-drivers and potentially other workers (such as a Key Contact or helper) to perform the work
- Assigning work and determining when and on what terms it will be completed
- Recruiting and training staff
- Determining compensation and benefits for employees
- Complying with all state and federal employment laws

**Scheduling**
- Establishing work, leave and vacation schedules for all ISP employees

Illinois

5

**Business Operations**
- Deciding whether to expand the business by acquiring additional CSAs
- Incorporating (and not operating in some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), or similar entity), unless already incorporated
- Registering as a corporation in good standing and as an employer in the states in which the ISP does business. Note: If a contractor has previously incorporated, then that corporate entity likely has already registered in at least one state, but proof of current registration and good standing will nevertheless need to be shown. Contractors should consult their own legal, financial or tax advisors to determine if they need to be registered in any additional states.

## ISP Agreement

Central to the ISP Model is an ISP Agreement, which is a legally-binding contract by which ISP Candidates (businesses seeking to enter into an ISP Agreement) have the opportunity to define their unique business relationship with FedEx Ground. An ISP Agreement outlines the service-level results and regulatory compliance requirements that ISPs have agreed to meet during the Negotiations Process for the term of an ISP Agreement. In the coming weeks, illustrative ISP Agreements will be distributed to all Independent Contractors impacted by the transition to the ISP model in the state of Illinois.

The following represents a list of some, though not all, of the financial and non-financial terms and elections that may be negotiated in an ISP Agreement:

**Key Financial Terms**
- **Annual Service Charge** – A fixed charge paid weekly to an ISP for providing service to FedEx Ground
- **Stop Charge** — A charge paid to an ISP for each stop to a customer location where a package is picked up or delivered
- **Per Stop Fuel Surcharge** — A surcharge, indexed to the price of fuel, paid for each daily stop where a package is picked up or delivered
- **Surge Stop Charge** – A charge paid for any stop above the negotiated "Daily Stop Threshold"
- **Package Charge** — A charge paid to an ISP for each package that is picked up or delivered when an ISP makes a stop
- **Period Safety Incentive** — An incentive paid to an ISP following a 4-week Safety Period. The payment amount is based on a ratio of the number of preventable accidents during the Safety Period and the total number of vehicles the ISP utilizes during that period. If a preventable accident is recorded during a period, the incentive payment for the involved vehicle for that period, plus the next two periods (for a total of 3 periods), is affected
- **New Account Start-Up** ('Meet-and-Greet') — A fee paid to an ISP for an initial visit to a new customer that has been arranged by FedEx Ground
- **Spotted Trailer Charges** — A charge paid to an ISP for providing "Spotted Trailer" service at a customer's request

**Key Non-Financial Terms**
- **Length of Agreement** — The length of an ISP Agreement typically will be between three to five years, but an ISP Candidate may propose a shorter or longer term for its ISP Agreement
- **Expiration Date** — The end date of an ISP Agreement, as determined by the negotiated length of term
- **Number of Load Positions by Year** — A fixed number of dedicated load positions that will be available each year in the ISP's associated station
- **Daily Stop Threshold** — The number of combined pick-up and delivery stops, above which the Surge Stop Charge is triggered and the ISP is able to invoke the Right to Decline

**Elections**
- **Customer Service Incentive** – A negotiable incentive paid to an ISP. The final amount of the payment is based on the ISPs customer service record during the 4-week reporting period
- **Periodic Maintenance Schedule** — ISP Candidates may elect to use the manufacturers' Periodic Maintenance Schedule or elect an alternative Periodic Maintenance Schedule
- **Facilitated Insurance Coverage** — ISP Candidates may elect to have FedEx Ground facilitate the procurement of required insurance for the ISP
- **Brand Promotion Programs** — A fee paid by FedEx Ground if an ISP elects to have its ISP employee-drivers or employee-helpers wear FedEx Ground-approved uniforms and/or have some or all of its vehicles display FedEx Ground approved logos; the fee is paid weekly by FedEx Ground to the ISP

- **Arbitration** — An ISP can elect binding arbitration of disputes with FedEx Ground, if any, as detailed in an ISP Agreement

## ISP Agreement Negotiations

The ISP Agreement Negotiations Process provides each ISP Candidate the opportunity to negotiate an ISP Agreement with FedEx Ground for a specific CSA.

During negotiations, ISP Candidates have the ability to define their unique business relationship with FedEx Ground. Depending on the ISP Candidate's business needs and desires, an ISP Candidate may choose to pursue an agreement with a higher contract fee to achieve a higher percentage of fixed income. Alternatively, an ISP Candidate may want to pursue higher package or stop rates to increase variable income potential if volumes increase. Individualized negotiations will allow each ISP Candidate to pursue an agreement that is best suited for its business.

ISP Agreement negotiations are conducted electronically, and by phone, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals.

## What is Different About the ISP Model?

The ISP Model will bring fundamental changes to the manner in which FedEx Ground operates in the state. There will be changes made to the definition of service areas, the structure of the working relationship between FedEx Ground and independent business owners, and the manner in which contractual agreements are reached with independent businesses to provide pick-up and delivery services.

The following provides an overview of these changes and a preview of the decisions contractors must make during the transition.

## The ISP – FedEx Ground Relationship

Under the ISP Model, FedEx Ground will contract through a negotiated ISP Agreement with only larger businesses that operate as corporations and not some other form of business, such as a LLP, LLC, or similar entity.

Once the ISP Model is in place, FedEx Ground generally will limit its dealings to the individual selected by an ISP to represent the ISP, known as the "ISP Key Contact." The ISP Key Contact alone will deal with FedEx Ground and receive all written and verbal communication from FedEx Ground, except in limited circumstances. The ISP Key Contact then deals with ISP employees, including drivers and helpers, as the ISP Key Contact deems appropriate.

## Contracted Service Areas

A significant change under the ISP Model is the elimination of traditional PSAs in favor of larger geographic service areas – or CSAs. A CSA may comprise any combination of at least three Ground and/or Home Delivery PSAs in a single station. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location. While a CSA may include non-contiguous (non-adjoining) work areas, a higher level of operational efficiency will likely be achieved through contiguous work areas.

Case 3:05-md-00527-RLM - CAN document 2080 filed 07/19/10 page 8 of 39


**Existing Operating Model
of a Contractor's Separate PSAs**


**Independent Service Provider
Model of an CSA**

CSAs will be defined as the combination of the PSAs operated by the ISP Candidate at the time negotiations begin. FedEx Ground PSAs are defined by Addendum 4 of the Ground OA and FedEx Home Delivery PSAs are defined by the proprietary ZIP Code listed in Addendum 4 of the Home Delivery OA. FedEx Ground will work with Home Delivery contractors to allocate non-proprietary areas based on data in the Home Delivery Vehicle Route Planning (VRP) PC. The ISP Agreement Addendum 4 will list entire ZIP Codes that are completely within a single CSA, as well as details of street address ranges where a ZIP Code is split among multiple CSAs.

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. FedEx Ground may seek multiple bids for the same CSA only in the event that the ISP Candidate's and FedEx Ground's negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

Once a negotiated ISP Agreement is signed, an ISP may trade or sell portions of its CSA, such as ZIP Codes, for the remaining term of the ISP Agreement, subject to the terms of the ISP Agreement.A dditional negotiations may occur during the term of an ISP Agreement based on mutual agreement between FedEx Ground and the ISP. Changes to the CSA are one of the limited scenarios under which negotiations may occur. Modifications to a CSA will be documented on a schedule in an ISP Agreement. As an alternative, two ISPs can informally agree to sub-contract P&D work in the respective CSAs. However, the ISP that originally contracted for the P&D work will ultimately remain responsible for that work.

<u>Notable Provisions of an ISP Agreement</u>

There are many provisions that are different from the existing OA. Some of the notable provisions as follows:

**Right to Decline** – The contractual right to decline certain requests, such as delayed-sort packages, pick-ups after 6:30 P.M. and stops above the negotiated Daily Stop Threshold.

**Service** – ISPs will maintain service levels agreed to in an ISP Agreement such as: service days, pick-up and delivery services, collection and return of COD charges; service results (meet customer expectations, achieve inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher, avoid theft, loss, damage and delays, and conduct all business with honesty and integrity).

**Flexing** – FedEx Ground will not offer company-coordinated flexing, meaning ISPs will need to ensure resources are in place to handle surges and variances in daily package volumes (such as Peak), whether by sub-contracting with other ISPs or by other means.

<u>Other Notable Provisions</u>

**Vehicles** – An ISP Agreement will require only that ISP vehicles meet government requirements, be white, have a height that is flush with conveyor walkways in the station, be of a size that allows for the station doors to close and maneuverability in the station.

Illinois                                                                                                                                            8

**Service Account** – An ISP Agreement will not include a service account. Contractors will be paid the balance of their service accounts when the current OA expires or is terminated by agreement.

**Escrow** – An ISP Agreement will not provide for an Escrow Program. Contractors will be paid the balance of their Escrow Accounts when the current OA expires or is terminated by agreement.

**Business Support Package** – FedEx Ground will not offer a Business Support Package in an ISP Agreement. ISPs will be able to seek business support services from any provider they choose.

**Scanners** – Scanners may be leased from FedEx Ground or purchased from an outside provider.

**Additional details can be found in the Illustrative ISP Agreements which will be distributed in the coming weeks.**

<u>Illustrative Examples</u>

Given the range of negotiable features contained in an ISP Agreement, and the differences from the existing OA, FedEx Ground is providing illustrative examples of the components of an ISP Agreement. The chart below sets forth **hypothetical** scenarios illustrating the significant flexibility ISP Candidates have in negotiating an ISP Agreement. For example, many revenue components are negotiable. The chart provided illustrates hypothetical revenue scenarios different ISP Candidates might negotiate in an ISP Agreement, such as Stop Charge, Package Charge and Surge Stop Charge.

In these hypothetical scenarios, some ISP Candidates elect to participate in the Optional Brand Promotion Programs, which includes the uniform program for ISP employee-drivers or employee-helpers and the vehicle program for some or all of the ISP's vehicles. In "Scenario 1," the ISP Candidate declines to participate in the Uniform Brand Promotion Program. The illustrative scenarios also reflect how ISP Candidates can negotiate a fee to be paid each time a "Meet-and-Greet" is performed with prospective new customers within the ISP's CSA.

Also, the chart illustrates a hypothetical range of business expenses such as employee wages and benefits, staffing and overtime expectations, vehicle choices and other needs, all of which are determined by the ISP Candidate. Actual costs and potential revenue will depend on how a particular ISP structures and operates its business.

As illustrated by the following chart, the **potential** for greater profit exists depending on an ISP's individualized revenue and cost decisions. The chart sets forth **potential** ranges of revenue, costs and hypothetical earnings that might result based on the characteristics of an ISP's CSA and individualized business decisions.

*The chart is for illustrative purposes only and should not set the terms of negotiation between ISP Candidates and FedEx Ground. The chart does not promise any particular range of outcomes.*

| | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| Daily Route Dynamics | Stops | 255 - 580 | | 450 - 900 | | 560 - 1800 | |
| | Stop-to-Stop Threshold | 400 - 800 | | 500 - 1000 | | 1000 - 2000 | |
| | Package | 750 - 1400 | | 1450 - 2220 | | 1575 - 2600 | |
| Business Resources | Vehicles | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Drivers | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Helpers | 0 | | 0 - 1 | | 0 - 1 | |
| Key ISP Agreement Terms | Annual Service Charge | $23K - $45K | | $35K - $40K | | $94K - $120K | |
| | Stop Charge | $1.24 - $2.85 | | $1.65 - $2.62 | | $1.43 - $2.60 | |
| | Fuel Surcharge | $0.25 - $0.27 | | $0.24 - $0.25 | | $0.11 - $0.15 | |
| | Surge Stop Charge | $0.50 - $1.50 | | $0.49 - $1.48 | | $0.50 - $1.89 | |
| | Package Surcharge | $.05 - $0.15 | | $0.05 - $0.15 | | $0.10 - $0.15 | |
| | Period Safety Incentive | $2330 - $3160 | | $2700 - $2800 | | $3960 - $5250 | |
| | Period Customer Service Incentive | $710 - $1,803 | | $1,156 - $2,798 | | $1,623 - $3,676 | |
| | New Account Start-Up | $8.00 - $10.00 | | $10.00 - $14.00 | | $8.00 - $12.00 | |
| | Uniform Brand Promotion (Weekly) | $0.00 | | $54 - $103 | | $69 - $264 | |
| | Vehicle Brand Promotion Charge (Weekly) | $32 - $56 (All vehicles) | | $32 - $56 (3 to 4 vehicles) | | $32 - $56 (6 to 7 vehicles) | |
| Revenue | Revenue | $280K - $401K | | $462K - $675K | | $628K - $852K | |
| Costs | Employee Expenses (1) Regular | $152K - $213K | | $252K - $349K | | $354K - $465K | |
| | Vehicle (2) | $52K - $69K | | $86K - $103K | | $121K - $138K | |
| | Payroll Taxes (3) | $20K - $29K | | $34K - $48K | | $48K - $64K | |
| | Administration (4) | $6.5K - $8.5K | | $11K - $13K | | $15K - $17K | |
| Hypothetical Pre-Tax Operating Income (5) | | $40K - $61K | | $79K - $162K | | $90K - $169K | |
| Hypothetical Pre-Tax Operating Margin | | 12% - 21% | | 12% - 35% | | 11% - 27% | |

1) These costs could include payroll expenses and similar employee expenses such as wages, healthcare benefits, paid sick leave and vacation.
2) These costs could include vehicle purchase or lease payments, maintenance, insurance, and fuel, and will vary based on, for example, the number and types of vehicles ISPs choose to operate.
3) Includes workers compensation, unemployment insurance and self-employment tax. These costs represent a national average and are not specific to any state. These costs do not include personal income tax.
4) These costs could include other administrative expenses associated with running a business, for example, recruiting, training and bookkeeping costs.
5) In scenarios 2 and 3, the ISP elected to include some, but not all vehicles in the Optional Brand Promotion Program.
6) Prior to the ISP's corporate or personal income tax.

## Contractor Options

Contractors affected by this transition have several options to choose from before November 19, 2010.

### 1. Pursue an ISP Agreement

Pursuing an ISP Agreement is an important decision that may require an investment, such as buying the necessary PSA(s) to achieve "scale," no later than November 19, 2010. If a contractor pursuing an ISP Agreement fails to do so by that date, the OA will expire according to its terms. There are additional deadlines that also must be completed by November 19, 2010, such as incorporating the business, and not some other form of business, such as a LLP, LLC, or other similar entity, and establishing an Entity Profile on *MyGroundBizAccount*. If an ISP Candidate does not complete these two steps before November 19, 2010, FedEx Ground and the Candidate may still negotiate an ISP Agreement, although FedEx Ground may also consider negotiations with alternative candidates as well.

ISP Candidates are entrepreneurial and understand the risk/reward of investing time and resources to position the business for the future. These candidates see the benefits of focusing on managing and growing the business. Pursuing an ISP Agreement should appeal to those eager to take advantage of the opportunity to operate businesses more efficiently utilizing economies-of-scale, which could lead to higher earnings.

**Steps to take:**

- Decide whether to sign and return the Contractor Limited Release and Operating Agreement Modification no later than August 27, 2010 (signing this document is not required, but doing so makes contractors eligible to receive the transition incentive).
- Incorporate the business no later than November 19, 2010.*
- Establish an Entity Profile on *MyGroundBiz Account* no later than November 19, 2010.*
- Operate a minimum of three PSAs in the same station no later than November 19, 2010.*

\* These steps can be initiated immediately

**Special Note for Certain P&D Contractors in Carol Stream Ground and Home Delivery, Wheeling Ground, Northbrook Home Delivery and Milwaukee, WI Ground and Home Delivery stations:** In August of 2011, the North Chicago co-location is scheduled to open in Grayslake, Illinois. Certain areas of PSAs from the six stations listed above will be moving to this new station. With the exception of Milwaukee, WI Ground and Home Delivery stations, contractors that are interested in pursuing an ISP Agreement must be at scale in either North Chicago or their current station as it will look after the spin-off by November 19, 2010. For Milwaukee, WI Ground and Home Delivery stations, contractors that are interested in pursing an ISP Agreement must be at scale with PSAs moving to North Chicago by November 19, 2010 and PSAs that remain in Milwaukee, WI Ground and Home Delivery stations will not count towards scale.

Details on the specific areas that will be staying in their current station and those that will be moving to the North Chicago station will be communicated as soon as possible.

### Additional Circumstances:

**P&D Tractor Contractors** (P&D tractor contractors are eligible for the transition incentive and growth incentives for acquiring eligible P&D routes and vehicles. P&D tractor contractors are not eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three non-P&D tractor PSAs in the same station no later than November 19, 2010 and operate the P&D tractor under an ISP Agreement, or
- Convert current OA to a Linehaul Agreement no later than November 19, 2010. P&D tractor contractors choosing this option are eligible for the transition incentive if they sign and submit a Contractor Limited Release and Operating Agreement Modification by August 27, 2010.

**Swing Contractors** (Swing contractors are eligible for the transition incentive and growth incentives for acquiring eligible non-swing P&D routes and vehicles; full-time swing contractors are eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three non-swing PSAs in the same station no later than November 19, 2010. Note: Swing work areas do not count toward the three PSA minimum and a contract for these swing work areas will expire on its termination date.

*The Time-off Program ends on November 19, 2010. All swing PSAs in Illinois go inactive on November 19, 2010.*

\* Stations include all stations currently domiciled in the state of Illinois, Hammond, St. Louis, Dubuque, as well as the future North Chicago station in Grayslake

## 2. Seek Employment with an ISP

Being an employee of an ISP means all terms of employment, including hours, compensation and benefits, must be worked out with the ISP. Discussions regarding employment terms are solely between ISPs and contractors seeking to become employees. FedEx Ground will not participate or intervene in employment discussions and will not set compensation or benefit terms that ISPs are required to meet. Employee-drivers and employee-helpers of an ISP will not have a direct relationship with FedEx Ground. Aside from casual interactions at the station, these employees will need to direct all questions and concerns to their employers.

Becoming an employee-driver for an ISP should appeal to those who enjoy driving a delivery vehicle and personally performing package pick-up and delivery services rather than the responsibilities of running a larger business.

**Steps to take:**

- Decide whether to sign and return the optional Contractor Limited Release and Operating Agreement Modification no later than August 27, 2010.
- Sell or transfer PSA(s) no later than the Operating Agreement's expiration date.
- If the contractor has signed the Contractor Limited Release and Operating Agreement Modification, the Supplemental Limited Release of Claims will need to be signed and submitted on or after the effective date of termination of the current Operating Agreement in order to receive the remaining $5,000 payment of the transition incentive.

## 3. Exit the network

Contractors not interested in pursuing an ISP Agreement or seeking employment with ISPs may choose to exit the network and pursue other opportunities. Contractors wishing to leave the network may sell their PSA(s) or simply continue to provide service under their OAs until the agreements expire (all OAs were non-renewed on May 20, 2010, and remain non-renewed).

**Special Note:** By signing and returning the Contractor Limited Release and Operating Agreement Modification, contractors agree that the current Operating Agreement will expire on November 19, 2010. If contractors choose not to sign the Contractor Limited Release and Operating Agreement Modification, the termination date of the current Operating Agreement will serve as the expiration date, absent an extension.

## Contractor Incentives

FedEx Ground is offering several financial incentives to assist eligible contractors that are affected by the transition to the ISP Model in Illinois.

## Transition Incentive

In addition to growth and vehicle incentives detailed below, FedEx Ground is offering a transition incentive of $10,000 to affected P&D contractors as of July 8, 2010 that elect to sign a Contractor Limited Release and Operating Modification Agreement, which includes a limited release of claims involving the transition and an agreement to terminate the existing OAs by November 19, 2010. See the Sample Contractor Limited Release and Operating Agreement Modification in this guide.

Payment of the transition incentive will be issued in two installments as follows:

<u>Initial $5,000 Transition Payment:</u>

Eligible P&D contractors that are active as of July 8, 2010 and request the transition incentive, are eligible to receive $5,000 of the payment within 15 business days of submitting to station management a signed Contractor Limited Release and Operating Agreement Modification, which includes a limited release and agreement to end the current Operating Agreement no later than November 19, 2010 (absent a further written contract extension).

<u>A signed agreement must be submitted from the date the Contractor Limited Release and Operating Agreement Modification is distributed to August 27, 2010 to receive this transition incentive.</u>

<u>Remaining $5,000 Transition Payment:</u>

After receiving initial payment:

- P&D contractors that sell/transfer all PSAs in Illinois by November 19, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

- P&D contractors that are operating three or more PSAs in the same station as of November 19, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs. (Note that for ISP Candidates successfully negotiating an ISP Agreement, the OAs will not terminate until the effective date of the ISP Agreement.)

- P&D contractors continuing to operate fewer than three PSAs in the same station as of November 19, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

Independent contractors that do not submit the limited release by August 27, 2010 will not receive the transition incentive. These contractors have all of the same options available as do contractors that have signed the limited release and received the transition incentive.

<u>Important Legal Note</u>

In exchange for the transition incentive, FedEx Ground is asking P&D contractors affected by this announcement for a release of certain potential claims related to this transition. Sample release documents are contained in this ISP Model Transition Guide. Actual release documents can be obtained from station management in the upcoming weeks. The release is not intended to settle all claims a contractor may have against FedEx Ground. The release is limited to potential claims concerning FedEx Ground's announcement of this transition, the termination, non-renewal or assignment of the current OA, and any sale, assignment, loss or other disposition of PSA(s). FedEx Ground cannot advise contractors on individual circumstances.

Pending lawsuits include *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys. Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys., Inc*, Civil No. 1:07-CV-10876-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Fluegel/Griffin v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00529-RLM-CAN (IL), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.).

<u>Contractors are not obligated to sign the release of claims documents.</u>  Deciding whether to sign these documents is completely up to each contractor.  If a contractor chooses to accept the transition incentive, a signed agreement and limited release needs to be submitted no later than August 27, 2010. If a contractor chooses not to sign the agreement and limited release, the contractor will not receive the transition incentive and will have the same options available to those contractors that have signed the agreement and limited release:

- Continue operating under the current agreement (which will not be renewed) until the date of its expiration;
- Sell or transfer PSAs to other contractors; or
- Operate at least three PSAs in an affected station by November 19, 2010 to become an ISP Candidate. Affected stations include all stations currently domiciled in the state of Illinois, Hammond, St. Louis, Dubuque, as well as the future North Chicago station in Grayslake.

## Contract Renewals and Extensions

All OAs remain non-renewed as a result of the May 20, 2010 Incorporation and Compliance Disclosure announcement. As indicated in the May 20, 2010 announcement, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to November 19, 2010 regardless of any prior extension.

## Growth Incentives

In addition to the transition incentive available to all affected P&D contractors, growth incentives of up to $100,000 are available to those choosing to grow the business by acquiring eligible PSAs and vehicles between announcement day and November 19, 2010, for total potential incentives of $110,000, depending on station-specific contractor volume guidelines.

Eligible PSAs are Ground or Home Delivery P&D routes servicing Illinois or domiciled in Illinois currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of July 8, 2010. For Milwaukee Ground and HD, eligible PSAs are Ground or Home Delivery P&D routes that will be moving to the North Chicago station and that are currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of July 8, 2010. PSAs transferred or sold by P&D contractors operating three or more PSAs are not eligible for growth incentives. For this transition, the size of active contractors is determined as of July 8, 2010.

Contractors acquiring eligible PSAs in the same station can receive up to $100,000 in potential growth incentives, subject to station contractor size guidelines. Growth incentives do not apply unless the PSA that is acquired gets the contractor to at least minimum scale (three PSAs in the same station); contractors that are already at or above scale are eligible to receive growth incentives for acquiring up to five eligible PSAs.

* For Contractors impacted by the opening of the North Chicago station (with the exception of Milwaukee Ground and HD stations), growth incentives will be calculated based on the number of PSAs acquired in either the current station or the future North Chicago station. For Milwaukee Ground and HD stations, growth incentives will be calculated based on the number of PSAs acquired that will be moving to the future North Chicago station only.

Each growth incentive will be reduced by $5,000 if a vehicle for that PSA is not acquired by the purchasing contractor from the selling contractor.

The following is an illustration of how the growth incentives would be calculated:

- $10,000 growth incentive for acquiring the first Ground or Home Delivery PSA and vehicle that results in achieving minimum scale; plus
- $15,000 for the second PSA and vehicle; plus
- $20,000 for the third PSA and vehicle; plus
- $25,000 for the fourth PSA and vehicle; plus
- $30,000 for the fifth PSA and vehicle.

Illinois                                                                                                14

These growth incentives are **available to existing FedEx Ground contractors** that acquire eligible routes and vehicles in the same station (a Ground station, Home Delivery station or co-location) by November 19, 2010. Note that a contractor's status for the growth incentives is based on the number of **PSAs operated within the same station and is subject to station contractor size guidelines**. For example, if a contractor operates two PSAs in the McCook Ground station, growth incentives will be available only for eligible routes acquired in the McCook Ground station. **Supplemental, swing and P&D tractor PSAs are not eligible for growth incentives and will not be counted toward the 3-PSA minimum needed to be eligible for ISP Agreement Negotiations**.

*Station is any Ground, Home Delivery or co-location station currently domiciled in the state of Illinois, Hammond, St. Louis, Dubuque, as well as the future North Chicago station in Grayslake

As the chart below illustrates, a variety of options are available if choosing to acquire eligible PSAs in the same station. For example:

- A single work area contractor in Illinois would receive $10,000 in growth incentives for acquiring its second eligible route (that results in achieving minimum scale) and vehicle in the same station, plus the additional $10,000 transition incentive – totaling $20,000.

- A contractor with three PSAs would receive $10,000 in growth incentives if acquiring one more eligible PSA and vehicle in the same station. With the $10,000 transition incentive, incentives would total $20,000.

- A contractor with two PSAs in a Illinois station would receive $45,000 in growth incentives if acquiring three more eligible PSAs and vehicles in that same station. With the $10,000 transition incentive, this would provide the contractor with $55,000.

Illinois

| Contractor Status as of July 8, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SWA | MWA-2 | MWA-3 | MWA-4 | MWA-5 | MWA-6 | MWA-7 | MWA-8 |
| Total growth incentive for acquiring one (1) eligible PSA and vehicle | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Total growth incentive for acquiring two (2) eligible PSAs and vehicles | $10,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Total growth incentive for acquiring three (3) eligible PSAs and vehicles | $25,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 |
| Total growth incentive for acquiring four (4) eligible PSAs and vehicles | $45,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 |
| Total growth incentive for acquiring five (5) eligible PSAs and vehicles | $70,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring six (6) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring seven (7) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Available Growth Incentives | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Transition Incentive | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Maximum Available Incentives | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 |

Note: Growth incentives shown here, which are subject to station contractor size guidelines, are contingent on the purchasing contractor's acquisition of the vehicle associated with the acquired PSA. Without such vehicle acquisition, each growth incentive is $5,000 less per PSA than shown above.

Contractors acquiring eligible PSAs will be notified by station management of the amount of the growth incentive(s). **Payment of the growth incentive(s) will be made within 15 business days of completion of the PSA acquisition in CDAS. All acquisitions of eligible PSAs and vehicles must be completed and approved no later than November 19, 2010 to receive growth incentives.**

<u>Vehicle Incentive Program</u>

SWA or MWA-2 contractors that are not pursuing an ISP Agreement and that do not sell or transfer vehicle(s) along with the PSA(s), to the acquiring contractor, may be eligible for a vehicle incentive up to $5,000. This amount applies to only one delivery vehicle per PSA, and applies only if the vehicle is not acquired by the contractor that purchases the associated PSA and if it is disposed of through a FedEx Ground designated third-party vendor.

Full-time swing contractors in Illinois not pursuing an ISP Agreement may also be eligible for a vehicle incentive of up to $5,000. This payment will cover one delivery vehicle currently operated by the full-time swing contractor.

The amount of the vehicle incentive, up to $5,000, is determined by the excess, if any, of the contractor's remaining balance due on the vehicle as determined by the lease holder or lender over the vehicle's fair market value. Fair market value will be determined by the designated third party vendor.

The vehicle incentive applies to those vehicles that are either owned or leased by a FedEx Ground or Home Delivery SWA, MWA-2 or full-time swing contractor in Illinois for use in the contractor's applicable PSA(s). **To be eligible for this incentive, contractors must sell or transfer their PSA(s) by November 19, 2010. Contractors may elect to retain or dispose of the vehicles in any manner the contractors choose, though these contractors will then not be eligible for the vehicle incentive.**

Contact information for the third party vendor will be provided by station management.

## Incorporation and Compliance Disclosure Requirement and the ISP Model Announcement

This announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and legal compliance. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines established within this ISP Transition Guide apply, and not those associated with the Incorporation and Compliance Disclosure Announcement.

**Contractors should note that all non-renewals and extensions associated with the Incorporation and Compliance Disclosure announcement on May 20, 2010 remain in effect.** Contractors that sign the Contractor Limited Release and Operating Agreement Modification agree to a new expiration date of November 19, 2010. For contractors that do not sign the limited release, the current expiration date remains unchanged. Contractors with expiration dates between July 1, 2010 and December 31, 2010 that do not sign the limited release are eligible to receive a 180-day extension.

Additionally, although affected P&D contractors are technically no longer eligible to receive the early adoption incentives described in the May 20 Incorporation and Compliance Disclosure Announcement, FedEx Ground has decided, as a good will gesture, to pay all affected P&D contractors the $750, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More information will be available in the coming weeks.

## Transition Timelines by Wave

Every contractor affected by this announcement will have the same amount of time to decide whether to sign the Contractor Limited Release and Operating Agreement Modification and choose which contractor option to pursue. However, in order to facilitate a smooth transition to the ISP Model in Illinois, FedEx Ground is implementing station-specific dates for the Negotiations Process which will be grouped in 2 waves.

Stations in Wave 1 include: Chicago Home Delivery, McCook Ground, Rockford co-location, Rock Island co-location, Peoria co-location, and Effingham co-location

Stations in Wave 2 include: Carol Stream Ground and Home Delivery, Wheeling Ground, Northbrook Home Delivery, Champaign co-location, Quincy co-location, Springfield co-location, Marion co-location, and North Chicago

See the charts below for additional details on the dates that affect your station.

### Wave 1

| July 2010 – April 2011 | April 2011 – July 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | April 22, 2011 – First proposal due |
| August 27, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due | June 17, 2011 – ISP Agreement negotiations end |
| November 19, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | July 2, 2011 – ISP Agreements go into effect |
| November 19, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount, and achieved "scale" | |
| March 11, 2011 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s), and submit the Initial Compliance Disclosure Form | |
| April 8, 2011 – Date by which CSA definition is finalized and RFI Response submitted | |

Illinois

## Wave 2

| July 2010 – May 2011 | May 2011 – August 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | May 28, 2011 – First proposal due |
| | July 23, 2011 – ISP Agreement negotiations end |
| August 27, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due | August 7, 2011 – ISP Agreements go into effect |
| November 19, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | |
| November 19, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on *MyGroundBizAccount*, and achieved "scale" | |
| March 11, 2011 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s), and submit the Initial Compliance Disclosure Form | |
| May 14, 2011 – Date by which CSA definition is finalized and RFI Response submitted | |

## Contract Extensions

An extension to the station-specific date of when an ISP Agreement goes into effect (see charts above) is available to any affected contractor that is operating three or more PSAs in the same station by November 19, 2010.

* Station is any Ground, Home Delivery or co-location station currently domiciled in the state of Illinois, Hammond, St. Louis, Dubuque, as well as the future North Chicago station in Grayslake

## Request for Information Process

The FedEx Ground Request for Information (RFI) Process helps the company assess whether an ISP Candidate has the ability to fulfill the obligations of an ISP Agreement. In order to begin the RFI Process, an ISP Candidate must be a corporation and not some other form of business, such as a LLP, LLC, or similar entity, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale by November 19, 2010.

In order to give ISP Candidates the opportunity to get through the transition in sufficient time to protect against service disruptions, an ISP needs to register with the state(s) in which it does business and be in good standing with those state(s) by March 11, 2011. Contractors will need to finalize the definition of their CSA and submit a Response to FedEx Ground's RFI by the station-specific deadline. If these steps are not completed by the associated deadline, an ISP Candidate may still be eligible to submit a Response to FedEx Ground's RFI and possibly advance to negotiations. However, FedEx Ground may negotiate with alternate candidates as well for the CSA.

FedEx Ground will evaluate the RFI Response based on the areas listed here:

- Business Experience
  - Including references and relevant experience in the transportation industry
- Financial Viability
  - Such as bank references and annual sales
- Customer Service Approach
  - Plans for meeting customer needs and address customer concerns
- Driver Recruitment and Retention
  - Goals for recruiting employees, historical turnover rates

- Skills and Knowledge of the ISP's Workforce
  - Plans for ensuring employee knowledge of FedEx Ground's services
- Safety Commitment and History
  - Injury and accident history, vehicle maintenance plan and history
- Security (Loss and Damage Avoidance)
  - Plans for minimizing package damage and loss, historical damage trends
- Contingency Situations
  - Ability to provide consistent customer service despite volume surge, employee absenteeism and/or equipment failures

An ISP Candidate should provide any additional information it considers important for FedEx Ground to review in evaluating its response. While ISP Candidates can submit an RFI Response on *MyGroundBizAccount*, the response can be submitted in any written format to FedEx Ground.

Once the RFI Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions:

- **Advance to Negotiations**
  Senior Manager determines the ISP Candidate has the ability to fulfill the obligations of the vendor relationship.

- **Clarification/Questions**
  Senior Manager determines further clarification will help determine if the ISP Candidate is capable of fulfilling the vendor relationship.

- **Does Not Advance to Negotiations**
  Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations of the vendor relationship.

After advancing through the RFI Process and onto the Negotiations Process, **certain qualifications must be met before entering into an ISP Agreement**. Some of these administrative tasks will take several weeks to complete and documentation must be in order before an ISP Agreement Signatory is permitted to electronically sign an ISP Agreement. If these tasks are not completed and an agreement cannot be reached, these contractors run the risk of having their OAs expire without an agreement in place.

For a complete list of qualifications, see the Qualification Steps for Pursuing an ISP Agreement section of this Guide.

Drivers and certain other employees of the ISP Candidate will need to pass a criminal background check prior to the effective date of an ISP Agreement. These background checks will be arranged and paid for by FedEx Ground through a third-party vendor.

## Negotiations and Execution Processes

## Negotiations Process

The first step in the Negotiations Process is the preparation and submission of a Proposal to FedEx Ground. The Proposal is an initial offer on the key financial, non-financial, and elective components of an ISP Agreement and any other terms the ISP Candidate wishes to propose. The deadline for submitting the first Proposal is based on which wave an ISP Candidate's station falls. If a Proposal is not submitted by the dates listed above, an ISP Candidate may still be eligible to submit a first proposal and negotiate an ISP Agreement. However, FedEx Ground may consider proposals and negotiate with alternate candidates as well for the CSA. For additional information, see Transition Timeline by Wave section of this Guide.

FedEx Ground and the ISP Negotiator (an officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate) will negotiate an ISP Agreement regarding terms for the proposed CSA. This provides ISP Candidates the flexibility to negotiate contract terms that best fit the particular business needs and unique service area the ISP Candidate is pursuing.

For example, an ISP Agreement may be negotiated with a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase – depending on business needs and desires. ISP Candidates can also choose whether to utilize FedEx Ground logos on all or some of their vehicles, and whether to outfit employees in FedEx Ground uniforms in exchange for negotiated brand promotion fees.

The following represents a list of some, though not all, of the key financial and non-financial terms, as well as elections that may be negotiated.

| Negotiable Financial Terms: | Negotiable Non-Financial Terms: | Elections: |
|---|---|---|
| ~ Annual Service Charge<br>~ Stop Charge<br>~ Fuel Charge<br>~ Surge Stop Charge<br>~ Package Charge<br>~ Period Safety Incentive<br>~ New Account Start-Up ("Meet-and-Greets")<br>~ Spotted Trailer Charges (if applicable)<br>~ Customer Service Incentive | ~ Length of Term<br>~ Expiration Date<br>~ Load Positions by Year<br>~ Daily Stop Threshold | ~ Additional Services<br>~ Periodic Maintenance Schedule<br>~ Facilitated Insurance Coverage<br>~ Brand Promotion Program (Vehicles and Uniforms)<br>~ Arbitration<br>~ Alternative Maintenance Program |

## Proposal Capture & Analysis Tool (PCAT)

The Proposal Capture and Analysis Tool, or PCAT, will be used by FedEx Ground to evaluate Proposals during the Negotiations Process. To facilitate negotiations, this optional tool is available to ISP Candidates for the preparation of the RFI Response and/or a Proposal. The PCAT will be available to ISP Candidates on *MyGroundBizAccount* and can be used to calculate estimated revenues for multiple scenarios based on inputs by the ISP Candidate.

Inputs include variable components such as Per Stop Charge, Fuel Surcharge and forecasted volume, as well as fixed financial components such as Annual Service Charge and the optional Brand Promotion Program.

Historical pick-up and delivery volume data for the proposed CSA, as well as individual PSA historical data and Spot information, will be made available on *MyGroundBizAccount*. This data may help in evaluating future business strategies, though past performance is not necessarily an indicator of future performance or volume. FedEx Ground cannot guarantee that the historical data supplied will be available for a CSA's predecessor PSAs, or that the data is an exact match to the geographic scope of a CSA, since it is a new area.

Using the PCAT is one way to ensure negotiable elements of an ISP Agreement are included in the Proposal that an ISP Candidate submits. However, Proposals may contain additional terms beyond those listed in the PCAT and can be submitted in any written format to FedEx Ground.

## Submitting a Proposal

Once a Proposal is submitted, a Pittsburgh-based, FedEx Ground Negotiator will be assigned and will contact the ISP Candidate to confirm receipt of the Proposal.

Negotiations will be conducted electronically and by phone over the course of several weeks, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals. The parties may submit several offers and counteroffers until an agreement is reached or there is an impasse.

Initially, the ISP Candidate that is currently operating the CSA will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. Furthermore, if certain transition deadlines are not reached, as detailed above, FedEx Ground may seek multiple bids for the same CSA even during the transition to the ISP Model. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

The first offer submitted by an ISP Candidate may not be the final offer. The first counteroffer submitted by FedEx Ground to the ISP Candidate may also not be a final offer. The Negotiator will continue working with the ISP Candidate in this manner until an agreement is reached or an impasse occurs.

| What to Expect: | What Not to Expect: |
|---|---|
| ~ FedEx Ground seeks proposals in line with market values | ~ Negotiator guidance on the "right" answer because there is not just one acceptable approach |
| ~ The need to set aside dedicated time to complete negotiations | ~ Negotiator guidance on volume forecasts |
| ~ Interactive process between ISP Candidates and Negotiators | ~ SRM participation in the process |

**The Negotiations Process will conclude in one of two ways:**

1) If an agreement is reached, the ISP Candidate will be able to review and sign an ISP Agreement

2) If the ISP Candidate and FedEx Ground cannot agree on terms for an ISP Agreement, the process will end, and station management will be notified. If an ISP Candidate has a current OA with FedEx Ground, it will expire according to its terms. It is in FedEx Ground's best interest to consider all of the terms put forward in order to reach an agreement that will meet the ISP Candidate's business needs, while providing the highest level of customer service possible.

## ISP Agreement Execution

Once the terms of an ISP Agreement with FedEx Ground have been reached, a draft of the agreement is available for review. There are additional steps to complete before a final agreement can be signed, electronically, on *MyGroundBizAccount*.

Additional steps will need to be completed prior to the final signing. For a complete list of these steps, see the "Qualification Steps for Pursuing an ISP Agreement" section of this Guide.

Please note: Drivers and certain members of the ISP Candidate's Workforce will need to pass a criminal background check **before** an ISP Agreement effective date; these criminal background checks may take several weeks to complete.

Once the above steps are completed, an ISP Agreement Signatory will be able to print out and review the entire ISP Agreement. If an ISP Agreement Signatory accepts all of the terms as outlined in the ISP Agreement, he/she will need to log on to *MyGroundBizAccount* and digitally sign the agreement via an electronic signature. The final agreement will reside on *MyGroundBizAccount* until it expires. Both the ISP and station management will be able to reference it online.

## Operating as an ISP

While some contractual obligations under an ISP Agreement will remain the same, others will be substantially different.

### Service Results

The following Service Results are detailed in an ISP Agreement:

### Service Days

Service Days remain consistent: Monday through Friday for FedEx Ground; Tuesday through Saturday for Home Delivery. FedEx Ground reserves the right to modify these days should customer demands and/or competitive advantage require changes. The three Saturdays and Mondays immediately preceding Christmas Day are considered Service Days for both FedEx Ground and FedEx Home Delivery.

### Services

Under the terms of an ISP Agreement, ISPs agree to provide a range of pick-up and delivery services to customers, including:

- Collection and loading, if necessary, of packages for delivery in a CSA.

- Transportation of packages from a domiciled station and delivery in a CSA consistent with customer-selected service offerings and subject to the ISP's Right to Decline.

- Timely collection and transmission of customer signatures, scanning results and package tracking data.

- Collection of COD charges and return of COD charges to FedEx Ground at the end of the Service Day.

- Pick-up of customer packages in a CSA and delivery of the packages to a domiciled station in time to meet service commitments, subject to the ISP's Right to Decline.

- Return of undelivered packages to the domiciled station, according to agreed-upon terms by FedEx Ground and the ISP.

- Additional services described and mutually agreed upon in the Additional Services Schedule, which may include services such as administrative support and shuttle loading and/or unloading.

- Preparation of any legally-required documents (driver logs, vehicle inspection reports, etc.) and submission to FedEx Ground at the end of each service day (or for FedEx Home Delivery the next business day, unless otherwise agreed upon by the ISP and FedEx Ground).

### Service Results

Measurements of "Inbound Local Service" performance will be provided electronically to an ISP. These numbers will also be posted at the FedEx Ground station. The following service results are the minimum standard outlined in an ISP Agreement:

- Provide services to the customers that are compatible with customers' schedules, expectations and pick-up and delivery requirements (subject to the ISP's Right to Decline).

- Achieve a daily inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher.

- Provide the "Service Offerings" detailed in Schedule E of an ISP Agreement (commercial deliveries, residential deliveries, alcohol deliveries, attempted deliveries and pick-ups, delivery signatures, driver release and indirect delivery, premium services, and package tracking information).

- Take reasonable measures to avoid theft, loss, damage, destruction, delay in the handling, loading, unloading, transporting and pick-up and delivery of packages in the CSA.

- Conduct all business activities with honesty and integrity and in a safe and professional manner.

### Service Failure

The Senior Manager will monitor Service Results to assess adherence to the terms of the ISP Agreement. The Senior Manager will document any Service Failure by an ISP (those involving Service, Professionalism or Safety) and will schedule an ISP Discussion with the ISP Key Contact to discuss the Service Failure. The ISP will have an opportunity to correct any Service Failure.

If Service Failures continue, the ISP may be in breach of contract with the terms of the ISP Agreement; such a breach may result in termination of the ISP Agreement, depending upon the circumstances.

### Right to Decline & Right to Ensure

Under an ISP Agreement, an ISP has the Right to Decline services in certain situations without impacting service results. In instances when an ISP exercises the Right to Decline, FedEx Ground has the Right to Ensure that customers within a CSA are properly serviced.

The activities that can be declined under an ISP Agreement are contained in the Agreement. Some instances include: stops over 200 packages, pickups scheduled after 6:30 p.m., spotted trailers, customer requests requiring special modifications to equipment, and stops over the negotiated Daily Stop Threshold.

### Subcontracting

ISPs will have the opportunity to subcontract any services within its CSA to other ISPs. In these situations, FedEx Ground will attempt to accommodate any ISP-directed Load Plan changes that are submitted by ISP Key Contacts in advance of implementation.

ISPs that subcontract work to another ISP will remain responsible for maintaining service levels as well as any claims that may arise. However, only the ISP performing the work will receive payment of charges for this activity, and the packages making up this activity will count toward the inbound local service of only the ISP performing the work.

### Peak Planning

ISPs are responsible for planning Peak operations within a CSA. FedEx Ground will offer its best projections of anticipated Peak volume in a given CSA and will work with the ISP to identify the ISP's anticipated service constraints and plan contingency operations.

### Scanner and Vehicle Usage

In co-locations, ISPs will have a choice to use either FedEx Ground or FedEx Home Delivery scanners, depending on the functionality preferred by the ISP. FedEx Ground will also work with ISPs to group an ISP's vehicles together on FedEx Ground docks, even across van lines that were previously dedicated to FedEx Ground or FedEx Home Delivery vehicles. Any operational changes will be discussed between the ISP and FedEx Ground and will be made after mutual agreement.

## Driver Data Collection Process and ISP Data Review

The Driver Data Collection Process and ISP Data Review will replace the existing Check-In Process (including the Revised Daily Settlement Report and the Revised Consolidated Daily Settlement Report, respectively) as summarized below:

### Driver Data Collection Process

This process is similar to the current Check-In Process and occurs when ISP employee-drivers return to the station. The collection of this information (scanner data, paperwork completed by the ISP employee-driver, and P&D activity captured in the FedEx Ground system) will be input by FedEx Ground personnel. Once FedEx Ground has input the data, FedEx Ground will generate an *ISP Driver Data Collection Report* that contains "driver-level pick-up and delivery activity" and will be shared with the ISP employee-driver. The ISP employee-driver will need to review and sign the report, confirming that it is accurate. FedEx Ground management will hold any data discrepancies or service-related issues for the following morning, and these issues will only be addressed with ISP Key Contacts, rather than individually with any ISP employee-drivers.

In the case of FedEx Ground, the information mentioned above should be submitted in the evening of the return to the station, unless otherwise agreed. For FedEx Home Delivery, the information should be submitted on the morning of the return to the station, unless otherwise agreed.

### ISP Data Review

Information submitted, reviewed, and signed by an ISP's employee-drivers will generate an *ISP Data Confirmation Report* which will be reviewed on a regular basis with the ISP Key Contact. This report will contain "CSA-level data" and will be provided only to the ISP Key Contact. It will be used to address any operational or contractual issues that arose on the previous day and will be discussed only with the ISP Key Contact. These meetings can occur as needed, either at the request of FedEx Ground or the ISP, and will optimally be conducted in person after morning dispatch, but they may take place in other formats or times as mutually agreed upon.

The *ISP Data Review* process will be used to cover prior day issues with the ISP, such as: the *ISP Daily Confirmation Report*, P&D Quality Reports, local inbound service, Claims Investigation, Complaints, Branding (if ISP is participating in the Brand Promotion Program) and scanning. The meeting may also be used to address any future ISP requests, such as ISP Load Plan changes and New Pick-up Start-ups, which include ISP-directed vehicle assignment.

The *ISP Data Collection Report*, as mentioned above, contains driver-level data only. It will not contain items such as: non-delivered packages, premium service failures, high profile van scans, uncollected COD monies, and open tracer reports. This information will be contained in the *ISP Data Confirmation Report* and will be sent to ISPs via *MyGroundBizAccount*.

Other daily reports and data will be shared directly with ISP Key Contacts and/or sent electronically to ISPs via *MyGroundBizAccount*.

### ISP Charge Statement

The ISP Charge Statement contains an itemized list of compensation elements that are based on the individual terms agreed to in the ISP Agreement. Examples of terms could include: Package and Stop Charges, Annual Service Charge, Period Safety Incentive, Brand Promotion Program (if elected), Surge Stop Charge and Fuel Surcharge.

Unlike the current settlement statement, the ISP Charge Statement will detail any discrepancies between scanned packages and stops versus summed totals used for ISP Charge purposes. Discrepancies may include hand-sheet totals updated during the Driver Data Collection Process or double stops reversed as part of ISP Charge calculations.

In addition to existing itemized charge backs and deductions (such as physical damage insurance, work accident insurance, workers' compensation insurance, and non-trucking liability), the ISP Charge Statement may also include weekly scanner lease and network access fees (including any additional scanners), claims, equipment registration, fuel tax, expenses and fees, and the current price of fuel within the CSA as indexed weekly by OPIS.

Accessing the ISP Charge Statement is a 100% digital process. Printed statements will not be provided. All related payments will be **made each Friday** (or on the preceding Thursday if Friday is a bank holiday) via Electronic Funds Transfer (EFT) or by check, as the ISP may elect. *MyGroundBizAccount* may be used to view an ISP Charge Statement, which is available in .PDF and/or .CSV formats.

### Availability of Electronic Tools

In addition to offering ISP Charge Statements through *MyGroundBizAccount*, FedEx Ground has developed and is rolling out web-based reports, workforce and fleet management capabilities, CSA operational planning tools and communication methods which will be made available to ISPs.

## Safety Terms & Qualifications

### Contractual Safety Standards

Schedule I, Safe Operating Practices, covers driver and non-driver qualification criteria, background qualification criteria, and the training and safety responsibilities an ISP agrees to assume. A sample Schedule I will be sent out over the next several weeks.

### Period Safety Incentive

FedEx Ground will pay ISPs a negotiated Period Safety Incentive payment for each completed 4-week Safety Period.

The amount of the payment, negotiated in an ISP Agreement, is based on the number of preventable accidents the ISP's employee-drivers are charged with and the number of vehicles the ISP operates during the Safety Period. The incentive will be paid to the ISP two periods, or eight weeks, following the close of the qualifying Safety Period.

### ISP Safety Results

FedEx Ground will provide electronic notification to an ISP if an ISP employee-driver is disqualified. This does not affect an ISP's right to disqualify their employee-drivers. SRMs will be given a monthly report of disqualified drivers.

### Driver Safety Violations

Any driver safety violation will be communicated by the SRM to the ISP, not the ISP employee-driver. As an exception, unsafe behavior on FedEx Ground property may be handled directly with the ISP employee-driver by station management. Any such exception will be subsequently communicated by FedEx Ground to the ISP.

### Controlled Substance Collection & Testing
All ISP employee-drivers need to pass a pre-qualification controlled substance screen to satisfy DOT qualification requirements. ISP employee-drivers are subject to random controlled substance testing.

### Physical / Medical Exam

All ISP employee-drivers must have a current DOT-compliant medical physical examination. When the physical expires (the term of the physical will be determined by the physician), additional exams and the related costs are the responsibility of the ISP.

### Maintenance

An ISP Agreement will set forth ISP maintenance obligations. Pursuant to DOT requirements, production of monthly maintenance records and annual inspections will continue.

## Other Changes

**Vehicle Insurance** – ISPs that choose to use Marsh for vehicle insurance will now be billed by Marsh directly, rather than having premiums deducted by FedEx Ground. ISPs that choose to use Marsh should contact Marsh prior to negotiations to determine if the transition or this change will impact their insurance premiums once they begin operating as ISPs.

**Scanner and Associated Equipment** – ISPs can still lease scanners through FedEx Ground or choose to purchase them from an outside vendor. ISPs that choose to lease scanners through FedEx Ground will now do so through a separate leasing agreement outside of the ISP Agreement. ISPs will receive an invoice for scanner charges.

**Equipment Registration** – Items such as base plates will no longer be deducted by FedEx Ground. ISPs will now be responsible for payments associated with the registration of base plates.

**Fuel Taxes** – FedEx Ground will not report and pay fuel taxes on behalf of ISPs. ISPs are responsible for both of these items. Failure by an ISP to report and pay fuel taxes could lead to contract termination. Additional resources on reporting and paying fuel taxes are available on *MyGroundBiz*.

**Fuel Expenses and Fees** – ISPs are responsible for the cost of all fuel and any other purchases made using a T-Check card. T-Check will bill ISPs directly for all fuel or others changes made utilizing their T-Check cards.

## Rentals & Spares, Van Washing

FedEx Ground will not arrange for third-party vehicles or use of spare vehicles. ISPs will be responsible for washing their vehicles. If desired, ISPs may select a van washing vendor and have the washing performed on FedEx Ground's property. Any van washing vendor may be used, subject to the vendor's agreement to comply, and compliance with, FedEx Ground's insurance and environmental standards.

## Locks

The ISP Agreement does not require the use of high-security locks; however, use of high-security locks will result in diminished liability for claims resulting from vehicle break-ins.

## Brand Promotion Program

Participation in the Uniform and/or Vehicle Brand Promotion is optional. A Uniform Brand Promotion charge and a Vehicle Brand Promotion charge may be negotiated if an ISP Candidate decides to participate in either program. Minimum vehicle specifications for vehicles in the Vehicle Brand Promotion program and vehicles not in the program are posted on *MyGroundBiz*.

Any vehicle may be utilized in non-FedEx Ground related activity as long as any FedEx Ground logos are removed or covered.

## Qualification Steps for Pursuing an ISP Agreement

An ISP Candidate must take several steps to negotiate, enter into and operate under an ISP Agreement. Some are one-time occurrences and some must be completed on an annual basis. Most require several weeks to complete and should be completed well in advance of entering negotiations.

These steps ensure ISP Candidates meet the terms of an ISP Agreement and continue to comply with all state and federal laws and regulations.

- **Incorporate the business, if not incorporated already**
  - While ISP Candidates can begin this process immediately, articles of incorporation must be submitted no later than November 19, 2010 to advance to the RFI Process

- **Establish an Entity Profile on *MyGroundBizAccount***

- o While ISP Candidates can establish an Entity Profile once incorporated, the Entity Profile must be established no later than November 19, 2010 to advance to the RFI Process
- o ISP Candidates will be asked, among other questions, to disclose direct or indirect ownership interest and/or participation in other ISP entities to determine if the ISP Candidate has exceeded station guidelines

- **Register the business in the state(s) in which it does business, if not registered already and be in good standing with those state(s)**
  - o While ISP Candidates can begin this process as soon as the business is incorporated, all ISP Candidates must be registered with the state(s) in which it does business and be in good standing by March 11, 2011

- **Submit Initial Compliance Disclosure Form**
  - o ISP Candidates certify compliance with federal and state independent business reporting and filing laws.
  - o The Initial Compliance Certification Form illustrates the compliance activities performed by the ISP Candidate and must be signed by the ISP Candidate and the ISP Candidate's accountant
  - o While this form can be submitted at any time, the Initial Compliance Disclosure must be completed and submitted by March 11, 2011
  - o ISPs will be contractually obligated to file an Annual Compliance Certification form each succeeding calendar year that an ISP Agreement is in effect

If an ISP Candidate does not complete all four of these steps by the deadlines stated above, FedEx Ground may still negotiate an ISP Agreement with the ISP Candidate. However, FedEx Ground may also consider negotiations with alternative contractors as well.

- **Identify an ISP Agreement Signatory that submits to and passes a criminal background check**
  - o The ISP Agreement Signatory must pass a criminal background check before signing an ISP Agreement. Should that person fail the criminal background check, another ISP Agreement Signatory must be identified and pass the criminal background check before an ISP Agreement can be signed

- **Secure insurance coverage**
  - o ISP Candidates must acquire insurance coverage, including Non-Trucking Liability and Physical Damage (for vehicles included on Schedule B of the ISP Agreement) as well as workers' compensation and work accident insurance (as required by state law and an ISP Agreement)
  - o ISP Candidates may secure insurance coverage from the provider of their choice though FedEx Ground will verify with Marsh that proper insurance has been secured
  - o ISP Candidates must secure coverage prior to an ISP Agreement effective date.

- **Provide a W-9 business tax form**
  - o All ISP Candidates, regardless of whether they were previously incorporated or not, must submit a W-9 business tax form indicating the name of the incorporated entity

- **Establish an Electronic Funds Transfer (EFT) Account (if desired to be paid via EFT)**
  - o If an ISP Candidate has a new corporate name and/or a new EFT account number, an updated authorization agreement for EFTs must be provided to FedEx Ground before an ISP Agreement effective date
  - o ISP Candidates should note this process can take up to three weeks to complete

- **Ensure qualified personnel pass criminal background checks**
  - o ISP employees who have access to FedEx Ground systems and/or FedEx Ground property, interact with FedEx Ground customers, or handle FedEx Ground packages must pass a criminal background check before performing these duties for an ISP
  - o ISP Candidates should note this process can take several weeks to complete

- **Ensure workforce compliance**
  - o Per an ISP Agreement, ISPs may only employ persons who are legally authorized to work in the United States
  - o Maintain an I-9 employment authorization form for each employee

Illinois                                                                                                                      28

- Provide evidence of compliance at the request of FedEx Ground
- These steps must be completed before an ISP Agreement effective date
- ISP Candidates should note these steps can take several weeks to complete

## ISP Model Key Terms & Definitions

**Contracted Service Area (CSA)** – A geographical area, defined in an ISP Agreement, in which an ISP is contractually obligated to provide pick-up and delivery services

**Driver Data Collection Process** – Daily collection of information from an ISP employee which is then inputted by FedEx Ground personnel into FedEx Ground's system

**Independent Service Provider (ISP)** – An independent business entity that contracts with FedEx Ground to provide pick-up and delivery services under an ISP Agreement

**ISP Agreement** – A legal contract negotiated between an ISP and FedEx Ground

**ISP Agreement Signatory** – An individual who signs an ISP Agreement on behalf of the ISP

**ISP Candidate** – An independent business entity that desires to become an ISP for a particular CSA, but has not yet executed an ISP Agreement for that CSA

**ISP Charge Statement** – A weekly statement detailing the ISP's financial earnings and CSA volumes

**ISP Data Collection Report** – A daily report that details package data for each ISP employee-driver. The ISP Data Collection Report is reviewed each afternoon for Ground and the next morning for Home Delivery

**ISP Data Confirmation Report** – A daily report that details package data for each CSA. The ISP Data Confirmation Report is reviewed with the ISP Key Contact each morning

**ISP Data Review** – A daily assessment between FedEx Ground and the ISP Key Contact of the prior day's activities and issues, as well as any future operational plans

**ISP Electronic Funds Transfer (EFT)** – A weekly payment provided to ISPs for work performed in the ISP's CSA. The ISP EFT replaces the settlement check. As an alternative, ISPs may also receive payment via paper check.

**ISP Employee** – An individual employed by the ISP. ISP Employees may include Key Contacts, P&D drivers, helpers and office support

**ISP Key Contact** – An individual employee of the ISP responsible for administering an ISP Agreement, including day-to-day operations

**ISP Negotiator** – An officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate

**Negotiations** – A process during which FedEx Ground and ISP Candidates attempt to work out various mutually acceptable financial and non-financial terms as well as elections of an ISP Agreement

**Negotiator** – A FedEx Ground employee who negotiates with the ISP Candidate on behalf of FedEx Ground.

**Proposal** – An ISP Candidate's offer on the key financial and non-financial terms as well as elections included in an ISP Agreement

**Request for Information (RFI)** – A request, issued to ISP Candidates by FedEx Ground, which seeks to ascertain the capabilities of prospective ISPs

**RFI Response** – An ISP Candidate's reply to FedEx Ground's RFI, that outlines the ISP Candidate's capabilities relative to the contractual obligations

## Q&As

**1.  Which contractors are affected by this announcement?**
This announcement impacts all P&D contractors domiciled in Illinois, all P&D contractors domiciled in Dubuque, IA co-location, all P&D contractors domiciled in the Hammond, IN Ground and Home Delivery stations as well as those P&D contractors domiciled in the St. Louis, MO Ground and Home Delivery stations that provide service in Illinois, and P&D contractors domiciled in the Milwaukee Ground and Home Delivery stations whose PSAs will be moving to the new North Chicago station in Grayslake, Illinois. Linehaul contractors are not affected.

**2.  Why implement a new contract and operational changes in Illinois?**
The Company believes these operational changes are necessary so that contractors will continue to have the opportunity of owning and growing an independent business in Illinois and so that the company can strengthen its independent contractor model in Illinois and continue to provide P&D services through the independent contractor model. While a transition in Illinois was necessary given the recent changes in state law, regulatory decisions, and enforcement actions that have made it more difficult for independent contractors to operate in Illinois, we believe the features of the new relationship will provide an attractive option for business-minded entrepreneurs.

**3.  If a contractor acquires additional routes, is that contractor guaranteed an ISP Agreement?**
No. Negotiating an ISP Agreement is an individualized negotiation between ISP Candidates and FedEx Ground. ISP Candidates will negotiate key financial and non-financial terms, as well as make elections, according to the unique business needs of the service area. The process will also involve a response to a Request for Information (RFI) so that ISP Candidates can demonstrate the ability to provide the level of service required. Participating in this process does not automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement.

**4.  How many PSAs can an ISP Candidate acquire in Illinois?**
There is no statewide limit on how many PSAs an ISP Candidate can acquire in Illinois. There are, however, station-specific guidelines in place to avoid excessive dependence for network service on any one contractor in a particular station. Station management can provide additional details regarding the guidelines for your station.

**5.  What happens once an ISP Agreement goes into effect?**
The ISP Model is intended to provide the potential for higher earnings by maximizing economies-of-scale, as well as other operating efficiencies of a larger, multi-vehicle operation. Under an ISP Agreement, ISPs are responsible for planning all P&D activity within the Contracted Service Area (CSA). This includes driver recruitment, training and staffing; vehicle fleet size selection, acquisition and maintenance; peak planning; and complying with all applicable laws and regulations. ISPs will have significant flexibility in allocating staff and vehicles as ISPs see fit to meet the unique and changing business needs of their CSAs.

**6.  Can an ISP Candidate operate both Ground and Home Delivery routes?**
Yes. ISP Candidates may operate any combination of at least three Ground and/or Home Delivery PSAs in the same station by November 19, 2010 to begin the RFI and Negotiations Processes for a new agreement. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location domiciled in the state of Illinois, Hammond, St. Louis, Dubuque, as well as the future North Chicago station in Grayslake.

**7.  Will ISPs continue to operate under FedEx Ground's operating authority?**
Yes. ISPs will continue to operate under FedEx Ground's operating authority.

**8.  What happens to the swing routes currently operated by contractors?**
Swing routes will cease to exist upon the expiration of the applicable Operating Agreement (OA). Swing contractors that acquire and operate at least three non-swing PSAs in the same station, incorporate as a corporation, and not some other form of business, such as an LLP or LLC, and establish an Entity Profile through *MyGroundBizAccount* by November 19, 2010 and that register with the state(s) which it does business, be in good standing, define a CSA, and respond to FedEx Ground's RFI will be eligible to submit a first proposal and begin negotiations for an ISP Agreement.  Swing PSAs will not count toward the three PSA minimum needed to be eligible for ISP Agreement negotiations.

**9.  How quickly will FedEx Ground make the transition incentive payments?**
- The first $5,000 of the transition incentive will be paid within 15 business days of submitting a signed Contractor Limited Release and Operating Modification Agreement. The remaining $5,000 of the transition incentive will be paid as follows:
- Contractors that sell/transfer PSAs and sign the supplemental limited release will receive a check within 15 business days at the station for the remaining $5,000 of the transition incentive once the current OA terminate and proof of sale or transfer of the routes is submitted to station management;
- P&D contractors operating fewer than three PSAs in a single Illinois station as of November 19, 2010 will receive the remaining $5,000 of the voluntary transition payment within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of the OA; or
- P&D contractors operating three or more PSAs in the same station in Illinois as of November 19, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of their OA.

A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location domiciled in the state of Illinois, Hammond, St. Louis, Dubuque, as well as the future North Chicago station in Grayslake.

**10.  Are contractors eligible for the $10,000 transition incentive even if they choose to sell their routes?**
Yes. These contractors will need to sign and timely submit a Contractor Limited Release and Operating Modification Agreement.  They will also need to submit proof of their transition and sign the supplemental limited release.

**11.  Is the transition incentive taxable?**
Contractors should consult with tax advisors as to the tax status of the transition incentive. The transition incentive will be reported by FedEx Ground on a Form 1099 for the year in which the amount is received.

**12.  What happens if a contractor decides not to sign the Contractor Limited Release and Operating Agreement Modification?**
Contractors are not required to sign the optional limited release.  If a contractor decides not to sign the limited release, that contractor will not receive the transition incentive described in this Guide and will continue to operating under the terms of their OA until its current expiration date, absent any further extension. This contractor can still pursue an ISP Agreement if it meets all the terms set forth in this Guide.

**13.  Are extensions still available for contractors that do not sign the Contractor Limited Release and Operating Agreement Modification?**
Yes.  As previously announced on May 20, 2010, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension.  This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to November 19, 2010 regardless of any prior extension.

**14.  Why are growth incentives tied to the acquisition of the vehicle and the PSA?**
By acquiring a vehicle that is already in service in a particular PSA, the ISP will have a vehicle that necessarily qualifies for service under an ISP Agreement.

**15.  Are growth incentives available for eligible PSAs acquired after November 19, 2010?**
No. All acquisitions of eligible PSAs, by eligible contractors, must be completed by November 19, 2010 in order to be eligible for growth incentive payments.

**16. Do ISP Candidates have to compete with other vendors from outside the network for the CSAs?**
Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground and, if operating three or more PSAs in the same station by November 19, 2010, will have an opportunity to extend a current Operating Agreement to do so. Should an impasse be reached, multiple candidates may be engaged in the process. FedEx Ground may also seek multiple bids for the same CSA in the event that certain transition deadlines are not met. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions. When the multi-year ISP Agreements expire, there is no automatic renewal. At that point, the existing ISP can bid for the CSA again, though FedEx Ground may also consider external candidates in order to contract with the best candidate in terms of experience, ability to provide service, cost, as well as other factors.

**17. Can a Ground contractor acquire a Home Delivery (HD) route (or vice versa) as part of the Illinois transition?**
Yes, but a new OA will need to be signed for the HD (or Ground) route. This new contract will expire on November 19, 2010, though an extension will be granted if the contractor is at scale.

**18. How does the transition to the ISP Model affect contractors operating PSAs in different Illinois stations?**
FedEx Ground is willing to consider the particular circumstances and make a decision as to whether these contractors are considered to be at scale to negotiate an ISP Agreement. Station management can discuss potential options.

**19. With whom will ISP Candidates negotiate?**
While Senior Managers are an important part of the process for identifying ISP Candidates, Pittsburgh-based FedEx Ground employees will serve as Negotiators on behalf of the Company.

**20. Is negotiating an ISP Agreement for a one-year term an option?**
Generally, ISP Agreements will be negotiated for a three-to-five year period; however, shorter or longer contract periods will be subject to the parties' negotiations.

**21. What impact will FedEx Ground's ISP Model announcement have on the Company's Incorporation and Compliance Disclosure announcement made on May 20, 2010? Does the non-renewal notice on May 20, 2010 remain in effect?**
The ISP Model announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines set forth in the ISP Transition Guide apply. The non-renewal notice on May 20, 2010 remains in effect.

**22. If a contractor already received an extension as a result of the Company's Incorporation and Compliance Disclosure announcement, what happens to that extension?**
Any extension a contractor has already received remains in effect, unless they sign the Contractor Limited Release and Operating Agreement Modification, which will change the termination date of any Operating Agreement to November 19, 2010. If a contractor does not sign the Contractor Limited Release and Operating Agreement Modification, then the Operating Agreement will expire at the end of any extension the contractor already received as a result of the Company's Incorporation and Compliance Disclosure announcement.

**24. Will contractors affected by the ISP Model announcement still receive the $750 early adoption incentive that FedEx Ground announced on May 20, 2010?**
Yes. As a good-will gesture on the part of the company, all affected P&D contractors will receive the $750 early adoption incentive associated with the May 20, 2010 announcement, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More details will be available in the coming weeks.

*In the future, additional Q&A can be found on www.mygroundbiz.com.

# Sample Contractor Limited Release and Operating Agreement Modification

**CONTRACTOR LIMITED RELEASE AND
OPERATING AGREEMENT MODIFICATION**

This Contractor Limited Release and Operating Agreement Modification (the "**Agreement**") is entered into by and between FedEx Ground Package System, Inc. ("**FedEx Ground**") and [_____] ("**Contractor**").

WHEREAS, Contractor has previously entered into a FedEx Ground Package System, Inc. Pickup and Delivery Contractor Operating Agreement and/or a FedEx Home Delivery Standard Contractor Operating Agreement (the "Operating Agreement").

WHEREAS, in exchange for the payment described in Article 2, Contractor agrees to an extension or early termination of the current Operating Agreement, as applicable to Contractor's circumstances (and as further described in Article 1), and to grant FedEx Ground a limited release of claims as described in Article 3.

WHEREAS, in exchange for Contractor's future execution of the supplemental limited release of claims attached as Exhibit A, FedEx Ground agrees to make the additional payment described in Article 4.

NOW THEREFORE, in consideration of the covenants and agreements contained herein and other good and valuable consideration, the parties knowingly and voluntarily agree as follows:

**1.     Termination of Current Operating Agreement.**  The parties irrevocably agree that their Operating Agreement shall terminate on November 19, 2010, unless otherwise subsequently agreed in writing.  This termination of the Operating Agreement shall be effective without any further notice of contract termination or non-renewal for those Operating Agreements which otherwise would expire after November 19, 2010, and without any further notice of renewal or extension for those Operating Agreements which otherwise would expire before November 19, 2010.  Upon termination, Contractor shall fulfill his or her "Obligations Upon Termination" as set forth in the Operating Agreement.  Except as otherwise provided in this Agreement, the provisions of the Operating Agreement, which, by their terms, survive termination, shall survive termination pursuant to this Agreement.

**2.     Payment.**  FedEx Ground shall pay to Contractor the sum of Five Thousand Dollars ($5,000).  This payment shall be made within fifteen (15) business days after the designated representative(s) of station management at Contractor's home station receives Contractor's fully-executed Agreement.

**3.     Release of Claims.**  Except for those obligations created by or arising out of this Agreement, Contractor, and any corporation, limited liability company, sole proprietorship, and/or any other business entity or person(s) with whom Contractor is affiliated, hereby covenants not to sue or demand arbitration and acknowledges full and complete satisfaction of

1

and releases and discharges, to the fullest extent permitted by law, FedEx Ground, its subsidiaries, divisions (including, without limitation, FedEx Home Delivery), parent and affiliated companies, past and present, and each of them, as well as its and their trustees, directors, officers, shareholders, agents, attorneys, insurers and employees, past and present, and each of them, hereinafter collectively referred to as "*Releasees*," with respect to and from any and all claims, demands, liens, agreements, contracts, covenants, actions, suits, causes of action, arbitrations, wages, obligations, debts, expenses, attorneys' fees, damages, judgments, orders and liabilities of whatever kind, whether known or unknown, suspected or unsuspected, which Contractor or any Contractor-related business entity now owns or holds or has at any time heretofore owned or held as against Releasees, or any of them, arising out of or in any way connected with (i) FedEx Ground's announcement(s) that it is modifying its relationship with contractors who provide service in Illinois, and (ii) any and all actions related to FedEx Ground's modification of its relationship with contractors who provide service in Illinois, including, without limitation, any contemplated or actual termination, non-renewal or assignment of Contractor's Operating Agreement, any contemplated or actual sale, assignment or other disposition of a primary service area (whether Contractor was the transferor or transferee of said primary service area), and any contemplated or actual sale, assignment or other disposition of a Contractor's vehicle.

4. **Supplemental Limited Release.** In exchange for Contractor's execution of the Supplemental Limited Release attached as Exhibit A on or after the effective date of the termination of Contractor's Operating Agreement (including any written extension thereof), FedEx Ground agrees to pay Contractor the sum of Five Thousand Dollars ($5,000). This payment shall be made within fifteen (15) business days after the designated representative(s) of station management at Contractor's home station receives Contractor's fully-executed Supplemental Limited Release. The parties understand and agree that Contractor's decision in the future regarding whether or not to execute the Supplemental Limited Release in exchange for the payment described in this Article 4 has no bearing whatsoever on Contractor's rights and obligations under other provisions of this Agreement (including, for example, under Articles 1-3).

5. **Non-Admission Of Liability.** Neither this Agreement, nor FedEx Ground's offer to enter into this Agreement with Contractor, shall constitute an admission on the part of FedEx Ground of any violation of federal, state or local law, ordinance or regulation, or of any violation of FedEx Ground's policies or procedures, or any violation of or wrongdoing under the Operating Agreement, or of any liability or wrongdoing whatsoever. Neither this Agreement nor anything in this Agreement shall be construed to be or shall be admissible in any proceeding as evidence of liability or wrongdoing on the part of any party.

6. **Consultation With Attorney. Contractor is advised to consult with an attorney before executing this Agreement, and Contractor acknowledges that reasonable and sufficient time has been given for such consultation**. If Contractor executes this Agreement without consulting an attorney, Contractor agrees that such decision was the result of Contractor's voluntary choice.

7. **Severability**. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Agreement which

2

can be given effect without the invalid provisions or application. To this end, the provisions of this Agreement are declared to be severable.

**8.** **Assignment.** The rights of FedEx Ground under this Agreement shall inure to the benefit of the successors, assigns and legal representatives of FedEx Ground. This Agreement may not be assigned, nor the duties hereunder delegated, by Contractor.

**9.** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without regard to principles of conflict of laws.

**10.** **Tax Matters.** Contractor acknowledges that FedEx Ground has not made any representations to Contractor regarding the taxability of any payment to Contractor under this Agreement.

**11.** **Reproductions.** Photocopies and other reproductions of the fully-executed Agreement (including where the Agreement contains electronic or other facsimile signatures) shall have the same force and effect as an original executed document.

**12.** **Entire Agreement.** This Agreement constitutes the entire and only understanding and complete agreement between the parties, and supersedes any prior discussion, agreement or understanding, whether oral or written, with respect to the subject matter herein. Any representation, promise or agreement not specifically included in this Agreement shall not be binding upon or enforceable against either party. This is a fully integrated agreement. No modifications or revisions of this Agreement shall have any force or effect unless put in writing and executed by both parties.

**13.** **Authority.** The undersigned Contractor represents and certifies that he/she has full legal authority to act on behalf of and legally bind any corporation, limited liability company, sole proprietorship, and any other business entity or person(s) with whom Contractor is affiliated. This authority includes, without limitation, the execution of this Agreement on behalf of any such entities or persons.

I have been advised by FedEx Ground to consult with legal counsel before signing this Agreement, as this Agreement will affect my legal rights. I have read the foregoing Agreement, and I understand and acknowledge the significance and consequence of it, and execute it voluntarily with full understanding of its consequences. I declare under penalty of perjury that the foregoing is true and correct.

FedEx Ground's offer to enter into this Agreement, as reflected in its officer's signature below, shall remain open until August 27, 2010.

**CONTRACTOR:**

**FEDEX GROUND PACKAGE SYSTEM, INC.**

By: _____
   Signature

Its _____


_____
Print Name

Contractor ID No: _____

Date: _____

By: _____
   Signature

Its _____


_____
Print Name

Date: _____

# EXHIBIT A
## SUPPLEMENTAL LIMITED RELEASE OF CLAIMS

This Supplemental Limited Release of Claims is executed by [_____]
("**Contractor**") as of the date set forth below.

WHEREAS, Contractor has previously entered into a FedEx Ground Package System, Inc.
("**FedEx Ground**") Pickup and Delivery Contractor Operating Agreement and/or a FedEx Home
Delivery Standard Contractor Operating Agreement.

WHEREAS, Contractor has also previously entered into a Contractor Limited Release and
Operating Agreement Modification ("**Agreement**"), which provided for a monetary payment by
FedEx Ground in exchange for, among other things, Contractor's limited release of claims.

NOW THEREFORE, in consideration of the covenants and other provisions in the Agreement,
and for other good and valuable consideration, Contractor agrees as follows:

    **Release of Claims.** Except for those obligations created by or arising out of said
Agreement, Contractor, and any corporation, limited liability company, sole proprietorship,
and/or any other business entity or person(s) with whom Contractor is affiliated, hereby
covenants not to sue and acknowledges full and complete satisfaction of and releases and
discharges, to the fullest extent permitted by law, FedEx Ground, its subsidiaries, divisions
(including, without limitation, FedEx Home Delivery), parent and affiliated companies, past and
present, and each of them, as well as its and their trustees, directors, officers, shareholders,
agents, attorneys, insurers and employees, past and present, and each of them, hereinafter
collectively referred to as "*Releasees*," with respect to and from any and all claims, demands,
liens, agreements, contracts, covenants, actions, suits, causes of action, arbitrations, wages,
obligations, debts, expenses, attorneys' fees, damages, judgments, orders and liabilities of
whatever kind, whether known or unknown, suspected or unsuspected, which Contractor or any
Contractor-related business entity now owns or holds or has at any time heretofore owned or
held as against Releasees, or any of them, arising out of or in any way connected with (i) FedEx
Ground's announcement(s) that it is modifying its relationship with contractors who provide
service in Illinois, and (ii) any and all actions related to FedEx Ground's modification of its
relationship with contractors who provide service in Illinois, including, without limitation, any
contemplated or actual termination, non-renewal or assignment of Contractor's Operating
Agreement, any contemplated or actual sale, assignment or other disposition of a primary service
area (whether Contractor was the transferor or transferee of said primary service area), and any
contemplated or actual sale, assignment or other disposition of a Contractor's vehicle.

    I represent and certify that I have full legal authority to act on behalf of and legally bind
any corporation, limited liability company, sole proprietorship, and any other business entity or
person(s) with whom I am affiliated. This authority includes, without limitation, the execution
of this Agreement on behalf of any such entities or persons.

    I have read the foregoing Supplemental Limited Release of Claims, and I understand and
acknowledge the significance and consequence of it and execute it voluntarily with full

understanding of its consequences. I have consulted with an attorney before executing this release or decided to execute this release without legal consultation. I declare under penalty of perjury that the foregoing is true and correct.

**CONTRACTOR:**

By: _____
            Signature
Its _____


_____
Print Name

Contractor ID No: _____

Date: _____

**FEDEX GROUND PACKAGE SYSTEM, INC.**

By: _____
            Signature
Its _____


_____
Print Name


Date: _____

# EXHIBIT 9

O'MELVENY & MYERS LLP

| CENTURY CITY | 400 South Hope Street | TYSONS CORNER |
| IRVINE SPECTRUM | Los Angeles, California 90071-2899 | WASHINGTON, D.C. |
| NEWPORT BEACH | | HONG KONG |
| NEW YORK | TELEPHONE (213) 430-6000 | LONDON |
| SAN FRANCISCO | FACSIMILE (213) 430-6407 | SHANGHAI |
| SILICON VALLEY | INTERNET www.omm.com | TOKYO |

OUR FILE NUMBER
259,075-217

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.                          Susan E. Ellingstad, Esq.
Leonard Carder, LLP                       Lockridge Grindal Nauen, PLLP
1330 Broadway Avenue, Suite 1450          100 Washington Avenue, South
Oakland, California 94612                 Suite 2200
                                          Minneapolis, Minnesota 55401

Re:    *FedEx Ground Package System, Inc. Employment Practices Litig.*; No.
       **3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model) in Minnesota. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Minnesota contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Minnesota-based contractors listed in the attachment to this letter:

1.     Minnesota Transition Information;

2.     Questions & Answers Regarding the Minnesota Transition;

3.     Sample Contractor Limited Release and Operating Agreement
       Modification

4.     DVD from FedEx Ground Executive Vice President and COO Michael
       Mannion, concerning the announcement;

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq., July 15, 2010 - Page 2

      5.     ISP Transition Timeline;

     6².    Minnesota Transition Update.

     This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Lee v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00533-RLM-CAN (MN), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground. Additional materials will be forthcoming when they are provided to the Minnesota contractors. The foregoing is without prejudice to FedEx Ground's rights and defenses.

     Please call me if you have any questions. Thank you for your time and attention.

                     Very truly yours,

                     Matthew P. Eastus
                     for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq., July 15, 2010 - Page 3

| | |
|---|---|
| Aldhahra, Tho Alfeqar | Easton, Dean |
| Anderson, Eric | Eckberg, James Christian |
| Andreen, Craig Allan | Elleraas, Vince |
| Arruda, Roberto Martins | Elting, Jamie Drew |
| Banwart, Thomas R. | Fern, Darla Ann |
| Barhorst, John W. | Fiegel, Christopher James |
| Bauerly, Jacob Gary | Firchau, Corey |
| Bennett, Steven | Frias, Steve |
| Birkland, Todd | Gammel, Gayle |
| Blasing, Shawn R | Gonzalez, Salvador |
| Blazek, Kenneth | Green, Keith Allen |
| Blazek, Korey | Grimes, Michael |
| Blini, Eduardo | Haghighi, Medi A |
| Boesch, Brent Robert | Hall, Lonny Lee |
| Brandt, Milton | Heitman, Dustin Lee |
| Broich, Joseph D. | Henderson, Sarah Megan |
| Busiahn, Charles | Herron, Patrick |
| Butor, Wayne David | Hetrick, Jack |
| Caillier, Marlan | Hindi, Suliman |
| Carlson ,Glenn James | Hoffman, Brian |
| Carlson, Glenn James | Holum, James Kenneth |
| Chea, Danyetta S. | Hynes, Timothy |
| Christensen, David James | Ibe, Steven |
| Cingilli, Mesude | Imgrund, Troy |
| Cingilli, Mustafa | Jackson, Bruce |
| Clausen, Stanley | Janni, Justin |
| Comben, Richard | Johnson, Brian |
| Cramer Jr., Gerald Francis | Johnson, Mark |
| Damon, Tim | Jolly, Jody |
| Davis, Floyd Angus | Kangas, Amber |
| Den Hartog, Corey James | Kaspszak, Thomas |
| Djonne, Christopher Alf | Kelm, Jason Allan |
| Donlon, John | Keogh, Brian |
| Donovan, David | Khang, Pao |
| Drevlow, Kip | Kollmann, Danny Alan |
| Drummer, Jeremy Matthew | Kolosov, Igor |
| Dubbeldee, Dennis | Kostyukevich, Mikhail Aleksandrov |
| Duevel, Joseph J. | Kriescher, Thomas |
| Dundas, Eben | Kruizenga ,Brent |

| | |
|---|---|
| Dwyer, Krzysztof | Kuepers, Ryan Adam |
| East, John | Leary, Thomas |
| Lee, Cheng | Peterson, Steven Derze |
| Lee, Geng | Plath, Jason |
| Lee, Touubee | Powers III , Carl Larry |
| Leonard, Louis Keith | Ramsdell, Christopher |
| Lesher, James L. | Ramsdell, James |
| Loftman, Jess Elliott | Ray, Randy |
| Lowrey, Jason | Reed, Darren Paul |
| Lund, Debra | Reetz, Jeffrey |
| Maccallum, Mark | Rein, Joel |
| Malum, Daniel | Rogers, im Richard |
| Marchbanks, Cheyenne Thomas | Rood, Jean |
| Martinez, Rene Marcus | Rusten, Kent Marvin |
| Mattson, Ross David | Schmidt, Alan |
| Maus, Benjamin William | Scroggins, Valerie |
| Meyer, Ronald | Selenskikh, Andrei A |
| Miller, Guerin | Slagter ,Barry |
| Miller, Wade | Smith, Troy |
| Morgan, William | Spiczka, Jason Richard |
| Mortenson, Chad R | Stegner, Shawn Andrew |
| Muraweh, Zakaria M | Strenke, Doug |
| Mustain, Barry | Strohmeier, Kurt Martin |
| Myers, Chris | Stumvoll, David J. |
| Nalewaja, Dean P. | Thomas, Blazek |
| Nelson ,Dustin Ray | Vue, Xoua |
| Nelson, Chad Peter | Weinberger, Jason Dennis |
| Nelson, Dustin Ray | Weismann, Richard |
| Nielsen, Kara | Wenholz, Robert |
| Nimis, Jeffrey Allan | Whitebird, Stan |
| Nordin, Gail Elizabeth | Wolle, Mark Gordon |
| Paulson, Andrew Ryan | Worts, Charles |
| Peddycoart, Ron | Yang, Lari |
| | Yurek, Michael R. |
| | Zangl, Mary |

# O'MELVENY & MYERS LLP

CENTURY CITY         400 South Hope Street         TYSONS CORNER
IRVINE SPECTRUM    Los Angeles, California 90071-2899    WASHINGTON, D.C.
NEWPORT BEACH                       HONG KONG
NEW YORK         TELEPHONE (213) 430-6000       LONDON
SAN FRANCISCO      FACSIMILE (213) 430-6407       SHANGHAI
SILICON VALLEY      INTERNET www.omm.com        TOKYO

OUR FILE NUMBER
259,075-217

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.                 Susan E. Ellingstad, Esq.
Leonard Carder, LLP            Lockridge Grindal Nauen, PLLP
1330 Broadway Avenue, Suite 1450     100 Washington Avenue, South
Oakland, California 94612          Suite 2200
                                 Minneapolis, Minnesota 55401

      Re:    ***FedEx Ground Package System, Inc. Employment Practices Litig.*; No.**
            **3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

      On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its
intention to transition to a new contractor model (the Independent Service Provider Model or
"ISP") in its Mason City, Iowa co-location, which provides service to Minnesota. As part of that
announcement, FedEx Ground is offering an ISP transition incentive to Mason City contractors,
provided the contractor signs a limited release with respect to the ISP transition.

      As a courtesy, I have enclosed the following documents and information, which FedEx
Ground has provided today to the Mason City-based contractors listed in the attachment to this
letter:

           1.      Mason City Transition Information;

           2.      Questions & Answers Regarding the Mason City Transition;

           3.      Sample Contractor Limited Release and Operating Agreement
                 Modification

           4.      DVD from FedEx Ground Executive Vice President and COO Michael
                 Mannion, concerning the announcement;

     5.     ISP Transition Timeline.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Johnson v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00652-RLM-CAN (IA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground.  Additional materials will be forthcoming when they are provided to the Mason City contractors.  The foregoing is without prejudice to FedEx Ground's rights and defenses.  Please call me if you have any questions.

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Ames, Rodney Dean |
| Beck, Brendan T. |
| Christenson, Jerry |
| Dedor, Spencer |
| Fox, Vicki |
| Koenigsberg, Bradley Gene |
| Low, Mark |
| Mcgee, Michael |
| Mondt, Pat Alan |
| Muller, Justin |

LA3:1168034.1

# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California  90071-2899

TELEPHONE  (213) 430-6000
FACSIMILE  (213) 430-6407
INTERNET  www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-217

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California  94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota  55401

    Re:    ***FedEx Ground Package System, Inc. Employment Practices Litig.;***
          **No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

    On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Spencer, Iowa co-location, which provides service to Minnesota. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Spencer contractors, provided the contractor signs a limited release with respect to the ISP transition.

    As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Spencer-based contractors listed in the attachment to this letter:

    1.    Spencer Transition Information;

    2.    Questions & Answers Regarding the Spencer Transition;

    3.    Sample Contractor Limited Release and Operating Agreement Modification

    4.    DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

    5.    ISP Transition Timeline.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Johnson v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00652-RLM-CAN (IA), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground.  Additional materials will be forthcoming when they are provided to the Spencer contractors.  The foregoing is without prejudice to FedEx Ground's rights and defenses.  Please call me if you have any questions.

Thank you for your time and attention.

Very truly yours,

Matthew P. Eastus
for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'Melveny & Myers LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Chappas, John Robert |
| Horsman, Kelly |
| Kessler, James |
| Murray, Jason |
| Slattery, Steven J. |
| Troe, Chad |
| Ward, Al |
| Weir, Cory Dean |

LA3:1168035.1



# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-217

July 15, 2010

**VIA HAND DELIVERY**

WRITER'S DIRECT DIAL
(213) 430-6679

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: *FedEx Ground Package System, Inc. Employment Practices Litig.*; No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Sioux Falls, South Dakota co-location, with regard to contractors who provide service to Minnesota. As part of that announcement, FedEx Ground is offering an ISP transition incentive to some Sioux Falls contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Sioux Falls-based contractors listed in the attachment to this letter:

1. Sioux Falls Transition Information;

2. Questions & Answers Regarding the Sioux Falls Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

     4.     DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

     5.     ISP Transition Timeline.

     This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Bunger v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00539-RLM-CAN (SD), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground.  Additional materials will be forthcoming when they are provided to the Sioux Falls contractors.  The foregoing is without prejudice to FedEx Ground's rights and defenses.  Please call me if you have any questions.

     Thank you for your time and attention.

                     Very truly yours,

                     Matthew P. Eastus
                     for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Byington, Randy |
| Earll, Brad Jason |
| Engbrecht, Darrell |
| Espinoza, Alexander |
| Fearing, Troy |
| Forthman, Jeremy james |
| Grave, Kevin |
| Hanson, James |
| Knuston, Michael |
| Nelson, Greg |
| Nelson, Thomas J. |
| Ordalen, Kevin |
| Zimmer, Jeffrey |

LA3:1168031.1



# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| CENTURY CITY | 400 South Hope Street | TYSONS CORNER |
| IRVINE SPECTRUM | Los Angeles, California 90071-2899 | WASHINGTON, D.C. |
| NEWPORT BEACH | | HONG KONG |
| NEW YORK | TELEPHONE (213) 430-6000 | LONDON |
| SAN FRANCISCO | FACSIMILE (213) 430-6407 | SHANGHAI |
| SILICON VALLEY | INTERNET www.omm.com | TOKYO |

OUR FILE NUMBER
259,075-217

July 15, 2010

**VIA HAND DELIVERY**

WRITER'S DIRECT DIAL
(213) 430-6679

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

> **Re:** ___FedEx Ground Package System, Inc. Employment Practices Litig.___; No. **3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its La Crosse, Wisconsin co-location, which provides service to Minnesota. As part of that announcement, FedEx Ground is offering an ISP transition incentive to La Crosse contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the La Crosse-based contractors listed in the attachment to this letter:

1. La Crosse Transition Information;

2. Questions & Answers Regarding the La Crosse Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

O'MELVENY & MYERS LLP

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

     5.     ISP Transition Timeline.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys., Inc.*, Civil No. 1:07-CV-10876-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Larson v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00601-RLM-CAN (WI), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground.  Additional materials will be forthcoming when they are provided to the La Crosse contractors.  The foregoing is without prejudice to FedEx Ground's rights and defenses.  Please call me if you have any questions.

Thank you for your time and attention.

          Very truly yours,

          Matthew P. Eastus
          for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Buckmaster, Jeffery |
| Foster, Matthew Edward |
| Janikowski, Paul |
| Lindberg, Chad Allen |
| Lindberg, Rodney |
| Martin, Karen Sue |
| Miller, Kent |
| Rud, Aaron |
| Schossow, Byron C. |
| Schossow, Jeremy Steven |
| Shelton, Timothy Donald |
| Vanbeek, Timothy J. |
| Vang, Tchu Yeej |
| Walen, Jeanne Lynn |
| Wenzel, Curtis Dean |
| Wright, Steven Roy |
| Yang, Chia Paul Ge |

LA3:1168036.1



# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-217

July 15, 2010

**VIA HAND DELIVERY**

WRITER'S DIRECT DIAL
(213) 430-6679

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota 55401

Re: _**FedEx Ground Package System, Inc. Employment Practices Litig.**; No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)_

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Duluth co-location, which is located in Superior, Wisconsin and provides service to Minnesota. As part of that announcement, FedEx Ground is offering an ISP transition incentive to Duluth contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Duluth-based contractors listed in the attachment to this letter:

1. Duluth Transition Information;

2. Questions & Answers Regarding the Duluth Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

4. DVD from FedEx Ground Executive Vice President and COO Michael Mannion, concerning the announcement;

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

     5.     ISP Transition Timeline.

     This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Vargas v. FedEx Ground Package Sys., Inc.*, Civil No. 1:07-CV-10876-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Larson v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00601-RLM-CAN (WI), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground.  Additional materials will be forthcoming when they are provided to the Duluth contractors.  The foregoing is without prejudice to FedEx Ground's rights and defenses.  Please call me if you have any questions.

     Thank you for your time and attention.

                 Very truly yours,

                 Matthew P. Eastus
                 for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 3

| |
|---|
| Carlson, Dale Robert |
| Carrothers Jr., William Rollin |
| Checkalski, Kelly L |
| Fenlason ,Mark |
| Frahm, Lee Alan |
| Gilbert, Gordon James |
| Gradine, Roger Lee |
| Gustavsson, Roy Edward |
| Heupel, Ronald |
| Hipp, Bryan |
| Jackson, Douglas Allen |
| Kegel, Eric Allan |
| Kresky, Loren Adam |
| Laiiila, Joshua Alan |
| Lassila, Alan Patrick |
| Lassila, Joshua Alan |
| Mc Clarey, Kevin |
| Melcher, John Patrick |
| Nyen, Dawn Marie |
| Petersen, Ronald Edward |
| Peterson, Michael John |
| Piwon, Richard |
| Renninger, Brad |

LA3:1168041.1



# O'MELVENY & MYERS LLP

CENTURY CITY
IRVINE SPECTRUM
NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SILICON VALLEY

400 South Hope Street
Los Angeles, California  90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
INTERNET www.omm.com

TYSONS CORNER
WASHINGTON, D.C.
HONG KONG
LONDON
SHANGHAI
TOKYO

OUR FILE NUMBER
259,075-217

July 15, 2010

WRITER'S DIRECT DIAL
(213) 430-6679

**VIA HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
meastus@omm.com

Robert I. Harwood, Esq.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California  94612

Susan E. Ellingstad, Esq.
Lockridge Grindal Nauen, PLLP
100 Washington Avenue, South
Suite 2200
Minneapolis, Minnesota  55401

> Re: ***FedEx Ground Package System, Inc. Employment Practices Litig.*;**
> **No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.)**

Dear Mr. Harwood, Ms. Faris, and Ms. Ellingstad:

On July 15, 2010, FedEx Ground Package System, Inc. ("FedEx Ground") announced its intention to transition to a new contractor model (the Independent Service Provider Model or "ISP") in its Watertown, South Dakota station, with regard to contractors who provide service to Minnesota. As part of that announcement, FedEx Ground is offering an ISP transition incentive to some Watertown contractors, provided the contractor signs a limited release with respect to the ISP transition.

As a courtesy, I have enclosed the following documents and information, which FedEx Ground has provided today to the Watertown-based contractors listed in the attachment to this letter:

1. Watertown Transition Information;

2. Questions & Answers Regarding the Watertown Transition;

3. Sample Contractor Limited Release and Operating Agreement Modification

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.  July 15, 2010 - Page 2

      4.      DVD from FedEx Ground Executive Vice President and COO Michael
              Mannion, concerning the announcement;

      5.      ISP Transition Timeline.

This information is being provided to you in case you receive questions from contractors who are class members or potential class members in the *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys. Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Bunger v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00539-RLM-CAN (SD), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.) cases that are part of the multi-district litigation involving FedEx Ground.  Additional materials will be forthcoming when they are provided to the Watertown contractors.  The foregoing is without prejudice to FedEx Ground's rights and defenses.  Please call me if you have any questions.

Thank you for your time and attention.

              Very truly yours,

              Matthew P. Eastus
              for O'MELVENY & MYERS LLP

Enclosures

cc:    Robert M. Schwartz, Esq.

O'MELVENY & MYERS LLP
Robert I. Harwood, Esq., Lynn Faris, Esq., and Susan E. Ellingstad, Esq.   July 15, 2010 - Page 3

| |
| --- |
| Dahl, Wallace |
| Ehlebracht, Robin |
| Eischens, Terry Irvin |
| Hills, Randy |
| Norgaard, David |
| Olene, Glenn |
| Starr, Justin James |
| Waite, Timothy M. |
| Weippert, Dennis |

LA3:1168033.1

# Minnesota
# ISP Transition Guide

case 3:05-md-00927-RLM-CAN Document 2088-10 filed 07/19/06 page 23 of 31

Minnesota

David F. Rebholz
*President and Chief Executive Officer*

1000 FedEx Drive
Pittsburgh, PA 15108

Telephone 412.269.1000
Fax 412.859.5687



**A letter from the President:**

As a result of discussions with the State of Minnesota, FedEx Ground has made the decision to transition to the Independent Service Provider (ISP) Model in Minnesota. This change applies to all P&D contractors domiciled in Minnesota, in the Mason City and in Spencer, IA co-locations, and in the Lacrosse, WI co-location. This change also applies to those P&D contractors domiciled in the Sioux Falls, SD co-location and the Watertown, SD Ground station with primary service areas that provide service in Minnesota. Linehaul contractors are not affected.

This transition in Minnesota is a necessary step in meeting the needs of the state, contractors, our customers, and the Company. Most importantly, it will ensure that P&D contractors will continue to have the freedom and flexibility to run independent businesses while providing the outstanding service our customers have come to expect from FedEx Ground.

This announcement to transition to the ISP Model affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. Also, the 180-day contract extension previously offered to contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 remains available.

Although the incentive and incorporation timelines associated with the May 20 announcement no longer apply, all affected contractors will receive the $750 early adoption incentive. This $750 payment is a good-will gesture on the part of the company and will be paid to all affected contractors, regardless of whether they incorporate or pursue ISP candidacy. Because linehaul contractors are not impacted by this ISP transition, the May 20, 2010 announcement still applies to them.

The transition to the ISP Model will involve important decisions and actions on the part of all affected P&D contractors. To facilitate the transition, FedEx Ground is offering eligible contractors various options, ample time to consider them and financial incentives, which are discussed in this Transition Guide and will be further explained in additional communications.

The senior manager of your station will review all the pertinent details of the transition and ensure you receive the information you need throughout this process to make the best decisions for you and your business. I encourage you to thoroughly review the contents of the attached ISP Transition Guide with your legal, business and financial advisors and to keep it on hand throughout the transition as a ready resource.

I am confident this is the most prudent course of action for our operations in these states. Many contractors have already successfully transitioned their businesses to the ISP Model in New Hampshire and Maryland. Based on our experiences in these two states, I believe the transition to the ISP Model in Minnesota and the other locations listed above will be equally successful.

We look forward to working with each contractor throughout this transition. There will be much more communication and opportunity for discussion as we begin to navigate this change together.

Scott Ray
Senior Vice President Station Operations

Minnesota

3

## What is the ISP Model?

The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent businesses that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs). In these states, FedEx Ground and ISPs enter into ISP Agreements, rather than the current Operating Agreement ("OA").

Under an ISP Agreement, ISPs agree to provide service within typically larger geographic service areas called Contracted Service Areas (CSAs). ISPs manage all aspects of the pick-up and delivery of packages within a CSA.

Under the ISP Model, ISPs negotiate a range of financial and non-financial terms on a multi-year basis according to the unique needs of the business and CSA. For example, ISPs have the ability to negotiate a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase.

The ISP Model is appealing to entrepreneurs wanting to focus on the management and administrative responsibilities of running a sizable pick-up and delivery company, and wanting to oversee significant business responsibilities that may lead to profitable growth opportunities.

### FedEx Ground Independent Service Provider Responsibilities

Under an ISP Agreement, an ISP agrees to provide pick-up and delivery services through its employees. ISPs have the flexibility to conduct business operations and make all decisions related to vehicles, service areas, staffing and scheduling. These include the following:

**Vehicles**
- Choosing vehicles that best fit an ISP's unique operations, with FedEx Ground only establishing minimum standards for vehicles
- Incurring the costs of operating vehicles, including maintenance, repairs, fuel, tolls, taxes, registration fees and licenses
- Complying with the U.S. Department of Transportation (DOT) requirements for ISP employee-drivers since ISPs operate under FedEx Ground's DOT operating authority

**Contracted Service Areas (CSA)**
- Negotiating terms for the CSA, which provides the ISP with exclusive service rights
- Deciding how best to provide service over the CSA

**Staffing**
- Managing a team of ISP employee-drivers and potentially other workers (such as a Key Contact or helper) to perform the work
- Assigning work and determining when and on what terms it will be completed
- Recruiting and training staff
- Determining compensation and benefits for employees
- Complying with all state and federal employment laws

**Scheduling**
- Establishing work, leave and vacation schedules for all ISP employees

Minnesota

5

**Business Operations**
- Deciding whether to expand the business by acquiring additional CSAs
- Incorporating (and not operating in some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), or similar entity), unless already incorporated
- Registering as a corporation in good standing and as an employer in the states in which the ISP does business. Note: If a contractor has previously incorporated, then that corporate entity likely has already registered in at least one state, but proof of current registration and good standing will nevertheless need to be shown. Contractors should consult their own legal, financial or tax advisors to determine if they need to be registered in any additional states.

## ISP Agreement

Central to the ISP Model is an ISP Agreement, which is a legally-binding contract by which ISP Candidates (businesses seeking to enter into an ISP Agreement) have the opportunity to define their unique business relationship with FedEx Ground. An ISP Agreement outlines the service-level results and regulatory compliance requirements that ISPs have agreed to meet during the Negotiations Process for the term of an ISP Agreement.. Within the next week, illustrative ISP Agreements will be distributed to all Independent Contractors impacted by the transition to the ISP Model in the state of Minnesota.

The following represents a list of some, though not all, of the financial and non-financial terms and elections that may be negotiated in an ISP Agreement:

**Key Financial Terms**
- **Annual Service Charge** — A fixed charge paid weekly to an ISP for providing service to FedEx Ground
- **Stop Charge** — A charge paid to an ISP for each stop to a customer location where a package is picked up or delivered
- **Per Stop Fuel Surcharge** – A surcharge, indexed to the price of fuel, paid for each daily stop where a package is picked up or delivered
- **Surge Stop Charge** – A charge paid for any stop above the negotiated "Daily Stop Threshold"
- **Package Charge** — A charge paid to an ISP for each package that is picked up or delivered when an ISP makes a stop
- **Period Safety Incentive** — An incentive paid to an ISP following a 4-week Safety Period. The payment amount is based on a ratio of the number of preventable accidents during the Safety Period and the total number of vehicles the ISP utilizes during that period. If a preventable accident is recorded during a period, the incentive payment for the involved vehicle for that period, plus the next two periods (for a total of 3 periods), is affected
- **New Account Start-Up** ('Meet-and-Greet') — A fee paid to an ISP for an initial visit to a new customer that has been arranged by FedEx Ground
- **Spotted Trailer Charges** — A charge paid to an ISP for providing "Spotted Trailer" service at a customer's request

**Key Non-Financial Terms**
- **Length of Agreement** — The length of an ISP Agreement typically will be between three to five years, but an ISP Candidate may propose a shorter or longer term for its ISP Agreement
- **Expiration Date** — The end date of an ISP Agreement, as determined by the negotiated length of term
- **Number of Load Positions by Year** — A fixed number of dedicated load positions that will be available each year in the ISP's associated station
- **Daily Stop Threshold** — The number of combined pick-up and delivery stops, above which the Surge Stop Charge is triggered and the ISP is able to invoke the Right to Decline

**Elections**
- **Equipment Registration** — ISP Candidates may elect to register certain equipment in FedEx Ground's name under the International Registration Plan (IRP) for base plates
- **Customer Service Incentive** – A negotiable incentive paid to an ISP. The final amount of the payment is based on the ISPs customer service record during the 4-week reporting period
- **Periodic Maintenance Schedule** — ISP Candidates may elect to use the manufacturers' Periodic Maintenance Schedule or elect an alternative Periodic Maintenance Schedule
- **Fuel Tax Reporting** — ISP Candidates may elect to have FedEx Ground report and pay its fuel tax liability on the ISP's behalf

Minnesota                                                                                                          6

- **Facilitated Insurance Coverage** — ISP Candidates may elect to have FedEx Ground facilitate the procurement of required insurance for the ISP and pay the premiums on the ISP's behalf
- **Brand Promotion Programs** — A fee paid by FedEx Ground if an ISP elects to have its ISP employee-drivers or employee-helpers wear FedEx Ground-approved uniforms and/or have some or all of its vehicles display FedEx Ground approved logos; the fee is paid weekly by FedEx Ground to the ISP
- **Arbitration** — An ISP can elect binding arbitration of disputes with FedEx Ground, if any, as detailed in an ISP Agreement

## ISP Agreement Negotiations

The ISP Agreement Negotiations Process provides each ISP Candidate the opportunity to negotiate an ISP Agreement with FedEx Ground for a specific CSA.

During negotiations, ISP Candidates have the ability to define their unique business relationship with FedEx Ground. Depending on the ISP Candidate's business needs and desires, an ISP Candidate may choose to pursue an agreement with a higher contract fee to achieve a higher percentage of fixed income. Alternatively, an ISP Candidate may want to pursue higher package or stop rates to increase variable income potential if volumes increase. Individualized negotiations will allow each ISP Candidate to pursue an agreement that is best suited for its business.

ISP Agreement negotiations are conducted electronically, and by phone, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals.

## What is Different About the ISP Model?

The ISP Model will bring fundamental changes to the manner in which FedEx Ground operates in the state. There will be changes made to the definition of service areas, the structure of the working relationship between FedEx Ground and independent business owners, and the manner in which contractual agreements are reached with independent businesses to provide pick-up and delivery services.

The following provides an overview of these changes and a preview of the decisions contractors must make during the transition.

## The ISP – FedEx Ground Relationship

Under the ISP Model, FedEx Ground will contract through a negotiated ISP Agreement with only larger businesses that operate as corporations and not some other form of business, such as a LLP, LLC, or similar entity.

Once the ISP Model is in place, FedEx Ground generally will limit its dealings to the individual selected by an ISP to represent the ISP, known as the "ISP Key Contact." The ISP Key Contact alone will deal with FedEx Ground and receive all written and verbal communication from FedEx Ground, except in limited circumstances. The ISP Key Contact then deals with ISP employees, including drivers and helpers, as the ISP Key Contact deems appropriate.

## Contracted Service Areas

A significant change under the ISP Model is the elimination of traditional PSAs in favor of larger geographic service areas – or CSAs. A CSA may comprise any combination of at least three Ground and/or Home Delivery PSAs in a single station. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location. While a CSA may include non-contiguous (non-adjoining) work areas, a higher level of operational efficiency will likely be achieved through contiguous work areas.



**Existing Operating Model
of a Contractor's Separate PSAs**



**Independent Service Provider
Model of an CSA**

CSAs will be defined as the combination of the PSAs operated by the ISP Candidate at the time negotiations begin. FedEx Ground PSAs are defined by Addendum 4 of the Ground OA and FedEx Home Delivery PSAs are defined by the proprietary ZIP Code listed in Addendum 4 of the Home Delivery OA. FedEx Ground will work with Home Delivery contractors to allocate non-proprietary areas based on data in the Home Delivery Vehicle Route Planning (VRP) PC. The ISP Agreement Addendum 4 will list entire ZIP Codes that are completely within a single CSA, as well as details of street address ranges where a ZIP Code is split among multiple CSAs.

Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. FedEx Ground may seek multiple bids for the same CSA only in the event that the ISP Candidate's and FedEx Ground's negotiations reach impasse, or in the event the ISP Candidate does not meet certain transition deadlines that have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

Once a negotiated ISP Agreement is signed, an ISP may trade or sell portions of its CSA, such as ZIP Codes, for the remaining term of the ISP Agreement, subject to the terms of the ISP Agreement. Additional negotiations may occur during the term of an ISP Agreement based on mutual agreement between FedEx Ground and the ISP. Changes to the CSA are one of the limited scenarios under which negotiations may occur. Modifications to a CSA will be documented on a schedule in an ISP Agreement. As an alternative, two ISPs can informally agree to sub-contract P&D work in the respective CSAs. However, the ISP that originally contracted for the P&D work will ultimately remain responsible for that work.

<u>Notable Provisions of an ISP Agreement</u>

There are many provisions that are different from the existing OA. Some of the notable provisions as follows:

**Right to Decline** – The contractual right to decline certain requests, such as delayed-sort packages, pick-ups after 6:30 P.M. and stops above the negotiated Daily Stop Threshold.

**Service** – ISPs will maintain service levels agreed to in an ISP Agreement such as: service days, pick-up and delivery services, collection and return of COD charges; service results (meet customer expectations, achieve inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher, avoid theft, loss, damage and delays, and conduct all business with honesty and integrity).

**Flexing** – FedEx Ground will not offer company-coordinated flexing, meaning ISPs will need to ensure resources are in place to handle surges and variances in daily package volumes (such as Peak), whether by sub-contracting with other ISPs or by other means.

Minnesota

8

## Other Notable Provisions

**Vehicles** – An ISP Agreement will require only that ISP vehicles meet government requirements, be white, have a height that is flush with conveyor walkways in the station, be of a size that allows for the station doors to close and maneuverability in the station.

**Service Account** – An ISP Agreement will not include a service account. Contractors will be paid the balance of their service accounts when the current OA expires or is terminated by agreement.

**Escrow** – An ISP Agreement will not provide for an Escrow Program. Contractors will be paid the balance of their Escrow Accounts when the current OA expires or is terminated by agreement.

**Business Support Package – Business Support Package** – FedEx Ground will not offer a Business Support Package in an ISP Agreement. ISPs will be able to seek business support services from any provider they choose.

**Scanners** – Scanners may be leased from FedEx Ground or leased or purchased from an outside provider.

**Additional details can be found in the Illustrative ISP Agreements which will be distributed in the coming weeks.**

## Illustrative Examples

Given the range of negotiable features contained in an ISP Agreement, and the differences from the existing OA, FedEx Ground is providing illustrative examples of the components of an ISP Agreement. The chart below sets forth **hypothetical** scenarios illustrating the significant flexibility ISP Candidates have in negotiating an ISP Agreement. For example, many revenue components are negotiable. The chart provided illustrates hypothetical revenue scenarios different ISP Candidates might negotiate in an ISP Agreement, such as Stop Charge, Package Charge and Surge Stop Charge.

In these hypothetical scenarios, some ISP Candidates elect to participate in the Optional Brand Promotion Programs, which includes the uniform program for ISP employee-drivers or employee-helpers and the vehicle program for some or all of the ISP's vehicles. In "Scenario 1," the ISP Candidate declines to participate in the Uniform Brand Promotion Program. The illustrative scenarios also reflect how ISP Candidates can negotiate a fee to be paid each time a "Meet-and-Greet" is performed with prospective new customers within the ISP's CSA.

Also, the chart illustrates a hypothetical range of business expenses such as employee wages and benefits, staffing and overtime expectations, vehicle choices and other needs, all of which are determined by the ISP Candidate. Actual costs and potential revenue will depend on how a particular ISP structures and operates its business.

As illustrated by the following chart, the **potential** for greater profit exists depending on an ISP's individualized revenue and cost decisions. The chart sets forth **potential** ranges of revenue, costs and hypothetical earnings that might result based on the characteristics of an ISP's CSA and individualized business decisions.

*The chart is for illustrative purposes only and should not set the terms of negotiation between ISP Candidates and FedEx Ground. The chart does not promise any particular range of outcomes.*

| | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High | Low | High |
| **Daily Route Dynamics** | Stops | 255 - 580 | | 450 - 900 | | 560 - 1800 | |
| | Stop Surge Threshold | 400 - 800 | | 500 - 1000 | | 1000 - 2000 | |
| | Packages | 750 - 1400 | | 1450 - 2220 | | 1575 - 2600 | |
| **Business Resources** | Vehicles | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Drivers | 3 - 4 | | 5 - 6 | | 7 - 8 | |
| | Helpers | 0 | | 0 - 1 | | 0 - 1 | |
| **Key ISP Agreement Terms** | Annual Service Charge | $23K - $ 45K | | $35K - $40K | | $94K - $120K | |
| | Stop Charge | $1.24 - $2.85 | | $1.65 - $2.62 | | $1.43 - $2.60 | |
| | Per-stop Fuel Surcharge | $0.25 - $0.27 | | $0.24 - $0.25 | | $0.11 - $0.15 | |
| | Surge Stop Charge | $0.50 - $1.50 | | $0.49 - $1.48 | | $0.50 - $1.89 | |
| | Package Charge | $.05 - $0.15 | | $0.05 - $0.15 | | $0.10 - $0.15 | |
| | Period Safety Incentive | $2330 - $3160 | | $2700 - $2800 | | $3960 - $5250 | |
| | Period Customer Service Incentive | $710 - $1,803 | | $1,156 - $2,798 | | $1,623 - $3,676 | |
| | New Account Start-Up | $8.00 - $10.00 | | $10.00 - $14.00 | | $8.00 - $12.00 | |
| | Uniform Brand Promotion (Weekly) | $0.00 | | $54 - $103 | | $69 - $264 | |
| | Vehicle Brand Promotion Charge (Weekly) | $32 - $56 (All vehicles) | | $32 - $56 (3 to 4 vehicles) | | $32 - $56 (6 to 7 vehicles) | |
| **Revenue** | Revenue | $280K - $401K | | $462K - $675K | | $628K - $852K | |
| **Costs** | Employee Expenses and Benefits[1] | $152K - $213K | | $252K - $349K | | $354K - $465K | |
| | Vehicles[2] | $52K - $69K | | $86K - $103K | | $121K - $138K | |
| | Payroll Taxes[3] | $20K - $29K | | $34K - $48K | | $48K - $64K | |
| | Administration[4] | $6.5K - $8.5K | | $11K - $13K | | $15K - $17K | |
| Hypothetical Pre-Tax Operating Income[6] | | $49K - $81K | | $79K - $162K | | $90K - $168K | |
| Hypothetical Pre-Tax Operating Margin | | 12% - 29% | | 12% - 35% | | 11% - 27% | |

1) These costs could include payroll expenses and similar employee expenses such as wages, healthcare benefits, paid sick leave and vacation.
2) These costs could include vehicle purchase or lease payments, maintenance, insurance, and fuel, and will vary based on, for example, the number and types of vehicles ISPs choose to operate.
3) Includes workers compensation, unemployment insurance and self-employment tax. These costs represent a national average and are not specific to any state. These costs do not include personal income tax.
4) These costs could include other administrative expenses associated with running a business, for example, recruiting, training and bookkeeping costs.
5) In scenarios 2 and 3, the ISP elected to include some, but not all vehicles in the Optional Brand Promotion Program.
6) Prior to the ISP's corporate or personal income tax.

Minnesota

## Contractor Options

Contractors affected by this transition have several options to choose from before November 19, 2010.

### 1. Pursue an ISP Agreement

Pursuing an ISP Agreement is an important decision that may require an investment, such as buying the necessary PSA(s) to achieve "scale," no later than November 19, 2010. If a contractor pursuing an ISP Agreement fails to do so by that date, the OA will expire according to its terms. There are additional deadlines that also must be completed by November 19, 2010, such as incorporating the business, and not some other form of business, such as a LLP, LLC, or other similar entity, and establishing an Entity Profile on *MyGroundBizAccount*. If an ISP Candidate does not complete these two steps before November 19, 2010, FedEx Ground and the Candidate may still negotiate an ISP Agreement, although FedEx Ground may also consider negotiations with alternative candidates as well.

ISP Candidates are entrepreneurial and understand the risk/reward of investing time and resources to position the business for the future. These candidates see the benefits of focusing on managing and growing the business. Pursuing an ISP Agreement should appeal to those eager to take advantage of the opportunity to operate businesses more efficiently utilizing economies-of-scale, which could lead to higher earnings.

> **Steps to take:**
>
> - Decide whether to sign and return the Contractor Limited Release and Operating Agreement Modification no later than August 27, 2010 (signing this document is not required, but doing so makes contractors eligible to receive the transition incentive).
> - Incorporate the business no later than November 19, 2010.*
> - Establish an Entity Profile on *MyGroundBiz Account* no later than November 19, 2010.*
> - Operate a minimum of three PSAs in the same station no later than November 19, 2010.*
>
> * These steps can be initiated immediately

**Additional Circumstances:**

**P&D Tractor Contractors** (P&D tractor contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible P&D routes and vehicles. P&D tractor contractors are <u>not</u> eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three non-P&D tractor PSAs in the same station no later than November 19, 2010 and operate the P&D tractor under an ISP Agreement, or
- Convert current OA to a Linehaul Agreement no later than November 19, 2010. P&D tractor contractors choosing this option are eligible for the transition incentive if they sign and submit a Contractor Limited Release and Operating Agreement Modification by August 27, 2010.

**Swing Contractors** (Swing contractors <u>are</u> eligible for the transition incentive and growth incentives for acquiring eligible non-swing P&D routes and vehicles; full-time swing contractors are eligible for the vehicle incentive program.)
- Acquire and operate a minimum of three <u>non-swing PSAs</u> in the same station no later than November 19, 2010. Note: Swing work areas <u>do not</u> count toward the three PSA minimum and a contract for these swing work areas will expire on its termination date.

*The Time-off Program ends on November 19, 2010. All swing PSAs in Minnesota go inactive on November 19, 2010.*

## 2. Seek Employment with an ISP

Being an employee of an ISP means all terms of employment, including hours, compensation and benefits, must be worked out with the ISP. Discussions regarding employment terms are solely between ISPs and contractors seeking to become employees of the ISPs. FedEx Ground will not participate or intervene in employment discussions and will not set compensation or benefit terms that ISPs are required to meet. Employee-drivers and employee-helpers of an ISP will not have a direct relationship with FedEx Ground. Aside from casual interactions at the station, these employees will need to direct all questions and concerns to their employers.

Becoming an employee-driver for an ISP should appeal to those who enjoy driving a delivery vehicle and personally performing package pick-up and delivery services rather than the responsibilities of running a larger business.

> **Steps to take:**
>
> - Decide whether to sign and return the optional Contractor Limited Release and Operating Agreement Modification no later than August 27, 2010.
> - Sell or transfer PSA(s) no later than the Operating Agreement's expiration date.
> - If the contractor has signed the Contractor Limited Release and Operating Agreement Modification, the Supplemental Limited Release of Claims will need to be signed and submitted on or after the effective date of termination of the current Operating Agreement in order to receive the remaining $5,000 payment of the transition incentive.

## 3. Exit the network

Contractors not interested in pursuing an ISP Agreement or seeking employment with ISPs may choose to exit the network and pursue other opportunities. Contractors wishing to leave the network may sell their PSA(s) or simply continue to provide service under their OAs until the agreements expire (all OAs were non-renewed on May 20, 2010, and remain non-renewed).

**Special Note:** By signing and returning the Contractor Limited Release and Operating Agreement Modification, contractors agree that the current Operating Agreement will expire on November 19, 2010. If contractors choose not to sign the Contractor Limited Release and Operating Agreement Modification, the termination date of the current Operating Agreement will serve as the expiration date, absent an extension.

## Contractor Incentives

FedEx Ground is offering several financial incentives to assist eligible contractors that are affected by the transition to the ISP Model in Minnesota.

## Transition Incentive

In addition to growth and vehicle incentives detailed below, FedEx Ground is offering a transition incentive of $10,000 to all P&D contractors that are domiciled in Minnesota, in the Mason City and in Spencer, IA co-locations, and in the Lacrosse, WI co-location as of July 8, 2010 and to all P&D contractors domiciled in the Sioux Falls, SD co-location and the Watertown, SD Ground station with primary service areas that provide service in Minnesota as of July 8, 2010 In order to receive that incentive, P&D contractors must sign a Contractor Limited Release and Operating Modification Agreement, which includes a limited release of claims involving the transition and an agreement to terminate the existing OAs by November 19, 2010. See the Sample Contractor Limited Release and Operating Agreement Modification in this guide.

Payment of the transition incentive will be issued in two installments as follows:

### Initial $5,000 Transition Payment:

Eligible P&D contractors that are active as of July 8, 2010 and request the transition incentive, are eligible to receive $5,000 of the payment within 15 business days of submitting to station management a signed Contractor Limited Release and Operating Agreement Modification, which includes a limited release and agreement to end the current Operating Agreement no later than November 19, 2010 (absent a further written contract extension).

A signed agreement must be submitted from the date the Contractor Limited Release and Operating Agreement Modification is distributed to August 27, 2010 to receive this transition incentive.

### Remaining $5,000 Transition Payment:

After receiving initial payment:
- P&D contractors that sell/transfer all PSAs by November 19, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs;

- P&D contractors that are operating three or more PSAs in the same station as of November 19, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs. (Note that for ISP Candidates successfully negotiating an ISP Agreement, the OAs will not terminate until the effective date of the ISP Agreement.)

- P&D contractors continuing to operate fewer than three PSAs in the same station as of November 19, 2010 will receive the remaining $5,000 of the transition payment within 15 business days of submitting to station management a signed supplemental limited release upon the termination of the OAs.

Independent contractors that do not submit the limited release by August 27, 2010 will not receive the transition incentive. These contractors have all of the same options available as do contractors that have signed the limited release and received the transition incentive.

## Important Legal Note

In exchange for the transition incentive, FedEx Ground is asking P&D contractors affected by this announcement for a release of certain potential claims related to this transition. Sample release documents are contained in this ISP Model Transition Guide. Actual release documents can be obtained from station management in the upcoming weeks. The release is not intended to settle all claims a contractor may have against FedEx Ground. The release is limited to potential claims concerning FedEx Ground's announcement of this transition, the termination, non-renewal or assignment of the current OA, and any sale, assignment, loss or other disposition of PSA(s). FedEx Ground cannot advise contractors on individual circumstances.

Pending lawsuits include *Craig v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00530-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); *Catanese/Givens v. FedEx Ground Package Sys., Inc.*, Civil No. 3:07-CV-00324-RLM-CAN, Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.); and *Lee v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-CV-00533-RLM-CAN (MN), Case No. 3:05-MD-527-RM (MDL 1700) (N.D. Ind.).

**Contractors are not obligated to sign the release of claims documents.** Deciding whether to sign these documents is completely up to each contractor. If a contractor chooses to accept the transition incentive, a signed agreement and limited release needs to be submitted no later than August 27, 2010. If a contractor chooses not to sign the agreement and limited release, the contractor will not receive the transition incentive and will have the same options available to those contractors that have signed the agreement and limited release:

- Continue operating under the current agreement (which will not be renewed) until the date of its expiration;
- Sell or transfer PSAs to other contractors; or
- Operate at least three PSAs in an affected station by November 19, 2010 to become an ISP Candidate.

## Contract Renewals and Extensions

All OAs remain non-renewed as a result of the May 20, 2010 Incorporation and Compliance Disclosure announcement. As indicated in the May 20, 2010 announcement, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to November 19, 2010 regardless of any prior extension.

## Growth Incentives

In addition to the transition incentive available to all P&D contractors domiciled in a Minnesota station, growth incentives of up to $100,000 are available to those choosing to grow the business by acquiring eligible PSAs and vehicles between announcement day and November 19, 2010, for <u>total potential incentives of $110,000, depending on station-specific contractor volume guidelines.</u>

<u>Eligible PSAs are Ground or Home Delivery P&D routes currently operated by and acquired from single work area contractors (SWAs) or multiple work area contractors operating two routes (MWA-2s) as of July 8, 2010. These routes must also be domiciled in Minnesota,</u> Mason City, Spencer, IA, and Lacrosse, WI co-locations or ones <u>domiciled in South Dakota that service Minnesota.</u> PSAs transferred or sold by P&D contractors operating three or more PSAs are not eligible for growth incentives. For this transition, the size of active contractors is determined as of July 8, 2010.

Contractors acquiring eligible PSAs in the same Minnesota station can receive up to $100,000 in potential growth incentives, subject to station contractor size guidelines. Growth incentives do not apply unless the PSA that is acquired gets the contractor to at least minimum scale (three PSAs in the same station); contractors that are already at or above scale are eligible to receive growth incentives for acquiring up to five eligible PSAs.

<u>Each growth incentive will be reduced by $5,000 if a vehicle for that PSA is not acquired by the purchasing contractor from the selling contractor.</u>

The following is an illustration of how the growth incentives would be calculated:

- $10,000 growth incentive for acquiring the first Ground or Home Delivery PSA and vehicle that results in achieving minimum scale; plus
- $15,000 for the second PSA and vehicle; plus
- $20,000 for the third PSA and vehicle; plus
- $25,000 for the fourth PSA and vehicle; plus
- $30,000 for the fifth PSA and vehicle.

These growth incentives are <u>available to existing FedEx Ground contractors</u> that acquire eligible routes and vehicles in the same station (a Ground station, Home Delivery station or co-location) by November 19, 2010. Note that a contractor's status for the growth incentives is based on the number of <u>PSAs operated within the same station and is subject to station contractor size guidelines</u>. For example, if a contractor operates two PSAs in the St. Paul Ground station, growth incentives will be available only for eligible routes acquired in the St. Paul Ground station. <u>Supplemental, swing and P&D tractor PSAs are not eligible for growth incentives and will not be counted toward the 3-PSA minimum needed to be eligible for ISP Agreement Negotiations.</u>

As the chart below illustrates, a variety of options are available if choosing to acquire eligible PSAs in the same station. For example:

- A single work area contractor in Minnesota would receive $10,000 in growth incentives for acquiring its second eligible route (that results in achieving minimum scale) and vehicle in the same station, plus the additional $10,000 transition incentive – totaling $20,000.

- A contractor with three PSAs would receive $10,000 in growth incentives if acquiring one more eligible PSA and vehicle in the same station. With the $10,000 transition incentive, incentives would total $20,000.

- A contractor with two PSAs in a Minnesota station would receive $45,000 in growth incentives if acquiring three more eligible PSAs and vehicles in that same station. With the $10,000 transition incentive, this would provide the contractor with $55,000.

| Contractor Status as of July 8 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SWA | MWA-2 | MWA-3 | MWA-4 | MWA-5 | MWA-6 | MWA-7 | MWA-8 |
| Total growth incentive for acquiring one (1) eligible PSA and vehicle | | $10,000 | $10,000 | $10,000 | | $10,000 | $10,000 | $10,000 |
| Total growth incentive for acquiring two (2) eligible PSAs and vehicles | $10,000 | $25,000 | $25,000 | $25,000 | | $25,000 | $25,000 | $25,000 |
| Total growth incentive for acquiring three (3) eligible PSAs and vehicles | $25,000 | $45,000 | $45,000 | $45,000 | | $45,000 | $45,000 | $45,000 |
| Total growth incentive for acquiring four (4) eligible PSAs and vehicles | $45,000 | $70,000 | $70,000 | $70,000 | | $70,000 | $70,000 | $70,000 |
| Total growth incentive for acquiring five (5) eligible PSAs and vehicles | $70,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring six (6) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Total growth incentive for acquiring seven (7) eligible PSAs and vehicles | $100,000 | $100,000 | $100,000 | $100,000 | | $100,000 | $100,000 | $100,000 |
| Available Growth Incentives | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Transition Incentive | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Maximum Available Incentives | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 | $110,000 |

Note: Growth incentives shown here, which are subject to station contractor size guidelines, are contingent on the purchasing contractor's acquisition of the vehicle associated with the acquired PSA. Without such vehicle acquisition, each growth incentive is $5,000 less per PSA than shown above.

Minnesota

Contractors acquiring eligible PSAs will be notified by station management of the amount of the growth incentive(s). **Payment of the growth incentive(s) will be made within 15 business days of completion of the PSA acquisition in CDAS. All acquisitions of eligible PSAs and vehicles must be completed and approved no later than November 19, 2010 to receive growth incentives.**

## Vehicle Incentive Program

SWA or MWA-2 contractors that are not pursuing an ISP Agreement and that do not sell or transfer vehicle(s) along with the PSA(s), to the acquiring contractor, may be eligible for a vehicle incentive up to $5,000. This amount applies to only one delivery vehicle per PSA, and applies only if the vehicle is not acquired by the contractor that purchases the associated PSA and if it is disposed of through a FedEx Ground designated third-party vendor.

Full-time swing contractors in Minnesota not pursuing an ISP Agreement may also be eligible for a vehicle incentive of up to $5,000. This payment will cover one delivery vehicle currently operated by the full-time swing contractor.

The amount of the vehicle incentive, up to $5,000, is determined by the excess, if any, of the contractor's remaining balance due on the vehicle as determined by the lease holder or lender over the vehicle's fair market value. Fair market value will be determined by the designated third party vendor.

The vehicle incentive applies to those vehicles that are either owned or leased by a FedEx Ground or Home Delivery SWA, MWA-2 or full-time swing contractor in Minnesota for use in the contractor's applicable PSA(s). <u>To be eligible for this incentive, contractors must sell or transfer their PSA(s) by November 19, 2010. Contractors may elect to retain or dispose of the vehicles in any manner the contractors choose, though these contractors will then not be eligible for the vehicle incentive.</u>

Contact information for the third party vendor will be provided by station management.

### Incorporation and Compliance Disclosure Requirement and the ISP Model Announcement

This announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and legal compliance. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines established within this ISP Transition Guide apply, and not those associated with the Incorporation and Compliance Disclosure Announcement.

**Contractors should note that all non-renewals and extensions associated with the Incorporation and Compliance Disclosure announcement on May 20, 2010 remain in effect.** Contractors that sign the Contractor Limited Release and Operating Agreement Modification agree to a new expiration date of November 19, 2010. For contractors that <u>do not</u> sign the limited release, the current expiration date remains unchanged. Contractors with expiration dates between July 1, 2010 and December 31, 2010 that <u>do not</u> sign the limited release are eligible to receive a 180-day extension.

Additionally, although affected P&D contractors are technically no longer eligible to receive the early adoption incentives described in the May 20 Incorporation and Compliance Disclosure Announcement, FedEx Ground has decided, as a good will gesture, to pay all affected P&D contractors the $750, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More information will be available in the coming weeks.

## Transition Timelines by Wave

Every contractor affected by this announcement will have the same amount of time to decide whether to sign the Contractor Limited Release and Operating Agreement Modification and choose which contractor option to pursue. However, in order to facilitate a smooth transition to the ISP Model in Minnesota, FedEx Ground is implementing station-specific dates for the Negotiations Process which will be grouped in 2 waves.

Stations in Wave 1 include: St. Paul Ground and Home Delivery, St. Cloud co-location, and Bemidji Ground

Stations in Wave 2 include: Minneapolis co-location, Mankato co-location, Willmar co-location and Brainerd co-location

See the charts below for additional details on the dates that affect your station.

### Wave 1

| July 2010 – March 2011 | March 2011 – June 2011 |
|---|---|
| Optional Contractor Limited Release and Operating Agreement Modification distributed | March 25, 2011 – Final proposal due |
| August 27, 2010 – Signed Contractor Limited Release and Operating Agreement Modification due | May 20, 2011 – ISP Agreement negotiations end |
| November 19, 2010 – Operating Agreements expire for contractors that signed a Contractor Limited Release and Operating Agreement Modification | June 4, 2011 – ISP Agreements go into effect |
| November 19, 2010 – Date by which all contractors pursuing an ISP Agreement will need to be incorporated, have established an Entity Profile on MyGroundBizAccount and achieved "scale" | |
| March 11, 2011 – Date by which all ISP Candidates will need to be registered and in good standing in the state(s), and submit the Initial Compliance Disclosure Form | |
| March 11, 2011 – Date by which CSA definition is finalized and RFI Response submitted | |

Minnesota                                                                                                    18

## Wave 2



## Contract Extensions

An extension to the station-specific date of when an ISP Agreement goes into effect (see charts above) is available to any affected contractor that is operating three or more PSAs in the same station by November 19, 2010.

## Request for Information Process

The FedEx Ground Request for Information (RFI) Process helps the company assess whether an ISP Candidate has the ability to fulfill the obligations of an ISP Agreement. In order to begin the RFI Process, an ISP Candidate must be a corporation and not some other form of business, such as a LLP, LLC, or similar entity, have established an Entity Profile on *MyGroundBizAccount*, and achieved scale by November 19, 2010.

In order to give ISP Candidates the opportunity to get through the transition in sufficient time to protect against service disruptions, an ISP needs to register with the state(s) in which it does business and be in good standing with those state(s) by March 11, 2011. Contractors will need to finalize the definition of their CSA and submit a Response to FedEx Ground's RFI by the station-specific deadline. If these steps are not completed by the associated deadline, an ISP Candidate may still be eligible to submit a Response to FedEx Ground's RFI and possibly advance to negotiations. However, FedEx Ground may negotiate with alternate candidates as well for the CSA.

Minnesota                                                                                              19

FedEx Ground will evaluate the RFI Response based on the areas listed here:

- **Business Experience**
  - o Including references and relevant experience in the transportation industry
- **Financial Viability**
  - o Such as bank references and annual sales
- **Customer Service Approach**
  - o Plans for meeting customer needs and address customer concerns
- **Driver Recruitment and Retention**
  - o Goals for recruiting employees, historical turnover rates

- **Skills and Knowledge of the ISP's Workforce**
  - o Plans for ensuring employee knowledge of FedEx Ground's services
- **Safety Commitment and History**
  - o Injury and accident history, vehicle maintenance plan and history
- **Security (Loss and Damage Avoidance)**
  - o Plans for minimizing package damage and loss, historical damage trends
- **Contingency Situations**
  - o Ability to provide consistent customer service despite volume surge, employee absenteeism and/or equipment failures

An ISP Candidate should provide any additional information it considers important for FedEx Ground to review in evaluating its response. While ISP Candidates can submit an RFI Response on *MyGroundBizAccount*, the response can be submitted in any written format to FedEx Ground.

Once the RFI Response is submitted, a Senior Manager will evaluate the response and make one of the following decisions:

- **Advance to Negotiations**
  Senior Manager determines the ISP Candidate has the ability to fulfill the obligations of the vendor relationship.

- **Clarification/Questions**
  Senior Manager determines further clarification will help determine if the ISP Candidate is capable of fulfilling the vendor relationship.

- **Does Not Advance to Negotiations**
  Senior Manager determines the ISP Candidate does not have the ability to fulfill the obligations of the vendor relationship.

After advancing through the RFI Process and onto the Negotiations Process, **certain qualifications must be met before entering into an ISP Agreement**. Some of these administrative tasks will take several weeks to complete and documentation must be in order before an ISP Agreement Signatory is permitted to electronically sign an ISP Agreement. If these tasks are not completed and an agreement cannot be reached, these contractors run the risk of having their OAs expire without an agreement in place.

For a complete list of qualifications, see the Qualification Steps for Pursuing an ISP Agreement section of this Guide.

Drivers and certain other employees of the ISP Candidate will need to pass a criminal background check prior to the effective date of an ISP Agreement. These background checks will be arranged and paid for by FedEx Ground through a third-party vendor.

## Negotiations and Execution Processes

### Negotiations Process

The first step in the Negotiations Process is the preparation and submission of a Proposal to FedEx Ground. The Proposal is an initial offer on the key financial, non-financial, and elective components of an ISP Agreement and any other terms the ISP Candidate wishes to propose. The deadline for submitting the first Proposal is based on which wave an ISP Candidate's station falls. If a Proposal is not submitted by the dates listed above, an ISP Candidate may still be eligible to submit a first proposal and negotiate an ISP Agreement. However, FedEx Ground may consider proposals and negotiate with alternate candidates as well for the CSA. For additional information, see Transition Timeline by Wave section of this Guide.

Minnesota

FedEx Ground and the ISP Negotiator (an officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate) will negotiate an ISP Agreement regarding terms for the proposed CSA. This provides ISP Candidates the flexibility to negotiate contract terms that best fit the particular business needs and unique service area the ISP Candidate is pursuing.

For example, an ISP Agreement may be negotiated with a higher contract fee for a higher percentage of fixed income, or higher stop/package/surge rates for variable income potential if volumes increase – depending on business needs and desires. ISP Candidates can also choose whether to utilize FedEx Ground logos on all or some of their vehicles, and whether to outfit employees in FedEx Ground uniforms in exchange for negotiated brand promotion fees.

The following represents a list of some, though not all, of the key financial and non-financial terms, as well as elections that may be negotiated.

| Negotiable Financial Terms: | Negotiable Non-Financial Terms: | Elections: |
|---|---|---|
| ~ Annual Service Charge | ~ Length of Term | ~ Additional Services |
| ~ Stop Charge | ~ Expiration Date | ~ Scanner Leasing Program |
| ~ Fuel Charge | ~ Load Positions by Year | ~ Equipment Registration (on certain vehicles) |
| ~ Surge Stop Charge | ~ Daily Stop Threshold | ~ Periodic Maintenance Schedule |
| ~ Package Charge | | ~ Fuel Tax Reporting |
| ~ Period Safety Incentive | | ~ Facilitated Insurance Coverage and Billing |
| ~ New Account Start-Up ("Meet-and-Greets") | | ~ Brand Promotion Program (Vehicles and Uniforms) |
| ~ Spotted Trailer Charges (if applicable) | | ~ Arbitration |
| ~ Customer Service Incentive | | ~ Alternative Maintenance Program |

## Proposal Capture & Analysis Tool (PCAT)

The Proposal Capture and Analysis Tool, or PCAT, will be used by FedEx Ground to evaluate Proposals during the Negotiations Process. To facilitate negotiations, this optional tool is available to ISP Candidates for the preparation of the RFI Response and/or a Proposal. The PCAT will be available to ISP Candidates on *MyGroundBizAccount* and can be used to calculate estimated revenues for multiple scenarios based on inputs by the ISP Candidate.

Inputs include variable components such as Per Stop Charge, Fuel Surcharge and forecasted volume, as well as fixed financial components such as Annual Service Charge and the optional Brand Promotion Program.

Historical pick-up and delivery volume data for the proposed CSA, as well as individual PSA historical data and Spot information, will be made available on *MyGroundBizAccount*. This data may help in evaluating future business strategies, though past performance is not necessarily an indicator of future performance or volume. FedEx Ground cannot guarantee that the historical data supplied will be available for a CSA's predecessor PSAs, or that the data is an exact match to the geographic scope of a CSA, since it is a new area.

Using the PCAT is one way to ensure negotiable elements of an ISP Agreement are included in the Proposal that an ISP Candidate submits. However, Proposals may contain additional terms beyond those listed in the PCAT and can be submitted in any written format to FedEx Ground.

## Submitting a Proposal

Once a Proposal is submitted, a Pittsburgh-based, FedEx Ground Negotiator will be assigned and will contact the ISP Candidate to confirm receipt of the Proposal.

Negotiations will be conducted electronically and by phone over the course of several weeks, giving ISP Candidates and FedEx Ground time to submit and evaluate proposals and counterproposals. The parties may submit several offers and counteroffers until an agreement is reached or there is an impasse.

Initially, the ISP Candidate that is currently operating the CSA will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground. Should an impasse be reached, multiple candidates may be engaged in the process. Furthermore, if certain transition deadlines are not reached, as detailed above, FedEx Ground may seek multiple bids for the same CSA even during the transition to the ISP Model. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions.

The first offer submitted by an ISP Candidate may not be the final offer. The first counteroffer submitted by FedEx Ground to the ISP Candidate may also not be a final offer. The Negotiator will continue working with the ISP Candidate in this manner until an agreement is reached or an impasse occurs.

| What to Expect: | What Not to Expect: |
| --- | --- |
| ~ FedEx Ground seeks proposals in line with market values<br>~ The need to set aside dedicated time to complete negotiations<br>~ Interactive process between ISP Candidates and Negotiators | ~ Negotiator guidance on the "right" answer because there is not just one acceptable approach<br>~ Negotiator guidance on volume forecasts<br>~ SRM participation in the process |

**The Negotiations Process will conclude in one of two ways:**

1) If an agreement is reached, the ISP Candidate will be able to review and sign an ISP Agreement

2) If the ISP Candidate and FedEx Ground cannot agree on terms for an ISP Agreement, the process will end, and station management will be notified. If an ISP Candidate has a current OA with FedEx Ground, it will expire according to its terms. It is in FedEx Ground's best interest to consider all of the terms put forward in order to reach an agreement that will meet the ISP Candidate's business needs, while providing the highest level of customer service possible.

## ISP Agreement Execution

Once the terms of an ISP Agreement with FedEx Ground have been reached, a draft of the agreement is available for review. There are additional steps to complete before a final agreement can be signed, electronically, on *MyGroundBizAccount*.

Additional steps will need to be completed **prior to** the final signing. For a complete list of these steps, see the "Qualification Steps for Pursuing an ISP Agreement" section of this Guide.

Please note: Drivers and certain members of the ISP Candidate's Workforce will need to pass a criminal background check **before** an ISP Agreement effective date; these criminal background checks may take several weeks to complete.

Once the above steps are completed, an ISP Agreement Signatory will be able to print out and review the entire ISP Agreement. If an ISP Agreement Signatory accepts all of the terms as outlined in the ISP Agreement, he/she will need to log on to *MyGroundBizAccount* and digitally sign the agreement via an electronic signature. The final agreement will reside on *MyGroundBizAccount* until it expires. Both the ISP and station management will be able to reference it online.

**Operating as an ISP**

While some contractual obligations under an ISP Agreement will remain the same, others will be substantially different.

## Service Results

The following Service Results are detailed in an ISP Agreement:

### Service Days

Service Days remain consistent: Monday through Friday for FedEx Ground; Tuesday through Saturday for Home Delivery. FedEx Ground reserves the right to modify these days should customer demands and/or competitive advantage require changes. The three Saturdays and Mondays immediately preceding Christmas Day are considered Service Days for both FedEx Ground and FedEx Home Delivery.

### Services

Under the terms of an ISP Agreement, ISPs agree to provide a range of pick-up and delivery services to customers, including:

- Collection and loading, if necessary, of packages for delivery in a CSA.

- Transportation of packages from a domiciled station and delivery in a CSA consistent with customer-selected service offerings and subject to the ISP's Right to Decline.

- Timely collection and transmission of customer signatures, scanning results and package tracking data.

- Collection of COD charges and return of COD charges to FedEx Ground at the end of the Service Day.

- Pick-up of customer packages in a CSA and delivery of the packages to a domiciled station in time to meet service commitments, subject to the ISP's Right to Decline.

- Return of undelivered packages to the domiciled station, according to agreed-upon terms by FedEx Ground and the ISP.

- Additional services described and mutually agreed upon in the Additional Services Schedule, which may include services such as administrative support and shuttle loading and/or unloading.

- Preparation of any legally-required documents (driver logs, vehicle inspection reports, etc.) and submission to FedEx Ground at the end of each service day (or for FedEx Home Delivery the next business day, unless otherwise agreed upon by the ISP and FedEx Ground).

### Service Results

Measurements of "Inbound Local Service" performance will be provided electronically to an ISP. These numbers will also be posted at the FedEx Ground station. The following service results are the minimum standard outlined in an ISP Agreement:

- Provide services to the customers that are compatible with customers' schedules, expectations and pick-up and delivery requirements (subject to the ISP's Right to Decline).

- Achieve a daily inbound local service level of at least 98.5 percent of the daily average Inbound Local Service attained by either the FedEx Ground station where an ISP is domiciled or the FedEx Ground District in which the FedEx Ground station is located, whichever is higher.

Minnesota

23

- Provide the "Service Offerings" detailed in Schedule E of an ISP Agreement (commercial deliveries, residential deliveries, alcohol deliveries, attempted deliveries and pick-ups, delivery signatures, driver release and indirect delivery, premium services, and package tracking information).

- Take reasonable measures to avoid theft, loss, damage, destruction, delay in the handling, loading, unloading, transporting and pick-up and delivery of packages in the CSA.

- Conduct all business activities with honesty and integrity and in a safe and professional manner.

## Service Failure

The Senior Manager will monitor Service Results to assess adherence to the terms of the ISP Agreement. The Senior Manager will document any Service Failure by an ISP (those involving Service, Professionalism or Safety) and will schedule an ISP Discussion with the ISP Key Contact to discuss the Service Failure. The ISP will have an opportunity to correct any Service Failure.

If Service Failures continue, the ISP may be in breach of contract with the terms of the ISP Agreement; such a breach may result in termination of the ISP Agreement, depending upon the circumstances.

### Right to Decline & Right to Ensure

Under an ISP Agreement, an ISP has the Right to Decline services in certain situations without impacting service results. In instances when an ISP exercises the Right to Decline, FedEx Ground has the Right to Ensure that customers within a CSA are properly serviced.

The activities that can be declined under an ISP Agreement are contained in the Agreement. Some instances include: stops over 200 packages, pickups scheduled after 6:30 p.m., spotted trailers, customer requests requiring special modifications to equipment, and stops over the negotiated Daily Stop Threshold.

### Subcontracting

ISPs will have the opportunity to subcontract any services within its CSA to other ISPs. In these situations, FedEx Ground will attempt to accommodate any ISP-directed Load Plan changes that are submitted by ISP Key Contacts in advance of implementation.

ISPs that subcontract work to another ISP will remain responsible for maintaining service levels as well as any claims that may arise. However, only the ISP performing the work will receive payment of charges for this activity, and the packages making up this activity will count toward the inbound local service of only the ISP performing the work.

## Driver Data Collection Process and ISP Data Review

The Driver Data Collection Process and ISP Data Review will replace the existing Check-In Process (including the Revised Daily Settlement Report and the Revised Consolidated Daily Settlement Report, respectively) as summarized below:

### Driver Data Collection Process

This process is similar to the current Check-In Process and occurs when ISP employee-drivers return to the station. The collection of this information (scanner data, paperwork completed by the ISP employee-driver, and P&D activity captured in the FedEx Ground system) will be input by FedEx Ground personnel. Once FedEx Ground has input the data, FedEx Ground will generate an *ISP Driver Data Collection Report* that contains "driver-level pick-up and delivery activity" and will be shared with the ISP employee-driver. The ISP employee-driver will need to review and sign the report, confirming that it is accurate. FedEx Ground management will hold any data discrepancies or service-related issues for the following morning, and these issues will only be addressed with ISP Key Contacts, rather than individually with any ISP employee-drivers.

In the case of FedEx Ground, the information mentioned above should be submitted in the evening of the return to the station, unless otherwise agreed. For FedEx Home Delivery, the information should be submitted on the morning of the return to the station, unless otherwise agreed.

## ISP Data Review

Information submitted, reviewed, and signed by an ISP's employee-drivers will generate an *ISP Data Confirmation Report* which will be reviewed on a regular basis with the ISP Key Contact. This report will contain "CSA-level data" and will be provided only to the ISP Key Contact. It will be used to address any operational or contractual issues that arose on the previous day and will be discussed only with the ISP Key Contact. These meetings can occur as needed, either at the request of FedEx Ground or the ISP, and will optimally be conducted in person after morning dispatch, but they may take place in other formats or times as mutually agreed upon.

The *ISP Data Review* process will be used to cover prior day issues with the ISP, such as: the *ISP Daily Confirmation Report*, P&D Quality Reports, local inbound service, Claims Investigation, Complaints, Branding (if ISP is participating in the Brand Promotion Program) and scanning. The meeting may also be used to address any future ISP requests, such as ISP Load Plan changes and New Pick-up Start-ups, which include ISP-directed vehicle assignment.

The *ISP Data Collection Report*, as mentioned above, contains driver-level data only. It will not contain items such as: non-delivered packages, premium service failures, high profile van scans, uncollected COD monies, and open tracer reports. This information will be contained in the *ISP Data Confirmation Report* and will be sent to ISPs via *MyGroundBizAccount*.

Other daily reports and data will be shared directly with ISP Key Contacts and/or sent electronically to ISPs via *MyGroundBizAccount*.

## Peak Planning

ISPs are responsible for planning Peak operations within a CSA. FedEx Ground will offer its best projections of anticipated Peak volume in a given CSA and will work with the ISP to identify the ISP's anticipated service constraints and plan contingency operations.

## Scanner and Vehicle Usage

In co-locations, ISPs will have a choice to use either FedEx Ground or FedEx Home Delivery scanners, depending on the functionality preferred by the ISP. FedEx Ground will also work with ISPs to group an ISP's vehicles together on FedEx Ground docks, even across van lines that were previously dedicated to FedEx Ground or FedEx Home Delivery vehicles. Any operational changes will be discussed between the ISP and FedEx Ground and will be made after mutual agreement.

## Brand Promotion Program

Participation in the Uniform and/or Vehicle Brand Promotion is optional. A Uniform Brand Promotion charge and a Vehicle Brand Promotion charge may be negotiated if an ISP Candidate decides to participate in either program. Minimum vehicle specifications for vehicles in the Vehicle Brand Promotion program and vehicles not in the program are posted on *MyGroundBiz*.

Any vehicle may be utilized in non-FedEx Ground related activity as long as any FedEx Ground logos are removed or covered.

## ISP Charge Statement

The ISP Charge Statement contains an itemized list of compensation elements that are based on the individual terms agreed to in the ISP Agreement. Examples of terms could include: Package and Stop Charges, Annual Service Charge, Period Safety Incentive, Brand Promotion Program (if elected), Surge Stop Charge and Fuel Surcharge.

Unlike the current settlement statement, the ISP Charge Statement will detail any discrepancies between scanned packages and stops versus summed totals used for ISP Charge purposes. Discrepancies may include hand-sheet totals updated during the Driver Data Collection Process or double stops reversed as part of ISP Charge calculations.

Minnesota                                                                                                                            25

In addition to existing itemized charge backs and deductions (such as physical damage insurance, work accident insurance, workers' compensation insurance, and non-trucking liability), the ISP Charge Statement may also include weekly scanner lease and network access fees (including any additional scanners), claims, equipment registration, fuel tax, expenses and fees, and the current price of fuel within the CSA as indexed weekly by OPIS.

Accessing the ISP Charge Statement is a 100% digital process. Printed statements will not be provided. All related payments will be **made each Friday** (or on the preceding Thursday if Friday is a bank holiday) via Electronic Funds Transfer (EFT). *MyGroundBizAccount* may be used to view an ISP Charge Statement, which is available in .PDF and/or .CSV formats.

**Availability of Electronic Tools**

In addition to offering ISP Charge Statements through *MyGroundBizAccount*, FedEx Ground has developed and is rolling out web-based reports, workforce and fleet management capabilities, CSA operational planning tools and communication methods which will be made available to ISPs.

**Rentals & Spares, Van Washing**

FedEx Ground will not arrange for third-party vehicles or use of spare vehicles. ISPs will be responsible for washing their vehicles. If desired, ISPs may select a van washing vendor and have the washing performed on FedEx Ground's property. Any van washing vendor may be used, subject to the vendor's agreement to comply, and compliance with, FedEx Ground's insurance and environmental standards.

**Locks**

The ISP Agreement does not require the use of high-security locks; however, use of high-security locks will result in diminished liability for claims resulting from vehicle break-ins.

**Safety Terms & Qualifications**

**Contractual Safety Standards**

Schedule I, Safe Operating Practices, covers driver and non-driver qualification criteria, background qualification criteria, and the training and safety responsibilities an ISP agrees to assume. A sample Schedule I will be sent out over the next several weeks.

**Period Safety Incentive**

FedEx Ground will pay ISPs a negotiated Period Safety Incentive payment for each completed 4-week Safety Period.

The amount of the payment, negotiated in an ISP Agreement, is based on the number of preventable accidents the ISP's employee-drivers are charged with and the number of vehicles the ISP operates during the Safety Period. The incentive will be paid to the ISP two periods, or eight weeks, following the close of the qualifying Safety Period.

**ISP Safety Results**

FedEx Ground will provide electronic notification to an ISP if an ISP employee-driver is disqualified. This does not affect an ISP's right to disqualify their employee-drivers. SRMs will be given a monthly report of disqualified drivers.

## Driver Safety Violations

Any driver safety violation will be communicated by the SRM to the ISP, not the ISP employee-driver. As an exception, unsafe behavior on FedEx Ground property may be handled directly with the ISP employee-driver by station management. Any such exception will be subsequently communicated by FedEx Ground to the ISP.

## Controlled Substance Collection & Testing

All ISP employee-drivers need to pass a pre-qualification controlled substance screen to satisfy DOT qualification requirements. When a FedEx Ground approved collection site is utilized, FedEx Ground will pay for screenings. ISP employee-drivers are subject to random controlled substance testing.

## Physical / Medical Exam

All ISP employee-drivers must have a current DOT-compliant medical physical examination. When a FedEx Ground approved physician is utilized, FedEx Ground will pay for the exam. When the physical expires (the term of the physical will be determined by the physician), additional exams and the related costs are the responsibility of the ISP.

## Maintenance

An ISP Agreement will set forth ISP maintenance obligations. Pursuant to DOT requirements, production of monthly maintenance records and annual inspections will continue.

## Claims for Liability to the Public

The ISP Agreement sets forth graduated amounts that will be charged back to, or deducted from, an ISP for any claims brought against FedEx Ground for bodily injury and/or property damage caused by an ISP employee, agent or subcontractor. The amounts to be charged back or deducted will be the actual amount incurred by FedEx Ground up to $1,000 for the first claim, up to $2,000 for the second claim, up to $3,000 for the third claim and up to $4,000 for the fourth and subsequent claims arising out of incidents occurring in any rolling 52-week period.

## Qualification Steps for Pursuing an ISP Agreement

An ISP Candidate must take several steps to negotiate, enter into and operate under an ISP Agreement. Some are one-time occurrences and some must be completed on an annual basis. Most require several weeks to complete and should be completed well in advance of entering negotiations.

These steps ensure ISP Candidates meet the terms of an ISP Agreement and continue to comply with all state and federal laws and regulations.

- **Incorporate the business, if not incorporated already**
  - While ISP Candidates can begin this process immediately, articles of incorporation must be submitted no later than November 19, 2010 to advance to the RFI Process

- **Establish an Entity Profile on *MyGroundBizAccount***
  - While ISP Candidates can establish an Entity Profile once incorporated, the Entity Profile must be established no later than November 19, 2010 to advance to the RFI Process
  - ISP Candidates will be asked, among other questions, to disclose direct or indirect ownership interest and/or participation in other ISP entities to determine if the ISP Candidate has exceeded station guidelines

Minnesota

27

- **Register the business in the state(s) in which it does business, if not registered already and be in good standing with those state(s)**
  - While ISP Candidates can begin this process as soon as the business is incorporated, all ISP Candidates must be registered with the state(s) in which it does business and be in good standing by March 11, 2011

- **Submit Initial Compliance Disclosure Form**
  - ISP Candidates certify compliance with federal and state independent business reporting and filing laws.
  - The Initial Compliance Certification Form illustrates the compliance activities performed by the ISP Candidate and must be signed by the ISP Candidate and the ISP Candidate's accountant
  - While this form can be submitted at any time, the Initial Compliance Disclosure must be completed and submitted by March 11, 2011
  - ISPs will be contractually obligated to file an Annual Compliance Certification form each succeeding calendar year that an ISP Agreement is in effect

If an ISP Candidate does not complete all four of these steps by the deadlines stated above, FedEx Ground may still negotiate an ISP Agreement with the ISP Candidate. However, FedEx Ground may also consider negotiations with alternative contractors as well.

- **Identify an ISP Agreement Signatory that submits to and passes a criminal background check**
  - The ISP Agreement Signatory must pass a criminal background check before signing an ISP Agreement. Should that person fail the criminal background check, another ISP Agreement Signatory must be identified and pass the criminal background check before an ISP Agreement can be signed

- **Secure insurance coverage**
  - ISP Candidates must acquire insurance coverage, including Non-Trucking Liability and Physical Damage (for vehicles included on Schedule B of the ISP Agreement) as well as workers' compensation and work accident insurance (as required by state law and an ISP Agreement)
  - ISP Candidates may secure insurance coverage from the provider of their choice though FedEx Ground will verify with Marsh that proper insurance has been secured
  - ISP Candidates must secure coverage prior to an ISP Agreement effective date.

- **Provide a W-9 business tax form**
  - All ISP Candidates, regardless of whether they were previously incorporated or not, must submit a W-9 business tax form indicating the name of the incorporated entity

- **Establish an Electronic Funds Transfer (EFT) Account**
  - If an ISP Candidate has a new corporate name and/or a new EFT account number, an updated authorization agreement for EFTs must be provided to FedEx Ground before an ISP Agreement effective date
  - ISP Candidates should note this process can take up to three weeks to complete

- **Ensure qualified personnel pass criminal background checks**
  - ISP employees who have access to FedEx Ground systems and/or FedEx Ground property, interact with FedEx Ground customers, or handle FedEx Ground packages must pass a criminal background check before performing these duties for an ISP
  - ISP Candidates should note this process can take several weeks to complete

- **Ensure workforce compliance**
  - Per an ISP Agreement, ISPs may only employ persons who are legally authorized to work in the United States
  - Maintain an I-9 employment authorization form for each employee
  - Provide evidence of compliance at the request of FedEx Ground
  - These steps must be completed before an ISP Agreement effective date
  - ISP Candidates should note these steps can take several weeks to complete

Minnesota

28

**ISP Model Key Terms & Definitions**

**Contracted Service Area (CSA)** – A geographical area, defined in an ISP Agreement, in which an ISP is contractually obligated to provide pick-up and delivery services

**Driver Data Collection Process** – Daily collection of information from an ISP employee which is then inputted by FedEx Ground personnel into FedEx Ground's system

**Independent Service Provider (ISP)** – An independent business entity that contracts with FedEx Ground to provide pick-up and delivery services under an ISP Agreement

**ISP Agreement** – A legal contract negotiated between an ISP and FedEx Ground

**ISP Agreement Signatory** – An individual who signs an ISP Agreement on behalf of the ISP

**ISP Candidate** – An independent business entity that desires to become an ISP for a particular CSA, but has not yet executed an ISP Agreement for that CSA

**ISP Charge Statement** – A weekly statement detailing the ISP's financial earnings and CSA volumes

**ISP Data Collection Report** – A daily report that details package data for each ISP employee-driver. The ISP Data Collection Report is reviewed each afternoon for Ground and the next morning for Home Delivery

**ISP Data Confirmation Report** – A daily report that details package data for each CSA. The ISP Data Confirmation Report is reviewed with the ISP Key Contact each morning

**ISP Data Review** – A daily assessment between FedEx Ground and the ISP Key Contact of the prior day's activities and issues, as well as any future operational plans

**ISP Electronic Funds Transfer (EFT)** – A weekly payment provided to ISPs for work performed in the ISP's CSA. The ISP EFT replaces the settlement check

**ISP Employee** – An individual employed by the ISP. ISP Employees may include Key Contacts, P&D drivers, helpers and office support

**ISP Key Contact** – An individual employee of the ISP responsible for administering an ISP Agreement, including day-to-day operations

**ISP Negotiator** – An officer or employee of the ISP Candidate authorized to negotiate on behalf of the ISP Candidate

**Negotiations** – A process during which FedEx Ground and ISP Candidates attempt to work out various mutually acceptable financial and non-financial terms as well as elections of an ISP Agreement

**Negotiator** – A FedEx Ground employee who negotiates with the ISP Candidate on behalf of FedEx Ground.

**Proposal** – An ISP Candidate's offer on the key financial and non-financial terms as well as elections included in an ISP Agreement

**Request for Information (RFI)** – A request, issued to ISP Candidates by FedEx Ground, which seeks to ascertain the capabilities of prospective ISPs

**RFI Response** – An ISP Candidate's reply to FedEx Ground's RFI, that outlines the ISP Candidate's capabilities relative to the contractual obligations

**Q&As**

Minnesota

1. **Which contractors are affected by this announcement?**
This announcement impacts all P&D contractors domiciled in Minnesota, the Mason City and Spencer, IA co-locations, and the Lacrosse, WI co-location, as well as those Sioux Falls, SD co-location and the Watertown, SD Ground station contractors providing P&D services within Minnesota. Linehaul contractors are not affected.

2. **Why implement a new contract and operational changes in Minnesota?**
The Company believes these operational changes are necessary so that contractors will continue to have the opportunity of owning and growing an independent business in Minnesota and so that the company can strengthen its independent contractor model in Minnesota and continue to provide P&D services through the independent contractor model. While a transition in Minnesota was necessary given the recent changes in state law, regulatory decisions, and enforcement actions that have made it more difficult for independent contractors to operate in Minnesota, we believe the features of the new relationship will provide an attractive option for business-minded entrepreneurs.

3. **If a contractor acquires additional routes, is that contractor guaranteed an ISP Agreement?**
No. Negotiating an ISP Agreement is an individualized negotiation between ISP Candidates and FedEx Ground. ISP Candidates will negotiate key financial and non-financial terms, as well as make elections, according to the unique business needs of the service area. The process will also involve a response to a Request for Information (RFI) so that ISP Candidates can demonstrate the ability to provide the level of service required. Participating in this process does not automatically guarantee that ISP Candidates will be able to successfully negotiate and enter into an ISP Agreement.

4. **How many PSAs can an ISP Candidate acquire in Minnesota?**
There is no statewide limit on how many PSAs an ISP Candidate can acquire in Minnesota. There are, however, station-specific guidelines in place to avoid excessive dependence for network service on any one contractor in a particular station. Station management can provide additional details regarding the guidelines for your station.

5. **What happens once an ISP Agreement goes into effect?**
The ISP Model is intended to provide the potential for higher earnings by maximizing economies-of-scale, as well as other operating efficiencies of a larger, multi-vehicle operation. Under an ISP Agreement, ISPs are responsible for planning all P&D activity within the Contracted Service Area (CSA). This includes driver recruitment, training and staffing; vehicle fleet size selection, acquisition and maintenance; peak planning; and complying with all applicable laws and regulations. ISPs will have significant flexibility in allocating staff and vehicles as ISPs see fit to meet the unique and changing business needs of their CSAs.

6. **Can an ISP Candidate operate both Ground and Home Delivery routes?**
Yes. ISP Candidates may operate any combination of at least three Ground and/or Home Delivery PSAs in the same station by November 19, 2010 to begin the RFI and Negotiations Processes for a new agreement. A single station is defined as a FedEx Ground station, a Home Delivery station, or a FedEx Ground and Home Delivery co-location.

7. **Will ISPs continue to operate under FedEx Ground's operating authority?**
Yes. ISPs will continue to operate under FedEx Ground's operating authority.

8. **What happens to the swing routes currently operated by contractors?**
Swing routes will cease to exist upon the expiration of the applicable Operating Agreement (OA). Swing contractors that acquire and operate at least three non-swing PSAs in the same station, incorporate as a corporation, and not some other form of business, such as an LLP or LLC, and establish an Entity Profile through *MyGroundBizAccount* by November 19, 2010 and that register with state(s) in which it does business, be in good standing, define a CSA, and respond to FedEx Ground's RFI will be eligible to submit a first proposal and begin negotiations for an ISP Agreement. Swing PSAs will not count toward the three PSA minimum needed to be eligible for ISP Agreement negotiations.

Minnesota

30

9. **How quickly will FedEx Ground make the transition incentive payments?**
The first $5,000 of the transition incentive will be paid within 15 business days of submitting a signed Contractor Limited Release and Operating Modification Agreement. The remaining $5,000 of the transition incentive will be paid as follows:

- Contractors that sell/transfer PSAs and sign the supplemental limited release will receive a check within 15 business days at the station for the remaining $5,000 of the transition incentive once the current OA terminate and proof of sale or transfer of the routes is submitted to station management;
- P&D contractors operating fewer than three PSAs in a single station as of November 19, 2010 will receive the remaining $5,000 of the voluntary transition payment within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of the OA; or
- P&D contractors operating three or more PSAs in the same station as of November 19, 2010 will receive the remaining $5,000 of the transition incentive within 15 business days of submitting, to station management, the Supplemental Limited Release of Claims upon the termination of their OA.

10. **Are contractors eligible for the $10,000 transition incentive even if they choose to sell their routes?**
Yes. These contractors will need to sign and timely submit a Contractor Limited Release and Operating Modification Agreement. They will also need to submit proof of their transition and sign the supplemental limited release.

11. **Is the transition incentive taxable?**
Contractors should consult with tax advisors as to the tax status of the transition incentive. The transition incentive will be reported by FedEx Ground on a Form 1099 for the year in which the amount is received.

12. **What happens if a contractor decides not to sign the Contractor Limited Release and Operating Agreement Modification?**
Contractors are not required to sign the optional limited release. If a contractor decides not to sign the limited release, that contractor will not receive the transition incentive described in this Guide and will continue to operating under the terms of their OA until its current expiration date, absent any further extension. This contractor can still pursue an ISP Agreement if it meets all the terms set forth in this Guide.

13. **Are extensions still available for contractors that do not sign the Contractor Limited Release and Operating Agreement Modification?**
Yes. As previously announced on May 20, 2010, contractors with Operating Agreement expiration dates between July 1, 2010 and December 31, 2010 are eligible to receive a 180-day contract extension. This extension remains available, even if contractors do not sign the Contractor Limited Release and Operating Agreement Modification. If and once a contractor signs the Contractor Limited Release and Operating Agreement Modification, however, the expiration date for the Operating Agreement will be reset to November 19, 2010 regardless of any prior extension.

14. **Why are growth incentives tied to the acquisition of the vehicle and the PSA?**
By acquiring a vehicle that is already in service in a particular PSA, the ISP will have a vehicle that necessarily qualifies for service under an ISP Agreement.

15. **Are growth incentives available for eligible PSAs acquired after November 19, 2010?**
No. All acquisitions of eligible PSAs, by eligible contractors, must be completed by November 19, 2010 in order to be eligible for growth incentive payments.

16. **Do ISP Candidates have to compete with other vendors from outside the network for the CSAs?**
Initially, competitive bidding between ISP Candidates is not expected to take place; the ISP Candidate currently serving a particular geographic area will be given the first opportunity to negotiate a multi-year ISP Agreement with FedEx Ground and, if operating three or more PSAs in the same station by November 19, 2010, will have an opportunity to extend a current Operating Agreement to do so. Should an impasse be reached, multiple candidates may be engaged in the process. FedEx Ground may also seek multiple bids for the same CSA in the event that certain transition deadlines are not met. These deadlines have been put in place in order to ensure the transition can be completed in sufficient time to protect against service disruptions. When the multi-year ISP Agreements expire, there is no automatic renewal. At that point, the existing ISP can bid for the CSA again, though FedEx Ground may also consider external candidates in order to contract with the best candidate in terms of experience, ability to provide service, cost, as well as other factors.

Minnesota

31

**17. Can a Ground contractor acquire a Home Delivery (HD) route (or vice versa) as part of the Minnesota transition?**
Yes, but a new OA will need to be signed for the HD (or Ground) route. This new contract will expire on November 19, 2010, though an extension will be granted if the contractor is at scale.

**18. How does the transition to the ISP Model affect contractors operating PSAs in different Minnesota stations?**
FedEx Ground is willing to consider the particular circumstances and make a decision as to whether these contractors are considered to be at scale to negotiate an ISP Agreement. Station management can discuss potential options.

**19. With whom will ISP Candidates negotiate?**
While Senior Managers are an important part of the process for identifying ISP Candidates, Pittsburgh-based FedEx Ground employees will serve as Negotiators on behalf of the Company.

**20. Is negotiating an ISP Agreement for a one-year term an option?**
Generally, ISP Agreements will be negotiated for a three-to-five year period; however, shorter or longer contract periods will be subject to the parties' negotiations.

**21. What impact will FedEx Ground's ISP Model announcement have on the Company's Incorporation and Compliance Disclosure announcement made on May 20, 2010? Does the non-renewal notice on May 20, 2010 remain in effect?**
The ISP Model announcement affects the announcement made by FedEx Ground on May 20, 2010 concerning incorporation and compliance disclosure. The timelines and deadlines established by this announcement supersede those announced on May 20, 2010, except for the non-renewal notices contained in that announcement and any contract term extensions already given, which remain in effect. That means only the timelines and deadlines set forth in the ISP Transition Guide apply. The non-renewal notice on May 20, 2010 remains in effect.

**22. If a contractor already received an extension as a result of the Company's Incorporation and Compliance Disclosure announcement, what happens to that extension?**
Any extension a contractor has already received remains in effect, unless they sign the Contractor Limited Release and Operating Agreement Modification, which will change the termination date of any Operating Agreement to November 19, 2010. If a contractor does not sign the Contractor Limited Release and Operating Agreement Modification, then the Operating Agreement will expire at the end of any extension the contractor already received as a result of the Company's Incorporation and Compliance Disclosure announcement.

**24. Will contractors affected by the ISP Model announcement still receive the $750 early adoption incentive that FedEx Ground announced on May 20, 2010?**
Yes. As a good-will gesture on the part of the company, all affected P&D contractors will receive the $750 early adoption incentive associated with the May 20, 2010 announcement, which is in addition to incentives that will be available as part of this ISP transition. This $750 will be paid to all affected contractors, regardless of whether they choose to incorporate, sign the Contractor Limited Release and Operating Agreement Modification, or pursue ISP candidacy. More details will be available in the coming weeks.

*In the future, additional Q&A can be found on www.mygroundbiz.com.*

Minnesota

32

# Sample Contractor Limited Release and Operating Agreement Modification

## CONTRACTOR LIMITED RELEASE AND
## OPERATING AGREEMENT MODIFICATION

This Contractor Limited Release and Operating Agreement Modification (the "**Agreement**") is entered into by and between FedEx Ground Package System, Inc. ("**FedEx Ground**") and [_____] ("**Contractor**").

WHEREAS, Contractor has previously entered into a FedEx Ground Package System, Inc. Pickup and Delivery Contractor Operating Agreement and/or a FedEx Home Delivery Standard Contractor Operating Agreement (the "Operating Agreement").

WHEREAS, in exchange for the payment described in Article 2, Contractor agrees to an extension or early termination of the current Operating Agreement, as applicable to Contractor's circumstances (and as further described in Article 1), and to grant FedEx Ground a limited release of claims as described in Article 3.

WHEREAS, in exchange for Contractor's future execution of the supplemental limited release of claims attached as Exhibit A, FedEx Ground agrees to make the additional payment described in Article 4.

NOW THEREFORE, in consideration of the covenants and agreements contained herein and other good and valuable consideration, the parties knowingly and voluntarily agree as follows:

1.     **Termination of Current Operating Agreement.**  The parties irrevocably agree that their Operating Agreement shall terminate on November 19, 2010, unless otherwise subsequently agreed in writing.  This termination of the Operating Agreement shall be effective without any further notice of contract termination or non-renewal for those Operating Agreements which otherwise would expire after November 19, 2010, and without any further notice of renewal or extension for those Operating Agreements which otherwise would expire before November 19, 2010.  Upon termination, Contractor shall fulfill his or her "Obligations Upon Termination" as set forth in the Operating Agreement.  Except as otherwise provided in this Agreement, the provisions of the Operating Agreement, which, by their terms, survive termination, shall survive termination pursuant to this Agreement.

2.     **Payment.**  FedEx Ground shall pay to Contractor the sum of Five Thousand Dollars ($5,000).  This payment shall be made within fifteen (15) business days after the designated representative(s) of station management at Contractor's home station receives Contractor's fully-executed Agreement.

3.     **Release of Claims.**  Except for those obligations created by or arising out of this Agreement, Contractor, and any corporation, limited liability company, sole proprietorship, and/or any other business entity or person(s) with whom Contractor is affiliated, hereby covenants not to sue or demand arbitration and acknowledges full and complete satisfaction of

and releases and discharges, to the fullest extent permitted by law, FedEx Ground, its subsidiaries, divisions (including, without limitation, FedEx Home Delivery), parent and affiliated companies, past and present, and each of them, as well as its and their trustees, directors, officers, shareholders, agents, attorneys, insurers and employees, past and present, and each of them, hereinafter collectively referred to as "**Releasees**," with respect to and from any and all claims, demands, liens, agreements, contracts, covenants, actions, suits, causes of action, arbitrations, wages, obligations, debts, expenses, attorneys' fees, damages, judgments, orders and liabilities of whatever kind, whether known or unknown, suspected or unsuspected, which Contractor or any Contractor-related business entity now owns or holds or has at any time heretofore owned or held as against Releasees, or any of them, arising out of or in any way connected with (i) FedEx Ground's announcement(s) that it is modifying its relationship with contractors who provide service in Minnesota, and (ii) any and all actions related to FedEx Ground's modification of its relationship with contractors who provide service in Minnesota, including, without limitation, any contemplated or actual termination, non-renewal or assignment of Contractor's Operating Agreement, any contemplated or actual sale, assignment or other disposition of a primary service area (whether Contractor was the transferor or transferee of said primary service area), and any contemplated or actual sale, assignment or other disposition of a Contractor's vehicle. Contractor, and any corporation, limited liability company, sole proprietorship, and/or any other business entity or person(s) with whom Contractor is affiliated, agrees that this Release of Claims shall be effective as a bar to each and every claim, demand and cause of action described above, including those that are unknown, unanticipated or unsuspected or which may hereafter arise as a result of the discovery of new or additional facts.

4.     **Supplemental Limited Release.**  In exchange for Contractor's execution of the Supplemental Limited Release attached as Exhibit A on or after the effective date of the termination of Contractor's Operating Agreement (including any written extension thereof), FedEx Ground agrees to pay Contractor the sum of Five Thousand Dollars ($5,000).  This payment shall be made within fifteen (15) business days after the designated representative(s) of station management at Contractor's home station receives Contractor's fully-executed Supplemental Limited Release.  The parties understand and agree that Contractor's decision in the future regarding whether or not to execute the Supplemental Limited Release in exchange for the payment described in this Article 4 has no bearing whatsoever on Contractor's rights and obligations under other provisions of this Agreement (including, for example, under Articles 1-3).

5.     **Non-Admission Of Liability.**  Neither this Agreement, nor FedEx Ground's offer to enter into this Agreement with Contractor, shall constitute an admission on the part of FedEx Ground of any violation of federal, state or local law, ordinance or regulation, or of any violation of FedEx Ground's policies or procedures, or any violation of or wrongdoing under the Operating Agreement, or of any liability or wrongdoing whatsoever.  Neither this Agreement nor anything in this Agreement shall be construed to be or shall be admissible in any proceeding as evidence of liability or wrongdoing on the part of any party.

6.     **Consultation With Attorney.  Contractor is advised to consult with an attorney before executing this Agreement, and Contractor acknowledges that reasonable and sufficient time has been given for such consultation.  If Contractor executes this Agreement**

without consulting an attorney, Contractor agrees that such decision was the result of Contractor's voluntary choice.

7.    **Severability**.  If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Agreement which can be given effect without the invalid provisions or application.  To this end, the provisions of this Agreement are declared to be severable.

8.    **Assignment.**  The rights of FedEx Ground under this Agreement shall inure to the benefit of the successors, assigns and legal representatives of FedEx Ground.  This Agreement may not be assigned, nor the duties hereunder delegated, by Contractor.

9.    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota without regard to principles of conflict of laws.

10.   **Tax Matters.**  Contractor acknowledges that FedEx Ground has not made any representations to Contractor regarding the taxability of any payment to Contractor under this Agreement.

11.   **Reproductions**.  Photocopies and other reproductions of the fully-executed Agreement (including where the Agreement contains electronic or other facsimile signatures) shall have the same force and effect as an original executed document.

12.   **Entire Agreement.**  This Agreement constitutes the entire and only understanding and complete agreement between the parties, and supersedes any prior discussion, agreement or understanding, whether oral or written, with respect to the subject matter herein.  Any representation, promise or agreement not specifically included in this Agreement shall not be binding upon or enforceable against either party.  This is a fully integrated agreement.  No modifications or revisions of this Agreement shall have any force or effect unless put in writing and executed by both parties.

13.   **Authority**.  The undersigned Contractor represents and certifies that he/she has full legal authority to act on behalf of and legally bind any corporation, limited liability company, sole proprietorship, and any other business entity or person(s) with whom Contractor is affiliated.  This authority includes, without limitation, the execution of this Agreement on behalf of any such entities or persons.

3

   **I have been advised by FedEx Ground to consult with legal counsel before signing this Agreement, as this Agreement will affect my legal rights.** I have read the foregoing Agreement, and I understand and acknowledge the significance and consequence of it, and execute it voluntarily with full understanding of its consequences. I declare under penalty of perjury that the foregoing is true and correct.

   FedEx Ground's offer to enter into this Agreement, as reflected in its officer's signature below, shall remain open until August 27, 2010.

**CONTRACTOR:**                                         **FEDEX GROUND PACKAGE SYSTEM, INC.**

By: _____                    By: _____
      Signature                                                    Signature

Its _____                      Its _____


_____                            _____
Print Name                                                   Print Name

Contractor ID No: _____

Date: _____            Date: _____

4

# EXHIBIT A
## SUPPLEMENTAL LIMITED RELEASE OF CLAIMS

This Supplemental Limited Release of Claims is executed by [_____]
("**Contractor**") as of the date set forth below.

WHEREAS, Contractor has previously entered into a FedEx Ground Package System, Inc.
("**FedEx Ground**") Pickup and Delivery Contractor Operating Agreement and/or a FedEx Home
Delivery Standard Contractor Operating Agreement.

WHEREAS, Contractor has also previously entered into a Contractor Limited Release and
Operating Agreement Modification ("**Agreement**"), which provided for a monetary payment by
FedEx Ground in exchange for, among other things, Contractor's limited release of claims.

NOW THEREFORE, in consideration of the covenants and other provisions in the Agreement,
and for other good and valuable consideration, Contractor agrees as follows:

   **Release of Claims.** Except for those obligations created by or arising out of said
Agreement, Contractor, and any corporation, limited liability company, sole proprietorship,
and/or any other business entity or person(s) with whom Contractor is affiliated, hereby
covenants not to sue and acknowledges full and complete satisfaction of and releases and
discharges, to the fullest extent permitted by law, FedEx Ground, its subsidiaries, divisions
(including, without limitation, FedEx Home Delivery), parent and affiliated companies, past and
present, and each of them, as well as its and their trustees, directors, officers, shareholders,
agents, attorneys, insurers and employees, past and present, and each of them, hereinafter
collectively referred to as "*Releasees*," with respect to and from any and all claims, demands,
liens, agreements, contracts, covenants, actions, suits, causes of action, arbitrations, wages,
obligations, debts, expenses, attorneys' fees, damages, judgments, orders and liabilities of
whatever kind, whether known or unknown, suspected or unsuspected, which Contractor or any
Contractor-related business entity now owns or holds or has at any time heretofore owned or
held as against Releasees, or any of them, arising out of or in any way connected with (i) FedEx
Ground's announcement(s) that it is modifying its relationship with contractors who provide
service in Minnesota, and (ii) any and all actions related to FedEx Ground's modification of its
relationship with contractors who provide service in Minnesota, including, without limitation,
any contemplated or actual termination, non-renewal or assignment of Contractor's Operating
Agreement, any contemplated or actual sale, assignment or other disposition of a primary service
area (whether Contractor was the transferor or transferee of said primary service area), and any
contemplated or actual sale, assignment or other disposition of a Contractor's vehicle.
Contractor, and any corporation, limited liability company, sole proprietorship, and/or any other
business entity or person(s) with whom Contractor is affiliated, agrees that this Release of
Claims shall be effective as a bar to each and every claim, demand and cause of action described
above, including those that are unknown, unanticipated or unsuspected or which may hereafter
arise as a result of the discovery of new or additional facts.

   I represent and certify that I have full legal authority to act on behalf of and legally bind
any corporation, limited liability company, sole proprietorship, and any other business entity or

person(s) with whom I am affiliated. This authority includes, without limitation, the execution of this Agreement on behalf of any such entities or persons.

I have read the foregoing Supplemental Limited Release of Claims, and I understand and acknowledge the significance and consequence of it and execute it voluntarily with full understanding of its consequences. I have consulted with an attorney before executing this release or decided to execute this release without legal consultation. I declare under penalty of perjury that the foregoing is true and correct.

**CONTRACTOR:**        **FEDEX GROUND PACKAGE SYSTEM, INC.**

By: _____     By: _____
      Signature                          Signature

Its _____     Its _____

_____         _____

Print Name                       Print Name

Contractor ID No: _____

Date: _____     Date: _____

LA3:1167900.2

6

case 3:05-md-00527-RLM-CAN document 2099 filed 07/28/10 page 1 of 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) |
| | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) ) |
| *ALL ACTIONS* | ) ) ) ) |
| | JUDGE MILLER |

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' THIRD MOTION TO AUGMENT THE RECORD WITH NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

---

Defendant FedEx Ground Package System, Inc. ("FXG") hereby opposes Plaintiffs' Third Motion to Augment the Record With Newly Produced Documents Relevant to Cross-Motions for Summary Adjudication of Employment Status (Doc. No. 2087).

Through their motion to supplement the record, plaintiffs seek to introduce several exhibits that describe the process by which FXG is moving towards an Independent Service Provider ("ISP") contractor model.[1] This ISP Model is one in which (among other things) FXG

---

[1] Specifically, plaintiffs have filed the following: Exhibit 1, a Decision of the Tennessee Department of Labor and Workforce Development dated February 2, 2010; Exhibit 2, a Settlement Agreement between FXG and the Tennessee Department of Labor and Workforce Development, dated June 2, 2010; Exhibit 3, the Tennessee Transition Announcement and ISP Transition Guide; Exhibit 4, announcement of settlement and Settlement Agreement between the Commonwealth of Massachusetts and FXG, dated July 15, 2010; Exhibit 5, Massachusetts Transition Announcement and ISP Transition Guide, dated July 15, 2010; Exhibit 6, Rhode Island Transition Announcement and Transition Guide, dated July 15, 2010; Exhibit 7, Vermont

enters into agreements with contractors that have larger geographic service areas (typically three routes or more), the ISPs are incorporated, and in which the ISPs agree that all workers who provide pick up and delivery services will be treated as employees for all regulatory purposes. These documents, other than the settlement agreements and announcement of the Massachusetts settlement, were provided to contractors in Tennessee, Massachusetts, Rhode Island, Vermont, Illinois, Minnesota, and certain contractors who work out of "cross-border" FXG stations in neighboring states in conjunction with FXG's decision to move to a substantially different Independent Contractor Model—the ISP Model—in these jurisdictions, but one that most assuredly still rests on the belief that the contractor relationship is a preferred method of operation. This decision was made in response to the concerns of certain state regulatory authorities. Specifically, FXG's interactions with some state authorities have led the Company to take proactive steps to help states ensure that FXG's contractors are themselves legally compliant. Under the ISP Model, ISPs would necessarily register with the state(s) in which they are incorporated and operate, increasing the transparency of their operations to the state to help ensure compliance with state law. By comparison, in 2007 FXG switched to an all-multiple work area ("MWA") version of its traditional independent contractor model after an adverse decision in California pertaining to single work area ("SWA") contractors there. The ISP Model has some similarities to, but is substantially different than, the all-MWA model in California, though both organizational forms were implemented to address the concerns of specific state regulators.

Plaintiffs' reliance on these documents to support their summary judgment motions is

---

Transition Announcement and ISP Transition Guide, dated July 15, 2010; Exhibit 8, Illinois Transition Announcement and ISP Transition Guide; and Exhibit 9, Minnesota Transition Announcement and ISP Transition Guide, dated July 15, 2010.

2

misplaced.  As explained below, the documents do ***not*** support plaintiffs' summary judgment arguments or demonstrate the employee status of the Tennessee contractors or those in any other state.  <u>First</u>, the documents do not evidence a "virtual abandonment" of the use of independent contractors as a business model.  To the contrary, the express purpose of the transition is to "ensure that P&D <u>contractors</u> will <u>continue</u> to have the freedom and flexibility <u>to run independent businesses</u> while providing the outstanding service [] customers have come to expect form FedEx Ground."   (Faris Decl. Ex. 3 at 3 [Doc. No. 2088-3 at 16].)  <u>Second</u>, the documents neither reflect nor create any right to control over the method and manner of performing the work and thus provide no evidence pertinent to the Court's assessment of the current FXG Operating Agreement and the current Independent Contractor Model.  <u>Third</u>, the documents that are settlement agreements are inadmissible under Fed. R. Evid. 408(a), inadmissible under Fed. R. Evid. 401 and 402 due to a lack of relevance, and inadmissible as subsequent remedial measures under Fed. R. Evid. 407.  <u>Fourth</u>, the ISP transition documents do not in any way demonstrate that FXG has the right to terminate its contractors at will.

Accordingly, Plaintiffs' Third Motion to Augment should be denied.

**A.      The Tennessee and Massachusetts Settlement Agreements Are Inadmissible And Irrelevant to the Pending Summary Judgment Motions**

The settlement agreements that plaintiffs attempt to add to the record (Plaintiffs' Exhibits 2 and 4), which were not produced by defendants,[2] are inadmissible.  First, as settlement agreements, they are excludible under Fed. R. Evid. 408(a) "when offered to prove liability,"

---

[2]Plaintiffs claim that the documents they propose to add to the record were produced by FXG "or other sources."  (Faris Decl. [Doc. No. 2088] at 1.)  FXG did not produce either the Tennessee settlement or the Massachusetts settlement to plaintiffs.  (Doc. No. 2088-3 at 2-3, 8-9, 11-12; Doc. No. 2088-5 at 2-6.)  The Massachusetts and Tennessee settlement agreements were intended to be kept confidential, (Doc. No. 2088-4 at 13-14; Doc. No. 2088-2 at 8), and their use in these proceedings is improper and should not be permitted.

which is plaintiffs' purpose. *See New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910

F.2d 1474, 1482 (7th Cir. 1990) (stating, in race discrimination case, "[n]or do we believe that

the district court abused its discretion by refusing to admit Exhibit 205, a letter and draft

agreement written by the Village's attorney to, among others, the plaintiffs' original attorney in

this case. Federal Rule of Evidence 408 authorizes the district court to exclude settlement letters.

There was a substantial showing that the letter was part of a settlement attempt, and would have

been used by the plaintiff to establish its claim that the demands of the defendants were a pretext

for racial animus"); *Delugas v. Publishers Equip. Corp*., No. 89 C 20363, 1991 WL 352531, at

*2-*3 (N.D. Ill. Oct. 10, 1991) (settlement evidence inadmissible). Here, plaintiffs offer them

only for the purpose of "[d]emonstrat[ing]" that the contractors "[a]re [e]mployees." (Pls.' Mot.

at 4.) Employment status is of course a key liability question in the MDL, and therefore

plaintiffs cannot use these documents to support their contentions in this regard.

Second, given their content, the documents are irrelevant. In neither agreement does

FXG admit any liability, (Doc. No. 2088-4 at 15-16; Doc. No. 2088-2 at 5), rendering these

agreements devoid of probative value for any purpose for the pending summary judgment

motions or otherwise. Indeed, the Massachusetts settlement agreement specifically notes that it

is made "without trial or adjudication of any alleged issue of fact or law and without any finding

of liability of any kind." (Doc. No. 2088-4 at 15-16.)[3] The Tennessee settlement agreement

states the parties' agreement that "nothing in this Agreement shall operate as an admission of

liability, or non-liability . . . ." (Doc. No. 2088-2 at 5.) As a result, it is impossible for the

settlement agreements to make the contested issue of employment status more or less probable,

---

[3]Additionally, a number of the citations covered by the settlement were supposed to be
"withdraw[n] and dismiss[ed]," further indicating why the settlement is not proof of liability.
(Doc. No. 2088-4 at 6-7.)

rendering the documents inadmissible under Fed. R. Evid. 401 and 402. *See Highland Capital*

*Management, L.P. v. Schneider*, 551 F. Supp. 2d 173, 199 (S.D.N.Y. Jan. 31, 2008) (granting

motion in limine to exclude settlement documents, and stating that "the settlement agreement and

any related evidence are not relevant to this case . . . [because it] does not contain any admissions

of liability by GRS or Rauch, or any other material relating to the dispute. Further, the

settlement negotiations and agreement occurred after the events giving rise to this action. There

is no showing that the settlement agreement or any related evidence are relevant to this case").

Third, to the extent the settlement agreements could be construed as anything pertinent to

the pending motions at all, it would be as a subsequent remedial measure, i.e., changes to the

current Independent Contractor Model to shore up some imperfections that plaintiffs have

alleged. Such a change would fall within the scope of Fed. R. Evid. 407, which bars evidence of

measures taken after an event that would have made the event less likely to occur if taken

beforehand. As the Seventh Circuit explained in a case involving a subsequent contract

modification:

> [T]o use at a trial a revision in a contract to argue the meaning of the original version
> would violate Rule 407 of the Federal Rules of Evidence, the subsequent-repairs rule, by
> discouraging efforts to clarify contractual obligations, thus perpetuating any confusion
> caused by unclarified language in the contract . . . . Pastor wants to use the evidence that
> State Farm, to avert future liability to persons in the position of the plaintiff, changed the
> policy, to establish State Farm's 'culpable conduct.' That is one of the grounds that
> evidence of subsequent corrective action may *not* be used to establish.

*Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1045 (7th Cir. 2007) (emphasis in

original). Consequently, the settlement agreements, which are not subject to any recognized

exception to the Rule, should be rejected pursuant to Rule 407's general prohibition.[4]

---

[4]The settlement agreements are also inadmissible under Rule 403, as their utility (if any) is far
outweighed by their potential for unfair prejudice, cumulative nature, and lack of probative
value. *Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 205-06 (1st Cir.

**B.** **The Introduction of the ISP Model Does Not Indicate a Right to Control Under the Current Independent Contractor Model.**

**1.** **FXG Has Not Abandoned the Current Independent Contractor Model**

Plaintiffs argue that these documents demonstrate that FXG has "[a]bandoned" the Operating Agreement and its current Independent Contractor Model. (Pls.' Mot. at 5.) Even if true—and it is not—such a fact has no probative value as to whether any plaintiff is or is not an independent contractor. In any case, plaintiffs' attribution of motives to FXG and their characterization of the business decision these documents reflect are incorrect. In certain states (only eight out of fifty), FXG has made changes to its current model and implemented the ISP Model in response to specific situations, including the particularities of those states' laws. That does not constitute an abandonment of the current independent contractor structure. Further, the ISP Model was implemented to ensure that FXG can *continue* to work with independent contractors. (Doc. No. 2088-3 at 43 ("Transitioning to the ISP Model will [] ensure that P&D contractors continue to have the freedom and flexibility to run independent businesses . . . .").) As with existing pick up and delivery contractors, an ISP is also an independent contractor, although the relationship has new attributes. (Doc. No. 2088-3 at 18 ("The cornerstone of FedEx Ground's growth and success is its relationship with a network of thousands of independent business that contract with the Company to provide package pick-up and delivery services. In certain states, FedEx Ground refers to these businesses as Independent Service Providers (ISPs).").) The ISP Model makes alterations to the current contractual relationship with FXG, such as by having companies contract, and be responsible for, larger geographic service areas. The ISP Model requires each ISP to service multiple routes with drivers, contemplates individualized negotiations for each contract between FXG and each ISP, and offers the potential

2007) (affirming refusal to admit evidence of settlement discussions under Rule 403).

for greater contractor profit than under the existing independent contractor model. (*Id.* at 20, 22-23.) The changes under the ISP Model do not in any sense "abandon" FXG's use of independent contractors.

> ### 2. Because Transition to the ISP Model Is Voluntary, FXG Is Not Controlling How Current Contractors Structure Their Businesses Or Perform Their Work

Plaintiffs contend that FXG's recent decision "is relevant to determining FXG's right to control the manner and means of the drivers' work—the critical indicator of employee status in most of the cases in this MDL and a material consideration in every MDL case." (Pls.' Mot. at 3.) Choosing to enter into a business relationship only with incorporated entities that have a defined minimum geographic size (generally three Primary Service Areas ("PSAs") in a single station or co-location, which then constitute a Contracted Service Area ("CSA")), (Doc. No. 2088-3 at 20), does not constitute any control over *how* a particular contractor picks up or delivers packages on a day-to-day basis. Similarly, by choosing to contract with corporate entities that use employees (*id.* at 41-42), FXG does not assume the right to control *how* the work is done or what those employees do.

FXG's recent decision is not indicative of a right to control its contractors but simply of its right to contract with entities of its choosing. That right is well established, and does not indicate an employee relationship. *E.g., Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Expert Masonry, Inc. v. Boone County, KY*, 440 F.3d 336, 347 (6th Cir. 2006) (stating that "it is the appropriate nature of a functioning competitive marketplace that buyers are free to choose from whom they will buy, sellers are free to choose to whom they will sell, and salesmen battle and strive to curry favor and close the deal") (emphasis added); *Macquarie Group Ltd. v. Pacific Corp. Group, LLC*, No. 08cv2113-

IEG-WMC, 2009 WL 539928, at *8 (S.D. Cal. Mar. 02, 2009) (same).  In response, the other

contracting party is free to accept the business requirements of the offering party or walk away

once the contract is terminated.  *See Monsanto Co.*, 465 U.S. at 761 ("[T]he manufacturer can

announce its resale prices in advance and refuse to deal with those who fail to comply.  A

distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.").

FXG's decision to contract only with incorporated entities that satisfy certain business criteria

does not "foist" a business format on the contractors (Pls.' Mot. at 7); rather, FXG is exercising

the right any enterprise has to set contracting standards for those with whom it contracts.

### 3.      FXG Has No Right to Terminate At Will

Contrary to plaintiffs' assertion, the Exhibits also do not show that FXG "has the right to

terminate and non-renew at will."  (Pls.' Mot. at 7.)  Rather than "terminat[e]" Operating

Agreements "at will," (*id.*), FXG is exercising only its contractual right to not <u>renew</u> the

contract—a bilateral right that the contractors also possess.  (*See* OA § 11.2.)  FXG exercised its

right to non-renew all contractors' Operating Agreements on May 20, 2010.  (Doc. No. 2088-3 at

25 (noting that, as part of a transition to dealing only with incorporated contractors, "all OAs

were non-renewed on May 20, 2010 and remain non-renewed").)  FXG's decision to exercise

this right, by providing ample notice prior to the anniversary date of these contracts in

accordance with their express terms, cannot reasonably be construed as "termination at will."

*See Hopkins v. Duckett*, No. 02-5589, 2006 U.S. Dist. LEXIS 84559, *12 (D.N.J. Nov. 21, 2006)

(one-year contract subject to annual automatic renewal was not terminable at will); *Vulcan*

*Materials Co. v. Atofina Chem. Inc.*, 355 F. Supp. 2d 1214, 1242 (D. Kan. 2005) (where contract

automatically renewed for a definite term in the absence of notice to terminate, the contract was

"not terminable 'at will,' as that term is generally understood in the law, meaning a relationship

which can be ended immediately without notice or other continuing duties"). Just as the Court recognized when it denied plaintiffs' request to enjoin FXG's transition in California to all-Multiple Work Area ("MWA") contractors, FXG "didn't terminate any existing contracts." (10/12/07 Order at 3.) Rather, "the contracts simply will not be renewed pursuant to the automatic renewal provision." (Id.)[5]

Moreover, plaintiffs' suggestion that FXG is unilaterally altering the end dates of Operating Agreements "irrespective of the expiration date of their contract[s]," (Pls.' Mot. at 7), is plainly incorrect. FXG has done no more than give plaintiffs the option of ending their contracts early. (Doc. No. 2088-3 at 16 ("FXG is offering eligible contractors various options, ample time to consider them and financial incentives."); id. at 24 ("Contractors affected by this transition have several options to choose from before October 8, 2010.") If they choose to do so, they are eligible for a transition incentive payment. (Id. (stating that "signing this document [a limited release] is not required, but doing so makes contractors eligible to receive the transition incentive"); id. at 27 ("**Contractors are not obligated to sign the release of claims documents**. Deciding whether to sign these documents is completely up to each contractor.") (emphasis in original).) Specifically, if contractors in the affected states where the ISP Model is being implemented sign a limited release, they are also agreeing to change the expiration date of their existing Operating Agreement in exchange for $10,000 in consideration to which the contractors were not already entitled. (Id. at 26 ("FedEx Ground is offering a transition incentive of $10,000 to all current P&D contractors [in affected states] . . . that elect to sign a Contractor Limited

---

[5]To the extent plaintiffs contend the Exhibits are "relevant" to the pending summary judgment motions, there is no common record that can be applied to all of the contractors. Not only do the recent ISP announcements not apply to the dozens of other states not part of the transitions, but FXG's decision to move to the ISP Model in certain states affects current contractors, but not any of the numerous former contractors in the pending cases or classes.

Release and Operating Modification Agreement, which includes a limited release of claims

involving the transition <u>and an agreement to terminate the existing OAs by October 8, 2010</u>.")

(emphasis added).)[6]  However, "[f]or contractors that <u>do not</u> sign the limited release, the <u>current</u>

<u>expiration date remains unchanged</u>."  (Doc. No. 2088-3 at 30 (second emphasis added); *id.* at 27

(stating that contractors who do not sign the release will not receive a transition payment but still

have the options of (1) "[c]ontinu[ing] to operate under the current agreement (which will not

renewed) until the date of its expiration;" (2) sell the contractor's routes; or (3) operate at least

three PSAs by a designated time to become an ISP candidate).)  Furthermore, in connection with

an earlier notice regarding FXG's plan in the future to contract only with incorporated entities in

states where the ISP Model has not come into effect (*see* Doc. No. 2064 Exs. A-B; Doc. No.

2065 2), contractors whose Operating Agreements expire between July 1, 2010 and December

31, 2010 are still eligible for a 180-day contract extension, even if they decline to sign the

limited release.  (Doc. No. 2088-3 at 16, 30.)  That does not force anyone to end their Operating

Agreements prior to the end of the term specified in each contract or unilaterally change the

expiration date of those contracts.[7]

---

[6]*See also id.* at 30 ("Contractors that sign the Contractor Limited Release and Operating
Agreement Modification <u>agree to a new expiration date</u> of October 8, 2010.") (emphasis added);
*id.* at 17 ("For contractors that do not sign the <u>do not</u> sign the limited release, the <u>current</u>
<u>expiration date remains unchanged</u>.") (second emphasis added); Doc. No. 2088-9 at 34 (limited
release states that, in exchange for two $5000 payments, "[t]he parties irrevocably agree that
their Operating Agreement shall terminate on" a specified date (regardless of the expiration date
specified in the contract), and contractor releases FXG from transition-related claims).

[7]Plaintiffs err in suggesting that these transition incentives, including growth incentives, show
that FXG is "subsidizing" its contractors' businesses "in order to satisfy its own legal
obligations."  (Pls.' Mot. at 7.).  Offering consideration in exchange for a limited release
constitutes sound risk management, not a subsidy.  Moreover, since growth incentives will likely
be immediately used by contractors to help them acquire the PSAs of exiting contractors or those
who want to work as an employee of an ISP, FXG can hardly be "investing" in its contractors'
businesses.  In addition, contractors do not have to sign a release or receive any transition or
growth incentives to be eligible to be an ISP candidate.  (Doc. No. 2088-3 at 27, 44.)  Finally,

Plaintiffs' suggestion that are cognizably harmed because they are "ineligible even to be considered for renewal" unless they become ISPs (Pls.' Mot. at 7), is baseless. No plaintiff has an absolute right to the renewal of his Operating Agreement. Those agreements expressly provide that FXG and each contractor has the right to non-renew upon giving notice. (*See* OA § 11.2 (OA renews "unless Contractor or FedEx Ground provides the other party notice of non-renewal in writing at least 30 days prior to the expiration [date]").) In addition, as noted above, the requirement that contractors become ISP candidates, i.e., incorporated entities that service "typically larger geographic service areas," in order to contract with FXG in the future is hardly a nefarious, FXG-only business rule. A business is entitled to choose the type of business entity with which it will contract. (*See supra* § B.2.) Corporate entities are common even under the existing Operating Agreement. That FXG has made such a decision, largely to be assured that contractors operate in regulatory compliance, is not subject to plaintiffs' second-guessing.

Finally, plaintiffs' repeated refrain that FXG has the right to terminate contractors at will, which demonstrates an employment relationship, (Pls.' Mot. at 7), is erroneous and misleading. The laws in most states that consider the right to terminate when assessing employment status provide that the right to terminate a contract without liability may indicate an employer-employee relationship. *See, e.g., St. Croix Sensory Inc. v. Dep't of Employment & Econ. Dev.,* No. A09-1627, ___ N.W.2d ___, 2010 WL 2813365, at *7 (Minn. Ct. App. July 20, 2010) ("The right to discharge a worker without incurring liability is the other most important factor in

---

since ISPs will treat their drivers and other workers as employees, (Doc. No. 2088-3 at 20), it strains credulity for plaintiffs to suggest that FXG is somehow not satisfying its legal obligations, (Pls.' Mot. at 7)—FXG will not owe legal obligations to another business entity's employees. (Doc. No. 2088-3 at 43-44 (under ISP Model, ISP is responsible for "planning all P&D activity" in CSA, including "driver recruitment, training and staffing; . . . and complying with all applicable laws and regulations").

determining whether a worker is an employee or an independent contractor.") (attached as Ex. A).

Here, FXG has no right to unilaterally terminate an Operating Agreement without cause, even upon thirty days' notice. The contractor does have such a right. (OA § 12.1(e).) Prior to the expiration of the term, FXG may terminate an Operating Agreement unilaterally only due to: (1) a material breach/failure to perform by the contractor, (2) the contractor's intentional, reckless, or willfully negligent operation of his truck while operating under FXG's public liability insurance policy (or knowledge that the contractor's driver so operated the vehicle), or (3) cessation of FXG's business or substantial business decline in a service area. (*Id.* § 12.1(b)-(d).) If FXG wrongfully terminates the Operating Agreement (including through "constructive termination"), the contractor has the right to challenge the termination in arbitration, and FXG is subject to liability, which can include reinstatement of the contractor and damages for lost net earnings between the time of termination and the last day of the contract's term. (*Id.* § 12.3(e).) Though plaintiffs have belittled FXG's potential liability, there is no escaping that FXG faces the possibility of liability for improperly terminating an Operating Agreement. (*Id.*) That potential liability means that FXG does not have the ability to terminate contractors at will without liability, and thus the termination provisions in the Operating Agreement do not provide for "at will" employment. *See St. Croix Sensory Inc.*, 2010 WL 2813365, at *7-*8 (where defendant only had to provide "very short or even immediate notice" of contract's termination, the defendant "would nevertheless incur some liability upon discharge" of contractor, e.g., "between $25 and $38," and "[a]ccordingly[] this factor suggests an independent-contractor relationship").

For the foregoing reasons, FXG respectfully requests that the Court deny plaintiffs' Third Motion to Augment the summary judgment record or, if plaintiffs are permitted to supplement, to

12

respond with additional evidence concerning the matters raised in the documents.


Dated:  July 28, 2010.

Respectfully submitted,

By:  /s/Robert M. Schwartz
Robert M. Schwartz

| | |
|---|---|
| Thomas J. Brunner | Robert M. Schwartz |
| Alison G. Fox | Chris A. Hollinger |
| BAKER & DANIELS LLP | Victor Jih |
| 202 S. Michigan St. | O'MELVENY & MYERS LLP |
| South Bend, IN 46601 | 1999 Avenue of the Stars, Suite 700 |
| Tel:  (574) 234-4149 | Los Angeles, CA 90067-6035 |
| Fax:  (574) 239-1900 | Tel: (310) 553-6700 |
| | Fax: (310) 246-6779 |

*Defendant's Lead and Liaison Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

 The undersigned hereby certifies that on the 28th day of July, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

  Susan E. Ellingstad
  seellingstad@locklaw.com

  Robert I. Harwood
  rharwood@whesq.com

  Lynn R. Faris
  lfaris@leonardcarder.com

  Beth A. Ross
  bross@leonardcarder.com

  Peter J. Agostino
  agostino@aaklaw.com

      By: /s/ Robert M. Schwartz

EXHIBIT A



--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)
**(Cite as: 2010 WL 2813365 (Minn.App.))**

Only the Westlaw citation is currently available.

Court of Appeals of Minnesota.
**ST**. **CROIX** SENSORY INC., Relator,
v.
DEPARTMENT OF EMPLOYMENT AND ECO-
NOMIC DEVELOPMENT, Respondent.
**No. A09-1627.**

July 20, 2010.

*Syllabus by the Court*

**\*1** A worker is an independent contractor when the totality of circumstances indicates that the worker exercises independence in controlling the method of performance, the control exercised over the worker by the employer is influenced by industry standards and client specifications, and the employer may not discharge the worker without incurring some liability.

Department of Employment and Economic Development, File No. 21109203.
Andrew E. Tanick, Jody A. Ward-Rannow, Ford & Harrison LLP, Minneapolis, MN, for relator.

Lee B. Nelson, Amy R. Lawler, Department of Employment and Economic Development, St. Paul, MN, for respondent.

Considered and decided by KLAPHAKE, Presiding Judge; HUDSON, Judge; and COLLINS, Judge.[FN*]

FN* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

**OPINION**

HUDSON, Judge.

Relator St. Croix Sensory Inc. argues that the unemployment-law judge (ULJ) erred in determining that certain individuals working for relator as "sensory assessors" were employees rather than independent

contractors. Under the undisputed facts, the totality of the circumstances demonstrates that the sensory assessors were independent contractors as a matter of law, and we reverse.

**FACTS**

Relator is a sensory laboratory that specializes in odor testing, training, and sales and rental of sensory equipment. Relator performs odor testing of materials, products, and air, and provides training to universities, governments, and industries for "monitoring odors in the field." As part of its odor-testing service, relator hires "sensory assessors" to perform odor evaluations. A sensory assessor sniffs a product or air sample and records his or her observations on a questionnaire, which is tallied and compiled into a client report. Any person can become a sensory assessor if he or she meets the standard industry qualifications.

The assessors perform smell tests at relator's facility, at a neutral site, or at the client's site. In most cases, however, the tests take place in relator's facility. Often, an olfactometer is used to perform the evaluations. An olfactometer is a large, podium-shaped machine with an attached nozzle, which dilutes the sample odor to varying levels. Smell tests are generally performed in a controlled laboratory setting because the olfactometer is very heavy and immobile, and the atmosphere must be completely odor-free to perform the evaluations pursuant to industry standards.

Relator enters into a contract with each assessor that states that the assessors are independent contractors and not employees. The contract provides that an assessor will be paid for each session for which he or she was hired, even if the session is canceled or ends prematurely. Once hired, assessors select sessions to participate in using an online system. If a particular session is selected by more assessors than are necessary to complete the evaluation, relator selects those assessors who have completed the fewest sessions. Assessors are paid a stipend for each testing session ranging between $20 and approximately $100 per session. The general stipend for each session is $38. Assessors are not paid hourly, so if a session ends early or begins late, the assessor will still receive the full stipend but nothing more. Test sessions may last

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00828-RLM - Document 21-2 Filed 08/17/11 Page 472 of 1149
case 3:09-md-00827-RLM-CAN document 2093 filed 07/23/10 page 3 of 7

Page 2

--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)
**(Cite as: 2010 WL 2813365 (Minn.App.))**

from one to three hours. Only 10 to 15 minutes of each test session are spent actually smelling the samples, and assessors are free to use the remainder of the time as they see fit.

**\*2** Relator has never asked an assessor to leave during a test session, but would allow or encourage an assessor to leave if he or she became ill during a session. Relator cannot order an assessor to participate in a particular session or discipline an assessor for not participating. Relator has never disciplined an assessor for conduct during a test session and does not believe that the assessors may be disciplined.

Relator trains the assessors "on their sense of smell and their sensory perception in general." If an assessor trained elsewhere began working for relator, the training program would only entail ensuring that the assessor's sense of smell meets industry standards and instructing the assessor on how to complete relator's forms. Relator gives assessors instructions on how to complete the questionnaires and operate the equipment, but does not instruct assessors how to smell the samples. For example, relator does not tell assessors whether to sniff slowly or quickly or whether to take one or many sniffs. Relator does not prescribe any specific method or technique for observing the odors and does not closely monitor test sessions. Relator relies on the assessors' backgrounds to interpret terms in the questionnaires and does not explain terms in the questionnaires. Assessors use their own judgment in assessing odors and recording reactions on the questionnaires.

After conducting a routine audit, the Minnesota Department of Employment and Economic Development (DEED) issued a decision finding that 37 sensory assessors, who were designated by relator as independent contractors and who provided services to relator during 2006 were actually employees. Accordingly, relator was ordered to pay unemployment taxes on wages paid to the sensory assessors and any others performing similar services.

Relator appealed DEED's determination. Following a hearing, the ULJ issued a decision affirming the determination that the sensory assessors were employees rather than independent contractors. The ULJ determined that relator "substantially possessed the right to control the means and manner of the [assessors'] performance," and that relator's right to inspect

and stop work or prescribe alterations "suggests a right to discharge an assessor ... without incurring liability." Relator filed a request for reconsideration, and the ULJ affirmed the decision. This certiorari appeal follows.

### ISSUE

Are the sensory assessors working for relator considered to be employees or independent contractors?

### ANALYSIS

Whether an individual is an employee or an independent contractor is a mixed question of law and fact. *Lakeland Tool & Eng'g, Inc. v. Engle,* 450 N.W.2d 349, 352 (Minn.App.1990). We review factual findings in the light most favorable to the decision. *Skarhus v. Davanni's Inc.,* 721 N.W.2d 340, 344 (Minn.App.2006). But where the facts are not disputed, a legal question is presented. *Wise v. Denesen Insulation Co.,* 387 N.W.2d 477, 479 (Minn.App.1986). We review questions of law de novo. *Ywswf v. Teleplan Wireless Servs., Inc.,* 726 N.W.2d 525, 529 (Minn.App.2007). Here, the parties agree that the facts are not disputed, and, accordingly, our review of this issue is de novo.

**\*3** An employee is an "individual who is performing or has performed services for an employer in employment." Minn.Stat. § 268.035, subd. 13(1) (2008). Employment includes services performed by "an individual who is considered an employee under the common law of employer-employee and not considered an independent contractor." *Id.,* subd. 15(a)(1) (2008). Unemployment taxes are those money payments "to be paid into the trust fund by an employer on account of paying wages to employees in covered employment." Minn.Stat. § 268.035, subd. 25 (2008). The remuneration of independent contractors does not constitute taxable wages covered by the unemployment-benefits law. *Nicollet Hotel Co. v. Christgau,* 230 Minn. 67, 68, 40 N.W.2d 622, 622-23 (1950).

Traditionally, five factors are used to determine whether a worker is an employee or an independent contractor: "(1) The right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)
**(Cite as: 2010 WL 2813365 (Minn.App.))**

right of the employer to discharge." *Guhlke v. Roberts Truck Lines,* 268 Minn. 141, 143, 128 N.W.2d 324, 326 (1964). Of these five factors, the two most important are "the right or the lack of the right to control the means and manner of performance," and the right or the lack of the right "to discharge the worker without incurring liability." Minn. R. 3315.0555, subp. 1 (2009).

The Minnesota Rules also provide additional factors to be considered when determining whether an employment relationship exists, including: (1) whether the individual makes services available to the public; (2) whether the individual is compensated on a job basis or by the hour; (3) whether the individual is in a position to realize a profit or loss as a result of the services offered; (4) whether the individual may end the relationship without incurring liability; (5) whether the individual made a substantial investment in the facilities used to perform the services; (6) whether the individual works simultaneously for multiple firms; (7) whether the individual is accountable for his or her own actions while working; and (8) whether the services performed by the individual are in the course of the employer's organization, trade or business. Minn. R. 3315.0555, subp. 2 (2009).

Finally, it is well settled that "[t]he nature of the relationship of the parties is to be determined from the consequences which the law attaches to their arrangements and conduct rather than the label they might place upon it." *Speaks, Inc. v. Jensen,* 309 Minn. 48, 51, 243 N.W.2d 142, 145 (1976). Therefore, "whether the parties have entered into a contract defining their relationship is not determinative." *Wise,* 387 N .W.2d at 479. In employment-status cases, there is no general rule that covers all situations, and each case will depend in large part upon its own particular facts. *Pettis v. Harken, Inc.,* 263 Minn. 289, 291, 116 N.W.2d 565, 567 (1962). We consider the traditional factors in turn.

*A. The right to control the means and manner of performance*

**\*4** Relator argues that it does not have the right to control the means and manner of the assessors' performance, and, therefore, the assessors are independent contractors. The right of control is the most important factor for determining whether a worker is an employee. *Wise,* 387 N.W.2d at 479. "The determina-

tive right of control is not merely over *what* is to be done, but primarily over *how* it is to be done." *Neve v. Austin Daily Herald,* 552 N.W.2d 45, 48 (Minn.App.1996) (quotation omitted).

The Minnesota Rules provide criteria for determining whether the employer has control over the method or performance of services, but the rules also state that control is determined by the totality of the circumstances. Minn. R. 3315.0555, subp. 3 (2009). The criteria include: (A) whether the employer has authority over assistants; (B) whether the individual is required to comply with detailed instructions or the employer has the right to instruct or direct the method of doing work; (C) whether regular reports relating to how the services are performed must be submitted to the employer; (D) whether the work is done on the employer's premises; (E) whether services must be personally rendered to the employer; (F) whether a continuing relationship exists between the parties; (G) whether the employer can terminate the individual without incurring liability; (H) whether set work hours are established; (I) whether training is given; (J) whether the employment is full-time; (K) whether the employer furnishes tools, supplies, and materials; (L) whether expenses are paid; and (M) whether the employer is required to enforce standards imposed by regulatory agencies. *Id.*

*Authority over assistants*

Control may be indicated "when the employer hires and pays the individual's assistants and supervises the details of the assistant's work." Minn. R. 3315.0555, subp. 3(A). Here, relator hires laboratory associates and assistants who are paid to assist the assessors during test sessions and ensure that assessors perform according to industry standards. The associates present samples to the assessors, ensure that the assessors actually smell the samples, and tell the assessors the sample numbers to mark on the forms. This factor indicates control.

*Right to instruct or direct the method of work*

Control may be indicated where the employer instructs or directs the method of work. Minn. R. 3315.0555, subp. 3(B). Two contract provisions address relator's right to instruct or direct the method of work. According to the first provision, the assessor "retains the right and responsibility to control or di-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)
**(Cite as: 2010 WL 2813365 (Minn.App.))**

rect the manner in which the sensory evaluation services are to be performed, consistent with standard methods and procedures of test sessions." The second provision states that relator "retains the right to inspect the assessor's work, to stop work, to prescribe alterations, and generally to ensure its conformity to the needs of [relator] or [relator's] client."

**\*5** The retained right to instruct or direct the method of work, even if not exercised, is a factor indicating control. *Moore Assocs., LLC v. Comm'r of Econ. Sec.,* 545 N.W.2d 389, 393 (Minn.App.1996). Here, although apparently not exercised, relator had the right to stop an assessor during a session or prescribe alterations. The ULJ determined that this contract language gives relator the right to control what is done during test sessions.

But relator argues that under the contract, only the assessors actually exercise control over the method of the work. Relator contends that its contractual reservation of the right to require the assessors to follow certain instructions does not negate the assessors' overall right to control the method and manner of performance. Relator's position is persuasive. A contract must be interpreted to give effect to all of its provisions. *Current Tech. Concepts, Inc. v. Irie Enters., Inc.,* 530 N.W.2d 539, 543 (Minn.1995). Factors that relate to the definition of a task, rather than the means of accomplishing it, are not relevant to the employment-status inquiry and do not support a finding of an employment relationship. *Neve,* 552 N.W.2d at 48. A worker may be an independent contractor and still remain "subject to control over [the] end product." *Id.*

Here, when reading the two contract provisions together, it appears that the assessors control the manner in which they perform the tests-how long to sniff, how many sniffs to take, and what reactions to record-while relator has control over the end product by retaining the ability to stop work or prescribe alterations if the work does not conform to requirements. Thus, relator grants the assessors the freedom to perform the services in a manner of their choosing, but within the parameters set by relator. We also note that some of the parameters set by relator appear to come directly from individual clients or are dictated by industry regulations. We conclude that under the totality of the circumstances, relator does not control the means and manner of performance.

### Requirement to comply with detailed instructions

"Control is indicated when an individual is required to comply with detailed instructions about when, where, and how to work including the order or sequence in which the service is to be performed." Minn. R. 3315.0555, subp. 3(B). At the hearing before the ULJ, an assessor testified that he did not feel that relator supervised the test sessions and that relator has never given a performance review or advice on how to improve performance. "Mere suggestions as to detail or necessary and usual cooperation where the work furnished is part of a larger undertaking, does not normally evince control." *Id.* Oral or written instructions that show how the desired result is to be accomplished evince control, but instructions required by laws or regulations or general instructions passed on by the employer from a client generally do not evince control. *Id.*

**\*6** Here, relator gives the assessors instructions on how to operate the equipment and complete the questionnaires, but does not instruct the assessors as to their method of sniffing or how to formulate their opinions, which are recorded by the assessors on the questionnaires. Thus, assessors rely on their own sense of smell and background when filling out the questionnaires. Some of the instructions, however, do seem to indicate that the assessors must perform the tests in a certain way in order to properly utilize the equipment and conform to industry standards. But these instructions are not overly complex and relate in part to the standards that must be enforced by regulation. This factor does not demonstrate a strong showing of control.

### Work performed on premises

Generally, testing takes place on relator's premises because a neutral, odor-free environment is required to accurately conduct the tests. But testimony indicated that testing might sometimes take place at a client facility or another location as long as that location meets the testing-site standards. Testing cannot take place at an assessor's home. Performing work on the employer's premises "is not control in itself," but this factor tends to imply control. Minn. R. 3315.0555, subp. 3(D). However, industry standards, rather than relator, generally require that the tests be performed in a laboratory environment. Still, asses-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00818-PLM - Document 21-2 - Filed 08/17/11 - Page 475 of 1497
case 3:09-md-00827-RLM - OAN - Document 2093 - filed 07/23/90 - page 81497

Page 5

--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)
**(Cite as: 2010 WL 2813365 (Minn.App.))**

sors utilize large equipment owned by relator and tests are overseen by lab associates employed by relator.

*Existence of a continuing relationship*

Relator admits that there is a continuing relationship with many assessors who "have been doing this for many years." But relator also noted that some assessors perform one or two test sessions and leave, some are "seasonal," and some simply stop bidding on test sessions. Relator does not advertise for assessor positions and new assessors generally find out about the job via word-of-mouth. The continuing relationship between relator and most of the assessors indicates control, but the fact that some assessors are very short-term undercuts that conclusion.

*Provision of tools and materials*

Relator provides certain tools, supplies, and materials to the assessors to perform the tests. The furnishing of tools by the employer indicates control. Minn. R. 3315.0555, subp. 3(K). Lack of control is indicated if the worker provides tools, but "not ... if the individual provides tools or supplies customarily furnished by workers in the trade." *Id.* Relator provides the assessors with the evaluation forms and the use of the olfactometer and a carbon respirator for refreshing their sense of smell between sniffs. Relator also provides sniffing masks that are retained and washed in between uses. The provision of such tools and materials indicates control.

Relator notes that assessors provide their own noses, which is arguably the most important tool for their job. Because assessors must pass a test showing that they have a sufficiently sensitive sense of smell, relator argues that this sets an assessor's nose apart from the body parts of other workers. But the nose is a tool that would certainly be customarily supplied by every worker in the sensory-assessor trade. Thus, lack of control is not indicated by the assessors' provision of their own noses.

*Submission of reports, fixed schedules, training, full-time employment*

**\*7** Numerous other important factors in the record indicate a lack of control. Assessors do not submit

regular reports to relator or participate in performance reviews. The assessors do not have fixed work schedules, and they set their own hours because they can choose which test sessions to participate in. Assessors do not work full-time for relator. Some assessors also perform the same job for other sensory assessment agencies in Minnesota, including relator's competitors. Training is limited, and assessors work without excessive supervision.

*Enforcement of regulatory standards*

Many of relator's standards and rules used during test sessions are established by outside regulatory agencies, including the European Committee for Standardization and the American Society for Testing and Materials. "If an employer is required to enforce standards or restrictions imposed by regulatory or licensing agencies, such action does not evince control." Minn. R. 3315.0555, subp. 3(M).

In sum, we conclude that, while some of the factors indicate control by relator-particularly relator's control over the assessors' final product-the totality of the circumstances demonstrates that the assessors have a significant degree of independence in determining the means and manner of their own performance and primarily control how they each perform their own job. This supports a determination of an independent-contractor relationship.

**B. Right to discharge without liability**

Relator argues that it cannot discharge an assessor without incurring liability, and thus the assessors are independent contractors. The right to discharge a worker without incurring liability is the other most important factor in determining whether a worker is an employee or independent contractor. Minn. R. 3315.0555, subp. 1. "An independent worker generally cannot be terminated without the firm being liable for damages if [the worker] is producing according to his or her contract specifications." *Id.,* subp. 3(G). Control may be indicated "particularly if the individual may be terminated with little notice, without cause, or for failure to follow specified rules or methods." *Id.*

The ULJ found that "any theoretical liability is very limited" because assessors are only paid between $25 and $38 per session, and that relator's right to stop

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00818-RLM - Document 21-2 - Filed 08/17/11 - Page 476 of 1149
Case 3:09-md-00827-RLM - CAN - Document 2093 - Filed 07/23/10 - Page 1 of 7

Page 6

--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)
**(Cite as: 2010 WL 2813365 (Minn.App.))**

work during a session "suggests a right to discharge an assessor who did not perform to these standards, without incurring liability." The parties' contract does not reflect that an assessor must be paid if he or she refuses to complete the session or does not meet relator's standards. The contract between relator and the assessors is not a fixed, long-term contract; assessors may work one or multiple test sessions. Moreover, the contract states that assessors will provide services "from time to time at test sessions." The contract also states that it will remain in effect until terminated by written notice of either party. Although the contract requires notice before termination, it appears that the notice may be very short or even immediate.

**\*8** Here, testimony indicated that, if an assessor was discharged during a session, that assessor would still be paid for the session. Accordingly, relator would at least be liable to the assessor for the cost of the session. The fact that relator may stop work during a session indicates that it may discharge an assessor, but presumably liability would still be incurred. Either party is apparently able to end the relationship at any time, and relator can cancel a test session or refuse to hire an assessor for a future session. Similarly, assessors may stop working for relator at any time simply by not bidding on test sessions or even leaving during a test session, without incurring liability. We conclude that, while control may be indicated because the assessors can be fired with little notice or even during a test session for failing to follow the test session rules, relator would nevertheless incur some liability upon discharge of an assessor. Accordingly, this factor suggests an independent-contractor relationship.

### C. Remaining traditional factors

The remaining traditional factors are the furnishing of tools, control of the premises where work is performed, and the mode of payment. *Guhlke, 268 Minn. at 143, 128 N.W.2d at 326.* The furnishing of tools and control of premises are discussed above and tend to indicate an employee-employer relationship, although this showing is somewhat weakened by the industry standards that dictate where tests can be performed.

Here, the mode of payment indicates independent-contractor status because the assessors are paid on a per-job basis. *See Minn. R. 3315.0555,* subp. 2(B) (

"Payment on a job basis is customary where the worker is independent."). Assessors and relator's full-time employees are paid out of different accounts. Furthermore, the contract between relator and assessors provides that the assessors are required to pay all state and federal tax obligations. Evidence that an individual is responsible for his or her own tax obligations is indicative of independent-contractor status. *See Neve, 552 N.W.2d at 48.*

Based on the totality of the circumstances and our review of the five traditional factors, we conclude that the sensory assessors are independent contractors. Our decision is based primarily on the fact that the assessors retain control over the performance of their jobs and have significant freedom in their work. Significantly, many of the rules and instructions given by relator to the assessors relate to industry standards and regulations that relator must enforce. And finally, there is evidence that relator is subject to liability if an assessor is discharged during a testing session.

### DECISION

Because the strength of the factors indicating an independent-contractor relationship outweighs the strength of factors indicating an employer-employee relationship, the ULJ erred in its determination that the sensory assessors were relator's employees.

**\*9 Reversed.**

Minn.App.,2010.
St. Croix Sensory Inc. v. Department of Employment and Economic Development
--- N.W.2d ----, 2010 WL 2813365 (Minn.App.)

END OF DOCUMENT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

--------------------------------------------------------------------

In re FEDEX GROUND PACKAGE
SYSTEM, INC., EMPLOYMENT
PRACTICES LITIGATION

--------------------------------------------------------------------

THIS DOCUMENT RELATES TO:

    *ALL ACTIONS*

--------------------------------------------------------------------

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:05-MD-527-RM
(MDL 1700)

JUDGE MILLER

---

## DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY (*NARAYAN v. EGL*)

---

FedEx Ground respectfully submits that the Ninth Circuit's recent decision in *Narayan v. EGL, Inc.*, __ F.3d __, 2010 WL 2735708 (9th Cir. July 13, 2010), is relevant to FedEx Ground's oppositions to plaintiffs' motions for summary judgment. (*Cf.* Pls.' Notice of Supp. Auth. (Doc. No. 2085) at 1 (contending that *Narayan* supports plaintiffs' motions for summary judgment).)

To be clear at the outset: the *Narayan* court did not find that the drivers were employees. Rather, it held that a reasonable jury could have found that enough of the *Borello* factors pointed to employee status such that it could not affirm the district court's grant of summary judgment in favor of independent contractor status. 2010 WL 2735708, at *9 (citing *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399 (Cal. 1989)). The court was not asked to decide, and did not hold, that the plaintiffs were employees. Given the case's procedural posture, it was required to draw all justifiable inferences in favor of an employment relationship. *Id.* at *3. That

1

said, the case is noteworthy for purposes of evaluating plaintiffs' motions for summary judgment here.

A. **The Decision Indeed Explains the Role of the Contract in Determining Employment Status.**

Plaintiffs correctly summarize the *Narayan* court's holding with respect to the choice-of-law provision in the contract: because the drivers' claims for violations of the California Labor Code existed independent of any contract, California law, and not the law of the state specified in the contract's choice-of-law provision, governed whether the drivers were employees or independent contractors. (Pls.' Notice at 2.) FedEx Ground has never argued otherwise. However, contrary to plaintiffs' suggestion, the choice-of-law provision is not "irrelevant" to employment status, (*id.*), because, as the Ninth Circuit recognized, "the contracts will likely be used as evidence to prove or disprove the statutory claims," 2010 WL 2735708, at *3, and the ***interpretation*** of the terms of the contract, in connection with a determination of employment status, is governed by the state's law that is specified in the contract's choice-of-law provision.

B. **How the Parties Label Their Relationship *Is* Relevant to Employment Classification in California.**

The Ninth Circuit did not hold, as plaintiffs' Notice implies, (*see* Pls.' Notice at 2), that courts should ***disregard*** the parties' mutual intent when applying California's multi-factor employment-status test. Rather, the Ninth Circuit held that, ***in that case***, the district court should not have relied on the parties' characterization of their relationship to find independent contractor status as a matter of law, because, looking at the totality of the factors and drawing all legitimate inferences in the drivers' favor (as the litigants opposing summary judgment), the parties' mutual intent was not "significant" enough to tip the balance. 2010 WL 2735708, at *8. California law plainly provides that the parties' mutual intent is one of the factors that courts—

2

and especially factfinders—should consider in determining employment status. *See Borello*, 769 P.2d at 403, 407 (listing as a factor "whether or not the parties believe they are creating the relationship of employer-employee," while acknowledging that the "label placed by the parties on their relationship is not dispositive"); *Desimone v. Allstate Ins. Co.*, 2000 WL 1811385, at *16 (N.D. Cal. Nov. 7, 2000) (applying California law) (citing the parties' intent as one of the *Borello* factors).

### C. *Narayan* Does Not Support Plaintiffs' Summary Judgment Motions.

As noted above, *Narayan* did not hold that the plaintiffs were employees. It only reversed a summary judgment based on a finding of independent contractor status because enough of the *Borello* factors weighed against that finding. 2010 WL 2735708, at *9.[1] Because the court was required to draw inferences in the drivers' favor, it focused on those factors that could, to a reasonable jury, support employee status and make summary judgment inappropriate. The court therefore did not discuss all the possible factors in California's employment-classification test—for example, whether the alleged employee had an opportunity for profit or loss. *See id.* at *5 (noting that this is one of the *Borello* factors). Moreover, the court's discussion of each of the factors was guided by this inference. For example, the court found that the fact that the plaintiffs were paid based on a percentage of each delivery did not necessarily **favor** employee status, and certainly did not **foreclose** a finding of independent contractor status. *Id.* at *8.

---

[1] Similarly, contrary to plaintiffs' contention, the Ninth Circuit's opinion in *Narayan* does not discredit the district court's decision in *Ruiz v. Affinity Logistics Corp.*, 2010 WL 1038226 (S.D. Cal. Mar. 22, 2010), which FedEx Ground provided as supplemental authority with respect to the *White* (GA) case. (*See* Doc. No. 2022.) The court in *Ruiz* issued findings of fact and conclusions of law after conducting a bench trial; it did not rule on summary judgment and therefore, unlike the Ninth Circuit in *Narayan*, did not draw any inferences in the plaintiffs' favor.

Finally, the facts in *Narayan* are not all "substantially similar" to the facts here. (Pls.'
Notice at 2.) For instance, the contract in *Narayan* allowed the company to terminate the
contract for any reason, even absent a breach by the driver—which, in the Ninth Circuit's view,
was "a substantial indicator of an at-will employment relationship." 2010 WL 2735708, at *7.
FedEx Ground does not have such authority here. (*See* FXG's Mem. ISO MSJ (*Alexander*)
(Doc. No. 1226) at 7.) And while none of the three plaintiffs in *Narayan* employed helpers,
2010 WL 2735708, at *7, numerous members of the *Alexander* class did. (*See* FXG's Opp. to
Pls.' MSJ (*Alexander*) (Doc. No. 1388) at 14 n.8 (citing examples).)

If anything, *Narayan* supports the proposition that decisions under California's multi-
factor test for employment classification are not appropriate for summary judgment.[2] As the
court noted, decisions regarding California's employment-classification standard, in which "no
one factor is decisive,"[3] should almost always be made by the trier of fact. *Narayan*, 2010 WL
2735708, at *5 (quoting *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1097 (9th Cir. 2007)); *see id.*
("A fact-bound approach calling for the balancing of incommensurables, an approach in which

---

[2] This is not to suggest that summary judgment in favor of independent contractor status is never
appropriate when applying a multi-factor test. In fact, just this week, the Ninth Circuit upheld a summary
judgment finding of independent contractor status under the *Darden* common law test, because even
though the insurance agent at issue in that case "receive[d] some benefits, ha[d] a long-term relationship
with [the company], possesse[d] an at-will contract, and [wa]s subject to some minimum standards
imposed by the hiring party," these indicia of employee status, "on balance, [we]re insufficient to
overcome the strong indications that [the insurance agent] [wa]s an independent contractor." *Murray v.
Principal Fin. Group, Inc.*, ___ F.3d ___, 2010 WL 2902512, at *3 (9th Cir. July 27, 2010). FedEx
Ground respectfully submits that *Murray* is supplemental authority in support of its motions for summary
judgment. A copy of the opinion is attached as Exhibit A.

[3] Indeed, the California Court of Appeal recently held that the Judicial Council's California Civil Jury
Instruction No. 3704 incorrectly stated California law because "it told the jury that the right of control, *by
itself*, gave rise to an employer-employee relationship." *Bowman v. Wyatt*, ___ Cal. Rptr. 3d ___, 2010
WL 261307, at *7 (Cal. Ct. App. July 1, 2010) (emphasis in original). Decisions about employment
classification in California *must* weigh "not only the right of control, but also [numerous] secondary
factors." *Id.* FedEx Ground respectfully submits that *Bowman* is supplemental authority in support of its
opposition to plaintiffs' motion for summary judgment in California (Doc. No. 1388). A copy of the
opinion is attached as Exhibit B.

no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays

the principal part." (quoting *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1542 (7th Cir.

1987) (Easterbrook, J., concurring))).  FedEx Ground's reliance on the district court's decision in

*Narayan* in opposing plaintiffs' summary judgment motion in California (*see* Doc. No. 1388)[4]

therefore still holds.

Dated:  July 30, 2010

Respectfully submitted,

By: s/ Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

Robert M. Schwartz
Scott M. Voelz
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

---

[4] FedEx Ground also cited the district court opinion in *Narayan*, 2007 WL 2021809 (N.D. Cal. July 10, 2007), in its oppositions to plaintiffs' motions for summary judgment in Pennsylvania, Texas, and Virginia.  (Doc. Nos. 1390, 1391, and 1523, respectively).  The Ninth Circuit's opinion in *Narayan* does not disturb the purpose of these citations—to show that plaintiffs are not entitled to summary judgment because, at most, their allegations raise triable issues of fact.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of July, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

DC1:808433.5

# Exhibit A

*Murray v. Principal Fin. Group, Inc.*, ___ F.3d ___, 2010 WL 2902512 (9th Cir. July 27, 2010)

--- F.3d ----, 2010 WL 2902512 (C.A.9 (Ariz.))
**(Cite as: 2010 WL 2902512 (C.A.9 (Ariz.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Ninth Circuit.
Patricia MURRAY, a married woman, Plaintiff-
Appellant,
v.
PRINCIPAL FINANCIAL GROUP, INC., a
Delaware corporation; Principal Life Insurance
Company, an Iowa corporation; Princor Financial
Services Corporation, an Iowa corporation, Defend-
ants-Appellees.
**No. 09-16664.**

Argued and Submitted June 17, 2010.
Filed July 27, 2010.

Bradley Schleier, Phoenix, AZ, for plaintiff-appel-
lant Patricia Murray.

Barbara McCloud, Phoenix, AZ, for defendants-ap-
pellees Principal Financial Group, Inc., et al.

Appeal from the United States District Court for the
District of Arizona, Susan R. Bolton, District
Judge, Presiding. D.C. No. 2:08-cv-01094-SRB.

Before MARY M. SCHROEDER and JAY S. BY-
BEE, Circuit Judges, and ALICEMARIE H.
STOTLER, Senior District Judge.[FN*]

> FN* The Honorable Alicemarie H. Stotler,
> Senior United States District Judge for the
> Central District of California, sitting by
> designation.

**OPINION**

SCHROEDER, Circuit Judge:

**\*1** The plaintiff in this case, Patricia Murray, is a
"career agent" for the defendants, Principal Finan-

cial Group, Inc., Principal Life Insurance Company,
and Princor Financial Services Corporation
(collectively "Principal"). Murray and other Prin-
cipal career agents sell Principal products that in-
clude a wide range of financial products and ser-
vices, including annuities, disability income, 401(k)
plans, and insurance. Murray sued Principal for sex
discrimination in violation of Title VII. The only is-
sue before us is whether Murray is an "employee"
within the meaning of that statute, or whether she
should be regarded as an independent contractor.
Murray is entitled to the protections of Title VII
only if she is an employee. *Adcock v. Chrysler
Corp.,* 166 F.3d 1290, 1292 (9th Cir.1999).

The district court correctly held that Murray is not
an employee, granting summary judgment for Prin-
cipal. In her appeal, Murray argues that Principal
exercises sufficient control over the conduct of her
duties to qualify her as an employee. We, along
with virtually every other Circuit to consider simil-
ar issues, have held that insurance agents are inde-
pendent contractors and not employees for purposes
of various federal employment statutes, including
the Employee Retirement Income Security Act
("ERISA"), the Age Discrimination in Employment
Act ("ADEA"), and Title VII. *See, e .g., Barnhart
v. New York Life Ins. Co.,* 141 F.3d 1310 (9th
Cir.1998); *Weary v. Cochran,* 377 F.3d 522 (6th
Cir.2004); *Wortham v. Am. Family Ins. Group,* 385
F.3d 1139 (8th Cir.2004).

We write principally to clarify the source of the ap-
propriate test to apply in this federal statutory con-
text. The able district judge viewed our decisions as
reflecting three different formulations of the test to
determine whether an individual is an independent
contractor or an employee for purposes of Title VII:
a "common law agency" test, an "economic realit-
ies" test, and a "common law hybrid" test. The dis-
trict court characterized the common law agency
test as "focus[ing] on 'the hiring party's right to
control the manner and means by which the product
is accomplished," and quoted the factors identified

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 2902512 (C.A.9 (Ariz.))
**(Cite as: 2010 WL 2902512 (C.A.9 (Ariz.)))**

by the Supreme Court in *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318 (1992). The district court perceived the second test to have been set forth by our court in *Adcock,* where we said that "[d]etermining whether a relationship is one of employment or independent contractual affiliation requires a fact-specific inquiry which depends on the economic realities of the situation." 166 F.3d at 1292 (internal quotation marks omitted). The district court stated, however, that the "primary factor" of that test is "the extent of the employer's right to control the means and manner of the worker's performance." The district court saw still a third test in *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980), where we enumerated more factors. The district court characterized this as combining the common law and economic realities tests to form a "common law hybrid test."

**\*2** We take this opportunity to clarify what the district court ultimately recognized: there is no functional difference between the three formulations. *See Adcock,* 166 F.3d at 1292 n.3 ("The common law agency approach [of *Darden* ] is essentially indistinguishable from the approach previously used by this Circuit...."). Even if the differences in formulation might suggest a difference in practical application, however, *Darden's* common law test as pronounced by the Supreme Court would have to control. We have previously said that the Supreme Court intended the *Darden* analysis to control whenever an employment statute defines the term "employee" in the way ERISA does, and the statute in question does not otherwise suggest that the common law test would be inappropriate. *See Barnhart,* 141 F.3d at 1313 (applying *Darden* analysis to definition of "employee" in the ADEA); *Loomis Cabinet Co. v. Occupational Safety & Health Review Comm'n,* 20 F.3d 938, 941 (9th Cir.1994) (applying *Darden* analysis to definition of "employee" in the Occupational Health and Safety Act). Both ERISA and Title VII define "employee" in a circular manner as "an individual employed by an employer." 42 U.S.C. § 2000e(f); 29 U.S.C. § 1002(6). There is no reason why the

*Darden* test would be inappropriate in the Title VII context.

Thus, when determining whether an individual is an independent contractor or an employee for purposes of Title VII, a court should evaluate "the hiring party's right to control the manner and means by which the product is accomplished." *Darden,* 503 U.S. at 323. The factors relevant to this inquiry, as identified by the Supreme Court, are:

> [1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6 ] the extent of the hired party's discretion over when and how long to work; [7] the method of payment;[8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party.

*Id.*

Applying these factors to Murray's case, we find Murray's situation to be virtually indistinguishable from that which we considered in *Barnhart,* when we decided that an insurance agent was an independent contractor under the *Darden* test for purposes of discrimination under the ADEA and ERISA. 141 F.3d at 1312-13. We concluded that the district court had correctly granted summary judgment to the defendant because the plaintiff was an independent contractor. *Id.* We reach the same result here.

Here, as in *Barnhart,* several factors strongly favor classifying Murray as an independent contractor. Like Barnhart, Murray is "free to operate [her] business as [she] s[ees] fit without day-to-day intrusions." *See id.* at 1313. Murray decides when and where to work, and in fact maintains her own office, where she pays rent. She schedules her own

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 2902512 (C.A.9 (Ariz.))
**(Cite as: 2010 WL 2902512 (C.A.9 (Ariz.)))**

time off, and is not entitled to vacation or sick days. Also like Barnhart, Murray is paid on commission only, reports herself as self-employed to the IRS, and sells products other than those offered by Principal in limited circumstances.

**\*3** There are a few factors present in Murray's case, as there were in *Barnhart,* that support the argument that Murray is an employee. Murray receives some benefits, has a long-term relationship with Principal, possesses an at-will contract, and is subject to some minimum standards imposed by the hiring party. These, however, on balance, are insufficient to overcome the strong indications that Murray is an independent contractor. *See Barnhart,* 141 F.3d at 1313.

The parties dispute the minutiae of some aspects of Murray's relationship with Principal, relating to who bears responsibility for providing some of the instrumentalities and tools required for Murray to perform her job, the degree of autonomy that Murray has to select and retain her assistant, and the degree to which Principal requires Murray to document and report her work. Even when all of these issues are resolved in Murray's favor, however, the overall picture presented by Murray's relationship with Principal is still one of an independent contractor rather than an employee. *See Barnhart,* 141 F.3d at 1313. The defendants do not control the manner and means by which Murray sells their financial products.

**AFFIRMED.**

C.A.9 (Ariz.),2010.
Murray v. Principal Financial Group, Inc.
--- F.3d ----, 2010 WL 2902512 (C.A.9 (Ariz.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

*Bowman v. Wyatt*, __ Cal. Rptr. 3d ___, 2010 WL 261307
(Cal. Ct. App. July 1, 2010)

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

Court of Appeal, Second District, Division 4, California.
Barry A. BOWMAN, Plaintiff and Respondent,
v.
Tommie WYATT, Jr., et al., Defendants and Appellants.
**No. B207468.**

July 1, 2010.

**Background:** Motorcyclist, who was involved in motor vehicle accident with dump truck that had just delivered asphalt to city work site, brought suit for damages against dump truck operator and city, alleging claims of negligence and vicarious liability. The Superior Court, Los Angeles County, No. BC329390,Holly E. Kendig, J., entered judgment, on jury verdict, for motorcyclist, awarding him over $15 million in damages. Defendants appealed.

**Holdings:** The Court of Appeal, Suzukawa, J., held that:
(1) right of control was not the only factor the jury could consider to determining whether operator was a city employee or an independent contractor;
(2) erroneous employment instruction prejudiced city;
(3) "peculiar risk" exception to rule of nonliability for negligence of an independent contractor did not apply;
(4) there was no evidence that dump truck's defective brakes were proximate cause of the collision; and
(5) erroneous admission of evidence that operator did not have a motor carrier permit did not result in a miscarriage of justice.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Labor and Employment 231H ⟜58**

231H Labor and Employment
   231HI In General
      231Hk58 k. Questions of Law and Fact as to Em-

ployment Status. Most Cited Cases
Whether a person is an independent contractor or an employee is a question of fact if dependent upon the resolution of disputed evidence or inferences.

**[2] Appeal and Error 30 ⟜893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most Cited Cases
Court of Appeal reviews de novo whether a challenged instruction correctly states the law.

**[3] Trial 388 ⟜228(1)**

388 Trial
   388VII Instructions to Jury
      388VII(C) Form, Requisites, and Sufficiency
         388k228 Form and Language
            388k228(1) k. Form and Arrangement. Most Cited Cases
Pattern jury instructions are not entitled to a presumption of correctness.

**[4] Appeal and Error 30 ⟜215(1)**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
         30k214 Instructions
            30k215 Objections in General
               30k215(1) k. Necessity of Objection in General. Most Cited Cases
A failure to object to civil jury instructions will not be deemed a waiver where the instruction is prejudicially erroneous as given, that is, which is an incorrect statement of the law.

**[5] Labor and Employment 231H ⟜3025**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(B) Acts of Employee
        231HXVIII(B)1 In General
           231Hk3025 k. In General. Most Cited Cases

**Labor and Employment 231H ⟲3125**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
      231HXVIII(C) Work of Independent Contractor
        231Hk3125 k. In General. Most Cited Cases
With some exceptions, an employer is vicariously liable for the negligent acts of its employees, but not of its independent contractors.

**[6] Labor and Employment 231H ⟲29**

231H Labor and Employment
   231HI In General
      231Hk28 Independent Contractors and Their Employees
        231Hk29 k. In General. Most Cited Cases
While the right of control is an important factor in determining whether a worker is an employee or an independent contractor, it is not the only factor; secondary factors that must be considered include whether the worker is engaged in a distinct occupation or business, the skill required in the particular occupation, whether the employer or the worker supplies the tools and the place of work, the length of time for which the services are to be performed, whether the worker is paid by time or by the job, whether the work is a part of the regular business of the employer, and the kind of relationship the parties believe they are creating.

**[7] Appeal and Error 30 ⟲1064.1(1)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
        30XVI(J)18 Instructions
          30k1064 Prejudicial Effect
            30k1064.1 In General
              30k1064.1(1) k. In General. Most

Cited Cases
In determining whether instructional error was prejudicial, a reviewing court evaluates (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled to determine whether it is reasonably probable that erroneous instructions misled the jury.

**[8] Appeal and Error 30 ⟲1064.1(1)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
        30XVI(J)18 Instructions
          30k1064 Prejudicial Effect
            30k1064.1 In General
              30k1064.1(1) k. In General. Most
Cited Cases
A "reasonable probability," in the context of whether it is reasonably probable that erroneous instructions misled the jury, does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.

**[9] Appeal and Error 30 ⟲1031(6)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
        30XVI(J)1 In General
          30k1031 Presumption as to Effect of Error
            30k1031(6) k. Instructions. Most Cited
Cases
In assessing an instruction's prejudicial impact, the Court of Appeal does not view of the evidence and inferences most favorable to the prevailing party; instead, the Court assumes that the jury might have believed appellant's evidence and, if properly instructed, might have decided in appellant's favor.

**[10] Appeal and Error 30 ⟲1064.1(4)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error

Case 3:07-md-01827-RLM - CAN document 2094-2 filed 07/30/10 page 5
Case: 3:07-md-01827-SI - Document 212 Filed 08/17/11 Page 490 of 1149
Page 5

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

30XVI(J)18 Instructions
  30k1064 Prejudicial Effect
   30k1064.1 In General
    30k1064.1(2) Particular Cases
     30k1064.1(4) k. Passengers, Pedestrians, Children and Cyclists, Automobiles. Most Cited Cases

In action by motorcyclist against city, alleging that city was vicariously liable for injuries motorcyclist sustained in collision with dump truck involved in delivery of asphalt to city work sites, reasonable probability existed that jury instruction, which erroneously set forth factors for jury to consider in determining whether dump truck operator was a city employee or an independent contractor, prejudicially affected jury's conclusion that operator was a city employee.

**[11] Labor and Employment 231H ⊜3156(1)**

231H Labor and Employment
  231HXVIII Rights and Liabilities as to Third Parties
   231HXVIII(C) Work of Independent Contractor
    231Hk3154 Necessary or Natural Consequences of Work
     231Hk3156 Peculiar Risk Doctrine
      231Hk3156(1) k. In General. Most Cited Cases

A critical inquiry in determining the applicability of the doctrine of peculiar risk is whether the work for which the independent contractor was hired involves a risk that is peculiar to the work to be done, arising either from the nature or the location of the work and against which a reasonable person would recognize the necessity of taking special precautions.

**[12] Labor and Employment 231H ⊜3156(1)**

231H Labor and Employment
  231HXVIII Rights and Liabilities as to Third Parties
   231HXVIII(C) Work of Independent Contractor
    231Hk3154 Necessary or Natural Consequences of Work
     231Hk3156 Peculiar Risk Doctrine
      231Hk3156(1) k. In General. Most Cited Cases

Term "peculiar risk," for purposes of peculiar risk doc-

trine, means neither risk that is abnormal to type of work done, nor risk that is as normally great; it simply means special, recognizable danger arising out of work itself.

**[13] Automobiles 48A ⊜187(2)**

48A Automobiles
  48AV Injuries from Operation, or Use of Highway
   48AV(A) Nature and Grounds of Liability
    48Ak183 Persons Liable
     48Ak187 Government; Immunity and Waiver Thereof
      48Ak187(2) k. Municipal Corporations; Districts. Most Cited Cases

**Automobiles 48A ⊜194(1)**

48A Automobiles
  48AV Injuries from Operation, or Use of Highway
   48AV(A) Nature and Grounds of Liability
    48Ak183 Persons Liable
     48Ak194 Acts of Independent Contractors
      48Ak194(1) k. In General. Most Cited Cases

The "peculiar risk" exception to rule of nonliability for negligence of an independent contractor did not apply to find city vicariously liable for injury of motorcyclist, who collided with dump truck that ran stop sign after it had unloaded asphalt at city work site; as operator's truck was unladen and he had left the job site, there was no direct relationship between any risk inherent in hauling asphalt and the accident, and operator's negligence in running stop sign entailed nothing more than ordinary failure to exercise due care in the operation of a motor vehicle.

**[14] Automobiles 48A ⊜187(2)**

48A Automobiles
  48AV Injuries from Operation, or Use of Highway
   48AV(A) Nature and Grounds of Liability
    48Ak183 Persons Liable
     48Ak187 Government; Immunity and Waiver Thereof
      48Ak187(2) k. Municipal Corporations;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Districts. Most Cited Cases

**Automobiles 48A ☞194(1)**

48A Automobiles
    48AV Injuries from Operation, or Use of Highway
        48AV(A) Nature and Grounds of Liability
           48Ak183 Persons Liable
                48Ak194 Acts of Independent Contractors
                    48Ak194(1) k. In General. Most Cited Cases

Dump truck's alleged regulatory violations were irrelevant to issue of whether city was liable for independent contractor's negligence in operating truck under peculiar risk doctrine in suit for damages brought by motorcyclist, who collided with dump truck that ran stop sign after it had unloaded asphalt at city work site.

**[15] Municipal Corporations 268 ☞854**

268 Municipal Corporations
    268XII Torts
        268XII(E) Condition or Use of Public Buildings and Other Property
           268k854 k. Proximate Cause of Injury. Most Cited Cases

For purposes of a claim against a municipality based on dangerous condition of public property, to establish causation, a plaintiff must prove that the defendant's conduct was a substantial factor in bringing about his or her harm; stated differently, evidence of causation must rise to the level of *a* reasonable probability based upon competent testimony. West's Ann.Cal.Gov.Code § 835.

**[16] Municipal Corporations 268 ☞854**

268 Municipal Corporations
    268XII Torts
        268XII(E) Condition or Use of Public Buildings and Other Property
           268k854 k. Proximate Cause of Injury. Most Cited Cases

For purposes of a claim against a municipality based on dangerous condition of public property, a defendant's conduct is not the cause in fact of harm where the evidence indicates that there is less than a probability, i.e., a

50-50 possibility or a mere chance, that the harm would have ensued. West's Ann.Cal.Gov.Code § 835.

**[17] Municipal Corporations 268 ☞857**

268 Municipal Corporations
    268XII Torts
        268XII(E) Condition or Use of Public Buildings and Other Property
           268k857 k. Actions for Injuries. Most Cited Cases

In reviewing evidence of causation, for purposes of claim against a municipality based on dangerous condition of public property, the court considers both direct and circumstantial evidence, and all reasonable inferences to be drawn from both kinds of evidence, giving full consideration to the negative and affirmative inferences to be drawn from all of the evidence, including that which has been produced by the defendant; the court cannot draw inferences from thin air. West's Ann.Cal.Gov.Code § 835.

**[18] Municipal Corporations 268 ☞857**

268 Municipal Corporations
    268XII Torts
        268XII(E) Condition or Use of Public Buildings and Other Property
           268k857 k. Actions for Injuries. Most Cited Cases

For purposes of claim against a municipality based on dangerous condition of public property, where the plaintiff seeks to prove an essential element of his case by circumstantial evidence, he cannot recover merely by showing that the inferences he draws from those circumstances are consistent with his theory; instead, he must show that the inferences favorable to him are more reasonable or probable than those against him. West's Ann.Cal.Gov.Code § 835.

**[19] Automobiles 48A ☞201(1.1)**

48A Automobiles
    48AV Injuries from Operation, or Use of Highway
        48AV(A) Nature and Grounds of Liability
           48Ak201 Proximate Cause of Injury

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

48Ak201(1) Efficient Cause of Injury in General

48Ak201(1.1) k. In General. Most Cited Cases

**Automobiles 48A ☞201(3)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
    48AV(A) Nature and Grounds of Liability
     48Ak201 Proximate Cause of Injury
      48Ak201(1) Efficient Cause of Injury in General

48Ak201(3) k. Defective Equipment. Most Cited Cases

There was no evidence that dump truck's defective brakes, rather than truck operator's failure to see motorcyclist approaching the intersection, were the proximate cause of the collision, as required to find city liable for injury caused by a dangerous condition of the dump truck, which had been used to deliver asphalt to city work sites. West's Ann.Cal.Gov.Code § 835.

*See Annot., Effect of defective brakes on liability for injury (1947) 170 A.L.R. 611; Annot., Automobiles: liability of owner or operator of motor vehicle for injury, death, or property damage resulting from defective brakes (1971) 40 A.L.R.3d 9; Cal. Jur. 3d, Automobiles, § 364.*

**[20] Municipal Corporations 268 ☞857**

268 Municipal Corporations
   268XII Torts
    268XII(E) Condition or Use of Public Buildings and Other Property
     268k857 k. Actions for Injuries. Most Cited Cases

Although proof of causation may be by circumstantial evidence, for purposes of claim against a municipality based on dangerous condition of public property, it must be by substantial evidence, and evidence which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient. West's Ann.Cal.Gov.Code § 835.

**[21] Labor and Employment 231H ☞3134**

231H Labor and Employment
   231HXVIII Rights and Liabilities as to Third Parties
    231HXVIII(C) Work of Independent Contractor
     231Hk3133 Non-Delegable Duty
      231Hk3134 k. In General. Most Cited Cases

Nondelegable duties, which impose upon an employer vicarious liability for the negligence of an independent contractor, derive from statutes, contracts, and common law precedents; they do not rest upon any personal negligence of the employer.

**[22] Municipal Corporations 268 ☞727**

268 Municipal Corporations
   268XII Torts
    268XII(A) Exercise of Governmental and Corporate Powers in General
     268k727 k. Duties Absolutely Imposed. Most Cited Cases

There are three elements to a cause of action against a public entity for breach of a mandatory duty under an enactment: first, the enactment at issue must be obligatory, not merely discretionary or permissive in its directions to the public entity; second, the duty imposed must be designed to protect against the particular kind of injury the plaintiff suffered; and third, the breach of the duty must have been a proximate cause of the plaintiff's injury. West's Ann.Cal.Gov.Code § 815.6.

**[23] Automobiles 48A ☞187(2)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
    48AV(A) Nature and Grounds of Liability
     48Ak183 Persons Liable
      48Ak187 Government; Immunity and Waiver Thereof
      48Ak187(2) k. Municipal Corporations; Districts. Most Cited Cases

**Automobiles 48A ☞197(3)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
    48AV(A) Nature and Grounds of Liability

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

48Ak183 Persons Liable
    48Ak197 Persons Other Than Owners or Operators in General
        48Ak197(3) k. Hirer or Borrower. Most Cited Cases

**Automobiles 48A &#9756;243(1)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
      48AV(B) Actions
        48Ak241 Evidence
          48Ak243 Admissibility
            48Ak243(1) k. In General. Most Cited Cases

Trial testimony concerning whether dump truck operator and various city employees believed that the city "rented" operator's dump truck was not relevant evidence to support finding that city was liable as truck's motor carrier for injuries third party sustained as result of operator's negligence; instead, relevant question was whether contractually-created relationship between the city and operator's truck constituted a "lease" relationship within meaning of the motor carrier statute. West's Ann.Cal.Vehicle Code § 34501.12 (2002).

**[24] Automobiles 48A &#9756;187(2)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
      48AV(A) Nature and Grounds of Liability
        48Ak183 Persons Liable
          48Ak187 Government; Immunity and Waiver Thereof
            48Ak187(2) k. Municipal Corporations; Districts. Most Cited Cases

**Automobiles 48A &#9756;197(3)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
      48AV(A) Nature and Grounds of Liability
        48Ak183 Persons Liable
          48Ak197 Persons Other Than Owners or Operators in General
            48Ak197(3) k. Hirer or Borrower. Most

Cited Cases
City did not lease dump truck from operator for a term exceeding four months, and thus, city was not truck's motor carrier, as required to support finding that city was liable for injury caused by a dangerous condition of its property; city did not have right to possess the dump truck, much less to do so exclusively, and contract did not provide for lease of truck for more than four months, but for a "day-to-day" rental on an as-needed basis. West's Ann.Cal.Vehicle Code § 34501.12; West's Ann.Cal.Gov.Code § 835.

**[25] Automobiles 48A &#9756;243(1)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
      48AV(B) Actions
        48Ak241 Evidence
          48Ak243 Admissibility
            48Ak243(1) k. In General. Most Cited Cases

**Automobiles 48A &#9756;243(8)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
      48AV(B) Actions
        48Ak241 Evidence
          48Ak243 Admissibility
            48Ak243(8) k. Equipment. Most Cited Cases

**Automobiles 48A &#9756;243(16)**

48A Automobiles
   48AV Injuries from Operation, or Use of Highway
      48AV(B) Actions
        48Ak241 Evidence
          48Ak243 Admissibility
            48Ak243(16) k. Proximate Cause of Injury. Most Cited Cases

Evidence that dump truck operator's motor carrier permit had been suspended was not relevant in motorcyclist's negligence action against operator and city to issues of whether the city failed to maintain the truck's brakes, whether faulty brakes caused the accident, or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 8:07-cv-00819-RLM - Document 21.2 - Filed 08/17/11 - Page 494 of 1149
case 3:05-md-00813-RLM - CAV - document 2094 - filed 07/30/10 - page 7
Page 7

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

whether operator's negligence caused the accident and city was therefore vicariously liable.

**[26] Witnesses 410 ⟨⟩405(2)**

410 Witnesses
   410IV Credibility and Impeachment
      410IV(E) Contradiction
         410k403 Testimony Subject to Contradiction
            410k405 Irrelevant, Collateral, or Immaterial Matters
               410k405(2) k. Party to Civil Action or Accused in Criminal Prosecution. Most Cited Cases
Evidence that dump truck operator's motor carrier permit had been suspended was not relevant to any claim in motorcyclist's negligence action against operator and city and, thus, was not proper impeachment evidence for purpose of contradiction. West's Ann.Cal.Evid.Code § 780.

**[27] Witnesses 410 ⟨⟩405(1)**

410 Witnesses
   410IV Credibility and Impeachment
      410IV(E) Contradiction
         410k403 Testimony Subject to Contradiction
            410k405 Irrelevant, Collateral, or Immaterial Matters
               410k405(1) k. In General. Most Cited Cases
Rule that a witness's credibility may be challenged by evidence relevant to the existence or nonexistence of any fact testified to by him does not allow irrelevant evidence to be introduced under the guise of impeachment. West's Ann.Cal.Evid.Code § 780.

**[28] Witnesses 410 ⟨⟩405(1)**

410 Witnesses
   410IV Credibility and Impeachment
      410IV(E) Contradiction
         410k403 Testimony Subject to Contradiction
            410k405 Irrelevant, Collateral, or Immaterial Matters
               410k405(1) k. In General. Most Cited Cases

If a question is put to a witness on cross-examination which is collateral or irrelevant to the issue, his answer cannot be contradicted to impeach the witness by the party who asked him the question. West's Ann.Cal.Evid.Code § 780.

**[29] Appeal and Error 30 ⟨⟩1026**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)1 In General
            30k1025 Prejudice to Rights of Party as Ground of Review
               30k1026 k. In General. Most Cited Cases
A "miscarriage of justice" should be declared only when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.

**[30] Appeal and Error 30 ⟨⟩1050.2**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)10 Admission of Evidence
            30k1050 Prejudicial Effect in General
               30k1050.2 k. Evidence Irrelevant to Issue. Most Cited Cases
Erroneous admission of irrelevant evidence, that operator of dump truck did not have a motor carrier permit when he ran stop sign and collided with motorcyclist, did not result in a miscarriage of justice when jury found him negligent in causing accident; jury would not have likely assumed that a person whose motor carrier permit had been suspended was less likely to have stopped at a stop sign, and the evidence revealed to jury that operator's motor carrier permit was suspended because operator's liability insurance allegedly had been cancelled, not because he was a poor driver.

**[31] Appeal and Error 30 ⟨⟩205**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
       30V(B) Objections and Motions, and Rulings Thereon
         30k202 Evidence and Witnesses
           30k205 k. Exclusion of Evidence. Most Cited Cases
To preserve an evidentiary ruling for appellate review, the proponent of the evidence must make an offer of proof regarding the anticipated testimony.

**[32] Appeal and Error 30 ⚬⚬205**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
       30V(B) Objections and Motions, and Rulings Thereon
         30k202 Evidence and Witnesses
           30k205 k. Exclusion of Evidence. Most Cited Cases
An offer of proof required to preserve an evidentiary ruling for appellate review must address the substance, purpose, and relevance of the excluded evidence, and must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. West's Ann.Cal.Evid.Code § 354.

**[33] Trial 388 ⚬⚬45(3)**

388 Trial
   388IV Reception of Evidence
       388IV(A) Introduction, Offer, and Admission of Evidence in General
         388k44 Offer of Proof
           388k45 In General; Necessity and Sufficiency
              388k45(3) k. Statement or Disclosure of Evidence Expected. Most Cited Cases
The trial court may reject a general or vague offer of proof that does not specify the testimony to be offered by the proposed witness.

**[34] Appeal and Error 30 ⚬⚬205**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
       30V(B) Objections and Motions, and Rulings Thereon
         30k202 Evidence and Witnesses
           30k205 k. Exclusion of Evidence. Most Cited Cases
Dump truck operator's proffered offer of proof to admit expert testimony concerning how a normal person would have reacted in similar circumstances to accident involving motorcyclist, so as to assist jury in assessing comparative negligence, failed to set forth actual evidence to be produced and substance, purpose, and relevance of such evidence, and thus, operator failed to preserve evidentiary ruling excluding the evidence for appellate review; proper offer of proof would have required operator to have established that percipient witnesses testified to distance between motorcyclist and operator when operator first pulled into intersection, and that available research established that a reasonable motorcyclist traveling under same conditions could have avoided hitting operator's truck. West's Ann.Cal.Evid.Code § 354.

**[35] Evidence 157 ⚬⚬471(19)**

157 Evidence
   157XII Opinion Evidence
       157XII(A) Conclusions and Opinions of Witnesses in General
         157k471 Conclusions and Matters of Opinion or Facts
           157k471(19) k. Nature, Condition, and Relation of Objects. Most Cited Cases
Elicited testimony of percipient witness, that motorcyclist did not have an opportunity to avoid hitting dump truck, was not improper opinion testimony as to ultimate conclusion of comparative negligence; rather, witness's "opinion" was an impression or sensation that was not susceptible of exact reproduction or description in words, and question asked of witness did not call for an opinion from him depending upon facts which he had subsequently learned, but rather was based on events which he had personally observed and felt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

Law Office of Stephen S. Talt and Stephen S. Talt, Pasadena, for Defendant and Appellant Tommie Wyatt, Jr.

John P. DeGomez, Greines, Martin, Stein & Richland, Feris M. Greenberger, Carolyn Oill, and Sheila A. Wirkus, Los Angeles, for Defendant and Appellant City of Los Angeles.

Robert S. Gerstein, Tourtelot & Butler and Robert H. Tourtelot, Los Angeles, and T. Sean Butler for Plaintiff and Respondent.

SUZUKAWA, J.

## INTRODUCTION

*1 Plaintiff Barry A. Bowman (plaintiff or Bowman) brought the present action after suffering devastating injuries when his motorcycle collided with a dump truck owned and operated by defendant Tommie Wyatt, Jr. (Wyatt). The collision occurred shortly after Wyatt delivered a load of asphalt to a work site of defendant City of Los Angeles (City), with whom Wyatt was under contract.

The jury found that Wyatt caused the accident by negligently making a left turn in front of Bowman's motorcycle. The jury further found that Wyatt was a City employee, that the City breached a duty to inspect and maintain the dump truck's brakes, that the truck was controlled by the City and was in a dangerous condition, and that the work in which Wyatt was engaged at the time of the accident involved a special risk of harm. It returned a verdict for Bowman of over $15 million.

The City has appealed, contending that: (1) the jury was misinstructed on several critical issues, including the factors it was to consider in determining if Wyatt was an employee or independent contractor; (2) there was no substantial evidence to support a finding that defects in the dump truck's brakes were a proximate cause of the accident; (3) as a matter of law, the work in which Wyatt was engaged did not involve a peculiar risk of harm; and (4) the trial court erred in deciding as a matter of law that the City was the dump truck's "motor carrier" within the meaning of Vehicle Code sections 408

and 34501.12. Wyatt has also appealed, contending that the court abused its discretion by allowing evidence that Wyatt's motor carrier permit had been suspended, allowing lay opinion testimony, and limiting the testimony of defendants' expert.

We agree with the City that the trial court erred by misinstructing the jury about the factors relevant to determining whether Wyatt was an employee or an independent contractor, allowing the jury to find that the work in which Wyatt was engaged involved a peculiar risk of harm, and instructing the jury that the City was the motor carrier as a matter of law. We further agree with the City that substantial evidence did not support the jury's finding that defects in the dump truck's brakes were a proximate cause of the accident. Because these errors infected all four bases of liability Bowman asserted against the City, we reverse the judgment for Bowman and against the City, and remand for a limited retrial on vicarious liability.

With respect to Wyatt's appeal, we conclude that his contentions are without merit and affirm the jury finding as to his liability.

## FACTUAL AND PROCEDURAL BACKGROUND

Bowman was seriously injured on October 13, 2004, when the motorcycle he was riding collided with a dump truck driven by Wyatt. Bowman had been traveling southbound on Wilbur Avenue in Northridge; Wyatt was traveling eastbound on Vanalden Avenue, rolled through a stop sign, and collided with Bowman at the intersection of Wilbur and Vanalden as he began making a left turn. As a result of the accident, Bowman suffered traumatic brain injury, a stroke, hearing and vision loss, a jaw laceration, a frozen shoulder, compound leg fractures, and a hip fracture. At the time of trial, he remained blind in one eye, walked with a cane, and suffered severe mental impairment that interfered with his memory and reasoning.

*2 When the accident occurred, Wyatt was under contract with the City of Los Angeles, Bureau of Street Services, to deliver asphalt to City work sites on an as-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

needed basis.[FN1] Wyatt had just delivered a load of asphalt for the City and was returning to a City yard to determine if there was another load for him to haul.

Bowman sued Wyatt and the City for personal injuries. The operative third amended complaint alleged that Wyatt failed to stop at the stop sign and/or to yield the right-of-way to Bowman; defendants negligently failed to maintain the dump truck's brakes; Wyatt was engaged in an activity that lawfully could be carried out only pursuant to a permit from the state of California; the City was vicariously liable for the harm to Bowman because Wyatt's duties involved possible danger to the public and were nondelegable; the operation of the dump truck was, as a matter of law, an activity involving an unreasonable risk of harm to others; Wyatt's operation of the dump truck was pursuant to the California Motor Carrier of Property Permit Act; and the City had a nondelegable duty to exercise due care to Bowman as a member of the driving public.

The case went to trial before a jury in November 2007. Bowman presented evidence that the dump truck's brakes failed, Wyatt's motor carrier permit had been suspended, and required safety inspections had not been performed as required by law. Defendants presented evidence that the brakes did not fail, Wyatt's motor carrier permit had not been suspended, required inspections were performed, and the City was not responsible for maintaining the dump truck.[FN2]

After hearing several weeks of testimony, the jury returned a verdict for Bowman, finding as follows:

"1. On the claim of Barry Bowman for negligence against Tommie Wyatt[,] we find in favor of Barry Bowman and against Tommie Wyatt[.]

"2. On the claim of Barry Bowman against the City of Los Angeles for failure to inspect or maintain the brakes of the truck it leased from Tommie Wyatt [,] we find in favor of Barry Bowman and against the City of Los Angeles[.]

"3. On the claim of Barry Bowman against the City of Los Angeles that the truck was controlled by the City and was in a dangerous condition[,] we find in favor of Barry Bowman and against the City of Los Angeles[.]

"4. On the claim of Barry Bowman against the City of Los Angeles that the work of Tommie Wyatt and the dump truck involved a special risk of harm[,] we find in favor of Barry Bowman and against the City of Los Angeles[.] ...

"5. On the claim of Barry Bowman against the City of Los Angeles that Tommie Wyatt was an 'employee' of the City and not an independent contractor[,] we find in favor of Barry Bowman and against the City of Los Angeles[.]"

The jury found that Wyatt was 25 percent responsible for the accident and the City was 75 percent responsible. It awarded damages as follows:

| | |
|---|---|
| Past economic loss: | $ 776,339 |
| Future economic loss: | $ 3,959,005 |
| Past noneconomic loss: | $ 1,500,000 |
| Future noneconomic loss: | $ 9,500,000 |
| **TOTAL:** | **$15,735,404** |

This timely appeal followed.

**\*3** Judgment was entered on January 28, 2008, and notice of entry of judgment was served on January 30, 2008. The trial court denied defendants' motions for new trial and for judgment notwithstanding the verdict.

### THE CITY'S APPEAL

The City contends: (1) the jury was misinstructed on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00818-LH -ART Document 21-2 Filed 08/17/11 Page 498 of 1149
case 3:08-mc-00052-RLM -CAN document 209-2 filed 07/30/10 page 1 of 36
Page 14

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

critical issues, including the factors it should consider in determining if Wyatt was an employee or independent contractor of the City; (2) the trial court erred in allowing the jury to find that Wyatt's use of the dump truck involved a special risk of harm; (3) substantial evidence did not support a finding that the condition of the brakes was a proximate cause of the accident and Bowman's injuries; and (4) the trial court erred in finding that the City was the "motor carrier" as a matter of law. We consider each issue below.

## I. THE TRIAL COURT MISINSTRUCTED THE JURY ON THE FACTORS RELEVANT TO DETERMINING WHETHER WYATT WAS AN EMPLOYEE OR INDEPENDENT CONTRACTOR

*A. The CACI No. 3704 Instruction*

[1] At Bowman's request, the jury was instructed pursuant to the Judicial Council's California Civil Jury Instructions (CACI) No. 3704 that it must determine whether Wyatt was an employee or an independent contractor of the City, as follows:[FN3]

"In deciding whether Tommie Wyatt, Junior was the City of Los Angeles's employee, you must first decide whether the City of Los Angeles had the right to control how Tommie Wyatt, Junior performed the work, rather than just the right to specify the result.

"It does not matter whether City of Los Angeles exercised the right to control. If you decide that the right to control existed, then Tommie Wyatt, Junior was the City of Los Angeles' employee.

"If you decide that the City of Los Angeles did not have the right of control, then you must consider all the circumstances in deciding whether Wyatt was the City of Los Angeles's employee.

"The following factors, if true, may show that Wyatt was the employee of the City of Los Angeles:

"A, The City of Los Angeles supplied the equipment, tools and place of work;

"B, Tommie Wyatt, Junior was paid by the hour rather than by the job;

"C, The work being done by Tommie Wyatt, Junior was part of the regular business of the City of Los Angeles;

"D, The City of Los Angeles had an unlimited right to end the relationship with Tommie Wyatt, Junior;

"E, The work being done by Tommie Wyatt, Junior was the only occupation or business of Tommie Wyatt, Junior;

"F, The kind of work performed by Tommie Wyatt, Junior is usually done under the direction of a supervisor rather than by a specialist working without supervision;

"G, The kind of work performed by Tommie Wyatt, Junior does not require specialized or professional skill;

"H, The services performed by Tommie Wyatt were to be performed over a long period of time;

"and I, The City of Los Angeles and Tommie Wyatt, Junior acted as if they had an employer-employee relationship."[FN4]

**\*4** The City contends that this instruction is erroneous because it told the jury that the right of control, *by itself,* compelled a finding that Wyatt was a City employee. In other words, the City says, the instruction told the jury that if it found that the City had the right to control how Wyatt performed his work, then it *must* find that he was a City employee. The instruction misstates the law, the City argues, because while the existence of control is an important factor in determining whether someone is an employee or an independent contractor, it is not the only factor. Instead, where the right to control is not absolute, "the fact finder must be allowed to weigh the extent of the control that could be exercised against additional factors to determine if the worker is more like an employee or more like an independent contractor."

[2][3][4] We review de novo whether a challenged instruction correctly states the law.[FN5] (*Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 24, 65 Cal.Rptr.3d 695; *Sander/Moses Productions, Inc. v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

*NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094-1095, 48 Cal.Rptr.3d 525; *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 439, 72 Cal.Rptr.2d 720.) For the reasons that follow, we conclude that CACI No. 3704 does not accurately state the law.[FN6]

### B. The Law Governing the Employee/Independent Contractor Distinction

[5] The distinction between an employee and an independent contractor is a significant one: With some exceptions, an employer is vicariously liable for the negligent acts of its employees, but not of its independent contractors. (E.g., *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350, 256 Cal.Rptr. 543, 769 P.2d 399 (*Borello* ) ["The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him"]; *Weiss v. Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094, 1100, 251 Cal.Rptr. 727 [noting "general rule refusing to impose vicarious liability for the negligence of an independent contractor"].) Accordingly, there is a rich body of case law discussing when a worker is an "employee" or an "independent contractor."

### 1. Supreme Court Authority

The "seminal case" (*Truesdale v. Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 615, 235 Cal.Rptr. 754) addressing the employee/independent contractor distinction is *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 168 P.2d 686 (*Empire Star* ), disapproved on other grounds in (*People v. Sims* (1982) 32 Cal.3d 468, 479-480, fn. 8, 186 Cal.Rptr. 77, 651 P.2d 321.). That case arose under the Unemployment Insurance Act, pursuant to which employers were required to pay unemployment insurance taxes for employees, but not for independent contractors. (*Empire Star,* at p. 36, 168 P.2d 686.) In affirming the trial court's determination that the defendant mining company's lessees were independent contractors, the Su-

preme Court identified a number of factors relevant to distinguishing independent contractors from employees. The most important factor was "the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists." (*Id.* at p. 43, 168 P.2d 686.) The court also identified a series of "other factors" to be taken into consideration: "(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal. Ann. § 220.)" (*Id.* at pp. 43-44, 168 P.2d 686.)

***5** The Supreme Court again addressed the employee/ independent contractor distinction in *Malloy v. Fong* (1951) 37 Cal.2d 356, 232 P.2d 241. There, the plaintiff was injured in a car accident while attending a vacation Bible school run by his church. The issue before the court was whether the church was vicariously liable for the alleged negligence of the church's pastor and his assistant. (*Id.* at pp. 360-363, 370, 232 P.2d 241.) The court identified the right of control as the primary factor in determining whether a person performing work for another is an agent or an independent contractor, but noted that the additional factors outlined in *Empire Star* were also relevant. (*Id.* at pp. 370-371, 232 P.2d 241.) The court addressed each of the factors before concluding that the pastor was an employee, not an independent contractor. (*Id.* at pp. 371-372, 232 P.2d 241.)

The Supreme Court revisited the factors relevant to distinguishing employees from independent contractors in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

*Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 88 Cal.Rptr. 175, 471 P.2d 975. There, the Director of Employment (director) levied assessments against a television production company for unemployment insurance contributions assertedly due based on salaries paid to writers who were employed to write television stories and plays. Such contributions were required only if the writers were employees rather than independent contractors. (*Id.* at p. 946, 88 Cal.Rptr. 175, 471 P.2d 975.) The trial court agreed with the director and found that the writers were employees; the production company appealed. (*Ibid.*) The Supreme Court held that in determining that the production company was an employer, the trial court "improperly restricted its consideration to whether [the production company] had the right to and did exercise control over the writers' work." (*Ibid.*) It explained that while the right of control is the "principal test" of an employment relationship, the court should also have considered the additional factors identified in *Empire Star.* (*Id.* at pp. 946-947, 88 Cal.Rptr. 175, 471 P.2d 975.) Indeed, it said, while the right to control and direct the individual who performs services as to the details and means by which the result is accomplished is the most important consideration, it is "*not the only element* in determining whether an employment relationship has been created." (*Id.* at p. 950, 88 Cal.Rptr. 175, 471 P.2d 975, italics added.) The court thus considered all of the *Empire Star* factors before agreeing with the trial court that an employment relationship existed between the production company and its writers. (*Id.* at p. 955, 88 Cal.Rptr. 175, 471 P.2d 975.)

The Supreme Court most recently discussed the employee/independent contractor distinction in *Borello, supra,* 48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399. There, it considered whether agricultural workers were employees or independent contractors within the meaning of the Worker's Compensation Act. It discussed the relevant legal principles as follows: "Following common law tradition, California decisions ... uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired....' [Citations.] [¶]

However, the courts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship." (*Id.* at p. 350, 256 Cal.Rptr. 543, 769 P.2d 399.) Those "secondary indicia" "have been derived principally from the Restatement Second of Agency." (*Id.* at p. 351, 256 Cal.Rptr. 543, 769 P.2d 399.) They generally " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Ibid.*)

*6 After reviewing the factors traditionally considered to determine whether workers are employees or independent contractors, the court declined to adopt new standards for examination of the issue. Instead, it determined that "the Restatement guidelines heretofore approved in our state remain a useful reference." (*Borello, supra,* 48 Cal.3d at p. 354, 256 Cal.Rptr. 543, 769 P.2d 399.) It also noted with approval "the six-factor test developed by other jurisdictions.... Besides the 'right to control the work,' the factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business. [Citation.]" (*Id.* at pp. 354-355, 256 Cal.Rptr. 543, 769 P.2d 399.) It concluded: "As can be seen, there are many points of individual similarity between these guidelines and our own traditional Restatement tests. [Citation.] We find that all are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor...." (*Id.* at p. 355, 256 Cal.Rptr. 543, 769 P.2d 399.)

### 2. *Appellate Court Authority*

Taken together, the body of Supreme Court authority

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

discussed above stands for the proposition that while the right of control is the "primary" factor to be considered in determining whether a worker is an employee or an independent contractor, a group of "secondary" factors also must be considered. Accordingly, appellate cases consistently apply a multi-factor test in evaluating employee/independent contractor determinations. The recent case of *Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd.* (2009) 175 Cal.App.4th 1074, 96 Cal.Rptr.3d 797 is illustrative. There, an employer association brought an action for declaratory judgment, seeking to invalidate a precedential decision by the California Unemployment Insurance Appeals Board (board) that designated certain truck drivers as employees, not independent contractors. The action was brought under section 621, subdivision (b), of the Unemployment Insurance Code, which defines an "employee" as " '[a]ny individual who, *under the usual common law rules applicable in determining the employer-employee relationship,* has the status of an employee.' " (*Id.* at p. 1085, 96 Cal.Rptr.3d 797, italics in original.) The employer association contended that under the italicized language of the statute, the board lacked jurisdiction to consider the "secondary criteria" established by case law, but instead must consider only the common law "control of details" test to determine employee status. (*Id.* at pp. 1088-1089, 96 Cal.Rptr.3d 797.) The court disagreed. It explained: "[W]e glean that our Supreme Court's and other courts' applications of both primary and secondary criteria of employment determinations are in the process of becoming part of the common law of this state, as expressed in judicial decisions such as *Empire Star, supra,* 28 Cal.2d 33, 168 P.2d 686, and *Borello, supra,* 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] [¶] We accordingly reject plaintiff's basic premise that the primary or common law test for employment status, regarding the right to control, must operate completely exclusively from the secondary factors that have been identified in other factual contexts as useful for determining employment status. There is nothing in the historical development of the common law to justify confining the statutory terminology in section 621, subdivision (b), to a narrow common law test for employment, simply because this is an unemployment insurance assessment case. The terms of section 621, subdivision (b) must be interpreted in light of comparable, complementary and overlapping criteria developed in case law...." (*Id.* at p. 1091-1092, 96 Cal.Rptr.3d 797.) It concluded: "[P]laintiff has provided no persuasive reason to fault the Board's reasoning in clarifying that both the primary and secondary *Borello* tests have application to unemployment insurance determinations under section 621, subdivision (b), *because the secondary criteria have been incorporated into the 'usual common law rules' mentioned in that subdivision.* " (*Id.* at p. 1095, 96 Cal.Rptr.3d 797, italics added; see also *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 85, 89 Cal.Rptr.3d 34 [approving instruction that told the jury that in determining whether plaintiff truck drivers were employees or independent contractors, it must " 'consider a number of factors' " and " 'weigh all of these factors based on the evidence that you have heard' "]; *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 64 Cal.Rptr.3d 327 [trial court correctly applied multi-factor *Borello* test in determining that drivers were employees, not independent contractors, for limited purpose of their entitlement to reimbursement for work-related expenses]; *Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 59 Cal.Rptr.3d 37 [multi-factor *Borello* test applied in employment tax context]; *Ali v. L.A. Focus Publication* (2003) 112 Cal.App.4th 1477, 5 Cal.Rptr.3d 791 [multi-factor test applied to determine whether plaintiff was an employee and, hence, permitted to assert wrongful termination claim]; *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 202, 38 Cal.Rptr.2d 98 [multi-factor test applied to conclude that, for unemployment insurance purposes, contract truck drivers were independent contractors as a matter of law; under *Borello,* "[r]ight of control retains significance, but is no longer determinative"].)[FN7]

*C. CACI No. 3704 Does Not Correctly State the Law Because It Instructs a Jury That the Right of Control, by Itself, Is Dispositive*

**\*7** [6] As the cases discussed above make clear, the right of control is an important factor in determining whether a worker is an employee or an independent

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

contractor, but it is not the only factor. Indeed, the Supreme Court has said, "the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." (*Borello, supra,* 48 Cal.3d at p. 350, 256 Cal.Rptr. 543, 769 P.2d 399.) Thus, as we have demonstrated, the cases consistently endorse a multi-factor test that considers not only the right of control, but also secondary factors such as whether the worker is engaged in a distinct occupation or business, the skill required in the particular occupation, whether the employer or the worker supplies the tools and the place of work, the length of time for which the services are to be performed, whether the worker is paid by time or by the job, whether the work is a part of the regular business of the employer, and the kind of relationship the parties believe they are creating.

CACI No. 3704, given in the present case, did not correctly instruct the jury that it must weigh all of these factors to determine whether Wyatt was an employee or an independent contractor. Instead, it told the jury that if it decided that the City had the right to control how Wyatt performed his work, then it *must* conclude that Wyatt was a City employee. In other words, it told the jury that the right of control, *by itself,* gave rise to an employer-employee relationship. Further, it told the jury that it should consider the secondary factors only "[i]f you decide that the City of Los Angeles did not have the right of control." (*Ibid.*) For all the reasons discussed above, this instruction thus is not a correct statement of the law.

### D. The Erroneous Instruction Likely Prejudiced the Jury's Determination That Wyatt Was the City's Employee

[7][8][9] In determining whether instructional error was prejudicial, a reviewing court evaluates " '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled' " to determine whether it is "reasonably probable" that erroneous instructions misled the jury. (*Red Mountain, LLC. v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359, 48 Cal.Rptr.3d 875; *Soule v. General Motors Corp.*

(1994) 8 Cal.4th 548, 581, fn. 11, 34 Cal.Rptr.2d 607, 882 P.2d 298.) "A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' ( *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894].)" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682, 36 Cal.Rptr.3d 495, 123 P.3d 931.) Accordingly, "our standard of review in this regard is the opposite of the traditional substantial evidence test. ' "[I]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]" [Citation.] Accordingly, we state the facts most favorably to the party appealing the instructional error alleged[.] [Citation.]' ( *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 298 [45 Cal.Rptr.2d 10].)" (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 423, 99 Cal.Rptr.2d 665, disapproved on other grounds in *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1153-1154, 17 Cal.Rptr.3d 289, 95 P.3d 513.)

**\*8** [10] In the present case, it is reasonably probable that the erroneous employment instruction prejudicially affected the jury's conclusion that Wyatt was a City employee, not an independent contractor. There was substantial evidence from which the jury could have concluded that Wyatt was an independent contractor, including the following: City employees testified that Wyatt controlled the dump truck and how it was operated; Wyatt supplied all of his own tools and equipment, including the dump truck, insurance, and a cell phone; Wyatt supplied and paid for his truck's gasoline and oil; Wyatt was responsible for all maintenance and repairs to his dump truck; Wyatt worked on a day-to-day, as-needed basis; the City paid Wyatt by the load, not by the hour; Wyatt did not have a City supervisor; Wyatt's work required him to be skilled in the operation of a dump truck; the agreement between Wyatt and the City says that he is an independent contractor; Wyatt testified that he worked for his own company, Tommie

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

Wyatt Trucking; City officials considered Wyatt an independent contractor and issued him a form 1099 at the end of each tax year; Wyatt did not receive any employee benefits from the City, such as pension, paid vacation time, paid sick leave; Wyatt was permitted to employ substitute drivers to perform work for the City.

Based on all of this evidence, we conclude that a jury properly instructed to consider all of the factors identified in the case law reasonably could have concluded that Wyatt was an independent contractor, not an employee. Therefore, it is reasonably probable that the erroneous employment instruction prejudicially affected the jury's conclusion concerning Wyatt's employment. FN8

## II. WYATT'S USE OF THE DUMP TRUCK DID NOT INVOLVE A PECULIAR RISK AS A MATTER OF LAW

Bowman alleged at trial that Wyatt's work for the City involved a "special" or "peculiar" risk of harm, and therefore the City was vicariously liable for Bowman's injuries, even if Wyatt was an independent contractor, not an employee. The jury was given a verdict form requesting a special finding on this issue, and it found that "the work of Tomm[ie] Wyatt and the dump truck involved a special risk of harm."

The City contends that the trial court erred in allowing the jury to make this special finding because, as a matter of law, the dump truck did not involve a peculiar risk of harm. For the reasons that follow, we agree.

### A. Overview of the Peculiar Risk Doctrine

At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work for which he or she was hired. Over time, the courts created exceptions to this general rule of nonliability. One such exception pertains to contracted work that poses an inherent risk of injury to others, which is commonly referred to as the doctrine of "peculiar" or "special" risk. (*Privette v. Superior Court*

(1993) 5 Cal.4th 689, 693, 21 Cal.Rptr.2d 72, 854 P.2d 721.)

**\*9** The peculiar risk doctrine is discussed in sections 413 and 416 of the Restatement Second of Torts. As relevant to the present case, section 416 provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

[11][12] "A critical inquiry in determining the applicability of the doctrine of peculiar risk is whether the work for which the contractor was hired involves a risk that is 'peculiar to the work to be done,' arising either from the nature or the location of the work and ' "against which a reasonable person would recognize the necessity of taking special precautions." ' [Citations.] The term 'peculiar risk' means neither a risk that is abnormal to the type of work done, nor a risk that is abnormally great; it simply means ' "a special, recognizable danger arising out of the work itself." ' [Citations.]" (*Privette v. Superior Court, supra,* 5 Cal.4th at p. 695, 21 Cal.Rptr.2d 72, 854 P.2d 721.)

### B. The Peculiar Risk Doctrine as Applied to Injuries Caused by Large Construction Vehicles

In several published cases, the appellate courts have discussed the contours of the peculiar risk doctrine as applied to liability for injuries caused by large construction vehicles. The earliest of these cases is *Anderson v. L.C. Smith Constr. Co.* (1969) 276 Cal.App.2d 436, 81 Cal.Rptr. 73 (*Anderson* ), where an engineer working on a freeway construction project was killed at the jobsite when a dump truck loaded with asphalt backed up over him. The decedent had been marking a chalk line for a paving machine to follow when he was struck; the paving operation required the paving machine to move forward along the chalk line, while dump trucks backed up

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

to the paver to load asphalt into its hopper. (*Id.* at pp. 438-439, 81 Cal.Rptr. 73.) The decedent's survivors sued the dump truck driver, the general contractor, and the trucking company to whom the hauling of asphalt had been subcontracted. The jury found for defendants. (*Ibid.*)

Plaintiffs appealed, contending that the trial court erred in refusing to instruct the jury on peculiar risk. (*Id.* at p. 439, 81 Cal.Rptr. 73.) The appellate court agreed that a peculiar risk instruction should have been given, concluding without analysis as follows: "The evidence contained in the record herein is certainly sufficient to support findings that (1) the type of work done by [the paving subcontractor] involved 'a peculiar risk of physical harm to others unless special precautions are taken' and (2) [the paving subcontractor] failed 'to exercise reasonable care to take such precautions.' " (*Id.* at p. 446, 81 Cal.Rptr. 73.)

The court reached a similar result in *Castro v. State of California* (1981) 114 Cal.App.3d 503, 170 Cal.Rptr. 734 (*Castro* ). There, the plaintiff was a dump truck driver who worked for a construction company hired by the state to install a pipeline. Plaintiff had gotten out of his truck while waiting to pull forward to load and was injured when a fellow driver backed into him. He sued, asserting that the state was vicariously liable for the other driver's negligence. The jury found for the plaintiff, but the trial court granted a motion for judgment notwithstanding the verdict, concluding that the evidence was insufficient as a matter of law to support the finding of peculiar risk. (*Id.* at pp. 507-509, 170 Cal.Rptr. 734.) The Court of Appeal reversed. It noted that construction procedures on the project required dump trucks to drive to a point beyond the construction site, turn around, and then back down the street for more than a half block. Further, there was evidence that the side mirrors on the dump trucks did not allow drivers to see what was directly behind them at distances of less than 85 feet. (*Castro, supra,* 114 Cal.App.3d at p. 512, 170 Cal.Rptr. 734.) Accordingly, the court concluded that there was sufficient evidence to support the jury's finding of liability under the peculiar risk doctrine: "There was substantial evidence that the

state should have recognized that the risk of someone being struck by dump trucks backing up for more than half a block was inherent in the approved plan of operation unless special precautions were taken. While evidence was conflicting in many respects, the very existence of the conflict rendered it inappropriate for the court to grant the motion for judgment notwithstanding the verdict." (*Id.* at p. 513, 170 Cal.Rptr. 734.)

**\*10** The court concluded differently in *A. Teichert & Son, Inc. v. Superior Court* (1986) 179 Cal.App.3d 657, 225 Cal.Rptr. 10 (*Teichert* ). Like *Anderson* and *Castro, Teichert* involved a serious injury caused by a construction truck; unlike the earlier cases, the truck in *Teichert* was unladen and was not engaged in construction work at the time of the accident. There, a child was killed when his bicycle collided with a dump truck turning from a public street into a gravel plant owned by Teichert. The child's father sued Teichert and the dump truck's driver; Teichert moved for summary judgment, asserting that because the driver was an independent contractor, it was not liable for his negligence. (*Id.* at p. 660, 225 Cal.Rptr. 10.) The appellate court held that Teichert was entitled to summary judgment because the peculiar risk doctrine did not apply as a matter of law. ( *Id.* at p. 661, 225 Cal.Rptr. 10.) It explained: "Plaintiff has failed to identify any peculiar risk inherent in the work [the driver] was engaged in, apart from the ordinary risk that he would not use due care in the driving of his dump truck. There was no direct relationship between the particular work performed by [driver], i.e., hauling a truck load of asphalt, and the accident. The incident could have occurred just as easily if [driver] were driving a standard passenger vehicle or an 'eighteen-wheeler.' [¶] Nor did the frequency of truck traffic into Teichert's plant create a special risk. The collision between decedent and [driver's] truck would have happened in the same way regardless of whether that truck was the first or the hundredth to enter the facility on that day." (*Id.* at p. 662, 225 Cal.Rptr. 10.)

The court went on to discuss a relevant comment to section 416 of the Restatement Second of Torts. "In disposing of this portion of plaintiff's case we find particularly apropos the illustration set forth in comment *d* to sec-

tion 416 of the Restatement Second of Torts. That comment reads: 'A "peculiar risk" is a risk differing from the common risks to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work done, which calls for special precautions. (See § 413, com. *b.*) Thus if a contractor is employed to transport the employer's goods by truck over the public highway, the employer is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit, because the risk is in no way a peculiar one, and only an ordinary precaution is called for. But if the contractor is employed to transport giant logs weighing several tons over the highway, the employer will be subject to liability for the contractor's failure to take special precautions or anchor them on his trucks.' " (*Teichert, supra,* 179 Cal.App.3d at p. 662, 225 Cal.Rptr. 10, fn. omitted.) Thus, the court concluded, "[Driver's] negligence, if any, entailed nothing more than ordinary failure to exercise due care in the operation of a motor vehicle. This is not sufficient to invoke the 'special risk' exception to the rule of nonliability for the negligence of an independent contractor." (*Id.* at p. 661, 225 Cal.Rptr. 10.)

*11 Most recently, in *American States Ins. Co. v. Progressive Casualty Ins. Co.* (2009) 180 Cal.App.4th 18, 102 Cal.Rptr.3d 591, a self-employed trucker was driving a tractor-trailer into the only entrance to a construction site when the rear portion of his trailer ran over the plaintiff, severely injuring both of his legs. Plaintiff sued the trucker, the owner of the trailer, the grading contractor on the construction project, the general contractor, and the developer. The defendants tendered the suit to various insurance companies; one such insurer sought summary judgment, asserting that it owed defendants no duty to defend because, among other things, defendants were not potentially vicariously liable for the trucker's negligence under the doctrine of peculiar risk. (*Id.* at pp. 23-24, 102 Cal.Rptr.3d 591.) The trial court granted the motion, concluding that as a matter of law the peculiar risk doctrine did not apply, and the Court of Appeal reversed. (*Id.* at p. 25, 102 Cal.Rptr.3d 591.) It explained that unlike the accident in *Teichert,*

where a bicyclist riding along the shoulder of a road "simply collided with a dump truck turning left," in the present case there was evidence "that Meza/Western's trailer (bottom-dump dirt hauler) collided with [plaintiff] while accessing the Vinci parties' Project entrance, a lone entrance which required Meza/Western 'to execute a [U]-turn (driving westbound in eastbound lanes), encroach on at least two pedestrian cross walks [ *sic* ], jump a curb, and drive across a sidewalk ..., all without assistance of ... flagmen.' " (*Id.* at p. 31, 102 Cal.Rptr.3d 591.) Thus, the court concluded, "*Teichert* is not the exemplar in this regard. *Castro* is." (*Ibid.*)

### C. As a Matter of Law, the Peculiar Risk Doctrine Does Not Apply to the Present Case

Taken together, the four cases discussed above suggest that the dispositive issue for purposes of applying the peculiar risk doctrine to the present case is whether there was a direct relationship between the accident and the "particular work performed" by Wyatt. (*Teichert, supra,* 179 Cal.App.3d at p. 662, 225 Cal.Rptr. 10.) In other words, if the "character" of the work contributed to the accident, the peculiar risk doctrine applies. If the accident resulted from "ordinary" use of the vehicle, the peculiar risk doctrine does not apply, notwithstanding the vehicle's size and weight.

[13] We conclude that the present case is of the latter kind. As the City correctly points out, there was no direct relationship between any risk inherent in hauling asphalt and the accident. At the time of the accident, Wyatt's truck was unladen and Wyatt had left the job site. He was not engaged in hauling or dumping asphalt nor, as in *Castro,* was he following a plan of work dictated by his hauling duties. Instead, Wyatt was simply traveling from a job site on ordinary city streets. Although it indisputably had catastrophic consequences, Wyatt's negligence-running a stop sign-thus "entailed nothing more than [the] ordinary failure to exercise due care in the operation of a motor vehicle." (*Teichert, supra,* 179 Cal.App.3d at p. 661, 225 Cal.Rptr. 10.)

*12 [14] Bowman contends that, notwithstanding the foregoing, *Anderson, supra,* 276 Cal.App.2d 436, 81

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

Cal.Rptr. 73, discussed above, supports the application of the peculiar risk doctrine here because "[t]he *Anderson* court found a peculiar risk of harm on the basis of a state administrative regulation-the Division of Industrial Safety's Construction Safety Order 1576(e)-which required a truck with a body capacity of two and a half cubic yards or more used to haul construction materials to have a back-up warning device." Thus, he urges, "the evidence that trucks with the size and weight of Wyatt's create a peculiar risk of harm requiring special precautions lies in the relevant California statutes and regulations, and in the [Bulletins For Contract Trucks] issued by the Los Angeles Bureau of Street Services."

We do not agree. While the *Anderson* court discussed the state administrative regulation to which Bowman refers, it did so in the context of an allegedly erroneous negligence per se instruction. (*Anderson, supra,* 276 Cal.App.2d at pp. 439-440, 81 Cal.Rptr. 73.) The court did *not* address the regulation in discussing peculiar risk. (*Id.* at pp. 445-446, 81 Cal.Rptr. 73.) We thus conclude that the alleged regulatory violations to which Bowman refers are irrelevant to the issue of peculiar risk.

Based on our analysis, we conclude as a matter of law that the work in which Wyatt and the dump truck were engaged at the time of the accident did not constitute a peculiar risk. Thus, the trial court erred in submitting the issue of peculiar risk to the jury.

**III. THE DANGEROUS CONDITION OF PUBLIC PROPERTY CLAIM WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

Bowman asserted at trial that the City was liable for his injuries pursuant to Government Code section 835 (the dangerous condition claim). Section 835 provides that a public entity is liable for injury caused by a dangerous condition of its property (here, the dump truck) if the plaintiff establishes that "the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred,

and either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." A " 'dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov.Code, § 830, subd. (a).) " 'Property of a public entity' and 'public property' mean real or personal property owned or controlled by the public entity[.]" (§ 830, subd. (c).)

**\*13** The City contends that the jury's verdict for Bowman on the dangerous condition claim is not supported by substantial evidence. Specifically, it contends that substantial evidence did not support the jury's finding that defects in the dump truck's braking system were a proximate cause of the accident and Bowman's injuries. For the reasons that follow, we agree.

*A. The Brakes Evidence*

Through several witnesses, Bowman introduced evidence of deficiencies in the dump truck's brakes. Dale Washburn, a police officer, testified that immediately after the accident the truck's air brakes did not hold any air pressure, one brake was out of compliance, and there were audible air leaks throughout the truck. When Washburn examined the truck the next morning, the air pressure gauges registered "zero," there was a rapid loss of air pressure in the braking system, the air reservoir tanks contained excessive water, and there was possible dirt contamination of one of the truck's axles. Plaintiff's investigator, Alan Coulter, testified that the truck front brakes had been disconnected and that disabling the truck's front brakes would have diminished braking ability.

The cited evidence unquestionably is substantial evidence of brake defects after the accident. The question

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00828-RLH -CAM Document 21-2 Filed 08/17/11 Page 507 of 1149
case 3:08-mc-00521-RLH -CAM Document 209-2 filed 07/30/10 page 21 of 26
Page 26

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

relevant to our inquiry, however, is not whether there was substantial evidence of brake defects, but instead whether there was substantial evidence that alleged brake defects were a proximate cause of the accident. (Gov.Code, § 835.) As relevant to that issue, the testimony was as follows.

*Meredith Kussin:* Kussin was an eyewitness to the accident. She first saw the dump truck one or two seconds before the accident. She did not see it cross the limit line, and she does not know whether it stopped prior to entering the intersection.

*Randy Aleman:* Aleman was an eyewitness to the accident. He was traveling directly behind Bowman immediately before the accident. Aleman saw Wyatt "look [ ] to the right, meaning south side, right away, but then he looks toward me. The bike was already coming, and I saw that he looked at me. He'd missed the policeman [Bowman] that was coming and he was still rolling." Wyatt "was going very slowly, just moving slowly. I know he saw me. He didn't see the cop [Bowman]." Bowman tried to swerve to avoid the accident, but "when he tried to swerve, the truck shook up" as Wyatt accelerated into a left turn.

*Brett Llewellyn:* Llewellyn was an eyewitness to the accident. He saw Wyatt's truck slowly roll through the intersection without stopping.

*Alan Coulter:* Coulter was an investigator hired by Bowman. He testified to multiple defects in the truck's braking system, but said that he could not determine "whether the brake system stopped the vehicle and/or how the brake system affected the ability of this vehicle to stop[.]" He also did not know how the removal of the front brakes might have affected the truck's ability to stop. He did not have an opinion as to whether or not the brakes stopped the truck, and he could not opine that the truck's brakes failed.

*14 *Tommie Wyatt:* Wyatt testified that he stopped at the limit line and then inched into the intersection, but that he never saw Bowman's motorcycle approaching him. He said that he "felt a bump, and ... thought, wow, what is that?" It was not until he got out of the truck

and saw Bowman and the motorcycle that he realized what had happened. He said that he never had had any trouble stopping his truck, including on the day of the accident.

*B. The Jury's Finding That Defective Brakes Were A Proximate Cause of the Accident Is Not Supported By Substantial Evidence*

[15][16] The City contends that the evidence cited above is not of sufficient substantiality to support the jury's finding that defective brakes caused the accident. To establish causation, a plaintiff must prove that the defendant's conduct was a "substantial factor" in bringing about his or her harm. (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752, 73 Cal.Rptr.3d 114 (*Padilla* ); *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132, 39 Cal.Rptr.2d 658.) Stated differently, evidence of causation "must rise to the level of *a reasonable probability based upon competent testimony.* [Citations.] 'A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.' [Citation.] The defendant's conduct is not the cause in fact of harm ' "where the evidence indicates that there is less than a probability, i.e., a 50-50 possibility or a mere chance," ' that the harm would have ensued." (*Williams v. Wraxall, supra,* at p. 133, 39 Cal.Rptr.2d 658, italics added.)

[17][18] In reviewing evidence of causation, "we consider both direct and circumstantial evidence, and all reasonable inferences to be drawn from both kinds of evidence, giving full consideration to the negative and affirmative inferences to be drawn from all of the evidence, including that which has been produced by the defendant." (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 483, 50 Cal.Rptr.2d 785 (*Leslie G.*).) We cannot, however, draw inferences "from thin air." ( *Ibid.*) As one court has explained, "Where ... the plaintiff seeks to prove an essential element of [his] case by circumstantial evidence, [he] cannot recover merely by showing that the inferences [he] draws from those circumstances are consistent with [his] theory. Instead, [he] must show that the inferences favorable to

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

[him] are more reasonable or probable than those against [him]." (*Ibid.,* italics omitted.)

[19] In the present case, Bowman did not introduce any direct evidence that faulty brakes caused the collision. Instead, he asked the jury to infer from the brake defects discovered after the accident that defects existed before the accident and were the accident's cause. To affirm the jury's finding, we therefore must conclude that the evidence established more than a *possibility* that the brakes failed and caused the collision; rather, we must conclude that it is *probable* that they did so.

**\*15** Having reviewed the entire record, we cannot conclude that the jury's finding that brake defects caused the accident is supported by substantial evidence. No witness testified that he or she saw Wyatt trying to brake to avoid the collision, and the single eyewitness who testified to the cause of the accident said that Wyatt did not see Bowman approaching the intersection because "[Bowman] was too close." This statement was consistent with Wyatt's testimony that he did not see Bowman prior to the impact, and that it was not until he got out of his truck and saw Bowman and the motorcycle that he realized that he and Bowman had collided. There was no evidence of physical indicia that Wyatt was trying to stop, such as skid marks or witness testimony of squealing brakes immediately before the collision. Finally, Bowman's expert witness did not testify that defective brakes caused the accident; to the contrary, while he testified to a host of defects, he was unwilling to say that brake failure caused the accident or even that a brake defect affected Wyatt's ability to stop.

The present case thus is analogous to *Padilla, supra,* 160 Cal.App.4th 742, 73 Cal.Rptr.3d 114. There, a two-year-old child drowned in the defendant's backyard pool when his mother left him unattended for about five minutes. The mother brought an action for negligence against the homeowners, asserting, among other things, premises liability based on an allegedly defective gate. The trial court granted the homeowners' summary judgment motion, in part on the ground that the mother could not establish that the absence of a self-locking gate at one entrance to the pool area was a cause of the accident because it was speculative as to whether the child entered the pool area through the gate or through one of the other points of access to the pool. (*Id.* at p. 745, 73 Cal.Rptr.3d 114.) The court of appeal affirmed, finding that even if it assumed that the gate was defective for lack of a self-latching mechanism, the mother could not establish causation. It explained: "With the evidence viewed most favorably to [mother], she is unable to show that it was more probable than not that a self-latching gate would have prevented Eddie's drowning. The probabilities are evenly balanced as to whether Eddie gained entrance to the pool through the side yard gate, the 'door' on the other side of the house, or the sliding glass doors of the house. Accordingly, [mother] cannot establish that Defendants' failure to provide a self-latching gate was a substantial factor in causing Eddie's drowning." (*Id.* at pp. 752-753, 73 Cal.Rptr.3d 114.)

The present case also is analogous to *Leslie G., supra,* 43 Cal.App.4th 472, 50 Cal.Rptr.2d 785. There, a woman was sexually assaulted in the parking garage of her apartment building. She sued the building's owners, contending they were negligent because they failed to repair a broken security gate and that their negligence caused her assault. The trial court granted the owners' motion for summary judgment, and the Court of Appeal affirmed. (*Id.* at p. 476, 50 Cal.Rptr.2d 785.) It explained that because there was no direct evidence either that the rapist entered or departed through the broken gate or that the broken gate was the only way that he could have entered or departed, plaintiff could not survive summary judgment simply because it was "*possible* that he *might* have entered through the broken gate." (*Id.* at p. 483, 50 Cal.Rptr.2d 785.) It said: "In this case, no one (other than the rapist, who has never been caught) knows how the rapist got into or out of the garage. Although the three access doors to the garage were found closed on the day after Leslie's rape, no one knows whether they were closed or propped open on the night of the rape. No one knows whether the rapist followed another tenant in through the front door and then found his own way down to the garage. No one knows whether the rapist somehow obtained a key to the premises (he could have found a lost key or stolen one from another tenant). These unknowns are significant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

because, had the gate been operating properly, the rapist still could have entered the garage. Moreover, even if it had been working, he could have entered through the security gate by waiting outside for a car to enter, ducking the closing gate, and hiding in the garage as he apparently did on the night of Leslie's rape. [Citations.] [¶] In short, there simply is no evidence from which to infer causation." (*Id.* at pp. 483-484, 50 Cal.Rptr.2d 785, fn. omitted.)

***16** [20] In the present case, as in *Padilla* and *Leslie G.,* there is simply no evidence from which to infer that defendants' conduct was a cause of plaintiff's harm. Although proof of causation may be by circumstantial evidence, it must be by " 'substantial' evidence, and evidence 'which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' (*Showalter v. Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 471 [106 P.2d 895]; see also Prosser & Keeton, Torts (5th ed. 1984) § 41, p. 269 [a mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to determine the issue in favor of the defendant as a matter of law].)" (*Leslie G., supra,* 43 Cal.App.4th at p. 484, 50 Cal.Rptr.2d 785.) Here, there simply was not evidence from which a reasonable jury could have concluded that defective brakes, rather than Wyatt's failure to see Bowman approaching the intersection, was the probable cause of the accident. Thus, Bowman's dangerous condition claim necessary fails.

# IV. SUBSTANTIAL EVIDENCE DID NOT SUPPORT THE JURY'S FINDING THAT THE CITY FAILED TO INSPECT OR MAINTAIN THE DUMP TRUCK'S BRAKES

Bowman asserted at trial, and the jury concluded, that the City "faile[ed] to inspect or maintain the brakes of the truck it leased from Tommie Wyatt[.]" The City challenges this finding on the same ground on which it challenges the dangerous condition claim-i.e., that substantial evidence did not support the jury's finding that the condition of the dump truck's brakes was a substan-

tial factor in causing the accident and plaintiff's harm. For the following reasons, we agree.

The jury was instructed on two separate legal theories relevant to the brakes claim. The first theory, breach of a mandatory duty, was premised on Government Code section 815.6. That section provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." The jury was instructed about a number of statutes and regulations pursuant to which the City assertedly had a "mandatory duty" to maintain the dump truck's brakes.[FN9] As to each alleged breach of a statutory duty, the jury was told that: "To establish this claim, plaintiff must prove all of the following: Number one, that the City of Los Angeles violated [the identified statute or regulation]; number two, that plaintiff was harmed; and number three, that the failure of the City of Los Angeles to perform its duty was a substantial factor in causing plaintiff's harm."

[21] The second theory relevant to the brakes claim asserted the breach of a nondelegable duty. Nondelegable duties "derive from statutes (*Maloney v. Rath* [ (1968) ] 69 Cal.2d [442,] 448 [71 Cal.Rptr. 897, 445 P.2d 513]) [,] contracts (*Harold A. Newman Co. v. Nero* (1973) 31 Cal.App.3d 490, 496-497 [107 Cal.Rptr. 464]; *Capitol Chevrolet Co.* [*v. Lawrence Warehouse Co.* (9th Cir.1955) ] 227 F.2d [169,] 173)[,] and common law precedents. (*Maloney, supra,* 69 Cal.2d at p. 447 [71 Cal.Rptr. 897, 445 P.2d 513].)" (*Barry v. Raskov* (1991) 232 Cal.App.3d 447, 455, 283 Cal.Rptr. 463.) They "do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

[¶] The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a 'non-delegable duty' requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted." (Rest. 2d Torts, introductory note to ch. 15, topic 2.) The jury was instructed that the City had a nondelegable duty to maintain the dump truck's brakes under a variety of statutes and regulations.FN10

*17 [22] Both breach of mandatory duty and breach of nondelegable duty claims have a causal element. That is, to find the City liable for breach of a mandatory duty or of a nondelegable duty, the jury had to find that the alleged breach of duty caused Bowman's injuries. (*Guzman v. County of Monterey* (2009) 178 Cal.App.4th 983, 991, 100 Cal.Rptr.3d 793, italics added ["[T]here are three elements to a cause of action under Government Code section 815.6. First, the enactment at issue must be obligatory, not merely discretionary or permissive in its directions to the public entity. [Citation.] Typically, an enactment imposing a mandatory duty also includes specific rules and guidelines for implementation. Second, the duty imposed must be designed to protect against the particular kind of injury the plaintiff suffered.... The third and final requirement is that the breach of the duty must have been a *proximate cause* of the plaintiff's injury."]; *Madden v. Summit View, Inc.* (2008) 165 Cal.App.4th 1267, 1281, 81 Cal.Rptr.3d 601 [to establish breach of a nondelegable duty, plaintiff must prove "a causal relationship between his injuries and [defendant's] asserted omission"].)

For all of the reasons discussed in the prior section, there was not substantial evidence that alleged defects in the dump truck's brakes caused plaintiff's injuries. Accordingly, plaintiff's brakes claim necessarily fails.

**V. THE CITY WAS NOT THE DUMP TRUCK'S MOTOR CARRIER AS A MATTER OF LAW**

The City contends that the trial court erred in instruct-

ing the jury that the City was the dump truck's "motor carrier" as a matter of law. That contention is relevant to the dangerous condition claims and the brakes claim; therefore, having concluded that those claims fail for lack of substantial evidence of causation, we need not reach the motor carrier issue to resolve this appeal. However, because the motor carrier issue was a significant issue at trial and because our conclusions will compel a retrial, we discuss the motor carrier issue for the guidance of the parties and trial court.

*A. Overview of Motor Carrier Issue*

The Vehicle Code requires the California Highway Patrol (CHP) to "regulate the safe operation of" large vehicles, including trucks with three or more axles that weigh more than 10,000 pounds. (Veh.Code, § 34500, subd. (a).) The CHP complies with this mandate, in part, through the "Biennial Inspection of Terminals Program" (BIT). Pursuant to the BIT, a vehicle's "motor carrier" must schedule a vehicle inspection by the CHP at least every 25 months, and the motor carrier may not operate the vehicle without the CHP inspection having been performed and a safety compliance report having been issued. (Veh.Code, § 34501.12, subds. (d)(1), (e)(1), (g)(1).)

In most cases, the "motor carrier" is "the registered owner of a vehicle." As relevant to the present case, however, if the registered owner "leases the vehicle to another person for a term of more than four months," then "the lessee is the motor carrier." (Veh.Code, § 34501.12, subds. (a), (a)(1).)

*18 It was undisputed at trial that the dump truck was subject to the BIT requirement and that Wyatt was the "registered owner" of the truck. The City therefore contended that Wyatt was the dump truck's motor carrier. Plaintiff conceded that Wyatt was the registered owner of the dump truck, but he contended that the City had leased the dump truck from Wyatt for a period of 12 months and, accordingly, was the motor carrier.

The trial court stated initially that it would let the motor carrier issue go to the jury. Hence, a great deal of testi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

mony was elicited regarding whether the City had leased the truck from Wyatt and, if so, for what period of time. Ultimately, however, the court took the issue from the jury, deciding that the City was the motor carrier as a matter of law because there was no factual dispute that the contract between Wyatt and the City was for more than four months. The court so instructed the jury, telling it as follows: "After hearing all the evidence, I determined as a matter of law that the City was a motor carrier because I found that there was really no dispute over the key issue. And the key issue is-and just so you all understand it-Vehicle Code 34501.12, and that's considered in conjunction with two other Vehicle Code sections, 34505.5 and 34505.6. And the key issue was that the Vehicle Code section-pertinent section under 34501.12 says in defining a motor carrier, ... if a registered owner leases the vehicle to another person for a term of more than four months ... the lessee is the motor carrier. That's the statute that I am finding-using to find as a matter of law that the City was the motor carrier. And the court found no dispute between the parties about whether the lease was for more than four months."

The City challenges the trial court's determination that the City was the motor carrier as a matter of law (the motor carrier determination), urging that it was a matter of dispute whether the City leased Wyatt's truck for more than four months. It contends that although the contract between it and Wyatt was for one year, the contract did not provide for a "lease" of Wyatt's truck, and hence it could not have been the truck's motor carrier. Bowman disagrees, asserting that "there was little conflict in the evidence" relevant to the motor carrier issue, and thus the trial court properly resolved it as a matter of law.

We review in the next section the evidence relevant to the motor carrier determination. Based on this evidence, we then conclude that the trial court erred in finding that the City was the motor carrier as a matter of law.

*B. Facts Relevant to the Motor Carrier Issue*

### 1. *The Contract*

As we have said, whether Wyatt or the City was the motor carrier turns on whether Wyatt "leased the [dump truck] to [the City] for a term of more than four months." (Veh.Code, § 34501.12, subd. (a)(1).) The relationship between Wyatt and the City was governed by a lengthy written contract, and thus we begin with the relevant contractual language.

**\*19** The contract defined its purpose as "the day-to-day rental and operation of privately owned dump trucks furnished with driver and necessary equipments [*sic* ] for hauling purposes." It began with a series of recitals that explained the parties' intent in entering the contract:

"Whereas, the CITY, in order to discharge certain duties and responsibilities in connection with hauling asphalt, rubbish, tree trimmings and other materials, requires the day-to-day use of dump trucks for such purposes under the direction of the Department of Public Works, Bureau of Street Services, or the authorized representative; and

"Whereas, the INDEPENDENT CONTRACTOR is willing to furnish and rent a dump truck for such purposes; and

"

"Whereas, the nature of this work is of an occasional character, NOW, THEREFORE, THE INDEPENDENT CONTRACTOR hereby makes the following AGREEMENT with the CITY OF LOS ANGELES[.]"

The contract "ha[d] a term of one-year from July 1, 2004 to June 30, 2005." It provided that Wyatt "from time to time as directed by the Bureau of Street Services will furnish his/her own dump truck for the transportation of various inert matter from place to place...." It further stated that that the City would provide, "in each request for dump trucks used, the Independent Contractor with the necessary information as may be reasonably required by the Independent Contractor to comply with each said request."

The contract allocated responsibility for BIT inspections to Wyatt, as follows: "The operation, transportation, maintenance and Biennial Inspection of Terminals

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

required by the California Vehicle Code (CVC) is the sole responsibility of the Independent Contractor and at no time the cost or expense of the CITY. In addition, the acquisition and maintenance of truck equipment required by the Bureau of Street Services is the sole responsibility of the Independent Contractor and at no time the cost or expense of the CITY."

The contract was supplemented by a series of "Bulletins for Contract Trucks" (BCTs), with which Wyatt agreed to comply. One such BCT provided that, "The Department of Public Works will rent privately owned and operated dump trucks in accordance with the Standard Contractual Agreement of the City of Los Angeles for the rental and operation of dump equipment." Another provided that, "The Owner-Operator's signature on the Contractual Agreement ... carries the commitment for the utilization of his/her truck for the contract period. The use of the Contractor[']s truck for the Bureau's Contract Truck Program shall be available during any given eight (8) hour shift as needed by the CITY. The CITY has the right of first refusal." And, another provided as follows: "The Bureau of Street Services has determined that all Contract Truck Owner-Operators must obtain (a) the current Biennial Inspection Terminal (BIT) certificate every two (2) years, and (b) a Commercial Vehicle Safety Association (CVSA) sticker every ninety (90) days, or more often if necessary, to insure safe operation. [¶] According to the California Vehicle Code (CVC), Division 14.8, Section 34501.12, the *City of Los Angeles* qualifies as a 'motor carrier' (or as 'lessee' based on the intent expressed in the Board-approved 'Procedures for Renting Privately Owned Dump Trucks'). Therefore, when the City/Bureau of Street Services rents Owner-Operator trucks that work exclusively under the authority and direction of the Bureau of Street Services for more than a four-month period, the City/Bureau is the 'motor carrier' and as such has the responsibility to require Owner-Operators to obtain current BIT and CVSA certificates. All certificates are obtained at the expense of the Owner-Operator."

### 2. *Trial Testimony*

**\*20** Although it was disputed at trial whether the City

"leased" Wyatt's truck, there was much about the relationship between Wyatt and the City that was not in dispute. This included the following:

• Wyatt worked for the City on an as-needed basis. Accordingly, although the contract term was one year, Wyatt did not necessarily work for the City every day of the year. Rather, he worked for the City only on those days when the City had work for him to do.

• During the contract period, Wyatt, not the City, "control[led]" the truck.

• Wyatt was free during the contract period to take other trucking jobs once he was "off the clock" with the City or if the City did not have work for him. During the 10-15 years that he worked under City contracts, he took trucking jobs for entities other than the City.

• The City was not permitted under the contract to drive Wyatt's truck; only Wyatt was permitted to do so. Thus, if Wyatt was unavailable to drive the truck, the City did not provide an alternative driver.

• Wyatt was required under the terms of the contract to maintain the truck.

• During the contract period, Wyatt paid for the truck's gas and oil and for all necessary repairs.

### 3. *As a Matter of Law, the City Did Not "Lease" the Dump Truck for a Term Exceeding Four Months*

[23] Much of the testimony at trial concerned whether Wyatt and various City employees believed that the City "rented" Wyatt's dump truck. Because this testimony was in conflict-some witnesses testified that Wyatt rented the truck to the City, while others testified that he did not [FN11]-the City contends that the trial court should not have taken the issue from the jury. Bowman contends otherwise: He suggests that the testimony on which the City relies is extrinsic evidence that is irrelevant to the dispute because it tends to prove a meaning of the contract to which its plain language is not reasonably susceptible. In other words, Bowman says, "[T]he testimony of City employees did not even

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

purport to provide an interpretation of the contract language to which it was 'reasonably susceptible.' It simply contradicted the contract language, flatly asserting, contrary to the contract's repeated statements that the City was 'renting' Wyatt's truck, that the truck 'wasn't rented.' "

With due respect to the contentions of the parties, we believe that the witnesses' beliefs about the proper characterization of the relationship between the City and Wyatt (or, more properly, the City and Wyatt's truck) is beside the point for purposes of the present dispute. While the parties' understanding of their relationship would be relevant to a breach of contract action between Wyatt and the City, it is not relevant to determining the City's liability to a third party. Instead, the relevant question is whether the contractually-created relationship between the City and Wyatt's truck constituted a "lease" relationship within the meaning of the motor carrier statute. We therefore turn to that issue.

**\*21** [24] As we have said, Vehicle Code section 34501.12 provides that if the registered owner of a large truck "leases" the truck to another person for a term of more than four months, the lessee is the motor carrier. ( *Id.,* subd. (a)(1).) Although the existence (or nonexistence) of a long-term "lease" therefore is critical to identifying the motor carrier, section 34501.12 does not define what a lease is. Other sections of the Vehicle Code define the terms "lessee" and "lessor," but they do not shed light on the present dispute. Pursuant to Vehicle Code section 371, "lessee" "includes 'bailee' and is a person who leases, offers to lease, or is offered the lease of a motor vehicle for a term exceeding four months." A "lessor" is "a person who, for a term exceeding four months, leases or offers for lease, negotiates or attempts to negotiate a lease, or induce any person to lease a motor vehicle; and who receives or expects to receive a commission, money, brokerage fees, profit or any other thing of value from the lessee of said vehicle. 'Lessor' includes 'bailor' and 'lease' includes 'bailment.' " (Veh.Code, § 372.) These definitions thus incorporate the four-month provision of section 34501.12, but they do not identify the fundamental attributes of a lease.

We turn therefore to the dictionary and to cases defining "lease" in other contexts. Black's Law Dictionary defines "lease" as the "grant[ing] [of] possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration" or "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration, usu[ally] rent." (Black's Law Dict. (7th ed. 1999) p. 900, col. 1, p. 898, col. 1.) The right to "possession and use" or to "use and occupy" property is thus, essential to the existence of a lease according to these definitions.

Cases arising in nonvehicle contexts also emphasize that the right to possession is critical to the existence of a lease. For example, in *San Jose Parking, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1321, 2 Cal.Rptr.3d 505, the court considered whether a contract between a redevelopment agency and a parking company constituted a "lease." The court concluded that it did not, explaining that because the parking company was required to provide reasonable access for pedestrian customers of the adjacent property owners and to maintain the preexisting monthly parking spaces on the lot, "the Agreement does not embody ' "[t]he distinguishing characteristics of a leasehold estate ... that the lease gives the lessee *the exclusive possession of the premises* against all the world, including the owner [citation], ... [Citation.]' [Citation.]' (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 32 [31 Cal.Rptr.2d 378], quoting *Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 972 [269 Cal.Rptr. 807].)" (*San Jose Parking, Inc. v. Superior Court, supra,* 110 Cal.App.4th at p. 1328, 2 Cal.Rptr.3d 505, italics added.)

**\*22** The court similarly concluded in *Garcia v. Halsett* (1970) 3 Cal.App.3d 319, 82 Cal.Rptr. 420. There, the plaintiff, a child, was injured at a launderette by a malfunctioning washing machine. He urged on appeal that the trial erred by refusing to instruct the jury on the issue of bailment (i.e., lease) of the washing machine. The Court of Appeal disagreed, concluding that the facts did not establish a bailment of the washing machine as a matter of law. It explained: "In order to con-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00818-RLH -CAN Document 212 Filed 08/17/11 Page 514 of 1149
Case 3:08-mc-00521-RLH -CAN Document 209-2 Filed 07/30/09 Page 27 of 36
Page 27

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

stitute a bailment, possession of the article bailed must be given or delivered to the bailee. [Citations.] [Plaintiffs] contend that [plaintiff] Arthur had at least constructive possession of the washing machine during the time he was using it. However, this argument is also without merit. [Plaintiff] Arthur assumed no responsibility for the safe-keeping of the machine, and did not have the right to remove it or tamper with the mechanical parts of the washer. [Plaintiff] merely acquired a license to use the washing machine and was not a bailee." (*Id.* at p. 324, 82 Cal.Rptr. 420.)

Based on the foregoing, we conclude that the right to possession is a fundamental attribute of a lease or rental. (See also Civ.Code, § 1927 ["An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring, against all persons lawfully claiming the same."].) In the present case, it is undisputed that the City did not have the right to "possess" the dump truck. Both Wyatt and City representatives testified that the City was not permitted under the contract to drive Wyatt's truck; only Wyatt was permitted to do so. Thus, if Wyatt was unavailable to drive the truck, the City did not provide an alternative driver. Further, the testimony was undisputed that Wyatt was free to take other trucking jobs once he was "off the clock" with the City or if the City did not have work for him, and Wyatt testified that during the 10-15 years that he worked under City contracts, he had taken trucking jobs for entities other than the City. Accordingly, the testimony was undisputed that the City did not have the right to possess the truck, much less to do so exclusively. As a matter of law, therefore, it was not the truck's "lessee."

Further, as discussed above, a vehicle's lessee is its "motor carrier" only if the lease term exceeds four months. (Veh.Code, § 34501.12.) In the present case, the trial court concluded that Wyatt was the motor carrier because it found no dispute between the parties "about whether the lease was for more than four months." The court based this conclusion on the fact that *the contract* between Wyatt and the City was for a period of more than four months. In other words, the court apparently concluded that because the contract

was for a 12-month period, the lease term necessarily was also for 12 months. We do not believe, however, that the contract's language bears out the trial court's conclusion.

**\*23** As we have noted, the contract defined its purpose as "the *day-to-day* rental and operation of privately owned dump trucks furnished with driver" and noted that the work for which the City required dump trucks was of "an occasional character." (Italics added.) It provided that Wyatt "from *time to time* as directed by the Bureau of Street Services will furnish his/her own dump truck for the transportation of various inert matter from place to place," and it characterized the City's right to the truck as one of "first refusal." (Italics added.) Thus, as we read the language of the contract, it did not provide for a one-year lease of the truck. Rather, it provided for "day-to-day" rental of the truck on an as-needed basis for one year.

Nothing in the testimony at trial suggests an alternative reading of the contractual language. To the contrary, City witnesses testified that because Wyatt's contract bound him to work for the City on an as-needed basis, he did not necessarily work for the City every day of the year. Instead, although the contract term was one year, Wyatt performed work for the City only on those days when the City requested his services.

Based on the language of the contract, considered in light of the extrinsic evidence offered at trial, we conclude as a matter of law that the City did not lease the dump truck from Wyatt for a term exceeding four months. The City therefore was not the dump truck's motor carrier.

### WYATT'S APPEAL

Wyatt contends that the trial court abused its discretion by: (1) admitting evidence that his motor carrier permit had been suspended; (2) admitting lay opinion testimony; and (3) limiting the testimony of defendants' expert. For the reasons that follow, we conclude that there was no prejudicial error and affirm the judgment against Wyatt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

## I. Admission of Evidence That Wyatt's Motor Carrier Permit Had Been Suspended

Over Wyatt's objection, Bowman introduced evidence, which Wyatt disputed, that the Department of Motor Vehicles (DMV) had suspended Wyatt's motor carrier permit in April 2004 and had never reinstated it. The issue first was addressed in the examination of Veronica Maxwell, the City's contract truck coordinator. Bowman's counsel asked whether Maxwell was "aware that the [DMV] certified that Mr. Wyatt's motor carrier permit had been suspended in April 2004 and has never been unsuspended?" Maxwell testified that she was not aware, and agreed that it "would have been important" for her to have had that information. Counsel later showed Maxwell two letters from the DMV, one addressed to Wyatt and the other addressed to Bowman's counsel, which confirmed the suspension of Wyatt's motor carrier permit in April 2004. Maxwell agreed that the letters said that Wyatt's motor carrier permit had been suspended, and she stated that she had never seen the letters before and did not know whether Wyatt's motor carrier permit ever had been reinstated.

**\*24** The suspension of Wyatt's motor carrier permit was raised again during Bowman's counsel's examination of Alan Coulter, who testified as an expert concerning inspection and maintenance requirements for large vehicles. Coulter testified that a current motor carrier permit is required to drive a large dump truck, and he said that he had contacted the DMV several times and had been told that Wyatt's motor carrier permit had expired and never had been renewed.

Wyatt also was asked about the suspension of his motor carrier permit. He testified that to his knowledge, his permit had never been suspended. He also testified about a document demonstrating that he had a valid motor carrier permit in June 2007.

After closing arguments, in which no party raised the permit suspension, the trial court admitted two documents relevant to the issue. The first, exhibit 86, was a letter from the DMV to Wyatt, dated April 3, 2004, stating that Wyatt's motor carrier permit was being suspended because Wyatt had not provided the DMV with

proof of liability insurance. The second, exhibit 87, was a letter from the DMV to Bowman's attorney, dated October 24, 2007, stating that Wyatt's motor carrier permit had been suspended on March 31, 2004, because his liability insurance had been cancelled. It further stated that Wyatt had never reinstated his permit and "[i]f Mr. Wyatt has been operating he has done so illegally because his valid permit was suspended." After admitting these documents, the court told the jury the following: "[Y]ou remember early on ... I told you that you must not consider whether any of the parties in this case has insurance. The presence or absence of insurance is totally irrelevant and you must decide this case based only on the law and the evidence.... I am admitting into evidence two documents, exhibits 86 and 87[,] that reference insurance.... You may consider these two documents for the limited purpose of the issue of insurance as complying with a requirement, okay. But not generally. You cannot consider the issue of insurance in determining liability or damages...."

Wyatt contends on appeal that evidence that his motor carrier permit had been suspended was irrelevant to any of the issues raised at trial and should not have been admitted. Further, he urges that this evidence was prejudicial because it suggested to the jury that he was a bad driver: "The evidence of the suspension undoubtedly impacted the jury, as it is easier to believe that a bad driver would not stop at a stop sign."

Bowman agrees that evidence of the alleged suspension of Wyatt's motor carrier permit was not relevant to his case against Wyatt, but urges that it was relevant to his case against the City-specifically, "to the issue of whether the City was meeting its responsibilities, as outlined in the BCT's [Bulletins For Contract Trucks] which were part of its contract with Wyatt." According to Bowman, the suspension of Wyatt's motor carrier permit "showed that the City was derelict in its responsibilities for Wyatt and his truck." Bowman also contends that the testimony was relevant to impeach Veronica Maxwell, who testified that she would not have renewed Wyatt's contract without a valid motor carrier permit, and Wyatt, who testified that he had a valid motor carrier permit at the time of the accident.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

**\*25** [25] We agree with Wyatt that evidence that his motor carrier permit had been suspended was not relevant to any of the issues the parties raised at trial. The issue to which Bowman claims the evidence was relevant-whether "the City was meeting its responsibilities, as outlined in the BCTs"-is not an "issue" at all. As outlined by the jury instructions, the questions properly before the jury with regard to the City's liability were whether (1) the City failed to maintain the truck's brakes and faulty brakes caused the accident, *or* (2) Wyatt's negligence caused the accident and the City was vicariously liable for Wyatt's negligence. The City's alleged failure to verify the status of Wyatt's motor carrier permit is manifestly irrelevant to any of these issues. FN12

[26][27][28] The alleged suspension of Wyatt's motor carrier permit also was not proper impeachment evidence. While Bowman is correct that a witness's credibility may be challenged by evidence relevant to "[t]he existence or nonexistence of any fact testified to by him" (Evid.Code § 780, subd. (i)), this rule does not allow *irrelevant* evidence to be introduced under the guise of impeachment. As the courts have said, " '[C]ollateral and irrelevant matter[s] ... may not be used for impeachment.... "[A] party cannot cross-examine his adversary's witness upon irrelevant matters, for the purpose of eliciting something to be contradicted." ... " '[I]f a question is put to a witness on cross-examination which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked him the question.' " ' " (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1033, 81 Cal.Rptr.3d 756 and cases cited therein.) Here, because the suspension of Wyatt's motor carrier permit was not relevant to any claim or defense, it also was not proper impeachment evidence.

[29] Although we thus have concluded that the motor carrier permit evidence was irrelevant, its erroneous admission does not justify a reversal of the judgment against Wyatt unless " 'the admitted evidence should have been excluded on the ground stated and ... the error or errors complained of resulted in a miscarriage of justice.' " (*People v. Earp* (1999) 20 Cal.4th 826, 878,

85 Cal.Rptr.2d 857, 978 P.2d 15.) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 363, 87 Cal.Rptr.2d 838.)

[30] Having reviewed the transcript of the entire trial, we cannot conclude that it is reasonably probable that a result more favorable to Wyatt would have been reached in the absence of the erroneous admission of the motor carrier permit evidence. As an initial matter, we do not agree with Wyatt that the jury was likely to have assumed that Wyatt was a bad driver because his motor carrier permit had been suspended, or that a person whose motor carrier permit had been suspended was less likely to have stopped at a stop sign. Further, in view of the court's instruction that the City, not Wyatt, was the motor carrier, it is unlikely that the jury attached any importance to the alleged suspension of Wyatt's motor carrier permit. Finally, although plaintiff sought to redact from exhibits 86 and 87 the reason for the alleged suspension of Wyatt's motor carrier permit, the court ultimately admitted the documents in unredacted form. These revealed to the jury that Wyatt's motor carrier permit was suspended because Wyatt's liability insurance allegedly had been cancelled, not because he was a poor driver. Accordingly, the jury had available to it the very information that Wyatt claims should have been admitted. For all of these reasons, the erroneous admission of evidence regarding Wyatt's motor carrier permit did not result in a miscarriage of justice.

**II. Exclusion of Expert Witness Testimony**

**\*26** Wyatt contends that the trial court erred in excluding some of the proffered expert testimony of Anthony Stein, a human factors and traffic safety expert. Defendants made an offer of proof that Stein intended to "offer an opinion about what [he] would expect the perception reaction time of the motorcyclist to be, and based on the research what [Stein] would expect him to do when faced with an emergency intrusion." Stein "would be

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

offering an opinion [about] what [he] would expect of a normal motorcycle rider operating in a normal manner to do based on research about how motorcyclists behave." Further, Stein intended to "offer an opinion on ... the research that shows the probability of detecting a motorcycle at various distances" and data from a "National Highway Traffic Safety Administration Report on [that issue]."

Based on this offer of proof, the trial court ruled as follows: "Mr. Stein may testify about perception and reaction time as long as it is limited to that. He's not allowed to testify as to how a normal person would have reacted. I think that is in the purview of the jury. The jury has to determine that from all the facts. I don't let any witness tell my jury how to decide the facts. And opinions, his opinions regarding the behavior of the plaintiff motorcyclist, I'm not going to allow that. That is for the jury to decide. I don't want testimony about what a normal motorcycle driver would have [done], and I don't want testimony included here about studies of people who think they have or have not seen motorcycles. All of these are issues for this jury to decide based on the facts of this case, and any such testimony would give an aura of expert opinion to the ultimate issues that they are to decide, and I am not going to allow that...."

Wyatt asserts that it was an abuse of discretion to exclude Stein's testimony because it "would have assisted the jury in assessing the extent of comparative negligence, and to what extent Bowman may have been able to avoid impact while operating a motorcycle at the speed, and under the conditions at issue, on the type of motorcycle at issue." Further, Wyatt suggests, the testimony "would have aided the jury in assessing what a motorcycle driver could have done to avoid the accident, an assessment that the jury would necessarily need to decide to what extent Bowman may have been comparatively negligent."

[31][32][33] Wyatt has not demonstrated that the trial court abused its discretion by excluding Stein's testimony. "To preserve an evidentiary ruling for appellate review, the proponent of the evidence must make an offer of proof regarding the anticipated testimony. [Citation.] The offer of proof must address the

'substance, purpose, and relevance of the excluded evidence' (Evid.Code, § 354, subd. (a)), and must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued [citation]. The trial court may reject a general or vague offer of proof that does not specify the testimony to be offered by the proposed witness. [Citations.]" (*People v. Carlin* (2007) 150 Cal.App.4th 322, 334, 58 Cal.Rptr.3d 495; see also *In re Mark C.* (1992) 7 Cal.App.4th 433, 444, 8 Cal.Rptr.2d 856 [failure to make an adequate offer of proof precludes consideration of the alleged error on appeal].)

**\*27** [34] Here, Wyatt failed to make an offer of proof that "set forth the actual evidence to be produced" and the " 'substance, purpose, and relevance of the excluded evidence.' " To make an offer of proof, Wyatt would have to have established that (1) percipient witnesses testified to the distance between Bowman and Wyatt when Wyatt first pulled into the intersection, and (2) the available research established that a reasonable motorcyclist traveling at the speed Bowman was traveling, at the distance Bowman was from Wyatt, under the conditions present immediately before the accident, would have been able to avoid hitting Wyatt's truck. Because Wyatt failed to do so, we cannot assess either the relevance or the prejudicial effect of the excluded evidence. (See *In re Mark C., supra,* 7 Cal.App.4th at p. 444, 8 Cal.Rptr.2d 856 [trial court did not err in excluding expert's testimony regarding test results where party proffering expert stated only that he would testify to " 'some 33 standardized tests that were conducted' " but "this 'voluminous number' of tests was not described in any detail"].)

**III. Admission of Percipient Witness Opinion Testimony**

[35] Wyatt contends finally that the trial court erred in admitting the opinion testimony of percipient witness Brett Llewellyn, as follows:

"Q From what you observed, did you see any way [Bowman] had an opportunity to avoid hitting that truck?

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00821-RLM -CAN document 209-2 filed 07/30/10 page 518 of 1149
Case 3:05-mc-00521-RLM -CAN document 212 Filed 08/17/11 Page 34
Page 34

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

"A No."

Wyatt suggests that this testimony was inadmissible because it sought Llewellyn's opinion as to an ultimate issue-whether Bowman could have done anything to avoid the collision-rather than a description of what Llewellyn observed. Wyatt urges: "While Llewellyn may have been able to provide a lay opinion as to the speed or the distance, he should not have been able to provide any opinion as to the ultimate conclusion of comparative negligence in this matter, whether Bowman could have exercised any care to have avoided ... the accident."

We do not agree. The court addressed a similar issue in *Bouse v. Madonna Construction Co.* (1962) 201 Cal.App.2d 26, 19 Cal.Rptr. 823, where the plaintiff was injured when his car collided with another in a highway construction zone. Plaintiff sued the construction company, asserting that the "taper" that diverted traffic from one lane to another constituted a dangerous condition of which motorists did not have sufficient warning. (*Id.* at p. 27, 19 Cal.Rptr. 823.) On appeal, plaintiff contended that the trial court erred in allowing a percipient witness to answer the following question: " '[W]as this taper of a sufficient length and sufficient gradualness so the traffic could get through, all the long traffic could get through without hitting the barricades?' " (*Id.* at p. 33, 19 Cal.Rptr. 823.) The appellate court concluded that the trial court had not erred in permitting the witness to answer the question. It explained: "Noll's opinion that the taper was long and gradual enough that long traffic could go through without hitting the barricades is the obvious result of his comparison of what he observed-the length of the taper and the maximum length and size of the vehicles he saw traveling through it without incident. This is little different than the matter of '[s]peed, distance, size, weight and the like [which] are properly described by such comparative expressions'; and '[t]hat which is reasonably descriptive of a car in action is proper. [Citation.]' [Citation.] It falls clearly within the classification of permissible nonexpert opinions[.]" (*Id.* at p. 34, 19 Cal.Rptr. 823.)

**\*28** The court similarly concluded in *Healy v. Visalia etc. R.R. Co.* (1894) 101 Cal. 585, 36 P. 125, cited in

*People v. McAlpin* (1991) 53 Cal.3d 1289, 1307-1308, 283 Cal.Rptr. 382, 812 P.2d 563. There, the plaintiff was injured when the railroad hand car in which she was traveling jumped the track, threw her out of the vehicle, and ran over her. (*Healy, supra,* at pp. 588-589, 36 P. 125.) The jury returned a verdict for plaintiff, and defendant appealed, contending that another passenger should not have been allowed to answer the following question: " 'Under the circumstances, was it possible for an ordinary person, sitting in the position Mrs. Healy was sitting in, to stand the force of the jars and still retain her seat upon the car?' " (*Id.* at p. 589, 36 P. 125.) The court disagreed: "This question does not fall within the rule which excludes the opinion of a witness. The general rule is that the testimony of a witness shall be limited to the facts of which he has a personal knowledge, and that he shall not give his individual opinion thereon; but in many instances the opinion of a witness may be received in connection with his statement of the facts upon which it is based. The border line between fact and opinion is often very indistinct, and the statement of a fact is frequently only an opinion of the witness. Impressions or sensations caused by external objects are not susceptible of exact reproduction or description in words, nor do they affect every individual alike, and the judgment or opinion of the witnesses by whom they have been experienced is the only mode by which they can be presented to a jury. The question asked of the witness in the present case did not call for an opinion from him depending upon facts which he had subsequently learned, but he was asked to describe the effect of the concussion or jar caused by the car leaving the track, as one of the facts out of which the injury had arisen, and which he had personally observed and felt. [¶] The position of the plaintiff on the car, as well as his own position thereon, the jumping of the car from the track, the effect produced upon himself, the sensation which he experienced thereby, were all facts which it was competent to show by his testimony, in order that the jury might get as clear an idea as possible of the circumstances under which the accident had occurred. The strength or force of this concussion was also a fact which it was proper to bring before the jury, and as it was not capable of exact measurement by any recognized standard, it was competent for the witness to state

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

its strength or force according to the opinion or judgment which he formed at the time that he felt it. His judgment or opinion of its effect upon an ordinary person would be the most efficient mode of enabling the jury to fully appreciate it, and to give to it its proper consideration in determining its influence in producing the injury. Such testimony is competent upon the same principle that permits evidence showing the strength or force of a blow, the distance at which a sound can be heard, or the direction from which it comes, the speed of a horse, the degree of cold or heat, or of light or darkness. In any such instance a witness who had a personal experience or knowledge of the sensation is competent to testify, although his answer is only his opinion of the matter. The accuracy or strength of his testimony is to be tested by cross-examination. These observations apply also to the testimony of the witness that he thought that the car was too narrow for the track, and also to the testimony of another witness, as to the appearance of the plaintiff immediately after the accident." (*Id.* at pp. 589-590, 36 P. 125.)

**\*29** The present case is analogous to *Bouse* and *Healy.* As in those cases, the "opinion" that plaintiff's counsel elicited from Llewellyn was an "[i]mpression[ ] or sensation[ ]" that was "not susceptible of exact reproduction or description in words." (*Healy, supra,* 101 Cal. at p. 589, 36 P. 125.) Further, the question asked of Llewellyn "did not call for an opinion from him depending upon facts which he had subsequently learned," but rather was based on events "which he had personally observed and felt." (*Id.* at pp. 589, 590, 36 P. 125.) Accordingly, the trial court did not err in admitting Llewellyn's testimony.

## DISPOSITION

We affirm the jury's liability finding as to Wyatt and we reverse it as to the City. We further affirm the jury's findings that Bowman was not contributorily negligent and that Bowman's damages are $15,735,404.

Because we have concluded that Bowman's direct liability theories against the City are not supported by substantial evidence, the only issue to be presented to the

jury on retrial is whether the City is vicariously liable for Wyatt's negligence. In this regard, Bowman may retry his claim that Wyatt was an employee of the City. Bowman may also retry his nondelegable duty claim, so long as any such nondelegable duty theory does not depend on a claim that the City was the truck's motor carrier or that the truck's brakes failed.

Bowman's motions for sanctions against the City and its attorneys, and Wyatt and his attorneys, are denied. The City is awarded its costs on appeal. Bowman and Wyatt are to bear their own costs.

We concur: EPSTEIN, P.J., and WILLHITE, J.

> FN1. We discuss the terms of the contract between Wyatt and the City in section V.B.1, *post.*
>
> FN2. We discuss the evidence in greater detail below.
>
> FN3. "Whether a person is an independent contractor or an employee is a question of fact if dependent upon the resolution of disputed evidence or inferences. [Citation.]" (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609, fn. 6, 262 Cal.Rptr. 842.)
>
> FN4. This instruction precisely tracked the language of CACI No. 3704; it differed from the model instruction only in that it substituted the parties' names for "[plaintiff]" and "[defendant]."
>
> FN5. Plaintiff suggests, without citation to any authority, that CACI instructions are entitled to a "presumption of correctness." We reject that suggestion as unsupported by the case law. (See *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 82, 55 Cal.Rptr.3d 600, citing *People v. Alvarez* (1996) 14 Cal.4th 155, 217, 58 Cal.Rptr.2d 385, 926 P.2d 365 ["Pattern jury instructions, ... while designed to accurately reflect the law, are not the law itself."].)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552
**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

FN6. Bowman contends that the City waived its claim of instructional error because it failed to object to the employee/independent contractor instruction in the trial court. We disagree. " 'A failure to object to civil jury instructions will not be deemed a waiver where the instruction is prejudicially erroneous as given, that is, which is an incorrect statement of the law.' " ( *Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 296-297, 112 Cal.Rptr.2d 869; see also *Brown v. Smith* (1997) 55 Cal.App.4th 767, 783, fn. 11, 64 Cal.Rptr.2d 301 ["Jury instructions which are erroneous on a material element of law are deemed excepted to even absent any objection at trial."].) Because we conclude, for reasons discussed more fully below, that CACI No. 3704 erroneously states the law, it was "deemed excepted to" by the City, even without any objection at trial.

FN7. Plaintiff directs our attention to *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 269 Cal.Rptr. 647, urging that it stands for the proposition that "factors other than control will be decisive only if *control* has not been proven." We do not agree that *Toyota Motor Sales* articulates a different rule than that applied in the cases discussed above-nor, in light of the Supreme Court's clear precedent, would we have discretion to follow it if it did. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

FN8. Because we have concluded that the instruction erroneously stated the factors the jury was to consider in determining whether Wyatt was an employee or independent contractor, we do not reach the City's alternative contention that, as phrased, the instruction was improperly suggestive of the conclusion that Wyatt was an employee.

FN9. The jury was instructed pursuant to CACI No. 423 that it must consider whether the City violated Government Code section 815.6

"mandatory duties" created by a number of statutes and regulations. Those statutes and regulations, as described to the jury, are:

(1) Vehicle Code section 26453: "All brakes and component parts thereof shall be maintained in good condition and in good working order. The brakes shall be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle."

(2) Vehicle Code section 26454: "The service brakes of every motor vehicle shall be adequate to control the movement and to stop and hold such vehicle under all conditions of loading on any grade on which it is operated."

(3) Vehicle Code section 26502, subdivision (a): "Air brakes of every motor vehicle shall be so adjusted and maintained as to be capable of providing full service brake application at all time. A full service brake application shall deliver all brake chambers not less than 90 percent of the air reservoir pressure remaining with the brakes applied."

(4) Vehicle Code section 34501.12: "[ (c):] Each motor carrier who, in this state, directs the operation of or maintains any vehicle of a type described in subdivision (a) shall designate one or more terminals, as defined in section 34515, in this state where vehicles can be inspected by the department pursuant to paragraph 4 of subdivision (a) of section 34501, and where vehicle inspection and maintenance records and driver records will be made available for inspection. [ (d) ]: The department shall inspect at least every 25 months every terminal, as defined in section 34515, of any motor carrier who at any time operates any vehicle described in subdivision (a). [ (e)(1) ]: It is the responsibility of the motor carrier to schedule with the Department the inspection required by subdivision

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:07-cv-00818-RLM-CAN document 21-2 filed 07/30/10 page 521 of 1149
Case 2:08-mc-00521-RLM-CAN document 209-2 filed 08/17/11 Page 34 of 36
Page 34

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

(d). The motor carrier shall submit an application form supplied by the department accompanied by the required fee. [ (f) ]: It is unlawful for a motor carrier to operate a vehicle subject to this section without having submitted an inspection application and the required fees to the Department as required by subdivision (e) or (h). [ (g) ]: It is unlawful for a motor carrier to operate a vehicle subject to this section after submitting an inspection application to the Department without the inspection described in subdivision (d) having been performed and a safety compliance report having been issued to the motor carrier within the 25-month inspection period or within 60 days immediately preceding the inspection period."

(5) Vehicle Code section 34505.5: "Every motor carrier operating a motor truck of three or more axles that are more than 10,000 pounds gross vehicle weight rating shall, as part of the systematic inspection, maintenance and lubrication service required of all motor carriers, require the vehicle or vehicles for which it is responsible to be inspected at least every 90 days. The inspection shall include, but not be limited to, all of the following: brake adjustment, brake system components and leaks, steering and suspension systems. No vehicle ... subject to this section shall be operated on the highway, other than to a place of repair, until all defects listed during the inspection ... have been corrected."

(6) Title 13, California Code of Regulations, section 1232 and 49 Code of Federal Regulations: "[F]or the preventative maintenance of brakes required of motor carriers, ... the City must insure that individual brake inspectors performing the brake inspections must be qualified as follows: (d)(1), understands the brake service or inspection task to be accomplished and can perform that task; (d)(2), is

knowledgeable of and has mastered the methods, procedures, tools and equipment used when performing an assigned brake service or inspection task; and (d)(3), is capable of performing the assigned brake service or inspection by reason of experience, training or both[.]"

FN10. The jury was given a series of "nondelegable duty" instructions, patterned on CACI No. 3713, as follows:

"Vehicle Code 26453 states-we're back to Vehicle Codes, not for too much longer, though. Bear with me. All brakes and component parts thereof shall be maintained in good condition and in good working order. The brakes shall be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle. If plaintiff proves that Wyatt did not comply with this law, then the City of Los Angeles is responsible for any harm caused by this failure unless the City of Los Angeles proves both of the following: [1], that it did what would be expected of a reasonably careful person acting under similar circumstances who wanted to comply with this law; and [2], that the failure to comply with this law was not due to Wyatt's negligence.

"These may all sound similar, but right now I'm giving you jury instructions relating to what's referred to as nondelegable duty.

"Next. Vehicle Code section 26454(a) states, the service brakes of every other vehicle shall be adequate to control the movement of and to stop and hold such vehicle under all conditions of loading. If plaintiff proves that Wyatt did not comply with this law, then the City of Los Angeles is responsible for any harm caused by this failure unless the City of Los Angeles proves both of the following: [1], that it did what would be expected of a reasonably careful person acting under simil-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

**(Cite as: 2010 WL 2613079 (Cal.App. 2 Dist.))**

ar circumstances who wanted to comply with this law; and [2], that the failure to comply with this law was not due to Wyatt's negligence.

"Vehicle Code section 26502(a) states, quote, Air brakes of every motor vehicle shall be so adjusted and maintained as to be capable of providing full service brake application at all time. A full service brake application shall deliver all brake chambers not less than 90 percent of the air reservoir pressure remaining with the brakes applied. If plaintiff proves that Wyatt did not comply with this law, then [the] City of Los Angeles is responsible for any harm caused by this failure unless the City of Los Angeles proves both of the following: [1], that it did what would be expected of a reasonably careful person acting under similar circumstances who wanted to comply with this law; and [2], that the failure to comply with this law was not due to Wyatt's negligence."

FN11. For example, Veronica Maxwell, the City's contract truck coordinator, was asked, "Didn't the City rent Mr. Wyatt's truck for the period of the contract?" She answered, "Yes." The following day, however, she testified that "[T]he truck is not actually rented. It's an offer of work where the contractor asks the City, do they have work available." She subsequently stated that the City "rented the truck" and was the "lessee or rentee." Marion Chapman, a superintendent for the City of Los Angeles, Bureau of Street Services, said that his understanding was that the City did not rent the dump truck from Wyatt, and that if Maxwell had said so, "[s]he's incorrect." Wyatt testified that he "rented" his truck to the City, but that he didn't believe that by doing so, the City became the motor carrier.

FN12. We do not opine as to whether this fact might be relevant upon retrial.

Cal.App. 2 Dist.,2010.

Bowman v. Wyatt

--- Cal.Rptr.3d ----, 186 Cal.App.4th 286, 2010 WL 2613079 (Cal.App. 2 Dist.), 10 Cal. Daily Op. Serv. 8552

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

---------------------------------------------------------- )
                                                  )
In re FEDEX GROUND PACKAGE         )       Case No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT          )       (MDL 1700)
PRACTICES LITIGATION               )
                                                    )
---------------------------------------------------------- )
                                                    )
THIS DOCUMENT RELATES TO:         )
                                                    )
ALL ACTIONS                                )
                                                    )
---------------------------------------------------------- )

## REPLY TO PLAINTIFFS' MOTION TO AUGMENT THE RECORD

FedEx Ground Package Systems, Inc. (FXG) again opposes Plaintiffs' reasonable request
to add brand new documents, not previously available, to the record in support of their Motions
for Summary Adjudication of Employment Status and in opposition to FXG's motions. FXG's
opposition merely reiterates arguments repeated many times in the past. FXG's wish to prevent
this Court's consideration of its wholesale abandonment of its current OA in direct response to
widespread determinations or concerns raised by multiple states that the OA violates state
employment laws is neither new nor surprising. By mandating that each pickup and delivery
driver change its so-called "business" to be even more protective of FXG's interest, irrespective
of the drivers' wishes or interests, FXG substantially undermines its claim that it is engaged in an
arms' length relationship that bears no resemblance to employment. This Court has full

discretion to augment the record and should consider the documents Plaintiffs have submitted.

The Plaintiffs' motion to augment should be granted.

Dated: August 4, 2010                    Respectfully submitted,

                                         LEONARD CARDER, LLP


                                         _____/s/ **Eleanor I. Morton**_____
                                         ELEANOR I. MORTON, ESQ.
                                         1188 Franklin St., Suite 201
                                         San Francisco, CA 94109
                                         Tel: (415) 771-6400
                                         Fax: (415) 771-7010


Susan E. Ellingstad                      Robert I. Harwood
LOCKRIDGE GRINDAL NAUEN P.L.L.P.         HARWOOD FEFFER LLP
100 Washington Avenue South, Suite 2200  488 Madison Avenue, 8th Floor
Minneapolis, MN  55401                   New York, NY  10022
Tel:    (612) 339-6900                   Tel:    (212) 935-7400
Fax:    (612) 339-0981                   Fax:    (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**


Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| -------------------------------------------- THIS DOCUMENT RELATES TO: ALL ACTIONS Civil No. 3:05-CV-530 RM (KS) | |

)
)
)
)
)
)
)
)
)
)
)
)

OPINION and ORDER

This matter is before the court on the parties' cross-motions for summary judgment concerning whether FedEx drivers[1] are employees or independent contractors under the Kansas Wage Payment Act, KAN. STAT. ANN. § 44-313 *et seq.* Numerous summary judgment motions pend in both the certified and non-certified class-actions. This opinion sets forth facts commonly applicable to all certified class actions and addresses the Kansas plaintiffs' motion for summary judgment (doc. ## 1163, 1248) and FedEx's cross-motion for summary judgment (doc. # 1215). The court also addresses FedEx's motion to strike individualized proof submitted in support of the plaintiffs' summary judgment motions (doc. #

---

[1] The court intends the terms "driver" and "contractor" to be synonymous, and the use of either term isn't meant to contain any connotation about a person's status as an "employee" or "independent contractor."

1

1398) and the plaintiffs' motions to augment the record in support of their summary judgment motions (docs. ## 1992, 2064, and 2087).

The court GRANTS FedEx's motion to strike individualized proof to the extent the plaintiffs rely on the submitted documents in support of summary judgment to show individual contractors' experiences in class certification cases. The court cannot make generalizations about the class as a whole from a review of the actual control FedEx exercised over a segment of drivers.

The court exercises its discretion to DENY the plaintiffs' motions to augment the record. The documents the plaintiffs propose to submit are relevant to only a small segment of the plaintiff classes, cumulative of the evidence already submitted, or of little evidentiary value.

The court DENIES FedEx's requests for oral argument on the motions for summary judgment (doc. ## 1400 and 1471). The court finds that this matter can properly be resolved by a review of the parties' extensive evidentiary record and summary judgment briefing.

The court DENIES the plaintiffs' motion for summary judgment and GRANTS FedEx's cross-motion. The plaintiffs have all signed Operating Agreements labeling themselves as independent contractors, they can hire others to perform their assigned work and go work for another delivery company, and they can sell their routes to other qualified drivers; yet, they contend they are employees. The court sees it differently.

2

Upon review of the evidence in the light most favorable to the plaintiffs, the only reasonable inference is that FedEx hasn't retained the right to direct the manner in which drivers perform their work. FedEx supervises the drivers' work and offers numerous suggestions and best practices for performance of assigned tasks, but the evidence doesn't suggest that FedEx has the authority under the Operating Agreement to require compliance with its suggestions. Further, other factors strongly weigh in favor of independent contractor status; in particular, the parties intended to create an independent contractor arrangement, the drivers have the ability to hire helpers and replacement drivers, they are responsible for acquiring a vehicle and can use the vehicle for other commercial purposes, they can sell their routes to other qualified drivers, and FedEx doesn't have the right to terminate contracts at-will. Although some facts weigh in favor of employee status, after considering all the relevant factors, the court finds that the plaintiffs are independent contractors as a matter of law.

## I. COMMON FACTS APPLICABLE TO RIGHT TO CONTROL

The court sets forth the facts from the perspective of what control FedEx has the right to exercise over its drivers and not necessarily what control FedEx actually exercises on a daily basis. While FedEx managers might exercise more control than what is retained in the Operating Agreement and commonly applicable policies and procedures, the class was certified on the basis of right to

case 3:05-md-00527-RLM -CAN   document 2097    filed 03/11/11   page 4 of 103

control, not actual exercise of control. The plaintiffs reiterated to this court during
class certification that they could show right to control by reliance solely on the
Operating Agreement and applicable policies and procedures and wouldn't go
beyond those documents to prove their case. In short, the issue for today's
purposes is what control FedEx had the right to exert pursuant to the parties'
contractual relationship.

### *FedEx's Business*

FedEx Ground, together with its operating division FedEx Home Delivery,
provides small-package pick-up and delivery services through a network of
pick-up and delivery drivers/contractors. FedEx Home Delivery provides small
package delivery services primarily to residential customers, while FedEx Ground
focuses on the pick-up and delivery of small packages to businesses. FedEx
Services, Inc. sets pricing policy and rates for FedEx and supplies shared
technology infrastructure support across all FedEx companies.

### *Business Objectives in the Operating Agreement*

The Kansas plaintiffs, individually or through a sole proprietorship or
corporation, entered into either a Ground or Home Delivery Operating Agreement
with FedEx to provide daily pick-up and delivery service. Contractors agree to
conduct their businesses so that they can be identified as part of the FedEx

system. OA, Background. The Operating Agreement states that "[b]oth [FedEx] and Contractor intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of [FedEx] for any purpose." Id. The Operating Agreement is to "set forth the mutual business objectives of the two parties intended to be served by th[e] Agreement — which are the results the Contractor agrees to seek to achieve — but the manner and means of reaching these results are within the discretion of the Contractor." Id. "[N]o officer or employee of [FedEx] shall have the authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding." Id. The "Contractor agrees to direct the operation of the Equipment and to determine the methods, manner and means of performing the obligations specified in this Agreement." Id. at ¶ 1.4.

The Operating Agreement specifically sets forth FedEx's standards of service. To achieve FedEx's business objectives, the drivers agree to:

> (a) Provide daily pick-up and delivery service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area, . . . and in such other areas as Contractor may be asked to service,[2] all consistent with the competitive standards within the industry (provided, however, that on any day where the volume of packages available for delivery or pick-up in Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, [FedEx] may reassign a portion of such packages to another contractor);

---

[2] The FXG OA states: "and in such other areas as Contractor may be asked to service, in the event Contractor elects to participate in the Flex Program."

5

(b) Make reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages per shipper within Contractor's Primary Service Area;

(c) Handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage;

(d) Cooperate with [FedEx's] employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal;

(e) Foster the professional image and good reputation of [FedEx] . . . including adhering to vehicle identification and operator appearance standards . . .;

(f) Conform to all applicable federal, state and local laws, regulations and ordinances;

(g) Cause the Equipment to be operated safely and in compliance with all applicable laws and regulations; and

(h) Conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times.

Id. ¶ 1.10.

The parties agree that "Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results . . . and no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results." FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15. For example, FedEx can't "prescribe the hours of work, whether or when the Contractor is to take

6

breaks, what route the Contractor is to follow, or other details of performance."
FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15.


*Policies and Procedures*

FedEx has many written policies and procedures in place directed toward FedEx employees involving management of FedEx business operations. FedEx managers are expected to know the policies and procedures and generally are expected to follow them to the extent it makes good business sense to do so. In 2005, FedEx began a "Document Reengineering Initiative" to overhaul its policies, procedures, and forms. That initiative was meant to clarify the line between policies (statements "outlining a mandatory course of action") and procedures (statements "providing the how and when or how often for implementing the policies"), so that FedEx managers could better understand FedEx's expectations. Among the changes was Policy-007, reiterating that FedEx employees must adhere to the Operating Agreement in their interactions with drivers, that the terms of the Operating Agreement can't be modified, and, most significantly, that "*[n]o officer, agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results.*" (FedEx Exh. B-02 (emphasis in original)). Policy-007 repeats the language of Section 1.15 of the Operating Agreement as a policy and states that a violation of its terms may result in disciplinary action against the manager.

Dan Sullivan, who was FedEx's CEO until January 2007, testified that he "would expect [FedEx drivers] to follow policy within general parameters but provide a certain amount of discretion in the administration of these policies and procedures depending upon terminal location, the issues in each facility, those kinds of things which are all different." Sullivan Dep., p. 162. In explaining the manager's reliance on FedEx policies, Mr. Sullivan stated:

> Obviously, all policies are there for a reason. They should be considered by the management. The management should try to follow them, but the management also has discretion to do the right thing for the business, the right thing for the customer, the right thing for our people within the parameters of those policies and procedures . . . so that they are administered somewhat differently in each circumstance.

Sullivan Dep., pp. 163-164. FedEx's Executive Vice President and Chief Operating Officer Rodger Marticke testified that FedEx expects managers to "adhere to company policies to the extent that it makes good business sense." Marticke Dep., p. 92. Division Vice President and Former Managing Director James Primm testified that FedEx confers discretion on its senior managers as to how to apply procedures so long as that discretion doesn't result in not achieving company results or violating federal law. Primm Dep., p. 212.

### *Regular and Integral Part of FedEx's Business*

FedEx drivers' work is a regular and integral part of FedEx's business. FedEx Vice President of Contractor Relations Robert Ostrov testified that

contractors are a cornerstone of FedEx's business. Ostrov Dep., pp. 192-193. Former CEO Dan Sullivan testified that the contractor is meant to be a "centerpiece" of FedEx's "work force" and is an "essential component of [FedEx's] business." Sullivan Dep., pp. 27, 106; *see also* Emmanuel Monti, Senior Manager of Contract Relations, Dep., p. 204 (describing FedEx drivers as being part of the FedEx "network"). It is undisputed that the drivers' work was performed within the usual course of FedEx's business.

*Approval Requirements for Contractors and Replacement Drivers*

FedEx has minimum eligibility requirements for people to become FedEx contractors. They must have no felony convictions, be 21 years of age or older, have a certain level of driving experience or undergo training, have the required driver's license, have a 36-month driving record that meets specific minimum requirements, undergo a drug screen and physical, and be able to obtain a delivery vehicle.

Contractors can run their own routes, hire helpers, or hire replacement contractors. Newman Decl., ¶¶ 15, 17. Non-driver helpers must be 18 years old and pass a background check. *See* Procedure: Authorization Process for Non-Driving Helper, CRL-566. Replacement drivers are subject to FedEx approval in other respects. The Operating Agreement says contractors may use others to assist them; all persons so utilized "shall be qualified pursuant to applicable

9

federal, state and municipal safety standards and [FedEx] Safe Driving Program standards." OA, ¶ 2.2. The Operating Agreement further requires that replacement drivers be "fully trained, at Contractor's expense, to operate the Equipment," and the contractor is responsible for ensuring that the replacement driver "conform fully to the applicable obligations undertaken by Contractor pursuant to this Agreement." Id.

The Safe Driving Program sets minimum experience, age, licensure, driving record, criminal record, and drug-and-alcohol abuse requirements. The program requires a showing of satisfactory work history and mandates compliance with basic safety and maintenance requirements. OA, Safe Driving Addend. FedEx policies state that all operators, including assistants and substitutes, must complete a road test, submit a driver information sheet, and (depending on work history) complete a FedEx-approved training course. See CRL-551, at 5-12 (Pl. Exh. 2:147-54) ("The individual must meet the minimum driver qualifications and requirements established by the Federal Motor Carrier Safety Regulations and FedEx."). Mr. Sullivan testified that the drivers must meet certain FedEx standards, such as grooming requirements, but terminal managers have discretion in assessing whether individuals meet FedEx's requirements to provide service. Sullivan Dep., pp. 210, 212.

FedEx is a registered motor carrier subject to the Department of Transportation's regulatory control. Scapellato Rept. (Nov. 8, 2007), p. 11. Federal

10

law for vehicles 10,001 pounds or more imposes many of FedEx's driver requirements; federal commercial driver's license and alcohol/drug testing are required for vehicles 26,001 pounds or more. FedEx expert witness James Scapellato stated that "[a]s the regulated motor carrier, FedEx . . . is ultimately responsible for the safe operation of all commercial vehicles providing transportation services under its DOT number." Scapellato Rept. (Nov. 8, 2007), p. 14. "As a regulated motor carrier, FedEx . . . must insure that each and every owner operator who operates under its DOT authority, as well as any driver working for an owner operator, achieves a satisfactory degree of safety compliance." Scapellato Rept. (Jan. 8, 2007), p. 6. For example, FedEx must keep a DOT file on each driver to provide "documentary proof that the driver . . . meet[s] standards imposed by federal safety requirements and that they can, by reason of experience, training, or both, safely operate the assigned commercial motor vehicle." Scapellato Rept. (Jan. 8, 2007), p. 14; *see also* 49 C.F.R. § 391.1 *et seq.* FedEx, however, has "adopted into policy many higher safety standards than those minimums prescribed in the federal motor carrier safety regulations to help business efficiency and reduce highway crashes." Scapellato Rept. (Jan. 8, 2007), p. 12.

*Training*

11

Contractors have the obligation to assure that everyone who operates the equipment is fully trained and capable of meeting the customer service standards set forth in the Operating Agreement. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. FedEx provides formal training to its drivers, but whether training is required varies from driver to driver. As of 2005, new FedEx contractors with six months' verified experience as a commercial motor vehicle operator within the previous five years aren't required to participate in Quality P&D Learning (QPDL), which, as FedEx explains, wasn't widely available until 2003 and isn't training, but a precondition, to becoming a contractor. Since November 2007, FedEx accepts training obtained from an "approved" FedEx vendor in lieu of prior experience or the FedEx QPDL course.

QPDL is a multi-day course consisting of a combination of classroom and on-the-road instruction meant to ensure compliance with federal safety regulations. The 2003 QPDL Participant Manual, however, addresses a number of topics, such as customer service skills, vehicle entrance and exit routines, route planning, terminal a.m. routines, delivery techniques, package handling techniques, scanning and sheeting, driver release of packages, and pick-up techniques. TM-205A (Aug. 2003). FedEx managers also hold weekly safety meetings that drivers should attend where managers address safety-related or operational issues. Attendance at certain safety meetings once was required, but is now voluntary, although managers still take attendance at those meetings.

FedEx also conducts an orientation program during contractors' first thirty days to familiarize them with various service quality procedures. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14 ("[FedEx] shall, during the first 30 days of the term of this Agreement, familiarize Contractor with various quality service procedures developed by [FedEx]."); *see also* FedEx Owner-Operator Familiarization Program, Pl. Exh. 5:306 (stating that the program is approximately ten hours). Drivers may enter the CARE training program to expunge a verified customer complaint from their record; managers often recommend that drivers attend such training for that purpose. The CARE program consists of the driver watching a video, receiving a manual, and participating in a follow-up business discussion (a documented meeting with the drivers' manager). The program instructs drivers on ways to achieve customer satisfaction and practices so as to avoid customer complaints.

FedEx used to distribute a Contractor's Companion to drivers, a document developed "to assist the contractor [in] the day-to-day administration of his or her duties." Sullivan Dep., p. 236. The Home Delivery Contractor's Companion is dated January 2003 and the Ground Contractor's Companion is dated December 2003. FedEx has described it as a summary of things that contractors should consider when performing their duties or a reference guide that gives contractors an idea of the best practices to use when interacting with customers. Sullivan Dep., pp. 235-236; Mark Byrum (Divisional Vice President) Dep., pp. 210-211. There are differences between the Home Delivery and Ground Contractor's

Companion, but generally they include information concerning customer service tips, scanner troubleshooting and status codes for deliveries, daily supply checklist, vehicle pre-trip inspection, C.O.D. handling, driver release guidelines and tips, service crosses and call tag processes, pick-up tips, and FAQs for different types of situations the driver might encounter. The Contractor's Companion is no longer available.

*Uniform and Appearance*

Drivers must wear the FedEx uniform and maintain a professional appearance. The Operating Agreement provides that the uniform should be "maintained in good condition" and the driver will "keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by [FedEx]." OA, ¶ 1.12. The uniform is required because "the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive . . . and to permit recognition and prompt access to customers' places of business." Id.

Senior Manager of Contract Relations Emmanuel Monti testified that the FedEx driver "is the most highly visible person out there . . . and his physical appearance, the way he interfaces with customers, tells a lot about the company and tells the customer basically whether they want to continue to do business

14

[with FedEx]." Monti Dep., pp. 202-203. Central Division Vice President Robert Holcombe testified that the drivers' "[a]ppearance is important because of the brand and the importance of brand image," which allows the drivers "access into customers' locations." Holcombe Dep., p. 216. Mr. Holcombe also testified that the FedEx logo is important for advertising and marketing of the brand. Holcombe Dep., pp. 259-260; *see also* Sullivan Dep., p. 263 (testifying that the drivers' uniform and truck are used to project FedEx's image).[3]

FedEx terminal managers generally observe drivers' appearance and check for compliance with paragraph 1.12 of the Operating Agreement. FedEx Admission (Set 1), No. 12, at 32. The terminal managers are supposed to make sure that the drivers are both in proper uniform and properly groomed before they go out to service FedEx customers. Sullivan Dep., p. 187. The senior manager has the authority to tell drivers they can't service customers if they aren't in proper uniform or aren't properly groomed. Sullivan Dep., pp. 187-188.

*Vehicles*

Contractors are responsible for obtaining their vehicles, and they bear all costs and expenses associated with their vehicles, such as vehicle payments, fuel, taxes, insurance, and maintenance. OA, ¶ 1.3 (contractor required to bear all

---

[3] Between 2004 and 2007, FedEx spent more than $1.1 billion in advertising and promoting its brand.

costs and expenses incidental to operation of the equipment, including risks of depreciation, maintenance, fuel, oil, tires, repairs, taxes, insurance coverage, etc.).

Each vehicle must be painted "FedEx White" and bear FedEx logos and advertising. While federal regulations require that FedEx's name be legibly marked on two sides of the truck, FedEx's marking requirements extend beyond federal regulations. Scapellato Rept. (Nov. 8, 2007), pp. 16-17 ("Although obviously not specifically required by the regulations, business markings and branding displayed on the vehicle obviously provide more effective notice to the public who is performing the transportation service."). The drivers can use their vehicles for other commercial or personal purposes when not actually carrying FedEx packages, as long as they mask or remove the identifying marks and logos. OA, ¶ 1.5.

The Operating Agreement provides that "subject to the determination of [FedEx] of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor." OA, ¶ 1.1. Vehicles must, though, meet FedEx's minimum specifications — *e.g.*, maximum height, width, and length; maximum bumper height; interior shelving requirements; and, in some cases, age restrictions. The vehicle goes through a FedEx approval process based on these specifications. Robert Flesher (Managing Director of Vehicle Maintenance) Dep., pp. 135-136 (2007), pp. 39-40 (2006). FedEx decides what size and configuration of truck is appropriate for a particular

16

route. FedEx's Answers to Interrogatories (Set 5) # 301, at 32. Senior Vice President of Terminal Operations Michael Mannion testified that FedEx reserves the right to approve or reject a particular vehicle if its size isn't sufficient to provide service to the primary service area. Mannion Dep., p. 239. FedEx managers "look at every single situation separately with every contractor and really understand what his business plan is going to be" when determining the proper size of a truck for a particular area. Mannion Dep., p. 239. A contractor with a vehicle that doesn't meet FedEx's minimum requirements can still request approval through an exception process. Flesher Dep., pp. 143-145.

Before 2008, FedEx purchased fleets of vehicles built to its specifications that contractors could buy or lease. FedEx also entered into relationships with outside vendors who offered financing or leasing of vehicles to contractors. In 2008, FedEx began outsourcing all its van sales to outside vendors and is now removed from the sales process.

FedEx has the right to evaluate contractors' trucks to ensure they comply with FedEx appearance standards and DOT guidelines. OA, ¶ 1.12 ("[T]he Equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry."); James Krappa (Managing Director for Contractor Relations) Dep., pp. 156-157; Flesher Dep. pp. 83-84 (Sept. 2007). Terminal managers also must ensure proper completion of monthly maintenance record forms reflecting any

repairs or maintenance work the driver performed on his vehicle. RVEH-002 at 1 (Pl. Exh. 2: 1480); *see also* Ground OA ¶ 1.2 ("Contractor agrees to provide [FedEx] with proof of timely maintenance and inspection of the Equipment in accordance with the periodic mandatory vehicle maintenance and inspection regulations administered or required by any federal, state or municipal agency with jurisdiction over the operations described in this Agreement."). FedEx should conduct an inspection of the vehicle every thirty days. Terminal managers have discretion to remove a vehicle from service if it doesn't meet appearance standards or the driver fails to timely submit maintenance reports. *See, e.g.*, OA, ¶ 1.2. Alternatively, the manager can discuss the matter with the contractor.

FedEx expert James Scapellato explained that for vehicles weighing 10,001 pounds or more, FedEx, "as the responsible motor carrier, must periodically examine or inspect an owner-operator's vehicle to determine safety compliance with vehicle parts and accessories standards and out-of-service criteria." Scapellato Rept. (Nov. 8, 2007), p. 11; Scapellato Rept. (Jan. 8, 2007), p. 21; *see also* 49 C.F.R. § 396.3 (requiring inspection, repair, and maintenance of motor vehicles). Paragraph 1.2 of the Operating Agreement requires contractors to maintain their vehicle at their own expense, in accordance with the safety and equipment standards specified in applicable federal, state, and municipal laws.

*Tools and Instrumentalities*

18

Under the Operating Agreement, the contractor "shall not be required to purchase or rent any products, equipment, or services from [FedEx] as a condition to entering into [the agreement]." OA, ¶ 7. Contractors can obtain most of the tools, instrumentalities, and services they need, such as uniforms, scanners, printers and communications-related equipment, DOT inspections, and equipment washing services, from FedEx's Business Support Package. FXHD OA, ¶ 7 and Addend. 6; FXG OA, ¶ 7 and Addend. 7. Contractors pay for these supplies and services through deductions from their weekly settlement. FedEx's BSP is an optional program, but ninety-nine percent of contractors participate. The BSP also includes Contractor Assistance, which before June 2007 consisted of the following programs: battery program, back-up camera program, body repair program, hand truck program, preventative maintenance program, rear door program, and tire program. The Contractor Assistance was revised in June 2007 to eliminate the contractors' ability to purchase equipment or pay for maintenance under the program.

Contractors also can participate in the Maintenance Loan Program. In early 2006, the Maintenance Loan Program was added as a FedEx Home Delivery settlement component. Under this program, FedEx provides contractors with loans against the balance in their Service Guarantee Account[4] to fund maintenance

---

[4] FedEx maintains an interest-bearing fund for the contractor to save for unexpected expenses, which may be withdrawn at the contractor's discretion.

19

costs. FXHD OA, ¶ 5; FXG OA, ¶ 8. Contractors must repay the loans through deductions from their weekly settlement.

Typically, FedEx terminals have package handling equipment, belts for moving packages to the vehicles, a staging area, a "Quality Assurance area" for processing packages, assigned parking spaces for drivers to park their vehicle while loading, and a check-in area. FedEx also has developed proprietary automated overhead laser sorting technologies, computer systems and software for tracking packages, and processes for customer payments.

*Compensation and Benefits*

Contractors are paid weekly, and compensation rates and formulae are set forth in the Operating Agreement at ¶ 4.1 and Addendum 3; compensation includes daily rates, piece rates, and various bonuses, including a bonus for years of service and performance. The compensation amounts vary by individualized factors, such as the type of vehicle used, number of packages delivered and stops serviced, weight and nature of the packages, miles traveled, temporary core zone density, and time of service. Ground contractors participating in the "Flex Program" receive a daily "flex fee." OA, ¶ 4.1 and Addend. 3. When contracting with an entity, FedEx pays the entity, not the individual driver.

The temporary core zone density is paid to contractors providing services in low density, low package volume areas; the core zone payment is reduced or

eliminated as density or volume increases. OA, ¶ 4.1(c). Until 2007, core zone compensation was prorated if the driver provided pick-up or delivery services for less than seven hours in one day. FedEx removed the hours reference and now conditions full payment of the core zone settlement on the driver making a minimum number of stops, which assumes, in part, expected daily work hours.

Compensation rates aren't negotiated, though some contractors have requested and received changes to their core zone density settlement. *See* CRL-55, p. 2 ("A [driver] may . . . request a service ride to evaluate temporary core zone density settlement."). Contractors can choose to not sign a yearly modified settlement addendum.

Contractors also can receive the "Contractor Customer Service" bonus, a monthly performance-based bonus that drivers receive when they achieve certain safety and customer service goals — *e.g.*, no at-fault accidents, no verified customer complaints. FXHD OA, Addend. 8; FXG OA, Addend. 6. A contractor can expunge one verified customer complaint from his record and still receive the CCS bonus if he or his driver participates in the CARE training program. FedEx notes that the CCS bonus structure has changed over time — some requirements have been eliminated in the current version of the Operating Agreement — and the bonus applies differently to Ground and Home Delivery drivers.

At Ground, the CCS bonus includes a weekly "Pick-Up Service Bonus." The requirements for the Pick-Up Service Bonus have changed over time; today's

version indicates that contractors will receive the bonus when there are no missed pick-ups, all scheduled pick-ups are made within the requested windows (with a twenty-minute grace period at the end of the pick-up window), and the scanner is used to process all pick-up stops (with the allowance of two instances of non-compliance per month for late pick-ups and/or manual reconciliations for improper use of the scanner). FXG OA, Addend. 6.

Before 2007, the CCS bonus included a "Terminal Group Performance-related Bonus." Contractors were eligible for the bonus if their terminal met its inbound service goal for a particular period. The bonus was issued on a terminal-wide basis, so either all the contractors at the terminal received the bonus, or no one did. FXG 2004 OA, Addend. 6; FXHD 2004 OA, Addend. 8.

FedEx offers its contractors certain benefits, such as a driver-funded retirement plan, matching contributions to the  "Service Guarantee Account," a college scholarship for drivers with children, and a time-off program based on seniority. FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, Social Security taxes, or any other similar charges. OA, ¶ 4.2. FedEx issues contractors a Form 1099 at each year end, and the contractors report their taxes as independent contractors. Each contractor agrees to obtain and keep work accident or workers compensation insurance, but, at his option, can obtain coverage under a policy negotiated by FedEx. OA, ¶ 3.6.

22

*Delivery Information*

FedEx drivers must record information about all package deliveries. OA, ¶ 1.10(d). Paragraph 1.10(d) of the Operating Agreement requires contractors to "provide such electronic and/or manual data pertaining to package handling," as necessary to achieve "efficient pick-up, delivery, handling, loading and unloading of packages and equipment." OA, ¶ 1.10(d). While package delivery information can be recorded manually, the vast majority of drivers use FedEx scanners. FedEx employees testified that a scanner isn't required, *see* Julie Brooks (Senior Manager for FHD) Dep., p. 303, but Mr. Sullivan testified that contractors must use a scanner so that customers can track their packages. Sullivan Dep., p. 214. FedEx manuals state that "[e]very package and Call Tag assigned to a P&D contractor for delivery must be scanned with a STAR scanner . . . [except in] contingency situations . . . . The P&D contractor records legible delivery information and obtains a legible recipient signature (when required) at the time of delivery." Pl. Exh. 2:282-283; Pl. Exh. 2:296-297. The scanners are connected to FedEx's computer system and transmit package tracking information to FedEx's website for customers to view.

Drivers are required to record on-duty, dispatch and return times, package tracking information, and odometer readings. As a motor carrier, federal regulations require FedEx to monitor the drivers' on-duty time and driving time. Scapellato Rept. (Nov. 8, 2007), p. 18. Certain shipping information, such as item

23

shipped, name of the shipper and consignee, and date of the shipment, also must be maintained under regulations.

### *Days and Hours of Service and Daily Work Assignments*

FedEx drivers are required to provide service on the days FedEx is open for operation, meaning the days FedEx agrees to provide service to customers. OA, ¶ 1.10(a); Sullivan Dep., p. 171. The company has authority to change the days of service. Sullivan Dep., p. 182. Ground drivers generally work Monday through Friday, and Home Delivery drivers generally work Tuesday through Saturday. Under the Operating Agreement, "[t]he company reserves the right to name the work days preceding and following any holiday falling on or in conjunction with a weekend." OA, Addend. 3(II)(D).

There is no set time that a contractor must be at the terminal, but "[a] contractor is not supposed to leave the terminal [at the start of the day] until all his packages are available to him." Michael Mannion (Sr. V.P. Terminal Operations) Dep., p. 305. Mr. Mannion explained that this is more of an expectation for drivers' convenience, not a requirement. Mannion Dep., pp. 379-380. While at the terminal, either the driver or a FedEx employee loads the packages onto the truck. FedEx procedures indicate that drivers should perform a "check-out" with their manger before leaving the terminal. Managers may provide the drivers with a delivery manifest, review drivers' settlement report and

deliveries made the previous day, or discuss any DNAs (packages where delivery was not attempted) or other service failures with the driver. The manifest lists the packages for delivery that day; this information may be loaded directly on the scanner. Although drivers in the Home Delivery division are given turn-by-turn directions, these directions are only a tool for the contractors to use. FXHD OA, ¶ 1.14; FXHD OA, ¶ 1.15 ("[N]o officer, agent or employee of [FedEx] shall have the authority to prescribe . . . . what route the Contractor is to follow.").

Drivers are responsible for attempting delivery of every package in their work area each day and every package assigned under the Flex Program, if applicable. Although FedEx requires the contractors to try to make all deliveries assigned for that day, drivers can choose to hire someone to fulfill their route obligations. Drivers aren't required to appear at pick-up and delivery stops at specific times, except when FedEx negotiates a pick-up or delivery window at a customer's request; drivers then must make the appointed pick-ups or deliveries within that window of time or make other arrangements through FedEx or directly with the customer. For example, Ground drivers who pickup from a FedEx World Shipping Center or FedEx Kinko's can't do so before 5:00 p.m. and 6:00 p.m., respectively. FedEx also offers Home Delivery customers evening service that guarantees that the package will be delivered between 5:00 p.m. and 8:00 p.m. FedEx Home Delivery drivers must provide those services when FedEx requests or pass them over to another driver. Senior Manager of Home Delivery Julie

Brooks testified that she would consider a contractor's refusal to comply with those services a service failure. Brooks Dep., pp. 11-12.

Home Delivery drivers aren't required to return to the terminal at the end of their day, but Ground drivers who pick up customer packages must return by a certain time and perform a "check-in" process with their service manager. If Home Delivery or Ground drivers collect charges for C.O.D. packages, they are required to return the charges to the terminal at the end of the day. OA, ¶ 1.8 ("Contractor . . . agrees to collect any charges owed by shippers and recipients and to return all collected charges to [FedEx] at the end of each business day."). The drivers must mark and return to the terminal all undelivered packages. OA, ¶ 1.11. Managers are supposed to track daily the number of stops assigned to each driver and, at the end of the day, the actual number of stops made.

FedEx drivers typically are required to flex packages. Flexing is the daily expansion or contraction of a drivers' work area; it involves the movement of packages or stops from one work area to another if the volume of packages or stops is more than a driver reasonably can handle. P&D Planning Seminar Participant Manual, TM-410PRes, Version 2.0. Under the Home Delivery Operating Agreement, contractors agree to "[p]rovide daily delivery and pick-up service . . . within Contractor's Primary Service Area . . . and in such other areas as Contractor may from time-to-time be asked to service." FXHD OA, ¶ 1.10(a). Under the Ground Operating Agreement, drivers agree to provide services "in such

26

other areas as Contractor may be asked to provide service in the event Contractor elects to participate in the Flex Program." FXG OA, ¶ 1.10(a). More than ninety-nine percent of Ground drivers participate in the Flex Program. FXG OA, ¶ 9 ("By electing to participate, Contractor agrees to accept packages from outside Contractor's Primary Service Area for pick-up and delivery, up to daily pick-up and delivery capacity . . . when requested to do so by FedEx Ground terminal management."). Contractors previously were restricted from flexing packages informally among themselves.[5]

For both Ground and Home Delivery, the Operating Agreement states that "on any day where the volume of packages available for delivery or pick-up in the Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, [FedEx] may reassign a portion of such packages to another contractor." OA, ¶ 1.10(a).

The Operating Agreement says FedEx "will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment." OA, Background. To accomplish this, FedEx would try to structure the drivers' routes so vehicles are in use nine to eleven hours per day; this measurement was called the "Service Flex Range" and would vary between facilities. The Service Flex Range represented "the minimum and maximum

---

[5] The reengineered OPR-716 excludes any restriction on contractors' informally trading or "flexing" packages amongst themselves. *Compare* FedEx Exh. B-14 *with* FedEx Exh. B-27.

number of stops that can be delivered by a trained contractor working at 'industry standard' time [on that particular route]." Operations Management Handbook, Ch. 2 (2001). FedEx replaced the "Service Flex Range" in the Fall of 2005 with a metric guideline called the "Delivery Stop Guideline" that eliminates the minimum stops, but otherwise is similar to the "Service Flex Range." The new metric guideline also sets forth a maximum number of stops a driver, while utilizing his vehicle fully, reasonably can handle on any given day. These measurements are used to determine the flexing of packages.

*Management and Supervision*

FedEx managers are expected to conduct at least two business discussions each year with each contractor; in August 2005, this goal was clarified as not mandatory because it is a procedure, not a mandatory policy. OPR 560 (procedure); UNV-001 (describing difference between policies and procedures). Business discussions are a means for managers to provide recommendations and counseling to contractors in performing their contracted work. A manager or contractor might request a business discussion to review the contractor's overall performance or operation, to document agreed predetermined flexes, to discuss customer feedback or complaints, or to address issues that arise between the manager and contractor. CRL-560, at 1-2 (2006). For example, a FedEx manager can request a business discussion to discuss DNAs, missed pick-ups, or improper

documentation, to suggest ways the contractor can improve his performance, or to provide positive feedback on the contractor's safe driving or customer service skills. While FedEx may not be able to force the contractor to engage in a business discussion, not participating will reflect poorly on the contractor upon contract renewal. Mannion Dep., pp. 278-279. The manager documents the meetings on a FedEx form and keeps the information in the contractor's business discussions file. These documents can be used to support contract termination.

A FedEx driver's performance is reviewed through various audits and customer service rides. Managers are to conduct daily van service audits of every driver to ensure compliance with FedEx procedures for undelivered packages; the resulting reports reflect any packages the driver didn't try to deliver and the driver's scanning compliance rate. FedEx also hires security specialists to do random in-route van security reviews, during which they inspect drivers' vehicles to verify that drivers are securing the vehicles properly when delivering packages, *e.g.*, the vehicle isn't left running, the bulkhead door is closed, and packages are secured. *See* Loss Prevention Manual, Vehicle Security Review, p. 18, Pl. Exh. 4:587 (describing the procedure that loss prevention staff should follow during vehicle security reviews). Failing to secure a vehicle is a violation of the Operating Agreement and should result in a business discussion with the contractor.

At FedEx Home Delivery, FedEx reserves the right to perform driver release audits to ensure proper release of packages to customers without their signature.

A driver release audit involves the manager going out on a driver's route for about ten stops after the driver leaves the terminal. The manager follows the driver and sometimes interviews customers to determine whether the driver is releasing customers' packages properly. *See* HD Driver Release Audits Participant Manual, TM-406PRes (12/03), Pl. Exh. 4:521 ("The driver release audit program focuses on how to better serve the external customer by ensuring the proper methods are used when driver releas[es] packages . . . . As a service manager, you have an important role in communicating the most effective methods of driver releasing packages, and ensuring the contractors see the importance of being customer focused."). After the driver-release audit, the manager generally offers suggestions for improvement. FedEx presents evidence that the audits aren't applied uniformly company-wide and terminal managers have discretion in enforcing driver release procedures. The frequency of the audits has changed during the relevant period from quarterly to yearly, and the procedure is done only at residences.

Contractors approved for the Residential Driver Release Program won't be liable for loss resulting from a proper driver release. If no signature is required, the driver must leave the package in an approved area, out of public sight, and in a location that isn't accessible to animals or susceptible to weather damage. FXHD OA, "Residential Driver Release Program" Addend. The Driver Release Program indemnifies contractors for packages released to residences, not businesses. Drivers should leave packages at businesses without a signature only when the

30

driver has written approval from the recipient. DLV-005 - FedEx Procedure: Driver Released Packages, FXG.

Mr. Sullivan testified that driver release procedures for both residential and business deliveries are rules that contractors should follow. Sullivan Dep., pp. 226-227. Terminal managers should hold a business discussion with any contractor who doesn't follow the procedures, and the contractor might lose his CCS bonus. Sullivan Dep., p. 227. Conversely, Vice President of Contractor Relations Robert Ostrov described the driver release procedures as recommendations. Ostrov Dep., pp. 236-237.

FedEx managers must conduct two, but not more than four, customer service rides each year. CRL-555, p. 2. The customer service rides give managers a chance to see if drivers are complying with FedEx's customer service standards and to ensure that drivers are operating their vehicles safely. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14 ("[Q]ualified [FedEx] terminal personnel may, at their option, visit customer locations with Contractor four times annually to verify that Contractor is meeting the standards of customer service provided in this Agreement."). Managers' goals during the customer service rides might include reviewing pick-up and delivery methods, customer contact skills, safe driving techniques, and critical safe behaviors; developing accurate contractor service flex range (min/max); providing training on new scanner functions; and maintaining a positive relationship between the terminal management and driver. CSR

Participant Manual, Pl. Exh. 4:361. Robert Ostrov testified that "the customer service rides are an attempt to generally observe how the contractor is running his route, running his business, without drilling down on the specifics[,]" such as how he turns off the vehicle, what he does with his keys, how he puts the scanner in his belt, how he enters the rear portion of the truck, etc. Ostrov Dep., pp. 244-245.

The CSR Seminar document sets forth a number of items managers should observe during the ride, including the driver's check-out and check-in routines; how the driver operates, parks, and enters and exits the vehicle; the driver's delivery and pickup methods; and any delay time by the driver in performing the work. CSR Seminar, Pl. Exh. 4:451-462. For example, the CSR Seminar lists several things a manager should record when a driver makes a delivery:

√ The type of stop

√ The number of steps to reach point of delivery

√ Attracts immediate attention and walks at a direct steady pace

√ Looks for alternate delivery locations upon approach

√ Looks for proper Driver Release location upon approach

√ Introduces themselves and is pleasant/courteous to customers

√ Proper scanning procedures followed

√ Efficient in deciding when to driver release

√ Shows good judgment in indirect delivery

32

✓ Leaves a delivery notice upon indirect delivery

✓ Driver releases packages according to guidelines and common sense

✓ Delivery notice is complete and legible

✓ Efficient in handling 100+ lb. packages

✓ Scan appropriate barcodes

✓ Applies proper exception codes in timely fashion

✓ Efficient in bulk stop methods

✓ Puts address of next stop into the scanner on way back to van

CSR Seminar, Pl. Exh. 4:457. Managers' observations are used to make suggestions to the contractors to improve their work performance.

A standard FedEx Customer Service Ride Worksheet allows the manager and driver to report general information about the drivers' performance in the areas of package quality at delivery, quality assurance, driver release, professional appearance (uniform and vehicle), customer courtesy, and service. During some customer service rides, FedEx managers also must complete a worksheet entitled, "Primary Service Area Analysis Worksheet," to evaluate the contractor's flex range and core zone. FedEx managers document the time the driver arrives and departs from each stop, the number of minutes at each stop, the number of minutes between stops, the last three digits of the driver's odometer reading at each stop, and the approximate distance the driver must walk to pick up or deliver a package. CRL-555, at 3. FedEx presents evidence that managers vary in how they

33

conduct customer service rides, the number of rides they perform each year, and what they review during the rides.

In addition to customer service rides, managers should annually discuss with the driver his business plan. CRL-560, p. 3. In the annual business plan discussion, managers "document discussion areas, problems, solutions agreed upon, predetermined flex(es), and the expectations of an individual contractor." CRL-560, p. 3. The documentation provides a record of the mutual commitments undertaken by FedEx and the driver. CRL-560, p. 3. The form provides spaces for the manager to document or compile the following information: the contractor's total number of stops, packages, miles, and DOT hours of work; anticipated changes in the contractor's primary service area; the condition and appearance of the contractor's equipment; any deficiencies and expected correction dates; the number and type of complaints the contractor has received in the last twelve months; the contractor's contingency plan in the event of a vehicle break-down; and any comments or questions the contractor might have.

FedEx presents evidence that business discussions, customer service rides, and audits result in recommendations, not mandatory policies that must be followed. *See, e.g.*, 2003 OPR 555 (2003), p. 2 ("Terminal management is to use [Contractor Customer Service Worksheet] as a consulting tool to provide recommendations to contractor."); CSR Participant Manual (2005), Pl. Exh. 4:321 (stating that managers are consultants and can make recommendations, but can't

require a contractor to follow methods, manner, or means of achieving desired results; the manager is to observe and make recommendations). As part of FedEx's 2005 Document Reengineering Initiative, FedEx revised CRL-555 (formerly OPR 555) to make clear that feedback based on customer service rides constitutes a "recommendation," not mandatory instruction, and that "[t]he contractor is solely responsible for exercising independent discretion and judgment to achieve business objectives" addressed by possible recommendations. 2005 CRL-555, p. 1.

The customer service rides, audits, and resulting business discussions, however, are at times used to instruct contractors that they have violated the contract for having DNAs or customer complaints, improperly scanning or recording packages, missing pick-up windows, or not complying with safety regulations, among other service failures. Contractors sometimes are warned that violations might result in contract termination if not remedied. In fact, FedEx tracks information listing contractors in jeopardy of losing their contracts for having an at-fault accident, customer complaint, or missed pick-up. Pl. Exh. 4:187, Instructions for using worksheet "Contractors in Jeopardy."

*Reconfiguration, Expansion, or Sale of Primary Service Area*

FedEx can reconfigure a contractor's Primary Service Area upon five days' written notice, unless the driver shows during that period that he can continue

35

to service the area. FXHD OA, ¶ 6.2; FXG OA, ¶ 5.2 ("During such notice period, [FedEx] shall give Contractor the opportunity, using means satisfactory to [FedEx], to continue to provide in such Primary Service Area the level of service called for in this Agreement. In the event Contractor is not able to provide reasonable means to continue to service the Primary Service Area, [FedEx] may, in its sole discretion, reconfigure such area."). The Operating Agreement requires compensation to the contractor if reconfiguration results in less customers or accounts, FXHD OA, ¶ 6.4, Addend. 5; FXG OA, ¶ 5.3; contractors may also be able to sell excess stops as an alternative to reconfiguration. Managers should review work area alignment twice a year to improve pick-up and delivery productivity and service through the restructuring of work areas. The goal is to provide each contractor with a full day's work using the service flex range valuation. Management above the terminal level conducts what is called a "P&D Tune-up" about once a year to determine, in part, whether the terminal's work areas are configured appropriately to maximize terminal capacity. The P&D Tune-up normally results in a recommendation to reconfigure contractors' work areas.

Drivers can expand their routes by acquiring additional service areas from FedEx or other contractors as they become available, subject to FedEx approval. The opportunity to acquire additional routes depends largely on the terminal. OA, ¶ 2.1 ("Contractor may, with the consent of [FedEx] and consistent with the capacity of the terminal serviced by Contractor, own and operate more than one

36

vehicle, with any such additional vehicles to be driven by qualified operators employed by Contractor."). FedEx restricts the maximum number of routes a contractor can own at any one terminal, but FedEx's Chief Operating Officer or Chief Executive Officer can make exceptions to this rule. Until 2005, contractors were prohibited from obtaining a second route within their first year of contracting. Contractors with more than one route — multiple work area contractors — have a greater opportunity to profit from their routes than single work area contractors. The percentage of multiple work area contractors differs between terminals.

Contractors have a proprietary interest in their routes and can sell them upon thirty days written notice to FedEx. The new driver assignee must be acceptable to FedEx as qualified to provide services under the Operating Agreement. FXHD OA, ¶ 15; FXG OA, ¶ 18 (allowing contractors to assign their rights and obligations to an approved replacement contractor). The assignee must meet the same minimum requirements and is subject to the same screening as contractors and temporary drivers. CRL-551, at 5 ("An individual applying to be a contractor/temporary driver must be prescreened and/or extensively reviewed or tested prior to completing the CDAS online application."). A driver whose contract is terminated by FedEx for cause can't assign his contractual rights to others.

*Length and Termination of Operating Agreements*

Contractors enter into Operating Agreements for an initial term of one, two, or three years (depending on the contractor's election) that automatically renews for another one-year term if there is no notice of non-renewal. Non-renewal of the contract is permitted by either party upon thirty days written notice before the term expires. FXHD OA, ¶ 8.2; FXG OA, ¶ 11.2. The Operating Agreement allows termination: (1) by the parties' mutual agreement; (2) if the contractor or his driver(s) engages in intentional misconduct or reckless or willful negligent operation of the vehicular equipment; (3) by either party "if the other party breaches or fails to perform the contractual obligations imposed by [the] Agreement[;]"(4) if FedEx stops doing business in all or part of the terminal service area or, as a result of decline in business, reduces operations in all or part of the service area; or (5) upon termination by the contractor upon thirty days' written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1.

FedEx sets forth procedures that managers should use if they decide to recommend termination of a "contractor who has breached or failed to perform . . . contractual obligations, as evidenced by repeated customer complaints, failure to service his/her work area, integrity issues, unsafe driving, D.O.T. and/or maintenance violations, or other such problems." RCRL-162, at 5, Pl. Exh. 2:786. Managers should compile documentation of specific contract violations that would support a recommendation to terminate and use FedEx's business discussion

process to tell the contractor if his contract is in jeopardy. Managers then discuss the recommendation with the regional managing director, who also considers whether contract termination is appropriate, *i.e.*, whether the supporting documentation is complete, accurate, and legible; whether steps were taken to counsel, train, and otherwise help the contractor in overcoming the documented shortcomings; and how the contractor's performance compares with other contractors at the same terminal.

If the regional managing director agrees that contract termination is appropriate, the file is forwarded to Contractor Relations for more internal review. Contractor Relations independently reviews the submitted record for breaches of the Operating Agreement. Contractor Relations has at times declined to concur and denied a proposed termination if valid grounds for doing so under the Operating Agreement were lacking. If Contractor Relations concurs that termination is warranted, FedEx's legal department reviews the file.

After the internal review process is complete, the regional managing director notifies the senior manager/operations manager of the appropriate actions to take. RCRL-162, at 5-5, Pl. Exh. 2:786-787; OP-162, Pl. Exh. 3:7-8. The Operating Agreement contains a mandatory arbitration clause if the contractor asserts a claim for wrongful termination. FXHD OA, ¶ 9.3 and Addend. 7; FXG OA, ¶ 12.3. If the arbitrator decides that termination wasn't within the terms of the Agreement, FedEx can either reinstate the contractor with damages from the date

of termination through the date of reinstatement or, alternatively, terminate the contractor with damages from the date of termination through expiration of the contract term. FXG OA, ¶ 12.3(e); FXHD OA, Addend. 7, ¶ 5).

## II. Evidentiary Issues

The parties have filed cross-motions for summary judgment on the issue of whether the Kansas plaintiffs are FedEx employees or independent contractors. Before the court can address the motions for summary judgment, it must resolve several evidentiary issues raised by the parties. First, FedEx argues that the Operating Agreement's merger clause limits the court's review of the evidence to the four corners of the agreement. Second, FedEx has moved to strike plaintiffs' individualized proof submitted in support of their summary judgment motions. Finally, the plaintiffs have filed three motions to augment the record.

### A. Merger Clause

FedEx bases its summary judgment motion on the terms in the Operating Agreement alone, contending that the merger clause in the Operating Agreement prevents the plaintiffs from relying on outside evidence, including FedEx policies and procedures. The merger provision states: "This Agreement, the Addenda hereto, and the Attachment to the Addenda, constitute the entire agreement and understanding between the parties . . . . This Agreement, the Addenda and

40

Attachments shall not be modified, altered, changed or amended in any respect unless in writing and signed by both parties." FXG OA, ¶ 13, FXHD OA, ¶ 10. FedEx Policy-007 similarly provides that the Operating Agreement and its addenda can't be modified unless in writing signed by both parties. Policy-007 states that the Operating Agreement and addenda "set forth the mutual obligations and objectives of FedEx Ground and the independent contractor owner-operators and must be adhered to by all officers, managers, agents and employees of FedEx Ground." The Operating Agreement doesn't generally incorporate FedEx policies and procedures.

FedEx reasons that the Operating Agreement alone governs the parties' relationship and doesn't contain any provisions requiring contractors to follow FedEx's policies and procedures. The policies and procedures are, on their face, directed to FedEx employees, not to the plaintiffs. FedEx asserts that the policies and procedures generally aren't shared with contractors because contractors aren't bound by them. The policies and procedures, according to FedEx, "do not -- and cannot -- reserve any rights that would conflict with the terms of the OA and its disclaimer of a right to control."

The drivers respond that the court isn't deciding whether the Operating Agreement creates an enforceable independent contractor relationship under contract law. Rather, they assert that the Operating Agreement and FedEx's generally applicable corporate policies and procedures provide relevant evidence

concerning the relationship between FedEx and its drivers. The drivers reason that FedEx can't contractually restrict the sources of relevant evidence bearing on the employment status inquiry. The corporate policies that empower FedEx's managers to direct the drivers' daily work activities, the drivers contend, are proof of FedEx's retained right to control how drivers perform their work and are probative of the ultimate issue of whether the independent contractor label in the Operating Agreement is legally inaccurate.

The court generally agrees with the drivers. Pennsylvania law governs interpretation and construction of the Operating Agreement. FXHD, ¶ 16, FXG OA, ¶ 19. Were this a breach of contract dispute, the merger provision would, absent an ambiguity, fraud, or mistake, generally restrict the court's review to the four corners of the agreement. Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 437 (Pa. 2004). But this isn't a breach of contract dispute; it's an employment dispute under the Kansas Wage Payment Act, and contract interpretation principles don't necessarily apply. For example, the Kansas Supreme Court explained that when resolving employment status, "language in a contract that characterizes an individual as an independent contractor, rather than an employee, is not controlling." Hartford Underwriters Ins. Co. v. Kansas Dep't of Human Res., 32 P.3d 1146, 1154 (Kan. 2001). The Hartford Underwriters court stated that "such provisions in a contract are not effective to keep an

42

employer outside the purview of the [employment statute] when the established facts bring him within it." Id.

The court's focus should be on "what is done under the contract and not what it states." Hartford Underwriters, 32 P.3d at 1154. Accordingly, "[t]he relationship of contracting parties depends on *all* the operative facts; the label which they choose to employ is only one of those facts." Hartford Underwriters, 32 P.3d at 1154 (emphasis in original); *see also* Knoble v. National Carriers, Inc., 510 P.2d 1274, 1281 (Kan. 1973) ("[M]ere terminology cannot bind a court or prevent it from assessing the effect of the overall conduct of the parties.").

The Operating Agreement's merger clause doesn't restrict the court to the four corners of the agreement when deciding employment status. FedEx notes, though, that the court has certified classes on the issue of right to control, not actual exercise of control. While FedEx is correct, the court finds it appropriate to review the policies and procedures that FedEx managers rely on when interacting with drivers to determine right to control. The court isn't required to turn a blind eye to FedEx's procedures implemented on a class-wide basis.

FedEx policies and procedures that fill out the broad terms of the Operating Agreement with more specific standards that FedEx managers are authorized and generally expected to enforce are probative of employment status. FedEx implemented these documents to guide the managers in their relationship with the drivers and to give meaning to what is more specifically expected under the

Operating Agreement. By putting such policies and procedures into place, FedEx acknowledges that the Operating Agreement depends on sources outside its four corners for implementation.

Further, Policy-007 doesn't render other policies and procedures meaningless. The undisputed evidence establishes that FedEx management employees are expected to know the relevant policies and procedures and, to the extent it makes good business sense, follow them. FedEx's right to control is restrained by the terms in the Operating Agreement, but to the extent the policies and procedures explain or more clearly or specifically define those terms, they are relevant and should be considered.

The court therefore finds it appropriate to consider the Operating Agreement and policies and procedures, as well, in deciding whether FedEx has a right to control its drivers on a class-wide basis.

### B. FedEx's Motion to Strike

FedEx says more than 1,600 pages of documents the plaintiffs filed with their summary judgment motions in class action states should be stricken because they contain individualized evidence. In its March 2008 class certification order (doc. # 1119), this court stated that it "has resolved these motions with the correlative assumption that the plaintiffs will not, at the summary judgment or trial stages, present evidence other than the Operating Agreement and generally

44

applicable FedEx policies." Throughout the order, the court recognized the common application of the Operating Agreement and FedEx policies and procedures in determining the merits of class action cases, but indicated it wouldn't consider any individualized evidence of the parties' relationship.

In April 2008, the plaintiffs filed a Statement of Intent listing seven categories of evidence on which they intended to rely, asserting that such evidence is "common proof applicable to members of the class as a whole." The court issued an order explaining that it didn't read plaintiffs' Statement of Intent to include "individualized evidence of driver intent and/or experience" and FedEx could file a motion to strike if plaintiffs included individualized evidence in their summary judgment motions. FedEx has filed its motion.

FedEx moves to strike the following evidence from the summary judgment record:

- A report listing hundreds of FedEx "Contractors in Jeopardy" of termination as a result of potential breaches of specific contractual obligations owed in the performance of the contractors' duties

- Business discussion notes between managers and individual contractors

- Contractor Customer Service Ride Worksheets created during and at the conclusion of a contractor's individual customer service "ride-along"

45

- Primary Service Area Analysis Worksheets detailing the package and load characteristics of a given contractor's work area

- Business Plan Meeting Notes reflecting individual contractor's circumstances, experiences, business goals, and approach to business

- Operator and Equipment Appearance Standard A.M. Checks (completed once per month) reflecting certain contractor's circumstances on a particular day

- Safety Meeting Reports reflecting discussions at periodic voluntary safety meetings that take place in terminals around the country

FedEx asserts that those documents are contractor specific and anecdotal in nature and don't represent the experiences of all contractors. By offering this evidence, FedEx contends the plaintiffs shift the substantive inquiry from the "right to control" under the Operating Agreement to an examination of the "reality of the relationship between drivers and FedEx across-the-board" and what managers across the country do "in fact."

In response, the plaintiffs explain the relevance of the documents to the class-wide plaintiffs. They say that the report listing hundreds of FedEx "Contractors in Jeopardy" illustrates that drivers who have had an accident, customer complaint, or missed pickup are "in jeopardy" of contract termination. Further, the plaintiffs point out that the samples of completed forms submitted

show that FedEx managers document their regular oversight of drivers' work performance, assignments, and training pursuant to FedEx policy. According to plaintiffs, the 128-page summary index of business discussion notes represents about two percent of the business discussion notes produced by FedEx. As FedEx policies require, FedEx managers throughout the country wrote those notes to document systematic counseling of drivers about a wide range of topics.

The plaintiffs offer these documents to prove that FedEx managers (1) systematically and routinely counsel drivers about compliance with a myriad of work methods established by FedEx; (2) follow FedEx's written policies and procedures, including those applicable to drivers' work methods; (3) evaluate, warn, discipline, and threaten to terminate drivers for violations of FedEx policies, procedures, and practices; (4) believe that the Operating Agreement and polices and procedures provide them with broad rights to control; and (5) limit drivers' decision-making.

For the most part, the court agrees with FedEx. In class action summary judgment motions, the drivers can't rely on individual contractors' experiences — whether that information is in the form of a list of contractors in jeopardy, completed FedEx forms, or business discussions — to show FedEx's right to control drivers on a class-wide basis. The detailed information the drivers produced represents anecdotal evidence of how FedEx treated individual drivers. Those instances amount to efforts to use actual control to show right to control.

47

The court has already explained that the plaintiffs can't submit such individualized evidence in the class action lawsuits to prove employment status.

The substance of the drivers' experiences contained in the submitted documents may differ from driver to driver, from manager to manager, and from terminal to terminal. For example, while each driver might have engaged in business discussions, the topic, number, and tone of the discussions would differ between drivers.  FedEx presented evidence that managers have discretion in how and how often they conduct business discussions and what issues are addressed and their intended effect. Were the court to allow the plaintiffs to introduce evidence to show the substance of FedEx managers' interaction with selected drivers, it would then have to allow FedEx the opportunity to produce contradictory evidence showing that other drivers weren't treated in a similar fashion. Class actions can't be based on such individualized evidence.

The plaintiffs have asked the court to review hundreds of "samples" of completed forms and business discussions and make generalizations about how all FedEx drivers were treated based on the experiences of the sample drivers. The court can't make generalizations about the class as a whole from a review of the actual control FedEx exercised over a segment of drivers. The court's analysis will focus on FedEx's right to control all drivers based on the Operating Agreement and generally applicable polices and procedures.

The court does, however, look to the submitted evidence to see generally how FedEx implemented its policies and procedures on a class-wide basis, *i.e.,* what forms managers used to evaluate drivers' work methods, the information managers were expected to input, the information FedEx tracked for all drivers, and the general topics addressed between managers and drivers. For example, the court relies on the "Contractors in Jeopardy" to show that FedEx tracks contractors who have had an at-fault accident, complaint, or missed pick-up. The court also relies on the submitted documents to show that customer service rides, audits, and resulting business discussions are used at times to let contractors know they are in violation of their contract for service failures, which, if not remedied, could result in contract termination.

The court GRANTS FedEx's motion to strike (doc. # 1389) to the extent the plaintiffs rely on the submitted documents to show individual contractors' experiences in class certification cases. The court will consider the evidence to show generally how FedEx implemented its policies and procedures on a class-wide basis. This ruling doesn't apply to summary judgment motions filed in non-class action cases.

C. PLAINTIFFS' MOTIONS TO AUGMENT RECORD

The plaintiffs have moved to augment the summary judgment record with newly produced documents. In their first motion, the drivers seek to offer four

newly promulgated Addenda to the FedEx Operating Agreement and four newly-produced IRS Notices of Proposed Assessment analyzing whether FedEx drivers are employees or independent contractors under the IRS's right to control test. In their second motion, the drivers seek to offer FedEx's Contractor Incorporation and Compliance Disclosure Announcement and a notification from FedEx's president that Operating Agreements won't be renewed, both dated May 2010. In their third motion, the plaintiffs seek to offer a decision of the Tennessee Department of Labor and Workforce Development and settlement between FedEx and the Department, a settlement agreement between the State of Massachusetts and FedEx, and transition announcements and ISP Transition guides in Tennessee, Massachusetts (including Albany, NY), Rhode Island, Vermont, Illinois, and Minnesota dated June or July 2010, explaining FedEx's transition to its "Independent Service Provider Model." The plaintiffs seek to offer these documents without further briefing.

The plaintiffs explain the materials they seek to introduce were produced after briefing concluded. The revisions to the Operating Agreement, the plaintiffs contend, are relevant and should be considered in deciding whether FedEx reserves any right to control the method, manner, or means of the drivers' performance. The plaintiffs reason that the revisions show FedEx's right to set and change at-will the continuing relationship between FedEx and its drivers and the compensation and means FedEx might use to enforce compliance with its rules.

50

FedEx responds that the newly-added Addenda should be rejected as cumulative because the documents are merely revisions of routine annual contract updates.

The Modified Term Addendum was given to drivers to sign in November or December 2009. It set a new contract termination date of May 15, 2010 for drivers who sign the Addendum. FedEx notes that this revision was for a limited number of contractors whose routes are based in or operate out of Maryland. Unless a contractor chooses to adopt the Modified Term Addendum and participate in the Maryland transition, the existing Operating Agreements and their terms remained in place.

The Employment Eligibility and Compliance Addendum, also given to drivers to sign in November or December 2009, requires E-Verify for all new hiring. FedEx explains that federal immigration laws require the E-Verify system. As a federal contractor, FedEx is required to ensure that subcontractors use E-Verify.

The Safe Driving Program and CCS Addendum were provided to drivers in January 2010, and revised versions were provided to contractors later. FedEx's new Safe Driving Program imposes more restrictions on contractors' ability to hire and retain workers. The drivers explain that the Program supercedes various Operating Agreement provisions and requires contractors to review and disqualify existing helpers or assistants who don't meet the new requirements, authorizes FedEx to judge the "guilt" of a driver arrested for various infractions and temporarily disqualify those it finds likely to be found guilty, and mandates

termination of drivers for certain traffic offenses. The CCS Addendum changes the terms of the CCS bonus by precluding a contractor from receiving the bonus for three consecutive months upon disqualification under the "Safe Driving Addendum."

FedEx notes that participation in the Enhanced CCS Program is contingent upon participation in the new Safe Driving Program. The revised Safe Driving Program Addendum was specifically "developed to further improve safety performance by rewarding contractors who operate safely each and every day." A contractor who chooses to follow the requirements of the Enhanced CCS Program is "eligible to be paid . . . an individual, performance-related bonus." These programs are optional, and a contractor who elects not to participate in the revised programs continues to operate under the existing Safe Driving Program and CCS bonus program in his Operating Agreement.

The drivers also seek to introduce IRS Notices of Proposed Assessment (NOPAs). On December 28, 2009, this court affirmed the magistrate judge's decision ordering FedEx to produce the IRS's four draft NOPAs, finding that the NOPAs are relevant and FedEx has placed the IRS's opinion of its driver model at issue. The drivers now seek permission to offer the notices to supplement the record. The drivers explain that the 2007 and 2009 NOPAs include a lengthy and detailed analysis of the relationship of the drivers to FedEx and each reaches the

conclusion that FedEx drivers are employees under the IRS Code's right-to-control employment test.

FedEx says the NOPAs are irrelevant and don't represent the IRS's position because the 2007 NOPA was a draft and the 2009 NOPA has been withdrawn. Further, FedEx asserts that according to applicable law and the IRS's own procedures, the application of Section 530 of the 1978 Revenue Act (safe harbor) renders the draft NOPAs of no substantive effect in establishing that any plaintiff or absent class member is an employee.

The plaintiffs respond that under the NOPAs' plain language, the IRS found, after detailed analysis, that FedEx contractors are employees under the common law right-to-control test applied by the IRS. The drivers assert that the right-to-control analysis in the NOPAs provides persuasive authority that this court should consider. The IRS ultimately decided that the "safe harbor" prevented it from seeking back taxes from FedEx, so it didn't issue a final determination of employee status. The drivers reason that the IRS's "safe harbor" ruling doesn't undercut the substance of the IRS's prior analysis and conclusion that FedEx reserves the right to control how the drivers perform their work.

The drivers also seek to include documents provided to FedEx contractors in May 2010. The first document is the Contractor Incorporation and Compliance Disclosure Announcement, which provides generally that FedEx will contract only with incorporated entities, registered in good standing, who agree to treat all

53

personnel who provide services under the Operating Agreement as employees. Contractors must sign and submit a new Addendum once FedEx confirms these standards have been satisfied. The Announcement provides that all Operating Agreements will be non-renewed. Contractors fulfilling the terms of the Agreement will be eligible to continue a relationship with FedEx if they satisfy the new standards at least thirty days before their contract expiration date. The second document is a related letter from FedEx's president. The drivers contend that the Announcement and letter show that FedEx retains the right to terminate at-will contracts unless and until the contractor conforms to FedEx's latest business edict.

Finally, in the third motion to augment, plaintiffs seek to introduce a decision from the Tennessee Department of Labor and Workforce Development determining that under the Tennessee Employment Security Law, FedEx drivers are employees for certain purposes. FedEx appealed, and the Department and FedEx entered into a settlement agreement. The plaintiffs similarly seek to introduce an agreement entered into between FedEx and Massachusetts in response to an administrative finding that the drivers were employees under Massachusetts law. The plaintiffs contend that the settlement agreements reflect FedEx's abandonment of its current business model and the introduction of its "Independent Service Provider Agreement," including the non-renewal of all Operating Agreements in these states.

54

Beginning in June 2010, FedEx provided documents to drivers introducing its transition to the "Independent Service Provider Model" in Tennessee, Massachusetts, Rhode Island, Vermont, Illinois, and Minnesota and to certain contractors who work out of "cross-border" FedEx stations in neighboring states. According to the transition documents, for contractors to continue their relationship as FedEx pickup and delivery drivers, they must incorporate by a certain date, acquire at least three primary service areas within one terminal by a date certain, register with the state, and execute certain forms. The transition documents also indicate that Operating Agreements are non-renewed and swing routes will "cease to exist." FedEx has offered incentives for drivers to terminate their current contracts and meet the requirements for this new model. The plaintiffs argue that these documents evidence FedEx's right to dictate the method of the drivers' performance and shows FedEx's right to terminate and non-renew contracts at-will.

Federal Rule of Civil Procedure 56(e) provides in pertinent part that the "court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits." FED. R. CIV. P. 56(e)(1). The court has discretion to allow the drivers to supplement the summary judgment record. Wren v. McCain, 23 F.3d 411 (Table), No. 93-2183, 1994 WL 142884, at *2 (7th Cir. Apr. 20, 1994) (affirming magistrate judge's decision permitting party to supplement summary judgment record after motion had been filed). The court

concludes that the submitted documents are relevant to only a small segment of the plaintiff classes, cumulative of the evidence already submitted, or of little evidentiary value. Accordingly, the court declines to allow the plaintiffs to supplement the record.

The Addenda to the Operating Agreement — Modified Term Addendum, Employment Eligibility and Compliance Addendum, Safe Driving Program and CCS Addendum — were provided to drivers in late 2009 or early 2010 and apply only to a small segment of the plaintiff classes: those working for FedEx in the last seven months who signed the new Addenda. The plaintiffs contend the Addenda evidence FedEx's right to control the drivers by illustrating FedEx's ability to change the terms of the parties' agreement, but these Addenda are voluntary. It's undisputed that FedEx can change the terms of the Operating Agreement upon the contractor's voluntary signature to an Addendum and has retained the right to not renew contracts upon expiration of the contract term. Accordingly, further evidence showing FedEx's ability to change the Operating Agreement's terms by agreement of the contractors or by non-renewal of their contracts is cumulative.

The evidence is also of limited relevance. The Modified Term Addendum only applies to drivers whose routes are based in or operate out of Maryland and isn't necessarily applicable to other classes. Federal immigration laws require the Employment Eligibility and Compliance Addendum. The Safe Driving Program imposes more restrictions on drivers' ability to hire and retain workers, but is a

voluntary program tied to the Enhanced CCS Program. To receive the CCS bonus already in effect, contractors had to similarly comply with certain FedEx standards. These Addenda are cumulative of documents already in the record and of little relevance to the pending motions for summary judgment.

The Contractor Incorporation and Compliance Disclosure Announcement and letter from FedEx's president were provided to FedEx contractors in May 2010, so their relevance is limited to drivers who were working for FedEx in the last several months. Because the documents illustrate FedEx's right to not renew contracts after the stated term and to change the terms of new contracts, the evidence is cumulative and doesn't shed additional light on the class members' relationship with FedEx during the relevant class period. The court declines to augment the record with new Addenda that apply only to a small segment of contractors and are submitted for the purpose of showing that FedEx has the right to not renew the contractors' agreements at the end of their term.

Further, the transition documents offered in plaintiffs' third motion to augment only relate to eight states and are dated in June or July 2010. In those states, FedEx has changed its current business model and implemented the ISP Model in response to particularities of the states' law. The new business model isn't at issue in the cases in this docket. The documents merely show FedEx's ability to non-renew contracts and to enter into new contracts with entities of its choosing; a right FedEx has retained under the Operating Agreement. FedEx has

57

also given the parties the option of ending their contracts early by offering
transition incentive payments. The transition documents, therefore, are of limited
relevance for the same reasons as the newly submitted Addenda.

Although the NOPAs may have some persuasive value, their value is limited
because they don't represent a final determination. This court required FedEx to
produce the documents because they are relevant and material to this litigation,
but relevancy for discovery can differ from relevancy for summary judgment
purposes. The determination that FedEx drivers are employees under the common
law right-to-control test as applied by the IRS is of little value without some
showing that the applicable state or federal law at issue in the class action suit
would give weight to such opinions.

Further, the Tennessee and Massachusetts settlements addressed in the
plaintiffs' third motion to augment the record are also of limited relevancy and not
admissible to show liability. *See* FED. R. EVID. 408(a). The decision that resulted
in the Tennessee settlement is also of limited persuasive authority because it
doesn't represent a final judgment on the merits. To the extent it has any
persuasive authority, the court will only consider it in the Tennessee class action.

At this stage in the litigation, the relevancy of the newly submitted
documents to the summary judgment motions doesn't justify augmentation of the
already voluminous record. The court therefore DENIES the plaintiffs' motions to
augment the record (docs. ## 1992, 2064, and 2087).

### III. Motions for Summary Judgment

### A. Standard

The plaintiffs and FedEx have filed cross-motions for summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 459-460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).

When cross motions for summary judgment confront the court, it must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. See McKinney v. Cadleway Props., Inc., 548 F.3d 496, 504 n.4 (7th Cir. 2008) ("The motions are treated separately."); Midwest Title Loans, Inc. v. Ripley, 616 F. Supp. 2d 897, 902 (S.D. Ind. 2009) ("[C]ourts

must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."). The standard for determining whether summary judgment should issue is unchanged from that which applies when only a single party has moved for the relief. McKinney v. Cadleway Props., 548 F.3d at 500.

Whether an individual is an employee or an independent contractor generally is considered a question of fact for the jury or trier of fact. McCubbin v. Walker, 886 P.2d 790, 795 (Kan. 1994). When the facts are undisputed or the evidence is susceptible of only a single conclusion, however, it is a question of law for the court. Id.

## B. Discussion

The Kansas plaintiffs allege that FedEx's classification of Kansas pickup and delivery drivers as independent contractors violates the Kansas Wage Payment Act. The Act circularly defines an employee as "any person allowed or permitted to work by an employer," KAN. STAT. ANN. § 44-313(b), so courts look to various facts and circumstances surrounding the parties' relationship to determine the package and delivery drivers' employment status. Herr v. Heiman, 75 F.3d 1509, 1512 (10th Cir. 1996) (Kansas Wage Payment Act) (citing Wallis v. Secretary of Kan. Dep't of Human Res., 689 P.2d 787, 792 (Kan. 1984) (Kansas Employment Security Act)).

Kansas courts appear to use the same test to determine employment status for claims brought under various employment statutes and for respondeat superior liability. FedEx contends the court shouldn't give weight to cases deciding employment status under the Worker's Compensation Act because those cases reflect a policy favoring employee status and so don't afford the same "considerable weight" to the parties' intent as is required here. The court disagrees. The cases determining employee status under the Kansas Worker's Compensation Act set forth an employment test that is similar to the test under the Kansas Wage Payment Act. Under the applicable common law test, intent is just one factor to consider in determining employment status; the right to control is the most significant factor. The court therefore finds these cases persuasive in deciding whether FedEx drivers in Kansas are employees or independent contractors.

There is no absolute rule for determining whether an individual is an independent contractor or an employee. Wallis v. Secretary, 689 P.2d at 792; *see also* Hartford Underwriters Ins. Co. v. Department of Human Res., 32 P.3d at 1151 (Kansas Employment Security Act). The facts and circumstances of each case determine whether one is an employee or an independent contractor, taking into consideration broad legal principles. Wallis v. Secretary, 689 P.2d at 792; McCubbin v. Walker, 886 P.2d at 794.

61

"An independent contractor is generally described as one who . . . contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work." <u>Wallis v. Secretary</u>, 689 P.2d at 792. The primary test used in determining whether an employment relationship exists is "whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished." <u>Id.</u> The existence of the right or authority to interfere or control by the employer, not the actual interference or exercise of control, renders one an employee rather than an independent contractor. <u>Id.</u>; <u>Hartford Underwriters</u>, 32 P.3d at 1151.

The right to control the manner and methods of the worker is the single most important factor in determining a worker's status, <u>McCubbin v. Walker</u>, 886 P.2d at 794, but it isn't exclusive and other relevant factors should be considered. <u>McDonnell v. Music Stand, Inc.</u>, 886 P.2d 895, 899 (Kan. Ct. App. 1994) (<em>citing</em> <u>Jones v. City of Dodge City</u>, 402 P.2d 108, 111 (Kan. 1965)). Other relevant factors include: whether there is an agreement to perform a  certain kind of work for a definite period of time; whether the employer has the right to discharge the worker at any time; whether the worker must furnish necessary tools, supplies, and materials; whether the worker is paid by the hour or by the job; whether the work is part of the regular business of the employer; whether the worker's business is

independent in nature; and whether the worker has the right to employ assistants and supervise their work. *See, e.g.*, McCubbin v. Walker, 886 P.2d at 794 (length of contract, independent nature of business, employment of assistants, furnishing equipment, method of payment, and regular part of business); Wallis v. Secretary, 689 P.2d at 792 (right to discharge, method of payment, furnishing equipment); McDonnell v. Music Stand, 886 P.2d at 899 (length of agreement, power to terminate, and method of payment).

Other cases have relied on similar factors as set forth in the RESTATEMENT (SECOND) OF AGENCY § 220(2):

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

63

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*See* Knorp v. Albert, 28 P.3d 1024, 1028 (Kan. Ct. App. 2001) (respondeat superior liability); Travelers Indem. Co. of Ill. v. Challenger Fence Co., 119 P.3d 666, 668 (Kan. Ct. App. 2005) (Worker's Compensation); *see also* Herr v. Heiman, 75 F.3d 1509, 1512 (10th Cir. 1996) (action brought under Kansas Wage Payment Act, considering twenty similar factors used by Kansas Department of Human Resources to determine employment status). "[T]here are numerous factors which may be considered in determining an individual's employment status, and many of those factors overlap." Hill v. Kansas Dep't of Labor, Div. of Workers Comp., 210 P.3d 647, 655 (Kan. Ct. App. 2009).

Several Kansas courts have applied the right to control test to find employee status when the employer retained control over numerous aspects of the employer's work. In Wallis v. Secretary, 689 P.2d at 789, the issue was whether individuals who were dealers of Kirby Vacuum Cleaners were employees of Mr. Wallis or independent contractors. The court held that the district court

64

incorrectly determined that the salesmen were independent contractors based on the adopted findings of fact from the Department of Human Resources. Id. at 795.

Mr. Wallis recruited potential "dealers" to sell vacuum sweepers within his distributorship and had the dealers sign what was designated as an independent dealer agreement. The newly associated dealers took a training course carried out by Mr. Wallis in which they were oriented with the product and counseled with regard to sales techniques. During the early course of their sales experience, new dealers were accompanied by more experienced dealers. The dealers were free to establish their own hours of service and the territories they serviced. Mr. Wallis didn't compensate or reimburse them for their expenses or provide them office space. The dealers didn't sell competing products. They could negotiate the product's price with the customer, but the distributor reviewed the sale for acceptance. Either party could terminate the "independent contractor" agreement upon thirty days written notice. Mr. Wallis could terminate the contract "in those instances wherein he finds the dealer to be not representative of the product or product line." 689 P.2d at 789-790.

In holding that the dealers were employees, the court noted that Mr. Wallis maintained direction and control with respect to training the dealers and the prices of the products. For example, experienced dealers initially accompanied new dealers during their door-to-door sales. Further, the dealers had to be authorized through Mr. Wallis, and he retained the right to terminate the contract

without cause upon thirty days notice. The court reasoned that although the dealers could sell the products in whatever method they chose, Mr. Wallis could terminate the contract with the dealer if he found that the dealer wasn't representative of the product or product line. The dealers didn't service the equipment and weren't responsible for repossession of the vacuum cleaners when installment contracts fell through. The court found, based on these facts, that the distributor had the right to control the dealers, even if he hadn't exercised that right. 689 P.2d at 795.

In Danes v. St. David's Episcopal Church, 752 P.2d 653 (Kan. 1988), the court affirmed the district court's order classifying a church organist as an employee. The plaintiff organist entered into an agreement with the defendant church to provide services as organist and choirmaster. Although the church didn't withhold Social Security or income tax from the organist's wages, the church rector had the authority to determine when the organist performed, to make final decisions concerning the amount, nature, and type of music that was played, and to make final selections of the music. The church paid the organist by the month and could fire him upon ninety days' notice. The church supplied the church organ, which was the basis of the organist's service. In light of these facts, the court held that the district court correctly determined that the plaintiff was an employee rather than independent contractor. 752 P.2d at 660.

66

In other cases, Kansas courts have found independent contractor status when the purported employer gave the hired worker general instructions to follow, but didn't control the means and manner of the work. In Home Design, Inc. v. Kansas Dep't of Human Res., 2 P.3d 789 (Kan. Ct. App. 2000), the court held that siding installers were independent contractors. The court noted that the siding installers were free to set their own hours as long as the job was completed within a reasonable time frame (with only the minimal requirement that they should be there at a decent time, in decent clothes, and put in a day's work). They were paid by the job and free to turn down work, work for other siding companies, or negotiate better deals. There wasn't continuity in the relationship between Home Design and the installers; the installers could refuse to accept a relationship or an assignment as they desired. Home Design provided the siding materials for the job, but didn't provide the tools, equipment, or training to the installers. The siding installers had to carry liability insurance and workers compensation insurance, but could be added to Home Design's policies for a fee. 2 P.3d at 792-793.

The Home Design court held that the general instructions given to the installers "were nothing more than what would be expected of any subcontractor working under the overall auspices of a general contractor." 2 P.3d at 793. There was no evidence that Home Design actually controlled the work of the siding installers or instructed them on how to perform their task or install the siding.

67

The court explained that Home Design or one of its salespersons would visit the job site to check the progress and address any problems the siding installers were encountering, but the company didn't supervise the siding jobs in the true sense of the word. Checking the job site for progress or problems, the court reasoned, was typical of any general contractor or architect. Accordingly, the court held that the siding installers weren't subject to Home Design's control in any meaningful sense other than as to results. 2 P.3d at 793.

The court in Crawford v. Department of Human Res., 845 P.2d 703 (Kan. Ct. App. 1989), addressed whether people who appear at stores or events to promote food or demonstrate how products work were employees or independent contractors. The administrative law judge ruled that the demonstrators were employees because Ms. Crawford exercised control by requiring a dress code and completion of recap sheets and retaining the right to terminate a demonstrator for cause.

The appellate court reversed. The court noted that the instructions and directions concerning the demonstrations came from the manufacturers of the products and the stores in which the demonstrations took place. Ms. Crawford merely transmitted the instructions to the workers; she had no part in formulating the instructions and didn't check on the workers or supervise them during the demonstrations. The court noted, too, that no training was provided, and Ms. Crawford didn't set the order or sequence of work or require that services be

provided personally by the demonstrators. Any set work hours were established by the store. Ms. Crawford didn't furnish tools, equipment, or materials, and demonstrators were paid by the job. Demonstrators could work for more than one demonstrating company and acceptance of each new job offer was a voluntary decision made by the worker. 845 P.2d at 704-707.

The Crawford court explained that the recap forms were simply a way of tracking the person and days worked, and the "appropriate dress" statement was merely a general instruction to not wear jeans and to dress appropriately. Because Ms. Crawford didn't appear to have much knowledge of the specific products demonstrated or of the manufacturers' instructions, nor did she supervise, direct, or control the workers doing the demonstrations, the court held that substantial evidence didn't exist to support a finding of employee status. Id. at 707-708.

These cases[6] illustrate that no single factor is dispositive when determining employment status, and the court must consider the facts as a whole when making this determination. Under the undisputed facts in today's summary judgment record, the totality of circumstances requires a finding of independent contractor status. Without question, there are facts in the record that cut both ways. But this case differs from Wallis v. Secretary and Danes v. St. David's because the Operating Agreement doesn't provide FedEx with the right to control

---

[6] The plaintiffs and FedEx have filed extensive supplemental authority on their summary judgment motions, but none specifically addressing Kansas law. The court has considered the supplemental authority offered by the parties, but doesn't find that the cases would change the effect of the application of Kansas law in this order.

the drivers' means and methods of work or the manner in which they complete their contractual obligations. Further, FedEx drivers can't be terminated without cause before the expiration of their contract term. *Cf.* Wallis v. Secretary, 689 P.2d at 790 (termination upon thirty days written notice); Danes v. St. David's, 752 P.2d at 660 (termination upon ninety days written notice).

FedEx has retained oversight and supervision over its drivers, but as in Home Design v. Department of Human Res., FedEx provides general instructions that it expects drivers to follow, not requirements on how to perform daily tasks. FedEx reviews drivers' work to check their progress or address problems, but its right to control is limited to offering suggestions and best practices, not mandatory courses of action. FedEx's retained control is limited to the results of the drivers' work, not how the drivers' achieve those results. As in Crawford v. Department of Human Res., FedEx doesn't set the order or sequence of the work or even require that services be provided personally by the contractors. Many general instructions set forth by FedEx are based on customer demands. FedEx's requirement that drivers meet these customer demands involves the results of the drivers' work. FedEx contractors can hire helpers or replacement drivers to perform their work and they can even sell their routes to other qualified drivers. The evidence, therefore, leads to one reasonable inference, *i.e.*, the plaintiffs are independent contractors.

### 1. Intent of the Parties

The court considers the parties' intent as expressed in their agreement when deciding employment status. <u>Knorp v. Albert</u>, 28 P.3d 1024, 1030 (Kan. Ct. App. 2001); *see also* <u>Lowe v. Surpas Res. Corp.</u>, 253 F. Supp. 2d 1209,1233 (D. Kan. 2003) (finding intent of parties to create independent contractor relationship evidenced by unambiguous language in the agreement was factor weighing heavily in favor of independent contractor status). The Kansas class plaintiffs, either individually or through a sole proprietorship or corporation, entered into Operating Agreements with FedEx acknowledging that they would provide services as independent contractors and not as employees. OA, Background.

In several provisions, the Operating Agreement says FedEx directs the results, but not the manner and means, of the plaintiffs' work. OA, Background, FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15 ("Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results . . . and no officer, agent or employee of [FedEx] shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results."). The Operating Agreement more specifically provides that FedEx can't "prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance." FXHD OA, ¶ 1.14; FXG OA, ¶ 1.15.

71

Further, under the Operating Agreement, FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, Social Security taxes, or any other similar charges with respect to the contractors or their employees. OA, ¶ 4.2. The contractors receive a Form 1099 at each year end and compute their income taxes as independent contractors.

The contractors understood they were classified as independent contractors and the parties intended to create an independent contractor agreement. This factor weighs strongly in favor of independent contractor status.

### 2. Right to Control

The Operating Agreement sets forth the basic parameters in which FedEx is required to operate in its interactions with drivers. While FedEx's policies and procedures provide specific guidelines that fill out the Operating Agreement's broad terms, FedEx's right to control ultimately is restrained by the parties' agreement. FedEx might actually exercise more control than authorized, but as explained, the court is limited in determining whether FedEx retained the right to control. The court relies on the policies and procedures to the extent they show how FedEx implemented its authority as retained by the Operating Agreement.

After reviewing the common undisputed evidence offered by the parties, the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis.

### a. Drivers' Obligation to Complete Daily Assigned Work

Various provisions of the Operating Agreement authorize FedEx to control the days of service, the contractor's daily workload, and certain time windows when pick-ups and deliveries must be made. These requirements weigh in favor of employee status, but are more suggestive of a results-oriented approach to management when viewed with the totality of circumstances. FedEx has contracted for the performance of certain work and has the right to require that the work be completed as agreed. As long as contractors complete their daily assigned work, they can decide their work schedule. For example, they can hire helpers to finish their assigned work more quickly or, alternatively, hire a replacement driver to take over their route.

Drivers agree to provide daily pick-up and delivery services to customers in their primary service area on days and at times that are compatible with their schedules, as consistent with the competitive standards within the industry. OA, ¶ 1.10(a). Under this provision, FedEx has reserved the right to require contractors, or their approved replacement drivers, to provide service on days that

FedEx agrees to provide service to customers. FedEx also has authority to change the days of service.

A driver is responsible for delivering every package in his work area each day and every package assigned under the Flex Program, if applicable. OA, ¶ 1.10(a). To enable full use of their equipment as set forth in the Operating Agreement, FedEx structured the drivers' routes so each vehicle was in use nine to eleven hours per day. This measurement varies somewhat between facilities and has been modified recently, but essentially sets forth a daily expected workload for drivers. Requiring workers to accept assigned work weighs in favor of employee status. *Compare* Knorp v. Albert, 28 P.3d at 1029 (physician not permitted to refuse service to any patients, a factor weighing in favor of employment status); *with* Home Design v. Kansas Dep't of Human Res., 2 P.3d at 792 (siding installers could refuse to accept relationship or assignment as they desired); Crawford v. Department of Human Res., 845 P.2d at 707 (acceptance of each new job offer was voluntary decision made by worker).

In the Operating Agreement, though, FedEx says it will provide enough packages to make full use of the contractor's vehicle; FedEx is required to fulfill this obligation pursuant to the parties' agreement, so it isn't necessarily indicative of employee status. *See, e.g.*, P.S. ex rel. Nelson v. The Farm, Inc., 658 F. Supp. 2d 1281, 1299 (D. Kan. 2009) (requirement that foster care agency accept custody of foster child within four hours of referral by the Social and Rehabilitation

Services didn't equate to control over scheduling because the contractual requirement bound SRS as well as the agency; SRS couldn't insist on shorter time frame absent modification of contract). Further, contractors can terminate their contracts upon thirty days' notice, in which case, they would be relieved of any future work assignments.

FedEx requires contractors to deliver packages outside their primary service area through the Flex Program. Home Delivery contractors must agree to flexing, FXHD OA, ¶ 1.10(a), but Ground contractors are given the option, FXG OA, ¶ 1.10(a). FedEx can also reassign packages to another driver under both the Ground and Home Delivery Operating Agreements when the packages in the driver's primary service area exceed the volume that he can reasonably be expected to handle that day. OA, ¶ 1.10(a).

FedEx also is authorized to reconfigure a contractor's primary service area upon five days' written notice, unless the driver is able to show during the notice period that he can continue to service the area. FXHD OA, ¶ 6.2; FXG OA, ¶ 5.2. FedEx's goal through restructuring is to provide each contractor with a full day's work (nine to eleven hours a day). FedEx must compensate the driver if the reconfiguration results in fewer customers or accounts. FXHD OA, ¶ 6.3, Addendum 5; FXG OA, ¶ 5.3. Even though FedEx has the right to control contractors' daily workloads by flexing and reconfiguration of primary service areas, FedEx is bound by the parties' agreement to provide full use of the

contractors' vehicles and can only reconfigure a primary service area under certain conditions. Employers generally aren't confined to such limitations.

FedEx places some restrictions on drivers' abilities to complete deliveries on their time schedule. Although drivers aren't required to appear at delivery stops at specific times, FedEx can negotiate pick-up or delivery windows upon a customer's request. FedEx requires drivers to make the appointed pick-ups or deliveries within the set window of time or negotiate a different time through FedEx or directly with the customer. FedEx also offers customers an evening service that guarantees delivery between 5:00 p.m. and 8:00 p.m. FedEx drivers must provide this service when FedEx requests or pass it on to another driver. Ground drivers must return to the terminal by a certain time at the end of the day, and Home Delivery or Ground drivers who collect charges for C.O.D. packages must return the charges to the terminal at the end of the day.

Within the confines of the Operating Agreement's terms, FedEx has retained the right to determine some time parameters for providing service to customers, but FedEx doesn't have authority to dictate what hours or how many hours drivers work. OA, ¶ 1.15. Drivers must work certain days of the week, deliver all packages assigned to them that day based on a nine to eleven hour work day, and, on occasion, meet pick-up and delivery windows, but aren't otherwise required to work a set schedule. These facts therefore aren't necessarily indicative of employee status. *Compare* <u>Home Design v. Department of Human Res.</u>, 2 P.3d at 792

(expecting installers to arrive around 8 a.m. and put in a good day's work, not indicative of employee status), *with* <u>Danes v. St. David's Episcopal Church</u>, 752 P.2d at 660 (authority to determine when organist performed weighed in favor of employee status).

Further, FedEx establishes the pick-up and delivery windows based on customer requests, so those windows focus on the results of the drivers' work. *See* <u>Crawford v. Department of Human Res.</u>, 845 P.2d at 707 ("Any set work hours were established by the store and not by Crawford."). Although, unlike <u>Crawford</u>, FedEx decides what services are provided to customers and consults with customers to determine when those services can be provided, contractors nevertheless are hired to provide such services. FedEx can dictate the results it expects of contractors without creating an employment relationship.

No less importantly, contractors can hire replacement drivers to run their full routes or hire assistants to help with their routes, thereby freeing them from any time parameters or delivery duties. The replacement drivers are subject to certain approval requirements set forth by FedEx, some of which exceed DOT regulations, and the contractors ultimately are responsible for ensuring that their replacement drivers fulfill the same obligations the Operating Agreement requires of the contractors. OA, ¶ 2.2. Contractors' ability to hire assistants and replacement drivers, though, even under FedEx's approval requirements, allows them to have complete freedom in their schedules.

Accordingly, FedEx's retained right to control the days of service, daily workload, and certain parameters when pick-ups or deliveries must be made isn't strongly indicative of employee status under these facts, especially in light of FedEx's obligation to make full use of the vehicles, restrictions on reconfiguration of work areas, lack of control over drivers' specific work schedules, and the ability of contractors to hire assistants or replacement drivers to complete their assigned work.

### b. Driver Appearance and Vehicle Suitability Standards

FedEx has some right to control the drivers' personal appearance and the appearance and suitability of their vehicles. The Operating Agreement requires contractors to foster FedEx's professional image and good reputation, including adhering to vehicle identification and operator appearance standards. OA, ¶ 1.10(e). Drivers must wear the FedEx uniform and maintain it in good condition. Each driver is to "keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by [FedEx]." OA, ¶ 1.12.

FedEx has authority to prohibit drivers from servicing customers if they aren't in proper uniform or aren't properly groomed. FedEx dictates certain appearance standards for its drivers to reinforce its brand and maintain a professional image, but requiring proper attire isn't precisely the same thing as a

right to control the drivers' manner and means of work. *See, e.g.*, Home Design v. Department of Human Res., 2 P.3d at 792-793 (mere instruction to dress appropriately wasn't indicative of employee status); Crawford v. Department of Human Res., 845 P.2d at 707-708 (general instruction not to wear jeans and to dress appropriately wasn't indicative of employee status). FedEx's requirement to wear a uniform, though, is more than a general instruction to dress appropriately and so weighs in favor of employee status, but, ultimately, doesn't affect the means or methods of the drivers' work.

FedEx managers also have the right to evaluate drivers' trucks for appearance and maintenance standards and can inspect the vehicles every thirty days. Drivers must submit vehicle maintenance reports monthly. Even though FedEx drivers supply their own vehicles, FedEx requires each vehicle to be painted "FedEx White," bear FedEx logos and advertising, and meet FedEx's minimum bumper height; interior shelving requirements; and, in some cases, age restrictions. FedEx also decides what size and configuration of truck is appropriate for each particular route. *See* OA, ¶ 1.1 ("[S]ubject to the determination of [FedEx] of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor."). Other than these requirements, contractors have the right to determine what vehicle to purchase.

79

Federal regulations set commercial vehicle maintenance and marking requirements for vehicles of 10,001 pounds or more, but while the existence of those regulations "may indeed furnish reasons for at least part of the control exercised," FedEx's requirements go beyond federal regulations. Knoble v. National Carriers, Inc., 510 P.2d 1274, 1280 (Kan. 1973) ("While such regulations may indeed furnish reasons for at least part of the control exercised, they do not alter the fact of its existence."). Thus, FedEx's right to determine and enforce driver and vehicle appearance and vehicle suitability standards slightly favors employee status. As noted though, while appearance standards may indicate control, they don't dictate the manner in which contractors must perform their work.

### c. Supervision over Drivers' Work

Various Operating Agreement provisions set forth objectives that contractors must meet in performing their work. For example, FedEx requires contractors to make reasonable efforts to retain and increase their customer base and volume; handle and transport packages using methods designed to avoid theft, loss, and damages; provide package tracking information; and cooperate with FedEx's employees, customers, and other contractors to achieve efficient package pick-up and delivery. OA, ¶¶ 1.10(b), (c), (d). Drivers agree to conduct all business activities with integrity and honesty, in a professional manner and with proper decorum, and to operate equipment safely. OA, ¶¶ 1.10(e), (g), (h).

To ensure contractors meet these objectives, FedEx has established policies and procedures that managers are to consult when reviewing drivers' work. These policies and procedures set forth guideposts for supervising drivers and determining their compliance with FedEx's expected standards of conduct. FedEx's requirement that drivers comply with certain standards of conduct and obligations set forth in the Operating Agreement, however, illustrates FedEx's concern with the results of the drivers' work, not their method in performing the work. *See, e.g.*, Lowe v. Surpas Res. Corp., 253 F. Supp. 2d 1209, 1233 n.19 (D. Kan. 2003) (finding that "[bank's] right to review collection efforts reflects its concern with the result of [debt collection agency's] work, not the method of collection and such authority does not indicate the type of control that would create an agency relationship under Kansas law.").

FedEx offers training to new drivers on its customer service procedures, but under the Operating Agreement, contractors have the responsibility to ensure that any person operating the equipment is fully trained and capable of meeting the customer service standards set forth in the agreement. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. Depending on the applicant's experience, he might be required to take the FedEx QPDL training course as a precondition to becoming a contractor. As of 2007, contractors could take a substitute course from an approved vendor. The QPDL course teaches federal safety regulations and other customer service procedures. FedEx also conducts a ten-hour orientation program during drivers'

81

first thirty days to familiarize them with various service quality procedures. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. FedEx used to provide drivers with the Contractor's Companion — a reference guide to assist contractors in performing their work. FedEx also holds safety meetings that were previously mandatory. Training is factor weighing in favor of employee status. Wallis v. Secretary, 689 P.2d at 789.

FedEx offers bonus incentives to contractors who meet certain standards. Contractors receive the CCS bonus monthly if they have no at-fault accidents and no verified customer complaints. FXHD OA, Addend. 8; FXG OA, Addend. 6. Contractors can expunge one verified complaint from their record by participating in the CARE training program, which teaches ways to achieve customer satisfaction. Ground contractors can receive a weekly Pick-Up Service Bonus if they don't miss any pick-ups, all pick-ups are made within the drivers' requested windows (with a grace period), and the scanner is used to process all pick-up stops (with an allowance for two instances of non-compliance). FXG OA, Addend. 6. These bonuses, however, aren't mandates requiring the driver to perform in a certain manner. Incentives aren't controls.

FedEx has processes in place to track the drivers' performance. Drivers should perform a "check-out" with their mangers before leaving the terminal in the morning so that the manager might review the driver's settlement report and deliveries made the previous day and discuss any DNAs or other service failures with the driver. Drivers also must use a FedEx scanner to record information

82

relating to pick-up and deliveries. The scanners are connected to FedEx's computer system and allow package tracking information to be transmitted to FedEx.

FedEx reviews its drivers' performance through audits and customer service rides. Managers are authorized to conduct daily van service audits to ensure drivers are complying with FedEx procedures for undelivered packages. FedEx also hires security specialists who perform random in-route van security reviews to inspect drivers' vehicles to verify that drivers are properly securing them. At Home Delivery, FedEx reserves the right to perform driver release audits on the drivers, where the manager follows the drivers, and sometimes interviews customers, to see whether customers' packages are being driver-released properly.

Managers are to conduct at least two, but not more than four, customer service rides each year, giving managers a chance to see whether FedEx drivers are complying with FedEx's customer service standards and to ensure that drivers are operating their vehicles safely. FXHD OA, ¶ 1.13; FXG OA, ¶ 1.14. FedEx procedures direct managers to review almost every aspect of the driver's work during these rides, including specific details about the driver's method and means of performance. For example, the manager is to observe whether the driver puts the address of the next stop into the scanner on his way back to the vehicle after a delivery. In general, managers review the contractor's package handling procedures, customer contact skills, safe driving techniques, and critical safe

behaviors. As noted though, FedEx managers can only go on four customer service rides a year, which binds FedEx from mandating additional oversight. *See, e.g.*, P.S. ex rel. Nelson v. The Farm, Inc., 658 F. Supp. 2d at 1299 (requirement not necessarily indicative of control where it also limited the purported employer from exercising more control).

FedEx managers discuss performance with the contractors at least twice a year through business discussions. During these discussions, managers make recommendations and counsel drivers in the performance of their contracted work. A wide range of topics can be raised during business discussions, such as overall performance, customer complaints or positive customer feedback, or violations of the Operating Agreement. While FedEx may not be able to force the contractor to engage in a business discussion, not participating will reflect poorly on the contractor upon contract renewal.

FedEx presents evidence that the purpose of the customer service rides, audits, and resulting business discussions is to provide contractors with recommendations, not requirements that must be followed. Under the Operating Agreement, FedEx doesn't have the right to determine the drivers' means and methods of work, but retains the right to exercise control over the results of the drivers' work. FedEx supervises drivers as to the means and methods of their work and provides them with suggestions they should follow, but, pursuant to their contractual arrangement, aren't required to follow. FedEx's supervision over the

drivers is therefore insufficient to show control over the means and methods of the drivers' work. *See, e.g.*, Lowe v. Surpas Res. Corp., 253 F. Supp. 2d at 1233 (noting that even though the bank had great latitude to review SRC's collection activity, such facts don't suggest that the bank retained the type of control over SRC necessary to establish an agency relationship).

The managers' suggestions might have the intended effect to get drivers to behave in a certain manner, but FedEx's ability to enforce these suggestions is limited. FedEx can restructure drivers' routes, but only if the drivers aren't able to provide reasonable means to continue to service their Primary Service Area. If the reconfiguration results in less customers or accounts, the Operating Agreement requires compensation to the contractor.

FedEx also can terminate drivers, but only if they breach or fail to perform the contractual obligations imposed by the Operating Agreement. FedEx's policies and procedures indicate that contract termination might be justified for repeated customer complaints, failure to service work area, integrity issues, unsafe driving, DOT and/or maintenance violations, or other such problems. RCRL-162, at 5. FedEx therefore retains a right to terminate contractors only when they have failed to perform the contracted-for results set forth in the Operating Agreement. *Cf.* Wallis v. Secretary, 689 P.2d at 789-790 (possible discharge if distributor determines worker isn't representative of product was fact weighing in favor of employee status); *but see* Crawford v. Department of Human Res., 845 P.2d 706-

707 (termination for cause not indicative of employee status). While FedEx has some discretion in deciding what actions constitute a violation of the broad terms of the Operating Agreement, its decision to terminate is subject to review by a neutral party. If contractors believe they have been wrongfully terminated, they can sue FedEx through arbitration and recover damages.

FedEx also can choose not to renew a driver's contract upon expiration of the contract's term, but such an option isn't atypical of an independent contractor relationship where a hiring party can simply decide not to re-hire a worker. Home Design, 2 P.3d at 793 (stating that the reliable siding installers "frequently received repeat business, but that is true with any prudent business which might wish to deal with reliable suppliers, middlemen, or subcontractors").

In sum, FedEx managers' right to supervise the drivers and provide suggestions of best practices isn't indicative of employee status given FedEx's restricted ability to enforce its suggestions. Similarly, in Nelson v. The Farm, 658 F. Supp. 2d at 1299, Social and Rehabilitation Services retained certain rights of control and oversight over the foster care agency, *e.g.,* it required minimal qualifications for agency employees, use of certain forms, certain approaches for recruiting and assessing foster families, the acceptance of a foster child within four hours of referral, approval of changes in placement, 24-hour access to the agency, and certain information from the agency. The court stated that the right

to such oversight didn't grant SRS the right to control in a general sense the manner in which the agency performed its duties on a daily basis.

The court in Home Design v. Department of Human Res. also held that Home Design didn't supervise the siding jobs in the true sense of the word, even though it would visit the job site and check the progress and any problems the siding installers were encountering. The court explained:

> It strikes us that a general contractor on a major project . . . would develop, in conjunction with the engineers, very detailed and specific instructions as to the work desired of the subcontractors, including the exact way certain items should be installed or erected, along with very specific cutoffs and deadlines for completion of various phases of the project. Surely it would not be seriously argued that such indicia would turn subcontractors into employees.

2 P.3d at 793. Home Design didn't instruct the siding installers on how to perform their tasks, but the evidence in this case doesn't show that FedEx retained the right to require drivers to follow managers' instructions as to the manner in which they performed.

Even though FedEx controls the area each driver must service, the services drivers must provide for customers, the prices charged for services, and certain customer service standards that drivers should meet, those requirements are result-oriented and would generally be expected of any hired party. FedEx doesn't have the right to dictate the course contractors take in completing routes, specific times contractors must pick up or deliver packages (except for some delivery and pick-up windows requested by the parties' mutual customers), or specifics as to

how contractors must complete their contractual obligations. FedEx supervises contractors and provides incentives for them to perform their work according to its suggested best practices, but the evidence doesn't show that FedEx has a right to require contractors to follow its advice. FedEx is bound by the terms and limitations set forth in the Operating Agreement.

Some facts suggest control — driver and vehicle appearance requirements, training provided by FedEx, and supervision and monitoring over drivers' work — but the facts also show that FedEx didn't have the right to ultimately control the means and methods used to complete the work.

### 3 . Length of Job Commitment

If the length of the job commitment is short, the worker is less apt to subject himself to control as to details. RESTATEMENT (SECOND) OF AGENCY, § 220, cmt. j (1958). The Operating Agreements are for an initial term of one, two, or three years and automatically renew absent notice of non-renewal. Non-renewal of the contract is permitted by either party upon thirty days' written notice before expiration of the term. FXHD OA, ¶ 8.2; FXG OA, ¶ 11.2. The contractor also may terminate the contract upon thirty days' prior written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1.

The Operating Agreement is for a definite term; FedEx can non-renew at the end of the term and the contractor can terminate upon thirty days' notice.

Although contractors aren't hired for short-term projects, the Operating Agreement doesn't necessarily contemplate a long-term relationship. This factor doesn't weigh strongly in favor of either party.

### 4. The Right to Employ Assistants

Contractors have the right to hire replacement drivers to run their routes or assistants to help with their routes, subject to FedEx's approval requirements. FedEx retains the right to monitor the replacement drivers' performance and hold the contractor responsible if the driver fails to comply with the requirements imposed upon the contractor. Contractors must, therefore, supervise their replacement drivers.

Because contractors can hire others to help perform their contractual obligations, they aren't personally subject to FedEx controls with respect to days, hours, or amount of work, leaving them free to work part-time or perform other jobs. Subject to FedEx approval, contractors can own more than one service area and hire other drivers to run their additional routes, providing the contractor with an opportunity to expand his business and income.

The contractors' ability to hire others to complete their work affords contractors more autonomy in running their business. This factor, therefore, weighs in favor of independent contractor status. Crawford v. Department of Human Res., 845 P.2d 707-708 (Crawford didn't require services be provided

personally by the demonstrators, a factor weighing in favor of independent contractor status).

### 5. Proprietary Interest in Routes

Contractors have a proprietary interest in their routes and as long as they are in good standing under the Operating Agreement, they can sell the route upon thirty days' written notice to FedEx. The new driver assignee must be acceptable to FedEx as qualified to provide services under the Operating Agreement. FXHD OA, ¶ 15; FXG OA, ¶ 18. The new driver, therefore, must meet the same minimum requirements and is subject to the same screening as contractors and temporary drivers. CRL-551, at 5. If FedEx terminates a contractor's agreement for cause, he cannot assign his contractual rights.

Contractors also have the ability to expand their routes by acquiring additional service areas from FedEx or other contractors as they become available, subject to FedEx approval. The contractor can own and operate more than one vehicle with the qualification that additional vehicles be driven by qualified operators. FedEx has certain restrictions on the maximum number of routes a contractor can own at any one terminal. Multiple work area contractors have a greater ability to profit from their routes than single work area contractors and so have greater entrepreneurial opportunities.

A contractor's proprietary interest in his route — *i.e.,* the right to sell the route or ability to obtain additional routes — weighs in favor of independent contractor status.

### 6. Furnishing of Necessary Tools, Supplies, and Materials

That a worker supplies his own tools is some evidence that he isn't an employee. RESTATEMENT (SECOND) OF AGENCY, § 220 cmt. k (1958); *see also* Home Design v. Department of Human Res., 2 P.3d at 793 (requirement that siding installer supply his own tools, while Home Design provided no equipment, weighed in favor of independent contractor status). The Operating Agreement provides that contractors "shall not be required to purchase or rent any products, equipment, or services from [FedEx] as a condition to entering into [the agreement]." OA, ¶ 7.

FedEx supplies contractors with software and a computer network for tracking packages and provides terminals and sorting equipment for packages, sales and marketing services, and customer service personnel. Contractors are responsible for obtaining other necessary equipment and supplies, including their vehicle. Contractors must maintain and bear all costs and expenses associated with their vehicles. OA, ¶¶ 1.2, 1.3. They can use their vehicles for other purposes when not carrying FedEx packages as long as identifying FedEx marks and logos are masked or removed. OA, ¶ 1.5.

FedEx dictates certain specifications for the equipment and supplies contractors must use. While contractors supply their own vehicles, the vehicles must meet FedEx's minimum specifications. FedEx decides the size and configuration of the vehicle appropriate for a particular route, and vehicles must be painted FedEx White and bear FedEx logos according to FedEx's specifications. Contractors must also obtain certain tools and supplies dictated by FedEx, some of which are FedEx specific, *e.g.,* uniform and scanners.

FedEx provides contractors an option of purchasing or renting supplies — FedEx uniforms, scanners, printers, and communications-related equipment — through FedEx's Business Support Package. Under that program, FedEx deducts the cost of the items purchased from the contractor's weekly settlement. FXHD OA, ¶ 7 and Addend. 6; FXG OA, ¶ 7 and Addend. 7. Prior to 2008, drivers could also purchase or lease vehicles directly from FedEx. Alternatively, contractors may purchase equipment and supplies through outside vendors who are generally recommended by FedEx.

Even though FedEx dictates certain specifications for the equipment and supplies and gives contractors the option of purchasing them through FedEx or recommended vendors, the responsibility for acquiring equipment and supplies ultimately rests with the contractors. The option to participate in certain programs doesn't establish a right to control. Because contractors are responsible for acquiring their vehicles and most other supplies necessary to the performance of

92

their work (excluding infrastructure), this factor weighs slightly in favor of independent contractor status.

### 7. Regular Business of the Employer

FedEx provides small-package pick-up and delivery services through a network of pick-up and delivery drivers. Home Delivery generally is responsible for residential delivery of packages and FedEx Ground generally is responsible for pick-up and delivery of packages to businesses.

The parties don't dispute that FedEx drivers' work is a regular and integral part of FedEx's business. FedEx Vice President of Contractor Relations Robert Ostrov testified that contractors are a cornerstone of FedEx's business. Ostrov Dep., pp. 192-193. Former FedEx CEO Dan Sullivan testified that the contractor is intended to be a "centerpiece" of FedEx's "work force" and is an "essential component of [FedEx's] business." Sullivan Dep., pp. 27, 106. This factor weighs in favor of employee status.

### 8. Compensation and Benefits

A court determining employment status also considers the method of payment, type of compensation, and negotiation of pay rates. "[P]ayment by the hour or the day is more indicative of an agency relationship, while payment by the job is more indicative of an independent contractor relationship." McDonnell v.

Music Stand, 886 P.2d 895, 899 (Kan. Ct. App. 1994). FedEx drivers aren't paid by the hour and not necessarily by the job. They are paid weekly and their compensation formula is based on fixed and variable factors, including a daily rate, piece rates, and bonuses. OA, ¶ 4.1 and Addend. 3. This method of payment doesn't weigh strongly in favor of either party.

FedEx also offers its drivers benefits, such as a driver-funded retirement plan, matching contributions to the "Service Guarantee Account," a college scholarship for drivers with children, and a time-off program based on seniority. But FedEx contractors can choose not to participate in these programs. That FedEx merely offers such benefits, therefore, doesn't weigh in favor of employee status.

Compensation rates aren't negotiated, except that contractors can choose not to sign yearly modified settlement addendum and others have requested and received changes to their core zone density settlement. *Compare* Lewis v. ASAP Land Express, Inc., 554 F. Supp. 2d 1217, 1225 (D. Kan. 2008) ("The record contains evidence that plaintiff could not negotiate pay based on his level of experience, which suggests employee status."); *with* Home Design v. Department of Human Res., 2 P.3d at 792-793 (noting that some more experienced installers would negotiate price with Home Design, a fact in favor of independent contractor status). Contractors' limited ability to negotiate compensation rates weighs slightly in favor of employee status.

On the other hand, FedEx has no responsibility to make deductions for, or to pay, health, welfare, and pension costs, withholding for income taxes, unemployment insurance premiums, Social Security taxes, or any other similar charges with respect to the contractors. OA, ¶ 4.2. Drivers must obtain and keep work accident or worker's compensation insurance. OA, ¶ 3.6. FedEx issues contractors a Form 1099 at the end of each year. These facts weigh in favor of independent contractor status. *See* Travelers Indem. Co. of Ill. v. Challenger Fence Co., Inc., 119 P.3d 666, 669 (Kan. Ct. App. 2005) (purported employer didn't pay taxes, unemployment insurance, disability insurance, or provide other benefits to plaintiff and plaintiff wasn't provided W-2 wages; these facts weighed in favor of independent contractor status); *cf.* Danes v. St. David's Episcopal Church, 752 P.2d at 660 (not withholding Social Security or income tax from agent's compensation doesn't alone establish agent's status as independent contractor).

### 9. Termination At Will

The inability to terminate a worker at will supports independent contractor status. *See* McDonnell v. Music Stand, 886 P.2d at 899 ("[S]ince the contract required a 30-day notice, termination at will was not permitted"; a factor favoring independent contractor status). The Operating Agreements allow termination under five limited circumstances, including by either party "if the other party breaches or fails to perform the contractual obligations imposed by [the]

Agreement," or by the contractor upon thirty days prior written notice. FXHD OA, ¶ 9.1; FXG OA, ¶ 12.1.

FedEx managers can recommend contract termination by documenting reasons for termination and discussing the contractor's file with the regional managing director. If the regional managing director agrees with the recommendation after reviewing supporting documentation, the file is forwarded to Contractor Relations for review and then to FedEx's legal department. Under the Operating Agreement, if a contractor believes he has been wrongfully terminated, he must submit his claim to arbitration. FXHD OA, ¶ 9.3 and Addend. 7; FXG OA, ¶ 12.3.

FedEx drivers aren't terminable at will. FedEx may terminate for breach of the Operating Agreement after several layers of review by FedEx management, and contractors can assert claims of wrongful termination through arbitration. *See* Richards v. Bryan, 879 P.2d 638, 645 (Kan. Ct. App. 1994) (employer couldn't terminate employment contract "for any reason, at its pleasure" where contract provided for discharge only in event plaintiff failed to "perform his duties credibly"); PaineWebber, Inc. v. Agron, 49 F.3d 347, 352 (8th Cir. 1995) (construing Kansas employment at-will doctrine and stating that contemplation of arbitration procedures "necessarily alters the employment relationship from at-will to something else — some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the

employment relationship"). This factor weighs in favor of independent contractor status.

### 10. Skill, Independent Business, and Kind of Occupation

The amount of skill required to complete a job is indicative of employment status. The skill factor focuses on whether the work requires performance by someone who is "highly educated or skilled" because such workers are less likely to submit to the hiring party's control. RESTATEMENT (SECOND) OF AGENCY, § 220 cmt. h (1958). The Operating Agreement requires the contractor to have a certain number of skills, including management of business expenses and costs (¶ 1.3), compliance with federal, state, and local licensing and regulatory requirements (¶¶ 1.6, 1.10), and training and management of additional drivers (¶ 1.14). Such skills aren't highly specialized; most of the contractor's required skills, such as driving and customer service skills, can be learned in the workplace, either through training (company orientation or QPDL when applicable) or on-the-job supervision. Multiple area contractors, on the other hand, must manage multiple routes and employees effectively and so must have a greater degree of business management skills than single area contractors. Drawing all reasonable inferences in favor of plaintiffs, this factor weighs in favor of independent contractor status for multiple area contractors, but not single area contractors.

97

Another factor the court should consider is whether the contractors are engaged in a distinct occupation or business. Some contractors have their own business and contract with FedEx through sole proprietorships or corporations. Contractors can be engaged in another occupation, especially if they choose to hire assistants or replacement drivers to help run their routes. Contractors can use their vehicles for other commercial or personal purposes when not actually carrying FedEx packages as long as identifying FedEx marks and logos are masked or removed. OA, ¶ 1.5. Since anecdotal evidence is excluded, the record contains no evidence that any contractor was engaged in a distinct occupation or business as a package pick-up or delivery driver. *Cf.* Lowe v. Surpas Res. Corp., 253 F. Supp. 2d at 1233 (debt collection agency hired by bank was in the business of collecting debts; a factor weighing in favor of independent contractor status). But the Operating Agreement doesn't give FedEx the right to prevent contractors from using their vehicles for other commercial purposes. This factor, therefore, weighs slightly in favor of independent contractor status.

The kind of occupation also can be indicative of employment status, depending on whether the work is usually done under the principal's direction or by a specialist without supervision. UPS, one of FedEx's primary competitors in the small package and delivery industry, performs its pick-up and delivery functions using employees. Other competitors — USPS and DHL — sometimes use contract carriers to pick-up and deliver packages. This factor weighs more in favor

98

of employee status because, in general, FedEx's primary competitors use employees to deliver and pick-up packages.

### 11. Totality of Circumstances

All of these factors are important when deciding employment status, but the most significant factor is the right to control. *See* <u>McCubbin v. Walker</u>, 886 P.2d at 795 ("The single most important factor in determining a worker's status as an employee or independent contractor is whether the employer controls, or has the right to control, the manner and methods of the worker in doing the particular task."). The court must determine whether FedEx has the right of control and supervision over the drivers' work, and the right to direct the manner in which the work is performed, as well as the result that is to be accomplished. <u>Wallis v. Secretary of Kan. Dep't of Human Res.</u>, 689 P.2d at 792. The court considers the totality of all the relevant facts when determining employment status.

When the facts in the record are undisputed or susceptible to only a single conclusion, the issue of employment status is a question of law for the court. <u>Mitzner v. State Dep't of SRS</u>, 891 P.2d 435, 438 (Kan. Ct. App. 2001). When all reasonable inferences are drawn in plaintiffs' favor, the evidence is insufficient to show that FedEx retained the right to control the plaintiffs and direct the manner in which they performed their work.

99

The evidence shows that FedEx retains the right to control the days of service, daily workload, and certain parameters when pick-ups or deliveries must be made. FedEx also retains the right to determine and enforce driver and vehicle appearance and vehicle suitability standards. FedEx offers training, supervises and monitors the drivers' work, and suggests best practices to drivers to follow in the performance of their work. While these facts weigh in favor of employee status, they are insufficient to show a right to control the manner and means of the drivers' work. FedEx can't control the drivers' specific work schedule, and contractors can hire assistants or replacement drivers to complete their assigned work, relieving them of any time restrictions or workload requirements. The evidence doesn't establish that FedEx has a right to require drivers to follow its suggested best practices; contractors can choose the best way to manage their routes as long as they are meeting the customer service obligations set forth in the Operating Agreement. FedEx's customer service requirements focus on the results expected of contractors in performing their assigned work, not the means and methods of their performance. Control over the results of the work — telling the worker what work must be accomplished — doesn't indicate employee status. McCubbin v. Walker, 886 P.2d at 799. Accordingly, while there are facts pointing to FedEx's right to control, they don't raise to the level of control necessary to show employee status.

If several other factors weighed strongly in favor of employee status, the right to control analysis, standing alone, might not be enough under these facts to establish independent contractor status. But many of the other factors also point to independent contractor status, and when viewing all the various factors together, the court finds that the drivers are independent contractor as a matter of law.

Importantly, the parties' intent pursuant to the terms in the Operating Agreement was to enter into an independent contractor relationship. The court in Lowe v. Surpas Res. Corp., held that the bank's great latitude to review the debt collection agency's collection activity didn't overcome the unambiguous intent of the contracting parties to establish an independent contractor relationship. 253 F. Supp. 2d at 1233. Similarly, the type and extent of control FedEx exercises doesn't outweigh the parties' unambiguous intent to create an independent contractor arrangement.

Other factors also weigh in favor of independent contractor status. Contractors have the ability to hire others to complete their work, which gives them more freedom in running their business. Contractors have a proprietary interest in their routes and can sell them to another qualified driver. If they become multiple area contractors, they can increase their entrepreneurial opportunities and ability to earn profits. Contractors are responsible for acquiring a vehicle and can use the vehicles for other commercial purposes. Finally,

contractors aren't terminable at will; FedEx can only terminate for breach of the Operating Agreement after several layers of review by FedEx management, and contractors can assert claims of wrongful termination through arbitration.

Although the contractors' work is a regular and integral part of FedEx's business, the skill required for single area contractors isn't highly specialized, and FedEx's competitors generally use employees to complete pick-up and delivery services, the other relevant factors favor independent contractor status. Accordingly, the court holds that after considering all the relevant factors, the drivers are independent contractors as a matter of law. Pursuant to the plaintiffs' agreement during class certification, the court notes that it makes this finding based on a limited review of the evidence relevant to the right to control, not actual exercise of control.

## IV. CONCLUSION

For these reasons, the court GRANTS IN PART FedEx's motion to strike individualized proof (doc. # 1398); DENIES the plaintiffs' motions to augment the record (doc. ## 1992, 2064, 2087); DENIES FedEx's request for oral argument (doc. ## 1400 and 1471); DENIES the plaintiffs' motion for summary judgment (doc. ## 1163 and 1248); and GRANTS FedEx's motion for summary judgment (doc. # 1215).

In class action cases where summary judgment motions pend, the court INSTRUCTS the parties to file a supplement statement within thirty days, not to exceed five pages, indicating why the outcome should be different or the same as this Kansas opinion.

SO ORDERED.

ENTERED:   August 11, 2010

/s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | | |
|---|---|---|
| ------------------------------------------------------ ) | | |
| ) | | |
| In re FEDEX GROUND PACKAGE ) | | |
| SYSTEM, INC., EMPLOYMENT ) | Case No. 3:05-MD-527 RM | |
| PRACTICES LITIGATION ) | (MDL 1700) | |
| ) | | |
| ------------------------------------------------------ ) | CHIEF JUDGE MILLER | |
| THIS DOCUMENT RELATES TO: ) | MAGISTRATE NUECHTERLEIN | |
| ) | | |
| ALL ACTIONS ) | | |
| ------------------------------------------------------ ) | | |

---

## PLAINTIFFS' UNOPPOSED MOTION FOR ADDITIONAL TIME
## IN WHICH TO FILE 5-PAGE BRIEFS REQUIRED BY THE COURT'S
## AUGUST 11, 2010 ORDER (DOC. NO. 2097)

---

Plaintiffs hereby move the Court for the following relief, which relief Defendant does not

oppose, permitting both parties an extra two week period within which to file the five-page briefs

required by the Court in its Order of August 11, 2010 (Doc. No. 2097) by July 24, 2010, for good

cause shown herein, as follows:

(1)  On August 11, 2010, the court gave the parties thirty days within which to file briefs

up to five-pages in the "class action cases where summary judgment motions pend"

(Doc. No. 2097, at p. 103).

(2)  Besides *Craig v. PedEx Ground*, there are twenty-seven cases in which the Court

certified statewide classes; of those, there are fifteen cases where cross-motions for

summary adjudication/judgment on employment status are pending and an additional

twelve cases where Plaintiffs alone moved for summary adjudication of employment

status.

(3) Additional time is needed by Plaintiffs because the issuance of the Court's order could not be anticipated and co-lead counsel are unavailable for significant portions of the thirty day period granted by the Court.  Plaintiffs' co-lead counsel Susan Ellingstad is out of the country between August 11 through August 30 on a previously scheduled vacation; Plaintiffs' co-lead counsel Robert Harwood will similarly be out of the country on a previously scheduled trip for half of the thirty day period; and Plaintiffs' co-lead counsel Lynn Rossman Faris is scheduled for surgery on September 3, 2010 and will be incapacitated for part of the thirty day period as well.

(4)  Given the duration of this case, an additional two-week period for the filing of 27 briefs will not unduly or unreasonably delay the litigation.

(5)  Plaintiffs sought agreement from the Defendant and were informed that the Defendant does not oppose the relief sought.

THEREFORE, Plaintiffs ask the Court to grant a brief extension of time to file the aforementioned briefs by September 24, 2010.

Dated:  August 20, 2009        Respectfully submitted,

LEONARD CARDER, LLP

By:    /s/ Lynn Rossman Faris
      Lynn Rossman Faris
      1330 Broadway, Suite 1450
      Oakland, CA  94612
      Tel:    (510) 272-0169
      Fax:    (510) 272-0174
      Email: lfaris@leonardcarder.com

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:     (612) 339-6900
Fax:     (612) 339-0981
Email: seellingstad@locklaw.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:     (212) 935-7400
Fax:     (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

```
------------------------------------------------- )
                                                   )
In re FEDEX GROUND PACKAGE                         )
SYSTEM, INC., EMPLOYMENT                            )    Case No. 3:05-MD-527 RM
PRACTICES LITIGATION                               )    (MDL 1700)
                                                   )
------------------------------------------------- )    CHIEF JUDGE MILLER
THIS DOCUMENT RELATES TO:                          )    MAGISTRATE NUECHTERLEIN
                                                   )
ALL ACTIONS                                        )
------------------------------------------------- )
```

---

**PLAINTIFFS' AMENDED UNOPPOSED MOTION FOR ADDITIONAL TIME
IN WHICH TO FILE 5-PAGE BRIEFS REQUIRED BY THE COURT'S
AUGUST 11, 2010 ORDER (DOC. NO. 2097)**

---

Plaintiffs hereby move the Court for the following relief, which relief Defendant does not

oppose, permitting both parties an extra two week period within which to file the five-page briefs

required by the Court in its Order of August 11, 2010 (Doc. No. 2097) by September 24, 2010,

for good cause shown herein, as follows:

(1)  On August 11, 2010, the court gave the parties thirty days within which to file briefs

up to five-pages in the "class action cases where summary judgment motions pend"

(Doc. No. 2097, at p. 103).

(2)  Besides *Craig v. PedEx Ground*, there are twenty-seven cases in which the Court

certified statewide classes; of those, there are fifteen cases where cross-motions for

summary adjudication/judgment on employment status are pending and an additional

twelve cases where Plaintiffs alone moved for summary adjudication of employment

status.

(3) Additional time is needed by Plaintiffs because the issuance of the Court's order could not be anticipated and co-lead counsel are unavailable for significant portions of the thirty day period granted by the Court. Plaintiffs' co-lead counsel Susan Ellingstad is out of the country between August 11 through August 30 on a previously scheduled vacation; Plaintiffs' co-lead counsel Robert Harwood will similarly be out of the country on a previously scheduled trip for half of the thirty day period; and Plaintiffs' co-lead counsel Lynn Rossman Faris is scheduled for surgery on September 3, 2010 and will be incapacitated for part of the thirty day period as well.

(4) Given the duration of this case, an additional two-week period for the filing of 27 briefs will not unduly or unreasonably delay the litigation.

(5) Plaintiffs sought agreement from the Defendant and were informed that the Defendant does not oppose the relief sought.

THEREFORE, Plaintiffs ask the Court to grant a brief extension of time to file the aforementioned briefs by September 24, 2010.

Dated: August 20, 2009                    Respectfully submitted,

                                          LEONARD CARDER, LLP


                                   By:    /s/ Lynn Rossman Faris
                                          Lynn Rossman Faris
                                          1330 Broadway, Suite 1450
                                          Oakland, CA 94612
                                          Tel:    (510) 272-0169
                                          Fax:    (510) 272-0174
                                          Email: lfaris@leonardcarder.com

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981
Email: seellingstad@locklaw.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| ----------------------------------------------- THIS DOCUMENT RELATES TO: ALL CASES | ) ) ) ) ) | |

ORDER

The court GRANTS Plaintiffs' unopposed motion [Doc. Nos. 2108 & 2109] for additional time to file five-page supplemental briefs required by this court's August 11, 2010 Opinion and Order. It is ORDERED that plaintiffs and defendants shall file their supplemental briefs on or before **September 24, 2010**.

SO ORDERED.

ENTERED: August 23, 2010

_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

---------------------------------------------------  ) Cause No. 3:05-MD-527-RM
                                               ) (MDL 1700)

In re FEDEX GROUND PACKAGE  SYSTEM,   )
INC., EMPLOYMENT                             )
PRACTICES LITIGATION                   )
                                                    )
---------------------------------------------------  )

THIS DOCUMENT RELATES TO:       )
                                                      )

*Jon Leighter, et al. v. FedEx Ground*   )
*Package System, Inc., et al.*               )
*Civil No. 3:07-cv-00328-RLM-CAN* (OR)   )
                                                    )

*Edward Slayman, et al. v. FedEx Ground*  )
*Package System, Inc., et al.*               )
*Civil No. 3 :05-cv-00596-RLM-CAN* (OR)   )
---------------------------------------------------

## OREGON PLAINTIFFS' SUPPLEMENTAL
## STATEMENT IN SUPPORT OF THEIR MOTION
## <u>FOR SUMMARY ADJUDICATION</u>

The Oregon plaintiffs submit this supplemental statement pursuant to this Court's instruction in its August 11, 2010 Opinion and Order denying the Kansas plaintiffs' motion for summary adjudication and granting FedEx's cross-motion for summary judgment (Doc. 2097, hereinafter "Kansas Order" or "Order"). This case differs from the Kansas case procedurally in that FedEx has not moved for summary judgment. Rather, FedEx opposes the Oregon plaintiffs' motion only on the ground that questions of fact exist with regard to determining the Oregon plaintiffs' employment status and that, therefore, FedEx is entitled to a trial. This case also differs from the Kansas case substantively in that Oregon courts consider different factors and a different analysis in determining employment status.[1] As the Court held, "varying factors and analysis can lead to different results; one jurisdiction's finding of what is sufficient to establish a right to control may not be sufficient in another jurisdiction . . . . Even if courts apply the same employment test, the relevant factors might not be analyzed and applied uniformly." (Doc. 2029 at 34.) Analyzing this Court's findings in the Kansas Opinion under Oregon law, the facts of this case and the reasonable inferences that can be drawn from those facts – even when viewed in FedEx's favor – plainly establish that the drivers are employees under Oregon law.

## I. The Procedural Posture of this Case Warrants a Different Outcome.

FedEx did not move for summary judgment. Rather, it argued that "genuine issues of material fact preclude summary judgment" in this case. (Doc. 1901 at 7.) Thus, even if the Court rejects Plaintiffs' assertion that the evidence permits only the conclusion that the drivers are employees under Oregon law, the Court should require a jury trial on this issue – there is no occasion to consider entering judgment in favor of FedEx.

If, however, the Court were to consider entering judgment in favor of FedEx, it must view the evidence and <u>all reasonable inferences</u> that may be drawn from the evidence in the light

---

[1] Plaintiffs do not waive the argument that, despite any differences, the right to control test in Oregon is sufficiently similar to California as to justify the application of collateral estoppel of the *Estrada* action.

most favorable to the Oregon plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As shown herein, controlling Oregon law establishes that, at a minimum, reasonable inferences could be drawn from the Court's findings of fact in the Kansas Opinion that would support a finding that the drivers are employees under Oregon law.[2] Therefore, the Court may not properly grant summary judgment to FedEx in this case.

## II. Oregon Courts Evaluate and Apply the Right to Control Test Differently than Kansas Courts.

The four primary factors that Oregon courts consider when applying the right to control test are: "(1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire." *Stamp v. Dep't of Consumer and Bus. Servs.*, 9 P.3d 729, 731 (Or. App. 2000) (citing *Kaiel v. Cultural Homestay Institute*, 879 P.2d 1319, 1322-23 (Or. App. 1994)).

### A. Under Oregon Law, a Single Factor Indicating an Employee Relationship May Constitute Proof of Employment.

This Court has held that "Kansas courts have applied the right to control test to find employee status when the employer retained control over <u>numerous</u> aspects of the employe[e]'s work." (Order at 64 (emphasis added)). By contrast, under Oregon law, "<u>a single factor that indicates an employer-employee relationship may constitute proof of an employment relationship</u> whereas contrary evidence, indicating independent contractor status, is, at best, mildly persuasive and may have no effect at all to a determination of worker status." *Stamp*, 9 P.3d at 733 (emphasis added); *see also Cy Inv. Inc. v. Nat'l Council on Compensation Ins.*, 876 P.2d 805, 807-08 (Or. App. 1994) (reversing determination that individuals were independent contractors

---

[2] In *Huggins v. FedEx Ground Package System, Inc.*, 592 F.3d 853 (8th Cir. 2010) and *Narayan v. EGL, Inc.*, -- F.3d --, 2010 WL3035487 (9th Cir., July 13, 2010), the Eighth and Ninth Circuits, respectively, reversed trial court orders granting summary judgment. In both cases, the district courts held that delivery drivers exactly like those here were independent contractors. The circuit courts reversed on the ground that evidence like that in the record here could support a finding that the drivers were employees. Contractual provisions characterizing the drivers as independent contractors and giving the drivers some discretion over their work were not determinative. The Ninth Circuit relied on Judge Easterbrook's opinion in *Secretary of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987), which suggests that a multi-factor employment test <u>requires</u> a trial where the factors must be weighed and inferences to be drawn are subject to legitimate dispute. 2010 WL 3035487 at *5 (quoting *Lauritzen*, 835 F.2d at 1542-43).

where one factor supported finding that individuals were independent contractors but other factors were inconclusive). For instance, the *Stamp* Court held that an individual was an employee even though only one of the four factors that the court considered indicated an employment relationship and the other three factors either indicated an independent contractor relationship or were inconclusive. 9 P.3d at 734-35.

This Court already has found that – with respect to determining employment status – "there are facts in the record that cut both ways." (Order at 69). Specifically, this Court has found numerous factors indicating employee status. (*E.g.*, *id* at 93 ("The parties don't dispute that FedEx drivers' work is a regular and integral part of FedEx's business."); *id.* at 100 ("The evidence shows that FedEx retains the right to control the days of service, daily workload, and certain parameters when pick-ups or deliveries must be made. FedEx also retains the right to determine and enforce driver and vehicle appearance and vehicle suitability requirements.")). At a minimum, under Oregon law, the conflicting evidence gives rise to a question of fact for a jury.

### B. Controlling Oregon Law Establishes that the Oregon Plaintiffs Are Employees as a Matter of Law.

In *HDG Enterprises Inc. v. Nat'l Council on Comp. Ins.*, 856 P.2d 1037 (Or. App. 1993), the Oregon Court of Appeals concluded that HDG had the right to control floor covering installers where: (1) HDG directed the time and place of installation; (2) the installation was in accordance with HDG's specifications; (3) written agreements indicated the degree of control that HDG could exercise; (4) HDG specified the nature and quality of the desired product; (5) HDG did not physically supervise the installation; and (6) customers turned to HDG if there was a problem with the quality of the installation. *Id.* at 518. Similarly, in *Stamp*, the court held, based on similar facts, that a tile installer was an employee of a swimming pool building company that hired him to perform tile work on a number of swimming pools that it installed. 9 P.3d at 734. By contrast, in *Home Design, Inc. v. Kansas Dep't of Human Res.*, 2 P.3d 789 (Kan. App. 2000), the Kansas court held, based on facts similar to those in *HDG Enterprises* and

*Stamp*, that siding installers were independent contractors.  *Id.* at 793-94.  A comparison of these cases illustrates the differing analyses under Oregon and Kansas law.

On the one hand, the Kansas *Home Designs* Court found that the company controlled only the results of the siding installers' work, but not how the work was performed.  The court also found that "visit[ing] the job site and check[ing] the progress and any problems the siding installers were encountering" did not constitute supervision "in the true sense of the word."  *Home Design*, 2 P. 3d at 793.  This analysis led the *Home Designs* Court to conclude that the siding installers were independent contractors.

On the other hand, the Oregon *HDG Enterprises* and *Stamp* Courts found that providing specifications about the nature and quality of the work to be completed alone weighed in favor of employee status.  *HDG Enterprises*, 121 Or. App. at 518; *Stamp*, 9 P.3d at 734.  In addition, the courts found that employee status existed despite a complete lack of onsite supervision.  *HDG Enterprises*, 121 Or. App. at 518; *Stamp*, 9 P.3d at 734.

While this Court stated that the facts of this case are distinguishable from *Wallis v. Secretary of Kan. Dep't of Human Res.*, 689 P.2d 787 (Kan. 1984) and *Danes v. St. David's Episcopal Church*, 752 P.2d 653 (Kan. 1988), which both held that an individual was an employee, the facts here are not distinguishable from *HDG Enterprises* and *Stamp*.  The Court has found that FedEx "controls the area each driver must service, the services drivers must provide for customers, the prices charged for services, and certain customer service standards that drivers should meet." (Order at 87).  On a daily basis, FedEx assigns the work, "track[s] the drivers' performance" (*id.* at 82-83), and requires drivers to "deliver all packages assigned to them that day based on a nine to eleven hour day" (*id.* at 76), between FedEx's morning load time and evening check-in (*id.* at 26).  FedEx "review[s the drivers'] performance through various audits and customer service rides" (*id.* at 29), and handles all customer pricing and billing, SUF ¶¶9-10.  Even though this Court has found that, under its interpretation of Kansas law, "FedEx directs the results, but not the manner and means, of [the drivers'] work" (Order at

4

71), the evidence and the controlling Oregon cases establish just the opposite. At a minimum, the facts and the reasonable inferences arising from those facts warrant a trial.

### C. Contractual Language Characterizing an Individual as an Independent Contractor Carries Less Weight under Oregon Law.

In the Kansas Opinion, the Court found that *Lowe v. Surpas Resource Corp.*, 253 F.Supp.2d 1209 (D. Kan. 2003), establishes that, under Kansas law, the "intent of [the] parties to create [an] independent contractor relationship [as] evidenced by unambiguous language in the [parties'] agreement was [a] factor weighing heavily in favor of independent contractor status." (Order at 71). This is not true in Oregon, where the retention of a right to control prevails over inconsistent contractual characterizations. *See Wallowa Valley Stages, Inc. v. Oregonian Publishing Co.*, 386 P.2d 430, 433-44 (Or. 1963); *Schaff v. Ray's Land & Sea Food Co., Inc.*, 45 P.3d 936, 941 (Or. 2002). Indeed, a contractual characterization – like any other single factor indicating independent contractor status – "is, at best, mildly persuasive and <u>may have no effect at all</u> to a determination of worker status." *Stamp*, 9 P.3d at 733 (emphasis added).

For instance, in *Wallowa Valley*, an agreement between an individual and his alleged employer referred to the individual as an "Independent Dealer's Franchise." 386 P.2d at 430-31. The court held that "[t]he jury was not bound to take the . . . language of the written contract at face value." *Id.* at 433. Rather, in determining the individual's status, the jury "was entitled to look beyond the written instrument and draw from the evidence its own inferences concerning the behavior of the parties." *Id.* In other words, contractual language does not support a finding of independent contractor status as a matter of law. At most, it is up to a jury to consider the contractual language and other relevant facts and to draw inferences from those facts.

### III. Conclusion.

Given that the analysis of the factors under Oregon law are more favorable to the drivers than under Kansas law, the Oregon plaintiffs respectfully request that the Court grant their motion for summary adjudication. Alternatively, for the same reason and given that FedEx has not moved for summary judgment, the Oregon plaintiffs request that the Court order a trial.

Dated: September 24, 2010

Respectfully submitted,
LEONARD CARDER, LLP

_____/s/ **Lynn Rossman Faris**_____
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

## PLAINTIFFS' CO-LEAD COUNSEL

Steve D. Larson
David F. Rees
STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.
209 Southwest Oak Street, 5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

Peter N. Wasylyk
LAW OFFICES OF PETER N.
WASYLYK
13 07 Chalkstone Avenue
Providence, RI 02098
Tel: (401) 83 1-7730
Fax: (401) 861-6064

Jordan M. Lewis
SIEGEL, BRILL, GREUPNER, DUFFY &
FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN 55401
Tel: (612) 337-6100
Fax: (612) 339-6591

## OREGON PLAINTIFFS' COUNSEL

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

## PLAINTIFFS' LIAISON COUNSEL

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

-----------------------------------------------------------
)
In re FEDEX GROUND PACKAGE )
SYSTEM, INC., EMPLOYMENT )
PRACTICES LITIGATION )
-----------------------------------------------------------)
THIS DOCUMENT RELATES TO: )
)
   *Slayman v. FedEx Ground*, 05-cv-596 (OR) )
)
   *Leighter v. FedEx Ground*, 07-cv-328 (OR) )
-----------------------------------------------------------)

Case No. 3:05-MD-527-RM
(MDL 1700)


JUDGE MILLER

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
SUPPLEMENTAL STATEMENT REGARDING SUMMARY
JUDGMENT ON THE CLASSIFICATION ISSUE**

---

In its August 11, 2010 Order, the Court applied a right to control test to find the Kansas plaintiffs independent contractors as a matter of law. Because Oregon's right to control test favors FXG no less than the Kansas test, the Court should—especially because it must view the record in the light most favorable to FXG—deny plaintiffs' motion for summary judgment. Indeed, the only reasonable view of the "commonly applicable" facts, (8/11/10 Order [Doc. No. 2097] at 1), under Oregon as well as Kansas law is that plaintiffs are independent contractors.

Though FXG did not file a cross summary judgment motion in Oregon, the entry of summary judgment in its favor is appropriate. Oregon courts grant summary judgment when the evidence allows only one reasonable inference as to status, despite their view that classification generally presents a question of fact. (8/11/10 Order at 60; FXG's MSJ Opp. [Doc. No. 1901] at 6.) Further, the parties have fully briefed the issues, thus placing before the Court all facts and law necessary to rule on plaintiffs' status. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."). As this Court observed in granting summary judgment to the non-moving party in *Rosado v. Taylor*, "drawing legal conclusions from undisputed facts after an issue has been fully briefed is the very stuff of summary judgment." 324 F. Supp. 2d 917, 924 (N.D. Ind. 2004). Judicial economy weighs in favor of summary judgment, rather than a jury trial in Oregon, given the common record and similarities between Kansas and Oregon law.

## I.      THE OREGON PLAINTIFFS ARE INDEPENDENT CONTRACTORS

Oregon, like Kansas, uses a "'right to control' test to decide a worker's status." (7/27/09 Order [Doc. No. 1770] at 59; 8/11/10 Order at 62.) Courts consider four factors in applying this test: "(1) the right to . . . control; (2) the method of payment; (3) the furnishing of equipment; and

(4) the right to fire." *Perri v. Certified Languages Int'l, LLC*, 66 P.3d 531, 535 (Or. Ct. App.

2003). Oregon law is consistent with the Court's analysis of similar factors under Kansas law.

    **A.**    <u>**The Right To Control Factor Favors Contractor Status.**</u>

    In Oregon, as in Kansas, the "right to control" relates to control over "the manner and

means of accomplishing the result, not the right to control the result itself." *Reforestation Gen.*

*Contractors, Inc. v. Nat'l Council on Comp. Ins.*, 872 P.2d 423, 431-32 (Or. Ct. App. 1994);

(8/11/10 Order at 70). The limited control FXG retains under the OA is insufficient to support

employee status under Oregon law. Like in Kansas, FXG's general, results-oriented

"instructions" are not evidence that it has the right to control the Oregon plaintiffs' work

methods. (8/11/10 Order at 70); *Bob Wilkes Falling, Inc. v. Nat'l Council on Comp. Ins.*, 878

P.2d 1136, 1139 (Or. Ct. App. 1994) (holding contractual requirement to perform job in a "good

and workmanlike manner" dealt "with the desired result of the contract, not the manner and

means of its performance"). And the OA's requirement that the Oregon contractors *complete*

assigned work does not give FXG any more right to control *how* the work is done than it did in

Kansas. *Compare Bob Wilkes Falling, Inc.*, 878 P.2d at 1139 (contractor status even though

hiring party "pointed out the boundaries of the timber to be cut, set a completion date, specified

log lengths"), *with* (8/11/10 Order at 78 (similar requirements did not support employee status)).

    Moreover, like in Kansas, the OA's branding provisions do not show FXG's right to

control "the means or methods of the drivers' work." (8/11/10 Order at 79-80); *Schaff v. Ray's*

*Land & Sea Food Co.*, 45 P.3d 936, 938 (Or. 2002) (finding independent contractor status as a

matter of law where worker was required to use equipment with hiring party's name). Similarly,

no Oregon employer would have supervisory rights as limited as FXG's or lack the authority to

offer anything more than "suggestions and best practices," (8/11/10 Order at 3), to its workers.

*Schaff*, 45 P.3d at 938 (independent contractors advised on "techniques and suggested prices");

*see also Or. Drywall Sys., Inc. v. Nat'l Council on Comp. Ins.*, 958 P.2d 195, 198 (Or. Ct. App. 1998) ("[T]he monitoring of progress toward job completion does not amount to the exercise of direction and control over the means and method of doing the work.").

Consistent with the Court's finding in Kansas, even when viewing the facts in the light most favorable to plaintiffs, the "only reasonable inference" from the record is that FXG "hasn't retained the right to control the details of the contractors' work methods."  (8/11/10 Order at 72-73); *Reforestation Gen. Contractors*, 872 P.2d at 432 (finding contractor status where hiring party "retained no control" over workers' methods).

**B.     The Method Of Payment Favors Contractor Status.**

As in Kansas, the method of payment factor considers whether the principal makes payroll deductions and issues Form 1099s.  *Lockard v. Murphy Co.*, 619 P.2d 283, 285 (Or. Ct. App. 1980); *Dutson v. Farmers Ins. Exch.*, 815 F. Supp. 349, 351 (D. Or. 1993); (8/11/10 Order at 95).  Although the Court found that parts of the method of payment factor were neutral or "slightly" favored employee status in Kansas, (*id.* at 94), its conclusion that the facts that FXG does not make deductions from the contractors' pay and issues them 1099s "weigh in favor" of contractor status applies equally in Oregon.  *Lockard*, 619 P.2d at 285 (finding fact that defendant did not make "payroll deductions" supported contractor status).  Further, the fact that contractors can "expand [their] business[es] and income" by acquiring additional work areas and hiring helpers, (8/11/10 Order at 89), supports contractor status.  *Dutson*, 815 F. Supp. at 351 (contractor status where agent's earnings did not "depend on the number of hours he work[ed] but upon his efforts and skill in placing business and writing insurance").

**C.     The Furnishing Of Equipment Factor Supports Contractor Status.**

Plaintiffs' responsibility for acquiring their own "equipment and supplies" supports contractor status under the furnishing of equipment factor as much as it did under Kansas law.

(8/11/10 Order at 91-92); *Schaff*, 45 P.3d at 942 (worker's payment of "all his own expenses, including insurance," supported contractor status); *Lockard*, 619 P.2d at 286 (same).

    **D.**      **The Right Of Termination Factor Supports Contractor Status.**

Under Oregon law, as under Kansas law, the fact that plaintiffs are not terminable at will strongly supports independent contractor status. (8/11/10 Order at 96-97); *Henn v. State Accident Ins. Fund Corp.*, 654 P.2d 1129, 1131 (Or. Ct. App. 1982) (contractor status where agreement provided that worker could not be discharged except for contractual violations). And, as in Kansas, plaintiffs' right to arbitrate termination claims supports contractor status under the right of termination factor. (8/11/10 Order at 96); *Bob Wilkes Falling*, 878 P.2d at 1139.

Accordingly, all four factors considered under Oregon's right to control test weigh in favor of independent contractor status. *Cf. Stamp v. Dep't of Consumer & Bus. Servs.*, 9 P.3d 729, 734 (Or. Ct. App. 2000) (affirming agency's finding of employee status where two factors were neutral, only one favored contractor status, and the "right to control factor" favored employment). As in Kansas, because there are no "reasonable inferences that a jury could draw" from the facts that support employment status, plaintiffs are independent contractors under Oregon law. *Schaff*, 45 P.3d at 941; (8/11/10 Order at 99 (concluding that facts are "insufficient" to show FXG "retained the right to control the plaintiffs").)

## II.    OTHER FACTORS DO NOT SUPPORT A REASONABLE INFERENCE OF EMPLOYEE STATUS

In addition to the four-factor test, some Oregon courts have also considered the factors applied by Oregon's Bureau of Labor and Industries ("BOLI"). *See Chard v. Beauty-N-Beast Salon*, 941 P.2d 611, 614 (Or. Ct. App. 1997). Even if the Court were to examine these extra factors, none support a reasonable inference of employee status. As in Kansas, the parties' intent to create an independent contractor relationship weighs in favor of independent contractor status.

*Henn*, 654 P.2d at 1131 ("[S]tatement that the parties intend the relationship of independent contractor . . . may swing the balance."); (8/11/10 Order at 72 (parties' intent "strongly" supports contractor status)). Contractors' rights to set their own work hours, to hire others, and to work for competitors are inconsistent with employee status in Oregon, as they were in Kansas. *Lockard*, 619 P.2d at 285-86 (hiring assistants and working for others); *Cantua v. Creager*, 7 P.3d 693, 701 (Or. Ct. App. 2000) (setting work hours); (*accord* 8/11/10 Order at 9, 73, 89-90). And while the length of employment factor may have been neutral in Kansas (8/11/10 Order at 88-89), the Oregon Supreme Court has held that evidence a contractor worked for a company for over four years did not support a reasonable inference of control. *See Schaff*, 45 P.3d at 942. Indeed, the only BOLI factor that may favor employee status is that some of FXG's competitors use employees. (8/11/10 Order at 98-99.) As in Kansas, however, the "totality of circumstances," (*id.* at 99), show that plaintiffs are independent contractors as a matter of law. *Chard*, 941 P.2d at 615 (examining the "totality" of proof under BOLI test).

For the foregoing reasons, FXG requests that the Court grant summary judgment in its favor and deny plaintiffs' motion for summary judgment.

Dated: September 24, 2010

Respectfully submitted,

By: /s/ Victor Jih
Victor Jih

Thomas J. Brunner                            Robert M. Schwartz
Alison G. Fox                                Victor Jih
BAKER & DANIELS LLP                          O'MELVENY & MYERS LLP
202 S. Michigan St.                          1999 Avenue of the Stars, Suite 700
South Bend, IN 46601                         Los Angeles, CA 90067-6035
Tel: (574) 234-4149                          Tel: (310) 553-6700
Fax: (574) 239-1900                          Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 24th day of September, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

Peter W. Overs, Jr.
povers@whesq.com

Mark A Friel
mfriel@stollberne.com

Steve D Larson
slarson@ssbls.com

The undersigned further certifies that a copy of the foregoing was mailed by United States Postal Service to the following non-CM/ECF participant:

David F Rees
Joshua L Ross
Stoll Stoll Berne Lokting & Shlachter PC
209 SW Oak Street Fifth Floor
Portland, OR 97204

By: /s/ Victor Jih

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE
SYSTEM, INC., EMPLOYMENT
PRACTICES LITIGATION

)
)
)
)
)
)
)
)
)
)
)

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

---

## UNOPPOSED MOTION TO CORRECT THE DOCKET

Since the Judicial Panel on Multidistrict Litigation created this MDL over five years ago, almost 75 cases have been consolidated before this Court.  Over time, as new cases were filed and transferred to this MDL, and as counsel entered and withdrew their appearances in the master case number and the individual constituent cases, the docket no longer fully reflected the proper defense counsel in each.  FedEx Ground Package System, Inc. ("FedEx Ground") therefore respectfully moves this Court to direct the Clerk to correct each case's docket as described below.  Counsel for FedEx Ground conferred with the Clerk's office regarding the issues surrounding the identification and correction of FedEx Ground's counsel in the constituent MDL cases, and the Clerk's office suggested filing an omnibus motion to effectuate the necessary changes.

Plaintiffs do not oppose this motion.

The requests herein are to remove some attorneys and change the cases with which some attorneys are affiliated.  FedEx Ground is not requesting that the Court add any new attorneys;

1

all attorneys subject to this motion have already entered their appearance somewhere in the MDL.

  FedEx Ground also respectfully requests that its name be corrected and standardized across the various cases within the MDL, as described below for each case's docket.  FedEx Ground is the proper defendant in these suits.  FedEx Home Delivery is not a separate legal entity and should not be separately listed as a defendant.

# I.  THE MDL 1700 DOCKET
## CASE NUMBER 3:05-MD-527

A.     FedEx Ground requests that the Court direct the Clerk to:

1.     Create an entity named "All FedEx Ground Defendants."[1]

2.     List the following attorneys as counsel for "All FedEx Ground Defendants":

a.     From O'Melveny & Myers LLP:

(1)     Cameron H Biscay

(2)     Kenneth L Blalack, II

(3)     Guy Brenner

(4)     Robin Devaux[2]

(5)     Michael W Garrrison

(6)     Chris A Hollinger

(7)     Victor H Jih

(8)     Aparna B Joshi

(9)     Carolyn J Kubota

(10)    Michael G McGuinness

(11)    Jennifer Merzon Evans[3]

(12)    Jeffrey S Nestler

(13)    Nora M Puckett

(14)    Laura E Robinson

(15)    Robert M Schwartz

(16)    Scott Voelz

---

[1] Administratively, this will allow documents filed by FedEx Ground that have applicability to more than one case to be easily identified.  In fact, there is already an entity in the CM/ECF system named "All Plaintiffs," which allows plaintiffs to do the same thing.

[2] Appearance was entered as Robin Dean.

[3] Appearance was entered as Jennifer Lee Merzon.

       b.      From Baker & Daniels LLP:

            (1)     Thomas J Brunner, Jr

            (2)     Alison G Fox

            (3)     D Lucetta Pope

## II.  ALABAMA (FLOYD)
## CASE NUMBER 3:06-CV-428

A.     FedEx Ground requests that the Court direct the Clerk to:

     1.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.[4]

     2.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

     3.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

         a.     Jeffrey S Nestler

         b.     Laura E Robinson

B.     The following three attorneys from Spotswood LLC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

     1.    Emily Joy Tidmore

     2.    Kenneth Daniel Sansom

     3.    Robert Keeling Spotswood

## III.  ALABAMA (GENTLE)
## CASE NUMBER 3:07-CV-191

A.     FedEx Ground requests that the Court direct the Clerk to:

     1.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

     2.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

---

[4] Mr. Cialkowski is counsel for plaintiffs and has never been counsel for FedEx Ground.  He should therefore be removed from the docket, rather than simply terminated.  This rationale applies to the 26 other cases for which Mr. Cialkowski is erroneously listed as defense counsel.

     3.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

         a.     Jeffrey S Nestler

         b.     Laura E Robinson

B.     The following three attorneys from Spotswood LLC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

     1.      Emily Joy Tidmore

     2.      Kenneth Daniel Sansom

     3.      Robert Keeling Spotswood

### IV.  ARIZONA (GIBSON)
### CASE NUMBER 3:07-CV-272

A.     FedEx Ground requests that the Court direct the Clerk to:

     1.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

     2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

         a.     Jeffrey S Nestler

         b.     Laura E Robinson

B.     The following four attorneys from Greenberg Traurig LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

     1.      John Alan Doran

     2.      John F Lomax , Jr

     3.      Laura Marie Lawless

     4.      Michael Cajer Mason

### V. ARKANSAS (HARRIS)
### CASE NUMBER 3:06-CV-209

A.     FedEx Ground requests that the Court direct the Clerk to:

     1.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

     2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.     Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

     a.     Jeffrey S Nestler

     b.     Laura E Robinson

B.     The following two attorneys from Friday Eldredge & Clark LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.     Elizabeth Robben Murray

2.     Kevin A Crass

## VI.  CALIFORNIA (ALEXANDER)
## CASE NUMBER 3:05-CV-528

A.     FedEx Ground requests that the Court direct the Clerk to:

1.     Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.     Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

3.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.     Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

     a.     Jeffrey S Nestler

     b.     Laura E Robinson

## VII.  CALIFORNIA (HUERTA)
## CASE NUMBER 3:08-CV-052

A.     FedEx Ground requests that the Court direct the Clerk to:

1.     Terminate the entity named "FedEx Ground."

2.     Terminate David R Eberhart as counsel for FedEx Ground Package System, Inc.

3.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.     Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

     a.     Jeffrey S Nestler

     b.     Laura E Robinson

B.     The following one attorney from O'Melveny & Myers LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.     Chris A Hollinger

### VIII.  CALIFORNIA (PEDRAZZI)
### CASE NUMBER 3:06-CV-429

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.     Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

    2.     Terminate Esther Elisabeth Wright as counsel for FedEx Ground Package System, Inc.

    3.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    4.     Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

        a.     Jeffrey S Nestler

        b.     Laura E Robinson

B.     The following one attorney from O'Melveny & Myers LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.     Chris A Hollinger

### IX.  COLORADO (BLANCHARD)
### CASE NUMBER 3:07-CV-496

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.     Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

        a.     Chris A Hollinger

        b.     Jeffrey S Nestler

        c.     Laura E Robinson

B.     The following one attorney from Wheeler Trigg Kennedy LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.     Steven Matthew Kelso

## X. COLORADO (FLORES)
## CASE NUMBER 3:07-CV-478

A.   FedEx Ground requests that the Court direct the Clerk to:

    1.   Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.   Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

        a.   Chris A Hollinger

        b.   Jeffrey S Nestler

        c.   Laura E Robinson

B.   The following one attorney from Wheeler Trigg Kennedy LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.   Steven Matthew Kelso

## XI. CONNECTICUT (DIZZINO)
## CASE NMBER 3:07-CV-323

A.   FedEx Ground requests that the Court direct the Clerk to:

    1.   Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.   Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Goodwin Procter LLP:

        a.   James Rehnquist

B.   The following two attorneys from Kainen Escalera & McHale PC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.   Burton Kainen

    2.   Sheldon D Myers

## XII. CONNECTICUT (MAGNO)
## CASE NUMBER 3:07-CV-322

A.   FedEx Ground requests that the Court direct the Clerk to:

    1.   Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.   Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Goodwin Procter LLP:

a. James Rehnquist

B. The following two attorneys from Kainen Escalera & McHale PC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1. Burton Kainen

2. Sheldon D Myers

### XIII. FLORIDA (CARLSON)
### CASE NUMBER 3:05-CV-664

A. FedEx Ground requests that the Court direct the Clerk to:

1. Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a. Jeffrey S Nestler

   b. Laura E Robinson

2. Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Hill Ward Henderson PA:

   a. Brett J Preston

B. The following one attorney from Hill Ward Henderson PA should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1. Benjamin H Hill, III

### XIV. FLORIDA (WARD)
### CASE NUMBER 3:09-CV-356

A. FedEx Ground requests that the Court direct the Clerk to:

1. Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a. Jeffrey S Nestler

   b. Laura E Robinson

B. The following one attorney from Morgan Lewis & Bockius LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1. Anne Marie Estevez

## XV.  GEORGIA (WHITE)
## CASE NUMBER 3:07-CV-411

A.    FedEx Ground requests that the Court direct the Clerk to:

    1.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

        a.    Jeffrey S Nestler

        b.    Laura E Robinson

B.    The following one attorney from Fisher & Phillips LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.    Edward Scott Smith

## XVI.  ILLINOIS (FLUEGEL/GRIFFIN)
## CASE NUMBER 3:05-CV-529

A.    FedEx Ground requests that the Court direct the Clerk to:

    1.    Terminate the entity named "FedEx Home Delivery Inc."[5]

    2.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

    3.    Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

    4.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    5.    Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

        a.    Chris A Hollinger

        b.    Jeffrey S Nestler

        c.    Laura E Robinson

    6.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Baker & Daniels LLP:

        a.    Thomas J. Brunner

---

[5] This entity never entered an appearance in the case.

10

b.      Alison G. Fox

## XVII.  INDIANA (RIEWE)
## CASE NUMBER 3:05-CV-390

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate the entity named "FedEx Home Delivery Inc."

2.      Change the name of the entity listed as "FedEx Ground System Inc." to its correct
name, "FedEx Ground Package System Inc"

3.      Terminate Jennifer Rygiel Boyd as counsel for FedEx Ground Package System,
Inc.

4.      Terminate R Jay Taylor, Jr as counsel for FedEx Ground Package System, Inc.

5.      Add as counsel for FedEx Ground Package System, Inc. the following two
attorneys from O'Melveny & Myers LLP:

a.      Jeffrey S Nestler

b.      Laura E Robinson

6.      Add as counsel for FedEx Ground Package System, Inc. the following two
attorneys from Baker & Daniels LLP:

a.      Thomas J. Brunner

b.      Alison G. Fox

## XVIII.  IOWA (JOHNSON)
## CASE NUMBER 3:05-CV-652

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate the entity named "FedEx Home Delivery Inc."

2.      Change the name of the entity listed as "FedEx Ground System Inc." to its correct
name, "FedEx Ground Package System Inc"

3.      Add as counsel for FedEx Ground Package System, Inc. the following two
attorneys from O'Melveny & Myers LLP:

a.      Cameron H Biscay

b.      Jeffrey S Nestler

B.      The following one attorney from Belin Lamson McCormick Zumbach Flynn should continue to be listed as counsel for FedEx Ground Package System, Inc.:

      1.      Michael R Reck

## XIX.  KANSAS (CRAIG/BERRY)
## CASE NUMBER 3:05-CV-530

A.      FedEx Ground requests that the Court direct the Clerk to:

      1.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

      2.      Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

      3.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

      4.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

            a.      Jeffrey S Nestler

            b.      Laura E Robinson

B.      The following one attorney from Frieden Unrein Forbes & Biggs LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

      1.      Randall J Forbes

## XX.  KENTUCKY (COLEMAN)
## CASE NUMBER 3:05-CV-666

A.      FedEx Ground requests that the Court direct the Clerk to:

      1.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

      2.      Terminate Whitney Frazier Watt as counsel for FedEx Ground Package System, Inc.

      3.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

      4.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

            a.      Jeffrey S Nestler

            b.      Laura E Robinson

B.      The following one attorney from Wyatt Tarrant and Combs should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.      Kenneth G Haynes

## XXI.  LOUISIANA (BOUDREAUX)
## CASE NUMBER 3:08-CV-193

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a.      Jeffrey S Nestler

   b.      Laura E Robinson

3.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Stone Pigman Walther Wittmann LLC:

   a.      Mary Stanfield Bubbett

   b.      Phillip A Wittmann

## XXII.  LOUISIANA (CATANESE/GIVENS)
## CASE NUMBER 3:07-CV-324

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate the entity named "FedEx Home Delivery."

2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.      Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

   a.      Chris A Hollinger

   b.      Jeffrey S Nestler

   c.      Laura E Robinson

B.      The following two attorneys from Stone Pigman Walther Wittmann LLC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.      Mary Stanfield Bubbett

2.      Phillip A Wittmann

## XXIII. MARYLAND (ELLISON)
### CASE NUMBER 3:07-CV-190

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.    Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

    2.    Terminate Sarah Alexander Goldfrank as counsel for FedEx Ground Package System, Inc.

    3.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

        a.    Jeffrey S Nestler

        b.    Laura E Robinson

    4.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Venable LLP:

        a.    Robert Ames

        b.    Leslie Pate Marin[6]

## XXIV.  MARYLAND (HOLLOWAY)
### CASE NUMBER 3:08-CV-087

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.    Terminate Sarah Alexander Goldfrank as counsel for FedEx Ground Package System, Inc.

    3.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

        a.    Jeffrey S Nestler

        b.    Laura E Robinson

    4.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Venable LLP:

        a.    Robert Ames

---

[6] This attorney's appearance was entered as Leslie A. Pate.

b.    Leslie Pate Marin[7]

## XXV. MARYLAND (JONES)
## CASE NUMBER 3:07-CV-189

A.    FedEx Ground requests that the Court direct the Clerk to:

1.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

2.    Terminate Sarah Alexander Goldfrank as counsel for FedEx Ground Package System, Inc.

3.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a.    Jeffrey S Nestler

   b.    Laura E Robinson

4.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Venable LLP:

   a.    Robert Ames

   b.    Leslie Pate Marin[8]

## XXVI.  MARYLAND (WESTCOTT)
## CASE NUMBER 3:06-CV-485

A.    FedEx Ground requests that the Court direct the Clerk to:

1.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

2.    Terminate Sarah Alexander Goldfrank as counsel for FedEx Ground Package System, Inc.

3.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a.    Jeffrey S Nestler

   b.    Laura E Robinson

---

[7] This attorney's appearance was entered as Leslie A. Pate.

[8] This attorney's appearance was entered as Leslie A. Pate.

4.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Venable LLP:

   a.      Robert Ames

   b.      Leslie Pate Marin[9]

## XXVII.  MASSACHUSETTS (PERRY)
## CASE NUMBER 3:05-CV-796

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.      Terminate Wesley S Chused as counsel for FedEx Ground Package System, Inc.

4.      Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from Goodwin Procter LLP:

   a.      Bradford J Smith

   b.      James Rehnquist

   c.      Marcy D Smirnoff

## XXVIII.  MASSACHUSETTS (SHEEHAN)
## CASE NUMBER 3:05-CV-531

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate the entity named "FedEx Ground Package System Inc dba FedEx Home Delivery Inc."

2.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.      Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

5.      Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from Goodwin Procter LLP:

   a.      Bradford J Smith

---

[9] This attorney's appearance was entered as Leslie A. Pate.

16

    b.      James Rehnquist

    c.      Marcy D Smirnoff

## XXIX.  MASSACHUSETTS (SOMERS/URBANK)
## CASE NUMBER 3:08-CV-575

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.     Change the name of the entity listed as "FedEx Home Delivery a division of FedEx Ground Package Systems Inc" to its correct name, "FedEx Ground Package System Inc."

B.     The following three attorneys from Goodwin Procter LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.     Bradford J Smith

    2.     James Rehnquist

    3.     Marcy D Smirnoff

## XXX.  MASSACHUSETTS (VARGAS)
## CASE NUMBER 3:07-CV-325

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.     Terminate Wesley S Chused as counsel for FedEx Ground Package System, Inc.

    3.     Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from Goodwin Procter LLP:

        a.      Bradford J Smith

        b.      James Rehnquist

        c.      Marcy D Smirnoff

## XXXI.  MICHIGAN (CURRITHERS/LESTER)
## CASE NUMBER 3:05-CV-532

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.     Terminate the entity named "FedEx HomeDelivery a divison of FedEx Ground Package System, Incorporated"

    2.     Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3. Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4. Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

5. Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

    a. Carolyn J Kubota

    b. Jeffrey S Nestler

    c. Laura E Robinson

### XXXII. MINNESOTA (LEE)
### CASE NUMBER 3:05-CV-533

A. FedEx Ground requests that the Court direct the Clerk to:

1. Terminate the entity named "FedEx Home Delivery Inc."[10]

2. Change the name of the entity listed as "FedEx Ground System Inc" to its correct name, "FedEx Ground Package System Inc."

3. Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a. Jeffrey S Nestler

    b. Laura E Robinson

B. The following one attorney from Maslon Edelman Borman & Brand LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1. Justin H Perl

### XXXIII. MISSISSIPPI (FLEMING)
### CASE NUMBER 3:05-CV-593

A. FedEx Ground requests that the Court direct the Clerk to:

1. Terminate the entity named "FedEx Home Delivery Inc."

2. Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3. Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

---

[10] This entity never entered an appearance in the case.

    4.    Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

        a.    Kenneth L Blalack, II

        b.    Jeffrey S Nestler

        c.    Laura E Robinson

B.    The following one attorney from Watkins & Eager should continue to be listed as counsel for FedEx Ground Package System, Inc.:

    1.    Kenneth E Milam

### XXXIV.  MISSOURI (GRAY)
### CASE NUMBER 3:06-CV-337

A.    FedEx Ground requests that the Court direct the Clerk to:

    1.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

    2.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    3.    Terminate Ronald E Jenkins as counsel for FedEx Ground Package System, Inc.

    4.    Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

        a.    Guy Brenner

        b.    Jeffrey S Nestler

        c.    Laura E Robinson

    5.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from McMahon Berger:

        a.    John B Renick

        b.    Bryan D LeMoine

### XXXV.  MONTANA (CARLSON)
### CASE NUMBER 3:06-CV-393

A.    FedEx Ground requests that the Court direct the Clerk to:

    1.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

    2.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.  Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

    a.  Chris A Hollinger

    b.  Jeffrey S Nestler

    c.  Laura E Robinson

B.  The following one attorney from Corette Pohlman & Kebe should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.  Gregory C Black

## XXXVI.  NEVADA (CAMPBELL)
## CASE NUMBER 3:08-CV-520

A.  FedEx Ground requests that the Court direct the Clerk to:

1.  Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

2.  Terminate Susan Hilden as counsel for FedEx Ground Package System, Inc.

3.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

    b.  Laura E Robinson

4.  Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Littler Mendelson PC:

    a.  Rick D Roskelley

## XXXVII.  NEVADA (DECESARE)
## CASE NUMBER 3:07-CV-120

A.  FedEx Ground requests that the Court direct the Clerk to:

1.  Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.  Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

b.      Laura E Robinson

B.    The following one attorney from Littler Mendelson PC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.    Rick D Roskelley

## XXXVIII.  NEW HAMPSHIRE (GENNELL)
## CASE NUMBER 3:05-CV-534

A.    FedEx Ground requests that the Court direct the Clerk to:

1.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.    Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

3.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

a.      Jeffrey S Nestler

b.      Laura E Robinson

5.    Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Goodwin Procter LLP:

a.      James Rehnquist

## XXXIX.  NEW JERSEY (CAPERS)
## CASE NUMBER 3:05-CV-535

A.    FedEx Ground requests that the Court direct the Clerk to:

1.    Change the name of the entity listed as "FedEx Ground and its OFFICERS and/or EMPLOYEES" to its correct name, "FedEx Ground Package System Inc."

2.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

a.      Jeffrey S Nestler

b.      Laura E Robinson

3.    For each one of the five individual defendants (Tyrone Gaskins, Albert Rettinger, Jim Gelhausen, Joe Collins, and Tom Dimaio):

a.      Terminate the following two attorneys from Jackson Lewis LLP:

21

    (1)  Carla D Macaluso

    (2)  John M Nolan

  b.  Add the following one attorney from Buchanan Ingersoll & Rooney PC:

    (1)  Rosemary J Bruno

B.  The following one attorney from Buchanan Ingersoll & Rooney PC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

  1.  Rosemary J Bruno

### XL.  NEW JERSEY (FARRELL) CASE NUMBER 3:07-CV-327

A.  FedEx Ground requests that the Court direct the Clerk to:

  1.  Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

  2.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

    b.  Laura E Robinson

  3.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Morgan Lewis & Bockius LLP:

    a.  Michael L Banks

    b.  Sara L Bouchard

### XLI.  NEW JERSEY (TOFAUTE) CASE NUMBER 3:05-CV-595

A.  FedEx Ground requests that the Court direct the Clerk to:

  1.  Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

  2.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

    b.  Laura E Robinson

    3.       Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Morgan Lewis & Bockius LLP:

          a.      Michael L Banks

          b.      Sara L Bouchard

## XLII.  NEW JERSEY (TOFAUTE II)
## CASE NUMBER 3:09-CV-002

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.       Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    2.       Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

          a.      Jeffrey S Nestler

          b.      Laura E Robinson

    3.       Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Morgan Lewis & Bockius LLP:

          a.      Michael L Banks

          b.      Sara L Bouchard

## XLIII.  NEW YORK (JOHNSON)
## CASE NUMBER 3:05-CV-537

A.     FedEx Ground requests that the Court direct the Clerk to:

    1.       Terminate the entity named "FedEx Home Delivery."[11]

    2.       Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

    3.       Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

    4.       Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

    5.       Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

          a.      Jeffrey S Nestler

---

[11] This entity never entered an appearance in the case.

b.      Laura E Robinson

## XLIV.  NEW YORK (LOUZAU)
## CASE NUMBER 3:05-CV-538

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

a.      Jeffrey S Nestler

b.      Laura E Robinson

## XLV.  NORTH CAROLINA (WHITESIDE)
## CASE NUMBER 3:07-CV-326

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate Nicholas G Walter as counsel for FedEx Ground Package System, Inc.

2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

a.      Jeffrey S Nestler

b.      Laura E Robinson

4.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Womble Carlyle Sandridge & Rice:

a.      James Cooney

b.      James Cooley

## XLVI.  OHIO (KELLY)
## CASE NUMBER 3:08-CV-336

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

24

       a.      Jeffrey S Nestler

       b.      Laura E Robinson

B.     The following one attorney from Manchester Bennett Powers & Ullman should continue to be listed as counsel for FedEx Ground Package System, Inc.:

     1.     Timothy J Jacob

## XLVII.  OHIO (WALLACE)
## CASE NUMBER 3:06-CV-801

A.     FedEx Ground requests that the Court direct the Clerk to:

     1.     Terminate the entity named "FedEx Home Delivery."

     2.     Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

     3.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

     4.     Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

       a.      Jeffrey S Nestler

       b.      Laura E Robinson

B.     The following two attorneys from Calfee Halter & Griswold LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

     1.     Kimberly M Moses

     2.     Laura K Kendall

## XLVIII.  OREGON (LEIGHTER)
## CASE NUMBER 3:07-CV-328

A.     FedEx Ground requests that the Court direct the Clerk to:

     1.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

     2.     Terminate Richard R Meneghello as counsel for FedEx Ground Package System, Inc.

     3.     Change the name of the entity listed as "FedEx Ground Package System Inc doing business as FedEx Home Delivery Inc." to its correct name, "FedEx Ground Package System Inc"

## XLIX.  OREGON (SLAYMAN)
## CASE NUMBER 3:05-CV-596

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.      Terminate Joseph J Haddad as counsel for FedEx Ground Package System, Inc.

## L.  PENNSYLVANIA (HART)
## CASE NUMBER 3:05-CV-598

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.      Jeffrey S Nestler

    b.      Laura E Robinson

4.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Morgan Lewis & Bockius LLP:

    a.      Michael L Banks

    b.      Sara L Bouchard

## LI.  PENNSYLVANIA (MITCHELL)
## CASE NUMBER 3:09-CV-003

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.      Jeffrey S Nestler

    b.      Laura E Robinson

3.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Morgan Lewis & Bockius LLP:

    a.  Michael L Banks

    b.  Sara L Bouchard

## LII.  PENNSYLVANIA (WILLIS)
## CASE NUMBER 3:05-CV-597

A.  FedEx Ground requests that the Court direct the Clerk to:

1.  Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

2.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

    b.  Laura E Robinson

3.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from Morgan Lewis & Bockius LLP:

    a.  Michael L Banks

    b.  Sara L Bouchard

## LIII.  RHODE ISLAND (TIERNEY)
## CASE NUMBER 3:05-CV-599

A.  FedEx Ground requests that the Court direct the Clerk to:

1.  Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.  Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

    b.  Laura E Robinson

4.  Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Goodwin Procter LLP:

    a.  James Rehnquist

B.      The following one attorney from Edwards Angell, Palmer & Dodge should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.      Patricia A Sullivan

### LIV.  SOUTH CAROLINA (COOKE)
### CASE NUMBER 3:05-CV-668

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Change the name of the entity listed as "FedEx Ground Package Systems Inc." to its correct name, "FedEx Ground Package System Inc."

2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.      Jeffrey S Nestler

    b.      Laura E Robinson

B.      The following two attorneys from Ogletree Deakins Nash Smoak & Stewart P.C. should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.      C Victor Pyle, III

2.      Charles T Speth, II

### LV.  SOUTH DAKOTA (BUNGER)
### CASE NUMBER 3:05-CV-539

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate the entity named "FedEx Ground Package System Inc also known as Fedex Home Delivery."

2.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.      Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

    a.      Chris A Hollinger

    b.      Jeffrey S Nestler

    c.      Laura E Robinson

B.  The following one attorney from Boyce Greenfield Pashby & Welk LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.  Thomas J Welk

### LVI.  TENNESSEE (SMITH)
### CASE NUMBER 3:05-CV-600

A.  FedEx Ground requests that the Court direct the Clerk to:

1.  Terminate the entity named "FedEx Home Delivery Inc and their respective health and benefits plans."

2.  Change the name of the entity listed as "FedEx Ground System Inc and their respect health and benefit plans" to its correct name, "FedEx Ground Package System Inc."

3.  Terminate James R Mulroy, II as counsel for FedEx Ground Package System, Inc.

4.  Terminate William T Fiala as counsel for FedEx Ground Package System, Inc.

5.  Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

    a.  Jeffrey S Nestler

    b.  Laura E Robinson

B.  The following one attorney from Thomason Hendrix Harvey Johnson & Mitchell PLLC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.  William H Haltom, Jr

### LVII.  TEXAS (HUMPHREYS)
### CASE NUMBER 3:05-CV-540

A.  FedEx Ground requests that the Court direct the Clerk to:

1.  Terminate the entity named "FedEx Home Delivery a division of FedEx Ground Package System Inc."[12]

2.  Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3.  Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.  Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

---

[12] This entity never entered an appearance in the case.

5.    Un-terminate -- *i.e.*, re-instate -- Joe E Lea, Jr of McGinnis Lochridge & Kilgore LLP as counsel for FedEx Ground Package System, Inc.[13]

6.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a.    Jeffrey S Nestler

   b.    Laura E Robinson

B.    The following one attorney from McGinnis Lochridge & Kilgore LLP should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.    Patton G Lochridge

### LVIII.  TEXAS (PRICE)
### CASE NUMBER 3:06-CV-802

A.    FedEx Ground requests that the Court direct the Clerk to:

1.    Terminate the entity named "FedEx Ground Package System Inc doing business as FedEx Home Delivery."

2.    Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.    Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

   a.    Jeffrey S Nestler

   b.    Laura E Robinson

B.    The following one attorney from Reid & Dennis PC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.    Steve Dennis

### LIX.  UTAH (FISHLER)
### CASE NUMBER 3:08-CV-053

A.    FedEx Ground requests that the Court direct the Clerk to:

1.    Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

---

[13] Lea appears to have been mistakenly terminated on August 19, 2010.

2.      Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

a.      Jeffrey S Nestler

b.      Laura E Robinson

B.      The following one attorney from Ray Quinney & Nebeker PC should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.      Kristine M Larsen

## LX.  VERMONT (GRUHN/THURSTON)
## CASE NUMBER 3:07-CV-412

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Terminate the entity named "FedEx Ground Package System Inc doing business as FedEx Home Delivery."

2.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.      Add as counsel for FedEx Ground Package System, Inc. the following one attorney from Goodwin Procter LLP:

a.      James Rehnquist

## LXI.  VIRGINIA (GREGORY)
## CASE NUMBER 3:05-CV-541

A.      FedEx Ground requests that the Court direct the Clerk to:

1.      Change the name of the entity listed as "FedEx Ground Package System Inc a division of FedEx Ground Package Systems Inc doing business as FedEx Home Delivery" to its correct name, "FedEx Ground Package System Inc."

2.      Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

3.      Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

4.      Terminate Michael J Murphy as counsel for FedEx Ground Package System, Inc.

5.      Terminate Rafael Eloy Morell as counsel for FedEx Ground Package System, Inc.

6.      Add as counsel for FedEx Ground Package System, Inc. the following three attorneys from O'Melveny & Myers LLP:

a.      Kenneth L Blalack, II

      b.     Jeffrey S Nestler

      c.     Laura E Robinson

7.     Add as counsel for FedEx Ground Package System, Inc. the following one attorney from McGuire Woods LLP:

      a.     Robert W. McFarland

## LXII.  WEST VIRGINIA (ASBURY)
## CASE NUMBER 3:06-CV-826

A.     FedEx Ground requests that the Court direct the Clerk to:

1.     Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.     Terminate Evelyn L Becker as counsel for FedEx Ground Package System, Inc.

4.     Terminate John H Beisner as counsel for FedEx Ground Package System, Inc.

5.     Terminate Brian J Moore as counsel for FedEx Ground Package System, Inc.

6.     Add as counsel for FedEx Ground Package System, Inc. the following two attorneys from O'Melveny & Myers LLP:

      a.     Jeffrey S Nestler

      b.     Laura E Robinson

B.     The following one attorney from Jackson Kelly should continue to be listed as counsel for FedEx Ground Package System, Inc.:

1.     Roger A Wolfe

## LXIII.  WISCONSIN (LARSON)
## CASE NUMBER 3:05-CV-601

A.     FedEx Ground requests that the Court direct the Clerk to:

1.     Remove David M Cialkowski as counsel for FedEx Ground Package System, Inc.

2.     Terminate Michael J Puma as counsel for FedEx Ground Package System, Inc.

3.     Terminate Tom A Jerman as counsel for FedEx Ground Package System, Inc.

4.     Terminate John H Beisner as counsel for FedEx Ground Package System, Inc.

5.      Add as counsel for FedEx Ground Package System, Inc. the following two
        attorneys from O'Melveny & Myers LLP:

        a.      Jeffrey S Nestler

        b.      Laura E Robinson

B.      The following two attorneys from Michael Best & Friedrich LLP should continue to be
        listed as counsel for FedEx Ground Package System, Inc.:

1.      Eric E Hobbs

2.      Eric H Rumbaugh

Dated:  October 21, 2010

                            Respectfully submitted,

                        By: /s/ Robert M. Schwartz
                            Robert M. Schwartz

Thomas J. Brunner                   Robert M. Schwartz
Alison G. Fox                       Chris A. Hollinger
BAKER & DANIELS LLP                 O'MELVENY & MYERS LLP
202 S. Michigan St.                 1999 Avenue of the Stars, Suite 700
South Bend, IN 46601                Los Angeles, CA 90067-6035
Tel: (574) 234-4149                 Tel: (310) 553-6700
Fax: (574) 239-1900                 Fax: (310) 246-6779

            *Defendant's Lead and Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 21st day of October, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Lynn R Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

Robert I Harwood
rharwood@whesq.com

By: /s/ Robert M. Schwartz
Robert M. Schwartz

DC1:812816.7

34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE ) | CAUSE NO. 3:05-MD-527 RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL-1700) |
| PRACTICES LITIGATION ) | |
| ---------------------------------------------- ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL ACTIONS ) | |
| _____ ) | |

ORDER

The court GRANTS FedEx's unopposed motion to correct the docket [3:05-md-527, Doc. No. 2221]. The court incorporates herein the issues requiring correction as set forth in FedEx's motion.

SO ORDERED.

ENTERED: October 22, 2010

_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

```
------------------------------------------------ )
                                                 )
In re FEDEX GROUND PACKAGE                       )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                          )        (MDL 1700)
PRACTICES LITIGATION                             )
------------------------------------------------ )
THIS DOCUMENT RELATES TO:                        )
                                                 )
Slayman, 3:05-CV-00596-RLM-CAN (OR)              )
Leighter, 3:07-CV-328-RLM-CAN (OR)               )
                                                 )
------------------------------------------------ )
```

## NOTICE OF APPEARANCE

To the Clerk of this Court and all parties of record:

I, the below-signed, state that pursuant to N.D. Ind. L.R. 83.5(f), I have read and will

abide by the Local Rules of the U.S. District Court for the Northern District of Indiana, including

Appendix B: Standards for Professional Conduct Within the Seventh Federal Judicial Circuit.

I declare under penalty of perjury that the foregoing is true and correct.

Enter my appearance as counsel in this case for the defendant, FedEx Ground Package

System, Inc.

Respectfully submitted,


Date:  November 12, 2010

Kelly P. Corr
Corr Cronin Michelson Baumgardner & Preece LLP
1001 Fourth Avenue, Suite 3900
Seattle, WA 98154
Tel: (206) 625-8600
Fax: (206) 625-0900
kcorr@corrcronin.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the _17th_ day of November, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Steve D. Larson
slarson@ssbls.com

Jordan M. Lewis
jordanlewis@sbgdf.com

Mark A. Friel
mfriel@stoffberne.com

The undersigned further certifies that a copy of the same was mailed by regular United States Postal Service to the following non-CM/ECF participant:

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

By: _____
      Kelly P. Corr

548 00008 kk100203

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

```
-------------------------------------------------- )
                                                    )
In re FEDEX GROUND PACKAGE                          )      Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                             )      (MDL 1700)
PRACTICES LITIGATION                                )
-------------------------------------------------- )
THIS DOCUMENT RELATES TO:                           )
                                                    )
Slayman, 3:05-CV-00596-RLM-CAN (OR)                 )
Leighter, 3:07-CV-328-RLM-CAN (OR)                  )
                                                    )
-------------------------------------------------- )
```

## NOTICE OF APPEARANCE

To the Clerk of this Court and all parties of record:

I, the below-signed, state that pursuant to N.D. Ind. L.R. 83.5(f), I have read and will abide by the Local Rules of the U.S. District Court for the Northern District of Indiana, including Appendix B: Standards for Professional Conduct Within the Seventh Federal Judicial Circuit. I declare under penalty of perjury that the foregoing is true and correct.

Enter my appearance as counsel in this case for the defendant, FedEx Ground Package System, Inc.

Respectfully submitted,

Date:    November 12, 2010

Guy P. Michelson
Corr Cronin Michelson Baumgardner & Preece LLP
1001 Fourth Avenue, Suite 3900
Seattle, WA 98154
Tel: (206) 625-8600
Fax: (206) 625-0900
gmichelson@corrcronin.com

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on the *12th* day of November, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

| | |
|---|---|
| Susan E. Ellingstad | Peter J. Agostino |
| sellingstad@locklaw.com | agostino@aaklaw.com |
| | |
| Lynn R. Faris | Steve D. Larson |
| lfaris@leonardcarder.com | slarson@ssbls.com |
| | |
| Robert I. Harwood | Jordan M. Lewis |
| rharwood@whesq.com | jordanlewis@sbgdf.com |
| | |
| Peter W. Overs, Jr. | Mark A. Friel |
| povers@whesq.com | mfriel@stoffberne.com |

The undersigned further certifies that a copy of the same was mailed by regular United States Postal Service to the following non-CM/ECF participant:

      David F. Rees
      Joshua L. Ross
      STOLL STOLL BERNE LOKTING & SHLACHTER PC
      209 SW Oak St., 5th Floor
      Portland, OR 97204

By: _____
        Guy P. Michelson

548 00008 kk106704

-2-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

—————————————————————
                                                    )
In re FEDEX GROUND PACKAGE         )        CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT           )                 (MDL-1700)
PRACTICES LITIGATION                   )
------------------------------------------------ )
THIS DOCUMENT RELATES TO:          )
                                                    )
ALL CASES                                    )
—————————————————————  )

OPINION and ORDER

The court today addresses all outstanding motions for summary judgment

and disposes of all other pending cases in this FedEx Multidistrict Litigation

docket. In August, this court granted FedEx's motion for summary judgment in

the Kansas case and ordered the parties to file five-page supplementary briefs for

each of the outstanding class cases addressing why the outcome in those cases

should be the same as or different from Kansas.

The court incorporates here the background and findings of fact contained

in its Kansas decision and assumes the reader's familiarity with the contents of

that decision and other substantive decisions in this MDL litigation. *See generally*

Op. and Ord., Aug. 11, 2010 [Doc. No. 2097][1] ("Kansas Decision").[2] The court

---

[1] All document numbers are found in the general MDL docket, 3:05-md-527.

[2] *See also, e.g.*, Class Certification Orders, Mar. 25., 2008 [Doc. No. 1119], July 27, 2009 [Doc. No. 1770], Feb. 10, 2010 [Doc. No. 2004] (clarifying Nevada certification); Evidentiary Orders, Feb. 23, 2010 [Doc. No. 2010] (granting in part Rule 56 motion to strike), Mar. 29, 2010 [Doc. No. 2016] (judicial notice), May 4, 2010 [Doc. No. 2056] (granting Rule 56 motion to strike and exclude expert testimony and report of Robert Wood); Dispositive Orders, Apr. 21, 2010 [Doc. No. 2029] (denying request to give preclusive effect to Estrada), *as amended by* May 18, 2010 [Doc. No. 2062], May 28, 2010 [Doc. No. 2068] (Illinois), June 28, 2010 [Doc. No. 2078] (ERISA).

applies the summary judgment standard set forth in the Kansas Decision, at 59-60.

When appropriate, the court will incorporate its reasoning from the Kansas decision. The reasoning for each of today's dispositions is provided state by state in alphabetical order and, for ease of reference, an appendix at the end of this opinion and order summarizes today's dispositions.

## I. GENERAL INTRODUCTION

Before turning to the specifics of today's decisions, the court addresses some common themes arising from the parties' briefs in these FedEx MDL cases and offers some general comments that might help to understand these decisions.

### A. These MDL Decisions Won't Preclude Most Future Litigation Concerning Employment Status of FedEx Ground Drivers.

The plaintiff drivers in these FedEx MDL cases have entered into independent contractor agreements with FedEx Ground to provide package delivery services. Generally, the drivers seek determinations that they are employees under the various states' laws and they seek reimbursement of business expenses and backpay for overtime and other wages. The nationwide character of this litigation makes it a truly unique set of cases, unlike anything that has appeared in the cases cited in the parties' briefs.

Employment status questions typically arise when someone is physically harmed—either a third party or a worker. Courts developed the common law right

2

to control test to determine whether an employer had reserved enough control over a worker to justify holding the employer liable for the worker's tortious conduct towards a third party. Modern statutes have extended worker's compensation protection to employees, sometimes using the common law right to control approach and sometimes broadly redefining the term "employee" to include a larger group of workers than the common law test would have included.

Today's cases don't involve physical harm to third parties or to the plaintiffs. Some of the states considered today have wage statutes that recognize the harm of illegal methods of paying wages to workers, such as not paying overtime, deducting business expenses from employees' wages, and the like. Cases involving these wage statutes often involve state agencies seeking to penalize wayward employers and to vindicate workers' statutorily created rights or the state's statutory rights to collect employment taxes. Though it is less common, workers also may vindicate their rights in private causes of action by seeking to have a court declare that they are employees instead of independent contractors. In other states lacking these statutes—and in all the states in this MDL litigation—there remains these MDL plaintiffs' generalized effort to be reclassified as employees so as to shift the balance of rights and duties in the working arrangement between themselves and FedEx: the plaintiff drivers then would have fewer duties and increased rights (but likely also decreased entrepreneurial opportunities with FedEx and decreased gross pay) and FedEx would face increased duties.

3

Beyond the substantive character of these claims, the procedural uniqueness of these cases—an MDL proceeding consisting of class actions—is particularly noteworthy because this procedural posture has substantially limited the scope of evidence available to this court to decide the drivers' generalized employment status question. Under the procedural posture of these cases, this court has considered evidence common to the drivers' relationships with FedEx on a nationwide basis: the Operating Agreement and generally applicable Policies and Procedures. As a condition of class certification, the court excluded particularized evidence of actual control between FedEx and the drivers. This condition was appropriate to satisfy the commonality requirement for class certification, to satisfy the commonality and judicial economy considerations motivating the consolidation of these cases in an MDL court, and to address the very nature of these plaintiffs' generalized claims.

The cases' substantive nature and procedural posture might limit the preclusive effect of this court's decisions in these cases. These decisions aren't expected to preclude injured persons from seeking *respondeat superior* liability or worker's compensation. Such personal injury cases would surely involve the review of much extrinsic and individualized evidence of a particular driver's relationship with FedEx. Today's decisions also don't address what the outcomes of these cases might be if the classes were defined differently.[3]

---

[3] The court directs the parties to the trial court's decision in <u>Estrada v. FedEx Ground</u>, No. BC 210130 (Cal. Super. Ct. July 26, 2004) [Exh. B to Pltfs' Req. for Judicial Notice, Apr. 24, 2008], for an example highlighting how class definitions might make a difference.

*B. The Procedural Posture of These Cases Limits the Scope of Evidence Reviewed.*

In their supplemental briefs, the drivers have complained at times that the court "refused" to consider extrinsic evidence of FedEx's actual conduct towards them. The cases' procedural posture limits the court to considering evidence truly common across the nation: the Operating Agreement and generally applicable Policies and Procedures. These cases might or might not come out differently under a different procedural posture allowing wider scope for review of extrinsic and particularized evidence, but that situation is not before the court today.[4]

The drivers' characterization of the court's use of evidence, after the court indulged their strategy of coming before an MDL court as classes, isn't well-taken. To disagree with the court's rulings is fair (and is a matter better handled through a motion to reconsider or an appeal), but to say the court "refused" to do something when the court accepted the drivers' own arguments on the matter isn't accurate.[5] The parties have heaped numerous insults upon each other's arguments and reasoning in their various briefs, and the court has patiently

---

[4] The scope of evidence surely has affected today's decisions, but a good example showing that the scope of evidence isn't determinative by itself is the trial court's decisions concerning Single Work Area and Multiple Work Area drivers in Estrada v. FedEx Ground, No. BC 210130 (Cal. Super. Ct. July 26, 2004) [Exh. B to Pltfs' Req. for Judicial Notice, Apr. 24, 2008]. On the flip side, the parties might find it helpful to review today's Pennsylvania decision, which involves discussion of two Pennsylvania cases containing very similar contractual arrangements, but very different outcomes due to the differing scopes of evidence available to the deciding courts. *Compare* Green v. Independent Oil Co., 201 A.2d 207, 210 (Pa. 1964), *with* Juarbe v. City of Philadelphia, 431 A.2d 1073 (Pa. Super. Ct. 1981).

[5] The court chronicles one example of the plaintiffs' flip-flop on their approach to the scope of evidence in today's Louisiana decision.

5

overlooked their excursions into the land of uncivil arguments, exaggerations, and mischaracterizations (and the court has avoided wasting time on listing citations to all the foul balls the parties pitched in their arguments); the court is less patient with mischaracterizations of its own efforts to rule fairly on the issues in this litigation.

The drivers have known at least since this court's first order granting class certification that the scope of evidence would, under the approach taken by the drivers, be limited to the Operating Agreement and generally applicable Policies and Procedures. *See generally* Op. and Ord., Mar. 25, 2008 [Doc. No. 1119]. In July 2005, the drivers argued to the Judicial Panel on Multidistrict Litigation in Denver that their cases were appropriate for MDL centralization and that they could satisfactorily litigate their case based on common evidence. The drivers' ensuing briefs seemed to indicate that they were perfectly comfortable with, and felt they could win their case based on, the use of common evidence. The court tried to remind the drivers that their cases would be decided on the basis of common evidence. *See, e.g.*, Op. and Ord., July 27, 2009, at 6 n.5 [Doc. No. 1770] ("The court notes that the plaintiffs may have indicated a desire to introduce anecdotal evidence to support their claims in this action. If the plaintiffs intend to introduce anecdotal evidence of FedEx's actual exercise of control to support their claims, they should inform the court immediately because this may require reevaluation of class certification."); Ord., Apr. 22, 2008 [Doc. No. 1152].

As the court stated in the Kansas Decision:

The court sets forth the facts from the perspective of what control FedEx has the right to exercise over its drivers and not necessarily what control FedEx actually exercises on a daily basis. While FedEx managers might exercise more control than what is retained in the Operating Agreement and commonly applicable policies and procedures, the class was certified on the basis of right to control, not actual exercise of control. The plaintiffs reiterated to this court during class certification that they could show right to control by reliance solely on the Operating Agreement and applicable policies and procedures and wouldn't go beyond those documents to prove their case. In short, the issue for today's purposes is what control FedEx had the right to exert pursuant to the parties' contractual relationship.

*    *    *

FedEx might actually exercise more control than authorized, but as explained, the court is limited to determining whether FedEx retained the right to control. The court relies on the policies and procedures to the extent they show how FedEx implemented its authority as retained by the Operating Agreement.

Kansas Decision, at 3-4, 72.

### C. Collateral Estoppel Issue

The California court of appeals affirmed the Estrada trial court's decision finding FedEx Single Work Area (SWA) drivers to be employees. Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007). The Estrada trial court held that the FedEx Multiple Work Area (MWA) plaintiff driver before it was an independent contractor, and that decision wasn't appealed. SWA drivers own and operate a single delivery route for FedEx, while MWA drivers own and operate two or more delivery routes. On the evidence before it, the Estrada trial court found that the MWA driver was subject to the same "strict controls" as the SWA drivers and that the MWA driver and SWA drivers were all integral to FedEx's

7

business. <u>Estrada v. FedEx Ground</u>, No. BC 210130, at *17 (Cal. Super. Ct. July 26, 2004) [Exh. B to Pltfs' Req. for Judicial Notice, Apr. 24, 2008]. Although the <u>Estrada</u> trial court held SWA drivers to be employees, it held the MWA driver to be an independent contractor based on his opportunity for profit as a MWA driver. MWA drivers testified at trial "as to their enthusiasm for their entrepreneurial opportunities for making good money," and the court noted that "a MWA has the opportunity to hire drivers and slowly but surely create a little financial empire under the aegis of FEG." <u>Id.</u> at *18. The opportunity for profit, and not how much profit the MWA plaintiff made, was dispositive. <u>Id.</u>

The plaintiff drivers have argued vigorously throughout this litigation that <u>Estrada</u>'s SWA finding should be given preclusive effect in all these MDL cases. This court has addressed the drivers' argument and denied granting preclusive effect to the <u>Estrada</u> decision. *See generally* Op. and Ord., Apr. 21, 2010 [Doc. No. 2029]. The court denied collateral estoppel because <u>Estrada</u> involved facts specific to the California class in that case. The facts before the <u>Estrada</u> court and those before this court are dissimilar insofar as the facts available to this court don't go beyond the Operating Agreement and generally applicable Policies and Procedures. *See* Op. and Ord., Apr. 21, 2010, at 25-29 [Doc. No. 2029]. Also, the SWA class in <u>Estrada</u> was markedly different from the classes before this court because the MDL classes lump together SWA and MWA drivers. Thus, though the parties litigated a right to control issue in <u>Estrada</u>, the issue decided in <u>Estrada</u> isn't identical to issue before this court.

8

The drivers never addressed how the collateral estoppel issue might differ for the California class as distinct from other states' classes, even though California adds an economic realities twist to the common law right to control test and other states in this centralized docket don't add such a twist. Also, in the interest of fairness, the court hasn't precluded FedEx from litigating the right to control factor in today's cases when the drivers haven't addressed the potential preclusive effect of the Estrada trial court's finding that a MWA driver was an independent contractor under the California test. Op. and Ord., Apr. 21, 2010, at 41. Indeed, the drivers have all but ignored the Estrada trial court's MWA finding and have hardly addressed this court's findings in the Kansas Decision relating to their entrepreneurial opportunities. It can't work both ways: the drivers can't argue persuasively that Estrada should have preclusive effect on the California class (and other states' classes) while ignoring the Estrada trial court's MWA finding. As in Estrada, this court has found the drivers' entrepreneurial opportunities to be highly persuasive evidence indicating independent contractor status. Unlike Estrada, and because of the classes defined in these MDL cases, the court has no occasion to distinguish between SWA and MWA drivers. To repeat the Order denying the grant of preclusive effect to Estrada, the court doesn't apply the finding of a right to control in Estrada to these cases, but rather analyzes the right to control again.

### D. Intent Wasn't Dispositive in the Kansas Decision.

9

In their supplemental briefs, the drivers characterize the Kansas Decision as placing dispositive weight on the clearly expressed intent in the Operating Agreement that an independent contractor relationship exist between themselves and FedEx. The court stated that this "factor weighs strongly in favor of independent contractor status." Kansas Decision, at 72. But among all the other factors, the intent factor weighed "strongly" because the intent expressed in the contracts was so clear, not because the intent factor had special status or carried dispositive weight. The court never said this factor was dispositive, and the court never believed this factor to be dispositive. The laws of every state considered in these cases generally require courts to look beyond contractual labels, and the court has done so by examining the Operating Agreement and generally applicable Policies and Procedures in their entirety, vis-à-vis the comprehensive list of factors that Kansas uses to determine employment status—the Kansas Decision would have been far shorter were it otherwise.

Most important in Kansas—and most important under the common law and Restatement tests generally—is the right to control, which typically is the weightiest factor. States often treat the right to discharge at will as the second most important factor. This court held that there was no reasonable inference that FedEx retained the right to control the methods and means of the drivers' work on a class-wide basis. See Kansas Decision, at 73. This finding came in light of the distinction between control of means and control of results. In most states, control of results doesn't indicate employee status; control of means used to achieve

10

contracted-for results does indicate employee status. Drawing the line between means and results is a challenging, highly contextual and fact-specific task. Bright-line rules prove elusive here. This court held that the controls reserved to FedEx were results-oriented: FedEx provides work to and pays contractor-drivers to provide the specific result of timely and safely delivered packages to FedEx customers. *See* Op. and Ord., Aug. 11, 2010, at 70, 73, 77, 81, 84, 85, 87, 100. The totality of the circumstances and review of all the relevant facts and factors led to this results-oriented conclusion. Buttressing this conclusion, FedEx has no right to discharge drivers at will. FedEx can non-renew a contract or cancel a contract for breach, but these are unexceptional rights common to any contractee in an independent contractor relationship; notably, FedEx is contractually unable to discharge a driver at a whim and on the spot the way an employee in an at-will employment relationship could be discharged.

In addition to the right to control and right to discharge factors, the court found the drivers' entrepreneurial opportunities to be highly probative of independent contractor status. Also, the plaintiff drivers are responsible for acquiring their own equipment, such as their own delivery trucks (and nothing suggests that the drivers aren't paid accordingly to cover these expenses), though the equipment factor generally weighs less heavily in indicating independent contractor status. The court repeats here what it stated in the Kansas Decision:

> Upon review of the evidence in the light most favorable to the plaintiffs, the only reasonable inference is that FedEx hasn't retained the right to direct the manner in which drivers perform their work.

11

> FedEx supervises the drivers' work and offers numerous suggestions and best practices for performance of assigned tasks, but the evidence doesn't suggest that FedEx has the authority under the Operating Agreement to require compliance with its suggestions. Further, other factors strongly weigh in favor of independent contractor status; in particular, the parties intended to create an independent contractor arrangement, *the drivers have the ability to hire helpers and replacement drivers, they are responsible for acquiring a vehicle and can use the vehicle for other commercial purposes, they can sell their routes to other qualified drivers, and FedEx doesn't have the right to terminate contracts at-will*. Although some facts weigh in favor of employee status, after considering all the relevant factors, the court finds that the plaintiffs are independent contractors as a matter of [Kansas] law.

Kansas Decision, at 3 (emphasis added).

The drivers' supplemental briefs gave little importance to their entrepreneurial opportunities with FedEx. Generally, employees can't sell their jobs, and they can't hire other people to do their jobs for them. The drivers call these entrepreneurial opportunities a "sham," but they haven't shown the court on the common evidence that these opportunities are but a sham. After considering a wealth of extrinsic testimonial evidence, the trial court in Estrada held a Multiple Work Area driver (a driver who took advantage of the entrepreneurial opportunities available to him with FedEx by owning multiple delivery routes) to be an independent contractor. This court made its own findings using the common evidence available to it in the Kansas Decision. To characterize the Kansas Decision as finding a contractual label to be dispositive is to fundamentally misunderstand this court's reasoning.

### E. Kansas Law is Typical of the States' Laws Reviewed Today.

The drivers' supplemental briefs make a strong effort to distinguish Kansas law as being unique, while FedEx seizes on language from the Kansas Decision to say that what's true in Kansas must be true elsewhere. These approaches have resulted in some jarringly inconsistent arguments between the summary judgment briefs and supplemental briefs, making it difficult for the court to accept the parties' statements on what the law is. For example, in the Arkansas case, FedEx argued in its summary judgment response brief that Arkansas courts require each and every Restatement factor to favor either employee or independent contractor status for summary judgment to be appropriate. The drivers' reply challenged this view of Arkansas law and persuasively distinguished the cases on which FedEx relied. In a move that reflects the parties' parries in this litigation as a whole, the drivers' post-Kansas supplemental brief now urges the very argument they previously condemned: that all Restatement factors must support independent contractor status in Arkansas for FedEx to win, and the drivers' supplemental brief relies exclusively on the very cases the drivers had persuasively argued held dubious value for this docket.

Rather than helping the court to understand the law, some arguments have bordered on simple misrepresentations of the law. In any event, as today's decisions will show, the court's own review of the law of the various states has led to the conclusion that Kansas law is not strangely alien or *sui generis*, but rather is very typical of the states' laws on determining employment status.

One of the drivers' characterizations of the court's understanding of Kansas law requires mention. The drivers try to distinguish the Kansas Decision by arguing that it carved out an exception in Kansas law: if an employer requires a worker to do a certain amount of work within customer-based time boundaries, that worker still can be considered an independent contractor if the employer (in this case, FedEx) is contractually bound to provide full days of work to the drivers. Without the employer's exceptional contractual obligation—so the drivers' argument goes—the worker would be considered an employee.

As today's considerations of the various states' laws should make clear, resolution of employment status at common law doesn't allow for bright-line rules. Statutory redefinitions of the scope of employee status sometimes create clearer bright-line rules, unmistakably broadening the scope of who is an employee (often called "statutory employees").[6] But at common law, the test is the right to control the means and methods of achieving results; control of the results doesn't indicate employee status. Determining the line between means and methods, and results, is context specific and requires considering multiple factors and examining the totality of the circumstances of a given working relationship.

The Kansas Decision carved out no exceptions to Kansas law: this court isn't in a position to declare what Kansas law is when Kansas itself hasn't declared what its law is or what its law most likely would be. Rather, the Kansas

---

[6] The court directs the parties to today's decisions in the Kentucky, New Hampshire, and Nevada cases.

14

Decision, and today's decisions, take into consideration all the circumstances of the FedEx/driver working relationship and conclude that customer-based constraints on the drivers are results-oriented controls that don't indicate employee status.

The drivers complain that FedEx makes them do so much work within so much time, which they say indicates control of means and methods. But the numerous cases across the states reviewed by the court indicate that "so much work within so much time" doesn't, by itself, indicate employee status— subcontractors often agree to get a job done within a specified time. The Kansas Decision pointed out that FedEx is contractually bound to give drivers work. The parties agreed to something: FedEx would provide work, and the drivers would do that work. This type of agreement is common and unexceptional in all working relationships, whether of the employee or independent contractor variety, and is unexceptional to states' laws differentiating between employee and independent contractor status. The court doesn't agree that it created an exception in Kansas law, and the court doesn't agree that Kansas law is alien and unique compared to the rest of the states' laws relevant to today's decisions.

15

*F. FedEx's Requests for Summary Judgment sua sponte.*

In eleven of the states with pending summary judgment motions filed by the drivers,[7] FedEx didn't file motions for summary judgment and instead argued in its summary judgment response briefs that the laws of those eleven states inflexibly required a trial on the employee vs. independent contractor question. The court held under Kansas law that the facts were susceptible to only one reasonable conclusion: on a class-wide basis, FedEx hasn't retained the right to control the details of the drivers' methods and means of doing their work. Kansas Decision, at 73. FedEx now urges the court to apply this same conclusion to these eleven states and enter judgment *sua sponte* in its favor.

"[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Generally, *sua sponte* entry of judgment is a "hazardous procedure, . . . warrants special caution and is often unnecessary," but it is permissible. Jones v. Union Pacific R.R. Co., 302 F.3d 735, 740 (7th Cir. 2002). Federal Rule of Civil Procedure 56(f)(1), which became effective December 1, 2010, specifically authorizes granting summary judgment for a nonmovant—what the Rule calls "Judgment Independent of the Motion"—after notice and a reasonable time to respond. The drivers' supplemental briefs make clear that they knew

---

[7] Alabama, Arizona, Arkansas, Nevada, New Hampshire, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, and West Virginia.

16

FedEx would seek such judgments. The drivers didn't ask for additional briefing; instead, they explained their disagreement with FedEx's view of the law and argued that judgment in favor of FedEx wouldn't be appropriate. Thus, the court concludes the drivers have had a reasonable opportunity for response.

FedEx argues that judicial economy would best be served by entering what is now called judgment independent of the motion in its favor in these eleven states. The parties have fully litigated these MDL cases within their procedural posture. The evidence before the court—the Operating Agreement and generally applicable Policies and Procedures—isn't in dispute, and the drivers didn't take the position that this evidence contains ambiguous terms. The drivers' presentation of facts is common and repeated across the board in these cases, and their arguments about how the court should view the facts don't materially change from one state to the next.

FedEx's about-face on the appropriateness of summary judgment in these cases seizes attention, but this court's duty is to decide these cases as the states' highest courts (or, in the absence of guidance from the highest courts, as the appellate courts) would decide them. *E.g.*, Home Valu, Inc. v. Pep Boys, 213 F.3d 960, 963 (7th Cir. 2000). As set forth in the decisions in this opinion, the court has reviewed the laws of these eleven states and finds that resolution of the employment status question without a trial is appropriate in these states when the facts are undisputed and lend themselves to but one inference. The court hesitates to grant FedEx a windfall, but because the drivers had full opportunity

17

to present their position, judicial economy is best served by granting judgment to FedEx in these states if the states' laws favor FedEx as did Kansas law. Also, insofar as it is most fair to give parties an answer to a question when the question is ripe and has been pending for quite some time, fairness to the parties is best served by answering now the general question presented in these MDL cases.

## II. DISPOSITION OF FEDEX MDL CASES

### A. Alabama

#### (1) 3:06-cv-428, <u>Floyd</u>

The <u>Floyd</u> drivers allege violations of the Alabama Deceptive Trade Practices Act and fraud; they seek an accounting, rescission, declaratory judgment, and injunctive relief. The drivers didn't move to certify the ADTPA and fraud claims, but they don't indicate that their claims turn on anything other than a determination of their employment status under Alabama law. *See* Memo. in Support of Mot. to Certify Class (Alabama), Apr. 2, 2007, at 1 [Doc. No. 583]. Only the drivers filed a motion for summary judgment. For the reasons stated below, the court denies the drivers' motion and grants judgment independent of the motion to FedEx. Because the Alabama claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx on all claims in this Alabama (<u>Floyd</u>) case.

18

As noted, FedEx didn't move for summary judgment against the Alabama class. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under Alabama law, the drivers' employment status can be examined today without prejudice to the plaintiffs, and answering now the question of the plaintiff drivers' employment status under Alabama law will conserve judicial resources.

FedEx's summary judgment response brief argued that summary judgment on the employment status question is "practically unavailable" in Alabama. Yet Alabama courts have been perfectly willing to enter judgment on employment status without a trial when the facts are undisputed. *See, e.g.*, Dickinson v. City of Huntsville, 822 So.2d 411, 416 (Ala. 2001) (affirming summary judgment finding independent contractor status where no substantial evidence was presented to show employee status); In re Curry v. Interstate Express, Inc., 607 So.2d 230, 233 (Ala. 1992) (reversing lower court and finding worker to be employee); Atchison v. Boone Newspapers, Inc., 981 So.2d 427, 434 (Ala. Civ. App. 2007) (affirming summary judgment finding worker to be independent contractor); *see also* Lankford v. Gulf Lumber Co., Inc., 597 So.2d 1340, 1344 (Ala. 1992) ("[W]hether a defendant reserved the right of control is generally a question of fact to be decided by the jury *if the evidence is in dispute* . . . ." (emphasis added)).

In Alabama "for one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the result to be accomplished or, in other words, not only what shall be done, but how it shall be done." <u>Atchison v. Boone Newspapers</u>, 981 So.2d at 431 (citations omitted). Alabama courts "look[] to the reserved right of control rather than the actual exercise of control." <u>Id.</u> (*quoting* <u>Turnipseed v. McCafferty</u>, 521 So.2d 31, 32 (Ala. Civ. App. 1987)); *see also* <u>In re Curry v. Interstate Express</u>, 607 So.2d at 232 ("In the last analysis, it is the reserved right of control rather than its actual exercise that provides the answer."). If the right of control extends no further than directing what is ultimately to be accomplished, employee status isn't indicated. *See* <u>Lankford v. Gulf Lumber Co.</u>, 597 So.2d at 1343 (finding right to supervise loggers was merely to ensure contracted-for results and didn't indicate employee status); <u>Williams v. Tennessee River Pulp and Paper Co.</u>, 442 So.2d 20, 21-22 (Ala. 1983) (finding the only reasonable inference from work site inspections was that company was supervising conformity with contract requirements, which didn't indicate employee status); <u>Atchison v. Boone Newspapers</u>, 981 So.2d at 431; <u>Liberty Mut. Ins. Co. v. D&G Trucking, Inc.</u>, 966 So.2d 266, 268 (Ala. Civ. App. 2006).

Alabama courts consider four factors to decide whether an employer has retained the right to control the manner of contract performance: (1) direct evidence of the right or exercise of control; (2) the method of payment used; (3) whether the alleged principal had the right to terminate employment; and (4) the

right to control another's time. <u>Dickinson v. City of Huntsville</u>, 822 So.2d 411, 416 (Ala. 2001); *see also* <u>Williams v. Tennessee River Pulp & Paper Co.</u>, 442 So.2d at 21 ("[T]he crucial factor is the right of Tennessee Paper to control the manner of Mauldin's performance."). Alabama courts sometimes consider the furnishing of equipment instead of the right to control another's time. <u>Atchison v. Boone Newspapers</u>, 981 So.2d at 432.

The <u>Floyd</u> plaintiffs argue that if a company "controlled what loads [the driver] picked up and where he picked them up," then Alabama views such control as establishing an employee relationship. Pltfs' Supp. Brief (Alabama), Sept. 24, 2010, at 2 [Doc. No. 2161] (*quoting* <u>In re Curry v. Interstate Express</u>, 607 So.2d at 233, and *citing* <u>Liberty Mut. Ins. v. D&G Trucking</u>, 966 So.2d at 269 ("Trucking personnel decide which driver to dispatch . . . [and] [o]nce that driver has accepted a load, he or she is not permitted by D&G Trucking to run a personal errand that might involve significant travel beyond the pickup and delivery.")). The presence of "some controls," the drivers argue, is direct evidence of the right to control. Pltfs' Supp. Brief, at 2-3 (*quoting* <u>Liberty Mut. Ins. v. D&G Trucking</u>, 966 So.2d at 270).

The drivers are right that at some point, "some control" amounts to enough control to indicate an employee relationship. But not here. <u>In re Curry</u> and <u>Liberty Mutual</u> are distinguishable from the case before the court today.[8] The <u>In re Curry</u>

---

[8] FedEx notes that these are worker's compensation cases and at least one Alabama decision distinguishes worker's compensation cases from other employment status cases. "The work[er's] compensation law is liberally construed to carry out the beneficent purposes of the act and to

court didn't find a right to control simply because "Interstate controlled what loads [Curry] picked up and where he picked them up, as well as the place of delivery of the cargo." In re Curry v. Interstate Express, 607 So.2d at 233. Interstate ordered Mr. Curry to transport his load of dog food even after Mr. Curry expressed his concern that the load wasn't properly secured, which led to Mr. Curry's injury. Id. Reasonably, in light of the order to transport a load known to be improperly secured, Interstate should be responsible to Mr. Curry for worker's compensation.

Liberty Mutual involved a worker's compensation insurance premium dispute where a company reclassified drivers as independent contractors without making significant changes to the company's actual relationship with the drivers. Liberty Mut. Ins. v. D&G Trucking, 966 So.2d at 269-270. Besides the reclassification, D&G Trucking continued to control drivers as it had before and continued to own the trucks the drivers drove. In both cases, the defendants' orders concerning the identity of loads and timing of pick up and delivery were not, by themselves, dispositive facts: those facts were surrounded by a larger context favoring employee status. Neither case involved facts that overlap in a compelling way with the facts before this court. Also, Alabama doesn't treat any single fact as dispositive; employment status is a fact-intensive inquiry. See Hooker Constr., Inc. v. Walker, 825 So.2d 838, 843-844 (Ala. Civ. App. 2001) ("[T]he retention of

---

eliminate procedural technicalities." Williams v. Tennessee River Pulp and Paper Co., 442 So.2d 20, 23 (Ala. 1983). The plaintiffs point out that no other Alabama decision makes this distinction. The court doesn't rely on any distinction in Alabama between the liberal construction of worker's compensation cases and other employment status cases.

control necessary to establish employee status is determined on a case-by-case basis. No one fact by itself can create an employer-employee relationship. . . . When taken as a whole, the evidence supports the trial court's finding." (citation omitted)).

The court incorporates here its reasoning in the Kansas Decision. As previously held, FedEx's controls are results-oriented, and FedEx's supervision exists to ensure contracted-for results. Such controls don't indicate employee status in Alabama. "After reviewing the common undisputed evidence offered by the parties, the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73.

As in the Kansas Decision, Alabama drivers don't negotiate their pay: FedEx controls their pay. Some Alabama courts view control of pay as weighing in favor of employee status. *See* In re Curry v. Interstate Express, 607 So.2d at 233 (finding Interstate controlled payment where Interstate determined percentage driver received). Other courts don't view it this way, but rather are satisfied that payment without deducting taxes and with provision of 1099 Forms weighs in favor of independent contractor status. *See* Atchison v. Boone Newspapers, 981 So.2d at 430, 432. Also, as in the Kansas Decision, FedEx doesn't have the right to terminate Alabama drivers at will, and FedEx doesn't have the right to control Alabama drivers' time insofar as contractors can hire assistants and replacement drivers and can develop profitable package delivery businesses in contract with

23

FedEx. Finally, Alabama drivers are fully responsible for obtaining their own equipment—even though FedEx makes fulfilling this responsibility easier through its Business Support Package, the drivers have the ultimate responsibility of obtaining equipment with or without FedEx's help. *See* Keebler v. Glenwood Woodyard, Inc., 628 So.2d 566, 568-569 (Ala. 1993) (noting that enabling contractor to work by providing equipment and insurance wasn't the same as controlling the manner in which he worked). For these reasons, and the reasons stated in the Kansas Decision, the Floyd drivers are independent contractors under Alabama law.

### (2) 3:07-cv-191, Gentle

Bruce and Stephanie Gentle present the same claims as the Floyd drivers—violations of the Alabama Deceptive Trade Practices Act and fraud—and seek an accounting, rescission, declaratory judgment, and injunctive relief. The Gentles haven't filed a motion for summary judgment, but today's decision in Floyd applies to Bruce Gentle's claims because he is a member of the Alabama class. The court has no information on whether Stephanie Gentle is a member of the Alabama class; if she isn't, the transferor court will decide how much weight to give to today's procedurally distinct decision in Floyd when deciding her case. The court will suggest remand of the Gentles' case to its transferor court for further disposition.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to

24

summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### B. Arizona (3:07-cv-272, _Gibson_)

The Gibson drivers allege violations of Arizona's wage withholding statute, ARIZ. REV. STAT. ANN. § 23-352, and seek rescission, declaratory relief, and injunctive relief. All claims are class certified; only the drivers filed a summary judgment motion. For the reasons stated below, the court denies the plaintiffs' motion and grants judgment independent of the motion to FedEx. Because the Arizona claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered in FedEx's favor on all claims in Gibson.

As noted, FedEx didn't file a motion for summary judgment against the Arizona class. In its supplemental brief, FedEx asks the court to enter judgment _sua sponte_ (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under Arizona law, the drivers' employment status can be examined today without prejudice to the

plaintiffs, and answering now the question of the plaintiff drivers' employment status under Arizona law will conserve judicial resources.

FedEx insisted in its summary judgment response brief that Arizona law requires a trial on the employment status question. As in other states, summary judgment is appropriate in Arizona where the material facts are undisputed and only one inference can be drawn from those facts. Santiago v. Phoenix Newspapers, Inc., 794 P.2d 138, 141 (Ariz. 1990). The Kansas Decision held that "[a]fter reviewing the common undisputed evidence offered by the parties, the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. For purposes of this case, Arizona law doesn't materially differ from Kansas law.

The parties agree that Arizona's common law test for employment status provides the definition of "employee" under Arizona's wage withholding statute. "The right to control or supervise the method of reaching a specific result determines whether an individual is an employee or an independent contractor." Home Ins. Co. v. Industrial Comm'n, 599 P.2d 801, 803 (Ariz. 1979); see also Hunt Bldg. Corp. v. Industrial Comm'n, 713 P.2d 303, 306 (Ariz. 1986) (same); Hughes v. Industrial Comm'n, 558 P.2d 11, 12-13 (Ariz. 1976) ("[W]e must look to the right to control the method of reaching a desired result reposed in the employer. It is not the exercise of the power to supervise and control, but rather its existence which is to be considered.").

26

Arizona doesn't follow a single formula for its right to control test. Some courts have looked to the multi-factor Restatement test for employment status, discussed in the Kansas Decision. *See, e.g.*, <u>Santiago v. Phoenix Newspapers</u>, 794 P.2d at 141 (*citing* RESTATEMENT (SECOND) OF AGENCY § 220)). Other courts have examined the right to control in light of other factors that also were discussed in the Kansas Decision. *See, e.g.*, <u>id.</u> at 145 n.6 (noting IRS list of twenty factors: instructions; training; integration; services rendered personally; hiring, supervising and paying assistants; continuing relationship; set hours of work; full time required; doing work on business premises; order of sequence set; reporting; payment by time, not job; payment of traveling expenses; furnishing of tools; investment; realization of profit or loss; working for more than one firm at a time; making service available to public; right to discharge; right to terminate without liability); <u>Home Ins. Co. v. Industrial Comm'n</u>, 599 P.2d at 803 ("These indicia . . . include: duration of the employment; the method of payment; who furnishes necessary equipment; the right to hire and fire; who bears responsibility for workmen's compensation insurance; the extent to which the employer may exercise control over the details of the work, and whether the work was performed in the usual and regular course of the employer's business."); <u>Dial-A-Messenger, Inc. v. Arizona Dep't of Econ. Sec.</u>, 648 P.2d 1053, 1057-1059 (Ariz. Ct. App. 1982) (discussing multiple factors: authority over an individual's assistants; compliance with instructions; oral or written reports; personal performance; establishment of work sequence; right to discharge; set hours of work; training;

27

amount of time; expense reimbursement; availability to the public; compensation on job basis; realization of profit or loss; significant investment). The common denominator is that the test is the alleged employer's reserved right to control. Arizona courts consider the totality of the circumstances when evaluating the indicia of control, and no single factor is itself conclusive. Santiago v. Phoenix Newspapers, 794 P.2d at 143; Hunt Bldg. Corp. v. Industrial Comm'n, 713 P.2d at 306; Home Ins. Co. v. Industrial Comm'n, 599 P.2d at 803 ("To determine the right to control, courts look to the totality of the facts and circumstances of each case, examining various indicia of control. . . . In undertaking an analysis none of the indicia is, in itself, conclusive.").

The drivers' supplemental brief highlights and relies on the use in some Arizona decisions of the disjunctive "*or*" to argue that a right to supervise contracted-for results indicates an employee relationship in Arizona. See Home Ins. Co. v. Industrial Comm'n, 599 P.2d at 803 (noting employment status turns on "[t]he right to control *or* supervise the method of reaching a specific result" (emphasis added)). The language cited by the drivers doesn't support their argument. The phrase doesn't say that the right to supervise a result indicates employee status; the phrase says the right to supervise the method of reaching a specific result indicates employee status. This test is no different from other states using the right to control test, and it differentiates between results-oriented supervision of contracted-for rights and supervision and control of means and methods used to achieve those results.

28

If the drivers were correct, Arizona law would be radically different from Kansas law and Arizona cases would reflect their argument. But Arizona cases don't interpret the "or" language as the drivers suggest. For example, the <u>Home Insurance</u> court, which used the disjunctive "or", held that a hiring party could reasonably expect the worker's compensation claimant to follow established departure and arrival times, and that he not deviate from well-recognized delivery routes, without creating an employment relationship. <u>Home Ins. Co. v. Industrial Comm'n</u>, 599 P.2d at 804; *see also* <u>Hunt Bldg. Corp. v. Industrial Comm'n</u>, 713 P.2d at 306-307 (noting that applying Arizona's right to control test "require[s] sufficient control over the method of reaching a desired result as opposed to merely controlling the end result of the work."); <u>Central Mgmt. Co. v. Industrial Comm'n</u>, 781 P.2d 1374, 1376-1377 (Ariz. Ct. App. 1989) ("If the right of control of details goes no further than is necessary to ensure a satisfactory end result, it does not establish employment." (citation omitted)).

The drivers also argue that the intent factor is "noticeably absent" from Arizona decisions. Arizona cases hardly mention intent at all. But, as discussed in the general introduction to today's decisions, even though the intent factor weighs clearly in favor of an independent contractor relationship in states that weigh this factor, this factor wasn't dispositive in the Kansas Decision and its absence from consideration under Arizona law doesn't change today's outcome.

The court has held that FedEx's retained controls are results-oriented and there is no reasonable inference that FedEx has retained the right to control the

29

methods and means of the plaintiff drivers' work on a class-wide basis. Kansas Decision, at 73. The Kansas Decision discussed nearly all the factors cited by Arizona courts, and the court incorporates that decision here. One factor not discussed in Kansas is the drivers' availability to the public. The drivers are free to work for whomever else they wish, and, as discussed in the Kansas Decision, this freedom is far from illusory when the drivers take advantage of the entrepreneurial opportunities available to them. Their trucks, when covered with the FedEx logo, aren't available to the public for service. Yet plumbers working at a job site aren't available to the rest of the public when working a contract, so there's nothing special in itself about a contractor or a van being tied up with a particular job. The availability factor could indicate employee status under numerous factual contexts, but in light of the drivers' entrepreneurial opportunities, this factor doesn't change the balance found by the court in its Kansas Decision. For the reasons stated here and in the Kansas Decision, the Gibson drivers are independent contractors under Arizona law.

### C. Arkansas (3:06-cv-209, Harris)

The Harris drivers allege violations of Arkansas' Wage and Hour Law, breach of contract, misrepresentation, unjust enrichment, conversion, quantum meruit, and violations of the Fair Labor Standards Act; they seek declaratory judgment and injunctive relief. The drivers didn't seek class certification on the breach of contract, misrepresentation, or FLSA claims, but they represented that "[a]t the

heart of the Arkansas claims is the common 'overarching issue' of whether FXG improperly labels these drivers as independent contractors." Memo. in Support of Mot. to Certify Class (Arkansas), Apr. 23, 2007, at 1 [Doc. No. 603]. Only the plaintiffs moved for summary judgment. For the reasons stated below, the court denies the drivers' summary judgment motion and grants judgment independent of the motion to FedEx on the state law claims only. To the extent the drivers' claims depend upon Arkansas state law, the court decides their claims today because they turn on the central question of the drivers' employment status under Arkansas law. The FLSA claim hasn't been briefed and requires further development with individualized evidence. *See* Op. and Ord., July 27, 2009, at 9-16 [Doc. No. 1770]. The court will suggest remand of the FLSA-related claims for further disposition.

FedEx didn't file a summary judgment motion with respect to the Arkansas class. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under Arkansas law, the drivers' employment status can be examined today without prejudice to the plaintiffs, and answering now the question of the plaintiff drivers' employment status under Arkansas law will conserve judicial resources. Summary judgment is appropriate in Arkansas when the facts are undisputed and only one inference can reasonably be drawn from them. Howard v. Dallas Morning News, Inc., 918

31

S.W.2d 178, 185 (Ark. 1996); *see also* <u>Dickens v. Farm Bureau Mut. Ins. Co. of</u>
<u>Arkansas</u>, 868 S.W.2d 476 (Ark. 1994) (affirming summary judgment finding
independent contractor status).

Arkansas follows the multi-factor Restatement test for employment status
discussed in the Kansas Decision. *See* RESTATEMENT (SECOND) OF AGENCY § 220.
The right to control is the most important factor, and the right to control, not
actual control, determines the relationship. Because a fact intensive inquiry is
required, each case must be decided on its own facts, under the totality of the
circumstances. *See* <u>Conagra Foods, Inc. v. Draper</u>, 276 S.W.3d 244, 249 (Ark.
2008); <u>Arkansas Transit Homes, Inc. v. Aetna Life & Casualty</u>, 16 S.W.3d 545,
547-548 (Ark. 2000); <u>Howard v. Dallas Morning News</u>, 918 S.W.2d at 182-183.

Arkansas follows the distinction between controlling results and controlling
methods and means used to obtain those results:

> It is not enough that the employer has merely a general right to order
> the work stopped or resumed, to inspect its progress or to receive
> reports, to make suggestions or recommendations which need not
> necessarily be followed, or to prescribe alterations and deviations.
> Such a general right is usually reserved to employers, but does not
> mean that the contractor is controlled as to his methods of work, or
> as to operative detail. There must be a retention of a right of
> supervision that the contractor is not entirely free to do the work his
> own way.

<u>Conagra Foods v. Draper</u>, 276 S.W.3d at 250 (*quoting* <u>Williams v. Nucor-Yamato</u>
<u>Steel Co.</u>, 886 S.W.2d 586, 587 (Ark. 1994) (alterations omitted)).

> [I]n contracts for the performance of work, the inclusion of such
> phrases as, "work is to be done in accordance with instructions,"
> "under direction and supervision," and the like does not relate to the

32

method or manner in which work is to be done, and does not govern
the details of the physical means by which the work is to be
performed, or change the status of independent contractor to that of
master and servant.

Conagra Foods v. Draper, 276 S.W.3d at 250 (discussing Moore v. Phillips, 120
S.W.2d 722 (Ark. 1938)).

Arkansas courts construe employee status more broadly in situations
involving *respondeat superior* liability or worker's compensation. Among all the
states' cases this court has examined, Arkansas courts have given special
emphasis to the rule that although one entrusts work to an independent
contractor, one may yet be liable for harm the contractor causes to others to the
extent one has retained control of any part of the contractor's work—even though
the contractor still is generally considered an independent contractor and not an
employee. Elkins v. Arkla, Inc., 849 S.W.2d 489, 490 (Ark. 1993) (*citing*
RESTATEMENT (SECOND) OF TORTS § 414). As the Arkansas Supreme Court put it,
"[W]hen one is sought to be held responsible for the tortious act of another under
the principle of *respondeat superior*, the question of responsibility will not depend
entirely upon the existence of some actual contractual relationship of master and
servant. It is sometimes allowable to prove the relation of master and servant by
the fact that one performs service for another." Conagra Foods v. Draper, 276
S.W.3d at 249, 250 (discussing RESTATEMENT (SECOND) OF TORTS § 414); Howard v.
Dallas Morning News, 918 S.W.2d at 184; *but see* Blankenship v. Overholt, 786
S.W.2d 814, 816 (Ark. 1990) (finding no liability even where employer provided

numerous specifications to contractor). Still, personal injury caused by an independent contractor doesn't automatically result in liability for the employer; when no factor supports a finding of employee status, no *respondeat superior* liability will attach. *See* Williams v. Nucor-Yamato Steel Co., 886 S.W.2d at 587 (stating that where there's no exercise of actual control or retained right of control, there's no liability for a company toward the injured employee of independent contractor). Yet Arkansas appears to give wider scope to employer liability in *respondeat superior* cases involving independent contractors, which has caused this court to read Arkansas *respondeat superior* cases with caution because today's case involves no personal injury issues.

Additionally, Arkansas policy is to liberally construe the scope of employee status in worker's compensation cases. *See, e.g.*, Franklin v. Arkansas Kraft, Inc., 670 S.W.2d 815, 816 (Ark. Ct. App. 1984) ("It is well settled that the determination whether, at the time of injury, a person was an employee or an independent contractor, is a factual one, and the Commission is required to follow a liberal approach, resolving doubts in favor of employment status for the [injured] worker." (citation omitted)); *see also* Irvan v. Bounds, 170 S.W.2d 674, 675 (Ark. 1943) (same). But this isn't a worker's compensation case, either.

The drivers rely on three key cases to argue that they are employees under Arkansas law,[9] but those cases are distinguishable because they involve issues of

---

[9] Ironically, the plaintiffs argued in their summary judgment reply brief that these non-summary judgment cases were, at a minimum, not controlling and, at most, held dubious persuasive value because their procedural posture involved jury verdicts and heavy burdens to overcome those jury

*respondeat superior* and worker's compensation. *See* Conagra Foods, Inc. v. Draper, 276 S.W.3d 244 (Ark. 2008) (*respondeat superior*, personal injury); Arkansas Transit Homes, Inc. v. Aetna Life & Casualty, 16 S.W.3d 545 (Ark. 2000) (worker's compensation); Howard v. Dallas Morning News, Inc., 918 S.W.2d 178 (Ark. 1996) (*respondeat superior*, personal injury). The physical harm context sufficiently colored the decisionmaking of those courts to cast doubt on the cases' controlling value for today's decision. As noted, the Conagra Foods court stated *respondeat superior* liability sometimes is appropriate merely because one person performs service for another. Independent contractors, by definition, perform services for others, so the general question of employment status can't be colored by a policy that imposes liability when physical injury occurs, because no physical harm is part of the case before the court today.

In the Kansas Decision, the court held FedEx's controls to be results-oriented controls, not controls over methods and means. Further, the court held that only one reasonable inference was available from the undisputed facts: although FedEx has reserved the right to control the contracted-for results, on the evidence available under this case's procedural posture, FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis. *See* Kansas Decision, at 73. The court addressed the Restatement factors in its

---

verdicts. *See* Reply Memo. in Support of Mot. for Summ. Judg. (Arkansas) (Corrected), July 10, 2008, at 2 & n.2 [Doc. No. 1475]. The plaintiffs' original argument is somewhat persuasive, but the differing issues of *respondeat superior* and worker's compensation dispositively distinguish these cases.

Kansas Decision, and the reasoning from that decision is incorporated here. The court concludes that the <u>Harris</u> drivers are independent contractors under Arkansas law.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the FLSA-related claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### D. California

#### (1) 3:05-cv-528, <u>Alexander</u>

The <u>Alexander</u> drivers allege violations of the Family and Medical Leave Act; violations of various California wage-related statutes, including failure to reimburse, failure to pay overtime, late payment of wages, failure to provide meal and break periods, and illegal deductions from wages; unlawful coercion; fraud; unfair business practices; and wrongful termination. They seek an accounting, civil penalties, declaratory relief, and injunctive relief. The court granted certification for the state law claims, but denied certification for the FMLA claims because the federal claims require individualized evidence for predominant issues.

36

*See* Op. and Or., Mar. 25, 2008, at 65-66 [Doc. No. 1119]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court grants summary judgment to FedEx and denies the plaintiffs' motion for summary judgment. The holding that the plaintiffs are independent contractors under California state law resolves the state law claims. The parties haven't briefed the FMLA-related claims, and those claims require further development. The court will suggest remand of the Alexander case for further disposition of the FMLA-related claims.

The parties agree that because the relevant statutes in question don't define "employee," the applicable employment status test is set forth in S.G. Borello & Sons, Inc. v. Department of Indus. Relations, 256 Cal. Rptr. 543 (Cal. 1989). *See* Estrada v. FedEx Ground Package Sys., 64 Cal. Rptr. 3d 327, 335 (Cal. Ct. App. 2007). The principal test of employment status is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established." S.G. Borello & Sons v. Department of Indus. Relations, 256 Cal. Rptr. at 548 (*citing* Tieberg v. Unemployment Ins. Appeals Bd., 88 Cal. Rptr. 175, 177 (Cal. 1970)). The right to discharge at will, without cause, is strong evidence of the existence of employee status. S.G. Borello & Sons v. Department of Indus. Relations, 256 Cal. Rptr. at 548 (*citing* Tieberg v. Unemployment Ins. Appeals Bd., 88 Cal. Rptr. at 179). Other factors to be

37

considered are the remaining factors from the Restatement (Second) of Agency §
220. S.G. Borello & Sons v. Department of Indus. Relations, 256 Cal. Rptr. at 548
(*citing* Tieberg v. Unemployment Ins. Appeals Bd., 88 Cal. Rptr. at 179-180 & n.4).
Individual factors aren't applied mechanically as separate tests; they are
intertwined and their weight often depends on particular combinations and the
circumstances and facts of each case. S.G. Borello & Sons v. Department of Indus.
Relations, 256 Cal. Rptr. at 548.

S.G. Borello & Sons pushed this traditional right to control test in the
direction of an "economic realities" test, without eliminating the applicability of the
right to control test and the Restatement factors. This way of approaching the
common law factors differs materially from other states considered in today's
decisions. S.G. Borello & Sons was a worker's compensation case and heavily
emphasized the history and remedial and social purposes of California's Worker's
Compensation Act: (1) to ensure that the cost of industrial injuries will be part of
the cost of goods rather than a burden on society; (2) to guarantee prompt, limited
compensation for an employee's work injuries, regardless of fault, as an inevitable
cost of production; (3) to spur increased industrial safety; and (4) to insulate the
employer from tort liability for an employee's injuries. S.G. Borello & Sons v.
Department of Indus. Relations, 256 Cal. Rptr. at 550. Traditional common law
analysis didn't meet these concerns:

> The common law and statutory purposes of the distinction between
> "employees" and "independent contractors" are substantially
> different. While the common law tests were developed to define an

38

employer's liability for injuries caused *by* his employee, the basic inquiry in compensation law involves which injuries *to* the employee should be insured against by the employer.

S.G. Borello & Sons v. Department of Indus. Relations, 256 Cal. Rptr. at 549 (citations and quotations omitted). In the face of employee-protective legislation, a worker's status must be resolved "with deference to the purposes of the protective legislation" and "[t]he nature of the work, and the overall arrangement between the parties, must be examined to determine whether they come within the 'history and fundamental purposes' of the statute." Id. at 550 (citations omitted).

To assist with this analysis, S.G. Borello & Sons mentioned a six-factor test other jurisdictions use in the worker's compensation context, while maintaining that the test was basically a re-hashing of the Restatement test:

Besides the 'right to control the work,' the factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

S.G. Borello & Sons v. Department of Indus. Relations, 256 Cal. Rptr. at 551 (citations omitted). Each situation must still be evaluated on its own facts, and the dispositive circumstances may vary from case to case. Id.

The S.G. Borello & Sons court applied a "right to control overall process" test that it believed met the policy objectives behind California's Worker's Compensation Act. The workers in S.G. Borello & Sons were cucumber harvesters who worked for short periods of time and were paid half the gross proceeds of the

39

cucumbers harvested. The harvesters alone were responsible for deciding the best method of hoeing, weeding, irrigating, and harvesting the cucumbers to maximize their payments, so the grower didn't reserve a right to control the details of the harvesters' work. Id. at 551-552; *see also* Rinaldi v. Workers' Comp. Appeals Bd., 278 Cal. Rptr. 105, 109 (Cal. Ct. App. 1991) (noting lack of traditional control over cucumber harvesters in Borello). But the Borello court turned to what later courts have described as the "economic realities" of the situation to take into account that the grower was in the business of producing and selling agricultural crops, and despite ceding control to the harvesters over a piecemeal aspect of the operation, the grower maintained "pervasive control over the operation as a whole." S.G. Borello & Sons v. Departmentt of Indus. Relations, 256 Cal. Rptr. at 552. The grower controlled all meaningful aspects of the business relationship—price, crop cultivation, fertilization, insect prevention, payment, and the right to deal with buyers. The grower thus maintained all "necessary" control over the work, and the lack of control of the details was attributable to the simplicity of the work, not to a relinquishment of control. Id. at 552. In sum, the S.G. Borello & Sons court's analysis found that S.G. Borello & Sons had a right to control the overall process, the harvesters were a regular and integral part of S.G. Borello & Sons' business operation, the harvesters' work was permanent insofar as they returned season after season for work, the harvesters didn't hold themselves out as businesses, the harvesters made no investment other than

40

personal service and hand tools, the harvesters had no opportunity for profit or loss, and the harvesters' terms of service were non-negotiable. Id. at 552-553.

Post-Borello courts have held the coupling of the right to control the overall process with the integral nature of a person's work in a business to indicate employee status. See Air Couriers Int'l v. Employment Dev. Dep't, 59 Cal. Rptr. 3d 37 (Cal. Ct. App. 2007) (affirming finding of employee status for employment tax purposes where courier retained all necessary control over the overall delivery operation, the work was simple, the workers weren't engaged in a separate profession or operating an independent business, and the delivery work was an integral aspect of the courier's business); JKH Enters., Inc. v. Department of Indus. Relations, 48 Cal. Rptr. 3d 563, 579 (Cal. Ct. App. 2006) (finding drivers in courier business to be employees because JKH retained all necessary control over the operation as a whole, drivers' work wasn't highly skilled, and drivers' function was integral to courier business, even though JKH didn't exercise control over the details of the work and JKH was more concerned with the results of the work than the means of its accomplishment); Rinaldi v. Workers' Comp. Appeals Bd., 278 Cal. Rptr. 105, 109 (Cal. Ct. App. 1991) (finding almond grower to be employer of injured worker because, although the grower lacked control in the traditional sense, he retained all necessary control over the Almond growing operation as a whole, harvesting almonds didn't require much skill, and the harvesters' work was integral to the grower's operation). But no case before this court, except for the trial court's decision in Estrada v. FedEx Ground, No. BC

41

210130 (Cal. Super. Ct. July 26, 2004) [Exh. B to Pltfs' Req. for Judicial Notice, Apr. 24, 2008], indicates what might happen if the S.G. Borello & Sons workers had entrepreneurial opportunities such that their work could be conducted from the auspices of a separately operating business. Each case must be analyzed under its own facts and circumstances. Nothing indicates a rule of law that an employer's right to control the overall operation together with integration into an employer's business necessarily requires a finding of employee status regardless of the other factors to be considered.

Cases after S.G. Borello & Sons haven't uniformly applied the "right to control overall operations" approach highlighted here. Some have focused on the traditional right to control methods and means test used by other states considered in today's decisions. *See* Antelope Valley Press v. Poizner, 75 Cal. Rptr. 3d 887, 899-900 (Cal. Ct. App. 2008) (using manners and means approach to evaluate the right to control); Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327, 335 (Cal. Ct. App. 2007) ("The essence of the [right to control] test is the 'control of details'—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work."). As in S.G. Borello & Sons, Antelope Valley Press was a worker's compensation case where that court, in harmony with S.G. Borello & Sons's policy analysis, expressed concern about newspaper carriers' inability to distribute the risk and cost of injury as an expense of doing business because no evidence showed the carriers had other sources of business income. Antelope Valley Press v. Poizner, 75 Cal.

42

Rptr. 3d at 900. The Estrada court zeroed in on extensive extrinsic evidence of the right to control FedEx Single Work Area drivers' methods and means of doing their work. Estrada v. FedEx Ground Package Sys., 64 Cal. Rptr. 3d at 331-337.

The drivers haven't argued the policies and purposes behind the California wage statutes in question. In a case similar to the one before this court, in which FedEx drivers sought reimbursement for work-related expenses, the Estrada appellate court didn't discuss the wage statutes' policies and purposes. Today's case doesn't involve concerns that injured employees should have their costs of on-the-job injuries covered, employers should cover those costs, employers should have their liability for these costs capped, and consumers of specific products of that work should ultimately bear the costs and not the public at large. See S.G. Borello & Sons v. Department of Indus. Relations, 256 Cal. Rptr. at 551; Rinaldi v. Workers' Comp. Appeals Bd., 278 Cal. Rptr. at 111 (expressing concern that to come to a different conclusion "would virtually guarantee that in all such cases the costs of injuries would be borne by society at large through the Uninsured Employer's Fund"). Rather, the concerns behind the statutes here at issue seem to be protecting employees from being deprived of their due wages and preventing employers from using contractual arrangements as a subterfuge to avoid paying due wages to employees. Cf. Narayan v. EGL, Inc., 616 F.3d 895, 897 (9th Cir. 2010) (stating, in the context of overtime, improper deductions, and business expenses claims, that "statutes enacted to confer special benefits on workers are designed to defeat rather than implement contractual arrangements" (quotation

43

omitted)). To the extent today's plaintiff drivers agreed to bear certain expenses of their work and be paid by FedEx in a way that accounts for these expenses, the court doesn't believe that special policy considerations (which the drivers didn't bring before the court) should color today's decision. Rather, the court applies the S.G. Borello & Sons common law test using both types of right to control found in California cases as a method of determining whether the contractual arrangement before the court is a subterfuge to avoid statutory duties imposed on employers or is a valid contractual arrangement between an employer and independent contractors.

The drivers state early in their supplemental brief that "[i]n California, local delivery drivers like the FXG drivers here are employees as a matter of law." The drivers' citations give this argument force, but the argument also forgets the Estrada trial court's finding that the MWA plaintiff was an independent contractor. The cases cited by the drivers contain findings that drivers were integral to the employer's business, but don't indicate that the workers had entrepreneurial opportunities or opportunities for profit, and so are readily distinguishable from the Alexander drivers' case for this reason (and for other reasons the court needn't discuss here, such as deferential standard of review). See Messenger Courier Assoc. of the Ams. v. California Unemp't Ins. Appeals Bd., 96 Cal. Rptr. 3d 797, 802 (Cal. Ct. App. 2009); Antelope Valley Press v. Poizner, 75 Cal. Rptr. 3d 887, 900 (Cal. Ct. App. 2008); Air Couriers Int'l v. Employment

Dev. Dep't, 59 Cal. Rptr. 3d 37, 46-48 (Cal. Ct. App. 2007); JKH Enters. v. Department of Indus. Relations, 48 Cal. Rptr. 3d 563, 577 (Cal. Ct. App. 2006).

Under the right to control details approach, this court has held that there is no reasonable inference that FedEx has retained the right to control the plaintiff drivers' methods and means of conducting their work on a class-wide basis. Kansas Decision, at 73. The court also addressed and weighed all the Restatement factors in its Kansas Decision and incorporates here its reasoning in that decision. Although the S.G. Borello & Sons court's economic realities approach would give greater emphasis to the finding that the plaintiff drivers' work is integral to FedEx's business, that approach also would give greater emphasis to the plaintiff drivers' class-wide entrepreneurial opportunities, which this court has held to be highly indicative of independent contractor status. California law, though different from Kansas law in its focus on economic realities, doesn't produce an outcome materially different from that under Kansas law. For the reasons stated here and in the Kansas Decision, the Alexander drivers are independent contractors under the right to control details approach.

The right to control details holding doesn't automatically apply under California's "right to control overall process" approach. FedEx clearly has the right to control the overall process of its package delivery business. As in S.G. Borello & Sons, the drivers perform a service that is an essential part of FedEx's overall business. FedEx controls the overall process by controlling pricing and by implementing many results-oriented controls to ensure proper package delivery,

45

as was discussed the Kansas Decision. Yet, the right to control, though a primary consideration, isn't dispositive; what is dispositive here is the drivers' class-wide ability to own and operate distinct businesses, own multiple routes, and profit accordingly. The court agrees with, and finds persuasive, the <u>Estrada</u> trial court's distinction between SWA and MWA drivers.[10] The court has weighed all the other relevant factors in the Kansas Decision and incorporates that decision here insofar as it addresses relevant factors other than the right to control details. The <u>Alexander</u> drivers are independent contractors under the right to control overall process approach.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the FMLA-related claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

*(2) 3:06-cv-429, <u>Pedrazzi</u>*

Jeremiah Pedrazzi, a sole plaintiff and a member of the California <u>Alexander</u> class, alleges illegal kickbacks, unfair business practices, violations of California's

---

[10] As already discussed, the court parts company with the <u>Estrada</u> trial court's finding of FedEx's right to control details, due to the differing evidentiary and procedural postures of these cases.

wage statutes and related statutes, breach of contract, retaliation, hostile work environment, employment discrimination based on disability, infliction of emotional distress, and wrongful termination in violation of public policy. FedEx moved for summary judgment, incorporating its <u>Alexander</u> arguments and also arguing that employment status under California's antidiscrimination statutes is governed by the standard set forth in <u>S.G. Borello & Sons, Inc. v. Department of Indus. Relations</u>, 256 Cal. Rptr. 543. Mr. Pedrazzi responded, agreeing that <u>S.G. Borello & Sons</u> controls his antidiscrimination claims. For the reasons just stated in <u>Alexander</u>, the court grants in part FedEx's request for summary judgment on Mr. Pedrazzi's wage-related and breach of contract claims,[11] which are identical to the claims made in <u>Alexander</u>, and the court will suggest remand of Mr. Pedrazzi's case to its transferor court for further disposition on his discrimination-related claims.

Although the parties agree that <u>S.G. Borello & Sons</u> applies to Mr. Pedrazzi's disability discrimination claims, the court notes that <u>S.G. Borello & Sons</u> applies the common law employment status test in light of the remedial purposes of the California statute in question. *See* <u>Alexander</u> decision, *supra* at 37-48. The parties haven't briefed the policy purposes behind California's antidiscrimination statutes and how those purposes affect the common law analysis set forth in <u>S.G. Borello</u>

---

[11] Mr. Pedrazzi's breach of contract claim is premised on the argument that FedEx misclassified him as an independent contractor. Like most other breach of contract claims in today's decisions, the determination that Mr. Pedrazzi is an independent contractor decides the breach of contract claim against him and in favor of FedEx.

& Sons. As discussed in <u>Alexander</u>, taking these policy purposes into account is essential under <u>S.G. Borello & Sons</u>. If, as Mr. Pedrazzi alleges in his complaint, FedEx terminated his contract because of his disabilities, the court can't say without briefing on the issue that today's <u>Alexander</u> holding should apply to Mr. Pedrazzi in the potentially different context of the remedial purposes of California's antidiscrimination laws. Mr. Pedrazzi's claims of intentional and negligent infliction of emotional distress, retaliation, hostile work environment, and wrongful termination in violation of public policy might be tied to a separate determination of Mr. Pedrazzi's employment status under California's antidiscrimination statutes. Additionally, Mr. Pedrazzi's discrimination-related claims aren't class claims, so further discovery of particularized evidence seems likely to be appropriate for the resolution of those claims.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the discrimination-related claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

*(3) 3:08-cv-52, <u>Huerta</u>*

48

Ricardo Huerta, a member of the California _Alexander_ class, brings several claims of breach of contract, fraud, misrepresentation, and violations of California's wage (and related) statutes. FedEx filed a motion for summary judgment incorporating its _Alexander_ arguments, and Mr. Huerta's response also incorporates the _Alexander_ arguments. Because Mr. Huerta is a member of the _Alexander_ class, today's decision in _Alexander_ is binding on him; he is an independent contractor. For the reasons stated in _Alexander_, the court grants summary judgment to FedEx. Unlike most breach of contract claims in these MDL cases, a number of Mr. Huerta's breach of contract claims appear to be premised on his position as an independent contractor and so appear to require further disposition. The court will suggest remand of Mr. Huerta's case to the transferor court for further disposition.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

_E. Florida_

49

*(1) 3:05-cv-664* <u>Carlson</u>

The <u>Carlson</u> drivers claim violations of Florida's Deceptive and Unfair Trade Practices Act, negligently supplied false information, breach of contract, and fraud; they seek rescission and declaratory judgment. The drivers indicated that all their claims would turn on the predominant, common issue of whether they are employees or independent contractors under Florida law. *See* Memo. in Support of Mot. to Certify Class (Florida), April 2, 2007, at 1 [Doc. No. 584]. The parties have filed cross-motions for summary judgment. For the reasons stated below, the court grants summary judgment to FedEx and denies the <u>Carlson</u> drivers' summary judgment motion. Because the Florida claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx on all claims in this Florida (<u>Carlson</u>) case.

The contents of the Operating Agreement and generally applicable Policies and Procedures are undisputed, so the determination of employment status "depends upon the legal relationship that the undisputed facts engender." <u>Hilldrup Transfer & Storage of New Smyrna Beach, Inc. v. Department of Labor and Emp't Sec., Div. of Emp't</u>, 447 So.2d 414, 415 (Fla. Dist. Ct. App. 1984) (*citing* <u>Cantor v. Cochran</u>, 184 So.2d 173, 174 (Fla. 1966)); *see also* <u>Harper v. Toler</u>, 884 So.2d 1124, 1130 (Fla. Dist. Ct. App. 2004) ("Thus, if the only reasonable view of the evidence compels the conclusion that an employment relationship did not exist, a court may determine the issue as a matter of law.").

50

Florida courts have stated Florida's common law employment status test in various ways over the last few decades. Some have turned to a very traditional four-factor test (see today's Alabama decision, *supra* at 19-25), with right to control being the weightiest factor. *See* <u>Saudi Arabian Airlines Corp. v. Dunn</u>, 438 So.2d 116 (Fla. Dist. Ct. App. 1983). Others have concluded that the test involves weighing seven of the Restatement factors. *See* <u>Carroll v. Kencher, Inc.</u>, 491 So.2d 1311, 1312 (Fla. Dist. Ct. App. 1986). Still others have held that the main test is simply whether the purported employer has direction and control over the purported employee. *See* <u>Verchick v. Hecht Invs., Inc.</u>, 924 So.2d 944, 946 (Fla. Dist. Ct. App. 2006).

The Florida Supreme Court, however, has turned to the full list of factors set forth in the Restatement (Second) of Agency, § 220(2). *See* <u>Cantor v. Cochran</u>, 184 So.2d at 174. One particular appellate court nicely summed up the law in a way fully consistent with other Florida appellate decisions and the Florida Supreme Court's decision in <u>Cantor v. Cochran</u>:

> The "extent of control" referred to in Restatement section 220(2)(1) has been recognized as the most important factor in determining whether a person is an independent contractor or an employee. Of course, employees and independent contractors both are subject to some control by the person or entity hiring them. The extent of control exercised over the details of the work turns on whether the control is focused on simply the "result to be obtained" or extends to the "means to be employed." A control directed toward *means* is necessarily more extensive than a control directed toward *results*. Thus, the mere control of results points to an independent contractor relationship; the control of means points to an employment relationship. Furthermore, the relevant issue is the extent of control which, by the agreement, the master *may* exercise over the details of

the work. Thus, [i]t is the right of control, not actual control or actual interference with the work, which is significant in distinguishing between an independent contractor and [an employee].

Harper v. Toler, 884 So.2d at 1131 (citations and quotations omitted; emphasis and alterations in the original); *see also* Keith v. News & Sun Sentinel Co., 667 So.2d 167, 172 (Fla. 1995) (noting that intent and right to control factors must be given special weight among the Restatement factors so as to avoid inconsistent results when applying them).

Florida courts consistently point out that no bright-line rule exists for applying these principles, and each case must be determined on its own facts and in light of the totality of the circumstances. Keith v. News & Sun Sentinel Co., 667 So.2d at 170 (holding that presumption of newspaper delivery person's status as independent contractor doesn't exist because "the facts peculiar to each case govern the decision"); Magarian v. Southern Fruit Distribs., 1 So.2d 858, 861 (Fla. 1941) ("[E]ach case must stand on its own facts and, therefore, no useful purpose may be served by citing particular cases involving different factual conditions."). Nonetheless, the parties' arguments search for bright-line rules.

FedEx urges the court to place dispositive weight on the intent expressed in the Operating Agreement that an independent contractor relationship should exist, an intent buttressed by provisions in the Agreement prohibiting FedEx from exercising control over drivers' means and methods of conducting their work. As in the Kansas Decision, the intent factor weighs "strongly" in FedEx's favor because of the clarity of the stated intent in the contracts, not because of its

52

relative weight vis-à-vis other factors, particularly the right to control. Some Florida courts have given the intent factor special significance, second only, perhaps, to the right to control. *See* <u>Keith v. News & Sun Sentinel Co.</u>, 667 So.2d at 171 ("Hence, courts should initially look to the agreement between the parties, if there is one, and honor that agreement, unless other provisions of the agreement, or the parties' actual practice, demonstrate that it is not a valid indicator of status."). But be that as it may, Florida courts also have issued the usual caution against accepting form over substance, so today's decision doesn't rely on giving the intent factor dispositive weight. *See, e.g.*, <u>Adams v. Department of Labor & Emp't Sec., Div. of Unemp't Comp.</u>, 458 So.2d 1161, 1162 (Fla. Dist. Ct. App. 1984) (*citing* <u>Cantor v. Cochran</u>, 184 So.2d at 174 (Fla. 1966)).

The drivers rely heavily on <u>Justice v. Belford Trucking Co., Inc.</u>, 272 So.2d 131 (Fla. 1972), in which a worker's compensation claimant filled out an employment application with Belford Trucking and signed a contract that expressly stated the intent to create an independent contractor relationship. The claimant was to lease a trailer from Belford Trucking for five years for exclusive use in the service of Belford Trucking. The claimant made pickups and deliveries at the command of Belford and was told he risked termination if he refused a trip. Sometimes, Belford Trucking would lease the claimant over to other carriers without his input. Belford Trucking took worker's compensation premiums out of the claimant's paychecks, paid him a percentage of his freight, and issued W-2's showing taxes withheld. <u>Id.</u> at 132-134.

The drivers argue that <u>Justice</u> is directly analogous to their situation, but the facts are readily distinguishable. FedEx drivers are ultimately responsible for obtaining their own equipment, which they can use for their own purposes so long as FedEx logos are removed; FedEx doesn't lease the contractor-drivers over to other carriers; and FedEx drivers are paid as independent contractors, i.e., no taxes are withheld and 1099 Forms are issued. <u>Justice</u> is instructive, but it doesn't compel a trial or judgment for the plaintiffs here: each case must be assessed on its own facts. <u>Keith v. News & Sun Sentinel Co.</u>, 667 So.2d at170; <u>Magarian v. Southern Fruit Distribs.</u>, 1 So.2d at 861.

The court has held that "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. Whether the court looks only to the right to control, or to all the Restatement factors or some number of factors in-between, the result is the same. The relevant factors are all addressed in the Kansas Decision, which is incorporated here. The <u>Carlson</u> drivers are independent contractors under Florida law.

*(2) 3:09-cv-356, <u>Ward</u>*

Scott Ward and Juan Gomez allege age discrimination and tortious interference with their businesses; they seek declaratory relief finding that they are employees and not independent contractors.

Mr. Gomez might be a member of the Florida class; Mr. Ward might not be a member of the class. *See* Sealed Document, June 16, 2009 [Doc. Nos. 1758-18 & 1758-19]. Their complaint doesn't specify their class status. If they are class members, today's decision in <u>Carlson</u> binds them and they are independent contractors. If they aren't class members, the transferor court will decide how much weight to give to today's procedurally distinct decision in <u>Carlson</u> when deciding their case. The tortious interference claim appears to be premised on their position as independent contractors. Because these remaining claims wouldn't benefit from continued inclusion in this docket, the court will suggest remand of their case to its transferor court for further disposition.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding (including an indication of whether they are members of the <u>Carlson</u> class), without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### F. Georgia (3:05-cv-411, <u>White</u>)

The <u>White</u> drivers allege unjust enrichment; they seek rescission, a constructive trust and other equitable relief, and injunctive and declaratory relief.

All the drivers' claims are class certified and stand or fall on the determination of the drivers' employment status under Georgia law. The parties filed cross-motions for summary judgment. For the reasons stated below, the court grants summary judgment to FedEx and denies the White drivers' summary judgment motion. Judgment will be entered for FedEx on all the White claims.

The drivers rely on Atkins v. MRP Park Lake, L.P., 687 S.E.2d 215, 220 (Ga. Ct. App. 2009), to suggest that if the facts are disputed, Georgia law requires a trial on the question of employment status. The Atkins court found summary judgment improper because the parties had no written contract, and disputed evidence showed that the employer exercised control. Id. at 220. The matter before this court centers around the right to control retained in a written contract. The contract's contents and the applicable policies and procedures aren't in dispute; rather, the dispute relates to the law's application to the undisputed facts.

As the drivers argued in their summary judgment motion, and as the court set forth in the class certification order, Georgia's "chief test [of employment status] lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work as distinguished from the right merely to require certain definite results in conformity to the contract." Ross v. Ninety-Two West, Ltd., 412 S.E.2d 876, 881 (Ga. Ct. App. 1991); Op. and Ord., July 27, 2009, at 16-24 (citing cases) [Doc. No. 1770]; see also RBF Holding Co. v. Williamson, 397 S.E.2d 440, 441 (Ga. 1990); Larmon v. CCR Enters., 647 S.E.2d 306, 595 (Ga. Ct. App. 2007); Cotton States Mut. Ins. Co. v. Kinzalow, 634

S.E.2d 172, 175 (Ga. Ct. App. 2006). Some Georgia cases have turned to the factors recited in the Restatement (Second) of Agency § 220(2), though those cases seem to be a small minority. *See* Murphy v. Blue Bird Body Co., 429 S.E.2d 530, 532 (Ga. Ct. App. 1993) (applying Restatement factors to employment status issue). Georgia courts recognize that a contracting company, such as FedEx, is "entitled to take steps to ensure compliance with its contract and to monitor the results obtained thereunder," and that "the exercise of [its] right to protect and control its trade name and good will does not equate to managing the daily operations of [the drivers'] business." Cotton States Ins. v. Kinzalow, 634 S.E.2d at 401-402; *see also* McLaine v. McLeod, 335 S.E.2d 695, 700 n.5 (Ga. Ct. App. 2008) (gathering cases where supervision to ensure contracted-for result didn't result in employee status).

Georgia law holds somewhat uniquely that a rebuttable presumption of independent contractor status arises when a contract for services explicitly designates a worker as an independent contractor. This presumption disappears if the contract "provides that [the worker] shall be subject to any rules or policies of the employer which may be adopted in the future." Ross v. Ninety-Two West, Ltd., 412 S.E.2d at 881; *see also* Cotton States Ins. v. Kinzalow, 634 S.E.2d at 175. The Operating Agreement in question obligates drivers to keep their personal appearance "consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by FedEx Ground." OA, § 1.12 [Doc. No. 1237-2]. The Agreement also obligates drivers to purchase or lease

57

communications equipment, such as scanners, that comply "with specifications promulgated from time to time by FedEx Ground." OA, § 1.13. These provisions allow FedEx to issue further rules in the future and raise a cautionary flag against presuming independent contractor status, but they don't, by themselves, indicate employee status.

The drivers cite a few cases to suggest that, at minimum, a trial is needed. In Jordan v. Townsend, 197 S.E.2d 482 (Ga. Ct. App. 1973), the appellate court reversed a grant of summary judgment because the contract at issue created a material issue of fact regarding whether the corporation retained the right to control a tractor-trailer contractor's employee. The Jordan case is distinguishable because that contract expressly allowed the corporation to provide without restriction written specifications, which weren't expressly articulated in the contract, to timber harvesters in the future. See id. at 483 ("There were no restrictions on what 'reasonable rules' might be adopted by Union Camp or what the rules might consist of."). But, as noted in the Kansas Decision, the FedEx Operating Agreement places express limits on FedEx's authority to direct the means and methods of FedEx Ground drivers' work (and the question of whether FedEx actually breached those limits isn't before the court).

The drivers also rely on the inapposite case of Brown v. Who's Three, Inc., 457 S.E.2d 186 (Ga. Ct. App. 1995), which involved the question of whether an apprentice facial esthetician was an employee or independent contractor in a personal injury matter. The Brown court discussed at length Georgia statutory

58

and public policy placing *respondeat superior* liability on apprentices' supervisors. As a matter of policy, the esthetician couldn't be considered an independent contractor so the <u>Brown</u> court didn't examine the traditional common law test as to whether she was or wasn't a contractor: it ruled simply, "[t]he statute precludes, by public policy, the status of independent contractor for an apprentice." <u>Id.</u> at 191.

Finally, the court in <u>Mark Six Realty Assocs., Inc. v. Drake</u>, 463 S.E.2d 917 (Ga. Ct. App. 1995), held that a real estate salesperson was, atypically, an employee rather than an independent contractor, in a situation in which the agent sold a house containing numerous structural defects. Mark Six assigned the agent to work on the subdivision in question, required her to follow certain negotiating procedures and use standard forms, subjected her to quarterly performance reviews, and exercised other similar controls. <u>Id.</u> at 919-920. The case differs for two reasons. First, the case's procedural posture was the appeal of a trial court's denial of a motion for judgment notwithstanding the verdict after a jury found for Drake. Under that posture, the procedural rules weighed heavily in favor of the plaintiff: "The standard of review is whether any evidence supports the jury's verdict, and we must construe the evidence in the light most favorable to the party who prevailed before the jury." <u>Id.</u> at 919. Nothing indicates what the trial court thought of the case at summary judgment, or whether such a motion had been filed. Because "some" evidence existed that Mark Six retained the right to exercise, and did exercise, control over the time, manner, and method of the agent's

performance of her duties, the trial court didn't err in denying the JNOV motion. Id. at 920. Second, the contract required the agent in question to work solely and exclusively for Mark Six during specified hours. Id. at 920. This MDL case involves much more freedom to apply the law to the undisputed facts and involves drivers who can have complete freedom in their schedules by hiring assistants or by otherwise taking advantage of the entrepreneurial opportunities allowed to them.

The court incorporates the Kansas Decision and its conclusion that there is no reasonable inference that FedEx has retained the right to control the plaintiffs' work methods on a class-wide basis. Kansas Decision, at 73. To the extent Georgia law would recognize a broader examination of the employment status question using the Restatement test, the court again incorporates here the reasoning of the Kansas Decision. The White drivers are independent contractors under Georgia law.

### G. Indiana (3:05-cv-390, Riewe)

The Riewe drivers claim illegal deductions from wages, in violation of Indiana Code §§ 22-2-6 and 22-2-4-4, and fraud. They seek rescission and declaratory and injunctive relief. Though the drivers didn't seek to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under Indiana law. See Memo. in Support of Mot. to Certify Class (Indiana), Mar. 12, 2007, at 1 [Doc. No. 556]. The parties filed cross-motions for summary judgment. For the reasons stated below,

the court grants summary judgment to FedEx and denies the <u>Riewe</u> drivers'
summary judgment motion. Because the Indiana claims stand or fall on the
common question of whether FedEx Ground misclassified its drivers as
independent contractors, judgment will be entered for FedEx on all claims in the
Indiana case.

The applicable Indiana statutes don't define the term "employee," and the
parties agree the court should interpret the term by using Indiana's common law
test for employment status. *See* <u>Mortgage Consultants, Inc. v. Mahaney</u>, 655
N.E.2d 493, 495 (Ind. 1995). Indiana courts look to the ten-factor analysis
outlined in Restatement (Second) of Agency § 220 to resolve employment status.
<u>Moberly v. Day</u>, 757 N.E.2d 1007, 1009-1010 (Ind. 2001). The right to control the
means and methods of achieving results is the most important factor; the right to
control contracted-for results doesn't indicate employee status. The Restatement
factors should be weighed in a balancing test that takes account of the facts and
circumstances as a whole and "not merely tallied in a majority-wins formulation."
*See* <u>Moberly v. Day</u>, 757 N.E.2d at 1010 & n.3, 1011, 1013; <u>Mortgage Consultants
v. Mahaney</u>, 655 N.E.2d at 495-496.

The drivers rely heavily on <u>Dague v. Fort Wayne Newspapers, Inc.</u>, 647
N.E.2d 1138 (Ind. Ct. App. 1995), in which a husband was delivering newspapers
for his wife, who herself had contracted to deliver newspapers for Fort Wayne
Newspapers. The husband collided with a motorcycle and the motorcyclist was
killed. The wife had signed a contract stating she was an independent contractor;

Fort Wayne Newspapers provided a list of subscribers to whom papers needed to be delivered; the delivery person could hire replacements; the delivery person bore the costs of papers delivered wet or torn; Fort Wayne Newspapers didn't provide a vehicle or dictate the vehicle type; and Fort Wayne Newspapers provided a manual to carriers on how to generate sales, conduct collections, and provide good service. The <u>Dague</u> court reversed a grant of summary judgment to Fort Wayne Newspapers and held that a material issue of fact existed because competing inferences could be drawn from the undisputed facts. *See* <u>id.</u> at 1143.

A few overlapping facts aren't enough to make <u>Dague</u> controlling under a legal test in which no one fact is dispositive and the totality of the circumstances must be considered. The <u>Dague</u> court made the effort to point out that "Christine could not buy or lease her route, and she could not sell the route to another person if she discontinued as a carrier." <u>Id.</u> at 1141. The FedEx Ground drivers have a proprietary interest in their routes, can sell their routes, and can acquire multiple routes—they have real profit potential, and, like any independent business, loss potential. *See* Kansas Decision, at 35-37, 90-91, 101.

The drivers hint that because FedEx restricts the sale of routes to approved buyers and because FedEx can reconfigure routes, their situation is like that of the contractor in <u>Dague</u>, who had no proprietary interest in her newspaper delivery route. The court can't agree: a mildly qualified right to sell isn't equivalent to no right to sell—the Fort Wayne Newspaper employees couldn't sell their job and didn't have the contractual rights for entrepreneurial growth that FedEx

Ground drivers have. FedEx can't be expected to provide this right to its contractors without ensuring contracted-for results. FedEx's limitations on these rights are to the mutual benefit of drivers and FedEx: customer satisfaction means business for both. Nothing about the limitations in themselves compels a finding of employee status.

Additionally, Fort Wayne Newspapers provided subscriber lists indicating to whom the carriers had to deliver papers and required papers to be delivered dry and in one piece or else the carrier would bear the cost of the paper. Without more, these facts wouldn't have indicated employee status. *See* Twin States Publ'g Co., Inc. v. Indiana Unemp't Ins. Bd., 678 N.E.2d 110, 114 (Ind. Ct. App. 1997) (finding carriers weren't employees even though they had to deliver "by 5:00 p.m. on Tuesdays, place the guides in a dry place, and perform their services in a workmanlike manner"). As Indiana courts have repeated,

> When the person employing may prescribe what shall be done, but not how it is to be done, or who shall do it, the person so employed is a contractor and not a servant. The fact that the work is to be done under the direction and to the satisfaction of certain persons representing the employer does not render the [worker] . . . a servant.

Nash v. Meguschar, 91 N.E.2d 361, 363 (Ind. 1950); Dallas Moser Transporters, Inc. v. Ensign, 594 N.E.2d 454, 457 (Ind. Ct. App. 1992).

This court held that "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The Kansas Decision listed and addressed the Restatement factors, as well as all other relevant factors

under the totality of the circumstances, and the court incorporates here that decision. The Riewe drivers are independent contractors under Indiana law.

### H. Kentucky (3:05-cv-599, Coleman)

The Coleman drivers claim unlawful withholding of wages in violation of Kentucky's Wage Payment statute and fraud; they seek rescission, and declaratory and injunctive relief. Though the drivers didn't seek to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under Kentucky law. See Memo. in Support of Mot. to Certify Class (Kentucky), Apr. 23, 2007, at 1 [Doc. No. 602]. The drivers and FedEx filed cross-motions for summary judgment. The drivers' claims raise two distinct questions: (1) whether the drivers are employees under Kentucky common law; and (2) whether the drivers are employees under Kentucky's Wage Payment statute, KY. REV. STAT. §§ 337.060 and 337.070.

For the reasons stated below, the court grants in part FedEx's motion for summary judgment to the extent it seeks a determination that the drivers are independent contractors under Kentucky common law, and the court grants in part the drivers' summary judgment motion to the extent it seeks a determination that they are employees under Kentucky Revised Statute § 337.010 et seq. To the extent the Kentucky plaintiffs' claims rely on a generalized determination that they are employees under Kentucky common law, their claims won't proceed beyond this stage. To the extent the Kentucky plaintiffs' claims depend on a determination

that they are employees under Kentucky Revised Statute § 337.010 *et seq.*, the court will suggest remand for further proceedings in the transferor court.

Kentucky common law considers the same multi-factor test set forth in the Restatement (Second) of Agency § 220(2), outlined in the Kansas Decision. *See* Kentucky Unemp't Ins. Comm'n v. Landmark Cmty. Newspapers of Kentucky, Inc., 91 S.W.3d 575, 579 (Ky. 2002). Both parties rely heavily on the Landmark Newspapers case, which clarifies that Kentucky treats the right to control differently from Kansas: rather than being the most important factor, the right to control is weighed as just one among many factors. *See* id. at 580. Though the Landmark Newspapers case was an unemployment insurance case, its analysis of the right to control test applies here. Each case must be addressed on its own facts and, when the facts are undisputed, employment status is a question of law for the court to decide. Id.

The drivers' key argument is that the "regular business of the employer" Restatement factor is of prime importance and even dispositive in Kentucky. This court has held that the plaintiff drivers form an integral part of FedEx's business, and a line of Kentucky worker's compensation cases emphasize this factor. *See* Purchase Transp. Servs. v. Estate of Wilson, 39 S.W.3d 816, 818 (Ky. 2001); Uninsured Empl'rs Fund v. Garland, 805 S.W.2d 116, 118-119 (Ky. 1991); Chambers v. Wooten's IGA Foodliner, 436 S.W.2d 265, 266 (Ky. 1969); Ratliff v. Redmon, 396 S.W.2d 320, 325 (Ky. 1965) (noting right to control should focus not on control of details of the work to be done but rather on "the nature of the

65

claimant's work in relation to the regular business of the employer."); *see also* Hargis v. Baize, 168 S.W.3d 36, 42 (Ky. 2005) (noting that if the case were a worker's compensation case, the Garland (805 S.W.2d at 118-119) test would apply). These cases refocus the Restatement inquiry into four factors, recognizing "the difference between compensation law and vicarious liability in the purpose and function of the employment concept" as a policy matter for worker's compensation. Ratliff v. Redmon, 396 S.W.2d 320, 324 (Ky. 1965). The four factors are: (1) the nature of the work being performed as it relates to employer's business; (2) the extent of control that the employer exercises; (3) the professional skill required of the worker; and (4) the true intentions of the parties. *E.g.,* Purchase Transp. Servs. v. Estate of Wilson, 39 S.W.3d at 818.

The court can't agree that this four factor test, which gives greater emphasis to the integral nature of the work, is the test to be applied to whether, as a general matter under Kentucky common law, the FedEx drivers are employees or independent contractors. A review of Kentucky cases, published and unpublished,[12] shows that this shift in emphasis occurs only in the worker's

---

[12] *See* Crunk v. Dean Milk Co., Inc., No. 3:06-CV-609, 2008 WL 2473662 (W.D.Ky. June 17, 2008) (personal injury); Purchase Transp. Servs. v. Estate of Wilson, 39 S.W. 3d 816, 818 (Ky. 2001) (worker's compensation); Uninsured Emp'rs Fund v. Poyner, 829 S.W.2d 430 (Ky. Ct. App. 1992) (worker's compensation); Husman Snack Foods Co. v. Dillon, 591 S.W.2d 701 (Ky. Ct. App. 1979) (worker's compensation); Kelly Mountain Lumber v. Meade, Nos. 2007-SC-507 & 526, 2008 WL 3890701 (Ky. Aug. 21, 2008) (worker's compensation); Ranck v. Gray, No. 2005-SC-863, 2006 WL 2456411 (Ky. Aug. 24, 2006) (worker's compensation); Dixon v. Don Amburgey Plumbing, No. 2005-SC-426, 2006 WL 1652579 (Ky. June 15, 2006) (worker's compensation); Hicks v. Eck Miller Transp., No. 2003-SC-272, 2004 WL 868489 (Ky. Apr. 22, 2004) (worker's compensation); KC Transp., Inc. v. Thompson, No. 2009-CA-617, 2010 WL 3214062 (Ky. Ct. App. Aug. 13, 2010) (worker's compensation); Robinson v. Gatewood, No. 2009-CA-2328, 2010 WL 2052120 (Ky. Ct. App. May 21, 2010) (worker's compensation); Boils v. Lovan, No. 2009-CA-256, 2010 WL 1253177

compensation and personal injury contexts. The full Restatement test, with no single factor being dispositive, applies here. *See generally* Kentucky Unemp't Ins. Comm'n v. Landmark Cmty. Newpapers of Ky., Inc., 91 S.W.3d 575 (Ky. 2002) (applying Restatement test in unemployment insurance context).

The court incorporates here its reasoning from the Kansas Decision, which applies even when, as here, the right to control factor is considered as just one among the other factors. The parties explicitly stated their intent in the Operating Agreement that the drivers would be independent contractors. The drivers aren't terminable at will, they hold proprietary interests in their routes, and they may hire assistants and expand their businesses to include multiple trucks and routes. These entrepreneurial opportunities show decreased control of the drivers (they are free to work or not work, as they please) and give rise to distinct businesses and increased need for skill. Also, the drivers are responsible for obtaining their own equipment. When weighed equally with the lack of right to control, these factors outweigh the factors pointing toward employment outlined in the Kansas Decision. Although some facts cut both ways, the court still may make a determination of law on the undisputed facts that the Coleman drivers are

---

(Ky. Ct. App. Apr. 2, 2010) (worker's compensation); Sweet v. Slusher, No. 2007-CA-1245, 2009 WL 792547 (Ky. Ct. App. Mar. 27, 2009) (personal injury); Broughton v. Quality Carriers, No. 2006-CA-62, 2006 WL 2382747 (Ky. Ct. App. Aug. 18, 2006) (worker's compensation); Golden Rule Publishers v. Edwards, No. 2003-CA-1596, 2004 WL 2315272 (Ky. Ct. App. Oct. 15, 2004) (personal injury); Adjuster Serv. of Ky., Inc. v. Hamilton, No. 2003-CA-672, 2004 WL 1909379 (Ky. Ct. App. Aug. 27, 2004) (worker's compensation).

independent contractors under Kentucky common law. *See* Kentucky Unemp't Ins. Comm'n v. Landmark Cmty. Newspapers, 91 S.W.3d at 581.

The Kentucky drivers' claims also turn on whether they are employees under Kentucky's Wage Payment statute, KY. REV. STAT. § 337.010 *et seq.* The wage payment statute defines "employee" broadly as "any person employed by or suffered or permitted to work for an employer." KY. REV. STAT. § 337.010(1)(e). Kentucky's Administrative Regulations clarify that employee status under Kentucky Revised Statutes Chapter 337 is "broader than the traditional common law concept of the master and servant relation." 803 KY. ADMIN. REGS. 1:005 §1(2).

Kentucky's Administrative Regulations identify factors similar to the Restatement and common law factors discussed in the Kansas Decision. Some factors favor a finding of an independent contractor relationship, such as the right to control, 803 KY. ADMIN. REGS. 1:005 § 4(1), and the alleged employee's opportunities for profit and loss. Id. at § 4(2)(c). But the Regulations also identify factors broadening the scope of statutory employees beyond the traditional common law factors. "Where the facts clearly establish that the possible employee is the subordinate party, the relation is one of employment." Id. at § 4(3). Factors used to determine whether the drivers are subordinate parties are:

    a.    Whether there are restrictive provisions in the contract between the possible employer and possible employee which require that the work must be satisfactory to the possible employer and detailing, or giving the possible employees the right to detail how the work is to be performed;

   b.   Whether the possible employer has control over the business
        of the person performing work for him even though the possible
        employer does not control the particular circumstances of the
        work;

   c.   Whether the contract is for an indefinite period or for a
        relatively long period;

   d.   Whether the possible employer may discharge employees of the
        alleged independent contractor;

   e.   Whether the possible employer may cancel the contract at his
        discretion, and on how much notice;

   f.   Whether the work done by the alleged independent contractor
        is the same or similar to that done by admitted employees.

803 KY. ADMIN. REG. 1:005 § 4(3)(a)-(f). Though the court's research finds no case

law to guide its interpretation of these Regulations, it seeks here to follow the

plain meaning of the Regulations' text and the explicitly stated purpose of

broadening the scope of who is an employee beyond the common law. On balance,

these factors indicate that the plaintiff drivers are "subordinate" to FedEx and so

are employees for purposes of Kentucky's Wage Payment Act.

   Factor (a) eliminates the results vs. means distinction at common law.

Though the drivers have the right to detail how their work is to be accomplished,

the Operating Agreement contains many results-oriented controls and the results

of the drivers' work must be satisfactory to FedEx for the drivers' contracts to

continue. Factor (b) eliminates any distinction between "a little control" and "a lot

of control" of the drivers' businesses. FedEx limits the number of routes drivers

may own at a given terminal, sets minimum requirements for who may be a hired

assistant or employee of the contractor (though it is up to the driver to find assistants or employees and not up to FedEx to suggest candidates to the driver), requires drivers to accept assigned work, and controls the flow of packages through individual trucks (though this is a mutually beneficial contractual obligation on FedEx to maximize efficient use of drivers' trucks). Factor (f) partially indicates employee status because the drivers' work as drivers (but not as business owners) is the same as that done by admitted employees of FedEx Express and by employees at UPS, DHL, and the USPS.

Factors (c), (d), and (e) don't outweigh the refocusing of the employment status balance caused by factors (a) and (b). The drivers' contracts are for limited duration, but they renew automatically absent any other action. FedEx can't discharge drivers' employees, but FedEx can refuse to dispatch a truck if a driver's employee is unsatisfactory to FedEx. FedEx can't cancel the contract at will, but it can cancel the contract for breach or on thirty days' notice (as can the drivers). While factors (c), (d), and (e) cut in the direction of independent contractor status, they don't do so strongly enough to outweigh the reshaping of the control question caused by factors (a) and (b). Finding the drivers to be subordinate to FedEx, in light of the clearly stated policy of the Kentucky statutes and regulations, the Coleman drivers are employees for purposes of the Kentucky Wage Payment statute, KY. REV. STAT. § 337.010 *et seq.*

No reason exists for the statutory wage payment claims to remain in this centralized docket, so the court instructs the parties to file a joint proposed

pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the wage payment statute-related claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

## I. Louisiana (3:08-cv-193, _Boudreaux_)

The _Boudreaux_ drivers allege fraud, misrepresentation, violations of Louisiana Revised Statutes §§ 23:631, 23:634, 23:635, 23:824, and 23:963, and breach of the duty of good faith and fair dealing. They seek rescission and declaratory relief. The drivers didn't move to certify the fraud and misrepresentation claims. This court denied certification of the drivers' claims under Louisiana Revised Statutes §§ 23:635 and 23:963, as well as their rescission claim. _See_ Op. and Ord., July 27, 2009, at 25-40 [Doc. No. 1770]. The drivers have argued—and have never indicated otherwise—that all their claims are premised on a determination of whether they are employees or independent contractors under Louisiana law. _See_ Memo. in Support of Mot. for Summ. Judg., Sept. 28, 2009, at 1 [Doc. No. 1797] ("The over-arching issue in this case is whether FXG has categorically misclassified its workforce of pickup and delivery drivers as independent contractors."); Memo. in Support of Mot. to Certify Class

71

(Louisiana), Aug. 4, 2008, [Doc. No. 1540]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court grants summary judgment to FedEx and denies the drivers' motion for summary judgment. The Louisiana drivers are independent contractors under Louisiana law. Because the Louisiana claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered in FedEx's favor in the Louisiana case.

In their original summary judgment motion, the Louisiana drivers argued that the common law right to control test applied to their employment status question and that the test was no different from other states' right to control tests. *See* Memo. in Support of Mot. for Summ. Judg., Sept. 28, 2009, at 1 (*citing* Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992), as in the plaintiffs' other summary judgment motions). The drivers originally argued that "it is not the supervision and control which is actually exercised which is significant; the important question is whether . . . the right to do so exists." Memo. in Support of Mot. for Summ. Judg., at 7 (citing multiple Louisiana cases emphasizing this point). The plaintiffs also emphasized that the principal test is the "control over the work reserved by the employer." Id. at 9 (discussing Hickman v. Southern Pac. Transp. Co., 262 So.2d 385, 390-391 (La. 1972)). In their motion for class certification—consistent with all their motions for class certification and their arguments to get their case before this MDL court—the Louisiana drivers argued that "FXG's reserved rights to control the Louisiana pickup and delivery drivers

72

flow directly from the standard form Operating Agreement ("OA") that every driver must sign and FXG's standardized policies and procedures the company uses to implement the OA. These common controls lie at the heart of each and every Louisiana driver's claim and provide the common proof from which the Court can make a categorical determination of each driver's employment status." Memo. in Support of Mot. to Certify Class (Louisiana), Aug. 4, 2008, at 1.

After the Kansas Decision, the Louisiana drivers took a turn in their argument and now complain that this court "refused" to consider extrinsic evidence in the Kansas Decision. They further argue that Louisiana law looks to evidence of actual control to determine employment status. For years, the Louisiana drivers have been on notice of this case's procedural posture and the resulting consequences on the scope of evidence the court could consider. Louisiana law looks to evidence of actual control to infer a right to control, but so do all the other states considered in today's decisions. *See* Fuller v. United States Aircraft Ins. Group, 530 So.2d 1282, 1289 (La. Ct. App. 1988) ("The degree of supervision and control actually exercised by the principal over the work performed . . . is highly indicative of reserved control."). But just like other right-to-control states, Louisiana law doesn't require a court to look to extrinsic evidence of actual control to infer a right to control. As the Fuller court stated, "[t]he amount of supervision and control actually exercised is not the crucial question, but rather the amount of supervision and control reserved by the principal from the nature of the relationship." Id.; *see also* McLeod v. Moore, 7

73

So.3d 190, 193 (La. Ct. App. 2009) ("[I]t is not the supervision and control actually exercised that is significant; the important question is whether, from the nature of the relationship, the right to do so exists."); <u>Arroyo v. East Jefferson Gen. Hosp.</u>, 956 So.2d 661, 664 (La. Ct. App. 2007) ("The important question is whether, from the nature of the relationship, the right to [control] exists, not whether supervision and control was actually exercised."); <u>Hughes v. Goodreau</u>, 836 So.2d 649, 656 (La. Ct. App. 2002) ("It is not the actual supervision or control which is actually exercised by the employer that is significant, but whether, from the nature of the relationship, the right to do so exists."). Louisiana courts, like courts in other states, take the evidence before them as it is and decide whether the right to control exists. *See generally* <u>Smith v. Prime, Inc.</u>, 20 So.3d 1184 (La. Ct. App. 2009) (relying on written agreement to determine nature of relationship); *compare* <u>Green v. Independent Oil Co.</u>, 201 A.2d 207 (Pa. 1964) (finding independent contractor status on evidence available to court, which was mostly the parties' written agreement), *with* <u>Juarbe v. City of Philadelphia</u>, 431 A.2d 1073 (Pa. Super. Ct. 1981) (finding employee status where testimony of actual exercises of control shed light on the nature of the parties' agreement, and distinguishing that case from the almost identical contractual agreement in <u>Green v. Independent Oil Co.</u>). As noted in the general introduction to today's decisions, the Louisiana drivers' argument on this point isn't well-taken; the drivers should have requested decertification if they found the procedurally limited scope of evidence to be disadvantageous to them. The law doesn't require the court to consider evidence

that would violate the commonality requirement for class certification and the law doesn't require the court to ignore the conditions it set forth for class certification.

The court reads the worker's compensation cases cited by the drivers with a wary eye because Louisiana's worker's compensation statute contains a statutory presumption of employee status that might have colored the way Louisiana courts have viewed the facts in worker's compensation cases. *See, e.g.*, Pitcher v. Hydro-Kem Servs., Inc., 551 So.2d 736, 740; Fuller v. United States Aircraft Ins. Group, 530 So.2d at 1288 (*quoting* LA. REV. STAT. ANN. § 23:1044).

> Louisiana courts look to five factors to examine the right to control:
>
> (1) whether there is a valid contract between the parties; (2) whether the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it; (3) whether the contract calls for specific piecework as a unit to be done according to the individual's own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered; (4) whether there is a specific price for the overall undertaking agreed upon; and (5) whether the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.

Hickman v. Southern Pac. Transp. Co., 262 So.2d at 390-391. The most important factor is the right to control. *See* Smith v. Prime, Inc., 20 So.3d at 1188 ("[T]he essence of an employer/employee relationship, rather than a[n] independent contractor relationship, is the right of control."); Guillory v. State Farm Ins. Co., 662 So.2d 104, 117 (La. Ct. App. 1995) ("[T]he key issue in determining independent contractor status is control over the process of performing the work."). No one factor is dispositive, and each case must be decided on its own

facts and circumstances. Smith v. Prime, Inc., 20 So.3d at 1188; Tate v.
Progressive Sec. Ins. Co., 4 So.3d 915, 916 (La. Ct. App. 2009); Kibodeaux v.
Progressive Ins. Co., 4 So.3d 222, 225 (La. Ct. App. 2009).

The drivers argue that under Louisiana law, FedEx's control of their
workloads—requiring every package to be delivered every day, pickup and delivery
within certain time windows, and the like—isn't "results-oriented," but rather
indicates control of the process of performing work. Louisiana maintains the
common law distinction between control of results, which doesn't indicate
employee status by itself, and control of means and methods of work, which does
indicate employee status. Hence, telling a truck driver "where and from whom to
pick up loads of sand, the times to be at a particular site to begin loading, and the
location where loads of sand were to be deposited" doesn't indicate employee
status because these are contracted-for results. Tate v. Progressive Sec. Ins. Co.,
4 So.3d at 917 & 921-922 ("[T]o suggest that Mr. Brown should have been given
the discretion of delivering the loads to wherever he chose is not reasonable."); *see
also* McLeod v. Moore, 7 So.3d at 193 (finding independent contractor status even
though company "controlled the process of loading and unloading the asphalt, and
all drivers were expected to operate under the same [company] rules and
procedures for loading, delivering, and unloading the asphalt" and drivers were
expected to deliver the asphalt quickly); Kibodeaux v. Progressive Ins. Co., 4 So.3d
at 225 ("Both servant and independent contractor are engaged in the performance
of an employment for the benefit of the employer."); Mullen v. R.A.M. Enterprises,

844 So.2d 376, 379 (La. Ct. App. 2003) (finding independent contractor status even though deliverymen were required to obtain signatures for each delivery, fill out a daily manifest form, and deliver each day's packages every day); Guillory v. State Farm Ins. Co., 662 So.2d at 107-108, 117 (reversing jury determination and finding independent contractor status even where State Farm threatened to terminate Guillory's agency contract if he didn't comply with State Farm's "added cars only program," stating that "requiring a contractor to comply with the owner's rules does not signify the requisite right of operational control necessary to vitiate the independent contractor relationship").

The drivers argue that their ability to hire assistants and drivers doesn't count in the Louisiana analysis because their assistants and drivers are subject to FedEx's approval. The plaintiffs offer a dubious citation to Pitcher v. Hydro-Kem Services., Inc., 551 So.2d at 739, to argue the point. In Pitcher, an injured carpenter was held to be an employee deserving worker's compensation benefits. In examining the worker's right to hire helpers and assistants, the court found that the carpenter had to ask his employer to provide assistants if he needed them; the carpenter had no right to hire assistants at all. There is quite a leap from having no right at all to hire assistants to saying that Louisiana holds that if a worker has a qualified right to hire, that qualified right to hire is equivalent to no right to hire. The drivers' argument on this point isn't the law in Louisiana.

The drivers also argue that the "independent nature" factor is viewed in light of the worker's integration into the employer's business and that Louisiana courts

77

place heavy emphasis on this factor. As one court put it, "it would be specious" to say that an employer couldn't control the particulars of a job when that work is integral to the employer's business. Fuller v. United States Aircraft Ins. Group, 530 So.2d at 1291. The Fuller court's statement, however, applied to the facts and circumstances before that court. The integral nature of work to a business isn't dispositive. Otherwise, an insurance agent working exclusively for a single insurance company could never be considered an independent contractor, yet Louisiana courts have considered insurance agents to be independent contractors. See Guillory v. State Farm Ins. Co., 662 So.2d 104 (La. Ct. App. 1995) (reversing a jury's finding of employee status and finding independent contractor status as a matter of law for State Farm insurance agent).

Finally, the drivers argue that the payment factor favors them because, they say, the relevant inquiry under Louisiana law is whether payment is made at regular intervals and whether the individual can bill for services provided. They rely on Kibodeaux v. Progressive Ins. Co., 4 So.3d 222 (La. Ct. App. 2009), where an electrical inspector who was paid bi-monthly for years and wasn't allowed to bill for his own services was found to be an employee. Id. at 226. However, the regularity of payment in Kibodeaux wasn't dispositive—the facts as a whole were dispositive, with the "most telling" fact being that the contract in question was terminable at will. Id. at 227; see also Smith v. Prime, Inc., 20 So.3d at 1188 ("None of these factors is determinative. Instead, the totality of the factors must be considered."); Tate v. Progressive Sec. Ins. Co., 4 So.3d at 918-919 (finding

78

truck driver to be independent contractor even though he was paid every Friday and worked primarily for a single company for many years).

For purposes of this case, Louisiana's common law right to control test doesn't differ materially from Kansas' method of distinguishing independent contractors from employees. "[T]he only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The court addressed all other relevant factors in its Kansas Decision and incorporates that reasoning here. The Boudreaux drivers are independent contractors under Louisiana law.

### J. Maryland (3:06-cv-485, Westcott; 3:07-cv-189, Jones)

The Westcott drivers allege violations of Maryland's Wage Payment and Collection Act, fraud, and unjust enrichment; they seek declaratory and injunctive relief. Though the drivers didn't move to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under the Maryland Wage Payment and Collection Act, MD. CODE ANN., LAB. & EMPL. § 3-501 et seq. See Memo. in Support of Mot. to Certify Class (Maryland), Mar. 12, 2007, at 1 [Doc. No. 546]. The parties indicate that both Maryland cases depend on the briefing in Westcott case because Laron Jones is a member of the Westcott Maryland class. The court grants FedEx's motions for summary judgment in both cases and denies the drivers' summary judgment motion in Westcott. Because the Maryland claims stand or fall on the common question of

79

whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx on all claims in both Maryland cases.

The parties rely heavily on cases that don't apply to whether FedEx drivers are employees or independent contractors for purposes of the Maryland Wage Payment and Collection Act, MD. CODE., LAB. & EMPL. § 3-501 *et seq.* Many cases the parties cite deal with the worker's compensation statutes, in which Maryland courts have distilled a test to be used in a context different from that presented here. *See, e.g.,* Great Atlantic & Pacific Tea Co., Inc. v. Imbraguglio, 697 A.2d 885, 893-894 (Md. 1997) (setting forth five factors and citing cases setting forth same five factors for worker's compensation context).

The court instead must consider the six factors set forth in Baltimore Harbor Charters, Ltd. v. Ayd to determine whether the drivers are employees covered by the Maryland Wage Payment and Collection Act:

1. Whether the employer actually exercised or had the right to exercise control over the performance of the individual's work;

2. Whether the individual's service is outside all the usual course of business of the enterprise for which such service is performed;

3. Whether the individual is customarily engaged in an independently established trade, occupation, profession, or business;

4. Whether it is the employer or the employee who supplies the instrumentalities, tools, and location for the work to be performed;

80

5.  Whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf; and

6.  Whether the individual held an ownership interest in the business such that the individual had the ability and discretion to affect the general policies and procedures of the business.

780 A.2d 303, 318-319 (Md. 2001). The Baltimore Harbors court emphasized the right to control factor, *see* id. at 315-316, 318, and distilled these six factors from the multi-factor test set forth in the Restatement (Second) of Agency, § 220(2). *See* id. at 318. The Baltimore Harbors court expressly stated that it wasn't following the broad definitions of employee, "such as 'any person suffered or permitted to work by an employer,'" contained in the statutes of other jurisdictions, and instead turned to the traditional common law distinctions made between employees and independent contractors. Id. at 315.

Baltimore Harbors clarified that "[t]he emphasis on the right to exercise control is whether [the alleged employer] could have exercised control over [the alleged employee], not whether [it] actually did." Id. at 319. As in the Kansas Decision, the only reasonable inference to be drawn from the facts before the court, under the posture of this case, is that FedEx hasn't retained the right to control the details of the contractors' performance on a class wide basis. Kansas Decision, at 73. The court incorporates here the reasoning of the Kansas Decision.

Addressing the other Maryland factors, this court has held that the drivers' service is integral to FedEx's business, so the second factor weighs in favor of employee status. The third factor also weighs in favor of employee status because

drivers for UPS, DHL, FedEx Express, and the USPS are employees, yet it also weighs in favor of a finding of an independent contractor relationship because the Maryland FedEx drivers have the ability to grow their businesses in the service of FedEx. Drivers ultimately are responsible for supplying their own instrumentalities and tools, though FedEx supplies the routes by virtue of its own package delivery business. Drivers receive wages directly from FedEx, and no evidence before the court suggests drivers have an ownership interest in FedEx.

Because of the emphasis Maryland places on the right to control as being the weightiest factor in this and other employment question contexts, *see, e.g.*, Great Atlantic & Pacific Tea Co., Inc. v. Imbraguglio, 697 A.2d at 894 (stating in workers' compensation context, "control is paramount and, in most cases, decisive," and citing cases with similar strong language), the court holds that the Maryland (Westcott and Jones) drivers are independent contractors for purposes of the Maryland Wage Payment and Collection Act.

### K. Minnesota (3:05-cv-533, Lee)

The Lee drivers allege illegal deductions from wages, in violation of Minnesota Statutes § 181.79; failure to keep records, in violation of Minnesota Statutes § 177.30; violations of the Prevention of Consumer Fraud Act, MINN. STAT. § 325F.69; and fraud. They seek rescission and declaratory and injunctive relief. The drivers didn't move to certify the fraud claim, but they don't indicate that their claims turn on anything other than a determination of their employment status

under Minnesota law. *See* Memo. in Support of Mot. to Certify Class, Apr. 2, 2007, at 1 [Doc. No. 576]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court denies the drivers' motion for summary judgment and grants FedEx's summary judgment motion. The Minnesota drivers are independent contractors under Minnesota law. Because the Minnesota claims all stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx on all claims in the Minnesota case.

Minnesota law looks to five factors to resolve employment status: (1) the right to control the means and manner of performance;[13] (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the employer's right to discharge. Boily v. Commissioner of Econ. Sec., 544 N.W.2d 295, 296 (Minn. 1996) (*citing* MINN. R. 3315.0555). Other factors can be considered if the five factors are inconclusive. *See* MINN. R. 3315.0555. The court doesn't review all those additional factors here because these five factors are conclusive.[14]

---

[13] Criteria for determining control include: authority over assistants; compliance with instructions; oral or written reports; place of work; personal performance; existence of a continuing relationship; right to discharge; set hours of work; training; amount of time; tools and materials; expense reimbursement; and satisfying requirements of regulatory and licensing agencies. MINN. R. 3315.0555, Subp. 3. The court considered all these factors in the Kansas Decision.

[14] The court already has weighed most of Minnesota's additional factors in the Kansas Decision by examining the totality of the circumstances. These factors include, but aren't limited to, availability to public; compensation on job basis; realization of profit or loss; obligation; substantial investment; simultaneous contracts; responsibility; and services in the course of the employer's organization, trade, or business. MINN. R. 3315.0555, Subp. 2.

The right to control the means and manner of performance is the most important factor. <u>Boily v. Commissioner of Econ. Sec.</u>, 544 N.W.2d at 296; *see also* <u>Corbin v. Commissioner of Revenue</u>, 240 N.W.2d 809, 812 (Minn. 1976) ("The approach invariably used by this court for determining whether one is an employee or an individual contractor focuses on the nature and extent of control reserved by the person for whom the work is done."); <u>Pettis v. Harken, Inc.</u>, 116 N.W.2d 565, 567-568 (Minn. 1962) ("The most important factor is the right of the employer to control the means and manner of performance."). The second key factor is the right to discharge. MINN. R. 3315.0555, Subp. 1(B); *see also* <u>Pettis v. Harken, Inc.</u>, 116 N.W.2d at 568 (finding that company's right to reclaim equipment and terminate relationship at any time supplied necessary authoritative control to establish employer-employee relationship); <u>Anfinson v. A.O.U.W. Ins. Co.</u>, 3 N.W.2d 7, 9 (Minn. 1942) ("Th[e] unrestricted right of discharge afforded adequate means for controlling Anfinson's work.").

Regular payment doesn't by itself indicate employee status. Relevant to the payment factor is whether wages are based on hours worked or are tied to the amount of contract performance. *See* <u>Boily v. Commissioner of Econ. Sec.</u>, 544 N.W.2d at 296 (noting independent contractor dentists were paid monthly). Providing space and fixtures and major equipment doesn't by itself indicate employee status, particularly if the contractors are responsible for some of their own equipment. *See* <u>id.</u> (noting independent contractor dentists were provided office space, fixtures, and major items of equipment but had to supply their own

hand instruments and pay their own malpractice insurance premiums and continuing dental education fees). On the other hand, even if the pay and equipment factors weighed clearly in favor of independent contractor status, these two factors don't indicate independent contractor status if there is a right to control the means and manner of performance. *See* Pettis v. Harken, Inc., 116 N.W.2d at 292-293 (deciding that person supplying his own tractor and being paid on acreage basis rather than hourly rate was employee where there was a right to terminate at any time); Anfinson v. A.O.U.W. Ins. Co., 3 N.W.2d at 9 (deciding that neither the fact that employee supplied his own sawmill nor that he was paid on the basis of what he produced was controlling).

The Minnesota drivers complain in their supplemental brief that in the Kansas Decision the court "refused to consider instances in which FXG exercised control." They argue that in Minnesota an exercise of actual control "form[s] a basis for inferring a right of further control if and when it should become necessary." Minnesota Pltfs' Supp. Stmt., Sept. 24, 2010, at 3 [Doc. No. 2177] (*quoting* Anfinson v. A.O.U.W. Ins. Co., 3 N.W.2d 7, 9 (Minn. 1942)). Today's general introduction addresses the drivers' characterization of this court's approach to the scope of the evidence.[15] The court doesn't read Minnesota law as requiring courts to look to the actual exercise of control. The Anfinson case was unique because no written agreement existed between a log cutter and a farm

---

[15] The court also chronicled an example of the inconsistencies in the plaintiffs' arguments on the scope of evidence in today's Louisiana decision.

manager; they had an oral and informal relationship. Anfinson v. A.O.U.W. Ins. Co., 3 N.W.2d at 8. To see whether the farm manager had a right to control the log cutter's manner and means of performance, extrinsic evidence of the parties' agreement was necessary, including an examination of letters the farm manager wrote to the log cutter. *See* id. at 8. The letters showed actual control of the details of the logger's work, and the Anfinson court found that in the absence of a written agreement it could properly assume that the employer had an unrestricted right to discharge the log cutter, and "[t]his unrestricted right of discharge afforded adequate means for controlling [the log cutter's] work." Id. at 9.

The drivers cite no case other than this unique 1942 case to support their complaint that the court didn't look at extrinsic evidence of actual control. The right to control, not the actual exercise of control, is determinative under Minnesota law. *See, e.g.*, Hunter v. Crawford Door Sales, 501 N.W.2d 623, 624 (Minn. 1993) ("Furthermore, the fundamental test of employment is the right, not just the exercise, of the employer to control the details of the work."); Pettis v. Harken, Inc., 116 N.W.2d at 568 ("As to the element of control, we have held that the right to control rather than the exercise of the right is decisive."); *see also* MINN. R. 3315.0501 ("'Control' is the power to instruct, direct, or regulate the activities of an individual whether or not the power is exercised."). The evidence available under this case's procedural posture—the Operating Agreement and generally applicable policies and procedures—has allowed the court to examine FedEx's right to control the methods and means of the plaintiff drivers' work.

86

Articulating a principle that applies across all these MDL cases, the
Anfinson court stated, "[i]t must be remembered that manner and means as
opposed to result necessarily vary in kind and degree with each fact situation."
Anfinson v. A.O.U.W. Ins. Co., 3 N.W.2d at 9; *see also* Iverson v. Independent Sch.
Dist., 257 N.W.2d 572, 573 (Minn. 1977) ("The very nature of the work [driving
handicapped students] required some form of control by the school district.").
Each case must be resolved on its unique facts, and what constitutes control of
results in one case ("I agree to deliver dry newspapers by 7 a.m. everyday") may
constitute control of means in another case ("I agree to drive a load of newspapers
from Indianapolis to Chicago by noon tomorrow, but you also tell me to overload
my truck, take the scenic route to avoid police, and leave before I've finished my
coffee, or else you'll hire someone else"). *See* Pettis v. Harken, Inc., 116 N.W.2d at
567 ("No general rule can be laid down which covers all situations. Each case
must depend to a great extent upon its own particular facts."); MINN. R.
3315.0555, Subp. 1 ("Other factors, including some not specifically identified in
this part, may be considered if a determination is inconclusive when applying the
essential factors, and the degree of their importance may vary depending upon the
occupation or work situation being considered and why the factor is present in the
particular situation."). Thus, for example, a newscarrier can be an independent
contractor even if she must complete deliveries in a timely fashion, maintain a
certain order in her deliveries to meet customer expectations, maintain records of
her deliveries, and respect the contractee's concerns if one of her freely hired

assistants incurs customer complaints directed to the contractee. *See* Neve v. Austin Daily Herald, 552 N.W.2d 45, 46-47 (Minn. Ct. App. 1996). In the world of newspaper deliveries, where customers expect dry newspapers delivered on time every day, such "controls" go to contracted-for results and not to how those results are to be achieved. Id. at 48. The same can easily be said of package delivery services.

Despite the uniqueness of each case, the plaintiffs argue that Corbin v. Commissioner of Revenue, 240 N.W.2d 809 (Minn. 1976), requires a grant of their summary judgment motion because, they say, the facts overlap in a controlling fashion. In Corbin, sales drivers were assigned routes and stops, couldn't change a route without the employer's agreement, and had no freedom to shop around for other suppliers. Beyond that, though, the employer owned the trucks, the employer maintained worker's compensation insurance for its sales drivers, and, more importantly, "[e]ither party could terminate the relationship without any contractual liability with the exception that a driver was bound by a 5-year covenant not to compete." Id. at 811-812. The facts of Corbin don't overlap with today's case in a compelling way. As Corbin stated, it is "necessary to examine the overall relationship between the parties to determine" employment status. Id. at 812.

The court already has decided—taking into account numerous subfactors under the totality of the circumstances—that "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the

88

contractors' work methods on a class-wide basis." Kansas Decision, at 73. Further, FedEx doesn't have the right to terminate the plaintiff drivers at will. Less importantly in Minnesota, the plaintiff drivers ultimately are responsible for obtaining their own trucks, and the drivers are paid according to a complex formula that takes into account the number of packages they deliver. Finally, FedEx doesn't control the premises because the contracts are performed on public roadways. *See* Iverson v. Independent Sch. Dist. No. 547, 257 N.W.2d at 573. The court incorporates here its reasoning in the Kansas Decision and concludes that the Lee drivers are independent contractors under Minnesota law.

### *L. Nevada*

### *(1) 3:07-cv-120, DeCesare*

The DeCesare drivers allege violations of Nevada's False Claims Act, NEV. REV. STAT. Chap. 357, violations of Nevada's Tax Liability Statutes, NEV. REV. STAT. § 363B.110(2), multiple violations of Nevada Revised Statutes Chapter 608, failure to fulfill statutory duties concerning unemployment insurance and worker's compensation, NEV. REV. STAT. §§ 612.455 & 616B.612, and fraud. They seek rescission and declaratory and injunctive relief. The court denied the Nevada drivers' motion to certify, except for the worker's compensation claim, NEV. REV. STAT. § 616B.612, which is class certified. Only the drivers moved for summary judgment. For the reasons stated below, the court finds that the DeCesare drivers are statutory employees for purposes of their worker's compensation claim, NEV.

89

Rev. Stat. § 616B.612. The court will suggest remand of all claims for further
disposition.

Nevada's Industrial Insurance Act defines "employee" as "every person in the
service of an employer under any appointment or contract of hire." Nev. Rev. Stat.
§ 616A.105. Independent contractors are expressly classified as statutory
employees for purposes of Chapters 616A through 616D. Nev. Rev. Stat. §
616A.210. A limited scope of employers of independent contractors are excluded
from the provisions of Chapters 616A through 616D—a person isn't a statutory
employer if (a) the person enters into a contract with another person or business
that is an independent enterprise and (b) the person isn't in the same trade,
business, profession, or occupation as the independent enterprise. Nev. Rev. Stat.
§ 616B.603(1). The test is fully conjunctive, so if either prong isn't met, the
independent contractor is a statutory employee for purposes of Chapters 616A
through 616D. *See* Hays Home Delivery, Inc. v. Employers Ins. Co. of Nevada, 31
P.3d 367, 370 (Nev. 2001) (emphasizing conjunctive nature of test).

The Nevada drivers' work is a regular and integral part of FedEx's business
and is essential to FedEx's business. *See* Kansas Decision, at 93. The drivers and
FedEx are engaged in the same trade, business, profession, or occupation:
package delivery. FedEx concedes as much by not addressing the plaintiffs'
certified class claim under Chapter 616 in its post-Kansas supplemental brief.
Because FedEx and the plaintiff drivers are engaged in the same business, the
DeCesare drivers are statutory employees for purposes of Nevada Revised Statutes

Chapter 616. *See* Hays Home Delivery, Inc. v. Employers Ins. Co., 31 P.3d at 371 ("[N]otwithstanding any minimal distinction between Green's and Hays's functions, both are in the same trade of delivering merchandise."). Whether the plaintiff drivers are "independent enterprises" makes no difference here. *See* id. at 370 ("We conclude that although Green was an independent enterprise, Green and Hays were, in fact, in the 'same trade.' Therefore, an employment relationship existed between Green and Hays, and Green is entitled to workers' compensation benefits.").

The court denied class certification for the drivers' claims under Nevada Revised Statutes Chapter 608 because no statutory language or case law clarified the test for dividing employees from independent contractors for those claims. *See generally* Op. and Ord., Feb. 17, 2010 [Doc. No. 2004]; Op. and Ord., July 27, 2009, at 44-50 [Doc. No. 1770]. FedEx now asks the court, based on Baldonado v. Wynn Las Vegas, LLC, 194 P.3d 96 (Nev. 2008), to deny the drivers' Chapter 608 claims for failure to pursue administrative remedies. The court declines to do so because the question at issue is the DeCesare drivers' status as employees or independent contractors. The Chapter 608 claims weren't certified, and the defense FedEx raises involves a question that can't be answered by the common evidence available for purposes of determining the drivers' employment status.

The drivers argue that the test distinguishing employees from independent contractors under Chapter 616A through 616D should be applied to their Chapter 608 claims. This court has expressly rejected the drivers' argument to

91

superimpose the Chapter 616 test onto Chapter 608. *See generally* Op. and Ord.,
Feb. 17, 2010 [Doc. No. 2004]; Op. and Ord., July 27, 2009, at 44-50 [Doc. No.
1770]. Further, the definitions in Nevada Revised Statutes §§ 616A.105,
616A.210, and 616B.603 expressly reference Chapters 616A through 616D, which
would, by the plain terms of the text, appear to limit the scope of the test
applicable to the Chapter 616 claims to only the Chapter 616 claims. In the
absence of interpretive guidance, the court denied the drivers' motion for class
certification on their Chapter 608 claims. Now, without a class for the Chapter
608 claims, evidence need not be limited in scope for the named Nevada plaintiffs
in the same way the evidence has been limited in scope for the MDL plaintiffs'
classes. The court again declines to accept the drivers' argument on this issue.

No reason remains under 28 U.S.C. § 1407 for these statutory Nevada
claims to remain in this centralized docket. The court instructs the parties to file
a joint proposed pretrial order with this court within twenty-one days of entry of
this order. In addition to summarizing the history of this case, including
significant orders and their docket numbers (including, but not limited to,
evidentiary, class certification, and dispositive orders), the parties should provide
a detailed description of the claims that remain outstanding, without arguing the
merits of those claims, and should outline for the court and the transferor court
how they anticipate resolving those claims.

*(2) 3:08-cv-234, <u>Campbell</u>*

Rob Campbell alleges unjust enrichment, breach of contract, breach of implied covenant of good faith and fair dealing, and violations of the Fair Labor Standards Act, 29 U.S.C. § 207. His complaint is distinct from the other Nevada case (DeCesare) in that many of his claims appear to be premised on his relationship with FedEx as an independent contractor and not on an allegation that FedEx has misclassified him as an independent contractor. No motion for summary judgment has been filed in the Campbell case, and the common question concerning the DeCesare drivers' employment status doesn't apply to Mr. Campbell's case. No reason of efficiency or economy appears to justify this case's continued placement in this centralized docket, so the court will suggest remand of Mr. Campbell's case to its transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

93

*M. New Hampshire (3:05-cv-601, <u>Gennell</u>)*

The <u>Gennell</u> drivers allege failure to pay overtime and provide meal breaks, conversion, fraud, unfair business practices, and failure to reimburse employee expenses; they seek rescission, an accounting, and declaratory judgment. Though the drivers didn't seek to certify the fraud claim, they don't indicate that their claims turn on the anything other than a determination of their employment status under New Hampshire law. *See, e.g.*, Memo. in Support of Mot. to Certify Class (New Hampshire), May 17, 2007, at 1 [Doc. No. 655]. The drivers filed the only summary judgment motion, which requires the court to resolve two distinct questions: (1) whether the drivers are employees under New Hampshire common law; and (2) whether the drivers are employees within the various New Hampshire statutes under which the New Hampshire drivers seek relief. For the reasons stated below, the court grants in part what is now called judgment independent of the motion to FedEx because the drivers are independent contractors under New Hampshire common law. The court grants in part the drivers' summary judgment motion because the drivers are employees under the relevant New Hampshire statutes. The drivers' common law claims are denied here and won't proceed beyond this stage. The court will suggest remand for further proceedings in the transferor court for the drivers' statutory claims.

As noted, FedEx didn't file a motion for summary judgment against the New Hampshire class. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor.

94

As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under New Hampshire law, the drivers' employment status can be examined today without prejudice to the drivers, and answering now the question of the drivers' employment status under New Hampshire law will conserve judicial resources.

FedEx argued at first that New Hampshire law requires a jury to determine the question of employment status even if the facts are undisputed. FedEx quoted New Hampshire courts as saying, "we [have] concluded that our concern will usually be 'whether on all the facts the community would consider the person an employee.'" Boissonnault v. Bristol Federated Church, 642 A.2d 328, 329 (N.H. 1994) (quoting Hunter v. R.G. Watkins & Son, Inc., 265 A.2d 15, 17 (N.H. 1970)). FedEx also relied on First Circuit case law stating that "New Hampshire . . . has decided to leave the marshalling and weighing of the factors, and the unavoidable policy judgments lurking beneath the surface of the amorphous 'control' test to a properly instructed jury." Kassel v. Gannett Co., 875 F.2d 935, 941-942 (1st Cir. 1989). In their supplemental brief, the drivers, who had previously argued strongly in favor of summary judgment issuing in New Hampshire, now rely on the Kassel language in an effort to prevent a result similar to Kansas.

The New Hampshire Supreme Court hasn't shied away from affirming summary judgments when the facts are undisputed. See, e.g., Boissonnault v. Bristol Federated Church, 642 A.2d 328 (N.H. 1994). The "community" language FedEx quotes appears in a case in which the New Hampshire Supreme Court

95

affirmed without fuss a summary judgment holding of non-employee status. *See id.* at 329. The Kassel case was before the First Circuit following a jury trial. The court can't say whether the First Circuit would have had something different to say about the case had its procedural posture been different. The court today follows the New Hampshire Supreme Court's lead from the later case of Boissonnault v. Bristol Federated Church, 642 A.2d 328 (N.H. 1994), and holds that summary judgment on the employment status question is appropriate in New Hampshire when the facts are undisputed.

New Hampshire common law on the distinction between employees and independent contractors follows a totality of the circumstances approach using the multi-factor test set forth in Restatement (Second) of Agency § 220. Boissonnault v. Bristol Federated Church, 642 A.2d at 329; Hunter v. R.G. Watkins & Son, 265 A.2d at 17. The drivers argued in their original summary judgment briefs that the right to control was dispositive in New Hampshire; they have retreated from that position. New Hampshire adopted the totality of the circumstances approach because the old approach of looking only to the right to control was too narrow. Yet, as this court noted when granting class certification to the New Hampshire plaintiffs, the right to control remains a weighty consideration: employee status is likely if the right to control exists; other factors might yet indicate employee status if the right to control doesn't exist. Op. and Ord., Mar. 25, 2008, at 96-97 [Doc. No. 1119]; *see also* Boissonnault v. Bristol Federated Church, 642 A.2d at 329 (discussing only the right to control when

96

affirming summary judgment); <u>Continental Ins. Co. v. New Hampshire Ins. Co.</u>, 422 A.2d 1309, 1311 (N.H. 1980) (noting that control is an important factor); <u>Hunter v. R.G. Watkins & Son, Inc.</u>, 265 A.2d 15, 17 (N.H. 1970) ("[W]here other facts indicate the nonexistence of an employer-employee relationship, control may be a decisive factor.").

The drivers argue in their supplemental brief that New Hampshire law makes no distinction between the right to control contracted-for results and the right to control the means and methods of obtaining those results. The court can't agree. As with other common law tests, the results vs. means distinction applies in New Hampshire. *See* <u>Boissonnault v. Bristol Federated Church</u>, 642 A.2d at 329 ("[T]he judge found that although the church may have had control over the tasks assigned to Seeler, it had no right to control the physical performance or the details of the accounting services she performed. To carry the plaintiffs' argument to its logical conclusion could result in a client of a certified public accountant being liable for the accountant's negligent driving while delivering the client's tax return."); <u>Continental Ins. Co. v. New Hampshire Ins. Co.</u>, 422 A.2d at 1311("The State determined when and where Mitch's trucks would plow snow, but there was no evidence that the State either exercised or had the right to control the actual operations of the truck itself.").

The New Hampshire drivers also argue that the stated intent of their contracts—that the drivers be independent contractors—carries no weight in New Hampshire. New Hampshire common law follows the Restatement test, so intent

97

is a factor to be considered along with all the other factors. *See* Continental Ins. Co. v. New Hampshire Ins. Co., 422 A.2d at 1312 (noting that "all of the facts" considered included the actual contract between the State and truck driver). The drivers are correct that intent isn't dispositive, *see* Merchants Ins. Grp. v. Warchol, 560 A.2d 1162, 1165 (N.H. 1989) (holding worker to be employee where intent of oral contract was the only factor court found favoring independent contractor relationship and other factors outweighed the intent factor), but that doesn't change the outcome here.

The court addressed the right to control test, the Restatement factors, and the totality of the circumstances in the Kansas Decision. For the reasons stated in the Kansas Decision, the Gennell drivers are independent contractors under New Hampshire common law.

The New Hampshire drivers' claims also turn on whether they are employees under several New Hampshire statutes that state broadly, "'Employee' means and includes every person who may be permitted, required, or directed by any employer, in consideration of direct or indirect gain or profit, to engage in any employment." N.H. Rev. Stat. Ann. §§ 275:4 II, 275:42 II, 279:1 X. New Hampshire statutes contain a narrow exception to the definition of "employee" for independent contractors who meet all of certain enumerated criteria, meaning that if any one factor weighs in favor of employee status, then there must be a finding of such status. N.H. Rev. Stat. Ann. §§ 275:4 II; 275:42 II; 279:1 X. Effective January 2008, the New Hampshire legislature narrowed the independent

contractor category by increasing the number of required exception factors from five to twelve. The additions to the list of criteria don't affect the outcome of today's decision because at least one factor that was part of the original five factor list indicates employment status.

One factor common to the old and new lists of factors asks whether "[t]he person holds himself or herself out to be in business for himself or herself." N.H. REV. STAT. ANN. §§ 275:4(e); 275:42 II(e); 279:1 X(e). The drivers' delivery services are a regular and integral part of FedEx's business. *See* Kansas Decision, at 8-9, 93. At the same time, the drivers can take advantage of their entrepreneurial opportunities to own and operate multiple delivery routes and can profit accordingly. But even if the drivers take advantage of those opportunities, they still must hold themselves out as part of the FedEx system. FedEx requires drivers' trucks to bear the FedEx logo when used for deliveries, and requires drivers to wear FedEx uniforms because "the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive . . . and to permit recognition and prompt access to customers' places of business." Kansas Decision, at 14 (*quoting* OA, ¶ 1.12). The goal of the results-oriented contractual requirements is simple: "Contractors agree to conduct their businesses so that they can be identified as part of the FedEx system." Id., at 4-5 (*citing* OA, Background). The New Hampshire "holding out" statutory factor eviscerates the common law distinction between results and means that otherwise has applied under these facts. Nothing in the evidence before the court supports

an inference that FedEx drivers hold themselves out as being in business for themselves (even though in many respects they can be). Drivers are contractually required to hold themselves out as being part of the FedEx system so as to further FedEx's business objectives. The New Hampshire drivers are FedEx employees under the relevant New Hampshire statutes.

No reason of economy or efficiency supports retaining this case in this centralized docket. The court instructs the parties to file a joint proposed pretrial order with this court within twenty-one days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the New Hampshire statutory claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### N. New Jersey

#### (1) 3:05-cv-595, Tofaute

The Tofaute (class) drivers assert violations of New Jersey's Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1 et seq., misrepresentation, violations of New Jersey's Wage Payment Law, N.J. STAT. ANN. § 34:11-4.1(a), and breach of duty of good faith and fair dealing. They seek rescission and declaratory relief. The New Jersey plaintiffs didn't seek to certify their misrepresentation claim, but they don't

indicate that their claims turn on anything other than a determination of their employment status under New Jersey law. *See* Memo. in Support of Mot. to Certify, Mar. 12, 2007, at 1 [Doc. No. 552]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court grants summary judgment to FedEx and denies the drivers' motion for summary judgment. Because the New Jersey (Tofaute class) claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx for all claims in this New Jersey (3:05-cv-595, Tofaute) case.

The parties agree that New Jersey courts look to the multi-factor test set forth in Restatement (Second) of Agency § 220 to decide if an employment relationship exists. Carter v. Reynolds, 815 A.2d 460, 464 (N.J. 2003) ("[W]e recognize § 220 of the Restatement (Second) of Agency as the touchstone for determining who is a servant."); Mavrikidis v. Petullo, 707 A.2d 977, 984 (N.J. 1998); MacDougall v. Weichert, 677 A.2d 162, 190-191 (N.J. 1996) (Pollock, J., dissenting) ("Traditionally, this Court has adopted the test in Restatement (Second) of Agency § 220 when determining whether a hired person is an employee or an independent contractor."). The essence of the employment relationship is control or the right to control the person employed. Carter v. Reynolds, 815 A.2d at 464.

The drivers urge the court to view the outcome in Tofani v. Lo Biondo Brothers Motor Express, Inc., 200 A.2d 493 (N.J. Super. Ct. App. Div. 1964), a

worker's compensation case, as controlling. As in many other states, New Jersey law may consider a worker to be an independent contractor for some purposes, but will, by force of public policy, consider that worker to be an employee for other purposes. MacDougall v. Weichert, 677 A.2d at 166 (majority opinion). To give effect to the remedial purposes of New Jersey's worker's compensation law, courts construe employee status under that law more broadly than employee status under the common law. *See* Tofani v. Lo Biondo Bros. Motor Express, Inc., 200 A.2d at 501-503 (using "relative nature of the work" test); *see also* Philadelphia Newspapers, Inc. v. Board of Review, 937 A.2d 318, 324 (N.J. Super. Ct. App. Div. 2007) (acknowledging broader scope of employee status for remedial purposes of unemployment benefits statute). The court can't agree that Tofani's outcome controls this case because the Tofani court added to the right to control analysis a broad "relative nature of the work" test to be applied in the worker's compensation context, and the plaintiffs' case here isn't a worker's compensation case.

The drivers' supplemental brief comes terribly close to misleading the court. While the drivers correctly state that New Jersey follows the Restatement test, they quote and underline in the same paragraph the following language: "Any single one [factor favoring employee status] is virtually proof of the Employment relation; while contrary evidence as to Any one fact is at best only mildly persuasive evidence of contractorship and sometimes is of no force at all." Pltfs' Supp. Br., Sept. 24, 2010, at *1 (*quoting* Tofani v. Lo Biondo Bros. Motor Express, 200 A.2d

102

at 498  (alteration by the plaintiffs)). In their supplemental briefs in these MDL cases, the drivers generally tend to rely on subtle exaggerations and incomplete statements of the various states' laws. The court can't ignore without comment the New Jersey brief's incomplete and misleading statement of the law.

The drivers' selective quotation and editorial addition of "factor favoring employment status" strongly implies that if any one of the ten Restatement factors supports employee status, then that one factor, by itself, is sufficient proof of employee status in New Jersey. That implication is incorrect. The <u>Tofani</u> court wrote the following words[16] before the language the plaintiffs quote: "Of the four factors evidencing right of control, Any single one . . . ." <u>Tofani v. Lo Biondo Bros. Motor Express, Inc.</u>, 200 A.2d at 498. Continued reading of this <u>Tofani</u> paragraph reveals the following: "[E]mployment can, if necessary, often be solidly proved on the strength of one of the four items: direct evidence of control, method of payment, furnishing of equipment and right to fire." <u>Id.</u> at 498-499. Four factors isn't the same as ten factors, so the drivers should have given further thought to the quoted language. Indeed, the <u>Tofani</u> court stated: "Where some of the above listed factors [from the Restatement] point one way and some the other, a court must follow some mental weighing process according to some principle." <u>Tofani v. Lo Biondo Bros. Motor Express</u>, 200 A.2d  at 498. The <u>Tofani</u> court all but

---

[16] The <u>Tofani</u> court was, all the while, quoting extensively from Professor Larson's work on employment status.

expressly said that one factor indicating employee status under the Restatement test doesn't necessarily prove an employer-employee relationship.

Tofani explained in detail that the four-factor test (under which any one factor proves employee status) is a test for the right to control, and the ten-factor Restatement test is really the right to control test plus nine subordinate factors. Tofani v. Lo Biondo Bros. Motor Express, 200 A.2d at 497-499; *see also* Wright v. State, 778 A.2d 443, 452 (N.J. 2001) (discussing four factor control test); Lowe v. Zarghami, M.D., 731 A.2d 14, 19-20 (N.J. 1999) (outlining same four factor control test). In New Jersey, only the right to control can be dispositive—the other Restatement factors help the analysis but aren't themselves dispositive. This court addressed the four factors in New Jersey's right to control test in the Kansas Decision; each factor was held to favor independent contractor status or to be neutral. The drivers' misstatement of the law, if followed by this court, wouldn't have been harmless.

The drivers complain that the court "refused" to look at extrinsic evidence of actual control and they quote Tofani as saying, "Under the control test, the right to control is usually inferred from direct evidence of right of control and exercise of control." Id. at 498. This court addressed the drivers' characterization of its analysis in today's general introduction.[17] As the Tofani court observed, "it is constantly said that the right to control the details of the work is the primary

---

[17] The court also chronicled an example of the plaintiffs' inconsistent arguments on the scope of evidence in today's Louisiana decision.

test." Id. at 498; see also Lowe v. Zarghami, M.D., 731 A.2d 14, 20 (N.J. 1999) ("The control test is satisfied whenever the employer retains the right of control, even if the employer may not exercise actual control over the worker."). Saying that the exercise of control is evidence from which the right to control can be inferred isn't the same as requiring a court to look to extrinsic evidence of actual control to infer a right to control. Were a court so required, class certification wouldn't have been proper in this case.

For purposes of today's decision, New Jersey law doesn't materially differ from Kansas law. As the court held in the Kansas Decision, "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The other factors relevant in New Jersey also were considered in the Kansas Decision, which is incorporated here. The Tofaute (class) drivers are independent contractors under New Jersey law.

### (2) 3:05-cv-535, Capers

Jessie Capers and his co-plaintiffs bring claims of race and age discrimination and denials of equal opportunity under state and federal law, breach of contract, violation of good faith and fair dealing, misrepresentation, retaliation, restraint of trade and commerce, infliction of emotional distress, racketeering, and negligence. FedEx moved for summary judgment. Mr. Capers is a member of the Tofaute class, and he has indicated in his summary judgment

response that the Tofaute class decision will be binding on his claims. At the same time, Mr. Capers' complaint alleges multiple times that he and his co-plaintiffs actually are independent contractors and, unlike most other breach of contract claims in these MDL cases, his breach of contract claim is premised on him being an independent contractor rather than on FedEx's alleged misclassification of the drivers. Thus, the court grants in part FedEx's motion for summary judgment because the issues briefed don't appear to dispose of all of Mr. Capers' claims.

For the reasons stated in Tofaute, Mr. Capers is an independent contractor under New Jersey law. His additional tort claims, breach of contract claim, and claims of discrimination under state and federal law weren't briefed and aren't addressed here. Those claims aren't class claims, so the transferor court will decide what weight to give to today's procedurally distinct decision in Tofaute. Today's decision isn't meant to suggest Mr. Capers' employment status under the facts and laws that apply to his remaining claims. None of the factors under 28 U.S.C. § 1407 counsel this case's retention in this centralized docket, so the court will suggest remand of Mr. Capers' case to the transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should

outline for the court and the transferor court how they anticipate resolving those claims.

### (3) 3:07-cv-327, _Farrell_

Richard Farrell alleges violations of the Uniformed Service Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301-4333, breach of contract, breach of the duty of good faith and fair dealing, and tortious interference with a contract and/or prospective business relationship. Mr. Farrell is a member of the Tofaute class, and today's decision in Tofaute binds him: he is an independent contractor under New Jersey law. The Tofaute decision doesn't address Mr. Farrell's federal law claim or his contractual claims premised on his status as an independent contractor. Those claims aren't class claims, so the transferor court will decide what weight to give to today's procedurally distinct decision in Tofaute. The court will suggest remand of Mr. Farrell's case to its transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

107

*(4) 3:09-cv-2, Tofaute*

Michael Tofaute, a named plaintiff in today's New Jersey class decision, brings a separate complaint alleging violations of FMLA, breach of implied good faith and fair dealing, and violations of New Jersey's antidiscrimination laws. Today's class decision in 3:05-cv-595 (<u>Tofaute</u>) binds Mr. Tofaute, and his relationship with FedEx under the Operating Agreement is one of an independent contractor. Because New Jersey law recognizes broader definitions of who is an employee under circumstances different from those considered in today's decisions, Mr. Tofaute might or might not be an independent contractor for purposes of his remaining FMLA and discrimination claims. These claims aren't class claims, so the transferor court will decide what weight to give to today's procedurally distinct decision in <u>Tofaute</u>. The court declined to certify class FMLA claims because resolution of those claims would require consideration of particularized evidence. *See* Op. and Ord., Mar. 25, 2008, at 61-66 [Doc. No. 1119]. The court will suggest remand of Mr. Tofaute's case to the transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should

outline for the court and the transferor court how they anticipate resolving those claims.

### O. New York

### (1) 3:05-cv-538, Louzau

The Louzau drivers allege violations of New York's wage statutes and fraud; they seek rescission and declaratory judgment. Though the New York drivers didn't move to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under New York law. *See, e.g.*, Memo. in Support of Mot. to Certify Class (New York), Mar. 12, 2007, at 1 [Doc. No. 548]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court grants FedEx's summary judgment motion and denies the drivers' summary judgment motion. Because the New York claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered in FedEx's favor for all claims in the New York case.

New York's wage statute defines "employee" as "any person employed for hire by an employer in any employment." N.Y. LAB. LAW § 190(2). The statute excludes independent contractors from this definition, so courts turn to New York's common law test to decide whether someone is an employee or independent contractor. *See* Bynog v. Cipriani Group, Inc., 802 N.E.2d 1090, 1093 (N.Y. 2003); Akgul v. Prime Time Transp., Inc., 742 N.Y.S.2d 553, 556 (N.Y. App. Div. 2002).

"Where the proof on the issue of control presents no conflict in evidence or is undisputed, the matter may properly be determined as a matter of law." Bhanti v. Brookhaven Mem'l Hosp. Med. Ctr., Inc., 687 N.Y.S.2d 667, 669 (N.Y. App. Div. 1999).

Like most common law tests, New York's common law test focuses on the right to control.

> [T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results. Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule.

Bynog v. Cipriana Group, 802 N.E.2d at 1092-1093.

The drivers argue in their supplemental brief that the Bynog v. Cipriani Group formulation shows that New York common law is unique because of its use of the disjunctive "or": if FedEx controls the results of their work, the drivers say, then that control establishes an employer-employee relationship under New York law. The court can't agree with this reading of New York law, though it seems plausible on its face. No New York case has declared employee status merely because of an employer's control of contracted-for results. Rather, New York courts focus on control of means and methods and not on control of results. *See* Gfeller v. Russo, 846 N.Y.S.2d 501, 502 (N.Y. App. Div. 2007) ("Control of the method and means by which the work is to be done . . . is the critical factor in determining whether one is an independent contractor or an employee for the

110

purposes of tort liability."); In re Askew, 826 N.Y.S.2d 840, 841 (N.Y. App. Div. 2007) (focusing on "sufficient supervision, direction and control over the manner in which claimant was required to perform his work such that there was an employer-employee relationship"); Matter of Pepsi-Cola Buffalo Bottling Corp., 534 N.Y.S.2d 532, 533-534 (N.Y. App. Div. 1988) ("[W]hile no single factor is determinative, control over the means used to achieve the desired result is particularly significant."). Indeed, New York courts aren't shy about reversing administrative decisions and finding that an independent contractor relationship existed. *See, e.g.*, Matter of Hertz Corp., 811 N.E.2d 5 (N.Y. 2004); In re Ted Is Back Corp., 475 N.E.2d 113 (N.Y. 1984); In re 12 Cornelia St., Inc., 438 N.E.2d 1117 (N.Y. 1982); In re Wilson Sullivan Co., 44 N.E.2d 387 (N.Y. 1942); Irrutia v. Terrero, 642 N.Y.S.2d 328 (N.Y. App. Div. 1996); Claim of Werner, 619 N.Y.S.2d 379 (N.Y. App. Div. 1994); Claim of Pavan, 570 N.Y.S.2d 696 (N.Y. App. Div. 1991). Such reversals would be unlikely if New York law indicated employee status simply because of results-oriented controls in a contractual relationship.

Judge Finch, sitting on the New York Court of Appeals, originated the disjunctive "or" language, and when he did so he didn't write it in a way suggesting so seismic a shift away from the common law distinction between control of results and control of means and methods. He wrote: "[U[pon the record in this case it cannot be seriously contended that there are any facts sufficient to show that the respondent exercises control over either the results produced by its salesmen or the means employed by them to achieve the results." In re Wilson

111

Sullivan Co., 44 N.E.2d at 388. Two years earlier, Judge Finch stated that "the distinction between an employee and an independent contractor has been said to be the difference between one who undertakes to achieve the agreed result and to accept the directions of his employer as to the manner in which the result shall be accomplished, and one who agrees to achieve a certain result but is not subject to the orders of the employer as to the means which are used." In re Morton, 30 N.E.2d 369, 371 (N.Y. 1940). The Court of Appeals author who originated the "or" language clearly distinguished between controlling contracted-for results and controlling the means and methods of attaining those results. Control of results didn't indicate employee status; control of means and methods did indicate employee status.

Although the contemporary Bynog court used the disjunctive "or" in reciting the employment status test, that court's analysis is in line with the form and substance of the common law test in other states. *See* Bynog v. Cipriani Group, 802 N.E.2d at 1092-1093 (finding plaintiffs to be independent contractors). The Bynog court didn't discuss contracted-for results in finding temporary waiters to be independent contractors. Yet surely the contracting company "controlled" the "results" of waiters' performance by declining to hire or continue to employ temporary waiters who didn't produce satisfactory results. *See generally* Bynog v. Cipriani Group, Inc., 802 N.E.2d 1090 (N.Y. 2003).

Before <u>Bynog v. Cipriani Group</u>, the New York Court of Appeals stated in in <u>Matter of Ted Is Back Corp.</u>, 472 N.E.2d 113 (N.Y. 1984), that although the employment determination

> may rest upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results, control over the means is the more important factor to be considered. Thus, incidental control over the results produced without further indicia of control over the means employed to achieve the results will not constitute substantial evidence of an employer-employee relationship.

475 N.E.2d at 114. The <u>Ted Is Back</u> court went on to say that "the evidence does not support a finding of control over the means of achieving the results" even where the corporation provided sales leads, retained the right to approve contract price, and supplied form contracts for salespeople's use. <u>Id.</u> at 115. After <u>Bynog v. Cipriani Group</u>, New York's highest court reiterated, "Incidental control over the results produced—without further evidence of control over the means employed to achieve the results—will not constitute substantial evidence of an employer-employee relationship." <u>Matter of Hertz Corp.</u>, 811 N.E.2d 5, 6 (N.Y. 2004).

Control over results is "incidental" if there is no control over the means used to achieve those results. In <u>Matter of Pavan</u>, 570 N.Y.S.2d 696 (N.Y. App. Div. 1991), self-employed limousine drivers subjected themselves to numerous results-oriented controls to become members of a dispatch pool: a membership committee screened prospective members, and the rules of the membership corporation required the limousine drivers to maintain a neat appearance, keep their cars clean and satisfactory, obtain and use specific radios, acquire vehicles meeting

113

specific requirements, work during rush hours, and complete accepted assignments. Id. at 698. The court viewed those membership requirements as evidencing "at most, 'incidental control over the results produced without further indicia of control over the means employed to achieve the results.'" Id. (*quoting* Matter of Ted Is Back Corp., 475 N.E.2d at 114). "Absent these insignificant controls, UTOG could not possibly conduct its business." Matter of Pavan, 570 N.Y.S.2d at 698 (*citing* Matter of Ted Is Back Corp., 475 N.E.2d at 114-115); *see also* Matter of Hertz. Corp., 811 N.E.2d at 6 (giving claimant instructions on what to wear, what products to promote, and how to make a presentation didn't require conclusion that claimant was employee); Irrutia v. Terrero, 642 N.Y.S.2d 328, 329 (N.Y. App. Div. 1996) ("Although drivers interested in receiving dispatches from Corona Car agreed to certain basic standards of conduct and rules of operation, these rules and standards related to largely incidental matters and constituted the exercise by Corona Car of only general supervisory powers."). In short, "[t]he requirement that work be done properly is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either." Matter of Hertz Corp., 811 N.E.2d at 6.

Because this court has held that FedEx doesn't have the right to control the drivers' means and methods of how they go about their work, FedEx's results-oriented controls don't result in employee status even under New York law. If FedEx did control means and methods, then the extensive results-oriented controls would weigh in under New York law.

114

Although the <u>Bynog</u> court clarified that the employment test involved five factors, most New York cases seem to take a totality of the circumstances approach to determining whether the right to control exists. *See, e.g.*, <u>Etherington v. Empire Improvements, Inc.</u>, 389 N.Y.S.2d 459, 460 (N.Y. App. Div. 1976) ("The question of whether or not an employment relationship exists is factual and no one fact can be exclusively relied upon to prove or disprove the relationship."). Some cases highlight Restatement factors without citing to the Restatement. *See* <u>Gfeller v. Russo</u>, 846 N.Y.S.2d 501, 502 (N.Y. App. Div. 2007); <u>Fitzpatrick v. Holimont, Inc.</u>, 669 N.Y.S.2d 88, 89 (N.Y. App. Div. 1998). Some courts issue a summary ruling without much discussion at all, other than to note that the right to control exists or doesn't exist. Other cases have placed weight on a contractor's ability to hire others to drive his vehicle and to sell his franchise. *See* <u>In re Jarzabek</u>, 738 N.Y.S.2d 742, 743 (N.Y. App. Div. 2002).

The court follows the <u>Bynog</u> approach, but notes that whatever the common law approach used—<u>Bynog</u>, Restatement, right to control, totality of the circumstances, or any permutation of these—the reasoning of the Kansas Decision holds, and the drivers are independent contractors chiefly (though not only) because FedEx doesn't have the right to control the means and methods of the drivers' work. The court held in the Kansas Decision that FedEx drivers can have complete freedom with their time to the extent they choose to hire assistants or otherwise take advantage of their entrepreneurial opportunities—to this extent the drivers work at their own convenience and don't work a fixed schedule. The

115

drivers are free to engage in other employment, and they receive fringe benefits only to the extent they choose to take advantage of them. The court incorporates the reasoning of the Kansas Decision and concludes that under the <u>Bynog</u> test and other New York permutations of the common law test, the <u>Louzau</u> drivers are independent contractors.

### (2) 3:05-cv-537, <u>Johnson</u>

Curtis and Margaret Johnson allege breach of contract, fraud, tortious interference with contract, intentional infliction of economic harm, and discrimination based on race. They aren't members of the New York <u>Louzau</u> class. FedEx filed a motion for partial summary judgment. Because the Johnsons aren't members of the <u>Louzau</u> class, the procedural posture of their case is distinct, particularly regarding the scope of evidence available to the court, and nothing justifies keeping their case in this centralized docket any longer. The transferor court will decide how much weight to give today's decision in <u>Louzau</u> to the Johnsons' claims in light of the differing procedural and evidentiary postures of the two New York cases. The court denies FedEx's motion for partial summary judgment as premature, and will suggest remand of their case to its transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket

116

numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

## P. North Carolina (3:07-cv-326, *Whiteside*)

The Whiteside drivers allege ERISA violations, breach of contract, fraud, unjust enrichment, and violations of North Carolina's Unfair Trade Practices Act, N.C. GEN. STAT. § 75-1.1(a). They seek rescission and declaratory relief. Though the drivers didn't move to certify the fraud or breach of contract claims, they don't indicate that these claims turn on anything other than a determination of their employment status under North Carolina law. *See* Memo. in Support of Mot. for Summ. Judg., Sept. 28, 2009, at 1 [Doc. No. 1799]; Memo. in Support of Mot. to Certify Class (North Carolina), Oct. 1, 2007, at 1 [Doc. No. 869-2].

Because the drivers indicate in their complaint that they haven't pursued all administrative remedies, the court denies the ERISA claim without prejudice in accord with the decision on the ERISA claims in the Kansas case. The court fully incorporates here its decision denying the Kansas ERISA claims, Op. and Ord., June 28, 2010 [Doc. No. 2078].

The North Carolina drivers filed the only summary judgment motion on the employment status question. For the reasons stated below, the court denies the

drivers' motion and grants judgment independent of the motion to FedEx. Because the North Carolina claims (other than the ERISA claims) stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors under North Carolina law, judgment will be entered for FedEx in the North Carolina case on all claims.

As noted, FedEx didn't file a summary judgment motion addressing the North Carolina class. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now calleded judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under North Carolina law, the drivers' employment status can be examined today without prejudice to the drivers and answering now the question of the plaintiff drivers' employment status under North Carolina law will conserve judicial resources.

Summary judgment in North Carolina is appropriate on the employment status question when the facts are undisputed and only one inference can be drawn from those facts. Johnson v. News and Observer Publ'g Co., 604 S.E.2d 344, 346 (N.C. Ct. App. 2004) (stating that summary judgment is appropriate "[w]here the facts are undisputed or the evidence is susceptible of only a single inference and a single conclusion"); *see also* McCown v. Hines, 549 S.E.2d 175 (N.C. 2001) (finding claimant was independent contractor as a matter of law and reversing Industrial Commission award of worker's compensation benefits); Youngblood v. North State Ford Truck Sales, 364 N.E.2d 433 (N.C. 1988) (finding

118

claimant was employee as a matter of law and affirming Industrial Commission award of worker's compensation benefits).

In North Carolina, the "vital" test distinguishing employees from independent contractors is the retained right to control the details of a worker's means and methods of performing a job. Hayes v. Board of Trs. of Elon College, 29 S.E.2d 137, 140 (N.C. 1944); *see also* McCown v. Hines, 549 S.E.2d 175, 177-178 (describing factors as facilitating determination of whether alleged employer has retained the right to control and direct the details of work). North Carolina courts turn to eight factors to help determine if an alleged employer has retained the right to control: whether the person employed (a) is engaged in an independent business, calling, or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price, for a lump sum, or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time. McCown v. Hines, 549 S.E.2d at 177; Hayes v. Board of Trs. of Elon College, 29 S.E.2d at 140. At least one North Carolina case has noted a differently formulated list of four "generally recognized" factors to evaluate the right to control: (a) method of payment; (b) the furnishing of equipment; (c) direct evidence of exercise of control; and (d) the right to fire. Youngblood v. North State Ford Truck Sales, 364 S.E.2d 433, 439 (N.C. 1988). No

single factor is controlling under either approach, nor must all factors be in agreement; these factors are considered "along with all other circumstances." McCown v. Hines, 549 S.E.2d at 178; Youngblood v. North State Ford Truck Sales, 364 S.E.2d at 438; Hayes v. Board of Trs. of Elon College, 29 S.E.2d at 140.

The drivers argue in their supplemental brief that in North Carolina, customer-based requirements placed on workers are control of means and methods and not control of results. The court disagrees. Independent contractors don't become employees just because they are subject to controls "as to the result of the work" to be done. McCown v. Hines, 549 S.E.2d at 177; Youngblood v. North State Ford Truck Sales, 364 S.E.2d at 437; Hayes v. Board of Trs. of Elon College, 29 S.E.2d at 140. North Carolina courts take this division between control of means and control of results seriously. For example, in the seminal Hayes case, the defendant Board issued instructions that it wanted electrical poles cut within certain parameters, including cutting ten feet off each pole. Even though the poles could have been cut in other ways, the court viewed these instructions as being results-oriented and not controls of the means and methods of how the workers actually cut the poles. 29 S.E.2d at 142.

In McCown v. Hines, the defendant home owner instructed a roofer to use some old, mismatched shingles, and directed where the roofer placed them on the roof. 549 S.E.2d at 176. The court found the home owner's instructions amounted "to nothing more than aesthetic decisions within the control of the owner" and

didn't go to the details of how the roofer performed the work. Id. at 178. The distinction between means and results holds true in North Carolina as in Kansas.

The drivers argue that the first factor—engagement in "an independent business, calling, or occupation"—looks at the independent nature of a worker's trade only by looking at whether the work involved was a regular part of the employer's business. See Cooper v. Asheville Citizen-Times Publ'g Co., Inc., 129 S.E.2d 107, 114 (N.C. 1963). The court doesn't agree that North Carolina courts interpret this factor only in this way. See McCown v. Hines, 549 S.E.2d at 178 (discussing roofer's independent calling where he engaged in roofing for ten years, had a certain degree of skill and experience, and provided his own equipment). If they did, this factor would weigh in favor of employee status because the drivers' work is integral to FedEx's business. By its terms, the first factor also asks whether the worker is engaged in an independent business, and FedEx drivers have the contractual right to be engaged in an independent business: they can acquire multiple trucks and routes, and they are free to do other work while operating their delivery business. This first factor encompasses considerations weighing on both sides of the equation.

The drivers say North Carolina courts have adopted a broader view of what constitutes the right to terminate: if a person can be discharged for breach of contract, that person is an employee. The drivers conclude that they are employees in North Carolina because FedEx can terminate them for breach of contract. Such a rule would radically alter the dynamics of independent contractor

121

relationships by forbidding a usually permitted method contractees have to ensure contracted-for results. The plaintiffs cite to Johnson v. News and Observer Publ'g Co. 604, S.E.2d 344 (N.C. Ct. App. 2004), where the court noted that a newspaper retained the right to fire a delivery person if he breached any provision of his contract and so could terminate "at will for a broad range of reasons." Id. at 348. But controlling precedent from North Carolina's Supreme Court indicates that Johnson didn't declare the far-sweeping rule of law the drivers suggest; rather, the Johnson decision applies to the facts that were before the Johnson court without declaring broad-sweeping changes to the common law. See McCown v. Hines, 549 S.E.2d at 176, 179 (noting that though injured roofer "did not feel completely free to leave the work site without getting fired," his duty to perform his contractual obligations didn't amount to him being subject to discharge for adopting one method of doing the work rather than another); Youngblood v. North State Ford Truck Sales, 364 S.E.2d at 438 ("North State retained the right to discharge plaintiff for any reason. The right to fire is one of the most effective means of control. An independent contractor is subject to discharge only for cause and not because he adopts one method of work over another. An employee, on the other hand, may be discharged without cause at any time." (citations omitted)). As noted in the Kansas Decision, FedEx can't discharge a driver at will; a termination must be based on one or more of five limited circumstances, including breach of contract—in other words, a termination must be "for cause". See Kansas Decision, at 95-97.

122

North Carolina law doesn't materially differ from Kansas law for purposes of today's decision. All the North Carolina factors and the totality of the circumstances were addressed and fully discussed in the Kansas Decision, which the court incorporates here. For these reasons, the <u>Whiteside</u> drivers are independent contractors under North Carolina common law.

*Q. Ohio*

*(1) 3:08-cv-336, <u>Kelly</u>*

The <u>Kelly</u> drivers allege unjust enrichment, denial of FMLA benefits, and fraud; they seek a constructive trust and declaratory and injunctive relief. All claims were class certified except the FMLA claim,[18] which the drivers didn't seek to certify because of the denial of certification for the California class' FMLA claim. *See* Op. and Or., Mar. 25, 2008, at 61-66 [Doc. No. 1119]. Only the drivers moved for summary judgment. For the reasons stated below, the court denies the drivers' motion and grants judgment independent of the motion to FedEx on all state law claims. The court will suggest remand of the FMLA-related claims for further disposition.

As noted, FedEx didn't file a summary judgment motion against the <u>Kelly</u> drivers. In its supplemental brief, FedEx asked this court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth

---

[18] Unlike other states, the *Kelly* class plaintiffs sought to certify their fraud claim, and that claim was class certified along with the other claims.

in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under Ohio law, the drivers' employment status can be examined today without prejudice to the drivers, and answering now the question of the plaintiff drivers' employment status under Ohio law will conserve judicial resources.

In response to the Ohio drivers' summary judgment motion, FedEx argued that Ohio courts disfavor resolving employment status questions on summary judgment. The parties have adopted each other's original arguments in the wake of the Kansas Decision. The drivers now argue in their supplemental brief that if any of the factors supports employment status, the employment status question can't be decided on summary judgment. Ohio law doesn't support the proposition that the presence of absolutely any indicia of employee status results in a jury trial in Ohio. Ohio follows the right to control test, recognizing that "where the evidence is not in conflict or the facts are admitted, the question of whether a person is an employee or an independent contractor is a matter of law to be decided by the court. However, the issue becomes a jury question where the claimant offers some evidence that he was an employee rather than an independent contractor." Bostic v. Connor, 524 N.E.2d 881, 884 (Ohio 1988). Ohio courts grant summary judgment when the facts are undisputed and allow but one inference on the right to control. See Richardson v. Mehan, 430 N.E.2d 927 (Ohio 1982) (finding employee status); Perron v. Hood Indus., Inc., No. L-06-1396, 2007 WL 2458472 (Ohio Ct. App. Aug. 31, 2007) (finding independent contractor

status);[19] Conway v. Calbert, 695 N.E.2d 271 (Ohio Ct. App. 1997) (finding independent contractor status); Testement v. National Highway Express, 683 N.E.2d 439 (Ohio Ct. App. 1996) (finding independent contractor status and affirming lower court's disagreement with worker's compensation tribunal's finding of employee status); Harmon v. Schnurmacher, 616 N.E.2d 591 (Ohio Ct. App. 1992) (finding employee status); Napier v. Administrator, Ohio Bureau of Emp't Servs., No. 89AP-741, 1990 WL 31774 (Ohio Ct. App. Mar. 22, 1990) (finding employee status).

Ohio courts use the common law right to control test to determine employment status. The determination depends on the facts of each case, and multiple factors are considered—who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes traveled; the length of employment; and any pertinent agreements or contracts—though the list is "certainly not limited to such indicia." Bostic v. Connor, 524 N.E.2d 881, 883-884 (Ohio 1988) (citing RESTATEMENT (SECOND) OF AGENCY § 220).

The drivers' chief argument is that the Bostic court's use of the present tense "controls" and "selects" indicates that Ohio courts authorize the use of evidence of actual control as proof of the right of control. Ohio courts—like those

---

[19] Both sides rely in part on unpublished court opinions, but Ohio has abolished the distinction in weight between unpublished and published opinions, and even before that rule was changed unpublished opinions could be considered persuasive as a court deems fit. See Ohio Supreme Court Rules for the Reporting of Opinions, Rule 4.

in all the other states—look to evidence of actual control when such evidence is available, but Ohio law doesn't require examination of actual control when, as here, examination of individualized evidence would violate the rules of class certification concerning common evidence. *See generally* <u>Perron v. Hood Indus., Inc.</u>, No. L-06-1396, 2007 WL 2458472 (Ohio Ct. App. Aug. 31, 2007) (relying heavily on written terms of contract between parties and finding independent contractor status). The court examines the relationship between the <u>Kelly</u> drivers and FedEx under the procedural posture of these MDL cases.

Ohio law under <u>Bostic</u> doesn't differ materially from Kansas law. The distinction between control of results (which doesn't indicate employee status) and control of means and methods of achieving those results (which indicates employee status) holds in Ohio as it does in Kansas and elsewhere. *See* <u>Conway v. Calbert</u>, 695 N.E.2d at 273-274 (finding independent contractor status because "the carrier [was] solely responsible for the satisfactory delivery of the advertising materials in the plastic bags within the contracted area" even though DCS told the carrier what materials to put in bags for delivery, where to make deliveries, and where to place deliveries on site, and subjected the carrier to delivery inspections and other special customer-specific instructions); <u>Perron v. Hood Indus., Inc.</u>, 2007 WL 2458472, at *5 (quoting lengthy selection from AMERICAN JURISPRUDENCE discussing the distinction between control of results and control of means and methods, and citing Ohio authority supporting this distinction).

126

FedEx hasn't retained the right to control the means and methods of the plaintiff drivers' work on a class-wide basis. Kansas Decision, at 73. The court incorporates here the Kansas Decision, which considered all factors relevant in Ohio and the totality of the circumstances, and concludes that the Kelly drivers are independent contractors under Ohio law.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the FMLA-related claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### (2) 3:06-cv-801, Wallace

Walter Wallace alleges breach of contract, labor law violations, unjust enrichment, conversion, FMLA and ERISA violations, race discrimination, and fraud. He seeks an accounting. Mr. Wallace is a member of the Kelly class, so today's decision that the Kelly class members are independent contractors binds him. Because today's decision leaves some of his claims unresolved, the court will suggest remand of Mr. Wallace's case to its transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding,[20] without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### R. Oregon (3:05-cv-596, _Slayman_; 3:07-cv-328, _Leighter_)

In _Slayman_, 3:05-cv-596, the Oregon drivers allege illegal wage deductions in violation of Oregon Revised Statutes § 652.610 _et seq._ and fraud; they seek rescission and declaratory relief. In _Leighter_, 3:07-cv-328, the drivers allege illegal wage deductions under Oregon Revised Statutes § 652.610 _et seq._ and violations of Oregon's Wage and Hour Laws; they seek rescission, declaratory and injunctive relief, and penalty wages. Though the _Slayman_ plaintiffs didn't seek to certify their fraud claim, they haven't indicated that their fraud claim turns on anything other than a determination of their employment status under Oregon common law. _See_ Memo. in Support of Mot. to Certify Class (Oregon), Mar. 12, 2007, at 1 [Doc. No.

---

[20] For example, the parties should break down Mr. Wallace's breach of contract claim and ferret out those claims that were premised on him being misclassified as an independent contractor (because he is an independent contractor) from those claims that are premised on him actually being an independent contractor (such as the claim that FedEx breached its contract with him by assigning too many packages to him to deliver in a single day).

128

557]. The court denied the <u>Leighter</u> class' motion to certify its rescission claim and decertified the <u>Slayman</u> class's rescission claim because the rescission claims require consideration of individualized evidence of actual control and the plaintiffs' engagement in independently established businesses. *See* Op. and Ord., July 27, 2009, at 56-67 [Doc. No. 1770]. In both cases, only the drivers moved for summary judgment. For the reasons stated below, the court denies the drivers' motion for summary judgment and grants judgment independent of the motion to FedEx on all but the rescission claims. The court will suggest remand of these cases for further disposition on the rescission claims because the evidence considered here won't resolve those claims, which involve the important question of whether the Operating Agreement in question violates Oregon public policy.

FedEx didn't move for summary judgment as to the Oregon class. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under Oregon law, the drivers' employment status can be examined today without prejudice to the plaintiffs, and answering now the question of the plaintiff drivers' employment status under Oregon law will conserve judicial resources.

FedEx argued in response to the Oregon drivers' motions that summary judgment in these cases would be inappropriate under Oregon law. To the contrary, Oregon courts have stated that when the facts are undisputed,

"[w]hether an individual is an employee or an independent contractor is a legal conclusion." Schaff v. Ray's Land & Sea Food, Inc., 45 P.3d 936, 939 (Or. 2002).

The common law test for employment status in Oregon examines whether the alleged employer "had the right to control the manner in which [the worker] performed services." Schaff v. Ray's Land & Sea Food, 45 P.3d at 939. The right to control, not the exercise of control, is determinative. S-W Floor Cover Shop v. National Council on Comp. Ins., 872 P.2d 1, 5 (Or. 1994); HDG Enters. v. National Council on Comp. Ins., 856 P.2d 1037, 1040 (Or. Ct. App. 1993). Although the extent of an employer's control over a worker isn't always easy to measure, "control over performance remains the principal test." Schaff v. Ray's Land & Sea Food, 45 P.3d at 939 (quoting Jenkins v. AAA Heating & Cooling, Inc., 421 P.2d 971, 973 (Or. 1966)). Oregon courts distinguish between control over results and control over "the physical conduct in the performance of the services." Schaff v. Ray's Land & Sea Food, 45 P.3d at 942 (quoting RESTATEMENT (SECOND) OF AGENCY, § 220(1) (1958)); see also Cy Inv., Inc. v. National Council on Comp. Ins., 876 P.2d 805, 807 (Or. Ct. App. 1994) (citing Great Am. Ins. v. General Ins., 475 P.2d 415, 417 (Or. 1970)).

In the worker's compensation context, the Oregon Court of Appeals has looked to a traditional four-factor test to further tease out standards for the right to control test: (1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to

fire. *E.g.*, Stamp v. Department of Consumer and Bus. Servs., 9 P.3d 729, 731 (Or.

Ct. App. 2000); HDG Enters. v. National Council on Comp. Ins., 856 P.2d at 1039.

The drivers focus their supplemental brief on the right to control factor and

say that a single factor in favor of employment status can be enough proof to

establish an employer-employee relationship. They do well to focus on the right

to control factor because the Oregon Supreme Court has only spoken of the right

to control as being determinative in the vicarious liability context. The drivers rely

on factual analogies to two worker's compensation cases[21] to argue that Oregon's

right to control test differs materially from Kansas' right to control test. They say

specifications about the nature and quality of the work to be completed doesn't

show control of results, but rather shows control of means and methods.

The court reads Oregon law differently. In Reforestation General

Contractors, Inc. v. National Council on Comp. Ins., 872 P.2d 423 (Or. Ct. App.

1994), a worker's compensation case, a logging consultant specified the contract

completion time for the loggers he hired, marked land boundaries or the timber

to be cut, and supervised the contracts. The Reforestation court disagreed with

the hearing officer's legal conclusion that this supervision and general

determination of work assignments amounted to a right to control the loggers'

---

[21] *See* Stamp v. Department of Consumer and Bus. Servs., 9 P.3d at 733 (approving of hearing officer's reliance on evidence regarding assignment of work, performance and quality control of that work, and the party held responsible for the work); HDG Enters. v. National Council on Comp. Ins., 856 P.2d at 1040 (agreeing with findings of fact that employer was specific about nature and quality of finished product desired, employer regulated quality of work but didn't supervise the work, and customer turned to employer if there was a problem with the work).

131

methods and means of achieving contracted-for results. The <u>Reforestation</u> court

stated, "Any independent contractor is subject to the control of the hiring party

by virtue of the fact that the contractor is directed to accomplish a desired result."

<u>Id.</u> Thus, an owner may retain as much control as necessary

> to ensure that he gets the end result from the contractor that he
> bargained for. Accordingly, a hiring party's control over the quality or
> the description of the work, as opposed to the person performing it,
> will not automatically convert an independent contractor relationship
> into one of employment. Here, the petitioner's specification of a
> completion date and marking of the physical boundaries for each job
> are part of the end result for which petitioner contracted and are not
> necessarily indicative of employee status. Similarly, petitioner's right
> to supervise the agreements goes to the right to ensure that the
> ultimate goal of the contract is accomplished.

<u>Id.</u> at 432 (internal citations omitted); *see also* <u>Oregon Drywall Sys., Inc. v.</u>

<u>National Council on Comp. Ins.</u>, 958 P.2d 195, 198 (Or. Ct. App. 1998) ("The

monitoring of progress toward job completion does not amount to the exercise of

direction and control over the means and method of doing the work."); <u>Bob Wilkes</u>

<u>Falling, Inc. v. National Council on Comp. Ins.</u>, 878 P.2d 1136, 1139 (Or. Ct. App.

1994) ("The direct evidence establishes that Wilkes controlled the result but not

the method of performance. Wilkes pointed out the boundaries of the timber to be

cut, set a completion date, specified log lengths and required that NWT and LPL

perform the job in a 'good and workmanlike manner.' These specifications deal

with the desired result of the contract, not the manner and means of its

performance.").

Nothing in Oregon law indicates that Oregon differentiates control of results vs. control of means and methods differently from Kansas or other states. Each case must be examined on its own facts, so factual analogies can enlighten but don't automatically control, especially when, as here, the context and facts are quite unique and truly applicable factual analogies are elusive.

This court has ruled that "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The Kansas Decision, which the court incorporates here, addressed the other Oregon factors. The Oregon plaintiff drivers are independent contractors under Oregon law.

The court instructs the parties to file joint proposed pretrial orders (one each for Slayman and Leighter) with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of rescission claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

*S. Pennsylvania*

*(1) 3:05-cv-597, Willis; 3:05-cv-598, Hart*

The Pennsylvania drivers in 3:05-cv-597 (Willis) allege violations of Pennsylvania's Wage Payment and Collection Law, 43 PA. CONS. STAT. § 260.1 *et seq.*; violations of Pennsylvania's Minimum Wage Act, 43 PA. CONS. STAT. § 333.101 *et seq.*; violations of Pennsylvania's Workman's Compensation Act, 77 PA. CONS. STAT. § 501(a)(d); and fraud. They seek rescission and injunctive and declaratory relief. Though the Pennsylvania drivers didn't move to certify the Minimum Wage Act, Workman's Compensation Act, and fraud claims, they don't indicate that their claims turn on anything other than a determination of their employment status under Pennsylvania law. *See* Memo. in Support of Mot. to Certify Class (Pennsylvania), Apr. 2, 2007, at 1 [ Doc. No. 579]. Only the drivers filed a motion for summary judgment. For the reasons stated below, the court denies the drivers motion for summary judgment and grants judgment independent of the motion to FedEx.

Jeffrey Hart, 3:05-cv-598, brought a class action complaint alleging violations of Pennsylvania's Minimum Wage Act, 43 PA. CONS. STAT. § 333.104(a); violations of Pennsylvania's Wage Payment and Collection Law, 43 PA. CONS. STAT. § 260.3; and unjust enrichment. Mr. Hart is a member of the Pennsylvania class certified in the Willis case. His case has languished for years without activity. His claims aren't unique or distinct from the Willis case, and because he is a member of the Pennsylvania class, today's decision resolves his employment status.

134

Because these Pennsylvania claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx in these Pennsylvania cases (3:05-cv-597, Willis; 3:05-cv-598, Hart).

As noted, FedEx didn't file a summary judgment motion against the Willis drivers. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under Pennsylvania law, the drivers' employment status can be examined today without prejudice to the plaintiffs, and answering now the question of the plaintiff drivers' employment status under Pennsylvania law will conserve judicial resources.

FedEx argued in its summary judgment response brief that a trial on the employment status question is required in Pennsylvania. The court can't agree. Summary judgment is appropriate in Pennsylvania because when the facts are undisputed, employment status is a question of law. *E.g.*, Lutz v. Cybularz, 607 A.2d 1089, 1091 (Pa. Super. Ct. 1992); Johnson v. Workmen's Comp. Appeal Bd., 631 A.2d 693, 696 (Pa. Super. Ct. 1993).

For all relevant purposes here, Pennsylvania courts use a common law analysis to distinguish between independent contractors and employees. Multiple factors are considered and these factors are not controlling, but rather provide general guidance to courts: (1) the control of the manner in which work is to be

135

done; (2) responsibility for result only; (3) terms of agreement between the parties; (4) the nature of the work or occupation; (5) the skill required for performance; (6) whether one employed is engaged in a distinct occupation or business; (7) which party supplies the tools; (8) whether payment is by the time or by the job; (9) whether the work is part of the employer's regular business; and (10) the right to terminate the employment at any time. The most important consideration is the right to control the manner in which the work is to be accomplished. The right to control, and not the actual exercise of control, is determinative. Hammermill Paper Co. v. Rust Eng'g Co., 243 A.2d 389, 392 (Pa. 1968); Morin v. Brassington, 871 A.2d 844, 850 (Pa. Super. Ct. 2005) (Wage Payment and Collections Law); Johnson v. Workmen's Comp. Appeal Bd., 631 A.2d at 696 (worker's compensation). In the vicarious liability context, Pennsylvania courts tend to look solely to the right to control and the totality of facts showing a right to control. Green v. Independent Oil Co., 201 A.2d 207, 210 (Pa. 1964); Lutz v. Cybularz, 607 A.2d at 1091; Myszkowski v. Penn Stroud Hotel, Inc., 634 A.2d 622, 625-626 (Pa. Super. Ct. 1993).

The drivers say Juarbe v. City of Philadelphia, 431 A.2d 1073 (Pa. Super. Ct. 1981), compels either a trial or a finding of employee status. They argue that, for purposes of their case, Juarbe shows that Pennsylvania law materially differs from Kansas law because, they say, in Pennsylvania the power to terminate for breach of contract and the exercise of supervision and provision of suggestions necessarily indicate employee status. They also say that Juarbe shows that, in

Pennsylvania, requiring customer service and performance standards, and inspecting work to ensure compliance with a contract, evidences employee status and not a results-oriented approach.

In Juarbe, the lessee of a gas station from lessor Exxon agreed to keep the station open for certain minimum hours, keep the station clean and sanitary, keep the premises unobstructed, place no signs on the premises without Exxon's permission, purchase motor fuels exclusively from Exxon in certain amounts and at prices set by Exxon, and render satisfactory customer service through employees he hired. Juarbe v. Philadelphia, 431 A.2d at 1076-1078. The Juarbe court held that a substantial fact issue existed as to whether the lessee was in a master-servant relationship with Exxon. Similar to Juarbe, the station operator in Green v. Independent Oil Co., 201 A.2d 207, 209-210 (Pa. 1964), had to purchase all motor oils and fuels from the petroleum company, could have his contract terminated for breach, and received visits from representatives of the petroleum company. Different from Juarbe, the service station operator in Green was held to be an independent contractor as a matter of law.

The distinction made by Pennsylvania courts between Juarbe and Green illustrates the context that has helped shape this court's decisions in these MDL cases. The Juarbe court said Green would have been controlling (meaning the Juarbe court would have held the lessee to be an independent contractor as a matter of law) but for a key difference: extensive evidence was present before the Juarbe court that Exxon "frequently threatened not to renew the leases and sales

137

agreements of its operators if they failed to adhere not only to the requirements of those documents, but also to Exxon's 'suggested' business conduct." Juarbe v. City of Philadelphia, 431 A.2d at 1079. As this court has noted elsewhere in today's decisions, there is nothing exceptional about an employer ensuring that a contractor produce contracted-for results. The evidence presented to the Juarbe court, though, went above and beyond the ordinary right to terminate for breach of contract and to supervise contracted-for results: the testimonial evidence created an inference of constant strong-arming, leaving open a fact issue for a jury to decide as to whether Exxon controlled the day-to-day details of the lessee's conduct. Juarbe v. City of Philadelphia, 431 A.2d at 1079. But for that additional evidence, the Juarbe court said, "we would probably feel that the Green decision was controlling." Id. Juarbe is unique for the evidence before that court and not for demonstrating a material difference between Pennsylvania and Kansas law. The procedural posture of these MDL cases, with the scope of evidence limited to evidence common across the nation, renders these cases more similar to Green than to Juarbe.[22]

---

[22] As noted in the general introduction to today's decisions, the procedural posture of these MDL cases isn't the only factor driving today's decisions. This court has found the lack of right to control methods and means of achieving contracted-for results, lack of right to terminate at will, and plaintiffs' responsibility for acquiring equipment to indicate independent contractor status. But most compellingly, the plaintiffs' entrepreneurial opportunities indicate independent contractor status. The court can't say whether a different procedural posture allowing extrinsic evidence to be presented would change this outcome and directs the plaintiffs to the trial court's decision in Estrada for another court's take on their claims, showing that even with additional extrinsic evidence a court may likely still find them (at least the MWA drivers and classes including MWA drivers) to be independent contractors. See generally, Estrada v. FedEx Ground, No. BC 210130 (Cal. Super. Ct. July 26, 2004) [Exh. B to Pltfs' Req. for Judicial Notice, Apr. 24, 2008].

Highlighting that <u>Juarbe</u> was decided on the basis of its particular facts and circumstances, and not on the basis of a material difference in law, post-<u>Juarbe</u> decisions demonstrate the similarities between Pennsylvania and Kansas law material to today's decision. For example, in <u>Myszkowski v. Penn Stroud Hotel, Inc.</u>, 634 A.2d at 627, Penn Stroud contracted with Best Western to use the Best Western brand in marketing its hotel. Best Western imposed a program of quality control, with corresponding rules and regulations, and conducted workshops to achieve quality service. The <u>Myszkowski</u> court concluded that those controls didn't create a master-servant relationship. "[T]he fact that Best Western sets certain standards in order to maintain a uniform quality of inn service only addresses the *result* of the work and not the *manner* in which it is conducted." <u>Id.</u> at 627 (emphasis in the original). Best Western could further enforce contracted-for results through biannual inspections and termination of its contract with Penn Stroud for breach. "Such a sanction [termination for breach], however, does not indicate that there is a continuous subjection to the will of the alleged master so as to constitute a master-servant relationship. . . . Best Western cannot compel Penn Stroud to alter its conduct. It merely has the ability to either terminate its relationship with Penn Stroud or threaten to terminate it." <u>Id.</u> at 627.

The drivers' argument that the threat of contract termination indicates employee status is without merit. The facts before this court don't rise to the type of control present before the <u>Juarbe</u> court, which created an issue of material fact in that case. The Kansas Decision addressed all the factors relevant in

139

Pennsylvania, together with the totality of the circumstances (Pennsylvania factors aren't limited to those listed in the cases, as stated by the Pennsylvania courts), and the court incorporates that decision here. The Pennsylvania drivers are independent contractors under Pennsylvania law.

### (2) 3:09-cv-3, *Mitchell*

Plaintiff David Mitchell alleges breach of contract, lack of good faith and fair dealing, and violations of the federal Family Medical Leave Act. Mr. Mitchell isn't a member of the Pennsylvania plaintiffs' class, and today's decision in Willis isn't necessarily binding on him because of the different procedural posture of his case. The first two counts of his complaint appear premised on his status as an independent contractor. The FMLA claim requires him to be considered an employee for FMLA purposes and requires individualized and particularized evidence of his relationship with FedEx. *See* Op. and Ord., Mar. 25, 2008, at 61-66 [Doc. No. 1119]. Retaining this case in a centralized docket won't further any of the interests of 28 U.S.C. § 1407, so the court will suggest remand of Mr. Mitchell's case to its transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within twenty-eight days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims

that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### T. Rhode Island (3:05-cv-599, <u>Tierney</u>)

The Tierney drivers allege fraud; they seek rescission and declaratory relief. Though the drivers didn't move to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under Rhode Island law. *See* Memo. in Support of Mot. to Certify Class (Rhode Island), Apr. 23, 2007, at 1 [Doc. No. 596]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court denies the drivers' motion for summary judgment and grants FedEx's motion for summary judgment. Because the Rhode Island claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered in FedEx's favor in the Rhode Island case.

Rhode Island looks to the traditional common law test of right to control to distinguish employees from independent contractors. The right to control, not the exercise of control, is determinative. Croce v. Whiting Milk Co., 228 A.2d 574, 576-577 (R.I. 1967); Pasetti v. Brusa, 98 A.2d 833, 834 (R.I. 1953); *see also* Absi v. State Dep't of Admin., 785 A.2d 554, 556 (R.I. 2001). Some Rhode Island courts look to the factors found in the Restatement (Second) of Agency § 220. *See* Estate of Perry v. Green Card, Inc., No. PC/03-4671, 2006 WL 3479056 (R.I. Super. Dec.

1, 2006) (unpublished). The Rhode Island Supreme Court hasn't gone beyond saying that the test is simply the right to control, but has said that "it is impossible to determine the relationship of employer and employee by any hard and fast rule" and "the answer to such question depends in each case upon its particular facts taken as a whole." <u>DiOrio v. R.L. Platter, Inc.</u>, 211 A.2d 642, 644 (R.I. 1965).

In their supplemental brief, the drivers rely almost exclusively on the unpublished opinion in <u>Estate of Perry v. Green Card, Inc.</u> to argue that Rhode Island's interpretation of the ten Restatement factors differs materially from Kansas. Rhode Island Supreme Court Appellate Procedure Rule 16(j) states that unpublished orders "shall have no precedential effect." This court's duty is to decide this case as Rhode Island's Supreme Court would, and that court would give no precedential weight to the <u>Perry</u> case. Additionally, <u>Estate of Perry</u> contains material factual differences from the case to be decided today, including an employer's ability to terminate a worker at will. *See* <u>Estate of Perry v. Green Card, Inc.</u>, 2006 WL 3479056, at *6. A unique factual context containing a strong indicator of employment status, such as the right to terminate at will, in an unpublished opinion doesn't indicate that Rhode Island courts interpret the Restatement factors any differently than other state courts do.

Rhode Island law doesn't materially differ from Kansas law for purposes of today's decisions. As fully explained in the Kansas Decision, "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the

details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. Based on only the consideration of the right to control, the plaintiff drivers are independent contractors under Rhode Island law. To the extent Rhode Island courts look to the Restatement factors and/or to the totality of the circumstances, the court has addressed these tests and factors in its Kansas Decision, which the court incorporates here. The Tierney drivers are independent contractors.

## U. South Carolina (3:05-cv-668, Cooke)

The Cooke drivers allege fraud and illegal wage deductions in violation South Carolina Code § 41-10-40; they seek rescission and declaratory relief. Though the South Carolina drivers didn't move to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under South Carolina law. See Memo. in Support of Mot. to Certify Class (South Carolina), Apr. 2, 2007, at 1 [Doc. No. 578]. Only the drivers moved for summary judgment. For the reasons stated below, the court denies the plaintiffs' motion for summary judgment and grants judgment independent of the motion to FedEx. Because the South Carolina claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx in the South Carolina case.

As noted, FedEx didn't file a motion for summary judgment against the South Carolina class. In its supplemental brief, FedEx asks the court to enter

judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under South Carolina law, the drivers' employment status can be examined today without prejudice to the plaintiffs, and answering now the question of the plaintiff drivers' employment status under South Carolina will conserve judicial resources.

Citing Young v. Warr, 165 S.E.2d 797, 806 (S.C. 1969), FedEx argued in its summary judgment response that even where the evidence on employment status is undisputed, the issue must go to a jury unless only one inference is available from the undisputed evidence. Young didn't hold that summary judgment on employment status is always inappropriate in South Carolina; the Young court declared independent contractor status in the very paragraph in which it stated the general jury trial rule. *See* id. Summary judgment is appropriate if the facts lend themselves to a single inference, as in most other jurisdictions. *See, e.g.*, Wilkinson v. Palmetto State Transp. Co., 676 S.E.2d 700 (S.C. 2009) (finding independent contractor status and reversing lower court's finding of employee status).

The parties agree that the drivers' claims are to be decided by South Carolina's common law test for employee status. In South Carolina, analysis of whether a worker is an employee or independent contractor focuses on whether the alleged employer had the right to control the worker in the performance of the work. Wilkinson v. Palmetto State Transp. Co., 676 S.E.2d at 702 (*citing* South

Carolina Workers' Comp. Comm'n v. Ray Covington Realtors, Inc., 459 S.E.2d 302, 303 (S.C. 1995)). South Carolina courts look to four factors to analyze the right to control: (1) direct evidence of the right or exercise of control; (2) furnishing of equipment; (3) method of payment; and (4) right to fire. Wilkinson v. Palmetto State Transp. Co., 676 S.E.2d at 702 (citing South Carolina Workers' Comp. Comm'n v. Ray Covington Realtors, Inc., 459 S.E.2d at 303). The right to control analysis is "a fact-specific determination reached by applying certain general principles." South Carolina Workers' Comp. Comm'n v. Ray Covington Realtors, Inc., 459 S.E.2d at 303 (citing Young v. Warr, 165 S.E.2d at 802). The South Carolina Supreme Court recently held that the four factors should be evaluated with equal force, overruling an earlier holding that an employer-employee relationship is indicated if any one factor weighed in favor of employee status. Wilkinson v. Palmetto State Transp. Co., 676 S.E.2d at 702 (overruling single factor employment rule in Dawkins v. Jordan, 534 S.E.2d 700, 703 (S.C. 2000) ("For the most part, any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation.")). The right to control, not the actual exercise of control, is determinative. Dawkins v. Jordan, 534 S.E.2d at 703, overruled on other grounds by Wilkinson v. Palmetto State Transp. Co., 676 S.E.2d at 702; Young v. Warr, 165 S.E.2d at 802 ("The general test is that of control by the employer. It is not the actual control then exercised, but whether there exists the right and authority to control and direct the particular work or undertaking, as to the manner or means of its accomplishment.").

145

The drivers argue that although this court held FedEx's controls to be results-oriented in its Kansas Decision, South Carolina would find those controls to indicate employee status. They cite Crim v. Decorator's Supply, 352 S.E.2d 520 (S.C. Ct. App. 1987) for the proposition that customer-requested results equate to FedEx's control of the drivers' methods and means of performance. The Crim court did note that Lexington Floor Covering gave clients' addresses to the alleged independent contractor and "sent him to install whatever materials the client ordered." Id. at 521. But that's not why the Crim court declared employee status. Various controls were exercised over Crim, and Crim didn't treat himself as an independent contractor; a key fact was that termination of Crim's relationship with Lexington Floor Covering was solely within Lexington's control. Id.; see also South Carolina Indus. Comm'n v. Progressive Life Ins. Co., 131 S.E.2d 694, 695 (S.C. 1963) ("The power to discharge or fire at will rested in the Company. The power to fire is the power to control. The absolute power to terminate the relationship without liability is not consistent with the concept of independent contract, . . ." (quotation omitted)). The Crim court held Crim was an employee under the totality of the circumstances and not merely because he had to fulfill customer expectations communicated through Lexington Floor Covering.

The drivers also rely on Smoky Mountain Secrets, Inc. v. South Carolina Emp't Sec. Comm'n, 458 S.E.2d 429 (S.C. 1995), because it overturned an appellate court decision that declared independent contractor status. The Smoky Mountain Secrets decision is the very definition of summary: it provides no

146

reasoning and in three short paragraphs states that substantial evidence supported the Employment Security Commission's findings. This court can't accept the drivers' implied, though bold, argument that summarily overturning a lower court's decision indicates a rule that all the indications of independent contractor status found by the lower court actually indicated employee status, so this court should find these drivers to be employees because some of those facts overlap with the drivers' facts. Without greater indication as to why the Smoky Mountain Secrets court ruled as it did, that case can stand for little more than the proposition that the South Carolina Supreme Court sometimes reverses a lower court.

"[T]he only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The plaintiff drivers are ultimately responsible for obtaining their own equipment, such as trucks; the drivers are paid according to a complex formula that takes into account the number of packages delivered; and FedEx doesn't have the right to terminate the plaintiff drivers at will. The court incorporates here the Kansas Decision and holds that the Cooke drivers are independent contractors under South Carolina common law.

### V. Tennessee (3:05-cv-600, Smith)

The Smith drivers allege violations of Tennessee's Consumer Protection Act of 1977, TENN. CODE ANN. § 47-18-101 et seq., and fraud. They seek an

147

accounting, rescission, and declaratory and injunctive relief. The Tennessee drivers didn't move to certify the fraud claim, but they don't indicate that their claims turn on anything other than a determination of their employment status under Tennessee law. *See* Memo. in Support of Mot. to Certify Class (Tennessee), Apr. 23, 2007, at 1 [Doc. No. 599-2]. The parties filed cross-motions for summary judgment. For the reasons stated below, the court denies the drivers' summary judgment motion and grants FedEx's motion for summary judgment. Because the Tennessee claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered in FedEx's favor on all claims in the Smith case.

The Tennessee drivers rely heavily on worker's compensation cases, which this court reviews with a wary eye because a statutory employee under the Tennessee Workers' Compensation Act is a broader concept than a common law employee. Tennessee courts give the Worker's Compensation Act a liberal construction in favor of employee status, and this construction might have colored a particular court's view of the facts before it in ways not applicable to today's case. *See* Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991); Stratton v. United Inter-Mountain Tel. Co., 695 S.W.2d 947, 951-952 (Tenn. 1985); Wooten Transps., Inc. v. Hunter, 535 S.W.2d 858, 860 (Tenn. 1976).

Tennessee courts look to seven factors to resolve employment status: (1) the right to control the conduct of the work; (2) the right of termination; (3) the method of payment; (4) the freedom to select and hire helpers; (5) the furnishing

148

of tools and equipment; (6) self-scheduling of work hours; and (7) freedom to render services to other entities. *E.g.*, Bargery v. Obion Gran Co., 785 S.W.2d 118, 119-120 (Tenn. 1990). The right to control is the most significant factor, with the relevant inquiry being whether the right exists, not whether it is exercised. Id. at 120; Galloway v. Memphis Drum Serv., 822 S.W.2d at 586; Boruff v. CNA Ins. Co., 795 S.W.2d 125, 127 (Tenn. 1990); Stratton v. United Inter-Mountain Tel. Co., 695 S.W.2d at 950; Wooten Transps. v. Hunter, 535 S.W.2d at 860. The second most significant factor is the right to terminate. Galloway v. Memphis Drum Serv., 822 S.W.2d at 587; Boruff v. CNA Ins., 795 S.W.2d at 127; Wooten Transps. v. Hunter, 535 S.W.2d at 860.

The seven factors aren't absolutes and don't "preclude examination of each work relationship as a whole." Jackson Sawmill, Inc. v. West, 619 S.W.2d 105, 107-108 (Tenn. 1981).

> Utilization of these tests depends upon the salient facts of a particular relationship. No one test is infallible or entirely indicative of the legal characterization to be given to a particular relationship. The decisional value of any single test is commensurate with the degree of its applicability to the particular case.

Id. at 107-108; *see also* Boruff v. CNA Ins. Co., 795 S.W.2d at 127.

The drivers' chief argument is that "Tennessee courts find any retained oversight and supervision incompatible with an independent contractor status." The drivers essentially say any supervision is control indicating employee status,

but that isn't the law in Tennessee.[23] The Tennessee Supreme Court has repeated the common refrain that "a party to a contract can exercise direction and control over the results of the work without destroying the independence of the contract or creating an employer-employee relationship." Wright v. Knox Vinyl & Aluminum Co., Inc., 779 S.W.2d 371, 373 (Tenn. 1989) (*quoting* Masiers v. Arrow Transfer & Storage Co., 639 S.W.2d 654, 656 (Tenn. 1982)).

> The mere fact that the principal contractor reserves a right to supervise or inspect the work during its performance[] does not make the subcontractor an employee or mere servant, where there is no right of control of the method of performance, except to see that the end result conforms to the plans and specifications.

Jackson Sawmill, Inc. v. West, 619 S.W.2d at 108 (internal quotations and citations omitted). The Jackson Sawmill court held that instructions about which trees to cut and how long to cut each log were allowable supervision of contracted-for results and not control of loggers' means and methods of obtaining those results. *See* id. at 109. In Knox Vinyl, the hiring party frequently checked on a vinyl installer's progress and suggested changes to conform with house plans, and that court viewed such supervision as necessary to ensure the contracted-for end result. Wright v. Knox Vinyl & Aluminum Co., Inc., 779 S.W.2d at 373-374.[24] The

---

[23] The plaintiffs rely, in part, on Blake v. Auto-Owners Ins. Co., No. W2005-01545-WC-R3-CV, 2007 WL258314 (Tenn. Jan. 30, 2007). The Tennessee Supreme Court Rules indicate that unpublished cases carry no precedential value, except for certain circumstances not before this court. *See* Tenn. Supreme Court Rule 4. Even were the court to consider the case, it doesn't support the plaintiffs' argument and contains facts dissimilar from the plaintiffs' case.

[24] In cases where Tennessee courts viewed supervisory controls as constituting the right to control, a second key element— the right to terminate at will, which Tennessee courts view as strong evidence of a right to control—was also present. For example, in Stratton v. United Inter-Mountain Telephone Co., 695 S.W.2d 947 (Tenn. 1985), the Telephone Company could request its

right to supervise contracted-for results is treated no differently in Tennessee than in Kansas and so doesn't indicate employee status.

The drivers' second chief argument is that the right to terminate in Tennessee is viewed differently than in Kansas insofar as Tennessee courts may inspect whether termination-limiting contract provisions are a mere smokescreen for termination at will. They analogize <u>Boruff v. CNA Ins. Co.</u>, 795 S.W.2d 125 (Tenn. 1990), with their own case because in <u>Boruff</u> an injured truck driver signed a written contract that, on its face, stated he could only be terminated for cause. *See* <u>id.</u> at 126. The analogy quickly breaks down because the driver in <u>Boruff</u> didn't own the truck he drove and the trucking company could take its truck from him without giving him another truck to drive. Effectively, the company could terminate the driver at will without any liability "merely by demanding the return of its tractor." <u>Id.</u> Even though the FedEx Operating Agreement contains no similar method of termination, the drivers argue that a jury should evaluate the "practical effects" of the provisions in the Agreement placing limitations on contract terminations. The drivers essentially ask the court to consider extrinsic

---

contractor to fire anyone who, "*in the sole opinion of the Telephone Company,*" wasn't doing a good enough job. <u>Id.</u> at 949 (emphasis added). No right to terminate at will existed in <u>Jackson Sawmill</u>. A right to terminate at will existed in other cases relied on by the plaintiffs. *See, e.g.,* <u>Galloway v. Memphis Drum Serv.</u>, 822 S.W.2d at 587 ("Second, nothing in the record suggests Memphis Drum's right to terminate Plaintiff at will was in any way restricted."); <u>Hartford Underwriters Ins. Co. v. Penney</u>, No. E2009-01330-COA-R3-CV, 2010 WL 2432058, at *5 n.6 (Tenn. Ct. App. June 17, 2010) (slip copy); <u>Blake v. Auto-Owners Ins. Co.</u>, No. W2005-01545-WC-R3-CV, 2007 WL 258314, at *2-3 (Tenn. Jan. 30, 2007) (unpublished opinion); <u>CNA v. King</u>, No. M2004-02911-COA-R3-CV, 2006 WL 2792159, at *3 (Tenn. Ct. App., Sept. 28, 2006) (unpublished opinion). Also, these same cases involved worker's compensation claims, and the court can't be certain the cases would have come out similarly if the same working relationship was examined within a different context.

evidence of actual dealings between individual drivers and FedEx, particularly regarding the termination of drivers. But, as explained in today's general introduction, the procedural posture of these MDL cases doesn't allow for examination of extrinsic evidence. As explained in the Kansas Decision, FedEx has no right to terminate the plaintiff drivers at will without incurring liability. Kansas Decision, at 95-97. A right to terminate for breach of contract, such as unsatisfactory performance, isn't a right to terminate at will, nor does it, by itself, indicate employee status. *See* Wright v. Knox Vinyl & Aluminum Co., 779 S.W.2d at 374 (finding that Knox Vinyl's power to terminate Wright at any stage of his work because of unsatisfactory performance didn't establish employer-employee relationship).

For purposes of the employment status question here at issue, Tennessee law isn't materially different from Kansas law. The court addressed all the Tennessee factors in the Kansas Decision and incorporates that decision here. The Smith drivers are independent contractors under Tennessee law.

### W. Texas

#### (1) 3:05-cv-540, *Humphreys*

The Humphreys drivers allege violations of the Federal Motor Carrier Act and fraud; they seek rescission and declaratory relief. Only the rescission and declaratory relief claims were class certified. The named Texas plaintiffs, not as a class but as individuals, also allege violations of the Texas Deceptive Trade

Practices Act and promissory estoppel; they seek damages and punitive damages. The parties filed cross-motions for summary judgment on the question of the class' employment status under Texas law. For the reasons stated below, the court grants FedEx's summary judgment motion and denies the plaintiffs' motion. The court's finding that the Humphreys drivers are independent contractors disposes of their state law claims. The court will suggest remand of this case to the transferor court for disposition of the Federal Motor Carrier Act claims.

To decide whether a worker is an employee or an independent contractor, Texas courts ask "whether the employer has the right to control the progress, details, and methods of operations of the work. [An] employer controls not merely the end sought to be accomplished, but also the means and details of its accomplishment." Limestone Prods. Distribution, Inc. v. McNamara, 71 S.W.3d 308, 312 (Tex. 2002) (citations omitted). Texas courts "measure" the right to control by considering (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work, other than the final result; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job. Id.; Durbin v. Culberson Cnty., 132 S.W.3d 650, 658-659 (Tex. App. 2004). The most important factor is the right of control. Durbin v. Culberson Cnty., 132 S.W.3d at 659; see also Weidner v. Sanchez, 14 S.W.3d 353, 373 (Tex. App. 2000) ("The right to control the details of

a person's work determines whether an employment or independent contractor relationship exists.").

A written contract "providing that a person shall be an independent contractor and providing for no right of control is controlling in determining the relationship between the parties." Durbin v. Culberson Cnty., 132 S.W.3d at 659; Weidner v. Sanchez, 14 S.W.3d at 373. A key exception to the rule is "if the evidence shows that the contract is a mere sham, subterfuge, or cloak designed to conceal the parties' true relationship." Durbin v. Culberson Cnty., 132 S.W.3d at 659. Texas courts take the written contract rule seriously, holding such contracts dispositive in the absence of extrinsic evidence undermining the contract's stated terms. See Durbin v. Culberson Cnty., 132 S.W.3d at 659 (finding decedent was independent contractor based on his written contract and the absence of extrinsic evidence showing the contract was a sham). "Otherwise, contract rights and relationships based thereon would be destroyed." Weidner v. Sanchez, 14 S.W.3d at 374. Occasional assertions of control and sporadic action directing the details of work don't destroy an independent contractor relationship upon which the parties agreed. Id. The assumption of the exercise of control must be persistent and the acquiescence pronounced to raise an inference that the parties impliedly agreed that the principal might have the right to control the details of the work. Id.

These Humphreys drivers freely signed onto a contractual relationship with FedEx; they agreed to be independent contractors and their contracts disclaim any

right to control by FedEx. *See* Kansas Decision, at 4-6. Due to the procedural posture of these MDL cases, the only evidence available to the court beyond the Operating Agreement is FedEx's generally applicable Policies and Procedures . As the court discussed in the Kansas Decision, nothing in the Operating Agreement or Policies and Procedures evidences that the intent to create an independent contractor relationship here is a mere subterfuge.

The result wouldn't change if the court were to look beyond the contract to the factors set forth under Texas law. The drivers rely on two cases to argue that Texas law would deem them employees. In Texas Emp'rs' Ins. Ass'n v. Brown, 309 S.W.2d 295 (Tex. App. 1958), a milk truck driver slipped and fell on his truck, injuring himself. The appellate court held that sufficient evidence supported the jury's finding of employee status where the driver received training and literature from the company, the truck he drove bore the company's name, the company supplied forms for the driver's use, the driver was paid every two weeks, and the driver wore a company uniform. The Brown court didn't indicate what facts it thought most compelling, but instead summarily affirmed the jury decision. *See* id. at 301-302. The Texas drivers, though, don't discuss key facts in Brown that are dissimilar from the facts in their own case: the employer provided all trucks and supplies, the employer paid the driver's Social Security and withholding taxes, and the driver had to follow the exact route dictated by the employer. *See* Texas Emp'rs' Ins. Ass'n v. Brown, 309 S.W.2d at 298-300.

In <u>Weidner v. Sanchez</u>, 14 S.W.3d 353 (Tex. App. 2000), a cab driver was involved in an accident while driving a route for a county transportation authority. The court held that sufficient evidence supported the jury's finding of employee status when the authority told the driver who to pick up, where and when to pick up and drop off passengers, dictated the sequence of pickups, required the driver to complete routes within a certain time, required him to dress a certain way, and prohibited him from picking up any other fares while on his route. <u>Id.</u> at 374-375. The <u>Weidner</u> court's analysis is more detailed than that in <u>Brown</u> but, again, additional key facts distinguish the <u>Weidner</u> case from this one: the cab in question and its radio were owned by Liberty Cab, not the driver, and the driver "was restricted from conducting any of his own business because his time was totally and completely monopolized and controlled by Liberty's assigned tasks." <u>Weidner v. Sanchez</u>, 14 S.W.3d at 375.

As the court has stated elsewhere in today's decisions, forced case analogies are of limited assistance when the employment vs. independent contractor question is highly fact specific. Unlike the plaintiffs in <u>Brown</u> and <u>Weidner</u>, the FedEx drivers are responsible for obtaining their own equipment, are free to choose the specific route they take, can have complete freedom over their time to the extent they take advantage of entrepreneurial opportunities, and are responsible for paying their own Social Security and other taxes.

Applying the Texas factors shows that: (1) to the extent FedEx drivers take advantage of entrepreneurial opportunities, their businesses are distinct and

independent of FedEx, though this doesn't hold for single work area drivers; (2) FedEx drivers ultimately are responsible for obtaining their own equipment, notwithstanding FedEx's efforts to help drivers meet their obligation to do this; (3) FedEx's controls are results-oriented and FedEx doesn't have the right to control the methods and means or "progress" of the drivers' work; (4) drivers are employed for limited periods of time, though their contracts can be renewed an unlimited number of times; (5) drivers aren't paid by the hour or by the job, but rather by a complex formula taking into account the amount of work they perform, and drivers are issued 1099s and are responsible for paying their own taxes. These factors, with right to control being most important, weigh decisively in favor of a holding that the drivers are independent contractors. The court incorporates here the Kansas Decision and concludes that the <u>Humphreys</u> drivers are independent contractors under Texas law.

The court instructs the parties to file a joint proposed pretrial order with this court within thirty-five days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the Federal Motor Carrier Act-related claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

*(2) 3:06-cv-802, Price*

James Larry Price is a member of the Humphreys class who separately claims breach of contract and violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Neither party has moved for summary judgment. Today's Humphreys decision holds that Mr. Price, as a member of the Texas class, is an independent contractor under Texas law. That decision doesn't dispose of Mr. Price's breach of contract claim or his FLSA claim. The court will suggest remand of Mr. Price's case to the transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within thirty-five days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

*X. Utah (3:08-cv-53, Fishler)*

The Fishler drivers allege illegal deductions under Utah's wage payment statute and related regulations, UTAH CODE ANN. § 34-28-3; UTAH ADMIN. CODE r. 601-3-18(D), 3-18(G), and 3-21. They seek rescission and declaratory and injunctive relief. All claims are class certified, and the parties filed cross-motions for summary judgment. For the reasons stated below, the court grants FedEx's

summary judgment motion and denies the drivers' motion. Because the Utah claims stand or fall on the common question of whether FedEx misclassified its drivers as independent contractors, judgment will be entered for FedEx on all claims in Fishler.

Summary judgment on the issue of employment status is appropriate in Utah when there aren't any disputed material facts. *See e.g.*, Glover v. Boy Scouts of Am., 923 P.2d 1383 (Utah 1996) (affirming grant of summary judgment finding no employer-employee relationship); Foster v. Steed, 432 P.2d 60 (Utah 1967) (reversing denial of summary judgment and finding no employer-employee relationship).

The parties agree that Utah's common law test for employment status defines who is an "employee" for purposes of Utah's wage payment statute. Utah courts examine whether the alleged employer had the right to control the methods and means of the alleged employee's work. Utah Home Fire Ins. Co. v. Manning, 985 P.2d 243, 246 (Utah 1999); Glover v. Boy Scouts of Am., 923 P.2d at 1385; Foster v. Steed, 432 P.2d at 62. Four factors help determine whether a right to control exists: (1) whatever covenants or agreements exist concerning the right of direction and control over the employee, whether express or implied; (2) the right to hire and fire; (3) the method of payment; and (4) the furnishing of equipment. Utah Home Fire Ins. Co. v. Manning, 985 P.2d at 247; Glover v. Boy Scouts of Am., 923 P.2d at 1385-1386. The parties' intent and the employer's business sometimes are considered as well. Glover v. Boy Scouts of Am., 923 P.2d at 1386.

159

No single factor is dispositive. The right to control, not actual control, is determinative. Utah Home Fire Ins. Co. v. Manning, 985 P.2d at 246; Glover v. Boy Scouts of Am., 923 P.2d at 1386, 1388.

Utah applies the same four factor test to *respondeat superior* and worker's compensation cases, but has a "long-standing policy that the Workers' Compensation Act should be liberally construed to effectuate its purposes." Utah Home Fire Ins. Co. v. Manning, 985 P.2d at 249; *see also* Smith v. Alfred Brown Co., 493 P.2d 994, 995 (Utah 1972) ("The general rule, which has been approved by this court a number of times is that the [Workers' Compensation Act] should be liberally construed to effectuate its purpose of providing protection to employees."). The court has considered the worker's compensation cases cited by the drivers with the caution that those cases' liberal construction might have resulted in finding employee status when the common law otherwise would find independent contractor status, even though the same four factor test is used. *See* Pinter Constr. Co. v. Frisby, 678 P.2d 305, 308 (Utah 1984) (discussing with approval the law in various jurisdictions allowing for the same person to be a "statutory" employee for worker's compensation purposes but an independent contractor under the common law).

The drivers argue that FedEx's "every package, every day" rule is treated as control of means and methods under Utah law, even though this "control" is a contracted-for result under Kansas law. The drivers cite Harry L. Young & Sons, Inc. v. Ashton, 538 P.2d 316 (Utah 1975), for the proposition that because the

160

right to control can be express or implied, the use of disciplinary-like procedures to correct and censure the plaintiff drivers implies a right to control and indicates employee status. In <u>Harry L. Young & Sons v. Ashton</u>, a truck driver was subject to penalties for violating his company's requirement that drivers drive five miles per hour below the lawful posted speed limit. *See* <u>id.</u> at 318-319. The drivers leap from this specific and detailed control of a driver's manner of driving to argue that FedEx's "every package, every day" rule implies a right to control because the drivers can be terminated if they miss three pickups in a year.

Utah, like many other jurisdictions, maintains the distinction between means and results. For example, the <u>Harry L. Young & Sons</u> court quoted Utah's Workers' Compensation Act, which defines the distinction as controlling means and results versus controlling only results. *See* <u>Harry L. Young & Sons v. Ashton</u>, 538 P.2d at 318; *see also* <u>Foster v. Steed</u>, 432 P.2d 60, 62 (Utah 1976) ("[I]f the control extends only to the result to be achieved, the actor is regarded as an independent contractor, and the defendant is liable under neither *respondeat superior* nor the workmen's compensation statutes."). The "every package every day" rule is a contracted-for result, not control of means and methods.

Similarly, the drivers argue that dictating "when, where, and how" the drivers do their work suggests that determination of the "when"—i.e., the timeframe in which packages must be delivered—should indicate employee status. *See* <u>Averett v. Grange</u>, 909 P.2d 246, 250 (Utah 1995) ("[B]oth Grange and his truck were subject to the direction of Geneva Rock as to what, when, how, and

161

where the work was to be performed."). The court doesn't read the <u>Averett</u> court's use of the word "when" to mean that any direction at all as to when results are to be achieved turns a contracted-for result into control of the means and methods of a contractor's work. The <u>Averett</u> court didn't rely on the use of the word "when," but rather applied Utah's four factor test to find that Geneva Rock had, by express contractual provision, the "sole exclusive right to supervise and direct the drivers or operators" of equipment. <u>Id.</u> at 250 (quoting the Grange truck lease). Further, the drivers in <u>Averett</u> were controlled in exactly the same way as similarly situated employee drivers, including being paid every two weeks by the hour and not by the job. *See* <u>id.</u> Finally, the <u>Averett</u> court gave liberal construction to the facts because it was a worker's compensation case. *See* <u>id.</u> at 250-251. The use of "when" in <u>Averett</u> was factually illustrative, not a rule of law, and didn't eliminate the distinction between results and means.

Finally, the drivers argue that their right to hire assistants doesn't matter because, they say, Utah law holds that employee status is indicated unless the right to hire assistants is completely unfettered. The drivers rely on <u>Rustler Lodge v. Industrial Commission</u>, 562 P.2d 227 (Utah 1977), which states that "[a]n independent contractor can employ others to do the work and accomplish the contemplated result without the consent of the contractee, while an employee cannot substitute another in his place without the consent of the employer." <u>Id.</u> at 228 (*quoting* <u>Ludlow v. Industrial Comm'n</u>, 235 P. 884, 888 (Utah 1925)). In affirming a finding of employment status, the <u>Rustler Lodge</u> court pointed out that

162

no facts supported the idea that the injured claimant had any right to hire assistants. Id. at 229. The Rustler Lodge court didn't examine what "consent" meant because the right to hire assistants wasn't a key issue there. In affirming a finding of independent contractor status, the Ludlow court examined the right to hire assistants because that right went to the very "crux" of the case. Ludlow v. Indus. Comm'n, 235 P. at 888. The key fact before the Ludlow court was that if drivers hired by the contractor were incompetent or didn't do their work satisfactorily, the school board or superintendent could only complain to the contractor, but the contractor alone had the right to terminate drivers he hired. See id. at 886. Finally, the Manning court, in affirming a finding of employee status for a subcontractor, addressed the "consent" language in a situation where a general contractor controlled which workmen its subcontractor employed by retaining the right to fire any of its subcontractor's employees for any reason. See Utah Home Fire Ins. Co. v. Manning, 985 P.2d at 247.

The court can't agree that the word "consent" is synonymous with "minimum requirements" such that FedEx's minimum requirements for drivers' hired assistants and employees are equivalent to the drivers having to get FedEx's "consent" to hire assistants. There is a distinction between the type of "consent" exercised in Manning (contractee could fire contractor's employees) and the type exercised in Ludlow (contractee could complain to contractor). The evidence before the court doesn't indicate that FedEx takes away the drivers' ability to choose and hire qualified assistants or that FedEx can fire these assistants.

163

Applying the four Utah factors, as in the Kansas Decision, the agreement between FedEx and the drivers is full of express understandings that FedEx can't control the drivers' means and methods of achieving their contracted-for results, the drivers aren't terminable at will, the drivers are paid according to a complex formula that involves the number of packages they deliver, and the drivers ultimately are responsible for obtaining their own equipment. Most importantly, no reasonable inference is available that FedEx has retained the right to control the plaintiff drivers' means and methods of work on a class-wide basis. *See* Kansas Decision, at 73. The court incorporates here the Kansas Decision and concludes that the Fishler drivers are independent contractors under Utah law.

### Y. *Vargas* (3:07-cv-325)

Genaro Vargas and his co-plaintiffs allege violations of the federal Motor Carrier Act Exemption for failure to pay overtime, and violations of states' overtime laws for drivers of trucks weighing less than 10,001 pounds. Mr. Vargas's complaint was a class action complaint, but the court denied his motion for class certification because his proposed class included people from many different states (including states for which this court denied class certification in related MDL cases), whose laws on employment status were sufficiently different to make class certification inappropriate. FedEx moved for summary judgment against Mr. Vargas's Wisconsin co-plaintiff, Tim Ketterhagen. The parties recently stipulated to Mr. Ketterhagen's dismissal from the Vargas case, *see* Ord., Nov. 2, 2010 [Doc.

No. 2227], so FedEx's summary judgment motion is denied as moot. Because Mr. Vargas now presents an individual claim unlike any others in this docket, no reason of efficiency or economy warrants its retention in a centralized docket, and the court will suggest remand of Mr. Vargas's case to the transferor court.

The court instructs the parties to file a joint proposed pretrial order with this court within thirty-five days of entry of this order. In addition to summarizing the history of this case, including significant orders and their docket numbers (including, but not limited to, evidentiary, class certification, and dispositive orders), the parties should provide a detailed description of the claims that remain outstanding, without arguing the merits of those claims, and should outline for the court and the transferor court how they anticipate resolving those claims.

### Z. West Virginia (3:06-cv-337, <u>Ashbury</u>)

The <u>Ashbury</u> drivers allege violations of West Virginia's Consumer Credit and Protection Act, W. VA. CODE § 46A-6-101 *et seq.*, illegal deductions from wages in violation of West Virginia Code § 21-5-1 *et seq.*, fraud, and unjust enrichment. They seek an accounting, rescission, and declaratory and injunctive relief. Though the West Virginia drivers didn't move to certify the fraud claim, they don't indicate that their claims turn on anything other than a determination of their employment status under West Virginia common law. *See* Memo. in Support of Mot. to Certify Class (West Virginia), Apr. 23, 2007, at 1 [Doc. No. 595]. Only the drivers filed a summary judgment motion. For the reasons stated below, the court denies the

165

plaintiffs' motion and grants judgment independent of the motion to FedEx. Because the West Virginia claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, the court will enter judgment for FedEx on all claims in the West Virginia case.

As noted, FedEx didn't file a motion for summary judgment against the West Virginia class. In its supplemental brief, FedEx asks the court to enter judgment *sua sponte* (now called judgment independent of the motion) in its favor. As set forth in the general introduction to today's decisions, the court takes this request seriously because summary judgment is appropriate under West Virginia law, the drivers' employment status can be examined today without prejudice to the plaintiffs, and answering now the question of the plaintiff drivers' employment status under West Virginia law will conserve judicial resources.

FedEx originally argued that summary judgment on the issue of employment status is inappropriate in West Virginia, even when the facts are undisputed, unless the facts justify only one reasonable inference. Although this standard is no different from other states, FedEx argued that West Virginia absolutely would require a jury trial on the employment status question. The drivers countered that West Virginia law is not "somehow uniquely hostile to summary adjudication of employment status." Unsurprisingly, after the Kansas Decision the parties' tunes have changed in their supplemental briefs. Summary judgment is appropriate in West Virginia (as in other states) when the undisputed facts lend themselves to one reasonable inference. *See, e.g.,* Burless v. West

Virginia Univ. Hosps., 601 S.E.2d 85 (W. Va. 2004) (affirming finding of no actual agency relationship); Robertson v. Morris, 546 S.E.2d 770 (W. Va. 2001) (affirming finding of independent contractor status); Shaffer v. Acme Limestone Co., 524 S.E.2d 688 (W. Va. 1999) (affirming finding of independent contractor status).

The parties agree that employment status in West Virginia is decided by the right to control, which is evaluated using four factors: (1) selection and engagement of the servant; (2) payment of compensation; (3) power of dismissal; and (4) power of control. The first three factors aren't essential; the fourth, power of control, is determinative. Each case must be resolved on its own facts, and ordinarily no one feature of the relationship is controlling. To say that the power of control is determinative is to say that it is the "major" factor. The determining factor is the right to control, not the actual exercise of control. Burless v. West Virginia Univ. Hosps., 601 S.E.2d at 91; Mountain Lodge Ass'n v. Crum & Forster Indem. Co., 558 S.E.2d 336, 342 (W. Va. 2001); Robertson v. Morris, 546 S.E.2d at 773; Shaffer v. Acme Limestone Co., 524 S.E.2d at 695; Sipple v. Starr, 520 S.E.2d 884, 888, 890 (W. Va. 1999) (finding issue of material fact because contractee retained significant control beyond express terms of agreement, as shown by ordering store employee fired because she had bad teeth).

FedEx relied on worker's compensation cases in its opposition to class certification. Now, at the summary judgment stage, the drivers rely on these same cases. West Virginia courts construe the law liberally in worker's compensation cases, favoring the finding of employee status. C&H Taxi Co. v. Richardson, 461

S.E.2d 442, 448 (W. Va. 1995); Myers v. Workmen's Comp. Comm'n, 148 S.E.2d 664, 668 (W. Va. 1966). "It is ordinarily considered when one person is retained to render a service for another that the relationship of employer and employee exists. To overcome this presumption it is incumbent upon the one who hired the workman to show that the latter is an independent contractor." Myers v. Workmen's Comp. Comm'n, 148 S.E.2d at 666. The right to supervise indicates employee status in the worker's compensation context. Id. at 667.

The liberal construction of worker's compensation cases doesn't apply to the case to be decided today. West Virginia courts often cite the Myers case for the four factor right to control test already discussed, but West Virginia courts don't apply the worker's compensation interpretive gloss when using that test in the respondeat superior context. This court has reviewed the worker's compensation cases cited by the drivers with the caution that the cases might have been decided differently in a different context. A general right to supervise the results of contracted-for work doesn't indicate employee status in the respondeat superior context or in the situation of this case, where the drivers generally seek to be reclassified as employees.

West Virginia courts have, in the past, used the following formulation: "If the right to control or supervise the work in question is retained by the person for whom the work is being done, the person doing the work is an employee and not an independent contractor." Spencer v. Travelers Ins. Co., 133 S.E.2d 735, 739 (W. Va. 1963). The drivers rely on this formulation to argue that the use of the

168

disjunctive "or" means that supervision indicates employee status in West Virginia. The court can't agree.

West Virginia courts have used their four factor test for decades. *See, e.g.,* Myers v. Workmen's Comp. Comm'n, 148 S.E.2d 664 (W. Va. 1966). But West Virginia courts don't use or rely on the disjunctive "or" language today. For example, the contemporary West Virginia Supreme Court has referred to the case of Paxton v. Crabtree, 400 S.E.2d 245 (W. Va. 1990), as the "seminal" case on the issue of employment status. Shaffer v. Acme Limestone Co., Inc., 524 S.E.2d at 695. Paxton didn't use the disjunctive "or," and Shaffer found Paxton "seminal" even though the independent contractor issue was hardly central to the Paxton case.

The Shaffer court put the nail in the coffin of any argument that Spencer's use of "or" broadened the scope of who is an employee under West Virginia's common law test. The Shaffer court held that Spade Trucking was an independent contractor of Acme Limestone even though, according to the plaintiff:

> (1) Spade Trucking employees arrived routinely at 7:00 in the morning at Acme's facility; (2) Acme directed Spade Trucking employees as to which products to pick-up and deliver; (3) Acme advised Spade Trucking employees when they should load their trucks at the legal weight limit; (4) Acme provided Spade Trucking employees with safety information; (5) Acme required spade Trucking drivers, when first hired, to undergo safety hazard training; (6) trucks owned by Spade Trucking were loaded by Acme employees; (7) compensation levels for work by Spade Trucking [were] established by Acme; (8) Spade Trucking employees were required to provide Acme customers with a copy of invoices and to return invoice copies to Acme; (9) Acme suggested the routes Spade Trucking employees

169

should take; and (10) when Acme closed its facility each day, the
Spade Trucking employees went home.

Shaffer v. Acme Limestone Co., Inc., 524 S.E.2d at 696. Addressing the plaintiffs'
arguments concerning supervision, the Shaffer court clarified, "The power of
control factor refers to control over the means and method of performing the
work." Id. (citation omitted). As the Shaffer court stated, while citing cases from
numerous jurisdictions far and wide:

> [W]e follow the lead of numerous other courts in holding that an
> owner who engages an independent contractor to perform a job for
> him or her may retain broad general power of supervision and control
> as to the results of the work so as to insure satisfactory performance
> of the contract—including the right to inspect, to stop the work, to
> make suggestions or recommendations as to the details of the work,
> or to prescribe alterations or deviations in the work—without
> changing the relationship from that of owner and independent
> contractor or changing the duties arising from that relationship.

Shaffer v. Acme Limestone Co., Inc., 524 S.E.2d at 696-697 (quotations and
citations omitted); see also Mountain Lodge Ass'n v. Crum & Forster Indem. Co.,
558 S.E.2d at 342 (same); Robertson v. Morris, 546 S.E.2d at 773 (W. Va. 1999)
(same). The drivers' argument on the use of the disjunctive "or" has no merit.

The West Virginia drivers argue that FedEx can fire them by not renewing
their contracts or by terminating their contracts for cause, which, they say, is
enough under West Virginia law to constitute a power to fire. The court doesn't
read the cases the same way. Further, the drivers' reliance on Huntington Publ'g
Co. v. Caryl, 377 S.E.2d 479 (W. Va. 1988), is misplaced because that case
involved a tax question and that court expressly stated that whether the carriers

170

in that case were independent contractors was beside the point. *See* id. at 490 ("The real issue in this case . . . is whether the appellee is making a retail sale to home delivery subscribers."). In a more applicable *respondeat superior* context, the West Virginia Supreme Court qualified Huntington Publishing's language to say that the "ability to release a carrier [without a stated reason] effectively controls the carrier's method of operation." Zirkle v. Winkler, 585 S.E.2d 19, 25 (W. Va. 2003) (alteration in the original). FedEx doesn't retain the power to fire the drivers at will: FedEx can't release drivers without notice nor can they release drivers without cause.

Finally, and most importantly, "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The court incorporates here the Kansas Decision and concludes that the Ashbury drivers are independent contractors under West Virginia law.

### AA. Wisconsin (3:05-cv-601, *Larson*)

The Larson drivers allege illegal wage deductions, WIS. STAT. § 103.455, and fraud; they seek rescission and declaratory relief. Though they didn't move to certify the fraud claim, the Wisconsin drivers don't indicate that their claims turn on anything other than a determination of their employment status under Wisconsin law. *See* Memo. in Support of Mot. to Certify (Wisconsin), Apr. 2, 2007, at 1 [Doc. No. 582]. The parties filed cross motions for summary judgment. For the

171

reasons stated below, the court grants summary judgment to FedEx and denies the drivers' motion for summary judgment. Because the Wisconsin claims stand or fall on the common question of whether FedEx Ground misclassified its drivers as independent contractors, judgment will be entered for FedEx on all claims in the Wisconsin case.

Though Wisconsin courts haven't specifically addressed how to resolve employee status for purposes of Wisconsin Statutes § 103.455, Wisconsin has long used the common law right to control test in all other relevant contexts. The parties agree the right to control test applies in this case, and nothing before the court indicates that Wisconsin courts would use any other test under this statute. *See* Pamperin v. Trinity Mem'l Hosp., 423 N.W.2d 848, 852 (Wis. 1988) (*respondeat superior*: "The right to control is the dominant test in determining whether an individual is a servant."); Snider v. Northern States Power Co., 260 N.W.2d 260, 263 (Wis. 1977) (*respondeat superior*: "The most important single criterion in determining whether a person is an independent contractor is the degree to which the owner, rather than the independent contractor, retains the right to control the details of the work."); Scholz v. Industrial Comm'n, 64 N.W.2d 204, 207 (Wis. 1954) (worker's compensation: "[T]he principal test for determining if a relationship of employer-employee exists is whether the alleged employer has the right to control the details of the work."); Reuter v. Murphy, 622 N.W.2d 464, 469 (Wis. Ct. App. 2000) (*respondeat superior*: "The dominant factor in determining whether an individual is a servant or an independent contractor is

172

whether the alleged master has the 'right to control the details of the servant's work."); <u>Madison Newspapers, Inc. v. Wisconsin Dep't of Revenue</u>, 599 N.W.2d 51, 60 (Wis. Ct. App. 1999) (tax exemption statute: "The dominant test in determining whether a person is an independent contractor or an employee is who has the right to control the details of the work."); <u>Goldberg v. Department of Indus., Labor and Human Relations</u>, 484 N.W.2d 568, 570 (Wis. Ct. App. 1992) (unemployment compensation). Wisconsin courts also cite other factors, such as the right to terminate without liability and the method of payment, and at least one case has referenced the ten factors listed in Restatement (Second) of Agency § 220. *See* <u>Pamperin v. Trinity Mem'l Hosp.</u>, 423 N.W.2d at 852 & n.4.

The drivers' chief argument is that the distinction between control of means and control of results—recognized by other states—doesn't exist in Wisconsin. *See* Pltfs' Supp., Sept. 24, 2010, at 4 [Doc. No. 2199] ("Unlike Kansas, there is no distinction drawn under Wisconsin law whether the right to control details of the work is part of the manner, method and means of the work or the result of the work."). The drivers rely heavily on an unpublished case, <u>Hernandez v. Romero</u>, No. 2006AP2783, 2007 WL 2593558 (Wis. Ct. App. Sept. 11, 2007), in which the appellate court reversed a grant of summary judgment because it found that a material issue of fact existed as to whether the alleged employer had the right to control a worker's means and methods of work. Certain facts in <u>Hernandez</u>, such as the alleged employer's control of Satellite TV workers' work orders and time windows, overlap with this MDL case, but <u>Hernandez</u> is an unpublished opinion

173

without precedential value for purposes of today's decision. *See* Wisconsin Rules of Appellate Procedure, Rule 809.23(3). Even if <u>Hernandez</u> were a citable case, it carries little persuasive value for two reasons. First, employment status most often is determined under the common law on the facts and circumstances of individual cases, not on bright-line rules by which a given fact will be dispositive in every circumstance. Second, the <u>Hernandez</u> court offered no explanation as to why it found a disputed issue of material fact, *see* <u>id.</u> at *4, which might be why the appellate court declined to publish the opinion.

FedEx relies on <u>Carothers v. Bauer</u>, 126 N.W.2d 758 (Wis. 1964), to argue that summary judgment is required in its favor. <u>Carothers</u> cuts against <u>Hernandez</u> because it comes from a higher court, some facts are similar, <u>Carothers</u> explains its reasoning, and <u>Hernandez</u> carries no precedential value. In <u>Carothers</u>, a contracting milk hauler owned a tractor trailer. The defendant dairy company provided the driver with a milk tank, kept all records, required the tank and truck to be used exclusively to haul for the dairy, required pickup and delivery to places listed by the dairy, and required satisfactory and prompt delivery at all times to prevent spoliation of the milk. The dairy's tank carried the dairy's trade name and legend, and the dairy had an employee ride with the trucker at least once a month to inspect the equipment and generally observe how the driver discharged his responsibilities. Farmers relied on the dairy—not the trucker—to be responsible for the safe hauling of their milk and the control of the drivers. *See* <u>Carothers v.</u>

174

Bauer, 126 N.W.2d 760-762. The Carothers court held the trucker to be an independent contractor as a matter of law.

As with the drivers' case citations in these MDL cases, the court doesn't point to the facts in Carothers and simply call it a day in favor of FedEx. Rather, Carothers is important for the key principle that in Wisconsin—and contrary to the drivers' argument—there exists the traditional common law distinction between control of results and control of means. The dairy in Carothers controlled contracted-for results by requiring prompt and satisfactory delivery of milk, by having the right to terminate the trucker on thirty days' notice, and by inspecting his work. But as the Carothers court explained, none of those things controlled how the trucker actually operated the truck on his route: he could hire help as he saw fit, could follow his own route of travel, and was responsible for the maintenance and expenses of his truck. The dairy controlled contracted-for results, and the trucker controlled the means and methods by which he obtained those results. See also Kerl v. Dennis Rasmussen, Inc., 682 N.W.2d 328, 338 (Wis. 2004) (distinguishing numerous controls exercised by franchisors as going to quality and operational requirements necessary for the benefit of both franchisee and franchisor, from routine, daily supervision, management, and control of a franchisee's business); Employers Mut. Liab. Ins. Co. v. Brower, 272 N.W. 359, 361 (Wis. 1937) ("[T]he mere procuring or controlling of the end result of work, by one for whom it is performed, without directing the means or details in which it is performed, does not necessarily constitute the person who performs the work

175

an employee. As we [have] said, 'Any employer of an independent contractor has that right.'" (*quoting* York v. Industrial Comm'n, 269 N.W. 726, 732 (Wis. 1936))).

This court has held that "the only reasonable inference that can be drawn is that FedEx hasn't retained the right to control the details of the contractors' work methods on a class-wide basis." Kansas Decision, at 73. The court also addressed all factors relevant in Wisconsin in the Kansas Decision, which the court incorporates here. The Larson drivers are independent contractors under Wisconsin law.

CONCLUSION

The only remaining outstanding matter appears to be FedEx's motion for trial by jury, which the court DENIES as moot [Doc. Nos. 1962, 1987]. Final Suggestions of Remand will be issued after the court reviews the parties' joint proposed pretrial orders requested in today's decisions.

The court INSTRUCTS the parties to file a joint status report with the court within fourteen days of entry of this order if they are aware of any further matters the court may have overlooked today and that require disposition. The court has staggered the due dates of the joint pretrial orders for the convenience of counsel and so as to stagger the remand orders by the Judicial Panel on Multidistrict Litigation. For ease of reference, the court summarizes today's rulings in the attached appendix.

SO ORDERED.

ENTERED: <u>December 13, 2010</u>


<u>      /s/ Robert L. Miller, Jr.      </u>
Judge
United States District Court

cc:   Magistrate Judge Nuechterlein
      JPMDL

# APPENDIX
## Summary of Dispositions

| MDL Member Cause No. | State | Summary |
|---|---|---|
| 3:06-cv-428 | Alabama (Floyd) | Drivers' motion for summary judgment DENIED [Doc. No. 1155]; judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
| 3:07-cv-191 | Alabama (Gentle) | Remand of case to be suggested for resolution of all claims. Joint proposed pretrial order due in 21 days. |
| 3:07-cv-272 | Arizona (Gibson) | Drivers' motion for summary judgment DENIED [Doc. No. 1792]; judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
| 3:06-cv-209 | Arkansas (Harris) | Drivers' motion for summary judgment DENIED [Doc. No. 1157]; judgment independent of the motion granted to FedEx on state law claims only. Remand of case to be suggested for resolution of FLSA-related claims. Joint proposed pretrial order due in 21 days. |
| 3:05-cv-528 | California (Alexander) | Drivers' motion for summary judgment DENIED [Doc. No. 1153]; FedEx's motion for summary judgment GRANTED [Doc. No. 1225]. Remand of case to be suggested for resolution of FMLA-related claims. Joint proposed pretrial order due in 21 days. |
| 3:06-cv-429 | California (Pedrazzi) | FedEx's motion for summary judgment GRANTED [Doc. No. 1356]. Remand of case to be suggested for resolution of Mr. Pedrazzi's state law discrimination-related claims. Joint proposed pretrial order due in 21 days. |
| 3:08-cv-52 | California (Huerta) | FedEx's motion for summary judgment GRANTED [Doc. No. 1658]. Remand of case to be suggested for resolution of claims premised on Mr. Huerta's status as independent contractor. Joint proposed pretrial order due in 21 days. |

| 3:05-cv-664 | Florida (Carlson) | Drivers' motion for summary judgment DENIED [Doc. No. 1159]; FedEx's motion for summary judgment GRANTED [Doc. No. 1235]. Judgment to be entered in favor of FedEx on all claims. |
|---|---|---|
| 3:09-cv-356 | Florida (Ward) | Remand of case to be suggested for resolution of all claims. Joint proposed pretrial order due in 21 days. |
| 3:05-cv-411 | Georgia (White) | Drivers' motion for summary judgment DENIED [Doc. No. 1794]; FedEx's motion for summary judgment GRANTED [Doc. No. 1818]. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-390 | Indiana (Riewe) | Drivers' motion for summary judgment DENIED [Doc. No. 1161]; FedEx's motion for summary judgment GRANTED [Doc. No. 1229]. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-599 | Kentucky (Coleman) | Drivers' motion for summary judgment GRANTED IN PART [Doc. No. 1165]; FedEx's motion for summary judgment GRANTED IN PART [Doc. No. 1231]. Remand of case to be suggested for resolution of claims related to Kentucky's Wage Payment statute. Joint proposed pretrial order due in 21 days. |
| 3:08-cv-193 | Louisiana (Boudreaux) | Drivers' motion for summary judgment DENIED [Doc. No. 1796]; FedEx's motion for summary judgment GRANTED [Doc. No. 1820]. Judgment to be entered in favor of FedEx on all claims. |
| 3:06-cv-485 | Maryland (Westcott) | Drivers' motion for summary judgment DENIED [Doc. No. 1167]; FedEx's motion for summary judgment GRANTED [Doc. No. 1213]. Judgment to be entered in favor of FedEx on all claims. |
| 3:07-cv-189 | Maryland (Jones) | FedEx's motion for summary judgment GRANTED [Doc. No. 1354]. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-533 | Minnesota (Lee) | Drivers' motion for summary judgment DENIED [Doc. No. 1169]; FedEx's motion for summary judgment GRANTED [Doc. No. 1211]. Judgment to be entered in favor of FedEx on all claims. |

| 3:07-cv-120 | Nevada (DeCesare) | Drivers' motion for summary judgment GRANTED IN PART [Doc. No. 1800]. Remand to be suggested for further disposition and resolution of all claims. Joint proposed pretrial order due in 21 days. |
| --- | --- | --- |
| 3:08-cv-234 | Nevada (Campbell) | Remand to be suggested for resolution of all claims. Joint proposed pretrial order due in 21 days. |
| 3:05-cv-601 | New Hampshire (Gennell) | Drivers' motion for summary judgment GRANTED IN PART [Doc. No. 1171]; judgment independent of the motion GRANTED IN PART, to FedEx. Remand to be suggested for resolution of claims tied to New Hampshire statutes. Joint proposed pretrial order due in 21 days. |
| 3:05-cv-595 | New Jersey (Tofaute – Class) | Drivers' motion for summary judgment DENIED [Doc. No. 1173]; FedEx's motion for summary judgment GRANTED [Doc. No. 1227]. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-535 | New Jersey (Capers) | FedEx's motion for summary judgment GRANTED IN PART [Doc. No. 1352]. Remand to be suggested for resolution of claims not resolved by Tofaute finding of independent contractor status. Joint proposed pretrial order due in 28 days. |
| 3:07-cv-327 | New Jersey (Farrell) | Remand to be suggested for resolution of federal law and contractual claims. Joint proposed pretrial order due in 28 days. |
| 3:09-cv-2 | New Jersey (Tofaute - Individual) | Remand to be suggested for resolution of claims not resolved by Tofaute finding of independent contractor status. Joint proposed pretrial order due in 28 days. |
| 3:05-cv-538 | New York (Louzau) | Drivers' motion for summary judgment DENIED [Doc. No. 1175]; FedEx's motion for summary judgment GRANTED [Doc. No. 1219]. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-537 | New York (Johnson) | FedEx's motion for partial summary judgment DENIED as premature [Doc. No. 1347]. Remand to be suggested for resolution of all claims. Joint proposed pretrial order due in 28 days. |

| 3:07-cv-326 | North Carolina (Whiteside) | Drivers' motion for summary judgment DENIED [Doc. No. 1798] (ERISA claim is DENIED without prejudice); judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
|---|---|---|
| 3:08-cv-336 | Ohio (Kelly) | Drivers' motion for summary judgment DENIED [Doc. No. 1802]; judgment independent of the motion GRANTED to FedEx on all state law claims. Remand to be suggested for resolution of FMLA-related claims. Joint proposed pretrial order due in 28 days. |
| 3:06-cv-801 | Ohio (Wallace) | Remand to be suggested for resolution of claims. Joint proposed pretrial order due in 28 days. |
| 3:05-cv-596 | Oregon (Slayman) | Drivers' motion for summary judgment DENIED [Doc. No. 1177]; judgment independent of the motion GRANTED to FedEx. Remand to be suggested for resolution of outstanding rescission claim. Joint proposed pretrial order due in 28 days. |
| 3:07-cv-328 | Oregon (Leighter) | Drivers' motion for summary judgment DENIED [Doc. No. 1804]; judgment independent of the motion GRANTED to FedEx. Remand to be suggested for resolution of outstanding rescission claim. Joint proposed pretrial order due in 28 days. |
| 3:05-cv-597 | Pennsylvania (Willis) | Drivers' motion for summary judgment DENIED [Doc. No. 1179]; judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-598 | Pennsylvania (Hart) | Judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
| 3:09-cv-3 | Pennsylvania (Mitchell) | Remand to be suggested for resolution of claims. Joint proposed pretrial order due in 28 days. |
| 3:05-cv-599 | Rhode Island (Tierney) | Drivers' motion for summary judgment DENIED [Doc. No. 1181]; FedEx's motion for summary judgment GRANTED [Doc. No. 1233]. Judgment to be entered in favor of FedEx on all claims. |

| 3:05-cv-668 | South Carolina (Cooke) | Drivers' motion for summary judgment DENIED [Doc. No. 1183]; judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
|---|---|---|
| 3:05-cv-600 | Tennessee (Smith) | Drivers' motion for summary judgment DENIED [Doc. No. 1185]; FedEx's motion for summary judgment GRANTED [Doc. No. 1217]. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-540 | Texas (Humphreys) | Drivers' motion for summary judgment DENIED [Doc. No. 1187]; FedEx's motion for summary judgment GRANTED [Doc. No. 1223]. Remand to be suggested for federal claims. Joint proposed pretrial order due in 35 days. |
| 3:06-cv-802 | Texas (Price) | Remand to be suggested for resolution of claims. Joint proposed pretrial order due in 35 days. |
| 3:08-cv-53 | Utah (Fishler) | Drivers' motion for summary judgment DENIED [Doc. No. 1806]; FedEx's motion for summary judgment GRANTED [Doc. No. 1822]. Judgment to be entered in favor of FedEx on all claims. |
| 3:07-cv-325 | Vargas (MA) | FedEx's motion for summary judgment DENIED as moot [Doc. No. 1870]. Remand to be suggested for resolution of all claims. Joint proposed pretrial order due in 35 days. |
| 3:06-cv-337 | West Virginia (Ashbury) | Drivers' motion for summary judgment DENIED [Doc. No. 1189]; judgment independent of the motion GRANTED to FedEx. Judgment to be entered in favor of FedEx on all claims. |
| 3:05-cv-601 | Wisconsin (Larson) | Drivers' motion for summary judgment DENIED [Doc. No. 1191]; FedEx's motion for summary judgment GRANTED [Doc. No. 1221]. Judgment to be entered in favor of FedEx on all claims. |
| FedEx's motions for trial by jury DENIED as moot [Doc. Nos. 1962, 1987]. | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

----------------------------------------------------------------

In re FEDEX GROUND PACKAGE
SYSTEM, INC., EMPLOYMENT
PRACTICES LITIGATION

----------------------------------------------------------------

THIS DOCUMENT RELATES TO:

ALL CASES

----------------------------------------------------------------

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:05-MD-527-RM
(MDL 1700)

JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**JOINT MOTION FOR EXTENSION OF TIME TO FILE**
**JOINT PROPOSED PRETRIAL ORDERS AND STATUS REPORT**

Plaintiffs and defendant FedEx Ground Package System, Inc. respectfully request a three-week extension of the deadlines listed in the Court's December 13, 2010 Order (Doc. No. 2239). In its Order, the Court set deadlines for two types of filings.

First, the Court instructed the parties to file a joint status report identifying any further matters requiring disposition by the Court. (*Id.* at 176.) The deadline for this joint status report is December 27, 2010. (*Id.*)

Second, the Court instructed the parties to file joint proposed pretrial orders ("PTOs") in 22 cases. (*Id.*, Appendix.) The deadlines were staggered for the convenience of counsel and so as to stagger the remand orders to be issued by the Judicial Panel on Multidistrict Litigation. (*Id.* at 176.) Those deadlines are:

- January 3, 2011:

    o Alabama -- Gentle

    o Arkansas -- Harris

    o California -- Alexander

- o California -- Pedrazzi

- o California -- Huerta

- o Florida -- Ward

- o Kentucky -- Coleman

- o Nevada -- DeCesare

- o Nevada -- Campbell

- o New Hampshire --Gennell

- January 10, 2011:

  - o New Jersey -- Capers

  - o New Jersey -- Farrell

  - o New Jersey -- Tofaute II (individual case)

  - o New York -- Johnson

  - o Ohio -- Kelly

  - o Ohio -- Wallace

  - o Oregon -- Slayman

  - o Oregon -- Leighter

  - o Pennsylvania -- Mitchell

- January 18, 2011[1]:

  - o Texas -- Humphreys

  - o Texas -- Price

  - o Vargas -- Massachusetts

---

[1]    35 days from December 13, 2010 is January 17, 2011, which is a federal holiday.

The parties believe that, despite their diligence, they will not be able to meet the Court's deadlines. This is because drafting these PTOs will likely take substantially more time than drafting the 16 PTOs which were filed on or about September 13, 2010. While those cases tended to be procedurally very similar, the cases at issue here tend to be procedurally distinct– with combinations of class cases, non-class cases, non-certified claims within class cases, and summary judgment for one party or the other (or both) on particular claims or issues within cases. Moreover, the parties will need to coordinate much more closely with local counsel in each case to implement the Court's instruction that the parties confer, and provide suggestions to this Court and the transferor court, on how the parties anticipate resolving the remaining claims and issues.

Drafting these 22 PTOs will thus require a great deal of work from both sides, including local counsel. Unfortunately, the time period for completing much of this work falls during the holiday season, when many individuals have pre-existing family and other obligations, making compliance with the current deadlines impracticable.

The parties also request additional time to complete the status report, because they must review the entire docket (more than 2200 filings), and especially the Court's recent orders addressing summary judgment, to ascertain if there any further matters that may have been inadvertently overlooked and require the Court's disposition. Again, with the upcoming holiday, the parties submit that meeting the current December 27, 2010 deadline is not feasible.

In light of the foregoing, the parties respectfully request that the Court extend by three weeks the time for the parties to make their joint filings, so that the deadlines are as follows:

- January 18, 2011:[2]

---

[2]     Three weeks from December 27, 2010 is January 17, 2011, which is a federal holiday.

- o Joint status report

- January 24, 2011.  PTOs in:

    - o Alabama -- Gentle

    - o Arkansas -- Harris

    - o California -- Alexander

    - o California -- Pedrazzi

    - o California -- Huerta

    - o Florida -- Ward

    - o Kentucky -- Coleman

    - o Nevada -- DeCesare

    - o Nevada -- Campbell

    - o New Hampshire --Gennell

- January 31, 2011.  PTOs in:

    - o New Jersey -- Capers

    - o New Jersey -- Farrell

    - o New Jersey -- Tofaute II (individual case)

    - o New York -- Johnson

    - o Ohio -- Kelly

    - o Ohio -- Wallace

    - o Oregon -- Slayman

    - o Oregon -- Leighter

    - o Pennsylvania -- Mitchell

- February 7, 2011.  PTOs in:

   o Texas -- Humphreys

   o Texas -- Price

   o Vargas -- Massachusetts


Dated: December 22, 2010.

<div align="center">Respectfully submitted,</div>

By: /s/Chris A. Hollinger
   Chris A. Hollinger

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

*Defendant's Lead and Liaison Counsel*

By: /s/Lynn Rossman Faris
   Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650


*Plaintiff's Lead and Liaison Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

-------------------------------------------------- )
                                 )

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| | ) | |

-------------------------------------------------- )

THIS DOCUMENT RELATES TO: )
                                   )

ALL CASES )
-------------------------------------------------- )

## PLAINTIFFS' CO-LEAD COUNSEL AND PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER

Co-Lead Counsel and the Plaintiffs' Steering Committee ("PSC") bring this Motion for entry of the Common Benefit Set-Aside Order to ensure fair and equitable sharing of any recovery by all counsel who have performed services and incurred expenses in the MDL proceedings in this above-captioned case.

Plaintiffs' Co-Lead Counsel and PSC move the Court as follows:

**1.**     **Common Benefit Fund to be Established.**

Plaintiffs' Co-Lead Counsel (Lynn Faris, Susan Ellingstad and Robert Harwood) are directed to establish an interest-bearing account at Signature Bank, New York, NY, to receive funds as provided in the proposed Common Benefit Set-Aside Order.

**2.**     **Assessments for the Common Benefit Fund.**

Plaintiffs and their attorneys who, after transfer of their case(s) from the MDL to their home jurisdiction, agree to settle or compromise their claims, or, with or without trial, recover a judgment for monetary damages or other monetary relief, including compensatory and punitive

damages, if any, with respect to any claims, are subject to an assessment, as described in the proposed Common Benefit Set-Aside Order.

    3.    **Application of Order.**

The Common Benefit Set-Aside Order shall apply to all cases that have been or are now pending or later filed in, transferred to, or removed to, this Court as well as all unfiled and tolled cases and claims which derive from and are treated as part of the coordinated proceeding known as *In re FedEx Ground Package System, Inc., Employment Practices Litigation*, Cause No. 3:05-MD-527-RM (MDL 1700).

In support of this motion, Plaintiffs refer the Court to the Plaintiffs' Memorandum of Law in Support of Motion for Common Benefit Set-Aside Order, the Affidavit of Robert Harwood and the proposed Common Benefit Set-Aside Order, and all prior pleadings, orders, and proceedings herein.

WHEREFORE, Plaintiffs respectfully request that the Court grant their motion and enter the Common Benefit Set-Aside Order.


Dated: December 28, 2010                    Respectfully submitted,

                                            LOCKRIDGE GRINDAL NAUEN P.L.L.P.

                                            **s/ Susan E. Ellingstad**
                                            Susan E. Ellingstad
                                            100 Washington Avenue South, Suite 2200
                                            Minneapolis, MN 55401
                                            Tel:    (612) 339-6900
                                            Fax:    (612) 339-0981
                                            Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel:     (510) 272-0169
Fax:     (510) 272-0174
Email: lfaris@leonardcarder.com
          emorton@leonardcarder.com

Robert I. Harwood
Matthew M. Houston
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:     (212) 935-7400
Fax:     (212) 753-3630
Email: rharwood@hfesq.com

## PLAINTIFFS' CO-LEAD COUNSEL

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650
Email: agostino@aaklaw.com

## PLAINTIFFS' LIAISON COUNSEL

Jerald R. Cureton
Anthony L. Marchetti, Jr.
CURETON CLARK, P.C.
3000 Midlantic Drive
Suite 200
Mt. Laurel, NJ 08054
Tel:     (856) 824-1001
Fax:     (856) 824-1008
Email: jcureton@curetonclark.com
          amarchetti@curetonclark.com

Jordan M. Lewis
SIEGEL, BRILL, GREUPNER, DUFFY
  & FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN 55401
Tel:     (612) 337-6100
Fax:     (612) 339-6591
Email: jordanlewis@sbgdf.com

J. Gordon Rudd
Anne T. Regan
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall
Suite 501
Minneapolis, MN 55401
Tel:     (612) 341-0400
Fax:     (612) 341-0844
Email: gordon.rudd@zimmreed.com
          anne.regan@zimmreed.com

## PLAINTIFFS' STEERING COMMITTEE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

------------------------------------------------------ )
                                                       )
In re FEDEX GROUND PACKAGE          )          Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT            )          (MDL 1700)
PRACTICES LITIGATION               )
                                                       )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:           )
                                                       )
ALL ACTIONS                         )
------------------------------------------------------ )

## PLAINTIFFS' CO-LEAD COUNSEL AND PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTS ................................................................................................................ 2

     The JPML Orders ............................................................................................ 3

     The Court's Pretrial Orders ............................................................................ 3

     Plaintiffs' Motions For Class Certification ...................................................... 4

     Plaintiffs' Motions for Summary Adjudication ................................................ 6

     Other Pretrial Motions and Discovery ............................................................ 7

     Plaintiffs' Initial Request to Move and Brief Whether the
     Court Should Enter a Common Benefit Set-Aside Order ...................................... 8

III.    ARGUMENT ...................................................................................................... 9

     A.     MDL Courts Routinely Enter Orders Directing The
            Set-Aside Of Funds From Plaintiffs' Recoveries For
            The Work Performed and Expense Incurred By MDL
            Counsel For The Common Benefit Of All MDL Plaintiffs. ................................ 10

     B.     The Court Should Permit Plaintiffs' Co-Lead Counsel
            To Establish The FXG MDL Common Benefit Fund. ........................................ 13

     C.     In Cases Where Plaintiffs Obtain A Judgment Or Settlement
            For Monetary Relief On A Fee-Shifting Claim, The Court
            Should Permit Plaintiffs' Co-Lead Counsel To Submit To
            This Court A Petition For Reasonable Attorney's Fees
            And Costs To Be Paid By FXG And Set Aside For Later
            Distribution To MDL Plaintiffs' Counsel. ........................................................ 16

     D.     In Non-Fee-Shifting Cases Where Plaintiffs Obtain A
            Judgment For Monetary Relief And In Cases That Result
            In A Settlement For Monetary Relief, The Court Should
            Encourage the Parties To Submit The Issue to Mediation/Binding
            Arbitration And Alternatively Submit The Issue to A Special Master. ............... 21

IV.    CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

<div align="right">Page(s)</div>

CASES

*Active Prods. Corp. v. A.H. Choitz & Co. Inc.*,
    163 F.R.D. 274 (N.D. Ind. 1995) ........................................................................18

*Anderson v. AB Painting & Sandblasting Inc.*,
    578 F.3d 542 (7th Cir. 2009) ...........................................................................18

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ......................................................................................11

*Bradshaw v. Thompson*,
    454 F.2d 75 (6th Cir. 1972) .............................................................................18

*Central R.R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885) ......................................................................................11

*Florin v. Nationsbank of Ga., N.A.*,
    34 F.3d 560 (7th Cir. 1994) .............................................................................15

*Goodyear v. Estes Exp. Lines, Inc.*,
    2008 WL 687130 (S.D. Ind. Mar. 10, 2008) .........................................................18

*In re Activision Securities Litig.*,
    723 F.Supp. 1373 (N.D. Cal. 1989) ...................................................................19

*In re Air Crash Disaster at Florida Everglades*,
    549 F.2d 1006 (5th Cir. 1977) .............................................................10, 12, 18, 20

*In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,
    2006 WL 471782 (N.D. Cal. Feb. 28, 2006) ........................................................13

*In re Clearsky Shipping Corp.*,
    2003 WL 1563820 (E.D. La. Feb. 26, 2003) ........................................................11

*In re Diet Drugs Prods. Liab. Litig.*,
    1999 WL 124414 (E.D. Pa. Feb. 10, 1999) ..........................................................13

*In re Diet Drugs Prods. Liab. Litig.*,
    2001 WL 497313 (E.D. Pa. May 9, 2001) ...........................................................14

*In re Enron Corp. Sec., Derivatives & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) ...........................................................16, 17

<div align="center">ii</div>

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig. (No. II)*,
381 F. Supp. 2d 1380 (J.P.M.L. 2005) ............................................................................3

*In re Genetically Modified Rice Litig.*,
2010 WL 716190 (E.D. Mo. Feb. 24, 2010) .............................................................. passim

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
MDL No. 05-1708, 2010 WL 2555235 (D. Minn. Jun. 23, 2010) .........................................19

*In re Katrina Canal Breaches Consolidated Litig.*,
2010 WL 2998848 (E.D. La. Jul. 28, 2010) ........................................................................15

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 644 (E.D. Pa. 2003) ...................................................................... passim

*In re MGM Grand Hotel Fire Litig.*,
660 F. Supp. 522 (D. Nev. 1987) .......................................................................................11

*In re Nineteen Appeals Arising Out of San Juan*
*DuPont Plaza Hotel Fire Litig.*,
982 F.2d 603 (1st Cir. 1992) ...........................................................................................10

*In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*,
2002 WL 31834446 (D. Md. Apr. 12, 2002) .....................................................12, 13, 15, 20

*In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*,
953 F.2d 162 (4th Cir. 1992) ............................................................................................11

*In re Synthroid Mktg. Litig.*,
264 F.3d 712 (7th Cir. 2001) ............................................................................................15

*In re Trans Union Corp. Privacy Litig.*,
MDL No. 1350, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) .................................................19

*In re Worldcom, Inc. Sec. Litig.*,
2004 WL 2549682 (S.D.N.Y. Nov. 10, 2004) ..............................................................11, 14

*In re Zyprexa Prods. Liab. Litig.*,
467 F. Supp. 2d 256 (E.D.N.Y. 2006) ...................................................................8, 11, 12, 14

*In re Zyprexa Prods. Liab. Litig.*,
594 F.3d 113 (2d Cir. 2010) .............................................................................................11

*Internal Imp. Fund Trustees v. Greenough*,
105 U.S. 527 (1881) ........................................................................................................11

*Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*,
26 F.3d 842 (8th Cir. 1994) ..............................................................................................17

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ................................................................................. 11

*Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*,
    776 F.2d 646 (7th Cir. 1985) ..................................................................... 19

*Report of Third Circuit Task Force, Court Awarded Attorney Fees*,
    108 F.R.D. 237, 249-50 (1986) ................................................................. 17

*Skelton v. General Motors Corp.*,
    860 F.2d 250 (7th Cir. 1988) ..................................................................... 17

*Smiley v. Sincoff*,
    958 F.2d 498 (2d Cir. 1992) ........................................................... 10, 12, 20

*Special Masters in Federal Court*,
    161 F.R.D. 211, 218 (1995) ....................................................................... 19

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939) ................................................................................... 11

*Turner v. Murphy Oil USA, Inc.*,
    422 F. Supp. 2d 676 (E.D. La. 2006) ................................................. passim

*Walitalo v. Iacocca*,
    968 F.2d 741 (8th Cir. 1992) ............................................................... 10, 12

## RULES

Fed. R. Civ. P. 23(c)(1)(C) ................................................................................. 5

Fed. R. Civ. P. 53 ............................................................................................... 18

Fed. R. Civ. P. 12 ............................................................................................... 3

Fed. R. Civ. P. 26(a)(1) ...................................................................................... 3

Fed. R. Civ. P. 30(b)(6) ...................................................................................... 7

## STATUTES

28 U.S.C. § 1407 ................................................................................................ 3

## I.    INTRODUCTION

Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee move the Court for entry of a common benefit set-aside order.  Since the Judicial Panel on Multidistrict Litigation's ("JPML") initial transfer order in August 2005, MDL Plaintiffs' Counsel[1] have devoted considerable time and expense to serving the common interests of all Plaintiffs in this complex MDL litigation.  MDL Plaintiffs' Counsel have expended thousands of hours and millions of dollars in litigating these forty-two statewide cases through discovery, experts, class certification and summary judgment, and preparing these cases to be tried.  As of August 2010, the six firms comprising Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee have spent approximately 74,750 attorney hours and have incurred $2,674,844 in expenses in the MDL proceedings.  Entry of a common benefit set-aside order is appropriate at this time to ensure the fair and equitable sharing of any potential recovery by MDL Plaintiffs after transfer of their cases from the MDL, by counsel who have performed services and incurred expenses on behalf of those Plaintiffs for more than five years in the MDL proceedings.

Accordingly, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request the Court to enter an order permitting Plaintiffs' Co-Lead Counsel to establish the FXG MDL Common Benefit Fund (hereinafter the "Fund"), and placing an assessment on Plaintiffs and their attorneys who, after transfer of their cases to their home jurisdictions, recover monetary damages or other monetary relief through settlement or judgment.

Specifically, in any remanded case where a judgment or a settlement for monetary relief is obtained on a fee-shifting claim, where pursuant to applicable statute the attorney's fees are to be paid by the Defendant, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee ask

---

[1] For purposes of this motion, "MDL Plaintiffs' Counsel" is defined as "all counsel who have performed services and incurred expenses in the MDL proceedings."

the Court to appoint a Special Master and in appropriate circumstances (discussed below) to permit Plaintiffs' Co-Lead Counsel, on behalf of MDL Plaintiffs' Counsel, to submit to the Special Master a petition for reasonable attorney's fees and costs to be paid by FXG and set aside in the Fund for later distribution to MDL Plaintiffs' Counsel.

For any judgment or settlement for monetary relief which does not involve a fee-shifting claim and where, after a good faith attempt by the parties to resolve all issues relating to the apportionment of fees and costs from such judgments or settlements, the parties are unable to agree, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request that the Court encourage the parties to mutually agree to the appointment of a mediator/arbitrator to mediate or arbitrate in a binding and expedited process the dispute regarding the appropriate allocation of fees and costs between MDL Plaintiffs' Counsel and the local Plaintiffs' counsel. If the parties cannot agree within twenty-days from the judgment or settlement to submit the fee apportionment issue to a mediator/arbitrator, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee ask this Court to appoint a Special Master to decide the issue of the proper apportionment of fees and costs between MDL Plaintiffs' Counsel and the local Plaintiffs' counsel.

## II.     FACTS

The Court, in its pretrial orders in several remanded cases, has detailed the procedural history and current posture of this complex MDL litigation.[2] To summarize, current and former FXG pick-up and delivery drivers in forty states filed putative statewide or nationwide class actions against FXG premised generally on the theory that FXG misclassified them as

---

[2] The Court provided a detailed procedural history of these MDL proceedings in its March 2, 2010 Order recommending that *Tim Johnson, et al. v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-cv-00652-RLM-CAN (IA), be remanded to the United States District Court for the Southern District of Iowa. *See* Doc. No. 2011 at 2.

independent contractors instead of FXG employees.  To date, FXG drivers have filed a total of forty-two putative class actions against FXG across the United States.

### The JPML Orders

On August 10, 2005, the JPML found that these putative class actions and other related cases brought against FXG challenging the drivers' independent-contractor status involved common questions of fact, and, under 28 U.S.C. § 1407, transferred fifteen then-pending cases to this Court for consolidated and coordinated pretrial proceedings.  *See In re FedEx Ground Package Sys., Inc., Employment Practices Litig. (No. II)*, 381 F. Supp. 2d 1380, 1381 (J.P.M.L. 2005).  After its initial transfer order, the JPML issued *thirty* additional conditional-transfer orders transferring additional related cases to this Court.  Not all of these related cases were filed as putative class actions in the transferor courts.

### The Court's Pretrial Orders

On November 15, 2005, this Court entered an initial scheduling order that, among other things, appointed Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee; bifurcated pretrial proceedings into liability and damages phases; ordered that certain preliminary discovery, including Rule 26(a)(1) disclosures, take place; and set an initial deadline for the filing of amended pleadings and Rule 12 motions.  *See* Doc. No. 52.  When appointing Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee, the Court ordered that Plaintiffs' Co-Lead Counsel be responsible for, among other things:

- Making known to counsel for FXG and the Court the positions of all MDL Plaintiffs;

- Delegating specific pretrial preparation tasks to other Plaintiffs' counsel;

- Entering into stipulations with counsel for FXG;

- Preparing and distributing periodic status reports and maintaining time and disbursement records for services and expenditures by Plaintiffs' counsel;

- Monitoring the activities of Plaintiffs' co-counsel and maintaining complete files and copies of all documents, including updated services lists;

- Distributing to Plaintiffs' co-counsel court orders and documents from FXG and its counsel;

- Representing Plaintiffs in mediations and settlement negotiations;

- Performing any other duties incidental to the proper coordination of Plaintiffs' pretrial activities;

- Receiving orders, notices, correspondence, and telephone calls from the Court, Clerk of Court, and JPML; and

- Coordinating and assisting with the electronic filing and docketing of pleadings, briefs, motions, and hearings.

*Id.* at 3-6.

On November 29, 2005, the Court entered a supplemental scheduling order that, among other things, directed that both class and merits discovery take place concurrently; established a schedule for briefing on motions for class certification; and bifurcated motions for summary judgment into two phases: (1) issues relating to independent-contractor/employee status; and (2) other issues. *See* Doc. No. 58. Since November 2005, the Court has entered numerous other case-management, scheduling, and confidentially orders governing this MDL proceeding. *See, e.g.*, Doc. Nos. 101, 261, 453, 481, 482, 766, 836, 898, 1118, 1123, 1139, 1425, 1603, and 1776.

### Plaintiffs' Motions For Class Certification

In the Court's initial scheduling order (Doc. No. 52), the Court ordered Plaintiffs to divide the then-pending cases into three separate waves of cases for the purpose of moving for class certification. As part of their class-certification motions, Plaintiffs filed an Omnibus Fact Memorandum detailing the common facts in the cases before the Court. *See* Doc. No. 559. Plaintiffs filed their first, second, and third waves ("Waves 1-3") of motions for class

4

certification in twenty-nine cases on March 12, April 2, and April 23, 2007, respectively.  On October 15, 2007, the Court issued its first class-certification ruling, certifying a statewide class of Kansas Plaintiffs and a nationwide class of ERISA Plaintiffs, and ordered the parties to submit five-page supplemental statements articulating how the class-certification decisions in the other cases should differ, if at all, from the Court's Order.  *See* Doc. No. 906.  The parties submitted their supplemental statements on November 14, 2007, and, on March 25, 2008, the Court certified classes in twenty cases in Waves 1-3 and denied class certification in nine cases in Waves 1-3.  *See* Doc. No. 1119.

On October 1, 2007 and August 4, 2008, Plaintiffs briefed and filed two more waves ("Waves 4-5") of motions for class certification in thirteen cases.  As it did with the motions in Waves 1-3, in Waves 4-5 the Court ordered the parties to file supplemental statements articulating how those cases were different, if at all, from the Court's March 25, 2008 order certifying the twenty statewide classes.  The parties filed their supplemental statements in the Waves 4-5 cases on April 25, 2008.  In response to the Waves 4-5 motions, the Court granted class certification in eight cases, and denied certification in five cases.  To date, the Court has granted Plaintiffs' motions for class certification in twenty-eight transferred cases, and denied certification in fourteen transferred cases.  *See* Doc. No. 2011 at 1.

Plaintiffs later moved, under Fed. R. Civ. P. 23(c)(1)(C), to amend the Court's class-certification orders in the cases where the Court had previously denied class certification.  On March 30, 2010, the Court denied the Michigan Plaintiffs' motion to amend the class-certification order in *Percival Currithers, et al. v. FedEx Ground Package Sys., Inc.*, Civil No. 3:05-cv-00532-RLM-CAN (MI), and requested that the parties file supplemental statements by April 29, 2010 articulating how the Court's March 30, 2010 order denying Plaintiffs' motion to

amend the certification order in *Currithers* differed, if at all, from the other nine pending motions to amend. *See* Doc. No. 2018. The parties filed supplemental statements in the nine other cases as directed by the Court. On May 19, 2010, the Court denied Plaintiffs' motions to amend the Court's class-certification orders in the remaining nine states. Doc. No. 2063.

### **Plaintiffs' Motions for Summary Adjudication**

Between April and August 2008, Plaintiffs filed motions for summary adjudication regarding their employment-status classification in states where classes had been certified and states where the Court had denied class certification during Waves 1-3. FXG moved for summary adjudication in thirteen cases where classes had been certified and five non-class cases. Between September 2009 and January 2010, Plaintiffs moved for summary adjudication regarding their employment-status classification in the states where classes had been certified and states where the Court had denied class certification during Waves 4-5. FXG also moved for summary adjudication in three of the Waves 4-5 cases where the Court had certified classes of drivers.

On May 28, 2010, the Court granted Illinois Plaintiffs' motion for summary adjudication on their Illinois Wage Act claims. Doc. No. 2068. On June 28, 2010, the Court granted FXG's partial motion for summary judgment on ERISA Plaintiffs' claim, and dismissed that claims without prejudice with leave to re-file once named Plaintiffs had exhausted their available remedies under the FXG ERISA plans. Doc. No. 2078. On August 11, 2010, the Court denied Kansas Plaintiffs' motion for summary adjudication and granted FXG's cross-motion for summary adjudication finding that Kansas Plaintiffs were independent contractors as a matter of law. Doc. No. 2097. As part of its August 11, 2010 Order, the Court ordered the parties to file supplemental statements in all other class-action cases where there were pending motions for summary adjudication indicating why the outcomes in those pending cases should be resolved by

the Court differently or the same as the Court's Kansas Order.  *Id.*  The parties filed their supplemental statements on September 24, 2010.  Doc. No. 2114.  On December 14, 2010, the Court also denied most of Plaintiffs' motions in the class cases and granted summary adjudication in favor of FXG.  The Court remanded several cases to their home jurisdictions for further proceedings.

### Other Pretrial Motions and Discovery

The Court has decided a number of other non-dispositive motions brought by both parties, including Plaintiffs' May 2008 motion to compel the production of a draft IRS Notice of Proposed Assessment to FXG and the deposition of a FXG 30(b)(6) tax witness, which Magistrate Judge Nuechterlein granted, *see* Doc. No. 1581, as well as FXG's motion to compel production of Plaintiffs' income tax returns, which Judge Nuechterlein granted in part and denied in part.  *See* Doc. Nos. 306, 451.

Since the JPML issued its initial August 10, 2005 transfer order, FXG has taken and Plaintiffs have defended approximately 215 depositions.  *See* Doc. No. 2011 at 7.  Plaintiffs have taken approximately 105 depositions, including the depositions of FXG corporate executives and managers; regional personnel; FXG Rule 30(b)(6) witnesses; and third parties.  *Id.*  Plaintiffs conducted and responded to extensive written discovery and Plaintiffs have reviewed over 3.5 million documents produced in this MDL.  The parties also deposed each others' experts, and the Court addressed various *Daubert* challenges to the expert reports of certain of these experts in its rulings on class certification.  *See* Doc. No. 906 at 1-22.  Plaintiffs also moved to strike the declarations of approximately 300 drivers offered by FXG in connection with the first three waves of class-certification motions, which Magistrate Judge Nuechterlein granted.  *See* Doc. No. 818.

**Plaintiffs' Initial Request to Move and Brief Whether the Court Should Enter a Common Benefit Set-Aside Order**

In the parties' Joint Proposed Pretrial Order in the *Johnson* (IA) action, which they jointly filed with the Court on February 22, 2010, Plaintiffs requested that the Court consider "issu[ing] an order for the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for MDL administration and common benefit of all Plaintiffs in this complex litigation." *See* Doc. No. 2008 at 8-9. Plaintiffs proposed to fully brief the issue of a common benefit set-aside order before the Court's remand of the *Johnson* action. *Id.* at 9.

In the Court's March 2, 2010 Order suggesting remand of the *Johnson* action to the United States District Court for the Southern District of Iowa, the Court addressed Plaintiffs' request that it issue a common benefit set-aside order before suggesting remand of the *Johnson* action. *See* Doc. No. 2011 at 11. The Court first noted that an "award of attorney's fees . . . is a 'collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits.'" *Id.* (quoting *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 274 (E.D.N.Y. 2006) ("*Zyprexa I*")). The Court suggested that *Johnson* be remanded prior to consideration of Plaintiffs' request for a common benefit order and "that it retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL Plaintiffs." *Id.* at 12.

In addition to issuing its March 2, 2010 suggesting remand of the *Johnson* action, on August 12, 2010 the Court issued an order suggesting remand of certain non-certified cases originating in Colorado, Connecticut, Illinois, Massachusetts, Michigan, Mississippi, Missouri, Montana, South Dakota, Vermont, and Virginia, as well as the *Givens* FLSA action, to their

transferor courts.   Doc. No. 2099.  The Court noted, as it did in its March 2, 2010 order in the *Johnson* action, that it would "retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL plaintiffs."  *Id.* at 10.  On August 20, 2010, the JPML issued a conditional-remand order remanding the actions identified in the Court's August 12, 2010 order to their transferor courts.

## III.    ARGUMENT

MDL Plaintiffs and MDL Counsel have some interest in any potential future settlement and/or judgment obtained in cases covered by this Order.  To ensure that Co-lead Counsel and the Plaintiff Steering Committee have an opportunity to address such interests and to facilitate such settlements and judgments, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request the Court to order that they be consulted for input with regard to damage issues, costs and attorney's fees incurred.  Because the final outcome of the cases and all efforts expended by various counsel to achieve such outcome must be considered in determining the proper treatment of fees, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee ask this Court to establish a process for resolution of any unresolved disputes rather than setting a percentage that might or might not be appropriate in every case depending on the circumstances.  Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request this process to apply only in the event that Co-lead Counsel and the Plaintiff Steering Committee and Plaintiffs' counsel in the transferor courts are unable to resolve among themselves and reach agreement regarding the issue of apportionment of fees between MDL Plaintiffs' Counsel and Plaintiffs' counsel in the transferor court.

**A.    MDL Courts Routinely Enter Orders Directing The Set-Aside Of Funds From Plaintiffs' Recoveries For The Work Performed and Expense Incurred By MDL Counsel For The Common Benefit Of All MDL Plaintiffs.**

It is well settled that MDL counsel are entitled to be compensated for the common benefit work they perform on behalf of all MDL Plaintiffs:

> [I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation. . . .  The interests to be served [by MDL counsel] are too important to be left to volunteers (or draftees) who are unpaid in the sense that they get nothing additional.

*In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1016 (5th Cir. 1977).[3]

Recognizing this principle, MDL courts commonly grant motions by MDL counsel to sequester or set aside funds from Plaintiffs' or their individual attorneys' recoveries (by way of settlement or satisfaction of judgment) to compensate MDL counsel for the work they perform for the common benefit of all Plaintiffs.  *E.g.*, *Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992) ("It is well established that courts can impose liability for court-appointed counsel's fees on all Plaintiffs benefitting from their services."); *In re Genetically Modified Rice Litig.*, No. 4:06 MD 1811 CDP, 2010 WL 716190, *4 (E.D. Mo. Feb. 24, 2010) ("It is standard procedure to fund [common benefit] trusts by ordering that a percentage of all recoveries be contributed to the

---

[3] *Accord Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) ("District courts have exercised [their] power to establish fee structures designed to compensate committee members for their work on behalf of all Plaintiffs involved in consolidated litigation."); *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 607 (1st Cir. 1992) (describing as "a proper exercise of judicial power" the MDL court's intention to enter a "'common fund fee award' to remunerate PSC members for their efforts on behalf of communal interests"); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 653 (E.D. Pa. 2003) ("A necessary corollary to court appointment of lead and liaison counsel and appropriate management committees is the power to assure that these attorneys receive reasonable compensation for their work."); Manual for Complex Litigation § 20.312 (4th ed. 2004) ("Class counsel generally have the benefit of the common fund doctrine to support payment for their efforts on behalf of the class or consolidated litigants.").

trust to compensate the leadership group for its work providing a common benefit." (citation omitted)).[4]

An MDL court's authority to enter a common benefit set-aside order to later compensate MDL counsel for their common benefit work is grounded both in the Supreme Court's common benefit doctrine jurisprudence,[5] as well as the MDL court's managerial authority over the consolidated litigation. *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *4; *see also In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 165 (4th Cir. 1992)

---

[4] *Accord Zyprexa I*, 467 F. Supp. 2d at 265 (stating that "it is standard practice for courts to compensate attorneys who work for the common benefit of all Plaintiffs by setting aside a fixed percentage of settlement proceeds"); *Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676, 680 (E.D. La. 2006) ("In accordance with the common benefit doctrine, it has been common practice in the federal courts to impose set-asides in the early stages of complex litigation in order to preserve common benefit funds for later distribution." (citations omitted)); *In re Worldcom, Inc. Sec. Litig.*, No. 02-CIV-3288, 2004 WL 2549682, *2 (S.D.N.Y. Nov. 10, 2004) ("In complex multi-party litigation, attorneys designated with responsibilities for actions beyond those in which they are retained may be compensated for their work not only by their own clients, but also by those other parties on whose behalf the work is performed and on whom a benefit has been conferred."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 668-69 (imposing set-aside for later compensation of MDL counsel); *In re Clearsky Shipping Corp.*, No. Civ. A. 96-4099, 2003 WL 1563820, *4 (E.D. La. Feb. 26, 2003) (district court must have the power to order appropriate compensation for lead counsel); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 524-25 (D. Nev. 1987) (sequestering funds to pay the attorney's fees and costs of Plaintiffs' Legal Committee); *see also* Manual for Complex Litigation § 14.215 ("Early in the litigation, the court should define designated counsel's functions, determine the method of compensation, specify that records be kept, and establish arrangements for their compensation, including setting up a fund to which designated parties should contribute in specified portions."); *id.* § 20.312 ("MDL [transferee] judges generally issue orders directing that defendants who settle MDL-related cases contribute a fixed percentage of the settlement to a general fund to pay national counsel."); David F. Herr, Annotated Manual for Complex Litigation § 22.927, at 669 (Supp. 2009) (stating that "the judge sometimes orders individual Plaintiffs' lawyers to pay a certain percentage of the fees they receive into a common fund to contribute to the fees of class counsel, whose work in discovery and trial preparation contributed to the settlement of the individual cases as well"); *cf. In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 115, 116 (2d Cir. 2010) ("*Zyprexa III*").

[5] *E.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527 (1881). For a concise discussion of these common benefit cases, *see, e.g.*, *Turner*, 422 F. Supp. 2d at 680.

The discretion of an MDL court to enter a common benefit set-aside order is broad; it may, for example, enter an order to determine compensation for lead counsel and impose that fee calculation on all Plaintiffs regardless of whether their cases are before federal courts other than the transferee court or not yet filed in federal court but ultimately in such a court. *See Zyprexa I*, 467 F. Supp. 2d at 265; *see also Walitalo*, 968 F.2d at 747 (stating that the district court had authority to direct how the trial courts should calculate the amount of lead and liaison counsel's fees in those cases remanded for trial). Indeed, as the Fifth Circuit has recognized, the MDL court may be the only court in the position to effectively manage the MDL counsel fee issues. *See In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1019.

Depending on the particular case, a common benefit set-aside order may direct that the sequestered common benefit funds come from Plaintiffs' recoveries themselves, or from the fee recoveries of Plaintiffs' individual attorneys. *See Smiley*, 958 F.2d at 501 (approving of set-aside order providing that common benefit fee would be paid by all attorneys on behalf of their clients rather than by plaintiffs out of their own recoveries); *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1019 (holding district court did not err by directing that MDL counsel be compensated by 8% contribution from other Plaintiffs' attorneys); *In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, No. 1:01-01387, 2002 WL 31834446, *2 (D. Md. Apr. 12, 2002) (ordering that set-aside funds should come "from the total amount of counsel fees payable to individual plaintiff's counsel").

Courts also have addressed – and rejected – the argument that an order directing a set-aside of common benefit funds is an impermissible levy on individual Plaintiffs' recoveries. *See In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *7 (finding that a required set-aside of funds for MDL counsel was not a levy or penalty); *Zyprexa I*, 467 F. Supp. 2d at 266

("The common benefit fund set-aside is a holdback, not a levy."); *Turner*, 422 F. Supp. 2d at 680-82.

Finally, it is both common – and proper – for an MDL court in a common benefit set-aside to order that the defendant(s) be primarily responsible for sequestering a percentage of any payments made by defendant(s) to MDL Plaintiffs into a common benefit fund established by MDL counsel. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 665 (rejecting defendants' arguments that they should not be required to set aside a percentage of their payments to individual Plaintiffs to comply with a common benefit set-aside order because "[i]f the Court were to impose on . . . Plaintiffs the burden of depositing a percentage of any settlement or judgment . . . into an escrow account, it would require [MDL] counsel to spend countless hours monitoring cases throughout the country and enforcing a court order in other jurisdictions").[6]

**B.      The Court Should Permit Plaintiffs' Co-Lead Counsel To Establish The FXG MDL Common Benefit Fund.**

Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee ask the Court to permit Plaintiffs' Co-Lead Counsel to establish an interest-bearing account at Signature Bank, in New York, New York, to serve as the "FXG MDL Common Benefit Fund" (hereinafter the "Fund"). Proposed Order ¶A.   Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee further

---

[6] *Accord In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *8 (finding it proper to require defendant to deposit a portion of any award or settlement into the common benefit set-aside fund); *Turner*, 422 F. Supp. 2d at 684 (ordering defendant to set-aside a percentage of any payments made to MDL Plaintiffs); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, MDL No. 1699, 2006 WL 471782, *1 (N.D. Cal. Feb. 28, 2006) (directing defendants "to withhold the amount of [the common benefit] assessment from any amounts paid to Plaintiffs and their counsel, and to pay the assessment directly into the common benefit fund as a credit against the settlement or judgment"); *In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, 2002 WL 31834446, at *1 ("Defendants shall have primary responsibility for withholding nine percent (9%) of the claim payments and tendering such sums to the . . . Fee and Cost Account."); *In re Diet Drugs Prods. Liab. Litig.*, MDL 1203, 1999 WL 124414, *3 (E.D. Pa. Feb. 10, 1999) (placing primary responsibility for withholding assessment amount on defendant).

request that Signature Bank be designated as escrow agent for the purpose of receiving common

benefit funds as provided for in the proposed order. *Id.*

MDL courts routinely permit MDL attorneys to establish a common benefit fund where,

as here, no settlement or other recovery exists when the fund is established. *See In re*

*Genetically Modified Rice Litig.*, 2010 WL 716190, at *7 (concluding that the request by MDL

Plaintiffs' Counsel to establish a common benefit fund was not premature because counsel had

already conferred "a substantial benefit upon all of the other Plaintiffs," even though Plaintiffs

had not yet recovered anything from the defendant); *Zyprexa I*, 467 F. Supp. 2d at 266 (entering

common benefit set-aside order providing that a percentage of any amount eventually recovered

from defendant will be held back in escrow account); *Turner*, 422 F. Supp. 2d at 680 (concluding

that set-asides established in early stages of complex litigation to preserve funds for later

distribution is common practice).

Here, there is good reason for this Court to enter a set-aside order permitting the Fund to

be established, despite that no MDL plaintiff to date has recovered from FXG:

> It is important to establish a set-aside fund immediately. Without
> the entry of a set-aside order in advance of Individual Action
> settlements or judgments, Individual Actions could be dismissed
> after settlement or a judgment, requiring [MDL] counsel to pursue
> separate compensation claims in any number of jurisdictions
> around the country. . . . Nor is it premature to find that all
> Individual Action Plaintiffs have benefitted enormously from the
> work already performed by [MDL counsel] and to predict that they
> will continue to so benefit.

*In re Worldcom, Inc. Sec. Litig.*, 2004 WL 2549682, at *4; *see also In re Diet Drugs Prods. Liab.*

*Litig.*, MDL 1203, 2001 WL 497313, *2 (E.D. Pa. May 9, 2001) (ordering that set-aside order

applied to all payments to Plaintiffs by defendants whether in the MDL or after remand to the

transferor court).

Establishing the Fund does not require this Court to resolve at this time the issues of how

432453                                                14

any potential funds should be distributed among MDL Plaintiffs' Counsel or of approval of specific time as reasonable and compensable.[7]   Rather, if the Court orders that funds be sequestered from Plaintiffs' recoveries after remand, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee, on behalf of MDL Plaintiffs' Counsel, will be required at a later date to petition the Court for an award of attorney's fees from the sequestered funds.  *See In re Katrina Canal Breaches Consolidated Litig.*, No. 05-4182, 2010 WL 2998848, *3 (E.D. La. Jul. 28, 2010) (the Court must evaluate the reasonableness of attorney's fees prior to distribution from the set-aside fund).

Only at that time, and after MDL Plaintiffs' Counsel have an opportunity to be heard, will the Court need to determine whether the request by Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee for attorney's fees on behalf of MDL Plaintiffs' Counsel is reasonable and should be compensable from the Fund under the percentage-of-fund, lodestar, or hybrid approach for awarding common benefit attorney's fees and costs.  *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001); *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) (in common-fund cases, courts in the Seventh Circuit may employ either a percentage-of-the-fund or lodestar approach in awarding attorney's fees and costs).

---

[7] *See In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *1 (ordering the creation of a common benefit set-aside fund maintained by MDL counsel from which funds could be "disbursed in the future only by order of th[e] court, after notice and an opportunity for any affected party to be heard"); *Turner*, 422 F. Supp. 2d at 681 ("It is important to note that [a common benefit set-aside is not a disbursement]: no amounts are paid to attorneys from the set-aside fund until the attorneys demonstrate that they have worked for the common benefit." (citation omitted)); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 666-67 (the creation of a common benefit set-aside fund requires later consideration of the work performed prior to distribution); *In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, 2002 WL 31834446, at *2 (requiring Plaintiffs' steering committee to make proper showing before receiving fees and reimbursement of expenses from the set-aside fund).

15

Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee propose that prior to such determination by the Court regarding the distribution of the Fund for attorney's fees and prior to any distribution for attorney's fees, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee first reimburse, out of the Fund, all MDL Plaintiffs' Counsel for their approved costs and expenses reasonably incurred in the MDL. Proposed Order n.1. After such costs and expenses have been paid, disbursements from the Fund will be made for attorney's fees pursuant to separate order of this Court. *Id.*[8]

**C.** **In Cases Where Plaintiffs Obtain A Judgment Or Settlement For Monetary Relief On A Fee-Shifting Claim, The Court Should Permit Plaintiffs' Co-Lead Counsel To Submit To This Court A Petition For Reasonable Attorney's Fees And Costs To Be Paid By FXG And Set Aside For Later Distribution To MDL Plaintiffs' Counsel.**

Approximately twenty-three cases in this MDL assert one or more claims under statutes that provide for the shifting of attorney's fees and costs to FXG if Plaintiffs prevail.[9] In other words, if there were ultimately a trial of these claims and Plaintiffs prevailed against FXG, they may be able to recover compensatory damages and/or prospective injunctive relief from FXG, as well as a separate award of their individual attorney's fees and costs incurred in the litigation. *See In re Enron Corp. Sec., Derivatives & ERISA Litig.*, 586 F. Supp. 2d 732, 745 n.10 (S.D.

---

[8] If the Fund is not depleted after all fees and costs have been disbursed, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee propose that any excess sequestered funds be distributed *pro rata* to Plaintiffs or their individual counsel in proportion to their respective payments to the fund. *See Turner*, 422 F. Supp. 2d at 681 ("The set-asides would be imposed to ensure that there will be adequate funds available if the Plaintiffs are successful. If the funds to be set aside are excessive, any surplus will be returned to the attorneys and their clients."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 667 (providing that "[a]s a necessary corollary, the sequestration order should provide for a refund of any excess funds in the escrow account. That is the practice followed by courts in other multidistrict cases that have entered orders similar to the one requested by designated counsel.").

[9] *See, e.g., Robert Gennell, Jr., et al., v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00601-RLM-CAN (NH); *Dale Fluegel, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00529-RLM-CAN (IL); and *Attilio Catanese, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00324-RLM-M-CAN (LA).

Tex. 2008) ("[I]n the statutory fee shifting context, the unsuccessful litigant bears the burden of paying attorney's fees of the prevailing party, while in the common fund situation, the fee is taken from the common fund, diminishing the amount ultimately to be distributed to plaintiff class members . . . .").

Statutory fee-shifting seeks "to encourage private enforcement of the statutory substantive rights, be they economic or noneconomic, through the judicial process. . . .  [Thus,] Defendants who have violated plaintiffs' rights may be required to compensate plaintiffs for the costs incurred in enforcing those rights."  *Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988) (quotation omitted)); *see also Report of Third Circuit Task Force, Court Awarded Attorney Fees*, 108 F.R.D. 237, 249-50 (1986) (discussing policies behind fee shifting cases of encouraging private enforcement of substantive rights and stating that the benefits achieved in such cases "are of great value to the individual or group directly affected as well as to society at large"); *In re Enron Corp. Sec., Derivatives & ERISA Litig.*, 586 F. Supp. 2d at 760 n.25 ("Fee-shifting statutes often apply to causes of action that result in nonmonetary relief or very modest monetary recoveries that are inadequate to provide a reasonable percentage fee."). Because statutory fees are paid by the defendant, and not from plaintiff's recovery, such fee-shifting statutes serve to avoid reduction of plaintiff's overall recovery. *Id.* at 745 n.10.

Indeed, statutory fee-shifting is particularly important in labor/employment cases such as those comprising this MDL.  *See Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842, 848 (8th Cir. 1994) (noting in Title VII case that "an award of attorneys' fees to prevailing Title VII plaintiffs is also a means by which Congress can punish employers who violate federal law and encourage the vindication of federal rights which might remain unenforced because of a plaintiff's lack of resources and the small size of expected recovery"

(citation omitted)); *Goodyear v. Estes Exp. Lines, Inc.*, No. 1:06-cv-863, 2008 WL 687130, *5

(S.D. Ind. Mar. 10, 2008) (noting that statutory fee-shifting provisions, such as the one in the

Indiana Wage Payment Statute, are meant to encourage private actions to enforce substantive

rights).  *See also Anderson v. AB Painting & Sandblasting Inc.*, 578 F.3d 542, 545 (7th Cir.

2009) (noting that the policy of statutorily awarded attorney's fees is to encourage the

prosecution of meritorious actions that might otherwise be abandoned due to the cost of counsel).

Here, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request that for any

judgment for monetary relief which is obtained on a claim involving fee shifting, the Court

appoint a Special Master and allow Plaintiff's Co-Lead Counsel and Plaintiffs' Steering

Committee the right to submit to the Special Master a petition for reasonable attorney's fees and

costs to be paid by Defendant and set aside in the FXG MDL Common Benefit Fund for the later

distribution to MDL Plaintiffs' Counsel.  This procedure would allow the Special Master to

determine a fair and reasonable attorney's fee award to MDL Plaintiffs' Counsel in a fee-shifting

case.  As the Court previously noted, the Court may hear such fee requests even after it is

divested of jurisdiction over the merits.  Doc. No. 2011 at 11; *see also In re Air Crash Disaster

at Florida Everglades*, 549 F.2d at 1019.

The Court has the authority to appoint a Special Master to determine issues such as the

appropriate fee allocation. *See* Federal Rule of Civil Procedure 53; Manual for Complex

Litigation (Fourth Ed.), § 11.52; *Active Prods. Corp. v. A.H. Choitz & Co. Inc.*, 163 F.R.D. 274,

282-83 (N.D. Ind. 1995) ("Courts have routinely appointed special masters for various tasks:

discovery masters, case managers, settlement masters, fact finders, expert advisors, remedial

masters, monitors, claims evaluators, etc.  In the present case, the use of masters for settlement

and fact-finding purposes is clearly justified."); *Bradshaw v. Thompson*, 454 F.2d 75, 80 (6th

Cir. 1972) ("The decision to appoint a master whose function is to aid the judge in the performance of specific judicial duties, is within the discretion of the District Court."); *see also Special Masters in Federal Court*, 161 F.R.D. 211, 218 (1995) ("A special master can be very helpful in mediating between or among parties and facilitating settlement."); *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 664 (7th Cir. 1985) (suggesting the possible use of special masters to resolve disputes over award of attorney's fees); *In re Trans Union Corp. Privacy Litig.*, MDL No. 1350, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) (using special master to examine time records and recommend an attorney's fee award in MDL); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2010 WL 2555235 (D. Minn. Jun. 23, 2010) (special master approved allocation of disbursement of common-benefit funds in MDL); *In re Activision Securities Litig.*, 723 F. Supp. 1373, 1379 (N.D. Cal. 1989) (special master considered attorney's fee petition in common-fund case).

Any such petition by Plaintiffs' Co-Lead Counsel would be substantively based on the particular state statute(s) providing for the shifting of attorney's fees and costs to FXG and on the time and resources expended by MDL Plaintiffs' Counsel in litigating the claims prior to the transfer of the case from the MDL to the home jurisdiction. Any such petition by Plaintiffs' Co-Lead Counsel would not preclude counsel who litigated the case both before transfer to the MDL and after transfer from the MDL from petitioning the transferor court for their reasonable attorney's fees and expenses incurred.[10]

---

[10] The right of Plaintiffs' Co-Lead Counsel, on behalf of MDL Plaintiffs' Counsel, to petition this Court for attorney's fees and costs paid by FXG in a remanded fee-shifting case may, if appropriate, be in addition to any separate award of attorney's fees made in the case based on a percentage of a monetary recovery. MDL Plaintiffs' counsel do not seek a double recovery of fees, but only seek to preserve the right to petition the Court for fees from FXG in addition to a percentage of the gross monetary recovery in the event that in a particular case

In cases involving any settlement of a fee-shifting claim, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request the right to petition the Special Master appointed by this Court for attorney's fees and costs payable by FXG to MDL Counsel, within twenty days notice, *only if* the total negotiated attorney fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel. If Plaintiffs' Co-Lead Counsel exercise their right to petition for attorney's fees, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee request that the settlement not be final or binding and the case not be dismissed until after final adjudication of attorney's fees and costs before the Special Master appointed by this Court. Every effort will be made to avoid delay in any agreed upon payment to the Plaintiffs in any such case. A settlement of attorney's fees and costs in a fee-shifting claim that does not as a whole substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel, but as to which, the parties cannot agree on the proper apportionment of attorney's fees and costs between the Plaintiffs' counsel in the transferor court and the MDL Plaintiffs' Counsel shall be subject to the process set forth in section D, *infra.*

Given that this Court has the authority to sequester funds from Plaintiffs' individual attorney's fee awards to compensate MDL Plaintiffs' Counsel for their common benefit work, permitting Plaintiffs' Co-Lead Counsel to petition this Court for an independent award of attorney's fees and costs in statutory fee-shifting cases would be consistent with the law discussed above. *See Smiley*, 958 F.2d at 501; *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1019; *In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, 2002 WL 31834446, at *2.

---

attorney's fees are awarded through a combination of fee-shifting and a percentage of the common fund.

**D.**     **In Non-Fee-Shifting Cases Where Plaintiffs Obtain A Judgment For Monetary Relief And In Cases That Result In A Settlement For Monetary Relief, The Court Should Encourage the Parties To Submit The Issue to Mediation/Binding Arbitration And Alternatively Submit The Issue to A Special Master.**

Where Plaintiffs obtain a monetary judgment in a non-fee-shifting case or where Plaintiffs obtain a settlement resulting in monetary relief and the parties are unable to agree on the appropriate apportionment of the attorney's fees and costs from such judgments or settlements between the Plaintiffs' counsel in the transferor court and the MDL Plaintiffs' Counsel, MDL Co-Lead Counsel and Plaintiffs' Steering Committee request the Court to encourage the parties to jointly agree to the appointment of a mediator/arbitrator to mediate or arbitrate (under a binding and expedited process, the cost of which would be born equally by both parties), the issue of the proper apportionment of fees and costs between MDL Plaintiffs' Counsel and the local Plaintiffs' counsel.

If the parties cannot agree within twenty-days from the judgment or settlement to submit the fee apportionment issue to a mediator/arbitrator, MDL Co-Lead Counsel and Plaintiffs' Steering Committee ask this Court to appoint a Special Master to decide the issue of the proper apportionment of fees and costs between MDL Plaintiffs' Counsel and the local Plaintiffs' counsel.    All fees and costs allocated to MDL Plaintiffs' Counsel, whether by agreement, decision of the arbitrator, or decision of the Special Master, shall be deposited in the MDL Common Benefit Set Aside Fund established by the Court for the benefit of and future distribution to the MDL Plaintiffs' Counsel pursuant to separate Court order.  *See supra* footnote 1.   MDL Co-Lead Counsel and Plaintiffs' Steering Committee request that the Court allow approved costs and expenses to be paid out of the FXG MDL Common Benefit Fund without further motion by MDL Co-Lead Counsel and Plaintiffs' Steering Committee and prior to the petition regarding the distribution for attorney's fees and any resulting distribution from the Fund

432453

for attorney's fees.

Instead of seeking from this Court a fixed percentage of the gross monetary recovery that would apply across the board to all potential future judgments in non-fee-shifting cases and settlements, MDL Co-Lead Counsel and Plaintiffs' Steering Committee believe the appropriate percentage should be determined on a case-by-case basis considering the circumstances of each case.   As set forth above, there was an enormous amount of work and cost performed and incurred by all of the MDL Plaintiffs' Counsel over the past five and one-half years on behalf of all Plaintiffs in this MDL.   *See supra* Section II.   In order to conduct adequate discovery to position each of the forty-two cases for trial, hundreds of depositions were both taken and defended by MDL Plaintiffs' Counsel, as well as millions of documents gathered, reviewed and prepared for use in these cases.   Hundreds of briefs were filed relating to class certification, summary judgment, and discovery issues.   All expert work except that relating to damages was completed in the MDL.   Indeed, in all of the remanded cases, most pretrial work will have been completed when remanded to their transferor courts.   MDL Plaintiffs' Counsel continues to expend time and expenses preparing the appeal of the adverse summary judgment rulings in the Seventh Circuit.

The appropriate allocation of any attorney's fees which may ultimately be recovered must consider the respective work done by MDL Plaintiffs' Counsel prior to transfer out of the MDL and the work done by Plaintiffs' counsel after transfer.   The allocation should be different, for example, in cases which settle immediately upon transfer from the MDL and cases which proceed to trial or settlement after significant litigation and significant effort by the local Plaintiff's counsel in the home jurisdiction.   It is due to these differences, which at this point are unknown and completely speculative, that submission of the attorney fee allocation issue to a

mediator/arbitrator – or if the parties will not voluntarily agree to that process, to a Special Master appointed by this Court – is appropriate. This process of a case-by-case determination of the appropriate allocation will ensure the most equitable fee allocation because the mediator/arbitrator or Special Master will be able to assess the relative work done by all counsel to achieve a successful result rather than assign an arbitrary percentage allocation prematurely when the relative contributions and ultimate outcomes of the various cases are not presently known.

For all of these reasons, MDL Co-Lead Counsel and Plaintiffs' Steering Committee request that in non-fee-shifting cases involving a monetary judgment or settlement where Plaintiffs' counsel cannot agree upon the appropriate allocation of attorney's fees, the Court encourage Plaintiffs' counsel to jointly and mutually submit the issue to mediation and/or binding arbitration, and absent agreement, to a Special Master appointed by this Court.

## IV.   CONCLUSION

In light of the JPML's August 20, 2010 conditional-remand order remanding the actions identified in this Court's August 12, 2010 order to their transferor courts and the additional suggestion of remand of several cases in the Court's December 14, 2010 Order, this MDL has progressed to the stage where entry of a common benefit set-aside order is proper to ensure that a common benefit fund is established from which MDL Plaintiffs' Counsel can be reimbursed for expenses incurred and can petition the Court for an award of their attorney's fees incurred for the common benefit of all Plaintiffs in this MDL.

Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee, therefore, respectfully request that the Court enter their proposed common benefit set-aside order to ensure the fair and equitable sharing of any potential recovery by Plaintiffs by all counsel who have performed services and incurred expenses in the MDL proceedings.

Dated: December 28, 2010

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/ Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:      (612) 339-6900
Fax:      (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA  94612
Tel:      (510) 272-0169
Fax:      (510) 272-0174
Email: lfaris@leonardcarder.com
          emorton@leonardcarder.com

Robert I. Harwood
Matthew M. Houston
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:      (212) 935-7400
Fax:      (212) 753-3630
Email: rharwood@hfesq.com

## PLAINTIFFS' CO-LEAD COUNSEL

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:      (574) 288-1510
Fax:      (574) 288-1650
Email: agostino@aaklaw.com

## PLAINTIFFS' LIAISON COUNSEL

Jerald R. Cureton
Anthony L. Marchetti, Jr.
CURETON CLARK, P.C.
3000 Midlantic Drive
Suite 200
Mt. Laurel, NJ 08054
Tel:      (856) 824-1001
Fax:      (856) 824-1008
Email: jcureton@curetonclark.com
          amarchetti@curetonclark.com

Jordan M. Lewis
SIEGEL, BRILL, GREUPNER, DUFFY
  & FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN  55401
Tel:      (612) 337-6100
Fax:      (612) 339-6591
Email: jordanlewis@sbgdf.com

J. Gordon Rudd
Anne T. Regan
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall
Suite 501
Minneapolis, MN  55401
Tel:     (612) 341-0400
Fax:     (612) 341-0844
Email: jgr@zimmreed.com
          atr@zimmreed.com

**PLAINTIFFS' STEERING COMMITTEE**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

-------------------------------------------------- )
                                  )

In re FEDEX GROUND PACKAGE      )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT       )        (MDL 1700)
PRACTICES LITIGATION            )
                                    )
-------------------------------------------------- )

THIS DOCUMENT RELATES TO:     )
                                    )

ALL ACTIONS                      )
-------------------------------------------------- )

## DECLARATION OF ROBERT I. HARWOOD IN
## SUPPORT OF PLAINTIFFS' CO-LEAD COUNSEL
## AND PLAINTIFFS' STEERING COMMITTEE'S MOTION
## FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER

I, Robert I. Harwood, declare:

1.      I am an attorney at law and a member of the law firm Harwood Feffer LLP ("Harwood Feffer"). Pursuant to the Scheduling Order entered by the Court on November 15, 2005 (Doc. No. 52), I am one of the three Co-Lead Counsel appointed to oversee the prosecution of this MDL action.

2.      My firm is responsible for collecting and maintaining the time and expense reports of all attorneys involved in this MDL action. In doing so, I and other Harwood Feffer attorneys established a standard reporting structure to account for time and expenses incurred by all participant firms and have routinely requested that such firms provide regular reporting of their time and expenses.

3.      Specifically, in preparation for this motion, I requested that the six law firms who constitute Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee provide the number of

hours expended in prosecution of this action and the expenses each firm incurred from inception of this action through August 2010.[1]

4. During the past five years, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee have expended approximately 74,750 attorney hours and have incurred $2,674,844 in expenses in the MDL proceedings.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 11th day of November, 2010 at New York, New York.

                               **s/Robert I. Harwood**
                                Robert I. Harwood

---

[1] Plaintiffs' Co-Lead Counsel includes Leonard Carder, LLP, Lockridge, Grindal & Nauen, P.L.L.P., and Harwood Feffer. Plaintiffs' Steering Committee includes Co-Lead Counsel and Zimmerman Reed, P.L.L.P., Cureton Clark, P.C., and Siegel, Brill, Greupner, Duffy & Foster, P.A.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

------------------------------------------------------ )
                                                        )
In re FEDEX GROUND PACKAGE         )     Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT           )     (MDL 1700)
PRACTICES LITIGATION               )
                                                        )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:          )
                                                        )
ALL ACTIONS                        )
------------------------------------------------------ )

---

## CERTIFICATE OF SERVICE

---

I, Susan E. Ellingstad, hereby certify that on December 28, 2010, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **Michael L. Banks** | mbanks@morganlewis.com; tmyers@morganlewis.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com; paralegal@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Cameron H. Biscay** | cbiscay@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Sarah E. Bouchard** | sbouchard@morganlewis.com; tmyers@morganlewis.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr.** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Rosemary J. Bruno** | rosemary.bruno@bipc.com; linda.boccino@bipc.com |

| | |
|---|---|
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Mark T. Clouatre** | clouatre@wtotrial.com; wesson@wtotrial.com |
| **James P. Cooney, III** | jcooney@wcsr.com; lreardin@wcsr.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; mstevens@bnhmlaw.com; sbaith@bnhmlaw.com; kstone@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Steve Dennis** | sdennis@reiddennis.com; dblackshear@reiddennis.com; csanford@reiddennis.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; aahn@leonardcarder.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Randall J. Forbes** | rforbes@fufblaw.com; loretta@fufblaw.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com; ellen.boshkoff@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **William H. Haltom, Jr.** | haltomw@thomasonlaw.com; sadetskyr@thomasonlaw.com |
| **Clayton D. Halunen** | halunen@halunenlaw.com |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |

| Robert I. Harwood | rharwood@hfesq.com |
| Kenneth G. Haynes | ghaynes@wyattfirm.com; tklapheke@wyattfirm.com; bleet@wyattfirm.com; sdubois@wyattfirm.com |
| Benjamin H. Hill, III | bhill@hwhlaw.com; bpreston@hwhlaw.com; jetlinger@hwhlaw.com |
| Chris A. Hollinger | chollinger@omm.com |
| Matthew M. Houston | mhouston@hfesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A. Jerman | tjerman@omm.com |
| Victor H. Jih | vjih@omm.com |
| Aparna B. Joshi | ajoshi@omm.com |
| Soye Kim | skim@geclaw.com |
| Carolyn J. Kubota | ckubota@omm.com |
| Steve D. Larson | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |
| Bryan D. LeMoine | lemoine@mcmahonberger.com |
| Jordan M. Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com; sguitherz@llrlaw.com |
| Gary F. Lynch | glynch@carlsonlynch.com |
| John S. Marshall | jmarshall@marshallandmorrow.com |
| Robert W. McFarland | rmcfarland@mcguirewoods.com; lneilson@mcguirewoods.com |
| Michael G. McGuinness | mmcguinness@omm.com |
| Bruce H. Meizlish | brucelaw@fuse.net |
| Sanford A. Meizlish | smeizlish@bnhmlaw.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Eleanor I. Morton | emorton@leonardcarder.com; aahn@leonardcarder.com |
| Daniel O. Myers | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| Jeffrey S. Nestler | jnestler@omm.com |
| Ian Otto | iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com |
| Peter W. Overs Jr. | povers@hfesq.com |
| Lesley A. Pate | lapate@venable.com |

3

| | |
|---|---|
| **Justin H. Perl** | justin.perl@maslon.com; amy.knott@maslon.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Brett J. Preston** | bpreston@hwhlaw.com; marcand@hwhlaw.com |
| **Nora M. Puckett** | npuckett@omm.com |
| **Charles Victor Pyle, III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | anne.regan@zimmreed.com; stefanie.hebig@zimmreed.com |
| **John B. Renick** | renick@mcmahonberger.com |
| **Laura E. Robinson** | lrobinson@omm.com |
| **Beth A. Ross** | bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **Jessica G. Simbalenko** | simbalenko@wtotrial.com; allen@wtotrial.com; farina@wtotrial.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; jwoolley@scopelitis.com |
| **Joni M. Thome** | thome@halunenlaw.com |
| **Matthew T. Tobin** | matt@sdtrustco.com; lenandlaura@iw.net |
| **Scott Voelz** | svoelz@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J. Watton** | jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com |
| **Thomas J. Welk** | tjwelk@bgpw.com; tajohnson@bgpw.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on December 28, 2010, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Steve Dennis
REID & DENNIS
Providence Tower
5001 Spring Valley Road, Suite 255W
Dallas, TX 75244

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

R. Christopher Gilreath
GILREATH & ASSOCIATES
200 Jefferson Ave. Suite 711
Memphis, TN 38103

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Dated: December 28, 2010                           Respectfully submitted,

                                                   LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                                   ___s/Susan E. Ellingstad_____
                                                   Susan E. Ellingstad
                                                   100 Washington Avenue South
                                                   Suite 2200
                                                   Minneapolis, MN  55401
                                                   Tel:     (612) 339-6900
                                                   Fax:     (612) 339-0981
                                                   Email:  seellingstad@locklaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____
                                        )
In re FEDEX GROUND PACKAGE              )      CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT                )             (MDL-1700)
PRACTICES LITIGATION                    )
-------------------------------------------- )
THIS DOCUMENT RELATES TO:               )
                                        )
     ALL CASES                          )
_____ )

ORDER

Upon consideration of the parties' Joint Motion for Extension of Time to

File Joint Proposed Pretrial Orders and Status Report [Doc. No. 2280], it is

hereby ORDERED that the Motion is GRANTED.

The applicable deadlines are as follows:

1.   January 18, 2011:

     a.   Joint status report due

2.   January 24, 2011.  Proposed pretrial orders due in:

     a.   Alabama -- Gentle

     b.   Arkansas -- Harris

     c.   California -- Alexander

     d.   California -- Pedrazzi

     e.   California -- Huerta

     f.   Florida -- Ward

     g.   Kentucky -- Coleman

     h.   Nevada -- DeCesare

      i.     Nevada -- Campbell

      j.     New Hampshire -- Gennell

3.     January 31, 2011.  Proposed pretrial orders due in:

      a.     New Jersey -- Capers

      b.     New Jersey -- Farrell

      c.     New Jersey -- Tofaute II (individual case)

      d.     New York -- Johnson

      e.     Ohio -- Kelly

      f.     Ohio -- Wallace

      g.     Oregon -- Slayman

      h.     Oregon -- Leighter

      i.     Pennsylvania -- Mitchell

4.     February 7, 2011.  Proposed pretrial orders due in:

      a.     Texas -- Humphreys

      b.     Texas -- Price

      c.     Vargas -- Massachusetts

SO ORDERED.

ENTERED: <u>December 23, 2010</u>

              <u>/s/ Robert L. Miller, Jr.</u>
              Judge
              United States District Court

cc:    JPMDL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

-------------------------------------------------)
                                                  )
In re FEDEX GROUND PACKAGE           )    Cause No.: 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT             )    (MDL 1700)
PRACTICES LITIGATION                 )
                                                  )
-------------------------------------------------)
THIS DOCUMENT RELATES TO:            )
                                                  )
ALL CASES                                 )
-------------------------------------------------)

## ORDER

Any party or attorney of record in these FedEx MDL cases who objects to the pending motion for common benefit set-aside order, *see* Doc. Nos. 2281-2284, must notify this court of such objection within 7 days of entry of this order. For everyone's convenience, the proposed Order is attached to this order as an appendix.

SO ORDERED.

ENTERED: January 4, 2011

_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court

cc: All counsel of record

## APPENDIX: PROPOSED ORDER

This Order is entered upon the motion of the Co-Lead Counsel and the Plaintiffs' Steering Committee ("PSC"), who were appointed and charged with specific responsibilities in conducting the pretrial proceedings of these consolidated cases pursuant to the Court's November 15, 2005 Order.  Doc. No. 52.  The Court previously stated that it would retain jurisdiction over the cases in these MDL proceedings "to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL Plaintiffs."  Doc. No. 2011 at 10-12.  This Order is entered to ensure such fair and equitable sharing of any recovery by all counsel who have performed services and incurred expenses in the MDL proceedings ("MDL Plaintiffs' Counsel").  This Court's authority derives from the Supreme Court's common benefit doctrine, as established in Internal Imp. Fund Trustees v. Greenough, 105 U.S. 527 (1881); refined in, inter alia, Central R.R. & Banking Co. v. Pettus, 113 U.S. 116 (1885); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161 (1939); Mills v. Electric Auto-Lite Co., 396 U.S. 375 (1970); Boeing Co. v. Van Gemert, 444 U.S. 472 (1980); and approved and implemented in the MDL context, in, inter alia, In re MGM Grand Hotel Fire Litig., 660 F. Supp. 522, 525-29 (D. Nev. 1987); In re Air Crash Disaster at Florida Everglades, 549 F.2d 1006,1019-21 (5th Cir. 1977). Any disputes arising under this Order, which cannot be resolved by agreement of counsel, will be resolved by

i

this Court, in the exercise of its jurisdiction under applicable legal and equitable principles.

The Court Orders as follows:

**A.  Common Benefit Fund to be Established.**

Plaintiffs' Co-Lead Counsel (Lynn Faris, Susan Ellingstad and Robert Harwood) are directed to establish an interest-bearing account at Signature Bank, New York, NY, to receive funds as provided in this Order.[1] Plaintiffs' Co-Lead Counsel have agreed on, and designate, US Bank as escrow agent for this purpose. These funds will be held as funds subject to the direction of the Court and are hereinafter referred to as the "FXG MDL Common Benefit Fund." No party or attorney has any individual right to any of these funds except to the extent of amounts directed to be disbursed to such person by subsequent order of the Court.  These funds do not constitute the separate property of any party or attorney and are not subject to garnishment or attachment for the debts of any party or attorney except when and as directed to be disbursed as provided by Court order to a specific person.

**B.  Assessments for the Common Benefit Fund.**

---

[1] The disbursement of any such funds among the MDL Plaintiffs' Counsel will be addressed by separate order following submission by Co-Lead Plaintiffs' Counsel and the Plaintiffs' Steering Committee of a proposal for the division of fees among all MDL Plaintiffs' Counsel who have performed services and incurred expenses in the MDL proceedings for the benefit of the MDL Plaintiffs.  As noted in the motion of the Co-Lead Counsel and the PSC, disbursements from the FXG MDL Common Benefit Fund will be made first to reimburse all MDL Plaintiffs' Counsel for the approved costs and expenses they have reasonably incurred in the MDL.  After such costs and expenses have been paid, disbursements from the Common Benefit Fund will be made for attorney's fees pursuant to separate order of this Court.

1.      Plaintiffs and their attorneys who, after transfer of their case(s) from the MDL to their home jurisdiction, agree to settle or compromise their claims, or, with or without trial, recover a judgment for monetary damages or other monetary relief, including compensatory and punitive damages, if any, with respect to any claims, are subject to an assessment, as described below.

2.      For any judgment for monetary relief which is obtained on a claim involving fee shifting (i.e. where pursuant to any applicable statute the attorney's fees are to be paid by the Defendant separate from and in addition to the Plaintiffs' monetary recovery), Plaintiff's Co-Lead Counsel shall have the right to submit to the undersigned Judge, Judge Robert L. Miller Jr., a petition for reasonable attorney's fees and costs to be paid by Defendant and set aside in the FXG MDL Common Benefit Fund for the later distribution to MDL Plaintiffs' Counsel.  This attorney fee petition shall be based exclusively on the time and resources provided by MDL Plaintiffs' Counsel in litigating the claims prior to transfer of the case from the MDL to the home jurisdiction.  This order does not preclude counsel who litigated the case both before transfer to the MDL and after transfer out of the MDL from petitioning the transferor court in a fee shifting case for their reasonable attorney's fees and expenses incurred in litigating the case before and after transfer.  Co-Lead Counsel's right to petition this Court for attorney's fees paid by Defendant in a fee-shifting case shall be in addition to any separate award of attorney's fees made in the case based on a percentage of a

iii

monetary recovery, which award is subject to the assessment or set-aside set forth in paragraph 3 below.

3.     For any settlement or judgment for monetary relief which does not involve any fee-shifting claim and where attorney's fees are awarded or agreed by the parties to be paid based on a percentage of the "gross monetary recovery" (or "common fund"), 15% of the gross monetary recovery (but not to exceed half of the total attorney fee award from the common fund) shall be set aside and placed in the Common Benefit Fund for later distribution to MDL Plaintiffs' Counsel pursuant to separate Court order.  (Approved costs and expenses will be paid out of the FXG MDL Common Benefit Fund prior to any distribution for attorney's fees).  "Gross monetary recovery" is defined as any payments made by Defendant to Plaintiffs and/or their attorneys as part of any settlement or satisfaction of judgment.  "Gross monetary recovery" shall include the present value of any fixed and certain payments to be made in the future.

4.     For any settlement for monetary relief involving a fee-shifting claim, or involving a settlement where attorney's fees are negotiated separately from the gross monetary recovery to the Plaintiffs, Defendant and Plaintiffs' counsel in the transferor court shall so inform MDL Plaintiffs' Co-Lead Counsel and Plaintiffs' Co-Lead Counsel shall have the right to petition this Court for review of the fee award for fairness, or, if appropriate, for attorney's fees payable by FXG if the negotiated attorney fee amount does not adequately reflect the time and effort incurred by MDL Plaintiffs' Counsel and/or compensate MDL Plaintiffs'

Counsel for their reasonable fees and costs incurred in the MDL. If Plaintiffs'
Co-Lead Counsel exercise their right to petition the Court for attorney's fees, the
case shall not be dismissed until after final adjudication of attorney's fees and
costs before this Court. Any attorney's fee awarded by this Court shall be set
aside and placed in the FXG MDL Common Benefit Fund for later distribution to
MDL Plaintiffs' Counsel pursuant to separate Court order.

     5.    Defendant is directed to withhold the amount of any set-aside
(as set forth in paragraphs 1-4 above) from any amount due to be paid to Plaintiffs
and their counsel in any case that is or was part of these MDL proceedings, and
to pay that amount directly into the FXG MDL Common Benefit Fund as a credit
against the settlement or judgment. Defendant is directed to promptly inform
Plaintiffs' Co-Lead Counsel of all settlements or judgments in any case that is or
was part of the MDL proceeding, as well as to notify Plaintiff's Co-Lead Counsel
of all payments into the FXG MDL Common Benefit Fund. If, for any reason, an
assessment is not or has not been so withheld, the Plaintiffs and their counsel are
jointly responsible for paying the assessment into the Common Benefit Fund
promptly.

     6.    Neither Plaintiffs nor Defendant shall file any request for order
of dismissal of any Plaintiff's claim in which any monetary recovery is received (by
settlement or judgment, with or without trial), and which is subject to this Order,
unless this request is accompanied by a certificate of Plaintiff's and Defendant's
counsel that the required assessment has been withheld and deposited into the

FXG MDL Common Benefit Fund. Any such request unaccompanied by such a certificate shall be null and void and have no force or effect. Likewise, pursuant to this Court's retention of jurisdiction to address matters related to attorney's fees and costs incurred in the MDL, no transferor court shall dismiss any Plaintiff's claim in which any monetary recovery is received (by settlement or judgment, with or without a trial), and which is subject to this Order unless Plaintiff's and Defendant's counsel have filed a certificate that the appropriate assessment has been set aside and deposited into the FXG MDL Common Benefit Fund pursuant to this Order.

### C. Application of Order.

This Common Benefit Set-Aside Order shall apply to all cases that have been[2] or are now pending or later filed in, transferred to, or removed to, this Court as well as all unfiled and tolled cases and claims treated as part of the coordinated proceeding known as In re FedEx Ground Package System, Inc., Employment Practices Litigation, Cause No. 3:05-MD-527-RLM (MDL 1700).

---

[2] This Order specifically applies to all of the recently remanded cases set forth in this Court's Orders suggesting remand. Doc. Nos. 2011, 2099, 2160.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

-----------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| ALL ACTIONS | ) ) ) ) | JUDGE MILLER |

-----------------------------------------------------------------

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OBJECTIONS TO PLAINTIFFS' CO-LEAD COUNSEL AND PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER**

# I.     INTRODUCTION

Broadly speaking, defendant FedEx Ground Package System, Inc. ("FXG") does not oppose the motion brought by Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee (collectively, "Lead MDL Plaintiffs' Counsel") for the establishment of a common benefit set-aside fund.  However, FXG does object to certain aspects of the proposal.  In particular, the Court should reject Lead MDL Plaintiffs' Counsel's request that, in the event of the settlement of a case involving claims which, typically by statute, permit the Court to award attorneys' fees and costs to a prevailing plaintiff ("fee-shifting claims"), Lead MDL Plaintiffs' Counsel be allowed to petition for **additional** attorneys' fees and costs **from FXG** if they believe that "the total negotiated attorney fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel."  (Pls.' Co-Lead Counsel and Pls.' Steering Comm.'s Memo. of Law in Supp. of their Mot. for Entry of Common Benefit Set-Aside Order ("Pls.' Brief") (Doc. No. 2282) at 20.)  Granting such a "second-bite-at-the-apple" request would be inconsistent with applicable legal principles and would create substantial impediments to settlement in the approximately 23 lawsuits which contain fee-shifting claims.  (*See* Pls.' Brief at 16.)  In addition, the task of administering and making payments into any common benefit fund should fall to plaintiffs' counsel, not FXG, and, finally, as discussed below, Lead MDL Plaintiffs' Counsel's proposal with respect to non-fee shifting claims requires clarification and explanation as their memorandum is inconsistent with their proposed order.  (*See* Appendix to Order ("Prop. Order") (Doc. No. 2330).)

## II.    ARGUMENT

### A.    Lead MDL Plaintiffs' Counsel's Request To Seek Additional Fees And Costs From FXG Following Settlement Of A Fee-Shifting Claim Is Unsupported By Applicable Law And Counter-Productive.

Lead MDL Plaintiffs' Counsel's request that they be given the right to nullify the terms of a negotiated settlement in a case with fee-shifting claims, and obtain additional payments from FXG after a settlement has been reached with the originating plaintiffs' counsel in the transferor courts (who were the attorneys the plaintiffs retained to prosecute their claims), is unsupported by and contrary to applicable case law, which instructs that plaintiffs and/or their other counsel are responsible for the fees and costs of "lead counsel."  The proposal also would create unacceptable levels of uncertainty with respect to the finality of negotiated settlements and thereby render settlement of cases with fee-shifting claims highly unlikely.  This request should therefore be rejected.

#### 1.    Lead MDL Plaintiffs' Counsel's Requested Fee-Recovery Approach Has No Support In The Applicable Law.

With respect to cases with *non*-fee shifting claims, such as common-law claims for fraud or rescission, Lead MDL Plaintiffs' Counsel propose that MDL Plaintiffs' Counsel's fees/costs be set aside from the total amount of the settlement.[1]  (*See* Pls.' Brief at 21-23; Prop. Order ¶ 3 at iv.)  Such a procedure is standard and appropriate (and, as explained below, should be utilized in cases involving fee-shifting claims as well).  *See, e.g., In re Air Crash Disaster at Fl. Everglades*, 549 F.2d 1006, 1019 (5th Cir. 1977) (finding it was proper to order the "retained lawyers" to contribute part of their fee to the common fund for the benefit of lead counsel); *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 124414, at *4 (E.D. Pa. Feb. 10, 1999) ("Any sum

---

[1]    In their Proposed Order (¶ 3 at iv), Lead MDL Plaintiffs' Counsel request that the set-aside be calculated as "15% of the gross monetary recovery (but not to exceed half of the total attorney fee award from the common fund [i.e., the gross monetary recovery])."

ordered to be paid [to lead counsel] by the Court pursuant to this [Pretrial] Order as an award of counsel fees shall be deducted from the total amount of counsel fees payable to individual plaintiff's counsel").

With respect to cases with fee-shifting claims, however, Lead MDL Plaintiffs' Counsel assert that MDL Plaintiffs' Counsel's fees/costs should be recoverable not only from the total settlement amount in a given case, but also from an ***additional payment*** to be made by FXG as determined by this Court, or a Special Master, "***if*** the total negotiated attorney fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel." (Pls.' Brief at 20 (emphasis in original).)[2]  Lead MDL Plaintiffs' Counsel cite no authority adopting their requested approach, and FXG has not found any.

Lead MDL Plaintiffs' Counsel is, in effect, asking this Court to treat the settlement of a case with a fee-shifting claim as if it were a final judgment in plaintiffs' favor based on a summary-judgment motion or trial (where successful plaintiffs' counsel generally would have the right to petition the court for an award of their fees/costs above and beyond the damages awarded to the plaintiffs).  But the law is to the contrary.  The general rule is that, when parties privately settle a fee-shifting claim, there is ***no*** "prevailing party" and the plaintiff and his counsel therefore ***do not*** have a statutory entitlement to attorneys' fees.  *Bingham v. New Berlin Sch. Dist.*, 550 F.3d 601, 603 (7th Cir. 2008) ("It could not be clearer that a voluntary settlement by the defendant . . . does not entitle a plaintiff to attorneys' fees.") (citing *Buckhannon Bd. Care Home, Inc. v. W. Va. Dep't. of Health Human Res.*, 532 U.S. 598, 606 (2001))).[3]  Accordingly,

---

[2]      Lead MDL Plaintiffs' Counsel's Proposed Order provides that these fee disputes would be resolved by "this Court" (Prop. Order ¶ 4 at iv-v), whereas their brief refers to "the Special Master." (Pls.' Brief at 20.)

[3]      To be sure, attorneys' fees may remain independently recoverable when a settlement agreement is "sufficiently analogous to a consent decree," thus conferring "prevailing party" status.  *See T.D. v. La Grange Sch. Dist. No. 102*, 349 F.3d 469, 478 (7th Cir. 2003) (describing four-factor test for whether a

the settlement of a case with a fee-shifting claim puts the parties in the same situation as if they had settled a case without such a claim—in neither event is there a statutory entitlement to attorneys' fees, and the plaintiffs' attorneys' fees/costs are recoverable only from the overall settlement amount. In such cases, MDL Plaintiffs' Counsel's fees/costs should come from whatever amount FXG has agreed to pay in settlement of a given lawsuit—and only from that negotiated amount.

### 2. Common Fund Principles Dictate That MDL Plaintiffs' Counsel's Fees/Costs Must Be Obtained From The Fund—And Only From The Fund.

Lead MDL Plaintiffs' Counsel's request is also problematic because, when a fee-shifting claim is settled and a common settlement fund created, common fund principles govern. *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 256 (7th Cir. 1988) (addressing settlement of claim under Magnuson-Moss Act, which includes fee-shifting provision, and stating that "when a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorney's fees, equitable fund principles must govern the court's award of the attorney's fees."). Under such common fund principles, all "who have benefited from litigation should share its costs." *Id.* at 252. This means that all attorneys' fees are paid from the fund; once a defendant has paid the agreed-upon amount into the settlement fund, it is not responsible for any additional payments. *Id.* at 254 ("In a common fund case . . . the defendant's liability is limited to the amount of the common fund, which is available to provide attorney's fees"); *see also Florin v. Nationsbank of Georgia*, 34 F.3d 560, 563-64 (7th Cir. 1994) (following *Skelton*); *In re Enron Corp. Sec., Derivative & 'ERISA' Litig.*, 586 F. Supp. 2d 732, 822 (S.D. Tex. 2008)

---

court was sufficiently involved in the preparation of a settlement agreement to warrant determination that plaintiff was "prevailing party"). However, there is no possibility that FXG would consent to the reclassification of the contractors as employees, so there is no possibility that any settlement of these cases would create implied prevailing party status or an implied right to shift attorneys' fees to the defendant.

("[U]nder the common fund doctrine, the fee award is not punitively imposed upon the defendant, but taken from a common fund to avoid the unjust enrichment of those who benefit from the fund.") (internal citation and quotations omitted)).  These common fund principles further indicate that, rather than "blowing up" a negotiated settlement by seeking additional payments from FXG, MDL Plaintiffs' Counsel's fees/costs can be recovered only from the established common settlement fund.

> **3.      Lead MDL Plaintiffs' Counsel's Request Would Create Substantial Impediments To Settlement In All Cases With Fee-Shifting Claims.**

As a practical matter, Lead MDL Plaintiffs' Counsel's proposal would render settlements in cases with fee-shifting claims highly unlikely, if not altogether impossible.  A defendant entering into settlement negotiations needs to know with certainty that the agreed settlement amount is all that it will have to pay to resolve a lawsuit.  If the defendant is instead asked to agree to a settlement that is subject to another set of lawyers' claims for attorneys' fees, the defendant will likely not even enter into meaningful settlement discussions in the first place.  Moreover, during settlement negotiations or mediation, a defendant (or a plaintiff for that matter) will often make and communicate factual or legal concessions in order to reach an agreement.  If there is a possibility that the negotiated settlement could later be un-done, then a defendant would likely be unwilling to make such "concessions" because the plaintiffs could later use them to their advantage.  Again, the result will be that a defendant is reluctant to enter into meaningful settlement negotiations from the outset.

Lead MDL Plaintiffs' Counsel's requested approach would eliminate the certainty and finality that is necessary for successful settlement negotiations.  Their motion states that any settlement in a case with fee-shifting claims—which they find objectionable because, in their view, "the total negotiated attorney fees and costs substantially undervalue the time, effort or

investment incurred by MDL Plaintiffs' Counsel"—should "not be final or binding and the case

not be dismissed until after final adjudication of attorney's fees and costs before the Special

Master appointed by this Court." (Pls.' Brief at 20.) The parties would, thus, never know when

they settle claims potentially eligible for fee-shifting whether the agreed-upon settlement amount

constitutes the actual payment obligation, or whether Lead MDL Plaintiffs' Counsel will be able

to essentially re-write the settlement by increasing their fees through the supplemental

proceedings they suggest in their motion. This lack of certainty and finality would substantially

impair the efficacy of settlement negotiations. For example, there are transferor courts which

have directed the parties to attend settlement conferences (*e.g.*, in *Flores* and *Blanchard*). Given

the uncertainty created by Lead MDL Plaintiffs' Counsel's requested approach, FXG could not

meaningfully participate in those settlement conferences or in other forms of alternative dispute

resolution that may be encouraged by the transferor courts.[4]

     **B.**     <u>**FXG Should Not Be Responsible For Administration Of The Common Benefit Fund**</u>.

     FXG objects to Lead MDL Plaintiffs' Counsel's request that FXG be tasked with

administering the common benefit fund. (Pls.' Brief at 13; Prop. Order ¶ 5 at v.) Although FXG

recognizes that this Court has discretion to direct a defendant to set aside a certain portion of any

settlement or judgment into a common fund, it is unnecessary to do so here. The number of

lawsuits at issue here is relatively small, particularly when compared to other cases where a

common fund has been established. *Cf. In re Genetically Modified Rice Litig.*, 2010 WL 716190

(W.D. Mo. Feb. 24, 2010) (in MDL consolidating 300 cases comprising claims of 5000

---

[4]     The pending motion does not explain how the two proposed approaches to recovery of MDL Plaintiffs' Counsel's fees/costs would operate when there has been a settlement in a case involving both fee-shifting and non-fee shifting claims, or how a lump-sum settlement amount and the related attorneys' fees/costs would be allocated between the two types of claims. The added layers of complexity and confusion that would be created by the adoption of two different approaches to fee recovery will further hinder the settlement process and create burdens on the Court and the parties.

plaintiffs, defendant responsible for setting aside a certain percentage of any recovery into a
common fund). If this Court issues an order providing for the establishment of a common
benefit fund, all plaintiffs' counsel will be so informed and FXG is amenable to also providing
notice of the Court's Order. However, once notified, all plaintiffs' counsel (including "local
counsel") can be expected to comply with the Court's order and should be responsible for setting
aside into the common fund the requisite portion of any monetary recovery they may receive.
*Cf. In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006) ("There is no
need to burden defendant Lilly with this chore; Lilly has no responsibility to provide for, or
administer, the fund.").

### C. Lead MDL Plaintiffs' Counsel's Fee-Recovery Proposal Is Unclear And Requires Clarification.

With respect to non-fee shifting claims, Lead MDL Plaintiffs' Counsel's proposal
requires clarification. In their motion, they suggest that any disputes regarding the allocation of
fees between MDL Plaintiffs' Counsel and local plaintiffs' counsel following a judgment or
settlement should be mediated, arbitrated, or submitted to a Special Master. (Pls.' Brief at 21-
22.) They further state that, at this time, no fixed percentage of the gross monetary recovery
should be set as MDL Plaintiffs' Counsel's portion of the total fees/costs, but instead a specific
percentage "should be determined on a case-by-case basis considering the circumstances of each
case." (*Id.* at 22.) The Proposed Order, on the other hand, would provide that 15 percent of the
gross monetary recovery is to be set aside for MDL Plaintiffs' Counsel. (Prop. Order ¶ 3 at iv.)
In principle, FXG does not object to the 15 percent figure (or any other allocation among the
various plaintiffs' counsel), as it does not result in an increase in the total settlement amount in
any given case. However, it reserves the right to submit further objections once Lead MDL
Plaintiffs' Counsel's proposal has been clarified and explained.

## III.    CONCLUSION

FXG respectfully requests that: (1) any common benefit order entered by this Court specifically indicate that, in the event of a settlement of any case, the set-aside for MDL Plaintiffs' Counsel's fees/costs shall be "15% [or another percentage determined by the Court] of the gross monetary recovery (but not to exceed half of the total attorney fee award from the common fund [i.e., the gross monetary recovery])" (Prop. Order ¶ 3 at iv), and that the total amount of the settlement cannot subsequently be increased for additional fees and costs (or for any other reason); and (2) any common benefit fund order entered by the Court make clear that plaintiffs' counsel, and not FXG, are responsible for making payments into the common benefit fund.

Dated:  January 12, 2011.

Respectfully submitted,

By: /s/ Chris A. Hollinger
Chris A. Hollinger

| | |
|---|---|
| Thomas J. Brunner | Robert M. Schwartz |
| Alison G. Fox | Chris A. Hollinger |
| BAKER & DANIELS LLP | O'MELVENY & MYERS LLP |
| 202 S. Michigan St. | 1999 Avenue of the Stars, Suite 700 |
| South Bend, IN 46601 | Los Angeles, CA 90067-6035 |
| Tel: (574) 234-4149 | Tel: (310) 553-6700 |
| Fax: (574) 239-1900 | Fax: (310) 246-6779 |

*Defendant's Lead and Liaison Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on the 12th day of January, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: <u>/s/ Chris A. Hollinger</u>
Chris A. Hollinger

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| *Harris*, 3:06-cv-209 (Arkansas) *Alexander*, 3:05-cv-528 (California) *Huerta*, 3:08-cv-052 (California) *Pedrazzi*, 3:06-cv-429 (California) *Coleman*, 3:05-cv-666 (Kentucky) *DeCesare*, 3:07-cv-120 (Nevada) *Gennell*, 3:05-cv-601 (New Hampshire) *Kelly*, 3:08-cv-336 (Ohio) *Leighter*, 3:07-cv-328 (Oregon) *Slayman*, 3:05-cv-596 (Oregon) *Humphries*, 3:05-cv-540 (Texas) *Carlson*, 3:05-cv-664 (Florida) *Gentle*, 3:07-cv-191 (Alabama) *Wallace*, 3:06-cv-801 (Ohio) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE MILLER |

---

## DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION FOR ENTRY OF JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

---

Pursuant to Federal Rule of Civil Procedure 54(b), Defendant FedEx Ground Package System, Inc. ("FedEx Ground"), by counsel, moves the Court to direct entry of final judgment as to the claims in the above-captioned proceedings that the Court resolved in its December 13, 2010 Opinion and Order [Doc. No. 2239] (hereafter "December 13 Order"). In support thereof, FedEx Ground states as follows:

1. In its December 13 Order, the Court resolved "all outstanding motions for summary judgment and dispose[d] of all other pending cases in this FedEx Multidistrict Litigation docket." (Dec. 13 Order at 1.) In doing so, the Court held that plaintiffs in 18 certified class actions, as well as two individual actions (*Jones* (Maryland) and *Hart* (Pennsylvania)) were independent contractors as a matter of law and subsequently entered judgment in those cases in favor of FedEx Ground on all claims.

2. Plaintiffs have appealed all cases for which final judgment was entered in favor of FedEx Ground pursuant to the December 13 Order, except *Carlson* (Florida), which is the subject of Plaintiffs' Motion to Reconsider [Doc. No. 2366], as well as the Court's August 11, 2010 [Doc. No. 2097] Kansas decision, to the Seventh Circuit Court of Appeals.

3. The Court did not include a direction to enter final judgment with respect to every case addressed in the December 13 Order, however, including claims in the following nine **class** cases: *Harris* (Arkansas), *Alexander* (California), *Coleman* (Kentucky), *DeCesare* (Nevada), *Gennell* (New Hampshire), *Kelly* (Ohio), *Leighter* and *Slayman* (Oregon), and *Humphries* (Texas). (*See* "Summary of Dispositions" Appendix located at Dec. 13 Order at 178-82.) The Court applied its reasoning from the *Craig* (Kansas) decision in each of these cases (except Nevada, which, the Court concluded, does not follow a common law test) and held

plaintiffs to be independent contractors with respect common law claims.[1]  Even so, the Court

suggested remand of each of these cases—three of which, *Coleman*, *DeCesare*, and *Gennell*,

resulted in rulings that plaintiffs were employees for the purposes of certain state statutory

claims—for further proceedings in the transferor courts on these claims and on the claims not

addressed in the December 13 Order.

       4.     In addition, in four **individual** actions, *Huerta* and *Pedrazzi* (California),

*Wallace* (Ohio), and *Gentle* (Alabama), the Court concluded that plaintiffs (by virtue of their

membership in certified classes[2]) are independent contractors for the purposes of some or all of

their claims, but found that other claims unique to individual plaintiffs were not appropriate for

resolution in the Multidistrict Litigation docket.  (*See* Dec. 13 Order at 178, 181.)  The Court

suggested remand of these cases as well.  (*See id.*)

       5.     Under Rule 54(b), an "express determination that there is no just reason

for delay" and entry of judgment as to the resolved claims in the nine class cases and the four

individual cases identified above is warranted.  Indeed, courts have accorded "special treatment"

to Rule 54(b) motions in the context of Multidistrict Litigation—a practice that allows

streamlined appellate review of the decisions of transferee courts.  *See Hill v. Henderson*, 195

F.3d 671, 677 (D.C. Cir. 1999) ("An appeal before re-transfer enhances the likelihood of

achieving the coordination benefits sought by [28 U.S.C.] § 1407 . . . as the circuit of the § 1407

court can give the issues a unified treatment . . . .").  Having all of these cases on appeal before

the same appellate court for purposes of reviewing common or related legal rulings carries

forward the efficiencies and central purpose of this Multidistrict Litigation.  It would make no

---

[1] The Court held that the *Slayman* and *Leighter* (Oregon) plaintiffs were independent contractors for all claims except their rescission claim, which it suggested for remand for further proceedings.  (Dec. 13 Order at 133.)
[2] Notably, with regard to the *Gentle* case, the Court held that it could not determine whether Stephanie Gentle was a member of the *Floyd* (Alabama) class.  (Dec. 13 Order at 24.)  Accordingly, FedEx Ground directs the present motion only to Bruce Gentle, who is a member of the *Floyd* class. (*See id.*)

sense to consolidate these Multidistrict Litigation cases for purposes of deciding their shared

legal issues only to scatter review of that decision across up to six circuits on appeal. *See*

*generally id.* ("The practice has favored certification by the transferee court of potentially

outcome determinative rulings for immediate, consolidated appeal under . . . Fed. R. Civ. P.

54(b), before the cases are returned to their courts of origin."); *see also FMC Corp. v. Glouster*

*Engineering Co.*, 830 F.2d 770, 771-72 (7th Cir. 1987) (discussing, in the context of 28 U.S.C. §

1292(b), the benefits of having the appellate court with jurisdiction over the transferee court

resolve appeals in Multidistrict Litigation); *In re Food Lion, Inc. Fair Labor Standards Act*

*Scheduling Litig.*, 73 F.3d 528, 533 (4th Cir. 1996) ("A consolidated appeal, heard by the

appellate court having jurisdiction over the transferee district court that entered the orders, is the

best means of achieving the goals of efficient and uniform adjudication of numerous actions.").

   6.  Federal Rule of Civil Procedure 54(b) "permits entry of a partial final

judgment . . . when a distinct claim has been fully resolved with respect to all parties." *Lottie v.*

*W. Am. Ins. Co.*, 408 F.3d 935, 938 (7th Cir. 2005) (quoting *Factory Mut. Ins. Co. v. Bobst*

*Group USA, Inc.*, 392 F.3d 922, 924 (7th Cir. 2004)). While Rule 54 nowhere defines a "distinct

claim," the purpose of permitting the Court to enter a judgment under such circumstances is

clear: it "spare[s] the court of appeals from having to keep relearning the facts of a case on

successive appeals." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th

Cir. 1984) (identifying "most important purpose" of separate claims requirement).

Consequently, the Seventh Circuit has taken a practical approach to determining whether claims

are "distinct" or "separate" for purposes of the entry of what amounts to a "partial final

judgment." Where claims involve different facts, the Seventh Circuit has found them separate

under Rule 54(b) because "consideration of the appeals piecemeal rather than all at once will not

-4-

involve a duplication in the efforts required of the judges to prepare for argument in, and to decide, each appeal." *Id.* In addition, the presence of different facts and issues suggest that the small gains from waiting until every claim is resolved "will be outweighed by the benefits of an immediate appeal in resolving the parties' rights with respect to a part of the controversy between them." *Id.*

       7.    In keeping with its flexible approach, the Seventh Circuit has recognized that even substantial factual overlap between claims does not foreclose the possibility of a partial judgment appeal. "Even if two claims arise from the same event or occurrence," for example, "they may be separable for Rule 54(b) purposes if they rely on entirely different legal entitlements yielding separate recoveries, rather than different legal theories aimed at the same recovery." *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 518 F.3d 459, 464 (7th Cir. 2008). Further, the district court retains significant discretion to assess the "separateness" of claims under the law of this Circuit. Absent "*complete* factual overlap between nominally separate claims," discretion to determine whether claims "are or are not separate" remains with the district court. *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1367 (7th Cir. 1990) (emphasis added).

       8.    For multiple reasons, the Court should exercise its discretion to make the partial final judgments in the class cases and individual actions suggested for remand appealable under Rule 54(b) here. First, there is no efficiency to be gained from delaying appeals until the remanded claims are finally resolved within these cases. Indeed, immediate appeal of the decided claims will not cause any appellate court to duplicate its efforts to learn the underlying facts. Because the cases suggested for remand share many of the facts as those cases being appealed as final judgments, they will impose little if *any* marginal cost on the Seventh Circuit's

record review.   Conversely, as particular facts relate to employment status *but not* to the claims suggested for remand, deferring appeals within these cases would most likely result in an additional burden on the transferee appellate court.

9.     Second, the claims suggested for remand represent "entirely different legal entitlements yielding separate recoveries," *see Marseilles Hydro Power, LLC*, 518 F.3d at 464, and involve significant factual differences.  Specifically:

a.   In four of the nine class cases, *Harris* (Arkansas) *Alexander* (California) and *Kelly* (Ohio), *Humphries* (Texas), the remaining claims assert independent causes of action for relief under federal statutes that require consideration of individualized evidence not at issue before this Court.  (*See* Dec. 13 Order at 36-37 (finding the *Alexander* plaintiffs' claims under the FMLA require further individualized evidence); *id.* at 127 (suggesting remand of *Kelly* plaintiffs' FMLA claims); *id.* at 31 (finding the *Harris* plaintiffs' FLSA claim "requires further development with individualized evidence"); *id.* at 157 (suggesting remand of *Humphries* plaintiffs' Federal Motor Carrier Act claims).)  Similarly, the only claim outstanding upon remand in the *Leighter* and *Slayman* cases—rescission— would turn on individualized evidence that played no role in the December 13 Order.  (*See id.* at 129.)

b.   Two other class cases suggested for remand involve merits and damages-related issues pertaining to state statutory claims (*see* Dec. 13 Order at 70-71 (suggesting remand of *Coleman* plaintiffs' statutory claims); *id.* at 100 (same for *Gennell* plaintiffs)), while the claims in the *DeCasare* case involve merits and damages

issues, as well as plaintiffs' employment classification under Nevada Revised Statutes Chapter 608. (*See id.* at 92.)

c.  With regard to the individual cases, the only claim that remains outstanding in the *Huerta* case is one for breach of contract that "appear[s] to be premised on" Huerta being an independent contractor," (Dec. 13 Order at 49), which is distinct from the claims decided in the December 13 Order. In *Pedrazzi*, the Court did not decide plaintiff's anti-discrimination claims, which the Court acknowledged may require a "separate determination of . . . employment status under California's" statutes involving individualized evidence. (*Id.* at 47-48.) For similar reasons, entry of final judgment in *Wallace* (Ohio) and *Gentle* (Alabama)[3] on the separate claims premised on their membership in the *Floyd* and *Kelly* classes is appropriate.

10.     Third, the Rule 54(b) appeal is necessary to avoid the potential for inconsistent judgments, even within the same jurisdiction, when the remanded cases ultimately proceed to appellate courts in the transferee jurisdictions. As the Fourth Circuit has recognized, "permitting the transferor courts [and possibility their Courts of Appeal] to reconsider the transferee court's summary judgment orders will frustrate the aims of § 1407" and the "overriding purpose of the multidistrict procedure." *In re Food Lion*, 73 F. F.3d at 532. Indeed, "[a]n appeal before re-transfer enhances the likelihood of achieving the coordination benefits sought by [28 U.S.C.] § 1407 . . . as the circuit of the § 1407 court can give the issues a unified treatment." *Hill*, 195 F.3d at 677. Even in the context of venue under § 1404(a) "it is

---

[3] Additionally, it appears that entry pursuant to Rule 54 with regard to Bruce Gentle's claims is appropriate because the Court's decision in the *Floyd* case resolved all of Bruce Gentle's claims. See Fed. R. Civ. P. 54(b) (providing that the court may "direct entry of a final judgment as to one or more, but fewer than all, claims or *parties*" (emphasis added)).

well-settled that transfer . . . is generally in the interest of justice if a decision not to transfer would lead to courts rendering inconsistent judgments on the same issue." *Convergence Techs. USA, LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 642 (E.D. Va. 2010).

11.     Plaintiffs have filed a motion [Doc. No. 2366] for reconsideration of the Court's entry of judgment on counts three ("False Information Negligently Provided") and four ("Breach of Contract") of the Third Amended Complaint in the *Carlson* (Florida) action. Plaintiffs' motion explicitly states that these claims "do not depend on any finding that Plaintiffs were employees and in fact were expressly pleaded without regard to their independent contractor/employment status." (*See* Doc. No. 2365 at 1.) Although FedEx Ground will file a separate response to that motion, it notes that, especially in light of plaintiffs' assertions concerning the nature of the claims subject to their motion for reconsideration, should the Court grant plaintiffs motion, entry of judgment under Rule 54(b) as to all other claims would be appropriate for the reasons outlined in this motion.

Accordingly, the Court should enter an order under Rule 54(b) regarding claims decided in the December 13 Order in following cases: *Harris* (Arkansas), *Alexander* (California), *Coleman* (Kentucky), *DeCesare* (Nevada), *Gennell* (New Hampshire), *Kelly* (Ohio), *Leighter* and *Slayman* (Oregon), *Humphries* (Texas), *Huerta* and *Pedrazzi* (California), *Wallace* (Ohio), *Gentle* (Alabama), and if the Court grants Plaintiffs' Motion to Reconsider, *Carlson* (Florida).

Respectfully submitted,

By:    *s/Alison G. Fox*

Thomas J. Brunner                          Robert M. Schwartz
Alison G. Fox                              Chris A. Hollinger
BAKER & DANIELS LLP                        O'MELVENY & MYERS LLP

BDDB01 6496890v2

202 S. Michigan St.                    1999 Avenue of the Stars, Suite 700
South Bend, IN 46601                   Los Angeles, CA 90067-6035
Tel: (574) 234-4149                    Tel: (310) 553-6700
Fax: (574) 239-1900                    Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of January, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

The undersigned further certifies that a copy of the same was mailed by regular United States Postal Service to the following non CM/ECF participants:

Ronald D. Kelsay                       Steven A. Owings
Kelsay Law Firm PA                     Law Offices of Steven A. Owings
227 Woodbine                           1320 Brookwood, Ste. D
Hot Springs, AR 71901                  Little Rock, AR 72202

Stephen M. Murphy                      Henry Bongiovi
Tania Beth Rose                        Henry J Bongiovi Law Offices
Law Offices of Stephen M. Murphy       831 State Street
180 Montgomery Street, Suite 940       Santa Barbara, CA 93101
San Francisco, CA 94104

Mark B. Wallace                        Brian C. Edwards
Walker, Vaughn & Wallace, PLLC         607 W. Main Street, Suite 500
7403 St. Andrews Church Rd.            Louisville, KY 40202
P. O. Box 9285
Louisville, KY 40209

Andrew J. Kahn PHV                     Robert E. McDaniel
Mccracken Stemerman & Holsberry        McDaniel Law Offices
1630 S. Commerce St., Ste. A-1         755 North Main St
Las Vegas, NV  89102                   Laconia, NH 03246

Andrew Santillo                        Shannon R. Baith
Winebrake Law Office                   Barkan Neff Handelman Meizlish LLP
Twining Office Center Suite 114        360 S. Grant Ave.
715 Twining Road                       Columbus, IN 43215
Dresher, PA 19025

Thomas N. Trefethern
2045 Chappel Hill Drive
Youngstown, OH 44511

David F. Rees
Joshua L. Ross
Stoll Stoll Berne Lokting & Shlachter PC
209 SW Oak St., 5th Floor
Portland, OR  97204

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham and Burgess LLP
301 Congress Ave., Ste. 1050
Austin, TX  78701

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

By:  *s/Alison G. Fox*

-10-

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

```
-------------------------------------------------- )
                                                   )
In re FEDEX GROUND PACKAGE                         )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                           )        (MDL 1700)
PRACTICES LITIGATION                               )
-------------------------------------------------- )
THIS DOCUMENT RELATES TO:                          )        JUDGE MILLER
                                                   )
All Cases                                          )
                                                   )
-------------------------------------------------- )
```

**MOTION FOR LEAVE TO FILE AMENDED RESPONSE TO**
**PLAINTIFFS' MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER**

FedEx Ground Package System, Inc. ("FedEx Ground") hereby seeks leave of

Court to file an amended response to Plaintiffs' Motion for Entry of Common Benefit Set-Aside

Order and Corrected Proposed Order by January 20, 2011, and in support hereof, states as

follows:

    1.  Plaintiffs filed their Motion for Entry of Common Benefit Set-Aside Order

[Doc. No. 2281] on December 28, 2010 ("Plaintiffs' Motion").  With their motion, Plaintiffs

submitted a detailed proposed order setting forth the relief requested.

    2.  On January 4, 2011, the Court entered an Order directing that any "party

or attorney of record in these FedEx MDL cases who objects to the pending motion for common

benefit set-aside order, *see* Doc. Nos. 2281-2284, must notify this court of such objection within

7 days of entry of this order."  [Doc. No. 2330.]  The Court attached Plaintiffs' proposed order to

its Order.

3.      FedEx Ground filed its objections to Plaintiffs' Motion and Plaintiffs' proposed order on January 12, 2011.  [Doc. No. 2369.]

4.      On January 13, 2011, Counsel for FedEx Ground learned from Plaintiffs' Co-Lead Counsel that the wrong proposed order had been forwarded to the Court in connection with Plaintiffs' Motion, that they intended to correct the error, and that they would agree to an opportunity for FedEx Ground to re-file its objections in light of the changes.

5.      On Friday, January 14, 2011, Plaintiffs' Co-Lead Counsel submitted to the Court by e-mail a corrected version of their proposed order, indicating in the e-mail to the Court that they had "notified Defendant FedEx Ground of the error and agree that Defendant may re-file its objections to the corrected Proposed Order."

6.      The Corrected Proposed Order contains material changes to the substance of the relief Plaintiffs' Co-Lead counsel request in relation to their Motion.  For the Court's convenience, a redlined version of the Proposed Order showing the changes is attached to this motion.

7.      FedEx Ground requests leave to file an amended response to Plaintiffs' Motion in light of the changes to the relief requested in their Corrected Proposed Order. Affording FedEx Ground an opportunity to respond is appropriate because the differences between Plaintiffs' original and corrected Proposed Orders are significant and relate directly to matters addressed by FedEx Ground in its objections filed on January 12, 2011.  [*See* Doc. No. 2369.]

8.      Plaintiffs Co-Lead Counsel do not object to allowing FedEx Ground an opportunity to respond to the changes they have made to their Proposed Order.

6501343_1.DOCX

WHEREFORE, FedEx Ground requests that the Court grant it leave to file an amended response to Plaintiffs' Motion for Entry of Common Benefit Set-Aside Order and Corrected Proposed Order by Thursday, January 20, 2011.

Respectfully submitted,

By:     s/Alison G. Fox

Thomas J. Brunner                        Robert M. Schwartz
Alison G. Fox                            Chris A. Hollinger
BAKER & DANIELS LLP                      O'MELVENY & MYERS LLP
202 S. Michigan St.                      1999 Avenue of the Stars, Suite 700
South Bend, IN 46601                     Los Angeles, CA 90067-6035
Tel: (574) 234-4149                      Tel: (310) 553-6700
Fax: (574) 239-1900                      Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of January, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By:     s/Alison G. Fox

3

6501343_1.DOCX

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

```
------------------------------------------------  )
                                                  )
In re FEDEX GROUND PACKAGE                        )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                           )        (MDL 1700)
PRACTICES LITIGATION                              )
                                                  )
------------------------------------------------  )
THIS DOCUMENT RELATES TO:                         )
                                                  )
ALL CASES                                         )
------------------------------------------------  )
```

**COMMON BENEFIT SET-ASIDE ORDER**

This Order is entered upon the motion of the Co-Lead Counsel and the Plaintiffs'
Steering Committee ("PSC"), who were appointed and charged with specific responsibilities in
conducting the pretrial proceedings of these consolidated cases pursuant to the Court's
November 15, 2005 Order. Doc. 52. The Court previously stated that it would retain
jurisdiction over the cases in these MDL proceedings "to consider the fair and equitable
assessment of any potential recovery for the services performed and expenses incurred by
attorneys acting for administration and common benefit of all MDL Plaintiffs." Doc. 2011
at 10-12. This Order is entered to ensure such fair and equitable sharing of any recovery by all
counsel who have performed services and incurred expenses in the MDL proceedings ("MDL
Plaintiffs' Counsel"). This Court's authority derives from the Supreme Court's common benefit
doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881);
refined in, *inter alia, Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885);
*Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co*., 396
U.S. 375 (1970); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and

implemented in the MDL context, in, inter alia, *In re MGM Grand Hotel Fire Litig. Litigation*,
660 F. Supp. 522, 525-29 (D. Nev. 1987); *In re Air Crash Disaster at Florida Everglades, on
December 29, 1972,* 549 F.2d  1006,1019-21 (5th Cir. 1977). Any disputes arising under this
Order, which cannot be resolved by agreement of counsel, will be resolved by this Court, in the
exercise of its jurisdiction under applicable legal and equitable principles.

The Court Orders as follows:

### A. Common Benefit Fund to be Established.

Plaintiffs' Co-Lead Counsel (Lynn Faris, Susan Ellingstad and Robert Harwood) are
directed to establish an interest-bearing account at Signature Bank, New York, NY, to receive
funds as provided in this Order.[1]  Plaintiffs' Co-Lead Counsel have agreed on, and designate,
US Bank as escrow agent for this purpose. These funds will be held as funds subject to the
direction of the Court and are hereinafter referred to as the "FXG MDL Common Benefit Fund."
No party or attorney has any individual right to any of these funds except to the extent of
amounts directed to be disbursed to such person by subsequent order of the Court. as ordered by
this Court. These funds do not constitute the separate property of any party or attorney and are
not subject to garnishment or attachment for the debts of any party or attorney except when and
as directed to be disbursed as provided by Court order to a specific person.

---

[1] The disbursement of any such funds among the MDL Plaintiffs' Counsel for attorney's fees
will be addressed by separate order following submission by Co-Lead Plaintiffs' Counsel and the
Plaintiffs' Steering Committee of a proposal for the division of fees among all MDL Plaintiffs'
Counsel who have performed services and incurred expenses in the MDL proceedings for the
benefit of the MDL Plaintiffs.  As noted in the motion memorandum of the Co-Lead Counsel and
the PSC, disbursements from the FXG MDL Common Benefit Fund will be made first to
reimburse all MDL Plaintiffs' Counsel for the approved costs and expenses they have reasonably
incurred in the MDL.  After such costs and expenses have been paid, disbursements from the
Common Benefit Fund will be made for attorney's fees pursuant to separate order of this Court.

**B.    Assessments for the Common Benefit Fund.**

1.    Plaintiffs and their attorneys who, after transfer of their case(s) from the MDL to their home jurisdiction, agree to settle or compromise their claims, or, with or without trial, recover a judgment for monetary damages or other monetary relief, including compensatory and punitive damages, if any, with respect to any claims, are subject to an assessment, as described below.    MDL Plaintiffs and MDL Counsel have some interest in the settlement and/or judgment obtained in cases covered by this Order.   To ensure that Co-lead Counsel and the Plaintiff Steering Committee have an opportunity to address such interests and to facilitate such settlements and judgments, they shall be consulted for input with regard to damage issues, costs and attorneys fees incurred.   Because the final outcome of the cases and all efforts expended to achieve such outcome must be considered in determining the proper treatment of fees, this Order establishes a process for resolution of any unresolved disputes rather than setting a percentage that might or might not be appropriate in every case.   This process shall only apply in the event that Co-lead Counsel and the Plaintiff Steering Committee and Plaintiffs' counsel in the transferor courts are unable to resolve among themselves the issue of apportionment of fees between MDL Plaintiffs' Counsel and Plaintiffs' counsel in the transferor court.

2.    For any judgment for monetary relief which is obtained on a claim involving fee shifting (i.e. where pursuant to any applicable statute the attorney's fees are to be paid by the Defendant separate from and in addition to the Plaintiffs' monetary recovery), Plaintiff's Co-Lead Counsel and Plaintiffs' Steering Committee shall have the right to submit to the undersigned Judge, Judge Robert L. Miller Jr., a Special Master appointed by this Court a petition for reasonable attorney's fees and costs to be paid by Defendant and set aside in the FXG MDL Common Benefit Fund for the later distribution to MDL Plaintiffs' Counsel.  This attorney fee petition shall be based exclusively on the time and resources provided by MDL

Plaintiffs' Counsel in litigating the claims prior to transfer of the case from the MDL to the home jurisdiction. This order does not preclude counsel who litigated the case both before transfer to the MDL and after transfer out of the MDL from petitioning the transferor court in a fee shifting case for their reasonable attorney's fees and expenses incurred in litigating the case before and after transfer. Co-Lead Counsel's right to petition this Court for attorney's fees paid by Defendant in a fee-shifting case shall be in addition to any separate award of attorney's fees made in the case based on a percentage of a monetary recovery, which award is subject to the assessment or set-aside set forth in paragraph 3 below, without any improper double recovery.

3. For any settlement or judgment for monetary relief which does not involve any fee-shifting claim and where attorney's fees are awarded or agreed by the parties to be paid based on a percentage of the "gross monetary recovery" (or "common fund"), 15% of the gross monetary recovery (but not to exceed half of the total attorney fee award from the common fund) shall be set aside and placed in the Common Benefit Fund for later distribution to MDL Plaintiffs' Counsel pursuant to separate Court order. (Approved costs and expenses will be paid out of the FXG MDL Common Benefit Fund prior to any distribution for attorney's fees). "Gross monetary recovery" is defined as any payments made by Defendant to Plaintiffs and/or their attorneys as part of any settlement or satisfaction of judgment. "Gross monetary recovery" shall include the present value of any fixed and certain payments to be made in the future.

3. 4. For In cases involving any settlement for monetary relief involving of a fee-shifting claim, or involving a settlement where attorney's fees are negotiated separately from the gross monetary recovery to the Plaintiffs, Defendant and Plaintiffs' counsel in the transferor court shall so inform MDL Plaintiffs' Co-Lead Counsel and Plaintiffs' Co-Lead Counsel shall have the right to petition a Special Master appointed by this Court for review of the fee award for

~~fairness, or, if appropriate, for~~ attorney's fees <u>and costs</u> payable by FXG <u>to MDL Counsel, within twenty days notice, only</u> if the <u>total</u> negotiated attorney ~~fee amount does not adequately reflect~~<u>fees and costs substantially undervalue</u> the time ~~and~~, effort <u>or investment</u> incurred by MDL Plaintiffs' Counsel ~~and/or compensate MDL Plaintiffs' Counsel for their reasonable fees and costs incurred in the MDL~~.  If Plaintiffs' Co-Lead Counsel exercise their right to petition ~~the Court~~ for attorney's fees,<u> the settlement shall not be final or binding and</u> the case shall not be dismissed until after final adjudication of attorney's fees and costs before ~~this Court.  Any attorney's fee awarded by this Court shall be set aside and placed in~~ the FXG MDL Common Benefit Fund for later distribution to MDL Plaintiffs' Counsel pursuant to separate Court order<u>the Special Master appointed by this Court.  Every effort will be made to avoid delay in any agreed upon payment to the Plaintiffs in any such case.  A settlement of attorney's fees and costs in a fee-shifting claim that does not as a whole substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel, but as to which, the parties cannot agree on the proper apportionment of attorney's fees and costs between the Plaintiffs' counsel in the transferor court and the MDL Plaintiffs' Counsel shall be subject to the provisions in paragraph 4, infra.</u>

<u>4.</u>    ~~5.~~<u>For any judgment for monetary relief which does not involve a fee-shifting claim and where attorney's fees are awarded or agreed by the parties to be paid based on a percentage of the "gross monetary recovery" (or "common fund"), and for any settlement resulting in a monetary recovery, all parties shall cooperate in good faith in attempting to resolve all issues relating to the apportionment of fees and costs between the Plaintiffs' counsel in the transferor court and the MDL Plaintiffs' Counsel expeditiously and in a manner which does not delay or restrict the proper payment of claims to the clients.  In the event the parties are unable to</u>

resolve any issue relating to the apportionment of the attorney's fees and costs from such judgments or settlements between the Plaintiffs' counsel in the transferor court and the MDL Plaintiffs' Counsel, the Court strongly encourages the parties to jointly agree to the appointment of a neutral mediator/arbitrator knowledgeable about MDL attorney fee distribution issues and without ties to either side, to mediate the dispute regarding the appropriate allocation of fees and, if the parties are unable to reach prompt agreement through mediation, to submit the issue of the proper apportionment of fees and costs between MDL Plaintiffs' Counsel and the local Plaintiffs' counsel to the jointly selected mediator/arbitrator for binding arbitration under an expedited process.  In reaching a decision, the arbitrator shall consider the respective time, effort, and investment by the MDL Plaintiffs' Counsel during the MDL and the Plaintiffs' counsel in the transferor court in reaching a successful resolution as well as all other appropriate equitable considerations.   The cost of such mediation/arbitration will be borne equally by the local Plaintiffs' attorneys and the Co-Lead Counsel/Plaintiffs' Steering Committee, with each side paying 50% of the mediation/arbitration cost.  If the parties cannot agree within twenty-days from the judgment or settlement to submit the fee apportionment issue to a mediator/arbitrator, this Court will appoint a Special Master to decide the issue of the proper apportionment of fees and costs between MDL Plaintiffs' Counsel and the local Plaintiffs' counsel.  All fees and costs allocated to MDL Plaintiffs' Counsel, whether by agreement or decision of the arbitrator or a Special Master, shall be deposited in the MDL Common Benefit Set Aside Fund established by this Order for the benefit of and future distribution to the MDL Plaintiffs' Counsel. *See supra* footnote 1.   Costs and expenses properly documented and incurred in accordance with guidelines issued by Co-lead counsel at the outset of this case will be paid out of the FXG MDL Common Benefit Fund  in proportionate amounts as funds permit and prior to any distribution

6

for attorney's fees and such distribution is hereby approved without further proceedings. Defendant is directed to withhold the amount of any set-aside (as set forth in paragraphs 1-4 above) from any amount due to be paid to Plaintiffs and their counsel in any case that is or was part of these MDL proceedings, and to pay that amount directly into the FXG MDL Common Benefit Fund as a credit against the settlement or judgment. Defendant is directed to promptly inform Plaintiffs' Co-Lead Counsel of all settlements or judgments in any case that is or was part of the MDL proceeding, as well as to notify Plaintiff's Co-Lead Counsel of all payments into the FXG MDL Common Benefit Fund. If, for any reason, an assessment is not or has not been so withheld, the Plaintiffs and their counsel are jointly responsible for paying the assessment into the Common Benefit Fund promptly.

        5.   6.  Neither Plaintiffs nor Defendant shall file any request for order of dismissal of any Plaintiff's claim in which any monetary recovery is received (by settlement or judgment, with or without trial), and which is subject to this Order, unless this request is accompanied by a certificate of Plaintiff's Co-Lead Counsel and Defendant's counsel that the required assessment has been withheld and deposited into the FXG MDL Common Benefit Fund. Any such request unaccompanied by such a certificate shall be null and void and have no force or effect. Likewise, pursuant to this Court's retention of jurisdiction to address matters related to attorney's fees and costs incurred in the MDL, no transferor court shall dismiss any Plaintiff's claim in which any monetary recovery is received (by settlement or judgment, with or without a trial), and which is subject to this Order unless Plaintiff's and Defendant's counsel have filed a certificate that the appropriate assessment has been set aside and deposited into the FXG MDL Common Benefit Fund pursuant to this Order.

       **C.**    **Application of Order.**

This Common Benefit Set-Aside Order shall apply to all cases that have been[2] or are now pending or later filed in, transferred to, or removed to, this Court as well as all unfiled and tolled cases and claims which are filed by MDL Plaintiffs' Counsel, derivative of the consolidated cases, or rely on the work performed in the MDL and treated as part of the coordinated proceeding known as *In re FedEx Ground Package System, Inc., Employment Practices Litigation*, Cause No. 3:05-MD-527-~~RLM~~RM (MDL 1700).

---

[2] This Order specifically applies to all of the recently remanded cases set forth in this Court's Orders suggesting remand.  Doc. ~~Nos.~~ 2011, 2099, 2160.

**SO ORDERED.**

Dated _____ –, ~~20~~ 2011

_____
~~Chief Judge~~ Hon. Robert L. Miller
United States District Court Judge

Document comparison by Workshare Professional on Friday, January 14, 2011
12:54:10 PM

| Input: | |
|---|---|
| Document 1 ID | file://L:/MOMS/WP/Proposed Order re Plaintiffs Motion Common Benefit Set-Aside Order 12-28-10.DOC |
| Description | Proposed Order re Plaintiffs Motion Common Benefit Set-Aside Order 12-28-10 |
| Document 2 ID | file://L:/MOMS/WP/Corrected Proposed order re Plaintiffs Common Benefit Motion 01-14-11.DOC |
| Description | Corrected Proposed order re Plaintiffs Common Benefit Motion 01-14-11 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 38 |
| Deletions | 41 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 89 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

---

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| ALL CASES | JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

---

## JOINT MOTION FOR APPOINTMENT OF LIAISON COUNSEL

In order to address certain administrative requirements of the Judicial Panel on

Multidistrict Litigation related to the electronic service of documents filed before the Panel,

plaintiffs and defendant FedEx Ground Package System, Inc. respectfully request that the Court

appoint their lead counsel, listed below, as "liaison counsel in MDL 1700 for purposes of

practice before the Judicial Panel on Multidistrict Litigation":

- o For plaintiffs:

    - o Lynn Rossman Faris
      Leonard Carder, LLP
      1330 Broadway, Suite 1450
      Oakland, CA 94612
      Telephone: (510) 272-0169
      Fax: (510) 272-0174
      e-mail: lfaris@leonardcarder.com

    - o Susan E. Ellingstad
      Lockridge Grindal Nauen P.L.L.P.
      100 Washington Avenue South, Suite 2200
      Minneapolis, MN 55401
      Telephone: (612) 339-6900
      Fax: (612) 339-0981
      e-mail: seellingstad@locklaw.com

      o    Robert I. Harwood
            Harwood Feffer LLP
            488 Madison Avenue, 8th Floor
            New York, NY 10022
            Telephone: (212) 935-7400
            Fax: (212) 753-3630
            e-mail: rharwood@hfesq.com

o    For defendants:

      o    Robert M. Schwartz
            O'Melveny & Myers LLP
            1999 Avenue of the Stars
            Suite 700
            Los Angeles, CA 90067-6035
            Telephone: (310) 246-6835
            Fax: (310) 246-6779
            e-mail: rschwartz@omm.com

      o    Chris A. Hollinger
            O'Melveny & Myers LLP
            Two Embarcadero Center
            28th Floor
            San Francisco, CA 94111-3305
            Telephone: (415) 984-8906
            Fax: (415) 984-8701
            e-mail: chollinger@omm.com

Dated:  January 18, 2011.

Respectfully submitted,

By: /s/Chris A. Hollinger        By: /s/Lynn Rossman Faris
    Chris A. Hollinger           Lynn Rossman Faris

Robert M. Schwartz          Lynn Rossman Faris
Chris A. Hollinger            LEONARD CARDER, LLP
O'MELVENY & MYERS LLP     1330 Broadway, Suite 1450
1999 Avenue of the Stars, Suite 700  Oakland, CA 94612
Los Angeles, CA 90067-6035    Tel: (510) 272-0169
Tel: (310) 553-6700          Fax: (510) 272-0174
Fax: (310) 246-6779

Thomas J. Brunner          Susan E. Ellingstad
Alison G. Fox             LOCKRIDGE GRINDAL NAUEN P.L.L.P.

BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Lead and Liaison Counsel*

100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

*Plaintiff's Lead and Liaison Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on the 18th day of January 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Chris A. Hollinger

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

-------------------------------------------------------------------

)
In re FEDEX GROUND PACKAGE           )
SYSTEM, INC., EMPLOYMENT             )          Case No. 3:05-MD-527-RM
PRACTICES LITIGATION                 )              (MDL 1700)
-------------------------------------------------------------------)
)
THIS DOCUMENT RELATES TO:            )
)            JUDGE MILLER
ALL ACTIONS                          )
)
-------------------------------------------------------------------)

---

**PLAINTIFFS' AND DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
JOINT STATUS REPORT**

---

Pursuant to the December 13, 2010 Opinion and Order [Doc. No. 2239)] ("December 13

Order"), Plaintiffs and Defendant FedEx Ground Package System, Inc. ("FXG") submit the

following Joint Status Report listing "further matters the court may have overlooked today and

that require disposition."  (*Id.* at 176.)  For the Court's convenience, this Joint Status Report also

lists outstanding matters that relate to motions filed since the December 13th Order.

1.    <u>Plaintiffs' Motion for Entry of Common Benefit Set-Aside Order</u>.  On

December 28, 2010, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee filed a

Motion for Entry of Common Benefit Set-Aside Order.  (Doc. Nos. 2281-83.)  In its March 2,

2010 Suggestion of Remand, Opinion and Order, the Court retained jurisdiction to address this

motion.  (Doc. No. 2011 at 11-12.)  Pursuant to the schedule established by the Court (*see* Doc.

No. 2330), objections to the Motion were filed on January 12, 2011 by the South Dakota

Plaintiffs (Doc. No. 2368) and by FXG (Doc. No. 2369).  As a result of a clerical error, Plaintiffs

submitted an erroneous proposed order to the Court; therefore, on January 14, 2011, Plaintiffs'

Co-Lead Counsel and Plaintiffs' Steering Committee submitted the correct Proposed Order with

respect to their Motion.  FXG has, by separate motion filed on January 17, 2011 (Doc.

No. 2405), requested that it be permitted to file its response to the January 14 submission by no

later than January 20, 2011; Plaintiffs have no opposition to this request.  Plaintiffs' Co-Lead

Counsel and Plaintiffs' Steering Committee will file a Reply Brief regarding their Motion to

respond to both of the objections in the time allowed by the Court's rules.

      2.     <u>*Carlson* (Florida) Plaintiffs' Motion for Reconsideration</u>.  Pursuant to Rule 59(e)

of the Federal Rules of Civil Procedure, the Florida (*Carlson*) Plaintiffs have filed a Motion to

Reconsider, Alter or Amend the Court's Order and Judgment.  (*See* Doc. Nos. 2365 & 2366.)

FXG's response to the Florida Plaintiffs' Motion is due on January 24, 2011, and the Florida

Plaintiffs' reply (if any) is due on February 3, 2011.  At that time, the motion will be fully-

briefed and ripe for the Court's decision.

      3.     <u>FXG's Motion for Entry of Judgment Under Rule 54(b)</u>.  On January 12, 2011,

FXG filed a motion for the entry of partial final judgment, pursuant to Rule 54(b) of the Federal

Rules of Civil Procedure, as to those claims that were resolved in the December 13 Order in the

following cases:  *Harris* (Arkansas); *Alexander* (California); *Coleman* (Kentucky); *DeCesare*

(Nevada); *Gennell* (New Hampshire); *Kelly* (Ohio); *Leighter* and *Slayman* (Oregon); *Humphries*

(Texas); *Huerta* and *Pedrazzi* (California); *Wallace* (Ohio); *Gentle* (Alabama); and, if the Court

were to grant Plaintiffs' Motion for Reconsideration (*see* ¶ 2, *supra*), *Carlson* (Florida).  (*See*

Doc. No. 2370.)  Plaintiffs' opposition to the Motion is due on January 31, 2011, and FXG's

reply is due on February 10, 2011.  At that time, the Motion will be fully-briefed and ripe for the

Court's decision.

4.    <u>FXG's Motion for Jury Trial</u>.  On January 20, 2010, FXG filed its Amended
Motion for Trials by Jury, pursuant to Rule 39(b) of the Federal Rules of Civil Procedure, with
respect to twelve cases.  (*See* Doc. No. 1987.)  On January 21, 2010, Plaintiffs filed their
opposition to that motion.  (*See* Doc. No. 1989.)  On February 2, 2010, FXG filed its Reply.  (*See*
Doc. No. 1998.)  On December 13, the Court denied FXG's motion for trial by jury as moot.
(Doc. No. 2239 at 176.)  It is FXG's position that the motion before the Court was indeed moot,
but only as to the cases covered by FXG's motion that had already been remanded or were
completely resolved by the December 13 Order, and FXG respectfully requests that the Court
clarify its December 13 Order to indicate that, with respect to six cases (i.e, *Pedrazzi*, *Coleman*,
*DeCesare*, *Farrell*, *Johnson*, and *Kelly*), the MDL Court's denial of FXG's motion for jury trial
as moot is without prejudice to FXG's right to renew the motion in the transferor courts
following remand.  Plaintiffs submit that, for the reasons explained in their opposition to the
motion and because no timely motion for reconsideration was filed, no such correction is needed
or appropriate.

5.    <u>New Maine/FLSA Class/Collective Action (*Scovil*)</u>.  The parties wish to advise
the Court that, on December 16, 2010, a new class- and collective-action lawsuit was filed in the
United States District Court for the District of Maine, asserting claims based on alleged
misclassification of FXG contractors.  *Scovil, et al. v. FedEx Ground Package Sys., Inc.*, Case
No. 1:10-cv-00515-DBH (D. Me.).  On December 30, 2010, the Panel issued a Conditional
Transfer Order (CTO-31).  The *Scovil* Plaintiffs have filed a Notice of Opposition to the transfer.
Their motion to vacate the Panel's Conditional Transfer Order is due January 21, 2011, and
FXG's opposition is due February 11, 2011.

* * *

In addition to the foregoing, FXG separately submits the following:

<u>Federal Rule of Civil Procedure 23(c)(3).</u>  FXG intends to file a motion under Rule 60(a) to seek correction of the Court's judgments to conform to the technical requirements of Rule 23(c)(3) with respect to the judgment in Florida (*Carlson*) (Doc. No. 2242) and all other cases with certified classes.  Plaintiffs will oppose such motion on procedural and substantive grounds.


Dated:  January 18, 2011

Respectfully submitted,

By: /s/Chris A. Hollinger
    Chris A. Hollinger

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

*Defendant's Lead and Liaison Counsel*

By: /s/Lynn Rossman Faris
    Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC

131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

*Plaintiffs' Lead and Liaison Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

      The undersigned hereby certifies that on the 18th day of January, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

      Susan E. Ellingstad
      seellingstad@locklaw.com

      Robert I. Harwood
      rharwood@whesq.com

      Lynn R. Faris
      lfaris@leonardcarder.com

      Beth A. Ross
      bross@leonardcarder.com

      Peter J. Agostino
      agostino@aaklaw.com

      By: <u>/s/Chris A. Hollinger</u>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____
                                   )
In re FEDEX GROUND PACKAGE          )    CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT            )           (MDL-1700)
PRACTICES LITIGATION                )
---------------------------------------------- )
THIS DOCUMENT RELATES TO:           )
                                    )
ALL CASES                           )
_____   )
                                    )

ORDER

The court GRANTS FedEx's motion for leave to file an amended response to

plaintiffs' motion for entry of common benefit set-aside order [Doc. No. 2405].

FedEx's amended response shall be filed within seven days of entry of this order.

The plaintiffs' reply, if any, shall be filed within seven days of FedEx's response.

Local Rule 7.1.

SO ORDERED.

ENTERED: January 18, 2011

                              ___/s/ Robert L. Miller, Jr._____
                              Judge
                              United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

---

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| ------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | |
| ALL CASES | ) ) | |

ORDER

The parties have filed a joint motion for appointment of liaison counsel [Doc.
No. 2406], in order to address administrative requirements of the Judicial Panel
on Multidistrict Litigation related to the electronic service of documents filed
before the Panel. The court GRANTS the motion. It is ORDERED that the following
attorneys are appointed as liaison counsel in this MDL-1700 litigation:

For the Plaintiffs:

- Lynn Rossman Faris
  Leonard Carder, LLP
  1330 Broadway, Suite 1450
  Oakland, CA 94612
  Telephone: (510) 272-0169
  Fax: (510) 272-0174
  e-mail: lfaris@leonardcarder.com

- Susan E. Ellingstad
  Lockridge Grindal Nauen P.L.L.P.
  100 Washington Avenue South, Suite 2200
  Minneapolis, MN 55401
  Telephone: (612) 339-6900
  Fax: (612) 339-0981
  e-mail: seellingstad@locklaw.com

- Robert I. Harwood

Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Fax: (212) 753-3630
e-mail: rharwood@hfesq.com

For the Defendants

•   Robert M. Schwartz
    O'Melveny & Myers LLP
    1999 Avenue of the Stars
    Suite 700
    Los Angeles, CA 90067-6035
    Telephone: (310) 246-6835
    Fax: (310) 246-6779
    e-mail: rschwartz@omm.com

•   Chris A. Hollinger
    O'Melveny & Myers LLP
    Two Embarcadero Center
    28th Floor
    San Francisco, CA 94111-3305
    Telephone: (415) 984-8906
    Fax: (415) 984-8701
    e-mail: chollinger@omm.com

SO ORDERED.

ENTERED: <u>January 19, 2011</u>

<u>      /s/ Robert L. Miller, Jr.      </u>
Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

|  |  |  |
|---|---|---|
| ------------------------------------------------------------- | ) | |
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| ------------------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
|  | ) | |
| ALL ACTIONS | ) | |
| ------------------------------------------------------------- | ) | |

**MDL PLAINTIFFS' COUNSEL'S REPLY TO SOUTH DAKOTA PLAINTIFFS'**
**MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR ENTRY OF**
**COMMON BENEFIT SET-ASIDE ORDER**

## INTRODUCTION

Seeking to be exempted from MDL Plaintiffs' Counsel's proposed common benefit set-aside order, South Dakota Plaintiffs' counsel argues that because the Court has already remanded the case to the District of South Dakota, it has "lost" its jurisdiction to apply the common benefit order to that case. But South Dakota Plaintiffs' counsel cites no apposite authority for his argument and to the contrary, the legal authority counsel relies on clearly holds that so long as a case is transferred to an MDL court, the MDL court has continuing jurisdiction to apply a common benefit order to the case even after it is remanded.

Applying the proposed common benefit order to South Dakota Plaintiffs would neither usurp the authority of the District of South Dakota nor otherwise interfere with the conduct of the litigation before that court as argued by South Dakota Plaintiffs' counsel. Indeed, it is well settled that this Court is the only court that can effectively handle the issue of compensating MDL Plaintiffs' Counsel for the work they have performed for the common benefit of all MDL Plaintiffs while their cases were before the MDL. To accept South Dakota Plaintiffs' counsel's argument would mean that MDL Plaintiffs' Counsel would be relegated to appearing all across the country in each transferor court to present requests for relief. This is not the law.

There also is no requirement that a case in an MDL be certified as a class action before a common benefit assessment can be applied to it. Nor is there any requirement that a common benefit fund be funded by a case-wide settlement during the pendency of the MDL. Indeed, the reason a common benefit fund is created is so that, when cases previously before the MDL are settled or proceed to judgment after remand, the common benefit fund can be funded by a percentage of these later recoveries.

Finally, the Court should reject South Dakota Plaintiffs' counsel's argument that the proposed common benefit order should not apply to the South Dakota case because South

Dakota Plaintiffs did not receive a "substantial benefit" from the work performed by MDL Plaintiffs' Counsel on their behalf during the MDL. In entering a common benefit order, an MDL court should not assess the degree to which individual plaintiffs have been benefitted by MDL counsel's work; instead, the focus should be on the benefit MDL counsel has conferred on all plaintiffs collectively. In addition, given the substantial discovery, expert work, and other pretrial work completed by MDL Plaintiffs' Counsel in this MDL, including a fully briefed summary judgment motion, there can be no doubt about the "substantial benefit" MDL Plaintiffs' Counsel has conferred on South Dakota Plaintiffs. Plaintiffs' counsel's argument that the case is in the same position today as it was when it was filed is disingenuous and the motive transparent.

## **ARGUMENT**

I.    **ALTHOUGH THE COURT HAS REMANDED THE SOUTH DAKOTA ACTION, IT STILL MAY REQUIRE SOUTH DAKOTA PLAINTIFFS' COUNSEL TO COMPLY WITH THE PROPOSED COMMON BENEFIT SET-ASIDE ORDER.**

South Dakota Plaintiffs' counsel argues that "since the Court has already remanded the South Dakota Plaintiffs' case back to South Dakota Federal District Court, those plaintiffs are no longer before this Court and the Court does not have authority to enter orders binding them." SD Pls. Mem. at 3; *id*. at 5 (stating that "[w]hile this Court may have had jurisdiction to order the South Dakota Plaintiffs to participate in a common benefit fund . . . that authority was lost when the case was remanded to South Dakota Federal District Court."). Counsel's contention that the Court lost jurisdiction to enter the proposed common benefit order in this case is simply incorrect.

### A.   In Its August 12, 2010 Remand Order, The Court Expressly Reserved Jurisdiction To Enter A Common Benefit Order That Applied To South Dakota Plaintiffs After Remand.

MDL Plaintiffs' Counsel originally requested in the February 22, 2010 Joint Proposed Pretrial Order in the *Johnson* (IA) action that the Court consider "issu[ing] an order for the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for MDL administration and common benefit of all Plaintiffs in this complex litigation," and proposed to brief the issue of a common benefit order before the Court remanded the *Johnson* action. *See* Doc. No. 2008 at 8-9. When suggesting remand of *Johnson*, however, the Court decided to defer the issue of the common benefit order, noting that an "award of attorney's fees . . . is a 'collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits.'" Doc. No. 2011 at 11 (quoting *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 274 (E.D.N.Y. 2006)). The Court, therefore, suggested to the JPML that the *Johnson* action be remanded but stated it would "retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL Plaintiffs." *Id*. at 12. No party, including South Dakota Plaintiffs' counsel, objected to the Court's explicitly reserved authority to enter a common benefit order at a later date.

Five months later, when suggesting remand of additional non-certified cases, the Court again held that it would "retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL plaintiffs." Doc. No. 2099, at 10. Again, no party objected to the Court's expressly reserved authority to enter a common benefit order at a later date that applied to these now-remanded cases. Only after MDL Plaintiffs' Counsel's motion for entry of a common benefit set-aside order did South Dakota counsel object to the

434221.5

3

Court's previously ordered retention of jurisdiction over their case for this purpose.  SD Pls. Mem. at 2.

The Court should not condone South Dakota Plaintiffs' counsel's "gotcha" litigation tactic, which transparently seeks a potential windfall in attorney's fees.  MDL Plaintiffs' Counsel timely raised the issue of a common benefit order before the Court remanded any case to its transferor court.  Doc. No. 2008 at 8-9.  The Court then expressly reserved jurisdiction to decide the issue of the proposed common benefit order.  Doc. Nos. 2011, 2099.  South Dakota Plaintiffs' counsel did not object to the Court's reservation of jurisdiction and thus has waived any objection now.

> **B.    The Cases Cited By South Dakota Plaintiffs' Counsel Support MDL Plaintiffs' Counsel's Argument That The Proposed Common Benefit Order Should Apply To All Plaintiffs Whose Cases Were At Any Time Consolidated For Pretrial Proceedings Before The Court.**

South Dakota Plaintiffs' counsel first relies on *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162 (4th Cir. 1992), arguing that because "the Court has already remanded the South Dakota Plaintiffs' case back to South Dakota Federal District Court, those plaintiffs are no longer before this Court and the Court does not have authority to enter orders binding them."  SD Pls. Mem. at 3.  But *In re Showa Denko* stands for no such principle.  There, the Fourth Circuit addressed the propriety of an MDL court's common benefit order that "attempt[ed] to reach not only plaintiffs in cases pending in the multi-district litigation, but also plaintiffs in federal cases not transferred to the multidistrict litigation, plaintiffs in some 683 pending state cases, and approximately 180 claimants known [to defendant] who have not yet filed suit in any court."  *Id*. at 164 (emphases added).

The *In re Showa Denko* court first noted that an MDL court's "jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties

to the cases transferred, and any attempt without service of process to reach others who are unrelated is beyond the court's power." *Id*. at 165-66. According to the court, the problem with the MDL's court's common benefit order was that it applied not just to cases that had been transferred to the MDL, but also "to actions venued in state courts, untransferred federal cases, and unfiled claims in which any MDL defendant is a party or payor." *Id*. at 166 (emphasis added).

Here, South Dakota Plaintiffs were before this Court for "five years and two days" before the Court remanded their case to the District of South Dakota. SD Pls. Mem. at 2. As such, they do not fall within the category of "untransferred federal cases" the *In re Showa Denko* court found could not be subject to an MDL court's common benefit order. Contrary to South Dakota Plaintiffs' counsel's argument, the *In re Showa Denko* court did not suggest that plaintiffs whose cases were at one time before an MDL court like South Dakota Plaintiffs here could not be subject to the MDL court's common benefit order entered after remand of the case to the transferor court.

South Dakota Plaintiffs' counsel also contends that *Walitalo v. Iacocca*, 968 F.2d 741 (8th Cir. 1992), stands for the proposition that an MDL court must enter a common benefit order before remanding a case to the transferor court for the common benefit order to apply to the remanded case. SD Pls. Mem. at 3 (contending that a MDL court's orders "remain binding if the case is sent back to the transferor court" but only if the MDL court enters the order "prior to transfer of the case"). In fact, *Walitalo* supports MDL Plaintiffs' Counsel's argument that the proposed common benefit order should apply to all cases that were at any time transferred to this Court for pretrial proceedings.

In *Walitalo*, the MDL court entered an order regarding the payment of attorney's fees and costs to MDL lead and liaison counsel late in the litigation, after lead and liaison counsel had performed duties for the MDL plaintiffs for more than two years. 968 F.2d at 746. Before the MDL court entered its order addressing compensation for lead and liaison counsel, twenty-seven cases had already settled as the result of certain plaintiffs accepting defendant's offers of judgment. *Id*. at 744. By the time the MDL court entered its order regarding the payment of attorney's fees and costs to MDL counsel, the defendant also had settled four additional consolidated cases, which cases the parties dismissed by entering into stipulations for dismissal under Fed. R. Civ. P. 41(a)(1)(ii). *Id*. at 745. Although the *Walitalo* court disagreed with various aspects of the MDL court's order regarding MDL counsel compensation (i.e., who should pay the compensation and how the compensation should be calculated), the court affirmed the order's application to the cases dismissed <u>before</u> the MDL court entered its compensation order. *Id*. at 747-50.

In doing so, the *Walitalo* court rejected as "without merit" the argument "that the parties to a case can avoid liability for their share of court-appointed counsels' fees by filing a stipulation of dismissal under Federal Rule of Civil Procedure 41(a)(1)(ii)": "If such a rule existed, a district court's power to appoint attorneys to act on behalf of other attorneys and parties in complex litigation would be meaningless. Attorneys would be unwilling to assume this position if the parties to the litigation could avoid compensating them simply by settling and filing a stipulation of dismissal." *Id*. at 747 n.11. Thus, under *Walitalo*, if it is proper for an MDL court to require parties who have already dismissed their cases to be responsible for compensating MDL counsel, there certainly is no merit to the claim made by South Dakota Plaintiffs' counsel here that this Court "lost" its authority to apply the proposed common benefit

order to South Dakota Plaintiffs "when the case was remanded to South Dakota Federal District Court."  SD Pls. Mem. at 6.

Finally, South Dakota Plaintiffs' counsel contends that *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 274 (E.D.N.Y. 2006), stands for the proposition that an MDL court is "required to make [a determination regarding compensation for MDL counsel] while the case is currently pending in its court," and that "[b]y the clear language of the opinion, the *Zyprexa* court's common benefit fund did not extend to cases that had been remanded."  SD Pls. Mem. at 5.  The *Zyprexa* court said no such thing in its order establishing the common benefit fund.

What the *Zyprexa* court did say was that its common benefit order was "binding on all cases pending before [the MDL court], and those which may be transferred to it as tag-along matters, notwithstanding that those cases may ultimately be adjudicated in the federal and state courts in which they originated. . . .  The common benefit fund fee set-aside imposed by this order shall apply to all cases pending – or to be pending – in this MDL, regardless of whether any of those cases are eventually remanded to state court or transferred to another federal court." 467 F. Supp. 2d at 273-74.

Thus, the *Zyprexa* court's order supports MDL Plaintiffs' Counsel's argument that the proposed common benefit order should apply to all cases that were at any time transferred to the Court for coordinated and consolidated pretrial proceedings, regardless of whether the Court has already remanded them to their transferor courts for trial.[1]  *Id.* at 274 ("It is well established that

---

[1] South Dakota Plaintiffs' counsel also cites *Hartland v. Alaska Airlines*, 544 F.2d 992 (9th Cir. 1976) and *In re Genetically Modified Rice Litig.*, No. 4:06 MD 1811 CDP, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010), contending that they "actually support[] the South Dakota Plaintiffs' position here."  SD Pls. Mem. at 5.  Again, neither does.  It is true that the *In re Genetically Modified Rice* court did decline to extend its common benefit order to state-court cases that had not been removed to federal court, much less transferred to the MDL court.  2010 WL 716190, at *1 ("I do not have jurisdiction to order hold-backs [in] state cases.").  But the *In*

434221.5                                                                                          7

a federal court may consider collateral issues after an action is no longer pending . . . ." (quotation omitted)).

## II. APPLYING THE PROPOSED COMMON BENEFIT ORDER TO SOUTH DAKOTA PLAINTIFFS WOULD NEITHER USURP NOR INTERFERE WITH THE TRANSFEROR COURT'S CONDUCT OF THE LITIGATION AFTER REMAND.

Citing cases involving attorney's fee awards in cases improvidently removed and later remanded to <u>state court</u>, South Dakota Plaintiffs' counsel also argues that in only "very limited circumstances" can a federal court "retain jurisdiction to issue orders in a case after remand regarding imposition of attorney's fees." SD Pls. Mem. at 3. But not only is this line of argument inapposite for the obvious reason that this Court did not remand the South Dakota action to state court, the cases cited by South Dakota Plaintiffs' counsel do not hold that an MDL court lacks authority to apply a common benefit order to cases that the MDL court has previously remanded to their transferor courts.[2]

_____

*re Genetically Modified Rice* court found no jurisdictional impediment to applying its order to federal cases that were, at the time the order was entered, not yet transferred to the MDL court, based on the assumption that the non-transferred cases would at some point be part of the MDL. *Id.* at *4 n.3 ("I . . . see no difficulty extending this order to all federal cases, whether they are now before me or are transferred here in the future."). Thus, *In re Genetically Modified Rice* stands for the simple proposition that a MDL court may apply a common benefit order to certain parties so long as the affected parties <u>are at some point</u> before the MDL court.

As for *Hartland*, it, too, does not support South Dakota Plaintiffs' counsel's argument that the Court cannot compel them to contribute to the proposed common benefit fund. In *Hartland*, the Ninth Circuit held that plaintiffs who had not filed a case <u>in any court</u> or had filed their case in Alaska <u>state court</u> could not be compelled to contribute a percentage of their settlements to a common benefit fund established by the MDL court in the MDL of related cases. 544 F.2d at 1001-02. It was undisputed that the *Hartland* plaintiffs were never parties to the MDL at any point in time before they settled their cases.

[2] *Mints v. Educ. Testing Serv.*, 99 F.3d 1253, 1258 (3d Cir. 1996), held that a district court may award fees under 28 U.S.C. § 1447(c) after remanding a case to state court, and noted that "section 1447(c), by providing that a court 'may require payment' of costs and attorney's fees incurred as a result of the removal does not imply that the court cannot enter an order for payment of such costs and fees as some later time," even after remand. *Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 445 (9th Cir. 1992), *overruling on others grounds recognized by*

And South Dakota Plaintiffs' counsel's contention that federal courts may only enter attorney's fee orders to address "specific conduct that happened while the case was under [sic] its jurisdiction," supports MDL Plaintiffs' Counsel's argument that its proposed common benefit order should apply to all cases that were before this Court prior to remand. SD Pls. Mem. at 4. Indeed, the proposed common benefit order seeks only an assessment for attorney's fees in the South Dakota case for the work performed by MDL Plaintiffs' Counsel on the Plaintiffs' behalf while their case was pending in this MDL. *See In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 127 (2d Cir. 2010) (Kaplan, J., concurring) (a common benefit order imposing an assessment to compensate MDL counsel is "even less related to the ultimate merits than orders awarding attorney's fees, which are collateral matters over which a court retains jurisdiction even if it ultimately is determined to lack subject matter jurisdiction").

Citing no legal authority, South Dakota Plaintiffs' counsel argues that applying the proposed common benefit order to the case would somehow "usurp[] the power of the transferor court." SD Pls. Mem. at 4. Counsel suggests that the District of South Dakota should be the

---

*Santos v. Harver Co.*, No. CV08-1206-C, 2009 WL 2184543 (D. Or. May 29, 2009), reached the same conclusion as the *Mints* court, noting that although the court had not previously "addressed the specific question whether a district court retains jurisdiction to award costs and fees pursuant to [28 U.S.C. §] 1447(c) after remand, it is clear that an award of attorney's fees is a collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits" by virtue of previously remanding the case to state court. *Willy v. Coastal Corp.*, 503 U.S. 131, 132 (1992), on which both *Mints* and *Moore* relied in reaching their decisions, held that "a federal district court may impose sanctions pursuant to Rule 11 . . . in a case in which the district court is later determined to be without subject-matter jurisdiction."

In none of these cases did the courts suggest (much less hold) that a MDL court "loses" jurisdiction to apply a common benefit order to parties who were previously before the MDL court but whose cases were remanded before the MDL court entered the common benefit order. In fact, as the *In re Zyprexa* court pointed out, the Supreme Court in *Willy* broadly stated that "a federal court may consider collateral issues after an action is no longer pending . . . . Such an order implicates no constitutional concern because it 'does not signify a district court's assessment of the legal merits of the complaint.'" *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d at 274 (quoting *Willy*, 503 U.S. at 138).

only court responsible for "making determinations as to whether, as a matter of equity or some other principal [sic], the movants are entitled to share in any recovery that is obtained in this matter." *Id.* But this argument flies in the face of the numerous cases cited by MDL Plaintiffs' Counsel in their opening brief, all of which are grounded in the well-settled principle that the MDL court is the <u>only court</u> that can effectively handle the issue of MDL counsel compensation. *See Walitalo*, 968 F.2d at 747 (stating that the MDL court properly "specif[ied] how the originating trial courts should calculate the amount of lead and liaison counsel's fees in those cases remanded for trial . . . the [MDL] court appointed lead and liaison counsel and thus had the authority to determine the amount of their compensation"); *In re Air Crash Disaster at Fl. Everglades*, 549 F.2d 1006, 1019 (5th Cir. 1977) (stating that the MDL court is the only court "that c[an] effectively handle the [MDL counsel] fee matter").

Indeed, one of the primary purposes of the MDL court establishing a common benefit fund is to foreclose the need – advocated by South Dakota Plaintiffs' counsel here – for MDL Plaintiffs' Counsel to have to petition in each of the transferor courts for attorney's fees at the conclusion of each case. *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1019 (noting that it would be "unfeasible and irrational, and demeaning to the authority of the [MDL] court, to remit [MDL counsel] to appearing all over the country . . . to present prayers for compensation"); *In re Worldcom, Inc. Sec. Litig.*, No. 02-CIV-3288, 2004 WL 2549682, *4 (S.D.N.Y. Nov. 10, 2004) (emphasizing the importance of establishing a common benefit fund so that MDL counsel need not "pursue separate compensation claims in any number of jurisdictions around the country").

III.    **AN MDL COURT MAY APPLY A COMMON BENEFIT ORDER TO ALL MDL CASES REGARDLESS OF WHETHER THE CASES ARE CERTIFIED AS CLASS ACTIONS AND REGARDLESS OF WHETHER OR NOT A "COMMON FUND" WAS CREATED DURING THE MDL.**

South Dakota Plaintiffs' counsel also contends "that when a case is not certified as a class action, the plaintiff is not entitled to recover attorney's fees under the theory of [sic] common fund." SD Pls. Mem. at 6. Counsel claims that because the "South Dakota case was not certified as a class, and the movants have not established any lump-sum to which a common fund exception could be applied . . . any such order is not permitted under South Dakota law." *Id.*

As an initial matter, the authority of an MDL court to enter a common benefit order and apply it to parties whose cases have been transferred to it by the JPML is not governed by state law. Rather, as MDL Plaintiffs' Counsel have extensively briefed, a MDL court's authority to enter a common benefit order is derived from the Supreme Court's common benefit doctrine jurisprudence as well as the MDL court's managerial power to control the consolidated litigation. MDL Pls. Mem. at 11.

Second, South Dakota Plaintiffs' counsel's claim that the South Dakota Plaintiffs need not contribute to the proposed common benefit fund because the Court declined to certify a class of South Dakota drivers ignores applicable case law. SD Pls. Mem. at 6. In their opening brief, MDL Plaintiffs' Counsel cited scores of non-class MDLs (mostly MDLs in the common-disaster and mass-tort context) where, despite their non-class status, they had been transferred to an MDL court for coordinated and consolidated pretrial proceedings. *See also generally In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 532 (3d Cir. 2009) (affirming MDL court's award of attorney's fees to mass-tort MDL counsel, in part, from common benefit fund previously established by the court and funded by a percentage of the fees due to the individual lawyers for opt-out claimants); Manual for Complex Litigation § 20.132 (4th ed. 2004) ("Class counsel generally have the

benefit of the common fund doctrine to support payment for their efforts on behalf of the class or consolidated litigants." (emphasis added)).

Third, the cases South Dakota Plaintiffs' counsel cites again undercut his own argument. *Walitalo v. Iacocca*, for example, addressed the creation of a common benefit fund in a non-class MDL comprised of opt-out plaintiffs who had filed 65 individual cases across the United States after the underlying class case settled. 968 F.2d at 743-44. The JPML transferred all of the individual opt-out cases to the MDL court for coordinated and consolidated pretrial proceedings, and the MDL court appointed lead and liaison counsel to act on the collective behalf of all plaintiffs. *Id*. *In re Showa Denko* and *In re Zyprexa*, discussed at length above, also were non-class cases. *E.g.*, *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d at 262, 265 (describing the *Zyprexa* MDL as a "quasi-class action" and "consolidated national mass litigation").

The other state court cases cited by South Dakota Plaintiffs' counsel are simply inapposite. *Private Truck Council of Am. v. New Hampshire*, 517 A.2d 1150, 1157 (N.H. 1986), held that the prevailing plaintiffs were not entitled to attorney's fees and costs under 42 U.S.C. § 1983 because the defendant's commerce-clause violation was not redressable under the statute. The court, citing no legal authority, noted that "the plaintiffs have not demonstrated a common law right to attorney's fees under the theory of a 'common fund' for the benefit of a class because [the] action has not been properly certified as a class action." *Id*. Even if that proposition is a correct statement of New Hampshire law, it has no applicability to this case, a federal MDL, where the Court has appointed MDL counsel to act on behalf of all cases in the MDL regardless of whether classes have been certified in any of the state cases.

In *Mound Hardware v. City of Spokane*, No. 16487-0-III, 1997 WL 731947, *5 (Wash. Ct. App. Nov. 25, 1997), the court affirmed the district court's decision not to certify the case as

a class action.  In finding the plaintiff was not entitled to attorney's fees under the "common

fund/common benefit theory," the court in fact noted that that doctrine "is a recognized equitable

ground that may support an award of attorney fees if the prevailing party preserves, creates, or

increases a common fund for the benefit of others as well as themselves."  *Id*.  The *Mound

Hardware* court's statement supports MDL Plaintiffs' Counsel's argument that establishing a

common benefit fund in this MDL is appropriate because of the work MDL Plaintiffs' Counsel

have performed for all Plaintiffs in this MDL.

Finally, in *Van Emmerik v. Mont. Dakota Utils. Co.*, 332 N.W.2d 279, 282 (S.D. 1983),

the South Dakota Supreme Court noted the general rule that "[a]pplication of the common fund

exception is appropriate when the classes of persons benefitted by the lawsuit are small in

number easily identifiable and the benefits can be traced with some accuracy."  The court held,

however, that because the "common fund" from which plaintiff sought to recover attorney's fees

did not exist, there was no basis for awarding attorney's fees to the plaintiff.  *Id*. at 283.  Relying

on *Van Emmerik*, South Dakota Plaintiffs claim that because MDL Plaintiffs' Counsel "have not

established any lump-sum to which a common fund exception [sic] could be applied," the

proposed common benefit order cannot apply to them.  SD Pls. Mem. at 6.

But the proposed common benefit order seeks to fund such a common benefit fund to

compensate MDL Plaintiffs' Counsel for the work they have performed in this MDL.  The fact

that no common fund yet exists as the result of the South Dakota litigation (or any other case in

this MDL) is beside the point.  *E.g.*, *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at

*7 (request to establish a common benefit fund was not premature because "the leadership group

has already conferred a substantial benefit upon all of the other plaintiffs," even though plaintiffs

had not yet recovered anything from the defendant); *In re Zyprexa Prods. Liab. Litig.*, 467 F.

13

Supp. 2d at 267 ("Even if no common benefit compensation had yet been earned, there would be

a need to put a hold-back method into place promptly.").[3]

## IV. THE COURT SHOULD EVALUATE THE BENEFIT TO ALL MDL PLAINTIFFS OF MDL PLAINTIFFS' COUNSEL'S WORK, AND IN ANY EVENT, THE BENEFIT TO SOUTH DAKOTA PLAINTIFFS HAS BEEN SUBSTANTIAL.

South Dakota Plaintiffs' counsel last argues that the Court should not require him to

abide by the proposed common benefit order because "movants cannot meet their burden of

establishing that they have conferred a substantial benefit on the South Dakota Plaintiffs." SD

Pls. Mem. at 7. Claiming that the Court denied South Dakota Plaintiffs' motions for class

certification and summary adjudication, South Dakota Plaintiffs' counsel also contends that "any

benefit conferred upon the South Dakota Plaintiffs as a result of the efforts of the movants is

pure speculation." *Id.*

First, South Dakota Plaintiffs' counsel incorrectly states that the South Dakota Plaintiffs'

motion for summary adjudication was "unsuccessful." SD Pls. Mem. at 2. In the Court's August

12, 2010 Order suggesting remand of the South Dakota action, the Court noted that even though

it had granted partial summary judgment in Illinois Plaintiffs' favor under an "ABC" test, it was

---

[3] South Dakota Plaintiffs' counsel also argues that "given that several cases have been remanded, including the South Dakota case, movants will not be able to demonstrate the establishment of a common fund, as each state case will be concluded on its own merits." SD Pls. Mem. at 6-7. If South Dakota Plaintiffs' counsel is arguing that there can be no common benefit assessment unless a common fund is created by way of settlement(s) <u>during the MDL</u>, there is no authority for that statement. *See In re Diet Drugs*, 582 F.3d at 533 (affirming district court's award of attorneys fees to MDL counsel from four distinct "pots," which included both MDL settlement funds and a separate "MDL Fee and Cost Account," which was funded by assessments on payments made by defendant to any plaintiff whose case was transferred to the MDL); David F. Herr, Annotated Manual for Complex Litigation §22.927, at 678-79 (4th ed. 2010) ("If there is a combination of individual settlements and a class-wide settlement, the judge sometimes orders individual plaintiffs' lawyers to pay a certain percentage of fees they receive into a common fund to contribute to the fees of the class counsel, whose work in discovery and trial preparation contributed to the settlement of the individual cases as well.").

not "inclined to similarly address the remaining cases involving the 'AB' or 'ABC' test [including South Dakota] to first determine if they can be resolved by common evidence." Doc. No. 2099 at 7. Thus, the Court did not rule on South Dakota Plaintiffs' motion for summary adjudication; that motion remains fully briefed and is currently pending before the District of South Dakota. *Id*. at 8-9. In addition, Illinois Plaintiffs' success in obtaining summary adjudication on their claims under a similar ABC test provides persuasive authority for the District of South Dakota to grant summary judgment in favor of South Dakota Plaintiffs.

Leaving aside counsel's misstatement of the current procedural posture, South Dakota Plaintiffs' counsel's own cases again undercut his argument that this Court should focus exclusively on the results obtained by MDL Plaintiffs' Counsel for South Dakota Plaintiffs while their case was pending in this MDL. For example, in *In re Genetically Modified Rice Litig.*, the court addressed certain MDL plaintiffs' arguments "that a [common benefit] trust is inappropriate because they have not received a substantial benefit from the leadership group's work." 2010 WL 716190, at *5. The Court dismissed the argument as "simply incorrect": "Substantial benefit should be determined with respect to the plaintiffs as a whole, not with respect to individual plaintiffs." *Id*. (citing *In re Diet Drugs*, 582 F.3d at 544-45, *In re Clearsky Shipping Corp.*, No. Civ. A 96-4099, 2003 WL 1563820, *1-4 (E.D. La. Feb. 26, 2003)).

South Dakota Plaintiffs' counsel's suggestion that MDL Plaintiffs' Counsel have done nothing to advance the South Dakota case from the date the complaint was filed is belied by the extraordinary time and resources expended by MDL Plaintiffs' Counsel on behalf of all MDL Plaintiffs, including South Dakota Plaintiffs, in discovery and non-dispositive motion practice to make these important motions even possible, which South Dakota Plaintiffs' counsel simply pretermits. *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *6 (rejecting argument

by certain MDL plaintiffs that MDL counsel's work "was poor," and noting that the "minor complaints about the organization or presentation of the leadership group's work ignore[d] the significant amount of time and effort the leadership group spent in obtaining the documents and depositions" to present evidence at bellwether trials).

Indeed, South Dakota Plaintiffs' counsel ignores the substantial discovery generated in this MDL, including the taking and defending of hundreds of depositions and the production and coding of hundreds of thousands of documents, that he will have access to when prosecuting the case in the District of South Dakota. *Id.* ("Plaintiffs are substantially benefitted by 'the mere availability' of relevant discovery, even if an objecting plaintiff chooses not to use it." (quoting *In re Diet Drugs*, 582 F.3d at 544-45)); *see also In re Diet Drugs*, 582 F.3d at 548 (noting that MDL counsel conferred a substantial benefit on every case in the MDL because MDL counsel "obtained a number of favorable discovery and evidentiary rulings that applied on a litigation-wide basis, and [they] enforced a uniform procedure for the production of documents, deposition testimony, and expert disclosures that governed every MDL case").

It is beyond dispute that South Dakota Plaintiffs have been substantially benefitted by the pretrial work performed by MDL Plaintiffs' Counsel because the posture of their case has changed dramatically and in their favor since the JPML transferred their case to this Court. In addition to the substantial discovery completed, expert work has been completed on all issues relating to employment status, and important discovery motions, including a motion to exclude a number of trial witnesses, have been won. As noted above, the South Dakota Plaintiffs' motion for summary adjudication is fully briefed, and MDL Plaintiffs' Counsel has obtained a favorable ruling from the Court on Illinois Plaintiffs' motion for summary adjudication. Plaintiffs' counsel's objection also ignores the obvious fact that resolution of a case is often only possible

after hard-fought litigation.  This case did not resolve upon Plaintiffs' counsel's initial filing of the complaint – the first and last act taken by South Dakota Plaintiffs' counsel outside of the MDL on his clients' behalf.  Immediately upon the filing of the complaint the case was transferred into the MDL and litigated for more than five years.  Now, immediately upon remand of the case, counsel seeks to dodge any common benefit assessment order claiming that he alone deserves any potential attorney's fees that might result, to the exclusion of the MDL Counsel appointed by this Court to prosecute the case during the pendency of the MDL, because MDL Counsel has conferred no benefit to his case.  This morally dubious stance is not supported by the law.  There can be no doubt that South Dakota Plaintiffs have been benefitted due to MDL Plaintiffs' Counsel's efforts, none of which were performed by South Dakota Plaintiffs' individual attorney outside of the MDL.  *See In re Diet Drugs*, 582 F.3d at 548.  "It stands to reason, then, that [South Dakota Plaintiffs] st[and] a better chance of recover[ing] from [FXG] than they would have absent" MDL Plaintiffs' Counsel's efforts.  *Id*.

## CONCLUSION

MDL Plaintiffs' Counsel respectfully request that the Court reject South Dakota Plaintiffs' counsel's objections and enter MDL Plaintiffs' Counsel's proposed common benefit set-aside order.

Dated: January 25, 2011                      Respectfully submitted,

                                             LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                             **s/ Susan E. Ellingstad**
                                             Susan E. Ellingstad
                                             100 Washington Avenue South, Suite 2200
                                             Minneapolis, MN  55401
                                             Tel:     (612) 339-6900
                                             Fax:     (612) 339-0981
                                             Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel:     (510) 272-0169
Fax:     (510) 272-0174
Email: lfaris@leonardcarder.com
          emorton@leonardcarder.com

Robert I. Harwood
Matthew M. Houston
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:     (212) 935-7400
Fax:     (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

J. Gordon Rudd
Anne T. Regan
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall
Suite 501
Minneapolis, MN 55401
Tel:     (612) 341-0400
Fax:     (612) 341-0844
Email: jgr@zimmreed.com
          atr@zimmreed.com

Jordan M. Lewis
SIEGEL, BRILL, GREUPNER, DUFFY
   & FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN 55401
Tel:     (612) 337-6100
Fax:     (612) 339-6591
Email: jordanlewis@sbgdf.com

**PLAINTIFFS' STEERING COMMITTEE**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

```
------------------------------------------------------ )
                                                       )
In re FEDEX GROUND PACKAGE                             )      Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                               )      (MDL 1700)
PRACTICES LITIGATION                                   )
                                                       )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:                              )
                                                       )
ALL ACTIONS                                            )
------------------------------------------------------ )
```

## CERTIFICATE OF SERVICE

I, Susan E. Ellingstad, hereby certify that on January 25, 2011, I electronically filed the

foregoing documents with the Clerk of Court using the CM/ECF system which sent notification

of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **Michael L. Banks** | mbanks@morganlewis.com; tmyers@morganlewis.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com; paralegal@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Cameron H. Biscay** | cbiscay@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Sarah E. Bouchard** | sbouchard@morganlewis.com; tmyers@morganlewis.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr.** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Rosemary J. Bruno** | rosemary.bruno@bipc.com; linda.boccino@bipc.com |

434564.1

| | |
|---|---|
| **Stevan E. Bunnell** | sbunnell@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Mark T. Clouatre** | clouatre@wtotrial.com; wesson@wtotrial.com |
| **James P. Cooney, III** | jcooney@wcsr.com; lreardin@wcsr.com |
| **Kelly P. Corr** | kcorr@corrcronin.com; dpatterson@corrcronin.com |
| **Thomas W. Cranmer** | crammer@millercanfield.com; rouman@millercanfield.com; Christenson@millercanfield.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; mstevens@bnhmlaw.com; sbaith@bnhmlaw.com; kstone@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Steve Dennis** | sdennis@reiddennis.com; dblackshear@reiddennis.com; csanford@reiddennis.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; aahn@leonardcarder.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Randall J. Forbes** | rforbes@fufblaw.com; loretta@fufblaw.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com; ellen.boshkoff@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |

| | |
|---|---|
| **William H. Haltom, Jr.** | haltomw@thomasonlaw.com; sadetskyr@thomasonlaw.com |
| **Clayton D. Halunen** | halunen@halunenlaw.com |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Kenneth G. Haynes** | ghaynes@wyattfirm.com; tklapheke@wyattfirm.com; bleet@wyattfirm.com; sdubois@wyattfirm.com |
| **Patrick H. Hicks** | phicks@littler.com; akoorndyk@littler.com |
| **Benjamin H. Hill, III** | bhill@hwhlaw.com; bpreston@hwhlaw.com; jetlinger@hwhlaw.com |
| **Chris A. Hollinger** | chollinger@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Kimberly K. Kefalas** | kefalas@millercanfield.com; kaiser@millercanfield.com |
| **Soye Kim** | skim@geclaw.com |
| **Wendy M. Krincek** | wkrincek@littler.com; ebeckman@littler.com |
| **Carolyn J. Kubota** | ckubota@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |
| **Bryan D. LeMoine** | lemoine@mcmahonberger.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com; sgutherz@llrlaw.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | jmarshall@marshallandmorrow.com |
| **Robert W. McFarland** | rmcfarland@mcguirewoods.com; lneilson@mcguirewoods.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Guy P. Michelson** | gmichelson@corrcronin.com; aesteves@corrcronin.com; ebrubaker@corrcronin.com |

| | |
|---|---|
| **Eleanor I. Morton** | emorton@leonardcarder.com; aahn@leonardcarder.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Steve Olson** | solson@omm.com |
| **Ian Otto** | iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Lesley A. Pate** | lapate@venable.com |
| **Justin H. Perl** | justin.perl@maslon.com; amy.knott@maslon.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Brett J. Preston** | bpreston@hwhlaw.com; marcand@hwhlaw.com |
| **Nora M. Puckett** | npuckett@omm.com |
| **Charles Victor Pyle, III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | anne.regan@zimmreed.com; stefanie.hebig@zimmreed.com |
| **John B. Renick** | renick@mcmahonberger.com |
| **Laura E. Robinson** | lrobinson@omm.com |
| **Lawrence J. Rosenfeld** | rosendfeldl@gtlaw.com; pisanoh@gtlaw.com |
| **Rick D. Roskelley** | rroskelley@littler.com; mrodriguez@littler.com |
| **Beth A. Ross** | bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **Jessica G. Simbalenko** | simbalenko@wtotrial.com; allen@wtotrial.com; farina@wtotrial.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; jwoolley@scopelitis.com |
| **Joni M. Thome** | thome@halunenlaw.com |
| **Matthew T. Tobin** | matt@sdtrustco.com; lenandlaura@iw.net |
| **Scott Voelz** | svoelz@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |

| | |
|---|---|
| **Michael J. Watton** | jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com |
| **Thomas J. Welk** | tjwelk@bgpw.com; tajohnson@bgpw.com |
| **Robert J. Wierenga** | wierenga@millercanfield.com; chapmand@millercanfield.com |

I also certify that on January 26, 2011, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

| | |
|---|---|
| J. Allen Brinkley | R Bruce Carlson |
| John A. Brinkley, Jr. | CARLSON LYNCH LTD |
| BRINKLEY & CHESNUT | 231 Melville Lane |
| P.O. Box 2026 | PO Box 367 |
| Huntsville, AL 35804 | Sewickley, PA 15143 |
| | |
| Robert J. Penny | Salvatore G. Gangemi |
| WICK BRAMER UKASICK & | GANGEMI LAW FIRM, P.C. |
| TRAUTWEIN LLC | 82 Wall Street, Suite 300 |
| 323 South College Avenue | New York, NY 10005 |
| PO Box 2166 | |
| Fort Collins, CO 80522 | |
| | |
| Steve Dennis | Robert A. Garcin |
| REID & DENNIS | LAW OFFICES OF ROBERT A. GARCIN |
| Providence Tower | 210 East 29th Street, #A |
| 5001 Spring Valley Road, Suite 255W | Loveland, CO 80538 |
| Dallas, TX 75244 | |
| | |
| William S. Hommel, Jr. | Andrew J. Kahn |
| WILLIAM S. HOMMEL, JR., PC | MCCRACKEN, STEMERMAN & |
| 1402 Rice Road, Suite 200 | HOLSBERRY |
| Tyler, TX 75703-3230 | 1630 S. Commerce Street, Suite A-1 |
| | Las Vegas, NV 89102 |
| | |
| Jack D Hilmes | R. Christopher Gilreath |
| Kevin J Driscoll | GILREATH & ASSOCIATES |
| FINLEY ALT SMITH SCHARNBERT | 200 Jefferson Ave. Suite 711 |
| CRAIG HILMES & GAFFNEY PC | Memphis, TN 38103 |
| 699 Walnut Street | |
| 1900 Hub Tower | |
| Des Moines, IA 50309 | |

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA  93901

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI  02908

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO  80202

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

Dated: January 25, 2011                    Respectfully submitted,

                                           LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                           ___s/Susan E. Ellingstad_____
                                           Susan E. Ellingstad
                                           100 Washington Avenue South
                                           Suite 2200
                                           Minneapolis, MN  55401
                                           Tel:    (612) 339-6900
                                           Fax:    (612) 339-0981
                                           Email:  seellingstad@locklaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ----------------------------------------------------- ) | | |
| In re FEDEX GROUND PACKAGE ) | | Case No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT ) | | (MDL 1700) |
| PRACTICES LITIGATION ) | | |
| ----------------------------------------------------- ) | | |
| ) | | |
| THIS DOCUMENT RELATES TO: ) | | |
| ) | | JUDGE MILLER |
| ALL ACTIONS ) | | |
| ) | | |
| ----------------------------------------------------- ) | | |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S *AMENDED*
OBJECTIONS TO PLAINTIFFS' CO-LEAD COUNSEL AND PLAINTIFFS' STEERING
COMMITTEE'S MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER**

Case 3:07-cv-00818-RLM-CAN Document 31-2 Filed 08/17/11 Page 999 of 1149

## I.     INTRODUCTION

Broadly speaking, defendant FedEx Ground Package System, Inc. ("FXG") does not

oppose the motion brought by Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee

(collectively, "Lead MDL Plaintiffs' Counsel") for the establishment of a common benefit set-

aside fund. [1]  However, FXG does object to certain aspects of the proposal.  In particular, the

Court should reject Lead MDL Plaintiffs' Counsel's request that, in the event of the settlement of

a case involving claims which, typically by statute, permit the Court to award attorneys' fees and

costs to a prevailing plaintiff ("fee-shifting claims"), Lead MDL Plaintiffs' Counsel be allowed

to petition for ***additional*** attorneys' fees and costs ***from FXG*** if they believe that "the total

negotiated attorney fees and costs substantially undervalue the time, effort or investment

incurred by MDL Plaintiffs' Counsel."  (Pls.' Co-Lead Counsel and Pls.' Steering Comm.'s

Memo. of Law in Supp. of their Mot. for Entry of Common Benefit Set-Aside Order ("Pls.'

Brief") (Doc. No. 2282) at 20.)  Granting such a "second-bite-at-the-apple" request would be

inconsistent with applicable legal principles and would create substantial impediments to

settlement in the approximately 23 lawsuits which appear to contain fee-shifting claims.  (*See*

Pls.' Brief at 16.)

FXG also objects to the scope of the application of the corrected Proposed Order, to the

extent that it purports to cover not just cases consolidated in the MDL but also cases that are

"derivative of" the MDL or that merely "rely on the work performed in the MDL."  (Corrected

---

[1]       Pursuant to the Court's Order (Doc. No. 2330), FXG filed its objections to Lead MDL Plaintiffs'
Counsel's motion on January 12, 2011.  (*See* Doc. No. 2369.)  On January 14, 2011, Lead MDL
Plaintiffs' Counsel submitted a "corrected Proposed Order" to the Court via e-mail, stating that an
incorrect version of the Proposed Order had been inadvertently submitted with their original motion.  The
e-mail also indicated that Lead MDL Plaintiffs' Counsel had notified FXG of the clerical error, and that
they had agreed that FXG could "re-file its objections to the corrected Proposed Order."  For the Court's
convenience and pursuant to the Court's subsequent order (Doc. No. 2426), FXG is filing an amended
brief superseding its original brief, both to address new issues that are raised by the "corrected Proposed
Order" and to remove arguments regarding issues that have been remedied by the new Proposed Order.

Proposed Order ("Prop. Order") § C at 7.) Similarly, FXG objects to the corrected Proposed

Order to the extent that Lead MDL Plaintiffs' Counsel seek to apply it retroactively to cases that

were settled prior to the Court's entry of any set-aside order. FXG opposes Lead MDL

Plaintiffs' Counsel's request that FXG be responsible for administering the common benefit

fund. Finally, FXG seeks clarification from the Court to confirm that, under no circumstances,

will any failure by "local" plaintiffs' counsel to "consult" with Lead MDL Plaintiffs' Counsel

regarding settlement-related issues permit anyone to challenge the terms of a settlement.

## II. ARGUMENT

### A. Lead MDL Plaintiffs' Counsel's Request To Seek Additional Fees And Costs From FXG Following Settlement Of A Fee-Shifting Claim Is Unsupported By Applicable Law And Counter-Productive.

Lead MDL Plaintiffs' Counsel's request that they be given the right to nullify the terms

of a negotiated settlement in a case with fee-shifting claims, and obtain additional payments from

FXG after a settlement has been reached with the originating plaintiffs' counsel in the transferor

courts (who were the attorneys the plaintiffs retained to prosecute their claims), is unsupported

by and contrary to applicable case law, which instructs that plaintiffs and/or their other counsel

are responsible for the fees and costs of "lead counsel." The proposal also would create

unacceptable levels of uncertainty with respect to the finality of negotiated settlements and

thereby create significant impediments to the settlement of cases with fee-shifting claims. This

request should therefore be rejected.

### 1. Lead MDL Plaintiffs' Counsel's Requested Fee-Recovery Approach Has No Support In The Applicable Law.

With respect to cases with ***non***-fee shifting claims, such as common-law claims for fraud

or rescission, Lead MDL Plaintiffs' Counsel propose that MDL Plaintiffs' Counsel's fees/costs

be set aside from the total amount of the settlement. (*See* Pls.' Brief at 21-23; Prop. Order ¶ 4 at

4-6.)  Such a procedure is standard and appropriate (and, as explained below, should be utilized in cases involving fee-shifting claims as well).  *See, e.g., In re Air Crash Disaster at Fl. Everglades*, 549 F.2d 1006, 1019 (5th Cir. 1977) (finding it was proper to order the "retained lawyers" to contribute part of their fee to the common fund for the benefit of lead counsel); *In re Diet Drugs Prods. Liab. Litig.*, 1999 WL 124414, at *4 (E.D. Pa. Feb. 10, 1999) ("Any sum ordered to be paid [to lead counsel] by the Court pursuant to this [Pretrial] Order as an award of counsel fees shall be deducted from the total amount of counsel fees payable to individual plaintiff's counsel . . . .").

With respect to cases with fee-shifting claims, however, Lead MDL Plaintiffs' Counsel assert that MDL Plaintiffs' Counsel's fees/costs should be recoverable not only from the total settlement amount in a given case, but also from an ***additional payment*** to be made by FXG as determined by a Special Master appointed by this Court, "***if*** the total negotiated attorney fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel."  (Pls.' Brief at 20 (emphasis in original); Prop. Order ¶ 3 at 4.)  Lead MDL Plaintiffs' Counsel cite no authority adopting their requested approach, and FXG has not found any.

Lead MDL Plaintiffs' Counsel is, in effect, asking this Court to treat the settlement of a case with a fee-shifting claim as if it were a final judgment in plaintiffs' favor based on a summary-judgment motion or trial (where successful plaintiffs' counsel generally would have the right to petition the court for an award of their fees/costs above and beyond the damages awarded to the plaintiffs).  But the law is to the contrary.  The general rule is that, when parties privately settle a fee-shifting claim, there is ***no*** "prevailing party" and the plaintiff and his/her counsel therefore ***do not*** have a statutory entitlement to attorneys' fees.  *Bingham v. New Berlin Sch. Dist.*, 550 F.3d 601, 603 (7th Cir. 2008) ("It could not be clearer that a voluntary settlement

3

by the defendant . . . does not entitle a plaintiff to attorneys' fees.") (citing *Buckhannon Bd. Care Home, Inc. v. W. Va. Dep't. of Health Human Res.*, 532 U.S. 598, 606 (2001)).[2]  Accordingly, the settlement of a case with a fee-shifting claim puts the parties in the same situation as if they had settled a case without such a claim—in neither event is there a statutory entitlement to attorneys' fees, and the plaintiffs' attorneys' fees/costs are recoverable only from the overall settlement amount.  In such cases, Lead MDL Plaintiffs' Counsel's fees/costs should come from whatever amount FXG has agreed to pay in settlement of a given lawsuit—and only from that negotiated amount.

> **2.    Common Fund Principles Dictate That MDL Plaintiffs' Counsel's Fees/Costs Must Be Obtained From The Fund—And Only From The Fund.**

Lead MDL Plaintiffs' Counsel's request is also problematic because, when a fee-shifting claim is settled and a common settlement fund created, common fund principles govern.  *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 256 (7th Cir. 1988) (addressing settlement of claim under Magnuson-Moss Act, which includes fee-shifting provision, and stating that "when a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorney's fees, equitable fund principles must govern the court's award of the attorney's fees.").  Under such common fund principles, all "who have benefited from litigation should share its costs."  *Id.* at 252.  This means that all attorneys' fees are paid from the fund; once a defendant has paid the agreed-upon amount into the settlement fund, it is not responsible

---

[2]     To be sure, attorneys' fees may remain independently recoverable when a settlement agreement is "sufficiently analogous to a consent decree," thus conferring "prevailing party" status.  *See T.D. v. La Grange Sch. Dist. No. 102*, 349 F.3d 469, 478-79 (7th Cir. 2003) (describing four-factor test for whether a court was sufficiently involved in the preparation of a settlement agreement to warrant determination that plaintiff was "prevailing party").  However, there is no possibility that FXG would consent to the reclassification of the contractors as employees, so there is no possibility that any settlement of these cases would create implied prevailing party status or an implied right to shift attorneys' fees to the defendant.

for any additional payments.  *Id.* at 254 ("In a common fund case . . . the defendant's liability is limited to the amount of the common fund, which is available to provide attorney's fees"); *see also Florin v. Nationsbank of Georgia*, 34 F.3d 560, 563-64 (7th Cir. 1994) (following *Skelton*); *In re Enron Corp. Sec., Derivative & 'ERISA' Litig.*, 586 F. Supp. 2d 732, 822 (S.D. Tex. 2008) ("[U]nder the common fund doctrine, the fee award is not punitively imposed upon the defendant, but taken from a common fund to avoid the unjust enrichment of those who benefit from the fund.") (internal citation and quotations omitted).  These common fund principles further indicate that, rather than "blowing up" a negotiated settlement by seeking additional payments from FXG, MDL Plaintiffs' Counsel's fees/costs can be recovered only from the established common settlement fund.

### 3. Lead MDL Plaintiffs' Counsel's Request Would Create Substantial Impediments To Settlement In Cases With Fee-Shifting Claims.

As a practical matter, Lead MDL Plaintiffs' Counsel's proposal would significantly hinder the settlement of cases with fee-shifting claims.  A defendant entering into settlement negotiations needs to know with certainty that the agreed settlement amount is all that it will have to pay to resolve a lawsuit.  If the defendant is instead asked to agree to a settlement that is subject to another set of lawyers' claims for attorneys' fees, the defendant will likely not even enter into meaningful settlement discussions in the first place.

Lead MDL Plaintiffs' Counsel's requested approach would eliminate the certainty and finality that is necessary for successful settlement negotiations.  Their motion states that any settlement in a case with fee-shifting claims—which they find objectionable because, in their view, "the total negotiated attorney fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel"—should "not be final or binding and the case not be dismissed until after final adjudication of attorney's fees and costs before the Special

Master appointed by this Court."  (Pls.' Brief at 20; *see also* Prop. Order ¶ 3 at 4 (stating that

"the settlement shall not be final or binding" if Lead MDL Plaintiffs' Counsel decide to seek

additional fees).)  The parties would, thus, never know when they settle claims potentially

eligible for fee-shifting whether the agreed-upon settlement amount constitutes the actual

payment obligation, or whether Lead MDL Plaintiffs' Counsel will be able to essentially re-write

the settlement by increasing their fees through the Special Master proceeding they suggest in

their motion.  This lack of certainty and finality would substantially impair the efficacy of

settlement negotiations.  For example, there are transferor courts which have directed the parties

to attend settlement conferences (*e.g.*, in *Flores* and *Blanchard*).  Given the uncertainty created

by Lead MDL Plaintiffs' Counsel's requested approach, FXG could not meaningfully participate

in those settlement conferences or in other forms of alternative dispute resolution that may be

encouraged by the transferor courts.[3]

      Nor is it any answer to say that, in some of these MDL cases, the uncertainty created by

Lead MDL Plaintiffs' Counsel's requested approach for settlement of cases involving fee-

shifting claims should be ignored because "MDL co-lead counsel is also lead counsel in this

case" and therefore "[l]ocal counsel, which is also MDL co-lead counsel, obviously have full

authority to settle the case . . . ."  (Jt. Prop. Pre-Trial Order (Doc. No. 2451) in Case No. 3:05-cv-

666 (*Coleman - Kentucky*) at 18-19.)  If the matter is obvious, as Lead MDL Plaintiffs' Counsel

suggest, then they should expressly limit their motion to indicate that their request for a "second-

---

[3]      This uncertainty is exacerbated by the fact that, while Lead MDL Plaintiffs' Counsel state that
"approximately twenty-three cases in this MDL assert one or more" fee-shifting claims (Pls.' Brief at 16),
they have not identified in their motion all the specific cases which they contend include such claims.  If
this Court were to determine that it is appropriate to issue a common benefit set-aside order that adopts
different rules for fee-shifting and non-fee shifting claims (which it should not), then FXG submits that
Lead MDL Plaintiffs' Counsel should first be directed to provide a list of all MDL cases which they
contend include fee-shifting claims so that the parties could seek resolution from this Court if they
disagreed as to the proper categorization, or ground rules for settlement negotiations, in a particular case.

bite-at-the-apple" approach to cases involving fee-shifting claims does not apply to cases where one of their own is the "local" counsel. They have not done so.

### B. The Scope Of The Order Should Be Limited To MDL Cases Which Have Not Been Resolved Prior To The Entry Of The Set-Aside Order.

Section C of the corrected Proposed Order states that the requested common benefit set-aside order "shall apply" not only to cases "pending or later filed in, transferred to, or removed to" this MDL proceeding, but *also* to "claims which are filed by MDL Plaintiffs' Counsel, derivative of the consolidated cases, or rely on the work performed in the MDL." (Prop. Order § C at 7.)[4] This Court lacks jurisdiction to enter a set-aside order that would apply to non-transferred federal cases, state cases, or unfiled claims that might be settled without litigation. *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 166 (4th Cir. 1992) ("any attempt without service of process to reach others who are [not parties to the cases transferred to the MDL] is beyond the [MDL] court's power"); *In re Genetically Modified Rice Litig.*, 2010 WL 716190, *4-5 (W.D. Mo. Feb. 24, 2010) (rejecting, on jurisdictional grounds, plaintiffs' lead counsel's request that state-court cases be included in set-aside order); *cf.* Lead MDL Plaintiffs' Counsel's Reply to South Dakota Plaintiffs' Opposition (Doc. No. 2457) at 4-5 (agreeing with above characterization of *In re Showa Denko*). The scope of any common benefit set-aside order should therefore be limited to only those cases that have been, or will be, filed in or transferred to this Court as part of this MDL.

While it is not clear from Lead MDL Plaintiffs' Counsel's motion whether they seek retroactive application of their requested set-aside order to any cases that were settled before the

---

[4] Confusingly, Section C of the corrected Proposed Order goes on to (apparently) portray both groups of cases as those that are "treated as part of the coordinated proceeding known as *In re FedEx Ground Package System, Inc., Employment Practices Litigation*, Case No. 3:05-MD-527-RM (MDL 1700)." (*Id.*) Accordingly, it is not entirely clear whether Lead MDL Plaintiffs' Counsel seek to expand the scope of their requested common benefit set-aside order beyond those cases that actually entered this MDL proceeding. For that reason, FXG includes the objection here.

Court decides their motion, it clearly would be impractical and inefficient to do so. Under the Proposed Order, this Court is being asked to prohibit a transferor court from dismissing any action unless the parties' counsel "have filed a certificate that the appropriate assessment has been set aside and deposited into the FXG MDL Common Benefit Fund" (Prop. Order ¶ 5 at 6-7), but it will be impossible to have made such a certification at the time of dismissal because the "appropriate assessment" will not have been known. This Court should not accept Lead MDL Plaintiffs' Counsel's invitation to create a regime in which the transferor courts are prohibited from dismissing actions on their dockets until a lengthy process of negotiation, mediation, arbitration, and a Special Master proceeding has run its course to resolve a fee dispute between Lead MDL Plaintiffs' Counsel and "local" counsel. Particularly with respect to any cases which have been settled and dismissed prior to the Court's entry of any set-aside order, FXG's only obligation should be to notify Lead MDL Plaintiffs' Counsel that a settlement occurred. Thereafter, "[i]f, for any reason, an assessment is not or has not been so withheld, the Plaintiffs and their counsel are jointly responsible for paying the assessment into the Common Benefit Fund promptly." (*Id.* ¶ 4 at 6.)

**C.** **FXG Should Not Be Responsible For Administration Of The Common Benefit Fund.**

FXG objects to Lead MDL Plaintiffs' Counsel's request that FXG be tasked with administering the common benefit fund. (Pls.' Brief at 13; Prop. Order ¶ 4 at 6.) Although FXG recognizes that this Court has discretion to direct a defendant to set aside a certain portion of any settlement or judgment into a common fund, it is unnecessary to do so here. The number of lawsuits at issue is relatively small, particularly when compared to other cases where a common fund has been established. *Cf. In re Genetically Modified Rice Litig.*, 2010 WL 716190 (W.D. Mo. Feb. 24, 2010) (in MDL consolidating 300 cases comprising claims of 5000

plaintiffs, defendant responsible for setting aside a certain percentage of any recovery into a common fund). If this Court issues an order providing for the establishment of a common benefit fund, all plaintiffs' counsel will be so informed and FXG is amenable to also providing notice of the Court's Order. However, once notified, all plaintiffs' counsel (including "local counsel") can be expected to comply with the Court's Order and should be responsible for setting aside into the common fund the requisite portion of any monetary recovery they may receive. *Cf. In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006) ("There is no need to burden defendant Lilly with this chore; Lilly has no responsibility to provide for, or administer, the fund.").

### D. The Court Should Clarify The Effect Of Any Failure By Local Counsel To "Consult" With Lead MDL Plaintiffs' Counsel.

Lead MDL Plaintiffs' Counsel's corrected Proposed Order states generally that they "shall be consulted for input with regard to damage issues, costs and attorneys fees incurred," but does not indicate what should happen in the event that they contend they were not so "consulted." (Prop. Order ¶ B.1 at 3.) Apart from the oddity of this Court ordering plaintiffs' local counsel to consult with anyone in particular in regard to settlement negotiations (there is no reason to believe that local counsel's ethical obligations to their clients would not be sufficient), there could potentially be disputes as to whether Lead MDL Plaintiffs' Counsel was adequately "consulted" prior to settlement in any given case. If such a "failure to consult" as between Lead MDL Plaintiffs' Counsel and "local" counsel—something over which FXG has no knowledge or control—could be the basis for undoing a settlement, that will inject still more uncertainty into the settlement negotiation process. Accordingly, FXG respectfully seeks confirmation from this

Court that any such "failure to consult" with Lead MDL Plaintiffs' Counsel cannot constitute a

basis for Lead MDL Plaintiffs' Counsel to challenge the terms of a settlement in any case.[5]

## III. CONCLUSION

FXG respectfully requests that: (1) any common benefit set-aside order entered by this

Court specifically indicate that the total amount of the settlement cannot subsequently be

increased for additional fees and costs; (2) Lead MDL Plaintiffs' Counsel be directed to identify

the specific MDL cases which they contend include fee-shifting claims; (3) any common benefit

set-aside order entered by the Court expressly be limited to actions that have been, or will in the

future be, filed in or transferred to this MDL proceeding, and as to which no settlement or

judgment was reached prior to the entry of the set-aside order; (4) any common benefit set-aside

order entered by the Court make clear that plaintiffs' counsel, and not FXG, are responsible for

making payments into the common benefit fund; (5) any common benefit set-aside order entered

by this Court specifically indicate that a purported "failure to consult" by local counsel with

Lead MDL Plaintiffs' Counsel cannot constitute a basis for challenging the terms of a settlement

in any case; and (6) any common benefit set-aside order entered by this Court provide that any

proceedings before a mediator, arbitrator and/or Special Master be conducted on a confidential

basis, and that any filings be made under seal.

Dated:  January 25, 2011.

Respectfully submitted,

By: /s/ Chris A. Hollinger
Chris A. Hollinger

Thomas J. Brunner                                        Robert M. Schwartz

---

[5]     FXG further requests that the Court order that any proceedings before a mediator, arbitrator, and/or Special Master be conducted on a confidential basis, and that any filings be made under seal, insofar as the proceedings relate to the settlement of an action that is not otherwise a matter of public record.

Alison G. Fox                              Chris A. Hollinger
BAKER & DANIELS LLP                        O'MELVENY & MYERS LLP
202 S. Michigan St.                        1999 Avenue of the Stars, Suite 700
South Bend, IN 46601                       Los Angeles, CA 90067-6035
Tel: (574) 234-4149                        Tel: (310) 553-6700
Fax: (574) 239-1900                        Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 25th day of January, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Chris A. Hollinger

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

```
-------------------------------------------------  )
                                                   )
IN RE FEDEX GROUND PACKAGE                         )    CAUSE NO. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                            )    (MDL 1700)
PRACTICES LITIGATION                               )
                                                   )
-------------------------------------------------  )
THIS DOCUMENT RELATES TO:                          )
                                                   )
Harris, 3:06-cv-209 (Arkansas)                     )
Alexander, 3:05-cv-528 (California)                )
Huerta, 3:08-cv-052 (California)                   )
Pedrazzi, 3:06-cv-429 (California)                 )
Coleman, 3:05-cv-666 (Kentucky)                    )
DeCesare, 3:06-cv-120 (Nevada)                     )
Gennell, 3:05-cv-601 (New Hampshire)               )
Kelly, 3:08-cv-336 (Ohio)                          )
Leighter, 3:07-cv-328 (Oregon)                     )
Slayman, 3:05-cv-596 (Oregon)                      )
Humphries, 3:05-cv-540 (Texas)                     )
Carlson, 3:05-cv-664 (Florida)                     )
Gentle, 3:07-cv-191   (Alabama)                    )
Wallace, 3:06-CV-801 (Ohio)                        )
-------------------------------------------------  )
```

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
## FOR ENTRY OF JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

## INTRODUCTION

Plaintiffs respectfully oppose partial entry of judgments pursuant to Fed. Civ. P. 54(b)

in the above-referenced actions, which this Court has already suggested for remand to the

transferor courts.[1]  FedEx Ground Package System Inc.'s ("FXG") motion for partial final

---

[1]Plaintiffs in *Kelly*, 3:08-cv-336 (Ohio) have stipulated to dismissal without prejudice of one
federal claim in order to proceed to appeal.  Plaintiffs in *Humphries*, 3:05-cv-540 (Texas) have
similiarly stipulated to dismissal of one federal claim in order to proceed immediately to appeal.
Thus, twelve of the fourteen cases in which FXG originally sought 54(b) relief remain before the

judgments fails to recognize that the adjudicated claims and the un-adjudicated claims are not "separate," as Rule 54(b) requires, but substantially overlap. The claims in each of these twelve actions suggested for remand depend upon the same complex set of facts regarding the relationship between Plaintiffs and FedEx Ground, even though the guiding state and federal law differs from the law addressed by this Court. The courts of appeal are uniform in holding that Rule 54(b) judgment is unavailable where the facts substantially overlap. Further, if this Court granted FXG's motion for partial final judgment, it would virtually guarantee that each case it proposed to remand would be subject to piecemeal litigation in both the Seventh Circuit and the circuit of the originating action after the remaining claims were adjudicated, causing significant further prejudicial delay in the final adjudication of the Plaintiffs' claims. The fact that this case is a multi-district action does not mean that the Court should abandon the essential Rule 54(b) analysis requiring "separate" claims. For the same reasons this Court denied Rule 54(b) judgment in *Thomas v. South Bend Comm. School Corp.*, 2010 WL 4007518 (N. D. Ind., Oct. 8, 2010), FXG's motion for entry of Rule 54(b) judgment should be denied.

## **ARGUMENT**

### I. **Standard For Issuance Of Partial Final Judgment Under Fed. R. Civ. P. 54(b).**

Rule 54(b) of the Federal Rules of Civil Procedure provides that:

When an action presents more than one claim for relief – whether as a claim, counterclaim, cross-claim, or third-party claim – or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

Therefore, there are three distinct requirements; 1) there must be an action involving multiple

---

Court on this motion. Since the cases in this MDL have never been consolidated, the actions of the Plaintiffs in those cases do not affect the other twelve cases for which FXG seeks relief in this motion.

parties or multiple claims for relief; 2) there must be a final decision as to one claim or the rights and liabilities of at least one party; and 3) the court must make an express determination that there is no "just reason for delay" of an appeal on the adjudicated claims.

Whether there is a justifiable basis for issuance of a Rule 54(b) certification is an issue left to the sound discretion of the court. "The district court is 'the one most likely to be familiar with the case and with any justifiable reasons for delay.'" *Bank of Lincolnwood v. Federal Leasing, Inc.*, 622 F.2d 944, 948 (7th Cir. 1980) (citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956)). "Nevertheless, because the Rule 54(b) procedure, if misused, can generate needless or duplicative appeals," the district court's certification under Rule 54(b) remains subject to review by the circuit court. *Id.* Further as this Court noted, "in applying Rule 54(b)**,** district courts must be cognizant that the norm in litigation is 'one appeal per case.'" *Thomas***,** 2010 WL 4007518, at *2 (citing *Graphic Communications Nat'l Health & Welfare Fund v. Tackett,* 2007 WL 2701304 (S.D. Ill. Sept. 12, 2007)).

A list of factors, not necessarily fully-inclusive, that a court may consider when determining whether there is a just reason for delay of the entry of judgment was set forth in *Allis-Chalmers v. Philadelphia Elec. Co.*, 521 F.2d 360, 364 (3d Cir. 1975):

> 1) The relationship between the adjudicated and unadjudicated claims; 2) the possibility that the need for review might be mooted by future developments in the district court; 3) the possibility that the reviewing court might be obliged to consider the same issue a second time; 4) the presence or absence of a claim or counterclaim that could result in a set-off against the judgment sought to be made final; 5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

While it is within the Court's discretion whether to grant Rule 54(b) certification, it is FXG's burden to convince the Court that each of these actions is "'the infrequent harsh case' meriting a favorable exercise of discretion." *Id*. at 365.

In each of the twelve cases slated for remand which are the subject of this motion, there are multiple claims for relief (*e.g.*, in *Harris*, there are Arkansas state law employment claims and a FLSA claim) which are all based on the same factual predicate – the complex relationship between FXG and its pickup and delivery drivers – and thus cannot be "separated" from the claims this Court has already adjudicated. As the cases below discuss, if the un-adjudicated claims rest on substantially the same factual predicate, there is a demonstrable "just reason for delay" in entering judgment and Rule 54(b) relief is not justified.

## II.     FXG Has Not Demonstrated Cause For Departure From the Final Judgment Rule or For the Issuance of The Rule 54(b) Partial Judgment.

### A.     There Is Not a "Separate" Decision Because the Remanded Claims Depend on Substantially the Same Complex Factual Predicate As the Claims Ruled Upon by This Court.

The relationship between the un-adjudicated claims and the adjudicated claims warrants denial of the relief requested here. For Rule 54(b) judgment to be appropriate, FXG must show that the claims directed for remand are "separate" from those on which FXG seeks judgment. *Lottie v. West American Ins. Co.*, 408 F.3d 935, 938-39 (7th Cir. 2005); *see also* Fed. R. Civ. 54(b) (permitting the entry of partial judgment only on a "distinct claim"). In *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 515 (7th Cir. 2002), the Seventh Circuit explained: "'[S]eparate' in the Rule 54(b) context does not mean arising under a different statute or legal doctrine but rather means involving different facts." "The test for separate claims under the rule is whether the claim that is contended to be separate so overlaps the claim or claims that have been retained for trial that if the latter were to give rise to a separate appeal at the end of the case the [appellate] court would have to go over the same ground that it had covered in the first appeal." *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1162 (7th Cir. 1997); *accord Minx v. Zick*, 2009 U.S. Dist. LEXIS 21412, at * 4 (N.D. Ind. Mar. 16, 2009) (citing *Ace*

*Am. Ins. Co. v. RC2 Corp., Inc.*, 2008 U.S. Dist. LEXIS 93692 (N.D. Ill. Nov. 13, 2008)).

Here, the claims on which FXG seeks judgment and those that the Court has directed for remand rest on the same principal factual predicate – the Operating Agreement and FXG's policies, practices and procedures. While the adjudicated and un-adjudicated claims arise under different laws, both sets of claims will require consideration of the same complex and voluminous factual record. For example, in *Alexander*, the Court has asked the JPMDL to remand the remaining claims under the Family Medical Leave Act ("FMLA"). The remanded FMLA claims will require an analysis of facts relevant to the drivers' employment status under the economic realities test, which substantially overlap with the facts that this Court considered in evaluating the employment status of the certified class of drivers under the California test, which also looks at the economic realities of the parties' relationship. Similarly, in *Harris* and *Wallace*, the transferor court will have to evaluate the drivers' employment status under the economic realities test applicable under the Fair Labor Standards Act, reviewing much of the same evidence that this Court considered. On remand, Plaintiffs will, of course, be entitled to offer **additional** individualized evidence not before this Court. However, the documentary record considered by this Court regarding the relationship between FXG and the Plaintiff drivers and its operations will be relevant and material to virtually every remaining claim, even those that do not turn on employment status, as virtually all of the claims still require an analysis of the parties' relationship and contract.

As Judge Posner has explained, "if there is a great deal of factual overlap between the decided and retained claims, they are not separate, and an appeal must be deferred until the latter are resolved." *Jack Waters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 702 (7th Cir. 1984). As this Court previously found, "Rule 54(b) allows appeal without delay of claims that

are truly separate and distinct from those that remain in the [case], where 'separate' means having minimal factual overlap." *Thomas*, 2010 WL 4007518, at *4 (citing *Lottie v. West American Ins. Co.*, 408 F.3d, 935, 938-39 (7th Cir. 2005).[2] Here, because the factual overlap is substantial and, in some cases, almost complete, the greatest efficiency is realized by following the one judgment rule so that all claims are reviewed in a single appeal.

FXG points to *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 518 F.3d 459, 464 (7th Cir. 2008) and argues that partial judgment is proper because the remanded claims "rely on entirely different legal entitlements yielding separate recoveries." But the Seventh Circuit made plain that it is not enough for claims to have different legal theories, the claims also must "involve different facts." *Id.at 464*; *see also id.* ("This inquiry [under Rule 54(b)] involves comparing the issues at stake in the appealed claims and those remaining in the district court and determining whether there is a significant factual overlap.") (quotations and citations omitted). As shown above, the claims here do not meet that standard.

## B. Grant of Rule 54(b) Certification Will Insure Piecemeal Litigation.

Partial judgment under Rule 54(b) should not be granted where it will result in piecemeal litigation. *Allegheny Airlines, Inc. v. LeMay*, 448 F.2d 1341, 1343 (7th Cir. 1971). The grant of FXG's request for Rule 54(b) judgments will virtually guarantee that each case will have two appellate proceedings, one in the Seventh Circuit on the adjudicated claims and one in the forum circuit of the transferor court on the remaining claims, absent settlement. The very harm that FXG claims to be avoiding by seeking a Rule 54(b) judgment will necessarily occur.

FXG sidesteps this cogent reason to deny it relief, focusing instead on the fact that there

---

[2] Rule 54(b) is not intended to provide an option to the district court to certify issues for interlocutory appeal. *Factory Mut. Ins. Co. v. Bobst Group USA, Inc.*, 392 F.3d 922, 924 (7th Cir. 2004).

will be little duplication in the Seventh Circuit because that court already has consolidated

appeals before it. But the Seventh Circuit cannot dispose of the un-adjudicated claims in the

actions that have been suggested for remand. FXG's argument does not address the inefficiency

and burden of having not only two appeals but, necessarily, two appeals in two circuit courts

resulting from one case.

As the Seventh Circuit noted, "there are grave practical objections to reading ... [R]ule

[54(b)] broadly. The caseload of the federal courts of appeals has increased faster than that of

any other component of the federal judiciary, and is now eight times as great as it was in 1960,

while the number of court of appeals judges has less than doubled. Rule 54(b) liberally construed

and applied has a tremendous potential to increase our caseload still more rapidly, because its

natural tendency is to generate multiple appeals in the same case." *Minority Police Officers*

*Asso. v. South Bend*, 721 F.2d 197, 200 (7th Cir 1983). "While each appeal in a series of

multiple appeals in the same case should be simpler to decide than would be an appeal from a

final judgment disposing of the entire lawsuit, the greater simplicity will usually be outweighed

by the burden on this court of having to reacquaint itself again and again with at least the basic

facts of the case." *Id.* The argument in this case is even stronger where the resulting multiple

appeals will be heard in two different circuits, each one having to acquaint itself with

substantially the same large, complex factual record.

**C.      The Court Should Delay Entering Partial Judgment Because Future Action
           in the Transferor Court May Render Moot the Need For Appellate Review.**

Denying FXG's motion is also more efficient because doing so may enable the courts and

parties to avoid appellate review of the remanded cases entirely. As the D.C. Circuit found, there

is no reason to disturb the "ordinary final judgment rule" when delay of an appeal may result in

elimination of any need for appellate review. *Hill v. Henderson*, 195 F.3d 671, 674 (D.C. Cir.

1999).[3] "The efficiencies sought to be achieved by the final judgment rule seem more likely to be accomplished if a claim dismissal tags along with the transfer than if a party dismissal does. With claims as opposed to parties there are greater probabilities that circumstances will moot dismissal of the appeal (*e.g.* by overall settlement, or by recovery on one of the claims that effectively compensates plaintiff for loss under the dismissed claim), that the issues between two (hypothetical) appeals will overlap." *Id.* Here, by allowing one consolidated appeal at the end of the proceedings before the transferor court, the parties will be given the fullest opportunity to resolve the entirety of the action and potentially avoid any appellate proceeding. Granting FXG's motion, on the other hand, will only multiply the number of appeals and further delay the resolution of the un-adjudicated claims.

### D. Balancing the Relative Impact on Plaintiffs Against the Impact on the Defendant Strongly Supports Denial of Rule 54(b) Judgment.

FXG's desire for an immediate appeal must be balanced against the burden on Plaintiffs which, in this case, is heavy and prejudicial. Plaintiffs will be forced to litigate an appeal in the Seventh Circuit, either simultaneously or before they prosecute their remaining claims in the transferor courts. Absent settlement, the parties then will face another round of appeal at the conclusion of the remanded action. As stated in *Thomas*, "'it is not enough that the court wants to accommodate counsel's desire for an immediate appeal. Rather the court must carefully consider whether immediate appeal is appropriate in a particular case.'" *Thomas*, 2010 U.S. Dist. LEXIS 109613, at 6 (quoting *Shopell v. Schrader*, 2009 U.S. Dist. LEXIS 37384, at *2 (N.D.

---

[3] As FXG's Amended Objection to the Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee's Motion for Entry of common Benefit Set-Adie Order makes clear, FXG has apparently settled several of the cases this Court earlier remanded (Doc. No. 2459, at 7-8) and objects generally to purported "impediments" to settlement. (*Id.)* Thus, because FXG's resistance to engaging in any form of ADR for the five years of this litigation appears to be waning, there is some reason to believe that some of remanded cases may be resolved without litigation of the remaining claims or appellate review of this Court's order.

Ind. May 1, 2009)).[4]  Given that most of Plaintiffs' cases are already five years old, and the

memories of witnesses and availability of witnesses have been compromised by such a long

delay, further delay would undoubtedly compound the difficulty of litigating the remaining

claims.  The fairest path for the parties, and the path of greatest efficiency and judicial economy,

is to follow the long accepted rule of one judgment and one appeal per case.

    **E.**    **The Multi-district Nature of These Actions Does Not Alter the Applicable Test for Entering Rule 54(b) Judgment.**

FXG argues that the analysis of Rule 54(b) changes when considering cases which have

been centralized in multi-district litigation because the MDL goal of judicial efficiency will be

"lost" by having more than one Circuit Court of Appeal review this Court's orders on

employment status under the various state laws.  While this argument may have surface appeal,

close examination reveals that the instant MDL counsels the opposite result.  Each case in this

MDL arises under different state law and involves different legal claims.  Despite the fact that

these cases were centralized for pretrial purposes by the JPMDL (over Plaintiffs' repeated

objections), the cases have always maintained their distinct characters with separate case

numbers and distinct claims.  As this court well knows, the state-law claims in this MDL and the

diversity of legal theories have required the Court to adjudicate the cases separately, examining

dozens of differing state statutory and common law standards and principles and addressing each

of the matters case by case.  Thus, in this MDL, it is fully consistent with prior proceedings to

return the cases to the transferor courts for resolution of remaining claims and, if needed, for case

---

[4] One of the principal justifications offered for granting a Rule 54(b) partial judgment is to permit the prevailing party to collect upon claims adjudicated in its favor, an interest which is absent here.  As Judge Easterbrook explains, "that's why a decision that resolves a dispute about liability while leaving relief to be determined cannot be appealed under Rule 54(b)."  *Candleway Properties, Inc. v. Ossian State Bank*, 478 F.3d 767769 (7th Cir. 2007), *see also Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737 (1976).

by case appellate review.

The authorities FXG offers in support of its position are neither applicable nor compelling. *In re Food Lion, Inc. Fair Labor Standards Act Scheduling Litigation*, 73 F.3d 528 (4th Cir. 1996) involved cases all claiming violation of a single statute – the FLSA. Because the claims in the various cases were exactly the same, it made sense that reviewing them all in one appellate proceeding would result in the greatest efficiency. Here, however, where the adjudicated claims (like those of the various remanded claims) are all based on differing state laws, the *Food Lion* rationale disappears. The Seventh Circuit would have to review each case, claim by claim, issue by issue, only to have twelve cases remanded back to the transferor courts when the appeal is complete regardless of the outcome. Then, another court of appeal would be required to cover substantially the same ground when reviewing the second appeal from the remanded claims. *Food Lion* does not support such a result.

*FMC Corp. v. Glouster Engineering Co.*, 830 F.2d 770 (7th Cir. 1987) addressed which circuit court should hear an interlocutory appeal under 28 U.S.C. § 1292(b). The district court in *FMC* had already decided that certification for appeal was proper under Section 1292(b). *Id.* at 770. *FMC*, thus, begs the question that is before this Court – whether immediate appeal is proper. Moreover, certification under Section 1292(b) required the district court to find that "'an immediate appeal … may materially advance the ultimate termination of the litigation.'" *Id.* at 771 (quoting 28 U.S.C. § 1292(b)). As shown above, immediate appeal here would delay the ultimate termination of the cases in this MDL and, in any event, Rule 54(b) requires consideration of other factors not present under Section 1292(b), such as whether the adjudicated claims are factually "separate" from the un-adjudicated ones.

Similarly, FXG places great reliance on *dicta* in *Hill v. Henderson*, 195 F.3d 671, 677

(D.C. Cir. 1999), discussed above.  In *Hill*, the D.C. Circuit merely noted an appeal before the circuit for the transferee court in an MDL action *might* have been more efficient if the facts and law were the same.  *Id.*  However, the *Hill* Court dismissed the appeal in question.  *Id.* at 673-74.

FXG's last argument is that the only way to obtain uniform adjudication of all state law employment claims – or avoid inconsistent determinations -- is to grant a Rule 54(b) certification.  Uniformity of judgments, however, is of little or no value here where the claims differ in substance.  Indeed, this Court has already determined that the claims must be evaluated separately; and the Court has already determined that drivers in four states (Illinois, Kentucky, New Hampshire and Nevada) are employees for some purposes while drivers in other states are not.  Despite the consolidation of the appeals, the Seventh Circuit will review the Court's separate determinations under the various state laws and could, itself, potentially reach different conclusions, based on the cases in the various states, just as this Court did. Thus, the fact that there may continue to be varying inconsistent conclusions regarding FedEx drivers' employment status under varying laws cannot be avoided by entering judgments under Rule 54(b).

## CONCLUSION

For the reasons set forth here, Plaintiffs respectfully request that the Court deny FXG's motion for entry of judgments pursuant to Rule 54(b) and remand the actions to the transferor courts for final disposition.

Dated: January 31, 2011                              Respectfully submitted,
                                                     **LEONARD CARDER, LLP**


                                                       /s/ Lynn Rossman Faris
                                                     Lynn Rossman Faris
                                                     Eleanor Morton
                                                     1330 Broadway, Suite 1450
                                                     Oakland, CA  94612
                                                     Tel: (510) 272-0169

Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
emorton@leonardcarder.com

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:     (612) 339-6900
Fax:     (612) 339-0981
Email: seellingstad@locklaw.com

Robert I. Harwood
Matthew M. Houston
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:     (212) 935-7400
Fax:     (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

# CERTIFICATE OF SERVICE

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. I, hereby certify that on **January 31, 2011**, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR ENTRY OF JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)**

### SERVICE LIST

**3:05-md-00527-RLM-CAN Notice has been electronically mailed to:**

Alison G Fox     Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, andrew.murphy@bakerd.com, ellen.boshkoff@bakerd.com, Melissa.Bozzuto@bakerd.com

Anne T Regan     anne.regan@zimmreed.com, stefanie.hebig@zimmreed.com

Aparna B Joshi     ajoshi@omm.com

Barry S Fagan     bfagan@dibandfagan.com

Benjamin H Hill , III     bhill@hwhlaw.com, bpreston@hwhlaw.com, jetlinger@hwhlaw.com

Beth A Ross     bross@leonardcarder.com, aahn@leonardcarder.com, ksangren@leonardcarder.com

Brett J Preston     bpreston@hwhlaw.com, marcand@hwhlaw.com

Bruce H Meizlish     brucelaw@fuse.net

C Victor Pyle , III     victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Cameron H Biscay     cbiscay@omm.com

Chris A Hollinger     chollinger@omm.com

Clayton D Halunen PHV     halunen@halunenlaw.com

D Lucetta Pope     Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com

Daniel O Myers     dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Darcie R Brault     dbrault@dibandfagan.com

David M Cialkowski     dmc@zimmreed.com

Deborah R Grayson     drgrayson@fuse.net

Dmitri Iglitzin     iglitzin@workerlaw.com

Edward J Efkeman     eefkeman@fedex.com

Edward R Forman     eforman@marshallandmorrow.com

Eileen S Goodin     egoodin@bnhmlaw.com

Eleanor I Morton    emorton@leonardcarder.com, aahn@leonardcarder.com

Gary F Lynch    glynch@carlsonlynch.com

George A Barton    gab@georgebartonlaw.com, paralegal@georgebartonlaw.com, renee@georgebartonlaw.com, stacy@georgebartonlaw.com

Ginger A DeGroff    degrofflaw@yahoo.com

Guy Brenner    gbrenner@omm.com

Ian Otto    iotto@straus-boies.com, cle@straus-boies.com, ecf@straus-boies.com

J Gordon Rudd    jgr@zimmreed.com

James A Staack    jims@staack-firm.com

James P Cooney , III    jcooney@wcsr.com, lreardin@wcsr.com

James R Mulroy , II    mulroyj@jacksonlewis.com, edwardsj@jacksonlewis.com

Jeffrey A Bartos    jbartos@geclaw.com

Jeffrey S Nestler    jnestler@omm.com

Jennifer Lee Merzon    jmerzon@omm.com

Jerald R Cureton    jcureton@curetonclark.com

John S Marshall    jmarshall@marshallandmorrow.com

Joni M Thome PHV    thome@halunenlaw.com

Jordan M Lewis    jordanlewis@sbgdf.com

Justin H Perl    Justin.Perl@Maslon.com, Amy.Knott@Maslon.com

Kenneth Lee Blalack , II    lblalack@omm.com

Larry A Golston , Jr    larry.golston@beasleyallen.com

Laura E Robinson    lrobinson@omm.com

Lesley A Pate    lapate@venable.com

Lynn R Faris    lfaris@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Mark A Friel    mfriel@stollberne.com

Martin S Garfinkel    garfinkel@sgb-law.com, cronan@sgb-law.com, luk@sgb-law.com

Mary D Walsh-Dempsey    mdempsey@omalleylangan.com

Matthew M Houston    mhouston@hfesq.com

Matthew T Tobin    matt@sdtrustco.com, lenandlaura@iw.net

Michael G McGuinness    mmcguinness@omm.com

Michael J Gorby    mgorby@gorbypeters.com

Michael J Watton    jdrewicz@Wattongroup.com, vgaroukian@wi.rr.com

Michael W Garrison , Jr    mgarrison@omm.com

Nora M Puckett    npuckett@omm.com

Peter D Winebrake    pwinebrake@winebrakelaw.com

Peter J Agostino    agostino@aaklaw.com, trybula@aaklaw.com

Peter W Overs , Jr    povers@whesq.com

Philip Stephen Fuoco    pfuoco@msn.com

R Jay Taylor , Jr    jtaylor@scopelitis.com, jwoolley@scopelitis.com

Randall J Forbes    rforbes@fufblaw.com, loretta@fufblaw.com

Richard T Phillips    flip@smithphillips.com, tresahharden@smithphillips.com

Robert E DeRose , II    bderose@bnhmlaw.com, ameige@bnhmlaw.com, egordon@bnhmlaw.com, sbaith@bnhmlaw.com

Robert G Ames    rgames@venable.com

Robert I Harwood    rharwood@hfesq.com

Robert K Firsten    rkfirsten@abbottnicholson.com

Robert K Handelman    rhandelman@bnhmlaw.com

Robert M Schwartz PHV    rschwartz@omm.com

Robin Dean    rdean@omm.com

Sanford A Meizlish    smeizlish@bnhmlaw.com

Scott Voelz    svoelz@omm.com

Shannon Liss-Riordan    sliss@llrlaw.com, hlichten@llrlaw.com, mhorwitz@llrlaw.com, sgutherz@llrlaw.com

Soye Kim    skim@geclaw.com

Steve D Larson    slarson@ssbls.com, dcerdas@ssbls.com, kdunn@ssbls.com

Susan E Ellingstad    seellingstad@locklaw.com, ddleishman@locklaw.com, hnpotteiger@locklaw.com, mortonware@locklaw.com, sljuell@locklaw.com

Thomas J Brunner , Jr    Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com

Tom A Jerman    tjerman@omm.com

Victor H Jih    vjih@omm.com

Wood R Foster PHV , Jr    woodfoster@sbgdf.com, heidifurlong@sbgdf.com

**3:05-md-00527-RLM-CAN Notice has been delivered by U.S. Mail or other means to:**

Aaron Roblan
Jackson Lewis
One Union Square
600 University St Suite 2900
Seattle, WA 98101

Alan M Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Andrew J Kahn PHV  (Emailed: ajk@dcbsf.com)
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102

B James Fitzpatrick (Emailed: bjfitzpatrick@fandslegal.com)
Fitzpatrick Spini & Swanston
838 S Main Street Suite E
Salinas, CA 93901

Carla D Macaluso (Emailed: MacalusoC@jacksonlewis.com)
Jackson Lewis LLP - Mor/NJ
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Charles N Nauen (Emailed: cnnauen@locklaw.com)
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Charles W Whetstone , Jr (Emailed: cwhetstone@attorneyssc.com)
Whetstone Meyers Perkins & Young
1303 Blanding Street
Columbia, SC 29201

Cheryl F Perkins (Emailed: cperkins@attorneyssc.com)
Whetstone Meyers Perkins & Young
1303 Blanding Street
Columbia, SC 29201
Dan S Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Devon Nugent

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Donald R Taylor (Emailed: dtaylor@taylordunham.com)
Taylor Dunham & Burgess LLP
301 Congress Ave Suite 1050

Austin, TX 78701

Eric E Hobbs (Emailed: eehobbs@michaelbest.com)
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Eric H Rumbaugh PHV (Emailed: ehrumbaugh@michaelbest.com)
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Evelyn L Becker PHV (Emailed: ebecker@omm.com)
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

Harold L Lichten (Emailed: HLichten@llrlaw.com)
Lichten & Liss-Riordan PC
100 Cambridge St 20th Floor
Boston, MA 02114

J Allen Brinkley (Emailed: Allen@bclegal.net)
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

Jack D Hilmes (Emailed: kdriscoll@finleylaw.com; jhilmes@finleylaw.com)
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178

Jeffrey A Trimarchi (Emailed: jtrimarchi@omm.com)
O'Melveny & Myers LLP - NY/NY
7 Times Square
New York, NY 10036

Jennifer Rygiel Boyd (Emailed: jennifer.rygiel-boyd@olgetreedeakins.com)
Ogletree Deakins Nash Smoak & Stewart PC - Mor/NJ
10 Madison Ave Suite 402
Morristown, NJ 07960

John H Beisner PHV  (Emailed: jbeisner@omm.com)
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

Joree Brownlow (Emailed: joree@jbrownlow.com)
Law Office of Joree G Brownlow
1444 Gillham Dr Suite 200
Bartlett, TN 38134

Joseph A Osefchen  (Emailed: pfuoco@msn.com; josefchen@msn.com)
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Karen P Kruse PHV
Jackson Lewis LLP - Sea/WA
One Union Square
600 University Street Suite 2900
Seattle, WA 98101

Kenneth E Milam (kemilam@watkinseager.com)
Watkins & Eager
PO Box 650
Jackson, MS 39205-0650

Kevin J Driscoll (Emailed: kdriscoll@finleylaw.com)
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Laron Jones
1505 N Ellamont St
Baltimore, MD 21216

Mary Donne Peters (Emailed: mpeters@gorbypeters.com)
Gorby Peters & Associates
Two Ravinia Drive Suite 1500
Atlanta, GA 30346

Melissa Rohman

Michael J Puma PHV (Emailed: mpuma@morganlewis.com)
Morgan Lewis & Bockius LLP - Phi/PA
1701 Market Street
Philadelphia, PA 19103-2921

Michael R Reck (Emailed:  mrreck@belinmccormick.com)
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989

Michael W Kopp (Emailed: mkopp@omm.com)
O'Melveny & Myers LLP - SF/CA
Two Embarcadero Center 28th Floor
San Francisco, CA 94111-3823

Monica Ferraro (Emailed: mferraro@bnhmlaw.com)
Barkan Neff Handelman Meizlish LLP
360 S Grant Ave
Columbus, IN 43215

Patricia A Sullivan (Emailed: psullivan@eapdlaw.com)
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Paula R Markowitz
Markowitz & Richman
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Peter N Wasylyk (Email: pnwlaw@aol.com)
1307 Chalkstone Avenue
Providence, RI 02908

R Bruce Carlson (Emailed: bcarlson@carlsonlynch.com)
Carlson Lynch Ltd - Sew/PA
231 Melville Lane
PO Box 367
Sewickley, PA 15143

R Christopher Gilreath (Emailed: chrisgil@sidgilreath.com)
Gilreath & Associates
6256 Poplar Avenue
Memphis, TN 38119

Ralph Carl Veal

Ricardo Huerta

Richard Tanenbaum (Email: rt@lawyer.com)
1131 McDonald Avenue
Brooklyn, NY 11230

Robert A Garcin
Law Offices of Robert A Garcin
210 East 29th Street # A
Loveland, CO 80538

Robert E McDaniel (Emailed: remcdanielesq@aol.com)
McDaniel Law Offices
4 Bicentennial Square
Concord, NH 03301

Robert James Penny (Emailed: rpenny@wicklaw.com)
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G Gangemi (Emailed: sgangemi@gangemilaw.com)
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005

Steve Dennis PHV (Emailed: sdennis@reiddennis.com)
Reid & Dennis PC
Providence Tower
5001 Spring Valley Road Suite 255W
Dallas, TX 75244

Steven Matthew Kelso (Emailed: kelso@wtklaw.com)
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202

Todd J O'Malley (Emailed: tomalley@omalleylangan.com)
O'Malley & Langan PC
Mulberry Professional Plaza
426 Mulberry St Suite 104
Scranton, PA 18503

Wesley Martin

William S Hommel , Jr
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703

William T Fiala
Lewis Fisher Henderson Claxton & Mulroy LLP
6410 Poplar Avenue Suite 300
Memphis, TN 38119


    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at Oakland, California, on **January 31, 2011**.

/s/ Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| 3:05-cv-596 (*Leighter* - Oregon) | ) ) ) ) | JUDGE MILLER |

## JOINT PROPOSED PRETRIAL ORDER

Pursuant to the Court's December 13, 2010 Opinion and Order (Doc. No. 2239), as modified and clarified by its December 23, 2010 (Doc. No. 2323) and January 10, 2011 (Doc. No. 2367) Orders, plaintiffs and defendant FedEx Ground Package System, Inc. ("FedEx Ground") respectfully submit this Joint Proposed Pretrial Order.

## I. INTRODUCTION

Plaintiffs are two former pick-up and delivery drivers/contractors for the FedEx Home Delivery division of FedEx Ground who allege that they were employees, rather than independent contractors, under Oregon law. (The Court intends the terms "driver" and "contractor" to be synonymous, and the use of either term is not meant to contain any connotations with respect to a person's status as an "employee" or "independent contractor.") With respect to all causes of action other than their rescission claim, plaintiffs represent a class of approximately 373 current and former contractors who drove full-time during the class period and who were dispatched out of a terminal located in Oregon.

FedEx Ground, together with FedEx Home Delivery, provides small-package pick-up and delivery services through a network of pick-up and delivery drivers/contractors. Current and former contractors/drivers in thirty-nine (39) states initiated putative statewide or nationwide class actions against FedEx Ground, premised generally on the theory that they were misclassified as independent contractors and are actually employees. A total of forty-two (42) such actions were filed; of those forty-two (42) cases, twenty-eight (28) have been certified by the Court in whole or in part, and fourteen (14) were denied class certification. In one of those certified cases (Kansas), a nationwide class was also certified under the Employee Retirement Income Security Act ("ERISA"). However, in an order issued on June 28, 2010, this Court dismissed without prejudice the ERISA claims of the plaintiff class. (Doc. No. 2078.)[1]

This Court has previously suggested remand and issued pretrial orders in 17 cases, including all cases where the Court denied class certification, as well as some of the cases not styled as putative class actions. (*See* Doc. Nos. 2011, 2159, 2225.) On December 13, 2010, the Court ruled on the remaining actions in the MDL proceedings. (Doc. No. 2239.) In its decision, the Court granted summary judgment for FedEx Ground on all claims in 20 actions.[2] (*See id.* at 178-82.) In 3 of the other cases, the Court granted summary adjudication to the Plaintiffs, finding that the drivers were employees for one or more of their claims, and instructed the parties to file joint proposed pretrial orders in those actions in advance of remand. (*See, e.g., id.* at 89-

---

[1] Plaintiffs filed a Notice of Appeal on September 9, 2010. (Doc. No. 2127.)

[2] Plaintiffs in the *Carlson* (Florida) case filed a motion to reconsider the Court's ruling as it pertains to two of the claims in their complaint which, in Plaintiffs' view, require remand. (Doc. Nos. 2365-66.) FedEx Ground filed its response to that motion on January 24, 2011. (Doc. No. 2446.) The Court granted plaintiffs' motion on January 27, 2011. (Doc. No. 2460.) Plaintiffs in the other 19 actions filed Notices of Appeal on December 30, 2010. (Doc. Nos. 2285, 2287, 2290, 2291, 2293, 2295, 2297, 2299, 2301, 2303, 2305, 2307, 2309, 2311, 2313, 2315, 2317, 2319, & 2321.)

92, 180.)  In the 19 other cases, [3] including *Leighter*, the Court ruled that there were some claims remaining which required further litigation and instructed the parties to file joint proposed pretrial orders in those actions with the Court in advance of remand.  (*See generally* Doc. No. 2239.)

Plaintiffs in *Leighter* asserted six causes of action: (1) illegal deductions from wages under Oregon Rev. Stat. § 652.610; (2) rescission; (3) declaratory relief; (4) injunctive relief; (5) violation of the Oregon Wage and Hour Laws on behalf of the subclass; and (6) penalty wages on behalf of the class and subclass.  In its December 13, 2010 Opinion and Order, the Court found that the members of the *Leighter* class are independent contractors as a matter of law, and granted judgment independent of the motion to FedEx Ground on all but the rescission claim.  (Doc. No. 2239 at 128-33, 181.)  The Court stated that it will recommend transfer of this case to the U.S. District Court for the District of Oregon "for further disposition on the rescission claim[] because the evidence considered here won't resolve those claims, which involve the important question of whether the Operating Agreement in question violates Oregon public policy."  (*Id.* at 129.)

## II.  HISTORY OF THE PROCEEDINGS AND RULINGS THAT MIGHT AFFECT FUTURE PROCEEDINGS[4]

On August 10, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") found that the putative class actions and other cases challenging the driver/contractors' independent contractor status against FedEx Ground involved common questions of fact, consolidated them

---

[3] FedEx Ground filed a motion for entry of partial final judgment with respect to 14 of these actions, including *Leighter*, on January 12, 2011.  (Doc. No. 2370.)

[4] This Court has made a large number of rulings throughout the course of this MDL.  This order does not attempt to mention all of these rulings.  The Court does not intend any omission or inclusion of a particular ruling in this order to contain any connotations regarding the extent to which a particular ruling is applicable to future proceedings in this case.

into a multidistrict litigation docket and transferred them pursuant to 28 U.S.C. § 1407 to the

U.S. District Court for the Northern District of Indiana for coordinated pretrial proceedings. *See*

*In re FedEx Ground Package Sys., Inc.*, *Employment Practices Litig.* (No. II),

381 F. Supp. 2d 1380 (J.P.M.L. 2005). MDL 1700 was assigned to the undersigned judge and

given the master docket number 3:05-md-527-RLM-CAN (N.D. Ind.).

Plaintiffs Jon Leighter and David Spicer filed a putative class action against FedEx

Ground in the United States District Court for the District of Oregon on June 1, 2007. The case

was assigned case number 3:07-cv-00818-KI. The Complaint asserted six causes of action:

(1) illegal deductions from wages under Oregon Rev. Stat. § 652.610; (2) rescission;

(3) declaratory relief; (4) injunctive relief; (5) violation of the Oregon Wage and Hour Laws on

behalf of the subclass; and (6) penalty wages on behalf of the class and subclass. Plaintiffs

sought rescission of the Operating Agreement, declaratory relief against FedEx Ground,

injunctive relief, and penalty wages on behalf of both the class and subclass. (*See* Doc. No. 1 in

the transferor docket.[5]) Plaintiffs' complaint included a demand for trial by jury. FedEx Ground

filed its Answer and affirmative defenses on June 25, 2007. (Doc. No. 5 in the transferor

docket.) These are the operative pleadings in the *Leighter* action.

The *Leighter* case was transferred to this Court and consolidated with other cases as a

part of MDL 1700 on July 12, 2007. (Doc. No. 6 in the transferor docket; *see also* 3:07-cv-328

(N.D. Ind.) (Doc. No. 1).) The case was assigned case number 3:07-cv-328 (N.D. Ind.).

Prior to the transfer of the *Leighter* case, this MDL Court entered an initial scheduling

order on November 15, 2005 (Doc. No. 52), in which it, among other things:

---

[5] All references to docket numbers are to the master MDL docket, 3:05-md-527, in the Northern
District of Indiana, unless otherwise noted. The "transferor docket" refers to the docket in the District of
Oregon, 3:07-cv-00818-KI.

- o        designated plaintiffs' three co-lead counsel, Lynn Rossman Faris of Leonard

  Carder, LLP, Susan E. Ellingstad of Lockridge Grindal Nauen, P.L.L.P., and

  Robert I. Harwood of Wechsler Harwood LLP;

- o        designated plaintiffs' steering committee, which consists of the three co-lead

  counsel plus Jerald R. Cureton of Cureton Caplan, P.C., Jordan M. Lewis of

  Siegel, Brill, Greupner, Duffy & Foster, P.A., and J. Gordon Rudd of Zimmerman

  Reed;

- o        designated FedEx Ground's lead counsel, O'Melveny & Myers LLP;

- o        bifurcated the proceedings into liability and damages phases;

- o        granted plaintiffs permission to amend their pleadings once, within two months,

  without leave of court;

- o        ordered FedEx Ground to initially produce:

  - o        general, non-testimonial discovery (i.e., manuals, policies and procedures,

    training materials, and recruitment materials),

  - o        materials from *Estrada v. FedEx Ground Package System, Inc.* (Los

    Angeles County Superior Court Case BC 210130), and

  - o        portions of FedEx Ground's files, such as "Department of Transportation"

    files, "Business Discussion" files, "Unit History" files, and "Contractor

    Business Plans," for each plaintiff; and

- o        ordered both parties to provide initial disclosures pursuant to Rule 26(a)(1) and

  produce any documents referenced in the disclosures.

Two weeks later, on November 29, 2005, the Court entered a supplemental scheduling

order (Doc. No. 58), in which it, among other things:

- o   ordered that "[d]iscovery for purposes of class certification and discovery for purposes of the merits of Plaintiffs' claims [would] take place concurrently";

- o   established a briefing scheduling for plaintiffs' motions for class certification; and

- o   divided summary judgment into two phases: summary judgment as to issues relating to independent contractor/employment status and summary judgment as to other issues.

FedEx Ground was permitted to, *inter alia*, serve ten interrogatories and five requests for admission on each plaintiff and to take the deposition of each named plaintiff (then 148), and an additional 25 other depositions.  *Id.*  (Of the named plaintiff depositions, 50 were permitted to last 8 hours and the rest were limited to 4 hours.)  The plaintiffs were permitted to, *inter alia*, serve, per plaintiff, ten interrogatories and five requests for admission on FedEx Ground and to take 75 depositions.  *Id.*  Subsequent to its November 29, 2005 supplemental scheduling order, the court entered numerous case management and scheduling orders.  (*See, e.g.,* Doc. Nos. 261, 453, 481, 482, 766, 836, 898, 1118, 1123, 1139, 1425, 1603, and 1776.)  Additional cases were also added to the MDL proceedings after the initial discovery limits were set.

The court entered a stipulation and protective order on January 13, 2006, to allow the parties to designate as "CONFIDENTIAL" discovery materials that contain: "(1) financial information not publicly filed with any federal or state regulatory authority or otherwise publicly available; (2) trade secret information as defined under state or federal law; (3) tax, medical, or other personnel information relating to and social security numbers of current or former employees or independent contractors of defendants; (4) proprietary sales, marketing, licensing, operational or other proprietary information not otherwise publicly available; (5) information

pertaining to defendants' customers that is not publicly available; [or] (6) information relating to non-public administrative or regulatory proceedings." (Doc. No. 101 at 2-3.)

FedEx Ground has taken approximately 215 depositions in the MDL proceedings. This includes the depositions of the two *Leighter* plaintiffs identified in the Complaint, Leighter and Spicer (both on August 21, 2007), as well as other named plaintiffs in the MDL proceedings. The plaintiffs have taken approximately 105 depositions in the MDL proceedings. This includes the following categories of depositions: corporate executives and managers; regional personnel, including one regional managing director whose area included Oregon (Darryl Sherman); Rule 30(b)(6) witnesses; and third parties. The parties also deposed FedEx Ground experts Robert Crandall, Deborah Jay, Richard Jeanneret, Jeremy Kahn, Francine Lafontaine, and James Scapellato, and plaintiffs' expert David Lewin.[6]

Throughout this MDL proceeding, the Court has ruled on numerous discovery motions brought by both parties. In May of 2008, plaintiffs moved to compel production of a draft IRS Notice of Proposed Assessment and a deposition of FedEx Ground's 30(b)(6) tax witness. In August of 2008, Magistrate Judge Nuechterlein granted the plaintiffs' motion (Doc. No. 1581), and FedEx Ground's motion for reconsideration was denied on December 28, 2009. (Doc. No. 1953.) In July 2006, FedEx Ground moved to compel production of plaintiffs' income tax returns. (Doc. No. 306.) That motion ultimately was granted in part and denied in part in December 2006. (Doc. No. 451.) Under that order, none of the *Leighter* plaintiffs were required to produce their tax returns.[7] On March 29, 2010, FedEx Ground filed a motion to clarify the

---

[6] The Court addressed various *Daubert* challenges to the class-certification expert reports of Deborah Jay, Richard Jeanneret and Robert Crandall in connection with its October 15, 2007 ruling on class certification in the Kansas/ERISA (*Craig*) case. (Doc. No. 906 at 1-22.) The Court addressed FedEx Ground's challenge to the expert report of Robert Wood in a separate order. (Doc. No. 2056.)

[7] FedEx Ground's motion for reconsideration of this Court's decision was denied on January 5, 2010. (Doc. No. 1961.)

Court's prior scheduling orders with respect to expert discovery on the employment

classification issue (Doc. No. 2017), and plaintiffs filed an opposition to that motion on April 12,

2010 (Doc. No. 2024.) On April 21, 2010, the Court issued a ruling on FedEx Ground's motion,

stating that "the deadline for expert disclosure and discovery on the issue of employment status

for all phases of litigation has passed, but additional expert discovery may be warranted for

issues other than employment status." (Doc. No. 2028 at 4.)

On October 1, 2007, the two Oregon plaintiffs named in the Complaint moved to certify a

class of Oregon contractors. (Doc. No. 871.) The proposed class was for plaintiffs' claims for

violation of Oregon's wage statutes, rescission, injunctive relief, and declaratory relief. (*Id.*)[8]

Plaintiffs also sought to certify two subclasses of drivers. (*Id.*)[9] FedEx Ground filed its

opposition to plaintiffs' class certification motion on November 16, 2007. (Doc. No. 998.)

Plaintiffs filed their reply on December 17, 2007. (Doc. No. 1054.)

---

[8] Plaintiffs' proposed class definition was: "All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since July 20, 1999, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Oregon." (*Id.* at 1.)

[9] Plaintiffs' first proposed subclass was for plaintiffs' fifth claim for relief for drivers who allegedly had been denied overtime premium pay. Plaintiffs' proposed definition for this subclass was: "All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) who, at any time after August 10, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds." (*Id.* at 2.)

Plaintiffs' second proposed subclass was for plaintiffs' sixth claim for relief for drivers with alleged claims for statutory penalty wages under ORS 652.150. Plaintiffs' proposed definition for this subclass was: "All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove a vehicle on a fulltime basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) whose Operating Agreement was terminated any date after July 20, 1999." (*Id.* at 2.)

On October 15, 2007, the Court certified a statewide class of Kansas plaintiffs and a nationwide class of ERISA plaintiffs[10] (Doc. No. 906), and FedEx Ground's Rule 23(f) petition for permission to appeal the class certification decision on an interlocutory basis was denied by the Seventh Circuit on January 9, 2008. On March 25, 2008, the Court entered an Order addressing the remaining class certification motions in the first through third waves of class certification. (Doc. No. 1119.) As part of this Order, the Court granted class certification in a separate Oregon action (*Slayman*), for the reasons explained in the Court's Order. (Doc. No. 1119 at 106-110.) On March 26, 2008, the Court entered an Order directing all parties that had filed briefs in the fourth wave of class certification motions (including in the *Leighter* case) to submit supplemental five-page statements regarding how, if at all, the decisions on those class certification motions should differ from the Court's class certification decision regarding the Kansas plaintiffs and regarding the other plaintiffs in the first through third waves of class certification. (Doc. No. 1121.) Plaintiffs and FedEx Ground each filed a supplemental statement on class certification in the *Leighter* case on April 25, 2008. (*See* Doc. Nos. 1206 (plaintiffs); 1242 (FedEx Ground).) On August 13, 2008, FedEx Ground filed a notice of supplemental authority in support of its opposition to plaintiffs' motion for class certification. (Doc. No. 1556.) Plaintiffs filed a response to FedEx Ground's notice of supplemental authority on August 22, 2008. (Doc. No. 1579.)

On July 27, 2009, the Court granted class certification to the proposed class and subclasses in the *Leighter* case for claims for damages and equitable relief relating to wage deductions, overtime, and non-payment of wages upon termination, and denied certification with

---

[10] However, in an order issued on June 28, 2010, this Court dismissed without prejudice the ERISA claims of the plaintiff class. (Doc. No. 2078.) Plaintiffs filed a Notice of Appeal on September 9, 2010. (Doc. No. 2127.)

respect to plaintiffs' claim for rescission. (Doc. No. 1770 at 56-67; 81-82.) The Court also

decertified the rescission claim in *Slayman*. (*Id.* at 66.)

On October 9, 2009, the parties filed long-form class notices for the *Leighter* case as well

as the other actions certified as class actions in the Court's July 27, 2009 Order. (Doc. No.

1843.) The proposed *Leighter* notice defined the *Leighter* class as follows:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery
> Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2)
> drove a vehicle on a full-time basis (meaning exclusive of time off for commonly
> excused employment absences) from July 20, 1999 through July 27,
> 2009 provide [*sic*] package pick-up and delivery services pursuant to the
> Operating Agreement; and 3) were dispatched out of a terminal in the state of
> Oregon.

(Doc. No. 1843-8 at 2.) The proposed notice also defined the sub-class for the claim for

overtime wages as follows:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery
> Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2)
> drove a vehicle on a full-time basis (meaning exclusive of time off for commonly
> excused employment absences) to provide package pick-up and delivery services
> pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the
> state of Oregon; and 4) who, at any time from August 10, 2005 through July 27,
> 2009 operated vehicles with a gross vehicle weight rating of less than 10,001
> pounds.

(*Id.*) Finally, the proposed notice defined the sub-class for the claim for statutory penalty wages

under Oregon Revised Statute § 652.150 as follows:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery
> Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2)
> drove a vehicle on a full-time basis (meaning exclusive of time off for commonly
> excused employment absences) to provide package pick-up and delivery services
> pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the
> state of Oregon; and 4) whose Operating Agreement was terminated at any time
> from July 20, 1999 through July 27, 2009.

(*Id.* at 2-3.)

On October 14, 2009, Magistrate Judge Nuechterlein approved the class notices, including the class notice for the *Leighter* case, and proposed class notice procedures.  (Doc. No. 1848.)  After proper notice was given to the class members identified by FedEx Ground, nine class members opted out of the *Leighter* class.  (Doc. No. 1980, Ex. BB-3.)

On August 13, 2009, the Court set the deadline for summary judgment motions on the employment classification issue in the *Leighter* case, as well as other cases, for September 28, 2009. (Doc. No. 1776.)  The plaintiffs in the *Leighter* action filed their motion for summary judgment on September 28, 2009, along with a memorandum in support of their motion and an omnibus statement of undisputed facts with accompanying evidence.  (Doc. Nos. 1804-1805; 1808-1816.)  On November 12, 2009, FedEx Ground filed its brief in opposition to plaintiffs' motion for summary judgment, accompanied by a statement of genuine issues and supporting evidence.  (Doc. Nos. 1893, 1895, 1901.)  The statement of genuine issues included a supplemental statement of material facts.  (Doc. No. 1893.)[11]  On December 14, 2009, plaintiffs filed a reply brief in support of their motion for summary judgment.  (Doc. No. 1924.)

In their motion for summary adjudication of their employment status, the *Leighter* plaintiffs contended, in part, that summary adjudication was warranted in their case in connection with the decision in *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1 (2007). (*See* Doc. No. 1805 at 1.)  Plaintiffs' argument was based on reasoning set forth in

---

[11] Plaintiffs moved to strike FedEx Ground's statements of genuine issues filed as part of its oppositions to plaintiffs' motions for summary judgment in these MDL cases on June 26, 2008, July 11, 2008, August 25, 2008, and December 14, 2009.  (Doc. Nos. 1428 (later withdrawn and re-filed), 1499, 1500, 1588, 1590, 1916, and 1917.)  The motion filed on December 14, 2009 (Doc. Nos. 1916-1917) sought to strike the statement of genuine issues filed by FedEx Ground in support of its opposition to plaintiffs' motion for summary judgment in *Leighter*.  FedEx Ground opposed each of these motions (Doc. Nos. 1527, 1604, and 1978), and plaintiffs filed replies in support of each of their three motions (Doc. Nos. 1555, 1611, and 1997).  The Court addressed the three motions to strike the statements of genuine issues in two decisions entered on February 23, 2010 and April 28, 2010.  (Doc. Nos. 2010, 2033.)

a concurrently-filed and separate brief based on collateral estoppel. (*See* Doc. No. 1194 (plaintiffs' brief), 1397 (FedEx Ground's opposition), and 1497 (plaintiffs' amended reply).) The Court denied plaintiffs' motion for summary adjudication based on collateral estoppel on April 21, 2010. (Doc. No. 2029; amended by Doc. No. 2062; *see also* Doc. No. 2239 at 7-9 (discussing same).)

In a decision entered March 29, 2010, the Court addressed plaintiffs' request to take judicial notice with respect to "documents identified by the plaintiffs that were filed in judicial and administrative proceedings involving FedEx, including the courts' determinations, findings and outcomes in those proceedings." (Doc. No. 2016 at 9.) The Court granted in part and denied in part plaintiffs' request. (*Id.* at 9-12.)

On May 28, 2010, this Court granted an employment classification summary adjudication motion filed by plaintiffs in the Illinois case, finding that the named plaintiffs were employees under the Illinois Wage Payment Act. (Doc. No. 2068.) On August 11, 2010, this Court granted FedEx Ground's motion for summary judgment on the classification issue in the Kansas case.[12] (Doc. No. 2097.) As a part of its August 11, 2010 Order, the Court also addressed FedEx Ground's motion to strike individualized proof in non-certified lawsuits (Doc. Nos. 1398 (FedEx Ground's motion), 1435 (plaintiffs' opposition), and 1507 (FedEx Ground's reply)). (*See* Doc. No. 2097 at 44-49.) In the same Order, the Court also denied plaintiffs' motions to augment the record on their summary judgment motions with newly discovered or new evidence: (1) IRS Notices of Proposed Adjustment documents and new Addenda to the FedEx Ground Operating Agreement (Doc. No. 1992); (2) documents related to FedEx Ground's announcement concerning its decision to contract exclusively with incorporated contractors and related

---

[12] Plaintiffs filed a Notice of Appeal on September 9, 2010. (Doc. No. 2127.)

Addenda to the Operating Agreement (Doc. No. 2064); and (3) documents related to FedEx

Ground settlement agreements in six states and business model transitions in those states (Doc.

No. 2087). (Doc. No. 2097 at 49-58.)[13]

The Court also instructed the parties to file supplemental statements of no more than five

pages in cases with pending summary judgment motions, indicating why the outcome should be

different or the same as its decision in the Kansas case. (Doc. No. 2097 at 103.) On August 23,

2010, the Court granted plaintiffs' unopposed motion for additional time to file the supplemental

statements, and ordered both plaintiffs and defendants to file their supplemental briefs on or

before September 24, 2010. (*See* Doc. No. 2114.) On September 24, 2010, the parties filed

supplemental statements for all cases with pending summary judgment motions, including the

Oregon (*Slayman* and *Leighter*) cases. (Doc. No. 2187 (plaintiffs' *Slayman* and *Leighter*

statement); Doc. No. 2206 (FedEx Ground's *Slayman* and *Leighter* statement).)

On December 13, 2010, the Court issued an Opinion and Order ruling on all of the

pending summary judgment motions, and addressing all of the remaining actions in these MDL

proceedings. (Doc. No. 2239.) With respect to the *Leighter* case, the Court ruled that plaintiffs

"are independent contractors under Oregon law," denied plaintiffs' motion for summary

judgment, and granted FedEx Ground judgment independent of the motion on all but plaintiffs'

rescission claims. (*Id.* at 129, 133.) The Court ruled that the rescission claims should be

remanded to the transferor court "because the evidence considered here won't resolve those

claims," and instructed the parties to file a joint proposed pretrial order within twenty-eight days.

---

[13] In a prior decision entered March 29, 2010, the Court addressed plaintiffs' request to take judicial notice with respect to "documents identified by the plaintiffs that were filed in judicial and administrative proceedings involving FedEx, including the courts' determinations, findings and outcomes in those proceedings." (Doc. No. 2016 at 9.)

(*Id.*; *see also id.* at 181.) Upon motion of the parties, the Court extended this deadline to January 31, 2011.

This Court has previously indicated that it will "retain jurisdiction to consider the fair and equitable assessment of any potential recovery for the services performed and expenses incurred by attorneys acting for administration and common benefit of all MDL plaintiffs." (*See* Doc. No. 2099 at 10; *see also* Doc. No. 2011 at 10-12.) On December 28, 2010, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee filed a motion for entry of a common benefit set-aside order. (Doc. No. 2281; *see also* Doc. Nos. 2282-83 (memorandum and affidavit in support.) On January 12, 2011, FedEx Ground and plaintiffs in the South Dakota (*Bunger*) action filed objections to the motion. (Doc. Nos. 2368 & 2369.) Correcting a clerical error in the submission of an incorrect proposed order, on January 14, 2011, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee submitted to the Court their proposed order, and, on January 18, 2011, the Court entered an Order granting FedEx Ground leave to file an amended response to the motion. (Doc. No. 2426.) FedEx Ground filed its amended response to the motion on January 25, 2011. (Doc. No. 2459.) The plaintiffs' reply is due seven days after the filing of FedEx Ground's amended response. (Doc. No. 2426.)

On January 12, 2011, FedEx Ground filed a motion for the entry of partial final judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, as to those claims that were resolved in the December 13 Order in various cases, including *Leighter*. (Doc. No. 2370.) Plaintiffs opposed the motion on January 31, 2011. (Doc. No. 2463.) Briefing is not yet complete.

### III. PLAINTIFFS' REMAINING CLAIM & FUTURE PROCEEDINGS

#### A. PLAINTIFFS' REMAINING CLAIM

There is one remaining claim in this case: Plaintiffs' Second Claim for Relief (Rescission

of Operating Agreement). This Court has stated that it will recommend transfer of this case to the District of Oregon "for further disposition on the rescission claim[] because the evidence considered here won't resolve those claims, which involve the important question of whether the Operating Agreement in question violates Oregon public policy." (Doc. No. 2239 at 129.)

**B.** CONSOLIDATION OF *SLAYMAN* AND *LEIGHTER*

The parties agree that, upon remand to the District of Oregon, the *Leighter* case should be consolidated with the *Slayman* case (transferee docket number 3:05-cv-00596 (N.D. Ind.) and transferor docket number 3:05-cv-1127 (D. Or.)) for all purposes, including trial.

**C.** SCHEDULING CONFERENCE

While the parties are still evaluating their options with respect to the *Leighter* case, the parties agree that they will promptly seek a scheduling/status conference in the District of Oregon in order to obtain definitive guidance from the transferor court regarding the future progress of the *Leighter* lawsuit, and that, until receiving such guidance from the transferor court, they will not commence or seek to commence any further discovery or file or seek to file any further dispositive or partially-dispositive motions.

**D.** REMAINING DISCOVERY

Additional Fact Discovery. The parties believe that, once the *Leighter* case proceeds to the trial-preparation phase, some additional non-duplicative discovery at the terminal level will be necessary regarding the merits of the plaintiffs' remaining claim and FedEx Ground's defenses. This may include some limited written discovery (e.g., requests for production of documents, and interrogatories) and depositions (e.g., Plaintiffs, FedEx Ground terminal senior and service managers, contractors, and contractor-retained workers). The parties propose to meet and confer regarding the precise limits for such discovery and to obtain definitive resolution thereof before the District of Oregon at the appropriate juncture.

Damages Discovery. No damages discovery has occurred in the MDL proceeding. The parties agree that damages discovery is necessary before any trial of the remaining claim occurs.

Expert Discovery. With respect to non-damages issues "other than employment status," the Court has previously stated that such expert discovery "may be warranted." (Doc. No. 2028 at 4.) Plaintiffs do not believe that expert discovery is warranted regarding the remaining claim. FedEx Ground may seek to use additional expert testimony with regard to the remaining claim.

### E. DISPOSITIVE MOTIONS

Plaintiffs and FedEx Ground reserve their respective rights to bring summary judgment motions regarding the Plaintiffs' remaining claim in the transferor court.

### F. PRETRIAL MOTIONS

The parties agree that they should be allowed to bring *Daubert* motions regarding additional expert reports, if any are allowed. The parties reserve their respective right to bring the motions described above, motions in limine, motions regarding jury instructions, and any other pre-trial motions.

### G. ALTERNATIVE DISPUTE RESOLUTION

Plaintiffs' Position. Plaintiffs have previously stated, and continue to submit, that the parties should engage in an appropriate ADR process and are willing to engage in private mediation or other settlement process.

Plaintiffs further submit that Co-Lead Counsel and Plaintiffs' Steering Committee's motion for a common benefit set-aside order covering the five years of intensive litigation before this Court is entirely proper and that a joint pre-trial order is not the appropriate vehicle for arguing a motion. FedEx Ground's objection to the provision of the Plaintiffs' requested common benefit order focused on settlement of fee-shifting claims in a manner which ignores the five years of litigation before this court is especially meritless, where any concern that the

paragraph to which they object will somehow thwart settlement is, at best, far-fetched. Local counsel for Plaintiffs have full authority to settle the case if FedEx Ground were not entirely resistant to every effort that has been made by Plaintiffs to engage in any variety of ADR.

      <u>FedEx Ground's Position</u>. As discussed above, Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee have filed a Motion for Entry of a Common Benefit Set-Aside-Order (Doc. No. 2281), which, as of the date of this filing has not been ruled upon by the Court. It is FedEx Ground's position that, given that several cases have already been remanded, the issues raised by the motion require prompt resolution to ensure certainty and clarity in the settlement negotiation process, and to increase the likelihood that such negotiations will be successful. Accordingly, as stated in its original objections to Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee's motion filed on January 12, 2011 (Doc No. 2369), FedEx Ground requests that the Court clarify that, upon remand, local plaintiffs' counsel shall have complete authority to negotiate a settlement of this action and that Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee shall not have the ability to contest or seek to increase the total amount paid in any settlement of this action (whether attorneys' fees or damages).

      Dated: January 31, 2011.

<div align="center">Respectfully submitted,</div>

By: /s/Chris A. Hollinger      By: /s/Lynn Rossman Faris
     Chris A. Hollinger           Lynn Rossman Faris

Robert M. Schwartz           Lynn Rossman Faris
Chris A. Hollinger             LEONARD CARDER, LLP
O'MELVENY & MYERS LLP      1330 Broadway, Suite 1450
1999 Avenue of the Stars, Suite 700   Oakland, CA 94612
Los Angeles, CA 90067-6035      Tel: (510) 272-0169
Tel: (310) 553-6700           Fax: (510) 272-0174
Fax: (310) 246-6779

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

*Defendant's Lead and Liaison Counsel*

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

*Plaintiffs' Lead and Liaison Counsel*

Steve D. Larson
Mark Friel
STOLL STOLL BERNE LOKTING & SHLACHTER
PC
209 SW Oak Street Fifth Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

*Plaintiffs' Local Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of January, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> Susan E. Ellingstad
> seellingstad@locklaw.com
>
> Robert I. Harwood
> rharwood@whesq.com
>
> Lynn R. Faris
> lfaris@leonardcarder.com
>
> Peter J. Agostino
> agostino@aaklaw.com
>
> Peter W. Overs, Jr.
> povers@whesq.com
>
> Mark A Friel
> mfriel@stollberne.com
>
> Steve D Larson
> slarson@ssbls.com

The undersigned further certifies that a copy of the foregoing was mailed by United States Postal Service to the following non-CM/ECF participant:

> David F Rees
> Stoll Stoll Berne Lokting & Shlachter PC
> 209 SW Oak Street Fifth Floor
> Portland, OR 97204
>
> Joshua L Ross
> Stoll Stoll Berne Lokting & Shlachter PC
> 209 SW Oak Street Fifth Floor
> Portland, OR 97204

By: /s/ Chris A. Hollinger

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| ALL ACTIONS | ) ) | |

## MDL PLAINTIFFS' COUNSEL'S REPLY TO DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S AMENDED OBJECTIONS TO MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER

## INTRODUCTION

Ironically, after refusing to engage in Alternative Dispute Resolution (ADR) for more than five years of litigation (*see e.g.* Doc. 1722 at 4), FXG is now concerned about the proposed common benefit order creating an impediment to its ability to settle these MDL cases. More disconcerting than that, however, are FXG's efforts, immediately after cases are transferred out of the MDL, to go *around* the lawyers who have litigated the cases for the past five years and attempt to reach a settlement with the local counsel without any input from MDL Plaintiffs' Counsel who have represented all of the Plaintiffs in the MDL for many years and undeniably have a vested interest in the settlement of those cases.

As a case in point, last week, unbeknownst to MDL Plaintiffs' Counsel, FXG and South Dakota Plaintiffs' counsel settled the recently transferred *Bunger* case; entered into a confidential settlement agreement which included a payment of attorney's fees to South Dakota counsel; and filed a stipulation for dismissal with prejudice with the South Dakota district court.[1] FXG engaged in settlement discussions and quickly moved to dismiss the case the next business day without any notice to MDL Plaintiffs' counsel despite this Court's express retention of jurisdiction over the case to enter an assessment for attorney's fees from any potential recovery; despite the pendency of MDL Plaintiffs' Counsel's motion for entry of a common benefit order which would affect the payment of attorney's fees under a settlement agreement; and despite FXG's and South Dakota Plaintiffs' counsel's objections to the proposed common benefit order which await resolution by this Court. Neither FXG nor South Dakota Plaintiffs' counsel have revealed the terms of the settlement or the attorney's fee provision to MDL Plaintiffs' Counsel. This deliberate exclusion of MDL Plaintiffs' Counsel and rush to settle a case that was almost

---

[1] *See* Exhibit 1 to the Declaration of Susan E. Ellingstad, filed herewith.

exclusively litigated in the MDL before the Court issues its order demonstrates the importance of the relief sought by MDL Plaintiffs' Counsel in their motion for a common benefit set-aside order.

This reply addresses FXG's amended objections to MDL Plaintiffs' Counsel's motion, which include FXG's objection to the Court's jurisdiction over any case that it can resolve and dismiss prior to entry of the Court's order. Although FXG takes no issue with the majority of the proposed common benefit order, it objects to certain provisions which it claims "impede" settlement. First, FXG objects to paragraph three of the proposed order, which permits MDL Plaintiffs' Counsel, in a limited number of cases, to petition a special master appointed by the Court for attorney's fees and costs from FXG if FXG settles a case involving a fee-shifting claim and "the total negotiated attorney fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel."

FXG does not object to paragraph two of the order, which permits MDL Plaintiffs' Counsel to petition a special master for an award of attorney fees if a remanded fee-shifting case is tried through judgment. But the law does not treat negotiated settlements of fee-shifting claims any differently than judgments on such claims. If FXG negotiates a settlement which includes attorney's fees with Plaintiffs' local attorneys, then MDL Plaintiffs' Counsel also should be permitted to petition a special master for an award of attorney's fees and costs which were not considered, especially considering the Court's broad equitable authority to compensate its appointed MDL counsel.

Second, as mentioned above, FXG challenges the applicability of the proposed order to remanded cases that were part of this MDL but that have been settled by FXG before the Court's impending ruling on MDL Plaintiffs' Counsel's motion for entry of the proposed common

benefit order. But as set forth in the reply to South Dakota Plaintiffs' counsel's opposition (Doc. 2457), it is entirely proper and within the Court's reserved jurisdiction to apply a common benefit order to cases that have been transferred back or even <u>dismissed</u> by way of settlement or offers of judgment before the court enters the common benefit order.

  FXG also complains that the proposed order allegedly requires FXG to "administer the common benefit fund." But in addition to being a well settled method of ensuring that a common benefit fund is properly and efficiently funded, what has transpired in South Dakota since the Court remanded that case shows why FXG should be required to withhold a part of any settlement or judgment and deposit that amount into the FXG MDL Common Benefit Fund. MDL Plaintiffs' Counsel should not be required to monitor the dockets of the remanded cases or to chase funds to independently ensure that MDL Plaintiffs' individual attorneys and FXG are complying with any set-aside order issued by the Court.

## <u>ARGUMENT</u>

I.  **MDL PLAINTIFFS' COUNSEL SHOULD BE PERMITTED TO PETITION FOR ATTORNEY'S FEES FROM FXG WHERE A NEGOTIATED SETTLEMENT IN A FEE-SHIFTING CASE SUBSTANTIALLY UNDERVALUES THE WORK PERFORMED BY MDL PLAINTIFFS' COUNSEL.**

  FXG objects to paragraph three of the proposed order, which applies to remanded fee-shifting cases settled by FXG and MDL Plaintiffs' local attorneys after remand. FXG Mem. at 2-7.[2] Paragraph three of the proposed order gives MDL Plaintiffs' Counsel "the right to petition

---

  [2] FXG concedes that, in cases involving "any <u>judgment</u> for monetary relief which is obtained on a claim involving fee shifting," MDL Plaintiffs' Counsel would "have the right to submit to a Special Master appointed by this Court a petition for reasonable attorney's fees and costs to be paid by [FXG] and set aside in the FXG MDL Common Benefit Fund for the later distribution to MDL Plaintiffs' Counsel." Prop. Order ¶ 2 (emphasis added); *see also* FXG Mem. at 3 (in cases where plaintiffs are successful on fee-shifting claims, "successful plaintiffs' counsel generally would have the right to petition the court for an award of their fees/costs above and beyond the damages awarded to the plaintiffs"). This is a correct statement of the law. *See Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992) (holding that "there is certainly no

a Special Master[3] appointed by this Court for attorney's fees and costs payable by FXG to MDL Counsel . . . only if the total <u>negotiated</u> attorney's fees and costs substantially undervalue the time, effort or investment incurred by MDL Plaintiffs' Counsel."  Prop. Order ¶ 3 (emphasis added).  If MDL Plaintiffs' Counsel exercise their right to petition a special master for such attorney's fees and costs, "the settlement shall not be final or binding and the case shall not be dismissed until after final adjudication of attorney's fees and costs before the Special Master appointed by this Court."  *Id*.

Twenty-four cases initially brought as class actions in this MDL include one or more fee-shifting claims.  Declaration of Susan E. Ellingstad ¶ 3.  The majority of those cases were brought by MDL Plaintiffs' Counsel and that counsel will be involved in the litigation or resolution of the cases after transfer.  Because MDL Plaintiffs' Counsel – who fill the roles of both MDL Plaintiffs' Counsel and local counsel -- are in a position to adequately value "the time, effort or investment incurred by MDL Plaintiffs' Counsel," invocation of paragraph three will clearly be unnecessary in those cases.  Accordingly, paragraph three has very limited applicability and FXG's concern is overstated.  In addition, given the consultation requirement in paragraph B.1 of the proposed order (to which FXG also objects), MDL Plaintiffs' Counsel expect and hope there will be little or no need to invoke paragraph three.  In any event, for the reasons below, the Court should enter paragraph three of the proposed order because it has the authority to do so.  It is also entirely equitable that it do so, given the public policy that underlies fee-shifting to ensure that fees and costs are not deducted from a Plaintiffs'' recovery where the

---

error in shifting liability for court-appointed counsel's fees to a defendant if the plaintiff obtains a judgment against it under a fee-shifting statute such as the Odometer Act. This is all that the district court's orders require.").

[3] MDL Plaintiffs' Counsel does not object to FXG's request that any proceedings before a mediator, arbitrator, or special master be conducted confidentially, and that any filing related to those proceedings be made under seal.  FXG Mem. at 10 n.5.

law makes the Defendant responsible instead to encourage compliance with special remedial statutes.

> **A.** **MDL Plaintiffs' Counsel Should Be Permitted To Petition A Special Master For A Separate Award Of Attorney's Fees And Costs Paid By FXG In Settlement Of A Fee-Shifting Case.**

Contrary to FXG's claim, there is authority for allowing MDL Plaintiffs' Counsel to petition for a separate award of attorney's fees from FXG where a settlement between Plaintiffs' local attorneys and FXG provides for attorney's fees. *See Walitalo v. Iacocca*, 968 F.2d 741, 747 (8th Cir. 1992) (addressing MDL court's order that MDL counsel's fees would be payable by defendant where "(1) the defendant expressly assumes liability for the plaintiff's attorneys' fees in a settlement agreement; or (2) a plaintiff goes to trial and obtains a judgment under a fee-shifting statute against the defendant").

For example, in *Walitalo*, the court noted that "[i]t is well established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefitting from their services [and] [n]othing prevents defendants from assuming liability for these fees in a settlement agreement." *Id*. ("Chrysler knew that the plaintiffs would have to compensate lead and liaison counsel for their services and, in fact, conducted discovery into the amount of their fees. Accordingly, imposing liability for these fees on Chrysler fully comports with the settlements between plaintiffs and Chrysler."). Thus, if Plaintiffs' local attorneys settle a fee-shifting case with FXG, which settlement includes attorneys' fees, MDL Plaintiffs' Counsel may also petition the transferor courts for their own award of attorney's fees and costs from FXG because FXG will have assumed responsibility for those attorney's fees under its settlement with MDL Plaintiffs' local attorneys. *Id*.

The proposed order here simply spares the parties the time and expense of litigating that issue before the transferor court (which is what happened in *Walitalo*) by providing that MDL

Plaintiffs' Counsel can petition a special master appointed by the Court instead of the transferor court. Prop. Order ¶B.3.  *See In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1019 (5th Cir. 1977) (noting that it would be "unfeasible and irrational, and demeaning to the authority of the [MDL] court, to remit [MDL counsel] to appearing all over the country . . . to present payers for compensation").

###### B.    This Is Not A Case Where The Plaintiff's Attorney Is Prohibited From Recovering Attorney's Fees From The Defendant Because The Plaintiff Is Not Considered A Prevailing Party.

FXG also argues that MDL Plaintiffs' Counsel should not be permitted to petition for a separate award of attorney's fees in fee-shifting case settled by FXG because a settlement in a case with a fee-shifting claim "puts the parties in the same situation as if they had settled a case without such a claim – in neither event is there a statutory entitlement to attorneys' fees, and the plaintiffs' attorneys' fees/costs are recoverable only from the overall settlement amount."  FXG Mem. at 4.  FXG, therefore, argues that in the case of a settlement with a fee shifting claim, common-fund principles should nonetheless apply, and MDL Plaintiffs' Counsel's attorney's "fees/costs [should] be recovered only from the established common settlement fund."  *Id.* at 5.

As noted above, the *Walitalo* court rejected that argument.  But even if *Walitalo* were not controlling, the cases FXG cites do not prohibit the Court from issuing the relief requested in paragraph three of the proposed order and are not comparable to this case.  Those cases involve settlements by individual plaintiffs of federal fee-shifting claims, where, due to the terms of the settlements, plaintiffs were not considered "prevailing parties" under the applicable statutes. FXG Mem. at 3-4 (citing cases).  The circumstances of this MDL are radically different than settlements in ordinary federal fee-shifting cases, where plaintiff's individual attorneys perform all of the work on the plaintiff's behalf, and, therefore, any lump-sum settlement with the defendant may account for that individual attorney work.

In *Bingham v. New Berlin Sch. Distr.*, 550 F.3d 601, 602 (7th Cir. 2008), for example, parents of a special-education student filed a request for a due-process hearing, alleging that the school district failed to comply with the law and asked the district to reimburse them for the cost of their child's private-school tuition. Without admitting liability, the district issued a check to the parents for the cost of the tuition, which the parents accepted. *Id.* The administrative law judge later dismissed the hearing, stating that "there remain[ed] no actual existing controversy that th[e] tribunal ha[d] the authority to adjudicate." *Id.* The parents then filed a request with the administrative law judge for a declaration that the parents had prevailed in their suit against the district, which was denied. *Id.* The parents appealed to the district court, which, too, held that the parents "were not prevailing parties, denied their motion for attorneys' fees, and dismissed the action." *Id.* The Seventh Circuit affirmed, noting that "[a] court may award attorneys' fees only in those cases where the plaintiff has prevailed by securing a material alteration of the legal relationship between the parties, either, for example, by court ordered consent decree or an enforceable judgment." *Id.* at 603.

*Bingham*, therefore, stands for the unremarkable proposition that an individual plaintiff bringing a federal fee-shifting claim who accepts a settlement that does not provide for attorney's fees cannot subsequently petition the court for an award of attorney's fees because the plaintiff cannot, by definition, be a prevailing party under the fee-shifting statute. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 600-01 (2001), which FXG also cites, stands for the same proposition.[4] Neither case applies to a MDL court's decision

---

[4] In *Buckhannon Bd. & Care Home, Inc.*, 532 U.S. 598, on which *Bingham* relied, plaintiffs – assisted-living facilities – brought suit against multiple parties alleging that certain provisions of West Virginia law violated the Fair Housing Amendments Act of 1988 (FHAA) and the Americans with Disabilities Act of 1990 (ADA). *Id.* at 600-01. While the lawsuit was pending, the West Virginia legislature repealed the statutes challenged by the lawsuit, and the

to fashion a common benefit order to account for a separate payment of attorney's fees to MDL counsel where a separately negotiated settlement of attorney's fees and costs between the defendant and Plaintiffs' local attorneys after transfer substantially undervalues the work performed by MDL counsel while the case was in the MDL.

### C. Cases Involving Final Attorney's Fees Awards From Classwide Settlement Funds Do Not Govern An MDL Court's Decision How To Fashion An Interim Common Benefit Order.

Citing Seventh Circuit cases involving classwide settlements resulting in the creation of common funds, FXG also argues that "when a fee-shifting claim is settled and a common settlement fund created, common fund principles govern." FXG Mem. at 4. But the cases cited by FXG, which do <u>not</u> address the propriety of a proposed common-benefit order, also do not control here because they address the proper method of compensating MDL and class counsel from an existing common fund rather than to create such a fund.

Indeed, the Seventh Circuit cases cited by FXG will apply only after the parties create and fund the proposed FXG MDL Common Benefit Fund, which MDL Plaintiffs' Counsel pointed out in their opening brief. MDL Pls. Mem. at 15 (noting that <u>after</u> the FXG MDL Common Benefit Fund contains funds to distribute for fees, MDL Plaintiffs' Counsel will have to petition the Court for an award of attorney's fees and the Court will have "to determine whether the request . . . for attorney's fees . . . is reasonable and should be compensable from the

---

defendant moved to dismiss the lawsuit as moot. *Id.* at 601. Plaintiffs subsequently moved for an award of attorney's fees and costs under both the FHAA and ADA, which the district court denied. *Id.* at 602. The Supreme Court, in affirming the denial of attorney's fees to the plaintiffs, addressed whether the "catalyst theory," "which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct," was not "a permissible basis for the award of attorney's fees under the FHAA and ADA." *Id.* at 601, 610 (internal citations omitted). The Court found that it was not.

Fund under the percentage-of-fund, lodestar, or hybrid approach for awarding common benefit attorney's fees and costs" (citing *Florin*)).

In *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 251 (7th Cir. 1988), plaintiffs successfully moved for class certification during the MDL and then later settled with defendant on a classwide basis. *Id.* The settlement resulted in a settlement fund. *Id.* Class counsel later petitioned the district court for an award of attorney's fees and costs from the fund. *Id.* On appeal from the district court's award of attorney's fees and costs to class counsel, the Seventh Circuit held that "when a case is initiated under a statute with a fee-shifting provision and is settled with the creation of a common fund," and "when a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees, equitable fund principles must govern the court's award of the attorneys' fees" from the fund. *Id*. at 254, 256.

The *Skelton* court held that in evaluating a request for class counsel's attorney's fees in a case where a settlement fund is created from a classwide settlement of fee-shifting claims, equitable-fund principles generally should govern the amount of the ultimate attorney's fees award. *Id.* Here, however, MDL Plaintiffs' Counsel seek merely to establish the FXG MDL Common Benefit Fund; they make no claim for attorney's fees and costs at this time. Thus, though *Skelton*'s analysis may apply when MDL Plaintiffs' Counsel petition the Court for an award of attorney's fees and costs <u>after</u> the common-benefit fund is created and funded, it does not apply to the initial step of creating and funding the fund through the multiple sources provided in the proposed order.

*Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 562 (7th Cir. 1994), also cited by FXG, was a <u>non-MDL</u> case that involved an issue similar to the one addressed by the *Skelton*

court, namely the method by which class counsel should be compensated from a classwide settlement fund created by a settlement of fee-shifting claims under ERISA. The *Florin* court held that "in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court," and the district court had the discretion to determine "which method is the most efficient and suitable to" the particular case. *Id*. at 566.

Like the *Skelton* court, the *Florin* court did not address the discretion an MDL court has in entering a common benefit set-aside order. *See also generally In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (addressing compensation to class counsel from settlement fund created by classwide settlement; no discussion about the proper way to fund a common benefit fund). Thus, neither *Skelton*, nor *Florin*, nor *In re Enron* prevents the Court from adopting paragraph three of the proposed common benefit order.

**D.     MDL Plaintiffs' Counsel's Ability To Petition For A Separate Award Of Attorney's Fees In A Fee-Shifting Case Would Not Impede Settlements Of Such Cases.**

FXG also contends that MDL Plaintiffs' Counsel's right to petition a special master for a separate award of attorney's fees from FXG in a fee-shifting case, and the provision of the proposed order that prevents any settlement in a fee-shifting case from being final and binding "until after final adjudication of attorney's fees and costs before the Special Master," Prop. Order ¶ 3, "would significantly hinder the settlement of cases with fee-shifting claims." FXG Mem. at 5. FXG claims that if paragraph three is adopted, it "will likely not even enter into meaningful settlement discussions in the first place." *Id*.

Aside from the irony that until now FXG has been completely unwilling to even explore ADR, FXG's contention that paragraph three would "substantially impair the efficacy of settlement negotiations" is also unfounded and overstated. As noted above, paragraph three would only potentially apply to a very limited number of cases where MDL Plaintiffs' Counsel is

not also local counsel, and in those instances only if the local counsel should substantially undervalue in the settlement the time, effort and investment incurred by MDL Plaintiffs' Counsel after pre-settlement consultation. MDL Plaintiffs' Counsel would again meet and confer with local counsel, seek in good faith to resolve any disagreement, and invoke paragraph three only as a last resort.

Significantly, FXG is the party who petitioned the JPML to transfer all of the related cases against FXG to this Court for coordinated and consolidated pretrial proceedings. That MDL proceeding necessitated a leadership structure (appointed by the Court) whereby that leadership became responsible to bear the bulk of the time, resources and expense required to litigate ***all of the transferred cases -- regardless of each case's likelihood of success***. Now, after MDL Plaintiffs' Counsel have expended their time and resources for more than five years (and continue to expend them on behalf of all of the cases on appeal to the Seventh Circuit), FXG is deliberately circumventing MDL Plaintiffs' Counsel in an effort to quickly settle the transferred cases without their "interference." Regardless of whether the local attorneys have performed any work outside of the MDL proceeding, FXG wants the ability to confidentially settle the cases with the local counsel to the complete exclusion of MDL Plaintiffs' Counsel who have a significant investment in the cases. Having successfully advocated for consolidated MDL proceedings in the first place, FXG's position that the attorney's fees paid by FXG in a fee shifting case is none of MDL Plaintiffs' Counsel's business is unfair and inequitable.

Importantly, it is not just the attorneys, but also the Plaintiffs themselves who have an interest in reasonable attorney's fees being paid by FXG under fee-shifting statutes enacted to promote compliance with remedial laws. Fee-shifting claims are unique in the American legal system because they run directly contrary to the American Rule that each party to litigation must

bear his or her own attorney's fees.  Fee-shifting claims serve public policy by requiring any award of attorney's fees to come from the defendant, not from plaintiffs' overall recovery. Paragraph three of MDL Plaintiffs' Counsel's proposed common benefit order is entirely in line with this public policy and provides protections to the Plaintiffs in these cases that their reasonable attorney's fees in fee-shifting cases are paid by the defendant and not out of their damages.  If MDL Plaintiffs' Counsel are required to invoke paragraph three, it would simply give the Court the ability to ensure that settlements in fee-shifting cases adequately consider the work of MDL Plaintiffs' Counsel, a task well within the Court's equitable authority and without prejudice to any argument by FXG as to the appropriate amount, if any.  Indeed, requiring court approval of settlements is common under both federal and state law.  *See, e.g.*, Fed. R. Civ. P. 23(e)(2) (court must ensure that class settlements are "fair, reasonable, and adequate"); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 583 (3d Cir. 1984) (attorney's fees requests from a common fund must be approved by the court and are subject to "heightened judicial scrutiny").[5]

## II. THE COURT SHOULD APPLY THE PROPOSED COMMON BENEFIT ORDER TO ALL CASES THAT WERE PART OF THIS MDL REGARDLESS OF WHETHER THEY WERE REMANDED OR SETTLED BEFORE THE COURT ENTERS THE ORDER.

FXG argues that "[w]hile it is not clear from Lead MDL Plaintiffs' Counsel's motion whether they seek retroactive application of their requested set-aside order to any cases that were settled before the Court decides their motion, it clearly would be impractical and inefficient to do so," because transferor courts should not be "prohibited from dismissing actions on their dockets

---

[5] In the alternative, if the Court has concerns over paragraph three in its present form, MDL Plaintiffs' Counsel propose that the Court require MDL Plaintiffs' local attorneys to consult with and have a member of the Plaintiffs' Steering Committee involved in any settlement negotiations in a fee-shifting case.  Given the significant interest MDL Plaintiffs' Counsel and their clients have in these cases, participation and consultation is only fair, and can avoid the uncertainty of which FXG complains.

until a lengthy process of negotiation, mediation, arbitration, and a Special Master proceeding has run its course to resolve a fee dispute between Lead MDL Plaintiffs' Counsel and 'local' counsel." FXG Mem. at 7-8. With respect to remanded cases that already have been settled, FXG contends that its obligation should only "be to notify Lead MDL Plaintiffs' Counsel that a settlement occurred." *Id.* at 8.

FXG's contention that this Court cannot apply the proposed order to cases that have been remanded and settled <u>before</u> the Court enters the order is wholly without merit, especially when this Court expressly reserved its jurisdiction to enter the common-benefit order and no party objected to that reserved jurisdiction. MDL Pls. Reply to SD Pls. Mem. at 2-8; FXG Mem. at 7 (the proposed order should apply to "cases that have been, or will be, filed in or transferred to this Court as part of this MDL").

The Eighth Circuit has rejected as "without merit" the argument "that the parties to a case can avoid liability for their share of court-appointed counsels' fees by filing a stipulation of dismissal under Federal Rule of Civil Procedure 41(a)(1)(ii)". . ."If such a rule existed, a district court's power to appoint attorneys to act on behalf of other attorneys and parties in complex litigation would be meaningless. Attorneys would be unwilling to assume this position if the parties to the litigation could avoid compensating them simply by settling and filing a stipulation of dismissal." *Walitalo,* 968 F.2d at 744-47, 747 n.11 (addressing applicability of common benefit order to twenty-seven cases that had already been settled as the result of certain plaintiffs accepting defendant's offers of judgment and four additional consolidated cases the parties had dismissed by entering into stipulations for dismissal under Fed. R. Civ. P. 41(a)(1)(ii)).[6]

---

[6] *Accord Willy v. Coastal Corp.*, 503 U.S. 131, 138 (1992) (a district court can consider collateral matters even after an action is no longer pending because such matters "do[]not signify a district court's assessment of the legal merits of the complaint"); *In re Zyprexa Prods. Liab.*

Contrary to FXG's argument, it is perfectly acceptable to require the parties (including FXG and South Dakota Plaintiffs) to certify in writing that an "assessment has been set aside and deposited into the FXG MDL Common Benefit Fund," even if the case has been settled before the Court enters the proposed order. *E.g.*, *In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig.*, MDL No. 1785, 2008 WL 2330571, *2 (D.S.C. May 21, 2008) (entering common benefit order requiring plaintiffs' and defendant's counsel to "certify that the assessment has been withheld and deposited into the Common Benefit Fund or, alternatively, that th[e] Order does not apply to the case"); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, MDL No. 1699, 2006 WL 471782, *2 (N.D. Cal. Feb. 28, 2006) ("No orders of dismissal of any plaintiff's claim in which any recovery is received, and which is subject to this order, shall be filed unless accompanied by a certificate of plaintiff's and defendant's counsel that the assessment has been withheld and deposited into the common benefit fund"); *In re Guidant Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2006 WL 409229, *2 (D. Minn. Feb. 15, 2006) (same certification language).

---

*Litig.*, 594 F.3d 113, 127 (2d Cir. 2010) (Kaplan, J., concurring) (a common benefit order imposing an assessment to compensate MDL counsel is "even less related to the ultimate merits than orders awarding attorney's fees, which are collateral matters over which a court retains jurisdiction even if it ultimately is determined to lack subject matter jurisdiction"); *In re Genetically Modified Rice Litig.*, , 2010 WL 716190, a *4 n.3 ("I . . . see no difficulty extending this order to all federal cases, whether they are now before me or are transferred here in the future."); *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 273-74 (E.D.N.Y. 2006) ("*Zyprexa I*") (applying common benefit order to "all cases pending before [the MDL court], and those which may be transferred to it as tag-along matters, notwithstanding that those cases may ultimately be adjudicated in the federal and state courts in which they originated. . . .  The common benefit fund fee set-aside imposed by this order shall apply to all cases pending – or to be pending – in this MDL, regardless of whether any of those cases are eventually remanded to state court or transferred to another federal court."); *id.* at 274 ("It is well established that a federal court may consider collateral issues after an action is no longer pending" and an " 'award of attorney's fees is a collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits.'").

Finally, it is not improper for this Court to prevent FXG and MDL Plaintiffs' local attorneys from dismissing settled actions[7] until the parties have certified that they have deposited the appropriate assessment into the FXG MDL Common Benefit Fund. *E.g.*, *In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig.*, 2008 WL 2330571, at *2 (stating that "the Court's receipt of [a certification that an assessment has been paid to the common benefit fund] shall be a precondition to the dismissal of any MDL plaintiffs case in which a recovery is received"); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2006 WL 471782, at *2 (conditioning dismissal on certification that the common benefit assessment had been paid); *In re Guidant Defibrillators Prods. Liab. Litig.*, 2006 WL 409229, at *2 (same language). [8]

---

[7] Of course, FXG and South Dakota Plaintiffs have already violated this provision of the proposed order by dismissing the South Dakota case with prejudice on January 25, 2001 despite both parties being aware that this order was pending before the Court. *See* Ex. 1 to Ellingstad Aff.

[8] FXG also argues that the "Court lacks jurisdiction to enter a set-aside order that would apply to non-transferred federal cases, state cases, or unfiled claims that might be settled without litigation." FXG Mem. at 7. To the contrary, a common benefit order can apply to such cases. *Zyprexa I*, 467 F. Supp. 2d at 265 ("A transferee court in federal multidistrict litigation has the power to determine the compensation for appointed lead counsel and to impose its fee calculation on all federal plaintiffs, even if their cases are 1) before other federal courts rather than the transferee court, or 2) not yet in federal court, but ultimately are in such a court."); *In re Genetically Modified Rice Litig.*, No. 4:06 MD 1811 CDP, 2010 WL 716190, *5 (E.D. Mo. Feb. 24, 2010) (pointing out that *In re Latex Gloves Prods. Liab. Litig.*, 2003 U.S. Dist. LEXIS 18118 (E.D. Pa. Sept. 5, 2003) "found that state court cases were properly subject to the common benefit assessment, because the lawyers in those cases were using discovery materials from the MDL").

But if the Court chooses not to apply the order to nontransferred federal cases, state cases, and unfiled cases, the Court should include a provision in the order preventing the use in such cases of MDL common benefit work unless counsel in those cases agrees to be bound by the order. In other words, the Court should include a provision in the order that conditions any use by future federal or state plaintiffs of the common benefit work created by Plaintiffs' MDL Counsel on their agreement to abide by the set-aside provisions of the proposed order. *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *5 (noting that plaintiffs' attorneys who did not agree to the common benefit order "will be unjustly enriched by being able to use the work of leadership counsel, unless their settlement agreements or the state courts having

## III. THE COURT SHOULD REQUIRE FXG TO WITHHOLD THE SET-ASIDE AMOUNT FROM ANY SETTLEMENT OR JUDGMENT AND PAY THAT AMOUNT DIRECTLY INTO THE FUND.

"Although FXG recognizes that this Court has discretion to direct a defendant to set aside a certain portion of any settlement or judgment into a common fund," it nonetheless argues that it should not be "tasked with administering the common benefit fund" because the number of lawsuits in this MDL "is relatively small, particularly when compared to other cases where a common fund has been established."  FXG Mem. at 8.  FXG argues that the responsibility for setting aside a part of any settlement or judgment should fall on MDL Plaintiffs' local attorneys because they "can be expected to comply with the Court's Order."  *Id*. at 9.

As an initial matter, MDL Plaintiffs' Counsel are not asking FXG to "administer the fund."  They are only asking that the Court require FXG to set aside part of any settlement or judgment and deposit that amount into the proposed FXG MDL Common Benefit Fund.  Proposed Order B.4.[9]

---

jurisdiction over their cases rectify this unfair free-riding by requiring their participation in the fund"); *In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig*., 2008 WL 2330571 at *3 (providing that plaintiffs' steering committee had "no obligation" to provide "MDL materials" to plaintiffs' attorneys who had chosen not to execute a participation agreement with the steering committee for use of the MDL materials); *Zyprexa I*, 467 F. Supp. 2d at 269 ("This court has suggested that the parties voluntarily resolve the issue of payment for [MDL counsel's] work by agreeing that attorneys in state cases will assume an equitable proportionate share of the costs of discovery in this litigation.  It would be equitable to require state plaintiffs' attorneys to pay their proportionate share of the time and costs incurred [by MDL counsel for] its work for the common benefit of all plaintiffs, state and federal.").

[9] FXG's citation to *In re Zyprexa* for its argument that it should not be required to "administer the fund" is disingenuous.  FXG Mem. at 9.  In stating that "[t]here is no need to burden defendant Lilly with this chore; Lilly has no responsibility to provide for, or administer, the fund," the *In re Zyprexa* court was simply pointing out that plaintiffs' MDL counsel had not briefed the issue of the appropriate set-aside percentage and the court requested that they "suggest an appropriate percentage as soon as possible, after consultation with all interested attorneys and the special masters."  467 F. Supp. 2d at 267.  The *In re Zyprexa* court made no mention of defendant Lilly's responsibility for setting aside and depositing a percentage of any

There is ample authority for requiring a defendant to be responsible for depositing part of a settlement or judgment into a common benefit fund. MDL Pls. Mem. at 13 & n.6 (citing six district court cases entering common benefit orders that placed the responsibility on the defendant to sequester a percentage of any payments made by defendant to any MDL plaintiff into a common benefit fund established by MDL counsel); *see also* Manual for Complex Litigation (Fourth) § 20.312 ("MDL judges generally issues orders directing the <u>defendants</u> who settle MDL-related cases contribute a fixed percentage of the settlement to a general fund to pay national counsel." (emphasis added)).

Indeed, the *In re Linerboard* court rejected the same argument made by FXG here, because "[if] the Court were to impose on . . . plaintiffs the burden of depositing a percentage of any settlement or judgment . . . into an escrow account, it would require [MDL] counsel to spend countless hours monitoring cases throughout the country and enforcing a court order in other jurisdictions." *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 665 (E.D. Pa. 2003). The *In re Linerboard*'s court's assessment order applied to only <u>nine</u> tag-along actions that were transferred to the MDL court after the tag-along plaintiffs opted out of the MDL class. *Id.* at 651.

As such, whether the number of assessed cases is 300, *In re Genetically Modified Rice Litig.*, No. 4:06 MD 1811 CDP, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010), or only <u>nine</u>, *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 665, the underlying considerations remain the same: MDL Plaintiffs' Counsel should not be required to constantly monitor all of the remanded cases to ensure that FXG and MDL Plaintiffs' individual attorneys comply with the proposed order. It will not be burdensome for FXG to comply with this part of the proposed order; indeed,

---

settlement or judgment into the common benefit fund <u>after</u> the percentages were agreed on by MDL counsel and the special masters. *Id.*

segregated payments to plaintiffs and their counsel happen all the time, even in the most basic civil litigation. Finally, the circumstances surrounding the South Dakota settlement show why FXG should be required to withhold the amount of any settlement or judgment and deposit that set-aside amount directly into the common benefit fund.

## IV. THE COURT SHOULD REQUIRE MDL PLAINTIFFS' LOCAL ATTORNEYS TO CONSULT WITH MDL PLAINTIFFS' COUNSEL BEFORE ENTERING INTO ANY SETTLEMENTS.

FXG also seeks "clarification" of the provision in the proposed order that requires MDL Plaintiffs' local attorneys to consult with MDL Plaintiffs' Counsel. Prop. Order ¶ B.1. The provision, in its entirety, states: "MDL Plaintiffs and MDL Counsel have some interest in the settlement and/or judgment obtained in cases covered by this Order. To ensure that Co-lead Counsel and the Plaintiff Steering Committee have an opportunity to address such interests and to facilitate such settlements or judgments, they shall be consulted for input with regard to damage issues, costs and attorneys fees incurred." *Id.* FXG argues that "there could potentially be disputes as to whether Lead MDL Plaintiffs' Counsel was adequately 'consulted' prior to settlement in any given case," and that if such a provision "could be the basis for undoing a settlement, that will inject still more uncertainly into the settlement negotiation process." FXG Mem. at 9.

The consultation provision in paragraph B.1 simply seeks to ensure that MDL Plaintiffs' Counsel are contacted and consulted before a case is settled by MDL Plaintiffs' individual attorneys. Given MDL Plaintiffs' Counsel's substantial investment in the cases that have been part of the MDL proceeding, it is reasonable to require consultation by Plaintiffs' local attorneys. In any event, the proposed order does not provide that any "failure to consult" would be the basis "for undoing a settlement," though it is conceivable that Plaintiffs' local attorneys could be subject to sanctions in this Court if they fail to comply with the Court's order. Given that the

only parties' subject to this provision are Plaintiffs' local attorneys, none of whom have objected

to the provision, FXG's objection to the inclusion of this provision should be rejected.

## CONCLUSION

MDL Plaintiffs' Counsel respectfully request that the Court reject FXG's amended

objections and enter MDL Plaintiffs' Counsel's proposed common benefit set-aside order.

Dated: February 1, 2011           Respectfully submitted,

                                       LOCKRIDGE GRINDAL NAUEN P.L.L.P.

                                       **s/ Susan E. Ellingstad**
                                       Susan E. Ellingstad
                                       100 Washington Avenue South, Suite 2200
                                       Minneapolis, MN  55401
                                       Tel:    (612) 339-6900
                                       Fax:    (612) 339-0981
                                       Email: seellingstad@locklaw.com

Lynn Rossman Faris                  Robert I. Harwood
Eleanor Morton                        Matthew M. Houston
LEONARD CARDER, LLP           HARWOOD FEFFER LLP
1330 Broadway, Suite 1450         488 Madison Avenue, 8th Floor
Oakland, CA  94612                 New York, NY  10022
Tel:    (510) 272-0169            Tel:    (212) 935-7400
Fax:    (510) 272-0174            Fax:    (212) 753-3630
Email: lfaris@leonardcarder.com   Email: rharwood@hfesq.com
        emorton@leonardcarder.com

### PLAINTIFFS' CO-LEAD COUNSEL

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650
Email: agostino@aaklaw.com

### PLAINTIFFS' LIAISON COUNSEL

J. Gordon Rudd
Anne T. Regan
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall
Suite 501
Minneapolis, MN  55401
Tel:     (612) 341-0400
Fax:     (612) 341-0844
Email: jgr@zimmreed.com
        atr@zimmreed.com

Jordan M. Lewis
SIEGEL, BRILL, GREUPNER, DUFFY
  & FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN  55401
Tel:     (612) 337-6100
Fax:     (612) 339-6591
Email: jordanlewis@sbgdf.com

**PLAINTIFFS' STEERING COMMITTEE**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

------------------------------------------------------ )
                                       )
In re FEDEX GROUND PACKAGE       )      Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT        )      (MDL 1700)
PRACTICES LITIGATION             )
                                         )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:       )
                                         )
ALL ACTIONS                              )
------------------------------------------------------ )

## DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF
## MDL PLAINTIFFS' COUNSEL'S REPLY TO DEFENDANT FEDEX GROUND
## PACKAGE SYSTEM, INC.'S AMENDED OBJECTIONS TO MOTION FOR ENTRY OF
## COMMON BENEFIT SET-ASIDE ORDER

I, SUSAN E. ELLINGSTAD, state:

1.       I am an attorney with the law firm of Lockridge Grindal Nauen P.L.L.P., one of the firms named Co-Lead Counsel for Plaintiffs in this matter. I submit this declaration in support of MDL Plaintiffs' Counsel's Reply to Defendant FedEx Ground Package System, Inc.'s Amended Objections to Motion for Entry of Common Benefit Set-Aside Order.

2.       Attached as Exhibit 1 are true and correct copies of dismissal pleadings from the case *Kimberly Bunger, et al. v. FedEx Ground Package System, Inc.*, Civil No. 4:05-cv-04056.

3.       Based on MDL Plaintiffs' Counsel's review of the state-wide cases, the following twenty-four cases include fee-shifting claims:

- *David Harris v. FedEx Ground Package System, Inc.,* Civil No. 3:06-cv-00209-RLM-CAN (AR)

- *Dean Alexander, et. al. v. FedEx Ground Package System, Inc.,* Civil No. 3:05-cv-00528-RLM- CAN (CA)

435005.1

- *Horacio Flores, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00478-RLM-CAN (CO)

- *Thomas Magno, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-CV-00322-RLM-CAN (CT)

- *Donald E. Carlson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00664-RLM-CAN (FL)

- *Tim Johnson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00652-RLM-CAN (IA)

- *Roger Riewe, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00390-RLM-CAN (IN)

- *Attilio Catanese, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00324-RLM-M-CAN (LA)

- *Edward Sheehan, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:05-cv-00531-RLM-CAN (MA)

- *Thomas Westcott v. FedEx Ground Package System, Inc.*, Civil No. 3:06-CV-00485-RLM-CAN (MD)

- *Katrina Lee, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:05-cv-00533-RLM-CAN (MN)

- *Rob Carlson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00393-RLM-CAN (MT)

- *Sharon Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-CV-00326-RLM-CAN (NC)

- *Robert Gennell, Jr., et al., v. FedEx Ground Package System, Inc.*, Civil No. 3:05-CV-00601-RLM-CAN (NH)

- *Michael Tofaute, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00595-RLM-CAN (NJ)

- *Michael Decesare, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00120-RLM-CAN (NV)

- *Larry Louzau, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:06-CV-00485-RLM-CAN (NY)

- *Jon Leighter, et al.  v. FedEx Ground Package System, Inc.,et al.,* Civil No. 3:07-cv-00328-RLM-CAN (OR) and *Edward Slayman, et al.  v.*

*FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00596-RLM-CAN (OR)

- *Derek Willis v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00597-RLM-CAN (PA)

- *Gregory Cooke, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:05-cv-00668-RLM-CAN (SC)

- *Arthur Smith, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00600-RLM-CAN (TN)

- *Dan Fishler, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:08-cv-00053-RLM-CAN (UT)

- *Frank Gruhn, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00412-RLM-CAN (VT); and

- *Lawrence Asbury, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:06-cv-00826-RLM-CAN (WV)

I swear under penalty of perjury under the laws of the State of Minnesota and the United States that the foregoing is true and correct. Executed on February 1, 2011 at Minneapolis, Minnesota.

**s/Susan E. Ellingstad**
Susan E. Ellingstad

3

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

KIMBERLY A. BUNGER,                    )          Civ. 05-4056-KES
DARRELL ENGBRECHT,                     )
JOHN F. ESCULANO, JAY                  )
HEINTZ, STEVE PERSING, and             )
CHAD VIERECK, on behalf of             )
themselves and others similarly        )
situated,                              )
                                       )
          Plaintiffs,                  )          JUDGMENT OF DISMISSAL
                                       )              WITH PREJUDICE
     vs.                               )
                                       )
FEDEX GROUND PACKAGE                   )
SYSTEM, INC., and FEDEX                )
GROUND PACKAGE SYSTEM,                 )
INC. d/b/a FEDEX HOME                   )
DELIVERY,                              )
                                       )
          Defendants.                  )

     Defendants move for entry of judgment for dismissal with prejudice,

and the parties have entered into a stipulation. It is

     ORDERED, ADJUDGED AND DECREED that plaintiffs', Kimberly A.

Bunger, Darrell Engbrecht, Jay Heintz, Steve Persing, and Chad Viereck,

Complaint, Amended Complaint, and Second Amended Complaint dated

January 9, 2006, in this matter are dismissed upon their merits with

prejudice, without taxation of costs and disbursements, and with each party to

bear their own attorneys' fees.

     Dated January 25, 2011.

                         BY THE COURT:


                         /s/ Karen E. Schreier
                         KAREN E. SCHREIER
                         CHIEF JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| KIMBERLY A. BUNGER, DARRELL ENGBRECHT, JOHN F. ESCULANO, JAY HEINTZ, STEVE PERSING, and CHAD VIERECK, on behalf of themselves and others similarly situated, | CIV. 05-4056-KES |
| Plaintiffs, | **MOTION FOR ENTRY OF JUDGMENT FOR DISMISSAL WITH PREJUDICE** |
| v. | |
| FEDEX GROUND PACKAGE SYSTEM, INC. and FEDEX GROUND PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY | |
| Defendants. | |

Defendant FedEx Ground Package System, Inc. ("FedEx Ground") respectfully moves the Court to adopt the attached Stipulation for Judgment for Dismissal with Prejudice, and dismiss this matter with prejudice, pursuant to the Stipulation.

Dated this 24th day of January, 2011.

/s/    Christopher W. Madsen
Electronically Filed
Thomas J. Welk
Christopher W. Madsen
BOYCE, GREENFIELD, PASHBY & WELK, L.L.P.
101 North Phillips Avenue, Suite 600
P.O. Box 5015
Sioux Falls, SD 57117-5015
(605) 336-2424

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Christopher W. Madsen, hereby certify that I am a member of the law firm of Boyce, Greenfield, Pashby & Welk, L.L.P. and that on the 24th day of January, 2011, I electronically filed a **Motion for Entry of Judgment and Dismissal with Prejudice** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filings to the following attorneys:

**Matthew T. Tobin** (matt@sdtrustco.com)


_/s/_     _Christopher W. Madsen_
Electronically Filed
Christopher W. Madsen

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| KIMBERLY A. BUNGER, DARRELL ENGBRECHT, JOHN F. ESCULANO, JAY HEINTZ, STEVE PERSING, and CHAD VIERECK, on behalf of themselves and others similarly situated, | CIV. 05-4056-KES |
| Plaintiffs, | **STIPULATION FOR JUDGMENT FOR DISMISSAL WITH PREJUDICE** |
| v. | |
| FEDEX GROUND PACKAGE SYSTEM, INC. and FEDEX GROUND PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY | |
| Defendants. | |

Plaintiffs Kimberly A. Bunger, Darrell Engbrecht, Jay Heintz, Steve Persing, and Chad Viereck ("Plaintiffs"), and Defendants FedEx Ground Package System Inc. and FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery ("Defendants"), through their respective attorneys of record, stipulate and agree that Plaintiffs' Complaint, Amended Complaint, and Second Amended Complaint dated January 9, 2006, against Defendants, shall be dismissed on their merits, with prejudice, and without taxation of costs, attorneys fees, or disbursements to any party, and that the Court may enter a judgment of dismissal, with prejudice, without necessity of a hearing or further notice to any party.

Dated this 21st day of January, 2011.

_____
Matthew T. Tobin
South Dakota Trust Company, LLC
201 S. Phillips Avenue, #200
Sioux Falls, SD 57104
(605) 271-5028

*Attorney for Plaintiffs*

Dated this **31** day of January, 2011.

Thomas J. Welk
Christopher W. Madsen
BOYCE, GREENFIELD, PASHBY & WELK, L.L.P.
101 North Phillips Avenue, Suite 600
P.O. Box 5015
Sioux Falls, SD  57117-5015
(605) 336-2424

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

-------------------------------------------------- )
                                                   )
In re FEDEX GROUND PACKAGE                         )      Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                            )      (MDL 1700)
PRACTICES LITIGATION                               )
                                                   )
-------------------------------------------------- )
                                                   )
THIS DOCUMENT RELATES TO:                          )
                                                   )
ALL ACTIONS                                        )
-------------------------------------------------- )

---

## CERTIFICATE OF SERVICE

---

I, Susan E. Ellingstad, hereby certify that on February 1, 2011, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **Michael L. Banks** | mbanks@morganlewis.com; tmyers@morganlewis.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com; paralegal@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Cameron H. Biscay** | cbiscay@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Sarah E. Bouchard** | sbouchard@morganlewis.com; tmyers@morganlewis.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr.** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Rosemary J. Bruno** | rosemary.bruno@bipc.com; linda.boccino@bipc.com |

435095.1

| | |
|---|---|
| **Stevan E. Bunnell** | sbunnell@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Mark T. Clouatre** | clouatre@wtotrial.com; wesson@wtotrial.com |
| **James P. Cooney, III** | jcooney@wcsr.com; lreardin@wcsr.com |
| **Kelly P. Corr** | kcorr@corrcronin.com; dpatterson@corrcronin.com |
| **Thomas W. Cranmer** | crammer@millercanfield.com; rouman@millercanfield.com; Christenson@millercanfield.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; mstevens@bnhmlaw.com; sbaith@bnhmlaw.com; kstone@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Steve Dennis** | sdennis@reiddennis.com; dblackshear@reiddennis.com; csanford@reiddennis.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; aahn@leonardcarder.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Randall J. Forbes** | rforbes@fufblaw.com; loretta@fufblaw.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com; ellen.boshkoff@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |

| William H. Haltom, Jr. | haltomw@thomasonlaw.com; sadetskyr@thomasonlaw.com |
| Clayton D. Halunen | halunen@halunenlaw.com |
| Robert K. Handelman | rhandelman@bnhmlaw.com |
| Robert I. Harwood | rharwood@hfesq.com |
| Kenneth G. Haynes | ghaynes@wyattfirm.com; tklapheke@wyattfirm.com; bleet@wyattfirm.com; sdubois@wyattfirm.com |
| Patrick H. Hicks | phicks@littler.com; akoorndyk@littler.com |
| Benjamin H. Hill, III | bhill@hwhlaw.com; bpreston@hwhlaw.com; jetlinger@hwhlaw.com |
| Chris A. Hollinger | chollinger@omm.com |
| Matthew M. Houston | mhouston@hfesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A. Jerman | tjerman@omm.com |
| Victor H. Jih | vjih@omm.com |
| Aparna B. Joshi | ajoshi@omm.com |
| Kimberly K. Kefalas | kefalas@millercanfield.com; kaiser@millercanfield.com |
| Soye Kim | skim@geclaw.com |
| Wendy M. Krincek | wkrincek@littler.com; ebeckman@littler.com |
| Carolyn J. Kubota | ckubota@omm.com |
| Steve D. Larson | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |
| Bryan D. LeMoine | lemoine@mcmahonberger.com |
| Jordan M. Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com; sgutherz@llrlaw.com |
| Gary F. Lynch | glynch@carlsonlynch.com |
| John S. Marshall | jmarshall@marshallandmorrow.com |
| Robert W. McFarland | rmcfarland@mcguirewoods.com; lneilson@mcguirewoods.com |
| Michael G. McGuinness | mmcguinness@omm.com |
| Sanford A. Meizlish | smeizlish@bnhmlaw.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Guy P. Michelson | gmichelson@corrcronin.com; aesteves@corrcronin.com; ebrubaker@corrcronin.com |

| | |
|---|---|
| **Eleanor I. Morton** | emorton@leonardcarder.com; aahn@leonardcarder.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Steve Olson** | solson@omm.com |
| **Ian Otto** | iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Lesley A. Pate** | lapate@venable.com |
| **Justin H. Perl** | justin.perl@maslon.com; amy.knott@maslon.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Brett J. Preston** | bpreston@hwhlaw.com; marcand@hwhlaw.com |
| **Nora M. Puckett** | npuckett@omm.com |
| **Charles Victor Pyle, III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | anne.regan@zimmreed.com; stefanie.hebig@zimmreed.com |
| **John B. Renick** | renick@mcmahonberger.com |
| **Laura E. Robinson** | lrobinson@omm.com |
| **Lawrence J. Rosenfeld** | rosendfeldl@gtlaw.com; pisanoh@gtlaw.com |
| **Rick D. Roskelley** | rroskelley@littler.com; mrodriguez@littler.com |
| **Beth A. Ross** | bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **Jessica G. Simbalenko** | simbalenko@wtotrial.com; allen@wtotrial.com; farina@wtotrial.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; jwoolley@scopelitis.com |
| **Joni M. Thome** | thome@halunenlaw.com |
| **Matthew T. Tobin** | matt@sdtrustco.com; lenandlaura@iw.net |
| **Scott Voelz** | svoelz@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |

| Michael J. Watton | jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com |
| Thomas J. Welk | tjwelk@bgpw.com; tajohnson@bgpw.com |
| Robert J. Wierenga | wierenga@millercanfield.com; chapmand@millercanfield.com |

I also certify that on February 2, 2011, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Steve Dennis
REID & DENNIS
Providence Tower
5001 Spring Valley Road, Suite 255W
Dallas, TX 75244

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

R. Christopher Gilreath
GILREATH & ASSOCIATES
200 Jefferson Ave. Suite 711
Memphis, TN 38103

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Dated: February 1, 2011                    Respectfully submitted,

                                           LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                           ___s/Susan E. Ellingstad_____
                                           Susan E. Ellingstad
                                           100 Washington Avenue South
                                           Suite 2200
                                           Minneapolis, MN  55401
                                           Tel:     (612) 339-6900
                                           Fax:     (612) 339-0981
                                           Email:  seellingstad@locklaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ------------------------------------------------------------ ) | | |
| In re FEDEX GROUND PACKAGE ) | Case No. 3:05-MD-527-RM | |
| SYSTEM, INC., EMPLOYMENT ) | (MDL 1700) | |
| PRACTICES LITIGATION ) | | |
| ------------------------------------------------------------ ) | | |
| ) | | |
| THIS DOCUMENT RELATES TO: ) | JUDGE MILLER | |
| ) | | |
| ALL ACTIONS ) | | |
| ) | | |
| ------------------------------------------------------------ ) | | |

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
MOTION FOR LEAVE TO FILE SUR-REPLY**

---

Defendant FedEx Ground Package System, Inc. ("FedEx Ground"), by counsel,
respectfully requests leave to file a sur-reply brief in response to the brief submitted by Lead
MDL Plaintiffs' Counsel in reply to FedEx Ground's Objections to Motion for Entry of Common
Benefit Set-Aside Order, and in support of its motion, states as follows:

1. Lead MDL Plaintiffs' Counsel filed a Motion for Entry of Common Benefit Set-
Aside Order (Doc. No. 2281) on December 28, 2010. FedEx Ground filed an objection to the
motion (Doc. No. 2369) on January 12, 2011, and submitted an amended objection on January
25, 2011 (Doc. No. 2459). Lead MDL Plaintiffs' Counsel filed a reply brief on February 1, 2011
(Doc. No. 2474).

2. In their reply brief, Lead MDL Plaintiffs' Counsel make representations
concerning FedEx Ground's actions with respect to settlement negotiations in remanded cases
that are inaccurate, and erroneously suggest they were unaware of settlement negotiations in

South Dakota (*Bunger*) due to efforts by FedEx Ground to "go *around* the lawyers who have litigated the cases for the past five years." (Doc. 2472 at 1 (emphasis in original).) To the contrary, FedEx Ground's counsel not only provided advance notice of the mediation to Lead MDL Plaintiffs' Counsel, but also confirmed with Lead MDL Plaintiffs' Counsel that, in their view, *Bunger* did not involve fee-shifting claims. Lead MDL Plaintiffs' Counsel would not have the right to modify a settlement in *Bunger* even if the Court granted their Motion. Further, while Lead MDL Plaintiffs' Counsel assert that the terms of the *Bunger* settlement have not been "revealed" to them, they omit reference to the fact that counsel for FedEx Ground offered to share the details of the settlement if they entered into a proposed confidentiality agreement. Lead MDL Plaintiffs' Counsel has not responded to this offer.

3. Lead MDL Plaintiffs' Counsel expressly cite their inaccurate statements as additional facts supporting their Motion. (*See, e.g.*, *id.* at 3 ("[W]hat has transpired in South Dakota since the Court remanded that case shows why FXG should be required to withhold a part of any settlement or judgment and deposit that amount into the FXG MDL Common Benefit Fund.").)

4. FedEx Ground could not have anticipated that Lead MDL Plaintiffs' Counsel would make or rely on such arguments in their reply brief. The statements need to be corrected so that this Court has an accurate record before it when ruling on Lead MDL Plaintiffs' Counsel's Motion for Entry of a Common Benefit Set-Aside Order.

5. FedEx Ground seeks leave to file a sur-reply brief, a copy of which is attached to this motion, to respond to Lead MDL Plaintiffs' Counsel's erroneous statements. The local rules do not provide for the filing of sur-reply briefs, as they typically are not necessary or required.

FedEx Ground, however, believes that a sur-reply is warranted in these circumstances, and respectfully requests leave to file the attached sur-reply brief.

Dated: February 3, 2011.

Respectfully submitted,

By: /s/ Chris A. Hollinger
     Chris A. Hollinger

| | |
|---|---|
| Thomas J. Brunner | Robert M. Schwartz |
| Alison G. Fox | Chris A. Hollinger |
| BAKER & DANIELS LLP | O'MELVENY & MYERS LLP |
| 202 S. Michigan St. | 1999 Avenue of the Stars, Suite 700 |
| South Bend, IN 46601 | Los Angeles, CA 90067-6035 |
| Tel: (574) 234-4149 | Tel: (310) 553-6700 |
| Fax: (574) 239-1900 | Fax: (310) 246-6779 |

*Defendant's Lead and Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 3d day of February, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

<u>/s/ Chris A. Hollinger</u>

# Exhibit 1

# Sur-Reply

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) ) ) | JUDGE MILLER |

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S SUR-REPLY IN RESPONSE TO PLAINTIFFS' CO-LEAD COUNSEL AND PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER**

In order to clarify certain facts regarding the settlement reached between FedEx Ground Package System, Inc. ("FedEx Ground") and the South Dakota plaintiffs, FedEx Ground respectfully submits this sur-reply and the accompanying Declaration of Chris A. Hollinger. The reply brief filed by Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee ("Lead MDL Plaintiffs' Counsel") in support of their Motion for Entry of Common Benefit Fund Set-Aside Order erroneously characterizes the settlement as a backroom deal that came as a complete surprise to them. (*See, e.g.,* Doc. No. 2474 at 1 (". . . last week, unbeknownst to MDL Plaintiffs' Counsel, FXG and South Dakota Plaintiffs' counsel settled the recently transferred *Bunger* case").)

In fact, FedEx Ground's counsel informed Lead MDL Plaintiffs' Counsel on multiple occasions that a settlement mediation was planned for the *Bunger* (South Dakota) case, and, in advance of the mediation, asked Lead MDL Plaintiffs' Counsel to confirm their prior oral

1

statements to the effect that the *Bunger* case did not involve fee-shifting claims (which Lead

MDL Plaintiffs' Counsel then confirmed). (*See* Declaration of Chris A. Hollinger ("Hollinger

Decl."), filed herewith, ¶¶ 2-4.)[1] FedEx Ground sought this assurance because, under their

Motion, Lead MDL Plaintiffs' Counsel would not have the right to modify the substantive terms

of a settlement with local counsel, or to seek the imposition of additional attorneys' fees and

costs against FedEx Ground, in a non-fee shifting case. As a result, the only potential issue with

the settlement in such a case would be a dispute between Lead MDL Plaintiffs' Counsel and

local counsel regarding the relative allocation of the attorneys' fees component of the settlement.

At no time before the dismissal of the *Bunger* case did Lead MDL Plaintiffs' Counsel take the

position that FedEx Ground must act as if their Motion had already been granted, by, for

example, not seeking dismissal of the *Bunger* case, or not making payments pursuant to the

terms of a settlement agreement, until their fee-allocation dispute with local counsel was

resolved. (*Id.* ¶ 5.)

  Also in need of clarification is Lead MDL Plaintiffs' Counsel's statement that "Neither

FXG nor South Dakota Plaintiffs' counsel have revealed the terms of the settlement or the

attorney's fee provision to MDL Plaintiffs' Counsel." (Doc. No. 2474 at 1.) Lead MDL

Plaintiffs' Counsel fail to mention that: (1) FedEx Ground's counsel had previously told them

that the details of the *Bunger* settlement would be shared as soon as they execute a

confidentiality agreement with FedEx Ground; (2) FedEx Ground's counsel had previously

provided a draft confidentiality agreement to Lead MDL Plaintiffs' Counsel for their review; and

(3) they have neither executed nor responded to the proposed confidentiality agreement.

(Hollinger Decl. ¶ 6.) Lead MDL Plaintiffs' Counsel also fail to mention that South Dakota

---

[1]   Lead MDL Plaintiffs' Counsel has similarly been given advance notice of settlement negotiations or settlement conferences in other cases. (*Id.* ¶ 2.)

plaintiffs' counsel had previously offered to hold the attorney's fees component of the *Bunger*

settlement in a trust account pending further instructions from the Court.  (*Id.* ¶ 7.)

    In sum, there has been no "deliberate exclusion of MDL Plaintiffs' Counsel," and the

facts regarding the *Bunger* settlement do not support the asserted "importance of the relief sought

by MDL Plaintiffs' Counsel."  (Doc. No. 2474 at 1-2.)

    Dated:  February 3, 2011.

<div align="center">Respectfully submitted,</div>

<div align="center">By: <u>/s/ Chris A. Hollinger</u><br>Chris A. Hollinger</div>

| | |
|---|---|
| Thomas J. Brunner | Robert M. Schwartz |
| Alison G. Fox | Chris A. Hollinger |
| BAKER & DANIELS LLP | O'MELVENY & MYERS LLP |
| 202 S. Michigan St. | 1999 Avenue of the Stars, Suite 700 |
| South Bend, IN 46601 | Los Angeles, CA 90067-6035 |
| Tel: (574) 234-4149 | Tel: (310) 553-6700 |
| Fax: (574) 239-1900 | Fax: (310) 246-6779 |

<div align="center">*Defendant's Lead and Liaison Counsel*</div>

SF1:812687.2

# Exhibit 2

# Declaration of Chris A. Hollinger

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

|  |  |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | JUDGE MILLER |

---

**DECLARATION OF CHRIS A. HOLLINGER IN SUPPORT OF SUR-REPLY IN RESPONSE TO PLAINTIFFS' CO-LEAD COUNSEL AND PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR ENTRY OF COMMON BENEFIT SET-ASIDE ORDER**

---

I, Chris A. Hollinger, declare and state as follows:

1.      I am a partner with the law firm of O'Melveny & Myers LLP, and I am one of the attorneys principally responsible for the representation of defendant FedEx Ground Package System, Inc. ("FedEx Ground") in the above-captioned matter.  I have personal knowledge of the facts set forth below, and, if called as a witness, I could and would competently testify thereto.

2.      After learning that a mediation would take place between FedEx Ground and the plaintiffs in the South Dakota (*Bunger*) action, I telephoned Lynn Faris, one of the MDL Plaintiffs' Co-Lead Counsel, on January 6, 2011.  I informed her that a mediation in *Bunger* had been scheduled, and asked her whether, given Lead MDL Plaintiffs' Counsel's December 28, 2010 filing of the motion for entry of a common benefit set-aside order, it was their position that the *Bunger* case involved fee-shifting claims.  Ms. Faris told me preliminarily that she did not think so, and that she would confirm Lead MDL Plaintiffs' Counsel's position.  In this

1

conversation, I also informed Ms. Faris that settlement conferences had been scheduled by the courts in the remanded *Blanchard* and *Flores* cases.

3.      On January 11, 2011, I sent Ms. Faris an e-mail asking for confirmation that, in the view of Lead MDL Plaintiffs' Counsel, the *Bunger* case did not involve a fee-shifting claim "within the meaning of plaintiffs' Motion For Entry Of Common Benefit Set-Aside Order." Shortly thereafter, Ms. Faris confirmed via e-mail that no fee-shifting claims were at issue in *Bunger*.  A true and correct copy of my January 11, 2011 e-mail exchange with Ms. Faris is attached hereto as Exhibit A.

4.      On January 14, 2011, Lead MDL Plaintiffs' Counsel submitted a "corrected" proposed order in connection with their motion for entry of a common benefit set-aside order. Thereafter, in a telephone conversation with Ms. Faris during the week of January 17 and prior to the mediation on January 21, I requested and received confirmation from Ms. Faris that the filing of the "corrected" proposed order did not change Lead MDL Plaintiffs' Counsel's previously-stated position that the *Bunger* case did not involve any fee-shifting claims.

5.      At no time before the dismissal of the *Bunger* case (on January 25, 2011) did Ms. Faris or other Lead MDL Plaintiffs' Counsel tell me that FedEx Ground should treat any settlement in the *Bunger* action in accordance with the procedures outlined in their motion and proposed order – a motion which has not been granted by the Court and as to which both South Dakota plaintiffs' counsel and FedEx Ground have filed objections.

6.      On or about January 27, 2011, I had a telephone conversation with Ms. Faris about the settlement in *Bunger*.  In response to her question, I told Ms. Faris that FedEx Ground would provide details about the *Bunger* settlement if Lead MDL Plaintiffs' Counsel entered into a confidentiality agreement.  Ms. Faris said that entering into a confidentiality agreement would

not be a problem.  On January 28, I provided Ms. Faris with a draft confidentiality agreement for her review.  A true and correct copy of my January 28, 2011 e-mail in that regard is attached hereto as Exhibit B.  Ms. Faris has not executed the proposed confidentiality agreement or responded to my January 28 e-mail.

7.      Exhibit C to my Declaration is a true and correct copy of a January 26, 2011 e-mail exchange between Susan Ellingstad (one of the MDL Plaintiffs' Co-Lead Counsel) and Matt Tobin (South Dakota plaintiffs' counsel).  In that e-mail exchange, Mr. Tobin offers to hold the attorney's fees component of the *Bunger* settlement in a trust account pending further instructions from this Court.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 3rd day of February, 2011, in San Francisco, California.

<div align="right">

/s/ Chris A. Hollinger
Chris A. Hollinger

</div>

SF1:812710.2

# Exhibit A
# to Hollinger Declaration

## Hollinger, Chris

---

| | |
|---|---|
| **From:** | Lynn Faris [lfaris@leonardcarder.com] |
| **Sent:** | Tuesday, January 11, 2011 2:37 PM |
| **To:** | Hollinger, Chris |
| **Cc:** | seellingstad@locklaw.com; rharwood@hfesq.com |
| **Subject:** | RE: FXG/South Dakota (Bunger) |

Chris:  On behalf of the MDL co-lead counsel, I can confirm that the Bunger case does not involve a fee-shifting claim within the meaning of the proposed common benefits set-aside order.

*Lynn Rossman Faris*

*Leonard Carder, LLP*

---

**From:** Hollinger, Chris [mailto:CHollinger@OMM.com]
**Sent:** Tuesday, January 11, 2011 2:27 PM
**To:** Lynn Faris
**Subject:** FXG/South Dakota (Bunger)

Lynn:

   As a follow-up to our discussion last week, it would be much appreciated if you could confirm Lead MDL Plaintiffs' Counsel's position that South Dakota (*Bunger*) does not involve a fee-shifting claim within the meaning of plaintiffs' Motion For Entry Of Common Benefit Set-Aside Order.

   Thanks for your cooperation.

Chris
*Chris A. Hollinger*
*O'Melveny & Myers LLP*
*Two Embarcadero Center*
*28th Floor*
*San Francisco, CA  94111-3305*
*Telephone:  (415) 984-8906*
*Fax:  (415) 984-8701*
*e-mail:  chollinger@omm.com*

*This message contains information from the law firm of O'Melveny & Myers LLP, which may be confidential or privileged.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.  If you have received this transmission in error, please notify me immediately by telephone ([415] 984-8906) or by return electronic mail (chollinger@omm.com).  Thank you.*

*IRS Circular 230 Disclosure*
*To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any matters addressed herein*

# Exhibit B
# to Hollinger Declaration

## Hollinger, Chris

| | |
|---|---|
| **From:** | Hollinger, Chris |
| **Sent:** | Friday, January 28, 2011 10:57 AM |
| **To:** | 'Lynn Faris' |
| **Subject:** | FXG/MDL -- Confidentiality Agreement |

Lynn:

As a follow-up to one of our prior discussions on the subject, I have set forth below a draft Confidentiality Agreement governing the provision of settlement-related information to Plaintiffs' Co-Lead Counsel. The final version of this document would be in letter format for your execution on behalf of the other two Plaintiffs' Co-Lead Counsel. Please let me know if this language is acceptable, and I will put it in a letter and send back for your signature.

Thanks. I will send you something on *Kelly* shortly.

\* \* \*

### CONFIDENTIALITY AGREEMENT

In consideration for FedEx Ground Package System, Inc.'s ("FedEx Ground's") disclosure to Plaintiffs' Co-Lead Counsel, or authorization of local plaintiffs' counsel to disclose to Plaintiffs' Co-Lead Counsel, otherwise confidential information regarding the settlement of *Bunger* or any other matter, Plaintiffs' Co-Lead Counsel hereby agree that, with the one exception noted below, they will not use or disclose to others any such confidential information--specifically including the fact of settlement, any monetary amounts agreed to or paid by FedEx Ground, and any other terms of any settlement in any matter. If Plaintiffs' Co-Lead Counsel is asked about the status of *Bunger* or any other settled matter, they will state only that "the case has been dismissed" or "no comment." In the event that Plaintiffs' Co-Lead Counsel believes that they are legally obligated to make any disclosure of information covered by this Confidentiality Agreement, they shall notify counsel for FedEx Ground in writing immediately, and in no event less than ten (10) days prior to the date for disclosure. If FedEx Ground takes any action to challenge such disclosure, Plaintiffs' Co-Lead Counsel shall defer making such disclosure until FedEx Ground's challenge is finally resolved, unless ordered by a Court to disclose the information notwithstanding FedEx Ground's challenge.

Notwithstanding the foregoing, FedEx Ground agrees that Plaintiffs' Co-Lead Counsel may use the information covered by this Confidentiality Agreement for the purpose, and **only** for the purpose, of resolving their dispute with local South Dakota plaintiffs' counsel regarding the relative allocation of attorney's fees as between the local plaintiffs' counsel and MDL Plaintiffs' Counsel in *Bunger* and/or resolving similar issues in other cases. In any proceeding to resolve fee-related disputes and issues (whether negotiation, mediation, arbitration, Special Master, or otherwise), Plaintiffs' Co-Lead Counsel shall hold and treat all information covered by this Agreement in the strictest confidence and, by way of example and without limitation, shall file documents containing such confidential information only under seal.

The undersigned is authorized to enter into this Agreement on behalf of the other Plaintiffs' Co-Lead Counsel, and to bind them to this Confidentiality Agreement.

\* \* \*

*Chris A. Hollinger*

*O'Melveny & Myers LLP*
*Two Embarcadero Center*
*28th Floor*
*San Francisco, CA  94111-3305*
*Telephone:  (415) 984-8906*
*Fax:  (415) 984-8701*
*e-mail:  chollinger@omm.com*

*This message contains information from the law firm of O'Melveny & Myers LLP, which may be confidential or privileged.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited.  If you have received this transmission in error, please notify me immediately by telephone ([415] 984-8906) or by return electronic mail (chollinger@omm.com).  Thank you.*

*IRS Circular 230 Disclosure*
*To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any matters addressed herein*

**Exhibit C
to Hollinger Declaration**

**Hollinger, Chris**

| | |
|---|---|
| **From:** | Ellingstad, Susan E. [Ellinse@locklaw.com] |
| **Sent:** | Wednesday, January 26, 2011 3:05 PM |
| **To:** | Matt Tobin; tjwelk@bgpw.com; cwmadsen@bgpw.com |
| **Cc:** | Hollinger, Chris; Schwartz, Robert; Lynn Faris; Robert Harwood; jordanlewis@sbgdf.com; Gordon Rudd; Anthony Marchetti |
| **Subject:** | RE: Bunger, et al. v. FedEx Ground Package System, Inc., et al. |
| **Attachments:** | Proposed order re Plaintiffs Common Benefit Motion.DOC |

Matt,

Your recollection of what is contained in the proposed order is incorrect, so I have attached it for your review. Please see paragraph 4. Pending before the court is MDL Plaintiffs' Counsel's motion and proposed order that would create obligations upon FXG regarding the payment of funds. We believe it is inappropriate to disburse funds in a way that is inconsistent with the pending motion and proposed order until the Court rules and therefore reiterate the request that such funds not be distributed until that time.

Susan E. Ellingstad | Attorney
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** Matt Tobin [mailto:matt@sdtrustco.com]
**Sent:** Wednesday, January 26, 2011 4:34 PM
**To:** Ellingstad, Susan E.; tjwelk@bgpw.com; cwmadsen@bgpw.com
**Cc:** chollinger@omm.com; rschwartz@omm.com; Lynn Faris; Robert Harwood; jordanlewis@sbgdf.com; Gordon Rudd; Anthony Marchetti
**Subject:** RE: Bunger, et al. v. FedEx Ground Package System, Inc., et al.

Susan,

This is in response to your letter on today's date to Mr. Welk and Mr. Madsen.

Contrary to the position taken in your letter, I don't recall your proposed order to require that any sum be withheld or paid into a common fund directly. Instead, for cases where a settlement is reached without a fee-shifting statute, I recall the motion requested that the court order the parties to proceed to binding mediation/arbitration if an agreement is not reached with regard to payment of attorney's fees. SD is a non-fee shifting state. I think your letter takes liberties and makes assertions that are not supported.

Also, any dispute as to attorney's fees is between Plaintiff's MDL counsel and me. It does not involve FedEx. I am well aware of your pending motion, as well as my continuing obligation to the Court. I am prepared to hold the funds until there is an order from the Court as to this issue. To suggest that we are engaged in some unwarranted activity or that we might cut and run is absurd!

As you know, the settlement was reached last Friday, and the case was dismissed yesterday. There has not been any breach of responsibility, especially in light of the fact that there isn't even an order from the Court, given that you have actual knowledge of the settlement within three business days.

I have confirmed with FedEx that I will handle the attorney fee issue, and I am now confirming that I will safeguard the attorney's fees in a trust account until such time as the Court issues its Order.

Matthew Tobin
SOUTH DAKOTA TRUST COMPANY, LLC
(605) 271-5028

---

**From:** Morton, Rachael M. [mailto:Mortorm@locklaw.com] **On Behalf Of** Ellingstad, Susan E.
**Sent:** Wednesday, January 26, 2011 4:11 PM
**To:** tjwelk@bgpw.com; cwmadsen@bgpw.com
**Cc:** chollinger@omm.com; 'rschwartz@omm.com'; Matt Tobin; Lynn Faris; Robert Harwood; jordanlewis@sbgdf.com; 'Gordon Rudd'; 'Anthony Marchetti'
**Subject:** Bunger, et al. v. FedEx Ground Package System, Inc., et al.

Mr. Welk and Mr. Madsen:

Please see the attached letter with regard to the above-referenced matter.

Susan E. Ellingstad | Attorney
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN  55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

**********
This e-mail may contain information that is privileged, confidential or otherwise protected from disclosure. If you are not the intended recipient or otherwise have received this message in error, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you are not the intended recipient or otherwise have received this message in error, please notify us immediately by e-mail, discard any paper copies and delete all electronic files of the message.
**********

**********
This e-mail may contain information that is privileged, confidential or otherwise protected from disclosure. If you are not the intended recipient or otherwise have received this message in error, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you are not the intended recipient or otherwise have received this message in error, please notify us immediately by e-mail, discard any paper copies and delete all electronic files of the message.
**********

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Harris*, 3:06-cv-209 (Arkansas) *Alexander*, 3:05-cv-528 (California) *Huerta*, 3:08-cv-052 (California) *Pedrazzi*, 3:06-cv-429 (California) *Coleman*, 3:05-cv-666 (Kentucky) *DeCesare*, 3:07-cv-120 (Nevada) *Gennell*, 3:05-cv-534 (New Hampshire) *Kelly*, 3:08-cv-336 (Ohio) *Leighter*, 3:07-cv-328 (Oregon) *Slayman*, 3:05-cv-596 (Oregon) *Humphreys*, 3:05-cv-540 (Texas) *Carlson*, 3:05-cv-664 (Florida) *Gentle*, 3:07-cv-191 (Alabama) *Wallace*, 3:06-cv-801 (Ohio) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE MILLER |

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S REPLY**
**IN SUPPORT OF ITS MOTION FOR ENTRY OF JUDGMENT**
**PURSUANT TO FED. R. CIV. P. 54(b)**

---

# I. INTRODUCTION

The Judicial Panel on Multidistrict Litigation transferred these cases to this Court to avoid inconsistent rulings, conserve the resources of the parties and the judiciary, and obtain the "economies of scale" that centralized proceedings provide. (Doc. No. 1.) Now, five years later, after the Court has resolved nearly all of plaintiffs' claims on the basis of a common record and common analysis, and after over 20 cases relying on that same record and analysis have been appealed to the Seventh Circuit, plaintiffs would have the cases scattered for review of the Court's orders across as many as six different appellate courts because a few distinct claims remain outstanding. But the purposes of Multidistrict Litigation, the inefficiencies that would result from having multiple courts of appeals review this Court's orders, and the standards applicable to Rule 54(b) all support the conclusion that the common analysis the Court applied throughout its December 13 Order (Doc. No. 2239) should receive common appellate review. For the reasons stated below and in FedEx Ground's Motion, the Court should grant FedEx Ground's Motion for entry of judgment under Rule 54(b).

# II. ARGUMENT

## A. Entry of Judgment Under Rule 54(b) Is Favored In Multidistrict Litigation

As plaintiffs acknowledge, whether to enter judgment under Rule 54(b) is an issue within the "sound discretion" of the Court. (Pls.' Br. at 3); *see also Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1367-68 (7th Cir. 1990) (discussing district courts' discretion to enter a Rule 54(b) judgment).[1] The Court's exercise of that discretion in this case is necessary to

---

[1] The fact that a majority of Seventh Circuit cases that plaintiffs cite *affirmed* the district court's decision to enter judgment under Rule 54(b) further underscores this point. *Bank of Lincolnwood v. Federal Leasing, Inc.*, 622 F.2d 944, 952 (7th Cir. 1980) ("We hold that the trial court acted within its discretion in ordering the entry of judgment."); *Ty, Inc. v. Publications Int'l LTD*, 292 F.3d 512, 516 (7th Cir. 2002); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1163 (7th Cir. 1997); *Jack Walters & Sons Corp. v. Morton Bld., Inc.*, 737

preserve the innumerable benefits to both the parties and the judiciary that have been obtained throughout the centralized proceedings in this Multidistrict Litigation.

FedEx Ground is aware of no case, and plaintiffs cite none, in which a court has found it advisable for multiple courts of appeals to review the orders of a transferee court. To the contrary, the weight of authority holds that streamlined appellate review of the transferee court's orders by that court's court of appeals best eliminates the risk of inconsistent judgments and preserves the efficiencies obtained in Multidistrict Litigation. *See, e.g.*, *FMC Corp. v. Glouster Eng'g Co.*, 830 F.2d 770, 771-72 (7th Cir. 1987) (noting benefits of streamlined review); *In re Food Lion, Inc. Fair Labor Standards Act Scheduling Litig.*, 73 F.3d 528, 533 (4th Cir. 1996) (holding an appeal to the transferee court's appellate court "is the best means of achieving the goals of efficient and uniform adjudication of numerous actions"); *Hill v. Henderson*, 195 F.3d 671, 677-78 (D.C. Cir. 1999) (noting that the "unified treatment" the transferee court's circuit can give to an appeal "enhances the likelihood of achieving the coordination benefits sought by [28 U.S.C.] § 1407"); *In re Cintas Corp Overtime Pay Arbitration Litig.*, No. M:06-cv-01781-SBA, 2007 WL 1302496, at *3 (N.D. Cal. May 2, 2007) (finding "favored MDL practice" is for review of an MDL transferee court's pretrial orders to proceed "in the court of appeals for the circuit in which the transferee court sits").[2]

Plaintiffs do not appear to dispute the fact that streamlined appellate review of a transferee court's orders is favored in Multidistrict Litigation, but argue that the appeal of this Court's orders should be heard in the courts of appeals with jurisdiction over the transferor

---

F.2d 698, 702 (7th Cir. 1984); *Minority Police Officers Ass'n v. City of South Bend, Ind.*, 721 F.2d 197, 201 (7th Cir. 1983) (affirming district court's order in part).

[2] *See also* Wright & Miller, *Federal Practice & Procedure* § 3862 ("Understandably, it has been held that appeals from pretrial orders issued by the transferee court must be taken to the court of appeals embracing that district, not the court of appeals embracing the transferor district; otherwise there might be appeals from more than one transferor district with a risk of conflicting appellate decisions, which would create a situation wholly inconsistent with the basic purpose of Section 1407.").

courts because their claims arise under "various state laws." (Pls.' Br. at 9-10.) But that argument has no support in, and is in fact undermined by, the history of this case and the applicable law. As an initial matter, the fact that plaintiffs' claims arise under different state laws was no barrier to the initial consolidation of these proceedings and provides no reason to undo the benefits obtained through consolidation now. Further, the Court's express incorporation of its Kansas analysis into its analysis of every claim that is subject to this Motion shows that the applicable law is neither as varied nor as diverse as plaintiffs suggest.

What is more, the existence of variations between transferred cases does not support varied appellate review. As the Fourth Circuit has noted, "[e]ven accounting for the peculiar facts of each case, it is clearly more efficient to provide for review by one appellate court in one proceeding rather than leaving open the possibility that [MDL transferee court's] decisions could be reconsidered by each of the transferor courts and reviewed by" multiple courts of appeals. *Food Lion*, 73 F.3d at 532-33 (discussing the "distinct factual predicates of each claim"). Thus, the bare fact that there may be some differences between state laws, which the Court already found were not an impediment to common analysis, is no reason to spread review of the Court's orders across as many as six different courts of appeals. In fact, such a result would be in tension with plaintiffs' assertion to the Seventh Circuit that consolidating the 21 cases that have already been appealed—which also all arise under different states' laws—would "facilitate the efficient handling" of the cases and promote "judicial economy." (*See* Seventh Cir. Case No. 10-3115, Doc. No. 18.)

Plaintiffs therefore identify no fact or law that in any way undermines the special treatment courts give to Rule 54(b) in Multidistrict Litigation. *See Hill*, 195 F.3d at 677. That treatment supports the Court's use of its discretion to enter judgment under Rule 54(b).

### B.    This Case's Unique Posture Supports Entry of Rule 54(b) Judgment

Not only does the general Multidistrict Litigation nature of these cases support the entry of Rule 54(b) judgment, the unique procedural posture of *this* Multidistrict Litigation provides additional reasons that support the Court's exercise of discretion to grant FedEx Ground's Motion.  In fact, the practical considerations that in some cases could counsel against entry of Rule 54(b) judgment are absent from this case.  At its core, the Seventh Circuit's Rule 54(b) jurisprudence (which is discussed in detail below) is aimed at sparing the court from the inefficiencies of "having to keep relearning the facts of a case on successive appeals."  *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir. 1984) (identifying this as the "most important purpose" behind Rule 54(b)).  Here, however, because the factual record of the cases plaintiffs have already appealed is *identical* to the factual record of the claims subject to this Motion, all of the relevant facts are already before the Seventh Circuit.  Thus, the Seventh Circuit will need to learn the facts needed to resolve the claims that are subject to FedEx Ground's Motion in any event.  Entry of Rule 54(b) judgment will therefore not impose any significant cost on the Seventh Circuit.

And, although plaintiffs argue that delaying appeal until all claims have been resolved in the transferor courts will be most efficient because all claims could then be considered by one appellate court, that approach would actually *ensure* redundancy.  Throughout this litigation, the Court has applied the common record to the law of Kansas, and then applied its Kansas analysis to the laws of other states.  (Dec. 13 Order at 13 (concluding "Kansas law is not strangely alien or *sui generis*, but rather is very typical of the states' laws on determining employment status").)  In light of that fact, both the common record and the Kansas analysis will need to be reviewed for every case on appeal.  Because the Seventh Circuit is already going to conduct that review, sending the claims subject to this Motion back to their courts of origin without entry of judgment

- 5 -

will guarantee another appellate court will have to go over the "same ground" as the Seventh

Circuit. Avoiding such a duplication of efforts is at the very core of Rule 54(b), and provides an

especially compelling reason for the Court to enter judgment here. *See, e.g.*, *Marseilles Hydro

Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 465 (7th Cir. 2008) (discussing the

court's concern about having to "rehash the same issues" on successive appeals); *Minority Police

Officers Ass'n v. City of South Bend, Ind.*, 721 F.2d 197, 200 (7th Cir. 1983) (noting the

"practical objection[]" to entry of judgment under Rule 54(b) in the usual case is that it will

increase strain on the "federal courts of appeals").

      None of the arguments plaintiffs offer in their Response overcomes these efficiencies.

For example, plaintiffs argue that the procedural posture of this case counsels against entry of

judgment because the parties may eventually settle the claims suggested for remand. But the

possibility of settlement is present in every interlocutory appeal, and the only case plaintiffs cite

ironically includes a discussion of why entry of judgment under Rule 54(b) before a case is

remanded to its court of origin is favored in Multidistrict Litigation. (Pls.' Br. at 7-8); *Hill*, 195

F.3d at 677-78. Further, the only factual assertion plaintiffs offer in support of their argument,

that FedEx Ground's "apparent[]" settlement of certain cases may suggest it is open to settling

others (Pls.' Br. at 8 n.3), is speculative at best.[3]

      Plaintiffs also claim that entering judgment under Rule 54(b) will prejudice them because

it will result in piecemeal litigation and delay the ultimate resolution of the claims suggested for

remand. (Pls.' Br. at 6-9.) But by virtue of the fact that some, but not all, claims have been

---

[3] Implying that they lacked knowledge of settlement discussions in certain cases, plaintiffs assert that FedEx Ground has "apparently" settled several cases. (Pls.' Br. at 8 n.3.) However, as noted in FedEx Ground's Motion to File a Sur-Reply in Response to plaintiffs' Motion for Entry of Common Benefit Set Aside Order (Doc. 2478), as well as South Dakota plaintiffs' counsel's Motion for Leave to File Sur-Reply (Doc. No. 2479), Lead MDL Plaintiffs' Counsel was not left in the dark concerning settlement discussions.

adjudicated, there is already going to be some piecemeal litigation of these cases.[4]  The question

is whether it will be more efficient to have the Seventh Circuit review these cases along with the

appeals that are already before it or require that several other courts of appeals invest additional,

substantial resources to learn the same record.  *See generally Jack Walters & Sons Corp.*, 737

F.2d at 702 (noting that the Rule 54(b) is focused primarily on eliminating "duplication in the

efforts required of the *judges*") (emphasis added).  In any event, immediate appeal would

undoubtedly speed the ultimate resolution of plaintiffs' claims by narrowing the issues that the

transferor court and another appellate court would have to consider after remand.

Accordingly, the unique posture of this case provides "compelling pragmatic reasons"

that support the Court's entry of judgment under Rule 54(b).  *Olympia Hotels Corp.*, 908 F.2d at

1368.  As Judge Posner has noted, these types of considerations are "the very stuff of

discretionary judgments." *Id.*  The Court should exercise its discretion and grant FedEx

Ground's Motion.

### C.     The Seventh Circuit's "Practical Approach" To Rule 54(b) Shows That Entry Of Judgment Is Appropriate

#### 1.     Plaintiffs' Generalizations Of The Record Do Not Satisfy The Applicable Standard

Even ignoring the Multidistrict Litigation nature and unique posture of this case, entry of

final judgment is warranted under the Seventh Circuit's "practical approach" to Rule 54(b).  *Jack*

*Walters & Sons Corp.*, 737 F.2d at 702 (noting that the "decisions of this court have

experimented with a practical approach" to Rule 54(b)).  Under that approach, claims that have

the same facts and are not based on distinct legal entitlements on which a party could recover

---

[4] Plaintiffs cite *Allegheny Airlines, Inc. v. LeMay*, 448 F.2d 1341 (7th Cir. 1971), for the proposition that "[p]artial judgment under Rule 54(b) should not be granted where it will result in piecemeal litigation."  (Pls.' Br. at 6.)  But while *Allegheny* discussed the "underlying policy" against piecemeal appeals, it did so when noting the reasons behind the final judgment rule.  448 F.2d at 1343.  It nowhere held that courts "should not" enter judgment under Rule 54(b) when doing so would result in piecemeal litigation, which is an obvious consequence of any decision to grant judgment under Rule 54(b).

BDDB01 6534228v3

without overlapping with the recovery available on his other claims, are not separate claims under the rule because they would require the court to relearn the same facts on successive appeals. *See generally Marseilles Hydro Power, LLC*, 518 F.3d at 463-64 (collecting cases and discussing Rule 54(b)). Plaintiffs' arguments are premised on a misinterpretation of this standard.

Indeed, plaintiffs' overarching argument is that the decided claims and the claims suggested for remand are not separable for the purposes of Rule 54(b) because they share the same "factual predicate," which they define as "the complex relationship between FXG and its pickup and delivery drivers." (Pls.' Br. at 4.) But if such a broad definition of the shared "factual predicate" sufficed under Rule 54(b), the rule would become decidedly *impractical*, as virtually every claim in every case involves the "relationship of the parties." (*Cf.* Pls.' Br. at 5 (asserting that all claims "require an analysis of the parties' relationship and contract").)

Plaintiffs' own cases show that the Seventh Circuit has rejected the notion that a party can defeat a Rule 54(b) motion by sweeping all claims together and pointing out some generalized factual overlap. *See, e.g.*, *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1163 (7th Cir. 1997) (noting that "some overlap between the facts in the retained and appealed claim is not fatal" and finding that Rule 54(b) judgment was appropriate even though the "background" facts pertaining to the decided and retained claims were the same); *Ty, Inc. v. Publications Int'l LTD*, 292 F.3d 512, 516 (7th Cir. 2002) (finding that even though copyright and trademark claims involved the exact same set of photographs, Rule 54(b) certification was proper because only the copyright claim was before the court on appeal).

Rather, Seventh Circuit law holds that the court must analyze each claim and make the "complex" determination of whether practical requirements underlying Rule 54(b) are satisfied.

BDDB01 6534228v3

*Marseilles Hydro Power, LLC*, 518 F.3d at 463. Plaintiffs' generalization of the shared "factual predicate" is at odds with that requirement, and provides no basis for denial of FedEx Ground's Motion.

> 2.     <u>Plaintiffs Fail to Offer Any Response to FedEx Ground's Arguments
> Concerning the Majority of Cases Subject to this Motion</u>

Plaintiffs' gloss on the claims' supposed common "factual predicate" is nowhere more apparent than in their failure to identify *any* factual overlap in nine of the 12 cases at issue.[5] In its opening Motion, FedEx Ground argued that the claims remaining in these cases turn on issues and facts that are distinct from what the Court considered when ruling on plaintiffs' employment classification in its December 13 2010 Order. (FedEx Ground's Br. at 6-7.) Aside from reiterating their generalized assertions about the relevance of the parties' "relationship" (Pls.' Br. at 5) and the allege overlap of their federal claims (which is discussed below), plaintiffs do not address or refute FedEx Ground's arguments.

Plaintiffs do not acknowledge FedEx Ground's point that the state statutory claims suggested for remand in *Coleman* (Kentucky), *Gennell* (New Hampshire), and *DeCasare* (Nevada) involve merits and damages issues that are distinct from the question of whether plaintiffs are employees within the meaning of the statutes. Plaintiffs similarly offer no response to FedEx Ground's arguments concerning *Gentle* (Alabama) or the outstanding rescission claims in *Leighter* and *Slayman* (Oregon), which the Court has already held involve questions of Oregon public policy that the "evidence considered here won't resolve." (Dec. 13 Order at 129.) They also fail to respond to the fact that the outstanding claim in *Huerta* is for breach of contract that, unlike the other claims the Court decided, is premised on Huerta being an independent

---

[5] *Kelly* (Ohio) and *Humphreys* (Texas) were included in FedEx Ground's original Motion. However, on February 4, 2011, after the parties filed joint stipulations of dismissal of undecided federal claims, the Court directed the clerk to enter judgment in favor of FedEx Ground in both cases. (Doc. No. 2480.)

BDDB01 6534228v3

contractor rather than an employee, or that resolution of the anti-discrimination claims in *Pedrazzi* will involve a "separate determination" of employment status involving public policy considerations not at issue in this Court.  (Dec. 13 Order at 47-49.)  And as for *Carlson* (Florida), plaintiffs' previous assertions that the outstanding claims "do not depend on any finding that Plaintiffs were employees" (Doc. No. 2365 at 1)—which provided the basis for the Court's Order granting their Motion to Reconsider (Doc. No. 2460 at 1)—confirm FedEx Ground's argument that they are factually and legally distinct from the claims decided in the December 13 Order.

Even if these claims share background facts with the claims the Court decided, that does not make them the "same" under Rule 54(b).  *Lawyers Title Ins. Corp.*, 118 F.3d at 1163 (affirming entry of Rule 54(b) judgment even though facts pertaining to the "bare bones" of the "background" to the parties' relationship overlapped the decided and retained claims).  Aside from background to the parties' relationship, the courts of appeals would not have to reconsider the same facts that would be at issue on appeal of the claims that the Court decided in its December 13 Order, which differs from the circumstances in the cases plaintiffs cite and supports the Court's entry of judgment here.  *See Factory Mutual Ins. Co. v. Bobst Group USA, Inc.*, 392 F.3d 922, 924 (7th Cir. 2004) (finding entry of judgment under Rule 54(b) on contribution claim was improper because it "*depend[ed] on*" resolution of the undecided principal claims) (emphasis added); *Thomas v. South Bend Cmty. Sch. Corp.*, 2:05-cv-253, 2010 WL 4007518, at *2 (N.D. Ind. Oct. 8, 2010) (denying Rule 54(b) motion when a second appeal would have required the court to analyze the same facts).

### 3.   Plaintiffs' Federal Claims Are Separable Under Rule 54(b)

Having made no specific arguments concerning nine of the 12 cases at issue, plaintiffs assert that entry of final judgment on their FMLA claim in *Alexander* (California) and FLSA claims in *Wallace* (Ohio) and *Harris* (Arkansas) is inappropriate because the economic realities

- 10 -

test applicable to those claims will require transferor courts to go "over the same ground" the Court covered in its analysis of common law claims in the December 13 Order. (Pls.' Br. at 4-5.) This argument too is at odds with the posture of this case and the applicable law.

As an initial matter, the "ground" that an appellate court would have to cover after resolution of these claims in the transferor court would bear little resemblance to the ground the Seventh Circuit is already going to cover. While an immediate appeal would require the Seventh Circuit to analyze a common record on a class-wide basis, resolution of the FLSA and FMLA claims—neither of which were certified for class treatment—will require the transferor court to wade through the application of individualized evidence to each particular plaintiff. (Dec. 13 Order at 31, 36-37 (discussing the need for individualized evidence to resolve the claims suggested for remand).) Plaintiffs acknowledge their intent to present individualized evidence (Pls.' Br. at 5), and they have previously indicated that individualized evidence would have changed the outcome of the Court's decisions, suggesting that the record will receive a heavy influx of individualized evidence on remand. (*See* Doc. No. 2177 at 4 (Minnesota (*Lee*) plaintiffs noted the Court "refused" to consider "instances in which FXG exercised control" in its Kansas Order); Doc. No. 2181 at 5 (asserting the same point in New Jersey (*Tofaute*)).) The individualized factual records in the remanded cases would not leave the courts of appeals covering the same ground as the Seventh Circuit if plaintiffs appeal their federal claims after remand. *See generally NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) (noting that determining "how much duplication is too much" is committed to "a district judge's discretion").

And apart from the different evidence that will be at issue on remand, in *Wallace* and *Harris* the transferor courts will apply an economic realities test that was not at issue when this

Court resolved plaintiffs' state law claims.  (Dec. 13 Order at 32 ("Arkansas [*Harris*] follows the multi-factor Restatement test  . . . discussed in the Kansas Decision."); *id.* at 125 (finding Ohio [*Kelly/Wallace*] uses the "common law right to control test"); *see also* July 2009 Order (Doc. No. 1770) at 15-16 (noting that, unlike the common law test, resolution of plaintiffs' employment status under the economic realities test requires "a consideration of all the circumstances of the work activity, not just one isolated factor").)  And as the Court has recognized, the application of different substantive standards supports a finding that successive appeals will not "involve the same issues."  *See Minix v. Canarecci*, No. 3:05-CV-144-RM, 2009 WL 702005, at *1 (N.D. Ind. Mar. 16, 2009) (finding the fact that the court had to apply a "different standard" to claims supported entry of judgment under Rule 54(b)).

Furthermore, even if there is some overlap between plaintiffs' federal claims and the claims the Court decided, the Seventh Circuit has cautioned against placing "too much weight on the existence and extent of factual overlap between . . . two claims."  *Olympia Hotels Corp.*, 908 F.2d at 1367.  This is especially true when, as here, the decided and undecided claims are legally distinct and separate recovery is available on each.  *Marseilles Hydro Power, LLC*, 518 F.3d at 464 ("Even if two claims arise from the same event or occurrence they may be separable for Rule 54(b) purposes if they rely on entirely different legal entitlements yielding separate recoveries, rather than different legal theories aimed at the same recovery.").

The claims suggested for remand implicate distinct legal issues and a record of individualized evidence that was not considered in the Court's December 13 Order.   As such, gains from waiting for resolution of all claims in such circumstances "will . . . be small and will be outweighed by the benefits of an immediate appeal."  *Jack Walters & Sons Corp.*, 737 F.2d at 702.  For this reason alone, the Court should grant FedEx Ground's Motion.

- 12 -

## III. CONCLUSION

For the reasons stated above and in FedEx Ground's opening motion, the Court should grant FedEx Ground's Motion and enter judgment under Rule 54(b) on the claims decided in the December 13 Order in the following cases: *Harris* (Arkansas), *Alexander* (California), *Coleman* (Kentucky), *DeCesare* (Nevada), *Gennell* (New Hampshire), *Leighter* and *Slayman* (Oregon), *Huerta* and *Pedrazzi* (California), *Wallace* (Ohio), *Gentle* (Alabama), and *Carlson* (Florida). Pursuant to Rule 23(c)(3), FedEx Ground further requests that, if the Court grants this Motion with respect to the cases with certified classes, the final judgment specify the individuals (set forth on the previously filed class lists), who are bound by the judgments, and that the judgment describe the classes by including the class definitions. *See generally* Fed. R. Civ. P. 23(c)(3)(B) (providing that judgment must, "for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and who the court finds to be class members"). For the Court's convenience, FedEx Ground is happy to submit the relevant class definitions and identify the docket numbers for the relevant class lists.

Respectfully submitted,

By: s/Alison G. Fox _____

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of February, 2011, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

The undersigned further certifies that a copy of the same was mailed by regular United States Postal Service to the following non CM/ECF participants:

Ronald D. Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Steven A. Owings
Law Offices of Steven A. Owings
1320 Brookwood, Ste. D
Little Rock, AR 72202

Stephen M. Murphy
Tania Beth Rose
Law Offices of Stephen M. Murphy
180 Montgomery Street, Suite 940
San Francisco, CA 94104

Henry Bongiovi
Henry J Bongiovi Law Offices
831 State Street
Santa Barbara, CA 93101

Mark B. Wallace
Walker, Vaughn & Wallace, PLLC
7403 St. Andrews Church Rd.
P. O. Box 9285
Louisville, KY 40209

Brian C. Edwards
607 W. Main Street, Suite 500
Louisville, KY 40202

Andrew J. Kahn PHV
Mccracken Stemerman & Holsberry
1630 S. Commerce St., Ste. A-1
Las Vegas, NV 89102

Robert E McDaniel
McDaniel Law Offices
4 Bicentennial Square
Concord, NH 03301

Andrew Santillo
Winebrake Law Office
Twining Office Center Suite 114
715 Twining Road
Dresher, PA 19025

Shannon R. Baith
Barkan Neff Handelman Meizlish LLP
360 S. Grant Ave.
Columbus, IN 43215

Thomas N. Trefethern
2045 Chappel Hill Drive
Youngstown, OH 44511

David F. Rees
Joshua L. Ross
Stoll Stoll Berne Lokting & Shlachter PC
209 SW Oak St., 5th Floor
Portland, OR 97204

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham and Burgess LLP
301 Congress Ave., Ste. 1050
Austin, TX  78701

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

By:     s/Alison G. Fox

- 15 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____

In re FEDEX GROUND PACKAGE      )      CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT        )              (MDL-1700)
PRACTICES LITIGATION            )
--------------------------------------------- )
THIS DOCUMENT RELATES TO:       )
                                )
ALL CASES                       )
_____ )

## ORDER

The court GRANTS Soye Kim's motions [Doc. Nos. 2489, 2490] to withdraw as attorney in the above-captioned cases,[1] with the understanding that the plaintiffs in these cases continue to be represented by Jeffrey A. Bartos of Guerrieri, Clayman, Bartos & Parcelli, P.C. Soye Kim's appearance in these cases is hereby terminated.

SO ORDERED.

ENTERED: February 11, 2011

_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court

---

[1] The court issued a suggestion of remand in these cases, but they remain before this court pending an order of remand from the JPML. *See* Final Suggestion of Remand, Nov. 1, 2010 [Doc. No. 2225].

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| _____ ) | |
| In re FEDEX GROUND PACKAGE ) | CAUSE NO. 3:05-MD-527 RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL-1700) |
| PRACTICES LITIGATION ) | |
| ---------------------------------------------- ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL CASES ) | |
| _____ ) | |

<u>OPINION and ORDER</u>

Plaintiffs' Co-Lead Counsel and Plaintiffs' Steering Committee ("co-lead counsel") have filed a motion for entry of a common benefit set-aside order. Co-lead counsel seek creation of a fund to be used to compensate themselves and all counsel who have worked in this MDL litigation for the benefit of all plaintiffs ("MDL counsel"). FedEx objects to aspects of co-lead counsel's proposed order, and the *Bunger* (South Dakota) plaintiffs' counsel objects to the proposed order in its entirety. No other local plaintiffs' counsel has objected to the proposed order and the motion is now fully briefed.[1] For the reasons stated below, the court denies the motion without prejudice in the event of reversal of this court's summary judgment opinions currently on appeal.

_____

[1] Both of co-lead counsel's reply briefs exceed the fifteen pages allowed by the local rules. *See* Local Rule 7.1(d). Nothing was gained by exceeding, without the court's leave, the page limits indicated in the local rules.

## I. BACKGROUND

This court's involvement in this multi-district litigation has nearly drawn to a close. On December 13, 2010, the court issued an opinion and order finding in most instances that the plaintiff drivers are independent contractors and not employees of FedEx. This litigation grew out of an effort by the plaintiffs to receive the benefits of being classified as employees, and the plaintiffs believed various states' laws supported a conclusion that, given their relationship with FedEx, they were employees.

The plaintiffs' effort spawned cases that co-lead counsel acknowledge are each somewhat unique, given the differing nuances in how the various states' laws distinguish between employees and independent contractors. At this stage of the litigation, there are four rough categories of cases: (1) those in which the court granted class certification but held the plaintiffs to be independent contractors, which are now on appeal or soon will be on appeal; (2) a few in which the court granted class certification and found the plaintiffs to be employees as a matter of a state's statutory laws; (3) those in which the court denied class certification, which have been remanded or for which this court will soon suggest remand; and (4) fee shifting cases involving Title VII discrimination claims or violations of federal labor laws, which have been remanded or for which this court will soon suggest remand. Category (1) cases greatly outnumber and outweigh category (2) cases. Category (1) and (2) cases go to the heart of this court's decisionmaking in this litigation, as embodied in the Opinions and Orders of May 28, 2010 [Doc. No.

2068], August 11, 2010 [Doc. No. 2097], and December 13, 2010 [Doc. No. 2239]. Cases orbiting this central core of decisionmaking overlap the core to widely varying degrees.

The plaintiffs have largely not succeeded on the central core of this court's decisionmaking (though that may change on appeal). Yet co-lead and MDL counsel have spent tens of thousands of hours and incurred millions of dollars in costs and fees to coordinate and litigate these cases in this court. Their efforts have provided what likely seem to be widely varying levels of assistance to the member MDL cases, and therefore widely varying levels of benefit to cases obtaining recovery.

Co-lead counsel ask the court to enter an order that would create a common benefit fund for the compensation of co-lead and MDL counsel through the following two mechanisms:

1) For fee shifting claims: permit co-lead counsel to submit to a special master petitions for reasonable attorneys' fees and costs to be paid by FedEx, including where claims are settled but co-lead counsel believe the total negotiated attorneys' fees and costs substantially undervalue the time, effort or investment incurred by MDL counsel.

2) For other claims: encourage co-lead counsel to settle with local counsel, encourage arbitration, and require submission of

disputes to a special master to decide the proper allocation of fees
and costs.

Neither mechanism would necessarily result in the disbursement of money from
the common benefit fund, but rather would result in the infusion of money into
the fund. Only an order of this court would result in the disbursement of money
to co-lead and MDL counsel. Co-lead counsel also ask the court to require local
counsel to "consult" co-lead counsel before settling cases, and they ask that FedEx
be required to ensure that the appropriate set-aside is diverted into the common
benefit fund from any recoveries paid out.

FedEx doesn't object to the idea of a common benefit fund, but makes a
serious objection to co-lead counsel's request that they be permitted to have a
second bite at the apple in settled fee shifting cases. FedEx says that this would
seriously hinder settlement negotiations because FedEx would never really know
what its liability would be in a settlement. FedEx also objects to administering the
common benefit fund. FedEx objects to any language in an order that would apply
not only to these MDL member cases but also to cases "derivative" of the MDL or
that simply "rely on the work performed in the MDL." FedEx also wonders what
the "consultation" requirement would mean and objects to any regime that would
require the various plaintiffs' attorneys to have their fee disputes settled before a
transferor court could dismiss a case.

The *Bunger* plaintiffs object to the motion in whole, arguing that this court
doesn't have jurisdiction anymore over cases that have been remanded before

entry of a set-aside order. The *Bunger* plaintiffs also say that co-lead counsel didn't confer a substantial benefit to them.

## II. ANALYSIS

Though the motion will be denied, the court addresses two of the objections raised here for the benefit of transferor courts and the parties, hoping to help other judges that might be asked to revisit these issues. The court doesn't address the *Bunger* counsel's "substantial benefit" objection because it goes to the merits of how fees should be allocated between him and co-lead and MDL counsel, and those merits aren't to be decided now. The transferor court will determine whether co-lead and MDL counsel conferred a substantial benefit in the *Bunger* case. Other minor objections appear to be moot in light of the court's decision today.

*a. Jurisdictional issues: cases never before this court and cases remanded from this court to their transferor courts.*

This court has jurisdiction to ensure the fair and equitable distribution of attorneys' fees among the various plaintiffs' attorneys in this MDL litigation, including any MDL member case filed in, removed to, or transferred to this court under the auspices of this litigation. This court doesn't have jurisdiction over cases never actually before this court, whether state or federal, even though it's possible that attorneys in state or federal cases might use the work done by co-lead and MDL counsel before this court.

5

> While [28 U.S.C.] § 1407 provides a procedure for transferring cases filed in different districts to a single district court for pretrial proceedings, nowhere does it expand the jurisdiction of either the transferor or the transferee court. As in any other case, a transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred, and any attempt without service of process to reach others who are unrelated is beyond the court's power.

In re Showa Denko K.K. L-Typtophan Prods. Liab. Litig.-II, 953 F.2d 162, 165-166 (4th Cir. 1992); *see also* In re Genetically Modified Rice Litig., No. 4:06 MD 1811 CDP, 2010 WL 716190, at * 4-5 (E.D. Mo. Feb. 24, 2010) (recognizing a situation of possible unjust enrichment but also court's lack of power to prophylactically prevent unjust enrichment and urging state court judges to order local state plaintiffs' attorneys to contribute to common benefit fund). Thus, co-lead counsel's proposed language applying their proposed order to cases "derivative" of the MDL or that "rely on the work performed in the MDL" is outside the scope of this court's power to order. Co-lead counsel can seek to avoid unjust enrichment by local plaintiffs' attorneys in cases not before this court, but they can't do so in the way they proposed.

This court expressly retained jurisdiction over cases it suggested be remanded so as to decide the collateral matter of equitable apportionment of attorneys' fees. As the court has previously stated:

> The award of attorney's fees, however, is a "collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits." In re Zyprexa Prods. Liab. Litig., 467 F. Supp. 2d 256, 274 (E.D. N.Y. 2006) (citations omitted); *see also* In re Zyprexa Prods. Liab. Litig.,--- F.3d ---, 2010 WL 367556, *10 (2d Cir. 2010) (stating that order imposing an assessment to create a fund

that could be used to compensate attorneys who demonstrate that their efforts conferred a benefit on the plaintiffs generally is "even less related to the ultimate merits than orders awarding attorney's fees, which are collateral matters over which a court retains jurisdiction even if it ultimately is determined to lack subject matter jurisdiction.") (*citing* Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395 (1990)("It is well established that a federal court may consider collateral issues after an action is no longer pending. For example, district courts may award costs after an action is dismissed for want of jurisdiction."); Moore v. Permanente Med. Group, Inc., 981 F.2d 443, 445 (9th Cir. 2003) ("It is clear that an award of attorney's fees is a collateral matter over which a court normally retains jurisdiction even after being divested of jurisdiction on the merits."); Overseas Dev. Disc Corp. v. Sangamo Constr. Co., 840 F.2d 1319, 1324 (7th Cir.1988) (declaring it to be "settled that a decision awarding or denying attorney's fees and expenses from a common fund ... is severable from the decision on the merits").

Opinion and Order, March 2, 2010, at 11-12 [Doc. No. 2011]; *see also* Opinion and Order, August 12, 2010, at 10 (retaining jurisdiction over collateral matter of attorney fee apportionment). Today's holding concerning double-dipping, *infra*, applies to all FedEx MDL member cases, but after today's decision the court divests itself of its expressly retained jurisdiction over collateral matters in remanded cases (and will divest itself of jurisdiction over collateral matters in cases yet to be remanded at the time of their remand) so that the transferor courts can issue final binding decisions on those collateral matters. If a reversal on this court's summary judgment opinions comes, it will likely be a good while from now, and there's no need to delay final resolution of collateral matters in remanded cases.

> *b. The law doesn't allow the plaintiffs' request to be permitted to double dip attorneys' fees from FedEx in settled fee shifting claims.*

Much of co-lead counsel's proposed order concerned their request for this court to allow them to petition for attorneys' fees above and beyond any settlement in fee-shifting cases if they believe the fees they obtain through the settlement substantially undervalue their work. The plaintiffs say they're only seeking permission to make such claims and that the merits of such claims would be later determined. The law doesn't permit such double-dipping, so there's no reason to grant permission to petition for such fees.

Co-lead counsel relies heavily on Walitalo v. Iacocca, 968 F.2d 741, 747 (8th Cir. 1992). But co-lead counsel forgets that, since 2001, the law has been that only prevailing parties may petition for attorneys' fees to be paid by a defendant. To be deemed a prevailing party there must be a material alteration in the legal relationship of the parties, which is shown in the form of an enforceable judgment or court-ordered consent-decree. "It could not be clearer that a voluntary settlement by the defendant . . . does not entitle a plaintiff to attorneys' fees." Bingham v. New Berlin Sch. Dist., 550 F.3d 601, 603 (7th Cir. 2008) (discussing Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. 598, 606 (2001)). By way of exception, defendants might agree in a settlement to allow an additional award of attorneys' fees. See Walitalo v. Iacocca, 968 F.2d at 747 ("Nothing prevents defendants from assuming liability for these fees in a settlement agreement.").

The common benefit fund doctrine is an exception to the American rule, as is statutorily created fee-shifting. These two exceptions to the American rule don't

8

combine to allow co-lead counsel to request attorneys' fees from FedEx in settled fee shifting claims because voluntary settlement doesn't entitle a plaintiff to attorneys' fees to be paid by defendants. This comports with the roots of the common fund doctrine, which provides that plaintiffs and their counsel contribute to lead counsel's compensation in exchange for the benefit of lead counsel's work, not that a defendant make such contribution. *See generally* Boeing Co. v. Van Gemert, 444 U.S. 472 (1980); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161 (1939); Cent. R.R. & Banking Co. of Ga. v. Pettus, 113 U.S. 116 (1885); Trustees v. Greenough, 105 U.S. 527 (1881).

Co-lead counsel should not be allowed to make any double-dipping fee requests except for the narrow set of circumstances allowed by law: (1) enforceable judgment; (2) court-ordered consent decree; and (3) express consent by FedEx in a settlement agreement.

### c. Denial of entry of a set-aside order creating a common benefit fund.

The court denies the motion for entry of a set-aside order creating a common benefit fund for two reasons: (1) the merits of the core of this litigation have been decided against the plaintiffs in all but a few cases; and (2) the plaintiffs acknowledge what this court suspected, which is that the natures of the cases remanded or yet to be remanded are such that any allocation of attorneys' fees must be determined on a case by case basis.

The court's power to issue a set-aside order creating a common benefit fund in a multi-district litigation is unquestioned. "The 'common fund' doctrine allows a court to distribute attorneys' fees from a common fund created by settlement or judgment in a class action" or similar complex litigation. In re Linerboard Antitrust Litig., 292 F. Supp. 2d 644, 654 (E.D. Pa. 2003)) (citing Sprague v. Ticonic Nat'l Bank, 307 U.S. 161 (1939); Cent. R.R. & Banking Co. of Ga. v. Pettus, 113 U.S. 116 (1885); Trustees v. Greenough, 105 U.S. 527 (1881)); see also Walitalo v. Iacocca, 968 F.2d 741, 747 (8th Cir. 1992) ("It is well-established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefitting from their services."); In re Air Crash Disaster at Florida Everglades, 549 F.2d 1006, 1016 (5th Cir. 1977) ("[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."); In re Linerboard Antitrust Litig., 292 F. Supp. 2d at 653 ("A necessary corollary to court appointment of lead and liaison counsel and appropriate management committees is the power to assure that these attorneys receive reasonable compensation for their work.").

But this power needn't necessarily be exercised. Co-lead counsel's motion raises serious concerns about how the court should manage its own docket and prevent unjust enrichment by attorneys free-riding off of the hard work of co-lead and MDL counsel in this litigation. See, e.g., In re Nineteen Appeals, 982 F.2d

603, 606 (1st Cir. 1992) ("A court supervising mass disaster litigation may intervene to prevent or minimize an incipient free-rider problem and, to that end, may employ measures reasonably calculated to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs." (quotation omitted)); In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig., 953 F.2d 162, 165 (4th Cir. 1992) ("[A] district court needs to have broad discretion in coordinating and administering multi-district litigation.").

Set-aside orders creating common benefit funds usually are created early in a litigation in anticipation of the plaintiffs' success. No authority suggests a practice of creating common benefit funds when the plaintiffs haven't succeeded on the core of their litigation. Cf. In re Air Crash Disaster, 549 F.2d at 1017 ("The power of the court to order compensation, and payment of it ... is reinforced by the body of law concerning the inherent equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds of a fund that has been created, increased or protected by successful litigation." (emphasis added)).

Co-lead and MDL counsel aren't guaranteed compensation irrespective of what happens in these cases—a substantial benefit conferred assumes a recovery. Still, MDL member cases continue to pend before this court and before transferor courts. Co-lead and MDL counsel did a great deal of work, and should be compensated if that work leads to success. To the extent their work contributes to recoveries in the remanded cases (whether by settlement or judgment) then they have a right to seek compensation. Further, that there doesn't appear to be a

11

practice of creating a common benefit fund when the core of the litigation has been unsuccessful doesn't mean this court can't create such a fund. Rather, that plaintiffs weren't successful on the core of the litigation suggests this court may better manage this MDL docket by turning attorney-fee apportionment disputes over to the transferor courts.

Given the current circumstances of this litigation, more equitable decisionmaking is likely if this court turns over to the transferor courts final resolution of attorney fee apportionment disputes. By multi-district litigation standards, there are relatively few cases remanded or left to be remanded. Though co-lead and MDL counsel might need to appear before a transferor court to obtain an order for compensation (absent an agreement with local counsel), the burden on them of seeking such compensation before those relatively few courts is outweighed by the increased likelihood of a fair determination by the transferor court.

The transferor courts will be in the best position to understand how much of co-lead and MDL counsel's work contributed to the specific recoveries obtained in their courts. Ordinarily, courts order the set-aside of percentages of recoveries or provide for an eventual lodestar calculation to be made. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.12. But co-lead counsel state what this court suspected: appropriate attorney fee apportionment will need to be determined on a case by case basis, given the substantially differing natures of the various cases that will be pending on remand. Because each case involves differing claims,

12

differing law, and differing circumstances, it wouldn't be equitable to simply "set[] a percentage that might or might not be appropriate in every case depending on the circumstances." Memo. in Support of Motion, Dec. 28, 2010, at 9 [Doc. No. 2281]. This court is in no position to predict how much co-lead counsel's work will turn out to have benefitted local plaintiffs, nor is this court in as advantageous a position as the transferor court to make that determination.

Co-lead and MDL counsel may seek compensation out of recoveries obtained in transferor courts. As a result, this court won't require local counsel to "consult" with co-lead and MDL counsel before settling because it's unclear what counsel meant by that request and because the prospects of being ordered to contribute portions of a recovery to co-lead and MDL counsel (absent an agreement by counsel) seem likely to cause local counsel to be cautious in their decisionmaking. *See* Walitalo v. Iacocca, 968 F.2d 741, 747 n.11 (8th Cir. 1992) ("Appellants' argument that the parties to a case can avoid liability for their share of court-appointed counsels' fees by filing a stipulation of dismissal ... is completely without merit. If such a rule existed, a district court's power to appoint attorneys to act on behalf of other attorneys and parties in complex litigation would be meaningless. Attorneys would be unwilling to assume this position if the parties to the litigation could avoid compensating them simply by settling and filing a stipulation of dismissal.").

## III. CONCLUSION

For the reasons stated, the court DENIES the motion for entry of a common benefit set-aside order [Doc. No. 2281]. Because the arguments and allegations contained in the motions to file sur-replies didn't factor into this decision,[2] the court DENIES those motions as unnecessary [Doc. Nos. 2478 & 2479]. Pursuant to this court's previously retained jurisdiction over collateral matters in these MDL cases, the holdings in this opinion and order will apply in transferor courts, specifically:

1) Subsequent to entry of this order, the court divests itself of jurisdiction over collateral matters in cases already remanded and the court will fully divest itself of jurisdiction over cases yet to be remanded once they are remanded;

2) Co-lead and MDL counsel should not be permitted to seek double-dipped attorneys' fees by making a request for attorneys' fees for voluntarily settled fee-shifting claims;

3) Co-lead and MDL counsel may seek court-ordered compensation from any recoveries obtained in remanded cases to the

---

[2] Today's decision is made for the reasons stated in the body of this Opinion and Order, but the motions for leave to file sur-replies provided evidence that questionable representations of fact were presented to the court during the briefing of the common benefit set-aside motion. The court's December 13, 2010 Opinion and Order hinted to plaintiffs and FedEx the court's diminished patience for name calling, specious case citations, and dubious representations of fact made to the court. The court today issues a clear warning to the parties: enough. Future misrepresentations of law or fact by any party will be rewarded with summary denials of motions and might result in sanctions. Spirited argument is to be expected, but the parties must make a more sincere effort to make true statements of law and fact to the court.

extent their work substantially benefitted local plaintiffs' efforts to

obtain a recovery (whether by settlement or judgment).

This denial is without prejudice in the event of a reversal of this court's summary

judgment opinions on appeal, and in that circumstance this court will not re-visit

attorney fee issues related to remanded cases.

SO ORDERED.

ENTERED: <u>February 11, 2011</u>


___/s/ Robert L. Miller, Jr.___
Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____

In re FEDEX GROUND PACKAGE )        CAUSE NO. 3:05-MD-527 RM
SYSTEM, INC., EMPLOYMENT )                    (MDL-1700)
PRACTICES LITIGATION )
--------------------------------------------- )
THIS DOCUMENT RELATES TO: )
)
3:06-CV-209 (*Harris* - Arkansas) )
3:05-CV-528 (*Alexander* - California) )
3:08-CV-052 (*Huerta* - California) )
3:06-CV-429 (*Pedrazzi* - California) )
3:05-CV-666 (*Coleman* - Kentucky) )
3:07-CV-120 (*DeCesare* - Nevada) )
3:05-CV-534 (*Gennell* - New Hampshire))
3:07-CV-328 (*Leighter* - Oregon) )
3:05-CV-596 (*Slayman* - Oregon) )
3:05-CV-664 (*Carlson* - Florida) )
3:07-CV-191 (*Gentle* - Alabama) )
3:06-CV-801 (*Wallace* - Ohio) )
_____ )

OPINION and ORDER

FedEx has filed a Rule 54(b) motion for entry of partial judgment in the
captioned cases in light of this court's Opinion and Order of December 13, 2010.
The plaintiffs oppose the motion. The court denies the motion for the reasons
stated below.

I. BACKGROUND

The court already has decided that the plaintiffs in the captioned cases are
independent contractors as a matter of the relevant states' common law (the
plaintiffs were determined to be employees as a matter of the relevant states'
statutory laws in a couple instances). Those decisions rely on the same course of

decisionmaking and underlying facts as decisions in cases in which judgment has been entered, which are now on appeal. But those adverse decisions also rely on application of laws uniquely nuanced in each state and, more importantly for today's ruling, also involve a wide variety of other claims, some of which are similar to those decided in this court and some of which are very different.

FedEx argues that entry of partial judgment on claims decided in this court will make appellate review more efficient by putting similar decisions up for review all at one time. FedEx further argues that this will avoid the potential for inconsistent judgments.

The plaintiffs respond that the decided claims and the remaining claims are not "separate" but rather substantially overlap because they rely on the same complex set of facts about the relationship between themselves and FedEx. The plaintiffs further argue that the judicial efficiency FedEx suggests would be obtained through entry of partial judgment is illusory because multiple courts of appeal would end up reviewing the same cases regardless of their outcomes. Finally, the plaintiffs object to FedEx's motion because their cases have pended for more than five years and requiring immediate appeal of this court's decisions in the captioned cases will further delay final resolution of the outstanding claims.

## II. ANALYSIS

Rule 54(b) allows a court to enter partial judgment "only if the court expressly determines that there is no just reason for delay." FED R. CIV. P. 54(b). This is a discretionary decision of the court, bounded by the requirement that partial judgment only be entered on truly "separate" claims. No bright-line rules demark separateness, but a separateness analysis involves inquiry into the law and facts behind the claims. *See* Marseilles Hydro Power, LLC v. Marseilles Land and Water Co., 518 F.3d 459, 464 (7th Cir. 2008); *see also* Lottie v. West Am. Ins. Co., 408 F.3d 935, 938 (7th Cir. 2005) ("We have insisted that Rule 54(b) be employed only when the subjects of the partial judgment do not overlap with those remaining in the district court."). FedEx provides little guidance on how this court should undertake what would amount to a rather unwieldy inquiry, but because the court denies the motion, it needn't enter into a sidebar analysis of the similarity or separateness of the dozens of claims filed across the subject cases.

The court agrees with the plaintiffs that the claimed judicial efficiency benefits of entering partial judgment in the captioned cases is illusory. The norm is one appeal per case. United States v. Ettrick Wood Prods., Inc., 916 F.2d 1211, 1218 (7th Cir. 1990). There's no getting around that appellate courts will need to review the complexities of these cases multiple times if the court enters partial judgment. To the extent the court of appeals decides issues currently on appeal that apply across the board, doctrines of claim preclusion will assist courts of appeals in not having to review the same issues again. Because each state's law

3

on the distinction between employee and independent contractor is different, much of the appellate review will be driven by the nuances of the different states' laws, requiring intensive inquiry into each case (and the relevant state's law) on appeal. There isn't one ball of wax to review here: there are dozens of balls of wax.

The possibility of resolution of the captioned cases on remand without requiring appellate review isn't something to be overlooked. Delaying appellate review pending final determination of outstanding claims might eliminate the need for appellate review and will ensure that related claims are reviewed one time only if they still require appellate review down the road. *See* Hill v. Henderson, 195 F.3d 671, 674-675 (7th Cir. 1999).

Finally, the plaintiffs have waited long enough for resolutions to all their claims. Given the considerations already noted, the court can't make an express finding that there's no just reason for delay. Instead, there is just reason for remand and forward progress in these cases.

### III. CONCLUSION

For the reasons stated, the court DENIES FedEx's motion for entry of partial judgment [Doc. No. 2370].

SO ORDERED.

4

ENTERED: February 11, 2011

                           /s/ Robert L. Miller, Jr.
                           Judge
                           United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

_____

| | ) | |
| In re FEDEX GROUND PACKAGE | ) | CAUSE NO. 3:05-MD-527 RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL-1700) |
| PRACTICES LITIGATION | ) | |
| --------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| 3:07-cv-191 (*Gentle* - Alabama) | ) | |
| 3:06-cv-209 (*Harris* - Arkansas) | ) | |
| 3:05-cv-528 (*Alexander* - California) | ) | |
| 3:06-cv-429 (*Pedrazzi* - California) | ) | |
| 3:08-cv-52  (*Huerta* - California) | ) | |
| 3:09-cv-356 (*Ward* - Florida) | ) | |
| 3:05-cv-666 (*Coleman* - Kentucky) | ) | |
| 3:07-cv-120 (*DeCesare* - Nevada) | ) | |
| 3:08-cv-520 (*Campbell* - Nevada) | ) | |
| 3:05-cv-601 (*Gennell* - New Hampshire) | ) | |
| 3:05-cv-535 (*Capers* - New Jersey) | ) | |
| 3:07-cv-327 (*Farrell* - New Jersey) | ) | |
| 3:09-cv-2    (*Tofaute*, individual - NJ) | ) | |
| 3:05-cv-537 (*Johnson* - New York) | ) | |
| 3:06-cv-801 (*Wallace* - Ohio) | ) | |
| 3:05-cv-596 (*Slayman* - Oregon) | ) | |
| 3:07-cv-328 (*Leighter* - Oregon) | ) | |
| 3:09-cv-3    (*Mitchell* - Pennsylvania) | ) | |
| 3:06-cv-802 (*Price* - Texas) | ) | |
| 3:07-cv-325 (*Vargas* - Massachusetts) | ) | |

_____ )

SUGGESTION OF REMAND

The court indicated in its Opinion and Order of December 13, 2010 that it
would suggest remand of the above-captioned cases belonging to this Multi-
District Litigation. In that opinion and order, the court instructed the parties to
submit a joint proposed pretrial order for each case, and the parties have done so.

The joint pretrial orders don't reflect more recent rulings this court issued:

• The court denied the plaintiffs' motion for entry of a common benefit set-aside order on February 11, 2011 [Doc. No. 2500]. The transferor court will decide any dispute about the apportionment of attorney's fees between the relevant plaintiffs' attorneys.

• The court denied FedEx's motion for entry of partial judgment on February 11, 2011 [Doc. No. 2501]. The plaintiffs in a given remanded case will be able to seek a final determination on their outstanding claims before appealing that remanded case to the relevant court of appeals.

• Over time, the court has hinted its concern about the attorneys' efforts to make accurate representations of law and fact, and to avoid name-calling. For the benefit of the transferor court, the court directs the transferor court to the following clear warning issued in this court's February 11, 2011 opinion and order denying the plaintiffs' motion for entry of a common benefit set-aside order:

> The court's December 13, 2010 Opinion and Order hinted to plaintiffs and FedEx the court's diminished patience for name calling, specious case citations, and dubious representations of fact made to the court. The court today issues a clear warning to the parties: enough. Future misrepresentations of law or fact by any party will be rewarded with summary denials of motions and might result in sanctions. Spirited argument is to be expected, but the parties must make a more sincere effort to make true statements of law and fact to the court.

Having reviewed and considered the parties' joint proposed pretrial orders, the court declines to address buried motions not properly raised as separate motions

2

(*see* Local Rule 7.1(b))[1] and adopts the proposed orders as its own, as amended by the updates just provided:

- 3:07-cv-191 (*Gentle* - Alabama) [Doc. No. 2452]

- 3:06-cv-209 (*Harris* - Arkansas) [Doc. No. 2448]

- 3:05-cv-528 (*Alexander* - California) [Doc. No. 2450]

- 3:06-cv-429 (*Pedrazzi* - California) [Doc. No. 2447]

- 3:08-cv-52 (*Huerta* - California) [Doc. No. 2455]

- 3:09-cv-356 (*Ward* - Florida) [Doc. No. 2454]

- 3:05-cv-666 (*Coleman* - Kentucky) [Doc. No. 2451]

- 3:07-cv-120 (*DeCesare* - Nevada) [Doc. No. 2456]

- 3:08-cv-520 (*Campbell* - Nevada) [Doc. No. 2453]

- 3:05-cv-601 (*Gennell* - New Hampshire) [Doc. No. 2449]

- 3:05-cv-535 (*Capers* - New Jersey) [Doc. No. 2471]

- 3:07-cv-327 (*Farrell* - New Jersey) [Doc. No. 2470]

- 3:09-cv-2 (*Tofaute*, individual - New Jersey) [Doc. No. 2467]

- 3:05-cv-537 (*Johnson* - New York) [Doc. No. 2461]

- 3:06-cv-801 (*Wallace* - Ohio) [Doc. No. 2468]

- 3:05-cv-596 (*Slayman* - Oregon) [Doc. No. 2465]

- 3:07-cv-328 (*Leighter* - Oregon) [Doc. No. 2466]

- 3:09-cv-3 (*Mitchell* - Pennsylvania) [Doc. No. 2469]

---

[1] One such buried motion is the plaintiffs' request for clarification on the status of their fraud claims.

- 3:06-cv-802 (*Price* - Texas) [Doc. No. 2483]

- 3:07-cv-325 (*Vargas* - Massachusetts) [Doc. No. 2484]

For the reasons stated in this court's December 13, 2010 opinion, these cases are now fully ready for remand to their transferor courts, and the court hereby issues its SUGGESTION of remand to the JPML, in accord with Judicial Panel of Multi-District Litigation Rule 10.1(b)(i) (October 2010).

SO ORDERED.

ENTERED: February 18, 2011

_____/s/ Robert L. Miller, Jr._____
Judge
United States District Court

4

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: FEDEX GROUND PACKAGE SYSTEM, INC.,
EMPLOYMENT PRACTICES LITIGATION (NO. II)**                    **MDL No. 1700**

## REMAND ORDER

**Before the Panel**:[*]  Pursuant to Panel Rule 10.2, defendant FedEx Ground Package System, Inc. (FedEx Ground) moves to vacate, in part, our order that conditionally remanded the twelve actions listed on Schedule A to their respective transferor courts.  Specifically, FedEx Ground moves the Panel to separate the claims resolved by the transferee court on summary judgment from the remaining claims and remand only the latter claims.  Plaintiffs in the actions oppose the motion.

The current dispute has arisen as the transferee judge, Robert L. Miller, Jr., of the Northern District of Indiana, has completed his work on these MDL proceedings.  In some of the cases, Judge Miller granted summary judgment to FedEx Ground on all claims.  In the twelve cases at issue here, he granted summary judgment on some claims, but not others.  Plaintiffs in the former group have already taken their appeals to the U.S. Court of Appeals for the Seventh Circuit.  In the latter group of twelve cases, Judge Miller denied defendant's request for entry of partial judgment under Fed. R. Civ. P. 54(b) and then entered a suggestion that the Panel remand the remaining twelve cases in their entirety.  These two rulings have raised some interesting questions.

FedEx Ground argues that under *In re Food Lion, Inc., Fair Labor Standards Act "Effective Scheduling Lit.,"* 73 F.3d 528 (4th Cir. 1996), these cases should be bifurcated, leaving the claims that the transferee court resolved on summary judgment for appeal to the Seventh Circuit, and remanding only the remaining claims to the respective transferor courts for final resolution.  Indeed, the Fourth Circuit did hold that the "overriding purpose of the multidistrict procedure dictates that [the claims decided on summary judgment by the transferee court] be decided in the same appellate forum."  *Id*. at 532.  Plaintiffs argue that it is fairer and more efficient to keep each case intact to allow for combined appeals of all issues at the conclusion of each case.  The evident merit in both views highlights an interesting intersection between Rule 54(b) and Section 1407.

No doubt, one can make strong arguments for either a preference for consistent appeals from a transferee court ruling or a preference that related claims in the same case be taken in the same appeal.  However, the Panel's role does not extend to reviewing the legal correctness of Judge Miller's Rule 54(b) decision.  Instead, the Panel's role is to decide whether Judge Miller's suggestion of remand is appropriate.  In doing so, we consistently have placed great weight on the transferee court's remand recommendation.  *See In re Columbia/HCA Healthcare Corp. Qui Tam Litig. (No.*

---

[*]  Judge Barbara S. Jones and Judge Paul J. Barbadoro took no part in the decision of this matter.

- 2 -

*II)*, 560 F.Supp.2d 1349, 1350 (J.P.M.L. 2008) (citing *In re Holiday Magic Sec. & Antitrust Litig.,* 433 F.Supp. 1125, 1126 (J.P.M.L. 1977)).

There are sound reasons why this deference has proven so essential and successful over the many years of our experience; in most instances the transferee judge has an acute sense about the procedural steps necessary to advance the litigation in the fairest and most efficient way. Here, when Judge Miller suggested remand of these actions, he was in the best position to consider the relative efficiencies of bifurcating the claims as well. Certainly, he considered FedEx Ground's views and all relevant factors in denying its related Rule 54(b) motion.

FedEx Ground has not persuaded us that remand of these cases in their entirety is misplaced. The transferor judges in the various courts are well prepared to resolve the remaining individual issues in these cases and to preside over any eventual trials.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are remanded to their respective transferor courts as set out in Schedule A.

PANEL ON MULTIDISTRICT LITIGATION

_____
John G. Heyburn II
Chairman

Kathryn H. Vratil        W. Royal Furgeson, Jr.
Frank C. Damrell, Jr.

**IN RE: FEDEX GROUND PACKAGE SYSTEM, INC.,**
**EMPLOYMENT PRACTICES LITIGATION (NO. II)**                  MDL No. 1700

## SCHEDULE A

### Northern District of Indiana

Bruce Edwin Gentle, et al. v. FedEx Ground Package System, Inc., et al.,
    C.A. No. 3:07-00191 (N.D. Alabama, C.A. No. 5:07-00392)
David Harris v. FedEx Ground Package System, Inc., C.A. No. 3:06-00209
    (E.D. Arkansas, C.A. No. 4:06-00175)
Ricardo Huerta v. FedEx Ground, et al., C.A. No. 3:08-00052
    (C.D. California, C.A. No. 2:07-08123)
Dean Alexander, et al. v. FedEx Ground Package System, Inc., et al.,
    C.A. No. 3:05-00528 (N.D. California, C.A. No. 3:05-00038)
Jeremiah Pedrazzi v. FedEx Corp., et al., C.A. No. 3:06-00429
    (N.D. California, C.A. No. 5:06-02393)
Donald E. Carlson, et al. v. FedEx Ground Package Systems, Inc., C.A. No. 3:05-00664
    (M.D. Florida, C.A. No. 8:05-01380)
Scott Ward, et al. v. FedEx Ground Package System, Inc., C.A. No. 3:09-00356
    (S.D. Florida, C.A. No. 9:09-80729)
Charlie Bertram, et al. v. Federal Express Corp., et al., C.A. No. 3:05-00666
    (W.D. Kentucky, C.A. No. 3:05-00522)
Robert Gennell, Jr., et al. v. FedEx Corp., et al., C.A. No. 3:05-00534
    (D. New Hampshire, C.A. No. 1:05-00145)
Walter Wallace v. FedEx Ground Package System, Inc., et al., C.A. No. 3:06-00801
    (N.D. Ohio, C.A. No. 1:06-01632)
Edward Slayman v. FedEx Ground Package System, Inc., C.A. No. 3:05-00596
    (D. Oregon, C.A. No. 3:05-01127)
Jon Leighter, et al. v. FedEx Ground Package System, Inc., C.A. No. 3:07-00328
    (D. Oregon, C.A. No. 3: 07-00818)