**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## MEMORANDUM IN SUPPORT OF THE PARTIES' JOINT MOTION TO AMEND THE CASE SCHEDULING ORDER

### INTRODUCTION

The parties jointly request that the Court amend the Scheduling Order to accommodate cases that have recently been transferred to this MDL and also to establish a summary adjudication schedule that will allow the Court's full consideration of summary adjudication issues presented by current and future constituent actions. While the parties have been meeting and conferring over the past two weeks and had hoped to submit this joint motion prior to the June 5 deadline for exchange of summary adjudication expert disclosures, the demands of the ongoing class certification briefing schedule (including preparation of substantial filings of briefs and supporting information by the defendant due this week) have, unfortunately, delayed this filing. Three modifications are sought by this motion:

First, because over the past four months, the parties have devoted themselves fully to class certification briefing, they have been unable to complete expert discovery relating to

summary adjudication of contractor/employment status. They have therefore stipulated to, and seek court approval of, a modification of the deadlines for expert discovery related to summary adjudication of contractor/employment status.

Second, because of the recent filing of additional cases likely to be transferred, the parties jointly seek to accommodate the scheduling of those new cases into the current schedule.

Third, the parties jointly seek a change in the current schedule for summary adjudication motions related to independent contractor/employment status, as more fully explained below

The parties have completed massive class certification and merits discovery on schedule, conducting over 200 depositions, exchanging approximately 2 million pages of documents, and completing class certification expert discovery. Since the completion of discovery the parties have worked diligently to address class certification issues. Plaintiffs have filed twenty-nine motions for class certification in three waves. FedEx Ground has filed its opposition to each of these motions, having filed yesterday (June 7, 2007) its oppositions to the last nine. Plaintiffs filed reply briefs in support of their first ten motions on May 29, 2007, and will file their second wave of replies on June 18, 2007, with their last set of reply briefs in support of their motions due on July 9, 2007.

Throughout this effort, the parties have devoted all of the necessary resources to meet the Court's ambitious schedule, as is required in a proceeding of this complexity.

Nevertheless, more work is required. Since the close of discovery, four cases have been transferred to this Court for pretrial coordination in this MDL proceeding.[1] In one of these cases, *Decesare v. FedEx Ground,* Plaintiffs seek to represent all pickup and delivery drivers in Nevada. Six additional complaints seeking class certification of other nationwide claims or in

[1] These cases are *Gentle v. FedEx Ground*, No. 3:07-cv-191-RLM; *Ellison v. FedEx Ground*, No. 3:07-cv-00190-RLM; *Jones v. FedEx Ground*, No. 3:07-cv-00189-RLM; and *Decesare v. FedEx Ground*, No. 3:07-cv-120-RLM.

other states not yet included in this MDL, but likely to be transferred into this MDL pursuant to FedEx Ground's Notices of Related Actions in the near future. Moreover, the parties believe that several additional complaints alleging class actions claims are likely to be filed in the near future, and the transfer of at least two additional non class action cases is also likely. Little discovery has taken place regarding these new cases as the parties worked diligently on class certification pleadings. The parties have begun and will continue to work diligently on completing discovery (similar in substance to that already undertaken in the pending cases) in the newly transferred cases.

Given the number of newly transferred and likely-to-be transferred cases, the parties believe that the interests of judicial economy warrant some modification of the current Scheduling Order, incorporating these cases for discovery, a fourth "wave" of class certification motions and summary adjudication of independent contractor/employment status. For this reason, as well as the encroachment of massive class certification briefing into the time allocated to summary adjudication expert discovery on the independent contractor/employment status issue, the parties jointly request that this Court amend the current case schedule also with regard to the deadlines for those expert reports and the filing of those motions. (FedEx Ground is concurrently making a separate motion, which Plaintiffs oppose, for alternative relief in connection with those motions, as it pertains to expert reports and expert discovery.)

## I. PROCEDURAL BACKGROUND

Under the existing case scheduling orders, merits and class certification discovery has closed. (Dec. 12, 2006 Order (Doc. No. 453).) The final wave of class certification opening briefs was filed on April 23, 2007. (Jan. 23, 2007 Order (Doc. No. 482).) Expert reports in support of summary adjudication motions directed to independent contractor/employment status were scheduled to be served on June 5, 2007. (Jan. 19, 2007 Order (Doc. No. 481).) Discovery

of these experts and production of opposition experts was to be completed by July 9, 2007. (*Id.*) Discovery of opposition experts was to be completed by August 6, 2007. (*Id.*) Motions for summary adjudication relating to independent contractor/employment status were scheduled to be filed on September 21, 2007 with oppositions and replies to be filed on November 5, 2007 and December 7, 2007, respectively. (May 26, 2006 Order (Doc. No. 261).) As explained below, the parties agree that this schedule should be modified to account for changed circumstances and extraordinary workloads.

## II. THE CURRENT SCHEDULING CANNOT BE MET WITH REASONABLE DILIGENCE

This Court may modify an existing scheduling order upon a showing of good cause. Fed. R. Civ. P. 16(b); 6A Charles Alan Wright, Arthur R. Miller & Mary A. Kane, Federal Practice and Procedure, § 1522.1 at 231 (2nd ed. 1990). Both parties submit that the current scheduling order cannot be met for two reasons. ***First***, the current scheduling order provided that the final wave of motions for class certification would be filed by April 23, 2007, which deadline was set before, and therefore did not account for transfer and discovery pertaining to complaints that were only recently filed. ***Second***, modifications made to the case schedule in December 2006 and January 2007 have pushed class certification briefing into the period originally scheduled for expert discovery and summary adjudication directed to independent contractor/employment status. The parties are also faced with the substantial likelihood of having to file motions for summary adjudication of independent contractor/employment status without knowing which, if any, claims will proceed on a class basis and, which test or tests of contractor/employment status will apply.

**A. Recently filed cases**

Several more recently-filed cases have or likely will become a part of this coordinated proceeding:

1. In *Decesare v. FedEx Ground,* 3:07-cv-00120 (N.D. Ind.), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases currently being briefed before this Court. The case was filed on January 24, 2007. An answer was filed and the case was transferred on March 19, 2007. At the time of transfer, no discovery had yet taken place; FedEx Ground has since propounded discovery requests on the named Plaintiffs. Named plaintiffs have not yet been deposed.
2. In *Whiteside v. FedEx Ground,* :1:07-cv-00167 (W.D.N.C.), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases from North Carolina. The complaint was filed on May 3, 2007. FedEx Ground is preparing to answer the complaint and request that it be consolidated with these MDL proceedings. No discovery has taken place in this action.
3. In *Gibson v. FedEx Ground,* 2:07-cv-00933 (D. Ariz.), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases from Arizona. The complaint was filed on May 7, 2007. An amended complaint was filed on May 15, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.
4. In *Mango v. FedEx Ground,* 3:07-cv-00811 (D. Conn), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases from Connecticut. The complaint was filed on May 22, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.
5. In *Leighter v. FedEx Ground,* 3:07-cv-00818 (D. Ore.), Plaintiffs seek to represent a class

of drivers from Oregon asserting claims and proposed classes similar to those sought in the other 29 MDL-transferred cases. Plaintiffs filed the complaint on June 1, 2007. FedEx Ground is preparing to answer it and seek consolidation. No discovery has taken place.

6. In *Dizinno v. FedEx Ground*, 3:07-cv-00812 (D. Conn.), a similar (though non-class action) complaint, was filed by five drivers from Connecticut on May 22, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.

7. In *Vargas v. FedEx Ground*, 1:07-cv-10876 (D. Mass.), Plaintiffs seek to represent a nationwide class of drivers relying on the overtime laws of the several states. It was filed in the District of Massachusetts on May 8, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.

8. In *Givens v. FedEx Ground,* 2:07-cv-01824 (E.D. La.), Plaintiffs seek to represent a nationwide class under the overtime provisions of the Fair Labor Standards Act. It was filed in the Eastern District of Louisiana on April 13, 2007. FedEx Ground is preparing to answer the complaint and request that it be consolidated with these MDL proceedings. No discovery has taken place in this action.

9. In *Farrell v. FedEx Ground*, 1:07-cv-02574 (D.N.J.), Plaintiff seeks recovery for an allegedly improper termination under the Uniformed Service Employment and Reemployment Rights Act of 1994 (which claim requires proving employment status), and for breach of contract. FedEx Ground is preparing to answer the complaint and request that it be consolidated with these MDL proceedings. No discovery has taken place in this action.

Plaintiffs are also aware of approximately four additional putative statewide class actions that are likely to be filed in the very near future.

The parties have utilized their best efforts to integrate newly-transferred cases into the existing case scheduling orders. For example, *Asbury v. FedEx Ground* was consolidated with these MDL proceedings on December 19, 2006, less than 45 days prior to the close of discovery, and the parties were able to conclude discovery and include it with the third wave of class certification motions filed under the existing discovery schedule. For the *Decesare* case, however, as well as the cases that have yet to be transferred, this has not been possible.

**B. The discovery period for summary adjudication has been compressed**

The class certification briefing process has consumed nearly all of the parties' time and effort since January 31, 2007. Accordingly, neither party has had sufficient time to finalize its merits expert reports for use in summary adjudication motions. Additionally, the parties agree that the substance of motions for such summary adjudication may depend upon the Courts' class certification orders. This is because plaintiffs' various claims implicate various independent contractor/employment status tests, including common law agency tests, the "economic realities" test, among others.

The parties were unable to exchange merits expert reports by June 5, 2007, and to complete all expert discovery pertaining to summary adjudication of independent contractor/employment status by the end of July, simultaneously with completion of the 29 class certification motions currently pending and therefore seek a brief extension of time to complete that discovery. The parties have agreed that movant's merits expert reports deadline should be extended to at least July 24, 2007, approximately 45-days later than currently contemplated by the case scheduling order, and that opponent's should have until at least August 31, 2007 to provide its expert reports and to conclude expert discovery relating to summary adjudication of

independent contractor/employment status no earlier than September 30, 2007. While stipulating with Plaintiffs to this extension, FedEx Ground alternatively proposes (without Plaintiffs' agreement) that expert discovery pertaining to summary adjudication of independent contractor/employment status be delayed until after the Court issues its class certification orders, as FedEx Ground on its own behalf explains in its separately-filed position statement.

In addition, the parties agree that it will not be possible to properly address summary adjudication of independent contractor/employment status until the court has addressed the class certification issue and, therefore, the parties ask the Court to vacate the September 21, 2007 deadline for the filing of such motions until the Court has done so, or until the Court convenes an additional Scheduling Conference. The Parties jointly propose to amend the case scheduling orders.

## III. JOINTLY PROPOSED CASE SCHEDULE

### A. Schedule for a fourth round of class certification briefing

To permit the parties to take necessary discovery in the newly-filed cases, as well as to allow for the outstanding known cases to be consolidated with these MDL proceedings, the parties jointly propose the following discovery and briefing schedule applicable to a fourth wave of class certification briefing.

***Discovery***. Document, written, and deposition discovery as to these new actions and other transferred into this MDL (even if non-class actions) shall be completed by **August 31, 2007**. This discovery shall pertain only to new plaintiffs, claims and states implicated by cases transferred to these MDL proceedings after March 1, 2007. To speed the discovery process, parties shall be permitted to propound discovery requests (and existing, applicable requests for production shall be automatically applicable to new plaintiffs without the need to propound those

requests) when a Conditional Transfer Order has been issued for any related action(s). Upon final transfer of these action(s), responses will be due within 30 days after service. The parties further agree: (1) that any new discovery shall pertain to issues raised in the newly transferred cases only; (2) that they will not conduct discovery that is duplicative or overlapping of the already completed discovery (e.g., the parties will not redepose persons who have already been deposed, without court approval and for good cause shown); and (3) to promptly meet and confer regarding the scope of the new discovery after the issuance of a revised Scheduling Order.

***Class certification briefing.*** Plaintiffs shall file motions and accompanying memoranda (to be limited to **20 pages**) for certification of classes and/or collective actions relating to newly-transferred cases by **October 1, 2007**. FedEx Ground shall file its oppositions to certification (to be limited to **30 pages**) by **November 15, 2007**. Plaintiffs shall file reply memoranda (to be limited to **20 pages**) by **December 17, 2007**.

***Impact on pending motions for class certification***. The parties agree that the newly-transferred cases and motions for class certification need not effect the Court's consideration of plaintiffs' 29 pending motions for class certification.

**B. Experts discovery for summary adjudication of independent contractor/employment status**

The parties agree that the current deadlines for experts discovery relating to motions for summary adjudication of independent contractor/employment status cannot be met. The parties disagree as to whether a new schedule for discovery of these experts should be set at this time, but have agreed that the moving party's expert reports deadline should be extended to at least July 24, 2007, approximately 45-days later than currently contemplated by the case scheduling order, and that the opposing party's expert report deadline should be moved to at least August 31, 2007, and that expert discovery relating to those reports should be concluded no earlier than

September 30, 2007. Plaintiffs favor rescheduling expert discovery to begin on July 24, 2007, while FedEx Ground favors deferring the current schedule pending the Court's rulings on the pending motions for class certification. The parties' respective positions are discussed in more detail in the accompanying supplemental position statements.

**C. Summary adjudication of contractor/employment status**

The parties jointly propose that the date set for filing of motions for summary adjudication of independent contractor/employment status be vacated pending resolution of the motions for class certification. This will allow the parties to file motions with the benefit of the Court's rulings on class certification, and tailored to them, and may save avoidable expense of briefing unnecessary issues.

## CONCLUSION

The parties have demonstrated the seriousness and diligence with which the parties have approached the completion of discovery and the class certification stage in the proceedings. The parties ask that this Court grant them limited additional time to complete discovery and address the remaining class certification motions on recently transferred cases, and to vacate the current deadline for filing of summary adjudication motions on independent contractor/employment status until the court issues class certification rulings.

The parties also jointly request that this Court extend the expert discovery schedule relating to summary adjudication of independent contractor/employment status proposed above for the reasons set forth in the parties' respective supplemental position statements.

For the reasons stated above, the parties respectfully request that this Court **GRANT** the parties' joint motion for amendment of the existing case scheduling order.

Dated: June 8, 2007

Respectfully submitted

By: /s
Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue
New York, New York 10022

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401

*Plaintiffs' Co-Lead Counsel*

By: /s
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

THIS DOCUMENT RELATES TO: )

ALL ACTIONS )

Case No. 3:05-MD-527-RM
(MDL 1700)

**FEDEX GROUND'S SUPPLEMENTAL POSITION STATEMENT IN SUPPORT OF AMENDING THE CASE SCHEDULING ORDER AND VACATING CURRENT EXPERT DISCOVERY DEADLINES**

## INTRODUCTION

In addition to the relief requested in the parties' joint motion to amend the case scheduling order, FedEx Ground requests that the Court vacate the deadlines applicable to expert reports and discovery for the summary adjudication motions directed to independent contractor/employment status. The parties agree that the motions should be deferred. For many of the same reasons, FedEx Ground does not want to engage in costly report preparation and discovery on material that likely will become substantially superseded—if not completely mooted—depending how the Court rules on the twenty-nine separate motions for class certification, involving several dozen distinct claims for relief.

Plaintiffs believe that FedEx Ground seeks this relief so it can reshuffle its line-up of previously-disclosed experts. That is not correct. This relief does not concern the relatively simple question of who the summary adjudication experts will be; it concerns the substance of

their research, preparation, and testimony, both in the form of written reports and deposition testimony. Put simply, the content of those expert reports, and the discovery that the parties will engage in to test those opinions, will turn significantly on which complaints, claims, and classes are, or are not, certified. There are simply too many distinct test for employment status still at issue in these cases to know what expert testimony may or may not be necessary. To avoid having to go through the process of preparing expert reports and engaging in discovery concerning those reports twice, defendant respectfully suggests that the process be deferred until the parties know what claims are proceeding on a class basis, and whether the case consists of 150 plaintiffs, 15,000 plaintiffs, or some presently unknowable number in between. To defendant, that represents the more sensible approach to managing this vast and extremely expensive dispute.

**ARGUMENT**

FedEx Ground believes that the interests of judicial and party economy will be far better served by deferring the preparation and discovery of expert reports until after the Court rules on the motions for class certification. Like the motions for summary judgment, the report content and discovery of experts will be influenced by the applicable tests and states, if any, upon which the Court certifies a class or classes. If some plaintiffs or claims are not certified, FedEx Ground is not likely to undertake the significant expenditure of resources of developing expert and reports in support of summary adjudication that apply only to uncertified classes, plaintiffs, or claims. Further, FedEx Ground believes that, in such an event, the parties may engage in discussions that could lead to a resolution of the cases without resorting to expensive and time consuming expert discovery and motions for summary adjudication. None of this is knowable now.

This logic is unaffected by Plaintiffs' position that their expert reports will not be effected by the Court's rulings on class certification. Even if Plaintiffs anticipate that their expert reports are not subject to change as a result of the significant class certification issues now pending, the content of the reports by FedEx Ground's experts absolutely would. FedEx Ground does not anticipate moving for summary adjudication on the classification question as to individual plaintiffs. Such motions would be made, however, were the Court to certify one or more of the requested classes. The experts (and reports) that FedEx Ground would rely on in support of its motions for summary adjudication depend on the claims and/or classes that may be certified and the legal tests pertinent to those claims and/or classes. By establishing a deadline for expert disclosure prior to resolution of the class certification issues, FedEx Ground would need to spend tens of thousands of dollars (or more) preparing expert reports as if *all* claims and classes were ultimately certified.

This great expense would be imposed not only on FedEx Ground, but also on Plaintiffs, who would have to conduct depositions and file opposition reports for experts and expert reports that, ultimately, may never be filed in connection with any motion practice. Given that the parties already agree that the briefing schedule for this motions should be deferred, there would be no prejudice in also deferring expert discovery pertaining to summary adjudication of contractor/employment status.

## CONCLUSION

For the reasons stated above, FedEx Ground respectfully request that this Court vacate, and not reset, the existing deadlines for expert discovery relating to contractor status until the Court establishes a briefing schedule for the motions themselves.

Dated: June 8, 2007

Respectfully submitted

By: /s
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | |

**PLAINTIFFS' SUPPLEMENTAL POSITION STATEMENT IN SUPPORT OF RESETTING CURRENT EXPERT DISCOVERY DEADLINES AS JOINTLY AGREED AND IN OPPOSITION TO FEDEX'S POSITION THAT THEY SHOULD BE INDEFINITELY VACATED**

## INTRODUCTION

Plaintiffs believe that the relief jointly requested by the parties represents the most efficient and speedy schedule to complete the remaining pretrial MDL proceedings. Plaintiffs oppose FedEx's alternative proposal to indefinitely delay merits experts' reports and depositions until after class certification orders. Plaintiffs submit that, since this case has proceeded at all times in reliance on the past Scheduling Order, and since FedEx has never previously suggested that merits expert discovery be delayed in the fashion it now asserts, Plaintiffs would be severely prejudiced vacating the schedule, as they have already engaged their substantive experts and are near completion of their reports.

I. The Parties Merits Experts Have Already Been Selected And Disclosed

FedEx mistakenly claims that it should not be required to "select" its experts for use in

moving or opposing summary adjudication of employment status; the parties were required to disclose their merits experts on or before January 8, 2007 and **did so**, pursuant to this Court's November 29, 2005 Scheduling Order requiring the disclosure of all merits experts by January 8, 2006:

> In accordance with Fed. R. Civ. P. 26(a)(1) and (b), and this Court's November 15, 2005 initial scheduling order, all parties shall disclose all experts and witnesses upon whom they will rely in the summary judgment phase of proceedings relating to independent contractor/employment status by **January 8, 2006**. Movants shall serve any expert reports affidavits upon which they rely in that phase of proceedings no later than **June 1, 2006**. Opponents shall have until **June 30, 2006**, to depose such expert(s). Opponents shall serve any expert reports or affidavits upon which they rely in that phase of proceedings no later than **June 30, 2006**. Depositions of such experts must take place no later than **August 1, 2006.**

While the Court extended the deadlines for these reports and depositions on May 26, 2006, the deadline for disclosure was not extended. Nor did either party request such an extension. Thus, the parties have already selected their merits experts to support and/or oppose summary adjudication motions regarding employment status.

II.      Merits Experts Reports & Depositions Should Be Done Without Further Delay

Plaintiffs submit that FedEx's proposal to suspend merits experts discovery indefinitely would unnecessarily delay the filing of summary adjudication motions until long after this court issues its class certification orders. If expert reports are not even begun until after all of the Court's class certification rulings are issued, there can be no doubt that a delay of many months will ensue. Even under the most ambitious schedule –that jointly proposed herein – merits experts discovery will take at least 3-4 months to complete. If this work is delayed until after all class certification orders are issued, the filing of summary adjudication motions will lag *at least* six months after the court's class certification orders.

FedEx admits in its separate position statement that it will oppose Plaintiffs' motion for

summary adjudication on employment status and that in the event that this Court certified "one of more of the requested classes" it will seek summary adjudication itself. In either event, whether in support or opposition to summary adjudication, FedEx intends to present expert testimony on employment status. It claims, however, that the scope of such expert testimony will differ depending on which claims or classes are certified. This position ignores the fact that the Court has already ruled that summary adjudication one employment status will precede any other dispositive motions as employment status must be proven as a predicate of each claim asserted in this MDL. FedEx's position that it will somehow save substantial sums on expert reports on employment status based on this Court's class certification orders is illogical and unsupported.

Plaintiffs disagree with FedEx's assertions that the reasons which support vacating the deadlines for the summary adjudication motions similarly support vacating merits experts discovery deadlines. Unlike the more typical class action case where different claims being certified might impact the use of experts, in this case, the merits experts at issue here are limited to the employment status issue alone, not the full range of liability issues which obviously would turn on which claims were certified. While the precise test of employment status differs for various claims asserted, making it difficult to file summary adjudication without knowing exactly which test the Court will be required to apply, the key factors under the various tests are substantially similar as the class certification motions and the oppositions to them make clear and as FedEx previously asserted to the Judicial Panel on Multi-District Litigation when seeking centralization. The right to control the method, manner and means of performance is a key factor under each and every employment status test and it is the primary battleground.[1]

[1] FedEx's class certification expert Robert Crandall has already submitted a 70-page

Moreover, FedEx fails to identify any manner in which their experts' reports would differ depending on the outcome of the class certification motions, except to say that it will not affirmatively seek summary adjudication unless at least one claim is certified. Plaintiffs will move for summary adjudication of the employment status question whatever the outcome of the class certification orders, given their representation of over 150 named plaintiffs, with even more filing new cases and seeking similar relief. Thus, the fact remains that at a minimum, Plaintiffs' motion for summary adjudication of employment status will be filed and should be expeditiously litigation. There is simply no substantial reason why this cannot be done while the court is considering the pending motions.

Plaintiffs believe that judicial economy will be better served by completion of the merits expert discovery during the pendency of the Court's consideration of the class certification motions. If merits expert discovery is completed, the parties can be ready to make their summary adjudication motions promptly after the Court issues its class certification orders. Plaintiffs experience in the Estrada litigation gives them scant reason to believe that claims which are not certified can somehow simply be "resolved." Whatever the result of class certification motions, no matter how many or few classes are certified, Plaintiffs will file their motion for summary adjudication of their employment status and thus Plaintiffs submit that the only result of failure to schedule merits experts now is needless delay of the litigation of these cases.

III. Plaintiffs Will Be Prejudiced By Unlimited Delay In Merit Experts Discovery

Plaintiffs merits expert work is well underway and while not complete, has been

---

report largely addressing several employment status issues: whether the drivers have a separate business, with an opportunity for profit or loss, and whether FedEx reserves to itself the right of control over method, manner and means of performance. Thus, there is no secret about his opinion and views of the drivers' employment status.

diligently pursued based on the Court's Scheduling Orders, which from the inception of the case have included deadlines for merits experts which followed closely on the submission of class certification motions and clearly were to be conducted and concluded during the period when the court was likely to have those motions under submission. To date, FedEx has never in any prior Scheduling Order proposal raised the prospect or even attempted to convince this court to delay the merits experts as they do now. Thus, Plaintiffs have already expended significant resources on their merits experts and do not wish to suspend that work and have to renew and re-do the work already undertaken.

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that this Court reset the existing deadlines for expert discovery relating to employment status in accordance with the joint motion and deny FedEx's alternative proposal.

Dated: June 8, 2007

Respectfully submitted,

By: ______________________
Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue
New York, New York 10022

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401

*Plaintiffs' Co-Lead Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PROPOSED ORDER AMENDING THE CASE SCHEDULE**

The parties have filed a joint motion requesting this Court amend the current case Scheduling Order relating to discovery and class certification regarding recently transferred cases, merits expert discovery, and summary adjudication of independent contractor/employment status. After considering the arguments raised by the parties, the Court now enters the following Order, which supersedes inconsistent provisions of the current Scheduling Order.

## I. DISCOVERY REGARDING NEWLY-TRANSFERRED CASES

For all cases that were transferred to MDL 1700 after March 1, 2007 ("newly-filed cases") and those transferred in the near future, discovery shall be completed by August 31, 2007, consistent with the parties' agreements contained in their Joint Motion

## II. CLASS CERTIFICATION

A fourth phase of class certification briefing shall occur for all newly-transferred cases. Motions for class certification (and accompanying memoranda not to exceed **20** pages) shall be filed by **October 1, 2007**. FedEx Ground shall file its oppositions to certification (to be limited

to **30 pages**) by **November 15, 2007**. Plaintiffs shall file reply memoranda (to be limited to **20 pages**) by **December 17, 2007**.

**III. SUMMARY ADJUDICATION OF CONTRACTOR/EMPLOYMENT STATUS**

**A. Motions and briefing.**

Deadlines for motions in support of summary adjudication of contractor/employment status are vacated. This Court will schedule a status conference upon resolution of class certification issues to establish a new schedule for those motions.

**B. Expert reports and discovery relating to summary adjudication of independent contractor/employment status**

[1. **Plaintiffs' unopposed proposal**

Expert reports in support of motions for summary adjudication of independent contractor/employment status shall be served on or before July 24, 2007. Discovery from such experts shall be concluded by August 31, 2007. Reports of experts to be relied upon in opposing such summary adjudication motions shall be produced by August 31, 2007, and discovery from such opposing experts shall be concluded by October 1, 2007. ]

[1. **FedEx Ground's proposal**

The deadlines for expert reports and discovery in support of motions for summary adjudication of independent contractor/employment status shall be deferred and will be reset as part of the status conference pertaining to the motions, described in section II(A), above.]

**SO ORDERED**

Dated this __ day of June 2007.

____________________________
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 93:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |

**CERTIFICATE OF SERVICE**

1. **Plaintiffs' Supplemental Position Statement in Support of Resetting Current Expert Discovery Deadlines as Jointly Agreed and in Opposition to FEDEX's Position That They Should Be Indefinitely Vacated;**

2. **FEDEX Ground's Supplemental Position Statement in Support of Amending the Case Scheduling Order and Vacating Current Expert Discovery Deadlines;**

3. **Joint Motion to Amend the Case Schedule and Memorandum in Support of the Parties' Joint Motion to Amend the Case Scheduling Order;**

4. **Proposed Order Amending the Case Schedule;**

5. **Proof of Service**

**CERTIFICATE OF SERVICE**

I, Carol Edgerton, hereby certify that on June 8, 2007, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com;amy.ricks@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David G. Caperton** | dcaperton@omm.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; efink@leonardcarder.com; |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert I. Harwood** | rharwood@whesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Dorothy Anne Jarrell** | dajarrell@omm.com; prowen@omm.com; jdonovan@omm.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |

| | |
|---|---|
| **Thomas P. Jirgal** | tjirgal@omm.com; jbanks@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com; jdonovan@omm.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| **Anh-Nguyet Tran, LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@whesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Robert G. Rikard** | rrikard@attorneyssc.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | matt@matthewtobinlaw.com |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |

I further certify that on June 8, 2007, I caused the foregoing documents to be served via overnight delivery upon:

Evelyn Becker
Guy Brenner
O'MELVENY & MYERS, LLP
1625 Eye Street N.W.
Washington, D.C. 20006-4001

Robert Schwartz
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, CA 90071-2899

I also certify that on June 8, 2007, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G
BROWNLOW
1444 Gillham Drive, Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave, Suite 3300
Milwaukee, WI 53202-4108

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Robert E McDaniel
THE MCDANIEL LAW OFFICES
755 North Main Street
Laconia, NH 03246

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

James R Mulroy II
William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN
FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

**NOTICE OF MANUAL FILING**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on June 8, 2007.

//s//
Carol Edgerton

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Case No. 3:05-MD-527-RM
(MDL 1700)

**FEDEX GROUND'S SUPPLEMENTAL POSITION STATEMENT IN SUPPORT OF AMENDING THE CASE SCHEDULING ORDER AND VACATING CURRENT EXPERT DISCOVERY DEADLINES**

## INTRODUCTION

In addition to the relief requested in the parties' joint motion to amend the case scheduling order, FedEx Ground requests that the Court vacate the deadlines applicable to expert reports and discovery for the summary adjudication motions directed to independent contractor/employment status. The parties agree that the motions should be deferred. For many of the same reasons, FedEx Ground does not want to engage in costly report preparation and discovery on material that likely will become substantially superseded—if not completely mooted—depending how the Court rules on the twenty-nine separate motions for class certification, involving several dozen distinct claims for relief.

Plaintiffs believe that FedEx Ground seeks this relief so it can reshuffle its line-up of previously-disclosed experts. That is not correct. This relief does not concern the relatively simple question of who the summary adjudication experts will be; it concerns the substance of

their research, preparation, and testimony, both in the form of written reports and deposition testimony. Put simply, the content of those expert reports, and the discovery that the parties will engage in to test those opinions, will turn significantly on which complaints, claims, and classes are, or are not, certified. There are simply too many distinct test for employment status still at issue in these cases to know what expert testimony may or may not be necessary. To avoid having to go through the process of preparing expert reports and engaging in discovery concerning those reports twice, defendant respectfully suggests that the process be deferred until the parties know what claims are proceeding on a class basis, and whether the case consists of 150 plaintiffs, 15,000 plaintiffs, or some presently unknowable number in between. To defendant, that represents the more sensible approach to managing this vast and extremely expensive dispute.

**ARGUMENT**

FedEx Ground believes that the interests of judicial and party economy will be far better served by deferring the preparation and discovery of expert reports until after the Court rules on the motions for class certification. Like the motions for summary judgment, the report content and discovery of experts will be influenced by the applicable tests and states, if any, upon which the Court certifies a class or classes. If some plaintiffs or claims are not certified, FedEx Ground is not likely to undertake the significant expenditure of resources of developing expert and reports in support of summary adjudication that apply only to uncertified classes, plaintiffs, or claims. Further, FedEx Ground believes that, in such an event, the parties may engage in discussions that could lead to a resolution of the cases without resorting to expensive and time consuming expert discovery and motions for summary adjudication. None of this is knowable now.

This logic is unaffected by Plaintiffs' position that their expert reports will not be effected by the Court's rulings on class certification. Even if Plaintiffs anticipate that their expert reports are not subject to change as a result of the significant class certification issues now pending, the content of the reports by FedEx Ground's experts absolutely would. FedEx Ground does not anticipate moving for summary adjudication on the classification question as to individual plaintiffs. Such motions would be made, however, were the Court to certify one or more of the requested classes. The experts (and reports) that FedEx Ground would rely on in support of its motions for summary adjudication depend on the claims and/or classes that may be certified and the legal tests pertinent to those claims and/or classes. By establishing a deadline for expert disclosure prior to resolution of the class certification issues, FedEx Ground would need to spend tens of thousands of dollars (or more) preparing expert reports as if *all* claims and classes were ultimately certified.

This great expense would be imposed not only on FedEx Ground, but also on Plaintiffs, who would have to conduct depositions and file opposition reports for experts and expert reports that, ultimately, may never be filed in connection with any motion practice. Given that the parties already agree that the briefing schedule for this motions should be deferred, there would be no prejudice in also deferring expert discovery pertaining to summary adjudication of contractor/employment status.

## CONCLUSION

For the reasons stated above, FedEx Ground respectfully request that this Court vacate, and not reset, the existing deadlines for expert discovery relating to contractor status until the Court establishes a briefing schedule for the motions themselves.

Dated: June 8, 2007

Respectfully submitted

By: /s
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**JOINT MOTION TO AMEND THE CASE SCHEDULE**

1. The parties have worked diligently to brief the 29 motions for class certification pending before the Court.

2. Since the last Case Scheduling Order was issued, at least one more case has joined these MDL proceedings, and transfer is expected of at least 10 more cases.

3. Many of these cases present similar issues as the 29 motions for class certification pending before the Court.

4. No significant discovery has yet taken place in any of these cases.

5. Due to the demands of the class certification briefing schedule, and the discovery needs of these newly-filed cases, the current Case Schedule Orders cannot be met with reasonable diligence as they pertain to: class certification briefing; discovery of experts to be used in conjunction with motions for summary adjudication relating to

contractor/employment status; and, summary adjudication briefing relating to contractor/employment status.

WHEREFORE, as well as for those reasons set forth in the Parties' Joint Memorandum in Support of Their Motion To Amend the Case Schedule, as well as for those reasons listed in each parties' supplemental position statement, the parties jointly request the Court to order that:

**(1)** Discovery for all cases that were transferred to MDL 1700 after March 1, 2007 ("newly-filed cases") and for those transferred in the near future, discovery shall be completed by **August 31, 2007,** consistent with the parties' agreements contained in their Joint Motion.

**(2)** Plaintiffs shall file briefs in support class certification (and accompanying memoranda not to exceed **20** pages) for all cases that were transferred to MDL 1700 after March 1, 2007 ("newly-filed cases") and for those transferred in the near future by **October 1, 2007.** FedEx Ground shall file its oppositions to certification (to be limited to **30 pages**) by **November 15, 2007**. Plaintiffs shall file reply memoranda (to be limited to **20 pages**) by **December 17, 2007**.

**(3)** The current dates for filing of motions for summary adjudication directed towards contractor/employment status are **vacated** pending a status conference to be conducted once the Court has ruled on class certification.

WHEREFORE, Plaintiffs request, and Defendant does not oppose, the Court to order that:

(1) Expert reports in support of motions for summary adjudication of contractor/employment status shall be produced on or before **July 24, 2007**. Discovery from the experts authoring such reports shall be concluded by **August 31, 2007.** Reports of experts to be relied upon in opposing summary adjudication shall also be produced by **August 31, 2007**. Discovery from opposing experts shall be concluded by **October 1, 2007**.

Alternatively, FedEx Ground separately requests the Court to order that:

(1) Expert report and discovery deadlines in support of motions for summary adjudication of contractor/employment status are **vacated** pending a status conference to be conducted once the Court has ruled on class certification.

Dated: June 11, 2007

Respectfully submitted

By: /s/ Lynn Rossman Faris
Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue
New York, New York 10022

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401

*Plaintiffs' Co-Lead Counsel*

By: /s/ Robert M. Sbhwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**MEMORANDUM IN SUPPORT OF THE PARTIES' JOINT MOTION TO AMEND THE CASE SCHEDULING ORDER**

**INTRODUCTION**

The parties jointly request that the Court amend the Scheduling Order to accommodate cases that have recently been transferred to this MDL and also to establish a summary adjudication schedule that will allow the Court's full consideration of summary adjudication issues presented by current and future constituent actions. While the parties have been meeting and conferring over the past two weeks and had hoped to submit this joint motion prior to the June 5 deadline for exchange of summary adjudication expert disclosures, the demands of the ongoing class certification briefing schedule (including preparation of substantial filings of briefs and supporting information by the defendant due this week) have, unfortunately, delayed this filing. Three modifications are sought by this motion:

First, because over the past four months, the parties have devoted themselves fully to class certification briefing, they have been unable to complete expert discovery relating to

summary adjudication of contractor/employment status. They have therefore stipulated to, and seek court approval of, a modification of the deadlines for expert discovery related to summary adjudication of contractor/employment status.

Second, because of the recent filing of additional cases likely to be transferred, the parties jointly seek to accommodate the scheduling of those new cases into the current schedule.

Third, the parties jointly seek a change in the current schedule for summary adjudication motions related to independent contractor/employment status, as more fully explained below

The parties have completed massive class certification and merits discovery on schedule, conducting over 200 depositions, exchanging approximately 2 million pages of documents, and completing class certification expert discovery. Since the completion of discovery the parties have worked diligently to address class certification issues. Plaintiffs have filed twenty-nine motions for class certification in three waves. FedEx Ground has filed its opposition to each of these motions, having filed yesterday (June 7, 2007) its oppositions to the last nine. Plaintiffs filed reply briefs in support of their first ten motions on May 29, 2007, and will file their second wave of replies on June 18, 2007, with their last set of reply briefs in support of their motions due on July 9, 2007.

Throughout this effort, the parties have devoted all of the necessary resources to meet the Court's ambitious schedule, as is required in a proceeding of this complexity.

Nevertheless, more work is required. Since the close of discovery, four cases have been transferred to this Court for pretrial coordination in this MDL proceeding.[1] In one of these cases, *Decesare v. FedEx Ground,* Plaintiffs seek to represent all pickup and delivery drivers in Nevada. Six additional complaints seeking class certification of other nationwide claims or in

[1] These cases are *Gentle v. FedEx Ground*, No. 3:07-cv-191-RLM; *Ellison v. FedEx Ground*, No. 3:07-cv-00190-RLM; *Jones v. FedEx Ground*, No. 3:07-cv-00189-RLM; and *Decesare v. FedEx Ground*, No. 3:07-cv-120-RLM.

other states not yet included in this MDL, but likely to be transferred into this MDL pursuant to FedEx Ground's Notices of Related Actions in the near future. Moreover, the parties believe that several additional complaints alleging class actions claims are likely to be filed in the near future, and the transfer of at least two additional non class action cases is also likely. Little discovery has taken place regarding these new cases as the parties worked diligently on class certification pleadings. The parties have begun and will continue to work diligently on completing discovery (similar in substance to that already undertaken in the pending cases) in the newly transferred cases.

Given the number of newly transferred and likely-to-be transferred cases, the parties believe that the interests of judicial economy warrant some modification of the current Scheduling Order, incorporating these cases for discovery, a fourth "wave" of class certification motions and summary adjudication of independent contractor/employment status. For this reason, as well as the encroachment of massive class certification briefing into the time allocated to summary adjudication expert discovery on the independent contractor/employment status issue, the parties jointly request that this Court amend the current case schedule also with regard to the deadlines for those expert reports and the filing of those motions. (FedEx Ground is concurrently making a separate motion, which Plaintiffs oppose, for alternative relief in connection with those motions, as it pertains to expert reports and expert discovery.)

## I.  PROCEDURAL BACKGROUND

Under the existing case scheduling orders, merits and class certification discovery has closed. (Dec. 12, 2006 Order (Doc. No. 453).) The final wave of class certification opening briefs was filed on April 23, 2007. (Jan. 23, 2007 Order (Doc. No. 482).) Expert reports in support of summary adjudication motions directed to independent contractor/employment status were scheduled to be served on June 5, 2007. (Jan. 19, 2007 Order (Doc. No. 481).) Discovery

of these experts and production of opposition experts was to be completed by July 9, 2007. (*Id.*) Discovery of opposition experts was to be completed by August 6, 2007. (*Id.*) Motions for summary adjudication relating to independent contractor/employment status were scheduled to be filed on September 21, 2007 with oppositions and replies to be filed on November 5, 2007 and December 7, 2007, respectively. (May 26, 2006 Order (Doc. No. 261).) As explained below, the parties agree that this schedule should be modified to account for changed circumstances and extraordinary workloads.

## II. THE CURRENT SCHEDULING CANNOT BE MET WITH REASONABLE DILIGENCE

This Court may modify an existing scheduling order upon a showing of good cause. Fed. R. Civ. P. 16(b); 6A Charles Alan Wright, Arthur R. Miller & Mary A. Kane, Federal Practice and Procedure, § 1522.1 at 231 (2nd ed. 1990). Both parties submit that the current scheduling order cannot be met for two reasons. ***First***, the current scheduling order provided that the final wave of motions for class certification would be filed by April 23, 2007, which deadline was set before, and therefore did not account for transfer and discovery pertaining to complaints that were only recently filed. ***Second***, modifications made to the case schedule in December 2006 and January 2007 have pushed class certification briefing into the period originally scheduled for expert discovery and summary adjudication directed to independent contractor/employment status. The parties are also faced with the substantial likelihood of having to file motions for summary adjudication of independent contractor/employment status without knowing which, if any, claims will proceed on a class basis and, which test or tests of contractor/employment status will apply.

**A. Recently filed cases**

Several more recently-filed cases have or likely will become a part of this coordinated proceeding:

1. In *Decesare v. FedEx Ground*, 3:07-cv-00120 (N.D. Ind.), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases currently being briefed before this Court. The case was filed on January 24, 2007. An answer was filed and the case was transferred on March 19, 2007. At the time of transfer, no discovery had yet taken place; FedEx Ground has since propounded discovery requests on the named Plaintiffs. Named plaintiffs have not yet been deposed.

2. In *Whiteside v. FedEx Ground*, :1:07-cv-00167 (W.D.N.C.), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases from North Carolina. The complaint was filed on May 3, 2007. FedEx Ground is preparing to answer the complaint and request that it be consolidated with these MDL proceedings. No discovery has taken place in this action.

3. In *Gibson v. FedEx Ground*, 2:07-cv-00933 (D. Ariz.), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases from Arizona. The complaint was filed on May 7, 2007. An amended complaint was filed on May 15, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.

4. In *Mango v. FedEx Ground*, 3:07-cv-00811 (D. Conn), Plaintiffs seek to represent a class of drivers similar to the classes sought in the other 29 pending cases from Connecticut. The complaint was filed on May 22, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.

5. In *Leighter v. FedEx Ground*, 3:07-cv-00818 (D. Ore.), Plaintiffs seek to represent a class

Case 3:05-md-00527-RLM-CAN document 726 filed 06/11/07 page 6 of 11

of drivers from Oregon asserting claims and proposed classes similar to those sought in the other 29 MDL-transferred cases. Plaintiffs filed the complaint on June 1, 2007. FedEx Ground is preparing to answer it and seek consolidation. No discovery has taken place.

6. In *Dizinno v. FedEx Ground*, 3:07-cv-00812 (D. Conn.), a similar (though non-class action) complaint, was filed by five drivers from Connecticut on May 22, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.

7. In *Vargas v. FedEx Ground*, 1:07-cv-10876 (D. Mass.), Plaintiffs seek to represent a nationwide class of drivers relying on the overtime laws of the several states. It was filed in the District of Massachusetts on May 8, 2007. FedEx Ground is preparing to answer the complaint and seek consolidation. No discovery has taken place in this action.

8. In *Givens v. FedEx Ground,* 2:07-cv-01824 (E.D. La.), Plaintiffs seek to represent a nationwide class under the overtime provisions of the Fair Labor Standards Act. It was filed in the Eastern District of Louisiana on April 13, 2007. FedEx Ground is preparing to answer the complaint and request that it be consolidated with these MDL proceedings. No discovery has taken place in this action.

9. In *Farrell v. FedEx Ground*, 1:07-cv-02574 (D.N.J.), Plaintiff seeks recovery for an allegedly improper termination under the Uniformed Service Employment and Reemployment Rights Act of 1994 (which claim requires proving employment status), and for breach of contract. FedEx Ground is preparing to answer the complaint and request that it be consolidated with these MDL proceedings. No discovery has taken place in this action.

Plaintiffs are also aware of approximately four additional putative statewide class actions that are likely to be filed in the very near future.

The parties have utilized their best efforts to integrate newly-transferred cases into the existing case scheduling orders. For example, *Asbury v. FedEx Ground* was consolidated with these MDL proceedings on December 19, 2006, less than 45 days prior to the close of discovery, and the parties were able to conclude discovery and include it with the third wave of class certification motions filed under the existing discovery schedule. For the *Decesare* case, however, as well as the cases that have yet to be transferred, this has not been possible.

**B. The discovery period for summary adjudication has been compressed**

The class certification briefing process has consumed nearly all of the parties' time and effort since January 31, 2007. Accordingly, neither party has had sufficient time to finalize its merits expert reports for use in summary adjudication motions. Additionally, the parties agree that the substance of motions for such summary adjudication may depend upon the Courts' class certification orders. This is because plaintiffs' various claims implicate various independent contractor/employment status tests, including common law agency tests, the "economic realities" test, among others.

The parties were unable to exchange merits expert reports by June 5, 2007, and to complete all expert discovery pertaining to summary adjudication of independent contractor/employment status by the end of July, simultaneously with completion of the 29 class certification motions currently pending and therefore seek a brief extension of time to complete that discovery. The parties have agreed that movant's merits expert reports deadline should be extended to at least July 24, 2007, approximately 45-days later than currently contemplated by the case scheduling order, and that opponent's should have until at least August 31, 2007 to provide its expert reports and to conclude expert discovery relating to summary adjudication of

independent contractor/employment status no earlier than September 30, 2007. While stipulating with Plaintiffs to this extension, FedEx Ground alternatively proposes (without Plaintiffs' agreement) that expert discovery pertaining to summary adjudication of independent contractor/employment status be delayed until after the Court issues its class certification orders, as FedEx Ground on its own behalf explains in its separately-filed position statement.

In addition, the parties agree that it will not be possible to properly address summary adjudication of independent contractor/employment status until the court has addressed the class certification issue and, therefore, the parties ask the Court to vacate the September 21, 2007 deadline for the filing of such motions until the Court has done so, or until the Court convenes an additional Scheduling Conference. The Parties jointly propose to amend the case scheduling orders.

## III. JOINTLY PROPOSED CASE SCHEDULE

### A. Schedule for a fourth round of class certification briefing

To permit the parties to take necessary discovery in the newly-filed cases, as well as to allow for the outstanding known cases to be consolidated with these MDL proceedings, the parties jointly propose the following discovery and briefing schedule applicable to a fourth wave of class certification briefing.

***Discovery.*** Document, written, and deposition discovery as to these new actions and other transferred into this MDL (even if non-class actions) shall be completed by **August 31, 2007**. This discovery shall pertain only to new plaintiffs, claims and states implicated by cases transferred to these MDL proceedings after March 1, 2007. To speed the discovery process, parties shall be permitted to propound discovery requests (and existing, applicable requests for production shall be automatically applicable to new plaintiffs without the need to propound those

requests) when a Conditional Transfer Order has been issued for any related action(s). Upon final transfer of these action(s), responses will be due within 30 days after service. The parties further agree: (1) that any new discovery shall pertain to issues raised in the newly transferred cases only; (2) that they will not conduct discovery that is duplicative or overlapping of the already completed discovery (e.g., the parties will not redepose persons who have already been deposed, without court approval and for good cause shown); and (3) to promptly meet and confer regarding the scope of the new discovery after the issuance of a revised Scheduling Order.

***Class certification briefing.*** Plaintiffs shall file motions and accompanying memoranda (to be limited to **20 pages**) for certification of classes and/or collective actions relating to newly-transferred cases by **October 1, 2007**. FedEx Ground shall file its oppositions to certification (to be limited to **30 pages**) by **November 15, 2007**. Plaintiffs shall file reply memoranda (to be limited to **20 pages**) by **December 17, 2007**.

***Impact on pending motions for class certification***. The parties agree that the newly-transferred cases and motions for class certification need not effect the Court's consideration of plaintiffs' 29 pending motions for class certification.

**B. Experts discovery for summary adjudication of independent contractor/employment status**

The parties agree that the current deadlines for experts discovery relating to motions for summary adjudication of independent contractor/employment status cannot be met. The parties disagree as to whether a new schedule for discovery of these experts should be set at this time, but have agreed that the moving party's expert reports deadline should be extended to at least July 24, 2007, approximately 45-days later than currently contemplated by the case scheduling order, and that the opposing party's expert report deadline should be moved to at least August 31, 2007, and that expert discovery relating to those reports should be concluded no earlier than

September 30, 2007. Plaintiffs favor rescheduling expert discovery to begin on July 24, 2007, while FedEx Ground favors deferring the current schedule pending the Court's rulings on the pending motions for class certification. The parties' respective positions are discussed in more detail in the accompanying supplemental position statements.

**C. Summary adjudication of contractor/employment status**

The parties jointly propose that the date set for filing of motions for summary adjudication of independent contractor/employment status be vacated pending resolution of the motions for class certification. This will allow the parties to file motions with the benefit of the Court's rulings on class certification, and tailored to them, and may save avoidable expense of briefing unnecessary issues.

## CONCLUSION

The parties have demonstrated the seriousness and diligence with which the parties have approached the completion of discovery and the class certification stage in the proceedings. The parties ask that this Court grant them limited additional time to complete discovery and address the remaining class certification motions on recently transferred cases, and to vacate the current deadline for filing of summary adjudication motions on independent contractor/employment status until the court issues class certification rulings.

The parties also jointly request that this Court extend the expert discovery schedule relating to summary adjudication of independent contractor/employment status proposed above for the reasons set forth in the parties' respective supplemental position statements.

case 3:05-md-00527-RLM -CAN document 726 filed 06/11/07 page 11 of 11

For the reasons stated above, the parties respectfully request that this Court **GRANT** the parties' joint motion for amendment of the existing case scheduling order.

Dated: June 11, 2007

Respectfully submitted

By: /s / Lynn Rossman Faris
Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue
New York, New York 10022

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401

*Plaintiffs' Co-Lead Counsel*

By: /s/ Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 93:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |

**CERTIFICATE OF SERVICE**

1.. **FEDEX Ground's Supplemental Position Statement in Support of Amending the Case Scheduling Order and Vacating Current Expert Discovery Deadlines;**

2. **Joint Motion to Amend the Case Schedule;**

3. **Memorandum in Support of the Parties' Joint Motion to Amend the Case Scheduling Order;**

4. **Proof of Service**

## CERTIFICATE OF SERVICE

I, Lorelei Badar, hereby certify that on June 11, 2007, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; |
| | Alicia.cummins@bakerd.com; |
| | Melissa.bozzuto@bakerd.com;amy.ricks@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David G. Caperton** | dcaperton@omm.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; |
| | efink@leonardcarder.com; |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; |
| | alicia.cummins@bakerd.com; |
| | Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; rwhite@sgb-law.com; |
| | bloch@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert I. Harwood** | rharwood@whesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Dorothy Anne Jarrell** | dajarrell@omm.com; prowen@omm.com; |
| | jdonovan@omm.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |

| Name | Email |
|---|---|
| **Thomas P. Jirgal** | tjirgal@omm.com; jbanks@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com; jdonovan@omm.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| **Anh-Nguyet Tran, LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@whesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Robert G. Rikard** | rrikard@attorneyssc.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | matt@matthewtobinlaw.com |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |

I also certify that on June 11, 2007, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G
BROWNLOW
1444 Gillham Drive, Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave, Suite 3300
Milwaukee, WI 53202-4108

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Robert E McDaniel
THE MCDANIEL LAW OFFICES
755 North Main Street
Laconia, NH 03246

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

James R Mulroy II
William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN
FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on June 11, 2007.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**FEDEX GROUND'S SUPPLEMENTAL POSITION STATEMENT IN SUPPORT OF AMENDING THE CASE SCHEDULING ORDER AND VACATING CURRENT EXPERT DISCOVERY DEADLINES**

**INTRODUCTION**

In addition to the relief requested in the parties' joint motion to amend the case scheduling order, FedEx Ground requests that the Court vacate the deadlines applicable to expert reports and discovery for the summary adjudication motions directed to independent contractor/employment status. The parties agree that the motions should be deferred. For many of the same reasons, FedEx Ground does not want to engage in costly report preparation and discovery on material that likely will become substantially superseded—if not completely mooted—depending how the Court rules on the twenty-nine separate motions for class certification, involving several dozen distinct claims for relief.

Plaintiffs believe that FedEx Ground seeks this relief so it can reshuffle its line-up of previously-disclosed experts. That is not correct. This relief does not concern the relatively simple question of who the summary adjudication experts will be; it concerns the substance of

their research, preparation, and testimony, both in the form of written reports and deposition testimony. Put simply, the content of those expert reports, and the discovery that the parties will engage in to test those opinions, will turn significantly on which complaints, claims, and classes are, or are not, certified. There are simply too many distinct test for employment status still at issue in these cases to know what expert testimony may or may not be necessary. To avoid having to go through the process of preparing expert reports and engaging in discovery concerning those reports twice, defendant respectfully suggests that the process be deferred until the parties know what claims are proceeding on a class basis, and whether the case consists of 150 plaintiffs, 15,000 plaintiffs, or some presently unknowable number in between. To defendant, that represents the more sensible approach to managing this vast and extremely expensive dispute.

**ARGUMENT**

FedEx Ground believes that the interests of judicial and party economy will be far better served by deferring the preparation and discovery of expert reports until after the Court rules on the motions for class certification. Like the motions for summary judgment, the report content and discovery of experts will be influenced by the applicable tests and states, if any, upon which the Court certifies a class or classes. If some plaintiffs or claims are not certified, FedEx Ground is not likely to undertake the significant expenditure of resources of developing expert and reports in support of summary adjudication that apply only to uncertified classes, plaintiffs, or claims. Further, FedEx Ground believes that, in such an event, the parties may engage in discussions that could lead to a resolution of the cases without resorting to expensive and time consuming expert discovery and motions for summary adjudication. None of this is knowable now.

This logic is unaffected by Plaintiffs' position that their expert reports will not be effected by the Court's rulings on class certification. Even if Plaintiffs anticipate that their expert reports are not subject to change as a result of the significant class certification issues now pending, the content of the reports by FedEx Ground's experts absolutely would. FedEx Ground does not anticipate moving for summary adjudication on the classification question as to individual plaintiffs. Such motions would be made, however, were the Court to certify one or more of the requested classes. The experts (and reports) that FedEx Ground would rely on in support of its motions for summary adjudication depend on the claims and/or classes that may be certified and the legal tests pertinent to those claims and/or classes. By establishing a deadline for expert disclosure prior to resolution of the class certification issues, FedEx Ground would need to spend tens of thousands of dollars (or more) preparing expert reports as if *all* claims and classes were ultimately certified.

This great expense would be imposed not only on FedEx Ground, but also on Plaintiffs, who would have to conduct depositions and file opposition reports for experts and expert reports that, ultimately, may never be filed in connection with any motion practice. Given that the parties already agree that the briefing schedule for this motions should be deferred, there would be no prejudice in also deferring expert discovery pertaining to summary adjudication of contractor/employment status.

## CONCLUSION

For the reasons stated above, FedEx Ground respectfully request that this Court vacate, and not reset, the existing deadlines for expert discovery relating to contractor status until the Court establishes a briefing schedule for the motions themselves.

Dated:  June 11, 2007              Respectfully submitted

                                    By:  /s / Robert M. Schwartz
                                          Robert M. Schwartz

                                    John H. Beisner
                                    Robert M. Schwartz
                                    Evelyn L. Becker
                                    O'MELVENY & MYERS LLP
                                    1625 Eye Street, NW
                                    Washington, DC 20006-4001

                                    Thomas J. Brunner
                                    Alison G. Fox
                                    BAKER & DANIELS LLP
                                    205 West Jefferson Blvd., Suite 250
                                    South Bend, IN  46601

                                    *Defendant's Co-Lead and Liaison Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

**FEDEX GROUND'S SUPPLEMENTAL POSITION STATEMENT IN SUPPORT OF AMENDING THE CASE SCHEDULING ORDER AND VACATING CURRENT EXPERT DISCOVERY DEADLINES**

**INTRODUCTION**

In addition to the relief requested in the parties' joint motion to amend the case scheduling order, FedEx Ground requests that the Court vacate the deadlines applicable to expert reports and discovery for the summary adjudication motions directed to independent contractor/employment status. The parties agree that the motions should be deferred. For many of the same reasons, FedEx Ground does not want to engage in costly report preparation and discovery on material that likely will become substantially superseded—if not completely mooted—depending how the Court rules on the twenty-nine separate motions for class certification, involving several dozen distinct claims for relief.

Plaintiffs believe that FedEx Ground seeks this relief so it can reshuffle its line-up of previously-disclosed experts. That is not correct. This relief does not concern the relatively simple question of who the summary adjudication experts will be; it concerns the substance of

their research, preparation, and testimony, both in the form of written reports and deposition testimony. Put simply, the content of those expert reports, and the discovery that the parties will engage in to test those opinions, will turn significantly on which complaints, claims, and classes are, or are not, certified. There are simply too many distinct test for employment status still at issue in these cases to know what expert testimony may or may not be necessary. To avoid having to go through the process of preparing expert reports and engaging in discovery concerning those reports twice, defendant respectfully suggests that the process be deferred until the parties know what claims are proceeding on a class basis, and whether the case consists of 150 plaintiffs, 15,000 plaintiffs, or some presently unknowable number in between. To defendant, that represents the more sensible approach to managing this vast and extremely expensive dispute.

**ARGUMENT**

FedEx Ground believes that the interests of judicial and party economy will be far better served by deferring the preparation and discovery of expert reports until after the Court rules on the motions for class certification. Like the motions for summary judgment, the report content and discovery of experts will be influenced by the applicable tests and states, if any, upon which the Court certifies a class or classes. If some plaintiffs or claims are not certified, FedEx Ground is not likely to undertake the significant expenditure of resources of developing expert and reports in support of summary adjudication that apply only to uncertified classes, plaintiffs, or claims. Further, FedEx Ground believes that, in such an event, the parties may engage in discussions that could lead to a resolution of the cases without resorting to expensive and time consuming expert discovery and motions for summary adjudication. None of this is knowable now.

This logic is unaffected by Plaintiffs' position that their expert reports will not be effected by the Court's rulings on class certification. Even if Plaintiffs anticipate that their expert reports are not subject to change as a result of the significant class certification issues now pending, the content of the reports by FedEx Ground's experts absolutely would. FedEx Ground does not anticipate moving for summary adjudication on the classification question as to individual plaintiffs. Such motions would be made, however, were the Court to certify one or more of the requested classes. The experts (and reports) that FedEx Ground would rely on in support of its motions for summary adjudication depend on the claims and/or classes that may be certified and the legal tests pertinent to those claims and/or classes. By establishing a deadline for expert disclosure prior to resolution of the class certification issues, FedEx Ground would need to spend tens of thousands of dollars (or more) preparing expert reports as if *all* claims and classes were ultimately certified.

This great expense would be imposed not only on FedEx Ground, but also on Plaintiffs, who would have to conduct depositions and file opposition reports for experts and expert reports that, ultimately, may never be filed in connection with any motion practice. Given that the parties already agree that the briefing schedule for this motions should be deferred, there would be no prejudice in also deferring expert discovery pertaining to summary adjudication of contractor/employment status.

**CONCLUSION**

For the reasons stated above, FedEx Ground respectfully request that this Court vacate, and not reset, the existing deadlines for expert discovery relating to contractor status until the Court establishes a briefing schedule for the motions themselves.

Dated: June 7, 2007

Respectfully submitted

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of June, 2006, I filed the foregoing ***Fedex Ground's Supplemental Position Statement In Support Of Amending The Case Scheduling Order And Vacating Current Expert Discovery Deadlines*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on June 18, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**FIFTH DECLARATION OF SUSAN E. ELLINGSTAD**
**IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: June 18, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:    (574) 289-9987
Fax:    (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on June 18, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**PLAINTIFFS' FIFTH APPENDIX**
**VOLUMES 78-84 (PA23623-25925)**

Dated: June 18, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:    (574) 289-9987
Fax:    (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Filing Documents Under Seal.

On June 18, 2007, Defendant FedEx Ground filed under seal the following:

1. Defendant FedEx Ground Package System, Inc.'s Opposition To Plaintiffs' Motion to Exclude the Expert Report of Dr. Richard Jeanneret [Docket #684];

2. Declaration of Linda Kwak in Support of Defendant FedEx Ground Package System, Inc.'s Opposition to Plaintiffs' Motion to Exclude the Expert Report of Dr. Richard Jeanneret [Docket #684]; and

3. Declaration of P. Richard Jeanneret, Ph.D. in Support of Defendant FedEx Ground Package System, Inc.'s Opposition to Plaintiffs' Motion to Exclude the Expert Report of Dr. Richard Jeanneret [Docket #684].

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

case 3:05-md-00527-RLM-CAN document 750 filed 06/18/07 page 2 of 3

Dated: June 18, 2007

Respectfully submitted,

By: s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S NOTICE OF FILING DOCUMENT UNDER SEAL*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Philip Stephen Fuoco
pfuoco@msn.com

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Filing Documents Under Seal.

On June 18, 2007, Defendant FedEx Ground filed under seal the following:

1. Exhibit A to the Declaration of Nora M. Puckett Submitted in Opposition to Plaintiffs' Motion to Exclude the Expert Report of Robert Crandall [Docket #686]; and

2. Exhibit B to the Declaration of Nora M. Puckett Submitted in Opposition to Plaintiffs' Motion to Exclude the Expert Report of Robert Crandall [Docket #686];

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

case 3:05-md-00527-RLM-CAN document 753 filed 06/18/07 page 2 of 3

Dated: June 18, 2007

Respectfully submitted,

By: s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S NOTICE OF FILING DOCUMENT UNDER SEAL*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Philip Stephen Fuoco
pfuoco@msn.com

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Filing Documents Under Seal.

On June 18, 2007, Defendant FedEx Ground filed under seal the following:

1. Exhibit A to the Declaration of Chris Hollinger in Opposition to Plaintiffs' Motion to Exclude Report of E. Deborah Jay [Docket # 690].

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

case 3:05-md-00527-RLM-CAN document 754 filed 06/18/07 page 2 of 3

Dated: June 18, 2007

Respectfully submitted,

By: s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

case 3:05-md-00527-RLM-CAN document 754 filed 06/18/07 page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S NOTICE OF FILING DOCUMENT UNDER SEAL*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Philip Stephen Fuoco
pfuoco@msn.com

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE SECOND WAVE DECLARATIONS OF PUTATIVE CLASS MEMBERS SUBMITTED BY DEFENDANT**

Pursuant to Rule 37(c) and 23(d) of the Federal Rules of Civil Procedure, Plaintiffs hereby move this Court for an Order to strike or exclude the declarations of purported class members submitted by FXG with its second wave of opposition briefs filed on May 17, 2007.

This motion is based upon all files, records and proceedings herein, including the Declaration of Patricia Bloodgood, filed herewith, which identifies the second wave declarations. In addition, this motion incorporates by reference Plaintiffs' memorandum of law in support of their motion to strike or exclude the first wave declarations of putative class members submitted by FXG. That memorandum was filed by Plaintiffs on May 29, 2007 (Doc. No. 688).

case 3:05-md-00527-RLM-CAN document 756 filed 06/18/07 page 2 of 2

Dated: June 18, 2007

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF PATRICIA A. BLOODGOOD IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE SECOND WAVE DECLARATIONS OF PUTATIVE CLASS MEMBERS SUBMITTED BY DEFENDANT**

I, PATRICIA A. BLOODGOOD, state:

1. I am an attorney with the law firm of Lockridge Grindal Nauen P.L.L.P., one of the firms named Co-Lead Counsel for Plaintiffs in this matter. I submit this declaration in support of Plaintiffs' Motion to Strike or Exclude Second Wave Declarations of Putative Class Members Submitted by Defendant.

2. Attached as Exhibit 1 is a true and correct copy of a spreadsheet listing the purported class member declarations submitted by Defendant with its second wave of briefs in opposition to Plaintiffs' motions for class certification.

I swear under penalty of perjury under the laws of the State of Minnesota and the United States that the foregoing is true and correct. Executed on June 18, 2007 at Minneapolis, Minnesota.

**s/Patricia A. Bloodgood**
Patricia A. Bloodgood

EXHIBIT 1

List of Purported Class Member Declarations Submitted by FXG
with Its Second Wave of Class Certification Opposition Briefs

| DKT NO. | EX NO. | FIRST NAME | LAST NAME | DATE OF DISCLOSURE | DATE OF DECLARATION |
|---|---|---|---|---|---|
| 653 | 4 | Chris | Allen | 01/03/07 | 11/09/06 |
| 648 | 12 | Eric | Anderson | | 04/24/07 |
| 653 | 35 | Darrel | Atchley | 01/03/07 | 11/16/06 |
| 647 | 32 | Anthony | Ayala | 01/03/07 | 11/29/06 |
| 647 | 12 | Jaime | Badui | | 11/01/06 |
| 655 | 15 | Kevin | Bausha | | 02/13/07 |
| 649 | 42 | Rita | Beckham | | 05/10/07 |
| 647 | 13 | Henry | Buchanan | 01/03/07 | 11/06/06 |
| 653 | 7 | Greg | Calhoun | 01/03/07 | 11/17/06 |
| 648 | 14 | Rich | Comben | | 04/24/07 |
| 654 | 13 | Randy | Copeland | | 05/10/07 |
| 647 | 43 | Allen | Crews | 01/03/07 | 11/02/06 |
| 655 | 13 | Brenden | Croke | | 05/08/07 |
| 650 | 19 | Michael | Dawicki | 01/31/07 | 12/20/06 |
| 650 | 16 | Jeremy | Dennee | 01/03/07 | 05/09/07 |
| 653 | 26 | John | Desmond | 01/03/07 | 11/15/06 |
| 648 | 7 | Dennis | Dubbeldee | 01/03/07 | 12/01/06 |
| 656 | 13 | John | Dubois | 01/31/07 | 01/21/07 |
| 649 | 16 | William | Foreman | | 05/07/07 |
| 647 | 27 | Evelio | Garcia | 01/03/07 | 05/08/07 |
| 649 | 15 | Joey | Giaccotto | 01/03/07 | 11/28/06 |
| 650 | 17 | Ted | Giese | 01/03/07 | 11/21/06 |
| 653 | 6 | Boniface | Githuka | 01/03/07 | 11/17/06 |
| 656 | 17 | Jody | Gross | | 05/03/07 |
| 647 | 28 | Eric | Guzman | 01/03/07 | 11/02/06 |
| 649 | 5 | Jerry | Hamm | 01/03/07 | 05/03/07 |
| 647 | 26 | Mark | Hanko | 01/03/07 | 11/04/06 |
| 653 | 9 | Shaun | Harvel | 01/03/07 | 11/17/06 |
| 656 | 12 | Justin | Haynes | 01/03/07 | 11/24/06 |
| 647 | 29 | Keith | Hines | 01/03/07 | 11/02/06 |
| 653 | 3 | Larry | Holmes | 01/03/07 | 11/17/06 |
| 648 | 9 | Donnie | Hopp | 01/03/07 | 04/27/07 |
| 654 | 11 | Chris | Hoppa | | 03/23/07 |
| 647 | 40 | Renny | Imperial | 01/03/07 | 11/01/06 |
| 653 | 24 | Michael | Jackson | 01/03/07 | 11/15/06 |
| 652 | 13 | Derrick | Johnson | | 11/03/06 |
| 656 | 11 | Tracy | Kecskes | 01/03/07 | 01/19/07 |

EXHIBIT 1
List of Purported Class Member Declarations Submitted by FXG
with Its Second Wave of Class Certification Opposition Briefs

| DKT NO. | EX NO. | FIRST NAME | LAST NAME | DATE OF DISCLOSURE | DATE OF DECLARATION |
|---|---|---|---|---|---|
| 650 | 12 | John | Kraus | 01/03/07 | 11/24/06 |
| 648 | 13 | Tom | Leary | | 04/25/07 |
| 652 | 11 | F. Blaine | Lewis | | 05/09/06 |
| 652 | 12 | Steven | McGahey | 01/31/07 | 05/04/07 |
| 650 | 18 | Kent | Miller | 01/03/07 | 04/24/07 |
| 648 | 10 | Chad | Mortenson | 01/03/07 | 04/19/07 |
| 653 | 13 | Bruce | Murray | 01/03/07 | 04/30/07 |
| 653 | 5 | Byron | Orr | 01/03/07 | 04/27/07 |
| 654 | 12 | Sylvester | Powell | 01/03/07 | 11/03/06 |
| 647 | 14 | Alipio | Quintero | 01/03/07 | 11/04/06 |
| 648 | 8 | Dean | Rood | 01/03/07 | 04/19/07 |
| 653 | 23 | Dwight | Rosse | 01/03/07 | 11/17/06 |
| 655 | 14 | Chris | Schmidt | | 01/04/06 |
| 652 | 14 | Craig | Shaw | 01/03/07 | 05/07/07 |
| 653 | 8 | Keith | Sims | 01/03/07 | 11/16/06 |
| 654 | 10 | Ile | Solaja | 01/31/07 | 01/13/07 |
| 650 | 13 | Mike | Soll | 01/03/07 | 12/05/06 |
| 648 | 11 | Shawn | Stegner | | 04/24/07 |
| 655 | 17 | Dana | Stephens | | 01/04/06 |
| 655 | 16 | Phil | Therrien | | 01/04/07 |
| 653 | 10 | Fred | Tolbert | 01/03/07 | 11/17/06 |
| 650 | 11 | Tim | VanBeek | 01/03/07 | 11/16/06 |
| 647 | 15 | Juan | Vazquez | 01/03/07 | 11/03/06 |
| 653 | 27 | Bobby | Wixon | 01/03/07 | 11/16/06 |
| 648 | 15 | Mike | Zawislak | | 04/24/07 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

The document listed below was sent to the Court on June 18, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

Declaration of Robert Crandall in Support of Defendant FedEx Ground Package, Inc.'s Opposition to Plaintiffs' Motion to Exclude the Expert Report of Robert Crandall [Docket #686];

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

Dated: June 18, 2007

Respectfully submitted,

By: s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

case 3:05-md-00527-RLM-CAN document 758 filed 06/18/07 page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S NOTICE OF FILING DOCUMENT UNDER SEAL*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Philip Stephen Fuoco
pfuoco@msn.com

By: s/Thomas J. Brunner

BDDB01 4796161v1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FedEx Ground PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-00527-RLM-CAN (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF ROBERT CRANDALL**

## Summary of Argument

In its oppositions to plaintiffs' motions for class certification, defendant FedEx Ground Package System, Inc. ("FedEx Ground") cites to Robert Crandall's expert report as support for the following propositions that—as discussed in FedEx Ground's briefs—warrant denying class certification:

- Many multiple-work-area contractors ("MWAs") have built businesses, starting with one route and growing into multiple routes. Some of these MWAs drive their own routes. The MWAs supervise employees and often earn hundreds of thousands of dollars in income every year.[1]
- Income varies substantially from contractor to contractor, and it is influenced by, among other things, whether the contractor employs a supplemental driver, whether the contractor has expanded to a second route, the nature of the route, the number of stops made and packages handled, the number of miles driven, the contractor's location, and how the contractor manages his business.[2]
- A substantial number of contractors believe that the value of their route has increased since the contractor acquired it.[3]

---

[1] *See Smith Opp'n* at 8 (Docket No. 713); *Willis Opp'n* at 24 (Docket No. 651; *Craig Opp'n* at 27 (Docket No. 621); *Harris Opp'n* at 9 (Docket No. 708); *Asbury Opp'n* at 10 (Docket No. 716); *Coleman Opp'n* at 11 (Docket No. 709); *Gregory Opp'n* at 24 (Docket No. 715); *Tierney Opp'n* at 12 (Docket No. 712); *Fluegel Opp'n* at 7-8 (Docket No. 654); *Gray Opp'n* at 24 (Docket No. 649); *Carlson (FL) Opp'n* at 24 (Docket No. 647); *Riewe Opp'n* at 8 (Docket No. 619); *Johnson Opp'n* at 9 (Docket No. 620); *Fleming Opp'n* at 23-24 (Docket No. 710); *Humphreys Opp'n* at 10 (Docket No. 714); *Bunger Opp'n* at 23-24 (Docket No. 626); *Louzau Opp'n* at 23 (Docket No. 607); *Sheehan Opp'n* at 24 (Docket No. 623); *Tofaute Opp'n* at 12 (Docket No. 624); *Westcott Opp'n* at 8 (Docket No. 622); *Cooke Opp'n* at 23 (Docket No. 652); *Currithers Opp'n* at 12 (Docket No. 656); *Floyd Opp'n* at 10, 20 (Docket No. 653); *Gennell Opp'n* at 25 (Docket No. 655); *Larson Opp'n* at 24 (Docket No. 650); *Lee Opp'n* at 8 (Docket No. 648; *Alexander Opp'n* at 22 (Docket No. 610).

[2] *See Asbury Opp'n* at 23; *Gray Opp'n* at 13-15; *Slayman Opp'n* at 16, 21 (Docket No. 625); *Smith Opp.* at 17; *Coleman Opp'n* at 14-15; *Gregory Opp'n* at 11-15; *Fluegel Opp'n* at 14, 16; *Willis Opp'n* at 11; *Carlson (FL) Opp'n* at 11; *Craig Opp'n* at 23; *Alexander Opp'n* at 11; *Fleming Opp'n* at 8, 11; *Humphreys Opp'n* at 18; *Bunger Opp'n* at 16; *Louzau Opp'n* at 5, 13, 20; *Westcott Opp'n* at 17; *Cooke Opp'n* at 9; *Currithers Opp'n* at 23, 25; *Floyd Opp'n* at 3, 16; *Gennell Opp'n* at 15, 25.

[3] *See Riewe Opp'n* at 16; *Carlson (FL) Opp'n* at 13; *Harris Opp'n* at 20; *Tierney Opp'n* at 20; *Willis Opp'n* at 16; *Craig Opp'n* at 23; *Johnson Opp'n* at 12; *Alexander Opp'n* at 12; *Humphreys Opp'n* at 15; *Sheehan Opp'n* at 13; *Gennell Opp'n* at 18.

- Contractors have equity in their routes, as demonstrated by the fact that the routes are bought and sold, often for significant sums.[4]

Although the portions of Crandall's report cited in FedEx Ground's opposition briefs are narrow, they are devastating to plaintiffs' class-certification argument. Crandall's conclusions demonstrate that plaintiffs have not had a "common" experience, and that, contrary to plaintiffs' assertions, plaintiffs and the contractors they seek to represent have not been subjected to a "nationwide, categorical policy [by FXG] of classifying its P&D Drivers . . . as employees." (*See, e.g.*, *Alexander Opp'n* at 5.) With no expert of their own to contradict the real-world empirical analysis Crandall presents, plaintiffs seek to exclude Crandall's report, claiming that the report doesn't meet the *Daubert* standards because Crandall is not qualified to opine as an expert and his report and opinions lack a reliable foundation.

Plaintiffs' contentions are wrong, and should be dismissed for the following reasons:

***First***, Crandall is eminently qualified to offer the opinions contained in his report. He is a founder and partner of Resolution Economics LLC, an economic consulting firm that specializes in performing the types of economic and statistical analyses, including labor studies, described in his report. He has an MBA, and during the past 14 years, he has conducted economic analyses in litigation contexts, and he testifies extensively. In his work before and at Resolution, Crandall has conducted nearly 15-20 surveys relating to employment disputes in a class-certification context. This educational background and extensive experience means that he has the "knowledge, skill, experience, education, or training" necessary to be qualified as an expert under Fed. R. Evid. 702.

***Second***, Crandall's testimony regarding the contractors' purchase and sales of routes is admissible under Fed. R. Evid. 702 because it is both relevant and reliable. Crandall conducted a survey using accepted techniques to ascertain whether a market for routes exists. Crandall

---

[4] *See Coleman Opp'n* at 23; *Riewe Opp'n* at 16; *Tierney Opp'n* at 23; *Harris Opp'n* at 8, 19; *Asbury Opp'n* at 9; *Carlson (MT) Opp'n* at 11 (Docket No. 711); *Gregory Opp'n* at 22; *Willis Opp'n* at 16; *Carlson (FL) Opp'n* at 13; *Fleming Opp'n* at 22; *Humphreys Opp'n* at 9, 15; *Bunger Opp'n* at 15; *Louzau Opp'n* at 5; *Westcott Opp'n* at 21; *Gennell Opp'n* at 17.

contacted contractors who reported that they had bought and sold routes, and he was able to ascertain what the average price of these routes was, including variations among states and among contractors who sold both their routes and vehicles in the transaction. Contrary to plaintiffs' argument, Defendants are not seeking to admit Crandall's survey. Instead, Crandall relied, among other things, on the survey results in forming his opinion that contractors operate businesses, in part, because their routes (as provided in the Operating Agreement) are valuable property that contractors can and do sell. It is not important to the issues now before the Court what the exact value of any given route is; what is important—and what Crandall concludes—is that the routes do have real value. This fact indicates that the contractors are operating a business and are not mere employees.

***Third***, Crandall's analysis regarding the opportunity for profit that contractors have and the variation in their earnings is also reliable, relevant, and methodologically sound. Plaintiffs claim that Crandall did not take other factors into consideration in determining that contractor earnings vary; this is simply false. Crandall did take into consideration other factors, such as fuel costs, type of route, and the like. Plaintiffs also complain that Crandall should have compared each contractor's individual business to large-scale delivery companies like UPS. But to compare a contractor's single route to a nationwide network is not reliable. Instead, Crandall looked at other small pick-up-and-delivery businesses, like those of most contractors, which had no employees. This, as he explains in his report and deposition, is the proper comparison.

Given the absence of a genuine basis to strike Crandall's report, it appears plaintiffs' *Daubert* motion is a means to submit unauthorized supplemental or additional expert reports. They should not be permitted to do so. The Court established a schedule for expert reports. Plaintiffs were required to submit their expert reports by November 1, 2006; Defendants were required to do so by December 8, 2006. (Docket No. 261 at 2.) As plaintiffs know, the Court made no provision for rebuttal or supplemental reports. (*Id.*) That is, however, exactly what plaintiffs have done. In support of their motion, plaintiffs submit not only a 22-page Memorandum, but a 25-page Declaration of their expert David Lewin (who includes another 34

pages of exhibits with his declaration) and a 20-page Declaration by previously undisclosed witness Paul Regan (who includes another 25 pages of exhibits). These two Declarations are, in fact, rebuttal reports, as they address numerous issues that plaintiffs don't even raise in their *Daubert* motion.[5] FedEx Ground anticipates bringing a motion at a later time to strike these improper Declarations. In the meantime, and as demonstrated in this brief, plaintiffs' motion should be denied regardless of the content in those improper Declarations.

## ARGUMENT

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The determination of whether a witness is qualified under [Rule 702] to testify as an expert lies within the sound discretion of the district court." *Chambers v. Ingraham*, 858 F.2d 351, 356 (7th Cir. 1988) (internal citation omitted). This means that if the Court "concludes that the witness possesses the background to give an expert opinion that finding will not be disturbed unless it is clearly erroneous." *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir. 1980).

Once the court is satisfied that an expert is qualified, the inquiry then is whether the expert's testimony is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Williams v. Brown*, 244 F. Supp. 2d 965, 966 (N.D. Ill. 2003); *see also Westchester*

---

5 For example, Paul Regan's declaration addresses, among other things, Crandall's internet research of route values and his interviews with other delivery services. (Regan Decl. (Docket No. 686) ¶¶ 44-49.) Similarly, Lewin's Declaration purports to respond to the portion of Crandall's report that specifically critiqued Lewin's original expert report. (Lewin Decl. (Docket No. 683) ¶¶ 33-34.) These issues are well outside the scope of the motion, which plaintiffs claim concerns "only portions" of Crandall's report—the telephone survey and his opinions regarding contractors' gross earnings.

*Fire Ins. Co. v. Am. Wood Fibers, Inc.*, No. 2:03-CV-178-TS, 2006 WL 752584, at *6, 12 (N.D. Ind. Mar. 21, 2006) (denying motion to strike expert after applying Rule 702 and *Daubert* analysis). No specific formulation is required for the expert to meet this requirement. *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere in *Daubert*, *Joiner*, or *Kumho Tire* does the Supreme Court mandate the form that the inquiry into relevance and reliability must take.").

The testimony is relevant if the expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592. It is reliable, or "the product of reliable principles and methods," if the expert "set[s] forth a process of reasoning beginning from a firm foundation. . . . " This is because "[e]xpertise is a rational process and a rational process implies expressed reasons for judgment." *City of Chanute, Kan. v. Williams Natural Gas Co.*, 743 F. Supp. 1437, 1445 (D. Kan. 1990). It is sufficient if the expert can set forth "articulable reasons" and "belief, supported by sound reasoning" for the conclusions reached. *United States v. Finley*, 301 F.3d 1000, 1011 (9th Cir. 2002).

## I. CRANDALL IS QUALIFIED TO PROVIDE EXPERT TESTIMONY CONCERNING THE CONTRACTORS' BUSINESSES.

"Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 n.3 (9th Cir. 1982) (quoting Fed. R. Evid. 702, Advisory Committee Notes) (internal citation omitted); *see also Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998) (expert witness deemed "proper for the jury because he testified regarding matters beyond the general knowledge of the jurors").

There should be no dispute that the subjects on which Crandall will offer expert testimony—the factors that make up a business, the ability of MWAs to expand and grow their businesses, the variability in contractor income and the factors causing that variability, and the equity in contractors' businesses—are beyond the subjects of general knowledge. Crandall has the "relevant expertise" and "specialized understanding" to "enlighten[]" the judge or jury on these topics. He has a Masters in Business Administration. For over 14-years he has worked full time providing economic and statistical analyses, often related to employment-litigation matters, including issues relating to class certification. (Report of Robert W. Crandall, MBA ("Crandall Rep.), Attachment A.[6]) This "relevant expertise" will assist the Court in determining whether the experience of contractors is so common as to make class certification appropriate. Crandall has proffered expert opinions in approximately three matters specifically relating to a party's employment or contractor status. (Declaration of Robert Crandall in Support of FedEx Ground Package System, Inc.'s Opposition to Plaintiffs' Motion To Exclude the Expert Report of Robert Crandall ("Crandall Decl.") ¶¶ 4-5 & Exhibit A, submitted herewith). He has been qualified as an expert and provided trial testimony on five occasions, one of which directly involved how FedEx Ground contractors' businesses should be valued. (*Id.*) And, he, in connection with his associates at Resolution, has conducted between 15 and 20 surveys related to class certification issues. (Deposition of Robert W. Crandall, dated Mar. 15, 2007 ("Crandall Dep.") at 49;[7] Crandall Decl. ¶¶ 5, 7.)

In the face of these impressive qualifications, plaintiffs argue that Crandall's report should be stricken because he is not an expert in research, economics, or statistics. (Pl. Br. at 6.) In making this assertion, they argue that Crandall lacks sufficient education to proffer an opinion as to whether the independent contractors are operating businesses. "Mr. Crandall's education is in history and business administration; he lacks any academic degree or even significant

---

6 The Crandall Report is attached as Exhibit A to the Declaration of Nora M. Puckett ("Puckett Declaration"), submitted herewith.

7 Excerpts from the transcript of Robert Crandall's March 15, 2007 deposition are attached as Exhibit B to the Puckett Declaration.

coursework devoted to research methods or survey design or economic statistics." (*Id.* at 6-7.) But as Crandall told plaintiffs at his deposition, that is not correct. He testified that he has taken courses in statistics in both his graduate and undergraduate course work. (Crandall Dep. at 14-15, 24.) And he has taken approximately six courses in economics at the graduate and undergraduate level. (*Id.* at 16-17.) And while Crandall has not taken coursework specifically dedicated to business valuation and survey design analysis or administration, he took classes in marketing and accounting that addressed these issues (*id.* at 15, 25, 29-30.), and at least five of his graduate-level courses included business-valuation components. (Crandall Decl. ¶ 6.) Notably, plaintiffs' counsel only asked Crandall how many classes he had taken that were devoted "exclusively" to business valuation. (Crandall Dep. at 16; Crandall Decl. ¶ 6.) This narrow question failed to elicit that Crandall has taken several courses that deal extensively with business-valuation issues, including mergers and acquisition, entrepreneurism, finance, and strategic planning. (Crandall Decl. ¶ 6.) The Seventh Circuit (in a case cited by plaintiffs) has stated that "The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prods., Inc.*, 223 F.3d at 591 (internal citation omitted). In *Tuf*, the Court found that the plaintiffs' expert was qualified to testify as to damages even though the expert did not have a degree in economics, statistics, mathematics, or "some other 'academic' field." *Id.* at 590.

Plaintiffs also say that Crandall is unqualified because he has not published in his area of expertise. (Pl. Br. at 7.) He has. As plaintiffs note, Crandall published an article with his colleague, Dr. Karyn Model (who herself has a Ph.D. in economics from Harvard) precisely addressing the issues in his report—that an expert's analysis of survey results may assist the court in deciding whether a putative class has had a common experience. (Crandall Dep. at 17-20.) But even an absence of publications wouldn't preclude Crandall from offering expert testimony. *See, e.g., Oshana v. Coca-Cola Co.*, No. 04 C 3596, 2005 WL 1661999, at *3 (N.D. Ill. Jul. 13, 2005) (rejecting argument that expert should be disqualified because he had not published articles in 20 years, had not presented at conferences in 18 years, and not taught in 16

because the lapse in time since the expert was active in teaching and publication was not "troublesome" "in light of his significant credentials").

Ultimately, "[e]xperts can be qualified to testify based upon personal experience and knowledge, so long as the experience and knowledge is reliable." *Market v. Marsh Supermarkets, Inc.*, No. 3:04-CV-770 AS, 2005 WL 2154677, at *2 (N.D. Ind. Sept. 7, 2005) (Nuechterlein, J.) (denying motions to strike expert testimony). Crandall's 14-years of professional experience working as an economist and conducting the type of research and analysis into employment-related issues reflected in his report is adequate experience. (Crandall Dep. at 21.) Indeed, Crandall has provided testimony, affidavits, and reports in over 25 separate matters. (Crandall Decl. Exhibit A.)

Plaintiffs quarrel with the breadth of Crandall's work experience by asserting that most of his work has dealt with economic damages. While it is correct that an area of Crandall's expertise extends to the evaluation of economic damages, this is not his exclusive expertise. To the contrary, as discussed above, he has conducted 15 to 20 surveys of the type described in his report and has worked extensively with a colleague who is an expert in survey design. (Crandall Dep. 25-28; Crandall Decl. ¶¶ 5, 7.) He has also performed business valuations in many cases and provided testimony in several of these. (Crandall Dep. at 33-34.)

Even if plaintiffs' assertion that most of Crandall's work has been "limited to economic damages" were correct— and it is not—Crandall still would be qualified to testify as an expert. *See Ashland Oil, Inc. v. Delta Oil Prods. Corp.*, 685 F.2d 175, 178 (7th Cir. 1982) (finding it was within the court's discretion to admit and consider testimony from expert who lacked specific expertise in area of testimony, but had general knowledge of field). "An expert need not necessarily have specific experience with a particular facet of his or her field of expertise in order to be competent to testify as to that facet." *Hawthorne Partners v. AT&T Techs., Inc.*, No. 91 C 7167, 1993 WL 311916, at *3 (N.D. Ill. Aug. 11, 1993) (rejecting argument that expert's testimony should be stricken because it was the first time he had attempted such a valuation because "[g]enerally, a lack of specialization in the specific topic of litigation does not affect the

admissibility of an expert's opinion, only its weight") (citations omitted). *See also Kauffman v. Fed. Express Corp.*, No. 02-4068, 2007 WL 1062591, at *2 (C.D. Ill. Apr. 5, 2007) (rejecting argument that expert should be disqualified because he had not performed the precise type of survey before because plaintiff did not show that the expert's "specialized skills and experience in the areas of vocational management, job placement, labor market surveys, and transferable skills evaluation" was "not equivalent or applicable to" the report he was proffering). Accordingly, plaintiffs' argument that Crandall lacks the "knowledge, skill, experience, training, or education" required by Rule 702 to qualify as an expert is baseless and should be rejected.

## II.   CRANDALL'S REPORT IS RELEVANT AND RELIABLE AND ADMISSIBLE UNDER FED. R. EVID. 702.

As discussed above, after determining that an expert is qualified to provide an opinion, the Court must then ascertain whether the opinion is "relevant and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert*, 509 U.S. 579). Because Crandall's report is being used in the class-certification context, a full review of the testimony under *Daubert* may be inappropriate at this stage. "A district court [at the class certification stage] must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001). *See also Gutierrez v. Johnson & Johnson*, No. 01-5302 (WHW), 2006 WL 3246605, at *2 (D.N.J. Nov. 6, 2006) (noting that "[m]any courts have held that a full review of expert testimony under the *Daubert* standard is inappropriate at the class certification stage"). Instead, "the Court's review of the expert's opinion shall be limited to the opinion's reliability and relevance to the requirements of class certification under Rule 23." *Turner v. Murphy Oil USA, Inc.*, No. Civ.A. 05-4206, 2006 WL 91364, at *4 (E.D. La. Jan. 12, 2006).

Plaintiffs do not dispute that Crandall's report is relevant. Nor could they. Crandall's report and his survey of independent contractors reveals that, contrary to plaintiffs' argument,

contractors have equity in their property and the opportunity for profit and loss, such that they operate businesses and are not subject to common, systematic FedEx Ground policies that treat them as employees instead of contractors.[8] This information regarding the variation in contractors' experiences exposes a fundamental flaw in plaintiffs' reasoning, and "assist[s] the trier of fact in understanding the evidence [and] determining a fact in issue." *Ramsey v. Consol. Rail Corp.*, 111 F. Supp. 2d 1030, 1036 (N.D. Ind. 2000).

Plaintiffs' motion focuses instead on the alleged unreliability of two portions of Crandall's report: "1) a telephone 'survey' conducted around New Year's weekend of 2006 regarding the asserted values of 'sales' and 'purchases' of FXG routes . . . and opinions derived from it; and 2) 'empirical economic and statistical' analysis . . . of gross earnings of the drivers . . . and opinions offered regarding that analysis." (Pl. Br. at 2.)

Plaintiffs' attack on Crandall's opinions and methods is unfounded and merely attempts to obscure evidence that the named plaintiffs do not adequately represent the interests of all FedEx Ground independent contractors and that class certification is inappropriate.

**A. Crandall's testimony concerning the market for contractors' routes is reliable and admissible under Fed. R. Evid. 702.**

Plaintiffs argue that Crandall's testimony regarding the existing market for contractors to buy and sell routes should be excluded because it is unreliable and lacks the methodological and analytic foundation required by Rule 702. (Pl. Br. at 8-17.) Plaintiffs complain that the telephone survey Crandall conducted to inform his opinion that there is a market for contractors' routes contained flaws in the survey's design and its analysis such that it is unreliable. (*Id.* at 9.)

Plaintiffs' arguments, however, are based on a misunderstanding of Crandall's opinion and how he used the telephone survey to support his opinions.[9] Contrary to plaintiffs'

---

[8] Plaintiffs' previously undisclosed witness Paul Regan does not challenge that "the opportunity to generate profit, loss, and changes in equity value through managerial decisions" is one of the "four criteria of what constitutes a business." (Regan Decl. ¶ 50 (citing Crandall Rep. ¶ 5).)

[9] Plaintiffs submit the declaration of David Lewin to support their attack on Crandall's report. According to Lewin, Crandall's survey is unreliable in part because it is not a probability-based survey. (*See* Lewin Decl. ¶ 43.) Lewin makes this criticism even though in *his* work, he, too, has relied on non-probability based surveys (on several occasions) and has filed expert reports based on such materials. (Crandall Decl. ¶ 60 & Exhibit C.)

assumptions, Crandall's report does not purport to provide an exhaustive analysis of the price for which contractors' routes are sold throughout the country. Indeed, such an analysis was not necessary to his conclusion that independent contractors at FedEx Ground own and operate businesses. Rather, Crandall's core opinion is that the routes are regularly bought and sold, and as a result the contractors have an equity value in their businesses. The precise amount at which each route was bought or sold, or whether the contractor remembered that amount accurately, isn't the issue. What is important is that the route was exchanged for value, thus undermining plaintiffs' claim that the routes are valueless. (Crandall Rep. ¶ 85.) "[T]he purpose of my study was just to examine whether or not Plaintiffs' assertion that these routes have no value is true." (Crandall Dep. at 207; *see also* Crandall Decl. ¶¶ 33, 61.)

To test the hypothesis that the routes have value, Crandall conducted telephone interviews of contractors who had bought and sold routes at some point between 2001 and 2006. (Crandall Rep. ¶ 85.) Crandall and his team interviewed 146 of these contractors to "get their experiences in terms of buying and selling routes." (Crandall Dep. at 207.) Crandall used the data from the interviews as part of his research of the route market and "[t]o demonstrate empirically the relationship between gross revenues, net income, and route valuation." (Crandall Rep. ¶ 85.) The telephone survey was merely one of a "variety [of] sources" and "variety of means" from which Crandall collected data. (*Id.*)

1. **Crandall's survey design is not flawed.**

Given the purpose of the telephone survey—to gather data regarding the market for routes and their value—the telephone survey is reliable. It was "conducted in accordance with generally accepted survey principles" and the results have been "used in a statistically correct manner." *Baumholser*, 630 F.2d at 552; *see also Daubert*, 509 U.S. at 590, 592-93 (expert's opinion is reliable if the "reasoning or methodology underlying the testimony is scientifically valid," meaning it is "derived by the scientific method" and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known"); *Gutierrez*, 2006 WL 3246605, at*6 (holding

that the expert had appropriately used her professional judgment in deciding what control variables to include in her analysis); *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1221, 1227 (9th Cir. 2007) (social scientist's testimony was found to be "reliabl[y] bas[ed] in the knowledge and experience of [the relevant] discipline").

Plaintiffs argue that Crandall's survey does not comport with "generally accepted survey principles": because (1) he did not survey a representative sample of contractors from an appropriately defined population; (2) the response rate was low; (3) the survey failed to address "memory decay"; and (4) the survey failed to exclude inaccurate data. (Pl. Br. at 12-14.)

None of these criticisms affect the reliability of Crandall's survey in light of what it was intended to accomplish. The focus of Crandall's survey was twofold: (1) is there a market for contractors' routes?; and (2) are these routes exchanged for consideration? (Crandall Decl. ¶ 61.) The answer to these questions was not dependent on a certain number of respondents. Rather, the answer was established by the fact that there were contractors in different geographical regions who had, in keeping with the Operating Agreement, sold their routes for valuable consideration. (*Id.*)[10] Crandall explained "[R]eally my purpose there was to assess whether or not there's evidence that these routes have value and whether or not there's evidence that there's a market for these routes, and my opinion, is, yes, there is." (Crandall Dep. at 324-25.) The only result of a larger sample size would have been more examples of contractors who had either sold or purchased routes for value.

Furthermore, neither the length of the interviews, nor the questions asked rendered the survey unreliable. During the interviews, which lasted between 5 and 15 minutes, the contractors were asked a series of consistent questions related to their route transactions,

---

[10] For example, in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (superseded by statute on other grounds), a female candidate alleged that she had been denied partnership at an accounting firm on the basis of sex discrimination. Plaintiff's expert, a social psychologist, reviewed the comments that had been submitted by the existing partners regarding the plaintiff's candidacy and concluded that the comments reflected sex stereotyping. Although only 32 out of 662 partners submitted comments about the plaintiff, the Supreme Court upheld the admissibility of the expert's testimony, even though he had merely reviewed the comment sheets, and did not conduct any direct interviews of the partners. *Id.* at 235-36, 255-56. Thus, the number of contractors responding to Crandall's survey simply did not affect its reliability.

including, the price of the route, whether the sale included the vehicle, and whether they believed their routes had increased in value over time. (Crandall Dep. at 213; Crandall Rep. ¶¶ 98-102.) The contractors were also asked questions regarding whether they had run a supplemental van and whether they believed that the package volume in their area could increase such that they could obtain a second route. (Crandall Rep. ¶ 103.)

Again, the interview script was carefully designed to obtain information relating to route sales and the active market in which the contractors responding participated. There was no bias inherent to the questions posed to the contractors,[11] and to the extent a contractor failed to recall something about the sale transaction (the so-called "memory decay"), Crandall took that into account in compiling the data. (*Id*. ¶ 98; Crandall Decl. ¶¶ 65-66.) Crandall's findings relate to three categories of contractors he interviewed, one category of which included contractors who "did not recall the details of their purchase/sales transaction." (Crandall Rep. ¶ 98.) Accordingly, any lack of memory by the respondents was appropriately addressed in Crandall's findings. *See, e.g.*, *James Burroughs, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (finding survey reliable where respondents were relevant portion of public and questions were not slanted or leading).

2. **Crandall's survey analysis is not flawed.**

In arguing that Crandall's analysis of the survey results is unreliable, plaintiffs once again misread the purpose of the survey as well as the opinions Crandall derived from it. (Pl. Br. at 15.) According to plaintiffs, Crandall's opinions are based on "incomplete data" or ignore "inconsistent data." (*Id.*) Crandall's report reveals, however, that neither of these accusations is true.

---

[11] Plaintiffs were provided a copy of the script used by Crandall and his colleagues in conducting the interviews. Although plaintiffs and the Declarations submitted by their experts are quick to claim that there was bias, they don't provide any analysis as to why there would be a bias, what the bias would be, or how they believe the bias would influence the results.

Plaintiffs emphasize that not all of the survey respondents could recall the price for which they bought or sold their routes; some of the respondents could not differentiate between the price of the vehicle and the price of the route bought or sold as part of their sales transaction; and other respondents had obtained their routes for free. (Pl. Br. at 15-16.) Although plaintiffs claim that Crandall "fails to account" for these issues, as noted above, Crandall specifically carved out respondents of this type in his report. Among the three categories of contractors interviewed, Crandall specifically noted a second category of contractors who "only recalled the aggregate price they paid or received for the route and the truck" and a third category that "obtained their routes from FedEx Ground for free, or did not recall the details of their purchase/sales transaction." (Crandall Rep. ¶ 98.)

Moreover, the existence of contractors who either received routes for free from FedEx Ground or chose to abandon their routes—what plaintiffs call "no-value exchanges"—similarly has no bearing on the reliability of Crandall's opinions or his conclusion that there exists a market for routes. An individual contractor's decision to abandon his route does not alter the fact that contractors regularly buy and sell routes for consideration. Similarly, the decision by FedEx Ground to offer routes to contractors for free does not undercut the existence of a market for routes. (Crandall Decl. ¶¶ 38-39, 49-51.) FedEx Ground has established a business model under which it does not charge contractors for new routes that FedEx Ground creates. Reasons for this business model include the desire to expand an area, to develop an area quickly, or to make a terminal more efficient. Plaintiffs apparently believe that such an approach is not in the FedEx Ground stockholders' best interest, because FedEx Ground could have sold the routes to the contractors rather than give them away. But the way FedEx Ground has decided to run its business vis-à-vis its stockholders isn't the inquiry for class certification. And what is undisputed is that after FedEx Ground gives the contractor the route, the contractor has the ability to grow and develop that route, and to sell all or part of the route to another contractor at a market-determined price. (*Id.*) Crandall's survey shows that contractors in different areas exercise that right.

Plaintiffs also claim that there is no foundation for Crandall's opinion that contractors used a "market-multiple" approach to value their routes. (Pl. Br. at 16.) This argument is wrong. As Crandall explained in his report, his conclusion that the contractors used a market-multiple approach to value their routes was based on his research, which included not only the telephone interviews, but also a review of "data and listings of businesses for sale from various Internet-based business-brokerage sites." (Crandall Rep. ¶¶ 85-86.) As Crandall notes, the market-multiple approach is "[o]ne of the most common valuation methods for small service businesses." And, upon interviewing the contractors, many stated, consistent with the market-multiple approach, that "they based their route valuation decisions . . . on the routes gross revenues." (*Id.* ¶ 86; Crandall Decl. ¶ 37.)[12] "Either hands-on testing or review of experimental, statistical, or other scientific data gathered by others may suffice as a reasonable methodology upon which to base an opinion." *Ramsey*, 111 F. Supp. 2d at 1036.

**B. Crandall may rely on the survey results even if they are not independently admissible.**

Plaintiffs gloss over the fact that FedEx Ground does not seek to admit Crandall's telephone survey results on their own. Therefore even if the survey itself was not admissible because of some alleged flaw, Crandall would still be entitled to rely upon it in forming his opinions. The Seventh Circuit has held that an expert may rely on a survey or study to support his or her opinion, even where the survey would not itself be admissible as evidence under Rule 702 because it was not conducted "in accordance with generally accepted survey principles" or where the results were not "used in a statistically correct manner." *Baumhosler*, 630 F.2d at 552-53. In *Baumholser*, the Court found that although the survey conducted by plaintiffs' expert was

---

12 Regan criticizes Crandall's use of the market-multiple approach as a simplistic "rule of thumb" approach that is not a reliable valuation method. (Regan Decl. ¶ 38.) Regan supports this by citing to Shannon P. Pratt's text, *Valuing a Business, The Analysis and Appraisal of Closely Held Companies*. Tellingly, however, Regan fails to mention Pratt's text *Valuing Small Businesses and Professional Practice*, which actually deals with small businesses, like those of the contractors, and which supports the use of the market-multiple approach in valuing small businesses. (Crandall Decl. ¶ 38 & Exhibit B.)

hearsay, the district court did not err in admitting the expert's opinion because the plaintiffs' expert "was testifying as an expert and as such was entitled to rely on hearsay evidence to support his opinion, so long as that evidence was of a type reasonably relied upon by other experts in the field." (*Id.* at 553.) The Court quoted with approval the Ninth Circuit's opinion in *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 222 (9th Cir. 1957):

> It is common practice for a prospective witness, in preparing himself to express an expert opinion, to pursue pretrial studies and investigations of one kind or another. Frequently, the information is hearsay or double hearsay, in so far as the trier of the facts is concerned. This, however, does not necessarily stand in the way of receiving such expert opinion in evidence. It is for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently reliable to warrant reception of the opinion. If the court so finds, the opinion may be expressed. If the opinion is received, the court may, in its discretion, allow the expert to reveal to the jury the information gained during such investigation and studies.

*Baumholser*, 630 F.2d at 553; *see also Halvorsen v. Lettuce Entertain You Enterps. Inc*., No. 01 C 6959, 2004 WL 542526, at *2 n.3 (N.D. Ill. Mar. 18, 2004) (experts are allowed to rely on facts and data not necessarily admissible in evidence if it is information of a type reasonably relied on by experts in the field) (citing, among other things, *Baumholser*, 630 F.2d at 552-53.).

Accordingly, even if there was some infirmity in either the design or analysis of the telephone survey—and there was not—Crandall still may rely on it in forming his conclusions. *See Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) ("Furthermore, we agree . . . that genuine expertise may be based on experience or training."); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (rejecting *Daubert* challenge, and stating that expert's opinion could properly rest on "factors grounded in academic and practical experience"); *Comfort ex rel. Neumyer v. Lynn School Comm*., 283 F. Supp. 2d 328, 360 (D. Mass. 2003) (stating that defense experts' "firsthand observations of the conditions," along with "years of expertise in their fields[] [and] an armful of social science literature, including in social and developmental psychology" could be basis for expert opinion), *aff'd*, 418 (1st Cir.) (en banc), *cert. denied*, 126 S. Ct. 798 (2005). *See also United States v. Lundy*, 809 F.2d 392, 395-96 (7th Cir. 1987) (stating that

"third-party observations that are of a type normally relied upon by an expert in the field are properly utilized by such an expert in developing an expert opinion" supported admission of expert testimony under Fed. R. Evid. 703).

**C. Crandall's opinions relating to contractors' earnings and revenue are reliable.**

Plaintiffs move to exclude Crandall's opinions and analysis relating to contractors' earnings and the variation in revenue experienced by FedEx Ground contractors. (Pl. Br. at 17-22.) Plaintiffs argue that the opinions are unreliable because Crandall failed to "test and rule out any alternative explanations for the pattern he observes" and his comparison of FedEx Ground contractors to drivers for small pickup and delivery companies is inappropriate. (*Id.* at 17-18.)

Neither assertion has merit. First, Crandall *did* consider other factors or "alternative explanations" for the patterns he observed, but based on his research and the data, maintained his conclusion that contractor revenues vary because of decisions individual contractors make. Second, Crandall's comparison of FedEx Ground contractors to small, non-employer pickup-and-delivery businesses is appropriate and certainly more apposite than comparing a single-work-area contractor to an employee of a huge conglomerate like UPS.

As plaintiffs state, Crandall took various factors into consideration in reaching his opinions regarding what issues most greatly affect variations in contractor revenue. (Pl. Br. at 21.) In doing so, Crandall distinguished between "strategic decisions that are likely to have a significant effect on owner's equity and tactical decisions that individually have relatively little effect on operating margins, but collectively can add up to large differences in profits." (Crandall Rep. ¶ 31.) Crandall noted that [e]ach type of decision affects profits and losses in varying degrees." (*Id.*) Included within the strategic decisions are those factors that Crandall believes most influence contractors' ability to profit and loss and their equity in their routes: business expansion, the selection of routes, and hiring supplemental drivers. (*Id.* ¶¶ 32-35.) The tactical decisions are the "tactical management decisions" contractors make, such as are "the most efficient method to service their route, including but not limited to time, mileage" and the

order they deliver packages; whether to flex packages; "where to buy fuel; where and when to perform maintenance; whether and how to market their services in their area; and, how to conduct their customer service." (*Id.* ¶ 36.)

After taking these decisions into account, Crandall analyzed gross revenues based on the expansion decisions of seven different contractors and analyzed contractors' operating results by analyzing data "related to contractor gross settlements, package volume, stop volume, hours worked, and miles driven." (*Id.* ¶¶ 37-47.) As Crandall's report reveals, he performed a careful analysis, using both the data available and his expertise in providing economic and statistical analyses related to employment litigation matters to conclude that contractor operating results vary because of certain strategic and tactical decisions contractors make. (*See, e.g.*, *id.* ¶ 59; Crandall Decl. ¶¶ 17-26.)[13]

Accordingly, Crandall's opinion is not "pure conjecture." (Pl. Br. at 22.) To the contrary, Crandall considered the various "alternative explanations" for variability in contractor revenue in forming his opinions and reached a methodologically sound opinion that is reliable under Fed. R. Evid. 702. *Daubert*, 509 U.S. at 590, 592-93 (opinion reliable where expert's "reasoning or methodology underlying the testimony is scientifically valid," "derived by the scientific method," and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known"); *Tyus*, 102 F.3d at 263 ("genuine expertise may be based on experience or training"); *Comfort ex rel. Neumyer*, 283 F. Supp. 2d at 360 ("firsthand observations of the conditions," along with "years of expertise in their fields[] [and] an armful of social science literature, including in social and developmental psychology" could be basis for expert opinion).

Similarly, Crandall's comparison of FedEx Ground contractors' businesses to those of other small, non-employer businesses in the transportation industry is appropriate and presents a

---

[13] Plaintiffs' expert accuses Crandall of failing to adequately account for the cost of fuel in his analysis of contractor revenue. (Regan Decl ¶ 22.) But Crandall did account for fuel costs in his analysis of tactical decisions contractors make (Crandall Rep. ¶ 36) and concluded "I don't think it's a big issue to my analysis." (Crandall Dep. at 172-73.)

methodologically sound approach to analyzing contractor revenues. Plaintiffs' expert suggests that Crandall should have compared the compensation received by FedEx Ground contractors with employees of UPS. (Regan Decl. ¶ 42.) However, such a comparison would be inappropriate because it ignores certain fundamental differences between the experiences of UPS employees and FedEx Ground contractors. Unlike FedEx Ground contractors, UPS drivers have set "starting times," must follow the order of deliveries established by management, must work a full shift (no leaving early), can be ordered to assist another driver, can be re-directed to change course in the middle of their delivery routes, have no proprietary interests in the routes they service, cannot hire someone else to drive for them, and cannot operate more than one route. (For a more detailed discussion, see, *e.g.*, *Louzau Opp'n Br*. 5-6.)

Instead, as set forth in Crandall's report, a more appropriate comparison is to smaller pick-up-and-delivery businesses that are non-employer firms. (Crandall Rep. ¶¶ 115, 125; Crandall Dep. at 298-300; Crandall Decl. ¶¶ 41-44.) As Crandall explained, he analyzed "other small businesses that FedEx Ground contractors could have gone into had they chose not to sign an operating agreement with FedEx." (*Id*. at 277.) "If the purpose of your study is to examine the business practices of other small businesses operating in the same market segment, then yeah, excluding a UPS would make sense." (*Id*. at 278.)

Ultimately, Crandall need not have conducted such a detailed analysis of contractor operating results and revenues to establish that contractor decisions create variability in contractor profits. Instead, a review of the diverse experiences and fortunes of the named plaintiffs themselves reveal how different their experiences were. *See, e.g.*, *Alexander Opp'n Br.* (named plaintiff Alan Ross owned four routes and earned $262,000 in 2002 whereas Suzanne Andrade owned one route and earned $56,000).)

## III. ANY QUESTION AS TO CRANDALL'S CONCLUSIONS GOES TO THE WEIGHT OF THE EVIDENCE, AND NOT ITS ADMISSIBILITY.

Because Defendants rely on Crandall in opposing plaintiffs' motions for class certification, the Court need only determine whether it "may ***consider*** the [report] in determining whether there are sufficient common issues of law and fact to support class certification." *Gutierrez*, 2006 WL 3246605, at *4 (emphasis in original). To the extent plaintiffs wish to challenge Crandall's methods and opinions, they will have the opportunity to do so on cross examination, since "vigorous cross examination" is the ordinary means of testing an expert. *Daubert*, 509 U.S. at 596.

Plaintiffs unsurprisingly disagree with Crandall's conclusions because they undermine plaintiffs' claim that the Court should certify a class here. But Plaintiffs' disagreement with and criticisms of Crandall's methods and approach are not grounds for excluding Crandall's report. *Gutierrez*, 2006 WL 3246605, at *4; *see also Buscaglia v. United States*, 25 F.3d 530, 533-34 (7th Cir. 1994) (challenge to the variables of expert's study is "generally a question of weight for the trier of fact, not a question of admissibility for the court"); *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) (holding that doctors' uncertainty as to causation of injury did not render their opinions inadmissible but rather went to the weight to be accorded them); *Drago v. Aetna Plywood, Inc.*, No. 96 C 2398, 1998 WL 474100, at *4 (N.D. Ill. Aug 3, 1998) ("[D]efendant takes issue with aspects of Oliva's methodology and certain of his findings. But the accuracy of expert testimony goes to the weight rather than the admissibility of evidence and, as such, it is a matter for the jury to resolve.") (citing *Stutzman*, 997 F.2d at 296).

## IV. CONCLUSION

For all the foregoing reasons, Defendant FedEx Ground respectfully requests that the Court deny Plaintiffs' Motion to Exclude the Expert Report of Robert Crandall.

Dated: June 18, 2007

Respectfully submitted,

By: __s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601
*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF ROBERT CRANDALL*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF INDIANA**

**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM (MDL 1700)

THIS DOCUMENT RELATES TO:

*All Coordinated Cases*

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**DECLARATION OF NORA M. PUCKETT SUBMITTED IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF ROBERT CRANDALL**

I, Nora M. Puckett, declare:

1. I am an attorney licensed to practice law in the State of California and am an associate in the law firm of O'Melveny & Myers LLP, located at 275 Battery Street, San Francisco, California 94111. I am one of the attorneys responsible for representing Defendant FedEx Ground Package System, Inc. ("FedEx Ground" or "Company") in the above-captioned matter. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2. Attached hereto as Exhibit A is a true and correct copy of the Report of Robert W. Crandall, MBA.

3. Attached hereto as Exhibit B is a true and correct copy of excerpts of the

transcript of the deposition of Robert W. Crandall, dated March 15, 2007.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 15th day of June 2007 in San Francisco, California

Nora M. Puckett

SF1:677112.1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM<br>(MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*All Coordinated Cases* | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF E. DEBORAH JAY**

---

Defendant Fed Ex Ground Package System, Inc. ("Fed Ex Ground") hereby submits this memorandum in opposition to Plaintiffs' Motion to Exclude the Report of E. Deborah Jay.

**PRELIMINARY STATEMENT**

Despite plaintiffs' baseless criticisms of the methodology of the survey conducted by Dr. Deborah Jay (the "Field Survey"), what remains indisputable and indisputably important is that the Field Survey demonstrates that there is a conflict between a significant portion of current FedEx Ground contractors and the proposed class representatives with respect to the form of forward-looking declaratory and injunctive relief sought by plaintiffs in the event they were to prevail with respect to liability. Fifty-two percent of the surveyed contractors would prefer to be independent contractors, whereas only 20% would prefer to be employees; yet, plaintiffs in these actions seek class-wide equitable relief that would require FedEx Ground to treat all contractors as "employees" on a going-forward basis, as opposed to requiring FedEx Ground to make adjustments in its business arrangements while preserving an independent contractor relationship. This conflict among the relevant putative class members strikes a devastating blow to plaintiffs' attempts to satisfy the requirements for class certification.

The relevance and admissibility of the Field Survey is not affected by plaintiffs' recital of alleged technical deficiencies in the Survey. Even if plaintiffs' criticisms were well-founded, which they are not, they would be relevant to the weight accorded the Field Survey and not its admissibility. And, if the Court were to accept plaintiffs' invitation to scrutinize the Field Survey's methodology, the facts establish that the Field Survey properly defined the relevant universe, selected a representative sample, was conducted in a double-blind fashion, and was properly administered with careful oversight to ensure accuracy and avoid bias. The outcome

will be clear: the Field Survey conforms to generally-accepted principles of survey evidence and is therefore admissible.

Accordingly, plaintiffs' Motion to Exclude should be denied.

## ARGUMENT

### I. THE FIELD SURVEY IS HIGHLY RELEVANT TO THE PROPRIETY OF CLASS CERTIFICATION ON PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF, AND, IN PARTICULAR, TO WHETHER THE PUTATIVE CLASS MEMBERS HAVE A COMMON INTEREST IN THE FORWARD-LOOKING RELIEF SOUGHT BY PLAINTIFFS.

Plaintiffs' argument that the Field Survey is irrelevant to the issue of whether FedEx Ground contractors are properly classified as independent contractors, rather than employees, betrays a fundamental misunderstanding of the Survey.[1] (*See* Plaintiffs' Memorandum In Support Of Motion To Exclude The Expert Report Of E. Deborah Jay ["Pl. Brief"], pp. 13-15.) FedEx Ground does not claim that the views of contractors, with respect to whether they would prefer to provide pick-up and delivery services in the future as an "independent contractor" or as an "employee," are determinative of the lawfulness of their current classification as independent contractors.

Rather, the Field Survey is being introduced to show that there is a conflict between the proposed class representatives and the putative class members about the form of the forward-looking declaratory and injunctive relief that would potentially be sought if plaintiffs were to prevail on the threshold liability issues. There are two options: plaintiffs could seek a ruling requiring FedEx Ground to change its business arrangements with the contractors to make them

---

[1] "Field Survey" refers to the "FedEx Ground Contractor Survey - Volume 1: Report," dated January 2007, which was prepared by E. Deborah Jay, Ph.D., of the Field Research Corporation. This document is attached as Exhibit A to the Declaration of J. Gordon Rudd, Jr., filed by plaintiffs in connection with their Motion to Exclude on May 29, 2007. In this brief, the Field Survey will be cited as the "Jay Report."

case 3:05-md-00527-RLM-CAN document 766 filed 06/18/07 page 4 of 21

"true" independent contractors; or plaintiffs could seek a ruling requiring FedEx Ground to treat the contractors as "employees" under various labor, employment, and tax laws. Plaintiffs and their counsel have chosen the latter option -- as demonstrated by both their formal litigation position in these actions[2] as well as their close cooperation and coordination with the

---

[2] The following passages from FedEx Ground's briefs in opposition to plaintiffs' motions for class certification (and the record evidence therein cited) describe the forward-looking equitable relief sought by plaintiffs in these actions: Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Slayman* (Oregon) Motion For Class Certification, filed April 27, 2007, p. 9; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Westcott* (Maryland) Motion For Class Certification, filed April 27, 2007, pp. 7-8; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Alexander* (California) Motion For Class Certification, filed April 27, 2007, pp. 20-21; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Bunger* (South Dakota) Motion For Class Certification, filed April 27, 2007, pp. 20-21; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Craig* (Kansas) Motion For Class Certification, filed April 27, 2007, pp. 26-27; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Johnson* (Iowa) Motion For Class Certification, filed April 27, 2007, pp. 7-8; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Louzau* (New York) Motion For Class Certification, filed April 27, 2007, p. 21; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Riewe* (Indiana) Motion For Class Certification, filed April 27, 2007, pp. 28-29; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Sheehan* (Massachusetts) Motion For Class Certification, filed April 27, 2007, p. 23; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Tofaute* (New Jersey) Motion For Class Certification; filed April 27, 2007, pp. 7-8; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Cooke* (South Carolina) Motion For Class Certification, filed May 17, 2007, p. 24; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Willis* (Pennsylvania) Motion For Class Certification, filed May 17, 2007, pp. 25,30; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Carlson* (Florida) Motion For Class Certification, filed May 17, 2007, p. 29; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Currithers* (Michigan) Motion For Class Certification, filed May 17, 2007, pp. 6-7; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Floyd* (Alabama) Motion For Class Certification, filed May 17, 2007, p. 7; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Fluegel* (Illinois) Motion For Class Certification, filed May 17, 2007, p. 7; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Gennell* (New Hampshire) Motion For Class Certification, filed May 17, 2007, p. 24; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Gray* (Missouri) Motion For Class Certification, filed May 17, 2007, p. 7; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Larson* (Wisconsin) Motion For Class Certification, filed May 17, 2007, pp. 23-24; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Lee* (Minnesota) Motion For Class Certification, filed May 17, 2007, p. 7; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Tierney* (Rhode Island) Motion For Class Certification, filed June 7, 2007, p. 9; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Asbury* (West Virginia) Motion For Class Certification, filed June 7, 2007, p. 8; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Carlson* (Montana) Motion For Class Certification, filed June 7, 2007, p. 10; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Coleman* (Kentucky) Motion For Class Certification, filed June 7, 2007, pp. 7-8; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Fleming* (Mississippi) Motion For Class Certification, filed June 7, 2007, pp. 21-22; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Gregory* (Virginia) Motion For Class Certification, filed June 7, 2007, p. 22; Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Harris* (Arkansas) Motion For Class Certification, filed June 7, 2007, p. 7; Defendant FedEx Ground Package System,

International Brotherhood of Teamsters' efforts to organize FedEx Ground's contractors as "employees" under the National Labor Relations Act.[3]

In evaluating their adequacy as class representatives, it is undeniably relevant that a substantial portion (52%) of the current contractors who responded to the Field Survey would prefer to be independent contractors and that a much smaller portion (20%) would prefer to be employees. *See, e.g.*, *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 493 (S.D. Ill. 1999) ("The election of a remedy . . . that is not the remedy that would be chosen by the entire class . . . creates a conflict of interest. This conflict renders the Plaintiffs' representation of the class as a whole inadequate."); *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000) (to certify a claim for injunctive relief, class members must be "cohesive and homogenous" so that the required remedy does not differentiate "materially" among members).

The significance of the Field Survey to the pending motions for class certification is illustrated by *Alston v. Virginia High School League, Inc.*, 184 F.R.D. 574 (W.D. Va. 1999), where the court found a lack of adequacy based on the difference of opinion among putative class members as to the remedy sought by the proposed class representatives. In *Alston*, the plaintiffs alleged that certain high schools scheduled athletic events in a gender-biased manner

---

Inc.'s Memorandum Of Law In Opposition To *Humphreys* (Texas) Motion For Class Certification, filed June 7, 2007, p. 8; and Defendant FedEx Ground Package System, Inc.'s Memorandum Of Law In Opposition To *Smith* (Tennessee) Motion For Class Certification, filed June 7, 2007, p. 8.

[3] *See, e.g.*, May 18, 2006 e-mail from David Welker (Senior Strategic Research & Projects Coordinator for International Brotherhood of Teamsters Parcel & Small Package Division) to Jerald R. Cureton (plaintiffs' counsel) (attaching the "Week 1 and Week 2 flyers for the FedEx Ground/Home actions," to be distributed to contractors at FedEx Ground terminals, and stating "The last thing I'd remind you: tell them Don't Sit Out the Fight, tell them to go to the lawsuit website fedexgrounddriverslawsuit.com for more info, and tell them to register at FedExWatch.com to stay in touch with the IBT.") (attached as Exhibit A to the Supplemental Declaration Of Chris A. Hollinger In Opposition To Plaintiffs' Motion To Exclude The Expert Report Of E. Deborah Jay ["Hollinger Supp. Decl."], executed June 18, 2007, ¶ 2); February 26, 2007 e-mail from William Gardner (named plaintiff in *Sheehan* [Massachusetts] case) to Tony Lepore (Teamsters) ("Thanks for the

and therefore sought an injunction to change the scheduling practices. The defendant introduced the results of a survey showing that "[a] majority of the female public school athletes surveyed" affirmatively disagreed with the plaintiffs' choice of injunctive remedy *Id*. at 579. On the basis of this survey, the court held that the plaintiffs could not satisfy the adequacy requirement for class certification. Even if the defendant had engaged in discriminatory action, class certification was inappropriate because there was a conflict among the putative class members about what remedies to seek in response to the alleged legal violation. As the court put it,

> Plaintiffs suggest that because defendant's practices are discriminatory and violate the law, the changes they propose must be accepted even by other members of the proposed class who oppose such changes . . . . Plaintiffs go so far as to assert that what other members of the class want is irrelevant. Clearly, Rule 23(a), with its typicality and adequacy requirements, does not allow certification of a class without regard for the interests of all members of that class. Regard for the interests of all members includes not only regard for legal theories viewed in a vacuum or notions that alignment would be more fair in the abstract, *but also regard for the specific remedies sought by class representatives as compared to the remedies favored by other members of the class*.
> *Id*. at 579-80 (emphasis added).

The Field Survey, like the survey in *Alston*, is strong evidence that there is a conflict of interest among putative class members about what specific remedy to pursue, and, like the survey in *Alston*, is clearly relevant to the propriety of class certification.[4]

---

hospitality extended to us yesterday at your union hall. I hope that we provided some useful info. to your future FedEx union members.") (*see* Hollinger Supp. Decl. ¶ 3, Ex. B.)

[4] Plaintiffs confuse the issue by citing cases holding that putative class members' opinions are irrelevant to a determination of whether there has been a violation of the law. *See, e.g.*, *Lanner v. Wimmer*, 662 F.2d 1349, 1357 (10th Cir. 1981) (conflict of opinion among class members concerned whether defendant had violated the law, not about differences in possible remedies); *Martino v. McDonald's Sys., Inc.*, 81 F.R.D. 81, 85 (N.D. Ill. 1979) (same); *Horton v. Goose Creek Ind. Sch. Dist.*, 690 F.2d. 470, 486 (5th Cir. 1982) (same). However, the Field Survey does not purport to measure the contractors' opinions as to whether or not their current arrangements with FedEx Ground are lawful, and, as noted in the text, FedEx Ground does not contend that any such conflict of views among putative class members would have a bearing on the classification question. Rather, the Field Survey is relevant to show that there is a conflict among putative class members and the

## II. THE FIELD SURVEY CONFORMS TO GENERALLY-ACCEPTED PRINCIPLES OF SURVEY EVIDENCE, AND IS THEREFORE ADMISSIBLE.

The Seventh Circuit has held that survey evidence is admissible if there is "some showing" that the survey was "conducted in accordance with generally accepted survey principles and that the results are used in a statistically correct manner." *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir. 1980). *See also Zippo Mfg Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670 (S.D.N.Y. 1963) (scientifically-conducted, unbiased survey admissible to establish likelihood of confusion between products); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp. in U.S.A.*, 533 F.2d 510 (10th Cir. 1976) (customers' responses to questionnaires evaluating quality of dealer's service department admissible as evidence of customers' then-existing state of mind).

The Field Survey was conducted under the auspices of E. Deborah Jay, Ph.D., the President and Chief Executive Officer of Field Research Corporation ("Field Research"), one of the oldest public research firms in the United States. Plaintiffs do not challenge Dr. Jay's qualifications as an expert -- nor could they. Dr. Jay's credentials in survey research are impeccable. Among other things, Dr. Jay is the past chair of the Council of American Survey Research Organizations, and she also has chaired that organization's Survey Research Quality and Standards and Ethics committees. Additionally, Dr. Jay previously served on the Executive Council of the American Association for Public Opinion Research, was elected that national organization's Standards Chair, and currently serves on the editorial board for *Survey Practice*

---

proposed class representatives as to what forward-looking equitable remedy to seek with respect to the alleged violations.

(an official publication of the national organization). (*See* Jay Report, pp. 2-4; Supplemental Report of E. Deborah Jay, Ph.D., executed June 15, 2007 ["Supplemental Jay Report"], pp. 1-2.[5])

As demonstrated below, the Field Survey is admissible because it conforms to generally-accepted principles of survey evidence and would withstand peer scrutiny. More particularly, the Field Survey: properly defined the relevant universe; selected a representative sample; was conducted in a double-blind fashion; and was properly administered with careful oversight to ensure accuracy and avoid bias.

**A. The Field Survey Appropriately Defined The Relevant Universe.**

The "first step in designing a survey is to determine the relevant universe to be studied." *Whirlpool Props., Inc. v. LG Electronics U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at 4 (W.D. Mich. Jan. 10, 2006). In the present case, the Field Survey's target population was every single current FedEx Ground pick-up/delivery contractor in the 31 states with state-wide class actions pending at the time of the survey. (*See* Supplemental Jay Report, pp. 3-4.) With the exception of 60 contractors who are named plaintiffs in the pending lawsuits, and 841 contractors for whom a telephone number could not be obtained, the Field Research interviewers attempted to contact all 9,157 persons in this universe.[6] (*See* Jay Report, p. 9.) This was an appropriate definition of the relevant universe to be studied.

5 The Supplemental Jay Report is attached as Exhibit A to the Declaration Of Chris A. Hollinger In Opposition To Plaintiffs' Motion To Exclude The Expert Report Of E. Deborah Jay, executed June 17, 2007. The Supplemental Jay Report contains a detailed point-by-point response to the criticisms of the Field Survey contained in plaintiffs' brief and the related Declaration Of Professor David Lewin In Support Of Plaintiffs' Motions To Exclude Expert Reports Of Jay, Crandall & Jeanneret, Executed May 25, 2007 ("Lewin Decl."). In this brief, FedEx Ground addresses only the methodological arguments emphasized by plaintiffs in their brief.

6 Field Research interviewers used multiple sources to track down telephone numbers for contractors in instances where no telephone number or an incorrect number was initially provided. (*See* Transcript of E. Deborah Jay Deposition, March 15, 2007 ["Jay Deposition"], pp. 106, 115.) The Jay Deposition transcript is attached as Exhibit B to the Declaration of J. Gordon Rudd, Jr., filed by plaintiffs in connection with their Motion to Exclude on May 29, 2007.

Plaintiffs' contention that the Field Survey is flawed because it did not include former contractors once again betrays their fundamental misunderstanding of the Survey. (*See* Pl. Brief, pp. 21-22.) The Field Survey is relevant because it shows that there is an affirmative conflict between the proposed class representatives and putative class members about the form of the *forward-looking* declaratory and injunctive relief that could potentially be sought if plaintiffs were to prevail on the liability issues. Although former contractors may have a monetary interest in this litigation, they have absolutely no interest in forward-looking injunctive and declaratory relief. *See Feit v. Ward*, 886 F.2d 848, 856-57 (7th Cir. 1989). A survey should not include information about a "wholly irrelevant universe of respondents," *Schwab v. Philip Morris USA, Inc*., 449 F. Supp. 2d 992, 1134 (E.D.N.Y. 2006), and it would have been ill-advised for the Field Survey to include information from former contractors.

Plaintiffs are equally erroneous in their assertion that the inclusion of only 31 of the 50 states biased the results of the Field Survey. (*See* Pl. Brief, pp. 21-22.) There were, in fact, pending state-wide class actions corresponding to each of those 31 states,[7] and whether or not the survey "should" also have included the other 19 states has no bearing on the probative value of the Field Survey with respect to the preferences of the current contractors in the 31 states.

Moreover, there is no reason to believe that the preferences of current contractors in the states not included in the survey would be systematically different than the preferences of contractors in the 31 states that Field Research did survey. (*See* Supplemental Jay Report, p. 3.) Neither plaintiffs nor their omnibus expert suggest any reason why such a systematic

---

[7] The situation in Ohio was not as clear. At the time of the Field Survey, the Complaint in the Ohio case stated that "Plaintiff may move to amend this portion of his claim to convert to a class action." (*See* Complaint in *Wallace v. FedEx Ground Package System, Inc.*, filed July 6, 2006, ¶ 28.) It was reasonable for FedEx Ground to assume that the plaintiff in *Wallace* would timely seek leave to amend his complaint to state class allegations, and to prepare for such an eventuality through the Field Survey. As it turned out, plaintiff did not timely seek to amend his Complaint.

case 3:05-md-00527-RLM -CAN document 760 filed 06/18/07 page 10 of 21

discrepancy would exist, nor could they -- after all, at least with respect to their nation-wide ERISA and FMLA claims, plaintiffs' theory is that the contractors are essentially the same regardless of where they live.[8]

Finally, even with respect to the claims that are the subject of proposed nation-wide classes, any under-inclusiveness on the part of the Field Survey (i.e., because all 50 states were not included) would affect the weight to be accorded the Survey and not its admissibility. *See, e.g., A & M Records, Inc. v. Napster, Inc.*, 2000 WL 1170106, at 2 (N.D. Cal. Aug. 10, 2000) (holding that survey conducted by Field Research, even though it only surveyed college students who used Napster and not other Napster users, and thus might have been under-inclusive, was admissible because survey helped analyze a subsection of Napster users); *Ty, Inc. v. Jones Group, Inc.*, 98 F. Supp. 2d 988, 994 (N.D. Ill. 2000); *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 780 F. Supp. 1283, 1296 (N.D. Cal. 1991); and *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1041 (C.D. Cal. 1998).

**B. The Population Interviewed In The Field Survey Is Representative Of FedEx Ground's Current Contractors.**

The 3,059 contractors who were surveyed by Field Research are clearly representative of the relevant universe of current contractors (*see* Supplemental Jay Report, pp. 11-13), and plaintiffs' claim that the Field Survey included a disproportionate number of Multiple Work Area Contractors ("MWAs") in comparison to Single Work Area Contractors ("SWAs") is wrong. (*See* Pl. Brief, p. 22.) An analysis of the universe of contractors telephoned by Field Research indicates that 75% were SWAs according to FedEx Ground's records and 25% were

8 *See, e.g.*, Fourth Amended Complaint in *Craig*, ¶¶ 49-58; Memorandum Of Law In Support Of Motion For Class Certification Of Kansas Claims and Nationwide ERISA Claims (*Craig*), filed on March 12, 2007, pp. 10-12; Second Amended Complaint in *Alexander*, ¶¶ 11, 39-46; California Plaintiffs' Memorandum Of Law In Support Of Motion For Class Certification (*Alexander*), filed on March 11, 2007, pp. 5-7.

MWAs; similarly, 73% of the contractors who actually responded to the Survey were SWAs according to FedEx Ground's records and 27% were MWAs.[9] (*See* Supplemental Jay Report, pp. 12-13.) In other words, the breakdown of SWAs versus MWAs in the sample is almost exactly the same as the breakdown in the universe.[10] There is no disproportionate response. (*See id.*)

In any case, plaintiffs' quarrels over the percentages of MWAs versus SWAs in the Field Survey sample are precisely the sort of technical arguments that go to the weight of a survey and not its admissibility. *See, e.g., United States Surgical Corp. v. Orris, Inc.*, 983 F. Supp. 963, 967-68 (D. Kan. 1997) ("sufficiency of the sample universe is relevant to the weight and not the admissibility of the survey").

**C. The Field Survey Was Double-Blind.**

In a double-blind survey, which is generally thought to enhance a survey's reliability, neither the person administering the survey nor the person taking it know "what the survey was intended to demonstrate." *March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786, 803 (N.D. Tex. 2003). The Field Survey was double-blind. Neither the

---

9 The reference in the text to "FedEx Ground's records" refers to FXG_M00150 and FXG_M00160, which forms the basis for plaintiffs' expert's claim that the breakdown between SWAs and MWAs in the Field Survey universe is actually 85%/15%. *See* Lewin Decl. ¶ 19 n.21. However, Professor Lewin's data file is both under- and over-inclusive, including contractors who were not telephoned by Field Research and excluding contractors who were telephoned. (*See* Supplemental Jay Report, p. 11.)

10 Plaintiffs' arguments to the contrary confuse the issue. The 65%/35% breakdown between MWAs and SWAs noted in the Field Survey is based on how the contractor-respondents self-identified themselves and not on how those contractors are identified in the FedEx Ground records that form the basis for Professor Lewin's flawed conclusions. The fact that there is a discrepancy between contractors' self-identification and FedEx Ground records has absolutely no bearing on the representativeness of the Field Survey's sample. There are several possible explanations for this relatively minor discrepancy. For example, the FedEx Ground records might not have been 100% up-to-date as of the time those records were generated, or some contractors, who were SWAs at the time the relevant records were generated, may have obtained a second route and become MWAs by the time of the Field Survey. (*See also* Supplemental Jay Report, pp. 12-13.) Regardless of the reason, this minor discrepancy does not change the fact that the Field Survey sample was almost exactly representative of the universe when measured by the SWA/MWA breakdown in the FedEx Ground records.

interviewees nor the interviewers were advised that the survey was being conducted for the purpose of litigation or that it was intended to determine whether there were divergences in the preferences of current contractors. (*See* Jay Report, pp. 6-7; Jay Deposition, p. 87.) The fact that the respondents were not advised that the Field Survey had a litigation purpose, coupled with the assurances of confidentiality of contractor responses, ensured that the respondents felt comfortable giving candid responses. (*See* Jay Deposition, pp. 137-38.) Although the survey respondents were advised that FedEx Ground was the sponsor of the survey, many contractors would likely have refused to participate in the Survey had Field Research not disclosed how it obtained the contractors' contact information. (*See* Supplemental Jay Report, p. 7.)

Plaintiffs contend that the disclosure of FedEx Ground as the sponsor of the Field Survey means that the survey was not double-blind, relying on cases where a random group of people, typically consumers, are being surveyed.[11] (*See* Pl. Brief, p. 19, n.9.) These cases are inapposite because in public or consumer surveys, there is no need for the interviewers to reveal to the interviewees how they got their telephone number; the interviewees understand that they have been contacted randomly. But when the interviewees are contractors or employees with a particular company, it is standard practice for the interviewers to reveal how they obtained the relevant contact information -- which necessarily entails disclosing the sponsor of the survey. (*See* Supplemental Jay Report, pp. 6-7 and 20, n.4; Jay Deposition, p. 137.) In short, for

[11] *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co*., 290 F.3d 578, 590 (3rd Cir. 2002) (consumer survey in false advertising case); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006) (consumer survey in trademark case); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 280 (S.D.N.Y. 2006) (consumer survey in trademark case); *Applera Corp. v. MJ Research Inc*., 389 F. Supp. 2d 344, 350 (D. Conn. 2005) (survey of random lab technicians in patent infringement case); *Tunnell v. Ford Motor Co*., 330 F. Supp. 2d 707, 719-20 (W.D. Va. 2004) (public opinion survey in product liability case); *Brockmeyer v. Hearst Corp*., 248 F. Supp. 2d 281, 292 (S.D.N.Y. 2003) (consumer survey in trademark case); *Edge Wireless, LLC v. U.S. Cellular Corp*., No. Civ. 03-1362-AA, 2004 WL 1661992, at *7 (D. Or. July 23, 2004) (consumer survey in trademark case); *Black v. Rhone-Poulenc, Inc*., 19 F. Supp. 2d 592, 602 (S.D. W.Va. 1998) (survey of area residents in strict liability case); *Castrol, Inc. v.*

logistical reasons, surveys of employees or contractors generally cannot be double-blind as to the sponsor, and, as recognized in the literature, the identification of FedEx Ground as the sponsor of the Field Survey does not render the Survey biased or otherwise invalid. (*See* Federal Judicial Center's Reference Guide on Survey Research ("Reference Guide"), p. 370 ("…in some surveys…disclosure of the survey's sponsor to respondents (and thus to interviewers) is required;" "…the identity of the sponsor may not suggest the kind of responses that the sponsor expects or would find acceptable. . . .").

Plaintiffs are incorrect in their assertion that a Field Research survey in *Marlo v. United Parcel Service, Inc*., No. CV-03-04336 (C.D. Cal. Aug. 22, 2005), was "blind" both with respect to the purpose and the sponsor of the survey.[12] In fact, the Field Research survey in the UPS litigation was *not* blind as to the sponsor, namely, the United States District Court for the Central District of California, and Field Research was mandated by the court to inform class members that Field Research had been asked to interview a representative sample of UPS supervisors "for a survey authorized by the United States District Court in connection with a class action lawsuit." (*See* Supplemental Jay Report, pp. 7-8.) Moreover, if respondents asked how they could verify the legitimacy of the survey, they were instructed to contact their human resources manager at UPS. (*See id.*, p. 8.) Even though the identity of the sponsor, and the employer's connection with the survey, were disclosed to the respondents in the *Marlo* case, the court relied, in part, on the survey in granting summary judgment for the defendant (*see, e.g.*, Rudd Decl. Ex. G at pp. 28-29) -- a ruling that refutes plaintiffs' contentions about Field Research's disclosure of FedEx Ground as the survey sponsor in this case.

---

*Pennzoil Quaker State Co*., No. Civ. A. 00-2511, 2000 WL 1556019, at *11 (D.N.J. Oct. 12, 2000) (consumer survey in trademark case).

12 The *Marlo* decision is attached as Exhibit G to the Declaration of J. Gordon Rudd, Jr., filed by plaintiffs in connection with their Motion to Exclude on May 29, 2007.

To the same effect is a Field Research survey of Home Depot employees conducted last year in connection with another matter, *Hinojos v. Home Depot*, No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434 (D. Nev. Dec. 1, 2006). In that case, Field Research identified Home Depot as the sponsor of the survey in order to inform the interviewees of how their contact information was obtained. (*See* Supplemental Jay Report, p. 7.) Even though Field Research made that identification, the district court credited the Field Research survey as showing that unpaid off-the-clock work and improper time reductions were rare occurrences in the defendant's Nevada stores. *See* 2006 U.S. Dist. LEXIS 95434, at *4. Simply put, the Field Survey in the instant case was double-blind as to the purpose of the survey, and, under the circumstances, that is all that was required.

**D. The Field Survey Was Properly Administered With Careful Oversight To Ensure Accuracy And Avoid Bias.**

Contrary to plaintiffs' assertions, the Field Survey was administered with proper and careful oversight to ensure accuracy and avoid bias. First, the interviewers made verbatim records of the interviewee responses under strict monitoring. Second, the response rate was high enough to ensure the survey's reliability. Third, the respondents' answers were not biased by previous surveys or by FedEx Ground publications. Finally, the interviewers' reference to the respondents as "contractors" rather than "drivers" did not bias the results.

**1. The Field Research Interviewers Transcribed The Interviewees' Responses Verbatim.**

The Seventh Circuit has held that the "verbatim recording" of interviewee responses negates any possibility of biased interpretation of the responses, and courts look favorably on a survey's reliability when the verbatim responses are preserved and provided to opposing counsel.

*James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (holding that a survey where interviewers typed verbatim responses was reliable and admissible); *Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F. Supp. 2d 335, 368 (D.N.J. 2002) (holding admissible a survey where interviewers made a "concerted effort" to record responses verbatim and provide them to opposing counsel, and where there was no evidence that the records were not accurate).

Here, the Field Survey followed the appropriate safeguards. The Field Research interviewers conducted the interviews over the telephone, and typed the contractors' responses verbatim. (*See* Supplemental Jay Report, pp. 8-9.) The interviewers were closely monitored by supervisors who made sure that the interviewers were transcribing the conversations verbatim. (*See* Jay Deposition, p. 135; *see also* Supplemental Jay Report, p. 9.) The interviewers preserved the transcripts, and the transcripts as well as the names and contact information for the respondents were provided to plaintiffs' counsel in this litigation. (*See* Supplemental Jay Report, p. 9.)

Plaintiffs have offered absolutely no evidence to call into question the accuracy of the Field Research interviewers' transcriptions of their interviews with respondents. Moreover, there is no support, in law or logic, for plaintiffs' claim that Field Research should have tape-recorded the interviews. Plaintiffs are unable to cite a single case to support the proposition that interviewers are required to tape-record respondents in order to ensure accuracy.[13] It is not standard practice for either academic or commercial survey research organizations to tape-record interviews. (*See* Supplemental Jay Report, p. 9.) And, finally, if followed, plaintiffs' suggestion that Field Research should have tape-recorded the conversations would actually have rendered

---

[13] The two cases cited by plaintiffs on this issue, namely, *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997), and *Menasha Corp. v. News Am. Marketing In-Store, Inc.*, 238 F. Supp. 2d 1024 (N.D. Ill. 2003), both hold that some form of verbatim recording is required, but do not even mention tape-recording.

the Field Survey less reliable. If respondents were aware that they were going to be tape-recorded, the response rate would likely have been lower and, with tape-recording, the interviewers would have not been able to assure respondents of the confidentiality and anonymity of their responses. (*See* Supplemental Jay Report, p. 9.)

**2. The Field Survey Had A High Response Rate.**

The relevant response rate is the number of individuals who completed the interview relative to the 4,074 contractors with whom the interviewers actually made contact. (*See* Jay Report, p. 9.) Here, 3,059 of the 4,074 contractors with whom contact was made completed the interview with Field Research. (See *id*.) This means that the actual response rate was 78% (*see id*.; *see also* Supplemental Jay Report, p. 10), which is a high cooperation rate. (*See* Jay Report, p. 11.) Based on the high cooperation rate and the overall design of the survey, Dr. Jay has concluded that the survey results have a sampling error of approximately +/- 2% within a 95% confidence interval. (*See id*.)

Plaintiffs are wrong in their assertion that the Field Survey's response rate was actually 15%, i.e., that only 3,059 drivers responded out of a total of 20,000 "drivers." (*See* Pl. Brief, p. 23.) Plaintiffs' calculation is flawed because they have incorrectly included in the category of "non-responders" both former contractors, who were not even in the Field Survey's universe, and contractors for whom there was no correct telephone number. (*See* Supplemental Jay Report, p. 10.) There is no reason to believe that contractors with whom the interviewers were unable to make a connection because of incorrect telephone information would have responded any differently than contractors with whom a connection was made. (*See id*.)

In any event, a survey's response rate goes to the weight accorded to the survey and not its admissibility. *Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal*,

676 F.2d 1144, 1154 (7th Cir. 1982). Similarly, the Reference Guide does not provide that a response rate of under 50% requires a survey to be excluded; rather, a court should regard such a survey "with significant caution as a basis for *precise* quantitative statements about the population from which the sample was drawn." Reference Guide on Survey Research (2006), p. 245 (emphasis added). Thus, even if the Field Survey's response rate were deemed to be less than 78%, even significantly so, that would not justify its exclusion. It would only mean that this Court should be cautious in relying on the Survey as the basis for "precise quantitative statements" about the preferences of FedEx Ground's current contractors. In this case, however, exact percentages are not necessary. It does not matter whether 52% of current contractors would prefer to provide services as independent contractors rather than employees, or whether the "true" number is 45% or 40% or 35%. The critical point is that the Field Survey demonstrates that there is no consensus -- and, indeed, there is a significant conflict -- in the preferences of current contractors vis-à-vis the appropriate form of forward-looking injunctive relief. (*See* Supplemental Jay Report, p. 2.)

**3. The Contractors' Responses Were Not Biased By Prior Surveys Or FedEx Ground Publications.**

In addition to being rooted in unjustified paternalism, there is no basis in reality for plaintiffs' claim that the Field Survey respondents -- or, more precisely, those who gave answers the plaintiffs do not like -- have effectively been "brain-washed" by prior surveys and Company communications. To the contrary, in "workforce" surveys, respondents are not typically influenced by external factors; rather, they provide answers based on their own personal experiences. (*See* Jay Deposition, pp. 141-42; *see also* Supplemental Jay Report, p. 17.) With respect to the Field Survey in particular, this general point is confirmed by the fact that 20% of

respondents told the interviewers they would prefer to be employees -- a view that is in direct conflict with FedEx Ground's publically-stated litigation position. (*See* Jay Report, p. 3.) Moreover, a review of the contractors' narrative responses to the open-ended survey questions indicates that the respondents were candid. (*See* Supplemental Jay Report, pp. 16-17.) Putting aside plaintiffs' speculation, the evidence shows that contractors were willing and able to give candid responses, and were not improperly influenced to give a particular Company-sanctioned response.[14]

Plaintiffs' "brain-washing" argument is especially ironic, given that plaintiffs' counsel and others have engaged in a substantial public relations campaign, through the internet, news media and public events, to influence contractors to support their lawsuits and to inform them about the alleged benefits of being classified as an employee. Plaintiffs' counsel have maintained a website intended to communicate with putative class members about these lawsuits, often in a misleading fashion.[15] For example, in the "Fact v. Myth" portion of the website, putative class members were told that it was a myth that "by joining the lawsuit, I will lose my right to be an independent contractor." (*See* Supp. Hollinger Decl. ¶ 5; Ex. D, at p. 5.) Yet, if the proposed class representatives were to get the forward-looking injunctive relief they seek, that is exactly what would happen.[16] There is no reason to believe that the *Independent Times* or

---

[14] The questions posed in the Scarlett surveys concerning contractor attitude are different than those posed in the Field Survey, and would not have influenced, in any way, a contractor's response on the issue of whether he or she preferred to be an employee or an independent contractor. (*See* Supplemental Jay Report, p. 17.) Similarly, there is no evidence that any of the respondents were influenced by the *Independent Times*. A review of the narrative responses suggests that the respondents did not simply mimic phrases from the *Independent Times*, but used their own language to describe their preferences and experiences. (*See id*.)

[15] *See* June 29, 2006 letter from Robert M. Schwartz to plaintiffs' counsel (detailing misrepresentations in plaintiffs' counsel's press release and website) (attached as Exhibit C to the Supplemental Hollinger Declaration).

[16] As noted earlier, plaintiffs and plaintiffs' counsel have also teamed up with the Teamsters to recruit contractors and engage in a public relations campaign against FedEx Ground. *See, e.g.*, May 8, 2006 e-mail from David Welker (Teamsters) to Lynn Faris (co-lead class counsel) ("The web site is a mission critical need for your team. Whatever the reasons or shortcomings in the past, the site must get your, Jerry, others & the pr folks attention

other Company communications would have influenced the respondents in the Field Survey any more than plaintiffs' and their lawyers' own communications. (*See* Supplemental Jay Report, p. 17.)

**4. The Interviewers' Reference To Respondents As "Contractors" Rather Than "Drivers" Did Not Bias The Results Of The Field Survey.**

Plaintiffs' argument that the Field Survey results are biased because the interviewers used the term "contractors" when addressing the respondents is meritless. Field Research interviewers used the term "contractor" because that is what many FedEx Ground contractors are accustomed to being called during the day and because some contractors, in fact, do not drive their vehicles but instead hire others to do so. (*See* Supplemental Jay Report, p. 4.) The fact that 20% of current contractors said they had a preference for being employees is evidence that the respondents were not conditioned to express a preference for being independent contractors simply because the Field Research interviewers used the term "contractors." (*See id.*; *see also* Jay Report, p. 3.) Indeed, plaintiffs have admitted that the terms "driver" and "contractor" are "interchangeable," and plaintiffs' counsel have themselves used the terms interchangeably in depositions, particularly in Dr. Jay's deposition. (*See* Jay Deposition, p. 31.) It is as far-fetched to assert that the Field Survey responses were conditioned by the interviewers' use of the term "contractor" as it would be to assert that Dr. Jay's deposition testimony was conditioned by plaintiffs' counsel's use of the term "driver."

---

asap. I think it should be paid for by your lawyers teams and the IBT funds are freed up for implementing other mid-term communications plans.") (attached as Exhibit E to the Supplemental Hollinger Declaration).

**CONCLUSION**

The Field Survey is highly relevant to the issue of whether there is a conflict among putative class members concerning the forward-looking injunctive and declaratory relief sought by the proposed class representatives -- an issue that is central to this Court's determination of the propriety of class certification. The Survey also follows, with fidelity, the generally-accepted principles of survey evidence. Plaintiffs' Motion to Exclude The Expert Report Of E. Deborah Jay should be denied.

Dated: June 18, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

Thomas J. Brunner
Alison G. Fox
Baker & Daniels LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF J. DEBORAH JAY*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*All Coordinated Cases*
Civil No. 3:05-cv-00541-RLM-CAN (VA)

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**DECLARATION OF CHRIS A. HOLLINGER IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF E. DEBORAH JAY**

I, Chris A. Hollinger, declare and state as follows:

1. I am a partner with the law firm of O'Melveny & Myers LLP, and am one of the attorneys principally responsible for the representation of FedEx Ground Package System, Inc. in the above-captioned matter. I have personal knowledge of the facts set forth below, and, if called as a witness, could and would competently testify thereto.

2. The original Supplemental Report of E. Deborah Jay, Ph.D., executed on June 15, 2007, is attached to my Declaration as Exhibit A.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 17th day of June, 2007, in San Francisco, California.

Chris Hollinger
Chris A. Hollinger

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *All Coordinated Cases* Civil No. 3:05-cv-00541-RLM-CAN (VA) | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**SUPPLEMENTAL DECLARATION OF CHRIS A. HOLLINGER IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF E. DEBORAH JAY**

I, Chris A. Hollinger, declare and state as follows:

1. I am a partner with the law firm of O'Melveny & Myers LLP, and am one of the attorneys principally responsible for the representation of FedEx Ground Package System, Inc. in the above-captioned matter. I have personal knowledge of the facts set forth below, and, if called as a witness, could and would competently testify thereto.

2. Attached to this Declaration as Exhibit A is a true and correct copy of a May 18, 2006 e-mail from David Welker (Senior Strategic Research & Projects Coordinator for International Brotherhood of Teamsters Parcel & Small Package Division) to Jerald R. Cureton (plaintiffs' counsel). This document was produced by plaintiffs in this litigation, and is designated PMDL0000178.

3. Attached to this Declaration as Exhibit B is a true and correct copy of a February 26, 2007 e-mail from William Gardner (a named plaintiff in the *Sheehan*

[Massachusetts] case) to Tony Lepore (Teamsters). This document was produced by plaintiffs in this litigation, and is designated PMDL0000173.

4. Attached to this Declaration as Exhibit C is a true and correct copy of a June 29, 2006 letter from Robert M. Schwartz (O'Melveny & Myers LLP) to plaintiffs' counsel.

5. Attached to this Declaration as Exhibit D is a true and correct copy of a printout of the "Myth vs. Facts" section of the website at http://www.fedexdriverslawsuit.com, which is linked through plaintiffs' law firm's website at http://www.leonardcarder.com. Exhibit D was printed on June 18, 2007.

6. Attached to this Declaration as Exhibit E is a true and correct copy of a May 8, 2006 e-mail from David Welker (Teamsters) to Lynn Faris (co-lead class counsel). This document was produced by plaintiffs in this litigation, and is designated PMDL0000117.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 18th day of June, 2007, in San Francisco, California.

Chris Hollinger

Chris A. Hollinger

case 3:05-md-00527-RLM-CAN document 760-4 filed 06/18/07 page 1 of 2

# EXHIBIT A

**From:** Welker David [DWelker@teamster.org]
**Sent:** Thursday, May 18, 2006 12:42 PM
**To:** Jerald R. Cureton
**Subject:** FW: FedEx Ground/Home flyers

Hello all
sorry the mass email...
attached are Week 1 and Week 2 flyers for the FedEx Ground/Home actions.
There is no set day for anyone, so the day and time is dependent on your schedules. We ask that you please hit the facility(s) starting next week.

We're always looking for good visuals for future communications, so if you plan to go out with some group or members and can take along a digital camera, just remember to shoot some photos and send me the pictures.

The last thing I'd remind you: tell them Don't Sit Out the Fight, tell them to go to the lawsuit web site fedexgrounddriverslawsuit.com for more info, and tell them to register at FedExWatch.com to stay in touch with the IBT.

please send me back a quick note to confirm you recd these 2 attachments. flyers for last 2 weeks actions are still in the works.

thanks
In Solidarity
David

David Welker
Senior Strategic Research & Projects Coordinator
Parcel & Small Package Division
International Brotherhood of Teamsters
p: 202-508-6427 / c: 202-437-6365 / f: 202-624-6931

<<FedExChange2_Week1.pdf>> <<FedExChange3_Week2.pdf>>

# EXHIBIT B

Case 3:05-md-00527-RLM-CAN document 760-5 filed 06/18/07 page 2 of 2

**From:** William Gardner [williamrgardner@yahoo.com]
**Sent:** Monday, February 26, 2007 2:00 PM
**To:** tlepore@teamsters671.com; Steve Sullivan
**Subject:** Fedex Class Action Suit

Hi Tony,

Thanks for the hospitality extended to us yesterday at your union hall.I hope that we provided some useful info. to your future FedEx union members. I have attached a copy of our Mass. FedEx class action complaint for your review.I spoke with our Class action atty's and they would like to speak via telephone to any Home Delivery or Ground drivers who would be interested in becoming a plaintiff for a Ct. class action.The contact info. is listed below.

Maydad Cohen, Esq.
Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
Phone: (617) 367-7200
Fax: (617) 367-4820

Bill Gardner

PMDL0000173

# EXHIBIT C

O

O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

June 29, 2006

OUR FILE NUMBER
259,075-003

WRITER'S DIRECT DIAL
(310) 246-6835

WRITER'S E-MAIL ADDRESS
rschwartz@omm.com

**VIA E-MAIL RHARWOOD@WHESQ.COM**
**LFARIS@LEONARDCARDER.COM**
**SEELLINGSTAD@LOCKLAW.COM**

Susan Ellingstad, Esq.
Lynn Faris, Esq.
Robert Harwood, Esq.

**Re:** ***In re FedEx Ground Package System, Inc. Employment Practices Litigation***

Dear Susan, Lynn and Rob:

I am writing about several situations where putative class members apparently are being provided with misleading information as well as solicitations to join the lawsuit. These may be oversights, but we ask that you correct them immediately to avoid confusion and prejudice.

First, it appears that attorneys have contacted certain contractors in Minnesota by telephone to encourage their participation in the litigation. Minnesota Rule of Professional Conduct 7.3 prohibits communications that, under the "totality of all the circumstances... indicates that the purpose of the [communication] was to solicit business." *See In re Charges of Unprofessional Conduct Against 97-29*, 581 N.W. 2d 350-351 (Minn. 1998). We are also aware of written materials being distributed to contractors in South Carolina which indicate that Lynn Faris asked an attorney to contact contractors to discuss the lawsuit. To the extent that such materials are intended to be advertisements, they do not identify themselves as such. We ask that you ensure that no lawyers associated with the case are engaging in improper solicitation of clients to join the lawsuits.

Second, some of the statements that you have made on your website intended for putative class members, www.leonardcarder.com, are misleading and/or unfounded. For example, in a section of your website labeled "Myth v. Fact" you state as "Myth" that "By joining the lawsuit, I will lose my right to be an independent contractor." In fact, if the named plaintiffs get the relief that you request, that is exactly what may well happen—all of the contractors in the putative class would see their status converted from independent contractor to employee even if they do not want that to occur. You also state as "Fact" that that the "majority" of drivers know that they are not treated as "independent contractors" and are "unhappy" with how FedEx treats them.

You offer absolutely no support for this allegation, nor has the Judge made any ruling on the issue that would permit you to state it as "Fact." You also state as "Fact" that FedEx Ground "misclassifies drivers as independent contractors in violation of the law." The Judge in the MDL suits has made no such determination, and for you to present that as "Fact" is misleading.

Additionally, the statements on your website regarding the recent ERISA rulings are misleading and/or inaccurate. First, you ignore the fact that the Judge granted FedEx Ground's motion to dismiss ERISA claims in seven of eight cases. Second, you inaccurately state that the Court has "preserved" the ERISA claims of absent putative class members. Since there is no certified class, that is not a true statement. Third, you imply that the Court has made some determination of the merits of the ERISA claims when, in fact, the Judge indicated that a determination of the merits should take place at a later stage of the proceedings. We request that you immediately set the record straight on your website.

Third, we have concerns that you have misled putative class members in your recent press release. For example, you state the *Wieber* and *Vincent* cases involve contractor classification issues, when they do not. You also imply that the *Issa* plaintiffs were determined to be employees, when they were actually determined to be independent contractors. You also imply that the class may be able to recover "hundreds of millions of dollars," notwithstanding that the MDL cases are still in discovery, no class has been certified, and no merits determination has been made. You also inaccurately state that the MDL cases are a "nationwide class action" when the Court has not made any determination as to whether the cases may proceed as class actions, and where the vast majority of your claims are limited to particular states. It is especially confusing when you look at your website together with the press release. The two together imply that plaintiffs are seeking, on a nationwide basis, recovery for the purchase or lease of the truck. That is not accurate.

We ask that you take immediate, affirmative steps to correct these misleading statements and to ensure no improper solicitation of clients. We would prefer to resolve these concerns without involving the Court.

Very truly yours,

Robert M. Schwartz
of O'MELVENY & MYERS LLP

RMS:jmb
CC1:744656.1

cc: John H. Beisner
Evelyn L. Becker

# EXHIBIT D

FedEx Drivers: Ground and Home Delivery Lawsuit Page 1 of 1

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME ABOUT US NEWSROOM CASE UPDATE THE TRUTH CONTACT US RELATED WEBSITES
PHONE / EMAIL / BY STATE

## MYTH VS. FACTS

MYTH: As independent "owner-operators," contractors run their own "business" and manage the day to day operations of the "business."

FACT: FedEx Ground and Home Delivery misclassify drivers as independent contractors in violation of the law. The Judge in the Estrada v. FedEx Ground case found that single route drivers at FedEx Ground were employees because FedEx Ground "purposefully created controls of an employment nature" and exercised "close to absolute actual control" over the drivers. The situation at Home Delivery is virtually identical to the Ground drivers. Drivers for both Ground and Home are not free to run their "business" as they see fit - FedEx tells them when, where and how many packages to deliver, when and where to pick-up packages and at what time, how to maintain their trucks, who they can hire to help drive, and even how to dress. These are just some of the restrictions that FedEx places on contractors virtually making it impossible for the contractors to run an independent business.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

FedEx Drivers: Ground and Home Delivery Lawsuit
Page 1 of 1

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME | ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH | CONTACT US | RELATED WEBSITES
PRESS RELEASES | ARTICLES

## MYTH VS. FACTS

MYTH: Thousands of FedEx Ground owner operators are succeeding and growing their "businesses."

FACT: While there are some contractors with multiple routes that make a profit, the majority of the contractors struggle to make ends meet. Every year, FedEx increases per package and per stop settlement payments but reduces the core zone settlement payment in essence making it impossible for drivers to make more money. In addition, FedEx mandates that drivers bear all expenses and buy their truck. The average operating expenses and benefits are approximately $15,000 to $30,000 annually. Drivers take home pay is significantly less than their gross earnings. Even FedEx's recruiting materials show that the average contractor makes between $40,000-50,000 after expenses are deducted.

By shifting the cost of its business to the drivers and providing no benefits, FedEx Ground alone brings in $4.7 billion dollars out of a total FedEx Corporation revenue of $29.4 billion. In fiscal year 2005, FedEx Ground's operating income grew by 16

**Trademark Notice**
**FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.**

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

# STAND YOUR GROUND

The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME | ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH | CONTACT US | RELATED WEBSITES | FAQ | INDEPENDENT TIMES

## MYTH VS. FACTS

MYTH: As an independent contractor, you can only be terminated for contract violations.

FACT: The contract is purposefully vague and the interpretation of the contract is soley in the hands of FedEx. FedEx has "almost absolute unilateral control over contract termination to the point of it being the same as termination at will" - where drivers can be fired for any reason or no reason at all.

Trademark Notice
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME | ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH | CONTACT US | RELATED WEBSITES
PHONE / EMAIL / BY STATE

## MYTH VS. FACTS

MYTH: The lawsuits threaten the livelihood of independent business owners.

FACT: The lawsuits challenge FedEx's unlawful business practices. If FedEx truly treated drivers as independent contractors, there would be no violation. But, FedEx shifts all of the costs of its business to the drivers yet maintaining absolute control over the services they provide. The lawsuits seek among other things to recover business expenses, illegal wage deductions, in some cases overtime pay, and damages based on state law from FedEx. It also seeks to stop FedEx from misclassifying drivers as independent contractors.

FedEx Express drivers who are classified as employees are better paid then the FedEx Ground and Home Delivery drivers. In addition, they are entitled to receive benefits under employment laws including workers compensation, unemployment insurance, and family medical leave.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

FedEx Drivers: Ground and Home Delivery Lawsuit Page 1 of 1

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME | ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH | CONTACT US | RELATED WEBSITES
FAQ | INDEPENDENT TIMES

## MYTH VS. FACTS

MYTH: Only former contractors are involved in the lawsuits.

FACT: The lawsuits include both current and former drivers. The majority of drivers know that they are not treated as true "independent contractors" and are unhappy with how FedEx treats them.

MYTH: By joining the lawsuit, I will lose my right to be an independent contractor.

FACT: FedEx cannot continue to label drivers as independent contractors and in reality treat them as employees but deny them all the legal rights of being an employee. Only FedEx profits as a result of the misclassification. FedEx will have to change the way it does business so that you can be treated fairly and legally.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

FedEx Drivers: Ground and Home Delivery Lawsuit Page 1 of 1

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME ABOUT US NEWSROOM CASE UPDATE THE TRUTH CONTACT US RELATED WEBSITES
FAQ INDEPENDENT TIMES

## MYTH VS. FACTS

MYTH: I should have a choice in whether I want to be an independent contractor or employee.

FACT: The law in each state dictates whether you are an independent contractor or employee. While the legal standards vary by state, generally, courts determine if a person is an employee or an independent contractor by asking certain key questions. See FAQs.

The conduct of the parties, not the labels used, determines whether the person is an employee or independent contractor. If the company creates requirements that make you an employee under the law, then you are legally an employee and the company must treat you as an employee and provide you benefits.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME
ABOUT US
NEWSROOM
CASE UPDATE
THE TRUTH
CONTACT US
RELATED WEBSITES
PHONE / EMAIL / BY STATE

## MYTH VS. FACTS

MYTH: The Judge in Estrada allowed FedEx to continue its independent contractor business model if it made a few changes.

FACT: The Judge in Estrada declared that single route drivers in California are employees and are entitled to the protections of the California labor laws as long as FedEx continues to use the same or substantially the same practices that it currently operates under. The Judge also prohibited FedEx from misclassifying drivers as independent contractors under its current Operating Agreement and from violating laws that protect employees. FedEx has 180 days from October 7, 2005 to make changes to its business so as to comply with the Judge's order. FedEx has vowed to appeal the order.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

FedEx Drivers: Ground and Home Delivery Lawsuit Page 1 of 1

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME ABOUT US NEWSROOM CASE UPDATE THE TRUTH CONTACT US RELATED WEBSITES
PHONE / EMAIL / BY STATE

## MYTH VS. FACTS

MYTH: The Judge granted very few of the reimbursements in Estrada.

FACT: In Estrada, the Judge ruled that the Plaintiffs and the class members were entitled to recover expenses including for fuel, oil, tires, repairs, routine maintenance, business taxes, truck cleaning, liability insurance, registration and licensing of truck, uniforms, Business Support Package, and escrow account. The Judge excluded some of the evidence that supported the expenses and Plaintiffs are planning to appeal this ruling. Plaintiffs recovered $5.3 million dollars in reimbursements in Estrada.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME
ABOUT US
NEWSROOM
CASE UPDATE
THE TRUTH
CONTACT US
RELATED WEBSITES

FAQ | INDEPENDENT TIMES

## MYTH VS. FACTS

MYTH: The expense of renting or buying the truck is not recoverable in the lawsuits.

FACT: The Judge in Estrada said that the cost of renting or buying the truck was not a work related expense under a single law. The plaintiffs in Estrada will appeal this ruling, but this ruling does not bar other legal theories in California or elsewhere. In the MDL litigation, Plaintiffs have asserted other legal theories to recover for the lease or purchase of the truck.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME ABOUT US NEWSROOM CASE UPDATE THE TRUTH CONTACT US RELATED WEBSITES
PHONE / EMAIL / BY STATE

## MYTH VS. FACTS

MYTH: If I have more than one route, I am not part of the lawsuits.

FACT: Some of the MDL lawsuits are limited to drivers with only one route. However, multiple route drivers in the other MDL cases are not automatically excluded. It will depend on the facts of your situation and the law in your state. Some state decisions including in California have ruled that drivers with multiple routes are employees even though they have hired other drivers to drive for them.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

FedEx Drivers: Ground and Home Delivery Lawsuit
Page 1 of 1

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME | ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH | CONTACT US | RELATED WEBSITES
FAQ | INDEPENDENT TIMES

## MYTH VS. FACTS

MYTH: That drivers will have to pay taxes on attorneys fees FedEx has to pay Plaintiffs' lawyers.

FACT: FedEx Ground has misrepresented the effect of the Estrada case yet again. FedEx Ground is circulating information saying that the attorney fees FedEx has been ordered to pay for the seven years of Plaintiffs' lawyers work on this case will be taxable to the drivers. Nothing could be further from the truth! In the fall of 2004, Congress passed a law to make sure that clients in employment cases were not required to pay taxes on any fees paid to their lawyers. Under that new law, for any judgment which occurred after October of 2004, no taxes are paid by the client. The final judgment in Estrada was issued in December of 2005 and the attorney fees were awarded in November, 2005; so, the Estrada fees fall under the new law.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

# STAND YOUR GROUND

## The Official Website of the FedEx Ground/Home Delivery Drivers Nationwide Class-Action Lawsuit

HOME ABOUT US NEWSROOM CASE UPDATE THE TRUTH CONTACT US RELATED WEBSITES
FAQ INDEPENDENT TIMES

## MYTH VS. FACTS

The company also tells people how much the lawyers were awarded, but it fails to mention that it is FedEx Ground that is required to pay those fees, not the drivers. The drivers' recovery will be entirely their own, without deduction for any attorney fees. While it emphasizes the large amount of fees the court awarded to the Plaintiffs' lawyers, the company never mentions the millions it has paid for its high-priced lawyers over the course of the seven-year case, which was deliberately delayed at every turn by the company.

Do you wonder why FedEx would misrepresent these facts to all its current drivers and others? That's easy - - they want to try to convince drivers not to participate in these lawsuits and to refrain from exercising or enforcing their legal rights.

**Trademark Notice**
FedEx Ground and FedEx Home Delivery are registered trademarks and/or servicemarks of FedEx Corporation. This mark is used for identifying the companies as defendants in the lawsuit and providing information to persons interested in learning more about the litigation. The lawfirms listed on the MDL Class list, who are co-sponsors of this website, are in no way affiliated with FedEx Ground, FedEx Home Delivery or FedEx Corporation.

**ABOUT US | NEWSROOM | CASE UPDATE | THE TRUTH |**

# EXHIBIT E

**Lynn Faris**

**From:** Welker David [DWelker@teamster.org]
**Sent:** Monday, May 08, 2006 5:40 PM
**To:** Lynn Faris
**Subject:** email input

Lynn
I tried calling you just now but it seems you are too easy on the receptionist...she's gone once the clock hits 5:01. And I don't have your direct extension.
So I was hoping to talk briefly about my impressions from chatting with Gwen, Liz and Steph last week.
My feeling is that Liz and Steph are willing, able, capable and manage-able while (if you are ok with the idea of delegating this to him) I think that selecting them will give impetus to Jerry to manage them appropriately and diligently. The immediate 6 month goal of redoing the website, designing a communications strategy targeted at the drivers to act as a counter the company propaganda and to spread the "david v goliath" vignettes locally & build indictment of FedEx/misclassification biz practices nationally are all things they can do.
Gwen is in my minds the consummate DC smooth operator. She might be good at a different stage of the fight but to me is hung up on strategzing and word smithing. And I fear she'll be less manage-able.
You need to get a message going immediately, and not weeks of market research on re-positioning FedEx brands in consumers' minds. You need to get the web site targeted to countering the company message, not dwell on color scheme and 'one sentence mottos' that play off FedEx perceptions.
The one factor that this reasoning hinges on is your trust in Jerry to manage Liz and Steph. I have no doubt you'll be deeply involved in the message development, but you simply cannot be the calendar watcher/task master/deadline whipper at this point of the fight. You have got to delegate.
The web site is a mission critical need for your team. Whatever the reasons or shortcomings in the past, the site must get your, Jerry, others & the pr folks attention asap. I think it should be paid for by your lawyers teams and the IBT funds are freed up for implementing other mid-term communications plans.
I wanted to discuss these things but we've missed each other a couple of days already. Time is not run out but is getting away from us....
Call me anytime you can spare a moment.
Best
David

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Filing Documents Under Seal.

On June 21, 2007, Defendant FedEx Ground filed under seal the following:

1. Motion to Substitute Crandall Declaration.

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

case 3:05-md-00527-RLM-CAN document 763 filed 06/21/07 page 2 of 3

Dated: June 21, 2007

Respectfully submitted,

By: sThomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

BDDB01 4800009v1

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of June, 2007, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S NOTICE OF FILING DOCUMENT UNDER SEAL*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Philip Stephen Fuoco
pfuoco@msn.com

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM (MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On June 11, 2007, the parties filed a joint motion to amend the case schedule. This joint motion was actually an amended revised motion filed by the parties. The original motion was filed on June 8, 2007, and is **DENIED AS MOOT** [Doc. No. 719]. However, the amended joint motion is **GRANTED IN PART** [Doc. No. 725].

In the Court's orders of November 15, 2005, and November 29, 2005, aggressive and demanding deadlines were set for class certification, experts, and summary judgment. On May 26, 2006, this Court granted in part the parties' joint motion to extend various deadlines. Class certification was reset and to begin on January 22, 2007, disclosure of experts was reset to take place by February 5, 2007, and summary judgment deadlines were reset to begin on September 21, 2007.

On December 21, 2006, and January 23, 2007, this Court extended the class certification deadlines a second and third time. On January 19, 2007, this Court extended the deadlines pertaining to experts a second time. The parties effectively began class certification briefing on March 12, 2007. However, the new deadline for serving expert reports, which was June 5, 2007,

has now come and passed. After the passing of this deadline, the parties filed a joint motion to amend deadlines again.

## I.    CLASS CERTIFICATION

The parties have nearly completed all three waves of class certification. However, since class certification began, new cases have continued to be transferred to this Court from various parts of the country. The parties agree that a fourth wave, with a limited discovery period, is needed for class certification. This Court agrees that a fourth wave is needed and finds the parties' request reasonable. Consequently, this Court **ORDERS** as follows with regards to class certification briefing:

- The parties shall have till **August 31, 2007,** to perform limited discovery on cases transferred to this Court since March 19, 2007, and any cases that will be transferred to this Court..
- Plaintiffs shall file the fourth wave of class certification briefs by **October 1, 2007**.
- Fedex's responses are due by **November 17, 2007**, and Plaintiffs' replies in support of their motions are due by **December 17, 2007**.

## II.    EXPERT DEADLINES

The parties agree that expert deadlines should be extended, but they do not agree on the length of the extension. Plaintiffs seek an extension to July 24, 2007, while Fedex desires to wait to set any expert deadlines until this Court has ruled upon the pending motions for class certification. This Court agrees with Plaintiffs that a specific deadline is needed at this time, but this Court also agrees with Fedex that more time is needed than Plaintiffs suggest. Therefore, this Court **ORDERS** the following:

- Movants shall serve any expert reports or affidavits upon which they will rely for summary judgment by **August 24, 2007**
- Opponents shall have until **October 5, 2007**, to depose such experts.

- Opponents shall have until **October 5, 2007**, to serve any expert reports or affidavits they wish to rely upon.
- Depositions of opponents' experts must take place by **November 5, 2007**.

## III. SUMMARY JUDGMENT

Both parties agree that the summary judgment deadline should be vacated now and reset after this Court has ruled upon the pending motions for class certification. The parties argue that because the Plaintiffs make many claims that implicate various substantive tests, the parties will be able to tailor and streamline summary judgment better if all class certification issues have been resolved. However, this Court does not appreciate the linkage between the issues involving class certification and the substantive issues regarding liability. The parties' argument regarding this issue is vague, cryptic, and unpersuasive. Consequently, this Court agrees with the parties that the current summary judgment deadline must be reset, but this Court does not agree that it should wait to set the deadline for summary judgment until after the class certification motions have been resolved. As a result, the Deadlines for summary judgment shall be as follows:

- Movants for summary judgment shall have until **November 30, 2007,** to file their motions for summary judgment.
- Responses to summary judgment shall be filed by **January 14, 2007**.
- Replies in support of motion for summary judgment shall be filed by **February 15, 2007**.

**SO ORDERED.**

Dated this 29th Day of June, 2007.


                                        S/Christopher A. Nuechterlein
                                        Christopher A. Nuechterlein
                                        United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| IN RE FED EX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 03:05-MD-527 RM<br>MDL Docket No. 1700<br><br>CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | ) | |

**NOTICE OF MANUAL FILING**

The document listed below is filed under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101] and is being maintained in the case file in the clerk's office.

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT REPORT OF E. DEBORAH JAY**

Dated: July 2, 2007

Respectfully Submitted,

**ZIMMERMAN REED, P.L.L.P.**

By: s/J. Gordon Rudd, Jr.
J. Gordon Rudd, Jr.
David M. Cialkowski
Anne T. Regan
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844

**PLAINTIFFS' CO-LEAD COUNSEL**

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA  94612
Tel:    (510) 272-0169
Fax:    (510) 272-0174

Robert I. Harwood
WECHSLER HARWOOD LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 2, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE OR EXCLUDE DECLARATIONS SUBMITTED BY DEFENDANT**

Dated: July 2, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton

HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller Magistrate Judge Nuechterlein |

**PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE THIRD WAVE DECLARATIONS OF PURPORTED "CONTRACTORS" SUBMITTED BY DEFENDANT**

Pursuant to Rule 37(c) and 23(d) of the Federal Rules of Civil Procedure, Plaintiffs hereby move this Court for an Order to strike or exclude the declarations of purported "contractors" submitted by FXG with its third wave of opposition briefs filed on June 7, 2007.

This motion is based upon all files, records and proceedings herein, including the Third Declaration of Patricia Bloodgood, filed herewith, which identifies the third wave declarations submitted by Defendant. In addition, this motion incorporates by reference Plaintiffs' memorandum in support of their motion to strike or exclude the first wave declarations of putative class members submitted by FXG. That memorandum was filed by Plaintiffs on May 29, 2007 (Doc. No. 688).

case 3:05-md-00527-RLM-CAN document 773 filed 07/02/07 page 2 of 2

Dated: July 2, 2007

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**<u>FILED UNDER SEAL</u>**

**THIRD DECLARATION OF PATRICIA A. BLOODGOOD IN SUPPORT OF PLAINTIFFS' MOTIONS TO STRIKE OR EXCLUDE DECLARATIONS OF PURPORTED "CONTRACTORS"SUBMITTED BY DEFENDANT**

Dated: July 2, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

**EXHIBITS 1 THROUGH 6 TO THIRD DECLARATION OF PATRICIA A. BLOODGOOD IN SUPPORT OF PLAINTIFFS' MOTIONS TO STRIKE OR EXCLUDE DECLARATIONS OF PURPORTED "CONTRACTORS"SUBMITTED BY DEFENDANT**

Dated: July 2, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/Susan E. Ellingstad
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**PLAINTIFFS REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. RICHARD JEANNERET**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. Dr. Jeanneret's Study Fails Any Test of Proper Scientific Methodology .......... 3

1. FXG Misrepresents Dr. Jeanneret's Use of "Generally Accepted Job/Work Analysis Methods" In Developing His Opinions .......... 5

2. FXG Falsely Claims Dr. Jeanneret Studied 107 Contractors .......... 8

3. FXG Falsely Claims Dr. Jeanneret Looked for Similarities As Well As Differences in His "Sample" Of 21 Individuals .......... 11

B. Under Settled Case Law the Deficiencies in Dr. Jeanneret's Methodology Preclude Admission of his Report .......... 12

1. FXG Fails to Address The Authority That Mandates Exclusion .......... 12

2. FXG Cites Authority Irrelevant To The Question Of Whether Dr. Jeanneret's Methodology Meets the Reliability Standards of *Daubert* .......... 13

III. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

Federal Cases

*Baumholser v. Amax Coal Co,*
630 F.2d 550 (7th Cir. 1980) .......... 13

*Carlson v. C.H. Robinson Worldwide, Inc.*
2005 WL 758601 (D. Minn) .......... 6

*Clark v. Takata Corp.*
192 F.2d 750 (7th Cir. 1999) .......... 2

*Comfort ex rel Neumyer v. Lynn School Comm.*
283 F.Supp.2d 328 (D.Mass 2003) .......... 14

*Cowan v. Treetop Enterprises Inc.*
120 F.Supp.2d 672 (M.D.Tenn.1999) .......... 6

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993) .......... 1

*Dukes v. Wal-Mart Inc.*
474 F.3d 1214 (9th Cir. 2007) .......... 3

*Flavel v. Svedala Indus., Inc.*
875 F.Supp.550 (E.D.Wis. 1994) .......... 15

*Garcia v. Los Banos U.S.D.*
2007 WL 215526 (E.D. Cal.) .......... 7

*James v. Marten Transport*
2006 WL 3755322 (N.D. Ind.) .......... 1

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) .......... 2

*Lang v. Kohl's Food Stores, Inc.*
217 F.3d 919 (7th Cir. 2000) .......... 13, 14

*Marting v. Crawford & Co.*
2004 WL 305724 (N.D. Ill) .......... 6, 7

*McClain v. Metabolife*
401 F.3d 1233 (11th Cir. 2005) .................... 2

*McCullock v. H.B.Fuller Co.*
61 F.3d 1038 (2d Cir. 1995).................... 15

*Norwest Bank v. Kmart Corp.*
1997 WL 33479072 (N.D. Ind.).................... 2

*Olinger v. U.S. Golf Association*
52 F.Supp.2d 947 (N.D.Ind. 1999) .................... 2

*Owens v. Amtrol, Inc.*
94 F.Supp.2d 952 (N.D.Ind. 2000) .................... 3

*Price Waterhouse v. Hopkins*
490 U.S. 228 (1989).................... 14

*Ramsey v. Consol. Rail Corp.*
111 F.Supp.2d 1030 (N.D.Ind 2000) .................... 2, 5, 11

*Reynolds v. Giuliani*
118 F.Supp.2d 353 (S.D.N.Y. 2000).................... 13

*Rosen v. Ciba-Geigy Corp.*
78 F.3d 316 (7th Cir. 1996) .................... 2

*Schering Corp. v. Pfizer, Inc*
189 F.3d 218 (2d Cir. 1999).................... 13

*Simon Property Group v. MySimon, Inc.*
104 F.Supp.2d 1033 (S.D.Ind. 2000).................... passim

*Smith v. Ford Motor Co.*
215 F.3d 713 (7th Cir. 2000) .................... 1

*Tyus v. Urban Search Mgt.*
102 F.3d 256 (7th Cir. 1996) .................... 15

*U.S. v. Hall*
974 F.Supp.1198 (C.D.Ill. 1997) .................... 14, 15

*U.S. v. Lundy*
809 F.2d 392 (7th Cir. 1987) .................... 15

*U.S. v. Southern Indiana Gas and Elec. Co.*
258 F.Supp.2d 884 (S.D.Ind. 2003) ........................................ 13

*Zenith Electronics v. WH-TV*
2003 WL 21506808 (N.D. Ill.),
affirmed in Zenith Electronics v. WH-TV, 395 F.3d 416 (7th Cir. 2005) ........................ 2

## Federal Rules

FRCP 23(a)(2) ........................................ 3

# I. INTRODUCTION

FXG has failed to meet its burden of proving that Dr. Jeanneret's Report complies with Rule 702. *James v. Marten Transport,* 2006 WL 3755322 at *2 (N.D. Ind.), citing *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) (proponent bears burden of proving compliance; opponent "has no burden to do anything more than object[.]"). Plaintiffs demonstrated that this Report rests on unscientific and unreliable research and analysis and therefore does not meet the reliability requirements of *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993). (Plaintiffs' Brief (hereafter "Pl.Br.") 5-11; Dec. of Dr. Lewin (hereafter "Lew.Dec."), ¶¶49-57). Three principle methodological flaws mandate exclusion under *Daubert*: 1) admitted failure to study a representative sample of potential class members, while generalizing findings, 2) failure to use standard, scientifically tested instrument of job analysis; and 3) failure to compare similarities in work activities to differences, a design flaw which guaranteed the conclusion.

In its Opposition, FXG does not remedy these patent deficiencies in any way. FXG offers an 8-page Declaration from Dr. Jeanneret that argues—for the first time and without evidentiary support—that a methodology known as "triangulation" allowed him to draw conclusions about the entire population of drivers from an admittedly tiny and non-representative sample. (Jean.Dec. ¶12). FXG's claim that Dr. Jeanneret compared the similarities among drivers to the asserted differences is belied by his report. FXG also inflate both the number of drivers Dr. Jeanneret purportedly studied by 30 and grossly exaggerates the extent to which he studied them. Thus, FXG's Opposition fails to justify the patent lack of scientific methodology used or to prove its reliability under *Daubert* and its progeny. [1]

[1] Dr. Jeanneret was contacted just a few weeks before his report was due and the "study" conducted was limited because of his and his colleagues' minimal availability prior to the holidays. (Jean.Dep. 70:2-74:3). While the deficiencies may thus be understandable, they are nonetheless fatal to the Report's admission and consideration.

## II. ARGUMENT

The proponent of expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence." *Zenith Electronics v. WH-TV*, 2003 WL 21506808 (N.D. Ill.), affirmed in *Zenith Electronics v. WH-TV,* 395 F.3d 416 (7th Cir. 2005); *see also McClain v. Metabolife,* 401 F.3d 1233, 1238 n.2 (11th Cir. 2005) ("In its order following the *Daubert* hearing, the court below indicated that it was unclear who bore the burden of proof. That burden clearly rests with the proponent of that expert.") To be admissible under the *Daubert* standard, the proponent of expert testimony must show that it is "not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The objective of the reliability requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Clark v. Takata Corp.,* 192 F.2d 750, 756 (7th Cir. 1999), quoting *Kumho, supra* at 152.

While Dr. Jeanneret's expert qualifications are not in issue, "adequate expertise is only a necessary constituent of a foundation under Rule 702; it is not sufficient alone." *Olinger v. U.S. Golf Association,* 52 F.Supp.2d 947, 949 (N.D.Ind. 1999). *See also Norwest Bank v. Kmart Corp.* 1997 WL 33479072 (N.D. Ind.), citing *Rosen v. Ciba-Geigy Corp.* 78 F.3d 316, 319 (7th Cir. 1996) ("The Seventh Circuit requires even the most esteemed expert to establish a nexus between the opinion and the established scientific principle and methodology.") Failure to establish such a nexus between the expert's methodology and his opinion mandates exclusion. *Ramsey v. Consol. Rail Corp.,* 111 F.Supp.2d 1030, 1036 (N.D.Ind 2000).

Rather than directly address the substance of Plaintiffs' Motion, FXG devotes much of its Opposition to re-stating Dr. Jeanneret's conclusions and re-arguing its position on class

certification, misrepresenting Plaintiffs' position in the process.[2] (Op.10,11,13) This Court can and should ignore such non-responsive matters.

**A. <u>Dr. Jeanneret's Study Fails Any Test of Proper Scientific Methodology</u>**

Side-stepping the inescapable conclusion that brief interviews with at most 14 hand-picked putative class members and cursory review of a brief summary of the depositions of 56 others cannot justify conclusions about a population of over 20,000 former and current drivers, FXG arguments in defense of this Report do not advance its cause.

**<u>First</u>**, FXG claims it was unnecessary for Dr. Jeanneret to record any quantitative data or perform any quantitative analysis to measure the importance of particular work functions before expressing the opinion that observed variation in work tasks was material. (Op.9). However, the scientifically tested instruments of job analysis, the PAQ and PMPQ, require that the frequency or importance of particular work activities be examined before any material differences can be found. (Jean.Dep. 63:15-66:8). Despite Dr. Jeanneret's clear admission that he used neither of the standard, well-tested scientific instruments of job analysis, FXG asserts that his "study" is nonetheless scientifically valid. (Op.9). Dr. Jeanneret's claim—made only after Plaintiffs' *Daubert* Motion was filed—to have triangulated his conclusions by making observations from multiple vantage points (Op.12) is entirely unsupported by the record.

---

[2] FXG uses its Opposition to improperly re-argue its position of class certification. However, the merits of an expert's conclusions go to the weight, not the admissibility, of the expert's testimony, and are not relevant to a *Daubert* motion. *Owens v. Amtrol, Inc.*, 94 F.Supp.2d 952, 955 (N.D.Ind. 2000). Moreover, FXG's also selectively quotes *Dukes v. Wal-Mart Inc.*, 474 F.3d 1214, 1227 (9th Cir. 2007) ignoring the following passage: "All questions of fact and law need not be common to satisfy [FRCP 23(a)(2)]. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Dukes, supra* at 1225. FXG also attempts to argue that "Plaintiffs conflate the commonality and predominance requirements for class certification." (Op.10, n. 2). While this argument may have been appropriate to FXG's Oppositions to Plaintiffs' Motions for Class Certification, it is irrelevant to the question of whether Dr. Jeanneret's Report is admissible under Rule 702 and *Daubert.* Accordingly, this entire section of FXG's Opposition to Plaintiffs' *Daubert* Motion should be ignored.

**Second**, FXG misrepresents both the number of drivers Dr. Jeanneret studied, and the extent to which he studied them. His sample of 21, chosen for him by FXG's attorneys, contains at least 7 individuals who are not class members. (Pl.Br.2). He observed only 2 drivers –for about an hour each -- actually driving a route and delivering packages, and FXG failed to prove that his colleague (Dr. McPhail) observed any. (Jean.Dep. 158:1-163:25). In an attempt to inflate the number of drivers considered to 107, FXG also claims Dr. Jeanneret reviewed the deposition transcripts of 86 named plaintiffs and found their testimony to corroborate his findings among the 21. (Op.7). In reality, Dr. Jeanneret reviewed only a 7-page summary of 56 depositions, consisting of about 14,000 pages, written by an assistant he had instructed to search for testimony supporting the conclusions he had drawn about the 21. (Jean.Dep. 155:4-156:1; compare Appendix D to Report with Exhibit A to Norman Dec filed herewith). The summary itself inaccurately portrays testimony and only rarely provides page citations, making verification virtually impossible. (Jean.Rep.Appx.D).

**Third**, responding to the obvious failure of the Report to objectively examine and compare similarities with differences in work activities, FXG speciously claims that Dr. Jeanneret actually did study similarities, although no reference to any such similarities appears anywhere in his Report. (Op.10). While Dr. Jeanneret's Report clearly identifies his task as analyzing "whether or how these work activities **differ** among contractors," he claims that in order to determine "whether" the activities differed he necessarily compared similarities. (Jean.Rep. ¶12, Jean.Dec. ¶3). He asserts that the fact that no similarities appear in his Report shows he did not find any, but he provides no explanation of how he came to this conclusion. (Op.10, Jean.Dec.3). This argument alone counsels exclusion, as the methodology Dr. Jeanneret used to arrive at this conclusion cannot be determined from reading the Report. *Ramsey, supra*

at 1036 ("the record identifies no scientific principle on which [the expert] based the critical last step of his analysis").

### 1. FXG Misrepresents Dr. Jeanneret's Use of "Generally Accepted Job/Work Analysis Methods" In Developing His Opinions

**Job Analysis:** FXG argues that, although Dr. Jeanneret did not use the Professional and Managerial Position Questionnaire ("PMPQ") in his **analysis** of his subjects, he "adapted 'verbatim' the structure of the PMPQ. . ." (Op.9).[3] Dr. Jeanneret specifically admitted that he did **not** decide to use the PMPQ until after the "study" was done and that he used the "structure to categorize the information **after** we had done the interviews." (Jean.Dep.189:24-190:9). His use of some headings from the PMPQ, verbatim or otherwise, is no defense to his failure to record quantitative answers of any sort to his questions or ascribe any quantitative scale to the work activities he studied. (*Id.*188:24-189:12, 275:24-276:4). The PMPQ, like the Position Analysis Questionnaire ("PAQ") requires measurement of the "importance" of various work behaviors, (*Id.*65:2-21), but Dr. Jeanneret admittedly made no effort to record or measure the relative importance of **any** of the behaviors he observed. (*Id.*183:5-186:12). Thus, it is impossible to tell whether "work tasks" he lists are done once in vie years or once a day. Further, although he regularly and misleadingly claims to have "observed" drivers, (Jean.Rep.¶12, Jean.Dec.¶¶10-13), he stated in his deposition that "it's not important to me to watch them driving a truck or delivering packages. That is not what was important to the answers to the questions we were asking." (*Id.* 167:25-168:12).

Failure to quantify the importance or frequency of various behaviors has been grounds for exclusion of expert testimony in several FLSA exemption cases. *Cowan v. Treetop*

[3] Dr. Jeanneret described the PMPQ as "associated with ... individuals who had work activities that . incorporated managerial, professional, technical, supervisory, business management." (Jean. Dep.69:6-19). The PAQ—which he helped to develop—can be used to analyze any type of job, including that of truck driver. (*Id.*30:6-12, 66:15-68:9). He has not previously used the PMPQ to do a job analysis of truck drivers. (*Id.*188:17-20).

case 3:05-md-00527-RLM -CAN document 775 filed 07/02/07 page 11 of 21

*Enterprises Inc.*, 120 F.Supp.2d 672, 681-4 (M.D.Tenn.1999) ("anecdotal comments" from interviews with four restaurant managers not reliable evidence for whether all managers meet test for exemption); *Carlson v. C.H. Robinson Worldwide, Inc.*, 2005 WL 758601 at *4 (D.Minn) (expert #1's non-quantified list of "essential job functions" not reliable evidence for non-exempt status, expert #2's demonstrates no "reasoning or analysis" justifying "inferential leap" from "description of duties" to exempt "classifications"); *Marting v. Crawford & Co.*, 2004 WL 305724 at *3 (N.D.Ill) ("merely ... dividing [employee] tasks up and deciding if she exercised discretion and independent judgment in each category" not shown to be reliable method to find non-exempt status). Similarly, nowhere does FXG show that superimposing PMPQ category titles without recording or applying <u>any</u> quantitative standards is a "Generally Accepted Job/Work Analysis Method." Dr. Jeanneret's failure to weigh how often his subjects engaged in such activities as "Selects vehicle insurance vendor" (Jean.Rep. 14)—an activity the overwhelming majority of contractors engage only once in their entire career at FXG[4]—with "Unloads packages and transports to specified location" (*Id.* 19)—the primary activity drivers engage in every work day—makes his research virtually worthless for determining any similarities or differences among drivers.

**<u>Triangulation</u>:** In Dr. Jeanneret's Declaration, he argues for the first time that "it is possible to make certain conclusions about the FXG/FHD contractor population without conducting a statistical survey. This is the well-accepted method of triangulation." (Jean.Dec. ¶12).[5] Dr. Jeanneret defines triangulation—a term that appears nowhere in his Report or Deposition—as "making observations from multiple vantage points in order to increase

---

[4] Over 99% of FXG drivers sign up for vehicle insurance through the company when they sign their initial contract, PA19278-79, but Dr. Jeanneret nonetheless lists this "decision" as a **difference** among drivers and relies upon this single to find that drivers differ in their decision making processes.

[5] Even if he had performed a proper triangulation analysis, his failure to disclose his methodology in his Report is grounds for excluding it. *Ramsey, supra* at 1036.

judgmental accuracy, without having to follow the strictures of a survey." (*Id*). A recent case approving an expert's use of triangulation defined it as follows:

> Triangulation was taking different sources of data and relating the sources to each other to discern the presence of epistemological gaps, inconsistencies, or errors in knowledge or perceptions; if needed, additional data would then be collected.
>
> In forming his opinions, [the expert] used methods that are approved [in his field], including triangulation from different data sources, looking for inconsistencies and patterns, doing further research, and then looking for further corroboration for consistencies, to determine whether there is a consistent pattern over time.
>
> He used the protocol, or screening devices to assess [data he gathered] and he had special knowledge and training in the use of protocols and had in fact developed them. The techniques he utilized in evaluating the claim had been subject to peer review; the ... scale and the use of triangulation were classic techniques that were in the textbooks, and the instrument had quantitative scores.

*Garcia v. Los Banos U.S.D.,* 2007 WL 215526 at *11 (E.D.Cal).

By contrast, Dr. Jeanneret relied exclusively on his few interviews and failed to examine business records or any other data source to uncover any weaknesses. Moreover, he chose the framework of analysis only after he gathered his survey data, (Jean.Dep.189:24-190:9), essentially instructed his assistant to look for confirming data, (*Id.* 155:4-156:1), neglected to address the similarities as well as the differences among his research subjects in his report, and did no quantitative[6] analysis. (*Id.*188:24-189:12, 275:24-276:4). His methodology used only data from one vantage point, confirming preconceived conclusions, and hence not satisfying triangulation requirements.

**Objectivity:** Finally, Dr. Jeanneret asserts that the questions he asked were so "objective" that the answers could not have been biased. (Jean.Dec.¶9). However, his Interview

[6] Even claiming that the relative importance of a work task is purely quantitative, rather than qualitative, as suggested by Dr. Jeanneret, is unwarranted. How can a "decision" made once or twice in a multi-year career be as "important" for job analysis purposes as tasks performed hundreds of times each day. Surely, even without a quantitative analysis of the hours worked at each task, the general frequency of such tasks demonstrate whether they are even a regular or routine part of the work.

Guide demonstrates a willingness to prompt the answers the researchers wished to elicit.[7] (Jean.Rep.Appx.C). Overly suggestive survey questions have been found to be "merely transparent paths to a desired but artificial result," and thus inadmissible under *Daubert*. *Simon Property Group v. MySimon, Inc.*, 104 F.Supp.2d 1033, 1048, 1052 (S.D.Ind. 2000). Moreover, the summaries of the interviews relied on for the conclusions of the Report (Appx A) contain no answer to the most critical question – describe your work day – suggesting that the **focus** was on issued dubbed "managerial" rather than any objective assessment of the actual work performed.

### 2. FXG Falsely Claims Dr. Jeanneret Studied 107 Contractors

**Observation:** FXG asserts that "Dr. Jeanneret's team used a combination of interviews and direct observation" to "study the 21 contractors in Indiana and Illinois," (Op.6), during the period of December 13-15, 2006. (Jean.Rep.¶17), but this claim does not stand up to scrutiny. Only 9 of the 21 were interviewed by Dr. Jeanneret, the other 12 by his colleague Dr. McPhail. (Jean.Dep. 196:17-197:7). The 21, deemed "subject matter experts" ("SMEs"), were located exclusively in Indiana and Illinois, and selected for study by FXG and FXG's counsel. (Jean.Dep. 106:11-12). Dr. Jeanneret characterized the purpose of this fieldwork as "to go into the field ... to talk to **and observe** contractors in their work setting." (*Id.* 74:9-15, emphasis added). Of his 9 interviewees, Dr. Jeanneret himself interviewed only 2—Sam Cloud and Doug Mufuka—while they were driving a route. (*Id.* 158:1-163:25). These interviews lasted just over an hour each, (*Id.*), but not a single comment in Dr. Jeanneret's Report can be attributed to his actual observation of a FXG driver at work.[8] Dr. Jeanneret interviewed another 7 drivers either

[7] For example, Appendix C shows the questions which assumed facts and gave examples for the interviewer to refer to, such as: "Describe your business plan." "What business advice have you sought?" "Describe the "operational issues that you have to handle and what you do (e.g., truck breakdowns, accidents, package missing or damaged, unexpected traffic delays)" and "Describe the decisions or choices that you have to make on a daily basis" etc.

[8] In his description of his interviews with Cloud and Mufuka, Dr. Jeanneret fails to say one word about any package delivery or driving functions they performed, what trucks they drove or equipment they used, or any other aspect of

at an FXG terminal or a restaurant, (*Id.*), stating "it's **not important** to me to watch them driving a truck or delivering packages. That is not what was important to the answers to the questions we were asking." (*Id.* 167:25-168:12, emphasis added). Obviously, Dr. Jeanneret preferred to interview his subjects when they were **not** actually working and to rely on their answers rather than observe the work of package delivery being performed. (*Id.* 163:8-165:17). Thus, any claim that "observation" played any independent corroborative role in his conclusions, for purposes of "triangulation," is not established by the evidence.

Nor has FXG ever established—by documents or declaration—that Dr. McPhail ever "observed" any driver while at work. Dr. Jeanneret admitted that he did not know how many drivers Dr. McPhail rode along with, although he was willing to speculate (*Id.* 164:7-166:4) and took issue with Plaintiffs' asserted "disregard" of Dr. McPhail's so-called observation. (Jean.Dec. ¶6, n.2) Yet, no declaration from Dr.McPhail or any other admissible evidence was offered to substantiate that Dr. McPhail observed **any** driver at work and his notes do not indicate any ride-along or observation.

**<u>Non-Class Members</u>:** FXG misrepresents the status of a number of members of its sample of 21. Plaintiffs have shown—by name—that at least one-third of Dr. Jeanneret's sample consisted of individuals whose work activities are immaterial to the pending motions because they are not full-time drivers, (Pl.Br.2). But instead of dealing with this fundamental issue, FXG misrepresents to the Court that "it is not clear who or why plaintiffs are excluding from the 21 interviewees." (Op.10). Even if FXG chose to ignore those specifically named by Plaintiffs in their brief (see footnote 2), FXG could also have examined Dr. Jeanneret's Report for the obvious answer:

---

work that was observed. (Jean.Rep. p. 34, 36-37). In fact, from his "Brief Summaries of Interviewee Operations" (*Id.*), it is impossible to tell that any observation of work took place at all.

1. Jason Tinman "does not drive a regular route himself, serving rather as manager and occasional fill-in when drivers are not able to work," (Jean. Rep. at 29);
2. Sylvester Powell "drives when one of his drivers is unavailable, but otherwise his time is spent managing the business," (*Id.* at 30)'
3. Tom Harris "has not personally been driving since 2005," (*Id.* at 31);
4. Rich Kindred "drives the routes of other contractors when they are not working," (*Id.*);
5. Mark Bell "only drives when necessary," (*Id.* at 36);
6. Doug Mufuka "drives a route 2 or 3 days per week," (*Id.*); and
7. Jerry Michael is an "absentee contractor." (*Id.* at 37).[9]

By including so many of those within the small group of contractors who do not drive full time (or at all), Dr. Jeanneret has illustrated both the non-representative nature of the purported "SMEs" selected by defense counsel and undermined the relevancy of his study as a whole.

**Depositions:** The claim that Dr. Jeanneret studied 86 named Plaintiffs is trebly false, as only 56 depositions were actually reviewed, and only in a highly selective and cursory manner, by Dr. Jeanneret's assistant. [10] Dr. Jeanneret "did not read the depositions," (Jean.Dep. 153:2-17), but instead reviewed only a 7-page "summary," drafted by a graduate student from a cursory review of nearly 14,000 pages of testimony.[11] (Jean.Rep.Appx.D). Singletary's summary contains about 130 "citations" to those depositions, but in over 100 of these she provides no page or line references, only the deposition as a whole. (Jean.Rep.Appx.B,D). Moreover, the student simply extracted quotes that support FXG's position that Plaintiffs are independent contractors;

[9] In addition, Plaintiffs could legitimately have questioned inclusion in the class of 4 more of the 21: Steve Medina is not listed as a driver or non-driver, but "serves a single route ... using a single truck. ... He employs one full-time driver. ... He owns and manages two other businesses: 1). house rehabilitation and 2) pizza restaurant," (*Id.* at 32); E.J. Delbovi and Jim Arman are not listed as driver or non-driver, (*Id.* at33, 35); Wayne Morrison "after the current [December, 2006] peak season he intends to drive only on a 'fill-in' basis," (*Id.*).

[10] FXG's false claims regarding how many individuals Dr. Jeanneret studied are nothing new. In 5 of its Oppositions to Plaintiffs' Motions for Class Certification, FXG claims Dr. Jeanneret studied the "contractor population." (*Willis* (Penn.), p.15 n.18; *Fluegel* (Ill.), p. 16; *Larson* (Wisc.), p. 13; *Alexander* (Cal.), p. 14; *Slayman* (Or.), p. 18 n.11). In 4 others, FXG claims Dr. Jeanneret studied the "contractor population in Indiana and Illinois. (*Gennell* (N.H.), p. 20 n.18; *Harris* (Ark.) p.20 n.36; *Tierney* (R.I.), p.24 n.18; *Riewe* (Ind.), p.17 n.23). In none of its 16 Oppositions citing to Dr. Jeanneret's Report does FXG bother to reveal that the Jeanneret study included only 21 contractors or that the contractors were selected for him by FXG's counsel.

[11] In his deposition, Dr. Jeanneret conceded that he placed passing, if any reliance of the flimsy summary of the 86 depositions and would have reached the same conclusions without it: "If I didn't have them, I don't think my conclusions would have been any different." (Jean. Dep. 233:20-235:24).

no attempt was made to analyze the drivers' full testimony or identify any similarities among them. (*Id.*). She spent at most 65 hours reviewing over 290 hours of transcribed testimony, (Jean. Dep. 154:10-24), but, as Dr. Jeanneret admitted, she was "looking for very specific kinds of information...having to do with planning and scheduling." (*Id.* 155:4-156:1). Dr. Jeanneret admits that he did nothing to verify the accuracy of Singletary's conclusions other than to examine "the extent to which they tended to comply or comport with the information we were learning." (*Id.* 148:15-22, 153:23-154:9). As "corroboration," Appendix D utterly fails.

### 3. FXG Falsely Claims Dr. Jeanneret Looked for Similarities As Well As Differences in His "Sample" Of 21 Individuals

Dr. Jeanneret claims he looked for similarities as well as differences in his sample of 21, (Jean.Dec.¶3; Jean. Dep. 82:18-22), but identifies no such similarities in his Report, its appendices or in his Declaration. During his deposition, he identified one similarity only—the use of scanners, (*Id.* 78:21-79:6), but even this is not identified as a similarity in his Report. If Dr. Jeanneret did, in fact, **study** the similarities among the drivers, and **weigh** them against the perceived differences, then his Report omits any description of this vital aspect of his analysis, and must be excluded on this basis alone. *Ramsey, supra* at 1036. From review of the Report, Dr. Jeanneret failed to observe or learn of such obvious similarities as the size, configuration and physical layout of the trucks, the type or level of customer service, or methods of delivery, although he claims to have included questions about these areas in his Interview Guide. (Jean.Rep.Appx.C). The gap between the claimed study of similarities and the failure to include any reference to such study in the Report is a defect which is fatal to admissibility and cannot be ignored.

Similarly, Dr. Jeanneret's failure to review any FXG business records, policies or documents or to ask key questions about FXG's involvement in any aspect of the drivers' work

is notable and unexplained. Despite his Report's discussion of hiring of helpers or drivers, Dr. Jeanneret never asked or learned that if a driver wants to hire a helper, that helper must be approved by FXG. (*Id.* 246:3-9). He was aware that supplemental drivers needed to be approved by FXG, (*Id.* 246:10-16), but believed supplemental vehicles could be used without approval. (*Id.* 246:17-248:10). He was also unaware that FXG requires certification of any insurance purchased by a contractor, (*Id.* 248:11-21), determines windows of pickup and delivery times to which drivers must adhere, (*Id.* 248:22-249:25), or encourages contractors to use supplemental vehicles and drivers during peak times. (*Id.* 254:2-258:10). He did not know what percentage of contractors purchase vehicles from FXG, (*Id.* 264:5-9), lease vehicles from Bush leasing (*Id.* 263:12-17), participate in the Contractor Assistance Plan, (*Id.* 266:14-19), or were being reimbursed for their fuel costs above $1.25/gallon . (*Id.* 267:11-270:10). Dr. Jeanneret did not ask his subjects about these material aspects of their work lives. Thus Dr. Jeanneret's research and report was structured so that differences would be recorded and similarities downplayed or ignored. (Lew.Dec.¶55, use of categories so broad as to ensure the "artificial creation of perceived variation" and "differences likely to occur in any workplace.").[12]

### B. Under Settled Case Law the Deficiencies in Dr. Jeanneret's Methodology Preclude Admission of his Report

#### 1. FXG Fails to Address The Authority That Mandates Exclusion

Plaintiffs cited a wealth of authority showing that Dr. Jeanneret's Report does not meet the standards for admission under *Daubert.* (Pl.Br. 5-11). In its Opposition, FXG inexplicably

[12] Finally, Dr. Jeanneret admittedly made no comparison of the behaviors he observed even in his sample of 21 with those of employees of any firm in the package delivery industry. (Jean.Dep.213:10-14). He reported that some FXG contractors use accountants to pay their taxes and some fill out their taxes themselves, and that some have home offices and some do not, but his Report is silent on whether some employees do or do not engage in the same behaviors. (*Id.*214:20-215:19). Dr. Jeanneret also neglected to research whether employees at other package delivery firms—even FedEx Express—had any discretion over the sequencing of their routes. (*Id.* 216:24-219:17).

**ignores** the vast majority of these cases. For example, Plaintiffs showed that to be admissible, survey evidence requires a substantial showing of reliability. *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 552 (7th Cir. 1980). Survey evidence that is so flawed that it renders the results unreliable must be excluded. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.* 238 F.Supp.2d 1024, 1030 (N.D.Ill, 2003), *affd.* 354 F.3d 661 (7th Cir. 2004); *U.S. v. Southern Indiana Gas and Elec. Co.,* 258 F.Supp.2d 884, 895 (S.D.Ind. 2003). FDX does not bother to distinguish these cases; indeed, it does not cite a single case in Section II of its Opposition, where it argues that "this is not an issue of sampling." (Op. 12). Similarly, Plaintiffs showed that a report that simply lists job duties, prepared by an expert who did not analyze how the duties are carried out, is inadmissible. *Lang v. Kohl's Food Stores, Inc.* 217 F.3d 919, 924 (7th Cir. 2000). FXG also does not address this case, preferring instead to claim Dr. Jeanneret's work is defensible as a triangulation (Op. 12), but other than introducing this concept in its Opposition, it does not prove that any data source other than the interviews was ever reviewed.

**2. FXG Cites Authority Irrelevant To The Question Of Whether Dr. Jeanneret's Methodology Meets the Reliability Standards of *Daubert***

While ignoring cases cited by Plaintiffs that demonstrate the inadmissibility of Dr. Jeanneret's Report, FXG cites, and often misrepresents, a host of cases that bear on issues such as an expert's qualifications, experience, or use of hearsay, or the weight to be accorded the expert's testimony, issues not presented by Plaintiffs Motion. For example, in an attempt to explain away Dr. Lewin's critique of Dr. Jeanneret's failure to address whether FXG's selection of subjects could have biased his results, FXG inexplicably cites *Schering Corp. v. Pfizer, Inc,* 189 F.3d 218, 224-6 (2d Cir. 1999) (addressing how hearsay objections affect admissibility of surveys in trademark infringement cases), and *Reynolds v. Giuliani,* 118 F.Supp.2d 353, 366 n.9 (S.D.N.Y. 2000) ("the four factors listed [in the Manual for Complex Litigation] establish

benchmarks for assessing the reliability of any survey, irrespective of its methodology and objectives."). These cases do not address biasing of survey results.

FXG also cites *Dukes, supra* 474 F.3d at 1227—in which the court granted class certification to female employees bringing sex discrimination charges against a major corporation—for the proposition that "social scientist's testimony based on deposition testimony was reliable." (Op.7).[13] But Dr. Jeanneret based his conclusions exclusively on brief interviews of at most 14 class members and on depositions that he admittedly did not read, (Jean.Dep. 133:15-20), while the expert in *Dukes*:

> based his opinion on, among other things, [the corporation's] managers' deposition testimony; organizational charts; correspondence; memos; reports; and presentations relating to personnel policy and practice, diversity and equal employment opportunity issues; documents describing the culture and history of the company; and a large body of social science research on organizational policy and practice and on workplace bias.

*Dukes, supra*, 474 F.3d at 1226.

Although well aware that Dr. Jeanneret's qualifications are not at issue in this matter (Op.1), FXG cites several cases that address only the qualifications of the purported experts or the relevance of their testimony. *Comfort ex rel Neumyer v. Lynn School Comm.,* 283 F.Supp.2d 328, 360 (D.Mass 2003), cited for the reliability of "firsthand observations" (Op.6-7), addresses only the weight testimony of various experts should be given. *U.S. v. Hall.* 974 F.Supp.1198, 1205 (C.D.Ill. 1997), cited for the claim that "social scientists testify from a practical standpoint about the human behavior they observe," (Op.6), permitted an expert in police interrogation techniques to testify to the possibility a particular technique would elicit a false confession. The

[13] FXG cites another landmark case for female employees challenging the discriminatory policies of their employers, *PriceWaterhouse v. Hopkins,* 490 U.S. 228 (1989), for the unchallenged proposition that "a social scientist's perspective" can be relevant to certain cases. (Op.5). Methodology was not at issue when *Hopkins* reached the Supreme Court, because the employer's counsel "twice assured the [district] court that he did not question [the expert's] expertise ... and failed to challenge the legitimacy of her discipline." *Hopkins, supra* at 255.

expert "discussed his reluctance to state an ultimate opinion on whether a false confession has actually occurred in a particular case." *Id.* Dr. Jeanneret by contrast seeks to testify not to possibilities, but to ultimate facts regarding the similarities and differences among class members. (Op.10-11, 12-15).[14] *McCullock v. H.B.Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995), cited for the proposition that "interviews" are "accepted methods in the field of industrial psychology" (Op.6), involves a challenge only on relevance grounds. Only *Tyus v. Urban Search Mgt.,* 102 F.3d 256, 263 (7th Cir. 1996), cited for the unremarkable proposition that "genuine expertise may be based on experience or training" (Op.9), directly addresses the expert's methodology, which the court found to be "within the range contemplated by *Daubert* for expert scientific testimony." These cases do not prove that the expert here used reliable scientific menthods.

## III. CONCLUSION

For the reasons explained above, Dr. Jeanneret's Report should be excluded.

Dated: July 2, 2007

Respectfully Submitted,

**LEONARD CARDER, LLP**

/s/Lynn Rossman Faris
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

---

[14] FXG cites *U.S. v. Lundy,* 809 F.2d 392, 395-6 (7th Cir. 1987) for the proposition that "third party observations" are "accepted methods in the field of industrial psychology." (Op.6-7). The expert in *Lundy* testified that interviews with "many witnesses to a fire are a standard investigatory technique in cause and origin inquiries." *Lundy, supra* at 395. Dr. Jeanneret's Report, however, makes no use of third-party observations, as he primarily asks the individuals in his sample questions about themselves. (Lew.Dec.¶¶49-57, Jean.Rep.8, Jean.Dec.¶8). Similarly unavailing to its position is FXG's citation of *Flavel v. Svedala Indus., Inc.,* 875 F.Supp.550 (E.D.Wis. 1994), (Op.5), in which the court, at the class certification stage, dismissed a challenge to the statistical analysis used by the an expert largely because the methods "have been clearly tested and subjected to peer review, are generally accepted within the scientific community, and have a low rate of error in assessing the variables considered." *Id.* at 556-7.

| Susan E. Ellingstad<br>LOCKRIDGE GRINDAL NAUEN P.L.L.P.<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN 55401<br>Tel: (612) 339-6900<br>Fax: (612) 339-0981 | Robert I. Harwood<br>HARWOOD FEFFER LLP<br>488 Madison Avenue, 8th Floor<br>New York, NY 10022<br>Tel: (212) 935-7400<br>Fax: (212) 753-3630 |
|---|---|

PLAINTIFFS' CO-LEAD COUNSEL

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138
PLAINTIFFS' LIASION COUNSEL

case 3:05-md-00527-RLM-CAN document 775-2 filed 07/02/07 page 1 of 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**DECLARATION OF DOUG NORMAN IN SUPPORT OF PLAINTIFFS REPLY MEMORANDUM OF LAW TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. RICHARD JEANNERET**

I, Doug Norman, state:

1.      I work for Leonard Carder, LLP as a paralegal on the above-captioned case.

2.      Attached hereto as Exhibit A is a summary of the number of pages and approximate time spent in each of the depositions of the 56 named plaintiffs identified in the expert report of Dr. Richard Jeanneret, in Appendix B. There are only 56 named on that Appendix, not 86 as erroneously described in the Report. I reviewed each transcript to determine, and enter on an Excel spreadsheet, the total number of pages in the transcript. The total number of pages in the 56 named plaintiffs depositions is 13, 835.

3.      To determine the approximate time elapsed, I first identified whether the particular named plaintiffs' deposition was for 4-hours or 8-hours and I reduced that amount by the parties' agreed upon reservation of 10 minutes (4-hour depos) or 20 minutes (8 hour depositions) for opposing-party examination. The approximate time elapsed during these 56 deposition was 291 hours and 20 minutes.

I swear under penalty of perjury under the laws of the United States that the foregoing facts are true and correct of my personal knowledge and if called to testify, I would testify thereto.

Executed at Oakland, California on July 2, 2007

Doug Norman

# EXHIBIT A

JEANNERET REPORT
Appendix D, Plaintiffs Depos Reviewed

| Plaintiff | # Pages | # Hours (approx.) |
|---|---|---|
| Andrade, Suzanne | 179 | 3:50 |
| Azzato, Randy | 183 | 3:50 |
| Bacani, Ricardo | 280 | 7:40 |
| Bell, L.C. | 183 | 3:50 |
| Bergkamp, Neal | 224 | 7:40 |
| Berry, Keith | 104 | 3:50 |
| Bunger, Kimberly | 199 | 3:50 |
| Carter, Jeff | 197 | 3:50 |
| Cook, Matthew | 188 | 3:50 |
| Cucinotti, Frank | 285 | 3:50 |
| Currithers, Percival | 167 | 3:50 |
| Engbrecht, Darrell | 155 | 3:50 |
| Erbentraute, Robert | 204 | 3:50 |
| Farland, Sammy | 169 | 3:50 |
| Fleming, Theodore | 235 | 7:40 |
| Gennell, Robert | 329 | 7:40 |
| Ginet, Alan | 199 | 3:50 |
| Gray, Reginald | 392 | 7:40 |
| Guillet, Ronald | 194 | 3:50 |
| Harting, Sheree | 256 | 7:40 |
| Hawkins, Tyrone | 262 | 7:40 |
| Henderson, Jerrett | 305 | 7:40 |
| Holmes, Marcus | 214 | 3:50 |
| House, Charles | 183 | 3:50 |
| Howell, Frederick ("Dea | 204 | 3:50 |
| Humphreys, Johnny | 307 | 7:40 |
| Ines, Ely | 430 | 7:40 |
| Infantino, Paul | 374 | 7:40 |
| Larson, Gary Lee | 194 | 3:50 |
| Lavake, Daniel | 155 | 3:50 |
| Lupo, Dominic | 181 | 3:50 |
| Lynch, Francis | 366 | 7:40 |
| Malkin, Charles | 405 | 7:40 |
| McClafferty, Donald | 185 | 3:50 |
| McHenry, Dennis | 304 | 7:40 |
| McMahon, David | 508 | 7:40 |
| Meredith, William | 231 | 3:50 |
| Mershon, Timothy | 165 | 3:50 |
| O'Brien, Sylvia Kay | 222 | 3:50 |
| Pacheco, Alan | 415 | 7:40 |
| Padilla, Jesse | 178 | 3:50 |
| Patton, Roy | 174 | 3:50 |
| Quimby, Natasha | 200 | 3:50 |
| Rodriguez, Joey | 188 | 3:50 |
| Ross, Allan | 392 | 7:40 |
| Sheehan, Edward | 385 | 7:40 |
| Slayman, Edward | 169 | 3:50 |
| Swazey, Donald | 202 | 3:50 |
| Taylor, Robert Lee | 204 | 3:50 |
| Tichenor, James | 190 | 3:50 |
| Tofaute, Michael | 214 | 3:50 |
| Tucker, Chad | 214 | 3:50 |
| Upman, Troy | 212 | 3:50 |
| Viereck, Chad | 158 | 3:50 |
| Westcott, Tom | 328 | 7:40 |
| Willis, Derek | 495 | 7:40 |
| **TOTALS:** | **13835** | **291:20** |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**CERTIFICATE OF SERVICE**

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **July 2, 2007**, I served the following document(s):

1. Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion to Exclude the Expert Report of Dr. Richard Jeanneret;

2. Declaration of Doug Norman; and

3. Proof of Service

I, Lorelei Badar, hereby certify that on July 2, 2007, I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| | |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |

| Jerald R Cureton | jcureton@curetoncaplan.com |
|---|---|
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |

| J Gordon Rudd | jgr@zimmreed.com |
|---|---|
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

///

///

///

I also certify that on **July 2, 2007,** I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

_X__ **BY REGULAR MAIL:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on July 2, 2007.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**PLAINTIFFS REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF ROBERT CRANDALL**

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. Defendant's Opposition Fails to Show that Crandall Is Qualified as an Expert in The Relevant Fields of Survey Research, Economics, or Statistics ..... 2

1. Mr. Crandall's "Experience" Is Insufficient to Be Certified As An Expert in The Fields In Which He Offers His Unsupported Opinions ..... 3

2. Defendant's Cited Cases Demonstrate Mr. Crandall's Lack of Sufficient Qualifications Under Rule 702 ..... 4

B. Defendant's Opposition Misrepresents Crandall's Use Of An Unrepresentative Sample And Dismissal Of Unfavorable Data As "Reliable" Methodology Under The Standards Of *Daubert* and *Kumho Tire* ..... 5

1. Defendant Misrepresents Irrelevant Authority as Supporting Crandall's Use Of An Unrepresentative Sample And Dismissal Of Unfavorable Data In His Analysis Of Route "Sales" ..... 6

2. Defendant Misrepresents Seventh Circuit Authority As Holding That An Expert's Conclusions Are Admissible Even When The Methodology Used Is Shown To Be Unreliable ..... 8

3. Defendant's False Claim That Mr. Crandall Does Not Generalize From His Survey To The Entire FXG Driver/Contractor Population Must Be Rejected ..... 10

C. Nor Does Mr. Crandall's Methodology In Analyzing Gross Income Withstand Scrutiny ..... 11

D. Defendant Mistakenly Claims That The Flaws In Mr. Crandall's Methodology Go To Weight, Not Admissibility ..... 13

E. Crandall's Declaration Fails To Remedy The Deficiencies In His Methodology And Instead Attacks Plaintiffs' Experts ..... 13

III. CONCLUSION ..... 14

# TABLE OF AUTHORITIES

Federal Cases

*Ashland Oil Inc. v. Delta Oil Prods. Corp.*
685 F.2d 175 (7th Cir. 1982) .......... 4

*Baumholser v. Amax Coal Co.*
630 F.2d 550 (7th Cir. 1980) .......... 8

*Buscaglia v. United States*
25 F.3d 530 (7th Cir. 1994) .......... 12-13

*Clark v. Takata Corp.*
192 F.2d 750 (7th Cir. 1999) .......... 5

*Comfort ex rel Neumyer v. Lynn School Comm.*
283 F.Supp.2d 328 (D.Mass 2003) .......... 9, 10

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993) .......... 1

*Fuesting v. Zimmer, Inc.*
421 F.3d 529 (7th Cir. 2005) .......... 12

*Gutierrez v. Johnson and Johnson*
2006 WL 3246605 at *2 (D.N.J.) .......... 6, 7

*Halvorsen v. Lettuce Entertain You Ent.*
2004 WL 542526 at *2 (N.D.Ill 2004) .......... 9

*Hawthorne Partners v. AT&T Techs Inc.*
1993 WL 311916 at *3 (N.D. Ill.) .......... 4

*In re Visa Check/Master Money Antitrust Litig.*
280 F.3d 125 (2d. Cir. 2001) .......... 6

*James Burroughs, Ltd. v. Sign of the Beefeater, Inc.*
540 F.2d 266 (7th Cir. 1976) .......... 7

*James v. Marten Transport*
2006 WL 3755322 at *2 (N.D. Ind.) .......... 1

*Kauffman v. Federal Express Corp.*
2007 WL 1062591 at *2 (C.D. Ill.) .......... 4

case 3:05-md-00527-RLM-CAN document 77-2 filed 07/02/07 page 4 of 24

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) .......... 5

*Market v. Marsh Supermarkets*
2005 WL 2154667 at *2 (N.D. Ind.) .......... 5

*McClain v. Metabolife*
401 F.3d 1233 (11th Cir. 2005) .......... 1

*McCullock v. H.B.Fuller Co.*
61 F.3d 1038 (2d Cir. 1995) .......... 9

*Naeem v. McKesson Drug Co.*
444 F.3d 593 (7th Cir. 2006) .......... 12

*Norwest Bank v. Kmart Corp.*
1997 WL 33479072 (N.D. Ind.) .......... 2

*Olinger v. U.S. Golf Association*
52 F.Supp.2d 947 (N.D.Ind. 1999) .......... 2

*Oshana v. Coca-Cola*
2005 WL 1661999 (N.D. Ill.) .......... 4

*Painter v. Marshall Field Co.*
646 F.2d 271 (7th Cir. 1981) .......... 14

*Ramsey v. Consol. Rail Corp.*
111 F.Supp.2d 1030 (N.D. Ind. 2000) .......... *passim*

*Rosen v. Ciba-Geigy Corp.*
78 F.3d 316 (7th Cir. 1996) .......... 2

*Simon Property Group L.P. V. mySimon, Inc.*
104 F.Supp2d 1033 (S.D. Ind. 2000) .......... 13

*Smith v. Ford Motor Co.*
215 F.3d 713 (7th Cir. 2000) .......... 1, 13

*Spraying Sys. Co. v. Delavan, Inc.*
975 F. 2d 387 (1992) .......... 13

*Standard Oil of Cal. v. Moore*
251 F.2d 188 (9th Cir. 1957) .......... 9

Case 3:05-md-00527-RLM-CAN document 77-2 filed 01/02/07 page 5 of 24

*Stutzman v. CRST*
997 F.2d 291 (7th Cir. 1993) ........ 13

*Tuf Racing Prods. v. Am. Suzuki Motor Corp.*
223 F.3d 585 (7th Cir. 2000) ........ 4, 8

*Turner v. Murphy Oil USA, Inc.*
2006 WL 91364 at *4 (E.D. La.) ........ 6

*Tyus v. Urban Search Mgt.*
102 F.3d 256 (7th Cir. 1996) ........ 9

*U.S. v. Lundy*
809 F.2d 392 (7th Cir. 1987) ........ 9

*United States v. So. Indiana Gas and Elec. Co.,*
258 F. Supp. 2d 884 (S.D. Ind. 2003) ........ 5, 13

*Zenith Elecs. Corp. v. WH-TV Broad. Corp*
395 F.3d 416 (7th Cir. 2005) ........ 12

*Zenith Electronics v. WH-TV*
2003 WL 21506808 (N.D. Ill.), aff'd, 395 F.3d 416 (7th Cir. 2005) ........ 1

## I. INTRODUCTION

In its Opposition to Plaintiffs' Motion, FedEx fails to demonstrate that its proffered expert is qualified under Rule 702 or has performed his analysis using scientific methodology in the reliable manner required by *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993). Instead, apparently hoping to gain by repetition what it cannot obtain by analysis, FXG simply repeats the opinions and reasserts, *ipse dixit,* its claim that Mr. Crandall and his methodology do meet the *Daubert* standards, as if saying so makes it so. FXG offers a fifty-page declaration (replete with irrelevant attacks on Plaintiffs' experts, argumentative hypotheticals and poor analogies) arguing that Plaintiffs were required to replicate his surveys *using proper methodology* to prove his conclusions wrong. (Crandall Dec., ¶¶ 9, 11, 23, 35, 48, 52, 60, 62, 67, 68).

But that is not the law. Defendant, as the proponent of these opinions, bears the burden of proving compliance with Rule 702 by a preponderance of the evidence. *James v. Marten Transport,* 2006 WL 3755322 at *2 (N.D. Ind.), citing *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000)(the opponent "has no burden to do anything more than object[.];" *Zenith Electronics v. WH-TV*, 2003 WL 21506808 (N.D. Ill.), *aff'd*, 395 F.3d 416 (7th Cir. 2005); *McClain v. Metabolife,* 401 F.3d 1233, 1238 n.2 (11th Cir. 2005) ("Th[e] burden clearly rests with the proponent of that expert.").

Moreover, the new declaration fails to offer additional admissible evidence supporting the expert's qualifications and fails to rebut the faults in the original report. Finally, FXG ignores Plaintiffs' applicable authorities and instead cites to—and misrepresents—a wealth of other authority, the majority of which is either irrelevant or supportive of Plaintiffs' argument for

exclusion of Crandall's Report. Accordingly, the court should exclude the Crandall's Report relied upon by FXG in opposition to class certification.

## II. ARGUMENT

FXG must show both expert qualifications and proper methodology, not one or the other. "Adequate expertise is only a necessary constituent of a foundation under Rule 702; it is not sufficient alone." *Olinger v. U.S. Golf Association,* 52 F.Supp.2d 947, 949 (N.D.Ind. 1999). *See also Norwest Bank v. Kmart Corp.* 1997 WL 33479072 (N.D. Ind.), citing *Rosen v. Ciba-Geigy Corp.* 78 F.3d 316, 319 (7th Cir. 1996) ("The Seventh Circuit requires even the most esteemed expert to establish a nexus between the opinion and the established scientific principle and methodology.") As Plaintiffs explain, FXG failed on both counts.

### A. Defendant's Opposition Fails to Show that Crandall Is Qualified as an Expert in The Relevant Fields of Survey Research, Economics, or Statistics

FXG has failed to show that Mr. Crandall has sufficient knowledge, skill, education or training, whether formal or informal, to warrant admission of his opinions about survey research, statistics or economics admissible under Rule 702. FXG identifies no courses, seminars, publications, professional awards or recognition of Mr. Crandall's work in any of the relevant fields. Thus, FXG is left to argue his experience working exclusively for a few litigation support companies alone qualifies him under Rule 702.[1] But FXG has failed to show even sufficient work experience the fields of survey research, statistics or economics to certify him; his expertise in calculating damages or discriminatory impact is of no use in supporting the opinions offered

[1] Comparison of Mr. Crandall's resume with those of FXG's other experts -- Dr. Jay and Dr. Jeanneret – and Plaintiffs' experts, Dr. Lewin and Mr. Regan, whose education, study, publications, awards, professional standing and extensive prior testimony in their fields, demonstrate that Mr. Crandall's "qualifications" are insufficient. Ironically, Dr. Jay, on FXG's behalf, questions the unassailable credentials of Plaintiffs' expert, Dr. Lewin, on the basis that he has not assertedly taught survey methods **recently** enough. By Dr. Jay's standards, Mr. Crandall, who has never even taken a graduate course on survey methods, let alone taught one, never published a single academic article in the field, never read a book he could identify on the subject, simply fails to have the background and knowledge of an expert witness.

here. Clearly, mere partnership in a litigation support company fails to support any inference that he is an economist or econometrician, a survey expert or a statistician.

**1. Mr. Crandall's "Experience" Is Insufficient to Be Certified As An Expert in The Fields In Which He Offers His Unsupported Opinions**

Defendant claims experience with employment status – i.e., that "Crandall has proffered expert opinions in approximately three [unspecified] matters relating to a party's employment or contractor status." (Op.6-8) FXG omits to mention that in all three, his testimony was offered by FedEx to show that FedEx drivers were independent contractors: (1) *FedEx Ground Package Systems* Cal. Employment Development Department Case No. 1485661 (2006), (2) *FedEx Ground Package Systems,* National Labor Relations Board Case No 4-RC-20994 (2005), (3) *John M. Tolen v. FedEx Ground Package Systems, Inc,* Case No. 155188. (Attachment to Crandall Resume "Testimony & Affidavits," last two pages of Report) The fact that Mr. Crandall has only previously testified about employment or contractor status *for FedEx* actually shows a lack of broad-based experience with employment status issues. Moreover, in both of the adjudicated cases[2], the trier of fact rejected Crandall's opinions that FXG drivers were independent contractors and found them to be employees. (Cr. Dep. 50:21-53:13, 57:8-59:7)

FXG similarly misleads the court about Mr. Crandall's limited experience providing "trial testimony," claiming he has "been qualified as an expert and provided trial testimony on five occasions." (Op.6) His resume shows four experiences as a trial expert, each involving testimony about damages, none on the topic of employment status, surveys or statistics and in only one case some unspecified aspect of "business valuation." (Resume Attachment, *Hartzler*, *Issaian*, *Chavez*, *Mellinger* cases) FXG provides the court with no information about whether Mr. Crandall's expertise was challenged or ruled upon in any of these cases and no evidence that

[2] The Tolen case did not go to trial and Mr. Crandall's "testimony" was at deposition only. (Appd to Report)

**any** court has ever "certified" him as an expert after a *Daubert* challenge. Considering the importance FXG attaches to this Report, the failure to offer stronger proof is a concession.

Finally, FXG is left defending its "expert" based on his limited experience with only a few surveys. Crandall claims sufficient expertise in survey design, administration and analysis based on having been involved, in some ill-defined fashion, in "between 15 and 20 surveys related to class certification," without providing any information about the role he played in these to allow the reader to judge its veracity. Moreover, Mr. Crandall's 11-page resume includes reference to only seven surveys (p., 4, 5, 9), six of which examined misclassification of managers as exempt from overtime and one other unrelated survey (regarding "redemption patterns"). Experience of such limited type and ranges hardly makes Mr. Crandall an "expert" in survey design, administration and analysis, let alone business valuation or labor economics.

**2. Defendant's Cited Cases Demonstrate Mr. Crandall's Lack of Sufficient Qualifications Under Rule 702**

FXG cites cases regarding qualifications which demonstrate that Mr. Crandall's credentials are inadequate; the experts in those cases had qualifications in relevant fields which were in no way comparable to Mr. Crandall. *Tuf Racing Prods. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000) (CPA had proper academic credentials to testify about damage calculations); *Oshana v. Coca-Cola,* 2005 WL 1661999 at *3, 7-8 (N.D.Ill)(eminently qualified PhD in Marketing had formal education in survey methodology, academic awards and honors, was not disqualified by lack of *recent* publications or *recent* teaching experience); *Ashland Oil Inc. v. Delta Oil Prods. Corp.* 685 F.2d 175, 178 (7th Cir. 1982)(expert testimony of PhD in Chemistry, specific teaching experience in the relevant field and extensive technical publications was admitted without objection); *Hawthorne Partners v. AT&T Techs Inc.,* 1993 WL 311916 at *3 (N.D. Ill)(expert with graduate degree and extensive experience in real estate appraisal was

qualified despite lack of experience with appraisal of environmentally contaminated property); *Kauffman v. Federal Express Corp.*, 2007 WL 1062591 at *2 (C.D. Ill.)(expert with graduate degree and extensive experience in many aspects rehabilitation counseling was qualified to testify about efforts of uninjured worker to obtain employment) But FXG cannot show that Mr. Crandall's credentials or experience in the field covered by his opinions match up to the experts in these cases. Finally, *Market v. Marsh Supermarkets*, 2005 WL 2154667 at *2 (N.D. Ind.) is irrelevant as the expert's qualifications were not challenged and opinion offering only the "bottom line" excluded as not "helpful" to the court.

**B. Defendant's Opposition Misrepresents Crandall's Use Of An Unrepresentative Sample And Dismissal Of Unfavorable Data As "Reliable" Methodology Under The Standards Of *Daubert* and *Kumho Tire***

The proponent of expert testimony must show that it is "not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The objective of the reliability requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Clark v. Takata Corp.,* 192 F.2d 750, 756 (7th Cir. 1999), quoting *Kumho, supra* at 152. FXG has failed to show that either Mr. Crandall's 5-minute telephone survey regarding the value of the FXG routes it gives away for free or the conclusions he draws from his "analysis" of the gross earnings of drivers rise to the required level of intellectual rigor. *United States v. So. Indiana Gas and Elec. Co.*, 258 F. Supp. 2d 884, 895 (S.D. Ind. 2003) (excluding survey evidence where the infirmities were "substantial and fundamental," rendering the survey "inherently untrustworthy" and admission a waste of the court's time); *Ramsey v. Consol. Rail Corp.,* 111 F.Supp.2d 1030, 1036 (N.D. Ind. 2000) (excluding expert testimony that omits "steps" necessary to the conclusion).

FXG ignores all of Plaintiffs' authority (citations at page 11 of Plaintiffs' Opening Brief) which require exclusion of the fatally-flawed survey and attempts to sidestep the flaws in Crandall's methodology employed in reviewing driver gross income. Instead, FXG argues that "a full review of the testimony under *Daubert* may be inappropriate at [the class certification] stage." This contention does not stand up to scrutiny. In *In re Visa Check/Master Money Antitrust Litig.,* 280 F.3d 125, 135 (2d. Cir. 2001), "the district court, in an almost fifty page opinion, carefully considered each of the [opponent's] criticisms of [the expert's] theory and [the expert's] response to each of these criticisms." Comparable inquiries into the reliability of the experts' methodology appear to have been made in *Gutierrez v. Johnson and Johnson,* 2006 WL 3246605 at *2 (D.N.J.), and *Turner v. Murphy Oil USA, Inc.,* 2006 WL 91364 at *4 (E.D.La). Moreover, the gross deficiencies in this report make it inadmissible under even the most relaxed *Daubert* standard.

Defendant's response to Plaintiff's critique of Crandall's methodology is twofold. In Sections II.A and II.C., Defendant, *ipse dixit,* asserts that Crandall's unscientific methodology actually is reliable enough. (Op.14-16, 17-19). In Section II.B, FXG makes the alternative, absurd and specious argument, without legal support, that even if Crandall's survey design and analysis are so fatally flawed as to bar the survey's admission, nonetheless Mr. Crandall as an 'expert" may rely on them anyway as "hearsay." (Op.15). As Plaintiffs establish below, these arguments rest on fallacious assertions and must be rejected.

**1. Defendant Misrepresents Irrelevant Authority as Supporting Crandall's Use Of An Unrepresentative Sample And Dismissal Of Unfavorable Data In His Analysis Of Route "Sales"**

Defendant reiterates Crandall's unsupported opinion that "contractors have equity in their property and the opportunity for profit and loss, such that they operate businesses and are not

subject to common, systematic FedEx Ground policies that treat them as employees instead of contractors." (Op.10). In support of admission of this sweeping and unsupported opinion, Defendant cites *Ramsey v. Consol. Rail Corp.*, 111 F.Supp.2d 1030, 1036 (N.D.Ind 2000), a case in which this Court excluded an expert's testimony because "the record identifies no scientific principle on which [the expert] based the critical last step of his analysis." *Ramsey* plainly supports exclusion here as no scientific principle justifies this generalization to the FXG driver population based on a flawed non-representative survey of 146 out of the thousands who allegedly "bought" or "sold" routes. (Lewin Dec. 36-48; Regan Dec. ¶¶ 10-12, 31-58).

In defense of Crandall's omission of unfavorable data in his survey –routes which were given away for free or abandoned -- Defendant cites *Gutierrez* 2006 WL 91364, *supra* at *6 for the proposition that an expert may use "professional judgment in deciding what control variables to include in her analysis." (Op.11-12). But *Gutierrez* involved a challenge to an expert's failure to gather data on particular variables, *Id.* at *5. Here, Plaintiffs have critiqued Crandall's analysis for simply ignoring data that Crandall himself gathered, but that undermined his predetermined conclusions. (Pl.Br.15-16). *Gutierrez* does <u>not</u> hold that the expert was entitled to ignore data gathered which supported the opposite conclusion.

Inexplicably, Defendant cites *James Burroughs, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) in an attempt to justify the design, administration, and analysis of Crandall's telephone survey. Defendant perhaps neglected to notice that in *Burroughs*, the survey "comprised a face-to-face interview with 500 heads of household" who had been "selected by a complex probability sampling procedure." *Id.* at 277. All 500 were interviewed by an experienced interviewer who recorded their responses verbatim. *Id.* at 278. Over 70% of respondents were reinterviewed to confirm their responses. *Id.* But Mr. Crandall's survey did

not use a probability sampling procedure or reinterview any respondents; instead a mere 146 out of 2900 contacts responded, many of whom could not provide reliable information, and Mr. Crandall's "analysis" of the data deliberately omitted unfavorable results. Thus, *Burroughs* does not counsel consideration of such "junk science." See *Tuf Racing Products, Inc. v. American Suzuki Motor, supra,* 223 F.3d at 591; *FJC's Survey Guide*, at pp. 229-276. [3]

### 2. Defendant Misrepresents Seventh Circuit Authority As Holding That An Expert's Conclusions Are Admissible Even When The Methodology Used Is Shown To Be Unreliable

In a desperate attempt to salvage Mr. Crandall's poorly grounded opinion, FXG claims that it "does not seek to admit Crandall's telephone survey results on their own." (Opp. 15). This is pure misdirection. In 17 of Defendant's 29 Oppositions to Plaintiff's Motions for Class Certification, Defendant has cited **directly** to the survey data in Crandall's Report.[4] Secondarily FXG claims that "even if the survey itself was not admissible because of some alleged flaw, Crandall would still be entitled to rely on it in forming his opinions." (*Id*). Not so.

FXG unjustifiably claims that reasonable experts can rely on unrepresentative flawed survey results. Its citation to *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552-3 (7th Cir. 1980) does not support FXG's claim that Mr. Crandall could rely on his inadmissible survey as proper hearsay. *Baumholser* held that a survey "of a type reasonably relied upon by other experts in the field," could be relied upon even if it failed to meet Rule 702 standards. Unlike this case, the expert showed through uncontradicted and unrebutted evidence that the survey was similar to

[3] FXG also attempts to justify Mr. Crandall's "survey" of small messenger services (Opp, 3) by claiming they are more analogous to FXG driver "businesses;" this assumes instead of proving the conclusion. By ignoring UPS or FedEx Express drivers, whose work daily work for FXG's competitors, Mr. Crandall compares apples to oranges and finds them to be "different."

[4] Exhibits 25 to 32 of Crandall's Report present data gathered during his telephone survey. Defendant cite to Crandall's Exhibits in its Oppositions to Plaintiffs' Motions for Class Certification as follows: Md.: Exh. 26-32; N.H.: Exh. 26, 30; Penn.: Exh. 26, 27, 30, 31; Ark., Tx.: Exh. 26-30; Miss., Mont., R.I., Va., W.Va.: Exh. 26-29; Cal., Ind., Iowa, Kan., Mass., S.D., Fla.: Exh. 30.

one "conducted by the Atomic Energy Commission . . ." As such, "it more than satisfied the threshold inquiry as to whether other experts would rely upon it." *Id. Baumholser* thus provides no support for Mr. Crandall's reliance on his own inadmissible, poorly designed and executed telephone survey; to the contrary, it is clear that competent experts would not generalize to a huge population based on such grossly non-representative results. Lewin Dec., ¶ 37- 48.

FXG's reliance on *U.S. v. Lundy,* 809 F.2d 392, 395-6 (7th Cir. 1987) is similarly misplaced. (Op.17). The expert in *Lundy* testified that interviews with third-party observers of "a fire are a standard investigatory technique in cause and origin inquiries." *Id.* at 395.[5] No evidence of any similar reliance supports use by Crandall of results of a survey that itself cannot be admitted because it fails to meet Rule 702 standards.

None of Defendant's cases authorize an expert to rely on unscientific research methodology. *Tyus v. Urban Search Mgt.,* 102 F.3d 256, 263-4 (7th Cir. 1996), for example, found that the proffered expert used methodology "within the range contemplated by *Daubert* for expert scientific testimony," but makes no mention of any "infirmity." Nor does *McCullock v. H.B.Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995) advance FXG's argument. There the court admitted expert testimony because the expert used "factors grounded in academic and personal experience;" the expert's testimony was challenged based on relevance, not unreliability. *Id.* FXG cites *Comfort ex rel Neumyer v. Lynn School Comm.,* 283 F.Supp.2d 328, 360 (D.Mass 2003), for the contention that "'firsthand observations of the conditions,' along with 'years of expertise in their fields[] [and] and armful of social science literature, including social and developmental psychology' could be the basis for expert opinion." (Op.18). *Comfort* does not

---

[5] Unlike the witnesses in *Lundy*, Crandall's interviewees were asked to recall information in a five-minute telephone call from years earlier. Defendant's other citations are to similarly irrelevant cases: *Standard Oil of Cal. v. Moore,* 251 F.2d 188, 222 (9th Cir. 1957) and *Halvorsen v. Lettuce Entertain You Ent.,* 2004 WL 542526 at *2 (N.D.Ill 2004).

cite *Daubert,* nor was admissibility even at issue. Defendant's citation addresses the weight, not the admissibility, of the experts' testimony.

### 3. Defendant's False Claim That Mr. Crandall Does Not Generalize From His Survey To The Entire FXG Driver/Contractor Population Must Be Rejected

FXG misleads the court when it contends that Plaintiffs "misunderstand ... Crandall's opinion and how he used the telephone survey to support his opinions." (Op.10). The focus of Crandall's survey is now alleged to have been whether there is any "market for contractors' routes" and whether "those routes [are] exchanged for consideration,"[6] with the sample's non-representativeness alleged to be irrelevant to Crandall's conclusions. (*Id.*). In his new Declaration, Mr. Crandall claims that his goal in conducting the survey was never to "generalize to the overall population of all routes." (Crandall Dec., ¶¶ 61, 64). However, Defendant's Opposition is replete with just such generalizations to the overall population of drivers/contractors, including:

- "Crandall's Report and his survey of independent contractors reveals that ... contractors have equity in their property and the opportunity for profit and loss, such that they operate businesses and are not subject to common, systematic FedEx Ground policies that treat them as employees instead of contractors." (Op.10).
- "Crandall's core opinion is that the routes are **regularly** bought and sold, and as a result the contractors have an equity value in their business." (Op.11, emphasis added).
- "'[M]y purpose there was to assess whether or not there's evidence that these routes have value and whether or not there's evidence that there's a market for these routes, and my opinion is, yes, there is.'" (Op.12, quoting Crandall Deposition (hereafter "Cr.Dep." At 324-5).

[6] If this statement were truly the extent of Crandall's opinion, then it should be excluded on relevance grounds. No particular expertise is required to determine that, on occasion, routes have been purchased or sold; this undisputed fact is established by testimony of several named plaintiffs who were unfortunate enough to have spend hard-earned money acquiring such routes. But that **is not** all Mr. Crandall concludes; instead he says the fact that these routes have on occasion been sold means that these are separate "businesses." But as Mr. Regan demonstrates, these "surveys" fail 1) to provide any data regarding the frequency of such sales or 2) to establish that FXG's approval process does not control such sales and 3) contrast with FXG's practice of giving the routes away for free, thus undermining Crandall's unsupported conclusion that routes have "equity" and must be valued as "businesses."

- "An individual contractor's decision to abandon his route does not alter the fact that contractors **regularly** buy and sell routes for consideration." (Op.14, emphasis added).

- "Similarly, the decision by FedEx Ground to offer routes to contractors for free does not undercut the existence of a market for routes." (Op.14).

- "What is undisputed is that after FedEx Ground gives the contractor the route, the contractor has the ability to grow and develop that route, and to sell all or part of the route to another contractor at a market-determined price." (Op.14, citing Cr.Decl.¶¶ 38-39, 49-51). "Crandall's survey shows that contractors in different areas exercise that right." (Op.14).

Plaintiffs have previously shown that these gross generalizations from Crandall's survey are entirely unscientific due to the non-representativeness of his sample and other flaws in design and analysis. Such generalizations do not become reliable simply because their proponent asserts that no generalizations are being made.[7]

## C. Nor Does Mr. Crandall's Methodology In Analyzing Gross Income Withstand Scrutiny As Scientific.

FXG grossly exaggerates the reliability, as well as the importance, of Mr. Crandall's statistical analysis of gross income variation and his conclusion that this demonstrates that FXG drivers cannot be employees. FXG simply ignores all of Plaintiffs' authority (cited at p. 17 of its brief), as well as the essence of the flaws identified in the Declaration of Paul Regan, CPA, at ¶¶ 14-16, 18-23 and 42-43) choosing instead to sidestep the report's utter failure to statistically support its essential claim that the asserted income variations arise from "strategic" decisions by the drivers. (Opp. 17-19) The "statistical" analysis of income variation speculates about contractor-specific factors and route-specific factors with no data or analytical framework and failed to even identify, let alone test, alternative explanations and is therefore inadmissible

[7] Mr. Crandall's "market multiples" approach exemplifies how unreliable his methods are. With only a handful of cases involving driver responses claiming that the price set for a route related in some vague way to the gross or net income earner on it, Mr. Crandall backs his way into multiple graphs and pages of testimony about use of an entirely fictitious market multiple approach that is unsupported in any way. (Regan, ¶¶38, 39) This is pure "junk science."

conjecture, not science. Hence under *Ramsey v. Consol. Rail Corp.,* 111 F.Supp.2d 1030, 1036 (N.D. Ind. 2000) it is inadmissible.

FXG ignores the holdings of*Naeem v. McKesson Drug Co.,* 444 F.3d 593 (7th Cir. 2006), *Fuesting v. Zimmer, Inc.,* 421 F.3d 529(7th Cir. 2005) and *Zenith Elecs. Corp. v. WH-TV Broad. Corp,* 395 F.3d 416 (7th Cir. 2005) which hold that for expert testimony to be admissible, it **must** account for the major factors affecting the results and be based on valid testing and analysis, not simply the expert's say so. Thus, Mr. Crandall's analysis should have taken into account proper comparison and testing of piece rate workers, various distinct elements of the income paid by FXG for some expense items like fuel, and involved proper comparison to similarly situated employees. (Regan Dec., ¶18-23) Although FXG and Mr. Crandall claim that he "tested" alternative explanations – such testing, if it was conducted, is entirely missing from his report. In fact, nothing more than his bald conclusion that FXG contractors' "strategic decisions" drive their income appears in the report or FXG's Opposition. As this Court has previously noted, where such an important step to the expert's conclusion is not apparent from the report, the report should be excluded. *Ramsey v. Consol. Rail Corp.,* 111 F.Supp.2d 1030, 1036 (N.D.Ind 2000).

There are so many methodological problems with the income "variation" analysis –from failure to identify the key elements of driver pay, to the failure to obtain data from FXG about its control over package volume through its engineered flexing (by computer at Home Delivery and by management under the Flex Program at Ground), to the "route-specific" factors like population density, that it is inescapable that the conclusion reached was not obtained by objective, scientific analysis rather than mere conjecture.

**D. Defendant Mistakenly Claims That The Flaws In Mr. Crandall's Methodology Go To Weight, Not Admissibility**

Finally, Defendant claims that all of the flaws in Mr. Crandall's work go to weight, not admissibility. (Opp. 20). Defendant claims support for this contention in *Buscaglia v. United States,* 25 F.3d 530, 533-4 (7th Cir. 1994) and *Stutzman v. CRST,* 997 F.2d 291, 296 (7th Cir. 1993)—cases in which the expert's methodology was not challenged. In *Buscaglia, supra* at 523-3, relevancy was the issue, not methodology. Similarly, in *Stutzman, supra* at 296, "[Opponents'] sole quarrel with [the experts'] opinions was with [the experts'] level of certainty. . ." not foundation or proper methodology.

FXG conveniently ignores the Seventh Circuit's admonition, in *Spraying Sys. Co. v. Delavan, Inc.,* 975 F. 2d 387, 394 (1992) that Courts "need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than its 'admissibility.'" *See also Simon Property Group L.P. v. mySimon, Inc.* 104 F.Supp2d 1033, 1040 (S.D. Ind. 2000); *U.S. v. Southern Indiana Gas and Elec., Co.,* 258 F.Supp.2d 884, 895 (S.D. Ind. 2003). Plaintiffs' challenge to the use of unscientific methods of analysis and survey research are entirely appropriately made at this time.

**E. Crandall's Declaration Fails To Remedy The Deficiencies In His Methodology And Instead Attacks Plaintiffs' Experts**

Deflecting attention from his original report, Mr. Crandall's new declaration consists almost entirely of lengthy and useless attacks on the work of Plaintiffs' experts—the admissibility of which is not at issue—rather than defenses of his own work. Thus, for example, Crandall suggests no fewer than ten times that Regan or Lewin should have performed certain analyses to verify their own conclusions. (Crandall Dec. ¶¶9,11,23,35,48,52,60,62, 67,68). Similarly, taking out of context past work performed by Dr. Lewin (*Id.*¶60) does not remedy any

of the defects in the design or analysis of Mr. Crandall's work, which is the only subject of this motion. Defendant bears the burden to show that Crandall's Report is admissible under Rule 702. *Smith, supra* at 718.

Mr. Crandall's declaration fails to rectify the problems and further illustrates his argumentative and defensive use of irrelevant hypothetical examples -- abandoned cars, factory closings, or poor customer service—which have no bearing here and do nothing more than waste the court's time. Crandall Dec. ¶¶20,21,39,42,49,64; Report ¶¶19,22,23,45,93. *See Painter v. Marshall Field Co.,* 646 F.2d 271, 296 n.8 (7th Cir. 1981).

## III. CONCLUSION

Plaintiffs have shown that Crandall lacks the qualifications of an expert in his professed areas of expertise—research, economics, and statistics. (Pl.Br.6-8). Plaintiffs have further shown that Crandall's methodology does not meet the reliability requirements for admissibility under *Daubert.* (Pl.Br.8-22). Accordingly, this Court must rule that the portions of Crandall's Report relied upon by Defendant in its Oppositions to Plaintiffs Motions for Class Certification are inadmissible.

Dated: July 2, 2007

Respectfully Submitted,

**LEONARD CARDER, LLP**

/s/Lynn Rossman Faris
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

| Susan E. Ellingstad<br>LOCKRIDGE GRINDAL NAUEN P.L.L.P.<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN 55401<br>Tel: (612) 339-6900<br>Fax: (612) 339-0981 | Robert I. Harwood<br>HARWOOD FEFFER LLP<br>488 Madison Avenue, 8th Floor<br>New York, NY 10022<br>Tel: (212) 935-7400<br>Fax: (212) 753-3630 |
|---|---|

PLAINTIFFS' CO-LEAD COUNSEL

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138
PLAINTIFFS' LIASION COUNSEL

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **July 2, 2007,** I served the following document(s):

1. Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion to Exclude the Expert Report of Robert Crandall

I, Lorelei Badar, hereby certify that on July 2, 2007, I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| | |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |

| Robert Firsten | rfirsten@firstenlaw.com |
|---|---|
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |

| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
|---|---|
| Richard Tanenbaum | rt@lawyer.com |
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

///

///

///

I also certify that on **July 2, 2007**, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

_X__ **BY REGULAR MAIL:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on July 2, 2007.

/s/Lorelei Badar
Lorelei Badar

**CERTIFICATE OF SERVICE**

I, J. Gordon Rudd, hereby certify that on July 2, 2007, I e-mailed the following documents:

1. Plaintiffs' Reply Memorandum in Support of Motion to Exclude the Expert Report of E. Deborah Jay; and
2. Exhibits H and I to the Declaration of J. Gordon Rudd, Jr.

and electronically filed the foregoing documents:

1. Placeholder for Plaintiffs' Reply Memorandum in Support of Motion to Exclude the Expert Report of E. Deborah Jay; and
2. Declaration of J. Gordon Rudd, Jr. (with placeholder for Exhibits H and I) and Exhibit J

with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

George A Barton gbarton@birch.net

Jeffrey A Bartos jbartos@geclaw.com

Evelyn L Becker PHV ebecker@omm.com

Kenneth Lee Blalack , II lblalack@omm.com

Darcie R Brault dbrault@dibandfagan.com

Laura C Bremer lbremer@omm.com

Guy Brenner gbrenner@omm.com

Thomas J Brunner , Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski dmc@zimmreed.com

Jerald R Cureton jcureton@curetoncaplan.com

Ginger A DeGroff degrofflaw@yahoo.com

Edward J Efkeman     eefkeman@fedex.com

Susan E Ellingstad     seellingstad@locklaw.com, hnpotteiger@locklaw.com,

rmmorton@locklaw.com

Barry S Fagan     bfagan@dibandfagan.com

Lynn R Faris     lfaris@leonardcarder.com, efink@leonardcarder.com,

kzerger@leonardcarder.com, lbadar@leonardcarder.com

Eric M Fink     efink@leonardcarder.com

Lee K Fink     lfink@omm.com

Robert K Firsten     rfirsten@firstenlaw.com

Wood R Foster PHV , Jr     woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox     Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com,

marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco     pfuoco@msn.com

Martin S Garfinkel     garfinkel@sgb-law.com, helm@sgb-law.com

Michael W Garrison , Jr     mgarrison@omm.com

R Christopher Gilreath     chrisgil@sidgilreath.com

John C Hamilton     jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net

Robert I Harwood     rharwood@whesq.com

Stacy J Hauf     shauf@omm.com, swickliffe@omm.com

Dmitri Iglitzin     iglitzin@workerlaw.com

Dorothy Anne Jarrell     dajarrell@omm.com, prowen@omm.com

Tom A Jerman     tjerman@omm.com

Victor H Jih     vjih@omm.com

Aparna B Joshi    ajoshi@omm.com

Soye Kim    skim@geclaw.com

Michael W Kopp    mkopp@omm.com

Steve D Larson    slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis    jordanlewis@sbgdf.com

Shannon Liss-Riordan    sliss@prle.com, blarimer@prle.com, syoung@prle.com

Anh-Nguyet Tran LyJordan    alyjordan@omm.com

Gary F Lynch    glynch@carlsonlynch.com

Michael G McGuinness    mmcguinness@omm.com

Matthew J Merrick    mmerrick@omm.com

Jennifer Lee Merzon    jmerzon@omm.com

Raquel A Millman    rmillman@omm.com

James R Mulroy , II    jrmulroy@kiesewetterwise.com, stroutman@kiesewetterwise.com

Daniel O Myers    dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com,
wking@rpwb.com

Peter W Overs , Jr    povers@whesq.com

Richard T Phillips    flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope    Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com,
marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Nora M Puckett    npuckett@omm.com, dmeredith@omm.com

Charles Victor Pyle , III    victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com,
meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan    atr@zimmreed.com, kmh@zimmreed.com

J Gordon Rudd jgr@zimmreed.com

Theodore B Schroeder tschroeder@omm.com

Robert M Schwartz PHV rschwartz@omm.com

James A Staack jims@staack-firm.com

R Jay Taylor , Jr jtaylor@scopelitis.com, lnewton@scopelitis.com

Matthew T Tobin matt@matthewtobinlaw.com

Jeffrey A Trimarchi jtrimarchi@omm.com

Michael J Watton jdrewicz@Wattongroup.com

Andrew M Weiner aweiner@omm.com

Kirsten L Zerger kzerger@leonardcarder.com

I further certify that on July 2, 2007, I caused the foregoing documents which were filed under seal to be served via overnight delivery upon:

Evelyn Becker
Guy Brenner
O'MELVENY & MYERS, LLP
1625 Eye Street N.W.
Washington, D.C. 20006-4001

Robert Schwartz
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, CA 90071-2899

I also certify that on July 3, 2007, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H Beisner PHV
O'Melveny & Myers LLP – Was/DC
1625 Eye Street NW Suite 10
Washington DC, 20006-4001

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Ste 200
Bartlett, TN 38134

David G Caperton
O'Melveny & Myers LLP – Was/DC
1625 Eye Street NW Suite 10
Washington DC, 20006-4001

R Bruce Carlson
Carlson Lynch Ltd
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Kevin J Driscoll
Finley Alt Smith Scharnbert Craig Hilmes &
Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309

William T Fiala
Lewis Fisher Henderson Claxton & Mulroy
6410 Poplar Ave Ste 300
Memphis, TN 38119

Clayton D Halunen
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Jack D Hilmes
Finley Alt Smith Scharnbert Craig Hilmes &
Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Michael Best & Friedrich LLP
100 E Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4102

Thomas P Jirgal
O'Melveny & Myers LLP – LA/CA
1999 Avenue of the Stars #700
Los Angeles, CA 90067-6035

Karen P Kruse PHV
Jackson Lewis LLP – Sea/WA
One Union Square
600 University Street Suite 2900
Seattle, WA 98101

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
Jackson Lewis LLP 220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
Markowitz & Richman
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Robert E McDaniel
McDaniel Law Offices
4 Bicentennial Sq
Concord, NH 03301

Kenneth E Milam
Watkins & Eager
PO Box 650
Jackson, MS 39205-0650

Charles N Nauen
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Joseph A Osefchen
The Law Firm of Phillip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Cheryl F Perkins
Whetsone Myers Perkins and Young LLC
PO Box 8086
Columbia, SC 29202

Alan M Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Michael R Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989

Aaron Roblan
Jackson Lewis
One Union Square
600 University St Suite 2900
Seattle, WA 98101

Beth A Ross
Leonard Carder LLP
1188 Franklin Street Suite 201
San Francisco, CA 94109

Eric H Rumbaugh PHV
Michael Best & Friedrich LLP – Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Jennifer Rygiel Boyd
Ogletree Deakins Nash Smoak & Stewart PC
10 Madison Ave Suite 402
Morristown, NJ 07960

Dan S. Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Patricia A Sullivan
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Richard Tanenbaum
Richard Tanenbaum Esq
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R Taylor
Taylor Dunham & Burgess LLP
301 Congress Ave Suite 1050
Austin, TX 78701

Joni M Thome
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Peter N Wasylyk
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr
Whetstone Myers Perkins & Young
PO Box 8086
Columbia, SC 29202

Dated: July 3, 2007

Respectfully Submitted,

**ZIMMERMAN REED, P.L.L.P.**

By: s/J. Gordon Rudd

J. Gordon Rudd
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400
Fax: (612) 341-0844

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**OPPOSITION TO FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION TO SUBSTITUTE CRANDALL DECLARATION**

Defendant FedEx Ground Package System, Inc. filed a motion to substitute that fails to address or explain any reason for the late-filing of a "substitute" declaration. Despite their best efforts, Plaintiffs have been unable to ascertain from FXG any reason for this substitution or any justification for the late filing of this new document. Since FXG has failed to establish any good cause for this late-filed substitution, Plaintiffs oppose the motion.

Dated: July 3, 2007

Respectfully submitted,

**LEONARD CARDER, LLP**

By: /s/Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

| Susan E. Ellingstad<br>LOCKRIDGE GRINDAL NAUEN P.L.L.P.<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN 55401<br>Tel: (612) 339-6900<br>Fax: (612) 339-0981 | Robert I. Harwood<br>HARWOOD FEFFER LLP<br>488 Madison Avenue, 8th Floor<br>New York, NY 10022<br>Tel: (212) 935-7400<br>Fax: (212) 753-3630 |
|---|---|

PLAINTIFFS' CO-LEAD COUNSEL

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:(574) 289-9987
Fax:(574) 289-8138

PLAINTIFFS' LIASION COUNSEL

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **July 3, 2007,** I served the following document(s):

1. **OPPOSITION TO FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION TO SUBSTITUTE CRANDALL DECLARATION**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |

| | |
|---|---|
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |

| | |
|---|---|
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

/ / /

/ / /

/ / /

I also mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

_X__ **BY REGULAR MAIL:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on July 3, 2007.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION<br>_________________________________<br>THIS DOCUMENT RELATES TO ALL ACTIONS<br>_________________________________ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:05-MD-527 RM<br>(MDL 1700)<br><br>CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 3, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**SUPPLEMENTAL DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. RICHARD JEANNERET**

Dated: July 3, 2007

Respectfully Submitted,

**LEONARD CARDER, LLP**

By: /s/Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

| Susan E. Ellingstad<br>LOCKRIDGE GRINDAL NAUEN P.L.L.P.<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN 55401<br>Tel: (612) 339-6900<br>Fax: (612) 339-0981 | Robert I. Harwood<br>HARWOOD FEFFER LLP<br>488 Madison Avenue, 8th Floor<br>New York, NY 10022<br>Tel: (212) 935-7400<br>Fax: (212) 753-3630 |
|---|---|

PLAINTIFFS' CO-LEAD COUNSEL

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:(574) 289-9987
Fax:(574) 289-8138
PLAINTIFFS' LIASION COUNSEL

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **July 3, 2007,** I served the following document(s):

**1. NOTICE OF MANUAL FILING**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |

| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
|---|---|
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |

| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
|---|---|
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

///

///

///

I also mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

_X___ **<u>BY REGULAR MAIL</u>:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on July 3, 2007.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION )

THIS DOCUMENT RELATES TO ALL ACTIONS )

Case No. 3:05-MD-527 RM
(MDL 1700)

CHIEF JUDGE MILLER
MAGISTRATE NUECHTERLEIN

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 3, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**SUPPLEMENTAL DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF ROBERT CRANDALL**

Dated: July 3, 2007

Respectfully Submitted,

**LEONARD CARDER, LLP**

By: /s/Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:(574) 289-9987
Fax:(574) 289-8138
PLAINTIFFS' LIASION COUNSEL

## PROOF OF SERVICE

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **July 3, 2007**, I served the following document(s):

**1. NOTICE OF MANUAL FILING**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |

| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
|---|---|
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |

| | |
|---|---|
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

/ / /

/ / /

/ / /

I also mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

_X___ **BY REGULAR MAIL:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on July 3, 2007.

/s/Lorelei Badar
Lorelei Badar

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 9, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**OMNIBUS REPLY MEMORANDUM**
**IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: July 9, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:      (574) 289-9987
Fax:      (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 9, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**SIXTH DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: July 9, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM-CAN document 795 filed 07/09/07 page 1 of 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 9, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**DECLARATION OF LYNN ROSSMAN FARIS**
**IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: July 9, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 9, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**DECLARATION OF JERALD R. CURETON
IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: July 9, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on July 9, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**PLAINTIFFS' SIXTH APPENDIX**
**VOLUMES 85-94**

Dated: July 9, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | PLAINTIFFS' OFFER OF PROOF IN REBUTTAL TO FEDEX'S DRIVER DECLARATIONS |

Plaintiffs in all of the constituent cases provide this Offer of Proof in rebuttal to the declarations of Fedex Ground pick-up and delivery drivers submitted in opposition to class certification by FedEx.

I. Procedural History

FedEx Ground Package Systems, Inc. (FXG) has asked this Court to deny class certification in part based on declarations filed on April 27, 2007, May 17, 2007 and June 7, 2007, that it obtained from pick-up and delivery drivers FXG claims "oppose" the equitable remedies sought by Plaintiffs for the purpose of demonstrating a fatal conflict of interest between these putative class members and named Plaintiffs.

On May 29, 2007, Plaintiffs filed their Motion to Strike Or Exclude Declarations of Putative Class Members (Dkt. 688) and supporting evidence (Dkt 687). FXG filed its Opposition to this Motion on June 18, 2007. Plaintiffs filed their Reply (Dkt 770, 771) on June 2, 2007.[2] This motion remains pending at this time.

---

[2] This motion was filed in connection with Plaintiffs' reply memoranda in response to FXG's opposition to the first wave of class certification motions.. Plaintiffs moved to strike the declarations submitted by FXG in its oppositions to the second wave of class certification motions on June 18, 2007. Plaintiffs moved to

Because Plaintiffs believe that FXG's declarations should be stricken pursuant to Federal Rule of Civil Procedure 37, Plaintiffs sought to avoid having to rebut the contents of what they consider to be inadmissible and irrelevant evidence and to avoid flooding the Court with more declarations of little assistance to this Court in ruling on the pending motions for class certification.

However, with the motion to strike FXG's declarations still pending, in an abundance of caution in the event that the Court denies Plaintiffs' Motion and considers FXG's declarations in ruling on Plaintiffs' class certification motions, Plaintiffs make this Offer of Proof, offering rebuttal evidence of 75 declarations of FXG pick-up and delivery drivers who are fully supportive of the goals and remedies sought in this litigation in the event that the Court decides to consider FXG's declarations. Unlike FXG's declarations which were executed over a period of six months between November of 2006 and May of 2007, these declarations were all obtained since FXG filed its driver declarations with the Court on April 27, 2007.

## II. Offer of Proof

Plaintiffs offer the attached declarations of 75 pickup and delivery drivers (Exhibit A) and four of Plaintiffs' counsel (Exhibit B) whose testimony demonstrates that:

1) besides the named Plaintiffs in these cases and the additional cases pending before the JPMDL that have not yet been transferred, there are many current P&D drivers among the putative class around the country who support this lawsuit and desire the relief requested, including a determination of their legal status;

2) besides the named Plaintiffs in these and the as-yet un-transferred cases, pickup

---

strike the declarations filed with FXG's third wave of opposition memoranda on July 2, 2007 on the same grounds. (Dkt. No. 773).

and delivery drivers at FXG share key, predominant common working conditions which demonstrate that FXG reserves the right to determine significant aspects of their work, including the determination of their working hours, package volume, schedules, scope of their routes, trucks and equipment to be used and required approval of any drivers or buyers used by them; and

3) FXG's P&D drivers are reluctant to express support for these cases due to their fear of retaliation by FXG as they are economically dependent upon FXG for their livelihood and support. Evidence from some drivers regarding the fear of retaliation is also corroborated by declarations from four attorneys of the team of Plaintiffs' counsel who have talked with drivers who support the goals of these cases but fear to participate by providing a declaration.

Dated: July 9, 2007

Respectfully Submitted,

LEONARD CARDER, LLP

[signature]

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:     (574) 289-9987
Fax:    (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

# EXHIBIT A

# Part 1

**Declaration of Dennis Aguilar**

I, Dennis Aguilar, hereby declare as follows:

1. I have been a package-delivery driver for Fed Ex Home for its Pomona, California terminal since February of 2000.

2. When I signed the Operating Agreement, I thought I would have the opportunity to be in charge of and grow my own business. But in the seven years I have been working at Fed Ex, I have felt more like an employee.

3. I first learned about the opportunity at Fed Ex Home at a job convention at a hotel. I expressed talked to the Fed Ex Home representative afterward and expressed interest, and he referred me to the Pomona Terminal to apply for a position. I went to the Pomona Terminal and spoke to the terminal manager, and I signed the Operating Agreement on the same day.

4. Every year, Fed Ex publishes Addenda to our Operating Agreements deciding what our pay would be. Sometimes aspects of my pay scale have been worsened – for example, the thresholds before you receive your bonus have been increased – but there is no chance to negotiate with the Company. When we are presented with the Addenda, it's already a done deal.

5. Fed Ex decides how many packages I deliver and which packages I deliver. I have no right to refuse to accept packages. It is my responsibility to load the packages into my truck and to deliver them.

6. If I fail to deliver a package I am assigned I will get a "DNA" ("do not attempt") which would lead to a Business Discussion or write-up which goes in my personal file. I would also certainly be written up if I left packages at the terminal.

7. I arrive at the terminal everyday between 5:45 and 6:00 am. Drivers have to get to the terminal in enough time to scan all of their boxes and have the terminal employees upload their scanners by 10:00 am.

8. I often have appointment deliveries – deliveries in which the customer is guaranteed delivery on a certain day and at a certain time. Terminal employees arrange the appointment deliveries. When I've asked the terminal manager to try to make the appointment delivery at a time that worked for my route, the terminal manager has told me that it's not up to him, that it's up to the customers. But there are times that a customer did not know, or care, what time an appointment delivery was set for. Arriving at an appointment delivery early or late is a delivery failure.

9. You have to wear the Fed Ex uniform: the Fed Ex shirt, a belt, the shirt tucked in, and black shoes. We are even told what color socks we are supposed to wear.

10. I used to have a second route. But I sold it. My supplemental driver was required to comply with all of Fed Ex's procedures. I often had terminal managers tell me that my supplemental driver did something wrong and I had to correct it. The terminal managers also told me which supplemental drivers I was allowed to use.

11. I have leased or bought several vehicles, all of which were approved by Fed Ex.

12. It can be very hard to take time off, especially when you are sick. Many drivers have worked when they were sick or have had family emergencies. They didn't have a choice. I have worked when sick myself.

13. This month, I agreed to sell my Fed Ex Home route to another individual. Fed Ex has not yet let me know whether they approve of the sale. In the meantime, I am teaching the other driver my route and how I do my job.

14. I am making these statements to let the court know I support this case. I believe I am a Fed Ex employee, and that I am entitled to the benefits that employees have. I am willing to testify if necessary.

15. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 21 day of June, 2007 at REDLANDS, California.

[signature]

Dennis Aguilar

**Declaration of Dennis Barber**

I, Dennis Barber, hereby declare as follows:

1. From March 2000 until December 2006, when I resigned, I was a package-delivery driver for Fed Ex Home. Most of this time I worked out of the Pomona, California terminal. In October 2006 Fed Ex transferred me to the terminal in Placentia, California.

2. Fed Ex decided which packages I had to deliver, how many packages I had to deliver, and where I had to deliver them to.

3. Every day Fed Ex employees sorted and placed on a pallet the packages that I was required to deliver. I could not refuse to accept packages. If I failed to deliver any packages I was assigned, I would risk getting a DNA, short for "did not attempt", a service failure that could result in the termination of my Operating Agreement. Terminal managers frequently threatened us with contract termination.

4. I have tried to refuse to accept packages before, but I didn't have a choice. The terminal manager made clear that if I didn't take them, it would put my Contract in jeopardy. Terminal employees wouldn't close out my scanner until I took them.

5. My Operating Agreement designated a primary zip code. In addition, I had to deliver packages to any other zip code that the Fed Ex terminal assigned me.

6. Once, I showed my terminal manager language in my Operating Agreement that seemed to say that I would only be asked to deliver packages outside of my area from time to time. The terminal manager responded, "If it's in your route, deliver it." But what was in my route, Fed Ex decided. Fed Ex configured my route to suit its business needs. Sometimes I was given packages to deliver in twelve zip codes. Other times I was given packages to deliver in far fewer zip codes. Other times I was given packages to deliver as far away as Pasadena.

7. In October of 2001, Fed Ex granted me a second Fed Ex route. Fed Ex notified me that the route was available a week before it was supposed to start. The terminal had already chosen and trained a person to drive the route, and told me to hire him. I did. Around seven months later, my manager claimed he had received complaints from two customers, and told me to fire him. I did. All drivers, including mine, had to be background checked, trained, and approved by Fed Ex. All drivers, including mine, were subject to the same Fed Ex Home rules as were we. I decided to sell my second route in October, 2003. Fed Ex did not approve it until February of 2004. Among other things, they made me put shelving in my van.

8. In Pomona, I got to the terminal between 6 and 6:30 a.m. Drivers were supposed to get to the terminal by around 7:00 a.m., because all drivers had to close out their scanners before the terminal employees closed out the terminal computer, and the terminal computer was closed out at 9 a.m. In Placentia, the terminal Fed Ex transferred me to in October 2006, arrival times were organized by terminal seniority. Because I had the lowest seniority, I was assigned to the second shift.

9. I had appointment deliveries, in which I had to deliver packages at the times agreed to between the Fed Ex customers and terminal. I also had evening deliveries, which I was required to service between 5 p.m. and 8 p.m.

10. I had to obtain approval from Fed Ex for the vans used on my routes. I had to put decals bearing the Fed Ex logo on the hood, sides, and back of my vans. While in theory we could use our van for personal reasons in our free time, in reality we couldn't, because first we had to cover up the indelible logos of Fed Ex.

11. On Christmas, I once wore Santa Claus socks with my uniform. On St. Patricks Day I wore green socks. The terminal manager scolded me. I think that I was written up. We were required to wear white socks with shorts and black socks with pants.

12. It was difficult taking time off. In 2005 and 2006 I paid for the Time Off Program, in which you pay Fed Ex Home to retain a driver while you take a week or two off and weeks are bid in advance by terminal seniority.

13. It is hard to take time off when you have an emergency or are ill. I did not make enough to keep a qualified Fed Ex authorized driver on call. When my grandmother passed away, the terminal asked me if I had someone to cover. I said I did not. I could not go to my own grandmother's funeral.

14. I certainly wanted to be an independent contractor, but given the way I was treated at Fed Ex, I quickly learned that I was not one. I agree with the goal of this lawsuit to give Fed Ex package-delivery drivers the legal benefits all employees are entitled to have.

15. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 30 day of June, 2007 at Whittier, California.

[signature]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE )
SYSTEM, INC., EMPLOYMENT ) Cause No. MDL 1700
PRACTICES LITIGATION )

## DECLARATION OF JOHNNY BATISTA

I, Johnny Batista, hereby declare as follows:

1. I was a Fed Ex home-delivery driver from on or about April 27, 2004 until on or about April 7, 2007. I worked out of the North Haven, Connecticut terminal.

2. When I first saw the opportunity to be a FedEx driver in the paper, I became interested because I was looking for something that would allow me to spend more time with my family. The ad said as a driver I would be in business for myself under the FedEx umbrella. As an independent contractor, I believed I would be in business for myself, able to decide how much I worked and when I worked, which was important to me.
3. On my first day, I met with the Terminal Manager at that time, Jeremy Martinez, along with other new drivers. He gave us a copy of the driver contract (Operating Agreement), which was extensive. He gave us only a few minutes to glance through it and told us we had to sign it. He said that he would copy it and that we would have an opportunity to read it more carefully later, but of course that was after we already signed.
4. When I met with Mr. Martinez initially, I asked about the earning potential for a driver. He told me it was up to me, based on what work I put in.
5. I thought I would have a choice about what type of vehicle to drive and whether it would be new or used, but I was told I had to get either the Workhorse P500 or the Freightliner P500. I had to lease a truck for six years. At that time, we were also forced to buy the truck insurance through FedEx. Drivers are responsible for gas and all maintenance on their truck.
6. I was forced to wear the FedEx uniform. This was paid for through a business support package, which was a mandatory weekly contribution (approximately $21.25) that drivers had to make to FedEx to cover operating expenses (for example, uniforms, the FedEx scanner, paper used to draw up our route, maps, and truck washes). Not only did we have to wear the uniform, bought through FedEx, but the company told us what color shoes to wear (black) and what color socks to wear (navy if wearing pants, white if wearing shorts).
7. As a driver, I would be penalized (money deducted from my pay/settlement) whenever a package I delivered was reported lost or stolen. Drivers are responsible for paying the full amount of the reported package value. In addition, there was a monthly bonus. If FedEx received a complaint about me, no matter how trivial and without taking into account my side of the issue, $120 was deducted from my bonus. Once I was penalized for something a FedEx manager told me to do. There was a package he assigned to me, but it was already past 8:00 p.m. and past the end of our delivery period. Normally I would code that package as delivery not attempted, but the manager told me to code it as recipient not in/unable to locate recipient. The recipient complained the next day that she was home and did not receive the package, and I lost $120 from my bonus because the manager would not take responsibility for the action.
8. A few days after starting as a FedEx driver, I was bombarded with work, even though I was inexperienced and still learning the scanner system and the route. I ended up bringing work back, which management did not like. I realized then that I would not be able to dictate my own work load, but I would have to do whatever was given to me by FedEx.

9. I was told that I did not have to be at the terminal at a set time as long as I got the work done, but when I showed up later in the morning to work, the manager would ask why I couldn't get there earlier. They wanted drivers there as early as possible.

10. Even if I got to the terminal early, I could not leave to start my route when I wanted. If a trailer with packages did not arrive on time, we had to stand around and wait. We were not paid for this time and it made my day longer.

11. Also, North Haven is a small terminal. Drivers are assigned a spot for loading, sometimes more than one truck per spot, and it was first-come/first-serve. After a while, I shared a spot with another driver that got there before me so I almost always had to wait before loading my truck.

12. FedEx also determined my route, and would frequently switch it around. It seemed like just when I would learn a route and could finish it faster to get home at a decent hour, they would switch my route around.

13. As a home-delivery driver, I was not allowed to take vacation unless I could find someone to cover for me. This was not easy because only a temporary driver certified by FedEx could cover a route, and there are only a limited number of them. In addition, I was still responsible for whatever happened when the temporary driver was covering, including recipient complaints and lost packages.

14. If a driver was sick, FedEx pressured them to come in or find someone to cover their route. If you did not show up, you risked being written up. In 2005, I injured my back in my truck. I told FedEx I was injured and could not do the route, but they put pressure on me to find someone to cover my route or they said I would have to cover it myself. I ended up only taking two to three days off because of it.

15. Peak season, around December, was terrible. I would have to work until 8:00 p.m. or 8:30 p.m. every night, pulling 70 hour work weeks. We were told we could not take any vacation in November or December.

16. In addition, in home delivery the normal work week was Tuesday through Saturday. During this past peak season, drivers were forced to work Monday through Saturday. I told the Terminal Manager, now Bruce Rogers, that I could not work Mondays because I had to watch my daughter while my wife worked. He told me I had to find someone to babysit my daughter. I refused, and FedEx gave extra work of mine to other drivers. All other drivers had to work Monday through Saturday, and they were afraid to lose their contract if they refused. I had already decided that I wanted out, however, and I was already trying to find someone to take over the lease of my truck.

17. Several times I was called into the manager's office when I was not able to finish my route because they assigned me too much work. The manager would sit me down and tell me this is not working out, and led me to believe that if I did not get my act together, he would get rid of me.

18. I frequently worked 12-14 hour days, often without any break to eat. I was constantly on the go. Some drivers had easier routes and almost always were done by 3:00 p.m. FedEx was not willing to reassign me to one of those routes. FedEx was also not willing to split my route into two routes to cut down on my work. I was even willing to take a cut on my settlement to get home earlier, but nothing happened.

19. Being a home-delivery driver under FedEx's current business model is not being an independent contractor. I support this court case because under this business model drivers should be classified as employees, which would give us benefits and provide relief from the expenses imposed on the drivers that do not get any of the flexibility and advantages that should be part of being an independent contractor.

20. I am willing to testify in court on these matters if needed.

Signed under the pains and penalties of perjury this 26 day of June 2007,

Johnny Batiste

# DECLARATION OF MIKE CALLAHAN

I, Mike Callahan, hereby declare as follows:

1. I am a former FedEx Ground driver. I started with FedEx in January 2001. I worked out of the Butte, Montana terminal but the actual route was in Bozeman, Montana.
2. I signed an operating agreement with FedEx because I was lead to believe that I was buying a certain area that I could grow into additional routes. That did not happen. Bozeman is probably the fastest growing city in Montana. FedEx preaches grow <u>your</u> business but did not make it financially possible by not allowing me a second route. Management threatened to take part of my area away if I didn't add a supplemental.
3. FedEx had total control over my situation, examples: the supplemental truck I had to buy, who I could hire to drive, uniforms to wear, and pickup and delivery times.
4. FedEx dictated to me how many packages I had to take and told me when and what packages I had to take from or give to others drivers, saying that is the Flex Program. This occurred on a daily basis. I told them I wanted to opt out of the Flex Program in 2005, but FedEx said I could not. They also added that I would be on my own in the peak season (November to December) when the route is over 180 stops.
5. FedEx set the hours I worked. The sort would start at 5:30 am, drive 90 miles to Bozeman, deliver all day, do pick-ups until 5:00 pm, and drive back to Butte returning at approximately 6:15-6:30 pm Monday – Friday. FedEx Sales Reps set pick-up times with their customers without consulting drivers.
6. Time off was almost impossible during the time I was employed by FedEx. I and my supplemental driver worked for more than 1 ½ years without a day off. I was paying for the Time Off Program the entire time but management said my route was too busy and denied my request for vacation. My driver had to take a week off so I had to use the Time Off Program to cover my supplemental drivers' time off without losing my CCS.
7. When I started at FedEx they said it would be my route and my business; while in reality it turned out to be a job with small pay, no benefits, long hours, and plenty of stress.
8. I would be willing to testify or serve as a named plaintiff if needed to support the drivers in this case.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Montana that the foregoing is true and correct.

Executed the 18th day of May 2007 at Butte, Montana.
Month City State

Mike Callahan

Mike Callahan

Declaration of Robert Carlson

I, Robert Carlson hereby declare as follows:

1. I was a Fed-Ex ground driver starting in August 1996 until May 2006. I started out as a temp driver until I was approved as a contractor.
2. I reviewed the contract before signing it, but was never given a copy of the signed contract.

I drove a P-1200 delivery van. When I started working for Fed-Ex Ground, I expected to an "Independent contractor" and signed an operating agreement with FedEx.

I reviewed the operating agreement before signing it.

The contract and its annual agenda were presented to me on a take it or leave it basis. It was nonnegotiable.

I expected to be my own boss.

3. The longer I worked for FedEx ground the more I learned they dictated most aspects of my business and how it would be performed as they did for all drivers in my terminal.

   I was required to wear a FedEx uniform, and meet managements grooming standards. I could not wear any other attire while performing this job.

   The company dictated maintenance schedules for my vehicle and required it to be painted with their logos. I was expected to change it as the company changed colors and logos at my expense. Management could decide to make repairs changes to your truck before you could use it on any given day.

   Company dictated pickup schedules without my input. This required me to work 12+ hours for years, which was against D.O.T. regulations, but required by FedEx. Drivers were encouraged/ forced to lie about duty hours.

   I was continually forced to deliver FedEx home delivery packages without choice of compensation for these packages. This caused a greater expense and longer work hours. I was told my contract stated I had to deliver all assigned packages even if they were shipped using another company.

   I was in the Flex Program. I was continually given packages to help out other drivers. This program was used to ensure everyone stayed busy. Management was not concerned about how far out of my way these packages were or how long it would take. It was required that I delivered these packages or I would lose my CCS bonus.

   The flex program only applied to accepting packaged, it did not give me the liberty to not take packages or give them to anyone else. It was a tool used by management to dictate how long each driver would work.

   I was forced to deliver every package every day. I could not refuse to service a package without consequence.

   I was also assigned a set of daily pick up stops that were required to be within a pickup window set up by FedEx. If I missed a pickup or did it outside the window, I would lose my CCS bonus and my contract would be threatened by management. This was a zero tolerance issue in their words.

4. Although FedEx indicated I would be able to set my own schedule, in fact, my work hours were set by FedEx. I was required to deliver every package every day

and complete pick ups in the required window. If I scanned a pickup outside the assigned window I would lose my CCS bonus and be threatened.

I was required to arrive each morning at the time as all the other drivers to sort the packages and load my van. This time was dictated by the terminal management and changed at their convenience. Pick ups scheduled at FedEx express terminals and Kinkos were mandated by FedEx nationally to be at the same time. This led to many drivers working longer than 12 hours automatically. I was required to return to the terminal each evening to unload any packages on my van, and was not allowed to leave each morning until it was OK'd by the manager.

5. When I signed my contract I was told I owned my route. This was not true! FedEx would take areas away and assign new areas at their discretion to ensure everyone had similar work schedules and you would not work too little. FedEx required at least 9.5 hours each day, or they would start to take your core zone away.

6. I am submitting this because I feel FedEx took away my ability to run my business and used their own judgment and profit motives to dictate my daily actions. I am willing to testify or serve as a plaintiff if I need to do so.

I declare under penalty of perjury under the laws of the State of Montana that the foregoing is true and correct.

Executed this 21st day of May at Butte Montana

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Edward Sheehan, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00531-RLM-CAN (MA) | |

**Declaration of John Chiasson**

I, John Chiasson, hereby declare as follows:

1. I am a Fed Ex Home package-delivery driver in the 3021 Boston Home Delivery terminal. I have worked there as a driver since September 2002.

2. When I received a copy of the Operating Agreement, I was not able to negotiate its terms.

3. When I first signed up to be a FedEx driver, I thought I would be my own boss, but I haven't been.

4. Every day, I show up to work and find out what deliveries my manager has assigned to me. I have certain towns in my route, but sometimes I see a zip code I don't recognize. On those occasions, I've told my manager that I've never been to this town, it's not on my route, and my manager has said, well you're doing it today.

5. We are required to wear the FedEx uniform at all times while working. I find the pants uncomfortable, and they split sometimes and feel cheaply made, but my manager has told me that I have to wear those pants.

6. Also, I have been told that I have to wear the FedEx cap. I like to wear a Patriots cap, but my manager has told me that I can't wear it, even when I am driving in the truck.

7. The managers also approve how our trucks look. One time, I was told to fix my bumper before a DOT inspection because it had been slightly dented in a fender-bender, even though I did not believe that it violated the DOT regulations.

8. The managers control our performance through withholding bonuses. Part of our bonus is withheld if we do something wrong, like not deliver a package during the correct window of time when there is an appointment. Bonuses are withheld from individual drivers' pay if they do something wrong, and also from the pay for the whole terminal, so making a mistake affects the drivers throughout the terminal. Sometimes when I have not received the full bonus, I have asked the manager what happened, and he said "somebody screwed up." In those cases, I don't know the reason why I didn't receive my full bonus.

9. We get time off for vacation based on seniority. We pay FedEx so that we can take vacation. Every year, we go down the seniority list and sign up for what weeks we will take for vacation.

10. It's very difficult to find someone to cover your route if you need to take days off other than the vacation days we are signed up for. Anyone who drives a route must be approved by the manager.

11. I support this case because FedEx treats us like employees, and so I want to be paid like an employee. I don't think I should have to pay for expenses like my truck, uniform, and other expenses.

12. I am willing to testify in court if I am needed to do so.

Signed under the pains and penalties of perjury this 14th day of May 2007,

John Chiasson

**Declaration of Young Soo Cho**

I, Young Soo Cho, hereby declare as follows:

1. I have been a package-delivery driver for Fed Ex Ground out of the terminal in Windsor, California, since about April, 2000.

2. When I signed my Operating Agreement with Fed Ex Ground, I understood I would be an independent contractor. But I have to follow all of the Company's rules.

3. I work from 7:30 a.m. to 6:30 p.m. Monday through Friday. I have to deliver all of the packages Fed Ex assigns to me. I have to deliver to businesses by 5:00 p.m., when they close. I have to pick up packages at daily pick-up times set between customers and Fed Ex.

4. If I fail to deliver any package I am assigned, I can get a DNA (short for "did not attempt"), a delivery failure that reduces my pay and can result in termination of my Operating Agreement. If I arrive at a pick-up early or late, that is another service failure that reduces my pay. Terminal managers have frequently threatened me and other drivers with termination of our Operating Agreements.

5. Fed Ex determines the area I cover. The Company once took away some of my area, without asking me. Another time, the Company re-arranged my area. The terminal manager informed me in a meeting and gave me papers to sign. But the change was already made. The terminal had made new maps. I did not think I had any choice but to give permission to Fed Ex to change my area.

6. I can't refuse to deliver packages that Fed Ex assigns to me. I am required to deliver every package assigned to me in my service area. The terminal often also assigns packages to me outside of my service area. I have complained that certain packages would make it difficult for me to meet my pick-up times. The manager said I had to take them.

7. I lease the Business Support Package – uniforms, paperwork, and scanner.

8. I purchased a P-1200 truck. Before I signed my Operating Agreement, the terminal manager told me that since my area was growing I should buy a truck of this size.

9. Before the van washing service was offered, managers in the terminal used to tell me that my truck was dirty and that I had to clean it. Now, I participate in the van washing service. Money is deducted from my paycheck to wash my truck every Tuesday.

10. I have had about two Customer Service Ride-Alongs a year. The manager rides along with me and watches my mileage, packages, timing, and how I

deal with customers. The manager used to give me comments about how I am doing my job.

11. It is very difficult to get time off when you have an emergency. Once I hurt my back. The ambulance took me to the hospital. I couldn't move my fingers. The terminal was very angry at me that I could not drive my route. They asked me if I had someone to cover for me. I said I didn't have someone to cover for me because.I hurt my back suddenly. On the third day, my manager threatened me with termination of my Contract. That day, I came in and rode along with someone else who drove and handled my packages for me.

12. I agree with this lawsuit. I believe that we are employees, and not independent contractors, and that we are entitled to employment benefits.

13. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 28th day of June, 2007 at Windsor, California.

Young Soo Cho

Young Soo Cho

**Declaration of John Churchwell**

I, John Churchwell, hereby declare as follows:

1. Until January of 2007, when I resigned and sold my route, I was a package-delivery driver for Fed Ex Home in the terminal in Redding, California.

2. I entered the Operating Agreement with Fed Ex Home because I wanted to be an independent contractor. To me, that meant being my own boss, and having some degree of flexibility and control over my hours of work; unfortunately, neither was the case. I also wanted to be a Fed Ex independent contractor because I liked driving. Before I had worked as a manager for UPS and did not have the opportunity to drive.

3. Every year Fed Ex presented us each with pre-printed Addenda to our contracts setting our annual pay. They gave us the Addenda to sign at the beginning of the day before they would close our scanner for us to begin our routes. At least once, I objected to my compensation. The terminal manager told me that it was out of his hands and did nothing.

4. Fed Ex decided the number of packages I was required to deliver. Fed Ex set how many hours I had to work.

5. When I arrived at the terminal every day, the packages for me to deliver were sorted and placed on a palate for me. I could not refuse to accept packages. Sometimes, I did object to delivering packages but the terminal manager told me that if I refused to deliver them, I would be written up. I did not object to delivering packages often because I did not want to lose my job. The terminal managers frequently threatened me and other drivers with contract termination.

6. Fed Ex had a policy of every package, every day. This meant that drivers were assigned, and required to deliver, every package the same day it arrived in the terminal.

7. I got to work every day at 6:30. Drivers could not get to the terminal any time they wanted. Packages had to be scanned, and uploaded from the scanners to the terminal computer, by a certain time. The terminal managers told us to arrive at the terminal by 8:00 a.m.

8. I had appointment deliveries (deliveries in which the Fed Ex customer paid extra for the package to arrive at a certain time). Fed Ex terminal managers or employees arranged the delivery time with the recipient, not me. Sometimes I told the terminal managers that a particular time was inconvenient. The terminal managers did nothing about it. They claimed the customers

requested the delivery time; only sometimes the customer who I delivered the packages to did not even realize a delivery time had been set.

9. I was also assigned packages to deliver to businesses. Because Fed Ex required me to deliver the packages before the businesses closed their doors, I had to deliver those packages by 4 pm.

10. I did not control the composition of my route, or how many routes I actually had, either.

11. For example, when I started, like all drivers I was given one primary zip code. I was also assigned packages to deliver in four other zip codes. I would often be required to deliver packages in other zip codes also.

12. As the number of packages in my area grew, I asked the Fed Ex terminal management to split my route. The terminal managers told me that since I had worked hard to serve Fed Ex's customers on my route, I would be entitled to both of the routes when my route was split. Then I was told that I was not working enough hours to justify the creation of a new route. Then Fed Ex did create a new route, but gave the new route to a different driver.

13. This took away half of the packages I delivered to in Redding.

14. I found it difficult to take time off, especially when I was sick. Many of the drivers worked when they were sick. Fed Ex required us to find a substitute driver. This was hard because the terminal had very few temporary drivers. I could not predict when I would be sick. I did not make enough to pay a person to be on call. In addition, any substitute driver who I used had to be approved by Fed Ex and trained in advance to do my route.

15. When I purchased my route, I also purchased the van from the previous driver. Fed Ex authorized the use of that van for my route. I later upgraded my vehicle to a truck with larger capacity. Fed Ex told me what kind of truck to obtain – an P-500 – and I did.
P500

16. I like to drive, and would love to have been a real independent contractor for Fed Ex. However, because we did not have the freedom to maintain our routes that real independent contractors have, I believe that I am an employee, and that I and other drivers are entitled to the legal benefits and protections of employees.

17. I am making these statements to let the court know I support this case, and that I would be willing to testify if needed to do so.

18. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 24 day of May at Redding, California.

[illegible signature]

**Declaration of Vincent Comeaux**

I, Vincent Comeaux, hereby declare as follows:

1. Since 2001, have worked as a package-delivery driver for Fed Ex Ground out of the terminal in Sacramento, California.

2. At first, I thought I would be able to direct and control my own business. But now I realize I am an employee of Fed Ex Ground.

3. I arrive at the terminal at 5:30 a.m. We cannot come whenever we want. We are responsible for delivering all of the packages that Fed Ex assigns to us. We have to meet pick-up and delivery windows scheduled by Fed Ex, deliver packages to businesses before they close, and get back to the terminal by 8 p.m.

4. It is our job to attempt to deliver every package sorted and placed on our van. If we do not attempt to deliver any package we are assigned, we will get a "did not attempt" ("DNA"), a service failure that can result in termination of our Operating Agreement.

5. I have a second Fed Ex Ground route. In 2006 Fed EX split my route into two authorized Fed Ex areas – giving me an extra core zone and van availability payment. The decision to split my route was made by Fed Ex, not me. I thought my package volume was heavy and justified establishment of a new route. I asked Fed Ex to split my route for four years. Fed Ex did so in 2006.

6. I have hired someone to drive my second route. That driver has been approved by Fed Ex. He is subject to the same Fed Ex rules and procedures as I am.

7. I lease the Business Support Package from Fed Ex. It includes our uniforms and scanner. You have to.

8. I have bought two P-1000 trucks for my routes. Fed Ex had to approve of the purchase of both of my vehicles. I asked the terminal manager about buying a different kind of vehicle. He said that that wouldn't be uniform with the trucks that the terminal uses.

9. It is very difficult to take time off. When my wife was pregnant and had to be admitted to the hospital for bleeding that threatened her life and the life of our child, I could not get off. I have seen others work when they were injured or sick because the terminal does not provide any replacement relief.

10. I support this lawsuit and I would be willing to testify if necessary.

11. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 28 day of June, 2007 at ______________, California.

[signature]
Vincent Comeaux

**DECLARATION OF STEVE CONNOR**

I, Steve Connor, hereby declare as follows:

1. For almost fifteen years, I have worked as a package-delivery driver for Fed Ex Ground (previously: RPS) out of the Beltsville, Maryland terminal.

2. We work Monday through Friday. I get to the terminal at about 6:30 a.m. I usually can't leave the terminal until 8:00 to 8:30 a.m. – even later. First, all of the packages that Fed Ex has assigned to me have to be found.

3. I am required to deliver – or attempt to deliver – every package that Fed Ex assigns me everyday. If I do not attempt to deliver a package, I will get a DNA, short for "delivery not attempted," a service failure that could result in termination of my Operating Agreement.

4. I have to make pick-ups at times of day that Fed Ex sets. If I arrive early or late, it is a service failure and reduces my pay. I also have to deliver packages to businesses before they close. Fed Ex has a policy that all packages delivered to businesses require the customer's signature.

5. I asked Fed Ex to split my route many times. In response to my requests, the terminal manager told me on several occasions that Fed Ex would split my route. But it never happened.

6. I lease the Business Support Package. It includes my uniforms and scanner. You have no choice. Fed Ex requires you to wear the uniform and use the scanner.

7. I own a P-1000 truck. That is what my terminal manager told me to get.

8. I have had to do Customer Service Ride Alongs, in which a managers comes with me in my truck, records all kinds of stuff, and provides me with feedback.

9. It is difficult to take time off. That is why I participate in the Time Off Program, in which I pay to take a vacation, and vacation is bid in advance by terminal seniority. In order to take off, otherwise, we have to find a driver who has been pre-approved by Fed Ex. I wasn't able to take a week off to be with my wife after she had our baby. I had a difficult time taking time off when she had complications during her pregnancy.

10. I agree with and fully support this lawsuit. I believe that Fed Ex treats me like an employee. I think I should be entitled to have employment benefits.

11. I declare under penalty of perjury under the laws of the United States and the State of Maryland that the foregoing is true and correct, to the best of my knowledge.

Executed this 8 day of July, 2007 at Crofton, Maryland.

Steve Connor

Steve Connor

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM (MDL 1700)

THIS DOCUMENT RELATES TO:

*Edward Sheehan, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00531-RLM-CAN (MA)

**Declaration of Cathy Curran**

I, Cathy Curran, hereby declare as follows:

1. I am a Fed Ex Home package-delivery driver in the 3022 Boston Home Delivery terminal. I have worked there as a driver since June 2001.

2. My husband, Wayne Curran, is also a FedEx Home Delivery Driver. Because FedEx has an anti-nepotism rule, we are not both allowed to have our own separate Operating Agreement, so my husband's Agreement includes both his route and my route. We both report directly to the same manager, and I am expected to follow all of the same rules that other drivers must follow, including all of the rules in the Operating Agreement.

3. We receive two separate paychecks each week, one for my husband and one for me.

4. When I first signed up to be a FedEx driver, I thought I would have control of my business and my schedule, but I have not. I have to deliver the packages that the manager assigns to me, and I don't know until I get to work each day what deliveries I will have to do that day.

5. We are not able to reject packages that are assigned to us. We can't start our route in the morning until all of the packages that we have been assigned have been accounted for – the scanner won't go into delivery mode until all the packages are accounted for on our trucks.

6. When we receive our list of packages, we also get a suggested order for delivering the packages, and it is very difficult to deliver packages in any other order than the one printed out for us.

7. For instance, when there are appointments, meaning deliveries that have to be made at a certain time, those appointments affect the routing of our deliveries for the entire day and an appointment can ruin an entire day. For example, because of an appointment, I could be routed to drive in an area that I know will have heavy traffic during the time required to meet the appointment, and this routing could make it very difficult for me to get the rest of my packages delivered that day. However, I cannot choose to wait and deliver that package on another day. We have to deliver all of our packages on the day assigned or else our manager will yell at us and withhold bonus money.

8. On one occasion, I was at a customer's house at ten minutes to five o'clock, but I wasn't supposed to deliver the package until five. So even though the customer was there and could have accepted the package, I had to wait until five o'clock to give it to the customer. If I delivered the package outside of the required window of time, I understood I would have lost bonus money, not just for myself, but for the whole terminal.

9. We are required to wear the full FedEx uniform, which includes black or brown shoes. I like wearing white sneakers because I have been able to find white sneakers that fit me better, but when my manager has seen me wearing them, he has told me that I have to wear black shoes.

10. It is very difficult to find someone to cover our route if we need to take a day off, since we are limited to using drivers that have been approved by FedEx. We really can only use temp drivers because they are the ones we know are approved, but there may be only one temp driver or so for 30 drivers.

11. Since I am treated like an employee by FedEx, I want to be called an employee and get paid money that should be paid to me as an employee. I also don't think I should have to pay FedEx's expenses, like the cost of my truck, uniform, and other business expenses.

12. I am making these statements because I support this case and hope that the drivers will be declared employees. I am willing to testify in court if I am needed to do so.

Signed under the pains and penalties of perjury this 14th day of May 2007,

[signature]
Cathy Curran

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: Edward Sheehan, et al. v. FedEx Ground Package System, Inc., Civil No. 3:05-cv-00531-RLM-CAN (MA) | |

**DECLARATION OF WAYNE CURRAN**

I, Wayne Curran, hereby declare as follows:

1. I have been a FedEx Home Delivery driver from approximately March 2000 to the present, in the Wilmington terminal in Massachusetts. I have personal knowledge of the facts set forth below.

2. I had previous experience working as an independent contractor for a courier company and when I started working for Fed Ex, I expected to be an "independent contractor" and be able to run my own business and have the flexibility that I knew existed for true independent contractors.

3. I was told to sign the Operating Agreement, the contract that FedEx has all its drivers sign. I was told that this agreement was a take-it-or-leave-it agreement. I did not review the Operating Agreement before I was told to sign it and I was never given a copy of the Agreement.

4. I have been asked to sign, and have signed, addendums to the Operating Agreement over the years. FedEx refused to provide me with copies of the most recent round of addendums. I was told that if I did not sign these addendums I would not be allowed to drive for FedEx.

5. After working as a FedEx driver for a period of time, I learned that Fed Ex determines how I perform almost every aspect of the package and delivery services for my route as it does for all of the drivers in my terminal.

6. I am required to have a FedEx uniform on, with the required black shoes and black socks. I also have to maintain my truck according to FedEx standards. For example, a FedEx inspection of my truck claimed that my truck required front-end work and I was told that I would not be allowed to make deliveries that day. When I took my truck to my mechanic, he found that no work needed to be done.

7. I am required to follow FedEx's rules regarding various pick-ups and deliveries and was told that instructions for driver release packages had to be precisely followed regardless of what any former terminal manager may have said.

8. FedEx assigns me with a different number of pickup and delivery stops each day. Some of these stops are inside the boundaries of my responsible zip code and some are not. I am required to delivery all the packages assigned to me no matter when, where or how.

9. FedEx managers have repeatedly claimed that they can assign me stops outside my route whenever they want. I have been told by my terminal manager that this means he can send me outside my route every day if he wants.

10. I complained about being required to deliver or pickup packages outside my route, but various terminal managers told me that I had no choice and that my contract would be "in jeopardy" if I did not deliver all the assigned packages.

11. If I brought back packages that were not delivered (DNAs, Did Not Attempt), I was told that I would lose my monthly bonus and that my contract would be in jeopardy.

12. Sometimes, I am required to deliver a package during a specific time, such as 5pm to 8pm. FedEx assigns me this delivery time.

13. I am also sometimes required to have scheduled pickups at specific times at specific locations. These pickups are scheduled by FedEx without my input.

14. If I don't deliver an assigned package, or miss a pickup, or arrive at a pickup too early, I can lose a portion of my monthly bonus. When this has happened, I have also been told by my manager that my contract is in jeopardy.

15. FedEx indicated that I would be able to set my own work schedule. This is not true because deliveries are required to be done between 8am and 8pm each day and in order to accomplish this goal my hours are set. Also, I don't have any say in when the specific pickup and delivery times are scheduled, and therefore, have to work around those times.

16. If I am to run my route each day, I have to try to leave the terminal as soon as the morning sort (the process used by FedEx to get me the packages each morning that will be loaded onto my truck) ends. There have been times when the manager has held me up

for more than one hour because FedEx has been unable to find a single package that was to be delivered that day.

17. I have to stay out until all of the assigned packages for that day are delivered, which often is later than I would like and may make for a 12 hour day.

18. I am also sometimes assigned an evening delivery – between 5:00pm and 8:00pm. The pickup windows are set by FedEx sales employees with FedEx customers.

19. FedEx claims that drivers can take time off whenever they want, but that is not true. I can "hire" someone else to drive my route, but that driver has to be approved and trained by FedEx before he is allowed to drive my route. Whether to approve a replacement driver, or to allow me to use a terminal temporary driver, is up to FedEx, and not me and it costs me a great deal. In fact, I am likely to lose money if I need to pay someone to drive the truck. FedEx will not allow me to just "close" for the day.

20. FedEx maintains control over my route. They can, and do, reconfigure my route, number of stops and mileage on a day-to-day basis without my input or request. For example, I delivered in Melrose and Saugus Massachusetts for three years and one day without any notice to me, FedEx took all my Saugus stops away.

21. I am submitting this statement to Court because I support the overall goal of this case to require FedEx to comply with the law by classifying me and the other pick-up and delivery drivers as employees because we are treated like employees.

22. I would be willing to testify about any of these matters, if necessary.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Massachusetts that the foregoing is true and correct.

Executed this 11th day of May at Boston, Massachusetts

Wayne Curran

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>Edward Sheehan, et al. v. FedEx Ground Package System, Inc., Civil No. 3:05-cv-00531-RLM-CAN (MA) | |

# AFFIDAVIT OF PAULO H.G. DASILVA

I, Paulo H.G. DaSilva, being duly sworn, depose and state as follows:

1. I am an adult resident of Winchester, Massachusetts.

2. I am a FedEx Home Delivery driver. I started out as a temporary driver in the Wilmington, Massachusetts Jewell Street facility in 2004. Shortly thereafter I became a permanent contractor. The route that I was given was Amesbury, Massachusetts. I also have delivered packages to Salisbury and Newburyport.

3. Before I became a permanent contractor, I did meet with FedEx officials. They presented me with the Operating Agreement, but I did not read it (it was very thick).

4. When I did meet with them, they told me that if I signed the Operating Agreement, I could be my "own boss" and that I could set my own hours.

5. After I became a permanent contractor, I soon found out that in fact I could not set my own hours, and that I was not my own boss. For example, because of the number of spaces at the terminal, and the number of FedEx Home Delivery drivers, and because of my low seniority, I was not allowed to put my truck in the space for loading of my packages until another driver had already picked up his packages and left. This meant that I could not get out of the terminal until at least 9:00 or 9:30 in the morning.

6. Also, because my route was so far away from the terminal, and given that all packages had to be delivered by 8:00 p.m., I found that I had no discretion whatsoever in setting my hours of work. In addition, I found myself scrambling on most days to finish my packages by 8:00 p.m., given the distance from the terminal and the number of packages and how large my geographical route was.

7. Over the time that I have been a contractor, FedEx has constantly changed my route structure. For example, I used to deliver in Amesbury, Salisbury, and Newburyport. Newburyport is a favorable route because one can deliver more packages there in a shorter period of time. However, in the last year or so, my Newburyport route has been taken away from me and given to someone else, and instead I was requested to deliver packages in Merrimac, Massachusetts, which is a difficult route because it is hard to deliver packages there quickly (because things are so spread out). I have had very little control over keeping those parts of my routes which I find to be the best and most cost effective to drive. When I finally told FedEx that I did not want the Merrimac route because it was not cost effective, I still did not get Newburyport back, but as a result, now have fewer packages to deliver and am making significantly less money.

8. Approximately six months ago, when I returned from a route, I still had several packages that had been undelivered in my truck. When I arrived the next morning, the packages were gone. I later found out that FedEX Security had taken the packages out of my truck and had them delivered. They then informed me that because there was not a lock on my truck, I could not make deliveries in my truck, but would have to rent a spare one, which I did, until a lock was put on.

9. In order that I can have some vacation, I participate in a program where they deduct $35.00 from my settlement checks on a periodic basis. That allows me to go on vacation. However, when I took my vacation and someone else delivered on my route, I do not receive the settlement checks for such deliveries.

10. If it was not for my having to make payments on the truck which I lease to have my FedEx route, I would gladly leave FedEX and go somewhere else to work. However, because of my financial obligation on my truck, I cannot afford to leave now.

11. I would very much like to become an employee, as other delivery drivers are employees, and have no financial obligation such as a truck. I am hopeful that FedEx Home Delivery drivers will become employees, and I am hopeful that things will get better when that happens.

12. I am willing to testify in court if I am needed to do so.

Signed under the pains and penalty of perjury this 14th day of May, 2007.

Paulo H.G. DaSilva

05/14/07

**Declaration of Rodney Deas**

I, Rodney Deas, hereby declare as follows:

1. I am a package-delivery driver for Fed Ex Home in the terminal in Pomona, California. I signed my Operating Agreement giving me a Fed Ex Home route in January of 2007. Before that, I was a driver in the Pomona, California terminal. I purchased the route that I had driven before.

2. My job is to deliver, or to attempt to deliver, every package the terminal assigns me. If I don't try to deliver any package assigned to me, I can get a "did not attempt" ("DNA"), a delivery failure that reduces my pay and can result in termination of my Operating Agreement with Fed Ex Home.

3. I am required to deliver packages to the primary zip code in my Operating Agreement. But I also required to deliver packages to any other areas that Fed Ex decides to assign me.

4. For instance, Fed Ex has reconfigured the area I am required to cover. In about March or April, I lost two zip codes. I was very happy about the change. I had too many packages to deliver before. But the decision to change my route was made by Fed Ex – not me. As best as I understand, Fed Ex established a new Fed Ex Home route for the Alhambra, California terminal, and re-routed the packages that were previously assigned to me to a new driver.

5. We cannot refuse to accept packages. In the past, when I had nearly 200 stops, I complained that the terminal assigned too many packages to me. The terminal manager said I had to take them.

6. I arrive at the terminal at about 7:30 a.m. We cannot come to the terminal whenever we want to. The terminal wants our scanners to be closed by 9 a.m., and before we can close our scanners we have to scan every package assigned to us, including packages that may not have been sorted and placed on our pallet initially, and we have to look for.

7. In June, Fed Ex came out with addenda to our Operating Agreements. We didn't negotiate these addenda, but we had to sign them. It was take it or leave it.

8. I drive a Workhorse P-450 truck. Fed Ex approved the use of that truck for my route. I had used that truck before when I was a driver. If that weren't the case, if I had come into the terminal from the outside, I don't think that Fed Ex would have approved the truck. The terminal usually requires drivers to get trucks that are larger.

9.  I lease the Business Support Package – including the uniform, scanner, and papers. It was never an option not to.

10. There is no such thing as time off. You have to make sure that you have someone who is able to cover your route. We cannot retain someone from outside. We need to find someone who is available to drive; who has been approved by Fed Ex; and who has gone through Fed Ex's required training.

11. I fully support this case. I am willing to testify if necessary. I like my job. But my job's as an employee – not an independent contractor.

12. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 20 day of June, 2007 at Industry, California.

Rodney Deas

**Declaration of Don DePugh**

I, Don DePugh, hereby declare as follows:

1. I am a package-delivery driver in the Santa Rosa terminal of Fed Ex Home, where I have worked for the past six years.

2. When I signed my Operating Agreement with Fed Ex, I thought that I would be an independent contractor. I thought I would have the freedom to do what I want and hire who I want. But that has not been the case.

3. When I get to the terminal every morning, the packages that I am required to deliver are sorted and placed in my station. It is my job to deliver every package that Fed Ex assigns to me. I have objected to taking packages before. Fed Ex told me I had to deliver them. If I do not attempt to deliver any package I am assigned, I will get a DNA ("did not attempt"), a delivery failure that not only reduces my pay but could result in termination of my Operating Agreement.

4. I am given one primary zip code in my Operating Agreement. But Fed Ex also assigns me to deliver packages anywhere else they want.

5. I used to regularly deliver packages to Rohnert Park and Cotati. Recently, and without any notice, Fed Ex took part of those areas away.

6. I get to the terminal at 5:45 a.m. Fed Ex does not close out my scanner, and let me get on my way to make my deliveries, until all of the packages sorted for me are found. Fed Ex requires us to service every package, every day.

7. I sometimes have appointment deliveries. I am required to make those deliveries during the window of time Fed Ex establishes with the customer.

8. I use a kind of van which Fed Ex told me to get.

9. I lease the Business Support Package, which includes the required scanner and uniform.

10. We have no say-so in the Contract Addenda. We sign them, or we don't work.

11. I'm making this declaration because I support this case. I think we are employees, not independent contractors, and we should be entitled to employment benefits.

12. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 5 day of July, 2007 at Rohnert Park California.

Don DePugh

Don DePugh

# DECLARATION OF DEBRA DIBELLO

I, Debra DiBello, hereby declare as follows:

1. From August of 2004 until July of 2006, when I resigned, I worked as a package-delivery driver for Fed Ex Home in the terminal in Duncansville, Pennsylvania.

2. Everyday, the packages I was assigned were sorted and placed on my pallet. I was required to deliver every package. If I failed to deliver any package I was assigned, I could get a DNA (short for "short for delivery not attempted"), a service failure that reduced my pay and could result in termination of my Operating Agreement.

3. I was given one zip code in my Operating Agreement. But Fed Ex assigned me packages everyday in other zip codes too.

4. As a Home Delivery Driver, I worked Tuesday through Saturday. I arrived at the terminal between 8 and 8:30 a.m. The service manager constantly told me to come in earlier. He told me that my packages should be scanned, my scanner should be closed out, and I should be ready to go, by 9 a.m.

5. Countless times I complained about the number of packages I was assigned. It could be unreasonable. There were occasions in which there were so many packages I couldn't fit them all in my van, and I had to come back to the terminal. The manager would tell me I had to deliver them.

6. Sometimes I was given appointment deliveries in which I had to meet the two-hour window set between the customer and Fed Ex. Packages had to be delivered to businesses before they closed. Fed Ex had a policy that all packages delivered to businesses required a customer's signature.

7. When I entered my Operating Agreement, I had to purchase a Fed-Ex approved van. The terminal manager originally told me to choose between two kinds of P-500 box trucks. Then he said that he may be able to "get an exception," and get the Company to approve a Sprinter. He did. I drove a sprinter for my route.

8. The van had to have decals with the Fed Ex logo. I once got a vanity license plate that said "Moby." I thought that my Sprinter looked like a white whale! My manager told me that I had to remove it.

9. I leased the Business Support Package, which included the uniform and scanner that I was required by Fed Ex to use to do my job.

D.A.D. 7/3/07

10. It was difficult to take time off. We had to find a relief driver who was qualified and approved by Fed Ex. One time, I came to work and told the terminal manager that I felt too ill to drive and that I thought I was going to throw up. He told me that's too bad, that I could throw up in the truck. I went to the terminal restroom and passed out. I hit my head and I had to rushed to the hospital in an ambulance.

11. I am making this declaration because I strongly support this lawsuit and I want to help out in any ways I can. I know that many of those I used to work with are too frightened to speak out. Fed Ex has far more power than them, and if they are terminated, they will not just be out of work. They will be stuck with a mountain of debt on their Fed Ex route and van.

12. I declare under penalty of perjury under the laws of the United States and the State of Pennsylvania that the foregoing is true and correct, to the best of my knowledge.

Executed this 3rd day of July, 2007 at Paxton, Pennsylvania.

Debra DiBello

**Declaration of Julian Escamilla**

1. From January of 2003 until September of 2006, when I resigned, I was a package-delivery driver for Fed Ex Home out of the Riverside, California terminal.

2. When I arrived at the terminal in the morning, the packages I was required to deliver were sorted and placed on my pallet. My job was to deliver, or attempt to deliver, every package. If I failed to deliver any package I was assigned, I could get a DNA ("did not attempt"), a service failure that reduced my pay and could result in termination of my Operating Agreement. If I refused to accept any package, that would also be a DNA.

3. My Operating Agreement assigned me a primary zip code, Lake Elsenor. Fed Ex also gave me packages to deliver to other zip codes.

4. Many times, I complained that I could not handle all of the packages I was given. Sometimes the terminal manager found someone else to deliver them. Other times, I had to take them.

5. I arrived at the terminal at 6:45 a.m. every day and I had to work long days. I usually could not leave the terminal until 8:30 a.m. I had to scan in all of my packages. Then the terminal had to close out my scanner. The terminal would not close my scanner out so I could begin my route until all of the missing packages were found.

6. When I had appointment deliveries, I had to deliver packages during the windows of time that Fed Ex told me. When I had to deliver to businesses, I had to deliver the packages before the businesses closed. Under Fed Ex policy, all business deliveries required a customer signature.

7. I leased from Fed Ex the Business Support Package, which included our Fed Ex uniforms and scanner. It was required.

8. I purchased a F-550 truck, which Fed Ex had to approve. It had the Fed Ex logs. Terminal managers and employees inspected our trucks, not just for safety. They also told us we had to repair things like scratches and dents right away.

9. It was difficult to take time off. It was hard to find a driver to relieve me who was approved by Fed Ex.

10. Before I signed my Operating Agreement with Fed Ex Home, I thought that I would have a flexible schedule, have control over my workload, and be able to make deliveries for other companies. In fact, I had to work long hours. I was

subject to the management and supervision of Fed Ex.

11. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 28 day of June, 2007 at Sun City, California.

Julian Escamilla

Julian Escamilla

# DECLARATION OF TIM FRANK

I, Tim Frank, hereby declare as follows:

1. I am a Fed Ex Ground driver. I started in June 2001 and work in Wisconsin.
2. When I first applied at FedEx, I expected to deliver packages and do pick ups. I was told others would be doing the selling and I would be given the work to do independently. In approximately late May, I was brought to an office at FedEx and given the contract to sign and initial as the manager went over it quickly.
3. When I started in June 2001, I went to my truck, sorted it, was given an area, and I went to deliver it. (I did not buy a route.) I found that when delivered packages, if there were complaints, FedEx would charge me for a package that was missing if it was delivered by driver release (leaving the package at a door). If there were any complaints, whether the complaint was correct or not, I would not be backed up, the money would be deducted from my pay. I also found I was given rules and directions on the ways and how to deliver the packages such as the location the package could be in, getting signatures was another thing they wanted us to get if we could.
4. When I have talked to shippers about pick ups windows and changing them to make my day work, one of the FedEx managers would tell me I could not do that and had to pick up based on pick up window given. The terminal manager, Kevin McGarth would tell me my contract was in jeopardy because I would bring packages back at the end of the day. If I was done at 2;00 pm they wanted me to stay out for a pick up window that was 4:00-6:00 pm.
5. I typically need to go in at approximately 6:00 am to correctly load my truck and re-load it as needed, and end my day at approximately 4:30. I work at least a 10 hour day. In my experience, three and half hours of that day, I am not receiving compensation for work I am doing for FedEx.
6. I am in the time off program and pay for it, but I cannot decide when I can take time off. When I am off a swing drivers gets my route and makes more money on it than I do based on FedEx's program.
7. Since I started with FedEx, my route has been cut because you it had more than the maximum number of stops, as set by FedEx, and I could not get all for the packages and stops completed. FedEx decided to take an area and which area it would be. Then, they added more miles, which also did not work although I did it to the best of my ability. Then, they revised it again after telling me again my contract was in jeopardy for nonservice.

8. I do my job well delivering packages and like that part of it. I do not agree with how FedEx controls my work and I put a great deal of effort into standing up for myself as FedEx is often telling me what to do and not to do. I would be willing to testify or serve as a plaintiff if I was needed to do so in support of the drivers in this case.

I declare under penalty of perjury under the laws of the United States and the laws of the State of WI (State) that the foregoing is true and correct.

Executed this 14 day of May (Month) at New Berlin (City)

WI.
State

[signature]
Tim Frank

# DECLARATION OF PETER GLYNN

I, Peter Glynn, hereby declare as follows:

1. I am a Fed Ex Ground driver. I started in November 2001 on the Home Delivery side and in 2006 bought Ground route.
2. When I started I was given an operating agreement to quickly read as the manager went over the highlights, according to him. I expected to be an independent contractor and set my own hours, but what I found was I had to be in for the sort each day or my dispatch would be delayed. When I have packages that had a specific delivery time given to me by FedEx, I don't control it. If I don't, for example, come in during the sort, my truck would be filled with packages that are not mine or on my route, but then I would be responsible for them for the day.
3. I do not have control over the volume of packages I get. Some days I had very little and other days I had more than I could handle based on what the Home Delivery manager wanted to give me. On the Ground side, it is the same.
4. The times to pick up packages are late in the afternoon and FedEx adds later ones when they want to extend the day. Most of the time they just add them and you don't have a choice.
5. One time when I received a flex, the manager told me it was just because another driver did not want to do it.
6. I typically work about 12 hours a day from the time I get in the terminal in the morning to the time I get back in the evening to turn in my paperwork and scanner. The first 2 years I worked I could not take any time off.
7. FedEx controls my route. When I was at Home Delivery, they would add and take away from my route packages and stops when the manager wanted.
8. I do like my job because it is fast paced and get to meet people. I do not like the control FedEx has over things. The only thing they do not check on me is my underwear. For example, my manager told me I could not wear white socks. Because of things like that, I would be willing to testify or serve as a plaintiff if I was needed to do so in support of the drivers in this case.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Wis that the foregoing is true and correct.
State

Executed this 17 day of May at Fond du Lac
Month City

Wis.
State

[signature]

**Declaration of Carlos Gonzalez**

I, Carlos Gonzalez, hereby declare as follows:

1. I have worked as a package-delivery driver out of the Fresno, California, terminal of Fed Ex Ground for the past three years.

2. The schedule I work is controlled by Fed Ex. I have to make pick-ups during daily pick-up windows set between the customer and Fed Ex. I have to arrive at businesses before they close. That is because Fed Ex has a policy that all deliveries to businesses require a signature. Also, I have to deliver or attempt to deliver every package I am assigned. My hours of work increased recently when Fed Ex changed my service area.

3. The first time that Fed Ex reconfigured my area was in December of 2005. The terminal assigned me additional areas to cover. I objected. But the terminal manager said I had to take the packages. Originally, the packages were flexed to me everyday. Then the new zip codes were given to me in Addenda to my Operating Agreement.

4. Fed Ex reconfigured my area again recently. In early June, Fed Ex created a new route. Fed Ex took two of my zip codes, and zip codes of other drivers in the terminal, to make the new route. Fed Ex also assigned two different zip codes to me. I complained about the route change. My area is not as convenient now, and takes longer to service. But the terminal manager said that the change was made by Corporate. Fed Ex decides how to draw our routes, not me or the other drivers.

5. I lease from Fed Ex the Business Support Package. I have to use the Business Support Package – it includes the uniform and scanner – in order to do my job.

6. I drive a P-550 van. I took over payments from the previous driver. Fed Ex had to approve of my use of this van.

7. We have two Customer Service Ride-Alongs a year. In my Customer Service Ride Alongs, a manager came with me in my truck, checked to make sure I was doing things correctly, told me how I could improve, and gave me a written evaluation.

8. I participate in the Time-Off Program. Money is deducted from my paycheck so I can go on vacation. Our weeks of vacation are bid in advance by terminal seniority.

9. I do not negotiate the Contract addenda. The terminal manager gives them to me and tells me to sign them.

10. I making this declaration because I support this case. I believe that Fed Ex treat us like employees, not independent contractors.

11. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 29th day of June, 2007 at Fresno, California

Carlos Gonzalez

**Declaration of Theresa Greenlee**

I, Theresa Greenlee, hereby declare as follows:

1. I have been a package-driver for Fed Ex Home, out of the Stockton, California terminal, since about August of 2004.

2. When I arrive at the terminal every morning the packages I am required to deliver are sorted and placed in my area. Sometimes, there are misplaced sorts, packages also assigned to me that haven't been sorted correctly, and that I have to find. My job is to deliver every package assigned to me. If I fail to deliver any package I am assigned I can get a DNA ("did not attempt"), or code 27, a service failure that could ultimately result in termination of my Fed Ex Home Operating Agreement.

3. I get to the terminal everyday at 5:45 a.m. Because of the large number of packages I deliver, I never work less than 12 hours a day.

4. Fed Ex decides how my area is configured.

5. I have been told that as an area grows in package volume, the route can be split – turning 1 official Fed Ex route into 2 official Fed Ex routes, giving the driver an additional van-availability and core-zone payment. My area has grown in package volume. I made clear to the terminal manager that I would obtain a second van and pay a second driver, if a second Fed Ex route were established. But Fed Ex decided not to split my route. Instead, a new Fed Ex route was established north of mine.

6. Some of the area I had serviced was given to the contractor in that new area. I do not necessarily object to my workload being made lighter. But I do wish I had a say. I complained to the terminal manager about which territory was taken from me. But the change had already been made.

7. When I have an appointment delivery I have to make the delivery during the two ~~one~~-hour window of time that the customer sets with Fed Ex. If I arrive at an appointment delivery early or late, it counts as a service failure.

8. I lease the Business Support Package – which includes our uniform and scanner. I don't see how I could perform my job without it.

9. I lease a Sprinter van. When I discussed with Fed Ex the opportunity to be an independent contractor, I was told the Sprinter was ready and waiting, and that Fed Ex was looking for someone who was willing to lease it.

10. Fed Ex does about two Customer Service Ride-Alongs per year. In mine, a manager came along with me. He had a clipboard. He provided some feedback, most of it positive.

11. I participate in the Time Off Program. Money is deducted from my pay to enable me to take time off. Vacation weeks are bid in advance by terminal seniority.

12. I am making this declaration because I support this case. I believe that we are employees, not independent contractors, and that we should be entitled to receive employment benefits and protections.

13. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 26 day of June, 2007 at Modesto, California.

Theresa Greenlee

Theresa Greenlee

# EXHIBIT A

## Part 2

MAY 2 9 2007

**DECLARATION OF Bob E. HAWKINS**

I, Bob E. Hawkins, hereby declare as follows:

1. I am currently a FedEx Home driver. I started with FedEx in October of 2004. I work in the state of Arkansas and have briefly gone over the border into Oklahoma on occasion for my work with FedEx.

2. I did sign an operating agreement with FedEx, but not until two weeks after I started working for the company. The manager came to me after those two weeks and had me sign the post-dated agreement which I was not allowed to read. I believed I was going to be my own boss, but learned that I didn't get to make any decisions. I was told when and how everything was going to be done. I had no control over how many zip codes I would deliver to or how far from home I would have to drive. They added FedEx Ground delivery packages to my route I and I was not allowed to refuse. I had to meet my threshold. I'm frustrated because I'm not being compensated for the additional work, mileage, gas, or other expenses. When I ask to be compensated, I am blown off. I was told to take the offer or leave it. There is no negotiation.

3. FedEx bases the volume of delivery of packages on what is called a "threshold." A threshold is a number of packages I delivered on a certain day in my area. If I delivered 40 packages in one day to a zip code then I was expected to always deliver 40 packages to that zip code and the threshold never changed. If I didn't meet the threshold then I got in trouble. FedEx added Ground delivery packages to my route without asking me and I had to deliver the packages to meet my threshold.

   FedEx would increase the number of packages I had to deliver, but wouldn't increase the number of stops I made or pay I was given. More work, same or even LESS money because of increased expenses.

   FedEx was also in control of all other aspects of my work life. I had to go with the FedEx dress code very strictly or I would get reported. I had to pay for my uniforms out of my own pocket including the black shoes required by FedEx.

   FedEx said I could choose my route, but they stuck me with one I didn't agree too.

4. FedEx tells me what time I have to be at the terminal to pick up my load

and how long I have to be at work. I have to make all of my deliveries for the day and also do a 15-minute inspection everyday after I go home. I have to document my mileage, etc. when I arrive at my last stop for the day. FedEx tells me that I'm not allowed to stop on the way home no matter how far it is, even to use the bathroom. I have to go straight home and can't even go back to the terminal.

FedEx told me that I would control my work hours, but they are actually set by FedEx. I have to be where they say when they say to be there or I get in trouble.

If the computers are messed up then I can't leave and start or finish my route until the computers are fixed and all work is done.

Taking time off is allowed, but not possible unless it's scheduled well ahead of time. Sick time is not possible to take. I remember a guy who broke his leg one day and had to be at work the next day because he couldn't take the time off. He was doing his deliveries with a cast.

5. FedEx told me I could control and own my route. I agreed to the Springdale/Lowell/Rogers route, but they initially put me on the Fayetteville route instead without my permission. Then they put me on the Huntsville route which is very rural. I made less money. I also have to find someone to cover my route if I'm not there. Again, there is no negotiation.

6. I am making this statement because I want to help myself and other drivers who are forced to go by the same rules as employees of FedEx in everyway, but are not given the same benefits, protections, or treatment as employees. FedEx is making it hard for and factoring out the independent contractor in favor of drivers with multiple contracts and vehicles.

7. I am willing to testify as a witness at trial or act as a plaintiff in this case.

I declare under penalty of perjury under the laws of the United States and the laws of the State of arkansas that the foregoing is true and correct.

Executed this 25 day of 5 2007 at Pea Ridge 11:00 AM

**Declaration of Michael Hoehn**

I, Michael Hoehn, hereby declare as follows:

1. I have been a package-delivery driver for Fed Ex Home out of the terminal in San Diego, California since September of 2004.

2. At the time I entered my Operating Agreement (which is my wife's name, in order to be able to finance my truck) I thought I would be an independent contractor. I thought I would run my own business. I thought I'd be able to make business decisions myself. But as it turns, out Fed Ex calls all of the shots.

3. I purchased the truck that Fed Ex told me I needed. The terminal manager handed me a sheet with two kinds of vehicles and told me I couldn't get one of them.

4. I am required to deliver every package that Fed Ex assigns me to deliver everyday. My Operating Agreement assigns me one "primary zip code." But, I also have to deliver packages to any place else Fed Ex sends me. The geographic area I cover has changed over time.

5. I have objected to packages I have been assigned in the morning. But the manager told me I had to take them.

6. I cannot refuse to deliver any packages I am assigned. My job is to scan them, put them in my truck, and deliver them. If I don't deliver any package I am assigned, I can get a DNA, short for "delivery not attempted," a service failure that reduces my pay and could lead to termination of my Contract. In fact, this week my van broke down and I couldn't deliver many of the packages I was given that day. The terminal manager told me that placed my Contract in jeopardy. Managers often threaten us with Contract termination.

7. I lease the Business Support Package from Fed Ex. It consists of our uniforms and scanners.

8. Several weeks ago I had to work sick because I couldn't find a driver to relieve me who was approved by Fed Ex.

9. Every year, Fed Ex comes out with Addenda to our Operating Agreements. I know these Addenda are important because they set things like my pay. But the terminal manager just hands them out. We are told that we have to sign them in a day or two. I have no choice. If I don't sign them, I'd have no Contract.

10. I agree with and strongly support this case. Fed Ex treats us like employees. We should be entitled to receive the legal benefits and protections that employees have.

11. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 8th day of July, 2007 at San Diego, California.

Michael Hoehn

**Declaration of Walter ~~Ybarra~~ IBARRA**

I, Walter ~~Ybarra,~~ IBARRA hereby declare as follows:

1. Since about April of 2005, I have worked as a package-delivery driver for Fed Ex Home. Originally I worked out of the Pomona, California terminal. In October of 2006, Fed Ex transferred me to the terminal in Burbank, California.

2. Every package is supposed to be delivered the same day it arrives in the terminal. My job is to deliver or to attempt to deliver every package the terminal assigns me. If I don't, I will get a DNA, short for "did not attempt," and a write-up, or "Business Discussion", in my file.

3. Tuesday is my busiest day. I have asked the terminal manager to not flex me packages from outside of my usual area on Tuesdays. He told me that he was going to flex them to me anyway, in order to even out the packages of the drivers in the terminal. (within my surrounding)

4. When I have appointment deliveries, I have to deliver packages at the times scheduled between Fed Ex and the customers. Sometimes, the terminal employee who schedules the appointment deliveries (the quality assurance employee) asks me what time is good for me.

5. When I have a package to deliver to a business, if I do not deliver it by 6 p.m., I will get a DNA or "did not attempt."

6. I get to the terminal everyday at (Around) 7:30 a.m. (I don't think we are allowed to get to the terminal whenever we want to.) We are expected to scan our packages and close out our scanners by 8:30 or 9:00 a.m. as long as we close before a certain time. its okay But must close out scanner by 830 or 900

7. I am required to wear the Fed Ex uniform everyday. It includes the Fed Ex T-shirt shirt and ~~Fed Ex hat~~ We are also supposed to be clean shaven and wear black shoes, a belt, white socks if we're wearing shorts, and black socks if we're wearing pants.

8. I drive a P-500 freightliner. When I signed my Operating Agreement with Fed Ex, the terminal told me I couldn't get anything smaller. OR BIGGER

9. All drivers' trucks have to have the Fed Ex logos. We have to submit monthly maintenance reports. Employees of the terminal examine our vans. Once, I had a dent and rubber on the side of my van from a hit and run, and the terminal manager told me that if I did not fix it right away someone from corporate would dead-line my vehicle.

10. I lease the Business Support Package. It includes our uniforms and scanners. I think Fed Ex requires us to.

11. It is difficult to take time off because I have to find a substitute driver in advance who is approved by Fed Ex and trained to drive my route. I have participated in the Fed Ex Time Off Program, in which money is deducted from my paycheck to hire a relief driver when I go on vacation. Vacation is bid for in advance by terminal seniority.

12. It is difficult to take off when you are sick. I sometimes worry what would happen if I did.

13. I do not control my own business. I feel I am an employee. I am making these statements because I understand and fully support the goals of this lawsuit. I would be willing to testify in court if necessary.

14. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 9th day of July, 2007 at Monrovia, California.

[signature]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. MDL 1700 |

DECLARATION OF RAYNARD JONES

I, Raynard Jones, hereby declare as follows:

1. I was a FedEx Ground driver from in around 2001 until January 2007. I started in the Loop office (Illinois), then I was at Bedford Park, Illinois before moving to the McCook, Illinois facility after it opened.

2. The newspaper ad I saw said that FedEx drivers get to be their own boss, set their own hours, and make a lot of money.

3. When I started, FedEx also told me that it would be my business to run as my own business, and that I could start in the morning anytime that I wanted. I would also be responsible for everything.

4. During orientation, FedEx told me that if I had no complaints and made a certain number of deliveries, then I would receive a bonus every month. That did not happen, though, even when I satisfied my criteria because FedEx later said bonuses were based on the performance of all the drivers in that location. So even though it was supposed to be my business, my bonus was dependent on other drivers.

5. I had to sign a contract when I was assigned a route by FedEx. The contract was very lengthy. The guy who processed me told me some things that were in it, but nothing in detail and not all the provisions. He only spent about ten minutes on it and then I had to sign it.

6. Every year I had to sign a new contract. Again, FedEx would only tell me about those things it wanted me to hear about. I had to sign or I would lose my route.

7. I was responsible for everything about my truck – payments, maintenance, gas, and so on. If it broke down, I had to get another truck. At one point, FedEx wanted me to get a bigger truck. I initially leased a used truck, then I converted to making payments so I could own it. I was steered towards Chuck's Trucking for the truck, which had an

arrangement to provide trucks to FedEx. The truck had to have the FedEx logo, or I could not work.

8. I also had to pay for my uniforms, which I had to buy from FedEx. If I did not have a proper uniform, I would not be allowed to work. All gear had to be proper FedEx gear, including jackets and hats.

9. My route was assigned by FedEx, and FedEx also told me how to run it. I had to stick to times for pick-ups that FedEx gave me, even though they could not be done on my route. My route covered about 40 to 50 miles. If FedEx assigned me a pick-up at one end when I was at the other end in my route at that time, I could not make the pick-up window given to me. The customers understood that it was not my fault, and they were mad at FedEx, but my manager harassed me for not making my pick-up windows.

10. When I finished my work early, FedEx harassed me for returning so early. I usually got back between 4:30 p.m. to 5:00 p.m., which they considered too early. They wanted drivers out on the road 14 to 15 hours a day, although they did not pay overtime. They would assign late pick-ups just to keep us on the road. So even if I was done with my route, I still had to sit around and wait to do a late pick-up if it was assigned to me.

11. I usually got to work around 5:30 a.m. to load my own truck because the loader did not know how to load correctly, which could really hurt you out on the route. I wanted to be on the road by 7:00 a.m. to be able to work at a good pace but not one that tore up my truck. But I had to wait for the last trucks and loading to be down and often the "pre-load" was not completed until 8:30 a.m. or 9:00 a.m. This really affected drivers who had to get downtown in rush hour traffic or cross-town. My route went out about 20 miles from the facility.

12. FedEx has what they call a Flex Program. If drivers on other routes needed help, their packages would get put on my truck to deliver (and I sometimes gave packages to other drivers). If you sign up for the Flex Program, then you have to take the extra packages. Whenever I complained about the extra packages flexed to me, my manager said that I was not a team player and he threatened to not renew my contract. He harassed all drivers that complained about flex packages by saying they were not team players.

13. My route got bigger over time. I started with about 60 to 70 stops, and before I left it was over 100 stops. This is not because I requested more stops; my manager just kept increasing my work. Even though I had more stops, FedEx still wanted me to do late pick-ups, but I just could not get there in time. My manager never asked me or discussed the late pick-ups with me or whether I could do them with my increased number of stops. I was just assigned them and had to do them or risk my contract.

14. FedEx also has a time-off program that I could sign up for and get two weeks off in a year, but without pay. FedEx assigned a driver to cover my route when I had vacation, but the driver did not know what he was doing and that led to big problems. I would come back and my route would be messed up, customers complained, and packages were

missing. My manager blamed me, even though he assigned the driver.

15. Once my car broke down and I could not make it in to work. My manager threatened me with route abandonment. He said I had to get a temporary driver on my own to cover. I could not hire who I wanted, though, because the driver had to be FedEx approved. I finally found a temporary driver that had FedEx approval, but he messed up. For example, he did not log all his pick-ups, so they were missing in the system and my manager blamed me and said I abandoned my route. I could be held financially responsible for last packages on my route, even if a temporary driver was covering it at the time.

16. I was called for jury duty twice while at FedEx, but my manager said I could not go and if I did I would be cited for route abandonment. I know this happened to another driver, too.

17. I tried to decrease my route so I did not have to stay out until 6:00 p.m. or 7:00 p.m. I have a son that I needed to be home for, and the managers knew it. But still they harassed me and wanted me to stay out late and do more work. I was not paid by the hour or paid overtime, so I was not going to stay out that late.

18. My manager then wanted me to re-do my route and give some of it to another driver. I said no. He wanted to get rid of me then and authorized a new driver and gave my route to him. My last contract was not supposed to end until around the end of May 2007. But on or about January 25, 2007, my manager called me in and told me FedEx was not renewing my contract. I asked for a reason and asked for it to be put in writing, but he refused. The only thing I received was a letter stating FedEx would not renew my contract. This was effective immediately, so FedEx prematurely terminated my contract without cause. It just wanted to give my route to someone else.

19. I support the goals of this lawsuit. FedEx treated me like an hourly employee, so I should have been paid like one.

20. I am willing to testify in this matter if needed to do so.

Signed under the pains and penalties of perjury this 27 day of June 2007,

Name

**Declaration of Richard Kasaine**

I, Richard Kasaine, hereby declare as follows:

1. Since March of 2001, I have been a package-delivery driver for Fed Ex Ground out of the terminal in Windsor, California.

2. When I signed my Operating Agreement, I understood I would be an independent contractor. I thought I'd have the opportunity to run my own business. But that has not been the case.

3. I drive a P-1000. Fed Ex told me I needed to have that kind of truck, and I bought it from the person I bought my route from.

4. Each day, I have to deliver every package Fed Ex assigns. If I don't, I could get a "DNA," a service failure that reduces my pay and could lead to termination of my Operating Agreement.

5. I have protested the number of packages I have been given before. The terminal manager said that I had to deliver them, even when they could hardly fit in my truck.

6. Fed Ex has changed the geographic area which I am responsible for servicing. Even though Penn Grove is not in my Operating Agreement, for five years, Fed Ex required me to deliver packages there.

7. I have asked Fed Ex to split my route – a second official Fed Ex route would give me an additional van availability payment and core zone payment. Fed Ex said that first I had to pay a supplemental driver and get a supplemental van. I did that, but Fed Ex still did not split my area.

8. I have to make pick-ups of packages during windows of time that Fed Ex sets. I have had customers who have given me the key to their warehouse and told me that I could pick up packages during a wide period of time, but I was still required by Fed Ex to meet the pick-up window. I have to deliver packages to businesses before they close.

9. I lease the Business Support Package from Fed Ex – my scanner and uniform.

10. I have to wear the uniform and comply with other appearance standards. Managers have told me to repaint my truck to cover scratches from trees.

11. I've worked sick when I had the flu or worse. I regret that I have never been to my children's school and that it is difficult for me to get off from my job when my family needs me.

12. I agree with and support this lawsuit. Fed Ex treats us like employees, not independent contractors. We should be entitled to employment benefits.

13. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed this 8 day of July, 2007 at Santa Rosa, California.

Richard Kasame

**Declaration of Noah Keefe**

I, Noah Keefe, hereby declare as follows:

1. For the past three years, I have been working as a package-delivery driver for Fed Ex Home out of the terminal in San Diego, California.

2. I bought the truck that I use for my route from a previous Fed Ex Home driver. Before I purchased the truck, a P-500, Fed Ex had to approve the truck for my route.

3. Every day, the terminal assigns us the packages that we have to deliver. If we do not deliver all of the packages we are assigned, we risk getting a DNA, a penalty short for "do not attempt" that could result in termination of our Operating Agreement. I have tried to protest the number of packages I was assigned. I have told the terminal manager I had too many packages. He didn't listen. I still had to deliver all of the packages.

4. I have one primary zip code (92108, in Mission Valley) in my Operating Agreement. In addition, the terminal assigns me packages to deliver in other zip codes. At one point, the area I usually service changed. A driver was fired, and the terminal asked me whether I would like to service North Park (an area he had serviced), instead of Hill Crest. I said I would. I am grateful for the change. I am glad that Fed Ex considered my opinion. But the decision of whether to change my route was Fed Ex's, not mine.

5. I lease the Business Support Package, which consists of the uniform and scanner we use to keep track of our packages.

6. I arrive at the terminal everyday before 7 a.m. Sometimes, the trailer delivering packages to the terminal is late and the terminal manager "holds" us and does not allow us to begin our routes until all of the packages get to the terminal. We have asked whether we can leave and come back to the terminal to pick up the remaining packages later, and the terminal manager said definitely not. He said that the decision wasn't his, but was made by somebody higher up. Fortunately recently, the trailers have arrived at the terminal on time. Before we can begin our routes, our scanners are updated. The terminal likes to run the update of our scanners by 8 a.m.

7. Sometimes I have appointment deliveries. I have to deliver those packages at the time agreed to between the customer and Fed Ex. When I deliver to a business I have to arrive during business hours – usually by 5 pm.

8. It is difficult taking time off. That is why I pay for the Time Off Program. I pay Fed Ex so that I can take a vacation. Fed Ex pays another driver to run

my route while I take my two week vacation. Vacation is bid for in advance based on terminal seniority.

9. I am submitting this declaration in order to let the court know that I support the lawsuit by the drivers of Fed Ex. I believe that we are employees, not independent contractors, and that we should receive the benefits that employees have.

10. I would be willing to testify in court if necessary.

11. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 9 day of June, 2007 at SAN DIEGO, California.

______________________________

**Declaration of Nikolay Krastev**

I, Nikolay Krastev, hereby declare as follows:

2007

1. From June 2005 until I was terminated in March 2005, I was a package-delivery driver for Fed Ex Home out of the Oakland, California terminal.

2. At Fed Ex Home, we worked Tuesdays through Saturdays. My job was to deliver every single package that went through Fed Ex's sort and was placed on my pallet. Often there were missing package also. Fed Ex wouldn't let me close out my scanner and begin my deliveries until those packages were found.

3. If I didn't deliver any package that Fed Ex gave me, I could get a DNA – "delivery not attempted." That reduced my pay and could lead to termination of my Operating Agreement. Sometimes I complained about the number of packages I was assigned or the areas I had to cover. The terminal manager told me I had to take them. He said that if I didn't it would place my Contract in jeopardy.

4. I had to deliver packages to businesses before the businesses closed. Sometimes I had appointment deliveries which I had to deliver to during a window of time.

5. I have had to work sick because I couldn't find a driver who was approved by Fed Ex to substitute for me.

6. I bought a Dodge Sprinter, the vehicle Fed Ex told me to buy. I leased the Business Support Package from Fed Ex, in order to get the uniform and scanner Fed Ex required.

MARCH 2007

7. In February of 2006, Fed Ex terminated my Contract. I wasn't given anything in writing. The terminal manager did not tell me why I was terminated. Like a thief, I was escorted out of the terminal by security guards. I was not allowed to sell the Fed Ex route that I supposedly owned.

8. I agree with and strongly support this lawsuit. Fed Ex treats us like employees, not independent contractors. We should be entitled to employment benefits and protections.

9. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 7 day of July, 2007 at HAYWARD, California.

Nice Krastev

**Declaration of Steve Leachman**

I, Steve Leachman, hereby declare as follows:

1. From about September of 2004 until last week when I resigned and sold my route, I have been a package-delivery driver for Fed Ex Home out of the terminal in Redding, California.

2. My wife Vicki and I worked together. I drove and delivered the packages. She scanned the packages and served as our navigator. We were a team.

3. When we arrived at the terminal everyday, the packages we were required to deliver were sorted and placed in our area. We were responsible for delivering any packages that came into the terminal and that Fed Ex assigned to us. If we failed to deliver a package we were assigned we risked getting a "DNA," short for "did not attempt," a service failure that could result in termination of our Operating Agreement. The terminal manager frequently threatened me, Vicki, and others with termination of our Contracts.

4. Our Operating Agreement was originally in Vicki's name. When Vicki got sick, we switched the Operating Agreement to my name.

5. The primary zip code in our Operating Agreement was in Chasta Lake City (96019). We were responsible for delivering packages to Chasta Lake City, as well as to any other zip codes that Fed Ex decided to assign us. Fed Ex also assigned us 96003. The area we covered grew in package volume. Sometimes, we complained that there were too many packages. Usually the terminal manager said that we had to take them. We worked 13 to 14 hours a day on average.

6. We asked many times about splitting our route because we had so many packages. But whether Fed Ex split our route, giving us an extra van availability payment and core zone payment, was up to Fed Ex, not us. We asked the terminal manager about splitting our route many times. Nothing was done. Once, we asked at a "Round Table Discussion" between the drivers and terminal managers and the Regional manager. The Regional manager claimed that the Fed Ex was making few new routes in the Region.

7. When we had appointment deliveries we had to deliver packages during the window of time set between Fed Ex and the customer. If we arrived early or late, it was a service failure, and we would lose pay. We had to deliver to businesses before they closed.

8. We leased the Business Support Package from Fed Ex, which included our scanner and uniforms.

9. We purchased a P-350 van, which Fed Ex approved for the route.

10. It was extremely difficult getting time off. Vicki has been very ill. On two occasions I tried to take off in order to support Vicki when she was undergoing surgery. Both times I had to go to work.

11. As mentioned, we just sold our route. Fed Ex had to approve the sale. Moreover, Fed Ex policies have made it difficult for us. We had to find a driver who had previous experience driving the *exact same kind of vehicle.* We were told that even a person who drove a school bus and had a Class A, DOT, license wouldn't do. Otherwise, the driver would have to attend a particular driving school. Then, the driver would have to serve as a supplemental driver before they could actually get the route. This made it extremely difficult for us to market this property we supposedly owned. We sold the route to someone inside the terminal.

12. I agree with and fully support this lawsuit. I believe that we were employees, not independent contractors.

13. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 27 day of June, 2007 at Redding, California.

Steve Leachman

Steve Leachman

**Declaration of Vicki Leachman**

I, Vicki Leachman, hereby declare as follows:

1. I have read the declaration that my husband, Steve Leachman, signed today and I have personal knowledge of the facts set forth therein.

2. I believe that we were Fed Ex Home employees, not independent contractors. I fully support this case.

3. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 27 day of June, 2007 at Redding, California.

Vicki Leachman
Vicki Leachman

**Declaration of Lance Lindquist**

I, Lance Lindquist , hereby declare as follows:

1. I am a Fed Ex ground package-delivery driver in the terminal in Witcha Kansas #672, where I've worked since December 1998.

2. When I signed my first Operating Agreement, my understanding is that I would be an independent contractor. I wanted to be an independent contractor. To me, that meant that I more or less would have more control over my own business. I feel like for the most part FedEx has the most control over me, I would like more freedom and control in decisions without FedEx interfering. I have to wear a FedEx uniform and advertise FedEx on my truck, I have pickups with one hour windows and I have to show up on time and I can't show up early or I am penalized. Therefore, FedEx puts me on a schedule. I had a truck that I had to put in the shop, it just so happened that I had bought a new truck for a different route but it didn't have FedEx decals on it yet. I had a truck that broke down, and I wanted to use the new truck and FedEx wouldn't let me use it because the FedEx logos weren't on the side. FedEx instead made me rent a Penske truck instead of using a new truck.

3. I had a driver who got a truck stuck out the country on a customers gravel driveway and she left some ruts in the driveway. The customer called in and complained to FedEx. I thought I should have been able to handle this problem but instead FedEx handled the situation and handed out $2,100.00 to fix the driveway and decided that I had to pay a $1,000.00 as a deductible without my consent.

4. The first year I started I had a claim where I delivered a package that was meant to go to Walmart A and I delivered it to Walmart B. Walmart sold the item and agreed to sign a statement that they received the item but FedEx instead took the claim out of my pay.

5. FedEx makes extra money on signature requests; I am not paid for any attempts to get that signature if I don't get it including pay for gas, time, milege etc.

6. FedEx decides how many packages I receive each day and I have to take all of the packages in the terrority. I have been assigned packages on numerous occasions that were outside my primary area and FedEx made me deliver them.

7. I have a starting time of 8:30 a.m. to deliver and pickup at Bed Bath and Beyond, if I do not meet this starting time FedEx would take this stop from me. I finish delivering the packages on the route at 1:30 p.m. and have to wait until 3:00 p.m. to begin pickups. I have to wait to do these pickups because I do not get to set the time of the pickups, FedEx and customer does. Therefore there is a period of time where I am not operating and not being paid each day.

8. FedEx had to approve the type of van/truck that I purchased for the route.

9. I am making the above statements to let the court know I support this case and I would be willing to testify in court if I am needed to do so.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Kansas that the forgoing is true and correct, to the best of my knowledge.

Executed this 21 day of May at Wichita, Kansas.

[signature]

Lance Lindquist

# DECLARATION OF JAMES MEO MARTINO

I, James Meo Martino, hereby declare as follows:

1. I am a Fed Ex Ground driver. I started with FedEx in 2002 and have been driving for them for about 5 years. I used to do a route in Milwaukee, WI and now do one in Kenosha, WI.

2. I have one route. It was my intention upon becoming a driver for FedEx to see what income I could make and to look at expanding as a business to more routes.

3. I found in working for FedEx that I am not in control of the number of packages and stops that I deliver. I am in the flex program, but it does not help me. For example, this past year when I had a stop of 30 -35 packages that I needed to have flexed off of me, the packages were put on a straight truck, but the straight truck did not deliver them so the next day they were back on my truck. As another example, I have a company that used to have a pick up window of 11-12:30 and I would pick up one to three packages. I was told the window changed to 3:00 – 5:00. I now I have to back-track on the route to do this stop, and the employees of that company go home at 2:30, so they leave about the same number, one to three packages, at the door with an external door unlocked.

4. One time, in 2006, FedEx measured the tires on my truck and said they had to be changed. I had a mechanic look at the tires and he said they do not need to be changed. A person from Pomps (who provides tires at the FedEx terminal) said they needed to be changed too. I think this is because of how they measure the tires to try to dictate when drivers change tires.

5. I work about 10-12 hours daily. This year, in May, I was on vacation per FedEx's vacation program. Because the terminal had not planned for another driver to be off, I had to come in from my vacation and do a route. Because of this, I had to cancel my planned vacation.

6. I decided I wanted to grow my business and had my brother-in-law and next door neighbor go through FedEx's training class. I planned to put on 2 vans. I got the specs for the vans that I needed from FedEx. I found that FedEx was training them to drive straight trucks and P100s to which I had no intention of them driving and were not the specs I had received. I told this to the terminal manager and so did my guys going through the class. FedEx told them don't even

bother, you are not going to pass the class anyway so it doesn't matter. I had another guy that drove for another contractor named Diwiacki. The terminal manager said he could not drive for me, but it was Ok for him to drive for Diwiacki. Therefore, I did not have any drivers that could do a route and could not expand.

7. There is a zip code that I do on my route, 53158, that is not on my route, is the farthest away and does not show up on my paperwork at the end of the day/checks. Only 53143 and 53140 come up on my paperwork because they bump 53158 into 53140.

8. I would be willing to testify or serve as a plaintiff if I was needed to do so.

I declare under penalty of perjury under the laws of the United States and the laws of the State of WI (State) that the foregoing is true and correct.

Executed this 21 day of MAY (Month) at Milwaukee (City)

WI
State

[signature]
James Meo-Martino

**Declaration of Kevin Maynard**

I, Kevin Maynard, hereby declare as follows:

1. I am a package-delivery driver out of the San Diego terminal of Fed Ex Home, where I have worked for the past three-and-a-half years.

2. When I arrive at the terminal in the morning, the packages I'm required to deliver are sorted and placed on my pallet. I am responsible for scanning them in, loading them in my truck, and delivering them. There are sometimes packages missing in the sort. I'm not supposed to close my scanner out until they are found. The terminal wants every package to be delivered everyday.

3. There is one primary zip code in my Operating Agreement. In addition, I am responsible for delivering packages to any other areas that Fed Ex gives me. The territory I cover has changed around over time.

4. Sometimes I have appointment deliveries. I am given a window of time in which to deliver those packages. I have sometimes been asked what's convenient for me before those windows are set. At other times I haven't.

5. I sometimes have business deliveries as well. All business deliveries require the customer's signature.

6. Fed Ex comes out with Addenda to my Operating Agreement. I do not have any input. I just have to sign them.

7. I have had about two Customer Service Ride Alongs a year. A manager sits in the passenger seat of my van, observes how I am doing, and gives me feedback. The feedback that I've gotten has tended to be positive.

8. I lease the Business Support Package from Fed Ex, which includes my scanner, uniform, and van washing. You don't really have a choice. You have to wear a uniform a nd use the scanner. Buying the scanner and software, and upgrades to the software, would be expensive.

9. I drive a P-500. When I entered my Operating Agreement with Fed Ex Home, I told the terminal manager I wanted to buy a used van. He discouraged me extensively, so I didn't pursue it further. He gave me a sheet that showed the two kinds of vans I could use, a P-500 and a Workhorse. He told me I couldn't get the Workhorse. So I had no choice but to get the P-500.

10. It is difficult to take a day off. I participate in the Time Off Program, in which I pay Fed Ex to take two unpaid weeks of vacation. Vacation is bid for by terminal seniority. A few weeks ago, I felt so sick I could hardly stand up. I went to the emergency room, and then completed my deliveries. In an

emergency, it's hard to find a relief driver, especially one who is Fed Ex approved. I Would Love To Be Able To Take off if My Son is sick.

11. I fully agree with and support this lawsuit. I believe that Fed Ex should acknowledge that we're really employees, pay us like employees, and entitle us to have the legal benefits and protections that employees have.

12. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of July, 2007 at San Diego, California.

[signature]

Kevin Maynard

**Declaration of Roy Mason**

I, Roy Mason, declare as follows:

1. For about ten years, I have been working as a Fed Ex Ground package-delivery driver out of the Eureka, California terminal.

2. I testified as a witness in the case, *Estrada v. Fed Ex Ground*. I totally support and am willing to testify as a witness in this case also.

3. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this [illegible] day of June, 2007 at [illegible], California.

[signature]

**DECLARATION OF JIM McCulloch**

I, Jim McCulloch, hereby declare as follows:

1. I am a Fed Ex Ground driver. I started in November 2003.

2. When I started with FedEx, I thought I was going to be running my own business. It didn't take long after running my route for me to find that was not the case. For example, I found I was working longer hours than I wanted as I was out consistently for about 12 hours and about 310 miles on a rural route.

3. When I started, FedEx told me, like other drivers, that they would supplement fuel costs. They do, but the amount does not cover the fuel completely because it is my understanding FedEx assumes all trucks are the same getting 10 miles per gallon. That is not the mileage I get on a rural route. There are also a lot of maintenance costs on vehicles, especially mine again because it runs a rural route. For example, on my route, I had to have an oil change approximately every 6 weeks at approximately $200 per time.

4. About twice a year, a Ground manager rode with me in the passenger seat and timed how long it took me to do stops. He would afterward tell me how many stops he thought I should be able to do in a 10 hour period. As I understand it, pick ups were not counted as a part of that, which generally takes longer to do than a delivery. So as result the amount FedEx and my manager would tell me I could do was inaccurate because it includes almost no time for pickups. And, it was explained that it does not count excess pick ups. So, although I only had 3-4 regular pick ups, I would get 10 - 12 pick ups which would add on considerable mileage and time on my rural route as they were spread out.

5. I was in the so-called flex program which I understood to mean that when I hit my max of 65 stops, FedEx would have another driver do excess stops. It was not uncommon for me to go out with over 70 stops plus pick ups, and in peak season (November –December) over 100 stops. FedEx would not take the excess packages even when I asked. And even if I delivered my 65 stops, if they gave 70-100 stops,

they would count any not delivered against my service percentage which in the end would cost me money.

6. I work about 10.5 to 11 hours a day and sometime more. I, like other Ground drivers, do not punch into my scanner until I leave although many times I am in the terminal for an hour or more prior to that do loading and preparing for the day so my truck is organized and I get out on time.
7. I thought I would own a route that was a specific area when I started with FedEx. As the quantity of the areas increased, FedEx would take an area away from me. I thought before FedEx would do that, they would discuss it with me, but what I found is that they dictate what my area will be, either taking an area away or adding on whether I agreed with it or not.
8. I am submitting this because I feel I was misled. I thought I would earn better money. I learned that if you are running 4 or so multiple routes you can make money, but as a single work area driver I did not make what they told me it would be. I would be willing to testify or serve as a plaintiff if I was needed to do so.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Wisconsin that the foregoing is true and correct.

Executed this 29 day of May at Ridgeland, Wi.

Month City

Wisconsin

State

Jim McCulloch

Jim McCulloch

**DECLARATION OF CARLOS McNAIR**

I, Carlos McNair, hereby declare as follows:

1. For the past five years, I have worked as a package-delivery driver for Fed Ex Ground out of the Roanoke, Virginia terminal.

2. When I first signed the Operating Agreement, I thought I would be an independent contractor. I thought I would have the ability to make decisions for a business I run myself and to make a profit. But that has not been the case.

3. We work Mondays through Fridays. The managers in the terminal tell us we should be dispatched to run our routes at 8:00 a.m. But that is not really possible. Because of delays with the sorting, we usually cannot leave the terminal to begin our deliveries until about 8:30 a.m.

4. I have early pick-up windows. If I do not make a pick-up window it is failure of service and I lose pay. In addition, we have to deliver packages to businesses before closing time. Fed Ex has a policy that all business packages require the customer's signature.

5. Every day I have to load in my truck and attempt to deliver every package I am assigned. If I do not deliver packages I am assigned, I can get a DNA, short for "did not attempt," a service failure that reduces my pay and could result in termination of my Contract.

6. The number of packages in the rural area I service has grown a lot in recent years. I've complained that I'm given an unreasonable amount of packages. I have made several suggestions, including that Fed Ex take some of my area away and assign it to someone else, and that Fed Ex split my route giving me an extra van-availability payment and core zone payment so that I can afford to hire a driver and buy another van. Fed Ex has done neither. The terminal manager tells me that I have to deliver all of the packages. If I don't, it will place my contract in jeopardy. I have to work long hours everyday.

7. I lease a P-1000. That is the kind of van that the service manager told me to get when I signed on with Fed Ex.

8. I lease the Business Support Package. That pays for my uniform and scanner. You have to do it.

9. Fed Ex decides how much to pay me. Fed Ex decides what my core zone payment, fuel supplement, and bonus threshold will be. I don't.

10. It is difficult to take time off. You have to find a replacement who has been qualified and approved by Fed Ex. This means that if you want to use someone from the outside, you usually have to send them to the driving school that Fed Ex requires, for a cost of about $1,000, and even then, you don't know if Fed Ex will approve them. When my sister passed, I was only able to take two days off to travel to Mississippi and to grieve and be with the family.

11. I am making this declaration because I agree with and I support the lawsuit. I believe that we are treated just like employees, and that we should be entitled to employment protections.

12. The schedule I work is controlled by Fed Ex. I have to make pick-ups during daily pick-up windows set between the customer and Fed Ex. I have to arrive at businesses before they close. That is because Fed Ex has a policy that all deliveries to businesses require a signature. Also, I have to deliver or attempt to deliver every package I am assigned. My hours of work increased recently when Fed Ex changed my service area.

13. I declare under penalty of perjury under the laws of the United States and the State of Virginia that the foregoing is true and correct, to the best of my knowledge.

Executed this 4th day of July, 2007 at Roanoke, Virginia

Carlos McNair
Carlos McNair

DECLARATION OF DAVE MITCHELL

I, Dave Mitchell, hereby declare as follows:

1. I was a Fed Ex Ground driver from approximately July 2004 to March of 2007. I worked in the Philadelphia terminal in Pennsylvania. I had one route and drove it as my job.

2. When I started working for Fed Ex Ground, I expected to be my own boss and I understood that is what FedEx meant by "independent contractor"; but I found that was not the case after I signed an Operating Agreement.

3. I did not pay for my route; it was given to me by FedEx.

4. I intended to buy a truck from another FedEx driver, Todd Tolameo, to do the route. I understood that in order to use the truck for the route, it had to be approved by FedEx, so I discussed it with FedEx management. A FedEx manager, Scott Hoppe, said he had to contact the leasing company. Hoppe advised that I could not take over the payments on Tolameo's truck, but rather, Hoppe said he had worked out a deal with Lisa Busch of Busch Leasing. Hoppe later told me that he had ordered me a new truck. He told me to give him a check for $2.000 for the truck and then I could start working. I gave him the check.

5. Shortly after I started, FedEx took part of the route away, the 19148 zip code. Although I told them I did not want them to do so, I was told by FedEx management that was how it was going to be.

6. After working as a FedEx driver, I learned that Fed Ex determines how and when I pick up and deliver packages in many ways. For example, I am required to do certain steps to driver release a package and I was told by FedEx to deliver every package every day.

7. I had an accident on while diving for FedEx in 2005. As a result of it, my knee was injured and a doctor treating me advised that I should not drive for some time. My manager Jim Bradley told me that FedEx could cover the route for 2 weeks, but after a couple of days called me and said if someone did not drive my route, FedEx would terminate my contract.

8. I am submitting this statement because I support this case as I understand the goal of it is to require FedEx to comply with the law by admitting that I and the other pick-up and delivery drivers for FedEx Ground are treated like employees. I would be willing to testify or serve as a plaintiff if I was needed to do so.

I declare under penalty of perjury under the laws of the United States and the laws of the State of ____________________ that the foregoing is true and correct.

Executed this 7th day of July, 2007 at

Phila., PA
City State

Dave Mitchell
Dave Mitchell

**DECLARATION OF LOREN MODESITT**

I, Loren Modesitt, hereby declare as follows:

1. I am a Fed Ex Ground driver. I started in fall 2005 and work in the state of Washington.
2. When I was given an Operating Agreement to read when I started. I thought it was one-sided, but in talking to others I learned that it would not be changed, although I asked a manager for things to be changed. I was lead to believe I would be an independent contractor and was familiar with that having had my own businesses for about 30 years. I learned quickly that I had little say in how I operate. I pay the bills but FedEx controls how the packages are delivered, when I work, what I wear. You do not have control over your business in how you run it.
3. A customer called saying I was too late because it was suppose to be after 6:00 am, and I came at 7:30 and did a delivery. It turned out the customer had an internal issue and I was correct, because the customer called the complaint line, I was charged.
4. I started near peak season October and my hours were approximately 5:00 am to getting home after 9:00 pm. I now average about 12 hours a day from about 5:40 am, I can leave the terminal at about 7:30, and I get done approximately 6:00 pm, back to the terminal. Last year I did not take any time off.
5. I do in the neighborhood of 200 miles a day and average about 95-105 stops a day. In peak, I have to put on a supplemental vehicle which costs me money which I would not choose to do but I know FedEx will not give me another route, unless I do, despite that my area growth has been near 50% because the population in my area is growing so quickly. (It is about 30 miles from Seattle).
6. I would be willing to testify or serve as a plaintiff if I was needed to do so in support of the drivers in this case.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Washington that the foregoing is true and correct.
State

Executed this 15 day of May at Buckley
Month City

Washington
State

[signature]
Loren Modesitt

**Declaration of Octavio Montero**

I, Octavio Montero, hereby declare as follows:

1. I have been a Fed Ex Home package-delivery driver since October of 2006, out of the terminal in Chico, California.

2. When I arrive at the terminal in the morning, the packages I am required to deliver have been sorted and placed on my pallet. I cannot refuse to accept packages. I have tried to refuse to accept packages before. The terminal manager told me I had to deal with them.

3. Fed Ex requires everyday service. Every area has to get serviced every day. Packages are assigned to us, and supposed to be delivered by us, on the day they arrive in the terminal. If we don't attempt to deliver a package we are assigned, we will get a DNA, a service failure short for "did not attempt" that could result in termination of our Operating Agreement.

4. My Operating Agreement gives me a primary zip code. In addition, I have to deliver packages to any other zip codes that Fed Ex tells me. My standard service area consists of 3 or 4 zip codes.

5. I arrive at the terminal everyday between 7:30 and 8:00 a.m. We have to scan our packages and close our scanners by 9:00 a.m.

6. My truck had to get approved by Fed Ex. It displays the Fed Ex logo. I once had a Nascar bumper sticker, but the terminal manager told me to remove it.

7. I lease the Business Support Package – the uniform and scanner. I believe we have to.

8. It is very difficult to take time off. We need to find a driver who has been pre-approved by Fed Ex, but the terminal doesn't have relief drivers available

9. I making these statements because I support this case. I believe we are employees – not independent contractors. We are entitled to the legal benefits that all employees have.

10. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 9 day of July, 2007 at GRIDLEY, California.

Octavio Montero

**Declaration of Bart Moore**

I, Bart Moore, hereby declare as follows:

1. I have been a package-delivery driver out of Fed Ex Home's Redding terminal since September of 2002.
2. At that time, I purchased my route from a previous Fed Ex contractor. Fed Ex approved of my purchase of the route. Fed Ex also approved my purchase of the vehicle, a Workhouse 450, from the previous contractor.
3. When I arrive at the terminal every day, the packages for me to deliver are sorted and placed in my area. I am responsible for whatever packages come in and are assigned to me. If I do not deliver all of the packages, I risk having a delivery failure or "DNA" and my terminal manager telling me that if I cannot deliver all of the packages, I have to get another vehicle, and pay another driver. I work a long day without a break to deliver all the packages assigned to me.
4. After I began working for Fed Ex, the number of packages in the areas I deliver to began to grow until there were too many packages for me to deliver.
5. I requested Fed Ex to split my route. We were told by terminal managers and others at Fed Ex that if the number of packages in our area grew sufficiently, we would be able to "split" our route, or have our route divided into two authorized Fed Ex areas. Once we split our route, Fed Ex would increase our pay and we would be able to rent or buy a second van and pay a second driver.
6. Fed Ex denied my requests to split my route. What the Western Regional manager told me is that before Fed Ex would agree to split the route, I would have to "support my area" by obtaining a second van and paying a second driver. Until Fed Ex split my route, increasing my pay, I would operate the second van at a loss. But the Western Regional manager made clear that unless I obtained a second vehicle and paid a second driver, Fed Ex would not split my route, or Fed Ex would split my route and give one of my routes to a different contractor.
7. From January 2006 until September 2006, I did rent a second van and pay a second driver. In September 2006, Fed Ex decided to split my route.
8. I rented a vehicle, a Sprinter van, which Fed Ex authorized me to use.
9. I lease the Business Support Package from Fed Ex through deductions from my pay. It includes my uniform and my scanner. I use my scanner to report to Fed Ex the status of each of my deliveries and I close out my scanner using Fed Ex's procedures at the end of the day.
10. I do not use my trucks on my days off. The terminal manager tells us that we cannot use our trucks for personal reasons unless we cover up the Fed Ex logos on them.
11. I have discussed with my terminal manager selling one of my routes. Fed Ex has to approve of the sale.
12. My terminal manager told me that Fed Ex will only approve the sale if I sell my route to a driver who has driven a similar van at least six months or who

goes to a Fed Ex-approved driving school. If the route is something I own, I do not understand why I am not free to sell the route to any willing buyer.

13. I support this case because I believe that a court should decide whether I am an independent contractor or an employee.

14. I would be willing to testify in court if needed to do so.

15. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 22ND of May at Redding, California.

Bart Moore

Bart Moore

                                                    **Declaration of Eloy ~~[illegible]~~ Moreno**

I, Eloy ~~[illegible]~~ Moreno, hereby declare as follows:

1. For the past two years, I have been a package-delivery driver for Fed Ex Ground out of the terminal in Windsor, California.

2. I have to pick up packages during the windows of time set between the customer and Fed Ex. If I arrive at a pick up early or late, it is service failure, which reduces my pay and could ultimately result in termination of my Operating Agreement. I have to deliver packages to businesses before they close. By Fed Ex policy, all packages delivered to businesses require the customers' signature.

3. Everyday, my job is to deliver, or at least attempt to deliver, the packages that Fed Ex assigns to me. If I fail to deliver any package I am assigned, I can get a DNA (short for "delivery not attempted"), which is a service failure that reduces my pay and ultimately could result in termination of my Operating Agreement.

4. Fed Ex has reconfigured my area before. Around a year after I started working as a package-delivery driver for Fed Ex Ground, I noticed that an area that I was required to service, part of Sonoma, was not in my Operating Agreement. I asked the manager why I was regularly servicing Sonoma, even though it wasn't in my Operating Agreement. He said that since I am in the Flex Program, I have to deliver packages there. I have routinely been required to deliver to Sonoma for the past two years. Just recently, Fed Ex created a new Fed Ex Ground route. In order to make this route, my area and the areas of other drivers were realigned. And last week, Fed Ex began assigning me areas that an interline service used to handle. Because these are remote, hard to reach places, that may be dangerous to go to with a truck, I expressed concern. But the terminal manager told me I have to make the deliveries.

5. I lease from Fed Ex the Business Support Package. The Company makes it sound like we don't have to. But we don't really have a choice. We are required to use the scanner. We are required to wear the uniform.

6. I drive a P-1000, step van, which Fed Ex had to approve.

7. It is difficult to take time off. I cannot afford to keep a driver on-call for when I get sick or have an emergency. We can't just use anyone. We have to use a relief driver who is qualified and trained in advance by Fed Ex. I have had to work sick.

8. I participate in the Time Off Program, in which money is deducted from my paycheck so that I can take a vacation. Vacation is bid in advance by terminal seniority.

9. I agree with and support this lawsuit. I would be willing to testify if necessary.

10. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 3 day of July, 2007 at 15216 Bellevue Rd Sebastopol, California.

Eloy ~~[illegible]~~ Moreno

**DECLARATION OF MIKE MORENO**

I, Mike Moreno, hereby declare as follows:

1. I am currently a Fed Ex driver. I started in April 2004. April 2004 to April 2005 I drove for Fed Ex Home Delivery. At that time, I drove for the another contractor because I could not afford to purchase a route. In April 2005, I purchased a FedEx Ground route and have been driving it since then.
2. I was given an Operating Agreement to read in August 2005, but I did not sign it at that time because it was my understanding that I was not yet approved to do so by FedEx and I had to drive under the current contractor I bought the route from. A few days before Christmas, my manager came to me one morning while I was getting ready for the day, and said I was approved, and to come to his office to sign an Operating Agreement right then. I did.
3. I am told what to wear as to my uniform. I have been told I can't wear things like white shoe laces in my black shoes. One time, in winter, I wore a plain black knit can to keep me warm. It did not have any writing, but I was told I could not wear it because it did not have a FedEx label on it.
4. I drive what FedEx calls a bulk truck which means it is one of the large trucks in the terminal with a large number of packages, and many packages are often delivered to one stop. There are a large number of packages and sometimes large packages that don't fit on the other trucks and FedEx loads those on my truck. Based on my experience the flex program says if I participate that if truck has capacity for packages they can be put on my truck if FedEx chooses. FedEx tells me if I have to take packages for other drivers because they are too big, or they say 'I am light' for the day. I am told I have to because I am in the flex program when I have said I do not want to.
5. FedEx holds all the cards and tells you what deliver, how to deliver, when to deliver. On my route they have counts for certain stores. One of mine is American Eagle Outfitters and I am given a delivery window, a time frame of 12:00 – 2pm, to deliver. I get this from one of my managers and it is my understanding that American Eagle corporate and FedEx corporate decide what that will be and then tell us. If I am early or late, even 5 minutes, one of my terminal managers will question me about it or may tell me I have to be on time, sometimes they are on the phone within a few minutes of it happening and say something like, why were you 5 minutes late to American Eagle Outfitters? They monitor this through the scanner. I also have Disney Store at same mall, and it has to be after 1:00. This is again because I think they have a deal with FedEx and tell

me to comply. They have bonuses for the whole terminal linked to these and everyone is linked to each other to receive those bonuses.

6. I have no option or I am told I you are not fulfilling your contract unless I do what they tell me. I control how fast I work, and a window of time to come in during the morning, but beyond that, FedEx controls it because they can hound you for what they want you to do. They tell you if I do not, they say I am not servicing my contract and sometimes they threaten me.
7. When I bought my route, I was told what it was by streets and zip codes. The route has changed a lot since I had it. It fluctuated because of FedEx's needs. When I still was not approved by FedEx in 2005, the driver that sold me the route told me FedEx had changed it and they fought FedEx but FedEx had the ultimate decision. So FedEx took a section of route away in about July 2005. They gave me a section of Gig Harbor that I did not want, I told them I did not, and temporarily it was taken away, but four months later I got it back. They told me it was a flex of 15-30 stops daily for 2 months. I told them often that I didn't want it and wanted it off my truck. FedEx said I had to take it as a flex, the current driver servicing that area was failing, and also had to because FedEx said I had enough time in my day. I told them I wanted to either essentially inherit the route are for nothing or not do it. About one week later, my manger told me it was mine. I did not pay anything for it or talk to another driver about arrangements for me to get it from him.
8. I am submitting this because I can do the job but don't want FedEx to manipulate me anymore to do what they want. We do their business and they tell us how to do it but it really should be our business if we were independent contractors. I would be willing to testify or serve as a plaintiff if I was needed to do so to support this case for drivers.

I declare under penalty of perjury under the laws of the United States and the laws of the State of W A that the foregoing is true and correct.
State

Executed this 15 day of May at 19:00 in Olympia
Month City

Washington
State

[signature]

Mike Moreno

**Declaration of Lance Morgan**

I, Lance Morgan, hereby declare as follows:

1. Since October of 2006, I have worked as a package-delivery driver for Fed Ex Home out of the terminal in Chico, California.

2. When I signed my Fed Ex Home Operating Agreement, I understood I would be an independent contractor. I thought it was an opportunity to have my own business and invest in a business that I could control. But I feel as much like an employee as in any job I have held.

3. I arrive at the terminal everyday at 7:00 a.m. The packages I am assigned to deliver are sorted and placed on my pallet. I have to scan them and load them in my van. After I have scanned every package the terminal has assigned me (including any missing packages, I have to find) the terminal uploads my scanner. Since the terminal uploads our scanners by 9:00 a.m., we have to get to the terminal early.

4. I service an area with heavy package volume. When I signed my Operating Agreement, I was told the route was expected to split. So there are more packages that arrive at the terminal for my area than I am able to deliver in one day. As a result, the terminal flexes some of the packages in my area to other drivers. There are times that I objected that there were still more packages than I could handle. The terminal manager told me I had to take them. He has said if I didn't, I'd end up failing. The manager frequently threatens me and other drivers with Contract termination.

5. Fed Ex decides our routes. I am assigned one zip code in my Operating Agreement called my "primary zip code." I am also required to deliver to any other zip code that Fed Ex assigns to me.

6. Recently, the terminal manager called me into his office to let me know that the terminal wanted to take Sutter away. I said that was fine. I asked if I had to sign anything. He said no and that the terminal really didn't have to ask me.

7. Whether I have the opportunity to service an additional Fed Ex Home route is up to Fed Ex, not me. Before I signed my Operating Agreement, the terminal manager told me my route was heavy and would probably split. But the decision of whether to split my route; when to split my route; how to configure the two new routes; and whether to offer both of them to me; will be made by Fed Ex, not me.

8. When I have an appointment delivery, I have to arrive during the window of time negotiated between the customer and Fed Ex and if I don't, I will get a delivery failure and lose pay.

9. I purchased a P-500 Freightliner truck. Fed Ex had to approve the use of the truck for my route.

10. I lease the Business Support Package which includes our Fed Ex uniform and scanner. I don't see how we could perform our jobs without it.

11. It's difficult to take time off. Any driver we use has to be trained and approved in advance by Fed Ex, but the terminal doesn't hire any relief drivers.

12. I fully support this case. I am willing to testify if necessary.

13. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 25 day of June, 2007 at Gridley, California.

Lance Morgan

case 3:05-md-00527-RLM -CAN document 810-4 filed 07/09/07 page 1 of 42

# EXHIBIT A

## Part 3

**Declaration of Larry Netz**

I, Larry Netz, hereby declare as follows:

1. For the past four years, I have been working as a package-delivery driver for Fed Ex Ground out of the terminal in Eureka, California.

2. When I signed my Operating Agreement, Fed Ex told me I would not be an employee, and that I would be an independent contractor. But I have been treated just like an employee. We have to follow all the rules that Fed Ex makes. We have to do exactly what our managers tell us. If we don't, Fed Ex could terminate our Contract.

3. Fed Ex sets the hours that I have to work. Until several months ago when Fed Ex brought in employees to load our trucks for us, we were told we had to get the terminal by 6:00 a.m., Tuesday through Fridays, and 5:30 a.m. Monday. Now there is no time we are told to get to the terminal in the morning. But we have to meet scheduled pick-ups. We have to deliver to businesses by 5 pm. We have to deliver every package that Fed Ex assigns us. As a result, we have to get to the terminal early in the morning.

4. We have to deliver (or attempt to deliver) every package that Fed Ex assigns us. If we refused to deliver a package, we would get a "did not attempt" (DNA), a service failure that could result in termination of our Operating Agreements.

5. We have to meet the daily pick-up windows that we do not set. Fed Ex does. If we arrive at a pick-up late, or even early, for that matter, we lose pay and get a service failure that could result in termination of our Operating Agreements.

6. Fed Ex decides the number of packages we have to deliver. Generally, Fed Ex requires us to deliver every package the same day it arrives in the terminal. However, there have been some rural, low volume zip codes, for which Fed Ex assigned the packages to be delivered every other day. Recently, the terminal manager announced that Fed Ex would be switching from alternate-day delivery to everyday delivery, in those areas.

7. My Operating Agreement sets forth several zip codes that I am responsible for delivering to. Recently, the terminal informed me that Fed Ex would take away one of my zip codes. He said I would sign a form giving permission. I am happy that that zip code, 95570, is being taken away. For years, I have been complaining that I have to drive long distances to deliver only a few packages to far-away, rural areas. But the decision to finally relieve me of that area is Fed Ex's, not mine. I would like to have dropped that earlier a long time ago, but couldn't. To best of my knowledge, Fed Ex decided to

relieve me of that area because it is switching the whole terminal to every package, every day service, and hired another driver.

8. I lease the Business Support Package. It includes the Fed Ex uniform and scanner. I thought it was mandatory.

9. I drive a P-700. That's the truck Fed Ex told me to buy. I have to submit monthly maintenance reports to the terminal. My truck has to display the Fed Ex logo. I am told by the terminal when it is time to wash my truck.

10. About once a year, a manager comes along with me on a Customer Service Ride Along. He has a clipboard on which he records my mileage and how fast I am able to deliver packages. He also gives me helpful feedback.

11. I totally support this case. I think that it's very important. Fed Ex misclassifies us as independent contractors in order to usurp our rights under labor law, rights that workers before us have fought hard—and even died—for.

12. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 25 day of June, 2007 at ORICK, California.

______________________________

**Declaration of Javier Olague**

I, Javier Olague, hereby declare as follows:

1. I have worked as a package-delivery driver for Fed Ex Home since 2004. Originally, I worked out of the terminal in Pomona, California. In about October of 2006, Fed Ex involuntarily transferred me to the terminal in Burbank, California.

2. Everyday, the packages I am required to deliver are sorted and placed on my pallet. I have to deliver every package. If I don't deliver any package, I can get a DNA (short for "did not attempt"), a service failure that reduces my pay.

3. I have objected to packages I was assigned before. Sometimes there were more packages than I could fit in my truck. But the terminal manager said that I had to deliver them. I asked whether I could leave some packages and deliver them the next day. He said I couldn't. Fed Ex wants every package delivered everyday. I had to reload my truck.

4. I arrive at the terminal at about 7:30 a.m. There's a time by which the terminal wants you to close out your scanner, which can only happen after all your packages have been scanned in. The terminal starts pressing me to close out at about 8:30 or 9:00 a.m. But when there are packages that are missing, or the inbound trailer is late, they won't let me close out or give me my paperwork until they've gotten the packages.

5. When I have an appointment delivery I have to make the delivery during the two-hour window of time that Fed Ex schedules with the customer. When I have a business delivery, I have to deliver the package before the business closes. Unlike with houses for which Fed Ex has driver release rules, someone has to be there to accept the package.

6. There is one primary zip code in my Operating Agreement. But I also have to deliver packages to the other areas Fed Ex gives me. The zip codes I deliver to have changed.

7. I drive a P-500 truck. When I entered the Operating Agreement Fed Ex told me I needed to get that kind of truck.

8. I lease the Business Support Package. I have to. Money is deducted from my paycheck every two weeks to pay for my uniform and scanner.

9. I've had several Customer Service Ride Alongs. A manager came with me in my truck. He tracked things like my mileage, time, and customer service skills. He gave a written evaluation to me.

10. Every so often there are Addenda to the Operating Agreement. Fed Ex makes them. You have to sign them, or else you have no Contract.

11. I agree with and support this lawsuit. Fed Ex dictates how we do our jobs. We should be entitled to the legal benefits and protections that employees have.

12. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 8 day of July, 2007 at Redlands, California.

[signature]

Javier Olague

**DECLARATION OF TOM OSINSKI**

I, Tom Osinski, hereby declare as follows:

1. I am a Fed Ex Ground driver. I started in 1996 with RPS at that time. I have had 3 different routes, one at a time, and I drove one of them over the last 11 years.
2. I was given an Operating Agreement to sign when I started with RPS. At that time, I intended to be an independent contractor.
3. When FedEx took over, the rules for my work became more strict. For example, FedEx created a pick up window during which drivers like me have to pick up a package and if I missed one, I am charged. One time I was 38 seconds early for a pick up and FedEx deducted $25.
4. I average working about 10 -11 hours a day. I do an island for which I have to go over on a ferry.
5. If I do not take packages that are over my maximum, FedEx tell me that I can either work 14 hours or take a later ferry to do them anyway. It is my opinion that they want me to have more packages with me and I say that if I scan them and do not get them off, I am not getting paid.
6. I do not do a supplemental vehicle in the peak season (November – December) because I know I will loose money on it. And, if the supplemental has an accident or poor service or any other problem, it comes back on me. I think it is a totally loosing proposition.
7. It has been a good experience being a driver if I could somehow take FedEx's control out of it. I realize there are things I need to do for FedEx, but I do not like when they control me, for example with the scanner. I would be willing to testify or serve as a named plaintiff if I was needed to do so.

I declare under penalty of perjury under the laws of the United States and the laws of the State of WASH. that the foregoing is true and correct.
State

Executed this 18 day of MAY at TACOMA
Month City

WA
State

[signature]
Tom Osinski

**Declaration of Mark Patton**

I, Mark Patton, declare as follows:

1. I have been a package-delivery driver in the Eureka, California, terminal of Fed Ex Ground since 1993.

2. I arrive at the terminal Mondays through Fridays between 7:00 and 7:15 a.m. Several months ago, Fed Ex hired employees to load our packages on our trucks. Before then, we had to get to the terminal by 6:00 a.m. or earlier. Now, because we do less work scanning and loading before we begin our routes, we can get to the terminal a little later. But that ~~does~~ does NOT MP mean we can get to the terminal whenever we want.

3. We have to deliver the number of packages that Fed Ex assigns us, or else we will get a DNA, a penalty short for "did not attempt." We have to meet delivery windows and pick-up windows set between the customers and Fed Ex. If we get there late (or early), we get penalized and could ultimately lose our Operating Agreements. And for businesses that do not have pick-up or delivery windows, we have to get them by 5 pm, when they close.

4. We have to get back to the terminal by 7 p.m. so our pick-ups can be loaded onto the terminal's outward-bound trailer.

5. When we get back to the terminal we leave our truck, place the packages we couldn't deliver at the front of the truck, and turn our scanners in to the terminal to be uploaded.

6. I lease the Business Support Package, which includes my Fed Ex uniform and scanner. I don't know if you can get out of it. I suppose that I could keep track of my packages using a handsheet. But that would take too long.

7. My truck, a P-700, had to be approved by Fed Ex. We are required to submit to Fed Ex monthly maintenance reports. And Fed Ex doesn't just look at maintenance. Terminal managers have told me about scratches and a dent: "We'd like you to take care of this right now."

8. It is hard to take time off. We are expected to find a substitute driver who knows our routes and who has been approved by Fed Ex. I participate in Fed Ex's Time Off Program, in which a certain amount is deducted from our pay to pay a relief driver, and we get to take vacation bid for in advance by terminal seniority.

9. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 21 day of June, 2007 at Fortuna, California.

[signature]

# DECLARATION OF STEVE PECKHAM

I, Steve Peckham, hereby declare as follows:

1.  I am currently a FedEx Ground driver. I started with FedEx in November of 2004. I work in the state of Washington.

2.  I signed an operating agreement with FedEx because I expected to be a pick up and delivery driver and have my own business. Once I started, I learned I was going to be told what time I had to do things. For example, they decided to add pick ups to my route later in the day and FedEx told me I had to do them, including one that was 2 miles out of my way or else they would restructure my route.

3.  I am frustrated with FedEx telling me what to wear, what to do, and when to do it.

4.  FedEx dictates to me how many packages I have to take and tells me when and what packages I have to take from or give to other drivers, saying that is the flex program. This occurred on a daily basis. I told them I wanted to opt out of the flex program in 2006, but FedEx said I could not. They also added that I would be on my own in the peak season (November – December) when the route is over 180 stops on average and we typically have another driver do a part of the route that is 2 hours beyond that.

5.  FedEx dictates when I work, for example I had a pick that had to be between 3- 3:30 or I would loose money. Another pick up window I have is between 12:00 and 2:00, and although I go past there at 10:00, I have to go back to that area at 1:00 because of the time FedEx tells me it has to be done. They control when you return to the terminal at the end of the day too because you have to be there for the FedEx outbound trucks.

6.  In May 2007, our terminal had a meeting with the drivers and managers. I was advised by terminal manger, Brian Barclay, that FedEx was changing the vacation program and we could only take vacation, from the approximately $360 already paid into the program, only in the months of January, February March, May and July and September but not other months. This is in addition to also giving our weekly settlement to the temporary driver for the terminal for any time we are on that vacation.

7.  When I signed on with FedEx, I was told that I own the route, but I was misled. FedEx has added pickups to my route, approximately 20, and also added the area in between my route and those pick ups. I told my manager that I did not want to do that but he said they didn't have anyone else and I had no choice.

8.  I would be willing to testify or serve as a named plaintiff if I was needed to do so in support of the drivers in this case because I don't

believe I have ever been treated as an independent contractor by FedEx. I did this to be able to build up equity in a business and retire and they have micromanaged things to the point that it is not possible.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Washington that the foregoing is true and correct.
State

Executed this 16 day of May at East Wenatchee
Month City

Washington.
State

Steve Peckham
Steve Peckham

# DECLARATION OF CHARLES PERDUE

I, Charles Perdue, hereby declare as follows:

1. I have been a package-delivery driver for Fed Ex Ground out of the terminal in Roanoke, Virginia since about 2001. I drove full-time until February, 2007, when I hired a driver to replace me.

2. I had to deliver every package that Fed Ex assigned to me everyday. If I declined to deliver any packages that Fed Ex gave me to deliver in the morning, I would get a DNA, short for "did not attempt," a service failure that reduces my pay and could result in termination of my Operating Agreement.

3. The managers didn't let us leave the terminal to begin our routes until every package had been found. Sometimes we'd have to wait around for hours. We had to deliver packages to businesses before the businesses closed. We had to make pick-ups during the pick-up windows listed on our pick-up sheets. If fact, I've had customers who didn't care what time I made pickups and even left me a key to their warehouse or store, but if I came before or after Fed Ex's established pickup time, it was a "service failure" and my bonus was reduced.

4. I lease the Business Support Package, which includes the scanner we are required to use and the uniforms we are required to wear. I have had two trucks, a 14-foot step van and a P-1000, both of which had to be approved by Fed Ex.

5. Every so often Fed Ex comes out with Addenda to our Operating Agreement. We don't negotiate the Addenda. The terminal manager hands them out and tells us to sign them.

6. Any driver I use has to be approved by Fed Ex. He has to do things the Fed Ex way just like I do. He has to wear the Fed Ex uniform, comply with scanner procedures, deliver every package everyday, meet pick-up windows, follow the rules for driver relief and signature deliveries, etc.

7. I once had a major accident. I had to come to work the next day, against doctor's advice, because I couldn't find a Fed-Ex- approved driver to relieve me.

8. I totally agree with and support this lawsuit. I think that since Fed Ex treats us like we're Fed Ex employees, we should be covered by all the legal protections and benefits that employees have.

9. I declare under penalty of perjury under the laws of the United States and the

State of Virginia that the foregoing is true and correct, to the best of my knowledge.

Executed this 8 day of July, 2007 at Roanoke, Virginia.

Charles Perdue

**Declaracion of Miguel Ponce**

*Yo, Miguel Ponce, declaro lo siguiente:*

1. Yo trabaje como repartidor para Fed Ex Ground desde Septiembre de 1990 hasta que Fed Ex termino mi contrato en la primavera de 2007. Trabaje en la terminal de Santa Ana. Tambien trabaje en las terminales de Pomona y Rialto, donde Fed Ex me ha trasladado involuntariamente.

2. Cuando firme mi contrato, el Operating Agreement, con Fed Ex, creia que yo era un contratista independiente. Creia tam bien que podia tener la libertad de hacer lo que queria y contratar con los quien queria. Pero eso no fue el caso.

3. Cada dia, me obligaron entregar todos los paquetes que Fed Ex me asignado. Si no podia entregar un paquete que Fed Ex me ha asignado, podia recibir un "DNA" (no intentar entregar), que es un falto de servicio que podia resultar en terminacion de mi contrato. En el pasado, ha disputado los paquetes en que me mandaron entregar, pero Fed Ex me decia que tenia que entregar. Si no, seria una violacion de servicio.

4. Cerca de 2003, compre otro camion, mi segundo, y contrate a otro chofer para asistirme en entregar todos los paquetes que Fed Ex me asignado. He comprado el camion por miedo de que si no, Fed Ex terminara mi contrato.

5. Seis meses despues en 2004, Fed Ex a decido dividir mi ruta donde finalmente podia obtener otro pago por la zona y pago por usar el van.

6. Yo tenia que ir a las ventanas de "pick-up" en la lista de "pick-up" que Fed Ex me dio. Si llegaba a un "pick up" temprano o tarde, fue un falto de servicio y mi pago fue reducido.

7. Teniamos que entregar paquetes a empresas durante las horas comerciales.

8. Alquile el mantenimiento de negocio de Fed Ex, que inlcuye el scanner y uniforme.

9. Compre tres camiones. Compre los camiones en que mi manager me ha dicho comprar y en la compania que ellos dician no podia compra los en otro logar

10. Fed Ex tenia que aprovar cada chofer que contrataba. Los choferes necesitaban ser qualificados por Fed Ex, que significaba que Fed Ex me obligaba mandarlos y pagarles una escuela de conducir. Los choferes tenian que cumplir las mismas reglas en que yo tenia que cumplir.

11. En septiembre 2006, decidi vender mis rutas. Encontre un comprador para dos rutas. Presente el comprador a Fed Ex, como fue obligado. Fed Ex no lo aprobaba. No comprendia por que, por que fue un chofer que ya fue calificado con Fed Ex. Despues, en Marzo de 2007, en el mismo dia en que fui a la terminal. El manager para darle papeles para aprobar vender mis rutas a un chofer diferente, Fed Ex termino mi contrato. Antes, Fed Ex me dieron hasta el 12 de Abril para vender mis rutas. Pero, cada vez en que presente un chofer para comprar, Fed Ex lo rechasaba Muchos de los choferes tenian "Class A" licencias con experiencia de vehiculos comerciales.

12. No podia vender mis rutas. Los tres camiones en que he comprado todavia estan en el terminal de Fed Ex.

13. Estoy de acuerdo y apoyo este caso. Fed Ex nos trata como empleados, no como contratistas independientes. Debemos tener protecciones y benificios de empleo.

14. Yo declaro bajo pena de perjuria segun las leyes de los Estados Unidos y el estado de California que esta declaracion es verdadera ye esta basada en concocimiento personal que yo sepa.

Executed this 7 day of July, 2007 at CHINO, California.

Miguel Ponce

**Declaration of Miguel Ponce**
**(*English Translation*)**

I, Miguel Ponce, hereby declare as follows:

1. I worked as a package-delivery driver for Fed Ex Ground from September of 1990 until Fed Ex terminated my Contract in the spring. I worked in the Santa Ana terminal. I also worked in the Pomona and Realto terminals, to which Fed Ex involuntarily transferred me.

2. When I signed my Operating Agreement with Fed Ex, I thought that I would be an independent contractor. I thought that meant that I would have the freedom to do what I want and hire who I want. But that has not been the case.

3. Every day, I was required to deliver all of the packages that Fed Ex assigned me. If I failed to deliver any package I was assigned, I could get a DNA (short for "did not attempt"), a service failure that could result in termination of my Operating Agreement. I protested packages I was given before. Fed Ex told me I had to take them. And they said if I didn't, it would be a violation of service.

4. In about 2003, out of fear that if I didn't Fed Ex would terminate my Operating Agreement, I bought a second truck and paid a second driver to assist me in delivering all of the packages that Fed Ex assigned.

5. Six months later in 2004 Fed Ex decided to split my route so that I finally got a second core zone payment and van availability payment.

6. I had to meet the pick-up windows on the pick-up list that Fed Ex gave me. If I arrived at a pick up early or late, it was a service failure and reduced my pay.

7. We had to deliver packages to businesses during business hours.

8. I leased the Business Support Package from Fed Ex, which consisted of my scanner and uniform.

9. I had owned three trucks. I bought the kind that my manager said to get.

10. Every driver who I hired had to be approved by Fed Ex. They had to be qualified by Fed Ex – which meant that Fed Ex required me to send them to driving school. They had to follow the same Fed Ex rules as I did.

11. In September 2006, I decided to sell my routes. I found a buyer of both of the routes, who I presented to Fed Ex, as I was required to do. Fed Ex disapproved him. I didn't understand it. He was a driver who was already

Fed Ex approved. Later in March of 2007 on the very day that I went to the terminal manager to give him papers to approve me selling my routes to a different driver, Fed Ex terminated my Contract. Fed Ex said they gave me until April 12, 2007 to sell my routes. But, every driver I presented to them, they rejected. Many had DOT 'Class A' licenses and previous experience driving commercial vehicles.

12. I was unable to sell my routes. The 3 trucks I bought for my routes are still parked at Fed Ex's terminal.

13. I agree with and support this case. Fed Ex treated us like employees, not independent contractors. We should be entitled to have employment protections and benefits.

14. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

RASKOWSKY

DECLARATION OF PETER ~~RADKOWSKY~~

I, Peter Radkowsky, hereby declare as follows:

1. I have been a FedEx Ground contractor at the Windsor, California Ground terminal since approximately 2002. I have personal knowledge of the facts set out in this statement.

2. I started working for the company as a temporary driver, first at the Windsor terminal, and then in the Benecia terminal while I waited to hear about an open route. After about six months, the Windsor terminal manager, Doug Worstershire (sp?), called me and said he had a route available in the Clear Lake area, in Northern California. However that route was an hour drive from the terminal, so I said no. Then he offered me a route in Sebastapol, California which became open because another contractor was getting fired. I liked that route better and I took it.

3. My job is to pickup and deliver packages for FedEx. Since I became a driver for FedEx, this has been my only job. I work full time. When I started working for FedEx, I was told I would be an independent contractor and in business for myself. I signed a contract written by FedEx. I was handed a binder that must have been over 200 pages long which I was told was the terms of my contract. The contract was not explained to me at all. There was no time to review it. I had to sign on the dotted line right then, because they needed me to take over the Sebastapol route immediately.

4. Before they would give me the contract, I had to obtain a truck. The terminal manager, Doug, suggested that I purchase the truck that belonged to the exiting contractor, which was less than a year old. He gave me her phone number and told me that they would approve me to use that truck. For the first two weeks, the terminal let me to use the terminal truck until the paperwork was completed on the truck sale. I needed the Company's approval to use her truck; you need company approval for all trucks.

5. All the contractors are required to wear the official FedEx uniform. If you wear the wrong color socks, or white shoes, they mention it to you and tell you not to wear those things again. A lot of contractors come into the terminal with their favorite team's baseball hat. I have personally been told that I had to take off my baseball hat. Some managers are very strict about this. At one time I had an earring. I was told by a manager that FedEx does not allow earrings, and that I had to take it off. When they want to enforce the rules, we have no choice.

6. I generally get to work at 7 am in the morning, and I usually finish my route between 6 and 7 pm. My work day is usually about 11-12 hours. No one has ever told me what time I have to come in, but if I don't get to work early enough, I can't get my work done. The contractors in my terminal are not allowed to get out on the road to start their deliveries until the package sort is completed and all of the packages have been loaded on the right trucks. At times, the managers have parked cars in front of the gate where we get out to keep us from leaving. We are not allowed to leave any packages behind, and we can't refuse packages. If we do, we will

be held accountable for what is called a DNA, which means "Did Not Attempt." A portion of my pay will be docked if I get too many DNAs in a month.

7. My daily work hours are determined by the amount of packages I am given to service, and the pickup windows that FedEx negotiates with its customers. Over the years, I have gone to the management to complain about being given so much work that it takes 12-13 hours to finish the route. There was a two year stint when I was working 12-13 hours almost every day. Every so often, I would ask the management to take territory off my route so that I could work shorter hours. Sometimes these requests were ignored. The times management did take territory off my route, I was not able to pick and choose what territory got taken . That is up to FedEx.

8. I can recall at least one time that the manager took away one of my best areas. About I wanted to give up a town, Cotati, California, that was not part of my contract. Instead, they wanted me to give up a piece of territory someplace else that was part of my contract. I lost the area FedEx chose, instead of Cotati. I complained to the terminal manager about the fact that they took an area that was part of my original contract, instead of territory I didn't believe I was ever contracted to service. The decision was not changed.

9. I cannot take off time if I am sick, I HAVE TAKEN TWO DAYS OFF IN FIVE YEARS BUT WARNERED NO MORE. ONE CONTRACTER WAS FIRED OVER THIS. PR or for any other reason, because there are no replacement drivers available. FedEx has to approve any replacement driver. To get a driver approved, you need to pay for him to go through a one or two week course, and then you have to train him on your route. What employee would take a two week driving course, just to work a day or two? There was a contractor in our terminal whose contract was threatened when he took off a day to go to his father's funeral. This shocked me. I worry about what would happen if I got very sick and could not work, or needed time off to take care of someone in my family.

10. I understand the purpose of this lawsuit is to have FedEx call us employees, and to pay us like employees and to provide us the benefits employees have. I believe that we are employees, and not real independent contractors. I support the goal of the lawsuit and the remedy the plaintiffs are asking for.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 16th day of May, 2007 at Cloverdale, California.

Pete Raskowsky

Peter ~~Radkowsky~~
RASKOWSKY

**Declaration of Jarrett Ray**

I, Jarrett Ray, hereby declare as follows:

1.   I am a Fed Ex Home package-delivery driver in the terminal in Chico,
     California, where I've worked since August, 2002.

2.   When I signed my first Operating Agreement, my understanding was that I
     would be an independent contractor. I wanted to be an independent
     contractor. To me, that meant that I would be my own boss, that the way I did
     my job would not be managed, monitored, and controlled, and that I would be
     able to control my own hours.

3.   Everyday, packages are sorted between 6:30 and 7:30 a.m. Then other
     procedures, like reviewing damaged packages, distributing packages that
     weren't delivered, synchronizing drivers' scanners with the terminal computer
     (closing out our scanners), and printing manifests and turn by turn directions,
     mean that we usually cannot leave the terminal until at least 8:30 a.m. We are
     supposed to scan our packages, and close out our scanners, by 9 a.m.

4.   Sometimes, the terminal manager tells us we cannot leave the terminal even
     when these processes are finished. When I have had to deliver agricultural
     products like flowers or fruit that have been shipped from outside of the state,
     and the terminal manager has to call the Department of Agriculture to send an
     inspector to inspect the packages, the terminal does not let me close my
     scanner out and begin my route until the inspection of the agricultural
     packages is completed.

5.   For appointment deliveries, in which the sender pays an extra amount so the
     recipient can pick the exact date and time for the package to arrive, the Fed Ex
     terminal manager tells us what time to make the delivery. The terminal
     manager, not the drivers, call the customers to schedule the time.

6.   Packages sent using Fed Ex Home have a delivery window, a date by which
     the package is supposed to arrive. But the terminal is under pressure to "beat"
     the delivery window. If a package doesn't get delivered on the same day that
     it arrives in the terminal (the every package, every day policy), then the entire
     terminal – and even managers – get their bonuses affected. Sometimes, I do
     not want to beat the delivery window, and would rather take a package the
     next day. But I don't have that luxury.

7.   I do not have any control over how many packages I have in the day. When I
     get in, the boxes have already been sorted and set aside for me to deliver. We
     have to load the packages in our van. We have to deliver them. We do not
     have the right to refuse to deliver the packages we've been assigned.

8. I have tried to refuse to accept packages in the past. I was ordered to deliver them. I was told that if I didn't it would be a violation of service and my contract could be terminated.

9. If we do not deliver all of the packages assigned to us, we risk getting a "DNA" ("do not attempt"), a service failure, which affects our pay, and which would ultimately lead to termination of the Operating Agreement.

10. There are delivery thresholds. As I understand from my last 5 years working at Fed Ex Home, delivery thresholds are numbers developed by efficiency experts at Fed Ex's corporate headquarters. The number is different for every driver, and the number fluctuates every day. We can access our deliver threshold by looking at our route scanning report on the terminal computer. We can ask our manager what our threshold is.

11. The delivery threshold helps to determine how many packages we are given and which geographic areas we are assigned. Obviously, the driver does not decide the delivery threshold. Even the terminal manager does not decide the delivery threshold. Fed Ex corporate does.

12. Even if we are assigned more packages than our delivery threshold, we still may not refuse to accept packages. I discussed this with my terminal manager and Tom Heard, a representative of Contractor Relations for our Region, who said that if you are unable to deliver a package and you are over your delivery threshold, the DNA will not count against you as long as you load all of the packages in your van and you try to deliver all the packages.

13. We do not have any control over the configuration of our routes either, or how many Fed Ex routes we are allowed to have. I now have 2 routes. That is because Fed Ex allowed me. I am happy to have a second route. But the decision to grant me a second route was Fed Ex's, not mine.

14. I had asked to split my route on previous occasions. The number of packages in my area had increased to more than I could handle by myself. Once, the terminal manager told me that Fed Ex decided to split my route, and then told me that Fed Ex decided not to split my route. Another time, Fed Ex decided to create a new route, and offer the new route to a new driver, by taking from my and several drivers' areas.

15. Now, my routes have again increased in volume. But that does not mean that I am entitled to a route split. When I asked about a route split, my terminal manager told me that unless I "protect my area" by hiring a supplemental driver and renting an additional truck, Fed Ex would not split my route.

16. I have hired supplemental drivers every year at Christmas time, and, now, to work for me on my second route. Fed Ex has to approve of any supplemental

driver that drivers hire. And once a driver is approved, Fed Ex can take the approval away. Our supplemental drivers take orders from the terminal managers and must follow the same rules as we do.

17. When I became a contractor for Fed Ex, Fed Ex told me what van I had to lease or buy, either a P-450 Conversion or a Workhorse. I chose the P-450. When I received my second route, Fed Ex told me I had to lease or buy a P-500 van. I did.

18. Although the vans are our own we are not allowed to use them in our free time for personal reasons, unless we cover up the large Fed Ex logos with white construction paper. Fed Ex used to permit us to use magnets to display the Fed Ex logo. Now, we have to use permanent decals. I do not understand why, if it is my van, and my business, I cannot display the Fed Ex logo in the manner I want.

19. I entered the Operating Agreement with Fed Ex five years ago because I wanted to be an independent contractor. I still do. Unfortunately, that is not what I am. I support this lawsuit because I believe that Fed Ex owes me the employment benefits and protections I am entitled to under the law.

20. I would be willing to testify if necessary.

21. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 30th day of June, 2007 at Chico, California.

[signature]

Jarrett Ray

**Declaration of Amir Sahinovic**

I, Amir Sahinovic, hereby declare as follows:

1. I am a Fed Ex Home package-delivery driver in the Oakland, California terminal. I have worked there as a driver since the fall of 2001.

2. When I signed the Operating Agreement in 2001, Fed Ex told me that "you're your own boss" and you have "your own company." But in my experience that has not been the case.

3. Fed Ex decides how many packages I deliver each day, not me. Because of this, Fed Ex decides how many hours I work.

4. When I arrive at the terminal every day, the packages I am required to deliver are sorted and placed on a pallet. If I do not scan every package I am assigned, the terminal will not let me close out my scanner. I have protested about taking packages before, and the manager told me "I'm giving them to you. You can DNA if you want." If you have too many DNAs – short for "do not attempt" – your contract will be terminated.

5. My "primary zip code" is 94602. But I am regularly also given packages in 94602, 94601 and 94606, and any other place the terminal assigns to me.

6. I arrive at the terminal every day at 6:00 a.m. The terminal manager Jennifer created two shifts. Drivers in the first shift have to arrive at the terminal by 7:00 a.m., and drivers in the second shift have to arrive at the terminal by 8:00 a.m. I am in the first shift.

7. Sometimes I have appointment deliveries in which I am responsible for delivering packages at the time agreed to between the Fed Ex customer and terminal. Other times I have evening deliveries which require me to deliver the packages between 5 and 7 p.m.

8. When I entered the Operating Agreement I bought a P-350 van because Fed Ex told me to. The terminal manager told me to get a GMC 2500 extended model van with 318 feet of cargo space at a minimum. He also told me to install a divider, get tinted windows, and install decals on the exterior with Fed Ex's logo.

9. I have to wear the Fed Ex uniform. We have to wear black shoes with our uniform. Once, I wore brown shoes because my black shoes were worn out, and the terminal manager made me buy a new pair of shoes or get my old pair from home.

10. The Business Support Package – which consists of the uniform and scanner – is not voluntary. Do we have a choice? No.

11. We all have difficulty taking time off. To do so we have to find a driver in advance who is approved by Fed Ex and who has been trained to run our route. In the past, I have had bad stomach problems, told my manager that, and had to work anyway.

12. I support this case because I believe we are employees, not independent contractors. I do not think we should be required to pay Fed Ex's business expenses. I think we should get overtime pay, health benefits, retirement benefits, and not have to work when we are sick. I would be willing to testify if I am needed.

I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 29 day of MAY, 2007 at SAN LEANDRO, California.

[signature]

**Declaration of Tavo De Santiago**

I, Tavo De Santiago, hereby declare as follows:

1. From 2000 until February 2007, when Fed Ex terminated my Contract, I worked as a package-delivery driver for Fed Ex Home out of its terminal in San Diego, California.

2. When first I entered my Operating Agreement with Fed Ex Home, I understood I would be an independent contractor. I thought that meant I would be on my own and be able to make calls myself about how best to service Fed Ex's customers, but that was not the case.

3. Everyday, my job was to deliver, or attempt to deliver, every package that Fed Ex assigned me. If I didn't deliver any package I was assigned, I could get a DNA, short for "did not attempt," a service failure that reduced my pay and could lead to termination of my Contract.

4. Whenever I had an appointment delivery, I had to deliver the package at the time that Fed Ex required. If I arrived at the delivery early or late, it was a service failure. I also had to deliver packages to businesses before they closed, because Fed Ex required all packages delivered to businesses to have a customer signature. I had to comply with other Fed Ex policies, including driver release rules, scanner procedures, and appearance requirements.

5. We worked Tuesday through Saturday. I generally got to the terminal between 7 and 7:30 a.m., but the terminal manager often told me that I had to come in earlier. So I tried to come to work between 6:30 and 7 a.m. There was a time by which our scanners had to be closed out by the terminal, which could only be done after we had scanned in every one of our packages.

6. My Operating Agreement had one primary zip code. In addition, I was responsible for delivering packages to any other areas that Fed Ex assigned to me everyday.

7. Every year, Fed Ex put out Addenda to my Operating Agreement. You had to sign them, or you had no Contract.

8. About two years ago, Fed Ex split my route, giving me an additional van availability payment and core zone payment.

9. Any driver you hire must be approved by Fed Ex. They must be qualified by Fed Ex. They have to follow the same Fed Ex rules as you do.

10. I had a step-van box truck and a P-450 Freightliner. Fed Ex had to authorize me to use both of these vehicles. Fed Ex told me to get the step van when I signed my Operating Agreement.

11. I leased the Business Support Package, which the included the scanner and uniform. We had to.

12. In February 2007, Fed Ex terminated my Operating Agreement for reasons I disagree with. And because I was terminated, I could not sell the Fed Ex route I supposedly owned.

13. I agree with and I support this lawsuit. I believe that we were employees, not independent contractors. We should be entitled to receive the legal benefits and protections that employees have.

14. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 7TH day of July, 2007 at SAN DIEGO, California.

[signature]

Tavo De Santiago

**DECLARATION OF PAUL SAWTELLE**

I, Paul Sawtelle, hereby declare as follows:

1. I am a Fed Ex Ground driver and have been since September of 2002, first in the Auburn terminal and later the Dupont terminal in the State of Washington. I have 2 routes in Puyallup. I drive one of them, another driver one. I also have a supplemental truck.

2. I previously had a retail business and a FedEx driver came to deliver who was selling his route. I was looking for another opportunity and I thought it would be good to own a business with FedEx. When I started working for Fed Ex Ground, I expected to be an independent contractor and signed a contract with FedEx like the other drivers. I incorporated. I expected to be my own boss like I had been before, but that is not what happened. I found I could not negotiate the contract. I get to write the checks and pay for things like new tires for the trucks, but that is about all I control. Every year FedEx gives what they call contract enhancements and a few cents more here and there, but really use it as an opportunity to change rules, and slip in new things that we must do. There is no negotiation, it is take it, or leave it. And we have to sign.

3. I am required by FedEx to deliver every package every day. I can't refuse packages. I am in the flex program because I feel I have been forced into it. I told FedEx I don't want to be involved in it. My manger said you can't do that. They pay approximately $37 per week to me and say it is worth it, but it is not. One day recently, I had a 21 box stop for a nursery. I asked if a bulk truck could take it because I told them my truck was too full and I needed to flex as I have seen bulk trucks take this size stop in the past. In the end, I had to take it per my manager. The driver next to me, Robert Maxey, also had a similar issue but for him the terminal manager gave the boxes to the bulk truck.

4. I have 10-15 pickups per day on one of my routes, and they have to be done at exactly the times FedEx says, even though that does not make for doing the route the most efficient way. For example, FedEx sets a pick up window and drivers like me are penalized for being early one minute or late after 15 minutes, we are penalized $25. Recently, we arrived at one, Mail Plus, 2 minutes early and the customer said, great you are a little early; but I was charged $25 by FedEx for not being in the pickup window. This has occurred even if the customer is a zero package pick up, I still have to be there within the time window or I loose money.

5. I also thought I would be able to control my hours but I can't. In the morning, the packages come down the belt and are loaded. Then the

Case 3:05-md-00527-RLM -CAN document 810-4 filed 07/09/07 page 27 of 42

belt manager comes around and says: Ok guys, you can go. Then we can leave. Yesterday we were held for a trailer coming from Portland, even though with no packages coming down the belt for half hour. We had to wait. It affects the drivers because we have to stay out later. We start at 5:30 and because of Kinko's; some drivers have to stay out until Kinko's 6:00 pick up time. I have no say in the matter whatsoever.

6. FedEx reduced one of my routes by about 20 stops per day and told me that is what happens as the route grows, it will be consolidated. But I only had the route for a month and a half at that point. I wrote a letter a Contractor Relations then and they did not respond. On my other route, it is so heavy and in South Hill that FedEx told me I would loose it or I had to add a supplemental. So, I was forced to make the expenditure of supplemental truck which increased my costs.

7. I'm trying to protect my investment. When I entered into the contract with FedEx I thought it was a business opportunity. I found it was presented under the false pretenses. In fact, FedEx controls things from the time we arrive in the morning to the time we return in the evening. I do my job the best I can. FedEx keeps a little black book on me for the things they do not like, and when they want to manipulate me, they use it to threaten my livelihood and tell me my contract may be in jeopardy. I was awarded contractor of the month last month.

8. I would be willing to testify in support of the drivers' case here or be a named plaintiff.

I declare under penalty of perjury under the laws of the United States and the laws of the State of WA. (State) that the foregoing is true and correct.

Executed this 17 day of MAY (Month) at Puyallup (City)

WA
State

Paul Sawtelle

**Declaration of Jeff Scull**

I, Jeff Scull, hereby declare as follows:

1. For the past four years, I have been a package-delivery driver for Fed Ex Ground out of the Windsor, California terminal.

2. When I entered my Operating Agreement, I thought that I would be an independent contractor. I thought I would have the freedom to make my own schedule and set my own standards. But that has not been the case.

3. I have to pick up packages during the time windows set between the customer and Fed Ex. If I arrive at a pick-up early or late (even when the business is still open), Fed Ex considers it to be a service failure and it reduces my pay. I also have to deliver packages to businesses before they close. By Fed Ex policy, every package delivered to a business requires a customer signature.

4. Each day, I have to deliver – or at least attempt to deliver – every package that Fed Ex assigns me. If I fail to deliver a package I am assigned, I can get a DNA, short for "did not attempt," a service failure that reduces my pay and could ultimately result in termination of my Operating Agreement.

5. I have objected to the number or the location of packages I have been assigned to deliver before. Sometimes, especially when they don't all fit in my truck, the manager has told me I could leave them until the next day. Other times, the manager has told me I had to take them.

6. In June, Fed Ex started requiring me and some others in my terminal to start covering more area. I deliver packages to Sonoma. Fed Ex used to use an interline service to deliver some packages to Sonoma. Now Fed Ex has assigned all of the packages to me. I am not the only one. Other drivers in my terminal as well now are required to deliver packages that an interliner used to handle. We have complained. But there was nothing that we could do. We have to deliver the packages.

7. I have had Customer Service Ride-Alongs. A manager came with me and tracked my mileage, driving time, and delivery time, and gave me a written evaluation that I had to sign.

8. I have had two vans, a P-550 and a P-1000. Fed Ex had to approve both of them.

9. I lease from Fed Ex the business support package that includes the scanner and uniforms that we need to perform our jobs.

10. Fed Ex publishes Addenda to the Operating Agreement every year. We do not negotiate the Addenda. We're given the forms and told to sign them. The Addenda determine things like your bonus threshold – the number of stops you have to do in a day before you're eligible for a bonus.

11. It's difficult to take time off. The relief driver you use has to be approved by Fed Ex and go through the training which Fed Ex requires. I participate in the Time Off Program. Money is deducted from my paycheck to enable me to go on vacation, and vacation is bid in advance by terminal seniority.

12. I fully support this case. I believe Fed Ex treats us as employees, not independent contractors. I am willing to testify if necessary.

13. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 6th day of July, 2007 at Rohnert Park, California

Jeff Scull

**DECLARATION OF JEFF SMITH**

I, Jeff Smith, of full age, hereby declare as follows:

1. I am currently employed as a driver for FedEx Home Delivery, driving a route centered in Williamstown, New Jersey that is dispatched from the Barrington, NJ terminal.

2. I started driving for FXG in March 2003.

3. I obtained a truck and signed an Operating Agreement with FXG because I wanted to be an independent contractor, to be my own boss and to have some flexibility and control over the hours I worked. In other words, I entered into this relationship because I wanted to be an independent contractor, as FXG advertised. Unfortunately, this was not the case.

4. FXG assigned me to a primary zip code just as with every other driver. In addition to my "primary" area set forth in my contract, I must deliver whatever packages FXG assigns to me each day, including packages in other zip codes. I have tried to decline packages FXG chose to assign to me. When I did so, FXG threatened to terminate my contract.

5. I enjoy driving and would like to work for FedEx as an independent contractor. But the reality is that I have no real freedom or independence in my work. FXG controls what I deliver, the types of truck I can use to deliver it, the days and times at which I can deliver it, what I wear and how I carry the package.

6. I don't have the freedom to control my route like I should and I believe that I as well as all the other drivers, are employees of FedEx and are therefore entitled to legal benefits of the status.

7. I am submitting this declaration to inform the court that I wholeheartedly support this case and would be more than willing to testify if I needed to.

8. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 7/6/07

Jeff Smith

**DECLARATION OF PAUL STACKOWICZ**

I, Paul Stackowicz, hereby declare as follows:

1. I have been working as a package-delivery driver for Fed Ex Ground out of the terminal in Rockford, Illinois for the past fourteen years.

2. My job is to deliver every package that Fed Ex assigns to me. If I fail to deliver any package I am assigned, I can get a "DNA," short for "delivery not attempted," a service failure that can result in termination of my Operating Agreement. Fed Ex requires packages to be serviced as soon as they arrive in the terminal.

3. The area I cover grew in package volume. I asked Fed Ex many times to split my route. Splitting my route into two official, Fed Ex routes would give me an additional van availability payment and core zone payment. That would enable me to afford to pay a supplemental driver and buy a second van. Fed Ex told me they would split my route. But they never did. Recently, Fed Ex established a new route and gave part of my area away to another driver.

4. I have to meet pick-up windows set by Fed Ex. It would take an Act of Congress to change a Fed Ex pick-up window. If I arrive at a pick-up early or late, it is a delivery failure and reduces my pay. I am required to make deliveries to businesses before they close.

5. I lease from Fed Ex the Business Support Package. It includes our uniforms and scanners.

6. The truck I drive, a P-1200, was approved by Fed Ex.

7. I've had to work sick. When I've gotten sick, the terminal manager has told me, "You have to have a plan" and threatened me with Contract termination. Obviously, I didn't plan on getting sick. I couldn't afford to have a Fed-Ex approved driver waiting on call in case I did. So on more than one occasion, I had to work when I was sick. I know that others have had to work when they were sick too.

8. Every year, Fed Ex comes out with Addenda to the Contract. A manager hands them out and tells us to sign them. You sign them, because that's what you do to keep your job.

9. I support this lawsuit and I will do what I can to help out with it. We should be entitled to have the benefits and protections that all employees have.

10. I declare under penalty of perjury under the laws of the United States and the State of Illinois that the foregoing is true and correct, to the best of my knowledge.

Executed this 5th day of July, 2007 at ROCKFORD, Illinois.

Paul Stackowicz

Paul Stackowicz

**Declaration of Jim Staggers**

I, Jim Staggers hereby declare as follows:

1. I am a FedEx Ground driver in the Harrisburg Terminal in Pennsylvania. I have been a FedEx driver since around August 10, 2001. I have personal knowledge of the facts set forth here.

2. When I started working with FedEx, I went over the Operating Agreement with the manager for about an hour. In that time period the manager explained some things and told me to sign the Operating Agreement when we finished. The contract was very complicated and I did not have time to interpret it or think about it and there was no negotiation over any of the contracts items.

3. Each year I and other drivers are given addenda to the contract. The addenda are presented as a take it or leave it deal. There is no opportunity to agree or disagree with them

4. When I first began I expected to have the freedom to have my own business as FedEx told me I would. However most of the time FedEx representatives are calling me up while I am servicing my route and telling me to make extra pick-ups or to re-arrange my delivery schedule.

5. The Senior Manager and P & D Manager determine how I and the other drivers perform our services. It is up to them what goes on and off our trucks; they decide when packages should be delivered and what to deliver.

6. I am in the Flex Program. The drivers and I pay to be in the program. The cost comes out of our settlement. FedEx will flex packages to me whether I like it or not. I think every driver is in the program.

7. Recently my territory, area-wise, has grown a tremendous amount. I added a supplemental driver and truck to this route because of the route's volume. I asked FedEx management if I could turn my supplemental route into a separate route but they would not allow me to do this, saying it will take 2 or 3 years for it to become a separate route. I am already forced to add a supplemental truck to the route because of the volume and because it is not considered a separate route, I do not get additional van availability or a separate CCS: I am paying two people to do one job. While I do have the volume to create a separate route, FedEx will not allow me and is saving money by not giving me van availability or a CCS that are required for separate routes, but not supplemental routes.

8. I and the other drivers are required to complete a monthly maintenance report due the 15th of each month. Because I am out on the road everyday and back at around 6:30PM, it becomes very difficult to do maintenance according to FedEx's requirements. The FedEx monthly maintenance report requires reports on oil changes and on the tires tread

level. FedEx has their own maintenance standards which require tires that can not go below 3/32nds, while DOT requires that tires cannot go below 2/32nds. Terminal management threatens my contract and has loaded my packages on the floor and dead-lined my vehicle when I did not have my maintenance report by the 15th of the month. As a result, I am forced to rent a truck and load the packages myself.

9. FedEx recently changed its driver release policy with residential stops. Packages that were originally driver release packages now require an adult signature or an indirect signature, a signature from a neighbor. I and the other drivers did not negotiate this new policy with FedEx and as a result it has forced us into a catch-22 because often times the houses are in rural areas, with neighbors miles away, making an indirect signature difficult to obtain and no guarantee of delivery.

10. I expected to have approval over new pick-up times, which the Terminal Manager or P & D Manager were supposed to check with the contractor before scheduling. However, the Terminal Manager and P & D Manager are not checking with me and the other drivers when they schedule pick-ups. The pick-up will just show up on our manifests each day. I can go and talk to the Terminal Manager but it never does any good.

11. The FedEx sales department scheduled me for a 4:00 PM pick-up everyday at the same place. The pick-up ships one envelope once or twice a week but I still have to go everyday. I tried to negotiate with management to go there only when necessary but they told me that if that's what the customer wants, that's what the customer wants—end of story.

12. Most contractors do not know who the FedEx Sales Representative is for the region. This Sales Representative contacts FedEx customers to schedule the pick-ups. I have never met the Sales Representative responsible for the area I service.

13. One of my routes has stops that go way up into another county that should be covered by another terminal which is closer to the stops. I mentioned this to management as a way to increase efficiency and they told me that it cannot be done, that it is too much of a hassle to change over.

14. Last week, one day I returned with 35 packages because my truck was so overloaded and over-dispatched by FedEx. The next Monday I had to go in and see Terminal Management before I could leave to service my route to discuss why I brought back packages. My settlement was affected by not getting paid for the missed stops.

15. The FedEx terminal management always threatens to cancel my contract if I bring packages back. I will bring packages back only if I am overloaded and over-dispatched. I will code these packages with a Code-27 or a DNA. The next morning, the Terminal Manager and the Senior Manager will take me in their office and threaten my contract.

16. FedEx keeps a personal file on me and other contractors that they call "Contractor Discussion Notes." I and the other contractors know that each file includes any customer

complaints, accidents, notes from meetings, full reports on our service and other documents. FedEx does not allow me to look at my file.

17. If I miss a pick-up window, FedEx takes $25 off my CCS; if I scan the package too late, FedEx takes $25 off my CCS; and even if I am early with a scan, FedEx takes $25 off my CCS. Even if a shipper approves an early scan on a pick-up, FedEx still takes $25 off my CCS if I scan the package early. I am forced to wait at the pick-up window to scan a package if I pick it up early, to avoid losing my CCS.

18. FedEx forces me and other drivers to wait in the terminal for delayed tractor trailers. FedEx will hold our scanners and our manifests and will not open the garage doors, preventing us from leaving to service the routes.

19. During the day, I can only take at most a 15-20 minute break. I cannot take a longer break because it will prevent me from completing the route. I am forced to eat my lunch while I am working.

20. FedEx requires me to stop at FedEx Kinko's for a daily pick-up at 5:00PM. Sometimes I finish my route at 4:00PM or 4:15PM and I have to wait until 5:00PM to go to Kinko's to pick-up packages.

21. I have to get a FedEx approved driver to service my route when I want to take a day off. I have to arrange this with the Terminal Manager. There are a limited number of drivers approved by FedEx and therefore there are a limited number of drivers to choose from. FedEx will not allow temp drivers and will only allow wing drivers to service a route. It is very difficult to find a FedEx approved driver to run my route and as a result I have only taken off approximately five days in the last six years. I haven't been to the dentist in three years.

22. In 2003 I twisted my ankle and was on crutches. I called the Terminal Manager to tell him what happened and he said I had to come in or else I would be terminated and that I would have to sit in the truck and navigate while someone else drove.

23. I am submitting this statement because I agree with the goals of this case to make FedEx comply with the law by classifying me and the other drivers as employees because we are treated like employees.

I declare under the penalty of perjury under the laws of the United States and the laws of the State of Pennsylvania that the foregoing is true and correct.

Executed this 2 day of July at 10:00 AM 2007

[signature]

**Declaration of Lonnie Stewart**

I, Lonnie Stewart, hereby declare as follows:

1. I have been a package-delivery driver for Fed Ex H ne out of the terminal in San Diego, California since September of 2004.

2. When I arrive at the terminal every morning, the pa ages that I am required to deliver have been sorted and placed on my pallet. I have to deliver every package I am assigned. If I fail to deliver any packa e, I can get a DNA, short for did not attempt, a service failure that could place ny Contract in jeopardy.

3. I arrive at the terminal between 7:30 a.m. and 8:00 a n. Before we can leave the terminal to begin our routes, we have to scan ou packages, load our packages in our trucks, and give our scanners to term nal employees to upload. The terminal wants our scanners to be close by, at latest, 9:00 a.m. When I have an appointment delivery, I have to deli er packages during the two-hour window scheduled between the customer a d Fed Ex.

4. All Fed Ex Home drivers deliver Tuesday through S urday. Several times, I delivered packages Monday also. But the terminal r nager told me that that was a violation of my Contract. Terminal managers ave often threatened us with Contract termination.

5. I have 2 routes with Fed Ex Home. For each route, t e Operating Agreement designates a primary zip code. But I am also respon ble for delivering packages to any other zip codes Fed Ex assigns to m For example, I heavily objected when Fed Ex required me to deliver packag s all the way to Warner Springs. But I had no choice. Dick Jean of Contract r Relations said that Fed Ex has the right to send me wherever it wants, when ver it wants, as long as I am not over my maximum threshold – a threshold th Fed Ex sets, not me.

6. Fed Ex also gave me the town of El Cajon over my o jection, at first temporarily, and then permanently.

7. In December of 2004, Fed Ex granted me a second F l Ex Home route. My terminal manager said it would take a couple of mon s until the route went through – until the route was official, and I would ge a second van availability payment and core-zone payment. It took ed Ex *thirteen months*. I was not given my second official Fed Ex Home rou until January, 2006. During the intervening time, I had to pay for a driver nd pay for a van, to service an un-official Fed Ex route I could not afford

8. I lease the Business Support Package. It includes ou canner and uniforms. They say we have a choice. But practically speaking, ve have to.

9. Fed Ex had to authorize both of my vehicles. In fac before I entered my first Operating Agreement with Fed Ex Home, the termi al manager gave me a paper displaying two trucks, a P-500 Freightliner ar a Workhorse. I chose the Workhorse, because it had dual back tires. But e terminal manager said I couldn't get the Workhorse. So I chose the P-500

10. The drivers I hire have to be approved in advance b Fed Ex. If Fed Ex decides that they don't have previous experience dr ing a "similar" kind of vehicle, they also have to attend Fed Ex's approved raining. Any drivers I use have to follow the same exact Fed Ex rules as n – i.e. uniforms, scanning procedures, driver release, signature deliveries, and ppointment deliveries.

11. Fed Ex has made it hard to sell my route. For instai e, I tried to sell my route to a person who drove big-rigs trucks for a food dis ibution company. He had a Class A DOT license. But Fed Ex said he wa not qualified and would have to go to driving school, and he lost interest.

12. I agree with and fully support this lawsuit. I believe hat we are treated like employees, not independent contractors. I am willi ; to testify if necessary.

13. I declare under penalty of perjury under the laws of ie United States and the State of California that the foregoing is true and cor ect, to the best of my knowledge.

Executed this 3 day of July, 2007 at Lake side, California.

Lonnie Stewart II

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Cause No. MDL 1700 |

**DECLARATION OF MICHAEL STORANDT**

I, Michael Storandt, hereby declare as follows:

1. I was a FedEx ground driver since approximately September 2001. During the time I was a driver, I worked out of Terminal 601 in Carol Stream, Illinois.

2. Before signing my contract, there was a group meeting with new drivers and the Human Resources person and the Terminal Manager. I was told the contract would be for a business-to-business delivery service. I would be able to set my own hours, set my route, and be able to work with customers to determine best pickup and delivery times. I was told there would be much flexibility within the day in how I handled my route. Also, I was told that I could go anywhere to purchase a truck as long as it met FedEx standards. The reality has been very different.

3. When I signed on as a contract driver, I was only given a few pages of the contract, the ones they needed me to sign. I could not even get a copy of the whole contract until about a week before I left. Whenever FedEx had changes to the contract, they would only bring copies of those pages with changes to sign. I was told I had to sign or I was done.

4. I had to purchase my truck through FedEx. I would have preferred to buy an automatic, but they had a large inventory of stick shifts. I was told I had to take from that inventory or I would not get a contract (they said anything I brought in would not meet their standards, but they would not give me their standards; they would only tell me if I brought a truck in). I got an International P1000 truck, a stick shift, with a seven year lease.

5. My uniform had to be purchased from FedEx. Even if I wore a windbreaker, it had to be FedEx's, bought at their prices. Shoes had to be black.

6. Although I was told it was a business-to-business delivery contract, in fact my route was only about 30% business.

7. If someone wanted a delivery or pickup at a certain time, I had to be there no matter where I was in my route. I had no option or right to negotiate with the customer on when to deliver or pickup. I had to do it when told or I could lose my contract. Any changes from the customer had to go through FedEx; the customer could not make arrangements directly with me. I also could not negotiate directly with a customer if I wanted to rearrange things so that I could be done earlier.

8. FedEx assigned me my territory. But, if they had stuff to deliver in another area, they would just put it on my truck and tell me I had to deliver it. It did not matter what the rest of my delivery day looked like or that the stop could be twenty miles out of my way. I would also be assigned late pickups, and even if I wanted to finish early that day I had to do it.

9. I could not start my route until after FedEx was done with the pre-load of my truck (the packages were usually haphazardly thrown into my truck and then I had to rearrange it). That was supposed to be done at 8:00 a.m., but it frequently ran late anywhere from thirty minutes to two hours late. Even if I could not start my route because pre-load was running late, if I had an early pickup I could not make it still counted against me – FedEx would deduct money from my compensation. My route was an hour away from the terminal, so this really affected my ability to make early pickup times. Late starts also made for late days.

10. If a customer called to complain that a pickup or delivery was not made on time or that a package was damaged, FedEx would deduct money from my monthly CCS payment (FedEx called it a monthly bonus, but it was something drivers relied upon to make ends meet). Too many complaints and FedEx could terminate my contract.

11. If I wanted a vacation, I had to pay into a FedEx fund that allowed another driver to take over my route for a week. That driver then got the settlement (pay) for that week. I had to take a full week off for vacation, there was no flexibility to take part of a week. And once a vacation was scheduled, it could not be changed. Once a year, I and other drivers had to submit when we wanted to take vacation for the coming year. Because senior drivers chose first, I could not always get the weeks I wanted because FedEx controlled how many drivers could take vacations at a time.

12. I was expected to drive my route, even if I was sick or injured. I was injured at work on a Friday in December 2004 when a box fell on my ankle. I called in about it, but I was told I had to finish my route or FedEx would pull my contract. I was told I could go to the doctor the next day, Saturday. On Saturday, I went to the doctor and found out my ankle was broken. I called the manager, and he said that if I did not have someone lined up to cover my route by Monday, FedEx would pull my contract.

13. I could hire a replacement driver as long as the driver met FedEx qualifications. Of course, FedEx would not tell anyone what those qualifications were, so I had to choose from a list of temps provided by FedEx. When I was out injured for my ankle, I used one of these temps. Then all of a sudden FedEx told me I could no longer use him and they

said I had to return to work or they would pull my contract and charge me for storage of my truck until I picked it up.

14. Because my ankle did not heal properly, I tried to get a temp again the following year, but FedEx continually gave me a bad time about it. Shortly before I left, I used a FedEx-approved temp, but there turned out to be some problem with his license. FedEx tried to hold me accountable, even though he came from FedEx's list, and threatened to pull my truck insurance.

15. When I first became a contract driver, I was assigned a route that was too large and I was not getting back to the terminal until 10:00 p.m. at night much of the time. That was way past the allotted legal hours, and FedEx wanted me to lie about my hours. I tried to reduce my route, but it was a major battle before FedEx allowed it. Then I usually finished by 7:00 p.m. – 8:00 p.m. (except during holiday season, when I always had late days).

16. In 2006, FedEx said I was not getting done with my route fast enough and took away a profitable area from me. I had no way to fight it – there were no customer complaints, no missed pickups, FedEx just wanted to give that area to someone else. It caused me a loss of income even though my expenses stayed pretty much the same. Even though FedEx's PR claimed that drivers would have proprietary rights to a territory, when it pulled this areafrom me I was told that I did not own the territory, I only had the right to contract with FedEx.

17. If I ever brought a package back undelivered, the manager would yell and scream at me and threaten to pull my contract. The amount of CCS/bonus money is based in part on how well the terminal did, and the manager had a "shit list" that he handed out every morning that listed drivers he claimed were not pulling their weight.

18. FedEx took $1000 and kept it in an escrow account (with very low interest) that supposedly was supposed to cover expenses if I left unexpectedly (payment for training new driver, missing packages, and so on). I also had to pay into a business support package, but I was never clear what that was for.

19. FedEx had a Flex Program, which in theory was supposed to be voluntary. But every year management came around and said I had to sign up or I would lose my contract. They only brought in the page I had to sign, nothing else. Under the program, if I could not take all my packages, I could leave it and FedEx would have someone else deliver it. In reality, FedEx would not usually allow me to leave any packages. On the other hand, FedEx could assign me additional packages to deliver at anytime even though they were outside my primary route. When I first started, it seemed like I was assigned additional packages outside my route almost every day. Over time, I started to complain about it and fight FedEx, and then it was more like once a week. The gas and truck expenses are so high that these extra deliveries outside my route impacted my bottom-line.

20. I support the goal of this lawsuit in trying to make FedEx classify drivers as employees because that is how it treated us, as low paid employees. Drivers do not have the flexibility we were told we would have as independent contractors.

21. I would be willing to testify in this case if needed.

Signed under the pains and penalties of perjury this 25 day of May 2007,

[signature]
Michael Storandt

case 3:05-md-00527-RLM -CAN document 810-5 filed 07/09/07 page 1 of 29

# EXHIBIT A

## Part 4

**Declaration of Aaron Thomas**

I, Aaron Thomas, hereby declare as follows:

1. From about September of 2001 until about March of 2006, when I resigned and sold my route, I was a package-delivery driver for Fed Ex Home out of the terminal in Moline, Illinois.

2. I didn't negotiate the Operating Agreement between me and Fed Ex Home. One morning before I left the terminal to do my route, the terminal manager handed me the Operating Agreement and told me to sign it. Every year, Fed Ex came out with Addenda. I didn't negotiate the Addenda to the Operating Agreement. Sometimes, I objected to an item like the bonus. The terminal manager told me, "You don't have to work here."

3. As a Home delivery driver I worked Tuesdays through Saturdays. I got to the terminal at 8:30 a.m. or 9:00 a.m. That was on the late side, and the terminal manager would yell at me and tell me to come in earlier. In addition, there was a time by which the terminal wanted our scanners to be closed in the morning. Our scanners could only be closed after we had scanned in all our packages. Around 10:00 a.m. terminal employees got agitated, told me to scan my packages in right away, and even helped me.

4. I was required to deliver – or attempt to deliver – every package Fed Ex assigned me everyday. If I failed to deliver any package I was assigned, I could get a DNA ("did not attempt"), a service failure that could result in termination of my Agreement.

5. Fed Ex controlled which packages I had to deliver. My Operating Agreement assigned me one zip code, called my primary zip code. In addition, I had to deliver packages to any other area Fed Ex required. The packages I was required to deliver everyday were sorted and placed in a pile for me. I couldn't refuse to deliver any packages I was assigned. If I did, I'd get a DNA. When I protested the number of packages I was given, the terminal manager said, "You don't have to work here."

6. I drove an E-350 cube cargo van. The manager told me what type of van to get, and even, where to get it from.

7. I leased the Business Support Package. Money was basically deducted from my paycheck to pay for the scanner and uniform that Fed Ex required.

8. I had several Customer Service Ride Alongs, in which a manager came along with me, took notes, and gave me his feedback about my job performance.

9. It was difficult to take time off especially in an emergency. I had to miss several funerals. I had to work even when I was very sick.

10. I am submitting this declaration because I support this lawsuit. I think that Fed Ex treated us like employees, and not independent contractors. In my opinion, we are entitled to employment benefits. I also want to help the lawsuit because I know that other people are far too afraid of losing their job, and being stuck with massive debt on a truck they no longer drive for a living, to speak out against Fed Ex.

11. I declare under penalty of perjury under the laws of the United States and the State of Illinois that the foregoing is true and correct, to the best of my knowledge.

Executed this 30 day of June, 2007 at Moline, Illinois.

Aaron Thomas

Aaron Thomas

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

Edward Sheehan, et al. v. FedEx Ground Package System, Inc.,
Civil No. 3:05-cv-00531-RLM-CAN (MA)

**DECLARATION OF MICHAEL TIMMONS**

I, Michael Timmons, hereby declare as follows:

1. I have been a FedEx Home Delivery driver from approximately August 2004 to the present, in the Wilmington terminal in Massachusetts. I have personal knowledge of the facts set forth below.

2. Before I started at FedEx, I was told that I would be running my own business and that I could have as much flexibility as I wanted. For example, during the summer months, I was expecting to be taking most Saturdays off.

3. When I was ready to be a driver, I was told to sign the Operating Agreement, the contract that FedEx has all its drivers sign. A FedEx manager quickly reviewed parts of the Agreement with me, but I did not have a right to negotiate the terms of the Agreement.

4. After working as a FedEx driver for a period of time, I quickly learned that I did not have the flexibility I thought I did because FedEx determines controls how many packages I get, who can drive and many other aspects of package and delivery services I provided.

5. I am always required to have a FedEx uniform on. I also have to maintain my truck according to FedEx standards.

6. I am required to follow FedEx's rules regarding various pick-ups and deliveries. For example, under FedEx rules which I am required to follow, only certain individuals are allowed to sign off on a package before I can release it. If I break one of these FedEx

imposed rules, I can lose my monthly bonus and was sometimes told that my contract was in jeopardy.

7. Each day, FedEx assigns me with a different number of pickup and delivery stops. Some of these stops are inside the boundaries of my responsible zip code and some are not. I am required to delivery all the packages assigned to me or I could lose my monthly bonus and have my contract terminated.

8. FedEx managers have repeatedly claimed that they can assign me stops outside my route whenever they want. I have been specifically told that "we can do whatever we want when we want" when I have complained about changes to my route. I have had my route reconfigured many times without my request or input.

9. Sometimes, I am required to have scheduled pickups at specific times at specific locations. These pickups are scheduled by FedEx without my input. For example, I have been required to pick an air conditioner and even a transmission.

10. If I don't deliver an assigned package, or miss a pickup, or arrive at a pickup too early, I can lose a portion of my monthly bonus. When this has happened, I have also been told by my manager that my contract is in jeopardy.

15. FedEx indicated that I would be able to set my own work schedule. This is not true because I am not allowed to start each day until the morning sort is completed and the gate is unlocked. FedEx only opens the gate at 5:30am.

16. There have been times when the manager has held me up for more than one hour because FedEx has been unable to find a single package that was to be delivered that day.

17. I am also sometimes assigned an evening delivery – between 5:00pm and or 8:00 pm. The pickup windows are set by FedEx sales employees with FedEx customers.

18. FedEx made it seem as if I could take time off whenever I want, but that is not true. I can only "hire" someone else to drive my route if that driver is pre-approved by FedEx. The decision whether to approve a driver is made solely by FedEx.

19. FedEx maintains control over my route. They can and do reconfigure my route, number of stops and mileage on a day-to-day basis without my input or request.

21. I am submitting this statement to Court because I support the overall goal of this case to require FedEx to comply with the law by classifying me and the other pick-up and delivery drivers as employees because we are treated like employees. If needed, I would be willing to testify in Court if I was needed to do so.

I declare under penalty of perjury under the laws of the United States and the laws of the State of Massachusetts that the foregoing is true and correct.

Executed this 14 day of MAY at Boston, Massachusetts

Michael Timmons

**Declaration of Drew Turpen**

I, Drew Turpen, hereby declare as follows:

1. For the past two-and-a-half years, I have worked as a package-delivery driver for Fed Ex Ground out of the terminal in Eureka, California.

2. When I arrive at the terminal in the morning, the packages I am required to deliver have been sorted, scanned, and loaded on my truck. Often, there are late sorts which I scan and load. I am required to deliver, or at least attempt to deliver, every package that Fed Ex assigns to me. If I do not attempt to deliver any package I am assigned, I will get a DNA, short for "delivery not attempted," a service failure that could lead to termination of my Operating Agreement.

3. I have objected to the number of packages assigned to me before. Sometimes, I couldn't fit them all on my truck. But the terminal manager told me that I had to take them. He said if I didn't, it would be a service failure.

4. I arrive at the terminal at about 7 or 8 a.m. Until several months ago, when Fed Ex hired employees to take the packages from the sort and load them on our vans, we were required to get to the terminal at 6 a.m. or earlier. Now, we do not have to get to the terminal by 6 a.m. But that does not mean that we can come whenever we want. I have pick-up windows. If I arrived at a pick-up early or late, it is a service failure. I have to deliver packages to businesses before they close because Fed Ex has a policy that all deliveries to businesses require a customer signature.

5. I lease the Business Support Package, which includes the Fed Ex uniform and hand-held computer. You have to.

6. I lease a P-1000 van, which Fed Ex had to approve.

7. Every year, Fed Ex comes out with Addenda to our Operating Agreement. We do not write or negotiate them. The terminal manager hands them out and tells us to sign them.

8. Any driver we hire has to be approved by Fed Ex, and they have to follow the same rules as we do.

9. I am making this declaration because I fully support this lawsuit. I believe Fed Ex treats us like employees, and not independent contractors. I believe we should be entitled to the legal benefits and protections that employees have.

10. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 6 day of July, 2007 at Mckinleyville, California.

Drew Turpen

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Edward Sheehan, et al. v. FedEx Ground Package System, Inc.*,<br>Civil No. 3:05-cv-00531-RLM-CAN (MA) | |

**Declaration of Genaro Vargas**

I, Genaro Vargas, hereby declare as follows:

1. I am an adult resident of Lawrence, Massachusetts.

2. I am a Fed Ex Home package-delivery driver in the 3021 Boston Home Delivery terminal. I have worked there as a driver since March 2001.

3. I was given an Operating Agreement when I first signed up, but I did not read it very carefully. I wasn't able to negotiate any of the terms of the agreement.

4. When I first signed up to be a FedEx driver, I wanted and expected to be my own boss, work the hours that I wanted, and there would be no schedule set.

5. I soon found out that this was not true. I am told what to do and when to do it, and I have no control over how much work is given to me. At times I have asked to have more work or less work given to me, but my manager has ignored those requests and gives me however much work he wants to give me.

6. My managers have told me how I should dress and look while I am working. When I have shown up to work without shaving, my manager told me I am supposed to be trim and clean and I was told that I would be in violation of my contract if I don't shave.

7. We have to wear the FedEx uniform, which includes brown or black shoes. I wanted to wear my own blue khaki pants (because the uniform pants run in

the rain, and I get blue ink on my legs), but the manager told me I had to wear the uniform pants, even though they look similar to my own pants.

8. Some package deliveries have appointments, which means you have to make the delivery at a certain time. We do not get to talk to the customers ourselves about appointments – they arrange them with FedEx and we have to keep to them. If you scan a package before or after the correct time, you lose your bonus money.

9. On a daily basis, you don't know how much work you have until you open your scanner.

10. We get packages outside our route, and we have to deliver them. Bringing them back is not an option. At times, this has been a daily occurrence.

11. It's very hard to find a driver to fill in for your route if you need to take a day off from work. It has to be someone that FedEx has approved, so we are very limited in who we could have fill in for us.

12. Since FedEx treats us like employees, I would like to be called an employee, so that I would get paid like an employee and not have to pay the expenses that employees would not pay, like the cost of my truck, uniform, and other business expenses.

13. I am making these statements because I support this case, and I would be willing to testify in court if I am needed to do so.

Signed under the pains and penalties of perjury this 14th day of May 2007,

[signature]

Genaro Vargas

**Declaration of Dennis Ward**

I, Dennis Ward, hereby declare as follows:

1. From October 2005 until January 2007, I worked as a package-delivery driver for Fed Ex Home out of the terminal in Fresno, California.

2. My dad was an independent contractor. So to me that meant that I would be my own boss and be able to negotiate how much I would make for my services. I resigned from my position because I love driving, but I did not have any independence and I did not make an amount of money that I thought was fair.

3. When I discussed becoming an independent contractor with terminal manager Pat Richardson, he asked me if I could buy a van. I said I could. He gave me the specifications. I suggested I get a Chevy. He said no, I had to get a Dodge. He also told me to install specific interior shelving and to place decals with the Fed Ex logo outside of the van. After I arranged to purchase the vehicle, Richardson gave me the Operating Agreement to sign. I was handed a two-hundred-plus page agreement, and told "just sign here."

4. We were required to attempt to deliver every package assigned to us each day. My primary zip code was in Mariposa, but on a daily basis I was also required to deliver packages in other areas and I sometimes covered as much as a 250-300 mile area.

5. I leased the Business Support Package consisting of the uniform and a scanner. I thought we had to.

6. Recently, my father died and my wife got sick. I was told by my boss to take as much time as I needed. That would not have happened at Fed Ex. There was no reserve pool of labor, and we had to hire a driver in advance who was approved by Fed Ex and trained to drive our routes.

7. I am making these statements to let the court know I support this case. I believe I was an employee, and that I and other package-delivery drivers should have the legal protections and benefits that all employees have.

8. I would be willing to testify if needed.

I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 1 day of June, 2007, at FRESNO, California.

**Declaration of Michael Ward**

1. Since about May of 2003, I have been a package-delivery driver for Fed Ex Ground out of the Sacramento, California terminal. When I signed my Operating Agreement, I understood that I would be an independent contractor. To me, that meant I would be able to run my own business and set my own hours. Unfortunately, that has not been the case.

2. I signed the Operating Agreement my first day of work. The terminal manager told me to come in early on the day I was to begin my route, and gave me the Operating Agreement to sign. Every year, Fed Ex comes out with Addenda. None of us negotiate the Addenda. The manager hands them out and tells us to sign them.

3. I work about 12 hours a day to deliver the packages I am required to deliver. I have pick-up windows scheduled between Fed Ex and the customer. If I arrive at a pick-up early or late, it reduced my pay and is considered a service failure. If I don't attempt to deliver any package I am assigned, I can get a DNA, short for "did not attempt," a service failure that could put my Operating Agreement in jeopardy.

4. Areas that are "everyday service" have to be serviced every day. Areas that are "alternate day service" have to be serviced alternate days. Recently, Fed Ex redesignated one of my areas, Rescue, from "alternate day" to "everyday" service. Now I have to go there everyday, even if there are few packages, and although it's far away. I had no say in that decision. Recently, Fed Ex has given me additional territory. There was a "split zip code," or a zip code split between me and another driver. Fed Ex decided to give the whole zip code to me.

5. I participate in the Flex Program. The idea is that if one driver's area has heavy package volume, and another driver's area has light package volume, Fed Ex can redistribute packages to even out the areas. But Fed decides who is heavy and light. My terminal manager told me I am "under-utilized." This is based on maximum delivery thresholds determined by Fed Ex Corporate – I not me. Packages are frequently flexed to me, and hardly ever flexed from me. I was once flexed an inconvenient stop, which I protested, for two and a half years.

6. I purchased a P-700 van, which Fed Ex had to approve. I lease from Fed Ex the Business Support Package. It includes my scanner and uniform.

7. We have to wear the Fed Ex uniform and meet Fed Ex's appearance standards. I cannot wear an earring. The terminal manager once told me I was wearing the wrong color T-shirt underneath my uniform.

8. I have had Customer Service Ride-Alongs. The manager came along with me in my truck and gave me some advice.

9. It is very hard to take time off. Before I signed my Operating Agreement, I told the terminal manager that I would need to take a day off for the birth of my child. He said no problem. I got a relief driver, who was approved by Fed Ex, to cover. But before the time that my wife had the baby, Fed Ex fired him (disapproved him). The day my wife had our baby, the terminal called me 4 to 5 times. I had to pay a professional cartage company to deliver my packages.

10. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2 day of July, 2007 at SACRAMENTO, California.

Michael Ward

**Declaration of Paul Welch**

I, Paul Welch, hereby declare as follows:

1. I am a package-delivery driver at Fed Ex Home's terminal in Fresno, California, where I have worked since September, 2003.

2. When I signed the Operating Agreement, I understood that I would be an independent contractor. To me that meant: being able to call the shots myself, and being able to set my own hours. Neither turned out to be the case.

3. I signed the Operating Agreement which granted me a primary zip code to deliver packages to. In addition, Fed Ex every day assigns me packages to deliver for at least three other zip codes. Fed Ex also assigns me packages to deliver in still other zip codes.

4. Several years ago, the terminal management required me and other drivers to deliver a large volume of packages to neighborhoods and zip codes that were far away and very difficult to handle. This went on for about a year until Fed Ex finally decided to establish a new route. Before Fed Ex created the new route, I complained. The Fed Ex terminal manager told me, "According to the contract, that's the flex program. You just have to work faster."

5. When I arrive at the Fresno terminal every morning, the packages assigned to me are sorted and placed on my pallet. I cannot refuse to accept them. It is my job to scan them in and load them on my truck. If I or any other drivers do not attempt to deliver packages we will get a "DNA" (short for "do not attempt)," a delivery failure that affects our pay and could lead to termination of our Contracts. If we left packages that we are supposed to deliver behind, the terminal manager would call us and we'd get written up.

6. I have tried to refuse to accept packages the past. The terminal manager said, "If you can't handle it, we'll find someone who can."

7. I get to the terminal every day at 7:00 am. Most days the sort is not finished until 8:00 a.m. The terminal managers like us to scan our packages, load them into our vans, upload our scanners, and be on our routes, by 10:00 a.m.

8. I lease the Business Support Package from Fed Ex. It consists of the uniform, the scanner, and turn-by-turn mapping. They say that it is voluntary. But we have to wear the uniform. And without a scanner, we couldn't do our jobs. We would have to handwrite the tracking number and delivery time of every package we delivered. Fed Ex would have to manually enter that information in the computer in the terminal. It would take too long. I don't know any drivers who don't use the Business Support Package.

9. When I bought my route from the previous contractor I took over the lease of his van, an S-350, and obtained prior approval from Fed Ex to use that van for my route.

10. Fed Ex retains ultimate say in whether or not I can sell the Fed Ex route I supposedly own.

11. About two years ago, I discussed selling my route to another driver. As I am required to under the Operating Agreement, I went to the terminal to get its approval. The terminal then gave a different route to that driver for free. Now the same thing has happened again. I negotiated selling my route for $15,000 to another individual. I went to the terminal manager to get Fed Ex's approval. Last month Fed Ex offered that individual a Fed Ex route for free.

12. I am making these statements because I understand and I support the goals of this lawsuit. I believe that I am an employee, and that Fed Ex should give me all of the legal benefits and protections that employees have. I would be willing to testify in court if necessary.

13. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 27 day of June, 2007 at FresNO, California.

[signature]

**Declaration of Joe Weathers**

I, Joe Weathers, hereby declare as follows:

1. I have been a package-delivery driver for Fed Ex Ground at the terminal in Windsor, California, where I have worked since about June of 2004.

2. I have pick-up windows that Fed Ex establishes. If I fail to meet a pick-up window, which is set between Fed Ex and the customer, it reduces my pay, and is a service failure that could lead to termination of my Operating Agreement. I have to deliver packages to businesses before they close, because Fed Ex requires a customer signature for packages delivered to businesses.

3. Everyday, I have to deliver, or attempt to deliver, every package Fed Ex assigns me. If I do not deliver a package I am assigned, I can get a DNA, short for "delivery not attempted," a service failure that reduces my pay and could result in termination of my Operating Agreement.

4. I have asked the terminal manager to split my route, giving me an extra van availability payment and core zone payment, but Fed Ex wouldn't do so.

5. Ever year Fed Ex comes out with Addenda to our Operating Agreement. We do not have any input. We have to sign them or else we have no Contract.

6. I drive a P-700 truck, which is what Fed Ex approved for use on my route.

7. I lease the Business Support Package, which includes my scanner and Fed Ex uniform. I have no choice because these are the tools that are required of me in order to perform my job.

8. It is difficult to take time off when we need to, because we have to find our own replacement, who has been approved in advance by Fed Ex. I had to work when I broke my left hand. I participate in the Time Off Program to take vacation. Money is deducted from my pay in order to pay a driver to relieve me, and the weeks of vacation are bid in advance by terminal seniority.

9. I am making this declaration because I strongly support this lawsuit. I believe Fed Ex treats us as employees, not independent contractors, and we should be entitled to employment benefits.

10. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, to the best of my knowledge.

Executed this 9 day of July, 2007 at Monterey, California.

Joe Weathers

Declaration of Derek Williams

I, Derek Williams, hereby declare as follows:

1. For the past five years, I have been working as a package-delivery driver for Fed Ex Home out of the terminal in Pomona, California.

2. When I arrive at the terminal every morning, the packages I am required to deliver have been sorted and placed on my pallet. I have to scan in every package and place it on my truck. I have to attempt to deliver every package. If I refuse to deliver any packages, I will get a DNA, short for "delivery not attempted," a delivery failure that could result in termination of my Operating Agreement with Fed Ex Home.

3. I have complained about the number of packages I have been assigned before. The terminal told me I had to take them.

4. My Operating Agreement designates a primary zip code. But I also have to deliver packages to any other zip code that Fed Ex assigns me to. For example, Fed Ex reconfigured my route to take away North San Gabriel, and give me high crime, South San Gabriel. I was also assigned Rosemead. Recently, Fed Ex reconfigured my route again. Fed Ex hired two new contractors relieving me of some of my area. I was very happy about this change. But I had no say in any of these decisions. In fact, I objected to servicing South San Gabriel. But, Fed Ex required me to.

5. I get to the terminal everyday at 7:00 a.m. I have to scan in my packages, load my packages in my truck, and then give my scanner to the terminal to be uploaded. The terminal won't close out my scanner so that I can begin my route until all of the missing sorts have been located. The terminal manager wants all drivers to have finished scanning in packages and have our scanners uploaded by the terminal by 9:00 a.m. I once had to go to court. The terminal manager said that the latest the terminal could close out my scanner was 10 a.m.

6. I lease the Business Support Package. We pay Fed Ex for the uniform and scanner. We don't really have a choice.

7. I have had several Customer Service Ride-Alongs. A manager sat in the passenger seat of my van, and took notes, and gave me feedback about how I was doing my job.

8. I have a Ford E-350, P-450, cut-away box truck. Fed Ex had to approve this vehicle. The terminal manager told me I couldn't use a cargo van.

9. Fed Ex constantly monitors the condition of our trucks. Managers have told me to fix a dent in my fender, and clean graffiti off, right away. About two years ago, I went to Fed Ex to get approval to sell my route and truck. The Fed Ex terminal manager told me that my P-450 was outdated, the terminal

was using P-550s, and so the sale wouldn't be approved. But I recently learned another driver was able to sell his P-450 van. I asked the terminal manager about it. He said, now, the Company is being more lenient. I didn't think that was fair.

10. I am making this declaration because I support this case. I believe that we are treated like employees, not independent contractors, and that we should be entitled to employment benefits.

11. I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 1 day of July, 2007 at Temple City, California.

Derek Williams

Derek Williams

**DECLARATION OF MICHAEL WISE**

I, MICHAEL J. WISE, hereby declare as follows:

1. I am a current FedEx Ground driver. I started with FedEx on February 20, 2006. Per FedEx, I attended school for 8 days in Portland, Oregon. I began as a driver for another contract on March 13, 2006.

2. I was never given an Operating Agreement to read prior to signing the document on May 8, 2006.

3. I was told by FedEx that I would be an independent contractor. I quickly found out that I am not an independent contractor but an employee directed by FedEx in the daily operations of my route.

4. I am required to wear the approved FedEx uniform. These clothes are only offered by one company. I must pay for the FedEx uniforms.

5. I must provide to FedEx "timely" maintenance reports, along with copies of all maintenance done to my vehicles by the 15th of every month or my vehicle is "impounded" to the terminal.

6. I am required to attend safety meetings and sign an attendance sheet. All meetings are conducted in the morning, stopping the morning preload.

7. I must be to work at 6:30am or later if the line haul trailer is late. I cannot go home during my day as the terminal manager says "this is against FedEx policy." I must return to the terminal by 7:15pm every day to unload outbound freight.

8. In actuality, I am not an independent contractor. FedEx dictates almost every aspect of my daily operations.

9. I would be willing to testify or serve as a named plaintiff if I was needed to do so in support of the drivers in this case.

I declare under penalty or perjury under the laws of the Unites States and the laws of the State of Montana that the foregoing is true and correct.

Executed this 22nd day of May, 2007.

Michael J. Wise
Michael J. Wise

**DECLARATION OF BRUCE WITTMEIER**

I, Bruce Wittmeier, hereby declare as follows:

1. I have been a package delivery driver out of the Roanoke, Virginia terminal of Fed Ex Ground since March, 2003.

2. I bought a P-1000 truck from the driver I bought the route from. I learned in Fed Ex driving school that the P-1000 is among the fleet of vans that Fed Ex allows us to use.

3. Every day, I am required to deliver every package that Fed Ex assigns to me. Fed Ex has a policy that every package has to be delivered, every day. If I do not deliver any package that Fed Ex assigns to me in the morning, I can get a DNA, short for "delivery not attempted," a service failure that reduces my pay, and can result in termination of my Operating Agreement.

4. I have to pick up packages during the pick-up windows that appear on my pick-up list. If I arrive at a pick-up early or late, it is a service failure that reduces my pay.

5. I have to deliver packages to businesses before they close, or it will result in another service failure that reduces my pay.

6. Fed Ex has always said that we have a property interest in our route. Yet Fed Ex is reconfiguring my route that I supposedly own and is not giving me any say.

7. Seven months after I began working, Fed Ex began assigning me packages to deliver to an area that was included in my Operating Agreement but to which I was never before required to deliver packages. This area is geographically remote from the core businesses which I was delivering. My expenses of fuel and maintenance would often exceed the pay for the stops and packages. This area, Bent Mountain, is difficult to service due to narrow and unpaved roads, small and steep driveways, poor terrain and many miles between stops.

8. The pickup and delivery manager told me that if I didn't service this area, Fed Ex would reconfigure my route in a way I may not like. I had to buy another vehicle and hired my son to deliver packages to Bent Mountain. My son and the vehicle had to be Fed Ex approved.

9. In late 2006, my son stopped driving for me. FXG reconfigured my route in an undesirable way. They took the core business stops (the most profitable area) and gave them to another driver. They left me Bent Mountain, which is

not completely serviceable in a P-1000 truck. I've complained. So far nothing has been done.

10. I lease the Business Support Package. It consists of our scanner and uniform. We are required to lease the Business Support Package from Fed Ex.

11. I strongly support this lawsuit. I am willing to testify and serve as a named plaintiff.

12. I declare under penalty of perjury under the laws of the United States and the laws of the State of Virginia that the foregoing is true and correct, to the best of my knowledge.

Executed this 7 day of July, 2007 at ROANOKE, Virginia.

[signature]

Bruce Wittmeier

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. MDL 1700 |

**DECLARATION OF MARK YORK**

I, Mark York, hereby declare as follows:

1. I have been a FedEx Ground driver for approximately nine years. I work out of the Littleton, New Hampshire terminal, but my route covers both Vermont and New Hampshire.

2. I signed a contract with FedEx when I started as a driver. I believed I was going to be self-employed, but that is not really the situation. I am told what, when and how to do my route.

3. I am required to purchase a business support package, which includes FedEx's scanner, FedEx's uniform, and van washing.

4. I arrive at the terminal around 7:00 a.m. to sort and load my truck, and then I generally work a twelve-hour day (I have to work until the packages are delivered). There is a list of rules to follow in how packages are delivered. For example, FedEx delivers COD packages for customers for an extra charge. If I get a COD package, I am required to attempt to deliver it three times (no matter if it is out of my way). I do not get paid unless and until it is delivered.

5. Pick-up times are set by FedEx and are set between a salesperson and the customer. As a driver, I do not have a say in the times because it is driven by the customer's demand. FedEx gives me a one-hour window in which to make the pick-ups and I have to do it regardless if it takes me out of my way on my route. Sometimes FedEx tells me a package has to be picked up by a certain time and no later than that time. Pick-ups really drive how I can run my route then.

6. If I miss a pick-up, pick-up a package either before or after the window assigned, or after a deadline, I am fined $50 each time it happens.

7. When the manager assigns me a home delivery package to deliver, I have to deliver it even though it adds time, mileage and increases my maintenance costs (I drive a lot of dirt roads that are hard on my truck). I do not receive additional compensation for the

home delivery packages, however, unless it is peak season (the weeks leading up to Christmas).

8. I have to pay for the right to take a vacation. There is a program run by FedEx that I can pay into weekly and FedEx then provides a swing driver to cover my route. I do not get compensated when I am on vacation, though. Technically, I could avoid the vacation program and hire someone to cover my route when I want to take time off, but the driver must be approved by FedEx anyway. Therefore, drivers are essentially locked into the program if they want to take a vacation. I did not take a vacation for my first five years.

9. I support the goals of this lawsuit. FedEx controls everything and treats me like an employee instead of a contractor, and yet I have all these costs I am responsible for because they call me a contractor.

10. I am willing to testify in this matter if needed to do so.

Signed under the pains and penalties of perjury this _29th__ day of June 2007,

Name

**Declaration of Nedzad Zagovic**

I, Nedzad Zagovic, hereby declare as follows:

1. I am a Fed Ex Home package-delivery driver in the San Jose, California terminal. I have worked there as a driver since July, 2003.

2. When I was shown the Operating Agreement in July 2003, I did not negotiate the terms. Every year, I and other drivers are presented with Addenda to our Operating Agreements changing what our compensation would be. For several years, I thought my core zone payment was too low, I protested, but the Addenda was implemented anyway.

3. Fed Ex has always decided which packages I deliver, how many packages I deliver, and what my area will be.

4. When I signed my Operating Agreement, like all drivers, I was given a primary zip code. I was also given packages to deliver in areas outside of my primary zip code. Some of these packages were in mountainous areas that were hard for me to cover. My terminal manager told me that I had to deliver all of the packages.

5. When I get to the terminal every day, the packages I am required to deliver are stacked on a palate that has my driver ID number. All drivers' packages are distributed this way. I scan my packages into the scanner. I give the scanner to a terminal employee, who gives me my manifest (a list of packages) and turn-by-turn directions. Then I make my deliveries.

6. If I do not deliver all the packages I am assigned, or if I deliver them the wrong way, I will lose pay.

7. For example, the previous terminal manager constantly found fault with my deliveries. There was hardly a month in which my bonus wasn't reduced. Now, since a new terminal manager came in around the summer of 2006, I have not been told that I do not deliver packages the right way. I receive my full bonus. But, I do not believe that a thing I do has changed.

8. When I signed up with the Company, Fed Ex told me what vehicle I had to buy. Fed Ex told me to buy a Chevy Van 350, so I did.

9. I am making these statements to let the court know I support this case and that I would be willing to testify in court if I am needed.

I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the forgoing is true and correct, to the best of my knowledge.

Executed this 23 day of May at San Jose, California.

ZAGOVIC NEDZAD

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| Edward Sheehan, et al. v. FedEx Ground Package System, Inc., Civil No. 3:05-cv-00531-RLM-CAN (MA) | |

# AFFIDAVIT OF MOULOUD ZOUAOUI

I, Mouloud Zouaoui, being duly sworn, depose and state as follows:

1. I am an adult resident of Lawrence, Massachusetts.

2. I have been a FedEx Home Delivery driver from December, 2005, to the present. During that time I have worked in the Wilmington, Massachusetts terminal on Jewell Drive.

3. I learned about the FedEx job through an acquaintance of mine who was a FedEx Home Delivery driver at the Wilmington terminal. I then started working as a temporary driver in the FedEx terminal. I was paid by an employment agency while a temporary driver. After several months, I was told that I would be hired as a FedEx Home Delivery driver.

4. When I was hired I was given, but did not read, the so-called "Operating Agreement." When FedEx finally notified me that I could be a contractor, they sat down

with me and told me things such as I could set my own hours. The Operating Agreement was presented to me but I had no right to negotiate any of the terms and I had to either sign it or not. There were no negotiations about the terms of the agreement.

5.    When I started for FedEx as a permanent contractor, while I would have liked to have come in first thing in the morning just after the sort to pick up my packages and start my deliveries, I was not permitted to because of my low seniority on the list. Instead, I had to wait until a more senior driver left the terminal until I could then park my van in the slot or space from which I could pick up my packages. This meant that I was required to leave later than most of the other drivers in the terminal. The earliest I was able to leave the terminal on most days was approximately 9 a.m. With the volume of packages that I had to deliver, it would often take me until 7:00 or 8:00 at night to finish my deliveries. I was aware that under FedEx's policies, I could not deliver packages beyond 8:00 p.m.

6.    Just before I signed the Operating Agreement, I informed the FedEx Home Delivery officials that I was reluctant to sign a contract which would obligate me to purchase a truck and be obligated to pay it off over the next number of years. I was informed that I should not worry about that, and that if at any time I wanted to leave, they would help me sell the truck to someone else and it would not be a problem. However, since that time I have known a number of other drivers who have tried to leave their route and sell their truck, but have not gotten any help in selling their truck and I know one driver who has been unable to sell his truck.

7. In early 2006, I needed to go overseas to visit a sick family member in Algeria. Prior to leaving, I informed FedEx that I needed to have this time off and believed that I would be permitted to participate in their so-called "Vacation Program." Under this program, I understood that I would pay some sort of fee and in return they would supply a temporary driver to cover my route. After I got back from my trip, when it was time to receive my settlement checks for the period I was gone, I was informed that because they did not consider me in the Vacation Program, they were deducting all of my settlement money from the time that I was out and that I would not receive these funds.

8. There have been many times in the past when the volume of packages that I am requested to deliver is greater than I believe I can finish within the day. However, I am not allowed to give back packages and have others deliver them, but am told that I am responsible for delivering all of the packages on my route regardless of how long it takes.

9. I am submitting this statement to the Court because I support the idea that I should be treated like a regular delivery driver, paid a fair wage, and not be required to have the obligation of my truck to pay back. I think the company has misclassified me as a contractor and not as a delivery driver and believe that we should be treated like employees. I would be willing to testify, if necessary, in court if I am needed to do so.

Signed under the pains and penalty of perjury this 14th day of May, 2007.

05/14/2007

[signature]
Mouloud Zouaoui

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF ALANNA COOPERSMITH**
**IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, Alanna D. Coopersmith, state:

1. I am an attorney with the law firm of Leonard Carder, LLP, one of the firms representing the Plaintiffs in this matter. I make this declaration in support of Plaintiffs' motions for class certification in all of these consolidated proceedings.

2. As a part of representing the Plaintiffs on this matter, I have personally talked to current pickup and delivery drivers from FedEx Ground and Fed Ex Home Delivery (hereinafter drivers) who are classified by FedEx as "independent contractors." All of my contacts with drivers conformed with the Rules of Professional Responsibility and did not involve any improper solicitation.

3. I interviewed a number of current drivers who expressed support for lawsuit, but who were reluctant to provide a declaration to the court. A reason given for this was a fear that the drivers would be subjected to some form of retaliation by FedEx. Due to the constraints of the attorney client privilege, I cannot divulge the substance of these communications, and

plaintiffs will not present these individuals as witnesses in this case as to any issue unless they agree to waive the privilege.

4.    I believe that more drivers would have provided Plaintiffs declarations if the drivers did not fear retaliation.

I swear under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Execute on July 8, 2007 at San Francisco, California

Alanna D. Coopersmith, CA BAR 248447

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**DECLARATION OF VICTORIA KIES GAROUKIAN
IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, Victoria Kies Garoukian, state:

1. I am an attorney with the law firm of Watton Law Group, one of the firms representing the Plaintiffs in this matter. I make this declaration in support of Plaintiffs' motions for class certification in all of these consolidated proceedings.

2. As a part of representing the Plaintiffs on this matter, I have personally talked to current pickup and delivery drivers from FedEx Ground and Fed Ex Home Delivery (hereinafter drivers) who are classified by FedEx as "independent contractors." All of my contacts with drivers conformed with the Rules of Professional Responsibility and did not involve any improper solicitation.

3. I interviewed a number of current drivers who expressed support for lawsuit, but who were reluctant to provide a declaration to the court. A reason given for this was a fear that the drivers would be subjected to some form of retaliation by FedEx. Due to the constraints of the attorney client privilege, I cannot divulge the substance of these communications, and

plaintiffs will not present these individuals as witnesses in this case as to any issue unless they agree to waive the privilege.

4. I believe that more drivers would have provided Plaintiffs declarations if the drivers did not fear retaliation.

I swear under penalty of perjury under the laws of the state of Wisconsin and the United States that the foregoing is true and correct.

Execute on July 6, 2007 in Milwaukee, Wisconsin.

Victoria Kies Garoukian

Victoria Kies Garoukian, WI Bar 01020901

case 3:05-md-00527-RLM-CAN document 810-6 filed 07/09/07 page 6 of 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF PHYLLIS NORMAN IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, Phyllis Norman state:

1. I am an attorney with the Law Offices of George A. Barton, P.C., one of the firms representing the Plaintiffs in this matter. I make this declaration in support of Plaintiffs' motions for class certification in all of these consolidated pleadings.

2. As a part of representing the Plaintiffs on this matter, I have personally talked to current pickup and delivery drivers from FedEx Ground and FedEx Home Delivery (hereinafter drivers) who are classified by FedEx as "independent contractors." All of my contacts with drivers conformed with the Rules of Professional Responsibility and did not involve any improper solicitation.

3. I interviewed some current drivers who expressed support for the lawsuit, but who were reluctant to provide a declaration to the court. A reason given for this was fear that they would be subject to some form of retaliation by FedEx. Due to the constraints of the attorney client privilege, I cannot divulge the substance of these

communications, and plaintiffs will not present these individuals as witnesses in this case as to any issue unless they agree to waive the privilege.

4. I believe that more drivers would have provided declarations if the drivers did not fear a form of retaliation.

I swear under penalty of perjury under the laws of the state of Missouri and the United States that the foregoing is true and correct.

Executed: July 9, 2007.

PHYLLIS A. NORMAN

STATE OF MO )
)
COUNTY OF Jackson )

9th SUBSCRIBED AND SWORN TO BEFORE ME, a notary public, this ____ day of July, 2007.

Leslie Anne Aronson
NOTARY PUBLIC

MY COMMISSION EXPIRES:

" NOTARY SEAL "
Leslie Anne Aronson , Notary Public
Jackson County, State of Missouri
My Commission Expires 3/3/2009
Commission Number 05445153

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF JENNIFER TATUM**
**IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, Jennifer Tatum state:

1. I am an attorney with the law firm of Taylor, Dunham & Burgess, L.L.P., one of the firms representing the Plaintiffs in this matter. I make this declaration in support of Plaintiffs' motions for class certification in all of these consolidated proceedings.

2. As a part of representing the Plaintiffs on this matter, I have personally talked to current pickup and delivery drivers from FedEx Ground and Fed Ex Home Delivery (hereinafter drivers) who are classified by FedEx as "independent contractors." All of my contacts with drivers conformed with the Rules of Professional Responsibility and did not involve any improper solicitation.

3. I interviewed some current drivers who expressed support for the lawsuit, but who were reluctant to provide a declaration to the court. A reason given for this was a fear that the drivers would be subjected to some form of retaliation by FedEx. Due to the constraints of the attorney client privilege, I cannot divulge the substance of these communications, and plaintiffs

will not present these individuals as witnesses in this case as to any issue unless they agree to waive the privilege.

4.    I believe that more drivers would have provided declarations if the drivers did not fear retaliation.

I swear under penalty of perjury under the laws of the state of Texas and the United States that the foregoing is true and correct.

Execute on July 6, 2007 in Austin, Texas.

Jennifer A. Tatum
Taylor, Dunham & Burgess, L.L.P.
301 Congress Ave. Suite 1050
Austin, Texas 78681
(512)473-2257-telephone
(512)478-4409-facsmilie

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

O R D E R

The court now GRANTS Fed Ex Ground's motion to substitute the Crandall Declaration (filed June 20, 2007) without objection and DIRECTS the clerk to make the following change to the docket: with respect to FedEx Ground's memorandum in opposition to plaintiffs' motion to exclude the expert report of Robert Crandall [Doc. No. 759], replace the declaration of Robert Crandall filed manually under seal with the court on June 18, 2007 with the declaration attached to FedEx Ground's motion to substitute.

SO ORDERED.

Entered: July 16, 2007

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

O R D E R

The court GRANTS the plaintiffs' motion to reschedule the hearing set for July 24, 2007 [Doc. No. 812]. The hearing is now SET for **August 20, 2007 at 1:30 p.m.**

SO ORDERED.

ENTERED: July 17, 2007

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

CAUSE NO. 3:05-MD-527 RM (MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**OPINION AND ORDER**

On May 29, 2007, Plaintiffs filed a motion to strike the declarations of putative class members that Defendant FedEx Ground Package System Inc. (Fedex) filed with its oppositions to Plaintiffs' motions for class certification. The issue before this Court is whether Fedex, which had disclosed thousands of potential witnesses, was required to supplement its disclosures to the Plaintiffs to inform them of the specific witnesses Fedex intended to use. This Court concludes Fedex was so required and that its failure to disclose requires this Court to strike the witnesses' statements. For the following reasons, Plaintiffs' motion is **GRANTED**.

## I. PROCEDURE

On August 10, 2005, this multidistrict litigation case was transferred to the Northern District of Indiana pursuant to 28 U.S.C. § 1407 to perform consolidated pretrial proceedings. On November 15, 2005, this Court entered an initial scheduling order where, pursuant to the parties' consent, discovery on liability and damages was bifurcated. For liability discovery, the parties' initial disclosures were due by January 8, 2006.

On November 29, 2005, this Court entered a supplemental scheduling order that, among other things, established deadlines for discovery and class certification. Non-expert discovery

was to be completed by June 1, 2006, while class certification would be divided into three stages with the first wave beginning on August 8, 2006. Each subsequent wave was to be filed approximately three weeks later.

On January 9, 2006, Fedex served its initial disclosures to Plaintiffs (P.s' Memorandum in Support, Ex. 20). Fedex indicated the following, in part, as individuals likely to have discoverable information that Fedex may use to support its claims or defenses:

> Named plaintiffs, plaintiffs, putative class members and contractors in jurisdictions in or relevant to the MDL 1700 actions (Id. at 5).

Fedex did not list any specific names of individual putative class members at this time.

On May 26, 2006, this Court granted in part the parties' joint motion to extend various deadlines. Non-expert discovery was reset to close on December 31, 2006. Class certification was reset to begin on January 22, 2007.

On June 30, 2006, and September 15, 2006, Fedex supplemented its initial disclosures. Fedex provided the names and contact information for current contractors nationwide (Def. Ex. 3, Declaration of Chris Hollinger, ¶ 5). Fedex's supplements spanned hundreds of pages and contained approximately ten thousand names (P.s' Reply Ex.s 4 & 5). Fedex did not indicate which people or how many it would use to support its claims or defenses.

On December 20, 2006, this Court held an in-court hearing regarding several motions to compel. The parties also raised some issues regarding deadlines at that hearing. By agreement of the parties, this Court extended the discovery deadline till January 31, 2007, solely for the completion of previously noticed depositions, which this Court memorialized in a December 21,

2006, order (P.s' Memorandum in Support, Ex. 19).[1] The class certification deadline was extended again and set to begin on February 12, 2007.

After the non-expert discovery deadline passed on December 31, 2006, Fedex again supplemented its Fed. R. Civ. P. 26(a) initial disclosures. On January 3, 2007, and January 31, 2007, Fedex provided substantially smaller lists, although still numbering in the hundreds, than the September or June list of individual putative class members likely to have discoverable information that Fedex may use to support its claims or defenses. On January 23, 2007, this Court extended the class certification briefing deadline a final time and class certification briefing began on March 12, 2007.

On March 12, 2007, Plaintiffs filed their first motions for class certification. On April 27, 2007, Fedex filed their responses in opposition to those motions. Fedex submitted statements from putative class members who were listed in its January 3, and January 31, 2007, supplemental disclosures with its responses. On May 29, 2007, Plaintiffs filed their replies in support of their motions. On that same day, Plaintiffs also filed a motion to strike the declarations of putative class members that Fedex had submitted with its responses to Plaintiffs' motions for class certification. On June 18, 2007, Fedex responded to Plaintiffs' motion to strike. On July 2, 2007, Plaintiffs filed their reply in support of its motion.

---

[1]On December 21, 2006, this Court entered an order that stated, "[b]y agreement of the parties, the discovery deadline for all current discovery is now January 31, 2007." See Doc. No. 453. However, this order was simply a memorialization of the parties' agreement, as indicated by the order. Fedex's counsel even clarified with the Court that the extension was solely for previously noticed depositions (P.s' Memorandum in Support Ex. 19, pg. 111). Neither party disputes that the end for all non-expert discovery, other than the previously noticed depositions, ended on December 31, 2006.

The current motion to strike was fully ripe by July 2, 2007, and as a result, this Court now enters its ruling on this motion and all similar motions.[2] This Court may rule on these motions pursuant to its referral order and 28 U.S.C. § 636(b)(1)(A).

## II. ANALYSIS

### A. Applicable Law

Under Fed. R. Civ. P. 26(a)(1) and Fed. R. Civ. P. 26(e)(1) a party must provide and supplement disclosures that include the names, addresses, and telephone numbers, if known, of each individual the disclosing party may use to support its claims or defenses. The purpose of both Fed. R. Civ. P. 26(a)(1)(A) and 26(e) is to accelerate the exchange of basic information about the case and to help effectuate the general purpose of all discovery rules that civil actions no longer need to be carried on in the dark. Schagenhauf v. Holder, 379 U.S. 104, 114-15 (1964); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2d. Cir. 1985); Fitz, Inc. v. Ralph Wilson Plastics Co., 174 F.R.D. 587, 589 (D.N.J. 1997). Both rules should be applied with "common sense" keeping in mind the salutary purpose the rules are intended to accomplish. See Fitz, Inc., 174 F.R.D. at 589; Paradigm Sales, Inc. v. Weber Marking Sys., Inc., 151 F.R.D. 98, 98 (N.D. Ind. 1993) (indicating Advisory Committee Notes to the 1993 amendments suggest Rule 26 requirement to be applied with common sense).

Under Fed. R. Civ. P. 37(c)(1), a party that fails to disclose or supplement information as required by Fed. R. Civ. P. 26(a)(1)(A) or 26(e)(1) is not allowed to use as evidence on a motion

---

[2] On June 18, 2007, and July 2, 2007, Plaintiffs submitted a second and third motion to strike with regards to similar declarations that Fedex submitted in response to Plaintiffs' second and third waves of motions for class certification. As of this date, Fedex has only responded to Plaintiffs' first and second motions to strike. However, because the arguments and issues are identical with regards to all three motions to strike, this Court will rule with regards to all three motions at this time.

any witness or information not disclosed. The sanction of exclusion is automatic and mandatory unless the party that failed to disclose can establish that its violation was justified or harmless. Salgado by Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998); Maritime-Ontario Freight Lines, Ltd. v. STI Holdings, Inc., 481 F.Supp.2d 963, 972 (W.D. Wis. 2007); Needham v. Innerpac, Inc., 2007 WL 1662681 at 2 (N.D. Ind. 2007). The determination of whether a violation is justified or harmless is entrusted to the broad discretion of the district court. Maritime-Ontario Freight Lines, Ltd., 481 F.Supp.2d at 972. While this Court does not need to make explicit findings concerning the existence of justification or harmlessness, the following factors guide this Court's discretion: 1) the prejudice or surprise to the party against whom the evidence is offered; 2) the ability to cure the prejudice; 3) the likelihood of disruption to the motion or trial; and 4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003).

B. Plaintiffs' Motion to Strike

In the present case, Plaintiffs argue that Fedex failed to disclose prior to the close of discovery the hundreds of witnesses they are now using in opposition to Plaintiffs' motions for class certification. In response Fedex argues that it disclosed as early as January 9, 2006, the members of the putative class who were potential witnesses that Fedex might use to support its case. Fedex further argues that it properly supplemented its disclosures by providing Plaintiffs with lists of thousands of names and contact information for current contractors nationwide on June 30, 2006, and September 15, 2006 (Def. Ex. 3, Declaration of Chris Hollinger, ¶ 5). Fedex maintains that these lists were sufficient to satisfy its Fed. R. Civ. P. 26(e) duty to supplement (P.s' Reply Ex.s 4 & 5).

This Court is not persuaded that Fedex's duty to disclose and supplement was satisfied by its extensive list of thousands of employees. While it is true that Fedex's list of September 15, 2006, contained all the names of possible witnesses, the disclosure was complete in form, but not complete in substance. See Ty, Inc. v. Publications Intern., Ltd, 2004 WL 421984 at 4 (N.D. Ill. 2004). As discussed earlier, the purpose of disclosure under Rule 26 is to have open, not hidden, discovery. Long gone are the days of litigation by ambush where key witnesses or critical information is sprung on the opponent at the last moment, too late to respond, counter or learn the details of the information. See U.S. v. Loggins, 486 F.3d 977, 987 (7th Cir. 2007) ("Trial by ambush has absolutely nothing to recommend itself to the judicial process."); Hodgdon v. Northwestern Univ., 2007 WL 15746486 at 3 (N.D. Ill. 2007); see generally 8 Wright, Miller & Marcus, Federal Practice & Procedure: Civil 2d § 2001 (1994). Although a list of 10,000 possible witnesses Fedex intended to use is a disclosure, it is simply too broad and extensive to be meaningful. It is not reasonable, or even possible, for a party to parse through 10,000 or more names to determine which people Fedex might use as witnesses, especially when Fedex knew a substantially smaller number of the names disclosed was actually going to be used. Essentially, Fedex's September 15, 2006, supplement was nothing more than a needle in a haystack. Additionally, the record reveals that Fedex continued to narrow its list from September 15, 2006, until it disclosed a more specific list in January.[3] As Fedex realized that a much smaller number of witnesses would already be used, candor and good faith should have caused a supplemental disclosure to the Plaintiffs well before the discovery period closed to

[3] Fedex does not deny that it knew some of the specific witnesses prior to the close of discovery if not all. Further, some of the statements submitted by Fedex have endorsement dates well before the close of discovery. See e.g. Doc. No. 622-5, Response in Opposition to Class Certification, Declaration of Paul O'Brien.

alert them of the specific witnesses Fedex intended to use. Waiting until the discovery period has closed to inform the Plaintiffs which specific witnesses will be used is too late. Fedex's response that the names were listed among 10,000 is technically correct, but it is inadequate and contrary to the purpose and goal of early disclosure and the common sense requirements of Fed. R. Civ. P. 26. Rather than constituting disclosure as Rule 26 contemplates, it is constructive concealment when the actual witnesses a party intends to use is among a list of 10,000 names.

Multi-district litigation is complex and difficult made so by its size and scope. Fair and efficient resolution of complex litigation requires for counsel to act cooperatively and civilly. See Manual for Complex Litigation § 10.21 (4th Ed. 2004). On August 20, 2005, this Court entered an order that advised the parties that communication and cooperation by counsel of the parties was essential. See Doc. No. 2-3 at 5. On November 15, 2005, this Court's scheduling order again indicated the parties were expected to cooperate in good faith. See Doc. No. 52 at 11. Yet again on March 24, 2006, this Court reminded the parties that the complexity of multi-district litigation required the parties to cooperate. See Doc. No. 215 at 8. Yet, what is before this Court now is not evidence of candor, cooperation, and good faith. Rather, it is evidence of one party seeking an unfair advantage of the other party, by conduct that may meet the letter of the law but is contrary to the very purpose of the law.

Fedex argues that because it disclosed all of the names it eventually used in responding to Plaintiffs' motions for class certification in the lists, Plaintiffs knew of all of Fedex's potential witnesses. Fedex argues it was not its duty to disclose but rather the Plaintiffs' duty to cull through the 10,000 names to determine which ones would testify.

This Court disagrees.  As between Fedex, who knew before discovery closed which of the 10,000 witnesses it would use, and the Plaintiffs, who did not, this Court, consistent with the modern philosophy of discovery and disclosure, concludes that the burden was on Fedex to supplement its disclosures more precisely.  Plaintiffs were not under a duty to object to initial or supplemental disclosures, nor would they be expected to object prior to the close of discovery.  In fact, Fed. R. Civ. P. 26(e) squarely places the burden on Fedex, the disclosing party, to supplement it disclosures.  See Carter v. Finely Hosp., 2003 WL 22232844 at 2 (N.D. Ill. 2003) ("Rule 26(e)(1) imposes a *duty* to supplement their disclosures.").  Only if Fedex could have provided a reason for the Plaintiffs to seek court intervention could Plaintiffs be deemed to have sat on their laurels.  See Fitz, Inc., 174 F.R.D. at 589-90.  Fedex had previously provided Plaintiffs with supplements, in both June and September of 2006.  It was reasonable for Plaintiffs to expect Fedex would provide more supplements of a smaller witness list.  There was no reason for Plaintiffs to seek court intervention, such as by filing a motion to compel.

Finally, Fedex argues that it was not required to disclose its roster of witnesses because such a list would be legitimate work product.  Fedex argues it were only required to identify those witnesses that are likely to have discoverable information, which it did by providing Plaintiffs with a list of 10,000 people. This argument fails the blush test.  Fedex cannot seriously argue that the names of witnesses used to support its position, and required to be disclosed under Fed. R. Civ. P. 26, constitutes attorney work product.

Generally, the work product doctrine shields materials a party prepares in anticipation of litigation.  Mattenson v. Baxter, 438 F.3d 763, 767-68 (7th Cir. 2006).  It only protects form discovery the materials that contain mental impressions, conclusions, opinions, or legal theories

of an attorney or other representative of a party concerning the litigation. Fed. R. Civ. P. 26(b)(3); Mattenson, 438 F.3d at 768. The names of lay witnesses a party will use to support its case is simply not work product. See Auto Meter Prod.s, Inc. v. Maxima Tech.s & Sys., LLC 2006 WL 3253636 at 4 (N.D. Ill. 2006); Fridkin v. Minn. Mut. Life Ins. Co., 1998 WL 42322 at 4 (N.D. Ill. 1998); cf. Lockhart v. Sullivan, 925 F.2d 214, 219 (7th Cir. 1991) *rev'd on other grounds*. A party's determination of who its witnesses will be does not contain any mental impressions, conclusions, opinions or other legal theories of an attorney involved in the case.

Finally, this Court cannot say Fedex's failure to disclose was harmless or justified. The most crucial factor to weigh is the prejudice to the parties. This Court finds that the prejudice Plaintiffs would suffer to be very high because of the late disclosures by Fedex. Knowing the identity of another party's witnesses is crucial. It allows a party to properly prepare for contested matters. Cf. Musser v. Gentiva Health Serv.s, 356 F.3d 751, 757 (7th Cir. 2004). Because Plaintiffs learned about the specific putative class members Fedex is using in its response against class certification and after discovery, the Plaintiffs did not have time to investigate those individuals further. Plaintiffs were not able to interview, question, depose, or otherwise discover information about these witnesses. As a result, Plaintiffs cannot provide a response to any declarations by these witnesses because they have not had an opportunity to generate one.

Additionally, there is also no chance to cure the prejudice. Class certification briefing is well underway and is on the eve of completion. Discovery closed nearly six months ago. It is simply not possible to re-open discovery at this late date because it would unreasonably delay the resolution of class certification as well as the filing of dispositive motions later this year.

There is no practical way that Plaintiffs could examine, question, depose, or otherwise explore hundreds of witnesses and the veracity of their statements. Simply put, it is not practical nor possible to re-open discovery at this point.

Fedex's attempts to establish that its failure to timely disclose were justified is also unpersuasive. Fedex claims that it did not know the full list of witnesses it would use until January 2007, because Fedex was working through the process of determining for itself which of the 10,000 witnesses it would use. Considering the history of this case, it is difficult for this Court to accept that Fedex did not know who of the thousands of witnesses they would use until after the close of discovery. Even assuming that Fedex was working to narrow its list, that does not justify its late supplement. It is clear that Fedex knew of at least some of the witnesses it would use prior to the close of discovery. At the very least, Fedex should have communicated with Plaintiffs that a more refined list was coming, or provided smaller, more regular supplements. But again, Fedex did nothing until after the close of discovery when it was too late for the Plaintiffs to use the information. This Court cannot say that Fedex's late supplementation was justified.[4]

In summary, while Fedex has technically complied with Fed. R. Civ. P. 26, they have not actually satisfied its duty. Also, Fedex has not proceeded with candor and good faith. Given the circumstances of this situation, this Court finds that Fed. R. Civ. P. 37(c)(1) demands that the witness statements submitted by Fedex to be **STRICKEN**. The Plaintiffs are, no doubt,

---

[4]Plaintiffs also attempt to establish that Fedex has clearly demonstrated bad faith by showing Fedex tampered or unduly influenced the potential putative class members. Under either Rule 37 or 23, Plaintiffs claim this warrants that the evidence should be struck. This Court simply notes in passing that it cannot definitively say whether Fedex engaged in improper behavior or not.

prejudiced by the late disclosures, and it is not possible to cure the prejudice at this time. The late disclosure by Fedex is neither harmless or justified. Plaintiffs' motion is **GRANTED**.

## III.  CONCLUSION

For the reasons stated, Plaintiffs' motion to strike the declarations Fedex filed with its responses in opposition to class certification is **GRANTED** [Doc. No. 688]. Because Plaintiffs' motions to strike with regards to the second and third waves of class certification are based on the same analysis, those motions are also **GRANTED** [Doc.s No. 756 & 773].

**SO ORDERED.**

Dated this 23rd Day of July, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**Steve D. Larson,** OSB No. 86354
Email: slarson@ssbls.com
**David F. Rees,** OSB No. 94513
Email: drees@ssbls.com
**Joshua L. Ross**, OSB No. 03438
Email: jross@ssbls.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

**Attorneys for Plaintiff**

FILED'07 JUN 01 1457USDC-ORP

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

JON LEIGHTER and DAVID SPICER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FEDEX GROUND PACKAGE SYSTEM, INC., and FEDEX GROUND PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY, INC.,

Defendants.

Case No. CV '07-0818-KI

**CLASS ACTION COMPLAINT**

(Illegal Deductions from Wages, Rescission, Declaratory Relief, Injunctive Relief, and Violations of Oregon Wage & Hour Laws)

JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, allege upon their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, as follows:

Certified to be a true and correct copy of original filed in my office.
Dated JUL 19 2007
Sheryl S. McConnell, Clerk
By Deputy

#15774
7523\001\00132168-1

## INTRODUCTION

1.

Throughout most of the upper-tier parcel shipping industry, the drivers who actually pick up and deliver packages are the employees of the companies for which they drive. This is true, for example, of FedEx, the parent of defendant FedEx Ground Package System, Inc. and of FedEx's largest competitors. This designation makes sense: these shippers have developed a highly regulated set of procedures and protocols that they could not require of drivers if they were independent contractors.

2.

Almost unique in the industry, however, are the drivers who deliver for defendant FedEx Ground Package System, Inc. Though these drivers are similarly subject to tightly regulated control by FedEx Ground, they are nevertheless called independent contractors by FedEx Ground. True independent contractor status would permit Plaintiffs certain freedoms to operate their business as they see fit, and to run the risks and rewards of owning a business. But there is nothing "independent" about the actual job requirements imposed on drivers by FedEx Ground.

3.

Accordingly, if FedEx Ground is going to treat Plaintiffs and Class Members as employees, then it must compensate them as employees, as well. Thus, this lawsuit, on behalf of the named Plaintiffs and the Class and subclasses described below, and as set out in greater detail below, seeks:

- a declaration that Plaintiffs and the Class are in fact, FedEx Ground employees;
- injunctive relief, precluding Defendant from engaging in the unlawful practices alleged in this complaint;

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

Case 3:05-md-00527-RLM-CAN document 819 filed 07/26/07 page 3 of 20

- compensation for all of the business expenses Plaintiffs and the Class were illegally required by FEG to bear, for all of the employment taxes, unemployment compensation and workers compensation that FEG should have but did not pay;
- the quantum meruit value of their services as employees;
- all unpaid overtime at a rate of one and one-half times the regular rate of pay;
- all unpaid wages currently owing and not timely paid to former employees at the time the employment relationship was terminated; and
- penalty wages.

## JURISDICTION AND VENUE

4.

This Court has subject matter jurisdiction over all other claims asserted in this action via 28 U.S.C. §1332 and 28 U.S.C. §1367.

5.

Venue in the District of Oregon is proper because Defendant resides and transacts business in this District and all named class members perform (or performed) work for Defendant in this District.

## PARTIES

6.

Jon Leighter was, during the relevant time period, and continues to be a driver for FedEx Home Delivery, a division of FedEx Ground.

7.

David Spicer was, during the relevant time period, a driver for FedEx Home Delivery, a division of FedEx Ground.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

8.

Defendant FedEx Ground Package System, Inc. and FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery, Inc. (hereafter collectively referred to as "Defendant" or "FXG") is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. FXG is a part of the "family" of corporations controlled by Federal Express Corporation. At all relevant times, FXG was engaged in providing small package information, transportation and delivery services in the United States, including in the State of Oregon.

9.

FXG is specifically defined in this complaint to include all successor, predecessor, and subsidiary entities to which these allegations pertain.

**COMMON FACTS**

10.

Defendant employs thousands of drivers to pick up and deliver packages for its customers throughout the United States. As a condition of employment, each FXG driver (referred to by Defendant as a "P&D contractor") must sign a "Pick-Up and Delivery Contractor Operating Agreement" and Addenda thereto (referred to hereinafter, as combined, as "OA" or the "Operating Agreement" or the "Agreement") as a mandatory condition of employment. These Operating Agreements were designed to conceal the true nature of the relationship between FXG and its drivers: that of employer and employee. The date, time and place of execution of each driver's Operating Agreement is within the knowledge of Defendant as each Agreement is maintained in the driver files described above, in the regular course of business. The Operating Agreement between each member of the Plaintiff Class and Defendant is the same in all material respects. The Operating Agreements between Plaintiffs and FXG

contain all of the same identical material terms with only a few, minor and insubstantial differences.

11.

The Operating Agreement contains various statements purporting to classify Plaintiffs and Plaintiff Class Members as independent contractors. At the same time, the Operating Agreement retains to the company, *inter alia*, the right to approve or disapprove any vehicle used to provide service; the right to approve or disapprove any driver or helper who provides service; the right to approve or disapprove the purchase or sale of any vehicle; the right to assign pickup and delivery stops to each driver; the right to temporarily or permanently transfer portions of any route to another with or without compensation; the right to determine when a driver has "too few" or "too many" packages to deliver on a given day; the right to inspect vehicles and drivers for compliance with company-promulgated appearance standards; the right to terminate the contract upon thirty days notice or whenever the company unilaterally determines that any provision of the contract has been "violated," amounting to the right to terminate at will; the right to require the use of communication equipment and the wearing of company uniforms; the right to take a vehicle out of service; the right to review and evaluate "customer service" and to set and change standards of such service; the right to require drivers to perform service at "times" requested by customers and determined by Defendant; the right to withhold pay for certain specified expenses; the right to require purchase of specified insurance and numerous other purchases by drivers; the right to require completion of specified paperwork; and other rights reserved to Defendant.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

12.

The Operating Agreement is and at all relevant times has been a contract of adhesion, drafted exclusively by Defendant and/or its legal counsel, with no negotiation with drivers, who are required to sign the Agreement as a condition of employment. Plaintiffs and Plaintiff Class Members are required to sign the Agreement as is, without any changes made to the terms contained therein. Each year, drivers are required to sign additional Addenda which are likewise not subject to negotiation and are unilaterally drafted adhesion contract provisions. The Agreement is, and at all material times has been unlawful, unconscionable and fraudulent in form and effect.

13.

Defendant has created and regularly updated a large number of written policies and procedures outside of the Operating Agreement that drivers are never given, but nonetheless are required to follow in their work. Defendant's written policies are contained in the FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies that are actively concealed from drivers and which Defendant fails to disclose and/or provide to drivers that govern the relationship between Defendant and the drivers. The other written handbooks and manuals and additional extra-contractual sources include, but are not limited to, written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures, memorandum and directives to terminal management, and other rules concealed from and not provided to the drivers. When drivers do not follow an FXG rule, whether disclosed or undisclosed, known or unknown, they are subject to various types of punishment, some financial and some disciplinary, up to and

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

including contract termination and/or non-renewal. Defendant documents such so called violations of such rules on forms referred to as "Business Discussion Notes" and retain these documents in secret driver files called "DOT" files, along with myriad other documents which are likewise concealed from and not disclosed to the drivers.

14.

Defendant's right of control over Plaintiff Class Members is also retained and/or exercised by Defendant as demonstrated by concealed and/or undisclosed extra- contractual sources such as Company written rules and policies described above and unwritten practices which supplement and fill gaps in the written Agreement.

15.

Examples of FXG control include:

- *Minimum daily hours*. Plaintiffs and Class Members must spend at least seven hours daily on the road, even if they have completed all their assigned deliveries and pickups. Plaintiffs and Class Members are docked if they leave the road early, even if their deliveries are completed.

- *Required insurance*. FXG requires a certain level of auto, liability and workers' compensation insurance, and further requires that Plaintiffs and Class Members buy their insurance from FXG.

- *No substitute drivers*. Plaintiffs and Class Members are not permitted to allow drivers who are not pre-approved by FXG to assume their job duties even temporarily.

- *Uniforms*. Plaintiffs and Class Members are required to wear FXG uniforms, without any variance. Their uniform may only be purchased from FXG.

- *Truck decals*. Plaintiffs and Class Members are required to decorate their trucks with the same standard-issue FXG decals, which is only available from FXG.

- *Punching the clock*. Plaintiffs and Class Members are required to carry an electronic scanner. Plaintiffs and Class Members are required to electronically "punch in" at the start of their workday, and "punch out" at the conclusion. The scanner transmits throughout the day, and records the whereabouts of the Plaintiffs and the Class Members.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

- *Controlled departures*. Plaintiffs and Class Members are not permitted to depart from their terminal until after the entire package sort is complete, even where Plaintiffs and Class Members have loaded and readied all of their packages that they are required to deliver. They are required to wait until FXG completes its paperwork.

- *Bonus tied to FedEx Ground performance*. Plaintiffs' and Class Members' bonuses are tied to the performance of FXG.

- *Authority over workdays*. FXG has the right to order the Plaintiffs and Class Members to work holidays and days after holidays (such as the Friday after Thanksgiving). Failure to show up to work on these required days can result in termination.

- *Authority over work assignments*. FXG assumes complete authority over which geographical area is to be serviced by Plaintiffs and Class Members. Plaintiffs and Class Members are not permitted to exchange those assigned geographical areas among themselves.

- *Authority over work load.* FXG exercises total control over the workload of Plaintiffs and Class Members.

- *Authority over drop-offs and pickups*. FXG assumes complete control over the daily drop-off and pickups assignments of Plaintiffs and Class Members. Plaintiffs and Class Members are not permitted to informally exchange work assignments among themselves.

- *Authority over the selling of routes*. Plaintiffs and Class Members cannot buy and sell their FXG assigned routes without prior approval by FXG.

- *No potential for entrepreneurial risks and rewards*. Plaintiffs and Class Members are compensated on a highly structured system that gives them no ability to exercise entrepreneurship or otherwise engage in the risks and rewards associated with owning a business. Accordingly, Plaintiffs and Class Members are paid a daily stipend, based on their geographical area assigned by FXG, and are paid a set amount for each FedEx assigned stop, and separately for each FedEx-assigned delivered package.

- *No opportunity to sell FXG services*. Plaintiffs and Class Members cannot take orders from customers for FXG services.

- *No opportunity to compete*. Plaintiffs and Class Members cannot separately offer pickup and/or delivery services independent from FXG.

- *"Company store."* Plaintiffs and Class Members receive weekly paychecks from FXG. From their total owed (assigned route stipend plus assigned stops plus completed deliveries), FXG deducts various compulsory expenses. These business expenses are for services (such as the leasing of equipment) that Plaintiffs and Class Members cannot shop around to other vendors to seek a better deal.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

- *Approval requirements*. FXG requires that all Plaintiffs and Class Members (and those substitute drivers who Plaintiffs and Class Members want to occasionally assume their job duties) take and pass a FXG institutional course.

- *Port-to-port control*. Plaintiffs and Class Members are required to begin their workday at their assigned FXG terminal.

16.

Despite Defendant's control over virtually all material aspects of the employment relationship, and despite the unequivocal command of applicable statutes and case law to the effect that workers such as Plaintiffs are entitled to the protections due employees under Oregon law, and despite the finding of the Los Angeles Superior Court in Estrada v. FedEx Ground Package Systems, Inc. (Case # BC 210130) that these drivers are employees, Defendant continues to misclassify their drivers as independent contractors. As a result, these drivers are deprived of the rights and protections guaranteed by Oregon state law to employees, including the right to compensation for overtime hours worked, and they are deprived of employer-financed workers compensation coverage and unemployment insurance benefits. Furthermore, the terms and conditions of their employment contract require these drivers to purchase, operate and maintain expensive trucks for Defendant's exclusive benefit and to work under other unlawful conditions. Defendant's mischaracterization of their drivers as independent contractors, the concealment and/or non-disclosure of the true nature of the relationship between Defendant and its drivers and the attendant deprivation of substantial rights and benefits of employment are part of an on-going unlawful and fraudulent business practice by Defendant which this court should enjoin.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

7523\001\00132168-1

## CLASS ALLEGATIONS

17.

For purposes of plaintiffs' First, Second, Third, Fourth, and Sixth Claims for Relief, as set forth below, plaintiffs' bring this case on behalf of the following Class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since July 20, 1999, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Oregon.

18.

Additionally, for purposes of plaintiffs' Fifth and Sixth Claims for Relief, as set forth below, plaintiffs' bring this case on behalf of the following Subclass:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) who, at any time after August 1, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds.

19.

The named Plaintiffs fit within these descriptions.

20.

All Class Members share an interest in ascertaining whether they should be treated as employees, or as independent contractors.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

21.

The named Plaintiffs will fairly and adequately represent the Class. The named Plaintiffs have no interest antagonistic to the members of the Class, and have retained lawyers experienced in Class action litigation to prosecute their case.

22.

The Class is large, numbering into the hundreds. Accordingly, joinder is impracticable.

23.

This case will be manageable as a class action. Nearly all relevant information, e.g., the identity of those Class Members, can be found in written and electronic records of FXG.

24.

Pursuant to Fed. R. Civ. P. 23(a)(2) and (a)(3), there are questions of law or fact common to the Class, including, but not limited to:

a. Whether Plaintiffs and Class Members have the requisite independence and discretion of independent contractors;

b. Whether the uniform acts of defendant convert the Plaintiffs and the Class, by law, into "employees;"

c. Whether Plaintiffs and the Class are entitled to be reimbursed for Defendant's business expenses that they covered;

d. Whether Plaintiffs and the Class are entitled to their pension and health benefits plans because they are, in fact, employees;

e. Whether the actions of FXG are applicable to the Class as a whole, entitling Class Members to injunctive relief;

f. Whether members of the proposed Subclass are entitled to overtime compensation at a rate of one and one-half times the regular rate of pay for all hours worked over

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

forty hours per week; and

g. Whether the members of the Class and Subclass who have terminated the employment relationship with Defendant are entitled to penalty wages for defendant's failure to timely pay all outstanding amounts of compensation owed upon termination of the employment relationship.

25.

The claims of Plaintiffs are typical of the claims of each member of the Class as a whole and are based on and arise out of identical conduct by FXG.

26.

Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class action litigation. Plaintiffs will fairly and adequately represent the interests of the members of the Class.

27.

The prosecution of separate actions by individual members of the Class would create a risk of establishing incompatible standards of conduct for defendant.

28.

Defendant's actions are generally applicable to the Class as a whole, and Plaintiffs seek remedies with respect to the Class, and Subclass, as a whole.

29.

The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class and Subclass, and a class action is the superior method for fair and efficient adjudication of the controversy.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

**FIRST CLAIM FOR RELIEF**

(Illegal Deductions From Wages Under O.R.S. 652.610)

30.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

31.

Plaintiffs and the Class are "employees" as defined in O.R.S. 652.310 and are not free from the control and direction of Defendant.

32.

Defendant unlawfully withheld monies from the compensation earned by Plaintiffs and Plaintiff Class Members for business expenses of Defendant, including but not limited to vehicle expenses, cargo claims and insurance claims in violation of O.R.S. 652.610. Plaintiffs and Plaintiff Class Members have not expressly and freely given written consent to such deductions, and these deductions are not made in response to a valid wage assignment or deduction order. Such deductions were not for the Plaintiffs and Plaintiff Class Members employees' benefit.

33.

Defendant has withheld said funds unlawfully without providing Plaintiffs and Plaintiff Class Members with advance notice of such amounts, reasons or documentation to justify such deductions, and absent any lawfully sufficient reason for such conduct.

34.

As a direct and proximate result of Defendant's conduct, Plaintiffs and Plaintiff Class Members suffered substantial losses and have been deprived of compensation to which they

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

were entitled, including the greater of monetary or statutory damages, civil penalties, pre-judgment interest, costs and reasonable attorney fees.

**SECOND CLAIM FOR RELIEF**

(Rescission of Operating Agreement)

35.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

36.

Despite the express terms of the Operating Agreement, Plaintiffs' relationship with FXG satisfies every aspect of the test for employment, and not for independent contractor status.

37.

FXG controls virtually every aspect of the Plaintiffs' work and earnings, as set forth in the general allegations hereof.

38.

Despite this control and the actual status of the drivers as employees, FXG mischaracterizes Plaintiffs and the Class as independent contractors. As a result, these drivers are denied overtime compensation and must pay substantial sums of their own money for work-related expenses, including but not limited to the purchase or lease of vehicles meeting company specifications, and all costs of operating, insuring and maintaining those vehicles.

39.

The Operating Agreement illegally and unfairly advantages FXG by mischaracterizing the status of Plaintiffs in that FXG evades employment-related obligations, such as overtime, social security contributions, workers' compensation coverage, and state disability and

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

case 3:05-md-00527-RLM CAN document 819 filed 07/26/07 page 15 of 26

unemployment compensation, illegally shifting the expense of workers' compensation coverage and other expenses to Plaintiffs.

40.

The Operating Agreement between FXG and Plaintiffs and members of the Class is void as against public policy and therefore unenforceable, as failing to recognize the employment status of the Plaintiffs and the Class Members, and therefore denying them the legally cognizable benefits of employment.

**THIRD CLAIM FOR RELIEF**

(Declaratory Relief Against Defendant)

41.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

42.

An actual controversy has arisen between Plaintiffs and the members of the Class, on the one hand, and Defendant, on the other hand, relating to the following matters:

a. Whether Defendant has unlawfully misclassified Plaintiffs and the members of the Class as independent contractors, and has thus denied them of the common benefits of employee status, such as

i. wages;

ii. holiday pay;

iii. workers' compensation;

iv. unemployment insurance;

v. contributions to the Defendant's retirement plan;

vi. income tax withholding;

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

vii. meal, break and rest periods.

b. Whether Defendant has unlawfully failed to pay benefits and compensation, including overtime, owing in a timely manner to Plaintiffs and Plaintiff Class Members whose employment with Defendant ended, as required by Oregon law.

c. What amounts Plaintiffs and Plaintiff Class Members are entitled to receive in compensation and benefits.

d. What amounts Plaintiffs and Plaintiff Class Members are entitled to receive in interest on unpaid compensation due and owing.

e. What amounts Plaintiffs and Plaintiff Class Members are entitled to receive from Defendant in statutory penalties and interest.

43.

Plaintiffs and Plaintiff Class Members further seek entry of a declaratory judgment in their favor which declares Defendant's practices as heretofore alleged to be unlawful and which provides for recovery of all sums determined by this Court to be owed by Defendant, and each of them, to the Plaintiffs and Plaintiff Class Members.

**FOURTH CLAIM FOR RELIEF**

(Injunctive Relief)

44.

Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs

45.

Defendant will continue to misclassify Plaintiff Class Members as independent contractors and unlawfully deny them the common benefits of employee status.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

46.

Plaintiff and Plaintiff Class Members have been injured and damaged, and are threatened with injury and damage, by Defendant's continued misclassification and unlawful refusal to pay all compensation and benefits as heretofore alleged, and Plaintiff and Plaintiff's Class Members have no adequate remedy at law.

47.

Plaintiff has reasonable fear that Defendant, upon receiving notice of this lawsuit, will take such action or inaction resulting in the termination, harassment, demotion, reassignment, or reduction in currently paid compensation or benefits against Plaintiff Class Members, to their detriment, in retaliation for attempting to enforce their rights under Oregon law.

48.

Defendant has acted, and threatened to act, on grounds generally applicable to the individual members of the Class, thereby making appropriate preliminary and permanent injunctive relief enjoining Defendant and their agents from practicing the unlawful practices heretofore alleged.

**FIFTH CLAIM FOR RELIEF**

(Violation of Oregon Wage and Hour Laws on Behalf of the Subclass)

49.

Plaintiffs restate and reallege the above paragraphs as if fully set forth herein.

50.

At all relevant times, Defendant was an "employer" within the meaning of O.R.S. 652.010, *et seq*, and O.R.S. 653.010, *et seq*.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

51.

O.R.S. 653.261 and O.A.R. 839-020-0030 require Defendant to pay all employees time and one-half for time worked in excess of forty hours per week. As alleged above, Defendant's illegally misclassified members of the Subclass as independent contractors and, as a result, failed to pay them all compensation due for hours worked above forty hours per week.

52.

As a result of Defendant's violations, members of the Subclass are entitled to damages in the amount of their respective unpaid wages earned and due at the regular hourly wage rate, and their respective unpaid overtime wages, as provided in O.R.S. 653.261 and 653.055, and O.A.R. 839-020-0030 as well as all costs and reasonable attorney fees pursuant to O.R.S. 652.200(2) and 653.055(4).

**SIXTH CLAIM FOR RELIEF**

(Penalty Wages on Behalf of the Class and Subclass)

53.

Plaintiffs restate and reallege the above paragraphs as if fully set forth herein.

54.

O.R.S. 652.140 and O.A.R. 839-001-0420 provide that all wages that have been earned but not paid become due and payable no later than at the next regularly scheduled payday after employment has terminated, or earlier if the employee was discharged or terminated by mutual agreement.

55.

As described above, Defendant violated Oregon law in that it unlawfully withheld monies from the compensation earned by Plaintiffs and Plaintiff Class Members for business expenses of Defendant. Likewise, Defendant illegally failed to pay all employees time and one-

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

half for time worked in excess of forty hours per week. As a result, Defendant failed to pay members of the Class and Subclass who have terminated the employment relationship all compensation due at the time the employment relationship terminated.

56.

As a result of those violations, Plaintiffs and members of the Class and Subclass are entitled to damages in the amount of their respective unpaid wages and waiting time penalties under O.R.S. 652.140, 652.150, 652.610 and 653.055, as well as all costs and reasonable attorney fees pursuant to O.R.S. 652.200(2) and 653.055(4).

**JURY DEMAND**

57.

Plaintiffs hereby demand a trial by jury for all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually, and on behalf of all other similarly situated, pray for the following relief:

A. An order certifying the Class and Subclass as described with the named Plaintiffs as Class representatives.

B. An order that requires FedEx Ground to rescind the Operating Agreement, and awarding restitution compensating Plaintiffs and the Class for the reasonable value of the benefit provided to FedEx Ground.

C. An order requiring FedEx Ground to reimburse and/or indemnify Plaintiffs and Class Members for the FedEx Ground business expenses that they have covered, or statutory damages, whichever is greater.

D. An award of all applicable penalty wages.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

E. An award to the Subclass in the amount of their unpaid overtime compensation.

F. An award of attorneys' fees, plus the costs and expenses of this action.

G. An award of punitive damages in an amount to be determined at trial.

H. Prejudgment interest, as afforded by law.

I. An order prohibiting Defendant from engaging in the illegal business practices and behavior; and

J. All such other legal and equitable relief to which Plaintiffs and Class are entitled.

DATED this 1st day of June, 2007.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By: ______________________

**Steve D. Larson,** OSB No. 86354
Email: slarson@ssbls.com
**David F. Rees,** OSB No. 94513
Email: drees@ssbls.com
**Joshua L. Ross,** OSB No. 03438
Email: jross@ssbls.com
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

**Attorneys for Plaintiff**

Page 20 - **CLASS ACTION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600 FAX (503) 227-6840

7523\001\00132168-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *All Coordinated Cases* | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**FEDEX GROUND'S EVIDENTIARY OBJECTION TO EXHIBIT B OF PLAINTIFFS' JULY 9, 2007 OFFER OF PROOF (ATTORNEY AFFIDAVITS OF ALANNA COOPERSMITH, VICTORIA KIES GAROUKIAN, PHYLLIS NORMAN, AND JENNIFER TATUM)**

On July 9, 2007, Plaintiffs submitted "attorney declarations" from Alanna Coopersmith, Victoria Kies Garoukian, Phyllis Norman, and Jennifer Tatum in Exhibit B to their Offer of Proof in Rebuttal to FedEx's Driver Declarations. (Doc. No. 810.) Each of these declarations states—in identical language—that the attorney declarant spoke with unidentified FedEx Ground and Home Delivery contractors; that a "number" of those contractors were reluctant to provide a declaration because they feared retaliation by FedEx Ground; and that these contractors would otherwise have provided a declaration "expressing support for the lawsuit." (*Id.*, Exhibit B.) The attorney declarant further states their belief that "more drivers would have provided declarations." (*Id.*)

FedEx Ground objects to these declarations on the grounds that they (1) constitute inadmissible hearsay; (2) lack foundation; and (3) are irrelevant.[1]

**Hearsay**: It is well-established that an attorney cannot testify for his or her client. Fed. R. Evid. 802; *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1998) (counsel cannot avoid the hearsay rule through use of affidavit); *Schertz v. Waupaca County*, 683 F. Supp. 1551, 1573 (E.D. Wis. 1988) (finding that attorney could not testify for client through use of affidavit). Because the hearsay rule prohibits the use of statements offered by someone other than the declarant to prove the truth of the matter asserted, the anonymous contractors are the only ones who can provide evidence that they "support" the lawsuit or "fear" retaliation—not their attorneys. *See Visser v. Packer Eng'g Ass'n., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (testimony concerning the motivations of third party was made without personal knowledge and was therefore inadmissible hearsay). None of the exceptions to the hearsay rule apply. *See* Fed. R. Evid. 801, 803-04.

**Foundation and Relevance:** In addition, Plaintiffs' attorneys cannot speculate that contractors they did not speak to would also, in their opinion, "support" the lawsuit but for their fear of retaliation. Not only is there no foundation for that opinion, *see* Fed. R. Evid. 602, it is irrelevant to the question of class certification. "Support" for the lawsuit is so vague that it does not provide any information that relates to the question of certification. Does "support for the lawsuit" mean they support an award of money damages? Does it mean they also support injunctive relief and a change in classification? Does it mean they empathize with the circumstances of particular contractors or does it mean that they themselves believe they are employees? Does it mean they support a

[1] Plaintiffs submitted their "offer of proof" in rebuttal to FedEx Ground's contractor declarations. Though Magistrate Judge Nuechterlein has issued an order granting plaintiffs' motions to strike FedEx Ground's contractor declarations, FedEx Ground files this objection to a portion of the offer of proof (the attorney declarations) because they should not be considered under any circumstances, whereas some of the evidence plaintiffs have placed in the record through their offer of proof should be considered by the Court in connection with plaintiffs' pending motions for class certification, whether or not FedEx Ground's contractor declarations are a part of the class certification record when the Court considers plaintiffs' motions.

case 3:05-md-00527-RLM-CAN document 820 filed 07/27/07 page 3 of 4

change in working conditions, policies, procedures or contract terms? Without answers to these questions, the Court is unable to determine how and to which requirement of Fed. R. Civ. P. 23 these declarations are supposedly relevant.

FedEx Ground does agree that the Court should consider evidence of the experiences and interests of contractors who would be affected by this case and any class certification. Instead of lawyer statements of what witnesses have said or might say, however, the Court should consider testimony from the contractors themselves. Both FedEx Ground and Plaintiffs have offered such declarations, which are the subject of other filings. As those declarations demonstrate, the classes Plaintiffs seek to represent do not have homogeneous experiences or interests with respect to this litigation.

Because attorney arguments and speculation—even if filed in the form of a declaration—is not a permissible substitute for actual evidence, FedEx Ground requests that the Court sustain its objections and exclude from its consideration the attorney declarations submitted as Ex. B to Plaintiffs' Offer of Proof (Doc. No. 810).

Dated: July 27, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendants' Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of July, 2007, I filed the foregoing ***FEDEX GROUND'S EVIDENTIARY OBJECTION TO EXHIBIT B OF PLAINTIFFS' JULY 9, 2007 OFFER OF PROOF (ATTORNEY AFFIDAVITS OF ALANNA COOPERSMITH, VICTORIA KIES GAROUKIAN, PHYLLIS NORMAN, AND JENNIFER TATUM)*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

**UNOPPOSED RENEWED MOTION TO AMEND THE CASE SCHEDULE**

For those reasons set forth in FedEx Ground's Memorandum in Support of its Unopposed Renewed Motion To Amend the Case Schedule, FedEx Ground requests the Court to order that:

**(1)** The current dates for filing of motions for partial summary judgment directed towards contractor/employment status are **vacated** pending a status conference to be conducted once the Court has ruled on class certification. Alternatively, such motions are to be filed no later than **February 29, 2008**.

**(2)** The date set for expert reports pertaining to motions for partial summary judgment be **vacated** pending resolution of the motions for class certification in these proceedings. Alternatively, such date is extended until sometime after the conclusion of the fourth wave of class certification briefing is complete.

**(3)** Any partial summary judgment expert discovery deadlines that occur prior to the Court's ruling on class certification issues will apply only to partial summary judgment with respect to the named plaintiffs.

Dated: August 1, 2007           Respectfully submitted

By:    s/Thomas J. Brunner
         Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of August, 2007, I filed the foregoing ***UNOPPOSED, RENEWED MOTION TO AMEND THE CASE SCHEDULING ORDER*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

BDDB01 4838436v1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ) | |
| ALL ACTIONS ) | |

**MEMORANDUM IN SUPPORT OF FEDEX GROUND'S UNOPPOSED, RENEWED MOTION TO AMEND THE CASE SCHEDULING ORDER**

**INTRODUCTION**

On June 11, 2007, the parties jointly moved this Court to amend the case scheduling order pursuant to Fed. R. Civ. P. 16(b) in two respects. First, the parties asked the Court to modify the schedule to permit discovery and class certification briefing relating to newly-transferred cases. Second, the parties asked the Court to vacate the existing summary judgment briefing deadlines pending the resolution of all class certification motions. On June 29, 2007, this Court granted the parties' motion as to the first part, but denied the request to vacate the existing summary judgment briefing schedule. Because the Court's denial may have been based on the parties' failure to adequately explain the rationale for their request, and its relationship to the phasing of summary judgment motions in relation to class certification motions that the Court established in its prior scheduling orders, FedEx Ground hereby submits a renewed request,

unopposed by plaintiffs, to vacate the deadlines pertaining to summary judgment briefing.[1] FedEx Ground also requests that the Court clarify its June Scheduling Order to confirm that, as with the Court's previous case scheduling orders, these summary judgment deadlines shall pertain only to the issue of plaintiffs' classification as either employees or independent contractors, and not to all issues in the constituent cases.

FedEx Ground renews its request to vacate the deadlines because: (1) it is not possible to efficiently brief summary judgment without knowing for or against whom summary judgment is sought; and (2) the current schedule imposes an overwhelming burden on the parties as it is not reasonable or efficient to brief both class certification and summary judgment simultaneously. As more fully set forth below, the relief requested would benefit the original goals of these MDL proceedings by conserving both party and judicial resources without unnecessarily delaying the administration of justice. Plaintiffs do not oppose this motion.

**ARGUMENT**

**I. PROCEDURAL BACKGROUND**

As reflected in this Court's November 29, 2005 Scheduling Order (Doc. No. 58, attached here to as Exhibit A) (the "November Scheduling Order"), the Court initially divided briefing in these MDL proceedings into a two-phase structure: ***first***, motions for class certification and ***second***, motions for partial summary judgment relating to employee or independent contractor status. Accordingly, the Court's November Scheduling Order appeared to contemplate that class certification briefing would conclude in its entirety and then, after a nearly nine-month

[1] The parties discussed the need for this relief shortly after the Court issued its June 29 Order. In response to these discussions, FedEx Ground drafted this motion and memorandum as a joint motion and submitted it to plaintiffs on July 20 for their review. Plaintiffs informed FedEx Ground on July 30 that they would be unable to join the motion, but would not oppose it. FedEx Ground restyled the motion and memorandum as an unopposed motion on its behalf and filed it promptly thereafter, and would have filed it sooner had FedEx Ground's attorneys not experienced e-mail difficulties.

intervening period, partial summary judgment briefing would begin, directed to the employment

versus independent contractor status of the plaintiffs.  (*Id.* at 2-3, 5) (scheduling class

certification briefing to conclude by mid-December 2005 and summary judgment briefing to

begin on September 1, 2006.)   Other summary judgment motions directed to other issues would

be scheduled thereafter.

 As discovery progressed, it became necessary for the parties to jointly request additional

time in order to complete the discovery required to furnish the proper evidentiary basis for the

Court to adjudicate issues of both class certification and summary judgment.  The Court granted

additional time to complete discovery and consequently, discovery closed on January 31, 2007

and class certification briefing on all cases that were part of the MDL prior to March 19, 2007

concluded on July 9, 2007.  (December 21, 2006 Order (Doc. No. 453) at 1.)  As the Court

granted the parties' requests for extensions, however, the Court also narrowed the nine-month

period separating the conclusion of class certification briefing and the commencement of

summary judgment briefing related to contractor status.  Nevertheless, prior to the Court's June

29, 2007 Order (Doc. No. 766) (the "June Scheduling Order"), the schedule maintained at least a

two and one-half month period separating the end of the class certification phase and the start of

the summary judgment phase.  (May 26, 2006 Order (Doc. No. 261) at 4.)

 The June Scheduling Order addressed all cases filed after March 19, 2007 and

coordinated them into these MDL proceedings by allowing for a fourth wave of class

certification briefing.  (June Scheduling Order at 2.)  In so doing, this Court applied the

efficiency benefits inherent to these MDL proceedings to the later-filed cases, promoting the

cost-effective administration of justice and conservation of party resources.  At the same time,

however, the June Scheduling Order eliminated all of the time between the class certification

briefing phase and the partial summary judgment phase, thus collapsing the two phases and requiring for the first time that the phases proceed *simultaneously*.

As a result, under the current schedule, motions and briefs in support of summary judgment relating to contractor status are due just 13 days after FedEx Ground's oppositions to plaintiffs' motions for class certification and just two weeks before plaintiffs' replies to those oppositions are due. This aspect of the June Scheduling Order will have the consequence of hindering the parties' ability to litigate key issues of liability and class treatment and will, therefore, hinder the administration of justice.

## II. THE CURRENT SCHEDULING ORDER WILL CAUSE UNNECESSARY INEFFICIENCIES

The June Scheduling Order's elimination of the two-phase briefing structure for class certification and partial summary judgment, which had always been contemplated pursuant to the Court's November Scheduling Order, will result in significant inefficiencies for the Court and the parties for two fundamental reasons: (1) because the parties will not know who or what is actually before the Court (*e.g.*, the definition of the class, if certified, and what claims are certified, if any) unless and until the classes are certified, the parties cannot file for or against summary judgment on behalf of any class; and (2) filing for or against partial summary judgment as to the named plaintiffs alone would, assuming that any classes are certified, lead to future waves of summary judgment briefing on the putative class members, unnecessarily consuming substantial, additional resources of the Court and the parties. These inefficiencies, however, are avoidable under the Court's original two-phase briefing structure, which allowed for determination of the class certification issue before addressing substantive contractor status thought partial summary judgment motions.

It is axiomatic that a party may not seek summary judgment against a non-party, nor may a non-party seek summary judgment against a party. *See* Fed. R. Civ. P. 56(a). As a result, neither plaintiffs nor FedEx Ground may seek summary judgment against or on behalf of any of the putative class members ***unless and until a class is certified***. While Plaintiffs have moved for certification of at least 31 state and nationwide classes in 29 cases, no class or classes have yet been certified. The parties thus cannot properly seek summary judgment for or against any class because the class and the certified claims, if any, are not yet known. *See Cowen v. United Bank of Tex., FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995) (finding that a defendant who obtains summary judgment against named plaintiffs prior to certification cannot apply that judgment in suits brought by potential members of the putative class). Even if the parties assumed certification, there are numerous possible certification outcomes that would affect summary judgment briefing, for example, the Court may refine class definitions, determine certain named plaintiffs are inadequate or limit the claims for which a class is certified. The precise contours of any eventually certified class will have a marked impact on the evidence and argument that will be brought to bear by each side during the partial summary judgment phase. For example, if the court were to exclude multiple work area contractors from any class memberships, regardless of whether they drove full time, argument and expert opinion as to the nature of these individuals' relationship with FedEx Ground would be irrelevant to the issues before the Court. Similarly, if the Court were to decline to certify a class of ERISA plaintiffs, then evaluation of the merits of plaintiffs' classification under ERISA law and the relevant plan language would also be irrelevant.

The current schedule requiring summary judgment briefing on contractor status to be filed while motions for class certification are pending – or, in the case of the fourth wave cases,

still being briefed – risks adjudicating only an incomplete portion of the claims of the putative class members that may someday be before this Court. That is, if the parties are forced to brief summary judgment as it relates to named plaintiffs alone under the current scheduling order, the parties and the Court could be faced with a second wave of summary judgment briefing to address the claims of putative class members, depending on which classes and claims are certified, if any. This would be in addition to a further round of dispositive motions concerning issues or claims in these constituent cases other than the question of contractors versus employee status, as set forth in the Court's prior scheduling order. (November Scheduling Order at 6.)

## III. THE CURRENT SCHEDULING ORDER IMPOSES AN ENORMOUS AND UNNECESSARY BURDEN ON THE PARTIES

In this high-stakes litigation, both motions for class certification and summary judgment relating to contractor status are of critical importance to each party. Together, the phases could resolve many of the questions concerning "liability" as they relate to most pickup and delivery contractors in the United States.[2] As a result, both plaintiffs and FedEx Ground have strong interests in having their principal and most experienced attorneys closely overseeing each of these phases of the litigation. Given the enormity of the evidentiary record in this case – including over two million pages of documents, approximately 250 depositions and six class certification experts – each phase is itself a massive undertaking. By requiring the parties to brief class certification and summary judgment for 29 cases simultaneously, the current order will stretch each side's resources unnecessarily to the limit. Moreover, this is not simply an issue of party resources or attorney manpower. Each party possesses only a small number of attorneys who are intimately familiar enough with the record and issues in this case to oversee these

---

[2]    As stated in its briefs in opposition to class certification, FedEx Ground believes that there are many issues (such as validity of deduction authorizations, individual reliance/causation, evaluation of the fair value of services performed and offsets, application of doctrines of estoppel and laches/statute of limitations, etc.) in addition to classification that are likely to weigh heavily on liability issues. Plaintiffs disagree.

crucial phases of the litigation. Given the voluminous record in these proceedings, the number of attorneys qualified to direct and oversee these phases of the litigation is fixed and cannot be increased efficiently. The interests of fairness and justice dictate that neither party be prejudiced by its inability to put its best arguments and supporting evidentiary record before the Court.

## IV. JOINTLY PROPOSED CASE SCHEDULE

### A. Summary judgment of contractor/employment status

FedEx Ground proposes that the date set for filing of motions for summary judgment of contractor/employment status be **vacated** pending resolution of the motions for class certification in these proceedings. This will allow the parties to file motions with the benefit of the Court's rulings on class certification and tailor summary judgment briefing to be responsive to them. This will also save the expense of briefing unnecessary issues and save the parties and the court from unnecessary waves of briefing.

If the Court believes that a date certain must be established at this time, FedEx Ground proposes that the Court allow a reasonable amount of time following completion of the fourth wave of class certification briefing before commencement of partial summary judgment briefing such that summary judgment briefing would begin no sooner than **February 29, 2008**.

### B. Expert discovery related to summary judgment of contractor/employee status

FedEx Ground proposes that expert discovery conducted prior to resolution of the pending class certification motions be limited to testimony pertaining to motions for partial summary judgment concerning the employee versus independent contractor question for the named plaintiffs only. FedEx Ground believes that, unless the Court and the parties are to assume that all of the pending motions for class certification will be denied, there is a real possibility that further expert reports would need to be prepared and cross-examined in

connection with a further round of partial summary judgment motions directed to the employee versus independent contractor question, that is, in connection with claims of persons who fall within any classes that may be certified, as discussed above. For that reason, FedEx Ground originally proposed a postponement of not only the schedule for motions concerning the employee versus independent contractor question, but a postponement of the preparation and discovery of related expert reports. FedEx Ground continues to believe that this would be the most efficient way to manage that phase of the case. Accordingly, FedEx Ground proposes that the date set for expert reports pertaining to motions for partial summary judgment be **vacated** pending resolution of the motions for class certification in these proceedings. To the extent that the Court believes a date certain should be established, FedEx Ground requests that the date for expert reports be extended until sometime after the conclusion of the fourth wave of class certification briefing is complete.

**CONCLUSION**

The parties have worked diligently to advance this litigation as quickly as the difficult legal issues and extensive factual record has allowed. FedEx Ground submits, however, that it is not possible to brief both class certification and summary judgment issues simultaneously, and that it is further not possible to efficiently brief summary judgment without knowing for or against whom summary judgment is sought. For this reason, vacating the current summary judgment briefing deadlines and returning to the two-phase briefing structure originally contemplated by this Court will aid the efficient administration of justice and the interests of the parties. Furthermore, because vacating the existing deadlines will eliminate the need for a potentially duplicative round of summary judgment briefing once class issues have been resolved, the relief requested will not unnecessarily delay the litigation as a whole.

For the reasons stated above, FedEx Ground respectfully requests that this Court

**GRANT** its unopposed motion for amendment of the existing case scheduling order such that:

**1.** The date set for filing of motions for summary judgment of contractor/employment status be vacated pending resolution of the motions for class certification in these proceedings, or in the alternative, be postponed until no sooner than February 29, 2008;

**2.** The date set for expert reports pertaining to motions for partial summary judgment be vacated pending resolution of the motions for class certification in these proceedings, or in the alternative, be extended until sometime after the conclusion of the fourth wave of class certification briefing is complete; and,

**3.** The deadlines for summary judgment set in the June Scheduling Order be clarified to reflect that they apply only to expert discovery and motions for partial summary judgment directed toward plaintiffs' classification as employees versus independent contractors.

Dated: August 1, 2007

Respectfully submitted

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of August, 2007, I filed the foregoing ***MEMORANDUM IN SUPPORT OF FEDEX GROUND'S UNOPPOSED, RENEWED MOTION TO AMEND THE CASE SCHEDULING ORDER*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*All Coordinated Cases*

**MOTION FOR RECONSIDERATION OF
MAGISTRATE JUDGE'S ORDER GRANTING PLAINTIFFS'
MOTION TO STRIKE THE DECLARATIONS OF PUTATIVE CLASS MEMBERS**

For the reasons stated in the accompanying memorandum, Defendant FedEx Ground Package System, Inc., pursuant to 28 U.S.C. § 636(b)(1)(A) and N.D. Ind. L.R. 72.1(c), respectfully requests reconsideration by this Court of the Magistrate Judge's July 23, 2007 Order (Docket No. 818) granting plaintiffs' motions to strike the 293 declarations of putative class members that FedEx Ground submitted in opposition to plaintiffs' motions for class certification.

Dated: August 9, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
O'MELVENY AND MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP

205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of August, 2007, I filed the foregoing ***MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S ORDER GRANTING PLAINTIFFS' MOTION TO STRIKE THE DECLARATIONS OF PUTATIVE CLASS MEMBERS*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 93:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF THE COURT OF APPEAL'S PUBLISHED DECISION IN ESTRADA V. FEDEX GROUND, CASE NO. B189031**

Plaintiff request that this Court take judicial notice, under Rule 201 of the Federal Rules of Evidence, of the August 13, 2007 published decision in Estrada v. FedEx Ground, Case No. B189031 (California Court of Appeal, Second Appellate Division), attached hereto as Exhibit A.

Federal courts may "take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to the matters at issue." *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir. 1983). The Estrada decision is directly relevant to all 29 pending motions for class certification because: 1) the Court affirmed the trial court's determination, based on common representative proof, that the class of pickup and delivery drivers were employees and not independent contractors, as FedEx claimed; 2) the

Court affirmed the class certification order, finding that the class of full time pickup and delivery drivers was ascertainable and also that common questions of law and fact predominated over individual issues; and 3) the Court rejected FedEx's claims that it had already indemnified the drivers through its settlement payments to the drivers and that federal regulations mandated the many controls imposed on the drivers. In addition to these significant points, Plaintiffs have also contended that one of the common issues herein is the Plaintiffs' entitlement to collateral estoppel effect of the Estrada decision and thus, the decision is directly at issue herein.

Because FedEx's opposition to class certification motions in this case expressly rely on many of the same arguments rejected by the California Court of Appeal, this decision can and should be judicially noticed and fully considered with respect to all pending class certification motions. Plaintiffs therefore respectfully request that this court take judicial notice of the attached decision.

Dated: August 16, 2007

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris

1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM

300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:    (574) 289-9987
Fax:    (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

# Exhibit A

Filed 8/13/07

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

ANTHONY ESTRADA et al.,

Plaintiffs and Appellants,

v.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant and Appellant.

B189031

(Los Angeles County Super. Ct. No. BC210130)

APPEALS from a judgment of the Superior Court of Los Angeles County, Howard J. Schwab, Judge, and Bruce Mitchell, Temporary Judge (pursuant to Cal. Const., art. VI, § 21). Affirmed in part, reversed in part, and remanded with directions.

Seyfarth Shaw, James M. Nelson; O'Melveny & Myers, Walter Dellinger, Robert M. Schwartz, Chris A. Hollinger, and Jonathan D. Hacker for Defendant and Appellant.

Law Offices of Ellen Lake and Ellen Lake; Leonard Carder, Lynn Rossman Faris and Beth A. Ross for Plaintiffs and Appellants.

Three drivers brought this class action against FedEx Ground Package System, Inc., contending that, for the limited purpose of their entitlement to reimbursement for work-related expenses, they were employees, not independent contractors. They sought reimbursement and declaratory and injunctive relief, and obtained class certification for their reimbursement claim. In a trifurcated trial, the court found the drivers were employees within the meaning of Labor Code section 2802 (Phase I), ordered FedEx to reimburse some (about $5 million, including prejudgment interest) but not all of their expenses (Phase II), granted most of the equitable relief sought by the drivers (Phase III), and ordered FedEx to pay the drivers' costs and attorneys' fees (about $12.3 million).

This is the third appeal in this case. In *Estrada I*, we held that orders dismissing some potential class members were not appealable, and dismissed the appeal as premature. (*Estrada v. RPS, Inc.* (2005) 125 Cal.App.4th 976.) In *Estrada II*, we reversed all of the equitable orders, resolving those issues against the drivers and in favor of FedEx. (*Estrada v. FedEx Ground Package System, Inc.* (Nov. 22, 2006, B187951) [nonpub. opn.], *Estrada II*.) On this appeal, we consider FedEx's challenges to the trial court's class certification order, the court's Phase I finding that the drivers are employees, its Phase II reimbursement awards, and its post-trial attorneys' fee award.[1] On the drivers' cross-appeal, we consider their

---

[1] The trial court defined the certified class to include present and former drivers who personally perform or performed pickup and delivery services for FedEx on a full-time basis in a single work area or route (SWA's). Drivers who operate or operated in multiple work areas or routes (MWA's), corporate entities, and others were excluded from the class. Two of the three named plaintiffs (Anthony Estrada and Jeffrey Morgan) were SWA's; the third named plaintiff (Harvey Roberts) was an MWA and was dismissed on that ground (he is not a party to this appeal). In the end, we are dealing with only the SWA's on appeal and we thus refer to them as drivers except when necessary to distinguish between SWA's and MWA's, and for simplicity use only masculine pronouns.

challenges to limitations imposed on the Phase II reimbursement awards and to the pretrial orders dismissing potential class members (the issue prematurely before us in *Estrada I*). We affirm the finding that the drivers are employees, the certification order, and the finding that attorneys' fees are recoverable, but reverse the fee award because the amount must be reconsidered, reverse two orders limiting the scope of reimbursable expenses, and remand to the trial court for further proceedings and recalculation of the attorneys' fee award.

## FACTS[2]

### A. *The Evidence At Trial*

#### 1. *The Operating Agreement*

Men and women who apply to FedEx for positions as drivers must complete applications, submit to background checks and strength tests, and satisfy appearance standards. The only required skill is driving and no commercial driving experience is needed. Upon acceptance, a driver must execute a nonnegotiable "Pick-up and Delivery Contractor Operating Agreement" that obligates him to "provide daily pick-up and delivery service, and to conduct his . . . business so that it can be identified as being a part of the [FedEx] system." The Operating Agreement identifies the driver as an "independent contractor, and not as an employee . . . for any purpose," sets forth the parties' "mutual business objectives," notes that "the manner and means of reaching [these objectives] are within the discretion of the [driver]," and states that "no officer or employee of [FedEx] shall have the authority to

---

[2] Our statement of facts is based on the evidence (and inferences supporting the judgment) presented during a nine-week trial. (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 937.)

impose any term or condition [including hours of work or travel routes] contrary to this understanding."

Under the terms of the Operating Agreement, the driver must provide his own truck meeting FedEx's specifications, mark the truck with the FedEx logo, pay all costs of operating and maintaining the truck (including repairs, cleaning, fuel, tires, taxes, licenses and insurance), and use the truck exclusively in the service of FedEx (or mask the logo if the truck is used for any other purpose). The driver must provide "fully competitive" service to a "primary service area" assigned by FedEx, and the Operating Agreement acknowledges the driver's "proprietary interest" in his primary service area's customer accounts -- but gives FedEx the right to reconfigure primary service areas (and to reassign packages to another driver) if the volume of packages in the driver's primary service area exceeds the amount the driver could reasonably be expected to handle on any given day. In the event of reconfiguration, the driver has a right "to receive payment" from FedEx or the benefited driver.

The Operating Agreement obligates the driver to try to "retain and increase" business within his primary service area, to "cooperate" with FedEx's employees, customers, and other drivers for the common goal of efficient pickup and delivery, to load, handle, and transport packages using methods designed to avoid theft, loss and damage, and to foster FedEx's "professional image" and "good reputation." The driver agrees to drive safely, to prepare driver logs, inspection reports, fuel receipts, and shipping documents, and (on a daily basis) to return these items and any collected charges and undeliverable packages to FedEx. He agrees to wear a FedEx-approved uniform and to maintain his appearance "consistent with reasonable standards of good order,"

his uniform "in good condition," and his truck in a "clean and presentable fashion."

For its part, FedEx reserves the right to have its management employees travel with the driver four times each year to verify that the driver is meeting FedEx's standards, and agrees to train or "familiarize [the driver] with [its] quality service procedures." FedEx pays or "settles" with a driver weekly based on a stated calculation, and offers the driver a "business support package" to help him obtain and maintain a truck, a scanner, clean uniforms, and other similar items, the cost of which is paid by the driver by deductions from his weekly "settlements."[3]

The driver may elect the initial term of his Operating Agreement (from one to five years), with automatic yearly renewals unless, 30 days before expiration of the term, one party gives the other written notice of termination.   The Operating Agreement may be terminated at any time by mutual consent, by FedEx for "intentional misconduct or reckless or willfully negligent operation" of equipment, by either party for breach of the Operating Agreement's obligations, by either party if FedEx stops doing business or reduces its operations at the driver's terminal, and by a driver on 30 days written notice.  The driver has the right to challenge his termination by an arbitration at which, if he prevails, he may be awarded reinstatement or damages or both.  A driver in good standing has the right to assign his rights under the Operating Agreement to a replacement contractor acceptable to FedEx.  The Operating Agreement

---

[3] The scanner, which is leased from FedEx, is the device used by the driver to obtain signatures when packages are delivered.  Every driver's truck has a computer, and the driver must insert the scanner into the computer after each delivery so that customers have immediate access to delivery information via the FedEx website.

recites that it and its attachments constitute the "entire agreement and understanding between the parties," and that it can be modified only by a writing signed by both parties.

*2. Implementation of the Operating Agreement*

Although FedEx claimed at trial that the Operating Agreement (and only the Operating Agreement) determined the drivers' status as independent contractors, both sides presented anecdotal and other evidence through the testimony of numerous drivers, FedEx managers, and experts.

Notwithstanding the merger clause in the Operating Agreement, the drivers' relationship to FedEx is defined by a number of other sources, including the FedEx "Ground Manual" and "Operations Management Handbook," which set forth "policies and procedures" in great detail to ensure the uniform operation of FedEx terminals throughout California, as well as by recruiting materials, welcome packets, memoranda, training videos, bulletin board posters, round-table presentations, and similar means of communication.

A new driver leases a scanner and purchases or leases a truck (usually obtained from FedEx preferred vendors) that meets FedEx's size, model and condition specifications, paints the truck "FedEx White," and applies the FedEx logo to the truck. To pay for these items, drivers may obtain loans through FedEx's business support programs (with repayment through pay deductions). FedEx offers its drivers a deferred compensation or retirement plan (the record is ambiguous on this point) and other "employee benefits" (including direct deposit, a seniority-based "time-off program" for unpaid leave, and a scholarship program for the drivers' children). As is true of all FedEx employees,

drivers are paid weekly at rates set by FedEx without negotiation (the drivers' rate is based on a daily rate, a piece rate for packages handled, and bonuses for length and quality of service).[4] Customers are billed by FedEx, not the drivers.

Regional managers supervise terminal managers and have weekly discussions about goals and procedures. Terminal managers, in turn, supervise and train drivers. Drivers work full time and exclusively for FedEx, and must work every day FedEx provides service unless they have preapproved replacements. FedEx sets the drivers' work hours (9.5 to 11 hours a day), and the average driver has worked for FedEx for eight years, with an annual income of $35,000 to $50,000 after expenses. The drivers and their trucks are subject to inspection every day (the trucks must be clean, the drivers in uniform and well groomed), and if either fails inspection, the driver may be barred from service.

Trucks must be parked in assigned spots and loaded by FedEx employees with the packages assigned to the driver by management (the drivers may not refuse an assignment).[5] FedEx adjusts the number of assigned packages (thereby controlling the driver's hours and pay) by "flexing" from an adjacent route to balance the workload between drivers and in furtherance of its goal --

---

[4] Drivers are paid according to a complex formula that includes $40/day for working in uniform and providing a van, $5/day for participating in the flex program, a piece-rate component based on the number of stops made and packages handled, and a daily "temporary core zone density" payment, plus a quarterly performance bonus based on years of service and a monthly bonus based on both the individual driver's performance and the performance of his terminal.

[5] Under federal law, the drivers' trucks cannot be used for personal use during the hours they are used to deliver packages for FedEx. (See 49 C.F.R. § 376.12(c).) Because the drivers must park their trucks in assigned spaces at their terminals, and because the logos on most of the trucks are difficult if not impossible to conceal, FedEx's assertion that the drivers may use their trucks for other purposes during off hours is more imagined than real. As a practical matter, most drivers rarely use their trucks for personal matters.

deliver "every package, every day." Almost all drivers participate in the flex program. When necessary (as determined by FedEx), FedEx reconfigures primary service areas without payment by FedEx to the driver for lost customers.

Drivers may not leave the terminal at the beginning of the work day until sorting is completed, and terminal managers may contact drivers during the day about additional assignments. Drivers may "sequence" the order of deliveries and pickups but must meet all pickup and delivery times or "windows" arranged by FedEx's sales representatives and certain customers. These windows affect a driver's ability to sequence his own route. Drivers must comply with FedEx's rules for obtaining signatures on scanners, releasing packages without signatures, special handling of overnight and C.O.D. packages, and tracing undelivered or improperly delivered packages. Drivers must place their scanners in their computers after each delivery (fn. 3, *ante*), and at the end of each day must return to their assigned terminal parking spaces, deliver all paperwork and cash from C.O.D. payments, download their scanners, and provide details about any unsuccessful deliveries.

When on any given day a driver makes no attempt to deliver a package, misses a pickup time or window, or is the subject of a complaint, the matter must be discussed with the terminal manager who, in addition, meets with each driver twice each year to communicate and document shortcomings. Several times each year, terminal managers evaluate each driver's performance by means of a "customer service ride" and there are covert checks and security audits conducted in the field. Each driver receives an annual progress review. Terminal managers decide which "failures to service" or alleged breaches of the Operating Agreement to document, and they have discretion (subject to the

regional managers' and upper management's approval) to recommend termination or nonrenewal.

In practice, therefore, the work performed by the drivers is wholly integrated into FedEx's operation. The drivers look like FedEx employees, act like FedEx employees, are paid like FedEx employees, and receive many employee benefits.

**B. *The Phase I Statement of Decision***

The trial court found, and set forth in its statement of decision, that the drivers were FedEx employees, not independent contractors, and that they had not been indemnified for any of the expenses at issue. The court described the Operating Agreement as "a brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model" -- because FedEx "not only has the right to control, but has close to absolute actual control over [the drivers] based upon interpretation and obfuscation."[6] The court found that FedEx's management witnesses "differed dramatically in their testimony as to the available remedies" for a driver challenging termination, with the head of contractor relations "admitting that he did not volunteer to [the drivers] any information about [their] rights to arbitrate or sue." In the trial court's view, FedEx's conduct established that the drivers could be terminated "at will."

---

[6] The court found the drivers' right to control their own routes and schedules was illusive because they were "constrained by customer pick up and delivery windows contracted by the [FedEx] sales force" and by FedEx's paperwork requirements that required the drivers' presence at the terminal.

The court found, in addition, that the drivers are "totally integrated into the [FedEx] operation," that they perform work essential to FedEx's core business, that they are required to work exclusively and full time for FedEx, that their customers are those assigned to them by FedEx, that no specialized skills are required, that they must wear uniforms and conform absolutely to FedEx's standards and that, in the end, each driver has a "job" with "little or no entrepreneurial opportunities." Although the drivers provide their own trucks and equipment, FedEx is involved in the purchasing process, providing funds and recommending vendors.

The essence of the trial court's statement of decision is that if it looks like a duck, walks like a duck, swims like a duck, and quacks like a duck, it is a duck.

**DISCUSSION**

***FedEx's Appeal***

**I.**

The trial court found that, for purposes of determining the drivers' right to reimbursement for their expenses, the drivers are employees within the meaning of Labor Code section 2802.[7] FedEx contends the trial court is wrong. We disagree.

**A.**

Subdivision (a) of section 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."

---

[7] Undesignated section references are to the Labor Code.

Because the Labor Code does not expressly define "employee" for purposes of section 2802, the common law test of employment applies. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1087.) The essence of the test is the "control of details" -- that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work -- but there are a number of additional factors in the modern equation, including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350-351 [*Borello*]; *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949; *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43-44; *Air Couriers Internat. v. Employment Development Dept., supra,* 150 Cal.App.4th at p. 933 [*Air Couriers*]; *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1064-1065.)[8] The parties' label is not dispositive and will be ignored if their actual

---

[8] *Air Couriers* and *JKH Enterprises* both involve package delivery drivers, albeit in different postures. In *Air Couriers,* a package delivery company sued the Employment Development Department for a refund of employment taxes, claiming its drivers were independent contractors; the trial court found the drivers were employees and the Third District affirmed. (*Air Couriers, supra,* 150 Cal.App.4th 923.) In *JKH Enterprises,* the Department of Industrial Relations found in administrative proceedings that a courier service's drivers were employees for whom workers' compensation insurance had to be provided; the courier service challenged the order by a petition for a writ of mandate, claiming the drivers were independent contractors. The trial court found the drivers were employees and the Sixth District affirmed. (*JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th 1046.)

conduct establishes a different relationship. (*Borello, supra,* 48 Cal.3d at p. 349; *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 877-878.)

The determination (employee or independent contractor) is one of fact and thus must be affirmed if supported by substantial evidence. (*Borello, supra,* 48 Cal.3d at p. 349; *Air Couriers, supra,* 150 Cal.App.4th at p. 937; *Santa Cruz Transportation, Inc. v. Unemployment Ins. Appeals Bd.* (1991) 235 Cal.App.3d 1363, 1367, 1373; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at p. 877.) Because the trial court expressly relied on *Borello,* and because FedEx does not dispute the applicability of the *Borello* test, there is no question of law with regard to this issue, only one of substantial evidence. (*Air Couriers, supra,* 150 Cal.App.4th at pp. 932-933, 937.)

**B.**

FedEx contends the trial court misapplied the test (by an erroneous analysis of the "right to control" factor and otherwise) and made "insupportable inferences of fact" in determining that the drivers are employees. We disagree.

First, FedEx's assumptions are wrong. Although it is true that the Operating Agreement says "the manner and means" to satisfy the objectives of the contract "are within the discretion of the [drivers]," and that FedEx does not have the "authority to impose any term or condition" to the contrary, the evidence shows unequivocally that FedEx's conduct spoke louder than its words. As noted above, the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship. (*Borello, supra,* 48 Cal.3d at p. 349; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at

pp. 877-878.) The same is true with regard to FedEx's claim that it cannot terminate the drivers at will. Although the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all -- and substantial evidence established that FedEx discharges drivers at will. (*Id.* at p. 875.)

Second and most significantly, the trial court's findings are supported by substantial evidence. FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors.[9] The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items -- trucks and scanners -- are obtained from FedEx approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income. The customers are FedEx's customers, not the drivers' customers. FedEx has discretion to reject a driver's helper, temporary replacement, or proposed assignee.

---

[9] The drivers were told they could not wear white shoes or socks; the men were told they could not wear earrings or ponytails, and sometimes that they needed to shave or get a haircut. We summarily reject FedEx's suggestion that constraints such as these are necessary to ensure the drivers' compliance with government regulations. (See *Southwest Research Institute v. Unemployment Ins. Appeals Bd.* (2000) 81 Cal.App.4th 705, 709.)

Drivers -- who need no experience to get the job in the first place and whose only required skill is the ability to drive -- must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed.[10]   The drivers are not engaged in a separate profession or business, and they are paid weekly, not by the job.   They must work exclusively for FedEx.   Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by "flexing" and withheld approvals, and for very slight violations of the rules.   Most drivers have worked for FedEx for a long time (an average of eight years), and drivers employed by FedEx's competitors (UPS, DHL, and FedEx's sister corporation, FedEx Express) are classified as employees.

Based on these facts, we reject FedEx's contention that this is a "true entrepreneurial opportunity depending on how well the [drivers] perform" and conclude that substantial evidence supports the trial court's finding that the drivers are employees, not independent contractors, for purposes of section 2802. (*Air Couriers, supra,* 150 Cal.App.4th at pp. 937-939; *JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th at pp. 1064-1065; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at pp. 876-878.)[11]

---

[10] FedEx's reliance on *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, is misplaced.   Although that case observes that "truck driving -- while perhaps not a skilled craft -- requires abilities beyond those possessed by a general laborer" (*id.* at pp. 202-203), the finding of independent contractor status in that case is based primarily on the facts that the truck drivers worked for more than one broker at a time and were compensated on a job-by-job basis, "with no obligation on the part of the [drivers] to accept any assignment and no retribution . . . for refusing assignments." (*Id.* at p. 203.)

[11] The federal cases relied on by FedEx are factually inapposite.   The truckers in *Berger Transfer v. Central States* (8th Cir. 1996) 85 F.3d 1374 were paid by the trip, could refuse assignments, and did not have to wear uniforms or paint their trucks with any special marks.   The drivers in *C.C.*

II.

FedEx contends the drivers' claims were unsuitable for class treatment, and that a classwide judgment is inappropriate on the evidence presented. More specifically, FedEx complains that the class certification order was flawed from the outset because it was based on the incorrect assumption that proof would focus on the terms of the Operating Agreement, when in fact the drivers offered "anecdotes about various alleged individual violations." In short, the claim is that individual facts predominated over the common issues. We disagree.[12]

A.

The decision whether to certify a class is one within the trial court's discretion and will be set aside only upon a showing of abused discretion. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326-327; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.) On this record, FedEx cannot

---

*Eastern, Inc. v. N.L.R.B.* (D.C. Cir. 1995) 60 F.3d 855 were paid by the job, did not have to wear uniforms, and could choose any kind of truck. The drivers in *Merchants Home Delivery Serv., Inc. v. N.L.R.B.* (9th Cir. 1978) 580 F.2d 966 were paid by the job, chose their own work hours, could refuse assignments, could sometimes work for other businesses, and operated as partnerships or corporations, not individuals. The drivers in *North American Van Lines, Inc. v. N.L.R.B.* (D.C. Cir. 1989) 869 F.2d 596 selected the frequency of their jobs, the type of loads, the routes taken, and they did not have to wear uniforms. The drivers in *United States v. Silk* (1947) 331 U.S. 704 hired their own helpers and hauled for more than one business. Meanwhile, the drivers in our case are not paid by the job but by a formula established by FedEx and must work only for FedEx, must wear uniforms, must conform their personal appearance to FedEx's rules and regulations, must work on the days required by FedEx, and must use FedEx's method of delivery.

[12] We reject FedEx's assertion that the certification order assumed the trial would be limited to the terms of the Operating Agreement. There is nothing in the order itself or FedEx's brief to support this assumption. In fact, the reporters' transcripts of the hearings leading up to and following the certification order include several discussions about the scope of the evidence at trial -- and it is clear that everyone understood the drivers were not "going to stand or fall on the operating agreement" but were "going to put in individual proof of the way things operate, and then we get to the issue of the way they operate at the time at each terminal, or span of time."

make the required showing because it is clear that common issues -- whether the drivers were employees and, if so, which expenses would be reimbursable -- predominated. The anecdotal evidence was admitted to show FedEx's power to interpret the Operating Agreement and was relevant to the class as a whole, not just to the drivers who happened to be the subject of a particular anecdote. FedEx's failure to raise this point below suggests it understood that it would fail (it did not at any time during the nine-week trial move for decertification on the basis of the anecdotal evidence). (*Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1166-1167; *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685-1686.)

**B.**

In a related argument, FedEx contends the class "never proved to be ascertainable or manageable in any reasonable sense: 209 distinct 'mini cases' . . . were required to ascertain who was actually within the class and . . . entitle[d] to reimbursement." We disagree.

A class action requires an ascertainable class with a well-defined community of interest among its members. Community of interest, in turn, requires that common questions of law or fact predominate, and that class representatives (who must be able to adequately represent the class) have claims typical of the class. The class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description. (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828.)

After much effort and briefing, the class was limited to single work area drivers who drive (or had driven) full time and who do not (or did not) subcontract their service areas out to others for reasons other than vacation, sick leave, or other commonly excused employment absences. The trial court found that the members of this class could reasonably be identified from FedEx's records and through discovery and, for the most part, they were. Discovery limited the class to 209 putative members. FedEx's suggestion that the members of this class shifted "in and out, sometimes on a day-to-day basis," is unsupported by a reference to the record and meaningless in the context of the trial transcript. If FedEx's claim is that every member of the class had to be identified from the outset, FedEx is simply wrong. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706.)

**III.**

FedEx contends that, assuming the drivers are employees, FedEx already indemnified them for the expenses due under section 2802. As did the trial court, we disagree.[13]

Subdivision (a) of section 2802 obligates an employer to indemnify its employee "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." According to FedEx, the Division of Labor Standards Enforcement requires reimbursement only for "any reasonable amount" (DLSE Interpretive Bulletin No. 84-7 (Jan. 8, 1985)), and

---

13 The trial court found that "[n]o evidence was presented to support [FedEx's] position [that the drivers had already been indemnified for the expenses they sought under section 2802] and no language in the [Operating Agreement] would bolster that theory. Rather all witnesses testified that the [drivers] were responsible for their own expenses."

the settlement formula in the Operating Agreement "effectively provided reasonable compensation" for the drivers' business expenses. FedEx is wrong.

The Operating Agreement obligates the drivers to provide their own trucks, scanners, and clean uniforms, and to "bear all costs and expenses incidental to operation" of the trucks, including maintenance, cleaning, depreciation, fuel, oil, tires, repairs, taxes, licenses, tolls, and insurance. The drivers, the terminal managers, and FedEx's upper management all testified that drivers are expected to bear their own costs. As for the "settlement," the Operating Agreement provides that it is "for services provided," not expenses incurred (for example, "contractor and van availability"). FedEx's suggestion that the settlement formula is keyed to specific expenses and, as such, includes reimbursement for those expenses, is not supported by any evidence.[14]

IV.

FedEx contends the attorneys' fee award is "manifestly improper," that it cannot be justified under Code of Civil Procedure section 1021.5, and that it must in any event be revisited in light of our reversal of the equitable orders in

---

[14] We summarily reject FedEx's claim of evidentiary error. It says it "sought to introduce evidence . . . establishing that the settlement was designed *overall* to provide de facto compensation for *all* expenses incurred by contractors," and it says it wanted to do this by "showing that the payments contractors made to their own hired drivers were far less than what contractors received through the settlement system for equivalent work." FedEx's record references do not support this point. Instead, the cited pages show that FedEx tried to ask witnesses about information in their tax returns, and that the trial court properly sustained objections to those questions based on the taxpayer privilege and because FedEx had other means to present the same information. (*Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1, 6.) FedEx did not make any offer of proof remotely similar to the argument it offers on this appeal. (*People ex rel. Dept. of Transportation v. Superior Court* (2003) 105 Cal.App.4th 39, 46.)

*Estrada II.*[15] We reject FedEx's substantive challenges but agree that the amount cannot stand.

Section 1021.5 provides as relevant that "[u]pon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[16]

Estrada's motion asked for $619,691 in costs and $6,789,325 for his attorneys' fees, a total of $7,409,016 -- plus a 2.0 multiplier as compensation for delay and contingency, a total of $14,818,032. The trial court reduced the fee by 18 percent (finding the amount "slightly bloated") but otherwise granted the motion (including the 2.0 multiplier) and gave Estrada a total of $12,373,875 for costs and fees, noting the risk inherent in a contingent fee, the "financial burden of private enforcement," and the years of "long, hard-fought" and "labor intensive" litigation involving "enforcement of an important right" that conferred a "significant benefit on a large class." FedEx contends the award is erroneous

---

[15] Subsequent references to section 1021.5 are to that section of the Code of Civil Procedure.

[16] In addition, subdivision (a) of section 2802 compels an employer to indemnify its employee for "all necessary expenditures and losses incurred by the employee in direct consequence of the discharge of his or her duties." Subdivision (c) of section 2802 defines "necessary expenditures or losses" to include "all reasonable costs, including but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section." Our conclusion that a fee award is justified under section 1021.5 makes it unnecessary to consider whether the section 2802 fee provision, which was enacted after this lawsuit was filed, applies in this case.

because Estrada was motivated primarily by his own financial interests, that any benefit to a larger class was incidental, that no significant benefit was conferred on the public or a larger class, and that the trial court's dual use of the same reasons to both calculate the fee and justify the multiplier created a windfall. We reject FedEx's claim that fees were not recoverable in this case but agree that the amount must be reduced and that the same facts cannot be used to trigger the application of section 1021.5 *and* justify a multiplier.

**A.**

Estrada's personal motivation does not diminish the fact that he pursued this public interest class action not only for himself but on behalf of a class comprised of FedEx's past and present drivers and ultimately obtained awards for 209 drivers. (*Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414; *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 231; *Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1005.) No more is required to satisfy the "significant benefit," "public interest," and "large class of persons" requirements of section 1021.5.

**B.**

But Estrada did not get everything he sought. In *Estrada II*, we reversed all the equitable orders, finding that Estrada lacked standing to pursue his claims for prospective equitable relief (a) because his relationship with FedEx ended before this lawsuit was filed, and (b) because the class certification order was expressly limited to the reimbursement issue. (*Estrada II*, typed opn., p. 2.) The equitable orders were a significant part of the litigation and the resulting judgment.

In Phase III of these proceedings, Estrada sought declaratory relief and a permanent injunction on behalf of "all California single work area pick-up and delivery drivers who at any time since May 11, 1996 worked or currently work or in the future are employed to work under FedEx's Operating Agreement." The trial court rejected FedEx's defenses, finding among other things that it was necessary to address the equitable claims in light of the "importance and recurring nature of the employment issues of the [drivers]." A permanent injunction issued, enjoining FedEx from (1) misclassifying drivers as independent contractors or participating in any agreement to misclassify them as independent contractors, and (2) violating or attempting to violate *any provision of the California Labor Code, Industrial Welfare Commission Orders, or other state laws and regulations protecting the drivers as employees -- both in the present and for as long as FedEx retained the employment model or substantially similar employment model used by FedEx at the time of trial.* We reversed all of the equitable orders, finding that Estrada lacked standing to seek prospective declaratory or injunctive relief and that the trial court thus lacked jurisdiction to grant such relief.

When we reversed the equitable orders in *Estrada II,* we disposed of all of the benefits Estrada had obtained in the third phase of trial. Although we agree that Estrada is still the prevailing party, the factual predicate for the trial court's award -- that Estrada won on all points, including the far-reaching injunctions -- is no longer valid. Estrada concedes as much, noting in his respondent's brief that, under the short-lived injunctions, "the benefits of the instant litigation [would have been] enjoyed by thousands of people who are not members of the class, including future [drivers] and employees," and that the equitable orders were "[m]ore important" to the trial court than the damages award because "the

injunctive and declaratory relief require[d] [FedEx] to treat all its current and future [drivers] as employees and thus provide[d] ongoing relief to a huge group of people."

The $12,373,875 award is excessive and cannot stand.

C.

In recalculating an appropriate fee award on remand, the trial court must determine anew whether any multiplier is appropriate in this case. The fee award sans multiplier ($5,567,246) exceeded the amount of the award to the entire class of plaintiffs (about $3 million before interest was added, about $5 million with prejudgment interest). By the time the trial court revisits this issue, the total monetary award to the plaintiffs will have increased for the reasons explained below with regard to the drivers' cross-appeal, and the attorneys will have spent more time on this case both on appeal and on the post-appeal trial court proceedings. While the amount of the fee is ultimately a decision within the trial court's discretion (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132), the fee must above all else be reasonable and a multiplier, if used, must be based on facts other than those used to trigger the application of section 1021.5. (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 626; and see *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322-323 [the starting point of every fee award must be a calculation of the attorney services in terms of the time spent on the case, and the exercise of the court's discretion in awarding fees must bear some reasonable relationship to the lodestar figure of time spent and hourly compensation].)[17]

---

[17] The trial court's statement that it was "not double counting" does not change the fact that the reasons justifying any award at all *and* an award based on high hourly rates (to lawyers who

***Estrada's Cross-Appeal***

**V.**

Estrada raises five issues on his cross-appeal, four challenging the trial court's rulings vis-à-vis the damages proved during the Phase II trial, the fifth revisiting the dismissal orders that were the subject of *Estrada I*. We address these issues seriatim.

**A.**

The August 2, 2001 class certification order recites that "[c]ommon questions of fact clearly predominate in this case. All members of the proposed class . . . incurred the below-listed similar expenses, delineated in the Operating Agreement and certified by the Court as susceptible to proof on a class basis, as a direct consequence of performing services for [FedEx] . . . ." Ten categories of "[e]xpenses the [Operating Agreement] requires" were listed: (1) purchasing or leasing a vehicle for the purpose of performing pickup and delivery services; (2) operating the vehicle, including fuel, oil, tires, repairs, business taxes, cleaning, insurance, registration and tolls; (3) maintaining the vehicle in accordance with federal, state and local law; (4) marking the vehicle with logos, colors, numbers, marks and insignia; (5) licensing the vehicle; (6) paying into the Contractor Performance Escrow Account; (7) purchasing, renting and cleaning uniforms; (8) purchasing or otherwise securing communications equipment, including but not limited to scanners and other required equipment; (9) obtaining liability insurance; and (10) obtaining and keeping in force "workers' compensation insurance for themselves."

---

took the case on a contingency basis) were the same as those used to justify the multiplier – the benefit to the class, the risk taken, the lawyers' skill, the excellent results.

On September 8, 2004, the trial court limited reimbursement to items actually paid out by the drivers or deducted from their settlement checks, ruled that proof of the claimed expenses would be "limited to receipts and personal records of the [drivers] . . . as well as records in the hands of [FedEx]," and limited some of the categories of recoverable expenses.[18] Four of the court's rulings are challenged on the drivers' cross-appeal.

**1.**

The trial court refused to permit proof of expenses by expert analysis and lay testimony about FedEx's estimates of the drivers' expenses, limiting the drivers' proof to receipts and records. More specifically, the trial court ruled "that sampling or statistical analysis [would] not suffice, as the amounts of monies that must be the subject of the accounting [would] be too disparate because of the economic differences in the California geographic area. . . . [¶] The [drivers] have the burden of proving areas of compensability by means limited to receipts and personal records . . . and [FedEx's] records . . . . [¶] The [drivers] will present a package to the referee containing the above items as to each [driver]. Upon receipt of said package, [FedEx] can either stipulate as to the amounts sought or file documents or records controverting those amounts." We reject Estrada's challenge to this ruling.

---

[18] In the same order, the trial court found that expenses recoverable under section 2802 included those related to the operation of the vehicle (fuel, oil, tires, repairs, business taxes, cleaning, insurance, registration, and tolls), to maintaining the vehicle in accordance with federal, state and local law, to marking the vehicle, to licensing the vehicle, to purchasing, renting, and cleaning uniforms, to renting scanners, and to obtaining liability insurance. On its own motion, the trial court appointed a referee (Code Civ. Proc., § 639) to take evidence, perform "an accounting as to the expenses and reimbursements claimed by the individual plaintiffs and class members," and to make recommendations to the court.

According to the drivers, they should have been permitted to offer "expert analysis computing the [drivers'] damages based on an economic model [that] used actual receipts produced by [the drivers] from around the state, together with expense estimates published in [a FedEx] recruiting booklet entitled, 'Becoming [a FedEx] Pickup and Delivery Contractor' [because the booklet included] data in the form of weekly and annual expense estimates," and a spreadsheet showing "the estimated costs for ten specific expense items projected over a ten-year period." The problem with this argument is that it is premised on a finding that the amounts due to the drivers were not susceptible of exact proof (*Long Beach Drug Co. v. United Drug. Co.* (1939) 13 Cal.2d 158, 174 [uncertain consequential damages]; *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745 [future damages]; *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545 [lost profit damages]; *DuBarry Internat. Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 562 [damages for lost commissions]) -- an assumption directly contradicted by the record the drivers established in proving their damage claims. In short, estimates and educated guesses are allowed where damages cannot be proved. That was not this case.[19]

**2.**

Although the September 2004 order required proof by receipts and other personal records, Estrada's lawyer -- claiming she had an agreement with FedEx's lawyer -- prepared spreadsheets listing the drivers' out-of-pocket

---

[19] Moreover, the notices sent to the putative class members told them quite plainly that they would "be asked to document any expenses for which [they] claim[ed] reimbursement." (See *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934; and see *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 749-753.)

expenses (such as gasoline and maintenance costs that were not deducted from the drivers' checks) with Bates-stamp references to each supporting document, the idea being that FedEx's lawyers would review the spreadsheets, determine which items were disputed, and request production of receipts for only the disputed items. After the deadline for the submission of evidence passed, FedEx objected to the spreadsheets as incompetent, contending there was no agreement to relieve the drivers of the court-ordered requirement to present all supporting documentation. The referee sustained the objection but found the drivers' lawyers had honestly "believed" an agreement had existed, and therefore found that the drivers should be allowed to present proper proof -- and accepted 40,000 documents (all of which had been produced to FedEx during discovery) which, if allowed, would result in an award to the drivers of about $5.23 million for these expenses.

FedEx objected to the referee's order. The trial court agreed with the referee that there had been no agreement,[20] found the drivers had offered "incompetent evidence," and approved the referee's decision to allow the drivers to reopen -- but only with regard to expenses provable by documents FedEx had produced during discovery, which necessarily excluded all of the drivers' out-of-pocket expenses provable only by the drivers' documents.

The trial court's reason for allowing the partial reopening -- so that FedEx would not obtain a "windfall" -- is entirely inconsistent with its order limiting the

---

[20] The trial court's credibility call is binding on this appeal (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614) and is supported by the record. In addition to the trial court's requirements (actual receipts and documentation), the referee ordered the parties to present both "calculation sheets and proof packets."

scope of the allowed reopening. Because the trial court's reasoning was correct (FedEx would indeed obtain a windfall if it was not required to reimburse the drivers for provable expenses that had been part of the case from the beginning, all of which were fully documented and produced to FedEx during discovery), the only possible conclusion is that the trial court's order is wrong and must be reversed. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.) However wrong Estrada's lawyer might have been in believing she had an agreement with opposing counsel to use the spreadsheets without the related proof packets, her error caused absolutely no prejudice to FedEx.[21] Accordingly, the trial court must revisit this issue and conduct such further proceedings as are necessary to determine the amounts to be awarded to the drivers for these expenses.

**3.**

The trial court, relying on a January 1985 Interpretive Bulletin (Bulletin 84-7) issued by the Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE), found the drivers were not entitled to reimbursement for expenses related "to purchasing or leasing a vehicle for the purpose of performing pick up and delivery services" because "employers in the pick up and delivery industry in California can require as a condition of employment that their drivers, at their own expense, purchase or lease a truck to the employer's specifications." Estrada contends the trial court should instead have relied on a January 2, 1997 DLSE Opinion Letter (No. 1997.01.02) opining that

---

[21] If, as FedEx suggests, the trial court's ruling was in effect a sanction based on its belief that the use of the spreadsheets "was an unauthorized tactic to get around the court's order with which [Estrada's lawyer] disagreed," the result was nonetheless an abuse of discretion – because the sanction, if that's what it was, should have been directed at counsel, not her clients.

employees may not be required to purchase a $50,000 customized truck as a condition of employment. (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 815 [we do not defer to DLSE bulletins and opinion letters but may nevertheless consider them for what they are worth].)[22] We agree with the trial court.

**(a)**

Bulletin 84-7 was a response to a question about "whether employers . . . may require mechanics or other employees to provide and maintain their own tools, regardless of the wages paid the employees, if it is customary in the industry for mechanics or other employees to do so." In response, the Labor Commissioner opined that "if an employee is paid at least twice the minimum wage, such employee may, as a condition of employment, be required to provide and maintain his[] own hand tools and equipment customarily required by the trade or craft." In addition, the Labor Commissioner opined that "[i]f an employee is paid at least twice the minimum wage, he[] may be required, as a condition of employment, to furnish his[] own tools, regardless of the custom or practice in the industry to the contrary."

In that context, the Labor Commissioner was also asked "whether an automobile or truck used in the course of employment by an employee . . . is a 'tool' within the meaning of [section 2802]." The Commissioner answered that "neither an automobile nor a truck is considered a tool within the meaning of [section 2802], and *an applicant for employment may be required, as a*

---

[22] The DLSE's opinion letters may be found at http://www.dir.ca.gov/dlse/DLSE OpinionLetters.htm (as of Aug. 6, 2007).

*condition of employment, to furnish his[] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid.* [¶] Under . . . [s]ection 2802, an employer who requires an employee to furnish his[] own car or truck to be used in the course of employment would be obligated to reimburse the employee for the costs necessarily incurred by the employee in using the car or truck in the course of employment." (Italics added.)

**(b)**

The January 2, 1997 Opinion Letter is a response to a question based on this situation: "'An employer hires a sales employee and requires him to purchase a customized truck for about $50,000.00, bearing the employer's name, as a condition of employment. The employer then directs the employee to the vendor who sells the trucks and to a leasing company that will finance the truck. Finally, the employer directs the employee to an insurance company that will insure the truck.'" The question was whether section 450 prohibits the employer from requiring the employee to patronize specific and identifiable third persons.[23] As relevant, the Chief Counsel for Division of Labor Standards Enforcement replied:

"California courts have determined that [section] 450 . . . promot[es] the right of a wage earner to all wages lawfully accrued to him. . . . [¶] Clearly, a condition of employment which requires the employee or applicant to make a $50,000.00 purchase of a vehicle which advertises the name of the employer and further requires that the vehicle be purchased from one vendor (or any

---

[23] Section 450 provides: "No employer . . . may compel or coerce any employee, or applicant for employment, to patronize his . . . employer, or any other person, in the purchase of any thing of value."

number of vendors) chosen by the employer is violative of [section] 450. [¶] *While your [question] does not [mention section 2802] I feel that it is imperative that you also consider [that statute]. . . . [¶] [Section 2802] may not be waived. (See . . . § 2804.)[24] Obviously, even if the practice you describe were not prohibited by the terms of [section] 450, the employer would be liable to the employee for the costs incurred by the employee under [section] 2802. [¶] Quite frankly, the scenario you paint is usually the type of arrangement made in franchise situations, but* ***the requirement to purchase something of value may not be extended to employer-employee situations [and] is, in my opinion, clearly prohibited by California law.***" (Emphasis added, fn. omitted.)

The essence of Estrada's argument is that, by implication, the 1997 Opinion Letter is a clarification of the Bulletin 84-7, and it is the 1997 Opinion Letter, not the Bulletin, that is factually similar to FedEx's position vis-à-vis its drivers. The problem with this argument is that it fails to consider the DLSE's other relevant Opinion Letters.

**(c)**

According to the 2002 Update of the DLSE Enforcement Policies and Interpretations Manual (§ 29.2.3.2, p. 29-2 (Revised), http://www.dir.ca.gov/dlse/Manual-Instructions.htm [as of Aug. 6, 2007]), Bulletin 84-7 is still valid and has *not* been superseded by the 1997 opinion letter.[25] More particularly, IWC Order No.

---

[24] Section 2804 provides: "Any contract or agreement express or implied, made by any employee to waive the benefits of [the article including section 2802] or any part thereof is null and void."

[25] According to section 29.2.3.2 of the Manual, orders issued by the Industrial Welfare Commission (IWC) "allow an employer to require that employees furnish 'hand tools and equipment' if the hand tools and equipment are 'customarily required by the trade or craft.'

9-2001, effective July 1, 2004, provides that *in the transportation industry*, "[w]hen tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, *except that an employee whose wages are at least two . . . times the minimum wage . . . may be required to provide and maintain hand tools and equipment customarily required by the trade or craft.*" (*Id.*, [¶] 9, p. 7.)[26] This 2004 statement by the IWC is entirely consistent with the DLSE's Bulletin 84-7, which provides that, because "neither an automobile nor a truck is considered a tool within the meaning of [section 2802], . . . *an applicant for employment may be required, as a condition of employment, to furnish his[] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid.*" (Italics added.)

Other DLSE Opinion Letters presume it is proper for an employer to require an employee to provide his own car or truck for use on the job. Thus, a February 25, 1991 Opinion Letter (No. 1991.02.25-1) opines that when an employee uses his own automobile for his work, the employer must pay for the employee's insurance premiums. An August 30, 1991 Opinion Letter (No. 1991.08.30) responds to an inquiry about employees in the trucking business who own their

---

The DLSE has concluded that in the phrase 'hand tools and equipment,' the word 'hand' is an adjective which modifies both the word 'tools' and the word 'equipment.' As the Labor Commissioner opined in 1984, an automobile is not the type of equipment contemplated in the IWC Orders." (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581 [the IWC is the state agency empowered to formulate regulations governing employment in California, and the DLSE is the state agency empowered to enforce California's labor laws, including the IWC's orders].)

[26] The same order (at [¶] 2(P), p. 3) defines "transportation industry" to mean "any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles."

own trucks and states that the DLSE's "enforcement policy requires that the employer agree to reimburse the employee for all the costs incurred by the employee in the operation of the equipment." An August 14, 1994 Opinion Letter (No. 1994.08.14) states that the reimbursement rates for an employee's use of his own truck differs from the rate applicable to automobiles. An Opinion Letter dated November 5, 1998 (No. 1998.11.05) responds to a question about employees who regularly drive their personal vehicles for business purposes and discusses the employer's obligation to pay insurance premiums for coverage above the legal minimum.

Implicit in all of these Opinion Letters is the assumption that it is perfectly lawful for an employer to require its employees to provide their own vehicles as a condition of employment, provided only that the employees must be reimbursed for the expenses thereby incurred. (And see *Lane v. Industrial Accident Commission* (1958) 164 Cal.App.2d 523.)

The only commentary we have found (none being cited by either party) supports our conclusion that an employer may require its employees to provide their own trucks: "An applicant or employee may be required, as a condition of employment, to furnish his . . . own vehicle to be used in the course of employment. [Section] 2802 requires an employer to indemnify its employees for all necessary expenses or losses incurred in the course of his . . . duties." (Advising California Employers and Employees (Cont.Ed.Bar (2005) § 5.89, p. 454.) In sum, aside from two tangential and conclusory sentences in one DLSE Opinion Letter, we have not found any authority for Estrada's proposition that an employer cannot require an employee to provide his own truck as a condition of employment. To the contrary, the DLSE's other Opinion Letters, Bulletin 84-7,

and the IWC Order all assume that an employer can in fact do just that. Accordingly, we conclude that FedEx need not reimburse the drivers for the cost of their trucks.

**4.**

The certification order and the September 8, 2004 order listed "workers compensation" insurance as a recoverable expense, notwithstanding that virtually all of the drivers carried "work accident" insurance (a form of insurance for self-employed workers). Although this technical error was discovered during discovery (in 2002), the drivers' lawyers failed to clarify the point at that time and the trial court later refused to allow reimbursement for work accident insurance.[27] We agree with Estrada's challenge to this ruling.

Although the drivers' lawyers should have sought clarification instead of assuming that everyone understood that the drivers would be reimbursed for their work accident insurance premiums, the failure to do so does not justify a windfall to FedEx -- particularly since it caused the confusion by treating the drivers as independent contractors and was at all times fully aware of the ambiguity in the court's orders (the Operating Agreement itself obligates the drivers "to obtain and keep in force at all times . . . work accident and/or workers compensation insurance . . ."). (*Rainer v. Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 254; *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31;

---

[27] In response to an interrogatory asking for the amount deducted for "workers compensation" insurance, FedEx responded that there were no deductions for this item because it viewed "each driver to be a self-employed person." In response to an order to provide a further response, FedEx explained that the "parties resolved the ambiguity in the use of the term 'worker's compensation insurance payments' as [that term] is used in the [i]nterrogatory to be a reference to work accident insurance premiums."

*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761; *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564-565; *South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.* (1999) 72 Cal.App.4th 1111, 1124.) The drivers are entitled to reimbursement for their work accident insurance premiums.

**B.**

Estrada contends the trial court erred in "using the class questionnaires as a litmus test to determine which of the 700 absent class members wished to participate rather than . . . determin[ing] which fit the class definition" (thus making it a prohibited "opt-in" class action) and then "dismissing all absent class members who did not fully participate in discovery." We disagree.

After the class certification order and after our decision in *Estrada I*, *Hypertouch, Inc. v. Superior Court* (2005) 128 Cal.App.4th 1527, 1543-1550, held that "an 'opt-in' procedure is not authorized by and conflicts with California class action rules." But *Hypertouch* does not support Estrada's challenge to his certification order because, as *Hypertouch* notes, "the existence of an ascertainable class is a precondition of class certification." (*Id.* at p. 1549.) In our case, discovery was necessary to determine whether in fact there was an ascertainable class and, if so, whether it was manageable. (*Estrada I, supra,* 125 Cal.App.4th at p. 983.) More to the point, Estrada's current argument ignores the fact that class certification was granted on the accepted condition that discovery would define the class. When prospective class members failed to respond (or responded inadequately) to the court-approved discovery requests, the court could not determine whether they fit the class definition or had compensable damages. Under these circumstances, there was no error.

**DISPOSITION**

The judgment is reversed (1) insofar as it awards $12,373,875 to plaintiffs for their attorneys' fees and costs and (2) insofar as it disallowed the expenses discussed in Parts V.A.2 and V.A.4 of this opinion; in all other respects, the judgment is affirmed and the cause is remanded to the trial court with directions to conduct such further proceedings as are necessary to determine the amounts to which the drivers are entitled for out-of-pocket expenses (Part V.A.2) and the amounts due for their work accident insurance premiums (Part V.A.4), and to thereafter determine the reasonable amount of fees and costs to be awarded (Part IV). Estrada is entitled to his costs of appeal.

**CERTIFIED FOR PUBLICATION.**

VOGEL, J.

We concur:

MALLANO, Acting P.J.

JACKSON, J.*

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **August 16, 2007,** I served the following document(s):

**Plaintiffs' Request for Judicial Notice of the Court of Appeal's Published Decision in *Estrada v. FedEx Ground,* Case No. B189031**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |

| | |
|---|---|
| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |

case 3:05-md-00527-RLM CAN document 826 filed 08/16/07 page 42 of 43

| | |
|---|---|
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

///

///

///

I also mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

_X___ **BY REGULAR MAIL**: I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on August 16, 2007.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On August 1, 2007, Defendant Fedex Ground Package System, Inc. (Fedex) filed an unopposed motion to amend the case schedule. For the following reasons, Fedex's motion is **GRANTED IN PART** [Doc. No. 821].

In the Court's orders of November 15, 2005, and November 29, 2005, aggressive and demanding deadlines were set for class certification, experts, and summary judgment. Fedex claims that this Court initially envisioned that class certification briefing would conclude in its entirety before the parties began briefing summary judgment. In fact, Fedex claims this Court allowed for a nine month gap between the completion of class certification briefing and the beginning of summary judgment briefing. This Court's November 29, 2005, order does not reflect this scheme at all. Originally, this Court ordered that the final wave of class certification was to begin by September 22, 2006. Meanwhile, summary judgment briefing was to begin by September 1, 2006. Class certification briefing and summary judgment briefing were to occur concurrently. See Doc. No. 58 at 2, 5.

It was not until this Court's May 26, 2006, order that a nine month gap between class certification briefing and summary judgment briefing appeared. Class certification was reset and

to begin on January 22, 2007, disclosure of experts was reset to take place by February 5, 2007, and summary judgment deadlines were reset to begin on September 21, 2007. At that time, this Court created a gap between the briefing schedules based upon the circumstances represented to this Court. This Court did not indicate a change in philosophy toward the scheduling of this case. This Court even declined to accept the parties' suggestion that discovery be split again between class certification and summary judgment due to the delay that would result. See Doc. No. 261 at 4.

On December 21, 2006, and January 23, 2007, this Court extended the class certification deadlines a second and third time. The deadline for summary judgment remained September 21, 2007. In essence the window between class certification briefing and summary judgment briefing narrowed, but again, it was a window that this Court had never initially even contemplated according to its November 29, 2005, scheduling order.

On June 29, 2007, the parties filed a joint motion to modify the deadlines again, which this Court granted in part. This Court extended the summary judgment deadline by over two months. The parties also indicated that there was a need to schedule a fourth wave for class certification. This Court agreed that a fourth wave would be needed. It set deadlines for the class certification briefing of the fourth wave, but it did not set any other deadlines with regards to the fourth wave.

Fedex argues that a later summary judgment deadline needs to be established with regards to that fourth wave. Fedex also argues that the expert deadline is unworkable with the fourth wave. This Court agrees that the current scheduling paradigm for the fourth wave of class certification is unworkable. Thus, with regards to the fourth wave only, Fedex's motion is

**GRANTED IN PART**.  The scheduling order with regards to the fourth wave is modified as follows:

- Movants shall serve any expert reports or affidavits upon which they will rely for summary judgment by **November 30, 2007**.
- Opponents shall have until **January 18, 2008**, to depose such experts.
- Opponents shall have until **January 31, 2008,** to serve any expert reports or affidavits they wish to rely upon.
- Depositions of opponents' experts must take place by **February 15, 2008.**
- Movants for summary judgment shall have until **March 14, 2008,** to file their motions for summary judgment.
- Responses to summary judgment shall be filed by **April 30, 2008**.
- Replies in support of motion for summary judgment shall be filed by **May 30, 2008**.

With respect to other deadlines, this Court has not determined that good cause exists to modify any of them.  While Fedex argues that this Court has deviated from its original plan, the Court does not believe it has.  This Court's original plan of November 15, 2005, and November 29, 2005, set aggressive deadlines so that this Court could expedite this litigation as quickly and as reasonably as possible.  The original order has been modified five times and the deadlines have been extended five times reflecting that this Court has been willing to adjust deadlines when the parties have demonstrated good cause.  Since May 26, 2006, there has never been less than six months between the deadlines for filing class certification and filing motions for summary judgment, yet, the parties, principally Fedex, argue for more time.  Therefore, to insure that the Court is fully appraised why the existing schedule is unworkable, this matter is now set for an in-court hearing to take place on **October 9, 2008, at 10:00 a.m. (E.D.T.)** in Room 201, Robert A. Grant Courthouse, 204 S. Main Street, South Bend, Indiana.  Counsel for both parties must appear in person and be prepared to discuss specifically how the resolution of class certification affects summary judgment briefing.

**SO ORDERED.**

Dated this 20th Day of August, 2007.


S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**AMENDED ORDER**

On August 1, 2007, Defendant Fedex Ground Package System, Inc. (Fedex) filed an unopposed motion to amend the case schedule. For the following reasons, Fedex's motion is **GRANTED IN PART** [Doc. No. 725]. OK

In the Court's orders of November 15, 2005, and November 29, 2005, aggressive and demanding deadlines were set for class certification, experts, and summary judgment. Fedex claims that this Court initially envisioned that class certification briefing would conclude in its entirety before the parties began briefing summary judgment. In fact, Fedex claims this Court allowed for a nine month gap between the completion of class certification briefing and the beginning of summary judgment briefing. This Court's November 29, 2005, order does not reflect this scheme at all. Originally, this Court ordered that the final wave of class certification was to begin by September 22, 2006. Meanwhile, summary judgment briefing was to begin by September 1, 2006. Class certification briefing and summary judgment briefing were to occur concurrently. See Doc. No. 58 at 2, 5.

It was not until this Court's May 26, 2006, order that a nine month gap between class certification briefing and summary judgment briefing appeared. Class certification was reset and

to begin on January 22, 2007, disclosure of experts was reset to take place by February 5, 2007, and summary judgment deadlines were reset to begin on September 21, 2007. At that time, this Court created a gap between the briefing schedules based upon the circumstances represented to this Court. This Court did not indicate a change in philosophy toward the scheduling of this case. This Court even declined to accept the parties' suggestion that discovery be split again between class certification and summary judgment due to the delay that would result. See Doc. No. 261 at 4.

On December 21, 2006, and January 23, 2007, this Court extended the class certification deadlines a second and third time. The deadline for summary judgment remained September 21, 2007. In essence the window between class certification briefing and summary judgment briefing narrowed, but again, it was a window that this Court had never initially even contemplated according to its November 29, 2005, scheduling order.

On June 29, 2007, the parties filed a joint motion to modify the deadlines again, which this Court granted in part. This Court extended the summary judgment deadline by over two months. The parties also indicated that there was a need to schedule a fourth wave for class certification. This Court agreed that a fourth wave would be needed. It set deadlines for the class certification briefing of the fourth wave, but it did not set any other deadlines with regards to the fourth wave.

Fedex argues that a later summary judgment deadline needs to be established with regards to that fourth wave. Fedex also argues that the expert deadline is unworkable with the fourth wave. This Court agrees that the current scheduling paradigm for the fourth wave of class certification is unworkable. Thus, with regards to the fourth wave only, Fedex's motion is

**GRANTED IN PART**. The scheduling order with regards to the fourth wave is modified as follows:

- Movants shall serve any expert reports or affidavits upon which they will rely for summary judgment by **November 30, 2007**.
- Opponents shall have until **January 18, 2008**, to depose such experts.
- Opponents shall have until **January 31, 2008,** to serve any expert reports or affidavits they wish to rely upon.
- Depositions of opponents' experts must take place by **February 15, 2008.**
- Movants for summary judgment shall have until **March 14, 2008,** to file their motions for summary judgment.
- Responses to summary judgment shall be filed by **April 30, 2008**.
- Replies in support of motion for summary judgment shall be filed by **May 30, 2008**.

With respect to other deadlines, this Court has not determined that good cause exists to modify any of them. While Fedex argues that this Court has deviated from its original plan, the Court does not believe it has. This Court's original plan of November 15, 2005, and November 29, 2005, set aggressive deadlines so that this Court could expedite this litigation as quickly and as reasonably as possible. The original order has been modified five times and the deadlines have been extended five times reflecting that this Court has been willing to adjust deadlines when the parties have demonstrated good cause. Since May 26, 2006, there has never been less than six months between the deadlines for filing class certification and filing motions for summary judgment, yet, the parties, principally Fedex, argue for more time. Therefore, to insure that the Court is fully appraised why the existing schedule is unworkable, this matter is now set for an in-court hearing to take place on **October 9, 2007, at 10:00 a.m. (E.D.T.)** in Room 201, Robert A. Grant Courthouse, 204 S. Main Street, South Bend, Indiana. Counsel for both parties must appear in person and be prepared to discuss specifically how the resolution of class certification affects summary judgment briefing.

**SO ORDERED.**

Dated this 22th Day of August, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO ALL ACTIONS

Case No. 93:05-MD-527 RM
(MDL 1700)

CHIEF JUDGE MILLER
MAGISTRATE NUECHTERLEIN

**PLAINTIFFS' REQUEST FOR CLARIFICATION OF THE COURT'S ORDER OF AUGUST 23, 2007 REGARDING MERITS' EXPERTS DISCOVERY**

Under the Court's recent scheduling order of August 23, 2007, the case schedule was amended "with regard to the fourth wave," setting new deadlines for merits expert discovery for purposes of summary judgment/adjudication motions on employment status and scheduling a court hearing for October 9 to discuss the motion schedule. In its November 29, 2005 Supplemental Scheduling Order, the Court previously said:

> "Summary judgment generally shall be divided into two phases: summary judgment or adjudication on issues relating to independent contractor/employment status and summary judgment or adjudication as to other issues. No other summary judgment motions may be filed without leave of Court."

The Order then set one uniform schedule for discovery of merits experts on employment status motions and for the filing of motions regarding employment status and left for later meet and

confer and later scheduling, all other summary judgment/adjudication motions on issues other than employment status. (Doc. No. 19, pp. 5-6) To date, summary judgment/adjudication motions on other issues have not yet been scheduled.

Discovery for wave four is now in progress and the parties currently anticipate being able to complete the necessary work and meeting the Court's deadlines for the filing of class certification motions regarding the new cases.[1]

With the addition of the new cases now referred to as "the fourth wave," at FedEx's request, the Court appears to have created a dual schedule which seems to contemplate two rounds of merits experts in support of employment status summary adjudication for waves one, two and three and an alternate schedule for merits experts to be used for an alternate summary adjudication motions for wave four. Thus, service of expert reports in support of summary adjudication on employment status for "the fourth wave" is required by November 30, 2007, with depositions of those experts by January 18, 2008 and service of opponents' expert reports by January 18, 2008, with depositions of those experts by February 15, 2008. By not vacating the existing merits expert schedule and by setting a hearing on the feasibility of filing summary adjudication motions by November 30 in accordance with the court's earlier motion, the Court's current scheduling orders appear to contemplate two separate rounds of merits expert discovery in support of employment status summary judgment/adjudication motions – expert reports and depositions regarding waves one, two and three and a separate round of merits expert reports for

---

[1]Fourth wave discovery includes approximately 40 depositions, document production and written discovery. The parties are fully engaged in completing all necessary work to meet the Court's current deadlines for the filing of the class certification motions. Plaintiffs do not anticipate that their experts' reports will be substantially affected by the discovery in progress, but to the degree it is necessary to factor in new information, this can still be accomplished in advance of the depositions of the experts if the court wishes the parties to proceed using the existing schedule set for the first three waves.

case 3:05-md-00527-RLM-CAN document 838 filed 08/24/07 page 3 of 3

the fourth wave cases.

As previously discussed in the parties' joint motion to amend the schedule (Dkt No. 726), all merits experts were identified by the parties on January 8, 2006. Plaintiffs have proceeded on the assumption that only one round of merits experts' reports and depositions would be conducted with regard to all of the consolidated cases. With the partial granting of the FedEx motion, and the establishment of seemingly dual schedules, Plaintiffs cannot now determine whether the parties should proceed with two rounds of merits experts on employment status leading potentially to more than one round of summary adjudication motions on employment status, an unanticipated result which would be duplicative and burdensome.

If Plaintiffs proceed per the old schedule, then the new dates contained in the August 23 Order will either have no meaning or require two rounds of expert discovery and motions. Plaintiffs are reluctant to assume either such result was intended. Yet, if Plaintiffs proceed with one set of expert reports using the new schedule, they risk potentially be seen as inadvertently ignoring the court's earlier schedule. Plaintiffs' are prepared to move forward with merits expert discovery now, anticipating that the November 30 deadline for the filing of summary adjudication motions remains in full force and effect. To avoid confusion or unnecessarily risks, Plaintiffs request that the court clarify its order to permit movants to engage in one unified round of merits expert discovery on any schedule of the court's choosing.

Dated: August 24, 2007

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris

1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

case 3:05-md-00527-RLM-CAN document 838 filed 08/24/07 page 4 of 8

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **August 24, 2007**, I served the following document(s):

**Plaintiffs' Request for Clarification of the Court's Order of August 23, 2007 Regarding Merits' Experts Discovery**

***Estrada v. FedEx Ground,* Case No. B189031**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| ***Attorneys for Defendant*** | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| ***Attorneys for Plaintiffs*** | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |

| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
|---|---|
| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |

| | |
|---|---|
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

///

///

///

Case 3:05-md-00527-RLM-CAN document 838 filed 08/24/07 page 8 of 8

I also mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

X **BY REGULAR MAIL:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on August 24, 2007.

/s/Carol Edgerton
Carol Edgerton

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | |
| | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On August 22, 2007, this Court granted in part Fedex's unopposed motion to amend the scheduling order. Fedex had proposed that deadlines for expert discovery on the merits be vacated. Fedex also represented that Plaintiffs had **no objection** to this request. Based on this representation, this Court only found good cause to extend, rather than vacate, the deadlines in part with regards to the recently added fourth wave of class certification. On August 24, 2007, Plaintiffs filed a document titled "Plaintiffs' Request for Clarification of the Court's Order." Now, it appears that Plaintiffs do object to Fedex's proposal to modify expert discovery.

Either Fedex misrepresented the extent of Plaintiffs' opposition to the original motion or the parties are simply not communicating. Either way, Plaintiffs' filing is evidence of the need for an in-court hearing. Plaintiffs' motion for clarification or modification is **DENIED** [Doc. No. 838]. If Plaintiffs have concerns, objections, or requests to modify the current scheduling plan, they may raise those concerns at the October 9, 2007, hearing. All deadlines that were previously established by this Court remain in effect for the first three waves of class certification.

**SO ORDERED.**

Dated this 29th Day of August, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on October 1, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**PLAINTIFFS' SEVENTH APPENDIX**
**VOLUMES 95-96 AS PA28887-PA29254**

Dated: October 1, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM -CAN document 871 filed 10/01/07 page 1 of 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Jon Leighter, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00328-RLM-CAN (OR) | |

***LEIGHTER* OREGON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs Jon Leighter and David Spicer move this Court for an Order pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3):

a. Allowing this action to proceed as a class action as to Plaintiffs' first, second, third, and fourth causes of action for damages, unjust enrichment, and declaratory and injunctive relief, arising under the statutory and common law of Oregon, on behalf of the following Plaintiff class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since July 20, 1999, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Oregon.

b.      Allowing this action to proceed as a class action on behalf of the following Plaintiff subclass under the fifth claim for relief for drivers who have been denied overtime premium pay for which they have been eligible since August 10, 2005:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) who, at any time after August 10, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds.

c.      Allowing this action to proceed as a class action on behalf of the following Plaintiff subclass under the sixth claim for relief for drivers with claims for statutory penalty wages under ORS 652.150 because they were not paid all wages due when their employment with FXG was terminated:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) whose Operating Agreement was terminated any date after July 20, 1999.

d.      Appointing Plaintiffs Jon Leighter and David Spicer as Class Representatives;

e.      Appointing Lockridge Grindal Nauen P.L.L.P., Leonard Carder, LLP, and Harwood Feffer LLP, who have been previously designated as Co-Lead Counsel, to serve as Class Counsel pursuant to Fed. R. Civ. P. 23(g) and directing that Class Counsel continue to conduct this litigation pursuant to the structure set forth in Sections II(A)-(C) of the Initial

Scheduling Order and seek the assistance of and consult with Plaintiffs' Steering Committee and the other attorneys of record for Plaintiffs in these proceedings, actions essential to the fair and adequate representation of the classes;

       f.    Requiring Defendant FedEx Ground Package System, Inc., to supply Class Counsel a list of all individuals who are members of the class and subclasses defined in paragraphs (a), (b) and (c) of this motion; and

       g.    Granting such further and other relief as this Court deems just and proper.

In support of this motion, Plaintiffs refer the Court to the Oregon Plaintiffs' Memorandum of Law in Support of Class Certification, the Omnibus Fact Memorandum, Omnibus Reply Memorandum, all Declarations of Susan E. Ellingstad, the Plaintiffs' Appendix, and all prior pleadings, Orders, and proceedings herein.

WHEREFORE, Plaintiffs respectfully request that the Court grant their motion and enter an Order certifying Plaintiffs' first, second, third, fourth, fifth, and sixth causes of action to proceed as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), appointing Plaintiffs as Class Representatives of the Class, and, pursuant to Fed. R. Civ. P. 23(g), appointing the undersigned Co-Lead Counsel as Class Counsel.

Dated: October 1, 2007             Respectfully Submitted,

                              LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                           **s/ Susan E. Ellingstad**
                           Susan E. Ellingstad
                           100 Washington Avenue South, Suite 2200
                           Minneapolis, MN  55401
                           Tel:   (612) 339-6900
                           Fax:   (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Steve D. Larson
David Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 Southwest Oak Street
5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

**OREGON PLAINTIFFS' COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Jon Leighter, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00328-RLM-CAN (OR) | |

**_LEIGHTER_ OREGON PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. THE PROPOSED CLASSES .......... 2

III. RECENT FACTUAL DEVELOPMENTS .......... 4

IV. ARGUMENT .......... 6

A. The Requirements Of Fed. R. Civ. P. 23(a) .......... 7

1. The class members are so numerous that joinder is impractical. .......... 7

2. Questions of law and fact are common to the class. .......... 8

3. Plaintiffs' claims are typical of those of absent class members. .......... 11

4. Plaintiffs are adequate representatives. .......... 12

B. The Damage Claims Satisfy The Requirements Of Rule 23(b)(3) .......... 14

1. Common issues of law and fact predominate. .......... 14

2. Class adjudication is superior to other available methods. .......... 17

C. Plaintiffs' Request For Declaratory And Injunctive Relief Merit Certification Of A 23(b)(2) Class. .......... 19

IV. CONCLUSION .......... 20

## TABLE OF AUTHORITIES

Adames v. Mitsubishi Bank, Ltd.,
133 F.R.D. 82 (E.D.N.Y. 1989)........................................ 18

Allapath Serv., Inc. v. Exxon Corp.,
333 F.3d 1248 (11th Cir.2003)........................................ 15

Allen v. Int'l Truck & Engine Corp.,
358 F.3d 469 (7th Cir. 2004)........................................ 19

Alliance to End Repression v. Rochford,
565 F.2d 975 (7th Cir. 1977)........................................ 3

American Pipe & Constr. Co. v. Utah,
414 U.S. 538 (1974)........................................ 2

Ansoumana v. Gristede's Operating Corp.,
201 F.R.D. 81 (S.D.N.Y. 2001)........................................ 7

Baby Neal v. Casey,
43 F.3d 48 (3d Cir. 1994)........................................ 20

Breedlove v. Tele-trip, Co. Inc.,
No. 91-C-5702, 1993 WL 284327 (N.D. Ill. July 27, 1993)....................passim

Carnegie v. Household Int'l Inc.,
376 F.3d 656 (7th Cir. 2004)........................................ 7

Chandler v. S.W. Jeep-Eagle, Inc.,
162 F.R.D. 302 (N.D. Ill. 1995)........................................ 15

Deposit Guaranty Nat'l Bank v. Roper,
445 U.S. 326 (1980)........................................ 18

Estrada v. FedEx Ground Package Sys., Inc.,
64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007)....................passim

ExxonMobil Corp. v. Allapath Serv., Inc.,
545 U.S. 516 (2005)........................................ 15

Fabricant v. Sears Roebuck,
202 F.R.D. 310 (S.D. Fla. 2001)........................................ 10

Flanagan v. Allstate Ins. Co.,
228 F.R.D. 617 (N.D. Ill. 2005)........................................ 15

case 3:05-md-00527-RLM -CAN document 871-2 filed 10/01/07 page 4 of 28

Godshall v. Franklin Mint Co., No. 01-CV-6539, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004) ....... 7

HDG Enters. v. Nat'l Council on Comp. Ins., 856 P.2d 1037 (Or. Ct. App. 1993)....... 11, 16-17

Hubler Chevrolet, Inc. v. Gen. Motors Corp., 193 F.R.D. 574 (S.D. Ind. 2000) .......12, 14

Jaqua v. Nike, Inc., 865 P.2d 442 (Or. Ct. App. 1993)....... 2

Jones v. Diamond, 519 F.2d 1090 (5th Cir. 1975) ....... 19

Keele v. Wexler, 149 F.3d 589 (7th Cir. 1998) ....... 8

Ladegard v. Hard Rock Concrete Cutters, Inc., 2000 WL 1774091 (N.D. Ill. 2000) ....... 18

Lee v. ABC Carpet & Home, 236 F.R.D. 193 (S.D.N.Y. 2006)....... 6-7

Local Joint Exec. Bd of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152 (9th Cir. 2001) .......15, 18

Lockyard v. Murphy Co., 619 P.2d 283 (Or. Ct. App. 1980) rev. denied, 219 Or. 519 (1981)....... 11

Lucas v. GC Serv. L.P., 226 F.R.D. 337 (N.D. Ind. 2005).......passim

Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910 (7th Cir. 2003) ....... 14

Mount Joseph Cattle Co. v. Makin Farms, Inc., 42 P.3d 331 (Or. Ct. App. 2002)....... 10

Mullen v. Treasure Chest Casino, 186 F.3d 620 (5th Cir. 1999) ....... 18

Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992)....... 7

O'Brien v. Encotech Const. Servs., Inc.,
203 F.R.D. 346 (N.D. Ill. 2001) ........ 18

Oregon & Western Colonization Co. v. Johnson,
102 P.2d 928 (Or. 1940)........ 10

Perri v. Certified Languages Int'l, LLC,
66 P.3d 531 (Or. Ct. App. 2003)........ 9, 10

In re Potash Antitrust Litig.,
159 F.R.D. 682 (D. Minn. 1995) ........ 14

In re Prudential Ins. Co. of Am. Sales Practices Litig.,
148 F.3d 283 (3d Cir. 1998) ........ 12

Ramirez v. NutraSweet Co.,
No. 95-C-130, 1996 WL 529413 (N.D. Ill. Sept. 11, 1996) ........ 15

Retired Chi. Police Ass'n v. City of Chicago,
7 F.3d 584 (7th Cir. 1989)........ 12

Rosario v. Livaditis,
963 F.2d 1013 (7th Cir. 1992) ........ 8, 11-12

Schaff v. Ray's Land & Seafood Co.,
45 P.3d 936 (Or. 2002)........ 10-11

Scott v. Aetna Services, Inc.,
210 F.R.D. 261 (D. Conn. 2002) ........ 18

Sec'y of Labor v. Fitzsimmons,
805 F.2d 682, 697 (7th Cir. 1986) ........ 12

Slahina v. West Penn Parking Corp.,
106 F.R.D. 419 (W.D. Pa. 1984) ........ 18

Smellie v. Mount Sinai Hosp.,
No. 03-Civ-0805, 2004 WL 2725124 (S.D.N.Y. Nov. 29, 2004) ........ 7

Thomas v. Smithkline Beecham Corp.,
201 F.R.D. 386 (E.D. Pa. 2001) ........ 6

Veal v. Crown Auto Dealerships,
236 F.R.D. 572 (M.D. Fla. 2006) ........ 10

In re Vitamins Antitrust Litig., 209 F.R.D. 251 (D.D.C. 2002) ........ 14

Wagner v. NutraSweet Co., 170 F.R.D. 448 (N.D. Ill. 1997) ........ 8

Wallowalla Valley Stages, Inc. v. Oregonian Publ'g Co., 386 P.2d 430 (Or. 1963)........ 10

**STATUTES**

61 F.R. 29031 (June 7, 1996)........ 13

49 C.F.R. § 565.6(b)........ 13

Or. Admin. R. ("OAR") § 839-020-0030 ........ 9

Or. Rev. Stat. ("ORS") § 12.010 ........ 19

Or. Rev. Stat. ("ORS") § 28.010 ........ 19

Or. Rev. Stat. ("ORS") § 316.167 ........ 9

Or. Rev. Stat. ("ORS") § 652.140 ........ 9

Or. Rev. Stat. ("ORS") § 652.150 ........ 3, 9

Or. Rev. Stat. ("ORS") § 652.310 ........ 9

Or. Rev. Stat. ("ORS") § 652.610 ........ 2, 9

Or. Rev. Stat. ("ORS") § 652.615 ........ 2, 9

Or. Rev. Stat. ("ORS") § 653.055 ........ 9

Or. Rev. Stat. ("ORS") § 653.261 ........ 9

Or. Rev. Stat. ("ORS") § 656.001 ........ 9

Or. Rev. Stat. ("ORS") § 656.005 ........ 9

Or. Rev. Stat. ("ORS") § 657.005 ........ 9

Or. Rev. Stat. ("ORS") § 657.040 ........ 9

Or. Rev. Stat. ("ORS") § 670.600 ........ 10

119 Stat. 1144 (Aug. 10, 2005) ........................................................................................ 1

**MISCELLANEOUS**

Manual for Complex Litigation § 21.221 (4th ed. 2006) ............................................................ 3

## I.    INTRODUCTION

This case concerns validity of FedEx Ground Package System, Inc.'s ("FXG") practice of labeling its Ground and Home Delivery division drivers "independent contractors." True independent contractor status would reserve to drivers the right to control their own businesses. Plaintiffs allege that there is nothing "independent" about the actual job relationship FXG imposes on its drivers and that, because FXG's reserves and exercises pervasive control over the P&D drivers in Oregon, they are, in fact, employees of FXG. FXG's standardized policies and procedures, and the Pickup and Delivery Contractor Operating Agreement ("OA"), which every driver must sign, categorically subjects all drivers to this employment misclassification. Because the proper classification of all FXG drivers in Oregon can be determined by reference to common proof, Oregon drivers should be able to pursue their case on a class-wide basis.

This case includes claims that overlap with the claims asserted in Case No. 3:05-cv-00596-RLM-CAN (OR), (one of the previous actions consolidated in these MDL proceedings), by plaintiffs Edward Slayman, Dennis McHenry, and Jeremy Brinker (the "Slayman" action). Plaintiffs in this action, Jonathan Leighter and David Spicer, seek certification of an identical class to pursue their claims for violations of Oregon's wage statutes, rescission and unjust enrichment, and declaratory relief.[1] In addition, Plaintiffs seek certification of two subclasses of drivers. First, Plaintiffs seek to certify a subclass of drivers who have been eligible for overtime under Oregon law since August 10, 2005 when the Motor Carriers Act exemption for drivers of vehicles under 10,001 pounds was eliminated.[2] Second, Plaintiffs seek certification of a subclass of drivers who have been terminated since July 20, 1999, and are entitled to 30 days of penalty

---

[1] Upon remand of this case to the District of Oregon for trial, plaintiffs will seek consolidation of the two Oregon cases for trial pursuant to Fed. R. Civ. P. 42(a).

[2] See the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005, PL 109-59, 119 Stat 1144 (Aug. 10, 2005), § 4142(a)(12).

wages because FXG improperly withheld amounts from their wages and failed to pay all earned overtime pay within one business day of these drivers' termination of employment with FXG. All of plaintiffs' claims turn on the predominant, overarching, and common question of whether FXG has improperly classified the drivers as independent contractors. This central issue will be decided based on common evidence of FXG's programmatic treatment of its drivers. Accordingly, this case, as well as the Slayman action, should be certified as a class action on behalf of Oregon drivers.

## II. THE PROPOSED CLASSES

Plaintiffs and proposed class representatives Jon Leighter and David Spicer move the Court to certify a damages and unjust enrichment class under Fed. R. Civ. P. 23(b)(3) for their First Claim, Illegal Deductions for Wages in Violation of Or. Rev. Stat. ("ORS") § 652.610, and their Second Claim, Rescission of Operating Agreement. Plaintiffs also seek to certify an equitable claim under Fed. R. Civ. P. 23(b)(2) for their Third Claim, Declaratory Relief, and Fourth Claim, Injunctive Relief. These claims are legally and factually common and typical among the following similarly situated class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since July 20, 1999,[3] to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Oregon.

[3] Plaintiffs propose a class period that begins six years prior to the commencement of the Slayman action based on the statute of limitations applicable to the Oregon claims. See ORS § 12.080(2) (creating a six year limit for liabilities created by certain statutes, including the statutory claim under ORS § 652.615); ORS § 12.080(1) (creating a six year limit for implied contract claims); Jaqua v. Nike, Inc., 865 P.2d 442, 445-46 (Or. Ct. App. 1993) (holding that the six year statute from ORS § 12.080(1) applies to claims for unjust enrichment that "sound in contract"); see also American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974) (holding that commencement of original class tolls claims for all purported members of that class).

Plaintiffs further move to certify two damages subclasses. The first subclass arises under Plaintiffs' Fifth Claim for drivers who have been denied overtime premium pay for which they have been eligible since August 10, 2005. This subclass is defined as:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) who, at any time after August 10, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds.

Plaintiffs' second proposed subclass under their Sixth Claim is for former drivers with claims for statutory penalty wages under ORS § 652.150 because they were not paid all wages due when their employment with FXG was terminated. This subclass is defined as:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) whose Operating Agreement was terminated any date after July 20, 1999.

Plaintiffs' proposed class definitions properly define an identifiable class and subclasses that can be ascertained by reference to objective criteria; in fact, the identity of class members can be readily determined from FXG's business records. See Alliance to End Repression v. Rochford, 565 F.2d 975, 977 (7th Cir. 1977) (noting that a class must be "sufficiently definite to permit ascertainment of the class members"); see also Manual for Complex Litigation § 21.221 (4th ed. 2006) ("An identifiable class exists if its members can be ascertained by reference to objective criteria.").

## III. RECENT FACTUAL DEVELOPMENTS[4]

During the last ten days, FXG held mandatory meetings with its P&D driver workforce across the country at which FXG announced that beginning October 26, 2007, it will not renew – and therefore effectively terminate – the contracts of single work area ("SWA") drivers in California. P&D drivers were informed that FXG intends to conduct its operations in California using only multiple work area ("MWA") drivers starting June 1, 2008. Seventh Declaration of Susan E. Ellingstad ("Seventh Ellingstad Decl.") ¶ 13. In the materials provided to its P&D drivers, FXG claimed that the mass termination of its SWA driver workforce in California was in response to "[o]ngoing litigation in different stages of trial and appeal creates questions about single work area agreements." PA29221.

A few weeks earlier, on August 13, 2007, the California Court of Appeals issued its decision in Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327, 338 (Cal. Ct. App. 2007) ("Estrada III"). The California Court of Appeals affirmed the trial court's finding that FedEx's SWA drivers in California are legally employees entitled to be fully reimbursed for the ordinary business expenses FXG had unlawfully imposed on them.[5] FXG's response is to terminate SWAs in California en masse.

To facilitate its plan to eliminate its SWA driver workforce in California, FXG will essentially fund the purchase of additional routes by paying California SWAs a "growth incentive" of $15,000 for each route acquired beyond the second route. PA29223. Despite its repeated insistence in this litigation that the P&D drivers are FXG's "business partners," who

[4] The factual background relevant to Plaintiffs' class certification motion is set forth more fully in Plaintiffs' Omnibus Fact Memorandum ("OFM") filed with the Court on March 12, 2007 along with the first wave of briefs in support of Plaintiffs' motions for class certification. (Dkt. No. 559). Here, Plaintiffs supplement the OFM with recent factual developments relevant to their motion.

[5] Just a day *after* FXG's dramatic announcement, the California Unemployment Insurance Appeals Board issued its decision affirming the administrative law judge's categorical finding that all of FXG's SWA drivers in California were employees, not independent contractors. PA29118-160.

have a proprietary interest in their routes, FXG – in one fell swoop – essentially put all the SWA routes in California up for sale and then provided the funds to buy them.[6]

Each of the more than 1,000 affected California SWAs received a package from FXG containing an offer of a so-called "transition incentive" payment of 1/3 of their prior year's gross revenues in exchange for a broad release of claims. PA29221-22. These drivers have been given approximately one month, until October 26, 2007, to sign the release. Id. Those who do not sign the release by October 26 will not receive the "transition incentive" but will still lose their job unless they acquire another route – and become an MWA – by their contract anniversary date.

FXG's announcement of the mass termination of SWA drivers in California was coupled with the company-wide rollout of incentives designed to significantly increase FXG's MWA driver workforce across the country. Seventh Ellingstad Decl. ¶ 14. Currently, approximately 75% of FXG's 12,000 P&D drivers are SWAs.[7] PA16493. Apparently, FXG believes that transforming its predominately SWA driver workforce into a predominantly MWA workforce "will help reduce the risk of further legal and regulatory challenges" to FXG's sham independent contractor model. PA29224.

Significantly, however, Plaintiffs in these proceedings have proposed class definitions which *include* MWAs, so long as they drive full time. OFM at 1. P&D drivers, whether they are an MWA or an SWA, all sign the same Operating Agreement, wear the same uniform, drive the

---

[6] Because FXG is not adding any additional routes in California, simple arithmetic dictates that, at most, only 50% of the California SWA drivers will be able to acquire an additional route, a prerequisite to keeping their job with FXG.

[7] Dubbed "Enhanced Primary Plus" the program FXG announced on September 20, 2007 pays P&D drivers thousands of dollars in annual bonuses for each additional route the driver operates, up to a cap of $26,000 per year for operating five or more routes. PA29221. Moreover, to be eligible for Enhanced Primary Plus, drivers must sign a document innocuously titled "Compliance-Disclosure Addendum." PA29241. But the Compliance-Disclosure is not innocuous. It mandates that MWAs classify the drivers who work for them as "employees" and further provides that the MWA indemnify and hold FXG harmless from all claims the MWA and anyone employed by the MWA might have. In other words, FXG is asking putative class members to sign an agreement which holds FXG harmless from all claims, apparently including claims asserted in this MDL proceeding.

same FXG branded trucks, use the same scanner and are subject to the same controls by FXG. Omnibus Reply Memorandum ("ORM") at 19.

These developments are relevant to class certification because, by announcing its unilateral decision to terminate across the board all SWA drivers in California without regard to their individual circumstances, FXG has demonstrated its right to terminate at will an *entire class* of P&D drivers. Thus, FXG has essentially conceded its right to control and to terminate at will (two key factors indicating an employment relationship). More importantly for purposes of class certification, despite arguing to this Court that P&D drivers' circumstances are so unique and varied that class treatment is not appropriate, FXG has itself treated all SWA drivers in California as a class for purpose of terminating them.

## IV. ARGUMENT

The case should be certified to proceed as a class action because all of the elements of Rule 23 are satisfied. In affirming the certification of a class of FXG drivers in California, the California Court of Appeals held: "it is clear that common issues - whether the drivers were employees and, if so, which expenses would be reimbursable - predominated." Estrada III, 64 Cal. Rptr. 3d at 338. This Court has already recognized "the over-arching issue in this litigation is the classification of certain package delivery drivers as independent contractors rather than employees." In re FedEx Ground Package Sys., Inc., No. 3:05-MD-527 RM (MDL 1700), slip op. at 4 (N.D. Ind. Dec. 14, 2006).

Class certification is proper where, as here, the central issue is employment classification and proposed class members with similar jobs are treated categorically. See, e.g., Breedlove v. Tele-trip, Co. Inc., No. 91-C-5702, 1993 WL 284327 (N.D. Ill. July 27, 1993); Thomas v. Smithkline Beecham Corp., 201 F.R.D. 386, 393-94 (E.D. Pa. 2001) (finding class certification appropriate where workers had similar job descriptions); Lee v. ABC Carpet & Home, 236

F.R.D. 193, 203-04 (S.D.N.Y. 2006) (finding certification of a state law wage act claim proper where defendants "employed centrally administered policies and practices to treat the potential plaintiffs as independent contractors, not employees"); Godshall v. Franklin Mint Co., No. 01-CV-6539, 2004 WL 2745890, at **2-3 (E.D. Pa. Dec. 1, 2004) (certifying settlement class of "freelancers" who alleged they had been treated uniformly and as employees); Smellie v. Mount Sinai Hosp., No. 03-Civ-0805, 2004 WL 2725124, at *4 (S.D.N.Y. Nov. 29, 2004) (certifying class of hospital "patient companions" where key issue was whether workers were improperly labeled); Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 86, 96 (S.D.N.Y. 2001) (finding class certification appropriate where central issue was whether working conditions imposed on plaintiffs made them employees rather than independent contractors). As the Supreme Court has established, employee status properly turns on "factual variables within employer's knowledge," permitting "categorical judgments" as to status. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 327 (1992).

### A. The Requirements Of Fed. R. Civ. P. 23(a)

The threshold criteria for class certification are set forth in FRCP 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These factors are commonly referred to as numerosity, commonality, typicality, and adequacy. Each of these prerequisites is satisfied.

#### 1. The class members are so numerous that joinder is impractical.

A class must be "so numerous that joinder is impracticable." Fed. R. Civ. P. 23(a)(1); Carnegie v. Household Int'l Inc., 376 F.3d 656, 663-64 (7th Cir. 2004). Numerosity may be

Case 3:05-md-00527-RLM -CAN document 871-2 filed 10/01/07 page 15 of 28

inferred where a company uses standardized documents in dealing with class members, or where the size of the company and the nature of its business point to numerosity. Lucas v. GC Serv. L.P., 226 F.R.D. 337, 340 (N.D. Ind. 2005).

Numerosity exists in this case. FXG's delivery system operates on a large scale nationally and in Oregon. Plaintiffs' Omnibus Factual Memorandum ("OFM") § II.A. The fact that there are 140 current P&D drivers in Oregon readily establishes numerosity. PA19201-02. Of these current drivers, 42 are home delivery drivers, who drive trucks under 10,001 pounds, and thus would be in Plaintiff's proposed overtime subclass. PA19202. The record establishes that numerous other drivers entered into OAs during the Class Period whose contracts have terminated. See PA29161-217 (annualized turnover rate for drivers in the applicable region varied between 13% and 22%). These terminated drivers are also members of the class, overtime subclass (if they drove trucks under 10,001 pounds), and the penalty wage subclass.

**2. Questions of law and fact are common to the class.**

To satisfy the commonality requirement of Fed. R. Civ. P. 23(a)(2), class members must share common questions of law or fact. The element is met when a defendant has "engaged in standardized conduct towards members of the proposed class," Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998), and where "the class claims arise out of standardized documents." Lucas, 226 F.R.D. at 340; see also Wagner v. NutraSweet Co., 170 F.R.D. 448, 450 (N.D. Ill. 1997) (finding that company guidelines regarding salaries created commonality even where guidelines not mandatory). "Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. Rather, there need only be a single issue common to all members of the class." Breedlove, 1993 WL 284327, at *4. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992).

Case 3:05-md-00527-RLM -CAN document 871-2 filed 10/01/07 page 16 of 28

Each of Plaintiffs' claims turns on the predominant issue of the drivers' employment status, which will be properly determined categorically based on common evidence. For example, the primary issue in determining FXG's liability under Oregon's wage deduction statute (ORS § 652.610), overtime statute, and penalty wage statute is whether Plaintiffs are employees rather than independent contractors. See ORS § 652.610 (stating that the illegal deduction statute applies to "an employee"); ORS § 652.310(2) (holding that the definition of "employee" excludes "independent contractors"); Perri v. Certified Languages Int'l, LLC, 66 P.3d 531, 536 (Or. Ct. App. 2003) (application of Oregon wage statutes depends on status as an "employee"). There can be no serious dispute that that FXG deducted amounts from Plaintiffs' compensation to cover various expenses and did not pay overtime. Thus, if Plaintiffs establish they are employees, they will be entitled to: (1) actual or statutory damages for the improper deductions under ORS § 652.610 and ORS § 652.615; (2) 30 days of penalty wages under ORS § 652.150 for failure to pay all amounts due to employees within one business day of termination pursuant to ORS § 652.140, ORS § 652.150, ORS § 652.610 and ORS § 653.055; and (3) overtime unpaid overtime wages, as provided in ORS § 653.261 and ORS § 653.055, and Or. Admin. R. ("OAR") § 839-020-0030.

Similarly, Plaintiffs' rescission claim will turn on the common issue of whether FXG has misclassified Plaintiffs and members of the proposed class as independent contractors. Plaintiffs allege that the FXG contract misclassifies all drivers as independent contractors as an illegal attempt to shift expenses to the drivers and circumvent Oregon law requiring employers to provide workers' compensation insurance and unemployment insurance, and withhold income tax for all subject employees. See ORS § 656.001 et seq.; ORS § 656.005(31); ORS § 657.005 et seq.; ORS § 657.040; ORS § 316.167. An employer must abide by these statutory obligations

for all workers, unless the workers are (a) "free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results"; and (b) "customarily engaged in an independently established business." ORS § 670.600(2). Under Oregon law, a party to an illegal contract that is not equally at fault or blameworthy may repudiate the bargain and recover the fair value of the party's performance. Mount Joseph Cattle Co. v. Makin Farms, Inc., 42 P.3d 331, 334 (Or. Ct. App. 2002); Oregon & Western Colonization Co. v. Johnson, 102 P.2d 928, 936 (Or. 1940). The determination of whether FXG's boilerplate OA violates Oregon public policy is an appropriate issue for class certification. See Fabricant v. Sears Roebuck, 202 F.R.D. 310 (S.D. Fla. 2001) (analysis of whether contracts are void as against public policy is suitable for class treatment); Veal v. Crown Auto Dealerships, 236 F.R.D. 572 (M.D. Fla. 2006) (finding that commonality exists on claim that contract was void as against public policy).

Oregon courts use the common law "right to control" test in determining whether a worker is an employee or an independent contractor. Perri, 66 P.3d at 536. The factors under that test are (1) the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire. Id. No one factor is dispositive; they are to be viewed in their totality. Id.; see also ORS § 670.600 (setting forth multi-factor test to determine if the worker is covered by unemployment insurance and worker compensation statute, including first factor of whether worker was subject to direction and control). Under Oregon law, any contractual characterization of the relationship is not controlling, and the fact-finder is entitled to look beyond the terms of any contract and at the parties' behavior to determine the true nature of the relationship. Wallowalla Valley Stages, Inc. v. Oregonian Publ'g Co., 386 P.2d 430, 433-34 (Or. 1963); see also Schaff v. Ray's Land & Seafood Co., 45

P.3d 936, 941 (Or. 2002) (noting that the terms of a contract are "not dispositive"). In determining employment status, the critical question is not the actual exercise of control, but whether the alleged employer has the right to control the worker. HDG Enters. v. Nat'l Council on Comp. Ins., 856 P.2d 1037, 1040 (Or. Ct. App. 1993) ("[t]he question is not how much control the employer actually exercises, but how much control it has the right to exercise."); Lockyard v. Murphy Co., 619 P.2d 283, 284 (Or. Ct. App. 1980), rev. denied, 219 Or. 519 (1981); see also OAR § 436-170-0200(1)(c) ("If the person for whom services are provided has the right to control the means and manner of providing the services, it does not matter whether that person actually exercised the right to control.") (emphasis added).

Whether Plaintiffs and the proposed class are "employees" under Oregon law is a question that is common to the class as a whole. See Perri, 66 P.3d at 535. This issue will dominate this lawsuit as it will be the primary issue upon which each of Plaintiffs' and proposed class members' claims turn. This predominant issue will be decided based on common class-wide evidence, including FXG's retention of far-reaching rights to control the manner and means of its drivers' performance of their work by virtue of its standard form OA and uniform written policies and procedures, as well as FXG's pervasive exercise of its rights of control over the drivers' work performance. OFM §§ III.A.-C.; see also Estrada, 64 Cal. Rptr. 3d at 336 ("FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors."). Plaintiffs satisfy the commonality requirement.

**3. Plaintiffs' claims are typical of those of absent class members.**

The Rule 23(a)(3) typicality requirement asks whether representative plaintiffs' claims arise from the same practice or course of conduct that gives rise to the claims of other class members, and whether their claims are based on the same legal theory. Rosario, 963 F.2d at

1018; Hubler Chevrolet, Inc. v. Gen. Motors Corp., 193 F.R.D. 574, 577 (S.D. Ind. 2000). The typicality inquiry proposes "to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 311 (3d Cir. 1998). If the named representative's claims have the same essential characteristics as the claims of the class at large, the typicality requirement can be satisfied even where factual distinctions appear between the representative's claims and those of other class members. Retired Chi. Police Ass'n v. City of Chicago, 7 F.3d 584, 597 (7th Cir. 1989).

Plaintiffs are members of the class they seek to represent. They signed the applicable, standard form OA that all class members signed, establishing FXG's extensive rights of control over the drivers' work performance. PA29007; PA29016-17. Plaintiffs were subjected to the same uniform policies and procedures, centralized training, and monitoring of work performed, just like all the other class members. OFM § III.C.1-3. Plaintiffs and proposed class members were subject to FXG's programmatic rights of control over the methods and means by which they accomplish their pickup and delivery services, including control over their appearances, their vehicles, the delivery methods, and the days and hours of work. Id. at § IV.A-D.

**4. Plaintiffs are adequate representatives.**

Under Rule 23(a)(4) the representative of the class must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). To fulfill the requirement, two factors must be satisfied: 1) "the adequacy of the named plaintiff's counsel, and 2) the adequacy of representation provided in protecting the different, separate, and distinct interests of the class members." Retired Chi. Police Ass'n, 7 F.3d at 598 (quoting Sec'y of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986)). Together, these elements require that both counsel and the

representatives be able to zealously represent and advocate on behalf of the class as a whole. Lucas, 226 F.R.D. at 341.

Plaintiffs all drove for FXG during the Class Period. Plaintiff Jon Leighter started driving for FXG Home Delivery in July 2002, and only recently stopped driving in August 2007. PA29007; Declaration of Jon Leighter ("Leighter Decl.") ¶ 2. Plaintiff David Spicer started driving on April 1, 2005 and continued driving until April or May 2007. PA29014-15; Declaration of David Spicer ("Spicer Decl.") ¶ 2. Both drove trucks with gross vehicle weight ratings under 10,001 pounds[8], and both routinely worked for FXG in excess of 8 hours per day and 40 hours per week. Leighter Decl. ¶¶ 2, 3, Ex. 1; PA29009-10 (since 2002 hours gradually increased from seven-and-a-half to eight hours a day, to about eleven hours a day); Spicer Decl. ¶¶ 2, 3, Ex. 1; PA29018 (routinely spent eight to ten hours driving until October 2006, when he purchased a supplemental van and hired a supplemental driver). Their interests do not differ from those of the class as a whole, and they have each already demonstrated that they will work to benefit the class through pursuit of their own goals. See PA29011-12; PA29019-20.

Plaintiffs have retained competent attorneys with extensive experience in the prosecution of class actions similar to those brought here. See Ellingstad Declaration ¶¶ 3-15 (dated March 11, 2007). This Court has already gone through the process of appointing the undersigned to "[d]etermine . . . the position of the plaintiffs in all matters arising during pre-trial proceedings."

---

[8] In their declarations, plaintiffs authenticate documents showing the vehicle identification numbers ("VINs") for their respective trucks. The VIN for Leighter's truck was 5T4HP41R323340563, and the VIN for Spicer's primary truck was 1FDWE35L43HA43113. Leighter Decl. at ¶ 3; Spicer Decl. at ¶ 3. Since 1996, the VIN regulations promulgated by the National Highway Traffic Safety Administration have provided that: (1) within the five characters of a VIN occupying positions four through eight, for trucks with a gross vehicle weight rating of 10,000 lbs. or less, "the first and second characters shall be alphabetic and the third and fourth characters shall be numeric"; and (2) within the eight characters of a VIN occupying positions ten through seventeen, for trucks with a gross vehicle weight rating of 10,000 lbs. or less, "[t]he last five (5) characters of this section shall be numeric …." 49 C.F.R. § 565.6(b), (d); 61 FR 29031 (June 7, 1996). Because both of the plaintiffs' trucks share these characteristics (Leighter: HP41 (four through seven) and 40653 (last five); Spicer: WE35 (four through seven) and 43113 (last five)), it is thus indisputable that plaintiffs drove trucks with gross vehicle weight ratings under 10,001 pounds.

Order dated Nov. 15, 2005 (Dkt No. 52). Plaintiffs and their counsel have demonstrated their adequacy through their zealous prosecution of this case. Plaintiffs have assisted in all aspects of the litigation, fully complied with their discovery obligations and provided valuable deposition testimony, fully satisfying the adequacy requirement of Fed. R. Civ. P. 23(a)(4).

**B. The Damage Claims Satisfy The Requirements Of Rule 23(b)(3)**

Certification of a class under Rule 23(b)(3) requires two findings: 1) that common questions of law or fact predominate, and 2) that a class action is superior to other methods available for fair and efficient adjudication. The damage claims are all susceptible of class adjudication because all are based upon the common question of employment status.

**1. Common issues of law and fact predominate.**

"There is no definitive test for determining whether common issues predominate[;] however, in general, predominance is met 'when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position.'" In re Vitamins Antitrust Litig., 209 F.R.D. 251, 262 (D.D.C. 2002) (quoting In re Potash Antitrust Litig., 159 F.R.D. 682, 693 (D. Minn. 1995)) (emphasis added). Common questions need not be dispositive or exclusive. Lucas, 226 F.R.D. at 342. When "there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolutions of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop." Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910, 911 (7th Cir. 2003). Thus, if there is a "common question . . . at the heart of the case," the class should be certified. Hubler Chevrolet, 193 F.R.D. at 577.

Employment status is the common question at the heart of this case. Defendant's categorical determination that all of its drivers are independent contractors rather than employees

case 3:05-md-00527-RLM -CAN document 871-2 filed 10/01/07 page 22 of 28

is *the* predominant question that must be resolved in order to determine liability under the legal theories asserted. See Estrada III, 64 Cal. Rptr. 3d at 338 (finding common issues clearly predominated); Breedlove, 1993 WL 284327, at *11 ("[T]he present case does not require a determination of individual questions of reliance or coercion. Objective criteria can be used to determine the facts necessary for determination of the case."). When questions of liability center on the meanings and functions of standardized forms or contracts, they predominate. See Lucas, 226 F.R.D. at 342 (finding predominance established based on a standard form dunning letter); Flanagan v. Allstate Ins. Co., 228 F.R.D. 617, 619 (N.D. Ill. 2005) (finding predominance based on employer's change of policy, which impacted all claimants, despite different resulting damages); Chandler v. S.W. Jeep-Eagle, Inc., 162 F.R.D. 302, 310 (N.D. Ill. 1995) (predominance found, based upon whether standard retail installment contract violated TILA); Ramirez v. NutraSweet Co., No. 95-C-130, 1996 WL 529413, at *3 (N.D. Ill. Sept. 11, 1996) (class members all had "virtually the same claim," that defendant breached implied contract by not paying for overtime spent changing uniforms); see also Allapath Serv., Inc. v. Exxon Corp., 333 F.3d 1248, 1260-61 (11th Cir.2003), aff'd. ExxonMobil Corp. v. Allapath Serv., Inc., 545 U.S. 516 (2005) (affirming certification of a class of gasoline dealers where contracts were "materially similar" and defendants' breaching conduct was common to the class).

Similarly, the Ninth Circuit has found the predominance requirement to be satisfied whenever common questions present a significant aspect of the case and these common questions can be resolved as to all class members in a single adjudication. Local Joint Exec. Bd of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 (9th Cir. 2001). Plaintiffs need not establish that there are no individual issues, but rather only that class issues predominate and that a class action is superior. See id. at 1163 ("But given the number and

importance of the common issues, we do not believe that this [individual] variation is enough to defeat predominance under Rule 23 (b)(3).")

Here, Plaintiffs' claims all turn on whether they have been improperly classified as independent contractors. As set forth in detail in Plaintiffs' OFM, Plaintiffs will prove that they have been improperly classified using objective, common proof, including the boilerplate OA, which establishes FXG's far-reaching rights of control over the manner and means of the drivers' work, as well as common evidence of: (1) FXG's programmatic exercise of its extensive rights to control the drivers; (2) FXG's retention of the right to terminate drivers; (3) FXG's uniform formulaic method of payment of the drivers; and (4) FXG's control over what equipment the drivers use in performance of their duties. OFM §§ III, IV, and V; see also Estrada III, 64 Cal. Rptr. 3d at 334, 336-37 (reciting trial court's finding that drivers were terminable at will, and affirming trial court's ruling that drivers were subject to FXG's extensive and wide-ranging rights of control, including FXG's right to control the drivers' opportunities to profit from their work).

FXG can be expected to argue that there is too much individual variation for class certification because different FXG managers may have exercised FXG's rights of control differently. Thus, anecdotal evidence, such as evidence presented in Estrada III that FXG managers insisted that drivers under their supervision wear black socks every day may not apply to all proposed class members. 64 Cal. Rptr. 3d at 336 & n. 9. Any such evidence, if it exists, does not detract from the dominant common issues. To the contrary, anecdotal evidence of FXG's exercise of its right of control is relevant to all drivers as it demonstrates FXG extensive rights to control all drivers. HDG Enters, 856 P.2d at 1040 ("[T]he question is not how much control the employer actually exercises, but how much control it has the right to exercise."). As

the Estrada III court reasoned: "The anecdotal evidence was admitted to show FedEx's power to interpret the Operating Agreement and was relevant to the class as a whole, not just to the drivers who happened to be the subject of a particular anecdote." 64 Cal. Rptr. 3d at 338.

Common questions of fact and common evidence will dominate the inquiry into the propriety of the drivers' employment classification. These common questions include:

- whether all class members were subject to the Operating Agreement and whether, through the restrictions in that Agreement, FXG retains the right to control the method, manner and means of the drivers' work;

- whether through its centralized management structure, policies and procedures, and rigid control over terminal operations, FXG exercises control over drivers' appearance, vehicles, routes, delivery methods, hours of work and the drivers' opportunity for profit and loss; and

- whether FXG improperly benefits from misclassifying drivers as independent contractors.

As recognized by the Estrada III court, the common issues of the drivers' employment classification and their rights to reimbursement of certain types of expenses clearly predominate. 64 Cal. Rptr. 3d at 338. As in Breedlove, the employment status determination can be made here based upon "objective criteria" such as the employer's categorical treatment of the class, and so certification is appropriate. Breedlove, 1993 WL 284327, at *10. And because these and other common issues are "likely to dominate the Court's attention," common questions of law and fact predominate. See Lucas, 226 F.R.D. at 342 (citing Tatz v. Nanophase Tech Corp., 2003 WL 21372471, at *9 (N.D. Ill. June 13, 2003)).

**2. Class adjudication is superior to other available methods.**

A party seeking class certification pursuant to Rule 23(b)(3) must also show "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." A single class action is superior to individual actions here, with their increased expense,

duplication of discovery, and potential for inconsistent results. Even if damages issues are adjudicated individually, the efficiencies gained by use of a class action for all common questions will ultimately benefit all of the class members and FXG by reducing litigation expenses and court resources. No reason exists to repeatedly litigate Plaintiffs' and the proposed class members' categorical employment status. It was this very reasoning that led to the coordination of these actions as an MDL. See MDL Transfer Order dated Aug. 10, 2005 (Dkt. No. 1). Moreover, class certification would protect the rights of the class members, most of whom would otherwise be precluded from pursuing claims for relatively small awards, given the substantial expense that has been and will be required to prosecute this case. See Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980); Local Joint Exec. Bd of Culinary/Bartender Trust Fund, 244 F.3d at 1163.

Class adjudication is decidedly superior in the employment context, especially where the employer is a multi-million dollar corporation with significant legal resources, and significant profits at stake. The Court in O'Brien v. Encotech Const. Servs., Inc., explained that fear of employer retaliation against individuals is "a very important concern" because "the nature of the economic dependency involved in the employment relationship is inherently inhibiting." 203 F.R.D. 346, 350 (N.D. Ill. 2001) (citing Ladegard v. Hard Rock Concrete Cutters, Inc., 2000 WL 1774091 (N.D. Ill. 2000)). Risk of reprisal by an employer is well-recognized as weighing in favor of certification. See, e.g., Mullen v. Treasure Chest Casino, 186 F.3d 620, 625 (5th Cir. 1999); Scott v. Aetna Services, Inc., 210 F.R.D. 261, 268 (D. Conn. 2002); Adames v. Mitsubishi Bank, Ltd., 133 F.R.D. 82, 89 (E.D.N.Y. 1989); Slahina v. West Penn Parking Corp., 106 F.R.D. 419, 423 (W.D. Pa. 1984). Here, Plaintiffs have presented evidence that FXG systematically identifies drivers it views as insufficiently loyal to FXG's independent contractor

artifice, and has targeted some of these drivers for termination. OFM § V.A. Fear of reprisal here is real, not imagined. Because class adjudication is a decidedly superior approach for these claims, certification should be granted.

**C. Plaintiffs' Request For Declaratory And Injunctive Relief Merit Certification Of A 23(b)(2) Class.**

Plaintiffs' claims for a declaratory judgment pursuant to ORS § 28.010, et seq. and for injunctive relief should also be certified under Rule 23(b)(2). To certify a class under Rule 23(b)(2), Plaintiffs must show that FXG "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). "This language does not mandate that all members of the (b)(2) class be aggrieved by or desire to challenge the defendant's conduct . . . [only] that the conduct or lack of it which is subject to challenge be premised on a ground that is generally applicable to the entire class." Jones v. Diamond, 519 F.2d 1090, 1100 (5th Cir. 1975) (internal citation omitted).

The Seventh Circuit has also roundly endorsed the use of (b)(2) certification of injunctive relief claims, determining that the nature of injunctive relief practically requires class treatment:

> How is it feasible to draft and enforce an injunction that will bear on these 27 plaintiffs alone, and not on the other 323 black employees . . . . [T]he equitable aspects of the litigation are class-wide whether the judge certifies a class or not. (The need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about.)

Allen v. Int'l Truck & Engine Corp., 358 F.3d 469, 471 (7th Cir. 2004); see also Breedlove, 1993 WL 284327, at *8 ("[A]ny consequential injunctive and declaratory relief will, for all practical purposes, settle the issue for other independent operators.").

Where the litigation "seeks to define the relationship between the defendant(s) and the world at large" and the relief sought by the named plaintiff will benefit the entire class, Rule

case 3:05-md-00527-RLM -CAN document 871-2 filed 10/01/07 page 27 of 28

23(b)(2) certification is appropriate. Baby Neal v. Casey, 43 F.3d 48, 58 (3d Cir. 1994). In this case, FXG acted and continues to act on grounds "generally applicable to the class" by entering into standard form contracts with each class member, applying various standardized policies to the relationship, and mischaracterizing the employment classification. OFM § III. Consequently, declaratory and injunctive relief that FXG drivers were misclassified as independent contractors rather than employees will impact all drivers, necessitating class certification. See Breedlove, 1993 WL 284327, at *8 ("[W]hether plaintiffs proceed on an individual or on a class suit basis, the requested injunctive and declaratory relief they seek will generally benefit not only plaintiffs but other persons previously employed as independent operators.").

## IV. CONCLUSION

For the reasons set forth herein, the Oregon Plaintiffs respectfully request that this Court **GRANT** their motion for class certification.

Dated: October 1, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Steve D. Larson
David Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 Southwest Oak Street
5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

**_LEIGHTER_ OREGON PLAINTIFFS' COUNSEL**

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel: (574) 289-9987
Fax: (574) 289-8138

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**SEVENTH DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, SUSAN E. ELLINGSTAD, state:

1. I am a partner with the law firm of Lockridge Grindal Nauen P.L.L.P., one of the firms serving as Co-Lead Counsel for Plaintiffs pursuant to the Initial Scheduling Order (Docket No. 52).

2. I submit this declaration in support of Plaintiffs' motions for class certification in these coordinated proceedings.

**DOCUMENTS ATTACHED TO THIS DECLARATION**

3. As set forth in more detail below, I attach the following documents and deposition transcript excerpts in support of Plaintiffs' motions for class certification. Due to the volume of materials submitted, they have been compiled into a supplemental appendix, entitled "Plaintiffs' Appendix" ("PA"). The location of the document within Plaintiffs' Appendix is indicated by tab number ("Tab ___") and then by page number ("PA__"). These documents will continue in numbering from the Plaintiffs' Appendix submitted with the first phase of class certification

motions on March 12, 2007, the second phase of class certification motions on April 2, 2007, the third phase of class certification motions on April 23, 2007, the first phase of class certification reply memoranda on May 29, 2007, second phase of class certification reply memoranda on June 18, 2007, and the third phase of class certification reply memoranda on July 9, 2007.

4.     Attached at Tabs 267-274 (PA28887-29085) are true and correct copies of excerpts of the transcripts of the depositions of Named Plaintiffs.

5.     Attached at Tab 275 (PA29086-29114) is a true and correct copy of excerpts of the Expert Report of Robert W. Wood served by Plaintiffs to Defendant on September 7, 2007.

6.     Attached at Tab 276 (PA29115-29117) is a true and correct copy of the Affidavit of Robert Mays dated July 28, 2006.

7.     Attached at Tab 277 (PA29118-29160) is a true and correct copy of a decision of the California Unemployment Insurance Appeals Board regarding the case of *FedEx Ground Package System Inc.*, Case No. AO-143164, dated September 21, 2007.

8.     Attached at Tab 278 (PA29161) is a true and correct copy of *FedEx Ground: P&D Weekly Turnover Report*, revised February 13, 2006, produced by Defendant to Plaintiffs during pretrial discovery.

9.     Attached at Tab 279 (PA29162) is a true and correct copy of the *FedEx Ground: P&D Weekly Turnover Report*, revised October 3, 2006, produced by Defendant to Plaintiffs during pretrial discovery.

10.     Attached at Tab 280 (PA29163) is a true and correct copy of the *FedEx Ground: P&D Weekly Turnover Report*, revised October 17, 2005, produced by Defendant to Plaintiffs during pretrial discovery.

11.     Attached at Tab 281 (PA29164-29190) is a true and correct copy of the *FedEx Ground Pick-Up and Delivery Contractor Turnover, Annualized*, revised July 14, 2003, produced by Defendant to Plaintiffs during pretrial discovery.

12.     Attached at Tab 282 (PA29191-29217) is a true and correct copy of the *FedEx Ground Pick-Up and Delivery Contractor Turnover, Annualized*, revised May 10, 2004, produced by Defendant to Plaintiffs during pretrial discovery.

13.     Attached at Tab 283 (PA29218-29239) is a true and correct copy of a letter to Lynn Faris from Michael Garrison, Jr. of O'Melveny & Myers LLP dated September 20, 2007 along with written materials attached to Mr. Garrison's September 20 letter.  According to Mr. Garrison, these written materials were distributed to California P&D drivers on September 20, 2007.  Upon information and belief, since September 20, these same written materials have been distributed to all of FedEx Ground's P&D drivers throughout the country.

14.     Attached at Tab 284 (PA29240-29241) is a true and correct copy of a document entitled "*Addendum 10; Pick-up and Delivery Contractor Operating Agreement; Compliance Disclosure*."  Upon information and belief, FedEx Ground has announced that all P&D drivers who wish to participate in the Enhanced Primary Plus incentives announced by the Company on September 20, 2007 must sign this Compliance Disclosure Addendum.

15.     Attached at Tab 285 (PA29242-29251) is a true and correct copy of a document entitled *Week 1 Update: Contractor Transition & Growth Incentives*."  I have been informed that these written materials were distributed to all FXG P&D drivers on or about September 26, 2007.

16.     Attached at Tab 286 (PA29252-29254) is a true and correct copy of a document which is posted on www.groundforce.fedex.com which purports to provide frequently asked questions regarding the termination of SWA drivers in California.

case 3:05-md-00527-RLM-CAN document 871-3 filed 10/01/07 page 4 of 4

Dated: October 1, 2007

**s/Susan E. Ellingstad**
SUSAN E. ELLINGSTAD

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**INDEX TO PLAINTIFFS' SEVENTH APPENDIX SUBMITTED IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

| VOLUME NO. | TAB NO. | PA NO. | DESCRIPTION |
|---|---|---|---|
| 95 | 267 | PA28887-28990 | Excerpts of the deposition transcripts of Arizona Named Plaintiffs |
| 95 | 268 | PA28991-29005 | Excerpts of the deposition transcripts of Nevada Named Plaintiffs |
| 95 | 269 | PA29006-29020 | Excerpts of the deposition transcripts of *Leighter* Oregon Named Plaintiffs |
| 95 | 270 | PA29021-29024 | Excerpts of the deposition transcripts of Vermont Named Plaintiffs |
| 95 | 271 | PA29025-29030 | Excerpts of the deposition transcripts of *Vargas* Massachusetts Named Plaintiffs |
| 95 | 272 | PA29031-29053B | Excerpts of the deposition transcripts of Connecticut Named Plaintiffs |
| 95 | 273 | PA29054-29060 | Excerpts of the deposition transcripts of North Carolina Named Plaintiffs |
| 95 | 274 | PA29061-29085 | Excerpts of the deposition transcripts of Louisiana Named Plaintiffs |

| VOLUME NO. | TAB NO. | PA NO. | DESCRIPTION |
|---|---|---|---|
| 95 | 275 | PA29086-29114 | Excerpts of the Expert Report of Robert W. Wood served September 7, 2007 |
| 96 | 276 | PA29115-29117 | Affidavit of Robert Mays dated July 28, 2006 |
| 96 | 277 | PA29118-29160 | Decision of California Unemployment Insurance Appeals Board regarding the case of *FedEx Ground Package System Inc.*, Case No. AO-143164, dated September 21, 2007 |
| 96 | 278 | PA29161 | *FedEx Ground: P&D Weekly Turnover Report*, revised February 13, 2006 |
| 96 | 279 | PA29162 | *FedEx Ground: P&D Weekly Turnover Report*, revised October 3, 2006 |
| 96 | 280 | PA29163 | *FedEx Ground: P&D Weekly Turnover Report*, revised October 17, 2005 |
| 96 | 281 | PA29164-29190 | *FedEx Ground Pick-Up and Delivery Contractor Turnover, Annualized*, revised July 14, 2003 |
| 96 | 282 | PA29191-29217 | *FedEx Ground Pick-Up and Delivery Contractor Turnover, Annualized*, revised May 10, 2004 |
| 96 | 283 | PA29218-29239 | Correspondence and attachments from Michael Garrison, Jr. to Lynn Faris dated September 20, 2007 |
| 96 | 284 | PA29240-29241 | *Addendum 10, Pick-Up and Delivery Contractor Operating Agreement, Compliance Disclosures* |
| 96 | 285 | PA29242-29251 | *Week 1 Update: Contractor Transition & Growth Incentives.* |
| 96 | 286 | PA29252-29254 | FedEx Ground document posted on the website (www.groundforce.fedex.com) regarding questions |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**<u>FILED UNDER SEAL</u>**

# PLAINTIFFS' SEVENTH APPENDIX IN SUPPORT OF MOTIONS FOR CLASS CERTIFICATION

Dated: October 1, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO: *Leighter et al. v. FedEx Ground Package System, Inc.*, Civ. No. 3:07-cv-328 (OR) | ) | **DECLARATION OF JON LEIGHTER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Jon Leighter, declare.

1. I am one of the plaintiffs in this action, and I have personal knowledge of the facts set forth herein.

2. During my employment with FedEx Ground Package System, Inc. ("FXG"), from July 2002 until August 2007, I routinely worked for FXG in excess of 8 hours per day and 40 hours per week.

3. Attached as Exhibit 1 hereto is a copy of the first page of the Capital Alliance Financial Services Professional Vehicle Lease Agreement that documents the lease from First Sierra Financial Inc. of the delivery truck I drove for FXG. Exhibit 1 shows that the vehicle identification number ("VIN") for my delivery truck was 5T4HP41R323340563.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 19th day of September, 2007 at Eugene, Oregon.

Jon Leighter

American Express Bus. Financial account #424062

# Capital Alliance Financial Services Professional Vehicle Lease Agreement

| First Sierra Financial Inc. (Lessor) | 600 Travis Street, Suite 1300<br>Houston, TX 77002<br>Phone: 800.745.9292 EXT. 2249 / Fax: 800.318.7177 | Lease Agreement Number: 491528 | Date 5/9/2002 |
|---|---|---|---|

**A. Lessee:**
JONATHAN LEIGHTER
4860 FURUTA
EUGENE, OR 97404
Contact: _____ Phone #: 541-683-3297

**Supplier:**
STUDEBAKER

| B. Equipment Description: | V.I.N.: 5T4HP41R323340563 | | | Mileage: |
|---|---|---|---|---|
| Year: 2002 | Make: WORKHORSE | Model: STEPVAN | Coach Builder: | Body Type: VN |

Location: ______

**C. Schedule of Payments:**

| Initial Term (In Months) | Total Number Of Payments | Amount of Each Payment (plus applicable taxes) | Total Initial Payment $710.04 | | | |
|---|---|---|---|---|---|---|
| 72 | 72 | 460.04 | First in advance ☒ | Last in advance ☐ | Doc. Fee $250.00 | Deposit |

Mileage Charges: _____ miles may be accumulated per each 12-month period. Lessee must pay _____ per mile for mileage in excess of the allowed amount.

Purchase Alternative: TRAC LEASE (see reverse or following page, section 6, for description of Purchase Alternatives) Purchase Alternative $3,800.00

**D. DISCLAIMER OF WARRANTIES AND CLAIMS: LIMITATION OF REMEDIES.** THERE ARE NO WARRANTIES BY OR ON BEHALF OF LESSOR AND NEITHER THE SUPPLIER NOR ANY OTHER PARTY IS LESSOR'S AGENT. LESSEE ACKNOWLEDGES AND AGREES BY ITS SIGNATURE BELOW AS FOLLOWS: (A) LESSOR MAKES NO WARRANTIES EITHER EXPRESS OR IMPLIED AS TO THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, ITS FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS DESIGN, ITS CONDITION, ITS CAPACITY, ITS QUALITY, OR WITH RESPECT TO ANY CHARACTERISTICS OF THE EQUIPMENT; (B) LESSEE LEASES THE EQUIPMENT "AS IS" AND WITH ALL FAULTS; (C) LESSEE ACKNOWLEDGES THAT THE EQUIPMENT IS LEASED TO LESSEE SOLELY FOR COMMERCIAL OR BUSINESS PURPOSES; (D) IF THE EQUIPMENT IS NOT PROPERLY INSTALLED, DOES NOT OPERATE AS REPRESENTED OR WARRANTED BY THE SUPPLIER OR MANUFACTURER, OR IS UNSATISFACTORY FOR ANY REASON, REGARDLESS OF CAUSE OR CONSEQUENCE, LESSEE'S ONLY REMEDY, IF ANY, SHALL BE AGAINST THE SUPPLIER OR MANUFACTURER OF THE EQUIPMENT AND NOT AGAINST LESSOR; (E) LESSEE SHALL HAVE NO REMEDY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES AGAINST LESSOR; AND (F) NO DEFECT, DAMAGE OR UNFITNESS OF THE EQUIPMENT FOR ANY PURPOSE SHALL RELIEVE LESSEE OF THE OBLIGATION TO MAKE PAYMENTS OR RELIEVE LESSEE OF ANY OTHER OBLIGATION UNDER THIS AGREEMENT.

E. Statutory Finance Lease ("A greement"): Lessee acknowledges and agrees that it is the Intent of both parties to this Agreement that it qualify as a statutory finance lease under Article2A of the Uniform Commercial Code. Lessee acknowledges and agrees that Lessee has selected both: 1) the Equipment and 2) Supplier from whom Lessor is to purchase the Equipment. Lessee acknowledges that Lessor has not participated in Lessee's selection of the Equipment or of the Supplier, and Lessor has not selected, manufactured, or supplied the Equipment. Lessee acknowledges that by this Agreement Lessor has informed Lessee in writing that Lessee may have rights under the supply contract evidencing Lessor's purchase of the Equipment from the Supplier chosen by Lessee and that Lessee should contact the Supplier for a description of any such rights and any limitations of such rights.

**F. Amendments:** No term or provision of this Agreement may be amended, altered, waived or discharged except by a written instrument signed by all parties to this Agreement.

**THIS AGREEMENT, THE TERMS OF WHICH HAVE BEEN FREELY NEGOTIATED BY EACH PARTY, IS SUBJECT TO THE TERMS AND CONDITIONS ON THE REVERSE SIDE OR FOLLOWING PAGE WHICH ARE MADE A PART HEREOF AND WHICH LESSEE AND LESSOR ACKNOWLEDGE THEY HAVE READ AND ACCEPTED.**

**THIS IS A NON-CANCELABLE AGREEMENT**

Lessor: First Sierra Financial Inc.
By: [signature]
Title: [signature]

Lessee: JONATHAN LEIGHTER
Signature: x [signature]
Title: Owner / Operator

**Guaranty:** In consideration of Lessor, its successors and assigns entering into this Agreement, the partie(s) or individual(s) executing this Guaranty ("Guarantor," whether one or more) unconditionally and irrevocably guaranty to Lessor, the prompt payment and performance of all obligations of the Lessee. Guarantor agrees that this is a guaranty of payment and not of collection, and that Lessor can proceed directly against Guarantor without first proceeding against Lessee or against the Equipment covered by the Agreement. Guarantor waives all defenses and notices, including those of protest, presentment and demand. Guarantor agrees that Lessor can renew, extend or otherwise modify the terms of the Agreement and Guarantor will be bound by such changes. If Lessee defaults under the Agreement, Guarantor will immediately perform all obligations of Lessee under the Agreement, including, but not limited to, paying all amounts due under the Agreement. Guarantor will pay to Lessor all expenses (including attorneys' fees) incurred by Lessor in enforcing Lessor's rights against Guarantor. This Guaranty will not be discharged or affected by the death, dissolution, termination, bankruptcy or insolvency of Lessee or Guarantor and will bind Guarantor's heirs, personal representatives, successors and assigns. If more than one Guarantor has signed this Guaranty, each Guarantor agrees that his/her liability is joint and several. Guarantor authorizes Lessor or any of Lessor's designees to obtain and share with others credit bureau reports regarding Guarantor's personal credit, and make other credit inquiries that Lessor determines are necessary. **THIS GUARANTY IS GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA. GUARANTOR CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN CALIFORNIA OR IN ANY OTHER STATE WHERE LESSOR HAS AN OFFICE. GUARANTOR EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY.**

x ______ Guarantor Signature
x ______ Guarantor Signature
x ______ Guarantor Signature

**Certificate of acceptance:** The undersigned Lessee certifies to Lessor that all items of Equipment referred to above or on the attachment(s) hereto have been received and irrevocably accepted by the Lessee and were at the time of receipt in good order and condition and acceptable to use. <u>Lessee hereby authorizes Lessor to immediately remit payment to Supplier. Lessee further understands that its obligations hereunder shall commence the earlier of the date that Lessee receives the Equipment or the date Lessor remits payment to Supplier.</u> Lessee hereby certifies that Lessor has fully and satisfactorily performed all covenants and conditions to be performed by it under the Agreement. Lessee agrees to enforce, in its own name, all warranties, agreements or representations, if any, which may be made by the Supplier in respect to the Equipment.

JONATHAN LEIGHTER
Signor Name (print)
Owner / Operator
Signor Title (print)
x [signature]
Signature

**REQUEST FOR ELECTRONIC PAYMENT**
**Please attach a voided check from the account to be debited**

The undersigned hereby authorizes and requests Lessor to initiate electronic debit entries (and credit entries and adjustments for any debit entries in error) or affect a charge by any other commercially accepted practice to the account indicated below in the financial institution named below ("Depository"). The undersigned hereby authorizes and requests the Depository to honor the debit and/or credit entries initiated by Lessor. This authorization is for payments due under the referenced Agreement. This authority is to remain in force until such time as all amounts due are paid in full or until Lessor and Depository have received written notification from the undersigned terminating this authorization in such time and manner as to afford Lessor and Depository a reasonable opportunity to act on it.

Customer Name Printed: JONATHAN LEIGHTER
Agreement Number: 491528
Depository Name and Branch: ______
Account Number: ______
Depository Address (city & state): ______
Depository Routing Number: ______
Depository Telephone Number: ______
Customer Signature: [signature]

EXHIBIT 1

PORLEI0000003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO:<br><br>*Leighter et al. v. FedEx Ground Package System, Inc.*, Civ. No. 3:07-cv-328 (OR) | ) | **DECLARATION OF DAVID SPICER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, David Spicer, declare:

1. I am one of the plaintiffs in this action, and I have personal knowledge of the facts set forth herein.

2. During my employment with FedEx Ground Package System, Inc. ("FXG"), from April 2005 until April or May 2007, I routinely worked for FXG in excess of 8 hours per day and 40 hours per week.

3. Attached as Exhibit 1 hereto is a copy of the Oregon Vehicle Certificate of Title for the delivery truck I purchased from Rolando Brown and drove for FXG. Exhibit 1 shows that the VIN for this delivery truck was 1FDWE35L43HA43113. This delivery truck was the only truck I drove for FXG prior to October 2006, when I purchased a supplemental van and hired a supplemental driver.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 19th day of September, 2007 at Bend, Oregon.

David Spicer

SSBLS Main Documents\7523\001\00144048-1

# OREGON VEHICLE CERTIFICATE OF TITLE

OREGON DRIVER AND MOTOR VEHICLE SERVICES CERTIFIES THE PARTY IS LISTED AS OWNER OF THE DESCRIBED VEHICLE. DOCUMENTS FILED WITH DMV SHOW THE VEHICLE IS SUBJECT TO THE OWNERSHIP INTERESTS SPECIFIED.

CONTROL NUMBER: 4153896

| PLATE NUMBER | TITLE NUMBER | PROCESS DATE | SURVIVOR | REFERENCE NUMBER |
|---|---|---|---|---|
| BOXES | 0327515003 | 100203 | N/N | |

| YEAR | MAKE | STYLE | MODEL | VEHICLE IDENTIFICATION NUMBER | EQUIPMENT NO. |
|---|---|---|---|---|---|
| 2003 | FORD | PU | 3DC | 1FDWE35L43HA43113 | |

OWNER/LESSEE

BROWN, ROLANDO JOHN
457 TAZ LN
EUGENE OR 97404

| ODOMETER READING | ODOMETER DATE |
|---|---|
| 14,000 | 09/12/03 |

ODOMETER MESSAGE

TITLE BRANDS

If a "brand" appears in this box, it indicates this vehicle was previously damaged, or otherwise "reconstructed" or rebuilt. If a state is listed, the damage occurred prior to issuance of an Oregon title.

USE THIS SECTION WHEN THE ONLY CHANGE IS TO REMOVE SECURITY INTEREST(S). FOR ANY OTHER CHANGES, SEE INSTRUCTIONS ON REVERSE.

If there is no change in owners as shown above AND all security interest holders have released interest, one registered owner must sign and date here, if not completing a separate application for title. In addition, if your address has changed, cross out the old address and write the new address and county of residence on the front of the title. Mail the title and the fee to: DMV, 1905 Lana Ave NE, Salem OR 97314

SIGNATURE (DOES NOT RELEASE INTEREST) | DATE

**To release interest in the vehicle, complete the first reassignment on back of the title.**

SECURITY INTEREST HOLDER/LESSOR

MARCH COMMUNITY CREDIT UNION
2350 CACTUS AVE CA
PO BOX 9500
MORENO VALLEY CA 92552

MARCH CCU

SIGNATURE AND COUNTERSIGNATURE OF SECURITY INTEREST HOLDER OR LESSOR RELEASING ALL INTEREST
X [signature] DATE 10/14/04

SIGNATURE AND COUNTERSIGNATURE OF SECURITY INTEREST HOLDER OR LESSOR RELEASING ALL INTEREST
X DATE

Oregon law requires that an application for transfer of title be made to DMV within 30 days after you buy a vehicle. Failure to do so within 30 days may result in a late title transfer fee of up to $50. SEE REVERSE OF TITLE FOR APPLICATION INSTRUCTIONS.

VOID WITHOUT LINKED-DIAMOND WATERMARK

VOID IF ALTERED OR ERASED

735-410 (10-02) BOXES 1FDWE35L43HA43113 0327515003 C
2676 053 10 V1 T2 03 S8 M1 P5 E0 M0 20

160349

EXHIBIT 1

FXG_LEIGHTER0001451

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO

*Michael Decesare, et al. v. FedEx Ground Package System, Inc.*,
Civil No. 3:07-cv-00120-RLM-CAN (NV)

*Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*,
Civil No. 3:07-cv-00272-RLM-CAN (AZ)

*Troy Givens, et al. v. FedEx Ground Package System, Inc.*,
Civil No. 3:07-cv-00324-RLM-CAN (LA)

*Frank Gruhn, et al. v. FedEx Ground Package System, Inc.,*
Civil No. 3:07-cv-00412-RLM-CAN (VT)

*Jon Leighter, et al. v. FedEx Ground Package System, Inc.,*
Civil No. 3:07-cv-00328-RLM-CAN (OR)

*Thomas Magno, et al. v. FedEx Ground Package System, Inc.,*
Civil No. 3:07-CV-00322-RLM-CAN (CT)

*Genaro Vargas, et al. v. FedEx Ground Package System, Inc.,*
Civil No. 3:07-cv-00325-RLM-CAN (MA)

*Ernest White, et al. v. FedEx Ground Package System, Inc.*,
Civil No. 3:07-cv-00411-RLM-CAN (GA)

*Sharon Whiteside, et al. v. FedEx Ground Package System, Inc.*,
Civil No. 3:07-CV-00326-RLM-CAN (NC)
---------------------------------------------------

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on October 1, 2007, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |

| | |
|---|---|
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Eric M. Fink** | efink@leonardcarder.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |

| | |
|---|---|
| **Aparna B. Joshi** | ajoshi@omm.com; jdonovan@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com; drees@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Anh-Nguyet Tran LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |

| | |
|---|---|
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on October 2, 2007, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
  & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Sanford A. Meizlish
BARKAN NEFF HANDLEMAN
  MEIZLISH, LLP
360 South Grant Avenue
P.O. Box 1989
Columbus, OH 43216-1989

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
3304 S. Broadway
Suite 100
Tyler, TX 75701

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

case 3:05-md-00527-RLM-CAN document 875 filed 10/01/07 page 8 of 8

I further certify that I caused a copy of the Proposed Orders, which were separately e-mailed to Chief Judge Robert L. Miller, Jr. pursuant to Section II.F of the CM/ECF Civil and Criminal User Manual for this District, to be delivered to all of the parties detailed above in the same manner as service of the documents filed with the Court.

Dated: October 1, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On October 9, 2007, this Court held an in-court hearing in which counsel for both parties appeared in person. The purpose of the hearing was to address issues regarding the scheduling order. After considering the arguments of counsel, the Court **ORDERS** that deadlines for summary judgment briefing regarding **all** cases shall be as follows:

- movants for summary judgment shall have until **March 14, 2008**, to file their motions for summary judgment,
- responses to summary judgment shall be filed by **April 30, 2008,**
- replies in support of motions for summary shall be filed by **May 30, 2008**.

All other deadlines previously set remain in effect.

Furthermore, at the hearing it was represented that there is no objection to a motion to amend Plaintiffs filed on October 1, 2007. Consequently, Plaintiffs motion [Doc. No. 881 & 884] is **GRANTED**.

**SO ORDERED.**

Dated this 9th Day of October, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527 RM (MDL-1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

OPINION AND ORDER

This multi-district action involving the classification of FedEx Ground pickup and delivery drivers is before the court on the Kansas plaintiffs' motion for class certification, as well as the certification of the national ERISA class. As a preliminary matter, though, all plaintiffs have moved to strike portions of expert reports the defendants use in support of their opposition to class certification. For the reasons that follow, the court overrules the plaintiffs' motions to strike, grants the Kansas and ERISA plaintiffs' motions for class certification, and denies defendant's request for oral argument on plaintiffs' motions for class certification

I

The Judicial Panel on Multi-District Litigation created this docket and assigned it to the undersigned judge in 2005. The docket now includes fifty-six cases. Briefing is complete on most of the class certification motions, and the putative class representatives have moved to strike, under Federal Rule of

Evidence 702, various expert opinions the defendants have offered as part of their certification submissions. The court heard argument on the motions to strike on August 20, 2007. Because argument on the class certification motions would be both unwieldy and unnecessary, the court declines to hear argument on those motions.

The over-arching issue in this docket is the classification of certain FedEx Ground pickup and delivery drivers as independent contractors rather than employees. The named plaintiffs have moved to certify thirty state class action complaints and a national ERISA class. Most of the putative state class actions seek some combination of monetary damages, rescission of the operating agreement, as well as declaratory and injunctive relief under the state wage statutes. The proposed class-definition for nearly all the state class actions is some version of the following:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since xx/xx/xxxx, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of the terminal state of xxxxxxxxx.

The ERISA national class claim seeks both declaratory relief regarding the putative class members' participant status and entitlement to benefits under FedEx Ground's ERISA plans, as well as payment of benefits to which they are entitled, but were improperly denied as a result of their misclassification.

The named plaintiffs seek to maintain class claims under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

The named plaintiffs seek exclusion of opinions of Dr. Deborah Jay, Robert Crandall, and Dr. Richard Jeanneret. Their reports generally seek to show, through various data, that the named plaintiffs haven't had the common experience necessary to warrant class certification. The named plaintiffs challenge the reports' admissibility on several grounds relating to relevance and the reliability of the methods used in gathering and analyzing the data.

Federal Rule of Evidence 702 seeks to assure that "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 924 (7th Cir. 2000). The rule substantially codifies Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), which made trial judges gatekeepers who ensure that testimony is relevant and protect courtrooms from scientific opinions not based on reliable principles and methods. Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002) The first prong of this framework evaluates the reliability of the testimony; the second prong evaluates the testimony's relevance—whether the testimony assists the trier of fact with its analysis of any of the issues involved in the case. Ammons v. Aramark Uniform Servs., Inc., 368 F.3d 809, 816 (7th Cir. 2004). The proponent of expert testimony bears the burden of proving its compliance with Rule 702. Daubert v. Merrell Dow, 509 U.S. at 592 n.10. A judge deciding whether evidence

is reliable "must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." Zelinski v. Columbia 300, Inc., 335 F.3d 633, 640 (7th Cir. 2003).

The reliability inquiry focuses on the expert's methodology, while the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment. Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) (*citing* Daubert v. Merrell Dow, 509 U.S. at 595); *see also* Walker v. Soo Line R.R. Co., 208 F.3d 581, 587 (7th Cir. 2000) (when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed"). The Daubert Court and the Advisory Committee notes to amended Rule 702 provide a series of guideposts gatekeeping courts are to use: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; (4) whether the theory has been generally accepted in the scientific community of which it is a part; (5) whether maintenance standards and controls exist; (6) whether the testimony addresses matters growing from research conducted independent of litigation; (7) whether the witness unjustifiably extrapolates from accepted premise to unfounded conclusion; (8) whether the

expert accounts adequately for obvious alternative explanations; (9) whether the expert uses as much care as she would use in professional work outside of paid litigation consulting; and (10) whether the expert's claimed field of expertise is known to reach reliable results for the type of opinion the expert would give. Fuesting v. Zimmer, 421 F.3d 528, 534-535 (7th Cir. 2005), *vacated in part* 448 F.3d 936 (7th Cir. 2006). The Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome. Smith v. Ford Motor Co., 215 F.3d at 719.

> The trial court must use the criteria relevant to a particular kind of expertise in a specific case to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field'.

Id. (*quoting* Kumho Tire v. Carmichael, 526 U.S. at 152).

When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case. Smith v. Ford Motor Co., 215 F.3d at 719. The expert may satisfy this requirement without opining on the ultimate question to be resolved by the trier of fact. Walker v. Soo Line R.R. Co., 208 F.3d at 587. The relevance consideration has been described as one of "fit" that requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert v. Merrell Dow, 509 U.S. at 591-592. In other words, "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. at 591.

An expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. While "extensive academic and practical expertise" in an area may suffice to qualify a potential witness as an expert, Bryant v. City of Chicago, 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." Walker v. Soo Line R.R. Co., 208 F.3d at 591; *see also* Kumho Tire v. Carmichael, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Thus, a court should consider a proposed expert's full range of practical experience, as well as academic or technical training, when determining whether that expert is qualified to render an opinion in a given area. Smith v. Ford Motor Co., 215 F.3d at 718.

The parties dispute the Daubert rule's applicability to class determinations. The defendants cite to Turner v. Murphy Oil USA, Inc., No. Civ. A. 05-4206, 2006 WL 91364 (E.D. La. Jan. 12, 2006), in which the court took a quick glance approach to the Daubert analysis only to ensure that "it contains no flaws that would render it inadmissible as a matter of law," id. at *4, leaving until trial the full Rule 702 analysis. *See also* Dukes v. Wal-Mart, Inc., 474 F.3d 1214, 1227 (9th Cir. 2007) ("courts need not apply the full *Daubert* 'gate-keeper' standard at the class certification stage. Rather, 'a lower *Daubert* standard should be employed at this [class certification] stage of the proceedings.'" (*citing* Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 162

(C.D. Cal. 2002)); In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 134-135 (2d Cir. 2001) (in the class certification phase, the "[d]istrict Court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law."). The plaintiffs cite West v. Prudential Securities, Inc., 282 F.3d 935, 938 (7th Cir. 2002), for the proposition that a "district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits. Tough questions must be faced and decided ."

None of those cases squarely reflect the posture of today's case. Those cases all involved evidence that would be used at trial, but which also affected the propriety of class certification. In contrast, the expert opinions challenged here all deal solely with the class certification question; there is no later inquiry to which a Rule 702 analysis might be deferred.

On the other hand, the Rule 702 analysis is a gatekeeping tool, designed to keep unreliable scientific opinion from juries. There is little reason to think a judge can dispassionately scrutinize an expert's opinion for reliability under Rule 702, only to be injudiciously affected by the same opinion. For that reason, "[t]he 'gatekeeper' doctrine . . . is largely irrelevant in the context of a bench trial." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004). A court evaluating expert opinion addressed solely to the factors the court must evaluate under Federal Rule of Civil Procedure 23 is, for all practical purposes, conducting a bench trial and serving as a trier of fact.

Accordingly, the court approaches the plaintiffs' objections to the defendant's experts under a substantially relaxed Rule 702 analysis. The court will not struggle to discern the often-faint line between the opinion that is unpersuasive because it is not based on reliable principles reliably applied and the opinion that is unpersuasive despite being based on reliable principles reliably applied.

A

Commissioned by FedEx in mid-2006, Dr. Jay's report relies on a survey of FedEx Ground drivers conducted under her leadership. Thirty-six interviewers contacted 3,059 drivers in thirty-one different states by telephone. The interviewer read from a script indicating that FedEx Ground requested the survey. Respondents were asked eleven questions, including whether they considered themselves independent contractors or employees and which designation they preferred. Based on the survey findings, Dr. Jay prepared a report stating that FedEx Ground workers prefer to be independent contractors by a 52% to 20% margin. FedEx Ground relies on the report in support of its opposition to class certification, claiming the report shows a disconnect between the remedies sought by putative class members.

The plaintiffs say the Jay Report fails both the reliability and relevance prongs of the Daubert test because the survey does not conform to generally

accepted principles of survey research and the report is irrelevant to the issue of class certification.

Survey evidence is independently admissible at trial where there is a substantial showing of reliability. Baumholser v. Amax Coal Co., 630 F.2d 550, 552 (7th Cir. 1980). Reliability of opinion survey evidence is based on whether (1) the survey was "conducted in accordance with generally accepted survey principles," and (2) "the results [were] used in a statistically correct manner." Id. The survey's facts and data needn't be independently admissible at trial for an expert to testify as to an opinion based on the otherwise inadmissible survey, so long as the methodology is of a type reasonably relied upon by experts in the field to form opinions or inferences. Id.; Fed. R. Evid. 703. Dr. Jay's report does more than simply state her conclusions based on data that someone else collected; the report actually conveys results of her study.

In determining whether the survey was conducted in accordance with "accepted survey principles," most courts look to the Federal Judicial Center's *Reference Manual on Scientific Evidence*, which provides several factors courts should consider in assessing the reliability of a survey: (1) the survey's purpose and design, (2) population definition and sampling —"was the appropriate universe defined"—, (3) the survey questions and structure —"were the questions framed to be clear, precise, and unbiased"—, and (4) the interviewers — "where the interviewers appropriately selected and trained."

First, the plaintiffs say Dr. Jay's method and procedures engineered a biased survey because the survey wasn't conducted in a "double blind" fashion in which both the respondents and the interviewers are unaware of the purpose of the survey or its sponsor. Novartis Consumer Health. Inc. v. Johnson & Johnson-Merck Consumer, 290 F.3d 578, 590 (3rd Cir. 2002). In response, FedEx Ground says the survey was conducted in a double blind manner because the respondents didn't know the purpose and disclosing the sponsor to them was necessary because unlike a consumer survey (where random calls are expected), the interviewer needed to explain how they knew the respondent was employed with FedEx Ground. The Judicial Center's Manual suggests that disclosing the sponsor to the respondents isn't fatal to the reliability of a survey and, in fact, might be required in some cases. In those cases, courts should consider (1) whether the sponsor has views and expectations that are apparent and (2) whether the respondents are aware of those views.

Interviewers had to disclose that FedEx Ground was the sponsor. Dr. Jay testified that cooperation depended on disclosing how the interviewer obtained the respondents' names. The plaintiffs say "the interviewees would be reluctant to express a view on this matter that is opposite the view held by FedEx," but disclosing FedEx Ground as the sponsor doesn't make the survey biased because the respondents wouldn't necessarily associate a view with FedEx Ground. Interviewees who knew of this litigation reasonably might presume the interview was for this suit, especially if, as the plaintiffs allege, FedEx Ground has engaged

in an information campaign aimed at controlling what the drivers know of the MDL proceedings. Still, Dr. Jay testified that in workforce surveys, respondents aren't influenced by external factors and typically provide answers based on their own experiences.

Second, the plaintiffs say Dr. Jay did not properly choose and define the relevant population because the surveyed population was under-inclusive. The parties disagree as to the implications of an under-inclusive sample. FedEx says the alleged under-inclusiveness of the survey would affect only the weight accorded the survey, not its admissibility, while the plaintiffs say under-inclusive surveys should be excluded. The cases cited by the parties suggest that "[t]echnical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not on the survey's admissibility," and "survey evidence should only be excluded "when the sample is clearly not representative of the universe it is intended to reflect." Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996); *see also* Spraying Systems Co. v. Delavan, Inc., 975 F.2d 387, 394 n. 5 (7th Cir. 1992) ("Since a sizable portion of the parties' products are sold to distributors and equipment manufacturers, the selection of farmers only as the relevant universe limits the surveys' *probative* value even further." (emphasis added)).

The plaintiffs first take issue with the size of the survey sample: (1) the starting population (9,000 potential respondents) was only 46 percent of the total number of drivers (20,000), (2) responses from 3,000 drivers constitutes only 15

percent of the total number of drivers, (3) former drivers weren't included, and (4) the survey included drivers from only thirty-one states, while the nationwide ERISA class includes potential drivers from all fifty states.

FedEx Ground says the target population for the survey was every driver in the thirty-one states in which a class action was pending at the time of the survey, and the absence of former drivers is irrelevant because the survey data will be used to show a conflict between the declaratory relief sought by the named plaintiffs and the proposed class members. FedEx Ground's position is the more persuasive. Dr. Jay testified that the survey's purpose was to determine whether current drivers would now prefer to perform their duties as independent contractors. In that respect, whether former drivers prefer classification as an employee goes only to monetary damages, not to declaratory relief. As Dr. Jay points out, nothing suggests the results would differ had the survey called drivers in the other nineteen states. Drivers in the thirty-one states that had class actions pending might be more likely to have been aware of the litigation, but that again goes to the weight of the evidence.

The plaintiffs' expert says Dr. Jay's sample has a disproportionate amount of multiple work area contractors, opposed to single work area contractors. Dr. Jay's supplemental report suggests the statistical breakdown is very close to reflecting the actual make-up of the contractors. Dr. Jay explains in her supplemental report that the percentile differences may be the result of a disconnect between the way FedEx Ground classifies its contractors and the way

the contractors classify themselves. Whatever difference might exist is not sufficient to render the survey unreliable.

Finally, the plaintiffs question the response rate, but Dr. Jay's response indicates the response rate was about 75 percent, which she says is a high cooperation rate. The plaintiffs' reply doesn't contest this conclusion.

The plaintiffs also take issue with the survey's questions and structure, which, they say, created a bias because the language primed respondents to lean towards answers indicating an independent contractor relationship. Specifically, the callers referred to the respondents as "contractors" eight times during the script. Dr. Jay explains that this terminology was chosen because FedEx Ground referred to the drivers as contractors, but that doesn't seem to affect whether people associate the term "contractor" with specific employment characteristics, one of which might be owning your own business. The plaintiffs say the bias created by the terminology is further exasperated by the failure to define the terms "employee" and "contractor." This seems to be the crux of the problem with this survey—the survey ultimately calls for lay persons to state preferences and understandings about a relationship that the law defines. The impact of the choice of terminology depends on the purpose for which FedEx Ground seeks to use Dr. Jay's results.

FedEx Ground says the survey is being introduced to show that "there is a conflict between the proposed class representatives and the putative class members about the form of the forward-looking declaratory and injunctive relief

that would potentially be sought if plaintiffs were to prevail on the threshold liability issues." Fifty-two percent of the current contractors who responded to the Field Survey would prefer to be independent contractors and 20 percent would prefer to be employees. As the plaintiffs point out, though, the answer to question—"Would you prefer to perform your pick-up and delivery services as an employee or an independent contractor?"—is meaningless because the question doesn't inquire into the respondents' preferences as to the remedy they would receive for being wrongfully classified. This survey is unpersuasive when offered to prove that the proposed class members don't want declaratory relief sought by the named plaintiffs.

B

The plaintiffs challenge the portion of Mr. Crandall's report that analyzed whether FedEx Ground routes meet the attributes of businesses such that it can be said that contractors are operating businesses. Mr. Crandall reviewed data relating to four different criteria attributable to businesses: (1) the requirement for capital investment; (2) the opportunity to expand; (3) the opportunity to generate profits and losses through the hiring of others; and (4) the opportunity to generate profit, loss, and changes in equity value through managerial decisions. To analyze the fourth criterion, Mr. Crandall conducted a phone survey of FedEx Ground drivers regarding the market for FedEx Ground delivery. He found that there is a significant market for FedEx Ground delivery routes, so drivers could make

decisions affecting their gross income. Based on these findings, Mr. Crandall concluded that FedEx Ground delivery drivers are operating a business.

The plaintiffs seek to exclude Mr. Crandall's report because he isn't qualified as an expert in research, economics, or statistics, and his survey lacks a reliable methodology, and his analysis of the data is unreliable.

The plaintiffs say Mr. Crandall is not an expert in survey design and administration or in economics. They say Mr. Crandall lacks requisite education in survey design and business valuation, isn't published in either of those fields, and his experience relating to economics is mainly in the field of damages. FedEx Ground says Mr. Crandall's education and experience are sufficient to allow him to testify as an expert.

Mr. Crandall is a partner in the litigation consulting practice of Resolution Economics, LLC. Before consulting, Mr. Crandall performed related work for fourteen years for Deloitte & Touche, Altschuler, Melvoin and Glasser, and Price Waterhouse. He holds a Masters of Business Administration Degree from Loyola Marymount University. Mr. Crandall's main area of expertise is economic damages, but he has experience in his consulting practice and during trial preparation related to economics, business valuations, and class action employment matters.

Mr. Crandall has no courses, seminars, or publications in the relevant fields of research, economics, or statistics and hasn't taken any course dedicated exclusively to "business valuation." He has, though, taken courses in substantive

areas relevant to valuing a business, including economics, accounting, statistics, mergers and acquisitions, enterpreneurism, finance, and strategic planning. This course work alone may not carry the day, but experts can qualify to testify based upon personal experience. *See* Smith v. Ford Motor Co., 215 F.3d at 718 (*citing* Walker v. Soo Line R.R. Co., 208 F.3d at 591) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."). Mr. Crandall has participated in fifteen to twenty surveys and has provided business valuation and testimony in other cases. That his experience has been predominately with FedEx, and that he has only provided trial testimony five other times, doesn't mean he isn't qualified to provide an opinion on the differing value of the drivers' "businesses." Mr. Crandall's background is in economics and includes several years of consulting on economic and employment matters, including survey design, research, and business valuations. The expertise that Mr. Crandall has developed as a result of these experiences puts him in a position to offer responsible opinion testimony on the subjects covered in his report.

The plaintiffs say Mr. Crandall's survey didn't comport to the Judicial Center's generally accepted survey principles. First, they say the sample of only 146 drivers out of the nearly 5,000 current and former drivers who had bought or sold routes between 2000 and 2006 (2,900 of whom's telephone numbers are available), results in a 5 percent response rate, which is too small to yield any conclusions. Mr. Crandall admits the sample is small. FedEx Ground says the sample was sufficient because the survey's purpose wasn't to review the sales

transactions in detail to determine route valuation, but rather "to examine the basic questions of (1) whether there is a market for routes and (2) are routes changing hands for consideration." The plaintiffs also say the survey wasn't reliable because some respondents didn't remember the transaction's details, a problem commonly referred to as "memory decay." The plaintiffs note that some respondents couldn't remember the price for which they bought or sold their routes; others received their routes for free. The survey results, however, take those responses into account with a category for respondents who couldn't recall the details of the purchase or had received the route for free. The plaintiffs also say the questions were confusing, but they don't say why, and the court's review of the script doesn't support that argument. Given the survey's limited purpose, the court can't find the survey too unreliable for Mr. Crandall to reasonably rely upon it.

The plaintiffs challenge the reliability of Mr. Crandall's analysis of the survey data because his analysis is based on incomplete data and ignores inconsistent data. They say his conclusion—that there is a market to buy and sell delivery routes—fails to account for the 20 percent of his respondents who either didn't recall the amount of the sale or "the thousands of drivers who were apparently unable to sell" their routes. The conflicting data, however, goes to the weight of his conclusion. See <u>In re Visa Check/MasterMoney Antitrust Litigation</u>, 280 F.3d at 134-135 (at class certification "a district court may not weigh

conflicting expert evidence or engage in 'statistical dueling' of experts" when considering reliability).

Mr. Crandall opines that the "market multiple approach" was "the most common measurement of value considered by FedEx Ground Contractors when they made their decision about route valuation at the time of purchase or sale." The most common answer provided when asked how the value of the route was determined was "whatever price was offered." From this, Mr. Crandall concluded that the contractors used a strategic approach under which they valued their routes after comparing a multiple of their gross revenue to the sales transaction of a comparable business. He also concluded contractors made certain strategic decisions, such as buying undervalued routes. These conclusions don't have the analytical framework to explain how the expert reached his conclusion in light of the contrary data, and seems much more like conjecture than science, and so are unpersuasive and likely inadmissible under a strict Daubert approach. *See* Ramsey v. Consolidated Rail Corp., 111 F. Supp.2d 1030, 1038 (N.D. Ind. 2000) (opinion testimony not admissible under Daubert where the report "contains no explanation as to how any scientific principles support the contrary opinion in the face of eight years of non-detect results in and immediately around the Ramsey well."); *see also* General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Mr. Crandall opines that such a valuation method is common based on his Internet research, but he offers no data from the survey suggesting that these contractors used such a valuation method or considered factors consistent with such a determination. Without evidence that the drivers considered additional factors utilized in a market multiple approach, his conclusion that the drivers engaged in such a behavior is an unpersuasive inferential leap.

Mr. Crandall's background, and more significantly his experience, is sufficient to allow him to testify about business valuation. His survey, although flawed in some aspects, is sufficiently reliable and persuasive to demonstrate what it was intended to show: that there is a market for buying and selling the delivery routes and some routes are sold for consideration. From this, Mr. Crandall concludes that supply and demand influenced route valuations. This seem apparent from the survey and his report. The court finds unpersuasive, however, his conclusion that contractors used a strategic approach whereby contractors valued their routes after comparing a multiple of their gross revenue to the sales transaction of a comparable business.

C

Dr. Jeanneret examined the work activities of FedEx Ground workers. He prepared his report after observing twenty-one FedEx Ground workers in Indiana and Illinois and reviewing summaries of some disputed portions of the depositions of the eighty-six class representatives. In preparation for his report, Dr. Jeanneret

participated in "ride-alongs" with drivers and interviewed various FedEx Ground workers about their work activities. Based on his observations, Dr. Jeanneret prepared a report identifying variations in the drivers' activities across five "work content domains" based in large part on the accepted methodology of the Professional Management and Position Questionnaire (PMPQ). FedEx Ground insists that the report shows important variations in the contractors' work. The plaintiffs contend that the survey is unreliable because the survey and analysis are flawed.

The plaintiffs say the study is unreliable because twenty-one drivers in two states constitutes an improperly drawn sample representative of an appropriately defined population. Dr. Jeanneret didn't base his conclusion on statistical survey data, which would require a higher sample population. Rather, he used direct observation and interviews of 107 drivers, two methods he says are reliable when performing job analysis; he cites to several academic treatises, including Earnest McCormick's "Job Analysis; Methods and Applications." The plaintiffs don't point to any evidence suggesting this isn't a reliable methodology for job analysis. The plaintiffs also say the study was biased because it only focuses on the "differences" in work activities. Dr. Jeanneret, however, says the team considered both similarities and differences, and he had no expectations when the study began.

The plaintiffs argue that there was substantial variation among the work performed by the studied drivers, and one would observe the same range of

differences (though not necessarily the same differences) among the greater population. Dr. Jeanneret's report says he used a slightly adapted version of the PMPQ to analyze the drivers' work activities, only adding a work content domain for technical/maintenance/physical activities (carries packages). The plaintiffs don't dispute that the PMPQ is "scientifically established." They say the test requires an examination of the frequency and importance of particular work activities. Dr. Jeanneret states in his declaration that he took these factors into consideration through a qualitative analysis. He did not, however, engage in a quantitative analysis of the frequency and importance of certain work tasks. He cited an academic treatise for the proposition that job analysis generally can either be quantitative or qualitative, but whether the PMPQ requires quantitative standards when reviewing how often a driver engages in certain activities is unclear. Without more, it seems that to compare job tasks it would be important to weigh how often (or how important) certain activities are. Dr. Jeanneret' s conclusion that there was substantial variation among the work performed by the studied drivers is not persuasive.

Dr. Jeanneret also concludes that his study's results can be attributed to the package drivers as a whole. He says he used a method of analysis called "triangulation," whereby a researcher compares different sources of data to discern the presence of epistemological gaps, inconsistences, or errors in knowledge or perception. He says multiple vantage points allowed him to generalize the findings to all contractors—"we can conclude among [ ] the

contractor population at large, there probably will be variations in the major work functions." This is unpersuasive. The term "triangulation" is nowhere in his report, and he didn't consider any other data source that could be compared to the results of his observations and interviews.

Dr. Jeanneret's report is unpersuasive on these points.

D

For these reasons, the court overrules the plaintiffs' motions to strike, but finds the targeted opinions unpersuasive to the extent noted in the preceding sections.

II

The court turns now to the Kansas plaintiffs' motions for class certification.

These plaintiffs challenge the practice of FedEx Group Package System, Inc. of labeling its Ground and Home Delivery division drivers as independent contractors. The plaintiffs assert that even though FedEx represents to its drivers that they are only partnering with FedEx and will essentially own their own business, the FedEx Operating Agreement signed by all FedEx drivers actually reserves to FedEx the right to exercise pervasive control over the method, manner, and means of the drivers' work, rendering improper the drivers' classification as independent contractors rather than employees. For examples of the actual control FedEx asserts over its drivers, the plaintiffs point to FedEx's right to

control the drivers' appearance and behavior, their pay and rates charged to customers, the vehicle they use and its appearance, their route and the number of packages they deliver each day, their delivery methods and mode of customer service, their hours of work, and their opportunity to increase their earnings. The plaintiffs say litigation of this case as a class action is appropriate and desirable since common evidence can resolve all plaintiffs' claims. The plaintiffs contend that FedEx has a categorical policy of classifying its drivers as independent contractors. All class members share the same job title, signed the same non-negotiable Operating Agreement, are paid under the same compensation formula, wear the same uniform, drive FedEx approved trucks bearing the FedEx logo, work exclusively for FedEx, and are all similarly integrated into FedEx's operations.

FedEx responds that the proposed Kansas class should not be certified because the plaintiffs' claims turn on individualized issues, including whether contractors should be classified as employees under Kansas' common law test, whether contractors should be classified as employees under the Kansas Wage Payment Act, and whether any individual contractor can meet the high bar for rescission of his individual contract. FedEx says the named plaintiffs themselves show how diverse this class would be because each contractor's experience is different: some named plaintiffs reviewed the Operating Agreement before signing; some had others drive their routes; some bought their routes from contractors; and one even developed his own alternating day schedule. FedEx further contends

that the proposed ERISA class shouldn't be certified because the named plaintiffs lack standing since they are ineligible for benefits under the plans' own terms, either as individuals or as putative class representatives.

A

To maintain a class action, the named representatives and each class they seek to represent must meet the requirements under FEDERAL RULE OF CIVIL PROCEDURE 23. First, the proposed class action must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. A district court has broad discretion in determining whether the plaintiffs have satisfied the prerequisites of Rule 23, *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993), but the court must conduct a rigorous inquiry into the propriety of proceeding as a class before certifying. *Livingston v. Associates Finance, Inc.*, 339 F.3d 553, 558 (7th Cir. 2003). The plaintiffs have the burden of demonstrating they satisfy the class certification prerequisites. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d at 596.

Numerosity means the proposed class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). No magic number establishes the numerosity requirement, and some courts have found this element satisfied when the putative class consists of fewer than forty members. *Lucas v. GC Services L.P.*, 226 F.R.D. 337, 340 (N.D. Ind. 2005) (collecting cases). "The exact number of class members need not be known. . . [i]nstead, the plaintiff can offer

'good faith estimates of class size... and the court may use 'common sense assumptions' to determine the validity of those estimates'." Id. (internal citations and quotations omitted).

The commonality requirement requires only that there exist "questions of law or fact common to the class." Keele v. Wexler, 149 F.3d 589, 594 (7th Cir.1998). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Id. That there is some factual variation among the class grievances will not defeat a class action. Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir. 1992). Claims arising from a defendant's standardized conduct towards members of the proposed class or from the interpretation of a standard contract often present a case for treatment as a class action. Keele v. Wexler, 149 F.3d at 594 (*citing* Kleiner v. First Nat'l Bank of Atlanta, 97 F.R.D. 683, 691 (N.D. Ga.1983) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action."); Heartland Communications, Inc. v. Sprint Corp., 161 F.R.D. 111, 116 (D. Kan. 1995) (certifying class where contracts signed by all class members contained virtually the same provision as that challenged by class representative)).

"The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality," Rosario v. Livaditis, 963 F.2d at 1018, but this requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the

class at large." Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d at 596-597. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983).

Rule 23(a)(4) requires that the named plaintiff "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This means that (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class, Rosario v. Livaditis, 963 F.2d at 1018; and (2) the class representatives must be willing and able to "vigorously pursue the litigation on behalf of the class," and the attorneys they have chosen to represent the class must be "qualified, experienced and able to conduct the litigation." Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 186 (N.D. Ill. 1992) (*citing* Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986)).

In addition to these four prerequisites, an action must also be maintainable under at least one of the three provisions of Rule 23(b). That is, the court must decide which form of class action, if any, is the most appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974); Jefferson v. Ingersoll International Inc., 195 F.3d 894, 898 (7th Cir. 1999) (the court should "endeavor to select the most appropriate subsection, not just the first linguistically applicable one in the list").

A court may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV .P. 23(b)(2). When a request is made for both declaratory and monetary relief, the class is properly certified under Rule 23(b)(2) only if the request for declaratory relief predominates over the request for monetary relief. Lemon v. International Union of Operating Engineers, Local No. 139, 216 F.3d 577, 580-581 (7th Cir. 2000). That is, the court must decide whether the requested monetary damages are "incidental" to the requested declaratory relief. Jefferson v. Ingersoll International Inc., 195 F.3d at 899. Incidental damages are those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." Lemon v. International Union of Operating Engineers, Local No. 139, 216 F.3d at 581 (*quoting* Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)). Incidental damages, therefore, don't depend "in any significant way on the intangible, subjective differences of each class member's circumstances" and don't "require additional hearings to resolve the disparate merits of each individual's case." Allison v. Citgo Petroleum Corp., 151 F.3d at 415.

Rule 23(b)(3) allows class certification when questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See* Szabo v. Bridgeport

Machines, Inc., 249 F.3d 672, 676 (7th Cir. 2001). The court looks beyond the pleadings to analyze the claims, defenses, relevant facts, and applicable substantive law that may be necessary to determine whether certification is appropriate. Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996). While individual issues may exist in determining the damages suffered, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 137 (3rd Cir. 2000) (*quoting* Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3rd Cir. 1977)); *see also* In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); Bertulli v. Independent Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir. 2001) (affirming district court's determination that common issues predominated, stating that "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); FED. R. CIV. P. RULE 23(b)(3) ADVISORY COMMITTEE'S NOTES ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of damages suffered by the individuals within the class.").

"To determine whether damages predominate, a court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate." Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 976 (5th Cir. 2000)*; See also* FED. R. CIV. P. 23(c)(4); Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 441 (4th Cir. 2003) ("courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case... if [an] action includes multiple claims, one or more of which might qualify as a certifiable class claim"); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues."). The plaintiffs must also show a class action is superior to other available methods for the fair and efficient adjudication of this controversy. FED. R. CIV. P. 23(b)(3); Wahl v. Midland Credit Mgmt. Inc., 243 F.R.D. 291, 299 (N.D. Ill. 2007). One factor often disputed in the superiority analysis (as it is in each of these cases) is "the difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23(b)(3)(D). Class actions have been found superior when potential damages might be too insignificant to provide class members with incentive to pursue a claim individually, and where potential plaintiffs may not be aware of their rights or be able to hire competent counsel to protect these rights. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997).

B

The Kansas plaintiffs allege that FedEx's classification of Kansas pickup and delivery drivers as independent contractors violates the Kansas Wage Payment Act. The plaintiffs seek rescission of their operating agreement as contrary to public policy and an unconscionable adhesion contract, as well as declaratory relief that FedEx's employment practices are unlawful under Kansas law. The Kansas plaintiffs seek to certify these claims for class treatment, asserting that the claims are legally and factually common and typical among the following proposed class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998, to provide package pick-up and delivery services pursuant to the Operating Agreement; and (3) were dispatched out of a terminal in the state of Kansas.

FedEx doesn't contest that the putative class representatives and the proposed Kansas class satisfy the requirements of Rule 23(a), but the court still must conduct its own review. *See, e.g.*, Gammon v. GC Services Ltd. Partnership, 162 F.R.D. 313, 317 (N.D. Ill. 1995) (defendant didn't contest three of the Rule 23(a) requirements and the court's "own independent review" confirmed that those requirements were satisfied). The class representatives include: Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law and Sylvia O'Brien.

The proposed Kansas class likely consists of at least 102 current package and delivery drivers who have entered into the standard operating agreement with FedEx, and an undisclosed number of former drivers who entered into the agreement during the class period. Based on the size of the delivery system in Kansas and other states, as well as the number of current drivers, it is reasonable to infer that the putative class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

The plaintiffs say they are entitled to repayment of costs and expenses these drivers paid during their employment, as well as overtime wages, because FedEx wrongfully classified the putative class members as independent contractors under the Kansas Wage Payment Act. To succeed on this claim, the putative members will have to show they are (or were) employees under Kansas law. *See* Crawford v. State Dep't. of Human Resources, 845 P.2d 703 (Kan. Ct. App. 1989). Because the putative class members were uniformly classified as independent contracts, they share several common factual and legal questions regarding their statutory wage claim. *See, e.g.,* Lucas v. GC Servs. L.P., 226 F.R.D. at 340 ("When a question of law refers to a standardized conduct by defendants toward members of the class, a common nucleus of operative facts is typically presented, and the commonality requirement is usually met.").

The plaintiffs also seek the operating agreement's recission as contrary to public policy and an unconscionable adhesion contract. Under Kansas law, a contract that is illegal to enforce is void as against public policy, so in assessing

the plaintiffs' rescission claim, the court must examine the operating agreement and the circumstances surrounding its execution and enforcement to determine the agreement's legality. *See* In re Shirk's Estate, 350 P.2d 1, 13 (Kan. 1960). A provision in a contract can make the agreement unconscionable if the provision is, under the circumstances, "so outrageous and unfair in its wording or its application that it . . . is against public policy." Adams v. John Deere Co., 774 P.2d 355, 357 (Kan. Ct. App. 1989). Because the putative class members all signed the disputed operating agreement, they share several common factual and legal questions relating to the interpretation, execution, and enforcement of the agreement.

The plaintiffs' statutory wage and rescission claims are also typical of the putative class members' claims because they arise from the same event—the drivers' classification as independent contractors—and rest on the same theory—that the drivers have wrongfully been denied wages and have paid unjust enrichment to FedEx as a result of their improper classification under the operating agreement. The plaintiffs and proposed class members all signed a standard-form operating agreement, so the claims of the plaintiffs have the same essential characteristics as the claims of the class at large.

Finally, the named plaintiffs say that they, along with proposed class counsel, can "fairly and adequately protect the interests of the class" as required by Federal Rule of Civil Procedure 23(a)(4). The named plaintiffs include current and former drivers from the Home Delivery and Ground divisions of FedEx, so the

court agrees their interests don't differ from the those of the class as a whole. Nothing in the named plaintiffs' conduct suggests they won't continue to vigorously pursue the litigation on the class's behalf, nor does the record suggest class counsel isn't qualified, experienced, and able to conduct the litigation.

Having determined the plaintiffs and the proposed class meet the Rule 23(a) prerequisites with regard to their Kansas state law claims, the court must determine which form of class action, if any, is appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974). The plaintiffs seek to have their claim for damages under the Kansas Wage Payment Act certified under Rule 23(b)(3), which permits class certification when questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Szabo v. Bridgeport Machines, Inc., 249 F.3d at 676. To answer these questions, the court considers the substantive elements of named plaintiffs' cause of action and inquires into the proof necessary for the various elements. Simer v. Rios, 661 F.2d 655, 672 (7th Cir. 1981).

Like many of the claims in the suit, the Kansas plaintiffs' wage claim hinges on whether they are employees under Kansas law. *See* KAN. STAT. ANN. §§ 44-313 (b) & 314(a); *see also* Herr v. Heiman, 75 F.3d 1509, 1512 (10th Cir. 1996). The Kansas Wage Act circularly defines an employee as "any person allowed or permitted to work by an employer," KAN. STAT. ANN. §§ 44-313 (b), so courts look

to the facts and circumstances surrounding the employer-employee relationship to determine the package and delivery drivers' employment status. Herr v. Heiman, 75 F.3d at 1512 (*citing* Wallis v. Secretary of Kansas Dep't. of Human Resources, 689 P.2d 787, 792 (Kan.1984). The Kansas Supreme Court has held that "[a]n employer's right to direct and control the method and manner of doing the work is the most significant aspect of the employer-employee relationship, although it is not the only factor entitled to consideration." Wallis v. Secretary of Kansas Dep't. of Human Resources, 689 P.2d at 792. "An employer's right to discharge the worker, payment by the hour rather than by the job, and the furnishing of equipment by the employer are also indicia of an employer-employee relationship." Id.; *see also* Crawford v. Department of Human Resources, 845 P.2d 703, 706 (Kan. Ct. App. 1989) (listing twenty additional factors Kansas Department of Human Resources uses to determine whether employee-employer relationship exists). FedEx says the court can't make categorical decisions as to the drivers' employment status because the Kansas drivers' varied experiences raise individualized issues.

FedEx first argues that "Kansas courts look to the actual conduct of the parties in determining whether the right to control exists," so determining the ability to control requires the court to engage in an individual analysis of each driver's experience. The court disagrees. In support of its argument, FedEx points to the deposition testimony of a few drivers who say they had control over their schedules, who they hired, their delivery methods, the volume of their packages,

and their delivery route. While courts should look to the actual employment relationship as opposed to an employer's unilateral determination, the nature of the employment relationship is determined by the existence of the right to exercise control, not the actual control FedEx exercised over some employees. Wallis v. Secretary of Kansas Dep't. of Human Resources, 689 P.2d at 792 ("It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor."). These few drivers' anecdotal experience, therefore, isn't determinative of the employment relationship. Wallis v. Secretary of Kansas Dep't. of Human Resources, 689 P.2d at 795.

In Wallis, a vacuum cleaner distributor contracted with individual dealers, whom the court determined were free to "sell the products in whatever method they feel best accomplishes their goals." Id. Despite the dealers' autonomy in their daily operations, the distributor reserved the right to terminate the contract "in those instances wherein he [found] the dealer to be not representative of the product or product line." The court concluded the distributor hadn't exercised actual control over the dealers, but the fact that the distributor reserved the contractual right to require that dealers comply with distributor's standards evinced an employer-employee relationship. Id. This court, too, must look to the substance of the standard operating agreement that purports to define FedEx's authority over the manner in which the drivers made their pick-ups and deliveries, rather than the actual control FedEx exercised.

The background statement to the operating agreement states that drivers will provide their services as "independent contractors, and not as an employee of [Fed Ex] for any purpose," and that the "method, manner and means" by which the drivers conduct their deliveries are "within the discretion of the Contractor." Despite this acknowledgment, the plaintiffs say the agreement goes on to require that drivers handle their packages using particular methods, cooperate with other FedEx drivers, and foster an image consistent with the FedEx brand. To that end, the plaintiffs say the agreement reserves certain rights to FedEx regarding the manner in which the drivers conduct pick-ups and deliveries.

The plaintiffs say the operating agreement reserves to FedEx the right to (1) "determine whether the truck used by the driver to drive his route is 'suitable for the service called for in the Agreement;'" (2) "determine the identifying colors and the appropriate logo which the driver must use to mark her truck;" (3) "determine what logs, inspection reports and shipping documents the driver must provide to [Fed Ex] at the conclusion of each day;" (4) "determine whether a driver's personal appearance meets the 'consistent image' that [Fed Ex] wishes to project to customers;" (5) "verify through 'customer service rides' and other 'visits' with customers that the drivers is meeting [Fed Ex's] standards of customer service;" (6) "approve any supplemental drivers or helpers the contractor has to employ to substitute for the contractor when he or she needs a day off or some assistance;" (7) "determine and assign the routes that will be covered by the drivers;" (8) "reconfigure or change the driver's route on five days' notice;" (9) "determine, in

its sole discretion, the compensation that will be paid to the driver for his services;" and "terminate the contractor if [Fed Ex] determines that the driver has failed to perform her 'contractual obligations' or not renew the driver's contract on 30-days notice." The operating agreement appears to provide common proof of FedEx's authority to control its package and delivery drivers, which allows the court to make categorical determinations of the driver's employment status, so the varying experiences of some drivers doesn't preclude certification.

Still, FedEx says the operating agreement doesn't provide common proof of control because there are material differences between the Ground and Home Delivery operating agreements and because the plaintiffs seek to rescind the agreement on the basis that it doesn't reflect the actual relationship of the parties' actual relationship. First, the court doesn't find the differences highlighted by FedEx to be material to the issue of control, so doesn't agree the differences mitigate the common proof that can be gleaned from the operating agreement. Second, the plaintiffs don't contend that the agreement doesn't reflect the actual employment relationship. They seek to rescind the operating agreement because the agreement was "*designed* to conceal the true nature of the relationship between FedEx [ ]and its drivers: that of employer and employee." The basis of the recision is the various statements purporting to classify [the drivers] [ ] as independent contractors," which creates a "misrepresented legal classification." The plaintiffs put the remaining portions of the operating agreement at issue by arguing that FedEx's right to control stems from such provisions.

FedEx argues that determining its ability to terminate drivers at will requires particularized evidence, making this claim unsuitable for class action treatment. FedEx claims the evidence to which the plaintiffs point for support of their contention that FedEx had the right to terminate drivers at will (e-mails between various managers discussing specific terminations) actually supports FedEx's contention that such determinations are highly case specific. This argument confuses the test: it isn't the actual practice of who and how FedEx terminates, but rather whether FedEx reserved the right to terminate drivers at will. When the Wallis v. Secretary of Kansas Dep't. of Human Resources court addressed this element, it didn't look at specific terminations, but rather noted that "Wallis can terminate the contract with the dealer 'in those instances wherein he finds the dealer to be not representative of the product or the product line.'" 689 P.2d at 795. Likewise, the FedEx Operating Agreement states that it may be terminated: "[b]y Contractor or FedEx Ground if the other party breaches or fails to perform the contractual obligations imposed by this Agreement." Deciding whether this element weighs in favor or against the drivers being employees will require the court to focus on the agreement's language, not the specific circumstances surrounding certain drivers' terminations.

FedEx also argues that the methods by which drivers are paid their "settlement checks" vary considerably. They claim drivers' checks are based on the number of stops and the number of packages picked up and delivered; a set figure for making available a qualifying van and operator; a "core zone" payment

particular to each serviced area, which is inversely related to customer density and package volume; and other payments. This formula means contractors servicing areas with a low density of customers and low package volume will receive a significant portion of their settlement in a "core zone" payment, while other contractors who service more concentrated areas may not receive any "core zone" payment.

The plaintiffs don't dispute the earnings calculation, but instead assert that the calculation proves how little control drivers have over how much they earn. They claim that each year FedEx unilaterally re-sets the package and store rates, the "core zone" payment, and announces the changes to the compensation formula in scripted, strictly controlled presentations to the drivers. The drivers can't negotiate any part of the compensation formula, since by the time the changes are announced they already have been incorporated into a take-it or leave-it contract addenda for the drivers to sign. The plaintiffs also assert that the drivers can't grow their business since as the number of stops and packages in a driver's route increase beyond what can be serviced individually, the driver risks having his or her route reconfigured and stops or packages diverted to another driver. The driver can put a supplemental truck on the route to cover the additions, but must absorb that cost.

The court needn't decide at this stage whether the amount of control Fed Ex has over what the drivers are paid supports the contention that an employer-employee relationship exists. The evidence to which the court will look to make

that decision, such as the Operating Agreement and yearly addenda, however, won't require the sort of individual analysis that would make class certification inappropriate.

Finally, FedEx argues that the provision of tools, supplies, and materials may vary by contractor depending on whether he or she purchased a business support package. Too, drivers acquire their vehicles in several ways: leasing through Bush Leasing; another leasing company; or purchasing from FedEx, another driver, or a separate entity. The variations would call for individual analyses rendering this claim unfit for a class action.

The plaintiffs counter by stating that FedEx ultimately retains the absolute right to approve or disapprove any vehicle a driver seeks to use. FedEx sets forth standardized vehicle specifications for each type and class of vehicle in its fleet, including policies on the height, width, and length of vehicles used by drivers. All vehicles must be painted FedEx White, a color Sherwin Williams developed for FedEx. Moreover, although the drivers bear the cost of owning their vehicles, FedEx actually orders and purchases most of the trucks in its fleet and resells those same trucks to drivers at a reduced price. The Operating Agreement requires these vehicles to be maintained in a clean and presentable fashion, free from body damage and extraneous markings. Inspections made by Fed Ex field managers reinforce this requirement. This element, too, can be determined on a class wide basis without the need for an assessment of each individual driver's experience.

From these analyses, the court finds that determining whether the drivers are employees under Kansas law will depend upon the amount of control reserved by Fed Ex and will require a detailed analysis of the standard Operating Agreement. These common questions of law and fact predominate over issues affecting only individual members and so support class certification.

For certification under Rule 23(b)(3), a class action must also be superior to other available methods for the fair and efficient adjudication of the controversy. In determining whether a class action is superior, Rule 23(b)(3) provides that the court should consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In this case, these factors support certification. The amount of damages available to individual class members likely wouldn't justify the cost of litigation if members were to proceed on an individual basis. Additionally, though managing a class action this large in one forum will present difficulties, the advantages of concentrating this litigation, such as preventing conflicting judicial decisions, outweigh the difficulties. Class actions have been found superior when potential damages might be too insignificant to provide class members with incentive to pursue a claim individually, and where potential plaintiffs may not be aware of

case 3:05-md-00527-RLM-CAN document 906 filed 10/15/07 page 42 of 57

their rights or be able to hire competent counsel to protect these rights. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997).

For the reasons stated above, certification under 23(b)(3) is appropriate for the Kansas Wage Payment Act claim.

C

Alternative to their claim under the Kansas Wage Payment Act, the plaintiffs have alleged common law claims of rescission, unjust enrichment, and *quantum meruit*. The drivers claim entitlement to rescission of their Operating Agreements on the grounds that those agreements contravene public policy and are unconscionable contracts of adhesion. The plaintiffs argue that Kansas labor statutes demonstrate a clear public policy in favor of providing employees with certain non-waivable employment rights, such as the right to unemployment compensation, workers compensation, and wage law protections. The plaintiffs say that FedEx, by allegedly misclassifying their drivers as independent contractors, undermines the public policy of ensuring their employees these benefits. The drivers further claim that the Operating Agreement meets the standard for unconscionability because it is "so one sided that no fair-minded person would view [it] as just or tolerable." Adams v. John Deere Co, 774 P.2d 355, 358 (Kan. Ct. App. 1989).

The plaintiffs contend that the issues raised by these claims are proper for class certification because they are based on the legality of the Operating

Agreement's classification of drivers as independent contractors, which is common to the whole class. Since the plaintiffs seek certification of these claims under Rule 23(b)(3), the court must decide whether the questions of law or fact common to the members of the class predominate over questions affecting only individual members and that a class action is superior to other available methods of adjudication.

FedEx counters that under Kansas law, one who continues to receive the benefits of a contract after learning the facts that would otherwise entitle him to rescission is not entitled to such a remedy. They point to Baker v. Penn Mutual Life Ins. Co., 788 F.2d 650, 662 (10th Cir. 1986), which provides that:

> Rescission is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud, or duress. Ordinarily, the nature of relief asked in such cases must be such as to place the parties in their original situation. Where one with knowledge of [the] facts entitling him to a rescission of the contract afterwards without duress ratifies it, he is not entitled to have it canceled.... Acts or conduct, inconsistent with an intention to avoid it, or in recognition of the contract, have the effect of an election to affirm it.

(emphasis removed). FedEx argues that individual issues would predominate since the court would need to engage in individualized inquiry of when each class member became aware of the facts entitling him to rescission. As the plaintiffs point out, the drivers allege that FedEx fraudulently misrepresented their legal classification, thereby concealing the true nature of the employment relationship. Until the court ultimately decides the legal nature of this employment relationship, the class members cannot "become aware" of their "employee status".

In any event, this claim is suitable for class certification because it is based on alleged misrepresentations contained in the Operating Agreement common to all drivers. FED. R. CIV. P. RULE 23(b)(3) ADVISORY COMMITTEE'S NOTES ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of damages suffered by the individuals within the class"). This claim can be decided on a class-wide basis because common legal and factual questions predominate over individual issues.

FedEx claims that rescission based on unconscionability is similarly unsuitable for class-wide proof, since whether a contract is unconscionable depends on whether similar terms existed in previous contracts between the parties. FedEx also argues that the standard for unconscionability is a high bar, which the drivers cannot meet; the contract must be "so outrageous and unfair in its wording or its application that is shocks the conscience or offends the sensibilities of the court." Adams v. John Deere Co., 774 P.2d 355, 357 (Kan. Ct. App. 1989). First, whether previous contracts between the parties had been executed is only one factor the courts take into consideration. That other contracts were entered into can be considered without examining each individual contract between the drivers and FedEx. Because the bar's height is not relevant at this stage and since this claim can be decided without in-depth individual analysis, it is also fulfills the predominance requirement of Rule 23(b)(3). Lastly, FedEx argues that under Kansas law, unjust enrichment and other quasi-

contractual remedies are not available where an express contract exists. FedEx doesn't believe that the contract can be rescinded and so argues that plaintiffs are not entitled to this relief. Again, whether the plaintiffs can meet their burden to rescind the Operating Agreement does not need to be decided at this stage.

FedEx also raises other substantive legal defenses that do not appear to raise individual issues and thus needn't be considered at this stage.

As stated in the Kansas Wage Payment Act analysis, the class action is the superior method for adjudicating this claim because the high cost of litigation would likely preclude most individual class members from bringing this lawsuit and this method will also promote judicial efficiency by having all of these common claims decided in one forum.

Class certification for plaintiffs common law claims is appropriate under Rule 23(b)(3).

D

The named Kansas plaintiffs, along with three additional package delivery drivers, seek to certify a national ERISA class action for recovery under 29 U.S.C. § 502(a)(1). The putative class members seek declaratory relief regarding their participant status and entitlement to benefits under the ERISA plans, as well as payment of benefits to which they are entitled, but were improperly denied as a result of their misclassification. They seek certification of an ERISA class defined as:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were eligible for ERISA plan benefits, absent their mischaracterization as independent contractors

FedEx doesn't contest that the named plaintiffs and the proposed ERISA class satisfy the numerosity, commonality, and typicality requirements of Rule 23(a), but as before, the court still conducts its own review. *See, e.g.*, Gammon v. GC Services Ltd. Partnership, 162 F.R.D. 313, 317 (N.D. Ill.1995)(defendant didn't contest three of the Rule 23(a) requirements and the court's "own independent review" confirmed that those requirements were satisfied).

The proposed ERISA class likely consists of "thousands of P & D drivers across the country" whom the named plaintiffs say "have been improperly denied benefits based on the mischaracterization of their employment status" so it is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

The commonality requirement requires only that there exist "questions of law or fact common to the class." Keele v. Wexler, 149 F.3d 589, 594 (7th Cir.1998). FED. R. CIV. P. 23(a)(2). That means, "[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Id. The putative class members' ERISA claim also hinges on their allegation that they were misclassified as independent contracts, so the court will need to focus on FedEx's treatment of the package and delivery drivers, specifically FedEx's right

to control the manner and means by which the drivers carried out their job functions. This constitutes a common nucleus of operative fact. *See, e.g.,* Breedlove v. Tele-Trip Co. Inc., No. 91-C5702, 1993 WL 284327, at *4-6 (N.D. Ill. July 27, 1993)(*citing* Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 323 (1992) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.")).

"The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality," Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992), but this requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596-597 (7th Cir. 1993). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983). The named plaintiffs' claims are typical of the putative class members' claims because the claims rest on the same theory—that the drivers have wrongfully been denied employee benefits under several ERISA plans as a result of their mischaracterization as independent contractors. The plaintiffs, like the putative class members, signed a standard-form operating agreement and their participant status under the FedEx's ERISA plans depends on their treatment by FedEx.

"Whether the named plaintiffs properly represent the class' interest depends upon a number of factors including: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the absentee members." Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986). FedEx doesn't challenge the adequacy of plaintiffs' counsel, and nothing in the record suggests counsel aren't "qualified, experienced and able to conduct the litigation." Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 186 (N.D. Ill. 1992) (*citing* Secretary of Labor v. Fitzsimmons, 805 F.2d at 697). Rather, FedEx says the named plaintiffs cannot adequately represent the ERISA class because they lack standing to bring a claim for benefits under the identified ERISA plans. The court disagrees.

A class action may not be certified unless the named plaintiff has standing to seek the relief requested. O'Shea v. Littleton, 414 U.S. 488, 494 (1974) The parties don't dispute that the named plaintiffs have standing under Article III because they claim a direct, substantial, and tangible interest. *See* Harzewski v. Guidant Corp., 489 F.3d 799, 803 (7th Cir. 2007) ("Obviously the named plaintiffs have standing to sue in the sense of being entitled to ask for an exercise of the judicial power of the United States as that term in Article III of the Constitution has been interpreted, because if they win they will obtain a tangible benefit."). The court therefore understands FedEx's use of the term "standing" as denoting the right to obtain a particular form of judicial relief. Such "nonconstitutional standing" requires that the plaintiff be in "the 'zone of interest' of the statute or

other source of rights under which he is suing." Harzewski v. Guidant Corp., 489 F.3d at 803 (*citing* Coan v. Kaufman, 457 F.3d 250, 256 (6th Cir. 2006) ("Although we have referred to a plaintiff's status as a 'participant' under ERISA as a question of 'standing,' [ ] it is a statutory requirement, not a constitutional one" and "[u]nlike Article III standing, which ordinarily should be determined before reaching the merits. . . .")(citations omitted)).

Prudential standing requires that a plaintiff seeking to recover benefits due to him under an ERISA plan be a "participant or beneficiary." 29 U.S.C. § 1132(a)(1); *see also* Miller v. Rite Aid Corp., 334 F.3d 335, 340 (7th Cir. 2005) ("ERISA... restricts civil actions against a plan administrator to actions brought by a 'participant or beneficiary'."). Participant status requires that the plaintiff show he is an employee and has a colorable claim for vested benefits under the plan's terms. Sallee v. Rexnord Corp., 985 F.2d 927, 929 (7th Cir. 1993). But unless it is an "extreme case"—one in which the party has no possible legally protected interest in the pension plan—"whether an ERISA plaintiff is a 'participant' entitled to recover benefits under the Act should be treated as a question of statutory interpretation fundamental to the merits of the suit rather than as a question of the plaintiff's right to bring the suit." Harzewski v. Guidant Corp., 489 F.3d at 804.

The named plaintiffs, and the class members they wish to represent, seek benefits under six FedEx benefit plans: (1) a wealth accumulation 401(k) plan; (2) a group life plan; (3) a short-term disability plan; (4) a long-term disability plan;

(5) a medical, dental, and vision care plan; and (6) a dependent care account plan. Each plan defines the term "employee," but courts look to the common-law employee test to determine a hired party's status for purpose of ERISA benefits. *See* Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-324 (1993). Whether the named plaintiffs are common law employees is unclear at this stage.

Still, the named plaintiffs must demonstrate a colorable claim of eligibility under the language of the plan because ERISA doesn't require employers to make their ERISA plans available to all common law employees. *See* Bauer v. Summit Bancorp, 325 F.3d 155, 164 (3rd Cir. 2003) (adopting the reasoning of multiple circuits to find that "ERISA does not preclude an employer from denying participation in an ERISA plan if the employer does so for reasons other than age or length of service."); Bronk v. Mountain States Tel. and Tel., Inc., 140 F.3d 1335, 1338 (10th Cir. 1998) (circuit court disagreed with the district court that ERISA's minimum participation standards require that leased employees who meet the test for common law employee status be automatically included in the company's plan, whether or not they were excluded under the terms of the plan). At least two of the plans, the medical plan and the 401(k), purport to exclude coverage to drivers classified by FedEx as independent contractors, "regardless of whether such individuals are subsequently reclassified by a court . . . as common law employees." FedEx says that under the terms of these plans, the named plaintiff cannot fall within the class of people who are eligible to receive benefits thereunder. The court disagrees.

This case isn't Jaeger v. Matrix Essentials, where the court declined to determine the plaintiff's employee status because it found the limiting language in the benefit plan—that employees who were not treated as employees for tax purposes were not to be covered—precluded coverage irrespective of the employment relationship. 236 F.Supp.2d at 825. The Jaeger court concluded that whether Ms. Jaeger was a common law employee and whether she was eligible for benefits were independent inquiries because tax treatment is only one of several Darden factors to be considered. Ms. Jaeger could have been a common law employee but still ineligible for benefits because she wasn't treated as such for tax purposes. Id. In our case, however, whether the named plaintiffs are common law employees and whether they are eligible for benefits under the plan's express terms aren't mutually exclusive inquiries. *See, e.g.,* Burrey v. Pacific Gas & Elec. Co., 159 F.3d 388 (9th Cir. 1998) (ERISA plan excluded leased employees but because the definition incorporated the common law employee definition, the court reasoned that if a person was determined to be common law employee, he or she was not a leased employee).[1]

If the court determines that the named plaintiffs are common law employees, they can't be independent contractors, despite FedEx classifying them

[1] That is not to say a company cannot exclude "leased employees," Abraham v. Exxon Corp., 85 F.3d 1126, 1130 (5th Cir. 1996), or provide coverage only to "regular employees." Bronk v. Mountain States Tel. & Tel., Inc., 140 F.3d at 1338; *see also* Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342 (11th Cir. 2000) ([H]er claim for ERISA benefits fails the second prong because she is specifically excluded from eligibility by the terms of Coca-Cola's ERISA plan. The plan includes regular employees and excludes temporary and leased employees.").

as such, so by demonstrating they are common law employees, the package drivers can satisfy both prongs of eligibility. *See, e.g.,* Burrey, 159 F.3d 388; Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1492-1493 (11th Cir. 1993). Indeed, allowing an employer to define participant status through exclusionary language that denies coverage to those parties based solely on the employer's classification of them as independent contractors, regardless of the reality of the employment relationship, runs contrary to the teachings of Darden. Despite the language purporting to deny newly-determined employees participant status, whether the named plaintiffs are employees eligible for benefits under the FedEx plans is a question fundamental to the merits of this lawsuit, which should be addressed at summary judgment rather than as a question of the plaintiff's right to bring the suit. The court can't say the named plaintiffs inadequately represent the class due to a lack of "standing." The plaintiffs have sufficiently demonstrated that they satisfy the class certification prerequisites Rule 23(a).

The court must determine which form of class action, if any, is appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974). The plaintiffs seek to certify a class pursuant to Rule 23(b)(2), which allows a class to be certified if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). FedEx says the plaintiffs' ERISA claims aren't appropriate for class

treatment under Rule 23(b)(2) because the plaintiffs' claim for declaratory relief is incidental to their monetary request. The court can't agree.

The named plaintiffs seek both declaratory and monetary relief, so the class is properly certified under Rule 23(b)(2) only if the request for declaratory relief predominates over the request for monetary relief. Lemon v. Int'l. Union of Operating Engineers, Local No. 139, 216 F.3d 577, 580-581 (7th Cir. 2000). The court must decide whether the requested monetary damages are "incidental" to the requested declaratory relief. Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 899 (7th Cir. 1999). Incidental damages are those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." Lemon v. International Union, 216 F.3d at 581(*quoting* Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)). "[I]ncidental damages do not depend 'in any significant way on the intangible, subjective differences of each class member's circumstances' and do not 'require additional hearings to resolve the disparate merits of each individual's case'." Id.

Fed Ex's treatment of the package and delivery drivers as independent contractors and denial of benefits on those grounds can fairly be characterized as a course of conduct that is "generally applicable" to the proposed class. *See, e.g.,* Breedlove v. Tele-Trip Co. Inc., No. 91-C5702, 1993 WL 284327, at *9 (N.D. Ill. July 27, 1993). And because the named plaintiffs seek benefits that were not paid as a result of their alleged uniform improper classification, the requested monetary relief is incidental to the declaratory relief with respect to the class

members' rights under the subject plans. Bublitz v. E.I. du Pont de Nemours & Co., 202 F.R.D. 251, 259 (S.D. Iowa 2001); Fuller v. Fruehauf Trailer Corp., 168 F.R.D. 588, 603 (E.D. Mich. 1996); Jansen v. Greyhound Corp., 692 F. Supp. 1022, 1028 (N.D. Iowa 1986). Certification under Rule 23(b)(2) is therefore appropriate.

The named plaintiffs also seek certification under Rule 23(b)(3), which allows class certification when questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Szabo v. Bridgeport Machines, Inc., 249 F.3d at 676. FedEx says the individualized nature of the statute of limitations defense renders the ERISA claims unsuitable for class treatment. The court disagrees.

Individualized statute of limitations determinations weigh against certification under Rule 23(b)(3), but courts have rejected a per se rule that the presence of such issues compels a finding that individual issues predominate. *See* In re Linerboard Antitrust Litigation, 305 F.3d 145, 162 (3rd Cir. 2002) ("[T]he mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones."); Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000) (same). Rather, "[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of

statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)." Id.

A claim under ERISA section § 502 accrues upon a clear and unequivocal repudiation of a claim to benefits. Miles v. N.Y. State Teamsters Conference Pension & Retirement Fund Employee Pension Ben. Plan, 698 F.2d 593, 598 (2d Cir. 1983). Both sides seem to agree that the court will need to look to when the putative class members should have known they would be denied benefits, but the parties disagree on whether signing the operating agreement served as an unequivocal repudiation of the putative class members' claim to benefits. This disagreement doesn't preclude class certification. While notice of repudiation may differ depending on each defendant, "[c]hallenges based on the statute of limitations . . . have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability." In re Linerboard Antitrust Litigation, 305 F.3d at 162 (*quoting* NEWBERG & CONTI, NEWBERG ON CLASS ACTIONS, § 4:26 (3d ed.)); The predominate issue for purposes of liability under the Fed Ex ERISA plans is whether the putative members are eligible employees, and because this issue arises from a common nucleus of facts, it can be demonstrated by common proof and certification is therefore economical and appropriate. *See, e.g.,* Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d at 296; Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 924 (3rd Cir. 1992). Individual statute of limitations issues can and should be addressed

separately with damages. In re Revco Securities Litigation, 142 F.R.D. 659, 663 (N.D. Ohio 1992); In re Plywood Anti-Trust Litigation, 76 F.R.D. 570, 586 (E.D. La 1976). Moreover, class treatment of the named plaintiffs' ERISA claim is superior to individual trials for adjudication of the matter because it will likely save time and money, as well as prevent different courts from interpreting the employment relationship differently. Breedlove v. Tele-Trip Co. Inc., No. 91-C5702, 1993 WL 284327, at *11. Certification under 23(b)(3) is also appropriate.

While the proposed ERISA class can be appropriately certified under both Rule 23(b)(2) and Rule 23(b)(3), the court must decide which form of class action, if any, is the most appropriate under Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974); Jefferson v. Ingersoll International Inc., 195 F.3d 894, 898 (7th Cir. 1999) (the court should "endeavor to select the most appropriate subsection, not just the first linguistically applicable one in the list").

Certification under Rule 23(b)(3) is more appropriate in this case so potential class members will retain the ability to opt-out of the class if they so choose. A class maintained under Rule 23(b)(2) doesn't require that members have the option of not being part of the class. Accordingly, the court concludes that the ERISA class should be maintained under Rule 23(b)(3), which is more suited to claims for monetary damages and contains a provision requiring notification to class members of their opt-out option.

III.

case 3:05-md-00527-RLM-CAN document 906 filed 10/15/07 page 57 of 57

For the foregoing reasons, the court DENIES the plaintiffs' motions to strike (docket nos. 684, 686, 690), GRANTS the Kansas and ERISA plaintiffs' motions for class certification (docket no. 551), and DENIES defendant's request for oral argument on plaintiffs' motions for class certification (docket no. 627).

The parties are ordered to confer regarding the preparation of a notice to the members of the classes pursuant to Federal Rule of Civil Procedure 23(c)(2)(B) and submit an agreed proposed notice (or separate proposals if they cannot reach agreement, supported by appropriate citations to case law) to the court by no later than October 31, 2007.

All parties that have filed briefs on class certification shall file, within 30 days of this order, a supplemental statement, not to exceed five pages, stating how their position on class certification differs from the positions addressed in this opinion. All class certification briefs yet to be filed also shall contain such a statement.

SO ORDERED.

ENTERED: October 15, 2007

/s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL COORDINATED CASES

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**FEDEX GROUND PACKAGE SYSTEM, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR:**
**(1) STAY OF CLASS NOTICE AND ADDITIONAL CLASS CERTIFICATION BRIEFING OR RULINGS PENDING RESOLUTION OF RULE 23(F) APPEAL; AND (2) EXPEDITED BRIEFING SCHEDULE ON THIS MOTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

ARGUMENT ..... 3

I. THE COURT SHOULD GRANT A STAY OF CLASS NOTICE AND FURTHER BRIEFING OR DECISIONS REGARDING CLASS CERTIFICATION TO AVOID POTENTIAL CONFUSION AND UNNECESSARY EXPENSE ..... 4

II. THE COURT SHOULD GRANT A STAY OF CLASS NOTICE AND FURTHER BRIEFING OR DECISIONS REGARDING CLASS CERTIFICATION BECAUSE THE BALANCE OF THE HARDSHIPS TIPS HEAVILY IN FAVOR OF A STAY ..... 5

A. This Court Should Grant FXG's Request For A Stay Notwithstanding Its Belief That The Kansas and ERISA Classes Were Properly Certified ..... 6

B. Denying A Stay Of Class Notice And Further Briefing Regarding Class Certification Will Cause Substantial Hardship And Inequity To FXG – And To Plaintiffs ..... 7

C. Plaintiffs Will Not Be Prejudiced If Class Notice And Further Briefing Regarding Class Certification Is Stayed ..... 8

D. A Stay Of Class Notice And Further Class Certification Briefing Will Serve The Public Interest ..... 9

CONCLUSION ..... 10

Case 3:05-md-00527-RLM-CAN document 913 filed 10/26/07 page 3 of 14

# TABLE OF AUTHORITIES

**CASES** **Page**

*Andrews v. Chevy Chase Bank, FSB*,
474 F. Supp. 2d 1006 (E.D. Wisc. 2007) .......... 5, 6

*Beesley v. Int'l Paper Co.*,
No. 06-CV-703-DRH, 2007 WL 2458228 (S.D. Ill. Aug. 24, 2007) .......... 4

*Blair v. Equifax Check Servs., Inc.*,
181 F.3d 832 (7th Cir. 1999) .......... 5, 7

*Castano v. Am. Tobacco Co.*,
162 F.R.D. 112 (E.D. La. 1995) .......... 7

*Chavez v. IBP, Inc.*,
No. CT-01-5093-EFS, 2002 WL 32145647 (E.D. Wash. Dec. 23, 2002) .......... 5

*Dujanovic v. MortgageAmerica, Inc.*,
CV98-TMP-0235-S, 1999 U.S. Dist. LEXIS 17231 (N.D. Ala. April 21, 1999) .......... 4, 6, 7, 9

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) .......... 4

*In re Lorazepam & Clorazepate Antitrust Litig.*,
208 F.R.D. 1 (D.D.C. 2002) .......... 5, 6, 7, 9

*In re Sumitomo Copper Litig.*,
262 F.3d 134 (2d Cir. 2001) .......... 5

*Monahan v. City of Wilmington*,
Civ. A. No. 00-5-5 JJF, 2004 WL 758342 (D. Del. Jan. 30, 2004) .......... 9

*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*,
No. 98 CV 1492, 2000 WL 1424931 (E.D.N.Y. Sept. 26, 2000) .......... 9

*Spano v. The Boeing Co.*,
No. 06-cv-743-DRH, 2007 WL 2688456 (S.D. Ill. Sept. 10, 2007) .......... 4

*Wachtel ex. rel. Jesse v. Guardian Life Ins. Co. of Am.*,
453 F.3d 179 (3d Cir. 2006) .......... 4

*Zeno v. Ford Motor Co., Inc.*,
480 F. Supp. 2d 825 (W.D. Pa. 2007) .......... 4

**OTHER AUTHORITIES**

*1998 Advisory Committee Notes* on Fed. R. Civ. P. 23(f) .......... 1,9

**PRELIMINARY STATEMENT**

Defendant FedEx Ground Package Systems, Inc. ("FXG") seeks a stay of (1) the class notice process, (2) additional class certification briefing, and (3) additional rulings on class certification motions pending the outcome of its Rule 23(f) Petition for Review of this Court's October 15, 2007 order granting the Kansas and ERISA plaintiffs' motions for class certification (the "Order"). FXG is not seeking a stay of any other proceedings in the MDL. FXG will file its Rule 23(f) petition with the Seventh Circuit Court of Appeals on or before October 29, 2007, and will provide this Court with a copy of its petition at that time. "It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal." *1998 Advisory Committee Notes* on Fed. R. Civ. P. 23(f).

FXG also moves this Court to set an expedited briefing schedule because the class certification briefing that FXG seeks to stay is currently due in mid-November, and thus the relief sought will be mooted if this motion is not briefed prior to that time. Specifically, the supplemental briefing ordered by the Court in the Order is due November 14, 2007, and FXG's opposition briefs to the fourth wave of class certification motions are due November 17, 2007. Because one of the deadlines will expire during the proposed expedited briefing schedule (the October 31, 2007 deadline for submitting a proposed form of class notice), FXG also requests a stay of that deadline pending the Court's ruling on this motion.

District courts ordinarily stay dissemination of class notice pending appellate review of class certification in order to avoid the expense and, more important, the confusion that would result if the appellate court modifies or reverses the class certification order. In this proceeding, the same reasoning also counsels in favor of a stay of further briefing and orders on class certification. The Court has asked the parties to brief the extent to which the Order should guide

case 3:05-md-00527-RLM-CAN document 913 filed 10/26/07 page 5 of 14

determination of the class certification motions pending in the other 37 cases pending in this MDL proceeding. Accordingly, dozens of cases may be affected by the Seventh Circuit's ruling on FXG's Rule 23(f) petition.

While courts sometimes grant stays of ***all*** further proceedings pending appellate review of a class certification order, the stay sought by FXG is ***limited and narrowly tailored***. FXG seeks a stay only of notice and further briefing and decisions regarding class certification. Because FXG does not seek a stay of any other proceedings, such as discovery, granting FXG's motion will not materially delay the progress of these cases.

Absent this limited stay, however, the potential prejudice to FXG, putative class members, and even to the named plaintiffs, will be substantial. If notice to the class is provided prior to appellate review and the class certification order is vacated or modified, it may be necessary to provide a second notice. Doing so would not only be time consuming and expensive, but could result in substantial confusion among class members. Further, if class certification orders are issued in the other cases based on the same reasoning as the Order, further briefing regarding the impact of the appeal on the other class certification orders (or further Rule 23(f) petitions) may also be necessary. And if notice is provided to any additional classes that are certified, a second notice may be required in all those cases as well. A brief stay will also relieve this Court of the burden of expending its time and resources on issues that may be affected by the Seventh Circuit's decision.

For these reasons, and as explained below, the Court should grant FXG's request for a limited stay of the class notice process and further class certification briefing or rulings on such motions pending the outcome on FXG's Rule 23(f) petition.

## STATEMENT OF FACTS

On October 15, 2007, this Court entered the Order granting the Kansas and ERISA plaintiffs' motions for class certification. The Court also ordered that the parties confer regarding the preparation of a notice to the members of the Kansas and ERISA classes and submit an agreed proposed order (or separate proposals if they cannot reach agreement, supported by appropriate citations to case law) by October 31, 2007. If class notice is given prior to a determination of FXG's Rule 23(f) petition, a second class notice may be necessary depending upon the Seventh Circuit's resolution of the petition.

The Court has yet to rule on class certification in the other 37 putative class actions that are a part of this MDL. While principal briefing is complete in 29 of the cases, the Court has ordered that the parties file a supplemental statement "stating how their position on class certification differs from the positions addressed in" the Court's October 15, 2007 opinion. The Court has ordered those briefs be submitted by November 14, 2007. Principal briefing in nine other class actions is still in progress, and the Court has ordered that a similar statement be included in that briefing. If that briefing is completed and/or if this Court makes any order regarding class certification in any of the other 37 actions prior to a determination of FXG's Rule 23(f) petition, a second round of briefing may be necessary to address the impact of the Seventh Circuit's opinion on those cases.

## ARGUMENT

As a matter of course, courts ordinarily stay the dissemination of class notice pending resolution of a Rule 23(f) petition. Where the defendant seeks to stay all further proceedings, courts typically require a showing that the potential prejudice from refusing to issue a stay would outweigh the harm caused by any delay. While FXG seeks only a limited stay of the notice

process for the Kansas and ERISA classes and of further class certification briefing and rulings in the other pending cases, it still readily satisfies the standard requiring that the potential prejudice from refusing to issue a stay outweigh the harm caused by any delay.

## I. THE COURT SHOULD GRANT A STAY OF CLASS NOTICE AND FURTHER BRIEFING OR DECISIONS REGARDING CLASS CERTIFICATION TO AVOID POTENTIAL CONFUSION AND UNNECESSARY EXPENSE.

"If the appeal is from a grant of certification, the district court should ordinarily stay the dissemination of class notice to avoid the confusion and the substantial expense of renotification that may result from appellate reversal or modification after notice dissemination." *Manual for Complex Litigation* (Fourth) § 21.28 (2004). Based on this reasoning, district courts routinely stay the dissemination of class notice pending resolution of an appeal of a class certification motion. *See, e.g., Dujanovic v. MortgageAmerica, Inc.*, CV98-TMP-0235-S, 1999 U.S. Dist. LEXIS 17231, at * 3-4 (N.D. Ala. April 21, 1999); *Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 828 n.1 (W.D. Pa. 2007); *see also Spano v. Boeing Co.*, No. 06-cv-743-DRH, 2007 WL 2688456 (S.D. Ill. Sept. 10, 2007) (staying, sua sponte, plaintiffs' motion for class certification pending resolution of 23(f) appeal to the Seventh Circuit in a similar case); *Beesley v. Int'l Paper Co.*, No. 06-CV-703-DRH, 2007 WL 2458228 (S.D. Ill., Aug. 24, 2007) (same). Courts of appeal also routinely grant stays as to class notice pending resolution of an appeal. *See, e.g., Wachtel ex. rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 183 (3d Cir. 2006); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1077 (6th Cir. 1996).

For these same reasons, this Court should stay the dissemination of notice to the Kansas and ERISA plaintiffs' class pending resolution of FXG's Rule 23(f) petition in the Seventh Circuit. The common rationale that a stay is necessary in order to avoid confusion and potential expense is substantially greater in this matter given that there are 37 additional actions that may

be impacted by the Seventh Circuit's ruling.[1] Staying further class certification briefing, in the context of the MDL, is closely analogous to staying notice to the class in a single class action because both have the potential for creating a substantial duplication of effort depending upon the resolution of the Rule 23(f) petition – particularly where, as here, the Court has indicated that its reasoning in its Order may guide its class certification decisions in the other cases.

## II. THE COURT SHOULD GRANT A STAY OF CLASS NOTICE AND FURTHER BRIEFING OR DECISIONS REGARDING CLASS CERTIFICATION BECAUSE THE BALANCE OF THE HARDSHIPS TIPS HEAVILY IN FAVOR OF A STAY.

Courts sometimes stay *all* further proceedings pending resolution of a Rule 23(f) petition. *See, e.g., Andrews v. Chevy Chase Bank, FSB*, 474 F. Supp. 2d 1006 (E.D. Wisc. 2007) (granting request for a stay of all proceedings pending resolution of appeal of class certification to Seventh Circuit); *In re Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1 (D.D.C. 2002); *Chavez v. IBP, Inc.*, No. CT-01-5093-EFS, 2002 WL 32145647 (E.D. Wash. Dec. 23, 2002). A court should grant such a stay if "the probability of error in the class certification decision is high enough that the costs of pressing ahead in the district court exceed the costs of waiting." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999); *see also In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001). FXG satisfies the test typically used in deciding whether to grant a complete stay.

That test raises "the same kind of question that a court asks when deciding whether to issue a preliminary injunction or a stay of an administrative decision." *Blair*, 181 F.3d at 835. Thus, in deciding whether to grant a stay, the district court should use a "flexible application" of the balancing test used to consider preliminary injunctive relief: "(1) whether there is a

[1] Staying dissemination of class notice is also particularly appropriate here given that there is no agreement as to class membership and further discovery is necessary to ascertain class membership (*e.g.*, who is a "full-time" driver under the class definition) — the procedures for which the Court has not yet identified.

BDDB01 4926540v1

substantial likelihood that the movant will succeed on the merits of the claim/appeal; (2) whether the movant will suffer irreparable injury if an injunction/stay does not issue; (3) whether others will suffer harm if an injunction/stay is granted; and (4) whether the public interest will be furthered by an injunction/stay." *In re Lorazepam*, 208 F.R.D. 1, at *3 ; *Andrews*, 474 F.Supp. 2d at 1007 (same).

**A. This Court Should Grant FXG's Request For A Stay Notwithstanding Its Belief That The Kansas and ERISA Classes Were Properly Certified.**

Because a Rule 23(f) motion for a stay is directed toward the same court that issued the underlying class certification order, a test for deciding the stay motion that includes as an element the movant's likelihood of success is, at first glance, anomalous: If the court believed a class certification order would be reversed, it is unlikely that the court would have issued the class certification order to begin with. The movant's burden to establish a likelihood of success, however, does not include convincing the Court that its order granting class certification was wrong.

Instead, the question is whether, if there is some possibility of reversal, the balance of the hardships tips in favor of a stay, even if the court is confident that its certification decision is correct. *See Dujanovic*, 1999 U.S. Dist. LEXIS 17231, at *2-3 (holding that "[w]hile the court remains confident of the correctness of its decision to certify this class" the matter should nevertheless be stayed because "money, time, and effort" will be wasted if the court of appeals disagrees); *see also Andrews*, 474 F. Supp. 2d at 1010 (although court believed that defendant should not prevail on appeal, it granted a stay of all proceedings recognizing some of defendant's arguments and crediting defendant's claim that it would be irreparably injured absent a stay because it would "have to send notices, provide discovery and respond to claims even though the class action might not proceed"). As set forth in FXG's Rule 23(f) Petition for Review, FXG has

raised sufficient questions going to the merits of its argument that a stay is appropriate under this standard.[2]

Further, the Seventh Circuit has stated that "[w]hen the justification for interlocutory review is contributing to development of the law, it is *less important to show that the district judge's decision is shaky*. Law may develop through affirmances as well as through reversals." *Blair*, 181 F.3d at 832 (emphasis added). FXG's request for a limited stay should be granted under this standard. The outcome of FXG's Rule 23(f) petition could potentially affect all of the other cases in this MDL. Because the Seventh Circuit's guidance will be of potential benefit to the entire MDL, a stay is appropriate even if this Court believes that its class certification order will be affirmed.

**B. Denying A Stay Of Class Notice And Further Briefing Regarding Class Certification Will Cause Substantial Hardship And Inequity To FXG – And To Plaintiffs.**

As courts have repeatedly recognized, staying class notice while the appeals court conducts its review benefits both plaintiffs and defendants – and conserves judicial resources – by ensuring that the parties and the Court do not engage in a massive and expensive notice plan unless (and until) the appeals court affirms the class certification order. *See, e.g., Dujanovic*, 1999 U.S. Dist. LEXIS 17231, at *2-4 (staying class notice because of potential for waste of resources and confusion of class members); *Castano v. Am. Tobacco Co*., 162 F.R.D. 112, 117-18 (E.D. La. 1995) (staying class notice in nationwide class action because "the time and expense to be expended on just the class notification issue – the cost of class notice itself, not counting the legal time and expense, may run into hundreds of thousands of dollars"); *In re*

---

[2] FXG will provide this Court with a copy of its Rule 23(f) Petition for Review when it is filed with the Seventh Circuit on October 29, 2007.

*Lorazepam*, 208 F.R.D. at 6 (granting complete stay based in part on potential of wasting resources of the parties and the court). Given that plaintiffs are generally responsible for the costs of notice, the benefits of postponing class notice and avoiding the possibility of multiple notices accrue to plaintiffs' benefit as well as to the benefit of FXG and the Court.

The case for a stay is even stronger here in light of the other actions pending as part of the MDL. Although briefing regarding class certification is completed in most of those actions, this Court has requested supplemental five-page briefs regarding the differences between those cases and the Kansas and ERISA plaintiff claims. In addition to the burden on the parties of producing a large number of supplemental briefs, and in addressing this supplemental question in principal briefing in nine other cases, the burden on this Court of rendering dozens of additional orders regarding class certification is substantial.

If FXG's petition to the Seventh Circuit results in any reversal or modification of the Order, the parties' and the Court's efforts in the other cases may be affected as well – potentially requiring another round of briefing in 38 actions and 38 new orders. And if the Court were to certify classes in any of those actions while FXG's petition was pending in the Seventh Circuit, notice to those classes presumably would follow. In light of the extraordinary expense that would entail, and the confusion that would result if the Order were modified or reversed, the burden of potentially proceeding with class notice in dozens of separate actions clearly outweighs the burden of a brief stay pending appellate review.

### C. Plaintiffs Will Not Be Prejudiced If Class Notice And Further Briefing Regarding Class Certification Is Stayed.

Plaintiffs will suffer no harm if the class notice and certification briefing process is briefly stayed. Because FXG has requested only a limited stay of class notice and class certification briefing, plaintiffs may proceed with all other aspects of the case, such as discovery.

Such a brief stay in inconsequential relative to the potential impact of the Seventh Circuit's ruling. *In re Lorazepam*, 208 F.R.D. at 6 (noting a short delay in discovery "when juxtaposed to the potential magnitude of a decision by the Court of Appeals on the issues before it, is simply *de minimis*. . . .").

Moreover, a stay is unlikely to delay the class certification proceedings significantly because "Rule 23(f) was shaped so appellate consideration of a class certification decision would not prolong the proceedings." *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc*., No. 98 CV 1492, 2000 WL 1424931, at *2 (E.D.N.Y. Sept. 26, 2000). Indeed, "Rule 23(f) was designed to accommodate the need for quick appellate review of class certification decisions." *Monahan v. City of Wilmington*, Civ. A. No. 00-5-5 JJF, 2004 WL 758342, at *2 (D. Del. Jan. 30, 2004) (internal quotation marks omitted); *see also* 1998 Fed. R. Civ. P. 23(f), 1998 advisory committee's note ("It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal.").

**D. A Stay Of Class Notice And Further Class Certification Briefing Will Serve The Public Interest.**

A stay of notice and further class certification briefing would avoid the public confusion, additional expense, and potential prejudice that would result if the Seventh Circuit modifies or vacates this Court's class certification order after notice has been sent to class members. *See Dujanovic*, 1999 U.S. Dist. LEXIS 17231, at *4 (if the court of appeals were to reverse the district court's order after notice had been accomplished, "confusion could result"). Further, the public will benefit by conservation of judicial resources. *See, e.g., In re Lorazepam*, 208 F.R.D. at 6 (granting stay, noting that "proceeding headlong with discovery and other matters before this Court has the very real potential of unnecessarily wasting significant resources of . . . the Court").

**CONCLUSION**

A complete stay of all proceedings may be appropriate where only a single class action is at issue in light of the significant burden of proceeding before the appellate court has affirmed a class certification order. Here, FXG is seeking only a limited stay of certain proceedings. In addition, 37 other actions are potentially affected by the outcome of FXG's current 23(f) petition. In light of the magnitude of the burden of proceeding with briefing and potential notice for those other actions, and in light of the limited nature of the stay sought by FXG, the potential prejudice that would result from proceeding with class notice and class certification briefing outweighs any prejudice to plaintiffs of a brief delay. Accordingly, and for all of the reasons set forth above, FXG respectfully requests that this Court GRANT its motion to stay, pending a ruling on its Rule 23(f) petition.

Dated: October 26, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Victor H. Jih
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 26th day of October, 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

      Susan E. Ellingstad
      sellingstad@locklaw.com

      Robert I Harwood
      rharwood@whesq.com

      Peter W. Overs, Jr.
      povers@whesq.com

      Lynn R Faris
      lfaris@leonardcarder.com

      John C Hamilton
      jch@hamiltonfirm.com
      hamiltonfirm@sbcglobal.net

           By:    s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* ) | |

**MOTION FOR APPROVAL OF CLASS NOTICES**

Pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, Plaintiffs hereby move the Court to approve the individual notices of pendency and summary notices for publication in the forms annexed to the accompanying memorandum of law in support of this motion as Exhibits A and B.

Dated: October 31, 2007

Respectfully submitted,

HARWOOD FEFFER LLP

/s/ Robert I. Harwood
Robert I. Harwood (RH-3287)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400

LEONARD CARDER, LLP
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

**PLAINTIFFS' CO-LEAD COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT**
**OF THEIR MOTION FOR APPROVAL OF CLASS NOTICES**

Plaintiffs respectfully submit individual notices of pendency (Exhibit A) and summary notices for publication (Exhibit B) for the Court's approval pursuant to Rule 23(c) of the Federal Rules of Civil Procedure. The notices, which closely track model forms of notice endorsed by the Federal Judicial Center ("FJC") regarding employment cases, provide clear, concise, and plain descriptions of the claims certified for class action status in the ERISA and Kansas actions and the rights of class members to participate or opt-out of such classes. Plaintiffs have conferred with FedEx Ground Package System, Inc. ("FXG") but have been unable to agree on the language of the notices.[1]

[1] Although the parties have narrowed their disputes about the language to be employed in the notices, and plaintiffs have adopted some of FXG's proposed changes, FXG repeatedly asserted during the meet-and-confer process that it was premature to distribute class notices in light of their motion to stay distribution of the class notices now pending. Plaintiffs disagree that notice is premature and will address this argument in their opposition to the motion to stay.

Rule 23(c)(2) directs that the parties are to provide the "best practicable notice under the circumstances." Fed. R. Civ. P. 23(c)(2). "The purpose of a class notice is to present a fair recital of the subject matter of the suit and to inform all class members of their opportunity to be heard." *Garcia v. Elite Labor Serv., Ltd.*, No. 95-C-2341, 1996 WL 33500122 (N.D. Ill. Jul. 11, 1996)(citing *Gypsum Antitrust Cases v. U.S. Gypsum Co.*, 565 F.2d 1123, 1125 (9th Cir. 1977)). Further, "a class notice is a mechanism to satisfy due process, thereby permitting a judgment to be binding on all class members." *Id.* Notice also serves "the important interest and function of informing persons that their rights may have been violated for which there is legal redress." *Id.* While advancing these important goals, the notice is not to be "a long legal 'brief' of the parties' positions, precise in every detail and slanted in such fashion as to please every litigant." *Goldwater v. Alston & Bird*, 673 F. Supp. 930, 932 (S.D. Ill. 1987).

Plaintiffs form notices are most appropriate because they follow the suggested language in forms propounded by the FJC. The FJC is a research and education agency of the federal judicial system established in 1967. One of its specific, statutorily-mandated duties is the continuing education and development of recommendations for the federal courts. As part of its continuing mission, the FJC has developed a series of form class notices that are clear, neutral, and informative. Plaintiffs have used the summary and long form notices that have been promulgated by the FJC for employment related litigation. Use of FJC's form notices has been noted with approval by Judge Herndon in *Perry v. Nat'l City Mtg., Inc.*, No. 05-cv-891, 2007 WL 1810472 (S.D. Ill. June 21, 2007) and in *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 185 (3d Cir. 2006).

The first disagreement between the parties is whether individual notices describing each state and national class should issue or whether a single, global notice encompassing all of the

Case 3:05-md-00527-RLM-CAN document 917-2 filed 10/31/07 page 3 of 8

claims should be utilized. FXG has suggested a global notice be issued once all of the claims in the constituent actions have been certified. FXG's preference for a global notice is nothing more than an attempt to open up another front in its campaign to delay these proceedings for an indeterminate period of time. Like its recent motion to stay all proceedings pending its Rule 23(f) appeal, FXG seeks to prevent any of the constituent actions from proceeding to notice to the class or to any step closer to a final resolution of the claims asserted in this MDL proceeding. Plaintiffs submit that, both as a matter of clarity and practicality, one notice describing each state class and one describing each national class should issue.[2]

The notices for each of the Kansas and ERISA actions, which are the only two classes certified at present, will necessarily result in some overlap (namely, Kansas residents will receive both notices). However, this dual notice program will ultimately be less confusing than following FXG's suggestion that a global notice issue describing all of the claims in each of the national and state class actions, with their varying claims and disparate class periods. FXG's proposal is far more susceptible to sowing confusion among class members than plaintiffs' plan. For example, under FXG's proposal class members in Kansas will be forced to sift through many different class period descriptions contained in a single notice to figure out what the class period is for their Kansas claims; moreover, they may well miss the fact that they could also participate in a national class. Plaintiffs' proposed form of notice make it clear that:

[2] Should the FMLA national class be certified prior to distribution of the ERISA national class notice, plaintiffs are amenable to describing both national classes in one form notice.

1) the notice pertains to a specific class; 2) there are other classes; and 3) an individual may have the right to participate in more than one class.[3]

FXG is also misusing the notice process as an opportunity to again argue over the class definition. FXG claims that the class definition, which includes persons who 1) entered into an Operating Agreement, (2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period, and 3) were dispatched out of terminals located in a particular state, is unascertainable. FXG is mistaken in its belief that the class notice must be so precisely drawn as to be fully determinative of who will ultimately benefit after trial or resolution of the action. *Parker v. Risk Mgmt. Alternatives, Inc.*, 206 F.R.D. 211, 212 (N.D. Ill. 2002). Notices and, indeed, the class described need not be so perfectly calibrated, but instead designed to generally inform individuals of their potential rights and, in the case of a 23(b)(3) class, the right to opt-out. The class definition provides objective standards (i.e. signing the Operating Agreement, full-time employment, working out of a particular state) and FXG already has demonstrated its ability to identify just who is a full-time driver and who is an "absentee driver" during the class certification process.[4] *See Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 397 (N.D. Ill. 1987). Taking issue with the class definition in the context of formulating notice language misses the mark that the class had already been certified using a definition that has been judicially scrutinized and approved.

---

[3] In meeting and conferring with FXG over the form of notice, plaintiffs expressed their willingness to consider FXG's desire for a global notice and requested it to submit a draft thereof. To date, FXG has declined to do so.

[4] For example, FXG's expert, Robert Crandall, was able to conduct a survey of terminal managers in less than 72 hours to ascertain the percentage of "absentee drivers" among FXG's workforce.

The principal disagreement between the parties concerns how long class members should be given to opt-out should they elect to do so. Plaintiffs propose that a 30-day opt-out period, with an additional 30-day period for re-mailing of notices that are returned as undeliverable. FXG suggests a 60-day opt-out period. The shorter opt-out period (with the second opportunity to opt-out after re-mailing) is more appropriate in this action because class members are being directly contacted and are knowledgeable about the issues directly affecting their livelihood. *Superior Beverage Co, Inc. v. Owens-Illinois, Inc.*, No. 83C512, 1988 WL 87038, *3 (N.D. Ill. Aug. 16, 1988); *Scaife v. Roush*, 370 F.Supp.2d 798, 801 (N.D. Ind. 2005); *McKersie v. IU Int'l*, 86C1683, 1988 WL 19586, *4 (Feb. 26, 1988) (45-60 days is considered to be a "generous" opt-out period.) Plaintiffs' 30-day opt-out proposal is particularly appropriate here where the affected driver workforce has been subject to FXG's prolonged two-year propaganda effort extolling its business model. As this Court recognized in its recent opinion in connection with plaintiffs' motion for a temporary restraining order, Opinion and Order, dated October 15, 2007 (Doc # 901), FXG's blanket elimination of single work area drivers in California could very well have a nationwide chilling impact on a driver's election to remain as a class member. FXG's 60-day proposal only serves to extend FXG's ability to propagandize and threaten retaliatory conduct in an improper effort to pare down the size of the classes.

Similarly, FXG objects to language in the notices counseling class members about the impropriety of any retaliation by FXG for participating in the litigation. For the reasons set forth above, such cautionary language is crucial to assure class members that they can pursue their rights without fear of retribution. Under Rule 23(d) of the Federal Rules of Civil Procedure, the Court possesses the authority to "make appropriate orders: . . . (2) requiring, for

the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct . . .." *See also Bublitz v. E.I. Dupont de Nemours and Co.*, 196 F.R.D. 545, 548 (S.D. Ia. 2000)(enjoining defendant's communications with putative class members where defendant was their current employer); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005)(court must restrain actions "that interfere with the proper administration of a class action or those that abuse the rights of members of the class").

Contrary to Plaintiffs' form and the examples provided by the FJC, FXG insists that an exclusion form be included in the notice mailed to class members. The inclusion of an exclusion form is unnecessary, potentially confusing, and not required by the FJC. To exclude oneself from the class, all a class member need do is send a letter requesting exclusion. By including an opt-out form, class members may be confused as to whether they need to fill out the form and return it to remain in the class. This very issue was addressed in *Whiteway v. FedEx Kinkos Office and Print Services*, No. C-050-2320, 2007 WL 1381514 (N.D. Cal. May 8, 2007). In *Whiteway*, FedEx argued (unsuccessfully) that an exclusion form be included in a mailing to a class of current and former FedEx Kinko's managers who were classified as exempt employees. The *Whiteway* court noted that Rule 23 did not explicitly require inclusion of an opt-out form and that in following the FJC form it was appropriate merely to include the instruction on how to opt-out. *Id.* at *2. Here, the result should be no different.

FXG also pressed plaintiffs to include language concerning FXG's purported right to take discovery of absent class members. The proposed notices already include an instruction to retain whatever records a class member may have related to their relationship with FXG. As the Court is aware, discovery of absent class members is generally not appropriate, and is only

warranted where a party can articulate a particularized need for such discovery. *See Clark v. Universal Builders, Inc.*, 501 f.2d 324, 340 (7th Cir.)(discovery of absent class members warranted only where "the information requested is necessary to trial preparation and [it] is not designed 'as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants.'"), *cert. denied*, 419 U.S. 1070 (1974)(quoting *Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971)). Whatever right FXG may have to discovery of absent class members later in the proceedings is protected by the verbiage related to document retention. Any other specific mention of possible discovery of class members would only serve as a scare tactic by FXG to inhibit class members from remaining in the class.

Lastly, FXG attempts to wordsmith the form language adopted by plaintiffs from the FJC forms. In each such instance, plaintiffs contend that the simple language and clarity of the FJC forms are lost. For example, FXG would have the Court approve the elimination of the section "What are Plaintiffs asking for?" because, in FXG's view, that question is answered elsewhere. What is self-evident is that the reader of the notice can easily get an answer to what is the ultimate purpose of the lawsuit and what are potential damages by including a brief and specific section addressing these points. The concise one-sentence answer makes it plain exactly what plaintiffs seek – just as the FJC envisioned. A class notice, of course, need not be a complete source of information as to each and every fact underlying the litigation, alternatives available to class members or defenses asserted by defendants. Instead, the notice

must contain neutral, clear and understandable language in order to be valid. *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94-C0897, 1995 WL 23058 (N.D. Ill. Jan. 17, 1995).[5]

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that individual and summary notices annexed hereto as Exhibit A and Exhibit B be approved as the forms of notice in this action.

Dated: October 31, 2007

Respectfully submitted,

HARWOOD FEFFER LLP

Robert I. Harwood (RH-3287)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400

LEONARD CARDER, LLP
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

**PLAINTIFFS' CO-LEAD COUNSEL**

---

5 To the extent that FXG is heard to complain that the notice does not provide sufficient detail about its affirmative defenses, there is no requirement that the notice include anything more than a specific denial of liability by a defendant. In *Allen v. Marshall Fields*, 93 F.R.D. 438, 439 (N.D. Ill. 1982), the court found that a single sentence stating defendants' denial of the allegations was sufficient. In Plaintiffs' form notice before the Court, far more than one sentence stating FXG's position is included. In the introductory section, Section No. 2 explaining what the lawsuit is about and Section No. 6, plaintiffs' notice makes clear that there has not been any final determination of the merits of the litigation and that FXG disputes the allegations of wrongdoing. A reader of the notice will be left with no doubt that FXG contests the allegations made by plaintiffs. Moreover, the website to which class members are directed will also have posted a copy of FXG's answer to the Kansas and ERISA claims should class members desire to see even more information about the lawsuit and FXG's defenses.

# Exhibit A

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees, and denied the benefits and protections of federal and state worker protection laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.

• In this particular case, plaintiffs have asserted claims for unpaid employee benefits under FXG's employment benefit plans under the federal Employee Retirement Income Security Act of 1974 (ERISA). In this case, Plaintiffs seek to recover benefits under several of FXG's employee benefit plans, including health and dental insurance, 401(k) contributions, life and supplemental security insurance, and long and short term disability benefits. The other lawsuits before the court arise from alleged violations of the federal Family and Medical Leave Act, state employment statutes pertaining to wage payment and expense reimbursements, and state common law claims. You may also be eligible to participate in those cases. **This notice pertains solely to the ERISA action.**

• The Court has allowed the lawsuit to be a nationwide class action on behalf of:

> All persons who: 1) entered or will enter into an FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were entitled to ERISA Plan benefits, absent their mischaracterization as independent contractors.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2008 (30 days after the date that notice issued).** FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, or to retaliate against you or any other pick-up and delivery driver in any way simply because you chose to participate in this lawsuit.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ........................................................ **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**........................................................ **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS**........................................................ **PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS** ........................................................ **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU**........................................................ **PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL**........................................................ **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION**........................................................ **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil Action No. 3:05-cv-00530-RLM-CAN (KS).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, Sylvia O'Brien, Dominic Lupo, Ronald Perry, and Alan Pacheco) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas. These two courts will resolve the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;

- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action originally brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) includes claims for certain employee benefits, such as health and dental insurance, and retirement and disability benefits, under ERISA.

The specific ERISA plans maintained by FXG include: (1) FXG Ground Package System, Inc. And Certain Affiliates Wealth Accumulation 401(k) Plan; (2) Group Life and Supplemental Life Plan For Employees of FXG Ground Package System, Inc., (3) Ground Benefits Plus Short-Term Disability Plan; (4) Group Long Term Disability Plan For the Employees of FXG Ground Package System, Inc.; (5) FXG Ground Package System, Inc. Medical, Dental and Vision Care Plan; and (6) Dependent Care Account of FXG Ground Package System, Inc.

Plaintiffs contend that they and others who have driven for FXG are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs claim that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these employee benefit plans.

Plaintiffs seek monetary damages for all members of the class who have been denied health, dental and vision insurance, disability benefits and the right to be part of FXG's 401(k) plan under the above-listed employee benefit plans, a declaration from the court that they are entitled to participate in these benefit plans in the future, and reasonable attorneys' fees and costs. You can read the Plaintiffs' Second Amended Complaint, which includes the ERISA allegations, at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are independent contractors and therefore not eligible for any employee benefits. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

### 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.

### 9. Is there any money available now?

No money or benefits can be collected now because the Court has not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 10. Am I part of the class?

As noted above, the Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan employment benefits, absent the mischaracterization of your employment status as an independent contractor.

Additionally, you must meet these conditions and provide pick-up and delivery services during one the appropriate class periods:

- You are a resident of any state, other than Kansas, and worked as a P&D driver for FXG for some period of time from January 9, 2001 to the present; or
- You are a resident of Kansas and worked as a P&D driver for FXG for some period of time from February 11, 1998 to the present.

### 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue separately or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [ERISA CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your

Exclusion Request postmarked by **MONTH DATE, 2008,** to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

## THE LAWYERS REPRESENTING PLAINTIFFS AND THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as Class Counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial. In the Kansas District Court. There has been no date set for the trial of this matter. Because of the nature of the ERISA lawsuit, a Judge will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class Counsel will present the case for the Plaintiffs, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

Case 3:05-md-00527-RLM -CAN document 917-3 filed 10/31/07 page 11 of 19

# If You are or Have Been A FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of state laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.

• In this particular case, plaintiffs have asserted claims for violation of the Kansas Wage Payment Act, including the failure to reimburse drivers for expenses and other wage claims, to rescind the Operating Agreement and to declare what drivers rights are under Kansas law. There are several other lawsuits arising from alleged violations of the federal law, including the Employee Retirement Income Security Act of 1974 (ERISA) and the Family and Medical Leave Act, as well as various other lawsuits based on state law other than Kansas. You might be eligible to participate in those cases. **This notice pertains solely to the Kansas action.**

• The Court has allowed the lawsuit to be a statewide class action on behalf of:

> All persons who: 1) entered or will enter into an FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998 to provide package pick-up and delivery services pursuant to the Operating Agreement ; and 3) were dispatched out of a terminal in the state of Kansas.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2008 (30 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, to retaliate against you or any other pick-up and delivery driver in any way simply because you chose to participate in this lawsuit.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## What This Notice Contains

**BASIC INFORMATION** ........................................................ **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**.............................................. **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS**.......................................................... **PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS** .............................................. **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU**...................................... **PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL**............................................................................ **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION**............................................. **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Craig, et al. v. FedEx Ground Package System, Inc. et al.*, Civil Action No. 3:05-cv-00530-RLM-CAN (KS).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, and Sylvia O'Brien) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas. These two courts will resolve issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) alleges that FXG's classification of Kansas P&D drivers as independent contractors violates the Kansas Wage Payment Act and that the drivers are entitled to all the protections of that law, including the right to reimbursement of expenses and other wage protections. Plaintiffs also seek to rescind the operating agreements as an illegal contract and to have the court declare the legal rights of drivers under Kansas wage and hour law.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the class who have been required to pay for certain business expenses (including improper deductions from wages) and for overtime pay required by law, to rescind the Operating Agreement as an illegal contract and for a declaration that class members are legally classified as employees and have the rights of employees under Kansas law. You can read the Plaintiffs' Second Amended Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are legally independent contractors and therefore not eligible for payment of business expenses, overtime or other wage protections. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

## 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the class?

As noted above, the Court has certified a Kansas state class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time since February 11, 1998 to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were or are presently dispatched out of a terminal in the state of Kansas.

## 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [KANSAS CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

## THE LAWYERS REPRESENTING PLAINTIFFS AND THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Kansas District Court. There has been no date set for the trial of this matter. A jury in Kansas will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class Counsel will present the case for the Plaintiffs, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

# Exhibit B

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup and Delivery Driver, A Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc. ("FXG") concerning whether FXG misclassified its pick-up and delivery drivers as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible for employee benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").

The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) and is in the United States District Court For The Northern District of Indiana. The Court decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at the website below. If you are included, you have to decide whether to stay in the Class and be bound by whatever results, or ask to be excluded and keep your right to sue FXG. There is no money available now and no guarantee that there will be.

**ARE YOU AFFECTED?**

The Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan employment benefits, absent the mischaracterization of your employment status as an independent contractor.

Additionally, you must meet these conditions and provide pick-up and delivery services during one the appropriate class periods:

- You are a resident of any state, other than Kansas, and worked as a P&D driver for FXG for some period of time from January 9, 2001 to the present; or
- You are a resident of Kansas and worked as a P&D driver for FXG for some period of time from February 11, 1998 to the present.

**WHAT IS THIS CASE ABOUT?**

Plaintiffs contend that they and others who have driven for FXG are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them unfairly by calling them independent contractors when, under law, they are really employees. As a consequence, Plaintiffs alleged that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these employee benefit plans. FXG denies that it did anything wrong and says that class members are independent contractors and therefore not eligible for employee benefits. The Court has not decided whether Plaintiffs or FXG is right.

**WHO REPRESENTS YOU?**

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as co-lead counsel for Plaintiffs in this lawsuit. You don't have to pay Plaintiffs' counsel, or anyone else, to participate. Instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer  Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, Sylvia O'Brien, Dominic Lupo, Ronald Perry, and Alan Pacheco are Class Representatives who brought this lawsuit.

**WHAT ARE YOUR OPTIONS?**

You have to decide whether to stay in the Class or ask to be excluded before the trial, and **you have to decide this now.** You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit.

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [ERISA CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008,** to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexdriverslawsuit.com or write to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc. ("FXG") concerning whether FXG misclassified its pick-up and delivery drivers as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible for monetary damages as a result of that misclassification.

The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) and is in the United States District Court for The Northern District of Indiana. The Court decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at www.fedexclassactionlawsuit.com. If you are included, you have to decide whether to stay in the Class and be bound by whatever results, or ask to be excluded and keep your right to sue FXG. **There is no money available now and no guarantee that there will be.**

## Who's affected?

**Anyone who has been or is currently a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver.**

## ARE YOU AFFECTED?

The lawsuit includes people who meet the following requirements:

• You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
• You personally drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998 to provide package pick-up and delivery services pursuant to the operating agreement; and
• You were dispatched out of a terminal in the state of Kansas.

## WHAT'S THIS CASE ABOUT?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG maintained the right of control over how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this contention. FXG denies that it did anything wrong and says that class members are independent contractors. **The Court has not decided whether Plaintiffs or FXG is right.**

## WHO REPRESENTS YOU?

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as co-lead counsel for Plaintiffs in this lawsuit. You don't have to pay Plaintiffs' counsel, or anyone else, to participate. Instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer .

## WHAT ARE YOUR OPTIONS?

You have to decide now whether to stay in the Class or ask to be excluded. You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit.

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [KANSAS CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008,** to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. from *Johnson v. MNO, Inc.* Include your name, address, and telephone number.

## HOW CAN YOU GET MORE INFORMATION?

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexclassactionlawsuit.com, call 1.800.000.0000 or write to:
XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* Civil No. 3:05-md-00527-RLM-CAN | Chief Judge Miller Magistrate Judge Nuechterlein |

## CERTIFICATE OF SERVICE

I, Craig Lowther, hereby certify that I am not a party to the action, am over the age of eighteen years, am employed by the law firm of Harwood Feffer LLP, attorneys for plaintiff, and that on October 31, 2007, I served the foregoing

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR APPROVAL OF CLASS NOTICES**

**and**

**MOTION FOR APPROVAL OF CLASS NOTICES**

in the within action, by causing true and correct copies of same to be electronically mailed and mailed to the following counsel:

**See Attached Service List**

Craig Lowther

**Motions**

3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II

CASREF, PROTO

**U.S. District Court Northern District of Indiana [LIVE]**

**USDC Northern Indiana**

## Notice of Electronic Filing

The following transaction was entered by Harwood, Robert on 10/31/2007 at 6:51 PM EST and filed on 10/31/2007

**Case Name:** In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II
**Case Number:** 3:05-md-527
**Filer:** FedEx Plaintiffs
**Document Number:** 917

**Docket Text:**
MOTION for Approval of Class Notices by Plaintiff FedEx Plaintiffs. (Attachments: # (1) Plaintiffs' Memorandum of Law In Support of Their Motion for Approval of Class Notices# (2) Exhibit A to Plaintiffs' Memo of Law# (3) Exhibit B to Plaintiffs' Memo of Law)(Harwood, Robert)

**3:05-md-527 Notice has been electronically mailed to:**

George A Barton gbarton@birch.net

Jeffrey A Bartos jbartos@geclaw.com

Evelyn L Becker PHV ebecker@omm.com

Kenneth Lee Blalack , II lblalack@omm.com

Darcie R Brault dbrault@dibandfagan.com

Laura C Bremer lbremer@omm.com

Guy Brenner gbrenner@omm.com

Thomas J Brunner , Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski dmc@zimmreed.com

Jerald R Cureton jcureton@curetoncaplan.com

Ginger A DeGroff degrofflaw@yahoo.com

Robert E DeRose , II bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Edward J Efkeman eefkeman@fedex.com

Susan E Ellingstad seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

Barry S Fagan bfagan@dibandfagan.com

Lynn R Faris lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Monica Ferraro mferraro@bnhmlaw.com

Lee K Fink lfink@omm.com

Robert K Firsten rfirsten@firstenlaw.com

Edward R Forman eforman@ee.net

Wood R Foster PHV , Jr woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco pfuoco@msn.com

Martin S Garfinkel garfinkel@sgb-law.com, helm@sgb-law.com

Michael W Garrison , Jr mgarrison@omm.com

R Christopher Gilreath chrisgil@sidgilreath.com

Eileen S Goodin egoodin@bnhmlaw.com

Deborah R Grayson drgrayson@fuse.net

John C Hamilton jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net

Robert K Handelman rhandelman@bnhmlaw.com

Robert I Harwood rharwood@whesq.com

Stacy J Hauf shauf@omm.com, swickliffe@omm.com

Matthew M Houston mhouston@whesq.com

Dmitri Iglitzin iglitzin@workerlaw.com

Tom A Jerman tjerman@omm.com

Victor H Jih vjih@omm.com

Aparna B Joshi ajoshi@omm.com

Soye Kim skim@geclaw.com

Michael W Kopp mkopp@omm.com

Steve D Larson slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis     jordanlewis@sbgdf.com

Shannon Liss-Riordan     sliss@prle.com, jhunt@prle.com, syoung@prle.com

Anh-Nguyet Tran LyJordan     alyjordan@omm.com

Gary F Lynch     glynch@carlsonlynch.com

John S Marshall     marshall@ee.net

Michael G McGuinness     mmcguinness@omm.com

Bruce H Meizlish     brucelaw@fuse.net

Sanford A Meizlish     smeizlish@bnhmlaw.com

Matthew J Merrick     mmerrick@omm.com

Jennifer Lee Merzon     jmerzon@omm.com

Raquel A Millman     rmillman@omm.com

James R Mulroy , II     jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Daniel O Myers     dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Peter W Overs , Jr     povers@whesq.com

Richard T Phillips     flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope     Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com,
Melissa.Bozzuto@bakerd.com

Nora M Puckett     npuckett@omm.com, dmeredith@omm.com

Charles Victor Pyle , III     victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com,
meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan     atr@zimmreed.com, kmh@zimmreed.com

Beth A Ross     bross@leonardcarder.com

J Gordon Rudd     jgr@zimmreed.com

Theodore B Schroeder     tschroeder@omm.com

Robert M Schwartz PHV     rschwartz@omm.com

James A Staack     jims@staack-firm.com

R Jay Taylor , Jr     jtaylor@scopelitis.com, lnewton@scopelitis.com

Matthew T Tobin     mtobin@sbslaw.net

Jeffrey A Trimarchi     jtrimarchi@omm.com

Mary D Walsh-Dempsey mdempsey@omalleylangan.com

Michael J Watton jdrewicz@Wattongroup.com

Andrew M Weiner aweiner@omm.com

Peter D Winebrake pwinebrake@winebrakelaw.com

**3:05-md-527 Notice has been delivered by U.S. Mail or other means to:**

John H Beisner PHV
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Ste 200
Bartlett, TN 38134

David G Caperton
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

R Bruce Carlson
Carlson Lynch Ltd
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Kevin J Driscoll
Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178

William T Fiala
Lewis Fisher Henderson Claxton & Mulroy
6410 Poplar Ave Ste 300
Memphis, TN 38119

Eric M Fink
Leonard Carder LLP - Oak/CA
1330 Broadway Suite 1450
Oakland, CA 94612

B James Fitzpatrick

Fitzpatrick Spini & Swanston
838 S Main Street Suite E
Salinas, CA 93901

Salvatore G Gangemi
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005

Robert A Garcin
Law Offices of Robert A Garcin
210 East 29th Street # A
Loveland, CO 80538

Clayton D Halunen
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Jack D Hilmes
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Eric E Hobbs
Michael Best & Friedrich LLP
100 E Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

William S Hommel , Jr
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703

Dorothy Anne Jarrell
O'Melveny & Myers LLP - NY/NY
7 Times Square
New York, NY 10036

Thomas P Jirgal
O'Melveny & Myers LLP - LA/CA
1999 Avenue of the Stars # 700
Los Angeles, CA 90067-6035

Andrew J Kahn PHV
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102

Steven Matthew Kelso
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202

Karen P Kruse PHV
Jackson Lewis LLP - Sea/WA
One Union Square

600 University Street Suite 2900
Seattle, WA 98101

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Harold L Lichten
Pyle Rome Lichten Ehrenberg & Liss-Riordan PC-MA
18 Tremont St Suite 500
Boston, MA 02108

Carla D Macaluso
Jackson Lewis LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
Markowitz & Richman
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Robert E McDaniel
McDaniel Law Offices
4 Bicentennial Sq
Concord, NH 03301

Kenneth E Milam
Watkins & Eager
PO Box 650
Jackson, MS 39205-0650

Charles N Nauen
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Todd J O'Malley
O'Malley & Langan PC
426 Mulberry St Suite 104
Scranton, PA 18503

Joseph A Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Robert James Penny
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Cheryl F Perkins
Whetstone Myers Perkins and Young LLC

PO Box 8086
Columbia, SC 29202

Alan M Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Michael R Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989

Aaron Roblan
Jackson Lewis
One Union Square
600 University St Suite 2900
Seattle, WA 98101

Eric H Rumbaugh PHV
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Jennifer Rygiel Boyd
Ogletree Deakins Nash Smoak & Stewart PC
10 Madison Ave Suite 402
Morristown, NJ 07960

Tom Skundrich Jr

Dan S Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Patricia A Sullivan
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Richard Tanenbaum
Richard Tanenbaum Esq
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R Taylor
Taylor Dunham & Burgess LLP
301 Congress Ave Suite 1050
Austin, TX 78701

Joni M Thome
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Walter Wallace

Peter N Wasylyk
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone , Jr
Whetstone Myers Perkins and Young
PO Box 8086
Columbia, SC 29202

Kirsten L Zerger
Leonard Carder LLP - Oak/CA
1330 Broadway Suite 1450
Oakland, CA 94612

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/31/2007] [FileNumber=931771-0
] [5e3331cb1d76aab7f2e7f10770d99edb6441f72185498cf06b4e23a42c37f9e68fc
1fb25daf258ebcfc9f92f26deafbf85e07ef4378f5d1917af7352fcd0939e]]
**Document description:** Plaintiffs' Memorandum of Law In Support of Their Motion for Approval of Class Notices
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/31/2007] [FileNumber=931771-1
] [961684616f2185556877019l999e1799558fbad06c1eac4f297ce03f3fc014f9c57
22d035268151d4f3aa16fc06d607765b252f44fb08a3a31213e69e969642a]]
**Document description:**Exhibit A to Plaintiffs' Memo of Law
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/31/2007] [FileNumber=931771-2
] [3508962288f93cdbd8a74045790604f9d636c5a9948b748563145ebf1595eb518ab
97a36e6de1cb0f670e16a3abe8899ef40e9891420c498bb255a4e1ed56052]]
**Document description:**Exhibit B to Plaintiffs' Memo of Law
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/31/2007] [FileNumber=931771-3
] [84c7542a8ec8cea19439a68334b54e6f1ed15f079d568caf40dc4b81e7432972f12
3e55c525a543c6ebe740d789cc76515acc3cd8f67c434f220fedb00dd3808]]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**FEDEX GROUND PACKAGE SYSTEM, INC.'S OBJECTIONS TO PLAINTIFFS' PROPOSED FORM OF CLASS NOTICE AND NOTICE PLAN**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 3

ARGUMENT ........ 5

I. THE COURT SHOULD DECLINE TO ISSUE PLAINTIFFS' PROPOSED CLASS NOTICES BECAUSE THE ISSUANCE OF ANY CLASS NOTICE IS PREMATURE AT THIS TIME ........ 5

II. IF THE COURT DETERMINES THAT THE CLASS NOTICE PROCESS SHOULD PROCEED NOW, IT SHOULD DIRECT THE PARTIES TO MEET AND CONFER REGARDING INTEGRATING PLAINTIFFS' TWO PROPOSED CLASS NOTICES INTO A SINGLE NOTICE ........ 8

III. IF THE COURT FURTHER CONCLUDES THAT TWO CLASS NOTICES IN THE CRAIG ACTION ARE APPROPRIATE, IT SHOULD ADOPT DEFENDANT'S MODIFIED VERSIONS OF PLAINTIFFS' NOTICES ........ 9

IV. IF THE COURT DECIDES TO PROCEED WITH CLASS NOTICE, IT SHOULD ALSO ADOPT DEFENDANT'S PROPOSED MODIFICATIONS TO PLAINTIFFS' NOTICE PLAN ........ 14

CONCLUSION ........ 16

case 3:05-md-00527-RLM-CAN document 919 filed 10/31/07 page 3 of 20

## TABLE OF AUTHORITIES

**CASES** **Page**

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 .......... 6

*Otto v. Variable Annuity Life Ins., Co.*,
730 F. Supp. 145 (N.D. Ill. 1990) .......... 11

*Twigg v. Sears, Roebuck & Co.*,
153 F.3d 1222 (11th Cir. 1998) .......... 6, 8

**OTHER AUTHORITY**

Newberg on Class Actions § 8.31 .......... 10

## PRELIMINARY STATEMENT

Defendant FedEx Ground Package System, Inc. ("Defendant" or the "Company") hereby submits objections to plaintiffs' proposed form of class notice and notice plan. Defendant objects on the grounds that it is premature to issue any class notice at this time and because the specific notices that plaintiffs seek to issue contain inaccuracies and are deficient.

In any class action, it is critical that the notice issued to class members be as clear as possible in order to apprise class members of their rights and thereby reduce the risks of future challenges to the adequacy of the notice on due process grounds. For the reasons discussed below, if any notice were to issue to class members at this juncture, it would be ineffective in apprising them of their rights and, therefore, would be deficient as a matter of law.

Notwithstanding the Court's determination that the Kansas state law claims and ERISA claims in *Craig et al. v. FedEx Ground Package System, Inc. et al.*, Civil No. 3:05-cv-00530-RLM-CAN (KS), are appropriate for class treatment, Defendant's pending petition to the U.S. Court of Appeals for the Seventh Circuit for leave to appeal this determination and the pending class certification motions in 37 other related cases in this MDL proceeding could impact any notice that is issued before these pending matters are resolved. This could result in the need for future corrective notices, or simply additional notices, both of which would likely cause unnecessary confusion among class members regarding how the multiple notices impact their rights. It could also result in class members deciding to opt out of one case and merely ignoring later notices in other cases, in which their non-response would be treated as overriding their prior, affirmative decision not to participate.

In addition, the class definitions in the two classes that the Court certified in the *Craig* action contain language that renders it impossible for class members to know whether they are members of the class and whether their rights are implicated in the litigation that is the subject of the proposed notice. These class members can only ascertain whether they are included in the certified classes after the ambiguous language in plaintiffs' class definitions has been defined and factual discovery has been taken from the individual class members. Because class members must be able to determine with ease whether they are members of the certified classes at the time they are presented with the opportunity to opt out, the plaintiffs' proposed notices are premature and deficient.

Even if the Court does not agree that class notice is premature, the two separate notices proposed by plaintiffs for claims in the single *Craig* action are confusing. The two notices also contain inaccuracies and fail to convey critical information necessary for class members to make an informed decision about their participation in the lawsuit. Accordingly, if the Court determines that notice should be issued to class members at this juncture, the Court should order the parties to meet and confer regarding the development of a single integrated notice for the claims that have been certified in the *Craig* action. In the alternative, if the Court determines that two separate notices for the Kansas law and ERISA classes in the *Craig* action are not unnecessarily confusing, the Court should, at a minimum, adopt the modified versions of these two notices prepared by Defendant, which are attached hereto as Exhibits A through D.[1]

[1] Plaintiffs have proposed two separate long forms of notice for the Kansas and ERISA classes and, in addition, two separate short forms of notice for these classes. Defendant's modified versions of the two long forms of notice are attached hereto as Exhibits A and B, and Defendant's modified versions of the two short forms of notice are attached hereto as Exhibits C and D.

case 3:05-md-00527-RLM-CAN document 919 filed 10/31/07 page 6 of 20

**STATEMENT OF FACTS**

On October 15, 2007, this Court entered an Order granting the Kansas and ERISA plaintiffs' motions for class certification in the *Craig* action. In that Order, the Court instructed the parties to confer regarding the preparation of a notice to members of the certified classes pursuant to Federal Rule of Civil Procedure 23(c)(2)(B) and to submit an agreed proposed notice, or separate proposals if agreement could not be reached, to the Court by October 31, 2007.[2]

Following the Court's ruling, the parties began a meet and confer process regarding the preparation of a class notice. The parties agreed that plaintiffs should draft a proposed notice and accompanying notice plan, to which Defendant would then propose suggested revisions. On October 23, 2007, plaintiffs sent Defendant two separate proposed long form notices in the *Craig* action, one for the Kansas class and one for the ERISA class (attached hereto as Exhibits E and F). Plaintiffs later provided Defendant with two separate short form notices, again one for the Kansas class and one for the ERISA class (attached hereto as Exhibit G), on October 25, 2007. In response to a request from Defendant, plaintiffs also transmitted an outline of a proposed notice plan via e-mail message (attached hereto as Exhibit H).

By letter dated October 27, 2007 (attached hereto as Exhibit I), Defendant responded to plaintiffs' proposed long form notices. Defendant explained its position

[2] On October 26, 2007, Defendant filed a motion with this Court seeking, *inter alia*, to stay the issuance of class notice in the *Craig* action pending the resolution of its forthcoming petition to the Seventh Circuit under Rule 23(f) of the Federal Rules of Civil Procedure for leave to appeal the Court's class certification ruling. *See* Def.'s Mot. For Stay of Additional Class Notice and Additional Class Certification Briefing or Rulings Pending Resolution of Rule 23(f) Appeal (Oct. 26, 2007). This motion is still pending. On October 29, 2007, Defendant filed its Rule 23(f) petition with the Seventh Circuit.

that notice is premature, and that only one notice should be sent to class members whose rights may be implicated by overlapping claims in various actions consolidated in this MDL proceeding. Notwithstanding its threshold objections to the issuance of notice at this stage of the proceedings, Defendants provided plaintiffs with proposed revisions to both of the proposed long form notices with specific line edits (attached hereto as Exhibits J and K ), the most significant of which Defendant also explained in its letter. On October 29, 2007, the parties met and conferred to discuss Defendant's objections to the issuance of notice and its proposed changes to the long forms of notice. During this meet and confer, the parties were able to reach agreement on some issues, agreed to disagree about other issues, and agreed to further consider other outstanding issues and then confer again.

On October 30, 2007, Defendant transmitted a second letter to plaintiffs (attached hereto as Exhibit L), addressing: certain outstanding issues regarding the proposed long form notices, its limited objections regarding plaintiffs' notice plan; and proposed revisions to plaintiffs' short forms of notice, which generally tracked its revisions to the long forms of notice (attached hereto as Exhibit M ).

Although plaintiffs indicated during the parties' October 29, 2007 meet and confer that they would take some open issues under advisement and get back to Defendant about these issues before the parties' submissions on the class notice issue were due to be filed with the Court, as of the time of the writing of this submission, Defendant has not heard from plaintiffs further regarding the class notice issue.

**ARGUMENT**

**I. THE COURT SHOULD DECLINE TO ISSUE PLAINTIFFS' PROPOSED CLASS NOTICES BECAUSE THE ISSUANCE OF ANY CLASS NOTICE IS PREMATURE AT THIS TIME.**

It is premature to transmit any class notice at this time. First, FedEx Ground has filed a petition to the U.S. Court of Appeals for the Seventh Circuit under Rule 23(f) of the Federal Rules of Civil Procedure for leave to appeal the Court's order granting class certification in the *Craig* action. In light of the potential for all or part of the class certification determination to be reversed or for the Court's class definitions to be altered as a result of this appeal, it is not prudent to conduct class notice now. Doing so could result in the need for corrective notices in the future, which would result in confusion among class members about their rights and render all of the notices deficient. Accordingly, the notice process should be stayed pending a resolution of Defendant's petition before the Seventh Circuit.[3]

Second, no notice in the *Craig* action should be issued until the Court has ruled on all pending class certification motions in these MDL 1700 proceedings because future rulings on pending class certification motions may impact a notice that has already been issued or result in the same individuals receiving multiple notices about their rights in the consolidated litigation. Again, the receipt of multiple notices, either corrective or complimentary, would lead to a great deal of unnecessary confusion among putative class members and inconsistent decisions about whether to participate or opt out.

Moreover, given the particular landscape of this litigation, in which individuals could potentially be members of multiple classes in multiple lawsuits, multiple notices

---

[3] Defendant refers the Court to its motion to stay and supporting memorandum of law, filed October 26, 2007, for a more comprehensive discussion of this argument.

could—and likely will—provide a basis for class members to argue in the future that they are not bound by any favorable judgment that Defendant obtains in this litigation. *See, e.g. Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227-29 (11th Cir. 1998) (concluding that, because deficiencies in the notice in a prior class action did not adequately inform the plaintiff that he was a class member, the prior judgment in favor of the defendant could not bar the plaintiff from bringing a similar claim against the defendant consistent with due process). The issuance of multiple notices provides such class members with ready-made arguments that they were confused about their class membership and thus their corresponding legal rights. Each individual class member should be able to ascertain his legal rights and responsibilities with respect to these proceedings through one notice alone, and should not be required to opt-out of overlapping litigation more than once. Accordingly, the most practical solution to this problem is for the Court to order the issuance of a single notice to each class member in these MDL proceedings once all of the class certification motions have been resolved and it is possible to identify those class members, if any, whose rights will be affected by overlapping class definitions in multiple cases.

Third, notice is premature at this time because serious deficiencies in the definitions of the ERISA and Kansas state law classes that have been certified preclude the Court and putative class members from ascertaining who is included in these classes and therefore required to receive notice. A class must be "susceptible to a precise definition." *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999). Here, however, the class definitions are ambiguous in terms of what driving "on a full-time basis" means or what a "commonly excused employment absence" is, and the Court has

yet to clarify how these phrases should be interpreted. Moreover, FedEx Ground does not maintain records that would enable individuals falling within such ambiguous categories to be identified with ease. Accordingly, it will not be possible to issue notice to class members based upon readily identifiable and objective criteria.

Setting aside the issue of how to identify which people should receive a notice, no class member reading a notice containing one of these class definitions will know with sufficient precision whether they are a part of the classes. For example, if a contractor was an "absentee contractor" for one year of the several years that he was a FedEx Ground contractor, it is not evidence whether that contractor would be a member of the class. And, what if the absentee period was only one month? The answers to these questions cannot be ascertained by reference to the class definition alone. Indeed, the identity of individuals who fall within the Kansas and ERISA class definitions cannot be determined by anyone until additional discovery is taken from each putative class member. Because of ambiguity in these class definitions, there is a serious risk that class members may not act on notices containing these definitions simply because they are not aware that the notices apply to them and affect their legal rights.

During the parties' meet and confer discussions on October 29, 2007, Defendant pressed plaintiffs to identify how they would define certain terms in the class definitions that FedEx Ground believes are ambiguous. Defendant also pressed plaintiffs to disclose what process they would recommend to the Court to ascertain membership in the certified classes and the specific types of evidence that plaintiffs believe would be competent to establish such class membership. Plaintiffs, however, would not disclose to Defendant their definitions of these terms. Nor would they disclose what evidence would

be used to establish class membership or when and how such an evidentiary process would unfold.

Plaintiffs' failure to offer any proposals in this regard further demonstrates the ambiguity in the Kansas and ERISA class definitions and the resulting inability for class membership to be ascertained by the parties, the Court and the putative class members. If unresolved by the Court, this ambiguity will likely deprive Defendant of its right to enforce in subsequent legal proceedings favorable orders and judgments in this litigation against class members who will surely argue in future proceedings that they are not bound because the notice in this class action was deficient and they did not understand that their legal rights were implicated. *See, e.g. Twigg*, 153 F.3d at 1227-29.

## II. IF THE COURT DETERMINES THAT THE CLASS NOTICE PROCESS SHOULD PROCEED NOW, IT SHOULD DIRECT THE PARTIES TO MEET AND CONFER REGARDING INTEGRATING PLAINTIFFS' TWO PROPOSED CLASS NOTICES INTO A SINGLE NOTICE.

Notwithstanding Defendant's threshold objections to the issuance of any class notice at this juncture, if the Court allows the class notice process to move forward in the *Craig* action, only one notice should issue for this case. The Kansas state law and ERISA claims that the Court determined were appropriate for class certification are part of the same *Craig* lawsuit. Therefore, there is no need for two separate notices to issue regarding these claims. Rather, a single notice to putative class members about the Kansas lawsuit is appropriate in order to avoid the inevitable confusion that would result from an individual receiving two class notices in a single case.

The Court's October 15, 2007 class certification Order, which directed the parties to confer regarding the preparation of "a notice," also appears to contemplate only one notice for the *Craig* action. Additionally, plaintiffs have indicated in the meet and confer

process that they might be amenable to a single notice for the *Craig* action. Accordingly, Defendant requests that the Court order the parties to meet and confer regarding the best way to integrate the separate notices for the Kansas and ERISA classes, which have been prepared by plaintiffs and revised by Defendant, into one combined document.

## III. IF THE COURT FURTHER CONCLUDES THAT TWO CLASS NOTICES IN THE *CRAIG* ACTION ARE APPROPRIATE, IT SHOULD ADOPT DEFENDANT'S MODIFIED VERSIONS OF PLAINTIFFS' NOTICES.

If the Court determines that class notice should proceed at this time and that multiple notices in the *Craig* action are advisable, the Court should nonetheless adopt Defendant's modified versions of plaintiffs' proposed notices (attached hereto as Exhibits A through D). Defendant has reviewed plaintiffs' proposed class notices and made specific objections to plaintiffs regarding the substance of each of them during the parties' meet and confer process. Specifically, Defendant has outlined for plaintiffs its major conceptual issues with plaintiffs' proposed notices and also presented revised versions of the notices to plaintiffs for consideration. Although the parties have been able to reach an agreement regarding some of the conceptual issues identified by Defendant, the parties have not been able to reach an agreement regarding the following changes proposed, which the Court should adopt. [4]

- The language in plaintiffs' proposed notices stating that individuals must prepare their own "Exclusion Request" letters in order to be excluded from the class should be changed. This language is confusing, particularly in light of the statement in the same draft notice that

[4] Specifically, the parties have reached an agreement with respect to issues number 1 and 11 outlined in Defendant's correspondence to plaintiffs dated October 27, 2007 (attached hereto as Exhibit I).

"Exclusion Request forms" are available on plaintiffs' website.  Filling out and mailing in a pre-prepared Exclusion Request form is all that should be required in order for individuals to opt out of the classes.  However, in addition to such pre-prepared forms being available on plaintiffs' website, they should also be included as part of the notice package that is transmitted to each putative class member, along with a pre-addressed stamped envelope.

The inclusion of Exclusion Request forms as part of notices is typical in class actions.  *See* Newberg on Class Actions § 8.31 at 257-58 (4th ed. 2002).  These pre-prepared forms prevent the ambiguous communications from class members concerning their intentions to opt out of or participate in litigation that can result from the sending of individual letters.

Ambiguous communications from contractors are of particular concern here in the context of multiple class notices.  For example, in the absence of pre-prepared Exclusion Request forms attached to each notice, a contractor in receipt of both a notice regarding the certified Kansas class and a separate notice regarding the ERISA class might submit a freeform letter expressing his or her desire to "opt out of the FedEx case."  In this situation, it would be unclear whether the contractor was opting out of the Kansas class or the ERISA class or both.  Even if the contractor specified a desire to opt out of the "*Craig*" case specifically, this same question would remain.  And, to the extent that any notices

were subsequently issued pertaining to other cases in this MDL proceeding, the potential confusion stemming from individual contractor letters would only be compounded. Accordingly, Defendant requests that the Court order the parties to meet and confer to develop the content of an Exclusion Request form to be included with any notice sent to class members.

- Any notice issued by the Court should also make class members aware that Defendant will require discovery from them in order to present its defense at trial. In addition, it should make them aware that they have an independent obligation to prove their membership in the class and their right to recover in the lawsuit. Thus, Defendant's modified versions of plaintiffs' notices, which contain language to advise putative class members of their duty to preserve evidence that may be relevant to their class membership and claims and of the possibility that they may be required to give related testimonial evidence, should be adopted by the Court. *See, e.g., Otto v. Variable Annuity Life Ins., Co.*, 730 F. Supp. 145, 150 (N.D. Ill. 1990) (finding notice inadequate because it "fail[ed] to inform the potential class members that they may be required to respond to individual discovery requests.").

Class members deciding whether to participate in this case will want to understand that obligations will be imposed on them as parties during this proceeding, including the obligation to preserve evidence and

to present evidence to establish their right to participate and recover in the case.

- In its modified versions of plaintiffs' proposed class notices, Defendant also removed descriptions of and references to the actions, other than the *Craig* action, which have been consolidated in the MDL. Given that the class notices pertain only to the *Craig* action, there should not be a discussion of other cases in the notice, because this would be misleading and confusing.

- The paragraph in plaintiffs' proposed long forms of notice regarding the impermissibility of retaliation against drivers by FedEx Ground should also be removed on the basis that this language is inflammatory and improperly suggests that the Company will retaliate against drivers. If any discussion of this topic is included in the notice, it should be the following: "This class action does not affect FXG's right to make day-to-day decisions in the ordinary course of business. FXG may non-renew or terminate contractor operating agreements for legitimate business reasons, and it may also make changes to its business practices for legitimate business reasons, including as a result of this litigation, as long as none of these decisions are made in retaliation against any driver for participating in this lawsuit." In the alternative, at a minimum, the phrase "to not renew or terminate your contract" should be removed from plaintiffs' versions of the long forms of notice, because it is misleading,

implying that any contract nonrenewal or termination going forward
would be grounds for alleging retaliation.

- Defendant also objects to the assertion in plaintiffs' long form
notices that each of the class periods "continues to today." Any notice
issued by the Court should contain a firm end date for the class period.
The appropriate end date for both of the class periods is October 15, 2007,
the date on which the classes were certified.

A firm end date for the class period is needed not only for the
administration of notice, but also to ensure that persons receiving the
notice can ensure that they are in the class for purposes of opting out.
The fact that a firm end date is chosen does not deprive the Court of
power to enter forward-looking injunctive relief that would apply to
persons who are not yet contractors.

- Plaintiffs' proposed long forms of notice should also be edited to
include the following language in the discussion of what Defendant is not
permitted to discuss with contractors: "However, FXG is free to express
its opinion about the merits of the litigation in the media and in corporate
communications to audiences that are not limited to class members."
This additional language will clarify Defendant's right to express its
opinion about the merits of the litigation in the media and to audiences
that are not limited to class members.

- Defendant deleted bullet point summaries in plaintiffs' long form
notices summarizing the Court's findings in certifying the respective

classes. This information should not be included in the notices because it is not relevant to putative class members' decisions as to whether to participate in the cases, and because the notices already inform individuals how they may access the Court's decision.

- Question 8 in plaintiffs' long form notices ("What are Plaintiffs' asking for?") should be deleted because this information is duplicative of information already contained in the answers to Questions 2 and 5.

- Finally, question 15 in plaintiffs' long form notices should be rephrased to read "Who represents the Plaintiffs in this case" because it is presumptuous for class counsel to assume that they represent any putative class member until after he or she has decided not to opt-out.

## IV. IF THE COURT DECIDES TO PROCEED WITH CLASS NOTICE, IT SHOULD ALSO ADOPT DEFENDANT'S PROPOSED MODIFICATIONS TO PLAINTIFFS' NOTICE PLAN.

If the Court determines that it is appropriate to proceed with the issuance of class notice in the *Craig* action at this time, it should also adopt Defendant's proposed modifications to plaintiffs' notice plan, which are as follows:

Plaintiffs proposed that notice be mailed to the class list within 35 days of Court approval of the list, following Defendant's provision of a fully updated list within 5 days of Court approval of a notice. This proposal does not allow Defendant enough time to provide an updated class list, and a two-week period from the date of Court approval of the notice would be more appropriate. Otherwise, Defendant agrees with this proposal with the qualification that it should not have any obligation to produce any such updated list unless plaintiffs provide, and the Court approves, specified criteria for determining

who should receive the notice so that Defendant will know what names and addresses to pull from its records.

Plaintiffs proposed a 30-day opt-out period from mailing of the class notice. This period is too short, and 60 days from the date of mailing of the class notice would be a more appropriate end date for the opt-out period.

Plaintiffs proposed that, with regard to any notices returned as undeliverable, there be an additional 30-day period in which to search for proper addresses and then re-send notices to the "best" available addresses. Defendant is in agreement with this proposal as long as it is under no obligation to investigate or identify the best available addresses for any individuals whose notice packets are returned as undeliverable and provided that the opt-out period for any class member to whom a notice is re-sent will be extended by a minimum of two additional weeks.

Finally, plaintiffs proposed that a "list" must be provided to the Court within 30 days of the closing of the opt-out period. Defendant agrees with this proposal with the two clarifications that: (1) the "lists" that must be filed with the Court are the final notice list and the list of confirmed opt-outs; and (2) it is plaintiffs' responsibility to compile and file both of these lists with the Court.

**CONCLUSION**

For all of the reasons set forth above, Defendant respectfully requests that the Court decline to issue any class notice at this time. If, however, the Court determines that the class notice process should proceed now, Defendant respectfully requests that the Court direct the parties to meet and confer regarding integrating plaintiffs' two proposed class notices into a single notice. In the alternative, if the Court concludes that two separate notices in the *Craig* action are appropriate, Defendant asks that the Court adopt Defendants' modified versions of plaintiffs' notices. Finally, if the Court decides to proceed with class notice, Defendant also respectfully requests that the Court adopt its modifications to plaintiffs' notice plan.

Dated: October 31, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601
*Defendant's Liaison and Lead Counsel*
*Tel: (574) 234-4149*
*Fax: (574) 239-1900*

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**LOCAL RULE 5.1(a) EXHIBIT INDEX**
**TO FEDEX GROUND PACKAGE SYSTEM, INC.'S OBJECTIONS TO**
**PLAINTIFFS' PROPOSED FORM OF CLASS NOTICE AND NOTICE PLAN**

1. **Exhibit A** is a true and correct copy of Defendant's modified version of Plaintiffs' proposed long form of notice for the Kansas class.

2. **Exhibit B** is a true and correct copy of Defendant's modified version of Plaintiffs' proposed long form of notice for the ERISA class.

3. **Exhibit C** is a true and correct copy of Defendant's modified version of Plaintiffs' proposed short form of notice for the Kansas class.

4. **Exhibit D** is a true and correct copy of Defendant's modified version of Plaintiffs' proposed short form of notice for the ERISA class.

5. **Exhibit E** is a true and correct copy of Plaintiffs' October 23, 2007 proposed long form of notice for the Kansas class.

6. **Exhibit F** is a true and correct copy of Plaintiffs' October 23, 2007 proposed long form of notice for the ERISA class.

7. **Exhibit G** contains true and correct copies of Plaintiffs' October 25, 2007 separate proposed short forms of notice for the Kansas and ERISA classes.

8.      **Exhibit H** is a true and correct copy of an e-mail chain between the parties containing the October 25, 2007 e-mail message from Plaintiffs to Defendant transmitting an outline of a proposed notice plan.

9.      **Exhibit I** is a true and correct copy of Defendant's October 27, 2007 letter to Plaintiffs in response to Plaintiffs' proposed long forms of notice.

10.     **Exhibit J** is a true and correct copy of the revised version of Plaintiffs' long form of notice for the Kansas class that Defendant sent to Plaintiffs on October 27, 2007.

11.     **Exhibit K** is a true and correct copy of the revised version of Plaintiffs' long form of notice for the ERISA class that Defendant sent to Plaintiffs on October 27, 2007.

12.     **Exhibit L** is a true and correct copy of Defendant's October 30, 2007 letter to Plaintiffs regarding outstanding notice issues.

13.     **Exhibit M** contains true and correct copies of the revised versions of Plaintiffs' short forms of notice for the Kansas and ERISA classes that Defendant sent to Plaintiffs on October 30, 2007.

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION**

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- Plaintiffs in this case are current and former pick-up and delivery drivers for FedEx Ground and FedEx Home Delivery (collectively "FXG"), most of whom were dispatched out of terminals in the state of Kansas. Plaintiffs have asserted claims against FXG for unpaid benefits under FXG's employment benefit plans under the federal Employee Retirement Income Security Act of 1974 (ERISA). They seek to recover benefits under several of FXG's employee benefit plans, including medical, dental and vision care insurance, 401(k) benefits, life and supplemental life insurance, and long and short term disability benefits.

- The Court has allowed the lawsuit to be a nationwide class action on behalf of:

  All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were eligible for ERISA Plan benefits, absent their mischaracterization as independent contractors.

- The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| DO NOTHING | **Stay in this lawsuit. Await the outcome. Give up certain rights.** By doing nothing, you keep the possibility of recovering money and/or benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same or similar legal claims in this lawsuit. And, you will be bound by any adverse ruling or judgment issued by the Court. |
| ASK TO BE EXCLUDED | **Get out of this lawsuit. Get no money or benefits from it. Keep rights.** If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you will not be bound by any adverse ruling issued by the Court and you will keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act by [**date 60 days after the date that notice is issued**]. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action. However, FXG is free to express its opinion about the merits of the litigation in the media and in corporate communications to audiences that are not limited to class members.

- Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how this affects your rights.

- This class action does not affect FXG's right to make day-to-day decisions in the ordinary course of business. FXG may non-renew or terminate contractor operating agreements for legitimate business reasons, and it may also make changes to its business practices for legitimate business reasons, including as a result of this litigation, as long as none of these decisions are made in retaliation against any driver for participating in this lawsuit.

- Any questions? Read on and visit www.fedexclassactionlawsuit.com.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

## WHAT THIS NOTICE CONTAINS

BASIC INFORMATION........................................ PAGE 4
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

THE CLAIMS IN THE LAWSUIT ........................................ PAGE 5
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. Is there any money available now?

WHO IS IN THE CLASS........................................ PAGE 6
9. Am I part of this Class?
10. I'm still not sure if I am included.

YOUR RIGHTS AND OPTIONS........................................ PAGE 6
11. What happens if I do nothing at all?
12. Why would I ask to be excluded?
13. How do I ask the Court to exclude me from the Class?

THE LAWYERS REPRESENTING THE CLASS........................................ PAGE 8
14. Who represents the Plaintiffs in this case?
15. Should I get my own lawyer?
16. How will the lawyers be paid?

THE TRIAL ........................................ PAGE 8
17. How and when will the Court decide who is right?
18. Do I have to come to the trial?
19. Will I get money after the trial?

GETTING MORE INFORMATION........................................ PAGE 9
20. Are more details available?

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has "certified" a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court rules upon any claims in this case and/or holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. This lawsuit is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00530-RLM-CAN (KS).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, Sylvia O'Brien, Dominic Lupo, Ronald Perry, and Alan Pacheco) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas. These two courts will resolve the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action originally brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) includes claims for certain benefits, such as health and dental insurance, and retirement and disability benefits, under ERISA.

Plaintiffs contend that the specific ERISA plans maintained by FXG include the: (1) FedEx Ground and Freight Retirement Savings Plan; (2) Group Life and Supplemental Life Plan For Employees of FXG Ground Package System, Inc., (3) Ground Benefits Plus Short-Term Disability Plan; (4) Group Long Term Disability Plan For the Employees of FXG Ground Package System, Inc.; (5) FXG Ground Package System, Inc. Medical, Dental and Vision Care Plan; and (6) Dependent Care Account Plan.

Plaintiffs contend that they are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs claim that, but for the classification of the P&D drivers as independent contractors, they would have been entitled to participate in these benefit plans.

Plaintiffs seek monetary damages for all members of the class who have not received health, dental and vision insurance, disability benefits and the right to be part of FXG's 401(k) plan under the above-listed employee benefit plans, a declaration from the court that they are entitled to participate in these benefit plans in the future, and reasonable attorneys' fees and costs for bringing this action. You can read the Plaintiffs' Second Amended Complaint, which includes the ERISA allegations, at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are legally independent contractors and therefore not eligible for the requested ERISA plan benefits. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

### 8. Is there any money available now?

No money or benefits can be collected now because the Court has not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 9. Am I part of the class?

As noted above, the Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the class period that applies to you (discussed below) to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan benefits, absent your characterization as an independent contractor.

If you are a resident of any state, other than Kansas, the class period that applies to you is the period from January 9, 2001 until October 15, 2007. If you are a resident of Kansas, the class period that applies to you is the period from February 11, 1998 until October 15, 2007.

### 10. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 14.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded, and you have to decide this now.

### 11. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights.

Note, however, that in order for you to recover in this lawsuit, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover. This means, for example, that you will be asked to provide proof of how many hours you have worked, proof of any time off that you have

taken and the reasons for that time off and proof of any expenses for which you claim reimbursement. Therefore, you need to preserve all documents that will affect your ability to demonstrate that you are a class member and your ability to recover in the lawsuit, which could include items such as your Operating Agreement and addenda, settlement records and expense receipts. You may also be required to present testimonial evidence in order to demonstrate your membership in the class or to recover in this lawsuit. Additionally, if your mailing address changes, you will need to notify the claims administrator or Class Counsel.

Also keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same or similar legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action, including any orders and judgments that are adverse to Plaintiffs.

## 12. Why would I ask to be excluded?

If you already have your own lawsuit against FXG, in which employment classification is a disputed question, and you want to continue with it, or if you do not want to be legally bound by any orders or judgments of the Court, you must ask to be excluded from the Class. Or, if you do not agree with the objectives of this lawsuit and do not wish to participate, you must ask to be excluded from the class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue separately or continue to sue FXG for employment classification practices that occurred or occurs at any time.

## 13. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must sign the "Exclusion Request" form that is enclosed with this Notice and mail it in the enclosed pre-addressed stamped envelope to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

Additionally, in order to be timely, your Exclusion Request form must be postmarked by **[date 60 days after the date that notice is issued]**. You may also get an Exclusion Request form at the website, www.fedexclassactionlawsuit.com.

## THE LAWYERS REPRESENTING THE CLASS

### 14. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as Class Counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 15. Should I get my own lawyer?

If you want your own lawyer, you are free to obtain one, and you have an absolute right to be represented by your own personal counsel. For example, you can have your own lawyer appear in Court for you if you want someone other than Class Counsel to speak for you. If you want your own lawyer, though, you will have to pay that lawyer. You are not required to have your own lawyer, because Class Counsel has been appointed to represent the interest of the Class.

### 16. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of attorneys' fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 17. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement, or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in a Kansas District Court. There has been no date set for the trial of this matter. Because of the nature of the ERISA lawsuit, a Judge in Kansas will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 18. Do I have to come to the trial?

You may need to attend the trial in Kansas. Plaintiffs will present the case for the Class,

and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 19. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate in any recovery against FXG, including in any further proceeding that will be required for you to prove your entitlement to money damages. We do not know how long this will take.

## GETTING MORE INFORMATION

### 20. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

**LEGAL NOTICE**

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc, ("FXG") originally filed in the United States District Court for the District of Kansas concerning whether FXG misclassified certain pick-up and delivery drivers as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible to recover money and/or benefits as a result of that misclassification.

This lawsuit, which is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)*, is currently pending in the United States District Court for The Northern District of Indiana for pretrial proceedings, after which it will be sent back to Kansas should there be a trial. The Court has decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at www.fedexclassactionlawsuit.com. If you are included, you have to decide whether to stay in the Class and be bound by all orders and judgments of the Court in the case, or ask to be excluded and keep your right to sue FXG. No money can be collected now, and there is no guarantee that there will be any.

### ARE YOU AFFECTED?

You must meet the following requirements to be included in the Kansas class:

- You entered into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the period from February 11, 1998 until October 15, 2007 (the "class period") to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were dispatched out of a terminal in the state of Kansas.

### WHAT'S THIS CASE ABOUT?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG maintained the right of control over how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this contention. FXG maintains that the independent contractor classification is appropriate and denies that it did anything wrong. The Court has not decided whether Plaintiffs or FXG is right.

### WHO REPRESENTS THE CLASS?

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as class counsel for Plaintiffs in this lawsuit. If you want your own personal lawyer, you are free to obtain and pay for one, but you are not required to do so, because class counsel have been appointed to represent the interests of the class.

If Plaintiffs do not recover anything as a result of this lawsuit, you will not have to pay any portion of the attorneys' fees and expenses of class counsel. However, if Plaintiffs do obtain any recovery, either at trial or through a settlement before trial, and you are able to prove your entitlement to a portion of this recovery, the Court will approve a reasonable share of attorneys' fees and expenses to be deducted from your recovery amount.

### WHAT ARE YOUR OPTIONS?

You have to decide now whether to stay in the Class or ask to be excluded. You don't have to do anything now if you want

want to keep the possibility of obtaining money or benefits in this lawsuit. By doing nothing you are staying in the Class. If you stay in the Class and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights. In order for you to recover in this lawsuit, though, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover, so you will need to preserve your records pertaining to your relationship with FXG. Also keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG – as part of any other lawsuit – about the same legal claims that are the subject of this lawsuit or about similar legal claims.

To ask to be excluded, you must sign an "Exclusion Request" form stating that you want to be excluded from *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)* and mail it, postmarked by **[date 60 days after the date that notice is issued]**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. A copy of this Exclusion Request form is available at the website, www.fedexclassactionlawsuit.com.

### HOW CAN YOU GET MORE INFORMATION?

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexclassactionlawsuit.com, call 1.800.000.0000 or write to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

LEGAL NOTICE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF INDIANA

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, A Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc. ("FXG") originally filed in the United States District Court for the District of Kansas concerning whether FXG misclassified certain pick-up and delivery drivers as independent contractors instead of as employees and whether these pick-up and delivery drivers are eligible for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").

The lawsuit, which is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)*, is currently pending in the United States District Court For The Northern District of Indiana for pretrial purposes, after which it will be sent back to Kansas should there be a trial. The Court has decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at www.fedexclassactionlawsuit.com. If you are included, you have to decide whether to stay in the Class and be bound by all orders and judgments of the Court in the case, or ask to be excluded and keep your right to sue FXG. No money can be collected now, and there is no guarantee that there will be any.

**ARE YOU AFFECTED?**

The Court has certified an ERISA class, and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the class period that applies to you (discussed below) to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan benefits, absent your characterization as an independent contractor.

If you are a resident of any state, other than Kansas, the class period that applies to you is the period from January 9, 2001 until October 15, 2007. If you are a resident of Kansas, the class period that applies to you is the period from February 11, 1998 until October 15, 2007.

**WHAT IS THIS CASE ABOUT?**

Plaintiffs contend that they and others who have driven for FXG are entitled to certain benefits under ERISA plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them unfairly by calling them independent contractors when they should be legally classified as employees. As a consequence, Plaintiffs allege that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these ERISA plans. FXG maintains that its independent contractor classification is appropriate and that class members, are not eligible for ERISA plan benefits. The Court has not decided whether Plaintiffs or FXG is right.

**WHO REPRESENTS THE CLASS ?**

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as class counsel for Plaintiffs in this lawsuit. If you want your own personal lawyer, you are free to obtain and pay for one, but you are not required to do so, because class counsel have been appointed to represent the interests of the class. You don't have to pay Plaintiffs' counsel to participate. Instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class.

**WHAT ARE YOUR OPTIONS?**

You have to decide now whether to stay in the Class or ask to be excluded. You don't have to do anything now if you want to keep the possibility of obtaining money or benefits in this lawsuit. By doing nothing you are staying in the Class. If you stay in the Class and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights. In order for you to recover in this lawsuit, though, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover, so you will need to preserve your records pertaining to your relationship with FXG. Also keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit or about similar legal claims.

To ask to be excluded, you must sign an "Exclusion Request" form stating that you want to be excluded from *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)* and mail it, postmarked by **[date 60 days after the date that notice is issued]**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. A copy of this Exclusion Request form is available at the website, www.fedexclassactionlawsuit.com.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexdriverslawsuit.com or write to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

# If You are or Have Been A FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of state laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.

• In this particular case, plaintiffs have asserted claims for violation of the Kansas Wage Payment Act, including the failure to reimburse drivers for expenses and other wage claims, to rescind the Operating Agreement and to declare what drivers rights are under Kansas law. There are several other lawsuits arising from alleged violations of the federal law, including the Employee Retirement Income Security Act of 1974 (ERISA) and the Family and Medical Leave Act, as well as various other lawsuits based on state law other than Kansas. You might be eligible to participate in those cases. **This notice pertains solely to the Kansas action.**

• The Court has allowed the lawsuit to be a statewide class action on behalf of:

> All persons who: 1) entered or will enter into an FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement since February 11, 1998; and 3) were dispatched out of a terminal in the state of Kansas.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2008**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action.

• Lawyers must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how to ask for a share.

• If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, to retaliate against you or any other pick-up and delivery driver in any way simply because you chose to participate in this lawsuit.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ........................................................ **PAGE 4**

1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**................................................ **PAGE 5**

5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS**................................................................ **PAGE 6**

10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS** .............................................. **PAGE 7**

12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU**.......................................... **PAGE 8**

15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL**.................................................................... **PAGE 8**

18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION**............................................ **PAGE 9**

21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, and Sylvia O'Brien) sue on behalf of other people who have similar claims. The people together are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. One court resolves the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;

- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) alleges that FXG's classification of Kansas P&D drivers as independent contractors violates the Kansas Wage Payment Act and that the drivers are entitled to all the protections of that law, including the right to reimbursement of expenses and other wage protections. Plaintiffs also seek to rescind the operating agreements as an illegal contract and to have the court declare the legal rights of drivers under Kansas wage and hour law.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the class who have been required to pay for certain business expenses (including improper deductions from wages) and for overtime pay required by law, to rescind the Operating Agreement as an illegal contract and for a declaration that class members are legally classified as employees and have the rights of employees under Kansas law. You can read the Plaintiffs' Second Amended Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are legally independent contractors and therefore not eligible for expenses, overtime or other wage protections. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.

## 9. Is there any money available now?

No money or benefits are available now because the Court has not yet decided whether it agrees with Plaintiffs that FXG has violated the law, or whether it agrees with FXG that it has not done anything wrong, and the two sides have not settled the case. There is no guarantee that money or benefits will or will not be obtained. If they are, you will be notified about how to ask for a share.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the class?

As noted above, the Court has certified a Kansas state class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were or are presently dispatched out of a terminal in the state of Kansas.
- Additionally, you must meet these conditions and provide pick-up and delivery services described above at some time during the class period, which starts on February 11, 1998 and continues to today.

## 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

# YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

## 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

## 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [KANSAS CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. You may also get an Exclusion Request form at the website, www.fedexclassactionlawsuit.com.

## THE LAWYERS REPRESENTING YOU

### 15. Do I have a lawyer in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or otherwise, Class Counsel will have to prove the Plaintiffs' claims at a trial. There has been no date set for the trial of this matter. A Judge or jury will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class Counsel will present the case for the Plaintiffs, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees, and denied the benefits and protections of federal and state worker protection laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.

• In this particular case, plaintiffs have asserted claims for unpaid employee benefits under FXG's employment benefit plans under the federal Employee Retirement Income Security Act of 1974 (ERISA). In this case, Plaintiffs seek to recover benefits under several of FXG's employee benefit plans, including health and dental insurance, 401(k) contributions, life and supplemental security insurance, and long and short term disability benefits. The other lawsuits before the court arise from alleged violations of the federal Family and Medical Leave Act, state employment statutes pertaining to wage payment and expense reimbursements, and state common law claims. You may also be eligible to participate in those cases. **This notice pertains solely to the ERISA action.**

• The Court has allowed the lawsuit to be a nationwide class action on behalf of:

> All persons who: 1) entered or will enter into an FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were entitled to ERISA Plan benefits, absent their mischaracterization as independent contractors.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2008.** FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action.

• Lawyers must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how to ask for a share.

• If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, or to retaliate against you or any other pick-up and delivery driver in any way simply because you chose to participate in this lawsuit.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

case 3:05-md-00527-RLM-CAN document 919-8 filed 10/31/07 page 3 of 9

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ........................................................... **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**................................................. **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS**.............................................................. **PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS** .................................................. **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU**........................................ **PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL**.................................................................................. **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION**............................................... **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, Sylvia O'Brien, Dominic Lupo, Ronald Perry, and Alan Pacheco) sue on behalf of other people who have similar claims. The people together are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. One court resolves the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;

- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action originally brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) includes claims for certain employee benefits, such as health and dental insurance, and retirement and disability benefits, under ERISA.

The specific ERISA plans maintained by FXG include: (1) FXG Ground Package System, Inc. And Certain Affiliates Wealth Accumulation 401(k) Plan; (2) Group Life and Supplemental Life Plan For Employees of FXG Ground Package System, Inc., (3) Ground Benefits Plus Short-Term Disability Plan; (4) Group Long Term Disability Plan For the Employees of FXG Ground Package System, Inc.; (5) FXG Ground Package System, Inc. Medical, Dental and Vision Care Plan; and (6) Dependent Care Account of FXG Ground Package System, Inc.

Plaintiffs contend that they and others who have driven for FXG are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs claim that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these employee benefit plans.

Plaintiffs seek monetary damages for all members of the class who have been denied health, dental and vision insurance, disability benefits and the right to be part of FXG's 401(k) plan under the above-listed employee benefit plans, a declaration from the court that they are entitled to participate in these benefit plans in the future, and reasonable attorneys' fees and costs. You can read the Plaintiffs' Second Amended Complaint, which includes the ERISA allegations, at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are independent contractors and therefore not eligible for any employee benefits. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

### 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.

### 9. Is there any money available now?

No money or benefits are available now because the Court has not yet decided whether it agrees with Plaintiffs that FXG has violated the law, or whether it agrees with FXG that it has not done anything wrong, and the two sides have not settled the case. There is no guarantee that money or benefits will or will not be obtained. If they are, you will be notified about how to ask for a share.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 10. Am I part of the class?

As noted above, the Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan employment benefits, absent the mischaracterization of your employment status as an independent contractor.

Additionally, you must meet these conditions and provide pick-up and delivery services during one the appropriate class periods:

- You are a resident of any state, other than Kansas, and worked as a P&D driver for FXG for some period of time from January 9, 2001 to the present; or
- You are a resident of Kansas and worked as a P&D driver for FXG for some period of time from February 11, 1998 to the present.

### 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue separately or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [ERISA CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your

Exclusion Request postmarked by **MONTH DATE, 2008**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. You may also get an Exclusion Request form at the website, www.fedexclassactionlawsuit.com.

## THE LAWYERS REPRESENTING YOU

### 15. Do I have a lawyer in this case?

The Court appointed the following lawyers and law firms to serve as Class Counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or otherwise, Class Counsel will have to prove the Plaintiffs' claims at a trial. There has been no date set for the trial of this matter. Because of the nature of the ERISA lawsuit, a Judge will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 19. Do I have to come to the trial?

You do not need to attend the trial.  Class Counsel will present the case for the Plaintiffs, and FXG will present the defenses.  You or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate.  We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

LEGAL NOTICE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc. ("FXG") concerning whether FXG misclassified its pick-up and delivery drivers as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible for monetary damages as a result of that misclassification.

The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) and is in the United States District Court for The Northern District of Indiana. The Court decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at www.fedexclassactionlawsuit.com. If you are included, you have to decide whether to stay in the Class and be bound by whatever results, or ask to be excluded and keep your right to sue FXG. **There is no money available now and no guarantee that there will be.**

## Who's affected?

**Anyone who has been or is currently a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver.**

### ARE YOU AFFECTED?

The lawsuit includes people who meet the following requirements:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998 to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were dispatched out of a terminal in the state of Kansas.

### WHAT'S THIS CASE ABOUT?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG maintained the right of control over how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this contention. FXG denies that it did anything wrong and says that class members are independent contractors. **The Court has not decided whether Plaintiffs or FXG is right.**

### WHO REPRESENTS YOU?

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as co-lead counsel for Plaintiffs in this lawsuit. You don't have to pay Plaintiffs' counsel, or anyone else, to participate. Instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer .

### WHAT ARE YOUR OPTIONS?

You have to decide now whether to stay in the Class or ask to be excluded. You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit.

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [KANSAS CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. from *Johnson v. MNO, Inc.* Include your name, address, and telephone number.

### HOW CAN YOU GET MORE INFORMATION?

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexclassactionlawsuit.com, call 1.800.000.0000 or write to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

**1.800.000.0000 www.fedexclassactionlawsuit.com**

LEGAL NOTICE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF INDIANA

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup and Delivery Driver, A Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc. ("FXG") concerning whether FXG misclassified its pick-up and delivery drivers as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible for employee benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").

The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) and is in the United States District Court For The Northern District of Indiana. The Court decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at the website below. If you are included, you have to decide whether to stay in the Class and be bound by whatever results, or ask to be excluded and keep your right to sue FXG. There is no money available now and no guarantee that there will be.

**ARE YOU AFFECTED?**

The Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan employment benefits, absent the mischaracterization of your employment status as an independent contractor.

Additionally, you must meet these conditions and provide pick-up and delivery services during one the appropriate class periods:

- You are a resident of any state, other than Kansas, and worked as a P&D driver for FXG for some period of time from January 9, 2001 to the present; or
- You are a resident of Kansas and worked as a P&D driver for FXG for some period of time from February 11, 1998 to the present.

**WHAT IS THIS CASE ABOUT?**

Plaintiffs contend that they and others who have driven for FXG are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them unfairly by calling them independent contractors when, under law, they are really employees. As a consequence, Plaintiffs alleged that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these employee benefit plans. FXG denies that it did anything wrong and says that class members are independent contractors and therefore not eligible for employee benefits. The Court has not decided whether Plaintiffs or FXG is right.

**WHO REPRESENTS YOU?**

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as co-lead counsel for Plaintiffs in this lawsuit. You don't have to pay Plaintiffs' counsel, or anyone else, to participate. Instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer.

**WHAT ARE YOUR OPTIONS?**

You have to decide whether to stay in the Class or ask to be excluded before the trial, and **you have to decide this now.** You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit.

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [ERISA CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008,** to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexdriverslawsuit.com or write to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

---

**From:** Lynn Faris [mailto:lfaris@leonardcarder.com]
**Sent:** Thursday, October 25, 2007 4:27 PM
**To:** Blalack, K. Lee
**Cc:** Susan E. Ellingstad; Robert Harwood
**Subject:** RE: Plaintiffs' Proposed Long Form ERISA and Kansas Class Notices

Lee: Attached please find Short Form notices for Kansas and the ERISA classes. We didn't have sufficient time to format the ERISA class notice, but it would look exactly like the Kansas short form notice.

Plaintiffs propose to handle the class notice issues as follows:
1) Mail notice to class list within 35 days after court approval with FXG provision of a fully updated list within 5-days of approval of the notice;
2) Provide for a 30 day opt-out period from mailing of the class notice;
3) For an additional 30 days, with regard to return undeliverable notices, search for a proper address and re-send to the "best" available address;
4) Publish the appropriate short form notice in USA Today (ERISA) and Kansas City Star (Kansas) twice in two consecutive weeks after mailing to class list;
5) Provide list to the Court within 30 days of closing of opt-out period.

We look forward to discussing these proposals and any proposed revisions to Plaintiffs' proposed notices as soon as possible.
My team will be available any time tomorrow and we will both be in Pittsburgh on Monday and possibly Tuesday and we could
meet either of those days outside of the depositions. Please let me know what is convenient for you.

*Lynn Rossman Faris*
*Leonard Carder, LLP*
*1330 Broadway, Suite 1450*
*Oakland, CA 94612*
*(510) 272-0169*

---

**From:** Blalack, K. Lee [mailto:LBlalack@OMM.com]
**Sent:** Wednesday, October 24, 2007 5:34 PM
**To:** Lynn Faris; Schwartz, Robert
**Cc:** Ellingstad, Susan E.; Robert Harwood; Merzon, Jennifer L.
**Subject:** RE: Plaintiffs' Proposed Long Form ERISA and Kansas Class Notices

Lynn,

Unless I missed it, we have not yet received the draft short forms of notice. Have you transmitted the short forms of notice to us yet and, if not, when will those be sent to us for review? Also, do the plaintiffs intend to provide us with their notice plan to accompany the forms of notice? The forms of notice do not include any proposed time periods for issuance of the notice following court approval, the duration of the opt out period, the time period post opt out when the list of opt outs must be provided to the court and the final class members confirmed. What are

plaintiffs' plans in this regard?

We will not be prepared to meet and confer on the long forms of notice tomorrow afternoon and we do not wish to meet and confer until we receive the plaintiffs' short forms of notice. If you can transmit the short forms of notice to us by tomorrow, we hope to be in a position to send you our comments and response to both the short and long forms of notice by either tomorrow evening or Friday morning. At that point, we can settle upon a day and time to meet and confer about the notice issue. Thanks. Lee

---

**From:** Lynn Faris [mailto:lfaris@leonardcarder.com]
**Sent:** Tuesday, October 23, 2007 4:24 PM
**To:** Blalack, K. Lee; Schwartz, Robert
**Cc:** Ellingstad, Susan E.; Robert Harwood
**Subject:** Plaintiffs' Proposed Long Form ERISA and Kansas Class Notices

Lee & Bobby: Attached please find the Plaintiffs' proposed Long Form notices. We have draft short forms for publication notice and will forward those to you shortly. Please let me know when you will be ready to comment on these, provide an alternate form of notice and/or meet and confer on these.

*Lynn Rossman Faris*
*Leonard Carder, LLP*
*1330 Broadway, Suite 1450*
*Oakland, CA 94612*
*(510) 272-0169*



O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

October 27, 2007

OUR FILE NUMBER
259075-003

**VIA ELECTRONIC DELIVERY**
**LFARIS@LEONARDCARDER.COM**

WRITER'S DIRECT DIAL
(202) 383-5374

WRITER'S E-MAIL ADDRESS
lblalack@omm.com

Lynn Faris, Esq.
Leonard Carder LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

**Re:** ***Proposed ERISA and Kansas Class Notices, MDL No. 1700 (N.D. Ind.)***

Dear Lynn:

This letter is in response to your email dated October 23, 2007, which attached draft long-form proposed class notices for the ERISA and Kansas classes certified by Judge Miller in the above-referenced matter. FedEx Ground's position, discussed below, is that the issuance of any class notice is inappropriate at this time. Nevertheless, we have provided comments on the substance of your proposed notices and also attached redlines with specific revisions that we believe are necessary to make the notice clear and understandable to the class.

It is premature to send out class notices at this time for several reasons. First, FedEx Ground will be filing a petition to the Seventh Circuit under Rule 23(f) of the Federal Rules of Civil Procedure for leave to appeal the Court's order granting class certification. In light of the potential for all or part of the class certification determination to be reversed or the Court's class definitions to be altered as a result of that appeal, it is not prudent to send any class notice at this time. Doing so could result in the need to send out corrective notices in the future, which would lead to confusion among class members about their rights and render all of the currently proposed notices deficient as a matter of law.

Second, it is our position that only one notice should be sent to each contractor who may be impacted by the MDL 1700 proceedings. Future rulings on pending class certification motions may impact a notice that has already been issued or result in the same individuals receiving multiple notices. The receipt of multiple notices, either corrective or complimentary, would lead to a great deal of unnecessary confusion among class members. Each individual should be able to ascertain his legal rights and responsibilities with respect to these proceedings through one notice alone, and should not be required to opt-out of overlapping litigation more

than once. For these reasons, it is our position that no notice should be issued until the Court has ruled on all pending class certification motions in this litigation.

Third, with respect the ERISA and Kansas classes that have been certified, serious deficiencies in the class definitions preclude the court from ascertaining who is included in these classes and therefore required to receive a notice. Specifically, the class definitions are ambiguous in terms of what driving "on a full-time basis" means or what a "commonly excused employment absence" is, and the Court has yet to clarify how these phrases should be interpreted. Moreover, FedEx Ground does not maintain records that would enable individuals falling within such ambiguous categories to be identified. And, setting aside the issue of how to identify which people should receive a notice, no class member reading a notice containing one of these class definitions would know with any degree of certainty whether they were a part of the class. Indeed, the identity of individuals who fall within these class definitions cannot be determined by anyone until after additional discovery is taken from each putative class member (as was done in *Estrada*).

Notwithstanding these threshold objections, we have reviewed plaintiffs' proposed class notices and have several comments regarding the substance of each of them. As a preliminary matter, the ERISA and Kansas law claims that the Court determined were appropriate for class certification are part of the same lawsuit, *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00530-RLM-CAN (KS). Therefore, there is no need for two separate notices to issue regarding these claims. Rather, our position is that a single notice about the Kansas lawsuit is appropriate in order to avoid the inevitable confusion that would result from an individual receiving two class notices in a single case. Nevertheless, we have provided redline versions for both of your proposed notices with our specific edits, some of which are explained in further detail below.

(1) We object to the direction to class members to visit the "www.fedexclassaction .com" website in the footer of the notices. This is very misleading in light of the header of the notices, which states "United States District Court Northern District of Indiana South Bend Division." In tandem with the header, readers will likely be left with the impression that this website is an official court website, which it is not. For the same reason, we object to the inclusion of a toll-free telephone number in the footer of the document, unless the number ultimately provided is to an office within the United States District Court for the Northern District of Indiana. We do not have an objection to referencing the website and toll-free number in the body of the notice, as it already is on page 2. Our objection lies in referencing the website and toll-free number in such a manner as to imply that they are official court resources.

(2) The language in the proposed notices stating that, in order to be excluded from the class, individuals must prepare their own "Exclusion Request" letters is also not acceptable. This language is confusing, particularly in light of the statement that "Exclusion Request forms" are available on plaintiffs' website. Filling out and mailing in a pre-prepared Exclusion Request form is all that should be required in order for individuals to opt out of the classes. However, in addition to such pre-prepared forms being available on plaintiffs' website, they should also be

case 3:05-md-00527-RLM -CAN document 919-11 filed 10/31/07 page 3 of 4

included as part of the notice package that it transmitted to each putative class member. The use of Exclusion Request forms in this manner will prevent the ambiguous communications from class members concerning their intentions to opt out or participate in the litigation that could result from the sending of individual letters.

(3) It is also our position that we will require discovery of class members in order to present our defense at trial. Accordingly, the class notices must make class members aware of this fact, as well as the fact that they have an independent obligation to prove their membership in the class and their right to recover in the lawsuit. We have inserted language into the drafts of the notices to advise putative class members of their duty to preserve evidence that may be relevant to their class membership and claims and of the possibility that they may be required to give related testimonial evidence.

(4) In our drafts of the notices, we have also removed descriptions of and references to the actions, other than the *Craig* action, which have been consolidated in the MDL. Given that the class notices pertain only to the *Craig* action, we think that the discussion of other cases in the notice would be misleading and confusing.

(5) We have also removed the paragraph on the second page of both notices regarding the impermissibility of retaliation against drivers by FedEx Ground. This paragraph is inflammatory and improperly suggests that the company will retaliate against drivers. At a minimum, the phrase "to not renew or terminate your contract" must be removed, because it is misleading, implying that any contract nonrenewal or termination going forward would be grounds for alleging retaliation.

(6) We also take issue with the assertion in both notices that each of the class periods "continues to today." On the contrary, a firm date needs to be established for the close of the class period. We think that the appropriate end date for both of the class periods is October 15, 2007, the date on which the classes were certified.

(7) We have modified the language in the introduction stating that FedEx Ground is not permitted to offer its opinion as to whether participation in this lawsuit is in the best interests of putative class members, because this position overstates the law. We think that it is appropriate to inform putative class members that FedEx Ground is prohibited only from asking or telling individuals not to participate, or from discouraging participation.

(8) We have deleted the bullet point summary summarizing the Court's findings in certifying the class. This information is not relevant to putative class members' decisions as to whether to participate in the case and the notice already informs individuals how they may access the Court's decision.

(9) We have also deleted Question 8 ("What are Plaintiffs' asking for?") because this information is duplicative of information already contained in the answers to Questions 2 and 5.

(10) We have rephrased Question 15 to read "Who represents the Plaintiffs in this case" because it is presumptuous to assume that any putative class member is represented until after he or she has decided not to opt-out.

(11) We have also clarified that the case is consolidated in the Northern District of Indiana only for pretrial proceedings. Therefore, if the case is not settled or otherwise resolved during the pretrial process, trial of plaintiffs' claims will occur in the District of Kansas.

Additionally, we received from you on Thursday evening plaintiffs' proposed notice plan and short forms of notice. We have not yet had a chance to review these proposals in detail, but we will send a second letter in the next few days containing any comments and/or objections to the notice plan and the short forms of notice.

As we discussed yesterday, the parties will meet and confer on Monday morning at 11:00 a.m., EST, in Pittsburgh to discuss our comments and proposed changes to plaintiffs' draft class notices and the development of a notice plan.

Very truly yours,

/s/ K. Lee Blalack, II
K. Lee Blalack, II
of O'MELVENY & MYERS LLP

Attachments

cc (via electronic delivery):
Robert M. Schwartz, Esq.
Susan Ellingstad, Esq.
Rob Harwood, Esq.

case 3:05-md-00527-RLM -CAN document 919-12 filed 10/31/07 page 1 of 10

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION**

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

~~•FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of state laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.~~

- Plaintiffs in this case are current and former pick-up and delivery drivers for FedEx Ground and FedEx Home Delivery (collectively "FXG"), most of whom were dispatched out of terminals in the state of Kansas. ~~In this particular case, p~~Plaintiffs have asserted claims against FXG for violation of the Kansas Wage Payment Act, including the failure to reimburse drivers for expenses and other wage claims, to rescind the Operating Agreement and to declare what drivers rights are under Kansas law. ~~There are several other lawsuits arising from alleged violations of the federal law, including the Employee Retirement Income Security Act of 1974 (ERISA) and the Family and Medical Leave Act, as well as various other lawsuits based on state law other than Kansas. You might be eligible to participate in those cases.~~ ~~**This notice pertains solely to the Kansas action.**~~

- The Court has allowed th~~e~~is Kansas lawsuit to be a statewide class action on behalf of:

> All persons who: 1) entered or will enter into a~~n~~ FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998, ~~during the class period~~ to provide package pick-up and delivery services pursuant to the Operating Agreement ~~since February 11, 1998~~; and 3) were dispatched out of a terminal in the state of Kansas.

- The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.** By doing nothing, you keep the possibility of ~~getting~~ recovering money and/or ~~employee~~ benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same or similar legal claims in this lawsuit. And, you will be bound by any adverse ruling or judgment issued by the Court or jury. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no money or benefits from it. Keep rights.** If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you will not be bound by any adverse ruling issued by the Court or jury and you will keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act by **[date 90 days after the date that notice is issued]** ~~before **MONTH DATE, 2008**~~. FXG is prohibited by law from asking or telling you to exclude yourself from this action~~, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action~~ or from discouraging you from participating in this action.~~.~~

- ~~Lawyers~~ Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how ~~to ask for a share~~this affects your rights.

~~•If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, to retaliate against you or any other pick-up and delivery driver in any way simply because you chose to participate in this lawsuit.~~

- **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION.................................................................. PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT .......................................................... PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS.................................................................. PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS.......................................................... PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU .............................................. PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL ........................................................................................ PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION........................................................ PAGE 9**
21. Are more details available?

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court rules upon any claims in this case and/or holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00530-RLM-CAN (KS).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, and Sylvia O'Brien) sue on behalf of other people who have similar claims. The people together are a who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas These two courts will resolve One court resolves the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

## 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action brought in Kansas (Craig v. FedEx Ground Package System, Inc., Civil No. 3:05-cv-00530) alleges that FXG's classification of Kansas P&D drivers as independent contractors violates the Kansas Wage Payment Act and that the drivers are entitled to all the protections of that law, including the right to reimbursement of expenses and other wage protections. Plaintiffs also seek to rescind the operating agreements as an illegal contract and to have the court declare the legal rights of drivers under Kansas wage and hour law.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay paid for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the class who have been required to pay paid for certain business expenses (including certain improper deductions from wages compensation) and for overtime pay required by law, to rescind the Operating Agreement as an illegal contract and for a declaration that class members are legally classified as employees and have the rights of employees under Kansas law. You can read the Plaintiffs' Second Amended Complaint at www.fedexclassactionlawsuit.com.

## 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are legally independent contractors and therefore not eligible for payment of business expenses, overtime or other wage protections. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

## 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the

Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## ~~8. What are the Plaintiffs asking for?~~

~~The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.~~

## 9. Is there any money available now?

No money or benefits ~~are available~~can be collected now because the Court and/or a jury have~~has~~ not yet decided whether it agrees with Plaintiffs that FXG has violated the law~~, or whether it agrees with FXG that it has not done anything wrong, and the two sides have not settled the case~~. There is no guarantee that money or benefits will or will not be obtained. If ~~they are,~~ Plaintiffs win in this case, or there is a settlement, you will be notified about how~~ to ask for a share~~ this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the class?

As noted above, the Court has certified a Kansas state class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ~~ERISA~~ Kansas class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) ~~during the class period~~ at some time during the period from February 11, 1998 until October 15, 2007 (the "class period") to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were or are presently dispatched out of a terminal in the state of Kansas.
- ~~Additionally, you must meet these conditions and provide pick-up and delivery services described above at some time during the class period, which starts on February 11, 1998 and continues to today.~~

## 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get ~~free~~ help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded~~ before the trial~~, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting ~~money or~~ benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights ~~to apply for a share~~ (or how to ask to be excluded from any settlement). ~~While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.~~

Note, however, that in order for you to recover in this lawsuit, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover. This means, for example, that you will be asked to provide proof of how many hours you have worked, proof of any time off that you have taken and the reasons for that time off and proof of any expenses for which you claim reimbursement. Therefore, you need to preserve all documents that will affect your ability to demonstrate that you are a class member and your ability to recover in the lawsuit, which could include items such as your Operating Agreement and addenda, settlement records and expense receipts. You may also be required to present testimonial evidence in order to demonstrate your membership in the class or to recover in this lawsuit. Additionally, if your mailing address changes, you will need to notify the claims administrator or Class Counsel.

~~Keep~~ Also keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same or similar legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action, including any orders and judgments that are adverse to Plaintiffs.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG~~,~~ ~~concerning~~ in which employment classification is a disputed question, and you want to continue with it, or if you do not want to be legally bound by any orders or judgments of the Court~~,~~ you ~~need to~~ must ask to be excluded from the Class. Or, if you do not agree with the objectives of this lawsuit and do not wish to participate, you must ask to be excluded from the class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification

practices that occurred or occurs at any time. ~~If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.~~

~~If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.~~

## 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must ~~send an~~ sign the "Exclusion Request" ~~in the~~ form ~~of a letter sent by mail~~ that is enclosed with this Notice~~, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [KANSAS CLAIMS]~~ and mail it in the enclosed pre-addressed stamped envelope to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX

~~. Be sure to include your name and address, and sign the letter~~. Additionally, in order to be timely, ~~Y~~your ~~must mail your~~ Exclusion Request form must be postmarked by **[date 90 days after the date that notice is issued]** ~~**MONTH DATE, 2008**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX~~. You may also get an Exclusion Request form at the website, www.fedexclassactionlawsuit.com.

### The Lawyers Representing ~~You~~ The Class

## 15. Who represents the Plaintiffs ~~Do I have a lawyer~~ in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

## 16. Should I get my own lawyer?

If you want your own lawyer, you are free to obtain one, and you have an absolute right to be represented by your own personal counsel. For example, you can have your own lawyer appear in Court for you if you want someone other than Class Counsel to speak for you.~~You do not need to hire your own lawyer because Class Counsel is working on~~

~~your behalf. But, i~~If you want your own lawyer, though, you will have to pay that lawyer. You are not required to have your own lawyer, because Class Counsel have been appointed to represent the interest of the Class ~~For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.~~

## 17. How will the lawyers be paid?

~~If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses.~~ If Plaintiffs do not recover anything as a result of this lawsuit, ~~Y~~you will not have to ~~won't have to~~ pay ~~these~~any portion of the attorneys' fees and expenses of Class Counsel. However, if Plaintiffs do obtain any recovery, either at trial or through a settlement before trial, and you are able to prove your entitlement to a portion of this recovery, the Court will approve a reasonable share of attorneys' fees and expenses to be deducted from your recovery amount. ~~If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.~~

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

## 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs ~~otherwise, Class Counsel~~ will have to prove their ~~the Plaintiffs'~~ claims at a trial in a Kansas District Court. There has been no date set for the trial of this matter. A ~~Judge or~~ jury in Kansas will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

## 19. Do I have to come to the trial?

You ~~do not~~ may need to attend the trial in Kansas. Plaintiffs ~~Class Counsel~~ will present the case for the ~~Plaintiffs~~ Class, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

## 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate in any recovery against FXG, including in any further proceeding that will be required for you to prove your entitlement to money damages. We do not know how long this will take.

## GETTING MORE INFORMATION

## 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

~~QUESTIONS CALL 1-800-000-0000 TOLL FREE, OR VISIT FEDEXCLASSACTIONLAWSUIT.COM~~

10

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION**

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

~~•FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees, and denied the benefits and protections of federal and state worker protection laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.~~

- Plaintiffs in this case are current and former pick-up and delivery drivers for FedEx Ground and FedEx Home Delivery (collectively "FXG"), most of whom were dispatched out of terminals in the state of Kansas.~~In this particular case~~, ~~plaintiffs~~ Plaintiffs have asserted claims against FXG for unpaid employee benefits under FXG's employment benefit plans under the federal Employee Retirement Income Security Act of 1974 (ERISA). ~~In this case, Plaintiffs~~They seek to recover benefits under several of FXG's employee benefit plans, including medical, dental and vision care insurance, 401(k) benefits, life and supplemental life insurance ~~health and dental insurance, 401(k) contributions, life and supplemental security insurance~~, and long and short term disability benefits. ~~The other lawsuits before the court arise from alleged violations of the federal Family and Medical Leave Act, state employment statutes pertaining to wage payment and expense reimbursements, and state common law claims. You may also be eligible to participate in those cases.~~ ~~**This notice pertains solely to the ERISA action.**~~

- The Court has allowed the lawsuit to be a nationwide class action on behalf of:

> All persons who: 1) entered or will enter into a~~n~~ FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were ~~entitled~~ eligible ~~to~~ for ERISA Plan benefits, absent their mischaracterization as independent contractors.

- The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights**. By doing nothing, you keep the possibility of ~~getting~~ recovering money and/or ~~employee~~ benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same or similar legal claims in this lawsuit. And, you will be bound by any adverse ruling or judgment issued by the Court. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no money or benefits from it. Keep rights.** If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you will not be bound by any adverse ruling issued by the Court and you will keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act by **[date 90 days after the date that notice is issued]** ~~before **MONTH DATE, 2008**~~. FXG is prohibited by law from asking or telling you to exclude yourself from this action~~, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action~~ or from discouraging you from participating in this action.

- ~~Lawyers~~ Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how ~~to ask for a share~~ this affects your rights.

~~•If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, or to retaliate against you or any other pick-up and delivery driver in any way simply because you chose to participate in this lawsuit.~~

- Any questions? Read on and visit www.fedexclassactionlawsuit.com.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION.................................................................... PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT .......................................................... PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS.................................................................... PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS.............................................................. PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU .............................................. PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL ......................................................................................... PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION........................................................ PAGE 9**
21. Are more details available?

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court rules upon any claims in this case and/or holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *In re FedEx Ground Package System, Inc. Employment Practices Litigation* Cause No. 3:05-MD-527RM (MDL-1700) *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00530-RLM-CAN (KS).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, Sylvia O'Brien, Dominic Lupo, Ronald Perry, and Alan Pacheco) sue on behalf of other people who have similar claims. The people together are a who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas One court resolves These two courts will resolve the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action originally brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) includes claims for certain employee benefits, such as health and dental insurance, and retirement and disability benefits, under ERISA.

Plaintiffs contend that tThe specific ERISA plans maintained by FXG include the: (1) FedEx Ground and Freight Retirement Savings Plan FXG Ground Package System, Inc. And Certain Affiliates Wealth Accumulation 401(k) Plan; (2) Group Life and Supplemental Life Plan For Employees of FXG Ground Package System, Inc., (3) Ground Benefits Plus Short-Term Disability Plan; (4) Group Long Term Disability Plan For the Employees of FXG Ground Package System, Inc.; (5) FXG Ground Package System, Inc. Medical, Dental and Vision Care Plan; and (6) Dependent Care Account Plan of FXG Ground Package System, Inc.

Plaintiffs contend that they and others who have driven for FXG are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs claim that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these employee benefit plans.

Plaintiffs seek monetary damages for all members of the class who have not received been denied health, dental and vision insurance, disability benefits and the right to be part of FXG's 401(k) plan under the above-listed employee benefit plans, a declaration from the court that they are entitled to participate in these benefit plans in the future, and reasonable attorneys' fees and costs for bringing this action. You can read the Plaintiffs' Second Amended Complaint, which includes the ERISA allegations, at

www.fedexclassactionlawsuit.com.

## 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are legally independent contractors and therefore not eligible for the requested ~~any~~ employee benefits. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

## 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## ~~8. What are the Plaintiffs asking for?~~

~~The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG.~~

## 9. Is there any money available now?

No money or benefits ~~are available~~ can be collected now because the Court has ~~has~~ not yet decided whether it agrees with Plaintiffs that FXG has violated the law~~, or whether it agrees with FXG that it has not done anything wrong, and the two sides have not settled the case~~. There is no guarantee that money or benefits will or will not be obtained. If ~~they are~~ Plaintiffs win in this case, or there is a settlement, you will be notified about how ~~to ask for a share~~ this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the class?

As noted above, the Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the class period that applies to you (discussed below) to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan ~~employment~~ benefits, absent ~~the~~ your mischaracterization ~~of your employment status~~ as an independent contractor.

~~Additionally, you must meet these conditions and provide pick-up and delivery services~~

~~during one the appropriate class periods:~~

~~—~~If ~~Y~~you are a resident of any state, other than Kansas, the class period that applies to you is the period from ~~and worked as a P&D driver for FXG for some period of time from~~ January 9, 2001 ~~to the present~~ until October 15, 2007~~; or~~.
~~—~~If ~~Y~~you are a resident of Kansas, the class period that applies to you is the period ~~and worked as a P&D driver for FXG for some period of time~~ from February 11, 1998 ~~to the present~~ until October 15, 2007 .

## 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get ~~free~~ help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded ~~before the trial~~, and you have to decide this now.

## 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting ~~money or~~ benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights ~~to apply for a share~~ (or how to ask to be excluded from any settlement). ~~While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.~~

Note, however, that in order for you to recover in this lawsuit, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover. This means, for example, that you will be asked to provide proof of how many hours you have worked, proof of any time off that you have taken and the reasons for that time off and proof of any expenses for which you claim reimbursement. Therefore, you need to preserve all documents that will affect your ability to demonstrate that you are a class member and your ability to recover in the lawsuit, which could include items such as your Operating Agreement and addenda, settlement records and expense receipts. You may also be required to present testimonial evidence in order to demonstrate your membership in the class or to recover in this lawsuit. Additionally, if your mailing address changes, you will need to notify the claims administrator or Class Counsel.

Also k~~K~~eep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same or similar legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action, including any orders and judgments that

are adverse to Plaintiffs.

## 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG, concerning in which employment classification is a disputed question, and you want to continue with it, or if you do not want to be legally bound by any orders or judgments of the Court, you must you need to ask to be excluded from the Class. Or, if you do not agree with the objectives of this lawsuit and do not wish to participate, you must ask to be excluded from the class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue separately or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an sign the "Exclusion Request" in the form that is enclosed with this Notice of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [ERISA CLAIMS] and mail it in the enclosed pre-addressed stamped envelope to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX

. Be sure to include your name and address, and sign the letter. Additionally, in order to be timely, You must mail your Exclusion Request form must be postmarked by **[date 90 days after the date that notice is issued]** **MONTH DATE**, 2008, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. You may also get an Exclusion Request form at the website, www.fedexclassactionlawsuit.com.

### THE LAWYERS REPRESENTING YOU THE CLASS

## 15. Who represents the Plaintiffs Do I have a lawyer in this case?

The Court appointed the following lawyers and law firms to serve as Class Counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

| **Lynn Rossman Faris** | **Susan E. Ellingstad** | **Robert I. Harwood** |
|---|---|---|
| LEONARD CARDER, LLP | LOCKRIDGE GRINDAL | HARWOOD FEFFER LLP |

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

488 Madison Avenue 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

## 16. Should I get my own lawyer?

If you want your own lawyer, you are free to obtain one, and you have an absolute right to be represented by your own personal counsel. For example, you can have your own lawyer appear in Court for you if you want someone other than Class Counsel to speak for you. You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, i If you want your own lawyer, though, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you. You are not required to have your own lawyer, because Class Counsel has been appointed to represent the interest of the Class.

## 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of attorneys' fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

## 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement, or by the Court in the Northern District of Indiana before a trial otherwise, Plaintiffs Class Counsel will have to prove the Plaintiffs' their claims at a trial in a Kansas District Court. There has been no date set for the trial of this matter. Because of the nature of the ERISA lawsuit, a Judge in Kansas will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

## 19. Do I have to come to the trial?

You do not may need to attend the trial in Kansas. Plaintiffs Class Counsel will present the case for the PlaintiffsClass, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

## 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate in any recovery against FXG, including in any further

proceeding that will be required for you to prove your entitlement to money damages. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.



O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

October 30, 2007

OUR FILE NUMBER
259075-003

WRITER'S DIRECT DIAL
(202) 383-5374

WRITER'S E-MAIL ADDRESS
lblalack@omm.com

<u>VIA ELECTRONIC DELIVERY</u>
<u>LFARIS@LEONARDCARDER.COM</u>

Lynn Faris, Esq.
Leonard Carder LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Re: ***<u>Short Form ERISA and Kansas Class Notices and Notice Plan, MDL No. 1700 (N.D. Ind.)</u>***

Dear Lynn:

This letter addresses FedEx Ground's comments regarding plaintiffs' proposed short form notices for the Kansas and ERISA classes certified by Judge Miller in the above-referenced matter and plaintiffs' outline of a proposed notice plan, which you provided via e-mail message on October 25, 2007. In addition, this letter addresses certain outstanding issues between the parties regarding plaintiffs' proposed long form notices that were discussed during our meet and confer yesterday.

First, regarding the short form notices, we have provided along with this letter redline versions of these documents containing our proposed revisions.[1] These revisions track our revisions to plaintiffs' proposed long form notices, which we provided previously. One change that we believe warrants noting separately, however, is our deletion of the "box" insert in the middle of the Kansas short form notice. This insert, which states: "Who's affected? Anyone who has been or is currently a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver," is plainly inaccurate given the much narrower scope of the class certified by the Court. To the extent that plaintiffs intend to include a similar insert in the ERISA short form notice once it has been formatted, we would object to such an insert for the same reason.

[1] Because we did not have a Microsoft Word version of the proposed short form notices, we created our own Word versions of the documents. We recognize that, due to the way that the Kansas short form notice was formatted, the revision process significantly alters the format of the document and renders it somewhat difficult to read, but we hope that you will still be able to discern our proposed changes.

Second, we have reviewed plaintiffs' outline of a proposed notice plan. While we are in agreement with most of the proposed plan, albeit with some qualifications, we have objections regarding the length of time allotted for the provision of a class list by FedEx Ground ("FXG") and the length of the proposed opt-out period, which we have discussed below. To facilitate our discussion of this plan, we have quoted plaintiffs' specific proposals in italics below, with our comments interlineated:

*Plaintiffs propose to handle the class notice issues as follows:*

(1) *Mail notice to class list within 35 days after court approval with FXG provision of a fully updated list within 5-days of approval of the notice;*

We do not think that this proposal allows FXG enough time to provide an updated class list and that a two-week period from the date of Court approval of the notice would be more appropriate. Otherwise, we agree with this proposal with the qualification that FXG should not have any obligation to produce any such updated list unless plaintiffs provide, and the Court approves, specified criteria for determining who should receive the notice so that FXG will know what names and addresses to pull from its records.

(2) *Provide for a 30 day opt-out period from mailing of the class notice;*

We believe that a 30-day opt-out period is too short and that 60 days from the date of mailing of the class notice would be a more appropriate end date for the opt-out period.

(3) *For an additional 30 days, with regard to return undeliverable notices, search for a proper address and re-send to the "best" available address;*

We agree with this proposal as long as FXG is under no obligation to investigate or identify the best available addresses for any individuals whose notice packets are returned as undeliverable and provided that the opt-out period for any class member to whom a notice is resent will be extended by a minimum of two additional weeks.

(4) *Publish the appropriate short form notice in USA Today (ERISA) and Kansas City Star (Kansas) twice in two consecutive weeks after mailing to class list;*

We agree with this proposal.

(5) *Provide list to the Court within 30 days of closing of opt-out period.*

We agree with this proposal with the two clarifications that: (1) the lists that must be filed with the Court are the final notice list and the list of confirmed opt-outs; and (2) it is plaintiffs' responsibility to compile and file both of these lists with the Court.

Third, during our meet and confer yesterday regarding plaintiffs' proposed long form notices, we agreed to compose language that attempts to resolve the parties' concerns related to objection numbers 5 and 7 in our letter dated October 27, 2007. With respect to our previous objection number 5, FXG proposes that the following paragraph be substituted for the original paragraph in the notice on this point: "This class action does not affect FXG's right to make day-to-day decisions in the ordinary course of business. FXG may non-renew or terminate contractor operating agreements for legitimate business reasons, and it may also make changes to its business practices for legitimate business reasons, including as a result of this litigation, as long as none of these decisions are made in retaliation against any driver for participating in this lawsuit."

With respect to our previous objection number 7, our concern with the original language in plaintiffs' notice would be addressed if the following language is added to the original text preserving FXG's right to express its opinion about the merits of the litigation in the media and to audiences that are not limited to class members: "However, FXG is free to express its opinion about the merits of the litigation in the media and in corporate communications to audiences that are not limited to class members."

Again, while FXG continues to object to the propriety of any class notice at this time, as previously noted to you, we hope to reach agreement with plaintiffs on those issues relating to the proposed forms of notice and notice plan where possible. Accordingly, please contact me at your earliest convenience to schedule another meet and confer early tomorrow regarding our proposed changes to the short form class notices, our comments to the proposed notice plans and our further suggestions regarding the long form notices. We also welcome plaintiffs' response to the open issues from our meet and confer discussion yesterday that you indicated plaintiffs would take under advisement. We hope to hear back from you on those open issues tomorrow morning so that we can finalize our papers for filing with the Court tomorrow.

Very truly yours,

/s/ K. Lee Blalack, II
K. Lee Blalack, II
of O'MELVENY & MYERS LLP

Attachments
cc (via electronic delivery):
Robert M. Schwartz, Esq.
Susan Ellingstad, Esq.
Rob Harwood, Esq.

**LEGAL NOTICE**

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

~~1.800.000.0000 www.fedexclassactionlawsuit.com.~~

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc, ("FXG") originally filed in the United States District Court for the District of Kansas concerning whether FXG misclassified ~~its~~ certain pick-up and delivery drivers as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible ~~for monetary damages~~to recover money and/or benefits as a result of that misclassification.

~~The~~ This lawsuit, ~~which~~ is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)*~~*In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL 1700)~~, is currently pending ~~and is~~ in the United States District Court for The Northern District of Indiana for pretrial proceedings, after which it will be sent back to Kansas should there be a trial. The Court has decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at www.fedexclassactionlawsuit.com. If you are included, you have to decide whether to stay in the Class and be bound by ~~whatever results~~all orders and judgments of the Court in the case, or ask to be excluded and keep your right to sue FXG. ~~There is no~~ No money can be collected ~~available~~ now, and there is no guarantee that there will be any.

~~**Who's affected?**~~

~~**Anyone who has been or is currently a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver**~~

### Are You Affected?

You must meet the following requirements to be included in the Kansas class:~~The lawsuit includes people who meet the following requirements~~:

- You entered ~~or will enter~~ into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove ~~or will drive~~ a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the period from February 11, 1998 until October 15, 2007 (the "class period") ~~since February 11, 1998~~ to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were dispatched out of a terminal in the state of Kansas.

### What's This Case About?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG maintained the right of control over how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this contention. FXG maintains that the independent contractor classification is appropriate and denies that it did anything wrong ~~and says that class members are independent contractors~~. The Court has not decided whether Plaintiffs or FXG is right.

### Who Represents ~~You~~The Class?

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as ~~co-lead~~ class counsel for Plaintiffs in this lawsuit. If you want your own personal lawyer, you are free to obtain and pay for one, but you are not required to do so, because class counsel have been appointed to represent the interests of the class. ~~You don't have to pay Plaintiffs' counsel, or anyone else, to participate. instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer.~~ If Plaintiffs do not recover anything as a result of this lawsuit, you will not have to pay any portion of the attorneys' fees and expenses of class counsel. However, if Plaintiffs do obtain any recovery, either at trial or through a settlement before trial, and you are able to prove your entitlement to a portion of this recovery, the Court will approve a reasonable share of attorneys' fees and expenses to be deducted from your recovery amount.

### What Are Your Options?

You have to decide now whether to stay in the Class or ask to be excluded. You don't have to do anything now if you want to keep the possibility of ~~getting~~ obtaining money or benefits ~~from~~ in this lawsuit. By doing nothing you are staying in the Class. If you stay in the Class and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights ~~to apply for a share (or how to ask to be excluded from any settlement)~~. In order for you to recover in this lawsuit, though, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover, so you will need to preserve your records pertaining to your relationship with FXG. Also k~~K~~eep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG – as part of any other lawsuit – about the same legal claims that are the subject of this lawsuit or about similar legal claims.

To ask to be excluded, you must ~~send an~~ sign an "Exclusion Request" ~~in the~~ form ~~of a letter sent by mail,~~ stating that you want to be excluded from *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)* ~~*In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL 1700) [KANSAS CLAIMS]. Be sure to include your name and address, and sign the letter. You must~~ and mail it, ~~your Exclusion Request~~ postmarked by **MONTH DATE, 2008,** to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. ~~from *Johnson v. MNO, Inc.* Include your name, address, and telephone number.~~ A copy of this Exclusion Request form is available at the website, www.fedexclassactionlawsuit.com.

case 3:05-md-00527-RLM -CAN document 919-15 filed 10/31/09 page 3 of 5

**HOW CAN YOU GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexclassactionlawsuit.com, call 1.800.000.0000 or write to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX

LEGAL NOTICE
UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF INDIANA

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, A Class Action Lawsuit May Affect Your Rights.

A class action has been certified in a lawsuit against FedEx Ground Package System, Inc. ("FXG") originally filed in the United States District Court for the District of Kansas concerning whether FXG misclassified ~~its~~ certain pick-up and delivery drivers as independent contractors instead of as employees and whether these pick-up and delivery drivers are eligible for ~~employee~~ benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").

The lawsuit, which is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)*~~*In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700)~~, is currently pending ~~and is~~ in the United States District Court For The Northern District of Indiana for pretrial purposes, after which it will be sent back to Kansas should there be a trial. The Court has decided that this lawsuit should be a class action on behalf of a "Class," or a group of people, that could include you. This notice summarizes your rights and options. More information is in a detailed notice available at ~~the website below~~www.fedexclassactionlawsuit.com. If you are included, you have to decide whether to stay in the Class and be bound by all orders and judgments of the Court in the case~~whatever results~~, or ask to be excluded and keep your right to sue FXG. ~~There is no~~No money ~~available~~ can be collected now, and there is no guarantee that there will be any.

**ARE YOU AFFECTED?**

The Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered ~~or will enter~~ into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You personally drove ~~or will drive~~ a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the class period that applies to you (discussed below) ~~during the class period~~ to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan ~~employment~~ benefits, absent ~~the~~your ~~mis~~characterization ~~of your employment status~~ as an independent contractor.

If you are a resident of any state, other than Kansas, the class period that applies to you is the period from January 9, 2001 until October 15, 2007. If you are a resident of Kansas, the class period that applies to you is the period from February 11, 1998 until October 15, 2007. ~~Additionally, you must meet these conditions and provide pick-up and delivery services during one the appropriate class periods:~~

- ~~You are a resident of any state, other than Kansas, and worked as a P&D driver for FXG for some period of time from January 9, 2001 to the present; or~~
- ~~You are a resident of Kansas and worked as a P&D driver for FXG for some period of time from February 11, 1998 to the present.~~

**WHAT IS THIS CASE ABOUT?**

Plaintiffs contend that they and others who have driven for FXG are entitled to certain ~~employment~~ benefits under ~~the employee benefit~~ERISA plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them unfairly by calling them independent contractors when~~, under law, they are really~~ they should be legally classified as employees. As a consequence, Plaintiffs allege~~d~~ that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these ~~employee benefit~~ERISA plans. FXG maintains that its independent contractor classification is appropriate and ~~denies that it did anything wrong and says~~ that class members, ~~are independent contractors and therefore~~ are not eligible for ~~employee~~ ERISA plan benefits. The Court has not decided whether Plaintiffs or FXG is right.

**WHO REPRESENTS THE CLASS ~~YOU~~?**

The Court appointed the law firms of Leonard Carder LLP, Lockridge Grindal & Nauen P.L.L.P., and Harwood Feffer LLP, to serve as ~~co-lead~~ class counsel for Plaintiffs in this lawsuit. If you want your own personal lawyer, you are free to obtain and pay for one, but you are not required to do so, because class counsel have been appointed to represent the interests of the class. You don't have to pay Plaintiffs' counsel~~, or anyone else,~~ to participate. Instead, if Plaintiffs' counsel gets money or benefits for the Class, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. ~~You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer.~~

**WHAT ARE YOUR OPTIONS?**

You have to decide now whether to stay in the Class or ask to be excluded~~ before the trial, and **you have to decide this now**~~. You don't have to do anything now if you want to keep the possibility of obtaining ~~getting~~ money or benefits ~~from~~ in this lawsuit. By doing nothing you are staying in the Class. If you stay in the Class and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how ~~to apply for a share~~ this impacts your rights ~~(or how to ask to be excluded from any settlement)~~. In order for you to recover in this lawsuit, though, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover, so you will need to preserve your records pertaining to your relationship with FXG. Also keep~~Keep~~ in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit or about similar legal claims.

To ask to be excluded, you must ~~send~~ sign an "Exclusion Request" ~~in the~~ form ~~of a letter sent by mail,~~ stating that you want to be excluded from *Craig, et al. v. FedEx Ground Package System, Inc., et al., Civil No. 3:05-cv-00530-RLM-CAN (KS)* ~~*In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-700) [ERISA CLAIMS]. Be sure to include your name and address, and sign the letter. You must~~ and mail it, ~~your Exclusion Request~~ postmarked by **MONTH DATE, 2008,** to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX. A copy of this Exclusion Request form is available at the website, www.fedexclassactionlawsuit.com.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights visit www.fedexdriverslawsuit.com or write to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- Plaintiffs in this case are current and former pick-up and delivery drivers for FedEx Ground and FedEx Home Delivery (collectively "FXG"), most of whom were dispatched out of terminals in the state of Kansas. Plaintiffs have asserted claims against FXG for violation of the Kansas Wage Payment Act, including the failure to reimburse drivers for expenses and other wage claims, to rescind the Operating Agreement and to declare what drivers rights are under Kansas law.

- The Court has allowed this Kansas lawsuit to be a statewide class action on behalf of:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Kansas.

- The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.** By doing nothing, you keep the possibility of recovering money and/or benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same or similar legal claims in this lawsuit. And, you will be bound by any adverse ruling or judgment issued by the Court or jury. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no money or benefits from it. Keep rights.** If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you will not be bound by any adverse ruling issued by the Court or jury and you will keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act by [**date 60 days after the date that notice is issued**]. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or to exclude yourself from this action. However, FXG is free to express its opinion about the merits of the litigation in the media and in corporate communications to audiences that are not limited to class members.

- Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how this affects your rights.

- This class action does not affect FXG's right to make day-to-day decisions in the ordinary course of business. FXG may non-renew or terminate contractor operating agreements for legitimate business reasons, and it may also make changes to its business practices for legitimate business reasons, including as a result of this litigation, as long as none of these decisions are made in retaliation against any driver for participating in this lawsuit.

- **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

## WHAT THIS NOTICE CONTAINS

BASIC INFORMATION .................................................. PAGE 4
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

THE CLAIMS IN THE LAWSUIT .................................................. PAGE 5
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. Is there any money available now?

WHO IS IN THE CLASS .................................................. PAGE 6
9. Am I part of this Class?
10. I'm still not sure if I am included.

YOUR RIGHTS AND OPTIONS .................................................. PAGE 6
11. What happens if I do nothing at all?
12. Why would I ask to be excluded?
13. How do I ask the Court to exclude me from the Class?

THE LAWYERS REPRESENTING THE CLASS .................................................. PAGE 8
14. Who represents the Plaintiffs in this case?
15. Should I get my own lawyer?
16. How will the lawyers be paid?

THE TRIAL .................................................. PAGE 8
17. How and when will the Court decide who is right?
18. Do I have to come to the trial?
19. Will I get money after the trial?

GETTING MORE INFORMATION .................................................. PAGE 9
20. Are more details available?

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has "certified" a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court rules upon any claims in this case and/or holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00530-RLM-CAN (KS).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, and Sylvia O'Brien) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas. These two courts will resolve the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action brought in Kansas (Craig v. FedEx Ground Package System, Inc., Civil No. 3:05-cv-00530) alleges that FXG's classification of Kansas P&D drivers as independent contractors violates the Kansas Wage Payment Act and that the drivers are entitled to all the protections of that law, including the right to reimbursement of expenses and other wage protections. Plaintiffs also seek to rescind the operating agreements as an illegal contract and to have the court declare the legal rights of drivers under Kansas wage and hour law.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG paid for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the class who have paid for certain business expenses (including certain deductions from compensation) and for overtime pay required by law, to rescind the Operating Agreement as an illegal contract and for a declaration that class members are legally classified as employees and have the rights of employees under Kansas law. You can read the Plaintiffs' Second Amended Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are legally independent contractors and therefore not eligible for payment of business expenses, overtime or other wage protections. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

### 8. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 9. Am I part of the class?

As noted above, the Court has certified a Kansas state class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the Kansas class:

- You entered into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time during the period from February 11, 1998 until October 15, 2007 (the "class period") to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were or are presently dispatched out of a terminal in the state of Kansas.

### 10. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 14.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded, and you have to decide this now.

### 11. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how this impacts your rights.

Note, however, that in order for you to recover in this lawsuit, you will have an obligation to prove that you are a member of the class and then a separate obligation to prove your ability to recover. This means, for example, that you will be asked to provide proof of how many hours you have worked, proof of any time off that you have taken and the reasons for that time off and proof of any expenses for which you claim reimbursement. Therefore, you need to preserve all documents that will affect your ability to demonstrate that you are a class member and your ability to recover in the lawsuit, which could include items such as your Operating Agreement and addenda, settlement records and expense receipts. You may also be required to present testimonial

evidence in order to demonstrate your membership in the class or to recover in this lawsuit. Additionally, if your mailing address changes, you will need to notify the claims administrator or Class Counsel.

Also keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same or similar legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action, including any orders and judgments that are adverse to Plaintiffs.

## 12. Why would I ask to be excluded?

If you already have your own lawsuit against FXG, in which employment classification is a disputed question, and you want to continue with it, or if you do not want to be legally bound by any orders or judgments of the Courtyou must ask to be excluded from the Class. Or, if you do not agree with the objectives of this lawsuit and do not wish to participate, you must ask to be excluded from the class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occurs at any time.

## 13. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must sign the "Exclusion Request" form that is enclosed with this Notice and mail it in the enclosed pre-addressed stamped envelope to:

XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

Additionally, in order to be timely, your Exclusion Request form must be postmarked by **[date 60 days after the date that notice is issued]**. You may also get an Exclusion Request form at the website, www.fedexclassactionlawsuit.com.

## THE LAWYERS REPRESENTING THE CLASS

### 14. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 15. Should I get my own lawyer?

If you want your own lawyer, you are free to obtain one, and you have an absolute right to be represented by your own personal counsel. For example, you can have your own lawyer appear in Court for you if you want someone other than Class Counsel to speak for you. If you want your own lawyer, though, you will have to pay that lawyer. You are not required to have your own lawyer, because Class Counsel have been appointed to represent the interest of the Class.

### 16. How will the lawyers be paid?

If Plaintiffs do not recover anything as a result of this lawsuit, you will not have to pay any portion of the attorneys' fees and expenses of Class Counsel. However, if Plaintiffs do obtain any recovery, either at trial or through a settlement before trial, and you are able to prove your entitlement to a portion of this recovery, the Court will approve a reasonable share of attorneys' fees and expenses to be deducted from your recovery amount.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 17. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in a Kansas District Court. There has been no date set for the trial of this matter. A jury in Kansas will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

case 3:05-md-00527-RLM -CAN document 919-16 filed 10/31/07 page 9 of 9

### 18. Do I have to come to the trial?

You may need to attend the trial in Kansas. Plaintiffs will present the case for the Class, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 19. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate in any recovery against FXG, including in any further proceeding that will be required for you to prove your entitlement to money damages. We do not know how long this will take.

## GETTING MORE INFORMATION

### 20. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On October 24, 2007, Defendant's counsel filed a motion to withdraw. Counsel's motion, however, was unaccompanied by a form of order pursuant to Local Rule 5.1. See N.D.L.R. 5.1(e) ("The filing of a motion or petition requiring the entry of a routine or uncontested order by the judge or the clerk shall be accompanied by a suitable form of order together with sufficient copies thereof for service upon all parties or their counsel.").

Because counsel has failed to comply with local rules, Defendant's counsel's motion is **DENIED WITHOUT PREJUDICE** [Doc. No. 911]. Counsel may re-file its motion along with the appropriate form of order.

**SO ORDERED.**

Dated this 9th Day of November, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On October 24, 2007, Defendant's counsel filed a motion to withdraw. Counsel's motion, however, was unaccompanied by a form of order pursuant to Local Rule 5.1. See N.D.L.R. 5.1(e) ("The filing of a motion or petition requiring the entry of a routine or uncontested order by the judge or the clerk shall be accompanied by a suitable form of order together with sufficient copies thereof for service upon all parties or their counsel.").

Because counsel has failed to comply with local rules, Defendant's counsel's motion is **DENIED WITHOUT PREJUDICE** [Doc. No. 911]. Counsel may re-file its motion along with the appropriate form of order.

**SO ORDERED.**

Dated this 9th Day of November, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Gibson, 3:07-cv-272-RLM-CAN (AZ);*
*Magno*, 3:07-cv-322-RLM-CAN (CT);
*White*, 3:07-cv-411-RLM-CAN (GA);
*Givens*, 3:07-cv-324-RLM-CAN (LA);
*Vargas*, 3:07-CV-325-RLM-CAN (MA);
*Decesare*, 3:07-CV-120-RLM-CAN (NV);
*Whiteside*, 3:07-cv-326-RLM-CAN (NC);
*Leighter*, 3:07-cv-328-RLM-CAN (OR); and
*Gruhn*, 3:07-cv-412-RLM-CAN (VT).

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**JOINT MOTION TO AMEND THE CASE SCHEDULE**

Pursuant to Fed. R. Civ. P. 16(b), parties in the above-captioned matter do hereby jointly move this Court for good cause to amend the case schedule, originally entered on November 29, 2005 (Doc. No. 58), and subsequently modified to allow for a fourth phase of class certification briefing on June 29, 2007 (Doc. No. 766). Both Plaintiffs and Defendants seek to take one page from each of their remaining briefs in the current wave of class certification briefing in order to file an omnibus brief.

On October 1, 2007, Plaintiffs filed nine class certification briefs, marking the fourth phase of class certification briefing in this lawsuit. Defendant's opposition briefs are due November 17, 2007, and Plaintiffs' reply briefs are due December 17, 2007. By this motion, the parties request the Court's permission to set aside one page from each of their remaining

certification briefs for the purpose of filing one omnibus brief per side.  Granting this request is consistent with the Court's prior rulings, whereby it allowed Plaintiffs to do exactly what the parties seek to do here.  (*See* Doc. No. 482 ("[A]n omnibus fact brief for all class certification would assist this Court in resolving all of the future motions for class certification.").)

For these reasons, the parties respectfully request that this Court GRANT their JOINT MOTION TO AMEND THE CASE SCHEDULE, and declare the following:

Both parties shall be permitted to file with the Court an omnibus brief with their respective opposition or reply briefs, limited to 9 pages each.  FedEx Ground shall be limited to 29 pages for each of their remaining class certification opposition briefs and Plaintiffs shall be limited to 19 pages for each of their remaining reply briefs in support of class certification.

Dated: November 12, 2007

By: s/Lynn Rossman Faris
Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, California 94612

Robert I. Harwood
WECHSLER HARWOOD LLP
488 Madison Avenue
New York, New York 10022

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401

*Plaintiffs' Co-Lead Counsel*

Respectfully submitted

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION TO STAY CLASS NOTICE AND ADDITIONAL CLASS CERTIFICATION BRIEFING OR RULINGS PENDING RESOLUTION OF RULE 23(f) APPEAL**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... **1**

**ARGUMENT** .......... **3**

I. IMMEDIATE DISSEMINATION OF THE NOTICE OF PENDENCY IS APPROPRIATE .......... **3**

II. STAY OF THIS LITIGATION , INCLUDING CLASS CERTIFICATION ORDERS, IS UNWARRANTED. .......... **8**

III. STAY OF THIS LITIGATION AND THE NOTICE PROCESS DOES NOT ADVANCE PUBLIC POLICY. .......... **10**

**CONCLUSION** .......... **11**

**TABLE OF AUTHORITIES**

**Cases** **Page**

*Beale v. EdgeMark Fin. Corp.*,
No. 94C1890,
1995 WL 631840 (N.D. Ill. Oct. 23, 1995) ....................4, 5

*Beesley v. Int'l Paper Co.*,
No. 06-cv-703-DRH,
2007 WL 2458228 (S.D. Ill. Aug. 24, 2007) ....................10

*Blair v. Equifax Check Serv., Inc.*,
181 F.3d 832 (7th Cir. 1999) ....................4, 8

*Cavin v. Home Loan Ctr., Inc.*,
469 F. Supp. 2d 561 (N.D. Ill. 2007) ....................5

*In re Farmers Ins. Co., Inc. FCRA Litig.*,
No. 03-158-F,
2006 WL. 1042499 (W.D. Okla. Apr. 13, 2006) ....................5

*In re Sumitomo Copper Litig.*,
262 F.3d 134 (2d Cir. 2001)....................4

*Lively v. Dynegy, Inc.*,
No. 07-2073 (7th Cir. filed May 8, 2007) ....................10

*Lorazepam & Clorazepate Antitrust Litig.*,
208 F.R.D. 1 (D.D.C. 2002) ....................8

*Sanders v. John Nuveen & Co.*,
463 F.2d 1075 (7th Cir. 1972) ....................3

*Smith v. Shawnee Library Sys.*,
60 F.3d 317 (7th Cir. 1995) ....................3

*Spano v. Boeing Co. Employee Benefits Plan Comm*,
No. 06-cv-743-DRH,
2007 WL 2688456 (S.D. Ill. Sept. 10, 2007) ....................10

**Statutes**

Fed. R. Civ. P. 23(b)(3) ....................1, 3, 4, 5

Fed. R. Civ. P. 23(c)(2)(B) ....................3, 6

Fed. R. Civ. P. 23(f) ....................1, 2

**Miscellaneous**

*Manual for Complex Litigation* (*Fourth*) § 21.28, at 376 (2007) .......................................4

**PRELIMINARY STATEMENT**

FedEx Ground Package System, Inc. ("FXG") now seeks to essentially vacate this Court's Scheduling Order and entire class certification process because it has sought review of the Court's first class certification order under Rule 23(f). Specifically, FXG asks the Court to delay dissemination of the class notices, stay additional class certification briefing, and refrain from issuing any more rulings on the other 37 pending class certification motions until after the Seventh Circuit addresses FXG's meritless Rule 23(f) petition. FXG specifically seeks to stay: 1) submitting proposed forms of class notice by the parties; 2) the filing of court-ordered supplemental five-page briefing on each of the fully briefed class certification motions due tomorrow, November 14, 2007; 3) the completion of nine pending motions, requiring the filing of FXG's opposition to the fourth wave of class certification briefs that is presently due on November 17, 2007; and 4) issuance of any class certification orders on any of the 28 other fully briefed motions. FXG's request to stay the filing of each party's proposed notice is now moot as the parties already submitted their proposed forms of notice to the Court on October 31, 2007. FXG's second and third requests are effectively moot as briefing on this motion is unlikely to be completed prior to the submission of the five-page briefings and FXG's opposition to the fourth wave of class certification.[1] The issues that remain are whether the Court in its discretion should be stay Rule 23(b)(3) notice to the class and whether the Court should stop issuing any further rulings on the remaining class actions pending the Seventh Circuit's consideration of the Rule 23(f) appeal.

---

[1] The only briefing that will remain after the briefing on this motion is concluded will be plaintiffs' reply memoranda, which are presently due on December 15, 2007. Plaintiffs do not assert that it will be difficult or burdensome to provide the Court with such briefing.

FXG ignores Rule 23(f)'s express language and the case law making clear that it is the unusual case where a stay should be issued. Despite the fact that there is no automatic provision for a stay when appellate review of class certification is sought under Rule 23(f) of the Federal Rules of Civil Procedure, FXG claims that great "harm" will result to FXG if interested persons are notified of their right to participate and/or opt-out of the classes. Plaintiffs disagree. The real harm from delaying notice and the class certification process will be to the uninformed class members who will not be given the earliest opportunity to learn that they may be a member of a certified class action over which the Court will preside and supervise, and that they have a right to opt-out, or seek individual representation if they choose. The restriction on the dissemination of court-approved notice to plaintiffs is all the more inequitable when it is considered that FXG has long had unilateral communication with drivers about this case and plaintiffs have had no corresponding opportunity to communicate with all current drivers.

FXG argues that potential confusion could result in the unlikely event that, after notification to the class, it succeeds in its Rule 23(f) petition before the Seventh Circuit. But following FXG's argument to its logical end, notice should never be given until the *end* of an action because of the mere possibility that a defendant might later succeed in dismissing claims on summary judgment or decertifying the class. The case law is clear that notification, however, should be given at the earliest opportunity following certification.

Separate from whether class notice should issue, FXG has offered no justification for why briefing and the remainder of the class certification process should not proceed. Class certification briefing is substantially complete and staying decisions on the pending class

certification motions will have the effect of unnecessarily derailing and substantially delaying the already scheduled summary judgment motions and conclusion of this action. Likewise, any expense that might be incurred, if a corrective notice were necessary, is slight when measured against the significant costs already incurred by the parties in litigating this action.

For the reasons set forth herein, FXG has failed to meet its burden of proving that this is the extraordinary case under Rule 23(f) that necessitates the proposed delay. FXG has offered insufficient proof to justify a stay of either the notice or further class certification proceedings and the motion should therefore be denied.

## ARGUMENT

### I. Immediate Dissemination of the Notice of Pendency Is Appropriate

Rule 23(b)(3) and 23(c)(2) specify that notice should be given advising class members of the existence of a class action and class members' rights to opt-out and obtain their own counsel prior to a court exercising jurisdiction over those class members. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 321 (7th Cir. 1995). Rule 23(b)(3) mandatory notice is designed to "advise all class members of their rights and privileges under the close supervision of the court." *Sanders v. John Nuveen & Co.*, 463 F.2d 1075, 1085 (7th Cir. 1972). "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Notice should be sent to class members *as soon as possible* after certification of a class in order to best protect the due process concerns of a Rule 23(b)(3) class to be informed of the existence of a class action, the right to participate or to opt-out, and the right to intervene with

separate counsel. *Beale v. EdgeMark Fin. Corp.*, No. 94C1890, 1995 WL 631840, at *2 (N.D. Ill. Oct. 23, 1995) (Immediate issuance of a notice protects the due process interests of a Rule 23(b)(3) class) (*citing Frankel, Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 40-41 (1967) ("it seems obvious that if notice is to be effective – if class members are to have a meaningful opportunity to request exclusion, appear in the action or object to the representation, etc. – the invitation must go out as promptly as the circumstances will permit")). "In other words, once we throw a party, all the guests should be invited." *Beale,* 1995 WL 631840, at *5.

Neither the filing of a Rule 23(f) petition, nor even the hearing of such an appeal, automatically stays distribution of the notice or the case itself absent an express order by the district court or the court of appeals. Fed. R. Civ. P. 23(f); *see also Manual for Complex Litigation* (*Fourth*) § 21.28, at 376 (2007) ("In the ordinary case, a stay will not be appropriate.") Indeed, cases which are stayed are the exception, not the rule. As the Court said in *In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001), "Finally, we note that parties should not view Rule 23(f) as a vehicle to delay proceedings in the district court." The Seventh Circuit endorses this view: "Rule 23(f) is drafted to avoid delay." *Blair v. Equifax Check Serv., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999) ("stays should be infrequent").

Stay of the notice distribution, as suggested by FXG, will result in delay because potential class members will not be advised of their membership in this court-supervised class action, their right to participate, to opt-out under Rule 23(b)(3), intervene into this action with their own counsel, or proceed with their own action brought by their own counsel. Delaying the notice, in turn, delays the opt-out period, which, in turn, delays final determination of the

class and the rights of those actually proceeding in the litigation, which already has been pending more than two years. Avoidance of delay does not appear to be a goal shared with plaintiffs by FXG, as FXG has asked the Seventh Circuit to brief the requested appeal on a regular track rather than on an expedited basis. FXG's strategy of delay has frequently been apparent in its previous repeated requests to vacate the Court's schedule until after certification orders were issued in all cases; now, FXG says most of the case should be stayed, including even completing briefing on the pending class certification motions.

The decision *when* to disseminate notices is left "to the sound discretion of the court." *Beale*, 1995 WL 631840, at *1; *see also Cavin v. Home Loan Ctr., Inc.*, 469 F. Supp. 2d 561, 574 (N.D. Ill. 2007)[2]; *In re Farmers Ins. Co., Inc. FCRA Litig.*, No. 03-158-F, 2006 WL 1042499, at *2 (W.D. Okla. Apr. 13, 2006). The issue of when the notice is sent is based on two intertwined factors: "whether delay will prejudice absentee class members and (2) whether issuance of notice will cause defendant any harm." *Beale*, 1995 WL 631840, at *4. FXG provides no evidence that it will suffer any harm whatsoever from issuance of the class notice, nor could it given its constant barrage of information to drivers about this pending case and others.

On the other hand, there is tangible prejudice to plaintiffs from delay of the notice distribution. First, members of the Rule 23(b)(3) classes will not be informed of their options

---

[2] The *Cavin* court properly set forth the standard for examining whether to stay notice and ultimately found that it was appropriate to stay the notice based on the facts in that particular case, namely that there had already been a determination that plaintiffs' claim lacked merit and summary judgment had been granted in favor if the defendant. While the test remains the same, the pre-existing summary adjudication is an important fact that set apart the holding in *Cavin* from the facts in the present action.

vis-à-vis the class and thus unable to timely pursue their options (*e.g.* participate through and assist class counsel, opt-out, or appear in this litigation with their own counsel). "Having found that Rule 23(c)(2) provides benefits that inure to the class (*i.e.* disclosure of the right to opt-out or enter an appearance) the Court now finds that failure to notify class members would unduly prejudice the class . . . ." *Id.* Second, the absent class members are prejudiced by failing to learn through a notice that an action has been certified to protect their interests. One-sided lines of communication between FXG and its current drivers remain open while class counsel is confounded in reaching out to the absent class members by FXG's refusal to provide contact information. Moreover, lack of notice essentially permits drivers to continue to enter into contracts with FXG without any notification that there is a certified class challenging employment status; that is manifestly prejudicial and unfair. Delaying class notice will leave class members unaware that they are within the protective umbrella of this action seeking to advance their interests. (Indeed, FXG's past insistence that that there are many drivers who do not want to be part of this class action seems utterly inconsistent with its stated desire to delay notification as long as possible – rather it seems to justify the earliest possible notice.) Third, delay is prejudicial to class members because every day that passes is one more day that class members remain ineligible for family medical leave and other important statutory rights, must pay for FXG's operating expenses, remain ineligible for workers compensation, and not receive employment benefits.

In comparison, FXG's only "harm" that it can point to is that, by sending the notice to class members now, there may be confusion if a corrective notice is later required.[3] This speculative harm is easily mitigated by using appropriate language in a corrective notice should one ever be required. Further, any contention that dissemination of a notice now will result in a waste of resources is based on the assumed facts that two notices will be required and that it will be FXG's responsibility to pay for such notices. As the *Beale* court held, the cost of notice issue does not constitute "harm" to a defendant because "defendants provide no evidence that notice would be financially overwhelming . . . ." *Id.* The cost of notice here is an extremely small expense when compared to the litigation costs already incurred by all parties. Lastly, FXG overlooks the fact that should a corrective notice ever be required, it will have an advantageous result of informing more class members about their rights in this litigation.

To the extent that FXG is heard to complain that notice is harmful because it creates a presumption that FXG did something wrong, this conjecture is simply wrong. The language of the notice will be court-approved, neutral, and understandable. The form of notice proposed by plaintiffs makes clear that there has been no final determination of liability and also makes reference to the fact that FXG denies all of the allegations. In fact, plaintiffs' notices submitted for Court approval specifically follows the neutral and plain language proposed for use by the Federal Judicial Center. A class member or any other individual reading the notice will be under no misconception that FXG admits that it did something wrong nor is such an

---

[3] Should the Court determine that even a brief delay of the notice is appropriate, plaintiffs alternatively suggest that a comprehensive notice plan be submitted to the Court to avoid any potential for confusion or excessive delay.

assumption likely given the vehemence contained in company communications to the drivers asserting that the company's position is legally correct.

For these reasons, FXG should be instructed to immediately provide a current, updated and accurate list of the names and addresses of class members and notice should be issued thereafter in an orderly and expedited fashion.

## II.    Stay of This Litigation, Including Class Certification Orders, Is Unwarranted

Separate and apart from seeking to stay classwide notice, FXG also seeks to stay all further proceedings related to class certification.[4]   While some of the specific certification deadlines FXG challenges have already passed, FXG seeks to have the Court impose a stay of further class certification briefing and issuance of any more class certification orders by this Court.  A stay of this aspect of the litigation is unwarranted and FXG has not offered any evidence that meets the standard for a grant of such an extraordinary stay which will indefinitely delay the processing of this case.

"Filing a request for permission to appeal does not stop the litigation unless the district court or the court of appeals issues a stay -- and a stay would depend on a demonstration that the probability of error is high enough that the costs of pressing ahead in the district court exceed the cost of waiting."  *Blair*, 181 F.3d at 835;[5] *see also Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1, 3 (D.D.C. 2002).   Notably, the *Blair* court stated "we did not

---

[4] Only a small amount of continuing discovery would be permitted under the stay proposed by FXG.  All other proceedings in the case would be halted.

[5] The *Blair* court characterized the demonstration of a need to a stay as being akin to seeking a preliminary injunction or stay of an administrative proceeding.  *Id.*  Thus, it is FXG's *burden*, as the chief proponent of delay, to demonstrate that there is a probability of error in the class certification decision and that it is high enough to exceed the costs of pressing ahead.

stay either of the two cases in which permission to appeal was sought; both continued in the district court . . . . Because stays will be infrequent, interlocutory appeals under Rule 23(f) should not unduly retard the pace of the litigation." *Id.*

FXG, by seeking to stay any further orders on class certification, is asking the court to vacate the pretrial schedule established for the remainder of this action. If class certification is delayed, FXG will undoubtedly ask to vacate the schedule for summary judgment motions presently set for March 2008. FXG has repeatedly taken the position that they will be unable to move for summary judgment until after class certification has been completed. As noted above, in addition to issues of due process and fairness, further indefinite delay will impact plaintiffs and the class who continue to be misclassified as independent contractors, forced to continue to pay for expenses normally paid for by employers, denied overtime payments, remain ineligible for FMLA leave and workers compensation, and refused employee benefits.

Though it is FXG's burden to demonstrate the necessity for issuance of a stay, FXG has not demonstrated that there is any "probability of error" of this Court in certifying the ERISA and Kansas class actions, let alone that a "probability of error" is sufficiently high that it outweighs the costs of forcing all the parties and their respective constituents to remain in limbo while the Seventh Circuit considers whether to take the appeal. Indeed, FXG's motion to stay points to no specific error that the Court allegedly committed in the Order granting certification. Def. Mem. 6-7. Further, the cost of continuing with all remaining aspects of this litigation is minimal in comparison to what has already been expended by the parties to bring the action to its present state. Conclusion of the briefing on the pending nine class certification

motions will undoubtedly closely mirror the briefing that has been completed to date and is hardly a high-expense endeavor for either plaintiffs or FXG.[6]

Although FXG cites to *Spano v. Boeing Co. Employee Benefits Plan Comm.*, No. 06-cv-743-DRH, 2007 WL 2688456 (S.D. Ill. Sept. 10, 2007) and *Beesley v. Int'l Paper Co.*, No. 06-cv-703-DRH, 2007 WL 2458228 (S.D. Ill. Aug. 24, 2007) as examples of why the present action should be stayed, those cases do not support FXG's request for a stay in this action. In both *Spano* and *Beesley*, Judge Herndon stayed two ERISA cases specifically because another action, *Lively v. Dynegy, Inc.*, No. 07-2073 (7th Cir. filed May 8, 2007), had already been accepted for review by the Seventh Circuit on an issue that was case dispositive to *Spano* and *Beesley*. FXG has not and, indeed, cannot point to any pending Seventh Circuit cases that would be dispositive of the class certification issued raised herein. FXG also seems to assert that because there are 39 cases centralized in this MDL, the Seventh Circuit decision impacts "other cases;" this argument is more rhetorical than real. The cases are combined for all pre-trial purposes into one proceeding, unlike *Spano* and *Beesley*.

**III. Stay of This Litigation and the Notice Process Does Not Advance Public Policy**

FXG argues, without support, that public policy will be advanced by staying the notice and further class certification proceedings, recapping its prior arguments of confusion, prejudice, and expense. FXG ignores the far more relevant public policy of providing information in a timely manner to individuals whose rights are affected by a lawsuit and in

---

[6] Given that the Court has not yet ruled on the Plaintiffs' motion for equitable tolling of the statute of limitations in Givens, the drivers who are eligible to opt-in to that FLSA case but have received no notice of that right will certainly by prejudiced by further delay in these proceedings.

proceeding with the expedient resolution of litigation that will adjudicate the rights of such individuals. Moreover, the employment rights sought to be protected in this litigation are important public rights, like Family Medical Leave, ERISA, protection of wages from improper deductions, coverage for industrial injuries, proper payment of overtime compensation, and the like. The public interest is advanced by the expeditious litigation of the wage and hour principles governing this case. Any argument based on public policy must look to the public's interests in lawful classification of workers – not to FXG's narrow strategic interests.

## CONCLUSION

For the reasons set forth herein, plaintiffs respectfully request that the Court deny FXG's motion to stay dissemination of the class notice or further proceedings with respect to class certification.

Dated: November 13, 2007

Respectfully submitted,

HARWOOD FEFFER LLP

Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400

LEONARD CARDER, LLP
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

PLAINTIFFS CO-LEAD COUNSEL

HAMILTON LAW FIRM
John C. Hamilton
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:    (574) 289-9987

PLAINTIFFS' LIAISON COUNSEL

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION TO STAY CLASS NOTICE AND ADDITIONAL CLASS CERTIFICATION BRIEFING OR RULINGS PENDING RESOLUTION OF RULE 23(f) APPEAL**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... **1**

**ARGUMENT** .......... **3**

I. IMMEDIATE DISSEMINATION OF THE NOTICE OF PENDENCY IS APPROPRIATE .......... **3**

II. STAY OF THIS LITIGATION , INCLUDING CLASS CERTIFICATION ORDERS, IS UNWARRANTED. .......... **8**

III. STAY OF THIS LITIGATION AND THE NOTICE PROCESS DOES NOT ADVANCE PUBLIC POLICY. .......... **10**

**CONCLUSION** .......... **11**

# TABLE OF AUTHORITIES

**Cases** **Page**

*Beale v. EdgeMark Fin. Corp.*,
No. 94C1890,
1995 WL 631840 (N.D. Ill. Oct. 23, 1995) ....................4, 5

*Beesley v. Int'l Paper Co.*,
No. 06-cv-703-DRH,
2007 WL 2458228 (S.D. Ill. Aug. 24, 2007) ....................10

*Blair v. Equifax Check Serv., Inc.*,
181 F.3d 832 (7th Cir. 1999) ....................4, 8

*Cavin v. Home Loan Ctr., Inc.*,
469 F. Supp. 2d 561 (N.D. Ill. 2007) ....................5

*In re Farmers Ins. Co., Inc. FCRA Litig.*,
No. 03-158-F,
2006 WL. 1042499 (W.D. Okla. Apr. 13, 2006) ....................5

*In re Sumitomo Copper Litig.*,
262 F.3d 134 (2d Cir. 2001)....................4

*Lively v. Dynegy, Inc.*,
No. 07-2073 (7th Cir. filed May 8, 2007) ....................10

*Lorazepam & Clorazepate Antitrust Litig.*,
208 F.R.D. 1 (D.D.C. 2002) ....................8

*Sanders v. John Nuveen & Co.*,
463 F.2d 1075 (7th Cir. 1972) ....................3

*Smith v. Shawnee Library Sys.*,
60 F.3d 317 (7th Cir. 1995) ....................3

*Spano v. Boeing Co. Employee Benefits Plan Comm*,
No. 06-cv-743-DRH,
2007 WL 2688456 (S.D. Ill. Sept. 10, 2007) ....................10

**Statutes**

Fed. R. Civ. P. 23(b)(3) ....................1, 3, 4, 5

Fed. R. Civ. P. 23(c)(2)(B) ....................3, 6

Fed. R. Civ. P. 23(f) ....................1, 2

**Miscellaneous**

*Manual for Complex Litigation* (*Fourth*) § 21.28, at 376 (2007) ......................................4

## PRELIMINARY STATEMENT

FedEx Ground Package System, Inc. ("FXG") now seeks to essentially vacate this Court's Scheduling Order and entire class certification process because it has sought review of the Court's first class certification order under Rule 23(f). Specifically, FXG asks the Court to delay dissemination of the class notices, stay additional class certification briefing, and refrain from issuing any more rulings on the other 37 pending class certification motions until after the Seventh Circuit addresses FXG's meritless Rule 23(f) petition. FXG specifically seeks to stay: 1) submitting proposed forms of class notice by the parties; 2) the filing of court-ordered supplemental five-page briefing on each of the fully briefed class certification motions due tomorrow, November 14, 2007; 3) the completion of nine pending motions, requiring the filing of FXG's opposition to the fourth wave of class certification briefs that is presently due on November 17, 2007; and 4) issuance of any class certification orders on any of the 28 other fully briefed motions. FXG's request to stay the filing of each party's proposed notice is now moot as the parties already submitted their proposed forms of notice to the Court on October 31, 2007. FXG's second and third requests are effectively moot as briefing on this motion is unlikely to be completed prior to the submission of the five-page briefings and FXG's opposition to the fourth wave of class certification.[1] The issues that remain are whether the Court in its discretion should be stay Rule 23(b)(3) notice to the class and whether the Court should stop issuing any further rulings on the remaining class actions pending the Seventh Circuit's consideration of the Rule 23(f) appeal.

---

[1] The only briefing that will remain after the briefing on this motion is concluded will be plaintiffs' reply memoranda, which are presently due on December 15, 2007. Plaintiffs do not assert that it will be difficult or burdensome to provide the Court with such briefing.

FXG ignores Rule 23(f)'s express language and the case law making clear that it is the unusual case where a stay should be issued. Despite the fact that there is no automatic provision for a stay when appellate review of class certification is sought under Rule 23(f) of the Federal Rules of Civil Procedure, FXG claims that great "harm" will result to FXG if interested persons are notified of their right to participate and/or opt-out of the classes. Plaintiffs disagree. The real harm from delaying notice and the class certification process will be to the uninformed class members who will not be given the earliest opportunity to learn that they may be a member of a certified class action over which the Court will preside and supervise, and that they have a right to opt-out, or seek individual representation if they choose. The restriction on the dissemination of court-approved notice to plaintiffs is all the more inequitable when it is considered that FXG has long had unilateral communication with drivers about this case and plaintiffs have had no corresponding opportunity to communicate with all current drivers.

FXG argues that potential confusion could result in the unlikely event that, after notification to the class, it succeeds in its Rule 23(f) petition before the Seventh Circuit. But following FXG's argument to its logical end, notice should never be given until the *end* of an action because of the mere possibility that a defendant might later succeed in dismissing claims on summary judgment or decertifying the class. The case law is clear that notification, however, should be given at the earliest opportunity following certification.

Separate from whether class notice should issue, FXG has offered no justification for why briefing and the remainder of the class certification process should not proceed. Class certification briefing is substantially complete and staying decisions on the pending class

certification motions will have the effect of unnecessarily derailing and substantially delaying the already scheduled summary judgment motions and conclusion of this action. Likewise, any expense that might be incurred, if a corrective notice were necessary, is slight when measured against the significant costs already incurred by the parties in litigating this action.

For the reasons set forth herein, FXG has failed to meet its burden of proving that this is the extraordinary case under Rule 23(f) that necessitates the proposed delay. FXG has offered insufficient proof to justify a stay of either the notice or further class certification proceedings and the motion should therefore be denied.

## ARGUMENT

### I. Immediate Dissemination of the Notice of Pendency Is Appropriate

Rule 23(b)(3) and 23(c)(2) specify that notice should be given advising class members of the existence of a class action and class members' rights to opt-out and obtain their own counsel prior to a court exercising jurisdiction over those class members. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 321 (7th Cir. 1995). Rule 23(b)(3) mandatory notice is designed to "advise all class members of their rights and privileges under the close supervision of the court." *Sanders v. John Nuveen & Co.*, 463 F.2d 1075, 1085 (7th Cir. 1972). "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Notice should be sent to class members *as soon as possible* after certification of a class in order to best protect the due process concerns of a Rule 23(b)(3) class to be informed of the existence of a class action, the right to participate or to opt-out, and the right to intervene with

separate counsel. *Beale v. EdgeMark Fin. Corp.*, No. 94C1890, 1995 WL 631840, at *2 (N.D. Ill. Oct. 23, 1995) (Immediate issuance of a notice protects the due process interests of a Rule 23(b)(3) class) (*citing Frankel, Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 40-41 (1967) ("it seems obvious that if notice is to be effective – if class members are to have a meaningful opportunity to request exclusion, appear in the action or object to the representation, etc. – the invitation must go out as promptly as the circumstances will permit")). "In other words, once we throw a party, all the guests should be invited." *Beale,* 1995 WL 631840, at *5.

Neither the filing of a Rule 23(f) petition, nor even the hearing of such an appeal, automatically stays distribution of the notice or the case itself absent an express order by the district court or the court of appeals. Fed. R. Civ. P. 23(f); *see also Manual for Complex Litigation* (*Fourth*) § 21.28, at 376 (2007) ("In the ordinary case, a stay will not be appropriate.") Indeed, cases which are stayed are the exception, not the rule. As the Court said in *In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001), "Finally, we note that parties should not view Rule 23(f) as a vehicle to delay proceedings in the district court." The Seventh Circuit endorses this view: "Rule 23(f) is drafted to avoid delay." *Blair v. Equifax Check Serv., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999) ("stays should be infrequent").

Stay of the notice distribution, as suggested by FXG, will result in delay because potential class members will not be advised of their membership in this court-supervised class action, their right to participate, to opt-out under Rule 23(b)(3), intervene into this action with their own counsel, or proceed with their own action brought by their own counsel. Delaying the notice, in turn, delays the opt-out period, which, in turn, delays final determination of the

class and the rights of those actually proceeding in the litigation, which already has been pending more than two years. Avoidance of delay does not appear to be a goal shared with plaintiffs by FXG, as FXG has asked the Seventh Circuit to brief the requested appeal on a regular track rather than on an expedited basis. FXG's strategy of delay has frequently been apparent in its previous repeated requests to vacate the Court's schedule until after certification orders were issued in all cases; now, FXG says most of the case should be stayed, including even completing briefing on the pending class certification motions.

The decision *when* to disseminate notices is left "to the sound discretion of the court." *Beale*, 1995 WL 631840, at *1; *see also Cavin v. Home Loan Ctr., Inc.*, 469 F. Supp. 2d 561, 574 (N.D. Ill. 2007)[2]; *In re Farmers Ins. Co., Inc. FCRA Litig.*, No. 03-158-F, 2006 WL 1042499, at *2 (W.D. Okla. Apr. 13, 2006). The issue of when the notice is sent is based on two intertwined factors: "whether delay will prejudice absentee class members and (2) whether issuance of notice will cause defendant any harm." *Beale*, 1995 WL 631840, at *4. FXG provides no evidence that it will suffer any harm whatsoever from issuance of the class notice, nor could it given its constant barrage of information to drivers about this pending case and others.

On the other hand, there is tangible prejudice to plaintiffs from delay of the notice distribution. First, members of the Rule 23(b)(3) classes will not be informed of their options

---

[2] The *Cavin* court properly set forth the standard for examining whether to stay notice and ultimately found that it was appropriate to stay the notice based on the facts in that particular case, namely that there had already been a determination that plaintiffs' claim lacked merit and summary judgment had been granted in favor if the defendant. While the test remains the same, the pre-existing summary adjudication is an important fact that set apart the holding in *Cavin* from the facts in the present action.

vis-à-vis the class and thus unable to timely pursue their options (*e.g.* participate through and assist  class counsel, opt-out, or appear in this litigation with their own counsel).  "Having found that Rule 23(c)(2) provides benefits that inure to the class (*i.e.* disclosure of the right to opt-out or enter an appearance) the Court now finds that failure to notify class members would unduly prejudice the class . . . ."  *Id.*  Second, the absent class members are prejudiced by failing to learn through a notice that an action has been certified to protect their interests.  One-sided lines of communication between FXG and its current drivers remain open while class counsel is confounded in reaching out to the absent class members by FXG's refusal to provide contact information.  Moreover, lack of notice essentially permits drivers to continue to enter into contracts with FXG without any notification that there is a certified class challenging employment status; that is manifestly prejudicial and unfair.  Delaying class notice will leave class members unaware that they are within the protective umbrella of this action seeking to advance their interests.  (Indeed, FXG's past insistence that that there are many drivers who do not want to be part of this class action seems utterly inconsistent with its stated desire to delay notification as long as possible – rather it seems to justify the earliest possible notice.)   Third, delay is prejudicial to class members because every day that passes is one more day that class members remain ineligible for family medical leave and other important statutory rights, must pay for FXG's operating expenses, remain ineligible for workers compensation, and not receive employment benefits.

In comparison, FXG's only "harm" that it can point to is that, by sending the notice to class members now, there may be confusion if a corrective notice is later required.[3] This speculative harm is easily mitigated by using appropriate language in a corrective notice should one ever be required. Further, any contention that dissemination of a notice now will result in a waste of resources is based on the assumed facts that two notices will be required and that it will be FXG's responsibility to pay for such notices. As the *Beale* court held, the cost of notice issue does not constitute "harm" to a defendant because "defendants provide no evidence that notice would be financially overwhelming . . . ." *Id.* The cost of notice here is an extremely small expense when compared to the litigation costs already incurred by all parties. Lastly, FXG overlooks the fact that should a corrective notice ever be required, it will have an advantageous result of informing more class members about their rights in this litigation.

To the extent that FXG is heard to complain that notice is harmful because it creates a presumption that FXG did something wrong, this conjecture is simply wrong. The language of the notice will be court-approved, neutral, and understandable. The form of notice proposed by plaintiffs makes clear that there has been no final determination of liability and also makes reference to the fact that FXG denies all of the allegations. In fact, plaintiffs' notices submitted for Court approval specifically follows the neutral and plain language proposed for use by the Federal Judicial Center. A class member or any other individual reading the notice will be under no misconception that FXG admits that it did something wrong nor is such an

[3] Should the Court determine that even a brief delay of the notice is appropriate, plaintiffs alternatively suggest that a comprehensive notice plan be submitted to the Court to avoid any potential for confusion or excessive delay.

assumption likely given the vehemence contained in company communications to the drivers asserting that the company's position is legally correct.

For these reasons, FXG should be instructed to immediately provide a current, updated and accurate list of the names and addresses of class members and notice should be issued thereafter in an orderly and expedited fashion.

## II. Stay of This Litigation, Including Class Certification Orders, Is Unwarranted

Separate and apart from seeking to stay classwide notice, FXG also seeks to stay all further proceedings related to class certification.[4] While some of the specific certification deadlines FXG challenges have already passed, FXG seeks to have the Court impose a stay of further class certification briefing and issuance of any more class certification orders by this Court. A stay of this aspect of the litigation is unwarranted and FXG has not offered any evidence that meets the standard for a grant of such an extraordinary stay which will indefinitely delay the processing of this case.

"Filing a request for permission to appeal does not stop the litigation unless the district court or the court of appeals issues a stay -- and a stay would depend on a demonstration that the probability of error is high enough that the costs of pressing ahead in the district court exceed the cost of waiting." *Blair*, 181 F.3d at 835;[5] *see also Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1, 3 (D.D.C. 2002). Notably, the *Blair* court stated "we did not

---

[4] Only a small amount of continuing discovery would be permitted under the stay proposed by FXG. All other proceedings in the case would be halted.

[5] The *Blair* court characterized the demonstration of a need to a stay as being akin to seeking a preliminary injunction or stay of an administrative proceeding. *Id.* Thus, it is FXG's *burden*, as the chief proponent of delay, to demonstrate that there is a probability of error in the class certification decision and that it is high enough to exceed the costs of pressing ahead.

stay either of the two cases in which permission to appeal was sought; both continued in the district court . . . . Because stays will be infrequent, interlocutory appeals under Rule 23(f) should not unduly retard the pace of the litigation." *Id.*

FXG, by seeking to stay any further orders on class certification, is asking the court to vacate the pretrial schedule established for the remainder of this action. If class certification is delayed, FXG will undoubtedly ask to vacate the schedule for summary judgment motions presently set for March 2008. FXG has repeatedly taken the position that they will be unable to move for summary judgment until after class certification has been completed. As noted above, in addition to issues of due process and fairness, further indefinite delay will impact plaintiffs and the class who continue to be misclassified as independent contractors, forced to continue to pay for expenses normally paid for by employers, denied overtime payments, remain ineligible for FMLA leave and workers compensation, and refused employee benefits.

Though it is FXG's burden to demonstrate the necessity for issuance of a stay, FXG has not demonstrated that there is any "probability of error" of this Court in certifying the ERISA and Kansas class actions, let alone that a "probability of error" is sufficiently high that it outweighs the costs of forcing all the parties and their respective constituents to remain in limbo while the Seventh Circuit considers whether to take the appeal. Indeed, FXG's motion to stay points to no specific error that the Court allegedly committed in the Order granting certification. Def. Mem. 6-7. Further, the cost of continuing with all remaining aspects of this litigation is minimal in comparison to what has already been expended by the parties to bring the action to its present state. Conclusion of the briefing on the pending nine class certification

motions will undoubtedly closely mirror the briefing that has been completed to date and is hardly a high-expense endeavor for either plaintiffs or FXG.[6]

Although FXG cites to *Spano v. Boeing Co. Employee Benefits Plan Comm.*, No. 06-cv-743-DRH, 2007 WL 2688456 (S.D. Ill. Sept. 10, 2007) and *Beesley v. Int'l Paper Co.*, No. 06-cv-703-DRH, 2007 WL 2458228 (S.D. Ill. Aug. 24, 2007) as examples of why the present action should be stayed, those cases do not support FXG's request for a stay in this action. In both *Spano* and *Beesley*, Judge Herndon stayed two ERISA cases specifically because another action, *Lively v. Dynegy, Inc.*, No. 07-2073 (7th Cir. filed May 8, 2007), had already been accepted for review by the Seventh Circuit on an issue that was case dispositive to *Spano* and *Beesley*. FXG has not and, indeed, cannot point to any pending Seventh Circuit cases that would be dispositive of the class certification issued raised herein. FXG also seems to assert that because there are 39 cases centralized in this MDL, the Seventh Circuit decision impacts "other cases;" this argument is more rhetorical than real. The cases are combined for all pre-trial purposes into one proceeding, unlike *Spano* and *Beesley*.

**III. Stay of This Litigation and the Notice Process Does Not Advance Public Policy**

FXG argues, without support, that public policy will be advanced by staying the notice and further class certification proceedings, recapping its prior arguments of confusion, prejudice, and expense. FXG ignores the far more relevant public policy of providing information in a timely manner to individuals whose rights are affected by a lawsuit and in

---

[6] Given that the Court has not yet ruled on the Plaintiffs' motion for equitable tolling of the statute of limitations in Givens, the drivers who are eligible to opt-in to that FLSA case but have received no notice of that right will certainly by prejudiced by further delay in these proceedings.

proceeding with the expedient resolution of litigation that will adjudicate the rights of such individuals. Moreover, the employment rights sought to be protected in this litigation are important public rights, like Family Medical Leave, ERISA, protection of wages from improper deductions, coverage for industrial injuries, proper payment of overtime compensation, and the like. The public interest is advanced by the expeditious litigation of the wage and hour principles governing this case. Any argument based on public policy must look to the public's interests in lawful classification of workers – not to FXG's narrow strategic interests.

**CONCLUSION**

For the reasons set forth herein, plaintiffs respectfully request that the Court deny FXG's motion to stay dissemination of the class notice or further proceedings with respect to class certification.

Dated: November 13, 2007

Respectfully submitted,

HARWOOD FEFFER LLP

Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400

LEONARD CARDER, LLP
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

PLAINTIFFS CO-LEAD COUNSEL

HAMILTON LAW FIRM
John C. Hamilton
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:     (574) 289-9987

PLAINTIFFS' LIAISON COUNSEL

Case 3:05-md-00527-RLM-CAN document 929 filed 11/14/07 page 1 of 9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

## CERTIFICATE OF SERVICE

I, Craig Lowther, hereby certify that I am not a party to the action, am over the age of eighteen years, am employed by the law firm of Harwood Feffer LLP, attorneys for plaintiff, and that on November 13, 2007, I served the foregoing

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION TO STAY CLASS NOTICE AND ADDITIONAL CLASS CERTIFICATION BRIEFING OR RULINGS PENDING RESOLUTION OF RULE 23(f) APPEAL**

in the within action, by causing true and correct copies of same to be electronically mailed and mailed to the following counsel:

John H. Beisner
Jonathan D. Hacker
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20007

Robert M. Schwartz, Esq.
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-6035

**See also Attached Service List**

Craig Lowther

**Responses, Replies, Memoranda, Briefs**

3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II

CASREF, PROTO

**U.S. District Court Northern District of Indiana [LIVE]**

**USDC Northern Indiana**

## Notice of Electronic Filing

The following transaction was entered by Harwood, Robert on 11/13/2007 at 1:35 PM EST and filed on 11/13/2007

**Case Name:** In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II
**Case Number:** 3:05-md-527
**Filer:** FedEx Plaintiffs
**Document Number:** 925

**Docket Text:**
MEMORANDUM in Opposition to [912] MOTION to Stay *(1) Stay Class Notice and Additional Class Certification Briefing or Rulings Pending Resolution of Rule 23(F) Appeal; and (2) For an Expedited Briefing Schedule on This Motion* filed by FedEx Plaintiffs. (Harwood, Robert)

**3:05-md-527 Notice has been electronically mailed to:**

George A Barton gbarton@birch.net

Jeffrey A Bartos jbartos@geclaw.com

Evelyn L Becker PHV ebecker@omm.com

Kenneth Lee Blalack , II lblalack@omm.com

Darcie R Brault dbrault@dibandfagan.com

Laura C Bremer lbremer@omm.com

Guy Brenner gbrenner@omm.com

Thomas J Brunner , Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski dmc@zimmreed.com

Jerald R Cureton jcureton@curetoncaplan.com

Ginger A DeGroff degrofflaw@yahoo.com

Robert E DeRose , II bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Edward J Efkeman eefkeman@[illegible].com

Susan E Ellingstad seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

Barry S Fagan bfagan@dibandfagan.com

Lynn R Faris lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Monica Ferraro mferraro@bnhmlaw.com

Lee K Fink lfink@omm.com

Robert K Firsten rfirsten@firstenlaw.com

Edward R Forman eforman@ee.net

Wood R Foster PHV , Jr woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco pfuoco@msn.com

Martin S Garfinkel garfinkel@sgb-law.com, helm@sgb-law.com

Michael W Garrison , Jr mgarrison@omm.com

R Christopher Gilreath chrisgil@sidgilreath.com

Eileen S Goodin egoodin@bnhmlaw.com

Deborah R Grayson drgrayson@fuse.net

John C Hamilton jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net

Robert K Handelman rhandelman@bnhmlaw.com

Robert I Harwood rharwood@whesq.com

Stacy J Hauf shauf@omm.com, swickliffe@omm.com

Matthew M Houston mhouston@whesq.com

Dmitri Iglitzin iglitzin@workerlaw.com

Tom A Jerman tjerman@omm.com

Victor H Jih vjih@omm.com

Aparna B Joshi ajoshi@omm.com

Soye Kim skim@geclaw.com

Michael W Kopp mkopp@omm.com

Steve D Larson slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis     jordanlewis@sbgdf.com

Shannon Liss-Riordan     sliss@prle.com, jhunt@prle.com, syoung@prle.com

Anh-Nguyet Tran LyJordan     alyjordan@omm.com

Gary F Lynch     glynch@carlsonlynch.com

John S Marshall     marshall@ee.net

Michael G McGuinness     mmcguinness@omm.com

Bruce H Meizlish     brucelaw@fuse.net

Sanford A Meizlish     smeizlish@bnhmlaw.com

Matthew J Merrick     mmerrick@omm.com

Jennifer Lee Merzon     jmerzon@omm.com

Raquel A Millman     rmillman@omm.com

James R Mulroy , II     jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Daniel O Myers     dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Peter W Overs , Jr     povers@whesq.com

Richard T Phillips     flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope     Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Nora M Puckett     npuckett@omm.com, dmeredith@omm.com

Charles Victor Pyle , III     victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan     atr@zimmreed.com, kmh@zimmreed.com

Beth A Ross     bross@leonardcarder.com

J Gordon Rudd     jgr@zimmreed.com

Theodore B Schroeder     tschroeder@omm.com

Robert M Schwartz PHV     rschwartz@omm.com

James A Staack     jims@staack-firm.com

R Jay Taylor , Jr     jtaylor@scopelitis.com, lnewton@scopelitis.com

Matthew T Tobin     mtobin@sbslaw.net

Jeffrey A Trimarchi     jtrimarchi@omm.com

Mary D Walsh-Dempsey [illegible]

Michael J Watton jdrewicz@Wattongroup.com

Andrew M Weiner aweiner@omm.com

Peter D Winebrake pwinebrake@winebrakelaw.com

**3:05-md-527 Notice has been delivered by U.S. Mail or other means to:**

John H Beisner PHV
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Ste 200
Bartlett, TN 38134

David G Caperton
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

R Bruce Carlson
Carlson Lynch Ltd
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Kevin J Driscoll
Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178

William T Fiala
Lewis Fisher Henderson Claxton & Mulroy
6410 Poplar Ave Ste 300
Memphis, TN 38119

Eric M Fink
Leonard Carder LLP - Oak/CA
1330 Broadway Suite 1450
Oakland, CA 94612

B James Fitzpatrick

Fitzpatrick Spini & Swanson
838 S Main Street Suite E
Salinas, CA 93901

Salvatore G Gangemi
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005

Robert A Garcin
Law Offices of Robert A Garcin
210 East 29th Street # A
Loveland, CO 80538

Clayton D Halunen
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Jack D Hilmes
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Eric E Hobbs
Michael Best & Friedrich LLP
100 E Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

William S Hommel , Jr
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703

Dorothy Anne Jarrell
O'Melveny & Myers LLP - NY/NY
7 Times Square
New York, NY 10036

Thomas P Jirgal
O'Melveny & Myers LLP - LA/CA
1999 Avenue of the Stars # 700
Los Angeles, CA 90067-6035

Andrew J Kahn PHV
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102

Steven Matthew Kelso
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202

Karen P Kruse PHV
Jackson Lewis LLP - Sea/WA
One Union Square

600 University Street Suite 2900
Seattle, WA 98101

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Harold L Lichten
Pyle Rome Lichten Ehrenberg & Liss-Riordan PC-MA
18 Tremont St Suite 500
Boston, MA 02108

Carla D Macaluso
Jackson Lewis LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
Markowitz & Richman
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Robert E McDaniel
McDaniel Law Offices
4 Bicentennial Sq
Concord, NH 03301

Kenneth E Milam
Watkins & Eager
PO Box 650
Jackson, MS 39205-0650

Charles N Nauen
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Todd J O'Malley
O'Malley & Langan PC
426 Mulberry St Suite 104
Scranton, PA 18503

Joseph A Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Robert James Penny
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Cheryl F Perkins
Whetstone Myers Perkins and Young LLC

PO Box 8086
Columbia, SC 29202

Alan M Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Michael R Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989

Aaron Roblan
Jackson Lewis
One Union Square
600 University St Suite 2900
Seattle, WA 98101

Eric H Rumbaugh PHV
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Jennifer Rygiel Boyd
Ogletree Deakins Nash Smoak & Stewart PC
10 Madison Ave Suite 402
Morristown, NJ 07960

Tom Skundrich Jr

Dan S Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Patricia A Sullivan
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Richard Tanenbaum
Richard Tanenbaum Esq
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R Taylor
Taylor Dunham & Burgess LLP
301 Congress Ave Suite 1050
Austin, TX 78701

Joni M Thome
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Peter N Wasylyk
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone , Jr
Whetstone Myers Perkins and Young
PO Box 8086
Columbia, SC 29202

Kirsten L Zerger
Leonard Carder LLP - Oak/CA
1330 Broadway Suite 1450
Oakland, CA 94612

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=11/13/2007] [FileNumber=939011-0
] [a1fb362772a9b0ab15f3083574581a416b2c37299f84d09a921bd20abd4873dd5d9
759ec1d8261b93423bf9e1115d21319d45741ae9dcbd007d0e5b75d0d8e8e]]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM<br>(MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Gibson, 3:07-cv-272-RLM-CAN (AZ);*<br>*Magno*, 3:07-cv-322-RLM-CAN (CT);<br>*White*, 3:07-cv-411-RLM-CAN (GA);<br>*Givens*, 3:07-cv-324-RLM-CAN (LA);<br>*Vargas*, 3:07-CV-325-RLM-CAN (MA);<br>*Decesare*, 3:07-CV-120-RLM-CAN (NV);<br>*Whiteside*, 3:07-cv-326-RLM-CAN (NC);<br>*Leighter*, 3:07-cv-328-RLM-CAN (OR); and<br>*Gruhn*, 3:07-cv-412-RLM-CAN (VT). | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**ORDER AMENDING THE CASE SCHEDULE**

Upon consideration of the parties Joint Motion to Amend the Case Schedule, it is hereby:

ORDERED that both parties shall be permitted to file with the Court an omnibus brief with their respective opposition or reply briefs, limited to nine (9) pages each. FedEx Ground shall be limited to 29 pages for each of their remaining class certification opposition briefs and Plaintiffs shall be limited to 19 pages for each of their remaining reply briefs in support of class certification.

**SO ORDERED.**

Dated this 14th Day of November, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Jon Leighter, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-328-RLM-CAN (OR) | |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Filing Documents Under Seal.

On November 16, 2007, Defendant FedEx Ground filed under seal Exhibits 10 and 13 to its Memorandum of Law In Opposition To *Leighter* (Oregon) Motion for Class Certification.

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

case 3:05-md-00527-RLM-CAN document 995 filed 11/16/07 page 2 of 3

Dated: November 16, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

case 3:05-md-00527-RLM-CAN document 995 filed 11/16/07 page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2007, I filed the foregoing ***Notice of Filing Document Under Seal*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Steve D. Larson
slarson@ssbls.com

and I further certify that I have mailed the foregoing document by United States Postal Service to the following non-CM/ECF participants:

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Gibson*, 3:07-cv-272-RLM-CAN (AZ);<br>*Magno*, 3:07-cv-322-RLM-CAN (CT);<br>*White*, 3:07-cv-411-RLM-CAN (GA);<br>*Givens*, 3:07-cv-324-RLM-CAN (LA);<br>*Vargas*, 3:07-CV-325-RLM-CAN (MA);<br>*Decesare*, 3:07-CV-120-RLM-CAN (NV);<br>*Whiteside*, 3:07-cv-326-RLM-CAN (NC);<br>*Leighter*, 3:07-cv-328-RLM-CAN (OR); and<br>*Gruhn*, 3:07-cv-412-RLM-CAN (VT). | |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF FILING DOCUMENT UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Filing Documents Under Seal.

On November 16, 2007, Defendant FedEx Ground filed under seal Exhibits 10 and 11 to its Memorandum In Support of Its Opposition To Plaintiffs' Omnibus Fact Memorandum Motion for Class Certification.

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

Dated: November 16, 2007

Respectfully submitted,

By: s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2007, I filed the foregoing ***Notice of Filing Document Under Seal*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Anne T Regan
atr@zimmreed.comand

Shannon Liss-Riordan
sliss@prle.com

Bruce H. Meizlish
brucelaw@fuse.net

Deborah R. Grayson
drgrayson@fuse.net

Edward R. Forman
eforman@ee.net

Eileen S. Goodin
egoodin@bnhmlaw.com

George A. Barton
gbarton@birch.net

John S. Marshall
marshall@ee.net

Mary D. Walsh-Dempsey
mdempsey@omalleylangan.com

Matthew M. Houston
mhouston@whesq.com

Monica Ferraro
mferraro@bnhmlaw.com

Peter D. Winebrake
pwinebrake@winebrakelaw.com

Robert E. DeRose, II
bderose@bnhmlaw.com

Robert K. Handelman
rhandelman@bnhmlaw.com

Sanford A. Meizlish
smeizlish@bnhmlaw.com

Steve D. Larson
slarson@ssbls.com

and I further certify that I have mailed by United States Postal Service the document to the
following non CM/ECF participant:

Hart Lawrence Robinovitch
Zimmerman Reed PLLP
14646 N Kierland Blvd Suite 145
Scottsdale, AZ 85254-2762

Anthony J. Pantuso, III
PANTUSO LAW FIRM LLC
204 Broad St., 2nd Fl.
Milford, CT 06460

Harold L. Lichten
PYLE ROME LICHTEN
EHRENBERG &
  LISS-RIORDAN PC-MA
18 Tremont St., Ste. 500
Boston, MA 02108

Richard Eugene Hayber
HAYBER LAW FIRM LLC
221 Main St., St. 400
Hartford, CT 06106

Mary Donne Peters
Michael J. Gorby
GORBY REEVES & PETERS
Two Ravinia Dr., Ste. 1500
Atlanta, GA 30346-2104

Salvatore G. Gangemi
GANGEMI LAW FIRM PC
82 Wall St., Ste. 300
New York, NY 10005

Todd J. O'Malley
O'MALLEY & LANGAN PC
426 Mulberry St., Ste. 104
Scranton, PA 18503

Phyllis Norman
LAW OFFICES OF GEORGE A.
  BARTON, P.C.
800 W. 47th St., Ste. 700
Kansas City, MO 64112

Andrew J. Kahn PHV
MCCRACKEN STEMERMAN &
HOLSBERRY
1630 S. Commerce St., Ste. A-1
Las Vegas, NV 89102

R. James Lore, Esq.
102-1 Commonwealth Court
Cary, NC 27511

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING &
SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

James J. Dunn, Jr.
MICKENBERG DUNN KOCHMAN
LACHS & SMITH
29 Pine Street
Burlington, VT 05402-0406

By:    s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Jon Leighter, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00328-RLM-CAN (OR) | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW AND SUPPLEMENTAL STATEMENT IN OPPOSITION TO *LEIGHTER* (OREGON) MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

ARGUMENT .......... 2

I. PLAINTIFFS' CLAIMS RAISE INDIVIDUALIZED ISSUES THAT CANNOT BE RESOLVED ON A CLASSWIDE BASIS .......... 3

A. Oregon's "right to control" test requires the evaluation of individualized evidence .......... 4

1. The fact-finder must interpret the Operating Agreement in light of each contractor's individual understanding, discussions with FedEx Ground, and course of conduct .......... 4

2. The fact-finder must consider all aspects of alleged control, including aspects not addressed in the Operating Agreement .......... 7

3. The fact-finder must examine each contractor's specific settlement terms to determine the method of payment .......... 11

4. The fact-finder must examine the characteristics of each contractor's business operations .......... 13

B. Oregon's statutory "independent contractor" definition requires the evaluation of individualized evidence .......... 15

C. Oregon's "economic realities" test requires the evaluation of individualized evidence .......... 17

II. THE TWO NAMED PLAINTIFFS CANNOT ADEQUATELY REPRESENT A DIVERSE CLASS OF OREGON CONTRACTORS .......... 18

A. The named plaintiffs lack standing to pursue equitable relief .......... 18

B. The named plaintiffs cannot adequately protect the divergent and conflicting interests of a heterogeneous class .......... 20

III. PLAINTIFFS' PROPOSED SUBCLASSES SHOULD NOT BE CERTIFIED .......... 28

CONCLUSION .......... 29

case 3:05-md-00527-RLM-CAN document 998 filed 11/16/07 page 3 of 38

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Kansas City Life Insurance Co.*,
192 F.R.D. 274 (W.D. Mo. 2000) .... 7

*Alliance to End Repression v. Rochford*,
565 F.2d 975 (7th Cir. 1977) .... 28

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .... 21

*Aspgren v. Columbia City*,
581 P.2d 536 (Or. Ct. App. 1978) .... 6

*Baranski v. Vaccariello*,
896 F.2d 1095 (7th Cir. 1990) .... 21

*Berry v. Lucas*,
150 P.3d 424 (Or. Ct. App. 2006) .... 5

*Bonser v. New Jersey*,
605 F. Supp. 1227 (D.N.J. 1985) .... 26

*Bowers v. Jefferson Pilot Financial Insurance Co.*,
219 F.R.D. 578 (E.D. Mich. 2004) .... 6, 7

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) .... 25, 27

*Buckel v. Nunn*,
883 P.2d 878 (Or. Ct. App. 1994) .... 12

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .... 2

*Cantua v. Creager*,
7 P.3d 693 (Or. Ct. App. 2000) .... 6, 8, 9

*Chard v. Beauty-N-Beast Salon*,
941 P.2d 611 (Or. Ct. App. 1997) .... 17, 18

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .... 18, 19

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999) .... 25

*Collins v. Anderson*,
596 P.2d 1001 (Or. Ct. App. 1979) .... 8, 9

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*De Grace v. Rumsfeld*,
614 F.2d 796 (1st Cir. 1980) .......... 22

*Demilly v. Butler Amusements, Inc.*,
33 P.3d 343 (Or. Ct. App. 2001) .......... 11, 12

*East Texas Motor Freight System v. Rodriguez*,
431 U.S. 395 (1977) .......... 27

*Eisen v. Carlisle & Jacquelin*,
391 F.2d 555 (2d Cir. 1968) .......... 18

*Feit v. Ward*,
886 F.2d 848 (7th Cir. 1989) .......... 18, 19

*Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*,
55 F.R.D. 26 (S.D.N.Y. 1972) .......... 27, 28

*Gilpin v. AFSCME*,
875 F.2d 1310 (7th Cir. 1989) .......... 27

*Giordano v. RCA*,
183 F.2d 558 (3d Cir. 1950) .......... 25

*HDG Enters., Inc. v. Nat'l Council on Compensation Ins.*,
856 P.2d 1037 (Or. Ct. App. 1993) .......... 8

*Horton v. Goose Creek Independent School District*,
690 F.2d 470 (5th Cir. 1982) .......... 27

*In re Compensation of Henn*,
54 P.2d 1129 (Or. Ct. App. 1982) .......... 5

*Kaiel v. NCE Cultural Homestay Inst.*,
879 P.2d 1319 (Or. Ct. App. 1994) .......... 12

*Kamean v. Local 363, Int'l Bhd. of Teamsters*,
109 F.R.D. 391 (S.D.N.Y. 1986) .......... 25

*Krieg v. Union Pacific Land Resources Corp.*,
529 P.2d 48 (Or. 1974) .......... 5, 6

*Lockard v. Murphy Co.*,
619 P.2d 283 (Or. Ct. App. 1980) .......... 10, 11, 12, 13, 14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 18, 19

*Lukenas v. Bryce's Mountain Resort, Inc.*,
66 F.R.D. 69 (W.D. Va. 1975) .......... 21

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Machado-Miller v. Mersereau & Shannon, LLP*,
43 P.3d 1207 (Or. Ct. App. 2002)........................................................................ 6

*Maywalt v. Parker & Parsley Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995) ............................................................................. 18

*Mejdrech v. Met-Coil System Corp.*,
319 F.3d 910 (7th Cir. 2003) ............................................................................. 2

*O'Shea v. Littleton*,
414 U.S. 488 (1974)........................................................................................ 20

*Or. Drywall Sys., Inc. v. Nat'l Council on Compensation Ins.*,
958 P.2d 195 (Or. Ct. App. 1998)....................................................................... 9

*Oregon ex rel. Roberts v. Acropolis McLoughlin, Inc.*,
942 P.2d 829 (Or. Ct. App. 1997)..................................................................... 17

*Perri v. Certified Languages Int'l, LLC*,
66 P.3d 531 (Or. Ct. App. 2003)......................................................................... 3

*Peters v. Double DD Trucking*,
813 P.2d 67 (Or. Ct. App. 1991)....................................................................... 10

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)........................................................................................ 18

*Presley v. Bureau of Labor & Indus.*,
112 P.3d 485 (Or. Ct. App. 2005)............................................................ 4, 8, 17, 18

*Reforestation Gen. Contractors, Inc. v. Nat'l Council on Compensation Ins.*,
872 P.2d 423 (Or. Ct. App. 1994)................................................................. 10, 11

*Retired Chi. Police Ass'n v. City of Chicago*,
7 F.3d 584 (7th Cir. 1993) ........................................................................... 21, 23

*Robinson v. City of Chicago*,
868 F.2d 959 (7th Cir. 1989) ........................................................................... 20

*Rubalcaba v. Nagaki Farms, Inc.*,
43 P.3d 1106 (Or. 2002) ......................................................................... 3, 7, 8, 9

*Schmidt v. Intel Corp.*,
112 P.3d 428 (Or. Ct. App. 2005)....................................................................... 5

*Sec'y of Labor v. Fitzsimmons*,
805 F.2d 682 (7th Cir. 1986) ........................................................................... 27

*Shea v. Begley*,
766 P.2d 418 (Or. Ct. App. 1988)....................................................................... 6

Case 3:05-md-00527-RLM-CAN document 598 filed 11/16/07 page 6 of 38

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Simer v. Rios*,
661 F.2d 655 (7th Cir. 1981) .......... 3

*Stallworth v. Sam Yoder Trucking, Inc.*,
819 P.2d 316 (Or. Ct. App. 1991) .......... 10

*Stamp v. Dep't of Consumer & Bus. Servs.*,
9 P.3d 729 (Or. Ct. App. 2000) .......... 4, 11

*Swain v. Brinegar*,
517 F.2d 766 (7th Cir. 1975) .......... 21, 26

*Tasini v. N.Y. Times Co.*,
184 F. Supp. 2d 350 (S.D.N.Y. 2002) .......... 19

*Trabosh ex rel. Johnson v. Washington County*,
915 P.2d 1011 (Or. Ct. App. 1996) .......... 13, 14

*U.S. Operations, M&W Zander, Inc. v. Scott Co.*,
78 P.3d 118 (Or. Ct. App. 2003) .......... 6

*United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*,
572 F. Supp. 1494 (N.D. Ill. 1983) .......... 27

*Valley Drug Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) .......... 22

*Welch v. U.S. Bancorp Realty & Mortgage Trust*,
596 P.2d 947 (Or. 1979) .......... 5, 6

**Rules**

Fed. R. Civ. P. 23 .......... 1

**Statutes**

2005 Or. Laws 533, § 10 .......... 15, 17

Or. Rev. Stat. § 81.120 .......... 6

Or. Rev. Stat. § 81.125 .......... 6

Or. Rev. Stat. § 652.140 .......... 29

Or. Rev. Stat. § 652.150 .......... 29

Or. Rev. Stat. § 657.047 .......... 15

Or. Rev. Stat. § 670.600 .......... 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**Other Authorities**

5 James Wm. Moore et al., *Moore's Federal Practice* § 23.63 (3d. ed. Supp. 2004) .................. 20

In this case, two former single work area ("SWA") Home Delivery ("HD") contractors in Eugene, Oregon – Jonathan Leighter and David Spicer – seek to certify statewide classes on behalf of both former and current, HD and Ground, and SWA and multiple work area ("MWA") contractors. Although their claims arise out of their experiences at just one HD terminal, the named plaintiffs seek to represent all Oregon contractors with respect to their claims for declaratory and injunctive relief, rescission, unjust enrichment, and allegedly unlawful wage deductions under Or. Rev. Stat. ("ORS") § 652.610. As plaintiffs note, this case is very similar to *Slayman*, the other Oregon case pending before the Court. Both cases present adequacy and commonality issues that preclude class treatment, and, even though the Court has ruled in favor of class certification under Kansas law in *Craig* (Order, Oct. 15, 2007 (Doc. No. 906) ("Oct. 15 Order")), the logic of the Kansas ruling does not apply to Oregon.[1]

***First***, unlike *Craig*, Oregon law does not allow "[a] court to make categorical determinations of the driver's employment status" based solely on the language of a common Operating Agreement. (Oct. 15 Order 37.) Instead, Oregon's "right to control" test focuses on the ***degree*** of control reserved by FedEx Ground, based on all aspects of performance, including those not discussed in the parties' contract. In particular, under Oregon law, the fact-finder must consider evidence concerning contractors' freedom to set their own schedule and hours, to structure and choose their delivery routes, to hire supplemental drivers and assistants, and to select tools and equipment for their businesses. In addition, the Court must consider each

---

[1] In its ruling, the Court ordered that all class certification briefs yet to be filed contain a statement "stating how their position on class certification differs from the positions addressed in this opinion." (Order 57, Oct. 15, 2007 (Doc. No. 906) ("Oct. 15 Order").) FedEx Ground has directly incorporated its position on class certification differences between *Leighter* and *Craig* into this opposition brief, which therefore serves as FedEx Ground's supplemental statement. In *Craig*, the Court's order also certified a nationwide class of plaintiffs with respect to their claims under ERISA. FedEx Ground has petitioned for interlocutory review of the October 15, 2007 ruling in *Craig*. Fed. R. Civ. P. 23(f). Whatever the outcome of the appeal of the Kansas ruling, certification is inappropriate for the proposed Oregon class.

contractor's particular business circumstances. The Operating Agreement does not provide a basis on which to adequately analyze these factors, making classwide proof impossible. As the Seventh Circuit explained in *Mejdrech v. Met-Coil System Corp.*, 319 F.3d 910 (7th Cir. 2003), fairness and accuracy cannot yield to plaintiffs' desire to resolve issues "in one fell swoop." *Id.* at 911. To permit certification, the issues must be "genuinely common issues" – that is, "issues ***identical*** across all the claimants." *Id.* (emphasis added). That is not the case here.

***Second***, the evidentiary record in this case establishes – much more clearly than in the Kansas action – that the named plaintiffs are inadequate representatives. Plaintiffs, as former contractors, are without standing to seek prospective equitable relief, such as injunctive relief, declaratory relief, and rescission. More fundamentally, as former SWA HD contractors, the named plaintiffs cannot represent the diverse class of contractors whose interests are affected by their lawsuit. This creates an impediment to class certification that was not present in the Kansas case, where the named plaintiffs "include[d] current and former drivers from the Home Delivery and Ground divisions of FedEx" and, as a result, "their interests don't differ from those of the class as a whole." (Oct. 15 Order 32-33.) Here, there is no assurance (and plaintiffs offer none) that the named plaintiffs' interests do not differ from the class or that the class has common interests.

**ARGUMENT**

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). They are limited to the unusual situation where the claims of an entire group of individuals can be adjudicated simultaneously in a single proceeding, with the jury deciding, in one fell swoop and based on a common set of classwide proof, that either all of the class

members have a claim, or none of them do.  On October 15, 2007, this Court held that a class of

Kansas plaintiffs satisfied that standard, based on the characteristics of the named plaintiffs in

that case and on Kansas' common law test for determining independent contractor status.  (Oct.

15 Order 22-45.)  The situation in Oregon, however, is far different.

## I.     PLAINTIFFS' CLAIMS RAISE INDIVIDUALIZED ISSUES THAT CANNOT BE RESOLVED ON A CLASSWIDE BASIS

To obtain class certification, plaintiffs must demonstrate that there are questions of law or

fact "common to the class."  Fed. R. Civ. P. 23(a).  For 23(b)(2) classes, plaintiffs must show

that the common questions make "appropriate final injunctive relief or corresponding declaratory

relief with respect to the class as a whole."  For 23(b)(3) classes, plaintiffs must show that the

common issues predominate over individualized issues.  *See Simer v. Rios*, 661 F.2d 655, 672

(7th Cir. 1981) (a court must "inquire into the proof necessary for the various elements" and the

"form that [the] trial on these issues would take").  For both their (b)(2) and (b)(3) classes,

plaintiffs proceed on the key assumption that contractor classification is a question that can be

answered in the same way for every member of the proposed classes.  Plaintiffs are wrong.

Under Oregon law, the classification of contractors is not a common question that can be

answered by looking exclusively to generalized, classwide proof.  Indeed, here, the resolution of

plaintiffs' claims could actually require the application of as many as three different

classification tests.  There is the common law "***right to control***" test which is used for some

statutory purposes, such as workers' compensation.  *See Perri v. Certified Languages Int'l, LLC*,

66 P.3d 531, 536 (Or. Ct. App. 2003); *Rubalcaba v. Nagaki Farms, Inc.*, 43 P.3d 1106, 1112 (Or.

2002).  There is the ***statutory independent contractor definition*** set forth in ORS § 670.600,

applicable to various statutory requirements imposed on employers, including payroll taxes.

Finally, there is the "***economic realities***" test articulated by the Oregon Bureau of Labor and

Industries ("BOLI"), which applies to plaintiffs' unpaid wage claims under ORS § 652.610. *See Presley v. Bureau of Labor & Indus.*, 112 P.3d 485, 487 (Or. Ct. App. 2005).[2] There are material differences between these tests, but all three require consideration of individualized evidence.

### A. Oregon's "right to control" test requires the evaluation of individualized evidence

Oregon's common law "right to control" test focuses on four factors: "(1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire." *Stamp v. Dep't of Consumer & Bus. Servs.*, 9 P.3d 729, 731 (Or. Ct. App. 2000) (en banc). Unlike *Craig*, the fact-finder here cannot look only at the terms of the Operating Agreement and decide what rights to control (if any) FedEx Ground has contractually reserved for itself. Moreover, the status of no two FedEx Ground contractors operating under the Operating Agreement will necessarily be analyzed the same way under Oregon law.

#### 1. The fact-finder must interpret the Operating Agreement in light of *each* contractor's individual understanding, discussions with FedEx Ground, and course of conduct

To determine whether FedEx Ground has reserved to itself the "right to control" contractors under the Operating Agreement, the fact-finder must interpret the language of the agreement. The Court noted in ruling on the *Craig* certification motion that there appears to be a conflict between provisions of the Operating Agreement. On the one hand, some provisions state that the "method, manner and means" by which the contractors conduct their pick-ups and deliveries are "within the discretion of the Contractor." On the other hand, plaintiffs have argued

[2] In the briefing for *Slayman*, both the plaintiffs and FedEx Ground analyzed the plaintiffs' claims under the common law test. (*Slayman* Br. 7-8, 12 (Doc. No. 557); *Slayman* Opp'n Br. 19-22 (Doc. No. 625); *Slayman* Reply 3 (Doc. No. 680).) In this case, however, plaintiffs also have invoked Oregon's statutory definition, which applies to certain statutory requirements imposed on employers. (*See* Pl. Br. 10 (relying on ORS § 670.600).) Although FedEx Ground does not concede the relevance of Oregon's alternative independent contractor classification tests, those tests only reinforce the need for the Court to examine individualized evidence, as explained below.

that other provisions in the Operating Agreement appear "to require that drivers handle their packages using particular methods, cooperate with other FedEx drivers, and foster an image consistent with the FedEx brand." (Oct. 15 Order 36.) How those different provisions should be reconciled, or, if they cannot be reconciled, which provisions should control, is not clear and requires contract interpretation.[3] That determination matters under Oregon law because how expansively a particular provision is construed can mean the difference between employment status or independent contractor status. *See, e.g.*, *Schmidt v. Intel Corp.*, 112 P.3d 428, 432 (Or. Ct. App. 2005) ("As pervasive and significant as the cleanliness and safety guidelines were, they were intended to ensure a clean environment and a safe workplace. Intel's control is qualitatively different from the right to control the method and manner of Schmidt's work of making the electrical installations. Intel's control was limited to collateral details . . . Intel did not retain the right to control [the] method of performance."); *In re Compensation of Henn*, 54 P.2d 1129, 1131 (Or. Ct. App. 1982) (the scope of the right to control matters).

To resolve this apparent tension between provisions of the Operating Agreement, the Court must look beyond the four corners of the Agreement and consider extrinsic evidence that will vary for each contractor. In construing standardized contracts, Oregon courts routinely look to extrinsic evidence, not only to resolve ambiguous contract terms, *Krieg v. Union Pacific Land Resources Corp.*, 529 P.2d 48, 52 (Or. 1974); *Welch v. U.S. Bancorp Realty & Mortgage Trust*, 596 P.2d 947, 957 (Or. 1979), but to determine whether an ambiguity exists in the first place, *see Berry v. Lucas*, 150 P.3d 424, 426 (Or. Ct. App. 2006) (applying established principles of contract interpretation to a standard form contract, a court, "in determining whether the contract

[3] How these provisions should be reconciled creates a conflict of interest, demonstrating that the named plaintiffs are not adequate class representatives. *See infra* 26-27. Some contractors (like Leighter and Spicer) may want the Court to disregard the "independent contractor" provisions as mere "background statement[s]" or irrelevant

is ambiguous, is also to consider extrinsic evidence"). Relevant extrinsic evidence includes the parties' understanding of how the contract would work. *See Cantua v. Creager*, 7 P.3d 693, 701 (Or. Ct. App. 2000) (fact that plaintiff "believed that she, rather than defendant, would retain control over the provision of her services," and entered into business with defendant with such intentions, was indicative of independent contractor status). It also includes the parties' course of dealing with each other, since the practical interpretation of the contract is strong evidence of a contract's meaning under Oregon law. *See Krieg*, 525 P.2d at 52; *Welch*, 596 P.2d at 957; *Shea v. Begley*, 766 P.2d 418, 420 n.3 (Or. Ct. App. 1988); *Aspgren v. Columbia City*, 581 P.2d 536, 547 (Or. Ct. App. 1978).[4]

The existence of a standard contract does not mean that the contract will be, or legally must be, interpreted in the same way for every contractor. In *Bowers v. Jefferson Pilot Financial Insurance Co.*, 219 F.R.D. 578, 580 (E.D. Mich. 2004), the district court rejected the notion that "when a standardized contract is at issue, the contract is to be interpreted uniformly." In *Bowers*, the plaintiffs tried to certify a class based on a standardized contract, arguing that the court should limit its analysis to the language of the contract itself or "admissible extrinsic evidence common to the class" – excluding any individualized evidence of "oral communications" with individual policyholders or a "policyholders' understanding of the provision at issue." *Id.* The district court rejected plaintiffs' argument, noting that while "other courts have found class

---

conclusions about a "misrepresented legal classification" (Oct. 15 Order 36). Others, however, may want the Court to construe the provisions in light of each other, giving effect to each provision of the Operating Agreement.

[4] It is not clear what law governs the interpretation of the Operating Agreement. Plaintiffs have not taken a position, and the Court did not address the issue in *Craig*. The contract contains a choice of law provision applying Pennsylvania law. Under ORS § 81.120, a contract should be interpreted and governed by the law chosen by the parties. That rule, however, does not apply to the extent it would require a party to act or not act in a manner prohibited by law, or if it would contravene an established fundamental policy embodied under the law that would be applied had no choice of law provision existed. *See* ORS § 81.125; *U.S. Operations, M&W Zander, Inc. v. Scott Co.*, 78 P.3d 118, 121 (Or. Ct. App. 2003); *Machado-Miller v. Mersereau & Shannon, LLP*, 43 P.3d 1207, 1210-11 (Or. Ct. App. 2002). Moreover, ORS § 81.105(3) provides that a contract of employment services to be rendered

certification to be appropriate" when there is a "standardized" contract, those cases are distinguishable "because they do not involve competing interpretations of specific contract language." *Id.* If there is a need to interpret contract language, then ***all*** extrinsic evidence must be considered – a contractor's subjective understanding, the discussions between the parties, and their course of dealing – and class certification is not appropriate. Thus, in *Adams v. Kansas City Life Insurance Co.*, 192 F.R.D. 274 (W.D. Mo. 2000), the district court rejected class certification despite the existence of a standardized contract because the claims "could probably only be resolved by considering varying types of extrinsic evidence." *Id.* at 282. "By allowing extrinsic evidence of the parties' dealings, the breach of contract claims become individualized and not reasonably susceptible to class action treatment." *Id*.

Examining the extrinsic evidence applicable to each contractor is likely to yield different interpretations of the Operating Agreement, based on what FedEx Ground told that contractor when the agreement was entered, what the contractor understood, and how FedEx Ground and the contractor have dealt with each other over the years. For example, a jury deciding whether FedEx Ground's right to approve drivers allows it to dictate whom Spicer can hire will need to consider the fact that FedEx Ground has never refused to approve one of his drivers and Spicer's own testimony that he understood that, under the contract, "you could use whoever you wanted." (Spicer Dep. 124 (Ex. 1).)

**2. The fact-finder must consider all aspects of alleged control, including aspects not addressed in the Operating Agreement**

Under Oregon's "right to control" test, the fact-finder must consider all aspects of the working relationship to make an overall assessment of the ***degree*** of alleged control that characterizes the relationship. As the Oregon Supreme Court explained in *Rubalcaba v. Nagaki*

---

primarily in Oregon by a resident of Oregon is governed by Oregon law. As explained in FedEx Ground's Omnibus

*Farms, Inc.*, 43 P.3d 1106, 1109-10 (Or. 2002), a fact-finder must not only identify the ways in which a putative employer had "some control," but also those ways in which the contractor had some "independence," before making a final determination based on "all the factors together." The question is not whether the putative employer has a right to control some aspects of the work, but, all things considered, "***how much*** control it has the right to exercise." *HDG Enters., Inc. v. Nat'l Council on Compensation Ins.*, 856 P.2d 1037, 1040 (Or. Ct. App. 1993) (emphasis added).

For example, in *Cantua v. Creager*, 7 P.3d 693, 701 (Or. Ct. App. 2000), the court of appeals did not find an employment relationship even though there was evidence suggesting "a limited right by defendant to control at least some aspects of the relationship." Evidence that the plaintiff "determined her own work hours according to when she had appointments" tipped the overall control balance in favor of independent contractor status, because that degree of freedom was "necessarily incompatible with defendant's retention of the right to control" the plaintiff. *Id.*

Because Oregon law requires a "totality of the circumstances" evaluation of the "right to control," the Court cannot focus exclusively on the "right to control" as expressed in the Operating Agreement. The Court must also consider matters not covered by the Operating Agreement. Oregon law makes clear that where the contract is silent on a particular aspect of performance, courts must consider the degree of control actually exercised by the parties. *See Presley*, 112 P.3d at 487. Plaintiffs concede this point in their *Slayman* reply brief: the Oregon right to control inquiry "necessarily require[s] evaluation of the actual control exercised over the employee" in the absence of a contractual provision. (*Slayman* Reply 4.)[5]

---

Opposition Brief, Pennsylvania law (like Oregon law) also requires the consideration of extrinsic evidence.

[5] This means that the approach the Court took in *Craig* is inapplicable under Oregon's version of the "right to control" test. For example, in *Collins v. Anderson*, 596 P.2d 1001, 1003 & n.1 (Or. Ct. App. 1979), a sheetrock company hired individual installers under an agreement that expressly created an independent contractor relationship and in which the installers "specifically acknowledge[d] their responsibility to pay taxes and insurance." Noting that the "right to control is the crucial inquiry," the court examined the contract and determined that the company had

As a result, employment classification under the "right to control" test in Oregon cannot be considered a one-answer-fits-all question. As noted below, individual contractors give different accounts, for example, of FedEx Ground's supposed control over their right to set their own schedule and hours, to structure and choose their delivery routes, to hire supplemental drivers and assistants, and to select tools and equipment for their businesses. Certifying the class as proposed by plaintiffs would deprive FedEx Ground of the opportunity to prove, based on individualized facts, that the degree of freedom enjoyed by a particular contractor outweighs any common evidence of a "right to control." For example:

***The freedom to control schedules.*** Oregon courts consider a right to set one's own work schedule to be a crucial factor in determining the degree of a putative employer's control.[6] Although plaintiffs claim that FedEx Ground exercises control over contractor work schedules (*see* Pl. Omnibus Fact Memo (Doc. No. 559) ("OFM") 21), not all contractors agree. (*See, e.g.*, Pullman Decl. ¶ 4 (Ex. 2); McHenry Dep. 243-44 (Ex. 3); Brinker Dep. 252-55 (Ex. 4).)[7] For example, Slayman testified, "I take my breaks as I choose to take my breaks. That's the purpose

---

reserved the right to terminate the installer without liability, the right to approve any assistant the installer engaged, and the right to discharge those assistants. *Id.* at 1002-03. This did not end the inquiry, however. The court also had to consider the degree of control actually exercised by the company with respect to other aspects of performance not covered by the contract. *Id.* The court noted that the installers generally provided their own tools, set their own work schedules, and were free to decline jobs. *Id.* The court went further and considered evidence specific to the individual plaintiff, even though that evidence was not applicable to installers generally. *Id.* It was only after balancing ***all*** of these factors that the court could reach a conclusion. *Id.*

[6] This factor proved dispositive, for example, in *Cantua*, where the court commented that the worker's freedom to set one's own schedule is "necessarily incompatible" with a right to control. 7 P.3d at 701; *see also Rubalcaba*, 43 P.3d at 619 n.1 ("the extent of the employer's control over work schedules" is one of several "[f]actors relevant to the right to control test"); *Or. Drywall Sys., Inc. v. Nat'l Council on Compensation Ins.*, 958 P.2d 195, 198 (Or. Ct. App. 1998) (holding that "[a]ll direct evidence of a right to control shows that the relationship . . . was not one of employment" where the contractors "could set their own hours within the time frame of the general contractor").

[7] In support of its opposition, FedEx Ground has submitted declarations from two current MWA contractors (Dorner and Pullen). Both contractors currently drive on a "full-time basis" or have done so during the class period (i.e., at some time since July 20, 1999). (*See* Dorner Decl. ¶ 10 ("I am currently driving five days a week.") (Ex. 7); Pullen Decl. ¶¶ 10-12 (drove full-time before October 2002 and now drives an alternate-day service route).) Although plaintiffs' class definition, in particular its use of the term "full-time basis," is ambiguous, there does not appear to be any basis on which to dispute that these declarants would be members of the putative class.

of being a contractor. Not an employee. I'm not set or adhered to a set schedule." (Slayman Dep. 59-60, 112-14 (Ex. 6).) Leighter testified at his deposition that he chose when to dispatch from the terminal and whether and when to take breaks. (Leighter Dep. 93-94, 98, 105 (Ex. 7).) Leighter typically finished his route between 4:30 and 5:00 p.m., and said he was never told by anyone in management how many hours to work: "No, just work until you are done." (*Id.* 108, 110.) Spicer testified that he was never told when he had to arrive and chose to arrive at 6:30 a.m. "because [he] wanted to finish early every day." (Spicer Dep. 78-79.)

***The freedom to structure routes.*** In a series of cases involving truckers and delivery drivers, Oregon courts have relied on a contractor's freedom to choose his/her own route in evaluating independent contractor status. *See Stallworth v. Sam Yoder Trucking, Inc.*, 819 P.2d 316, 320 (Or. Ct. App. 1991) (plaintiff was "responsible for selecting his own routes and could obtain additional labor if necessary to complete the contract"); *Peters v. Double DD Trucking*, 813 P.2d 67, 67-68 (Or. Ct. App. 1991). Although plaintiffs claim that FedEx Ground exercises control over contractor routes (*see* OFM 22), the contractors do not agree. Slayman testified that he chose his route himself and was free to ignore the turn-by-turn directions provided by FedEx Ground. (Slayman Dep. 31-34, 38, 98-99.) Both Leighter and Spicer acknowledge that they were free to determine what routes to take each day. (Leighter Dep. 95; Spicer Dep. 83-84.) As Leighter put it: "I could do the whole route backwards and they probably wouldn't [care], as long as the stuff got delivered." (Leighter Dep. 97.) Contractors also testified that they were free to give packages to other contractors to deliver. (*Id.* 81-82; Slayman Dep. 70-71, 110-11, 118-19; McHenry Dep. 165-67, 175-78; Dorner Decl. ¶ 13.)

***The freedom to hire assistants.*** Oregon courts also consider evidence that an individual has the right to hire others to perform the services as indicative of independent contractor status.

*See Reforestation Gen. Contractors, Inc. v. Nat'l Council on Compensation Ins.*, 872 P.2d 423, 430 (Or. Ct. App. 1994); *Lockard v. Murphy Co.*, 619 P.2d 283, 285 (Or. Ct. App. 1980). Although plaintiffs claim that FedEx Ground reserved a right to control whom contractors hired, the contractors disagree. Spicer, for example, testified he was free to retain any driver he chose so long as that person met certain legal and safety requirements. (Spicer Dep. 123-25.) Spicer testified FedEx Ground never controlled whom he hired, "you could use whoever you wanted." (*Id.* 124; *see also* Dorner Decl. ¶¶ 9-11 ("The power to hire, pay and supervise other drivers was critical" to his becoming a contractor.); Pullen Decl. ¶ 8 (hired his brother).)

***The freedom to select tools and equipment.*** Oregon courts also consider whether contractors furnish and select their own tools and equipment. *See Lockard*, 619 P.2d at 284. Although plaintiffs claims that FedEx Ground specifies what vehicles and other equipment contractors must obtain, the contractors disagree. Slayman, for example, admitted at his deposition that he could choose to lease or buy different vehicles and from a variety of sources. (Slayman Dep. 122-24; *see also* Brinker Dep. 185 (purchased truck from another contractor); Martin Decl. ¶ 7 ("contacted a company in Portland" to lease his truck) (Ex. 8).)

**3. The fact-finder must examine each contractor's specific settlement terms to determine the method of payment**

In applying the "right to control" test, Oregon courts also consider the method of payment. *Stamp*, 9 P.3d at 731. As the Court noted in *Craig*, plaintiffs do not dispute the fact that individual contractors' checks "vary considerably" based on "the number of stops and the number of packages picked up and delivered; a set figure for making available a qualifying van and operator; a 'core zone' payment particular to each serviced area, which is inversely related to customer density and package volume; and other payments." (Oct. 15 Order 38-39.)

Under Oregon law, differences in how each contractor's compensation is derived affect employment classification. Payment by time is considered "a strong indication of a right to control." *Demilly v. Butler Amusements, Inc.*, 33 P.3d 343, 346 (Or. Ct. App. 2001). Payment by quantity or "on a per load basis" favors independent contractor status. *Lockard*, 619 P.2d at 285, 297. Even if, as plaintiffs allege, some portion of payments to contractors could be considered as payments "by time," settlement payments also manifestly contain a highly variable "by quantity" component, and, under Oregon law, the exact mix of the two will determine whether the method of payment tilts in favor of employment or independent contractor status, or is inconclusive. *See Buckel v. Nunn*, 883 P.2d 878, 881 (Or. Ct. App. 1994); *Kaiel v. NCE Cultural Homestay Inst.*, 879 P.2d 1319, 1323 (Or. Ct. App. 1994).

Applying this factor will require individualized consideration of each contractor's circumstances. The proportion of allegedly per-time and per-job payments directly affects the "method of payment" factor, *Buckel*, 883 P.2d at 881; *Kaiel*, 879 P.2d at 1323, and that mixture differs from contractor to contractor. Some contractors' settlement checks consist almost entirely of fixed daily payments. Contractors servicing areas with a low density of customers and low package volume, for example, will receive a significant portion of their settlement in a fixed daily "core zone" payment, regardless of the number of packages they deliver. (Oates Decl. ¶ 3 (Ex. 9).) Other drivers, however, receive almost all of their settlement in variable per-job payments. Contractors servicing highly concentrated areas may have a "core zone" payment of zero, meaning that nearly all of their compensation is tied to the number of packages delivered, stops made, and miles traveled. (Pullen Decl. ¶ 13 ("[M]y company, Pullen, Inc., is an independent contractor that gets paid by the package not by the hour."); Oates Decl. ¶ 3;

McHenry Dep. 83-84; Crandall Rep. Exs. 16, 18, 21, Jan. 2007 (Ex. 10) ("Crandall Rep. I").) The remaining contractors fall somewhere in between.

#### 4. The fact-finder must examine the characteristics of each contractor's business operations

Although it seems like a misnomer, Oregon's "right to control" test also requires the fact-finder to consider factors that have nothing to do with control. When the "right to control" factors point in different directions, Oregon law looks to non-control factors to help evaluate how the "control" factors should be balanced. For example, in *Lockard*, the Court applied the "right to control" test to the plaintiff, who was hired to haul logs for the defendant. 619 P.2d at 285. The Oregon court noted that the defendant "had the right to control the plaintiff's performance in some respects but not others." *Id.* at 285. On the one hand, the court found several control factors suggesting an employment relationship: either party could terminate their relationship without liability; the defendant designated the pickup and destination point for the loads plaintiff was to carry; and the defendant's employees loaded plaintiff's truck. On the other hand, the court found several "control" factors suggesting an independent contractor relationship: the plaintiff was paid on the basis of the quantity of lumber hauled; plaintiff furnished and maintained his own equipment; plaintiff had a right to object to how the truck was loaded; the plaintiff could choose his own route; and plaintiff could hire assistants and work for others. *Id.* at 285-86. Because the control factors pointed in different directions, the court turned to certain "business" factors – whether plaintiff operated a separate business; whether plaintiff established an "assumed business name"; whether plaintiff had an employer identification number; whether plaintiff had a separate bank account, etc. *Id.* at 287. These separate business facts were sufficient to "override" the control exercised by the defendant, and the Oregon court concluded that the plaintiff was an independent contractor. *Id.*

Similarly, in *Trabosh ex rel. Johnson v. Washington County*, 915 P.2d 1011, 1015 (Or. Ct. App. 1996), the Oregon court found that the "control" factors pointed in different directions and thus were not "conclusive." Even though the "right to control test leans toward [the plaintiff] not being a worker," *id.*, the court was still required to consider "business" factors before it could come to an ultimate conclusion. In finding independent contractor status, the court pointed out the fact that plaintiff carried its own liability insurance, that plaintiff had its own business cards, and advertised in the Yellow Pages. *Id.* at 1016.

Application of the Oregon "right to control" test to FedEx Ground contractors will similarly require consideration of non-control business factors. Those factors require individualized evaluation of each contractor and cannot be proven by common evidence.

- For example, 71 current contractors have had incorporated their businesses and established an assumed business name, while 83 current contractors have not. (Malley Decl. ¶ 3s (Ex. 11); DeMaria Decl. ¶ 3s (Ex. 12).)[8] The named plaintiffs illustrate the difference: Spicer chose to incorporate as Three Legged Dog LLC, a business that not only contracts with FedEx Ground but also includes his wife's business operations. (Spicer Dep. 50-51.)[9] Leighter knew incorporation was an option but chose not to incorporate. (Leighter Dep. 56.)

- Some contractors print their own business cards and directly solicit business from customers, as in *Trabosh*. Kevin Martin, a contractor out of the Newport Ground terminal, solicits new customers by giving local businesses the sales number to establish

[8] These numbers differ slightly from the numbers reported in the *Slayman* briefing. Previous declarations in support of FedEx Ground's memoranda of law, including the declaration cited in *Slayman*, mistakenly included line-haul contractors as well as pick-up and delivery ("P&D") contractors. (DeMaria Decl. ¶ 4.) The figures cited here, like the plaintiffs' proposed class, include only P&D contractors. (*Id.*)

[9] *See also* Brinker Dep. 72-73 (Brinker Logistikos, Inc.); Pullen Decl. ¶¶ 7-8 (Pullen, Inc.); Dorner Decl. ¶¶ 1, 6 (Dorner Enterprise, Inc.).

an account as well as his cell phone number. "I go out of my way to make it easy for businesses along my route to use FedEx Ground rather than any other shipper." (Martin Decl. ¶ 11.) Timothy Pullen, a Ground contractor from The Dalles, takes a similar approach. When Pullen sees a new business opening on his route, he and his partner "make a point of introducing ourselves to the billing manager and seeing who they use for their small package shipping and pickup." Pullen gives these potential new customers his business card and the FedEx Ground sales force's number and has found that "[w]ith this approach and the power of the FedEx brand we have seen the Dalles route . . . expand by more than 50 stops per day in the past three years." (Pullen Decl. ¶ 13.) By contrast, other contractors – like named plaintiff Leighter – never solicited customers or made any effort to build their own businesses. (Leighter Dep. 84.)

**B. Oregon's statutory "independent contractor" definition requires the evaluation of individualized evidence**

In their claims for rescission and equitable relief, plaintiffs allege that the Operating Agreement is unlawful because it allows FedEx Ground to "evade[] employment-related obligations," including payroll taxes and unemployment insurance. (*See* Compl. ¶¶ 39, 42a-b.)[10] Those obligations arise by statute, however, and they do not apply to "independent contractors" as defined in ORS § 670.600. Plaintiffs therefore allege that FedEx Ground contractors are not independent contractors under the statutory definition. (*See* Pl. Br. 10.)

[10] Oregon's unemployment statute contains a blanket exemption for owner-operators like the plaintiffs. *See* ORS § 657.047(1)(b) ("employment" does not include "[t]ransportation performed by motor vehicle for a for-hire carrier by any person that leases their equipment to a for-hire carrier and that personally operates, furnishes and maintains the equipment and provides service thereto").

As amended in 2005, ORS § 670.600 requires that a person satisfy four "standards" to qualify as an independent contractor.[11] Although those standards track the common law test in some respects, *see* ORS § 670.600(2), the fact-finder must ***also*** consider whether the contractor is "customarily engaged in an independently established business," ORS § 670.600(2)(b). That standard requires the fact-finder to examine whether an individual contractor maintains a separate business location (such as a home office), whether the contractor has made a "significant investment" in the business, and whether the contractor "has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons." ORS §§ 670.600(3)(a)(A)-(B), 670.600(3)(d). Although the "creation or use of a business entity, such as a corporation or a limited liability company" does not, "by itself," prove independent contractor status, it is another factor that must be considered because the business can satisfy the statutory standards. ORS § 670.600(5)(b).

Applying the "independently established business" provision of ORS § 670.600 is impossible without considering individualized evidence. Some contractors maintain a separate home office, while others do not. (*See* Jeanneret Rep. Exs. 2-4, Jan. 2007 (Ex. 13) (discussing variation in contractor operations, including the use of home offices).) While some contractors made virtually no initial "investment" to start their businesses (Leighter Dep. 46; Slayman Dep. 46), others have made substantial investments. Spicer paid $48,000 to a contractor to acquire his route and vehicle after seeing an advertisement in an Eugene newspaper. (Spicer Dep. 19-20, 25, 35.) He later purchased a supplemental van for $16,000, which he financed, and hired supplemental drivers in an effort to reduce the wear and tear on his primary vehicle and the number of hours he drove each day. (*Id.* 88-89, 109, 112.) Jeremy Brinker, a named plaintiff in

[11] *See* 2005 Or. Laws 533, § 10 (effective Jan. 1, 2006). The amendment took effect in the middle of the class period, creating another obstacle to class certification. To prevail on a claim based on the pre-2005 statutory

the other Oregon action (*Slayman*), paid another contractor $60,000 to acquire his route and a vehicle. (Brinker Dep. 99-101, 128-30.) Medford Ground contractor Samuel David Dorner has made significant investments to grow his business from the single Ground route he purchased to one HD and two Ground routes. (Dorner Decl. ¶¶ 5-6, 12.) He and his wife employ several drivers and, while Dorner still drives five days a week, he is training a driver to drive for him full-time so he can continue to "focus[] on trouble shooting and growing [his] business." (*Id.* ¶¶ 10, 15.)[12]

**C. Oregon's "economic realities" test requires the evaluation of individualized evidence**

For other claims, such as the unpaid wage claims under § 652.610 (Compl. ¶ 32), Oregon law applies an "economic realities" test as articulated by the Oregon Bureau of Labor and Industries ("BOLI"). *Presley*, 112 P.3d at 487; *Oregon ex rel. Roberts v. Acropolis McLoughlin, Inc.*, 942 P.2d 829 (Or. Ct. App. 1997); *Chard v. Beauty-N-Beast Salon*, 941 P.2d 611, 628-29 (Or. Ct. App. 1997). Under the "economic realities" test, the fact-finder must weigh "five factors to gauge the degree to which the worker is economically dependent on the business to which he or she renders services." *Presley*, 112 P.3d at 487. This requires an individualized determination based on the degree of control exercised by the alleged employer, the extent of the investment by the worker, the degree to which the worker has an opportunity for profit and loss, the skill and initiative required in performing the work, and the permanence of the relationship. *Id.* Applying this test requires the fact-finder to go beyond any "right to control" FedEx Ground may reserve to itself and to examine the actual exercise of any control and the parties' course of

---

definition, contractors would have to prove their claims using Oregon's previous eight-factor test.

[12] *See* Pullen Decl. ¶ 9 (describing how his former helper has gone from working for him on his days off from his furniture delivery job "to incorporating his own package delivery business and hiring his own driver to service one of his other" routes).

dealings – "Who determined the Claimant's particular hours of work?" "Could the Claimant employ workers to employ, or help perform, the Claimant's work?" *Chard*, 941 P.2d at 629.

As detailed above, the evidence of actual control, the degree of investment, the efforts to establish an independent business, and the demonstrated ability and opportunity to profit and to lose money differ from contractor to contractor. As long as the evidence as a whole is "not unmixed" and "certain evidence or elements might suggest" independent contractor status, the question must be left for an Oregon jury–which is free to decide that some contractors are employees and others are independent contractors given their specific circumstances. *Id.* at 614-15.

## II. THE TWO NAMED PLAINTIFFS CANNOT ADEQUATELY REPRESENT A DIVERSE CLASS OF OREGON CONTRACTORS

A court cannot certify a class action unless it is satisfied that the representative plaintiffs "will fairly and adequately protect the interests of the class." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995). The adequacy requirement derives not only from the Federal Rules of Civil Procedure, but from the Constitution's Due Process Clause, because any judgment will conclusively determine the rights of absent class members. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). For that reason, district courts must "carefully scrutinize the adequacy of representation." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968).

### A. The named plaintiffs lack standing to pursue equitable relief

As a threshold matter, the named plaintiffs lack standing to seek declaratory relief, injunctive relief, and rescission. To establish standing, a plaintiff must show: (1) that he suffers a concrete, particularized injury that is actual or imminent; (2) a causal connection between the injury and the conduct challenged in the lawsuit; and (3) that the injury will likely be redressed

by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 556-61 (1992). Those requirements ensure that the plaintiff has a "personal stake in the outcome" of the case. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). Applying those principles, the Seventh Circuit has held that a plaintiff lacks standing to obtain relief governing the conduct of his former employer with respect to current employees. *See Feit v. Ward*, 886 F.2d 848, 856-57 (7th Cir. 1989) (because the plaintiff "is not presently employed with the Forest Service . . . he is no longer affected by the defendants' actions," and "even if we were to grant the relief he requests, he would not benefit from this relief"). Similarly, a former employee or contractor lacks standing to seek rescission of another party's current contract. *See Tasini v. N.Y. Times Co.*, 184 F. Supp. 2d 350, 355-56 (S.D.N.Y. 2002) ("only the actual or alleged party to the contract is in a position to challenge its validity").

Because Leighter and Spicer no longer perform work for FedEx Ground, they lack standing to seek an injunction, prospective declaratory relief, or rescission of any current contractor's Operating Agreement. This is the same problem that plagued the *Slayman* action, the other Oregon case class counsel filed. On March 12, 2007, Edward Slayman, Dennis McHenry and Jeremy Brinker filed a motion to certify a class of FedEx Ground contractors in Oregon, including current drivers from both the Ground and HD divisions. All three named *Slayman* plaintiffs were former contractors. FedEx Ground opposed the motion in part because plaintiffs lacked standing to obtain the equitable relief requested in the complaint. The *Slayman* plaintiffs moved to add a current contractor to the complaint, but this Court denied their untimely motion to amend. (*See* Op. & Order, Apr. 2, 2007 (Doc. No. 572).)

This action was filed, manifestly, in an attempt to cure the deficiencies in the *Slayman* complaint. Class counsel found two additional Oregon contractors – Jonathan Leighter and

David Spicer – as named plaintiffs.  On June 1, 2007, they filed this materially identical suit in

the District of Oregon, Case No. 3:07-cv-00818-K1 (OR).  Since filing that action, however,

both Leighter and Spicer have voluntarily terminated their contractual relationship with FedEx

Ground.  (*See* Pl. Br. 13; Spicer Dep. 15.)  Because Leighter stopped contracting in August 2007,

shortly after his deposition, and Spicer already had stopped at the time his suit was filed, the

*Leighter* plaintiffs find themselves in the same position as the *Slayman* plaintiffs – without

standing to seek the declaratory and equitable relief in their second, third and fourth Claims.

The plaintiffs' lack of standing is fatal to their request for class certification with respect

to their second, third, and fourth Claims.  The plaintiffs have failed to satisfy the jurisdictional

requirement that at least one named plaintiff have standing.  *See O'Shea v. Littleton*, 414 U.S.

488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the

requisite of a case or controversy with the defendants, none may seek relief on behalf of himself

or any other member of the class."); *Robinson v. City of Chicago*, 868 F.2d 959, 968 (7th Cir.

1989) (refusing to certify a class because the named plaintiff lacked standing to seek equitable

relief, and "a class will not be certified unless the named plaintiff has standing at that time"); 5

James Wm. Moore et al., *Moore's Federal Practice* § 23.63[1][b] (3d ed. Supp. 2004) ("If the

named plaintiff does not have standing to bring a particular claim, the named plaintiff may not

represent the class with respect to that claim and certification is, therefore, improper.").

**B.      The named plaintiffs cannot adequately protect the divergent and conflicting
interests of a heterogeneous class**

There is a more basic problem with the plaintiffs' request for class certification that

affects all of the *Leighter* claims, whether for equitable relief or for past damages.  The two

named plaintiffs seek to represent a class of as many as 356 Oregon contractors.  (*See* Malley

Decl. ¶ 3s; De Maria Decl. ¶ 3s.)  Unlike the named plaintiffs, however, more than two-thirds of

those contractors have worked in the Ground division (237), and more than one-third are current contractors (154), of whom more than one-third (53) have serviced multiple work areas. (*Id.*) As former SWA contractors from the HD division, the named plaintiffs are differently situated from current contractors, MWA contractors, and Ground contractors -- who make up approximately 85% of the proposed class.

The heterogeneous makeup of the contractor population dooms plaintiffs' request for class certification. Adequate representation requires not only the competence of class counsel and the diligence of the named plaintiffs, but also demands protection of "the different, separate, and distinct interest of the class members." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). To ensure adequacy, a court must uncover any conflicts that may exist between the named plaintiffs and the putative class members. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (the "adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent"). The adequacy requirement precludes class certification where, as here, the proposed class members have even "potentially conflicting interests." *Baranski v. Vaccariello*, 896 F.2d 1095, 1098 (7th Cir. 1990).

There are clear differences within the proposed classes that raise "at least a possibility" of antagonistic interests, *Swain v. Brinegar*, 517 F.2d 766, 780 (7th Cir. 1975):

***Former versus current contractors.*** Because Leighter and Spicer no longer have any contracting relationship with FedEx Ground, they have no interest in the ongoing viability of FedEx Ground, its independent contractor model, or how the terms of the Operating Agreement are construed. Their litigation priority is clear: maximize the amount of money damages and pressure on FedEx Ground, even if that makes future contracting with FedEx Ground unprofitable, intolerable, or impossible. Current contractors, by contrast, depend on a FedEx

Ground contract for at least some portion of their livelihood and thus have an interest in how the
Operating Agreement is construed, the future of the contractor model, and the success of FedEx
Ground. *See De Grace v. Rumsfeld*, 614 F.2d 796, 810 (1st Cir. 1980) (former employee may be
"in a different position" than current ones because he "may have no greater an interest in
ameliorating employment conditions than that of any other non-employee"); *Lukenas v. Bryce's
Mountain Resort, Inc.*, 66 F.R.D. 69, 71-72 (W.D. Va. 1975) (the interest of purchasers seeking
rescission "is clearly antagonistic to that of those purchasers who have a continuing interest in
the financial viability of the defendant").

    ***SWA versus MWA contractors.*** As the trial court in *Estrada* recognized, MWA
contractors have a greater entrepreneurial interest in their contract with FedEx Ground.
Although plaintiffs argue that the MWAs' entrepreneurial interest should not make a difference
in terms of ultimate liability (FedEx Ground disputes that), it does make a material difference for
purposes of adequacy of representation. Many MWAs have built substantial businesses in
reliance on the core structure of the independent contractor model, in some cases earning
hundreds of thousands of dollars per year and supervising multiple employees. (Crandall Rep. I
19-21; Dorner Decl. ¶¶ 6, 8, 12.) By definition, MWAs have expanded beyond a single work
area and have demonstrated a desire to capitalize on their independent contractor status. Some
SWA contractors, by contrast, may be more likely to desire a relationship that involves less risk
and fewer demands, even if that relationship does not yield the same opportunities for profit.
Leighter, for example, testified that he was uninterested in a second route because "it would be a
headache" and could get expensive, whereas working a single route was "easier." (Leighter Dep.
72-74.) As the Eleventh Circuit has explained, "disparate groups cannot be mixed together under
Rule 23(a) where the economic reality of the situation leads some class members to have

economic interests that are significantly different from – and potentially antagonistic to – the named representatives purporting to represent them." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1195 (11th Cir. 2003) *cert. denied*, 127 S. Ct. 937 (2007).

***HD versus Ground contractors.*** Both Leighter and Spicer are HD contractors; neither of them have ever been Ground contractors. The Ground Operating Agreement allows contractors to make more money by participating in the Flex Program and contains different settlement options. (Ground OA ¶ 9, Add. 3 (Ex. 14); HD OA Add. 3 (Ex. 15).) Ground contractors therefore have a strong litigation interest in remedies that would preserve those rights and entitlements, whereas HD contractors would not be affected one way or the other if the Ground Operating Agreement was declared unlawful. *Cf. Retired Chi. Police Ass'n*, 7 F.3d at 598 (finding inadequacy where some class members, but not the named plaintiffs, had entered a separate agreement and "those benefits would evaporate if the class action succeeded").

Even though the possibility of conflict arising from these inherent differences is enough to defeat plaintiffs' class certification motion, there is evidence that the conflict between Oregon contractors is not merely possible but ***actual***. Indeed, there is demonstrable disagreement between contractors who want to remain independent contractors, those who want to be employees, and those who do not care – a disagreement that affects SWAs, MWAs, HD contractors, and Ground contractors alike. According to the survey conducted by Dr. Deborah Jay, only 2% of current Oregon contractors would prefer to be employees of FedEx Ground. (Jay Rep. 16, Jan. 2007 (Ex. 18 to *Louzau Opp'n Br.* (Doc. No. 607) ("Jay Rep. I".) By comparison, 90% of current Oregon contractors want to remain independent contractors. (*Id.*;

*see also* Martin Decl. ¶ 14.) Even if Dr. Jay's survey conclusions are discounted as ambiguous,[13] the individual narratives accompanying the contractors' survey responses are clear:

- As one Oregon contractor put it, "As an employee, they dictate to where you go and when you go home when. Those are the reasons why I am an independent contractor, as I don't want those things" (Jay Rep. I, App. F, RID00326);
- another explained, "I kind of like the ideal [sic] of not having big brother looking over my back." (*Id.* RID00259);
- another noted, "More freedom on my side, taking care of my own business. When I want to take time I can. I have four employees and trucks. As long as it's taken care of, I can take a few days off." (*Id.* RID00099);
- and another believed that being a contractor would provide "for the opportunity . . . to make a greater income." (*Id.* RID01083).

These survey responses echo the declarations from Oregon contractors:

- Kevin Martin, a Ground contractor based out of Toledo, Oregon, explained that he "like[s] being an independent contractor, even with the risks it presents and the pressures that come with my being responsible for getting the job done no matter what happens." (Martin Decl. ¶ 14.) In fact, he makes "considerably more"

[13] In its *Craig* ruling, the Court found that Dr. Jay's survey was "unpersuasive when offered to prove that the proposed class members don't want declaratory relief sought by the named plaintiffs." (Oct. 15 Order 14.) This conclusion appeared to be based, in part, on the Court's belief that survey respondents did not necessarily understand the question posed in the survey, in particular, that the survey respondents did not appreciate the benefits and other entitlements that might flow from plaintiffs' desired re-classification of contractors as "employees." It is important to note, however, that the Jay survey also asked those contractors who wanted to remain independent contractors about the disadvantages of being a contractor. The contractors' responses revealed that they did understand what being a contractor means, including some of its drawbacks relative to being an employee. One contractor in Oregon reported that, although he wanted to remain a contractor, there were disadvantages: "[n]o health insurance and no overtime" (Jay Rep. I, App. H, RID01289). (*See also id.*, RID01012, RID01799, RID01981, RID01984, RID02076).

case 3:05-md-00527-RLM -CAN document 998 filed 11/16/07 page 32 of 38

money and has "more security" as a contractor than he did when he was a union-represented "employee-driver [with] fourteen years on the job." (*Id.* ¶¶ 12-15.)

- Samuel David Dorner, a Ground contractor in Medford, Oregon, declared that he never would have left his mid-level management job were it not for "the opportunity to run my own business and own a delivery territory leveraging off FedEx [Ground]'s brand name." (Dorner Decl. ¶ 5.)
- Timothy Pullen, a Ground contractor in The Dalles, Oregon, stated that he enjoys being an independent contractor because of the freedom he has over his schedule. (Pullen Decl. ¶ 4.) Since becoming a contractor, Pullen has acquired a second route which his brother drives and incorporated his business. (*Id.* ¶¶ 7-8, 13.) He explains to potential customers that "my company, Pullen, Inc., is an independent contractor that gets paid by the package not by the hour." (*Id.* ¶ 13.)

In contrast to all of these Oregon contractors, Leighter prefers to be an employee and testified that his "outlook [] changed" because he felt that he was "not really being treated as an independent contractor." (Leighter Dep. 53.) This evidence of an actual difference of opinion among class members precludes a finding of adequate representation. *See Giordano v. RCA*, 183 F.2d 558, 560 (3d Cir. 1950) (finding the class representative inadequate because "membership of [the union] is sharply divided on the very question involved in this case," and "it would be absurd to say that the leader of one faction in the internecine struggle could adequately represent the whole membership").

These potential and actual conflicts are not merely theoretical. When "class representatives are not motivated by the same interests and concerns as the absent class members, then there is no assurance that the important litigation decisions made will fairly and adequately

vindicate the claims of the absent class members who will be bound by them thereafter." *Kamean v. Local 363, Int'l Bhd. of Teamsters*, 109 F.R.D. 391, 395-96 (S.D.N.Y. 1986). In this case, the conflicts will taint every aspect of the litigation.

***First***, there will be an obvious disagreement about what prospective remedies to pursue. Ground contractors may not wish to rescind their contracts with FedEx Ground. Current contractors who wish to remain independent contractors obviously will not agree with plaintiffs' request for declaratory and injunctive relief or the scope of any equitable relief (assuming named plaintiffs have standing to seek such relief, which they do not). *See Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 493 (S.D. Ill. 1999) (pursuit of "a remedy that does not benefit the entire class . . . and that is not the remedy that would be chosen by the entire class creates a conflict of interest"). As former contractors, named plaintiffs have no interest in the continued success of FedEx Ground. That is fatal to their request for certification. In *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), the Fourth Circuit refused to certify a class of current and former franchisees, noting that there will be conflicting interests between them even as to claims for past damages. Although both current and former franchisees would benefit from past damages, former franchisees "have an interest only in maximizing any damages [defendant] would have to pay," whereas current franchisees with a "residual, forward-looking interest" in defendant's "continued viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees." *Id.* at 338. In this sense, the named plaintiffs' unmitigated zeal to "vigorously pursue the litigation" (Oct. 15 Order 33) actually exacerbates the conflict of interest.

***Second***, different contractors may want to pursue different legal strategies and arguments. Those who continue to work with FedEx Ground, for example, may value their independence

and therefore oppose arguing that the Operating Agreement should be interpreted as granting FedEx Ground a pervasive "right of control" over every aspect of their business. *See Bonser v. New Jersey*, 605 F. Supp. 1227, 1235-36 (D.N.J. 1985) (denying class certification because different members may "feel their interests are best protected by an interpretation of the plan's terms" as opposed to "scrapping" the plan). Likewise, class members who wish to preserve the independent contractor model may wish to avoid aggressive or overreaching legal arguments about the requirements of Oregon law. *Cf. Swain*, 517 F.2d at 780 (denying class certification to plaintiff-landowners seeking to enjoin highway project because "there is at least a possibility that some of those who have 'already conveyed or agreed to convey their property' will have an interest in the integrity of their bargain with the state"). These conflicts of interest will also affect class members' approach to the litigation generally. As explained in *Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*, 55 F.R.D. 26 (S.D.N.Y. 1972), it would be of "no concern" to former contractors "whether the defendant can survive economically against the threat of heavy and burdensome expenses involved in resisting a class action." *Id.* at 29. It is, however, definitely "a matter of concern" to present contractors. *Id.*

Given these considerations, the adequacy problem boils down to one undeniable conclusion: even if all proposed class members agreed on the defendant's liability, class certification is ***not*** permitted if the putative class members have motivations and interests that may conflict. *See Gilpin v. AFSCME*, 875 F.2d 1310, 1313 (7th Cir. 1989); *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc). This is an inherent adequacy problem that cannot be overcome by the opt-out provisions of Rule 23(b)(3). *See United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 572 F. Supp. 1494, 1500 (N.D. Ill. 1983), *aff'd*, 756 F.2d 1274 (7th Cir. 1985); *Free World Foreign Cars, Inc.*, 55 F.R.D. at 29. Such a fundamental

divergence of interests also cannot be solved by resorting to sub-classes, *see East Texas Motor Freight System v. Rodriguez*, 431 U.S. 395, 401-05 (1977), or by relying on the defendant to represent the views of certain class members, *see Horton v. Goose Creek Independent School District*, 690 F.2d 470, 488 n.33 (5th Cir. 1982) (holding that to the extent there is "disagreement among class members over appropriate relief . . .we cannot depend on the defendant to represent the views of all absentees."). Nor can such a divergence of interests be ignored by substituting the actual interests of contractors with plaintiffs' paternalistic view of what their interests should be.

## III.  PLAINTIFFS' PROPOSED SUBCLASSES SHOULD NOT BE CERTIFIED

Plaintiffs also request certification of two "damages subclasses." (Pl. Br. 3.) The first putative subclass seeks overtime damages on behalf of persons who "operated vehicles with a gross weight rating of less than 10,001 pounds" after August 10, 2005. (*Id.* 1, 3.) The second putative subclass seeks statutory penalties under ORS § 652.150 for unpaid wages on behalf of any person "whose Operating Agreement was terminated any date after July 20, 1999." (*Id.* 1-3.) In addition to the adequacy and commonality issues addressed above, the subclasses suffer from ascertainability defects. *See Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) (to be certified, a class must be "sufficiently definite to permit ascertainment of the class members").

The proposed overtime damages subclass turns on whether the driver "operated" a vehicle of less than 10,001 pounds. (Pl. Br. 3.) Plaintiffs assume that particular contractors can be easily matched to particular vehicles. Many contractors (especially MWAs and SWAs who hire supplemental drivers), however, have multiple vehicles, some of which may fall above and some below the 10,001 pound weight threshold. (Dorner Decl. ¶¶ 7, 10 (owns two new trucks and presently drives five days a week, but is currently training another driver).) For example,

named plaintiff Spicer testified that after he purchased a supplemental van, he often drove the supplemental van while his driver used the vehicle he had originally purchased for his route. (Spicer Dep. 71-72, 110.) Spicer also testified that he sometimes operated a different van that he rented from another driver. (*Id.* 72-73.) Plaintiffs offer no ready way to ascertain for what periods, if at all, individual contractors may have operated vehicles over 10,001 pounds.[14]

The proposed statutory penalty sub-class turns on the individual circumstances of contract terminations. The statutory penalty applies only to individuals "whose employment ceases, as provided in ORS 652.140 and 652.145." ORS § 652.150(1). Those provisions apply to situations where "an employer discharges an employee," "when employment is terminated by mutual agreement," and when "an employee who does not have a contract for a definite period quits employment." ORS §§ 651.140(1), (2)(a). The provisions do not apply, for example, to employees who have a contract for a definite period but "quit[] employment." Thus, to ascertain membership in the proposed subclass, the court will have to examine the circumstances of each contractor's termination. This cannot be readily determined from FedEx Ground's business records because FedEx Ground did not record "termination reasons" in its contractor termination database before 2004, and even now does not differentiate between contractors who quit and those who leave "by mutual agreement." (Obenauf Decl. ¶¶ 4-6 (Ex. 16).)

**CONCLUSION**

For the foregoing reasons, FedEx Ground respectfully requests that plaintiffs' motion for class certification in *Leighter* be denied in its entirety.

[14] Additional discussion of the ascertainability defects in plaintiffs' proposed overtime sub-class is found in FedEx Ground's opposition brief in *Vargas*. *See Vargas* Opp'n Br.

Dated:  November 16, 2007

Respectfully submitted,

By:  s/Thomas J. Brunner
      Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN  46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C. Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Steve D. Larson
slarson@ssbls.com

and I further certify that I have mailed the foregoing document by United States Postal Service to the following non-CM/ECF participants:

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

All exhibits associated with the foregoing (whether filed electronically or under seal) have been provided to all counsel listed above.

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Jon Leighter, et al. v. FedEx Ground Package System, Inc.*,<br>Civil No. 3:07-cv-00328-RLM-CAN (OR) | CHIEF JUDGE MILLER |

**EXHIBITS TO DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO *LEIGHTER* (OREGON) MOTION FOR CLASS CERTIFICATION**

1. David Spicer Deposition Excerpts
2. Declaration of Timothy A. Pullen
3. Dennis McHenry Deposition Excerpts
4. Jeremy Brinker Deposition Excerpts
5. Edward C. Slayman Deposition Excerpts
6. Jon Leighter Deposition Excerpts
7. Declaration of Samuel David Dorner
8. Declaration of Kevin B. Martin
9. Declaration of Dennis Oates
10. Robert W. Crandall, MBA, Expert Report I (Filed Under Seal)
11. Declaration of Dennis Malley
12. Declaration of David DeMaria

13. P. Richard Jeanneret, Ph.D., Expert Report I (Filed Under Seal)

14. Troy Givens FedEx Ground Operating Agreement

15. Jon Leighter FedEx Home Delivery Operating Agreement

16. Declaration of Marsha Obenauf

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

In Re: FedEx Ground Package System Inc., Employment Practices Litigation

KATRINA LEE, et al.,

Plaintiffs,

v. No. 3:05-MD-527-RM

FEDEX GROUND PACKAGE.

SYSTEM, INC.,

Defendant.

COPY

---

VIDEOTAPED DEPOSITION OF DAVID SPICER

TAKEN ON BEHALF OF THE DEFENDANT

TUESDAY, AUGUST 21, 2007

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the videotaped deposition of DAVID SPICER was taken before Janette Dukic, Court Reporter and Notary Public, on Tuesday, August 21, 2007, commencing at the hour of 1:13 p.m., the proceedings being reported at 111 Southwest Fifth Avenue, Suite 1250, Portland, Oregon.

Q. Can you give me the year?
A. No.
Q. Can you tell me what the misdemeanor was for?
A. No. Is it -- is it pertinent to what we are doing here?
Q. Well, it may be.
A. Why is that?
Q. I get to ask the questions, Mr. Spicer.
A. I had a DUI when I was in my early 20s.
Q. Okay. Thank you.
A. It was irrelevant, but you are welcome.
Q. Mr. Spicer, when did you first contract with FedEx Home Delivery?
A. April Fool's Day 2005.
Q. And when did your relationship with FedEx Home Delivery end?
A. June of 2007.
Q. Since your relationship with FedEx Home Delivery ended on June 5th of this year, what jobs have you held?
A. I worked briefly for Frito-Lay, and I am working currently for a company called Office Values.
Q. Which job did you hold first?
A. Frito-Lay.
Q. When did you start working at Frito-Lay?

A. I did.

Q. Why did you sell it?

A. I had some other issues that came up. I needed some health insurance that I was not able to get running my own business, so I sold it.

Q. What hours was the business open to the public?

A. Six to six.

Q. Six a.m. to six p.m.?

A. Yes.

Q. And were those the hours you kept?

A. No. I was usually there at 5:30.

Q. And would you work after you closed at six?

A. It would depend on the day. I mean, I would close at six. If I had a busy day and had to clean up afterwards, then yes.

Q. Did you have -- did you have to deal with financial statements and balance sheets and other financial issues related to your business?

A. I had a checkbook. That was it.

Q. That was it.

How often -- how long did you own this business for?

A. Roughly, a year.

Q. How did you learn about the possibility of

contracting with FedEx Home Delivery?

A. From The Registry Guide.

Q. I am sorry?

A. The newspaper in Eugene.

And I looked at FedEx Ground's website.

Q. Did the newspaper -- was it an advertisement?

A. It was an individual selling the route.

Q. So there was an ad placed by another contractor?

A. Yes.

Q. Do you remember what the advertisement said?

A. Not word for word, no.

Q. What did you do after you saw the advertisement and checked the FedEx Ground website?

A. I thought I would have a tremendous opportunity to run my own business again. I talked to the person who was selling their route, got as much of his financials as he was willing to give out, and proceeded to buy the route.

I had reason to be in Eugene at the time, so I needed to be able.

Q. Where were you at the time when you learned about the opportunity?

A. I lived in Bend, Oregon, the whole time I worked the FedEx route. I would work there during the

A. Ask them.

Q. Do you remember asking them any questions?

A. Not at the moment, no.

Q. Were these conversations -- these conversations preceded your decision to buy?

A. After.

Q. Buy the route?

A. After moneys had been passed, so it was too late. If they would have discouraged, I would have been $47,000 in the hole.

Q. So you didn't talk to contractors prior to paying Mr. Brown money?

A. I did not know any contractors.

Q. Okay. Did you know the area that Mr. Brown serviced before you entered into an agreement with him?

A. No.

Q. Did you investigate that at all?

A. I rode with Mr. Brown for approximately two weeks as a form of training and after moneys had passed hands to learn his area.

Q. So you didn't think that it was important to learn about his route before paying him money?

A. A route is a route. I have driven routes for FedEx Express. If you learn the area, it is not brain surgery.

Q. Okay. Is Mr. Brown's signature? Is that Mr. Brown's signature underneath the name, Rolando Brown?

A. I would have to suppose it is, yes.

Q. Who drafted this agreement?

A. Either Rolando Brown or some agent for Rolando Brown.

Q. Was there any back and forth over the language of this document?

A. No, sir.

And, apparently, I said I paid 47,000, but I paid 48, according to this document.

Q. So this document says that for $48,000, you were purchasing his route and an approved Ford P-550 truck; is that correct?

A. Yes.

Q. It says that original maintenance receipts were given to you; is that correct?

A. I had some of his maintenance receipts, yes.

Q. Okay.

A. I can't say that I had all of them, but I had some.

Q. According to the document, you received a copy of Mr. Brown's contract; is that correct?

A. Yes.

A. Isn't that every business owner's dream? Yes.
Q. Thank you.
Before you signed your contract with Home Delivery did you ever consider incorporating your business?
A. I was incorporated, yes.
Q. At the time that you entered into the contract?
A. No.
Q. At the time that you entered into the contract, were you considering incorporating?
A. Yes.
Q. And why was that a consideration for you at the time?
A. For tax purposes. My wife had another business. If anything happened, I didn't want it involved in -- like I say, if I hit somebody's tree and they wanted to sue me, I didn't want her business dragged into it. That was about it.
Q. Was it your decision to incorporate or did someone else tell you, you had to incorporate your business?
A. It was my decision.
Q. Do you know when you incorporated your business?

A. I couldn't give you the exact date, no.

MR. BRENNER: I am going to mark another document. I believe this is Exhibit 4.

(Whereupon, Articles of Organization-Limited Liability Company, PORSPI 0000022 - 23, was marked Exhibit 4 for identification.)

BY MR. BRENNER:

Q. Is this document familiar to you?

A. Yes.

Q. Are these your incorporation documents for your corporation, Three Legged Dog, LLC?

A. Yes.

Q. And the date of filing here is stamped June 6th, 2005. Is that the date that you established your corporation?

A. I suppose it is, yes.

Q. And that would be roughly two months after you contracted with FedEx Home Delivery?

A. Yes.

Q. Before contracting with Home Delivery, you testified earlier that you were a courier with FedEx Express, correct?

A. Yes.

Q. And you were an employee when you worked for FedEx Express, correct?

Q. Delivering packages. Are there skills involved in delivering packages that make some people better than others?

A. Sure.

You have to have organizational skills, time management skills, customer service skills. I am sure there are others.

Q. What about driving skills?

A. You have to be able to drive, yes.

Q. Did you drive your route yourself?

A. I was not allowed to have anybody else in my truck. I had -- I had a person who worked with me through FedEx approval. That's the supplemental van that I bought that had to be approved by FedEx.

Q. But you would personally service your route on a daily basis?

A. Until it got too large for one person to do.

Q. But even when you were running your supplemental vehicle, you were still delivering packages?

A. Yes.

Q. On a daily basis?

A. Yes.

Q. You brought the supplemental. When did you bring the supplemental vehicle on?

A. I believe I bought that in October of 2006.

MR. BRENNER: I am going to mark another exhibit.

THE WITNESS: Can we take a short bathroom break?

MR. BRENNER: Surely. I meant to say it is not a marathon.

THE VIDEOGRAPHER: This concludes tape number 1. We are off the record at 1444.

(A brief recess was taken.)

THE VIDEOGRAPHER: Back on the record at 1451.

BY MR. BRENNER:

Q. Before the break, Mr. Spicer, we were talking about your driving of your route and we were talking a little bit about supplemental, your supplemental vehicle.

A. Yes.

Q. When you brought on your supplemental vehicle, would you drive the supplemental vehicle or would you drive the primary vehicle?

A. I drove the supplemental vehicle in the primary core zone of my route.

Q. What kind of vehicle was your supplemental vehicle?

A. It was a Chevy Express cargo van.

Q. So you would drive the cargo van and you would have the driver drive the vehicle you purchased from Mr. Brown?

A. Yes.

Q. And when you were driving your supplemental vehicle, would you generally -- did that reduce the hours you were driving?

A. Yes.

Q. Prior to bringing on the supplemental vehicle, how many hours on average would you say you were driving a day?

A. Specifically driving or working within the FedEx terminal and driving?

Q. Just driving.

A. Before I brought on the supplemental, I was spending eight to ten hours a day driving.

Q. And after you brought on the supplemental, how many hours a day were you driving?

A. Five to six.

Q. Five to six hours a day?

A. Yes.

Q. And that started when?

A. In October. Now through the peak season through Christmas, I was driving more than that, but on average, I was driving five to six hours. My

in order to load 'em on my truck. Scan 'em and load 'em on my truck. It was roughly an hour and a half, two hours worth of work, sometimes more. If we -- let's say there was a weather delay. We had to sit and wait for FedEx to bring us our work. Scanned all of the packages into the truck. Go into the terminal office. Wait for my paperwork. Sign paperwork from the previous day. Collect my paperwork. Enter my mileage and the time of day that I was starting my route. Go out, deliver packages.

After the first stop, deliver the time of day that your first stop or enter the time of day that your first stop happened. Go about your day.

Usually, you didn't have time for lunch. If you did, it was a drive through, eat while you are driving. Work until anywhere from 5:30 to 7:30 or eight o'clock at night. Come back into the terminal, download your hand held or your scanner. Get in my car and drive home or to the place I was staying.

Q. Let me just break down a few of those items.

You said you generally arrived at the terminal around 6:30.

A. Yes.

Q. Was that consistent a daily basis or were there occasional days where you would arrive, you know,

later or earlier?

A. I am sure there were occasions when I did. I don't recall any exact days or dates or -- you know, it was -- 6:30 was a pretty average time for most all of us.

Q. Did anybody tell you, you had to be there at 6:30?

A. No.

Q. So you decided that 6:30 was the time for you to get there that was best for you?

A. In order to get my packages loaded and get out on my route, yes, that was the best time for me.

Q. And were there ever days when you knew that you would be heavy or you would be light and you would adjust your arrival time accordingly?

A. We were never informed or they never gave us a forecast of what was coming up, so no.

Q. Was there a ever a day that you felt that you wanted to finish early or earlier and so you would get to the terminal early?

A. That's why I got there at 6:30, because I wanted to finish early every day.

Q. So I think I heard you testify that your truck was kept at the terminal.

A. Yes.

features, download stuff, and it could sometimes take a while and would delay you, but I don't think it was a -- I wouldn't say that it was an act meant just to delay you. They just delayed you, because it was red tape.

Q. Would you be given turn-by-turn directions each day?

A. Uh-huh.

Q. By the terminal?

A. Every day.

Q. And what did you think of those directions?

A. They were usually 45 percent worthless. My analogy was if you went to Rent-a-Center and rented a tool -- I had to pay for those directions. So if you went to Rent-a-Center and rented a tool, would you be irritated if the tool only worked 60 percent of the time? Yes. So, my money was wasted.

Q. Did you have to get the turn-by-turn directions?

A. I don't suppose they twisted your arm to do it, no.

Q. Did you find on balance they were worth having?

A. The paperwork in the whole was worth having. The turn-by-turn was not necessarily worth having.

Q. So did you often deviate from the turn-by-turn

directions?

A. I did not often deviate from them. If I knew that they were wrong, which, as I said before, 45 percent of it was wrong, I knew the way to get to that area.

Q. So would you say 45 percent of the time you didn't follow the turn-by-turn directions?

A. Yes, I guess I would have to.

Q. Were there any consequences to you for not following the turn-by-turns?

A. No.

Q. Did you ever look at the turn-by-turn directions and think to yourself that, you know, I can -- there is a much more efficient route to get from point A to point B?

A. Yeah. Once or twice, sure.

Q. And then you would follow your own, more efficient route?

A. Yes.

Q. You said earlier that you talked about eating lunch. Did I hear you correctly that you didn't eat lunch much while you were delivering packages?

A. If I ate lunch, it was run into a fast food place and run out and eat while I was working.

Q. Did you ever take any breaks during the day?

Q. Is that the only factor?

A. Yeah.

I mean, you know, I suppose there could have been an auto accident somewhere that could delay you, but I wouldn't consider that. It was more just the number of stops that FedEx told me I had to do.

Q. Were there ever days where the location of deliveries were just more -- just happened to be more convenient and more efficient than other days that would affect when you would finish your route?

A. Sure, but I had no control over that.

Q. I don't think I have asked you this already or just tell me if I have. How often would you have a pick up?

A. You did ask me. Maybe once or twice a week.

Q. Okay.

A. I think that's what I told you, but you did ask me.

Q. Thanks.

Now talking about the period of time after October of 2006, when you had brought on the supplemental vehicle. And you had one supplemental vehicle; is that correct?

A. That's correct.

Q. Did you still typically arrive at the terminal

at 6:30 in the morning?

A. Yes, I did.

Q. And did it typically still take you an hour and a half to two hours to leave the facility?

A. Yes, it did.

Q. And did you load both trucks or were you -- did you work with your driver to load both trucks?

A. Typically, I was done loading my truck before she was done loading hers, so I would go help her load her truck, and then we would wait for our paperwork, and if she needed gas, I would go with her and pay for the gas, and I typically got done earlier than she did.

Q. And in terms of the down time or the time when you weren't working in that one and a half to two hours, did it change at all after October of 2006?

A. I had a little more down time if I helped her load or if -- if I helped her load, I had a little more down time. If I just loaded mine and left, it was probably close to the same, which sounds kind of odd, I know, but I wasn't doing all of the work by myself, so --

Q. And so there were some days where you would leave the terminal before eight o'clock?

A. There was -- well, not before eight o'clock. Usually never, no.

Q. So part of the reason that you brought on the supplemental vehicle was to protect your original vehicle from overuse?

A. Less wear and tear, yes.

Q. Did FedEx Home Delivery ever suggest that you change your vehicle?

A. No.

MR. BRENNER: I am going to have these two pages marked as Exhibit 10. They are Bates numbered FXG LEIGHTER 1428 and 1438.

(Whereupon, FHD Supplemental Vehicle Use Request, FXG_LEIGHTER 0001428 and 438, was marked Exhibit 10 for identification.)

BY MR. BRENNER:

Q. Do these documents look familiar to you?

A. Yes.

Q. Can you tell me what these documents are?

A. It is a request for a supplemental vehicle that was approved.

Q. I am sorry?

A. That had to be approved by FedEx before I could actually use it.

Q. So on the second page that is marked 1438, it is dated November 11th, 2005.

A. No, that's a typo.

Q. And the one on the first page is marked October 31st, 2006.

A. Oh, okay. Two different. Two different vehicles.

Q. Did you have a supplemental vehicle back on November 11th, 2005?

A. That was during the Christmas season, and I did not own the vehicle. It was one that was rented for peak season.

Q. Okay.

A. From Lisa Needham.

Q. Was it represented from her or for her?

A. From her and for her.

Q. So Lisa Needham owned the Chevy Jeep 2500?

A. Yes.

Q. And so this was for peak season 2005?

A. Yes.

Q. When you were driving -- did she run the supplemental vehicle on your route starting November 11th, 2005?

A. Yes.

Q. And when did she stop running the supplemental vehicle?

A. December 26th, 2005, roughly.

Q. Okay. And why did you decide to bring on a

permanently in October -- or at the beginning of November of 2006?

A. Yes.

Q. Okay. So when we were talking before about the differences in your days between before and after October of 2006, this is the vehicle that you brought on that affected when you finished working?

A. Yes.

Q. Okay. And this Chevrolet Express 2004, that's the Econoline van that you purchased?

A. Yes.

Q. Where did you purchase that vehicle?

A. In Bend, Oregon.

Q. Did you purchase it from?

A. From a dealer.

Q. You purchased it from a dealer?

A. Yes.

Q. Did it have logos on it?

A. No.

Q. Did you finance it or did you buy it outright?

A. Financed it.

Q. And who did you use for financing?

A. I believe Selco Credit Union.

Q. Do you remember how much it cost?

A. Roughly $16,000.

A. Occasionally. I think possibly maybe three times.

Q. Do you know how you went about finding these drivers?

A. The first time it was a gal who used to -- who was already approved by FedEx who worked for Rolando Brown, the person that I bought the route from.

Q. What was her name?

A. Betty. Betty something.

Q. Betty Kent?

A. Betty Kent. Thank you very much.

And then I used occasionally, once or twice, a gal named Holly Plumb, who later became my supplemental driver.

Q. And how did you find Holly Plumb and Betty Kent?

A. Holly Plumb was working part time for one of the other drivers, and as I said a minute ago, Betty Kent was someone that Rolando Brown used that I knew was FedEx preapproved.

Q. Did you have a choice of drivers that you could have work for you in a relief capacity at that time?

A. I believe it was a limited choice, but as long as FedEx approved them, I could use them if they were

willing to work.

Q. Could FedEx Home Delivery care who you used, as long as they were qualified?

A. As long as FedEx approved them, you could use whoever you wanted. You may have to -- they may request that you train them on your route first.

Q. When you say FedEx approved, does that mean that they have been certified or that -- does it mean something else?

A. Certified. Able to drive a vehicle. I suppose pass a drug test and a physical.

Q. So it wasn't that they would approve someone for you, but there would be certain people who had gone through that process that you had discussed?

A. They didn't approve people just for one particular driver unless that one particular driver specifically hired someone, and then that person could jump ship and go to another driver if they wanted. It was free will.

Q. Was there ever a time that you wanted to use a driver and were prohibited from doing so?

A. Not me, no.

Q. And you could choose from any of the certified or approved drivers that you wanted to use?

A. Yes.

Q. Do you remember how much you paid Holly and Betty when they served as a relief driver for you between April and November of 2005?

A. It was either a hundred or a hundred ten dollars per day.

Q. Did you use anyone else as a substitute driver at any time during your contract, not a supplemental, but a relief or substitute driver?

A. Yes. I used a man named Earl Ruttencutter.

Q. Do you know how many times you used him, roughly?

A. 15, I guess. I don't know. He was also the one I used after I started working at Frito-Lay. He worked for me a couple times a week, and then 15 or 20 is not counting those.

Q. When he was working for you as a relief driver, do you know how much you paid him?

A. $100 a day.

Q. When he became your two-time-a-week supplemental driver, how much did you pay him then?

A. One dollar per stop.

Q. And the other driver that I believe has been mentioned is Lisa Needham?

A. Yes.

Q. And she worked as your supplemental driver at

**DECLARATION OF TIMOTHY A. PULLEN**

I, Timothy A. Pullen, am over 18 years of age and make this declaration based on personal knowledge.

1. I am an independent contractor for FedEx Ground in The Dalles, Oregon, which is located off Interstate 84 approximately eighty miles east of Portland on the banks of the Columbia River. The Dalles is an industrial town of 20,000 named for the French word for water flowing fast over a dam.

2. Before I started working as a contractor for FedEx Ground, I worked for two years as an independent contractor for Western Parcel Delivery serving The Dalles, Hood River, and surrounding areas in the northeast corner of Wasco County bordering the Columbia River.

3. Prior to working as a contractor for Western Parcel, I worked for UPS as a "permanent part-time employee" during peak delivery season (October 1 – January 1) while working full time at a local grain elevator. I worked hard for UPS for three peak seasons from 1996 to 1999. Supervisors praised my drive, but filled the full-time UPS routes that came open with more senior employees promising every year that I would receive the "next" full-time driver position. The only full-time positions available were as a clerk or night loader. I left because I wanted a route not a desk or an 8 p.m.- 4 a.m. workday.

4. As an independent contractor for Western Parcel, I often crossed paths with the driver servicing the same area for Roadway Packaging Services, one of Western Parcel's competitors. The RPS contractor put his route up for sale in the classified section of *The Dalles Chronicle* for $45,000. I knew he wanted to retire because he lived near Portland, picked up his packages from the RPS terminal in Portland and commuted 80 miles one way just to get to The Dalles to make his first delivery. I bought the route and his delivery truck in the spring of 2001 for $25,000. Most of the sale price went toward the route which covered all of The Dalles and immediately surrounding areas. That same route now produces $60,000 in annual gross revenue.

5. I bought The Dalles route a month after FedEx announced that it had purchased RPS, so I was among the first contractors to get the ball rolling for FedEx Ground in Wasco County. There was no was no RPS/FedEx Ground terminal in The Dalles (or anywhere else in Wasco County). The nearest FedEx Ground manager came over from Portland maybe twice a year.

6. My first six months, I drove to Portland, picked up packages bound for The Dalles before backtracking 80 miles over Interstate 84 to The Dalles to begin delivering.

7. In October 2001, shortly after FedEx Ground arranged to have all packages bound for Wasco County brought over daily from Portland on a line haul truck, I acquired a second route along with a truck for $13,000. The route covered the Hood River area and had been owned by another long-time RPS contractor who lived in Portland and no longer wanted to make the trip. The Dalles route and the Hood River route jointly covered much of Columbia River Gorge.

8. I hired my older brother in August 2001 to drive The Dalles route and I delivered the denser part of the Hood River route myself. I hired a part-time driver to service more rural areas after FedEx Ground launched "alternative day service" to areas where RPS had formerly delivered packages only by contracting delivery to the Post Office.

9. My former helper has gone from working for me on his days off from his furniture delivery job in 2001 to incorporating his own package delivery business and hiring his own driver to service one of his other FedEx Ground routes. Between the two of us we own much of the delivery territory in and around The Dalles and in upper Wasco County.

10. I wound up selling the Hood River route to my former alternative day driver after I learned that I had an atrial fibrillation. I sold the Hood River route along with the same truck I bought the year before for $35,000 in October 2002. It was hard to part with Hood River, which has been one of the fastest-growing areas in Oregon with many home-based businesses, but I was advised at age 37 to slow down by my doctors and eliminate my stress triggers.

11. I dropped out as a driver myself, went to work full-time as a maintenance supervisor at a local nursing home, but retained and managed The Dalles route driven by my brother. He is not a shareholder in my company, prefers it that way, and is content to deliver packages.

12. After getting my heart condition stabilized, I went back out in June 2005 and bought additional rural service areas for $6,000 from another contractor, which includes an expansive alternative day service area which fits doctor's orders. I send my brother downtown and to the industrial park. I have another full-time driver who services part of the rural area. I have a part-time driver who can help service both The Dalles and the rural areas as needed. This permits me to deliver a long loop to the southeast servicing each half of my alternative day service route on alternating days. I am not required to call into the terminal, and in many areas I cannot be reached even by extended network cell service. That is fine with me and I service the route just the same.

13. My brother and I have lived in The Dalles area all of our lives and went to the local high school. Many people in the area know us and we know most of the local businesses. If we see a new business opening its doors, we make a point of introducing ourselves to the billing manager and seeing who they use for their small package shipping and pickup. We explain the services that we can provide through FedEx Ground and that my company, Pullen, Inc., is an independent contractor that gets paid by the package not by the hour. We give them my business card and the number for the FedEx Ground sales force. With this approach and the power of the FedEx brand we have seen The Dalles route, for example, expand by more than 50 stops per day in the past three years.

14. In addition, in the industrial park right between the idled Northwest Aluminum plant and the animal shelter, search engine giant Google just built a huge computer data center on a 30-acre compound that taps the river for electricity and cooling. This "secret" project revealed in a 2005 exclusive in our local paper is a real coup for a town of 20,000 known for its used car lots as well as for local contractors, including my company, Pullen, Inc., which acquired the territory two years after I was shut out of a route at UPS.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct, to the best of my knowledge. Executed on this 1st day of March 2007, in The Dalles, Oregon.

Timothy A. Pullen

DENNIS McHENRY
1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC.
EMPLOYMENT PRACTICES LITIGATION
DEAN ALEXANDER, et al.,
Plaintiffs,
vs. Case No. 3-05-MD-527-RM
FEDEX GROUND PACKAGE SYSTEM, INC.,
Defendant.

COPY

---

VIDEOTAPED DEPOSITION OF DENNIS McHENRY
TAKEN ON BEHALF OF DEFENDANT
AUGUST 22, 2006

- - -

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the videotaped deposition of DENNIS McHENRY was taken before Marcel Johnson, Registered Professional Reporter, on August 22, 2006, commencing at the hour of 8:51 a.m., the proceedings being reported at 111 Southwest Fifth Avenue, Suite 1250, Portland, Oregon.

LEGALINK®
A MERRILL COMMUNICATIONS COMPANY
420 Lexington Ave
Suite 2108
New York, NY 10170
tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171
www.merrillcorp.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

and there was no mention about prorating it -- in fact, I don't -- I don't even think it was supposed to be prorated. They added that in based on how many hours a day you worked. If you worked less than seven hours, they -- they cut -- cut the -- the core zone. Which -- and that was never explained. Everybody was shocked at that one.

Q. Did you ever have your core zone pay cut because you worked less than seven hours?

A. A few times.

Q. When was that?

A. It was -- it was, like, May of 2001 or could have been March. There were a couple of real, real light days.

Q. And those were in 2001?

A. If -- if I -- it could have -- it wasn't March of 2000. It was -- it -- it could have been March of 2002. But it was only a couple of times. I think there -- there was -- there might have been a couple of days when I was working in Eugene that it got cut, too.

Q. And when your core zone was prorated when you worked in -- in several areas, can you explain how that worked?

A. I can almost show you. If we turn to page

652 in this exhibit, Exhibit No. 2, it shows -- it starts with 406, 409. Well, each -- each zip code has a core zone number assigned to it, and you can see they vary. They actually vary quite a bit more than this.

If you go back to page 651, I mean, this is an old one, there's -- I think the -- the highest one on this page is $111, and I see one of, like, $62, but there's -- this is an old one. This is from 2002.

Anyway, there's -- there's core zones that actually go up to as much as 100 and -- I remember seeing them as high as $135 and as low as zero dollars and if you do half of your stops in a zero dollar core zone and half your stops in a $135 core zone, you get -- you get the average of the two core zones. So it would be like $62. And 60 -- or 70? $67.50.

Q. Were any core zones actually zero?

A. I don't -- none of mine were. I understand that there's contractors that have zero dollar core zones. But I never had any zero dollar core zones.

Q. So if you were actually delivering half of your packages in your core zone and then another

a job done and they don't -- they're not given the resources to get the job done, I mean, it flows downhill. And as the last person to -- in the FedEx line to get the package, you know, they -- they -- everything goes downhill to the drivers. And, you know, if they tell you you're going to drive 40 miles up a hill to deliver one package to the ranger station and you say no, I mean, it's threats all the time. You know, Oh, we're going to terminate your contract. Or, You're putting your contract in jeopardy. If -- if -- if you don't do this, we will cut your area down to just your primary core zone. And I always said, Great, do that, but they never did it. So here we are.

Q. Did -- did you ever refuse to deliver packages that any terminal managers told you to deliver other than with Jack?

A. With -- with Ben, I had to.

Q. And --

A. Actually, it wasn't -- it wasn't -- it was Ben, one day he actually told me that from now on, all you're going to get is your primary service area. So the next day I didn't come in till 11:00 or 11:30 in the morning expecting to just have my, you know, 25, 30 stops in my contracted area. And

they had -- he -- he actually, I guess -- I don't know if he went out of his way or not, but there were probably twice as many stops as I usually would have, for the whole route.

Q. And so did you refuse to deliver some of those packages?

A. I -- there was no way I could. I only had half a day left. You know, there's -- there's -- there's more of a chance for packages to get delivered if I don't take them in my van. You know, that way maybe they could find, you know, some help somewhere. But if I have them in my van and, you know, it's 10 o'clock at night, it's not going to do anybody any good.

Q. Did you ever refuse to deliver packages other than when Ben and Jack were terminal manager?

A. The only -- I think I -- in -- in four years -- well, maybe, what, 3 1/2 years, whatever, prior to that, I might have had a total of seven packages, total in that whole time, that I -- I couldn't attend. One -- one day I was sick. I worked until 7:30 at night and the -- the next three stops were going to take me an hour or -- or so, and they were -- they were on a way that I could pass them in the morning on my way to work the next

morning, so I delivered them the next morning on my way in to work. And that was with -- that was in -- that was probably in 2000. Those three are the three that I remember not being able to deliver -- or not -- not making an effort to deliver them.

I -- I don't remember -- oh. Oh. There was -- there were some -- it was a similar situation. I -- I wasn't sick, but it was -- it was just a real heavy day and it was a Saturday when we were required to return packages to the terminal if they're not delivered, and I had already had a couple that people weren't home or businesses were closed or something, so I knew I had to go back to the terminal and I didn't get back to the terminal until about 9 o'clock, and that was without -- without trying. There -- there were a couple that would have taken, I mean, I don't know, maybe two hours to deliver, two or three stops or something.

Q. And --

A. Ryan King was manager then. Other than that, I don't remember having packages that I -- that I didn't even make an attempt to deliver.

Q. And did you ever hire anyone to help service your route in Washington?

A. I had my two niece -- two of my nieces

pay him, like, $100 a day, up to a certain -- I think like 50 stops. And then it was a dollar or two or three dollars extra for every stop after that or -- or something. It was some -- some -- some combination of a set rate, plus a bonus. Because I knew people -- you know, Christmas was coming up, so I had to pay him. Because he -- he was a good worker.

Q. And how did you come up with the amount that you would pay Michael Zentz?

A. Based on what I could afford.

Q. And it was just direct negotiations between you and Michael?

A. Yes.

Q. Did Betty Kent and Holly Plumb receive the same amount every day regardless of how much you made?

A. Holly received the same amount -- well, I mean, other than what I paid her to cover me when I took a few days off, she received $100 every day. Betty, I think she started $100 a day, and then asked if she could make more money. So I talked with Ryan King, and we worked out a way where that route could -- could cover a different area, and then my other route could flex, you know, back and

Q. And -- and Ryan King agreed to make the changes that you suggested?

A. I don't know why he wouldn't have. He didn't disagree. I mean, he was happy to get them done.

Q. Did you tell anyone at FedEx Home Delivery how much you were paying your second route drivers?

A. Specifically tell anybody?

Q. Yes.

A. I -- I'm sure I told people how much I was paying them.

Q. Do you know -- well, why -- why are you sure you told other people?

A. People ask. You know, other contractors, they want to know what the expenses are. You know, even -- even the manager, they want to know what you're paying your drivers. They, you know, need to have -- if -- if people come into the office looking for work, you know, the managers want to know, before they waste their time filling an application and getting approved, they want to be able to tell -- tell the prospective drivers, you know, what'll they -- you know, what they'll make. So everyone -- everyone kind of has an interest.

Q. Did you also hire supplemental drivers

contractors had sold routes.

Q. And how much had they sold their routes for?

A. One was sold for 40,000, and the other was sold for 46,000, and neither one of those included a vehicle. Oh. Oh. I know -- I know there was another one that sold. I think it ended up selling for 20,000, or 25,000, somewhere in that range.

Q. And how much were you selling your routes for?

A. I -- I -- I think I was trying to sell it for one -- one route, plus whichever van went with the route, for 60,000.

Q. And how did you come up with that number?

A. Basically by the 40,000 to 46,000 for a route without a van, and then you add the value of the van. Or, actually, what I did was I added -- I added what I owed on the van, so the van would be paid off. And that -- that $25,000 sale, the guy that owned it was kind of a hardship sale because he was already moved and retired in Mexico and having somebody else run it for him.

Q. When you first moved to the Eugene terminal, what time would you typically start in the morning?

A. Between 7:30 and 8:00. Sometimes as early as 7:00.

Q. And how would you decide to come in, then?

A. Well, part of it, I mean, if I worked until 10:30 the night before, I'd probably come in a little bit later the next morning. I mean, and part of it -- you know, part of it is by -- I mean, you're required to have everything scanned by 9:00 a.m., I think. I think it was 9:00. It might have been 8:30. You had -- had to be -- you were required to have everything scanned in by 9:00, so you had to get there -- you know, you couldn't get there later than -- than 8:30 or so without having somebody climb all over your back.

Q. And who told you that there was a requirement to have everything scanned by 9:00?

A. I believe every manager has said that everything had to be scanned into the terminal so he could send it off to Pittsburgh or wherever it goes.

Q. And was that a change from when you had worked in the Seattle terminal?

A. I don't remember ever hearing a deadline like that in the Seattle terminal. Because they had those three waves. I mean, the last wave you couldn't get out of there until, you know, 10:00,

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

IN RE: FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION DEAN ALEXANDER, et al.,

Plaintiffs,

vs. Case No. 3-05-MD-527-RM

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

---

DEPOSITION OF JEREMY BRINKER

Taken on behalf of the Plaintiffs

January 26, 2007

- - -

BE IT REMEMBERED THAT, pursuant to Federal Rules of Civil Procedure, the videotaped deposition of Jeremy Brinker was taken before Jea H. Oh, a Professional Shorthand Reporter, and a Notary Public for the State of Oregon, on January 26, 2007, commencing at the hour of 9:09 a.m., in the Law Offices of Fisher & Phillips, LLC, 111 Southwest Fifth Avenue, Portland, Oregon.

11:18:05 to acquire this truck and this route?

11:18:08 A. Yes, sir.

11:18:09 Q. Okay. And you were going to need to generate enough income to service those loans, right?

11:18:12 A. That is correct.

11:18:14 Q. Is that possibly what you were referring to there?

11:18:19 A. It is possible.

11:18:20 Q. That was a concern you needed to take into account when you were acquiring this business, correct?

11:18:27 A. That is correct.

11:18:28 Q. Now, the last section there, there's a line across there. It says, "Offer goals/objectives. Make him sweat my offer." What did you mean by that?

11:18:38 A. I wanted him to have something to think about. I didn't want him walking out there with, you know, that offer's just not even close or yes. You know, I didn't want to offer him full price. We're in a business negotiating mode here. I wanted him to go home and sweat that offer out; you know, really think about it. I wanted to give him enough morsel to chew on for a while.

Q. And second line here it says, "Don't communicate that I potentially have more than offering." That's self-explanatory.

A. That's self-explanatory.

Q. The next line down, quote, "Lock up deal. Take into consideration my dedication, team player attitude." What are you referring to there?

A. At this point I did not understand Brett Davis's role within the FedEx business model, and I was trying to communicate here that I have some good skills and a team-player type attitude to bring to the table, thinking he would consider those positive attributes as partial compensation because I was prepared to offer him less than he was asking for. I didn't know at the time that he didn't really care; it was just the check to him, the money to him. I thought maybe his reputation to FedEx may be enhanced by recruiting me because I was going to perform as I had done in the past and tried to do in everything that I've ever done, so --

Q. Okay. What does the last line here say? "If not -- " Well --

A. "Accepted."

Q. Yes. "If not accepted," and then, "encountered," and then there's some words crossed out there. "Close with, 'I will look at numbers. Please call me if you -- "

A. " -- don't get an amiable offer or -- " I

can't read that word before "offer." But this basically refers to if I couldn't get the deal locked up that day for what I was going to offer him, not to kill the deal, to close it with some outs. You know, let him know, "Okay. Well, I'll go ahead and look at the numbers since you're -- " You know, I was thinking he would counter and say, "I want more than that." And I was going to counter with, "You know what? I'll go look at the numbers, and why don't you give me a call if you don't get any other offers you find acceptable."

Q. Okay. And how did that meeting end then?

A. I threw a number at him, and he said he would think about it. There was no further negotiation at that meeting, if I recall.

Q. Did he make much effort to convince you that should be what he was asking or a higher number?

A. If I recall, he said, you know, "I'm looking for more than that, but I'll think about it." And the deal had come to -- and it slowed down more than I wanted it to at that point.

Q. All right. Now, you said after you spoke with Brett Davis, you spoke with FedEx, right -- people at FedEx?

A. That's correct. I had a meeting with Jerrod Grim, the terminal manager, to ask him some specific

11:55:35 template, right. I wouldn't have the experience to
11:55:39 write something this specific. I've written several
11:55:42 purchase and sale business agreements -- maybe not
11:55:42 several, but a couple anyways, selling and purchasing
11:55:45 businesses, but I'm sure I used some kind of template
11:55:45 to draft and cover everything, right.
11:55:46 Q. But then you tailored it to a
11:55:46 specific document?
11:55:50 A. That's correct. Yeah, I definitely needed
11:55:51 one.
11:55:52 Q. And there it lists the actual zip code that
11:55:56 you're intending to buy?
11:55:57 A. That's correct.
11:56:03 Q. And the price is $35,000, right?
A. That's correct.
11:56:05 Q. And that's -- that's for the route. And,
11:56:09 actually, let's take a look at Exhibit 6.
11:56:12 A. Okay.
11:56:13 Q. And this is -- 2159 is the first page, and
11:56:14 this is a, "Vehicle Conditional Purchase and Sale
11:56:17 Agreement."
11:56:17 A. Right, that's correct.
Q. And you drafted this document yourself?
A. I did.
Q. And why did you call it a conditional

Case 3:05-md-00527-RLM -CAN document 958-6 filed 11/16/07 page 6 of 12

purchase and sale agreement?

A. It should probably read vehicle condition -- oh, no, right. This is my conditional -- right. This is, hey, I'm paying you for this truck, but it must meet these requirements. So it's a conditional -- some of the requirements had not been met at the time I drafted this document.

Q. Okay. And what were those conditions?

A. Specifically, the big heavy hitter was the shelving that needed to be installed to meet FedEx requirements of how my vehicle should be set up.

Q. Okay. Now, let's see, the zip code, the route asset purchase agreement for the zip code was $35,000, right?

A. That's correct.

Q. And the vehicle is $25,000, right?

A. That's also correct.

Q. So that adds up to $60,000?

A. Which is also correct.

Q. And is that -- is that the original price that he had asked for -- that Davis asked for?

A. I think it is. I think he finally got what he was asking for.

Q. So he never backed down?

A. No, not really. There was some other things

that went into it, but, right. So, yes, basically I gave him what he wanted. It came to a point where I gave him -- he might have been asking 65. I don't remember. I find it hard to believe that I would give anybody full price for something like that, but it could have happened.

Q. How much time -- this is dated October 28th, 2003.

A. That's correct.

Q. How much -- well, actually, let's look back at one of those exhibits. It mentions a meeting at Starbuck's, right?

A. Right.

Q. Exhibit 3?

A. That would be Page 3 of Exhibit 2134.

Q. Exhibit 1, right?

A. Right, Exhibit 1.

Q. It doesn't give us a date, though, does it?

A. No.

Q. There's a time.

A. It says 1:00 p.m. and -- I'm pretty good about noting dates. I'm disappointed in my thoroughness.

Q. How much time do you think transpired from the time you had that first meeting with Brett Davis

packages increase?

A. Yes. Although not significantly, but, yes, they did.

Q. Now, you said that you lost control of your business, and one of the other items you mentioned was that FedEx told you what to drive, right?

A. Uh-huh.

Q. What kind of vehicle did you purchase from Mr. Davis?

A. I purchased what was referred to as a P550. It's a box van, box truck.

Q. What was the condition of it?

A. It was in good condition.

Q. Now, did you find that vehicle to be adequate for servicing your route?

A. I did, yes.

Q. That's a yes?

A. Yes. Sorry.

Q. Okay. However, you did mention to me that FedEx was controlling what it is that you drove, right?

A. I said to you, right, that I had -- that they were determining what I could drive, what -- and, specifically, if I were to buy a vehicle to service my route, what I had to buy. There was no option.

Q. So did there come a time when you wanted to

delivered was in the top five percent of the terminal.

Q. Was that consistent throughout the time you were a contractor?

A. That's correct, yeah. I don't want to float my own boat, but I did a fantastic job.

Q. That's fine. What was the -- what kind of criticisms were some of these other contractors getting that you were not receiving?

A. A lot of them had to do with their service levels, maybe they brought back too many packages; a lot of them had to do with safety issues; and I'd say the other third, let's say they were all thirds, were customer complaints. I'd say you could probably divide those up equally into thirds.

Q. What do you think it is that makes certain contractors better than others?

A. I don't want to speculate. I don't know. Maybe motivation.

Q. What time would you typically arrive at the terminal?

A. I would arrive between 6:00 and 6:30.

Q. Were you told what time you needed -- had to be at the terminal?

A. No.

Q. Were there contractors that typically arrived

later than you or earlier than you?

A. Yes. And that was heavily frowned upon. Arriving later was frowned upon.

Q. And what makes you think it was frowned upon?

A. Because I had heard things said by the terminal manager in a derogatory way about the people that can't get up in the morning or too lazy to show up on time even though there wasn't really a predetermined time. I just heard it spoken about in a negative way.

Q. And this is Jerrod Grim?

A. All the front people, to be honest. And I'll explain that just a little bit. Some of their performance is judged on how early in the day that they dispatch all their packages, how early they get all their routes dispatched out of the building. That goes on their performance reports.

Q. On the managers of the terminals' performance reports?

A. Right. Some of the people that don't show up until 10:00 or 11:00 brings down their average considerably. "Hey, you're not getting all your people out of the building by 7:30 a.m." You know, some of them were -- so they didn't like -- it was frowned upon, but I never heard any formal retribution for it -- or reprimand, sorry.

03:34:03 Q. Now, you say you arrived between 6:00 and 6:30, right?

03:34:06 A. Correct.

03:34:10 Q. Typically.

03:34:12 A. Right.

03:34:15 Q. Was that the time you wanted to arrive, or did you want to arrive at a later time?

03:34:19 A. No. It's fair to say that I wanted to arrive at that time.

03:34:24 Q. So you arrived at that time because you wanted to, not because you were going to be reprimanded if you arrived later?

03:34:33 A. That's right.

03:34:34 Q. And there were other contractors who consistently arrived later than 6:30, right?

03:34:41 A. That's correct. And there were a few that consistently arrived at 5:45, which is about as early as you can show up.

03:34:56 Q. Right. By arriving earlier, would you be able to complete your route earlier in the day usually?

03:35:04 A. Possibly. Because you're loading has occurred a little bit earlier than others, and maybe your closeout and paperwork is provided to you a little bit earlier than the others because you were there a little bit earlier than the others. But really you are

at the mercy of that last sort off the last truck -- off the last freight trailer. Nobody's going anywhere until they say that we're ready to go.

Q. Okay. Now, do you have a -- are you familiar with the term "turn-by-turn directions"?

A. I am.

Q. And what are those?

A. Those are a series of directions based on -- every turn that needs to be made, there will be a new direction line.

Q. Now, do you use those -- were those intended to be used for packing the truck, or for driving the route, or for both, or something else?

A. No. I would say their primary function was directions for driving the truck from one stop to the next.

Q. Okay. Now, did you follow the turn-by-turn directions -- did you receive these every day when you left the terminal?

A. I personally never used them.

Q. You received them, right?

A. No. I told them to go ahead and save the paper, that I don't require that to be printed every day because it's -- you know, it's at least that much paper every day.

EDWARD C. SLAYMAN
1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC.
EMPLOYMENT PRACTICES LITIGATION
DEAN ALEXANDER, et al.,
Plaintiffs,
vs. Case No. 3-05-MD-527-RM
FEDEX GROUND PACKAGE SYSTEM, INC.,
Defendant.

---

COPY

VIDEOTAPED DEPOSITION OF EDWARD C. SLAYMAN
TAKEN ON BEHALF OF DEFENDANT
AUGUST 21, 2006
- - -

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the videotaped deposition of EDWARD C. SLAYMAN was taken before Marcel Johnson, Registered Professional Reporter, on August 21, 2006, commencing at the hour of 1:39 p.m., the proceedings being reported at 111 Southwest Fifth Avenue, Suite 1250, Portland, Oregon.

LEGALINK®
A MERRILL COMMUNICATIONS COMPANY
420 Lexington Ave
Suite 2108
New York, NY 10170
tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171
www.merrillcorp.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Q. So would you -- you would get a mapping printout in the morning; is that right?

A. First off, you would get a sheet that would show name, address, city, how many packages involved. A lot of the times the drivers had to help unload the semis just so they could get out on there on time. Inadequate help in the terminal. I would sort it as to areas I was delivering in because I could not see delivering on the west side of town and have to chase the east side, clear back to the west side again, back and forth. Why drive added miles when you don't have to?

Q. So --

A. Why run 10 -- or 12 hours when you can do it in 10?

Q. So would you make changes on the -- on the form with the sequence of deliveries that you received?

A. I would just change the delivery sequence. I would not change the form. And then I was asked why I did not adhere to the delivery sequence.

Q. Did you -- you requested that they change the delivery sequence?

A. They told me they had the capability within their computer to do that, and refused to do

it.

Q. And what were you requesting be done?

A. The separation -- well, how do I explain this? First off, you -- let's say you take an area. You have a square. You have four different quadrants. You may have nine packages over here, six here, five here, four there. Why would you drive here, to here, to here, to here, to here, to here, to here, to here, back and forth. This is what they had you doing. They had no correlation of taking this area, say, hey, map those all into first stops --

Q. And just --

A. -- second stops, third stops, and your final stops.

Q. So --

A. You would come into each area and do nine, five, six, and four, rather than bouncing back and forth. Hey, we have that capability in the computer. Well, then map it.

Q. Okay.

A. They never did. They refused to do it. So I would change it out. I would go in and deliver nine. I would go in and deliver five --

Q. One second.

A. -- I'd deliver six, I'd deliver four, and they chewed me out because I didn't run back and forth and all over.

Q. Okay. Just so you know, when you write like that it doesn't show up very well on the record at all, so I'm going to try and go over what I think you're saying, which is their -- the area was split up. You would have it split up into four quadrants and you would go to deliver all your -- you wanted to deliver all packages in one quadrant first and then move to the second and then the third and then the fourth; is that right?

A. Yes. Their mapping, they said they had the capability in the computer to do that, but when you asked them to do it, they would refuse to do it.

Q. And they had you going back and forth between --

A. If you did it by theirs, yes. And I got chewed on several times because I didn't follow their sequence.

Q. How many times were you chewed out for not following their sequence?

A. I don't have enough fingers and toes.

Q. Did some terminal managers permit you to deliver in any sequence you wanted?

A. I don't know if it was permitted. I just did it.

Q. How many terminal managers were at the Portland terminal while you were contracted there?

A. Norm Rothwell. And then they had Jerrod Grim.

Q. So just two?

A. Yeah. I'm -- they had other guys in management, whatever, in there. I don't know what their titles were, but there were more chiefs than there were Indians.

Q. Was one of them easier for you to deal with than the other?

A. Not really. Jerrod probably a lot easier than Norm.

Q. And why was Jerrod easier than Norm to deal with?

A. I just didn't like Norm. He was too two-faced. He'd say one thing, turn around and do something else.

Q. What were their different management styles?

A. I don't really think either one had a management style. I think it was hit and miss, trial by error.

Q. When you were under contract with FedEx Home, did you have any other jobs?

A. No.

Q. Did you have other sources of income?

A. No.

MS. BREMER: Let's -- let's take a quick break, okay?

THE VIDEOGRAPHER: Going off the record at 2:30 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 2:36 p.m.

BY MS. BREMER:

Q. Mr. Slayman, you indicated that you had been chewed out for not following FedEx guidelines, and you gave an example of the mapping system. What were you told with respect to using the mapping system?

A. I was told the mapping system is the way that they want it delivered. I let it go, and I continued to do it my way, which was more efficient.

Q. And did both Norm Rothwell and Jerrod Grim tell you that they wanted you to use the mapping software, or was that one of them?

A. Their -- their sequencing, yes.

A. I based it upon what I based everything else at on, that's when I ran semis. Only scale was a little bit different gas mileage, a little different versus diesel. I ran my own analysis.

Q. And what did you consider?

A. Explain. Consider what?

Q. That your expenses would be.

A. I ran them on a daily basis, monthly basis, bi-annually, yearly. Didn't take into effect the big fluctuation that first started coming in or anything. I couldn't tell you exactly what my figures were then.

Q. Right. I guess I mean before you started -- before you signed the contract, did you investigate expenses?

A. I couldn't do -- I couldn't do a strong investigation until after I knew exactly what my costs were.

Q. Did you know what route you were being offered before you signed the contract?

A. Yes.

Q. And what route was that?

A. That was Battle Ground, La Center, part of Woodland, Amboy, and Ariel.

Q. Did you have to pay for your route?

A. Yes.

Q. -- after you started? And when you say that you were working 8 -- 8 to 12 hours, is that driving or from the time that you --

A. Oh, that's driving. By DOT rules and regulations, it's the time you leave your house. Because you're in a company van, you go in and you load, and if I wasn't there at 5 o'clock in the morning, I got a phone call, where are you, and I didn't have to be there till 8 o'clock.

Q. Did you always -- what time did you typically go to the terminal in the morning?

A. 5:00.

Q. Were all of the other contractors there when you got there?

A. Couple. We'd show up about that time.

Q. Everyone would show up about that time?

A. No.

Q. A couple people would show up about that time?

A. A couple people.

Q. You were the early birds.

A. It's an internal clock, a problem I have. I wake up early in the morning. I'd rather get the day started and over with. I would go in and I

would load and then at Norm's little whim, he might get me my papers by 8 o'clock.

Q. When would Norm typically come in?

A. I don't know. Never watched.

Q. How long would it -- would you load your own truck?

A. Yes.

Q. How long did that take?

A. Depends on if we had to help unload the semis, because they didn't have adequate help.

Q. If you did not have to help unload the semis, how long would it take for you to unload your truck?

A. If we didn't help unload the semis, we'd be there all day.

Q. So are you saying you always helped unload the semis?

A. We helped more than we should have, yes.

Q. When were they typically done unloading the semis?

A. Well, let's see. If they came in at proper time and if they had adequate help, they should have been done totally by 5:30, 6:00. Totally. But there were times they didn't finish up until 7:30, 8:00. There were times the trailers

miles for one box. I'm not going to Ariel.

Q. So you threw it off your truck?

A. Yeah. I threw it off the truck. I threw it in the back of Norm's pickup.

Q. And you continued to refuse to deliver packages to Ariel?

A. I refused to go to Ariel. I'm not going that distance for one box and make, what, $2.53? That doesn't cover my insurance or fuel.

Q. Did you ever talk to other contractors and decide among yourselves to switch around packages?

A. Once in a while we -- I didn't do it so much as other contractors would flex things back and forth, depending on their areas. Now, I was not in Portland, so I don't know what the city routes did. I know the Ground guy and I, every so often I'd run into him, we'd have a cup of coffee, and he's got one package going way out here. I've got four or five. I'd say, Here, I'll take it, and vice versa. We would do that, too. But that was a -- that was a rare thing, too, because we didn't always run into one another.

Q. And when that happened, did you tell anyone in management that you were swapping packages?

A. No. It's a driver helping a driver.

Q. Did you ever request that your route be reconfigured other than wanting to get the Battle Ground route back?

A. Be specific.

Q. Did you ever request that your route be split into two?

A. No.

Q. Did you ever think about acquiring another route?

A. No.

Q. Why not?

A. No money involved. After you pay the other driver, there was no money to be made.

Q. And how did you determine that there was no money to be made?

A. You go out and buy a $40,000 truck that's going to last you maybe two years and you're going to pay a driver approximately 100, $125 a day, you're going to pay workmen's comp, you're going to pay insurance. You're only making 900 a week, plus you have your fuel expenses. Doesn't take a brain surgeon to tell you there's no money involved.

Q. Were there some contractors in Portland who did have multiple routes?

address, name. Okay. If you have these top two packages going here and you have the bottom two going here --

Q. Somewhere else?

A. Yes. And you have, let's say, five packages going in the center, you have a choice. You can go deliver the first two up here, then your five, then your two and go home. Or you could do these two, these five, these two, go home.

Q. Right. I understand that, and we did talk about the sequencing --

A. And I would decide as to how I would do it, but I would have to take and decipher the mess that FedEx created on a piece of paper because this is how they wanted me to run around, and they told you approximate time and they put approximate miles. Let's say it's 295 miles. I ran their sequences twice. Not once were they anywhere near their mileage.

Q. So --

A. I put an average of 300 miles a day on. But to run by their sequencing, you could add another 10 to 15 percent.

Q. So once you decided the order that you wanted to deliver the packages in, how would that

influence how you loaded your truck?

A. It would influence how it's coming off. You have -- packages are not all the same size, okay?

Q. Right.

A. All right. So if I get a big box that's coming off in the last, guess what, it's going to be in the front of the truck. If I've got a little, tiny box about this big or an envelope, it's going to be sitting on the seat in between, in a box in between the seats. That way, I don't have to go to the back.

Q. And -- and how did you determine what was the most efficient way to load your vehicle?

A. Common sense. Common sense and knowing the area, is what I'm trying to explain. And obviously it's not registering.

Q. I ask that that last part be stricken.

A. No. I ask that it stay. See, she can laugh. All right.

Q. So when you came to the terminal in the morning, how often did you talk to FedEx Home Delivery personnel?

A. Good morning. I'd pull in, back the truck inside. Hey, good morning. That's where it was at.

A. Sometimes, yes. Sometimes I could have as low as 39. Other times I could have as high as 78. Sometimes I could have 50. I don't know what the percentage is.

Q. Do you know what the largest number of stops you had in a day?

A. Hundred-and-some.

Q. Approximately how many packages would you deliver a day?

A. You just asked me that. Stops --

Q. I asked stops.

A. -- work packages -- well, no, it shouldn't, because -- all right. The majority were single stops. Single packages. Occasionally you'd have one place that had maybe four boxes. Packages and stops were usually different. Example, 55 stops, 78 packages. 65 stops, 68 packages. Some would be multiple. But, yeah -- no --

Q. But generally most of yours were single packages?

A. No. No. I always had multiples on there.

Q. But were most -- most of your stops were for single packages, though?

A. A lot were, yeah.

Q. Did you have any pick-ups during the day?

A. I refused to do them because I wasn't getting paid for them.

Q. You refused to do pick-ups?

A. Because I wouldn't be paid for them.

Q. And why weren't you paid?

A. FedEx didn't feel Home Delivery drivers were good enough to be paid for a pick-up so I said, Fine, I won't pick it up.

Q. And who did you tell you wouldn't --

A. Told Jerrod Grim that.

Q. During the day, did you ever take -- take breaks or eat lunch?

A. Usually I worked through my lunch.

Q. Sometimes you did stop to eat lunch?

A. Sometimes.

Q. Would you stop sometimes at a sit-down restaurant, or would you take it on your truck?

A. Both. I'm the type, I'd -- I'd go to work, do my job, go home.

Q. Did anyone ever tell you that you couldn't take breaks or have lunch?

A. No. But it was one supervisor rode with me said, Why don't we just get it, eat it, and drive and work at the same time.

Q. And who was that?

A. Brian.

Q. And that was a day that he was driving with you?

A. Riding with me. Same with Jerrod Grim.

Q. And how would you determine whether or not you would take a lunch break on a given day?

A. God. Clarify that one, would you?

Q. Was it just your mood? Some days you just felt like taking a lunch? Sometimes you wanted to meet a friend?

A. Very good. Yes. Yes to all the above there. I mean . . .

Q. Other than lunch breaks, would -- would you take other breaks during the day when you were servicing a route?

A. Clarify that.

Q. Some days did you run personal errands when -- when you were servicing a route?

A. Such as?

Q. Any -- any personal errand.

MR. LARSON: You obviously haven't been up to Castle Rock and Woodland. There's not a whole lot to do up there.

BY MS. BREMER:

Q. And I -- I assume you don't have a lot of

dry cleaning?

MR. LARSON: That's true, too.

A. Excuse me? I've got 33 suits in my closet, my dear.

BY MS. BREMER:

Q. Okay. Well, sometimes would you stop -- did you stop to go to the dry cleaner?

A. No. Like everybody else, Hey, got to go to the bank. You pop it, you go to the bank. I always got taken care of right away because I delivered to that -- to my own bank up there all the time, so I was always rushed to the front and rushed out. So if I had any banking, just do that.

Q. So your bank was in your delivery area?

A. Not my bank, but a branch. Personal errands? In lieu of a lunch at times, yeah, I may turn around and stop at Freddy's and buy my kid something, or I may not.

Q. And you decided whether or not you wanted to take a break?

A. I take my breaks as I choose to take my breaks. That's the purpose of being a contractor. Not an employee. I'm not set or adhered to a set schedule.

Q. And you liked being able to do that, then?

A. Correct.

Q. Do you know if anyone from terminal management ever followed you on your route?

A. Of course they did.

Q. And how do you know that?

A. Because you'd see the guy lurking in various spots through town.

Q. What do you mean lurking?

A. We also knew what kind of car he drove. You'd see him from point A to point B.

Q. And -- and who was it?

A. A little, short guy that worked in security with his mustache who was in the room when I was terminated. Him and another big bozo from security. Pretty bad when you've got -- when you're -- terminate a man's contract, and they've got to have two people from security in the room. What a joke. Same guy that followed me around. I always knew he was back there. I'd wave to him.

Q. Did anyone tell you why you were being followed?

A. Are you kidding me? No. They wouldn't even tell you you're being followed, but we'd know.

Q. How often were you followed?

A. I was followed three times that I know,

4:39.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 4:43.

BY MS. BREMER:

Q. How far away from the terminal did you live?

A. Approximately 7 to 8 miles.

Q. 7 to 8?

A. 7 to 8.

Q. So would that take you about how long to get to the terminal in the morning?

A. Depend on traffic.

Q. On average.

A. 10 minutes, 15 minutes, 20 minutes.

Q. Did you have any customers with late delivery windows?

A. Clarify.

Q. Did -- were you ever given any specific windows of time during which you had to deliver a package to a particular customer?

A. That's correct.

Q. And were -- were any of those delivery windows after, say, 4:00 p.m.?

A. I wouldn't deliver them if I was done. I

would deliver them early, but not late.

Q. Were -- were you given any delivery windows that were later in the afternoon or into the evening?

A. Yes. And as I told Jerrod, I said it's against DOT and IRS rules and regulations in regards to contractors. You cannot set my time. And I would always find a way to deliver.

Q. When did that occur?

A. Numerous times.

Q. Was there a particular customer --

A. I don't know dates.

Q. Was there a particular customer that would have a later delivery time?

A. Not a particular.

Q. And you would just make arrangements yourself to -- to make the delivery?

A. That's correct.

Q. Did you ever have pick-ups or deliveries to or from Kinko's?

A. I would not do pick-ups if I wasn't getting paid for it.

Q. And you didn't make deliveries to Kinko's; is that right?

A. No. I made deliveries.

wouldn't. Sometimes I'd just say to hell with it, go to bed, get up and do it at 4 o'clock in the morning because it always went through at 4 o'clock in the morning.

Q. So -- so what was required? Was -- was it a -- some type of modem that you were hooking it up to?

A. Right.

Q. And then it transmitted the information --

A. Correct.

Q. -- to -- to FedEx?

A. And the time you transmitted it. But that was not considered the close of the day. The close of the day was once you've scanned all your packages, you have to close out the scanner. And that's not so. You still have an hour to drive home. You're still, under DOT rules, driving time.

Q. When you first started servicing your route as a contractor for FedEx Home Delivery, what vehicle did you use?

A. As I answered previously, before I could sign a contract, I had to purchase a truck. Truck was purchased.

Q. What type --

A. Anything -- I had a Chevy with a cube van

on it. Single axle.

Q. And how did you decide to buy the Chevy with a cube van?

A. That's all they said they needed -- I needed.

Q. Were there other options that they gave to you?

A. Yeah. I could have gotten by with just a regular van, but that would have never lasted. So I just bought a cube truck. No big deal.

Q. And you decided that the cube van would be better for you than the -- than just a regular van?

A. Right.

Q. And why was that?

A. More room. If the area did grow, you could actually carry more packages.

Q. Did you buy a new or used truck?

A. New. New.

Q. Did you buy or lease it?

A. Buy.

Q. Why did you decide to buy it?

A. Why would I lease it? It would have cost me more to lease.

Q. So you decided to buy it because it was less expensive to do it that way?

A. Correct.

Q. How much did you pay for your Chevy cube van?

A. 40, 42. Don't recall the actual figures, but somewhere in there.

Q. Did some of the contractors in Portland use different types of vehicles?

A. Yes. Some were required, when they came on, it was just a van. Some were required cube vans. Some went bigger trucks. By choice.

Q. What did you do to make sure that your vehicle was maintained?

A. Been driving trucks too long. I -- I have always maintained my trucks. Did it myself.

Q. And what types of things would you do to maintain your truck yourself? I'm just wondering how far you went. Were you changing the oil yourself? Changing the tires?

A. Brakes. Fuel filters. Oils. Transmission. Anything.

Q. So you would -- you would make your own repairs to the truck, too?

A. Yes.

Q. Did it --

A. If it was feasible. If I had the time and

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

COPY

In Re: FedEx Ground Package System Inc., Employment Practices Litigation

KATRINA LEE, et al.,

Plaintiffs,

v. No. 3:05-MD-527-RM

FEDEX GROUND PACKAGE.

SYSTEM, INC.,

Defendant.

---

VIDEOTAPED DEPOSITION OF JONATHAN PAUL LEIGHTER

TAKEN ON BEHALF OF THE DEFENDANT

TUESDAY, AUGUST 21, 2007

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the videotaped deposition of JONATHAN PAUL LEIGHTER was taken before Janette Dukic, Court Reporter and Notary Public, on TUESDAY, AUGUST 21, 2007, commencing at the hour of 8:41 a.m., the proceedings being reported at 111 Southwest Fifth Avenue, Suite 1250, Portland, Oregon.

Q. So the question I was asking was -- I just want to make sure I understand your answer -- do I understand correctly that being an independent contractor as opposed to an employee was not a -- was not a big factor in your decision to accept the contract from Matt?

A. No.

Q. Were you required to pay any money for the route?

A. No.

Q. At the time that you were offered the contract, you said that you were a package handler for ground and you didn't really interact much with Home Delivery, correct?

A. Yes.

Q. Did you do any work to figure out the differences between Home Delivery and Ground before you signed the contract?

A. No, not really.

Q. Are there differences between the two operating companies, Home Delivery and Ground?

A. The only thing I see is different is they get paid more than we do.

You know, I have talked to a couple contractors and talked to them about the pay and

what your proprietary interests or other rights are --

A. No.

Q. -- to your route?

And when you signed this agreement, you understood that you were -- you would be an independent contractor, correct?

A. Yes.

Q. And that was your intention when you signed this agreement was to become an independent contractor?

A. Whatever it took to get on and -- you know, I just wanted to -- wanted to work there and have the job.

Q. Do you care today about whether or not you are an independent contractor or an employee?

A. Yeah.

Q. And what are your feelings on that question today?

A. I feel that I am not really being treated as an independent contractor -- all the guidelines we have to follow. You know, my outlook has changed since I started there.

Q. And would you like to be what you consider to be an independent contractor or would you like to be an employee?

A. I would prefer to be an employee.

Q. Okay. So even if the company was to make

A. Yes.
Q. Do you see next to two years, there are the initials, JL?
A. Yes.
Q. Are those your initials?
A. Yes.
Q. Do you remember writing that?
A. Yes.
Q. So is it correct to say that you elected a two-year term for your two-year initial term for your contract?
A. Yes.
Q. Before signing your contract with Home Delivery did you -- did you consider incorporating as a business?
A. No.
Q. No. Since signing your contract -- well, let me ask you. At that time, did you know that was an option?
A. Yes.
Q. And you decided not to do it?
A. Yes.
Q. Since that time, have you incorporated as a business?
A. No.

after being turned down the other two times. He said he didn't think I was interested in doing it.

Q. And you told him that you would have been interested?

A. Actually, that time I said, well, you denied me the first two times, so you are probably right, I probably wouldn't want a second route at this time.

Q. Would you like a second route today?

A. No.

It is less of a headache just going to my part-time job, and I can make just as much money doing that to make me happy.

Q. Looking back, are you happy that you didn't get a second route?

A. Well, the second routes they had then were out-of-town routes, which wouldn't have really benefited me, anyway.

Q. So you were requesting routes that you think would have been beneficial to you if you would have received them?

A. The only routes I would have been taken would have been in-town routes, and they didn't have any available at that time.

Q. So the routes that you requested the first two times were out-of-town routes?

A. Yeah, they were just routes that came up.
Q. And you requested those routes even though they were out-of-town routes?
A. Yeah, I would have taken then, them, but they denied me, and now I look back and it doesn't matter to me. I am just as happy not having taken them when I look back.
Q. You think maybe it would have been -- maybe lucky that you didn't get them?
A. Yeah, because I see the contractors that are running them now and the issues they have, and I am just kind of glad -- I think the in-town routes are the better ones to have.
Q. Was the third route an in-town route?
A. It was a coast route.
Q. Is that like a rural route?
A. Yeah, it's mostly rural.
Q. Have you ever asked to have your route split into two?
A. I have about a month ago, a month or two ago.
Q. A month or two ago. And what was the response?
A. They said that it wasn't big enough to split to make two routes out of it.
Q. Do you agree with that?

A. I think it could have been split, you know. I was doing -- at that time they were giving the extra stuff off to a supplemental driver for one of the other contractors, but at that time my route was bringing in a hundred forty, a hundred fifty stops.

To me, when other contractors are going out with 60 or 70 or 80 stops, that is almost two routes right there, you know, a hundred fifty stops.

Q. Are the contractors who go out with 60 or 70 stops, are they doing rural routes or are they doing urban routes?

A. Some are rural. Some are in town. Maybe the rural routes do 40 to 50, and the in-town ones are doing 70 or 80 stops.

Q. When you requested either to have a second route or to have your route split, did you do that thinking that it would be economically beneficial for you?

A. I don't know if it would have been beneficial.

I was the one that split, not even for my benefit, just because I told them that I couldn't be doing this many stops in the day, and you guys need to keep me with my primary work area and get rid of my secondary work area.

Q. Okay. What do you mean by your secondary work

Q. Did you ever ask other contractors if they would be willing to take part of your route?

A. Just on a daily basis.

Q. Not permanent?

A. No.

Q. So on a daily basis if you have too many packages, you will ask someone else to take them?

A. Yes, just on Ground side or someone close to my area. Usually on Ground side, they will take some stuff for me.

Q. Have you ever taken packages for other contractors?

A. On Ground side, yeah. I take packages for people that are in my area. I don't go outside my area, because that wouldn't make sense to me.

Q. So if a contractor had packages in your area on the Ground side and they felt that they didn't want to go there or for whatever reason, they could come to you and ask you to take their packages?

A. Yes.

Q. And you have done that on occasion?

A. Almost all the time, yes. Almost on a daily basis.

Q. Have you ever turned a request down if it is in your area?

A. Yeah.

Q. Why would you accept someone's packages if you are not responsible for 'em?

A. I would help 'em out. If I have a light enough day and they need help, then I will help 'em out.

Q. Is there any benefit to you to taking their packages?

A. Well, financially, there is, but also just to be a good person and help 'em out if they need help.

Q. I imagine these might be the same people who would take your packages if you need help?

A. Yeah, it is just a joint thing that we do.

Q. Did you ever talk to the management about doing this or do you just do it on your own?

A. No, they know we do it. We just do it on our own on a daily basis.

Q. And you have never had someone else's route permanently put on your route, have you?

A. No.

Q. Before you entered into the contract, did you have any training or take any courses?

A. I didn't have any training or anything. They just told me how it works, and, you know, I didn't have to do the training they do now, as far as the driving school and all of that stuff.

for you?

A. No.

Q. No?

A. They would say something if I did something out of the ordinary or anything like that.

Q. Did anyone ride with you when you started servicing your route?

A. They do ride-alongs, yeah.

Q. But when you first started servicing your route?

A. No.

Q. They didn't ride along with you?

A. No.

Q. You said that your stop count has increased over the time you have been a contractor.

A. Yes.

Q. What do you attribute the growth in packages to?

A. Just people moving into the area that I service, a lot of new subdivisions.

Q. Have you ever done anything to increase the package volume on your route?

A. No.

Q. No. You have never solicited customers?

A. No.

Q. So you have never worked a Monday or a Sunday?

A. Only if they have asked during peak and we have gotten permission.

Q. So there have been some days that you have worked six days a week?

A. Yeah, maybe once or twice a year.

Q. How does your typical day start?

A. Just get out of bed, go to work, and set up the scanner and scan all of the boxes, and load 'em on the truck.

Q. What time does that -- what time do you generally get up in the morning?

A. I get up about 5:30.

Q. Is that the same every day?

A. Yeah.

Q. And you get to the terminal at the same time every day?

A. Yeah, usually ten to six.

Q. Ten to six?

A. Or six at the latest. Depends on how fast I get out the door.

Q. And is your truck at the terminal?

A. No, it's at home.

Q. So you park your truck at home?

A. Yes.

Q. And that's every night?

A. Yes.

Q. And you arrive at the terminal either ten to six or six o'clock?

A. Yeah.

Q. Is that your choice to do --

A. Yes.

Q. -- to arrive at that time?

A. Yes.

Q. Why do you arrive at that time?

A. Because I know how busy my route is, and if I don't get to there at that time, the route won't get serviced completely.

Q. So no one has ever told you that you have to be in by six o'clock?

A. No.

Q. If there was some day that you knew you were going to be light, would you come in later?

A. No.

Q. So you would always come in at that time?

A. Yes.

Q. Would that be because you would rather, if you knew your day was light, you would rather finish early --

A. Yes.

Case 3:05-md-00527-RLM -CAN document 998-8 filed 11/16/07 page 13 of 18

Q. -- than start later?
A. Yes.
Q. What do you do when you get to the terminal after you have set up your scanner?
A. Just scan the boxes, and load 'em as I scan 'em into the back of the truck.
Q. So the boxes are waiting for you when you get there?
A. Yes.
Q. And you load your vehicle yourself?
A. Yes.
Q. Do you -- does Home Delivery suggest the order in which you deliver -- that you should deliver the packages?
A. They give us out a turn-by-turn. When you scan the stuff up, it gets put into the computer and the computer spits out the way it thinks it should be set up and delivered.
Q. Do you decide how to scan, what order to scan the boxes in?
A. I do, yes.
Q. And that's based on your knowledge of your route?
A. Yeah.
I start with the highest numbers and end with

Do you feel that the computer does a good job in giving you the most efficient way to deliver your packages?

A. Yes.

Q. Do you ever vary from it at all?

A. Just occasionally in one area that the computer flops it for some reason and puts it to where it doesn't quite recognize some of the side streets, and so I have to do that every day. There is an area of my route where if I did it that way, I would be driving back and forth several times.

Q. And so I imagine -- well, strike that.

Is there any repercussion for not following the turn-by-turns at that point?

A. No.

Q. And if you wanted to, you could deviate from those turn-by-turns at any point?

A. Yeah.

I would assume I could do the whole route backwards and they probably wouldn't, as long as the stuff got delivered.

Q. From the moment you get to the terminal, which is around six a.m., what time do you -- how long are you at the terminal before you drive out?

A. Usually about an hour.

Q. An hour. And other than setting up your scanner and loading your boxes and picking up the turn-by-turn directions, is there anything else you do while you are there?

A. Not really. You know, maybe talk to some of the other contractors while we are getting our stuff, but --

Q. Do you ever -- is that hour that you are there, is that full-time working or is some of that socializing?

A. It is mostly -- it takes me about 45 to 50 minutes to load my truck and get the paperwork, and then I spend a few minutes just talking to the contractors.

Q. So would you say out of the hour, maybe five minutes are spent socializing?

A. Five to ten at the most.

Q. Five to ten?

A. At the most, and then I am out the door.

Q. Have you ever been told what time you have to leave?

A. No.

Q. Does anyone ever prevent you from leaving?

A. The only times they prevented us from leaving is when we are waiting on ground stuff, in case they have Home Delivery packages on their trailers, if are

MR. BRENNER: Let me just finish this point, and then we will.

BY MR. BRENNER:

Q. Have there been points -- earlier on when you were a contractor, were you able to take more breaks than you can today?

A. No, I chose not to.

Q. Did anyone ever tell you, you had to or could not take breaks?

A. No.

Q. So no one from management has told you either way what you can do about breaks?

A. No.

Q. Okay. Do you ever conduct personal business during the day?

A. No.

Q. You never run an errand or see a doctor?

A. No.

Q. I am sorry?

A. No. Sorry.

MR. BRENNER: I think we can break here.

THE VIDEOGRAPHER: This concludes tape number 1. We are off the record at 10:29.

(A brief recess was taken.)

THE VIDEOGRAPHER: This begins tape number 2.

Q. So it is not really an issue?
A. Not really for me, no.
Q. At the end of the day, you said that you -- well, you said you park your truck at home at night --
A. Yes.
Q. -- correct?
A. Yes.
Q. And you do that every night?
A. Yes.
Q. So is it correct that when you are finished your route, you just drive home?
A. Unless I work at my part-time job in the evening, and then I take my truck there, you know, lock it up, and then when I am done there, I take it home.
Q. Okay. Do you end your day every day at the same time?
A. I am usually done around 4:30, five o'clock every day.
Q. You are done delivering packages at that time or you are home at that time?
A. No, I am done delivering packages. If I don't work at night, then I go straight home, yes.
Q. How long does it take you to get from wherever your last stop is to your home, in general?
A. Maybe five, ten minutes.

out of school.

Q. So there are days that you finish earlier than 4:30?

A. Some days, but not very often.

Q. What is the earliest you have ever finished?

A. Maybe 3:30, 3:45.

Q. That's a good day, right?

A. It is a good day unless I have to go to my other job.

Q. Right.

A. Then I just have time to take a nap in between.

Q. So your day ends when you finish delivering your packages?

A. Yes.

Q. And you can with some -- you have some control over how quickly you are able to deliver the packages, correct?

A. Yes.

Q. Has Home Delivery ever told you that they want you to stop delivering by a certain time?

A. No.

Q. Did they ever tell you how many hours they want you to work on a given day?

A. No, just work until you are done.

**DECLARATION OF SAMUEL DAVID DORNER**

I, Samuel David Dorner, am over 18 years of age and make this declaration based on personal knowledge.

1. I am an independent contractor for FedEx Ground in Medford, Oregon, which is located off Interstate 5 approximately forty miles north of the California border and 280 miles south of Portland.

2. I left a mid-level management job with a Fortune 100 company in Atlanta and relocated across the country to operate a FedEx Ground route in Oregon. I bought the route and two trucks in June 2004 paying $95,000 (one times annual route revenue) and have not looked back. The trucks were worth less than $10,000 at the time of the sale.

3. After working for eight years at Best Buy Company, Inc. and receiving several promotions, it was clear to me that to advance within the company I would have to leave Georgia, where I was raised.

4. While I was considering my future with Best Buy, my father-in-law told me about a FedEx Ground route he knew was being put up for sale by a contractor on the West Coast, near his hometown. The more I thought about it, the more interested I became. I was likely going to have to relocate in order to continue advancing with Best Buy, and I knew my wife would welcome a move close to her parents.

5. After a period of intense review and preparation, I resigned from Best Buy, bought the route and we moved to Oregon. I would never have left had it not been for the opportunity to run my own business and own a delivery territory leveraging off FedEx's brand name.

6. We immediately incorporated as Dorner Enterprise, Inc. in July 2004, with my wife as officer and 50% shareholder. She started working as a driver, and has since transitioned to managing payroll, bookkeeping, and our newborn.

7. My transition from salaried manager to independent contractor has been challenging, but we are on a firm footing as we approach our third anniversary in July. I am presently making more than I did at Best Buy and our profit margins should continue to increase as we grow the business and pay down our new $32,000 and $50,000 delivery trucks.

8. Our gross revenues have continued to rise beyond expectation due to the surge in population and economic growth in and around Medford, which has become the region's primary commercial center. We deliver and pickup FedEx packages in the area immediately south of Medford, including Ashland. Ashland sits at the foot of Mt. Ashland and is fast becoming a

Northwest cultural hub due its hosting the popular Oregon Shakespeare Festival from February through October. Our package volume is steadily increasing as the entire area has become a trendy and comparatively low-cost relocation and retirement spot for Californians and other transplants.

9. My decision to leave Best Buy was motivated by understanding that my business relationship with FedEx Ground would give me ownership of a defined delivery territory and control over whether and when to delegate driving and route servicing responsibilities. The power to hire, pay and supervise other drivers was critical to my career change. It was never my intention to drive a delivery truck through to retirement.

10. I am currently driving five days a week, however, I am currently training a driver to drive my route full time. Best Buy would never have permitted me to hire and supervise someone to do my job.

11. At the same time managing employees who often work miles out of sight creates headaches and operational risks well beyond those I addressed on the floor at Best Buy. For example, one of our drivers failed to service the Southern Oregon University bookstore in Ashland for nearly a week during the peak delivery season running up to Christmas, despite a sign on the front door posting hours as open. I fired the driver and had to pay a personal visit to smooth out the situation with the head of the bookstore. I assured him that I was adding Southern Oregon University to my personal delivery route because I recognize that retaining customers is vital to the continued success of our small business.

12. Package volume on our first route grew to the point that in October 2006 FedEx Ground agreed to split the route into two routes, and in effect pay us considerably more to service the same territory that we acquired in June 2004. In addition, we recently acquired a FedEx Home route from another contractor. The Home route is particularly good fit. It gives us exclusive right to deliver to a zip code of homes contained within the route where we have been delivering FedEx Ground packages to businesses since mid-2004. This positions us to profit from delivering goods bought by local households over the Internet.

13. By acquiring and managing concentrated routes, we are now well positioned to service the delivery and shipping needs all FedEx customers, both business and residential in our fast-growing territory south of Medford. The driver that we hired to service the FedEx Home route can trade packages with me and our other drivers servicing the high-volume FedEx Ground route on an as needs basis either on the loading dock or with a phone call during the day.

14. We have also made our overall operations more efficient and productive by developing relationships with local firms. For example, my father-in-law's skill as a certified mechanic along with his local contacts have allowed us to safely reduce operating costs and get the most out of our four trucks.

15. I have increasingly focused on trouble shooting and growing our business. For example, we secured health insurance for ourselves, our child, and our three employees. After a lot of looking, we obtained coverage on competitive terms from a local broker through Pacific Source Health Plans. It is a far more affordable policy than the policy offered through the National Association for the Self Employed which we canceled.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct, to the best of my knowledge. Executed on this 27 day of February 2007, in Medford, Oregon.

S. David Dorner

Samuel David Dorner

**DECLARATION OF KEVIN B. MARTIN**

I, Kevin B. Martin, am over the age of 18 and make this declaration based on personal knowledge.

1. I am an independent contractor for FedEx Ground in Newport, Oregon, which is located along the central Oregon coast about 125 miles south of the mouth of the Columbia River along Highway 101.

2. Before becoming a contractor for FedEx Ground, I spent fourteen years working as an employee in the Lincoln County school system as a bus driver, a warehouse delivery driver and, for my last three years, as a school district courier. As district courier, I averaged 40 stops a day delivering packages, interdepartmental mail, and other items to and from every school facility in district, including administrative and maintenance facilities.

3. After years of staffing nearly all work internally, including courier work, food services, custodial, and school busing, the school district came under increasing budgetary strain, and in 2003 I learned I would be laid off. My supervisor liked my work as district courier. But due to job outsourcing, a custodian, with more seniority whose job had been contracted out, had the right under our union agreement to "bump" me out of my job.

4. At the time I had just gone from paying my sister $500 a month in rent to live on my grandmother's farm near Newport to buying a home 15 miles in-land in Siletz, with a $1300 mortgage.

5. I got a job driving for an independent contractor who owned the FedEx Ground route primarily servicing Newport and South Beach. I drove his truck and delivered and picked up FedEx Ground packages for him for two years making $700 a week. He was responsible for maintenance, paid the operating expenses, and I just drove. In those two years before I started working for myself, I probably delivered to every business and most residences located along a 22-mile stretch of Route 101, and inland and rural areas as well, because FedEx Ground delivers to both.

6. In June 2005, the contractor whose route I was servicing decided to sell his route. I bought his Newport/South Beach route for $13,000 using a 6.9%, no collateral loan offer sent to me in the mail by a credit card company. I did not buy his delivery truck because it had over 200,000 miles on it, and I wanted something more reliable.

7. I contacted a company in Portland instead and leased a new, $44,000 P-1200 delivery truck. The truck has more cargo capacity than I need even today and a durable diesel engine which gets better fuel mileage than a gas engine.

8. FedEx Ground packages arrive every weekday morning at around 6:00 a.m. via a line haul truck that comes over the mountain from the FedEx Ground terminal in Portland and pulls into a gravel lot across from the Dairy Queen in Toledo, eight miles inland. If the line haul drivers are new and unfamiliar with our operations they pass right by and wind up at the beach.

9. From that lot we operate out of a stationary truck trailer with four cargo doors equipped with underground wiring that provides light and powers an unmanned fax machine that rarely rings. The closest FedEx Ground terminal and manager is 90 miles away in the state capital. The manager might come over once a month.

10. My driver and I offload packages from the line haul truck through the stationary trailer and then load them on my trucks. We glance at familiar customer addresses, divide packages between the two trucks, and sort them more on each truck based delivery schemes in our head that we find most efficient. After we load we go out and make our deliveries rarely contacting Salem.

11. I go out of my way to make it easy for businesses along my route to use FedEx Ground rather than any other shipper. I make a point to give local businesses, even emerging home businesses, the FedEx Ground sales number so they can establish an account and I give them my cell number so that they can call me directly if they have a package they need to ship. My route has grown from 80 to 100 plus stops a day since June 2005.

12. In 2006, the Fed Ex Ground manager in Salem approached FedEx Ground contractors here about our running an evening shuttle back to Salem loaded with outgoing packages. I agreed to do the job, went out and leased a $40,000 step van, and hired a driver I know who was out of work at the time to run to Salem (and back empty) five nights a week. This makes my company, KBM Delivery Co., $650 or so a week and helps build the FedEx brand along the central Oregon coast. The local Walmart as well as small coastal galleries, and specialty shops along my route, and outlet stores and business on other local routes that I do not own now have a competitive alternative to UPS. They can ship their merchandise by FedEx Ground with next day delivery to Portland and other locations in the Northwest.

13. With the money I make running the shuttle, I have been paying my driver to service the southernmost parts of my Newport/South Beach route. Customers throughout my route are now getting their packages delivered and picked up earlier than in years past, and I am free to get home by 3:30 p.m. while making considerably more than the $23,000 that I made while I was employed by the school district.

14. I like being an independent contractor even with the risks it presents and the pressures that come with my being responsible for getting the job done no matter what happens. As an independent contactor, I won't have my contract terminated for doing a good job, which is more security than the union gave me as an employee-driver after fourteen years on the job.

15. I am positioned with two trucks and a driver to meet the anticipated increase in FedEx Ground business in my territory, and I am interested in buying the route that runs immediately to the south of my route, which the owner has indicated some interest in selling.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct, to the best of my knowledge. Executed on this 2nd day of March 2007, in Siletz, Oregon.

Kevin B. Martin

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *All Coordinated Cases* | CHIEF JUDGE MILLER |

**DECLARATION OF DENNIS OATES IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Dennis Oates, declare:

1. I am currently employed by Defendant FedEx Ground Package System, Inc. ("FedEx Ground") as Managing Director of Field P & D Engineering Performance. I have been employed by FedEx Ground since approximately 1998 in the engineering group and I have held my current position since June 2005. In this position, my primary responsibilities include directing the inbound or preload engineering group, outbound engineering group, Home Delivery division ("HD") Regional Operations Engineering Manager ("ROEM") support, and Ground division ROEM support. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2. Although both the HD and Ground divisions use the same term "primary service area" to describe the area in which the contractor has proprietary interest, the "primary service

area" concept varies significantly between HD and Ground. At Ground, a contractor has proprietary interest in an entire geographical area, known as a route, and has a consistent proprietary interest in that route day in and day out. Every geographical area is therefore owned by a contractor. At HD, a contractor has proprietary interest in a zip code, and there are thus large areas that in which no contractor has a proprietary interest. Instead, different HD contractors service those areas, depending on the service needs of the day. Reconfiguration at HD and Ground have different impacts on a contractor's proprietary interest as the result of the different proprietary interest structures.

3.     For those contractors who service areas with a low density of customers and low package volume, the "core zone" payment makes up a significant portion of their settlement. For other contractors who service highly concentrated areas, their "core zone" may be very little, potentially even zero.

4.     There is no limit to the number of work areas a contractor may own overall, but there is  a limit on the number they may own at any given terminal, which depends on the terminal's size.

5.     Only contractors who contract with the Ground division may choose to participate in the Flex Program, which is a voluntary program. If a Ground contractor elects to participate in the Flex Program, he agrees that Ground may provide him with additional packages and in return, Ground pays the contractor a fee regardless of whether packages are actually flexed to him. Packages are not taken away from a Ground contractor's proprietary service area absent a service failure or consent.

6.     No Flex Program exists at the Home Delivery division. Thus, contractors who contract with HD do not choose to participate in and are not compensated for participation in any

flex program. Instead, packages to unassigned areas are allocated using a HD-specific software program. Packages are not taken away from an HD contractor's proprietary service area absent a service failure or consent.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of April 2007.

4/24/07

Dennis Oates

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Michael Decesare, et al.* 3:07-cv-00120 (NV)<br>*Maragaret Gibson, et al.* 3:07-cv-00272 (AZ)<br>*Troy Givens, et al.* 3:07-cv-00324 (LA)<br>*Frank Gruhn, et al.* 3:07-cv-00412 (VT)<br>*Jon Leighter, et al.* 3:07-cv-00328 (OR)<br>*Thomas Magno, et al.* 3:07-cv-00322 (CT)<br>*Genaro Vargas, et al.* 3:07-cv-00325 (MA)<br>*Earnest White, et al.* 3:07-cv-00411 (GA)<br>*Sharon Whiteside, et al.* 3:07-cv-00326 (NC) | CHIEF JUDGE MILLER |

**DECLARATION OF DENNIS MALLEY IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDA OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, Dennis Malley, declare:

1. I am a Developer in the Applications Management Department of FedEx Ground Package System, Inc. ("FedEx Ground"). I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2. On October 25, 2007, November 5, 2007, and November 6, 2007, I ran queries in a database containing FedEx Home Delivery ("HD") settlement data current through the date of the queries respectively and going back to July 13, 1999, approximately the time HD began operations.

3. The results of my queries are as follows:

   a. **Alaska.** From August 10, 2005 to November 5, 2007, there have been 2 HD contractors who have worked out of terminals in the state of Alaska. On November 5, 2007, 1 of these contractors was under contract with HD ("current contractor"). This current contractor is not incorporated nor has this contractor ever owned multiple routes.

   b. **Arizona.** From May 11, 2004 to October 25, 2007, there have been 103 HD contractors who have worked out of terminals in the state of Arizona. On October 25, 2007, 50 of these contractors were under contract with HD. Of the Arizona HD current contractors, 19 have incorporated businesses, and 20 own (or have owned) multiple routes.

   c. **Colorado.** From August 10, 2005 to November 5, 2007, there have been 98 HD contractors who have worked out of terminals in the state of Colorado. On November 5, 2007, 62 of these contractors were under contract with HD. Of the Colorado HD current contractors, 27 have incorporated businesses, and 23 own (or have owned) multiple routes.

   d. **Connecticut.**

      i. From May 22, 2001 to October 25, 2007, there have been 208 HD contractors who have worked out of terminals in the state of Connecticut.

      ii. From August 10, 2005 to November 5, 2007, there have been 118 HD contractors who have worked out of terminals in the state of Connecticut.

iii. On November 5, 2007, 80 contractors were under contract with

HD. Of the Connecticut HD current contractors, 7 have

incorporated businesses, and 17 own (or have owned) multiple

routes.

e. **Georgia.** From July 26, 2001 to October 25, 2007, there have been 314

HD contractors who have worked out of terminals in the state of Georgia.

On October 25, 2007, 138 of these contractors were current contractors.

Of the Georgia HD current contractors, 31 have incorporated businesses,

and 44 own (or have owned) multiple routes

f. **Illinois.** From August 10, 2005 to November 5, 2007, there have been

186 HD contractors who have worked out of terminals in the state of

Illinois. On November 5, 2007, 134 of these contractors were current

contractors. Of the Illinois HD current contractors, 55 have incorporated

businesses, and 55 own (or have owned) multiple routes.

g. **Kentucky.** From August 10, 2005 to November 5, 2007, there have been

78 HD contractors who have worked out of terminals in the state of

Kentucky. On November 5, 2007, 53 of these contractors were current

contractors. Of the Kentucky HD current contractors, 21 have

incorporated businesses, and 19 own (or have owned) multiple routes

h. **Maine.** From August 10, 2005 to November 5, 2007, there have been 51

HD contractors who have worked out of terminals in the state of Maine.

On November 5, 2007, 37 of these contractors were current contractors.

Of the Maine HD current contractors, 6 have incorporated businesses, and 8 own (or have owned) multiple routes.

i. **Maryland.** From August 10, 2005 to November 5, 2007, there have been 155 HD contractors who have worked out of terminals in the state of Maryland. On November 5, 2007, 97 of these contractors were current contractors. Of the Maryland HD current contractors, 19 have incorporated businesses, and 28 own (or have owned) multiple routes.

j. **Massachusetts.** From August 10, 2005 to November 5, 2007, there have been 174 HD contractors who have worked out of terminals in the state of Massachusetts. On November 5, 2007, 107 of these contractors were current contractors. Of the Massachusetts HD current contractors, 10 have incorporated businesses, and 27 own (or have owned) multiple routes.

k. **Missouri.** From August 10, 2005 to November 5, 2007, there have been 134 HD contractors who have worked out of terminals in the state of Missouri. On November 5, 2007, 87 of these contractors were current contractors. Of the Missouri HD current contractors, 30 have incorporated businesses, and 36 own (or have owned) multiple routes.

l. **Montana.** From August 10, 2005 to November 5, 2007, there have been 5 HD contractors who have worked out of terminals in the state of Montana. On November 5, 2007, 3 of these contractors were current contractors. Of the Montana HD current contractors, 2 have incorporated businesses, and 1 owns (or has owned) multiple routes.

m. **Nevada.**

i. From August 1, 2001 to November 6, 2007, there have been 88 HD contractors who have worked out of terminals in the state of Nevada.

ii. From August 10, 2005 to November 5, 2007, there have been 54 HD contractors who have worked out of terminals in the state of Nevada.

iii. On November 5, 2007, 30 contractors were under contract with HD. Of the Nevada HD current contractors, 6 have incorporated businesses, and 9 own (or have owned) multiple routes.

n. **New Jersey.** From August 10, 2005 to November 5, 2007, there have been 181 HD contractors who have worked out of terminals in the state of New Jersey. On November 5, 2007, 114 of these contractors were current contractors. Of the New Jersey HD current contractors, 39 have incorporated businesses, and 42 own (or have owned) multiple routes.

o. **New York.** From August 10, 2005 to November 5, 2007, there have been 348 HD contractors who have worked out of terminals in the state of New York. On November 5, 2007, 243 of these contractors were current contractors. Of the New York HD current contractors, 74 have incorporated businesses, and 83 own (or have owned) multiple routes.

p. **North Carolina.**

i. From May 2, 2003 to October 25, 2007, there have been 234 HD contractors who have worked out of terminals in the state of North Carolina.

      ii. From August 10, 2005 to November 5, 2007, there have been
180 HD contractors who have worked out of terminals in the state
of North Carolina.

      iii. On November 5, 2007, 128 contractors were under contract
with HD. Of the North Carolina HD current contractors, 32 have
incorporated businesses, and 46 own (or have owned) multiple
routes.

q. **North Dakota.** From August 10, 2005 to November 5, 2007, there have
been 9 HD contractors who have worked out of terminals in the state of
North Dakota. On November 5, 2007, 8 of these contractors were current
contractors. Of the North Dakota HD current contractors, 4 have
incorporated businesses, and 1 owns (or has owned) multiple routes.

r. **Ohio.** From August 10, 2005 to November 5, 2007, there have been 199
HD contractors who have worked out of terminals in the state of Ohio. On
November 5, 2007, 136 of these contractors were current contractors. Of
the Ohio HD current contractors, 48 have incorporated businesses, and 50
own (or have owned) multiple routes.

s. **Oregon.**

      i. From July 20, 1999 to October 25, 2007, there have been 119
HD contractors who have worked out of terminals in the state of
Oregon.

    ii. From August 10, 2005 to November 5, 2007, there have been 70

    HD contractors who have worked out of terminals in the state of

    Oregon.

    iii. On November 5, 2007, 48 contractors were under contract with

    HD. Of the Oregon HD current contractors, 11 have incorporated

    businesses, and 15 own (or have owned) multiple routes.

 t. **Pennsylvania.** From August 10, 2005 to November 5, 2007, there have

  been 316 HD contractors who have worked out of terminals in the state of

  Pennsylvania. On November 5, 2007, 201 of these contractors were

  current contractors. Of the Pennsylvania HD current contractors, 40 have

  incorporated businesses, and 67 own (or have owned) multiple routes.

 u. **Rhode Island.** From August 10, 2005 to November 5, 2007, there have

  been 23 HD contractors who have worked out of terminals in the state of

  Rhode Island. On November 5, 2007, 13 of these contractors were current

  contractors. Of the Rhode Island HD current contractors, 2 have

  incorporated businesses, and 6 own (or have owned) multiple routes.

 v. **Vermont.**

    i. From July 25, 2001 to October 25, 2007, there have been 62 HD

    contractors who have worked out of terminals in the state of

    Vermont.

    ii. From August 10, 2005 to November 5, 2007, there have been 36

    HD contractors who have worked out of terminals in the state of

    Vermont.

iii. On November 5, 2007, 20 contractors were under contract with HD. Of the Vermont HD current contractors, 5 have incorporated businesses, and 5 own (or have owned) multiple routes.

w. **West Virginia.** From August 10, 2005 to November 5, 2007, there have been 32 HD contractors who have worked out of terminals in the state of West Virginia. On November 5, 2007, 23 of these contractors were current contractors. Of the West Virginia HD current contractors, 7 have incorporated businesses, and 11 own (or have owned) multiple routes.

x. **Wisconsin.** From August 10, 2005 to November 5, 2007, there have been 124 HD contractors who have worked out of terminals in the state of Wisconsin. On November 5, 2007, 83 of these contractors were current contractors. Of the Wisconsin HD current contractors, 31 have incorporated businesses, and 27 own (or have owned) multiple routes.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of November, 2007.

Dennis Malley

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Michael Decesare, et al.* 3:07-cv-00120 (NV)
*Maragaret Gibson, et al.* 3:07-cv-00272 (AZ)
*Troy Givens, et al.* 3:07-cv-00324 (LA)
*Frank Gruhn, et al.* 3:07-cv-00412 (VT)
*Jon Leighter, et al.* 3:07-cv-00328 (OR)
*Thomas Magno, et al.* 3:07-cv-00322 (CT)
*Genaro Vargas, et al.* 3:07-cv-00325 (MA)
*Earnest White, et al.* 3:07-cv-00411 (GA)
*Sharon Whiteside, et al.* 3:07-cv-00326 (NC)

CHIEF JUDGE MILLER

**DECLARATION OF DAVID DeMARIA IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDA OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

I, David DeMaria, declare:

1. I am an Analyst in the Information Technology Department of FedEx Ground Package System, Inc. ("FedEx Ground"). I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2. On October 22, 2007, I ran queries in two databases containing FedEx Ground division ("Ground") settlement data going back to January 1, 1999 and were current through October 22, 2007.

3. The results of my queries are as follows:

a **Alaska.** From August 10, 2005 to October 22, 2007, there have been 17 Ground contractors who have worked out of terminals in the state of Alaska. On October 22, 2007, 12 of these contractors were under contract with Ground ("current contractors"). Of the Alaska Ground current contractors, 7 have (or have had) incorporated businesses, and 3 own (or have owned) multiple routes.

b **Arizona.** From May 11, 2004 to October 22, 2007, there have been 247 Ground contractors who have worked out of terminals in the state of Arizona. On October 22, 2007, 158 of these contractors were under contract with Ground. Of the Arizona Ground current contractors, 38 have (or have had) incorporated businesses, and 66 own (or have owned) multiple routes.

c **Colorado.** From August 10, 2005 to October 22, 2007, there have been 270 Ground contractors who have worked out of terminals in the state of Colorado. On October 22, 2007, 166 of these contractors were current contractors. Of the Colorado Ground current contractors, 86 have (or have had) incorporated businesses, and 60 own (or have owned) multiple routes.

d **Connecticut.**

i. From May 22, 2001 to October 22, 2007, there have been 166 Ground contractors who have worked out of terminals in the state of Connecticut.

ii. From August 10, 2005 to October 22, 2007, there have been 108 Ground contractors who have worked out of terminals in the state of Connecticut.

iii. On October 22, 2007, 88 contractors were under contract with Ground. Of the Connecticut Ground current contractors, 6 have (or have had) incorporated businesses, and 18 own (or have owned) multiple routes.

e) **Georgia.** From July 26, 2001 to October 22, 2007, there have been 587 Ground contractors who have worked out of terminals in the state of Georgia. On October 22, 2007, 286 of these contractors were current contractors. Of the Georgia Ground current contractors, 80 have (or have had) incorporated businesses, and 78 own (or have owned) multiple routes.

f) **Illinois.** From August 10, 2005 to October 22, 2007, there have been 402 Ground contractors who have worked out of terminals in the state of Illinois. On October 22, 2007, 294 of these contractors were current contractors. Of the Illinois Ground current contractors, 161 have (or have had) incorporated businesses, and 98 own (or have owned) multiple routes.

g) **Kentucky.** From August 10, 2005 to October 22, 2007, there have been 141 Ground contractors who have worked out of terminals in the state of Kentucky. On October 22, 2007, 103 of these contractors were current contractors. Of the Kentucky Ground current contractors, 43 have (or have had) incorporated businesses, and 29 own (or have owned) multiple routes.

h) **Maine.** From August 10, 2005 to October 22, 2007, there have been 67 Ground contractors who have worked out of terminals in the state of Maine. On October 22, 2007, 52 of these contractors were current contractors. Of the Maine Ground current contractors, 3 have (or have had) incorporated businesses, and 9 own (or have owned) multiple routes.

i) **Maryland.** From August 10, 2005 to October 22, 2007, there have been 247 Ground contractors who have worked out of terminals in the state of Maryland. On October 22, 2007, 187 of these contractors were current contractors. Of the Maryland Ground current contractors, 34 have (or have had) incorporated businesses, and 44 own (or have owned) multiple routes.

j) **Massachusetts.** From August 10, 2005 to October 22, 2007, there have been 246 Ground contractors who have worked out of terminals in the state of Massachusetts. On October 22, 2007, 179 of these contractors were current contractors. Of the Massachusetts Ground current contractors, 23 have (or have had) incorporated businesses, and 42 own (or have owned) multiple routes.

k) **Missouri.** From August 10, 2005 to October 22, 2007, there have been 249 Ground contractors who have worked out of terminals in the state of Missouri. On October 22, 2007, 169 of these contractors were current contractors. Of the Missouri Ground current contractors, 97 have (or have had) incorporated businesses, and 61 own (or have owned) multiple routes.

l) **Montana.** From August 10, 2005 to October 22, 2007, there have been 67 Ground contractors who have worked out of terminals in the state of Montana. On October 22, 2007, 44 of these contractors were current contractors. Of the Montana Ground current contractors, 19 have (or have had) incorporated businesses, and 18 own (or have owned) multiple routes.

m) **Nevada.**

i. From August 1, 2001 to October 22, 2007, there have been 161 Ground contractors who have worked out of terminals in the state of Nevada.

ii. From August 10, 2005 to October 22, 2007, there have been 108 Ground contractors who have worked out of terminals in the state of Nevada.

iii. On October 22, 2007, 72 contractors were under contract with Ground. Of the Nevada Ground current contractors, 28 have (or have had) incorporated businesses, and 27 own (or have owned) multiple routes.

n) **New Jersey.** From August 10, 2005 to October 22, 2007, there have been 362 Ground contractors who have worked out of terminals in the state of New Jersey. On October 22, 2007, 273 of these contractors were current contractors. Of the New Jersey Ground current contractors, 83 have (or have had) incorporated businesses, and 56 own (or have owned) multiple routes.

o) **New York.** From August 10, 2005 to October 22, 2007, there have been 638 Ground contractors who have worked out of terminals in the state of New York. On October 22, 2007, 486 of these contractors were current contractors. Of the New York Ground current contractors, 208 have (or have had) incorporated businesses, and 106 own (or have owned) multiple routes.

p) **North Carolina.**

i. From May 2, 2003 to October 22, 2007, there have been 460 Ground contractors who have worked out of terminals in the state of North Carolina.

ii. From August 10, 2005 to October 22, 2007, there have been 373 Ground contractors who have worked out of terminals in the state of North Carolina.

iii. On October 22, 2007, 287 contractors were under contract with Ground. Of the North Carolina Ground current contractors, 97 (or have had) have incorporated businesses, and 65 own (or have owned) multiple routes.

q) **North Dakota.** From August 10, 2005 to October 22, 2007, there have been 57 Ground contractors who have worked out of terminals in the state of North Dakota. On October 22, 2007, 41 of these contractors were current contractors. Of the North Dakota Ground current contractors, 24 (or have had) have incorporated businesses, and 17 own (or have owned) multiple routes.

r) **Ohio.** From August 10, 2005 to October 22, 2007, there have been 393 Ground contractors who have worked out of terminals in the state of Ohio. On October 22, 2007, 281 of these contractors were current contractors. Of the Ohio Ground current contractors, 119 have (or have had) incorporated businesses, and 99 own (or have owned) multiple routes.

s) **Oregon.**

i. From July 20, 1999 to October 22, 2007, there have been 237 Ground contractors who have worked out of terminals in the state of Oregon.

ii. From August 10, 2005 to October 22, 2007, there have been 159 Ground contractors who have worked out of terminals in the state of Oregon.

iii. On October 22, 2007, 106 contractors were under contract with Ground. Of the Oregon Ground current contractors, 60 have (or have had) incorporated businesses, and 38 own (or have owned) multiple routes.

case 3:05-md-00527-RLM-CAN document 998-13 filed 11/16/09 page 8 of 9

t) **Pennsylvania.** From August 10, 2005 to October 22, 2007, there have been 484 Ground contractors who have worked out of terminals in the state of Pennsylvania. On October 22, 2007, 356 of these contractors were current contractors. Of the Pennsylvania Ground current contractors, 64 (or have had) have incorporated businesses, and 80 own (or have owned) multiple routes.

u) **Rhode Island.** From August 10, 2005 to October 22, 2007, there have been 37 Ground contractors who have worked out of terminals in the state of Rhode Island. On October 22, 2007, 32 of these contractors were current contractors. Of the Rhode Island Ground current contractors, 6 have (or have had) incorporated businesses, and 15 own (or have owned) multiple routes.

v) **Vermont.**

i. From July 25, 2001 to October 22, 2007, there have been 58 Ground contractors who have worked out of terminals in the state of Vermont.

ii. From August 10, 2005 to October 22, 2007, there have been 32 Ground contractors who have worked out of terminals in the state of Vermont.

iii. On October 22, 2007, 23 contractors were under contract with Ground. Of the Vermont Ground current contractors, 4 have (or have had) incorporated businesses, and 6 own (or have owned) multiple routes.

w) **West Virginia.** From August 10, 2005 to October 22, 2007, there have been 41 Ground contractors who have worked out of terminals in the state of West Virginia. On October 22, 2007, 32 of these contractors were current contractors. Of the West Virginia Ground current contractors, 16 have (or have had) incorporated businesses, and 13 own (or have owned) multiple routes.

x) **Wisconsin.** From August 10, 2005 to October 22, 2007, there have been 287 Ground contractors who have worked out of terminals in the state of Wisconsin. On October 22, 2007, 201 of these contractors were current contractors. Of the Wisconsin Ground current contractors, 88 have (or have had) incorporated businesses, and 43 own (or have owned) multiple routes.

4. The number of Ground contractors in this declaration includes only package and delivery ("P&D") contractors. However, in my previous declarations provided in support of FedEx Ground's memoranda of law (filed on April 27, 2007, May 17, 2007, and June, 7, 2007 respectively), the number of Ground contractors mistakenly included line-haul contractors, as well as P&D contractors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 13 day of November, 2007, in Moon Township, PA.

David DeMaria

David DeMaria



OP-149

FEDEX GROUND PACKAGE SYSTEM, INC.

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

JUNE 2004

Case 3:07-cv-00818-HZ Document 32-2 Filed 08/17/11 Page 1011 of 3649

# TABLE OF CONTENTS

BACKGROUND STATEMENT ..... 1

1. EQUIPMENT AND OPERATIONS. ..... 2
   - 1.1 Power Equipment. ..... 2
   - 1.2 Equipment Maintenance. ..... 2
   - 1.3 Operating Expenses. ..... 3
   - 1.4 Operation of the Equipment. ..... 3
   - 1.5 Equipment Identification while in FedEx Ground's Service. ..... 4
   - 1.6 Licensing. ..... 4
   - 1.7 Logs and Reports. ..... 5
   - 1.8 Shipping Documents and Collections. ..... 5
   - 1.9 Contractor Performance Escrow Account ..... 5
   - 1.10 Agreed Standard of Service. ..... 7
   - 1.11 Refused or Returned Shipments. ..... 9
   - 1.12 Operator and Equipment Appearance Standard. ..... 9
   - 1.13 Communications Equipment. ..... 10
   - 1.14 Contractor's Obligation to Meet Standards of Customer Service. ..... 10
   - 1.15 Discretion of Contractor to Determine Method and Means of Meeting Business Objectives. ..... 10

2. VEHICLE OPERATION. ..... 11
   - 2.1 Additional Vehicles; Safe Operation Required. ..... 11
   - 2.2 Employment of Qualified Persons. ..... 11

3. INSURANCE AND INDEMNITIES. ..... 13
   - 3.1 Non-Trucking Liability Coverage -- Contractor Responsibility. ..... 13
   - 3.2 Public Liability -- FedEx Ground's Responsibility. ..... 13
   - 3.3 Public Liability -- Contractor's Responsibility. ..... 14
   - 3.4 FedEx Ground's Non-Liability for Equipment. ..... 15
   - 3.5 Contractor's Responsibility for Certain Losses. ..... 15
   - 3.6 Work Accident and Workers Compensation. ..... 17

4. SETTLEMENT WITH CONTRACTOR. ..... 18
   - 4.1 Settlement for Services Performed. ..... 18
   - 4.2 Settlement Statements. ..... 20

5. CONTRACTOR PRIMARY SERVICE AREA. ..... 21
   - 5.1 Definition. ..... 21
   - 5.2 Mutual Intention to Reduce Geographic Size of Primary Service Area. ..... 21
   - 5.3 Recognition of Contractor's Proprietary Interest in Customers Served. ..... 22

6. CONTRACTOR CUSTOMER SERVICE (CCS) PAYMENTS. .......... 25

7. BUSINESS SUPPORT PACKAGE. .......... 25

8. SERVICE GUARANTEE PROGRAM. .......... 26

9. FLEX PROGRAM. .......... 28

10. HR 10 PLAN. .......... 28

11. TERM OF AGREEMENT. .......... 29
 11.1 Initial Term. .......... 29
 11.2 Renewal Terms. .......... 29

12. TERMINATION PROVISIONS. .......... 29
 12.1 Termination. .......... 29
 12.2 Obligations Upon Termination. .......... 31
 12.3 Arbitration of Asserted Wrongful Termination. .......... 32

13. MERGER OF UNDERSTANDING. .......... 35

14. CAPTIONS. .......... 35

15. SAVINGS CLAUSE. .......... 35

16. FAILURE TO ENFORCE. .......... 35

17. FORCE MAJEURE. .......... 36

18. ASSIGNMENT. .......... 36

19. GOVERNING LAW. .......... 37

ADDENDUM 1 .......... Identification of Leased Equipment

ADDENDUM 2 .......... Insurance - Minimum Coverage Requirements

case 3:05-md-00527-RLM -CAN document 958-14 filed 11/16/07 page 4 of 30

ADDENDUM 3 .......... Settlement
Attachment I-1. .......... Spotted Trailer Settlement
Attachment I-2. .......... Railhead, Airport, Storage Staging Area and Shuttle
Attachment I-3. .......... Temporary Core Zone Density Settlement
Attachment I-4. .......... Added Service Settlement

ADDENDUM 4 .......... Primary Service Area

ADDENDUM 5 .......... Proprietary Interest

ADDENDUM 6 .......... Contractor Customer Service Program

ADDENDUM 7 .......... Business Support Package
Attachment I-1. .......... Time-Off Program

FEDEX GROUND SAFE DRIVING PROGRAM

**FEDEX GROUND PACKAGE SYSTEM, INC.**
**PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT**

**BACKGROUND STATEMENT.** FedEx Ground Package System, Inc. is a duly licensed motor carrier engaged in providing a small package information, transportation and delivery service throughout the United States, with connecting international service. The Contractor is an owner-operator of one or more pieces of trucking equipment suitable for use in such a service. Contractor wants to make this equipment available, together with a qualified operator for each piece of equipment, to provide daily pick-up and delivery service on behalf of FedEx Ground. FedEx Ground wants to provide for package pick-up and delivery services through a network of independent contractors, and, subject to the number of packages tendered to FedEx Ground for shipment, will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment. Contractor wants the advantage of operating within a system that will provide access to national accounts and the benefits of added revenues associated with shipments picked up and delivered by other contractors throughout the FedEx Ground system. In order to get that advantage, Contractor is willing to commit to provide daily pick-up and delivery service, and to conduct his/her business so that it can be identified as being a part of the FedEx Ground system. Both FedEx Ground and Contractor intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of FedEx Ground for any purpose. Therefore, this Agreement will set forth the mutual business objectives of the two parties intended to be served by this Agreement -- which are the results the Contractor agrees to seek to achieve -- but the manner and means of reaching these results are within the discretion of the Contractor, and no officer or employee of FedEx Ground

shall have the authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding.

**1. EQUIPMENT AND OPERATIONS.**

**1.1 Power Equipment.** In conjunction with providing to FedEx Ground transportation services as herein provided, Contractor will provide and utilize the vehicular equipment identified in the most recent Addendum 1 to this Agreement (hereinafter called the "Equipment"). Contractor certifies that the Equipment meets the requirements of all applicable federal, state and municipal laws and regulations, and, subject to the determination of FedEx Ground of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor.

**1.2 Equipment Maintenance.** Contractor agrees, at Contractor's expense, to maintain the Equipment in accordance with the safety and equipment standards specified in applicable federal, state and municipal laws and any rules, regulations and orders of any applicable agency. In particular, Contractor agrees to provide FedEx Ground with proof of timely maintenance and inspection of the Equipment in accordance with the periodic mandatory vehicle maintenance and inspection regulations administered or required by any federal, state or municipal agency with jurisdiction over the operations described in this Agreement. The periodic maintenance schedule recommended by the equipment manufacturer shall be deemed to meet these requirements, absent specific federal, state, or municipal regulations. In the event the Equipment is found to be deficient under any law or regulation, Contractor agrees to remove the Equipment from service

with FedEx Ground until it is brought into compliance. During such interim period, Contractor shall, at Contractor's expense, provide alternative equipment suitable for use in carrying out Contractor's obligations under this Agreement.

**1.3 Operating Expenses.** Contractor agrees to bear all costs and expenses incidental to operation of the Equipment, whether empty or loaded, including, without limitation, all risks of depreciation, all maintenance (including cleaning and washing), fuel, oil, tires, repairs, business taxes, consumption and sales taxes, personal property taxes, ad valorem taxes, fuel and road-use taxes, ton-mile taxes, insurance coverage as provided herein, workers compensation assessments, licenses, vehicle registration renewal fees, base plates, and all highway, bridge and ferry tolls. To facilitate payment of licenses, taxes and fees, where mutually convenient or otherwise required by statute or regulation, Contractor hereby authorizes FedEx Ground to pay these charges on Contractor's behalf and to charge Contractor for any such payments, together with any direct expenses incurred by FedEx Ground in connection with their payment. Contractor agrees that unless strictly prohibited by law, any licenses, permits, assessments and taxes paid by FedEx Ground on behalf of Contractor pursuant to this paragraph may be charged back against and deducted from any compensation owed Contractor by FedEx Ground.

**1.4 Operation of the Equipment.** Contractor agrees to direct the operation of the Equipment and to determine the methods, manner and means of performing the obligations specified in this Agreement. FedEx Ground shall be considered to have such exclusive possession, use and control of the Equipment required by D.O.T. regulation at 49 CFR Part 376.12(c), or other

applicable regulations, but shall have no right or authority, without the express permission of Contractor, to operate the Equipment for any purpose (except for incidental yard movement and positioning) unless the Equipment is driven either by Contractor or by an operator engaged by Contractor. While the Equipment is in the service of FedEx Ground, it shall be used by Contractor exclusively for the carriage of the goods of FedEx Ground, and for no other purpose. If the Equipment is operated in the service of anyone other than FedEx Ground, including any separate business activities of Contractor, Contractor agrees to hold FedEx Ground harmless from any liability arising from operation of the Equipment that may be asserted against FedEx Ground by any person.

**1.5 Equipment Identification while in FedEx Ground's Service.** Contractor agrees to mark Equipment while in FedEx Ground's service with such identifying colors, logos, numbers, marks and insignia as may be required either under applicable regulations, including 49 CFR Part 390, or to identify the Equipment as a part of the FedEx Ground system. Contractor may use the Equipment for other commercial or personal purposes when it is not in the service of FedEx Ground, with the understanding that all such identifying numbers, marks, logos and insignia will be removed or masked (by paper or plastic overlay) when the Equipment is so used.

**1.6 Licensing.** If necessary to comply with the vehicle registration requirements of applicable state regulations or laws, the base plate portion of the Equipment registration shall be in the name of FedEx Ground. If, at any time during the term of this Agreement, applicable state regulations require Contractor to obtain an owner/driver operating authority in order to serve intrastate

customers, Contractor agrees, at his/her own expense, to acquire and maintain such operating authority and to cooperate with FedEx Ground in altering the arrangements set out in this Agreement to the extent necessary to ensure compliance by Contractor and FedEx Ground with any such state regulations, practices and procedures.

**<u>1.7 Logs and Reports.</u>** Contractor agrees to prepare daily driver logs and daily inspection reports, along with fuel receipts, shipping documents, and other documents as required by law or regulation, and to file the originals with FedEx Ground upon the conclusion of each business day.

**<u>1.8 Shipping Documents and Collections.</u>** Contractor agrees to prepare and present for the signature of consignors and consignees such shipping documents as FedEx Ground may from time to time designate, and to complete and return these documents to FedEx Ground at the end of each business day. Contractor further agrees to collect any charges owed by consignors and consignees and to return all collected charges to FedEx Ground at the end of each business day.

**<u>1.9 Contractor Performance Escrow Account.</u>** Contractor agrees to deposit with FedEx Ground at such time and in such manner as FedEx Ground may specify the sum of $1,000, which deposit shall be held by FedEx Ground in an account (hereinafter called the "Contractor Performance Escrow Account"). FedEx Ground agrees to handle the Contractor Performance Escrow Account as follows:

(a) Amounts held by FedEx Ground in the Contractor Performance Escrow Account shall be applied only for the purposes described in subparagraph (d) below.

(b) FedEx Ground agrees to pay (by credit to Contractor's weekly Settlement Statements at quarterly intervals) interest on the daily balance in the Contractor Performance Escrow Account. Such interest shall be at a rate equal to the average annual yield of 13-week U.S. Treasury bills at the rate established at the beginning of each quarter for the funds held on deposit during such quarter.

(c) FedEx Ground agrees to provide Contractor with an accounting of all credits to or subtractions from Contractor's balance in such Account as part of Contractor's weekly Settlement Statement.

(d) Upon termination of this Agreement, Contractor agrees that any balance attributable to Contractor in the Contractor Performance Escrow Account shall be applied to reduce any indebtedness of Contractor to FedEx Ground as reflected on Contractor's Settlement Statements or other instruments. Contractor shall remain liable for any remaining indebtedness which exceeds Contractor's balance in such Account.

(e) Upon Contractor's fulfillment of the obligations due to FedEx Ground upon termination, FedEx Ground shall, after making such deductions from the

Contractor Performance Escrow Account as are permitted herein, provide Contractor with a final accounting of all final transactions involving Contractor's balance in such Account and remit to Contractor any remaining balance within 45 days from the date of termination.

**1.10 Agreed Standard of Service.** FedEx Ground has represented to shippers and consignees that, in arranging transportation of packages within the FedEx Ground system, it will provide a standard of service that is fully competitive with that offered by other national participants in the industry. Contractor acknowledges the benefits to his/her business of participation in the FedEx Ground national system, and agrees to conduct activities under the terms of this Agreement to achieve the results represented to shippers and consignees. To achieve these business objectives, Contractor agrees to:

(a) Provide daily pick-up and delivery service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area, as that term is defined in this Agreement, and in such other areas as Contractor may be asked to provide service in the event Contractor elects to participate in the Flex Program described in Paragraph 9 of this Agreement, all consistent with the competitive standards within the industry (provided, however, that on any day where the volume of packages available for pick-up or delivery in Contractor's Primary Service Area exceeds the volume that

Case 3:05-md-00527-RLM -CAN document 998-14 filed 11/16/07 page 12 of 30

Contractor can reasonably be expected to handle on such day, FedEx Ground may reassign a portion of such packages to another contractor);

(b) Make reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages handled per shipper within Contractor's Primary Service Area;

(c) Handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage;

(d) Cooperate with FedEx Ground's employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal;

(e) Foster the professional image and good reputation of FedEx Ground and Contractor with shippers and consignees, including adhering to the vehicle identification and operator appearance standards specified in Paragraphs 1.5 and 1.12 of this Agreement;

(f) Conform to all applicable federal, state and local laws, regulations and ordinances;

(g) Cause the Equipment to be operated safely and in compliance with all applicable laws and regulations; and,

(h) Conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times.

**1.11 Refused or Returned Shipments.** If a package cannot be delivered on the day it is tendered to Contractor for delivery, Contractor agrees to return the package to FedEx Ground that same day at the terminal facility where it was tendered for delivery, and to inscribe on the package and to provide by electronic and/or manual means whatever notational references FedEx Ground may from time to time reasonably require in order to document the package location and the reason for non-delivery (i.e., service cross).

**1.12 Operator and Equipment Appearance Standard.** Contractor acknowledges that the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive with other alternatives available to shippers and consignees and to permit recognition and prompt access to customers' places of business. Accordingly, each person having contact with the public under the provisions of this Agreement will wear a FedEx Ground-approved uniform, maintained in good condition, and will otherwise keep his/her

personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by FedEx Ground. In addition, the Equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry.

**1.13 Communications Equipment.** Contractor shall, at Contractor's expense, purchase or lease the electronic communications equipment necessary to fulfill the obligations specified in Paragraph 1.10 (d) above and which complies with specifications promulgated from time to time by FedEx Ground. Alternatively, at Contractor's option, Contractor may acquire such equipment from FedEx Ground through the Business Support Package described in Addendum 7 of this Agreement.

**1.14 Contractor's Obligation to Meet Standards of Customer Service.** Contractor shall have the obligation to assure that all persons who operate the Equipment are fully trained and capable of meeting the customer service standards set forth in this Agreement. FedEx Ground shall, during the first 30 days of the term of this Agreement, familiarize Contractor with various quality service procedures developed by FedEx Ground. In addition, qualified FedEx Ground terminal personnel may, at their option, visit customer locations with Contractor four times annually to verify that Contractor is meeting the standards of customer service provided in this Agreement.

**1.15 Discretion of Contractor to Determine Method and Means of Meeting Business Objectives.** It is specifically understood and agreed by both parties that Contractor shall be

responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of FedEx Ground shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of FedEx Ground shall have the authority to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance.

**2. VEHICLE OPERATION.**

**2.1 Additional Vehicles; Safe Operation Required.** Contractor may, with the consent of FedEx Ground and consistent with the capacity of the terminal serviced by Contractor, own and operate more than one vehicle, with any such additional vehicles to be driven by qualified operators employed by Contractor, as described in subparagraph 2.2 below. The FedEx Ground Safe Driving Standards are attached hereto and made a part of this Agreement. No vehicle may be operated pursuant to this Agreement by any operator who is not in compliance with such standards.

**2.2 Employment of Qualified Persons.** Contractor may employ or provide person(s) to assist Contractor in performing the obligations specified by this Agreement. All persons so employed or provided by Contractor shall be qualified pursuant to applicable federal, state and municipal safety standards and the FedEx Ground Safe Driving Standards, and shall be fully trained, at Contractor's expense, to operate the Equipment. Contractor understands and agrees that such persons shall not be considered employees of FedEx Ground and that it is Contractor's

responsibility to assure that such persons conform fully to the applicable obligations undertaken by Contractor pursuant to this Agreement. Contractor further agrees to:

(a) Bear all expenses associated with qualifying such persons to perform the services agreed to be provided herein, including, without limitation, the cost of physical examinations and drug screen tests;

(b) Bear all expenses associated with the employment of such persons, including, without limitation, wages, salaries, employment taxes, workers compensation coverage, health care, retirement benefits and insurance coverages;

(c) Assume sole responsibility for compliance with all applicable laws, rules, regulations and orders respecting payroll deductions and maintenance of payroll and employment records; and,

(d) Hold FedEx Ground harmless from any liability and claims by others or by governments arising from Contractor's relationship with Contractor's employees or substitutes whether under industrial accident prevention laws or any other federal, state or municipal laws applicable to the relationship between employers and employees.

**3. INSURANCE AND INDEMNITIES.**

**3.1 Non-Trucking Liability Coverage -- Contractor Responsibility.** Contractor agrees to obtain and keep in force at all times a policy(ies) of public liability (automobile/truckers bodily injury and property damage insurance coverage), issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated, and rated A, Class VII or better by A.M. Best Co., to cover all costs, losses and expenses arising from operation of the Equipment while it is in operation without packages on board (empty mile coverage) in amounts not less than $1,000,000 per occurrence. Contractor shall provide FedEx Ground Certificate(s) of Insurance evidencing such coverage naming FedEx Ground an additional insured and providing FedEx Ground 30 days' prior written notice of cancellation or material change. Minimum coverage requirements are listed in Addendum 2.

**3.2 Public Liability -- FedEx Ground's Responsibility.** FedEx Ground agrees to self-retain and maintain insurance coverages for public liability (general and automobile/truckers personal injury and property damage insurance coverage), and cargo loss and damage risks in amounts sufficient to meet its legal obligations under 49 CFR Part 387 and, subject to the exception described in subparagraph 3.5, will indemnify Contractor and Contractor's drivers against liability for operation of Equipment when any package is on board while on FedEx Ground's business subject to the following exceptions and conditions, the occurrence of any one of which will void this indemnity:

case 3:05-md-00527-RLM -CAN document 998-14 filed 11/16/079 page 18 of 30

(a) As to the involved Equipment operator, if the operator has engaged in intentional misconduct or reckless or willfully negligent operation of the Equipment;

(b) As to the Contractor, if the Contractor is not the involved Equipment operator, but has knowledge of or reason to anticipate such operator's intentional misconduct or reckless or willfully negligent operation of the Equipment; or

(c) As to Contractor and operator(s), when FedEx Ground has elected to discontinue its indemnity hereunder pursuant to the provisions of subparagraph 3.3.

**3.3 Public Liability -- Contractor's Responsibility.** At any time that FedEx Ground discovers that Contractor or an operator engaged by Contractor to drive the Equipment fails to meet FedEx Ground's Safe Driving Standards as published from time to time, all as determined by FedEx Ground in its sole discretion, FedEx Ground may elect to terminate its indemnity for liability to Contractor and Contractor's drivers (hereinafter referred to as "indemnity termination"). Any such election of indemnity termination shall be given in writing to Contractor not less than 30 days before the effective date thereof, as specified in such election. In such event (unless Contractor cures such violation to FedEx Ground's sole and complete satisfaction before such effective date), Contractor shall obtain, effective not later than such specified date, and continually thereafter maintain, a policy of public liability (automobile/truckers bodily injury and property damage insurance coverage) for a combined single limit of not less than $2,000,000 naming FedEx Ground as an additional insured, issued by an insurance company qualified to

write such coverage in the state(s) where the Equipment is operated and rated A, Class VII or better by A.M. Best Co. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to showing FedEx Ground as an additional insured and providing FedEx Ground 30 days' prior written notice of cancellation or material change. In addition, Contractor will obtain and continually thereafter maintain a policy of insurance for cargo loss and damage risk for an amount not less than $40,000 per vehicle, with deductibles not greater than $250, to be issued by an insurance company meeting the same qualifications provided above. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to FedEx Ground naming FedEx Ground as an additional insured and providing FedEx Ground 30 days' prior written notice of cancellation or material change.

**3.4 FedEx Ground's Non-Liability for Equipment.** Contractor agrees that FedEx Ground shall not be liable to Contractor for any depreciation, loss or damage that may occur to the Equipment by collision, fire, theft or similar occurrence, excepting such loss or damage as may be caused by FedEx Ground, its agents, servants and employees.

**3.5 Contractor's Responsibility for Certain Losses.** The following indemnities constitute an exception to the provision for risk protection to Contractor provided in subparagraph 3.2. During the term of this Agreement and thereafter, Contractor agrees to indemnify and save FedEx Ground harmless against liabilities as follows:

(a) The first $1,000 arising from each claim brought against FedEx Ground and all liabilities incurred by FedEx Ground for or on the account of bodily injury and/or property damage in any manner caused by, incidental to or growing out of any act or omission of Contractor or Contractor's agents, servants or employees arising out of the ownership, maintenance, use or operation of the Equipment and/or FedEx Ground-provided equipment, or out of the conduct of Contractor's business;

(b) After one year of continuous safe operation of the Equipment under the terms of this Agreement, the Contractor's responsibility under this subparagraph shall be reduced to $500; after two years, to $250; and after three years to zero (provided, however, in the event the Equipment is involved in an at-fault accident while in the service of FedEx Ground, the Contractor's responsibility shall revert to $1,000 until, by passage of time without a further at-fault accident, the modifications of this subparagraph (b) again apply);

(c) The first $1,000 of each claim for loss or damage to packages tendered for shipment or handling hereunder while such packages are in the possession of Contractor or Contractor's agents, servants or employees;

(d) Any or all claims brought against FedEx Ground and liabilities incurred by FedEx Ground arising from the Contractor's relationship with Contractor's employees,

whether under industrial accident prevention laws, or any other federal, state or municipal laws, rules, regulations and orders applicable to the relationship between employers and employees; and,

(e) Any and all claims brought against FedEx Ground or liabilities incurred by FedEx Ground for or on account of Contractor's failure or failure of Contractor's agents, servants or employees to comply with any laws, rules, regulations or orders applicable to Contractor's business.

(f) Any and all claims brought against FedEx Ground or liabilities incurred by FedEx Ground in the event the Contractor or the involved Equipment operator fails to assist FedEx Ground in securing and giving evidence, attending hearings and trials, obtaining the attendance of witnesses, or otherwise fails to cooperate with FedEx Ground in such matters.

**3.6 Work Accident and Workers Compensation.** Contractor agrees to obtain and keep in force at all times during the term of this Agreement work accident and/or workers compensation insurance insuring Contractor and all of Contractor's employees. At Contractor's option, such coverage may be obtained either under a policy negotiated by FedEx Ground, through an applicable state sponsored program, or through a policy providing comparable benefits and issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated, and rated A, Class VII or better by A.M. Best Co. Such insurance

coverage shall be evidenced by a Certificate of Insurance provided to FedEx Ground and providing FedEx Ground 30 days' prior written notice of cancellation or material change. Minimum coverage requirements are as listed in Addendum 2.

**4. SETTLEMENT WITH CONTRACTOR.**

**4.1 Settlement for Services Performed.** FedEx Ground agrees to settle on a weekly basis with Contractor for services provided in accordance with the settlement schedule set forth in Addendum 3, from which settlement shall be deducted charges for items which are authorized in writing or required by law. The settlement to Contractor shall consist of the following parts:

(a) **Package Pick-Up and Delivery Settlement**, which amount shall be a payment for stops made and packages handled.

(b) **Contractor and Van Availability Settlement**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement, in consideration of Contractor making available to FedEx Ground at the start of such day a clean, properly maintained van, driven by a qualified and uniformed operator. In order to encourage van availability on business days falling immediately before and immediately after certain national holidays, the Contractor and Van Availability Settlement shall be enhanced on such days, as shown in Addendum 3.

FXG_GIVENS0001235

(c) **Temporary Core Zone Density Settlement**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement in Contractor's Primary Service Area, in consideration of Contractor agreeing to provide daily package pick-up and delivery service during such period of time when the customer density and package volume in such Primary Service Area is still developing. In the event Contractor provides service in another contractor's Primary Service Area pursuant to the Flex Program, Contractor shall also receive a proportionate share of any Temporary Core Zone Density Settlement applicable to such other Primary Service Area. The intention of Contractor and FedEx Ground is to cooperate in increasing the customer density and package volume in Contractor's Primary Service Area to such an extent that the Temporary Core Zone Density Settlement will be reduced or eliminated, and Contractor agrees that, as such density and/or package volume increases, FedEx Ground may reduce or eliminate the Temporary Core Zone Density Settlement. Except where the Contractor's Primary Service Area is reconfigured, with a resulting increase in customer density and/or package volume, or in the case of a new terminal opening or other major increase in customer density and/or package volume in Contractor's Primary Service Area, such settlement amount shall not be decreased by more than $10 per day in any six month period, and then only with 30 days' prior written notice to Contractor.

(d) **Flex Fee**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement, provided Contractor has agreed to participate in the Flex Program offered by FedEx Ground.

(e) **Quarterly Performance Settlement**, which amount shall be paid in the first settlement of each quarter, beginning after Contractor has completed one year as an FedEx Ground Contractor and shall be equal to that percentage specified in Addendum 3 of the aggregate amounts credited to Contractor in the immediately preceding quarter, pursuant to subparagraphs (a)-(d) above.

**4.2 Settlement Statements.** FedEx Ground agrees to issue Settlement Statements and settlement checks to Contractor on a weekly basis (except when this Agreement is terminated as provided herein, in which case a final Settlement Statement and settlement check shall be issued within 45 days of termination). Settlement Statements shall contain a computation of the settlement Contractor is entitled to receive and an itemized listing of all deductions from Contractor's settlement. FedEx Ground shall have no responsibility to make deductions for, or to pay wages, benefits, health, welfare and pension costs, withholding for income taxes, unemployment insurance premiums, payroll taxes, disability insurance premiums, social security taxes, or any other similar charges with respect to Contractor or Contractor's employees. To facilitate prompt settlement, Contractor agrees to prepare such settlement documents and records as FedEx Ground may from time to time require in order to compute such settlement. Upon

written request, Contractor shall be provided copies of those documents which are necessary to determine the validity of all deductions from Contractor's settlement. Settlement Statements and the entries thereon shall be deemed conclusive and binding on Contractor, unless written objections to entries on a questioned Settlement Statement are received by FedEx Ground within 30 days from the date of issuance of the Settlement Statement to which the objections apply.

**5. CONTRACTOR PRIMARY SERVICE AREA.**

**5.1 Definition.** Contractor shall be responsible for the daily pick-up and delivery of packages in Contractor's Primary Service Area, as assigned to Contractor from time to time by FedEx Ground, and as shown in Addendum 4 to this Agreement.

**5.2 Mutual Intention to Reduce Geographic Size of Primary Service Area.** Contractor recognizes that, as the customer base and package volume in the Primary Service Area increases, the geographic size of the area which Contractor will be able to serve with the Equipment can be expected to decrease. Contractor acknowledges that the increased concentration in customer base and package volume which results from a decrease in the geographic size of Contractor's Primary Service Area is in the interest of Contractor, since Contractor will thereby have the opportunity to complete a greater number of package pick-ups and deliveries with less expense, and Contractor agrees to cooperate with the reasonable efforts of FedEx Ground in gathering data necessary to evaluate Contractor's Primary Service Area, including permitting FedEx Ground personnel to ride with Contractor from time to time in connection with these efforts. FedEx Ground shall have the authority, upon five work days of prior written notice to Contractor, to

reconfigure Contractor's Primary Service Area to take account of customer service requirements. During such notice period, FedEx Ground shall give Contractor the opportunity, using means satisfactory to FedEx Ground, to continue to provide in such Primary Service Area the level of service called for in this Agreement. In the event Contractor is not able to provide reasonable means to continue to service the Primary Service Area, FedEx Ground may, in its sole discretion, reconfigure such area.

**5.3 Recognition of Contractor's Proprietary Interest in Customers Served.** This Agreement is based on the concept that Contractor and FedEx Ground are each engaged in an undertaking to operate an efficient package delivery service which is fully competitive with the standards of other national participants in the industry. FedEx Ground and Contractor recognize that, because of the reciprocal benefits which flow from participation in an interrelated, national service, they have a mutual interest in increasing package volume and the number of customers both in Contractor's Primary Service Area and in the service areas of other contractors who have entered into substantially identical agreements with FedEx Ground. Contractor specifically acknowledges that the intentions set forth in this Agreement to provide a national delivery service cannot be met -- either nationwide or in the service area served by the terminal (the "Terminal Service Area") which includes Contractor's Primary Service Area -- without the participation of a network of contractors. Therefore this Agreement contemplates the recognition both by the parties hereto and by other contractors in the FedEx Ground system of a proprietary interest by Contractor in the customer accounts in his/her Primary Service Area as that area is configured from time to time, and a consequent right of Contractor to receive payment in the

event his/her Primary Service Area is reconfigured with the result that customers previously served by the Contractor are reassigned. Depending on the circumstance, as provided below, such payments may be from other contractors or from FedEx Ground. In consideration of the mutual obligations contained herein and in substantially similar agreements with other contractors, the parties hereto agree as follows:

In the event Contractor's Primary Service Area is reconfigured so that the Contractor gains customer accounts, the Contractor hereby authorizes FedEx Ground to deduct from Contractor's settlement and to pay to the Contractor relinquishing such accounts the payments calculated as provided below; and

In the event Contractor's Primary Service Area is reconfigured so that customer accounts which had been serviced by the Contractor are reassigned to another contractor or to a spotted trailer, the Contractor shall receive payments, calculated and made as provided below.

Payments to or from Contractor for customer accounts gained or relinquished when Contractor's Primary Service Area is reconfigured shall be calculated and made as follows:

**First,** the average number of package deliveries per day gained or relinquished by Contractor shall be determined by reference to the average number of package

deliveries in the area relinquished in the three most recent complete FedEx Ground accounting periods;

**Second,** the average number of package pick-ups per day gained or relinquished by the Contractor shall be determined by reference to the average number of package pick-ups in the area relinquished in the three most recent complete accounting periods;

**Third,** the Contractor shall be entitled to a payment of the dollar amount specified in Addendum 5, multiplied by the average number of package deliveries relinquished, and the dollar amount specified in Addendum 5, multiplied by the average number of package pick-ups relinquished;

**Fourth,** the Contractor shall make payments calculated using the same formula as set forth in the preceding paragraph to relinquishing contractor(s) for package deliveries and pick-ups gained;

**Fifth,** in the event, in connection with the reconfiguration, package deliveries or pick-ups previously in Contractor's Primary Service Area are reassigned to another contractor, FedEx Ground shall remit payment to Contractor, but only as to the extent FedEx Ground receives payments from the contractor to whom the package deliveries or pick-ups were reassigned;

**Sixth,** in the event package pick-ups or deliveries are permanently reassigned to a spotted trailer, FedEx Ground itself shall have the obligation to make the payments to the Contractor called for herein; and

**Seventh,** if contractors so request, and if FedEx Ground in its sole discretion agrees, payments provided hereunder may be made by credits to and deductions from the affected Contractor's weekly settlement, as shown on such Contractor's Settlement Statement.

**6. CONTRACTOR CUSTOMER SERVICE (CCS) PAYMENTS.** In addition to the payments listed above in Paragraph 4, beginning with the first day of the second full FedEx Ground accounting period, Contractor shall be eligible to receive performance-based Contractor Customer Service (CCS) payments each period in the amounts specified in Addendum 6. Payment shall be based on Contractor meeting individual customer service and safety goals, as well as Contractor's terminal meeting it's service goals, all as determined by FedEx Ground.

**7. BUSINESS SUPPORT PACKAGE.** Contractor shall not be required to purchase or rent any products, equipment, or services from FedEx Ground as a condition to entering into this Agreement. At Contractor's election (which election shall be as indicated on Addendum 7, and may be changed annually during the first FedEx Ground accounting period and as provided below) FedEx Ground will provide a Business Support Package to Contractor at a per van charge to Contractor as set out in the current version of Addendum 7, which amount shall be deducted from Contractor's weekly settlement. The Business Support Package shall include uniforms,

communications and data processing equipment, D.O.T. inspections, equipment washing, drug tests meeting D.O.T. requirements, and other items and services found in the current version of Addendum 7. The cost of the Business Support Package may be changed once annually to reflect changes in the cost to FedEx Ground of providing such package. In the event FedEx Ground proposes to implement any such change, it shall provide Contractor with 30 days' prior written notice, during which period Contractor may elect to discontinue participation.

**8. SERVICE GUARANTEE PROGRAM.** FedEx Ground and Contractor recognize the mutual benefits to each party of keeping the Equipment, together with a qualified operator, in continuous daily service pursuant to the terms of this Agreement. The expenses of both maintenance and engaging a substitute operator during periods when Contractor is ill or does not desire to drive are, pursuant to the terms of this Agreement, borne by Contractor. In order to encourage Contractor to accumulate a fund from which these and other unusual costs of operation can be paid when they arise, FedEx Ground agrees to maintain an interest-bearing fund, a Service Guarantee Account (with interest calculated and applied the same way as with respect to the Contractor Performance Escrow) to account for contributions to the Service Guarantee Account. Contractor may from time to time, and solely at Contractor's discretion, make contributions to such Account. Each quarter, FedEx Ground shall credit matching contributions to the Account as follows:

| Contractor Average Balance in Preceding Quarter | Quarterly Matching Contribution |
|---|---|
| $ 500 or more | $100 |
| $ 750 or more | $150 |
| $1,000 or more | $200 |

In addition, if Contractor has more than one year as a P&D contractor for FedEx Ground, FedEx Ground shall, on the anniversary of the date Contractor first became a P&D Contractor for FedEx Ground, credit the Service Guarantee Account with a Service Bonus. The amount of this Service Bonus shall be in accordance with the settlement schedule set forth in Addendum 3. The Contractor may withdraw amounts credited to the Service Guarantee Account at any time and for any purpose. FedEx Ground may, at its discretion and taking into account the credit history of Contractor, make a loan to Contractor to fund maintenance costs in excess of the balance in the Contractor's Service Guarantee Account. The maximum amount of any such loan is as follows: if the aggregate balance in Contractor's Service Guarantee Account is between $500 and $1,000, the maximum loan is the amount of such aggregate balance; if such aggregate balance is in excess of $1,000, the maximum loan is twice the amount of such aggregate balance, up to a maximum loan of $5,000. Loans must be repaid within one year, and shall bear interest at the same rate as then applicable to interest payments by FedEx Ground on balances held in the Contractor Performance Escrow Account.

**9. FLEX PROGRAM.** At Contractor's election (which election shall be as indicated on Addendum 3, and may be changed annually during the first FedEx Ground accounting period), Contractor may participate in the FedEx Ground Flex Program. By electing to participate, Contractor agrees to accept packages from outside Contractor's Primary Service Area for pick-up and delivery, up to daily pick-up and delivery capacity (determined by reference to time required, mileage, and van capacity), when requested to do so by FedEx Ground terminal management. In consideration of Contractor's election to participate, Contractor shall receive, in addition to other components of the settlement provided in Paragraph 4 of this Agreement, a daily flex fee as specified in Addendum 3 for each piece of vehicular equipment in service under this Agreement. Such payment shall be made with respect to each business day that Contractor has also become entitled to the Contractor and Van Availability Settlement, regardless of whether Contractor is called upon to pick up or deliver packages outside Contractor's Primary Service Area. P&D contractors who utilize a tractor/trailer to perform P&D work, may elect to participate in the flex program, but will only receive the daily flex fee as specified in Addendum 3, on days they actually make a live pickup or delivery stop. P&D trailer spots do not qualify for the daily flex fee.

**10. HR 10 PLAN.** At Contractor's election (which election shall be and may be changed annually during January of each year, Contractor may, provided Contractor meets the eligibility requirements for participation, adopt the Prototype Defined Contribution Retirement Plan created and sponsored by Merrill Lynch for self-employed individuals such as Contractor (hereinafter referred to as the "Plan"). Any contributions by Contractor shall be in such amounts as Contractor shall specify, not to exceed 15 percent of the "covered compensation," as that term is

used in the Internal Revenue Code of 1986, as amended, of Contractor and his employees, shall be subject to any applicable limitations contained in the Plan, and shall be allocated to participant accounts as provided in the Plan.

**11. TERM OF AGREEMENT.**

**11.1 Initial Term.** This Agreement shall, at the election of Contractor, as indicated by Contractor's initials below, continue in full force and effect for an initial term ranging from one to three years from the date this Agreement is signed. Contractor hereby elects a term of:

a) one year ____

b) two years ____

c) three years ____

**11.2 Renewal Terms.** This Agreement shall automatically renew for successive terms of one year each after expiration of the initial term unless Contractor or FedEx Ground provides the other party notice of non-renewal in writing at least 30 days prior to the expiration of the initial term or any successive renewal term.

**12. TERMINATION PROVISIONS.**

**12.1 Termination.** This Agreement may be terminated during the initial term or during any renewal term hereof, as follows:

(a) At any time, by mutual agreement of Contractor and FedEx Ground;

(b) By FedEx Ground in the event that Paragraphs 3.2(a) or 3.2(b) apply;

(c) By Contractor or FedEx Ground if the other party breaches or fails to perform the contractual obligations imposed by this Agreement;

(d) By either party in the event that FedEx Ground:

(1) ceases to do business in all or part of the Terminal Service Area; or,

(2) as a result of a decline in business, reduces operations in all or part of the Terminal Service Area; or

(e) By Contractor, upon 30 days' prior written notice to FedEx Ground. The parties hereto specifically recognize the damage to FedEx Ground, which is difficult to quantify, but which includes the cost of engaging and qualifying temporary operators and replacement equipment to service Contractor's Primary Service Area, if Contractor should terminate his/her service obligations hereunder without first giving notice as provided in this paragraph. Therefore, in the event of such unauthorized termination by Contractor (except if such termination is caused by the death or disability of Contractor) Contractor shall pay to FedEx Ground, as liquidated damages, and not as a penalty, the sum of $1,000. FedEx Ground may withhold such amount from Contractor's final settlement or from Contractor's Performance Escrow Account.

case 3:05-md-00527-RLM -CAN document 958-15 filed 11/16/07 page 5 of 31

**12.2 Obligations Upon Termination.** Upon termination of this Agreement for any reason, Contractor agrees promptly to:

(a) Return to FedEx Ground's terminal facility any trailers furnished by FedEx Ground for use in connection with the Equipment (if Contractor fails to return FedEx Ground's trailers to FedEx Ground's terminal facilities, FedEx Ground shall be entitled to a rental charge of $50 per day per trailer until said trailer is returned, (each 24-hour period or fraction thereof being considered one day, and may deduct any such charges from Contractor's final settlement, or from Contractor's Performance Escrow Account);

(b) Return to FedEx Ground any packages tendered for pickup and/or delivery and any shipping papers, documents, collections, or other property of FedEx Ground in Contractor's possession;

(c) Return to FedEx Ground any property of FedEx Ground furnished to Contractor pursuant to the Business Support Package; and

(d) Remove and return or permanently mask (such as by painting over) all of FedEx Ground's vehicle identification from the Equipment.

case 3:05-md-00527-RLM -CAN document 958-15 filed 11/16/07 page 6 of 31

FedEx Ground may withhold the return of any monies owed Contractor, including any balance remaining in Contractor's Performance Escrow Account, until Contractor completes the return of the items listed above.

**12.3 Arbitration of Asserted Wrongful Termination.** In the event FedEx Ground acts to terminate this Agreement (which acts shall include any claim by Contractor of constructive termination) and Contractor disagrees with such termination or asserts that the actions of FedEx Ground are not authorized under the terms of this Agreement, then each such disagreement (but no others) shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (AAA) and judgment upon the award of the arbitrator may be rendered in any court having jurisdiction thereof, according to the following:

(a) Written notice of a demand for arbitration must be mailed by Contractor to FedEx Ground and to the AAA by certified mail within 90 days of the occurrence of the claimed wrongful termination. Failure to mail written notice of a demand for arbitration within such 90 day period and comply with all procedural requirements set forth in the Commercial Arbitration Rules of the AAA shall constitute an absolute bar to the institution of any proceedings and a waiver of the claimed wrongful termination. The copy of the demand sent to the American Arbitration Association will be addressed to Four Gateway Center, Suite 419, Pittsburgh, PA 15222-1207, with a request that the demand be forwarded to the appropriate AAA Regional Office.

(b) The dispute shall be heard and determined by a single arbitrator, chosen pursuant to the procedures of the AAA.

(c) The arbitrator shall set the date, time, and place for each hearing, and shall schedule the hearing and make his or her determination in an expeditious manner. Neither party shall be entitled to written or deposition discovery from the other, except with respect to damages.

(d) As to any dispute or controversy which under the terms hereof is made subject to arbitration, no suit at law or in equity based on such dispute or controversy shall be instituted by either party hereto, other than a suit to confirm, enforce, vacate, modify or correct the award of the arbitrator as provided by law; provided, however, that this clause shall not limit FedEx Ground's right to obtain any provisional remedy including, without limitation, injunctive relief, writ for recovery or possession or similar relief, from any court of competent jurisdiction, as may be necessary in FedEx Ground's sole subjective judgment to protect its property rights.

(e) The arbitrator shall have the authority only to conclude whether the termination of Contractor was within the terms of this Agreement, to determine damages if required to do so under this subparagraph, and to provide for the division of the AAA fees and AAA assessed expenses of the arbitration between the parties;

case 3:05-md-00527-RLM -CAN document 958-15 filed 11/16/07 page 8 of 31

provided, however, each party shall bear the cost of attorneys, expert witnesses, or other expenses incurred by that party, and the arbitrator shall have no authority to allocate or apportion such costs. If the arbitrator concludes the termination was within the terms of this Agreement, the termination shall be effective on the date specified in the notice of termination from FedEx Ground to Contractor. If the arbitrator concludes the termination was not within the terms of this Agreement, then, at the option of FedEx Ground: (1) the Contractor shall be reinstated within a reasonable period of time, not to exceed 90 days from the Company's receipt of the abitrator's decision, and in that event shall be entitled to damages equal to the arbitrator's determination of what Contractor's net earnings (after payment of all expenses which are borne by Contractor pursuant to this Agreement) would have been during the period between the date of termination and the date of reinstatement; or (2) Contractor shall nevertheless be terminated, and, in that event, shall be entitled to damages equal to the arbitrator's determination of what Contractor's net earnings (after payment of all expenses which are borne by Contractor pursuant to this Agreement) would have been during the period between the date of termination to the last day of the term of this Agreement (without any renewals). Contractor shall have no claim for damages in any other amount, and the arbitrator shall have no power to award punitive or any other damages.

(f) The arbitrator shall provide the parties with only a written determination of the outcome of the arbitration, without accompanying opinion, and shall have no authority to alter, amend or modify any of the terms and conditions of this Agreement, and further, the arbitrator may not enter any award which alters, amends or modifies the terms or conditions of this Agreement in any form or manner.

**13. MERGER OF UNDERSTANDING.** This Agreement, the Addenda hereto, and the Attachments to the Addenda, constitute the entire agreement and understanding between the parties and, when executed, shall constitute a revocation of any earlier Contractor Operating Agreement between the parties. This Agreement, the Addenda and Attachments shall not be modified, altered, changed or amended in any respect unless in writing and signed by both parties .

**14. CAPTIONS.** Captions appearing in this Agreement are for convenience only and do not in any way limit, amplify, modify or otherwise affect the terms and provisions of this Agreement.

**15. SAVINGS CLAUSE.** If any part of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect.

**16. FAILURE TO ENFORCE.** Failure of either party to enforce strictly any provision of this Agreement shall not be construed as a waiver thereof or as excusing the other party from future performance.

**17. FORCE MAJEURE.** The performance of the obligations of this Agreement on the part of either FedEx Ground or the Contractor shall be excused by reason of closing of public highways, changes in customer shipping and/or receiving requirements, strikes or work stoppages, weather conditions which make operations unsafe or impractical, Acts of God, or temporary or permanent cessation of business by FedEx Ground within the Terminal Service Area.

**18. ASSIGNMENT.** This Agreement shall be binding upon and enure to the benefit of the parties to this Agreement and their assignees. FedEx Ground shall have the right to assign its rights and obligations hereunder to an affiliate of FedEx Ground. Provided Contractor is in good standing hereunder, Contractor shall, with 30 days' prior written notice to FedEx Ground, have the right to assign his/her rights and obligations hereunder to a replacement contractor acceptable to FedEx Ground as being qualified to provide the services of Contractor under this Agreement (the "Replacement Contractor"), and, provided Contractor or Contractor's representative continues to provide service under this Agreement up to the effective date of such assignment, FedEx Ground shall thereupon enter into a new agreement with Replacement Contractor on substantially the same terms and conditions as herein contained. In addition, in the event of the death or disability of Contractor, Contractor or his/her representative shall have a period of 30 days from and after such death or disability to secure a qualified Replacement Contractor to whom Contractor's rights and obligations may be assigned. Any consideration to be paid by Replacement Contractor on account of such assignment shall be strictly a matter of agreement between Contractor (or Contractor's representative) and Replacement Contractor. As a matter of

accommodation to Contractor, FedEx Ground at its sole discretion, may agree, upon receipt of written instructions from Contractor and Replacement Contractor, to collect such consideration from Replacement Contractor by means of deductions from Replacement Contractor's weekly settlements for a period not to exceed one year, and promptly to remit such amounts to Contractor or his/her representative. FedEx Ground shall have no other obligations whatsoever either to secure a Replacement Contractor for the benefit of Contractor, or to assure any payment to Contractor on account of Contractor's assignment of this Agreement.

**19. GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**CONTRACTOR ACKNOWLEDGES AND REPRESENTS THAT CONTRACTOR HAS READ AND FULLY UNDERSTANDS THE PROVISIONS OF THIS AGREEMENT, AND HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH PERSONAL FINANCIAL, TAX AND LEGAL ADVISORS PRIOR TO EXECUTING THIS AGREEMENT.**

**IN WITNESS WHEREOF,** the parties hereto enter into and execute this Agreement this 13 day of September, 2004, at 6:00AM.

**FedEx Ground Package System, Inc.:**

[signature]
Signature

P&D Mgr
Title

Bob Dean (BD)
Witness

**Contractor:**

Troy Givens
Signature

Troy Givens
Typed Name

Bob Dean (BD)
Witness

FXG_GIVENS0001255

EFFECTIVE:

ADDENDUM 1

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

IDENTIFICATION OF LEASED EQUIPMENT

| FedEx Ground Unit Number | Vehicle Make | Vehicle Year | Body Type | VIN | Number Axles |
|---|---|---|---|---|---|
| 96208 | Int | 2000 | P-1000 | 1HTMGABM7YA024100 | 2 |

Case 3:05-md-00527-RLM -CAN  document 998-15  filed 11/16/07  page 14 of 31

EFFECTIVE: 2/01/03

ADDENDUM 2

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

INDEPENDENT CONTRACTOR INSURANCE COVERAGE
WORK ACCIDENT INSURANCE & NON-TRUCKING LIABILITY
MINIMUM COVERAGE REQUIREMENTS

| WORK ACCIDENT INSURANCE | |
|---|---|
| COVERAGE | LIMITS |
| Disability | 66 2/3% of earnings payable weekly |
| Disability Benefit Period | 2 years |
| Medical | $250,000 maximum -- Reasonable & Customary |
| Medical Benefit Period | 2 years |
| Loss of Life | 55% of earnings |
| Loss of Life Benefit Period | 2 years |
| Loss of Life Amount | $144,000 |
| Co-insurance | 0 |
| Deductible | 0 |
| Contingent Workers' Compensation | Required |
| Minimum A.M. Best Rating | A |
| Alternative Coverage | Workers compensation by "A" rated insurer or state owned and licensed in Contractor's home state |

| NON-TRUCKING LIABILITY AND PHYSICAL DAMAGE | |
|---|---|
| COVERAGE | LIMITS |
| Auto liability | $2,000,000 combined single unit |
| Empty Miles vs. Non-Dispatch | Required |
| Physical Damage | Stated Value |
| Comprehensive Deductible | $500.00 |
| Collision Deductible | $500.00 |
| Rental Reimbursement | $100/day -- 30 days -- tractors<br>$50/day -- 60 days -- vans |
| Additional Insured | FedEx Ground must be named |
| Minimum A.M. Best Rating | A |

**PLEASE ADD THE ADDENDUM 3**

**THAT APPLIES TO YOUR**

**FACILITY**

**IF YOU NEED A COPY, E-MAIL YOUR REQUEST TO judy.johnston@fedex.com**

Case 3:05-md-00527-RLM -CAN document 998-15 filed 11/16/07 page 16 of 31

EFFECTIVE: 6/1/04

ATTACHMENT I-1 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

SPOTTED TRAILER SETTLEMENTS

| Account | Settlement ($) |
| --- | --- |

Notes:

1. FedEx Ground agrees to pay Contractor a full settlement per account when a trailer is spotted (or a previously spotted trailer is picked up) and no other pick-up or deliveries are performed enroute to or from the terminal.

2. FedEx Ground agrees to pay Contractor a half settlement per account when a trailer is spotted (or previously spotted trailer is picked up) and pick-up and/or deliveries are made enroute <u>either</u> to <u>or</u> from the terminal.

3. If other pick-up and/or deliveries are performed enroute <u>both</u> before <u>and</u> after a trailer is spotted (or a previously spotted trailer is picked up), FedEx Ground agrees to pay Contractor a Drop and Hook settlement of $6 in addition to any other settlement due Contractor for pick-ups and deliveries.

4. Automated Voice Response (AVR) Settlement. For each spotted trailer dispatch during which the Contractor completes all required calls under the AVR system, an additional payment of $.25 will be made to the Contractor for that dispatch. A dispatch will consist of one departure and return to the terminal facility, regardless of the number of trailers handled or customer locations visited during the trip.

EFFECTIVE:

ATTACHMENT I-2 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

RAILHEAD, AIRPORT, STORAGE STAGING AREA
AND SHUTTLE SETTLEMENTS

| Name and Location | Settlement ($) |
| --- | --- |

Note: Settlement is a composite amount and includes drops, hooks, and other activities related to picking up or delivering equipment at the above locations.

6/7/99

EFFECTIVE:

ATTACHMENT I-3 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

TEMPORARY CORE ZONE DENSITY SETTLEMENT

| | Settlement ($) | | |
|---|---|---|---|
| Core Zone | Package Van | Straight Truck | Tractor/Trailer |

Core Zones are comprised of one or more five-digit ZIP Code areas.

If Contractor provides pick-up and/or delivery service in more than one Core Zone on any one day, Contractor's Core Zone settlement for that day shall be prorated between the Core Zones, taking into consideration the number of stops in each Core Zone for vans and packages and stops for straight trucks and tractor/trailers.

For Contractors driving greater than 200 miles a day, the miles driven and differences in Core Zone settlement are also considered.

Core Zone settlement will be prorated if Contractor provides pick-up and/or delivery service for less than seven hours in any one day.

Case 3:05-md-00527-RLM -CAN document 998-15 filed 11/16/07 page 19 of 31

EFFECTIVE: 6/2/03

ATTACHMENT I-4 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

ADDED SERVICE SETTLEMENT

Contractor will receive additional settlement in the amounts shown below for each day an approved helper is used and the total number of pickup and delivery stops completed by Contractor are greater than the established thresholds.

| Contractor | $20 Threshold | $25 Threshold | $35 Threshold |
|---|---|---|---|
| | _______ stops | _______ stops | _______ stops |

EFFECTIVE:

ADDENDUM 4

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

PRIMARY SERVICE AREA

Contractor's Primary Service Area is as described below or refer to specific attachment that describes the Service Area:

(Copy of Contractor's load chart and pickup listing should be attached.)

____________________________
Terminal Manager

____________________________
Contractor

____________________
Date

____________________
Date

Case 3:05-md-00527-RLM -CAN document 998-15 filed 11/16/07 page 21 of 31

EFFECTIVE: 6/5/00

ADDENDUM 5

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

PROPRIETARY INTEREST

FedEx Ground recognizes that Contractor has a proprietary interest in the customer accounts in Contractor's Primary Service Area, as defined in Addendum 4 of this Agreement (but excluding package deliveries assigned by shippers to the FedEx Home Delivery division of FedEx Ground). FedEx Ground also recognizes that in the event Contractor's Primary Service Area is reconfigured, resulting in customers previously served by contractor being permanently reassigned, Contractor is entitled to payment. Such payment may be from other contractors or from FedEx Ground, in accordance with the provisions of Paragraph 5.3 of this Agreement.

> For every delivery package relinquished, under the provisions of Paragraph 5.3 of the Agreement, Contractor is entitled to a minimum payment of $1.00 per package.
>
> For every pick-up package relinquished, under the provisions of Paragraph 5.3 of the Agreement, Contractor is entitled to a minimum payment of $2.00 per package. This does not include trailer spots.

As Contractor's settlement and density increase in the Primary Service Area, the potential value of Contractor's customers may increase. Contractor may offer more than the minimum amounts prescribed above for packages being relinquished by another contractor, in order to gain additional customers and increase profitability, or Contractor may sell to the highest bidder when Contractor's customers are being reassigned. FedEx Ground makes no guarantees of such increases, nor will FedEx Ground interfere in such transactions between Contractor and other persons who have the capability and qualifications to perform the services required by this Agreement.

In the event a trailer spot, pick-up or delivery being performed by a P&D Contractor operating a tractor/trailer is permanently returned to a P&D Contractor operating a van or straight truck, FedEx Ground shall pay the tractor/trailer Contractor a one-time payment of $100.00 for each such trailer spot.

In every case involving payment for packages transferred between contractors, whether tractor/trailer, van, or straight truck, the reason must be based on FedEx Ground's determination, reasonably made, that such changes in pick-up and delivery assignments are permanent, not seasonal, nor known to be of short duration.

EFFECTIVE: 6/01/04

ADDENDUM 6

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

CONTRACTOR CUSTOMER SERVICE PROGRAM

Beginning with the completion of one full FedEx Ground accounting period, a P&D Contractor is eligible to receive an individual, performance related bonus, each period, under the Contractor Customer Service (CCS) Program.

Payment of this bonus will be based on Contractor's individual performance or the performance of Contractor's employed driver, the length of Contractor's service and on Contractor's terminal meeting its CCS Goals.

| Contractor Service | Individual Safety and Customer Service |
|---|---|
| 1st full Period - 3 years | $205.00 per period |
| 3 - 5 years | $230.00 per period |
| Over 5 years | $260.00 per period |

INDIVIDUAL SERVICE AND SAFETY

Each full accounting period, eligibility for the individual CCS Bonus will be determined by the Contractor's performance in customer service and safety. To qualify, during each period, Contractor or Contractor's driver must have no at-fault accidents, no verified customer complaints, meet the goals set for daily scanning or sheeting of packages returned to the terminal at the end of each day, and must remain a contractor and complete the full accounting period.

Examples of customer complaints include, but are not limited to, complaints about the following:

- Driver release to business.
- Unauthorized indirect deliveries.
- Rudeness, abusive, or objectionable language or behavior.
- Poor appearance or not in FedEx Ground uniform.
- Failure to follow customer instructions.
- Unsafe driving.
- Accidents or property damage.

EFFECTIVE: 6/01/04

TERMINAL SERVICE

The Contractor is eligible for a "Terminal Group Performance-related Bonus", as described below.

If the terminal achieves inbound service:

- At level one, the period CCS bonus will be $50 per Contractor.
- At level two, the period CCS bonus will be $75 per Contractor.
- At level three, the period CCS bonus will be $99 per Contractor.

Eligibility for the Terminal Group CCS Bonus will be based on whether the Contractor's terminal meets its inbound service goal for the period being considered. If it does, all eligible Contractors at that terminal receive the Terminal Group CCS Bonus; if it does not meet its goal, no one receives the Terminal Group CCS Bonus.

NO MISSED PICKUPS

A weekly service bonus of $25 will be paid to every Contractor who has had no early or missed pick-ups during that week.

This payment will be calculated as follows:

For each calendar week in which the Contractor completes all pickups per the customer instructions, with no missed pickup or any pickup earlier than the time designated on the daily pickup listing (collectively referred to as "Missed Pickups"), the Contractor shall receive a credit of $25 for that particular week of an accounting period. After the completion of each accounting period, FedEx Ground shall pay Contractor a Service Bonus calculated by the number of calendar weeks in which Contractor had no Missed Pickups, multiplied by $25.

Contractor may request, in writing, in the first period of each quarter, that CCS monies be deposited in Contractor's HR-10 Account, Service Guarantee Account, or be paid in the applicable weekly settlement.

Contractors with multiple vans are eligible for CCS awards for each van beginning after each such additional van has been in service for one full period.

EFFECTIVE: 6/4/01

ADDENDUM 7

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

BUSINESS SUPPORT PACKAGE

The Business Support Package consists of the following items:

- Uniform Program.
- Lease of FedEx Ground scanner, printer (where applicable) and communications and related equipment necessary for customer service and package data processing.
- Annual D.O.T. inspection.
- Drug tests meeting D.O.T. requirements.
- Equipment washing service which complies with applicable federal, state and municipal regulations pertaining to waste water run-off and at sufficient frequency to meet the Appearance Standards of Paragraph 1.12 of this Agreement.
- The opportunity, at contractor's discretion, to purchase from vendors, at FedEx Ground negotiated prices, tires, batteries, bumpers, package handling equipment, body repairs, preventive maintenance services, and painting.

Contractor is not required to purchase the Business Support Package. The cost of the Package is $8 per day, per van, for each business day Contractor is entitled to receive van availability. If Contractor elects to participate in the program, Contractor agrees to be liable for loss or damage to such equipment received under this program under the following conditions:

1. Loss while in the possession of Contractor;
2. Willful and/or intentional damage;
3. Damage resulting from disregard of vendor's recommended operating procedures.

Contractor will not be liable for normal wear and tear or defects associated with manufacture and/or vendor repair and maintenance.

By initialing the appropriate space below, Contractor

 elects

____ elects not

to participate in the Business Support Package. Contractor may change such election as provided in the Agreement.

EFFECTIVE: 6/1/04

ATTACHMENT I-1 TO ADDENDUM 7

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

TIME-OFF PROGRAM

Each contractor, at his or her own discretion, may elect to participate in the company's time-off program. The program consists of the following key elements:

A contractor is eligible to sign up for two weeks time-off during each year. Weeks available will be posted prior to the company fiscal year. (A year being the normal company fiscal year, June through the end of May).

- A contractor operating multiple vans may select time-off for each van for which deductions are made for the Business Support Package (BSP).

- Selection of time off weeks will take place in May of each year with selections made according to length of time as a contractor. Highest local inbound service for the previous full accounting period will serve as a tiebreaker.

- Each contractor will select one week off, in order, through the entire list of participating contractors before the second week is selected, in the same order.

- Holidays that occur during a contractor's time-off week will be included as part of the contractor's time-off week.

- A contractor who signs up for the time-off program must remain in the program for the entire year.

The Time-Off Program will provide participating contractors with two weeks off under the following conditions:

- The contractor's van will not be used to service his or her work area.

- The contractor will have no liability for accidents, claims or service resulting from the activities of the individual working in his work area during his absence.

- Contractor's eligibility for a CCS bonus during the time-off period will not be affected by the replacement driver.

Prior to taking time-off, the replacement driver will ride with the contractor an appropriate number of days to familiarize himself with the contractor's work area.

EFFECTIVE: 6/1/04

- The contractor is expected to provide guidance, suggestions, and advice concerning the most efficient manner of serving his work area and any special customer requirements.

- The cost of such familiarization rides is included in the Time-Off Program.

To participate in the Time-Off Program, Contractor must indicate that he or she understands and agrees to the following provisions:

- For two weeks time-off, Contractor agrees to have an additional $3.00 added to the daily BSP settlement deduction.

- If available, additional weeks can be purchased for an additional $1.50/day added to daily BSP settlement deduction.

- Contractor will not receive any settlement for work performed by the replacement driver in his or her work area during the time-off period.

- If a contract is terminated for any reason, contractor is not entitled to any reimbursement of monies collected in the BSP for time-off.

- If a contract is terminated and contractor has taken all or part of his selected time-off, the remaining monies owed to the BSP for the Time-Off Program that year will be deducted from final settlement.

- If a contract is not renewed at the time it expires and contractor is participating in the Time-Off Program but has not taken any time-off, he or she will be reimbursed the amount paid into the BSP for time-off.

- If a contractor, participating in the Time-Off Program, sells his or her work area and the buyer agrees to participate in the program and continue the BSP deduction for the remainder of the year, the selling contractor will not be charged for the remainder of the year. In that case, the buyer will assume the days off selected by the selling contractor.

- Any contractor participating in the Time-Off Program may sell or trade his selected days off to any other participating contractor in the same type of group. Terminal management must be informed for planning purposes only. A one-time lump sum settlement deduction may be used for such transactions using the Contractor Equity Settlement Deduction form (SET005), not to exceed $1,000.

________ I wish to participate in the Time-Off Program and hereby acknowledge that I understand and accept the above provisions and conditions of the Time-Off Program.

________ I don't wish to participate in the time-off program.

# FEDEX GROUND SAFE DRIVING PROGRAM

FedEx Ground maintains a program of self-coverage for public liability and property damage risks supplemented by insurance coverages with a commercial insurance carrier. Under this program, FedEx Ground is able to maintain cost-effective management of its exposure arising through road accidents and cargo loss and damage. The success of the program requires that all drivers maintain, without exception, a high standard of care at all times when driving a motor vehicle, whether or not on Company business. For those drivers who do maintain such a high standard -- and they include the overwhelming majority of drivers engaged in driving on FedEx Ground business -- this program provides a distinct benefit to them and those they serve. The protection against liability afforded thereunder is essentially cost-free to them.

The criteria for safe driving have been developed by FedEx Ground from its own experience and in consultation with its drivers. FedEx Ground will disqualify any driver from participation in the FedEx Ground Safe Driving Program who does not comply with the requirements and standards set forth below; provided, however, notwithstanding any provision of this Safe Driving Program, Contractor is not relieved of the obligation to conform to all applicable federal, state and local laws in the operation of the Equipment, as provided in paragraph 1.10 (f) of the Agreement, and breach of that obligation remains grounds for termination of the Agreement pursuant to paragraph 12.1 (c) thereof. The result of disqualification would be to require that substitute insurance covering the driver be found if he/she is to continue to render services required for FedEx Ground's business.

## Driver Eligibility Requirements

The driver eligibility requirements listed below are the minimum requirements for all drivers:

1. No record of conviction for a felony.

2. A minimum age of 21 years.

3. A minimum of one year's experience (within the past three years) as a driver of commercial motor vehicles similar to the type of equipment to be utilized by the driver, or successful completion of a FedEx Ground-approved driver training course.

4. Possession of a valid commercial driver's license for the type of vehicle to be operated, issued by the resident state of the driver.

FXG_GIVENS0001270

5. No record of a driver's license suspension or revocation for more than 30 days, during the 36 consecutive months prior to the date of engagement.

The suspension or revocation must be the direct result of the conviction while operating a motor vehicle.

Suspensions for failure to appear (FTA), failure to meet financial responsibility laws, or non-moving convictions (NMVC) are excluded.

6. No record of citation or conviction for the violations listed below during the 36 consecutive months prior to the date of engagement:

   a. Driving while under the influence of alcohol or drugs;

   b. Refusal to submit to a test of intoxication or impairment requested by a police officer or FedEx Ground;

   c. Operating a motor vehicle which contains alcoholic beverages in open containers contrary to law;

   d. Being charged with homicide resulting from the unlawful or negligent operation of a motor vehicle;

   e. Operating a motor vehicle while the driver's license was suspended, cancelled or expired;

   f. Failing to stop, or remain, at the scene of an accident;

   g. Driving a motor vehicle in a speed exhibition, contest or drag race;

   h. Use of a motor vehicle in the commission of a felony;

   i. Dangerous or careless operation of a motor vehicle, whether causing harm to another person or not;

   j. Operating a motor vehicle without the permission of the owner; and,

   k. Fleeing or attempting to flee a police officer.

7. No record of involvement in an at-fault traffic accident resulting in a person's death, or bodily injury.

8. No record of involvement in more than two at-fault traffic accidents and two moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

9. No record of involvement in more than one at-fault traffic accident and three moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

10. No record of conviction for more than four motor vehicle moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

11. Completion of a suitable contractor/driver information sheet.

12. A history of safe commercial driving experience and satisfactory work history.

13. Evidence of a valid commercial driver's license.

14. A current and satisfactory motor vehicle record abstract.

15. Successful completion of a thorough physical examination confirming physical fitness to operate a commercial motor vehicle. The physical examination must be completed by a qualified physician approved by FedEx Ground.

16. Successfully pass a drug screen administered at such time and place and in such manner as determined by FedEx Ground.

17. No record of positive results in any drug or alcohol test.

18. Successful completion of a written examination pertaining to commercial vehicle safety. The examination is to be scored and must show evidence that instruction was given to provide accurate information on incorrect responses.

19. Successful completion of a well-designed road driving skill test which meets the minimum commercial driver's license standards.

FedEx Ground Driver Safety Standards

The following acts or omissions by a driver are prohibited:

1. Driving while under the influence of alcohol or drugs.

2. Refusing to submit to a drug or alcohol test requested by a law enforcement officer or FedEx Ground.

3. Operating a motor vehicle which contains alcoholic beverages, or a controlled substance contrary to law.

4. Being charged with homicide resulting from the unlawful or negligent operation of a motor vehicle.

5. Operating a motor vehicle while the driver's license has been suspended, cancelled or has expired.

6. Failing to stop, or remain, at the scene of an accident.

7. Driving a motor vehicle in a speed exhibition, contest or drag race.

8. Using a motor vehicle in the commission of a felony.

9. Dangerous or careless operation of a commercial motor vehicle (such as speeding at 80 m.p.h. or more; or more than one incident of speeding at 15 m.p.h. or more, over the posted speed limit), whether causing harm to another person or not.

10. Operating a motor vehicle without the permission of the owner.

11. Fleeing or attempting to flee a police officer.

12. Causing an at-fault traffic accident resulting in a person's death, or bodily injury resulting in medical costs or incurred reserves in excess of $50,000, or property damage in excess of $25,000.

13. Causing more than two at-fault accidents in any vehicle in any 12 consecutive months, or more than five at-fault accidents in any vehicle in any 36 consecutive months period. Any accident involving less than $500 in property damage is exempt from the five accident rule.

14. Committing more than two motor vehicle moving violations in a commercial vehicle, or more than three motor vehicle moving violations in any vehicle, in any 12 consecutive months period.

15. Committing more than five motor vehicle moving violations in any vehicle in any 36 consecutive months period.

16. Negligently or knowingly failing systematically to inspect, repair, maintain and otherwise ensure the leased equipment is at all times in safe operating condition.

17. Carrying passengers not authorized by FedEx Ground while on FedEx Ground's business.

18. Failure to report an accident as soon as possible.

19. Falsifying any safety-related report or document such as an annual motor vehicle record report.

20. Violation of any applicable hours of service policy(ies), rule(s) or regulation(s).

21. Failure to complete or refusal to undergo a thorough physical examination confirming physical fitness to operate a commercial motor vehicle at least every two years and following any physical or mental impairment from injury or disease. Such physical examination must be completed by a qualified physician approved by FedEx Ground.

22. Failure to pass or submit to a drug screen administered at such time and place and in such manner as determined by FedEx Ground.

23. Failure to report promptly any incident resulting in property damage and any incident or accident involving any pedestrian or occupant of any type of vehicle, whether or not the incident or accident appears to have resulted in personal injury, regardless of who appears to be at fault.

24. Failure to forward immediately to FedEx Ground every demand, notice, summons or other legal process received that involves a claim, suit or other legal process received that involves a claim, suit or other legal proceeding arising from or in any way related to any matter encompassed within the provisions of this Safe Driving Program.

25. Failure to cooperate fully with FedEx Ground in the conduct of any legal action, regulatory hearing or other similar process arising from or in any way related to any matter encompassed within the provisions of this Safe Driving Program. Such cooperation includes, without limitation, attendance at hearings, trials, meetings, etc.; the securing of evidence; and, obtaining the attendance of witnesses.

NOTE: With respect to any of the acts or omissions above specified that would constitute an offense of law, and which, if the driver were found guilty would result in disqualification, FedEx Ground in its sole discretion based upon reasonable inquiry, may make a preliminary determination of the probability that the driver is guilty of the offense whether charged or not. In such event, FedEx Ground may suspend the driver for up to 15 days pending the filing of charges against such driver. If such charges are filed, such suspension shall continue until a final determination by a court, and will become permanent unless the driver is found not guilty of the offense at issue.

case 3:05-md-00527-RLM -CAN document 958-16 filed 11/16/07 page 1 of 25

OP149-Res

# FEDEX HOME DELIVERY

# STANDARD CONTRACTOR OPERATING AGREEMENT

**JUNE 2001**

Case 3:05-md-00527-RLM CAN document 958-16 filed 11/16/07 page 2 of 25

## TABLE OF CONTENTS

BACKGROUND STATEMENT ........ 1

1. EQUIPMENT AND OPERATIONS. ........ 2
   - 1.1 Power Equipment. ........ 2
   - 1.2 Equipment Maintenance. ........ 2
   - 1.3 Operating Expenses. ........ 3
   - 1.4 Operation of the Equipment. ........ 3
   - 1.5 Equipment Identification While in FHD's Service. ........ 4
   - 1.6 Licensing. ........ 4
   - 1.7 Reports. ........ 5
   - 1.8 Shipping Documents and Collections. ........ 5
   - 1.9 Contractor Performance Escrow Account. ........ 5
   - 1.10 Agreed Standard of Service. ........ 7
   - 1.11 Refused or Returned Shipments. ........ 9
   - 1.12 Operator and Equipment Appearance Standard. ........ 9
   - 1.13 Contractor's Obligation to Meet Standards of Customer Service. ........ 9
   - 1.14 Discretion of Contractor to Determine Method and Means of Meeting Business Objectives. ........ 10

2. VEHICLE OPERATION. ........ 10
   - 2.1 Additional Vehicles; Safe Operation Required. ........ 10
   - 2.2 Employment of Qualified Persons. ........ 11

3. INSURANCE AND INDEMNITIES. ........ 12
   - 3.1 Non-Trucking Liability Coverage -- Contractor's Responsibility. ........ 12
   - 3.2 Public Liability -- FHD's Responsibility. ........ 12
   - 3.3 Public Liability -- Contractor's Responsibility. ........ 13
   - 3.4 FHD's Non-Liability for Equipment. ........ 14
   - 3.5 Contractor's Responsibility for Certain Losses. ........ 14
   - 3.6 Work Accident and Workers's Compensation. ........ 16

4. SETTLEMENT WITH CONTRACTOR. ........ 17
   - 4.1 Settlement for Services Performed ........ 17
   - 4.2 Settlement Statements ........ 18

5. SERVICE GUARANTEE PROGRAM. ........ 19

6. CONTRACTOR PRIMARY SERVICE AREA ........ 20
   - 6.1 Definition ........ 20
   - 6.2 Mutual Intention to Reduce Geographic Size of Primary Service Area. ........ 20
   - 6.3 Recognition of Contractor's Proprietary Interest in Customers Served. ........ 21
   - 6.4 Payments to or From Contractor. ........ 22

7. BUSINESS SUPPORT PACKAGE. ........ 24

8. TERM OF AGREEMENT .......... 24
- 8.1 Initial Term. .......... 24
- 8.2 Renewal Terms. .......... 25

9. TERMINATION PROVISIONS. .......... 25
- 9.1 Termination. .......... 25
- 9.2 Obligations Upon Termination. .......... 26
- 9.3 Arbitration of Asserted Wrongful Terminations. .......... 27

10. MERGER OF UNDERSTANDING .......... 27

11. CAPTIONS. .......... 27

12. SAVINGS CLAUSE .......... 28

13. FAILURE TO ENFORCE. .......... 28

14. FORCE MAJEURE. .......... 28

15. ASSIGNMENT. .......... 28

16 GOVERNING LAW .......... 29

ADDENDUM 1 .......... Identification of Leased Equipment

ADDENDUM 2 .......... Insurance - Minimum Coverage Requirements

ADDENDUM 3 .......... Settlement
- Attachment 3.1. .......... Temporary Core Zone Density Settlement
- Attachment 3.2. .......... Shuttle Service Settlement

ADDENDUM 4 .......... Primary Service Area

ADDENDUM 5 .......... Proprietary Interest

ADDENDUM 6 .......... Business Support Package

ADDENDUM 7 .......... Arbitration

ADDENDUM 8 .......... Contractor Customer Service Program

FHD SAFE DRIVING PROGRAM

FHD DRIVER RELEASE PROGRAM

**FEDEX HOME DELIVERY**
**STANDARD CONTRACTOR OPERATING AGREEMENT**

**BACKGROUND STATEMENT.** FedEx Home Delivery (FHD), a division of FedEx Ground Package System, Inc. (FedEx Ground), a duly licensed motor carrier, is engaged in providing a small package information, transportation and delivery service throughout the United States, with connecting international service. The Contractor is an owner-operator of one or more pieces of trucking equipment suitable for use in such a service. Contractor wants to make this equipment available, together with a qualified operator for each piece of equipment, to provide daily pick-up and delivery service on behalf of FHD. FHD wants to provide for package pick-up and delivery services through a network of independent contractors, and, subject to the number of packages tendered to FHD for shipment, will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment. Contractor wants the advantage of operating within a system that will provide access to national accounts and the benefits of added revenues associated with shipments picked up and delivered by other contractors throughout the FHD system. In order to get that advantage, Contractor is willing to commit to provide daily pick-up and delivery service, and to conduct his/her business so that it can be identified as being a part of the FHD system. Both FHD and Contractor intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of FHD for any purpose. Therefore, this Agreement will set forth the mutual business objectives of the two parties intended to be served by this Agreement -- which are the results the Contractor agrees to seek to achieve -- but the manner and means of reaching these results are within the discretion of the Contractor, and no officer or employee of FHD shall have the

authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding.

## 1. EQUIPMENT AND OPERATIONS.

1.1 **Power Equipment.** In conjunction with providing to FHD transportation services as herein provided, Contractor will provide and utilize the vehicular equipment identified in the most recent Addendum 1 to this Agreement (hereinafter called the "Equipment"). Contractor certifies that the Equipment meets the requirements of all applicable federal, state and municipal laws and regulations, and, subject to the determination of FHD of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor.

1.2 **Equipment Maintenance.** Contractor agrees, at Contractor's expense, to maintain the Equipment in accordance with the safety and equipment standards specified in applicable federal, state and municipal laws and any rules, regulations and orders of any applicable agency. In the event the Equipment is found to be deficient under any law or regulation, Contractor agrees to remove the Equipment from service with FHD until it is brought into compliance. During such interim period, Contractor shall, at Contractor's expense, provide alternative equipment suitable for use in carrying out Contractor's obligations under this Agreement.

**1.3 Operating Expenses.** Contractor agrees to bear all costs and expenses incidental to operation of the Equipment, whether empty or loaded, including, without limitation, all risks of depreciation, all maintenance (including cleaning and washing), fuel, oil, tires, repairs, business taxes, consumption and sales taxes, personal property taxes, ad valorem taxes, fuel and road-use taxes, ton-mile taxes, insurance coverage as provided herein, workers compensation assessments, licenses, vehicle registration renewal fees, base plates, and all highway, bridge and ferry tolls. To facilitate payment of licenses, taxes and fees, where mutually convenient or otherwise required by statute or regulation, Contractor hereby authorizes FHD to pay these charges on Contractor's behalf and to charge Contractor for any such payments, together with any direct expenses incurred by FHD in connection with their payment. Contractor agrees that unless strictly prohibited by law, any licenses, permits, assessments and taxes paid by FHD on behalf of Contractor pursuant to this paragraph may be charged back against and deducted from any compensation owed Contractor by FHD.

**1.4 Operation of the Equipment.** Contractor agrees to direct the operation of the Equipment and to determine the methods, manner and means of performing the obligations specified in this Agreement. FHD shall be considered to have such exclusive possession, use and control of the Equipment required by D.O.T. regulation at 49 CFR Part 376.12(c), or other applicable regulations, but shall have no right or authority, without the express permission of Contractor, to operate the Equipment for any purpose (except for incidental yard movement and positioning) unless the Equipment is driven either by Contractor or by an operator engaged by Contractor. While the Equipment is in

the service of FHD, it shall be used by Contractor exclusively for the carriage of the goods of FHD, and for no other purpose. If the Equipment is operated in the service of anyone other than FHD, including any separate business activities of Contractor, Contractor agrees to hold FHD harmless from any liability arising from operation of the Equipment that may be asserted against FHD by any person.

**1.5 Equipment Identification while in FHD's Service.** Contractor agrees to mark Equipment while in FHD's service with such identifying colors, logos, numbers, marks and insignia as may be required either under applicable regulations, including 49 CFR Part 390, or to identify the Equipment as a part of the FHD system. Contractor may use the Equipment for other commercial or personal purposes when it is not in the service of FHD, with the understanding that all such identifying numbers, marks, logos and insignia will be removed or masked (by paper or plastic overlay) when the Equipment is so used.

**1.6 Licensing.** If, at any time during the term of this Agreement, applicable state regulations require Contractor to obtain an owner/driver operating authority in order to serve intrastate customers, Contractor agrees, at his/her own expense, to acquire and maintain such operating authority and to cooperate with FHD in altering the arrangements set out in this Agreement to the extent necessary to ensure compliance by Contractor and FHD with any such state regulations, practices and procedures.

FXG_LEIGHTER0000267

**1.7 Logs and Reports.** Contractor agrees to prepare daily driver logs and daily inspection reports, along with fuel receipts and other documents as required by law or regulation, and to file the originals with FHD at the beginning of the next business day.

**1.8 Shipping Documents and Collections.** Contractor agrees to prepare and present for the signature of consignors and consignees such shipping documents as FHD may from time to time designate, and to complete and return these documents to FHD within one business day. Contractor further agrees to collect any charges owed by consignors and consignees and to return all collected charges to FHD at the end of each business day.

**1.9 Contractor Performance Escrow Account.** Contractor agrees to deposit with FHD at such time and in such manner as FHD may specify the sum of $500, which deposit shall be held by FHD in an account (hereinafter called the "Contractor Performance Escrow Account"). FHD agrees to handle the Contractor Performance Escrow Account as follows:

(a) Amounts held by FHD in the Contractor Performance Escrow Account shall be applied only for the purposes described in subparagraph (d) below.

(b) FHD agrees to pay (by credit to Contractor's weekly Settlement Statements at quarterly intervals) interest on the daily balance in the Contractor Performance Escrow Account. Such interest shall be at a rate equal to the average annual yield

of 13-week U.S. Treasury bills at the rate established at the beginning of each quarter for the funds held on deposit during such quarter.

(c) FHD agrees to provide Contractor with an accounting of all credits to or subtractions from Contractor's balance in such Account as part of Contractor's weekly Settlement Statement.

(d) Upon termination of this Agreement, Contractor agrees that any balance attributable to Contractor in the Contractor Performance Escrow Account shall be applied to reduce any indebtedness of Contractor to FHD as reflected on Contractor's Settlement Statements or other instruments. Contractor shall remain liable for any remaining indebtedness which exceeds Contractor's balance in such Account.

(e) Upon Contractor's fulfillment of the obligations due to FHD upon termination, FHD shall, after making such deductions from the Contractor Performance Escrow Account as are permitted herein, provide Contractor with a final accounting of all final transactions involving Contractor's balance in such Account and remit to Contractor any remaining balance within 45 days from the date of termination.

**1.10 Agreed Standard of Service.** FHD has represented to shippers and consignees that, in arranging transportation of packages within the FHD system, it will provide a standard of service that is fully competitive with that offered by other national participants in the industry. Contractor acknowledges the benefits to his/her business of participation in the FHD national system, and agrees to conduct activities under the terms of this Agreement to achieve the results represented to shippers and consignees. To achieve these business objectives, Contractor agrees to:

(a) Provide daily delivery and pick-up service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area, as that term is defined in this Agreement, and in such other areas as Contractor may from time-to-time be asked to service, all consistent with the competitive standards within the industry (provided, however, that on any day where the volume of packages available for delivery or pick-up in Contractor's Primary Service Area exceeds the volume that Contractor can reasonably be expected to handle on such day, FHD may reassign a portion of such packages to another contractor);

(b) Make reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages handled per shipper within Contractor's Primary Service Area;

(c) Handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage;

(d) Cooperate with FHD's employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal;

(e) Foster the professional image and good reputation of FHD and Contractor with shippers and consignees, including adhering to the vehicle identification and operator appearance standards specified in Paragraphs 1.5 and 1.12 of this Agreement;

(f) Conform to all applicable federal, state and local laws, regulations and ordinances;

(g) Cause the Equipment to be operated safely and in compliance with all applicable laws and regulations; and,

(h) Conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times.

**1.11 Refused or Returned Shipments.** If a package cannot be delivered on the day it is tendered to Contractor for delivery, Contractor agrees to return the package to FHD at the beginning of the next business day at the terminal facility where it was tendered for delivery, and to inscribe on the package and to provide by electronic and/or manual means whatever notational references (i.e., service cross) FHD may from time to time reasonably require in order to document the package location and the reason for non-delivery. On Saturdays, undelivered packages, together with accompanying reports and documentation, must be returned at the end of the business day.

**1.12 Operator and Equipment Appearance Standard.** Contractor acknowledges that the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive with other alternatives available to shippers and consignees and to permit recognition and prompt access to customers' places of business. Accordingly, each person having contact with the public under the provisions of this Agreement will wear an FHD-approved uniform, maintained in good condition, and will otherwise keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by FHD. In addition, the Equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry.

**1.13 Contractor's Obligation to Meet Standards of Customer Service.** Contractor shall have the obligation to assure that all persons who operate the Equipment are fully trained and capable of meeting the customer service standards set forth in this Agreement. FHD

shall, during the first 30 days of the term of this Agreement, familiarize Contractor with various service quality procedures developed by FHD. In addition, qualified FHD terminal personnel may, at their option, visit customer locations with Contractor four times annually to verify that Contractor is meeting the standards of customer service provided in this Agreement.

**1.14 Discretion of Contractor to Determine Method and Means of Meeting Business Objectives.** It is specifically understood and agreed by both parties that Contractor shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of FHD shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of FHD shall have the authority to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance.

**2. VEHICLE OPERATION.**

**2.1 Additional Vehicles; Safe Operation Required.** Contractor may, with the consent of FHD and consistent with the capacity of the terminal serviced by Contractor, own and operate more than one vehicle, with any such additional vehicles to be driven by qualified operators employed by Contractor, as described in subparagraph 2.2 below. No vehicle may be operated pursuant to this Agreement by any operator who is not in compliance with such standards.

FXG_LEIGHTER0000273

**2.2 Employment of Qualified Persons.** Contractor may employ or provide person(s) to assist Contractor in performing the obligations specified by this Agreement. All persons so employed or provided by Contractor, either driving or non-driving, shall be qualified pursuant to applicable federal, state and municipal safety standards and FHD Safe Driving Program standards as published from time to time. All persons employed or provided by Contractor shall be fully trained, at Contractor's expense, to operate the Equipment. Contractor understands and agrees that such persons shall not be considered employees of FHD and that it is Contractor's responsibility to assure that such persons conform fully to the applicable obligations undertaken by Contractor pursuant to this Agreement. Contractor further agrees to:

(a) Bear all expenses associated with qualifying such persons to perform the services agreed to be provided herein, including, without limitation, the cost of physical examinations and drug screen tests;

(b) Bear all expenses associated with the employment of such persons, including, without limitation, wages, salaries, employment taxes, workers compensation coverage, health care, retirement benefits and insurance coverages;

(c) Assume sole responsibility for compliance with all applicable laws, rules, regulations and orders respecting payroll deductions and maintenance of payroll and employment records; and,

(d) Hold FHD harmless from any liability and claims by others or by governments arising from Contractor's relationship with Contractor's employees or substitutes whether under industrial accident prevention laws or any other federal, state or municipal laws applicable to the relationship between employers and employees.

**3. INSURANCE AND INDEMNITIES.**

**3.1 Liability Coverage -- Contractor Responsibility.** Contractor agrees to obtain and keep in force at all times a policy(ies) of public liability (vehicular bodily injury and property damage insurance coverage), issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated, and rated A, Class VII or better by A.M. Best Co., to cover all costs, losses and expenses arising from operation of the Equipment while it is being operated for Contractor's personal benefit in amounts not less than $100,000 per person, $300,000 per occurrence for bodily injury, $50,000 per occurrence for property damage. Minimum coverage requirements are set forth in Addendum 2 to this Agreement. Contractor shall provide FHD Certificate(s) of Insurance evidencing such coverage naming FHD an additional insured and providing FHD 30 days' prior written notice of cancellation or material change.

**3.2 Public Liability -- FHD's Responsibility.** FHD agrees to self-retain and maintain insurance coverages for public liability (vehicular personal injury and property damage insurance coverage), and cargo loss and damage risks in amounts sufficient to meet its legal obligations under 49 CFR Part 387 and, subject to the exception described in subparagraph 3.5 below, will indemnify Contractor and Contractor's drivers against

liability for operation of the Equipment while on FHD's business subject to the following exceptions and conditions, the occurrence of any one of which will void this indemnity:

(a) As to the involved Equipment operator, if the operator has engaged in intentional misconduct or reckless or willfully negligent operation of the Equipment;

(b) As to the Contractor, if the Contractor is not the involved Equipment operator, but has knowledge of or reason to anticipate such operator's intentional misconduct or reckless or willfully negligent operation of the Equipment; or

(c) As to Contractor and operator(s), when FHD has elected to discontinue its indemnity hereunder pursuant to the provisions of subparagraph 3.3.

**3.3 Vehicular Liability -- Contractor's Responsibility.** At any time that FHD discovers that Contractor or an operator engaged by Contractor to drive the Equipment fails to meet FHD's Safe Driving Program standards, as determined by FHD in its sole discretion, FHD may elect to terminate its indemnity for liability to Contractor and Contractor's operators (hereinafter referred to as "indemnity termination"). Any such election of indemnity termination shall be given in writing to Contractor not less than 30 days before the effective date thereof, as specified in such election. In such event (unless Contractor cures such violation to FHD' sole and complete satisfaction before such effective date), Contractor shall obtain, effective not later than such specified date, and continually thereafter maintain, a policy of public liability (vehicular bodily injury and property damage insurance coverage) for a combined single limit of not less than $2,000,000

naming FHD as an additional insured, issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated and rated A, Class VII or better by A.M. Best Co. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to FHD showing FHD as an additional insured and providing FHD 30 days' prior written notice of cancellation or material change. In addition, Contractor will obtain and continually thereafter maintain a policy of insurance for cargo loss and damage risk for an amount not less than $40,000 per vehicle, with deductibles not greater than $250, to be issued by an insurance company meeting the same qualifications provided above. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to FHD naming FHD as an additional insured and providing FHD 30 days' prior written notice of cancellation or material change.

**3.4 FHD's Non-Liability for Equipment.** Contractor agrees that FHD shall not be liable to Contractor for any depreciation, loss or damage that may occur to the Equipment by collision, fire, theft or similar occurrence, excepting such loss or damage as may be caused by FHD, its agents, servants and employees.

**3.5 Contractor's Responsibility for Certain Losses.** The following indemnities constitute an exception to the provision for risk protection to Contractor provided in subparagraph 3.2. During the term of this Agreement and thereafter, Contractor agrees to indemnify and save FHD harmless against liabilities as follows:

(a) The first $500 arising from each claim brought against FHD and all liabilities incurred by FHD for or on the account of bodily injury and/or property damage in any manner caused by, incidental to or growing out of any act or omission of Contractor or Contractor's agents, servants or employees arising out of the ownership, maintenance, use or operation of the Equipment and/or FHD-provided equipment, or out of the conduct of Contractor's business;

(b) After one year of continuous safe operation of the Equipment under the terms of this Agreement, the Contractor's responsibility under this subparagraph shall be reduced to $250; and after two years to zero (provided, however, in the event the Equipment is involved in an at-fault accident while in the service of FHD, the Contractor's responsibility shall revert to $500 until, by passage of time without a further at-fault accident, the modifications of this subparagraph (b) again apply);

(c) The first $500 of each claim for loss or damage to packages tendered for shipment or handling hereunder while such packages are in the possession of Contractor or Contractor's agents, servants or employees; provided, however, Contractor shall not be required to pay any claim on packages delivered pursuant to the FHD Driver Release Program as published from time to time;

(d) Any or all claims brought against FHD or liabilities incurred by FHD arising from the Contractor's relationship with Contractor's employees, whether under industrial accident prevention laws, or any other federal, state or municipal laws,

FXG_LEIGHTER0000278

rules, regulations and orders applicable to the relationship between employers and employees;

(e) Any and all claims brought against FHD or liabilities incurred by FHD for or on account of Contractor's failure or failure of Contractor's agents, servants or employees to comply with any laws, rules, regulations or orders applicable to Contractor's business; and,

(f) Any and all claims brought against FHD or liabilities incurred by FHD in the event the Contractor or the involved Equipment operator fails to assist FHD in securing and giving evidence, attending hearings and trials, obtaining the attendance of witnesses, or otherwise fails to cooperate with FHD in such matters.

**3.6 Work Accident and Workers Compensation.** Contractor agrees to obtain and keep in force at all times during the term of this Agreement work accident and/or workers compensation insurance insuring Contractor and all of Contractor's employees. Minimum coverage requirements are set forth in Addendum 2 to this Agreement. At Contractor's option, such coverage may be obtained either under a policy negotiated by FHD, through an applicable state sponsored program, or through a policy providing comparable benefits and issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated, and rated A, Class VII or better by A.M. Best Co. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to FHD and providing FHD 30 days' prior written notice of cancellation or material change.

FXG_LEIGHTER0000279

## 4. SETTLEMENT WITH CONTRACTOR.

**4.1 Settlement for Services Performed.** FHD agrees to settle on a weekly basis with Contractor for services provided in accordance with the settlement schedule set forth in Addendum 3, from which settlement shall be deducted charges for items which are authorized in writing or required by law. The settlement to Contractor shall consist of the following parts:

(a) **Package Pick-Up and Delivery Settlement**, which amount shall be a payment for stops made and packages handled;

(b) **Contractor and Van/Vehicle Availability Settlement**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement, in consideration of Contractor making available to FHD at the start of such day a clean, properly maintained van, driven by a qualified and uniformed operator; and,

(c) **Temporary Core Zone Density Settlement**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement in Contractor's Primary Service Area, in consideration of Contractor agreeing to provide daily package delivery and pick-up service during such period of time when the customer density and package volume in such Primary Service Area is still developing. In the event Contractor provides service

FXG_LEIGHTER0000280

outside his/her Primary Service Area, Contractor shall also receive a proportionate share of any Temporary Core Zone Density Settlement applicable to other area served. The intention of Contractor and FHD is to cooperate in increasing the customer density and package volume in Contractor's Primary Service Area to such an extent that the Temporary Core Zone Density Settlement will be reduced or eliminated, and Contractor agrees that, as such density and/or package volume increases, FHD may reduce or eliminate the Temporary Core Zone Density Settlement. Except in the case of a new terminal opening or other major increase in customer density and/or package volume in Contractor's Primary Service Area, such settlement amount shall not be decreased by more than $10 per day in any six month period, and then only with 30 days' prior written notice to Contractor.

**4.2 Settlement Statements.** FHD agrees to issue Settlement Statements and settlement checks to Contractor on a weekly basis (except when this Agreement is terminated as provided herein, in which case a final Settlement Statement and settlement check shall be issued within 45 days of termination). Settlement Statements shall contain a computation of the settlement Contractor is entitled to receive and an itemized listing of all deductions from Contractor's settlement. FHD shall have no responsibility to make deductions for, or to pay wages, benefits, health, welfare and pension costs, withholding for income taxes, unemployment insurance premiums, payroll taxes, disability insurance premiums, social security taxes, or any other similar charges with respect to Contractor or Contractor's employees. To facilitate prompt settlement, Contractor agrees to prepare such settlement documents and records as FHD may from time to time require in order to

compute such settlement. Upon written request, Contractor shall be provided copies of those documents which are necessary to determine the validity of all deductions from Contractor's settlement. Settlement Statements and the entries thereon shall be deemed conclusive and binding on Contractor, unless written objections to entries on a questioned Settlement Statement are received by FHD within 30 days from the date of issuance of the Settlement Statement to which the objections apply.

5. **SERVICE GUARANTEE PROGRAM.** FHD and Contractor recognize the mutual benefits to each party of keeping the Equipment, together with a qualified operator, in continuous daily service pursuant to the terms of this Agreement. The expenses of both maintenance and engaging a substitute operator during the periods when Contractor is ill or does not desire to drive are, pursuant to the terms of this Agreement, borne by Contractor. In order to encourage Contractor to accumulate a fund from which these and other unusual costs of operation can be paid when they arise, FHD agrees to maintain an interest-bearing fund, to account for contributions to the Service Guarantee Account. FHD agrees to pay (by credit to Contractor's weekly Settlement Statements at quarterly intervals) interest on the daily balance in the Service Guarantee Account. Such interest shall be paid at a rate equal to the average annual yield of 13-week Treasury Bills at the rate established at the beginning of each quarter for the funds held on deposit during such quarter. The Contractor may withdraw amounts credited to the Service Guarantee Account at any time for any purpose.

FXG_LEIGHTER0000282

## 6. CONTRACTOR PRIMARY SERVICE AREA.

**6.1 Definition.** Contractor shall be responsible for the daily delivery and pick-up of packages in Contractor's Primary Service Area, as assigned to Contractor from time to time by FHD, and as shown in Addendum 4 to this Agreement.

**6.2 Mutual Intention to Reduce Geographic Size of Primary Service Area.** Contractor recognizes that, as the customer base and package volume in the Primary Service Area increases, the geographic size of the area which Contractor will be able to serve with the Equipment can be expected to decrease. Contractor acknowledges that the increased concentration in customer base and package volume which results from a decrease in the geographic size of Contractor's Primary Service Area is in the interest of Contractor, since Contractor will thereby have the opportunity to complete a greater number of package deliveries and pick-ups with less expense, and Contractor agrees to cooperate with the reasonable efforts of FHD in gathering data necessary to evaluate Contractor's Primary Service Area, including permitting FHD personnel to ride with Contractor from time to time in connection with these efforts. FHD shall have the authority, upon five work days' prior written notice to Contractor, to reconfigure Contractor's Primary Service Area to take account of customer service requirements. During such notice period, FHD shall give Contractor the opportunity, using means satisfactory to FHD, to continue to provide in such Primary Service Area the level of service called for in this Agreement. In the event Contractor is not able to provide reasonable means to continue to service the Primary Service Area, FHD may, in its sole discretion, reconfigure such area.

**6.3 Recognition of Contractor's Proprietary Interest in Customers Served.** This Agreement is based on the concept that Contractor and FHD are each engaged in an undertaking to operate an efficient home package delivery service which is fully competitive with the standards of other national participants in the industry. FHD and Contractor recognize that, because of the reciprocal benefits which flow from participation in an interrelated, national service, they have a mutual interest in increasing package volume and the number of customers both in Contractor's Primary Service Area and in the service areas of other contractors who have entered into substantially identical agreements with FHD. Contractor specifically acknowledges that the intentions set forth in this Agreement to provide a national delivery service cannot be met -- either nationwide or in the service area served by the terminal (the "Terminal Service Area") which includes Contractor's Primary Service Area -- without the participation of a network of contractors. Therefore this Agreement contemplates that the parties hereto and other contractors in the FHD system recognize the proprietary interest of Contractor in the FHD deliveries and pick-ups in Contractor's Primary Service Area as that area is configured from time to time, and a consequent right of Contractor to receive payment in the event his/her Primary Service Area is reconfigured with the result that FHD deliveries and pick-ups previously served by the Contractor are reassigned by FHD. FHD deliveries and pick-ups are the deliveries and pick-ups which shippers tender to the FHD Division. They do not include the deliveries and pick-ups which shippers tender to FedEx Ground. Depending on the circumstance, as provided below, a payment to Contractor for reassigned FHD deliveries and pick-ups may be from other contractors or from FHD. In

consideration of the mutual obligations contained herein and in substantially similar agreements with other contractors, the parties hereto agree as follows:

(a) In the event Contractor's Primary Service Area is reconfigured so that the Contractor gains FHD deliveries and pick-ups, the Contractor hereby authorizes FHD to deduct from Contractor's settlement and to pay to the Contractor relinquishing such accounts the payments calculated as provided below; and

(b) In the event Contractor's Primary Service Area is reconfigured so that FHD deliveries and pick-ups which Contractor had previously serviced are reassigned to another contractor or to a spotted trailer, the Contractor shall receive payments, calculated and made as provided below.

**6.4 Payments to or From Contractor.** Payment to or from Contractor for FHD deliveries and pick-ups gained or relinquished when Contractor's Primary Service Area is reconfigured shall be calculated and made as follows:

(a) First, the average number of package deliveries per day gained or relinquished by Contractor shall be determined by reference to the average number of package deliveries in the area relinquished in the three most recent complete FHD accounting periods;

(b) Second, the average number of package pick-ups per day gained or relinquished by the Contractor shall be determined by reference to the average number of package pick-ups in the area relinquished in the three most recent complete accounting periods;

(c) Third, the Contractor shall be entitled to a payment of the dollar amount specified in Addendum 5, multiplied by the average number of package deliveries relinquished, and the dollar amount specified in Addendum 5, multiplied by the average number of package pick-ups relinquished;

(d) Fourth, the Contractor shall make payments calculated using the same formula as set forth in the preceding paragraph to relinquishing contractor(s) for package deliveries and pick-ups gained;

(e) Fifth, in the event, in connection with the reconfiguration, package deliveries or pick-ups previously in Contractor's Primary Service Area are reassigned to another contractor, FHD shall remit payment to Contractor, but only as and to the extent FHD receives payments from the contractor to whom the package deliveries or pick-ups were reassigned;

(f) Sixth, in the event package pick-ups or deliveries are permanently reassigned to a spotted trailer, FHD itself shall have the obligation to make the payments to the Contractor called for herein; and

(g) Seventh, if contractors so request, and if FHD in its sole discretion agrees, payments provided hereunder may be made by credits to and deductions from the affected Contractor's weekly settlement, as shown on such Contractor's Settlement Statement.

**7. BUSINESS SUPPORT PACKAGE.** Contractor shall not be required to purchase or rent any products, equipment, or services from FHD as a condition to entering into this Agreement. At Contractor's election (which election shall be as indicated on Addendum 6, and may be changed annually during the first FHD accounting period and as provided below) FHD will provide a Business Support Package to Contractor at a per van charge to Contractor as set out in the current version of Addendum 6, which amount shall be deducted from Contractor's weekly settlement. The Business Support Package shall include uniforms, D.O.T. inspections, drug tests meeting D.O.T. requirements, and other items and services found in the current version of Addendum 6. The cost of the Business Support Package may be changed once annually to reflect changes in the cost to FHD of providing such package. In the event FHD proposes to implement any such change, it shall provide Contractor with 30 days' prior written notice, during which period Contractor may elect to discontinue participation.

**8. TERM OF AGREEMENT.**

**8.1 Initial Term.** This Agreement shall, at the election of Contractor, as indicated by Contractor's initials below, continue in full force and effect for an initial term of one or two years from the date this Agreement is signed. Contractor hereby elects a term of:

a) one year ____

b) two years JL

**8.2 Renewal Terms.** This Agreement shall automatically renew for successive terms of one year each after expiration of the initial term unless Contractor or FHD provides the other party notice of non-renewal in writing at least 30 days prior to the expiration of the initial term or any successive renewal term.

## 9. TERMINATION PROVISIONS.

**9.1 Termination.** This Agreement may be terminated during the initial term or during any renewal term hereof, as follows:

(a) At any time, by mutual agreement of Contractor and FHD;

(b) By FHD in the event that Paragraphs 3.2(a) or 3.2(b) apply;

(c) By Contractor or FHD if the other party breaches or fails to perform the contractual obligations imposed by this Agreement;

(d) By either party in the event that FHD:

(1) ceases to do business in all or part of the Terminal Service Area; or,

(2) as a result of a decline in business, reduces operations in all or part of the Terminal Service Area; or

(e) By Contractor, upon 30 days' prior written notice to FHD. The parties hereto specifically recognize the damage to FHD, which is difficult to quantify, but

which includes the cost of engaging and qualifying temporary operators and replacement equipment to service Contractor's Primary Service Area, if Contractor should terminate his/her service obligations hereunder without first giving notice as provided in this paragraph. Therefore, in the event of such unauthorized termination by Contractor (except if such termination is caused by the death or disability of Contractor) Contractor shall pay to FHD, as liquidated damages, and not as a penalty, the sum of $500. FHD may withhold such amount from Contractor's final settlement or from Contractor's Performance Escrow Account.

**9.2 Obligations Upon Termination.** Upon termination of this Agreement for any reason, Contractor agrees promptly to:

(a) Return to FHD any packages tendered for pickup and/or delivery and any shipping papers, documents, collections, or other property of FHD in Contractor's possession;

(b) Return to FHD any property of FHD furnished to Contractor pursuant to the Business Support Package; and

(c) Remove and return or permanently mask (such as by painting over) all of FHD's vehicle identification from the Equipment.

FHD may withhold the return of any monies owed Contractor, including any balance remaining in Contractor's Performance Escrow Account, until Contractor completes the return of the items listed above.

**9.3 Arbitration of Asserted Wrongful Termination.** In the event FHD acts to terminate this Agreement (which acts shall include any claim by Contractor of constructive termination) and Contractor disagrees with such termination or asserts that the actions of FHD are not authorized under the terms of this Agreement, then each such disagreement (but no others) shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (AAA) in accordance with the terms and conditions set forth in Addendum 7 to this Agreement.

**10. MERGER OF UNDERSTANDING.** This Agreement, the Addenda hereto, and the Attachments to the Addenda, constitute the entire agreement and understanding between the parties and, when executed, shall constitute a revocation of any earlier Contractor Operating Agreement between the parties. This Agreement, the Addenda and Attachments shall not be modified, altered, changed or amended in any respect unless in writing and signed by both parties .

**11. CAPTIONS.** Captions appearing in this Agreement are for convenience only and do not in any way limit, amplify, modify or otherwise affect the terms and provisions of this Agreement.

**12. SAVINGS CLAUSE.** If any part of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect.

**13. FAILURE TO ENFORCE.** Failure of either party to enforce strictly any provision of this Agreement shall not be construed as a waiver thereof or as excusing the other party from future performance.

**14. FORCE MAJEURE.** The performance of the obligations of this Agreement on the part of either FHD or the Contractor shall be excused by reason of closing of public highways, changes in customer shipping and/or receiving requirements, strikes or work stoppages, weather conditions which make operations unsafe or impractical, Acts of God, or temporary or permanent cessation of business by FHD within the Terminal Service Area.

**15. ASSIGNMENT.** This Agreement shall be binding upon and enure to the benefit of the parties to this Agreement and their assignees. FHD shall have the right to assign its rights and obligations hereunder to an affiliate of FHD. Provided Contractor is in good standing hereunder, Contractor shall, with 30 days' prior written notice to FHD, have the right to assign his/her rights and obligations hereunder to a replacement contractor acceptable to FHD as being qualified to provide the services of Contractor under this Agreement (the "Replacement Contractor"), and, provided Contractor or Contractor's representative continues to provide service under this Agreement up to the effective date of such assignment, FHD shall thereupon enter into a new agreement with Replacement Contractor on substantially the same terms and conditions as herein contained. In

addition, in the event of the death or disability of Contractor, Contractor or his/her representative shall have a period of 30 days from and after such death or disability to secure a qualified Replacement Contractor to whom Contractor's rights and obligations may be assigned. Any consideration to be paid by Replacement Contractor on account of such assignment shall be strictly a matter of agreement between Contractor (or Contractor's representative) and Replacement Contractor. As a matter of accommodation to Contractor, FHD at its sole discretion, may agree, upon receipt of written instructions from Contractor and Replacement Contractor, to collect such consideration from Replacement Contractor by means of deductions from Replacement Contractor's weekly settlements for a period not to exceed one year, and promptly to remit such amounts to Contractor or his/her representative. FHD shall have no other obligations whatsoever either to secure a Replacement Contractor for the benefit of Contractor, or to assure any payment to Contractor on account of Contractor's assignment of this Agreement.

16. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

case 3:05-md-00527-RLM -CAN document 958-17 filed 11/16/07 page 8 of 30

**CONTRACTOR ACKNOWLEDGES AND REPRESENTS THAT CONTRACTOR HAS READ AND FULLY UNDERSTANDS THE PROVISIONS OF THIS AGREEMENT, AND HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH PERSONAL FINANCIAL, TAX AND LEGAL ADVISORS PRIOR TO EXECUTING THIS AGREEMENT.**

**IN WITNESS WHEREOF,** the parties hereto enter into and execute this Agreement this 5th day of June, 2002, at 14 11 pm

FHD

[signature]
Signature

Operations Manager
Title

[signature]
Witness

CONTRACTOR:

[signature]
Signature

JONATHAN P. LEIGHTER
Typed Name

[signature]
Witness




case 3:05-md-00527-RLM -CAN document 958-17 filed 11/16/07 page 9 of 30

EFFECTIVE: 03/13/00

ADDENDUM 1

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

IDENTIFICATION OF LEASED EQUIPMENT

| FHD Unit Number | Vehicle Make | Vehicle Year | Body Type | VIN | Number Axles |
|---|---|---|---|---|---|
| 703595 | Workhorse | 2002 | Stepvan | 5T4HP41R323340563 | 1 |

EFFECTIVE: 3/13/00

ADDENDUM 2

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

INDEPENDENT CONTRACTOR INSURANCE COVERAGE
WORK ACCIDENT (OR WORKERS' COMPENSATION) INSURANCE
VEHICULAR LIABILITY INSURANCE
MINIMUM COVERAGE REQUIREMENTS

| WORK ACCIDENT INSURANCE | |
|---|---|
| COVERAGE | LIMITS |
| Disability | 66 2/3% of net earnings payable weekly |
| Disability Benefit Period | 2 years |
| Medical | $500,000 maximum -- Reasonable & Customary |
| Medical Benefit Period | 2 years |
| Loss of Life | 55% of net earnings |
| Loss of Life Benefit Period | 2 years |
| Loss of Life Amount | $144,000 |
| Co-insurance | 0 |
| Deductible | 0 |
| Contingent Workers' Compensation | Required |
| Minimum A.M. Best Rating | A |
| Alternative Coverage | Workers compensation by "A" rated insurer or state owned and licensed in Contractor's home state |

| VEHICULAR LIABILITY AND PHYSICAL DAMAGE | |
|---|---|
| COVERAGE | LIMITS |
| Vehicular Liability | $100,000/$300,000/$50,000 |
| Physical Damage | Actual Cash Value |
| Comprehensive Deductible | $500.00 Maximum |
| Collision Deductible | $500.00 Maximum |
| Rental Reimbursement | $40/day – 30 days minimum |
| Additional Insured | FedEx Ground Package System, Inc. must be named |
| Minimum A.M. Best Rating | A |

EFFECTIVE: 06/03/02

ADDENDUM 3

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

SETTLEMENT

FHD agrees to settle with Contractor for performance of the contractual obligations imposed by this Agreement as follows:

## I. Delivery and Pick-Up Settlement

A. Delivery Settlement

$1.13 per stop at each consignee or other authorized location for the purpose of delivering a package(s).

$.22 per package

B. Pick-up Settlement

$1.00 per stop at each shipper or other authorized location for the purpose of picking up a package(s) for delivery elsewhere.

$.130 per package

C. Call Tag Settlement -- $.50 for each Call Tag package picked up in response to a validly issued Call Tag.

Settlement for the first Call Tag "not ready" stop will be paid, provided that stop is reported and logged and the consignee's signature is obtained.

D. One-time Pick-up Settlement -- $.30 for each stop made in response to a one-time pick-up request, in addition to the Delivery Settlement described in this Addendum 3.

E. Daily Mileage Settlement – For each mile driven daily in excess of 200 miles, to a maximum of 310 miles, (mileage for supplemental vehicles will be included), the following settlement shall be paid:

| 201 – 310 Miles | $0.15 per mile |
|---|---|

Mileage for this program will be taken from the manifest provided by the Contractor and is subject to verification. This settlement does not apply to shuttle runs or to tractors performing trailer spots.

06/03/02

F. At a designated Contractor load and/or unload terminal, Contractor will be paid $ .04 for each package he/she is required to load from a staging area into the Equipment and, if Contractor is required to participate in sorting the packages prior to loading, an additional $ .11 for each package sorted prorated equally on the basis of persons participating in the sort. For example, if ten persons participate in the sort, Contractor will receive 1/10th of settlement paid.

G. Fuel/Mileage Settlement—In the event of substantial increases in fuel prices in Contractor's terminal area, Contractor shall receive an additional fuel/mileage settlement, calculated as follows (If fuel price per gallon/settlement per mile go above the scale shown below, the numbers will continue to increase incrementally.):

| Fuel Price per Gallon | $1.25 | $1.40 | $1.55 | $1.70 | $1.85 | $2.00 | $2.15 |
|---|---|---|---|---|---|---|---|
| Settlement per Mile | +$.01 | +$.02 | +$.03 | +$.04 | +$.05 | +$.06 | +$.07 |

For purposes of calculating this settlement, fuel prices will be based on the lowest unleaded self-service cash price available to contractor within a five-mile radius of the terminal. Mileage will be calculated utilizing the lesser of actual miles reported by contractor or estimated mapping software miles.

## II. Contractor and Van/Vehicle Availability Settlement

A. Van/vehicle settlement for each business day that Contractor makes a van/vehicle and a qualified driver available and provides services under the Agreement.

Standard Agreement - with van model year 5 years old or newer - $25

Standard Agreement - with van model year 6 or more years old - $10

Van model year will be determined on January 1 of each year.

B. A holiday van availability bonus of $50 will be paid if the Contractor makes the Equipment and a qualified driver available on both the work day falling immediately before and the work day falling immediately after the following national holidays:

| | |
|---|---|
| Memorial Day | Thanksgiving |
| 4th of July | Christmas Day |
| Labor Day | New Year's Day |

C. The Company reserves the right to name the work days preceding and following any holiday falling on or in conjunction with a weekend.

OTHER/H

Case 3:05-md-00527-RLM -CAN   document 998-17   filed 11/16/07   page 13 of 30

06/03/02

D. This van availability bonus is only paid on primary vehicles, not supplemental units.

## III. Temporary Core Zone Density Settlement

See Attachment 3.1 to this Addendum 3

## IV. Multiple trip settlement

Contractors who are required to return to the facility during the course of the business day (to reload packages which, due to capacity restriction, could not be placed into the delivery vehicle) will be additionally compensated at a rate of 50% of the TCZDS rate for the day the return trip is completed. This rate will be paid for the primary vehicle only, not supplemental units, regardless of the number of return trips completed. Authorization (by local terminal management) must be made prior to the start of the delivery day, for the additional core zone settlement to be paid under this section.

## V. Service Bonus

After completion of the first year of service with FHD, a Contractor shall receive a Service Bonus of $150 for each fully completed additional fiscal quarter. This Service Bonus will be credited to the Service Guarantee Account after the completion of each additional fiscal quarter, so long as the contractor remains active and in good standing with FHD for the entire quarter.

## VI. Shuttle Service.

See Attachment 3.2 to this Addendum 3.

## VII. Premium Service Settlement. *(Shipper designated service)*

Delivery by Appointment - $6.50/stop, in addition to Delivery Settlement

Evening Delivery - 5:00pm and 8:00pm - $2.75/stop, in addition to Delivery Settlement

Signature Required - $.50/stop, in addition to Delivery Settlement

In the case of multiple premium services, the single highest applicable settlement will be paid to the contractor.

OTHER/H

FXG_LEIGHTER0000298



EFFECTIVE: 02/05/2002 TERMINAL: 3974

ATTACHMENT 3.1 TO ADDENDUM 3
FHD STANDARD CONTRACTOR OPERATING AGREEMENT
TEMPORARY CORE ZONE DENSITY SETTLEMENT

Settlement ( $ )

| Core Zone | Van / Vehicle |
|---|---|
| 100 | $67 |
| 105 | $64 |
| 110 | $60 |
| 115 | $81 |
| 120 | $85 |
| 125 | $92 |
| 130 | $90 |
| 135 | $94 |
| 140 | $91 |
| 145 | $104 |
| 147 | $87 |
| 150 | $104 |
| 153 | $103 |
| 155 | $105 |
| 160 | $102 |
| 163 | $102 |
| 165 | $108 |
| 170 | $100 |
| 173 | $104 |
| 175 | $105 |
| 200 | $81 |
| 205 | $90 |
| 210 | $88 |
| 215 | $80 |
| 220 | $93 |
| 225 | $96 |
| 230 | $95 |
| 235 | $91 |
| 240 | $105 |
| 243 | $107 |
| 245 | $102 |
| 250 | $105 |
| 253 | $107 |
| 255 | $105 |
| 260 | $102 |
| 263 | $108 |
| 265 | $105 |
| 270 | $103 |
| 273 | $103 |
| 275 | $106 |
| 300 | $75 |
| 305 | $92 |
| 310 | $94 |
| 315 | $98 |
| 320 | $89 |
| 325 | $59 |
| 330 | $104 |
| 333 | $104 |

ATTACHMENT 3.1 TO ADDENDUM 3 ( 3974 )
FHD STANDARD CONTRACTOR OPERATING AGREEMENT
EFFECTIVE: 02/05/2002
PAGE: 2 OF 2

Settlement ( $ )

| Core Zone | Van / Vehicle |
|---|---|
| 335 | $102 |
| 340 | $78 |
| 343 | $105 |
| 345 | $107 |
| 350 | $106 |
| 353 | $105 |
| 400 | $90 |
| 405 | $92 |
| 410 | $85 |
| 415 | $95 |
| 420 | $96 |
| 425 | $96 |
| 430 | $97 |
| 435 | $95 |
| 440 | $92 |
| 445 | $91 |
| 450 | $97 |
| 455 | $108 |
| 460 | $84 |

Core zones are comprised of one or more five digit zip code areas.

If Contractor provides pick-up and/or delivery service in more than one Core Zone on any one day, Contractor's Core Zone settlement for that day shall be prorated between the Core Zones, taking into consideration the number of stops made in each Core Zone and Core Zone values.

Core Zone settlement will be prorated if Contractor provides pick-up and/or delivery service for less than seven hours in any one day.

Received by,

[signature] 06/05/02
( Contractor ) ( Date )

Case 3:05-md-00527-RLM -CAN document 998-17 filed 11/16/07 page 16 of 30

EFFECTIVE: 03/13/00

ADDENDUM 4

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

PRIMARY SERVICE AREA

Contractor's Primary Service Area shall be the following:

ZIP CODES: 9 7 4 0 5, or

OTHER DESCRIPTION: ______________________

CONTRACTOR

FHD

DATED: 6-5-02

Case 3:05-md-00527-RLM document 998-17 filed 11/16/079 page 17 of 30

EFFECTIVE: 03/13/00 

ADDENDUM 5

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

PROPRIETARY INTEREST

FHD recognizes that Contractor has a proprietary interest in the delivery and pick-up accounts in Contractor's Primary Service Area, as defined in Addendum 4 of this Agreement (but excluding delivery and pick-up accounts assigned by shippers to FedEx Ground). FHD also recognizes that in the event Contractor's Primary Service Area is reconfigured, resulting in customers previously served by Contractor being permanently reassigned by FHD, Contractor is entitled to payment. Such payment may be from other contractors or from FHD, in accordance with the provisions of Paragraph 6.4 of this Agreement.

> For every delivery package relinquished, under the provisions of Paragraph 6.4 of the Agreement, Contractor is entitled to a minimum payment of $1.00 per package.
>
> For every pick-up package relinquished, under the provisions of Paragraph 6.4 of the Agreement, Contractor is entitled to a minimum payment of $2.00 per package. This does not include trailer spots.

As Contractor's settlement and density increase in the Primary Service Area, the potential value of Contractor's customers may increase. Contractor may offer more than the minimum amounts prescribed above for packages being relinquished by another contractor, in order to gain additional customers and increase profitability, or Contractor may sell to the highest bidder when Contractor's customers are being reassigned by FHD. FHD makes no guarantees of such increases, nor will FHD interfere in such transactions between Contractor and other persons who have the capability and qualifications to perform the services required by this Agreement.

In the event a trailer spot, pick-up or delivery being performed by a P&D Contractor operating a tractor/trailer is permanently returned to a P&D Contractor operating a van or straight truck, FHD shall pay the tractor/trailer Contractor a one-time payment of $100.00 for each such trailer spot.

In every case involving payment for packages transferred between contractors, whether tractor/trailer, van, or straight truck, the reason must be based on FHD' determination, reasonably made, that such changes in pick-up and delivery assignments are permanent, not seasonal, nor known to be of short duration.

EFFECTIVE: 03/13/00

ADDENDUM 6

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

BUSINESS SUPPORT PACKAGE

| Item | | Cost |
|---|---|---|
| Magnetic Logo/Decals | ) | |
| Business Card | ) | |
| Standard Uniform | ) | |
| Random Drug test | ) | $1.00/day |
| Contractor Assistance programs | ) | |
| Annual DOT Inspection | ) | |

Accept Standard BSP JL

Reject Standard BSP ______

| Mapping Software | ) | $0.50/day |
|---|---|---|

Accept Mapping Software JL

Reject Mapping Software ______

Contractor is not required to purchase the Business Support Package. The cost of the Business Support Package is $1.00 or $1.50 per day, per van, for each business day Contractor is entitled to receive van/vehicle availability settlement. If Contractor elects to participate in the program, Contractor agrees to be liable for loss or damage to such equipment received under this program under the following conditions:

1. Loss while in the possession of Contractor;
2. Willful and/or intentional damage;

Contractor will not be liable for normal wear and tear or defects associated with manufacture and/or vendor repair and maintenance.

EFFECTIVE: 03/13/00

ADDENDUM 7

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

ARBITRATION

The arbitration of contract termination shall be instituted and conducted in accordance with the following terms and conditions:

1. Contractor must mail written notice of a demand for arbitration to FHD and to the AAA by certified mail within 90 days of the occurrence of the claimed wrongful termination. Failure to mail written notice of a demand for arbitration within such 90-day period and comply with all procedural requirements set forth in the Commercial Arbitration Rules of the AAA shall constitute an absolute bar to the institution of any proceedings and a waiver of the claimed wrongful termination. The copy of the demand sent to the American Arbitration Association shall be addressed to Four Gateway Center, Suite 419, Pittsburgh, PA 15222-1207, with a request that the demand be forwarded to the appropriate AAA Regional Office.

2. The dispute shall be heard and determined by a single arbitrator, chosen pursuant to the procedures of the AAA.

3. The arbitrator shall set the date, time, and place for each hearing, and shall schedule the hearing and make his or her determination in an expeditious manner. Neither party shall be entitled to written or deposition discovery from the other, except with respect to damages.

4. As to any dispute or controversy which under the terms hereof is made subject to arbitration, no suit at law or in equity based on such dispute or controversy shall be instituted by either party hereto, other than a suit to confirm, enforce, vacate, modify or correct the award of the arbitrator as provided by law; provided, however, that this clause shall not limit FHD's right to obtain any provisional remedy including, without limitation, injunctive relief, writ for recovery or possession or similar relief, from any court of competent jurisdiction, as may be necessary in FHD's sole subjective judgment to protect its property rights.

5. The arbitrator shall have the authority only to conclude whether the termination of Contractor was within the terms of this Agreement, to determine damages if required to do so under this subparagraph, and to provide for the division of the AAA fees and AAA assessed expenses of the arbitration between the parties; provided, however, each party shall bear the cost of attorneys, expert witnesses, or other expenses incurred by that party, and the arbitrator shall have no authority to allocate or apportion such costs. If the arbitrator concludes the termination was within the terms of this Agreement, the termination shall be effective on the date specified in the notice of termination from FHD to Contractor. If the arbitrator concludes the termination was not within the terms of this Agreement, then, at the option of FHD: (1) the Contractor shall be reinstated within a reasonable period of time, not to exceed 90 days from the Company's receipt of the arbitrator's decision, and in that event shall be entitled to damages equal to the arbitrator's determination of what Contractor's net earnings (after payment of all expenses which are borne by Contractor pursuant to this Agreement) would have been during the period between the date of termination and the date of reinstatement; or (2) Contractor shall nevertheless be terminated, and, in that event, shall be entitled to damages equal to the arbitrator's determination of what Contractor's net earnings (after payment of all expenses which are borne by Contractor pursuant to this Agreement) would have been during the period between the date of termination to the last day of the term of this Agreement (without any renewals). Contractor shall have no claim for damages in any other amount, and the arbitrator shall have no power to award punitive or any other damages.

6. The arbitrator shall provide the parties with only a written determination of the outcome of the arbitration, without accompanying opinion, and shall have no authority to alter, amend or modify any of the terms and conditions of this Agreement, and further, the arbitrator may not enter any award which alters, amends or modifies the terms or conditions of this Agreement in any form or manner.

7. Judgement upon the award of the arbitrator may be rendered in any court having jurisdiction thereof.

EFFECTIVE: 6/4/01

ADDENDUM 8

FHD STANDARD CONTRACTOR OPERATING AGREEMENT

CONTRACTOR CUSTOMER SERVICE PROGRAM

After the completion of one full FHD accounting quarter, and beginning with the second accounting quarter, an FHD P&D Contractor is eligible to begin receiving both an individual performance-related bonus and a terminal group performance-related bonus. The Contractor is eligible for these bonuses each full quarter that he operates under this agreement. These bonuses will be referred to as the Contractor Customer Service (CCS) Program.

Payment of these bonuses will be based on the Contractor's individual performance (and/or the performance of Contractor's employed driver), as well as on the Contractor's terminal meeting its CCS Local Inbound Service Goal.

Individual Safety and Customer Service

The Contractor is eligible for one individual performance-related bonus of $125 per quarter (regardless of the number of vehicles operated under the FHD Operating Agreement by said Contractor) as described below.

For each full accounting quarter, eligibility for the individual CCS Bonus will be determined by the Contractor's performance in the areas of both customer service and safety. To qualify, during each quarter the Contractor or Contractor's driver must: have no at-fault accidents, have no verified customer complaints, meet the goals set for daily remote check-in compliance and accuracy at the end of each day, and must remain a Contractor and complete the full accounting quarter.

Examples of customer complaints include, but are not limited to, complaints about the following:

- Driver release to business
- Unauthorized indirect deliveries
- Rudeness, abusive, or objectionable language or behavior
- Poor appearance or not in approved uniform
- Failure to follow customer instructions
- Unsafe driving
- Accidents or property damage

06/04/01

Terminal Local Inbound Service

The Contractor is eligible for one terminal group performance-related bonus (regardless of the number of vehicles operated under the FHD Operating Agreement by said Contractor) as described below.

If the Terminal Local Inbound Service for the quarter is:

- At least 97.0%, and less than 98.0%, the quarterly CCS Bonus will be $25 per Contractor.
- At least 98.0%, and less than 99.0%, the quarterly CCS Bonus will be $50 per Contractor.
- Equal to or in excess of 99.0%, the quarterly CCS Bonus will be $75 per Contractor.

Eligibility for the terminal group CCS Bonus will be based on whether the Contractor's terminal meets its local inbound service goal for the quarter being considered. If it does, all eligible Contractors at that terminal receive the terminal group CCS Bonus; if it does not meet its goal, no one receives the terminal group CCS Bonus.

Payment

CCS Bonus monies will be first applied to any outstanding start-up loan balance owed by the Contractor that exceeds $250. All remaining monies will be deposited into the Contractor's Service Guarantee Account.

**FEDEX HOME DELIVERY**
**SAFE DRIVING PROGRAM**

FedEx Home Delivery (FHD) maintains a program of self-coverage for public liability and property damage risks supplemented by insurance coverages with a commercial insurance carrier. Under this program, FHD is able to maintain cost-effective management of its exposure arising through road accidents and cargo loss and damage. The success of the program requires that all drivers maintain, without exception, a high standard of care at all times when driving a motor vehicle, whether or not on Company business. For those drivers who do maintain such a high standard -- and they include the overwhelming majority of drivers engaged in driving on FHD business -- this program provides a distinct benefit to them and those they serve. The protection against liability afforded thereunder is essentially cost-free to them.

The criteria for safe driving have been developed by FHD from its own experience and in consultation with its drivers. FHD will disqualify any driver from participation in the FHD Safe Driving Program who does not comply with the requirements and standards set forth below; provided, however, notwithstanding any provision of this Safe Driving Program, Contractor is not relieved of the obligation to conform to all applicable federal, state and local laws in the operation of the Equipment, as provided in paragraph 1.10 (f) of the Agreement, and breach of that obligation remains grounds for termination of the Agreement pursuant to paragraph 9.1 (c) thereof. The result of disqualification would be to require that substitute insurance covering the driver be found if he/she is to continue to render services required for FHD' business.

Driver Eligibility Requirements

The driver eligibility requirements listed below are the minimum requirements for all drivers:

1. No record of conviction for a felony.

2. A minimum age of 21 years.

3. Possession of a valid driver's license for the type of vehicle to be operated, issued by the resident state of the driver.

4. No record of a driver's license suspension or revocation for more than 30 days, during the 36 consecutive months prior to the date of engagement.

   The suspension or revocation must be the direct result of the conviction while operating a motor vehicle.

   Suspensions for failure to appear (FTA), failure to meet financial responsibility laws, or non-moving convictions (NMVC) are excluded.

5. No record of citation or conviction for the violations listed below during the 36 consecutive months prior to the date of engagement:

a. Driving while under the influence of alcohol or drugs;

b. Refusal to submit to a test of intoxication or impairment requested by a police officer or FHD;

c. Operating a motor vehicle which contains alcoholic beverages in open containers contrary to law;

d. Being charged with homicide resulting from the unlawful or negligent operation of a motor vehicle;

e. Operating a motor vehicle while the driver's license was suspended, cancelled or expired;

f. Failing to stop, or remain, at the scene of an accident;

g. Driving a motor vehicle in a speed exhibition, contest or drag race;

h. Use of a motor vehicle in the commission of a felony;

i. Dangerous or careless operation of a motor vehicle, whether causing harm to another person or not;

j. Operating a motor vehicle without the permission of the owner; and,

k. Fleeing or attempting to flee a police officer.

6. No record of involvement in an at-fault traffic accident resulting in a person's death, or bodily injury.

7. No record of involvement in more than two at-fault traffic accidents and two moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

8. No record of involvement in more than one at-fault traffic accident and three moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

9. No record of conviction for more than four motor vehicle moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

10. Completion of a suitable contractor/driver information sheet.

11. A history of safe commercial driving experience and satisfactory work history.

12. Evidence of a valid commercial driver's license.

13. A current and satisfactory motor vehicle record abstract.

14. Successful completion of a thorough physical examination confirming physical fitness to operate a motor vehicle. The physical examination must be completed by a qualified physician approved by FHD.

15. Successfully pass a drug screen administered at such time and place and in such manner as determined by FHD.

16. No record of positive results in any drug or alcohol test.

17. Successful completion of a written examination pertaining to commercial vehicle safety. The examination is to be scored and must show evidence that instruction was given to provide accurate information on incorrect responses.

18. Successful completion of a well-designed road driving skill test which meets the minimum commercial driver's license standards.

## FHD Driver Safety Standards

The following acts or omissions by a driver are prohibited:

1. Driving while under the influence of alcohol or drugs.

2. Refusing to submit to a drug or alcohol test requested by a law enforcement officer or FHD.

3. Operating a motor vehicle which contains alcoholic beverages, or a controlled substance contrary to law.

4. Being charged with homicide resulting from the unlawful or negligent operation of a motor vehicle.

5. Operating a motor vehicle while the driver's license has been suspended, cancelled or has expired.

6. Failing to stop, or remain, at the scene of an accident.

7. Driving a motor vehicle in a speed exhibition, contest or drag race.

8. Using a motor vehicle in the commission of a felony.

9. Dangerous or careless operation of a commercial motor vehicle (such as speeding at 80 m.p.h. or more; or more than one incident of speeding at 15 m.p.h. or more, over the posted speed limit), whether causing harm to another person or not.

10. Operating a motor vehicle without the permission of the owner.

11. Fleeing or attempting to flee a police officer.

12. Causing an at-fault traffic accident resulting in a person's death, or bodily injury resulting in medical costs or incurred reserves in excess of $50,000, or property damage in excess of $25,000.

13. Causing more than two at-fault accidents in any vehicle in any 12 consecutive months, or more than five at-fault accidents in any vehicle in any 36 consecutive months period. Any accident involving less than $500 in property damage is exempt from the five accident rule.

14. Committing more than three motor vehicle moving violations in any vehicle, in any 12 consecutive months period.

15. Committing more than five motor vehicle moving violations in any vehicle in any 36 consecutive months period.

16. Negligently or knowingly failing systematically to inspect, repair, maintain and otherwise ensure the leased equipment is at all times in safe operating condition.

17. Carrying passengers not authorized by FHD while on FHD's business.

18. Failure to report an accident as soon as possible.

19. Falsifying any safety-related report or document such as an annual motor vehicle record report.

20. Violation of any applicable hours of service policy(ies), rule(s) or regulation(s).

21. Failure to complete or refusal to undergo a thorough physical examination confirming physical fitness to operate a motor vehicle at least every two years and following any physical or mental impairment from injury or disease. Such physical examination must be completed by a qualified physician approved by FHD.

22. Failure to pass or submit to a drug screen administered at such time and place and in such manner as determined by FHD.

23. Failure to report promptly any incident resulting in property damage and any incident or accident involving any pedestrian or occupant of any type of vehicle, whether or not the incident or accident appears to have resulted in personal injury, regardless of who appears to be at fault.

24. Failure to forward immediately to FHD every demand, notice, summons or other legal process received that involves a claim, suit or other legal process received that involves a claim, suit or other legal proceeding arising from or in any way related to any matter encompassed within the provisions of this Safe Driving Program.

25. Failure to cooperate fully with FHD in the conduct of any legal action, regulatory hearing or other similar process arising from or in any way related to any matter encompassed within the provisions of this Safe Driving Program. Such cooperation

includes, without limitation, attendance at hearings, trials, meetings, etc.; the securing of evidence; and, obtaining the attendance of witnesses.

NOTE: With respect to any of the acts or omissions above specified that would constitute an offense of law, and which, if the driver were found guilty would result in disqualification, FHD in its sole discretion based upon reasonable inquiry, may make a preliminary determination of the probability that the driver is guilty of the offense whether charged or not. In such event, FHD may suspend the driver for up to 15 days pending the filing of charges against such driver. If such charges are filed, such suspension shall continue until a final determination by a court, and will become permanent unless the driver is found not guilty of the offense at issue.



# FEDEX HOME DELIVERY DRIVER RELEASE PROGRAM

**Contractors will not be liable for loss for driver release if:**

1. The contractor is approved for the Driver Release Program.

2. Packages are left in an approved driver release area. Certain areas will be designated "Signature Required." Signatures must be obtained for deliveries in such areas.

3. Packages are left out of public sight.

4. Driver release packages are left only at residential dwellings with single family entryways.

5. Packages are left in places that are not susceptible to weather damage. If this is not possible, packages must be securely wrapped in weatherproof bags.

6. Packages are left in places inaccessible to animals.

7. Delivery notices are left at the primary entrance whenever, and wherever, a package is left without the consignee's signature.

**Contractors will be liable for loss resulting from driver release if:**

1. Signatures are not obtained for packages requiring signature.

2. Packages destined to businesses are driver released. Businesses include churches, schools and businesses operated out of a residence.

3. Packages destined to apartments or residences with public access and/or common entryways are driver released.

4. Packages are released to any address other than the one specified on the address label. These packages are mis-deliveries.

**Indirect Deliveries:**

Contractors will not be responsible for loss resulting from indirect deliveries if:

1. They use the proper exception code and record the correct address of the location where the packages are indirectly delivered.

2. They get the signature of an adult (someone over 18) living or working at the indirect delivery site.

3. They print the name (first initial and last name) of the person signing for the package in the area provided on the delivery record/manifest.

4. They leave a delivery notice at the primary entryway at the correct consignee's address.

**The following represents packages not included in the Driver Release Program.**

**Packages Requiring Signatures** (Noted on the Contractor's Delivery Record/Manifest)

1. Premium Service Packages for which the shipper has requested (and paid for) signature service, evening delivery, appointment delivery and, in certain cases, select day delivery.

2. Packages destined for areas designated as "Signature required."

3. Packages with declared value of over $500.00.

FXG_LEIGHTER0000314



# Business Support Package Uniform Program

FedEx Home Delivery agrees to provide, at the Contractor's election in the Business Support Package, a standard uniform. The uniform items provided meet the FHD-approved uniform requirement referenced in the FHD Standard Contractor Operator Agreement, paragraph 1.12 "Operator and Equipment Appearance Standard".

The standard uniform consists of the following:

| | | |
|---|---|---|
| QTY 1 | ~ | Cap |
| QTY 12* | ~ | Polo Shirt (Long or Short Sleeve) |
| | | Pants (Long Pants or Shorts) |
| QTY 1 | ~ | Jacket (Insulated or Unlined) |
| QTY 1 | ~ | Dress Belt |

*At least 5 must be chosen from the Shirt and Pant categories, with the total items selected equaling 12.

The following conditions apply to the Uniform Program:

FHD will replace or repair worn out uniform items as a result of normal wear and tear at no charge to the contractor.

Misuse or loss on behalf of the contractor is not covered by the program and replacement cost will be borne by the contractor.

Uniform size changes will be provided at no additional cost, provided the contractor returns the existing uniform items to terminal management.

Additional approved uniform items may be purchased by the Contractor through the direct purchase program or local retailers.

Contractor agrees to self-launder and maintain the uniform in good condition consistent with reasonable standards maintained by our competitors.

Upon termination of the FHD Standard Contractor Lease and Operating Agreement, contractor agrees that Contractor shall pay to FHD $75, to be withheld from Contractor's Final Settlement, and Contractor is free to keep the uniform items provided.

Contractor Signature

Terminal Management Signature

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br>*Jon Leighter, et al.* 3:07-cv-00328 (OR) | CHIEF JUDGE MILLER |

**DECLARATION OF MARSHA OBENAUF IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Marsha Obenauf, declare:

1. I am a Contractor Relations Specialist in the Contractor Relations Department of FedEx Ground Package System, Inc. ("FedEx Ground"). I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2. I have worked for FedEx Ground for more than 21 years. I have worked as a Contractor Relations Specialist for FedEx Ground since July 2006. From March 2001 to July 2006, I worked as a Contractor Settlement Specialist.

3. In my role as a Contractor Relations Specialist, I recently helped to implement a revision of the termination codes in the Contractor/Driver Administration and Settlement (CDAS) system, FedEx Ground's primary database for contractor information. I worked to

define new termination codes and performed testing on the revisions, which went into effect in October 2007.

4. Before June 2004, FedEx Ground did not record any data concerning the reasons for a contract termination in CDAS.

5. Since June 2004, FedEx Ground has recorded a termination reason in CDAS for each contract termination. The senior manager at each FedEx Ground terminal has discretion to designate the appropriate termination reason. Termination reason codes differentiate between voluntary terminations and involuntary terminations, but they do not separately capture whether a contractor left by mutual agreement.

6. FedEx Ground maintains a termination file for each contract termination. For some contractors, that file may contain information concerning whether the contractor left by mutual agreement, but the information in the file varies depending on the circumstances of the termination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15 day of November, 2007, in Moon Township, PA.

Marsha Obenauf
Marsha Obenauf

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Decesare*, No. 3:07-cv-00120 (NV);
*Gibson*, No. 3:07-cv-00272 (AZ);
*Givens*, No. 3:07-cv-00324 (LA);
*Gruhn*, No. 3:07-cv-00412 (VT);
*Leighter*, No. 3-07-cv-00328 (OR);
*Mango*, No. 3:07-cv-00322 (CT);
*Vargas*, No. 3:07-cv-00325 (MA);
*White*, No. 3:07-cv-00411 (GA); and
*Whiteside*, No. 3:07-cv-00326 (NC).

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' PHASE IV CLASS CERTIFICATION MOTIONS**

Pursuant to Judge Neuchterlein's November 14, 2007 Order (Doc. No. 931), FedEx Ground files this omnibus brief in opposition to plaintiffs' motions to certify classes in the Arizona, Connecticut, Georgia, Louisiana, Massachusetts, Nevada, North Carolina, Oregon, and Vermont actions. This brief highlights some of the problems inherent in plaintiffs' approach to certification and explains why the logic of the Court's decision in *Craig* (Kansas) does not apply.

## I. THE CLASSIFICATION OF DRIVERS AS EMPLOYEES OR INDEPENDENT CONTRACTORS IS NOT A COMMON ISSUE.

Plaintiffs ask the Court to certify class actions on the premise that the classification of FedEx Ground owner-operators is a common question that can be resolved categorically, on the basis of the Operating Agreement and "common proof." As explained below and in the individual briefs, however, the classification question cannot be resolved by simply reading FedEx Ground's standard Operating Agreement. Not only do different states use different tests for different claims, but even interpretation of the Operating Agreement is not a common question.

### A. Determining FedEx Ground's rights to control requires interpretation of the Operating Agreement, which in turn requires an examination of individualized extrinsic evidence

Independent contractor status – under the state laws at issue in Phase IV and those at issue in prior phases – is subject to a diversity of tests, many of which require courts to consider the actual relationships between the parties regardless of what the Operating Agreement says.

To the extent classification turns on the "right to control," as in *Craig*, deciding that issue itself will require interpreting the parties' Operating Agreement. The Operating Agreement makes clear that the parties "intend that Contractor will provide these service strictly as an independent contractor" and that "no officer or employee of FHD shall have the authority to impose any term or condition" contrary to that understanding. (Ground OA Background Statment (Ex. 1).) Other provisions, for example, state that the selection of vehicles "is within the discretion of Contractor" (*id.* ¶ 1.1) that the Contractor will "determine the methods, manner and means of performing the obligations" (*id.* ¶ 1.4), that no one at FedEx Ground has "the

authority to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance" (*id.* ¶ 1.15).

The Court observed in *Craig*, however, that there seems to be a conflict between those provisions and other provisions that appear to exert control. (Order 36, Oct. 15, 2007 (Doc. No. 906) ("Oct. 15 Order").) The Court must determine whether these apparently conflicting provisions can be reconciled and – if not – which provisions take priority. Plaintiffs do not dispute this and go so far as to argue that the Operating Agreement cannot be interpreted on its face; they allege that "***[v]irtually every term in the lengthy contract is susceptible of multiple interpretations and understanding***."[1]

The interpretation of the Operating Agreement is governed by Pennsylvania law pursuant to the parties' express choice-of-law provision.[2] Under Pennsylvania law, the focus of contract interpretation is to ascertain the intent of the parties. *See Mace v. Atl. Refining & Mktg. Corp.*, 785 A.2d 491, 496 (Pa. 2001). If a contract is ambiguous – as plaintiffs contend here – then interpretation of the contract must be left to the factfinder in view of extrinsic evidence. *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). Even when a contract is ***not*** ambiguous, Pennsylvania law requires a factfinder to consider the parties' course of dealing. *See Pa. Eng'g Corp. v. McGraw-Edison Co.*, 459 A.2d 329, 332 (Pa. 1983). These rules apply to form contracts, as well. The state Supreme Court explained in *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736 (Pa. 1978) (form contract):

> Though our prior cases limited a court's use of evidence of course of performance to aid interpretation to instance where the writing is ambiguous, we agree with the draftsmen of the Restatement

[1] *See, e.g.*, Gibson (AZ) 10th Set Interrog. Resp. No. 4 (Ex. 2); Leighter (OR) 11th Set Interrog. Resp. No. 4 (Ex. 6); DeCesare (NV) 9th Set Interrog. Resp. No. 4 (Ex. 5); Whiteside (NC) 11th Set Interrog. Resp. No. 4 (Ex. 4); Edwards (CT) 11th Set Interrog. Resp. No. 4 (Ex. 3).

[2] The Court will need to determine, on a contractor-by-contractor basis, whether the "Pennsylvania choice of law" provision in the Operating Agreement will be enforced. *See, e.g.*, *SimplexGrinnell, LP v. Rancho El Eden, Inc.*, 2006 Mass. Super. LEXIS 183, at *10 (Mass. Super. Ct. Mar. 27, 2006) (enforcing choice-of-law provisions unless enforcement is not "fair and reasonable" because of "fraud, undue influence, overweening bargaining power, or such a serious inconvenience"). Determining what law will govern raises additional individualized issues since some named plaintiffs claim the Operating Agreement is an "unconscionable contract of adhesion" (*see Louzau* Pls.' Br. 7 (Doc. No. 548)), and others claim that they were not given an opportunity to review – and did not understand – the provisions (*see, e.g.*, Gibson (AZ) 10th Set Interrog. Resp. No. 4).

case 3:05-md-00527-RLM-CAN document 1066 filed 11/16/07 page 4 of 12

> (Second) of Contracts that: "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."

*Id.* at 741 n.6. Thus, "the course of conduct of a party is ***always*** relevant in interpreting a contract." *Sun Co. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 880 (Pa. Commw. Ct. 1998) (emphasis added). Under Pennsylvania law, then, the Court cannot interpret the "form" Operating Agreement without considering individualized extrinsic evidence, such as a particular contractor's course of dealing with FedEx Ground. Especially because plaintiffs claim the contract is ambiguous, the Court cannot rule on the "right to control" without evaluating evidence of "actual control," since that evidence will inform what "rights" FedEx Ground has.[3]

The existence of a standard contract does not mean that the contract will be, or legally must be, interpreted in the same way for every contractor. The path the plaintiffs propose would have the Court erroneously ignore individualized extrinsic evidence and artificially create a "common" question for certification. The district court in *Bowers v. Jefferson Pilot Financial Insurance Co.*, 219 F.R.D. 578 (E.D. Mich. 2004), refused to adopt the notion that "when a standardized contract is at issue, the contract is to be interpreted uniformly." *Id.* at 580. In *Bowers*, the plaintiffs tried to certify a class based on a standardized contract, arguing that the court should limit its analysis to the language of the contract itself or "admissible extrinsic evidence common to the class" – excluding any individualized evidence of "oral communications" with individual policyholders or a "policyholders' understanding of the provision at issue." *Id.* The district court rejected plaintiffs' argument, noting that while "other courts have found class certification to be appropriate" where there is a "standardized" contract, those cases are ***distinguishable*** "because they do not involve competing interpretations of specific contract language." *Id.* Since "extrinsic evidence of the parties' dealings" is admissible, the "claims become individualized and not reasonably susceptible to class action treatment." *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 282 (W.D. Mo. 2000).

[3] These interpretation issues cannot be avoided by simply construing the contract language "against the drafter." This maxim can be invoked only if the parties' intent cannot otherwise be determined from extrinsic evidence. *See Consolidation Coal Co. v. Liberty Mut. Ins. Co.*, 406 F. Supp. 1292, 1296 (W.D. Pa. 1976).

### B. Plaintiffs cannot create common issues by alleging all individualized facts are "immaterial"

Like the contract interpretation issue, resolving the classification issue in the Phase IV complaints will require the factfinder to go beyond the four corners of the Operating Agreement. The Operating Agreement is silent on certain factors that the Court is required to analyze under the various substantive standards. As explained in the separate briefs, many of the legal standards look to aspects of control that are not covered by the Operating Agreement.[4] Many of the legal standards also look to non-control factors, such as whether the worker has incorporated his business, maintains a home office, and exercises entrepreneurial skill. With respect to these factors, contractors are not alike: some have created corporations; some manage multiple employees; and some are real business-builders, while others are content to just drive.

Throughout plaintiffs' briefs, they argue that classification is a common question that "***can***" be proven "by common proof." If, however, the only way classification "can" be proven by common proof is by excluding or ignoring individualized proof, then the issue is not a "genuinely common" issue. *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003). Plaintiffs argue that individualized evidence is simply irrelevant. In evaluating whether class certification is appropriate, though, what plaintiffs argue is not dispositive; certification cannot be based on an assumption that plaintiffs will prevail. Instead, a court must predict the "form that [the] trial on these issues would take." *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981). If the law permits a factfinder to consider individualized evidence, class treatment is inappropriate.

Failing to consider any fact is dangerous here, since it risks the wrong outcome. Plaintiffs want the Court to focus on the Operating Agreement and FedEx Ground's policies and procedures. Focusing on that "common" proof, though, invariably affects the classification analysis. In the *Estrada* case, for example, focusing exclusively on that "common" proof could

[4] Focusing on FedEx Ground's policies and procedures does not eliminate the need to consider individualized evidence. First, all of FedEx Ground's procedures are subject to POLICY-007 (Ex. 9), which states that "*No officer, agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results*." Second, the policies and procedures have changed over time. (*See* D'Alesandro Dep. 11 (Ex. 10).) Plaintiffs have never explained how a class spanning multiple years can be certified when the legal issue requires an evaluation of changing policies and procedures.

case 3:05-md-00527-RLM-CAN document 1060 filed 11/16/07 page 6 of 12

have led the *Estrada* court to erroneously conclude that multiple work area ("MWA") contractors, single work area ("SWA") contractors who are incorporated, and unincorporated SWA contractors should be classified the same under the California Labor Code because they all sign the same basic Operating Agreement and FedEx Ground had the same policies and procedures pertaining to them. But the *Estrada* court found that a greater opportunity to profit and the mere fact of incorporation were important factors that could not be ignored in the totality of circumstances analysis and necessitated exclusion from the class. *See Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 4 n.1 (2007). In the end, class certification is never appropriate unless the Court is confident "the accuracy of the resolution" of the cases "is unlikely to be enhanced" by repeated individual proceedings. *Mejdrech*, 319 F.3d at 911. There can be no such confidence here, especially since many other factfinders have, after examining an operator's particular facts, found him or her to be an independent contractor.[5]

**C. Plaintiffs cannot seek class certification on the basis of "common proof" yet reserve the right to introduce "anecdotal" evidence**

In addition to the Operating Agreement and policies and procedures, plaintiffs have reserved the right to introduce anecdotal evidence. In *Leighter* (Oregon), for instance, plaintiffs argue that "anecdotal evidence of FXG's exercise of its right of control is relevant to all drivers as it demonstrates FXG's extensive rights to control all drivers." (*Leighter* Pls.' Br. 16 (Doc. No. 871).) But the anecdote could also be unique to named plaintiffs and represent isolated deviations by a stray manager. Plaintiffs offer nothing more than their assertion that any anecdote is typical. This is not sufficient for class certification. The Court must go "behind a plaintiff's allegations" and assure itself that "the issues presented could fairly and confidently be resolved with respect to all the absent class members based on the proof offered on behalf of

[5] *See Lemmings v. FedEx Ground Package System, Inc.*, No. 05-2516, at 15 (W.D. Tenn. May 15, 2007) (Ex. 12) (finding that FedEx Ground did not have an indirect employment relationship with a contractor's driver because the contractor had his own "operations, equipment, work assignments, management, personnel control, accounting practices, or financial control"); *Mailhot v. FedEx Ground Package System, Inc.*, No. 02-4257 (D.N.H. Feb. 11, 2004) (Ex. 13) (jury finding of independent contractor status in an ADA action); *Skidmore v. FedEx Ground Package System, Inc.*, No. 12-44331, at 2-5 (Cal. Lab. Comm'r Nov. 30, 2001) (Ex. 11) (dismissing wage claim on the grounds that the terms of the Operating Agreement establish an independent contractor relationship).

only the named plaintiffs." *Hyderi v. Wash. Mut. Bank, FA*, 235 F.R.D. 390, 395 (N.D. Ill. 2006).

More important, plaintiffs' desire to introduce anecdotal evidence proves that classification cannot be adjudicated solely by reference to "common" proof. If anecdotal evidence is allowed for the named plaintiffs, any merits trial will result in an amalgam of "material facts" that only some contractors can testify to, but is then improperly combined and applied to the entire class. The factfinder cannot be allowed to piece together a "worst-case" composite that no class member actually resembles. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998). To rebut plaintiffs' anecdotes, FedEx Ground would be allowed to introduce stories of other contractors – but then that would defeat the entire premise for class certification, which assumes that a trial based on the claims of the named plaintiffs alone will yield a representative and just result. *See Hyderi*, 235 F.R.D. at 395. That is why courts have held that if trial will include anecdotal evidence, class treatment is not proper. *See Morgan v. Metro. Dist. Comm'n*, 222 F.R.D. 220, 231 (D. Conn. 2004) ("anecdotal" evidence undermines commonality and typicality); *Clayborne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 595 (D. Neb. 2002) (anecdotes insufficient to support certification).

## II. PLAINTIFFS CANNOT ADEQUATELY REPRESENT A HETEROGENEOUS CLASS WITH CONFLICTING INTERESTS

Plaintiffs' proposed classes are also fatally deficient because they attempt to aggregate not only SWA and MWA contractors, current and former contractors, and Ground and Home Delivery contractors, but also contractors who want FedEx Ground to retain an independent contractor model and those who do not. Here, there is ample evidence of conflicting interests, as set forth in the separate oppositions. Even though the Court did not find Dr. Deborah Jay's survey conclusions to be probative, the survey responses themselves are enlightening. One North Carolina contractor said "I make over $50,000 a year as an independent contractor. If I were an employee, they wouldn't pay me anywhere near that." (Jay Rep., App. H, RID00012, Aug. 2007, (Ex. 22 to *Magno* Opp'n Br.).) An Arizona contractor said "I own multiple routes

and for me to lose that would not be a good deal." (*id.*, App. F, RID00087.) The same divergence is found in the declarations from absent class members. An Oregon contractor declares that he makes "considerably more" as a contractor. (Martin Decl. ¶¶ 12-15 (Ex. 14).) A Vermont contractor agrees being an independent contractor is "much more lucrative." (Roell Decl. ¶ 11 (Ex. 15).) Another North Carolina contractor declares "[t]he people who filed the lawsuit do not speak for me … Why would they want to be employees? They just do not realize what they are asking for." (Hill Decl. ¶ 19 (Ex. 16).)

Differences in the economic interests of contractors "represent a substantial conflict going to the subject matter of the litigation, thus rendering class certification inappropriate." *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1284 (7th Cir. 1985). As the Eleventh Circuit noted, "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003). Indeed, the mere "possibility" that such antagonistic interests exist defeats class certification. *Swain v. Brinegar*, 517 F.2d 766, 780 (7th Cir. 1975).

Plaintiffs dismiss this evidence as irrelevant claiming putative class members cannot defeat certification merely because they "prefer to leave the violation of their right unremedied." (Pls.' Omnibus Reply Mem. 12, 16 (Doc. No. 793) ("ORM").) Plaintiffs miss the point. First, plaintiffs cannot assume they will prevail in the lawsuit and – based on an assumption of victory – ignore what potential class members' actual interests are. Second, absent class members' interests relevant to adequacy are not limited to choice of remedy. Adequacy of representation is necessary to assure that ***all*** "important litigation decisions made will fairly … vindicate the claims of the absent class members who will be bound by them thereafter." *Gilpin v. AFSCME*, 875 F.2d 1310 (7th Cir. 1989). In the Phase IV cases, there are ***irreconcilable*** conflicts of interest at all stages of the litigation: While some contractors will want to construe the Operating Agreement to give FedEx Ground expansive rights of control to maximize the possibility of an employment finding, other contractors will not want to construe the Operating Agreement in a

way that is inconsistent with what they understood, the discretion that was promised to them, and the parties' course of dealing. Contractors may take different positions on what the state law actually requires to maintain contractor status (*i.e.*, is requiring a uniform enough to result in employment status) depending on whether they have an interest in the future viability of the existing contractor model (or even a modified one) in the state. And certainly not all contractors want to rescind their agreements or to declare themselves to be employees.

These conflicts of interest cannot be assumed away. These lawsuits are about thousands of absent class members: how they were treated in the past, how they are being treated now, and how they want to be treated in the future. These lawsuits will have real consequences to them: how their Operating Agreements are interpreted, what will happen to their business investments, and whether an independent contractor model remains viable in their state. If the *Craig* approach is followed, there will be no evidence at a trial or on summary judgment about individual contractors and the Operating Agreement will be interpreted without any consideration of what individual contractors were promised, understood, or relied upon. If plaintiffs' Phase IV approach is followed, the factfinder will only have the anecdotal experiences of the named plaintiffs, but no other experiences or testimony from other contractors, even though many do not believe the named plaintiffs are like them or have their interests at heart. In the final analysis, when members of a proposed class do not share common interests, no "selection of representatives" can adequately represent the others or afford the "protection to absent parties which due process requires." *Hansberry v. Lee*, 311 U.S. 32, 45 (1940).

## III.  PLAINTIFFS HAVE FAILED TO DEFINE AN ASCERTAINABLE CLASS

Plaintiffs continue to leave unresolved the issue of who belongs in the proposed classes. Contrary to Rule 23, their proposed class definitions are neither precise, *see Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999), nor resolvable without fact-intensive inquiries, *see Simer v. Rios*, 661 F.2d 655, 671 (7th Cir. 1981). On the basis that each class member "drove or will drive a vehicle on a full-time basis (exclusive of commonly excused employment

absences),” plaintiffs state that the class definitions “include[] those who drive for a living, but exclude[] those whose work is limited to supervision alone.” (ORM 8.)

It is not clear what “full-time” means when the evidence shows that all FedEx Ground contractors do more than just drive and each has a choice, on any given day, to hire someone else to drive instead. For example, it is not clear why *Whiteside* (North Carolina) named plaintiff John Brown, Jr. can be considered a “full-time” driver when he subcontracted his route for several months. (Brown Dep. 124-24, 161-63 (Ex. 18).) Or why *Gibson* (Arizona) named plaintiff Margaret Gibson can be considered a “full-time” driver when she took six weeks off at one point and drove sporadically at other times. (Gibson Dep. 83, 90-91 (Ex. 17).) Plaintiffs’ class definition is not only difficult to manage,[6] but the failure to clearly resolve what “full-time” driving means will have the tendency to mask deeper commonality and adequacy problems. If the class includes contractors (like Brown and Gibson) who drove certain parts of the year and managed their businesses during the other parts, then there are greater divergences in circumstances and interests than plaintiffs have thus far acknowledged.

Dated: November 16, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendants’ Liaison and Lead Counsel*

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O’MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

[6] Prior to January 2006, FedEx Ground did not keep records identifying who serviced each route each day and FedEx Ground ***never*** tracked the reason a contractor did not drive, much less whether it was due to a “commonly excused employment absence.” (Wolf Dec. ¶¶ 2-5 (Ex. 19).)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Anne T Regan
atr@zimmreed.comand

Shannon Liss-Riordan
sliss@prle.com

Bruce H. Meizlish
brucelaw@fuse.net

Deborah R. Grayson
drgrayson@fuse.net

Edward R. Forman
eforman@ee.net

Eileen S. Goodin
egoodin@bnhmlaw.com

George A. Barton
gbarton@birch.net

John S. Marshall
marshall@ee.net

Mary D. Walsh-Dempsey
mdempsey@omalleylangan.com

Matthew M. Houston
mhouston@whesq.com

Monica Ferraro
mferraro@bnhmlaw.com

Peter D. Winebrake
pwinebrake@winebrakelaw.com

Robert E. DeRose, II
bderose@bnhmlaw.com

Robert K. Handelman
rhandelman@bnhmlaw.com

Sanford A. Meizlish
smeizlish@bnhmlaw.com

Steve D. Larson
slarson@ssbls.com

and I further certify that I have mailed by United States Postal Service the document to the following non CM/ECF participant:

Hart Lawrence Robinovitch
Zimmerman Reed PLLP
14646 N Kierland Blvd Suite 145
Scottsdale, AZ 85254-2762

Anthony J. Pantuso, III
PANTUSO LAW FIRM LLC
204 Broad St., 2nd Fl.
Milford, CT 06460

Harold L. Lichten
PYLE ROME LICHTEN EHRENBERG & LISS-RIORDAN PC-MA
18 Tremont St., Ste. 500
Boston, MA 02108

Richard Eugene Hayber
HAYBER LAW FIRM LLC
221 Main St., St. 400
Hartford, CT 06106

Mary Donne Peters
Michael J. Gorby
GORBY REEVES & PETERS
Two Ravinia Dr., Ste. 1500
Atlanta, GA 30346-2104

Salvatore G. Gangemi
GANGEMI LAW FIRM PC
82 Wall St., Ste. 300
New York, NY 10005

Todd J. O'Malley
O'MALLEY & LANGAN PC
426 Mulberry St., Ste. 104
Scranton, PA 18503

Phyllis Norman
LAW OFFICES OF GEORGE A. BARTON, P.C.
800 W. 47th St., Ste. 700
Kansas City, MO 64112

Andrew J. Kahn PHV
MCCRACKEN STEMERMAN & HOLSBERRY
1630 S. Commerce St., Ste. A-1
Las Vegas, NV 89102

R. James Lore, Esq.
102-1 Commonwealth Court
Cary, NC 27511

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

James J. Dunn, Jr.
MICKENBERG DUNN KOCHMAN LACHS & SMITH
29 Pine Street
Burlington, VT 05402-0406

All exhibits associated with the foregoing (whether filed electronically or under seal) have been provided to all counsel listed above.

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

CHIEF JUDGE MILLER

**EXHIBITS TO DEFENDANT FEDEX GROUND'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' OMNIBUS FACT MEMORANDUM MOTION FOR CLASS CERTIFICATION**

---

1. Troy Givens FedEx Ground Operating Agreement
2. Objections and Response of Margaret Gibson to FedEx Ground's Tenth Set of Interrogatories
3. Objections and Response of Neville Edwards to FedEx Ground's Eleventh Set of Interrogatories
4. Objections and Response of Sharon Whiteside to FedEx Ground's Eleventh Set of Interrogatories
5. Objections and Response of Michael Decesare to FedEx Ground's Ninth Set of Interrogatories
6. Objections and Response of Jon Leighter to FedEx Ground's Eleventh Set of Interrogatories
7. Intentionally Omitted
8. Intentionally Omitted
9. Contractor Relations, Policy-007

10. Heather D'Alesandro Deposition Excerpts (File Under Seal)

11. *Skidmore v. FedEx Ground*, No. 12-44331-SB (Dept. of Indus. Relations Nov. 30, 2001) (Filed Under Seal)

12. Order, *Lemmings v. FedEx Ground*, Case No. 2:05-cv-02516 (W.D. Tenn. May 15, 2007)

13. Order, *Mailhot v. FedEx Ground*, Case No. 02-257-JD (D. N.H. Feb. 11, 2004)

14. Declaration of Kevin Martin

15. Declaration of Loran Roell

16. Declaration of Michael Hill

17. Deposition Excerpts of Margaret Gibson

18. Deposition Excerpts of John Brown

19. Declaration of Ray Wolf



OP-149

**FEDEX GROUND PACKAGE SYSTEM, INC.**

**PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT**

**JUNE 2004**

# TABLE OF CONTENTS

BACKGROUND STATEMENT .... 1

1. EQUIPMENT AND OPERATIONS. .... 2
   - 1.1 Power Equipment. .... 2
   - 1.2 Equipment Maintenance. .... 2
   - 1.3 Operating Expenses. .... 3
   - 1.4 Operation of the Equipment. .... 3
   - 1.5 Equipment Identification while in FedEx Ground's Service. .... 4
   - 1.6 Licensing. .... 4
   - 1.7 Logs and Reports. .... 5
   - 1.8 Shipping Documents and Collections. .... 5
   - 1.9 Contractor Performance Escrow Account .... 5
   - 1.10 Agreed Standard of Service. .... 7
   - 1.11 Refused or Returned Shipments. .... 9
   - 1.12 Operator and Equipment Appearance Standard. .... 9
   - 1.13 Communications Equipment. .... 10
   - 1.14 Contractor's Obligation to Meet Standards of Customer Service. .... 10
   - 1.15 Discretion of Contractor to Determine Method and Means of Meeting Business Objectives. .... 10

2. VEHICLE OPERATION. .... 11
   - 2.1 Additional Vehicles; Safe Operation Required. .... 11
   - 2.2 Employment of Qualified Persons. .... 11

3. INSURANCE AND INDEMNITIES .... 13
   - 3.1 Non-Trucking Liability Coverage -- Contractor Responsibility. .... 13
   - 3.2 Public Liability -- FedEx Ground's Responsibility. .... 13
   - 3.3 Public Liability -- Contractor's Responsibility. .... 14
   - 3.4 FedEx Ground's Non-Liability for Equipment. .... 15
   - 3.5 Contractor's Responsibility for Certain Losses. .... 15
   - 3.6 Work Accident and Workers Compensation. .... 17

4. SETTLEMENT WITH CONTRACTOR. .... 18
   - 4.1 Settlement for Services Performed. .... 18
   - 4.2 Settlement Statements. .... 20

5. CONTRACTOR PRIMARY SERVICE AREA. .... 21
   - 5.1 Definition. .... 21
   - 5.2 Mutual Intention to Reduce Geographic Size of Primary Service Area. .... 21
   - 5.3 Recognition of Contractor's Proprietary Interest in Customers Served. .... 22

case 3:05-md-00527-RLM CAN document 1606-3 filed 11/16/09 page 9 of 30

6. CONTRACTOR CUSTOMER SERVICE (CCS) PAYMENTS. .......... 25

7. BUSINESS SUPPORT PACKAGE. .......... 25

8. SERVICE GUARANTEE PROGRAM. .......... 26

9. FLEX PROGRAM. .......... 28

10. HR 10 PLAN. .......... 28

11. TERM OF AGREEMENT. .......... 29
 11.1 Initial Term. .......... 29
 11.2 Renewal Terms. .......... 29

12. TERMINATION PROVISIONS. .......... 29
 12.1 Termination. .......... 29
 12.2 Obligations Upon Termination. .......... 31
 12.3 Arbitration of Asserted Wrongful Termination. .......... 32

13. MERGER OF UNDERSTANDING. .......... 35

14. CAPTIONS. .......... 35

15. SAVINGS CLAUSE. .......... 35

16. FAILURE TO ENFORCE. .......... 35

17. FORCE MAJEURE. .......... 36

18. ASSIGNMENT. .......... 36

19. GOVERNING LAW. .......... 37

ADDENDUM 1 .......... Identification of Leased Equipment

ADDENDUM 2 .......... Insurance - Minimum Coverage Requirements

FXG_GIVENS0001216

case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/07 page 4 of 30

ADDENDUM 3 .......... Settlement
Attachment I-1. .......... Spotted Trailer Settlement
Attachment I-2. .......... Railhead, Airport, Storage Staging Area and Shuttle
Attachment I-3. .......... Temporary Core Zone Density Settlement
Attachment I-4. .......... Added Service Settlement

ADDENDUM 4 .......... Primary Service Area

ADDENDUM 5 .......... Proprietary Interest

ADDENDUM 6 .......... Contractor Customer Service Program

ADDENDUM 7 .......... Business Support Package
Attachment I-1. .......... Time-Off Program

FEDEX GROUND SAFE DRIVING PROGRAM

**FEDEX GROUND PACKAGE SYSTEM, INC.**
**PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT**

**BACKGROUND STATEMENT.** FedEx Ground Package System, Inc. is a duly licensed motor carrier engaged in providing a small package information, transportation and delivery service throughout the United States, with connecting international service. The Contractor is an owner-operator of one or more pieces of trucking equipment suitable for use in such a service. Contractor wants to make this equipment available, together with a qualified operator for each piece of equipment, to provide daily pick-up and delivery service on behalf of FedEx Ground. FedEx Ground wants to provide for package pick-up and delivery services through a network of independent contractors, and, subject to the number of packages tendered to FedEx Ground for shipment, will seek to manage its business so that it can provide sufficient volume of packages to Contractor to make full use of Contractor's equipment. Contractor wants the advantage of operating within a system that will provide access to national accounts and the benefits of added revenues associated with shipments picked up and delivered by other contractors throughout the FedEx Ground system. In order to get that advantage, Contractor is willing to commit to provide daily pick-up and delivery service, and to conduct his/her business so that it can be identified as being a part of the FedEx Ground system. Both FedEx Ground and Contractor intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of FedEx Ground for any purpose. Therefore, this Agreement will set forth the mutual business objectives of the two parties intended to be served by this Agreement -- which are the results the Contractor agrees to seek to achieve -- but the manner and means of reaching these results are within the discretion of the Contractor, and no officer or employee of FedEx Ground

Case 3:05-md-00527-RLM -CAN document 1606-3 filed 11/16/09 page 6 of 30

shall have the authority to impose any term or condition on Contractor or on Contractor's continued operation which is contrary to this understanding.

**1. EQUIPMENT AND OPERATIONS.**

**1.1 Power Equipment.** In conjunction with providing to FedEx Ground transportation services as herein provided, Contractor will provide and utilize the vehicular equipment identified in the most recent Addendum 1 to this Agreement (hereinafter called the "Equipment"). Contractor certifies that the Equipment meets the requirements of all applicable federal, state and municipal laws and regulations, and, subject to the determination of FedEx Ground of its suitability for the service called for in this Agreement, the selection and replacement of the Equipment is within the discretion of Contractor.

**1.2 Equipment Maintenance.** Contractor agrees, at Contractor's expense, to maintain the Equipment in accordance with the safety and equipment standards specified in applicable federal, state and municipal laws and any rules, regulations and orders of any applicable agency. In particular, Contractor agrees to provide FedEx Ground with proof of timely maintenance and inspection of the Equipment in accordance with the periodic mandatory vehicle maintenance and inspection regulations administered or required by any federal, state or municipal agency with jurisdiction over the operations described in this Agreement. The periodic maintenance schedule recommended by the equipment manufacturer shall be deemed to meet these requirements, absent specific federal, state, or municipal regulations. In the event the Equipment is found to be deficient under any law or regulation, Contractor agrees to remove the Equipment from service

with FedEx Ground until it is brought into compliance. During such interim period, Contractor shall, at Contractor's expense, provide alternative equipment suitable for use in carrying out Contractor's obligations under this Agreement.

**1.3 Operating Expenses.** Contractor agrees to bear all costs and expenses incidental to operation of the Equipment, whether empty or loaded, including, without limitation, all risks of depreciation, all maintenance (including cleaning and washing), fuel, oil, tires, repairs, business taxes, consumption and sales taxes, personal property taxes, ad valorem taxes, fuel and road-use taxes, ton-mile taxes, insurance coverage as provided herein, workers compensation assessments, licenses, vehicle registration renewal fees, base plates, and all highway, bridge and ferry tolls. To facilitate payment of licenses, taxes and fees, where mutually convenient or otherwise required by statute or regulation, Contractor hereby authorizes FedEx Ground to pay these charges on Contractor's behalf and to charge Contractor for any such payments, together with any direct expenses incurred by FedEx Ground in connection with their payment. Contractor agrees that unless strictly prohibited by law, any licenses, permits, assessments and taxes paid by FedEx Ground on behalf of Contractor pursuant to this paragraph may be charged back against and deducted from any compensation owed Contractor by FedEx Ground.

**1.4 Operation of the Equipment.** Contractor agrees to direct the operation of the Equipment and to determine the methods, manner and means of performing the obligations specified in this Agreement. FedEx Ground shall be considered to have such exclusive possession, use and control of the Equipment required by D.O.T. regulation at 49 CFR Part 376.12(c), or other

Case 3:05-md-00527-RLM CAN document 1606-3 filed 11/16/09 page 8 of 30

applicable regulations, but shall have no right or authority, without the express permission of Contractor, to operate the Equipment for any purpose (except for incidental yard movement and positioning) unless the Equipment is driven either by Contractor or by an operator engaged by Contractor. While the Equipment is in the service of FedEx Ground, it shall be used by Contractor exclusively for the carriage of the goods of FedEx Ground, and for no other purpose. If the Equipment is operated in the service of anyone other than FedEx Ground, including any separate business activities of Contractor, Contractor agrees to hold FedEx Ground harmless from any liability arising from operation of the Equipment that may be asserted against FedEx Ground by any person.

**1.5 Equipment Identification while in FedEx Ground's Service.** Contractor agrees to mark Equipment while in FedEx Ground's service with such identifying colors, logos, numbers, marks and insignia as may be required either under applicable regulations, including 49 CFR Part 390, or to identify the Equipment as a part of the FedEx Ground system. Contractor may use the Equipment for other commercial or personal purposes when it is not in the service of FedEx Ground, with the understanding that all such identifying numbers, marks, logos and insignia will be removed or masked (by paper or plastic overlay) when the Equipment is so used.

**1.6 Licensing.** If necessary to comply with the vehicle registration requirements of applicable state regulations or laws, the base plate portion of the Equipment registration shall be in the name of FedEx Ground. If, at any time during the term of this Agreement, applicable state regulations require Contractor to obtain an owner/driver operating authority in order to serve intrastate

customers, Contractor agrees, at his/her own expense, to acquire and maintain such operating authority and to cooperate with FedEx Ground in altering the arrangements set out in this Agreement to the extent necessary to ensure compliance by Contractor and FedEx Ground with any such state regulations, practices and procedures.

**<u>1.7 Logs and Reports.</u>** Contractor agrees to prepare daily driver logs and daily inspection reports, along with fuel receipts, shipping documents, and other documents as required by law or regulation, and to file the originals with FedEx Ground upon the conclusion of each business day.

**<u>1.8 Shipping Documents and Collections.</u>** Contractor agrees to prepare and present for the signature of consignors and consignees such shipping documents as FedEx Ground may from time to time designate, and to complete and return these documents to FedEx Ground at the end of each business day. Contractor further agrees to collect any charges owed by consignors and consignees and to return all collected charges to FedEx Ground at the end of each business day.

**<u>1.9 Contractor Performance Escrow Account.</u>** Contractor agrees to deposit with FedEx Ground at such time and in such manner as FedEx Ground may specify the sum of $1,000, which deposit shall be held by FedEx Ground in an account (hereinafter called the "Contractor Performance Escrow Account"). FedEx Ground agrees to handle the Contractor Performance Escrow Account as follows:

(a) Amounts held by FedEx Ground in the Contractor Performance Escrow Account shall be applied only for the purposes described in subparagraph (d) below.

(b) FedEx Ground agrees to pay (by credit to Contractor's weekly Settlement Statements at quarterly intervals) interest on the daily balance in the Contractor Performance Escrow Account. Such interest shall be at a rate equal to the average annual yield of 13-week U.S. Treasury bills at the rate established at the beginning of each quarter for the funds held on deposit during such quarter.

(c) FedEx Ground agrees to provide Contractor with an accounting of all credits to or subtractions from Contractor's balance in such Account as part of Contractor's weekly Settlement Statement.

(d) Upon termination of this Agreement, Contractor agrees that any balance attributable to Contractor in the Contractor Performance Escrow Account shall be applied to reduce any indebtedness of Contractor to FedEx Ground as reflected on Contractor's Settlement Statements or other instruments. Contractor shall remain liable for any remaining indebtedness which exceeds Contractor's balance in such Account.

(e) Upon Contractor's fulfillment of the obligations due to FedEx Ground upon termination, FedEx Ground shall, after making such deductions from the

Contractor Performance Escrow Account as are permitted herein, provide Contractor with a final accounting of all final transactions involving Contractor's balance in such Account and remit to Contractor any remaining balance within 45 days from the date of termination.

**1.10 Agreed Standard of Service.** FedEx Ground has represented to shippers and consignees that, in arranging transportation of packages within the FedEx Ground system, it will provide a standard of service that is fully competitive with that offered by other national participants in the industry. Contractor acknowledges the benefits to his/her business of participation in the FedEx Ground national system, and agrees to conduct activities under the terms of this Agreement to achieve the results represented to shippers and consignees. To achieve these business objectives, Contractor agrees to:

(a) Provide daily pick-up and delivery service to consignees and shippers on days and at times which are compatible with their schedules and requirements within Contractor's Primary Service Area, as that term is defined in this Agreement, and in such other areas as Contractor may be asked to provide service in the event Contractor elects to participate in the Flex Program described in Paragraph 9 of this Agreement, all consistent with the competitive standards within the industry (provided, however, that on any day where the volume of packages available for pick-up or delivery in Contractor's Primary Service Area exceeds the volume that

Contractor can reasonably be expected to handle on such day, FedEx Ground may reassign a portion of such packages to another contractor);

(b) Make reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages handled per shipper within Contractor's Primary Service Area;

(c) Handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage;

(d) Cooperate with FedEx Ground's employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal;

(e) Foster the professional image and good reputation of FedEx Ground and Contractor with shippers and consignees, including adhering to the vehicle identification and operator appearance standards specified in Paragraphs 1.5 and 1.12 of this Agreement;

Case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/07 page 13 of 30

(f) Conform to all applicable federal, state and local laws, regulations and ordinances;

(g) Cause the Equipment to be operated safely and in compliance with all applicable laws and regulations; and,

(h) Conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum at all times.

**1.11 Refused or Returned Shipments.** If a package cannot be delivered on the day it is tendered to Contractor for delivery, Contractor agrees to return the package to FedEx Ground that same day at the terminal facility where it was tendered for delivery, and to inscribe on the package and to provide by electronic and/or manual means whatever notational references FedEx Ground may from time to time reasonably require in order to document the package location and the reason for non-delivery (i.e., service cross).

**1.12 Operator and Equipment Appearance Standard.** Contractor acknowledges that the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive with other alternatives available to shippers and consignees and to permit recognition and prompt access to customers' places of business. Accordingly, each person having contact with the public under the provisions of this Agreement will wear a FedEx Ground-approved uniform, maintained in good condition, and will otherwise keep his/her

personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by FedEx Ground. In addition, the Equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry.

**1.13 Communications Equipment.** Contractor shall, at Contractor's expense, purchase or lease the electronic communications equipment necessary to fulfill the obligations specified in Paragraph 1.10 (d) above and which complies with specifications promulgated from time to time by FedEx Ground. Alternatively, at Contractor's option, Contractor may acquire such equipment from FedEx Ground through the Business Support Package described in Addendum 7 of this Agreement.

**1.14 Contractor's Obligation to Meet Standards of Customer Service.** Contractor shall have the obligation to assure that all persons who operate the Equipment are fully trained and capable of meeting the customer service standards set forth in this Agreement. FedEx Ground shall, during the first 30 days of the term of this Agreement, familiarize Contractor with various quality service procedures developed by FedEx Ground. In addition, qualified FedEx Ground terminal personnel may, at their option, visit customer locations with Contractor four times annually to verify that Contractor is meeting the standards of customer service provided in this Agreement.

**1.15 Discretion of Contractor to Determine Method and Means of Meeting Business Objectives.** It is specifically understood and agreed by both parties that Contractor shall be

responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of FedEx Ground shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of FedEx Ground shall have the authority to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance.

**2. VEHICLE OPERATION.**

**2.1 Additional Vehicles; Safe Operation Required.** Contractor may, with the consent of FedEx Ground and consistent with the capacity of the terminal serviced by Contractor, own and operate more than one vehicle, with any such additional vehicles to be driven by qualified operators employed by Contractor, as described in subparagraph 2.2 below. The FedEx Ground Safe Driving Standards are attached hereto and made a part of this Agreement. No vehicle may be operated pursuant to this Agreement by any operator who is not in compliance with such standards.

**2.2 Employment of Qualified Persons.** Contractor may employ or provide person(s) to assist Contractor in performing the obligations specified by this Agreement. All persons so employed or provided by Contractor shall be qualified pursuant to applicable federal, state and municipal safety standards and the FedEx Ground Safe Driving Standards, and shall be fully trained, at Contractor's expense, to operate the Equipment. Contractor understands and agrees that such persons shall not be considered employees of FedEx Ground and that it is Contractor's

responsibility to assure that such persons conform fully to the applicable obligations undertaken by Contractor pursuant to this Agreement. Contractor further agrees to:

(a) Bear all expenses associated with qualifying such persons to perform the services agreed to be provided herein, including, without limitation, the cost of physical examinations and drug screen tests;

(b) Bear all expenses associated with the employment of such persons, including, without limitation, wages, salaries, employment taxes, workers compensation coverage, health care, retirement benefits and insurance coverages;

(c) Assume sole responsibility for compliance with all applicable laws, rules, regulations and orders respecting payroll deductions and maintenance of payroll and employment records; and,

(d) Hold FedEx Ground harmless from any liability and claims by others or by governments arising from Contractor's relationship with Contractor's employees or substitutes whether under industrial accident prevention laws or any other federal, state or municipal laws applicable to the relationship between employers and employees.

**3. INSURANCE AND INDEMNITIES.**

**3.1 Non-Trucking Liability Coverage -- Contractor Responsibility.** Contractor agrees to obtain and keep in force at all times a policy(ies) of public liability (automobile/truckers bodily injury and property damage insurance coverage), issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated, and rated A, Class VII or better by A.M. Best Co., to cover all costs, losses and expenses arising from operation of the Equipment while it is in operation without packages on board (empty mile coverage) in amounts not less than $1,000,000 per occurrence. Contractor shall provide FedEx Ground Certificate(s) of Insurance evidencing such coverage naming FedEx Ground an additional insured and providing FedEx Ground 30 days' prior written notice of cancellation or material change. Minimum coverage requirements are listed in Addendum 2.

**3.2 Public Liability -- FedEx Ground's Responsibility.** FedEx Ground agrees to self-retain and maintain insurance coverages for public liability (general and automobile/truckers personal injury and property damage insurance coverage), and cargo loss and damage risks in amounts sufficient to meet its legal obligations under 49 CFR Part 387 and, subject to the exception described in subparagraph 3.5, will indemnify Contractor and Contractor's drivers against liability for operation of Equipment when any package is on board while on FedEx Ground's business subject to the following exceptions and conditions, the occurrence of any one of which will void this indemnity:

(a) As to the involved Equipment operator, if the operator has engaged in intentional misconduct or reckless or willfully negligent operation of the Equipment;

(b) As to the Contractor, if the Contractor is not the involved Equipment operator, but has knowledge of or reason to anticipate such operator's intentional misconduct or reckless or willfully negligent operation of the Equipment; or

(c) As to Contractor and operator(s), when FedEx Ground has elected to discontinue its indemnity hereunder pursuant to the provisions of subparagraph 3.3.

**3.3 Public Liability -- Contractor's Responsibility.** At any time that FedEx Ground discovers that Contractor or an operator engaged by Contractor to drive the Equipment fails to meet FedEx Ground's Safe Driving Standards as published from time to time, all as determined by FedEx Ground in its sole discretion, FedEx Ground may elect to terminate its indemnity for liability to Contractor and Contractor's drivers (hereinafter referred to as "indemnity termination"). Any such election of indemnity termination shall be given in writing to Contractor not less than 30 days before the effective date thereof, as specified in such election. In such event (unless Contractor cures such violation to FedEx Ground's sole and complete satisfaction before such effective date), Contractor shall obtain, effective not later than such specified date, and continually thereafter maintain, a policy of public liability (automobile/truckers bodily injury and property damage insurance coverage) for a combined single limit of not less than $2,000,000 naming FedEx Ground as an additional insured, issued by an insurance company qualified to

Case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/07 page 19 of 30

write such coverage in the state(s) where the Equipment is operated and rated A, Class VII or better by A.M. Best Co. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to showing FedEx Ground as an additional insured and providing FedEx Ground 30 days' prior written notice of cancellation or material change. In addition, Contractor will obtain and continually thereafter maintain a policy of insurance for cargo loss and damage risk for an amount not less than $40,000 per vehicle, with deductibles not greater than $250, to be issued by an insurance company meeting the same qualifications provided above. Such insurance coverage shall be evidenced by a Certificate of Insurance provided to FedEx Ground naming FedEx Ground as an additional insured and providing FedEx Ground 30 days' prior written notice of cancellation or material change.

**3.4 FedEx Ground's Non-Liability for Equipment.** Contractor agrees that FedEx Ground shall not be liable to Contractor for any depreciation, loss or damage that may occur to the Equipment by collision, fire, theft or similar occurrence, excepting such loss or damage as may be caused by FedEx Ground, its agents, servants and employees.

**3.5 Contractor's Responsibility for Certain Losses.** The following indemnities constitute an exception to the provision for risk protection to Contractor provided in subparagraph 3.2. During the term of this Agreement and thereafter, Contractor agrees to indemnify and save FedEx Ground harmless against liabilities as follows:

(a) The first $1,000 arising from each claim brought against FedEx Ground and all liabilities incurred by FedEx Ground for or on the account of bodily injury and/or property damage in any manner caused by, incidental to or growing out of any act or omission of Contractor or Contractor's agents, servants or employees arising out of the ownership, maintenance, use or operation of the Equipment and/or FedEx Ground-provided equipment, or out of the conduct of Contractor's business;

(b) After one year of continuous safe operation of the Equipment under the terms of this Agreement, the Contractor's responsibility under this subparagraph shall be reduced to $500; after two years, to $250; and after three years to zero (provided, however, in the event the Equipment is involved in an at-fault accident while in the service of FedEx Ground, the Contractor's responsibility shall revert to $1,000 until, by passage of time without a further at-fault accident, the modifications of this subparagraph (b) again apply);

(c) The first $1,000 of each claim for loss or damage to packages tendered for shipment or handling hereunder while such packages are in the possession of Contractor or Contractor's agents, servants or employees;

(d) Any or all claims brought against FedEx Ground and liabilities incurred by FedEx Ground arising from the Contractor's relationship with Contractor's employees,

Case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/079 page 21 of 30

whether under industrial accident prevention laws, or any other federal, state or municipal laws, rules, regulations and orders applicable to the relationship between employers and employees; and,

(e) Any and all claims brought against FedEx Ground or liabilities incurred by FedEx Ground for or on account of Contractor's failure or failure of Contractor's agents, servants or employees to comply with any laws, rules, regulations or orders applicable to Contractor's business.

(f) Any and all claims brought against FedEx Ground or liabilities incurred by FedEx Ground in the event the Contractor or the involved Equipment operator fails to assist FedEx Ground in securing and giving evidence, attending hearings and trials, obtaining the attendance of witnesses, or otherwise fails to cooperate with FedEx Ground in such matters.

**<u>3.6 Work Accident and Workers Compensation.</u>** Contractor agrees to obtain and keep in force at all times during the term of this Agreement work accident and/or workers compensation insurance insuring Contractor and all of Contractor's employees. At Contractor's option, such coverage may be obtained either under a policy negotiated by FedEx Ground, through an applicable state sponsored program, or through a policy providing comparable benefits and issued by an insurance company qualified to write such coverage in the state(s) where the Equipment is operated, and rated A, Class VII or better by A.M. Best Co. Such insurance

coverage shall be evidenced by a Certificate of Insurance provided to FedEx Ground and providing FedEx Ground 30 days' prior written notice of cancellation or material change. Minimum coverage requirements are as listed in Addendum 2.

**4. SETTLEMENT WITH CONTRACTOR.**

**4.1 Settlement for Services Performed.** FedEx Ground agrees to settle on a weekly basis with Contractor for services provided in accordance with the settlement schedule set forth in Addendum 3, from which settlement shall be deducted charges for items which are authorized in writing or required by law. The settlement to Contractor shall consist of the following parts:

(a) **Package Pick-Up and Delivery Settlement**, which amount shall be a payment for stops made and packages handled.

(b) **Contractor and Van Availability Settlement**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement, in consideration of Contractor making available to FedEx Ground at the start of such day a clean, properly maintained van, driven by a qualified and uniformed operator. In order to encourage van availability on business days falling immediately before and immediately after certain national holidays, the Contractor and Van Availability Settlement shall be enhanced on such days, as shown in Addendum 3.

Case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/07 page 23 of 30

(c) **Temporary Core Zone Density Settlement**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement in Contractor's Primary Service Area, in consideration of Contractor agreeing to provide daily package pick-up and delivery service during such period of time when the customer density and package volume in such Primary Service Area is still developing. In the event Contractor provides service in another contractor's Primary Service Area pursuant to the Flex Program, Contractor shall also receive a proportionate share of any Temporary Core Zone Density Settlement applicable to such other Primary Service Area. The intention of Contractor and FedEx Ground is to cooperate in increasing the customer density and package volume in Contractor's Primary Service Area to such an extent that the Temporary Core Zone Density Settlement will be reduced or eliminated, and Contractor agrees that, as such density and/or package volume increases, FedEx Ground may reduce or eliminate the Temporary Core Zone Density Settlement. Except where the Contractor's Primary Service Area is reconfigured, with a resulting increase in customer density and/or package volume, or in the case of a new terminal opening or other major increase in customer density and/or package volume in Contractor's Primary Service Area, such settlement amount shall not be decreased by more than $10 per day in any six month period, and then only with 30 days' prior written notice to Contractor.

case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/07 page 24 of 30

(d) **Flex Fee**, which amount shall be payable to Contractor with respect to each business day that Contractor provides services under this Agreement, provided Contractor has agreed to participate in the Flex Program offered by FedEx Ground.

(e) **Quarterly Performance Settlement**, which amount shall be paid in the first settlement of each quarter, beginning after Contractor has completed one year as an FedEx Ground Contractor and shall be equal to that percentage specified in Addendum 3 of the aggregate amounts credited to Contractor in the immediately preceding quarter, pursuant to subparagraphs (a)-(d) above.

**4.2 Settlement Statements.** FedEx Ground agrees to issue Settlement Statements and settlement checks to Contractor on a weekly basis (except when this Agreement is terminated as provided herein, in which case a final Settlement Statement and settlement check shall be issued within 45 days of termination). Settlement Statements shall contain a computation of the settlement Contractor is entitled to receive and an itemized listing of all deductions from Contractor's settlement. FedEx Ground shall have no responsibility to make deductions for, or to pay wages, benefits, health, welfare and pension costs, withholding for income taxes, unemployment insurance premiums, payroll taxes, disability insurance premiums, social security taxes, or any other similar charges with respect to Contractor or Contractor's employees. To facilitate prompt settlement, Contractor agrees to prepare such settlement documents and records as FedEx Ground may from time to time require in order to compute such settlement. Upon

written request, Contractor shall be provided copies of those documents which are necessary to determine the validity of all deductions from Contractor's settlement. Settlement Statements and the entries thereon shall be deemed conclusive and binding on Contractor, unless written objections to entries on a questioned Settlement Statement are received by FedEx Ground within 30 days from the date of issuance of the Settlement Statement to which the objections apply.

**5. CONTRACTOR PRIMARY SERVICE AREA.**

**5.1 Definition.** Contractor shall be responsible for the daily pick-up and delivery of packages in Contractor's Primary Service Area, as assigned to Contractor from time to time by FedEx Ground, and as shown in Addendum 4 to this Agreement.

**5.2 Mutual Intention to Reduce Geographic Size of Primary Service Area.** Contractor recognizes that, as the customer base and package volume in the Primary Service Area increases, the geographic size of the area which Contractor will be able to serve with the Equipment can be expected to decrease. Contractor acknowledges that the increased concentration in customer base and package volume which results from a decrease in the geographic size of Contractor's Primary Service Area is in the interest of Contractor, since Contractor will thereby have the opportunity to complete a greater number of package pick-ups and deliveries with less expense, and Contractor agrees to cooperate with the reasonable efforts of FedEx Ground in gathering data necessary to evaluate Contractor's Primary Service Area, including permitting FedEx Ground personnel to ride with Contractor from time to time in connection with these efforts. FedEx Ground shall have the authority, upon five work days of prior written notice to Contractor, to

FXG_GIVENS0001238

reconfigure Contractor's Primary Service Area to take account of customer service requirements. During such notice period, FedEx Ground shall give Contractor the opportunity, using means satisfactory to FedEx Ground, to continue to provide in such Primary Service Area the level of service called for in this Agreement. In the event Contractor is not able to provide reasonable means to continue to service the Primary Service Area, FedEx Ground may, in its sole discretion, reconfigure such area.

**5.3 Recognition of Contractor's Proprietary Interest in Customers Served.** This Agreement is based on the concept that Contractor and FedEx Ground are each engaged in an undertaking to operate an efficient package delivery service which is fully competitive with the standards of other national participants in the industry. FedEx Ground and Contractor recognize that, because of the reciprocal benefits which flow from participation in an interrelated, national service, they have a mutual interest in increasing package volume and the number of customers both in Contractor's Primary Service Area and in the service areas of other contractors who have entered into substantially identical agreements with FedEx Ground. Contractor specifically acknowledges that the intentions set forth in this Agreement to provide a national delivery service cannot be met -- either nationwide or in the service area served by the terminal (the "Terminal Service Area") which includes Contractor's Primary Service Area -- without the participation of a network of contractors. Therefore this Agreement contemplates the recognition both by the parties hereto and by other contractors in the FedEx Ground system of a proprietary interest by Contractor in the customer accounts in his/her Primary Service Area as that area is configured from time to time, and a consequent right of Contractor to receive payment in the

event his/her Primary Service Area is reconfigured with the result that customers previously served by the Contractor are reassigned. Depending on the circumstance, as provided below, such payments may be from other contractors or from FedEx Ground. In consideration of the mutual obligations contained herein and in substantially similar agreements with other contractors, the parties hereto agree as follows:

In the event Contractor's Primary Service Area is reconfigured so that the Contractor gains customer accounts, the Contractor hereby authorizes FedEx Ground to deduct from Contractor's settlement and to pay to the Contractor relinquishing such accounts the payments calculated as provided below; and

In the event Contractor's Primary Service Area is reconfigured so that customer accounts which had been serviced by the Contractor are reassigned to another contractor or to a spotted trailer, the Contractor shall receive payments, calculated and made as provided below.

Payments to or from Contractor for customer accounts gained or relinquished when Contractor's Primary Service Area is reconfigured shall be calculated and made as follows:

**First,** the average number of package deliveries per day gained or relinquished by Contractor shall be determined by reference to the average number of package

Case 3:05-md-00527-RLM -CAN document 1006-3 filed 11/16/07 page 28 of 30

deliveries in the area relinquished in the three most recent complete FedEx Ground accounting periods;

**Second,** the average number of package pick-ups per day gained or relinquished by the Contractor shall be determined by reference to the average number of package pick-ups in the area relinquished in the three most recent complete accounting periods;

**Third,** the Contractor shall be entitled to a payment of the dollar amount specified in Addendum 5, multiplied by the average number of package deliveries relinquished, and the dollar amount specified in Addendum 5, multiplied by the average number of package pick-ups relinquished;

**Fourth,** the Contractor shall make payments calculated using the same formula as set forth in the preceding paragraph to relinquishing contractor(s) for package deliveries and pick-ups gained;

**Fifth,** in the event, in connection with the reconfiguration, package deliveries or pick-ups previously in Contractor's Primary Service Area are reassigned to another contractor, FedEx Ground shall remit payment to Contractor, but only as to the extent FedEx Ground receives payments from the contractor to whom the package deliveries or pick-ups were reassigned;

**Sixth,** in the event package pick-ups or deliveries are permanently reassigned to a spotted trailer, FedEx Ground itself shall have the obligation to make the payments to the Contractor called for herein; and

**Seventh,** if contractors so request, and if FedEx Ground in its sole discretion agrees, payments provided hereunder may be made by credits to and deductions from the affected Contractor's weekly settlement, as shown on such Contractor's Settlement Statement.

**6. CONTRACTOR CUSTOMER SERVICE (CCS) PAYMENTS.** In addition to the payments listed above in Paragraph 4, beginning with the first day of the second full FedEx Ground accounting period, Contractor shall be eligible to receive performance-based Contractor Customer Service (CCS) payments each period in the amounts specified in Addendum 6. Payment shall be based on Contractor meeting individual customer service and safety goals, as well as Contractor's terminal meeting it's service goals, all as determined by FedEx Ground.

**7. BUSINESS SUPPORT PACKAGE.** Contractor shall not be required to purchase or rent any products, equipment, or services from FedEx Ground as a condition to entering into this Agreement. At Contractor's election (which election shall be as indicated on Addendum 7, and may be changed annually during the first FedEx Ground accounting period and as provided below) FedEx Ground will provide a Business Support Package to Contractor at a per van charge to Contractor as set out in the current version of Addendum 7, which amount shall be deducted from Contractor's weekly settlement. The Business Support Package shall include uniforms,

communications and data processing equipment, D.O.T. inspections, equipment washing, drug tests meeting D.O.T. requirements, and other items and services found in the current version of Addendum 7. The cost of the Business Support Package may be changed once annually to reflect changes in the cost to FedEx Ground of providing such package. In the event FedEx Ground proposes to implement any such change, it shall provide Contractor with 30 days' prior written notice, during which period Contractor may elect to discontinue participation.

**8. SERVICE GUARANTEE PROGRAM.** FedEx Ground and Contractor recognize the mutual benefits to each party of keeping the Equipment, together with a qualified operator, in continuous daily service pursuant to the terms of this Agreement. The expenses of both maintenance and engaging a substitute operator during periods when Contractor is ill or does not desire to drive are, pursuant to the terms of this Agreement, borne by Contractor. In order to encourage Contractor to accumulate a fund from which these and other unusual costs of operation can be paid when they arise, FedEx Ground agrees to maintain an interest-bearing fund, a Service Guarantee Account (with interest calculated and applied the same way as with respect to the Contractor Performance Escrow) to account for contributions to the Service Guarantee Account. Contractor may from time to time, and solely at Contractor's discretion, make contributions to such Account. Each quarter, FedEx Ground shall credit matching contributions to the Account as follows:

FXG_GIVENS0001243

| Contractor Average Balance in Preceding Quarter | Quarterly Matching Contribution |
|---|---|
| $ 500 or more | $100 |
| $ 750 or more | $150 |
| $1,000 or more | $200 |

In addition, if Contractor has more than one year as a P&D contractor for FedEx Ground, FedEx Ground shall, on the anniversary of the date Contractor first became a P&D Contractor for FedEx Ground, credit the Service Guarantee Account with a Service Bonus. The amount of this Service Bonus shall be in accordance with the settlement schedule set forth in Addendum 3. The Contractor may withdraw amounts credited to the Service Guarantee Account at any time and for any purpose. FedEx Ground may, at its discretion and taking into account the credit history of Contractor, make a loan to Contractor to fund maintenance costs in excess of the balance in the Contractor's Service Guarantee Account. The maximum amount of any such loan is as follows: if the aggregate balance in Contractor's Service Guarantee Account is between $500 and $1,000, the maximum loan is the amount of such aggregate balance; if such aggregate balance is in excess of $1,000, the maximum loan is twice the amount of such aggregate balance, up to a maximum loan of $5,000. Loans must be repaid within one year, and shall bear interest at the same rate as then applicable to interest payments by FedEx Ground on balances held in the Contractor Performance Escrow Account.

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 2 of 31

**9. FLEX PROGRAM.** At Contractor's election (which election shall be as indicated on Addendum 3, and may be changed annually during the first FedEx Ground accounting period), Contractor may participate in the FedEx Ground Flex Program. By electing to participate, Contractor agrees to accept packages from outside Contractor's Primary Service Area for pick-up and delivery, up to daily pick-up and delivery capacity (determined by reference to time required, mileage, and van capacity), when requested to do so by FedEx Ground terminal management. In consideration of Contractor's election to participate, Contractor shall receive, in addition to other components of the settlement provided in Paragraph 4 of this Agreement, a daily flex fee as specified in Addendum 3 for each piece of vehicular equipment in service under this Agreement. Such payment shall be made with respect to each business day that Contractor has also become entitled to the Contractor and Van Availability Settlement, regardless of whether Contractor is called upon to pick up or deliver packages outside Contractor's Primary Service Area. P&D contractors who utilize a tractor/trailer to perform P&D work, may elect to participate in the flex program, but will only receive the daily flex fee as specified in Addendum 3, on days they actually make a live pickup or delivery stop. P&D trailer spots do not qualify for the daily flex fee.

**10. HR 10 PLAN.** At Contractor's election (which election shall be and may be changed annually during January of each year, Contractor may, provided Contractor meets the eligibility requirements for participation, adopt the Prototype Defined Contribution Retirement Plan created and sponsored by Merrill Lynch for self-employed individuals such as Contractor (hereinafter referred to as the "Plan"). Any contributions by Contractor shall be in such amounts as Contractor shall specify, not to exceed 15 percent of the "covered compensation," as that term is

used in the Internal Revenue Code of 1986, as amended, of Contractor and his employees, shall be subject to any applicable limitations contained in the Plan, and shall be allocated to participant accounts as provided in the Plan.

**11. TERM OF AGREEMENT.**

**11.1 Initial Term.** This Agreement shall, at the election of Contractor, as indicated by Contractor's initials below, continue in full force and effect for an initial term ranging from one to three years from the date this Agreement is signed. Contractor hereby elects a term of:

a) one year _____

b) two years _____

c) three years _____

**11.2 Renewal Terms.** This Agreement shall automatically renew for successive terms of one year each after expiration of the initial term unless Contractor or FedEx Ground provides the other party notice of non-renewal in writing at least 30 days prior to the expiration of the initial term or any successive renewal term.

**12. TERMINATION PROVISIONS.**

**12.1 Termination.** This Agreement may be terminated during the initial term or during any renewal term hereof, as follows:

(a) At any time, by mutual agreement of Contractor and FedEx Ground;

(b) By FedEx Ground in the event that Paragraphs 3.2(a) or 3.2(b) apply;

(c) By Contractor or FedEx Ground if the other party breaches or fails to perform the contractual obligations imposed by this Agreement;

(d) By either party in the event that FedEx Ground:

(1) ceases to do business in all or part of the Terminal Service Area; or,

(2) as a result of a decline in business, reduces operations in all or part of the Terminal Service Area; or

(e) By Contractor, upon 30 days' prior written notice to FedEx Ground. The parties hereto specifically recognize the damage to FedEx Ground, which is difficult to quantify, but which includes the cost of engaging and qualifying temporary operators and replacement equipment to service Contractor's Primary Service Area, if Contractor should terminate his/her service obligations hereunder without first giving notice as provided in this paragraph. Therefore, in the event of such unauthorized termination by Contractor (except if such termination is caused by the death or disability of Contractor) Contractor shall pay to FedEx Ground, as liquidated damages, and not as a penalty, the sum of $1,000. FedEx Ground may withhold such amount from Contractor's final settlement or from Contractor's Performance Escrow Account.

**12.2 Obligations Upon Termination.** Upon termination of this Agreement for any reason, Contractor agrees promptly to:

(a) Return to FedEx Ground's terminal facility any trailers furnished by FedEx Ground for use in connection with the Equipment (if Contractor fails to return FedEx Ground's trailers to FedEx Ground's terminal facilities, FedEx Ground shall be entitled to a rental charge of $50 per day per trailer until said trailer is returned, (each 24-hour period or fraction thereof being considered one day, and may deduct any such charges from Contractor's final settlement, or from Contractor's Performance Escrow Account);

(b) Return to FedEx Ground any packages tendered for pickup and/or delivery and any shipping papers, documents, collections, or other property of FedEx Ground in Contractor's possession;

(c) Return to FedEx Ground any property of FedEx Ground furnished to Contractor pursuant to the Business Support Package; and

(d) Remove and return or permanently mask (such as by painting over) all of FedEx Ground's vehicle identification from the Equipment.

FedEx Ground may withhold the return of any monies owed Contractor, including any balance remaining in Contractor's Performance Escrow Account, until Contractor completes the return of the items listed above.

**12.3 Arbitration of Asserted Wrongful Termination.** In the event FedEx Ground acts to terminate this Agreement (which acts shall include any claim by Contractor of constructive termination) and Contractor disagrees with such termination or asserts that the actions of FedEx Ground are not authorized under the terms of this Agreement, then each such disagreement (but no others) shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (AAA) and judgment upon the award of the arbitrator may be rendered in any court having jurisdiction thereof, according to the following:

(a) Written notice of a demand for arbitration must be mailed by Contractor to FedEx Ground and to the AAA by certified mail within 90 days of the occurrence of the claimed wrongful termination. Failure to mail written notice of a demand for arbitration within such 90 day period and comply with all procedural requirements set forth in the Commercial Arbitration Rules of the AAA shall constitute an absolute bar to the institution of any proceedings and a waiver of the claimed wrongful termination. The copy of the demand sent to the American Arbitration Association will be addressed to Four Gateway Center, Suite 419, Pittsburgh, PA 15222-1207, with a request that the demand be forwarded to the appropriate AAA Regional Office.

(b) The dispute shall be heard and determined by a single arbitrator, chosen pursuant to the procedures of the AAA.

(c) The arbitrator shall set the date, time, and place for each hearing, and shall schedule the hearing and make his or her determination in an expeditious manner. Neither party shall be entitled to written or deposition discovery from the other, except with respect to damages.

(d) As to any dispute or controversy which under the terms hereof is made subject to arbitration, no suit at law or in equity based on such dispute or controversy shall be instituted by either party hereto, other than a suit to confirm, enforce, vacate, modify or correct the award of the arbitrator as provided by law; provided, however, that this clause shall not limit FedEx Ground's right to obtain any provisional remedy including, without limitation, injunctive relief, writ for recovery or possession or similar relief, from any court of competent jurisdiction, as may be necessary in FedEx Ground's sole subjective judgment to protect its property rights.

(e) The arbitrator shall have the authority only to conclude whether the termination of Contractor was within the terms of this Agreement, to determine damages if required to do so under this subparagraph, and to provide for the division of the AAA fees and AAA assessed expenses of the arbitration between the parties;

provided, however, each party shall bear the cost of attorneys, expert witnesses, or other expenses incurred by that party, and the arbitrator shall have no authority to allocate or apportion such costs. If the arbitrator concludes the termination was within the terms of this Agreement, the termination shall be effective on the date specified in the notice of termination from FedEx Ground to Contractor. If the arbitrator concludes the termination was not within the terms of this Agreement, then, at the option of FedEx Ground: (1) the Contractor shall be reinstated within a reasonable period of time, not to exceed 90 days from the Company's receipt of the abitrator's decision, and in that event shall be entitled to damages equal to the arbitrator's determination of what Contractor's net earnings (after payment of all expenses which are borne by Contractor pursuant to this Agreement) would have been during the period between the date of termination and the date of reinstatement; or (2) Contractor shall nevertheless be terminated, and, in that event, shall be entitled to damages equal to the arbitrator's determination of what Contractor's net earnings (after payment of all expenses which are borne by Contractor pursuant to this Agreement) would have been during the period between the date of termination to the last day of the term of this Agreement (without any renewals). Contractor shall have no claim for damages in any other amount, and the arbitrator shall have no power to award punitive or any other damages.

(f) The arbitrator shall provide the parties with only a written determination of the outcome of the arbitration, without accompanying opinion, and shall have no authority to alter, amend or modify any of the terms and conditions of this Agreement, and further, the arbitrator may not enter any award which alters, amends or modifies the terms or conditions of this Agreement in any form or manner.

**13. MERGER OF UNDERSTANDING.** This Agreement, the Addenda hereto, and the Attachments to the Addenda, constitute the entire agreement and understanding between the parties and, when executed, shall constitute a revocation of any earlier Contractor Operating Agreement between the parties. This Agreement, the Addenda and Attachments shall not be modified, altered, changed or amended in any respect unless in writing and signed by both parties .

**14. CAPTIONS.** Captions appearing in this Agreement are for convenience only and do not in any way limit, amplify, modify or otherwise affect the terms and provisions of this Agreement.

**15. SAVINGS CLAUSE.** If any part of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect.

**16. FAILURE TO ENFORCE.** Failure of either party to enforce strictly any provision of this Agreement shall not be construed as a waiver thereof or as excusing the other party from future performance.

**17. FORCE MAJEURE.** The performance of the obligations of this Agreement on the part of either FedEx Ground or the Contractor shall be excused by reason of closing of public highways, changes in customer shipping and/or receiving requirements, strikes or work stoppages, weather conditions which make operations unsafe or impractical, Acts of God, or temporary or permanent cessation of business by FedEx Ground within the Terminal Service Area.

**18. ASSIGNMENT.** This Agreement shall be binding upon and enure to the benefit of the parties to this Agreement and their assignees. FedEx Ground shall have the right to assign its rights and obligations hereunder to an affiliate of FedEx Ground. Provided Contractor is in good standing hereunder, Contractor shall, with 30 days' prior written notice to FedEx Ground, have the right to assign his/her rights and obligations hereunder to a replacement contractor acceptable to FedEx Ground as being qualified to provide the services of Contractor under this Agreement (the "Replacement Contractor"), and, provided Contractor or Contractor's representative continues to provide service under this Agreement up to the effective date of such assignment, FedEx Ground shall thereupon enter into a new agreement with Replacement Contractor on substantially the same terms and conditions as herein contained. In addition, in the event of the death or disability of Contractor, Contractor or his/her representative shall have a period of 30 days from and after such death or disability to secure a qualified Replacement Contractor to whom Contractor's rights and obligations may be assigned. Any consideration to be paid by Replacement Contractor on account of such assignment shall be strictly a matter of agreement between Contractor (or Contractor's representative) and Replacement Contractor. As a matter of

accommodation to Contractor, FedEx Ground at its sole discretion, may agree, upon receipt of written instructions from Contractor and Replacement Contractor, to collect such consideration from Replacement Contractor by means of deductions from Replacement Contractor's weekly settlements for a period not to exceed one year, and promptly to remit such amounts to Contractor or his/her representative. FedEx Ground shall have no other obligations whatsoever either to secure a Replacement Contractor for the benefit of Contractor, or to assure any payment to Contractor on account of Contractor's assignment of this Agreement.

**19. GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**CONTRACTOR ACKNOWLEDGES AND REPRESENTS THAT CONTRACTOR HAS READ AND FULLY UNDERSTANDS THE PROVISIONS OF THIS AGREEMENT, AND HAS HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH PERSONAL FINANCIAL, TAX AND LEGAL ADVISORS PRIOR TO EXECUTING THIS AGREEMENT.**

**IN WITNESS WHEREOF,** the parties hereto enter into and execute this Agreement this 13 day of September, 2004, at 6:00AM.

**FedEx Ground Package System, Inc.:**

[signature]
Signature

P+D Mgr
Title

Bob Dean (BD)
Witness

**Contractor:**

Troy Givens
Signature

Troy Givens
Typed Name

Bob Dean (BD)
Witness

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 13 of 31

EFFECTIVE:

ADDENDUM 1

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

IDENTIFICATION OF LEASED EQUIPMENT

| FedEx Ground Unit Number | Vehicle Make | Vehicle Year | Body Type | VIN | Number Axles |
|---|---|---|---|---|---|
| 96208 | Int | 2000 | P-1000 | 1HTMGABM7YA024100 | 2 |

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 14 of 31

EFFECTIVE: 2/01/03

ADDENDUM 2

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

INDEPENDENT CONTRACTOR INSURANCE COVERAGE
WORK ACCIDENT INSURANCE & NON-TRUCKING LIABILITY
MINIMUM COVERAGE REQUIREMENTS

| WORK ACCIDENT INSURANCE | |
|---|---|
| COVERAGE | LIMITS |
| Disability | 66 2/3% of earnings payable weekly |
| Disability Benefit Period | 2 years |
| Medical | $250,000 maximum -- Reasonable & Customary |
| Medical Benefit Period | 2 years |
| Loss of Life | 55% of earnings |
| Loss of Life Benefit Period | 2 years |
| Loss of Life Amount | $144,000 |
| Co-insurance | 0 |
| Deductible | 0 |
| Contingent Workers' Compensation | Required |
| Minimum A.M. Best Rating | A |
| Alternative Coverage | Workers compensation by "A" rated insurer or state owned and licensed in Contractor's home state |

| NON-TRUCKING LIABILITY AND PHYSICAL DAMAGE | |
|---|---|
| COVERAGE | LIMITS |
| Auto liability | $2,000,000 combined single unit |
| Empty Miles vs. Non-Dispatch | Required |
| Physical Damage | Stated Value |
| Comprehensive Deductible | $500.00 |
| Collision Deductible | $500.00 |
| Rental Reimbursement | $100/day -- 30 days -- tractors<br>$50/day -- 60 days -- vans |
| Additional Insured | FedEx Ground must be named |
| Minimum A.M. Best Rating | A |

case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/079 page 19 of 31

**PLEASE ADD THE ADDENDUM 3**

**THAT APPLIES TO YOUR**

**FACILITY**

**IF YOU NEED A COPY, E-MAIL YOUR REQUEST TO judy.johnston@fedex.com**

EFFECTIVE: 6/1/04

ATTACHMENT I-1 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

SPOTTED TRAILER SETTLEMENTS

| Account | Settlement ($) |
| --- | --- |

Notes:

1. FedEx Ground agrees to pay Contractor a full settlement per account when a trailer is spotted (or a previously spotted trailer is picked up) and no other pick-up or deliveries are performed enroute to or from the terminal.

2. FedEx Ground agrees to pay Contractor a half settlement per account when a trailer is spotted (or previously spotted trailer is picked up) and pick-up and/or deliveries are made enroute either to or from the terminal.

3. If other pick-up and/or deliveries are performed enroute both before and after a trailer is spotted (or a previously spotted trailer is picked up), FedEx Ground agrees to pay Contractor a Drop and Hook settlement of $6 in addition to any other settlement due Contractor for pick-ups and deliveries.

4. Automated Voice Response (AVR) Settlement. For each spotted trailer dispatch during which the Contractor completes all required calls under the AVR system, an additional payment of $.25 will be made to the Contractor for that dispatch. A dispatch will consist of one departure and return to the terminal facility, regardless of the number of trailers handled or customer locations visited during the trip.

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 17 of 31

EFFECTIVE:

ATTACHMENT I-2 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

RAILHEAD, AIRPORT, STORAGE STAGING AREA AND SHUTTLE SETTLEMENTS

| Name and Location | Settlement ($) |
| --- | --- |

Note: Settlement is a composite amount and includes drops, hooks, and other activities related to picking up or delivering equipment at the above locations.

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 18 of 31

6/7/99

EFFECTIVE:

ATTACHMENT I-3 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

TEMPORARY CORE ZONE DENSITY SETTLEMENT

| | Settlement ($) | | |
|---|---|---|---|
| Core Zone | Package Van | Straight Truck | Tractor/Trailer |

Core Zones are comprised of one or more five-digit ZIP Code areas.

If Contractor provides pick-up and/or delivery service in more than one Core Zone on any one day, Contractor's Core Zone settlement for that day shall be prorated between the Core Zones, taking into consideration the number of stops in each Core Zone for vans and packages and stops for straight trucks and tractor/trailers.

For Contractors driving greater than 200 miles a day, the miles driven and differences in Core Zone settlement are also considered.

Core Zone settlement will be prorated if Contractor provides pick-up and/or delivery service for less than seven hours in any one day.

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 19 of 31

EFFECTIVE: 6/2/03

ATTACHMENT I-4 TO ADDENDUM 3

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

ADDED SERVICE SETTLEMENT

Contractor will receive additional settlement in the amounts shown below for each day an approved helper is used and the total number of pickup and delivery stops completed by Contractor are greater than the established thresholds.

| Contractor | $20 Threshold | $25 Threshold | $35 Threshold |
|---|---|---|---|
| | _______ stops | _______ stops | _______ stops |

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 20 of 31

EFFECTIVE:

ADDENDUM 4

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

PRIMARY SERVICE AREA

Contractor's Primary Service Area is as described below or refer to specific attachment that describes the Service Area:

(Copy of Contractor's load chart and pickup listing should be attached.)

____________________________
Terminal Manager

____________________________
Contractor

____________________
Date

____________________
Date

EFFECTIVE: 6/5/00

ADDENDUM 5

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

PROPRIETARY INTEREST

FedEx Ground recognizes that Contractor has a proprietary interest in the customer accounts in Contractor's Primary Service Area, as defined in Addendum 4 of this Agreement (but excluding package deliveries assigned by shippers to the FedEx Home Delivery division of FedEx Ground). FedEx Ground also recognizes that in the event Contractor's Primary Service Area is reconfigured, resulting in customers previously served by contractor being permanently reassigned, Contractor is entitled to payment. Such payment may be from other contractors or from FedEx Ground, in accordance with the provisions of Paragraph 5.3 of this Agreement.

For every delivery package relinquished, under the provisions of Paragraph 5.3 of the Agreement, Contractor is entitled to a minimum payment of $1.00 per package.

For every pick-up package relinquished, under the provisions of Paragraph 5.3 of the Agreement, Contractor is entitled to a minimum payment of $2.00 per package. This does not include trailer spots.

As Contractor's settlement and density increase in the Primary Service Area, the potential value of Contractor's customers may increase. Contractor may offer more than the minimum amounts prescribed above for packages being relinquished by another contractor, in order to gain additional customers and increase profitability, or Contractor may sell to the highest bidder when Contractor's customers are being reassigned. FedEx Ground makes no guarantees of such increases, nor will FedEx Ground interfere in such transactions between Contractor and other persons who have the capability and qualifications to perform the services required by this Agreement.

In the event a trailer spot, pick-up or delivery being performed by a P&D Contractor operating a tractor/trailer is permanently returned to a P&D Contractor operating a van or straight truck, FedEx Ground shall pay the tractor/trailer Contractor a one-time payment of $100.00 for each such trailer spot.

In every case involving payment for packages transferred between contractors, whether tractor/trailer, van, or straight truck, the reason must be based on FedEx Ground's determination, reasonably made, that such changes in pick-up and delivery assignments are permanent, not seasonal, nor known to be of short duration.

EFFECTIVE: 6/01/04

ADDENDUM 6

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

CONTRACTOR CUSTOMER SERVICE PROGRAM

Beginning with the completion of one full FedEx Ground accounting period, a P&D Contractor is eligible to receive an individual, performance related bonus, each period, under the Contractor Customer Service (CCS) Program.

Payment of this bonus will be based on Contractor's individual performance or the performance of Contractor's employed driver, the length of Contractor's service and on Contractor's terminal meeting its CCS Goals.

| Contractor Service | Individual Safety and Customer Service |
|---|---|
| 1st full Period - 3 years | $205.00 per period |
| 3 - 5 years | $230.00 per period |
| Over 5 years | $260.00 per period |

INDIVIDUAL SERVICE AND SAFETY

Each full accounting period, eligibility for the individual CCS Bonus will be determined by the Contractor's performance in customer service and safety. To qualify, during each period, Contractor or Contractor's driver must have no at-fault accidents, no verified customer complaints, meet the goals set for daily scanning or sheeting of packages returned to the terminal at the end of each day, and must remain a contractor and complete the full accounting period.

Examples of customer complaints include, but are not limited to, complaints about the following:

- Driver release to business.
- Unauthorized indirect deliveries.
- Rudeness, abusive, or objectionable language or behavior.
- Poor appearance or not in FedEx Ground uniform.
- Failure to follow customer instructions.
- Unsafe driving.
- Accidents or property damage.

FXG_GIVENS0001265

EFFECTIVE: 6/01/04

TERMINAL SERVICE

The Contractor is eligible for a "Terminal Group Performance-related Bonus", as described below.

If the terminal achieves inbound service:

- At level one, the period CCS bonus will be $50 per Contractor.
- At level two, the period CCS bonus will be $75 per Contractor.
- At level three, the period CCS bonus will be $99 per Contractor.

Eligibility for the Terminal Group CCS Bonus will be based on whether the Contractor's terminal meets its inbound service goal for the period being considered. If it does, all eligible Contractors at that terminal receive the Terminal Group CCS Bonus; if it does not meet its goal, no one receives the Terminal Group CCS Bonus.

NO MISSED PICKUPS

A weekly service bonus of $25 will be paid to every Contractor who has had no early or missed pick-ups during that week.

This payment will be calculated as follows:

For each calendar week in which the Contractor completes all pickups per the customer instructions, with no missed pickup or any pickup earlier than the time designated on the daily pickup listing (collectively referred to as "Missed Pickups"), the Contractor shall receive a credit of $25 for that particular week of an accounting period. After the completion of each accounting period, FedEx Ground shall pay Contractor a Service Bonus calculated by the number of calendar weeks in which Contractor had no Missed Pickups, multiplied by $25.

Contractor may request, in writing, in the first period of each quarter, that CCS monies be deposited in Contractor's HR-10 Account, Service Guarantee Account, or be paid in the applicable weekly settlement.

Contractors with multiple vans are eligible for CCS awards for each van beginning after each such additional van has been in service for one full period.

EFFECTIVE: 6/4/01

ADDENDUM 7

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

BUSINESS SUPPORT PACKAGE

The Business Support Package consists of the following items:

- Uniform Program.
- Lease of FedEx Ground scanner, printer (where applicable) and communications and related equipment necessary for customer service and package data processing.
- Annual D.O.T. inspection.
- Drug tests meeting D.O.T. requirements.
- Equipment washing service which complies with applicable federal, state and municipal regulations pertaining to waste water run-off and at sufficient frequency to meet the Appearance Standards of Paragraph 1.12 of this Agreement.
- The opportunity, at contractor's discretion, to purchase from vendors, at FedEx Ground negotiated prices, tires, batteries, bumpers, package handling equipment, body repairs, preventive maintenance services, and painting.

Contractor is not required to purchase the Business Support Package. The cost of the Package is $8 per day, per van, for each business day Contractor is entitled to receive van availability. If Contractor elects to participate in the program, Contractor agrees to be liable for loss or damage to such equipment received under this program under the following conditions:

1. Loss while in the possession of Contractor;
2. Willful and/or intentional damage;
3. Damage resulting from disregard of vendor's recommended operating procedures.

Contractor will not be liable for normal wear and tear or defects associated with manufacture and/or vendor repair and maintenance.

By initialing the appropriate space below, Contractor

 elects

____ elects not

to participate in the Business Support Package. Contractor may change such election as provided in the Agreement.

EFFECTIVE: 6/1/04

ATTACHMENT I-1 TO ADDENDUM 7

PICK-UP AND DELIVERY CONTRACTOR OPERATING AGREEMENT

TIME-OFF PROGRAM

Each contractor, at his or her own discretion, may elect to participate in the company's time-off program. The program consists of the following key elements:

A contractor is eligible to sign up for two weeks time-off during each year. Weeks available will be posted prior to the company fiscal year. (A year being the normal company fiscal year, June through the end of May).

- A contractor operating multiple vans may select time-off for each van for which deductions are made for the Business Support Package (BSP).

- Selection of time off weeks will take place in May of each year with selections made according to length of time as a contractor. Highest local inbound service for the previous full accounting period will serve as a tiebreaker.

- Each contractor will select one week off, in order, through the entire list of participating contractors before the second week is selected, in the same order.

- Holidays that occur during a contractor's time-off week will be included as part of the contractor's time-off week.

- A contractor who signs up for the time-off program must remain in the program for the entire year.

The Time-Off Program will provide participating contractors with two weeks off under the following conditions:

- The contractor's van will not be used to service his or her work area.

- The contractor will have no liability for accidents, claims or service resulting from the activities of the individual working in his work area during his absence.

- Contractor's eligibility for a CCS bonus during the time-off period will not be affected by the replacement driver.

Prior to taking time-off, the replacement driver will ride with the contractor an appropriate number of days to familiarize himself with the contractor's work area.

EFFECTIVE: 6/1/04

- The contractor is expected to provide guidance, suggestions, and advice concerning the most efficient manner of serving his work area and any special customer requirements.

- The cost of such familiarization rides is included in the Time-Off Program.

To participate in the Time-Off Program, Contractor must indicate that he or she understands and agrees to the following provisions:

- For two weeks time-off, Contractor agrees to have an additional $3.00 added to the daily BSP settlement deduction.

- If available, additional weeks can be purchased for an additional $1.50/day added to daily BSP settlement deduction.

- Contractor will not receive any settlement for work performed by the replacement driver in his or her work area during the time-off period.

- If a contract is terminated for any reason, contractor is not entitled to any reimbursement of monies collected in the BSP for time-off.

- If a contract is terminated and contractor has taken all or part of his selected time-off, the remaining monies owed to the BSP for the Time-Off Program that year will be deducted from final settlement.

- If a contract is not renewed at the time it expires and contractor is participating in the Time-Off Program but has not taken any time-off, he or she will be reimbursed the amount paid into the BSP for time-off.

- If a contractor, participating in the Time-Off Program, sells his or her work area and the buyer agrees to participate in the program and continue the BSP deduction for the remainder of the year, the selling contractor will not be charged for the remainder of the year. In that case, the buyer will assume the days off selected by the selling contractor.

- Any contractor participating in the Time-Off Program may sell or trade his selected days off to any other participating contractor in the same type of group. Terminal management must be informed for planning purposes only. A one-time lump sum settlement deduction may be used for such transactions using the Contractor Equity Settlement Deduction form (SET005), not to exceed $1,000.

________ I wish to participate in the Time-Off Program and hereby acknowledge that I understand and accept the above provisions and conditions of the Time-Off Program.

[initials] I don't wish to participate in the time-off program.

FXG_GIVENS0001269

Case 3:07-cv-00818-HZ Document 32-2 Filed 08/17/11 Page 1198 of 3649

# FEDEX GROUND SAFE DRIVING PROGRAM

FedEx Ground maintains a program of self-coverage for public liability and property damage risks supplemented by insurance coverages with a commercial insurance carrier. Under this program, FedEx Ground is able to maintain cost-effective management of its exposure arising through road accidents and cargo loss and damage. The success of the program requires that all drivers maintain, without exception, a high standard of care at all times when driving a motor vehicle, whether or not on Company business. For those drivers who do maintain such a high standard -- and they include the overwhelming majority of drivers engaged in driving on FedEx Ground business -- this program provides a distinct benefit to them and those they serve. The protection against liability afforded thereunder is essentially cost-free to them.

The criteria for safe driving have been developed by FedEx Ground from its own experience and in consultation with its drivers. FedEx Ground will disqualify any driver from participation in the FedEx Ground Safe Driving Program who does not comply with the requirements and standards set forth below; provided, however, notwithstanding any provision of this Safe Driving Program, Contractor is not relieved of the obligation to conform to all applicable federal, state and local laws in the operation of the Equipment, as provided in paragraph 1.10 (f) of the Agreement, and breach of that obligation remains grounds for termination of the Agreement pursuant to paragraph 12.1 (c) thereof. The result of disqualification would be to require that substitute insurance covering the driver be found if he/she is to continue to render services required for FedEx Ground's business.

## Driver Eligibility Requirements

The driver eligibility requirements listed below are the minimum requirements for all drivers:

1. No record of conviction for a felony.

2. A minimum age of 21 years.

3. A minimum of one year's experience (within the past three years) as a driver of commercial motor vehicles similar to the type of equipment to be utilized by the driver, or successful completion of a FedEx Ground-approved driver training course.

4. Possession of a valid commercial driver's license for the type of vehicle to be operated, issued by the resident state of the driver.

FXG_GIVENS0001270

5. No record of a driver's license suspension or revocation for more than 30 days, during the 36 consecutive months prior to the date of engagement.

The suspension or revocation must be the direct result of the conviction while operating a motor vehicle.

Suspensions for failure to appear (FTA), failure to meet financial responsibility laws, or non-moving convictions (NMVC) are excluded.

6. No record of citation or conviction for the violations listed below during the 36 consecutive months prior to the date of engagement:

   a. Driving while under the influence of alcohol or drugs;

   b. Refusal to submit to a test of intoxication or impairment requested by a police officer or FedEx Ground;

   c. Operating a motor vehicle which contains alcoholic beverages in open containers contrary to law;

   d. Being charged with homicide resulting from the unlawful or negligent operation of a motor vehicle;

   e. Operating a motor vehicle while the driver's license was suspended, cancelled or expired;

   f. Failing to stop, or remain, at the scene of an accident;

   g. Driving a motor vehicle in a speed exhibition, contest or drag race;

   h. Use of a motor vehicle in the commission of a felony;

   i. Dangerous or careless operation of a motor vehicle, whether causing harm to another person or not;

   j. Operating a motor vehicle without the permission of the owner; and,

   k. Fleeing or attempting to flee a police officer.

7. No record of involvement in an at-fault traffic accident resulting in a person's death, or bodily injury.

8. No record of involvement in more than two at-fault traffic accidents and two moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

9. No record of involvement in more than one at-fault traffic accident and three moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

10. No record of conviction for more than four motor vehicle moving violations in any vehicle in the 36 consecutive months prior to the date of engagement.

11. Completion of a suitable contractor/driver information sheet.

12. A history of safe commercial driving experience and satisfactory work history.

13. Evidence of a valid commercial driver's license.

14. A current and satisfactory motor vehicle record abstract.

15. Successful completion of a thorough physical examination confirming physical fitness to operate a commercial motor vehicle. The physical examination must be completed by a qualified physician approved by FedEx Ground.

16. Successfully pass a drug screen administered at such time and place and in such manner as determined by FedEx Ground.

17. No record of positive results in any drug or alcohol test.

18. Successful completion of a written examination pertaining to commercial vehicle safety. The examination is to be scored and must show evidence that instruction was given to provide accurate information on incorrect responses.

19. Successful completion of a well-designed road driving skill test which meets the minimum commercial driver's license standards.

FedEx Ground Driver Safety Standards

The following acts or omissions by a driver are prohibited:

1. Driving while under the influence of alcohol or drugs.

2. Refusing to submit to a drug or alcohol test requested by a law enforcement officer or FedEx Ground.

3. Operating a motor vehicle which contains alcoholic beverages, or a controlled substance contrary to law.

4. Being charged with homicide resulting from the unlawful or negligent operation of a motor vehicle.

5. Operating a motor vehicle while the driver's license has been suspended, cancelled or has expired.

6. Failing to stop, or remain, at the scene of an accident.

7. Driving a motor vehicle in a speed exhibition, contest or drag race.

8. Using a motor vehicle in the commission of a felony.

9. Dangerous or careless operation of a commercial motor vehicle (such as speeding at 80 m.p.h. or more; or more than one incident of speeding at 15 m.p.h. or more, over the posted speed limit), whether causing harm to another person or not.

10. Operating a motor vehicle without the permission of the owner.

11. Fleeing or attempting to flee a police officer.

12. Causing an at-fault traffic accident resulting in a person's death, or bodily injury resulting in medical costs or incurred reserves in excess of $50,000, or property damage in excess of $25,000.

13. Causing more than two at-fault accidents in any vehicle in any 12 consecutive months, or more than five at-fault accidents in any vehicle in any 36 consecutive months period. Any accident involving less than $500 in property damage is exempt from the five accident rule.

14. Committing more than two motor vehicle moving violations in a commercial vehicle, or more than three motor vehicle moving violations in any vehicle, in any 12 consecutive months period.

15. Committing more than five motor vehicle moving violations in any vehicle in any 36 consecutive months period.

16. Negligently or knowingly failing systematically to inspect, repair, maintain and otherwise ensure the leased equipment is at all times in safe operating condition.

17. Carrying passengers not authorized by FedEx Ground while on FedEx Ground's business.

FXG_GIVENS0001273

Case 3:05-md-00527-RLM -CAN document 1006-4 filed 11/16/07 page 31 of 31

18. Failure to report an accident as soon as possible.

19. Falsifying any safety-related report or document such as an annual motor vehicle record report.

20. Violation of any applicable hours of service policy(ies), rule(s) or regulation(s).

21. Failure to complete or refusal to undergo a thorough physical examination confirming physical fitness to operate a commercial motor vehicle at least every two years and following any physical or mental impairment from injury or disease. Such physical examination must be completed by a qualified physician approved by FedEx Ground.

22. Failure to pass or submit to a drug screen administered at such time and place and in such manner as determined by FedEx Ground.

23. Failure to report promptly any incident resulting in property damage and any incident or accident involving any pedestrian or occupant of any type of vehicle, whether or not the incident or accident appears to have resulted in personal injury, regardless of who appears to be at fault.

24. Failure to forward immediately to FedEx Ground every demand, notice, summons or other legal process received that involves a claim, suit or other legal process received that involves a claim, suit or other legal proceeding arising from or in any way related to any matter encompassed within the provisions of this Safe Driving Program.

25. Failure to cooperate fully with FedEx Ground in the conduct of any legal action, regulatory hearing or other similar process arising from or in any way related to any matter encompassed within the provisions of this Safe Driving Program. Such cooperation includes, without limitation, attendance at hearings, trials, meetings, etc.; the securing of evidence; and, obtaining the attendance of witnesses.

NOTE: With respect to any of the acts or omissions above specified that would constitute an offense of law, and which, if the driver were found guilty would result in disqualification, FedEx Ground in its sole discretion based upon reasonable inquiry, may make a preliminary determination of the probability that the driver is guilty of the offense whether charged or not. In such event, FedEx Ground may suspend the driver for up to 15 days pending the filing of charges against such driver. If such charges are filed, such suspension shall continue until a final determination by a court, and will become permanent unless the driver is found not guilty of the offense at issue.

FXG_GIVENS0001274

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

*Margaret Gibson, et al. v. FedEx Ground Package System, Inc.,*
Civil No. 3:07-cv-00272-RLM-CAN (AZ)

Case No. 3:05-MD-527-RM
(MDL 1700)

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**OBJECTIONS AND RESPONSE OF MARGARET GIBSON TO DEFENDANTS TENTH SET OF INTERROGATORIES**

PROPOUNDING PARTY: DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.

RESPONDING PARTY: MARGARET GIBSON

SET NUMBER: TEN

Pursuant to Federal Rule of Civil Procedure 33(b), Named Plaintiff Margaret Gibson, through counsel, hereby responds to Defendant FedEx Ground Package System, Inc.'s Tenth Set of Interrogatories, served on June 29, 2007.

**PRELIMINARY STATEMENT, GENERAL OBJECTIONS AND RESPONSES**

1. Named Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it calls for a narrative answer by seeking detailed information as to every fact, instance, and act.

2. Named Plaintiff objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

3. Named Plaintiff objects to each Interrogatory in so far as it defines "you" and

"your" as including Plaintiff's counsel.

4.      Named Plaintiff objects to each Interrogatory in so far as it seeks information and evidence about damages, which issue has been bifurcated for all purposes.

5.      Named Plaintiff objects to each Interrogatory to the extent that it invades the Named Plaintiff's right to privacy protected by federal law and the applicable state laws.

6.      Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already provided in Named Plaintiff's Initial Disclosures pursuant to Fed. R. Civ. P. 26.  Named Plaintiff incorporates by reference his Initial Disclosures.

7.      Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already in Defendant's knowledge, possession, custody or control. See Fed. R. Civ. P. 26(b)(2) (requiring the court to limit discovery where the information sought is obtainable from another source that is more convenient, less burdensome or less expensive).

8.      Named Plaintiff's responses (and any further objections or responses to these discovery requests or their subject matter), whether submitted collectively or on behalf of any individual Plaintiff, are made without waiver of, and with preservation of:

        a.      All questions as to competency, relevance, materiality, privilege and admissibility of each response and the subject matter thereof as evidence for any purpose in any further proceeding in this matter (including the trial of this lawsuit), and in any other lawsuit or proceedings;

        b.      The right to object to the use of any response, or the subject matter thereof, on any ground in any further proceedings in this matter (including the trial of this lawsuit) and in any other lawsuit or proceeding.

9.       Named Plaintiff objects to each Interrogatory to the extent that it is compound

with myriad discrete sub-parts that address separate matters and purports to seek information that is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. Named Plaintiff reserves the right to seek a protective order to the extent that the Interrogatories exceed the numerical limitations placed by the Court.

10. Named Plaintiff objects to Defendant's definitions and instructions to the extent that they seek to impose obligations on Named Plaintiff beyond those imposed by Rule 33 of the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Northern District of Indiana.

**INTERROGATORY NO. 1:**

If anyone assisted you in the performance of your duties, please identify those persons, including their name(s), last known address(es) and telephone number(s), the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation of consideration.

**RESPONSE NO. 1:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory on the grounds of the individual's privacy, to the extent that it seeks "last known address and telephone number." This Named Plaintiff further objects to this Interrogatory on the grounds that the phrases "assisted you in the performance of your duties," "details of service," and "nature of their relationship to you" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as no one is permitted to "assist" without FedEx's written permission. This

Named Plaintiff further objects that this Interrogatory is onerous, burdensome and oppressive and duplicative of information in Defendant's files and/or documents already produced by Named Plaintiff. Without waiving and subject to the General and Specific Objections to Interrogatory No. 1, Named Plaintiff Margaret Gibson responds as follows:

**I was assisted briefly in February 2006 by Joe Dixon. I paid him $400 per week. This is because the terminal manager, James Simms, had asked if I could "help the terminal out" by working for another driver whose driver had taken his truck to FedEx Express, and left it there. I agreed, with the proviso that he provide someone to place the packages. Joe was the young man asked to assist. He regularly unpacked four of the trailers unassisted.**

**I hired other drivers to service my second route. Jeremy Fields assisted in January-February 2006; he has since moved out of state. Rachel Rabatin, a friend, helped in January-April 2006. A current phone number for her is (480) 232-5505. Mark Wright helped from March –June 2006, at (623) 628-5507. I paid my drivers between $500-550 per week, because that is what James Simms said to pay them.**

**<u>INTERROGATORY NO. 2</u>:**

Please state in detail your efforts to: have others assist you in your pick up and delivery duties, increase the size of your route, operate supplemental vehicles, utilize trailers or acquire a larger vehicle, shorten the time or increase the efficiency of your pick ups and/or deliveries (including deviating from any turn-by-turn route suggestions that Defendants may have provided you with), and participate in the Flex Program.

**RESPONSE NO. 2:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as compound, overbroad and unduly burdensome, in that it consists of multiple discrete sub-parts that address separate matters and thus is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "efforts" and "assist you" are vague and ambiguous and the Interrogatory otherwise incorporates assumptions and conclusions which are erroneous. This Named Plaintiff objects to this Interrogatory because it requests information within Defendant's knowledge, possession, custody or control and that it duplicates the information requested in Interrogatory #1. Without waiving and subject to the General and Specific Objections to Interrogatory No. 2, Named Plaintiff Margaret Gibson responds as follows:

**See Response to Interrogatory #1. In addition, I did my best to deliver all packages assigned to me each day in the most efficient way possible, given the number of packages the company required me to deliver on any given day and given that I had to follow the company's detailed procedures for pick-up and delivery, serving customers when, where and how the company directed me to. I have produced numerous "turn-by-turn" maps showing these instructions. I made no "efforts" to "participate" in the Flex Program but I did what I was told to do.**

**As but one example, rather than make Good Year a full route, terminal management would flex that to me or would flex the packages from other routes to me. I was asked, on several occasions, how many stops I could deliver without contravening the DOT rules. I explained that I could deliver no more than 80, perhaps 90 stops. The later**

**one left the terminal, the more difficult it became to deliver more that 80 stops. There were times when I left the terminal with over a hundred stops after 9 AM. The managers did not care.**

**On many occasions terminal managers suggested to me that I run a supplemental route and driver, and that I would at least be able to complete my deliveries in less time. After speaking with several other drivers, to whom the same was said, I discovered that terminal management's interest was not in my completing my deliveries with respect to time, but his (James Simms) being able to flex MORE stops to me. He had promised, on numerous occasions, that if I took on Good Year,it would be made into a full route. This had been told to several others as well. And, I discovered, that even if I took on a flex area for six months or so, Mr. Simms was not obligated to give me the area if it was made into a route, despite what had been promised.**

**I soon discovered that a driver can only break even with a supplemental; most often however, it is a loss. But terminal management consistently represented that it was only slightly less financially lucrative than a full route. It was only when I began speaking to other drivers that I was made to understand that this was not the case. After bringing this up with terminal management, James Simms then admitted that yes, supplementals were, more often than not, a loss.**

**INTERROGATORY NO. 3:**

Please explain in detail each incident in which Defendant breached its obligations to you under the applicable Operating Agreement, whether such incidents form the basis for a breach of contract claim, breach of fiduciary duty claim, or any other claim against Defendant. For each incident, please provide the date of each occurrence.

**RESPONSE NO. 3:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each incident" and such breaches of contract occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the term "any other claim against Defendant" is vague and ambiguous. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific objections to Interrogatory No. 3, Named Plaintiff Margaret Gibson responds as follows:

**See Response to Interrogatory # 6. In addition, FedEx regularly and continuously breached its obligations under the Operating Agreement in ways too numerous to "explain in detail."**

**INTERROGATORY NO. 4:**

If you did not read and understand each term contained in the Operating Agreement, including all addenda thereto, between yourself and Defendants prior to signing it, please explain which terms you did not understand, what meaning, if any, you understood those terms to have, and the reason or reasons for your failure to read and/or understand any such terms.

**RESPONSE NO. 4:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as

overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each term" of a 66-page form contract with addenda which Named Plaintiff "did not understand." Virtually every term in the lengthy contract is susceptible of multiple interpretations and understanding; Named Plaintiff thus further objects to this Interrogatory because the term "understanding" is vague and ambiguous, and because the Interrogatory, which asks Named Plaintiff to "explain" each contract term that he "did not understand" is utterly unintelligible. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific Objections to Interrogatory No. 4, Named Plaintiff Margaret Gibson responds as follows:

**On December 12, 2005, the day on which I was told my contract was ready, I asked James Simms, the senior manager, for time to read the contract. First I was told that the contract could not leave the terminal. I was then told, by Mr. Simms, that it was the same contract everyone else had signed, so I should just sign it. So I cannot now identify each and every term of the over 60 pages of contract that I did not "understand" at the time I signed it. However, I had asked about one specific piece of information in the contract which I later learned pertained to the number of packages which can be placed on your vehicle. There was a max and a min value necessary. I asked to have this explained to me before signing. Mr. Simms led me to believe that this was a terminal "thing" which was used during peak. Later, a member of contractor relations told me that the min/max value entered would limit the number of packages that could be placed on my vehicle daily.**

**Furthermore, since I am not a lawyer, I can say that I was not and am not familiar with, and therefore did not "understand" the legal terms contained throughout the Contract. I did not have a lawyer review the Operating Agreement before I signed it,**

**because I was not given the opportunity to do so.**

**<u>INTERROGATORY NO. 5</u>:**

If any Defendant or their agent made any oral fraudulent statements or misrepresentations of material fact, please state the content of any such statement(s), the circumstances surrounding any such statement(s), the date any such statement(s) was/were made, and the speaker(s) of any such statement(s).

**<u>RESPONSE NO. 5</u>:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "any such statement" and such oral fraudulent statements or misrepresentations occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Named Plaintiff also objects on the grounds of relevance, because Named Plaintiff does not assert a fraud claim. Without waiving and subject to the General and Specific Objections to Interrogatory No. 5, Named Plaintiff Margaret Gibson responds as follows:

**See Response to Interrogatory # 6. In addition, FedEx and its agents regularly and continuously made oral statements too numerous to list in detail that misrepresented that I was an independent contractor under the Operating Agreement.**

**INTERROGATORY NO. 6:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including how that action affected your business. For each incident or fact, please state in detail, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the communication or fact.

**RESPONSE NO. 6:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "every fact" and "every action" that demonstrates control by Defendant. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff Margaret Gibson responds as follows:

a) **I was required to attend compulsory meetings, held on almost every Saturday morning. Additionally, there were some meetings held other than Saturdays, particularly if someone in the higher corporate echelon was visiting. The managers would walk around and make certain that everyone was told that there was a meeting and yell at you to attend. As an independent contractor, any meetings I**

attended should have been with other independent contractors, and not at the insistence of FedEx management!

b) On these occasions when there were higher echelon individuals visiting, we were told if asked questions, what to say. There was only one occasion on which we were permitted to speak our minds.

c) I was told what to wear.

d) I was told I could not use my vehicle outside of business hours. This was amended several months later. I was then told as long as the logo is hidden, outside use was permitted.

e) I was told who could, and, could not work with me, as a jumper or driver!

f) When route areas other than those stipulated in my contract could not be covered, they were "flexed" to me without my knowledge. For example, Good Year is a rather large area which could not be covered. I was told it had been written into the contract of another driver, however, invariably, Mr. Simms would "flex" this area to me and, "flex" my packages to another driver.

g) There was no autonomy, the terminal managers dictated without asking. My drivers were sent into areas other than those which they should. When the packages were undelivered or, when they exceeded the DOT regulations, THEN, the managers would harass and ask stupid questions such as, "why did it take so long?"

h) I was told I had to purchase vehicles from only one of two companies. I subsequently discovered that FedEx purchased the vehicles in bulk, sold the vehicles to at least one of these companies, to be sold to the "contractors." We could not purchase just any vehicle which had equal capacity to the vehicles FedEx specified.

i) I was told when I should arrive and when I could leave. Initially I was told the sort is completed by 7 AM, which would permit us to leave at 7:30 AM. There were mornings when I did not leave the terminal until 10 AM because the sort was not complete. Many times I spoke to terminal management about being overworked and, not being able to leave the terminal before 9 AM. Simms said getting out of the terminal at that time is relatively normal, the trucks do not arrive on time and it takes a little while to sort. He said if I felt this way I should speak to Dick Jean in contractor relations. I asked for the number and called. I asked to speak with Dick Jean, he was not in his office. I left a message. Several days later, I again called and spoke with a member of the contractor relations group. He explained that ALL contractors were supposed to be out of the terminal by 7:30 AM no later than 8 AM. When I told him that I sometimes was unable to leave the terminal until 9AM and later, he was surprised.

j) FedEx did everything in its power to destabilize my efforts to establish my business. In February 2006, I explained to terminal management I had four individuals who wished to go through the drivers' training class. I explained these were alternate drivers for me and another contractor, Steve Risk. However, after these drivers took driver training (because this was compulsory and I could not train them without FedEx approval), FedEx's senior manager usurped the drivers and attempted to get them to work for FedEx, not for me or Steve Risk, by offering them routes.

k) I was told my contract was in jeopardy.

**l) I could not sell my route to any one I wanted to sell my route to. I had to get FedEx's approval to do this.**

<u>INTERROGATORY NO. 7</u>:

Please state in detail each and every effort you made to acquire an additional route(s) or portion(s) of route(s), and each and every effort you made to divest yourself of any route(s) or portion of route(s).

<u>RESPONSE NO. 7</u>:

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. Named Plaintiff specifically objects to this Interrogatory on the grounds that it requests information within Defendant's knowledge, possession, custody or control. Without waiving and subject to the General and Specific Objections to Interrogatory No. 7, Named Plaintiff Margaret Gibson responds as follows:

**See Responses to Interrogatories 1, 2, 6, and 8. Initially, I wished to have three routes. This never came to fruition, because terminal management obstructed my efforts to be independent. I was always subject to FedEx's control.**

**When I went to sell my routes, I attempted to sell my routes to Phil, one of the gentlemen who had completed the training class in Scottsdale, and a Mr. Singh. James Simms blocked the sale of both routes. Since his approval was necessary, he insisted that Phil train with one of the managers again. James gave part of Scottsdale to the driver, who was supposed to work with Steve Risk. He deliberately did everything possible to avoid selling the routes! The routes had already been promised to Randy Lithicum, this was why James would not permit the sale. Thus, I never received compensation for them.**

case 3:05-md-00527-RLM -CAN document 1006-5 filed 11/16/07 page 14 of 17

**INTERROGATORY NO. 8:**

Please state in detail the circumstances surrounding the termination of any contract or contractual relationship with Defendants, even in cases where not all contracts or contractual relationships terminated, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale. Please include instances when any or all contracts or contractual relationships terminated through non-renewal.

**RESPONSE NO. 8:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as improper on the grounds that the terms "circumstances" and "termination" and "terminated" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as any such "termination" directly involved Defendant and any such "sale" or assignment necessarily involved Defendant's approval and execution of a new Operating Agreement. Without waiving and subject to the General and Specific Objections to Interrogatory No. 8, Named Plaintiff Margaret Gibson responds as follows:

**See Response to Interrogatories 6 & 7. My contracts were terminated in July 2006. At that time, I was told that my contract was being terminated for failure to service a customer. However, Simms also told me that he was keeping a file on me, so there may be other reasons listed that I do not know about. Prior to my termination, I was also told my contract was in jeopardy because of supposed DOT violations—but I followed the procedures terminal management told me to follow, and Martin Daza of contractor relations told me I was not responsible for these violations.**

**I sold one truck to a FedEx Ground driver. The other truck was repossessed.**

**INTERROGATORY NO. 9:**

Please state in detail the equitable, declaratory and injunctive relief that you seek, including whether you seek a judgment that some or all putative class members should be classified and treated as employees and, if so, which putative class members should be treated as employees and for what purpose(s).

**RESPONSE NO. 9:**

Named Plaintiff Margaret Gibson incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific Objections to Interrogatory No. 9, Named Plaintiff Margaret Gibson responds as follows:

**I seek a court ruling that all of FedEx's drivers are employees, by virtue of the extensive control that Defendant retains and exercises over the manner and means by which class members perform their jobs. Employees are what we are, so we should be paid like employees and, be entitled to every benefit of an employee. The independent contractor is NOT an independent anything. When one is told what, when, where, how many, where your own business is concerned, then there is no autonomy. You are an employee, and, as such, should be entitled to all that benefits of an employee.**

**I also seek injunctive relief against FedEx's misclassification of class members as "independent contractors" so long as FedEx continues to retain and exercise control over the who, what, when, where, and how of drivers' job performance. If FedEx continues to treat drivers the way they have treated me and my fellow drivers, all drivers listed as**

**independent contractors should be reclassified as employees, subject to all benefits, particularly vacation and sick leave.**

____________________________________
Margaret Gibson

Subscribed and sworn to before
me this ____ day of _________, 2007.

____________________________________
Notary Public

Dated: August 1, 2007

Respectfully Submitted,

**HARWOOD FEFFER, LLP**

By: ______________________
Peter W. Overs, Jr. (PO-4409)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**PLAINTIFFS' CO-LEAD COUNSEL**

J. Gordon Rudd, Jr.
David M. Cialkowski
Anne T. Regan
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844

**PLAINTIFFS' LOCAL COUNSEL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re MDL -1700 FedEx Group Package System, Inc., Employment Practices Litigation (No. II)

Case No. Case No. 3-05-MD-527-RLM-CAN

This Document relates to:

*Magno et al. v. FedEx Ground Package System, Inc. et al.*, No. 3:07-cv-322 (CT)

**OBJECTIONS AND RESPONSE OF NEVILLE EDWARDS TO DEFENDANT'S ELEVENTH SET OF INTERROGATORIES**

PROPOUNDING PARTY: DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.

RESPONDING PARTY: NAMED PLAINTIFF NEVILLE EDWARDS

SET NUMBER: ELEVENTH

Pursuant to Federal Rule of Civil Procedure 33(b), Named Plaintiff NEVILLE EDWARDS, through counsel, hereby responds to Defendant FedEx Ground Package System, Inc.'s Eleventh Set of Interrogatories, served on June 29, 2007.

**PRELIMINARY STATEMENT, GENERAL OBJECTIONS AND RESPONSES**

1. Named Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it calls for a narrative answer by seeking detailed information as to every fact, instance, and act.

2. Named Plaintiff objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

3. Named Plaintiff objects to each Interrogatory in so far as it defines "you" and "your" as including Plaintiff's counsel.

4. Named Plaintiff objects to each Interrogatory in so far as it seeks information and evidence about damages, which issue has been bifurcated for all purposes.

5. Named Plaintiff objects to each Interrogatory to the extent that it invades the Named Plaintiff's right to privacy protected by federal law and the applicable state laws.

6. Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already provided in Named Plaintiff's Initial Disclosures pursuant to Fed. R. Civ. P. 26. Named Plaintiff incorporates by reference his Initial Disclosures.

7. Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already in Defendant's knowledge, possession, custody or control. See Fed. R. Civ. P. 26(b)(2) (requiring the court to limit discovery where the information sought is obtainable from another source that is more convenient, less burdensome or less expensive).

8. Named Plaintiff's responses (and any further objections or responses to these discovery requests or their subject matter), whether submitted collectively or on behalf of any individual Plaintiff, are made without waiver of, and with preservation of:

a. All questions as to competency, relevance, materiality, privilege and admissibility of each response and the subject matter thereof as evidence for any purpose in any further proceeding in this matter (including the trial of this lawsuit), and in any other lawsuit or proceedings;

b. The right to object to the use of any response, or the subject matter thereof, on any ground in any further proceedings in this matter (including the trial of this lawsuit) and in any other lawsuit or proceeding.

9. Named Plaintiff objects to each Interrogatory to the extent that it is compound with myriad discrete sub-parts that address separate matters and purports to seek information that is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. Named Plaintiff reserves the right to seek a protective order to the extent that the Interrogatories exceed the numerical limitations placed by the Court.

10. Named Plaintiff objects to Defendant's definitions and instructions to the extent that they seek to impose obligations on Named Plaintiff beyond those imposed by Rule 33 of the Federal Rules of Civil Procedure and the local rules of the United States District Court Of Connecticut.

**The following Interrogatories shall be answered separately by Plaintiff NEVILLE EDWARDS:**

**INTERROGATORY NO. 1:**

If anyone assisted you in the performance of your duties, please identify those persons, including their name(s), last known address(es) and telephone number(s), the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation of consideration.

**RESPONSE NO. 1:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory on the grounds of the individual's privacy, to the extent that it seeks "last known address and telephone number." This Named Plaintiff further objects to this Interrogatory on the grounds that the phrases "assisted you in the performance of your duties," "details of service," and "nature of their relationship to you" are vague and ambiguous. This Named Plaintiff further objects on the grounds

that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as no one is permitted to "assist" without FedEx's written permission. This Named Plaintiff further objects that this Interrogatory is onerous, burdensome and oppressive and duplicative of information in Defendant's files and/or documents already produced by Named Plaintiff. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

Around peak season 2005, I used a supplemental driver to drive my supplemental vehicle. His name is Ron Poole. I paid him approximately $12/hour. Mr. Poole provided the same pickup and delivery services that I performed for FedEx. Once or twice, I used Mr. Poole as a relief driver when I was sick or needed a day off.

**INTERROGATORY NO. 2:**

Please state in detail your efforts to: have others assist you in your pick up and delivery duties, acquire or take on additional routes or portions of routes, increase the size of your route, operate supplemental vehicles, utilize trailers or acquire a larger vehicle, shorten the time or increase the efficiency of your pick ups and/or deliveries (including deviating from any turn-by-turn route suggestions that Defendant may have provided you with), and participate in the Flex Program.

**RESPONSE NO. 2 :**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as compound, overbroad and unduly burdensome, in that it consists of multiple discrete sub-parts that address separate matters and thus is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "efforts" and "assist you" are vague and ambiguous and the Interrogatory otherwise

incorporates assumptions and conclusions which are erroneous. This Named Plaintiff objects to this Interrogatory because it requests information within Defendant's knowledge, possession, custody or control and that it duplicates the information requested in Interrogatory #1. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

I do not recall having made efforts to have others assist me or take on additional routes, or utilize trailers or acquire a larger vehicle. Approximately from the Summer of 2006 through April 2007, I assisted Thomas Magno with a portion of his route while it was particularly heavy, with the approval of Scott Hagar and Lenny [last name unknown], Defendant's service manager. Now that I know my route, I do not always use the turn-by-turn route suggestions from Defendant, which are sometimes inaccurate. I was required to participate in Defendant's Flex Program, and have regularly had worked "flexed" to me. From time to time I used a supplemental vehicle. See Response to Interrogatory # 1.

**INTERROGATORY NO. 3:**

Please explain in detail each incident in which Defendant breached its obligations to you under the applicable Operating Agreement, whether such incidents form the basis for a breach of contract claim, breach of fiduciary duty claim, or any other claim against Defendant. For each incident, please provide the date of each occurrence.

**RESPONSE NO. 3:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each incident" and such breaches of contract occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the term "any

other claim against Defendant" is vague and ambiguous. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

Defendant breached its obligations to me under the Operating Agreement by failing to treat me as an independent contractor. This conduct occurred every day in the ways in which Defendant exerted control over the means and manners by which I performed my job. See Response to Interrogatory # 6 for more detail.

**INTERROGATORY NO. 4:**

If you did not read and understand each term contained in the Operating Agreement, including all addenda thereto, between yourself and Defendant prior to signing it, please explain which terms you did not understand, what meaning, if any, you understood those terms to have, and the reason or reasons for your failure to read and/or understand any such terms.

**RESPONSE NO. 4:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each term" of a 66-page form contract with addenda which Named Plaintiff "did not understand." Virtually every term in the lengthy contract is susceptible of multiple interpretations and understanding; Named Plaintiff thus further objects to this Interrogatory because the term "understanding" is vague and ambiguous, and because the Interrogatory, which asks Named Plaintiff to "explain" each contract term that he "did not understand" is utterly unintelligible. This

Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

I signed the Operating Agreement in November 2004 after I had just finished Defendant's required training. Bruce Rogers offered me a route. I was excited to begin working, and based on Defendant's prior representations concerning the agreement I did not review the document in detail when I signed it. Bruce Rogers was present when I signed the document and encouraged me to sign it quickly, and did not provide me the opportunity to take the document home to read. We rushed through the document. Bruce Rogers did not clarify any of its terms. I received a copy of the document several weeks after I signed it.

**INTERROGATORY NO. 5:**

Please state in detail the circumstances surrounding the termination of any contract or contractual relationship with Defendants, even in cases where not all contracts or contractual relationships terminated, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale. Please include instances when any or all contracts or contractual relationships terminated through non-renewal.

**RESPONSE NO. 5:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as improper on the grounds that the terms "circumstances" and "termination" and "terminated" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as any such "termination" directly involved Defendant and any such "sale" or assignment necessarily involved Defendant's approval and execution of a new Operating Agreement. Without waiving and subject to

the foregoing General and Specific Objections, Plaintiff responds as follows:

My contractual relationship with the Defendant has not terminated, and I have never sold my truck or route to anyone.

**INTERROGATORY NO. 6:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the communication or fact.

**RESPONSE NO. 6:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "every fact" and "every action" that demonstrates control by Defendant. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

Defendant regularly and repeatedly controls the means and manners by which I perform my job and treats me like an employee rather than an independent contractor. Before signing the contract, Defendant required me to attend driver training sessions. Twice each year, Defendant has

required me to submit to a Customer Service Ride or "ride along". From time to time, Defendant has required me to sign documents acknowledging my understanding of applicable safety requirements.

From time to time I have been prevented from leaving the terminal in the morning when I wanted to because packages were missing due to Defendant's misplacing them. When I do leave, frequently and regularly I have been required to deliver packages outside my primary service area by being "flexed" the packages. On a regular basis, I am required to work more than 12 hours/day or 60 hours/week against DOT regulations in order to finish my route. Scott Hagar requires that I complete all deliveries each day despite the time it takes. During peak seasons and when I could not make deliveries due to weather, Defendant has required that I work on days beyond those specified in the contract.

When I leased a truck, Defendant forced me to choose a P500 truck with certain specifications. On one occasion, on or around June 2006, Lenny (Defendant's service manager) told me that my tires had to be replaced. I had already ordered tires but they had not been delivered. Defendant told me I would not be able to drive my route the next day if I did not replace the relevant tires despite the pending order, so I was forced to rent a van until the tires I had ordered arrived. I was forced to "elect" the Business Support Package because it includes the scanner, which is necessary to service my route. Defendant also requires that I maintain insurance through Protective Insurance.

Defendant has also exerted control over my route. Defendant encouraged me to use a supplemental van and driver during peak season in 2005. Bruce Rogers told me that it was necessary. A portion of my work was taken away when I ceased using a supplemental van and driver because it was too expensive. In March 2007, Scott Hagar pressured me to take on portions of Hartford that were not within my route when I did not want to. Around the same time, I wanted to

use Frank ___, who used to drive for Ernest Baldwin, as an occasional relief driver. Scott Hagar first required that we meet to discuss it and then ultimately did not allow me to use him.

Defendant requires that I wear its uniform. On several occasions, Bruce Rogers or Scott Hagar have told me that my shoes were not the required black shoes.

**INTERROGATORY NO. 7:**

Please state in detail each and every effort you made to acquire an additional route or route(s) or portion(s) of route(s), and each and every effort you made to divest yourself of any route or route(s) or portion(s) of route(s).

**RESPONSE NO. 7:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. Named Plaintiff specifically objects to this Interrogatory on the grounds that it requests information within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

I have never made any effort to acquire an additional route or route(s) or divest myself of any route or route(s).

**INTERROGATORY NO. 8:**

If any Defendant or their agent made any oral fraudulent statements or misrepresentations of material fact, please state the content of any such statement(s), the circumstances surrounding any such statement(s), the date any such statement(s) was/were made, and the speaker(s) of any such statement(s).

**RESPONSE NO. 8:**

Named Plaintiff NEVILLE EDWARDS incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as

overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "any such statement" and such oral fraudulent statements or misrepresentations occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "fraudulent," "misrepresentations," and "circumstances" are vague and ambiguous. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

See Response to Interrogatory # 6. In addition, FedEx and their agents regularly and continuously made oral statements too numerous to list in detail that misrepresented that I was an independent contractor under the Operating Agreement.

Case 3:05-md-00527-RLM -CAN document 1006-6 filed 11/16/07 page 12 of 13

# *VERIFICATION*

NEVILLE EDWARDS, being duly sworn, deposes and says:

I have read the foregoing responses to Interrogatories. I hereby verify that the foregoing answers are true to the best of my knowledge and belief.

Neville Edwards
NEVILLE EDWARDS 8·8·07

Sworn to before me this 8th
day of August, 2007.

Theresa G. Samuel
~~Commissioner of Superior Court~~
Notary
my com exp 02-28-2008

Dated: Aug 20, 2007

Respectfully submitted,

**HARWOOD FEFFER LLP**

By: [signature]
Peter W. Overs, Jr. (PO-4409)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.: (212) 935-7400

Lynn Rossman Faris
**LEONARD CARDER, LLP**
1330 Broadway Avenue, Suite 1450
Oakland, CA 94612
Tel.: (510) 272-0169

Susan E. Ellingstad
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900

Plaintiffs' Co-Lead Counsel

Richard E. Hayber
**THE HAYBER LAW FIRM, LLC**
221 Main Street, Suite 400
Hartford, CT 06106
(860) 522-8888

Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re MDL -1700 FedEx Ground Package System, Inc., Employment Practices Litigation (No. II) | ) | Case No. 3-05-MD-527-RLM-CAN (MDL 1700) |
| This Document relates to: | ) | Chief Judge Miller<br>Magistrate Judge Nuechterlein |
| *Whiteside, et al. v. FedEx Ground Package System, Inc. et al.*, No. 3:07-cv-326 (NC) | ) | **OBJECTIONS AND RESPONSE OF SHARON B. WHITESIDE TO DEFENDANTS ELEVENTH SET OF INTERROGATORIES** |

PROPOUNDING PARTY: DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.

RESPONDING PARTY: NAMED PLAINTIFF SHARON B. WHITESIDE

SET NUMBER: ELEVENTH

Pursuant to Federal Rule of Civil Procedure 33(b), Named Plaintiff SHARON B. WHITESIDE, through counsel, hereby responds to Defendant FedEx Ground Package System, Inc.'s Eleventh Set of Interrogatories, served on June 29, 2007.

**PRELIMINARY STATEMENT, GENERAL OBJECTIONS AND RESPONSES**

1. Named Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it calls for a narrative answer by seeking detailed information as to every fact, instance, and act.

2. Named Plaintiff objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

3. Named Plaintiff objects to each Interrogatory in so far as it defines "you" and

"your" as including Plaintiff's counsel.

4.     Named Plaintiff objects to each Interrogatory in so far as it seeks information and evidence about damages, which issue has been bifurcated for all purposes.

5.     Named Plaintiff objects to each Interrogatory to the extent that it invades the Named Plaintiff's right to privacy protected by federal law and the applicable state laws.

6.     Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already provided in Named Plaintiff's Initial Disclosures pursuant to Fed. R. Civ. P. 26. Named Plaintiff incorporates by reference his Initial Disclosures.

7.     Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already in Defendant's knowledge, possession, custody or control. See Fed. R. Civ. P. 26(b)(2) (requiring the court to limit discovery where the information sought is obtainable from another source that is more convenient, less burdensome or less expensive).

8.     Named Plaintiff's responses (and any further objections or responses to these discovery requests or their subject matter), whether submitted collectively or on behalf of any individual Plaintiff, are made without waiver of, and with preservation of:

a.     All questions as to competency, relevance, materiality, privilege and admissibility of each response and the subject matter thereof as evidence for any purpose in any further proceeding in this matter (including the trial of this lawsuit), and in any other lawsuit or proceedings;

b.     The right to object to the use of any response, or the subject matter thereof, on any ground in any further proceedings in this matter (including the trial of this lawsuit) and in any other lawsuit or proceeding.

9.     Named Plaintiff objects to each Interrogatory to the extent that it is compound with

myriad discrete sub-parts that address separate matters and purports to seek information that is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. Named Plaintiff reserves the right to seek a protective order to the extent that the Interrogatories exceed the numerical limitations placed by the Court.

10. Named Plaintiff objects to Defendant's definitions and instructions to the extent that they seek to impose obligations on Named Plaintiff beyond those imposed by Rule 33 of the Federal Rules of Civil Procedure and the local rules of the United States District Court North Carolina.

**The following Interrogatories shall be answered separately by Plaintiff SHARON B. WHITESIDE**:

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

If anyone assisted you in the performance of your duties, please state the identities of those individuals including their name, last known address and telephone number, the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO.1:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory on the grounds of the individual's privacy, to the extent that it seeks "last known address and telephone number." This Named Plaintiff further objects to this Interrogatory on the grounds that the phrases "assisted you in the performance of your duties," "details of service," and

"nature of their relationship to you" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as no one is permitted to "assist" without FedEx's written permission. This Named Plaintiff further objects that this Interrogatory is onerous, burdensome and oppressive and duplicative of information in Defendant's files and/or documents already produced by Named Plaintiff. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

I hired two temporary drivers that had to be approved by FXG. However, I do not recall their names or compensation.

**INTERROGATORY NO.2:**

Please state in detail your efforts to: have others assist you in your pick up and delivery duties, increase the size of your route, operate supplemental vehicles, utilize trailers or acquire a large vehicle, shorten the time or increase the efficiency of your pick ups and/or deliveries (including deviating from any turn-by-turn route suggestions that defendants may have provided you with), and participate in the Flex Program.

**RESPONSE NO.2:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as compound, overbroad and unduly burdensome, in that it consists of multiple discrete sub-parts that address separate matters and thus is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "efforts" and "assist you" are vague and ambiguous and the Interrogatory otherwise incorporates assumptions and conclusions which are erroneous. This

Named Plaintiff objects to this Interrogatory because it requests information within Defendant's knowledge, possession, custody or control and that it duplicates the information requested in Interrogatory #1. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

See Response to Interrogatory No.1. I did my best to deliver all packages assigned to me each day in the most efficient way possible, given the number of packages the company required me to deliver on that day and given that I had to follow the company's detailed procedures for pick-up and delivery, serving customers when, where and how the company directed me to. When told by FedEx Ground management to deliver or pick up packages outside my primary service area, I did what I was told to do.

I disagree that the categories listed above provided opportunity to increase my earnings. Unfortunately, any attempts to increase my earning ability were counteracted by the control FXG exerted upon me. For example:

  a) FXG managed how many routes I could have;

  b) FXG required use of their in-house DOT mechanic;

  c) Management would interfere with contractors trying to sell their route.

  d) I had a buyer for my second route. He successfully finished FXG driving school and passed all the requirements. However, two months into his training on my second route, FXG told me they were not going to make him a contractor. Because management would not make the buyer a contractor, I lost $15,000.00 and assumption of truck lease, even though he was originally approved by FedEx to be a contractor/driver.

  e) Management would reconfigure my route on a nearly daily basis without consulting with me to discuss the utilization of my vehicle to maximize my "profit margin";

  f) Management would take packages off my route and place them on another route without my consent. They would also take packages off my route and not replace them without consulting me and to help "FXG" profit margin and not

mine. The additional packages would actually be costly for me. If I questioned packages, I would be told that my contract was in jeopardy.

g) Management organized bills and assessed additional expenses on me without consideration.

My earnings and expenses therefore varied based almost exclusively upon choices FXG made, not my personal choices.

**INTERROGATORY NO.3:**

Please explain in detail each incident in which Defendant breached its obligation to you under the applicable Operating Agreement, whether such incidents form the basis for a breach of contract claim, breach of fiduciary claim, or any other claim against Defendant. For each incident, please provide the date of each occurrence.

**RESPONSE NO.3:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each incident" and such breaches of contract occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the term "any other claim against Defendant" is vague and ambiguous. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

Defendant breached its obligations to me under the Operating Agreement by failing to treat me as an independent contractor. This conduct occurred every day in the ways in which Defendant

exerted control over the means and manners by which I performed my job. See Response to Interrogatory No. 6 for more detail.

**INTERROGATORY NO.4:**

If you did not read and understand each term contained in the Operating Agreement, including all addenda thereto, between yourself and Defendant prior to signing it, please explain which terms you did not understand, what meaning, if any, you understood those terms to have, and the reasons for your failure to read and/or understand any such terms.

**RESPONSE NO.4:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each term" of a 66-page form contract with addenda which Named Plaintiff "did not understand." Virtually every term in the lengthy contract is susceptible of multiple interpretations and understanding; Named Plaintiff thus further objects to this Interrogatory because the term "understanding" is vague and ambiguous, and because the Interrogatory, which asks Named Plaintiff to "explain" each contract term that he "did not understand" is utterly unintelligible. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

The contract I signed is so long, complicated and confusing that I am certain there are portions that I did not read and also portions that I did not understand. I cannot now identify each and every term of the over 60 pages of contract that I did not "understand" at the time I signed it. Since I am not a lawyer, I can say that I was not and am not familiar with, and therefore did not

"understand" the legal terms contained throughout the Contract. There are also many terms in the contract that are open to many interpretations, so whether I "understood" them is impossible to say. I did not have a lawyer review the Operating Agreement before I signed it.

**INTERROGATORY NO.5:**

Please state in detail the circumstances surrounding the termination of any contract or contractual relationship with Defendants, even in cases where not all contracts or contractual relationships terminated, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale. Please include instances when any or all contacts or contractual relationships terminated through non-renewal.

**RESPONSE NO.5** Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as improper on the grounds that the terms "circumstances" and "termination" and "terminated" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as any such "termination" directly involved Defendant and any such "sale" or assignment necessarily involved Defendant's approval and execution of a new Operating Agreement.

Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

As to my first route - After 5 years, I terminated my contract with FedEx Ground after finding a buyer for the route and truck. Once she was approved by FedEx Management, she was sent to FedEx driving school. She passed the required FedEx driving school. Management kept delaying the transfer of the route and making her a contractor. It took management 60-90 days to finally make her a contractor after she had completed the

required driving school. My sale was prompted due to the fact that I had no control of my "business" whatsoever and the amount of pay I received for all the hours worked was probably less than min. wage after taking out all expenses. I got tired of going home at night wondering if I had a job the next day if my contract was "pulled" and what I would do with my outstanding debts for loans, and lease on 2 vehicles. I would have lost everything and that is not an environment I care to work in. I sold the route and truck to Jewel Stockton and as stated above, the transaction was not a quick smooth transaction.

As to my second route - I had a buyer. He successfully finished FXG driving school and passed all the requirements. However, two months into his training on my second route, FXG told me they were not going to make him a contractor. Because management would not make the buyer a contractor, I lost $15,000.00 and assumption of truck lease, even though he was originally approved by FedEx to be a contractor/driver. Finally I had to let the route go to an existing driver in the terminal. She assumed the lease, did all the deliveries, and FedEx had not made her a contractor yet. She operated under my contractor number and would pay her the settlement for that route. Terminal manager once again dragged their feet and it took forever to get the contractorship transfered. I ended up selling that route for $1.00 to Rhonda Meadows, she also assumed the truck lease with Lease Deminisions.

**INTERROGATORY NO.6:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or

case 3:05-md-00527-RLM -CAN document 1006-7 filed 11/16/07 page 10 of 18

attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO.6:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "every fact" and "every action" that demonstrates control by Defendant. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

Objection, overbroad, unduly burdensome and requires the regurgitation of information already in the possession of Defendant and its counsel. Without waiving said objection, Plaintiff responds as follows:

FXG exercised pervasive control over virtually every aspect of my work as a P&D Driver. I understand from my attorneys that there are extensive documents, transcripts of testimony, and other documents that show the system-wide control FXG exerts over its drivers. Based upon my own knowledge, I do not believe I could express all the ways FXG asserted control. The following are some examples of the control FXG has exerted over me:

**Truck:**

1. FXG imposed requirements on the type of truck I could drive; specifications regarding the truck; where I could purchase the truck; the types of shelving required on the truck; the placement and size of logos; did not permit any other logos on my truck; the color of my truck; limitations that the only advertising on my truck that

was permitted was FXG's logos, and other specifications and requirements as to the type of vehicle I could use when running my so-called delivery business. I could not use the truck for other purposes unless I covered or removed the FXG logos. FXG controlled when and whether I would paint my truck. FXG imposed vehicle maintenance requirements in excess of what was required to keep the truck legal, beyond the manufacturer's specifications, and regardless of whether I agreed that the work needed to be done; FXG required me to perform repairs on my truck for appearance purposes to which I did not agree;

**Uniform/appearance:**

2. FXG required me to come to work wearing FXG uniform with a company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FXG jacket or cap;

3. I purchased my uniform from FXG as part of the business support package;

4. I was required to meet various FXG grooming standards;

5. I was told that if my appearance and grooming were not acceptable to FXG, I would not be allowed to drive until my appearance and grooming met FXG standards.

**Work Performance:**

6. FXG controlled virtually every aspect of the actual work of working as a package driver. On several occasions, I was told that, if I did not follow instructions, down to the finest detail such as how to park and where to put my keys when making a delivery, I could lose my job. FXG also maintained "service goals" and I would lose a portion of my pay under the Contractor Customer Service program if I did not meet them and could actually lose my job.

7. FXG had strict rules about releasing packages without customer signature (driver release). If I did not comply with FXG's driver release rules, I could lose my bonus or even my job;

8. I was required to follow FXG's "Safe Driving Standards" which I believe exceeded DOT and state requirements; if I did not follow any of these, I could lose my insurance (which, because of the prohibitive cost of replacement insurance, would effectively terminate my employment) or be directly terminated;

9. I would lose my CCS bonus if other drivers in my terminal did not meet FXG's service goals – regardless of my personal performance;

10. Each day, my service percentage was posted in the terminal for all the other drivers to see. If my serve percentage fell below the goal it would be posted in red for all drivers to see;

11. FXG controlled the manner in which I picked up and delivered packages, how to enter and exit my truck, how to select my packages, how to deliver my packages,

how to use call tags, FXG produced and required forms, how to handle COD deliveries/other special services and how to get the customer's signature. FXG terminal management conducted Customer Service Rides, where terminal management would ride along with me on my route to evaluate how well I followed these directions, and would score my performance.

12. FXG decided the size and weight of packages it required me to deliver and could change those to meet its own business goals without my agreement.

13. FXG management would call me during the day on my cell phone from the terminal during the day with instructions or additional work assignments;

14. I was often required to research past package deliveries whenever asked to by FXG in order to avoid money being withheld from my pay.

15. FXG "flexed" packages to me, requiring me to deliver packages outside of my route to meet it's needs;

16. FXG determined the size of the service area of my route.

17. FXG changed or could change the size and service area of my route, even over my objection, based on its unilateral needs without my approval and without paying me.

18. FXG determined the "minimum" and "maximum" number of packages to assign to me (the "min and the max") to meet FXG's business needs regardless of my views.

19. FXG did not permit anyone that was not authorized by FXG to ride with me in my truck at any time.

20. I could not sign up new customers myself to increase my route;

21. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FXG.

22. Even though my route had enough packages and stops to be split into two routes, FXG would not allow me to split my route in two, as only FXG can create new routes or reconfigure routes;

23. FXG could deny my request for a second route;

24. I had to get FXG's approval if I wanted to sell or transfer my truck to another driver;

25. I had to get FXG's approval to sell or transfer my route or part of my route to another driver and as a result we lost several potential buyers;

26. FXG could deny my attempt to sell my route.

27. FXG could deny my attempt to sell my truck.

28.  I could not and did not deliver packages for any other company other than FXG;

29.  I could not decline to deliver any package assigned to me by FXG for any reason;

30.  FXG determined the total number of packages and location of deliveries it assigned to me on the day it was assigned;

31.  I was required to make deliveries or pick-ups that were not profitable, even if they were not on my route, if FXG assigned the stop to me.

32.  I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or paperwork until terminal management was ready for me to leave;

33.  I had to report to FXG on my deliveries at the end of each day;

34.  Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route;

35.  By assigning me more stops than I wanted and timed stops, FXG required me to work more hours each day than I would have chosen to work.

36.  I could never take a day off when I wished or when there was an emergency unless I found a replacement driver, approved by FXG, to take my place;

37.  Even when I was ill or injured, I would be forced to work because I did not have a readily-available replacement driver.

38.  When I asked for a second route, FXG required me to acquire a second truck and run it as a supplemental at a financial loss even though I did not want to.

39.  I could not negotiate any of the terms of the Operating Agreement.

40.  I was told I needed to purchase deadhead insurance through a FXG-sponsored group plan using Protective Insurance and the cost was deducted from my pay.

41.  FXG deducted money from my pay for "cargo" claims without providing me with information about the claims before the deduction was made and without my approval.

42.  FXG determined the rate I was charge for the Business Support Package for the scanners, uniforms, truck washing and other services required by FXG. I had no choice but to pay for the Business Support Package. I had to rent the scanner from FXG as opposed to buying one for myself.

43.  FXG determined the rate I was paid for pickup and delivery services;

44.  FXG determined that rate I was paid for "van availability," "core zone," and controlled all other aspects of my pay.

45. If I keep a balance in my Service Guarantee Account, FXG contributed additional money to it which I may use for any purpose.

46. FXG required me to pay $500 into an Escrow Account and to leave that amount in the account for the duration of my work there.

47. My core zone pay was reduced when FXG made me deliver to areas outside my route.

48. My core zone pay was reduced or would be reduced for any day that I worked less than seven hours.

49. I rarely if ever worked fewer than 10 hours in a work day.

50. I often worked 12 hours or more in a work day.

51. I often had no time for a meal break or even a rest break in a work day.

52. FXG gave me the option to have my pay directly deposited into my bank account.

53. FXG sends me a monthly magazine and other materials to my home.

54. FXG trained me in its methods of package handling, delivery, pick-up and customer service.

55. I was required to attend ongoing training sessions and meetings at FXG which included topics such as performance, productivity and customer service standards.

56. I was given training and promotional videotapes which I was required to watch and follow.

57. Often FXG required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often on topics that had nothing to do with safety.

58. During Roundtable Meetings, FXG management discussed new company policies and accounts and promoted its business goals.

59. When I contacted the Contractor Relations manager for my area about issues, he sided with terminal management and tried to justify whatever decision terminal management made.

60. I was required to use a scanner each day to permit customers to track the time of the deliveries on FXG's website.

61. I had to input into the scanner the number of miles I had driven in the course of the day.

62. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, an the time I arrived at the terminal or home at the end of the day.

63. At the end of the day, I was required to download the information in my scanner into FXG's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups and delivery information.

64. I was required to follow the FXG check in and check out procedures each day and to provide the information about my service for that day.

65. I was required to provide service on each day FXG decided to provide service to its customers.

66. I was threatened with contract termination on multiple occasions for allegedly not complying with FXG's customer service requirements.

67. FXG deducted from my escrow accounts amounts it claimed I owed FXG without my consent.

68. I was required to purchase or lease a truck of the size specified by FXG to obtain a second route.

69. I was required to get the driver for my second route approved by FXG prior to being given the second route.

70. The driver of my second route was given instructions by the terminal manager directly.

71. The driver of my second route was evaluated in Customer Service Rides by terminal management.

72. The driver of my second route was required to attend meetings with the terminal management whenever they asked.

73. The driver of my second route was subject to all of the same rules and requirements I was subject to as a driver.

74. The driver of my second route was trained by FXG in its pickup and delivery techniques, customer service requirements and other rules.

75. The driver of my second route had to attend the same weekly meetings I had to attend and to sign attendance sheets showing he or she was there.

76. I was repeatedly told by the terminal management that my routes were in jeopardy if the driver of my second route did not adequately service that route.

77. FXG management forced returns to locations because the customer called and wanted the package.

Terminal manager would change my accurate coding of a package as a misload to "did not attempt" which would reduce my service percentage, threaten by CCS bonus or my job, without investigation or any basis for doing so.

**INTERROGATORY NO.7:**

Please state in detail each and every effort you made to acquire an additional route(s) or portions of route(s), and each and every effort your made to divest yourself of any route(s) or portion of route(s).

**RESPONSE NO.7:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. Named Plaintiff specifically objects to this Interrogatory on the grounds that it requests information within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

Not Applicable as Plaintiff owned more than one route.

**INTERROGATORY NO. 8:**

If any Defendant or their agent made any oral fraudulent statements or misrepresentations of material fact, please state the content of any such statement(s), the circumstances surrounding any such statement(s), the date any such statement(s) was/were made, and the speaker(s) of any such statement(s).

**RESPONSE NO. 8:**

Named Plaintiff SHARON B. WHITESIDE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this

Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "any such statement" and such oral fraudulent statements or misrepresentations occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "fraudulent," "misrepresentations," and "circumstances" are vague and ambiguous. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and Specific Objections, Plaintiff responds as follows:

The claims for fraud and misrepresentation stated in the Complaint are based on the written misrepresentations made by Defendant.

Case 3:05-md-00527-RLM -CAN document 1006-7 filed 11/16/07 page 18 of 18

Dated: August 10, 2007

Respectfully submitted,

**HARWOOD FEFFER LLP**

By: ______________________
Peter W. Overs, Jr. (PO- 4409)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.: (212) 935-7400

Lynn Rossman Faris
**LEONARD CARDER, LLP**
1330 Broadway Avenue, Suite 1450
Oakland, CA 94612
Tel.: (510) 272-0169

Susan E. Ellingstad
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900

**Plaintiffs' Co-Lead Counsel**

**R. JAMES LORE**
102-I Commonwealth Court
Cary, NC 27511
Tel.: (919) 469-9103

Palmer Freeman, Esq.
**WHETSTONE MYERS PERKINS & YOUNG, LLC**
The Vista
601 Devine Street
P.O. Box 8086
Columbia, SC 29201
Tel.: (803) 799-9400

Jerald R. Cureton
Anthony L. Marchetti, Jr.
**CURETON CAPLAN**
950B Chester Avenue
Delran, NJ 08075
Tel.: 856-824-1001

Jordan M. Lewis
**SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A.**
1845 Walnut St., 24th Floor
Philadelphia, PA 19103
Tel.: 215-814-9322

**Counsel for Plaintiffs**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | **OBJECTIONS AND RESPONSE OF MICHAEL DECESARE TO DEFENDANT'S NINTH SET OF INTERROGATORIES** |

PROPOUNDING PARTY: DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.

RESPONDING PARTY: NAMED PLAINTIFF MICHAEL DECESARE

SET NUMBER: NINTH

Pursuant to Federal Rule of Civil Procedure 33(b), Named Plaintiff MICHAEL DECESARE, through counsel, hereby responds to Defendant FedEx Ground Package System, Inc.'s Ninth Set of Interrogatories.

**PRELIMINARY STATEMENT, GENERAL OBJECTIONS AND RESPONSES**

1. Named Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it calls for a narrative answer by seeking detailed information as to every fact, instance, and act.

2. Named Plaintiff objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

3. Named Plaintiff objects to each Interrogatory in so far as it defines "you" and "your" as including Plaintiff's counsel.

4. Named Plaintiff objects to each Interrogatory in so far as it seeks information and evidence about damages, which issue has been bifurcated for all purposes.

5. Named Plaintiff objects to each Interrogatory to the extent that it invades the Named Plaintiff's right to privacy protected by federal law and the applicable state laws.

6. Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already provided in Named Plaintiff's Initial Disclosures pursuant to Fed. R. Civ. P. 26. Named Plaintiff incorporates by reference his Initial Disclosures.

7. Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already in Defendant's knowledge, possession, custody or control. See Fed. R. Civ. P. 26(b)(2) (requiring the court to limit discovery where the information sought is obtainable from another source that is more convenient, less burdensome or less expensive).

8. Named Plaintiff's responses (and any further objections or responses to these discovery requests or their subject matter), whether submitted collectively or on behalf of any individual Plaintiff, are made without waiver of, and with preservation of:

a. All questions as to competency, relevance, materiality, privilege and admissibility of each response and the subject matter thereof as evidence for any purpose in any further proceeding in this matter (including the trial of this lawsuit), and in any other lawsuit or proceedings;

b. The right to object to the use of any response, or the subject matter thereof, on any ground in any further proceedings in this matter (including the trial of this lawsuit) and in

any other lawsuit or proceeding.

9.    Named Plaintiff objects to each Interrogatory to the extent that it is compound with myriad discrete sub-parts that address separate matters and purports to seek information that is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. Named Plaintiff reserves the right to seek a protective order to the extent that the Interrogatories exceed the numerical limitations placed by the Court.

10.    Named Plaintiff objects to Defendant's definitions and instructions to the extent that they seek to impose obligations on Named Plaintiff beyond those imposed by Rule 33 of the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Northern District of Indiana.

**INTERROGATORY NO. 1:**

If anyone assisted you in the performance of your duties, please state the identities of those individuals, including their name(s), last known address(es) and telephone number(s), the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation of consideration.

**RESPONSE NO. 1:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory on the grounds of the individual's privacy, to the extent that it seeks "last known address and telephone number." This Named Plaintiff further objects to this Interrogatory on the grounds that the phrases "assisted you in the performance of your duties," "details of service,"

and "nature of their relationship to you" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as no one is permitted to "assist" without FedEx's written permission. This Named Plaintiff further objects that this Interrogatory is onerous, burdensome and oppressive and duplicative of information in Defendant's files and/or documents already produced by Named Plaintiff. Without waiving and subject to the foregoing General and Specific Objections, Named Plaintiff MICHAEL DECESARE responds as follows:

From 12/04-3/05, I used a second driver to drive my second route. This was Jose Corsos and then Robert Kendall. I paid them $1 per stop. These drivers provided the same pickup and delivery services that I performed for FedEx.

From time to time, I used a relief driver when I was sick or needed a day off. This was Jon Haveus or Greg Wolf. I paid them $1 per stop. These drivers provided the same pickup and delivery services that I performed for FedEx.

**INTERROGATORY NO. 2:**

Please state in detail your efforts to: have others assist you in your pick up and delivery duties, acquire or take on additional routes or portions of routes, increase the size of your route, operate supplemental vehicles, utilize trailers or acquire a larger vehicle, shorten the time or increase the efficiency of your pick ups and/or deliveries (including deviating from any turn-by-turn route suggestions that Defendant may have provided you with), and participate in the Flex Program.

**RESPONSE NO. 2 :**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as compound, overbroad and unduly burdensome, in that it consists of multiple discrete sub-parts that address separate matters and thus is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "efforts" and "assist you" are vague and ambiguous and the Interrogatory otherwise incorporates assumptions and conclusions which are erroneous. This Named Plaintiff objects to this Interrogatory because it requests information within Defendant's knowledge, possession, custody or control and that it duplicates the information requested in Interrogatory #1. Without waiving and subject to the foregoing General and Specific Objections, Named Plaintiff MICHAEL DECESARE responds as follows:

See Response to Interrogatory #1. I did my best to deliver all packages assigned to me each day in the most efficient way possible, given the number of packages the company required me to deliver on that day and given that I had to follow the company's detailed procedures for pick-up and delivery, serving customers when, where and how the company directed me to. I made no "efforts" to "participate" in the Flex Program as I had no choice but to be in this program. When told by FedEx Ground management to deliver or pick up packages outside my primary service area, I did what I was told to do. I did not make "efforts" to increase the size of my route but instead had it involuntarily increased. I made an effort to have my area divided into three routes by requesting this repeatedly of management and explaining how it was taking too much time and providing too little income to have so large and busy an area only divided into two routes instead of three. I rented a second van in order to handle the second route, but made

no other efforts to operate supplemental vehicles, utilize trailers or acquire a large vehicle. I occasionally made an effort to shorten the time or increase the efficiency of my pickups and deliveries, such as on rare occasion deviating from the turn-by-turn route instructions given me by the Company when through some unusual circumstance beyond the Company's control (like major traffic accident) I saw a better route to use.

**INTERROGATORY NO. 3:**

Please explain in detail each incident in which Defendant breached its obligations to you under the applicable Operating Agreement, whether such incidents form the basis for a breach of contract claim or any other claim against Defendant. For each incident, please provide the date of each occurrence.

**RESPONSE NO. 3:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as not calculated to lead to the discovery of admissible evidence as the complaint does not purport to allege breach of contract. This Named Plaintiff further objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each incident" and such breaches of contract occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the term "any other claim against Defendant" is vague and ambiguous. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. This Named Plaintiff further

objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific objections to Interrogatory No. 3, Named Plaintiff MICHAEL DECESARE responds as follows:

See Response to Interrogatory # 6. In addition, FedEx regularly and continuously breached its obligations under the Operating Agreement in ways too numerous to "explain in detail." These included pressuring us to attempt more than three times to deliver packages requiring a signature.

**INTERROGATORY NO. 4:**

If you did not read and understand each term contained in the Operating Agreement, including all addenda thereto, between yourself and Defendant prior to signing it, please explain which terms you did not understand, what meaning, if any, you understood those terms to have, and the reason or reasons for your failure to read and/or understand any such terms.

**RESPONSE NO. 4:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each term" of a 66-page form contract with addenda which Named Plaintiff "did not understand." Virtually every term in the lengthy contract is susceptible of multiple interpretations and understanding; Named Plaintiff thus further objects to this Interrogatory because the term "understanding" is vague and ambiguous, and because the Interrogatory, which asks Named Plaintiff to "explain" each contract term that he "did not understand" is utterly unintelligible. This Named Plaintiff further objects to this

Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific Objections to Interrogatory No. 4, Named Plaintiff MICHAEL DECESARE responds as follows:

The contract I signed is so long, complicated and confusing that I am certain there are portions that I did not read and also portions that I did not understand. I cannot now identify each and every term of the over 60 pages of contract that I did not "understand" at the time I signed it. Since I am not a lawyer, I can say that I was not and am not familiar with, and therefore did not "understand" the legal terms contained throughout the Contract. There are also many terms in the contract that are open to many interpretations, so whether I "understood" them is impossible to say. I did not have a lawyer review the Operating Agreement before I signed it.

**INTERROGATORY NO. 5:**

If any Defendant or their agent made any oral fraudulent statements or misrepresentations of material fact, please state the content of any such statement(s), the circumstances surrounding any such statement(s), the date any such statement(s) was/were made, and the speaker(s) of any such statement(s).

**RESPONSE NO. 5:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "any such statement" and such oral fraudulent statements or misrepresentations occurred on a continual basis, and many such statements are not being pursued in this lawsuit and hence discovery into them is not calculated to lead to the

discovery of admissible evidence. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "fraudulent," "misrepresentations," and "circumstances" are vague and ambiguous. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the General and Specific Objections to Interrogatory No. 5, Named Plaintiff MICHAEL DECESARE responds as follows:

See Response to Interrogatory # 6. FedEx and their agents regularly and continuously made oral statements too numerous to list in detail that misrepresented that I was an independent contractor under the Operating Agreement. During the period 9/04-9/05 Fed Ex through its manager Scott Ulm repeatedly promised (in response to Plaintiff's requests) that Fed Ex would revise the routes within my existing area to give me an additional route, but never made good on such promises.

**INTERROGATORY NO. 6:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications

you had with Defendants about the communication or fact.

**RESPONSE NO. 6:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "every fact" and "every action" that demonstrates control by Defendant. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control.

Without waiving these objections, this Named Plaintiff responds as follows: Plaintiff incorporates herein the factual allegations of the complaint and of his declaration (attached). Plaintiff was told by management that his effort to sell a route would be rejected if not initiated several months in advance of the holiday season, and thus ultimately Plaintiff could not sell his remaining route but had to give it away.

**INTERROGATORY NO. 7:**

Please state in detail each and every effort you made to acquire an additional route or route(s).

**RESPONSE NO. 7:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. Named Plaintiff specifically objects to this Interrogatory on the grounds that it requests information within Defendant's knowledge, possession, custody or control. Without waiving and subject to the foregoing General and

Specific Objections, Named Plaintiff MICHAEL DECESARE responds as follows: Plaintiff incorporates herein his responses to Interrogatory Numbers 2 and 5.

**INTERROGATORY NO. 8:**

Please state in detail the circumstances surrounding the termination of any contractual relationship with Defendants, even in cases where not all contracts or contractual relationships terminated, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale. Please include instances when any or all contracts or contractual relationships terminated through non-renewal.

**RESPONSE NO. 8:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as improper on the grounds that the terms "circumstances" and "termination" and "terminated" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as any such "termination" directly involved Defendant and any such "sale" or assignment necessarily involved Defendant's approval and execution of a new Operating Agreement. Without waiving and subject to the General and Specific Objections to Interrogatory No. 8, Named Plaintiff MICHAEL DECESARE responds as follows:

I was forced to resign and turn in my route in September 2005 because the work required too many hours, barely paid me enough to survive, and I was not going to receive approval for sale of this route within any reasonable time period as I was told it would not be approved until after the holiday season. In July 2005 I tried to get approval to sell my second route and did not

receive such approval until September. I sold my 2nd route to Mark Shofner: I received from him $35,000 for the route and $15,000 for my truck. After I turned in my route he bought my remaining truck for $25,000.

**INTERROGATORY NO. 9:**

Please state in detail the equitable, declaratory and injunctive relief that you seek, including whether you seek a judgment that some or all putative class members should be classified and treated as employees and, if so, which putative class members should be treated as employees and for what purpose(s).

**RESPONSE NO. 9:**

Named Plaintiff MICHAEL DECESARE incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific Objections to Interrogatory No. 9, Named Plaintiff MICHAEL DECESARE responds as follows:

I seek a declaratory judgment that all putative class members are, as a matter of law, employees, by virtue of the extensive control that Defendant retains and exercises over the manner and means by which class members perform their jobs.

I seek injunctive relief against Defendant's misclassification of class members as "independent contractors" so long as Defendant retains and exercises such control over the manner and means by which class members perform their jobs as to render them employees as a matter of law, and to ensure that the legal classification of class members as "employees" or "independent contractors" is congruent with Defendant's treatment of, and exercise of control

over, class members.

Dated: 4/27/07, 2007

Respectfully submitted,
**McCRACKEN, STEMERMAN & HOLSBERY**

By ______________________
Andrew J, Kahn
595 Market Street, Suite 1400
San Francisco, CA 94105
Tel.: (415) 597-7200

Attorneys for Plaintiffs

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, CA 94612
Tel.: (510) 272-0169

Robert I. Harwood (RH-3286)
WECHSLER HARWOOD LLP
488 Madison Avenue
New York, NY 1002
Tel.: (212) 935-7400

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900

Co-Lead Counsel For Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO:<br><br>*Leighter et al. v. FedEx Ground Package System, Inc.*, Civ. No. 3:07-cv-328 (OR) | ) | **OBJECTIONS AND RESPONSE OF JON LEIGHTER TO DEFENDANT'S ELEVENTH SET OF INTERROGATORIES** |

PROPOUNDING PARTY: DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.

RESPONDING PARTY: NAMED PLAINTIFF JON LEIGHTER

SET NUMBER: ELEVENTH

Pursuant to Federal Rule of Civil Procedure 33(b), Named Plaintiff JON LEIGHTER, through counsel, hereby responds to Defendant FedEx Ground Package System, Inc.'s Eleventh Set of Interrogatories.

## **PRELIMINARY STATEMENT, GENERAL OBJECTIONS AND RESPONSES**

1. Named Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it calls for a narrative answer by seeking detailed information as to every fact, instance, and act.

2. Named Plaintiff objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.

3. Named Plaintiff objects to each Interrogatory in so far as it defines "you" and "your" as including Plaintiff's counsel.

4. Named Plaintiff objects to each Interrogatory in so far as it seeks information and evidence about damages, which issue has been bifurcated for all purposes.

5. Named Plaintiff objects to each Interrogatory to the extent that it invades the Named Plaintiff's right to privacy protected by federal law and the applicable state laws.

6. Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already provided in Named Plaintiff's Initial Disclosures pursuant to Fed. R. Civ. P. 26. Named Plaintiff incorporates by reference his Initial Disclosures.

7. Named Plaintiff objects to each Interrogatory to the extent that compliance would require providing information already in Defendant's knowledge, possession, custody or control. *See* Fed. R. Civ. P. 26(b)(2) (requiring the court to limit discovery where the information sought is obtainable from another source that is more convenient, less burdensome or less expensive).

8. Named Plaintiff's responses (and any further objections or responses to these discovery requests or their subject matter), whether submitted collectively or on behalf of any individual Plaintiff, are made without waiver of, and with preservation of:

a. All questions as to competency, relevance, materiality, privilege and admissibility of each response and the subject matter thereof as evidence for any purpose in any further proceeding in this matter (including the trial of this lawsuit), and in any other lawsuit or proceedings;

b. The right to object to the use of any response, or the subject matter thereof, on any ground in any further proceedings in this matter (including the trial of this lawsuit) and in any other lawsuit or proceeding.

9. Named Plaintiff objects to each Interrogatory to the extent that it is compound with myriad discrete sub-parts that address separate matters and purports to seek information that is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. Named Plaintiff reserves the right to seek a protective order to the extent that the Interrogatories exceed the numerical limitations placed by the Court.

10. Named Plaintiff objects to Defendant's definitions and instructions to the extent that they seek to impose obligations on Named Plaintiff beyond those imposed by Rule 33 of the Federal Rules of Civil Procedure and the local rules of the United States District Court for the Northern District of Indiana.

**The following Interrogatories are answered separately by Plaintiff JON LEIGHTER:**

**INTERROGATORY NO. 1:**

If anyone assisted you in the performance of your duties, please identify those persons, including their name(s), last known address(es) and telephone number(s), the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation of consideration.

**RESPONSE NO. 1 :**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory on the grounds of the individual's privacy, to the extent that it seeks "last known address and telephone number." This Named Plaintiff further objects to this Interrogatory on the grounds that the phrases "assisted you in the performance of your duties," "details of service," and "nature of their relationship to you" are vague and ambiguous. This Named Plaintiff further objects on the grounds that the Interrogatory requests information within Defendant's knowledge, possession, custody or control, as no one is permitted to "assist" without FedEx's

written permission. This Named Plaintiff further objects that this Interrogatory is onerous, burdensome and oppressive and duplicative of information in Defendant's files and/or documents already produced by Named Plaintiff. Without waiving and subject to the General and Specific Objections to Interrogatory No. 1, Named Plaintiff Jon Leighter responds as follows:

For approximately 6 days of each year from 2002, I hired a supplemental/relief driver approved by FedEx. I paid the driver $100 per day. The drivers I hired are Earl Ruttencutter, Ryan Ashcraft, Kevin Renner, and Holly Plumb. In 2002, for "peak season" I hired Matt Hilton as a supplemental driver. I paid him $100 per day. All of these drivers provided the same pickup and deliver service that I performed for FedEx. FedEx should have contact information for each of these drivers, who were approved by FedEx.

**INTERROGATORY NO. 2:**

Please state in detail your efforts to: have others assist you in your pick up and delivery duties, increase the size of your route, operate supplemental vehicles, utilize trailers or acquire a larger vehicle, shorten the time or increase the efficiency of your pick ups and/or deliveries (including deviating from any turn-by-turn route suggestions that Defendants may have provided you with), and participate in the Flex Program.

**RESPONSE NO. 2 :**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as compound, overbroad and unduly burdensome, in that it consists of multiple discrete sub-parts that address separate matters and thus is beyond the scope of the discovery limits set forth in the Initial Scheduling Order. This Named Plaintiff further objects to this Interrogatory on the grounds that the terms "efforts" and "assist you" are vague and ambiguous and the Interrogatory otherwise incorporates assumptions and conclusions which are erroneous. This Named Plaintiff

objects to this Interrogatory because it requests information within Defendant's knowledge, possession, custody or control and that it duplicates the information requested in Interrogatory No. 1. Without waiving and subject to the General and Specific Objections to Interrogatory No. 2, Named Plaintiff Jon Leighter responds as follows:

See Response to Interrogatory No. 1. I do my best to deliver all packages FedEx assigns to me each day in the most efficient way possible to follow the company's detailed procedures for pick-up and delivery, serving customers when, where and how the company directs me to.

**INTERROGATORY NO. 3:**

Please explain in detail each incident in which Defendant breached its obligations to you under the applicable Operating Agreement, whether such incidents form the basis for a breach of contract claim, breach of fiduciary duty claim, or any other claim against Defendant. For each incident, please provide the date of each occurrence.

**RESPONSE NO. 3:**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each incident" as such breaches of contract occurred on a continual basis. This Named Plaintiff further objects to this Interrogatory on the grounds that the term "any other claim against Defendant" is vague and ambiguous. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific objections to Interrogatory No. 3, Named Plaintiff Jon Leighter responds as follows:

case 3:05-md-00527-RLM -CAN document 1006-9 filed 11/16/07 page 6 of 15

See Response to Interrogatory No. 6. In addition, FedEx regularly and continuously breached its obligations under the Operating Agreement in ways too numerous to "explain in detail."

**INTERROGATORY NO. 4:**

If you did not read and understand each term contained in the Operating Agreement, including all addenda thereto, between yourself and Defendant prior to signing it, please explain which terms you did not understand, what meaning, if any, you understood those terms to have, and the reason or reasons for your failure to read and/or understand any such terms.

**RESPONSE NO. 4:**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking detailed information as to "each term" of a 66-page form contract with addenda which Named Plaintiff "did not understand." Virtually every term in the lengthy contract is susceptible of multiple interpretations and understanding; Named Plaintiff thus further objects to this Interrogatory because the term "understanding" is vague and ambiguous, and because the Interrogatory, which asks Named Plaintiff to "explain" each contract term that he "did not understand" is utterly unintelligible. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific Objections to Interrogatory No. 4, Named Plaintiff Jon Leighter responds as follows:

The contract I signed is so long, complicated and confusing that I am certain there are portions that I did not read and also portions that I did not understand. I cannot now identify each and every term of the over 60 pages of contract that I did not "understand" at the time I

signed it. I am not familiar with, and therefore did not "understand" many of the legal terms contained throughout the Contract. There are also many terms in the contract that are open to many interpretations, so whether I "understood" them is impossible to say.

**INTERROGATORY NO. 5:**

Please state in detail the circumstances surrounding the termination of any contract or contractual relationship with Defendant, even in cases where not all contracts or contractual relationships terminated, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale. Please include instances when any or all contracts or contractual relationships terminated through non-renewal.

**RESPONSE NO. 5:**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. Without waiving and subject to the General and Specific Objections to Interrogatory No. 5, Named Plaintiff Jon Leighter responds as follows:

My contract has not been terminated.

**INTERROGATORY NO. 6:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 6:**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff specifically objects to this Interrogatory as overbroad and burdensome to the extent that it calls for a lengthy narrative answer by seeking

case 3:05-md-00527-RLM -CAN document 1006-9 filed 11/16/07 page 8 of 15

detailed information as to "every fact" and "every action" that demonstrates control by Defendant. This Named Plaintiff further objects to this Interrogatory on the grounds that it requests information uniquely within Defendant's knowledge, possession, custody or control. Without waiving and subject to the General and Specific Objections to Interrogatory No. 6, Named Plaintiff Jon Leighter responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required that my truck have certain shelving, a back-up camera, and meet other specifications. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I cannot display anything else on my vehicle. FedEx requires me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx periodically has required me to change tires before I believed it was necessary.

I am required to come to work wearing a FedEx uniform with company logo and colors, dark shoes, and if I wear a jacket or hat, it has to be a FedEx jacket or cap. I rent my uniform from FedEx as part of the Business Support Package. I must keep the FedEx uniform in a condition acceptable to FedEx, clean and free of damage, and meet FedEx personal grooming standards.

FedEx decides what days I must provide service to its customers. FedEx requires me to make "appointment deliveries" to certain of its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx sets the price it charges its customers and I cannot negotiate prices for my pick-up and delivery services. FedEx has strict rules about releasing packages without customer signature (driver release). FedEx performs "driver release audits" to check up on my compliance with its rules, and terminal management has followed me on my route without my knowledge to see if I am complying with

driver release rules. FedEx determines the service goals I must satisfy to receive bonus payments in the Contractor Customer Service program.

I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to. I was required to watch instructional videos, about how to enter and exit my truck, how to select my packages, how to deliver my packages, how to get the customer's signature and customer service. I am required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I use in performing my work are FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with work instructions. I am required to follow FedEx's "Safe Driving Standards." My service percentage has often been posted in the terminal for all the other drivers to see. If my service percentage was below the goal, it was posted in red. I have attended required trainings and meetings addressing topics such as performance, productivity, and customer service standards. FedEx has required that I attend meetings at my terminal and sign attendance sheets showing my attendance.

FedEx terminal management conducts Customer Service Rides, where terminal management rides along with me on my route to evaluate my performance and efficiency. After a ride-along, I have received instruction from an FXG manager telling me how to "improve," including specific direction that I should avoid backing up as much as possible and needed to better secure my truck when I was away from it.

FedEx controls the number of packages and location of deliveries and pick-ups it assigns to me on a daily basis. FedEx determined the size and service area of my route. FedEx can change the size and service of my route based on its needs without my approval. FedEx sometimes assigns me packages to deliver outside of my route to meet its needs. I cannot take a

Case 3:05-md-00527-RLM -CAN document 1006-9 filed 11/16/079 page 10 of 15

day off unless I find a replacement driver, approved by FedEx, to take my place. I have worked when I was sick because I did not have a readily-available replacement driver. I rarely, if ever, work fewer than 10 hours in a work day. I often have no time for a meal break or even a rest break in a work day.

I cannot sign up new customers myself to increase my route. I cannot acquire or take on additional routes or portions of routes without the express consent and approval of FedEx. FedEx denied my request for a second route. FedEx denied my request to split my route into two routes even though the number of packages and stops warrants two routes. I must get FedEx's approval to sell or transfer my truck to another FedEx driver. I must get FedEx's approval to sell or transfer my route or part of my route to another driver. I cannot deliver packages for any company other than FedEx.

FedEx does not permit anyone that was not authorized by FedEx to ride with me in my truck at any time. One time I violated this rule because I had to pickup my children at school and my terminal manager somehow found out and threatened to send my contract up for review and potential termination if it ever happened again.

FedEx can prevent me from leaving the terminal when I am ready to go by keeping my equipment or paperwork until terminal management is ready for me to leave. On a few occasions, the terminal manager has required me to meet with him before leaving to discuss my performance, personal appearance, or "attitude."

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase workers accident insurance and deadhead insurance, which I did through a FedEx-sponsored group plan and the cost was and is deducted from my pay. On a few occasions, FedEx required me to research cargo claims regarding disputed package deliveries to avoid money

being withheld from my pay. FedEx deducted money from my pay for a "cargo" claim by a customer. FedEx determined that a customer complaint was valid, although I believed my delivery of the package to the complaining customer was proper and complied with FXG's required delivery procedures. FedEx required me to pay $1,000 into an Escrow Account and I must keep that amount in the account for the duration of my work there.

FedEx determines the rate I am charged for the Business Support Package for the scanner, uniforms, and other services required by FedEx. I have no real choice but to pay for the Business Support Package. FedEx determines the rate I am paid for pick-up and delivery services. FedEx determines the rate I am paid for "van availability" "core zone," and all other aspects of my pay. FedEx directly deposits my pay into my bank account.

I am required to use the FedEx provided scanner each day to permit customers to track the time of deliveries on FedEx's website. I am required to input into the scanner the number of miles I had driven in the course of the day, the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pick-up, and the time I arrived at the terminal or home at the end of the day, as well as each package delivered or picked up during the day. At the end of the day, I am required to download the information in my scanner into FedEx's system. I also follow the FedEx check in and check out procedures each day and to provide information about my service for that day. At the beginning of each day, FedEx provides me with a turn-by turn chart of my route and a manifest which listed all of my deliveries in the order I should deliver them.

**INTERROGATORY NO. 7:**

Please state in detail each and every effort you made to acquire an additional route(s) or portion(s) of route(s), and each and every effort you made to divest yourself of any route(s) or portion of route(s).

**RESPONSE NO. 7:**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. Named Plaintiff specifically objects to this Interrogatory on the grounds that it requests information within Defendant's knowledge, possession, custody or control. Without waiving and subject to the General and Specific Objections to Interrogatory No. 7, Named Plaintiff Jon Leighter responds as follows:

On several occasions, I asked the terminal manager for an additional route. I was told I would not be allowed an additional route because my monthly maintenance reports were not submitted timely or that, because of my second job delivering pizzas in the evenings, I would not have time to service an additional route. Due to the size of my route, in the last few months I have requested my route be split into two. I was told that my route was not large enough to warrant another route.

**INTERROGATORY NO. 8:**

If any Defendant or their agent made any oral fraudulent statements or misrepresentations of material fact, please state the content of any such statement(s), the circumstances surrounding any such statement(s), the date any such statement(s) was/were made, and the speaker(s) of any such statement(s).

**RESPONSE NO. 8:**

Without waiving and subject to the General and Specific Objections to Interrogatory No. 8, Named Plaintiff Jon Leighter responds as follows:

FedEx represented to me at the outset that I would be an independent contractor, I would have control over my business and I would be able to grow my business. However, FedEx treats me like an employee and exerts control over how I perform my work and my ability to grow my business.

Case 3:05-md-00527-RLM -CAN document 1006-9 filed 11/16/07 page 13 of 13

**INTERROGATORY NO. 9:**

Please state in detail the equitable, declaratory and injunctive relief that you seek, including whether you seek judgment that some or all putative class members should be classified and treated as employees and, if so, which putative class members should be treated as employees and for what purpose(s).

**RESPONSE NO. 9:**

Named Plaintiff Jon Leighter incorporates by reference the General Objections and Responses set forth above. This Named Plaintiff further objects to this Interrogatory because it calls for a legal opinion. Without waiving and subject to the General and Specific Objections to Interrogatory No. 9, Named Plaintiff Jon Leighter responds as follows:

I seek declaratory relief that all putative class members have been misclassified as employees and denied the benefits of employee status, and that Defendant's practice of treating drivers as employees but denying them the benefits of employee status is unlawful

I seek injunctive relief against Defendant's misclassification of class members as "independent contractors" so long as Defendant retains control over the manner and means by which class members perform their jobs as to render them employees, and to ensure that the legal classification of class members as "employees" or "independent contractors" is consistent with Defendant's treatment of, and retention of rights to control class members performance of their labor.

I seek rescission of the Operating Agreement and unjust enrichment or quantum meruit damages for the reasonable value of the services that I and other drivers have provided to FedEx Ground.

I also seek whatever additional equitable relief that the Court determines is fair and appropriate.

Dated: August 14, 2007

Respectfully submitted,

**HARWOOD FEFFER LLP**

By: ______________________
Peter W. Overs, Jr. (PO-4409)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.: (212) 935-7400

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450
Oakland, CA 94612
Tel.: (510) 272-0169

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900

**PLAINTIFF'S CO-LEAD COUNSEL**

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER
209 S.W. Oak Street, 5th Fl
Portland, OR 97204
Tel.: (503) 227-1600

Local Counsel for Plaintiffs

**VERIFICATION**

I, Jon Leighter, declare under penalty of perjury under the laws of the United States that I have read the foregoing and know that the responses to the interrogatories propounded to me are true and correct to the best of my knowledge.

Executed this 13 day of August, 2007 at Eugene, OR (City, State).

Jon Leighter

FOR REFERENCE ONLY

FedEx Ground

**POLICY-007**

# Policy: Contractor Relations

**Applies to:**

| X | FXG |
|---|---|
| X | FHD |

PGH Department Owner: Contractor Relations

**Policy**

FedEx Ground, as an authorized motor carrier, enters into lease and operating agreements, in compliance with the U.S. Department of Transportation Regulations pertaining to the Lease and Interchange of Vehicles, found at 49 C.F.R. Part 376, with independent contractor owner-operators to provide package pickup and delivery and/or linehaul services and vehicular equipment. These operating agreements, and their addenda, set forth the mutual obligations and objectives of FedEx Ground and the independent contractor owner-operators and must be adhered to by all officers, managers, agents and employees of FedEx Ground.

As set forth in the operating agreements, the independent contractor owner-operators are responsible for exercising independent discretion and judgment to achieve the business objectives and results specified in their agreements. *No officer, agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results.*

The operating agreements, their addenda, and attachments may not be modified, altered, changed, or amended in any way unless in writing and signed by both parties. All recommended changes, additions, or deletions to the operating agreements or the addenda and attachments thereto, including, but not limited to, adjustments to or deductions from settlement, must be submitted to the Senior Vice President, Contractor Relations. The Senior Vice President, Contractor Relations, will then be responsible for ensuring that the necessary approvals are obtained and that the approved changes, additions, or deletions are implemented and communicated.

All such changes, additions, or deletions must be reviewed and approved in writing, at a minimum, by the:

- Senior Vice President, General Counsel, FedEx Ground
- Corporate Vice President, Tax and Employee Benefits Law, FedEx Corporation
- President & CEO, FedEx Ground

The Senior Vice President, Contractor Relations, is also responsible for ensuring compliance with operating agreements and their addenda and attachments.

Any violation of this policy must be immediately reported to the Senior Vice President, Contractor Relations.

**Scope**

This document applies to the FedEx managers and employees responsible for its implementation.

*Continued on next page*

**Consequence**

Failure to comply with this policy may result in disciplinary action up to and including termination.

**Related documents**

Further information is contained in the documents listed below.

**Reference Materials:**

- *FedEx Ground Package System, Inc. Pickup and Delivery Contractor Operating Agreement and its addenda*
- *FedEx Home Delivery Standard Contractor Operating Agreement and its addenda*
- *FedEx Ground Package System, Inc. Linehaul Contractor Operating Agreement and its addenda*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | | |
|---|---|---|
| **EMILY CARYL LEMMINGS** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 05-2516 Ma/P** |
| **FEDEX GROUND PACKAGE SYSTEM, INC., Defendant.** | ) | |

---

**ORDER GRANTING`**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Emily Caryl Lemmings ("Lemmings") brings this action for hostile work environment sexual harassment[1] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq*., against Defendant FedEx Ground Package System, Inc. ("FedEx"). Before the court is FedEx's motion for summary judgment, filed on August 30, 2006 ("Def.'s Mem."). On October 11, 2006, FedEx filed a motion for dismissal with prejudice and/or for judgment in its favor as a matter of law pursuant to Rules 41(b) and 56(e) of the Federal Rules of Civil Procedure on the ground that Lemmings had

---

[1] In her January 12, 2007 response, Lemmings elected not to pursue her retaliation claim and acknowledged that FedEx is entitled to dismissal on the retaliation claim under Title VII and the THRA. Therefore, the only claim fully briefed by the parties and analyzed by the court is the sexual harassment claim.

failed to respond timely to FedEx's motion for summary judgment. After the court granted Lemmings' motion for an extension of time to file a response and entered an order allowing excess page limit, Lemmings responded to the summary judgment motion on January 12, 2007 ("Pl.'s Mem."), and FedEx filed a reply on January 5, 2007.[2] For the following reasons, FedEx's motion for summary judgment is GRANTED.

**I. Background**

The following facts are undisputed except where otherwise noted. Before Lemmings herself became a pick-up and delivery contractor for FedEx (a "contractor") in December 2004, she drove a delivery truck for Dale McCollum ("McCollum"), a FedEx contractor. (Emily Carolyn Lemmings Dep. at 101 & 171, Apr. 11, 2006.) McCollum is the sole owner of McCollum Delivery Service. (Id. at 27.)

Pursuant to FedEx's Pick-Up and Delivery Contractor Operation Agreement, a FedEx contractor is obligated to serve specific FedEx work areas, while remaining a business owner, owning her own delivery vans, leasing and owning equipment needed for picking up and delivering packages, and maintaining and fueling her own vans. (Id. at 17, 18, 27-28, 32-36, 88-89.) A contractor may retain her own driver or drivers and other staff

---

[2] Lemmings transmitted her proposed response to the court and to FedEx on December 19, 2006. During the December 8, 2006 final pretrial conference, the court directed FedEx to file its reply by January 5, 2007. Therefore, FedEx filed its reply before Lemmings filed her response.

to assist in performing her obligations under her agreement with FedEx. (Carlos Etheredge Dec. Ex. B ¶ 2.2, Aug. 30, 2006). If she chooses to do so, a contractor has sole discretion over the compensation, supervision, and disciplining of her staff. (Lemmings Dep. 22-24, 30-32.) The Internal Revenue Service recognizes contractors engaged by FedEx pursuant to operation agreements as independent contractors for tax purposes. (Tim Wright Decl. ¶¶ 3-4, Aug. 30, 2006; James E. Scapellato Decl. Ex. A, Preliminary Expert Report, June 30, 2006.)

McCollum hired Lemmings as a driver in February 2002 and later employed her as an administrative assistant. Lemmings considered him at all times to be her “boss.” (Lemmings Dep. at 57, 153, 79-81.) McCollum supervised Lemmings, who reported to him only, and McCollum determined Lemmings’ work area, job responsibilities, compensation, and vacation time. (Id. at 40, 42-45, 60-61.)

Until September 10, 2004, the date of the alleged incident, Lemmings found Duane Johnson, a FedEx Ground Service Manager (“Johnson”), to be friendly, and he had never harassed her. (Lemmings Dep. at 119-20.) Johnson never had a right to supervise or direct contractors or their drivers. (Etheredge Dep. at 45.) Lemmings acknowledges that Johnson never supervised her. (Pl.’s Mem. at 15, n.3.)

On the date of the alleged incident, which was a Friday,

when Lemmings jumped onto the transfer loading dock at the FedEx Memphis Terminal (the “Terminal”), where she normally performed her duties for McCollum, Johnson walked towards Lemmings and, while facing her, wrapped his arms around her back, lifted her up, and carried her backward several steps. (Lemmings Dep. at 121, 136-45.) Johnson’s hands did not touch any private part of Lemmings’ body. (Id. at 142-43.) The incident occurred between 7:29:09 a.m. and 7:29:18 a.m. (Id. at 140-42.) When Johnson picked her up, Lemmings allegedly told him to put her down (Id. at 141-42), although Christopher Johns, the only witness to the incident (“Johns”), did not hear her say anything. (Christopher Johns Dep. at 71, July 28, 2006.) After Johnson put Lemmings down, he allegedly licked her neck up to her ear, telling her “Think about me later, baby.” (Lemmings Dep. at 121, 143-44.) Johns did not notice the licking, and a security videotape that recorded the incident does not show the asserted licking. (Johns Dep. at 71.) The truck loading belt area where the incident occurred is about ten feet wide, about three feet of it occupied by belt machinery. (Id. at 17-19.) Lemmings states that, because she felt so embarrassed by the incident, she did not return to the loading dock until she thought no one was there. (Lemmings Dep. at 144-47.)

During the weekend of September 11-12, Lemmings did not report the incident, but she did discuss it with her boyfriend.

(Lemmings Dep. at 121, 145-53.) She did not call McCollum to report the incident immediately after it happened because he was out of town that weekend. (Id. at 148.) Lemmings states that she would typically call him only if “something serious . . . [were] wrong.” (Id. at 148-49.) Following the advice of her boyfriend, on Monday, September 13, Lemmings told McCollum about the incident, and he suggested she talk to Carlos Etheredge, the Terminal Senior Manager (“Etheredge”), which she did the same day. (Id. at 153-56.) Lemmings testified that she spoke to Etheredge about the incident in the morning (Id. at 154-56.), although Etheredge testified that the exchange took place in mid-afternoon. (Carlos Etheredge Dep. at 63, July 28, 2006.) Lemmings states that Etheredge told her he was not aware of FedEx’s procedures for handling sexual harassment complaints (Lemmings Dep. at 161.), although Etheredge denies this. (Etheredge Dep. at 25-30.) Later the same day, Etheredge requested a copy of a security surveillance videotape of the incident. (Etheredge Dep. at 62-71.)

On September 14, Etheredge interviewed Johnson, who admitted lifting Lemmings off of her feet, although he characterized the incident as playful. On September 15, Etheredge watched the videotape separately with Lemmings and Johnson. (Etheredge Dep. at 72-83.) Later the same day, Etheredge interviewed the only witness to the incident shown on the videotape, Johns, who

Case 3:05-cv-02526-RLM-CAN Document 100-4 Filed 06/15/2009 Page 6 of 22

confirmed that the physical contact had occurred. (Id. at 77-80; Johns Dep. at 55-60.) Johns told Etheredge that he had seen Lemmings turn her head away from Johnson when he lifted her up, appearing to try to get away from him. (Johns Dep. at 59-60.) Johns did not see Johnson lick Lemmings. (Id. at 55.) After first contacting Mark Kirkpatrick, FedEx's Regional Human Resources Manager, on September 16, Etheredge reviewed the videotape with Kirkpatrick after his return to town on September 17. (Id. at 87-91.)

During the week of September 13-17, Lemmings avoided Johnson, and he did not say anything to her or look at her. (Lemmings Dep. at 165-66.) On September 16, Lemmings called the FedEx sexual harassment hotline and was allegedly told that she should call the general customer service phone line instead because the hotline was for FedEx employees only. (Compl. ¶¶ 41-42.)

On Saturday, September 18, FedEx suspended Johnson for eight days pending the outcome of the investigation into the incident Lemmings had reported. (Etheredge Dep. at 91-95, 115.) FedEx counted Johnson's suspension against his vacation days, not resulting in any loss of pay. (Id. at 98-99.) After Johnson returned from his suspension on September 30, he was issued a warning letter, his hours were changed, and he was transferred to an area of the Terminal 400 yards from Lemmings' work site, part

of a different FedEx division and under a different management chain. (Id. at 97-105, 115-24.) Etheredge considered Johnson’s transfer a demotion because it diminished his prospects for a future promotion. (Id. at 98-100.) FedEx terminated Johnson in March 2005 after an unrelated sexual harassment incident was reported by a female FedEx employee. (Mark Kirkpatrick Dep. at 28, July 28, 2006.)

After taking a previously planned vacation starting on September 17, Lemmings returned to work on Monday, September 27. (Lemmings Dep. at 129-30, 165-67.) During FedEx’s investigation of the incident, FedEx asked Lemmings what she felt should be done to Johnson, and she told FedEx that the only solution acceptable to her would be Johnson’s immediate termination. (Id. at 175, 180-81; Etheredge Dep. at 96.) After his transfer, Johnson’s new work area at the Terminal was in a different part of the same transfer facility where Lemmings worked. There were no barriers or policies against movement of personnel between the two sites. (Etheredge Dep. at 18-19, 106-08.) Johnson’s new work hours overlapped Lemmings’ hours by about 30 minutes (Id. at 108-09, 115-16.), and Johnson had to walk past Lemmings’ work site to travel between the employee parking lot and his new work area. (David Munoz Jr. Dep. at 40, Aug. 1, 2006.)

After Johnson’s transfer, Lemmings continued to see him about once a week for about 10 or 15 minutes. (Lemmings Dep. at

110.) No words were ever exchanged between them. (Id. at 122-24.) Johnson was once within ten feet of Lemmings and she complained to Dave Munoz, a pick-up and delivery manager whom she perceived to be sympathetic, (Id. at 112-13, 122-24; Munoz Dep. at 41.), and to Mark Kirkpatrick. (Lemmings Dep. at 109.) Kirkpatrick told Lemmings that he had no authority to deal with her concerns and suggested she speak to Etheredge, who was responsible for resolving such issues. (Kirkpatrick Dep. at 6, 25-26.) After making these complaints, Lemmings saw Johnson once or twice more, as he was leaving the Terminal about 150 feet from where Lemmings parked her car. (Lemmings Dep. at 109-10; Munoz Dep. at 29-32, 40-42.) Once after the September 10 incident Johnson allegedly glared at Lemmings. (Lemmings Dep. at 124.)

On October 21, 2004, Lemmings timely filed a charge of discrimination and retaliation with the U.S. Equal Employment Opportunity Commission, which issued a notice of right to sue on April 21, 2005. (Compl. ¶¶ 50-51.)

Lemmings alleges that her work for McCollum required her to spend from half an hour to three hours at the Terminal every weekday. (Lemmings Dep. at 87-88.) Lemmings continued to work for McCollum in the same capacity as before the incident until December 2004 or January 2005, when she became a contractor herself with a pick-up and delivery location at the Terminal. (Lemmings Dep. at 79-81, 171.) Lemmings was a FedEx contractor

when she filed this action.

FedEx maintains a Zero Tolerance Policy that includes extensive reporting, both formal and informal, and investigative procedures for sexual harassment allegations. Employees who violate the policy are subject to discipline, up to and including termination. (Kirkpatrick Dec. ¶¶ 3-4.) Lemmings was aware of the policy and procedures. (Lemmings Dep. at 170-71.)

**II. Jurisdiction and applicable law**

This court has original jurisdiction over federal claims under Title VII pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the THRA claims pursuant to 28 U.S.C. § 1367(a).

Because the "stated purpose and intent of the [THRA] . . . is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 30 (Tenn. 1996) (citing Tenn. Code Ann. § 4-21-101(a)(1) (1991)), Tennessee courts use the same framework to evaluate the THRA claims as federal courts use to evaluate Title VII actions. See Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984). Therefore, this court's analysis of Lemming's sexual harassment claim is identical under Title VII and the THRA, and the court will apply federal law.

**III. Summary judgment standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted if the pleadings and evidence on file show that there is no genuine issue as to any material fact. LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986). The moving party can meet this burden by pointing out that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of her case. See Street v. J.T. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts establishing that there is a genuine issue for trial by showing that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989). The district court does not have the duty to search the record for that evidence. See InterRoyal Corp. v. Sponseller, 889 F.2d 108, 110–11 (6th Cir. 1989). The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in her favor. See id.

**IV. Analysis**

FedEx argues that it is entitled to summary judgment on Lemmings' hostile work environment sexual harassment claim because she was not its employee, but a driver retained by an independent contractor, because the incident was not sufficiently severe or pervasive, because Lemmings failed to take advantage of FedEx policies addressing sexual harassment, and because FedEx took prompt remedial action after Lemmings notified it of her allegations.

FedEx maintains that Title VII protections apply to employees only, pointing out that, at the time of the incident, Lemmings was employed directly by McCollum, a pick up and

delivery contractor who worked with FedEx pursuant to an operation agreement. The Internal Revenue Service formally recognized contractors like McCollum as independent contractors for federal income tax purposes. FedEx insists that Lemmings was not an indirect employee of FedEx because FedEx was not integrated with McCollum Delivery Service, in that FedEx and McCollum did not share operations, management, personnel control, or financial control. FedEx was not a joint employer of Lemmings because FedEx did not retain control over any of the terms or conditions of Lemmings’ employment and McCollum was not an agent of FedEx in establishing or implementing his employment practices, but was independently responsible for all employment-related decisions.

FedEx argues that Lemmings cannot meet the objective test of a hostile work environment because a single ten-second incident that did not unreasonably interfere with Lemmings’ work performance and was not physically threatening does not create an environment that a reasonable person would find hostile or abusive. FedEx points out that Lemmings herself did not subjectively regard her work environment as hostile because she did not call McCollum during the weekend immediately after the incident, although she admits that she would contact him when he was out of town if something serious were wrong. FedEx argues that it promptly took an appropriate remedial action once it

learned of the incident. Although FedEx points out that Johnson was never Lemmings' supervisor, and at most, he was her coworker, FedEx alleges that the Faragher v. City of Boca Raton, 524 U.S. 775, 808 (1998), supervisor affirmative defense applies to preclude FedEx's liability.

Lemmings argues that Title VII imposes liability on a defendant employer for unlawful employment conditions that affect any individual when the defendant controls the individual's access to employment, even if no direct employer-employee relationship exists. Lemmings asserts that FedEx controlled Lemmings' workplace because Lemmings could not perform her duties for McCollum, her immediate employer, without entering the Terminal. Lemmings argues that she need not show that she was an employee, either direct or indirect, of FedEx.

Lemmings avers that, given the totality of the circumstances, she establishes a *prima facie* case of sexual harassment because Johnson's continued presence in her work area during the weeks after the incident, which had included forcible intimate physical contact in a small area, constituted harassment severe enough to create an objectively and subjectively hostile work environment. According to Lemmings, FedEx's remedial measures were neither prompt nor effective and did not constitute a good-faith response to the incident because Johnson continued to come into contact with Lemmings and was not demoted or forced

to accept lower compensation.

**A. Employment relationship**

Title VII protections apply only to a defendant employer's direct or indirect employees. Although the statute refers to protecting "individuals," courts have limited Title VII's protections to "employees" only. Birch v. Cayahoga County Probate Court, 392 F.3d 151, 157 (6th Cir. 2004). Federal employment discrimination statutes, including Title VII, protect employees, not independent contractors. See, e.g., Shah v. Deaconess Hosp.,355 F.3d 496, 499 (6th Cir. 2004). The term "employee" means "an individual employed by an employer." 42 U.S.C.A. § 2000e(f).

The Sixth Circuit applies the common law test of agency, as opposed to the economic reality test, to determine whether a plaintiff is a defendant's employee or an independent contractor. Id. Critical factors which courts analyze include the right to control the means by which assignments are completed, the skills required of the plaintiff, the defendant's right to assign projects, control of the method of work, the power to hire and to determine how to compensate the plaintiff, and the tax treatment of the relationship. Id. (citing Simpson v. Ernst & Young, 100 F.3d 436, 443 (6th Cir. 1996)).

Lemmings admits that she was not a direct employee of FedEx. The evidence is not sufficient to raise an inference of an

indirect employment relationship. FedEx and McCollum did not share their operations, equipment, work assignments, management, personnel control, accounting practices, or financial control. FedEx did not retain any influence over any of the terms or conditions of Lemmings' employment by McCollum. McCollum was neither an employee nor an agent of FedEx in establishing and implementing his employment practices. He was instead independently responsible for all employment-related decisions under the operation agreement. Lemmings served at the pleasure of McCollum, who was responsible for hiring, supervising, compensating, and firing her. Lemmings reported directly to McCollum and was his immediate subordinate. McCollum Delivery Service was treated by the IRS as an independent contractor for tax purposes.

**B. *Prima facie* case of hostile work environment**

Even if Lemmings could present sufficient evidence to establish an indirect employment relationship with FedEx, she would fail to meet the elements of a *prima facie* case of sexual harassment. A plaintiff may establish a Title VII violation by proving that the sexual harassment created a hostile or abusive work environment. Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). To establish a hostile work environment claim, an employee must show that: (1) she belongs to a protected class; (2) she was subjected to an unwelcome sexual harassment;

(3) the harassment complained of was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2006) (citing Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999)); see also Bowman, 220 F.3d at 462-63.

The first three Randolph factors appear undisputed. As a female, Lemmings is a member of a protected class. See Valentine-Johnson v. Roche, 386 F.3d 800, 814 (6th Cir. 2004). She was subjected to unwelcome touching, allegedly accompanied by a lick and a lewd remark from a male coworker.

To establish that the harassment complained of was based on her sex, the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment. Williams v. Gen. Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999). Harassing behavior need not be sexually explicit or sexual in nature; any harassing behavior motivated by sex-based discriminatory animus will satisfy the "based on sex" requirement. Id. Johnson allegedly licked Lemmings on her neck, while restraining her, and told her, with sexual connotations, to think of him. The alleged conduct was arguably sexual in nature because of the alleged statement and the physically invasive lick. Even if it were not overtly sexual in nature, based on the record, it appears that Lemmings would not have been subjected to

the same treatment but for her sex because Johnson did not subject males to any inappropriate behavior and was later terminated for sexually harassing another female.

Discrimination creates a hostile work environment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Randolph, 453 F.3d at 733 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The test must be met both from the plaintiff's subjective position and from the objective position of a reasonable person. Id.

The court must consider the totality of the circumstances in determining whether harassment is sufficiently severe or pervasive to constitute a hostile work environment. Id. Specifically, the court must look at the "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Bowman, 220 F.3d at 463 (citing Harris, 510 U.S. at 23); see also Valentine-Johnson, 386 F.3d at 814.

The Sixth Circuit has frequently addressed the extent of harassment necessary to survive a motion for summary judgment. In Burnett v. Tyco Corp., 203 F.3d 980 (6th Cir. 2000), the court affirmed summary judgment for defendant employer where the

plaintiff alleged three specific instances of offensive behavior by her supervisor during a period of five months, including the manager's placement of a cigarette pack inside her brassiere strap, his offering a cough drop to her while commenting "Since you lost your cherry, here's one to replace the one you lost," and his comment "Dick the malls, dick the malls, I almost got aroused" on seeing plaintiff's Christmas sweater that read "Deck the malls." Id. at 981.

In Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000), the court upheld summary judgment for a defendant where a supervisor made several dirty jokes in the plaintiff's presence that were not aimed at her, made a sexual advance related to the plaintiff's evaluation, referred once to her as "hot lips," and made isolated comments about her state of dress.

The court reversed a grant of summary judgment to defendant employer, however, in Williams v. Gen. Motors Corp., 187 F.3d 553, 559 (6th Cir. 1999), where the plaintiff had been subjected to constant obscene language, had been told to "back up" while she was bending over, had her supervisor put his arms around her neck while he was making an obscene comment, had been locked into the warehouse where she worked, and had been told "you can rub up against me anytime" by a colleague while he was staring at her breasts. The court found these incidents, collectively, not

Case 2:05-md-02523-RLM-CAN Document 1006 Filed 05/12/07 Page 19 of 22

merely crude, offensive and humiliating, but also physically invasive. Id.

The harassment alleged here is both less frequent and less severe than the factual circumstances not only in Williams, but also in Burnett and Morris. Isolated incidents of harassment are generally not actionable unless they are egregious. Bowie v. Advanced Ceramics Corp., 72 F. App'x 258, 264 (6th Cir. 2003); see also Randolph, 453 F.3d at 733. Other circuits have occasionally found a hostile work environment based on a single incident, but only if it involved a significant physical violation, see, e.g., Ferris v. Delta Air Lines, Inc., 277 F.3d 128 (2d Cir. 2001) (rape); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243-44 (10th Cir. 2001) (choking, biting, undressing); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1072 (10th Cir. 1998) (being pulled by the hair while a coworker grabbed plaintiff's breast and put his mouth on it), or was committed by a supervisor, see, e.g., Quantock v. Shared Marketing Servs., Inc., 312 F.3d 899 (7th Cir. 2002).

Lemmings' feelings of embarrassment and humiliation, without more, are not enough to constitute harassment, particularly because they were incited by a coworker not in a position of authority. Lemmings testified that, before the day of the incident that lead to this lawsuit, she considered Johnson friendly and not disrespectful. Johnson and Lemmings worked

together only rarely, for short periods of time. Johnson's behavior was inappropriate and offensive, but it did not involve a significant physical violation, it was not prolonged or repeated, and it was not perpetrated by someone in a position of authority or with whom Lemmings had to interact frequently. Johnson's behavior was not sufficiently severe to create a hostile work environment from the objective position of a reasonable person. Although Lemmings appears to have been subjectively offended by the incident, she did not stop working, she did not complain to McCollum or to FedEx immediately after the incident, and she continued to work for McCollum and then as a contractor for FedEx.

The fifth Randolph factor is employer liability. Different liability standards apply depending on whether the perpetrator is the plaintiff's supervisor or coworker. Williams, 187 F.3d at 560-61. When a hostile work environment claim is based on a coworker's, as opposed to supervisor's, actions, Faragher factors do not apply. Id. at 561. Even after a hostile work environment has been established, "for an employer to be liable for the sexual harassment of an employee by a coworker, the harassed employee must show that the employer both (1) knew or should have known of the harassment, and (2) failed to take prompt and appropriate corrective action." McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005) (quoting EEOC v. Harbert-Yeargin,

Inc., 266 F.3d 498, 518 (6th Cir. 2001)). When an employer has fashioned a response to allegations of harassment by the plaintiff's coworker, the employer will only be liable if its response "manifests indifference or unreasonableness" given the facts the employer knew or should have known. McCombs, 395 F.3d at 353 (citing Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 872 (6th Cir. 1997)).

Johnson exercised no authority over Lemmings. Indeed, Lemmings admits that he was not her supervisor. When Lemmings informed FedEx of the incident, management began to investigate her allegations the same day, interviewed employees, and subsequently warned and transferred Johnson. Lemmings testified that she found Johnson offensive again only once, when he glared at her. Lemmings' disagreement with FedEx's treatment of Johnson after the investigation of the incident does not make FedEx's response indifferent or unreasonable.

Lemmings has not presented sufficient evidence to raise a genuine issue of material fact about the lack of an employment relationship between Lemmings and FedEx, about the lack of a hostile work environment, or about FedEx's liability.

**V. Conclusion**

FedEx's motion for dismissal with prejudice and/or for judgment in its favor as a matter of law pursuant to Rules 41(b) and 56(e) of the Federal Rules of Civil Procedure is DENIED as

MOOT.

Because Lemmings has elected not to pursue her claim of retaliation, the retaliation claim under Title VII and the THRA is DISMISSED.

Lemmings has failed to set forth specific facts establishing a *prima facie* case of sexual harassment. Reading the evidence as well as all inferences drawn from it in the light most favorable to Lemmings, there is no material factual dispute about the lack of an employment relationship between Lemmings and FedEx, about the lack of a hostile work environment, or about FedEx’s liability. Therefore, FedEx’s motion for summary judgment on the sexual harassment claim under Title VII and the THRA is GRANTED.

So ordered this 15th day of May 2007.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

# Exhibit 114

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2004 FEB 11 P 4:55

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

RECEIVED
FEB 13 2004
GALLAGHER CALLAHAN & GARTRELL

Robert Mailhot

v. Civil No. 02-257-JD

FedEx Ground Package System, Inc.

O R D E R

Robert Mailhot brought suit under the Americans with Disabilities Act ("ADA") against his former employer, FedEx Ground Package System, Inc. Because the ADA protects only employees, Mailhot's employment status was a threshold issue for his ADA claim. The trial was bifurcated to address the issue of employment status before the ADA claim.

On February 10, 2004, the jury found that Robert Mailhot was not an employee of FedEx. Therefore, the necessary employment status prerequisite is lacking for Mailhot's ADA claim. Because no further proceedings are necessary in this case, the pending motions in limine (documents no. 33, 34, 35, 40, 42) are terminated as moot.

The clerk of court shall enter judgment for the defendant, FedEx Ground Package System, Inc., in accordance with the jury's finding and this order, and shall close the case.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

February 11, 2004

cc: Stacey Heitzenrater, Esquire
Andrea K. Johnstone, Esquire
Eleanor H. MacLellan, Esquire

# DECLARATION OF KEVIN B. MARTIN

I, Kevin B. Martin, am over the age of 18 and make this declaration based on personal knowledge.

1. I am an independent contractor for FedEx Ground in Newport, Oregon, which is located along the central Oregon coast about 125 miles south of the mouth of the Columbia River along Highway 101.

2. Before becoming a contractor for FedEx Ground, I spent fourteen years working as an employee in the Lincoln County school system as a bus driver, a warehouse delivery driver and, for my last three years, as a school district courier. As district courier, I averaged 40 stops a day delivering packages, interdepartmental mail, and other items to and from every school facility in district, including administrative and maintenance facilities.

3. After years of staffing nearly all work internally, including courier work, food services, custodial, and school busing, the school district came under increasing budgetary strain, and in 2003 I learned I would be laid off. My supervisor liked my work as district courier. But due to job outsourcing, a custodian, with more seniority whose job had been contracted out, had the right under our union agreement to "bump" me out of my job.

4. At the time I had just gone from paying my sister $500 a month in rent to live on my grandmother's farm near Newport to buying a home 15 miles in-land in Siletz, with a $1300 mortgage.

5. I got a job driving for an independent contractor who owned the FedEx Ground route primarily servicing Newport and South Beach. I drove his truck and delivered and picked up FedEx Ground packages for him for two years making $700 a week. He was responsible for maintenance, paid the operating expenses, and I just drove. In those two years before I started working for myself, I probably delivered to every business and most residences located along a 22-mile stretch of Route 101, and inland and rural areas as well, because FedEx Ground delivers to both.

6. In June 2005, the contractor whose route I was servicing decided to sell his route. I bought his Newport/South Beach route for $13,000 using a 6.9%, no collateral loan offer sent to me in the mail by a credit card company. I did not buy his delivery truck because it had over 200,000 miles on it, and I wanted something more reliable.

7. I contacted a company in Portland instead and leased a new, $44,000 P-1200 delivery truck. The truck has more cargo capacity than I need even today and a durable diesel engine which gets better fuel mileage than a gas engine.

Case 3:05-md-00527-RLM CAN document 1006-13 filed 11/16/07 page 2 of 3

8. FedEx Ground packages arrive every weekday morning at around 6:00 a.m. via a line haul truck that comes over the mountain from the FedEx Ground terminal in Portland and pulls into a gravel lot across from the Dairy Queen in Toledo, eight miles inland. If the line haul drivers are new and unfamiliar with our operations they pass right by and wind up at the beach.

9. From that lot we operate out of a stationary truck trailer with four cargo doors equipped with underground wiring that provides light and powers an unmanned fax machine that rarely rings. The closest FedEx Ground terminal and manager is 90 miles away in the state capital. The manager might come over once a month.

10. My driver and I offload packages from the line haul truck through the stationary trailer and then load them on my trucks. We glance at familiar customer addresses, divide packages between the two trucks, and sort them more on each truck based delivery schemes in our head that we find most efficient. After we load we go out and make our deliveries rarely contacting Salem.

11. I go out of my way to make it easy for businesses along my route to use FedEx Ground rather than any other shipper. I make a point to give local businesses, even emerging home businesses, the FedEx Ground sales number so they can establish an account and I give them my cell number so that they can call me directly if they have a package they need to ship. My route has grown from 80 to 100 plus stops a day since June 2005.

12. In 2006, the Fed Ex Ground manager in Salem approached FedEx Ground contractors here about our running an evening shuttle back to Salem loaded with outgoing packages. I agreed to do the job, went out and leased a $40,000 step van, and hired a driver I know who was out of work at the time to run to Salem (and back empty) five nights a week. This makes my company, KBM Delivery Co., $650 or so a week and helps build the FedEx brand along the central Oregon coast. The local Walmart as well as small coastal galleries, and specialty shops along my route, and outlet stores and business on other local routes that I do not own now have a competitive alternative to UPS. They can ship their merchandise by FedEx Ground with next day delivery to Portland and other locations in the Northwest.

13. With the money I make running the shuttle, I have been paying my driver to service the southernmost parts of my Newport/South Beach route. Customers throughout my route are now getting their packages delivered and picked up earlier than in years past, and I am free to get home by 3:30 p.m. while making considerably more than the $23,000 that I made while I was employed by the school district.

14. I like being an independent contractor even with the risks it presents and the pressures that come with my being responsible for getting the job done no matter what happens. As an independent contactor, I won't have my contract terminated for doing a good job, which is more security than the union gave me as an employee-driver after fourteen years on the job.

15. I am positioned with two trucks and a driver to meet the anticipated increase in FedEx Ground business in my territory, and I am interested in buying the route that runs immediately to the south of my route, which the owner has indicated some interest in selling.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct, to the best of my knowledge. Executed on this 2nd day of March 2007, in Siletz, Oregon.

Kevin B. Martin

**DECLARATION OF LORAN ROELL**

I, Loran Roell, declare and state the following:

1. I am an independent contractor with FedEx Ground in Williston, Vermont. I have been an independent contractor here since October, 2005.

2. I am originally from Virginia. I moved to the area when I attended the New England Culinary Institute. I was working as a chef in Burlington, Vermont, when a friend of mine asked me to begin driving one of his FedEx Ground routes in approximately 2002. I drove this route out of the Williston terminal for approximately one and a half years.

3. I liked driving, so I became a temporary driver for a couple of months after I stopped driving my friend's FedEx Ground route.

4. I then began driving another FedEx Ground route that was owned by another independent contractor in the Williston terminal. I drove this route for approximately two years.

5. Sometime near the end of my experience driving the first FedEx Ground route, I began driving FedEx Home Delivery routes on Saturdays to earn extra money.

6. In approximately October, 2005, the independent contractor for whom I initially drove moved to Massachusetts. He offered me his route and 14 foot box truck for a total of approximately $10,600. I bought it and became and independent contractor with FedEx Ground.

7. I financed the truck and the route through my bank, but this was my choice. I had other options regarding financing, but I did not choose to exercise them.

8. As I had been driving for several years, I understood the difference between being an employee and being an independent contractor. The terminal manager went through the Operating Agreement with me, and I signed it.

9. I participate in the Flex Program and I flex informally among other FedEx Ground contractors and with FedEx Home Delivery contractors. I also plan my own routes and determine when I arrive at the terminal. I usually get in between 7:00 am and 8:00 am, and I am usually finished running my route by 5:00 pm or 5:30 pm.

10. I do not plan on adding any additional routes in the near future. I like only driving and managing one route.

Case 3:05-md-00527-RLM -CAN document 1006-14 filed 11/16/07 page 2 of 2

11. I definitely feel that I run my own business, and I like it that way. I much prefer being an independent contractor to being an employee, as it is much more lucrative. There is much more potential to earn more money being an independent contractor as opposed to being an employee.

I declare, under penalty of perjury of the laws of the State of Vermont, that the foregoing is true and correct to the best of my knowledge. Executed this 2 day of Aug, 2007, in Williston, Vermont.

Loran Roell

**DECLARATION OF MICHAEL HILL**

I, Michael Hill, declare and state the following, based on my own personal knowledge:

1. I am the owner and operator of Hill Distribution, Inc., a corporation that provides transportation services to FedEx Ground in Charlotte, North Carolina.

2. I first contracted with FedEx Ground in October 2000. I currently own seven (7) routes and either lease or loan fifteen (15) trucks. Before then, I loaded trucks as a part-time employee for FedEx Ground for about six months before I heard that they were in need of independent contractors.

3. I had prior experience running a business before I contracted with FedEx Ground. For 21 years, I was an independent contractor for the Charlotte Observer handling route sales.

4. I wanted to become an independent contractor for FedEx Ground because it was a great opportunity. I have always felt very strongly about "pay-for-performance" so becoming an independent contractor worked with my philosophy. An employee is compensated for hours worked whereas an independent contractor is compensated for work that you actually do. I just could not imagine being an employee. An independent contractor has more flexibility, and does not have a set schedule.

5. When I signed on with FedEx Ground, I had plans to grow my business. At the time, I wanted to service the entire north side of Mecklenburg County, something I have since accomplished.

6. I like being an independent contractor with FedEx Ground. I like the satisfaction of knowing that my drivers and I do a good job. I also like the customer contact and I have developed some great business relationships. The customers call my drivers and me directly and we have grown close. For example, one of my drivers broke his back in an accident recently and we received numerous calls from customers to check in on him.

7. I would not want my status changed to be an employee. I do not think I would last long as an employee. I do not like anybody looking over my shoulder telling me how and when to do things. I feel that I am in a partnership with FedEx so I would not want to give FedEx control over my business, my drivers, or me, which would be the case if I became an employee.

8. Since I first contracted with FedEx Ground, my business has really grown. I started with one route, which then split into two routes. I then purchased another route from another independent contractor, which included the truck. My business continued to grow so I purchased additional trucks. I then continued to buy and trade routes with neighboring independent contractors and I recently purchased a pick-up and delivery

("P&D") spot contract. In total, I now own seven (7) routes. Each route I purchased was negotiated individually with the other independent contractor.

9.      Occasionally I have sold pieces of my routes but normally I only acquire pieces, stops, and routes. I usually do not get rid of pieces, stops, and routes. I wheel and deal all the time with the other contractors as I grow my business. Nevertheless, I am able to make changes to my routes whenever I want to adjust them.

10.      With all of my fifteen (15) trucks, I have decided where to purchase or lease them and I decide where to have them maintained.

11.      I decided to incorporate because my accountant advised me to.

12.      I usually hire my drivers through referrals but mostly they are cousins. FedEx does not manage my drivers and FedEx comes to me if they have issues with any driver. I usually assign my drivers to a work area and as long as they complete their work, I do not interfere any further.

13.      I am able to set my own schedule. I always come in and leave whenever I want. Furthermore, if I have a full staff, I do not even run a route. I usually only cover vacation periods and sick days. If I do run a route, I take breaks when I want and I conduct personal business during the day if I need to. Also, on hot summer days, I occasionally go home in the afternoon to take a nap.

14.      I have numerous scheduled pickups and/or appointment deliveries. At the beginning, the customers set up pick and delivery times with FedEx Ground but now I have been able to customize those times to our liking. That is a good aspect of running a route for a long period of time. Our customers work with us and are flexible with the schedule. I have also met with customers at a particular location instead of going to their usual place of business. In this case, the customer usually has some order that has to go out and instead of having to return to their place of business, they are willing to meet us at a mutually convenient location. Either way, the customer calls my drivers and me directly.

15.      I also believe that many of my customers have a loyalty to me, as opposed to FedEx Ground. I try to get more business from my customers and I try to build my business in that regard. It does help my business being associated with FedEx Ground but for the most part customers just care about price.

16.      In planning on how to run my routes, logistically I try to adjust daily routes based on the package volume and as I feel necessary. I try not to make it too hard on any one of my drivers, and usually assign about 100 pieces. Nobody tells me how to load my trucks or run my routes.

17.      At the beginning, I learned to service my route by trial and error and based on traffic patterns. Each route is a little bit different and I just had to get out and do it.

Accordingly, I control how I service my routes. FedEx Ground would not have the first clue how to run my routes and therefore does not tell me how to service it.

18. My income has increased since I began with a single route. However, I am not satisfied with my current income because I am never satisfied. I just want to keep growing and acquire additional routes.

19. The people who filed the lawsuit do not speak for me. I do not even know what they are talking about. Why would they want to be employees? They just do not realize what they are asking for. If my status did change, the only way I would stay is if I were part of management. I would not want to be in a truck running all day. I just do not see myself staying with FedEx Ground as an employee.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge.

Executed on this 8th day of August 2007, in Charlotte, North Carolina.

Michael Hill

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FedEx Ground PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) Case No. 3:05-MD-527-RM ) (MDL 1700)

COPY

DEPOSITION OF MARGARET GIBSON
(Videotaped)

Phoenix, Arizona
August 9, 2007

By: Terese M. Heisig/RPR, CSR, CPE
Certified Court Reporter
Certification Number 50378

only 24 hours in any one day.

Q. Did you mention earlier that at some point you added a second route?

A. Once again --

Q. Did you mention earlier that some time you added a second route?

A. Yes, I had.

Q. When did you add that second route?

A. The second route became mine in -- I think it was March. Let's see, yes, March of 2006.

Q. Prior to March of 2006, were you personally providing pickup and delivery services every day?

A. Yes, for -- wait a minute. Me, personally?

Q. You, personally.

A. No. A good portion -- for at least six weeks, four weeks, I hadn't delivered myself, personally. Rachel drove for me, and Jeremy Fields drove for me.

Q. Why would they drive for you?

A. I had an injury to my right hand, so they drove for me.

Q. Did you compensate Rachel?

A. Yes, I did. It wasn't -- let's just say, it was sufficient to meet a bill.

Q. Which bills?

A. I can't recall. I think Mark called me. Mark was given my number through a mutual friend.

Q. Was Mark already a qualified driver?

A. No. Mark went through the FedEx training course.

Q. Did you have to pay for that?

A. Yes, I did.

Q. How much did you pay?

A. I think the course was like -- what is it? $200 a week, or something like that. I can't recall.

Q. A week?

A. I think so.

Q. How many weeks did he have to go?

A. It was just two weeks. Just two weeks, like, 10 days, or something like that.

Q. When did you terminate your relationship with FedEx Ground?

A. That occurred March -- I'm sorry, July 5th or 6th, something like that. This was -- it was not a mutual termination. The termination came from FedEx.

Q. So from this period from December 28th through July 5th or 6th, can you give me an estimate of how many days you personally provided service on either of your routes?

A. Let's see, I drove Apache Junction May and

June. I drove Litchfield Park -- I drove -- let me think. I can't remember the length of time which I drove Litchfield Park actually, but I did drive Apache Junction in May and June.

Q. Is that around the same time you -- did you train Mark on Apache Junction during that May and June time period?

A. No. I trained -- I trained Mark in Apache -- Litchfield Park -- oh, my God. I'm sorry.

Q. Thank you.

When did you train him in Litchfield Park?

A. I think it was March and April. I think it was March and April.

Q. And did he provide service in Litchfield Park after you trained him?

A. Yes.

Q. Every day?

A. Yes, I think so.

Q. Okay. So if he is providing service to Litchfield Park after April -- or starting in April and afterwards, and you were providing service to Apache Junction in May and June, were Rachel and Jeremy still involved?

A. Oh, no, no. Jeremy had moved on. He had actually gone to work for the contractor who told him he

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

COPY

In Re: MDL-1700 FedEx Group )
Package System, Inc., )
Employment Practices )
Litigation (No. II) )
________________________________) CN: 3-05-MD-527-RLM-CAW
) (MDL-1700)
This Document Relates to: )
)
Whiteside, et al. versus )
FedEx Ground Package System, )
Inc., et al., )
No. 3:07-CV-326 (NC) )
________________________________)

VIDEOTAPE DEPOSITION OF JOHN CHESTER BROWN, JR.
(Taken by Defendant(s))
Asheville, North Carolina
Tuesday, August 14, 2007

Reported in Stenotype by
Dorothy J. M. McGrath, RPR, Shorthand Reporter
Transcript Produced by Computer-aided Transcription

operating -- did you -- did you continue operating your route, you know, like every day that home delivery provided service?

A. Until 2007.

Q. Until 2007? When in 2007 did you stop doing that?

A. I don't remember exact date. It was early -- early on.

Q. So January?

A. I'd say February because that's when I had the DOT inspection. Somewhere in February, I guess.

Q. Okay. And so -- and so what did you do in February?

A. I started looking for other jobs.

Q. And -- and is it correct that you arranged for -- Mr. Britt is his name?

A. Barry Britt, yes.

Q. Yeah. Mr. Britt to service your route for you?

A. Yes.

Q. Okay. And how did you set that up?

A. He had been a temp during Christmas season and lived in Brevard, and I knew him, knew his parents and grandparent, and so I asked him, I said, I'm wanting to find another job, and I can't do it

working like this. Will you run my route for me. So he was looking for work, and I was looking for a way out, so it worked out for both of us.

Q. Okay. And how much did you pay Mr. Britt?

A. $600 a week.

Q. Is that something -- is that an agreement that the two of you came to?

A. Well, yeah.

Q. Okay.

A. Just between me and him, yes.

Q. Was terminal management involved at all in -- in you subcontracting your route to Mr. Britt or having him cover your route, however you want to put it?

A. They didn't like it, but -- but he had already been approved as -- and had worked as a temp for three months so --

Q. Why didn't they like it?

A. As in any situation when you add someone new, they don't do as good a job as an experienced person.

Q. Okay. And how -- did a terminal manager explain to you that they didn't like the situation, or how did you -- how did you come by that information?

A. I recall a part of this conversation.

Q. Okay.

A. I'm not saying this word-for-word, but yes.

Q. Understood. And this says -- this is at a point that -- that Mr. Britt was having trouble as -- as was explained to terminal management to you, Mr. Britt was not servicing your route properly and --

A. That's correct.

Q. -- and you were having to -- to deal with it. You were working at this time; is that -- or at least so it reflects here; is that -- is that correct?

A. That's correct.

Q. Okay. And who were you working for?

A. Postal Fleet Services.

Q. Okay. So you had this job as of -- when did you start working for Postal Fleet Services?

A. I'm still just part-time fill in when they need me --

Q. Right.

A. -- but I'm not sure of the month, but it was 2007, May, I guess, April, May.

Q. So you -- you had recently -- you --

Mr. Britt was running your route as of sometime in February; is that accurate? Is --

A. I don't remember the exact date, but that was in that time frame.

Q. Okay. And you spent about -- you were looking for a job at the time when you were not running your route? Is that accurate as well?

A. Yes.

Q. And so around, you know, April, May, of 2007 you had found part-time work at Postal -- with Postal Fleet Services?

A. That's correct.

Q. Were you make any money off the route at this point?

A. No, sir.

Q. Okay. Were you losing money?

A. Yes, sir.

Q. And why didn't you just stop operating the route?

A. I did eventually.

Q. Is that -- is that ultimately how you terminated your -- did you just give 30 days' notice or just --

A. I gave -- I originally gave 30 day's notice, and then in January, Marcus approached me

about buying my route and began discussion on trying to sell it, and after two or three months, Marcus said, well, this is not going to go through, they're not going to approve it. So at that time, Barry was running my route every day for me, and I was what -- I was working part time for the Postal and then looking for work, full-time work, and if he needed a day off, I would drive the route. If he wanted a day off, I would drive that day to give him a day off. And by the time I paid him and my truck expenses, I was going in the -- in the hole.

Q. How much?

A. About $1,000 a month.

Q. And during this time, you were looking to sell the route?

A. Yes.

Q. And --

A. As a matter of fact, Barry Britt who was driving the route wanted to buy the route. His daddy, Donald Britt, offered to give him the money to buy my route.

Q. And couldn't go through because as you -- I believe you said that Mr. Britt's service record wasn't -- wasn't --

A. Well, it didn't go through because

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *All Coordinated Cases* ) | CHIEF JUDGE MILLER |

**AMENDED DECLARATION OF RAY A. WOLF IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Ray A. Wolf, declare:

1. I am an Information Technology Specialist for FedEx Ground Package System Inc. ("FedEx Ground"). I have been employed by FedEx Ground for 15 years and have held my current position as an Information Technology Specialist since November 2006. My primary responsibilities include Project Management, technical and business solution design for the Contractor/Driver Administration and Settlement system, which includes the use of pick-up and delivery operational information collected through scanner systems. I have personal knowledge of the matters set forth in this declaration, which are true and correct, and if called to testify to the facts stated herein, I could and would do so under oath.

2. Prior to June 2004, FedEx Ground did not centrally track who performed service each day. Contractors and drivers logged into scanners manually using a contractor

identification number. For contractors with only one work area, that number was the contractor's social security number. For contractors with multiple work areas, that number was the contractor's social security number +1 for his first route, +2 for the second route, and so on. No matter who actually performed service, the driver entered the contractor identification number assigned to that particular work area into his scanner. Contractors and drivers were supposed to sign a daily settlement record each day which should have indicated who actually performed service, and those records were supposed to be maintained in hard copy at each terminal.

3. In June 2004, FedEx Ground began centrally tracking who actually services each work area, each day. Scanners were programmed to prompt the driver to enter an identification number unique to that driver. This new scanner program was not fully deployed until December 2004. This information is now captured by an automatic procedure that allows contractors and drivers to log into scanners using their identification badges.

4. FedEx Ground is aware of several potential problems with the accuracy of its centralized records generated by contractors' and their drivers' use of identification badges to log into scanners. Drivers do not always use their own badges. For example, it is my understanding based on empirical data and personal field management interviews that a frequent practice when a contractor or driver has forgotten his badge is to use someone else's badge to log into the scanner. The system does not prevent an individual from logging onto the system twice. I estimate that approximately 5% of FedEx Ground's centralizes database records are inaccurate as a result of such practices. FedEx Ground continues to work with contractors to ensure that information entered into scanners is accurate.

5. When another driver performs service on behalf of a contractor, FedEx Ground does not centrally track why the contractor did not personally perform service on that particular day.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of May, 2009, at Moon Township, Pennsylvania.

Ray A. Wolf

State of Pennsylvania )
) to wit:
County of Allegheny )

**TAKEN, SWORN TO** and **SUBSCRIBED** before me, a Notary Public, this **12TH** day of MAY ASP ~~**MARCH**~~, **2009**.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Amy Pinchotti, Notary Public
Moon Twp., Allegheny County
My Commission Expires Nov. 26, 2012
Member, Pennsylvania Association of Notaries

**AMY PINCHOTTI**, Notary Public

case 3:05-md-00527-RLM -CAN document 1008 filed 11/17/07 page 1 of 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Gibson*, 3:07-cv-272-RLM-CAN (AZ);
*Magno*, 3:07-cv-322-RLM-CAN (CT);
*White*, 3:07-cv-411-RLM-CAN (GA);
*Givens*, 3:07-cv-324-RLM-CAN (LA);
*Vargas*, 3:07-CV-325-RLM-CAN (MA);
*Decesare*, 3:07-CV-120-RLM-CAN (NV);
*Whiteside*, 3:07-cv-326-RLM-CAN (NC);
*Leighter*, 3:07-cv-328-RLM-CAN (OR); and
*Gruhn*, 3:07-cv-412-RLM-CAN (VT).

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S REQUEST FOR ORAL ARGUMENT ON PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground"), by counsel, pursuant to Rule 7.5 of the Local Rules for the N.D. Ind., respectfully requests that the Court permit oral argument on Plaintiffs' Motions for Class Certification in the above-captioned cases. In support of this Request, FedEx Ground states as follows:

1. FedEx Ground incorporates herein its arguments in favor of oral argument as set forth in its Requests for Oral Argument in the first three waves of class certification briefing. *See, e.g.,* Docket Entry No. 717 (third wave request for oral argument).

2. In addition, FedEx Ground submits that oral argument is particularly appropriate in light of the Court's October 15, 2007 Order granting certification in the Kansas

(*Craig*) case, so that the parties may address the effect of that ruling and the Court's reasoning on the remaining class certification motions.

      3.    FedEx Ground respectfully requests approximately one day of argument for these nine cases. That total is the equivalent of allotting only ten to fifteen minutes per case, per party—a modest amount given all that is at stake.

      Wherefore, defendant FedEx Ground Package System, Inc. respectfully requests that the Court set oral argument on the plaintiffs' class certification motions in the nine above-captioned cases.

Dated:   November 16, 2007        Respectfully submitted,

       By:   s/Thomas J. Brunner
           Thomas J. Brunner

       John H. Beisner
       Robert M. Schwartz
       Evelyn L. Becker
       O'MELVENY & MYERS LLP
       1625 Eye Street, NW
       Washington, DC 20006-4001

       Thomas J. Brunner
       Alison G. Fox
       BAKER & DANIELS LLP
       205 West Jefferson Blvd., Suite 250
       South Bend, IN 46601

       *Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of November, 2007, I filed the foregoing ***Request for Oral Argument*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

Anne T Regan
atr@zimmreed.comand

Shannon Liss-Riordan
sliss@prle.com

Bruce H. Meizlish
brucelaw@fuse.net

Deborah R. Grayson
drgrayson@fuse.net

Edward R. Forman
eforman@ee.net

Eileen S. Goodin
egoodin@bnhmlaw.com

George A. Barton
gbarton@birch.net

John S. Marshall
marshall@ee.net

Mary D. Walsh-Dempsey
mdempsey@omalleylangan.com

Matthew M. Houston
mhouston@whesq.com

Monica Ferraro
mferraro@bnhmlaw.com

Peter D. Winebrake
pwinebrake@winebrakelaw.com

Robert E. DeRose, II
bderose@bnhmlaw.com

Robert K. Handelman
rhandelman@bnhmlaw.com

Sanford A. Meizlish
smeizlish@bnhmlaw.com

Steve D. Larson
slarson@ssbls.com

and I further certify that I have mailed by United States Postal Service the document to the following non CM/ECF participant:

Hart Lawrence Robinovitch
Zimmerman Reed PLLP
14646 N Kierland Blvd Suite 145
Scottsdale, AZ 85254-2762

Anthony J. Pantuso, III
PANTUSO LAW FIRM LLC
204 Broad St., 2nd Fl.
Milford, CT 06460

Harold L. Lichten
PYLE ROME LICHTEN EHRENBERG &
LISS-RIORDAN PC-MA
18 Tremont St., Ste. 500
Boston, MA 02108

Richard Eugene Hayber
HAYBER LAW FIRM LLC
221 Main St., St. 400
Hartford, CT 06106

Mary Donne Peters
Michael J. Gorby
GORBY REEVES & PETERS
Two Ravinia Dr., Ste. 1500
Atlanta, GA 30346-2104

Salvatore G. Gangemi
GANGEMI LAW FIRM PC
82 Wall St., Ste. 300
New York, NY 10005

Todd J. O'Malley
O'MALLEY & LANGAN PC
426 Mulberry St., Ste. 104
Scranton, PA 18503

Phyllis Norman
LAW OFFICES OF GEORGE A.
BARTON, P.C.
800 W. 47th St., Ste. 700
Kansas City, MO 64112

Andrew J. Kahn PHV
MCCRACKEN STEMERMAN &
HOLSBERRY
1630 S. Commerce St., Ste. A-1
Las Vegas, NV 89102

R. James Lore, Esq.
102-1 Commonwealth Court
Cary, NC 27511

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING &
SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

James J. Dunn, Jr.
MICKENBERG DUNN KOCHMAN
LACHS & SMITH
29 Pine Street
Burlington, VT 05402-0406

By: s/Thomas J. Brunner

BDDB01 4947273v1

case 3:05-md-00527-RLM-CAN document 1016 filed 11/20/07 page 1 of 14

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL COORDINATED CASES

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**FEDEX GROUND PACKAGE SYSTEM, INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR STAY OF CLASS NOTICE AND ADDITIONAL CLASS CERTIFICATION RULINGS PENDING RESOLUTION OF RULE 23(F) APPEAL**

**<u>TABLE OF CONTENTS</u>**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..........................................................................................................................2

I. STAYS OF CLASS NOTICE AND OTHER PROCEEDINGS ARE COMMONLY GRANTED PENDING RULE 23(F) PETITIONS ..........................................................2

A. A Stay Of Class Notice Pending Determination Of A Rule 23(f) Petition Is The Rule, And Not The Exception ......................................................2

B. Plaintiffs Are Unable To Cite A Single Case Holding That Class Notice Should Not Be Stayed While A Rule 23(f) Petition Is Pending ............................4

II. A STAY WOULD AVOID CONFUSION TO CLASS MEMBERS, UNNECESSARY EXPENSE, AND WOULD NOT PREJUDICE PLAINTIFFS...........5

A. The Potential Harm From Denying A Stay Is Significant ....................................6

B. No Harm Would Result From Granting A Stay....................................................6

CONCLUSION .......................................................................................................................9

**TABLE OF AUTHORITIES**

**CASES** **Page**

*Andrews v. Chevy Chase Bank*,
474 F. Supp. 2d 1006 (E.D. Wisc. 2007)....3, 8

*Beale v. Edgemark Financial Corp.*,
No. 94 C 1890, 1995 WL 631840 (N.D. Ill. Oct. 23, 1995)....4, 5

*Beesley v. Int'l Paper Co.*,
No. 06-cv-703-DRH, 2007 WL 2458228 (S.D. Ill. Aug. 24, 2007)....3, 4

*Blair v. Equifax Check Serv., Inc.*,
181 F.3d 832 (7th Cir. 1999)....5, 8, 9

*Castano v. Am. Tobacco Co.*,
162 F.R.D. 112 (E.D. La. 1995)....6

*Cavin v. Home Loan Ctr., Inc.*,
469 F. Supp. 2d 561 (N.D. Ill. 2007)....4, 5

*Chavez v. IBP, Inc.*,
No. CT-01-5093-EFS, 2002 WL 32145647 (E.D. Wash. Dec 23, 2002)....3

*Dujanovic v. MortgageAmerica, Inc.*,
CV98-TMP-0235-S, 1999 U.S. Dist. LEXIS 17231
(N.D. Ala. April 21, 1999)....3, 6, 8

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996)....3

*In re Farmers Ins. Co., Inc. FCRA Litig.*,
No. CIV-03-158-F, MDL 1564, 2006 WL1042499 (W.D. Ok. April 13, 2006)....4, 5

*In re Lorazepam & Clorazepate Antitrust Litig.*,
208 F.R.D. 1 (D.D.C. 2002)....3, 6, 7

*In re Sumitomo Copper Litig.*,
262 F.3d 134 (2d Cir. 2001)....5

*In re Urethane Antitrust Litig.*,
No. 04-MD-1616-JWL, 2006 WL 3021126 (D. Kan. Oct. 23, 2006)....3, 7, 8, 9

*Lively v. Dynergy, Inc.*,
No. 07-2073 (7th Cir. filed May 8, 2007)....3, 4

*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*,
No. 98 CV 1492, 2000 WL 1424931 (E.D.N.Y. Sept. 26, 2000)....7

*Sanders v. John Nuveen & Co.*,
463 F.2d 1075 (7th Cir. 1972)....7

*Smith v. Shawnee Library Sys.*,
60 F.3d 317 (7th Cir. 1995)....7

*Spano v. Boeing Co. Employee Benefits Plan Comm.*,
No. 06-cv-743-DRH, 2007 WL 2688456 (S.D. Ill. Sept. 10, 2007)....3, 4

# TABLE OF AUTHORITIES

**CASES** **Page**

*Wachtel ex. rel. Jesse v. Guardian Life Ins. Co. of Am.*,
453 F.3d 179 (3d Cir. 2006)....................3

*Zeno v. Ford Motor Co., Inc.*,
480 F. Supp. 2d 825 (W.D. Pa. 2007)....................3

**RULES**

Advisory Committee Notes on Fed. R. Civ. P. 23(f)....................1, 6

**OTHER AUTHORITY**

Manual for Complex Litigation (Fourth) (2004) ....................1, 2, 3, 7

Annotated Manual for Complex Litigation (Fourth) (2007) ....................2

**PRELIMINARY STATEMENT**

Plaintiffs argue that a stay pending the outcome of a Rule 23(f) petition is rare, but it is not, and the authorities they cite do not support that assertion. Plaintiffs fail to address the numerous cases FXG cited where courts have granted such stays, including stays of the entire proceedings, as opposed to the more limited stay sought here. More importantly, Plaintiffs fail to cite a single decision denying a motion for a stay of dissemination of **class notice** pending determination of a Rule 23(f) petition. The case law confirms what the *Manual for Complex Litigation* states: When a defendant requests a stay pending determination of a Rule 23(f) petition, "[t]he district court should ordinarily stay the dissemination of class notice to avoid the confusion and the substantial expense of renotification that may result from appellate reversal or modification after notice dissemination." *Manual for Complex Litigation* (Fourth) § 21.28, at 284 (2004).

Even if limited stays were not regularly granted—and they are—a stay of this case is particularly appropriate for two reasons. First, because this Court has indicated that class certification decisions in the other 37 putative class actions pending in the MDL will be made with reference to the Court's certification of the Kansas and ERISA classes, the Seventh Circuit's ruling could potentially impact those actions as well.

Second, the stay FXG seeks will not interfere with the other progress of this case. Given that FXG has already filed all of its class certification opposition briefs, the request is limited to a stay of: (1) the class notice process as to the ERISA and Kansas classes; (2) Plaintiffs' reply briefing on the nine cases that comprise the "fourth wave," and (3) rulings by the Court on the pending certification motions. Plaintiffs' concerns about the effect of the delay are overstated, given that "[i]t is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal." *1998 Advisory Committee Notes* on Fed. R. Civ. P. 23(f).

case 3:05-md-00527-RLM-CAN document 1016 filed 11/20/07 page 6 of 14

For these reasons, and as explained below and in FXG's opening brief, the Court should grant FXG's request for a brief stay of the class notice process and further class certification briefing and rulings pending the outcome of its Rule 23(f) petition.

**ARGUMENT**

**I. STAYS OF CLASS NOTICE AND OTHER PROCEEDINGS ARE COMMONLY GRANTED PENDING RULE 23(F) PETITIONS.**

Plaintiffs argue that a stay is not automatic (Opp. at p. 4), but FXG never argued that it was. The decision whether, and to what extent, to grant a stay pending determination of a Rule 23(f) petition is within the Court's discretion. The parties' disagreement concerns the circumstances in which courts should exercise that discretion.

**A. A Stay Of Class Notice Pending Determination Of A Rule 23(f) Petition Is The Rule, And Not The Exception.**

A "district court should ordinarily stay the dissemination of class notice to avoid the confusion and the substantial expense of renotification that may result from appellate reversal or modification after notice dissemination." *Manual for Complex Litigation* (Fourth) § 21.28, at 284 (2004). Plaintiffs ignore this statement of the law set forth in FXG's opening brief, yet purport to quote the *Manual for Complex Litigation* for the opposite proposition that, "[i]n the ordinary case, a stay will not be appropriate." (Opp. at p. 4.) Plaintiffs' quotation results in seemingly inconsistent statements of the law; but the confusion arises because they took comments from an annotated version of the *Manual* out of context.[1] The discussion surrounding the "comments" passage Plaintiffs quoted relates to the question of whether to stay <u>all proceedings</u>. It may be that such a stay would be inappropriate in an ordinary case, but as the

[1] Plaintiffs' citation is not from the *Manual for Complex Litigation* (Fourth) 2004 published by the Federal Judicial Center, but from the "Author's Comments" section of an Annotated version of the *Manual for Complex Litigation* published by Thomson West. *Annotated Manual For Complex Litigation* (Fourth) at 376 (2007). As the Annotated version relied on by Plaintiffs acknowledges, "author commentary and annotations are included in a manner designed to distinguish them from the FJC material." *Id.* at xxiii.

*Manual* states in the section FXG quoted, "[t]he district court *should ordinarily stay the dissemination of class notice*." *Id.* (Emphasis added.) Because FXG seeks only a limited stay—of class notice, fourth wave reply briefing, and class rulings in the other putative class actions—FXG's motion should be granted as a matter of course.

The case law confirms stays of class notice are regularly granted once a Rule 23(f) petition is filed, and that complete stays are often appropriate as well. *See e.g.*, *In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2006 WL 3021126, at *2 (D. Kan. Oct. 23, 2006) ("In cases involving a Rule 23(f) appeal the court should ordinarily stay the dissemination of class notice to avoid the confusion and substantial expense of renotification that may result from appellate reversal or modification."); *Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 828 n.1 (W.D. Pa. 2007) (staying notice to class); *Wachtel ex. rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 183 (3d Cir. 2006) (same); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1077 (6th Cir. 1996) (same); *see also Andrews v. Chevy Chase Bank*, 474 F. Supp. 2d 1006 (E.D. Wis. 2007) (granting request for a stay of all proceedings pending resolution of appeal of class certification to Seventh Circuit); *Chavez v. IBP, Inc.*, No. CT-01-5093-EFS, 2002 WL 32145647 (E.D. Wash. Dec. 23, 2002) (granting stay of all proceedings); *In re Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1 (D.D.C. 2002) (same); *Dujanovic v. MortgageAmerica, Inc.*, CV98-TMP-0235-S, 1999 U.S. Dist. LEXIS 17231, at *3-4 (N.D. Ala. Apr. 21, 1999) (same).

Plaintiffs ignore the majority of cases relied on by FXG and attempt to distinguish only two: *Beesley v. Int'l Paper Co.*, No. 06-cv-703-DRH, 2007 WL 2458228 (S.D. Ill. Aug. 24, 2007), and *Spano v. Boeing Co. Employee Benefits Plan Comm.*, No. 06-cv-743-DRH, 2007 WL 2688456 (S.D. Ill. Sept. 10, 2007). Plaintiffs argue that *Beesley* and *Spano* are inapplicable here because stays were granted pending the determination of a Rule 23(f) petition that had been taken up by the Seventh Circuit in a third case, *Lively v. Dynergy, Inc.*, No. 07-2073 (7th Cir. filed May 8, 2007). Yet the same issue of the petition in one matter affecting another is present

case 3:05-md-00527-RLM-CAN document 1016 filed 11/20/07 page 8 of 14

here—albeit on an much larger scale because FXG's Rule 23(f) petition could impact 37 other coordinated putative class actions. By contrast, in *Beesley* and *Spano*, the courts issued stays *sua sponte* even though the *Lively* case impacted just one class action in each case. The only other difference on which Plaintiffs rely is that the Seventh Circuit had already granted the petition for review in *Lively*, whereas here the Seventh Circuit has not yet made its decision. Given the number of cases in the MDL that could be affected by the Seventh Circuit's ruling, the fact that the courts in *Beesley* and *Spano* stayed those cases *sua sponte* in light of the potential that they would be impacted by another case strongly suggests that the limited stay sought by FXG (which could impact 37 other coordinated cases) should be granted.

**B. Plaintiffs Are Unable To Cite A Single Case Holding That Class Notice Should Not Be Stayed While A Rule 23(f) Petition Is Pending.**

In contrast to the authorities FXG cited in which stays have been granted—either of all proceedings or, at a minimum, of notice to the class—Plaintiffs failed to cite even one case denying a motion for a stay of class notice pending determination of a Rule 23(f) petition. Instead, Plaintiffs seek to rely on two lines of cases, both of which are inapposite.

First, Plaintiffs cite cases dealing with stay motions generally, but not in the context of a pending Rule 23(f) petitions. *See Beale v. Edgemark Financial Corp.*, No. 94 C 1890, 1995 WL 631840 (N.D. Ill. Oct. 23, 1995) (declining stay pending motion to dismiss); *In re Farmers Ins. Co., Inc. FCRA Litig.*, No. CIV-03-158-F, MDL 1564, 2006 WL1042499 (W.D. Ok. Apr. 13, 2006) (declining stay pending motion to dismiss); *cf. Cavin v. Home Loan Ctr., Inc.*, 469 F. Supp. 2d 561, 574 (N.D. Ill. 2007) (granting stay where summary judgment had been granted in favor of the defendant).[2] Plaintiffs' reliance on these cases is misplaced because they concern the

[2] Plaintiffs cite *Beale* for the proposition that notice should be given to the class as soon as possible after a class is certified. But that general proposition has no application here, where the question is whether a stay of notice should be granted pending determination of a Rule 23(f) petition. Rule 23(f) expressly contemplates that stays may be granted by the court in

propriety of a stay pending decision of a dispositive motion—not pending decision of an appeal of the class certification decision. Unlike *Beale*, *In re Farmers Insurance*, and *Cavin*, the issue here is the potential confusion that may result if the Seventh Circuit modifies or reverses the certification order.

Second, Plaintiffs cite cases dealing with Rule 23(f) petitions, but not with stay motions. *See Blair v. Equifax Check Serv., Inc.*, 181 F.3d 832 (7th Cir. 1999); and *In re Sumitomo Copper Litig.*, 262 F.3d 134 (2d Cir. 2001). While the proceedings were not stayed pending determination of the Rule 23(f) petitions in those cases, the holdings of both of those cases are rulings on the merits of the Rule 23(f) petitions themselves—not on the related stay motions. Accordingly, whatever value they add to the question of the regularity of granting a stay is dicta. Beyond that, the cases offer no guidance as to the circumstances in which a stay should be granted, and thus are of no assistance here.

## II.    A STAY WOULD AVOID CONFUSION TO CLASS MEMBERS, UNNECESSARY EXPENSE, AND WOULD NOT PREJUDICE PLAINTIFFS.

The arguments in favor of staying class notice proceedings *as a matter of course*—avoiding "the confusion and the substantial expense" associated with re-notification—strongly support the limited stay FXG seeks. The case for a stay is much stronger here, however, in light of the potential for impact on 37 other coordinated cases. Indeed, even under the standard used to determine whether a court should grant a stay of *all proceedings*—a broader stay than FXG seeks here—"the probability of error in the class certification decision is high enough that the cost of pressing ahead in the district court exceed[s] the cost of waiting." *Blair*, 181 F.3d at 835.

---

such circumstances, and with good reason: Until there is finality with respect to the class certification decision, it may be premature to give notice.

**A. The Potential Harm From Denying A Stay Is Significant.**

In an attempt to downplay the prejudice that would result from the denial of a stay, Plaintiffs erroneously re-characterize FXG's arguments. Plaintiffs assert that the motion is based on FXG's assumption that the class notice will be worded to prejudice FXG, but they note that the notice will be subject to this Court's pre-approval. Plaintiffs miss the point: The prejudice will not result from the particular wording of any notice, but from the confusion and expense associated with multiple notices. In the 38 class actions comprising this MDL, putative plaintiffs may be members of classes in multiple cases. If other classes are certified, it will be confusing enough for class members to sort through class notices for the cases in which they may or may not be members. But it will be unduly confusing and prejudicial if corrective notices are issued in one or more of the cases, such that class members need to sort through multiple, inconsistent class notices in each of several cases.

Plaintiffs also assert that "the cost of notice here is extremely small" (Opp. at p. 7), but do not establish what "extremely small" translates to in dollars or demonstrate that it is "extremely small" in comparison to the comparable costs in the numerous cases in which stays have been granted based in part on cost. *See, e.g.*, *Castano v. Am. Tobacco Co.*, 162 F.R.D. 112, 117-18 (E.D. La. 1995); *In re Lorazepam*, 208 F.R.D. at 6; *Dujanovic*, 1999 U.S. Dist. LEXIS 17231 at *2-4. Plaintiffs also ignore the potential for compounding of that expense that again results from the fact that there are 38 putative class actions at issue here.

**B. No Harm Would Result From Granting A Stay.**

Plaintiffs have not identified any harm to the putative class members in delaying class notification pending determination of FXG's Rule 23(f) petition. A stay will not, as Plaintiffs claim, "vacate" this Court's scheduling order, and should not materially delay any of the proceedings. "It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal." *1998 Advisory Committee Notes* on Fed. R. Civ. P.

23(f); *see also Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, No. 98 CV 1492, 2000 WL 1424931, at *2 (E.D.N.Y. Sept. 26, 2000) ("Rule 23(f) was shaped so appellate consideration of a class certification decision would not prolong the proceedings."). Accordingly, it is likely that a stay will be brief—unless the Seventh Circuit takes issue with the propriety of class certification, which would make the need for a stay all the more acute. Such a brief stay is immaterial in relation to the potential impact of the Seventh Circuit's ruling and the confusion that could result from corrective- or re-notification. *See In re Urethane*, 2006 WL 3021126, at *2 (possible harm to class arising from delay in receiving notice is outweighed by potential confusion if class certification order is vacated or modified); *In re Lorazepam*, 208 F.R.D. at 6 (a short delay "when juxtaposed to the potential magnitude of a decision by the Court of Appeals on the issues before it, is simply *de minimis*. . . .").

Even assuming that a stay would delay judgment (which seems doubtful given that Rule 23(f) proceedings move expeditiously), any damages recovered by Plaintiffs can and will compensate them for that delay. This Court held in denying Plaintiffs' recent motion for a preliminary injunction that, "[i]f the plaintiffs or putative class members are losing their jobs for an illegal reason, those losses are compensable by an award of damages." (Oct. 12, 2007 Order at p. 22.) That being the case, Plaintiffs' contention that a brief delay in issuing class notice somehow is an "irreparable" harm is wrong.[3]

Finally, Plaintiffs claim that failure to send the notice would violate the class members' "due process" rights to notice (Opp. at p. 3), citing *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 321 (7th Cir. 1995) and *Sanders v. John Nuveen & Co.*, 463 F.2d 1075, 1085 (7th Cir. 1972).

[3] Plaintiffs see the need for re-notification as a *good* thing, suggesting that if a corrective notice is required, "it will have an advantageous result of informing more class members about their rights in this litigation." (Opp. at p. 7.) That is not logical and the authorities are uniformly to the contrary. *See, e.g.*, *Manual for Complex Litigation* (Fourth) § 21.28 (2004); *In re Urethane Antitrust Litig.*, 2006 WL 3021126 at *2.

But those cases deal with the question of whether class members must be given notice at all, not the question of when that notice need be given. FXG has not argued for dispensing with notice. If the Seventh Circuit denies FXG's Rule 23(f) petition, putative class members will be given appropriate notice. But it would be a mistake to begin now the time-consuming and expensive process of providing class notice, deciding whether to certify 37 additional class actions, and providing class notice in those cases if they are certified when a brief stay will allow the Seventh Circuit an opportunity to weigh in on this important issue.

Even under the standard used to determine whether a court should grant a stay of *all proceedings*, here "the probability of error in the class certification decision is high enough that the cost of pressing ahead in the district court exceed[s] the cost of waiting." *Blair*, 181 F.3d at 835. While Plaintiffs assert that FXG has not "demonstrated any 'probability of error' of this Court in certifying the ERISA and Kansas class actions" (Opp. at p. 9.), this assertion is belied by FXG's Rule 23(f) petition, a copy of which FXG has provided to the Court. The Court need not conclude that FXG has a substantial likelihood of success in its 23(f) petition. Instead, if there is some possibility of error, the court must balance the relative hardships to the parties to determine whether the balance tips in favor of a stay. *See Dujanovic*, 1999 U.S. Dist LEXIS 17231, at *2-3 (though believing it had ruled correctly, court stayed matter because of the waste of "time money and effort" if the court of appeals disagreed); *In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2006 WL 3021126, at *2 (D. Kan. Oct. 23, 2006) (staying dissemination of class notice even though "the court does not believe Chemtura's appeal has a substantial likelihood of success on the merits"); *Andrews*, 472 F. Supp. 2d at 1010 (same). Here, for all of the reasons set forth in FXG's Rule 23(f) Petition, there is some possibility of error that, in light of the substantial prejudice to all parties if the Court does not stay certification proceedings and

the minimal harm to Plaintiffs in the event of a stay, the balance of hardships tips heavily in favor of a stay.[4]

**CONCLUSION**

For the foregoing reasons and the reasons set forth in its opening brief, FXG respectfully requests that this Court GRANT its motion for a stay pending a ruling on its Rule 23(f) petition.

Dated: November 20, 2007

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Victor H. Jih
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

[4] Further, where, as here, "the justification for interlocutory review is contributing to the development of the law, it is less important that the district judge's decision is shaky." *Blair*, 181 F.3d at 832. As the Seventh Circuit has noted: "[l]aw may develop through affirmances as well as through reversals." *Id.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of November, 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION<br>---<br>THIS DOCUMENT RELATES TO:<br><br>*ALL ACTIONS* | Cause No. 3:05-MD-527-RM<br>(MDL 1700) |

**PLAINTIFFS' CORRECTED "EXHIBIT A" FILED IN**
**SUPPORT OF THEIR MOTION FOR APPROVAL OF CLASS NOTICES**

Plaintiffs respectfully submit "Corrected Exhibit A," annexed hereto, in support of their motion for approval of class notices (Document 917-3). The only change made in the "Corrected Exhibit A" is inclusion of a reference to the identity of local counsel in Kansas. Defendants do not have any objection to the substitution of the "Corrected Exhibit A."

Dated: November 29, 2007

Respectfully submitted,

HARWOOD FEFFER LLP

[signature]

Robert I. Harwood (RH-3287)
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400

case 3:05-md-00527-RLM-CAN document 1017 filed 11/29/07 page 2 of 20

LEONARD CARDER, LLP
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

**PLAINTIFFS' CO-LEAD COUNSEL**

case 3:05-md-00527-RLM-CAN document 1017 filed 11/29/07 page 3 of 20

[CORRECTED]

# EXHIBIT A

# If You are or Have Been a FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees, and denied the benefits and protections of federal and state worker protection laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.

• In this particular case, plaintiffs have asserted claims for unpaid employee benefits under FXG's employment benefit plans under the federal Employee Retirement Income Security Act of 1974 (ERISA). In this case, Plaintiffs seek to recover benefits under several of FXG's employee benefit plans, including health and dental insurance, 401(k) contributions, life and supplemental security insurance, and long and short term disability benefits. The other lawsuits before the court arise from alleged violations of the federal Family and Medical Leave Act, state employment statutes pertaining to wage payment and expense reimbursements, and state common law claims. You may also be eligible to participate in those cases. **This notice pertains solely to the ERISA action.**

• The Court has allowed the lawsuit to be a nationwide class action on behalf of:

> All persons who: 1) entered or will enter into an FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were entitled to ERISA Plan benefits, absent their mischaracterization as independent contractors.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2008 (30 days after the date that notice issued).** FXG is prohibited by law from asking or telling you to exclude yourself from this action, discouraging you from participating in any way and from expressing an opinion as to whether you should or should not remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified about how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract because you chose to participate in this case, or to retaliate against you or any other pick-up and delivery driver in any other way simply because you chose to participate in this lawsuit. FXG retains those rights it has under the Operating Agreement you signed.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ........ **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT** ........ **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS** ........ **PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS** ........ **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU** ........ **PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL** ........ **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION** ........ **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Craig, et al. v. FedEx Ground Package System, Inc., et al.*, Civil Action No. 3:05-cv-00530-RLM-CAN (KS).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, Sylvia O'Brien, Dominic Lupo, Ronald Perry, and Alan Pacheco) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas. These two courts will resolve the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;

- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Second Amended Complaint in the action originally brought in Kansas (*Craig v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530) includes claims for certain employee benefits, such as health and dental insurance, and retirement and disability benefits, under ERISA.

The specific ERISA plans maintained by FXG include: (1) FXG Ground Package System, Inc. And Certain Affiliates Wealth Accumulation 401(k) Plan; (2) Group Life and Supplemental Life Plan For Employees of FXG Ground Package System, Inc., (3) Ground Benefits Plus Short-Term Disability Plan; (4) Group Long Term Disability Plan For the Employees of FXG Ground Package System, Inc.; (5) FXG Ground Package System, Inc. Medical, Dental and Vision Care Plan; and (6) Dependent Care Account of FXG Ground Package System, Inc.

Plaintiffs contend that they and others who have driven for FXG are entitled to certain employment benefits under the employee benefit plans maintained by FXG for its employees. Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs claim that, but for the misclassification of the P&D drivers as independent contractors, they would have been entitled to participate in these employee benefit plans.

Plaintiffs seek monetary damages for all members of the class who have been denied health, dental and vision insurance, disability benefits and the right to be part of FXG's 401(k) plan under the above-listed employee benefit plans, a declaration from the court that they are entitled to participate in these benefit plans in the future, and reasonable attorneys' fees and costs. You can read the Plaintiffs' Second Amended Complaint, which includes the ERISA allegations, at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that class members are independent contractors and therefore not eligible for any employee benefits. FXG's Answer to the complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

### 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.

### 9. Is there any money available now?

No money or benefits can be collected now because the Court has not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 10. Am I part of the class?

As noted above, the Court has certified an ERISA class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) during the class period to provide package pick-up and delivery services pursuant to the operating agreement; and
- You would be eligible for ERISA plan employment benefits, absent the mischaracterization of your employment status as an independent contractor.

Additionally, you must meet these conditions and provide pick-up and delivery services during one of the appropriate class periods:

- You are a resident of any state, other than Kansas, and worked as a P&D driver for FXG for some period of time from January 9, 2001 to the present; or
- You are a resident of Kansas and worked as a P&D driver for FXG for some period of time from February 11, 1998 to the present.

### 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue separately or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [ERISA CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your

Exclusion Request postmarked by **MONTH DATE, 2008 (30 days after notice issues)**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as Class Counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Kansas District Court. There has been no date set for the trial of this matter. Because of the nature of the ERISA lawsuit, a Judge will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class Counsel will present the case for the Plaintiffs, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

# If You are or Have Been A FedEx Ground or FedEx Home Delivery Pickup and Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed 48 lawsuits against FXG in 37 states alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of state laws. These cases have all been joined together to be heard by Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana.

• In this particular case, plaintiffs have asserted claims for violation of the Kansas Wage Payment Act, including the failure to reimburse drivers for expenses and other wage claims, to rescind the Operating Agreement and to declare what drivers rights are under Kansas law. There are several other lawsuits arising from alleged violations of the federal law, including the Employee Retirement Income Security Act of 1974 (ERISA) and the Family and Medical Leave Act, as well as various other lawsuits based on state law other than Kansas. You might be eligible to participate in those cases. **This notice pertains solely to the Kansas action.**

• The Court has allowed the lawsuit to be a statewide class action on behalf of:

> All persons who: 1) entered or will enter into an FXG Ground or FXG Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since February 11, 1998 to provide package pick-up and delivery services pursuant to the Operating Agreement ; and 3) were dispatched out of a terminal in the state of Kansas.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2008 (30 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG is not permitted to non-renew or terminate your contract, to retaliate against you or any other pick-up and delivery driver in any other way simply because you chose to participate in this lawsuit.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ........ **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT** ........ **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS** ........ **PAGE 6**
10. Am I part of this Class?
11. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS** ........ **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU** ........ **PAGE 8**
15. Do I have a lawyer in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL** ........ **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION** ........ **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Craig, et al. v. FedEx Ground Package System, Inc. et al.*, Civil Action No. 3:05-cv-00530-RLM-CAN (KS).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Leo Rittenhouse, Jeff Bramlage, Lawrence Laible, Kent Whisler, Mike Moore, Keith Berry, Matthew Cook, Neal Bergkamp, Heidi Law, and Sylvia O'Brien) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Kansas. These two courts will resolve issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers who interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

## 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employee of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the class?

As noted above, the Court has certified a Kansas state class and everyone who fits the following description is a class member. You must meet the following requirements to be included in the ERISA class:

- You entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time since February 11, 1998 to provide package pick-up and delivery services pursuant to the operating agreement; and
- You were or are presently dispatched out of a terminal in the state of Kansas.

## 11. I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the Class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the Class, you should keep your records pertaining to your relationship with FedEx. Likewise, if your mailing address changes, please notify the claims administrator or Class Counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Class. If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occurs at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this class action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *In re FedEx Ground Package System, Inc. Employment Practices Litigation*, Cause No. 3:05-MD-527 RM (MDL-1700) [KANSAS CLAIMS]. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2008**, to: XXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, local counsel is Law Offices of George A. Barton, P.C., 800 West 47th Street, Suite 700, Kansas City, MO, 64112, telephone (816) 300-6252.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 17. How will the lawyers be paid?

If Class Counsel obtains money or benefits for the Class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants Class Counsels' request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the Class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Kansas District Court. There has been no date set for the trial of this matter. A jury in Kansas will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the Class.

### 19. Do I have to come to the trial?

Case 3:05-md-00527-RLM-CAN document 1017 filed 11/29/07 page 20 of 20

You do not need to attend the trial. Class Counsel will present the case for the Plaintiffs, and FXG will present the defenses. You or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Order and Opinion Certifying the Class, the Second Amended Complaint that the Plaintiffs submitted, the Defendant's Answer to the complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: XXXXXXXXXX, P.O. Box XXX, XXXX, XX XXXXX-XXXX.

DATE: MONTH 00, 0000.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On October 26, 2007, Defendant Fedex Ground Package System, Inc. (Fedex) filed a motion to stay. Plaintiffs filed an objection to that motion on November 13, 2007. For the following reasons, Fedex's motion is **DENIED**.

On August 10, 2005, this multidistrict litigation case was transferred to the Northern District of Indiana pursuant to 28 U.S.C. § 1407 to perform consolidated pretrial proceedings. This Court set deadlines for the filing of motions for class certification and dispostive motions. Motions for class certification were to be in three waves, each approximately three weeks apart.

After several modifications to this Court's initial deadlines, on March 12, 2007, Plaintiffs filed their first motions for class certification. By July 9, 2007, the briefing on the first three waves of class certification was completed.

On June 29, 2007, this Court also set deadlines for a fourth wave of class certification motions for cases that had been transferred in since the parties began briefing the first three waves for class certification. As of this date, the fourth wave is not yet fully briefed.

On October 15, 2007, this Court entered an opinion and order that granted Plaintiffs' motion to certify two classes: a national ERISA class, and a class for the state of Kansas. This

Court ordered the parties to submit an agreed proposed notice, or separate proposed notices if they could not agree, to be sent to class members by October 31, 2007. This Court also ordered the parties to file supplemental statements by November 14, 2007, regarding pending motions for class certification in this Court's October 15, 2007, order.

On October 26, 2007, Fedex filed a motion to stay. Fedex seeks to stay: all briefing on class certification briefing for wave four, filing of its supplemental statements as ordered by this Court on October 15, 2007, any rulings by this Court on pending class certification motions, and the class notice process. Fedex claims that a stay is appropriate because it filed a Fed. R. Civ. P. 23(f) appeal of this Court's October 15, 2007, opinion and order. Fedex claims that there is no reason to continue with briefing or notice to the absent class members until the 7th Circuit has approved, disagreed with, or modified this Court's order regarding the certification of the Kansas and ERISA classes. On November 13, 2007, Plaintiffs filed their response in opposition to this motion, and on November 20, 2007, Fedex filed its reply.

Fedex seeks to stay its obligation to file response briefs to wave four and to file a statement regarding other pending motions for class certification. However, as of this date, Fedex has already filed both its responses to wave four and its statements. Consequently, Fedex's request to stay briefing is **DENIED AS MOOT**.

With regards to staying decisions on the remaining pending motions for class certification and staying the class notice procedure, this Court does not find that a stay is appropriate. Once this Court certifies a class, it must direct class members the best notice practicable. See Fed. R. Civ. P. 23(c)(2)(B). The notice must state the nature of the action, the definition of the class certified, the class claims and issues, the right to opt out, the right to have

counsel enter an appearance, and the binding effect of a class judgment.  Id.  Fedex seeks to stay this process until the 7th Circuit resolves the current appeal of this Court's October 15, 2007, order.  While Fed. R. Civ. P. 23(c)(2) mandates that notice is to be sent, it does not specify when such notice must issue.  Beale v. EdgeMark Fin. Corp., 1995 WL 631840 at *1 (N.D. Ill. 1995). Consequently, it is left to the sound discretion of the trial court to determine when notice should issue.  Id.

Normally, notice should be sent as soon as possible so that the absent class members are well aware of their rights before the adjudication of the merits.  Id. at *2.  However, notice may be delayed if a party can articulate prejudice will result absent a stay.  Id.  Consequently, this Court will weigh any competing prejudices in deciding whether the case should be stayed.

Plaintiffs argues that staying any part of this case will result in a delay, which is prejudicial.  This Court agrees.  Fed. R. Civ. P. 1 requires this Court to administer the rules in such a way ". . . to secure the just, speedy, and inexpensive determination of every action." Staying this case runs afoul of Fed. R. Civ. P. 1.  The absent class members will be delayed in their ability to be notified of this lawsuit.  Plaintiffs will be delayed in their ability to prepare their case on behalf of the absent class members.  Also, preventing work from being done on class certification will threaten the dispositive motion briefing deadlines, which will delay the ultimate adjudication of this case if those deadlines are pushed back.  These are just a few of the delays that will result if this case is stayed, and all have a prejudicial effect upon the Plaintiffs.

Fedex, on the other hand, has articulated only a speculative prejudicial effect if the stay is not granted.  Fedex claims that if the 7th Circuit modifies or rejects this Court's order on class certification, and if the class notice has already been issued, then maybe this Court would have to

issue another notice to the absent class members. Fedex claims multiple notices might be confusing to the absent class members, or at the very least, would result in increased costs. Fedex's claim of prejudice is speculative. As it stands, this Court's October 15, 2007, order is the law of the case. If the 7th Circuit says otherwise later, then this Court will resolve any potential problems that arise at that time. But at this time, Fedex's speculative articulation of prejudice is insufficient to outweigh the prejudice that arises from delaying this litigation.

Furthermore, while Fedex oddly argues how the absent class members, its adversaries, will be prejudiced, Fedex does not articulate how it will be prejudiced if a stay is not issued. Consequently, there is no prejudicial effect to Fedex that this Court needs to weight against the prejudicial effect of delay that the stay will have.

Consequently, because staying class certification, notice or adjudication, is prejudicial to Plaintiffs, and because Fedex has failed to articulate any prejudicial effect that is not speculative, Fedex's motion to stay is **DENIED** [Doc. No. 912].

**SO ORDERED.**

Dated this 29th Day of November, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) <br> <br> THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On October 1, 2007, Plaintiffs filed a motion for discovery. Plaintiffs seek to amend their complaint and they seek to re-open limited discovery. This motion is **DENIED AS MOOT** [Doc. No. 882] as a result of this Court's October 9, 2007, and October 24, 2007, orders, which granted Plaintiffs requested relief.

Also, on October 1, 2007, Plaintiffs filed a motion to supplement their pending motions for class certification. On October 19, 2007, Defendant indicated that it had no objection. Defendant objects to any conclusions Plaintiffs ask this Court to draw from the items Plaintiffs wish to supplement, but this Court will not draw any conclusions from any supplemental documents at this time. Consequently, Plaintiffs' motion to supplement is **GRANTED** [Doc. No. 876].

**SO ORDERED.**

Dated this 29th Day of November, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

The Plaintiffs filed their motions for class certifications on March 12, 2007, April 20, 2007, and April 23, 2007. Defendant filed responses in opposition to those motions, and Defendant also filed many exhibits in support of its position. Now, nearly six months later, Defendant has learned that it either inadvertently failed to file all of the exhibits they meant to file or failed to file complete copies of the exhibits they filed. Consequently, on October 15, 2007, Defendant filed a motion to correct the record and seeks leave to file all of the documents in support of their position that were inadvertently not filed.

On October 30, 2007, Plaintiffs filed an opposition to this motion. Plaintiffs claim that Defendants' motion should be denied either because it is excessively tardy or because the exhibits are moot based on a recent ruling by this Court to certify two of the many proposed classes.

This Court agrees that the Defendant's motion for leave to file exhibits is quite tardy. However, this fact by itself does not justify denying Defendant's motion. Plaintiffs have not articulated how they will be prejudiced if Defendant is allowed to file the exhibits, even though they are filed at this late time. Furthermore, while Plaintiffs are correct that this Court's recent

ruling suggests how this Court may rule on class certification, this Court's ruling by no means establishes that all issues regarding class certification are moot. At this time, there remains dozens of motions for class certification pending. Consequently, the Plaintiffs reasons for denying the Defendant's motion are unpersuasive.

Therefore, this Court only needs to determine whether Defendant has established good cause to file their exhibits. Defendant offers no justification other than excusable neglect. But, given the circumstances of this case, this Court finds that this justification is sufficient. As this Court has expressed many times before, this litigation is complex, massive, and time consuming. As a result, it is completely understandable that some documents may have been temporarily misplaced or lost, even for several months. Furthermore, it is not as though Defendant has committed this or other filing errors consistently. To this Court's knowledge, this is the first such error that Defendant has committed. For these reasons, this Court finds Defendants have established sufficient good cause for leave to correct the record.

In summary, because Defendant has articulated sufficient good cause and because Plaintiffs have failed to articulate any prejudicial effect, Defendant's motion is **GRANTED** [Doc. No. 903].

**SO ORDERED.**

Dated this 29th Day of November, 2007.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

case 3:05-md-00527-RLM-CAN document 1025 filed 12/04/07 page 1 of 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527 RM (MDL 1700) |
| | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

**REQUEST FOR JUDICIAL NOTICE**

Plaintiffs request that this Court take judicial notice, under Rule 201 of the Federal Rules of Evidence, of the November 28, 2007 decision of the California Supreme Court in Estrada v. FedEx Ground Package Systems, Inc., S156595 (California Supreme Court, 11/28/07) in which the Court denied FedEx Ground's Request for Review and Request for Depublication. The order is attached hereto as Exhibit A.

Federal courts may "take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to the matters at issue." Green v. Warden, U.S. Penitentiary, 699 F. 2d 364, 369 (7th Cir. 1983). The Estrada decision is directly relevant to all 38 pending motions for class certification because: 1) the Supreme Court rejected FedEx's assertion that this case is not a proper class action and cannot be tried on common evidence, based on common facts; 2) the Supreme Court has left, as precedent, the

decision of the Court of Appeal finding that FedEx drivers are employees and not independent contractors based on the company's reservation of the right to control and its exercise of actual control, determined on a class-wide basis, with reference to the same Operating Agreement signed by all members of the putative classes in the instant case; and 3) the issue of the collateral estoppels effect of Estrada is a common legal issue and FedEx's final appeal is now over. Thus, the decision of the California Supreme Court is directly related to the matters at issue in this pending litigation.

Dated: December 4, 2007

Respectfully submitted,
LEONARD CARDER, LLP

 /s/ Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel:    (510) 272-0169
Fax:    (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

John C. Hamilton
HAMILTON LAW FIRM
300 N. Michigan Street, Suite 454
South Bend, IN 46601
Tel:    (574) 289-9987
Fax:    (574) 289-8138

PLAINTIFFS' LIAISON COUNSEL

case 3:05-md-00527-RLM -CAN document 1025 filed 12/04/07 page 3 of 9

# EXHIBIT A

case 3:05-md-00527-RLM-CAN document 1025 filed 12/04/07 page 4 of 9

Court of Appeal, Second Appellate District, Div. 1 - No. B189031
**S156595**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

ANTHONY ESTRADA, Plaintiff and Appellant,

v.

FEDEX GROUND PACKAGE SYSTEM INC, Defendant and Appellant.

The applications to appear as counsel pro hac vice are granted.
The petition for review is denied.
The request for an order directing depublication of the opinion is denied.

SUPREME COURT
FILED

NOV 28 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **December 4, 2007**, I served the following document(s):

REQUEST FOR JUDICIAL NOTICE

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

| | |
|---|---|
| George A Barton | gbarton@birch.net |
| Jeffrey A Bartos | jbartos@geclaw.com |
| Evelyn L Becker | ebecker@omm.com |
| Kenneth Lee Blalack , II | lblalack@omm.com |
| Darcie R Brault | dbrault@dibandfagan.com |
| Laura C Bremer | lbremer@omm.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J Brunner , Jr | Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Michael C Camunez | mcamunez@omm.com, cgreenberg@omm.com |
| David M Cialkowski | dmc@zimmreed.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Ginger A DeGroff | degrofflaw@yahoo.com |
| Robert E DeRose , II | bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Susan E Ellingstad | seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com |
| Barry S Fagan | bfagan@dibandfagan.com |
| Lynn R Faris | lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com |
| Monica Ferraro | mferraro@bnhmlaw.com |
| Lee K Fink | lfink@omm.com |
| Robert K Firsten | rfirsten@firstenlaw.com |
| Edward R Forman | eforman@ee.net |
| Wood R Foster PHV , Jr | woodfoster@sbgdf.com, heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S Garfinkel | garfinkel@sgb-law.com, helm@sgb-law.com |
| Michael W Garrison , Jr | mgarrison@omm.com |
| R Christopher Gilreath | chrisgil@sidgilreath.com |
| Eileen S Goodin | egoodin@bnhmlaw.com |
| Deborah R Grayson | drgrayson@fuse.net |

| Name | Email |
|---|---|
| John C Hamilton | jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net |
| Robert K Handelman | rhandelman@bnhmlaw.com |
| Robert I Harwood | rharwood@whesq.com |
| Stacy J Hauf | shauf@omm.com, swickliffe@omm.com |
| Matthew M Houston | mhouston@whesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Victor H Jih | vjih@omm.com |
| Aparna B Joshi | ajoshi@omm.com |
| Soye Kim | skim@gcclaw.com |
| Michael W Kopp | mkopp@omm.com |
| Steve D Larson | slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com, jhunt@prlc.com, syoung@prle.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| John S Marshall | marshall@ee.net |
| Michael G McGuinness | mmcguinness@omm.com |
| Bruce H Meizlish | brucelaw@fuse.net |
| Matthew J Merrick | mmerrick@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Raquel A Millman | rmillman@omm.com |
| James R Mulroy , II | jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com |
| Daniel O Myers | dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com |
| Peter W Overs , Jr | povers@whesq.com |
| Richard T Phillips | flip@smithphillips.com, tresahharden@smithphillips.com |
| D Lucetta Pope | Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Nora M Puckett | npuckett@omm.com, dmeredith@omm.com |
| Charles Victor Pyle, III | victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com, kmh@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Theodore B Schroeder | tschroeder@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| James A Staack | jims@staack-firm.com |
| R Jay Taylor , Jr | jtaylor@scopelitis.com, lnewton@scopelitis.com |
| Matthew T Tobin | mtobin@sbslaw.net |
| Jeffrey A Trimarchi | jtrimarchi@omm.com |
| Mary D Walsh-Dempsey | mdempsey@omalleylangan.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Andrew M Weiner | aweiner@omm.com |
| Peter D Winebrake | pwinebrake@winebrakelaw.com |

I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:

| | |
|---|---|
| John H Beisner PHV<br>O'Melveny & Myers LLP - Was/DC<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jbeisner@omm.com | J Allen Brinkley<br>Brinkley & Chesnut<br>307 Randolph Avenue<br>PO Box 2026<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net |
| Joree Brownlow<br>Law Office of Joree G Brownlow<br>1444 Gillham Dr Ste 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com | David G Caperton<br>O'Melveny & Myers LLP<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001 |
| R Bruce Carlson<br>Carlson Lynch Ltd<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com | Kevin J Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes &<br>Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309 |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178 | William T Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B James Fitzpatrick<br>Fitzpatrick Spini & Swanston<br>838 S Main Street Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com | Salvatore G Gangemi<br>Gangemi Law Firm PC<br>82 Wall St Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com |
| Clayton D Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Jack D Hilmes<br>Finley Alt Smith Scharnberg Craig Hilmes &<br>Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: jhilmes@finleylaw.com;<br>kdriscoll@finleylaw.com |
| Eric E Hobbs<br>Michael Best & Friedrich LLP<br>100 E Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com | William S Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 |

| | |
|---|---|
| Andrew J Kahn PHV<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 | Karen P Kruse PHV<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Donald B Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Harold L Lichten<br>Pyle Rome Lichten Ehrenberg & Liss-Riordan PC-MA<br>18 Tremont St Suite 500<br>Boston, MA 02108 |
| Carla D Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Paula R Markowitz<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 |
| Robert E McDaniel<br>McDaniel Law Offices<br>4 Bicentennial Sq<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | Sanford A Meizlish<br>Barkan Neff Handelman Meizlish LLP<br>360 S Grant Ave<br>Columbus, OH 43215<br>Email: smeizlish@bnhmlaw.com |
| Kenneth E Milam<br>Watkins & Eager<br>PO Box 650<br>Jackson, MS 39205-0650<br>Email: kemilam@watkinseager.com | Charles N Nauen<br>Lockridge Grindal Nauen PLLP<br>100 Washington Avenue South Suite 2200<br>Minneapolis, MN 55401<br>Email: cnnauen@locklaw.com |
| Todd J O'Malley<br>O'Malley & Langan PC<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 | Joseph A Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |
| Cheryl F Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |
| Michael R Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 |

| | |
|---|---|
| Eric H Rumbaugh PHV<br>Michael Best & Friedrich LLP - Mil/WI<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Jennifer Rygiel Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Dan S Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050<br>Email: addiealexis@verizon.net | Patricia A Sullivan<br>Edwards & Angell<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| Richard Tanenbaum<br>Richard Tanenbaum Esq<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | Donald R Taylor<br>Taylor Dunham & Burgess LLP<br>301 Congress Ave Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Joni M. Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Peter N Wasylyk<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com |
| Charles W Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>PO Box 8086<br>Columbia, SC 29202 | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on **December 4, 2007**.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

South Bend Division

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 (MDL 1700) |
| ---------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL COORDINATED CASES | ) | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

MOTION TO WITHDRAW AS LIAISON COUNSEL IN BEHALF OF PLAINTIFFS

Pursuant to Local Rule 83.8(b), John C. Hamilton and The Hamilton Law Firm moves the court for leave to withdraw as liaison counsel to plaintiffs in this action as of December 17, 2007 based upon the fact that the undersigned is retiring from the practice of law with an official effective date of December 31, 2007, but a practical cessation of the practice as of December 21, 2007. Undersigned counsel and lead plaintiffs' counsel, are actively engaged in obtaining replacement liaison counsel for plaintiffs, a process that should be successfully completed by December 17, 2007.

Based on the foregoing, the undersigned counsel, pursuant to Local Rule 83.8(b), requests the court to grant them leave to withdraw as plaintiffs' liaison counsel in this action as of December 17, 2007.

Respectfully submitted,

THE HAMILTON LAW FIRM
John C. Hamilton (7416-71)
300 N. Michigan Street
Suite 454
South Bend, IN 46601
(574) 289-9987
Facsimile (574) 289-8138

 s/John C. Hamilton

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, John C. Hamilton hereby certify that on December 6, 2007, I electronically filed the foregoing document, Motion to Withdraw as Liaison Counsel in Behalf of Plaintiffs, with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |

| | |
|---|---|
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com; drees@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |

case 3:05-md-00527-RLM-CAN document 1028 filed 12/06/07 page 3 of 6

| | |
|---|---|
| **Anh-Nguyet Tran LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |

**Peter D. Winebrake**          pwinebrake@winebrakelaw.com

I also certify that on December 6, 2007, I mailed by United States Postal Service the
foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
  & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
3304 S. Broadway
Suite 100
Tyler, TX  75701

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO  80202

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV  89102

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO  80522

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI  02908

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Patricia A Sullivan
EDWARDS ANGELL PALMER
 & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
 AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: December 6, 2007

Respectfully submitted,

THE HAMILTON LAW FIRM
John C. Hamilton (7416-71)
300 N. Michigan Street
Suite 454
South Bend, IN 46601
(574) 289-9987
Facsimile (574) 289-8138

 s/John C. Hamilton

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

South Bend Division

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL COORDINATED CASES | ) | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

ORDER

John C. Hamilton and The Hamilton Law Firm having moved for leave to withdraw as liaison counsel in behalf of plaintiffs in this action and good cause appearing therefor,

IT IS ORDERED that John C. Hamilton and The Hamilton Law Firm shall be granted leave to withdraw as liaison counsel in behalf of plaintiffs as of December 17, 2007.

Dated: December 7th, 2007.

S/Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527 RM (MDL 1700) |
| | ) | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | |

**NOTICE OF ASSOCIATION OF PLAINTIFFS' LIAISON COUNSEL**

Notice is hereby given that Plaintiffs designate the following as their liaison counsel in accordance with the Court's Initial Scheduling Order of November 15, 2005, Section IIB:

Mr. Peter. J. Agostino
Anderson, Agostino & Keller, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

Dated: December 11, 2007

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

Mr. Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

PLAINTIFFS' LIAISON COUNSEL

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **December 11, 2007**, I served the following document(s):

**NOTICE OF ASSOCIATION OF PLAINTIFFS' LIAISON COUNSEL**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

| | |
|---|---|
| George A Barton | gbarton@birch.net |
| Jeffrey A Bartos | jbartos@geclaw.com |
| Evelyn L Becker | ebecker@omm.com |
| Kenneth Lee Blalack , II | lblalack@omm.com |
| Darcie R Brault | dbrault@dibandfagan.com |
| Laura C Bremer | lbremer@omm.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J Brunner , Jr | Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Michael C Camunez | mcamunez@omm.com, cgreenberg@omm.com |
| David M Cialkowski | dmc@zimmreed.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Ginger A DeGroff | degrofflaw@yahoo.com |
| Robert E DeRose , II | bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Susan E Ellingstad | seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com |
| Barry S Fagan | bfagan@dibandfagan.com |
| Lynn R Faris | lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com |
| Monica Ferraro | mferraro@bnhmlaw.com |
| Lee K Fink | lfink@omm.com |
| Robert K Firsten | rfirsten@firstenlaw.com |
| Edward R Forman | eforman@ee.net |
| Wood R Foster PHV , Jr | woodfoster@sbgdf.com, heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S Garfinkel | garfinkel@sgb-law.com, helm@sgb-law.com |
| Michael W Garrison , Jr | mgarrison@omm.com |
| R Christopher Gilreath | chrisgil@sidgilreath.com |
| Eileen S Goodin | egoodin@bnhmlaw.com |

Deborah R Grayson                 drgrayson@fuse.net
John C Hamilton                   jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net
Robert K Handelman                rhandelman@bnhmlaw.com
Robert I Harwood                  rharwood@whesq.com
Stacy J Hauf                      shauf@omm.com, swickliffe@omm.com
Matthew M Houston                 mhouston@whesq.com
Dmitri Iglitzin                   iglitzin@workerlaw.com
Tom A Jerman                      tjerman@omm.com
Victor H Jih                      vjih@omm.com
Aparna B Joshi                    ajoshi@omm.com
Soye Kim                          skim@geclaw.com
Michael W Kopp                    mkopp@omm.com
Steve D Larson                    slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com,
                                  kdunn@ssbls.com
Jordan M Lewis                    jordanlewis@sbgdf.com
Shannon Liss-Riordan             sliss@prle.com, jhunt@prle.com, syoung@prle.com
Anh-Nguyet Tran LyJordan          alyjordan@omm.com
Gary F Lynch                      glynch@carlsonlynch.com
John S Marshall                   marshall@ee.net
Michael G McGuinness              mmcguinness@omm.com
Bruce H Meizlish                  brucelaw@fuse.net
Matthew J Merrick                 mmerrick@omm.com
Jennifer Lee Merzon               jmerzon@omm.com
Raquel A Millman                  rmillman@omm.com
James R Mulroy , II               jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com
Daniel O Myers                    dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com,
                                  wking@rpwb.com
Peter W Overs , Jr                povers@whesq.com
Richard T Phillips                flip@smithphillips.com, tresahharden@smithphillips.com
D Lucetta Pope                    Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com,
                                  marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com
Nora M Puckett                    npuckett@omm.com, dmeredith@omm.com
Charles Victor Pyle, III          victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com,
                                  meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com
Anne T Regan                      atr@zimmreed.com, kmh@zimmreed.com
J Gordon Rudd                     jgr@zimmreed.com
Theodore B Schroeder              tschroeder@omm.com
Robert M Schwartz                 rschwartz@omm.com
James A Staack                    jims@staack-firm.com
R Jay Taylor , Jr                 jtaylor@scopelitis.com, lnewton@scopelitis.com
Matthew T Tobin                   mtobin@sbslaw.net
Jeffrey A Trimarchi               jtrimarchi@omm.com
Mary D Walsh-Dempsey              mdempsey@omalleylangan.com
Michael J Watton                  jdrewicz@Wattongroup.com
Andrew M Weiner                   aweiner@omm.com
Peter D Winebrake                 pwinebrake@winebrakelaw.com

I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:

| John H Beisner PHV<br>O'Melveny & Myers LLP - Was/DC<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jbeisner@omm.com | J Allen Brinkley<br>Brinkley & Chesnut<br>307 Randolph Avenue<br>PO Box 2026<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net |
|---|---|
| Joree Brownlow<br>Law Office of Joree G Brownlow<br>1444 Gillham Dr Ste 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com | David G Caperton<br>O'Melveny & Myers LLP<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001 |
| R Bruce Carlson<br>Carlson Lynch Ltd<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com | Kevin J Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309 |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178 | William T Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B James Fitzpatrick<br>Fitzpatrick Spini & Swanston<br>838 S Main Street Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com | Salvatore G Gangemi<br>Gangemi Law Firm PC<br>82 Wall St Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com |
| Clayton D Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Jack D Hilmes<br>Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: jhilmes@finleylaw.com; kdriscoll@finleylaw.com |

| Eric E Hobbs<br>Michael Best & Friedrich LLP<br>100 E Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com | William S Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 |
|---|---|
| Andrew J Kahn PHV<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 | Karen P Kruse PHV<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Donald B Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Harold L Lichten<br>Pyle Rome Lichten Ehrenberg & Liss-Riordan PC-MA<br>18 Tremont St Suite 500<br>Boston, MA 02108 |
| Carla D Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Paula R Markowitz<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 |
| Robert E McDaniel<br>McDaniel Law Offices<br>4 Bicentennial Sq<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | Sanford A Meizlish<br>Barkan Neff Handelman Meizlish LLP<br>360 S Grant Ave<br>Columbus, OH 43215<br>Email: smeizlish@bnhmlaw.com |
| Kenneth E Milam<br>Watkins & Eager<br>PO Box 650<br>Jackson, MS 39205-0650<br>Email: kemilam@watkinseager.com | Charles N Nauen<br>Lockridge Grindal Nauen PLLP<br>100 Washington Avenue South Suite 2200<br>Minneapolis, MN 55401<br>Email: cnnauen@locklaw.com |
| Todd J O'Malley<br>O'Malley & Langan PC<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 | Joseph A Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |
| Cheryl F Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |

| Michael R Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 |
|---|---|
| Eric H Rumbaugh PHV<br>Michael Best & Friedrich LLP - Mil/WI<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Jennifer Rygiel Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Dan S Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050<br>Email: addiealexis@verizon.net | Patricia A Sullivan<br>Edwards & Angell<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| Richard Tanenbaum<br>Richard Tanenbaum Esq<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | Donald R Taylor<br>Taylor Dunham & Burgess LLP<br>301 Congress Ave Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Joni M. Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Peter N Wasylyk<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com |
| Charles W Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>PO Box 8086<br>Columbia, SC 29202 | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on **December 11, 2007**.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) | CHIEF JUDGE MILLER MAGISTRATE NEUCHTERLEIN |

To the Clerk of this court and all parties of record:

I, the below-signed, state that pursuant to N.D. Ind. L.R. 83.5(g), I have read and will abide by the Local Rules of the U.S. District Court for the Northern District of Indiana, including Appendix B: Standards for Professional Conduct Within the Seventh Federal Judicial Circuit. I declare under penalty of perjury that the foregoing is true and correct.

Enter my appearance as ***liaison counsel on behalf of Plaintiffs***.

Dated this 12th day of December, 2007.

/s/ Peter J. Agostino

ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650
Email: agostino@aaklaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | CHIEF JUDGE MILLER MAGISTRATE NEUCHTERLEIN |

**CERTIFICATE OF SERVICE**

I, Peter J. Agostino, hereby certify that on the 12th day of December, 2007, I electronically filed the foregoing document, Appearance as Liaison Counsel in Behalf of Plaintiffs, with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| George A. Barton | gbarton@birch.net |
| Jeffrey A. Bartos | jbartos@geclaw.com |
| Evelyn L. Becker | ebecker@omm.com |
| Kenneth Lee Blalack, II | lblalack@omm.com |
| Darcie R. Brault | dbrault@dibandfagan.com |
| Laura C. Bremer | lbremer@omm.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J. Brunner, Jr | Tom.Brunner@bakerd.co Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| Michael C. Camunez | mcamunez@omm.com; cgreenberg@omm.com |
| David M. Cialkowski | dmc@zimmreed.com |
| Jerald R. Cureton | jcureton@curetoncaplan.com |
| Ginger A. DeGroff | degrofflaw@yahoo.com |
| Robert E. DeRose, II | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| Edward J. Efkeman | eefkeman@fedex.com |
| Susan E. Ellingstad | seellingstad@locklaw.com; hnpotteiger@locklaw.com; rmmorton@locklaw.com |
| Barry S. Fagan | bfagan@dibandfagan.com |
| Lynn R. Faris | lfaris@leonardcarder.co emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| Monica Ferraro | mferraro@bnhmlaw.com |

| | |
|---|---|
| Lee K. Fink | lfink@omm.com |
| Robert K. Firsten | rfirsten@firstenlaw.com |
| Edward R. Forman | eforman@ee.net |
| Wood R. Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G. Fox | Alison.Fox@bakerd.com alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S. Garfinkel | garfinkel@sgb-law.com; helm@sgb-law.com |
| Michael W. Garrison, Jr. | mgarrison@omm.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Eileen S. Goodin | egoodin@bnhmlaw.com |
| Deborah R. Grayson | drgrayson@fuse.net |
| Robert K. Handelman | rhandelman@bnhmlaw.com |
| Robert I. Harwood | rharwood@hfesq.com |
| Stacy J. Hauf | shauf@omm.com; swickliffe@omm.com |
| Matthew M. Houston | mhouston@hfesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A. Jerman | tjerman@omm.com |
| Victor H. Jih | vjih@omm.com |
| Aparna B. Joshi | ajoshi@omm.com |
| Soye Kim | skim@geclaw.com |
| Michael W. Kopp | mkopp@omm.com |
| Steve D. Larson | slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com; drees@ssbls.com |
| Jordan M. Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Gary F. Lynch | glynch@carlsonlynch.com |
| John S. Marshall | marshall@ee.net |
| Michael G. McGuinness | mmcguinness@omm.com |
| Bruce H. Meizlish | brucelaw@fuse.net |
| Sanford A. Meizlish | smeizlish@bnhmlaw.com |
| Matthew J. Merrick | mmerrick@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Raquel A. Millman | rmillman@omm.com |
| James R. Mulroy, II | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| Daniel O. Myers | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| Peter W. Overs, Jr. | povers@hfesq.com |
| Richard T. Phillips | flip@smithphillips.com |

case 3:05-md-00527-RLM -CAN document 1033 filed 12/12/07 page 3 of 6

| | |
|---|---|
| | tresahharden@smithphillips.com |
| D. Lucetta Pope | lucetta.Pope@bakerd.com<br>alicia.cummins@bakerd.com;<br>melissa.bozzuto@bakerd.com;<br>marion.jacobson@bakerd.com |
| Nora M. Puckett | npuckett@omm.com; dmeredith@omm.com |
| Charles Victor Pyle, III | victor.pyle@ogletreedeakins.com;<br>Meredith.smith@ogletreedeakins.com;<br>ted.speth@ogletreedeakins.com;<br>Linda.lyday@ogletreedeakins.com |
| Anne T. Regan | atr@zimmreed.com; kmh@zimmreed.com |
| J. Gordon Rudd | jgr@zimmreed.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| Robert M. Schwartz | rschwartz@omm.com |
| James A. Staack | jims@staack-firm.com |
| R. Jay Taylor, Jr. | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| Matthew T. Tobin | mtobin@sbslaw.net |
| Jeffrey A. Trimarchi | jtrimarchi@omm.com |
| Mary D. Walsh-Dempsey | mdempsey@omalleylangan.com |
| Michael J. Watton | jdrewicz@Wattongroup.com |
| Andrew M. Weiner | aweiner@omm.com |
| Peter D. Winebrake | pwinebrake@winebrakelaw.com |

I also certify that on the 12th day of December, 2007, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive, Suite 200
Bartlett, TN 38134

R. Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane, PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

B. James Fitzpaqtrick
FITZPATRICK SPINI & SWANSTON
838 S. Main St., Suite E
Salinas, CA 93901

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street, Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
& LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Sanford A. Meizlish
BARKAN NEFF HANDELMAN MEIZLISH
LLP
360 South Grant Avenue
Columbus, OH 43215

Charles N. Nauen
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J. Driscoll
FINLEY ALT SMITH SCHARNBERT
CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Cheryl F. Perkins
WETSTONE MYERS PERKINS AND
YOUNG LLC
PO Box 8086
Columbia, SC 29202

Eric E. Hobbs
Eric H. Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave, Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
3304 S. Broadway, Suite 100
Tyler, TX 75701

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 S. College Ave., PO Box 2166
Fort Collins, CO 80522

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Robert E. McDaniel
McDANIEL LAW OFFICES
4 Bicentennial Square
Concord, NH 03301

Carla D. Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R. Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad Street
Philadelphia, PA 19107

Kenneth E. Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T. Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M. Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R. Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue, Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S. Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A. Sullivan
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated:  December 12, 2007

Respectfully submitted,

  /s/ Peter J. Agostino
Peter J. Agostino                                    (#10765-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN  46601
Telephone:  (574) 288-1510
Facsimile:  (574) 288-1650

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on December 17, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

***LEIGHTER* OREGON PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Dated: December 17, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on December 17, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**OMNIBUS REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFFS' PHASE IV MOTIONS FOR CLASS CERTIFICATION**

Dated: December 17, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

case 3:05-md-00527-RLM -CAN document 1046 filed 12/17/07 page 2 of 2

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on December 17, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**EIGHTH DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: December 17, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The document listed below was sent to the Court on December 17, 2007 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. This document will be maintained in the case file in the clerk's office:

**PLAINTIFFS' EIGHTH APPENDIX**
**VOLUMES 97-101 AS PA29255-30355**

Dated: December 17, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

case 3:05-md-00527-RLM-CAN document 1048 filed 12/17/07 page 2 of 2

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

***LEIGHTER* OREGON PLAINTIFFS'**
**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

Dated: December 16, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**CONFIDENTIAL:**
**FILED UNDER SEAL**

**EIGHTH DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

Dated: December 16, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

case 3:05-md-00527-RLM -CAN document 1054-3 filed 12/17/09 page 1 of 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM (MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**INDEX TO PLAINTIFFS' EIGHTH APPENDIX SUBMITTED IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION**

| VOLUME NO. | TAB NO. | PA NO. | DESCRIPTION |
|---|---|---|---|
| 97 | 287 | PA29255-29341 | Selection of Business Discussion Notes from Arizona |
| 97 | 288 | PA29342-29443 | Selection of Business Discussion Notes from Connecticut |
| 97 | 289 | PA29444-29553 | Selection of Business Discussion Notes from Georgia |
| 98 | 290 | PA29554-29671 | Selection of Business Discussion Notes from North Carolina |
| 98 | 291 | PA29672-29819 | Selection of Business Discussion Notes from Oregon |
| 99 | 292 | PA29820-29849 | Selection of Business Discussion Notes from Vermont |
| 99 | 293 | PA29850-29873 | Selection of Business Discussion Notes from Louisiana |
| 99 | 294 | PA29874-29907 | Selection of Business Discussion Notes from Nevada |

case 3:05-md-00527-RLM -CAN document 1054-3 filed 12/17/09 page 2 of 4

| VOLUME NO. | TAB NO. | PA NO. | DESCRIPTION |
|---|---|---|---|
| 99 | 295 | PA29908-30025 | Selection of Business Discussion Notes from Massachusetts |
| 100 | 296 | PA30026-30034 | Excerpts of the deposition transcripts of Arizona Named Plaintiffs |
| 100 | 297 | PA30035-30059 | Excerpts of the deposition transcripts of Connecticut Named Plaintiffs |
| 100 | 298 | PA30060-30084 | Excerpts of the deposition transcripts of *Leighter* Oregon Named Plaintiffs |
| 100 | 299 | PA30085-30092 | Excerpts of the deposition transcripts of Nevada Named Plaintiffs |
| 100 | 300 | PA30093-30106 | Excerpts of the deposition transcripts of Georgia Named Plaintiffs |
| 100 | 301 | PA30107-30126 | Excerpts of the deposition transcripts of Vermont Named Plaintiffs |
| 100 | 302 | PA30127-30128 | Excerpts of the deposition transcripts of *Vargas* Massachusetts Named Plaintiffs |
| 100 | 303 | PA30129-30130 | Excerpts of the deposition transcripts of North Carolina Named Plaintiffs |
| 100 | 304 | PA30131-30152 | Excerpts of the deposition transcript of Rick Bosch |
| 100 | 305 | PA30153-30167 | Excerpts of the deposition transcript of Wesley Dietz |
| 100 | 306 | PA30168-30188 | Excerpts of the deposition transcript of Roger Jones |
| 100 | 307 | PA30189-30213 | Excerpts of the deposition transcript of Mark McCarthy |
| 101 | 308 | PA30214-30235 | Excerpts of the deposition transcript of Samuel Minaya |
| 101 | 309 | PA30236-30251 | Excerpts of the deposition transcript of John Smith |

| VOLUME NO. | TAB NO. | PA NO. | DESCRIPTION |
|---|---|---|---|
| 101 | 310 | PA30252-30254 | Excerpts of the deposition transcript of Clyde Cairnes |
| 101 | 311 | PA30255-30260 | Excerpts of the deposition transcript of William Reirsen |
| 101 | 312 | PA30261-30278 | Excerpts of the deposition transcript of Bruce Faulkner |
| 101 | 313 | PA30279-30296 | Excerpts of the deposition transcript of Patrick Porter |
| 101 | 314 | PA30297-30299 | Excerpts of the deposition transcript of Janie Olderbak |
| 101 | 315 | PA30300-30304 | Excerpts of the deposition transcript of David Steinke |
| 101 | 316 | PA30305-30307 | Excerpts of the deposition transcript of Kenneth Frank |
| 101 | 317 | PA30308-30309 | Excerpts of the deposition transcript of James Niemi |
| 101 | 318 | PA30310-30314 | Plaintiffs' Response to Defendant's First Set of Requests for Admissions, dated February 21, 2006 |
| 101 | 319 | PA30315-30326 | Excerpts of the deposition transcript of Robert Flesher |
| 101 | 320 | PA30327-30340 | *Procedure: Vehicle Guidelines and Upgrades*, revision date February 20, 2007 |
| 101 | 321 | PA30341-30345 | *FHD Contractor Provided, Vehicle Approval Process* |
| 101 | 322 | PA30346-30351 | Excerpts of Defendant's Objections and Responses to Plaintiffs' Seventh Set of Interrogatories, dated October 4, 2007 |

case 3:05-md-00527-RLM-CAN document 1054-3 filed 12/17/07 page 4 of 4

| VOLUME NO. | TAB NO. | PA NO. | DESCRIPTION |
|---|---|---|---|
| 101 | 323 | PA30352-30355 | *Bahramipour v. Citigroup Global Markets, Inc.*, No. 04-04440 (N.D. Cal. Mar. 2, 2007), Order Granting Preliminary Approval of Class Action Settlement |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

**PLAINTIFFS' EIGHTH APPENDIX**
**(PA29255-30355)**

Dated: December 16, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527-RM
(MDL 1700)

**CONFIDENTIAL:**
**FILED UNDER SEAL**

**OMNIBUS REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' PHASE IV MOTIONS FOR CLASS CERTIFICATION**

Dated: December 16, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO | |
| *Michael Decesare, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00120-RLM-CAN (NV) | |
| *Margaret Gibson, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00272-RLM-CAN (AZ) | |
| *Troy Givens, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00324-RLM-CAN (LA) | |
| *Frank Gruhn, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00412-RLM-CAN (VT) | |
| *Jon Leighter, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00328-RLM-CAN (OR) | |
| *Thomas Magno, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-CV-00322-RLM-CAN (CT) | |
| *Genaro Vargas, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00325-RLM-CAN (MA) | |
| *Ernest White v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00411-RLM-CAN (GA) | |

*Sharon Whiteside, et al. v. FedEx Ground* )
*Package System, Inc.,* )
Civil No. 3:07-CV-00326-RLM-CAN (NC) )
-------------------------------------------------- )

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on December 17, 2007, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |

| | |
|---|---|
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com; drees@ssbls.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@prle.com; jhunt@prle.com; syoung@prle.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** marshall@ee.net

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Matthew J. Merrick** mmerrick@omm.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Raquel A. Millman** rmillman@omm.com

**James Mulroy** jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Peter W. Overs Jr.** povers@hfesq.com

**Mary Donne Peters** mpeters@gorbypeters.com; rwright@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Nora M Puckett** npuckett@omm.com; dmeredith@omm.com

case 3:05-md-00527-RLM-CAN document 1059 filed 12/17/07 page 5 of 8

| | |
|---|---|
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on December 17, 2007, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

case 3:05-md-00527-RLM-CAN document 1059 filed 12/17/07 page 6 of 8

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

Andrew J. Kahn
MCCRACKEN, STEMERMAN & HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Robert J. Penny
WICK BRAMER UKASICK & TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

case 3:05-md-00527-RLM-CAN document 1059 filed 12/17/07 page 8 of 8

Dated: December 17, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 93:05-MD-527 RM (MDL 1700) |
| | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF FEDEX'S MOST RECENT 10Q REPORT TO THE U.S. SECURITIES & EXCHANGE COMMISSION REGARDING THE INTERNAL REVENUE SERVICE'S DETERMINATION THAT FEDEX'S PICKUP AND DELIVERY DRIVERS ARE MISCLASSIFIED AND THE CITATION OF FEDEX GROUND BY THE MASSACHUSETTS ATTORNEY GENERAL FOR MISCLASSIFICATION**

Plaintiffs request that this Court take judicial notice, under Rule 201 of the Federal Rules of Evidence, of FedEx Corporation's December 21, 2007 10Q Quarterly Report (Exhibit A) to the United States Securities & Exchange Commission, which includes notice to the public (at page 19) that the Internal Revenue Service has concluded an audit for the year 2002, finding that "FedEx Ground pick-up and delivery owner-operators should be reclassified as employees for federal income tax purposes" and anticipates that FedEx will owe back taxes and penalties of $319 million plus interest for that tax year alone. In addition, the 10Q report indicates that the IRS has similar audits open for 2004-2006.

This crucial information contained in FedEx's official filing with the SEC is of direct relevance to the pending 38 motions for class certification as well as upcoming motions for the

following reasons:

1) FedEx Ground has offered in evidence the IRS 1995 "letter of assurance" which FedEx has represented as demonstrating that its "independent contractor" model had the approval of the IRS; Plaintiffs have previously informed the court that the IRS was reviewing and reconsidering that letter, as admitted by FedEx Corporation executive responsible for tax matters, Ms. Sallie Ford, at her deposition. The current 10Q report demonstrates that, like its recent SS-8 determinations (which Plaintiffs have offered in evidence), the IRS has now rejected the “letter of assurance” entirely and determined that the pick-up and delivery drivers are in fact legally employees and should be reclassified as such. Equally significant, the IRS has determined that it may impose penalties for FedEx Ground's misclassification of its drivers despite the earlier “letter of assurance.” This conclusion must rest on a finding that FedEx does not have a reasonable, good faith belief that its drivers are lawfully classified and therefore does not qualify for the protection of the safe harbor provisions of Section 530 of the Internal Revenue Code. The fact that the IRS has flatly reversed its position on the proper classification of the drivers shows that the IRS letter is entitled to no weight in the court’s determination of Plaintiffs’ class certification motions.

2) The IRS conclusion demonstrates that a categorical determination of employment status, even under the complex 20-factor IRS test, is the norm rather than the exception and this supports Plaintiffs assertion that class certification is both appropriate and proper because of the overwhelming commonality of factual and legal issues in this case.

3) The IRS determination demonstrates that on the merits, Plaintiffs can offer and prove, by common evidence, that the drivers are legally employees not independent contractors.

Plaintiffs also request that this Court take judicial notice of the December 19, 2007

case 3:05-md-00527-RLM-CAN document 1068 filed 01/02/08 page 3 of 3

citation of FedEx Ground by the Massachusetts' Attorney General for intentional misclassification of pick-up and delivery drivers as independent contractors. (Exhibit B) The citation assesses FedEx Ground for $190,000 for the violation and finds that FedEx deprive the drivers of statutory rights due them under Massachusetts Wage and Hour laws. This citation is yet another governmental determination, after full investigation, that the FedEx Ground drivers are misclassified and are legally employees. This citation is clearly relevant to all of the pending class certification motions and of special importance in *Sheehan v. FedEx Ground*, where the Massachusetts state statutory test for employee status has been analyzed by the Attorney General as requiring the reclassification of FedEx's Massachusetts' drivers.

Dated: January 2, 2008

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

Mr. Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

PLAINTIFFS' LIAISON COUNSEL

# EXHIBIT A

# ATTACHMENT 1

# FEDEX CORP

## FORM 10-Q
(Quarterly Report)

## Filed 12/21/07 for the Period Ending 11/30/07

| | |
|---|---|
| Address | 942 SOUTH SHADY GROVE ROAD<br>MEMPHIS, TN 38120- |
| Telephone | 9018187500 |
| CIK | 0001048911 |
| Symbol | FDX |
| SIC Code | 4513 - Air Courier Services |
| Industry | Air Courier |
| Sector | Technology |
| Fiscal Year | 05/31 |

http://www.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 4 of 40

Table of Contents

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

(Mark One)

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED NOVEMBER 30, 2007 OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM ________ TO ___**

**Commission File Number: 1-15829**

# FEDEX CORPORATION

(Exact name of registrant as specified in its charter)

| Delaware<br>(State or other jurisdiction of incorporation or organization) | 62-1721435<br>(I.R.S. Employer Identification No.) |
|---|---|
| 942 South Shady Grove Road<br>Memphis, Tennessee<br>(Address of principal executive offices) | 38120<br>(ZIP Code) |

(901) 818-7500
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Common Stock | Outstanding Shares at December 17, 2007 |
|---|---|
| Common Stock, par value $0.10 per share | 309,464,551 |

case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 6 of 40

FEDEX CORPORATION

INDEX

| | PAGE |
|---|---|
| **PART I. FINANCIAL INFORMATION** | |
| ITEM 1. Financial Statements | |
| Condensed Consolidated Balance Sheets November 30, 2007 and May 31, 2007 | 3-4 |
| Condensed Consolidated Statements of Income Three and Six Months Ended November 30, 2007 and 2006 | 5 |
| Condensed Consolidated Statements of Cash Flows Six Months Ended November 30, 2007 and 2006 | 6 |
| Notes to Condensed Consolidated Financial Statements | 7 |
| Report of Independent Registered Public Accounting Firm | 26 |
| ITEM 2. Management's Discussion and Analysis of Results of Operations and Financial Condition | 27 |
| ITEM 3. Quantitative and Qualitative Disclosures About Market Risk | 48 |
| ITEM 4. Controls and Procedures | 48 |
| **PART II. OTHER INFORMATION** | |
| ITEM 1. Legal Proceedings | 49 |
| ITEM 1A. Risk Factors | 49 |
| ITEM 4. Submission of Matters to a Vote of Security Holders | 49 |
| ITEM 6. Exhibits | 51 |
| Signature | 52 |
| Exhibit Index | E-1 |

Exhibit 12.1
Exhibit 15.1
Exhibit 31.1
Exhibit 31.2
Exhibit 32.1
Exhibit 32.2

FEDEX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
(IN MILLIONS)

ASSETS

| | November 30, 2007 (Unaudited) | May 31, 2007 |
|---|---|---|
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 830 | $ 1,569 |
| Receivables, less allowances of $140 and $136 | 4,324 | 3,942 |
| Spare parts, supplies and fuel, less allowances of $161 and $156 | 392 | 338 |
| Deferred income taxes | 531 | 536 |
| Prepaid expenses and other | 274 | 244 |
| Total current assets | 6,351 | 6,629 |
| PROPERTY AND EQUIPMENT, AT COST | 28,381 | 27,090 |
| Less accumulated depreciation and amortization | 15,156 | 14,454 |
| Net property and equipment | 13,225 | 12,636 |
| OTHER LONG-TERM ASSETS | | |
| Goodwill | 3,515 | 3,497 |
| Intangible and other assets | 1,256 | 1,238 |
| Total other long-term assets | 4,771 | 4,735 |
| | $ 24,347 | $ 24,000 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

FEDEX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
(IN MILLIONS, EXCEPT SHARE DATA)

LIABILITIES AND STOCKHOLDERS' INVESTMENT

| | November 30, 2007 (Unaudited) | May 31, 2007 |
|---|---|---|
| CURRENT LIABILITIES | | |
| Current portion of long-term debt | $ 127 | $ 639 |
| Accrued salaries and employee benefits | 1,066 | 1,354 |
| Accounts payable | 2,300 | 2,016 |
| Accrued expenses | 1,417 | 1,419 |
| Total current liabilities | 4,910 | 5,428 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 2,007 | 2,007 |
| OTHER LONG-TERM LIABILITIES | | |
| Deferred income taxes | 928 | 897 |
| Pension, postretirement healthcare and other benefit obligations | 824 | 1,164 |
| Self-insurance accruals | 790 | 759 |
| Deferred lease obligations | 631 | 655 |
| Deferred gains, principally related to aircraft transactions | 330 | 343 |
| Other liabilities | 167 | 91 |
| Total other long-term liabilities | 3,670 | 3,909 |
| COMMITMENTS AND CONTINGENCIES | | |
| COMMON STOCKHOLDERS' INVESTMENT | | |
| Common stock, $0.10 par value; 800 million shares authorized; 309 million shares issued as of November 30, 2007 and 308 million shares issued as of May 31, 2007 | 31 | 31 |
| Additional paid-in capital | 1,796 | 1,689 |
| Retained earnings | 12,882 | 11,970 |
| Accumulated other comprehensive loss | (945) | (1,030) |
| Treasury stock, at cost | (4) | (4) |
| Total common stockholders' investment | 13,760 | 12,656 |
| | $ 24,347 | $ 24,000 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Table of Contents

FEDEX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF INCOME
(UNAUDITED)
(IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

| | Three Months Ended November 30, | | Six Months Ended November 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| REVENUES | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |
| OPERATING EXPENSES: | | | | |
| Salaries and employee benefits | 3,510 | 3,526 | 6,993 | 6,811 |
| Purchased transportation | 1,136 | 996 | 2,161 | 1,892 |
| Rentals and landing fees | 611 | 584 | 1,204 | 1,154 |
| Depreciation and amortization | 482 | 430 | 955 | 829 |
| Fuel | 1,060 | 860 | 2,024 | 1,801 |
| Maintenance and repairs | 519 | 492 | 1,063 | 1,007 |
| Other | 1,350 | 1,199 | 2,653 | 2,354 |
| | 8,668 | 8,087 | 17,053 | 15,848 |
| OPERATING INCOME | 783 | 839 | 1,597 | 1,623 |
| OTHER INCOME (EXPENSE): | | | | |
| Interest, net | (15) | (17) | (40) | (26) |
| Other, net | — | 1 | (2) | (4) |
| | (15) | (16) | (42) | (30) |
| INCOME BEFORE INCOME TAXES | 768 | 823 | 1,555 | 1,593 |
| PROVISION FOR INCOME TAXES | 289 | 312 | 582 | 607 |
| NET INCOME | $ 479 | $ 511 | $ 973 | $ 986 |
| EARNINGS PER COMMON SHARE: | | | | |
| Basic | $ 1.55 | $ 1.67 | $ 3.15 | $ 3.22 |
| Diluted | $ 1.54 | $ 1.64 | $ 3.12 | $ 3.17 |
| DIVIDENDS DECLARED PER COMMON SHARE | $ 0.10 | $ 0.09 | $ 0.20 | $ 0.18 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

FEDEX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)
(IN MILLIONS)

| | Six Months Ended November 30, 2007 | 2006 |
|---|---|---|
| Operating Activities: | | |
| Net income | $ 973 | $ 986 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 955 | 829 |
| Provision for uncollectible accounts | 62 | 61 |
| Stock-based compensation | 54 | 56 |
| Deferred income taxes and other noncash items | 30 | (27) |
| Changes in operating assets and liabilities: | | |
| Receivables | (379) | (352) |
| Other current assets | (76) | (38) |
| Accounts payable and other operating liabilities | (314) | 167 |
| Other, net | (27) | (334) |
| Cash provided by operating activities | 1,278 | 1,348 |
| Investing Activities: | | |
| Capital expenditures | (1,513) | (1,459) |
| Business acquisition, net of cash acquired | — | (784) |
| Proceeds from asset dispositions and other | 11 | 32 |
| Cash used in investing activities | (1,502) | (2,211) |
| Financing Activities: | | |
| Principal payments on debt | (515) | (226) |
| Proceeds from debt issuance | — | 999 |
| Proceeds from stock issuances | 50 | 55 |
| Excess tax benefit on the exercise of stock options | 12 | 13 |
| Dividends paid | (62) | (55) |
| Other, net | — | (5) |
| Cash (used in) provided by financing activities | (515) | 781 |
| Net decrease in cash and cash equivalents | (739) | (82) |
| Cash and cash equivalents at beginning of period | 1,569 | 1,937 |
| Cash and cash equivalents at end of period | $ 830 | $ 1,855 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

FEDEX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

(1) General

*SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES.* These interim financial statements of FedEx Corporation ("FedEx") have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information, the instructions to Quarterly Report on Form 10-Q and Rule 10-01 of Regulation S-X, and should be read in conjunction with our Annual Report on Form 10-K for the year ended May 31, 2007 ("Annual Report"). Accordingly, significant accounting policies and other disclosures normally provided have been omitted since such items are disclosed therein.

In the opinion of management, the accompanying unaudited condensed consolidated financial statements reflect all adjustments (including normal recurring adjustments) necessary to present fairly our financial position as of November 30, 2007 and the results of our operations for the three- and six-month periods ended November 30, 2007 and 2006 and our cash flows for the six-month periods ended November 30, 2007 and 2006. Operating results for the three- and six-month periods ended November 30, 2007 are not necessarily indicative of the results that may be expected for the year ending May 31, 2008.

Except as otherwise specified, references to years indicate our fiscal year ending May 31, 2008 or ended May 31 of the year referenced and comparisons are to the corresponding period of the prior year.

Certain prior period amounts have been reclassified to conform to the current period's presentation.

*NEW ACCOUNTING PRONOUNCEMENTS.* New accounting rules and disclosure requirements can significantly impact the comparability of our financial statements. We believe the following new accounting pronouncements are relevant to the readers of our financial statements.

On June 1, 2007, we adopted Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 48, "Accounting for Uncertainty in Income Taxes." This interpretation establishes new standards for the financial statement recognition, measurement and disclosure of uncertain tax positions taken or expected to be taken in income tax returns.

The cumulative effect of adopting FIN 48 was immaterial. Upon adoption, our liability for income taxes under FIN 48 was $72 million, and the balance of accrued interest and penalties was $26 million. The liability recorded includes $57 million associated with positions that if favorably resolved would provide a benefit to our effective tax rate. We classify interest related to income tax liabilities as interest expense, and if applicable, penalties are recognized as a component of income tax expense. These income tax liabilities and accrued interest and penalties are presented as noncurrent liabilities because payment of cash is not anticipated within one year of the balance sheet date. These noncurrent income tax liabilities are recorded in the caption "Other liabilities" in our condensed consolidated balance sheets. As of November 30, 2007, there were no material changes to the adoption date disclosures made above.

We file income tax returns in the U.S. and various foreign jurisdictions. The U.S. Internal Revenue Service is currently examining our returns for the 2004 through 2006 tax years. We are no longer subject to U.S. federal income tax examination for years through 2003 except for specific U.S. federal income tax positions that are in various stages of appeal. No resolution date can be reasonably estimated at this time for these audits and appeals. We are also subject to ongoing audits in state, local and foreign tax jurisdictions throughout the world.

It is difficult to predict the ultimate outcome or the timing of resolution for tax positions under FIN 48. Changes may result from the conclusion of ongoing audits or appeals in state, local, federal and foreign tax jurisdictions, or from the resolution of various proceedings between the U.S. and foreign tax authorities. Our liability for tax positions under FIN 48 includes no matters that are individually material to us. It is reasonably possible that the amount of the benefit with respect to certain of our unrecognized tax positions will increase or decrease within the next 12 months, but an estimate of the range of the reasonably possible outcomes cannot be made. However, we do not expect that the resolution of any of our tax positions under FIN 48 will be material.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. ("SFAS") 157, "Fair Value Measurements," which provides a common definition of fair value, establishes a uniform framework for measuring fair value and requires expanded disclosures about fair value measurements. The requirements of SFAS 157 are to be applied prospectively, and we anticipate that the primary impact of the standard to us will be related to the measurement of fair value in our recurring impairment test calculations (such as measurements of our recorded goodwill and indefinite life intangible asset). We do not presently hold any financial assets or liabilities that would require recognition under SFAS 157 other than investments held by our pension plans. SFAS 157 is effective for us beginning June 1, 2008 (fiscal 2009); however, the FASB has proposed a one-year deferral of the adoption of the standard as it relates to non-financial assets and liabilities. Our evaluation of the impact of this standard is ongoing, and we have not yet determined the impact of the standard on our financial condition or results of operations.

In December 2007, the FASB issued SFAS 141R, "Business Combinations," and SFAS 160, "Accounting and Reporting Noncontrolling Interest in Consolidated Financial Statements, an amendment of ARB No. 51." These new standards significantly change the accounting for and reporting of business combination transactions and noncontrolling interests (previously referred to as minority interests) in consolidated financial statements. Both standards are effective for us beginning June 1, 2009 (fiscal 2010) and are applicable only to transactions occurring after the effective date.

*EMPLOYEES UNDER COLLECTIVE BARGAINING ARRANGEMENTS.* The pilots of FedEx Express, which represent a small number of our total employees, are employed under a collective bargaining agreement. During the second quarter of 2007, the pilots ratified a new four-year labor contract that included signing bonuses and other upfront compensation of approximately $143 million, as well as pay increases and other benefit enhancements. These costs were partially mitigated by reductions in variable incentive compensation.

*BUSINESS ACQUISITION.* On September 3, 2006, we acquired FedEx National LTL (formerly Watkins Motor Lines) for $787 million in cash. The financial results of FedEx National LTL are included in the FedEx Freight segment from the date of acquisition.

*DIVIDENDS DECLARED PER COMMON SHARE.* On November 16, 2007, our Board of Directors declared a dividend of $0.10 per share of common stock. The dividend will be paid on January 2, 2008 to stockholders of record as of the close of business on December 12, 2007. Each quarterly dividend payment is subject to review and approval by our Board of Directors, and we evaluate our dividend payment amount on an annual basis at the end of each fiscal year.

(2) Stock-Based Compensation

We have two types of equity-based compensation: stock options and restricted stock. The key terms of the stock option and restricted stock awards granted under our incentive stock plans are set forth in our Annual Report.

Table of Contents

We use the Black-Scholes option pricing model to calculate the fair value of stock options. The value of restricted stock awards is based on the price of the stock on the grant date. We recognize stock-based compensation expense on a straight-line basis over the requisite service period of the award in the "Salaries and employee benefits" caption of our condensed consolidated income statements.

Our total stock-based compensation expense for the periods ended November 30 was as follows (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Stock-based compensation expense | $ 25 | $ 25 | $ 54 | $ 56 |

The following table summarizes the stock option shares granted and corresponding weighted-average Black-Scholes value for the periods ended November 30:

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Stock options granted | 2,645,710 | 1,801,146 |
| Weighted-average Black-Scholes value | $ 30.45 | $ 31.81 |

The stock option grants during the six-month period ended November 30, 2007, were primarily in connection with our principal annual stock option grant in July 2007.

See our Annual Report for a discussion of our methodology for developing each of the assumptions used in the valuation model. The following table presents the key weighted-average assumptions used in the valuation calculations for the options granted during the periods ended November 30:

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Expected lives | 5 years | 5 years |
| Expected volatility | 19% | 22% |
| Risk-free interest rate | 4.90% | 4.95% |
| Dividend yield | 0.329% | 0.300% |

 

(3) Comprehensive Income

The following table provides a reconciliation of net income reported in our financial statements to comprehensive income for the periods ended November 30 (in millions):

| | Three Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Net income | $ 479 | $ 511 |
| Other comprehensive income: | | |
| Foreign currency translation adjustments, net of deferred taxes of $9 in 2007 and $2 in 2006 | 47 | 2 |
| Amortization of unrealized pension actuarial gains/losses, net of deferred taxes of $5 in 2007 | 9 | — |
| Comprehensive income | $ 535 | $ 513 |

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Net income | $ 973 | $ 986 |
| Other comprehensive income: | | |
| Foreign currency translation adjustments, net of deferred taxes of $9 in 2007 and $2 in 2006 | 63 | 2 |
| Amortization of unrealized pension actuarial gains/losses, net of deferred taxes of $12 in 2007 | 22 | — |
| Comprehensive income | $ 1,058 | $ 988 |

(4) Financing Arrangements

We have a shelf registration statement filed with the Securities and Exchange Commission ("SEC") that allows us to sell, in one or more future offerings, any combination of our unsecured debt securities and common stock. In August 2006, we issued $1 billion of senior unsecured debt under our shelf registration statement, comprised of floating-rate notes totaling $500 million and fixed-rate notes totaling $500 million. The $500 million in floating-rate notes were repaid in August 2007. The fixed-rate notes bear interest at an annual rate of 5.5%, payable semi-annually, and are due in August 2009. The net proceeds were used for working capital and general corporate purposes, including the funding of several acquisitions during 2007.

From time to time, we finance certain operating and investing activities, including acquisitions, through borrowings under our $1 billion revolving credit facility or the issuance of commercial paper. The revolving credit agreement contains certain covenants and restrictions, none of which are expected to significantly affect our operations or ability to pay dividends. Our commercial paper program is backed by unused commitments under the revolving credit facility and borrowings under the program reduce the amount available under the credit facility. At November 30, 2007, no commercial paper borrowings were outstanding and the entire amount under the credit facility was available.

(5) Computation of Earnings Per Share

The calculation of basic and diluted earnings per common share for the periods ended November 30 was as follows (in millions, except per share amounts):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Net income | $ 479 | $ 511 | $ 973 | $ 986 |
| Weighted-average shares of common stock outstanding | 309 | 307 | 309 | 306 |
| Common equivalent shares: | | | | |
| Assumed exercise of outstanding dilutive options | 14 | 18 | 15 | 18 |
| Less shares repurchased from proceeds of assumed exercise of options | (11) | (14) | (12) | (13) |
| Weighted-average common and common equivalent shares outstanding | 312 | 311 | 312 | 311 |
| Basic earnings per common share | $ 1.55 | $ 1.67 | $ 3.15 | $ 3.22 |
| Diluted earnings per common share | $ 1.54 | $ 1.64 | $ 3.12 | $ 3.17 |
| Antidilutive options excluded from diluted earnings per common share calculation | 4.4 | 0.1 | 4.3 | 0.1 |

Antidilutive options included in the table above were excluded from the calculation of diluted earnings per share, as the exercise price of these options was greater than the average market price of common stock.

(6) Retirement Plans

We sponsor programs that provide retirement benefits to most of our employees. These programs include defined benefit pension plans, defined contribution plans and postretirement healthcare plans. Key terms of our retirement plans are provided in our Annual Report. Our retirement plans costs for the periods ended November 30 were as follows (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| U.S. domestic and international pension plans | $ 78 | $ 114 | $ 163 | $ 228 |
| U.S. domestic and international defined contribution plans | 34 | 41 | 72 | 81 |
| Postretirement healthcare plans | 15 | 14 | 31 | 28 |
| | $ 127 | $ 169 | $ 266 | $ 337 |

Net periodic benefit cost of the pension and postretirement healthcare plans for the periods ended November 30 was composed of the following (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Pension Plans: | | | | |
| Service cost | $ 130 | $ 133 | $ 259 | $ 265 |
| Interest cost | 180 | 177 | 360 | 354 |
| Expected return on plan assets | (247) | (233) | (493) | (465) |
| Amortization of prior service cost and other | 15 | 37 | 37 | 74 |
| | $ 78 | $ 114 | $ 163 | $ 228 |
| Postretirement Healthcare Plans: | | | | |
| Service cost | $ 8 | $ 8 | $ 17 | $ 16 |
| Interest cost | 7 | 7 | 15 | 14 |
| Amortization of prior service cost and other | — | (1) | (1) | (2) |
| | $ 15 | $ 14 | $ 31 | $ 28 |

We made tax-deductible voluntary contributions to our qualified U.S. domestic pension plans of $479 million during the first six months of 2008 and $482 million during the first six months of 2007. We do not expect to make any additional significant contributions in 2008.

(7) Business Segment Information

We provide a broad portfolio of transportation, e-commerce and business services through companies competing collectively, operating independently and managed collaboratively under the respected FedEx brand. Our major service lines include Federal Express Corporation ("FedEx Express"), the world's largest express transportation company; FedEx Ground Package System, Inc. ("FedEx Ground"), a leading provider of small-package ground delivery services; and FedEx Freight Corporation, a leading U.S. provider of LTL freight services. FedEx Services provides customer-facing sales, marketing and information technology support, as well as retail access for customers through FedEx Kinko's, primarily for the benefit of FedEx Express and FedEx Ground. These businesses form the core of our reportable segments.

Case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 17 of 40

Our reportable segments include the following businesses:

| | |
|---|---|
| **FedEx Express Segment** | FedEx Express (express transportation)<br>FedEx Trade Networks (global trade services) |
| **FedEx Ground Segment** | FedEx Ground (small-package ground delivery)<br>FedEx SmartPost (small-parcel consolidator) |
| **FedEx Freight Segment** | FedEx Freight LTL Group:<br>FedEx Freight (regional LTL freight transportation)<br>FedEx National (long-haul LTL freight transportation)<br>FedEx Custom Critical (time-critical transportation)<br>Caribbean Transportation Services (airfreight forwarding) |
| **FedEx Services Segment** | FedEx Services (sales, marketing and information technology functions)<br>FedEx Kinko's (document and business services and package acceptance)<br>FedEx Customer Information Services ("FCIS") (customer service, billing and collections)<br>FedEx Global Supply Chain Services (logistics services) |

The FedEx Services segment includes FedEx Services, which is responsible for our sales, marketing and information technology functions, FCIS, which is responsible for customer service, billings and collections for FedEx Express and FedEx Ground, FedEx Global Supply Chain Services, which provides a range of logistics services to our customers, and FedEx Kinko's.

During the first quarter of 2008, FedEx Kinko's was reorganized as a part of the FedEx Services segment. FedEx Kinko's provides retail access to our customers for our package transportation businesses and an array of document and business services. FedEx Services provides access to customers, through digital channels such as fedex.com. Under FedEx Services, FedEx Kinko's benefits from the full range of resources and expertise of FedEx Services to continue to enhance the customer experience, provide greater, more convenient access to the portfolio of services at FedEx, and increase revenues through our retail network. With this reorganization, the FedEx Services segment is now a reportable segment. Prior year amounts have been revised to conform to the current year segment presentation.

As part of this reorganization, we are pursuing synergies in sales, marketing, information technology and administrative areas. During the third quarter of 2008, management decided to slow the rate of expansion for new locations in 2009 and balance the focus between store expansion and improving core services at existing stores. However, we remain committed to the long-term expansion of our retail network.

FedEx Kinko's will continue to be treated as a reporting unit for purposes of goodwill and tradename impairment testing. A material change in our strategy or long-range outlook for FedEx Kinko's could trigger the need to perform an impairment test on these assets in advance of our regularly scheduled annual tests in the fourth quarter.

The costs of providing the sales, marketing and information technology functions of FedEx Services and the customer service functions of FCIS, together with the net operating costs of FedEx Global Supply Chain Services and FedEx Kinko's, are allocated primarily to the FedEx Express and FedEx Ground segments based on metrics such as relative revenues or estimated services provided. We believe these allocations approximate the net cost of providing these functions.

Certain FedEx operating companies provide transportation and related services for other FedEx companies outside their reportable segment. Billings for such services are based on negotiated rates, which we believe approximate fair value, and are reflected as revenues of the billing segment. These rates are adjusted from time to time based on market conditions. Such intersegment revenues and expenses are eliminated in the consolidated results and are not separately identified in the following segment information, as the amounts are not material.

The operating expenses line item "Intercompany charges" on the accompanying unaudited financial summaries of our transportation segments includes the allocations from the FedEx Services segment to the respective transportation segments. The "Intercompany charges" caption also includes allocations for administrative services provided between operating companies and certain other costs such as corporate management fees related to services received for general corporate oversight, including executive officers and certain legal and finance functions. Management evaluates transportation segment financial performance based on operating income.

The following table provides a reconciliation of reportable segment revenues, depreciation and amortization, and operating income to our condensed consolidated statements of income totals for the periods ended November 30 (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| **Revenues** | | | | |
| FedEx Express segment | $ 6,037 | $ 5,693 | $ 11,926 | $ 11,333 |
| FedEx Ground segment | 1,698 | 1,520 | 3,316 | 2,937 |
| FedEx Freight segment [1] | 1,236 | 1,225 | 2,469 | 2,238 |
| FedEx Services segment | 550 | 543 | 1,075 | 1,070 |
| Other and eliminations | (70) | (55) | (136) | (107) |
| | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |
| **Depreciation and amortization** | | | | |
| FedEx Express segment | $ 234 | $ 208 | $ 464 | $ 413 |
| FedEx Ground segment | 77 | 65 | 150 | 126 |
| FedEx Freight segment [1] | 58 | 52 | 115 | 83 |
| FedEx Services segment | 113 | 104 | 226 | 206 |
| Other and eliminations | — | 1 | — | 1 |
| | $ 482 | $ 430 | $ 955 | $ 829 |
| **Operating Income** [2] | | | | |
| FedEx Express segment | $ 531 | $ 508 | $ 1,050 | $ 983 |
| FedEx Ground segment | 173 | 193 | 363 | 352 |
| FedEx Freight segment [1] | 79 | 138 | 184 | 288 |
| | $ 783 | $ 839 | $ 1,597 | $ 1,623 |

(1) Includes the results of FedEx National LTL from the date of acquisition on September 3, 2006.

(2) The net operating costs of the FedEx Services segment, including FedEx Kinko's, are allocated back to the transportation segments it supports. Prior year amounts have been revised to conform to the current year presentation.

The following table provides a reconciliation of segment assets to our condensed consolidated balance sheets totals as of November 30, 2007 and May 31, 2007 (in millions):

| | November 30, 2007 | May 31, 2007 |
|---|---|---|
| Segment Assets | | |
| FedEx Express segment | $ 16,934 | $ 15,650 |
| FedEx Ground segment | 4,276 | 3,937 |
| FedEx Freight segment | 3,274 | 3,150 |
| FedEx Services segment | 5,460 | 5,384 |
| Other and eliminations | (5,597) | (4,121) |
| | $ 24,347 | $ 24,000 |

The following table provides a reconciliation of reportable segment capital expenditures to consolidated totals for the six months ended November 30 (in millions):

| | FedEx Express Segment | FedEx Ground Segment | FedEx Freight Segment | FedEx Services Segment | Consolidated Total |
|---|---|---|---|---|---|
| 2007 | $ 815 | $ 288 | $ 181 | $ 229 | $ 1,513 |
| 2006 | 770 | 317 | 168 | 204 | 1,459 |

Table of Contents

The following table presents revenue by service type and geographic information for the periods ended November 30 (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| **REVENUE BY SERVICE TYPE** | | | | |
| FedEx Express segment: | | | | |
| Package: | | | | |
| U.S. overnight box | $ 1,615 | $ 1,634 | $ 3,231 | $ 3,288 |
| U.S. overnight envelope | 481 | 488 | 992 | 1,000 |
| U.S. deferred | 730 | 716 | 1,441 | 1,421 |
| Total U.S. domestic package revenue | 2,826 | 2,838 | 5,664 | 5,709 |
| International Priority (IP) | 1,910 | 1,697 | 3,731 | 3,362 |
| International domestic [1] | 174 | 57 | 329 | 109 |
| Total package revenue | 4,910 | 4,592 | 9,724 | 9,180 |
| Freight: | | | | |
| U.S. | 604 | 624 | 1,197 | 1,231 |
| International priority freight | 312 | 271 | 604 | 520 |
| International airfreight | 96 | 106 | 190 | 209 |
| Total freight revenue | 1,012 | 1,001 | 1,991 | 1,960 |
| Other [2] | 115 | 100 | 211 | 193 |
| Total FedEx Express segment | 6,037 | 5,693 | 11,926 | 11,333 |
| FedEx Ground segment | 1,698 | 1,520 | 3,316 | 2,937 |
| FedEx Freight segment [3] | 1,236 | 1,225 | 2,469 | 2,238 |
| FedEx Services segment | 550 | 543 | 1,075 | 1,070 |
| Other and Eliminations | (70) | (55) | (136) | (107) |
| | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |
| **GEOGRAPHICAL INFORMATION** [4] | | | | |
| Revenues: | | | | |
| U.S. | $ 6,790 | $ 6,649 | $ 13,483 | $ 12,995 |
| International | 2,661 | 2,277 | 5,167 | 4,476 |
| | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |

The following table presents noncurrent assets as of November 30, 2007 and May 31, 2007 (in millions):

| | November 30, 2007 | May 31, 2007 |
|---|---|---|
| Noncurrent assets: | | |
| U.S. | $ 14,782 | $ 14,191 |
| International | 3,214 | 3,180 |
| | $ 17,996 | $ 17,371 |

(1) International domestic revenues include our international domestic express operations in the United Kingdom, Canada, India and China.

(2) Other revenues includes FedEx Trade Networks.

(3) Includes the results of FedEx National LTL from the date of acquisition on September 3, 2006.

(4) International revenue includes shipments that either originate in or are destined to locations outside the United States. Noncurrent assets include property and equipment, goodwill and other long-term assets. Flight equipment is allocated between geographic areas based on usage.

Table of Contents

(8) Commitments

As of November 30, 2007, our purchase commitments for the remainder of 2008 and annually thereafter under various contracts were as follows (in millions):

| | Aircraft | Aircraft-Related [1] | Other [2] | Total |
|---|---|---|---|---|
| 2008 (remainder) | $ 243 | $ 82 | $ 288 | $ 613 |
| 2009 | 930 | 143 | 183 | 1,256 |
| 2010 | 907 | 132 | 113 | 1,152 |
| 2011 | 665 | 9 | 62 | 736 |
| 2012 | 31 | — | 56 | 87 |
| Thereafter | — | — | 164 | 164 |

(1) Primarily aircraft modifications.

(2) Primarily vehicles, facilities, and advertising and promotions contracts.

The amounts reflected in the table above for purchase commitments represent non-cancelable agreements to purchase goods or services. Commitments to purchase aircraft in passenger configuration do not include the attendant costs to modify these aircraft for cargo transport unless we have entered into non-cancelable commitments to modify such aircraft. Open purchase orders that are cancelable are not considered unconditional purchase obligations for financial reporting purposes and are not included in the table above.

Deposits and progress payments of $122 million have been made toward aircraft purchases, options to purchase additional aircraft and other planned aircraft-related transactions. Our primary aircraft purchase commitments include the Boeing 757 ("B757") and Boeing 777 Freighter ("B777F") aircraft. In addition, we have committed to modify our DC10 aircraft for two-man cockpit configurations. Future payments related to these activities are included in the table above. Aircraft and aircraft-related contracts are subject to price escalations. The following table is a summary of the number and type of aircraft we are committed to purchase as of November 30, 2007, with the year of expected delivery:

| | A300 | B757 | B777F | MD11 | Total |
|---|---|---|---|---|---|
| 2008 (remainder) | 3 | 6 | — | — | 9 |
| 2009 | 3 | 14 | — | 2 | 19 |
| 2010 | — | 4 | 6 | — | 10 |
| 2011 | — | 5 | 9 | — | 14 |
| 2012 | — | 3 | — | — | 3 |
| Total | 6 | 32 | 15 | 2 | 55 |

A summary of future minimum lease payments under capital leases at November 30, 2007 is as follows (in millions):

| | |
|---|---|
| 2008 (remainder) | $ 92 |
| 2009 | 13 |
| 2010 | 97 |
| 2011 | 8 |
| 2012 | 8 |
| Thereafter | 137 |
| | 355 |
| Less amount representing interest | 50 |
| Present value of net minimum lease payments | $ 305 |

A summary of future minimum lease payments under non-cancelable operating leases with an initial or remaining term in excess of one year at November 30, 2007 is as follows (in millions):

| | Aircraft and Related Equipment | Facilities and Other | Total |
|---|---|---|---|
| 2008 (remainder) | $ 388 | $ 576 | $ 964 |
| 2009 | 558 | 1,046 | 1,604 |
| 2010 | 544 | 870 | 1,414 |
| 2011 | 526 | 713 | 1,239 |
| 2012 | 504 | 596 | 1,100 |
| Thereafter | 3,430 | 3,574 | 7,004 |
| | $ 5,950 | $ 7,375 | $ 13,325 |

While certain of our lease agreements contain covenants governing the use of the leased assets or require us to maintain certain levels of insurance, none of our lease agreements include material financial covenants or limitations.

FedEx Express makes payments under certain leveraged operating leases that are sufficient to pay principal and interest on certain pass-through certificates. The pass-through certificates are not direct obligations of, or guaranteed by, FedEx or FedEx Express.

(9) Contingencies

*Wage-and-Hour.* We are a defendant in a number of lawsuits containing various class-action allegations of wage-and-hour violations. The plaintiffs in these lawsuits allege, among other things, that they were forced to work "off the clock," were not paid overtime or were not provided work breaks or other benefits. The complaints generally seek unspecified monetary damages, injunctive relief, or both. In September 2007, we tentatively agreed to settle two such lawsuits against FedEx Ground for an immaterial amount. We have denied any liability and intend to vigorously defend ourselves in the other wage-and-hour lawsuits. Given the nature and status of the claims in these other lawsuits, we cannot yet determine the amount or a reasonable range of potential loss, if any.

*Independent Contractor. Estrada v. FedEx Ground* is a class action involving single work area contractors in California. In August 2007, the California appellate court affirmed the trial court's ruling in *Estrada* that a limited number of California single work area contractors (most of whom have not contracted with FedEx Ground since 2001) should be reimbursed as employees for some of their operating expenses. The California supreme court has refused to review the appellate court decision. Accordingly, the case has been remanded to the trial court for reconsideration of the amount of such reimbursable expenses. We do not expect to incur a material loss in the *Estrada* matter.

FedEx Ground is involved in numerous other purported class-action lawsuits and state administrative proceedings that claim that the company's owner-operators should be treated as employees, rather than independent contractors. Most of the purported class actions have been consolidated for administration of the pre-trial proceedings by a single federal court, the U.S. District Court for the Northern District of Indiana. With the exception of recently filed cases that have been or will be transferred to the multi-district litigation, discovery and class certification briefing are now complete.

In October 2007, we received a decision from the court granting class certification in a Kansas action alleging state law claims on behalf of a statewide class and federal law claims under the Employee Retirement Income Security Act of 1974 on behalf of a nationwide class. The court also required the parties to submit briefs on the issue of whether the decision should be applied to the other actions pending class certification determination in the multi-district litigation. We have appealed the decision to the U.S. Court of Appeals for the Seventh Circuit.

Adverse determinations in these matters could, among other things, entitle certain of our contractors to the reimbursement of certain expenses and to the benefit of wage-and-hour laws and result in employment and withholding tax liability for FedEx Ground, and could result in changes to the independent contractor status of FedEx Ground's owner-operators. We believe that FedEx Ground's owner-operators are properly classified as independent contractors. Given the nature and status of the claims, we cannot yet determine the amount or a reasonable range of potential loss, if any, in these matters, but it is reasonably possible that such potential loss or such changes could be material.

On December 20, 2007, the Internal Revenue Service ("IRS") informed us that its audit team had concluded an audit for the 2002 calendar year regarding the classification of owner-operators at FedEx Ground. The IRS has tentatively concluded, subject to further discussion with us, that FedEx Ground's pick-up-and-delivery owner-operators should be reclassified as employees for federal employment tax purposes. The IRS has indicated that it anticipates assessing tax and penalties of $319 million plus interest for 2002. Similar issues are under audit by the IRS for calendar years 2004 through 2006. We believe that we have strong defenses to the IRS's tentative assessment and will vigorously defend our position, as we continue to believe that FedEx Ground's owner-operators are independent contractors. Given the preliminary status of this matter, we cannot yet determine the amount or a reasonable range of potential loss. However, we do not believe that any loss is probable.

*Antitrust — FedEx Freight Fuel Surcharge.* In July 2007, a purported antitrust class action lawsuit was filed in California federal court, naming FedEx Corporation (particularly FedEx Freight Corporation and its LTL freight subsidiaries) and several other major LTL freight carriers as defendants. The lawsuit alleges that the defendants conspired to fix fuel surcharge rates in violation of federal antitrust laws and seeks injunctive relief, treble damages and attorneys' fees. Since the filing of the original case, similar cases have been filed against us and other LTL freight carriers, each with allegations of conspiracy to fix fuel surcharge rates along with other related allegations. We believe that these lawsuits have no merit and intend to vigorously defend ourselves. Given the nature and status of the claims, we cannot yet determine the amount or a reasonable range of potential loss, if any, in these matters.

*Other.* FedEx and its subsidiaries are subject to other legal proceedings that arise in the ordinary course of their business. In the opinion of management, the aggregate liability, if any, with respect to these other actions will not materially adversely affect our financial position, results of operations or cash flows.

(10) Supplemental Cash Flow Information

The following table presents supplemental cash flow information for the periods ended November 30 (in millions):

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Cash payments for: | | |
| Interest (net of capitalized interest) | $ 65 | $ 64 |
| Income taxes | 567 | 642 |

(11) Condensed Consolidating Financial Statements

We are required to present condensed consolidating financial information in order for the subsidiary guarantors (other than FedEx Express) of our public debt to continue to be exempt from reporting under the Securities Exchange Act of 1934.

The guarantor subsidiaries, which are wholly owned by FedEx, guarantee approximately $1.2 billion of our debt. The guarantees are full and unconditional and joint and several. Our guarantor subsidiaries were not determined using geographic, service line or other similar criteria, and as a result, the "Guarantor" and "Non-Guarantor" columns each include portions of our domestic and international operations. Accordingly, this basis of presentation is not intended to present our financial condition, results of operations or cash flows for any purpose other than to comply with the specific requirements for subsidiary guarantor reporting.

Condensed consolidating financial statements for our guarantor subsidiaries and non-guarantor subsidiaries are presented in the following tables (in millions):

CONDENSED CONSOLIDATING BALANCE SHEETS
(UNAUDITED)
November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CURRENT ASSETS | | | | | |
| Cash and cash equivalents | $ 435 | $ 140 | $ 255 | $ — | $ 830 |
| Receivables, less allowances | 2 | 3,284 | 1,083 | (45) | 4,324 |
| Spare parts, fuel, supplies, prepaid expenses and other, less allowances | 3 | 564 | 99 | — | 666 |
| Deferred income taxes | — | 493 | 38 | — | 531 |
| Total current assets | 440 | 4,481 | 1,475 | (45) | 6,351 |
| PROPERTY AND EQUIPMENT, AT COST | 23 | 25,796 | 2,562 | — | 28,381 |
| Less accumulated depreciation and amortization | 14 | 13,987 | 1,155 | — | 15,156 |
| Net property and equipment | 9 | 11,809 | 1,407 | — | 13,225 |
| INTERCOMPANY RECEIVABLE | — | 2,873 | 654 | (3,527) | — |
| GOODWILL | — | 2,667 | 848 | — | 3,515 |
| INVESTMENT IN SUBSIDIARIES | 17,656 | 3,410 | — | (21,066) | — |
| OTHER ASSETS | 661 | 482 | 745 | (632) | 1,256 |
| | $ 18,766 | $ 25,722 | $ 5,129 | $ (25,270) | $ 24,347 |
| LIABILITIES AND STOCKHOLDERS' INVESTMENT | | | | | |
| CURRENT LIABILITIES | | | | | |
| Current portion of long-term debt | $ 41 | $ 84 | $ 2 | $ — | $ 127 |
| Accrued salaries and employee benefits | 39 | 842 | 185 | — | 1,066 |
| Accounts payable | 39 | 1,793 | 513 | (45) | 2,300 |
| Accrued expenses | 24 | 1,148 | 245 | — | 1,417 |
| Total current liabilities | 143 | 3,867 | 945 | (45) | 4,910 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 1,249 | 756 | 2 | — | 2,007 |
| INTERCOMPANY PAYABLE | 3,527 | — | — | (3,527) | — |
| OTHER LONG-TERM LIABILITIES | | | | | |
| Deferred income taxes | — | 1,282 | 278 | (632) | 928 |
| Other liabilities | 107 | 2,507 | 128 | — | 2,742 |
| Total other long-term liabilities | 107 | 3,789 | 406 | (632) | 3,670 |
| STOCKHOLDERS' INVESTMENT | 13,740 | 17,310 | 3,776 | (21,066) | 13,760 |
| | $ 18,766 | $ 25,722 | $ 5,129 | $ (25,270) | $ 24,347 |

CONDENSED CONSOLIDATING BALANCE SHEETS
May 31, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CURRENT ASSETS | | | | | |
| Cash and cash equivalents | $ 1,212 | $ 124 | $ 233 | $ — | $ 1,569 |
| Receivables, less allowances | — | 3,029 | 948 | (35) | 3,942 |
| Spare parts, fuel, supplies, prepaid expenses and other, less allowances | 7 | 500 | 75 | — | 582 |
| Deferred income taxes | — | 505 | 31 | — | 536 |
| Total current assets | 1,219 | 4,158 | 1,287 | (35) | 6,629 |
| PROPERTY AND EQUIPMENT, AT COST | 22 | 24,681 | 2,387 | — | 27,090 |
| Less accumulated depreciation and amortization | 14 | 13,422 | 1,018 | — | 14,454 |
| Net property and equipment | 8 | 11,259 | 1,369 | — | 12,636 |
| INTERCOMPANY RECEIVABLE | — | 924 | 539 | (1,463) | — |
| GOODWILL | — | 2,667 | 830 | — | 3,497 |
| INVESTMENT IN SUBSIDIARIES | 14,588 | 3,340 | — | (17,928) | — |
| OTHER ASSETS | 670 | 457 | 755 | (644) | 1,238 |
| | $ 16,485 | $ 22,805 | $ 4,780 | $ (20,070) | $ 24,000 |
| LIABILITIES AND STOCKHOLDERS' INVESTMENT | | | | | |
| CURRENT LIABILITIES | | | | | |
| Current portion of long-term debt | $ 551 | $ 85 | $ 3 | $ — | $ 639 |
| Accrued salaries and employee benefits | 60 | 1,079 | 215 | — | 1,354 |
| Accounts payable | 37 | 1,563 | 448 | (32) | 2,016 |
| Accrued expenses | 36 | 1,197 | 189 | (3) | 1,419 |
| Total current liabilities | 684 | 3,924 | 855 | (35) | 5,428 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 1,248 | 757 | 2 | — | 2,007 |
| INTERCOMPANY PAYABLE | 1,463 | — | — | (1,463) | — |
| OTHER LONG-TERM LIABILITIES | | | | | |
| Deferred income taxes | — | 1,262 | 279 | (644) | 897 |
| Other liabilities | 451 | 2,445 | 116 | — | 3,012 |
| Total other long-term liabilities | 451 | 3,707 | 395 | (644) | 3,909 |
| STOCKHOLDERS' INVESTMENT | 12,639 | 14,417 | 3,528 | (17,928) | 12,656 |
| | $ 16,485 | $ 22,805 | $ 4,780 | $ (20,070) | $ 24,000 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Three Months Ended November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 7,788 | $ 1,773 | $ (110) | $ 9,451 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 24 | 2,870 | 616 | — | 3,510 |
| Purchased transportation | — | 822 | 336 | (22) | 1,136 |
| Rentals and landing fees | 1 | 532 | 78 | — | 611 |
| Depreciation and amortization | 1 | 409 | 72 | — | 482 |
| Fuel | — | 983 | 77 | — | 1,060 |
| Maintenance and repairs | — | 478 | 41 | — | 519 |
| Intercompany charges, net | (53) | (57) | 110 | — | — |
| Other | 27 | 1,131 | 280 | (88) | 1,350 |
| | — | 7,168 | 1,610 | (110) | 8,668 |
| OPERATING INCOME | — | 620 | 163 | — | 783 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 479 | 72 | — | (551) | — |
| Interest, net | (12) | 1 | (4) | — | (15) |
| Intercompany charges, net | 14 | (18) | 4 | — | — |
| Other, net | (2) | 1 | 1 | — | — |
| INCOME BEFORE INCOME TAXES | 479 | 676 | 164 | (551) | 768 |
| Provision for income taxes | — | 220 | 69 | — | 289 |
| NET INCOME | $ 479 | $ 456 | $ 95 | $ (551) | $ 479 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Three Months Ended November 30, 2006

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 7,541 | $ 1,479 | $ (94) | $ 8,926 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 25 | 2,987 | 514 | — | 3,526 |
| Purchased transportation | — | 762 | 241 | (7) | 996 |
| Rentals and landing fees | 2 | 519 | 64 | (1) | 584 |
| Depreciation and amortization | 1 | 373 | 56 | — | 430 |
| Fuel | — | 807 | 53 | — | 860 |
| Maintenance and repairs | — | 460 | 32 | — | 492 |
| Intercompany charges, net | (49) | (63) | 112 | — | — |
| Other | 21 | 1,055 | 209 | (86) | 1,199 |
| | — | 6,900 | 1,281 | (94) | 8,087 |
| OPERATING INCOME | — | 641 | 198 | — | 839 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 511 | 123 | — | (634) | — |
| Interest, net | (7) | (11) | 1 | — | (17) |
| Intercompany charges, net | 8 | (6) | (2) | — | — |
| Other, net | (1) | 1 | 1 | — | 1 |
| INCOME BEFORE INCOME TAXES | 511 | 748 | 198 | (634) | 823 |
| Provision for income taxes | — | 261 | 51 | — | 312 |
| NET INCOME | $ 511 | $ 487 | $ 147 | $ (634) | $ 511 |

Case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 28 of 40

Table of Contents

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Six Months Ended November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 15,434 | $ 3,422 | $ (206) | $ 18,650 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 57 | 5,726 | 1,210 | — | 6,993 |
| Purchased transportation | — | 1,568 | 634 | (41) | 2,161 |
| Rentals and landing fees | 2 | 1,051 | 152 | (1) | 1,204 |
| Depreciation and amortization | 1 | 808 | 146 | — | 955 |
| Fuel | — | 1,879 | 145 | — | 2,024 |
| Maintenance and repairs | — | 984 | 79 | — | 1,063 |
| Intercompany charges, net | (106) | (75) | 181 | — | — |
| Other | 46 | 2,231 | 540 | (164) | 2,653 |
| | — | 14,172 | 3,087 | (206) | 17,053 |
| OPERATING INCOME | — | 1,262 | 335 | — | 1,597 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 973 | 146 | — | (1,119) | — |
| Interest, net | (21) | (12) | (7) | — | (40) |
| Intercompany charges, net | 26 | (31) | 5 | — | — |
| Other, net | (5) | 2 | 1 | — | (2) |
| INCOME BEFORE INCOME TAXES | 973 | 1,367 | 334 | (1,119) | 1,555 |
| Provision for income taxes | — | 465 | 117 | — | 582 |
| NET INCOME | $ 973 | $ 902 | $ 217 | $ (1,119) | $ 973 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Six Months Ended November 30, 2006

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 15,009 | $ 2,641 | $ (179) | $ 17,471 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 52 | 5,857 | 902 | — | 6,811 |
| Purchased transportation | — | 1,491 | 415 | (14) | 1,892 |
| Rentals and landing fees | 2 | 1,033 | 120 | (1) | 1,154 |
| Depreciation and amortization | 1 | 735 | 93 | — | 829 |
| Fuel | — | 1,711 | 90 | — | 1,801 |
| Maintenance and repairs | — | 957 | 50 | — | 1,007 |
| Intercompany charges, net | (99) | (94) | 193 | — | — |
| Other | 44 | 2,092 | 382 | (164) | 2,354 |
| | — | 13,782 | 2,245 | (179) | 15,848 |
| OPERATING INCOME | — | 1,227 | 396 | — | 1,623 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 986 | 237 | — | (1,223) | — |
| Interest, net | (6) | (21) | 1 | — | (26) |
| Intercompany charges, net | 9 | (15) | 6 | — | — |
| Other, net | (3) | — | (1) | — | (4) |
| INCOME BEFORE INCOME TAXES | 986 | 1,428 | 402 | (1,223) | 1,593 |
| Provision for income taxes | — | 498 | 109 | — | 607 |
| NET INCOME | $ 986 | $ 930 | $ 293 | $ (1,223) | $ 986 |

Case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 30 of 40

Table of Contents

CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS
(UNAUDITED)
Six Months Ended November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | $ (320) | $ 1,403 | $ 195 | $ — | $ 1,278 |
| INVESTING ACTIVITIES | | | | | |
| Capital expenditures | — | (1,361) | (152) | — | (1,513) |
| Proceeds from asset dispositions and other | — | 4 | 7 | — | 11 |
| CASH USED IN INVESTING ACTIVITIES | — | (1,357) | (145) | — | (1,502) |
| FINANCING ACTIVITIES | | | | | |
| Net transfers from (to) Parent | 55 | (28) | (27) | — | — |
| Principal payments on debt | (512) | (2) | (1) | — | (515) |
| Proceeds from stock issuances | 50 | — | — | — | 50 |
| Excess tax benefit on the exercise of stock options | 12 | — | — | — | 12 |
| Dividends paid | (62) | — | — | — | (62) |
| CASH USED IN FINANCING ACTIVITIES | (457) | (30) | (28) | — | (515) |
| CASH AND CASH EQUIVALENTS | | | | | |
| Net (decrease) increase in cash and cash equivalents | (777) | 16 | 22 | — | (739) |
| Cash and cash equivalents at beginning of period | 1,212 | 124 | 233 | — | 1,569 |
| Cash and cash equivalents at end of period | $ 435 | $ 140 | $ 255 | $ — | $ 830 |

CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS
(UNAUDITED)
Six Months Ended November 30, 2006

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | $ (290) | $ 1,439 | $ 199 | $ — | $ 1,348 |
| INVESTING ACTIVITIES | | | | | |
| Capital expenditures | — | (1,355) | (104) | — | (1,459) |
| Business acquisition, net of cash acquired | — | — | (784) | — | (784) |
| Proceeds from asset dispositions and other | — | 15 | 17 | — | 32 |
| CASH USED IN INVESTING ACTIVITIES | — | (1,340) | (871) | — | (2,211) |
| FINANCING ACTIVITIES | | | | | |
| Net transfers (to) from Parent | (633) | (44) | 677 | — | — |
| Proceeds from debt issuance | 999 | — | — | — | 999 |
| Principal payments on debt | (200) | (26) | — | — | (226) |
| Proceeds from stock issuances | 55 | — | — | — | 55 |
| Excess tax benefit on the exercise of stock options | 13 | — | — | — | 13 |
| Dividends paid | (55) | — | — | — | (55) |
| Other, net | (5) | — | — | — | (5) |
| CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | 174 | (70) | 677 | — | 781 |
| CASH AND CASH EQUIVALENTS | | | | | |
| Net (decrease) increase in cash and cash equivalents | (116) | 29 | 5 | — | (82) |
| Cash and cash equivalents at beginning of | | | | | |

Case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 32 of 40

| | | | | | |
|---|---|---|---|---|---|
| period | 1,679 | 114 | 144 | — | 1,937 |
| Cash and cash equivalents at end of period | $ 1,563 | $ 143 | $ 149 | $ — | $ 1,855 |

Case 3:05-md-00527-RLM -CAN document 1068-2 filed 01/02/08 page 33 of 40

REPORT OF INDEPENDENT REGISTERED
PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
FedEx Corporation

We have reviewed the condensed consolidated balance sheet of FedEx Corporation as of November 30, 2007, and the related condensed consolidated statements of income for the three-month and six-month periods ended November 30, 2007 and 2006 and the condensed consolidated statements of cash flows for the six-month periods ended November 30, 2007 and 2006. These financial statements are the responsibility of the Company's management.

We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the condensed consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of FedEx Corporation as of May 31, 2007, and the related consolidated statements of income, changes in stockholders' investment and comprehensive income, and cash flows for the year then ended not presented herein, and in our report dated July 9, 2007, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of May 31, 2007, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Ernst & Young LLP

Memphis, Tennessee
December 21, 2007

*Item 2. Management's Discussion and Analysis of Results of Operations and Financial Condition*

GENERAL

The following Management's Discussion and Analysis of Results of Operations and Financial Condition describes the principal factors affecting the results of operations, liquidity, capital resources, contractual cash obligations and critical accounting estimates of FedEx. This discussion should be read in conjunction with the accompanying quarterly unaudited condensed consolidated financial statements and our Annual Report on Form 10-K for the year ended May 31, 2007 ("Annual Report"). Our Annual Report includes additional information about our significant accounting policies, practices and the transactions that underlie our financial results, as well as our detailed discussion of the most significant risks and uncertainties associated with our financial and operating results.

We provide a broad portfolio of transportation, e-commerce and business services through companies competing collectively, operating independently and managed collaboratively under the respected FedEx brand. Our major service lines include Federal Express Corporation ("FedEx Express"), the world's largest express transportation company; FedEx Ground Package System, Inc. ("FedEx Ground"), a leading provider of small-package ground delivery services; and FedEx Freight Corporation, a leading U.S. provider of less-than-truckload ("LTL") freight services. Our FedEx Services segment provides customer-facing sales, marketing and information technology support, as well as retail access for customers through FedEx Kinko's Office and Print Services, Inc. ("FedEx Kinko's"), primarily for the benefit of FedEx Express and FedEx Ground. These companies form the core of our reportable segments. See "Reportable Segments" for further discussion.

The key indicators necessary to understand our operating results include:

- the overall customer demand for our various services;
- the volumes of transportation services provided through our networks, primarily measured by our average daily volume and shipment weight;
- the mix of services purchased by our customers;
- the prices we obtain for our services, primarily measured by yield (average price per shipment or pound or average price per hundredweight for FedEx Freight LTL Group shipments);
- our ability to manage our cost structure (capital expenditures and operating expenses) to match shifting volume levels; and
- the timing and amount of fluctuations in fuel prices and our ability to recover incremental fuel costs through our fuel surcharges.

Except as otherwise specified, references to years indicate our fiscal year ending May 31, 2008 or ended May 31 of the year referenced and comparisons are to the corresponding period of the prior year. References to our transportation segments include, collectively, our FedEx Express, FedEx Ground and FedEx Freight segments.

## RESULTS OF OPERATIONS

### *CONSOLIDATED RESULTS*

The following table compares revenues, operating income, operating margin, net income and diluted earnings per share (dollars in millions, except per share amounts) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 [1] | Change | 2007 | 2006 [1] | Change |
| Revenues | $ 9,451 | $ 8,926 | 6 | $ 18,650 | $ 17,471 | 7 |
| Operating income | 783 | 839 | (7) | 1,597 | 1,623 | (2) |
| Operating margin | 8.3% | 9.4% | (110)bp | 8.6% | 9.3% | (70)bp |
| Net income | $ 479 | $ 511 | (6) | $ 973 | $ 986 | (1) |
| Diluted earnings per share | $ 1.54 | $ 1.64 | (6) | $ 3.12 | $ 3.17 | (2) |

(1) Operating expenses for the three and six months ended November 30, 2006 include a $143 million charge associated with upfront compensation and benefits under the new labor contract with our pilots, which was ratified in October 2006. The impact of this new contract on net income was approximately $78 million net of tax, or $0.25 per diluted share.

The following table shows changes in revenues and operating income by reportable segment for the three- and six-month periods ended November 30, 2007 compared to 2006 (in millions):

| | Change in Revenue | | Percent Change in Revenue | | Change in Operating Income | | Percent Change in Operating Income | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended | Six Months Ended | Three Months Ended | Six Months Ended | Three Months Ended | Six Months Ended | Three Months Ended | Six Months Ended |
| FedEx Express segment [1] | $ 344 | 593 | 6 | 5 | $ 23 | 67 | 5 | 7 |
| FedEx Ground segment | 178 | 379 | 12 | 13 | (20) | 11 | (10) | 3 |
| FedEx Freight segment [2] | 11 | 231 | 1 | 10 | (59) | (104) | (43) | (36) |
| FedEx Services segment | 7 | 5 | 1 | — | — | — | — | — |
| Other and Eliminations | (15) | (29) | NM | NM | — | — | — | — |
| | $ 525 | $ 1,179 | 6 | 7 | $ (56) | $ (26) | (7) | (2) |

(1) FedEx Express operating expenses for the three and six months ended November 30, 2006 include a $143 million charge associated with upfront compensation and benefits under the new labor contract with our pilots, which was ratified in October 2006.

(2) FedEx Freight segment results for the six months ended include the results of FedEx National LTL from the date of its acquisition on September 3, 2006.

Table of Contents

The following graphs for FedEx Express, FedEx Ground and the FedEx Freight LTL Group show selected volume statistics (in thousands) for the five most recent quarters:

The following graphs for FedEx Express, FedEx Ground and the FedEx Freight LTL Group show selected yield statistics for the five most recent quarters:

(1) Package statistics do not include the operations of FedEx SmartPost.

The following graph for our transportation segments shows our average cost of jet and vehicle fuel per gallon for the five most recent quarters:

***Overview of Consolidated Results***

Our operating income and net income for the second quarter and first half of 2008 declined due to the net impact of substantially higher fuel costs and the continued weakness in the U.S. economy, which is limiting demand for our U.S. domestic package and LTL freight services. Increases in international shipments at FedEx Express and strong volume growth at FedEx Ground were positive factors for both the second quarter and first half of 2008. Lower variable incentive compensation and reduced retirement plans costs partially mitigated the impact of higher net fuel costs and the weak U.S. economy on our overall results. Operating income for the second quarter and first half of 2007 included $143 million in expenses associated with our pilot contract, which were mostly offset by the benefits from the timing of net fuel impacts and Hurricane Katrina insurance proceeds.

Revenue growth for the second quarter and first half of 2008 was primarily attributable to continued growth in FedEx Express International Priority ("IP") volumes and yields, significant increases in FedEx Express international domestic revenues due to acquisitions in the second half of 2007 and strong volume growth at FedEx Ground. FedEx Freight segment revenues remained relatively flat during the second quarter of 2008 due to the weak U.S. economy, and growth in the first half of 2008 was due to the inclusion of FedEx National LTL, which was acquired in the second quarter of 2007.

Operating income decreased in the second quarter and first half of 2008 due to the negative net impact of fuel costs across our transportation segments (as noted above) and the continued weakness in the U.S. economy. Reduced profitability in the second quarter was also driven by lower operating income at the FedEx Freight segment and costs associated with the independent contractor incentive programs within our FedEx Ground segment. Higher legal costs at FedEx Ground during the first quarter of 2008 negatively impacted our operating income for the first half of 2008.

Fuel expense increased approximately 23% during the second quarter of 2008, and approximately 12% for the first half of 2008, primarily due to an increase in the average price per gallon of fuel. Our operating income in the second quarter of 2008 reflected a difficult quarter-over-quarter comparison, as last year's second quarter results benefited from the timing lag that exists between when we purchase fuel and when our indexed fuel surcharges automatically adjust. During the second quarter of 2008, we experienced the opposite effect, as fuel prices significantly increased throughout the quarter, while changes in fuel surcharges for FedEx Express and FedEx Ground lag these increases by approximately six to eight weeks.

Fuel surcharges were not sufficient to offset incremental fuel costs for the second quarter and first half of 2008 based on a static analysis of the year-over-year changes in fuel prices compared to changes in fuel surcharges. Though fluctuations in fuel surcharge rates can be significant from period to period, fuel surcharges represent one of the many individual components of our pricing structure that impact our overall revenue and yield. Additional components include the mix of services purchased, the base price and other extra service charges we obtain for these services and the level of pricing discounts offered. In order to provide information about the impact of fuel surcharges on the trend in revenue and yield growth, we have included the comparative fuel surcharge rates in effect for the second quarter and first half of 2008 and 2007 in the following discussions of each of our transportation segments.

Our effective tax rate was 37.6% for the second quarter of 2008 and 37.4% for the first half of 2008, as compared to 37.9% for the second quarter of 2007 and 38.1% for the first half of 2007. The 2008 tax rate was lower than the 2007 rate primarily due to a favorable tax audit adjustment in the first quarter of 2008 and to increased international earnings permanently reinvested in our global network outside the United States. We expect the effective tax rate to be between 37.5% and 38.0% for the remainder of 2008. The actual rate will depend on a number of factors, including the amount and source of operating income.

***Outlook***

We expect our revenue growth rates to continue to moderate across all segments for the second half of 2008, as the continued weak U.S. economy is expected to further restrain demand for U.S. domestic express package and LTL freight services. We anticipate modest earnings growth for the remainder of 2008, as ongoing weakness in the U.S. economy and rising fuel costs will continue to negatively impact our results. These factors will be partially mitigated by revenue growth, primarily from IP services at FedEx Express and increased volumes at FedEx Ground. We are employing cost containment initiatives across all business segments to manage near-term expenditures, but continue to pursue strategic projects related to our long-term growth plans. Accordingly, we continue to expect our earnings in 2008 to be below our long-term goal of 10% to 15% annual earnings growth. However, we remain optimistic about the long-term prospects for all of our business segments.

We expect to continue to make significant investments to expand our global networks and broaden our service offerings, particularly through our international investments. Our planned investments for 2008 are focused on support for long-term volume growth, such as additional or expanded facilities and new aircraft, improvements in service levels, and improvements to productivity, including updates and enhancements to our technology capabilities. However, in light of the impact of the weak U.S. economy on demand for domestic package and LTL services, we have reduced our 2008 capital expenditure forecast from $3.5 billion to $3.1 billion.

All of our businesses operate in a competitive pricing environment, exacerbated by continuing volatile fuel prices. Historically, our fuel surcharges have largely been sufficient to offset incremental fuel costs; however, volatility in fuel costs may impact earnings because adjustments to our fuel surcharges lag changes in actual fuel prices paid. Therefore, the trailing impact of adjustments to our fuel surcharges can significantly affect our earnings in the short-term.

See "Forward-Looking Statements" for a discussion of potential risks and uncertainties that could materially affect our future performance.

***NEW ACCOUNTING PRONOUNCEMENTS***

New accounting rules and disclosure requirements can significantly impact the comparability of our financial statements. We believe the following new accounting pronouncements are relevant to the readers of our financial statements.

On June 1, 2007, we adopted Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 48, "Accounting for Uncertainty in Income Taxes." This interpretation establishes new standards for the financial statement recognition, measurement and disclosure of uncertain tax positions taken or expected to be taken in income tax returns. The cumulative effect of adopting FIN 48 was immaterial. For additional information on the impact of adoption of FIN 48, refer to Note 1 to the accompanying unaudited condensed consolidated financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. ("SFAS") 157, "Fair Value Measurements," which provides a common definition of fair value, establishes a uniform framework for measuring fair value and requires expanded disclosures about fair value measurements. The requirements of SFAS 157 are to be applied prospectively, and we anticipate that the primary impact of the standard to us will be related to the measurement of fair value in our recurring impairment test calculations (such as measurements of our recorded goodwill and indefinite life intangible asset). We do not presently hold any financial assets or liabilities that would require recognition under SFAS 157 other than investments held by our pension plans. SFAS 157 is effective for us beginning June 1, 2008 (fiscal 2009); however, the FASB has proposed a one-year deferral of the adoption of the standard as it relates to non-financial assets and liabilities. Our evaluation of the impact of this standard is ongoing, and we have not yet determined the impact of the standard on our financial condition or results of operations.

In December 2007, the FASB issued SFAS 141R, "Business Combinations," and SFAS 160, "Accounting and Reporting Noncontrolling Interest in Consolidated Financial Statements, an amendment of ARB No. 51." These new standards significantly change the accounting for and reporting of business combination transactions and noncontrolling interests (previously referred to as minority interests) in consolidated financial statements. Both standards are effective for us beginning June 1, 2009 (fiscal 2010) and are applicable only to transactions occurring after the effective date.

*REPORTABLE SEGMENTS*

FedEx Express, FedEx Ground and FedEx Freight represent our major service lines and, along with FedEx Services, form the core of our reportable segments. Our reportable segments include the following businesses:

| | |
|---|---|
| **FedEx Express Segment** | FedEx Express (express transportation)<br>FedEx Trade Networks (global trade services) |
| **FedEx Ground Segment** | FedEx Ground (small-package ground delivery)<br>FedEx SmartPost (small-parcel consolidator) |
| **FedEx Freight Segment** | FedEx Freight LTL Group:<br>FedEx Freight (regional LTL freight transportation)<br>FedEx National LTL (long-haul LTL freight transportation)<br>FedEx Custom Critical (time-critical transportation)<br>Caribbean Transportation Services (airfreight forwarding) |
| **FedEx Services Segment** | FedEx Services (sales, marketing and information technology functions)<br>FedEx Kinko's (document and business services and package acceptance)<br>FedEx Customer Information Services ("FCIS") (customer service, billing and collections)<br>FedEx Global Supply Chain Services (logistics services) |

*FEDEX SERVICES SEGMENT*

The FedEx Services segment includes FedEx Services, which is responsible for our sales, marketing and information technology functions, FCIS, which is responsible for customer service, billings and collections for FedEx Express and FedEx Ground, FedEx Global Supply Chain Services, which provides a range of logistics services to our customers, and FedEx Kinko's.

During the first quarter of 2008, FedEx Kinko's was reorganized as a part of the FedEx Services segment. FedEx Kinko's provides retail access to our customers for our package transportation businesses and an array of document and business services. FedEx Services provides access to customers, through digital channels such as fedex.com. Under FedEx Services, FedEx Kinko's benefits from the full range of resources and expertise of FedEx Services to continue to enhance the customer experience, provide greater, more convenient access to the portfolio of services at FedEx, and increase revenues through our retail network. With this reorganization, the FedEx Services segment is now a reportable segment. Prior year amounts have been revised to conform to the current year segment presentation.

As part of this reorganization, we are pursuing synergies in sales, marketing, information technology and administrative areas. During the third quarter of 2008, management decided to slow the rate of expansion for new locations in 2009 and balance the focus between store expansion and improving core services at existing stores. However, we remain committed to the long-term expansion of our retail network.

FedEx Kinko's will continue to be treated as a reporting unit for purposes of goodwill and tradename impairment testing. A material change in our strategy or long-range outlook for FedEx Kinko's could trigger the need to perform an impairment test on these assets in advance of our regularly scheduled annual tests in the fourth quarter.

The costs of providing the sales, marketing, and information technology functions of FedEx Services and the customer service functions of FCIS, together with the net operating costs of FedEx Global Supply Chain Services and FedEx Kinko's, are allocated primarily to the FedEx Express and FedEx Ground segments based on metrics such as relative revenues or estimated services provided. We believe these allocations approximate the net cost of providing these functions.

FedEx Services segment revenues, which reflect the operations of FedEx Kinko's and FedEx Global Supply Chain Services, increased slightly for the second quarter and first half of 2008. Higher package acceptance fees and revenue generated from new locations more than offset declines in copy product revenues at FedEx Kinko's for the second quarter and first half of 2008. Capital expenditures for the FedEx Services segment are primarily associated with information technology investments and store expansion activities at FedEx Kinko's. FedEx Kinko's continues to invest in a multi-year plan to open new store locations, improving core services and enhancing its integrated digital document service network, supporting the company's objective of being the back office for local businesses and the remote office for traveling professionals. FedEx Kinko's opened 173 new centers during the first half of 2008.

***OTHER INTERSEGMENT TRANSACTIONS***

Certain FedEx operating companies provide transportation and related services for other FedEx companies outside their reportable segment. Billings for such services are based on negotiated rates, which we believe approximate fair value, and are reflected as revenues of the billing segment. These rates are adjusted from time to time based on market conditions. Such intersegment revenues and expenses are eliminated in the consolidated results and are not separately identified in the following segment information, as the amounts are not material.

The operating expenses line item "Intercompany charges" on the accompanying unaudited financial summaries of our transportation segments includes the allocations from the FedEx Services segment to the respective transportation segments. The "Intercompany charges" caption also includes allocations for administrative services provided between operating companies and certain other costs such as corporate management fees related to services received for general corporate oversight, including executive officers and certain legal and finance functions. Management evaluates transportation segment financial performance based on operating income.

***FEDEX EXPRESS SEGMENT***

The following table compares revenues, operating expenses, operating income and operating margin (dollars in millions) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Revenues: | | | | | | |
| Package: | | | | | | |
| U.S. overnight box | $ 1,615 | $ 1,634 | (1) | $ 3,231 | $ 3,288 | (2) |
| U.S. overnight envelope | 481 | 488 | (1) | 992 | 1,000 | (1) |
| U.S. deferred | 730 | 716 | 2 | 1,441 | 1,421 | 1 |
| Total U.S. domestic package revenue | 2,826 | 2,838 | — | 5,664 | 5,709 | (1) |
| International Priority (IP) | 1,910 | 1,697 | 13 | 3,731 | 3,362 | 11 |
| International domestic [1] | 174 | 57 | NM | 329 | 109 | NM |
| Total package revenue | 4,910 | 4,592 | 7 | 9,724 | 9,180 | 6 |
| Freight: | | | | | | |
| U.S. | 604 | 624 | (3) | 1,197 | 1,231 | (3) |
| International priority freight | 312 | 271 | 15 | 604 | 520 | 16 |
| International airfreight | 96 | 106 | (9) | 190 | 209 | (9) |
| Total freight revenue | 1,012 | 1,001 | 1 | 1,991 | 1,960 | 2 |
| Other [2] | 115 | 100 | 15 | 211 | 193 | 9 |
| Total revenues | 6,037 | 5,693 | 6 | 11,926 | 11,333 | 5 |
| Operating expenses: | | | | | | |
| Salaries and employee benefits | 2,059 | 2,116 | (3) | 4,119 | 4,118 | — |
| Purchased transportation | 299 | 269 | 11 | 579 | 532 | 9 |
| Rentals and landing fees | 417 | 392 | 6 | 828 | 790 | 5 |
| Depreciation and amortization | 234 | 208 | 13 | 464 | 413 | 12 |
| Fuel | 872 | 716 | 22 | 1,672 | 1,514 | 10 |
| Maintenance and repairs | 376 | 365 | 3 | 778 | 763 | 2 |
| Intercompany charges | 536 | 520 | 3 | 1,051 | 1,022 | 3 |
| Other | 713 | 599 | 19 | 1,385 | 1,198 | 16 |
| Total operating expenses [3] | 5,506 | 5,185 | 6 | 10,876 | 10,350 | 5 |
| Operating income | $ 531 | $ 508 | 5 | $ 1,050 | $ 983 | 7 |
| Operating margin | 8.8% | 8.9% | (10)bp | 8.8% | 8.7% | 10bp |

(1) International domestic revenues include our international domestic express operations, primarily in the United Kingdom, Canada, India and China.

(2) Other revenues includes FedEx Trade Networks.

(3) Operating expenses for the three and six months ended November 30, 2006 included a $143 million charge associated with upfront compensation and benefits under the labor contract with our pilots, which was ratified in October 2006.

Table of Contents

The following table compares selected statistics (in thousands, except yield amounts) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent Change | Six Months Ended | | Percent Change |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | | 2007 | 2006 | |
| Package Statistics [1] | | | | | | |
| Average daily package volume (ADV): | | | | | | |
| U.S. overnight box | 1,163 | 1,183 | (2) | 1,150 | 1,174 | (2) |
| U.S. overnight envelope | 677 | 700 | (3) | 688 | 702 | (2) |
| U.S. deferred | 902 | 895 | 1 | 883 | 875 | 1 |
| Total U.S. domestic ADV | 2,742 | 2,778 | (1) | 2,721 | 2,751 | (1) |
| IP | 535 | 502 | 7 | 516 | 484 | 7 |
| International domestic [2] | 310 | 49 | NM | 294 | 46 | NM |
| Total ADV | 3,587 | 3,329 | 8 | 3,531 | 3,281 | 8 |
| Revenue per package (yield): | | | | | | |
| U.S. overnight box | $ 22.06 | $ 21.92 | 1 | $ 21.94 | $ 21.87 | — |
| U.S. overnight envelope | 11.27 | 11.06 | 2 | 11.26 | 11.13 | 1 |
| U.S. deferred | 12.84 | 12.70 | 1 | 12.76 | 12.69 | 1 |
| U.S. domestic composite | 16.36 | 16.21 | 1 | 16.26 | 16.21 | — |
| IP | 56.63 | 53.71 | 5 | 56.52 | 54.33 | 4 |
| International domestic [2] | 8.90 | 18.41 | NM | 8.75 | 18.37 | NM |
| Composite package yield | 21.73 | 21.90 | (1) | 21.52 | 21.86 | (2) |
| Freight Statistics [1] | | | | | | |
| Average daily freight pounds: | | | | | | |
| U.S. | 8,915 | 9,917 | (10) | 8,878 | 9,642 | (8) |
| International priority freight | 2,279 | 1,980 | 15 | 2,150 | 1,876 | 15 |
| International airfreight | 1,827 | 1,946 | (6) | 1,789 | 1,922 | (7) |
| Total average daily freight pounds | 13,021 | 13,843 | (6) | 12,817 | 13,440 | (5) |
| Revenue per pound (yield): | | | | | | |
| U.S. | $ 1.08 | $ 1.00 | 8 | $ 1.05 | $ 1.00 | 5 |
| International priority freight | 2.17 | 2.18 | — | 2.19 | 2.17 | 1 |
| International airfreight | 0.83 | 0.86 | (3) | 0.83 | 0.85 | (2) |
| Composite freight yield | 1.23 | 1.15 | 7 | 1.21 | 1.14 | 6 |

(1) Package and freight statistics include only the operations of FedEx Express.

(2) International domestic statistics include our international domestic express operations, primarily in the United Kingdom, Canada, India and China.

***FedEx Express Segment Revenues***

FedEx Express segment revenues increased 6% in the second quarter of 2008 and 5% in the first half of 2008 due to growth in IP and international domestic revenue, partially offset by decreases in U.S. domestic package and U.S. freight revenues. During the second quarter of 2008, IP revenues grew 13% on volume growth of 7% and yield improvement of 5%. During the first half of 2008, IP revenue grew 11% on volume growth of 7% and yield improvement of 4%. Significant increases in international domestic revenues were driven by business acquisitions in the second half of 2007, primarily in the United Kingdom.

IP volume growth during the second quarter and first half of 2008 was due to increased demand in Asia, resulting from continued expansion of our services in Asian markets, as well as increases in the U.S. outbound and European markets. Increased international domestic volumes were driven by business acquisitions in the second half of 2007. U.S. domestic package and U.S. freight volumes decreased during the second quarter and first half of 2008, as the ongoing weak U.S. economy continued to have an impact on demand for these services.

IP yield increased during the second quarter and first half of 2008 primarily due to favorable exchange rates and increases in international average weight per package, partially offset by decreases in the average rate per pound. International domestic yield decreased during the second quarter and first half of 2008 as a result of the inclusion of lower-yielding services at the companies acquired in the second half of 2007. Composite freight yield increased in both the second quarter and first half of 2008 due to changes in service mix and favorable exchange rates.

Case 3:07-cv-00887-IZ-LM Document 32-2 Filed 08/17/11 Page 1475 of 3649
Case 3:05-md-00627-IZ-LM DQN Document 1000-3 filed 01/02/08 page 5 of 649

-36-

Our fuel surcharges are indexed to the spot price for jet fuel. Using this index, the U.S. domestic and outbound fuel surcharge and the international fuel surcharges ranged as follows for the three- and six-month periods ended November 30:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| U.S. Domestic and Outbound Fuel Surcharge: | | | | |
| Low | 14.00% | 12.50% | 13.50% | 12.50% |
| High | 16.50 | 17.00 | 16.50 | 17.00 |
| Weighted-average | 15.00 | 15.35 | 14.34 | 15.67 |
| International Fuel Surcharges: | | | | |
| Low | 12.50 | 12.00 | 12.00 | 12.00 |
| High | 16.50 | 17.00 | 16.50 | 17.00 |
| Weighted-average | 14.91 | 14.33 | 14.47 | 14.55 |

In October 2007, we announced a 6.9% average list price increase effective January 7, 2008 on FedEx Express U.S. domestic and U.S. outbound express package and freight shipments and made various changes to other surcharges, while we lowered our fuel surcharge index by 2%. In November 2006, we announced a 5.5% average list price increase effective January 1, 2007 on FedEx Express U.S. domestic and U.S. outbound shipments and made various changes to other surcharges, while we lowered our fuel surcharge index by 2%.

***FedEx Express Segment Operating Income***

Operating results for the second quarter and first half of 2008 were negatively impacted by higher net fuel costs and the continued softness in the U.S. economy. Continued investment in domestic express services in China also negatively impacted results in the second quarter and first half of 2008. However, volume growth in IP services, reduced retirement plan costs, the favorable impact of foreign currency exchange rates and lower variable incentive compensation offset the net impact of increased fuel costs on operating income during the second quarter and first half of 2008. Operating income for the second quarter and first half of 2007 included $143 million in expenses associated with our pilot contract, which were partially offset by the benefits from the timing of net fuel impacts and Hurricane Katrina insurance proceeds.

Fuel costs increased in the second quarter and first half of 2008 due to an increase in the average price per gallon of fuel. Our operating income in the second quarter of 2008 reflected a difficult year-over-year comparison, as last year's second quarter results benefited from the timing lag that exists between when we purchase fuel and when our indexed fuel surcharges automatically adjust. During the second quarter of 2008, we experienced the opposite effect, as fuel prices significantly increased throughout the quarter, while our changes in fuel surcharges lag these increases by approximately six to eight weeks.

Purchased transportation costs increased in the second quarter and first half of 2008 primarily due to the inclusion of our 2007 business acquisitions, the impact of higher fuel costs and IP volume growth, which required a higher utilization of contract pickup and delivery services. These increases were partially offset by the elimination of payments by us for pickup and delivery services provided by our former China joint venture partner, as we acquired this business in the second half of 2007. Depreciation expense increased 13% in the second quarter of 2008 and 12% in the first half of 2008 primarily due to aircraft purchases and our 2007 business acquisitions. Other operating expenses increased during the second quarter and first half of 2008 principally due to the inclusion of our 2007 business acquisitions, including the full consolidation of the results of our China joint venture. We previously recorded only our portion of the net results of the China business due to the joint venture structure.

*FEDEX GROUND SEGMENT*

The following table compares revenues, operating expenses, operating income and operating margin (dollars in millions) and selected package statistics (in thousands, except yield amounts) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Revenues | $ 1,698 | $ 1,520 | 12 | $ 3,316 | $ 2,937 | 13 |
| Operating expenses: | | | | | | |
| Salaries and employee benefits | 272 | 256 | 6 | 532 | 497 | 7 |
| Purchased transportation | 697 | 592 | 18 | 1,317 | 1,145 | 15 |
| Rentals | 50 | 44 | 14 | 93 | 80 | 16 |
| Depreciation and amortization | 77 | 65 | 18 | 150 | 126 | 19 |
| Fuel | 46 | 28 | 64 | 80 | 59 | 36 |
| Maintenance and repairs | 38 | 32 | 19 | 72 | 63 | 14 |
| Intercompany charges | 165 | 145 | 14 | 324 | 279 | 16 |
| Other | 180 | 165 | 9 | 385 | 336 | 15 |
| Total operating expenses | 1,525 | 1,327 | 15 | 2,953 | 2,585 | 14 |
| Operating income | $ 173 | $ 193 | (10) | $ 363 | $ 352 | 3 |
| Operating margin | 10.2% | 12.7% | (250) bp | 10.9% | 12.0% | (110) bp |
| Average daily package volume | | | | | | |
| FedEx Ground | 3,505 | 3,242 | 8 | 3,356 | 3,082 | 9 |
| FedEx SmartPost | 672 | 657 | 2 | 603 | 585 | 3 |
| Revenue per package (yield) | | | | | | |
| FedEx Ground | $ 7.27 | $ 7.04 | 3 | $ 7.34 | $ 7.08 | 4 |
| FedEx SmartPost | $ 2.12 | $ 1.95 | 9 | $ 2.07 | $ 1.86 | 11 |

*FedEx Ground Segment Revenues*

Revenues increased during the second quarter and first half of 2008 due to continued volume and yield growth. Average daily volumes at FedEx Ground rose in both the second quarter and first half of 2008 due to market share gains in our commercial business and the continued growth of our FedEx Home Delivery service. Yield improvement during the second quarter and first half of 2008 was primarily due to the impact of a general rate increase, higher extra service revenue (primarily through our residential, additional handling and large package surcharges) and dimensional rating. This increase was partially offset by higher customer discounts and a lower average weight and zone per package.

FedEx SmartPost picks up and delivers shipments from customers and delivers them to various points within the United States Postal Service ("USPS") network for final delivery. FedEx SmartPost revenue and yield represent the amount collected from customers net of postage paid to the USPS.

The FedEx Ground fuel surcharge is based on a rounded average of the national U.S. on-highway average prices for a gallon of diesel fuel, as published by the Department of Energy. Our fuel surcharge ranged as follows for the three- and six-month periods ended November 30:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Low | 4.75% | 4.50% | 4.50% | 4.25% |
| High | 5.00 | 5.25 | 5.00 | 5.25 |
| Weighted-average | 4.84 | 4.84 | 4.67 | 4.71 |

In November 2007, we announced a 4.9% average list price increase and made various changes to other surcharges effective January 7, 2008 on FedEx Ground shipments.

***FedEx Ground Segment Operating Income***

FedEx Ground segment operating income decreased 10% during the second quarter of 2008 primarily due to an increase in purchased transportation costs and the net impact of increased fuel costs. Operating income increased slightly for the first half of 2008, as revenue growth was substantially offset by the net impact of increased fuel costs during the second quarter of 2008 and higher legal costs during the first quarter of 2008.

Fuel costs increased significantly year-over-year for both the second quarter and first half of 2008 due to an increase in the average price per gallon of fuel. Purchased transportation costs increased in the second quarter and first half of 2008 as a result of the costs associated with our independent contractor program (as described below) and increased fuel expenses. The independent contractor incentive program costs were recorded as incurred in the second quarter of 2008. Depreciation expense and rent expense increased in the second quarter and first half of 2008 due to higher spending on material handling equipment and facilities associated with our multi-year capacity expansion plan. Increases in intercompany charges during the second quarter and first half of 2008 were primarily due to increased sales and marketing and customer service costs.

***Independent Contractor Matters***

FedEx Ground faces increased regulatory and legal uncertainty with respect to its independent contractors. As part of its operations, FedEx Ground has made changes to its relationships with contractors that, among other things, provide incentives for improved service and enhanced regulatory and other compliance by our contractors. In September 2007, FedEx Ground announced a nationwide program which provides greater incentives to certain of its 15,000 contractors who choose to grow their businesses by adding routes. Also, during the second quarter of 2008, FedEx Ground offered special incentives to encourage California-based single route contractors to transform their operations into multiple-route businesses or sell their routes to others. The response to our California-based single route contractor program has been exceptional, with virtually all contractors accepting the incentives.

FedEx Ground anticipates continuing changes to its relationships with its contractors, which are expected to increase the cost of operations, and it is reasonably possible that such cost increases could be material. However, management believes the FedEx Ground business remains fundamentally strong and will continue to grow market share and improve the customer experience.

FedEx Ground is involved in numerous purported class-action lawsuits, state administrative proceedings and Internal Revenue Service audits that claim the company's owner-operators should be treated as employees, rather than independent contractors. For a description of these proceedings, see Note 9 of the accompanying unaudited consolidated financial statements.

***FEDEX FREIGHT SEGMENT***

The following table shows revenues, operating expenses, operating income and operating margin (dollars in millions) and selected statistics for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 (1) | Change | 2007 | 2006 (1) | Change |
| Revenues | $ 1,236 | $ 1,225 | 1 | $ 2,469 | $ 2,238 | 10 |
| Operating expenses: | | | | | | |
| Salaries and employee benefits | 607 | 592 | 3 | 1,202 | 1,076 | 12 |
| Purchased transportation | 147 | 140 | 5 | 277 | 223 | 24 |
| Rentals and landing fees | 29 | 30 | (3) | 57 | 53 | 8 |
| Depreciation and amortization | 58 | 52 | 12 | 115 | 83 | 39 |
| Fuel | 141 | 116 | 22 | 271 | 228 | 19 |
| Maintenance and repairs | 45 | 45 | — | 92 | 77 | 19 |
| Intercompany charges | 20 | 16 | 25 | 41 | 30 | 37 |
| Other | 110 | 96 | 15 | 230 | 180 | 28 |
| Total operating expenses | 1,157 | 1,087 | 6 | 2,285 | 1,950 | 17 |
| Operating income | $ 79 | $ 138 | (43) | $ 184 | $ 288 | (36) |
| Operating margin | 6.4% | 11.3% | (490) bp | 7.5% | 12.9% | (540) bp |
| Average daily LTL shipments (in thousands) | 82 | 87 | (6) | 81 | 78 | 4 |
| Weight per LTL shipment (lbs) | 1,129 | 1,127 | — | 1,130 | 1,128 | — |
| LTL yield (revenue per hundredweight) | $ 19.56 | $ 18.73 | 4 | $ 19.48 | $ 18.35 | 6 |

(1) Includes the results of FedEx National LTL from the date of its acquisition on September 3, 2006.

***FedEx Freight Segment Revenues***

FedEx Freight segment revenues remained relatively flat during the second quarter of 2008 due to the weak U.S. economy and increased 10% during the first half of 2008 primarily due to the inclusion of the FedEx National LTL acquisition. Average daily LTL shipments declined 6% in the second quarter of 2008, as demand for services in the LTL sector has been restrained by the weak U.S. economy. Average daily LTL shipments grew 4% during the first half of 2008 due to the inclusion of FedEx National LTL. LTL yield grew 4% during the second quarter of 2008 due to higher rates. LTL yield increased 6% in the first half of 2008 reflecting higher yields from longer-haul FedEx National LTL shipments. The yield increase for the second quarter and first half of 2008 was negatively impacted by the fuel surcharge reduction described below.

During the first quarter of 2008, FedEx Freight reduced its standard regional LTL fuel surcharge by 25% and FedEx National LTL reduced its standard LTL fuel surcharge to levels commensurate with FedEx Freight. We made these changes to assist our customers, who are facing a challenging economy and high fuel prices. The indexed LTL fuel surcharge is based on the average of the national U.S. on-highway average prices for a gallon of diesel fuel, as published by the Department of Energy. The indexed LTL fuel surcharge ranged as follows for the three- and six-month periods ended November 30:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Low | 14.9% | 15.0% | 14.5% | 15.0% |
| High | 17.3 | 20.5 | 19.7 | 21.2 |
| Weighted-average | 16.1 | 16.8 | 16.6 | 18.5 |

***FedEx Freight Segment Operating Income***

FedEx Freight segment operating income and operating margin decreased in both the second quarter and first half of 2008, reflecting lower volumes at FedEx National LTL and slower year-over-year growth in regional LTL yield. The net impact of higher fuel costs and the fuel surcharge reduction described above also negatively affected margins. Second quarter and first half results for 2007 include a gain related to the sale of an operating facility and insurance proceeds associated with Hurricane Katrina, which were recorded in other operating expenses. Lower volumes at FedEx National LTL continue to be driven by the weak U.S. economy.

The inclusion of FedEx National LTL in our results has impacted the first half of 2008 comparability of all our operating expenses. Along with incremental costs from FedEx National LTL, depreciation expense increased during the second quarter and first half of 2008 due to equipment purchased to support ongoing replacement requirements and long-term volume growth. Fuel costs increased during the second quarter and first half of 2008 due to an increase in the average price per gallon of diesel fuel. Fuel surcharges did not offset the effect of fuel costs on operating results for the second quarter of 2008, due to the fuel surcharge rate reduction described above. Purchased transportation costs increased in the first half of 2008 due to the inclusion of FedEx National LTL, which uses a higher proportion of these services, and higher rates paid to our third-party transportation providers.

FINANCIAL CONDITION

***LIQUIDITY***

Cash and cash equivalents totaled $830 million at November 30, 2007, compared to $1.569 billion at May 31, 2007. The following table provides a summary of our cash flows for the six month periods ended November 30 (in millions):

| | 2007 | 2006 |
|---|---|---|
| Operating activities: | | |
| Net income | $ 973 | $ 986 |
| Noncash charges and credits | 1,101 | 919 |
| Changes in operating assets and liabilities | (796) | (557) |
| Cash provided by operating activities | 1,278 | 1,348 |
| Investing activities: | | |
| Business acquisition, net of cash acquired | — | (784) |
| Capital expenditures and other investing activities | (1,502) | (1,427) |
| Cash used in investing activities | (1,502) | (2,211) |
| Financing activities: | | |
| Proceeds from debt issuances | — | 999 |
| Principal payments on debt | (515) | (226) |
| Dividends paid | (62) | (55) |
| Proceeds from stock issuances | 50 | 55 |
| Other | 12 | 8 |
| Cash (used in) provided by financing activities | (515) | 781 |
| Net decrease in cash and cash equivalents | $ (739) | $ (82) |

*Cash Provided by Operating Activities.* The $70 million decrease in cash flows from operating activities in the first half of 2008 was largely attributable to significant year-over-year increases in fuel expenses. We made tax-deductible voluntary contributions to our principal U.S. domestic pension plans of $479 million in the first half of 2008 and $482 million during the first half of 2007.

*Cash Used for Investing Activities* . Capital expenditures during the first half of 2008 were 4% higher than the prior year period largely due to planned expenditures for facility expansion at FedEx Express. See "Capital Resources" below for further discussion.

*Debt Financing Activities* . We have a shelf registration statement filed with the Securities and Exchange Commission ("SEC") that allows us to sell, in one or more future offerings, any combination of our unsecured debt securities and common stock. In August 2006, we issued $1 billion of senior unsecured debt under our shelf registration statement, comprised of floating-rate notes totaling $500 million and fixed-rate notes totaling $500 million. The $500 million in floating-rate notes were repaid in August 2007. The fixed-rate notes bear interest at an annual rate of 5.5%, payable semi-annually, and are due in August 2009. The net proceeds were used for working capital and general corporate purposes, including the funding of several business acquisitions during 2007.

A $1 billion revolving credit agreement is available to finance our operations and other cash flow needs and to provide support for the issuance of commercial paper. Our revolving credit agreement contains a financial covenant, which requires us to maintain a leverage ratio of adjusted debt (long-term debt, including the current portion of such debt, plus six times rentals and landing fees) to capital (adjusted debt plus total common stockholders' investment) that does not exceed 0.7 to 1.0. Our leverage ratio of adjusted debt to capital was 0.5 at November 30, 2007. We are in compliance with this and all other restrictive covenants of our revolving credit agreement and do not expect the covenants to affect our operations. As of November 30, 2007, no commercial paper was outstanding and the entire $1 billion under the revolving credit facility was available for future borrowings.

*Dividends.* We paid $62 million of dividends in the first half of 2008 and $55 million in the first half of 2007. On November 16, 2007, our Board of Directors declared a dividend of $0.10 per share of common stock. The dividend is payable on January 2, 2008, to stockholders of record as of the close of business on December 12, 2007.

*Other Liquidity Information* . We believe that our existing cash and cash equivalents, cash flow from operations, our commercial paper program, revolving bank credit facility and shelf registration statement with the SEC are adequate to meet our current and foreseeable future working capital and capital expenditure needs. In addition, other forms of secured financing may be used to obtain capital assets if we determine that they best suit our needs for the foreseeable future. We have been successful in obtaining investment capital, both domestic and international, although the marketplace for such capital can become restricted depending on a variety of economic factors. We believe the capital resources available to us provide flexibility to access the most efficient markets for financing capital acquisitions, including aircraft, and are adequate for our future capital needs.

We have a senior unsecured debt credit rating from Standard & Poor's of BBB and a commercial paper rating of A-2. Moody's Investors Service has assigned us a senior unsecured debt credit rating of Baa2 and a commercial paper rating of P-2. Moody's and Standard & Poor's characterize our ratings outlook as "stable." If our credit ratings drop, our interest expense may increase. If our commercial paper ratings drop below current levels, we may have difficulty utilizing the commercial paper market. If our senior unsecured debt ratings drop below investment grade, our access to financing may become more limited.

### *CAPITAL RESOURCES*

Our operations are capital intensive, characterized by significant investments in aircraft, vehicles, technology, package handling facilities and sort equipment. The amount and timing of capital additions depend on various factors, including pre-existing contractual commitments, anticipated volume growth, domestic and international economic conditions, new or enhanced services, geographical expansion of services, availability of satisfactory financing and actions of regulatory authorities.

The following table compares capital expenditures by asset category and reportable segment for the three- and six-month periods ended November 30 (in millions):

| | Three Months Ended | | Six Months Ended | | Percent Change 2007/2006 | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 | Three Months Ended | Six Months Ended |
| Aircraft and related equipment | $ 175 | $ 215 | $ 462 | $ 517 | (19) | (11) |
| Facilities and sort equipment | 257 | 196 | 425 | 300 | 31 | 42 |
| Information and technology investments | 109 | 96 | 189 | 182 | 14 | 4 |
| Vehicles | 144 | 184 | 308 | 347 | (22) | (11) |
| Other equipment | 62 | 69 | 129 | 113 | (10) | 14 |
| Total capital expenditures | $ 747 | $ 760 | $ 1,513 | $ 1,459 | (2) | 4 |
| FedEx Express segment | $ 367 | $ 376 | $ 815 | $ 770 | (2) | 6 |
| FedEx Ground segment | 155 | 183 | 288 | 317 | (15) | (9) |
| FedEx Freight segment | 106 | 83 | 181 | 168 | 28 | 8 |
| FedEx Services segment | 119 | 118 | 229 | 204 | 1 | 12 |
| Total capital expenditures | $ 747 | $ 760 | $ 1,513 | $ 1,459 | (2) | 4 |

Capital expenditures during the first half of 2008 were higher than the prior year period primarily due to increased spending at FedEx Express for facility expansion and increased spending at FedEx Services associated with the addition of new locations at FedEx Kinko's. However, in light of the impact of the weak U.S. economy on demand for our domestic package and LTL services, we have reduced our 2008 capital expenditure forecast from $3.5 billion to $3.1 billion, compared to $2.9 billion in 2007. Much of the anticipated increase in 2008 is on spending to support long-term volume growth, such as additional or expanded facilities and new aircraft. We also plan to continue to invest in our technology capabilities to improve productivity and service levels.

Because of substantial lead times associated with the manufacture or modification of aircraft, we must plan our aircraft orders or modifications well in advance of the expected delivery of the aircraft. While we also pursue market opportunities to purchase aircraft when they become available, we must make commitments regarding our airlift requirements years before aircraft are actually needed. We are closely managing our capital spending based on current and anticipated volume levels.

### *CONTRACTUAL CASH OBLIGATIONS*

The following table sets forth a summary of our contractual cash obligations as of November 30, 2007. Certain of these contractual obligations are reflected in our balance sheet, while others are disclosed as future obligations under accounting principles generally accepted in the United States. Except for the current portion of long-term debt and capital lease obligations, this table does not include amounts already recorded on our balance sheet as current liabilities at November 30, 2007. Accordingly, this table is not meant to represent a forecast of our total cash expenditures for any of the periods presented.

| | Payments Due by Fiscal Year (in millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2008 (1) | 2009 | 2010 | 2011 | 2012 | Thereafter | Total |
| *Amounts reflected in Balance Sheet:* | | | | | | | |
| Long-term debt | $ 23 | $ 518 | $ 499 | $ 250 | $ — | $ 539 | $ 1,829 |
| Capital lease obligations (2) (3) | 92 | 13 | 97 | 8 | 8 | 137 | 355 |
| *Other cash obligations not reflected in Balance Sheet:* | | | | | | | |
| Unconditional purchase obligations (3) | 613 | 1,256 | 1,152 | 736 | 87 | 164 | 4,008 |
| Interest on long-term debt | 57 | 111 | 79 | 65 | 47 | 1,553 | 1,912 |
| Operating leases (3) | 964 | 1,604 | 1,414 | 1,239 | 1,100 | 7,004 | 13,325 |
| Total | $ 1,749 | $ 3,502 | $ 3,241 | $ 2,298 | $ 1,242 | $ 9,397 | $21,429 |

(1) Cash obligations for the remainder of 2008.

(2) Capital lease obligations represent principal and interest payments.

(3) See Note 8 to the accompanying unaudited consolidated financial statements.

We have certain contingent liabilities that are not accrued in our balance sheet in accordance with accounting principles generally accepted in the United States. These contingent liabilities are not included in the table above. In addition, we have historically made voluntary tax-deductible contributions to our U.S. pension plan; however, such amounts have not been legally required and therefore are not reflected in the table above.

*Amounts Reflected in Balance Sheet*

We have certain financial instruments representing potential commitments, not reflected in the table above, that were incurred in the normal course of business to support our operations, including surety bonds and standby letters of credit. These instruments are required under certain U.S. self-insurance programs and are also used in the normal course of international operations. The underlying liabilities insured by these instruments are reflected in our balance sheets, where applicable. Therefore, no additional liability is reflected for the surety bonds and letters of credit themselves.

We have other long-term liabilities reflected in our balance sheet, including deferred income taxes, obligations or interest for tax positions under FIN 48 (as described in Note 1), qualified and non-qualified pension and postretirement healthcare liabilities and other self-insurance accruals. The payment obligations associated with these liabilities are not reflected in the table above due to the absence of scheduled maturities. Therefore, the timing of these payments cannot be determined, except for amounts estimated to be payable within twelve months that are included in current liabilities.

*Other Cash Obligations Not Reflected in Balance Sheet*

The amounts reflected in the table above for purchase commitments represent non-cancelable agreements to purchase goods or services. Such contracts include those for certain purchases of aircraft, aircraft modifications, vehicles, facilities, computers, printing and other equipment and advertising and promotions contracts. In addition, we have committed to modify our DC10 aircraft for two-man cockpit configurations, which is reflected in the table above. Commitments to purchase aircraft in passenger configuration do not include the attendant costs to modify these aircraft for cargo transport unless we have entered into a non-cancelable commitment to modify such aircraft. Open purchase orders that are cancelable are not considered unconditional purchase obligations for financial reporting purposes and are not included in the table above. Such purchase orders often represent authorizations to purchase rather than binding agreements.

The amounts reflected in the table above for interest on long-term debt represent future interest payments due on our long-term debt, which are primarily fixed rate.

The amounts reflected in the table above for operating leases represent future minimum lease payments under non-cancelable operating leases (principally aircraft and facilities) with an initial or remaining term in excess of one year at November 30, 2007. In the past, we financed a significant portion of our aircraft needs (and certain other equipment needs) using operating leases (a type of "off-balance sheet financing"). At the time that the decision to lease was made, we determined that these operating leases would provide economic benefits favorable to ownership with respect to market values, liquidity or after-tax cash flows.

In accordance with accounting principles generally accepted in the United States, our operating leases are not recorded in our balance sheet. Credit rating agencies routinely use information concerning minimum lease payments required for our operating leases to calculate our debt capacity.

## CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make significant judgments and estimates to develop amounts reflected and disclosed in the financial statements. In many cases, there are alternative policies or estimation techniques that could be used. We maintain a thorough process to review the application of our accounting policies and to evaluate the appropriateness of the many estimates that are required to prepare the financial statements of a large, global corporation. However, even under optimal circumstances, estimates routinely require adjustment based on changing circumstances and new or better information.

As discussed in our Annual Report, during the first quarter of 2008, we updated our critical accounting estimates by adding "Contingencies" and removing "Revenue Recognition." As discussed in Note 1 to the accompanying unaudited condensed consolidated financial statements and previously in this MD&A, we adopted new accounting rules for income taxes under FIN 48 in 2008. The cumulative effect of adopting FIN 48 was immaterial; however, FIN 48 substantially increases the sensitivities of the estimation process used in the accounting for and reporting of tax contingencies. In addition, as discussed in Note 9 to our unaudited condensed consolidated financial statements, we are involved in various legal and regulatory proceedings that require complex and judgmental decisions regarding reserves and disclosures. Based on these factors we added the "Contingencies" category to our critical accounting estimates in the first quarter of 2008.

Information regarding our critical accounting estimates can be found in our Annual Report, including Note 1 to the financial statements therein, as well as under the heading "Critical Accounting Estimates" in our quarterly report on Form 10-Q for the quarter ended August 31, 2007. Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of our Board of Directors and with our independent registered public accounting firm.

## FORWARD-LOOKING STATEMENTS

Certain statements in this report, including (but not limited to) those contained in "Outlook," "Liquidity," "Capital Resources" and "Contractual Cash Obligations," are "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to our financial condition, results of operations, cash flows, plans, objectives, future performance and business. Forward-looking statements include those preceded by, followed by or that include the words "may," "could," "would," "should," "believes," "expects," "anticipates," "plans," "estimates," "targets," "projects," "intends" or similar expressions. These forward-looking statements involve risks and uncertainties. Actual results may differ materially from those contemplated (expressed or implied) by such forward-looking statements, because of, among other things, potential risks and uncertainties, such as:

- economic conditions in the global markets in which we operate;
- the impact of any international conflicts or terrorist activities on the United States and global economies in general, the transportation industry or us in particular, and what effects these events will have on our costs or the demand for our services;
- damage to our reputation or loss of brand equity;
- disruptions to the Internet or our technology infrastructure, including those impacting our computer systems and Web site, which can adversely affect shipment levels;
- the price and availability of jet and diesel fuel;
- the impact of intense competition on our ability to maintain or increase our prices (including our fuel surcharges in response to rising fuel costs) or to maintain or grow our market share;
- our ability to manage our cost structure for capital expenditures and operating expenses, and match it to shifting and future customer volume levels;
- our ability to effectively operate, integrate, leverage and grow acquired businesses, and to continue to support the value we allocate to these acquired businesses, including their goodwill;
- any impacts on our businesses resulting from new domestic or international government regulation, including regulatory actions affecting global aviation rights, increased air cargo and other security requirements, and tax, accounting, labor or environmental rules;
- changes in foreign currency exchange rates, especially in the euro, Chinese yuan, Canadian dollar, British pound and Japanese yen, which can affect our sales levels and foreign currency sales prices;
- the impact of costs related to (i) challenges to the status of FedEx Ground's owner-operators as independent contractors, rather than employees, and (ii) any related changes to our relationship with these owner-operators;
- any liability resulting from and the costs of defending against class-action litigation, such as wage-and-hour and race discrimination claims, and any other legal proceedings;
- our ability to maintain good relationships with our employees and prevent attempts by labor organizations to organize groups of our employees, which could significantly increase our operating costs;
- a shortage of qualified labor and our ability to mitigate this shortage through recruiting and retention efforts and productivity gains;
- increasing costs and the volatility of costs for employee benefits, especially pension and healthcare benefits;
- significant changes in the volumes of shipments transported through our networks, customer demand for our various services or the prices we obtain for our services;

- market acceptance of our new service and growth initiatives;

- the impact of technology developments on our operations and on demand for our services;

- adverse weather conditions or natural disasters, such as earthquakes and hurricanes, which can damage our property, disrupt our operations, increase fuel costs and adversely affect shipment levels;

- widespread outbreak of an illness or any other communicable disease, or any other public health crisis;

- availability of financing on terms acceptable to us and our ability to maintain our current credit ratings, especially given the capital intensity of our operations and the current volatility of credit markets; and

- other risks and uncertainties you can find in our press releases and SEC filings, including the risk factors identified under the heading "Risk Factors" in "Management's Discussion and Analysis of Results of Operations and Financial Condition" in our Annual Report, as updated by our quarterly reports on Form 10-Q.

As a result of these and other factors, no assurance can be given as to our future results and achievements. Accordingly, a forward-looking statement is neither a prediction nor a guarantee of future events or circumstances and those future events or circumstances may not occur. You should not place undue reliance on forward-looking statements, which speak only as of the date on which they are made. We undertake no obligation to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise.

*Item 3. Quantitative and Qualitative Disclosures About Market Risk*

As of November 30, 2007, there have been no material changes in our market risk sensitive instruments and positions since the disclosure in our Annual Report and our Quarterly Report on Form 10-Q for the quarter ended August 31, 2007. While we are a global provider of transportation, e-commerce and business services, the substantial majority of our transactions are denominated in U.S. dollars. The distribution of our foreign currency denominated transactions is such that foreign currency declines in some areas of the world are often offset by foreign currency gains in other areas of the world. The principal foreign currency exchange rate risks to which we are exposed are in the euro, Chinese yuan, Canadian dollar, British pound and Japanese yen. While foreign currency fluctuations during the three- and six-month periods ended November 30, 2007 were favorable, they did not have a material effect on our results of operations.

While we have market risk for changes in the price of jet and diesel fuel, this risk is largely mitigated by our fuel surcharges. However, our fuel surcharges for FedEx Express and FedEx Ground have a timing lag of approximately six to eight weeks that exists before they are adjusted for changes in fuel prices. Our fuel surcharge index also allows fuel prices to fluctuate approximately 3% for FedEx Express and approximately 4% for FedEx Ground before an adjustment to the fuel surcharge occurs. Therefore, our operating income may be affected should the spot price of fuel suddenly change by a significant amount or change by amounts that do not result in a change in our fuel surcharges.

*Item 4. Controls and Procedures*

The management of FedEx, with the participation of our principal executive and financial officers, has evaluated the effectiveness of our disclosure controls and procedures in ensuring that the information required to be disclosed in our filings under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, including ensuring that such information is accumulated and communicated to FedEx management as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our principal executive and financial officers have concluded that such disclosure controls and procedures were effective as of November 30, 2007 (the end of the period covered by this Quarterly Report on Form 10-Q).

During our fiscal quarter ended November 30, 2007, no change occurred in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

*Item 1. Legal Proceedings*

For a description of all material pending legal proceedings, see Note 9 of the accompanying consolidated financial statements.

In December 2007, we received a grand jury subpoena for the production of documents in connection with an ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") into possible anti-competitive behavior in the international air freight forwarding industry. This investigation is different from the ongoing investigations by the DOJ, the Directorate General for Competition of the European Commission and the Australian Competition and Consumer Commission that were disclosed in our Annual Report. We do not believe that we have engaged in any anti-competitive activities, and we are cooperating with these investigations.

*Item 1A. Risk Factors*

There have been no material changes from the risk factors disclosed in our Annual Report (under the heading "Risk Factors" in "Management's Discussion and Analysis of Results of Operations and Financial Condition") in response to Part I, Item 1A of Form 10-K.

*Item 4. Submission of Matters to a Vote of Security Holders*

At the FedEx Corporation annual meeting of stockholders held on September 24, 2007, FedEx's stockholders took the following actions:

The stockholders elected fourteen directors, each for a one-year term. The tabulation of votes with respect to each nominee for director was as follows:

| Nominee | For | Against | Abstain |
|---|---|---|---|
| Frederick W. Smith | 274,799,258 | 2,653,840 | 1,840,221 |
| James L. Barksdale | 274,174,139 | 2,900,825 | 2,218,355 |
| August A. Busch IV | 275,154,843 | 2,287,315 | 1,851,161 |
| John A. Edwardson | 275,190,078 | 2,017,812 | 2,085,429 |
| Judith L. Estrin | 275,343,176 | 1,960,964 | 1,989,179 |
| Philip Greer | 274,090,758 | 3,222,527 | 1,980,034 |
| J.R. Hyde, III | 273,917,678 | 3,311,253 | 2,064,388 |
| Shirley A. Jackson | 270,930,304 | 6,445,150 | 1,917,865 |
| Steven R. Loranger | 275,498,399 | 1,731,164 | 2,063,756 |
| Gary W. Loveman | 273,348,684 | 3,844,140 | 2,100,495 |
| Charles T. Manatt | 275,673,293 | 1,561,235 | 2,058,791 |
| Joshua I. Smith | 274,713,769 | 2,466,456 | 2,113,094 |
| Paul S. Walsh | 272,586,374 | 4,723,485 | 1,983,460 |
| Peter S. Willmott | 271,995,957 | 5,004,702 | 2,292,660 |

The Audit Committee's designation of Ernst & Young LLP as FedEx's independent registered public accounting firm for the fiscal year ending May 31, 2008 was ratified by the stockholders. The tabulation of votes on this matter was as follows:

- 276,133,290 votes for
- 1,504,975 votes against
- 1,655,054 abstentions
- There were no broker non-votes for this item.

A stockholder proposal requesting that the Board of Directors take the necessary steps to amend FedEx's bylaws to require that, subject to any presently existing contractual obligations of FedEx, the Chairman of the Board of Directors shall not concurrently serve as the Chief Executive Officer was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 64,528,011 votes for
- 177,146,579 votes against
- 2,050,823 abstentions
- 35,567,906 broker non-votes

A stockholder proposal requesting that the Board of Directors adopt a policy that stockholders be given the opportunity at each annual meeting to cast a non-binding vote on an advisory resolution to ratify the compensation of FedEx's named executive officers was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 77,458,692 votes for
- 162,844,375 votes against
- 3,422,096 abstentions
- 35,568,156 broker non-votes

A stockholder proposal requesting that the Board of Directors report on the scientific and economic analyses relevant to FedEx's environmental policy concerning greenhouse gases was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 7,919,547 votes for
- 202,035,524 votes against
- 33,770,402 abstentions
- 35,567,846 broker non-votes

A stockholder proposal requesting that FedEx provide a report disclosing certain information regarding corporate political contributions and trade association payments was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 42,632,659 votes for
- 165,479,476 votes against
- 35,613,338 abstentions
- 35,567,846 broker non-votes

*Item 6. Exhibits*

| Exhibit Number | Description of Exhibit |
|---|---|
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 15.1 | Letter re: Unaudited Interim Financial Statements. |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

FEDEX CORPORATION

Date: December 21, 2007

/s/ JOHN L. MERINO
JOHN L. MERINO
CORPORATE VICE PRESIDENT
PRINCIPAL ACCOUNTING OFFICER

Case 3:05-md-00527-RLM -CAN document 1068-3 filed 01/02/08 page 22 of 34

EXHIBIT INDEX

| Exhibit Number | Description of Exhibit |
|---|---|
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 15.1 | Letter re: Unaudited Interim Financial Statements. |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

EXHIBIT 12.1

FEDEX CORPORATION
COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES
(UNAUDITED)
(IN MILLIONS, EXCEPT RATIOS)

| | Six Months Ended November 30, | | Year Ended May 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 | 2005 | 2004 | 2003 |
| Earnings: | | | | | | | |
| Income before income taxes | $ 1,555 | $ 1,593 | $ 3,215 | $ 2,899 | $ 2,313 | $ 1,319 | $ 1,338 |
| Add back: | | | | | | | |
| Interest expense, net of capitalized interest | 64 | 70 | 136 | 142 | 160 | 136 | 124 |
| Amortization of debt issuance costs | 2 | 3 | 6 | 5 | 6 | 7 | 4 |
| Portion of rent expense representative of interest factor | 393 | 407 | 766 | 842 | 800 | 712 | 713 |
| Earnings as adjusted | $ 2,014 | $ 2,073 | $ 4,123 | $ 3,888 | $ 3,279 | $ 2,174 | $ 2,179 |
| Fixed Charges: | | | | | | | |
| Interest expense, net of capitalized interest | $ 64 | $ 70 | $ 136 | $ 142 | $ 160 | $ 136 | $ 124 |
| Capitalized interest | 20 | 19 | 34 | 33 | 22 | 11 | 16 |
| Amortization of debt issuance costs | 2 | 3 | 6 | 5 | 6 | 7 | 4 |
| Portion of rent expense representative of interest factor | 393 | 407 | 766 | 842 | 800 | 712 | 713 |
| | $ 479 | $ 499 | $ 942 | $ 1,022 | $ 988 | $ 866 | $ 857 |
| Ratio of Earnings to Fixed Charges | 4.2 | 4.2 | 4.4 | 3.8 | 3.3 | 2.5 | 2.5 |

case 3:05-md-00527-RLM -CAN document 1068-3 filed 01/02/08 page 25 of 34

Case 3:05-md-00527-RLM -CAN document 1068-3 filed 01/02/08 page 26 of 34

EXHIBIT 15.1

The Board of Directors and Stockholders
FedEx Corporation

We are aware of the incorporation by reference in the Registration Statements (Form S-8 Nos. 33-55055, 333-03443, 333-45037, 333-71065, 333-34934, 333-55266, 333-100572, 333-111399, 333-121418, 333-130619 and Form S-3 No. 333-136253) of FedEx Corporation and in the related Prospectuses, of our report dated December 21, 2007, relating to the unaudited condensed consolidated interim financial statements of FedEx Corporation that are included in its Form 10-Q for the quarter ended November 30, 2007.

/s/ Ernst & Young LLP

Memphis, Tennessee
December 21, 2007

EXHIBIT 31.1

CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Frederick W. Smith, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of FedEx Corporation (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 21, 2007

/s/ Frederick W. Smith
Frederick W. Smith
Chairman, President and
Chief Executive Officer

EXHIBIT 31.2

CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Alan B. Graf, Jr., certify that:

1.  I have reviewed this quarterly report on Form 10-Q of FedEx Corporation (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 21, 2007

/s/ Alan B. Graf, Jr.
Alan B. Graf, Jr.
Executive Vice President and
Chief Financial Officer

Case 3:05-md-00527-RLM -CAN document 1068-3 filed 01/02/08 page 32 of 34

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of FedEx Corporation ("FedEx") on Form 10-Q for the period ended November 30, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Frederick W. Smith, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of FedEx.

Date: December 21, 2007

/s/ Frederick W. Smith
Frederick W. Smith
Chairman, President and
Chief Executive Officer

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of FedEx Corporation ("FedEx") on Form 10-Q for the period ended November 30, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Alan B. Graf, Jr., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of FedEx.

Date: December 21, 2007

/s/ Alan B. Graf, Jr.

Alan B. Graf, Jr.
Executive Vice President and
Chief Financial Officer

# EXHIBIT B

## PROOF OF SERVICE

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **January 2, 2008**, I served the following document(s):

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF FEDEX'S MOST RECENT 10Q REPORT TO THE U.S. SECURITIES & EXCHANGE COMMISSION REGARDING THE INTERNAL REVENUE SERVICE'S DETERMINATION THAT FEDEX'S PICKUP AND DELIVERY DRIVERS ARE MISCLASSIFIED AND THE CITATION OF FEDEX GROUND BY THE MASSACHUSETTS ATTORNEY GENERAL FOR MISCLASSIFICATION**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

| Name | Email |
|---|---|
| George A Barton | gbarton@birch.net |
| Jeffrey A Bartos | jbartos@geclaw.com |
| Evelyn L Becker | ebecker@omm.com |
| Kenneth Lee Blalack , II | lblalack@omm.com |
| Darcie R Brault | dbrault@dibandfagan.com |
| Laura C Bremer | lbremer@omm.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J Brunner , Jr | Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Michael C Camunez | mcamunez@omm.com, cgreenberg@omm.com |
| David M Cialkowski | dmc@zimmreed.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Ginger A DeGroff | degrofflaw@yahoo.com |
| Robert E DeRose , II | bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Susan E Ellingstad | seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com |
| Barry S Fagan | bfagan@dibandfagan.com |
| Lynn R Faris | lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com |
| Monica Ferraro | mferraro@bnhmlaw.com |
| Lee K Fink | lfink@omm.com |
| Robert K Firsten | rfirsten@firstenlaw.com |
| Edward R Forman | eforman@ee.net |
| Wood R Foster PHV , Jr | woodfoster@sbgdf.com, heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |

| | |
|---|---|
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S Garfinkel | garfinkel@sgb-law.com, helm@sgb-law.com |
| Michael W Garrison , Jr | mgarrison@omm.com |
| R Christopher Gilreath | chrisgil@sidgilreath.com |
| Eileen S Goodin | egoodin@bnhmlaw.com |
| Deborah R Grayson | drgrayson@fuse.net |
| John C Hamilton | jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net |
| Robert K Handelman | rhandelman@bnhmlaw.com |
| Robert I Harwood | rharwood@whesq.com |
| Stacy J Hauf | shauf@omm.com, swickliffe@omm.com |
| Matthew M Houston | mhouston@whesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Victor H Jih | vjih@omm.com |
| Aparna B Joshi | ajoshi@omm.com |
| Soye Kim | skim@geclaw.com |
| Michael W Kopp | mkopp@omm.com |
| Steve D Larson | slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com, jhunt@prle.com, syoung@prle.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| John S Marshall | marshall@ee.net |
| Michael G McGuinness | mmcguinness@omm.com |
| Bruce H Meizlish | brucelaw@fuse.net |
| Matthew J Merrick | mmerrick@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Raquel A Millman | rmillman@omm.com |
| James R Mulroy , II | jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com |
| Daniel O Myers | dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com |
| Peter W Overs , Jr | povers@whesq.com |
| Richard T Phillips | flip@smithphillips.com, tresahharden@smithphillips.com |
| D Lucetta Pope | Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Nora M Puckett | npuckett@omm.com, dmeredith@omm.com |
| Charles Victor Pyle, III | victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com, kmh@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Theodore B Schroeder | tschroeder@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| James A Staack | jims@staack-firm.com |
| R Jay Taylor , Jr | jtaylor@scopelitis.com, lnewton@scopelitis.com |
| Matthew T Tobin | mtobin@sbslaw.net |

Jeffrey A Trimarchi jtrimarchi@omm.com
Mary D Walsh-Dempsey mdempsey@omalleylangan.com
Michael J Watton jdrewicz@Wattongroup.com
Andrew M Weiner aweiner@omm.com
Peter D Winebrake pwinebrake@winebrakelaw.com

I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:

<table>
<tr><td>John H Beisner PHV<br>O'Melveny & Myers LLP - Was/DC<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jbeisner@omm.com</td><td>J Allen Brinkley<br>Brinkley & Chesnut<br>307 Randolph Avenue<br>PO Box 2026<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net</td></tr>
<tr><td>Joree Brownlow<br>Law Office of Joree G Brownlow<br>1444 Gillham Dr Ste 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com</td><td>David G Caperton<br>O'Melveny & Myers LLP<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001</td></tr>
<tr><td>R Bruce Carlson<br>Carlson Lynch Ltd<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com</td><td>Kevin J Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309</td></tr>
<tr><td>Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178</td><td>William T Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119</td></tr>
<tr><td>B James Fitzpatrick<br>Fitzpatrick Spini & Swanston<br>838 S Main Street Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com</td><td>Salvatore G Gangemi<br>Gangemi Law Firm PC<br>82 Wall St Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com</td></tr>
</table>

| | |
|---|---|
| Clayton D Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Jack D Hilmes<br>Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Eric E Hobbs<br>Michael Best & Friedrich LLP<br>100 E Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com | William S Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 |
| Andrew J Kahn PHV<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 | Karen P Kruse PHV<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Donald B Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Harold L Lichten<br>Pyle Rome Lichten Ehrenberg & Liss-Riordan PC-MA<br>18 Tremont St Suite 500<br>Boston, MA 02108 |
| Carla D Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Paula R Markowitz<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 |
| Robert E McDaniel<br>McDaniel Law Offices<br>4 Bicentennial Sq<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | Sanford A Meizlish<br>Barkan Neff Handelman Meizlish LLP<br>360 S Grant Ave<br>Columbus, OH 43215<br>Email: smeizlish@bnhmlaw.com |
| Kenneth E Milam<br>Watkins & Eager<br>PO Box 650<br>Jackson, MS 39205-0650<br>Email: kemilam@watkinseager.com | Charles N Nauen<br>Lockridge Grindal Nauen PLLP<br>100 Washington Avenue South Suite 2200<br>Minneapolis, MN 55401<br>Email: cnnauen@locklaw.com |
| Todd J O'Malley<br>O'Malley & Langan PC<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 | Joseph A Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |

case 3:05-md-00527-RLM -CAN document 1068-5 filed 01/02/08 page 5 of 5

| | |
|---|---|
| Cheryl F Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |
| Michael R Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 |
| Eric H Rumbaugh PHV<br>Michael Best & Friedrich LLP - Mil/WI<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Jennifer Rygiel Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Dan S Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050<br>Email: addiealexis@verizon.net | Patricia A Sullivan<br>Edwards & Angell<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| Richard Tanenbaum<br>Richard Tanenbaum Esq<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | Donald R Taylor<br>Taylor Dunham & Burgess LLP<br>301 Congress Ave Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Joni M. Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Peter N Wasylyk<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com |
| Charles W Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>PO Box 8086<br>Columbia, SC 29202 | Mr. Peter. J. Agostino<br>Anderson, Agostino & Keller, PC<br>131 South Taylor Street<br>South Bend, IN 46601<br>Email: agostino@aaklaw.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **January 2, 2008**.

/s/Lorelei Badar
Lorelei Badar

# EXHIBIT B



MARTHA COAKLEY
ATTORNEY GENERAL

THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

**FOR IMMEDIATE RELEASE**
**December 19, 2007**

**MEDIA CONTACT:**
**Harry Pierre**
**(617) 727-2543**

**ATTORNEY GENERAL MARTHA COAKLEY FINES FEDERAL EXPRESS GROUND OVER $190,000 FOR MISCLASSIFYING DRIVERS**

**BOSTON –** The Office of Attorney General Martha Coakley has assessed penalties of more than $190,000 against FedEx Ground Package System, Inc. for intentionally misclassifying 13 drivers as independent contractors rather than as employees. The Attorney General's Office cited FedEx Ground for violating the Massachusetts Independent Contractor Law by misclassifying the drivers, failing to provide a proper paystub, failing to provide workers' compensation, not paying overtime to certain drivers, and neglecting to deduct and withhold state income taxes. In addition to the penalties, the citations require FedEx Ground to rectify the violations and provide restitution to the 13 drivers.

"Our office places a high priority on the proper classification of individuals in the workplace. The practice of misclassification does great harm, not only to misclassified workers and to the Commonwealth in the form of lost revenues, but also by putting law-abiding businesses at a disadvantage," Attorney General Martha Coakley said. "We intend to pursue aggressively employers such as FedEx Ground when they violate the Commonwealth's Independent Contractor Law."

The Massachusetts Independent Contractor Law provides that an individual performing any service shall be considered to be an employee unless: (1) the individual is free from control and direction in connection with the performance of the service, both under his or her contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Attorney General Coakley's Office commenced an investigation into the practices of FedEx Ground during the summer of 2007 after receiving a driver's complaint. Investigators concluded that FedEx Ground intentionally violated all three prongs of the Independent Contractor Law by directing and controlling the activities of drivers and restricting the drivers'

ability to deliver for any other entity. In addition, the investigation found that the drivers are performing the core business of FedEx Ground.

By misclassifying the drivers, FedEx Ground deprives their drivers of health care benefits, access to unemployment insurance, worker's compensation benefits, and in some cases, overtime pay. In addition, FedEx Ground deprives the Commonwealth of tax revenue by not deducting and withholding taxes from employee pay checks.

At least 400 drivers work for FedEx Ground throughout the Commonwealth and FedEx Ground has terminals in Billerica, Northboro, Wilmington, West Bridgewater, and on Martha's Vineyard. The Attorney General's investigation into FedEx Ground is ongoing.

Upon receiving the citations today, FedEx Ground has 10 days to inform the Attorney General's Office whether it intends to appeal the citations. An appeal would be heard before the Division of Administrative Law Appeals (DALA), an administrative agency within the Commonwealth of Massachusetts' Executive Office of Administration and Finance.

The case is being handled by Assistant Attorney General Joanne Goldstein, Chief of Attorney General Coakley's Fair Labor Division, Assistant Attorney General Lillian Hirales, and Inspector Scott Simpson of the Fair Labor Division.

##########

case 3:05-md-00527-RLM -CAN document 1074 filed 01/08/08 page 1 of 6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller Magistrate Judge Nuechterlein |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**

Plaintiffs' request that this Court take judicial notice of FedEx Corporation's December 21, 2007 10-Q Quarterly Report and a December 19, 2007 press release referencing citations issued by the Massachusetts Attorney General mischaracterizes the relevant facts and their applicability to the class certification matters currently under consideration by the Court. For these reasons, FedEx Ground respectfully requests that plaintiffs' request for judicial notice be denied.

Judicial notice of an adjudicative fact is properly taken when that fact is "not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Therefore, while the Court may take judicial notice of documents within the public record, it cannot take judicial notice of disputed facts or inferences from any such documents. *Holmes v. Nigro*, No. 97-c-4360. 1998 U.S. Dist. LEXIS 18718, at *8-9 (N.D. Ill. Nov. 25, 1998); *see also United States v. So. Cal.*

case 3:05-md-00527-RLM-CAN document 1074 filed 01/08/08 page 2 of 6

*Edison, Co.*, 300 F. Supp. 2d 964, 977 (E.D. Cal. 2004) (citing *California ex rel. RoNo, LLC. v. Altus Fin. S.A.*, 344 F.3d 920, 931 (9th Cir. 2003). Under this rule, plaintiffs' request might have been appropriate had they limited their request for judicial notice merely to the fact that FedEx Corp. issued a 10-Q report in which it disclosed that the IRS has tentatively indicated that it may issue an assessment against FedEx Ground at some time in the future. However, as amply demonstrated by plaintiffs' request, they ask the Court to take judicial notice of the 10-Q report and a press release regarding citations issued by the Massachusetts Attorney General for the purposes of making arguments based upon the assumed facts and preliminary findings that *underlie* these regulatory activities. Judicial notice of facts and interpretations that are reasonably in dispute is not appropriate. Fed. R. Evid. 201(b); *Hennessy v. Penril Datacomm Networks*, 69 F.3d 1344, 1354 (7th Cir. 1995). This is why the Seventh Circuit in *Hennessy* announced that SEC filings are generally inappropriate for judicial notice and found that the district court rightly refused to take notice of a company's SEC filing because, "given that there was considerable argument over the significance of the 10-K form, the judge properly found that its contents were subject to dispute." *Id.*

Like in *Hennessy*, plaintiffs here ask this Court to take judicial notice of their characterization of the import of FedEx Ground's 10-Q filing, as well as the citations preliminarily issued by the Massachusetts Attorney General.

First, contrary to plaintiffs' characterizations (*see* Pls.' Req. at 2), the IRS has not issued a dispositive determination that FedEx Ground contractors are employees under federal tax law, or any determination at all. FedEx Ground objects to plaintiffs' characterization of these in-progress proceedings. In a routine SEC filing, FedEx Ground's parent advised that IRS auditors indicated a tentative conclusion that for 2002 certain contractors might be reclassified as

case 3:05-md-00527-RLM-CAN document 1074 filed 01/08/08 page 3 of 6

employees. Additional discussions with the auditors, however, are planned and the audit remains ongoing. And, significantly, that tentative conclusion conflicts with a prior IRS audit and may be inconsistent with IRS audits of contractors. Additional review will occur before any IRS determination is made, which will be subject to court review. This matter remains preliminary and does not invalidate the IRS 1994 Letter of Assurance that FedEx Ground's contractors *are* contractors. As such, judicial notice of FedEx Ground's parent 10-Q is not merited.

Second, the IRS applies its own unique 20-factor test for determining independent contractor status – a test that is not at issue in the vast majority of jurisdictions in which motions for class certification are currently pending.[1] Even were the IRS test applicable to other jurisdictions, the mere fact that an IRS field-level audit team has tentatively concluded an audit for 2002 and that it could conclude that contractors in that year should be classified as employees for federal tax purposes might pertain to merits issues but it says nothing about whether the plaintiffs' proposed classes meet the requirements of commonality, typicality and manageability under Rule 23. If anything, a tentative IRS finding that FedEx Ground's contractors should be classified as con employees for federal tax purposes in 2002 can only *undermine* plaintiffs' theory for class certification, as such a finding may conflict with IRS findings relating to other time periods and would indicate that the relevant facts have changed critically over the relevant class periods. Further, since plaintiffs claim that the Operating Agreement has not materially

[1] *See, e.g., Home Ins. Co. v. Indus. Comm'n*, 599 P.2d 801, 803 (Ariz. 1979) (applying "totality of circumstances" test in Arizona); *Bourgeois v. Cacciapuoti*, 84 A.2d 122, 123 (Conn. 1951) (applying "right of general control" test in Connecticut); *Hayes v. Bd. of Trs.*, 29 S.E.2d 137, 140 (N.C. 1944) (applying eight-factor test in North Carolina); *Stamp v. Dep't of Consumer & Bus. Servs.*, 9 P.3d 729, 731 (Or. Ct. App. 2000) (en banc) (applying four-factor "right to control" test in Oregon); *Am. Fam. Life Assur. Co. v. Welch*, 170 S.E.2d 703, 707 (Ga. Ct. App. 1969) (Georgia courts presume parties' characterization of the relationship is correct).

changed over the relevant class periods, any IRS assessment also would demonstrate that the classification question requires looking beyond the Agreement, to individualized evidence.

Plaintiffs' assertion that the tentative IRS conclusion disclosed in FedEx Ground's parent SEC filing "must rest on a finding that FedEx does not have a reasonable, good faith belief that its drivers are lawfully classified and therefore does not qualify for the protection of the safe harbor provisions of Section 530 of the Internal Revenue Code" (Pl. Req. at 2) exemplifies the great liberties in plaintiffs' logic, and, why this matter is inappropriate for judicial notice. First, the SEC disclosure merely advises that there is a *possibility* of a liability in this matter, not that there *is* a liability. Second, the IRS itself has made no decisions. The IRS *audit team* has merely indicated *its* tentative conclusions and, as disclosed, invited further discussions with respect to that tentative conclusion. Third, plaintiffs are attempting to draw an unsupported legal conclusion with respect to the reasonableness of FedEx Ground's classifications. In this untested assertion, plaintiffs speculate as to the facts, logic and law related to a tentative audit conclusion that may – or may not – be found to be consistent with IRS and judicial standards related to the good faith presumption of FedEx Ground's classification, and the classifications themselves under the law. The 10-Q disclosure is just the sort of "non-fact" that should not be judicially noticed. *Hennessy*, 69 F.3d at 1355. (As a point of clarification, Section 530 of the Internal Revenue Code relates to Coverdell education savings accounts. FedEx Ground believes plaintiffs' reference to Section 530 was meant to reference Section 530 of the Revenue Act of 1978.)

Plaintiffs' request that the Court take judicial notice of a press release regarding thirteen ***individual*** citations issued by the Massachusetts Attorney General is also inappropriate and rests on mischaracterizations of the facts. Plaintiffs' assertion that these citations reflect a generalized

case 3:05-md-00527-RLM -CAN document 1074 filed 01/08/08 page 5 of 6

finding that "FedEx Ground drivers are misclassified and are legally employees" (Pls.' Req. at 3) is patently false. In fact, the Massachusetts citations apply only to thirteen ***individual*** contractors and thus reflect the appropriateness and necessity of individual, case-by-case adjudication of contractor status. Just as important, FedEx Ground has the right to object to the citations and to seek adjudication through administrative and judicial means. The company has already exercised this right and intends to vindicate its position. Further undermining the consistency needed for class treatment, the former Massachusetts Attorney General previously investigated this issue and issued no citation. Other Massachusetts agencies have also repeatedly found for FXG regarding contractor status. This more recent historical anomaly under Massachusetts law demonstrates that determinations may vary according to time and individualized circumstances. A one-size fits all, multi-year class action is not consistent with such outcomes.

For the foregoing reasons, FedEx Ground respectfully requests that this court reject plaintiffs' request to take judicial notice in its entirety.

Dated: January 8, 2008.

Respectfully submitted,

/s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400

South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of January, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On November 30, 2007, Plaintiffs filed a motion to compel Defendant to produce a corporate deponent pursuant to Fed. R. Civ. P. 30(b)(6). On January 9, 2008, Plaintiffs filed a notice with this Court that the parties had since met, conferred, and resolved the dispute covered by Plaintiffs' motion to withdraw. As a result, Plaintiffs' notified this Court that they were withdrawing their motion to compel. This Court will construe Plaintiffs' filing as a motion to withdraw the motion to compel, which is **GRANTED** [Doc. No. 1075]. The clerk is instructed to term Plaintiffs' motion to compel [Doc. No. 1022].

**SO ORDERED.**

Dated this 10th Day of January, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| --------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) | |

ORDER

On December 4, 2007, the plaintiffs requested that this court, pursuant to Federal Rule of Evidence 201(b), take judicial notice of the November 28, 2007 decision of the California Supreme Court in Estrada v. FedEx Ground Package Systems, Inc, in which that court denied FedEx Ground's Request for Review and Request for Depublication. Since FedEx has not contested this motion and the California decision is "capable of accurate and ready determination by resort to [a] source[] whose accuracy cannot reasonably be questioned", this motion (Doc. No. 1025) is GRANTED.

SO ORDERED.

ENTERED: January 11, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' REPLY TO FEDEX'S OPPOSITION TO**
**REQUEST FOR JUDICIAL NOTICE**

Plaintiffs file the instant reply to FedEx Ground Package System, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Request for Judicial Notice (Doc. 1074). Plaintiffs have asked this Court to take judicial notice of two public documents -- FedEx's own SEC 10-Q report and an announcement of an administrative ruling from the Massachusetts Office of the Attorney General – stating, *inter alia,* that the IRS and Massachusetts Attorney General, respectively, have found that FedEx's pick-up and delivery drivers are employees, not independent contractors as FedEx has long claimed. (Doc. 1068) While FedEx complains that the IRS and the Massachusetts Attorney General (and multiple other courts and agencies) got it wrong, FedEx offers no argument to suggest that the facts contained within these public documents are not appropriate for judicial notice by this Court. For the reasons discussed below and in Plaintiffs' initial request, Plaintiffs' request for judicial notice should be granted.

Under the Federal Rules of Evidence, a court must take judicial notice of any fact that is "not subject to reasonable dispute" and either 1) "generally known within the territorial

jurisdiction of the trial court" or 2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). These elements are established here.

FedEx does not and cannot reasonably dispute any of the facts that Plaintiffs seek to have judicially noticed here. These include that: (1) the Internal Revenue Service has completed its audit for the year 2002, finding that "FedEx Ground pick-up and delivery owner-operators should be reclassified as employees for federal income tax purposes;" (2) FedEx anticipates that it will owe back taxes and penalties of $319 million plus interest as a result of this audit, (3) the IRS has similar audits open for 2004 through 2006; (4) FedEx reported these facts in its December 21, 2007 10-Q report; (5) the Massachusetts Attorney General has found that FedEx violated the Massachusetts Independent Contractor Law by, *inter alia*, misclassifying 13 drivers, (6) the Attorney General has assessed penalties of more than $190,000 against FedEx for this violation and ordered FedEx to rectify the violations and provide restitution, and (7) the Attorney General's investigation is ongoing. FedEx even concedes most of these facts in its opposition brief, as it must, and concedes that judicial notice of some of these facts "might" be appropriate. *See* FedEx's Opposition to Plaintiffs' Request for Judicial Notice at 2 (Doc. 1074).

These facts are also "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" because they are all determined by reference to reliable public records. Courts have time and again found statements contained in filings with the Securities and Exchange Commission to be appropriate for judicial notice. *Hernandez v. Midland Credit Management, Inc.*, 2006 WL 695451, *3-4 (N.D. Ill. Mar. 14, 2006) (taking judicial notice of statements in SEC filing and collecting cases); *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 893 (D. Del. 1991) (taking judicial notice of statements in SEC filing) (cited by the Seventh Circuit in *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d

1344, 1355 (7th Cir. 1995)); *In re Delmarva Securities Litigation*, 794 F.Supp. 1293, 1299, (D. Del. 1992) (taking judicial notice of statements in SEC filing); *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (taking judicial notice of earnings history posted by defendant on its own website and agreeing that "the information should not be subject to dispute by [defendant] because [defendant] created it").

Likewise, findings of administrative agencies are routinely judicially noticed. *E.g.*, *Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir.2004) (taking judicial notice of administrative findings); *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir.1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper.").

FedEx claims the IRS finding is preliminary and therefore not worthy of judicial notice, but administrative agency findings that are **preliminary**, even if subject to further administrative or judicial review, are properly subject to judicial notice. *E.g., Bloedorn v. Francisco Foods, Inc.*, 284 n.8 (7th Cir. 2001) (taking judicial notice of ALJ decision even though subject to further administrative and judicial review); *Transmission Agency of Northern California v. Sierra Pacific Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002) (taking judicial notice of administrative decision subject to further agency and judicial review).

*Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995) – the sole authority discussed by FedEx in its opposition brief – does not support denying Plaintiffs' request for judicial notice here. FedEx's brief glosses over the critical point that the plaintiff in that case sought judicial notice of a fact that the defendant hotly disputed and that the cited SEC filing did not support in the first place. Specifically, the plaintiff offered the defendant's parent corporation's SEC filing as proof positive of the defendant's number of employees. Because the SEC filing covered two entities within the parent corporation in addition to the defendant and

because multiple witnesses had testified that the defendant had fewer employees than indicated in the filing, unremarkably the court held that judicial notice of the filing for the purpose of establishing defendant's number of employees would be improper. *Id.* at 1354-55. Here, however, FedEx does not dispute that the IRS and Attorney General have found it guilty of misclassifying drivers as independent contractors and assessed penalties accordingly. FedEx also cannot dispute that it has asked this court repeatedly to consider and rely on a now-superceded IRS "letter of assurance" rejected by even the IRS in its latest audit. Nor does FedEx dispute any of the other facts detailed above.

Plaintiffs' Request for Judicial Notice of two public records of unquestionable relevant to this case should be granted.

Dated: January 14, 2008

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

Mr. Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650
PLAINTIFFS' LIAISON COUNSEL

## PROOF OF SERVICE

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. I served the following document(s):

**PLAINTIFFS' REPLY TO FEDEX'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

| | |
|---|---|
| George A Barton | gbarton@birch.net |
| Jeffrey A Bartos | jbartos@geclaw.com |
| Evelyn L Becker | ebecker@omm.com |
| Kenneth Lee Blalack , II | lblalack@omm.com |
| Darcie R Brault | dbrault@dibandfagan.com |
| Laura C Bremer | lbremer@omm.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J Brunner , Jr | Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Michael C Camunez | mcamunez@omm.com, cgreenberg@omm.com |
| David M Cialkowski | dmc@zimmreed.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Ginger A DeGroff | degrofflaw@yahoo.com |
| Robert E DeRose , II | bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Susan E Ellingstad | seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com |
| Barry S Fagan | bfagan@dibandfagan.com |
| Lynn R Faris | lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com |
| Monica Ferraro | mferraro@bnhmlaw.com |
| Lee K Fink | lfink@omm.com |
| Robert K Firsten | rfirsten@firstenlaw.com |
| Edward R Forman | eforman@ee.net |
| Wood R Foster PHV , Jr | woodfoster@sbgdf.com, heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S Garfinkel | garfinkel@sgb-law.com, helm@sgb-law.com |
| Michael W Garrison , Jr | mgarrison@omm.com |
| R Christopher Gilreath | chrisgil@sidgilreath.com |
| Eileen S Goodin | egoodin@bnhmlaw.com |

| | |
|---|---|
| Deborah R Grayson | drgrayson@fuse.net |
| John C Hamilton | jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net |
| Robert K Handelman | rhandelman@bnhmlaw.com |
| Robert I Harwood | rharwood@whesq.com |
| Stacy J Hauf | shauf@omm.com, swickliffe@omm.com |
| Matthew M Houston | mhouston@whesq.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Victor H Jih | vjih@omm.com |
| Aparna B Joshi | ajoshi@omm.com |
| Soye Kim | skim@gcclaw.com |
| Michael W Kopp | mkopp@omm.com |
| Steve D Larson | slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com, jhunt@prle.com, syoung@prle.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Gary F Lynch | glynch@carlsonlynch.com |
| John S Marshall | marshall@ee.net |
| Michael G McGuinness | mmcguinness@omm.com |
| Bruce H Meizlish | brucelaw@fuse.net |
| Matthew J Merrick | mmerrick@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Raquel A Millman | rmillman@omm.com |
| James R Mulroy , II | jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com |
| Daniel O Myers | dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com |
| Peter W Overs , Jr | povers@whesq.com |
| Richard T Phillips | flip@smithphillips.com, tresahharden@smithphillips.com |
| D Lucetta Pope | Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Nora M Puckett | npuckett@omm.com, dmeredith@omm.com |
| Charles Victor Pyle, III | victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com, kmh@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Theodore B Schroeder | tschroeder@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| James A Staack | jims@staack-firm.com |
| R Jay Taylor , Jr | jtaylor@scopelitis.com, lnewton@scopelitis.com |
| Matthew T Tobin | mtobin@sbslaw.net |
| Jeffrey A Trimarchi | jtrimarchi@omm.com |
| Mary D Walsh-Dempsey | mdempsey@omalleylangan.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Andrew M Weiner | aweiner@omm.com |
| Peter D Winebrake | pwinebrake@winebrakelaw.com |

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

| | |
|---|---|
| John H. Beisner PHV<br>O'Melveny & Myers LLP - Was/DC<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jbeisner@omm.com | J. Allen Brinkley<br>Brinkley & Chesnut<br>307 Randolph Avenue<br>PO Box 2026<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net |
| Joree Brownlow<br>Law Office of Joree G Brownlow<br>1444 Gillham Dr Ste 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com | David G. Caperton<br>O'Melveny & Myers LLP<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001 |
| R. Bruce Carlson<br>Carlson Lynch Ltd<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com | Kevin J. Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309 |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178 | William T. Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B. James Fitzpatrick<br>Fitzpatrick Spini & Swanston<br>838 S Main Street Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com | Salvatore G. Gangemi<br>Gangemi Law Firm PC<br>82 Wall St Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com |
| Clayton D. Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Jack D. Hilmes<br>Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: jhilmes@finleylaw.com;<br>kdriscoll@finleylaw.com |

| | |
|---|---|
| Eric E. Hobbs<br>Michael Best & Friedrich LLP<br>100 E Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com | William S. Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 |
| Andrew J. Kahn<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 | Karen P. Kruse<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Donald B. Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Harold L. Lichten<br>Pyle Rome Lichten Ehrenberg &<br>Liss-Riordan<br>18 Tremont St Suite 500<br>Boston, MA 02108 |
| Carla D. Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Paula R. Markowitz<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 |
| Robert E. McDaniel<br>McDaniel Law Offices<br>4 Bicentennial Sq<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | Sanford A. Meizlish<br>Barkan Neff Handelman Meizlish LLP<br>360 S Grant Ave<br>Columbus, OH 43215<br>Email: smeizlish@bnhmlaw.com |
| Kenneth E. Milam<br>Watkins & Eager<br>PO Box 650<br>Jackson, MS 39205-0650<br>Email: kemilam@watkinseager.com | Charles N. Nauen<br>Lockridge Grindal Nauen PLLP<br>100 Washington Avenue South Suite 2200<br>Minneapolis, MN 55401<br>Email: cnnauen@locklaw.com |
| Todd J. O'Malley<br>O'Malley & Langan<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 | Joseph A. Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |
| Cheryl F. Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M. Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |

| | |
|---|---|
| Michael R. Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 |
| Eric H. Rumbaugh<br>Michael Best & Friedrich LLP<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Jennifer R. Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Dan S. Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050<br>Email: addicalexis@verizon.net | Patricia A Sullivan<br>Edwards & Angell<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| Richard Tanenbaum<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | Donald R Taylor<br>Taylor Dunham & Burgess LLP<br>301 Congress Ave, Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Joni M.. Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Peter N. Wasylyk<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com |
| Charles W. Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>PO Box 8086<br>Columbia, SC 29202 | Peter. J. Agostino<br>Anderson, Agostino & Keller, PC<br>131 South Taylor Street<br>South Bend, IN 46601<br>Email: agostino@aaklaw.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **January 14, 2008**.

/s/Lorelei Badar
Lorelei Badar

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

---

**PLAINTIFFS' MOTION TO STRIKE REPORTS OF PREVIOUSLY UNDISCLOSED EXPERTS**

---

Pursuant to Rules 37(c), 26(a) and 26(e) of the Federal Rules of Civil Procedure, Plaintiffs hereby move this Court for an order striking the reports of FXG experts Francine Lafontaine and Richard Smith, two experts that FXG failed to disclose pursuant to court orders and the Rules of Civil Procedure.

This motion will be based upon all files, records and proceedings herein, and the memorandum of law that will be filed in accordance with the local rules of this district.

Dated: January 28, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO STRIKE REPORTS OF PREVIOUSLY UNDISCLOSED EXPERTS**

## I. <u>INTRODUCTION</u>

Plaintiffs seek an order striking two of Defendant FedEx Ground Package System's ("FXG") four experts' reports served on November 8, 2007. Plaintiffs' request is based on FXG's failure to disclose those experts as required by Rule 26(a) by the Court's deadline, or at any time prior to the service of their reports.

FXG has previously been found to have ignored its obligations under Rule 26, resulting in the striking of other pleadings filed in this court. On July 23, 2007, this Court struck declarations FXG had submitted in connection with its class certification opposition, finding that FXG had not "proceeded with candor and good faith" with regard to disclosing these witnesses pursuant to Rule 26(a). Doc. No. 818 at 10. This Court also sanctioned FXG by striking briefs FXG had tried to pass off as "appendices," calling FXG's conduct a "blatant disregard of this Court's previous order and perversion of the local Rules" Doc. No. 698 at 3.

Now, FXG has again demonstrated its propensity to disregard this Court's orders and the Rules of Civil Procedure. On November 8, 2007, FXG served Plaintiffs with the reports of four experts. Declaration of Patricia A. Bloodgood ("Bloodgood Decl.") ¶ 2. The problem is two of these four experts had never been disclosed to Plaintiffs as required by Rule 26(a) and by this Court's Initial Scheduling Order. *Id.* Pursuant to the Supplemental Scheduling Order, the parties were required to disclose their expert witnesses more than two years ago. Doc. No. 58 at 2, 5. FXG has repeatedly supplemented its initial disclosures but *never* disclosed the names of these two new experts before simply serving their reports on Plaintiffs on November 8, 2007. *See* Bloodgood Decl. ¶ 11.[1]

FXG's failure to disclose these experts as required by Rule 26(a) and the Supplemental Scheduling Order – or to supplement its disclosure pursuant to Rule 26(e) – is sufficient grounds to strike these two new experts. But there is an additional reason. FXG affirmatively misled this Court and Plaintiffs by assuring them last June, when the parties were seeking an extension of the deadline for issuance of expert *reports*, that FXG had no intention of "reshuffling" its lineup of previously disclosed experts. Doc. No. 724 at 1. Because that is exactly what FXG has done, these two previously undisclosed experts and their reports should be stricken.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 29, 2005, this Court ordered, among other things, that experts for both the class certification stage and summary adjudication stage be disclosed by January 8, 2006. Doc. No. 58 at 2, 5. Pursuant to this Order, FXG disclosed the following experts in early January 2006: James Scapellato, Robert Crandall of Resolution Economics, and James Hardman. *See* FXG's Initial Disclosures at p. 5 (Bloodgood Decl., Ex. 8). Plaintiffs also disclosed their experts

[1] Plaintiffs' request of November 30, 2007 that FedEx withdraw these reports based on its failure to disclose the experts was rejected during a meet and confer on January 22, 2008. Bloodgood Decl. ¶ ¶ 6 and 7.

in early January 2006, naming Paul Regan of Hemming Morse, Fritz Kahn, Robert Wood, Jon Krosniak, and Michael Ward. *See* Plaintiffs' Initial Disclosures at p. 7 (Bloodgood Decl., Ex. 6). As far as the *reports* of the disclosed experts, the Supplemental Scheduling Order set separate deadlines for expert reports relating to class certification and later deadlines for reports from experts relating to summary adjudication. Doc. No. 58 at 5.

In an order dated May 26, 2006, this Court granted a joint request of the parties to extend many of the pretrial deadlines set in the Supplemental Scheduling Order. Doc. No. 261. Specifically with regard to expert reports, Plaintiffs were given until November 1, 2006, to provide FXG with the report of any of their experts on which they intended to rely in support of their class certification motions. *Id.* at 2. FXG was given until December 8, 2006, to provide the report of those experts it intended to rely on for class certification proceedings. *Id.* The May 26, 2006, Order also set forth new deadlines for reports from experts upon whom the parties intended to rely in support of, or in opposition to, summary adjudication proceedings. *Id.* at 4. Summary judgment movants were given until February 5 to serve reports of any expert upon which they intended to rely for summary adjudication. Opponents of summary judgment were given until March 7, 2007 to serve reports from experts relating to summary adjudication. *Id.*

On September 25, 2006, Plaintiffs served a supplemental initial disclosure, alerting FXG to a change in their line-up of experts. Plaintiffs indicated that, in addition to Paul Regan, Robert Wood, Fritz Kahn, all of whom had been previously disclosed, Plaintiffs would be relying on Professor David Lewin. Bloodgood Decl., Ex. 7. On December 26, 2006, FXG served a supplemental initial disclosure identifying new experts. Bloodgood Decl., Ex. 10. In addition to the previously disclosed experts, FXG supplemental disclosure identified Dr. Deborah Jay and Dr. Richard Jeanneret.

The pretrial deadlines were amended again in an order dated January 19, 2007 and again in an Order dated June 29, 2007. Doc. Nos. 481, 766. The June 29 Order required the reports of experts being relied upon to support summary adjudication be served by August 24. Reports of experts offered in opposition to summary adjudication were due October 5.

Although the June 29 Order was issued upon a joint motion of the parties, the parties did not agree about everything. The parties submitted supplemental statements to the Court setting forth their areas of disagreement on the request for an amendment to the pretrial schedule. Doc. Nos. 724, 721. FXG asked the Court not to set any new deadlines for expert reports until the Court ruled on the pending motions for class certification. Plaintiffs agreed that an extension was necessary, but did not agree that an indefinite extension was appropriate.

In their supplemental statement, Plaintiffs expressed concern and puzzlement about FXG's request for an indefinite extension for the "selection" of experts. Doc. No. 721. Plaintiffs noted that the time for "selecting" summary adjudication experts had long since passed and the only issue remaining was *when* the reports of these experts should be served. *Id.* at 2.

In its supplemental statement, FXG assured Plaintiffs and the Court that it was not seeking to "reshuffle its line-up of previously-disclosed experts." Doc. No. 724 at 1. According to FXG, its request for an extension of the deadline for expert reports to be disclosed "does not concern the relatively simple question of <u>who</u> the summary adjudication experts will be; it concerns the <u>substance</u> of their research, preparation, and testimony, both in the form of written reports and depositions." *Id.* at 1-2 (emphasis in original).

Since serving its initial disclosures in January 2006, FXG has served Plaintiffs with numerous supplements pursuant to Rule 26(e). Bloodgood Decl., Exs. 9-19. Although these disclosures identified many new witnesses, no new experts were disclosed. *Id.* at ¶ 11.

Despite this and despite its repeated assurance to Plaintiffs and the Court that it had no intention of "reshuffling" its line-up of experts, on November 8, 2007, FXG served the reports of four experts, two of whom, Richard L. Smith and Francine Lafontaine, had never been disclosed to Plaintiffs, either in FXG's initial disclosure or in any of its numerous supplements to that initial disclosure. Bloodgood Decl. ¶ 2.

Plaintiffs now move to strike or exclude these experts and their reports as a sanction for FXG's blatant disregard of this Court's order requiring the parties to identify the names of their experts by January 2006 and its duty to supplement such disclosures as required by Rule 26(e). FXG has never sought an extension of the original deadline or supplemented its initial disclosure to identify these new experts and, as recently as June 2007, assured this Court that it had no intention of relying on experts not already disclosed.

## III. ARGUMENT

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert witnesses. Expert witness disclosure must be delivered by the deadlines set by the trial judge under Rule 26(a)(2) ("These disclosures shall be made at the times and in the sequence directed by the court.").

"The expert witness disclosure rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their case adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, No. 1:05-CV-207, 2007 WL 1850859, at *2 (N.D. Ind. June 25, 2007) (*citing Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1093-94 (N.D. Ill, 2001)); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004).

Federal Rule of Civil Procedure 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," the party is not allowed to use that witness

to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. Rule 37(c)(1).[2] Generally, "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)); *see also Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir. 2005).

When deciding whether to impose the sanction of exclusion, the following factors should guide the analysis: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857.

Here, Plaintiffs have been both surprised and prejudiced. FXG's counsel assured them in a court filing at the time the parties were jointly seeking an extension of the expert deadline that FXG had no intention of changing its line-up of experts. Doc. No. 724. The extension of the schedule was granted and FXG used the extra time to do exactly what it said it had no intention of doing: line up two entirely new experts. Plaintiffs have suffered prejudice because their time to name experts and obtain expert reports in support of their summary adjudication motion is long past. In formulating their strategy for expert testimony, they had no opportunity to consider the type of experts now being offered in opposition, nor the likely nature of their testimony when determining their line-up of experts and the nature of their reports. Moreover, given that Plaintiffs' motion for summary adjudication is due in fewer than 60 days, their preparation of the summary adjudication motion will be unduly disrupted by having to take the time to prepare for

---

[2] Rule 37 was amended as of December 1, 2007 as part of a general restyling of the Civil Rules. According to the Advisory Committee Notes, the change is intended to be stylistic only.

case 3:05-md-00527-RLM-CAN document 1085-2 filed 01/28/08 page 7 of 9

and depose extra, undisclosed experts. Given how simple compliance would have been, there is no excuse for FedEx's failure to disclose its true line-up of expert witnesses.

Nor can FedEx cure this violation at this late date. Plaintiffs' preparation of their motion for summary adjudication is well underway. Short of significantly delaying the summary adjudication schedule, which Plaintiffs would oppose, there is no adequate way to correct the deficiency. Giving Plaintiffs the opportunity to provide rebuttal experts to the previously undisclosed experts does not cure the problem. This would require months of additional work and expense. In short, the violation cannot be adequately remedied and thus, the reports of Smith and Lafontaine should be stricken.

Significantly, at least one of FXG's newly disclosed experts is entirely duplicative of another of its experts. With regard to Richard L. Smith, his report makes clear that the scope of his work for FXG is response to the report of Plaintiffs' expert, Paul Regan. Smith Report at 2 (Bloodgood Decl., Ex. 2). But FXG served a report from its previously *disclosed* expert, Robert Crandall, on the same day it served Dr. Smith's report. Mr. Crandall's report is to present "analysis responsive to the affirmative expert report filed by Mr. Regan." Crandall November 8 report at 2 (Bloodgood Decl., Ex. 3). Because Mr. Regan testified on May 12, 2004 in the *Estrada* trial, FXG has had three years to figure out the right expert to use to refute Mr. Regan's testimony and analysis. There simply is no justification for yet another expert to repeat Mr. Crandall's theory, analysis and testimony, particularly one FXG did not bother to disclose as required by this Court's orders and the Rules of Civil Procedure. Thus, the duplicative nature of Dr. Smith's testimony as well as the surprise of his appearance in this case strongly support exclusion of his report as the most logical sanction for FXG's failure to disclose him before serving his report.

As far as FXG's bad faith and willfulness, FXG recently sought an extension of the pretrial expert deadlines with an express assurance that the extension was not going to be used to change its line-up of experts. Doc. No. 724. But that is exactly what FXG has done. Thus, FXG's conduct here goes beyond just ignoring court imposed deadlines and the Rules of Civil Procedure. FXG affirmatively misled both the Court and the Plaintiffs about its intentions with regard to its line-up of experts. In these circumstances, the sanction of exclusion of both previously undisclosed experts is the most appropriate sanction." *See Superior Aluminum Alloys*, 2007 WL 1850859, at *2.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs request that this Court strike the expert reports of Richard L. Smith and Francine Lafontaine, two experts that FXG failed to disclose before serving their reports.

Dated: January 28, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM-CAN document 1085-3 filed 01/28/08 page 1 of 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

# DECLARATION OF PATRICIA A. BLOODGOOD IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE REPORTS OF PREVIOUSLY UNDISCLOSED EXPERTS

Dated: January 28, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on January 28, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**DECLARATION OF PATRICIA A. BLOODGOOD
IN SUPPORT OF MOTION TO STRIKE REPORTS
OF PREVIOUSLY UNDISCLOSED EXPERTS AND EXHIBITS 1-19**

Dated: January 28, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on January 28, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |

| | |
|---|---|
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |

**Matthew M. Houston** mhouston@hfesq.com

**Dmitri Iglitzin** iglitzin@workerlaw.com

**Tom A. Jerman** tjerman@omm.com

**Victor H. Jih** vjih@omm.com

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@ssbls.com; dcerdas@ssbls.com; kdunn@ssbls.com; drees@ssbls.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@prle.com; jhunt@prle.com; syoung@prle.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** marshall@ee.net

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Matthew J. Merrick** mmerrick@omm.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Raquel A. Millman** rmillman@omm.com

**James Mulroy** jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Jeffrey S. Nestler** jnestler@omm.com

**Peter W. Overs Jr.** povers@hfesq.com

**Mary Donne Peters** mpeters@gorbypeters.com; rwright@gorbypeters.com

| | |
|---|---|
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on January 29, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN & HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO  80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO  80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: January 28, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 93:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |

**PLAINTIFFS' REQUEST FOR A STATUS CONFERENCE REGARDING THE PARTIES' DISPUTE OVER SUMMARY JUDGMENT/ADJUDICATION FILINGS DUE ON MARCH 14**

A dispute regarding this Court's schedule for summary judgment/adjudication motions on the issue of independent contractor/employment status due to be filed on March 14, 2008 has arisen, and despite their best efforts, the parties are unable to resolve the issue and therefore need and request Court assistance. Specifically, given the impending deadline, Plaintiffs request that this Court hold a telephonic status conference to resolve the dispute described below as soon as possible.

Plaintiffs notified this Court on October 9, 2007 that they will file one omnibus motion for summary judgment/adjudication of employment status for all 38 cases where class certification has been sought. (Transcript of October 9 Hearing, p. 23-26) Defendant, however,

only recently notified Plaintiffs that it intends to file a **separate** motion for each case, in most if not all the 38 cases.[1] Defendant further informed Plaintiffs that Defendant's motions will seek adjudication of the status of only the individually-named Plaintiffs in pending cases where class certification has not yet been decided. The current scheduling order requires the parties to file and complete all briefing pertaining to such motions between March 14 and May 30, 2008.

In contrast to the class certification schedule, the Court's Scheduling Orders contemplated unified cross-motions for summary judgment – one from each side –on the lawful employment status of the drivers. If this were not the case, the Court would have staged the motions for summary judgment/adjudication, just as it did with the class certification motions. The Scheduling Order refers to the "staging" of class certification "[b]ecause of the large amount of labor that will be required to adequately address the issues pertinent to each case, the parties agree that the staggering of class certification is the most efficient way for the court to review the motions." (Doc. 19 (November 29, 2005 Supplemental Scheduling Order) This staging of class certification motions continued in subsequent orders regarding cases added to this MDL.

In marked contrast, this Court referred to movants – plural -- for summary judgment and set the following ground rules.

> Summary judgment generally shall be divided into two phases: summary judgment or adjudication on issues relating to independent contractor/employment status and summary judgment or adjudication as to other issues. No other summary judgment motions may be filed without leave of Court. . . .
>
> Movants shall have until September 1, 2006, to file motions for summary judgment or summary adjudication, including memoranda in support thereof. Opponents shall have

[1] FedEx has said that it has not yet finally determined the exact number of motions it will file, but that it will file multiple motions and believes it has the right to file a separate motion in each case as to the Named Plaintiffs' status.

> until October 16m 2006 to file memoranda in opposition to such motions. Movants shall have until November 15, 2006, to file replies to the memoranda in opposition to such motions.
>
> Memoranda in support of motions for summary judgment shall not exceed 30 pages. Memoranda in opposition to such motions shall not exceed 25 pages. Reply memoranda in support of such motions shall not exceed 20 pages. Reply briefs shall be limited to arguments made in the opposition briefing.

At the October 9, 2007 hearing, the filing date was continued to March 14, but the concept of each side filing a single motion remained unchanged.

During past scheduling conferences and in the pleadings FXG filed in advance of those conferences, FedEx never proposed any staging for summary judgment/adjudication motions or even suggested that summary judgment proceed on a state-by-state, or plaintiff by plaintiff basis. Although FedEx has repeatedly proposed to delay summary judgment/adjudication until after class certification orders were issued, it has never previously suggested that the schedule be created or adjusted to accommodate its newly announced intention to file literally dozens of motions for summary judgment and/or adjudication regarding the employment status of each of the 187 Named Plaintiffs to these 38 consolidated actions, let alone to have two waves of employment status motions for named plaintiffs and classes separately.

Plaintiffs do not believe that the Court's prior orders contemplated or allow either side to file a separate motion in each case, or to allow Defendant to file a separate motion for summary judgment/adjudication as to the employment status of each of the 187 named plaintiffs, to be followed by further summary judgment/adjudication motions addressing the employment status of absent class members in each case where a class is subsequently certified. This would mean that FedEx may file 76 separate motions on employment status, although it has always

categorically classified every single driver as an independent contractor.

Defendant's current plan would needlessly multiple the proceedings, and one could hardly imagine a less efficient means of litigating the employment status issue in this case. After successfully moving for centralization of these cases over the plaintiffs' objections, and winning, FedEx now claims the right to treat the cases as entirely distinct with regard to the single common issue it claimed supported centralization – independent contractor status.

FedEx did not suggest or mention any such plan when the scheduling of these cross-motions was discussed last with this Court on October 9, 2007, although that would have been the natural time to do so. At the October 9th hearing, Plaintiffs made clear that they intend to file a single omnibus motion on employment status on March 14. FedEx asked the court to employ "hanging" dates for schedule summary judgment/adjudication which would "lag" issuance of class certification orders. Based on the Court's hope and anticipation that class certification orders in all cases would be issued in advance of the March 14 filing date, the Court fixed dates for the employment status cross-motions. At the hearing, FedEx objected solely to being limited to filing one twenty-five page brief in opposition to Plaintiffs' single, unified motion:

> "[W]e don't want our briefing of class certification to proceed on the basis – on summary judgment as if the cases had been certified. In other words, if the plaintiffs file one, 30-page brief on behalf of even 200-plus existing named plaintiffs, we would not want to be constrained in identifying factual issues that preclude summary judgment of the class issue for 203 people to be confined to one, 25-page opposition. That would be highly prejudicial to us."

(Transcript, p. 30) At the hearing, FedEx made no mention of any intent to file separate motions for summary judgment/adjudication on each case, or to seek such adjudication for Named Plaintiffs only and re-do the same motions after the Court issues class certification orders.

Plaintiffs have no wish to disrupt the Court's schedule and are prepared to move ahead with the schedule. Plaintiffs ask this Court to conduct a telephonic conference and to clarify that each party is permitted to seek summary judgment/adjudication of employment status in a single motion on the dates contained in this Court's October 10th Order.

Dated: February 14, 2008

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. I served the following document(s):

**PLAINTIFFS' REQUEST FOR A STATUS CONFERENCE REGARDING THE PARTIES' DISPUTE OVER SUMMARY JUDGMENT/ADJUDICATION FILINGS DUE ON MARCH 14**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

| | |
|---|---|
| Peter Agostino | agostino@aaklaw.com |
| George A Barton | gbarton@birch.net |
| Jeffrey A Bartos | jbartos@geclaw.com |
| Evelyn L Becker | ebecker@omm.com |
| Kenneth Lee Blalack , II | lblalack@omm.com |
| Darcie R Brault | dbrault@dibandfagan.com |
| Laura C Bremer | lbremer@omm.com |
| Guy Brenner | gbrenner@omm.com |
| Thomas J Brunner , Jr | Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Michael C Camunez | mcamunez@omm.com, cgreenberg@omm.com |
| David M Cialkowski | dmc@zimmreed.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Ginger A DeGroff | degrofflaw@yahoo.com |
| Robert E DeRose , II | bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Susan E Ellingstad | seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com |
| Barry S Fagan | bfagan@dibandfagan.com |
| Lynn R Faris | lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com |
| Monica Ferraro | mferraro@bnhmlaw.com |
| Lee K Fink | lfink@omm.com |
| Robert K Firsten | rfirsten@firstenlaw.com |
| Edward R Forman | eforman@ee.net |
| Wood R Foster PHV , Jr | woodfoster@sbgdf.com, heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com |
| Martin S Garfinkel | garfinkel@sgb-law.com, helm@sgb-law.com |
| Michael W Garrison , Jr | mgarrison@omm.com |

R Christopher Gilreath     chrisgil@sidgilreath.com
Eileen S Goodin     egoodin@bnhmlaw.com
Deborah R Grayson     drgrayson@fuse.net
John C Hamilton     jch@hamiltonfirm.com, hamiltonfirm@sbcglobal.net
Robert K Handelman     rhandelman@bnhmlaw.com
Robert I Harwood     rharwood@whesq.com
Stacy J Hauf     shauf@omm.com, swickliffe@omm.com
Matthew M Houston     mhouston@whesq.com
Dmitri Iglitzin     iglitzin@workerlaw.com
Tom A Jermantjerman@omm.com
Victor H Jih     vjih@omm.com
Aparna B Joshi     ajoshi@omm.com
Soye Kim     skim@geclaw.com
Michael W Kopp     mkopp@omm.com
Steve D Larson     slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis     jordanlewis@sbgdf.com
Shannon Liss-Riordan     sliss@prle.com, jhunt@prle.com, syoung@prle.com
Anh-Nguyet Tran LyJordan     alyjordan@omm.com
Gary F Lynch     glynch@carlsonlynch.com
John S Marshall     marshall@ee.net
Michael G McGuinness     mmcguinness@omm.com
Bruce H Meizlish     brucelaw@fuse.net
Matthew J Merrick     mmerrick@omm.com
Jennifer Lee Merzon     jmerzon@omm.com
Raquel A Millman     rmillman@omm.com
James R Mulroy , II     jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com
Daniel O Myers     dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Peter W Overs , Jr     povers@whesq.com
Richard T Phillips     flip@smithphillips.com, tresahharden@smithphillips.com
D Lucetta Pope     Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com
Nora M Puckett     npuckett@omm.com, dmeredith@omm.com
Charles Victor Pyle, III     victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan     atr@zimmreed.com, kmh@zimmreed.com
J Gordon Rudd     jgr@zimmreed.com
Theodore B Schroeder     tschroeder@omm.com
Robert M Schwartz     rschwartz@omm.com
James A Staack     jims@staack-firm.com
R Jay Taylor , Jr     jtaylor@scopelitis.com, lnewton@scopelitis.com
Matthew T Tobin     mtobin@sbslaw.net
Jeffrey A Trimarchi     jtrimarchi@omm.com
Mary D Walsh-Dempsey     mdempsey@omalleylangan.com
Michael J Watton     jdrewicz@Wattongroup.com

case 3:05-md-00527-RLM-CAN document 1090 filed 02/14/08 page 8 of 10

Andrew M Weiner aweiner@omm.com
Peter D Winebrake pwinebrake@winebrakelaw.com

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

| | |
|---|---|
| John H. Beisner PHV<br>O'Melveny & Myers LLP - Was/DC<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jbeisner@omm.com | J. Allen Brinkley<br>Brinkley & Chesnut<br>307 Randolph Avenue<br>PO Box 2026<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net |
| Joree Brownlow<br>Law Office of Joree G Brownlow<br>1444 Gillham Dr Ste 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com | David G. Caperton<br>O'Melveny & Myers LLP<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001 |
| R. Bruce Carlson<br>Carlson Lynch Ltd<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com | Kevin J. Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309 |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178 | William T. Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B. James Fitzpatrick<br>Fitzpatrick Spini & Swanston<br>838 S Main Street Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com | Salvatore G. Gangemi<br>Gangemi Law Firm PC<br>82 Wall St Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com |
| Clayton D. Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Jack D. Hilmes<br>Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: jhilmes@finleylaw.com; kdriscoll@finleylaw.com |

| | |
|---|---|
| Eric E. Hobbs<br>Michael Best & Friedrich LLP<br>100 E Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com | William S. Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 |
| Andrew J. Kahn<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 | Karen P. Kruse<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Donald B. Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Harold L. Lichten<br>Pyle Rome Lichten Ehrenberg &<br>Liss-Riordan<br>18 Tremont St Suite 500<br>Boston, MA 02108 |
| Carla D. Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Paula R. Markowitz<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 |
| Robert E. McDaniel<br>McDaniel Law Offices<br>4 Bicentennial Sq<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | Sanford A. Meizlish<br>Barkan Neff Handelman Meizlish LLP<br>360 S Grant Ave<br>Columbus, OH 43215<br>Email: smeizlish@bnhmlaw.com |
| Kenneth E. Milam<br>Watkins & Eager<br>PO Box 650<br>Jackson, MS 39205-0650<br>Email: kemilam@watkinseager.com | Charles N. Nauen<br>Lockridge Grindal Nauen PLLP<br>100 Washington Avenue South Suite 2200<br>Minneapolis, MN 55401<br>Email: cnnauen@locklaw.com |
| Todd J. O'Malley<br>O'Malley & Langan<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 | Joseph A. Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |
| Cheryl F. Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M. Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |

| | |
|---|---|
| Michael R. Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 |
| Eric H. Rumbaugh<br>Michael Best & Friedrich LLP<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Jennifer R. Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Dan S. Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050<br>Email: addiealexis@verizon.net | Patricia A Sullivan<br>Edwards & Angell<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| Richard Tanenbaum<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | Donald R Taylor<br>Taylor Dunham & Burgess LLP<br>301 Congress Ave, Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Joni M.. Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Peter N. Wasylyk<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com |
| Charles W. Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>PO Box 8086<br>Columbia, SC 29202 | Peter. J. Agostino<br>Anderson, Agostino & Keller, PC<br>131 South Taylor Street<br>South Bend, IN 46601<br>Email: agostino@aaklaw.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **February 14, 2008.**

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3-05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF MANUAL FILING**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Manual Filing.

The documents listed below were sent to the Court on February 15, 2008 for filing under seal in paper form only pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101]:

1. Declaration of Paul McNamara in Support of FedEx Ground Package System, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion To Strike Reports of Professors Lafontaine and Smith; and

2. Exhibits A through G to the Declaration of Paul McNamara in Support of FedEx Ground Package System, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion To Strike Reports of Professors Lafontaine and Smith.

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

Dated: February 15, 2008

Respectfully submitted,

By: /s/Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of February, 2008, I filed the foregoing ***DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S NOTICE OF MANUAL FILING*** with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By:/s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05–MD–527–RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE REPORTS OF PROFESSORS LAFONTAINE AND SMITH**

The *rebuttal* reports of experts Professor Francine Lafontaine and Professor Richard L. Smith directly contradict and undermine the expert testimony plaintiffs will use in seeking summary judgment. Plaintiffs move to strike those reports, relying on a strained, implausible reading of this Court's orders. Specifically, plaintiffs claim that the Court should strike Lafontaine's and Smith's rebuttal expert reports because FedEx Ground failed to disclose Lafontaine's and Smith's identities *before* plaintiffs served their own expert reports. What makes plaintiffs' position implausible is the fact — never mentioned by plaintiffs — that Lafontaine and Smith are rebuttal experts. A summary-judgment opponent is not required to — and indeed, usually cannot — disclose the identity of its *rebuttal* expert before it receives the summary-judgment movant's own expert report(s).

There can be no quarrel that Lafontaine and Smith are rebuttal experts. Smith's November 8, 2007 report is entitled "Expert Report of Professor Richard L. Smith *in Response to*

Expert Report of D. Paul Regan CPA, CFE" [**"Smith Report"**] (emphasis supplied), and Smith's very first paragraph discussing the scope of his assignment states plainly, "I have been requested by counsel for FedEx Ground Package System, Inc. to review and evaluate the analysis prepared by Mr. Paul Regan as reflected in his 'Expert Report.'" (Smith Report ¶ 6 (attached as Ex. 2 to Pls. Mem.).) Similarly, Lafontaine's November 7, 2007 report states in the paragraph immediately following the one summarizing plaintiffs' contentions that, "I was retained by Counsel for FedEx to read the expert report filed by Professor David Lewin on September 7, 2007, and evaluate the opinions expressed therein." (Expert Report of Francine Lafontaine ¶ 7 [**"Lafontaine Report"**] (attached as Ex. 1 to Pls. Mem.).)

Plaintiffs write that their motion to strike is "based on FXG's failure to disclose those experts as required by Rule 26(a) by the Court's deadline, or at any time prior to the service of their reports." (Pls. Mem. at 1.) Plaintiffs' statements concerning the requirements of both Rule 26(a) and this Court's guidelines are incorrect. The Court never set a deadline for the disclosure of *rebuttal* experts. And plaintiffs' complaint that FedEx Ground's rebuttal experts' identities were not disclosed before service of their reports makes no sense: Rule 26(a)(2)(B) provides that disclosure of experts' identities shall be made *contemporaneously* with their reports. The Federal Rules imposed no obligation on FedEx Ground to disclose its rebuttal experts' identities before it served their reports. Therefore, none of the purported bases for plaintiffs' motion supports their requested relief.

In fact, the Federal Rules of Civil Procedure, the Court's Scheduling Orders, and common sense dictate that rebuttal experts be disclosed *after* the opposing party's expert reports are served. This is particularly true here where plaintiffs' experts put forth entirely new theories in their reports. Moreover, plaintiffs have not suffered any prejudice by the timing of disclosure,

as demonstrated by their decision to wait nearly twelve weeks before bringing this motion. FedEx Ground therefore respectfully requests that the Court deny plaintiffs' motion.

## ARGUMENT

### I. FEDEX GROUND HAS COMPLIED WITH THE FEDERAL RULES AND WITH THE COURT'S SCHEDULING ORDERS.

The Federal Rules of Civil Procedure provide that the identity of a rebuttal expert need not be disclosed until *after* the opposing party's expert's report is disclosed. Fed. R. Civ. P. 26(a)(2)(B) and (C). According to Rule 26(a)(2)(B), an expert's identity should be disclosed contemporaneously with the service of that expert's report. And pursuant to Rule 26(a)(2)(C), rebuttal expert reports — *i.e.*, reports that are "intended solely to contradict or rebut evidence on the same subject matter identified by [the opposing party's expert]" — shall be made after the opposing party's disclosure. In other words, reading subsections (A) and (B) of Rule 26(a)(2) together, the rule is that the disclosure of a rebuttal expert's *identity* should be made with the disclosure of that rebuttal expert's *report*, and that both should be made *after* the opposing party discloses its own expert's identity and report. FedEx Ground complied precisely with the requirements of Rule 26(a)(2)(B) and (C).

The Advisory Committee's notes to the 1993 Amendment buttress this position. In those notes, the Committee recognized the common-sense proposition that a rebuttal expert need not be retained until the opposing party knows what she will be retained to rebut. "[T]he party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue." Fed. R. Civ. P. 26(a)(2) adv. cmte. n. (1993). Here, plaintiffs, who are the party moving for summary adjudication on the contractor/employee issue, bear the burden of proof on that issue. *See* Fed. R. Civ. P. 56(c) (providing that the moving party must, with supporting evidence, "show that . . . [it] is entitled to

judgment as a matter of law"). Thus, plaintiffs were required to disclose their expert testimony on the contractor/employee issue *before* FedEx Ground was required to disclose its rebuttal experts on this issue.

Rule 26(a)(2)'s dictate — that the identity of a rebuttal expert need not be disclosed until *after* the opposing party's expert's report is disclosed — may be altered only by stipulation of the parties or by court order. Fed. R. Civ. P. 26(a)(2)(C). Neither is present here.

The parties did not stipulate to amending the Rule 26(a)(2). Plaintiffs have identified no such stipulation.[1] In fact, the only document plaintiffs reference (Doc. No. 724) is actually a statement about the parties' *disagreement* as to scheduling issues. (*See* Doc. Nos. 721, 724 (demonstrating the disagreement between FedEx Ground and plaintiffs).). This does not meet the requirements of a stipulation to modify discovery procedures. Rather, a "stipulation" to modify discovery procedures, as defined in Rule 29, "only is satisfied by a formal written stipulation signed by both parties." 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2092 (2d ed. 2007). To be binding, a stipulation must be definite and certain. *Estate of Sanford v. Comm'r*, 308 U.S. 39, 50 (1939). "The essence of a stipulation is an agreement of the parties, albeit a judicially sanctioned one." *United States v. Harris*, 542 F.2d 1283, 1297 (7th Cir. 1976). Here, there exists no formal written agreement that rebuttal experts'

---

[1] Plaintiffs' characterization of FedEx Ground's June 2007 statement that FedEx Ground would not "reshuffle" its lineup of experts (Pls. Mem. at 2) is incorrect and beside the point. In that filing (Doc. No. 724), FedEx Ground disputed plaintiffs' claim that FedEx Ground was proposing to defer summary-judgment briefing until after the Court had ruled on the pending class-certification motions as a means of "swapping out" summary-judgment experts that FedEx Ground had already disclosed. FedEx Ground explained that the *identity* of its expert-witness line-up did not depend on *when* the motions were filed in relation to resolving class certification, but that the *content* of its experts' reports likely would. (*Id.* at 1-2.) There is no inconsistency between that and FedEx Ground's assertion of a right to use rebuttal expert testimony in response to reports that plaintiffs had by then not yet prepared or served. In fact, FedEx Ground did not change the identify of the experts it told plaintiffs it would use in FedEx Ground's own motions for summary judgment on the classification issue.

identities would be disclosed prior to the service of their reports. Therefore, no stipulation abrogates Rule 26(a)(2).

Likewise, the Court has not altered the rule. In fact, the Scheduling Orders' silence as to deadlines for disclosing *rebuttal* experts confirms that rebuttal experts need not be disclosed until after the movants' experts. Of the five pertinent Scheduling Orders, only the Court's November 29, 2005 Order speaks to the disclosure of experts' identities before their reports.[2] (Doc. No. 58.) This Order, however, does not control the disclosure of rebuttal experts' identities because it provides only for early disclosure of experts "upon whom [parties] will rely" for summary adjudication of contractor/employee status. (*Id.* at 5.) By definition, only summary-adjudication *movants* "rely" on their experts' reports in support of summary adjudication. Summary-adjudication *opponents* (which FedEx Ground is here) do not "rely" on their experts' reports at summary adjudication; they use their own experts' reports to rebut the movant's experts' reports.[3]

Courts have explicitly held that a scheduling order that sets a deadline for the disclosure of expert witnesses' identities does *not* constitute the setting of a deadline for the disclosure of *rebuttal* expert witnesses' identities. *See Todd v. LaMarque*, Civ. No. 03–3995–SBA, 2007 WL 3168272, at *1 (N.D. Cal. Oct. 25, 2007) (holding that while the court set deadlines for the disclosure of expert witnesses, it "did not set a deadline for disclosure of expert *rebuttal*

---

2 The other four Scheduling Orders that amended the summary-adjudication deadlines were silent as to identity-disclosure deadlines. (*See* Doc. Nos. 261; 481; 766; 836.) All five pertinent Scheduling Orders, however, provide for the disclosure of rebuttal experts' reports after the disclosure of movant's experts' reports. (*See* Doc. Nos. 58; 261; 481; 766; 836.) Consistent with this approach, FedEx Ground disclosed its rebuttal experts' identities and reports after plaintiffs disclosed their experts' identities and reports.

3 FedEx Ground will be submitting its own affirmative motions for summary judgment, but it will not be supporting those motions with reports from Lafontaine or Smith. Rather, in support of those affirmative motions, FedEx Ground will rely on reports from experts previously identified.

witnesses. Therefore, the default provision of Rule 26(a)(2)(C) applies" (emphasis supplied)); *Walker v. Yellow Freight Sys., Inc.*, Civ. No. 98–3565, 1999 WL 757022, at *3 (E.D. La. Sept. 24, 1999) ("The Court finds that the Pretrial Scheduling Order does not override the provisions of Rule 26(a)(2)(C) because the Order does not provide a deadline for disclosure of rebuttal witnesses."); *see also Syringe Dev. Partners L.L.C. v. New Med. Tech., Inc.*, No. IP98–1726–C–M/S, 2001 WL 403232, at *36 n.7 (S.D. Ind. Feb. 9, 2001) ("[The case management plan's] language on the issue of expert disclosures and reports is sufficiently vague about rebuttal experts to allow for resort to Rule 26(a)(2)(C)."). For a scheduling order to abrogate the rule in Rule 26(a)(2)(C), it must explicitly provide a deadline for the disclosure of *rebuttal* experts' identities. No such deadline was provided in any of the Court's Scheduling Orders.

Finally, common sense supports the conclusion that a rebuttal expert's identity need not be disclosed until after the moving party's expert reports are served. Until the opposing party knows what the moving party's experts have to say, it cannot intelligently select its rebuttal experts. This is particularly true here where, as discussed below, plaintiffs' summary-judgment experts expressed opinions that had not been expressed previously. In fact, FedEx Ground only retained experts Lafontaine and Smith after plaintiffs served the Lewin and Regan reports and FedEx Ground thereby learned of the opinions plaintiffs would defend in support of their summary judgment motion. (*See* Declaration of Paul G. McNamara **["McNamara Decl."] ¶¶** 12–13.[4])

4 The McNamara Declaration and Exhibits A to G thereto have been filed under seal. (Doc. No. 1091.)

II.     EVEN IF FEDEX GROUND SHOULD HAVE DISCLOSED THE EXPERTS' IDENTITIES SOONER, STRIKING THE EXPERTS' REPORTS IS IMPROPER WHERE — AS HERE — THE LATE DISCLOSURE WAS EITHER JUSTIFIED OR HARMLESS.

Although Rule 37(c) provides that the remedy for a failure to comply with Rule 26(a) is striking of the evidence in question, such evidence will not be struck if, as plaintiffs themselves recognize, the late disclosure was *either* justified *or* harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). (*See* Pls. Mem. at 5–6.)

   A.     FedEx Ground could not have disclosed Lafontaine's and Smith's identities until plaintiffs served their own expert reports because FedEx Ground did not yet know what the experts would be retained to rebut.

FedEx Ground retained experts Lafontaine and Smith after it received plaintiffs' reports.[5] It did not retain them sooner because it did not know what its rebuttal experts (if any) would be required to rebut. There is no clearer justification for a failure to "timely" disclose than that the party did not possess the information to be disclosed during the time in question.

In determining whether a late justification is justified, the Seventh Circuit has stated that one of the factors guiding the district court is "the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857. Here, there was no bad faith or willfulness on FedEx Ground's part. FedEx Ground did not know Lafontaine's and Smith's identities until after plaintiffs served their reports. It did not conclude that it needed to retain additional experts to rebut the Lewin and Regan reports until after those reports were served. (McNamara Decl. ¶¶ 8, 12, and 13.) This is particularly true because the plaintiffs' reports contained completely new opinions. (McNamara Decl. ¶¶ 4, 5, 9–11.) And FedEx Ground did not retain Lafontaine and Smith until two weeks before it served its own expert reports. (McNamara Decl. ¶ 13.) There simply was no bad faith or willfulness involved.

case 3:05-md-00527-RLM-CAN document 1092 filed 02/15/08 page 8 of 17

FedEx Ground's point — that a party need not disclose its rebuttal expert's identity until it receives the moving party's expert report — is illustrated by *Superior Aluminum Alloys, LLC v. U.S. Fire Insurance Co.*, Civ. No. 05–207, 2007 WL 1850859 (N.D. Ind. June 25, 2007), a case relied on by plaintiffs. In *Superior Aluminum*, the court disallowed the expert's report because the expert's "identity and opinions were known to [the plaintiff] well before [the disclosure] deadline — in fact, even before it commenced this suit." *Id.* at *4; *see also Uhrick v. United States*, Civ. No. 04–99, 2006 WL 2623285, at *3 (N.D. Ind. Sept. 12, 2006) ("[T]he identity and opinions of [the expert] were also known to the Plaintiff well before the deadline for disclosure."). In *Superior Aluminum* and *Uhrick*, the experts in question were the *plaintiffs'*; the plaintiffs bore the burden of proof; and the plaintiffs knew their experts' identities and opinions well in advance of the disclosure deadline. Here, the experts in question are the *defendant's*; FedEx Ground does not have the burden of proof; and, most importantly, FedEx Ground did not (and could not) know the experts' identities and opinions before receiving plaintiffs' experts' reports, *because they were rebuttal experts*.

1. **Here, FedEx Ground had to retain rebuttal experts *after* it received plaintiffs' experts' reports because plaintiffs' experts posited opinions and theories that were unfamiliar to FedEx Ground.**

FedEx Ground did not — and could not — know what opinions plaintiffs' experts' would put forth. Despite plaintiffs' suggestion that FedEx Ground "should have known" what Regan and Lewin would say in their reports — based on Regan's testimony in *Estrada*, Lewin's report in support of class certification, and Regan's and Lewin's declarations in support of striking Crandall's report — Regan's and Lewin's reports contained opinions and analyses that were presented for the first time.

[5] FedEx Ground received the reports of plaintiffs' experts Lewin and Regan on September 7, 2007, and on approximately October 23 it retained Lafontaine and Smith to review and

*a. Lewin's summary-judgment report presents analysis not discussed in his class-certification report or his declaration.*

Plaintiffs offered Professor David Lewin as their expert in support of class certification. (*See* McNamara Decl. ¶ 3.) In his November 13, 2006 report, Lewin stated that his "opinion [was] that FedEx Ground is an organization that uses a system of control that is designed to ensure that field pickup and delivery operations are carried out in a manner that is uniform, consistent, and standardized." (Expert Report of Professor David Lewin ¶ 8 (Nov. 13, 2006) (attached as Ex. A to McNamara Decl.).) On December 19, 2006, FedEx Ground took Professor Lewin's deposition. He testified then that

- "My opinions, for purposes of this case, are what they are as stated in my report. . . . *No more and no less. They are the only opinions I have rendered in this case.*" (Lewin Deposition at 200:19–201:2 (attached as Ex. B to McNamara Decl.) (emphasis supplied).)
- He hadn't been requested to render any opinions on any matter other than as set forth in his report, "[a]nd if that remains to be true, my opinions are what they are as expressed in my report." (Lewin Deposition at 220:8–22 (attached as Ex. C to McNamara Decl.).)
- He had no additional work in progress, and he didn't anticipate doing any additional work. He hadn't been advised by plaintiffs' counsel that there might be additional work in connection with either class certification or with the merits. (Lewin Deposition at 228:13–229:4 (attached as Ex. D to McNamara Decl.).)
- He did not study contractors; he wasn't asked to provide opinions about contractor behavior, how policies and procedures were implemented, or whether contractors

---

respond, respectively, to the Lewin and Regan reports. (*See* McNamara Decl. ¶¶ 8, 13.)

followed procedures; he hasn't studied whether procedures are implemented in a uniform way; he had no opinion whether operating agreements are understood in a uniform, consistent manner; and he was not doing a report on the issue of whether the drivers were employees or independent contractors. (Lewin Deposition at 116:17–20; 222:9–10; 223:6–11; 226:25–227:17; 238:3–19; 250:16–25; 319:22–320:2 (attached as Ex. E to McNamara Decl.).)

Lewin's latest report departs significantly from his earlier work. In his latest report, Lewin analyzed FedEx Ground policies and procedures in six areas — (1) recruiting, selection and hiring of drivers; (2) training of drivers; (3) compensation and rewards of drivers; (4) performance management and appraisal; (5) discipline and termination review; and (6) communications, union avoidance, and driver-morale programs — and concluded based on that review that "1) FedEx Ground's policies and practices applied to its P&D drivers are largely indistinguishable from the human resource policies and practices used by corporations for their employees, and 2) the functions performed by FedEx Ground's Contractor Relations unit are largely indistinguishable from the functions performed by Human Resources Departments of corporations." (Expert Report of Professor David Lewin ¶ 10 (Sept. 7, 2007) (attached as Ex. F to McNamara Decl.; McNamara Decl. ¶ 9).)

Lewin's conclusions in support of plaintiffs' summary-judgment motion are nowhere to be found in the original report(s) Lewin prepared either in support of class certification or in attempting to strike Crandall's report. (McNamara Decl. ¶ 11.) Indeed, Lewin professed repeatedly to have no opinions concerning how the procedures at FedEx actually were implemented, whether they were implemented uniformly, or whether the operating agreements were understood in a uniform, consistent manner. (Lewin Deposition at 226:25–227:17; 238:3–

19; 250:16–25; 319:22–320:2 (McNamara Decl. Ex. E); McNamara Decl. ¶ 5.) For this reason, FedEx Ground needed a rebuttal expert, and it engaged that expert after Lewin submitted his most recent report. (*See* McNamara Decl. ¶¶ 11–13.)

Lafontaine is the rebuttal expert to Lewin Lafontaine is an expert in various forms of business organization. (*See* McNamara Decl. ¶ 14; Lafontaine Report ¶¶ 1–2.) In her rebuttal report, she focuses on each area described by Lewin and demonstrates — through both analysis and concrete examples — that the characteristics isolated by Lewin actually are found in a multitude of business relationships, including those using independent contractors, those involving franchises (which, of course, are not employees), those involving independent trucking arrangements, and those using employees. (*See* McNamara Decl. ¶ 16; Lafontaine Report ¶¶ 11–42.) Lafontaine's opinions directly contradict and completely undermine Lewin's analysis in each area. It is unsurprising that plaintiffs would prefer to have the Lafontaine report struck, but to do so would not be a just result because it was not possible to disclose Lafontaine's identity until Lewin produced his report.

*b. Regan's summary-judgment report presents analysis that was not presented in his* Estrada *testimony or his declaration in this case.*

Until FedEx Ground saw Regan's report and conclusions, it could not know what it needed to rebut, or the qualifications of the person who would be able to do so. Once FedEx Ground saw Regan's report, it retained Professor Smith —a Professor of Financial Management at the Peter F. Drucker and Masatoshi Ito Graduate School of Management, as well as at Chapman University (McNamara Decl. ¶ 17; Smith Report ¶ 1) — who is qualified to review Regan's work and opine on the flaws that infuse it.

Plaintiffs complain that FedEx Ground had "three years to figure out the right expert to use to refute Mr. Regan's testimony and analysis," based on Regan's May 12, 2004 testimony in

*Estrada*. (Pls. Mem. at 7.) But this is a fallacy. First, Regan did not submit an expert report in *Estrada*; he simply provided expert testimony. (*See* McNamara Decl. ¶ 11.) Moreover, Regan's analysis did not — and FedEx Ground did not expect it to — remain the same over the course of these three-plus years. New evidence was amassed. New expert reports were produced. New depositions were taken. Indeed, Regan's expert report is littered with cites to several post-*Estrada* deposition transcripts, post-*Estrada* reports of other experts, and post-*Estrada* data. (*See* Expert Report of D. Paul Regan, CPA, CFE (Sept. 7, 2007) (attached as Ex. G. to McNamara Decl.); McNamara Decl. ¶ 20.) The long period of time — and the multitude of relevant events that took place during that time — only supports FedEx Ground's position that it would not know the substance or methodology of Regan's report until it actually received the report.

Similarly, Regan's submission of a declaration in support of plaintiffs' motion to strike Crandall's report did not put FedEx Ground "on notice" of the substance of Regan's expert report. Regan's declaration is dedicated to attempting to show why Crandall's methodology and conclusions were wrong; nowhere did Regan point to his own methodology or conclusions or attempt to explain why they were correct. There is simply no basis for plaintiffs' allegation that, based on Regan's testimony in *Estrada* or his declaration in this case, FedEx Ground should have known the substance of Regan's expert report well enough to retain an expert to rebut it before even seeing it.

**2. Smith's rebuttal report is necessary (and thus FedEx Ground was justified in retaining him after receiving Regan's report) because his rebuttal of Regan's report differs from Crandall's.**

As plaintiffs note, FedEx Ground has put forth two experts to rebut Regan's report: Smith and Crandall. Both rebuttal experts are necessary because they attack Regan's report from different perspectives.

On the one hand, Crandall criticizes Regan's data and assumptions, including his extrapolation of the data from a recruiting presentation titled "The Entrepreneurial Spirit," his assumption that all drivers lease their trucks (many own them), his use of UPS drivers' wage-labor rates as a comparator (labor-market data for the transportation industry is more reflective), and his assumption that all buyers of small businesses do so for only investment value (as opposed to "buying a job").  (*See* Expert Report of Robert W. Crandall ¶¶ 26, 27, 34, 43 (Nov. 8, 2007) (attached as Ex. 3 to Pls. Mem.).)  On the other hand, Smith targets Regan's fundamental approach, attacking his report for failing to recognize that FedEx Ground operates as a customer of the contractors and for erroneously focusing on the value of a route instead of the value of the business.  (*See* Smith Report ¶¶ 15, 20.)

Smith's and Crandall's rebuttal reports serve different functions, and until FedEx Ground received Regan's report, FedEx Ground did not know that it would need Smith's services to rebut Regan's methodology.

B.  The disclosure of Lafontaine's and Smith's identities contemporaneously with their reports has not caused plaintiffs any prejudice.

1.  **Plaintiffs have suffered no prejudice by learning of Lafontaine's and Smith's identities on November 8, 2007.**

FedEx Ground's disclosing of Lafontaine's and Smith's identities contemporaneously with serving their experts reports did not harm plaintiffs.  Although plaintiffs spend considerable space criticizing FedEx Ground's conduct in connection with other disputes not the subject of this motion, they devote virtually no substance to the issue as to whether they are prejudiced by the timing of FedEx Ground's disclosure of Lafontaine's and Smith's identities.

This is not surprising, because plaintiffs have not been prejudiced.  Regardless of when plaintiffs learned of Lafontaine's and Smith's identities, they would not have been able to depose them until their reports were served on November 8, 2007.  Plaintiffs complain that "[i]n

formulating their strategy for expert testimony, they had no opportunity to consider the type of experts now being offered in opposition, nor the likely nature of their testimony when determining their line-up of experts and the nature of their reports." (Pls. Mem. at 6.) Plaintiffs' argument turns rebuttal-expert practice on its head, essentially requiring FedEx Ground to rebut reports it had not yet received so that plaintiffs could include responses to such rebuttal in those reports. Plaintiffs presumably have had their experts offer the best argument they can make in support of summary adjudication. There is no reason to believe that plaintiffs would have chosen different experts, or would have had their experts say anything different, had they known that FedEx Ground would retain the services of Professor Lafontaine and Professor Smith. For example, it is not credible for plaintiffs to suggest that, armed only with the knowledge of Lafontaine's and Smith's identities, Lewin would have chosen different areas to focus on, or that Regan's report would not contain the four fatal "critical analytical errors" identified by Smith (*see* Smith Report ¶ 8).

Void of any specifics, plaintiffs also assert a generalized prejudice that it will cost them time and money to depose Lafontaine and Smith. (*See* Pls. Mem. at 6.) But plaintiffs would have deposed them anyway and had the same expense and time investment had they known the identities of Lafontaine and Smith earlier.

Finally, plaintiffs' contention that they are prejudiced is illogical. First they argue that they are "prejudice[d]" by Lafontaine's and Smith's reports because it would "require months of additional work and expense" to rebut the reports. (Pls. Mem. at 6–7.) Yet plaintiffs also state that Smith's report is "entirely duplicative of" FedEx Ground expert Robert Crandall's. (Pls. Mem. at 7.) Plaintiffs fail to explain why they will be required to spend months of work and expense rebutting a report that is, in their own words, "entirely duplicative" of another report that

case 3:05-md-00527-RLM-CAN document 1092 filed 02/15/08 page 15 of 17

they will be rebutting. If, as plaintiffs contend, the Smith report covers the same ground as Crandall (a position FedEx Ground denies), they are not prejudiced because they are already familiar with Smith's opinions. *See Wilcox v. CSX Transportation, Inc.*, Civ. No. 05–107, 2006 WL 5153113, at *3 (N.D. Ind. Mar. 29, 2006).

2. **Precedent supports denying plaintiffs' motion based on lack of prejudice.**

Denying plaintiffs' motion for lack of prejudice is consistent with precedent. For example, in *Wilcox v. CSX Transportation, Inc.*, Civ. No. 05–107, 2006 WL 5153113, at *3 (N.D. Ind. Mar. 29, 2006), the court held that the plaintiff's failure to timely disclose its expert caused no prejudice to the defendant because the defendant's counsel was familiar with the expert and with the substance of his testimony. Importantly, "[the defendant] is likely in the same situation now that it would have been in had [plaintiff's counsel] timely disclosed [plaintiff's expert]." *Id*. Here, plaintiffs have not — and indeed, cannot — point to any substantive difference that would have occurred had FedEx Ground disclosed Lafontaine's and Smith's identities prior to the service of their reports.

Similarly, in *Concordia Theological Seminary, Inc. v. Hendry*, Civ. No. 05–285, 2006 WL 668219, at *2 (N.D. Ind. Mar. 10, 2006), the court found the party's Rule 26(a) violation harmless because, from the date of the tardy Rule 26(a) disclosure, the discovery deadline was six months away and the trial was a year away. Here, the summary-adjudication deadline (March 14, 2008) was over four months away from the date of FedEx Ground's disclosure (November 8, 2007). Moreover, in *Concordia*, the court found "the lack of prejudice [to be] apparent by the fact that the [defendant] waited almost four months before filing the current motion [to strike]." *Id.* Here, Lafontaine's and Smith's identities and reports were disclosed on

November 8, 2007. The fact that plaintiffs filed their motion to strike almost three months later (on January 28, 2008) severely undermines any claim of prejudice.

Finally, in spite of plaintiffs' grand protestations about prejudice, the Seventh Circuit is quite lenient in finding that Rule 26(a) violations oftentimes cause no prejudice to the opposing party. Thus, in *David v. Caterpillar, Inc*. — a case relied on by plaintiffs — the Seventh Circuit upheld the district court's conclusion that the party that moved to strike had suffered no prejudice. 324 F.3d at 857. And in *Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir. 2005) — another case relied on by plaintiffs — the Seventh Circuit reversed the district court and held that the Rule 26 violation caused no prejudice to the opposing party.

Similarly, plaintiffs here have not suffered any prejudice as a result of FedEx Ground's disclosing Lafontaine's and Smith's identities when it served their expert reports on plaintiffs. As a result, the delay was harmless, and it would not be proper to strike those reports.

**CONCLUSION**

FedEx Ground's disclosure of rebuttal experts Lafontaine's and Smith's identities contemporaneously with service of their reports on November 8, 2007, is in compliance with Rule 26(a)(2)(A) and (B) and with the Court's Scheduling Orders. Alternatively, even if the Court were to find otherwise, the sanction of striking the reports is unwarranted because FedEx Ground's actions were both justified and harmless. As a result, Rule 37(c) dictates against striking the reports.

FedEx Ground therefore respectfully requests that this Court deny plaintiffs' motion to strike the reports of rebuttal experts Lafontaine and Smith.

case 3:05-md-00527-RLM-CAN document 1092 filed 02/15/08 page 17 of 17

Dated: February 15, 2008.

Respectfully submitted,

/s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006–4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Ste. 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of February, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By:/s/Thomas J. Brunner

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Chief Judge Miller
Magistrate Judge Nuechterlein

**FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' REQUEST FOR STATUS CONFERENCE**

Plaintiffs' request to limit FedEx Ground to only one motion for summary adjudication of contractor status in over fifty coordinated cases is contrary to the Practice and Procedure Order and other Case Scheduling Orders, the Court's understanding as reflected during case status conferences, and most fundamentally, FedEx Ground's due process rights. Contrary to plaintiffs' contention, FedEx Ground has, from day one in this litigation and consistently thereafter, maintained that each case must be adjudicated under its own facts and with reference to the specific laws that apply to it. FedEx Ground respectfully requests that the Court deny plaintiffs' request for a scheduling conference and allow the summary adjudication motions concerning contractor status to proceed as scheduled.

## I. CONSOLIDATED ADJUDICATION OF CONTRACTOR STATUS IS INAPPROPRIATE, AS THE COURT HAS PREVIOUSLY RECOGNIZED

### A. Separate Treatment Of The Cases Is Appropriate, As Recognized Thus Far In This Litigation

Each case in this MDL proceeding has retained its separate identity since the beginning

of this litigation. The original Practice and Procedure Order entered by the Court states that "[e]ven though . . . papers filed in these cases shall all be filed in one consolidated case file, ***the MDL cases shall not lose their separate identities for substantive purposes, including entry of final orders and judgments***." (Doc. No. 2 at 3.) Further, the Court has respected separate treatment of the cases in response to plaintiffs' efforts to combine them for substantive purposes. During the October 24, 2005, case scheduling conference, plaintiffs suggested that the Court adopt a bellwether approach to class certification ***and*** to "adjudication of the employment status of the drivers." (Oct. 24, 2005 Transcript at 10.) The Court responded:

> But is it not unique, because [the cases] are coming out of different states and controlled by different state laws? If you pick a bellwether, while it might be a bellwether if there were multiple cases from one particular state, but to the extent that there are multiple states involved it wouldn't really be dispositive or indicative of what might be the result in nonbellwether cases.

(*Id*.)

The Seventh Circuit has previously recognized that individual constituent actions transferred pursuant to an order by the Judicial Panel for Multidistrict Litigation, such as the one in this case, retain their separate identities and do not merge into a single consolidated action. *Brown v. U.S.*, 976 F.2d 1104, 1107 (7th Cir. 1992). Moreover, "[c]onsolidation does not merge the suits into a single cause, or ***change the rights of the parties*** . . .." *In re TMI Litig.*, 193 F.3d 613, 724 (3rd Cir. 1999) (emphasis added and quotation marks omitted) (quoting *Johnson v. Manhattan R.R. Co.,* 289 U.S. 479, 497 (1933)). In *TMI*, the Third Circuit rejected defendant's attempt to apply a summary judgment ruling against one set of trial plaintiffs to the group of non-trial plaintiffs because the non-trial plaintiffs were entitled to the adjudication of their own cases on their own merits. 193 F.3d at 725. Plaintiffs in this case have previously recognized that unique issues render consolidated adjudication of the cases inappropriate by joining with FedEx Ground in notifying the Court that "[t]he parties have agreed that a master complaint

case 3:05-md-00527-RLM-CAN document 1093 filed 02/19/08 page 3 of 7

would not serve the efficient administration of the subject actions." (Doc. No. 36 at 26.)

Because there is no single law with reference to which the proper classification of all plaintiffs may be determined in all cases, separate consideration of summary adjudication of contractor status in each case is appropriate. To do otherwise would necessarily affect the substantive rights of the parties, a conclusion that is prohibited in multidistrict litigation. *See In re TMI Litig.*, 193 at 724. Plaintiffs' proposed approach would also require the Court to harmonize the variations and conflicts inherent in the plethora of state and federal laws that are applicable to the employee vs. independent contractor classification question in these proceedings. Such subversion of state substantive law would constitute the application of a "federal general common law" and is strictly prohibited. *Erie R.R. Co. v. Tomkins*, 304 U.S. 64, 78 (1938).

Nothing has happened in this proceeding to alter the Court's initial – and correct – assessment that the cases be treated as separate for purposes of any final orders or judgments. In fact, at no point have plaintiffs demonstrated to the Court that the same legal tests ought to govern the classification question in all states. Nor can they. As demonstrated by their reliance on state-specific authority in each of their statewide motions for class certification, plaintiffs confirm that different tests must be applied in each state. As a result, adjudication of the independent contractor classification question cannot be resolved in a one-size-fits-all motion. Instead, the employee vs. independent contractor status question can be resolved only by looking at the law of each jurisdiction and applying that law to the parties in that case.

## II. FEDEX GROUND HAS REPEATEDLY EXPRESSED ITS INTENT TO FILE MULTIPLE MOTIONS FOR SUMMARY ADJUDICATION OF CONTRACTOR STATUS

In addition to the legal authority that compels individual consideration of the classification question in each state, FedEx Ground has consistently said that motions for

summary adjudication are appropriate on a case-by-case basis. In discussing the case schedule on November 28, 2005, FedEx Ground explained that its motions for summary adjudication would depend on the Court's ruling on class certification in each case:

> [Prior to class certification rulings], we won't know at that point whether we're moving for summary judgment with respect to the one or two named plaintiffs in the case, with the one kind of motion very much focused on those individuals, or whether we'll be moving for summary judgment with respect to a class, or what kind of class, which would be a very different kind of motion.

(Nov. 28, 2005 Transcript at 31.)

During the October 9, 2007 hearing in South Bend, FedEx Ground again argued in favor of setting motions for summary adjudication to be due "30 days from Judge Miller's determination of the class status ***in that particular case***." (October 9, 2007 Transcript at 11.) FedEx Ground's request for floating deadlines could not have more clearly signaled its intent to file multiple motions. Thus, FedEx Ground has unequivocally indicated the intent to file case-specific motions for summary adjudication.

## III. PLAINTIFFS' READING OF THE CASE SCHEDULING ORDERS IS NOT SUPPORTABLE

Plaintiffs' contention that the "Court's Scheduling Orders contemplated unified cross-motions for summary judgment," (Pl. Br. 2) is wrong. Nothing in any Court Order limits FedEx Ground to a single motion on the classification question. Instead, the Orders consistently refer to "motions" for summary judgment. (*See*, Doc. No. 58 at 5-6; Doc. No. 766 at 3; Doc. No. 898 at 1.) The only restriction is that each of the memoranda in support of those motions is limited to 30 pages. It would be absurd for the parties to be limited to 30 pages to discuss the dozens of different tests at issue. Indeed, it would take more than 30 pages just to identify the multiple factors in each relevant test – leaving no space for any discussion of how each test applies to the parties in the case. That can't be what the Court intended.

Plaintiffs argue that their reading of the Court Orders is appropriate on the basis that class certification briefing was staged, whereas summary adjudication briefing has not been. As an initial matter, plaintiffs' assumption that multiple-case briefing must be performed on a staged basis is incorrect. The Court established the deadline of February 8, 2006 for the filing of motions to dismiss (Doc. No. 58 at 1) and FedEx Ground filed individual memoranda in support of motions to dismiss in eight cases (Doc. Nos. 143, 157, 159, 161, 163, 165, 167, 169) without objection.

Even were plaintiffs' assumption correct, however, the Court ***did*** stage the summary judgment motions in two regards. First, in starting with the narrow question of contractor classification, the Court made clear that it would entertain subsequent motions on summary judgment in the future. Second, the Court initially established a second round of summary adjudication ***of contractor status*** for the fourth wave of cases (Doc. No. 823 at 3), although the Court merged those two rounds at the October 2007 status conference. Similarly, as previously indicated to the Court, the parties are currently expecting to argue for an additional wave of summary judgment motions for the fifth wave of cases that have recently been transferred to the MDL. If plaintiffs were correct that summary adjudication of contractor status was to be resolved in one motion, then the Court never would have set multiple deadlines for the same "omnibus" motion, and plaintiffs could not have contemplated filing just one such motion, as they now do.

**CONCLUSION**

The upcoming summary judgment deadline creates significant work for the parties. If plaintiffs wish to file a single "omnibus" motion for summary adjudication of contractor status, that is within their right. FedEx Ground anticipates that any such motion will be fatally flawed

in its legal analysis, and will oppose it on that basis, among others. But there can be no dispute

that FedEx Ground is entitled to recognize the separateness and individuality of each case and to

file discrete motions in as many cases as it deems appropriate. FedEx Ground has worked hard

to meet the deadlines established by the Court and is prepared to move forward according to the

Case Scheduling Orders currently in force. At this late date, it would be contrary to the case

management orders and procedures, and highly prejudicial to FedEx Ground to render these

efforts meaningless.

Dated: February 19, 2008.                          Respectfully submitted,


                                                   s/Thomas J. Brunner
                                                        Thomas J. Brunner

                                                   John H. Beisner
                                                   Robert M. Schwartz
                                                   Evelyn L. Becker
                                                   O'MELVENY & MYERS LLP
                                                   1625 Eye Street, NW
                                                   Washington, DC 20006-4001

                                                   Thomas J. Brunner
                                                   Alison G. Fox
                                                   BAKER & DANIELS LLP
                                                   202 South Main Street
                                                   Suite 1400
                                                   South Bend, IN 46601

                                                   *Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of February, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On November 29, 2005, this Court entered a scheduling order that established briefing for class certification to be in three stages. The first wave was to be filed on August 8, 2006, with each subsequent wave to be filed approximately in three week increments. As time passed, it became apparent that the parties would need a fourth wave of class certification briefing. Consequently, on June 29, 2007, this Court added a fourth wave of class certification briefing.

On April 27, 2007, Defendant Fedex Ground Package Systems, Inc. (Fedex) filed its responses to Plaintiffs' first wave of class certification briefs. Fedex also filed three documents as "appendixes" that were never contemplated or ordered by this Court. This Court struck two of the appendixes because they contained argumentative material when Fedex had already exhausted its page limitations with regards to its response brief.

Now, with regards to the fourth wave of class certification, this Court, again, is faced with the same situation. Again, Fedex has filed an approximately fifty page appendix with one of its responses to Plaintiffs' fourth wave of class certification motions. Again, Fedex did not seek leave from this Court to file such an appendix, and Plaintiffs, again, filed a motion to strike

case 3:05-md-00527-RLM -CAN document 1094 filed 02/20/08 page 2 of 3

the appendix on December 17, 2007, claiming that the appendix was actually more argument rather than an objective appendix.

Fedex claims that the appendix is proper because it merely recites the law of approximately twenty states regarding their respective legal tests for employee classification. However, an examination of the documents reveals that it is, as Plaintiffs claim, more argument.

Fedex begins its "appendix" by stating, "[a]s demonstrated below, a myriad of differences distinguishes the unique independent contractor versus employee classification tests . . . in each of these states." Doc. No. 1007-3. This statement sounds like a statement of fact, but it is a statement regarding a legal issue in dispute that this Court must resolve. One of the main issues before the parties is whether the legal test for employee classification varies. Plaintiffs claim that the law does not vary from jurisdiction to jurisdiction, and Fedex believes the antithesis to be true. Thus, Fedex's statement is a contention or opinion rather than a statement of fact.

Fedex then proceeds to recite the legal tests from the various jurisdictions, but Fedex also analyzes parts of those legal tests and how they differ from jurisdiction to jurisdiction. Even if all of the statements are in fact derived from caselaw, the appendix allows Fedex to "highlight" or "accentuate"certain cases or parts of cases to make their position appear more appealing or correct. Simply put, this is the epitome of argument.

Both parties covered the issue regarding the respective jurisdictions' legal test for whether an individual is an employee or an independent contractor extensively in their briefs. Fedex's "State Law Variations Appendix" is nothing more than extended argument on this issue. Fedex did not have leave to file additional pages of argument. Consequently, Plaintiffs' motion

to strike is **GRANTED** [Doc. No. 1060] and Fedex's "appendix" [Doc. No. 1007-3] is **STRICKEN**.

**SO ORDERED.**

Dated this 20th Day of February, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

case 3:05-md-00527-RLM-CAN document 1098 filed 02/25/08 page 1 of 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' REQUEST FOR STATUS CONFERENCE**

FedEx Ground Package System, Inc.'s ("FXG") opposition to the requested status conference underscores the reasons why this Court can and should conduct a conference. First, it is readily apparent that the parties' understanding of the Court's scheduling orders are radically different and cannot be reconciled. A status conference will have the curative effect of resolving any misapprehension by the parties about the Court's expectations. Second, FXG clearly intends to litigate summary adjudication of employment status for each case twice, first as to the individual plaintiffs and later as to any class certified as represented by the individual plaintiffs. This repetitive approach places a huge and unnecessary burden on this Court and the parties' resources in what can only be the most inefficient, unnecessary, and unwieldy, if not chaotic, manner. Third, the adoption of FXG's approach to briefing on summary adjudication will have the unintended effect of forcing Plaintiffs to respond to 38 separate determinations of

individual employment status (without resolution of the question on a class-wide basis) within a six-week period when FedEx had at least six months to draft the same.

The briefing on summary adjudication of employment status is scheduled to begin on March 14, 2007, and the briefing schedule was determined in part on the belief that the class certification phase of this proceeding would be completed and notice would be disseminated.[1] At present, only the Kansas and ERISA claims have been ruled upon and certified. While Plaintiffs are certainly prepared to go forward with *briefing* on the employment status question, prior to notice and the expiration of the opt-in period, the Court may not resolve the motions for summary adjudication (although filings may go forward) without running afoul of the Seventh Circuit's admonitions against one-way intervention. *Watkins v. Blinzinger*, 789 F.2d 474, 476 n.3 (7th Cir. 1986) (citing *Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762-63 (7th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976)). By allowing a status conference to proceed, the Court will best be able to clarify the sequencing of the briefing process and consider the current status of the action as opposed to what was considered months ago.

In an effort to resolve the scheduling dilemma, Plaintiffs made several alternative compromise suggestions to FXG -- each of which were rejected by FXG but could be adopted by this Court. First, Plaintiffs proposed that the parties ask the Court to amend the schedule to proceed only with filings of cross-motions for summary adjudication on the nationwide ERISA claim that has already been certified. The record with respect to that claim is fully developed, there is a single test, and the class is the largest, all-inclusive class sought to be certified in this MDL. The Court could then schedule the remaining motions to follow as state classes are

[1] It was the anticipated by both the parties and the Court that class certification would be resolved in the first and second waves of cases prior to summary adjudication. *See* October 9, 2007 Transcript of Motions Hearing Before The Honorable Christopher A. Nuechterlein, P. 29-30. Indeed, the Court invited parties to re-address the scheduling issues if class certification had not progressed as expected. *Id.* at 31.

certified by the Court. Plaintiffs submit that the United States Supreme Court's decision in *Nationwide Mt. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992), utilized in an ERISA context, also sets out the test most commonly governing the constituent actions and one in which no favorable presumption for employee status is used. Alternatively, Plaintiffs also suggested that the parties could limit their motions to the Kansas case, which encompasses both the ERISA claim and Kansas state law claims, giving FedEx what it originally wanted: summary adjudication of only those cases in which the class was already determined. Accordingly under either compromise, subsequent briefing on employment status with respect to other state classes could be abbreviated or follow the supplemental briefing structure ordered by Judge Miller following the certification of the Kansas and ERISA classes.

Either of these compromises avoids legal pitfalls without delaying the adjudication of the case. Neither of these alternatives restricts the parties to one motion, but avoids needless and senseless repetition of motions in this unified action. Further, either alternative avoids the severe prejudice to Plaintiffs that would result from the surprise filing of myriad motions which neither the Court nor the Plaintiffs are prepared to address in one compressed briefing cycle.

Plaintiffs' respectfully submit that the need for a status conference with the Court exists, regardless of which party is correctly interpreting the briefing schedule on summary adjudication, if only to permit all parties work efficiently with the same assumptions based on the current status of the case as a whole.

Dated: February 25, 2008

Respectfully submitted,

HARWOOD FEFFER LLP

Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On February 14, 2008, Plaintiffs filed a "Request for a Status Conference Regarding the Parties' Dispute Over Summary Judgment." On February 19, 2008, Defendant filed a response to that motion, and on February 25, 2008, Plaintiffs filed a reply. The filings by the parties reveals that several issues need to be addressed in relation to the summary judgment deadline. As a result, this Court finds that a status conference would be beneficial. The main request of Plaintiffs' motion, which is for a status conference, is **GRANTED** [Doc. No. 1090], but the status conference will be in-court on **March 19th, 2008**, **at 11:00 a.m. (E.D.T)** in Room 201, Robert A. Grant Courthouse, 204 S. Main Street, South Bend, Indiana. Counsel for both parties must appear in person. Furthermore, the summary judgment deadline of March 14, 2008, is also **SUSPENDED**. This Court will address the summary judgment deadline at the in-court status conference along with any other scheduling issues.

**SO ORDERED.**

Dated this 27th Day of February, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE REPORTS OF PREVIOUSLY UNDISCLOSED EXPERTS**

## I. INTRODUCTION

In an effort to stave off exclusion of two experts who were not disclosed in accordance with the Court's Scheduling Orders, FXG recasts them as "rebuttal" experts whose reports should be allowed because the timing of their disclosure is governed by Rule 26(a)(2)(C), not by any of the expert disclosure deadlines set by the Court. FXG argues that Plaintiffs' motion to strike these experts relies on a "strained" and "implausible" reading of this Court's Orders because "the Court never set a deadline for the disclosure of *rebuttal* experts." FXG's Memorandum of Law in Opposition to Plaintiffs' Motion to Strike Reports of Professors Lafontaine and Smith ("FXG Mem.") at 1 and 2 (emphasis in original). There are two fatal flaws in this argument.

First, although correctly noting that the Scheduling Orders governing expert disclosure nowhere contemplate a round of rebuttal experts, it is *FXG's* reading of that silence as a license to introduce a new round of rebuttal experts that is strained and implausible. The Supplemental

Scheduling Order clearly contemplates a disclosure schedule for experts offered by Plaintiffs and responsive experts offered by Defendant. That schedule called for disclosure of expert witnesses by **both sides** in January 2006. Doc. No. 58 at 5. If FXG wanted to add another round of experts designated as "rebuttal" experts, it should have sought this Court's permission to do so. Perhaps FXG was reluctant to seek leave of Court to offer undisclosed "rebuttal" experts because FXG previously argued that the Court should **not allow** an "unorthodox and prejudicial round of 'rebuttal' experts that was never contemplated by the Court or the parties." Doc. No. 477 at 1.

Second, even if FXG were correct that its right to serve rebuttal expert reports is not governed by any of the Court's Scheduling Orders but instead is governed entirely by Rule 26(a)(2)(B) and (C), then the reports of these two experts should be stricken because they are untimely. Rule 26(a)(2)(C) mandates that, in the absence of other direction from the court or stipulation by the parties, the report of any expert being offered solely as rebuttal evidence must be disclosed within 30 days after disclosure made by the other party. Fed. R. Civ. P. 26(a)(2)(C). The reports of FXG's new, previously undisclosed "rebuttal" experts were served more than 60 days after FXG received the reports purportedly being rebutted.

## II. ARGUMENT

### A. A Round Of "Rebuttal" Experts Is Neither Contemplated Nor Permitted By The Orders Governing Expert Disclosures In This Case.

FXG argues that although the Scheduling Orders in this case do not contemplate "rebuttal" experts, FXG is nonetheless permitted to offer rebuttal experts pursuant to Rule 26(a)(2)(C). According to FXG, "the Scheduling Orders' silence as to deadlines for disclosing *rebuttal* experts confirms that rebuttal experts need not be disclosed until after the movants' experts." FXG Mem. at 5 (emphasis in original). Taken to its logical extreme, FXG's argument is that the Scheduling Orders simply do not govern the identification of FXG's opposition or

responsive experts or the timing of their reports so long as those reports can be described as "rebuttal" reports.  However, the Supplemental Scheduling Order clearly sets forth a schedule for disclosure of the identification of expert witnesses for **both** Plaintiffs and Defendant:

> In accordance with Fed. R. Civ. P. 26(a)(1) and (b), and this Court's November 15, 2005 initial scheduling order, **all parties** shall disclose all experts and witnesses upon whom they will rely in the summary judgment phase of proceedings relating to independent contractor/employment status by January 8, 2006. Movants shall serve any expert reports or affidavits upon which they rely in that phase of proceedings no later than June 1, 2006. Opponents shall have until June 30, 2006, to depose such expert(s). Opponents shall serve any expert reports or affidavits upon which they rely in that phase of proceedings no later than June 30, 2006. Depositions of such experts must take place no later than August 1, 2006**.**

Doc. No. 58 at 5 (emphasis added).[1]  FXG does not dispute that it did not disclose Professors Smith and Lafontaine by January 8, 2006 or at any time prior to serving their reports on November 8, 2007.

FXG's task of convincing the Court that these new experts should be allowed as "rebuttal" experts is further undermined by the fact that FXG opposed a request by Plaintiffs for permission to offer rebuttal experts.  A little over a year ago, FXG argued that Plaintiffs should not be entitled to offer rebuttal experts because they were not contemplated by the Scheduling Orders. *See* FXG Statement Regarding Briefing and Scheduling Issues (Doc. No. 450) at 6-7; FXG Memorandum of Law In Opposition to Plaintiffs' Motion to Amend Scheduling Order (Doc. No. 477) at 9.  Among other things, FXG argued that the "Scheduling Orders neither contemplate nor permit Plaintiffs to offer" rebuttal expert reports and the "unfairness of the request and the prejudice it would impose on FedEx Ground is substantial."  Doc. No. 450 at 6.

---

[1] As indicated in Plaintiffs' opening brief, the deadlines for the *reports* of summary judgment experts were extended several times.  Importantly, however, the deadline for disclosure of the *identity* of those experts has not changed.

According to FXG, "the Scheduling Order offers the standard approach to expert discovery: the Plaintiffs provide their experts' reports and produce those experts for deposition, and then the Defendant does the same." *Id.* FXG also stated that "[t]here is nothing so unique about the issues in this case that they warrant an unorthodox extra round of expert discovery." *Id.* at 7. FXG should be held to its own prior position and the reports of Professors Smith and Lafontaine should be stricken.

The few cases cited by FXG that have allowed rebuttal experts when a scheduling order does not contemplate them are factually inapposite. None of those cases involved a situation where, as here, the party seeking to offer rebuttal experts has previously opposed the use of rebuttal experts.

Nor do the cases cited by FXG reflect the majority rule on this issue. Most district courts that have addressed this situation have ruled that when a scheduling order is silent as to rebuttal experts, rebuttal experts are not allowed. *See Johnson v. Petsmart, Inc.*, No. 6:06-cv-1716, 2007 WL 3024029, at *2 (M.D. Fla. Oct. 15, 2007); *see also Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) ("[W]hen there is a discovery plan covering expert disclosures, the plan controls and not the explicit provisions of Rule 26(a)(2)(C)."). "The scheduling order does not have to account for every deadline set forth in Rule 26(a)(2)(C). When the court crafted its own schedule for expert disclosures, the mechanism set forth in Rule 26 was nullified, including the provision for supplemental disclosures." *IBM v. Fasco Indus., Inc.*, 1995 WL 115421, at *2 (N.D. Cal. Mar. 15, 1995). The court in *Fasco* rejected the defendant's argument that because the scheduling order was silent as to rebuttal experts, Rule 26(a)(2)(C) controlled: this argument "mistakenly reads into Rule 26(a)(2)(C) a substantive right to supplement an initial witness disclosure with rebuttal experts." *Id.*

On facts similar to those present here, the court in *Schablonentechnik v. MacDermid Graphic Arts, Inc.* followed the reasoning of *Fasco* and noted that the case management schedule agreed to and submitted by both parties did not mention or provide for rebuttal experts. The court found that it was therefore unreasonable for the plaintiff to have assumed that Rule 26(a)(2)(C) governed its right to offer rebuttal experts. No. 1:02-CV-2585, 2005 WL 5974438, at *3 (N.D. Ga. June 21, 2005). Where a schedule adopted on the consent of both parties "makes it obvious that neither party expected or requested the inclusion of time for rebuttal experts," the holding in *Fasco* is all the more persuasive. *Id.* "It is not reasonable for Plaintiff, in the absence of permission from the Court or advance notice to Defendants, to assume that Rule 26(a)(2)(C) allows the disclosure of rebuttal experts even where those disclosures will inevitably entail a breach of the existing scheduling order." *Id.*

**B. If Professors Smith's And Lafontaine's Reports Are Governed Solely By Rule 26(a)(2)(B) And (C) As FXG Now Contends, They Should Be Stricken Because They Are Untimely.**

FXG's argument – that the timelines are governed by Rule 26(a)(2)(C) rather than the Scheduling Orders – is also puzzling because FXG did not comply with Rule 26(a)(2)(C) either. Indeed, by arguing that Rule 26(a)(2)(C) controls, FXG has provided an even stronger argument for the exclusion of the reports of Professors Lafontaine and Smith.

Rule 26(a)(2)(C) requires "disclosure to one's opponent of expert testimony intended for use as rebuttal evidence within 30 days of the opponent's disclosure of his expert testimony, unless the district court otherwise directs or the parties otherwise stipulate." *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).[2] When a party fails to follow Rule 26(a)(2)(C)'s

[2] FXG repeatedly cites Rule 26(a)(2)(C) for the proposition that rebuttal experts should be identified and their reports served "after" the opposing party's expert reports are served. *See* FXG Mem. at 3, 4, 5, 8. FXG neglects to mention anywhere in its brief that Rule 26(a)(2)(C) also sets a 30-day time period within which a rebuttal expert report must be served.

mandate, Rule 37(c)(1) requires exclusion of the rebuttal testimony. *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). Exclusion is automatic and mandatory unless the sanctioned party can show the violation of Rule 26(a) was either justified or harmless. *Id.*

Plaintiffs served their expert reports on September 7, 2007. Declaration of Paul McNamara in Support of FedEx Ground's Opposition to Plaintiffs' Motion to Strike Reports of Professors LaFontaine and Smith ("McNamara Decl.") ¶ 8. It is undisputed that FXG served what it now calls the "rebuttal" reports of Professors Lafontaine and Smith some 60 days later, on November 8, 2007. Bloodgood Decl. ¶ 2. On that same day, FXG served expert reports from Messrs. Crandall and Scapellato. Second Bloodgood Decl. ¶ 2. FXG identified and disclosed Crandall and Scapellato in January 2006 and the timing of the service of their reports was consistent with the Court's Scheduling Orders. *Id.* Interestingly, both the Crandall and Scapellato reports, like the Lafontaine and Smith reports, are clearly *responding to* Plaintiffs' expert reports served on September 7. *See* Bloodgood Decl. Ex. 3; Second Bloodgood Decl. Ex. 1. The only difference is that FXG now labels Lafontaine and Smith as "rebuttal" experts in an obvious attempt to escape the Scheduling Order's requirement that such experts should have been previously identified.

Despite claiming that Rule 26(a)(2)(C) should govern the timing of rebuttal experts, FXG concedes it did not comply with the strict 30 day timeline set forth in the Rule. Indeed, although Plaintiffs' expert reports were served on September 7, 2007, FXG apparently did not even retain Lafontaine or Smith until October 23, more than six weeks later. McNamara Decl. ¶ 13. Their reports should therefore be stricken as untimely.

**C. If FXG Believed It Needed To Offer Previously Undislosed Experts, It Should Have Sought Court Permission To Do So.**

FXG devotes much ink in its opposition brief attempting to justify why it could not have retained and disclosed Lafontaine and Smith before it obtained the reports of Plaintiffs' experts, Professor Lewin and Mr. Regan. FXG Mem. at 7-11. But this does not excuse FXG's conduct, nor explain why FXG could not comply with the 30 day deadline set forth in Rule 26(a)(2)(C) once it received Plaintiffs' expert reports on September 7. Once FXG received and reviewed Plaintiffs' expert reports and determined that it wished to offer experts neither previously disclosed nor contemplated by the Scheduling Orders, it should have requested Court permission to name new experts.

In fact, the parties were before this Court on October 9, 2007 for a status conference where the specific topic of experts was addressed by the Court and the parties. Second Bloodgood Decl. Ex. 2 (Transcript of October 9 Proceedings) at 33-34. By then, FXG had been in possession of Plaintiffs' summary judgment expert reports for over a month and presumably had decided to offer new "rebuttal" experts who had not been disclosed as required by the Scheduling Orders. FXG was also aware that neither the Court nor the Plaintiffs had any inkling that FXG would introduce new experts at this late stage of the proceedings. Only a few months earlier, FXG assured the Court and Plaintiffs that FXG had no intention of changing its lineup of experts. Doc. No. 724 at 1. At the October 9 status conference, the parties informed the Court that they had extended informal, two week courtesy extensions to the Scheduling Orders' deadlines for exchange of expert reports.[3] Second Bloodgood Decl. Ex. 2 at 33-34. But FXG

[3] As FXG itself has argued, this informal extension of Scheduling Order deadlines did not extend the 30 day deadline for rebuttal reports set forth in Rule 26(a)(2)(C) and therefore has no bearing on the timing of the disclosure of the reports of Lafontaine and Smith. FXG correctly points out in its opposition memorandum that "the parties did not stipulate to amending Rule 26(a)(2)." FXG Mem. at 4. FXG also concedes that a stipulation intended to modify discovery

never mentioned that, in light of Plaintiffs' expert reports, it desired to add two previously undisclosed experts to the five experts already disclosed. Nor did FXG seek the Court's permission to do so. This failure to seek Court permission should not be rewarded.

**D. <u>FXG's Failure To Disclose Lafontaine And Smith Pursuant To The Timeline Set Forth In Rule 26(a)(2)(C) Was Neither Substantially Justified Nor Harmless.</u>**

The sanction of exclusion pursuant to Rule 37(c)(1) is automatic unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The factors which guide the analysis of whether to impose the sanction of exclusion are prejudice or surprise, disruption to the trial and bad faith or willfulness. *Id.* at 857.

Here, even assuming FXG is correct that the disclosure of the identity and reports of Professors Smith and Lafontaine is governed by Rule 26(a)(2)(C), FXG has offered no justification whatsoever as to why it did not submit rebuttal reports within 30 days from the date it received Plaintiffs' experts' reports. Instead, FXG goes on the offensive, arguing that "Plaintiffs' grand protestations about prejudice" are "severely undermined" by the fact that they waited "almost three months" to file their motion to strike. FXG Mem. at 15-16. However, Plaintiffs wrote to FXG's counsel just two weeks after receiving the reports of Professors Lafontaine and Smith objecting to the introduction of these previously undisclosed experts and requesting that the reports be withdrawn. Bloodgood Decl. Ex. 4 (November 30, 2007 letter from Faris to Schwartz). FXG's counsel's response, via email, requested that the parties "fight about the two additional experts another time. . ." Second Bloodgood Decl. Ex. 3 (December 3, 2007 email from Schwartz to Faris). Not until a meet and confer on January 22, 2008 did FXG

---

procedures is ineffective and not binding unless it is a "formal, written stipulation signed by both parties." *Id.* at 4.

finally inform Plaintiffs that it refused to voluntarily withdraw the reports of Lafontaine and Smith. Bloodgood Decl. ¶ ¶ 6 and 7. This motion was filed six days after the meet and confer.

It is unfortunate that FXG would use its own request that Plaintiffs defer this dispute as evidence of a delay that should cause this Court to deny Plaintiffs' motion. Bad faith is a factor which should guide the Court's analysis of whether to exclude the evidence which was not properly disclosed. *David*, 324 F.3d at 857. Here, this factor weighs heavily in favor of excluding the reports of Professors Lafontaine and Smith.

Beginning with FXG's assurance to the Court and Plaintiffs in June 2007 that it had no intention of reshuffling its expert lineup (Doc. No. 724), to its deliberate decision not to inform the Court or parties at the October 9, 2007 status conference that it intended to introduce and offer two new experts (Second Bloodgood Decl. Ex. 2 at 33-34), to its inaccurate claim in its opposition memorandum that it "complied precisely" with the requirements of Rule 26(a)(2)(C) (FXG Mem. at 3), FXG has exhibited a lack of good faith warranting exclusion of Professors Lafontaine and Smith.

Plaintiffs have been both surprised and prejudiced. Summary judgment briefing is already underway. As FXG itself argued in opposing Plaintiffs' request that they be allowed to name rebuttal experts in connection with class certification briefing, allowing rebuttal experts "would lead to substantial, additional delays" in the briefing schedule. Doc. No. 477 at 9. In addition, the introduction of two new previously undisclosed experts, on top of the five experts FXG has already offered, will mean Plaintiffs will incur significant additional time and expense reviewing the reports and deposing the new experts.

In contrast, at least with regard to Professor Smith, FXG cannot claim that it will be significantly prejudiced by his exclusion. FXG essentially admits that Professor Smith is

cumulative to Mr. Crandall, but claims they are both necessary because they "attack Regan's report from different perspectives." FXG Mem. at 12. This is hardly the kind of compelling need which justifies FXG's failure to comply with the time frames set forth in either the Scheduling Orders or in Rule 26(a)(2)C). *See Primus v .United States*, 389 F.3d 231, 235-36 (1st Cir. 2004) (upholding district court's refusal to allow a late designated expert when, among other things, counsel conceded that the new expert's testimony was cumulative to that of a previously disclosed expert).

## III. CONCLUSION

For all of the foregoing reasons, and the reasons set forth in Plaintiffs' opening brief, Plaintiffs request that this Court strike the expert reports of Richard L. Smith and Francine Lafontaine, two experts that FXG failed to disclose before serving their reports.

Dated: March 3, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>NOTICE OF MANUAL FILING</u>**

The documents listed below were sent to the Court on March 3, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**SECOND DECLARATION OF PATRICIA A. BLOODGOOD IN SUPPORT OF MOTION TO STRIKE REPORTS OF PREVIOUSLY UNDISCLOSED EXPERTS AND EXHIBITS 1-3**

Dated: March 3, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**<u>s/Susan E. Ellingstad</u>**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on March 3, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**SECOND DECLARATION OF PATRICIA A. BLOODGOOD IN SUPPORT OF MOTION TO STRIKE REPORTS OF PREVIOUSLY UNDISCLOSED EXPERTS AND EXHIBITS 1-3**

Dated: March 3, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

379261-1

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on March 3, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |

**David M. Cialkowski** dmc@zimmreed.com

**Jerald R. Cureton** jcureton@curetonclark.com

**Ginger A. DeGroff** degrofflaw@yahoo.com

**Robert E. DeRose, II** bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com

**Edward J Efkeman** eefkeman@fedex.com

**Barry S. Fagan** bfagan@dibandfagan.com

**Lynn R. Faris** lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com

**Monica Ferraro** mferraro@bnhmlaw.com

**Lee K. Fink** lfink@omm.com

**Robert K. Firsten** rfirsten@firstenlaw.com

**Edward R. Forman** eforman@ee.net

**Wood R. Foster Jr** woodfoster@sbgdf.com; heidifurlong@sbgdf.com

**Alison G. Fox** Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Philip Stephen Fuoco** pfuoco@msn.com

**Martin S. Garfinkel** garfinkel@sgb-law.com; helm@sgb-law.com

**Michael W. Garrison, Jr.** mgarrison@omm.com

**R. Christopher Gilreath** chrisgil@sidgilreath.com

**Eileen S. Goodin** egoodin@bnhmlaw.com

**Michael Gorby** mgorby@gorbypeters.com; rwright@gorbypeters.com

**Deborah R. Grayson** drgrayson@fuse.net

**Robert K. Handelman** rhandelman@bnhmlaw.com

| | |
|---|---|
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |

**Jeffrey S. Nestler** jnestler@omm.com

**Peter W. Overs Jr.** povers@hfesq.com

**Mary Donne Peters** mpeters@gorbypeters.com; rwright@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Nora M Puckett** npuckett@omm.com; dmeredith@omm.com

**Charles Victor Pyle III** victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com

**Anne T. Regan** atr@zimmreed.com; kmh@zimmreed.com

**Beth A. Ross** bross@leonardcarder.com

**J. Gordon Rudd** jgr@zimmreed.com

**Theodore B. Schroeder** tschroeder@omm.com

**Robert M. Schwartz** rschwartz@omm.com

**James A. Staack** jims@staack-firm.com

**R. Jay Taylor Jr.** jtaylor@scopelitis.com; lnewton@scopelitis.com

**Matthew T. Tobin** mtobin@sbslaw.net; lstewart@sbslaw.net

**Jeffrey A. Trimarchi** jtrimarchi@omm.com

**Mary D. Walsh-Dempsey** mdempsey@omalleylangan.com

**Michael J Watton** jdrewicz@Wattongroup.com

**Andrew M. Weiner** aweiner@omm.com

**Peter D. Winebrake** pwinebrake@winebrakelaw.com

I also certify that on March 4, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
  & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: March 3, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05–MD–527–RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller Magistrate Judge Nuechterlein |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S**
**MOTION FOR LEAVE TO FILE SUR-REPLY**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground"), by counsel, respectfully requests leave to file a sur-reply brief in response to the reply brief submitted by plaintiffs in support of their Motion to Strike Reports of Previously Undisclosed Experts, and in support of its motion, states as follows:

1. Plaintiffs filed a Motion to Strike on January 28, 2008. FedEx Ground filed its response brief on February 15, 2008. Plaintiffs filed a reply brief on March 3, 2008.

2. In their reply brief, plaintiffs make two arguments in support of their motion to strike which could have been included in plaintiffs' opening brief (thereby affording FedEx Ground an opportunity to respond), but were not raised until the reply brief. The arguments are based on erroneous facts about the procedural history of this case. FedEx Ground could not have anticipated that plaintiffs would make these arguments and misstatements when FedEx Ground filed its response brief, and they need to be corrected to fairly consider FedEx Ground's right to

have served two rebuttal expert reports in connection with the upcoming round of independent contractor vs. employee status summary-judgment motions:

    a.    Plaintiffs' reply brief claims that, in FedEx Ground's Statement Regarding Scheduling Issues (Doc. No. 450) and FedEx Ground's Memorandum of Law in Opposition to Plaintiffs' Motion to Amend the Scheduling Order (Doc. No. 477), FedEx Ground argued against allowing rebuttal experts. This is not true. In those two documents, FedEx Ground argued only against allowing plaintiffs an unorthodox third round of experts reports — in effect sur-rebuttal experts by the moving party.

    b.    Plaintiffs' reply brief states that FedEx Ground did not comply with Rule 26(a)(2)(C)'s 30-day deadline. The brief omits any reference to the parties' stipulation to extend the deadline so that FedEx Ground would have until November 8, 2007 to file the reports, even though Rule 26 specifically applies that the default 30-day deadline may be changed by stipulation of the parties.

    3.    FedEx Ground seeks leave to file a sur-reply brief, a copy of which is attached to this motion, to respond to these two erroneous statements. The local rules do not provide for the filing of sur-reply briefs, as they typically are not necessary or required. FedEx Ground, however, believes that a sur-reply is warranted in these circumstances, and respectfully requests leave to file the attached sur-reply brief.

Dated: March 10, 2008.

Respectfully submitted,

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006–4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Main Street
Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

case 3:05-md-00527-RLM -CAN document 1106 filed 03/10/08 page 4 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of March, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Thomas J. Brunner

BDDB01 5163122v1

case 3:05-md-00527-RLM-CAN document 1106-2 filed 03/10/08 page 1 of 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05–MD–527–RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller Magistrate Judge Nuechterlein |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S [PROPOSED] SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE REPORTS OF PROFESSORS LAFONTAINE AND SMITH**

## INTRODUCTION

Plaintiffs' reply memorandum includes two misstatements that, when corrected, repudiate plaintiffs' position. Both could have been made in plaintiffs' opening brief, but were not. Accordingly, FedEx Ground addresses them here. First, plaintiffs claim that FedEx Ground previously had argued against allowing rebuttal experts. This is not true; in fact, FedEx Ground's position has remained consistent. Second, plaintiffs argue that Lafontaine's and Smith's reports were tardy because they were not produced within the 30-day time limit in Rule 26(a)(2)(C). Plaintiffs never mention, however, that the parties stipulated to an extension (past this deadline) for FedEx Ground to serve its expert reports, and FedEx Ground met the deadline.

## <u>ARGUMENT</u>

I. <u>FEDEX GROUND DID NOT PREVISOULY ARGUE AGAINST ALLOWING "REBUTTAL" EXPERTS.</u>

Plaintiffs' reply mischaracterizes the parties' dispute last year stemming from plaintiffs' unsuccessful efforts to file "rebuttal" expert reports in connection with their motions for class-certification. In FedEx Ground's Statement Regarding Scheduling Issues (Doc. No. 450) and FedEx Ground's Memorandum of Law in Opposition to Plaintiffs' Motion to Amend the Scheduling Order (Doc. No. 477), FedEx Ground stated that the class-certification ***movant*** (i.e., plaintiffs) should produce its expert reports first, and then the class-certification opponent (i.e., FedEx Ground) should produce its reports responding to plaintiffs' reports. Plaintiffs suggested further that they be allowed an unorthodox ***third round*** of expert reports, which they characterized as "rebuttal" reports — an inaccurate characterization of such reports, since plaintiffs were the moving parties in connection with class certification and have the burden of proof. (Doc. No. 450 at 6-7; Doc. No. 477 at 9.) FedEx Ground opposed this request, since it would have allowed plaintiffs to provide barebones reports and not submit their full expert reports until the proposed third round, when FedEx Ground would have no opportunity to address their contents. (Doc. No. 477 at 9.) The Court rejected plaintiffs' approach and denied their request.

Plaintiffs misuse the term "rebuttal expert report" in their request to strike the Lafontaine and Smith reports, which address the testimony plaintiffs intend to offer in support of summary judgment. What FedEx Ground objected to in the context of class-certification motions was permitting plaintiffs, as the moving party, to file watered down "opening" expert reports, wait to see what FedEx Ground's experts were planning on testifying to in opposition, and then file an additional round of expert reports that FedEx Ground's experts would have no right to address in their testimony. This is evident in the very quotations from FedEx Ground that plaintiffs

case 3:05-md-00527-RLM-CAN document 1106-2 filed 03/10/08 page 3 of 5

included in their reply: "Plaintiffs provide their expert reports . . . and then Defendant does the same"; nothing here "warrant[s] an unorthodox extra round of expert discovery." (Pls. Reply Mem. at 4, quoting Doc. No. 450 at 6, 7.)

FedEx Ground, of course, did not have an extra round of reports. Rather, it had rebuttal experts to respond to the new conclusions provided by plaintiffs in their round of expert reports,[1] and FedEx Ground provided those rebuttal reports at the same time it produced all of its expert reports. There is nothing inconsistent in FedEx Ground's position, which plaintiffs' motion inaccurately portrays.

## II. PLAINTIFFS STIPULATED THAT FEDEX GROUND HAD UNTIL NOVEMBER 8, 2007, TO SERVE ITS REBUTTAL EXPERT REPORTS.

Plaintiffs correctly state that Rule 26(a)(2)(C) normally provides a 30-day deadline for the service of rebuttal reports.[2] They also quote that portion of the Rule that provides that the default 30-day deadline applies "unless the district court otherwise directs **or the parties otherwise stipulate**." Rule 26(a)(2)(C) (emphasis supplied). But plaintiffs omit mentioning that they agreed to extend until November 8 the deadline FedEx Ground to provide reports responding to plaintiffs' expert reports.

The original deadline for FedEx Ground to serve its expert reports was October 5. (Doc. No. 766, at 3.) Plaintiffs then granted FedEx Ground an extension until October 19. *See* 10/9/07 Tr. at 33-34 (indicating that, because FedEx Ground had allowed plaintiffs a two-week extension,

---

1 Rule 26(a)(2)(c) applies to expert reports "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)." This was the role of the Lafontaine and Smith reports.

2 In their reply brief, plaintiffs claim for the first time that because FedEx Ground served its expert reports more than thirty days after plaintiffs served their expert reports, the Lafontaine and Smith reports are not timely. This is a different argument than plaintiffs made in their original motion, where they focused only on the timing of the identity of the experts, not the date the reports were produced. (*See* Pls. Reply Mem. at 5-6.) But because Rule 26(a)(2)(C) applies equally to both disclosure of the identify of experts and the reports of the experts, and permits both deadlines to be extended by stipulation, the parties' stipulated extension of the deadline to November 8 for providing the reports controls.

plaintiffs were allowing FedEx Ground a two-week extension) (attached as Ex. 2 to Second Declaration of Patricia A. Bloodgood).  Next, the parties stipulated that FedEx Ground would have until November 7 to serve its expert reports.  *See* Email from Lynn Rossman Faris to Robert Schwartz (Oct. 22, 2007) ("I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th."); Email from Robert Schwartz to Lynn Rossman Faris (Oct. 22, 2007) ("You are correct that we've agreed to serve those on or before 11/7.") (attached as Ex. 1 to attached Declaration of Robert Schwartz [**"Schwartz Decl."**]).  Finally, plaintiffs agreed to a one-day extension, to November 8, for service of the reports.  *See* Letter from Lynn Rossman Faris to Evelyn Becker, at 3 (Feb. 8, 2008) ("Plaintiffs agree[d] to the requested additional one day delay [for FedEx to serve its expert reports].") (attached as Ex. 2 to Schwartz Decl.).

Indeed, plaintiffs' counsel's recent characterization of the events of last fall confirms that plaintiffs "[gave] FedEx a second two-week extension" (until November 8) to serve its expert reports.  *See id.* at 1.  This agreement is a stipulation to extend the deadline and overrides the default 30-day provision in Rule 26(a)(2)(C).

The timing of the service of the Crandall and Scapellato rebuttal reports further confirms this account.  FedEx Ground experts Crandall and Scapellato produced rebuttal reports.  FedEx Ground served the Crandall and Scapellato reports on November 8.  And plaintiffs concede that the "timing of the service of [Crandall's and Scapellato's] reports was consistent with the Court's Scheduling Orders."  (Pls. Reply Mem. at 6.)

Thus, as conceded by plaintiffs, FedEx Ground's deadline for serving all its reports was November 8, 2007, the date stipulated to by the parties.  FedEx Ground served the Lafontaine and Smith reports on that date.  Therefore, those reports were timely served.

## CONCLUSION

FedEx Ground therefore respectfully requests that this Court deny plaintiffs' motion to strike the reports of rebuttal experts Lafontaine and Smith.

Dated: March 10, 2008.

Respectfully submitted,

By: s/Thomas J. Brunnner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006–4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Main Street
Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller Magistrate Judge Nuechterlein |

**DECLARATION OF ROBERT M. SCHWARTZ IN SUPPORT OF FEDEX GROUND'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE REPORTS OF PROFESSORS LAFONTAINE AND SMITH**

I, Robert M. Schwartz, say:

1. I am one of the lawyers responsible for representing defendant FedEx Ground Package System, Inc. in this matter. I submit this Declaration in support of FedEx Ground's opposition to plaintiffs' motion to strike the rebuttal expert reports submitted by Professor Francine Lafontaine and Professor Richard Smith.

2. On October 22, 2007, Lynn Rossman Faris, counsel for plaintiffs, sent me an email that stated in relevant part, "I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th." Later on the same day, I responded via email to Ms. Faris, in relevant part, "You are correct that we've agreed to serve those on or before 11/7." An accurate copy of this email exchange is attached to this Declaration as Exhibit 1.

3.      On November 7, 2007, I had a phone conversation with Ms. Faris during which she orally agreed to extend FedEx Ground's deadline for serving its expert reports one day, until November 8.  This agreement was memorialized in a February 8, 2008 letter from Ms. Faris to Evelyn Becker, one of my partners who also works on this case.  The letter states in relevant part on page 5: "November 7, 2007, 8:01 am e-mail [from] Schwartz to Faris re: 'MDL Expert Report Deadline:' 'I'll spare you the details, but it would help me out considerably if we could serve ours tomorrow instead of today.  Is that OK?'  After a telephone conference, Plaintiffs agree to the requested additional one day delay."  The letter states in relevant part on page 2 that plaintiffs "[gave] FedEx a second two-week extension" (until November 8) to serve its reports.  An accurate copy of this letter is attached to this Declaration as Exhibit 2.


I declare under penalty of perjury under the laws of the state of California that the statements contained in Declaration are true, and that I signed this Declaration at Los Angeles, California, on Friday, March 7, 2008.

Robert M. Schwartz

# Exhibit 1

**Nestler, Jeff**

**From:** Schwartz, Robert
**Sent:** Monday, October 22, 2007 6:29 PM
**To:** 'Lynn Faris'
**Subject:** RE: Extension to Nov 7 for service of FedEx's Merits Expert Reports

Lynn--

You are correct that we've agreed to serve those on or before 11/7. (The 10/5 date was extended previously to 10/19 by reason of defendant's two-week extension of plaintiffs' filing date for their reports.)

Thank you again for agreeing to that.

--Bobby

---

**From:** Lynn Faris [mailto:lfaris@leonardcarder.com]
**Sent:** Monday, October 22, 2007 3:27 PM
**To:** Schwartz, Robert
**Cc:** Susan E. Ellingstad; Robert Harwood
**Subject:** Extension to Nov 7 for service of FedEx's Merits Expert Reports

Bobby: I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th, pursuant to our agreement to extend FedEx's time for service of merits expert reports from the court's October 5th deadline and your request at our Scheduling Conference with Magistrate Neuchterlein.

*Lynn Rossman Faris*
*Leonard Carder, LLP*
*1330 Broadway, Suite 1450*
*Oakland, CA 94612*
*(510) 272-0169*

# Exhibit 2

# LEONARD CARDER, LLP

ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612

TELEPHONE: (510) 272-0169
FAX (510) 272-0174
www.leonardcarder.com

VICTORIA CHIN
ALANNA D. COOPERSMITH
LYNN ROSSMAN FARIS
SHAWN GROFF
KATE R. HALLWARD
CHRISTINE S. HWANG
ARTHUR A. KRANTZ
DANIELLE LUCIDO
PHILIP C. MONRAD
ELEANOR I. MORTON
ROBERT REMAR
MARGOT A. ROSENBERG
BETH A. ROSS
MATTHEW D. ROSS
JACOB F. RUKEYSER
PETER W. SALTZMAN
PHIL A. THOMAS
FRANCISCO UGARTE
RICHARD ZUCKERMAN

NORMAN LEONARD
(1914 - 2006)

OF COUNSEL

WILLIAM H. CARDER
SANFORD N. NATHAN
KIRSTEN L. ZERGER

SAN FRANCISCO OFFICE
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400
FAX: (415) 771-7010

PLEASE REFER TO OUR FILE NO.
359-7

February 11, 2008

By E-mail and Mail

Ms. Evelyn Becker
O'Melveny & Myers, LLP
1625 Eye Street, NW
Washington, DC 20006-4001
ebecker@omm.com

Re: *FedEx Ground Employment Practices Litigation*
Response to your letter of January 31, 2008

Dear Evelyn:

I have reviewed your letter of January 31, 2008 and write to respond on behalf of Plaintiffs. Your letter appears to be based on several serious misunderstanding regarding the scheduling and production of expert reports and files in support of or opposition to summary judgment/adjudication motions on employment status. I can only assume that your letter was written without access to the letters and emails regarding the agreements reached by Bobby Schwartz and I on this subject. Moreover, your letter suggests that Magistrate Neuchterlein would reject the agreements between Bobby and I about service of the experts reports (and bar their use as "untimely") despite our specific notice to him at the hearing of October 9th of our brief, mutual extensions of time. His only comment about the mutual extensions was "Courtesy extended should be returned." (Page 33) As the chronology below shows, Fedex's courtesy in giving Plaintiffs a two-week extension was doubly returned by Plaintiffs not only extending the schedule by the two-weeks we received but by further giving FedEx a second two-week extension, to say nothing of Plaintiffs acceptance of expert files four weeks late without explanation or advance agreement. Thus, your assertion that Magistrate Neuchterlein would be disinclined to give effect to the agreement of parties seems particularly unwarranted. Nevertheless, to clarify all of the facts, I provide a chronology of the exchanges which took place between the parties and the agreements reached during those exchanges.



LEONARD CARDER, LLP

Ms. Evelyn Becker February 11, 2008
Page 2

**Chronology of Events**

Court's Scheduling Order of 11/29/05: SJ movants have until 6/1/06 to serve expert reports; opponents have until 6/30/06 to depose movants' experts and serve their own expert reports; depositions of opposition experts by 8/1/06.

Court's Scheduling Order of July 29, 2007: SJ movants have until 8/24/07 to serve expert reports; opponents have until 10/5/07 to depose movants' experts and serve their own expert reports; depositions of opposition experts by 11/5/07

Court Order of August 22, 2007 sets additional time limits for Wave 4.

August 22, 2007 Letter from Faris to Schwartz: memorializes agreement to extend time to serve expert reports to seek court clarification of its order.

Court Order of August 29, 2007 denied clarification requested and sets status conference for October 9, 2007.

August 31, 2007, 11:25 am email from Faris to Schwartz : "After our discussion last night, I want to thank you for your courtesy and to memorialize our agreement that Plaintiffs will serve their merits expert reports by Friday, September 7 and Defendant will have until October 19, 2007 to depose our experts and serve any reports they plan to reply [sic] on in opposition and the deposition of those experts will occur by November 19. Essentially, this is adding two weeks to the schedule." This agreement was conditioned upon informing Magistrate Neuchterlein of the two week extensions, which was accomplished at the hearing on October 9th.

September 7, 2007: Plaintiffs serve their four expert reports in support of summary judgment/ adjudication.

October 9, 2007 Hearing before Magistrate Neuchterlein: Schwartz informs the Magistrate of the parties' agreement to briefly extend deadline for service of expert reports and time to depose experts, in accordance with August 31st agreement. (Page 17) Faris clarifies that Plaintiffs gave FedEx the same two additional weeks to complete expert discovery, moving the date back to October 19th (page19) and indicates a willingness to "accommodate some small adjustments. . .." (Page 33)
On October 9, Plaintiffs anticipated that depositions of their experts would be requested and scheduled by October 19th. No such request was ever made prior to or at that time or even at the time FedEx served its expert reports, on November 8. At the October 9th hearing, Faris specifically objected to FedEx's proposal to extend its time for expert discovery until January as highly prejudicial, given that Plaintiffs had served their reports months earlier. (Page 32) Plaintiffs expressly notified FedEx and the court that it would not serve any new reports for

LEONARD CARDER, LLP

Wave 4 cases but would rely on those produced on September 7th (page32); FedEx similarly served no reports in support of any summary judgment motion and provided no additional opposition expert report by the Wave 4 deadline, which is now long past.

October 22, 2007, email string to/from Faris and Schwartz: "I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th, pursuant to our agreement to extend FedEx's time for service of merits expert reports from the court's October 5th deadline and your request at our Scheduling Conference with Magistrate Neuchterlein."
Schwartz e-mail responds: "You are correct that we've agreed to serve those on or before 11/7. (The 10/5 date was extended previously to 10/19 by reason of defendant's two-week extension of plaintiffs' filing date for their reports.) Thank you again for agreeing to that."
Faris responds: "My pleasure."
There was neither a request nor any agreement for any extension of time to depose Plaintiffs' experts.

November 7, 2007, 8:01 am e-mail Schwartz to Faris re: "MDL Expert Report Deadline:" "I'll spare you the details, but it would help me out considerably if we could serve ours tomorrow instead of today. Is that OK?"
After a telephone conference, Plaintiffs agree to the requested additional one day delay. Again, there was no request for or agreement to extension to depose Plaintiffs experts.

November 8, 2007: Service of FedEx expert reports in opposition to summary judgment/adjudication.

November 14, 2007, 8:32 am E-mail Faris to Schwartz: "We are expecting the expert files tomorrow. Are those going to come by mail or email?"
9:16 am email Schwartz to Faris: "I am checking on the delivery of the expert materials and will let you know."

November 30, 2007 Letter from Faris to Schwartz: Letter states inter alia that Plaintiffs have never received the expert files and requests that Plaintiffs be provided with dates when FedEx'sdisclosed experts (Mr. Crandall and Mr. Scapellato) will be available for deposition and objects to the service of reports from undisclosed experts.

December 3, 2007, 11:45 am email Schwartz to Faris: "I'm looking into why you don't already have the expert information. You will have it shortly. We can fight about the two additional experts we identified another time. Right now, I want to get you the information."
There was no mention of deposing Plaintiffs' experts and no mention of dates FedEx would make its experts available.

December 18, 2007: FedEx expert files arrive by mail without explanation of four-week delay.

December 19, 2007, 11:08 am email Faris to Schwartz: "We received your expert files yesterday and I assume that given that they were produced so late, there will be no problem about taking the depositions after we all return from our holidays in January."
4:30 pm e-mail response from Schwartz: "Sorry about the lag in the expert files. Of course January is fine for the depositions."

Both Faris and Schwartz return to work after vacations on January 7, 2008.

January 16, 2008, 5:51 am email Faris to Schwartz: "When can your experts be available for deposition? Who on your team should I communicate with about this?"
2:41pm email Schwartz to Faris: "I will check and let you know."
There was no mention of deposing Plaintiffs' experts.

January 22, 2008 Meet and confer conference (Faris, Ellingstad, Becker and Schroeder) regarding scheduling of Wave 5 cases. Becker requests dates to take Plaintiffs' experts depositions regarding their September 7th reports for the first time.

As this chronology clearly shows, Plaintiffs timely served their expert reports, provided the necessary expert files and were ready to produce experts for deposition during the period of expert discovery, but FedEx never requested to depose Plaintiffs' experts or to extend the time to depose them. Nevertheless, on January 22, 2008, over three months after the time to depose Plaintiffs experts expired on October 19th pursuant to express agreement of the parties, FedEx asked Plaintiffs to produce their experts for depositions. FedEx also never requested to continue the time set to depose those experts either nor would Plaintiffs have agreed to a three month extension of time. The Court's Scheduling Orders provided for the deposition of the experts of summary judgment movants by the date the same date opposition expert reports were due. Especially in view of the reminder in open court on October 9 to FedEx that its' time to depose Plaintiffs' experts was over on October 19 (page 19), the failure to request additional time or dates for deposition gave Plaintiffs every reason to believe that FedEx did not intend to depose their merits experts. Three months elapsed between the last day to depose our experts and your first request of any kind to depose Plaintiffs' experts. We had long ago informed our experts that they would not be deposed and could clear their calendars.

In stark contrast to this chronology, Plaintiffs diligently and persistently sought FedEx's experts' files and dates to depose FedEx's experts in opposition to summary adjudication of employment status. I requested and obtained your agreement (in advance) to take the depositions in January, due to the holidays and the unexplained late production of the experts' files (without prior agreement). I timely asked for dates for those depositions by letter and email and received no reply of any kind regarding our requests to schedule those depositions.

Thus, your claim that Plaintiffs' expert reports would be deemed by Magistrate Neutchterlein to be "untimely" or that our request to depose them is untimely is expressly belied by written agreements to extend the time to serve them and to depose your experts. No such agreements were ever requested or entered into with regard to your deposing Plaintiffs' experts. Thus, these situations are in no way equivalent.

I agree that we have enjoyed a cooperative relationship and I fully intend to maintain such a relationship. We have previously resolved scheduling issues and problems **by agreement in advance** of any deadline, not unilaterally nor months after the deadline was past. As you are well aware from the numerous times I have agreed to extend extra time when requested by you and others on your team, I have provided every professional courtesy consistent with my duty to vigorously represent my clients and I fully intend to continue in that manner. However, I cannot simply ignore the fact that you are three months late in seeking a continuance of a date long-gone and that you have waited until we are in the middle of drafting summary adjudication motions, due in a few weeks, to request to depose four experts whose reports you have had for four and one-half months, since September 7 and who were supposed to be deposed by October 19.

I respectfully request that you reconsider trying to turn what is a proper request for access to your experts into a quid pro quo to excuse FedEx's failure to timely depose Plaintiffs' experts. If you wish to meet and confer about this situation, I am available to do so.

Respectfully,

LYNN ROSSMAN FARIS

cc: Rob Harwood, Susan Ellingstad
Bobby Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' RESPONSE TO FEDEX GROUND'S MOTION FOR LEAVE TO FILE A SURREPLY**

## I. INTRODUCTION

FXG's motion to file a surreply brief in opposition to Plaintiffs' motion to strike should be denied. FXG claims that Plaintiffs made two arguments in their reply brief which could have been included in their opening brief. This is not true. Until they received FXG's memorandum in opposition to Plaintiffs' motion to strike FXG's previously undisclosed experts, Plaintiffs had no idea that FXG would attempt to characterize their previously undisclosed experts as "rebuttal" experts whose reports were governed by Rule 26(a)(2)(C) and not by any of the Court's Scheduling Orders. When faced with this unanticipated argument, Plaintiffs appropriately pointed out in their reply brief that: 1) FXG had previously opposed the use of rebuttal experts; and 2) FXG's reliance on Rule 26(a)(2)(C) is misplaced because FXG did not comply with the Rule 26(a)(2)(C) 30 day deadline. These arguments could not have been made before Plaintiffs received FXG's response brief.

## II. ARGUMENT

Surreply briefs are not generally allowed. Local Rule 7.1 does not provide for the filing of a surreply and represents the drafter's conclusion that, ordinarily, a brief, response and reply are sufficient in this district. A surreply may be filed only by leave of court and upon showing of some factor that justifies deviation from the rule. *Taylor v. Lifetouch National School Studios, Inc.*, 490 F.Supp.2d 944, 950 (N.D. Ind. 2007); *see also Goltz v. University of Notre Dame du Lac*, 177 F.R.D. 638, 641, n.3 (N.D. Ind. 1997).

Here, FXG argues that a surreply brief is necessary to correct two misstatements in Plaintiffs' reply brief. First, FXG challenges Plaintiffs' claim that FXG itself opposed the use of rebuttal experts in this litigation. This challenge is easily resolved. In their reply brief, Plaintiffs directed the Court to the specific filings in which FXG previously opposed Plaintiffs' request that they be permitted to name rebuttal experts. In its Memorandum of Law in Opposition to Plaintiffs' Motion to Amend Scheduling Order (Doc. No. 477) and in its Statement Regarding Briefing and Scheduling Issues (Doc. No. 450) FXG said the following:

- "Nor is there any justification for granting Plaintiffs' request to supplement their prima facie presentation, and *substantially* delay the case schedule, with the production of an undisclosed number of 'rebuttal experts.'" Doc. No. 477 at 8.

- "Were the Court to grant [Plaintiffs' request to serve rebuttal expert reports], Defendant should be given the opportunity to provide rebuttal reports, and both sets of rebuttal experts would be subject to further depositions. This proposal would lead to substantial, additional delays in the class briefing schedule." Doc. No. 477 at 9.

- "In addition, FedEx Ground opposes Plaintiffs' request to file an 'omnibus' class certification 'fact brief,' *as well as their request to engage and prepare reports from rebuttal experts to support their class certification motions*. Doc. 450 at 2 (emphasis added).

- "During counsels' telephone discussions concerning the relief Plaintiffs intended to seek, Plaintiffs stated that they *may* also ask permission to generate a second set of expert reports, which they refer to as 'rebuttal' expert reports. Should they

> make such a request, FedEx Ground opposes it. **The Scheduling Orders neither contemplate nor permit Plaintiffs to offer such testimony,** and the unfairness of the request and the prejudice it would impose on FedEx Ground is substantial." Doc. No. 450 at 6 (emphasis added).

While it is understandable that FXG wishes to distance itself from its above assertions, the fact remains that when Plaintiffs requested permission to name rebuttal experts, FXG opposed that request.

FXG's second purported basis for seeking to file a surrreply is baffling as it directly contradicts assertions made in FXG's response brief. Despite having adamantly claimed in its response to Plaintiffs' motion to strike that the parties had **no stipulation** which altered the deadlines set forth in Rule 26(a)(2)(C), FXG now argues in its motion for a surreply that Plaintiffs stipulated to an extension of Rule 26(a)(2)(C)'s 30-day deadline for serving any reports from rebuttal experts. *See* FXG Proposed Surreply at 3.[1]

In fact, the parties did informally stipulate to short extensions of the deadlines **set forth in the Scheduling Orders** for the service of expert reports. But, as FXG argued in its response to Plaintiffs' motion to strike, "the parties did not stipulate to amending Rule 26(a)(2)." FXG Mem. at 4. Surprisingly, in light of the argument it now makes in its proposed surreply, FXG took pains to insist in its response to Plaintiffs' motion to strike that anything less than a formal, written stipulation, signed by both parties would not extend the deadline set forth in Rule 26(a)(2). *Id.*

In contrast, in its proposed surreply brief, FXG reverses itself and claims that the parties did in fact stipulate to an extension of the deadlines set forth in Rule 26(a)(2)(C). But the email

[1] FXG correctly notes that Plaintiffs' argument that FXG failed to serve its rebuttal expert reports within the 30 day window of Rule 26(a)(2)(C) was not made in Plaintiffs' opening brief. There is a good reason for that. FXG's defense to naming two entirely new experts – that they were rebuttal experts governed by Rule 26(a)(2)(C) and not the Scheduling Orders – was unveiled for the first time in its response brief. Thus, Plaintiffs' reply brief was the first available vehicle in which Plaintiffs could point out that FXG did not comply with Rule 26(a)(2)(C) either.

exchange which Mr. Schwartz attaches as Exhibit 1 to his declaration in support of FXG's motion to file a surreply does not, using the standard advanced by FXG, "meet the requirements of a stipulation to modify discovery procedures." FXG Mem. at 4.[2] A surreply which directly contradicts assertions a party made in its response brief is neither helpful nor justified.

In any case, Plaintiffs could not have stipulated to extend the deadline for serving the reports of experts who were not contemplated either by the Scheduling Orders or by Plaintiffs. Indeed, only a few months before serving reports from these brand new, previously undisclosed experts, FXG had assured Plaintiffs and the Court that it had no plans to change its lineup of experts. Doc. No. 724 at 1. Essentially, FXG now contends that Plaintiffs stipulated to extend the deadline for reports from experts that Plaintiffs had been assured did not exist.

## III. CONCLUSION

FXG's motion to file a surreply should be denied.

Dated: March 14, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

---

[2] Tellingly, although FXG now claims that Plaintiffs stipulated to extend the deadline to serve its rebuttal expert reports, it is clear from the email exchange attached as Exhibit 1 to Mr. Schwartz's Declaration that the parties were extending the deadlines for experts whose reports are governed by the Scheduling Orders. Here FXG has argued that the reports of Professors Lafontaine and Smith are **not** governed by the Scheduling Orders; they are governed by Rule 26(a)(2)(C). FXG should not be permitted to have it both ways. If Professors Lafontaine and Smith are not contemplated nor governed by the deadlines in the Scheduling Orders, as FXG now claims, then a stipulation to extend those Scheduling Order deadlines does not excuse FXG's failure to comply with Rule 26(a)(2)(C)'s 30 day deadline for serving reports from rebuttal experts.

Lynn Rossman Faris  
LEONARD CARDER, LLP  
1330 Broadway, Suite 1450  
Oakland, CA  94612  
Tel:     (510) 272-0169  
Fax:    (510) 272-0174  

Robert I. Harwood  
HARWOOD FEFFER LLP  
488 Madison Avenue, 8th Floor  
New York, NY  10022  
Tel:     (212) 935-7400  
Fax:    (212) 753-3630  

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino  
ANDERSON, AGOSTINO & KELLER, PC  
131 South Taylor Street  
South Bend, IN  46601  
Tel:     (574) 288-1510  
Fax:    (574) 288-1650  

**PLAINTIFFS' LIAISON COUNSEL**

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on March 14, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |

case 3:05-md-00527-RLM-CAN document 1169 filed 03/14/08 page 7 of 11

| | |
|---|---|
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |

| | |
|---|---|
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Mary Donne Peters** | mpeters@gorbypeters.com; rwright@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on March 14, 2008, I mailed by United States Postal Service the

foregoing documents to the following non CM/ECF participants:

| | |
|---|---|
| John H. Beisner<br>O'MELVENY & MYERS, LLP<br>1625 Eye Street, N.W.<br>Washington, D.C. 20006-4001 | J. Allen Brinkley<br>John A. Brinkley, Jr.<br>BRINKLEY & CHESNUT<br>P.O. Box 2026<br>Huntsville, AL 35804 |

case 3:05-md-00527-RLM-CAN document 1169 filed 03/14/08 page 9 of 11

| | |
|---|---|
| Joree Brownlow<br>LAW OFFICE OF JOREE G BROWNLOW<br>1444 Gillham Drive<br>Suite 200<br>Bartlett, TN 38134 | R Bruce Carlson<br>CARLSON LYNCH LTD<br>231 Melville Lane<br>PO Box 367<br>Sewickley, PA 15143 |
| Jacqueline M. Fernandez<br>LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC<br>9600 N.W. 38th Street, Suite 301<br>Miami, FL 33178 | Clayton D. Halunen<br>Joni M. Thome<br>HALUNEN & ASSOCIATES<br>220 South Sixth Street<br>Suite 2000<br>Minneapolis, MN 55402 |
| Harold L. Lichten<br>PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.<br>18 Tremont Street, 5th Floor<br>Boston, MA 02108 | Salvatore G. Gangemi<br>GANGEMI LAW FIRM, P.C.<br>82 Wall Street, Suite 300<br>New York, NY 10005 |
| Robert A. Garcin<br>LAW OFFICES OF ROBERT A. GARCIN<br>210 East 29th Street, #A<br>Loveland, CO 80538 | Todd O'Malley<br>O'MALLEY & LANGAN, P.C.<br>426 Mulberry Street, Suite 104<br>Scranton, PA 18503 |
| Jack D Hilmes<br>Kevin J Driscoll<br>FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC<br>699 Walnut Street<br>1900 Hub Tower<br>Des Moines, IA 50309 | Eric E Hobbs<br>Eric H Rumbaugh<br>MICHAEL BEST & FRIEDRICH LLP<br>100 E Wisconsin Ave<br>Suite 3300<br>Milwaukee, WI 53202-4108 |
| William S. Hommel, Jr.<br>WILLIAM S. HOMMEL, JR., PC<br>1402 Rice Road, Suite 200<br>Tyler, TX 75703-3230 | Andrew J. Kahn<br>MCCRACKEN, STEMERMAN & HOLSBERRY<br>1630 S. Commerce Street, Suite A-1<br>Las Vegas, NV 89102 |
| Steven M. Kelso<br>WHEELER TRIGG KENNEDY LLP<br>1801 California Street, #3600<br>Denver, CO 80202 | Robert J. Penny<br>WICK BRAMER UKASICK & TRAUTWEIN LLC<br>323 South College Avenue<br>PO Box 2166<br>Fort Collins, CO 80522 |

| Donald B Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Carla D Macaluso<br>JACKSON LEWIS LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 |
|---|---|
| Paula R Markowitz<br>MARKOWITZ & RICHMAN<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 | Kenneth E Milam<br>WATKINS & EAGER<br>PO Box 650<br>Jackson, MS 39205-0650 |
| William T Fiala<br>LEWIS FISHER HENDERSON<br>CLAXTON & MULROY<br>6410 Poplar Ave<br>Suite 300<br>Memphis, TN 38119 | Joseph A. Osefchen<br>LAW FIRM OF PHILIP STEPHEN FUOCO<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |
| Alan M Purdie<br>PURDIE & METZ<br>P.O. Box 2659<br>Ridgeland, MS 39158<br>INCORRECT ADDRESS<br>402 Legacy<br>Ridgeland, MS 39157 | Aaron Roblan<br>Karen P Kruse<br>JACKSON LEWIS LLP<br>One Union Square<br>600 University Street, Suite 2900<br>Seattle, WA 98101 |
| Michael R Reck<br>BELIN LAMSON MCCORMICK<br>ZUMBACH FLYNN<br>666 Walnut Street<br>Suite 2000<br>Des Moines, IA 50309-3989 | Jennifer Rygiel Boyd<br>OGLETREE DEAKINS NASH<br>SMOAK & STEWART PC<br>10 Madison Avenue<br>Suite 402<br>Morristown, NJ 07960 |
| Richard Tanenbaum<br>1131 McDonald Avenue<br>Brooklyn, NY 11230 | Dan S Smith<br>DAN SOLOMON SMITH LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050 |
| Donald R. Taylor<br>TAYLOR DUNHAM AND BURGESS LLP<br>301 Congress Avenue, Suite 1050<br>Austin, TX 78701 | Patricia A Sullivan<br>EDWARDS ANGELL PALMER<br>& DODGE LLP<br>2800 Financial Plaza<br>Providence, RI 02903 |

| Peter N Wasylyk<br>LAW OFFICES OF PETER N. WASYLYK<br>1307 Chalkstone Avenue<br>Providence, RI 02908 | Charles W Whetstone Jr.<br>Cheryl F Perkins<br>WHETSTONE MYERS PERKINS<br>AND YOUNG LLC<br>PO Box 8086<br>Columbia, SC 29202 |
|---|---|

Dated: March 14, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO: )

ALL ACTIONS )

**FEDEX GROUND'S STATUS CONFERENCE STATEMENT**

To aid the Court in revising the case schedule so that it will permit the just and efficient resolution of the summary adjudication motions concerning contractor status, FedEx Ground submits this status conference statement.

The parties now appear to be in agreement that any class-wide summary adjudication of contractor status must follow the opt-out periods for any certified classes in order to avoid the impermissible "one-way intervention" problem (Doc. No. 1093 at 2), which would effectively preclude FedEx Ground from prevailing on summary judgment against the class because class members would not opt in after a successful motion against the class. *Watkins v. Blinzinger*, 789 F.2d 474, 476 n.3 (7th Cir. 1986) ("The defendants have an interest in obtaining the preclusive effect of a certification, which prevents members of the class from bringing the same suit later on."). This sequence also allows plaintiffs and FedEx Ground to submit motions and briefs on the contractor status issue that are directed at the parties before the Court and at the issues and proof that the Court determines may be dispositive.

DC1:739571.4

While the parties agree that summary adjudication should follow resolution of class certification issues, plaintiffs are concerned with the burden of briefing summary adjudication of contractor status simultaneously in all of the jurisdictions. To address plaintiffs' concern, FedEx Ground proposes dividing the briefing into "waves," similar to the approach adopted for class certification briefing.[1] Moreover, because the certified nationwide ERISA class in *Craig/Berry* overlaps with the proposed classes in jurisdictions outside Kansas, the Court should resolve summary adjudication of contractor status after the Court has resolved class certification in ***all*** of the actions in these proceedings, rather than through a piecemeal approach that is likely to confuse class members and waste judicial and party resources. If the Court were to adopt an alternative approach, class members would be at risk of receiving class notices contemporaneously with notification that they have already won or lost summary adjudication of contractor status as a member of another class in these proceedings. Additionally, the piecemeal approach threatens to rob these proceedings of their coordinated nature, which allows the parties and the Court to gain efficiencies by turning to related issues of law and fact at once in all proceedings in which they arise.

In any event, FedEx Ground opposes any proposal to brief summary adjudication of contractor status in the Kansas action ahead of all other cases in these proceedings. Such a procedure strongly resembles the "bellwether" approach that the Court previously rejected for good reason. (Oct. 24, 2005 Case Scheduling Conference Transcript at 10.) As the Court recognized in 2005, the legal standards at issue will vary from state to state and from case to case (*id.*). Consequently, any determination of contractor status in Kansas will not aid the Court's consideration of dispositive motions in other cases. Moreover, to the extent that the

---

[1] Of course, in order to accommodate briefing in the non-class cases, there either would need to be more waves or more cases in each wave.

Kansas action were to serve as the "bellwether," it would do so at the expense of the "separate identities [of the constituent actions] for substantive purposes." (Practice and Procedure Order at 3, Doc. No. 2.) The only way to conduct summary adjudication of contractor status in a manner that respects the individual nature of each action while also achieving the efficiencies of MDL coordination is to establish a single briefing schedule that governs all cases in these proceedings.

Finally, any Scheduling Order should respect FedEx Ground's due process rights to file a discrete brief (and opposition, where applicable) in each case where plaintiffs move for summary adjudication of contractor status. For the reasons cited in FedEx Ground previous opposition to plaintiffs' request for a status conference, consolidated treatment of dispositive motions in inappropriate in light of the panoply of operative legal standards and facts that are at issue in each case. (Doc. No. 1093 at 2-3.) While plaintiffs are entitled to their view that these operative standards and facts overlap to a degree that they may be set forth in a single filing, FedEx Ground, as the defendant in each action, is likewise entitled to separately brief in each case the reasons why the law together with the undisputed facts support the conclusion that plaintiffs are contractors as a matter of law.

FedEx Ground looks forward to the opportunity to elaborate on this position statement during the Case Status Conference to be held on March 19, 2008.

case 3:05-md-00527-RLM-CAN document 1111 filed 03/18/08 page 4 of 5

Dated: March 18, 2008

Respectfully submitted

By: s/Thomas J. Brunner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of March, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Thomas J. Brunner

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

The Court notifies counsel that they shall be prepared to address all pending matters at the March 19, 2008, hearing, including, but not limited to, the motion to strike experts [Doc. No. 1085], the motion to file a sur-reply [Doc. No. 1106], the joint motion to amend [Doc. No. 1107], and the motion to amend a complaint [Doc. No. 1110].

**SO ORDERED.**

Dated this 18th Day of March, 2008.

S/Christopher A. Neuchterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05–MD–527–RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Chief Judge Miller
Magistrate Judge Nuechterlein

**ORDER**

The defendant, FedEx Ground Package System, Inc., filed its Motion For Leave to File Sur-reply in response to the reply brief submitted by plaintiffs in support of their Motion to Strike Reports of Previously Undisclosed Experts. The Court, having considered the Motion and being duly advised, now GRANTS the Motion.

It is ORDERED that the defendant FedEx Ground Package System, Inc. is granted leave to file its Sur-reply to the reply brief submitted by plaintiffs in support of their Motion to Strike Reports of Previously Undisclosed Experts attached to Defendants' Motion For Leave To File Sur-reply. The Sur-reply attached to the Motion shall be deemed filed as of the date of this Order.

Dated this 19th Day of March, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05–MD–527–RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Chief Judge Miller
Magistrate Judge Nuechterlein

**FEDEX GROUND PACKAGE SYSTEM, INC.'S [PROPOSED] SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE REPORTS OF PROFESSORS LAFONTAINE AND SMITH**

**INTRODUCTION**

Plaintiffs' reply memorandum includes two misstatements that, when corrected, repudiate plaintiffs' position. Both could have been made in plaintiffs' opening brief, but were not. Accordingly, FedEx Ground addresses them here. First, plaintiffs claim that FedEx Ground previously had argued against allowing rebuttal experts. This is not true; in fact, FedEx Ground's position has remained consistent. Second, plaintiffs argue that Lafontaine's and Smith's reports were tardy because they were not produced within the 30-day time limit in Rule 26(a)(2)(C). Plaintiffs never mention, however, that the parties stipulated to an extension (past this deadline) for FedEx Ground to serve its expert reports, and FedEx Ground met the deadline.

## ARGUMENT

I. FEDEX GROUND DID NOT PREVISOULY ARGUE AGAINST ALLOWING "REBUTTAL" EXPERTS.

Plaintiffs' reply mischaracterizes the parties' dispute last year stemming from plaintiffs' unsuccessful efforts to file "rebuttal" expert reports in connection with their motions for class-certification. In FedEx Ground's Statement Regarding Scheduling Issues (Doc. No. 450) and FedEx Ground's Memorandum of Law in Opposition to Plaintiffs' Motion to Amend the Scheduling Order (Doc. No. 477), FedEx Ground stated that the class-certification ***movant*** (i.e., plaintiffs) should produce its expert reports first, and then the class-certification opponent (i.e., FedEx Ground) should produce its reports responding to plaintiffs' reports. Plaintiffs suggested further that they be allowed an unorthodox ***third round*** of expert reports, which they characterized as "rebuttal" reports — an inaccurate characterization of such reports, since plaintiffs were the moving parties in connection with class certification and have the burden of proof. (Doc. No. 450 at 6-7; Doc. No. 477 at 9.) FedEx Ground opposed this request, since it would have allowed plaintiffs to provide barebones reports and not submit their full expert reports until the proposed third round, when FedEx Ground would have no opportunity to address their contents. (Doc. No. 477 at 9.) The Court rejected plaintiffs' approach and denied their request.

Plaintiffs misuse the term "rebuttal expert report" in their request to strike the Lafontaine and Smith reports, which address the testimony plaintiffs intend to offer in support of summary judgment. What FedEx Ground objected to in the context of class-certification motions was permitting plaintiffs, as the moving party, to file watered down "opening" expert reports, wait to see what FedEx Ground's experts were planning on testifying to in opposition, and then file an additional round of expert reports that FedEx Ground's experts would have no right to address in their testimony. This is evident in the very quotations from FedEx Ground that plaintiffs

included in their reply: "Plaintiffs provide their expert reports . . . and then Defendant does the same"; nothing here "warrant[s] an unorthodox extra round of expert discovery." (Pls. Reply Mem. at 4, quoting Doc. No. 450 at 6, 7.)

FedEx Ground, of course, did not have an extra round of reports. Rather, it had rebuttal experts to respond to the new conclusions provided by plaintiffs in their round of expert reports,[1] and FedEx Ground provided those rebuttal reports at the same time it produced all of its expert reports. There is nothing inconsistent in FedEx Ground's position, which plaintiffs' motion inaccurately portrays.

## II. PLAINTIFFS STIPULATED THAT FEDEX GROUND HAD UNTIL NOVEMBER 8, 2007, TO SERVE ITS REBUTTAL EXPERT REPORTS.

Plaintiffs correctly state that Rule 26(a)(2)(C) normally provides a 30-day deadline for the service of rebuttal reports.[2] They also quote that portion of the Rule that provides that the default 30-day deadline applies "unless the district court otherwise directs **or the parties otherwise stipulate**." Rule 26(a)(2)(C) (emphasis supplied). But plaintiffs omit mentioning that they agreed to extend until November 8 the deadline FedEx Ground to provide reports responding to plaintiffs' expert reports.

The original deadline for FedEx Ground to serve its expert reports was October 5. (Doc. No. 766, at 3.) Plaintiffs then granted FedEx Ground an extension until October 19. *See* 10/9/07 Tr. at 33-34 (indicating that, because FedEx Ground had allowed plaintiffs a two-week extension,

---

1 Rule 26(a)(2)(c) applies to expert reports "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)." This was the role of the Lafontaine and Smith reports.

2 In their reply brief, plaintiffs claim for the first time that because FedEx Ground served its expert reports more than thirty days after plaintiffs served their expert reports, the Lafontaine and Smith reports are not timely. This is a different argument than plaintiffs made in their original motion, where they focused only on the timing of the identity of the experts, not the date the reports were produced. (*See* Pls. Reply Mem. at 5-6.) But because Rule 26(a)(2)(C) applies equally to both disclosure of the identify of experts and the reports of the experts, and permits both deadlines to be extended by stipulation, the parties' stipulated extension of the deadline to November 8 for providing the reports controls.

plaintiffs were allowing FedEx Ground a two-week extension) (attached as Ex. 2 to Second Declaration of Patricia A. Bloodgood). Next, the parties stipulated that FedEx Ground would have until November 7 to serve its expert reports. *See* Email from Lynn Rossman Faris to Robert Schwartz (Oct. 22, 2007) ("I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th."); Email from Robert Schwartz to Lynn Rossman Faris (Oct. 22, 2007) ("You are correct that we've agreed to serve those on or before 11/7.") (attached as Ex. 1 to attached Declaration of Robert Schwartz [**"Schwartz Decl."**]). Finally, plaintiffs agreed to a one-day extension, to November 8, for service of the reports. *See* Letter from Lynn Rossman Faris to Evelyn Becker, at 3 (Feb. 8, 2008) ("Plaintiffs agree[d] to the requested additional one day delay [for FedEx to serve its expert reports].") (attached as Ex. 2 to Schwartz Decl.).

Indeed, plaintiffs' counsel's recent characterization of the events of last fall confirms that plaintiffs "[gave] FedEx a second two-week extension" (until November 8) to serve its expert reports. *See id.* at 1. This agreement is a stipulation to extend the deadline and overrides the default 30-day provision in Rule 26(a)(2)(C).

The timing of the service of the Crandall and Scapellato rebuttal reports further confirms this account. FedEx Ground experts Crandall and Scapellato produced rebuttal reports. FedEx Ground served the Crandall and Scapellato reports on November 8. And plaintiffs concede that the "timing of the service of [Crandall's and Scapellato's] reports was consistent with the Court's Scheduling Orders." (Pls. Reply Mem. at 6.)

Thus, as conceded by plaintiffs, FedEx Ground's deadline for serving all its reports was November 8, 2007, the date stipulated to by the parties. FedEx Ground served the Lafontaine and Smith reports on that date. Therefore, those reports were timely served.

**CONCLUSION**

FedEx Ground therefore respectfully requests that this Court deny plaintiffs' motion to strike the reports of rebuttal experts Lafontaine and Smith.

Dated: March 10, 2008.

Respectfully submitted,

By: s/Thomas J. Brunnner
Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006–4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Main Street
Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**DECLARATION OF ROBERT M. SCHWARTZ IN SUPPORT OF FEDEX GROUND'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE REPORTS OF PROFESSORS LAFONTAINE AND SMITH**

I, Robert M. Schwartz, say:

1. I am one of the lawyers responsible for representing defendant FedEx Ground Package System, Inc. in this matter. I submit this Declaration in support of FedEx Ground's opposition to plaintiffs' motion to strike the rebuttal expert reports submitted by Professor Francine Lafontaine and Professor Richard Smith.

2. On October 22, 2007, Lynn Rossman Faris, counsel for plaintiffs, sent me an email that stated in relevant part, "I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th." Later on the same day, I responded via email to Ms. Faris, in relevant part, "You are correct that we've agreed to serve those on or before 11/7." An accurate copy of this email exchange is attached to this Declaration as Exhibit 1.

3.     On November 7, 2007, I had a phone conversation with Ms. Faris during which she orally agreed to extend FedEx Ground's deadline for serving its expert reports one day, until November 8.  This agreement was memorialized in a February 8, 2008 letter from Ms. Faris to Evelyn Becker, one of my partners who also works on this case.  The letter states in relevant part on page 5: "November 7, 2007, 8:01 am e-mail [from] Schwartz to Faris re: 'MDL Expert Report Deadline:' 'I'll spare you the details, but it would help me out considerably if we could serve ours tomorrow instead of today.  Is that OK?'  After a telephone conference, Plaintiffs agree to the requested additional one day delay."  The letter states in relevant part on page 2 that plaintiffs "[gave] FedEx a second two-week extension" (until November 8) to serve its reports.  An accurate copy of this letter is attached to this Declaration as Exhibit 2.

I declare under penalty of perjury under the laws of the state of California that the statements contained in Declaration are true, and that I signed this Declaration at Los Angeles, California, on Friday, March 7, 2008.

Robert M. Schwartz

DC1:739008.1

# Exhibit 1

**Nestler, Jeff**

**From:** Schwartz, Robert
**Sent:** Monday, October 22, 2007 6:29 PM
**To:** 'Lynn Faris'
**Subject:** RE: Extension to Nov 7 for service of FedEx's Merits Expert Reports

Lynn--

You are correct that we've agreed to serve those on or before 11/7. (The 10/5 date was extended previously to 10/19 by reason of defendant's two-week extension of plaintiffs' filing date for their reports.)

Thank you again for agreeing to that.

--Bobby

---

**From:** Lynn Faris [mailto:lfaris@leonardcarder.com]
**Sent:** Monday, October 22, 2007 3:27 PM
**To:** Schwartz, Robert
**Cc:** Susan E. Ellingstad; Robert Harwood
**Subject:** Extension to Nov 7 for service of FedEx's Merits Expert Reports

Bobby: I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th, pursuant to our agreement to extend FedEx's time for service of merits expert reports from the court's October 5th deadline and your request at our Scheduling Conference with Magistrate Neuchterlein.

*Lynn Rossman Faris*
*Leonard Carder, LLP*
*1330 Broadway, Suite 1450*
*Oakland, CA 94612*
*(510) 272-0169*

# Exhibit 2

# LEONARD CARDER, LLP

ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612

TELEPHONE: (510) 272-0169
FAX (510) 272-0174
www.leonardcarder.com

VICTORIA CHIN
ALANNA D. COOPERSMITH
LYNN ROSSMAN FARIS
SHAWN GROFF
KATE R. HALLWARD
CHRISTINE S. HWANG
ARTHUR A. KRANTZ
DANIELLE LUCIDO
PHILIP C. MONRAD
ELEANOR I. MORTON
ROBERT REMAR
MARGOT A. ROSENBERG
BETH A. ROSS
MATTHEW D. ROSS
JACOB F. RUKEYSER
PETER W. SALTZMAN
PHIL A. THOMAS
FRANCISCO UGARTE
RICHARD ZUCKERMAN

NORMAN LEONARD
(1914 - 2006)

OF COUNSEL

WILLIAM H. CARDER
SANFORD N. NATHAN
KIRSTEN L. ZERGER

SAN FRANCISCO OFFICE
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400
FAX: (415) 771-7010

PLEASE REFER TO OUR FILE NO.
359-7

February 11, 2008

By E-mail and Mail

Ms. Evelyn Becker
O'Melveny & Myers, LLP
1625 Eye Street, NW
Washington, DC 20006-4001
ebecker@omm.com

Re: *FedEx Ground Employment Practices Litigation*
Response to your letter of January 31, 2008

Dear Evelyn:

I have reviewed your letter of January 31, 2008 and write to respond on behalf of Plaintiffs. Your letter appears to be based on several serious misunderstanding regarding the scheduling and production of expert reports and files in support of or opposition to summary judgment/adjudication motions on employment status. I can only assume that your letter was written without access to the letters and emails regarding the agreements reached by Bobby Schwartz and I on this subject. Moreover, your letter suggests that Magistrate Neuchterlein would reject the agreements between Bobby and I about service of the experts reports (and bar their use as "untimely") despite our specific notice to him at the hearing of October 9th of our brief, mutual extensions of time. His only comment about the mutual extensions was "Courtesy extended should be returned." (Page 33) As the chronology below shows, Fedex's courtesy in giving Plaintiffs a two-week extension was doubly returned by Plaintiffs not only extending the schedule by the two-weeks we received but by further giving FedEx a second two-week extension, to say nothing of Plaintiffs acceptance of expert files four weeks late without explanation or advance agreement. Thus, your assertion that Magistrate Neuchterlein would be disinclined to give effect to the agreement of parties seems particularly unwarranted. Nevertheless, to clarify all of the facts, I provide a chronology of the exchanges which took place between the parties and the agreements reached during those exchanges.



**Chronology of Events**

Court's Scheduling Order of 11/29/05: SJ movants have until 6/1/06 to serve expert reports; opponents have until 6/30/06 to depose movants' experts and serve their own expert reports; depositions of opposition experts by 8/1/06.

Court's Scheduling Order of July 29, 2007: SJ movants have until 8/24/07 to serve expert reports; opponents have until 10/5/07 to depose movants' experts and serve their own expert reports; depositions of opposition experts by 11/5/07

Court Order of August 22, 2007 sets additional time limits for Wave 4.

August 22, 2007 Letter from Faris to Schwartz: memorializes agreement to extend time to serve expert reports to seek court clarification of its order.

Court Order of August 29, 2007 denied clarification requested and sets status conference for October 9, 2007.

August 31, 2007, 11:25 am email from Faris to Schwartz : "After our discussion last night, I want to thank you for your courtesy and to memorialize our agreement that Plaintiffs will serve their merits expert reports by Friday, September 7 and Defendant will have until October 19, 2007 to depose our experts and serve any reports they plan to reply [sic] on in opposition and the deposition of those experts will occur by November 19. Essentially, this is adding two weeks to the schedule." This agreement was conditioned upon informing Magistrate Neuchterlein of the two week extensions, which was accomplished at the hearing on October 9th.

September 7, 2007: Plaintiffs serve their four expert reports in support of summary judgment/ adjudication.

October 9, 2007 Hearing before Magistrate Neuchterlein: Schwartz informs the Magistrate of the parties' agreement to briefly extend deadline for service of expert reports and time to depose experts, in accordance with August 31st agreement. (Page 17) Faris clarifies that Plaintiffs gave FedEx the same two additional weeks to complete expert discovery, moving the date back to October 19th (page19) and indicates a willingness to "accommodate some small adjustments. . .." (Page 33)
On October 9, Plaintiffs anticipated that depositions of their experts would be requested and scheduled by October 19th. No such request was ever made prior to or at that time or even at the time FedEx served its expert reports, on November 8. At the October 9th hearing, Faris specifically objected to FedEx's proposal to extend its time for expert discovery until January as highly prejudicial, given that Plaintiffs had served their reports months earlier. (Page 32) Plaintiffs expressly notified FedEx and the court that it would not serve any new reports for

Wave 4 cases but would rely on those produced on September 7th (page32); FedEx similarly served no reports in support of any summary judgment motion and provided no additional opposition expert report by the Wave 4 deadline, which is now long past.

October 22, 2007, email string to/from Faris and Schwartz: "I wanted to memorialize our agreement that FedEx will serve on Plaintiffs' counsel all of their merits expert reports on or before Wednesday, November 7th, pursuant to our agreement to extend FedEx's time for service of merits expert reports from the court's October 5th deadline and your request at our Scheduling Conference with Magistrate Neuchterlein."
Schwartz e-mail responds: "You are correct that we've agreed to serve those on or before 11/7. (The 10/5 date was extended previously to 10/19 by reason of defendant's two-week extension of plaintiffs' filing date for their reports.) Thank you again for agreeing to that."
Faris responds: "My pleasure."
There was neither a request nor any agreement for any extension of time to depose Plaintiffs' experts.

November 7, 2007, 8:01 am e-mail Schwartz to Faris re: "MDL Expert Report Deadline:" "I'll spare you the details, but it would help me out considerably if we could serve ours tomorrow instead of today. Is that OK?"
After a telephone conference, Plaintiffs agree to the requested additional one day delay. Again, there was no request for or agreement to extension to depose Plaintiffs experts.

November 8, 2007: Service of FedEx expert reports in opposition to summary judgment/adjudication.

November 14, 2007, 8:32 am E-mail Faris to Schwartz: "We are expecting the expert files tomorrow. Are those going to come by mail or email?"
9:16 am email Schwartz to Faris: "I am checking on the delivery of the expert materials and will let you know."

November 30, 2007 Letter from Faris to Schwartz: Letter states inter alia that Plaintiffs have never received the expert files and requests that Plaintiffs be provided with dates when FedEx'sdisclosed experts (Mr. Crandall and Mr. Scapellato) will be available for deposition and objects to the service of reports from undisclosed experts.

December 3, 2007, 11:45 am email Schwartz to Faris: "I'm looking into why you don't already have the expert information. You will have it shortly. We can fight about the two additional experts we identified another time. Right now, I want to get you the information."
There was no mention of deposing Plaintiffs' experts and no mention of dates FedEx would make its experts available.

December 18, 2007: FedEx expert files arrive by mail without explanation of four-week delay.

December 19, 2007, 11:08 am email Faris to Schwartz: "We received your expert files yesterday and I assume that given that they were produced so late, there will be no problem about taking the depositions after we all return from our holidays in January."
4:30 pm e-mail response from Schwartz: "Sorry about the lag in the expert files. Of course January is fine for the depositions."

Both Faris and Schwartz return to work after vacations on January 7, 2008.

January 16, 2008, 5:51 am email Faris to Schwartz: "When can your experts be available for deposition? Who on your team should I communicate with about this?"
2:41pm email Schwartz to Faris: "I will check and let you know."
There was no mention of deposing Plaintiffs' experts.

January 22, 2008 Meet and confer conference (Faris, Ellingstad, Becker and Schroeder) regarding scheduling of Wave 5 cases. Becker requests dates to take Plaintiffs' experts depositions regarding their September 7th reports for the first time.

As this chronology clearly shows, Plaintiffs timely served their expert reports, provided the necessary expert files and were ready to produce experts for deposition during the period of expert discovery, but FedEx never requested to depose Plaintiffs' experts or to extend the time to depose them. Nevertheless, on January 22, 2008, over three months after the time to depose Plaintiffs experts expired on October 19th pursuant to express agreement of the parties, FedEx asked Plaintiffs to produce their experts for depositions. FedEx also never requested to continue the time set to depose those experts either nor would Plaintiffs have agreed to a three month extension of time. The Court's Scheduling Orders provided for the deposition of the experts of summary judgment movants by the date the same date opposition expert reports were due. Especially in view of the reminder in open court on October 9 to FedEx that its' time to depose Plaintiffs' experts was over on October 19 (page 19), the failure to request additional time or dates for deposition gave Plaintiffs every reason to believe that FedEx did not intend to depose their merits experts. Three months elapsed between the last day to depose our experts and your first request of any kind to depose Plaintiffs' experts. We had long ago informed our experts that they would not be deposed and could clear their calendars.

In stark contrast to this chronology, Plaintiffs diligently and persistently sought FedEx's experts' files and dates to depose FedEx's experts in opposition to summary adjudication of employment status. I requested and obtained your agreement (in advance) to take the depositions in January, due to the holidays and the unexplained late production of the experts' files (without prior agreement). I timely asked for dates for those depositions by letter and email and received no reply of any kind regarding our requests to schedule those depositions.

Thus, your claim that Plaintiffs' expert reports would be deemed by Magistrate Neutchterlein to be "untimely" or that our request to depose them is untimely is expressly belied by written agreements to extend the time to serve them and to depose your experts. No such agreements were ever requested or entered into with regard to your deposing Plaintiffs' experts. Thus, these situations are in no way equivalent.

I agree that we have enjoyed a cooperative relationship and I fully intend to maintain such a relationship. We have previously resolved scheduling issues and problems **by agreement in advance** of any deadline, not unilaterally nor months after the deadline was past. As you are well aware from the numerous times I have agreed to extend extra time when requested by you and others on your team, I have provided every professional courtesy consistent with my duty to vigorously represent my clients and I fully intend to continue in that manner. However, I cannot simply ignore the fact that you are three months late in seeking a continuance of a date long-gone and that you have waited until we are in the middle of drafting summary adjudication motions, due in a few weeks, to request to depose four experts whose reports you have had for four and one-half months, since September 7 and who were supposed to be deposed by October 19.

I respectfully request that you reconsider trying to turn what is a proper request for access to your experts into a quid pro quo to excuse FedEx's failure to timely depose Plaintiffs' experts. If you wish to meet and confer about this situation, I am available to do so.

Respectfully,

LYNN ROSSMAN FARIS

cc: Rob Harwood, Susan Ellingstad
Bobby Schwartz

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On March 19, 2008, this Court held an in-court hearing regarding a variety of matters. Based on that hearing, Plaintiffs' motion to strike is taken under **ADVISEMENT**. Plaintiffs indicated that they desired to consider Fedex's offer to allow its experts disclosed on November 8, 2007, to be deposed in an attempt to cure any prejudice Plaintiffs have suffered. Plaintiffs have until **March 27, 2008**, to notify this Court whether deposing the experts will cure the prejudice Plaintiffs have suffered and whether they desire to depose the experts.

Furthermore, Plaintiffs are **ORDERED** to submit a proposed form of order regarding the summary judgment briefing deadlines for all waves one through four of class certification and all other cases not part of wave five by **March 27, 2008**.

**SO ORDERED.**

Dated this 20th Day of March, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | |

**ORDER AMENDING THE CASE SCHEDULE**

On March 13, 2008, the parties filed a joint motion to amend the case scheduling order to add deadlines for a fifth wave of cases. By agreement of the parties as indicated at the March 19, 2008, hearing, the joint motion is **GRANTED** [Doc. No. 1107] and it is **ORDERED** that the case schedule is amended as follows:

1. The parties shall perform limited discovery on "fifth wave" cases (cases transferred to the MDL Court after September 1, 2007), by **May 30, 2008**.

2. Plaintiffs shall file motions and accompanying memoranda (to be limited to **20 pages**) for certification of classes and/or collective actions relating to newly transferred cases by **June 20, 2008**.

3. FedEx Ground shall file its oppositions to certification (to be limited to **30 pages**) by **August 1, 2008**.

4. Plaintiffs shall file reply memoranda in support of certification (to be limited to **20 pages**) by **August 29, 2008**.

5. Movants for summary judgment/adjudication shall serve expert reports or affidavits in support of such motions by **June 16, 2008**.

6. Opponents of summary judgment/adjudication shall depose movants' experts by July 16**, 2008**.

7. Opponents of summary adjudication shall serve expert reports or affidavits in opposition to such motions by **July 16, 2008.**

8. Depositions of opponents' summary-adjudication experts shall take place by **August 16, 2008**.

9. The parties shall file any summary judgment/adjudication motions related to independent contractor/employment status by **October 1, 2008,** <u>in cases in which there is no pending motion for class certification</u>**.** Opposition to summary judgment/adjudication motions shall be filed by **November 14, 2008,** in those cases, and replies in support of summary judgment/adjudication motions shall be filed by **December 15, 2008**.

10. <u>In cases in which any party has sought class certification</u>, the parties shall file any summary judgment motions within **thirty (30)** days of this Court's ruling on the pending class certification motion. Responses in opposition to those motions shall be filed **thirty (30)** days from when the motions are filed, and movants shall have **fifteen (15)** days to from the date the response is filed to file a reply.

**SO ORDERED**

Dated this 20th Day of March, 2008.

<u>S/Christopher A. Nuechterlein</u>
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER

Given the court's opinion and order dated March 25, 2008 as to waves 1-3 motions for class certification, the court DENIES Plaintiffs' Motion for Review of Portions of Magistrate's Decision Dated March 5, 2007 (Doc. No. 567) as moot.

SO ORDERED.

ENTERED: March 27, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER

All parties that have filed briefs for the fourth wave of class certification shall file, within 30 days of this order, a supplemental statement, not to exceed five pages, stating how their position on class certification differs from the positions addressed in the Kansas order and Waves 1-3 order (dated March 25, 2008).

SO ORDERED.

ENTERED: March 26, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO ALL ACTIONS

Case No. 93:05-MD-527 RM
(MDL 1700)

CHIEF JUDGE MILLER
MAGISTRATE NUECHTERLEIN

**PLAINTIFFS' NOTIFICATION IN RESPONSE TO COURT ORDER (Doc. No. 1116) REGARDING PLAINTIFFS' MOTION TO STRIKE FEDEX GROUND'S UNDISCLOSED EXPERTS**

Plaintiffs hereby notify the Court, pursuant to its Order dated March 20, 2008 (Doc. No. 1116), that Plaintiffs agree that the Defendant's offer to permit Plaintiffs to depose both of their undisclosed experts at this time will cure the prejudice Plaintiffs have suffered from the lack of timely disclosure of the experts. Plaintiffs will depose Professor LaFontaine but opt not to depose Professor Smith.

Dated: March 27, 2008

Respectfully submitted,
LEONARD CARDER, LLP

/s/ Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

PROOF OF SERVICE

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. I served the following document(s):

**PLAINTIFFS' NOTIFICATION IN RESPONSE TO COURT ORDER (Doc. No. 1116) REGARDING PLAINTIFFS' MOTION TO STRIKE FEDEX GROUND'S UNDISCLOSED EXPERTS**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

Thomas J Brunner, Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com, marion.jacobson@bakerd.com

Daniel O Myers dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

D Lucetta Pope Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com, marion.jacobson@bakerd.com

Alison G Fox Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com, marion.jacobson@bakerd.com

Wood R Foster PHV, Jr woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Jordan M Lewis jordanlewis@sbgdf.com

Evelyn L Becker PHV ebecker@omm.com

Beth A Ross bross@leonardcarder.com

Edward J Efkeman eefkeman@fedex.com

George A Barton gbarton@birch.net, bartonlaw3@birch.net

Shannon Liss-Riordan sliss@prle.com, jhunt@prle.com, syoung@prle.com

Robert I Harwood rharwood@whesq.com

Matthew T Tobin mtobin@sbslaw.net, lstewart@sbslaw.net

Dmitri Iglitzin iglitzin@workerlaw.com

Richard T Phillips flip@smithphillips.com, tresahharden@smithphillips.com

Jerald R Cureton jcureton@curetoncaplan.com

Steve D Larson slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Philip Stephen Fuoco pfuoco@msn.com

Gary F Lynch glynch@carlsonlynch.com

Anne T Regan atr@zimmreed.com, kmh@zimmreed.com

J Gordon Rudd jgr@zimmreed.com

R Christopher Gilreath chrisgil@sidgilreath.com

Susan E Ellingstad seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

James R Mulroy, II jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Michael J Watton jdrewicz@Wattongroup.com

Tom A Jerman tjerman@omm.com

Robert M Schwartz PHV rschwartz@omm.com

Guy Brenner gbrenner@omm.com

Lynn R Faris lfaris@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Martin S Garfinkel garfinkel@sgb-law.com, helm@sgb-law.com

Peter W Overs, Jr povers@whesq.com

James A Staack jims@staack-firm.com

Ginger A DeGroff degrofflaw@yahoo.com

Aparna B Joshi ajoshi@omm.com

Charles Victor Pyle, III victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Robert G Rikard (Terminated) rrikard@attorneyssc.com

Raquel A Millman rmillman@omm.com

Barry S Fagan bfagan@dibandfagan.com

Darcie R Brault dbrault@dibandfagan.com

Robert K Firsten rfirsten@firstenlaw.com

Michael G McGuinness mmcguinness@omm.com

Jennifer Lee Merzon jmerzon@omm.com

Michael W Kopp mkopp@omm.com

Michael W Garrison, Jr mgarrison@omm.com

Kenneth Lee Blalack, II lblalack@omm.com

Lee K Fink lfink@omm.com

Stacy J Hauf shauf@omm.com, swickliffe@omm.com

Victor H Jih vjih@omm.com

Theodore B Schroeder tschroeder@omm.com

Jeffrey A Trimarchi jtrimarchi@omm.com

Nora M Puckett npuckett@omm.com, dmeredith@omm.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

Laura C Bremer lbremer@omm.com

Jeffrey A Bartos jbartos@geclaw.com

Matthew M Houston mhouston@whesq.com

Matthew J Merrick mmerrick@omm.com

Andrew M Weiner aweiner@omm.com

Debra Brewer Hayes dhayes@dhayeslaw.com

David M Cialkowski dmc@zimmreed.com

Soye Kim skim@geclaw.com

Edward R Forman eforman@ee.net

Mary D Walsh-Dempsey mdempsey@omalleylangan.com

Peter D Winebrake pwinebrake@winebrakelaw.com

Sanford A Meizlish smeizlish@bnhmlaw.com

Robert K Handelman rhandelman@bnhmlaw.com

Bruce H Meizlish brucelaw@fuse.net

John S Marshall marshall@ee.net

Robert E DeRose, II bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Monica Ferraro mferraro@bnhmlaw.com

Deborah R Grayson drgrayson@fuse.net

Eileen S Goodin egoodin@bnhmlaw.com

Michael J Gorby mgorby@gorbypeters.com, rwright@gorbypeters.com

Mary Donne Peters mpeters@gorbypeters.com, rwright@gorbypeters.com

Jeffrey S Nestler jnestler@omm.com

Peter J Agostino agostino@aaklaw.com, trybula@aaklaw.com

Pamela A Paige ppaige@defur.com, amiller@defur.com, kcarr@defur.com

R Jay Taylor, Jr jtaylor@scopelitis.com, lnewton@scopelitis.com

Dennis M Brennan DBrennanLaw@wmconnect.com

Edith A Thomas edithomas1@aol.com

Melissa M Zensen mzensen@tomazensen.com

Richard A Haws rhaws@curetoncaplan.com

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

| | |
|---|---|
| John H. Beisner<br>David G. Caperton<br>David R. Eberhart<br>O'Melveny & Myers LLP<br>Email: jbeisner@omm.com; debcrhart@omm.com; dcaperton@omm.com | Gregory C Black<br>Corette Pohlman & Kebe<br>PO Box 509<br>Butte, MT 59703 |
| Louis Adams Bledsoe , III<br>Nicholas G. Walter<br>Robinson Bradshaw & Hinson PA<br>Email: lbledsoe@rbh.com; nwalter@rbh.com | J. Allen Brinkley<br>Email: Allen@bclegal.net |
| Henry Bongiovi<br>Henry J Bongiovi Law Offices<br>831 State Street<br>Santa Barbara, CA 93101 | Heather B. Brock<br>Fowler White Boggs Banker<br>501 E. Kennedy Blvd. Suite 1700<br>PO Box 1438<br>Tampa, FL 33601-1438 |
| Joree Brownlow<br>Email: joree@jbrownlow.com | James N Boudreau<br>Littler Mendelson<br>Email: jboudreau@littler.com |
| R. Bruce Carlson<br>Email: bcarlson@carlsonlynch.com | Wesley S. Chused<br>Looney & Grossman LLP<br>E-mail: wchused@lgllp.com |
| Kevin A. Crass<br>Elizabeth Robben Murray<br>Friday Eldredge & Clark LLP<br>Email: crass@fec.net; murray@fec.net | John A. Doran<br>Laura M. Lawless<br>John Lomax Jr.<br>Michael Mason<br>Greenberg Traurig LLP<br>Email: doranj@gtlaw.com; robertsonl@gtlaw.com; lomaxj@gtlaw.com; masonm@gtlaw.com |
| Steve Dennis<br>Reid & Dennis<br>Providence Tower<br>5001 Spring Valley Road Suite 255W<br>Dallas, TX 75244 | James J Dunn, Jr<br>Mickenberg Dunn Kochman Lachs & Smith<br>29 Pine Street<br>Burlington, VT 05402-0406 |

| | |
|---|---|
| Kevin J. Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309 | Anne M. Estevez<br>Jason R. Nickerson<br>Morgan Lewis & Bockius<br>Email: aestevez@morganlewis.com;<br>jnickerson@morganlewis.com |
| Damon L Ellis<br>Mani & Ellis<br>PO Box 1266<br>Charleston, WV 25326-1266 | William T. Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178 | Merrie M Frost<br>7784 Reynolds Road<br>Mentor, OH 44060 |
| B. James Fitzpatrick<br>Fitzpatrick Spini & Swanston<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com | Robert A. Garcin<br>Law Offices of Robert A. Garcin<br>210 East 29th Street, #A<br>Loveland, CO 80538 |
| Salvatore G. Gangemi<br>Gangemi Law Firm<br>Email: sgangemi@gangemilaw.com | Stanley Miller Gosch<br>Richard Rosenblatt & Associates LLC<br>8085 East Prentice Avenue<br>Greenwood Village, CO 80111-2745 |
| Christopher Dean Glover<br>Hollis & Wright PC<br>505 North 20th St Suite 1500<br>Birmingham, AL 35203 | Clayton D. Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 |
| Joseph J. Haddad<br>Richard R. Meneghello<br>Fisher & Phillips LLP<br>1001 SW Fifth Ave. Suite 1600<br>Portland, OR 97204 | Jack D. Hilmes<br>Email: jhilmes@finleylaw.com;<br>kdriscoll@finleylaw.com |
| Richard Eugene Hayber<br>Hayber Law Firm LLC<br>221 Main St Suite 400<br>Hartford, CT 06106 | Chris A Hollinger<br>Esther Wright<br>Sarah Goldfrank<br>O'Melveny & Meyers LLP<br>Email: cholinger@omm.com;<br>swright@omm.com; sgoldfrank@omm.com |
| Eric E. Hobbs<br>Email: eehobbs@michaelbest.com | Dorothy A. Jarrell<br>Anh-Nguyet T. LyJordan<br>O'Melveny & Myers LLP<br>7 Times Square<br>New York, NY 10036 |

| | |
|---|---|
| William S. Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 | Ronald E. Jenkins<br>Jenkins and Kling PC<br>Email: rjenkins@jenkinskling.com |
| Thomas P. Jirgal<br>O'Melveny & Myers LLP<br>1999 Avenue of the Stars #700<br>Los Angeles, CA 90067-6035 | Clark C. Johnson<br>Stites & Harbison<br>Email: cjohnson@stites.com; wwatt@stites.com |
| Richard Eugene Hayber<br>Hayber Law Firm LLC<br>221 Main St Suite 400<br>Hartford, CT 06106 | Burton Kainen<br>Sheldon D. Myers<br>Kainen Escalera & McHale PC<br>Email: bkainen@kemlaw.com;<br>smyers@kemlaw.com |
| Andrew J. Kahn<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 | Ronald D Kelsay<br>Kelsay Law Firm PA<br>227 Woodbine<br>Hot Springs, AR 71901 |
| Steven M. Kelso<br>Wheeler Trigg Kennedy LLP<br>1801 California Street, # 3600<br>Denver, CO 80202 | Karen P. Kruse<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Kristine M. Larsen<br>Ray Quinney & Nebeker<br>Email: klarsen@rqn.com | Donald B. Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 |
| Harold L. Lichten<br>Pyle Rome Lichten Ehrenberg &<br>Liss-Riordan<br>18 Tremont St Suite 500<br>Boston, MA 02108 | R James Lore<br>102-1 Commonwealth Court<br>Cary, NC 27511 |
| James S Lowrie<br>Jones Waldo Holbrook & McDonough SLC<br>170 S Main St Ste 1500<br>Salt Lake City, UT 84101 | Jonathan R Mani<br>Mani & Ellis<br>PO Box 1266<br>Charleston, WV 25326-1266 |
| Carla D. Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Robert E. McDaniel<br>Email: remcdanielesq@aol.com |

| Paula R. Markowitz<br>Thomas H. Kohn<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 | Tina L Morin<br>Morin Law Firm<br>125 West Granite Street Suite 212<br>Butte, MT 59701 |
|---|---|
| Kenneth E. Milam<br>Email: kemilam@watkinseager.com | Kimberly M Moses<br>Laura K. Kendall<br>Calfee Halter & Griswold<br>1400 McDonald Investment Center<br>800 Superior Avenue<br>Cleveland, OH 44114 |
| Brian J Moore<br>Jackson Kelly<br>PO Box 553<br>Charleston, WV 25322-0553 | Todd J. O'Malley<br>O'Malley & Langan<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 |
| Charles N. Nauen<br>Email: cnnauen@locklaw.com | Steven A Owings<br>Law Offices of Steven A Owings<br>1320 Brookwood Suite D<br>Little Rock, AR 72202 |
| Joseph A. Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 | Anthony J Pantuso , III<br>Pantuso Law Firm LLC<br>Email: apantuso@pantusolaw.com |
| Shannon H. Paliotta<br>Sidney Zonn<br>Littler Mendelson<br>625 Liberty Ave. 26th Floor<br>Pittsburgh, PA 15222 | Robert J. Penny<br>Wick Bramer Ukasick & Trautwein LLC<br>323 South College Avenue<br>PO Box 2166<br>Fort Collins, CO 80522 |
| Charles W. Whetstone , Jr<br>Cheryl F. Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M. Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |
| Michael R. Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Dennis C Reich<br>Rodney K Castille<br>Reich & Binstock<br>4265 San Felipe Suite 1000<br>Houston, TX 77027 |

| | |
|---|---|
| Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 | Hart L. Robinovitch<br>Zimmerman Reed PLLP<br>Email: hlr@zimmreed.com |
| Rick D Roskelley<br>Littler Mendelson PC<br>3960 Howard Hughes Parkway Suite 300<br>Las Vegas, NV 89169-5937 | Jennifer R. Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Eric H. Rumbaugh<br>Michael Best & Friedrich LLP<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Edward Scott Smith<br>Fisher & Phillips LLP-ATL<br>945 East Paces Ferry Road<br>1500 Resurgens Plaza<br>Atlanta, GA 30326-1125 |
| Mark Schirmer<br>Straus and Boies LLP<br>1661 International Place Dr Suite 400<br>Memphis, TN 38120 | Robert K. Spotswood<br>Kenneth D. Sansom<br>Emily J. Tidmore<br>Spotswood LLC<br>2100 Third Avenue North<br>Concord Center Suite 940<br>Birmingham, AL 35203 |
| Dan S. Smith<br>Email: addiealexis@verizon.net | Patricia A Sullivan<br>Email: psullivan@eapdlaw.com |
| Charles T Speth PHV, II<br>Email: ted.speth@ogletreedeakins.com | Richard Tanenbaum<br>Email: rt@lawyer.com |
| Donald R Taylor<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com | Mark B. Wallace<br>Walker Vaughn & Wallace<br>7403 St. Andrews Church Road<br>PO Box 9285<br>Louisville, KY 40209 |
| Joni M.Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Phillip A Wittmann<br>Stone Pigman Walther Wittmann LLC<br>Email: pwittmann@stonepigman.com |
| Peter N. Wasylyk<br>Email: pnwlaw@aol.com | Roger A Wolfe<br>Jackson Kelly<br>PO Box 553<br>Charleston, WV 25322-0553 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **March 27, 2008**.

/s/Lorelei Badar
Lorelei Badar

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On March 19, 2008, this Court held an in-court hearing on a variety of matters. This Court afforded Plaintiffs until March 27, 2008, to file various responses. The Court now enters the following order.

**I. SUMMARY JUDGMENT DEADLINE**

Even though this Court has entered a ruling on many of the pending motions for class certification on March 25, 2008, the hanging deadlines will remain in effect. Essentially, the parties shall have until **April 25, 2008**, to file any dispositive motions for **all** cases in which there has been a ruling on class certification, which includes the Kansas case. In any case in which there has not been a class certification ruling, the parties shall have **thirty (30)** days from the date of this Court's ruling on any pending class certification motion to file dispositive motions. Finally, in those cases in which there are no pending motions for class certification, the parties shall file any dispositive motions by **June 1, 2008**. Any memoranda in support of dispositive motions shall not exceed 30 pages.

Responses in opposition to any dispositive motions shall be filed within **forty-five (45)** days from the filing of dispositive motions. Memoranda in opposition to such motions shall not exceed 25 pages. Movants shall have **thirty (30)** days from the filing of the opposition to file

reply memoranda. Reply memoranda in support of such motions shall not exceed 20 pages and shall be limited to arguments made in the opposition briefing.

## II.    PLAINTIFFS' MOTION TO STRIKE

On January 28, 2008, Plaintiffs filed a motion to strike two of Fedex's experts because Fedex's disclosure of these experts was untimely. Fedex indicated that they would allow Plaintiffs to depose the experts to cure any prejudice from the untimely disclosure. This Court gave Plaintiffs until March 27, 2008, to articulate if deposing the experts would cure any prejudice or to articulate any other prejudicial effect by the late disclosure.

On March 27, 2008, Plaintiffs filed a notice indicating that deposing the experts would cure any prejudice. Consequently, Plaintiffs' motion to strike is **DENIED AS MOOT** [Doc. No. 1085]. Fedex is to allow Plaintiffs to depose the two experts, LaFontaine and Smith. The parties are to confer with regards to an appropriate time and date for the depositions.

**SO ORDERED.**

Dated this 28TH Day of March, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**PLAINTIFFS' MOTION FOR CLARIFICATION OF MARCH 25, 2008 ORDER**

In its Order dated March 25, 2008, among other things, this Court granted in part motions for class certification which had been filed by Plaintiffs in 19 of the cases that make up Waves 1, 2 and 3 of this MDL proceeding. ("March 25 Order") Doc. No. 1119. Plaintiffs had requested certification of their claims under both Rule 23(b)(2) and (b)(3). The March 25 Order certified the classes under Rule 23(b)(2), noting that "as in the Kansas opinion, certification under Rule 23(b)(2) alone is preferable." Doc. No. 1119 at 153. The Court also noted that it was using the Kansas opinion as the basis for its March 25 Order. Doc. No. 1119 at 9.

The "Kansas opinion" referred to in the March 25 Order was issued by this Court on October 15, 2007. In it, this Court granted the Kansas Plaintiffs' motion for class certification of their claims under the Kansas Wage Payment Act and their claims for rescission and declaratory relief. The Court also certified a nationwide class seeking relief under ERISA ("Kansas Order") Doc. No. 906. As with the motions at issue in the March 25 Order, the Kansas Plaintiffs had sought class certification under both Rule 23(b)(2) and Rule 23(b)(3).

In the Kansas Order, the Court found that certification of Plaintiffs' state law claims was appropriate under **Rule 23(b)(3)**. Kansas Order at 42 (Kansas Wage Payment Claim) and 45 (Kansas common law claims). With regard to Plaintiffs' motion for certification of a nationwide ERISA class, the Court found that the ERISA claim could properly be certified under both Rule 23(b)(2) and (b)(3). Kansas Order at 56. The Court determined, however, that certification under Rule 23(b)(3) was "more appropriate in this case so potential class members will retain the ability to opt-out of the class if they so choose." *Id.* The parties were ordered to confer regarding the preparation of notice to the class members.

In light of the apparent inconsistency between the March 25 Order and the Kansas Order, Plaintiffs respectfully move for clarification of the March 25 Order. Plaintiffs note that, given the concern expressed by the Court in the Kansas Order about class members being given the opportunity to opt out *and* the fact that, in any case, there will be a nationwide notice to class members of the certification of the nationwide ERISA class, certification under Rule 23(b)(3) of the claims at issue in the March 25 Order will ensure that class members retain the ability to opt out if they so choose.

Dated: April 1, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

case 3:05-md-00527-RLM -CAN document 1130 filed 04/01/08 page 3 of 9

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

## CERTIFICATE OF SERVICE

I, Susan E. Ellingstad, hereby certify that on April 1, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |

| | |
|---|---|
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |

| | |
|---|---|
| **Mary Donne Peters** | mpeters@gorbypeters.com; rwright@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on April 2, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN & HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK & TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Patricia A Sullivan
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: April 1, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**OPINION AND ORDER**

On October 31, 2007, both parties made filings with this Court that indicated they were unable to reach an agreement as to the class notices. The Court now enters the following order as to the class notices for the Kansas and ERISA classes, which shall also serve as a guideline for notices in all future cases that have been certified as class actions.

## I. PROCEDURE

On October 15, 2007, this Court entered an opinion and order that granted Plaintiffs' motions to certify two classes: 1) a class regarding the state of Kansas, and 2) a national ERISA class. This Court instructed the Plaintiffs and Defendant, Fedex Ground Package Systems, Inc. (Fedex), to confer and submit an agreed proposed notice or separate notices if the parties could not reach an agreement.

On October 29, 2007, Fedex filed a Fed. R. Civ. P. 23(f) notice of appeal with the 7th Circuit regarding this Court's October 15, 2007, opinion and order. On October 31, 2007, both parties made filings with this Court that indicated they were unable to reach an agreement as to the class notices. Plaintiffs filed a motion for approval of their class notices, and they provided their versions of proposed notices to be sent to the absent class members. Fedex filed its

objection to Plaintiffs' motion and provided amended versions of the Plaintiffs' proposed notices.

On November 29, 2007, Plaintiffs filed a motion to amend its proposed notices. The only change to the proposed notices was the inclusion of and a reference to the identity of "local counsel" for the Kansas Plaintiffs, George A. Barton and his law offices (collectively "Barton"). Defendants never filed an objection to Plaintiffs' motion. However, on December 13, 2007, Barton filed a motion to appoint himself as additional class counsel. Plaintiffs' current counsel in this MDL litigation filed an objection to this motion on January 11, 2008, and Barton filed a reply in support of his motion on January 25, 2008.

On January 9, 2008, the 7th Circuit denied Fedex's petition for permission to appeal this Court's October 15, 2007, opinion and order.

On March 25, 2008, this Court entered an opinion and order that granted in part and denied in part twenty-nine of the pending motions for class certification. That order did not address class notices with regards to any of the cases that were certified as class actions. The Court now enters the following opinion and order regarding the Kansas and ERISA classes, which shall also serve as a guideline for notices in all future cases that have been certified as class actions. This Court has the authority to enter this order pursuant to its referral order and 28 U.S.C. § 636(b)(1)(A).

## II. ANALYSIS

### A. Legal Standards

Under Fed. R. Civ. P. 23(c)(2), this Court may issue a class notice for Fed. R. Civ. P. 23(b)(1) or (b)(2) classes, but notice is mandatory for Fed. R. Civ. P. 23(b)(3) classes. Fed. R. Civ. P. 23(c)(A)-(B). The rule provides:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(B).

The purpose of class notice is to present a fair recital of the subject matter of the suit and to inform class members of their opportunity to be heard. See In re Brand Name Prescription Drugs Antitrust Litigation, 1995 WL 23058 at *1 (N.D. Ill. 1995). Notice provides an opportunity for class members to participate in the litigation, to opt-out of the litigation, to monitor the performance of class representatives and class counsel, and to ensure that predictions of adequate representation are fulfilled. MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.13 (2004). Class notice is not intended to serve as a complete source of information as to each and every alternative a class member may have in pursuing any potential claim against named defendants." In re Brand Name Prescription Drugs Antitrust Litigation, 1995 WL 23058 at *1.

District courts have broad discretion and flexibility in determining what constitutes the most practical notice under the circumstances. See Contract Buyers League v. F & F Inv., 48

F.R.D. 7, 14 (N.D. Ill. 1969); 7B Wright, Miller, & Kane, Federal Practice & Procedure Civil 3d, § 1793 (2005); see also Beale v. EdgeMark Fin. Corp., 1995 WL 631840 at *1 (N.D. Ill. 1995). However, individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort. Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 173 (1974).

B. Plaintiffs' Motion for Approval of Class Notice

In accordance with this Court's October 15, 2007, opinion and order, Plaintiffs have submitted two proposed forms of notice. One of the notices pertains to the Kansas lawsuit while the other pertains to the national ERISA lawsuit. Fedex argues that class notice should not be issued at all at this time, and if this Court decides to proceed with issuing class notice, Fedex objects to several provisions of the Plaintiffs' proposed notices.

1. Proceeding with Class Notice

Fedex offers several reasons why class notice should not be issued at this time. First, Fedex claims that this Court should simply delay issuing class notice because there is a pending appeal before the 7th Circuit. However, on January 9, 2008, the 7th Circuit denied petition of a Fed. R. Civ. P. 23(f) appeal. Consequently, this argument is moot.

Second, Fedex claims that issuing notices now will be confusing to the absent class. There are many cases in this litigation in which Plaintiffs have sought class certification. Some of the classes are limited geographically to a particular state, and other classes are national classes. Fedex argues that if the absent class receives some notices now and others as this Court rules on future motions for class certification, the absent class would be confused why it is receiving multiple notices. If this Court were to wait until all of the pending motions for class

certification were resolved, the delay would be substantial. The class must receive notice before this Court rules on dispositive motions. See Watkins v. Blinzinger, 789 F.2d 474, 476 n. 3 (7th Cir. 1986). As a result, the longer it takes the absent class to receive the notices, the longer this Court must wait to resolve any issues in this litigation. Simply put, the detrimental effect of not issuing the notices outweighs any confusion the absent class might suffer from receiving multiple notices. Furthermore, any future notices can be crafted to adequately explain why and how the notices are different.

Third, Fedex argues there are serious flaws in the definitions of the ERISA and Kansas classes. Fedex is simply attempting to rehash arguments they already made in opposition to class certification. This Court indicated that:

> The proposed class-definition for nearly all the state class actions is some version of the following:
>
>> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement . . . 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) . . . and 3) were dispatch out of terminal state of xxxxxxxx.

See In re Fedex Ground Package System, Inc. Employment Practices Litigation, 2007 WL 3027405 at *1 (N.D. Ind. 2007). Based on this class definition, this Court certified class actions for the Kansas case and ERISA case. Fedex had the opportunity to raise arguments about the insufficiency of this definition while this Court considered Fedex's opposition to Plaintiffs' motions for class certification. This Court will not revisit whether the definition of the class is appropriate as a basis to delay class notice.

In summary, Fedex has not offered any persuasive justification for delaying the issuance of class notice at this time. Consequently, this Court will proceed with issuing class notice under Fed. R. Civ. P. 23(c)(2).

2. Disputes Regarding the Content of Class Notice

Even though this Court has determined that class notice shall be issued, the parties have several disagreements regarding the contents of the class notice. The Court now addresses each disagreement in turn.

First, Plaintiffs have suggested two notices: one for the state Kansas class that this Court has certified and one for the national ERISA class. Fedex opposes having multiple notices and proposes that one unified notice be sent to the Kansas class, which covers both the Kansas claims and the national ERISA claims. Upon examination of Plaintiffs' proposed notices, it appears only pages five and eight have slightly different content. Otherwise, the notices are identical. Undoubtedly, it would be less confusing to the absent class to receive one notice rather than multiple notices. Also, if absent class members received these two notices that are nearly identical, there is a strong possibility many absent class members may ignore one notice or the other as a duplicate. Furthermore, because the notices are almost identical, the differences between the notices could be easily integrated. Therefore, Plaintiffs and Fedex are **ORDERED** to confer on the best possible manner to integrate the two notices into one notice. Plaintiffs shall than submit a final proposed notice for final approval by this Court.

Next, Fedex argues that the notice should include an "opt out form" that absent class members can simply mail-in to Plaintiffs' counsel. Fedex argues that this would be the simplest way for absent class members to opt out. Nothing in Fed. R. Civ. P. 23(c)(2) requires an opt out

form, and the notice provides reasonable and clear instructions on the procedure of opting out. Plaintiffs' proposed notice clearly indicates that a letter simply needs to be mailed to Plaintiffs' counsel, and the notice provides clear instructions on page seven.[1] Consequently, the advantages provided by an "opt out form" would be minuscule, and there is simply no need to require Plaintiffs to include one.

Third, Fedex argues that the notice should include language that suggests the absent class members may be forced to respond to discovery requests. First, Fedex's argument is based on the speculative belief that they "might" need discovery. As time passes, Fedex may find that they do not need discovery at all. Consequently, Fedex is raising a concern that simply is not ripe. Also, this Court has never previously ordered that the parties are to expect the absent class members to be subject to discovery.[2] In fact, this Court has even indicated a reluctance to allow discovery from absent class members in its previous orders absent the requisite showing of "need." See eg. In re Fedex Ground Package System, Inc., Employment Practices Litigation, 2007 WL 733753 at *6-8 (N.D. Ind. 2007) citing Brennan v. Midwestern United Life Ins. Co., 450 F.2d 999, 1005 (7th Cir. 1971) (indicating that a party can obtain discovery from absent class members if discovery is necessary and not used to gain an unfair advantage); see also MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.41 (2004). Regardless, the discovery period in this case has closed. Consequently, even if Fedex desired or needed more discovery of any

---

[1]However, because this Court has decided that one notice is more appropriate, Plaintiffs shall also amend the page seven "opt out" instructions so that the absent class members clearly understand that they must specifically indicate that they are opting out as to only the Kansas claims, or only the ERISA claims, or both.

[2]The case cited by Fedex, Otto v. Variable Annuity Life Ins. Co., 730 F. Supp. 145, 150 (N.D. Ill. 1990), is not on point or persuasive. In that case, the Court had specifically indicated in its class certification order that there were several issues that might require discovery. Id. at n.4. This Court has never provided such directions in any of its orders.

kind, whether from the absent class or the named Plaintiffs, Fedex would have to establish legitimate "good cause" for discovery to be re-opened on a limited basis and file a motion to reopen discovery, which they have not done.[3]  Consequently, the class notice does not need to include any information to absent class members about being subject to discovery.

Fourth, Fedex argues that it is improper for the Plaintiffs to refer to other lawsuits that are pending before this Court in this MDL litigation.  This Court agrees.  When this Court entered its first practice and procedure order on August 30, 2005, this Court indicated that each case in this MDL litigation was to maintain its individual identity.  See Doc. No. 2 at 3.  Plaintiffs' proposed notice makes reference to all of the pending cases, and as it stands, gives the appearance of some kind of giant, super class action, which is simply not the case.  In fact, this Court has denied several motions to certify class actions in several MDL cases on March 25, 2008, which directly contradicts such a supposition.  Therefore, the Plaintiffs are **ORDERED** to amend their notice and omit any reference to the other cases pending in the MDL litigation.

Fifth, Fedex seeks a firm end date for the class.  Fedex suggest that the date of this Court's order, October 15, 2007, with the Kansas and ERISA cases, as the end date for the class.  Plaintiffs do not indicate that they object to such a request.  Without an end date, the class could potentially continue to grow exponentially as time passed, which would result in a never ending line of notices.  Therefore, Plaintiffs are **ORDERED**  to amend the notice to include the end date of the class as the date of this Court's certification order.

---

[3] In other words, not only would Fedex have to satisfy the standards of Brennan, 450 F.2d at 1005, and its progeny, but Fedex would also have to justify why this discovery could not have been sought before the close of discovery, why Fedex did not indicate that they would need such discovery prior to class certification, and why the need for the discovery outweighs any prejudice to the Plaintiffs.  See Fed. R. Civ. P. 6(b) and 16(b)(4); Hodowaniec v. Raco, 2006 WL 1285111 at 1 (N.D. Ind. 2006); Reytblatt v. Nuclear Regulatory Com'n, 1991 WL 140920 (N.D. Ill. 1991); see generally 4B Wright & Miller Federal Practice & Procedure: Civ.1 3d §1165 at 521 (2002).

Sixth, Fedex seeks to add information about Fedex's right to express their opinion about the lawsuit. While Fedex believes it needs to express to the class that it has a right to express its opinion, that is not the purpose of class notice. Class notice is meant to **inform** the class of their rights, but it is not meant to protect the rights of the defendant. See  In re Brand Name Prescription Drugs Antitrust Litigation, 1995 WL 23058 at *1. Consequently, this Court declines to entertain Fedex's suggestion that the notice include information about Fedex's right to express its opinion.

Finally, Fedex seeks to delete certain portions that Plaintiffs have included in the notice because those portions are "duplicative" or "not relevant." Upon examination of the notice, it is not too extensive so as to cause confusion or otherwise prejudice the absent class. The notice is only approximately nine pages, and deleting the material Fedex requested will not drastically reduce this length. Furthermore, the material Fedex seeks to delete only provides more information and increases the clarity of the notice. Again, this Court rejects Fedex's suggestion that any "duplicative" or "irrelevant" sections must be deleted.[4]

In summary, the Plaintiffs are **ORDERED** to combine their notices into one, unified notice, omit any reference in the notice to other MDL cases, and to include an end date for the class, which is the date of this Court's certification order. Fedex's objections to include an "opt out form," information regarding class discovery, and to have certain language omitted as not relevant are **OVERRULED**.

---

[4] The parties also have a dispute regarding a paragraph in the notice that indicates it is unlawful for Fedex to retaliate against the absent class members. The basis of this dispute is trivial. The parties basically agree that something regarding the unlawfulness for Fedex to retaliate, but they disagree as to the semantics of the language in the notice. The Court is confident the parties will confer to resolve this dispute so that the paragraph in question is written so as to appease both parties.

3. Timing

The final dispute between the parties regarding the notice pertains to timing. More specifically, the parties disagree as to the appropriate amount of time for the "opt out" period and for dates regarding the compilation of the class list.

First, Plaintiffs suggest a 30 day window for absent class members to "opt out" while Fedex argues that 60 days is more appropriate. Without diving into the trivial nature of a 30 day dispute, this Court simply finds that the "opt out" period for absent class members shall be **45 days**. The parties are in agreement that there will be an additional **30 day** opt-out period for any notices that are reissued because the previous notices have been returned as undeliverable.

With the directions from this Court's order, Plaintiffs are **ORDERED** to submit an amended final proposed notice for the Kansas class action by **April 18, 2008**. Furthermore, based on this Court's March 24, 2008, order, there are several other cases that have been certified for class certification. The parties shall submit a joint proposed notice for all cases that have been certified by **April 28, 2008,** and all notices shall be in conformance with this order. If the parties cannot agree on a proposed notice, they shall submit separate proposed notices and indicate the basis of their disagreements. All submitted notices shall be consistent with this order.

After this Court approves any notice, the parties are **ORDERED** to confer with regards to the timing of the issuance of the notice. Specifically, the parties are to determine when they may practically generate a list of absent class members and issue the notices. A final list shall be provided to this Court within **30 days** of the closing of the "opt out" periods for all absent class members for each case that has been certified as a class action. As stated, these lists will be the

**final** lists, and Plaintiffs shall bear the responsibility of compiling them and filing them with the Court.

C. Barton's Motion to Revise

On December 13, 2007, Barton, who is the local counsel for the Kansas Plaintiffs, filed a motion to revise the proposed notices. Barton indicates that he has been chosen by the named Kansas Plaintiffs to represent them. Therefore, Barton wants this Court to appoint him as additional class counsel, and he also wants his name on the class notice.

Under 28 U.S.C. § 1407, as indicated in this Court's original practice and procedure order, actions in this MDL litigation are consolidated for **pretrial proceedings**. On November 15, 2007, this Court entered its first scheduling order that covered many different aspects of this litigation. At that time, this Court appointed Plaintiffs' co-lead counsel, Lynn Rossman Faris, Susan Ellingstad, and Robert Harwood. Co-lead counsel were appointed by agreement of all of Plaintiffs' counsel, which included Barton. This Court's scheduling order indicated that co-lead counsel would be responsible for determining the legal position for all Plaintiffs, delegating tasks, and entering into stipulations. Basically, the full responsibility of how to handle all pretrial matters, including class certification and summary adjudication, rests with co-lead counsel. If Barton had any reservations with not being co-lead counsel, or wanted to have a stronger say in how this litigation would be prosecuted during pretrial proceedings, he should have raised those objections at or prior to the time this Court entered the November 15, 2007, scheduling order.[5]

[5] Craig v. FedEx Ground Package System, Inc., from the federal district court in Kansas, was one of the initial cases transferred in to this MDL litigation, which is the case in which Barton is involved. See Doc. No. 1.

That is not to say Barton is out of this case or his representation of the Kansas Plaintiffs is nixed. Clearly, Barton's full ability to communicate with this Court, or even act, on behalf of the Kansas Plaintiffs has been deferred to co-lead counsel during these MDL proceedings, but in some capacity Barton still represents the Kansas Plaintiffs now. During these MDL proceedings, this Court has endowed co-lead counsel with discretion to determine to what extent all local counsel, including Barton, are delegated responsibilities. See Doc. No. 52. Furthermore, at some point, these actions will be remanded to the transferor courts for trial. Lexecon. Inc. v. Milberg Weiss Bershad Hynes, and Lerach, 523 U.S. 26 (1998). At that time, Barton may or may not become the only counsel to speak and act on behalf of the Kansas Plaintiffs. But this Court leaves that decision to the federal district court in Kansas, or transferor court, that will receive the case. The transferor court conducts further pretrial proceedings as needed, and the transferor judge has the power to vacate or modify rulings made by this Court, such as re-appointing class counsel. See MANUAL FOR COMPLEX LITIGATION (Fourth) § 20.133 (2004). Therefore, Barton will have the opportunity to petition the transferor court to appoint him as representative of the Kansas Plaintiffs. The full extent of this Court's ability to appoint counsel relates to the pre-trial proceedings, which it has already done.

However, because Barton is not completely out of this case, this Court agrees that his name and contact information shall be included on the notice. If the Kansas case is remanded for trial, and the original court, or transferor court, decides that Barton should try the case, the absent class members will be aware of who Barton is and why he is involved in this litigation. And, co-lead counsel agrees to include Barton on the notice as indicated by their motion of November 29, 2007, motion. To the extent Barton's motion seeks to have his name and contact

information included on the class notice, that motion is **GRANTED**. Similarly, co-lead counsel's motion of November 29, 2007, is also **GRANTED**. But, to the extent that Barton is asking this Court now to appoint him as co-lead counsel for class certification during MDL proceedings, that request is **DENIED**. Barton may be entitled to be the only class counsel upon remand, but this Court leaves that decision for the transferor court that receives this case upon remand.

## III. CONCLUSION

Plaintiffs' motion for approval of class notices is **GRANTED IN PART** and **DENIED IN PART** [Doc. No. 917]. This Court agrees that class notice should be issued. However, Plaintiffs are afforded until **April 18, 2008**, to submit an amended proposed notice that is consistent with this order.

Plaintiffs' motion to amend the proposed notice to include Barton is **GRANTED** [Doc. No. 1017] and Barton's motion to appoint additional class counsel is **GRANTED IN PART** and **DENIED IN PART** [Doc. No. 1034]. Barton's name and contact information shall be included on the proposed absent class notice, but Barton's request to be appointed class counsel is **DENIED**.

**SO ORDERED.**

Dated this 4th Day of April, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**OBJECTION AND OPPOSITION**
**OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.**
**TO PLAINTIFFS' MOTION TO CLARIFY THE MARCH 26, 2008**
**OPINION AND ORDER ON CLASS CERTIFICATION**

FedEx Ground objects to plaintiffs' request to the Court to convert the Rule 23(b)(2) classes certified in the Court's March 26, 2008 Order into b(3) classes. FedEx Ground does not believe that Plaintiffs' request to the Court to change the rule number in its Order is consistent with the Court's finding that plaintiffs' "damages claims are incidental to the dominant claims for injunctive and declaratory relief." (Mar. 26, 2008 Order (Doc. No. 1119) at 153.)

Dated:  April 9, 2008

Respectfully submitted,

By:   s/Robert M. Schwartz

      Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., 14th Floor
South Bend, Indiana 46601

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

*Defendants' Liaison and Lead Counsel*

case 3:05-md-00527-RLM-CAN document 1137 filed 04/09/08 page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of April, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Robert M. Schwartz

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

Upon consideration of the parties' Joint Motion to Clarify/Amend the Case Schedule, it is hereby **GRANTED** [Doc. No. 1133] and **ORDERED** that:

1. For cases in the "Fifth Wave," all deadlines set forth in the Court's March 20, 2008, Order remain in effect.

2. For cases subject to the March 28, 2008, Order, deadlines for summary judgment/adjudication briefing apply to summary judgment/adjudications relating to independent contractor/ employee status only.

3. For cases in which class certification was denied by the Court's March 25, 2008 Order (Doc. No. 1119), motions for summary judgment/adjudication relating to independent contractor/s employee status shall be filed by **June 2, 2008.**

4. The June 1, 2008 filing deadline contained in the March 28, 2008, Order is changed to **June 2, 2008.**

5. Plaintiffs shall be permitted to file an omnibus brief to address the potential collateral estoppel effect of the *Estrada v. FedEx Ground* case by April 25, 2008. Such brief shall be limited to **30** pages at a maximum and Plaintiffs shall reduce the total pages for their

separate memoranda in support of the motions that are due by June 2, 2008 by the same number of pages used in the omnibus brief, to a maximum reduction of two pages per brief. FedEx Ground shall likewise be permitted to file up to a **30** page omnibus responsive brief, reducing their opposition briefs by the same number of pages used in their omnibus brief, to a maximum reduction of two pages per brief. Plaintiffs shall be permitted to file up to a **15** page omnibus reply brief on the collateral estoppel issue, reducing their reply briefs by the same number of pages used in the omnibus reply, to a maximum reduction of two pages per brief.

6. For the Fifth Wave cases, the parties shall serve any new reports or affidavits of previously-disclosed class certification expert(s) regarding new claims and/or new states by **May 30, 2008.**

**SO ORDERED**

Dated this 10th day of April 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

case 3:05-md-00527-RLM-CAN document 1140 filed 04/11/08 page 1 of 11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

# PLAINTIFFS' STATEMENT OF INTENT TO PROVIDE THE COURT WITH COMMON PROOF OF EMPLOYMENT STATUS

On March 26, 2008, this Court issued its Order (Doc. 118) regarding Plaintiffs' pending class certification motions for the cases briefed in Waves 1-3. In Section D of that Order (pp. 153-54), the Court requested that Plaintiffs respond to the Court's inquiry regarding the type of proof Plaintiffs plan to rely on as evidence that the members of the certified classes are legally employees and not independent contractors.

The Court is correct that Plaintiffs plan to present common proof applicable to members of the class as a whole, including, but not limited to:

1) the Operating Agreements and Addenda (OA);

2) FXG's extensive corporate policies and procedures available to all terminal managers on the company intranet;

3) FXG training materials (written manuals and videotapes) used to train terminal managers and/or to train class members in FXG's OA and its policies, procedures and practices;

4) corporate business records that FXG collects and retains regarding all class members in accordance with FXG policies and procedures;

5) corporate communications among and from high-level managers to terminal managers and pickup and delivery drivers regarding the policies, procedures and practices applicable to class members as a whole;

6) sworn admissions by FXG's officers, directors, and managers regarding the Operating Agreement, policies, procedures and practices applicable to class members as a whole; and

7) expert testimony regarding the OA, policies and procedures and practices applicable to class members as a whole.

That these categories of evidence comprise the type of common proof properly relied upon at summary judgment and trial in class action cases is confirmed by this Court's reference to such types of proof in the March 25 Order, where the court mentioned, inter alia, proof of "common practices and procedures standard to all" plaintiffs (p. 50), "centralized practices and procedures that are systemically applicable to all [] Plaintiffs" (p. 45), "corporate documents" (p. 102) and "centralized practices and procedures that are systematically applicable to all" (p. 149-150).

For their motions for summary adjudication of employment status in all cases where class actions were certified, Plaintiffs do not intent to offer individualized proof of the "experiences of individual drivers" through plaintiff and/or class member declarations or deposition testimony. As the Court indicated, however, such evidence might become necessary to "fight fire with fire" in opposition to FedEx's motion or in rebuttal to FedEx's opposition to Plaintiffs' motions. Plaintiffs believe it is unnecessary for the Court to consider evidence of individual plaintiffs'

subjective belief that they were treated as employees in order to determine their employment classification.

In the event that the employment status issue is not resolved by summary adjudication, at trial, Plaintiffs anticipate that the vast documentary record of FXG OA, policies and procedures and corporate records along with the testimony of its officers, directors and managers will be offered as overwhelming common proof that FXG has reserved to itself the right to control all aspects of the method, manner and means of performance used by pickup and delivery drivers in providing service to FXG's customers. At the same time, without knowing whether these trials will be bench or jury trials, Plaintiffs cannot fully develop or finalize their trial strategy or anticipate all witnesses they will call if the cases proceed to trial.

That Plaintiffs will be able to prove employment status at trial by way of common proof is amply demonstrated by both the trial court and appellate court's determinations in *Estrada v. FedEx Ground,* 154 Cal. App. 4th 1 (2007) expressly rejecting FXG's assertion that Plaintiffs failed to provide common proof of employment status.

Dated: April 11, 2008

Respectfully submitted,
**LEONARD CARDER, LLP**

/s/ Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

Mr. Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

PLAINTIFFS' LIAISON COUNSEL

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. I served the following document(s):

**PLAINTIFFS' STATEMENT OF INTENT TO PROVIDE THE COURT WITH COMMON PROOF OF EMPLOYMENT STATUS**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

Thomas J Brunner, Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com, marion.jacobson@bakerd.com

Daniel O Myers dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

D Lucetta Pope Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com, marion.jacobson@bakerd.com

Alison G Fox Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com, marion.jacobson@bakerd.com

Wood R Foster PHV, Jr woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Jordan M Lewis jordanlewis@sbgdf.com

Evelyn L Becker PHV ebecker@omm.com

Beth A Ross bross@leonardcarder.com

Edward J Efkeman eefkeman@fedex.com

George A Barton gbarton@birch.net, bartonlaw3@birch.net

Shannon Liss-Riordan sliss@prle.com, jhunt@prle.com, syoung@prle.com

Robert I Harwood rharwood@whesq.com

Matthew T Tobin mtobin@sbslaw.net, lstewart@sbslaw.net

Dmitri Iglitzin iglitzin@workerlaw.com

Richard T Phillips flip@smithphillips.com, tresahharden@smithphillips.com

Jerald R Cureton jcureton@curetoncaplan.com

Steve D Larson slarson@ssbls.com, dccrdas@ssbls.com, drccs@ssbls.com, kdunn@ssbls.com

Philip Stephen Fuoco pfuoco@msn.com

Gary F Lynch glynch@carlsonlynch.com

Anne T Regan atr@zimmreed.com, kmh@zimmreed.com

J Gordon Rudd jgr@zimmreed.com

R Christopher Gilreath chrisgil@sidgilreath.com

Susan E Ellingstad seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

James R Mulroy, II jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Michael J Watton jdrewicz@Wattongroup.com

Tom A Jerman tjerman@omm.com

Robert M Schwartz PHV rschwartz@omm.com

Guy Brenner gbrenner@omm.com

Lynn R Faris lfaris@leonardcarder.com, bross@lconardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Martin S Garfinkel garfinkel@sgb-law.com, helm@sgb-law.com

Peter W Overs, Jr povers@whesq.com

James A Staack jims@staack-firm.com

Ginger A DeGroff degrofflaw@yahoo.com

Aparna B Joshi ajoshi@omm.com

Charles Victor Pyle, III victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Robert G Rikard (Terminated) rrikard@attorneyssc.com

Raquel A Millman rmillman@omm.com

Barry S Fagan bfagan@dibandfagan.com

Darcie R Brault dbrault@dibandfagan.com

Robert K Firsten rfirsten@firstenlaw.com

Michael G McGuinness mmcguinness@omm.com

Jennifer Lee Merzon jmerzon@omm.com

Michael W Kopp mkopp@omm.com

Michael W Garrison, Jr mgarrison@omm.com

Kenneth Lee Blalack, II lblalack@omm.com

Lee K Fink lfink@omm.com

Stacy J Hauf shauf@omm.com, swickliffe@omm.com

Victor H Jih vjih@omm.com

Theodore B Schroeder tschroeder@omm.com

Jeffrey A Trimarchi jtrimarchi@omm.com

Nora M Puckett npuckett@omm.com, dmeredith@omm.com

Michael C Camuncz mcamunez@omm.com, cgreenberg@omm.com

Laura C Bremer lbremer@omm.com

Jeffrey A Bartos jbartos@geclaw.com

Matthew M Houston mhouston@whesq.com

Matthew J Merrick mmerrick@omm.com

Andrew M Weiner aweiner@omm.com

Debra Brewer Hayes dhayes@dhayeslaw.com

David M Cialkowski dmc@zimmreed.com

Soye Kim skim@geclaw.com

Edward R Forman eforman@ee.net

Mary D Walsh-Dempsey mdempsey@omalleylangan.com

Peter D Winebrake pwinebrake@winebrakelaw.com

Sanford A Meizlish smeizlish@bnhmlaw.com

Robert K Handelman rhandelman@bnhmlaw.com

Bruce H Meizlish brucelaw@fuse.net

John S Marshall marshall@ee.net

Robert E DeRose, II bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Monica Ferraro mferraro@bnhmlaw.com

Deborah R Grayson drgrayson@fuse.net

Eileen S Goodin egoodin@bnhmlaw.com

Michael J Gorby mgorby@gorbypeters.com, rwright@gorbypeters.com

Mary Donne Peters mpeters@gorbypeters.com, rwright@gorbypeters.com

Jeffrey S Nestler jnestler@omm.com

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

| John H. Beisner PHV<br>Email:  jbeisner@omm.com | J. Allen Brinkley<br>Email: Allen@bclegal.net |
|---|---|
| Joree Brownlow<br>Email: joree@jbrownlow.com | David G. Caperton<br>O'Melveny & Myers LLP<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001 |

| | |
|---|---|
| R. Bruce Carlson<br>Email: bcarlson@carlsonlynch.com | Kevin J. Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>699 Walnut St 1900 Hub Tower<br>Des Moines, IA 50309 |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178 | William T. Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B. James Fitzpatrick<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com | Salvatore G. Gangemi<br>Email: sgangemi@gangemilaw.com |
| Robert A. Garcin<br>Law Offices of Robert A. Garcin<br>210 East 29th Street, #A<br>Loveland, CO 80538 | Clayton D. Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 |
| Jack D. Hilmes<br>Email: jhilmes@finleylaw.com;<br>kdriscoll@finleylaw.com | Eric E. Hobbs<br>Email: eehobbs@michaelbest.com |
| William S. Hommel , Jr<br>Attorney at Law<br>1402 Rice Road Suite 200<br>Tyler, TX 75703 | Dorothy A. Jarrell<br>Anh-Nguyet T. LyJordan<br>O'Melveny & Myers LLP<br>7 Times Square<br>New York, NY 10036 |
| Thomas P. Jirgal<br>O'Melveny & Myers LLP<br>1999 Avenue of the Stars #700<br>Los Angeles, CA 90067-6035 | Andrew J. Kahn<br>McCracken Stemerman & Holsberry<br>1630 S Commerce St Suite A-1<br>Las Vegas, NV 89102 |
| Steven M. Kelso<br>Wheeler Trigg Kennedy LLP<br>1801 California Street, # 3600<br>Denver, CO 80202 | Karen P. Kruse<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Donald B. Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Harold L. Lichten<br>Pyle Rome Lichten Ehrenberg & Liss-Riordan<br>18 Tremont St Suite 500<br>Boston, MA 02108 |

| | |
|---|---|
| Carla D. Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Paula R. Markowitz<br>Markowitz & Richman<br>1100 North American Building<br>121 S Broad St<br>Philadelphia, PA 19107 |
| Robert E. McDaniel<br>Email: remcdanielesq@aol.com | Kenneth E. Milam<br>Email: kemilam@watkinseager.com |
| Charles N. Nauen<br>Email: cnnauen@locklaw.com | Todd J. O'Malley<br>O'Malley & Langan<br>426 Mulberry St Suite 104<br>Scranton, PA 18503 |
| Joseph A. Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 | Robert J. Penny<br>Wick Bramer Ukasick & Trautwein LLC<br>323 South College Avenue<br>PO Box 2166<br>Fort Collins, CO 80522 |
| Cheryl F. Perkins<br>Whetstone Myers Perkins and Young LLC<br>PO Box 8086<br>Columbia, SC 29202 | Alan M. Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |
| Michael R. Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989 | Aaron Roblan<br>Jackson Lewis<br>One Union Square<br>600 University St Suite 2900<br>Seattle, WA 98101 |
| Eric H. Rumbaugh<br>Michael Best & Friedrich LLP<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108 | Jennifer R. Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>10 Madison Ave Suite 402<br>Morristown, NJ 07960 |
| Dan S. Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050 | Patricia A Sullivan<br>Email: psullivan@capdlaw.com |
| Richard Tanenbaum<br>Email: rt@lawyer.com | Donald R Taylor<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |

| Joni M.. Thome<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402 | Peter N. Wasylyk<br>Email: pnwlaw@aol.com |
|---|---|
| Charles W. Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>PO Box 8086<br>Columbia, SC 29202 | Peter. J. Agostino<br>Email: agostino@aaklaw.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **April 11, 2008**.

/s/Lorelei Badar
Lorelei Badar

case 3:05-md-00527-RLM -CAN document 1141 filed 04/11/08 page 1 of 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Genaro Vargas, et al. v. FedEx Ground Package System, Inc.* Civil No. 3:05-md-00325-RLM-CAN (MA) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S ORDER GRANTING PLAINTIFFS' MOTION TO STRIKE THE STATE LAW VARIATIONS APPENDIX**

FedEx Ground provided the State Law Variations Appendix to assist the Court in reviewing the laws of the twenty states relevant to the Court's class certification decision. FedEx Ground did not intend to circumvent the Court's orders or page limits, or to submit materials that were unhelpful, overly-argumentative, or improper. FedEx Ground requests that the Court reconsider the Magistrate Judge's ruling striking the Appendix from the record.

Dated: April 11, 2008                    Respectfully submitted,

                                          By:   /s/ Robert M. Schwartz

                                          John H. Beisner
                                          Robert M. Schwartz
                                          Evelyn L. Becker
                                          O'MELVENY & MYERS LLP
                                          1625 Eye Street, NW
                                          Washington, DC 20006-4001

                                          Thomas J. Brunner
                                          Alison G. Fox
                                          BAKER & DANIELS LLP
                                          205 West Jefferson Blvd., Suite 250
                                          South Bend, IN 46601
                                          thomas.brunner@bakerd.com

                                          Defendant's Liaison and Lead Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of April, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Shannon Liss-Riordan
sliss@prle.com

George A. Barton
gbarton@birch.net

Peter D. Winebrake
pwinebrake@winebrakelaw.com

Robert E. DeRose , II
bderose@bnhmlaw.com

Robert K. Handelman
rhandelman@bnhmlaw.com

and I further certify that the foregoing document by United States Postal Service was mailed to the following non-CM/ECF participants:

Harold L. Lichten
PYLE ROME LICHTEN EHRENBERG &
LISS-RIORDAN PC-MA
18 Tremont St., Ste. 500
Boston, MA 02108

Phyllis Norman
LAW OFFICES OF GEORGE A.
BARTON, P.C.
800 W. 47th St., Ste. 700
Kansas City, MO 64112

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall St., Ste. 300
New York, NY 10005

By: /s/ Robert M. Schwartz

BDDB01 5201955v1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION )
---
THIS DOCUMENT RELATES TO: )

ALL ACTIONS )

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

ORDER

On April 15, 2008, FedEx Ground asked the court to suspend the April 25 deadline for status-related summary judgment motions in the cases in which class certification has been granted. The impetus for this motion was the plaintiffs' "Statement of Intent to Provide the Court with Common Proof of Employment Status" in which, FedEx Ground claims, plaintiffs listed certain categories of evidence outside the Operating Agreements and policies on which they intend to rely at summary judgment and/or trial. The court doesn't read the plaintiffs' statement of intent to include individualized evidence of driver intent and/or experience. If plaintiffs include such evidence in their summary judgment motions FedEx Ground can move to strike such individualized proof. The court, therefore, DENIES FedEx Ground's motion (Doc. No. 1143)

SO ORDERED.

ENTERED: April 22, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW RE: COLLATERAL ESTOPPEL IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION**

**TABLE OF CONTENTS**

INTRODUCTION ........ 1

STATEMENT OF UNDISPUTED FACTS AND PROCEDURAL HISTORY ........ 2

ARGUMENT ........ 8

I. THE *ESTRADA* DECISION IS ENTITLED TO THE SAME FULL FAITH AND CREDIT HERE AS IT WOULD BE GIVEN IN A CALIFORNIA COURT ........ 8

II. CALIFORNIA'S COLLATERAL ESTOPPEL PRINCIPLES PRECLUDE RE-LITIGATION OF ISSUES THAT HAVE BEEN ACTUALLY LITIGATED AND NECESSARILY DECIDED ON THE MERITS IN PRIOR PROCEEDINGS ........ 8

A. The Issue of Whether FXG Has Reserved to Itself the Right to Control the Manner and Means used by Drivers to Perform their Work Was Fully Litigated and Finally Decided *Against* FXG in *Estrada* ........ 11

B. FXG's Anticipated Arguments that the certified MDL cases Pose a Different Issue than the Resolved Against it in *Estrada* Should Be Rejected ........ 14

1. The Right to Control Retained by FXG in OA and its Implementing Policies and Procedures Has Remained Constant ........ 14

2. The Right to Control Retained in the FXG OA and its Implementing Policies Applies Equally to Single and Multiple Work Area Drivers Who Are All Equally Subject to its Terms. ........ 19

3. *Estrada* and the certified MDL cases Address Overlapping Time Frames, and the Critical Evidence is National in Scope ........ 20

*C.* FXG's Right to Control the Drivers Work Was Actually Litigated and Necessarily Decided on the Merits in *Estrada* ........ 20

D. The Public Policies Underlying The Collateral Estoppel Principle Strongly Support Application of the Doctrine In These MDL Cases ........ 23

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

Pages

## Federal Cases

*Arizona v. California*, 530 U.S. 392 (2000)........ 9

*Braselton v. Clearfield State Bank*, 606 F.2d 285 (10th Cir. 1979)........ 8

*Continental Can Co., USA v. Marshall*, 603 F.2d 590 (7th Cir. 1979) ........ 17

*Durfee v. Duke*, 375 U.S. 106 (1963) ........ 8

*Kreinik v. Showbran*, 400 F.Supp. 2d 554 (S.D.N.Y. 2005)........ 10

*Kremer v. Chemical Construction Co.*, 456 U.S. 461 (1982)........ 21

*Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430 (1943)........ 8

*Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75 (1984)........ 8

*Nationwide Mt. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ........ 2, 12

*Parklane Hosiery Company, Inc. v. Shore*, 439 U.S. 322 (1979)........ 9, 10, 21, 22

*Pignons S.A. de Mecanique v. Polaroid Corp.*,701 F.2d 1 (1st Cir. 1983) (Breyer, J.) ........ 16, 17

*Reinke v. Boden*, 45 F.3d 166 (7th Cir. 1995)........ 8

*Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840 (3d Cir. 1974)........ 16, 19

*Securities Exchange Comm'n. v. Monarch Funding Co.*, 192 F.3d 295 (2d Cir. 1999)........ 21

## California State Cases

*Carroll v. Puritan Leasing Co.*, 143 Cal. Rptr. 772 (Cal. Ct. App. 1978)........ 12, 13

*Crain v. Crain*, 9 Cal. Rptr. 850 (Cal. App. 1960) ........ 13

*Estrada v. Fed Ex Ground Package Systems, Inc.* Case No. BC 210130 (2004), *aff;d*, 64 Cal. Rptr. 3d 327 (2007), *rev. denied* (November 28, 2007) ........ passim

*Evans v. Celotex Corp.*, 238 Cal. Rptr. 259 (Cal. App. 1987)........ 17

*Hurd v. Albert*, 3 P.2d 545 (Cal. 1931)........ 17

*Lucido v. Superior Court*, 795 P.2d 1223 (Cal. 1990)........ 9, 10, 12

*Martin v. Martin*, 470 P.2d 662 (Cal. 1970)........ 12

*McClain v. Rush*, 264 Cal. Rptr. 563 (1989) ........ 23

*Panos v. Great Western Packing Co.*, 134 P.2d 242 (Cal. 1943)........ 12

*People v. Sims*, 651 P.2d 321 (Cal. 1982)........ 10

*Roos v. Red*, 30 Cal. Rptr. 3d 446 (Cal. Ct. App. 2005)........ passim

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations, 48 Cal.3d 341 (1989)*........ 13

*S.G. Borello and Sons, Inc. v. Dept. of Industrial Relations*, 769 P.2d 399 (Cal. 1989) ........ 1, 2, 4
*Smith v. Exxon Mobile Oil Corp.*,64 Cal. Rptr. 3d 69 (Cal. Ct. App. 2007) .......................... 11, 18
*Tevis v. Beigel* , 319 P.2d 98 (Cal. App. 1957) .................................................................... 13
*Vandenberg v. Superior Court*, 982 P.2d 229 (Cal. 1999) ....................................................... 10

**Federal Statutes**

28 U.S.C. §1738 ....................................................................................................... 1, 8
Restatement (Second) of Agency, §220 ...................................................................................... 13
Restatement (Second) of Judgments § 27 .................................................................................. 9, 12
*United States v. Silliman*, 167 F.2d 607 (3d Cir.), *cert. denied* 335 U.S. 825 (1948) .................... 8

**State Statutes**

California Business and Professions Code Section 17200 ............................................................ 3
California Labor Code Section 2802 ........................................................................................... 3

**Other Authorities**

*Baltimore Harbor Charters, Ltd. V. Ayd*, 780 A.2d 303 (Md. 2001) ........................................... 14
*Bargery v. Obion Grain Co.*, 785 S.W.2d 118 (Tenn. 1990) ....................................................... 14
*Boily v. Comm'er of Econ. Sec.*, 544 N.W. 2d 295 (Minn. 1996) ............................................... 14
*Burless v. West Va. University Hosps. Inc.*, 601 S.E.2d 85 (W. Va. 2004) ................................. 14
*Bynog v. Cipriani Group Inc.*, 802 N.E.2d 1090 (B.Y. 2003) ...................................................... 14
*Draper v. Conagra Foods, Inc.*, 212 S.W. 3d 61 (Ark. Ct. App. 2005) ....................................... 14
*Durbin v Culberson Cty.*, 132 S.W. 3d 650 (Tex. App. 2004) ...................................................... 14
*Estate of Perry v. Green Card, Inc.*, 2006 WL 3479056 at *4 (R.I. Super. Dec. 1, 2006) ........... 15
*Hunter v. R.G. Watkins & Son, Inc.*, 265 A.2d 15 (N.H. 1970) ................................................... 14
*Kentucky Unempl. Ins. Comm'n v. Landmark Cmty. Newspapers of Ky. Inc.*, 91 S.W.3d 575 (Ky. 2002) ........................................................................................................................ 14
*Lockhard v. Murphy Co.*,, 619 P.2d 283 (Or. Ct. App. 1980) ..................................................... 14
*Lowe v. Zarghami*, 731 A.2d 14 (1999) ..................................................................................... 14
*Madison Newspapers, Inc. v. Wisconsin Dept. of Revenue*, 599 N.W. 2d 51 (Wis. Ct. App. 1999) ....................................................................................................................... 14
*Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001) ............................................................................ 14
*Nazworth v. Swire Florida, Inc.*, 486 So. 2d 687 (Fla. Dist. App. 1986) .................................... 15
*Nelson v. Yellow Cab Co.*, 538 S.E.2d 276 (S.C. Ct. App. 2000) ................................................. 14
*Perri v. Certified Languages Int'l, LCC*, 66 P.3d 531 (Or. App. 2003) ....................................... 14

case 3:05-md-00527-RLM -CAN document 1194 filed 04/25/08 page 5 of 30

*Roadway Package System, Inc.* 326 NLRB 842 (1998) ............ 25

*Turnipseed v. McCafferty*, 521 So., 2d 31 (Ala. Civ. App. 1987) ............ 14

*Urbano v. STAT Courier, Inc.*, 878 A.2d 58 (Pa. Super. Ct. 2005) ............ 14

*Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842 (Fla. 1997) ............ 15

*Wallis v. Secretary of Kansas Dept. of Human Resources*, 689 P.2d 787 (Kan. 1984) ............ 14

## INTRODUCTION

In *Estrada v. Fed Ex Ground Package Systems, Inc.*,[1] the California court found that "[FXG] not only has the right to control, but has close to absolute actual control" over its California pickup and delivery drivers because it reserved to itself sole discretion to interpret and apply" their contract for service, the 1994 FXG Pickup and Delivery Contractor Operating Agreement (OA). (RJN, Exh. B [SD] at 4). [2] The trial court's conclusion was reached under California's common law "right to control" test for determining employment status. *See S.G. Borello and Sons, Inc. v. Dept. of Industrial Relations,* 769 P.2d 399 (Cal. 1989). The California Court of Appeal affirmed, observing: "FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors." *Estrada*, 64 Cal. Rptr. 4th at 327 (2007). The *Estrada* finding that the drivers are subject to FXG's reserved right to control is entitled to preclusive effect. FXG should be barred from re-litigating this identical issue again as a predicate to the employment law claims asserted in each of the twenty cases certified by this court for class wide adjudication in this MDL docket ("certified MDL cases").[3]

Under the Full Faith and Credit clause to the U.S. Constitution, art. IV, § 1, as implemented by 28 U.S.C. §1738, this Court must accord the same full faith and credit to the *Estrada* judgment to which it would be entitled in a California court, including its preclusive effect under familiar principles of res judicata and collateral estoppel. The identical issue at the core of each of the certified MDL cases – FXG's reservation of the right to control the drivers' performance -- was actually litigated, necessarily decided, and finally resolved *adversely* to

[1] Case No. BC 210130 (2004), *aff'd*, 64 Cal. Rptr. 3d 327 (2007), *rev. denied* (November 28, 2007).

[2] Plaintiffs' Request for Judicial Notice (RJN), Exh. E [Estrada v FedEx Ground Package Systems, Inc., California Court of Appeal Oral Argument recording, July 24, 2007]), filed herewith.

[3] See Doc. Nos. 960 (Opinion and Order filed October 15, 2007) and 1119 (Opinion and Order filed March 25, 2008) (certifying nationwide class under ERISA asserted in Kansas, complaint, and state law class claims asserted in cases involving drivers from Alabama, Arkansas, California, Florida, Indiana, Kansas, Kentucky, Maryland, Minnesota, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin).

FXG. FXG had a full and fair opportunity to litigate the driver's employment status under the same common law right to control test governing these cases. *Compare Borello*, *supra*, with *Nationwide Mt. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) and cases cited in Doc. No. 1119. FXG did so, aggressively, during nearly five years of pre-trial litigation and a nine week bench trial, followed by every level of appellate review.

In this motion, applicable to all twenty of the certified MDL cases, Plaintiffs ask the Court to accord full preclusive effect to the *Estrada* judgment. Under the doctrine of collateral estoppel, FXG should be barred from re-litigating the issue of whether FXG has reserved to itself the right to control the manner and means of the drivers' performance under the terms of the OA, as implemented by FXG's common corporate policies, procedures and practices. Further, because the "right to control" is the determinative factor under the common law agency test, Plaintiffs are entitled to judgment as a matter of law that they are employees.

## STATEMENT OF UNDISPUTED FACTS AND PROCEDURAL HISTORY

On July 26, 2004, following a nine week bench trial, the Superior Court of the State of California for the County of Los Angeles found that FedEx Ground (hereafter "FXG")'s California pick-up and delivery truck drivers were employees, not independent contractors, under common law agency principles, in *Estrada v. Fed Ex Ground Package Systems, Inc.*,, Case No. BC 210130 (2004), *aff'd*, 64 Cal. Rptr. 3d 327 (2007), *rev. denied* (November 28, 2007). (Plaintiff's Request for Judicial Notice (RJN), Exh. B [July 26, 2004 Statement Decision, or "SD"] at 4; *Estrada*, 64 Cal Rptr. 3d at 336-37. This was not even a close case. Indeed, during oral argument, appellate court Justice Vogel candidly told FXG counsel that he did not have a "snowball's chance" of persuading the court that the drivers employed by FXG under the terms of the OA are anything other than employees. RJN, Exh. E.

The *Estrada* Complaint was initially filed in Los Angeles Superior Court on May 11, 1999. A First Amended Complaint ("FAC") was filed in May 2000 asserting five class claims

case 3:05-md-00527-RLM-CAN document 1194 filed 04/25/08 page 8 of 30

for expense reimbursement under California Labor Code Section 2802, equitable claims for restitution, declaratory and injunctive relief under California Business and Professions Code Section 17200, and for an accounting. (RJN, Exh. A).[4]

The claims asserted in the FAC were premised on the same threshold issue presented in the certified MDL cases: that FXG has misclassified its local pickup and delivery drivers as "independent contractors" when, in fact, they perform service for FXG as employees under *Borello's* common law "right to control" test and its progeny. Plaintiffs' motion for class certification was granted on August 2, 2001, followed by nearly three years of merits discovery and motion practice.

The case was referred to a trial department in March 2004. The trial judge bifurcated the case into three phases. Phase I was a bench trial to address two key issues, including whether the drivers were employees, as Plaintiffs claimed, or independent contractors, as FXG insisted, under the *Borello* "right to control" test. Trial commenced on April 16, 2004 and continued through June 30, 2004. On July 26, 2004, after nine weeks and forty-six witnesses, the trial court issued a twenty-six (26) page Statement of Decision ("SD") finding the drivers in the Plaintiff class were employees and not independent contractors. (RJN, Exh. B [SD]).[5]

Final judgment was entered on January 27, 2006. (RJN, Exh. D) FXG appealed from the Phase I trial rulings, the class certification order and the attorney fee award, and Plaintiffs cross-appealed on a number of discrete damage rulings. FXG vigorously prosecuted its appeal. After oral argument on July 24, 2007 (RJN, Exh. E), the Court of Appeal issued a published opinion on August 13, 2007 in which, *inter alia*, it affirmed the employment status ruling. FXG's petition for review to the California Supreme Court was denied. (RJN, Exh. F). Remitter issued

---

[4] The relevant portions of the *Estrada* proceedings which demonstrate that the threshold issue there is the same as that presented in the certified MDL cases are reproduced here as Exhibit A through I of Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Motions for Summary Adjudication, filed concurrently herewith (RJN).

[5] During Phase II, the parties identified the class members entitled to recovery, and an accounting was performed. During Phase III, the trial court heard and resolved Plaintiffs' claims for declaratory and injunctive relief and plaintiffs' motion for attorneys' fees. RJN, Exh C. Judgment was initially entered on December 11, 2005 but corrected on January 27, 2006. *Id.* at Exh. D.

case 3:05-md-00527-RLM-CAN document 1194 filed 04/25/08 page 9 of 30

on December 10, 2007(RJN, Exh.G). The remaining damage and attorney fee issues were remanded to the trial court.

Plaintiffs offered only common evidence during the Phase I trial. The documentary record consisted of the 1994 OA, which obligates all drivers "to provide daily pickup and delivery service" using means that enable them to "be identified as being part of the FedEx system",[6] along with the plethora of written policies and procedures and other generally applicable corporate documents demonstrating FXG's conduct in implementing the OA's terms. (*Id*. at RA457-1938; See Also RJN, Exh. B [SD] at 5).

The terms and conditions under which Plaintiffs in this case perform service for FXG are no different. The common evidence developed during discovery is the same, or substantially similar, to the evidence admitted and considered by the court in *Estrada*, and includes:

1. The FXG OA and its addendum (*compare* RJN, Exh. H at RA458-523 *with* Declaration of Lynn Rossman Faris in Support of Motions for Summary Adjudication ("Faris Decl."), Exh. 1 (OAs)
2. FXG's written policies and procedures (*compare* RJN, Exh. H at RA525 – 626 and RA RA801-1060 (FXG policy manuals 1998-2001) *with* Faris Decl., Exhs. 2, Vols. 1 through (selected 2007 P&P), Exh. 3, Volumes 1 -2 (FXG polices 2000-2006);
3. FXG's generally applicable corporate documents pertaining to recruiting and training of drivers so they can serve FXG customers using methods that "foster[ ] the professional image and good reputation of FXG" and promote the FXG brand; *compare* RJN, Exh. H at RA 1183-1279 (Estrada Trial Exhibit 4, Tabs 2-11 [training and recruitment documents] *with* Faris Decl., Exh. 5 (driver training) and Exh. 7 (recruitment); and
4. Other generally applicable FXG corporate documents, such as "Dear Contractor" letters and memos, contractor newsletters, company forms, terminal photographs, and management training. (*Compare* RJN, Exh. H (Estrada TE's 2B and 3, RA1111-1179,

---

6 RJN, Exh. H, Estrada Trial Exhibit (TE) 1, Tab 2 [OA] at RA458, 462.

TE 7 – 10, 12, and 39-66) *with* Faris Decl., Exhs. 4 (management training, documents and DVDs), Exh. 5 (driver training), Exh.6 (corporate communications), and Exh. 10 (terminal photographs).

In the SD, the trial court was careful to note that because *Estrada* was a statewide class action, its analysis and conclusion that the class members were employees was based on common evidence, and not localized anecdotes" and observed that "the bulk of the evidence" relied upon "was provided by testimony from [FedEx Ground] management." (RJN, Exh. B [SD] at 4). 7 The trial court went on to find

> [T]he workings of the OA, which in effect gives almost absolute control over the SWAs (and even its own employees) is borne out by the testimony of FEG's management team. It should be noted in the beginning that the OA is a brilliantly drafted contract creating the constraints of an employment relationship with the SWAs in the guise of an independent contractor model."

*Id.* at 5.

Throughout the trial, FXG claimed that the "total relationship" between FXG and the class members is encompassed in the OA. FXG witnesses were compelled to agree, however, that because the terms of the OA are stated in broad and general terms, FXG management employees must necessarily rely on sources outside the contract to implement its terms. (RJN, Exh. B at 5; Se Also RJN, Exh. I). The trial court found the most important (and troubling) of the "extra-contractual sources" were FedEx Ground's extensive and detailed written policies and procedures. (*Id.* at 6; see also RJN, Exh. H, RA525– 1061 [Estrada TE 2A, Tabs 1 and 2 [policy manuals]). Examples included rules mandating minimum service hours, wearing of uniforms, daily observation of the drivers' appearance and the appearance of their trucks, mandatory meetings with and evaluations by management, and FXG changing of drivers' work areas. RJN, Exh. B at 6-7. These policy-based examples of control are rooted in the broadly worded OA,

---

[7] The trial court expressly did *not* admit any anecdotal evidence, and did not rely on the driver testimony *except* to the extent it showed "FedEx's power to interpret the Operating Agreement" evidence the trial court and the Court of Appeal concluded "was relevant to the class as a whole, not just the drivers who happened to be the subject of the anecdote." *Estrada*, 64 Cal. Rptr. 3d. at 338.

which the trial court found vests in FXG management the right to control all aspects of the driver's work through its unilateral right to interpret and apply the OA to meet its business goals.

The trial court specifically rejected FXG's effort to show that testimony and documents demonstrating instances of "actual" control offered during the trial to prove the existence of FXG's retained right to control were nothing more than anecdotes regarding the acts of "rogue" managers. On this point, the trial court stated:

> There is no necessity for the court to determine if each alleged event was the purposeful design of [FXG] or the act of a "rogue" terminal manager. What is important is that by reason of the interpretive power of [FXG], such actions can and do flourish with the tacit approval of higher management based upon the uncertainty of the standards which FEB determines to be applicable or non applicable, depending on the situation. . . .
>
> The lack of objective, precisely defined guidelines either reflects a totally disorganized business, which [FXG] is certainly not, or a highly motivated, well organized entity, which it is, that utilizes control and order in order to meet its successful economic goals. Thus, FXG unilaterally ordered its SWAs to work the Friday after Thanksgiving, which it had never done before, in order to be competitive with other package delivery services.

RJN, Exh. B at 10-11.

The trial court did <u>not</u> find that the OA was ambiguous, as FXG may claim. Rather, the Court found that FXG drafted the OA in broad, general terms, described by the court as "platitudes and guidelines," and that FXG's retained right to control is demonstrated by the fact that it necessarily relies on extra-contractual sources to implement is terms.

More specifically, the SD noted that the OA requires, *inter alia*, the signatory drivers to "provide a standard of service that is fully competitive with that offered by other national participants in the industry" (FXG/ FHD OA, §1.10), to "conduct activities under the terms of [the OA] to achieve the results represented to shippers and consignees" by FXG/FHD, (*id).*, to "*cooperate* with FXG/ FHD employees, customers and other contractors" to perform their work efficiently, *id.* at §1.10(d) and to "foster the professional image and good reputation of FXG/ FHD", *id.* at §1.10(e). RJN, Exh. B at 8.

The trial court expressly found that these general terms are implemented through FXG's more detailed corporate policies and procedures which are "laden with detailed descriptions of control" FXG management has the right to exercise over its "contractors." RJN, Exh. B at 8. The trial court further found that FXG provides to its management "broad leeway for interpretation" of the OA and, in so doing, creates "a tightly controlled hierarchical employment model." *Id*. at 9.

The trial court rejected the significance of factors that FXG claimed demonstrated that the drivers were independent contractors. For example, although drivers provide their own trucks, the court found FXG is "involved deeply" in the process of leasing the trucks and providing the scanner, uniform and other items needed, as well as loans, all of which "place a great deal of control in the hands of [FXG]." RJN, Exh. B at 17. The system is similar to "a company store," the court concluded. (*Ibid.*)

Similarly, although the OA states that the drivers have a propriety interest in their routes and can hire their own employees to drive their routes, the trial court found FXG "has control over who can purchase a route from or be hired as an employee by a driver" and "has its own standards before approving a sale of a route or the hiring by an SWA of a driver." RJN, Exh. B at 14. No driver can obtain an additional route without FXG's consent, nor can a new route be created without company approval. *Ibid.*

The trial court concluded: "[W]hile on its surface the description of the SWA appears to be that of an independent contractor, the pervasive control by [FXG] creates an employment relationship." RJN, Exh. B at 15. Affirming, the Court of Appeal characterized the essence of the trial court's decision about the force and effect of the OA: "[I]f it looks like a duck, walks like a duck, swims like a duck, and quacks like a duck, it is a duck." *Estrada*, 64 Cal. Rptr. at 9.

## ARGUMENT

### I. THE *ESTRADA* DECISION IS ENTITLED TO THE SAME FULL FAITH AND CREDIT HERE AS IT WOULD BE GIVEN IN A CALIFORNIA COURT

The Full Faith and Credit Clause, U.S.Const. art. IV, § 1, requires that "Full Faith and Credit shall be given in each State to the . . . Judicial Proceedings of every other State." This provision establishes "the salutary principle of the common law that litigation once pursued to judgment shall be as conclusive of the rights of the parties in every other court as in that where the judgment was rendered." *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439, (1943). Implementing this provision, Congress enacted 28 U.S.C. § 1738, which provides that judicial proceedings, properly authenticated, "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."

As noted above, the collateral estoppel aspect of res judicata is included within the operation of the Full Faith and Credit Clause. *United States v. Silliman*, 167 F.2d 607, 621 (3d Cir.), *cert. denied* 335 U.S. 825 (1948); *Braselton v. Clearfield State Bank*, 606 F.2d 285, 287 (10th Cir. 1979). State courts are therefore required "to give to a judgment *at least* the res judicata effect which the judgment would be accorded in the State which rendered it." *Durfee v. Duke*, 375 U.S. 106, 109 (1963); *Migra v. Warren City Sch. Dist. Bd. of Ed,* 465 U.S. 75, 81 (1984). The same rule applies to federal courts sitting in diversity, as here. *Reinke v. Boden,* 45 F.3d 166, 169 (7th Cir. 1995). The Court must therefore look to the preclusive effect California courts would give the judgment in *Estrada.*

### II. CALIFORNIA'S COLLATERAL ESTOPPEL PRINCIPLES PRECLUDE RE-LITIGATION OF ISSUES THAT HAVE BEEN ACTUALLY LITIGATED AND NECESSARILY DECIDED ON THE MERITS IN PRIOR PROCEEDINGS

Four threshold requirements must be met for a party to be precluded from re-litigating issues argued and decided in a prior proceeding under the collateral estoppel doctrine. The issue in the two proceedings must be *identical.* Additionally, the issue must have been *actually litigated,* and *necessarily* and *finally decided,* on the *merits* in the earlier case. *Lucido v. Superior*

*Court*, 795 P.2d 1223, 1225 (Cal. 1990) *citing People v. Sims*, 651 P.2d 321, 331 (Cal. 1982); *see also Arizona v. California*, 530 U.S. 392, 414 (2000) (collateral estoppel, also known as issue preclusion, "attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'"), *quoting* Restatement (Second) of Judgments § 27, at 250 (1982).

Beyond the threshold requirements, the Court must also determine whether application of the collateral estoppels bar would be fair to the parties and constitute sound judicial policy, taking into account the integrity of the judicial system, promotion of judicial economy and protection of litigants from harassment by vexatious litigation. *Lucido*, 795 P.2d at 1226-27.

The doctrine of collateral estoppel precludes "a party to prior litigation from re-disputing *issues* decided again him, even when those issues bear on different claims raised in a later case." *Vandenberg v. Superior Court*, 982 P.2d 229, 237 (Cal. 1999). Moreover, the estoppel need not be mutual; the California courts apply the doctrine of non-mutual, offensive collateral estoppel adopted by the United States Supreme Court *Parklane Hosiery Company, Inc. v. Shore*, 439 U.S. 322, 332-33 (1979). Thus, "it is not necessary that the earlier and later proceedings involve identical parties or their privies. Only the party *against* whom the doctrine is invoked may be bound by the prior proceeding." *Roos v. Red*, 30 Cal. Rptr. 3d 446, 452 (Cal. Ct. App. 2005). Like res judicata, "collateral estoppel has the dual purpose of protecting litigants from the burden of re-litigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Company, Inc.*, 439 U.S. at 326 *quoted in Smith v. Exxon Mobile Oil Corp.*,64 Cal. Rptr. 3d 69, 73 (Cal. Ct. App. 2007).

The propriety of barring a party, like FXG, who has litigated and lost the issue of whether a hired party is an employee or independent contractor under the common law "right to control" test from re-litigating the same question in a later case under a different statute was

answered in the affirmative in *Kreinik v. Showbran,* 400 F.Supp. 2d 554 (S.D.N.Y. 2005). *Kreinick* was an action to recover employee benefits under ERISA. The plaintiff claimed he had been wrongfully classified as an independent contractor. However, he had been adjudicated to be an independent contractor under the common law "right to control" test in an earlier action brought under the New York Labor Code. In the later ERISA case, the court gave preclusive effect to the earlier finding regarding the Plaintiff's employment status where the facts were the same, and New York and ERISA both use the common-law test "right to control" test to determine whether a worker is an employee. *Kreinik,* 400 F. Supp.2d at 563-65.

While the converse situation is presented here, the policy justifications for applying the preclusion doctrine to bar FXG from re-litigating the drivers' employee status is far greater. The key issue presented in these MDL cases has been conclusively resolved *against FXG* in previous class action litigation in *Estrada*. This case involves the status of thousands of workers, across the country and not just one. Indeed, this MDL proceeding was initiated by FXG on the ground that the common issue of employment status had to be adjudicated in a single forum to conserve judicial resources and protect against the risk of inconsistent adjudications. These are the salutatory purposes served by the collateral estoppel doctrine which compel their application here. *Parklane Hosiery Co.,* 439 U.S. at 326.

Having litigated and lost, FXG should not be allowed to impose on its nationwide complement of drivers who are members of the certified class herein, and the judiciary, the burden and expense of re-litigating the very same issue, under the very same legal standards, based on the same evidentiary facts, in potentially dozens of federal courts from coast to coast until FXG is satisfied with the result. Neither California nor the federal preclusion doctrines allow such misuse of scarce judicial resources. No litigation is perfect. It is settled, however, that an adverse litigation result "obviously cannot outweigh the interest in having an end to litigation." *Carroll v. Puritan Leasing Co.,* 143 Cal. Rptr. 772, 779 (Cal. Ct. App. 1978). "The

policy of repose, which is the basis of preclusion would certainly be frustrated" were any other result to obtain here.[8]

**A. Whether FXG Has Reserved to Itself the Right to Control the Manner and Means used by Drivers to Perform their Work Was Fully Litigated and Finally Decided *Against* FXG in *Estrada***

For issue preclusion to apply, the issue raised in this case must be identical to that previously ruled upon. *Lucido v. Superior Court*, 795 P.2d at 1225. The "identical issue" requirement addresses whether "identical factual allegations are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." *Id.* It is well established that materials extrinsic to the judgment roll, such as the memorandum opinion of the trial court or a declaration of counsel, may be used to establish the nature of the issues presented and decided in a former adjudication. (*Carroll,* 143 Cal. Rptr. at 780; *Crain v. Crain* 9 Cal. Rptr. 850, 854-55 (Cal. App. 1960); *Tevis v. Beigel* , 319 P.2d 98, 102 (Cal. App. 1957); *see generally* 7 Witkin, *California Procedure* at 922-23 (4th Ed. 1997).

The identity of issues requirement is handily met here. As demonstrated in the SD – and Plaintiffs' evidentiary record -- the threshold issue tried and resolved in *Estrada* was whether FXG's pickup and delivery drivers are employees, or independent contractors, under the common law "right to control test. So, too, has this court previously recognized, the overarching issue in these MDL cases is whether the drivers are employees, or independent contractors, under the common law "right to control" test. (See Doc. Nos. 906 and 1119).

The legal standards for determining employment status applied by the *Estrada* Court are identical to those that apply to the certified California claims in the *Alexander* case, as well as those applicable to the certified nationwide ERISA claim, and the nineteen other certified statewide classes. Under California law "the essence of the [common law agency] test is the 'control of detail' – that is, whether the principal has the *right* to control the manner and means

8 Indeed, while FXG seeks another bite at the apple to achieve the opposite result, the California courts have long held that collateral estoppel may apply even where the issue was wrongly decided in the first action, explaining that "[a]n erroneous judgment is as conclusive as a correct one." *Roos*, 30 Cal. Rptr. 3d at 458 *citing Martin v. Martin,* 470 P.2d 662, 670 (Cal. 1970) and *Panos v. Great Western Packing Co.*, 134 P.2d 242, 244 (Cal. 1943).

by which the worker accomplishes the work." *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 350-351 (1989); *accord Estrada* 64 Cal. Rptr. 4th at 335. The class members' employment status in the certified MDL cases will also turn on whether FXG has retained the right to control the manner and means of the drivers' work performance, regardless of whether that right is exercised. While secondary factors considered by courts in the various jurisdictions vary to some degree, this court has correctly recognized that the predominant and controlling inquiry in each jurisdiction is the "right to control." [9] Thus, in the March 25, 2008 class certification order, this court rejected FXG's argument that it could demonstrate the drivers are employees, despite having retained the right to control the drivers'

[9] **See Doc. No. 906** (certifying claims asserted in Kansas case under ERISA and Kansas law, citing to, *inter alia, Nationwide Mt. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (employment status under ERISA turns on "'the hiring party's right to control the manner and means by which the product is accomplished'"); *Restatement (Second) of Agency, § 220(1) (1958)* ("servant [or employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or *right to control*"); *Wallis v. Secretary of Kansas Dept. of Human Resources*, 689 P.2d 787, 792 (Kan. 1984) (Kansas: "right to control" is determinative)) **and Doc. No. 1119 citing, *inter alia*:** *Bargery v. Obion Grain Co.*, 785 S.W.2d 118, 120 (Tenn. 1990) (Tennessee); *Draper v. Conagra Foods, Inc.*, 212 S.W. 3d 61, 67 (Ark. Ct. App. 2005) (Arkansas: "right to control" test determinative; RS (Second) Agency, §220(2) factors are "tool to weigh the evidence" bearing on the right to control); *Kentucky Unempl. Ins. Comm'n v. Landmark Cmty. Newspapers of Ky. Inc.*, 91 S.W.3d 575, 580 (Ky. 2002) (Kentucky: factors listed in Restatement (Second) of Agency §220 determine employment status); *Durbin v Culberson Cty.*, 132 S.W. 3d 650, 658 (Tex. App. 2004) (Texas: fundamental factor is right to control; the exercise of control is of evidentiary value); *Madison Newspapers, Inc. v. Wisconsin Dept. of Revenue*, 599 N.W. 2d 51, 60 (Wis. Ct. App. 1999) (Wisconsin: "right to control details of work" is dominant test); *Turnipseed v. McCafferty*, 521 So., 2d 31, 32, (Ala. Civ. App. 1987)(Alabama: "reserved right to control" rather than actual control, establishes employee status); *Bynog v. Cipriani Group Inc.*, 802 N.E.2d 1090, 1092-3 (B.Y. 2003) (New York: "right to control" is critical inquiry); *Lowe v. Zarghami*, 731 A.2d 14, 20 (1999) (New Jersey: "right to control" whether exercised or not is determinative, following RS (Second) Agency, §220(2)); *Baltimore Harbor Charters, Ltd. V. Ayd*, 780 A.2d 303 (Md. 2001) (Maryland: whether employer "could have" exercised control over worker determines employee status); *Boily v. Comm'er of Econ. Sec.*, 544 N.W. 2d 295, 296 (Minn. 1996) (Minnesota: "right to control" carries greatest weight in determining employee status under Minnesota law); *Urbano v. STAT Courier, Inc.*, 878 A.2d 58, 61 (Pa. Super. Ct. 2005) (Pennsylvania: "right to control" is paramount); *Hunter v. R.G. Watkins & Son, Inc.*, 265 A.2d 15, 17 (N.H. 1970) (New Hampshire: "right to control" is primary test; employee status can also be proven by reference to other Restatement factors); *Nelson v. Yellow Cab Co.*, 538 S.E.2d 276 (S.C. Ct. App. 2000) (South Carolina: "right to control", whether used or not, determinative of employee status); *Perri v. Certified Languages Int'l, LCC*, 66 P.3d 531, 535-36 (Or. App. 2003) and *Lockhard v. Murphy Co.*, 619 P.2d 283, 84 (Or. Ct. App. 1980) (Oregon: critical inquiry is whether "right to control" exists, whether exercised or not); *Moberly v. Day*, 757 N.E.2d 1007, 1009-10 (Ind. 2001) (Indiana: applies RS (Second) of Agency test, with "right to control" being most important factor); *Burless v. West Va. University Hosps. Inc.*, 601 S.E.2d 85, 91 (W. Va. 2004) (West Virginia: "power to control" is determinative of employee status); *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 (Fla. 1997) and *Nazworth v. Swire Florida, Inc.*, 486 So. 2d 687, 638 (Fla. Dist. App. 1986) ("right to control" whether or not exercised determines employee status); *Estate of Perry v. Green Card, Inc.*, 2006 WL 3479056 at *4 (R.I. Super. Dec. 1, 2006) ("right of control," not its exercise, that matters; RS (Second) of Agency, §220 factors are relevant to analysis).

work performance, if it can show that other of the secondary factors might favor a finding of independent contactor status. *See* Doc. No. 1119 at 97 ("The court parts ways with FedEx Ground's reading of the law at the point FedEx Ground implicitly concludes that one with right to control the manner and means of the task's execution can shed its employer status . . . if it can marshal enough of the factors from the Restatement (Second) of Agency, §220).

The undisputed record shows that here, as in *Estrada*, the MDL class members perform service for FXG pursuant to the same contract on terms that are identical in all essential respects, to those at issue in *Estrada.* The OA has not been revised in any material way since 1994. (SUF 21-23)[10]. The FedEx Home Delivery OA, drafted in 2000 when FHD opened its doors, was modeled precisely on the FXG OA. FXG admits, and this court has previously found, that the terms of the agreements are virtually identical. (SUF 22).

Any doubt about the identity of issues is resolved by review of the system-wide policies and procedures as evidenced in these certified MDL cases are substantially the same to those at issue in *Estrada*. Now, as before, the policies fill out with specifics the general terms of the OA pertaining to (1) the drivers' personal appearance, (SUF 107-11) (2) the size, type, markings and appearance of their vehicles (SUF 112-124), (3) FXG procedures for recruiting and training drivers in FXG delivery and customer service methods, evaluating their work performance and imposing discipline, (SUF 60-106, 146-180, and 222); (4) FXG procedures for approving the use of additional vehicles, drivers and helpers, and routes, (SUF 182- 189 and 193-197) (5) FXG's procedures for shifting packages between drivers on a day to day basis (flexing) and reconfiguring driver routes permanently to balance the workloads between them, (SUF 135-141 and 190-192), (6) FXG's procedures that determine the drivers' days and hours of work, (SUF

---

[10] Appendix A: Plaintiffs' Omnibus Statement of Undisputed Material Facts In Support of Plaintiffs' Motions for Summary Adjudication (SUF). The SUF references here identity the policies and procedures at issyue in the Estrada cases, produced in support of the instant motions as Exhibits A through I to Plaintiffs' RFN, as well as the record evidence adduced in the MDL actions, produced here as Exhibits 1 through 12 to the Faris Declaration.

case 3:05-md-00527-RLM -CAN document 1194 filed 04/25/08 page 19 of 30

129-145), (7) FXG's compensation programs, (SUF 217) and (7) and FXG procedures for terminating driver contracts. (See SUF 218-221). [11]

In sum, FXG cannot legitimately dispute that the identical threshold issue here that is determinative of the driver's employment status in the certified MDL cases was litigated and resolved against it in *Estrada.*

**B. FXG's Anticipated Argument that The Certified MDL Cases Pose a Different Issue than Estrada Should Be Rejected**

FedEx will likely argue that "identical" issue was not litigated in *Estrada* because its corporate policies were revised in 2006 after the SD issued in *Estrada* to "clarify" that FXG contracts with its drivers for "results only" leaving the manner and means of performance to the drivers' discretion. It will also likely point out that the class composition in *Estrada* was limited to single-work area drivers, whereas the classes certified in the certified MDL cases include both single and multiple-work area drivers, and that the two cases pertain to different time periods and geographic locations. FXG is wrong on all counts.

**1. The Right to Control Retained by FXG in OA and its Implementing Policies and Procedures Has Remained Constant**

FXG's anticipated "changed circumstance" defense to application of the collateral estoppel is belied by its concession that the terms of the OA have not changed since 1994. (See RFN, Exh. J at 2, fn. 1). FXG has held fast to the position that the OA completely defines the relationship between itself and the drivers. Thus, whatever rights FXG has reserved to itself in the OA are the same today as they were in *Estrada*. Moreover, as this court has recognized, this is true regardless of whether the signatory class members are current or former drivers, whether they performed service for FXG or FHD, and/or whether they have serviced a single, or multiple routes. Doc. No. 1119 at 47-48; *See also D*iscussion at Section II(B)(3), *infra*.

---

[11] SUF at 65; Expert Report of Robert W. Wood at 5, 20-27 and Exhibits D and E (analyzing FXG policies) and 25-27 (opining that current policies, compared with those he analyzed in preparing for his testimony in *Estrada* have been changed only cosmetically ). In any event, whether FXG did or did not materially alter the substance of its policies is not relevant here, as the terms of the OA have remained unchanged, as has FXG's unilateral right to promulgate policies and procedures to implement the OA's broadly stated terms.

case 3:05-md-00527-RLM -CAN document 1194 filed 04/25/08 page 20 of 30

Nor do the cosmetic changes made by FXG to its operating policies and procedures in 2006 preclude application of the collateral estoppel bar here. Under California law, a prior judgment will only be denied preclusive effect in subsequent litigation of the same or similar legal issue where "the facts have materially changed or new facts have occurred so as to alter the legal rights or relations of the litigants." *Evans v. Celotex Corp.*, 238 Cal. Rptr. 259, 262 (Cal. App. 1987) *quoting Hurd v. Albert*, 3 P.2d 545, 549 (Cal. 1931). Different facts that merely go to the *weight* of the evidence, but which do not "establish a previously undiscovered theory of liability" or "denote a change in the parties' legal rights" will not bar application of collateral estoppel as a litigation bar. *Id.*

The principle is illustrated in *Evans. Evans* was a wrongful death action brought by the heirs of a decedent who had previously lost a personal injury case against the same defendant relating to the same injuries that led to his death. The heirs argued that the prior judgment that asbestosis was the cause of death should not preclude a new inquiry into causation because the autopsy results provided new evidence unavailable in the first case to prove causation. The heirs did not demonstrate how the new evidence "differed, if at all, from the evidence adduced at the personal injury trial." *Evans*, 238 Cal. Rptr. at 262. The court rejected the argument, explaining: "An exception to the collateral estoppel doctrine cannot be grounded on the alleged discovery of more persuasive evidence. Otherwise, there would be no end to litigation." *Id*; *accord Roos,*30 Cal. Rptr. at 459 (the existence of "new evidence" does not normally bar the application of collateral estoppel); *cf. Smith*, 64 Cal. Rptr.3d at 1419 (reversing wrongful death judgment entered based on liability finding made in prior personal injury judgment under collateral estoppel doctrine; *Celotex* distinguished because record showed that Defendant, through no fault of its own, was unable to present expert witness testimony crucial to its defense which could have changed the outcome).

The federal courts, too, have consistently held that a plea of collateral estoppel will only be vitiated where a continuing course of conduct is at issue, as here, if the alleged changed circumstances relate to "controlling facts of legal significance." *See, e.g. Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 845-46 (3d Cir. 1974); *Pignons S.A. de Mecanique v. Polaroid Corp.*,701 F.2d 1 (1st Cir. 1983) (Breyer, J.). In *Scooper Dooper, Inc.*, the Third Circuit cogently explained the limits of the "changed circumstances" exception:

> Carried to its extreme, the concept of changed factual circumstances could totally undermine the application of collateral estoppel. Rare would be the case in which counsel could not conjure up some factual element that had changed between adjudications. Analysis of *Commissioner of Internal Revenue v. Sunnen*, [333 U.S. 591 (1948)], indicates the manner in which the doctrine of changed circumstances may be recognized without undercutting the doctrine of collateral estoppel. In finding changed circumstances, the Court declared in *Sunnen* that collateral estoppel would be confined to cases where the issue raised in the second suit is '… identical in all respect with the decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. . . . Where the situation is *vitally altered* between the time of the first judgment and the second, the prior determination is not conclusive. [citations omitted]. ***Thus, where changed circumstances are not material and therefore do not amount to controlling facts, collateral estoppel remains applicable.*** *Cf. Bankers Mortgage Company v. United States*, 423 F.2d 73, 80-81 (5th Cir.) *cert. denied* 399 U.S. 927 (1970) (collateral estoppel applied because the changed circumstances did not constitute controlling facts).
>
> *Scooper Dooper*, 494 F.2d at 846 (*emphasis supplied*).

The court's analysis in *Pignons* is also instructive. *Pignons* involved successive false advertising actions brought against the Polaroid Corporation. In the first action, the court granted summary judgment against the Plaintiff. In the second case, the Plaintiff alleged the same legal claims against Polaroid based on a ongoing course of alleged wrongful conduct. Pignons argued collateral estoppels should not apply because the new claims were based on different advertisements run by Polaroid after the first complaint was filed. The district court granted summary judgment in favor of Polaroid, finding that the judgment in the first action was

entitled to collateral estoppel effect, and precluded Plaintiff from re-litigating whether the advertisements constituted false advertising. *Pignons*, 701 F.2d at 1-2.

In its appeal, Pignons argued that the collateral estoppel bar was wrongly applied because (1) the complaint concerned new advertisements and products, *and* (2) plaintiff has new theories, evidence and argument to offer. Both claims were rejected. The First Circuit agreed with the district court that collateral estoppel was appropriately applied to bar re-litigation Polaroid's continuing conduct because the new advertisements and products did not "differ in any significant respect from the old." *Pignons*, 701 F.2d at 2. The Circuit explained that the Plaintiff's intent to offer "new theories, evidence, and arguments" to avoid the collateral estoppel bar "is just the type of argument … that collateral estoppel bars Pignons from making." *Id*. Relying on a series of Seventh Circuit cases, the First Circuit continued:

> Pignons had a fair opportunity to make these arguments and introduce this evidence the first time. The law requires the courts to offer Pignons nothing more, for collateral estoppel implements "the principle that one opportunity to litigate an issue fully and fairly is enough." *Continental Can Co. v. Marshall,* 603 F.2d 590, 594 (7th Cir. 1979). Once a plaintiff has had a fair chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence. *See Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 469-70 (7th Cir. 1982)*; Continental Can. Co, supra,* and *James Talcott, Inc. v. Allahabad Bank, Ltd.,* 444 F.2d 451, 463 (7th Cir. 1971).

*Id*; *cf. Continental Can Co., USA v. Marshall,* 603 F.2d 590, 595 (7th Cir. 1979) (ruling that can manufacturer's operations at one set of plants violated federal law entitled to collateral estoppels effect to bar re-litigation of manufacturer's liability under same law based on its operation of different plants that used similar machinery and manufacturing methods in later case).

FXG cannot point to *any* new facts or changed circumstances that have materially altered the legal relationship between it and the drivers since *Estrada* was decided. The OA is the same. FXG continues to implement the broad terms of the standard OA with the more detailed, common corporate policies and procedures. While FXG "reengineered" the corporate policies, partially in response to the trial court's ruling in *Estrada* between March 2005 and January 2006,

FXG witnesses testified that the purpose of the "Document Reengineering Initiative" ("DRI") was to *clarify* the companies' documentation, and not to change the substance of the policies. (SUF 63-64). FXG provided *no training* to its field employees regarding the "reengineered" policies and procedures, and conducted no special rollout to introduce them to the field management. FXG admits that the DRI did not result in any significant changes to the substance of FXG's policies and procedures at all. (SUF 64).

FXG may also argue that the *Estrada* judgment is not entitled to collateral estoppel effect in California due to its unilateral elimination of the single-work area drivers (SWAs) in California beginning in October 2007, euphemistically referred to as "the California Transition." (SUF 219). This argument fares no better. FXG's decision to operate in California using only multiple work area drivers (MWAs), instead of a combination of SWAs and MWAs, does not alter the legal relationship between the remaining MWAs – who are all members of the certified California class – and FXG. As explained in Section II(B)(2) below, the *Estrada* judgment precludes re-litigation of whether the OA vests FXG with the right to control the manner and means used by the signatory drivers, whether they service single or multiple routes.

While the revised policies and the "California transition" may be new historical facts, nothing about them alters the legal relationship between the drivers and FXG. If anything, FXG's unilateral decision to revise the policies that affect the drivers and to unilaterally eliminate the California SWAs is further evidence of its right to control the business operation as a whole, a right that it exercises as it sees fit to meet its business goals. It was this very type of kind of unilateral conduct that led the *Estrada* court to conclude that leaving the right to interpret the OA to "the discretion of management, the relationship between the SWAs and FEG[12] ceases to be a partnership, metamorphosizing into a tightly controlled hierarchical employment model." (RJN, Exh. B at 9).

---

[12] In the SD, the trial court referred to the drivers as SWAs because the certified class included only single-work area drivers. Additionally, Judge Schwab referred to FedEx Ground as FEG, whereas the convention here has been to refer to Defendant as FXG.

In sum, FXG's anticipated argument that the *Estrada* judgment is not entitled to preclusive effect due to changed circumstances must be seen for what it really is: an attempt by FXG to "conjure up some factual element that ha[s] changed between adjudications," *Scooper Dooper, Inc.*, 494 F.2d at 846, to avoid a finding that the issue here is no different from the core issue litigated and resolved against it in *Estrada*.

**2. The Right to Control Retained in the FXG OA and its Implementing Policies Applies to Both Single and Multiple Work Area Drivers Who Are All Equally Subject to its Terms.**

FXG can also be expected to argue that the *Estrada* ruling is not entitled to preclusive effect in these MDL cases because the certified classes here include multiple-work area (MWA) drivers, while the *Estrada* class was limited to single-work area (SWA) drivers in California from 1995- 2005. This argument should be rejected.

During class certification, this court held that whether a driver has contracted to provide service as an SWA or an MWA, FXG's reserved rights to control their work performance are the same because they are all signatory to the same OA, and subject to the same common corporate policies, procedures and practices that implement the OA's terms. FXG argued unsuccessfully that the single and multiple work area drivers are differently situated for purposes of applying the common law "right to control" test. The court observed: "Any distinctions between [Tina Floyd, a former FHD single work area driver] and Ground or and multiple work area drivers are meaningless because each of the drivers signed nearly identical Operating Agreements." Doc. No. 1119 (March 25, 2008 Opinion and Order) at 47-48. Similarly, while the *Estrada* court did not adjudicate the employment of the California MWAs as a class, he did conclude that the single MWA whose claim was heard simultaneously with the SWA's class claims was subject to the same "strict controls" as the SWAs. (RJN, Exh. B at 17-18) The trial court's conclusion that Roberts was an independent contractor -- which FXG can be expected to ask this Court to follow – was based on an alternate ground, and not the "right to control." *Ibid.*

Thus, the *Estrada* court's finding that the OA "in effect gives almost absolute control" (RJN, Exh B, at 4) to FXG over the drivers should apply with equal force to the status of the multiple-work area drivers who are equally subject to its terms.

**3. *Estrada* and the Certified MDL Cases Address Overlapping Time Frames, and the Critical Evidence is National in Scope**

Any argument that *Estrada* related to a different time period, and was confined to California only, may also be summarily rejected. The certified MDL cases and *Estrada* relate to overlapping time periods. The *Estrada* class period covered the period from 1996 to 2005. The *Craig* case – which asserts the nationwide ERISA claim as well as a variety of statutory and common law claims under Kansas law – was originally filed in February 2003, a full year before *Estrada* went to trial, and the class period dates back six years to 1998; the limitations period applicable to the other cases starts in 2001. (Doc. No. 276 – Opinion and Order Denying FXG Motion to Dismiss). Further, while the *Estrada* judgment pertained only to California drivers, the finding of employment status was premised on evidence applicable nationwide: the common OA and FXG's common, nationwide corporate policies, procedures and practices. (See discussion, *infra*, at Section II(A).

***C.*** **FXG's Right to Control the Drivers Work Was Actually Litigated and Necessarily Decided on the Merits in *Estrada***

There can also be no serious dispute that the remaining threshold elements for applicable of the collateral estoppel doctrine are satisfied here. FXG cannot deny that the right to control vested in FXG by the OA was "actually litigated" in the *Estrada* case. The Phase I trial decided whether the class members were employees under *Borello's* "right to control" test. (Pls. RJN, Exh. B and *Estrada*, 64 Cal. Rptr. at 336. Central to FXG's defense was its claim that the relationship between the drivers and FXG is defined exclusively by the terms of the OA. (RJD, Exh. B at_). FXG *cannot* honestly claim that the focus of the litigation was elsewhere.

Nor can there be any legitimate dispute that the *Estrada* court found that FXG has retained the "right to control" the drivers' work performance in the OA in a final ruling on the

merits. FXG pursued every avenue of appeal available to it and lost. (RJN, Exhs. F and G). While two discrete issues have been remanded to the trial court, pertaining solely to damages and attorneys' fees, the employment status ruling is final. *Estrada*, 64 Cal. Rptr. at 338; *See McClain v. Rush*, 264 Cal. Rptr. 563, 567 (1989) (for purposes of collateral estoppel, "final judgment" includes any prior adjudication sufficiently firm to be accorded conclusive effect," citing Rest. 2d Judgment, §13).

Where collateral estoppel is sought to be applied "offensively," as here, "the courts consider whether the party against whom the earlier decision is asserted has a full and fair opportunity to litigate the issue. *Roos*, 30 Cal. Rptr. 3d at 452 and cases cited therein. To avoid the collateral estoppel bar here, FXG must show that it had no incentive to vigorously litigate the driver's employment status in *Estrada* because the MDL actions were not foreseeable, that the judgment in the prior action was inconsistent with a previous judgment in its favor, or that the certified MDL cases "afford[ ] procedural opportunities unavailable in the first action that could readily cause a different result." *Id.*, *citing Kremer v. Chemical Construction Co.*, 456 U.S. 461, 481 (1982); *Parklane Hosiery Co.*, 439 U.S. at 330, and *Securities Exchange Comm'n. v. Monarch Funding Co.*, 192 F.3d 295, 304 (2d Cir. 1999).

FXG cannot satisfy this standard. FXG had *more* than a full and fair opportunity to fully litigate every aspect of the drivers' employment status in *Estrada*. The complaint was filed in May 1999 and the remitter issued in December 2007. Litigation of the employment status issue consumed close to eight years. FXG had every reason to litigate the case vigorously, and did so. The *Estrada* plaintiffs sought damages and broad declaratory and injunctive relief which was the primary focuses of the Phase I trial. Indeed, the reason employment status issue was tried to the bench, rather than a jury, was because the equitable claims in the case predominated, as explained by the trial judge.[13]

---

[13] In fact, the trial court did award Plaintiffs declaratory and injunctive relief. (RJN, Exh. C). That aspect of the *Estrada* ruling was overturned on appeal on procedural grounds pertaining to an intervening change in California's standing requirements that was unrelated to the merits.

Before *Estrada* went to trial, FXG had already been served with class action lawsuits in at least three states.[14] During the same time frame, the State of Montana was prosecuting FXG for misclassifying its pickup and delivery drivers under Montana law. (RJN, Exh. M). Previous to that, in 1998 the National Labor Relations Board issued a precedential decision finding that drivers who performed service for RPS under the terms of the 1994 OA were employees. *Roadway Package System, Inc.* 326 NLRB 842 (1998). It was fully on notice that a class action judgment and injunction in Plaintiffs' favor, potentially requiring reclassification of its entire California workforce, would have a ripple effect across the country, as in fact happened. Thus, while the *Estrada* plaintiffs sought relief for California drivers, FXG's national business model was already under siege. FXG pursued a scorched earth litigation strategy for eight years to avoid a finding in Plaintiffs' favor.

Last, there are no procedural advantages available to FXG in these MDL cases that were not available to it in *Estrada.* FXG may complain that *Estrada* was a court trial, while it has the right to have a jury hear *some* of the claims pending here. Even if this were true, in *Parklane Hosiery Co.*, 439 U.S. at 331-2 and 336-38, the Supreme Court squarely held that the unavailability of jury trial in the first action does not preclude application of offensive collateral estoppel in the second action, or violate the Seventh Amendment right to a jury trial. 439 U.S. at 336-38; *accord Roos*, 30 Cal. Rptr. 3d at 453. Moreover, the nationwide ERISA claim is equitable, and carries no right to a jury. The same is true with regard to numerous the equitable state claims as well.

---

[14] *Craig v. FedEx Ground,* Case No. 5:03-cv-04197, was initially filed in the state court and removed to United States District Court for the District of Kansas in 2003, and asserted class claims under ERISA, the FLSA and Kansas law which put FXG's independent contractor business model at issue. *Gregory v. FedEx Corp. et. al.*, Civil Action No. 2:03cv479, was also filed in 2003 in the United States District Court for the Eastern District of Virginia and asserted class claims premised on a challenge to FXG's independent contractor model. *Lester v. FedEx Express Corp., et. al.*, Case No. 04-10055 was filed in the U.S. District Court for the Eastern District of Michigan in March 2004 by the same attorney who represented the *Gregory* plaintiffs and also posed a challenge to FXG's independent contractor model.

### D. The Public Policies Underlying the Collateral Estoppel Litigation Bar Strongly Support Its Application to These MDL Cases

The California Courts have held that once minimum requirements for collateral estoppel are satisfied, the court must then examine whether application of collateral estoppel "will advance the public policies which underlie the doctrine." *Roos,* 30 Cal. Rptr. 3d at 458 and cases cited therein. "The purposes of the doctrine are to promote judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and to protect against vexatious litigation." *Ibid.* All of the public policy interests served by the collateral estoppel doctrine weigh heavily in favor of its application here.

First, application of collateral estoppel will plainly promote judicial economy, prevent potentially inconsistent judgments which would undermine the integrity of the judicial system, by reducing the burden on this Court (and potentially more than 20 District Courts) to re-litigate the exact issue tried before Judge Schwab, i.e. whether FXG reserves to itself the right to control its driver workforce under its non-negotiable OA, policies, procedures and practices. It is hard to imagine a more wasteful use of judicial resources than re-trying this case twenty or more times.

FXG can offer no legitimate reason why it should not be estopped from re-litigating its reservation of the rights to control it driver workforce after eight years of vigorous litigation, nine weeks of a bench trial, and full appellate review. FXG had a full and fair opportunity to litigate and there is simply no reason why the drivers should be required to litigate this issue yet again. To the contrary, no possible purpose would be served by requiring more FXG drivers to start from scratch to litigate over and over again an issue to which the California judiciary has already devoted such an extraordinary amount of resources. As Plaintiffs have shown, the evidence demonstrates that FXG had and took every opportunity to advocate for its business model and lost, despite years of expensive and hard-fought litigation in *Estrada*.

Having initiated this MDL proceeding on the basis that it should not be subjected to duplicative litigation, with the potential for inconsistent judgments, FXG cannot now be heard to complain it would be unfair to accord preclusive effect to the *Estrada* decision. Plaintiffs

strongly agree that the public interest will best be served by enforcing the California decision, reached after a full trial and appellate review, to ensure those Plaintiffs and the class members they represent who are all similarly situated to the California drivers obtain the full benefit of the judgment and are not forced to begin anew.

FXG cannot be allowed to have it both ways. Having elected to conduct its nationwide business operation in a uniform manner, to categorically define its relationship with its nationwide complement of pickup and delivery drivers under the terms of an identical contract, the twin public policies of judicial economy and integrity underlying the collateral estoppel doctrine would be harmed, not advanced, were FXG allowed to re-litigate the right to control issue that it litigated and lost.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order prohibiting FXG from re-litigating the question of whether it has reserved to itself the right to control the manner and means to be used by members of the certified classes in the certified MDL cases, and to give preclusive effect to the California *Estrada* judgment.

Dated: April 24, 2008

Respectfully Submitted,

LEONARD CARDER, LLP

/s/ **Lynn Rossman Faris**

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, California 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022

Tel: (612) 339-6900
Fax: (612) 339-0981

Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM (MDL 1700)

THIS DOCUMENT RELATES TO:

*Jon Leighter, et al. v. FedEx Ground Package System, Inc., et al.*
Civil No. 3:07-cv-00328-RLM-CAN (OR)

**_LEIGHTER_ (OREGON) PLAINTIFFS'**
**SUPPLEMENTAL STATEMENT IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

The *Leighter* Plaintiffs submit this supplemental statement pursuant to this Court's Order dated March 26, 2008 (Doc. No. 1121) requiring that all parties that have filed briefs for the fourth wave of class certification file a supplemental statement indicating how their position on class certification differs from the positions addressed in the Kansas Order (dated October 15, 2007; Doc. No. 906) and the Waves 1-3 Order (dated March 25, 2008; Doc. No. 1119).[1] As with the claims addressed by the Court in the Kansas Order, the issue of whether or not the *Leighter* Plaintiffs have been improperly classified as independent contractors is the central inquiry. Like Kansas, the outcome hinges on FXG's retention of the right to control the method and means of the work of the P&D drivers in Oregon.

This Court's March 25 Order significantly strengthens the *Leighter* Plaintiffs' argument that their proposed classes should be certified. In the March 25 Order, this Court addressed,

[1] The *Leighter* Plaintiffs' reply brief in support of their motion for class certification was filed *after* the Court issued the Kansas Order on October 15, 2007. Therefore, the *Leighter* Plaintiffs incorporated into their reply brief their position that there is no basis to distinguish the class-certification issues in their case from the issues decided by the Court in the Kansas Order. Here, Plaintiffs focus on why there is no basis to distinguish their motion for class certification from the 19 cases where this Court granted class certification in the March 25 Order.

among other things, a motion to certify a class P&D drivers seeking relief under Oregon law in *Edward Slayman, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:05-cv-00596-RLM-CAN (OR). This Court granted the *Slayman* Plaintiffs' motion, certifying a class of Oregon P&D drivers asserting claims under Oregon law for illegal deductions from wages (Or. Rev. Stat. § 652.610), rescission, and declaratory relief. March 25 Order at 162. As this Court noted, no matter what precise factors are applied under the Oregon wage statute or the common-law claims, Oregon law focuses on the employer's right to control the manner and means of the driver's work and does "not require individual, driver-by-driver analysis to determine whether the drivers are employees or independent contractors." *Id.* at 108-110 (citation omitted).

The *Leighter* action includes claims that overlap with the claims of the *Slayman* Plaintiffs and so the outcome of their motion for class certification should be no different than the outcome of the *Slayman* Plaintiffs' motion. Indeed, the *Leighter* Plaintiffs intend to seek consolidation of their case with the *Slayman* action on remand of their case to the District of Oregon. *See* Doc. 871 at n 1.

The only difference between the *Slayman* action and this action is that, in addition to seeking certification of their claims for violations Oregon's wage statutes, rescission, unjust enrichment, and declaratory relief, the *Leighter* Plaintiffs have asked this Court to certify two damages subclasses of drivers. First, the *Leighter* Plaintiffs have asked the Court to certify a subclass of drivers who have been eligible for overtime under Oregon law since August 10, 2005 when the Motor Carriers Act exemption for drivers of vehicles under 10,001 pounds was eliminated.[2] Second, the *Leighter* Plaintiffs seek certification of a subclass of drivers who have been terminated since July 20, 1999, and are entitled to 30 days of penalty wages because FXG improperly withheld amounts from their wages and failed to pay all earned overtime pay within one business day of these drivers' termination of employment with FXG. Both of these claims

[2] *See* the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005, PL 109-59, 119 Stat 1144 (Aug. 10, 2005), § 4142(a)(12).

arise under Oregon's statutory wage and hour laws. *See Leighter* Plaintiffs Memorandum of Law in Support of Motion for Class Certification at 9.

This Court determined in the March 25 Order that the central inquiry in the *Slayman* Plaintiffs' claim under Oregon's wage-deduction statute (ORS § 652.610) is whether they are "employees" within the meaning of that statute, which turns on whether FXG retained the right to control the drivers. Thus, this Court has already found that this common inquiry, which will not require any individualized, driver-by-driver analysis, will predominate in adjudicating closely related claims arising under the same statutory scheme. March 25 Order at 109-10. The central inquiry at issue in the Oregon overtime statute, and penalty wage statute under which the *Leighter* Plaintiffs are suing and for which they are seeking certification of two subclasses is no different. The question is whether the P&D drivers in these subclasses are employees rather than independent contractors. *See* ORS § 652.610 (stating that the illegal-deduction statute applies to "an employee"); ORS § 652.310(2) (holding that the definition of "employee" excludes "independent contractors"); *Perri v. Certified Languages Int'l, LLC*, 66 P.3d 531, 536 (Or. Ct. App. 2003) (application of Oregon wage statutes depends on status as an "employee"). As such, this Court should reject FXG's argument that individual issues will predominate in adjudicating the claims of the *Leighter* Plaintiffs.

Both the Kansas Order and the March 25 Order also provide the complete framework for rejecting FXG's argument that the *Leighter* Plaintiffs lack standing to assert claims for declaratory relief because they no longer work for FXG. This Court has determined that former employees may be adequate class representatives. *See* Kansas Order at 33; March 25 Order at 11-12. In any case, one of the plaintiffs here, Jon Leighter, was a current driver at the time he filed this lawsuit. FXG, therefore, cannot dispute that a live case or controversy between FXG and current drivers existed during the pendency of litigation between FXG and the Oregon drivers. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980) ("an action brought on

behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim").

The March 25 Order also dispenses with FXG's argument that the *Leighter* Plaintiffs cannot adequately represent what FXG describes in its opposition memorandum as a "diverse class." *See* March 25 Order at 48 (finding that any distinctions between the named Alabama Plaintiff and other Ground or MWA drivers are "meaningless because each of the drivers signed nearly identical Operating Agreements"); and 133 (finding that the differences between Ground and Home Delivery drivers and single and multiple work area drivers are not so significant to weigh against class certification). The same goes for FXG's argument that extrinsic, parol evidence will be required to prove the Leighter class members' employment status, or to interpret the OA. In the March 25 Order, this Court correctly determined that Plaintiffs are not arguing that the OA is ambiguous; rather, they are arguing that despite the independent-contractor label assigned by FXG, Plaintiffs are employees. March 25 Order at 15.

In their memorandum in support of their motion for class certification, the *Leighter* Plaintiffs requested certification under Rule 23(b)(3) for their damages claims and under Rule 23(b)(2) for their claim for injunctive relief. Because these Plaintiffs satisfy the requirements of both Rule 23(a) and 23(b)(3), their damages claims may be appropriately certified under Rule 23(b)(3) and their claim for injunctive relief may be certified under Rule 23(b)(2).[3]

[3] This Court concluded in certifying the 19 classes in the March 25 Order, that the claims at issue in those cases should be certified under Rule 23(b)(2) rather than Rule 23(b)(3). March 26 Order at 152-53. As Plaintiffs pointed out in their motion for clarification, this conclusion is inconsistent with the Court's ruling in the Kansas Order, which certified classes under Rule 23(b)(3). Doc. No. 1130. The Court has not yet ruled on Plaintiffs' motion for clarification.

Dated: April 25, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Steve D. Larson
David Rees
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 Southwest Oak Street
5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

Jordan M. Lewis
SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN 55401
Tel: (612) 337-6100
Fax: (612) 339-6591

Peter N. Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02098
Tel: (401) 831-7730
Fax: (401) 861-6064

**OREGON PLAINTIFFS' COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| *Michael Decesare, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00120-RLM-CAN (NV) | |
| *Margaret Gibson, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-CV-00272-RLM-CAN (AZ) | |
| *Troy Givens, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00324-RLM-CAN (LA) | |
| *Frank Gruhn, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00412-RLM-CAN (VT) | |
| *Jon Leighter, et al. v. FedEx Ground Package System, Inc., et al.* Civil No. 3:07-cv-00328-RLM-CAN (OR) | |
| *Thomas Magno, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-CV-00322-RLM-CAN (CT) | |
| *Genaro Vargas, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00325-RLM-CAN (MA) | |
| *Sharon Whiteside v. FedEx Ground Package System, Inc.,* Civil No. 3:07-cv-00326-RLM-CAN (NC) | |

*Ernest White v. FedEx Ground* )
*Package System, Inc.,* )
Civil No. 3:07-cv-00411-RLM-CAN (GA) )
---------------------------------------------------- )

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on April 25, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |

| | |
|---|---|
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@prle.com; jhunt@prle.com; syoung@prle.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** marshall@ee.net

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Matthew J. Merrick** mmerrick@omm.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Raquel A. Millman** rmillman@omm.com

**James Mulroy** jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Jeffrey S. Nestler** jnestler@omm.com

**Peter W. Overs Jr.** povers@hfesq.com

**Mary Donne Peters** mpeters@gorbypeters.com; rwright@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

| | |
|---|---|
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on April 28, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL  33178

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
 & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA  02108

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO  80538

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX  75703-3230

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO  80202

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN  55402

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY  10005

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA  18503

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI  53202-4108

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV  89102

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO  80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

case 3:05-md-00527-RLM -CAN document 1210 filed 04/25/08 page 8 of 8

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: April 25, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

case 3:05-md-00527-RLM -CAN document 1242 filed 04/25/08 page 1 of 7

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Jon Leighter, et al. v. FedEx Ground,* Civil No. 3:07-cv-00328-RLM-CAN (OR) | ) ) ) ) ) | CHIEF JUDGE MILLER |

**SUPPLEMENTAL STATEMENT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC. ON CLASS CERTIFICATION IN *LEIGHTER* (OR)**

Pursuant to the Court's March 26, 2008 Order, FedEx Ground provides the following statement of how its position on class certification in this case differs from the arguments addressed in the Court's March 25, 2008 Opinion and Order. In acknowledging the similarities between arguments the Court has rejected in "Waves 1-3" and those made in this case, FedEx Ground does not waive its arguments regarding class certification.

As an initial matter, FedEx Ground's counsel offers its sincere apologies for the issues the Court noted in the March 25 Order with regard to the use and citation of case authorities. We have reexamined each of the arguments and cases in the *Leighter* opposition brief, including those that pertain to issues similar to the ones already decided in plaintiffs' favor in the prior class certification orders, as noted in this statement. We note in footnotes 1 and 3, below, corrections to our prior filing, in the context of the applicable argument.

**I. ADEQUACY** (Mem. Law & Suppl. Statement in Opp'n to Mot. for Class Cert. [Nov. 16, 2007] [Doc. No. 998] ["*Leighter* Opp'n"], at 18-20 & 23-28). The Court rejected similar arguments in its March 25 Order.

## II. COMMONALITY/PREDOMINANCE.

***Wage Deductions, Overtime And Non-Payment Of Wages Upon Contract Termination*** (*Leighter* Opp'n at 17-18). The Court rejected similar arguments in its Order.[1]

***Rescission/Unjust Enrichment***. In *Slayman*, plaintiffs argued that their claims were governed by Oregon's common-law "right to control" test, and FedEx Ground argued that the "right to control" test requires an individualized analysis not suitable for class adjudication.[2] The Court disagreed and granted class certification. (March 25 Order, at 108-110.) FedEx Ground's commonality/predominance arguments in this case concerning the "right to control" test (*see Leighter* Opp'n at 4-15) are similar to the arguments rejected in the March 25 Order.[3]

In contrast to *Slayman*, the *Leighter* plaintiffs argue that a statutory test governs the independent contractor vs. employee component of their rescission/unjust enrichment claim:

> Plaintiffs allege that the FXG contract misclassifies all drivers as independent contractors as an illegal attempt to shift expenses to the drivers and circumvent Oregon law requiring employers to provide workers' compensation insurance and unemployment insurance, and withhold income tax for all subject employees. An employer must abide by these statutory obligations for all workers, ***unless the workers are (a) 'free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results'; and (b) 'customarily engaged in an independently established business.'*** ORS § 670.600(2).[4]

---

[1] FedEx Ground withdraws its reliance on *Chard v. Beauty-N-Beast Salon*, 941 P.2d 611, 628-29 (Or. Ct. App. 1997) (*Leighter* Opp'n at 17), for the proposition that the case applied the "economic realities" test.

[2] *See* Mem. Law in Supp. Mot. for Class Cert. (Mar. 12, 2007) (Doc. No. 557-2) ("*Slayman* Br."), at 6-11; Mem. Law in Opp'n to Mot. for Class Cert. (Apr. 27, 2007) (Doc. No. 625) ("*Slayman* Opp'n"), at 19-22.

[3] FedEx Ground withdraws its reliance on the following cases for the purposes identified: *Cantua v. Creager*, 7 P.3d 693, 701 (Or. Ct. App. 2000) (*Leighter* Opp'n at 8) (for the implication that the court held that a worker's ability to set her own hours is "necessarily incompatible" with a purported employer's right to control); *Presley v. Bureau of Labor & Indus.*, 112 P.3d 485, 487 (Or. Ct. App. 2005) (*Leighter* Opp'n at 8) (for implying that a general rule of contract interpretation, rather than the "economic realities" test, was the basis for the court's consideration of actually-exercised control); *Stallworth v. Sam Yoder Trucking, Inc.*, 819 P.2d 316, 320 (Or. Ct. App. 1991) (*Leighter* Opp'n at 10) (for the suggestion that the case applied Oregon law, when it applied Illinois law); *Lockard v. Murphy Co.*, 619 P.2d 283, 287 (Or. Ct. App. 1980) (*Leighter* Opp'n at 13) (for implying that the court's use of "override" was in the context of the "right to control" analysis).

[4] Mem. Law in Supp. Mot. for Class Cert. (Oct. 1, 2007) (Doc. No. 871-2) ("*Leighter* Br."), at 9-10 (citations omitted; emphasis added).

Both parties have here argued that ORS § 670.600 applies to workers' compensation claims. In preparing this brief, counsel became aware of *S-W Floor Cover Shop v. Nat'l Council on Comp. Ins.*, 318 Or. 614, 872 P.2d 1, 10 (1994) (a case not previously cited by the parties), where, notwithstanding the statutory text, the court held that status for workers' compensation purposes is governed in the first instance by the judicially-created "right to control" test codified at then ORS § 656.005(28), and that ORS § 670.600 is not triggered. The Court has already rejected similar commonality/predominance arguments with respect to the "right to control" test.

As to unemployment insurance and income tax withholdings, which are governed by ORS § 670.600, the prong mandating that a worker be "customarily engaged in an independently established business" requires FedEx Ground to prove three of five factors listed in the statute--i.e., whether the worker: (a) "maintains a business location" that is "separate from the business or work location of the person for whom the services are provided" or is "in a portion of the person's residence and that portion is used primarily for the business"; (b) "bears the risk of loss related to the business or the provision of services"; (c) "provides contracted services for two or more different persons within a 12-month period," or "routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services"; (d) "makes a significant investment in the business"; and (e) "has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons." ORS §§ 670.600(3)(a)-(e). FedEx Ground previously argued that this prong requires individualized analysis (*Leighter* Opp'n at 15-17), and plaintiffs disagreed.[5]

ORS § 670.600 is quite similar to the South Dakota test. The first part of that test is "whether the worker is free, both under any contract and in fact, from control or direction over

5 Reply Mem. Law in Supp. Mot. for Class Cert. (Dec. 16, 2007) (Doc. No. 1054) ("*Leighter* Reply"), at 12-14.

how the services are performed," and the second part is whether the worker is "customarily engaged in an independently established trade, occupation, profession or business." (March 25 Order at 112, 113.) The Court has ruled that the second part of the test "requires driver-by-driver examination," explaining that South Dakota courts consider, *inter alia*, "whether the workers held themselves out to the public as engaged in an independent business, whether they advertised their [] services, whether they had any separate clientele, and whether they had business premises or business cards," and "whether the worker sought unemployment benefits upon termination and whether the worker had a proprietary interest in his equipment." (*Id.* at 113 [citing *In re Hendrickson's Health Care Serv.*, 462 N.W.2d 655, 659 (S.D. 1990); *Egemo v. Flores*, 470 N.W.2d 817, 823 (S.D. 1991)].) The Court concluded: "FedEx Ground must be allowed to present evidence of which drivers purchased their own equipment, drove their own equipment before (or after) signing the Operating Agreement, were incorporated, and so on." (*Id*. at 114.)

Many of the factors that predominantly require "driver-by-driver examination" in South Dakota are substantially similar to the factors listed in the "independently established business" prong of ORS § 670.600. *See* ORS §§ 670.600(3)(a) (worker maintains a "business location"); (3)(c) (worker "provides contracted services for two or more different persons within a 12-month period," or "routinely engages in business advertising, solicitation or other marketing efforts"); and § (3)(d) (worker "makes a significant investment in the business").[6]

It is not clear whether the Court intended to rule in *Slayman* on class certification where the independent contractor vs. employee inquiry is governed by the Oregon statutory test. The Court did not cite ORS § 670.600, presumably because the parties' briefs focused on the

---

[6] The current version of ORS § 670.600 became effective on January 1, 2006. FedEx Ground's research has not disclosed, and plaintiffs do not cite, any reported decisions applying the current version of ORS § 670.600. (*See Leighter* Br. at 9-10; *Leighter* Reply at 12-14.)

common-law "right to control" test and did not address ORS § 670.600 in any meaningful way.[7] Three things, however, are now clear: (1) the *Leighter* plaintiffs seek certification on the basis of ORS § 670.600; (2) the parties have fully briefed ORS § 670.600 in *Leighter*; and (3) based on the Court's analysis of South Dakota law, the *Leighter* motion should be denied to the extent it is based on a failure to provide unemployment insurance and make income tax withholdings.

***Declaratory And Injunctive Relief*** (*Leighter* Opp'n at 4-15). Except, as discussed above, to the extent these claims are based on a failure to provide unemployment insurance and make income tax withholdings, the Court rejected similar arguments in the March 25 Order.

**III. ASCERTAINABILITY.**

***Overtime.*** FedEx Ground previously argued that plaintiffs' overtime sub-class is not ascertainable because there is no ready way to identify which contractors actually operated vehicles after August 10, 2005 with a gross vehicle weight rating of less than 10,001 pounds, and, if so, for how many hours. (*See Leighter* Opp'n at 28-29.) The Court did not rule on this ascertainability argument in the March 25 Order, but it is based on arguments that are similar to those the Court rejected in its Order.

***Non-Payment Of Wages Upon Contract Termination*** (*Leighter* Opp'n at 29). The Court rejected similar arguments in its Order.

Dated: April 25, 2008

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz
Chris A. Hollinger

[7] The *Slayman* plaintiffs' opening brief contained a "see also" citation to ORS § 670.600 in a discussion of the wage deduction claim. (*See* Slayman Br. at 7.) FedEx Ground did not address the statutory test in its opposition. Plaintiffs' first discussion of ORS § 670.600 in connection with their rescission/unjust enrichment claim is found in their reply. (*See* Reply Mem. Law in Supp. Mot. for Class Cert. [May 29, 2007] [Doc. No. 680], at 16-17.) While this Court cited *HDG Enters., Inc. v. National Council on Comp. Ins.*, 856 P.2d 1037, 1040 (1993), where a court applied both the common-law "right to control" test and a prior version of ORS § 670.600, this Court quoted the holding from *HDG Enterprises* pertaining to the "right to control" test. (*See* March 25 Order at 109.)

case 3:05-md-00527-RLM -CAN document 1242 filed 04/25/08 page 6 of 7

John H. Beisner
Robert M. Schwartz
Chris A. Hollinger
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 25th day of April, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Steve D. Larson
slarson@ssbls.com

The undersigned further certifies that a copy was mailed by United States Postal Service to the following non-CM/ECF participants:

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

By: /s/ Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT**

Pursuant to Rules 26 and 37, and based upon the memorandum of law, and all of the files and records submitted herewith, Plaintiffs move to compel Defendant FedEx Ground Package System, Inc. ("FXG") to produce the Notice of Proposed Assessment, and any attachments thereto, which FXG received from the IRS on December 20, 2007.

Dated: May 7, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT

Dated: May 7, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

# DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF THEIR RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT

Dated: May 7, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' LOCAL RULE 37.1 CERTIFICATION IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT**

Plaintiffs, by counsel, submit this statement in compliance with Fed. R. Civ. P. 37 and N.D. Ind. Local Rule 37.1.

Prior to filing Plaintiffs' Motion to Compel Production of IRS Notice of Proposed Assessment on May 7, 2008, Plaintiffs' counsel sought in good faith to resolve the discovery dispute without the aid of the Court and took reasonable efforts to reach agreement with opposing counsel regarding the dispute.

1. On February 1, 2006, Plaintiffs propounded their First Requests for Production to Defendant FedEx Ground Package System, Inc. ("FXG"). Later, Plaintiffs propounded their Third Request for Production. Three of these requests (Nos. 23 and 25 and 166) sought determinations from governmental agencies relating to the employment status of FXG drivers.

2. FXG responded to Plaintiffs' First Set of Requests for Production, raising various objections to requests 23 and 25 and stating that it would only "produce documents sufficient to

show the result of any adversarial proceeding initiated by or stemming from a complaint made by a member of the putative class against Defendant." FXG's response to RFP 166 was similar.

3.      The parties thereupon commenced an extended discussion of the proper scope of production under these requests.

4.      In a letter to Plaintiffs' counsel, Lynn Faris, dated June 26, 2006, Michael McGuinness, counsel for FXG, summarized the parties' agreement that FXG "will produce determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge."

5.      On December 21, 2007, FXG disclosed in its 10-Q report filed with the SEC that the IRS had "tentatively concluded" that FXG's pick-up and delivery drivers "should be reclassified as employees for federal employment tax purposes."

6.      Faris emailed McGuinness on December 21, 2007, to request that FXG produce the document reflecting the conclusion reached by the IRS regarding FXG's pickup and delivery drivers.

7.      In a letter dated January 15, 2008, FXG declined to do produce the document. McGuinness explained that conclusion of the IRS had been communicated to FXG in a Notice of Proposed Assessment ("NOPA"). McGuinness claimed that FXG did not have to produce it because the NOPA did not fall within the scope of documents that FXG had agreed to produce as it was not a "determination," not final, and not the result of an adversarial proceeding. FXG also contended that the NOPA was protected by "the taxpayer privilege."

8. Faris responded by letter on January 23, 2008, that FXG misstated the parties' agreement, as the agreement did not contemplate any requirement that a determination be the result of an adversarial proceeding. Faris also explained that any privilege that may have applied had long since been waived by FXG's reliance on a 1994 Letter of Assurance that FXG's drivers were contractors.

9. FXG again declined to produce the NOPA.

10. As part of fifth wave discovery, in their Ninth Set of Requests for Production of Documents, Plaintiffs specifically requested the NOPA.

11. In its Response to Plaintiffs' Ninth Set of Requests for Documents, FXG again refused to produce the NOPA for substantially the same reasons it refused to do so in January.

12. Counsel for FXG and counsel for Plaintiffs agreed that, given the parties' extensive discussions concerning FXG's refusal to produce the NOPA, further conversation among the parties will be fruitless and Court action is required.

WHEREFORE, on the basis of the foregoing, and pursuant to Fed. R. Civ. P. 37 and N.D. Ind. Local Rule 37.1, the undersigned certifies that Plaintiffs have in good faith attempted to confer with counsel for Defendant in an effort to resolve this dispute without the Court's involvement.

Dated: May 7, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM -CAN document 1279 filed 05/07/08 page 1 of 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on May 7, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT**

Dated: May 7, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on May 7, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**DECLARATION OF SUSAN E. ELLINGSTAD**
**IN SUPPORT OF PLAINTIFFS' RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT**

Dated: May 7, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:     (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on May 7, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |

case 3:05-md-00527-RLM -CAN document 1281 filed 05/07/08 page 2 of 7

| | |
|---|---|
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |

| | |
|---|---|
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |

| | |
|---|---|
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Mary Donne Peters** | mpeters@gorbypeters.com; rwright@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on May 7, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
 & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: May 7, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

---

**PLAINTIFFS' MOTION TO WITHDRAW MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT**

---

Plaintiffs hereby move to withdraw their motion filed May 7, 2008, to compel Defendant FedEx Ground Package System, Inc. ("FXG") to produce the IRS Notice of Proposed Assessment. Plaintiffs will file an amended motion to compel dated May 9, 2008. FXG does not object to the withdrawal of Plaintiffs' original motion and filing of the amended motion.

Dated: May 9, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

---

**PLAINTIFFS' AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

---

Pursuant to Rules 26 and 37, and based upon the memorandum of law, and all of the files and records submitted herewith, Plaintiffs move to compel Defendant FedEx Ground Package System, Inc. ("FXG") to produce the Notice of Proposed Assessment, and any attachments thereto, which FXG received from the IRS on December 20, 2007, and to produce Sallie Ford for deposition by Plaintiffs' counsel.

Dated: May 9, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**<u>FILED UNDER SEAL</u>**

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION

Dated: May 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

case 3:05-md-00527-RLM-CAN document 1283-3 filed 05/09/08 page 1 of 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CONFIDENTIAL:**
**FILED UNDER SEAL**

# DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION

Dated: May 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**PLAINTIFFS' CO-LEAD COUNSEL**

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER DATED JANUARY 13, 2006 [DOC. NO. 101]: This envelope is sealed and contains Confidential Information and is not to be opened or the contents thereof displayed or revealed except by order of the Court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the Court, except by officers of the Court and counsel of record, who, after reviewing the contents shall return them to the clerk in a sealed envelope or container.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on May 9, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Dated: May 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on May 9, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Dated: May 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' LOCAL RULE 37.1 CERTIFICATION IN SUPPORT OF THEIR AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Plaintiffs, by counsel, submit this statement in compliance with Fed. R. Civ. P. 37 and N.D. Ind. Local Rule 37.1.

Prior to filing Plaintiffs' Amended Motion to Compel Production of IRS Notice of Proposed Assessment and Deposition of Sallie Ford on May 9, 2008, Plaintiffs' counsel sought in good faith to resolve the discovery dispute without the aid of the Court and took reasonable efforts to reach agreement with opposing counsel regarding the dispute.

1. On February 1, 2006, Plaintiffs propounded their First Requests for Production to Defendant FedEx Ground Package System, Inc. ("FXG"). Later, Plaintiffs propounded their Third Request for Production. Three of these requests (Nos. 23 and 25 and 166) sought determinations from governmental agencies relating to the employment status of FXG drivers.

2. FXG responded to Plaintiffs' First Set of Requests for Production, raising various objections to requests 23 and 25 and stating that it would only "produce documents sufficient to

show the result of any adversarial proceeding initiated by or stemming from a complaint made by a member of the putative class against Defendant." FXG's response to RFP 166 was similar.

3.    The parties thereupon commenced an extended discussion of the proper scope of production under these requests.

4.    In a letter to Plaintiffs' counsel, Lynn Faris, dated June 26, 2006, Michael McGuinness, counsel for FXG, summarized the parties' agreement that FXG "will produce determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge."

5.    On December 21, 2007, FXG disclosed in its 10-Q report filed with the SEC that the IRS had "tentatively concluded" that FXG's pick-up and delivery drivers "should be reclassified as employees for federal employment tax purposes."

6.    Faris emailed McGuinness on December 21, 2007, to request that FXG produce the document reflecting the conclusion reached by the IRS regarding FXG's pickup and delivery drivers.

7.    In a letter dated January 15, 2008, FXG declined to produce the document. McGuinness explained that the conclusion of the IRS had been communicated to FXG in a Notice of Proposed Assessment ("NOPA"). McGuinness claimed that FXG did not have to produce it because the NOPA did not fall within the scope of documents that FXG had agreed to produce as it was not a "determination," not final, and not the result of an adversarial proceeding. FXG also contended that the NOPA was protected by "the taxpayer privilege."

8.      Faris responded by letter on January 23, 2008, that FXG misstated the parties' agreement, as the agreement did not contemplate any requirement that a determination be the result of an adversarial proceeding.  Faris also explained that any privilege that may have applied had long since been waived by FXG's reliance on a 1994 Letter of Assurance that FXG's drivers were contractors.

9.      FXG again declined to produce the NOPA.

10.     The parties met and conferred and agreed that rather than file an immediate motion to compel production of the NOPA on the grounds that it should have been produced as a Rule 26(e) supplement to prior discovery responses, Plaintiffs would serve a new Request for Production, specifically seeking the NOPA, as part of its discovery for Fifth Wave cases.  The parties also agreed that FXG would respond promptly to Plaintiffs' request to redepose Sallie Ford, FXG's Rule 30(b)(6) designee on IRS investigations, audits, and reviews, to allow any resulting motion to compel to include both the NOPA and the Ford deposition.

11.     As part of fifth wave discovery, in their Ninth Set of Requests for Production of Documents, Plaintiffs specifically requested the NOPA.

12.     In its Response to Plaintiffs' Ninth Set of Requests for Documents, FXG again refused to produce the NOPA for substantially the same reasons it refused to do so in January.  FXG also declined to produce Ms. Ford for deposition.

13.     The parties have since conferred and are unable to agree with respect to production of the NOPA or Ms. Ford.

WHEREFORE, on the basis of the foregoing, and pursuant to Fed. R. Civ. P. 37 and N.D. Ind. Local Rule 37.1, the undersigned certifies that Plaintiffs have in good faith attempted to

confer with counsel for Defendant in an effort to resolve this dispute without the Court's involvement.

Dated: May 9, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM -CAN document 1287 filed 05/09/08 page 1 of 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on May 9, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |

| | |
|---|---|
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |

| | |
|---|---|
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |

| | |
|---|---|
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Mary Donne Peters** | mpeters@gorbypeters.com; rwright@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on May 12, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
 & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: May 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On March 25, 2008, this Court issued an opinion and order that certified class actions for the several actions in this case. On April 4, 2008, this Court ordered the parties to file proposed agreed notices, or separate notices if they could not agree. On April 30, 2008,the parties filed a joint submission regarding the class notices for all class actions certified by this Court's March 25, 2008, opinion and order. The notices, attached as Exhibits A through T to the April 30, 2008, filing are **APPROVED**. Plaintiffs' counsel shall post and mail the respective notices as soon as practicable and in accordance with this Court's previous orders.

**SO ORDERED.**

Dated this 12th Day of May, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER NUNC PRO TUNC**

On May 7, 2008, Plaintiffs filed a motion to compel. On May 9, 2008, Plaintiffs filed a motion to withdraw that motion to compel. On May 14, 2008, this Court, as a result of a technical error, erroneously granted the Plaintiffs' original motion to compel rather than Plaintiffs' motion to withdraw. The Court intended to grant the Plaintiffs' motion to withdraw the motion to compel. Consequently, Plaintiffs' motion to withdraw the motion to compel is now **GRANTED** [Doc. No. 1282] *nunc pro tunc*. The clerk is instructed to strike this Court's May 14, 2008, order. [Doc. No. 1289]. Plaintiffs original motion to compel [Doc. No. 1278] is to remain termed.

**SO ORDERED.**

Dated this 15th Day of May, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

case 3:05-md-00527-RLM-CAN document 1294 filed 05/27/08 page 2 of 20

**INTRODUCTION**

Plaintiffs' motion to compel production of a **draft** Notice of Proposed Adjustment ("NOPA") comes long after the close of a prolonged discovery schedule that has been heavily regulated by the Court and subject to extensive negotiated agreements between the parties. Discovery in the first twenty-nine of the cases in this MDL proceeding, which comprised the first three "waves" of cases to be filed, closed nearly eighteen months ago—on December 31, 2006. Discovery in the Wave 4 cases closed on August 31, 2007, and was limited to the issues raised uniquely by those newer cases. Discovery in the Wave 5 cases will close on June 15, and at plaintiffs' own insistence, "[t]he current jointly-stipulated discovery plan severely restricts new discovery in the case to new issues related solely to the new cases and expressly forbids overlapping discovery or re-litigation."[1] In addition, in response to plaintiffs' massive document requests in 2006, FedEx Ground met and conferred with plaintiffs extensively, and negotiated agreements to limit many of the more than 200 requests. As to plaintiffs' requests to obtain communications and documents with any state or federal taxing agency on the subject of whether FedEx Ground contractors were, in fact, contractors or employees, plaintiffs specifically agreed that FedEx Ground need not produce "each and every" document falling within that category, such as correspondence or interim findings or citations, but only actual agency "determinations" of liability or status.

Despite this record, plaintiffs move to compel FedEx Ground to produce a **draft** document the Company received long after the December 31, 2006 close of general fact discovery, and which falls outside the written agreement between the parties about documents subject to production. Specifically, plaintiffs seek a **draft** NOPA issued in December 2007 by

an Internal Revenue Service ("IRS") audit team in connection with an ongoing audit and review of FedEx Ground's 2002 employment tax return. Even though it is a "draft" document and remains tentative—and reflects the views of those working at only the initial level of review—plaintiffs contend that the document is discoverable because it represents the "conclusion" of the IRS that FedEx Ground's independent contractors should be considered "employees" for federal tax purposes. Plaintiffs' motion is baseless, and the production of this "draft" of a "proposed" adjustment should be denied for three important reasons.

First, plaintiffs are not entitled to request the draft NOPA as part of Wave 5 discovery. The parties stipulated that Wave 5 discovery (like previous waves) would be limited to "new issues related solely to new cases." It was not intended to reopen the massive document and deposition discovery that has already been completed on the independent contractor issues. The draft NOPA is not unique to any issue raised for the first time by any of the Wave 5 cases. It is a document of general application to all cases, and, if discoverable, would be available only as a supplement to a prior request (which it is not, as noted below). Given the extremely narrow scope of permissible Wave 5 discovery, and the clear dictate to not reopen general discovery, the draft NOPA is not a proper subject of a Wave 5 document request.

Second, the draft NOPA does not fall within the scope of discovery previously propounded by the plaintiffs, as it cannot reasonably be characterized as an agency determination. Plaintiffs agreed that FedEx Ground need produce only "determinations … which have decided the issue of whether individuals providing pickup and delivery services for

[1] (Memorandum in Support of the Parties' Joint Motion to Amend the Case Scheduling Order filed March 13, 2008 (Doc. No. 1108) ["Wave 5 Joint Memorandum"] at 6.)

FedEx Ground are independent contractors or employees."[2] The draft NOPA is not such a "determination" and it does not decide anything. It is merely a "draft" of a "proposed" adjustment. It is, at most, tentative, and does not represent the final opinion of even the field audit team that may or may not eventually issue an actual NOPA. It cannot be treated as an agency determination.

Third, even if the request were still timely (it is not), and even if the document fell within the parties' express agreement as to what was discoverable (it does not), compelling production of the draft NOPA is contrary to the public policy animating our tax laws—to encourage the free flow of accurate information between taxpayers and the IRS. In our self-reporting tax system, forthright communication between the taxpayer and the IRS must be encouraged, and protected, especially given the highly confidential nature of the information that is shared. To that end, the IRS has developed strict guidelines prohibiting the agency from disclosing tax returns, the fact that a return is being audited, or information shared between the taxpayer and the IRS in connection with the preparation or audit of a tax return. The courts have similarly recognized the importance of protecting this confidential exchange of information. The draft NOPA, which has no force and effect given its "draft," preliminary nature, is the type of document that this qualified privilege was designed to protect.

Finally, plaintiffs' request to depose Sallie Ford, Vice President of Tax at FedEx Corporate Services, Inc., likewise should be denied. Plaintiffs have already deposed Ford, in November 2006, on the subject of tax agency determinations. Not only would granting the plaintiffs' request impermissibly reopen discovery that has long ago closed, but permitting

[2] (*See* June 26, 2006 letter from Michael McGuinness to Lynn Faris, Ex. 5 to the Declaration of Susan Ellingstad in Support of Plaintiffs' Amended Rule 37 Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition ("Ellingstad Decl.").)

plaintiffs to depose Ford would constitute an even more serious encroachment on the qualified privilege protecting taxpayer communications with the IRS. If Ford is deposed regarding the draft NOPA, it will send a clear message to FedEx Ground, and other businesses around the nation, that otherwise confidential conversations with the IRS are subject to the broad discovery rules attendant to civil litigation. This is contrary to public policy, particularly given that the subject of the deposition would be the draft of a NOPA that may never actually be issued by the field auditors.

For these reasons, and those set forth below, plaintiffs motion to compel the production of the draft NOPA, and the deposition of Sallie Ford, is without merit and should be denied.

## STATEMENT OF FACTS

### A. The Extensive Discovery and the Parties' Limiting Agreements

Plaintiffs served their First Set of Requests for Production of Documents ("RFPs") in February 2006. The RFPs included more than 50 extremely broad requests, including several seeking all documents related to any state or federal agency decision in which FedEx Ground's independent contractor classification had been "adjudicated, reviewed, resolved, investigated, settled, or in any manner addressed," as well as all documents provided by FedEx Ground to any taxing agency or received by FedEx Ground from any taxing agency regarding the status of any driver in any state. (Ellingstad Decl., Ex. 1.)

FedEx Ground served its responses and objections in March 2006. FedEx Ground objected to these requests on various grounds, including, *inter alia*, that the requests were overbroad, burdensome, and called for documents covered by the privilege for tax returns and/or tax related materials. (*Id.*) Nevertheless, FedEx Ground responded that it would produce "documents sufficient to show the result of any adversarial proceeding initiated by or stemming from a complaint made by a member of the putative class against Defendant." (*Id.*)

In April and May 2006, plaintiffs served another 158 document requests in their Second and Third Sets of RFPs, seeking, *inter alia*, all communications between FedEx Ground and the California Employment Development Department ("EDD") "regarding any audit conducted by the EDD addressing the issue of the proper classification of drivers in California," all documents "which are, or which refer to, any determination or finding by any state or federal governmental entity," regarding classification status, and all documents "which refer or relate to any investigation by any state or federal governmental entity" regarding classification status. (Declaration of Michael McGuinness in Support of Defendant FedEx Ground Package System, Inc.'s Memorandum in Opposition to Plaintiffs' Amended Rule 37 Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition ("McGuinness Decl."), Ex. A; Ellingstad Decl., Ex. 2.) FedEx Ground again objected on similar grounds. (*Id*.) Nevertheless, FedEx Ground agreed to produce "any judgment or decision rendered by the California [EDD] resulting from any audit or review conducted by the EDD addressing" driver classification. (McGuinness Decl., Ex. A.)

Throughout May and June 2006, the parties engaged in extensive, good-faith meet and confer efforts, including numerous telephone conferences and the exchange of several detailed letters designed to avoid motion practice and settle any disagreements related to the scope of discovery. (McGuinness Decl. ¶ 3; Ellingstad Decl., Exs. 3, 4, and 5.) The parties ultimately agreed that FedEx Ground would produce "***determinations*** from any state or federal taxing agency ***which have decided the issue*** of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge." (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5) (emphasis added).) The parties

agreed that production of these "determinations" would fully satisfy FedEx Ground's obligations with respect to RFPs 23, 24, 25, 77, mis-numbered 76, and mis-numbered 77, given FedEx Ground's assertion of the tax-payer privilege with respect to any other potentially responsive documents. (May 31, 2006 Faris letter, Ellingstad Decl., Ex. 4; June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5.) As plaintiffs acknowledged:

> FedEx Ground has taken the position that any other tax related documents responsive to these requests (or any other requests calling for the production of tax related materials) are protected from production by privilege and privacy related objections and has refused to produce them. Plaintiffs have agreed to accept production of the determinations in full satisfaction of these requests with the understanding that FedEx Ground will not attempt to use any withheld documents affirmatively for purposes of this case.

(June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5.)

Following this agreement, FedEx Ground produced documents called for by the agreement. Since completing its initial production, FedEx Ground has supplemented its production as necessary to produce additional documents responsive to the narrowed requests. (McGuinness Decl. ¶ 2.)

On November 8, 2006 Sallie Ford, Vice President of Tax at FedEx Services, Inc., which oversees tax audits at FedEx Ground, testified as FedEx Ground's corporate designee regarding "investigations, audits, reviews and/or determinations by the IRS and any state taxing authority … which concern or relate to the classification of FedEx Ground's pickup and delivery drivers as independent contractors." (October 3, 2006 Faris email, Ellingstad Decl., Ex. 6.) She provided testimony related to these topics, including testimony about an ongoing IRS audit of FedEx Ground's 2002 tax return examining the contractors' classification status. Ford testified, truthfully, that she did not know when the audit would be finished or when the IRS would issue a written report setting forth its determination with respect to the classification of pickup and

delivery drivers. (Ford Tr. at 279:4-17, Ellingstad Decl., Ex. 7.)

Discovery closed on December 31, 2006. Since that time, the parties have agreed to limited additional discovery related to new plaintiffs or new claims in newly filed cases that were transferred into the MDL after the close of discovery (Waves 4 and 5). For "Wave 4," the parties agreed that "[t]his discovery shall pertain only to new plaintiffs, claims, and states implicated by cases transferred to these MDL proceedings after March 1, 2007," and that "they will not conduct discovery that is duplicative or overlapping of the already completed discovery." (Memorandum in Support of the Parties' Joint Mot. to Amend the Case Scheduling Order filed June 8, 2007 (Doc. No. 720) ["Wave 4 Joint Memorandum"] at 8-9.) When plaintiffs propounded document requests which were not limited to Wave 4 issues, FedEx Ground objected to those requests and refused to produce the documents. (*See* Defendant FedEx Ground's Response to Plaintiffs' Sixth Set of Requests for Production of Documents, Nos. 297, 301-07, 309, 313-14, 317-18, 321, 329, 332, 334-36, 338, 340, McGuinness Decl., Ex. C.)

The parties reached the same agreement with respect to "Wave 5" cases (those transferred to the MDL proceedings after September 1, 2007) as they did with Wave 4. ((Memorandum in Support of the Parties' Joint Mot. to Amend the Case Scheduling Order filed March 13, 2008 (Doc. No. 1108) ["Wave 5 Joint Memorandum"] at 4-5.) Moreover, in opposing FedEx Ground's request to substitute experts during Wave 5 discovery and class certification proceedings, plaintiffs specifically noted that "[t]he current jointly-stipulated discovery plan severely restricts new discovery in the case to new issues related solely to the new cases and expressly forbids overlapping discovery or re-litigation." (*Id*. at 6.) The Court issued amended scheduling orders on June 29, 2007 and March 20, 2008, permitting only "limited discovery" on fourth and fifth wave cases. (June 29, 2007 Scheduling Order (Doc. No. 766) at 2;

March 20, 2008 Scheduling Order (Doc. No. 1118) ¶ 1.)

**B. The IRS Audit**

The IRS began an employment tax audit of FedEx Ground's 2002 tax return in December 2003. (Declaration of Michael D. Fryt ("Fryt Decl.") ¶ 2.) This audit is still in progress. (*Id*.) Under IRS audit procedures, the audit ends when the field auditors issue a NOPA, summarizing their audit. 26 C.F.R. § 601.105(b)(4). This is also known as a "30 day letter," because the taxpayer then has 30 days to accept the findings or file a protest. 26 C.F.R. § 601.105(d). If the taxpayer files a protest, the case is transferred to the Appeals Division of the Internal Revenue Service, which conducts its own thorough review of the case. 26 C.F.R. § 601.106(b). It is only at the end of the appeals process that the agency issues a "determination." 26 C.F.R. § 601.106(d); *see also* IRS Notice 2002-5, 2002-3 I.R.B. 320 (January 22, 2002). If the agency agrees with the field auditors that taxes are due, the agency issues a "Notice of Determination of Worker Classification." *See* IRS Notice 2002-5 and 26 U.S.C. § 7436.[3] At that point, the taxpayer has 90 days either to pay or file a petition with the United States Tax Court to overturn the Notice of Determination of Worker Classification. *See* IRS Notice 2002-5 and 26 U.S.C. § 6213(a). If the taxpayer pays the tax in response to the Notice of Determination of Worker Classification, it may then seek a refund in Federal court. *See* IRS Notice 2002-5. Thus, even if a NOPA is ultimately issued with respect to some or all of the Ground contractors, it is not a "determination" of worker classification, which occurs only upon issuance of the Notice of Determination of Worker Classification. *Id*.

As part of the audit process, FedEx Ground and the IRS have engaged in extensive,

---

[3] Section 7436 of the Internal Revenue Code of 1986, as amended, 26 U.S.C. § 7436, (the "Code") grants the Tax Court jurisdiction if the Internal Revenue Service issues a determination of worker classification. The procedures established by Section 7436 parallel the Notice of Deficiency procedures set forth in Section 6212 of the Code.

ongoing discussions. (Fryt Decl. ¶ 3.) In December 2007, the IRS sent FedEx Ground the ***draft*** NOPA. (*Id*.) As if to emphasize its tentative, non-binding nature, at the top of the form document, in bold, capital letters, appears the word "**DRAFT**." (*Id*.) Documents from the IRS marked "Draft" are highly preliminary in nature and often are substantially revised in terms of substance and ultimate conclusions. (Priest Decl. ¶¶ 7-10.) After FedEx Ground had an opportunity to review the draft NOPA, FedEx Ground met with the IRS to discuss issues raised in the draft, and FedEx Ground's positions with respect to those issues. (*Id*. ¶ 4.)

In December 2007, after FedEx Ground disclosed the issuance of the draft NOPA publicly, but *not* the substantive content, plaintiffs requested a copy. (December 21, 2007 Faris email, Ellingstad Decl., Ex. 6.) FedEx Ground declined to produce it because it is not a "determination" from a state or federal agency that would fall within the scope of the parties' June 26 agreement. (February 4, 2008 McGuinness letter, Ellingstad Decl., Ex. 11.) Despite the longstanding agreement, plaintiffs then requested production of the very same document as part of their Wave 5 discovery requests. (Ellingstad Decl., Ex. 15.) FedEx Ground objected on numerous grounds, including that the requested document is not a "determination," is protected from disclosure by the tax-payer privilege, and is "inconsistent with the discovery limits set forth in the Scheduling Order, which reopened discovery on a limited basis." (*Id*.) FedEx Ground also objected to the request to re-open the deposition of Sallie Ford on the ground that the issuance of a draft NOPA—"a document which is not even subject to production under the terms of the parties' discovery agreement"—does not constitute good cause to reopen a deposition that closed on November 8, 2006. (February 4, 2008 McGuinness letter, Ellingstad Decl., Ex. 11.)

## ARGUMENT

## I. THE DRAFT NOPA IS NOT WITHIN THE SCOPE OF WAVE 5 DISCOVERY.

Plaintiffs included a request for the draft NOPA as part of their Wave 5 discovery requests, notwithstanding that the parties requested that discovery be reopened for "new discovery … pertain[ing] to issues raised in the newly transferred cases only," (Wave 5 Joint Memorandum at 5) and the Court permitted only "limited discovery on 'fifth wave' cases" (March 20, 2008 Scheduling Order ¶ 1). Plaintiffs argue that, because the draft NOPA is "relevant" to Wave 5 cases, as well as to other cases, they should be able to propound a separate request for its production as part of Wave 5 discovery. (Pls.' Mot. to Compel at 12-13.) But plaintiffs ignore their own assertion in the Joint Memorandum that discovery would be severely restricted, apply only to new issues raised by the new cases, and would not overlap prior discovery. (Wave 5 Joint Memorandum at 6) (emphasis added).). The draft NOPA does not relate solely to the new plaintiffs or new claims contained in the Wave 5 cases. (*Id*. at 4; March 20, 2008 Scheduling Order at ¶ 1.) It is a document generally applicable to the MDL cases as a whole, and plaintiffs' request for its production represents an end run around the narrow limitations that resulted in the stipulation to allow Wave 5 discovery.

As noted, discovery in this MDL proceeding closed nearly a year and a half ago, on December 31, 2006. Although the parties have agreed to very limited discovery for cases filed since then, they repeatedly have acknowledged their intent not to conduct additional discovery as to issues that had already been the subject of prior discovery. (Wave 5 Joint Memorandum at 5, 6.) Yet plaintiffs now claim that they are entitled to propound additional discovery with respect to any subject that might be "relevant" to any of the Wave 5 cases. Since all of the Wave 5 cases involve disputes over the classification of drivers as independent contractors—the central issue in all of the MDL cases—plaintiffs are arguing that their prior agreements mean nothing and that

they can reopen discovery to investigate any issue related to independent contractor status. Plaintiffs cannot so disregard the clear limits of the Joint Memorandum and the Scheduling Order. The draft NOPA is not uniquely related to the new plaintiffs or new claims in any of the Wave 5 cases, and, thus, is not a proper subject of Wave 5 discovery. To hold otherwise is to render the parties' agreed-upon discovery limits meaningless.

## II.   THE DRAFT NOPA IS NOT A "DETERMINATION" WITHIN THE SCOPE OF THE JUNE 26 AGREEMENT.

Plaintiffs contend that the draft NOPA is a "determination" which should be produced, apparently as a supplement to prior productions, under the party's June 26 letter agreement. (Pls.' Mot. to Compel at 5-6.) The letter agreement by its express terms applies only to "determinations … which have decided the issue of whether individuals providing pickup and delivery services for FedEx ground are independent contractors or employees." (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex 5.) The draft NOPA, however, is not even a distant cousin of the "determinations" contemplated by the letter agreement. It is nothing more than a preliminary draft of an audit team report, not a determination that has decided the independent contractor issue. Under IRS regulations and procedures, the draft NOPA has no legal significance whatsoever. It is neither a "determination" of the field auditors, nor a "determination" of the IRS.[4]   *See* IRS Notice 2002-5 ("Because ***the Notice of Determination constitutes the Service's determination*** described in § 7436(a), the Notice of Determination is a jurisdictional prerequisite for seeking Tax Court review of the Service's determinations regarding worker classification…") (emphasis added).

Plaintiffs repeatedly assert that the IRS has "concluded" that FedEx Ground's drivers

"should be reclassified as employees." (*See, e.g.,* Pls.' Mot. to Compel at 5.) This characterization of the draft NOPA is erroneous and misleading. The IRS field auditors have not even issued an actual NOPA – it is nothing more than a draft – and even a non-draft NOPA would represent only the views of the audit team and not the IRS itself. The audit is still in progress and neither the IRS nor its field auditors have reached any conclusions or "decided the issue" of whether some or all of the FedEx Ground pickup and delivery drivers are independent contractors or employees. In fact, it is very likely that the draft NOPA will change significantly in content and very possibly with respect to conclusions as the audit progresses and the parties continue their discussions. (Priest Decl. ¶¶ 7-10.) Therefore, the draft NOPA falls outside the scope of the party's written discovery agreement.

Plaintiffs argue that because FedEx Ground produced a *non-draft* "Proposed Notice of Assessment" ("EDD Notice") from the California Employment Development Department ("EDD"), FedEx Ground indirectly waived its right to object to the production of the *draft* NOPA from the IRS. (Pls.' Mot. to Compel at 11-12.) This argument is unfounded. The EDD Notice was not a draft, and did not have the term "DRAFT" printed in all capital letters at the top of the document. The EDD audit had ended and the auditors had issued their findings in the form of a proposed adjustment of taxes. The document at issue in this motion is not comparable; the audit has not ended and the auditors have not issued anything but a draft document. By prominently marking the document a **"DRAFT"** the field audit team was clearly expressing that the content of the document was tentative and subject to change.

Moreover, the EDD Proposed Notice of Assessment was the subject of an administrative

[4] Webster's defines determination as "a judicial decision settling and ending a controversy … the act of deciding definitely and firmly." A draft of a field auditor's proposal to the IRS for an adjustment to FedEx Ground's 2003 income taxes does not fit within this definition.

hearing conducted on June 7, 2006, and as part of that proceeding, plaintiffs saw and reviewed a copy of the document. Indeed, Beth Ross of the LeonardCarder law firm attended the proceedings, and the EDD Notice was marked and entered as an exhibit. (McGuinness Decl., Ex. B.) Therefore, it would have been futile for FedEx Ground to oppose plaintiffs' request for production of the EDD Notice because they had seen and received it as part of this proceeding.

Furthermore, the draft NOPA is not discoverable under Rule 26, as it is neither itself admissible evidence nor reasonably calculated to lead to the discovery of admissible evidence. Fed R. Civ. P. 26 (b)(1). First, the draft NOPA would not be admissible at trial. Numerous courts have held that drafts of agency reports are not admissible. *See, e.g., Toole v. McClintock*, 999 F.2d 1430, 1434 (11th Cir. 1993) (admitting the preliminary Food and Drug Administration report was an abuse of discretion in part because it contained only "proposed" findings, as it "invited public comment and forecasted the issuance of a 'final' document after more study"); *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (upholding the exclusion of the interim Urban Mass Transit Administration report in part because it was a preliminary agency finding containing the tentative results of an incomplete staff investigation that was subject to revision and review); *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742-43 (2d Cir. N.Y. 1989) (upholding the exclusion of various government reports in part because of their interim or inconclusive nature). Moreover, the draft NOPA will not lead to the discovery of admissible evidence. Instead, production of this single draft document will lead only to the discovery of confidential communications between FedEx Ground and the IRS which were never intended to be public. By the IRS's own determination, the document is a draft and disclosure would interfere with fundamental public policies encouraging dialogue between corporations and government agencies.

For all of these reasons, plaintiffs' request that the draft NOPA be produced as a supplement to previous productions should be denied.

## III. THE DRAFT NOPA IS SUBJECT TO THE QUALIFIED PRIVILEGE FOR TAX RETURNS AND RETURN INFORMATION.

Even if the draft NOPA falls within the confines of Wave 5 discovery, or arguably should be part of a supplemental production because it is a determination (neither of which are true), plaintiffs' request for production of the draft NOPA should be denied on the ground that it violates the privilege applicable to tax returns and tax payers. While tax returns and return information do not enjoy an absolute privilege from discovery, *Polous v. NAAS Foods, Inc.*, 959 F.2d 69, 74 (7th Cir. 1992) (citing *St. Regis Paper Co. v. United States*, 368 U.S. 208, 219 (1961)), many courts, including the Seventh Circuit, have recognized a public policy against unnecessary public disclosure of tax returns. *See, e.g.*, *CFTC v. Collins*, 997 F.2d 1230, 1233-34 (7th Cir. 1993); *Premium Srvc. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975). Thus, tax returns are subject to what some courts refer to as a qualified privilege. *See, e.g.*, *E. Auto Distribs., Inc. v. Peugeot Motors of Am.*, 96 F.R.D. 147, 148 (E.D. Va. 1982).

Courts have recognized that the proper functioning of the tax laws depends on taxpayer willingness to "file complete and accurate returns." *Premium Srvc. Corp.*, 511 F.2d at 229. "The self-reporting, self-assessing character of the income tax system would be compromised were [returns] promiscuously disclosed." *Collins*, 997 F.2d at 1233. The need to encourage taxpayers to file complete and accurate returns extends equally to corporate taxpayers, and several courts have refused to compel production of corporate tax returns. *See, e.g.*, *E. Auto Distribs.*, 96 F.R.D. 147 (refusing to order production of corporate tax returns where the information legitimately sought by plaintiff also was contained in other sources, such as public filings); *Tele-Radio Sys. Ltd. v. De Forest Elects., Inc.*, 92 F.R.D. 371 (D.N.J. 1981) (refusing to order

production of corporate tax returns sought in order to prove that the corporation is an agent or instrumentality of another entity for purposes of satisfying a judgment because this information is otherwise available); *O'Neale's Transp., Inc. v. Marshall & Sterling, Inc.*, 1994 WL 90627 (V.I. 1994).

Plaintiffs have argued that the privilege extends only to actual tax returns. (Pls.' Mot. to Compel at 14.) The public policy behind the qualified privilege is rooted in the importance of the confidentiality provisions of the Tax Return Privacy Act, 26 U.S.C. § 6103, to the proper functioning of the tax system. *Collins*, 997 F.2d at 1232-33; *Premium Srvc. Corp.*, 511 F.2d at 229. That statute prohibits the IRS from disclosing not only returns, but also "return information." 26 U.S.C. § 6103(a). Thus, the same public policy that discourages disclosure of tax returns should similarly protect "return information" from civil discovery in order to encourage the taxpayer to be complete and accurate during all interactions with the IRS.

Section 6103(b)(2)(A) defines "return information" as:

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or ***any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense***,

26 U.S.C. § 6103(b)(2)(A) (emphasis added). The draft NOPA was "prepared by" the IRS "with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) … for any tax" and thus constitutes "return information" within the meaning of Section 6103(b)(2).

As discussed above, FedEx Ground and the IRS are involved in ongoing discussions over

an audit of the 2002 tax return. Embedded in the draft NOPA is information regarding those confidential, back and forth discussions, exactly the type of information the parties in this case agreed would not be subject to production in their June 26 agreement. (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5.) The Court should not allow an intrusion upon the confidential communications between FedEx Ground and the IRS, and should protect the important public policy of encouraging accurate, timely, and open communications between the IRS and taxpayers. Otherwise, the Court will put FedEx Ground and all other taxpayers on notice that their communications with the IRS are free game for the purpose of litigation with others, and that they should proceed in their interactions with the IRS accordingly.

It is important to note that earlier in this case plaintiffs asserted the taxpayer privilege to avoid the production of tax related information. In opposing FedEx Ground's motion to compel production of their own tax returns earlier in this case, plaintiffs argued that disclosing their tax returns, even under the protection of a confidentiality order, would "undercut[] ***the right*** to maintain ***complete privacy*** between taxpayers and the government." (Pls.' Opp'n to Mot. to Compel at 3 n.3 [Docket No. 320]) (emphasis added). After refusing to produce their own tax returns, and taking the issue to this Court, Plaintiffs nonetheless seek production of FedEx Ground's confidential tax related information.

Plaintiffs also assert that, even if it is subject to the qualified privilege for tax returns, the draft NOPA should nevertheless be produced because FedEx Ground put it at issue by citing the 1995 Letter of Assurance in several of its briefs in opposition to class certifications. They claim that FedEx Ground is "in possession of a document – the [draft] NOPA – which makes clear that the 1995 Letter of Assurance is no longer operative." (Pls.' Mot. to Compel at 10.) This argument is baseless. The draft NOPA does not negate the 1995 Letter of Assurance, nor could

it given that it is a draft and was issued by an audit team rather than the IRS itself. It has no legal force and effect whatsoever, and thus does not "overrule" the 1995 Letter of Assurance. Any use by FedEx Ground of the 1995 Letter of Assurance does not provide a basis for producing a draft document that could change substantially when and if it is ever actually issued.[5]

For the reasons discussed above, and in order to encourage all tax payers to be frank and thorough with the IRS, the Court should protect the draft NOPA from the improper discovery demands propounded by plaintiffs.

## IV. PLAINTIFFS ARE NOT ENTITLED TO REOPEN SALLIE FORD'S DEPOSITION.

Since the Court should deny plaintiffs' motion to produce the draft NOPA, it likewise should deny their request to re-depose Ford. The public policy underlying the taxpayer privilege applies with even greater force to Ford's testimony. If plaintiffs are permitted to grill Ford about communications with the IRS, it will inhibit her ability to communicate with the IRS, knowing that her every word could be the subject of future discovery. It also will circumvent the letter agreement in which plaintiffs limited their document request to determinations, and specifically eschewed their request for "[a]ny documents(s) received by Defendant from any governmental agency or taxing agency. (First RFP, No. 25, Ellingstad Decl., Ex. 1.)

Even if the court orders production of the draft NOPA, Ford should not be ordered to attend another day of deposition. Plaintiffs cannot demand to re-depose FedEx Ground's witnesses every time a new document is created, a new policy is established, a new training program is delivered, and so on. If this were the case, discovery would never close and this litigation would drag on indefinitely. Ford has already testified extensively about the ongoing audit. Appearing for a deposition imposes a substantial burden on any witness. In recognition of

[5] Furthermore, as noted previously, only a Notice of Determination of Worker Classification, if

this fact, the Federal Rules of Civil Procedure prohibit re-deposing any witness without express permission from the court. Fed. R. Civ. P. 30(a)(2). The mere fact that the IRS has created a draft document does not constitute "good cause" to subject Ford to the burden of appearing for another deposition.

**CONCLUSION**

For the foregoing reasons, FedEx Ground respectfully requests that the Court deny the plaintiffs' motion to compel.

Dated: May 27, 2008

Respectfully submitted,

By: s/Michael G. McGuinness

John H. Beisner
Robert M. Schwartz
Michael G. McGuinness
Evelyn L. Becker
O'MELVENY & Myers LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

---

one is ever issued, could "overrule" the 1995 Letter of Assurance.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of May, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Michael G. McGuinness

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: <br> ALL ACTIONS | ) ) ) ) ) ) | CHIEF JUDGE MILLER |

**DECLARATION OF MICHAEL MCGUINNESS IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

I, Michael McGuinness, declare and state as follows:

1.     I am an attorney licensed to practice in California and a member of the law firm of O'Melveny & Myers LLP, located at 400 South Hope Street, Los Angeles, California 90071. I represent Defendant FedEx Ground Package System, Inc. ("FedEx Ground") in the above-captioned matter. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2.     Plaintiffs propounded formal document requests to FedEx Ground in or about February 2006. Shortly thereafter, FedEx Ground began producing documents responsive to those requests. By far the large majority of responsive documents were produced in 2006. Since completing its initial production, FedEx Ground has supplemented its production at plaintiffs request to produce additional documents responsive to plaintiffs' requests. These supplemental productions have included documents responsive to plaintiffs' request for agency determinations.

3.     Throughout May and June of 2006, the parties engaged in extensive, good-faith meet and confer efforts, including numerous telephone conferences and the exchange of several detailed letters designed to avoid motion practice and settle any disagreements related to the scope of discovery.

4.     As part of those meet and confer efforts, I personally negotiated with plaintiffs' counsel regarding the scope of documents that would be produced in response to requests related to tax information. The scope of the requests was very broad and FedEx Ground believed the requests were objectionable because, among other reasons, they intruded upon the tax payer privilege. Ultimately, these negotiations resulted in the agreement memorialized in my letter to Ms. Faris dated June 26, 2006, attached to the declaration of Susan E. Ellingstad as Exhibit 5.

5.     Attached as Exhibit A is a true and correct copy of excerpts from FedEx Ground's

Amended Response to Plaintiffs' Second Request for Production of Documents.

6. Attached as Exhibit B is a true and correct copy of an excerpt from a June 7, 2006 California Unemployment Insurance Appeals Board hearing in *FedEx Ground Package System, Inc. v. Employment Development Department* regarding the EDD Proposed Notice of Assessment.

7. Attached as Exhibit C is a true and correct copy of excerpts from FedEx Ground's Response to Plaintiffs' Sixth Set of Requests for Production of Documents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 27, 2008.

[signature]
Michael G. McGuinness

SF1:716218.2

EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

Case No. 03:05-MD-527 RM
(MDL 1700)

THIS DOCUMENT RELATES TO ALL ACTIONS )

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

**DEFENDANT FEDEX GROUND'S AMENDED RESPONSE TO PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Federal Rule of Civil Procedure 26 and 34, Defendant FedEx Ground Package System, Inc. ("FedEx Ground" or "FEG") hereby objects and responds to the Second Set of Requests for Production of Documents by Plaintiffs as follows:

**PRELIMINARY STATEMENT**

Defendant hereby amends its objections and responses to Plaintiffs' second set of document requests consistent with its ongoing meet and confer efforts with Plaintiffs. Nothing in this response shall supersede or contradict the parties' document production agreement set forth in the letter from Robert M. Schwartz to Lynn Rossman Faris dated May 15, 2006.

Responding to plaintiffs' twenty-two requests, in addition to their original fifty-eight requests, is a massive undertaking and Defendant has deployed a significant number of attorneys and paralegals to collect, process, and review the large volume of paper and electronic records. To the extent that responsive documents have not already been produced, Defendant will continue to produce on a rolling basis with all due speed and will use its best efforts to complete its production within a reasonable timeframe.

Responsive documents will be produced in electronic form pursuant to the preexisting production agreement with Plaintiffs. Responsive documents will be numbered and will be

Request for Production #77.  Any and all communications between FedEx Ground and/or any of its agents, attorneys or representatives with the California Employment Development Department regarding any audit conducted by the EDD addressing the issue of the proper classification of drivers in California.

Response to Request for Production #77.  Defendant incorporates by reference General Objections Numbers 1-7, set forth above.  Defendant further objects to this Request on the grounds that it seeks documents that are neither relevant to this matter, nor reasonably calculated to lead to the discovery of admissible evidence, and is burdensome and oppressive such that the burden of responding outweighs the likely benefit.  Defendant further objects to the Request on the grounds that it seeks documents from states where no matter consolidated in this action is pending, and no putative class member performs services for Defendant. Defendant also objects to this Request on the grounds that it is overbroad, burdensome and harassing in that it includes no time limitation.  Defendant further objects to this Request on the grounds that it invades the privacy interests of third party non-litigants to an extent incommensurate with Plaintiffs' legitimate discovery needs.  Defendant further objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege and work product doctrine.  Defendants also object to this Request to the extent that it calls for documents protected by any state or federal privilege for tax returns or tax related materials, any privacy rights related to tax information or documents and/or to the extent it calls for tax related documents entitled to any other protection under the law.  Subject to and without waiving the foregoing objections, Defendant will produce any judgment or decision rendered by the California Employment Development Department resulting from any audit or review conducted by the EDD addressing the issue of the proper classification of drivers in California. This will constitute the entire search Defendant will undertake to respond to this request.

Request for Production #78[1]. Any and all communications between FedEx Ground and/or any of its agents, attorneys or representatives with the State of Montana Department of Labor and Industry Employment Relations Division regarding any audit or review conducted addressing the issue of the proper classification of drivers in Montana.

Response to Request for Production #78. Defendant incorporates by reference General Objections Numbers 1-7, set forth above. Defendant further objects to this Request on the grounds that it seeks documents that are neither relevant to this matter, nor reasonably calculated to lead to the discovery of admissible evidence, and is burdensome and oppressive such that the burden of responding outweighs the likely benefit. Defendant further objects to the Request on the grounds that it seeks documents from states where no matter consolidated in this action is pending, and no putative class member performs services for Defendant. Defendant also objects to this Request on the grounds that it is overbroad, burdensome and harassing in that it includes no time limitation. Defendant further objects to this Request on the grounds that it invades the privacy interests of third party non-litigants to an extent incommensurate with Plaintiffs' legitimate discovery needs. Defendant further objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege and work product doctrine. Defendants also object to this Request to the extent that it calls for documents protected by any state or federal privilege for tax returns or tax related materials, any privacy rights related to tax information or documents and/or to the extent it calls for tax related documents entitled to any other protection under the law. Subject to and without waiving the foregoing objections, Defendant will produce any judgment or decision rendered by the State of Montana Department of Labor and Industry Employment Relations Division resulting from any audit or review conducted addressing the issue of the proper classification of drivers in Montana. This will constitute the entire search Defendant will undertake to respond to this request.

[1] Plaintiff's Second Set of Requests for Production mis-numbered Requests 78 through 80. The numbering of those Requests have been corrected herein in Defendant's response.

Request for Production #79[2]:  Any and all communications between FedEx Ground and/or any of its agents, attorneys or representatives with any of state agency regarding the issue of the proper classification of any driver in any state.

Response to Request for Production #79.  Defendant incorporates by reference General Objections Numbers 1-7, set forth above.  Defendant further objects to this Request on the grounds that it seeks documents that are neither relevant to this matter, nor reasonably calculated to lead to the discovery of admissible evidence, and is burdensome and oppressive such that the burden of responding outweighs the likely benefit.  Defendant further objects to the Request on the grounds that it seeks documents from states where no matter consolidated in this action is pending, and no putative class member performs services for Defendant. Defendant also objects to this Request on the grounds that it is overbroad, burdensome and harassing in that it includes no time limitation.  Defendant further objects to this Request on the grounds that it invades the privacy interests of third party non-litigants to an extent incommensurate with Plaintiffs' legitimate discovery needs.  Defendant further objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege and work product doctrine.  Defendants also object to this Request to the extent that it calls for documents protected by any state or federal privilege for tax returns or tax related materials, any privacy rights related to tax information or documents and/or to the extent it calls for tax related documents entitled to any other protection under the law.  Subject to and without waiving the foregoing objections, Defendant will produce any judgment or decision rendered by a state agency resulting from any audit or review conducted by such state agency addressing the issue of the proper classification of drivers in states where actions in this consolidated MDL proceeding were filed.  This will constitute the entire search Defendant will undertake to respond to this request.

---

[2] Plaintiff's Second Set of Requests for Production mis-numbered Requests 78 through 80.  The numbering of those Requests have been corrected herein in Defendant's response.

EXHIBIT B

00001

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD
M. JEFF FINE, ADMINISTRATIVE LAW JUDGE

FEDEX GROUND PACKAGE SYSTEM, INC.,
Petitioner,
vs. Case No. 145661 (T)
EMPLOYMENT DEVELOPMENT DEPARTMENT,
Respondent.
_______________________________________/

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE M. JEFF FINE, ADMINISTRATIVE LAW JUDGE
Wednesday, June 7, 2005
VOLUME I

PAGES 1 - 202

00002

APPEARANCES OF COUNSEL:

FOR PETITIONER:

SUTHERLAND, ASBILL & BRENNAN LLP
BY: RICHARD G. MURPHY, JR.
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004-2415
Telephone: (202) 383-0635

O'MELVENY & MYERS LLP
BY: CHRIS A. HOLLINGER, ESQ.
275 Battery Street, Suite 2600
San Francisco, California 94111-3305
Telephone: (415) 984-8700

FOR FEDEX CORPORATION:
BY: KATHLEEN L. CHAMBERS,
Staff Director - Tax Law
Tax & Employee Benefits Law
942 South Shady Grove Road

Memphis, TN 38120-4117
(Telephone) (901) 818-7409

00003

A P P E A R A N C E S (Continued):

FOR RESPONDENT:

EMPLOYMENT DEVELOPMENT DEPARTMENT
STATE OF CALIFORNIA
BY: RICHARD A. STEVENS, Attorney
GLENN C. JONES, Senior Counsel
800 Capitol Mall
Sacramento, California 95814
Telephone: (916) 654-8410

ALSO PRESENT:

LEONARD, CARDER
BY: BETH A. ROSS, ESQ.
1188 Franklin Street, Suite 201
San Francisco, California 94109-6839
Telephone: (415) 771-6400

SHANNA ESPEJO, Tax Auditor
JUDY CARTER, Tax Auditor
TOM HERD, FedEx Ground, Manager
STEVEN J. GREEN, Deputy Attorney General

00004

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SHANNA ESPEJO | 40 | 65 | 70 | 88 |
| JUDY CARTER | 71 | 79 | | |
| JERRETT HENDERSON | 89 | 129 | 151 | 167 |
| JERRY FERGUSON | 170 | 183 | 195 | |

E X H I B I T S

| NUMBER | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|

(All exhibits retained by the Court.)

00005

WEDNESDAY, JUNE 7, 2006 9:10 A.M.

PROCEEDINGS

THE COURT: I am going to open the record in Case No. 1485661. This is the matter involving FedEx Ground Package Systems and the Employment Development Department. My name is Jeff Fine. I am the Administrative Law Judge today as of June 7, 2006, and we are having this hearing today in San Bruno, California.

The first matter, which was discussed briefly by both parties prior to opening the record, was the question of the official transcript. And the agreement among the parties is that we will have a court reporter; that transcript that is created by the court reporter will be the official transcript, subject to any corrections that may be made where there is clarity about the correction based on the digital recording that I am making. The Petitioner will bear the expenses of providing a transcript to the Administrative Law Judge and to the Employment Development Department.

Mr. Murphy, representing the Petitioner, is it accurate?

MR. MURPHY: That's correct.

THE COURT: Mr. Stevens, representing the Department?

MR. STEVENS: That is correct, your Honor, as long as the digital tape itself has the final say.

00006

THE COURT: Yes. If it's clear, the digital tape will have the final say. If I did not articulate that, that's what I meant to do.

Is that agreeable, counsel.

MR. MURPHY: That is correct.

THE COURT: So that is what we are going to do here today.

All right. So before we go any further, let me get the Petitioner's representatives and the other individuals on the record.

Start first with you, Mr. Murphy.

MR. MURPHY: I am Richard Murphy of the law firm Sutherland, Asbill & Brennan in Washington D.C., and I am here representing FedEx Ground Package System, Incorporated, Petitioner.

THE COURT: Okay. And next.

MS. CHAMBERS: Kathleen Chambers. I am in-house tax lawyer for FedEx Corporation.

THE COURT: And you, sir?

MR. HOLLINGER: Chris Hollinger from O'Melveny & Myers LLP in San Francisco, representing Petitioner.

THE COURT: Okay. And we will start at the end of the table on the EDD side.

MR. JONES: Good morning. Glenn C. Jones, Senior Staff Counsel with Employment Development Department.

00007

MS ESPEJO: Shanna Espejo, Tax Auditor for EDD.
THE COURT: And?
MR. STEVENS: I am Rick Stevens, attorney for EDD. Mr. Jones and I are co-counsel in the matter.
THE COURT: Now, we have some observers here, and let me get their names.
We will start with you, ma'am, to my left, your right.
MS. DEEDS: I am Sandra Deeds. I am the General Counsel for the Employment Development Department.
THE COURT: All right. And you, sir?
MR. GREEN: Steven J. Green, Deputy Attorney General, State of California.
THE COURT: And you, sir?
MR. HERD: Tom Herd, Senior Manager of Contractor Relations, FedEx Corporation.
THE COURT: How do you spell your last name, Mr. Herd?
MR. HERD: H-E-R-D.
MR. MURPHY: And, your Honor, if I may interject. Mr. Herd is FedEx Ground's company representative at this hearing. He will also be FedEx Ground's lead witness.
THE COURT: Okay. The issue in this case, as I understand it, is a question as to whether certain individuals who are associated with FedEx Ground are

00008

independent contractors or employees. There is an assessment that issued as a result of the Department's conclusion that they were employees, and this is a Petition for Re-Assessment. The assessment that I have is in the amount of $7,297,000 and change.
Any other matters we need to deal with before we start, Mr. Stevens, that you know of?
MR. STEVENS: Well, we have -- yesterday, FedEx and EDD got together and talked about FedEx stipulating to some of the evidence that EDD was going to present, and I believe that we were going to talk about that.
THE COURT: All right. Is that right, Mr. Murphy?
MR. MURPHY: Yes, that is correct, your Honor.
THE COURT: So whatever you guys stipulate to, in terms of evidence, what is that?
MR. STEVENS: Well, we haven't -- they were going to think about it last night.
MR. MURPHY: We were going to think about it last night.
MR. STEVENS: And we were going to talk it about this morning, your Honor.
MR. MURPHY: And we didn't have an opportunity before we got started.
THE COURT: All right. So while there are some documents that we know are going to be evidence, like the

00009

Assessment and the Petition for Re-Assessment.
MR. MURPHY: That's correct.
THE COURT: So why don't I deal with those initially.

MR. MURPHY: Okay.

THE COURT: I have a file of documents which has nothing in it that you have not all seen, although you may not have actually looked at this particular file.

So what I am going to do is mark some of the documents in it. I am going to mark the Assessment as Exhibit 1. Fair enough?

(Exhibit 1 marked for identification.)

THE COURT: We will mark the Department's audit as Exhibit 2, and it is a lengthy document.

MR. STEVENS: The audit report, your Honor?

THE COURT: The audit report, yes. And each page is numbered in the documents, so that if we find ourselves having to refer to the document, we can refer to the specific page so we can all follow along.

Exhibit No. 3 will be the Petition for Re-Assessment, which, again, is a lengthy document, but is paginated. And in it, the Petitioner makes a number of arguments regarding why it believes the Department was incorrect.

(Exhibit 3 marked for identification.)

00010

THE COURT: Exhibit No. 4 is going to be a manual referred to by the Petitioner in its petition called "Roadway Package System, Inc. Pick-Up and Delivery Contractor Operating Agreement."

MR. STEVENS: What is the date on that, your Honor?

THE COURT: The date?

MR. STEVENS: Are those ones that are dated?

THE COURT: No, they may not be dated.

MR. MURPHY: And there may be an aside about that. Your Honor, we may want to substitute the current, or the operating agreement that was current during the period at issue for this one. The Operating Agreement attached to the petition was an older version. They are identical in all material respects, but just for clarity.

THE COURT: All right. Let's mark this as Exhibit 4, what I have, and then we can always mark as another exhibit the updated one, or the later one. This Exhibit 4 is 38 pages, and it's not signed. And let's see if it has a date on it.

MR. STEVENS: The newer versions have a date on the front on the cover sheet.

MR. MURPHY: And the way we might be able to distinguish, your Honor, is this one lists the contracting party as Roadway Package systems.

MR. STEVENS: Right.

00011

MR. MURPHY: Which is different from the one that we have seen.

THE COURT: Okay. So that is what this one is.

MR. MURPHY: Yes.

THE COURT: So that was appended to the Petition for Re-Assessment. So that is Exhibit 4.

(Exhibit 4 marked for identification.)

THE COURT: And Exhibit 5 is going to be a document called "Closing Agreement on Final Determination Covering

Specific Matters, Roadway Package System," and it's a Form 906, and it's whereas the IRS -- some agreement between Roadway Package Systems and IRS. That, again, is multipage, and this one is signed, and it's signed by someone from the EDD on the last page.

MR. MURPHY: If I may, your Honor. That would be the employee --

THE COURT: I'm sorry, employee benefit and signed in 1995. So that is Exhibit 5.

(Exhibit 5 marked for identification.)

THE COURT: Exhibit 6 is a letter addressed to John M. Glenn, Esquire, and it is furnished, it says: "Dear Mr. Glenn: This letter is being furnished to you as part of the overall settlement of the issue involving the federal employment tax status of pick-up and delivery drivers owners-operators." It's dated January 9, 1995.

00012

(Exhibit 6 marked for identification.)

THE COURT: Exhibit 7 is going to be a letter on the letterhead of Shawn, Mann & Niedermayer, Attorneys at Law, dated June 14, 1994, and it's a response to Roadway Package System's request for this law firm to analyze the impact of the U.S. Department of Transportation Safety Regulations on the obligations of RPS under the Contractor Operating Agreement.

That will be Exhibit 7.

(Exhibit 7 marked for identification.)

THE COURT: Exhibit 8 appears to be a sample type of letter with a June, blank, 1994: "Dear Contractor: This is to remind you of the tax reporting obligations you have as an independent contractor."

Now, these documents that I am marking are all referred to and attached to the Petition for Re-Assessment, and they are evidence at some point that the Petitioners were making in the Petition.

(Exhibit 8 marked for identification.)

THE COURT: Exhibit 9 --

MR. HOLLINGER: Your Honor, we have a new attendee in the room. Do you want --

THE COURT: We will deal with that when I am done. Thank you for pointing that out, though.

Exhibit 9 is a similar type of letter with a March,

00013

blank, 1994 "Dear Terminal Managers and Coordinators," and it's seems to be a letter regarding the implementation of the new P&D Contractor Agreement, which I guess was arrived at in '94 as a result of discussions between Roadway and the government.

(Exhibit 9 marked for identification.)

THE COURT: Exhibit 10 is a "Closing Agreement," entitled. And this, again, is -- dates, and so forth, are not filled in, but it contains a background statement and a dispute resolution clause in which the matter is assigned by someone for Roadway Package System and someone from the EDD, dated 10-24-95, four pages.

(Exhibit 10 marked for identification.)

THE COURT: Now, these printout documents, Employer

Account Summary, from '95, which are really part of this. They are attached to this Closing Agreement; is that right?

MR. MURPHY: I believe so, yes, your Honor.

THE COURT: All right. So they are part of. So we will consider that to be part of this last exhibit that I marked, the Closing Agreement.

And then there is a document, which is a power of attorney form. So that gets you guys to be the representatives here. We will mark that just for the completeness of the record. That will be 11.

(Exhibit 11 marked for identification.)

00014

THE COURT: We will mark as 12, the envelope in which all this was contained.

(Exhibit 12 marked for identification.)

THE COURT: We will mark as 13 today's notice of hearing.

(Exhibit 13 marked for identification.)

THE COURT: So that will be the preliminary documents that I would mark and identify. And unless there is any objection, I will put them into the record.

Mr. Murphy, any objections?

MR. MURPHY: No objection, your Honor.

THE COURT: How about you, Mr. Stevens?

MR. STEVENS: I am not sure about the relevancy of 11-year-old agreements, your Honor, but that, I suppose, would go to the weight that you give those.

THE COURT: It goes to the weight, and it is part of their Petition for Re-Assessment. So anyone who might have to read that as part of this might want to be able to refer to these documents and understand better what the Petitioner is saying and decide whether they agree or disagree.

MR. STEVENS: I understand.

THE COURT: All right. So they are all admitted.

(Exhibits admitted in evidence.)

MR. JONES: Before we go any further, is there any way we can get the temperature reduced?

00015

THE COURT: I don't know. I am new to this building myself. I will ask.

(Discussion off the record.)

THE COURT: So we have a new person who entered the room. Can I get your name, please?

MS. ROSS: Beth Ross. I am with Leonard, Carder, LLP.

THE COURT: You are going to be an observer, Ms. Ross, R-O-S-S?

MS. ROSS: Yes.

THE COURT: Okay. Did you say Beth?

MS. ROSS: Yes.

THE COURT: Okay.

MR. STEVENS: She is with Leonard, Carder.

THE COURT: All right. So we have some documents in. We have pending discussions between the Department and the Petitioner about other documents.

Do you want to deal with that now, or do you want

EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FED GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND'S RESPONSE TO PLAINTIFFS' SIXTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Federal Rule of Civil Procedure 26 and 34, Defendant FedEx Ground Package System, Inc. ("FedEx Ground" or "FXG") hereby objects and responds to the Sixth Set[1] of Requests for Production of Documents by Plaintiffs as follows:

**PRELIMINARY STATEMENT**

Responding to Plaintiffs' 101 requests is a massive undertaking that has and continues to require Defendant to deploy a significant number of attorneys and paralegals to address. Moreover, Plaintiffs' requests are much broader than what was agreed to by the parties and memorialized in their Memorandum in Support of the Parties' Joint Motion to Amend the Case Scheduling Order, dated June 11, 2007, and what the Court permitted in its June 29, 2007 Order. Specifically, the parties requested that discovery be reopened for "new discovery … pertain[ing] to issues raised in the newly transferred cases only," (Mem. in. Supp. of Jt. Mot. to Am. Case Scheduling Order at 9), and the Court permitted "limited discovery on cases transferred to this

1 Plaintiffs have served two distinct document requests identified as their "Sixth" set of requests for production. This document responds to the set dated August 16, 2007.

state or company-wide during the period 1999 to the present. Please produce any document responsive to this request that is stored in an electronic format such as Excel in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 296:**     Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order.  Defendant further objects to this Request on the ground that the term "who you contend" is vague and ambiguous.  Subject to and without waiving the foregoing objections, Defendant will produce a document or documents sufficient to show the approximate number of U.S.-based P & D Contractors nationwide who elected not to participate in the Flex Program from the year 2000 to the present.

**Request for Production No. 297:**    All OPR-209 forms (Missed Pick-Up CCS Responses) relating to any terminal during the period 2000 to the present to the extent such documents have not been previously produced. Please identify any responsive documents that have previously been produced by Bates number.

**Response to Request for Production No. 297:**     Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order.  Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the documents with reasonable particularity.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June

11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 298:** All Weekly Turnover Summaries for any terminal, region or state, during the period 2004 to the present to the extent such documents have not been previously produced. Please produce any document responsive to this request that is stored in an electronic format or program (such as Microsoft Excel) in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 298:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the grounds that it is duplicative of previous discovery requests including, but not limited to, Request for Production No. 17. Subject to and without waiving the foregoing objections, Defendant will produce Weekly Turnover Summaries to the extent such documents exist, have not been previously produced or provided in written discovery, and can be located by Defendant after a reasonably diligent search pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 299:** All documents reflecting every version of the PowerPoint slide presentation entitled "Managing the Brand -- Senior Management Orientation" or "Protecting and Managing the Brand —Senior Management Orientation" or "Protecting and Enhancing the Brand" presented or provided to any FedEx Ground or Home Delivery management employee from 2004 and the present to the extent such documents have not been previously produced, and/or any documents reflecting presentations given to FedEx Ground or

have not been previously produced or provided in written discovery, and can be located by Defendant after a reasonably diligent search pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 301:**   All correspondence between Diane O'Shea and any representative of any truck leasing company, whether in written or email format, including, but not limited to, Bush Leasing Company, Continental First Federal, Inc., Stearns Bank, Forman-Price Vehicle Leasing and Quality Leasing Co. Inc. relating to equipment leased by drivers and vehicles purchased by the Defendant during the period 2000 to the present.

**Response to Request for Production No. 301:**      Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the documents with reasonable particularity.  Defendant further objects to this Request on the ground that the term "driver" is vague and ambiguous.  Defendant further objects to this Request on the ground that "Diane O'Shea" fails to identify an employee of the Defendant.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 302:**   All documents reflecting communications between Defendant and any insurance broker, provider or carrier, including, but not limited to, Protective Insurance Co., Baldwin & Lyons and Marsh McClellan, relating to any aspect of the requirement implemented June 2007 that all FedEx Ground and Home Delivery drivers obtain and maintain

in place worker's compensation insurance for themselves and/or persons they employ where required by State law (as opposed to "work accident insurance" provided by Protective Insurance Company), including the reason(s) the requirement was implemented, the amount of the premiums to be charged to drivers in each state and the coverage limits for true worker's compensation insurance, the method for collecting and accounting for insurance premiums deducted from drivers' settlement checks for forwarding on to any insurance broker, carrier or provider, whether Defendant could or would underwrite or subsidize the costs to be incurred by drivers to obtain such insurance, either directly or indirectly and, if so, amounts paid by Defendant in each state or locality to subsidize the costs incurred by drivers in obtaining such insurance.

**Response to Request for Production No. 302:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the grounds that it is vague and unintelligible in that it appears to seek several different types of documents in a single Request. Defendant further objects to this Request on the grounds that the terms "relating to" and "reflecting" are vague, ambiguous, overbroad and do not identify the documents with reasonable particularity. Defendant further objects to this Request on the ground that the term "driver" is vague and ambiguous. Defendant further objects to this Request on the ground that the term "could or would" is vague, ambiguous and unintelligible. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 303:**   All documents reflecting monetary payments from Defendant to any insurance broker, provider or carrier, or any agreement by Defendant to make such payments, for the purpose of underwriting and/or subsidizing the cost of workers' compensation insurance obtained by drivers between June 2007 to the present. Please produce any document responsive to this request that is stored in an electronic format or program (such as Microsoft Excel) in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 303:**   Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the ground that the term "driver" is vague and ambiguous.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto.  In addition, investigation revealed that no documents responsive to this Request exist.  Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 304:**   All documents reflecting presentations made to FedEx management employees, whether at the terminal, regional or corporate level, addressing any aspect of the subject of route reconfiguration, including, but not limited to, any updates or revisions to the presentation entitled P & D Route Reconfiguration dated April 23, 2003, from 2003 to the present.

**Response to Request for Production No. 304:**   Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague,

ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that the term "reflecting presentations" is vague and ambiguous. Defendant further objects to this Request on the ground that "any aspect" is overbroad and unduly burdensome. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 305:**    All documents containing map(s) or diagrams reflecting the geographic boundaries of each "primary service area" encompassed within each FedEx Ground terminal during every year for each year between 2000 to the present, including, but not limited to, Wall Maps and all layers or overlays, core zone maps and similar documents.

**Response to Request for Production No. 305:**    Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 306:**    All documents reflecting any occasion when Defendant paid to any driver consideration of the purchase of a route or pursuant to Section 5.2 of the Operating Agreement in consideration of route reconfiguration. Please produce any document responsive to this request that is stored in an electronic format or program (such as Microsoft

Case 3:05-md-00527-RLM -CAN document 1294-2 filed 05/27/08 page 22 of 38

Excel) in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 306:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that the term "driver" is vague and ambiguous. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 307:** All documents reflecting the number of Ground and Home Delivery drivers who have participated in the QPDL program, on a monthly, quarterly, and/or annual basis, in each region, during each year from 2003 to the present. Please produce any document responsive to this request that is stored in an electronic format or program (such as Microsoft Excel) in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 307:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 308:**  All documents the identify and/or relate to any training

provided to a newly hired or newly promoted terminal manager, including the location of such

training, the duration of such training, and the person or persons who provide such training

between 2000 and the present to the extent such documents have not been previously produced.

Please identify any responsive documents that have previously been produced by Bates number.

**Response to Request for Production No. 308:**  Defendant incorporates by reference General

Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague,

ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the

ground that "relate to" is vague and ambiguous and does not identify the documents with

reasonable particularity.  Defendant further objects to this Request on the ground that "between

2000 and the present" is vague and ambiguous.  Subject to and without waiving the foregoing

objections, Defendant will produce senior manager orientation materials to the extent they exist,

have not been previously produced or provided in written discovery, and can be located by

Defendant after a reasonably diligent search pursuant to the terms of the "First" paragraph in the

May 15 Letter Agreement.

**Request for Production No. 309:**  All documents reflecting each and every "Pickup and

Delivery Tune Up" analysis performed by Defendant relating to any Ground or Home Delivery

terminal from 2000 to the present, including, but not limited to, documents containing the same

or similar information and presented in the same or similar format to that reflected in

FXG000535506-535514.

**Response to Request for Production No. 309:**  Defendant incorporates by reference General

Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague,

ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set

forth in the Court's Scheduling Order. Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the documents with reasonable particularity. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 310:**    All documents relating to the June 2007 settlement enhancements presented to FedEx Ground and Home Delivery drivers, including, but not limited to, interoffice memoranda, instruction sheets, scripts, PowerPoint slide presentations, overheads or other materials presented or distributed to Defendant's management employees to utilize in presenting the 2007 settlement enhancement to drivers, as well as any written materials provided to drivers pertaining to the 2007 settlement enhancements.

**Response to Request for Production No. 310:**    Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the grounds that the terms "settlement enhancements," "Defendant's management employees," "to utilize," "in presenting," and "pertaining to" are vague and ambiguous. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Subject to and without waiving the foregoing objections, Defendant will produce documents

forth in the Court's Scheduling Order. Defendant further objects to this Request on the ground that it is duplicative of other discovery requests including, but not limited to, Request for Production No. 61, to which Defendant has already produced responsive document(s). Defendant will produce documents responsive to this Request consistent with its response to Request for Production No. 61, to the extent such documents exist, have not been previously produced or provided in written discovery, and can be located by Defendant after a reasonably diligent search.

**Request for Production No. 313:**    All documents that relate to any vehicle appearance improvement program(s), vehicle buy-back programs or requirements initiated by Defendant between 2004 and the present, including paint, decals, external body work, internal configuration (such as the addition or elimination of shelving) to the extent such documents have not been previously produced. Please identify any responsive documents that have previously been produced by Bates number.

**Response to Request for Production No. 313:**    Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that the terms "relate to" and "between 2004 and the present" are vague, ambiguous, overbroad and do not identify the documents with reasonable particularity. Defendant further objects to this Request on the grounds that it appears to seek several different types of documents in a single request. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as

understandings between the parties related thereto.  Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 314:**    All documents identifying for each P & D driver participating in the "Premium Plus" settlement: (a) the full name and address of each participant; (b) the total amount of additional compensation received by each participant.

**Response to Request for Production No. 314:**    Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order.  Defendant further objects to this Request on the grounds that the term "Premium Plus" is vague and unintelligible.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto.  Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 315:**    All Terminal Contractor Relations Reviews for the terminals listed in Request for Production No. 286 above from January 1, 1999 to the present, to the extent not previously produced.  Please identify any responsive documents that have previously been produced by Bates number.

**Response to Request for Production No. 315:**    Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order.  Defendant further objects to this Request on the ground that it is vague and unintelligible in that it appears to seek several different types of documents in

a single request.  Subject to and without waiving the foregoing objections, Defendant will produce Terminal Contractor Relations Reviews for the eight (8) terminals it will produce documents from in response to RFP 286, to the extent such documents exist, have not been previously produced or provided in written discovery, and can be located by Defendant after a reasonably diligent search pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 316:**    To the extent not previously produced in response to Plaintiffs' Request for Production Number 2, all current and past organizational charts for corporate operations in Pittsburgh including the Contractor Relations Department.

**Response to Request for Production No. 316:**    Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order.  Defendant further objects to this Request on the ground that the term "in Pittsburgh" is vague and ambiguous.  Defendant further objects on the ground that this Request is duplicative of previous discovery requests including, but not limited to, Request for Production No. 2.  On August 8, 2007, Defendant provided organizational chart materials (Bates-stamped ORG0001-0096) to Plaintiffs, in addition to those produced in the discovery period which ended January 31, 2007.  Defendant will produce no additional documents in response to this request.

**Request for Production No. 317:**    To the extent not previously produced, all documents, correspondence, reports or action plans involving any terminal audit conducted by any department located at Defendants headquarters in Pittsburgh, PA. Please produce any document responsive to this request that is stored in an electronic format such as Excel in an electronic

format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 317:**   Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto.  Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 318:**   Any documents relating to, describing or discussing the reason(s) for the increase in Contractor Relations personnel since 2005 and any such increase.

**Response to Request for Production No. 318:**   Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the documents with reasonable particularity.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto.  Accordingly, Defendant will produce no documents in response to this Request.

suggestions for Ground or Home Delivery drivers from January 1, 2000 to the present, including, but not limited to, the policy changes described above in document request No. 319 above.

**Response to Request for Production No. 320:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order. Defendant further objects to this Request on the ground that the term "FedEx" is vague and ambiguous. Defendant further objects to this Request on the ground that the term "of any kind" is vague and ambiguous. Defendant further objects to this Request on the ground that it is duplicative of other discovery requests including, but not limited to, Request for Production Nos. 9 and 289. Subject to and without waiving the foregoing objections, Defendant will produce final general communications to all U.S.-based P & D contractors to the extent such documents exist, have not been previously produced and can be located by Defendant after a reasonably diligent search pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 321:** All documents containing information regarding injuries sustained by P & D drivers while performing any of their duties as P & D drivers for Defendant including, but not limited to the P & D driver's name, address and terminal; the date the injury occurred; the nature of the injury; the cause of the injury; the location of the P & D driver at the time of the injury, duration of the injury, any dates or times P & D activities were not performed as a result of the injury, and any actions taken by FedEx as a result of such injury.

**Response to Request for Production No. 321:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the the

grounds that it seeks documents that are neither relevant to this matter, nor reasonably calculated to lead to the discovery of admissible evidence, and that the burden of responding outweighs the likely benefits. Defendant further objects to this Request on the ground that the term "regarding" is vague and ambiguous. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 322:** Any documents, spreadsheets or reports reflecting the total number of current and former drivers from 1999 to the present referred to as "independent contractors" for FedEx Ground including; ID number, contractor name, business name, terminal number/name/state, and phone number as produced in FXG000673621 for the following states: Nevada, Arizona, Alabama, Georgia, Louisiana, North Carolina, Vermont, Maryland, West Virginia, Florida, Connecticut and Massachusetts. Please produce any document responsive to this request that is stored in an electronic format such as Excel in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 322:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, unduly burdensome and inconsistent with the discovery time limits set forth in the Court's Scheduling Order. Defendant further objects to this Request on the ground that "referred to" is vague and ambiguous. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and

**Request for Production No. 328:**    All documents concerning any financial assistance P & D drivers received in connection with the incorporation of businesses through The Company Corporation, including, but not limited to, the amount of such financial assistance and the requirements of any such assistance program.

**Response to Request for Production No. 328:**    Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the grounds that it is vague and ambiguous, overbroad and unduly burdensome and seeks documents from third parties not connected to this action.  Defendant further objects on the ground that the terms "concerning" and "requirements" are vague and ambiguous.  Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Based on these objections, and based on investigation which revealed no documents responsive to this request, Defendant will produce no documents in response to this Request.

**Request for Production No. 329:**    All Multiple Complaint Contractor reports (containing the same or similar information to that shown in FXG000608317) relating to any terminal, region, or state, for the period 1999 to the present, to the extent such documents have not been previously produced.

**Response to Request for Production No. 329:**    Defendant incorporates by reference General Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the

documents with reasonable particularity. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 330:**   All documents concerning the identity (including name, address, terminal location and date of demand) of each P & D driver who has made a demand for arbitration of the termination of his or her contract under the arbitration provisions of the OA to the extent that such information has not previously been produced for the following states: Nevada, Arizona, Alabama, Georgia, Louisiana, North Carolina, Vermont, Maryland, West Virginia, Florida, Connecticut and Massachusetts.

**Response to Request for Production No. 330:**   Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that the term "concerning" is vague and ambiguous. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Subject to and without waiving the foregoing objections, Defendant will produce arbitration demand letters from P & D contractors in Nevada, Arizona, Georgia, Louisiana, North Carolina, Vermont and Connecticut to the extent such documents exist, have not been previously produced or provided in written discovery, and can be located by Defendant after a reasonably diligent search pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 331:**    As to each P & D driver who has had his or her claim

arbitrated, all documents concerning the award issued by the arbitrator, the date of the

arbitration, the name of the arbitrator, and the location of the arbitrator to the extent such

information has not already been produced for the following states: Nevada, Arizona, Alabama,

Georgia, Louisiana, North Carolina, Vermont, Maryland, West Virginia, Florida, Connecticut

and Massachusetts.

**Response to Request for Production No. 331:**    Defendant incorporates by reference General

Objections 1-13, set forth above.  Defendant specifically objects to this Request as vague,

ambiguous, overbroad, and unduly burdensome.  Defendant further objects to this Request on the

ground that the term "concerning" is vague and ambiguous.  Defendant further objects to this

Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order

and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case

Scheduling Order, as well as understandings between the parties related thereto.  Subject to and

without waiving the foregoing objections, Defendant will produce arbitration award

determinations related to P & D contractors from Nevada, Arizona, Georgia, Louisiana, North

Carolina, Vermont and Connecticut to the extent such documents exist, have not been previously

produced or provided in written discovery, and can be located by Defendant after a reasonably

diligent search pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 332:**    All Monthly Training Compliance Reports relating to any

terminal, region or state, for the period 1999 to the present, to the extent such documents have

not been previously produced, including, but not limited to, such reports for the reporting periods

covered by the fourth quarter of FY2006 and all quarters covered by FY2007. Please produce

any document responsive to this request that is stored in an electronic format or program (such as

Microsoft Excel) in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 332:**     Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the documents with reasonable particularity. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 333:**     All documents reflecting the initial calculation(s) performed to determine the appropriate Temporary Core Density Settlement (TCZDS) amount to he paid to each Plaintiff for each contracted route, as well as all documents reflecting any subsequent calculation(s) performed to determine any adjustments to the TCZDS for each such route pursuant to the formula described in Defendant's First Supplemental Response to Interrogatory No. 114, to the extent such documents have not been previously produced.

**Response to Request for Production No. 333:**     Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case

Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 334:**    All documents referred to or relied upon in performing the calculation(s) to determine the appropriate Temporary Core Density Settlement (TCZDS) amount to be paid to each Plaintiff for each contracted route, and any subsequent calculations, pursuant to the formula described in Defendant's response to Interrogatory No. 114, including but not limited documents reflecting the estimated cost items of operating each route, and estimated settlement amounts described in Defendant's First Supplemental Response to Interrogatory Nos. 115 and 116, to the extent such documents have not been previously produced.

**Response to Request for Production No. 334:**    Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 335:**    All "Core Zone Structure Update Forms" for all FedEx Ground and FHD terminals during the period 2002 to the present, to the extent such documents have not been previously produced.

**Response to Request for Production No. 335:**    Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the

Case 3:05-md-00527-RLM -CAN document 1294-2 filed 05/27/08 page 30 of 38

ground that the term "during the period" is vague and ambiguous. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 336:** All Contractors in Jeopardy Worksheets, containing the same or similar information to that shown in FXG000608338, relating to any terminal, region or state, for the period 1999 to the present, to the extent such documents have not been previously produced. Please produce any document responsive to this request that is stored in an electronic format or program (such as Microsoft Excel) in an electronic format (either excel or as a comma-delimited flat file), even as to documents previously produced as TIF or PDF files.

**Response to Request for Production No. 336:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the documents with reasonable particularity. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 337:** All "Headcount" documents completed by any member of terminal management, or by FedEx corporate management for a particular terminal, in any state

from January 1, 1999 to the present, to the extent not previously produced in response to

Plaintiffs' RFP No. 62.

**Response to Request for Production No. 337:**     Defendant incorporates by reference General

Objections 1-13, set forth above. Defendant specifically objects to this Request as vague,

ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the

ground that it is duplicative of previous discovery requests including, but not limited to, Request

for Production No. 62. Subject to and without waiving the foregoing objections, Defendant will

produce documents responsive to this Request consistent with its response to Request for

Production No. 62, to the extent such documents exist, have not been previously produced or

provided in written discovery, and can be located by Defendant after a reasonably diligent search

pursuant to the terms of the "First" paragraph in the May 15 Letter Agreement.

**Request for Production No. 338:**     Any documents not previously produced containing or

relating to current and past job descriptions of persons in the Contractor Relations department,

including Tim Edmonds, the person to whom each reports and the scope of each person's

authority.

**Response to Request for Production No. 338:**     Defendant incorporates by reference General

Objections 1-13, set forth above. Defendant specifically objects to this Request as vague,

ambiguous, overbroad, and unduly burdensome. Defendant further objects to this request on the

ground that the term "past" is overbroad. Defendant further objects to this Request on the

grounds that the term "relating to" is vague, ambiguous, overbroad and does not identify the

documents with reasonable particularity. Defendant further objects to this Request on the ground

that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in

the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as

well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 339:** With respect to each course identified in FXG000790272-790273, please produce complete copies of any web-based materials in connection with that course.

**Response to Request for Production No. 339:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Subject to and without waiving the foregoing objections, Defendant will produce materials identified on the list referenced in Request for Production No. 339 to the extent they relate to Defendant's relationship with U.S.-based P & D contractors.

**Request for Production No. 340:** All photographs, motion pictures and/or videotapes or summary of any and all surveillance of any named Plaintiff at any time.

**Response to Request for Production No. 340:** Defendant incorporates by reference General Objections 1-13, set forth above. Defendant specifically objects to this Request as vague, ambiguous, overbroad, and unduly burdensome. Defendant further objects to this Request on the ground that it exceeds the limitations set forth in the Court's June 29, 2007 Order and memorialized in the June 11, 2007 Memorandum in Support of Joint Motion to Amend Case Scheduling Order, as well as understandings between the parties related thereto. Accordingly, Defendant will produce no documents in response to this Request.

**Request for Production No. 341:** All documents referring, relating or pertaining to each FedEx's termination/non-renewal, within the past 4 years, of the employment or OA of any individual who had ever requested leave on account of military or reserve service.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | CHIEF JUDGE MILLER |

**DECLARATION OF MICHAEL D. FRYT IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' AMENDED RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

I, Michael D. Fryt, declare and state as follows:

1. I am the Corporate Vice President of Tax at FedEx Corporation. In this role, I am responsible for overseeing all corporate tax matters, including tax audits, for FedEx Corporation and its subsidiaries, including FedEx Ground Package System, Inc. ("FedEx Ground"). I submit this declaration in support of Defendant FedEx Ground's Opposition to Plaintiffs' Amended Rule 37 Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2. The Internal Revenue Service ("IRS") began an employment tax audit of FedEx Ground's 2002 tax return in December 2003. This audit is still in progress.

3. As part of the audit process, FedEx Ground and the IRS have engaged in extensive, ongoing discussions. In December 2007, the IRS sent FedEx Ground the draft Notice of Proposed Adjustment ("NOPA"). At the top of the form document, in bold, capital letters, appears the word "**DRAFT**."

4. After FedEx Ground had an opportunity to review the draft NOPA, FedEx Ground met with the IRS to discuss issues raised in the draft, and FedEx Ground's positions with respect to those issues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 23, 2008.

Michael D. Fryt

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re: FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | CHIEF JUDGE MILLER |

**AFFIDAVIT OF PROFESSOR GEORGE L. PRIEST**

I. Brief Statement of Qualifications

1. I serve as a professor of law and economics at Yale Law School, teaching courses in torts, civil procedure, insurance, antitrust, products liability, and the economic analysis of law. I have served as a professor at Yale Law School since 1980. I hold a chair as the John M. Olin Professor of Law and Economics at Yale Law School.

2. My experience extends beyond the academic. For the past eighteen years, I have served as a Special Master in the federal District of New Jersey in the litigation, McLendon v. The Continental Group, Inc., upon reference by the Honorable H. Lee Sarokin and, subsequently, under the Honorable Dickinson R. Debevoise. The McLendon case is a nationwide class action comprising over 7,000 settlement participants which was settled in 1990 for the sum of $415 million.

3. As part of my responsibilities as a Special Master, I was asked to resolve among the parties countless numbers of discovery disputes over the production of documents, witnesses and the like. Thus, I am aware of the nature of the discovery process.

4. As a further part of my responsibilities, it was necessary for me to supervise attorneys for the class and, on many occasions, participate directly in negotiations with the Internal Revenue Service (I.R.S.). The reason that the McLendon litigation has extended for as long as it has—again, over seventeen years after the settlement of the dispute—is that the attorneys for the class believed that the settlement amounts awarded to class members were exempt from income taxation as personal injury damages. Pursuant to that claim, it was necessary to work out with the I.R.S. a mechanism for seeking a judicial resolution of the tax issues involved. Along with the attorneys, I worked with the I.R.S. to obtain an agreement to pursue four separate test cases which eventually reached four separate federal Courts of Appeal. Regrettably, the decisions of these four Courts were not uniform: roughly speaking, two supported the position of the I.R.S. that the settlements were subject to taxation; two others supported the position of the class that the settlements were tax-exempt. Following these resolutions, it was again necessary for me, in the context of supervising the attorneys for the class, to work with the I.R.S. in crafting a final settlement with respect to the class members' claims. (There were several other tax issues, as well, each requiring discussion with the I.R.S. following I.R.S. proposals of "draft" findings.) As a consequence, I have had substantial experience in working with I.R.S. officers at all levels of administration, from what might be called the "field" level to the highest levels of administration whose officers ultimately approve or disapprove preliminary agreements or findings.

5. Entirely separate from my work as a Special Master, I have served on multiple occasions as an expert witness for FedEx Ground Transportation in various litigation around the country. I am aware of FedEx Ground's organization and operations. I do not view the testimony I am presenting in this Affidavit as expert testimony, but rather testimony based upon my experience as a Special Master, in particular, in working with the I.R.S. to reach a final determination of tax issues. I am being compensated by FedEx Ground at my standard rate of $750.00 per hour. My complete resume appears as Appendix I.

6. I have been asked to address the status of the draft Notice of Proposed Assessment (NOPA) at issue in the underlying discovery dispute before the Court. For this purpose, I have reviewed the Plaintiffs' Third Amended Complaint, the FedEx Corporation's Form 10-Q of November 30, 2007, the Plaintiffs' Memorandum in Support of Their Amended Rule 37 Motion to Compel Production of IRS

Notice of Proposed Assessment and Corporate Designee Deposition, and the Declaration of Susan E. Ellingstad in support of that Motion.

7. From my experience with the I.R.S., a document marked by the I.R.S. as a "Draft" is highly preliminary and stands far from any final resolution or determination by the agency both in substance and in terms of any ultimate conclusion by the I.R.S. as to the questions underlying the subject at issue. In the McLendon litigation, for example, the class received draft findings by the I.R.S. that were completely factually erroneous, necessitating extensive subsequent discussions between lower level officers of the agency and attorneys for the class. In more than one instance, it was necessary for me to intervene with these officers—roughly approximating field officers—in order to correct the erroneous basis for the draft opinion so to proceed to a rational resolution of the issue.

8. It was moreover the experience of the McLendon litigation that draft findings by lower level officials, even when the underlying factual basis had been corrected, were often adjusted or overturned by higher level officials to whom the lower officials reported. This made it necessary again for the attorneys and myself to engage in further protracted discussions with then the next higher level of officers toward resolution. Indeed, this experience of de novo review of previous "draft" findings proceeded through several levels of I.R.S. administration.

9. Quite frankly, in my experience, the I.R.S. is a very complicated bureaucracy. As mentioned, regardless of the seriousness of any single issue, there are multiple levels of I.R.S. officer review, each affording little deference to either the field level officers or even to the officers to whom field officers report. That is why, as I recall, it took roughly six years from the final resolution of the four McLendon test cases to conclude a final determination with the I.R.S. as to the tax treatment of the class settlement.

10. For these reasons, though I surely do not speak for the I.R.S., it would be my expectation that the draft NOPA at issue here is a highly preliminary document. Based upon my experience, the terms of an initial I.R.S. draft may not resemble in any significant way the terms of a final determination by the I.R.S. given both that the draft is subject to substantial discussion with the taxpayer and that multiple layers of subsequent agency review may change it entirely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and understanding.

Executed in New Haven, Connecticut on this 27th day of May, 2008.

George L. Priest

# APPENDIX I

Resume

May, 2008

George L. Priest

Yale Law School
P.O. Box 208215
New Haven, Connecticut 06520-8215
Telephone: (203) 432-1632
Fax: (203) 432-7225
e-mail: george.priest@yale.edu

Home Office
350 Livingston Street
New Haven, Connecticut 06511
Telephone: (203) 562-8467
Fax: (203) 562-7692

Personal:

Age: 60
Birth: November 24, 1947
Married, four children, six grandchildren

Employment:

John M. Olin Professor of Law and Economics, Yale Law School, since 1986. Professor of Law, Yale University, since 1981. Director, Program in Civil Liability, Yale Law School, since 1982. Director, John M. Olin Center for Studies in Law, Economics and Public Policy, Yale Law School, 1983-1988; Co-Director, since 1988.

Visiting Professor, Yale University, 1980-81. Professor of Law, University of California, Los Angeles, 1980-81; Visiting Professor, 1979-80. Professor of Law, State University of New York, Buffalo, 1979-80; Associate Professor, 1977-79. Lecturer and Fellow in Law and Economics, University of Chicago Law School, 1975-77. Associate Professor of Law, University of Puget Sound, Tacoma, Washington, 1975-1977 (on leave); Assistant Professor, 1973-75.

Other Visiting Professor Positions: University of Washington School of Law, 1980; University of Miami Economics Department and Graduate School of Business, 1982-85; University of Rome, "Law Sapienza," Rome, Italy, 1983, 1986; Scuola Superiore, University of Pisa, Italy, 1984, 1986, 1988; University of Toronto Department of Economics and Law School, 1988; Escuela de Derecho, Universidad de Puerto Rico, 2007.

Education:

B.A., Yale University (1969); J.D., University of Chicago (1973).

Bibliography:

A. Published and Committed Articles

1. Law and Economic Distress: Sangamon County, Illinois 1837-1844, 2 J. Legal Studies 469 (1973). Reprinted in Essays in Nineteenth-Century American Legal History (W. Holt, ed., 1976).

2. The History of the Postal Monopoly in the United States, 18 J. Law & Econ. 33 (1975).

3. The Common Law Process and the Selection of Efficient Rules, 6 J. Legal Studies 65 (1977).

4. Cartels and Patent License Arrangements, 20 J. Law & Econ. 309 (1977). Reprinted in 8 J. Rep. for Antitrust Law & Econ. 357 (1979).

5. Breach and Remedy for the Tender of Nonconforming Goods under the Uniform Commercial Code: An Economic Approach, 91 Harv. L. Rev. 960 (1978). Excerpts reprinted in Economic Readings in Contract Law (Posner & Kronman eds., 1978).

6. Selective Characteristics of Litigation, 9 J. Legal Studies 399 (1980).

7. The Structure and Administration of the Magnuson-Moss Warranty Act, in Economic Regulation and Consumer Welfare: The Federal Trade Commission in the 1970's (Clarkson and Muris eds., Cambridge U. Press, 1981).

8. The New Scientism in Legal Scholarship: A Comment on Clark and Posner, in Symposium: "Legal Scholarship: Its Nature and Purposes," 90 Yale L.J. 1284 (1981).

9. A Theory of the Consumer Product Warranty, 90 Yale L.J. 1297 (1981). Awarded the 1981-82 Prize for Distinguished Scholarship in Law and Economics (University of Miami). Excerpted and reprinted variously.

10. Punitive Damages and Enterprise Liability, 56 So. Cal. L. Rev. 123 (1982).

11. The Civil Jury: Trends in Trials and Verdicts, Cook County, Illinois, 1960-1979 (with Mark Peterson) (Rand Corp., R-2881-ICJ, 1982). Reprinted 32 Fed. Ins. Counsel Q. 361 (1982).

12. Will Uniform Legislation Increase or Decrease the Rate of Injuries from Product Defects?, in Product Liability and Tort Law Reform at 7 (Theberge ed., 1982).

13. Regulating the Content and Volume of Litigation: An Economic Analysis, 1 Sup. Ct. Econ. Rev. 163 (1982). Reprinted as Rand Corp., R-3084-ICJ (1983).

14. The Best Evidence of the Effect of Products Liability Law on the Accident Rate, 91 Yale L.J. 1386 (1982).

15. Social Science Theory and Legal Education: The Law School as University, 33 J. Leg. Ed. 437 (1983).

16. The Selection of Disputes for Litigation (with Benjamin Klein), 13 J. Legal Studies 1 (1984). Reprinted as Rand Corp., R-3084-ICJ (1984).

17. Law and Economics and Law Reform: A Comment on Barth's Cancer Compensation Proposal, 13 J. Legal Studies 587 (1984).

18. Gossiping about Ideas, 93 Yale L.J. 1625 (1984).

## APPENDIX I

19. The Economics of Cost and Fee Rules: A Primer, In Health-Related Claims: Can the Tort and Compensation Systems Cope? at 189 (1984).

20. Reexamining the Selection Hypothesis, 14 J. Legal Studies 215 (1985).

21. Commentary on the Dodd and Gorton Amendments to S-100 (The Kasten Bill) (with Guido Calabresi), Working Paper #34, Program in Civil Liability, Yale Law School, June 1985.

22. What Economists Can Tell Lawyers about Intellectual Property, 8 Research in Law & Econ. 19 (1986).

23. Introduction, "Critical Issues in Tort Law Reform: A Search for Principles" (with Richard A. Epstein), 14 J. Legal Studies 459 (1985).

24. The Invention of Enterprise Liability: A Critical History of the Intellectual Foundations of Modern Tort Law, 14 J. Legal Studies 461 (1985). Excerpted and reprinted variously.

25. Legal and Scientific Concepts of Causation, in Causation and Financial Compensation at 475 (Burger, ed. 1986).

26. The Personality Theory of Agency Regulation, 3 Yale J. Regulation 391 (1986).

27. My Greatest Benefactions, 9 U. Puget Sound L. Rev. 457 (1986).

28. Compensation Systems and Tort Law: A Preliminary Comparative Approach in Risk, Compensation, and Liability: The Policy Choices at 161 (C.E.D., 1986).

29. The Current Insurance Crisis and Modern Tort Law, 96 Yale L.J. 1521 (1987). Excerpted and reprinted variously.

30. Puzzles of the Tort Crisis, 48 Ohio L. Rev. 497 (1987).

31. Modern Tort Law and Its Reform, 22 Valparaiso L. Rev. 1 (1987). Reprinted as El derecho de la responsabilidad extracontractial moderno y su reforma in La responsabilidad extracontractual at 263 (C.F. Rosenkrantz com. 2005).

32. The Liability Crisis: A Diagnosis, Fall 1987 Yale Law Report 2.

33. The Disappearance of the Consumer From Modern Products Liability Law, in The Frontier of Research in the Consumer Interest at 771 (Maynes ed., 1988).

34. Measuring Legal Change, 3 J. Law, Econ. & Org. 193 (1988).

35. The Aims of Privatization, 6 Yale Law & Policy Rev. 1 (1988).

36. Satisfying the Multiple Goals of Tort Law, 22 Valparaiso L. Rev. 643 (1988).

37. Products Liability Law and the Accident Rate, in Liability: Perspectives and Policy at 184 (Litan & Winston eds., Brookings Inst. 1988).

38. Compensation for Personal Injury in the United States, in Compensation for Personal Injury in Sweden and other Countries at 127 (J. Hellner ed., 1988).

39. Understanding the Liability Crisis, in New Directions in Liability Law (Proceedings of the Academy of Political Science) at 196 (W. Olson ed., 1988).

40. Statement Dissenting and Concurring, American Bar Association, Report of the Commission to Improve the Liability Insurance System at F-1 (1989).

41. The Antitrust Suits and the Public Understanding of Insurance, 63 Tulane L. Rev. 999 (1989). Reprinted variously.

42. Strict Products Liability: The Original Intent, 10 Cardozo L. Rev. 2301 (1989). Reprinted variously.

43. La Controrivoluzione nel Diritto della Responsibilita' da Prodotti negli Stati Uniti d'America (The Counter-Revolution in Products Liability in the United States), 119 Il Foro Italiano 1 (N.4, March 1989).

44. Introduction, "Issues in Civil Procedure: Advancing the Dialogue" (with Judyth W. Pendell), 69 Boston U.L. Rev. 467 (1989).

45. Private Litigants and the Court Congestion Problem, 69 Boston U. L. Rev. 527 (1989).

46. Insurability and Punitive Damages, 40 Alabama L. Rev. 1009 (1989). Excerpted and reprinted variously.

47. The Modern Irony of Civil Law: A Memoir of Strict Products Liability in the United States, 9 Tel-Aviv U. Studies in Law 93 (1989).

48. The Increasing Division Between Legal Practice and Legal Education, 37 Buff. L. Rev. 681 (1989).

49. Crisis Comes to the Insurers: The Modern Misunderstanding of Insurance Policy, 3 Insurance Law Anthology 13 (1989).

50. The Continuing Crisis in Liability, 1 Prod. Liability L. J. 243 (1989).

51. The Deep Justification for Tort Reform, in Product Liability Reform: Debating the Issues at 7 (Chilton ed., Cen. Study Amer. Bus., No. 98, Washington Univ., St. Louis 1990).

52. The New Legal Structure of Risk Control, 119 Daedalus 207 (1990). Reprinted in Risk at 207 (Burger ed., 1993); forthcoming in The International Library of Essays in Law and Society (Sarat, ed., 2006).

Case 3:05-md-00527-RLM CAN document 1294-4 filed 05/27/08 page 9 of 17

## APPENDIX I

53. L'Assicurazione Obbligatoria per la Circolazione degli Autoveicoli negli Stati Uniti (The Compulsory Automobile Insurance Problem in the United States), 1 Quadrimestre rivista di diritto privato 32 (1990).

54. The Role of the Civil Jury in a System of Private Litigation, 1990 U. Chi. Leg. Forum 161 (1990).

55. Riding the Tide toward Modern Tort Law: William Prosser's "The Assault upon the Citadel (Strict Liability to the Consumer)", 100 Yale L.J. 1470 (1991).

56. Law and Economics after Europe's Revolution, in Economic Analysis of Law: A Collection of Applications (Weigel, ed., 1991).

57. The Modern Expansion of Tort Liability: Its Sources, Its Effects, and Its Reform, 5 J. Econ. Perspectives 31 (1991).

58. Foreword, "Modern Civil Procedure: Issues in Controversy" (with Judyth W. Pendell), 54 Law and Contemp. Probs. 1 (1991).

59. Can Absolute Manufacturer Liability be Defended?, 9 Yale J. on Reg. 237 (1992).

60. The Inevitability of Tort Reform, 26 Valparaiso L. Rev. 701 (1992).

61. The Triumphs or Failings of Modern Legal Scholarship and the Conditions of its Production, 63 Colorado L. Rev. 725 (1992).

62. Justifying the Civil Jury, in Verdict: Assessing the Civil Jury System at 103 (Litan ed., Brookings Institution 1993).

63. The Origins of Utility Regulation and the "Theories of Regulation" Debate, 36 J. Law & Econ. 289 (1993). Reprinted in Transaction Cost Economics (Williamson and Masten eds., 1994).

64. The Growth of Interdisciplinary Research and the Industrial Structure of the Production of Legal Ideas: A Reply to Judge Edwards, 91 Mich. L. Rev. 1929 (1993).

65. Lawyers, Liability, and Law Reform: Effects on American Economic Growth and Trade Competitiveness, 71 Denver U.L. Rev. 115 (1993).

66. Economic Problems of Accidents and Compensation, 15 U. Hawaii L. Rev. 544 (1993).

67. The Ambiguous Moral Foundations of the Underground Economy, 103 Yale L.J. 2259 (1994).

68. Socialism, Eastern Europe, and the Question of the Postal Monopoly in Governing the Postal Service at 54 (American Enterprise Institute, Sidak ed., 1994).

69. Contracts Then and Now: An Appreciation of Friedrich Kessler, 104 Yale L.J. 2145 (1995).

70. Channeling Civil Litigation: A Comment on Civil Justice Reform in Ontario, in Prospects for Civil Justice at 237, Ontario Law Reform Commission, (1995).

71. The Government, the Market, and the Problem of Catastrophic Loss, 12 J. Risk & Uncertainty 219 (1996). Reprinted as Les Risques, "Catastrophe": Intervention Publique ou Marchés Concurrentiels?, 34 Risques 69 (Avril-Juin 1998).

72. Punitive Damages Reform: The Case of Alabama, 56 La. L. Rev. 825 (1996). Reprinted as La reforma del régimen de daños punitivos: el caso de Alabama in La responsabilidad extracontractual at 301 (C.F. Rosenkrantz com. 2005).

73. Procedural versus Substantive Controls of Mass Tort Class Actions, 26 J. Legal Studies 521 (1997).

74. Can Privatization Bring Economic Growth to Africa?, in Gerald Bisong Tanyi, Designing Privatization Strategies in Africa: Law, Economics, Practice at ix (1997).

75. The American Legal System and the Insurability of Environmental Damage and Catastrophic Loss, 83 Geneva Papers on Risk and Insurance 190 (1997).

76. Antitrust Enforcement in the Information Age, 4 Texas Rev. L. & Pol. 141 (1999).

77. Henry Manne and the Market Measure of Intellectual Influence, 50 Case Western Reserve L. Rev. 325 (1999).

78. The Simple Economics of Civil Procedure, 9 Kansas J. of Law & Pub. Pol. 389 (2000).

79. Economics of Civil Justice Reform Proposals, 9 Kansas J. of Law & Pub. Pol. 401 (2000).

80. Controversies Surrounding Class Actions, 9 Kansas J. of Law & Pub. Pol. 481 (2000).

81. Pobreza, inequidad y crecimiento económico. Principios básicos (Poverty, Inequality, and Economic Growth: Simple Principles), SELA 1999 Revista Jurídica de la Universidad de Palermo 157 (2000). Reprinted in Felicidad: Un Enfoqua de Derecho y Economiá, (Roemer compl. 2005).

82. The Culture of Modern Tort Law, 34 Valparaiso L. Rev. 573 (2000).

83. Reflexiones Respecto de la Contratación Masiva, in Por Qué Hay Que Cambiar el Código Civil? at p. 155 (Fernando Cantuarias Salaverry, ed. 2001).

84. A Careful Look at the Drama of *Bush v. Gore*, Summer 2001 Yale Law Report 40.

85. International Control of Environmental Harm through Regulation and Law, Forward to Lucas Bergkamp, Liability and Environment at xvii (2001).

86. The Constitutionality of State Tort Reform Legislation and *Lochner*, 31 Seton Hall L. Rev. 683 (2001).

## APPENDIX I

87. Reanalyzing Bush v. Gore: Democratic Accountability and Judicial Overreaching, 72 U. Colo. L. Rev. 953 (2001).

88. Derechos economicos, derechos personales y otras restricciones sobre los resultados de las mayorias, (Economic Rights, Personal Rights, and Other Constraints on Majoritarian Outcomes), Los derechos fundamentales, SELA 2001 at 19.

89. U.S. v. Microsoft: A Legal and Economic Analysis of the Settlement, Washington Legal Foundation, Contemporary Legal Notes, Number 41, March, 2002.

90. The [Punitive Damages] Problem and Efforts to Understand it, in Sunstein, et al., Punitive Damages: How Juries Decide at 1 (2002).

91. L'antitrust negli Stati Uniti e in Europa. Analisi e psicoanalisi di una divergenza (The Prospects of Convergence of U.S. and European Commission Competition Policies), 4 mercato concorrenza regole 151 (April 2002).

92. Government Insurance versus Market Insurance, 28 Geneva Papers on Risk and Insurance 71 (2003).

93. Small Business, Economic Growth, and the Huffman Conjecture, 7 J. of Small and Emerging Business Law 1 (2003).

94. Flawed Efforts to Apply Modern Antitrust Law to Network Industries, High-Stakes Antitrust at 117 (AEI/Brookings Institute Press, 2003).

95. The Cumulative Sources of the Asbestos Litigation Phenomenon, 31 Pepperdine L. Rev. 261 (2004).

96. The Problematic Structure of the September 11th Victim Compensation Fund, 53 DePaul L. Rev. 527 (2004).

97. Beyond Brown: Opportunity versus Equality as an Empowerment Norm: An Essay for Owen Fiss, 58 U. Miami L. Rev. 347 (2004).

98. The Gentle Genius of Franco Romani in Franco Romani, scienziato sociale 1935-2002 at 131 (da Empoli & Pulitini eds., 2004).

99. What We Know and What We Don't Know about Modern Class Actions, Manhattan Inst., Civil Justice Rep. (2005).

100. The Rise of Law and Economics: A Memoir of the Early Years in Law and Economics: Essays by the Founding Fathers at 350 (Rowley & Parisi, eds.) (2005); reprinted as El surgimiento del análisis económico del derecho: una memoria de los primeros años, 2 Revista de Economía y Derecho 51 (Autumn 2004).

101. Reexamining the Market for Judicial Clerks and other Assortative Matching Markets, 22 Yale J. Reg. 123 (2005).

102. Reduciendo la Pobreza Global: Teoría, Práctica y Reforma (Reducing Global Poverty: Theory, Practice and Reform), SELA 2005: Law and Poverty.

103. Law and Economics, in American Conservatism: An Encyclopedia at 490 (Frohnen, Beer & Nelson eds. 2006).

104. The Modern Transformation of Civil Law, 54 Buff. L. Rev. 947 (2006).

105. *Aspen Skiing*: Product Differentiation and Preventing Free Riding as Monopolization (with Jonathan Lewinsohn), in Antitrust Stories at 229 (Fox & Crane eds., 2007).

106. Rethinking Antitrust Law in an Age of Network Industries, forthcoming in Issues in Competition Law and Policy (ABA, Collins ed., 2008).

107. Market Share Liability in Personal Injury and Public Nuisance Litigation: An Economic Analysis, forthcoming (2008).

108. Francesco Busnelli and the Development of Modern Tort Law in the U.S., Italy, and the European Community, forthcoming (2008).

109. The Abiding Influence of [*The Anitrust Paradox*]: An Essay in Honor of Robert H. Bork, forthcoming ___ Harv. Law & Policy Rev. ___ (2008).

110. The Illusive Attraction of No Fault, forthcoming ___ Clev. St. L. Rev. ___.

B. Current Drafts in Circulation

111. Internalizing Costs (mimeo 1984, 1987, 1989, 1990).

112. The Current Crisis in Compensation Systems for Traffic Accidents in the United States (mimeo 1990).

113. Justifying Tort Reform in our Confused System of Accident Law (mimeo 1991).

114. The Government versus the Market in Protecting against Economic Misfortune (July 1998).

C. Legislative, Executive and Regulatory Testimony (* indicates written report also submitted).

115.* Modernizing the Regulation of Product Warranties, Federal Trade Commission, 1985.

116.* "Products Liability Reform and the Dodd and Gorton Amendments to S.100", United States Senate Committee on Commerce, Science and Transportation, June 25, 1985.

## APPENDIX I

117.* "A Legal Analysis of the Jurisdiction and Choice of Law Provisions of the Gorton Amendment No. 1951 to S.1999" (with Professor Perry Dane), United States Senate Committee on Commerce, Science and Transportation, June 13, 1986.

118. "Tort Reform and Insurance Regulation", Select Committee on Insurance, California Legislature, October 20, 1986.

119. "A Legal Analysis of S.2805, An Act Concerning Product Liability and Punitive Damages", Committee on the Judiciary, New Jersey Senate, February 9, 1987.

120.* "Joint and Several Liability: The Issues and Remaining Questions", Ontario Law Reform Commission, March 23, 1987.

121. "Products Liability Reform and the Insurance Crisis", Committee on the Judiciary, Louisiana Senate, June 9, 1987.

122.* "An Analytical Critique of the United States' No-Fault Automobile Experience", Inquiry into Motor Vehicle Accident Compensation in Ontario (Osborne Inquiry), June 30, 1987.

123.* "Hearings on the Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States", Committee on the Judiciary, United States Senate, 100th Congress, 1st Session 2439-2444 (1987).

124.* "The Liability Crisis, the Antitrust Suits and the McCarran-Ferguson Act", Subcommittee on Antitrust, Monopolies and Business Rights, Committee on the Judiciary, United States Senate, June 14, 1988.

125.* "Allowing Drivers a Choice between No-Fault and Fault-Based Auto Insurance: An Analytical Critique", Ontario Automobile Insurance Board, May 24, 1989.

126. "Alternative Compensation Systems and the Problems of Modern Tort Law", Minnesota Injury Compensation Study Commission, June 21, 1989.

127.* "The Costs of Regulation Given the Role of the Insurance Industry in Modern Society", Consolidated Hearings before the Insurance Commissioner of the State of California, January 9, 1990.

128.* "The Successes and Failures of Threshold No-Fault Systems in the United States", Standing Committee on General Government, Parliament of Ontario, January 17, 1990.

129.* "The Effects of Proposition 103 on Consumers and on Competition in Property/Casualty Insurance", Comment on Proposed Regulations, Department of Insurance, State of California, April 8, 1991.

130.* "Confiscatory Regulation and the Effects of Proposition 103's Rollback Orders on Consumers and on Competition in Property/Casualty Insurance", Department of Insurance, State of California, November 21, 1991.

131.* "Internalizing the Costs of Nuclear Power", Ontario Court (General Division), April 23, 1993.

132. Economic Function of Life Insurance Agency Commissions and the Effects on Consumers of Mandatory Rebates," Department of Insurance, State of California, October 18, 1993.

133.* "How to Privatize Intelsat".

134.* McCarran-Ferguson Reform, State Regulation and the Consumer Interest, National Conference of Insurance Legislators, New York, November 12, 1994.

135.* "Statement Concerning H.R. 10", Common Sense Legal Reforms Act of 1995, Committee on the Judiciary, 104th Congress, February 13, 1995.

136.* "Statement Concerning Punitive Damages Tort Reform," Committee on the Judiciary, United States Senate, April 4, 1995; and "Response to Statement of [Clinton] Administration Policy of April 25, 1995," May 2, 1995.

137. "Punitive Damages Reform in Historical Perspective," Hearing on S.1554, "Fairness in Punitive Damages Awards Act," Committee on the Judiciary, United States Senate, July 29, 1998; and Response to Senator Orrin G. Hatch, Chairman, United States Senate Committee on the Judiciary Re: S.1554, "Fairness in Punitive Damages Award Act," September 3, 1998.

138. "The Antitrust Implications of the Cable Bills," New Jersey State Assembly, February 3, 2003; New Jersey State Senate, March 10, 2003.

139. Securing Our Economic Future: The White House Conference on the Economy, The High Costs of Lawsuit Abuse, December 15, 2004, http://www.whitehouse.gov/news/releases/2004/12/print/20041215-11.html

D. Journalism

140. "The Benefits of Tort Reform--Sense & Nonsense", Wall Street Journal, February 11, 1987 at 26.

141. "USA, Cartelli in Rimonta" in Dossier Antitrust at 23, Il Sole 24 Ore, 29 January 1988, Roma, Italia.

142. Commentary, "The (Pop-Gun) War Against the Insurers", Hartford Courant, June 26, 1988 at C1.

143. "Tort Law, Insurance, and the Insurance Crisis", in Tort Law and the Insurance Crisis, The World & I at 522 (Criner ed., February, 1989).

144. "How to Control Liability Costs", Fortune, April 24, 1989 at 323.

145. "The Antitrust Suit Counteroffensive to Tort Reform", Legal Backgrounder, Washington Legal Foundation, May 12, 1989.

146. "Negli States la Privatizzazione si Chiama Deregulation", L' Opinione, 21 March 1989 at 57, Roma, Italia.

## APPENDIX I

147. "Will Argentina Simply Replace One Monopoly With Another?", Wall Street Journal, September 22, 1989 at A13.

148. "What Bork and Sarokin Have in Common", (letter) Wall Street Journal, August 22, 1994 at A15.

149. "The Punitive Damages Problem in Alabama", Birmingham News, December 29, 1996 at 1C.

150. "The Supreme Court Passes the Buck on Asbestos", Wall Street Journal, July 2, 1997 at A15.

152. "True Conservatism and Satellite Competition", Space News, May 11, 1998 at 21; reprinted Congressional Record, May 20, 1998 at E908.

152. "The Stakes in the Case against Microsoft", Wall Street Journal, May 19, 1998 at A22; "The Dangers of Attack on Microsoft" (response to Robert H. Bork), Wall Street Journal, June 8, 1998 at A23.

153. "The Conservative Delusion over Auto Choice", Wall Street Journal, July 21, 1998 at A14. Reprinted in "On the Issues," American Enterprise Institute, August, 1998; Louisiana Advocates at 4 (September, 1998).

154. "Why Clinton Lied", Wall Street Journal, September 23, 1998 at A22.

155. "Trial by State," review of Richard A. Posner, *An Affair of State* in The Wall Street Journal, September 14, 1999 at A20.

156. "Judge Jackson's Case against Microsoft," Wall Street Journal, November 8, 1999 at A50.

157. Dialogue with Jonathan Zittrain: "The False Epic of the Microsoft Decision," November 24, 1999; "Judge Jackson's Case More Carefully Considered," November 30, 1999; "General Rules, the Remedy in Microsoft, and the Role of Judge Posner," December 1, 1999, Slate Magazine, www.slate.com/dialogues

158. "Don't Count on a Breakup," Wall Street Journal, April 26, 2000 at A26; reprinted in the Toronto Financial Post, April 28, 2000 at C19.

159. "On Character Assassination," Yale Docket, May 2000 at p. 3.

160. "Some Kind of Remedy," The New York Times, June 9, 2000 at A31.

161. "Letter to Larry," The Industry Standard, July 3, 2000 at 122.

162. "Community Impact Evaluation Needed," The Denver Post, August 12, 2000 at 7B.

163. "It's Not Just Alabama," Reader's Digest, October 2000 at 156.

164. "The Deeper Scandal of the Clinton Pardons," (with Minor Myers III), The Christian Science Monitor, February 26, 2001 at 9.

165. "A Ruling for 'Predators'–and Consumers," The Wall Street Journal, May 3, 2001 at A18.

166.   "The GE/Honeywell Precedent," (with Franco Romani), The Wall Street Journal, June 20, 2001 at A18.

167.   "Justice Bows to Reason," The Wall Street Journal, September 7, 2001 at A14.

168.   "Microsoft Wins . . . Sort Of," The Wall Street Journal, November 2, 2001 at A14.

169.   "Microsoft and the Courts," (response to Larry Lessig) The New York Times, November 16, 2001 at A24.

170.   "The End of the Microsoft Case," The Wall Street Journal, November 4, 2002 at A14; reprinted in the National Post, November 5, 2002 at FP15.

171.   "Class Warfare," The Wall Street Journal, May 5, 2003 at A14; reprinted in the National Post, May 6, 2003 at FP15.

172.   "An Expensive Game to Play," April 12, 2004, Tech Central Station, www.techcentralstation.com/041204E.html

173.   "Supreme Wisdom," The Wall Street Journal, June 18, 2004 at A10.

174.   "Tackling Tort Reform," February 11, 2005, National Review Online, http://www.nationalreview.com/comment/priest200502111122.asp


Distinguished Lectureships:

Olin Distinguished Lecture Series, University of California at Los Angeles School of Business (Inaugural Lecture, 1985).

Monsanto Lecture in Tort Law and Jurisprudence, Valparaiso Law School (Inaugural Lecture, 1987).

Distinguished Visiting Professor in Legal Theory, University of Toronto Faculty of Law and Department of Economics, Michelmas Term, 1988.

Martin P. Miller Centennial Lecture, University of Denver College of Law, 1992.

Fifty-Sixth Cleveland-Marshall Fund Lecture, Cleveland-Marshall College of Law, 1993.

Twenty-Sixth Geneva Lecture on Insurance, Geneva Association, 2002.

Twentieth Higgins Distinguished Visiting Professor, Lewis & Clark Law School, 2003.

Distinguished Economist Lecture, Bureau of Competition, Federal Trade Commission, 2004.

Case 3:05-md-00527-RLM -CAN document 1294-4 filed 05/27/09 page 17 of 17

## APPENDIX I

Other Awards:

Templeton Honor Rolls for Education in a Free Society, 1997.

Profesor Honorario, Universidad Peruana de Ciencias Aplicadas, Lima, Peru, 2003.

Teaching:

Recent courses: Antitrust; Advanced Antitrust: Network Industries; Civil Procedure; Insurance and Public Policy; Regulated Industries; Constitutional Law; Federalism; Capitalism; Campaign Finance Regulation; Products Liability; Advanced Antitrust; Torts; Advanced Torts; Democracy or Capitalism? (seminar).

Other offerings: Contracts; Commercial Law; Price Theory; Remedies; Criminal Case Settlement (seminar); Theories of the Common Law (seminar).

Journal Referee:

American Economic Review; Economic Inquiry; Journal of Health Politics, Policy and Law; Journal of Japanese Studies; Journal of Law & Economics; Journal of Law, Economics & Organization; Journal of Legal Studies; Law and Policy; Journal of Political Economy; Rand Journal of Economics; National Science Foundation (Law and Social Sciences) (Economics); Review of Economics and Statistics; Science.

Consultantships:

Institute for Civil Justice, The Rand Corporation, since 1980;

Federal Trade Commission, 1984-85; 2001-03.

Other Professional Service:

President's (U.S.) Commission on Privatization, 1987-88.

American Bar Association, President's Commission to Improve the Liability Insurance System, 1987-89.

Special Master, McLendon v. The Continental Group, Inc., et. al., U.S. District Court, District of New Jersey, 1989- .

President, American Law and Economics Association, 1991-92.

Council of Academic Advisers, American Enterprise Institute, 1994- .

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3-05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

CHIEF JUDGE MILLER

*Floyd*, 3-05-CV-428-RLM-CAN (AL);
*Harris*, 3-06-CV-337-RLM-CAN (AR);
*Alexander*, 3-05-CV-528-RLM-CAN (CA);
*Carlson*, 3-05-CV-664-RLM-CAN (FL);
*Riewe*, 3-05-CV-390-RLM-CAN (IN);
*Berry*, 3-05-CV-531-RLM-CAN (KS);
*Coleman*, 3-05-CV-666-RLM-CAN (KY);
*Wescott*, 3-06-CV-485-RLM-CAN (MD);
*Lee*, 3-05-CV-533-RLM-CAN (MN);
*Gennell*, 3-05-CV-534-RLM-CAN (NH);
*Tofaute*, 3-05-CV-595-RLM-CAN (NJ);
*Louzau*, 3-05-CV-538-RLM-CAN (NY);
*Slayman*, 3-05-CV-596-RLM-CAN (OR);
*Willis*, 3-05-CV-597-RLM-CAN (PA);
*Tierney*, 3-05-CV-599-RLM-CAN (RI);
*Cooke*, 3-05-CV-668-RLM-CAN (SC);
*Smith*, 3-05-CV-600-RLM-CAN (TN);
*Humphrey*, 3-05-CV-540-RLM-CAN (TX);
*Asbury*, 3-05-CV-826-RLM-CAN (WV)
*Larson*, 3-05-CV-601-RLM-CAN (WI); and

ALL CASES (Collateral Estoppel).

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF MANUAL FILING OF DOCUMENTS UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Manual Filing of Documents Under Seal.

On June 9, 2008, Defendant FedEx Ground filed the following under seal:

(1) Defendant FedEx Ground Package System, Inc.'s Statement Of Genuine Issues and Statement of Additional Material Facts In Support Of Its Memoranda Of Law In Opposition To Plaintiffs' Motions For Summary Adjudication Of Employment Status (In The 20 Above-Captioned Cases) and Omnibus Collateral Estoppel Motion (In All Cases).

(2) CD ROM Of Exhibits To FedEx Ground's Statement Of Genuine Issues and Statement of Additional Material Facts.

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

Dated: June 9, 2008

Respectfully submitted,

By: s/Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Victor Jih
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street, Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 9th day of June, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Beth A. Ross
bross@leonardcarder.com

R. Christopher Gilreath
Chrisgil@sidgilreath.com

James A. Staack
jims@staack-firm.com

Ginger A. DeGroff
degrofflaw@yahoo.com

George A. Barton
gbarton@birch.net

Jeffrey A. Bartos
jbaros@geclaw.com

Anne T. Regan
atr@zimmreed.com

J. Gordon Rudd
jgr@zimmreed.com

Jerald R. Cureton
jcureton@curetoncaplan.com

Steve D. Larson
slarson@ssbls.com

Jordan M. Lewis
jordanlewis@sbgdf.com

Philip Stephen Fuoco
pfuoco@msn.com

R. Christopher Gilreath
chrisgil@sidgilreath.com

James R. Mulroy, II
jrmulroy@kiesewetterwise.com

Wood R. Foster, Jr.
woodfoster@sbgdf.com

Michael J. Watton
jdrewicz@Wattongroup.com

The undersigned further certify that a copy of the same has been mailed by regular U.S. Postal Service to the following non CM/ECF participant:

Clayton D Halunen
Joni M Thome
Halunen & Associates
220 South Sixth Street Ste 2000
Minneapolis, MN 55402

Robert E. McDaniel
McDaniel Law Offices
755 North Main St
Laconia, NH 03246

Salvatore G. Gangemi
Gangemi Law Firm, P.C.
82 Wall St., Ste. 300
New York, NY 10005

Paula R. Markowitz
Thomas Herman Kohn
Markowitz & Richman
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Joseph A. Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Peter N. Wasylyk
1307 Chalkstone Ave.
Providence, RI 02908

Charles W. Whestone, Jr.
Cheryl F. Perkins
WHETSTONE, MYERS, PERKINS AND YOUNG
P. O. Box 8086
Columbus, SC 29202

Joree Brownlow
Law Office of Joree G. Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN 38134

Donald R Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham and Burgess LLP
301 Congress Ave., Ste. 1050
Austin, TX 78701

Damon L. Ellis
Jonathan R. Mani
Mani & Ellis
PO Box 1266
Charleston, WV 25326-1266

Debra Brewer Hayes
Dennis C. Reich
Rodney K. Castille
Reich & Binstock LLP
4265 San Felipe Suite 1000
Houston, TX 77027

By: s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Plaintiffs hereby move this Court for a one-day extension of time, to and including June 10, 2008, for Plaintiffs to file their Reply Memorandum in Support of Motion to Compel Defendant FedEx Ground Package System, Inc. to produce the Notice of Proposed Assessment and attachments, which FXG received from the IRS on December 20, 2007, and to produce a corporate designee for deposition. In support of this motion, Plaintiffs state as follows:

1. Plaintiffs' reply brief in support of their motion to compel is currently due on June 9, 2008;

2. Plaintiffs seek one additional day to file their reply brief due to the large number of filings also due today, June 9, in connection with the summary judgment briefing;

3. FXG agrees to and does not oppose the extension of one day for Plaintiffs to file their reply brief; and

4. This request is not made for the purpose of delay and no party will be prejudiced if the Court grants this motion.

WHEREFORE, pursuant to the parties' agreement, Plaintiffs' seek one additional day, to and including June 10, 2008, to file their reply memorandum with the Court.

Dated: June 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on June 9, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |

| | |
|---|---|
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |

| | |
|---|---|
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; jhunt@prle.com; syoung@prle.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | marshall@ee.net |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **James Mulroy** | jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |

| | |
|---|---|
| **Mary Donne Peters** | mpeters@gorbypeters.com; rwright@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on June 10, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M.
FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG
 & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

case 3:05-md-00527-RLM-CAN document 1359-2 filed 06/09/08 page 7 of 7

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: June 9, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

case 3:05-md-00527-RLM -CAN document 1363 filed 06/09/08 page 1 of 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM INC.'S**

**MOTION TO EXCLUDE**

**THE EXPERT TESTIMONY AND REPORT OF ROBERT WOOD**

Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure and Rules 702 and 704 of the Federal Rules of Evidence, Defendant FedEx Ground Package System, Inc. ("FedEx Ground") respectfully objects and files this Motion to Exclude the expert testimony and report of Robert Wood, submitted by Plaintiffs in support of their Motion for Summary Adjudication of Employment Status, (the "Wood report"), in its entirety. In support of its motion, FedEx Ground files contemporaneously herewith its Memorandum of Law in Support of its Motion to Exclude with exhibits attached.

Dated: June 9, 2008.

Respectfully submitted,

By: *<u>/s/ Robert M. Schwartz</u>*
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of June, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: *\/s/ Robert M. Schwartz*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CHIEF JUDGE MILLER

**DEFENDANT FEDEX GROUND'S MEMORANDUM OF LAW**

**IN SUPPORT OF MOTION TO EXCLUDE**

**THE EXPERT TESTIMONY AND REPORT OF ROBERT WOOD**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

ARGUMENT ........................................................................................................ 5

I. THE WOOD REPORT IMPROPERLY TREADS ON THE PROVINCE OF THE COURT TO DETERMINE THE LAW ........................................ 6

A. Mr. Wood's Improper Legal Conclusions Are Outcome-Determinative And Invade The Province Of The Court ........................ 6

B. Mr. Wood's Improper And Explicit Opinions About The Legal Standard To Determine Employment Status Infringes On The Court's Authority To Determine The Applicable Law ........................ 8

C. Mr. Wood's Testimony On Ultimate Issues Of Law Are Inadmissible ........................................................ 9

D. Mr. Wood's Implicitly Legal Judgments Throughout The Report Result In An Impermissible Usurpation Of The Role Of The Court ....... 11

II. MR. WOOD MISAPPROPRIATES THE COURT'S RIGHT TO DECIDE THE ISSUE OF THE COLLATERAL ESTOPPEL EFFECT OF THE ESTRADA CASE ........................................................ 13

III. THE WOOD REPORT IS AND RELIES ON THE TYPE OF EXTRINSIC EVIDENCE THAT THIS COURT REJECTED WHEN CERTIFYING THE PLAINTIFFS' CLASSES ........................................ 14

CONCLUSION ........................................................................................................ 18

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amakua Dev. LLC v. Warner*,
No. 05 C 3082, 2007 WL 2028186 (N.D. Ill. Jul. 10, 2007) .............................................. 6, 10

*Anderson v. Fel-Pro Chem. Prods., L.P.*,
No. 95 C 4604, 1996 WL 33410082 (N.D. Ill. Dec. 19, 1996) ................................................ 8

*Apotex Corp. v. Merck & Co., Inc.*,
No. 04 C 7312, 2006 WL 1155954 (N.D. Ill. Apr. 25, 2006).................................................... 7

*Ass'n Benefit Servs., Inc. v. AdvancePCS Holding Corp.*,
No. 04 C 3271, 2005 WL 2335484 (N.D. Ill. Sep. 23, 2005)............................................. 7, 14

*Bratton v. Roadway Package Sys., Inc.*,
77 F.3d 168 (7th Cir. 1996) ......................................................................................... 9

*Breezy Point Co-op., Inc. v. CIGNA Prop. & Cas. Co.*,
868 F. Supp. 33 (E.D.N.Y. 1994) .................................................................................. 10

*Buckner v. Sam's Club*,
75 F.3d 290, (7th Cir. 1996) .......................................................................................... 6

*Cerceo v. DeMarco*,
137 A.2d 296 (Pa. 1958)................................................................................................ 9

*Daubert v. Merrell Dow Pharmaceutical*,
509 U.S. 579 (1993)................................................................................................ 2, 6

*Delta Mining Corp. v. Big Rivers Elec. Corp.*,
18 F.3d 1398, 1402 (7th Cir. 1994) ................................................................................ 8

*Good Shepherd Manor Found. v. City of Momence*,
323 F.3d 557 (7th Cir. 2003) ................................................................................ 1, 6, 8

*Haberern v. Kaupp Vascular Surgeons Ltd.*,
812 F. Supp. 1376 (E.D. Pa. 1992)................................................................................. 9

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*,
482 F. Supp. 2d 1045 (N.D. Ind. 2007) .......................................................................... 6

*In re Ocean Bank*,
481 F. Supp. 2d 892 (N.D. Ill. 2007)............................................................................. 14

*Klaczak v. Consol. Med. Transp. Inc.*,
No. 96 C 6502, 2005 WL 1564981 (N.D. Ill. May 26, 2005) ............................................... 11

*Landmark Builders, Inc. v. Cottages of Anderson, LP*,
No. IP 01-C-1592-C-M/S, 2003 WL 21508118 (S.D. Ind. May 20, 2003) .............................. 10

*Lincoln Pulp & Paper Co., v. Dravo Corp.*,
436 F. Supp. 262 (D. Me. 1977) ............................................................................... 9

*Loeb v. Hammond*, 407 F.2d 779 (7th Cir. 1969) ............................................................... 8

*Marcinak v. Se. Green Sch. Dist.*,
544 A.2d 1025 (Pa. Super. Ct. 1988) ........................................................................ 15

*Marx & Co. v. Diner's Club Inc.*,
550 F.2d 505 (2d Cir. 1977) ...................................................................................... 10

*Meeting House Lane, Ltd. v. Melso*,
628 A.2d 854 (Pa. Super. Ct. 1993) ...................................................................... 9, 15

*Mycogen Corp. v. Monsanto Co.*,
No. 04 CV 573, 2005 WL 1925835 (S.D. Ind. Aug. 11, 2005) ........................................ 8

*Perez v. Radioshack Corp.*,
No. 02 C 7884, 2005 WL 3455858 (N.D. Ill. Dec. 13, 2005) ........................................ 11

*Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*,
No. 04 CV 1587, 2007 WL 831613 (S.D. Ind. Mar. 5, 2007) .......................................... 9

*RLJCS Enters., Inc. v. Prof'l Benefit Trust*,
487 F.3d 494 (7th Cir. 2007) ....................................................................................... 8

*Se-Kure Controls, Inc. v. Vanguard Prods. Grp. Inc.*,
No. 02 C 3767, 2008 WL 169054 (N.D. Ill. Jan. 17, 2008) ............................................ 6

*Sparton Corp. v. United States*,
77 Fed. Cl. 1 (2007) .................................................................................................. 10

*United States v. Cross*,
113 F. Supp. 2d 1282 (S.D. Ind. 2000) ........................................................................ 9

**Rules**

Fed. R. Civ. P. 56(e)(1) ................................................................................................. 5

Fed. R. Evid. 702 ......................................................................................................... 2, 6

Fed. R. Evid. 704 ....................................................................................................... 9, 10

## INTRODUCTION

Robert Wood, a tax attorney in private practice and the author of a treatise on independent contractors, was retained by Plaintiffs to apply his legal expertise to render an opinion on the "proper classification of workers as employees or independent contractors." (*See* Expert Report of Robert Wood, Exhibit 11 to the Declaration of Lynn Faris In Support Of Plaintiffs' Motions for Summary Adjudication [Doc. Nos. 1196-97] at 4 (the "Wood report" or "Rep."), attached hereto as Exhibit A.) Plaintiffs rely on the Wood report to support their legal arguments, such as their claim that the general manner-and-means provision of Section 1.15 is "meaningless in light of the specific and express provisions" elsewhere in the contract that "reserve rights of control to FXG" and, therefore, that the FedEx Ground Operating Agreement ("OA") is not an independent contractor agreement. (*See*, *e.g.*, New York (*Louzau*) Plaintiffs' Memorandum of Law In Support Of Plaintiffs' Motion for Summary Adjudication [Doc. No. 1176] at 9 n. 7). Plaintiffs also rely on Mr. Wood's report to conclude that, "The re-engineered policies and procedures may have changed cosmetically, but to the drivers, little has changed …. The policies and procedures evidence the same degree of control at issue in the Estrada litigation." (*See* Plaintiffs' Omnibus Statement of Material Facts In Support Of Plaintiffs' Motions' For Summary Adjudication [Doc. No. 1197] at No. 65.)

At its core the Wood report is a supplemental legal brief presented under the label of an expert report. It is laden with legal opinions and conclusions. Under Seventh Circuit law, expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *United States v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir. 1996)). Moreover, Mr. Wood's opinions set forth in his report fall well short of the admissibility standards set forth by the

case 3:05-md-00527-RLM-CAN document 1366 filed 06/09/08 page 6 of 22

Supreme Court in *Daubert v. Merrell Dow Pharmaceutical*.[1] *See* 509 U.S. 579 (1993). As Federal Rule of Evidence 702 explicitly states, expert testimony is admissible only if it is: (1) sufficiently reliable,[2] and (2) the "specialized knowledge will assist the trier of fact." Fed. R. Evid. 702. Since the Wood report opines on legal conclusions based on Mr. Wood's interpretation of the OA, FedEx Ground's plain language policies and procedures, and other extrinsic evidence, it does not provide any specialized knowledge that will help this Court or any trier of fact better understand any facts in issue.

Mr. Wood's proffered legal opinion testimony fails on four grounds:

1. Mr. Wood's opinions on the legal standards to be used to classify independent contractors improperly tread on the province of the judge as sole arbiter of the law, and would confuse the relevant law.

2. Mr. Wood assumes the role of the fact-finder by applying his interpretation of the law to his interpretation of the facts to determine the outcome of the case.

3. Mr. Wood consistently refers to his testimony in *Anthony Estrada, et al. v. FedEx Ground Package System, Inc.*, and the appellate court's affirmation of the trial court's decision in that case in *Estrada v. FedEx Ground Package System, Inc.*, 64 Cal. Rptr. 3d 327 (Ct. App. 2007). Such references misappropriate the Court's authority to render a decision regarding the collateral estoppel effect of the findings in *Estrada* to the instant case.

4. Mr. Wood's opinion is, and relies on, precisely the type of extrinsic evidence that the Court neither sought nor expected when certifying Plaintiffs' classes, and thus, would not assist the trier of fact. Also, admitting his conclusions, which are based on that extrinsic evidence, would allow Plaintiffs to present evidence indirectly that they should not be allowed to present directly.

For these reasons, Mr. Wood's opinions on the employment status of FedEx Ground's

[1] FedEx Ground is raising the issue of the inadmissibility of Mr. Wood's expert report at this stage of the litigation because a *Daubert* review at the summary judgment stage is appropriate—*Daubert* itself arose in the context of summary judgment briefings. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 582-85 (1993).

[2] Rule 702 states: "(1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. FedEx Ground does not challenge here Mr. Wood's qualifications or the reliability of his expert report and methods because his testimony is just another form of legal briefing. Since he is a lawyer of some experience, FedEx Ground accepts that he is qualified to express legal opinions and can seek to persuade the Court, in arguments or briefs, that his interpretation of the law is correct, just as any attorney could.

contractors, and his report as a whole, should be stricken and excluded in their entirety.

## BACKGROUND

A comparison of the Wood report with Plaintiffs' New York Memorandum of Law in support of their motion for summary judgment shows that the Wood report is structured in much the same way as Plaintiffs' legal brief and contains similar content. In Section I, Mr. Wood explains his qualifications as an expert and recalls his opinions in the *Estrada* case—opinions which he proclaims to continue to hold and admits that he has applied to this case. (*See* Rep. at 4-8.) He then proceeds to summarize his opinions in this case in much the same way as in a preliminary statement. (*See Id*. at 8-10.)

In Section II, Mr. Wood sets forth his articulation of the general legal standards and tests employed in determining worker status, explaining the history of the law, comparing different tests in different areas of the law, and opining what he finds to be the common central issue for determining worker status—the right to control. (*See Id*. at 10-15.) He then discusses how "[a]nother feature common to all tests for assessing employment status is that labels are not controlling." (*Id*. at 14.) In fact, statements of law and legal standards appear throughout the Wood report, not just in these preliminary sections. For example, Mr. Wood states at one point that "[t]he Court of Appeals for the Seventh Circuit has held that 'an individual's unique work skills may indicate independent contractor status [but that] if the individual requires substantial training and supervision, an employee/employer status is more likely.'" (*Id.* at 28.) Such explications into the law of a worker's employment status would confuse a trier of fact and interfere with the Court's ability to determine the applicable law.

In Section III.A of the Wood report, Mr. Wood argues that the OA and other contracts that he reviewed "secure FXG/FHD's unequivocal right to control myriad details of the method, manner, and means carried out by the P&D drivers. This reserved control is so strong that, in my

opinion, whether FXG or FHD ever exercises it is unimportant." (*Id*. at 15.) This is an impermissible legal conclusion, and assumes that the agreements do secure FedEx Ground's right to control. Mr. Wood goes so far as to opine that "Section 1.15 of the FXG Agreement cannot prevent something from occurring. It can only suggest that perhaps FXG did not ***intend*** it to occur. In my opinion, control that is reserved (or exercised) cannot be obviated by a savings clause such as Section 1.15 on these facts. The bell cannot be un-rung." (*Id*. at 20.)

Mr. Wood, in addition to assuming the role of the Court as arbiter of the law, goes so far in Sections III and IV to apply his interpretation of the law to the facts in Sections III and IV—much the way the Court would do in rendering a judgment. Some examples of Mr. Wood's improper opinions and conclusions include:

- "Under every test of employment status, the right to control is a key factor, if not the key factor." (*Id*. at 9.)

- "Under the facts herein presented, I believe the status of the P&D drivers as employees to be confirmed by both FXG's express contract rights, and by FXG's nationwide and uniform practices, although either one alone would be sufficient." (*Id*. at 9-10.)

- "However, given that I also find repeated and significant evidence that FXG consistently exercises its right of control, the voluminous evidence of FXG's actual exercise thereof prove that FXG has retained the right to do so." (*Id*. at 13.)

- "The personal and equipment standards are thus mandatory, and represent classic controls over the method, manner and means used by the drivers to perform their work." (*Id*. at 22.)

- "FXG's voluminous policies and procedures control the P&D driver's daily activities, and strongly influence the method, manner and means by which P&D drivers go about their daily work." (*Id*. at 25.)

- "One of the traditional indices of employee versus independent contractor status is whether the worker provides his own tools and equipment. FXG's entire system of terminals, hubs, its corporate-wide sales and customer service workforce, all operate in an integrated fashion." (*Id*. at 38.)

- "Regardless of FXG's reasons for its tight and multi-tiered approvals and oversight, I would not expect to see this level of control in a truly independent contractor relationship." (*Id*. at 39.)
- "Furthermore, a P&D driver may not assign his rights and obligations without the consent of FXG. Even when a P&D driver dies, the replacement must be acceptable to FXG. In my view, FXG's contractual control of driver routes is a crushing blow to any claim of driver independence." (*Id*. at 40.)
- "In my opinion, the Agreements effectively amount to contracts at will, allowing FXG unfettered termination rights for any reason, without material recourse by the affected P&D driver." (*Id*. at 46.)
- "Termination at will is a fundamental basis of control, and FXG's right to effect termination at any time without repercussions is difficult to square with a claim of independent contractor status." (*Id*.)

Not surprisingly, given the broad scope of his other opinions and conclusions, Mr. Wood further encroaches on the Court's role in ruling on the dispositive motions by explicitly concluding that the OA is inconsistent with an independent contractor agreement: "The FXG Agreement, particularly viewed in concert with FXG's other written business records, make unequivocal FXG's significant and pervasive right to control nearly every facet of driver work performance." (*Id*. at 13.) As a result, Mr. Wood concludes, "In my opinion, plainly, unequivocally, and without qualification, the P&D drivers do not (and cannot) constitute *bona fide* independent contractors under any existing test for assessing worker status." (*Id*. at 9.)

**ARGUMENT**

The Federal Rules of Civil Procedure set forth the requirements for affidavits accompanying motions for summary judgment: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Applying this rule, courts in this circuit have consistently held that improper affidavits cannot support summary judgment pleadings. *See Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 482 F. Supp.

2d 1045, 1057 (N.D. Ind. 2007); *see also Amakua Dev. LLC v. Warner*, No. 05 C 3082, 2007
WL 2028186, at *2 (N.D. Ill. Jul. 10, 2007) (citations omitted) ("Where a party has offered a
legal conclusion or a statement of fact without offering proper evidentiary support, the Court will
not consider that statement.") (interpreting local Rule 56.1 based on Fed. R. Civ. P. 56).  The
Wood report is an unsworn and unverified expert report that offers legal conclusions that are not
admissible as evidence, and is thus not admissible for purposes of summary judgment.

## I.  THE WOOD REPORT IMPROPERLY TREADS ON THE PROVINCE OF THE COURT TO DETERMINE THE LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Fed. R.
Evid. 702; *see also Amakua*, 2007 WL 2028186, at *5.  In determining whether or not expert
evidence is admissible, it must be both reliable and "specialized knowledge [that] will assist the
trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see
also Daubert*, 509 U.S. at 589-90; *Buckner v. Sam's Club*, 75 F.3d 290, 293-94 (7th Cir. 1996)
(affirming district court's exclusion of expert testimony that "merely states the obvious" was not
specialized knowledge that would assist the trier of fact).

### A.  Mr. Wood's Improper Legal Conclusions Are Outcome-Determinative And Invade The Province Of The Court

In the Seventh Circuit, expert testimony is inadmissible where such testimony is on
"purely legal matters and made up solely of legal conclusions" because it would "determine the
outcome of the case."  *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564
(7th Cir. 2003) (citing *United States v. Sinclair*, 74 F.3d at 757 n. 1) (affirming district court's
exclusion of expert testimony by a law professor as inadmissible); *see, e.g.*, *Se-Kure Controls,
Inc. v. Vanguard Prods. Grp. Inc.*, No. 02 C 3767, 2008 WL 169054, at *3 (N.D. Ill. Jan. 17,
2008) (excluding testimony of expert patent lawyer with regards to legal conclusions, but
permitting testimony regarding the patent application process and to provide factual context).

Such outcome-determinative legal conclusions would not be helpful to the trier of fact in understanding the evidence or determining a fact in issue any better than if the expert opinion had not been rendered. *See Apotex Corp. v. Merck & Co., Inc.*, No. 04 C 7312, 2006 WL 1155954, at *8 (N.D. Ill. Apr. 25, 2006) (holding that plaintiff's expert testimony of "two distinguished legal scholars" as to whether the defendant committed fraud was inadmissible under Rule 702 because it consisted of legal conclusions that would not assist the trier of fact but merely told the fact-finder what result to reach); *Ass'n Benefit Servs., Inc. v. AdvancePCS Holding Corp.*, No. 04 C 3271, 2005 WL 2335484, at *4 (N.D. Ill. Sep. 23, 2005) (excluding expert testimony with respect to breach of contract claims because *inter alia* his testimony "merely tells the [fact-finder] what result to reach"). Yet that is precisely what Mr. Wood does in opining on the degree of FedEx Ground's control under the OA and that, this control means, "In my opinion, plainly, unequivocally, and without qualification, the P&D drivers do not (and cannot) constitute *bona fide* independent contractors under any existing test for assessing worker status." (Rep. at 9.)

Admitting Mr. Wood's improper legal conclusions in the form of an expert report would not only be unhelpful, but would obviate the Court's need to decide whether there are any factual issues on summary judgment. By applying his opinions on the law to his interpretation of the facts, Mr. Wood impermissibly tells the Court what result to reach. And while Plaintiffs can and do make similar arguments in their briefs, they should not be allowed to expand their briefs through an expert report that is afforded evidentiary consideration. Mr. Wood's opinions and report should therefore be excluded as outcome-determinative.

**B. Mr. Wood's Improper And Explicit Opinions About The Legal Standard To Determine Employment Status Infringes On The Court's Authority To Determine The Applicable Law**

The Wood report consists entirely of legal argument, as opposed to an "expert" opinion

about specialized industry usage of terms of art. It is therefore inadmissible. *Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994) (affirming trial court's exclusion of expert testimony because there was no need to clarify or define terms of art, science or trade); *see Good Shepherd*, 323 F.3d at 564; *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969) (affirming the district court's exclusion of an attorney's testimony "as an expert witness as to the legal significance of the various papers," explaining that expert testimony is neither admissible as to the "interpretation of the contract" nor as to "the question of legal effect"). The Seventh Circuit has held that legal arguments "belong[] in briefs, not in 'expert reports,'" and that "[i]f specialized knowledge about [an area of the law] would assist the judge, the holders of that knowledge can help counsel write the briefs and present oral argument." *RLJCS Enters., Inc. v. Prof'l Benefit Trust*, 487 F.3d 494, 498 (7th Cir. 2007) (affirming the district court's exclusion of three expert reports by an accountant and two lawyers on legal issues of tax and demutualization); *see Mycogen Corp. v. Monsanto Co.*, No. 04 CV 573, 2005 WL 1925835, at *15-17 (S.D. Ind. Aug. 11, 2005) (granting motion to exclude expert testimony on matters contained in expert report where "[m]ost of the report amounts to legal arguments and conclusions that merely echo [defendant's] briefs and/or address questions of law for th[e] court to determine").

Moreover, the judge, not an expert, is the sole arbiter of determining the legal effect of a contract term, which is a question of law. *See Anderson v. Fel-Pro Chem. Prods., L.P.*, No. 95 C 4604, 1996 WL 33410082, at *6 (N.D. Ill. Dec. 19, 1996) (court granted motion to strike expert affidavit with respect to paragraphs attempting to establish legal effect of contract terms or interpreting those terms); *see also Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa.

Super. Ct. 1993) (Under Pennsylvania law, contract interpretation is a question of law).[3]

Legal conclusions are also inadmissible through expert testimony because they would permit experts to provide legal guidance. *See United States v. Cross*, 113 F. Supp. 2d 1282, 1285 (S.D. Ind. 2000) (excluding the testimony of defendant's expert attorney that the video gaming devices in question were not illegal gambling devices since that conclusion is on an ultimate question of law). Furthermore, since the provenance of the applicable law is in the Court, other expert opinions on the law, apart from the parties' briefings, would not be helpful. *See Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, No. 04 CV 1587, 2007 WL 831613, at *2-3 (S.D. Ind. Mar. 5, 2007) (excluding expert opinion on breach of fiduciary duty and fraud claims as *inter alia* impermissible legal conclusions); *Haberern v. Kaupp Vascular Surgeons Ltd.*, 812 F. Supp. 1376, 1378-79 (E.D. Pa. 1992) (denying defendant's motion *in limine* to introduce the expert testimony of a lawyer, an expert in labor law, as inadmissible because an opinion on a question of law would not help the trier of fact).

The Wood report is, in essence, a fifty-page single-spaced legal brief titled as an "expert report." This Court should exclude it and Mr. Wood's legal opinions as improperly treading on the province of the Court to determine the applicable law.

### C. Mr. Wood's Testimony On Ultimate Issues Of Law Are Inadmissible

Mr. Wood's testimony is likewise inadmissible under Federal Rule of Evidence 704. Although Rule 704 does allow "otherwise admissible" testimony to "embrace an ultimate issue,"

[3] Moreover, Mr. Wood applies the wrong legal analysis for contract interpretation. The report makes no effort to interpret the Operating Agreement according to Pennsylvania law, despite the contract's valid choice-of-law provision. *See Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 (7th Cir. 1996). Instead, Mr. Wood's conclusion that specific provisions of the Operating Agreement control over the general provisions runs contrary to the principle of Pennsylvania contract law that courts should give effect to "each and every part of [a contract]" and avoid a construction of "one part of a contract which will annul another part of it." *Cerceo v. DeMarco*, 137 A.2d 296, 298 (Pa. 1958) (internal quotation marks omitted); *see also Lincoln Pulp & Paper Co., v. Dravo Corp.*, 436 F. Supp. 262, 269-70 (D. Me. 1977) (holding that a court may not simply invoke a "specific-governs-the-general" rule in construing a contract where the contract is (1) not ambiguous, (2) the intent of the parties is not in question, and (3) there are no inconsistent and conflicting contractual provisions).

this applies to *factual* conclusions and does not "permit the expert witness to usurp the province of the judge." *Amakua*, 2007 WL 2028186, at *9-11 (citations omitted) (finding an expert's opinions on legal conclusions or conclusions of mixed law and fact inadmissible, because, among other things, the opinions on covered matters are best addressed by "jury instructions from the Court, not by an expert's testimony"). Additionally, while "an expert may testify to an ultimate fact, and to the practices and usage of a trade," an expert may not offer "legal opinions as to the meaning of the contract terms at issue," opinions as to the "applicable principles of law," or "conclusions as to the legal significance of various facts." *Marx & Co. v. Diner's Club Inc.*, 550 F.2d 505, 509-10, 512 (2d Cir. 1977) (concluding that district court's admission of evidence was highly prejudicial to appellant); *see Landmark Builders, Inc. v. Cottages of Anderson, LP*, No. IP 01-C-1592-C-M/S, 2003 WL 21508118, at *2-3 (S.D. Ind. May 20, 2003) (excluding expert's testimony because *inter alia* "[w]hether or not the terms of the [c]ontract are ambiguous is a matter of law for the Court to decide"); *Breezy Point Co-op., Inc. v. CIGNA Prop. & Cas. Co.*, 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (excluding expert's testimony regarding alleged violations of the terms of an insurance policy because it would require the expert "to construe provisions of the insurance contract and thus contains inadmissible legal opinions as to the meaning of the contract terms at issue.") (internal quotations omitted) (citation omitted). Such expert testimony in the form of legal conclusions, which are in the province of the Court, is inadmissible on its face under Rules 702 and 704. *See Sparton Corp. v. United States*, 77 Fed. Cl. 1, 6-9, 31 n.11 (2007) ("Expert testimony is an improper mechanism for offering legal arguments to the Court. Plaintiff's counsel can make each of the arguments proffered by [the expert] during the trial. It would be unfair to Defendant for the Court to award Plaintiff's legal arguments the elevated stamp of 'expert.'").

Throughout the Wood report, Mr. Wood impermissibly interprets the OA and offers conclusions as to the alleged vagaries, ambiguities and contradictions within the contract. Also, given his explicit opinions on what legally constitutes independent contractor status, he reaches improper conclusions on ultimate issues of law and applies those to the facts, impermissibly mixing law and fact. Thus, Mr. Wood's testimony and report should be excluded as inadmissible on their face under Federal Rules of Evidence 702 and 704.

**D. Mr. Wood's Implicitly Legal Judgments Throughout The Report Result In An Impermissible Usurpation Of The Role Of The Court**

Mr. Wood's report and testimony cannot be saved by excising his explicitly legal statements and judgments. His report is replete with "factual" statements that, rather than simply describing relevant facts, inevitably, inextricably, and impermissibly mix facts and law. For example, Mr. Wood discusses what, in his view, are the practices and procedures of what an independent contractor relationship might entail. When an expert makes assertions about the legal status of certain practices or discusses the legal import of certain facts, those assertions "contain various implicit legal determinations that invade the province of the Court." *Klaczak v. Consol. Med. Transp. Inc.*, No. 96 C 6502, 2005 WL 1564981, at *9 (N.D. Ill. May 26, 2005) (court granted motion *in limine* to exclude portions of expert lawyer's report where expert opines on the applicable law and arrives at legal conclusions). "The mere fact that [the expert witness] does not expressly state as much does not preclude a finding that he has opined on that legal issue." *Perez v. Radioshack Corp.*, No. 02 C 7884, 2005 WL 3455858, at *2 (N.D. Ill. Dec. 13, 2005) (court excluded expert testimony relating to the key issue before it which was whether management is the primary duty of "Y store" managers, since if it is not, then they would not be exempt executives and must receive overtime pay).

In order to expound on his view of the practices and procedures of independent contractor

case 3:05-md-00527-RLM -CAN document 1366 filed 06/09/08 page 16 of 22

relationships, Mr. Wood must first establish that they adhere to the legal standards that define the employment status of an independent contractor. Mr. Wood thereby implicitly imparts his opinion of the legal standards and tests for employment status and improperly suggests that the practices and procedures he has set forth are actually the past custom of *bona fide* independent contractor relationships.

When Mr. Wood writes that "[i]n my practice, I would not draft an agreement in the form of the Agreements, for in my opinion it could have no reasonable chance of securing the desired independent contractor status," he implies that the OA is inconsistent with legal standards. (*Id*. at 19.) Mr. Wood implicitly states that a worker's ability to hire helpers is a factor to consider in determining that worker's status by commenting that: "Conversely, when a worker cannot hire helpers, or can do so only with approval from the principal, that control is more consistent with employee status …. In my experience and professional opinion, such blatant interference with the worker's method, manner and means of performance does not occur with *bona fide* independent contractors. True independent contractors should be able to help hire helpers of their own choosing without material interference by a company." (*Id*. at 25.)

Similarly, a statement such as: "The following are mere examples of the right of control which FXG reserves to itself," (*Id*. at 20), also improperly signals that the examples listed are incompatible with the legal standards set forth for independent contractor status. For example, Mr. Wood assumes that "FXG has reserved its right to control nearly every aspect of a P&D driver's daily work, from whether the P&D driver must shave; to the cleanliness of his uniform; to the number of hours he is expected to work; to the hat he must wear; to the time he arrives at FXG's facility each day" and concludes that "[n]otwithstanding FXG's interest in protecting its global brand and uniform standards, such control over the minutest details is antithetical to

independent contractor status." (*Id*. at 36.) Other examples of inadmissible inferences abound, such as that a right to control can be determined from the fact of termination for bad attitudes, (*Id*. at 48), or the ability to make business decisions, (*Id*. at 28). Also, Mr. Wood impermissibly applies a legal test when he posits that "[o]ne of the traditional indices of employee versus independent contractor status is whether the worker provides his own tools and equipment" and then notes that "FXG's entire system of terminals, hubs, its corporate-wide sales and customer service workforce, all operate in an integrated fashion." (*Id*. at 38.)

Since, as described above, Mr. Wood's report is replete with implicit statements of his view of what the legal standards should be, as well as improper applications of these legal tests in statements mixing facts and the law, it is not practical to merely strike portions of the report—instead it and any of Mr. Wood's expert testimony should be excluded entirely.[4]

## II. MR. WOOD MISAPPROPRIATES THE COURT'S RIGHT TO DECIDE THE ISSUE OF THE COLLATERAL ESTOPPEL EFFECT OF THE ESTRADA CASE

Mr. Wood repeatedly invokes his testimony and the state court's decision in the *Estrada* case throughout his report. His reliance on *Estrada* infringes on this Court's authority to decide the collateral estoppel issues, which the parties are now briefing on their own. Furthermore, *Estrada* is not relevant since it involved California law and the status of single-work area contractors seven to twelve years ago. Any legal conclusions that Mr. Wood may have concerning FedEx Ground's right of control now as compared with the facts presented in *Estrada*, (*see, e.g.*, Rep. at 5-6, 8-10, 14, 15, 17, 18, 25-26), would be inadmissible and highly

[4] Even if the Wood report were admissible, it is unhelpful because Mr. Wood uses general legal standards that he has deduced from studying case law from multiple jurisdictions. At best, providing this general standard would confuse the trier of fact as to the actual standard used in the specified jurisdiction, or for example, under New York law. In offering an opinion on the legal effect of contract provisions, the report makes no effort to apply New York's test for determining employment status, and contains no discussion of relevant New York case law. In Mr. Wood's view, variations in state law do not matter because all formulations use "similar" criteria and "seek a common truth: to identify who is truly an employee, and who is not." (*Id*. at 11.) That assessment cannot be reconciled with the careful and required analysis of variations in state law, such as in this Court's March 25 Order.

prejudicial. (*See* FedEx Ground's Omnibus Response in Opposition to Plaintiffs' Memorandum of Law re: Collateral Estoppel.) Because the Wood report and Mr. Wood's opinions tread heavily on this Court's province to decide the issue of collateral estoppel, and determine its relevance to the instant case, they should be excluded in their entirety.

## III. THE WOOD REPORT IS AND RELIES ON THE TYPE OF EXTRINSIC EVIDENCE THAT THIS COURT REJECTED WHEN CERTIFYING THE PLAINTIFFS' CLASSES

Even if the Wood report were admissible under the Federal Rules of Evidence, it is, and relies on, the type of extrinsic evidence that this Court assumed would not be presented when certifying Plaintiffs' many state classes. Courts have recognized that legal testimony might be permissible where it may be helpful to determine the probable meaning of an ambiguous term in a contract. *See In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007) (citing *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 365-66 (7th Cir. 1990)); *see also Ass'n Benefit Servs., Inc. v. AdvancePCS Holding Corp.*, 2005 WL 2335484, at *4 (N.D. Ill. Sept. 23, 2005) (court held that expert physician's testimony interpreting contract language was inadmissible absent a need to clarify or define terms). In this case, however, the Court certified a number of the classes assuming that the class plaintiffs were not arguing that the OA was ambiguous,[5] and therefore that extrinsic evidence would not be necessary. Furthermore, this Court has not found the OA or any of its terms to be ambiguous.[6] *See Meeting House Lane, Ltd.*, 628 A.2d at 857 (under Pennsylvania law, contract interpretation is a question of law); *Marcinak v. Se. Green Sch. Dist.*, 544 A.2d 1025, 1027 (Pa. Super. Ct. 1988) (under Pennsylvania contract law, "[w]hile

[5] The Court noted that the following States' plaintiffs did not argue that the Operating Agreement is ambiguous: Tennessee (Mar. 25 Order at 15), Montana (*id.* at 18), Arkansas (*id.* at 28), Texas (*id*. at 38), Wisconsin (*id.* at 46), Alabama (*id*. at 50).

[6] Despite that, Mr. Wood opines that "vague and ambiguous terms and phrases appear throughout the Agreements, providing FXG tremendous latitude in controlling the method, manner, and means by which each P&D driver goes about his work." (Rep. at 17-18.)

case 3:05-md-00527-RLM -CAN document 1366 filed 06/09/08 page 19 of 22

the interpretation of ambiguous writings is left to the discretion of the finder of fact, unambiguous terms are construed by a court as a matter of law").

Additionally, the Court assumed that the plaintiffs had no intent to offer anecdotal evidence of individual drivers and ordered that "[b]ased on that assumption, the court has resolved these motions with the correlative assumption that the plaintiffs will not, at the summary judgment or trial stages, present evidence other than the Operating Agreements and generally applicable FedEx policies." (Mar. 25 Order at 153-54.) Plaintiffs were given, at that time, the opportunity to decide whether or not the Court's assumption was mistaken and if they intended to present extrinsic evidence. They told the Court that its assumption was correct. (*See* Plaintiffs' Statement Of Intent To Provide The Court With Common Proof Of Employment Status, dated April 11, 2008 [Doc. No. 1140] at 2-3 ("Pls.' Apr. 11 Stmt of Intent").)

Mr. Wood's proffered expert testimony circumvents the Court's March 25 Order [Doc. No. 1119] by introducing extrinsic evidence of the type the Court neither sought nor expected, both directly (by introducing the Wood report itself, which is neither the OA nor generally applicable FedEx policies), and indirectly (through Mr. Wood's analysis of the anecdotal evidence and experiences of individual drivers). The Wood report is rife with these references, both in the body of the report and in the footnotes supporting Mr. Wood's interpretation of the OA and FedEx Ground's policies and his legal conclusions.

For instance, to support the claim that FedEx Ground's right to control P&D drivers' personal appearance extends to grooming, cleanliness and decorum, Mr. Wood cites to two examples: (1) where "driver [was] reprimanded for getting something to eat during the work day while not wearing a FedEx cap and with his shirt untucked" (PA13102); and (2) where "driver [was] told that he needed to shave more consistently, and that it was a 'piss or get off the pot'

policy" (PA13090). (Rep. at 21 n. 87.) To support the claim of FedEx Ground's control over the appearance of drivers' trucks, Mr. Wood cited to two other incidents where: (1) "FXG manager performed an appearance standard check on all contractor's vans, and driver was 'spoken to' about dent in van. P&D driver was allowed 30 days to fix the dent in order to maintain a professional appearance" (PA14490); (2) "P&D driver was given 4 weeks to remove fiberglass from front of van; two weeks to fix scratches; a few days to fix big scratch" (PA14478). (Rep. at 22 n. 93.) Mr. Wood also provides anecdotes of how FedEx Ground exercised control over its P&D drivers through Customer Service Rides ("CSRs"). (*Id*. at 23 n. 102, citing PA14229-PA14230, PA14258-PA14259.)

Mr. Wood also uses anecdotal examples to support his interpretation that the word "suggestion" meant the same as "mandatory" at FedEx Ground. (*Id*. at 23 n. 103, citing PA14236, PA14314, PA13848, and PA14022.) And, in supporting the conclusion that FedEx Ground controls helper use by drivers in a way that would not occur with "*bona fide* independent contractors," Mr. Wood cites to an instance where a P&D driver was "admonished that 'unauthorized passenger and an unauthorized driver driving his van [would] not be tolerated,' and 'could lead to termination of his contract.'" (*Id*. at 25, citing PA13131.) These are just a few examples of how Mr. Wood uses extrinsic evidence to support his legal conclusions and interpretations of the OA and FedEx Ground's policies and procedures regarding the employment status of P&D drivers.[7]

[7] Other examples include: Rep. at 25 n. 117 (supporting legal conclusion that "FXG's voluminous policies and procedures control the P&D driver's daily activities, and strong influence the method, manner and means by which P&D drivers go about their daily work."); 27 n. 129 (supporting legal conclusion that FXG controls P&D drivers through managers who enforce and interpret the rules); 27 n. 130 (supporting proposition that FXG regularly threatens P&D drivers "that their contract is in 'jeopardy' or subject to termination."); 28 n. 135, 136 (supporting conclusion that P&D drivers are required to follow FXG procedures because to do otherwise would jeopardize the P&D driver's contract.); 33-34 n. 166, 167, 168 (supporting conclusion that "Business Discussions (also known as Contract Discussion Notes) demonstrate the right to control, and comprehensive actual control, over [FXG's] P&D drivers."); 36 n. 185, 186, 187, 189, 190, 191, 192, 193 (supporting conclusion that "FXG has reserved its right to

case 3:05-md-00527-RLM -CAN document 1366 filed 06/09/08 page 21 of 22

Allowing Mr. Wood's testimony would have the effect of permitting Plaintiffs to introduce evidence indirectly that they expressly stated would not be needed nor introduced, (*see* Pls.' Apr. 11 Stmt of Intent at 2-3), and that the Court by its March 25, 2008 Order had assumed would not be introduced. The question of whether there are any issues of material fact and any resultant award of summary judgment in favor of the multitude of class plaintiffs cannot be decided based on the hearsay anecdotes of a few drivers from unidentified jurisdictions, but rather only on the unambiguous terms of the OA itself.

**CONCLUSION**

For the foregoing reasons, FedEx Ground respectfully requests that this Court exclude the expert testimony and report of Robert Wood in their entirety.

Dated: June 9, 2008.

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

control nearly every aspect of a P&D driver's daily work); 38 n. 207 (supporting that FXG has the right to control P&D drivers vehicles and equipment); 41 n. 233, 235 (supporting conclusion that FXG has the right to control P&D drivers hours, schedules, and workload; 44 n. 257, 258, 259 (same); 46 n. 270, 271, 272 (supporting conclusion that FXG's right to effect termination at will is proof of FXG's right to control for purposes of worker status).

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of June, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: *_/s/ Robert M. Schwartz_*

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/09 page 1 of 227

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF INDIANA**

**SOUTH BEND DIVISION**

**In re: FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION**

**CASE NO.: 3:05-MD-527RM (MDL 1700)**

**CHIEF JUDGE MILLER**

**MAGISTRATE NUECHTERLEIN**

**EXPERT REPORT OF ROBERT W. WOOD**

# Table of Contents

I. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Qualifications as Expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. My Opinions in *Estrada*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C. Summary of Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. Methodologies in Assessing Worker Status. . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. Legal Standards.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. Right to Control vs. Actual Exercise Thereof. . . . . . . . . . . . . . . . . . . . . . . . 12

C. Reality Prevails over Labels.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III. Right to Control Method, Manner, and Means of P&D Drivers. . . . . . . . . . . . . . . 15

A. Operating Agreement - FXG Expressly Reserves Right to Control. . . . . . . . . 15

B. Policies and Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1. General Procedures and Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

a. Check-Out, Check-In and Completion Procedures. . . . . . . . . . . . . . . . . 20

b. Uniform and Vehicle Appearance. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

c. Customer Service Rides (CSR).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

d. Driver Release Audits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

e. FXG Must Approve All Drivers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2. Revisions to Policies and Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. Other FXG Documents Evince Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1. FXG's Manuals and Flip Charts Show Control. . . . . . . . . . . . . . . . . . . . . . 29

2. FXG's Training Shows Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3. FXG's Business Discussions and Records Show Control. . . . . . . . . . . . . . 33

D. FXG's Method of Payment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

E. FXG's Right to Control Vehicles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

F. FXG's Right to Control Routes and Assignments. . . . . . . . . . . . . . . . . . . . . . 39

G. FXG's Right to Control Hours. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV. Right to Terminate - Termination at Will. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

A. Operating Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B. Threats of Termination.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

C. Termination Unrelated to Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Exhibit A-1. Resume of Robert W. Wood

Exhibit A-2. Books, Chapters and Monographs by Robert W. Wood

Exhibit A-3. Articles by Robert W. Wood

Exhibit A-4. Speeches and Papers Presented by Robert W. Wood

Exhibit A-5. Expert Witness Roles of Robert W. Wood

Exhibit B. Decision in *Anthony Estrada v. FedEx Ground Package System, Inc.*, 64 Cal.Rptr. 3rd 327 (Cal.Ct. App. 2nd Aug. 13. 2007)

Exhibit C. Robert W. Wood's Testimony in *Anthony Estrada v. FedEx Ground*, Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004)

Exhibit D. Items Reviewed by Robert W. Wood in *Anthony Estrada v. FedEx Ground*, Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004)

Exhibit E. Items Reviewed by Robert W. Wood in *Anthony Estrada v. FedEx Ground Package System, Inc.*, 64 Cal.Rptr. 3rd 327 (Cal.Ct. App. 2nd Aug. 13. 2007)

# I.   BACKGROUND

## A. QUALIFICATIONS AS EXPERT

I am an attorney licensed to practice law in California, New York, Texas, Washington, Arizona, Wyoming, Montana and the District of Columbia. I am also qualified as a Solicitor in England and Wales. I am Certified as a Specialist in Taxation by the California Board of Legal Specialization. I regularly represent companies in disputes with taxing agencies over the proper characterization of workers as independent contractors or employees. I also regularly render expert testimony on the proper classification of workers as employees or independent contractors.

I am the author of *Legal Guide to Independent Contractor Status* (4th Ed., Tax Institute © 2007), originally published in 1992, now in its Fourth Edition (hereafter "*Legal Guide*"). The *Legal Guide* includes a systematic discussion of the differences between independent contractors and employees, and explores some of the myriad contexts in which such characterization issues arise. Furthermore, the *Legal Guide* examines the various criteria used under different substantive laws and in different jurisdictions for characterizing workers as independent contractors or employees. These subjects include federal and state income and employment taxes, federal and state labor law concerns, pension law liabilities and compliance, and tort and other liabilities to the employer.

The *Legal Guide* includes discussion on the burgeoning contexts in which disputes over the status of workers arise, consideration in drafting agreements with workers, pension and employee benefit considerations, employer tort and other liability considerations, and handling IRS contractor/employee disputes. In addressing planning for worker status and approaches to drafting independent contractor and employment agreements, the *Legal Guide* also includes sample forms and agreements.

My duties as author of the *Legal Guide* include regularly monitoring legal developments relating to independent contractor and employee characterization issues. This includes summarizing case law, as well as statutory and regulatory developments. I have regularly performed these tasks since the publication of the first edition of the *Legal Guide* in 1992, and even before 1992, I followed the area closely as part of preparing the manuscript for the first edition.

In addition to the requisite revisions which led periodically to new editions over the past fifteen years, I have regularly written and published supplements or update material to the *Legal Guide*. I have generally produced published updates as separate paperbound volumes once or twice a year. Thus, my authorship of this treatise has required me to remain current with developments in the law impacting independent contractors, and to regularly follow and comment upon such developments. In addition to the *Legal Guide*, I am the author or editor of 31 books and over 1,000 articles published in legal, accounting and business periodicals.

Case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 5 of 227

I attach my educational background and work experience (Exhibit A-1), books, chapters and monographs authored (Exhibit A-2), published articles (Exhibit A-3), speeches and papers presented (Exhibit A-4), and pertinent expert witness roles (Exhibit A-5). In addition to serving as author of the *Legal Guide*, I have consistently maintained an active role as an attorney practicing primarily in the tax arena over the past 28 years. Due to my expertise in worker status matters, I have regularly been called upon to defend companies accused of mischaracterizing workers as independent contractors.

In fact, I have argued far more frequently for independent contractor (rather than employee) status of workers. Most such disputes have involved governmental entities seeking to reclassify as employees workers who were classified as independent contractors. I have handled many such disputes across a wide variety of industries, including the medical and health care fields, consulting and professional services, beauty and personal care, education, construction, publishing, transportation, retailing, food production, processing and delivery, and many other industries.

Furthermore, I have often been retained to advise businesses with respect to such matters, being engaged to help clients establish *bona fide* independent contractor arrangements. In that role I have drafted, edited or assisted in drafting dozens of independent contractor agreements over nearly three decades.

I have served numerous times as an expert witness concerning worker characterization matters (see Exhibit A-5). On most such occasions, I have served as an expert for the parties seeking recognition as employees. I have had expert roles in the insurance, sales, transportation, publishing and food industries. Conversely, on one occasion (involving the health care industry) I served as an expert witness in support of an employer's position that workers seeking reclassification were in fact properly treated as independent contractors.

### B. MY OPINIONS IN *ESTRADA*

I was an expert witness in *Anthony Estrada, et al. v. FedEx Ground Package System, Inc.*[1] I was not asked to (and did not) prepare a written report in *Estrada*, as the applicable state court rules did not require one. On June 29, 2004, I testified before Judge Howard Schwab in Los Angeles Superior Court. A copy of my trial testimony in *Estrada* is attached hereto as Exhibit C. In connection with that testimony and my work in *Estrada*, I comprehensively reviewed the operating agreement,[2] and policies, training

---

[1] Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004) (herein referred to as *Estrada*). In *Estrada v. FedEx Ground Package System, Inc*., 64 Cal.Rptr. 3rd 327 (Cal.Ct. App. 2nd Aug. 13. 2007), the appellate court affirmed the trial court's decision, finding FedEx Ground drivers to be employees, among other rulings (Exhibit B, attached hereto for the Court's convenience, is the *Estrada* appellate opinion of August 13, 2007).

[2] As used in this report (herein referred to as "Report"), the FedEx Ground Package System, Inc. Pick-Up and Delivery Contractor Operating Agreement (June 2004), described as the "Operating Agreement" in my *Estrada* testimony, is referred to as the "FXG Agreement." See further definitions on p. 15, *infra*.

materials, driver files, Business Discussions, manuals, and videos/DVDs.[3] A complete list of the items I reviewed in connection with *Estrada* appears in Exhibit D.

I expressed the following general opinions in *Estrada* concerning FedEx Ground Package System, Inc. ("FXG"), and its practices relating to its pick-up and delivery ("P&D") drivers:

1. The use of independent contractor terminology and the presence of Section 1.15[4] of the FXG Agreement does not resolve the independent contractor inquiry.[5] Rather, Section 1.15 is a sort of savings clause, included in the FXG Agreement as an attempt by FXG to call its P&D drivers independent contractors despite actually treating its P&D drivers as employees.[6] Section 1.15 is meaningless in light of the other specific and express provisions of the FXG Agreement which reserve rights of control to FXG.[7]

2. Section 1.15 is inconsistent with other provisions of the FXG Agreement.[8] For example, Section 1.10 (Agreed Standard of Service) states that each P&D driver must provide service "consistent with the competitive standards within the industry,"[9] "cooperate with FedEx Ground's employees, customers and other contractors,"[10] "foster the professional image and good reputation of FedEx Ground,"[11] and "conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum."[12] Section 1.10 is contrary to Section 1.15 because these phrases leave open such matters as: 1) who determines the standards; 2) the ramifications for violating the standards; and 3) creates control by terminal managers by virtue of the uncertainty over 1 and 2.[13]

Section 1.12 includes the phrase, "promulgated from time to time" with reference to standards for P&D driver personal appearance.[14] This allows FXG to impose or change unspecified terms and conditions of employment on P&D drivers solely at the discretion of FXG.[15] Moreover, Section 1.12 states that "the equipment shall be maintained in a

---

3 Videos have been replaced with DVDs.

4 Section 1.15 states that each P&D driver "shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results ... and no officer, agent, or employee of FedEx Ground shall have the authority to direct contractor as to the manner and means employed to achieve such objectives and results." (FXG_GRIFFIN0003320 – 3321).

5 See Robert W. Wood Testimony, 12035 – 12036.

6 *Id*. at 12036.

7 *Id*. at 12047.

8 *Id*. at 12041, 12050.

9 See Section 1.10(a) (FXG_GRIFFIN0003317).

10 See Section 1.10(d) (FXG_GRIFFIN0003318).

11 See Section 1.10(e) (FXG_GRIFFIN0003318).

12 See Section 1.10(h) (FXG_GRIFFIN0003319).

13 See Robert W. Wood Testimony, 12064

14 See Section 1.12 (FXG_GRIFFIN000320).

15 See Robert W. Wood Testimony, 12041 – 12042.

clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry."[16] Section 1.12 is wholly inconsistent with Section 1.15 because it gives terminal managers control over the method, manner, and means of P&D drivers.[17] I would not expect to find such a provision in an independent contractor agreement.[18]

Furthermore, FXG's ability to unilaterally change what it claims is an independent business is inconsistent with independent contractor status. I believe FXG's unilateral right to reconfigure routes denotes an employment relationship.[19] In addition, in my opinion, the policies and procedures related to Business Discussions[20] are of a disciplinary nature, bespeaking employment status, and also inconsistent with Section 1.15.

3.  FXG controls the method, manner and means of picking up and delivering packages, not merely the end result.[21] For example, customer service rides, which allow FXG to supervise its P&D drivers, provide demonstrable evidence of control exerted by FXG over P&D drivers.[22] Uniforms,[23] required personal appearance consistent with company standards,[24] vague requirements to conduct business activities with proper decorum and in a professional manner,[25] are all inconsistent with independent contractor status, because they provide FXG terminal managers the right to control the method, manner and means of its P&D drivers.[26] Furthermore, FXG's right to approve or disapprove replacement drivers, a second van or a helper provide additional evidence that FXG has the right to control the method, manner, and means P&D drivers use to pick up and deliver packages.[27]

FXG possesses the right to control the method, manner and means by which all packages are delivered, the number of packages delivered each day, and hence the hours to be worked.[28] FXG's Flex Program (in which FXG removes packages from a

---

[16]  See Section 1.12 (FXG_GRIFFIN000320).

[17]  See Robert W. Wood Testimony, 12044.

[18]  *Id*. at 12043 – 12044.

[19]  *Id*. at 12059, 12074 – 12076.

[20]  In accordance with FXG's terminology, this Report sometimes abbreviates Business Discussions as "BDs".

[21]  See Robert W. Wood Testimony, 12048 – 12051.

[22]  *Id*. at 12045 – 12047.

[23]  *Id*. at 12042.

[24]  *Id*. at 12042 – 12043.

[25]  *Id*. at 12060.

[26]  *Id*. at 12062 – 12064.

[27]  *Id*. at 12049 – 12050.

[28]  *Id*. at 12072 – 12073.

P&D driver's route and adds packages to the routes of others) is inconsistent with independent contractor status.[29]

4. The Contractor Assistance Program,[30] provides a floor or safety net to ensure that each P&D driver has little if any risk of loss. This is also inconsistent with independent contractor status.[31]

5. Section 12.1(c) – Termination, and Section 11.2 – Renewal Terms, along with vague standards of service in Section 1.10, allow FXG to terminate P&D drivers at will.[32] The FXG Agreement allows FXG to terminate drivers for a terribly small infraction, i.e., a torn uniform or a missed pick-up window, or FXG may simply not renew the FXG Agreement with or without reason.[33]

6. FXG would be unable to perform its core business of picking up and delivering packages without its P&D drivers. Such integration of the P&D drivers into the heart of FXG's business bespeaks employment.[34]

### C. SUMMARY OF OPINIONS

I have been engaged as an expert in this case. I continue to hold the opinions to which I testified in *Estrada* regarding the employment status of FXG drivers, as well as the import of the operating agreement and policies and procedures. Judge Schwab took specific note of my testimony and relied on it in the Court's Statement of Decision.[35]

I have been presented with a variety of new FXG business records and depositions as part of this litigation. I have reviewed these new items in developing the opinions I now express. A complete list of the new items with which I have been provided appears as Exhibit E.

I have been asked to examine and evaluate the documents and materials listed in Exhibit D because of:

(a) my practical experience over nearly three decades of legal practice in representing companies defending independent contractor arrangements before taxing and administrative bodies;

---

[29] *Id*. at 12071 – 12072.

[30] FXG negotiates for volume discounts for goods and services by drivers to perform their duties, and provides for weekly deductions of small amounts to pay for such goods and services. See Procedure: Contractor Assistance Program, FXG, CRL-371, Revision date: 8/31/05 (FXG000000144 – 151).

[31] See Robert W. Wood Testimony, 12082 – 12084.

[32] *Id*. at 12067 – 12069.

[33] *Id*. at 12067.

[34] *Id*. at 12030 – 12033.

[35] *Estrada v. FedEx Ground*, Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004), p. 4.

(b) my academic survey and writing in the independent contractor field as a result of my authorship of the *Legal Guide*, published with regular updates and in four editions since 1992;

(c) my drafting and planning experience as an attorney with clients establishing, maintaining and/or modifying contractual independent contractor and/or employee relationships; and

(d) my knowledge of FXG's practices and policies relating to P&D drivers prior to, during, and subsequent to the *Estrada* case.

Based on my review and evaluation of the new documents and materials with which I have been provided, it is my opinion that:

1. FXG's P&D drivers are the cornerstone of its enterprise.[36] To a truly extraordinary degree, P&D drivers are integrated within FXG's global system. All drivers wear company prescribed uniforms, all carry company mandated (and company provided) equipment, all drive company procured and prescribed trucks, all perform an extraordinary list of functions the company alone dictates, and all do so in an unequivocally FXG branded manner down to the most banal of details. In my opinion, plainly, unequivocally, and without qualification, the P&D drivers do not (and cannot) constitute *bona fide* independent contractors under any existing test for assessing worker status.

2. Across the panoply of contexts in which worker classification issues arise, the spectrum of federal and state labor law, federal and state tax law, pension laws, tort laws, worker's compensation and unemployment insurance law, one axiom prevails: the employer's <u>right</u> to control, not the employer's actual <u>exercise</u> of that control, defines an employment relationship. Under every test of employment status, the right to control is a key factor, if not <u>the</u> key factor.

3. In a case where the employer's contractual rights manifest the unequivocal right to control the method, manner and means by which the workers go about their daily tasks, it is not necessary to evaluate the extent to which the contractual right to control is actually exercised on a day to day basis to determine the worker's status. Conversely, where a contract does not clearly vest such controlling rights in the employer, it is necessary to evaluate the entire relationship between company and worker to assess the status of the worker. In my opinion, FXG's reserved contractual rights over its P&D drivers obviate reference to FXG's actual patterns of practice.

4. FXG's efforts to "re-engineer" its policies after *Estrada* affected only cosmetic changes, and, in my view, did not materially or substantially change FXG policies and procedures. From the numerous business records I reviewed from June 2004 on, I see no material change in FXG's relationship with P&D drivers. In my opinion, FXG's enforcement of its policies and procedures dictates an extraordinary level of method,

---

[36] See Dan Sullivan Deposition Exhibit 6 (FXG000640682).

manner and means detail in each P&D driver's daily work behavior. In my opinion, both before and after *Estrada*, FXG's firm grip on its P&D drivers evidences employment, under any of the various tests of employment status.[37]

5. Whether labeled "policies," "procedures," or in any other fashion, enforced step-by-step instructions indicate an employment relationship. FXG's plethora of rules for every step, from check-out to check-in, to scanning, to approval of trucks and vans, to dress, to shaving, to hours, to hats worn during lunch, is entirely inconsistent with the independence normally associated with independent contractor status. The fact that FXG requires its workforce of P&D drivers to follow its directives, and to document that such steps have been completed, provides strong evidence not only of FXG's right to control its P&D drivers, but also of FXG's actual exertion of such control.

6. In my opinion, if this Court determines either that FXG retains the contractual right to control the P&D drivers' method, manner, and means, or if FXG does so in practice, that would require a finding of employment status. Under the facts herein presented, I believe the status of the P&D drivers as employees to be confirmed by both FXG's express contract rights, and by FXG's nationwide and uniform practices, although either one alone would be sufficient.

## II. METHODOLOGIES IN ASSESSING WORKER STATUS

### A. LEGAL STANDARDS

A number of tests are used to determine whether a worker is truly an independent contractor or employee. Although there is no universal test for determining worker status, there are more similarities than differences in the legal tests, as well as in the results their application produces. As stated in the *Legal Guide*, "[t]he common law right-to-control standard is by far the most important and overarching consideration in determining employee status."[38] Furthermore, most tests trace their origins to the common law, assessing worker status based on the employer's right to control the worker, particularly with respect to the details of production rather than merely the end result.[39]

---

[37] For example, Contractor Relations was "reinvigorated" and expanded in size after *Estrada*. See Robert Ostrov Deposition, 25/7 – 32/19. Contractor Relations began publishing *Independent Times* to communicate more often and directly with its P&D drivers. See, *e.g.*, *Independent Times*, Vol. 1, Sept. 2005 (FXG_000008078 – 8079). However, even with the mass communication and larger Contractor Relations group, in my opinion, since the functions performed by Contractor Relations remained the same except for its expanded size, these changes have not had a material impact on FXG's relationship with its P&D drivers.

[38] *Legal Guide*, ¶ 3.02, p. 3-7.

[39] *Alexander v. Rush North Shore Med. Center*, 101 F.3d 487, 492 (7th Cir. 1996) quoting *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435 (7th Cir. 1996) and *Spirides v. Reinhardt*, 198 U.S. App. D.C. 93, 613 F.2d 826, 831-32 (D.C. Cir. 1979); *N.L.R.B. v. Steinberg*, 182 F.2d 850, 857 (5th Cir. 1950), *N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912 (11th Cir. 1983); *Williams v. United States,* 126

The most prevalent tests used to assess worker classification in labor and employment cases are the *Darden* common law agency test, state unemployment law "ABC" tests, and the economic realities test. The Internal Revenue Service uses a 20 factor test for federal income and employment tax purposes,[40] yet the criteria are similar. The United States Supreme Court in *Nationwide Mutual Insurance Co. v. Darden*[41] described the common law of agency test applicable to ERISA and similar labor claims.

Although there are various formulations, they all seek a common truth: to identify who is truly an employee, and who is not. Almost without question, the court or agency ruling on the matter must determine the truth by evaluating the governing contract and business records. Where printed contracts and other niceties are not enough to resolve the matter, the court or agency must go beyond them, evaluating what really occurs between the company and the worker in the real world.

Although the tests have differing formulations, in addition to the key factor of the right to control, most all evaluate the degree to which the worker's function is integrated into the heart of the company's operations, the degree of special skills held by the worker, the longevity of the relationship between company and worker, and the company's ability to terminate the relationship. These and other factors are used as earmarks of traditional employment status, to assess the kind of independence, professional stature and entrepreneurial risk that a true independent contractor has, versus the lockstep of direction (whether the direction be exercised or merely held in reserve) which reposes between employer and employee.

As discussed throughout this Report, in my professional opinion, the defendant's voluminous business records themselves are an overwhelming, incontrovertible and unequivocal testament to the employee status of these P&D drivers under any applicable legal standard. I do not view this as a remotely close case, nor one that can fairly be said to be debatable. The business records and depositions in this case are voluminous, and the defendant's business practices are complex, yet this is a remarkably simple case.

The essence of the *Estrada* decision is the plainspoken truth that "if it looks like a duck, walks like a duck, swims like a duck, and quacks like a duck, it is a duck."[42] In practice, the work performed by the driver is wholly dependent upon FXG's operation. "The drivers look like FedEx employees, act like FedEx employees, are paid like FedEx employees, and receive many employee benefits."[43] The difference between Express drivers, whom FXG admits are employees, and Ground drivers, whom FXG claims are

---

F.2d 129, 133 (7th Cir. 1942); *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 522 (1889); *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 350 (1989); *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 N.J. 567, 581 (N.J. 1991).

40 *Legal Guide*, ¶ 3.02, p. 3-7 – 3-16.

41 503 U.S. 318 (1992).

42 See Exhibit B at p. 335.

43 See Exhibit B at p. 334.

not, is negligible.[44] Such disparate treatment of identically situated workers is rarely countenanced.[45]

In my opinion, the facts presented in this litigation lead inexorably to employee status for the P&D drivers, regardless of which test for examining worker status this Court applies. I find that no difference in result would apply whether this Court applies a common law approach, an economic realities test, a hybrid analysis, or indeed, any other prevailing test.

### B. RIGHT TO CONTROL VS. ACTUAL EXERCISE THEREOF

Standards for characterizing workers have received extensive statutory, regulatory, and judicial attention. Judicial examinations of this issue consistently enunciate the principle that the right to control the method, manner and means of a worker's performance is the fundamental common law indicator of an employer-employee relationship.[46] Across the spectrum of contexts in which worker classification issues arise, from federal and state labor law, federal and state tax law, pension law, tort law, worker's compensation and unemployment insurance law, the axiom is the same.[47] The employer-employee relationship exists if the employer possesses the right to direct the employee's

---

[44] See David Rebholtz Deposition, 80/04 – 81/01, 106/17 – 107/23, 112/17 – 112/22.

[45] *Legal Guide*, ¶ 5.05, p. 5-47.

[46] See, e.g., Restatement (Second) of Agency, §220 (1957) (the principal element of the common-law test is the extent of one party's right to direct and control the performance of the other); *Weber v. CIR*, 60 F.3d 1104, 1110 (4th Cir. 1995); *Farrell v. Greater Houston Transp. Co.*, 908 S.W.2d 1(Tex. 1995); *Falls v. Scott*, 815 P.2d 1104 (Kan,1991); *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (Ca., 1989); *Carver v. Sparta Elec. System*, 690 S.W.2d 218 (Tenn.,1985); *Sawyer v. Chevron U.S.A., Inc.*, 421 So.2d 1263 (Ala.1982); *Hodges v. Doctors Hospital*, 234 S.E.2d 116 (Ga.App.,1977); *Hickman v. Southern Pac. Transport Co.*, 262 So.2d 385 (La.,1972); *Solmica of Gulf Coast, Inc. v. Braggs*, 232 So.2d 638 (Ala.,1970); *Young v. Warr*, 165 S.E.2d 797 (S.C.,1969); *Van Pelt v. Paull*, 150 N.W.2d 185 (Mich.,1967); *Cooper v. Asheville Citizen-Times Pub. Co.*, 129 S.E.2d 107 (N.C.,1963); *Spencer v. Travelers Ins. Co.*, 133 S.E.2d 735 (W.Va.,1963); *Fardig v. Reynolds*, 348 P.2d 661(Wash.,1960); *Nordling v. Johnston*, 283 P.2d 994 (Or.,1955); *Feller v. New Amsterdam Cas. Co.*, 70 A.2d 299 (Pa.,1950); *Empire Star Mines Co. v. California Employment Commission*, 28 Cal.2d 33 (Ca., 1946); *Moore-Handley Hardware Co. v. Williams*, 189 So. 757 (Ala.,1939); *Caraher v. Sears, Roebuck & Co.*, 200 A. 324 (Conn.,1938); *Professional and Executive Leasing v. CIR*, 862 F.2d 751, 753 (9th Cir. 1988); *see also Air Couriers Int'l et al. v. Employment Dev. Dep't et al* (April 12, 2007),150 Cal. App. 4th 923.; *Legal Guide*, ¶ 1.05, p.1-8.

[47] See, e.g., *N.L.R.B. v. Steinberg*, 182 F.2d 850, 857 (5th Cir. 1950); *N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 920 (11th Cir. 1983); *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992); *Zaremba v. Miller*, 169 Cal. Rptr. 688, 689 (Cal. App. Dep't Super. Ct. 1980); *Leone v. United States of America*, 910 F.2d 46 (2d Cir. 1990); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 630 (1st Cir. 1996); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989); *Moses v. Diocese of Colorado,* 863 P.2d 310, 324 (Colo. 1993); *Willard Storage Battery Co. v. Caray*, 103 F. Supp. 7, 9 (N.D. Ohio 1942); see also *Legal Guide* at ¶ 1.09; ¶ 5.02, p. 5-9 – 5-11; ¶ 6.02, p. 6-4 – 6-10; ¶ 7.05, p. 7-13 – 7-21.

performance of assigned duties whether or not the employer ever actually exercises that right.

Although various tests can be applied to ascertain the proper legal status of workers, all the tests exhibit certain commonality. A key unifying element is the principal's right to control the worker. An individual is generally classified as an employee "if [his] employer has the right to control and direct the work of [the] individual, not only as to the result to be achieved, but also as to the details by which that result is achieved."[48] The employer's right to control, not the employer's actual exercise of that control, defines an employment relationship.[49]

In my opinion as expressed throughout this Report, workers constitute employees if the employing company merely reserves the right to control them, even if there is no evidence the employer actually exercises such right, or only exercises that right sporadically. As stated herein, it is my opinion that FXG's contractually reserved rights of control by themselves impart such control, rendering FXG's patterns of practice with its P&D drivers irrelevant. The FXG Agreement, particularly viewed in concert with FXG's other written business records, make unequivocal FXG's significant and pervasive right to control nearly every facet of driver work performance.

However, given that I also find repeated and significant evidence that FXG consistently exercises its rights of control, the voluminous evidence of FXG's actual exercise thereof prove that FXG has retained the right to do so. Since FXG clearly exercises such rights, FXG must, by definition, hold such rights. In my opinion, although it is not necessary to examine FXG's actual practices *viz*. its P&D drivers, such an examination reveals incontrovertible proof of the detailed nature and expansive scope of such retained rights.

As stated in the *Legal Guide*, "[e]ven if the agreement contains all of the terms and conditions one would expect to find in an independent contractor context, the written agreement will not overcome the reality of the situation."[50]

---

48 *Alexander v. Rush North Shore Med. Center*, 101 F.3d 487, 492 (7th Cir. 1996) quoting *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435 (7th Cir. 1996) and *Spirides v. Reinhardt*, 198 U.S. App. D.C. 93, 613 F.2d 826, 831-32 (D.C. Cir. 1979); *N.L.R.B. v. Steinberg*, 182 F.2d 850, 857 (5th Cir. 1950), *N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912 (11th Cir. 1983); *Williams v. United States,* 126 F.2d 129, 133 (7th Cir. 1942); *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 522 (1889); *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 350 (1989); *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 N.J. 567, 581 (N.J. 1991); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991).

49 *Legal Guide* at ¶ 5.02, p. 5-9; ¶ 5.06, p. 5-53 – 5-54; ¶ 5.07, p. 5-71.

50 *Legal Guide*, ¶ 8.02, p. 8-5.

## C.  REALITY PREVAILS OVER LABELS

Another feature common to all tests for assessing employment status is that labels are not controlling. The fact that a written agreement denominates a worker as an independent contractor does not actually make the worker an independent contractor. Moreover, even if an agreement contains all of the terms and conditions one would expect to find in an independent contractor context, the written agreement will not overcome the reality of the relationship.

If the worker is subject to the duties and obligations of an employee, the mere fact that a written agreement labels him[51] as an independent contractor, specifies that he is to use his own tools on the job, allows him to work whatever hours he chooses, etc., will not save him from employee status if taxing or labor authorities properly recharacterize him as an employee.[52] Indeed:

> "the contract itself is not the be-all and end-all of the relationship. Many companies have written quite a reasonable contract purporting to establish independent contractor relationships, only to find that their actual practice involves many actions (and many controls over the worker) that simply fly in the face of the contract language. Where this occurs, anyone attempting to characterize the relationship is likely to look beyond the language of the contract and to the actual conduct of the relationship. In fact, it could not be otherwise."[53]

The FXG Agreement manifests FXG's strong and consistent right to control the method, manner and means of P&D drivers. This is so notwithstanding FXG's elaborate independent-sounding nomenclature, and despite FXG's numerous references to an intended independent contractor relationship. In rendering his opinion in *Estrada*, Judge Schwab quoted the California Supreme Court's admonition in *Borello* that "[t]he label by the parties on their relationship is not dispositive, and subterfuges are not countenanced."[54]

I believe Judge Schwab was correct in *Estrada* that:

> "the OA [Operating Agreement] is a brilliantly drafted contract creating the constraints of an employment relationship with SWAs [single work area P&D drivers] in the guise of an independent contractor model."[55]

---

[51]  As used throughout this Report, the masculine includes the feminine.

[52]  *Legal Guide*, ¶ 8.02, p. 8-5.

[53]  *Legal Guide*, ¶ 8.01, p. 8-2 – 8-3.

[54]  See *Estrada v. FedEx Ground*, Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004), quoting *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341, 349 (1989).

[55]  See *Estrada v. FedEx Ground*, Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004).

Moreover, Judge Vogel noted in the *Estrada* appellate decision that, "FedEx's conduct spoke louder than its words."[56] Judge Vogel agreed that "the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship."[57]

## III. RIGHT TO CONTROL METHOD, MANNER AND MEANS OF P&D DRIVERS

### A. OPERATING AGREEMENT

I have reviewed the 1994 Roadway Package System, Inc. Pick-Up and Delivery Contractor Operating Agreement[58]; the FedEx Ground Package System, Inc. Pick-Up and Delivery Contractor Operating Agreement (June 2004) ("FXG Agreement")[59]; the FedEx Home Delivery Standard Contractor Operating Agreement (June 2004) ("FHD Agreement")[60]; and Addenda.[61] In this Report, these agreements are collectively referred to as the "Agreements," unless otherwise noted.[62]

These contracts secure FXG/FHD's unequivocal right to control myriad details of the method, manner, and means carried out by the P&D drivers. This reserved control is so strong that, in my opinion, whether FXG or FHD ever exercises it is unimportant. Because the Agreements contain various internal inconsistencies, it is important to address these inconsistencies, and to explain why, in my opinion, such inconsistencies do not negate FXG's significant rights of control.

Section 1.15 of the FXG Agreement, a provision entitled "Discretion of Contractor to Determine Method and Means of Meeting Business Objectives," states that each P&D driver:

> "shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent, or employee of FedEx Ground shall have the authority to direct Contractor as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of FedEx Ground shall have the authority

---

56 Exhibit B at 336.

57 *Id.*

58 EST0005712 – 5773

59 FXG_ GRIFFIN0003307 – 3348.

60 FXG_SMITH0001344 – 1375.

61 See Addenda 1 - 7 to the 2005 FXG Agreement (PWI10002285 – 2299); Addenda 1 - 9 to the 2007 FXG Agreement (PCA0047620 – 679).

62 While the substance of the FXG and FHD Agreements remain substantially the same (there are only minor differences between these Agreements, including variations in the Flex Program, location of the arbitration provision in the Agreements, and the HR10 Plan (Prototype Defined Contribution Retirement Plan)), the numbering scheme in the FXG and FHD Agreements are not identical. As a result, throughout this Report, all references to Section are in reference to the FXG Agreement, unless otherwise noted.

to prescribe hours of work, whether or when the Contractor is to take breaks, what route the Contractor is to follow, or other details of performance."[63]

Although it states that no officer, agent or employee of FXG shall have the authority to control the method, manner and means of a P&D driver, other provisions reserve FXG's right to control everything each P&D driver does.[64]

Section 1.15 is completely inconsistent with many other provisions of the Agreements, such as FXG's:

- Right to control uniform and driver appearance. Section 1.12;
- Right to control truck appearance. Section 1.12;
- Right to control selection of truck. Section 1.1;
- Right to determine suitability of equipment or remove from service. Section 1.2;
- Right to determine color, logos, and markings of truck. Section 1.5;
- Right to determine and interpret all standards of customer service. Section 1.10;
- Right to determine electronic or manual documentation of delivery. Sections 1.11, 1.10(d);
- Right to determine insurance required. Sections 3.1, 3.6;
- Right to determine days of service. Section 1.10(a), Addenda 3;
- Right to determine number of packages delivered each day. Sections 9, 1.10(a);
- Right to control use of truck (full utilization). Background Statement to Agreements;
- Right to determine size of route. Sections 5.2, 5.3;
- Right to control use of other drivers. Sections 2.1, 2.2;
- Right to control assignment of contract rights. Section 18;
- Right to control amount of settlement. Sections 4.1, 6.0, 9.0, Addenda 3, 6;
- Right to control driver work performance by evaluation and training. Section 1.4;

---

[63] See FXG_GRIFFIN0003320 – 3321 (and FXG_SMITH0001356 for FHD).

[64] The FHD Agreement is to the same effect.

- Right to control daily reporting and delivery method. Sections 1.8, 1.11, 1.13, 1.14, 4.2; and

- Right to control contract termination. Sections 11.2, 3.3, 12.1.

These specific contractual provisions control over the contradictory general provisions.[65] Hence, FXG's Agreement contains many specific contradictions to Section 1.15's general platitude.

The Agreements include myriad express reservations of FXG's right to control the method, manner, and means of each P&D driver's work.[66] In my practical experience over the last twenty eight years, taxing and other governmental bodies treat such express reservations of control as indicative of employment. Such control is difficult to defend before such agencies, and impossible to square with the independence needed for independent contractor status.

As I explained in my testimony in *Estrada*, vague and ambiguous terms and phrases appear throughout the Agreements,[67] providing FXG tremendous latitude in controlling

---

[65]  See generally, Restatement (Second) of Contracts § 203 (c)(1981); see also, *Baton Rouge Oil and Chemical Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002).

[66]  See Section 1.8 ("Contractor agrees to prepare and present for the signature of consignors and consignees such shipping documents as FedEx Ground may from time to time designate") (FXG_GRIFFIN0003315); Section 1.13 ("Contractor shall, at Contractor's expense, purchase or lease the electronic communications equipment necessary to fulfill the obligations specified in Paragraph 1.10(d) above and which complies with specifications promulgated from time to time by FedEx Ground.") (FXG_GRIFFIN0003320); Section 3.3 ("[a]t any time that FedEx Ground discovers that Contractor or an operator engaged by Contractor to drive the Equipment fails to meet FedEx Ground's Safe Driving Standards as published from time to time, all as determined by FedEx Ground in its sole discretion, FedEx Ground may elect to terminate its indemnity for liability ...") (FXG_GRIFFIN0003324); Section 5.2 ("In the event Contractor is not able to provide reasonable means to continue to service the Primary Service Area, FedEx Ground may, in its sole discretion, reconfigure such area.") (FXG_GRIFFIN0003332); Addendum 3 - II.D. to FXG Agreement ("The company reserves the right to name the work days preceding and following any holiday falling on or in conjunction with a weekend") (PWI10002289).

[67]  Section 1.10(a) (A P&D driver must provide service "consistent with the competitive standards within the industry... FedEx Ground may reassign a portion of such packages to another contractor"); Section 1.10(c) ("handle, load, unload, and transport packages using methods that are designed to avoid theft, loss, and damage"); Section 1.10(h) ("conduct all business activities with integrity and honesty, in a professional manner, and with proper decorum); Section 1.10(d) ("cooperate with FedEx Ground's employees, customers, and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading, and unloading of packages and equipment, and provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal"); Section 1.10(e) ("foster the professional image and good reputation of FedEx Ground and Contractor with shippers and consignees, including adhering to the vehicle identification and operator appearance standards..."); Section 1.12 ("Contractor acknowledges that the presentation of a consistent image and standard of service to customers throughout the system is essential in order to be competitive with other alternatives available to shippers and consignees and to permit recognition and prompt access to customers' places of business"

the method, manner, and means by which each P&D driver goes about his work. They leave murky:

- who defines these standards;
- how one measures compliance;
- the ramifications of violation; and
- under what circumstances a violation may result in termination.

For example, FXG's terminal managers presumably assess whether P&D drivers are acting with integrity and honesty, with proper decorum, and with professionalism.[68] Yet, FXG has not even attempted to define such standards, much less to specify who applies them. Such inherent ambiguity imparts significant control in FXG over issues that may be critical to the P&D drivers' work.

It is difficult to read the Agreements in this case without reflecting on the duties of the contractor drafter. As I wrote in the *Legal Guide*, "many attorneys have found themselves trying to draft an agreement that the client hopes will provide for independent contractor treatment of certain workers, and yet that contains inordinate provisions affecting control."[69] Whatever the respective roles of the company and its advisors in contract drafting, even advisors who are trying to act as mere scriveners "may need to inform the client that some provisions in a contract denominated as one for an independent contractor status simply are too employee-like to withstand scrutiny."[70]

In my opinion, that should have occurred here, for both the language and spirit of the Agreements are simply incongruent with all legal tests for assessing independent contractor status. Although some contract drafters have found themselves drafting an agreement as instructed, only to later learn it is being roundly ignored (that is, where the company's controlling practices with its workers are at odds with the contracts nomenclature of independence), that is decidedly not the case here. Here, the Agreements themselves—however FXG may interpret or apply them—unambiguously reflect employment.

Furthermore, these are non-negotiable contracts,[71] and I have seen no evidence even suggesting that the P&D drivers have any power to bargain over or vary any provisions.

---

and "each person having contact with the public under the provisions of this Agreement will wear a FedEx Ground-approved uniform, maintained in good condition, and will otherwise keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by FedEx Ground") (FXG_GRIFFIN0003317 – 3320); Section 5.2 ("FedEx Ground shall give Contractor the opportunity, using means satisfactory to FedEx Ground") (FXG_GRIFFIN0003332).

[68] See, *e.g.*, Dan Sullivan Deposition, 187 (Terminal managers make sure the P&D drivers are dressed in a proper uniform and properly groomed before going out to service FXG customers.).

[69] *Legal Guide*, ¶ 8.01, p. 8-2.

[70] *Id.*

[71] *Estrada,* BC210130, at 4; Exhibit A to Estrada at 331.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 19 of 227

Some courts have looked to similar facts in finding employment status based on contract language alone.[72]

In my practice, I would not draft an agreement in the form of the Agreements, for in my opinion it could have no reasonable chance of securing the desired independent contractor status. I make such assessment based on many years of contract drafting, many years of representing companies accused of mischaracterizing workers, and many years of monitoring and writing about this field of law for the *Legal Guide*. As a contractor drafter, I am mindful that the typical (if not universal) desire of the client who engages me to write an independent contractor agreement is to secure independent contractor status.

Understandably, "[e]mployers commonly fear that persons they have retained as independent contractors may be recharacterized as employees by one of the taxing or labor authorities."[73] Appropriately, "the courts generally look to the truth of the relationship."[74] An assessment of such recharacterization risk is an inevitable part of the contract drafter's responsibilities. As a contract drafter, there are times when the drafter "should bear in mind the adage that only very rarely can one have one's cake and eat it too."[75]

Section 1.15 of the FXG Agreement contains the broad statements that P&D drivers will not be controlled by any part of FXG management.[76] Similarly, Contractor Relations Policy-007 states that no FXG management personnel shall control any of its P&D drivers.[77] Both the FXG Agreement and the policies are replete with many provisions contradicting these broad expressions of non-control.

In my 28 years of practice, I have drafted many savings clauses, and have interpreted or defended many others. I believe there is a fundamental difference between certain types of savings clauses and the type here in question. For example, savings clauses in compensation agreements with employees often state that, in determining the amount of compensation to be paid to a particular corporate officer, any payment that is later judged to be "unreasonable" by the Internal Revenue Service (for purposes of deductibility by the corporation) must be repaid. A savings clause of this type is generally designed to put the parties back in the *status quo ante*, the position in which they would have found themselves were it not for excessive compensation being paid. The case law confirms that such a provision is effective for federal income tax purposes.[78]

---

[72] See discussion in *Legal Guide*, ¶ 8.01, p. 8-3.

[73] *Legal Guide*, ¶ 8.02, p. 8-6.

[74] *Id*. at Preface.

[75] *Id*. at ¶ 4.05[C], p. 4-35.

[76] See Section 1.15 (FXG_GRIFFIN0003320 – 3321). The same provision appears as Section 1.14 in the FHD Agreement (FXG_SMITH0001356).

[77] Policy: Contractor Relations, Policy-007, Revision date: 08/21/06 (FXG000714119 – 120).

[78] See *Pahl v. Commissioner*, 67 T.C. 286 (T.C. 1976) (holding that the taxpayer was allowed a deduction for taxpayer's return of excessive compensation to his employer due to a provision in his contract limiting his compensation "to such maximum amount" as is not finally disallowed).

In contrast, Section 1.15 of the FXG Agreement requires one to evaluate a prohibition on control. A provision such as Section 1.15 may be included in an independent contractor agreement precisely because the draftsperson hopes that, if provisions in the agreement establish control, or if control is manifested in practice, such a clause might help to convince a court that the worker was truly not an employee.

This is a fundamentally different purpose from that intended by the tax savings clauses noted above. Section 1.15 of the FXG Agreement cannot prevent something from occurring. It can only suggest that perhaps FXG did not intend it to occur. In my opinion, control that is reserved (or exercised) cannot be obviated by a savings clause such as Section 1.15 on these facts. The bell cannot be un-rung.

## B. POLICIES AND PROCEDURES

### 1. General Procedures and Policies

FXG has elaborate step-by-step procedures[79] elucidating precisely how a P&D driver must pick up and must deliver packages. The mere fact of pick-up and delivery may be an end result, but many details FXG prescribes clearly dictate *how* a P&D driver collects and delivers packages, as well as the extraordinary information drivers must collect and remit to FXG. These procedures enunciate the daily steps a P&D driver must follow, commencing with checking out of the terminal in the morning, and terminating with checking in each night.

The following are mere examples of the right to control which FXG reserves to itself:

#### a. Check-Out, Check-In and Completion Procedures

P&D drivers must conduct a check-out prior to leaving the FXG facility each morning,[80] and a corollary detailed check-in at day's end.[81] Moreover, P&D drivers are required to complete and submit many different reports and logs to FXG upon check-in.[82] The reports and forms enable FXG to supervise the method, manner, and means by which each P&D driver picks up and delivers packages. The directives include step-by-step instructions a P&D driver must follow,[83] including a detailed pick-up regimen.[84]

---

[79] Although I refer to FXG policies and procedures in this Report, FHD policies and procedures generally mirror those of FXG, unless otherwise noted.

[80] See Procedure: A.M. Check-Out, FXG, CKO-102, Revision date: 11/16/05 (FXG000005673 – 5676); Procedure: A.M. Check-Out, FHD, CKO-151, Revision date: 8/31/05 (FXG000000013 – 16).

[81] See Procedure: Check-In Requirements, FXG, CKI-251, Revision date: 8/31/05 (FXG000000103 – 108); Procedure: Check-In Requirements, FHD, CKI-257, Revision date: 1/31/06 (FXG000006679 – 6685).

[82] See generally, Procedure: Contractor Check-In for Service Managers, FXG, CKI-802, Revision date: 12/19/2005 (FXG000005677 – 5688); Procedure: Check-In Requirements, FXG, CKI-251, Revision date: 8/31/05 (FXG000000103 – 108).

[83] See Procedure: Check-In Requirements, FXG, CKI-251, Revision date: 8/31/05 (FXG000000103 – 108); Procedure: Check-In Requirements, FHD, CKI-257, Revision date: 1/31/06 (FXG000006679 – 6685);

FXG rules literally regulate the length and breadth of the driver's daily activities. Based on my practical experience over many years of drafting contracts, defending independent contractor arrangements, and writing and editing developments in the law for my *Legal Guide*, such extreme regimentation is inconsistent with independent contractor status. Viewed in their totality, FXG's byzantine check-in, check-out and pick-up procedures, its constant micro-management, coupled with the extraordinary documentation requirements P&D drivers must observe, are inconsistent with independent contractor status.

**b. Uniform and Vehicle Appearance**

FXG retains the right to control its P&D drivers' personal appearance, and that of all trucks.[85] Uniform requirements include: FedEx uniform knit shirts, FedEx uniform pants or shorts, FedEx uniform jackets, dark shoes and socks, and an approved FedEx ball cap.[86] This regimentation goes far beyond FXG's interest in branding, and extends to grooming, cleanliness, and decorum.[87]

In addition, each vehicle must bear the FXG brand, marked "with such identifying colors, logos, numbers, marks and insignia as may be required under applicable regulations, ... or to identify the Equipment as part of the FedEx Ground system."[88] Furthermore, all "equipment shall be maintained in a clean and presentable fashion free of body damage and extraneous markings, in accordance with the standards of the industry."[89] Beyond that, the vehicles must be free of dents and be "presentable." These strict requirements have little bearing on timely package pick-up and delivery, and instead reflect FXG's larger goals of global branding and image.[90]

---

DVD: Safe Work Methods, Order # TV-2201, Rev. 4/02 (FXG_M00031); DVD: Suggested Home Delivery Techniques, TV-9914 RES (FXG_M00108); DVD: Customer Service Ride, Order # TV-058, Rev. 4/03 (FXG_M00016); DVD: Instructor Class, QPDL (FXG_M00100).

[84] Procedures: Pickup Record Completion, FXG, PKP-056, Revision date: 8/31/2005 (The P&D driver must enter the number of packages picked up at the shipper's location, enter the core zone where the shipper is located, enter the time of day the pick-up was made (in military time), enter the 9 digit contractor number, and sign the pick-up record.) (FXG000000719 – 726).

[85] For example, see Deposition of Dan Sullivan, 187-189 (Terminal managers make sure the P&D drivers have proper uniforms and they are groomed properly. In addition, FXG has the right to require P&D drivers to post FXG's web address and telephone number on the sides of each P&D driver's truck.).

[86] See Procedure: Uniform Program for Contractors, FXG, PCH-359, Revision date: 7/10/06, (FXG000714239 – 241).

[87] See PA13102 (driver reprimanded for getting something to eat during the work day while not wearing a FedEx cap and with his shirt untucked); PA13090 (driver told that he needed to shave more consistently, and that it was a "piss or get off the pot" policy).

[88] Section 1.5 (FXG_GRIFFIN0003314).

[89] Section 1.12 (FXG_GRIFFIN0003320).

[90] FedEx Managers Guide - Ground Edition ("FedEx brand–one of the most recognized and admired") (FXG000001684).

In any event, their strictures involve more control than is possible with true independent contractors. Personal appearance, uniform, and even grooming are all addressed by contract provisions. Significantly, FXG can set (and change) undisclosed standards to assess whether any of its P&D drivers—on any particular day—complies with FXG's uniform and grooming requirements.[91]

Regardless of FXG's reason for mandating spotless appearance (of both driver and truck), these rules can have consequences for the P&D drivers. The documents and materials an FXG manager can use to support a decision to terminate a P&D driver include "equipment appearance notes."[92] Going far beyond FXG branding and safety, a dent or a scrape on a fender can result in discipline.[93] Poor truck or equipment maintenance is grounds for taking a truck out of service, or contract non-renewal.[94] The personal and equipment standards are thus mandatory, and represent classic controls over the method, manner and means used by the drivers to perform their work.

### c. Customer Service Rides (CSR)

FXG also exercises control over the method, manner, and means used by P&D drivers through routine Customer Service Rides ("CSRs").[95] FXG has reserved to itself its right to conduct four CSRs each year for each driver.[96] FXG claims that its objectives for CSRs are to reduce terminal expenses, improve service dispatch, create safety awareness, raise contractor settlement, reduce contractor operating expenses, and enhance customer relations.[97]

Yet, CSRs provide FXG a venue for making "suggestions" to its P&D drivers. The instructions FXG gives its managers who conduct such ride-alongs makes the extraordinary minutia encompassed by such suggestions clear.[98] Based on the evidence

---

[91] See Deposition of Dan Sullivan 186/11 – 188/6.

[92] See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707337).

[93] See, *e.g.*, PA14490 (FXG manager performed an appearance standard check on all contractor's vans, and driver was "spoken to" about dent in van. P&D driver was allowed 30 days to fix the dent in order to maintain a professional appearance); PA14478 (P&D driver was given 4 weeks to remove fiberglass from front of van; two weeks to fix scratches; a few days to fix big scratch).

[94] See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707348).

[95] See Procedure: Customer Service Rides, CRL-555, Revision date: 8/28/06 (FXG000707526 – 528).

[96] See *id.*

[97] See DVD: Customer Service Ride, Order # TV-058, Rev. 4/03 (FXG_M00016).

[98] See DVD: Customer Service Ride, Order # TV-058, Rev. 4/03 (FXG_M00016) (In completing a CSR, managers are instructed to record the van's arrival time when the wheels of the vehicle stop, release their seatbelt, observe the driver for proper exit methods, record the odometer's mileage when the driver leaves his seat to go to the bulkhead door, turn from the odometer and observe the driver as he selects packages from the cargo area, exit the vehicle before the driver as the driver leaves the cargo area, observe the driver as he exits, follow the driver to the recipient, estimate the walking distance by counting the number of

I have reviewed, I believe some suggestions could legitimately be (and in fact are) interpreted by P&D drivers as mandatory directives.[99] The fact that FXG managers are trained to make such "suggestions" across such an enormous and detailed array of tasks shows that FXG has the right to control the method, manner, and means of P&D drivers' daily activities.

FXG managers are trained to comment on how much time a driver should take to execute each segment of a driver's exit, entry and driving routines, and to record detailed written observations of the examinee's performance.[100] Moreover, falling short has consequences, as P&D drivers plainly understand. If a service manager believes a P&D driver's behavior does not comport with FXG's standards of customer service, FXG provides P&D drivers with "suggestions."[101] Not following one "suggestion" from a manager prompts a Business Discussion.[102] Suggestions not followed can spell termination.[103] This type of regular and routine evaluation and counseling is typical of employment relationship, and flatly inconsistent with independent contractor status.

---

steps the driver takes, record the walking distance on the appropriate form, observe the contractor for proper delivery techniques and customer interaction, record the number of packages delivered and stop type, ask driver for address of next stop when walking back to van, observe the driver enter that address in his scanner, observe the driver for proper entrance routine, sit down, shut the passenger door, fasten his seatbelt, and record the departure time as wheels begin to roll).

[99]  "Suggestion" nomenclature will not necessarily be interpreted as permissive in nature. See, *e.g.*, *Armor Bronze & Silver Co. Inc., v. Chittick*, 221 F. Supp. 505 (Sept. 1963) ("In the great majority of instances its [the corporation's] 'suggestions' were treated and followed as orders." *Id.* at 513. "The company made it plain that it expected compliance by the managers and counselors with the procedures outlined by the company... it set quotas for the addition of new counselors and threatened to discharge managers who did not meet them." *Id.* at 514).

[100]  See Procedure Reference: Completing the Contractor Customer Service Ride Worksheet, FHD, RCRL-555, Revision date: 8/31/05 (FXG000707329 – 331).

[101]  See Michael Mannion Deposition, 263/8 – 264/13.

[102]  PA14229-PA14230 (FXG manager performed a CSR. Manager asked P&D driver how many stops he should assign the P&D driver. P&D driver reprimanded for not doing enough stops each day); PA14258-PA14259 (P&D driver had CSR and FXG manager told him to back into the dock, and to obtain co-signee's signature before picking up shipment from receiving).

[103]  Many of FXG's procedures state that the outlined procedures are merely suggestions. However, failing to follow the procedures results in Business Discussions which are used to support termination or nonrenewal. See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707332 – 353); see, *e.g.*, PA14236 (P&D driver told to follow state laws, avoid backing up, use horn when backing up, install shelves and bulkhead, put packages closer to front. These suggestions would "increase the settlement." Driver didn't want Manager to install the bulkhead or shelves); PA14314 (FXG manager suggested that P&D driver rent a bigger van. P&D driver said that the company doesn't reimburse enough for that. Manager said, "I'll check into it. We can't leave boxes behind ... our customers don't want to hear that."); PA13848 (FXG manager suggested P&D driver give away some of his area to prevent service problems); and PA14022 (to the same effect).

### d. Driver Release Audits

In addition to CSR's, at FHD, they perform "Driver Release Audits," ostensibly designed to assure that packages are driver-released safely, and that packages are out of sight.[104] Unlike a CSR, in which an FHD manager rides in the P&D driver's truck and supervises up-close, a Driver Release Audit involves following the P&D drivers as they perform their delivery duties to determine if the driver is following mandatory driver release procedures. This surveillance-type procedure, which occurs at least four times a year,[105] confirms in FHD an extraordinary degree of control over method, manner and means minutia that, in my opinion, is simply inconsistent with true independent contractor status.

FXG also performs van service audits to ensure that "returned shipments are in compliance with sheeting, reporting, and service cross procedures (reasons why package was not delivered)."[106] FXG performs various other audits to scrutinize driver performance.[107] In my experience, independent contractors are not subject to such strict, routine oversight or surveillance.

### e. FXG Must Approve All Drivers

The Agreements allow P&D drivers to engage others to drive for them when ill or absent, but only with FXG's prior approval.[108] If a driver does not have a FXG approved replacement driver, he may not be absent from work. In addition, generally FXG drivers must pay FXG in order to obtain a replacement driver for vacation, or must simply forgo the desired time off.[109]

---

104 FHD Driver Release Procedures, RDLV-029, Rev. 3/27/06 ("Always... indirect deliver to an alternate address whenever possible, leave a properly completed door tag at the primary entrance of residence. Do ring the doorbell, and driver release to a residential stop when no signature is required, areas out of public sight, areas out of weather (or use a rain bag). Do not driver release to stops with a common entrance (i.e., apartment, condo, or flat), any stop when a signature is required, a business, a mailbox, and areas exposed to weather without a rain bag) (FXG000013724); see also Procedure: Driver Released Packages, FXG, DLV-005, Revision date: 8/31/05 (FXG000000388 – 391), and Procedure: Driver Released Packages, FHD, DLV-006, Revision date: 1/26/06 (FXG000006795 – 6809). See also Michael Mannion Deposition, 258/7 – 258/17.

105 See Driver Release Audits Participant Manual, 12/03, TM-406 ("One driver release audit MUST be completed every quarter (total of four per year) for each contractor, supplemental, or temporary driver assigned. If a contractor's driver release procedures are not 100% compliant ... [a] follow-up driver release audit must be completed within one week of the failure." Further driver release audit noncompliance results in "de-certification" for a minimum of 30 days.) (FXG000842805).

106 See Procedure: Van Service Audit, FHD, SVC-375, Revision date: 8/31/05 (FXG00000992).

107 See Procedure: Security Audit, SEC 130, Revision date: 7/17/06 (FXG000715433 – 437).

108 Section 2.2 (FXG_GRIFFIN0003321).

109 See Attachment 7.1 to Addendum 7 to FXG Agreement, Time Off Program (PCA0047662 – 7664).

Also, a worker's unfettered ability to hire helpers is one factor supporting the independence consistent with independent contractor treatment.[110] Conversely, when a worker cannot hire helpers, or can do so only with approval from the principal, that control is more consistent with employee status.[111]

Here, FXG controls helper use too,[112] and failing to abide by FXG's rules can be serious.[113] For example, one P&D driver was admonished that "unauthorized passenger and an unauthorized driver driving his van [would] not be tolerated," and "could lead to termination of his contract."[114] Although the lack of freedom to hire helpers alone does not dictate employment status, it is another in an extraordinary volume of rights reserved to FXG. In my experience and professional opinion, such blatant interference with the worker's method, manner and means of performance does not occur with *bona fide* independent contractors.[115] True independent contractors should be able to hire helpers of their own choosing without material interference by a company.[116]

### 2. Revisions to Policies and Procedures

FXG's voluminous policies and procedures control the P&D driver's daily activities, and strongly influence the method, manner and means by which P&D drivers go about their daily work.[117] I have reviewed a variety of revised procedures and new policies,[118] many

---

[110] *Legal Guide*, ¶ 3.02, p. 3-10.

[111] *Silvicraft, Inc. v. Lambert,* 661 S.W. 2d 403 (Ark. Ct. App. 1983) (The right to control includes the right to hire or control the hiring of helpers.).

[112] See Procedure: Authorization Process for Non-driving helper, CRL-566, Revision date: 8/31/05 (FXG000000022 – 23).

[113] See also PA 14247 (FXG personnel took picture of driver's helper driving the truck, which is against policy. Both driver and helper were taken out of service pending termination for violation of the contract).

[114] See PA13131; see also Michael Mannion Deposition, 198/4 – 200/25. FXG management often couches violations of FXG's company policies, such as the use of additional drivers or the use of non-driving helpers as potential violations of Department of Transportation ("DOT") regulations. FXG's pervasive control far exceed the DOT regulations. See Expert Report Fritz Kahn, *Estrada* Exhibit 62 (August 23, 2007).

[115] In fact, in March 2007, FXG instructed P&D drivers who hire employees or helpers to provide them with workers' compensation insurance. See Dan Sullivan Deposition at 144.

[116] *Legal Guide*, ¶ 3.02, p. 3-10.

[117] See PA13580 – 13581 (FXG manager reprimanded driver for his delivery method and manager stated, "the contract clearly states that you are to provide daily delivery and pick-up service to the ... shippers on days and times which are compatible with their schedules and requirements within your primary service area.").

[118] See Heather D'Alesandro Deposition, page 89/20 – 91/15 (There are approximately 1,300 pages of policies and procedures); 202/5 – 203/1, 205/1 – 205/12 ("A procedure is going to outline how to conduct a specific business process, and it will have a governing policy or policies. So in all instances a policy will supersede a procedure but a procedure's going to provide a how and a framework for executing the business practice.").

of which were "re-engineered"[119] or revised by FXG after (and in direct response to) the *Estrada* litigation. In addition, I have reviewed numerous depositions, exhibits, and other documents related to FXG's policies and procedures.[120] The policies and procedures address with extraordinary exactitude how FXG managers and personnel should treat P&D drivers. They also prescribe procedures for P&D drivers themselves to follow.[121]

In May 2002, FXG redesigned its intranet to help its managers transition from the print version to an online format.[122] In direct response to *Estrada*,[123] FXG embarked on a Document Re-engineering Initiative ("DRI") in March 2005, completing it in January 2006.[124] The substance of the re-engineered procedures is not materially different. FXG relabeled its "policies" as "procedures,"[125] and created "Contractor Relations, Policy-007,"[126] which mirrors Section 1.15 terminology.

The insertion of Contractor Relations Policy-007 in each procedure has not affected significant changes in the manner in which FXG operates its business, nor in how FXG treats its P&D drivers.[127] Although an individual driver may not know the number or title

---

[119] See Dan Sullivan Deposition Exhibit 4, which states that FXG must adjust its rules and procedures to improve the P&D driver's experience, while maintaining fundamentally sound business practices. These "efforts are underway to fortify and promote the independent contractor model" (FXG000586318).

[120] Although such policies and procedures are now on FXG's intranet, I have reviewed some of them in hard copy.

[121] See *Estrada v. FedEx Ground*, Superior Court of Los Angeles County, No. BC210130, Statement of Decision (July 2004) (FXG management stated that outside sources defined the relationship between FXG and the P&D drivers, including: verbal information, memorandum from management, internet and website, custom, and under certain circumstances, the Operations Management Handbook and the FXG Manual.).

[122] See Heather D'Alesandro Deposition, 156/19 – 157/8.

[123] See Dan Sullivan Deposition, 123/8 – 123/9, 123/19 – 124/25; Dan Sullivan Deposition Exhibit 4 ("modify policies, procedures, and practices to address concerns/confusion raised by the judge in *Estrada* and elsewhere") (FXG000586317).

[124] See Heather D'Alesandro Deposition, 7/18 – 7/23.

[125] See Heather D'Alesandro Deposition, 235/7 – 235/10.

[126] FXG Policy: Contractor Relations, Policy-007, Revision date: 08/21/06 (FXG000714119 – 120); Standing as an analog to Section 1.15 of the FXG Agreement, Policy-007 (Contractor Relations) applies to both FXG and FHD, and states that "no officer, agent, or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results." Policy-007 states that FXG personnel who fail to comply with this directive may face disciplinary action, up to and including termination. Yet, in much the same way that Section 1.15 of the FXG Agreement is contradicted by a plethora of specific provisions that reserve FXG's right to control P&D drivers, Policy-007 is also contradicted by more specific provisions in the "procedures."

[127] See Michael Mannion Deposition, 75/3 – 75/9, 89/12 – 89/21 ("I don't know of anything that's happened because of [the DRI]"); see also Procedure: Contractor Check-In for Service Managers, FXG, CKI-802, Revision date: 12/19/2005 (FXG000005678); Contractor Check-In, Ch. 8, P.M. Routine, Administrative Management Handbook, Revised March 2002 (FXG000682241). The only substantive difference between these two passages is the inclusion of the word "must," which is noticeably absent from the 2005 version. The 2002 version states: "The P&D contractors must give the items listed below to the service manager

of a particular policy or procedure, terminal management consistently reminds the driver of the rules and policies required by FXG through the use of constant Business Discussions. FXG managers are expected to access the FXG intranet to follow these policies and procedures.[128] These FXG managers interface daily with P&D drivers, enforcing and interpreting the rules.[129] Business Discussions reflect regular threats to P&D drivers that their contract is in "jeopardy" or subject to termination.[130]

FXG's re-engineered procedures have no impact on the opinions I expressed in *Estrada*, nor on those I render here. The re-engineered policies and procedures may have changed cosmetically, but to the drivers, little has changed.[131] Although FXG's CEO admits its "re-engineering" was explicitly intended to bolster its contention that P&D drivers are independent contractors,[132] the policies and procedures evidence the same degree of control at issue in the *Estrada* litigation.

Regardless of labels as "policies" or "procedures," step-by-step instructions like those described above indicate an employment relationship. FXG's plethora of rules for every step, from check-out to check-in, to scanning, to approval of trucks and vans, to dress, to shaving, to hours, to hats worn during lunch, are entirely inconsistent with the independence necessary to independent contractor status. The fact that FXG requires its P&D drivers to follow its directives and to document that such steps have been completed provides strong evidence not only of FXG's right to control its P&D drivers, but also of FXG's actual exertion thereof.

---

every evening at the check-in window". The 2005 version states: "The P&D contractor gives the items listed below to the service manager every evening at the check-in window". The list that a P&D driver must follow in each year is essentially the same. There are other instances throughout the check-in and check-out procedures reflecting minor verbiage changes. In many places in the 2005 version the "must" verbiage is retained, however.

[128] See Heather D'Alesandro Deposition. However, the FXG manual remained intact, and could be accessed online by FXG managers. See 50/5 – 52/18, 56/12 – 57/11.

[129] PA14102 – 101 (FXG manager told P&D driver at FXG, that she operates independently but must follow policies and procedure of the company and her contract.); FXG now allows its P&D drivers to leave the terminal prior to the completion of sorting packages. See Michael Mannion Deposition, 308-312. However, P&D drivers are required to deliver all of their packages, and they must return to the terminal to pickup any packages initially left behind. In reality, P&D drivers continue to wait for all of their packages before leaving the terminal. Accordingly, the procedure may have changed, but the P&D drivers' practices have not changed materially.

[130] See *e.g.*, PA14404 (P&D driver reprimanded for not turning in maintenance reports, which are expected every month); PA14448 (P&D driver's van would be taken out of service if P&D driver did not turn in maintenance reports); PA14518 (P&D driver was reprimanded for unsecured vehicle); and PA14463 (P&D driver told his trash must be dumped out every morning before he will be allowed to dispatch. Manager said she will check driver's van the next day).

[131] See Michael Mannion Deposition, 75/3 – 75/9, 89/12 – 89/21; also I note settlements are adjusted annually, but this is not a qualitative or relationship change.

[132] See Dan Sullivan Deposition, 122/14– 124/25.

### C. OTHER FXG DOCUMENTS EVINCE CONTROL

FXG utilizes manuals, P&D driver checklists, DVDs, and a driver training course to further exert control over P&D driver tasks. The Court of Appeals for the Seventh Circuit has held that "an individual's unique work skills may indicate independent contractor status [but that] if the individual requires substantial training and supervision, an employee/employer status is more likely."[133] This reflects the maxim that persons commencing a working relationship with pre-existing training and credentials show one index of independence. In contrast, those receiving training from the particular employer in question are more likely to be employees.

FXG attempts to downplay the weight of its manuals, checklists, DVDs, training, and other paraphernalia as mere "suggestions" to maximize a P&D driver's profits.[134] However, my review of these materials and of FXG's pervasive training and supervision of P&D drivers leads inevitably to employee/employer status. P&D drivers are required to follow FXG procedures, and non-compliance results in a Business Discussion, which may put the P&D driver's "contract at risk."[135]

Business Discussions are the equivalent of counseling and discipline, and can lead to termination.[136] All Business Discussions are documented and maintained in the P&D drivers' file for future use as a verbatim written record. Business Discussions are used to support termination, and to show that a driver has been warned of possible contract termination.[137] Unequivocally, this bespeaks employment.

From the voluminous evidence I have reviewed, P&D drivers have no significant latitude in making the vast quantity of business decisions which true independent contractors must inevitably make.[138] The apparently perpetual record of Business Discussions FXG retains, in the equivalent of an employee's personnel file, is something I have never previously encountered outside an explicit employment context in my nearly three decades of practice.

---

[133] See, *e.g.*, *Worth v. Tyer,* 276 F.3d 249, 263 (7th Cir. 2001).

[134] For discussion of the meaning of "suggestions," see discussion at page 22 - 23, *supra*.

[135] For example, see PA14252 (P&D driver reprimanded for leaving vehicle unsecured. FXG manager stated that this is a contract violation that could result in immediate termination, and next time it would "go to review"); PA14251 (P&D driver reprimanded for leaving terminal door open); PA13500 (P&D driver reprimanded for not finding a replacement driver and not serving area; put "contract in jeopardy").

[136] In FXG's preferred lexicon, this is "putting your contract at risk". See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707332 – 353); see, *e.g.*, PA13325 (where P&D driver was told "this is not an eight-hour job. You are expected to deliver every package every day").

[137] See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707332 – 353).

[138] Such unfettered and detailed control would in my opinion be difficult (if not impossible) to explain to a taxing or regulatory agency examining the status of workers under such scrutiny.

### 1. FXG'S Manuals and Flip Charts Show Control

FXG disseminates a Contractor's Companion,[139] a detailed flip chart designed to assist P&D drivers in the day-to-day administration of their duties.[140] The Contractor's Companion is a small 3" x 5" flip chart fitting neatly in the front shirt pocket of a P&D driver's company uniform, so its prescribed rules are never far away. The Contractor's Companion includes step by step instructions for retail and business pickup and deliveries, how to reconcile a pickup, how to scan packages, what to do when a package is too heavy or poorly packaged, how to account for COD packages, etc.

In addition, the Contractor's Companion includes a list of common customer complaints, and what a P&D driver "should" do to avoid confrontation with a client, including smiling, extending a handshake, never touching the customer, and following customer instructions.[141] The Contractor's Companion also covers step by step instructions on what to do when a P&D driver is involved in an accident ("a statement should be given to police, but do NOT admit liability.").[142]

Significantly, the Contractor's Companion was expressly created to ensure that each P&D driver performs his duties in accordance with FXG requirements.[143] As with so many of its other badges of control, FXG's distribution of its Contractor's Companion evidences the kind of explicit and implicit control one encounters solely in an employment relationship. Extending far beyond end-result functions of timely package pick-up and delivery, FXG prescribes rules that dictate the method, manner and means each P&D driver must follow with virtually military precision.

FXG also provides every FXG manager with a manual entitled "FedEx Managers Guide - Ground Edition" (the "Guide").[144] FXG managers are <u>required</u> to enforce the provisions in the Agreements, as well as the polices and procedures promulgated by FXG.[145] In addition, FXG provides FXG managers with detailed training materials to evaluate P&D drivers on customer service rides,[146] and materials with how to plan and manage pick up

---

139 PWI10000028-PWI10000056; PCA0004619- PCA0004638.

140 See Deposition of Dan Sullivan, 236/3 – 236/18 (The Contractor Companion are procedures the P&D drivers "need to follow to effect those deliveries correctly.").

141 PWI10000028-PWI10000056; PCA0004619- PCA0004638.

142 *Id.*

143 See Deposition of Dan Sullivan, 236/3 – 236/18 (The Contractor's Companion are procedures the P&D drivers "need to follow to effect those deliveries correctly.").

144 See FXG000001522 – 1686; Deposition Dan Sullivan 254/8 – 255/2.

145 See, *e.g.*, FXG Policy: Contractor Relations, Policy-007, Revision date: 08/21/06 (FXG000714120) ("Failure to comply with this policy may result in disciplinary action up to and including termination.").

146 See Procedure: Customer Service Rides, CRL-555.

and delivery requirements.[147] All manager materials incorporate instructions to terminal management about their important supervisorial oversight of P&D drivers.[148]

### 2. FXG'S Training Shows Control

FXG not only undertakes to prescribe and enforce hygiene, attire, and grooming standards, but even broaches interpersonal demeanor. FXG's "Customers Are Really Everything" ("C.A.R.E.") program[149] instructs drivers how to avoid confrontations with customers, how to please customers, and how drivers should deport themselves in the course of delivering a package.[150] Although C.A.R.E is nominally voluntary, in practice, it is more disciplinary than extra-curricular. In much the same way that "traffic school" can be attended voluntarily to expunge tickets for motor vehicle violations in many states, a driver may participate in the C.A.R.E. Program to expunge a verified customer complaint from the driver's record. Expunging a complaint is important, as it enables the P&D driver to remain eligible for a CCS reimbursement.[151]

For example, one P&D driver was charged with a complaint because he scanned a customer's packages twice instead of the requisite three times.[152] Because the P&D driver had taken a C.A.R.E. class, the charge was put in his file, but he did not lose his Contractor Customer Service bonus.[153] Although one might perhaps debate the degree

---

[147] See P&D Planning Seminar, Participant Manual (FXG (FXG000938609-FXG000938818) and FHD (FXG000002993-FXG000003145)); see also P&D Planning Seminar Workbook - FHD (FXG000003146-3234)

[148] *Id.*

[149] DVD: WE C.A.R.E.: Customers Are Really Everything, Order # TV-143 RES, Rev. 4/04 (FXG_M00018) ("Remember to: S.M.I.L.E.," which stands for: Say "Good Morning" or "Good afternoon"; Make eye contact; Initiate the Conversation; Look for ways to be helpful; Exit with a "Thank you for using FedEx Home Delivery.").

[150] See Deposition of Dan Sullivan, 235/4 – 235/10; see also DVD: WE C.A.R.E.: Customers Are Really Everything, Order # TV-143 RES, Rev. 4/04 (FXG_M00018) (shows scene of driver delivering package, where "the contractor did three things right here. First, he didn't lose his cool; he apologized for his mistake; then he offered to look in his van for the customer's package. Calling the customer by her name was a nice touch too.").

[151] See Procedure: Customers are Really Everything (C.A.R.E.) Program, FXG and FHD, CRL-255, Revision date: 2/02/06 (FXG000013976 – 979).

[152] Procedure: Contractor Customer Service Program, FXG, CRL-366, Revision date: 8/31/05 (FXG000000158 – 164) (all packages must be scanned three times); this scanning requirement is itself another manifestation of control FXG possesses and exercises.

[153] See PA 13153; FXG has developed the CCS program to encourage and reward P&D drivers for excellence in service, reduced accident frequencies, no missed or early pick-ups and no customer complaints. See Procedure: Contractor Customer Service Program, FXG, CRL-366, Revision date: 8/31/05 (FXG000000158 – 164). The CCS bonus tied to the P&D driver's terminal has been eliminated. See Addendum 6, Pick-Up and Delivery Contractor Operating Agreement - Contractor Customer Service Program (PCA0047655).

to which C.A.R.E. is "voluntary," it is considered a "behavior modification program"[154] and is used by FXG to further indoctrinate its P&D drivers.

FXG also provides step-by-step instructional DVDs directly to its P&D drivers. The stated purpose of the DVDs is:

> "to provide a detailed overview of the pick-up and delivery methods used by successful contractors. The contractors discovered these methods as an efficient means of providing their customers with the best possible service. It guarantees the contractor will get the most out of the work day."[155]

The DVDs provide FXG's "suggested" practices for pick-up and delivery of packages, with special emphasis on maximizing the time devoted to service.[156] These DVDs contain directions and instructions styled as "suggestions".[157] One FXG training program called Quality P&D Learning ("QPDL") is targeted to persons who are not qualified to become P&D drivers because they lack the requisite driving and delivery experience. The QPDL training program affords prospective P&D drivers an opportunity to become FXG P&D

---

[154] See Michael Byrum, 208/15 - 208/23.

[155] See DVD: Safe Work Methods, Order #TV-2201, Rev. 4/02 (FXG_M00031) (The video tells the P&D driver to pull into a customer's location; to note the importance of obtaining the customer's immediate attention (tapping the horn notifies the recipient the FXG P&D driver is there for delivery); to point the front of the van towards the exit path to discourage other vehicles from blocking the van; to reduce walking distance by parking close to the stop and perform a smooth exit; and to avoid backing as much as possible. A proper load will have the following characteristics: Labels facing out so that the P&D driver will not have to handle the packages to view the address; packages should be lip loaded to avoid sliding and potential damage to the customer's shipment; and the packages should be loaded in stop order. Point of Delivery Techniques: P&D driver should walk immediately to the recipient and attract attention, and indicate number of packages for delivery. Package is scanned, recipient signs scanner, thanks the recipient and leaves the building. Before entering the van, enter the next stop into the scanner and return scanner to its holster. P&D driver should plan ahead and know the best travel path to the next stop.).

[156] See DVD: Time Saving Techniques, Order # TV-204, Rev. 08/02 (FXG_M00027) (Saving just 30 seconds on each stop every day adds up quickly and can save P&D driver much time during the day.).

[157] See note 99, *supra*, *e.g.*, *Armor Bronze & Silver Co. Inc., v. Chittick*, 221 F. Supp. 505 (Sept. 1963) ("In the great majority of instances its [the corporation's] 'suggestions' were treated and followed as orders." *Id.* at 513.).

drivers,[158] and includes multiple customer service rides after they become drivers to ensure that their training was successful.[159]

FXG does not charge a fee to attend its 8 day training course,[160] and any driver lacking a full year of driving a "similar truck" is required to attend.[161] As with virtually every other determination, FXG unilaterally decides what is and is not "similar." Even highly trained and experienced professional drivers can be required to attend QPDL training, if the driver has not been driving a "similar truck" (as determined solely by FXG) for a full year.

Going far beyond safety instruction, FXG expects its QPDL teachings to be re-enacted by drivers in performing everyday functions.[162] The QPDL training, extraordinary in the depth and breadth of its FXG branding and uniformity, includes step-by-step instructions covering virtually everything the P&D driver will do, all in the FXG way. For example, the Vehicle Entrance and Exit Routine scripts step-by-step procedures, covering such minutia as starting the engine, using turn signals, removing seat belts, and even such stylistics as placing keys on the little finger of the driver's non-writing hand.[163] This minutia is clearly not only about timely pick-up and delivery, and indeed, seems entirely removed from it.

QPDL training also includes "Knowledge Check," a test administered at the end of each training day. This test is designed to assess whether the driver has the requisite knowledge FXG requires of its drivers. In the face of such detailed training and

---

[158] See Deposition of Dan Sullivan, 244/10 – 244/21; *Independent Times*, Vol. 13, Oct. 2006, p. 3 (PCA0047607) (For P&D drivers who want to start their own driver training, newsletter states, "You will have the option to train your own drivers, or operate your own training school, provided you meet the curriculum requirements established by the DOT and FedEx Ground. You will have to submit your proposed curriculum and training plan in writing to the senior manager of the facility you service for approval. The curriculum must comply with all DOT regulations and meet FedEx Ground requirements.") (emphasis added).

[159] See Deposition of Ivor Wood, Senior Manager P&D Learning, 115/20 – 116/11; Deposition of Ronald Joseph, 47/21 – 48/8.

[160] See Deposition of Ronald Joseph, 47/25– 48/21.

[161] See Deposition of Dan Sullivan, 245/15 – 246/12.

[162] See Deposition of Dan Sullivan, 248/1– 248/9.

[163] Quality P&D Learning Participant Manual (Version 8/03), Day 1, Step Van – Vehicle Entrance and Exit Routines (FXG000396342 – 345); Quality P&D Learning Participant Manual (Version 4/05), Day 1, Suggested Vehicle Entrance/Exit Routine (PCA0021445 – 446). See also DVD: Safe Work Methods, Order # TV-2201, Rev. 4/02 (FXG_M00031) ("as the vehicle approaches the stop, the contractor turns on the flashers and taps the horn to attract attention, shifts into the lowest appropriate gear, engages the emergency break, turns off the ignition, and removes the keys. Next, he unlatches the seatbelt, removes the Star scanner from its cradle and places it in the holster, then proceeds to the bulkhead door. The bulkhead door is opened, and the keys are placed on the little finger of the non-writing hand. Each of these elements has a specific purpose...").

assessment, broad contract statements or savings clauses about a lack of control cannot contradict the evidence.[164]

FXG purports to have no control over its P&D drivers, despite its manuals, flip charts, ride alongs, hygiene and grooming rules, despite its audits, Flex Program, route modifications, uniform signage and grooming mandates, and its host of other minutia. In my opinion, FXG's business records demonstrate that FXG retains the right to control the method, manner and means of daily driver performance.

### 3. FXG'S Business Discussions and Records Show Control

FXG's Business Discussions (also known as Contract Discussion Notes) demonstrate the right to control, and comprehensive actual control, over its P&D drivers. In fact, FXG admits that its Business Discussions are a "tool" for FXG manager use.[165] In many Business Discussions I have reviewed, the FXG terminal manager concludes that the P&D driver has "put [the] contract in jeopardy."[166] A Business Discussion for even a minor infraction often warns the driver that—in FXG vernacular—he has "put his contract at risk."[167]

FXG's right to control and exercise of control is consistently evident in its Business Discussions with its P&D drivers. Failure to follow the procedures "suggested" by FXG not only can result in disciplinary action, it does.[168] In the parlance of employment, this is

---

[164] "Even if the agreement contains all of the terms and conditions one would expect to find in an independent contractor context, the written agreement will not overcome the reality of the situation." See *Legal Guide* at ¶ 8.02, p. 8-5. If an entire agreement cannot save the relationship from characterization as employment, a mere savings clause cannot do so.

[165] See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707335).

[166] See PA13088 (because of his dirty uniform, P&D driver was putting his contract in jeopardy); Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707332 – 353) (FXG senior managers and operations managers are instructed to inform the P&D driver in his most recent Business Discussion that he was "in danger of losing his contract... that he had been told his contract was in jeopardy.").

[167] See PA13500 (P&D driver stated: "I'm still sore and can't sit down yet [from surgery] - still draining puss from where they cut me. Can't drive either." P&D driver was reprimanded for not finding a replacement. FXG manager stated this put the contract at risk.); PA13541 (P&D driver vomiting in the morning and he wanted to make deliveries later in the day. FXG manager told the P&D driver that he should have had a back up driver prepared. FXG manager told the P&D driver that it was his choice to deliver or not, but failure to do so was a direct violation of the contract and put the contract at risk. The FXG manager directed the P&D driver to complete all pick-ups, look at his hours, and log all his hours of work. FXG manager also showed P&D driver how to scan packages.).

[168] See, *e.g.*, PA13584 (P&D driver told manager that he was going to do 106 stops. Manager said driver had to do 140. Manager stated, "if you fail to service your area completely, you put your contract in jeopardy of termination." Driver still refused. Manager said, "You have made your own decision. I have no choice but to put your contract up for termination."); PA13695 (P&D driver's employee did not upload the

tantamount to an employee being warned he may be fired. Semantics do not obscure the gravity of these Business Discussions, nor do they lessen their implicit control to obtain desired performance.

For example, if a P&D driver commits any failure or discrepancy in the check-in paperwork, the field manager must engage in a Business Discussion.[169] Furthermore, the field manager must document the content of the Business Discussion in accordance with Contract Discussion Note, OP-147.[170] If a P&D driver fails to remit the monthly vehicle maintenance return, the FXG manager must hold a BD.[171] If a P&D driver's vehicle fails to meet FXG's appearance standard, FXG requires a BD.[172]

The same goes for FHD P&D drivers.[173] If an FHD P&D driver incorrectly marks a package for recycle, it triggers a Contract Discussion.[174] If a customer complains about any P&D driver, FXG conducts a BD.[175] If during a Customer Service Ride, the FXG manager notices a potential breach of the FXG Agreement, it triggers a BD.[176]

---

scanner. Manager told driver that this was a serious issue and was jeopardizing the future of his operating agreement with FHD. Any further occurrences would result in possible termination.); PA13722 – 725 (P&D driver was reprimanded for having multiple missed pick-ups. Manager said, "I would be remiss in my duties as a manager for FXG if I did not bring this matter to an end. I am submitting your contract for termination review. ... I will not allow my customers to be missed in the quantity that you have.").

[169] See Procedure: Check-In Requirements, FHD, CKI-257, Revision date: 1/31/06 (FXG000006679 – 6685) (emphasis added); Procedure: Check-In Requirements, FXG, CKI-251, Revision date: 8/31/05 (FXG000000103 – 108). See also Mark Byrum Deposition, 129/20 – 130/18.

[170] *Id.* See also Procedure: Check-In Requirements, FXG, CKI-251, Revision date: 8/31/05 (FXG000000107) (If a P&D driver refuses to complete a Recipient I.D. Label Installation Record and Problem Report, FXG mandates a Business Discussion. A Business Discussion is required if a P&D driver has no valid reason for not scanning a Recipient I.D. placard. If there is incomplete paperwork, there must be a Business Discussion held with the P&D driver.).

[171] See Mark Byrum Deposition, 130/14 – 130/18.

[172] See Mark Byrum Deposition, 131/24 – 132/5.

[173] See Procedure: Check-In Requirements, FHD, CKI-257, Revision date: 1/31/06 (FXG000006681 – 6682).

[174] See Procedure: A.M. Check-Out, FHD, CKO-151, Revision date: 8/31/05 (FXG000000016).

[175] See Procedure: Contractor Customer Service Program, FXG, CRL-366, Revision date: 8/31/05 (FXG000000161).

[176] See Procedure: Customer Service Rides, CRL-555, Revision date: 8/28/06 (FXG000707526).

The regulation and documentation of such discipline is consistent and extraordinary.[177] FXG can and does employ Business Discussions to threaten P&D drivers with contract termination.[178] "Contractor Business Plans"[179] also serve to document discussions, problems, solutions, and expectations for P&D drivers.[180] Business Plans record what FXG has committed to do, and what the P&D driver has committed to do.[181] FXG's extraordinary focus on driver detail is clearly not limited to annual Business Plans. Business Discussions can occur at any time.[182]

Companies commonly set and monitor objectives for employees and for independent contractors. Furthermore, monitoring such objectives does not necessarily contradict true independent contractor status. However, in addition to FXG's exacting scrutiny over the minutia of its P&D drivers' work, FXG's Business Plans go beyond customary independent contractor standards, and are analogous to employee annual reviews. Like an employee annual review, a Business Plan assesses whether the P&D driver has met the prior year's service goals, and sets goals for the new year.

---

[177] See Procedure: Business Discussions, FXG, CRL-560, Revision date: 8/17/06 (FXG000707315); Procedure: Business Discussions, FHD, CRL-572, Revision date: 8/17/06 (FXG000707313) (FXG requires its managers to record notes from each Business Discussion on the Contract Discussion Note form (OP-147). A Business Discussion can be held for any of the following purposes: review of the P&D driver's overall operations, documentation of agreed predetermined flex(es), positive customer feedback, customer complaints, "problem-solving," or for discussion of one more aspects of either the driver's or the facility's operation. Furthermore, FXG requires that each P&D driver must have at least two Business Discussion's per year. If a P&D driver refuses to participate in a Business Discussion, FXG directs its managers to contact Contractor Relations. FXG also mandates that each facility maintain a log of all Customer Service Rides and Business Discussions made (Customer Service Rides and Business Discussion Record, OP-214Res).

[178] See Procedure Reference: Contract Termination Guidelines, RCRL-162, Revision date: 8/17/06 (FXG000707337); see also Reaching Higher Ground FXG Kickoff FY07 Presentation (Business Discussions provide "proof" that a P&D driver has breached his Agreement. During such a discussion, FXG directs its managers to: (1) inform the P&D driver of what is expected of him under the contract; (2) identify any problems he/she may have meeting his contractual obligations; (3) seek solutions to those problems; and (4) make very clear what the consequences will be if service objectives are not met.) (FXG000922422–428).

[179] Contractor Business Plans are commonly referred to as "Business Plans" at FXG and in this Report.

[180] See Procedure: Business Discussions, FXG, CRL-560, Revision date: 8/17/06 (FXG000707315).

[181] See Procedure: Business Discussions, FXG, CRL-560, Revision date: 8/17/06 (FXG000707316).

[182] Business Discussions are performed by the FXG managers "when a situation arises." See Michael Mannion Deposition, 276/22 – 277/12.

FXG managers administer Business Discussions[183] to document failures to follow FXG procedures. FXG's managers and personnel enforce FXG's detailed policies and procedures to ensure that P&D drivers follow FXG protocol.[184] As but one example, one P&D driver was reprimanded for getting something to eat during the workday with his shirt untucked and not wearing his FXG cap.[185] Moreover, the driver was told by the FXG terminal manager that he could only dress and undress at the terminal.[186] Hats feature in other Business Discussions too.[187] In fact, a P&D driver who wants to wear a Santa hat during the holidays (even if his customers love it) cannot do so because "it is a violation of the operating agreement."[188]

FXG has reserved its right to control nearly every aspect of a P&D driver's daily work, from whether the P&D driver must shave[189]; to the cleanliness of his uniform[190]; to the number of hours he is expected to work[191]; to the hat he must wear[192]; to the time he arrives at FXG's facility each day.[193] Notwithstanding FXG's interest in protecting its global brand and uniform standards,[194] such control over the minutest of details is antithetical to independent contractor status.

My long experience in representing companies facing recharacterization disputes with taxing and other governmental authorities, my regular summary of legal authorities as the author of the *Legal Guide*, and my extensive contract drafting experience all suggest

---

[183] See Procedure: Business Discussions, FXG, CRL-560, Revision date: 8/17/06 (FXG000707315) ("It is imperative for managers to formally communicate with P&D and linehaul contractors... A business discussion with a contractor can be any of the following: review of the contractor's overall operation; documentation of agreed predetermined flex(es); positive customer feedback; customer complaint; problem-solving meeting; discussion of one or more aspects of either the contractor's or the facility's operations.").

[184] See Rodger Marticke Deposition, 90/16 – 90/25.

[185] See PA13102.

[186] See *id.*

[187] See PA13086.

[188] See Dan Sullivan Deposition Exhibit 6 (FXG00640691) (FXG manager "should have a documented Business Discussion with the contractor so he understands that he has a contractual obligation to maintain a professional image that represents the FedEx brand.).

[189] See PA13095.

[190] See PA13088.

[191] See PA13260 (P&D driver admonished for not making his first delivery until 10:53 a.m., and for only working a little over 10 hours that day; P&D driver told that "by DOT regulations, you can work up to 14 hours before you have to have an 8 hour break.").

[192] See PA13078 (P&D driver admonished for wearing a University of Michigan baseball hat).

[193] See PA13302 (P&D driver warned that he is placing his "contract in serious jeopardy" by coming into work at 10 a.m. so he can take care of his baby and not finishing his route after 8 hours).

[194] For example, UPS' global branding of its "brown" image, includes its workers wearing standard brown uniforms. Of course, UPS, the U.S. Postal Service, and DHL all use employees. In fact, even FXG's sister company, Federal Express Corporation ("Express"), utilizes employees as P&D drivers. FXG is the exception to the rule.

that companies with *bona fide* independent contractors are concerned with results, not consumed (as FXG appears to be) with the method, manner and means each P&D driver uses daily to reach those results.

**D. FXG'S METHOD OF PAYMENT**

FXG issues settlement statements and weekly checks to P&D drivers.[195] FXG styles its driver pay as a "settlement payment" to suggest it is merely paying for an end result, package pick-up and delivery. However, the pay here is a piece rate, not a "by the job" payment.[196] FXG makes payment dependent on P&D drivers' compliance with method, manner and means details.

P&D drivers must prepare settlement documents and records, daily driver logs, daily inspection reports, shipping documents, and other documents.[197] In order for a P&D driver to receive his weekly settlement statement and check, he must prepare all documents in accordance with FXG rules, or risk not getting paid.[198] Moreover, settlement statements (created by FXG) are conclusive and binding on P&D drivers,[199] unless written objections are submitted to FXG within 30 days.[200] Furthermore, the CCS payment is tied to FXG's discretion.[201]

In a manner befitting payroll checks, FXG allows automatic deposit of weekly settlement checks to P&D drivers' bank accounts.[202] Like an employer withholding deductions for expenses and retirement plan contributions, FXG withholds amounts from a P&D driver's settlement check for expenses or contributions to various benefit plans. If the P&D driver elects to participate in the HR-10 retirement plan, FXG deducts it from the settlement check and funds the retirement account.[203] If the P&D driver elects to participate in the

---

195 Section 4.1; see also Procedure: Settlement Record Completion, FXG, SET-005, Revision date: 8/31/05 (FXG000715663 – 672).

196 Payment by the hour, week, or month generally points to an employer-employee relationship, provided that this method of payment is not merely a convenient way to pay an agreed lump sum. Payment made upon completion of the job or on straight commission generally indicates that the worker is an independent contractor. See *Legal Guide* at ¶ 5.02, p. 5-9; ¶ 5.03, p. 5-28, 5-29, 5-31; ¶ 5.05, p. 5-43, 5-50; ¶ 5.07, p. 5-68, 5-69, 5-72.

197 Section 1.7 and 1.8 (FXG_GRIFFIN0003315).

198 See Procedure: Settlement Record Completion, FXG, SET-005, Revision date: 8/31/05 (FXG000715663 – 672).

199 Section 4.2 (FXG_GRIFFIN0003330).

200 Section 4.2 (FXG_GRIFFIN0003330).

201 Section 6.0 (FXG_GRIFFIN0003335).

202 See Procedure: Contractor Direct Deposit, SET-006, Revision date: 8/31/05 (FXG000000168 – 169), at page 1.

203 See Procedure: HR-10 Plan for U.S. Only, FXG, SET-002, Revision date: 8/31/05 (FXG000000552 – 553), at page 1.

Service Guarantee Account Program, FXG deducts it from the settlement check to fund the account, and provides matching funds just as employee savings do.[204]

These payroll procedures extend to operating expenses too. Almost all P&D drivers obtain insurance through Protective Insurance Company using the FXG group sponsored plan; FXG deducts all costs from weekly settlement checks and pays the insurance company.[205] The fact that FXG manages this withholding and payment function, instead of the P&D driver himself, constitutes further evidence of control.

### E. FXG'S RIGHT TO CONTROL VEHICLES

One of the traditional indices of employee versus independent contractor status is whether the worker provides his own tools and equipment. FXG's entire system of terminals, hubs, its corporate-wide sales and customer service workforce, all operate in an integrated fashion. This vast array of infrastructure, equipment, tools and technology are all provided by FXG, and all constitute the work location and equipment needed by the P&D drivers.[206]

Moreover, even if one were to disregard facilities and equipment, and argue that the equipment needed by P&D drivers is limited to a truck, scanner, and uniform, these items too are all supplied and regulated by FXG. Although nominally purchased by P&D drivers,[207] the trucks are procured in bulk by FXG,[208] decorated according to FXG specifications, and then resold to drivers.[209] In fact, over and above DOT requirements,

---

[204] Section 8.0 (FXG_GRIFFIN0003336).

[205] See Procedure: Financing Requirements, SET-356, Revision date: 8/31/05 (FXG000002509 – 2511), at page 2.

[206] DVD: The FedEx Ground Network, Order # TV-009 (FXG_M00048) ("With more than 300 FedEx Ground terminals across the United States and Canada, and nearly 300 FedEx Home delivery facilities, and 27 central distribution hubs, FedEx Ground sorts more than 2 million packages a day, automatically along computerized conveyer routes, through six-sided camera scan tunnels. From these hubs, we transport packages to FedEx Ground and Home Delivery terminals, for their final on-time delivery.").

[207] Even if one could conclude that the truck truly "belongs" to the P&D driver, FXG's own documents make it clear that such ownership is highly regulated. PA14255 (P&D driver was reprimanded for unsecured vehicle. He responded, "it is my truck and I am responsible for the packages." Management replied, "that's true, but I also pay to insure those packages. The 1st $1000 of each claim can be yours; the rest is mine. Also, those packages should be considered mine until they are delivered. The P&D driver stated, "No way, they belong to the shippers." Manager retorted, "Manager is the guardian of those packages."); PA14527c (P&D driver told that he must be approved before getting a van. Driver said, "I'm a contractor, not an employee. When I started I never had to go through this. I went and bought a van and that was it. ... I don't understand why I have to buy a P-550." The manager said the van requirements are set by the company. If this is company policy it must be followed.).

[208] See FXG000383648 (FHD team requests approval to purchase 100 white Chevrolet Express XP Cargo Vans for $1.9 million for April 2000 delivery).

[209] See FXG000383565 (FXG purchase of FHD vehicles for resale); FXG000383640 (RPS purchase of vehicles); Stephen Myers Deposition, 62/12-68/9 (FXG charges administrative handling fee on van

FXG has the ultimate (and apparently unfettered) right to approve the sale, disposal, or upgrade of vehicles.[210] FXG's discretion erects another barrier to any degree of independence by P&D drivers. In addition to FXG's approval of van sales and upgrades, FXG also requires trucks, cargo vans, and package vans to meet detailed specifications regarding size, shelving, color, etc.[211]

Even vehicle use is restricted. P&D drivers "may use the Equipment for other commercial or personal purposes when it is not in the service of FedEx Ground," with the understanding that "all such identifying numbers, marks, logos, and insignia will be removed or masked (by paper or plastic overlay) when the Equipment is so used."[212] As a practical matter, this means P&D drivers cannot use the trucks for any other purpose, and they generally do not do so.[213]

While selection and replacement of equipment is ostensibly within the discretion of P&D drivers,[214] FXG reserves the right to approve all equipment,[215] no matter how minor, and no matter whether it complies with all pertinent governmental laws and regulations.[216] In fact, FXG controls the minimum size truck each P&D driver can use.[217]

Regardless of FXG's reasons for its tight and multi-tiered approvals and oversight, I would not expect to see this level of control in a truly independent contractor relationship. Such requirements represent badges of control which, in my view, cannot be squared with independent contractor status.

### F. FXG'S RIGHT TO CONTROL ROUTES AND ASSIGNMENTS

There is little more fundamental to FXG's asserted independence of its P&D drivers than their routes, denominated as Primary Service Areas. Each P&D driver is responsible for daily pick-up and delivery of packages in his Primary Service Area, as assigned from

---

purchases).

[210] Procedure: Vehicle Guidelines and Upgrades, VEH-553, Revision date: 8/31/2005 (FXG000001029 – 1042).

[211] *Id.*

[212] Section 1.5 (FXG_GRIFFIN0003314).

[213] *Estrada v. RPS,* Questionnaire Two Responses (P&D drivers rarely deliver non-RPS packages)(EST0005855-5896).

[214] Section 1.1 (This is "subject to the determination of FedEx Ground of its suitability for the service called for in this Agreement.") (FXG_GRIFFIN0003312).

[215] Section 1.1 (FXG_GRIFFIN0003312); Section 2.1 ("No vehicle may be operated pursuant to this Agreement by any operator who is not in compliance with such standards") (FXG_GRIFFIN0003321); Procedure: Vehicle Guidelines and Upgrades, VEH-553, Revision date: 8/31/2005 (FXG000001029 – 1042); DVD: Settlement Enhancements - U.S. P&D Version, June FY02 (FXG_M00097) (Moreover, to even ask for an exception, the P&D driver must provide an explanation why the exception is needed. A P&D driver must submit an explanation for any exceptions to these specifications to FXG's headquarters.).

[216] See Michael Mannion Deposition, 238/19 – 241/14.

[217] See Dan Sullivan Deposition, 196/16 – 197/19; see also PA14527c.

time to time by FXG.[218] Significantly, FXG can unilaterally reconfigure a route, merely by giving the affected P&D driver five-days notice, even when a P&D driver objects.[219] If a P&D driver is unable to provide reasonable means to service a Primary Service Area, FXG, in its sole discretion, may reconfigure the area.[220]

FXG also has control over the routes a driver can acquire.[221] FXG reserves the right to refuse to allow a P&D driver a second or third route.[222] FXG also limits the number of routes a driver can acquire by imposing a ceiling.[223]

Moreover, FHD issues daily route and delivery details through its Vehicle Route Planning Enhancements and Facility-entered Delivery instructions.[224] FHD provides drivers with daily route maps, turn-by-turn instructions and a planned sequence of deliveries. FHD makes daily routing changes to improve performance based on routes, stops, packages, start/end locations, and autoflex flex groups.[225] FHD even shuffles stops among the routes to optimize stops the P&D driver makes during the day.[226] FHD also flexes stops from routes with too many stops to routes with too few.[227]

Furthermore, a P&D driver may not assign his rights and obligations without the consent of FXG.[228] Even when a P&D driver dies, the replacement must be acceptable to FXG. In my view, FXG's contractual control of driver routes is a crushing blow to any claim of driver independence.

---

[218] Section 5.1 (FXG_GRIFFIN0003331).

[219] Section 5.2 (FXG_GRIFFIN0003331 – 3332); Dan Sullivan Deposition, 192/13 – 193-22.

[220] Section 5.2 (FXG_GRIFFIN0003332).

[221] While FXG eliminated the requirement that a driver work a full year before obtaining a second route, FXG still rewards multiple work area drivers with bonuses. See Attachment 3.4 to Addendum 3 to FHD Agreement (PCA0029895).

[222] See Dan Sullivan Deposition, 135/15 – 137/12.

[223] See Rodger Marticke Deposition, 140/21 – 142/17 (Prior to October 6, 2005, the maximum number of work areas a driver could acquire was five; that was subsequently increased to eight routes.); Dan Sullivan Deposition, 137/4 – 137/23.

[224] See Procedure: Vehicle Route Planning Enhancements, FHD, VRP-159, Revision date: 2/07/06 (FXG000382950 – 968). Each day, by using Vehicle Route Planning 5.02 software ("VRP"), FXG calculates the amount of time it takes to travel and deliver packages for each route. FXG also calculates the time required to travel to and deliver each routed stop. FXG also uses VRP to calculate the minimum and maximum number of stops that each P&D driver can make for each route (FXG000382955).

[225] See Procedure: Vehicle Route Planning Enhancements, FHD, VRP-159, Revision date: 2/07/06 (FXG000382951 – 952).

[226] See Procedure: Vehicle Route Planning Enhancements, FHD, VRP-159, Revision date: 2/07/06 (FXG000382951 – 953).

[227] See Procedure: Vehicle Route Planning Enhancements, FHD, VRP-159, Revision date: 2/07/06 (FXG000382952).

[228] Section 18 (FXG_GRIFFIN0003346).

FHD can even exercise up-to-the-minute control over P&D drivers on the road each day through "facility-entered delivery instructions".[229] FHD managers input specific delivery instructions for specific routes, stops, or deliveries into FHD's route planning software, and such "Delivery Instructions" are downloaded to the P&D drivers' scanners.[230] FXG's ability to monitor pick-up and delivery of every package clearly evidences its right of control.

### G. FXG'S RIGHT TO CONTROL HOURS

An employer's right to control a worker's hours is consistent with employee status.[231] According to the Agreements and FXG procedures, P&D drivers provide pick-up and deliver service to consignees and shippers on days and at times compatible with customer schedules and requirements.[232] At first blush, such wording might be read to suggest that the hours a P&D driver works are based on consignee and shipper schedules.

However, a careful reading of the Agreements and other business records reveals FXG's control over driver hours. FXG expects to fully utilize every truck, every day. If there were any doubt that FXG wants its drivers to work a full day every day, and to control every driver's workload, the Flex Program resolves that doubt. Characterized by FXG as "voluntary"[233] in reality, Flex is the norm.[234] Any P&D driver in the Flex Program must deliver <u>additional</u> packages even if they are <u>not</u> located on the driver's route.[235] For

---

[229] See Procedure: Procedure: Vehicle Route Planning Enhancements, FHD, VRP-159, Revision date: 2/07/06 (FXG000382956 – 968).

[230] See Procedure: Vehicle Route Planning Enhancements, FHD, VRP-159, Revision date: 2/07/06 (FXG000382965). See also Turn by Turn Directions Detail (Instructions to drivers may include: "Frequent customer - leave pkg at back door under porch" and "Do not ring bell - driver release!" These instructions can be given for a particular delivery, for a particular customer address, for one particular day or for future days.) (PCA0009073; PMO0011541; PRI0003383; PTX20000085).

[231] *Legal Guide*, ¶ 3.02, p. 3-12.

[232] Section 1.10(a) (FXG_GRIFFIN0003317).

[233] PA13841 (FXG manager suggested to driver (PA13840) that they create a flex plan. P&D driver didn't want to, and the manager responded that the bottom line is that every customer must get serviced.); PA13853 (FXG manager was trying to figure out a flex that would be beneficial to two P&D drivers. Neither driver liked the manager's suggestion. Manager said they would have to make the changes anyway).

[234] *In re FedEx Ground Package System, Inc.*, Employment Practices Litigation, Defendant FedEx Ground Package System, Inc.'s Second Supplemental Objectives and Response to Plaintiff's First Set of Interrogatories, Interrogatory #63, (Approximately 10,207 P&D drivers participate in the Flex Program, and approximately 94 P&D drivers do not participate.).

[235] See Dan Sullivan Deposition, 202/1 – 202/16; PA13202 (P&D driver was reprimanded for having DNAs but coding them as 16s. P&D driver refused to take flex route. Manager stated, "We assigned those packages to your route, and you refused to take them. From time to time we have to make flexes like that ... We have to make decisions that make sense for all 30 routes and our customers."); PA13205 (FXG manager (PA13204) told driver that he wasn't going to change the flex assignment, and driver responded that he wouldn't deliver the extras. FXG manager said, "That's your decision to make," and gave the P&D

"electing" to participate in Flex, P&D drivers receive a daily flex fee for each piece of vehicular equipment in service under the Agreement.[236] In so electing, each P&D driver agrees to accept packages outside his Primary Service Area, up to daily pick-up and delivery capacity (determined by reference to time required, mileage, and van capacity).[237]

Because virtually every P&D driver participates in Flex, FXG can unilaterally assign packages from one P&D driver to another.[238] FXG may "flex" packages on any day where the volume of packages available for pick-up and delivery in a P&D driver's Primary Service Area exceeds the volume a P&D driver can "reasonably be expected to handle."[239] These determinations are all made by FXG, not by the drivers, and FXG does so under its own criteria.

FXG embraces this package equalization phenomenon across its entire system. FXG thereby has the right to control the number of packages each P&D driver picks up and delivers every day. With the ability to control the number of packages each P&D driver can deliver, FXG can control driver hours and driver pay.[240]

The injection of non-route specific packages is for FXG's convenience and efficiency. FXG has unfettered ability to control the creation, size and scope of each driver's route, and even to make daily exceptions to those routes. FXG can dictate how many packages each driver will deliver, and therefore how many hours each driver will work.

DOT regulations restrict the maximum hours a P&D driver is permitted to operate a vehicle.[241] FXG assigns packages every day to P&D drivers, so that each P&D driver is expected to work between 9.5 and 11 hours.[242] FXG provides each P&D driver with a

---

driver a resignation form. P&D driver refused to sign. Manager said he would assign another manager to ride with driver to assess how many more stops driver could make.).

[236] Section 9.0 (FXG_GRIFFIN0003338).

[237] Section 9.0 (FXG_GRIFFIN0003338).

[238] Section 1.10(a) (FXG_GRIFFIN0003317).

[239] Section 1.10(a) (FXG_GRIFFIN0003317).

[240] P&D drivers' temporary core zone density payments were based on a seven hour work day. However, the density payment is now based on the number of stops performed by the P&D driver. I see no material change between the two procedures.

[241] Procedure: Hours of Service, FHD, SAF-085, Revision date: 1/12/06 (No motor carrier shall permit or require any driver, nor shall any driver operate a vehicle: more than 11 hours following 10 consecutive hours off duty; for any period after having been on duty 14 consecutive hours following 10 consecutive hours off duty; for any period after having been on duty, seventy hours in any eight consecutive days.) (FXG000714913).

[242] See Customer Service Ride Participant Manual (FXG000006344) (CSR riders, when determining maximum routes, should calculate maximum stops at 11.5 hours); FHD P&D Planning Seminar (FXG000003038) ("When using the Service Flex Range to develop work areas manually or to check how many stops a contractor can do in a typical day, use 9.1 planned hours. ... planned hours for use as a guideline when calculating a contractor's maximum stop capability is 11.0 hours.").

daily list of packages to deliver. The number of packages, determined solely by FXG, is expressly calculated so P&D drivers will work from 9.5[243] to 11 hours a day.[244]

Moonlighting is thus virtually impossible.[245] P&D drivers logging between 9.5 and 11 hours a day work substantially full-time for FXG, plainly evidencing exclusivity. Although the Agreements technically permit P&D drivers to work for other companies, FXG rules make working for anyone else impracticable.

Furthermore, FXG uses its rights to deny P&D drivers new routes to control the number of hours they work. FXG managers receive a monthly report detailing the average hours worked per day by each P&D driver.[246] FXG uses this information to determine whether a new route should be granted for any particular facility.[247] Where a P&D driver averaged only nine hours per day, FXG denied that driver a new route.[248] The fact that FXG looks to the number of hours worked (rather than the number of packages delivered) demonstrates FXG's express interest in and control over hours.

FXG changed its "min and max" stop policy to a "delivery stop guideline" to fully utilize a vehicle.[249] Prior to FXG's Document Re-engineering Initiative, the calculation of the minimum and maximum number of stops based on a 9.5 to 11 hour day was used to determine whether the vehicle was being fully utilized,[250] and included completion of the daily service planning worksheet.[251] Under the new delivery stop guideline, the form has been revised, and is now called the "daily service worksheet."[252]

The delivery stop guideline measures the number of stops a P&D driver makes during the day to fully utilize his vehicle.[253] FXG utilizes a mathematical formula comprised of the number of packages, stops, and miles to calculate vehicle utilization.[254] Despite FXG's metamorphosis of its explicit hours rules into its "delivery stop guideline," I see no evidence that FXG's full utilization and hour-conscious policies have changed in any material respects. A change in semantics does not signal any relinquishment of FXG's many prerogatives of control.

---

243 See Dennis Oates Deposition, 87/3 – 88/16 (the range was changed from 9.1 to 9.5).

244 See Dennis Oates Deposition, 96/18 – 97/4.

245 *Estrada v. RPS,* Questionnaire Two Responses (P&D drivers rarely deliver non-RPS packages)(EST0005855-5896).

246 See Mark Byrum Deposition, 99/15 – 100/6.

247 See McIntyre Deposition Exhibit 5 (FXG000538264 – 265).

248 See Dennis Oates Deposition Exhibit 13 (FXG000538624- FXG000538625).

249 See Dennis Oates Deposition, 110/12 – 120/14.

250 See Dennis Oates Deposition, 112/13 – 115/1.

251 See Dennis Oates Deposition, 97/1 – 97/15.

252 See Dennis Oates Deposition, 99/24 – 108/23.

253 See Dennis Oates Deposition, 120/9 – 120/14.

254 See Dennis Oates Deposition, 126/12 – 126/17.

Working hourly or daily, rather than to complete prescribed tasks or to achieve a particular result, is more consistent with employee rather than independent contractor status.[255] When required hours are long, there is implicit exclusivity,[256] another badge of employment. As with other FXG regulations, noncompliance has consequences. A P&D driver who does not deliver all his packages breaches his contract,[257] and FXG personnel are instructed to subject the offending P&D driver to a Business Discussion.

By controlling the number of packages a P&D driver must deliver each day, FXG controls the hours each P&D driver works. In some instances, FXG controls driver hours even more blatantly. For example, one P&D driver was reprimanded by a FXG terminal manager for failing to return to the terminal before 7:30 p.m. The FXG terminal manager admonished the P&D driver that if he could not make all his required deliveries before 7:30 pm, he would have to arrive at the terminal at 7:00 a.m., not 8:30 a.m., to begin his deliveries.[258] In another instance, a P&D driver told his manager he had over 130 stops and 30 to 40 packages to deliver that day, that this was too much work, and that he could not get it all done. The FXG terminal manager instructed him to do as much as he could in 12 hours.[259]

Such instances of control are inconsistent with the degree of independence possessed by independent contractors. FXG also reserves the right to name the work days preceding and following any holiday which falls on or in conjunction with a weekend.[260] Moreover, FXG maintains a Time-Off Program under which P&D drivers, based on seniority, can sign up for two weeks time-off during each year.[261]

---

[255] *Chuck Bennett & Sons Heating & Air Conditioning v. Cottrell*, 2003 Va. App. LEXIS 697 (Dec. 30, 2003) (holding that a worker hired on an hourly basis was an employee, not an independent contractor).

[256] Region 34, NLRB Decision and Direction of Election in *FedEx Home Delivery, A Separate Operating Division of FedEx Ground Package Systems, Inc. v. International Brotherhood of Teamsters, Local Union 671*, dated September 20, 2006 at page 26 ("their ability to use their vehicles for other business purposes when they are not providing service for the Employer is further constrained by the Employer's requirement that the contract drivers provide delivery services every Tuesday through Sunday between the hours of approximately 6 am to 8 pm...this lack of pursuit of outside business activity appears to be less a reflection of entrepreneurial choice by the ... drivers and more a matter of the obstacles created by their relationship with [the Employer].").

[257] See PA14096 (P&D driver's service was 87.8%; the required percentage is 99. Driver said "if you want my service at 99%, you need to take Croton and Centerburg off my route." Manager said he wouldn't do that, and that driver only worked 8.5 hours. Manager suggested driver work more hours, and do back-tracking if necessary. Manager told driver to rearrange how he does the route.); PA14105 (P&D driver told manager that driver was leaving behind packages for the day. Manager said driver's contract could be sent up for termination. P&D driver said the routes were set up to meet the terminal's needs.).

[258] See PA13256.

[259] See PA13264.

[260] Addendum 3 - II.D (PCA0047630).

[261] Attachment 7.1 to Addendum 7 to FXG Agreement, Time Off Program (Based on seniority, P&D driver selects one week off, and after all the participating P&D drivers have selected their first week, the P&D drivers then select a second week of vacation. Furthermore, Time-Off weeks must be taken in Monday thru

However, FXG requires P&D drivers to take a one-week block off, even if the driver only wants to take 1 or 2 days. Furthermore, vacation must be claimed in Monday to Friday blocks, so a P&D driver apparently cannot take vacation time from Tuesday to Tuesday.[262] Even if a P&D driver wants to take vacation during the holidays, the holiday itself evidentally counts toward his 5 days off, despite the fact that other P&D drivers would also have that holiday off.

Furthermore, the Time-Off Program does not allow a P&D driver to take 2 weeks off consecutively. The Time Off Program suggests that its drivers have virtually no latitude over their vacation, lacking control over both the hours they work, and the time they can take off.

## IV. RIGHT TO TERMINATE - TERMINATION AT WILL

### A. OPERATING AGREEMENT

Real or perceived threats to terminate a worker are often cited as the ultimate condition forcing the worker to submit to the company's control.[263] Several provisions in FXG's Agreements with its P&D drivers speak to this issue. For example, Section 12.1 states that:

> "This Agreement may be terminated: (a) At any time; by mutual agreement of Contractor and FedEx Ground; ... (c) by Contractor or FedEx Ground if the other party breaches or fails to perform the contractual obligations imposed by this Agreement."[264]

---

Friday increments. Holidays that occur during a P&D driver's Time-Off week are included as part of the P&D driver's Time-Off week. A P&D driver who signs up for the Time-Off Program must remain in the program for the entire year.) (PWI10002295 – 2296).

[262] See Attachment 7.1 to Addendum 7 to FXG Agreement, Time Off Program ("Time Off weeks must be taken in Monday thru Friday increments.") (PWI10002295).

[263] *Legal Guide*, ¶ 5.10, p. 5-78; ¶ 5.02, p. 5-7. See also *Brose v. Union-Tribune Publishing Co.*, 183 Cal. App. 3d 1079, 1085 (Cal. App. 4th 1986) ("the power of an employer to terminate the employment at any time 'is a strong circumstance tending to show the subserviency of the employee, since it is incompatible with the full control of the work usually enjoyed by an independent contractor. Perhaps no single circumstance is more conclusive to show the relationship of an employee than the right of the employer to end the service whenever he sees fit to do so.'"); *Cockran v. Rice*, 26 S.D. 393, 397 (1910) ("No single fact is more conclusive as to the effect of the contract of employment, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself."); *Messmer v. Bell (& Coggeshall Co.)*, 133 Ky. 19, 25 ("The power to discharge has been regarded as the test by which to determine whether the relation of master and servant exists. While it is not the sole test, it is the best test upon the question of control.").

[264] Section 12.1 (FXG_GRIFFIN0003339 – 3340).

If a P&D driver fails to follow FXG procedures for termination, FXG can assess $1,000 of liquidated damages and withhold it from the P&D driver's final settlement or Performance Escrow Account.

The Agreements include an automatic yearly renewal with a 30 day notice for nonrenewal, with or without any reason.[265] Nonrenewal is entirely at FXG's will and discretion. In any case, standards of service in Section 1.10 are so vague that virtually any infraction could be seen by FXG to be a violation, and hence justification for termination under Section 12.1. In my opinion, the Agreements effectively amount to contracts at will, allowing FXG unfettered termination rights for any reason, without material recourse by the affected P&D driver.

"In the trial court's view, FedEx's conduct established that the drivers could be terminated 'at will'".[266] "Although the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all and substantial evidence established that FedEx discharges drivers at will."[267]

Termination at will is a fundamental basis of control,[268] and FXG's right to effect termination at any time without repercussions is difficult to square with a claim of independent contractor status. The Agreements provide that P&D drivers may be terminated for any breach or failure to perform any contractual obligations.[269] As FXG's business records reveal, those contractual obligations are extensive, detailed, changeable by FXG, and solely within FXG's control.

**B. THREATS OF TERMINATION**

Apart from contract rights, the evidence shows that FXG voices an omnipresent threat of termination, a sword of Damocles over each P&D driver. Even a slight infraction, such as wearing a grey T-shirt,[270] not shaving,[271] or failing to wear the required logo cap while eating lunch[272] can be enough. If such trivial reasons can trigger threats of termination (in FXG vernacular, "putting one's contract at risk"), then FXG wields a potent weapon to control driver behavior.

---

[265] Section 11.2 (FXG_GRIFFIN0003339).

[266] 64 Cal.Rptr. 3rd 327 (Cal.Ct. App. 2nd Aug. 13. 2007) at 334.

[267] *Id.* at 336.

[268] See, *e.g.*, *Benson v. Scott*, 734 F.2d 1181, 1190 (7th Cir. Ill. 1984),*Taylor v. Lumberman's Mutual Casualty Co.*, 43 Ga. App. 292 (Ga. Ct. App. 1931); *Moore v. Vantil*, 1999 U.S. Dist. LEXIS 964 at 15 (N.D. Il. 1999); *Barrientos v. Taylor*, 917 F. Supp. 375, 383 (E.D.N.C. 1996).

[269] Section 12.1(c) (FXG_GRIFFIN0003340).

[270] PA13077 (FXG manager told P&D driver that gray Fed Ex t-shirt he was wearing was not a uniform, and that "this is an image issue and part of the contract. You must always be in uniform.").

[271] PA13095 (P&D driver told to shave more often to foster a professional image like their competition, UPS).

[272] PA13102 (P&D driver reprimanded for getting something to eat during the work day without a FedEx cap and his shirt untucked).

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 47 of 227

Whether or not termination ultimately results, this scrutiny is likely to have a material impact on the extent to which P&D drivers feel required to follow FXG directions and suggestions. To the common observer, these standards suggests a military regime more than a modern private enterprise. FXG's standards of service are sufficiently vague that drivers can inadvertently breach their contract in myriad ways, allowing FXG to "terminate their contract" at will.

### C. TERMINATION UNRELATED TO SERVICE

Discovery in this case uncovered substantial evidence demonstrating that FXG terminates drivers for reasons unrelated to performance. FXG terminal managers perform a "headcount"[273] twice annually (in June and December) to evaluate P&D driver attitudes toward their status as putative independent contractors for FXG.[274] Assessing worker attitudes is entirely inconsistent with an independent contractor relationship.

Each terminal manager rates P&D drivers with a plus, a minus, or a question mark to assess whether the P&D driver favors his independent contractor status, would rather be an hourly employee, or it is uncertain how he feels.[275] Senior Managers are further directed to explain the reasons for a driver's feelings about being an independent contractor, any desire to be an employee, whether he is a follower or a leader, who he influences, and who influences him. This information is all sent to FXG headquarters.[276]

A "minus" rating plainly spells trouble for a P&D driver, irrespective of his work performance.[277] The minus rates attitude, and not even pleasant demeanor or cheerfulness, but attitude toward FXG and particularly toward its independent contractor model. Not only do the plus/minus criteria have nothing to do with job performance (or the ultimate goal of timely pick-up and delivery), but P&D drivers are evidently unaware they are being rated.

---

[273] Contractor Relations now performs these headcounts, not FXG terminal management. See Robert Ostrov Deposition, 267/2 – 271/4.

[274] FedEx Ground Contractor Relations Plan, Revised 06/05 ("every Senior Manager and Sr. Hub Manager/Sr. Manager - Linehaul is to make an individual assessment, in writing, of how each linehaul and P&D contractor feels about his status as an independent contractor versus being an employee. This written assessment is referred to as a 'headcount' and is prepared by listing the names of all contractors and Temp A's, separate linehaul from P&D. Beside each name, place a plus (+) to indicate that person favors independent contractor status, a minus (-) if he would rather be an hourly employee, and a question mark (?) if the contractor is not known well enough to judge, or if you are unsure how he feels.") (FXG000392964).

[275] *Id.*

[276] FedEx Ground Contractor Relations Plan, Revised 06/05 (FXG000392965).

[277] See Contractor Relations Plan, June 2002 (Support for a union by a P&D driver results in a negative mark).

Ratings occur at and after Roundtable Meetings ("Roundtables"), at which free discussion is encouraged.[278] Promoted as morale enhancing sessions where the free exchange of ideas is encouraged, FXG requires a written report of what transpired at each Roundtable,[279] identifying by name the P&D drivers who raised particular issues. For each driver rated with a minus or a question mark, FXG managers are instructed to work to increase the driver's rating to a plus, or to do something more final: find a way to terminate the driver.[280]

The P&D driver's work could be proficient, yet he could be fired for having a low opinion (as perceived by FXG) of the FXG's independent contractor model. This is a criterion on which the driver has no idea he is being rated, and which is wholly irrelevant to driver duties or end results. P&D drivers with poor attitudes about FXG (as subjectively determined solely by FXG) are labeled "rotten apples,"[281] and subject to termination. To further "clean house," FXG managers who fail to follow-up on audits, or to deal with driver "misfits," whose terminals had high levels of P&D complaints, etc.[282]

In my opinion, FXG's power to remove P&D drivers who have not violated their Agreements, but who simply exhibit a bad attitude, unambiguously bespeaks employment. That is especially true where the pivotal "attitude" is subjectively

---

[278] FedEx Ground Contractor Relations Plan, Revised 06/05 ("During roundtables, Regional Managing Directors and Senior Managers are to identify contractors or package handlers whose remarks, questions, or behavior indicate dissatisfaction with their status or with the independent contractor concept. Note inflammatory or confrontational remarks aimed at fostering antagonism and distrust between contractors, package handlers and the FedEx Ground management team." Managers are to pay close attention to any early warning signs of union activity, and if detected, to gather all facts available the immediately notify the Regional Managing Director and Contractor Relations.) (FXG000392968).

[279] See Regional Director Quarterly Roundtable Report (must include information regarding attendance, topics addressed, questions asked and answers given, attitude of contractors present, which contractors asked questions or made comments that indicated their lack of support for the independent contractor model, etc.) (FXG000392979 – 981); see also Tim Edmonds Interoffice Memo ("A Roundtable is not completed or counted until the written Roundtable report is received at Contractor Relations.") (FXG000739750 – 51).

[280] See Michael Mannion Deposition, 340/13 - 345/25. See Email from Tim Edmonds (FXG "needs to be more aggressive on removing rotten [*sic*] apples") (FXG000452967).

[281] See Emails from Tim Edmonds (FXG000760541, FXG000658466).

[282] See Email from Tim Edmonds (FXG000658466 – 67); see also See Independent Contractor Research, FedEx Executive Summary, P&D Independent Contractors, January 2004 (FXG even engaged a consulting firm to survey P&D driver morale. The survey measured P&D drivers attitude and morale toward FXG, their commitment to FXG, and their willingness to consistently provide superior consumer service. The survey results reveal that FXG interferes with drivers' ability to provide superior customer service. In write-in comments, P&D drivers expressed frustration "over control of ways and means of accomplishing work, overscheduled and under-compensated pick-ups, consistent long days, poor inconsistent loading practices, and unreasonable departure times. The survey results conclude that the problems "stem primarily from driver perceptions of lack of control over speed and quality of truck loading, terminal departure time, residential delivery mandates and required time pick-up scheduling.") (FXG000549789).

determined by FXG based on company surveillance of ostensibly morale-boosting meetings (Roundtables) at which secret ratings are recorded.

Respectfully submitted,

Date: September 7, 2007

Robert W. Wood

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 50 of 227

**Exhibit A-1**

# WOOD & PORTER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

Certified in Taxation
California Board of Legal Specialization

Certified Public Accountants

333 SACRAMENTO STREET
SAN FRANCISCO, CA 94111-3601
TEL 415.834.1800 FAX 415.834.1888
WWW.WOODPORTER.COM

Qualified in CA, NY, DC, AZ, WA, MT, WY, TX, England and Wales

Canadian Bar Association
Australian Bar Council

## ROBERT W. WOOD
## PROFESSIONAL EXPERIENCE

Robert Wood has extraordinarily broad experience in corporate, partnership, individual and employment tax matters. Mr. Wood also performs general corporate and transactional work, from start-up companies to the negotiation and documentation of mergers and acquisitions. Mr. Wood's tax controversy and administrative work includes audits, appeals, rulings, protests, appellate conferences, closing agreements, Tax Court and appellate court litigation. He has also regularly been involved in California franchise tax and State Board of Equalization audits, appeals and rulings, and has frequently contested matters involving worker classification (as employee vs. independent contractor).

Mr. Wood regularly represents companies in disputes with taxing agencies over the proper characterization of workers as independent contractors or employees. Moreover, he often consults with companies in advance of such disputes, in structuring, implementing, and amending independent contractor arrangements. He has drafted, edited or assisted in drafting dozens of independent contractor agreements, and he regularly renders expert testimony on the proper treatment of workers as employees or independent contractors. Mr. Wood is the author of *Legal Guide to Independent Contractor Status*, now in its 4th edition.

He also has an international reputation as a consultant on the tax treatment of litigation recoveries. Indeed, in this area he is perhaps the most well-known lawyer in the United States, having recently been labeled the "preeminent authority for tax practitioners" in this area by former Commissioner of Internal Revenue, Lawrence Gibbs. *Tax Notes*, April 18, 2005, p. 393. He has also long maintained a corporate tax practice emphasizing general business planning, negotiation and documentation of corporate distributions, divisive and acquisitive reorganizations, financings, recapitalizations, formations and liquidations. He is listed among "America's Best Lawyers" by Forbes Magazine, is featured in "The Best Lawyers in America," and was named a "Super Lawyer" by publishers of Law & Politics and San Francisco magazines. Rob is a frequent guest on Legal Broadcast Network radio shows, the Sky Radio Network, and is featured on the Legal Talk Network and Ringler Radio.

Unlike many tax lawyers, Rob Wood performs related general corporate and transactional work including the negotiation and documentation of mergers and acquisitions, financing, leases and licenses. His representation in partnership transactions including negotiation and documentation of institutional joint ventures, limited partnership syndications and real estate development projects. He also documents like-kind exchanges. Mr. Wood is also a frequent expert witness on tax matters in civil cases, class actions, tax and accounting malpractice cases, etc.

Mr. Wood has obtained many IRS private letter rulings for clients. He has even been hired to meet with the IRS National Office in Washington by other law or accounting firms when they have failed to obtain a ruling. He also has significant experience with exempt organization work, including formation, qualification, termination, and operation of public charities and private foundations. He has often successfully pursued property tax contests, including appeals and hearings.

He was formerly a partner with Bancroft, Avery & McAlister, San Francisco; and with Steefel, Levitt & Weiss, San Francisco; and formerly associated with McCutchen in San Francisco.

**PROFESSIONAL MEMBERSHIPS**

California, New York, District of Columbia, Montana, Washington, Arizona and Wyoming Bars: Member, Sections on Taxation
Qualified Solicitor, Supreme Court of England and Wales
Law Society of England and Wales
Canadian Bar Association
Law Council of Australia
U.S. Supreme Court, U.S. Tax Court, Northern District of California, Ninth Circuit, Third Circuit, District of Columbia Circuit, Central District of California, Southern District of California, District of Arizona Bars
Certified Tax Specialist, California Board of Legal Specialization
Fellow, American College of Tax Counsel

**OFFICES AND LEADERSHIP POSITIONS**

Chair, Taxation Law Advisory Commission, California Board of Legal Specialization (member 1989-1992; Chair 1991-1992)
Co-chair, Corporate Tax Committee, California State Bar Tax Section (1991-1992)
Executive Committee, State Bar of California, General and Solo Practice Section (1994-1995)
Vice Chair, Taxation Section, State Bar of California (2002-2003)
Executive Committee, State Bar of California, Taxation Section (2000-2003)
Advisory Council, International Biographical Centre, Cambridge, England
Alliance of Merger & Acquisition Advisors
National Trust for Historic Preservation
International Fiscal Association, London
International Bar Association, London
ABA Tax Section: Committees on S Corporations and Environmental Taxes

**EDITORIAL BOARD MEMBERSHIPS**

Journal of Corporate Taxation (WG&L) 1985-1989
Taxation for Lawyers (WG&L) 1985-1989
Journal of Real Estate Taxation (WG&L) 1986-
Journal of Bank Taxation (Faulkner & Gray) 1987-1992
BusinessWeek Newsletter for Family-Owned Business (McGraw Hill) 1988-1990
Corporate Taxation (Faulkner & Gray) 1988-1992
S Corporations: The Journal of Tax, Legal and Business Strategies (Executive Enterprises) 1988-1991
The Real Estate Tax Digest (Matthew Bender) 1989-
Taxation of Mergers and Acquisitions (Faulkner & Gray) 1990-1992, Editor-in-Chief
The Journal of New York Taxation (Faulkner & Gray) 1991-1992
Bankruptcy Law Review (Faulkner & Gray) 1992
Consolidated Returns Tax Report (Faulkner & Gray) 1992, Editor-in-Chief
The M&A Tax Report (Tax Institute) 1992-, Editor-in-Chief
The Practical Accountant (Faulkner & Gray) 1993-
Corporate Business Taxation Monthly (CCH) 2003-

**BOARD OF DIRECTOR AND CLUB MEMBERSHIPS**

Bohemian Club, Mzuri Safari Club (Past Director and Past President), Mzuri Wildlife Foundation (Past Trustee and Secretary), Tax Institute (Director), Nutriceutical Products Corporation (Past Director)

**OTHER ACTIVITIES**

Adjunct Professor, Golden Gate University School of Law (LL.M. Program) (2004)

Contributor, *Legal Checklists* (West Group 2000)
2000, 2001 and 2002 Delegations, Los Angeles County Bar Association and California Bar Association Tax Section to Washington DC
Contributor, *California Torts* (Matthew Bender 1999)
Planning Committees, 1988, 1989 and 1990 Tax Planning Conferences For Closely Held Corporations (California CPA Society)
Planning Committee, 1994 Tax Disputes Conference (California CPA Society)
Planning Committees, 1990 and 1993 S Corporations Conference (California CPA Society)
Chairman, 1991 S Corporations Conference (California CPA Society)
Consultant, Wrongful Employment Termination Practice, 2d Ed. (CEB 1997)
Contributor, *Legal Checklists* (Callaghan)
Contributor, *Modern Trust Forms*
Instructor, University of California, Hastings College of the Law (1981-1982)
Mentor Program, General and Solo Practice Section, State Bar of California

**EDUCATION**

University of Chicago Law School, J.D. 1979 (Florence James Adams Prize; University of Chicago scholarship)
Humboldt State University, A.B., English 1976 (summa cum laude, President's Scholar)
University of Sheffield, England (1975-1976)
University of the Witwatersrand, South Africa (1977) (independent research)

**BOOKS, ARTICLES, CHAPTERS AND SPEECHES**

Author of numerous books and articles on taxation in legal, accounting and business publications. Frequent speaker on tax subjects at conferences. **List of books, articles and speeches available on request.**

**HONORS AND AWARDS**

V. Judson Klein Award, 2006, California State Bar, Taxation Section.
Named "Best of Class" for tax lawyers by Best of the U.S., a rating service.
Featured in BNA's 2006 Authorities Calendar.
Elected to *The Best Lawyers in America*, 2006 Ed, by Woodward/White, Inc.
Named a Super Lawyer by *Law and Politics* and *San Francisco Magazine*.
Named by *Forbes Magazine* to America's Best Lawyers.
AV-Rated by Martindale-Hubbell.
Elected to more than a dozen biographical publications, including Who's Who in America, Who's Who in American Law, Who's Who in California, Who's Who in the World, and Who's Who in the West.
Ranked in the top half dozen tax lawyers in the country by United States Lawyer Rankings.
Distinguished Leadership Award, American Biographical Institute.

**REFERENCES**

Client references and professional references available on request.

## Exhibit A-2

### ROBERT W. WOOD
### BOOKS

*Legal Guide to Independent Contractor Status* (Tax Institute 4th Ed. 2007)
*Taxation of Damage Awards and Settlement Payments* (Tax Institute 3d Ed. 2005) (with 2006 and 2007 Updates)
*Tax Aspects of Settlements and Judgments*, 552-3rd T.M. (BNA 2007)
Consulting Editor, *Fee Agreement Forms Manual* (CEB 2d Ed. 2007)
*Home Office, Vacation Home, and Home Rental Deductions* (Tax Management 2005), BNA Tax Management Portfolio 547-2d
*Legal Guide to Independent Contractor Status* (Aspen 3d Ed. 2000) (with 2006 Supplement)
Editor, *Limited Liability Companies: Formation, Operation and Conversion* (Aspen Publishers 2d Ed. 2001) (with 2005 Supplement)
Editorial Consultant, *California Small Business Guide, Volumes 1-4* (Matthew Bender 1998) (with 2005 supplement)
*Taxation of Damage Awards and Settlement Payments* (Tax Institute 2d Ed. 1998)
Editor, *Limited Liability Partnerships: Formation, Operation, and Taxation* (Aspen Law & Business 1997) (with 2005 Supplement)
Co-Author and Editor, *Legal Guide to Independent Contractor Status* (Aspen Law & Business 2d Ed. 1996) (2 volumes)
*Taxation of Corporate Liquidations* (WG&L 2d Ed. 1994)
*Corporate Liquidations: Federal and California*, with Kathleen K. Wright (California CPA Society 1994)
*Corporate Formation* (RIA Tax Advisors Planning Series 1994, 1996)
*Corporations: Complete Tax Practice and Planning Guide* (Professional Tax & Business Publications, Inc. 1994) (with 2002 Update)
Editor, *Limited Liability Companies: Formation, Operation and Conversion* (Aspen Law & Business 1993) (with 1999 Supplement)
Editor, *Legal Guide to Independent Contractor Status, State by State Legal Guide* (John Wiley & Sons 1993)
*Corporate Taxation: Selected Topics* (Tax Institute 1993)
*Tax Aspects of Settlements and Judgments*, 552 T.M. (BNA 1993)
*Bankruptcy and Insolvency: Tax Planning Strategies* (California CPA Society 1992)
*The Home Office Tax Guide* (Tax Institute 1992) (with 2004 Supplement)
*Home Office Money and Tax Guide* (Probus 1992)
*Legal Guide to Independent Contractor Status* (John Wiley & Sons 1992)
*Tax Strategies in Hiring, Retaining and Terminating Employees* (John Wiley & Sons 1991)
*A Guide to Tax Issues in Bankruptcy and Insolvency* (Faulkner & Gray 1991)
*Taxation of Damage Awards and Settlement Payments* (Tax Institute 1991)
*The Ultimate Tax Planning Guide for Growing Companies* (Business One Irwin 1991)
*S Corporations* (WG&L 1990, 1997)
*Corporation Taxation: Complete Planning and Practice Guide* (Maxwell MacMillan 1989)
*The Executive's Complete Guide to Business Taxes* (Dow Jones-Irwin 1989)
Editor, *California Closely Held Corporations: Tax Planning and Practice Guide*, Volumes 1-3 (Matthew Bender 1987)
*Taxation of Corporate Liquidations: A Complete Planning Guide* (Prentice Hall 1987)
*Corporate Liquidations: Transitional Relief and Beyond* (Prentice Hall 1988).
*Tax Aspects of Settlements, Judgments, Antitrust Payments and Recoveries*, 121-5th T.M. Part I (BNA 1986)

### BOOK CHAPTERS AND MONOGRAPHS

*Tax Aspects*, Chapter 7, in California Attorney's Guide to Damages, Second Edition, (CEB 2006), p. 409.
*Personal Residences*, Chapter 9, in Federal Taxes Affecting Real Estate (Matthew Bender 1995) (revised 1999).
*Current Trends and Transactions*, in Tax Strategies for Corporate Acquisitions, Dispositions, Spin-offs, Joint Ventures, Financings, Reorganizations and Restructurings 1995, Vol. 8, pp. 585-656 (PLI 1995).
*Original Issue Discount*, Chapter K:13, in CCH Federal Tax Service (Commerce Clearing House 1995).
*Recent Trends and Transactions*, in Tax Strategies for Corporate Acquisitions, Dispositions, Spin-offs, Joint Ventures and Other Strategic Alliances, Financings, Reorganizations, and Restructurings 1994, Vol. 7, pp. 597-624 (PLI 1994).
*Drafting Employment Contracts*, in Employment Law Forms Disk Library (John Wiley & Sons 1993).

*Current Trends and Transactions*, in Tax Strategies for Corporate Acquisitions, Dispositions, Spin-offs, Joint Ventures and Other Strategic Alliances, Financings, Reorganizations and Restructurings 1993, Volume 6, pp. 523-582 (PLI 1993).

*Taxation of Litigation Recoveries*, Vol. 47, Am Jur Trials 591 (1993).

*Getting Out of a Business or Practice*, Chapter 4, Personal Tax Planning for Professionals and Owners of Small Businesses, 1993 Supp. (CEB 1993).

*Recent Trends and Transactions*, in Tax Strategies for Corporate Acquisitions, Dispositions, Financings, Joint Ventures, Reorganizations, and Restructurings 1992, Vol. 5, pp 87-116 (PLI 1992).

*Choosing the Form in Which to Do Business*, with Jerold A. Friedland, in California Partnerships & Proprietorships (Matthew Bender 1992).

*Recent Trends and Transactions*, in Tax Strategies for Corporate Acquisitions, Dispositions, Financings, Joint Ventures, Reorganizations and Restructuring 1991, Vol. 4, pp. 251-281 (PLI 1991).

*Corporate Liquidations: Transitional Relief and Beyond* (Prentice Hall Pamphlet 1988).

*Other Exempt Organizations*, Chapter J:3, Bender's Federal Tax Service (Matthew Bender 1989).

*Original Issue Discount*, Chapter K:13, Bender's Federal Tax Service (Matthew Bender 1989).

*Getting Out of a Business or Practice*, Chapter 4, Personal Tax Planning for Professionals and Owners of Small Businesses, 1985 Supp. (CEB 1985).

## Exhibit A-3

**ROBERT W. WOOD**
**ARTICLES AND NEWSLETTERS**

### A. TAXATION OF SETTLEMENTS AND JUDGMENTS AND RELATED TOPICS

*Audits Mandatory for Some Settlement Payments, Profile Raised for Others*, August-September 2007 Issue, Journal of Tax Practice and Procedure (September 4, 2007), p. 47.
*Tax Stories Can Be Ribald - Who Knew?*, Vol. 116, No. 10, Tax Notes (September 3, 2007), p. 899.
*Thoughts on 'Thinking Outside the Code'*, Vol. 116, No. 9, Tax Notes (August 27, 2007), p. 803.
*Damages for Tax Consequences,* Vol. 116, No. 6, Tax Notes (August 6, 2007), p. 475.
*Audit Crackdown on Deductibility of Government Settlements,* Vol. 116, No. 5, Tax Notes (July 30, 2007), p. 371.
*Waiting to Exhale: Murphy Part Deux and Taxing Damage Awards,* Vol. 116, No. 4, Tax Notes (July 23, 2007), p. 265.
*Litigation Settlements and Income in Respect of a Decedent*, Vol. 116, No. 1, Tax Notes (July 2, 2007), p. 51.
*Taxing Matters in Settling Cases*, Vol. 27, No. 6, California Lawyer (June 2007), p. 41.
*Hidden Taxes in Options Backdating Probe*, Vol. 16, No. 2, California Tax Lawyer (Spring 2007), p. 22.
*Number Crunching and Qualified Small-Business Stock Gains*, Vol. 115, No. 4, Tax Notes (April 23, 2007), p. 343.
*What's Really Important in* Murphy, Vol. 115, No. 4, Tax Notes (April 23, 2007), p. 397.
*Tax Effects of the Stock Options Backdating Flap*, Vol. 115, No. 2, Tax Notes (April 9, 2007), p. 137.
*Structured Settlements: Are Factoring and Commuting Different?* Vol. 38, No. 4, The Tax Adviser (April 2007), p. 204.
*Structured Installment Sales as a Backup to §1031 Exchange*, Vol. 48, No. 6, BNA Tax Management Memorandum (March 19, 2007), p. 91.
*Defer Tax and Be Safer with A Structured Sale*, Vol. 27, No. 3, Tax Hotline (March 2007), p. 9.
*Tax Treatment of Legal Malpractice Recoveries*, Vol. 114, No. 6, Tax Notes (February 12, 2007), p. 665.
*Wood on the Private Annuity Regs And Structured Attorney Fees*, Vol. 114, No. 5, Tax Notes (February 5, 2007), p. 577.
*When High-Priced Celebrity Lawyers Are Tax Deductible*, Vol. 79, No. 2, New York State Bar Association Journal (February 2007), p. 10.
*Tax Opinions and Nonopinions: How Far Does Liability Go?* Vol. 114, No. 4, Tax Notes (January 29, 2007), p. 427.
*More on Interest in Tax Malpractice Cases*, Vol. 114, No. 2, Tax Notes (January 15, 2007), p. 247.
*Consider Who Gets Tax Deduction For Settlement Payments*, Vol. 16, No. 1, California Tax Lawyer (Winter 2007), p. 9.
*Structured Settlements: Factor vs. Commute?*, Vol. 113, No. 13, Tax Notes (December 25, 2006), p. 1147.
*The Federal Income Taxation of Contingent Attorneys' Fees: Patchwork by Congress and Supreme Court Creates Uncertainty*, The Monthly Digest of Tax Articles (December 2006), p. 10.
*Big Board Payback*, Vol. 113, No. 9, Tax Notes (November 27, 2006), p. 836.
Murphy: *It's Not Just About Basis*, Vol. 113, No. 8, Tax Notes (November 20, 2006), p. 789.
*Opt-In, Opt-Out Hopscotch Over Taxes in Class Actions*, Vol. 113, No. 7, Tax Notes (November 13, 2006), p. 654.
*Structuring Attorney Fees When You're Not a Solo*, Vol. 42, Issue 12, TRIAL (November 2006), p. 62.
*Wood Looks at the Flip Side of Murphy v. IRS*, Vol. 113, No. 2, Tax Notes (October 9, 2006), p. 188.
*Tax Practitioner Wood Offers Top 10 Reasons Why His Favorite Case Is D.C. Circuit's Murphy*, Vol. 27, No. 13, Employment Discrimination Report (October 4, 2006), p. 413; abstracted from: *Top 10 Reasons Murphy Is My Favorite Tax Case*, No. 190, Daily Tax Report (October 2, 2006), p. J-1.
*Top 10 Reasons Murphy Is My Favorite Tax Case*, No. 190, Daily Tax Report (October 2, 2006), p. J-1.
*'It's Deductible': Sharp Pencils And Boeing's Imbroglio*, Vol. 112, No. 12, Tax Notes (September 18, 2006), p. 1053.
*Final Regs Fuel Fuss Over Attorney Fee Reporting*, Vol. 112, No. 11, Tax Notes (September 11, 2006), p. 929.
*Tax-Free Damages:* Murphy's *Law Opens Floodgates*, Vol. 112, No. 10, Tax Notes (September 4, 2006), p. 850.
*What's Deductible? Case Law Provides Guidance for Celebrities Looking to Deduct Legal Fees*, California CPA (September 2006), p. 15.
*New Regulations Address 1099s for Lawyers' Fees*, Vol. 8, No. 4, Journal of Tax Practice & Procedure (August/September 2006), p. 31.
*Omnipresent* Seinfeld *Episodes Contain Ample Clues About Tax Policy*, No. 152, BNA Daily Tax Report (August 8, 2006), p. J-1.
*The Advantages of Selling Appreciated Assets via a Structured Sale*, Vol. 37, No. 8, The Tax Adviser (August 2006), p. 472.
*Structuring Attorney Fees When You're Not a Solo*, Vol. 78, No. 6, New York State Bar Association Journal (July/August 2006), p. 44.
*Identity of Payer Problems With Settlements*, Vol. 112, No. 3, Tax Notes (July 17, 2006), p. 255.

*What's Excludable? Despite Amendment, IRC Sec. 104 Leaves Some Questions Unanswered*, California CPA (July 2006), p. 31.
*Damage Awards: Sickness, Causation, and More*, Vol. 111, No. 11, Tax Notes (June 12, 2006), p. 1233.
*When You Are Not a Solo, Should You be Concerned About Structuring Fees?*, Vol. 28, No. 3, California Civil Litigation Reporter (June 2006), p. 114.
*Taxing Punitives*, Law Finance Group (http://www.lawfinance.com/taxing.html).
*No Free Lunch: When Someone Pays Your Legal Fees*, Tax Notes (May 22, 2006), p. 909.
*Rulings Make Qualified Settlement Funds More Attractive*, Tax Notes (May 8, 2006), p. 673.
*The GWE, a (Not So New) Tax Exclusion Worth a Look*, with Richard C. Morris, Vol. 37, No. 5, The Tax Adviser (May 2006), p. 286.
*Paying the Piper: Executives and Legal Fees*, The Monthly Digest of Tax Articles (May 2006), p. 56.
*Stars And Their Legal Fees: Another Red Carpet?* Vol. 15, No. 2, California Tax Lawyer (Spring 2006), p. 36.
*Legal Fee Structures, Law Firms, And Lawyers: Children of Childs?*, Vol. 111, No. 2, Tax Notes (April 10, 2006), p. 173.
*Denying Deductions Based on Public Policy*, Vol. 110, No. 12, Tax Notes (March 27, 2006), p. 1415.
*Contingent Attorney Fees in The Post-Banks Era*, Vol. 110, No. 5, Tax Notes (February 6, 2006), p. 663.
*Structuring Attorneys' Fees: What's All the Fuss?*, Vol. 60, No. 2, Washington State Bar News (February 2006), p. 23.
*Recent Damage Awards Decisions*, The Monthly Digest of Tax Articles (February 2006), p. 55.
*Wood Responds to Daley on Attorney Fee Puzzles*, Vol. 110, No. 3, Tax Notes (January 23, 2006), p. 413.
*Tax Deductions for Damage Payments: What, Me Worry?*, Vol. 110, No. 2, Tax Notes (January 16, 2006), p. 243.
*The Federal Income Taxation of Contingent Attorneys' Fees: Patchwork by Congress and Supreme Court Creates Uncertainty*, Vol. 67, No. 1, Montana Law Review (Winter 2006), p. 1.
*Substitution of Installment Obligors*, with Stuart Vogt, Vol.15, No.1, California Tax Lawyer (Winter 2006), p.19.
*General Welfare Exclusion Can Mean Tax-Free Money*, with Richard C. Morris, Vol.15, No. 1, California Tax Lawyer (Winter 2006), p.31.
*Follow-Up to Article on Settling Suits with Charitable Payments*, Vol. 109, No. 10, Tax Notes (December 5, 2005), p. 1370.
*Discovering (or Revisiting) the General Welfare Exception from Gross Income*, Taxes–The Tax Magazine (December 2005), p. 39.
*Taxation of Contingent Attorneys' Fees Altered by the Jobs Act and the Supreme Court*, Chapter 4, Vol. 1, Fifty-Seventh Annual Tax Institute, USC Law School 2005 Tax Institute.
*Discharging Debt, Settling Litigation, and Singing the Blues*, Vol. 109, No. 8, Tax Notes (November 21, 2005), p. 1041.
*Assigning Pending Litigation: Tax Savings or Tax Disaster*, Vol. 109, No. 7, Tax Notes (November 14, 2005), p. 910.
*Litigation Settlements, Sales and Exchanges, and Section 1234A*, Vol. 109, No. 6, Tax Notes (November 7, 2005), p. 776.
*Better to Give Than Receive? Tax Effects of Returning Compensation*, Taxes–The Tax Magazine (November 2005), p. 25.
*IRC Section 1234A Could Impact Taxation of Litigation Settlements*, No. 209, Daily Tax Report (October 31, 2005), p. J-1.
*Resolving Litigation by Payments to Charity*, Vol. 109, No. 5, Tax Notes (October 31, 2005), p. 633.
*The General Welfare Exception to Gross Income*, Tax Notes (October 4, 2005), p. 1129.
*Should Taxes Be Included in Damage Calculations?* Vol. 36, No. 10, The Tax Adviser (October 2005), p. 614.
*Stakes Loom Large in Determining Taxation of Investment Loss Lawsuit Recoveries*," No. 171, BNA Daily Tax Report (September 6, 2005), p. J-1.
*Recent Damage Awards Decisions*, Vol. 108, No. 11, Tax Notes (September 5, 2005), p. 1129.
*Paying the Piper: Executives and Legal Fees*, Vol. 108, No. 9, Tax Notes (August 22, 2005), p. 901.
*Securities Lawsuit Recoveries: Capital Gain or Ordinary Income?*, Vol. 108, No. 8, Tax Notes (August 15, 2005), p. 767.
*More on Attorney Fees Post*-Banks, Vol. 108, No. 7, Tax Notes (August 8, 2005), p. 707.
*Tax Issues with Environmental Expenditures*, Vol. 46, No. 16, Tax Management Memorandum (August 8, 2005), p. 323.
*Structuring Attorney Fees: Kingdom of Heaven?*, Vol. 108, No. 6, Tax Notes (August 1, 2005), p. 539.
*Will the IRS Pursue Attorney Fees Post*-Banks*?*, Vol. 108, No. 4, Tax Notes (July 18, 2005), p. 319.
*Breathing Life Into Installment Sales*, Vol. 108, No. 3, Tax Notes (July 11, 2005), p. 201.
*Insurance Industry Settlements Revive Old Questions: When Is a Payment a Nondeductible Penalty?*, Vol. 103, No. 1, Journal of Taxation (July 2005), p. 47.
*Substitution of Installment Obligors*, with Stuart Vogt, Vol. 107, No. 13, Tax Notes (June 27, 2005), p. 1621.
*Ulcers and the Physical Injury/Physical Sickness Exclusion*, Vol. 107, No. 12, Tax Notes (June 20, 2005), p. 1529.
*An Ulcer Does Not Provide For Exclusion From Income*, Los Angeles Daily Journal (June 3, 2005), p. 7.
*Contingent Fees in Anti-Discrimination Cases*, Vol. 28, No. 3, Wyoming Lawyer (June 2005), p. 10.
*Deducting Legal Fees for Governmental Corporate Investigations*, The Tax Adviser (June 2005), p. 341.
*Boomerang Bonuses: Tax Effects When You Get It But Give It Back*, with Richard C. Morris, Vol. 107, No. 5, Tax Notes (May 2, 2005), p. 591.
*Lawsuit Plaintiffs Can Lose Big Even When They Win Big*, Vol. 25, No. 5, Tax Hotline (May 2005), p. 1.

*Attorneys' Fees Continue to Raise Tax Issues*, Vol. 14, No. 2, California Tax Lawyer (Spring 2005), p. 17.
*Tax Treatment of Class Action Attorneys' Fees: After* Banks, J. of Tax Practice & Procedure (April - May 2005), p. 25.
*The Case for Excluding Discrimination, Harassment Recoveries Under Section 104*, No. 78, Daily Tax Reporter (April 25, 2005), p. J-1.
*Contingent Fees and Tax Burdens: Planning After* Commissioner v. Banks, Vol. 27, No. 2, Civil Litigation Reporter (April 2005), p. 52.
*Tax Consequences of Personal Injury Damages–What Employers Need to Know*, Vol. 6, No. 7, Corporate Business Taxation Monthly (April 2005), p. 13.
*Optimizing Tax Treatment on Interest: More Practical Advice,* Vol. 106, No. 12, Tax Notes (March 21, 2005), p. 1466.
*Structured Settlements & Factoring: Never the Twain Shall Meet?*, Vol. 106, No. 11, Tax Notes (March 14, 2005), p. 1278.
*On Second Thought, More Disagreement With Jensen*, Vol. 106, No. 10, Tax Notes (March 7, 2005), p. 1219.
*Tax Aspects of Settling Corporate Lawsuits*, Vol. 6, No. 6, Corporate Business Taxation Monthly (March 2005), p. 26.
*Defendants Should Worry About Nondeductible Settlements*, Vol. 106, No. 9, Tax Notes (February 28, 2005), p. 1064.
*Supreme Court Attorney Fees Decision Leaves Much Unresolved*, Vol. 106, No. 7, Tax Notes (February 14, 2005), p. 792.
*Physical Sickness and The Section 104 Exclusion*, Vol. 106, No. 1, Tax Notes (January 3, 2005), p. 121.
*Structured Settlements and Nonqualified Assignments*, The Tax Adviser (January 2005), p. 26.
*Jobs Act Gives Partial Fix to Double Tax on Attorneys' Fees*, Issue 37, The Witness Chair (Winter 2005), p. 1.
*Effective Date of Attorney Fee Deduction Misses Many Judgments*, Vol. 105, No. 13, Tax Notes (December 20, 2004), p. 1643.
*Washington Attorneys' Lien Law*, The Tax Adviser (December 2004), p. 729
*What Happens When Companies Pay Executives' Legal Fees?*, Vol. 23, No. 48, TM Weekly Report (November 29, 2004), p. 1.
*Jobs Act Attorney Fee Provision: Is It Enough?*, Vol. 105, No. 8, Tax Notes (November 15, 2004), p. 961.
*Attorney Fees: The* Amici *Believe the Taxpayer is Correct*, Vol. 105, No. 6, Tax Notes (November 1, 2004), p. 760.
*Taxation of Legal Fees When Paid By A Corporation For An Employee*, Vol. 13, No. 4, California Tax Lawyer (Fall 2004), p. 29.
*Attorney Fees and Partnership Theory: Another View*, Vol. 105, No. 2, Tax Notes (October 11, 2004), p. 250.
*Post-1996 Act Section 104 Cases: Where Are We Eight Years Later?* Vol. 105, No. 1, Tax Notes (October 4, 2004), p. 68.
*New Uses for Structured Settlements: Non-Physical Injury Cases?* Vol. 27, Wyoming Lawyer (October 2004), p. 18.
*Settlements and Judgments: Attorney Fees and Section 104 Cases*, Vol. 104, No. 7, Tax Notes (August 16, 2004), p. 733.
*Structured Settlements in Non-Physical Injury Cases: Tax Risks?*, Vol. 104, No. 5, Tax Notes (August 2, 2004), p. 511.
*Were Sex Abuse Payments for Physical Injuries or Sickness?*, Vol. 104, No. 1, Tax Notes (July 5, 2004), p. 56.
*Class Actions and the Attorneys' Fees Conundrum*, with Dominic L. Daher, The Tax Adviser (July 2004), p. 428.
*Tax Horrors Of Sexual Molestation Recoveries*, Vol. 13, No. 3, California Tax Lawyer (Summer 2004), p. 13.
*Structured Settlements Plus Nonqualified Assignments – Expanding the Field of Structures*, Vol. 6, No. 3, J. of Tax Practice and Procedure (June-July 2004), p. 29.
*Hyperbolic Viewpoint on Attorney Fee Cases Proves Too Much*, Vol. 103, No. 13, Tax Notes (June 28, 2004), p. 1675.
*Settlements & Taxes: The Seven Deadly Sins*, Vol. 27, No. 3, Wyoming Lawyer (June 2004), p. 32.
*Tax Treatment of Settlements and Judgments*, Vol. 103, No. 9, Tax Notes (May 31, 2004), p. 1134; abstracted in Vol. 4, No. 21, Tax Law Abstracts: Practitioners Services (May 28, 2004, pub. by LSN Tax Law & Policy Journals).
*Income from the Assignment of Non-Qualified Settlement Payments*, California Tax Delegation to Washington DC (Internal Revenue Service, Senate Finance Committee and U.S. Treasury Department), published in Tax Analysts (May 10, 2004), Doc. 2004-10021; 2004 TNT 111-29.
*Another Bite at the Apple? Ninth Circuit Takes Another Look at the Attorneys' Fee Fiasco and Changes Its Tune*, with Dominic L. Daher, Vol. 6, No. 2, Tax Practice & Procedure (April-May 2004), p. 45.
*Second Circuit Further Muddies The Water On The Attorneys' Fee Mess*, Vol. 13, No. 2, California Tax Lawyer (Spring 2004), p. 5.
*Using Non-Physical Injury Structured Settlements – Any Tax Risks?*, Vol. 13, No. 2, California Tax Lawyer (Spring 2004), p. 19.
*When Clients Must Report Fee Payments*, Vol. 24, No. 4, California Lawyer (April 2004), p. 41.
*Everybody Loves* Raymond*? Second Cir. Weighs In on Att'y Fees*, Vol. 102, No. 13, Tax Notes (March 29, 2004), p. 1639.
*Second Circuit Perpetuates the Attorneys' Fee Snafu*, Vol. 22, No. 11, BNA's Employment Discrimination Report (March 17, 2004), p. 309.
*Shot Through the Heart: Tax Indemnity Payments to Your Former Better Half*, No. 44, Daily Tax Report (March 8, 2004), p. J-1.
*Taxation of Settlements and Judgments*, Vol. 102, No. 9, Tax Notes (March 1, 2004), p. 1120.

*IRS Audit Guide on Damage Awards Misses the Mark*, with Dominic L. Daher, Vol. 102, No. 8, Tax Notes (February 23, 2004), p. 1013.
*Settlements and Taxes: The Seven Deadly Sins*, Vol. 76, No. 2, New York State Bar Journal (February 2004), p. 52.
*Are Tax Indemnity Payments to an Ex-Spouse Taxable?*, with Dominic L. Daher, The Tax Adviser (February 2004), p. 83.
*Tax Reports on Lawyers' Fees: Sneaky IRS Rules On Forms 1099*, Vol. 28, No. 1, NTLA Advocate (January/February 2004), p. 10.
*Attorneys' Fee Debacle Keeps Going, Going, and Going As Mutinous Sixth Circuit Refuses Reliance on Lien Law Analysis*, with Dominic L. Daher, No. 11, Daily Tax Report (January 20, 2004), p. J-1.
*Attorney Fees: Rebellious Circuit Don't Need No Stinkin' Lien Law*, with Dominic L. Daher, Vol. 101, No. 12, Tax Notes (December 22, 2003), p. 1427.
*IRS' MSSP on Lawsuit Awards, Settlements: Useful as a Gelding at a Stud Farm?*, with Dominic L. Daher, No. 245, Daily Tax Report (December 22, 2003), p. J-1.
*Beating a Dead Horse: Tax Indemnity Payments to Ex-Spouses*, with Dominic L. Daher, Vol. 101, No. 7, Tax Notes (November 17, 2003), p. 875.
*Tax Treatment of Attorney' Fees in Litigation Recoveries – A Proposal Recommending New Legislation and Regulations*, Vol. 12, No. 4, California Tax Lawyer (Fall 2003), p. 16.
*Class Action Attorney Fees: Even Bigger Tax Problems?*, with Dominic L. Daher, Vol. 101, No. 4, Tax Notes (October 27, 2003), p. 507.
*Attorneys' Fees: Maverick Circuit Says, 'Oregon Good, Calif. Bad',* with Dominic L. Daher, Vol. 101, No. 1, Tax Notes (October 6, 2003), p. 91.
*Slip Slidin' Away: The Ninth Circuit Welcomes* Cotnam *Into the Fold?*, with Dominic L. Daher, Vol. 21, No. 13, BNA's Employment Discrimination Report (October 1, 2003), p. 411.
*Contingent Attorney's Fees in Class Action Cases – From Bad to Worse for Taxpayer-Plaintiffs*, with Dominic L. Daher, Vol. 99, No. 4, Journal of Taxation (October 2003), p. 228.
*Tax Effects of Antitrust Payments and Recoveries*, Vol. 12, No. 3, California Tax Lawyer (Summer 2003), p. 18.
*'Civil Rights Tax Relief' Fails: How Do You Spell Relief?*, Vol. 100, No. 3, Tax Notes (July 21, 2003), p. 401.
*Thoughts on the Origin of The Clintons' Legal Fees*, Vol. 100, No. 2, Tax Notes (July 14, 2003), p. 265.
*Proposed Nondeductibility for Punitive Damages: Will It Work?*, Vol. 100, No. 1, Tax Notes (July 7, 2003), p. 99.
*Tax Treatment of Business Litigation Recoveries – Capital Gain vs. Ordinary Income*, Vol. 99, No. 1, Journal of Taxation (July 2003), p. 27.
*Tax Bill Prevents Employers From Deducting Punitive Damages*, Vol. 20, No. 24, BNA's Employment Discrimination Report (June 11, 2003), p. 789.
*Deductibility of Attorneys' Fees: Half a Loaf?*, Vol. 20, No. 22, BNA's Employment Discrimination Report (May 28, 2003), p. 727.
*More Confusion on Tax Treatment of Attorneys' Fees: Whose Law Applies?*, Vol. 20, No. 21, BNA's Employment Discrimination Report (May 21, 2003), p. 701.
*Should the Securities Industry Settlement Be Deductible?*, Vol. 99, No. 1, Tax Notes (April 7, 2003), p. 101.*Lawyers' Fees: Beware Final IRS Rules on Forms 1099 for Attorneys*, Vol. 12, No. 2, California Tax Lawyer (Spring 2003), p. 10.
*Reporting Lawyers' Fees*, Vol. 23, No. 1, California Lawyer (January 2003), p. 17.
*Making Room for the Middleman: New Tax Rules for Attorneys' Fees Go into Effect Jan. 1*, with Jonathan R. Flora, The Recorder (Dec. 4, 2002), p. 4.
*Davenport's Solution for the Attorney's Fee Mess: A Capital Idea*, Vol. 97, No. 7, Tax Notes (Nov. 18, 2002), p. 969.
*Capitalizing Legal Fees in Real Estate Deals*, Vol. 20, No. 9, Real Estate Tax Digest (November 2002), p. 3.
*New (Final!) Form 1099 Reporting Regs: Attorneys' Fee Regs in Drag?*, with Jonathan R. Flora, Vol. 97, No. 2, Tax Notes (Oct. 14, 2002), p. 265.
*Employment Lawyers Face Hidden Final IRS Rules On Form 1099 for Attorney-Related Payments*, with Jonathan R. Flora, Vol. 19, No. 12, BNA's Employment Discrimination Report (Sept. 25, 2002), p. 347.
*Observations on Taxation of Infringement Recoveries*, Vol. 96, No. 9, Tax Notes (August 26, 2002), p. 1273.
*More Attorneys' Fee Cases*, Cal Tax Network (August 2002), p. 8.
*Is A Sale or Exchange Required to Get Capital Gains?*, Cal Tax Network (August 2002), p. 10.
*Resolve Tax Treatment Before Settlement Agreement is Signed*, San Francisco Daily Journal (July 30, 2002), p. 5.
*Proposed Attorney Fee Reporting Regulations: Déjà Vu?*, Vol. 96, No. 3, Tax Notes (July 15, 2002), p. 409.
*Damage Awards Update 5:05*, Tax Analysts Taxation of Damages Discussion Group, July 9, 2002.
*IRS Again Proposes Tax Reporting on Attorneys' Fees*, Vol. 18, No. 24, BNA's Employment Discrimination Report (June 12, 2002), p. 712.
*Damage Awards Update 5:04*, Tax Analysts Taxation of Damages Discussion Group, June 10, 2002.
*Damage Awards Update 5:03*, Tax Analysts Taxation of Damages Discussion Group, April 29, 2002.

*Consider Tax Treatment of Environmental Payments*, Vol. 20, No. 4, The Real Estate Tax Digest (April 2002), p. 3.
*The Step Transaction Doctrine: Beyond the Grasp of Mere Mortals?*, Vol. 94, No. 7, Tax Notes (February 18, 2002), p. 923.
*Exotic Dancers Win Tax Disputes*, Vol. 94, No. 4, Tax Notes (January 28, 2002), p. 498; reprinted in Vol. 11, No. 3, California Tax Lawyer (Spring 2002), p. 13.
*Dirty Taxing*, Vol. 115, No. 7, Los Angeles Daily Journal (January 11, 2002), p. 7.
*Tax Language in Settlement Agreements: Binding or Not?*, Vol. 17, No. 23, BNA's Employment Discrimination Report (December 19, 2001), p. 728; Vol. 93, No. 14, Tax Notes (December 31, 2001), p. 1872.
*Further Thoughts on Tax Treatment of Punitive Damages*, Tax Notes (December 10, 2001), p. 1502.
*Tax Treatment of Will Contest Recoveries*, Tax Notes (November 26, 2001), p. 1198; reprinted in Vol. 11, No. 3, California Tax Lawyer (Spring 2002), p. 17.
*The Continuing Attorneys' Fees Mess*, Tax Notes (November 19, 2001), p. 1115.
*Precise Drafting*, Vol. 114, No. 195, Los Angeles Daily Journal (October 5, 2001), p. 7.
*More Confusion Over 1099s*, Vol. 92, No. 9, Tax Notes (August 27, 2001), p. 1215.
*More Confusion Over IRS Form 1099 Obligations*, Vol. 17, No. 6, BNA's Employment Discrimination Report (August 8, 2001), p. 189.
*Punitive Damages: Can They be Assigned to Avoid Income?*, Vol. 10, No. 4, California Tax Lawyer (Summer 2001), p. 30.
*What Litigation Recoveries are Excludable as "Physical?" IRS Finally Weighs In*, Vol. 10, No. 4, California Tax Lawyer (Summer 2001), p. 33.
*Taxation of Damages Why* Every *Settlement Agreement Should Address Tax Consequences*, Vol. 10, No. 4, California Tax Lawyer (Summer 2001), p. 35.
*Why Every Settlement Agreement Should Address Tax Consequences*, Vol. 31, No. 4, TaxPractice (July 27, 2001), p. 97.
*Use Tax Specific Settlement Agreements: Don't Let Courts Influence Tax Reporting*, Vol. 17, No. 3, BNA's Employment Discrimination Report (July 18, 2001), p. 102.
*Why Settlement Agreements Should Account for Taxes*, Vol. 92, No. 3, Tax Notes (July 16, 2001), p. 405; reprinted in The Monthly Digest of Tax Articles (March 2002), p. 36..
*Food Fight Over Contingent Attorneys' Fees*, Vol. 92, No. 3, Tax Notes (July 16, 2001), p. 434.
*Damage Awards Update 4:04*, Tax Analysts Taxation of Damages Discussion Group, June 13, 2001.
*AMT Critic Wasn't Critical Enough*, Vol. 91, No. 13, Tax Notes (June 11, 2001), p. 1927.
*How Do You Spell R-E-L-I-E-F?*, Vol. 91, No. 10, Tax Notes (May 28, 2001), p. 1631.
*Uncertain Recovery*, Vol. 107, No. 102, San Francisco Daily Journal (May 25, 2001), p. 5; reprinted in Los Angeles Daily Journal (May 25, 2001), p. 7.
*What's Left of the "Physical Injury" Tax Exclusion?*, Issue 22, The Witness Chair (Spring 2001), p. 4.
*IRS Finally Weighs In - What Litigation Recoveries Are Excludable as "Physical"?*, Vol. 17, No. 1, The Employee Advocate (Spring 2001), p. 90.
*Damage Awards Update 4:03*, Tax Analysts Taxation of Damages Discussion Group, April 26, 2001.
*Punitive Damages: Can They Be Assigned to Avoid Income?*, Vol. 16, No. 17, BNA's Employment Discrimination Report (April 25, 2001), p. 607; also published in Vol. 17, No. 1, The Employee Advocate (Spring 2001), p. 101; also published in Vol. 30, No. 6, TaxPractice (May 7, 2001), p. 166; also published in Vol. 91, No. 13, Tax Notes (June 11, 2001), p. 1905.
*Tax Provisions in Settlement Agreements: Breaches and Needless Litigation*, Vol. 29, No. 11, TaxPractice (March 12, 2001), p. 324; also published in Vol. 16, No. 11, BNA's Employment Discrimination Report (March 14, 2001), p. 382.
*Tax Law: Section 104 is Alive and Kicking*, Vol. 21, No. 3, California Lawyer (March 2001), p. 25.
*Tax Issues in Settlement Agreements*, Vol. 26, No. 7, Montana Lawyer (March 2001), p. 28.
*What Litigation Recoveries Are Excludable as "Physical?": IRS Finally Weighs in With Some Guidance in Private Letter Ruling*, Vol. 16, No. 6, BNA's Employment Discrimination Report (February 7, 2001), p. 195; also published in Vol. 29, No. 8, TaxPractice (February 19, 2001), p. 230.
*Exercising Stock Options: What You (and Your Clients) Need to Know Before Joining the Dot-Com World*, GPSolo (January/February 2001), p. 52.
*Damage Awards Update 4:01*, Tax Analysts Taxation of Damages Discussion Group, January 17, 2001.
*Consider Attorney's Fees In Tax Treatment of Settlements*, Vol. 20, No. 3, The Trial Lawyer (Winter 2000), p. 22.
*Tangled Web: New Form 1099 Regulations Affect Attorneys*, San Francisco Daily Journal (December 29, 2000), p. 5, Los Angeles Daily Journal (December 29, 2000), p. 7.
*Damage Awards Update 3:10*, Tax Analysts Taxation of Damages Discussion Group, December 18, 2001.
*New Proposed Form 1099 Regs: Lawyers and Others Take Note*, Vol. 28, No. 11, Tax Practice (December 11, 2000), p. 328.
*Leave Section 83 Out of this Mess*, Vol. 89, No. 9, Tax Notes (November 27, 2000), p. 1187.
*New Proposed Form 1099 Regs: Employment Lawyers and Others Take Note*, Vol. 15, No. 19, BNA's Employment Discrimination Report (November 15, 2000), p. 675.

*Lawsuit Settlements: Tax Issues for Corporate Counsel*, Vol. 15, No. 43, BNA's Corporate Counsel Weekly (November 8, 2000), p. 8.
*Section 104 Viability: Still Alive and Kicking*, Vol. 89, No. 4, Tax Notes (October 23, 2000), p. 524.
*Damage Awards Update 3:09*, Tax Analysts Taxation of Damages Discussion Group, October 14, 2000.
*Why Employment Attorneys Should Address Tax Issues In Settlement Agreements*, Vol. 2000, No. 9, California Employment Law Reporter (September 2000). p. 229.
*Damage Awards Update 3:08*, Tax Analysts Taxation of Damages Discussion Group, August 25, 2000.
*The Energizer Bunny Has Nothing on the Attorneys' Fee Debate*, Vol. 88, No. 8, Tax Notes (August 21, 2000), p. 1059.
*Robert W. Wood Responds*, Vol. 88, No. 7, Tax Notes (August 14, 2000), p. 949.
*Attorneys' Fees: A Few More Observations*, Vol. 88, No. 5, Tax Notes (July 31, 2000), p. 701.
*Even Tax Court Itself Divided on Attorneys' Fees Issue!*, Vol. 88, No. 4, Tax Notes (July 24, 2000), p. 573; reprinted Vol. 27, No. 5, Tax Practice (July 31, 2000), p. 136.
*Damage Awards Update 3:07*, Tax Analysts Taxation of Damages Discussion Group, July 18, 2000.
*Tax-Reporting Regulation Date Delayed*, Vol. 25, No. 10, The Montana Lawyer (June/July 2000), p. 44.
*Tax Treatment of Attorneys' Fees Should Be Addressed in Settlement*, Vol. 68, No. 48, U.S. Law Week (June 20, 2000), p. 2755.
*Damage Awards Update 3:06*, Tax Analysts Taxation of Damages Discussion Group, June 5, 2000.
*More Praise for Lee Sheppard*, Vol. 87, No. 7, Tax Notes (May 15, 2000), p. 1007.
*A Brave New Loophole*, Vol. 5, No. 2, House Counsel (May-June 2000), p. 38.
*Why You Should Address Tax Issues in Settlement Agreements*, Vol. 23, No. 3, The Trial Lawyer: Journal of Strategy, Technique & Case Management (May-June 2000), p. 238.
*Damage Awards Update 3:05*, Tax Analysts Taxation of Damages Discussion Group, May 8, 2000.
*Sometimes Hoary Cases are Better Than None*, Vol. 87, No. 5, Tax Notes (May 1, 2000), p. 711.
*Why Tax Treatment of Attorneys' Fees Should be Addressed in Settlement Agreements*, Vol. 14, No. 16, BNA's Employment Discrimination Report (April 19, 2000), p. 546.
*Don't Ignore Tax Issues in Settlement Agreements*, Vol. 87, No. 3, Tax Notes (April 17, 2000), p. 409.
*Damage Awards Update 3:04*, Tax Analysts Taxation of Damages Discussion Group, April 7, 2000.
*Attorneys Must Report Those Payments*, Vol. 25, No. 7, The Montana Lawyer (March 2000), p. 20.
*Damage Awards Update 3:03*, Tax Analysts Taxation of Damages Discussion Group, February 26, 2000.
*Damage Awards Update 3:02*, Tax Analysts Taxation of Damages Discussion Group, January 21, 2000.
*Litigation Settlements: Are They Ordinary Income or Capital Gain?*, Vol. 86, No. 2, Tax Notes (January 10, 2000), p. 277.
*Damage Awards Update 3:01*, Tax Analysts Taxation of Damages Discussion Group, January 7, 2000.
*Reporting Payments to Lawyers*, Vol. 20, No. 1, California Lawyer (January 2000), p. 67.
*Tax Treatment of Litigation Settlement Payments*, Proceedings of the National CLE Conference on Taxation Law (Law Education Institute 2000).
*Damage Awards Update 2:13*, Tax Analysts Taxation of Damages Discussion Group, November 11, 1999.
*Damage Awards Update 2:12*, Tax Analysts Taxation of Damages Discussion Group, October 20, 1999.
*Damage Awards Update 2:11*, Tax Analysts Taxation of Damages Discussion Group, September 28, 1999.
*Damage Awards Update 2:10*, Tax Analysts Taxation of Damages Discussion Group, September 14, 1999.
*More Thoughts on Taxation of Commercial Litigation Income*, Tax Notes (August 16, 1999), p. 1100.
*Damage Awards Update 2:9*, Tax Analysts Taxation of Damages Discussion Group, August 5, 1999
*Taxing Punitives*, Vol. 4, No. 3, House Counsel (Summer 1999), p. 38.
*Payments to Attorneys Subject of Proposed Reporting Regulations*, Vol. 13, No. 2, BNA's Employment Discrimination Report, July 14, 1999, p. 76.
*Damage Awards Update 2:8*, Tax Analysts Taxation of Damages Discussion Group, July 13, 1999
*Damage Awards Update 2:7*, Tax Analysts Taxation of Damages Discussion Group, June 21, 1999
*Damage Awards Update 2:6*, Tax Analysts Taxation of Damages Discussion Group, May 31, 1999.
*Damage Awards Update 2:5*, Tax Analysts Taxation of Damages Discussion Group, May 12, 1999.
*Damage Awards Update 2:4*, Tax Analysts Taxation of Damages Discussion Group, April 20, 1999.
*Settling Employers: Do You Withhold or Not?*, Vol. 82, No. 13, Tax Notes (March 29, 1999), p. 2001.
*Damage Awards Update 2:3*, Tax Analysts Taxation of Damages Discussion Group, March 11, 1999.
*Damage Awards Update 2:2*, Tax Analysts Taxation of Damages Discussion Group, February 12, 1999.
*Should Prejudgment Interest Be Taxable?*, Vol. 82, No. 5, Tax Notes (Feb. 1, 1999), p. 719.
*Withholding on Awards and Settlements Redux*, Vol. 82, No. 3, Tax Notes (Jan. 18, 1999), p. 381
*Damage Awards Update 2:1,* Tax Analysts Taxation of Damages Discussion Group, January 7, 1999.
*Scope of Personal Injury Tax Exclusion Still Clouded*, Vol. 81, No. 13, Tax Notes (Dec. 28, 1998), p. 1675; reprinted in Tax Practice (Jan. 4, 1999), p. 12.

*Scope of Personal Injury Tax Exclusion Still Clouded*, Vol. 11, No. 24, BNA's Employment Discrimination Report (Dec. 23, 1998), p. 857.
*Musings on Reporting and Withholding*, Vol. 81, No. 12, Tax Notes (Dec. 21, 1998), p. 1575.
*Damage Awards Update 98-17,* Tax Analysts Taxation of Damages Discussion Group, December 18, 1998.
*Problems Caused by the AMT: One Example*, Vol. 81, No. 11, Tax Notes (Dec. 14, 1998). p. 1437.
*Damage Awards Update 98-16*, Tax Analysts Taxation of Damages Discussion Group, December 1, 1998.
*The Plight of the Plaintiff: The Tax Treatment of Legal Fees*, Vol. 81, No. 7, Tax Notes (Nov. 16, 1998), p. 907.
*Settling Employers: Do You Withhold or Not?*, Vol. 11, No. 18, BNA's Employment Discrimination Report (Nov. 4, 1998), p. 635.
*Damage Awards Update 98-15*, Tax Analysts Taxation of Damages Discussion Group, October 28, 1998.
*Damage Awards Update 98-14*, Tax Analysts Taxation of Damages Discussion Group, October 14, 1998.
*Interesting Questions in Tax Treatment of Settlements and Judgments*, Vol. 11, No. 14, BNA's Employment Discrimination Report (Oct. 7, 1998), p. 493.
*Damage Awards Update 98-13*, Tax Analysts Taxation of Damages Discussion Group, September 2, 1998.
*ERISA Settlement Held Taxable: Is There Any Room Left?*, Vol. 11, No. 9, BNA's Employment Discrimination Report (Aug. 26, 1998), p. 312.
*Damage Awards Update 98-12*, Tax Analysts Taxation of Damages Discussion Group, August 5, 1998.
*Damage Awards Update 98-11*, Tax Analysts Taxation of Damages Discussion Group, July 17, 1998.
*Damage Awards Update 98-10*, Tax Analysts Taxation of Damages Discussion Group, June 3, 1998.
*Damage Awards Update 98-9*, Tax Analysts Taxation of Damages Discussion Group, May 20, 1998.
*Damage Awards Update 98-8*, Tax Analysts Taxation of Damages Discussion Group, April 29, 1998.
*Damage Awards Update 98-9*, Tax Analysts Taxation of Damages Discussion Group, April 16, 1998.
*Damage Awards Update 98-8*, Tax Analysts Taxation of Damages Discussion Group, March 24, 1998
*The Taxing Matter of Bill's Legal Bills*, Vol. 78, No. 12, Tax Notes, March 23, 1998, p. 1567.
*Kudos for Tax Analysts*, Vol. 78, No. 10, Tax Notes (March 9, 1998), p. 1329.
*Damage Awards Update 98-7*, Tax Analysts Taxation of Damages Discussion Group, March 5, 1998.
*Watch Out Assigning Assets in Divorce*, Vol. 78, No. 9, Tax Notes (March 2, 1998), p. 1185.
*Damage Awards Update 98-4*, Tax Analysts Taxation of Damages Discussion Group, February 18, 1998.
*Damage Awards Update 98-3*, Tax Analysts Taxation of Damages Discussion Group, February 4, 1998.
*Damage Awards Update 98-2*, Tax Analysts Taxation of Damages Discussion Group, January 21, 1998.
*Damage Awards Update 98-1*, Tax Analysts Taxation of Damages Discussion Group, January 7, 1998.
*IRC Section 104 Cases, Other Settlement Issues, Continue to Merit Practitioners' Attention*, Vol. 9, No. 24, BNA's Employment Discrimination Report (Dec. 24, 1997), p. 844.
*Sheppard Article Interests This Practitioner*, Vol. 77, No. 12, Tax Notes (December 22, 1997), p. 1411.
*Damage Awards Update 97-11*, Tax Analysts Taxation of Damages Discussion Group, December 5, 1997.
*Section 104 Cases Continue to Merit Attention*, Tax Notes (November 24, 1997), p. 983.
*Damage Awards Update 97-10*, Tax Analysts Taxation of Damages Discussion Group, November 19, 1997.
*Damage Awards Update 97-9,* Tax Analysts Taxation of Damages Discussion Group, August 4, 1997.
*Confusion High Over Tax Issues Surrounding Employment Recoveries*, Vol. 5, No. 4, Employment Law Strategist (August 1997), p. 1.
*Salt and Twitty Burgers Don't Make a Digestable Argument*, Tax Notes (July 28, 1997), p. 555.
*Damage Awards Update 97-8*, Tax Analysts Taxation of Damages Discussion Group, July 1, 1997.
*Damage Awards Update 97-7*, Tax Analysts Taxation of Damages Discussion Group, June 3, 1997.
*Damage Awards Update 97-6*, Tax Analysts Taxation of Damages Discussion Group, May 6, 1997.
*Make Certain to Address Tax Issues in Settlement Agreements*, BNA's Employment Discrimination Report (April 9, 1997), p. 501.
*Navigating the Tax Maze of Workplace Winnings*, Vol. 74, No. 12, Tax Notes (March 24, 1997), p. 1605; reprinted in Vol. 23, No. 3, San Francisco Attorney (June/July 1997), p. 36.
*Damage Awards Update 97-5*, Tax Analysts Taxation of Damages Discussion Group, March 25, 1997.
*Damage Awards Update 97-4*, Tax Analysts Taxation of Damages Discussion Group, March 13, 1997.
*Interest Characterization in Settlement Agreements*, Vol. 74, No. 10, Tax Notes (March 10, 1997), p. 1337.
*Congress Limits Tax-Free Settlements*, California Lawyer (March 1997), p. 35.
*Will Courts Import Punitive Characterization*, Vol. 74, No. 9, Tax Notes (March 3, 1997), p. 1200.
*Damage Awards Update 97-3*, Tax Analysts Taxation of Damages Discussion Group, February 18, 1997.
*Navigating the Tax Maze of Workplace Recoveries*, BNA's Employment Discrimination Report (February 12, 1997), p. 215, reprinted in Vol. 46, The Employee Advocate (Winter 1997), p. 17.
*Damage Awards Update 97-2*, Tax Analysts Taxation of Damages Discussion Group, January 28, 1997.

*What Is Punitive?*, The Recorder, January 15, 1997, p. 5.

*Damage Awards Update 97-1*, Tax Analysts Taxation of Damages Discussion Group, January 10, 1997.

*Are Employment Settlements Subject to Employment Taxes?*, Vol. 8, No. 1, BNA's Employment Discrimination Report (January 1, 1997), p. 27, reprinted in Vol. 46, The Employee Advocate (Winter 1997), p. 13.

*Supreme Court Says Punitive Damages are Taxable Once and For All: But Just What is Punitive?*, Vol. 7, No. 23, BNA's Employment Discrimination Report (December 18, 1996), p. 763, reprinted in Vol. 46, The Employee Advocate (Winter 1997), p. 11.

*Damage Awards Update 96-6*, Tax Analysts Taxation of Damages Discussion Group, December 13, 1996.

*Damage Awards Update 96-5*, Tax Analysts Taxation of Damages Discussion Group, November 5, 1996.

*New Law Radically Changes Tax Rules in Employment Litigation*, State Bar of California Legal Specialization Digest, Fall 1996, p. 9.

*High Stakes in Damages Case*, The Recorder, October 7, 1996, p. 1.

*Damage Awards Update 96-4*, Tax Analysts Taxation of Damages Discussion Group, October 1, 1996.

*Taxing Recovery*, The Recorder, September 25, 1996, p. 5.

*Damage Awards Update 96-3*, Tax Analysts Taxation of Damages Discussion Group, August 26, 1996.

*New Federal Law Radically Changes Tax Rules in Employment Litigation*, Vol. 7, No. 8, BNA's Employment Discrimination Report (August 21, 1996), p. 253.

*Damage Awards Update 96-2*, Tax Analysts Taxation of Damages Discussion Group, August 12, 1996.

*New Law Radically Changes Tax Rules in Employment Litigation*, Vol. 72, No. 8, Tax Notes (August 19, 1996), p. 1045, reprinted in The Employee Advocate, Vol. 44 (Summer 1996), p. 81.

*Consider Tax Treatment When Settling Cases*, The Verdict (Summer 1996), p. 16.

*Damage Awards Update 96-1*, Tax Analysts Taxation of Damages Discussion Group, July 19, 1996.

*Attorneys' Fees Held to be Below the Line Deduction*, Vol. 70, No. 10, Tax Notes (February 26, 1996), p. 1279.

*When Is Interest Taxable in a Judgment?*, Vol. 70, No. 8, Tax Notes (February 19, 1996), p. 1055.

*Can Attorneys' Fees Be Deducted By Employment Discrimination Plaintiffs*, BNA's Employment Discrimination Report, Vol. 6, No. 6 (February 7, 1996), p. 161, reprinted in Vol. 13, The Employee Advocate (Spring 1996), p. 103.

*A Damaging Look at Interest*, The Recorder, February 1, 1996, p. 6.

*Ninth Circuit Allows Law Firms to Deduct Costs Paid on the Client's Behalf*, The General and Solo Practitioner, Vol. 7, No. 3 (Fall/Winter 1995), p. 8.

*IRS Revisits Tax Treatment of Gender and Race Discrimination Recoveries*, The General and Solo Practitioner, Vol. 7, No. 3 (Fall/Winter 1995), p. 10.

*Proposed Bill on Tax Treatment of Damages Would Not Solve All of Lawyers' Problems*, BNA's Employment Discrimination Report, Vol. 5, No. 16 (October 25, 1995), p. 471.

*IRS Revisits Discrimination Recoveries*, Vol. 68, No. 13, Tax Notes (September 25, 1995), p. 1649.

*Uncertainty About Deductibility for Law Firms of Costs Paid on Client's Behalf*, BNA's Employment Discrimination Report (August 23, 1995), p. 231.

*Taxpayers Take Three Strikes From Schleier Decision*, Tax Notes (July 24, 1995), p. 475.

*Appellate Tax Assistance: The Ninth Circuit Gets the IRS Out of a Lawyer's Pockets for Costs Advanced On a Client's Behalf*, The Recorder, July 24, 1995, p. 8.

*Taxpayers Get Struck Three Times in Supreme Court Ruling on Taxability of Age Discrimination Recoveries*, BNA's Employment Discrimination Report, Vol. 5, No. 1 (July 5, 1995), p. 22.

*Taxing Definitions for Types of Harm*, The Recorder, June 27, 1995, p. 8.

*Litigation as a Taxing Matter*, The Recorder, June 9, 1995, p. 6.

*Why You Should Consider Taxes in Settling Employment Disputes and/or Negotiating Employment Agreements*, Vol. 22, No. 4, Advocate (April 1995), p. 22.

*Consider Taxes in Negotiating Employment Terminations*, Vol. 7, No. 2, General and Solo Practitioner (Spring 1995), p. 14.

*Circuits Split Over Whether Age Discrimination Recoveries Are Excludable From Income*, Vol. 7, No. 1, General and Solo Practitioner (Winter 1995), p. 10.

*Tax Treatment of Litigation Payments*, Vol. 24, No. 2 The Brief (Winter 1995), p. 53.

*Way to Go!—Not*, Vol. 4, No. 3, Business Law Today (January/February 1995), p. 19.

*Tax Treatment of Punitive Damages in Employment Cases Still Up in the Air*, BNA's Employment Discrimination Report (December 21, 1994), p. 692.

*The Tax Treatment of "Golden Handshakes,"* Tax Notes, December 5, 1994, p. 1293.

*Taxation of Punitive Damages: No Easy Answers*, Tax Notes, November 7, 1994, p. 783.

*IRS Winning Some Battles to Include Age Discrimination Recoveries*, The Practical Accountant (November 1994), p. 69.

*Pre-1991 Title VII Recoveries Now Taxable As a Result of U.S. Supreme Court Ruling*, Vol. 2, No. 23 BNA's Employment Discrimination Report (June 8, 1994), p. 707.

*Taxing Judgments; Keeping the IRS at Bay*, Legal Times, Vol. XVII, No. 1 (May 23, 1994), p. 41.
*Timing Taxation on Discrimination*, The Recorder, May 17, 1994, p. 8.
*Why Taxes Should Be Considered In Settling Employment Disputes and/or Negotiating Employment Termination Agreements*, Vol. 2, No. 18, BNA's Employment Discrimination Report (May 4, 1994), p. 560.
*Role-Playing and Characterization in Taxing Employment Disputes*, The Recorder, May 3, 1994.
*Taxation of Settlements Raises Tough Questions*, Tax Notes, April 25, 1994, p. 484.
*Opinions as a Basis for Financial Support*, The Recorder, April 18, 1994, p. 11.
*Disagreeing With Settled Agreements*, The Recorder Tax Law Magazine (Spring 1994), p. 20.
*IRS Rules Discrimination Awards Are Nontaxable*, Vol. 62, No. 10, Tax Notes (March 7, 1994), p. 1317.
*IRS Ruling on Non-Taxation of Bias Damage Awards Is Welcomed, But Raises Questions*, Vol. 2, No. 1, BNA's Employment Discrimination Report (January 5, 1994), p. 27.
*Freeing Discrimination Recoveries From Taxation*, The Recorder, January 4, 1994, p. 8.
*Controversy Surrounds Taxation of Discrimination Recoveries*, Vol. 1, No. 1, BNA's Employment Discrimination Report (October 27, 1993), p. 27.
*In the Interest of Taxation*, The Recorder, September 13, 1993, p. 8.
*Basing Recovery Upon Available Remedies*, The Recorder, September 7, 1993, p. 16.
*Taxing Advanced Costs*, The Recorder, August 3, 1993, p. 8.
*The Punitive Damages Controversy Continues*, Vol. 26, No. 5, Practical Accountant 53 (May 1993).
*Untangling The Taxation of Workplace Winnings*, The Recorder, April 7, 1993, p. 10.
*Controversy Surrounds Taxation of Discrimination Recoveries*, BNA's Employment Discrimination Week (February 22, 1993), p. 25.
*What Trial Lawyers Should Know About How Settlements and Judgments are Taxed*, Vol. 22, No. 9, CTLA Forum (November 1992), p. 13.
*What Every Litigator Should Know About Tax Planning*, San Francisco Daily Journal, Nov. 20, 1992, p. 5; Los Angeles Daily Journal, Nov. 20, 1992, p. 7.
*Taxing Discrimination Recoveries: Bucking Burke*, Vol. 56, No. 3, Tax Notes 363 (July 20, 1992).
*The Constructive Receipt Myth*, with George King and Marc Fishleder, Vol. 1, No. 2, Informed Consent (1988). Reprinted in 18 CLTA Forum 257 (1988).
*Drafting Litigation Settlement Agreements to Achieve Tax Goals*, 15 Tax'n for Lawyers 314 (1987).
*Structured Settlements*, 13 Tax Management Compensation Planning Journal 339 (1985). Published simultaneously as *Structured Settlements After the 1984 TRA*, 4 Tax Management Weekly Report 1399 (1985). Digested in Vol. 37, No. 1, Monthly Digest of Tax Articles 52 (Sep. 1986).

## B. Corporate Tax, S Corporations and Mergers & Acquisition Topics

*Noncompete vs. Stock Payments: Evergreen Issue*, Vol. 15, No. 9, The M&A Tax Report (April 2007), p. 1.
*Gather (and Harvest) Your Losses While You May*, Vol. 15, No. 5, The M&A Tax Report (December 2006), p. 1.
*B Reorganizations: A Time to Kill?* Vol. 15, No. 4, The M&A Tax Report (November 2006), p. 1.
*Book Review: Reverse Mergers: Taking a Company Public Without an IPO,* Vol. 15, No. 4, The M&A Tax Report (November 2006), p. 7.
*2005 Tax Act Offers Good News And Bad News for Spinoffs*, Bowne Review for CFOs & Investment Bankers (October 2006), p. 1; abstracted from: *Latest Tax Act Impacts Spin-Offs*, Vol. 14, No. 12, The M&A Tax Report (July 2006). p. 1.
*Latest Tax Act Impacts Spin-offs*, Vol. 14, No. 12, The M&A Tax Report (July 2006), p. 1.
*Second Helpings on Sandwiches*, with Richard C. Morris, Vol. 14, No. 9, The M&A Tax Report (April 2006), p. 6.
*(Not So) Golden Parachutes*, Vol. 14, No. 9, The M&A Tax Report (April 2006), p. 7.
*Corporate Inversion Reporting*, Vol. 14, No. 8, The M&A Tax Report (March 2006), p. 1.
*All in the Family: NOLs and Other Family Jewels*, Vol. 14, No. 8, The M&A Tax Report (March 2006), p. 7.
*Reporting Acquisitions of Control*, Vol. 14, No. 7, The M&A Tax Report (February 2006), p. 7.
*Those Were the Days: Times Mirror and How to Make a Sandwich (Part II of II)*, with Richard C. Morris, Vol. 14, No. 6, The M&A Tax Report (January 2006), p. 1.
*The Continuing Conundrum of Escrowed Stock*, Vol. 14, No. 6, The M&A Tax Report (January 2006), p. 5.
*Those Were the Days: Times Mirror and How to Make a Sandwich (Part I of II)*, with Richard C. Morris, Vol. 14, No. 5, The M&A Tax Report (December 2005), p. 1.
*IPO and Other Stock Issuance Costs Still Not Deductible*, Bowne Review for CFOs & Investment Bankers (December 2005), p. 1; abstracted from: *To Deduct or Not to Deduct: The Cost of an IPO,* Vol. 14, No. 3, The M&A Tax Report (October 2005), p. 7.
*Norman Conquest? Insolvency Reorganizations and Net Value*, with Stuart M. Vogt, Vol. 14, No. 3, M&A Tax Report

(October 2005), p. 4.

*To Deduct or Not to Deduct: The Cost of an IPO,* Vol. 14, No. 3, M&A Tax Report (October 2005), p. 7.

*Spin-off Rulings Revisited*, Vol. 14, No. 2, M&A Tax Report (September 2005), p. 1.

*Paying the Golden Parachute Excise Tax*, Vol. 14, No. 2, M&A Tax Report (September 2005), p. 4.

*Book Review: Due Diligence in Business Transactions*, Vol. 14, No. 2, M&A Tax Report (September 2005), p. 7.

*Transaction Costs in Acquisitions*, Vol. 14, No. 1, M&A Tax Report (August 2005), p. 4.

*Golden Parachutes Again in the News*, Vol. 14, No. 1, M&A Tax Report (August 2005), p. 6.

*U.K. Private Equity Tax Problems*, Vol. 13, No. 11, M&A Tax Report (June 2005), p. 6.

*Giving Back the Bonus*, with Richard C. Morris, Vol. 13, No. 10, M&A Tax Report (May 2005), p. 5.

*Inversion Transactions Revisited*, Vol. 13, No. 7, M&A Tax Report (March 2005), p. 5.

*Spin Cycle*, Vol. 13, No. 8, M&A Tax Report (March 2005), p. 7.

*How to Treat Stock Issuance Costs*, Vol. 13, No. 7, M&A Tax Report (February 2005), p. 4.

*Spin-off Regulations Proposed: Part II*, Vol. 13, No. 7, M&A Tax Report (February 2005), p. 5.

*New M&A Reporting Requirement*, Vol. 13, No. 7, M&A Tax Report (February 2005), p. 7.

*Poison Pill Redux*, Vol. 13, No. 7, M&A Tax Report (February 2005), p. 8.

*Ruminations on Intangibles*, Vol. 13, No. 6, M&A Tax Report (January 2005), p. 6.

*Deferred Compensation Provision of the Jobs Act*, Vol. 13, No. 5, M&A Tax Report (December 2004), p. 1.

*Spin-off Regulations Proposed (Part I)*, Vol. 13, No. 5, M&A Tax Report (December 2004), p. 8.

*Tax Implications of Companies Paying Employees' Legal Fees*, Vol. 13, No. 4, M&A Tax Report (November 2004), p. 4.

*Treatment of Options in M&A Deals: Let's Kick It Old School*, Vol. 13, No. 3, M&A Tax Report (October 2004), p. 1.

*Revisiting the Step Transaction Doctrine: The Legacy of* American Bantam Car?, with Dominic L. Daher, Vol. 13, No. 3, M&A Tax Report (October 2004), p. 4.

*Capitalizing Legal Fees Related to Acquisitions: Will* INDOPCO *Ever Die*?, with Dominic L. Daher, Vol. 13, No. 3, M&A Tax Report (October 2004), p. 7.

*Information Return Reporting for Settlement Payments: Are Most Corporations in the Dark*?, with Dominic L. Daher, Vol. 13, No. 3, M&A Tax Report (October 2004), p. 8.

*M&A Dealmakers: Do Not Overlook Tax Implications*, Bowne Review for CFOs & Investment Bankers, October 2004.

*Tax Aspects of M&A Deals: A Pervasive and Intricate Part of Any Transaction*, Vol. 13, No. 1, M&A Tax Report (August 2004), p. 5.

*Payors of Punitive Damages: Have They Made a Deal with the Devil Himself?* Vol. 13, No. 1, M&A Tax Report (August 2004), p. 8.

*Tax Allocations Really Do Work*, Vol. 12, No. 12, M&A Tax Report (July 2004), p. 6.

INDOPCO *Era of Uncertainty Comes to a Close*, with Dominic L. Daher, Vol. 12, No. 12, M&A Tax Report (July 2004), p. 7.

*Don't Wait Until It's Too Late – Address Tax Issues in M&A Deals Sooner Rather Than Later*, Vol. 12, No. 10, M&A Tax Report (May 2004), p. 3.

*Corporate Lawsuit Settlements – What to Watch for and How Not to Get Burned*, with Dominic L. Daher, Vol. 12, No. 10, M&A Tax Report (May 2004), p. 5.

*Noncompetes: Do the Tax Issues Ever End?*, with Dominic L. Daher, Vol. 12, No. 6, M&A Tax Report (January 2004), p. 1.

*What Happens If You Have to Collect on Your Tax Indemnity Agreement? Are You Taxed on the Tax?*, with Dominic L. Daher, Vol. 12, No. 6, M&A Tax Report (January 2004), p. 7.

*Business Litigation Recoveries – The Capital vs. Ordinary Debate Continues to Smolder*, Vol. 12, No. 5, M&A Tax Report (December 2003), p. 2.

*Are We Having Fun Yet? Employee Equity Choices for LLCs*, with Dominic L. Daher, Vol. 12, No. 4, M&A Tax Report (November 2003), p. 1.

*Reciprocity and Section 83: What's Good for the Goose?*, Vol. 12, No. 3, M&A Tax Report (October 2003), p. 1.

*Bye Bye Love, Bye Bye Happiness: Is Giving Up Flow-Through Taxation to Go Public Really Worth It?*, with Dominic L. Daher, Vol. 12, No. 3, M&A Tax Report (October 2003), p. 5.

*Control, and Immediately After: Whither 351?*, Vol. 12, No. 2, M&A Tax Report (September 2003), p. 3.

*Executive Option? Not So Fast...*, Vol. 12, No. 1, M&A Tax Report (August 2003), p. 1.

*Stock Options vs. Restricted Stock: The Following Microsoft?*, Vol. 12, No. 1, M&A Tax Report (August 2003), p. 5.

*Buying (or Selling) Foreign Businesses*, Vol. 11, No. 12, M&A Tax Report (July 2003), p. 1.

*Business Purpose Redux?*, Vol. 11, No. 12, M&A Tax Report (July 2003), p. 2.

*Valuation Verisimilitude*, with Dominic L. Daher, Vol. 11, No. 12, M&A Tax Report (July 2003), p. 5.

*Is it Football Time Yet?*, Vol. 11, No. 12, M&A Tax Report (July 2003), p. 7.

*New Bill Would Bar Settlement Deductions*, Vol. 11, No. 11, M&A Tax Report (June 2003), p. 1.

*357(d) Proposed Regulations in the Works?*, Vol. 11, No. 11, M&A Tax Report (June 2003), p. 5.

*Economic Substance: Who and Why?*, Vol. 11, No. 10, M&A Tax Report (May 2003), p. 1.
*Reasonable Compensation?*, Vol. 11, No. 10, M&A Tax Report (May 2003), p. 4.
*Boot or Booty?*, Vol. 11, No. 10, M&A Tax Report (May 2003), p. 7.
*Buyers Beware (of Transferee Tax Obligations)*, Bowne Review (April 2003), p. 7.
*Tracking Stock Tribulations*, Vol. 11, No. 9, M&A Tax Report (April 2003), p. 1.
*Bankruptcy Notes*, Vol. 11, No. 9, M&A Tax Report (April 2003), p. 2.
*Spins: Does Anyone Care Anymore?*, Vol. 11, No. 9, M&A Tax Report (April 2003), p. 3.
*ABA Books Navigate Antitrust Merger Review*, Vol. 11, No. 9, M&A Tax Report (April 2003), p. 6.
*Can You Use the Installment Method on Corporate Liquidations?*, Vol. 11, No. 9, M&A Tax Report (April 2003), p. 7.
*Don't Forget Bankruptcy NOL Rules*, Vol. 11, No. 8, M&A Tax Report (March 2003), p. 1.
*Stock Buybacks: Reporting Obligations?*, Vol. 11, No. 8, M&A Tax Report (March 2003), p. 4.
*Anti-INDOPCO Regulations (Part Two)*, Vol. 11, No. 8, M&A Tax Report (March 2003), p. 6.
*To Expense or Capitalize: That is the Question*, Vol. 11, No. 8, M&A Tax Report (March 2003), p. 8.
*Transferee Liability: What, Me Worry?*, Vol. 11, No. 7, M&A Tax Report (February 2003), p. 1.
*INDOPCO: Dead Without a Wake?*, Vol. 11, No. 7, M&A Tax Report (February 2003), p. 4.
*COD Income, Reporting, and Injustice (Or, How the IRS Makes You Pay Taxes On Income You Don't Have)*, with Jonathan R. Flora, Vol. 11, No. 6, M&A Tax Report (January 2003), p. 1.
*When Redemptions Are Treated as Dividends: Whither Basis?*, Vol. 11, No. 6, M&A Tax Report (January 2003), p. 3.
*Sham Transactions: Do You Know One When You See It?*, Vol. 11, No. 6, M&A Tax Report (January 2003), p. 7.
*Legislative* INDOPCO *Reversal?*, Vol. 11, No. 6, M&A Tax Report (January 2003), p. 7.
*M&A Business Purpose Cannot Be A Sham*, Bowne Review for CFOs & Investment Bankers (January 2003).
Thinking The Unthinkable: Recognizing Gain on 351 Transfers, Vol. 11, No. 5, M&A Tax Report (December 2002), p. 1.
*Capital-Gains Treatment A Hard Sell for M&A Litigation*, Bowne Review for CFOs & Investment Bankers (December 2002).
*Deducting Legal Fees For Criminal Defense*, Vol. 11, No. 4, M&A Tax Report (November 2002), p. 1.
*Business Purpose And Economic Substance: Catch Me If You Can*, Vol. 11, No. 4, M&A Tax Report (November 2002), p. 5.
*Capital Idea! Legal Fees In Acquisitions*, Vol. 11, No. 4, M&A Tax Report (November 2002), p. 7.
*Should Built-In Tax Liability Be Taken Into Account In Valuing a Company?*, Vol. 11, No. 3, M&A Tax Report (October 2002), p. 1.
*ISOs And Section 83(b) Elections*, with Jonathan R. Flora, Vol. 11, No. 3, M&A Tax Report (October 2002), p. 1.
*Capitalizing M&A Legal Fees*, Vol. 11, No. 3, M&A Tax Report (October 2002), p. 7.
*Acquisition Litigation: Must There Be A Sale Or Exchange For Capital Treatment?*, Vol. 11, No. 2, M&A Tax Report (September 2002), p. 1.
*Stock Option Ruminations*, Vol. 11, No. 2, M&A Tax Report (September 2002), p.
*Do It Through A Conduit: Active Businesses Under Section 355*, Vol. 11, No. 2, M&A Tax Report (September 2002), p. 6.
*More Step Transaction Authority*, Vol. 11, No. 2, M&A Tax Report (August 2002), p. 1.
*Business Purpose: A Universal Maxim?*, Vol. 10, No. 12, M&A Tax Report (July 2002), p. 1.
*Another Spoiled Spinoff*, Vol. 10, No. 12, M&A Tax Report (July 2002), p. 1.
*Merger of S and C Corporations Yields Suspended Loss Benefit*, Vol. 10, No. 12, M&A Tax Report (July 2002), p. 4.
*Sale vs. Reorganization: Eye of the Beholder?*, Vol. 10, No. 12, M&A Tax Report (July 2002), p. 5.
*How Not to Do a Section 355 Spinoff*, Bowne Review for CFOs and Investment Bankers (June/July 2002), p. 6.
*"E" Is For Excellent: The New 355(e) Regulations*, Vol. 10, No. 11, M&A Tax Report (June 2002), p. 1.
*Section 269 and Acquisitions*, Vol. 10, No. 11, M&A Tax Report (June 2002), p. 7.
*Valuing Stock Options: Guidance in the Maze*, Vol. 10, No. 10, M&A Tax Report (May 2002), p. 1.
*Spinoffs: The Good, the Bad, and the Ugly*, Vol. 10, No. 10, M&A Tax Report (May 2002), p. 1.
*Revisiting the Step Transaction Doctrine*, Vol. 11, No. 3, California Tax Lawyer (Spring 2002), p. 15.
*Proposed Golden Parachute Regs*, Vol. 10, No. 9, M&A Tax Report (April 2002), p. 1.
*Fizzled German Tax Law*, Vol. 10, No. 9, M&A Tax Report (April 2002), p. 1.
*More Poison Pills*, Vol. 10, No. 9, M&A Tax Report (April 2002), p. 4.
*Nondeductible Stock Redemption Payments*, Vol. 10, No. 9, M&A Tax Report (April 2002), p. 4.
*Spins In The News Again*, Vol. 10, No. 8, M&A Tax Report (March 2002), p. 1.
*The Step Transaction Doctrine: Beyond the Grasp of Mere Mortals?*, Vol. 94, No. 7, Tax Notes (February 18, 2002), p. 923.
*Media Rights for Sports Franchises: Separate Assets?*, Vol. 10, No. 7, M&A Tax Report (February 2002), p. 1.
*Overhead Deduction on Acquisition Allowed*, Vol. 10, No. 7, M&A Tax Report (February 2002), p. 6.
*Step Transaction Doctrine and Mergers*, Vol. 10, No. 6, M&A Tax Report (January 2002), p. 6.
INDOPCO *Coalition Weighs In*, Vol. 10, No. 5, M&A Tax Report (December 2001), p. 1.
*Revisiting the Step Transaction Doctrine*, Vol. 10, No. 5, M&A Tax Report (December 2001), p. 1; reprinted in Vol. 11, No. 3, California Tax Lawyer (Spring 2002).

*Noncompete Agreements*, Vol. 10, No. 4, M&A Tax Report (November 2001), p. 1.
*Temporary* Morris Trust *Regs Issued*, Vol. 10, No. 3, M&A Tax Report (October 2001), p. 5.
*Contingent Liability Transaction Fails Exchange Test*, Vol. 10, No. 3, M&A Tax Report (October 2001), p. 8.
*Section 1.1502-20 Loss Disallowance Regulations Invalid!*, Vol. 10, No. 2, M&A Tax Report (September 2001), p. 1.
*FDIC Insurance Fees Deductible, Not* INDOPCO*ed!*, Vol. 10, No. 2, M&A Tax Report (September 2001), p. 1.
*Preferred Stock Distributed in Recapitalization Held Not Taxable*, Vol. 10, No. 2, M&A Tax Report (September 2001), p. 5.
*Latest Spin News*, Vol. 10, No. 2, M&A Tax Report (September 2001), p. 6.
*Germany in the News Again*, Vol. 10, No. 2, M&A Tax Report (September 2001), p. 8.
*Tender Offer and Merger Equals Control for Voting Stock*, Vol. 10, No. 1, M&A Tax Report (August 2001), p. 1.
*Levered ESOPs: A Management Acquisition Tool*, with Rod Goodwin, Vol. 10, No. 1, M&A Tax Report (August 2001), p. 1.
*Pooling Dead Now*, Vol. 10, No. 1, M&A Tax Report (August 2001), p. 6.
*FTC Enters Your Lives*, Vol. 10, No. 1, M&A Tax Report (August 2001), p. 7
*Tax-Free Merger Unaffected by Later Asset Sale*, Vol. 10, No. 1, M&A Tax Report (August 2001), p. 7.
*REIT Spinoffs*, Vol. 9, No. 12, M&A Tax Report (July 2001), p. 1.
*European Takeovers*, Vol. 9, No. 12, M&A Tax Report (July 2001), p. 6.
*Amortization Covenants*, Vol. 9, No. 12, M&A Tax Report (July 2001), p. 6.
*Spins and No Spins*, Vol. 9, No. 12, M&A Tax Report (July 2001), p. 7.
*No Change in Ownership*, Vol. 9, No. 11, M&A Tax Report (June 2001), p. 1.
*FASB's Final Rules*, Vol. 9, No. 11, M&A Tax Report (June 2001), p. 5.
*Correction and Clarification*, Vol. 9, No. 11, M&A Tax Report (June 2001), p. 8.
*Tax and Accounting Primer for Nonqualified Stock Options*, Vol. 9, No. 10, M&A Tax Report (May 2001), p. 1.
*Tax and Accounting Treatment of ISOs*, Vol. 9, No. 10, M&A Tax Report (May 2001), p. 1.
*To Deduct or Capitalize Option Deal Costs*, Vol. 9, No. 10, M&A Tax Report (May 2001), p. 3.
*Treatment of Options in M&A Deals*, Vol. 9, No. 10, M&A Tax Report (May 2001), p. 5.
*To Rule or Not to Rule: That is the Question*, Vol. 9, No. 9, M&A Tax Report (April 2001), p. 1.
*Asset Allocation Regs Finalized*, Vol. 9, No. 9, M&A Tax Report (April 2001), p. 1.
*Spins and Reverse Spins*, Vol. 9, No. 9, M&A Tax Report (April 2001), p. 5.
*No Change in Ownership for Golden Parachute Purposes*, Vol. 9, No. 9, M&A Tax Report (April 2001), p. 7.
*More on Anti-*Morris Trust *Regs*, Vol. 9, No. 8, M&A Tax Report (March 2001), p. 1.
*Contingent Liabilities Nondeductible*, Vol. 9, No. 8, M&A Tax Report (March 2001), p. 1.
*M&A Markets — Gone Awry or Anew*, Vol. 9, No. 8, M&A Tax Report (March 2001), p. 4.
*New Section 355(e) Rules Save Us!*, Vol. 9, No. 7, M&A Tax Report (February 2001), p. 1.
*One More Word About Tracking Stock*, Vol. 9, No. 7, M&A Tax Report (February 2001), p. 6.
*A Few More Spins*, Vol. 9, No. 7, M&A Tax Report (February 2001), p. 6.
*Stock Acquisitions Given Unattractive Redemption Treatment*, Vol. 9, No. 6, M&A Tax Report (January 2001), p. 1.
*Holes in Golden Parachutes*, Vol. 9, No. 6, M&A Tax Report (January 2001), p. 1.
*European Deals Stagnant*, Vol. 9, No. 6, M&A Tax Report (January 2001), p. 6.
*Poison Pills and Other Defenses*, Vol. 9, No. 5, M&A Tax Report (December 2000), p. 1; condensed as "Poison Pills and Antidotes," Bowne Review for CFOs & Investment Bankers (March 2001), p 5.
*Just What is Reasonable Compensation Anyway?*, Vol.9, No. 5, M&A Tax Report (December 2000), p. 2.
*PLI's Massive M&A Seminar Held*, Vol. 9, No. 5, M&A Tax Report (December 2000), p. 4.
*Tracking Tracking Stock*, Vol. 9, No. 5, M&A Tax Report (December 2000), p. 7.
*Parachute Ruling Request Withdrawn*, Vol. 9, No. 5, M&A Tax Report (December 2000), p. 8.
*Whoa! Eighth Circuit Reigns in* INDOPCO *for Wells Fargo*, Vol. 9, No. 4, M&A Tax Report (November 2000), p. 1.
*Environmental Remediation and Asbestos Removal: More* INDOPCO *Trash? (Part Two)*, Vol. 9, No. 4, M&A Tax Report (November 2000), p. 1.
*Additional Spins*, Vol. 9, No. 4, M&A Tax Report (November 2000), p. 6.
*More on German Tax Reform*, Vol. 9, No. 4, M&A Tax Report (November 2000), p. 8.
*Exchanging Vested Options: Is There a Golden Parachute Payment?*, Vol. 9, No. 3, M&A Tax Report (October 2000), p. 1.
*1031 Exchanges of Businesses?*, Vol. 9, No. 3, M&A Tax Report (October 2000), p. 6.
*Environmental Remediation and Asbestos Removal: More* INDOPCO *Trash? (Part One)*, Vol. 9, No. 3, M&A Tax Report (October 2000), p. 7.
*Altered States: New (and Not So New) Rules on Liability Assumptions*, Vol. 9, No. 2, M&A Tax Report (September 2000), p. 2.
*U.S./U.K. Acquisitions: Basic Differences*, Vol. 9, No. 2, M&A Tax Report (September 2000), p. 4.
INDOPCO *Applies to REIT IPO*, Vol. 9, No. 2, M&A Tax Report (September 2000), p. 7.
*Massive German Tax Overhaul*, Vol. 9, No. 1, M&A Tax Report (August 2000), p. 1.

*Spinoffs in the News*, Vol. 9, No. 1, M&A Tax Report (August 2000), p. 1.
*Tracking Stock Not Dead Yet*, Vol. 9, No. 1, M&A Tax Report (August 2000), p. 7.
*More Spins in the News*, Vol. 8, No. 12, M&A Tax Report (July 2000), p. 1.
*Final Regulations on Solely for Voting Stock Reverse Service Position*, Vol. 8, No. 12, M&A Tax Report (July 2000), p. 6.
*Excessive Compensation?*, Vol. 8, No. 11, M&A Tax Report (June 2000), p. 1.
*New Regs on Stock for Property Exchanges*, Vol. 8, No. 11, M&A Tax Report (June 2000), p. 6.
*Installment Repeal Guidance Provided*, Vol. 8, No. 11, M&A Tax Report (June 2000), p. 6
*Deductions on Stock Buybacks? (Part II)*, Vol. 8, No. 10, M&A Tax Report (May 2000), p. 5.
*Spins: Ever Present*, Vol. 8, No. 10, M&A Tax Report (May 2000), p. 7.
*Revenue Rulings Questions Statutory Mergers*, Vol. 8, No. 9, M&A Tax Report (April 2000), p. 1.
*Golden Parachutes Land in Europe*, Vol. 8, No. 9, M&A Tax Report (April 2000), p. 1.
*Small Deals Suffer Under New Provision*, Vol. 8, No. 9, M&A Tax Report (April 2000), p. 5.
*Foreign Corporation Restructuring Regs Published*, Vol. 8, No. 9, M&A Tax Report (April 2000), p. 6.
*Deduction on Stock Buybacks? (Part I)*, Vol. 8, No. 9, M&A Tax Report (April 2000), p. 7.
*More Spins and Spin Doctoring*, Vol. 8, No. 8, M&A Tax Report (March 2000), p. 6.
*Tax Law Effect on Deals? You Bet!* Vol. 8, No. 7, M&A Tax Report (February 2000), p. 1.
*Further Spinoff Thoughts, This Time Dun & Bradstreet!* Vol 8, No. 7, M&A Tax Report (February 2000), p. 5.
Do*n't Forget About Pooling*, Vol. 8, No. 7, M&A Tax Report (February 2000), p. 7.
*New Continuity of Interest Ruling*, Vol. 8, No. 7, M&A Tax Report (February 2000), p. 7.
*Pooling Perambulations: Lock-Up Options and Termination Fees*, Vol. 8, No. 6, M&A Tax Report (January 2000), p. 6.
*Spinoff Business Purpose: Two is Better Than One*, Vol. 8, No. 6, M&A Tax Report (January 2000), p. 7.
*How Much is "Substantially All?"* Vol. 8, No. 5, M&A Tax Report (December 1999), p. 1
*Redemptions: Gaining a Capital Gain*, Vol. 8, No. 5, M&A Tax Report (December 1999), p. 1.
*Recapitalization Accounting*, Vol. 8, No. 5, M&A Tax Report (December 1999), p. 4.
*Book Review:* The Best in M&A, Vol. 8, No. 5, M&A Tax Report (December 1999), p. 6.
*Forming and Liquidating Simpler in California*, with Kathleen K. Wright, Vol. 8, No. 4, M&A Tax Report (November 1999), p. 1.
Morris Trust *Regulations At Last*, Part II, Vol. 8, No. 4, M&A Tax Report (November 1999), p. 7.
*Tracking Stock Makes News (Again)*, Vol. 8, No. 3, M&A Tax Report (October 1999), p. 1.
*IRS Issues Regulations Under Sec. 338*, Vol. 8, No. 3, M&A Tax Report (October 1999), p. 1.
*Devices Under Section 355: Who, Me?*, Vol. 8, No. 3, M&A Tax Report (October 1999), p. 6.
Morris Trust *Regulations at Last*, Part I, Vol. 8, No. 3, M&A Tax Report (October 1999), p. 7.
*M&A Taxes: Voluminous System*, California Law Business, Special Supplement to Vol. 112, No. 191, L.A. Daily Journal (October 4, 1999). p. 28.
*Advance Pricing Agreement Fees:* INDOPCO *Exempt!*, Vol. 8, No. 2, M&A Tax Report (September 1999), p. 1.
*Stock Rights in Reorganizations: New Bells and Whistles?*, Vol. 8, No. 2, M&A Tax Report (September 1999), p. 1.
*Section 269 and Tax Avoidance: Should the IRS Give Up?*, Vol. 8, No. 2, M&A Tax Report (September 1999), p. 4.
*Bad "Device" Present in Cable & Wireless Deal*, Vol. 8, No. 2, M&A Tax Report (September 1999), p. 7.
Pope & Talbot's *Last Gasp*, Vol. 8, No. 1, M&A Tax Report (August 1999), p. 1.
*Disqualified Debt Instruments*, Vol. 8, No. 1, M&A Tax Report (August 1999), p. 1.
*Current Spins in the News*, Vol. 8, No. 1, M&A Tax Report (August 1999), p. 5.
*Whither* Bausch & Lomb*?*, Vol. 8, No. 1, M&A Tax Report (August 1999), p. 6.
INDOPCO *Hits Reorgs—What's Deductible and What's Not*, Vol. 8, No. 1, M&A Tax Report (August 1999), p. 7.
*Spinoffs and Cost Savings: Is It* The *Business Purpose?*, Vol. 7, No. 12, M&A Tax Report (July 1999), p. 1.
*U.S. West and Global Crossing: Taxing History*, Vol. 7, No. 12, M&A Tax Report (July 1999), p. 1.
*Amortizing Goodwill: FASB Still At It After All These Years*, Vol. 7, No. 12, M&A Tax Report (July 1999), p. 6.
*Pooling: One More Word*, Vol. 7, No. 12, M&A Tax Report (July 1999), p. 7.
*Capitalizing Plant Costs?*, Vol. 7, No. 12, M&A Tax Report (July 1999), p. 8.
*Valuing Stock: Built-in Tax, Securities Laws and Other Such Blemishes*, Vol. 17, No. 6, Real Estate Tax Digest (June 1999), p. 179.
*'Pooling of Interests' Accounting to be Ousted*, Vol. 7, No. 11, M&A Tax Report (June 1999), p. 1.
*IRS Embraces 'Deductible' Preferred*, Vol. 7, No. 11, M&A Tax Report (June 1999), p. 1.
*More Acquisition Expenses to Watch Out For*, Vol. 7, No. 11, M&A Tax Report (June 1999), p. 5.
*Continuity of Business Enterprise Requirement: Loved but Misunderstood?*, Vol. 7, No. 11, M&A Tax Report (June 1999), p. 7.
*Retaining Stock After a Spinoff*, Vol 7, No. 10, M&A Tax Report (May 1999), p. 1.
*New LLC Book Delivers*, Vol. 82, No. 15, Tax Notes (April 12, 1999), p. 303

*Spinoffs of Captive Companies*, Vol. 7, No. 9, M&A Tax Report (April 1999), p. 1.
*Will FASB Actions Derail the M&A Train?*, Vol. 7, No. 9, M&A Tax Report (April 1999), p. 3.
*Stingy Continuity of Interest Rulings*, Vol. 7, No. 9, M&A Tax Report (April 1999), p. 6.
*Preacquisition Salaries Nondeductible Under* INDOPCO, Vol. 7, No. 9, M&A Tax Report (April 1999), p. 7.
*Newspaper Publisher Required to Capitalize Expenses of Carrier Settlement*, Vol. 7, No. 9, M&A Tax Report (April 1999), p. 8.
*Voting Power and Consolidations: The* Alumax *Story*, Vol. 7, No. 8, M&A Tax Report (March 1999), p. 5.
*Crossing Borders: Legitimizing Outbound Reorganizations*, Vol. 7, No. 8, M&A Tax Report (March 1999), p. 6.
*FASB Rules and Consolidations*, Vol. 7, No. 8, M&A Tax Report (March 1999), p. 8.
*Spin Update*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 1.
*Beware Tax Avoidance Purpose*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 1.
*Covenants Not to Compete: Be Realistic*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 3.
*Liquidating a Recently Acquired Subsidiary*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 4.
*Section 1031: Not Just for Real Estate*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 5.
*Redemption Expenses Nondeductible: Avoiding Redemption Characterization*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 7.
*One More FSA: This Time, Continuity of Interest*, Vol. 7, No. 7, M&A Tax Report (February 1999), p. 8.
*The Continued Controversy About Pooling Transactions*, Vol. 7, No. 6, M&A Tax Report (January 1999), p. 1.
*Poison Pills and 'Dead Hand' Pills*, Vol. 7, No. 6, M&A Tax Report (January 1999), p. 1, digested as *Pooling Primer for Tax Pros*, Vol. 10, No. 5, Bowne Review for CFOs and Investment Bankers, (March 1999), p. 7.
*Retiring Debt After a Spinoff*, Vol. 7, No. 6, M&A Tax Report (January 1999), p. 5.
*Spins in the News*, Vol. 7, No. 6, M&A Tax Report (January 1999), p. 5.
*Watch Out for Golden Parachute Rules in Restructuring*, Vol. 7, No. 6, M&A Tax Report (January 1999), p. 7.
*Gifting Stock Options*, Vol. 7, No. 5, M&A Tax Report (December 1998), p. 1.
*Spinoffs and the All-Important Business Purpose*, Vol. 7, No. 5, M&A Tax Report (December 1998), p. 1; digested as "How to Satisfy the Business Purpose Test for Tax-Free Spinoffs," Vol. 10, No. 3, Bowne Review for CFOs & Investment Bankers (January 1999), p. 4.
*Tax Considerations for Investors Facing Losses*, Vol. 7, No. 5, M&A Tax Report (December 1998), p. *5.*
*Spins and No Spins*, Vol. 7, No. 5, M&A Tax Report (December 1998), p.7.
*Phantom Stock Payments Made During Redemption Held Deductible*, Vol. 7, No. 5, M&A Tax Report (December 1998), p.*8.*
*Tax Benefits of Covenants Not to Compete*, with Robert Willens, Vol. 7, No. 4, M&A Tax Report (November 1998), p. 1.
*AMP Poison Pill Toughened: Consider Tax Effects*, Vol. 7, No. 4, M&A Tax Report (November 1998), p.6.
*Book Review: The Year 2000 Legal Guide*, Vol. 7, No. 4, M&A Tax Report (November 1998), p. 7.
*Valuing Stock: Taxing Issues Part II*, Vol. 7, No. 3, M&A Tax Report (October 1998), p. 1.
*A Tax-Free Corporation Liquidation?*, Vol. 7, No. 2, M&A Tax Report (September 1998), p. 4.
*Dealing with Liabilities Excess of Basis Under Section 351*, Vol. 7, No. 2, M&A Tax Report (September 1998), p. 5.
*Valuing Stock: Does the Built-in Tax Hit Count?*, Vol. 7, No. 1, M&A Tax Report (August 1998), p. 1.
*Book Review: The Best in Securities Offerings*, Vol. 7, No. 1, M&A Tax Report (August 1998), p. 7.
*Using Partnerships in Corporate Transactions*, Vol. 7, No. 1, M&A Tax Report (August 1998), p. 8.
*Acquiring an S Corporation*, with Robert Willens, Vol. 6, No. 12, M&A Tax Report (July 1998), p. 1, summarized as "Tax Break When Buying S Corp. Assets," Vol. 9, No. 10, Bowne Review for CFOs & Investment Bankers (September 1998), p. 3.
*Poison, Chewable Pills, and More*, Vol. 6, No. 12, M&A Tax Report (July 1998), p. 4.
*More Spins in the News*, Vol. 6, No. 12, M&A Tax Report (July 1998), p. 8.
*More Poison Pill Plans*, Vol. 6, No. 11, M&A Tax Report (June 1998), p. 1; summarized as "Poison Pill Plans Are Popping," Vol. 9, Nos. 9 and 10, Bowne Review for CFOs & Investment Banders (July-August 1998), p. 8.
*Port-a-Potties Mired in Former Owners' Problems*, Vol. 6, No. 11, M&A Tax Report (June 1998), p. 4.
*Successor Liability in Bank Acquisition*, Vol. 6, No. 10, M&A Tax Report (May 1998), p. 1.
*Fluctuating REIT Fortunes*, Vol. 6, No. 10, M&A Tax Report (May 1998), p. 5.
*Watch Out for Breach of Fiduciary Duty Claims After Merger*, Vol. 6, No. 10, M&A Tax Report (May 1998), p. 6.
*More Spins in the News*, Vol. 6, No. 10, M&A Tax Report (May 1998), p. 7.
*Even More Rewarding Golden Parachutes*, Vol. 6, No. 10, M&A Tax Report (May 1998), p. 8.
*Attorney/Client Privilege and Work Product Doctrines*, Vol. 6, No. 9, M&A Tax Report (April 1998), p. 1.
*Final Regs on Installment Obligations in Liquidation*, Vol. 6, No. 9, M&A Tax Report (April 1998), p. 6.
*More Spins in the News*, Vol. 6, No. 9, M&A Tax Report (April 1998), p. 7.
*Continuity of Business Enterprise/Continuity of Interest Regs*, Vol. 6, No. 8, M&A Tax Report (March 1998), p. 1.
*New "Golden Bungee" Device to ITT Executives*, Vol. 6, No. 8, M&A Tax Report (March 1998), p. 5.

*Spinoff Ruling Revoked*, Vol. 6, No. 8, M&A Tax Report (March 1998), p. 7.
*Spinoff Trends: Business Purpose, Serial Spinoffs and Capital Transactions*, Vol. 6, No. 7, M&A Tax Report (February 1998), p. 1.
*Regulations on Stock Rights and Nonqualified Preferred Stock*, Vol. 6, No. 7, M&A Tax Report (February 1998), p. 6.
*Book Review:* Securities Regulation in Cyberspace, Vol. 6, No. 7, M&A Tax Report (February 1998), p. 8.
*Spinoffs and Filling the Business Purpose Requirement*, Vol. 6, No. 6, M&A Tax Report (January 1998), p. 1.
*Buy Me, I'm Deductible*, Vol. 6, No. 6, M&A Tax Report (January 1998), p. 5.
*Book Review: The Best in D&O Duties and Liabilities*, Vol. 6, No. 6, M&A Tax Report (January 1998), p. 6.
*Liquidation Fails to Trigger Ownership Change Under Parachute Rules*, Vol. 6, No. 6, M&A Tax Report (January 1998), p. 7.
*Swallowing the Anti-Seagrams Provisions*, Vol. 6, No. 5, M&A Tax Report (December 1997), p. 1.
*Guidance on the Anti-*Morris Trust *Provision*, Vol. 6, No. 5, M&A Tax Report (December 1997), p. 6.
*Disputes Still Scrappy Over Takeover Costs*, Vol. 6, No. 5, M&A Tax Report (December 1997), p. 8.
*Amended Spinoff Law: How Bad Is It?*, Vol. 6, No. 3, M&A Tax Report (October 1997), p. 1; summarized as *Spinoff Restrictions Continue to Build*, Vol. 9, No. 2, Bowne Review for CFOs & Investment Bankers (December 1997), p. 4.
*Spin Count*, Vol. 6, No. 3, M&A Tax Report (October 1997), p. 7.
*Extra Severance Pay Deductible Following Merger*, Vol. 6, No. 2, M&A Tax Report (September 1997), p. 6.
*Hostile Takeover Insurance?*, Vol. 6, No. 2, M&A Tax Report (September 1997), p. 8.
*Severance Payments Deductible After Acquisition*, Vol. 5, No. 12, M&A Tax Report (July 1997), p. 1.
*New M&A Publication Begun*, Vol. 5, No. 12, M&A Tax Report (July 1997), p. 8.
*General Utilities Repeal and Charitable Contributions*, Vol. 5, No. 11, M&A Tax Report (June 1997), p. 1.
*Restoration of Triggered Gain from Deferred Intercompany Transaction*, Vol. 5, No. 11, M&A Tax Report (June 1997), p. 4.
*No Ownership Change Under Golden Parachute Rules*, Vol. 5, No. 11, M&A Tax Report (June 1997), p. 6.
*Spinoff Rulings; Morris Trust Repeal?*, Vol. 5, No. 10, M&A Tax Report (May 1997), p. 1.
*S Corporations*, Bulletin 13 (April 1997).
*Investment Banker Fees Held Deductible in Pope & Talbot*, Vol. 5, No. 9, M&A Tax Report (April 1997), p. 1.
*No Amortization for Covenant Not to Compete: Yes on Client List*, Vol. 5, No. 9, M&A Tax Report (April 1997), p. 1.
*Dealing With the Non-Tax Aspects of Golden Parachute Payments*, Vol. 5, No. 9, M&A Tax Report (April 1997), p. 4.
*Dear Meredith: More on Intangibles*, Vol. 5, No. 9, M&A Tax Report (April 1997), p. 7.
*S Corporations*, Bulletin 12 (March 1997).
*Proposed Regs on Installment Obligations and Liquidation*, Vol. 5, No. 8, M&A Tax Report (March 1997), p. 7.
*S Corporations*, Bulletin 11 (February 1997).
*Proposed Regulations Issued on Continuity of Interest*, Vol. 5, No. 7, M&A Tax Report (February 1997), p. 1.
*Are Training Costs Exempt from INDOPCO?*, Vol. 5, No. 7, M&A Tax Report (February 1997), p. 1.
*Stock Rights Connected with Reorganization Subject of Proposed Regs*, Vol. 5, No. 7, M&A Tax Report (February 1997), p. 7.
*S Corporations*, Bulletin 10 (January 1997).
*Allocating Fees: To Deduct or Capitalize?*, Vol. 5, No. 6, M&A Tax Report (January 1997), p. 1; summarized as *New Advice on Deducting Consent and Tender Fees*, Bowne Review for CFOs and Investment Bankers (February 1997), p. 2.
*S Corporations*, Bulletin 9 (December 1996).
*Investment Interest Restrictions Can't be Buried*, Vol. 5, No. 5, M&A Tax Report (December 1996), p. 1.
*New Fort Howard Opinion*, Vol. 5, No. 5, M&A Tax Report (December 1996), p. 7
*And a Few More Spins...*, Vol. 5, No. 5, M&A Tax Report (December 1996), p. 8.
*S Corporations*, Bulletin 8 (November 1996).
*Mergers and Continuity of Interest*, with Robert Willens, Vol. 5, No. 4, M&A Tax Report (November 1996), p. 1.
*Kerkorian's Company Claims Sale, Not Redemption*, Vol. 5, No. 4, M&A Tax Report (November 1996), p. 7.
*S Corporations*, Bulletin 7 (October 1996).
*Spin City*, Vol. 5, No. 3, M&A Tax Report (October 1996), p. 7.
*S Corporations*, Bulletin 6 (September 1996).
*Greenmail Held Not Deductible*, Vol. 5, No. 2, M&A Tax Report (September 1996), p. 1; summarized in *Greenmail Tax Rules Prove Costly*, Vol. 8, No. 1, Bowne Review for CFOs & Investment Bankers (November 1996), p. 2.
*S Corporations*, Bulletin 5 (August 21, 1996).
*ESOPs and Hybrid ESOP Buyouts*, with Robert Willens, Vol. 5, No. 1, M&A Tax Report (August 1996), p. 1.
*Viacom 355 Ruling Sparks Praise and Criticism*, Vol. 5, No. 1, M&A Tax Report (August 1996), p. 1.
*Proposed Regulations Treat Redemptions as Extraordinary Dividends*, Vol. 5, No. 1, M&A Tax Report (August 1996), p. 5.
*Tax-Exempt Spinoffs?*, Vol. 5, No. 1, M&A Tax Report (August 1996), p. 6.
*S Corporations*, Bulletin 4 (July 12, 1996).

*The IRS Solves the Problem of Allocating Income and Principal in a QSST*, Vol. 13, No. 4, Journal of Tax'n of Investments (Summer 1996), p. 297.
*Spins Continue in the News*, Vol. 4, No. 12, M&A Tax Report (July 1996), p. 4.
*S Corporations*, Bulletin 3 (June 12, 1996).
*Spinoff Changes Announced*, Vol. 4, No. 11, M&A Tax Report (June 1996), p. 1.
*Section 355 Deja Vu*, Vol. 4, No. 11, M&A Tax Report (June 1996), p. 6.
*S Corporations*, Bulletin 2 (May 8, 1996).
*Big Breakup Fees Listed*, Vol. 4, No. 10, M&A Tax Report (May 1996), p. 8.
*S Corporations*, Bulletin 1 (April 10, 1996).
*Severance Payments and Other Golden and Quasi-Golden Parachutes*, Vol. 4, No. 9, M&A Tax Report (April 1996), p. 4.
*S Corporations*, Bulletin 24 (March 20, 1996).
*Sale vs. Liquidation Dichotomy Invoked by Tax Court*, Vol. 4, No. 8, M&A Tax Report (March 1996), p. 1.
*Avoiding Constructive Distributions*, Vol. 8, No. 4, M&A Tax Report (March 1996), p. 5.
*Business Purpose Under Section 355 Expanding?*, Vol. 8, No. 4, M&A Tax Report (March 1995), p. 6.
*S Corporations*, Bulletin 23 (February 21, 1996).
*Executive Compensation Limitation Regs Finalized*, Vol. 4, No. 6, M&A Tax Report (February 1996), p. 1.
*S Corporations*, Bulletin 22 (January 10, 1996).
*"Pearl Harbor" Proposal Targets Debt Securities*, Vol. 4, No. 6, M&A Tax Report (January 1996), p. 4.
*S Corporation Mergers and Distributions: Which Rules Govern?*, Vol. 4, No. 6, M&A Tax Report (January 1996), p. 6.
*S Corporations*, Bulletin 21 (December 13, 1995).
*New Authorities on Deducting Environmental Costs*, with Steven K. Matthias, Vol. 4, No. 5, M&A Tax Report (December 1995), p. 4.
*Book Review: Taxation of Intangible Assets*, Vol. 4, No. 5, M&A Tax Report (December 1995), p. 7.
*S Corporations*, Bulletin 20 (November 8, 1995).
*INDOPCO Rears Its Ugly Head, Preventing Deductions, Says Full Tax Court*, Vol. 4, No. 4, M&A Tax Report (November 1995), p. 1, digested as "Expense Write-Off Denied For a Not-So-Friendly Takeover," Vol. 7, No. 2, Bowne Review For CFOs & Investment Bankers (December 1995), p. 3.
*Partnership Distribution of Stock Does Not Affect Continuity of Interest*, Vol. 4, No. 4, M&A Tax Report (November 1995), p. 1.
*Redemption Borrowing Expenses Slated to be Deductible*, Vol. 4, No. 4, M&A Tax Report (November 1995), p. 6.
*Payments to Cancel Stock Options and SARs on Takeover are Deductible*, Vol. 4, No. 4, M&A Tax Report (November 1995), p. 8.
*S Corporations*, Bulletin 19 (October 12, 1995).
*Liquidation of a Subsidiary Held to be a "Disposition" by Tax Court*, Vol. 4, No. 3, M&A Tax Report (October 1995), p. 1.
*Payments After Sale of a Business: Is It Passive or Portfolio Income?*, Vol. 4, No. 3, M&A Tax Report (October 1995), p. 6.
*S Corporations*, Bulletin 18 (September 13, 1995).
*Measuring Voting Power: Is It All in the Numbers?*, with Robert Willens, Vol. 4, No. 2, M&A Tax Report (September 1995), p. 1.
*Spin Count*, Vol. 4, No. 2, M&A Tax Report (September 1995), p. 4.
*Check-the-Box System: How Far Will It Go?*, Vol. 4, No. 2, M&A Tax Report (September 1995), p. 6.
*S Corporations*, Bulletin 17 (August 9, 1995).
*Chrysler Devises Platinum Parachutes: How Will They Stand Up Under Tax Laws?*, Vol. 4, No. 1, M&A Tax Report (August 1995), p. 1.
*The Flap Continues Over Seagrams and DuPont*, Vol. 4, No. 1, M&A Tax Report (August 1995), p. 6.
*Book Review: Taxation of Compensation and Benefits Demystifies Rules*, Vol. 4, No. 1, M&A Tax Report (August 1995), p. 7.
*S Corporations*, Bulletin 16 (July 13, 1995).
*Total Distribution Can Be More Than Sum of Its Parts*, Vol. 28, No. 7, The Practical Accountant (July 1995), p. 32.
*Spinoffs Dominate the News*, Vol. 3, No. 12, M&A Tax Report (July 1995), p. 2.
*S Corporations*, Bulletin 15 (June 14, 1995).
*Basis and Distributions for S Corporation Shareholders: Final Regulations Promulgated Under Sections 1367 and 1368*, Vol. 22, No. 4, The Journal of Real Estate Taxation (Summer 1995), p. 343.
*All the Flap Over Seagrams and DuPont*, Vol. 3, No. 11, M&A Tax Report (June 1995), p. 1.
*Is Target Stock Really an Alternative to a Spinoff?*, Vol. 3, No. 11, M&A Tax Report (June 1995), p. 4.
*Taxable Spinoffs May Now Carry Greater Tax Liabilities*, Vol. 3, No. 11, M&A Tax Report (June 1995), p. 6.
*S Corporations*, Bulletin 14 (May 10, 1995).
*Indirect Distributions in Life Insurance Company Reorganizations*, Vol. 3, No. 10, M&A Tax Report (May 1995), p. 5.

*More Spins on the Drawing Board*, Vol. 3, No. 10, M&A Tax Report (May 1995), p. 6.
*Basic Operation of Section 382*, Vol. 3, No. 10, M&A Tax Report (May 1995), p. 7.
*S Corporations*, Bulletin 13 (April 12, 1995).
*More Spinoffs In the Air*, Vol. 3, No. 9, M&A Tax Report, (April 1995), p. 6.
*ISO Spread Income Held to be "Wages"*, Vol. 3, No. 9, M&A Tax Report, (April 1995), p. 7.
*1031 Exchanges of Businesses Clarified*, Vol. 3, No. 9, M&A Tax Report, (April 1995), p. 8.
*S Corporations*, Bulletin 12 (March 8, 1995).
*No Loss for Seagram on Conoco/DuPont Stock Swap*, Vol. 3, No. 8, M&A Tax Report, (March 1995), p. 1.
*Built-in Gains Regulations Finalized*, Vol. 3, No. 8, M&A Tax Report, (March 1995), p. 4.
*S Corporations*, Bulletin 11 (February 8, 1995).
*Final Partnership Antiabuse Regulations Issued, Slightly Softened,* Vol. 3, No. 7, M&A Tax Report (February 1995), p. 3.
*Proposed Regulations Treat Basis Adjustments Following Triangular Mergers,* Vol. 3, No. 7, M&A Tax Report (February 1995), p. 8.
*S Corporations,* Bulletin 10 (January 11, 1995).
*More Parachute Payment Rulings*, Vol. 3, No. 6, M&A Tax Report (January 1995), p. 1.
*FASB Harsh Option Cost Rule Reversed*, Vol. 3, No. 6, M&A Tax Report (January 1995), p. 5.
*To Spin or Split: It's All in the Name?*, with Robert Willens, Vol. 3, No. 6, M&A Tax Report (January 1995), p. 6. excerpted in Vol. 6, No. 4, Bowne Review for CFOs & Investment Bankers (February 1995), p. 2.
*S Corporations*, Bulletin 9 (December 14, 1994).
*Fifth Circuit in U.S. v. Houston Pipeline Co. Rules No Deduction on Stock Redemption Payment to Fend Off Takeover*, Vol. 3, No. 5, M&A Tax Report (December 1994), p. 1.
*Deducting a Repurchase Premium on Stock*, Vol. 3, No. 5, M&A Tax Report (December 1994), p. 4.
*Covenants Not To Compete and the Goold Old (Pre-Section 107) Days*, Vol. 3, No. 5, M&A Tax Report (December 1994), p. 6.
*Amounts Paid by Acquiring Corporation to Purchase Options Are Deductible by Target*, Vol. 3, No. 5, M&A Tax Report (December 1994), p. 7.
*S Corporations*, Bulletin 8 (November 9, 1994).
*Equity Swaps As Sales: What, Me Worry?*, with Robert Willens, Vol. 3, No. 4, M&A Tax Report (November 1994), p. 4.
*Final Regulations Issued Concerning Consolidated Return Stock Basis Adjustments*, Vol. 3, No. 4, M&A Tax Report (November 1994), p. 1.
*Bonus Treated As Golden Parachute Payment Even Though Agreement Not Enforceable*, Vol. 3, No. 4, M&A Tax Report (November 1994), p. 2.
*Equity Swaps As Sales: What, Me Worry?*, with Robert Willens, M&A Tax Report (November 1994), p. 4.
*S Corporations*, Bulletin 7 (October 12, 1994).
*To Spin or Not to Spin?*, Vol. 3, No. 3, M&A Tax Report (October 1994), p. 1.
*Loan Fees In LBOs: Back to the Drawing Board*, with Robert Willens, Vol. 3, No. 3, M&A Tax Report (October 1994), p. 4.
*IRS Makes Changes to Regs. on Retroactive Intangibles Amortization Election*, Vol. 3, No. 3, M&A Tax Report (October 1994), p. 6.
*S Corporations*, Bulletin 6 (September 14, 1994).
*Poison Pills Newsworthy Again*, Vol. 3, No. 3, No. 2, M&A Tax Report (September 1994), p. 6.
*Hardware Plus Victory Is Good News*, Vol. 3, No. 1, M&A Tax Report (August 1994), p. 1.
*International Accounting Rule Levels Goodwill Playing Field*, Vol. 3, No. 1, M&A Tax Report (August 1994), p. 6.
*S Corporations*, Bulletin 5 (August 10, 1994).
*Section 1060 Asset Value Used in Later Sale*, Vol. 3, No. 1, M&A Tax Report (August 1994) p. 7.
*Final Regs. on Section 382 Closing-of-Books Election*, Vol. 3, No. 1, M&A Tax Report (August 1994), p. 8.
*S Corporations*, Bulletin 4 (July 13, 1994).
*GM, Bally Try Spins*, Vol. 2, No. 12, M&A Tax Report (July 1994), p. 3.
*Safe Harbor Provided for Nominal or Token" Stock*, Vol. 2, No. 12, M&A Tax Report (July 1994), p. 4.
*Environmental Cleanup Costs Now Deductible*, Vol. 2, No. 12, M&A Tax Report (July 1994), p. 6.
*S Corporations*, Bulletin 3 (June 15, 1994).
*Core Deposits Held Amortizable in Trustmark*, Vol. 2, No. 11, M&A Tax Report (June 1994), p. 4.
*S Corporations*, Bulletin 2 (May 18, 1994).
*Can GE Capital Deduct Its Kemper Takeover Bid Costs?*, with Robert Willens, Vol. 2, No. 10, M&A Tax Report (May 1994), p. 1.
*S Corporations*, Bulletin 1 (April 13, 1994).
*Making the Section 197 Intangibles Election*, Vol. 2, No. 9, M&A Tax Report (April 1994), p. 1.
*Fourth Circuit Upholds Denial of Work Force Depreciation*, Vol. 2, No. 9, M&A Tax Report (April 1994), p. 3.

*S Corporations*, Bulletin 12 (March 9, 1994).
*Asset Deal's Purchase Price Allocation Binds Buyer*, Vol. 2, No. 8, M&A Tax Report (March 1994), p. 6.
*S Corporations*, Bulletin 11 (February 9, 1994).
*Partnership Allocation Regs. Affect Contributions of Property*, Vol. 2, No. 7, M&A Tax Report (February 1994), p. 1.
*Prop. Regs. Issued on Deduction Limits for Executive Compensation*, Vol. 2, No. 7, M&A Tax Report (February 1994), p. 7.
*S Corporations*, Bulletin 10 (January 12, 1994).
*More Spinoffs in the News*, Vol. 2, No. 6, M&A Tax Report (January 1994), p. 2.
*Huge Mellon/Dreyfus Deal Represents Pooling of Interests*, Vol. 2, No. 6, M&A Tax Report (January 1994), p. 4.
*New FASB Proposal May Impair Public Offerings*, with Robert Willens, Vol. 2, No. 5, M&A Tax Report (December 1993), p. 4.
*Intangibles Settlements: Clearing Up the Pre-Section 197 Backlog*, Vol. 2, No. 5, M&A Tax Report (December 1993), p. 5.
*S Corporations*, Bulletin 9 (December 8, 1993).
*Hedging Your Bets Against Anticipated FASB Options Changes*, Vol. 2, No. 5, M&A Tax Report (December 1993) p. 6.
*S Corporations*, Bulletin 8 (November 10, 1993).
*New Temp. Regs. Favor Hedges*, Vol. 2, No. 4, M&A Tax Report (November 1993), p. 1.
*Will the $1 Million Cap on Compensation Pose Problems?*, Vol. 2, No. 4, M&A Tax Report (November 1993), p. 6.
*S Corporations*, Bulletin 7 (October 14, 1993).
*Like Soda for Chocolate: Dr. Pepper Poison Pill Plan Fights Cadbury*, Vol. 2, No. 3, M&A Tax Report (October 1993), p. 1.
*Uniroyal (and Other) Buyouts: Revisiting the Step-Transaction Doctrine*, Vol. 2, No. 3, M&A Tax Report (October 1993), p. 3.
*Harcourt, Cyanamid, Ethyl Contemplate Spins*, Vol. 2, No. 3, M&A Tax Report (October 1993), p. 6.
*Rulings Address Dividend Treatment of Boot in Reorgs.*, Vol. 2, No. 3, M&A Tax Report (October 1993), p. 7.
*S Corporations*, Bulletin 6 (September 15, 1993).
*Ninth Circuit Takes Hard Line on Built-In Deductions*, Vol. 2, No. 2, M&A Tax Report (September 1993), p. 3.
*RRA '93 Hastens Death Knell for Bankrupt Corporations*, Vol. 2, No. 2, M&A Tax Report (September 1993), p. 5.
*From the Bookshelf* Mergers & Acquisitions: A Valuation Handbook, Vol. 2, No. 2, M&A Tax Report (September 1993). p. 6.
*Intangibles Amortization Passes Amid Rate Increases*, Vol. 2, No. 2, M&A Tax Report (September 1993), p. 7.
*Section 382(1)(5) Prop. Regs. Broaden Relief*, Vol. 2, No. 2, M&A Tax Report (September 1993), p. 8.
*S Corporations*, Bulletin 5 (August 11, 1993).
*Hedging Your Bets? Tax Court Blesses Fannie Mae*, Vol. 2, No. 1, M&A Tax Report (Aug. 1993), p. 1.
*Built-in Gains Regs. Hearings Reap AICPA Comments*, Vol. 1, No. 12, M&A Tax Report (Aug. 1993), p. 3.
*S Corporations*, Bulletin 4 (July 14, 1993).
*Corporate Opportunity Doctrine Raises Tax, Ethical Issues*, Vol. 1, No. 12, M&A Tax Report (July 1993), p. 1.
*Asbestos Abatement and Other INDOPCO Problems*, Vol. 1 No. 12, M&A Tax Report (July 1993), p. 7.
*S Corporations*, Bulletin 3 (June 17, 1993).
*Additional Compensation Held Excess Parachute Payments in* Balch, Vol. 1, No. 11, M&A Tax Report (June 1993), p. 1.
*Prudential, Allergan, and Tokos Medical Adopt Poison Pill Plans*, Vol. 1, No. 11, M&A Tax Report (June 1993), p. 6.
*IRS Permits Intangible's Depreciation*, Vol. 1, No. 11, M&A Tax Report (June 1993), p. 8.
*S Corporations*, Bulletin 2 (May 12, 1993).
*Bump-and-Strip Regs. Finalized*, Vol. 1, No. 10, M&A Tax Report 3 (May 1993).
*Availability of Section 355 Rulings Further Curtailed*, Vol. 1, No. 10, M&A Tax Report 6 (May 1993).
*Problems With Repaying ESOP Loans*, Vol. 1 No. 10, M&A Tax Report (May 1993).
*Proposed Roll-Up Legislation Sparks Interest*, Vol. 1, No. 10, M&A Tax Report 8 (May 1993).
*S Corporations*, Bulletin 1 (April 20, 1993).
*Regs Block Avoidance of General Utilities Repeal*, Vol. 26, No. 4, Practical Accountant 55 (April 1993).
*LBO Loan Fees Ko'd in* Kroy, Vol. 1, No. 9, M&A Tax Report 4 (April 1993).
*More on Partnerships to Avoid* General Utilities *Repeal*, Vol. 1, No. 9, M&A Tax Report 5 (April 1993).
*Tax Court Rejects Sweep of Golden Parachute Provisions in* Powell, Vol. 1, No. 9, M&A Tax Report 6 (April 1993).
*Can RJR Nabisco's New Stock Disarm Section 355?*, Vol. 1, No. 9, M&A Tax Report 7 (April 1993).
*More Spins to Win*, Vol. 1, No. 9, M&A Tax Report 8 (April 1993).
*S Corporations*, Bulletin 15 (March 10, 1993).
*More Ways to Save with ESOP Rollovers*, Vol. 1, No. 8, M&A Tax Report 6 (March 1993).
*Rash of Spinoffs Continues*, Vol. 1, No. 8, M&A Tax Report 7 (March 1993).
*Closing-of-Books Election Sparks Interest*, Vol. 1, No. 8, M&A Tax Report 7 (March 1993).
*S Corporations*, Bulletin 14 (February 10, 1993).

*Prop. Regs. Address Use of Partnerships to Avoid General Utilities Doctrine Repeal*, Vol. 1, No. 7, M&A Tax Report 1 (Feb. 1993).
*S Corporations*, Bulletin 13 (January 29, 1993).
*Built-In Gains Prop. Regs. Offer Relief*, Vol. 1, No. 6, M&A Tax Report 1 (Jan. 1993).
*Prop. Regs. Withdrawn on Information Returns for Acquisitions*, Vol. 1, No. 6, M&A Tax Report 7 (Jan. 1993).
*One More Word: Section 355 and Business Purpose*, Vol. 1, No. 6, M&A Tax Report 8 (Jan. 1993).
*S Corporation Acquisitions Under Sections 332 and 338*, Vol. 1, No. 5, M&A Tax Report 1 (Dec. 1992).
*S Corporations*, Bulletin 12 (December 17, 1992).
*Sears' Spin-off: In the Land of the Giants*, Vol. 1 No. 4, M&A Tax Report 1 (Nov. 1992).
*Debt-for-Equity Shuffle in H.R. 776*, Vol. 1 No. 4, M&A Tax Report 3 (Nov. 1992).
*Cottage Savings Regs. on the Way*, Vol. 1 No. 4, M&A Tax Report 5 (Nov. 1992).
*Business Purpose for a Spin-off: Is Nothing Sacred?*, Vol. 1, No. 4, M&A Tax Report. 6 (Nov. 1992).
*Is Counting Spins Like Counting Stars?*, Vol. 1 No. 4, M&A Tax Report 8 (Nov. 1992).
*S Corporations*, Bulletin 11 (November 19, 1992).
*S Corporations*, Bulletin 10 (October 15, 1992).
*McDonald's Gets a Break Today in Canterbury*, Vol. 1, No. 3, M&A Tax Report 3 (October 1992), with Robert Willens.
*Dual Consolidated Losses Treated in Final Regulations*, Vol. 1, No. 3, M&A Tax Report 3 (October 1992).
*Capital Bancshares Holds No Refund from NOL of Subsidiary*, Vol. 1 No. 3, M&A Tax Report 5 (October 1992).
*The Continuing Flap Over Expenses—Takeover and Otherwise*, Vol. 1, No. 3, M&A Tax Report 7 (October 1992).
*Mutual Funds Get Break from Ownership Change Rules*, Vol. 1 No. 3, M&A Tax Report 8 (October 1992).
*S Corporations*, Bulletin 9 (September 29, 1992).
*Proposed Regs. Deal With NOLs in Insolvency*, Vol. 1, No. 2, M&A Tax Report 7 (September 1992).
*S Corporations*, Bulletin 8 (August 20, 1992).
*The M&A Tax Report*, Vol. 1, No. 1 (August 1992).
*Final Regulations on the One-Class-of-Stock Requirement*, S Corporations Para. 419 (1992).
*S Corporations*, Vol. 8, No. 7 (July 17, 1992).
*S Corporations*, Bulletin 6 (June 18, 1992).
*Consolidated Returns Tax Report*, Vol. 3, No. 6 (June 1992).
*Taxation of Mergers & Acquisitions*, Vol. 3, No. 2 (June 1992).
*S Corporations Tax Bulletin*, Vol. 8, No. 5 (May 21, 1992).
*Supreme Court Stiffs National Starch: Bifurcating Fees in Bankruptcy?*, Vol. 5, No. 1, Corporate Taxation 47 (May/June 1992).
*Taxation of Mergers & Acquisitions*, Vol. 3, No. 1 (May 1992).
*Consolidated Returns Tax Report*, Vol. 3, No. 5 (May 1992).
*S Corporations Tax Bulletin*, S Corporations, Vol. 8, No. 4 (April 16, 1992).
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 12 (April 1992).
*Consolidated Returns Tax Report*, Vol. 3, No. 4 (April 1992).
*S Corporations Tax Bulletin*, Vol. 8, No. 3, S Corporations (March 19, 1992).
*S Corporations in Financial Difficulty, Bankruptcy and Insolvency*, S Corporations Para. 427.
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 11 (March 1992).
*Consolidated Returns Tax Report*, Vol 3, No. 3 (March 1992).
*S Corporations Tax Bulletin*, Vol. 8, No. 2, S Corporations (Feb. 20, 1992).
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 10 (Feb. 1992).
*IRS Proposes Regulations on NOLs and Bankruptcy*, Vol. 3, No. 4, Bankruptcy Law Review 35 (Winter 1992).
*S Corporations Tax Bulletin*, Vol. 8, No. 1, S Corporations (Jan. 16, 1992).
*G Reorganizations Offer Tax Planning Possibilities*, Vol. 3, No. 4, Bankruptcy Law Review 59 (Winter 1992).
*Taxation of Mergers & Acquisitions*, Vol 2, No. 9 (January 1992).
*S Corporations Tax Bulletin*, Vol. 7, No. 15, S Corporations (December 19, 1991).
*S Corporations Shareholder Guarantees*, Vol. 9, No. 12, Real Estate Digest 277 (December 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 14, S Corporations (November 21, 1991).
*Taxation of Mergers & Acquisitions*, Vol 2, No. 8 (December 1991).
*Happy Ending in Disney Strikes Blow to Step-transaction Doctrine*, Vol. 4, No. 4, Corporate Taxation 55 (November/December 1991).
*G Reorganizations Offer Planning Possibilities*, Vol. 4, No. 4, Corporate Taxation 37 (November/December 1991).
*Taxation of Mergers & Acquisitions*, Vol 2, No. 7 (November 1991).
*Revised One-Class-of-Stock Regulations Offer Improvements*, S Corporations Para. 419.
*S Corporations Tax Bulletin*, Vol. 7, No. 13, S Corporations (October 17, 1991).

*Taxation of Mergers & Acquisitions*, Vol. 2, No. 6 (October 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 12, S Corporations (September 19, 1991).
*Putting the Mail into Greenmail*, Vol. 4, No. 3, Corporate Taxation 55 (September/October 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 11, S Corporations (August 15, 1991).
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 4 (August 1991).
*Some Like-Kind Exchange Restrictions Eased in Final Rules*, Vol. 4, No. 2, Corporate Taxation 34 (July/August 1991).
*S Corporations Tax Bulletin*, Vol 7, No. 10 (July 18, 1991).
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 3 (July 1991).
*S Corporations Tax Bulletin*, Vol 7, No. 9 (July 20, 1991).
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 3 (June 1991).
*Advance Rulings on Transfer Pricing Agreements Now Available*, Vol. 4, No. 1, Corporate Taxation 37 (May/June 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 8 (May 16, 1991).
*Taxation of Mergers & Acquisitions*, Vol. 2, No. 1 (May 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 7 (April 18, 1991).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 12 (April 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 6 (March 21, 1991).
*Proposed Regs on Acquisitions and Bankruptcy Reorganizations Jeopardize NOLs*, Vol. 3, No. 6, Corporate Taxation 40 (March/April 1991).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 11 (March 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 5 (February 22, 1991).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 10 (February 1991).
*National Starch Revisited: TAM Offers New Planning For Deductions of Takeover Expenses*, Vol. 3, No. 5, Corporate Taxation 11 (January/February 1991).
*S Corporations Tax Bulletin*, Vol. 7, No. 4 (January 17, 1991).
*The Taxable Income Limit and Built-in Gain Tax*, S Corporations Para. 418 (1991).
*Terminations and Revocations of Elections: Re-Elections*, Vol. 3, No. 4, S Corporations: The Journal of Tax, Legal and Business Strategies 335 (Winter 1990/91).
*New One Class of Stock Rules Impact S Class Corporation*, Vol. 9, No. 1, Real Estate Tax Digest 3 (January 1991).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 9 (January 1991).
*New Scrutiny for Buy-Sell Agreements in Family Firms Makes It Vital to Follow Three Rules*, Vol. 3, No. 3, BusinessWeek Newsletter for Family-Owned Business 9 (December 21, 1990).
*S Corporations Tax Bulletin*, Vol. 7, No. 3 (December 20, 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 8 (December 1990).
*S Corporations Tax Bulletin*, Vol. 7, No. 2 (November 16, 1990).
*IRS and New Law Cuts Back Partnership Structures to Avoid Corporate Gain Recognition*, Vol. 8, No. 11, Real Estate Tax Digest 275 (November 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 7 (November 1990).
*S Corporations Tax Bulletin*, Vol. 7, No. 1 (October 19, 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 6 (October 1990).
*Even Without Favorable Capital Gains Rates, Stock Redemptions Must Be Treated Carefully*, Vol. 2, No. 22, BusinessWeek Newsletter for Family-Owned Business (October 12, 1990).
*S Corporations Tax Planning Alert*, Bulletin 21, S Corporations (September 20, 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 5 (September 1990).
*Tax and Management Considerations May Suggest Dividing the Family Business in Two*, Vol. 2, No. 20, BusinessWeek Newsletter for Family-Owned Business 9 (August 24, 1990).
*S Corporations Tax Planning Alert*, Bulletin 20, S Corporations (August 16, 1990).
*Tax Benefit Rule Does Not Always Apply, Says Ninth Circuit*, Vol. 3, No. 3, Corporate Taxation 44 (Sept./Oct. 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 4 (August 1990).
*S Corporations Tax Planning Alert*, Bulletin 19, S Corporations (July 19, 1990).
*Like-Kind Exchanges for Business Assets: Are the Possibilities Narrowed?*, Vol. 3, No. 4, J. Bank Tax'n 54 (1990).
*The Solely for Voting Stock Requirement of B Reorganizations*, Vol. 3, No. 2, Corporate Taxation 44 (July/Aug. 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 3 (July 1990).
*Transferring Assets Sooner Rather Than Later Makes Sense for Many Family-Owned Companies*, Vol. 2, No. 16, BusinessWeek Newsletter for Family-Owned Business (June 29, 1990).
*S Corporation Tax Planning Alert*, Bulletin 18, S Corporations (June 21, 1990).
*Taxation of Mergers & Acquisitions*, Vol. 1, No. 2 (June 1990).
*S Corporations Tax Planning Alert*, Bulletin 17, S Corporations (May 17, 1990).

*Taxation of Mergers & Acquisitions*, Vol. 1, No. 1 (May 1990).
*S Corporations Tax Planning Alert*, Bulletin 16, S Corporations (April 20, 1990).
*Is the Step-transaction Doctrine Still a Threat for Taxpayers?*, 72 J. Tax'n 296 (1990).
*A Practical Guide to Terminations and Revocations of the S Election*, Vol. 2, No. 3, Journal of Taxation of S Corporations 25 (1990).
*S Corporations Tax Planning Alert*, Bulletin 15, S Corporations (March 15, 1990).
*Poison Pill Rights Do Not Give Rise to Income*, with Robert Willens, Vol. 2, No. 6, Corporate Taxation 20 (March/April 1990).
*How to Minimize Taxes Selling the Family Business: Arrange a Trade for a Company Like Yours*, Vol. 2, No. 8, BusinessWeek Newsletter for Family-Owned Business (March 9, 1990); reproduced in audio, Newstrack Executive Tape Service, Track 2 (April 17, 1990).
*S Corporations Tax Planning Alert*, Bulletin 14, S Corporations (Feb. 15, 1990).
*Revisiting the Step Transaction Doctrine*, Vol. 2, No. 5, Corporate Taxation 43 (Jan./Feb. 1990).
*S Corporations Tax Planning Alert*, Bulletin 13, S Corporations (Jan. 18, 1990).
*IRS Reconsiders Deductibility of Takeover Expenses*, Vol. 2, No. 5, Corporate Taxation 45 (Jan./Feb. 1990).
*S Corporations Tax Planning Alert*, Bulletin 12, S Corporations (Dec. 21, 1989).
*National Starch: Deductibility of Takeover Expenses Depends on New Distinction*, Vol. 2, No. 4, Corporate Taxation 41 (1989).
*S Corporations Tax Planning Alert*, Bulletin 11, S Corporations (Nov. 16, 1989).
*A Primer on the Ins and Outs of ESOPs: How to Decide If It's the Right Option for Your Firm*, Vol. 1, No. 25, BusinessWeek Newsletter for Family-Owned Business 9 (Nov. 10, 1989).
*S Corporation Distributions: Demystifying the Accumulated Adjustments Account and Other Issues*, Vol. 2, No. 3, S Corporations: The Journal of Tax, Legal and Business Strategies 305 (1989).
*IRS Cracks Down on Circumvention of General Utilities Repeal*, Vol. 3, No. 1, J. of Bank Tax'n 50 (1989).
*Buying Out the Stockholder You Don't Like Can Have a Nasty Tax Bite If You're Not Careful*, Vol. 1, No. 21, BusinessWeek Newsletter for Family-Owned Business 7 (September 15, 1989).
*Recent Section 355 Developments Include Tax Court on ITC Recapture and New IRS Ruling Policy*, Vol. 2, No. 3, Corporate Taxation 44 (1989).
*Drafting Corporate Acquisition Agreements to Minimize Tax Liability*, Vol. 18, No. 1, Tax'n for Lawyers 62 (1989).
*New Regulations Impose Stringent Requirements on Divisive Reorganizations*, Vol. 2, No. 4, J. of Bank Tax'n 44 (1989).
*The Built-In Gain Tax After TAMRA*, Vol. 2, No. 1, S Corporations: The Journal of Tax, Legal and Business Strategies 39 (Spring 1989).
*Planning Can Minimize Tax Burden on the Liquidation of an S Corporation*, Vol. 1, No. 6 Corporate Taxation 41 (1989), reprinted in Vol. 1, No. 3, J. of Tax'n of S Corporations 12 (1989).
*Drafting Buy-Sell Agreements for S Corporations to Preserve Tax Benefits*, Vol. 17, No. 5, Tax'n for Lawyers 318 (1989).
*How to Juggle the Tax Impact When Selling the Family Firm to a Bigger Company*, Vol. 1, No. 8, BusinessWeek Newsletter for Family-Owned Business 9 (March 1989).
*Special Rules Come into Play When Liquidating an S Corporation*, Vol. 1, No. 5, Corporate Taxation 34 (1989).
*Consider Changing the Business Structure Now to Reduce the Tax Bite Later*, Vol. 1, No. 3, BusinessWeek Newsletter for Family-Owned Business 9 (December 1988).
*Step Transactions: CA-7 Collapses Steps into a Dividend Equivalent Redemption*, Vol. 1, No. 4, Corporate Taxation 39 (1988).
*There is Still Time to Avoid Gain Recognition Upon Liquidation by Electing S Status*, Vol. 1, No. 3, Corporate Taxation 45 (1988).
*It May Not Be Too Late to Liquidate*, Vol. 1, No. 2, Corporate Taxation 40 (1988).
*Settlement Proceeds in Securities Fraud Litigation Is Held to be Boot*, Vol. 1, No. 1, Corporate Taxation 44 (1988).
*Corporate Liquidations: Planning After Tax Reform*, 1 Tax Times 16B (April 1987).
*Corporate Organizations and Reorganizations*, 13 J. Corp. Tax 377 (1987).
*New Double Tax on Liquidations Can Be Avoided By Certain Corporations That Act Promptly*, with Boyd A. Blackburn, 38 Tax'n for Accountants 86 (1987), reprinted in 15 Tax'n for Lawyers 308 (1987).
*General Utilities Repeal: Injecting New Levies Into M & A*, 21 Mergers & Acquisitions 44 (1987).
*Drafting P.C. Service Agreements to Avoid Personal Holding Company Problems*, 15 Tax'n for Lawyers 188 (1986).
*Corporate Organizations and Reorganizations*, 13 J. Corp. Tax 273 (1986).
*Corporate Organizations and Reorganizations*, 13 J. Corp. Tax 164 (1986).
*Developments in Corporate Organizations and Reorganizations*, 13 J. Corp. Tax 76 (1986).
*Developments in Corporate Organizations and Reorganizations*, 12 J. Corp. Tax 381 (1986).
*Incorporation of Professionals Still Offers Benefits*, 3 Business Strategies 2967 (1985). Reprinted in 64 TAXES 38 (1986).

*Corporate Organizations and Reorganizations*, 12 J. Corp. Tax 289 (1985).
*Developments in Corporate Organizations and Reorganizations*, 12 J. Corp. Tax 197 (1985).
*Recent Developments in Corporate Organizations and Reorganizations: Legislative Developments; Administrative Developments; Judicial Developments*, 12 J. Corp. Tax 82 (1985).
*E&P, Affiliated Groups, Departing Corporate Executives, All Affected by New Law Changes*, 33 Tax'n for Accountants 178 (1984). Reprinted in 13 Tax'n for Lawyers 168 (1984).
*Benefits of Distributions Paid or Received by Corporations Limited by New Law*, 33 Tax'n for Accountants 70 (1984). Reprinted in 13 Tax'n for Lawyers 68 (1984).
*The Keller, Foglesong, and Pacella Cases: 482 Allocations, Assignments of Income, and New Section 269A*, 10 J. Corp. Tax 65 (1983).
*New S Corporation Rules Revised and Explained by Technical Corrections Act, Temporary Regs.*, with Fred B. Weil, 30 Tax'n for Accountants 142 (1983). Published simultaneously in 11 Tax'n for Lawyers 272 (1983).
*Incorporation Game Changed*, S.F. Barrister (Nov./Dec. 1982).
*Subchapter S Corporations Made Simpler by New Law, But Not All Changes Are Improvements*, with Fred B. Weil, 29 Tax'n for Accountants 348 (1982). Reprinted in 11 Tax'n for Lawyers 196 (1983).
*Rethinking Professional Corporations after Tax Equity*, with Fred B. Weil, 3 Financial & Estate Planning 21,701 (1982). Reprinted in 120 Professional Corporations Handbook 10,146 (Jan. 20, 1983); 61 TAXES 186 (1983); and AICPA Physicians and Dentists (1984).
*Corporations Can Make a Profit from Contributions of Qualified Property*, 29 Tax'n for Accountants 30 (1982).
*The Desirability of Professional Corporations after the Economic Recovery Tax Act*, 60 TAXES 261 (1982). Reprinted in 112 Professional Corporations Handbook 10,099 (May 24, 1982).
*New Incentives for the Incorporation of Professionals*, S.F. Barrister (Jan.-Feb., 1982).
*Avoiding Personal Holding Company Income for Professional Corporations: Is It Really So Simple?*, 59 TAXES 685 (1981).

## C. Real Estate Tax Subjects

*Selling Real Estate: Improving Installment Sales*, Vol. 22, No. 6, Tax Management Real Estate Journal (June 7, 2006), p. 124.
*Mortgage Interest, Refinancings and the AMT*, Vol. 21, No. 12, Tax Management Real Estate Journal (December 7, 2005), p. 360.
*The IRS Narrows the Scope of Deductions for Environmental Remediation*, Vol. 33, No. 1, Real Estate Taxation (4th Quarter 2005), p. 26.
*Conservation Easements:* Quid Pro Quo *Revisited*, Vol. 23, No. 2, Real Estate Tax Digest (February 2005), p. 17.
*Home Offices: Exceptions to the Harsh Regime*, Vol. 21, No. 1, Tax Management Real Estate Journal (January 5, 2005), p. 3.
*Capitalizing Legal Fees in Real Estate Transactions*, Vol. 32, No. 1, Real Estate Taxation (4th Quarter 2004), p. 41.
*Home Improvement or Home Disaster? Can The Tax Law Help When You Get Taken?*, Vol. 13, No. 4, California Tax Lawyer (Fall 2004), p. 27.
*Deciding Whether, and How Much, Real Estate Has Been Given to Charity*, Vol. 15, No. 6, Taxation of Exempts (May/June 2004), p. 284.
*Home Office Rules and Charitable Contributions: Together Forever or Forever Apart?*, Vol. 22, No. 5, Real Estate Tax Digest (May 2004), p. 13.
*Home Offices: Exceptions to the Harsh Regime*, Vol. 21, No. 5, Real Estate Tax Digest (May 2003), p. 3.
*Home Office Rules and Charitable Contributions: Never the Twain Shall Meet?*, Vol. 30, No. 4, Real Estate Taxation (3rd Quarter 2003), p. 186.
*Deciding Whether, and How Much, Real Estate Has Been Given to Charity*, Vol. 30, No. 1, Real Estate Taxation (4th Quarter 2002), p. 39.
*Capitalizing Legal Fees in Real Estate Deals*, Vol. 20, No. 9, Real Estate Tax Digest (November 2002), p. 3.
*Developments in Home Offices*, Vol. 29, No. 3, Real Estate Taxation (2nd Quarter 2002), p. 116.
*Charitable Contributions of Industrial/Commercial Property: Market Tax Benefits Plus Bargain Sales Revisited*, Vol. 19, No. 5, The Real Estate Tax Digest (May 2001), p. 15.
*Casualty Losses in All Their Guises: But What Is Deductible?*, Vol. 8, No. 7, Real Estate Tax Digest (July 2000), p. 249.
*1999 Yields Home Office Expense Deductions (Finally)*, Vol. 26, No. 4, J. Real Estate Tax'n (Summer 1999), p. 326.
*Recent Decisions Give Valuation Discounts a Boost*, Vol. 26, No. 3, J. Real Estate Tax'n (Spring 1999), p. 224.
*Home Office Deductions*, Vol. 26, No. 3, J. Real Estate Tax'n (Spring 1999), p. 253.
*Charitable Contributions of Property/Home Office Deductions*, Vol. 26, No. 1, J. Real Estate Tax'n (Fall 1998), p. 62.
*Be Careful When Making Gifts of Limited Partnership Interests*, Vol. 16, No. 8, Real Estate Tax Digest (August 1998).

*Charitable Contributions and Bargain Sales of Real Estate Continue to Proliferate*, Vol. 25, No. 4, J. Real Estate Tax'n (Summer 1998), p. 380.

*Drafting Home Office Expenses After the '97 Act: Congress Gets Solomonic*, Vol. 16, No. 2, Real Estate Tax Digest (February 1998), p. 53; reprinted in California Real Estate Reporter, Vol. 1998, No. 4 (April 1998), p. 1.

*Draft Carefully When Making Environmental Payments*, Vol. 15, No. 9, Real Estate Tax Digest (September 1997), P. 281.

*The Home Office: More Home Office Changes Since* Soliman, Vol. 24, No. 4, J. of Real Estate Tax'n (Summer 1997), p. 402.

*Revisiting Spinoffs of Real Estate*, Vol. 15, No. 6, The Real Estate Tax Digest (June 1997), p. 183.

*Timing of Charitable Contribution and Intent*, Vol. 24, No. 3, J. of Real Estate Tax'n (Spring 1997), p. 323.

*Recent Authority Underscores Importance of Home Office Deduction*, Vol. 14, No. 8, Real Estate Tax Digest (August 1996), p. 231.

*Scenic, Conservation and Facade Easements*, Vol. 14, No. 2, Real Estate Tax Digest (February 1996), p. 39.

*Converting Residential Property to Investment Property*, Vol. 13, No. 8, Real Estate Tax Digest (August 1995), p. 247.

*Drawing the Line Between Vacation Homes and Rental Property*, Vol. 12, No. 11, Real Estate Tax Digest 319 (November 1994).

*Revenue Ruling 94-24, Notice 93-12, and the Post-Soliman Blues*, Vol. 21, No. 4, J. Real Estate Tax'n 334 (Summer 1994).

*IRS Explains Its Soliman Two-Prong Home-Office Test*, Vol. 27, No. 5, The Practical Accountant 55 (May 1994), digested in March 1995, The Monthly Digest of Tax Articles, p. 1.

*The Home Office*, Vol. 21, No. 3, Journal of Real Estate Tax'n 293 (Spring 1994).

*A Checklist for Preserving Home Office Deductions*, Vol. 12, No. 1 Real Estate Tax Digest 3 (January 1994).

*The Home Office*, Vol. 21, No. 1 Journal of Real Estate Tax'n 88 (Fall 1993).

*The Home Office*, Vol. 20, No. 4 Journal of Real Estate Tax'n 370 (Summer 1993).

*Home-Office Deductions Still Alive After Soliman*, Vol. 26, No. 4 Practical Accountant 32 (April 1993).

*Supreme Court in Soliman Just Says "No" to Home Office Deductions*, Vol. 11, No. 3 Real Estate Tax Digest 61 (March 1993).

*Tax Provisions of the Energy Bill*, Vol. 11, No. 1 Real Estate Tax Digest 3 (January 1993).

*Charitable Contributions of Property: Scenic and Conservation Easements: The Continuing Saga*, 20 J. Real Estate Tax'n 196 (Winter 1993).

*Your Furnishings Can Help You Secure Home Office Deduction*, Vol. 10, No. 11 Real Estate Tax Digest 263 (November 1992).

*Meeting the Exclusive and Regular Use Requirements for Home Office Deductions*, Vol. 10, No. 5, Real Estate Tax Digest 113 (May 1992).

*Charitable Contributions of Property: No Bargain Sale Deduction on Condemnation*, Vol. 19, No. 3, J. Real Estate Tax'n 258 (Spring 1992).

*Real Estate S Corporations*, Vol. 10, No. 1, Real Estate Tax Digest 3 (January 1992).

*Charitable Contributions of Property: Grant of Historical Facade Easement Held a Disposition*, Vol. 19, No. 1, J. Real Estate Tax'n 64 (Fall 1991).

*Structuring Around Property Tax Assessments*, Vol. 9, No. 3, Real Estate Tax Digest 53 (March 1991).

*Charitable Contributions of Property*, Vol. 18, No. 3, Journal of Real Estate Taxation 282 (Spring 1991).

*Charitable Contributions of Property*, with Jill S. Dodd, Vol. 18, No. 2, Journal of Real Estate Tax'n 172 (Winter 1991).

*Spinoffs of Real Estate Operations: Can They Really Work?*, Vol. 8, No. 2, Real Estate Tax Digest (Feb. 1990).

*Valuing Scenic Easements; The Charitable Donation of the Use of a Vacation Home*, with Jill S. Dodd, 17 J. Real Estate Tax'n 182 (1990).

*Service Addresses Use of Partnerships to Escape the Repeal of General Utilities*, Real Estate Tax Digest 125 (May 1989).

*New Revenue Procedure on Obtaining Partnership Classification*, Real Estate Tax Digest 103 (April 1989).

*Problems of Motive in Donating Real Estate*, with Jill S. Dodd, 16 J. Real Estate Tax'n 276 (1989), reprinted in Vol. 6, No. 6, Connecticut Real Estate Law Journal 88 (1989).

*The Magic of Bargain Sales*, 16 J. Real Estate Tax'n 188 (1989).

*Installment Sales: What's Left for Real Estate and the Dealer-Investor Distinction Revisited*, with Jill S. Dodd, Real Estate Tax Digest (January 1989).

*The Final Substantiation Regulations*, 16 J. Real Estate Tax'n 93 (1988).

*Valuation of Charitable Contributions of Real Property*, 15 J. Real Estate Tax'n 375 (1988).

*Avoiding the Alternative Minimum Tax*, 15 J. Real Estate Tax'n 288 (1988).

*Exchange Agreements Should Set Time Limits and Allow for Nondesignation*, 16 Tax'n for Lawyers 252 (1988).

*Valuations of Property*, 15 J. Real Estate Tax'n 94 (1987).

*Making Bargain Sales*, 14 J. Real Estate Tax'n 359 (1987).

*Retained Mineral Interests in Land*, 14 J. Real Estate Tax'n 194 (1987).

*Giving Encumbered Property to Charity*, 14 J. Real Estate Tax'n 91 (1986).

*Drafting Deeds to Charity When Donor Retains Some Rights in the Property*, 15 Tax'n for Lawyers 126 (1986).
*Qualified Appraisal Rules*, 13 J. Real Estate Tax'n 385 (1986).

## D. ARTICLES ON MISCELLANEOUS TAX TOPICS

*Private Annuity Trust Article Should Be Required Reading*, Vol. 109, No. 4, Tax Notes (October 24, 2005), p. 546.
*Don't Let Drivers Take You to the Cleaners*, Vol. 72, No. 2, J. of Transportation Law, Logistics and Policy (Second Quarter 2005), p. 248.
*Good Flow Charts, Bad Tax System*, Vol. 96, No. 11, Tax Notes (Sept. 9, 2002), p. 1531.
*Employment Taxes — Advantage Exotic Dancers*, Vol. 11, No. 3, California Tax Lawyer (Spring 2002), p. 13.
*Recent Interesting Tax Opinions*, Cal Tax Network, April 2002, p. 1.
*Exotic Dancers Win Tax Disputes*, Vol. 94, No. 4, Tax Notes (January 28, 2002), p. 498.
*Dirty Taxing,* Vol. 115, No. 7, Los Angeles Daily Journal (January 11, 2002), p. 7.
*Trusts, Unlawful Detainers, and Reuniting Families*, California Lawyer (April 2000), p. 31.
*Hobby or Business: Brothel-Hopping Scrutinized by IRS*, Tax Notes (June 28, 1999), p. 1941.
*New LLC Book Delivers*, Tax Notes (April 12, 1999), p. 303.
*Sale of Law Practice Goodwill May Have Negative Tax Consequences*, The Montana Lawyer (November 1998), p. 25.
*Don't Toke At Tax Time*, The Recorder, April 9, 1997, p. 5.
*Conference Addresses Key Tax Issues in China*, Vol. 13, No. 14, Tax Notes International (Sept. 30, 1996), p. 1101.
*Sales Tax on Food Depends on Who Eats It: New California Cuisine?*, Vol. 69, No. 1, Tax Notes (Oct. 2, 1995), p. 113.
*Digesting the Law*, The Recorder, Sept. 18, 1995, p. 8.
*Ninth Circuit Validates Private Foundation/Charitable Lead Trust Planning*, Vol. 80, No. 5, Journal of Tax'n 290 (May 1994).
*Bankruptcy or Another Way to Handle a Debt Load? Consider the Tax Impact Before Making a Choice*, Vol. 2, No. 4, BusinessWeek Newsletter for Family-Owned Business 9 (Jan. 12, 1990).
*Golden Parachutes Make Good Business Sense But Must Be Calculated Carefully to Minimize Taxes*, Vol. 1, No. 17, BusinessWeek Newsletter for Family-Owned Business 6 (July 1989).
*Ways to Build Employee Loyalty By Letting Nonfamily Managers in on Company Growth*, Vol. 1, No. 12, BusinessWeek Newsletter for Family-Owned Business 7 (April 1989).
*How to Help a Client Choose a Stock or Stock-Related Compensation Plan*, Vol. 21, No. 12 The Practical Accountant 84 (1988), reprinted in Vol. 10, No. 1, WG&L Accounting News 1 (1989).
*Three Cases for Compensating with Stock and Stock Substitutes*, 12 Directors and Boards 37 (1987).
*Getting the Most Mileage Out of Bank T & E Deductions*, 1 J. Bank Tax'n 11 (1987).
*Drafting to Avoid Imposition of the Golden Parachute Rules*, 13 Tax'n for Lawyers 380 (1985).
*New Taxes Tarnish Luster of Golden Parachutes*, with Fred B. Weil, 19 Mergers & Acquisitions 54 (1985).
*Individual Charitable Deductions After the Tax Reform Act of 1984*, 9 Rev. Tax'n Individuals 88 (1985).
*Using the Section 83(b) Election for Market Value Transfers*, 62 TAXES 525 (1984).
*Maximizing Miscellaneous Deductions for Professionals*, with Benjamin I. Delancey, *Using Life Insurance in the Professional Practice*, with James B. Ellis, and *Breakups of Professional Practices*, with Benjamin I. Delancey, in Tax Planning for Professionals and Small Business Owners (S.F. Bar Assoc. 1984).
*Maximizing Miscellaneous Deductions for Professionals*, *Using Life Insurance in the Professional Practice*, and *Breakups of Professional Practices*, in Tax Planning for Lawyers, Doctors and Accountants (S.F. Bar Assoc. 1983).
*Deducting Entertainment, Automobile and Home Office Expenses*, S.F. Barrister (July/Aug. 1982).
*Research and Development Expenditures Under the Economic Recovery Tax Act*, 59 TAXES 777 (1981). Digested in Vol. 32, No. 9, Monthly Dig. of Tax Articles (June 1982).

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 79 of 227

## Exhibit A-4

### ROBERT W. WOOD
### SPEECHES

"Tax Issues for the Employment Lawyer," American Bar Association Annual Meeting, Section of Labor & Employment Law, San Francisco, California, August 11, 2007.

"The Impact of the *Murphy* Decision on Taxability of Personal Injury Damages Under Internal Revenue Code Section 104(a)(2) – Update on the New and Final Attorney Reporting Regulations Under Section 6045," Orange County Bar Association Tax Law Section Meeting, Santa Ana, California, December 14, 2006.

"*Murphy v. IRS*: What It Means and What To Do," California Society of CPAs, East Bay Chapter Tax Night, Berkeley, California, December 12, 2006.

"Structured Installment Sales as a Backup to 1031 Exchange," BNA Tax Management Advisory Board Meeting, New York City, New York, December 7, 2006.

"To Tax or Not To Tax: A Discussion of *Murphy v. IRS*," Los Angeles County Bar Association, Labor and Employment Law Section, Santa Monica, California, November 15, 2006.

"Qualified Small Business Stock," Institute for International Research, Venture Capital & Private Equity Tax Practices Conference, San Francisco, California, October 25, 2006.

"Tax Update for Brokers," Business Team, San Francisco, California, July 19, 2006.

"Structured Settlements In Employment Cases," National Employment Lawyers Association, 2006 17th Annual Convention, San Francisco, California, June 24, 2006.

"Update on the Tax Treatment of Litigation Settlements and Judgments," 25th Annual 2006 J. Nelson Young Tax Institute, North Carolina, April 27, 2006.

"Update on the Tax Treatment of Litigation Damage Awards and Settlement Payments," 53rd Annual University of Montana Tax Institute, Missoula, Montana, October 28, 2005.

"Structured Annuities Aren't Just For Personal Injury Cases," Structured Financial Associates 20th Annual Meeting, Atlanta, Georgia, October 22, 2005.

"Update on the Tax Treatment of Litigation Damage Award and Settlement Payments," 40th Annual Southern Federal Tax Institute, Atlanta, Georgia, September 28, 2005.

"Advising Your Litigation Partners and Clients About the Taxation of Settlements and Judgments," 40th Annual Southern Federal Tax Institute, Atlanta, Georgia, September 28, 2005.

"Structured Sales Make Installment Sales Better," Sponsored by ATG Trust Company and Creative Capital, Inc., Chicago, Illinois, September 22, 2005.

"Structured Legal Fees: Problem Solved!" Sponsored by ATG Trust Company and Creative Capital, Inc., Chicago, Illinois, September 21, 2005.

"Circular 230 and Employment Taxes," American Bar Association, Committee on Employment Taxes Annual Meeting, San Francisco, California, September 16, 2005.

"Structured Annuities: Beyond Personal Injury Cases," Presented by Settlement Partners and Insight Asset Management, Denver, Colorado, September 9, 2005, 1:00 p.m.–4:00 p.m.

"Breathing Life Into Installment Sales," Presented by Settlement Partners and Insight Asset Management, Denver, Colorado, September 9, 2005, 9:00 a.m. –12:00 pm.

"Current Tax Issues with Litigation Settlements and Judgments," State Bar of Utah, Annual Meeting, Sun Valley, ID, July 14, 2005.

"Update on Taxation of Employment Settlements and Awards," National Employment Lawyers Association, 16th Annual Convention, Philadelphia, PA, June 24, 2005.

"Tax Issues with Environmental Expenditures," BNA Tax Management Advisory Board Meeting, New York, NY, June 16, 2005.

"Summary of New Tax Laws Affecting Employment Law Verdicts and Settlements," Plenary Session, 22nd Annual Upper Midwest Employment Law Institute, State Bar of Minnesota, St. Paul, MN, June 2, 2005.

"New Tax Laws Affecting Employment Law Verdicts and Settlements," Breakout Sessions (Sessions 111 and 404), 22nd Annual Upper Midwest Employment Law Institute, State Bar of Minnesota, St. Paul, MN, June 2, 2005.

"The Bottom Line: Tax Issues in Employment Cases," 38th Annual Pacific Coast Labor and Employment Law Conference, Seattle, WA, May 19, 2005.

"New Developments in the Taxation of Settlements and Attorneys Fees," Labor and Employment Law Section and Business Law/Business Litigation Section of the San Mateo County Bar Association, Redwood Shores, CA, April 28, 2005.

"Creative Uses of the 468B Trust," Society of Settlement Planners Annual Meeting, Washington DC, March 4, 2005.

"Legislation and Rulings Affecting Settlements," Society of Settlement Planners, Annual Meeting, Washington DC, March 4, 2005.

"Nonqualified Structured Settlements and Attorneys Fees Developments," Creative Capital-Allstate Conference, Newark, NJ, March 3, 2004.

"Non-Qualified Assignments," with John McCulloch and Brad Cantwell, Regional Conference, National Structured Settlements Trade Association, Charleston, SC, January 27, 2005.

"Update on Taxation of Damage Awards and Settlement Payments," University of Southern California Tax Institute, Los Angeles, CA, January 24, 2005.

"How to Effectively Utilize Structured Settlements in Employment Litigation," with Steve Chapman and John McCulloch, Labor and Employment Law Section of the San Francisco Bar Association, San Francisco, CA, December 15, 2004.

"Update on the Tax Treatment of Damage Awards," CBIZ Tax Conference 2004, San Francisco, CA, November 8-10, 2004.

"Update on the Tax Treatment of Damage Awards," 41st Heart of America Tax Institute, Kansas City, MO, November 4-5, 2004.

"Non-Qualified Assignments," National Structured Settlements Trade Association Regional Conference, Las Vegas, NV, October 7, 2004.

"Tax Reports on Lawyers' Fee: An Update on IRS 1099 Requirements," Wyoming Trial Lawyers Association, Telephone Seminar, October 7, 2004.

"Taxation of Plaintiffs Settlements Gross vs. Net?: Conflict Among the Circuits," with Randall L. Zamarra, Taxation, Law Practice Management and Litigations Sections of the San Francisco Bar Association, San Francisco, CA, September 24, 2004.

"Taxation of Litigation Payments in California: Including Damage Awards and Settlements," National Business Institute, San Francisco, CA, May 11, 2004.

"Taxation of Litigation Payments in California: Including Damage Awards and Settlements," Santa Clara County Bar Association, Santa Clara, CA, April 27, 2004.

"Tax and Strategy Issues in Selling Businesses," Business Team M&A Seminar, Pleasant Hill, CA, February 27, 2004.

"Business Break-ups and Divorce: Tax Aspects of Business Buyouts Pursuant to Marital Dissolution Agreements," 2003 Annual Meeting of the California Tax Bar, California Tax Policy Conference, San Francisco, CA, November 8, 2003.

"Allocation of the Proceeds of Litigation," Representing Workers and Low-Income Plaintiffs: Tax Consequences in Administration of Settlements and Resolving IRS Controversies, Workers Tax Committee, Oakland, CA, October 24, 2003.

"Payment, Distribution and Reporting of Litigation Proceeds," Representing Workers and Low-Income Plaintiffs: Tax Consequences in Administration of Settlements and Resolving IRS Controversies, Workers Tax Committee, Oakland, CA, October 24, 2003.

"Settlement Agreements," Representing Workers and Low-Income Plaintiffs: Tax Consequences in Administration of Settlements and Resolving IRS Controversies, Workers Tax Committee, Oakland, CA, October 24, 2003.

"Tax Issues in Buying or Selling a Business," Lorman Education Services, July 8, 2003.

"Taxation of Employment Law Settlements and Verdicts," Minnesota State Bar Association, 20th Annual Upper Midwest Employment Law Institute, Plenary Session, St. Paul, MN, May 28, 2003.

"Taxation of Damage Awards and Settlement Payments," Minnesota State Bar Association, 20th Annual Upper Midwest Employment Law Institute, Plenary Session, St. Paul, MN, May 28, 2003

"Tax Treatment of Attorneys' Fees," Internal Revenue Service National Office, Washington DC, May 12, 2003; House Committee on Ways and Means, May 12, 2003; U.S. Treasury Department, May 13, 2003; U.S. Tax Court, May 14, 2003 (2003 Delegation, California State Bar Tax Section).

"Tax Aspects of Settlements," California CPA Foundation, Advanced Litigation Institute, Palm Springs, CA, May 9, 2003.

"Estate Tax Planning," National Structured Settlement Trade Association, 2003 Annual Meeting & Conference, San Diego, CA, April 28, 2003.

"Section 468B Trusts: Can it Work with One Claimant?" National Structured Settlement Trade Association, Regional Meeting, St. Petersburg, FL, January 24, 2003.

"IRS Middleman Regulations and Other Issues with Taxation of Settlements," Metropolitan Washington Employment Lawyers Association, Live Videoconference, Washington DC, December 11, 2002.

"Tax Issues in Divorce," California State Bar Tax Section, 2002 Annual Meeting of the California Tax Bars, San Diego, CA, November 1, 2002.

"Income Tax and 1099 Aspects of Attorneys Fees," California State Bar Tax Section, 2002 Annual Meeting of the State Bar of California, Monterey, CA, October 12, 2002.

"Tax Issues In Buying or Selling a Business," San Francisco Women Tax Lawyers, San Francisco, September 19, 2002.

"Tax Aspects of Litigation Recoveries," Sacramento Consumer Attorneys, Sacramento, CA, September 13, 2002.

"Taxes and Employment Cases — Help!" Plaintiffs Employment Lawyers Association, Golden, CO, August 23, 2002.

"The Taxation of Settlements," University of Denver 52nd Annual Tax Institute, Denver, CO, July 25, 2002.

"Tax Issues in Buying or Selling a Business," Closely Held Corporations: Tax Issues and Planning Considerations, Lorman Education Services, San Francisco, July 18, 2002.

"Tax Issues in Executive Compensation," National Employment Lawyers Association, 13th Annual Convention, Lake Buena Vista, Florida, June 29, 2002.

"Taxation of Settlements and Judgments," National Employment Lawyers Association, 13th Annual Convention, Lake Buena Vista, Florida, June 28, 2002.

"Tax Issues in Buying or Selling a Business," California Association of Business Brokers, Buena Park, CA, June 1, 2002.

"Tax Treatment of Judgments and Settlements," Placer County Bar Association, 2002 Granlibakkan Conference, Tahoe City, April 26, 2002.

"Tax Aspects of Litigation Recoveries," San Mateo County Bar Association, Labor and Employment Law Section, Redwood City, March 28, 2002.

"Tax and Strategy Issues in Selling Businesses," Business Team, M&A Seminar, Pleasant Hill, February 13, 2002.

"Update on Damages/Settlements Tax Treatment," Sacramento County Bar Association Tax Section, Sacramento, January 28, 2002.

"Section 104 Compensation for Injuries and Sickness," Gonzaga University School of Law, Winter Tax Workshops, Spokane, WA, December 14, 2001.

"Tax Aspects of Litigation Recoveries," California State Bar Tax Section, 2001 Annual Meeting of the California Tax Bars, San Francisco, November 10, 2001.

"Selling Troubled Businesses," International Business Brokers Association, Inc., 34th Conference and Educational Program, Indian Wells, October 31, 2001.

"Tax Issues in Buying or Selling a Business," 49th Annual University of Montana Tax Institute, Missoula, MT, October 26, 2001.

"Update on Tax Treatment of Settlements and Judgments," State Bar of California Annual Meeting 2001, Anaheim, September 8, 2001.

"Settlement: The Tax Issues," American Law Institute, American Bar Association, Current Developments in Employment Law, Santa Fe, NM, July 28, 2001.

"Executive Compensation, Stock Options and Golden Parachutes," American Law Institute, American Bar Association, Current Developments in Employment Law, Santa Fe, NM, July 27, 2001.

"The Latest on Taxation of Settlements and Judgments," National Employment Lawyers Association, Twelfth Annual Convention, Seattle, WA, June 29, 2001.

"Current Trends Relating to Taxation of Damage Awards," San Francisco Bar Association, Tax Section, San Francisco, May 10, 2001.

"Recent Developments in The Taxation of Employment Awards and Settlements," Contra Costa County Bar Association, Employment Section, Walnut Creek, CA, March 27, 2001.

"Tax Issues in Employment Litigation," Presentation for Lewis, D'Amato, Brisbois & Bisgaard LLP, San Francisco, CA, March 7, 2001.

"Tax Issues in Employment Cases," Emerging Issues in Employment Law and Litigation, American Law Institute - American Bar Association, Live American Law Network Satellite Seminar, 80 locations in US broadcast from Reuters Telecom, Washington DC, February 22, 2001.

"Special Issues Affecting Dot.Coms and High-Tech Employees," California Employment Lawyers' Association Annual Conference, Santa Monica, CA, October 6, 2000.

"Tax Planning for Clients with Stock Options," California State Bar Tax Section, The 2000 Annual Income Tax Seminar: Real Estate and High-Tech Income Tax Issues, Whittier Law School, Costa Mesa, CA, June 16, 2000.

"Proposal to Amend Section 104," House Ways & Means Committee Staff, Washington DC, May 15, 2000; Joint Committee on Taxation, Washington DC, May 15, 2000; Senate Finance Committee Staff, Washington DC, May 16, 2000.

"Income Taxation of Damage Awards," California CPA Foundation, Advanced Fraud & Economic Damages Conference, La Quinta Resort & Club, Palm Springs, CA, May 12, 2000.

"M&A Tax Update for Advisors," Alliance of M&A Advisors Annual Meeting, Hard Rock Hotel, Las Vegas, NV, April 28, 2000.

"Tax Treatment and Reporting of Settlement Payments," Tax Executives Institute, 50th Mid-Year Conference, Washington DC, March 22, 2000.

"Negotiating Settlements of Employment Claims," Co-Sponsored by ABA Sections of Labor & Employment Law, Litigation, and Center of Continuing Legal Education, Live American Law Network Satellite Seminar, 80 locations in US broadcast from Reuters Telecom, Washington DC, January 27, 2000.

"Tax Planning for the Recovery of Damages," at The 52nd Annual Institute on Federal Taxation, University of Southern California, The Beverly Hilton, Beverly Hills, CA, January 11, 2000.

"The M&A Middle Market Today: An Overview of Taxes, Trends & Techniques," at The Corporate Profitability Continuum, sponsored by National Association of Certified Valuation Analysts and Quantum Alliance Companies, Chicago, IL, November 5, 1999.

"Due Diligence in Acquisitions," at The Corporate Profitability Continuum, sponsored by National Association of Certified Valuation Analysts and Quantum Alliance Companies, Chicago, IL, November 5, 1999.

"Update on Taxation of Damage Awards & Settlement Payments," 47th Annual University of Montana, Tax Institute, Missoula, MT, October 22, 1999.

"Buying and Selling Pass-through Entities," California CPA Foundation, 1999 S Corporations and Other Flow-through Entity Issues Conference, Los Angeles, August 26, 1999; San Francisco, August 27, 1999.

"Tax Aspects of Employment Settlements," Program on Settlement Agreements, American Bar Association Annual Meeting, Section on Employment Law, Atlanta, GA, August 11, 1999.

"Tax Treatment of Litigation Payments and Recoveries," American Lawyer Media Online Seminar, May 24-28, 1999.

"State Sales Tax Considerations in a Merger or Acquisition," Tax Executives Institute, State Tax Night, San Francisco, April 19, 1999.

"Tax Aspects of Employment Cases," Santa Clara County Bar Association, Tax Law Luncheon, Sunnyvale, March 25, 1999.

"Tax Aspects of Employment Cases," at The Nuts and Bolts of Plaintiff's Employment Litigation VII: Sexual Harassment Law, Dallas NELA, Dallas, TX, February 19, 1999.

"Planning with Family Limited Partnerships, S Corporations and Other Estate Planning Thoughts," Frank, Rimerman + Co., Palo Alto, January 8, 1999.

"Planning with Pass-through Entities," California CPA Foundation, 1998 Tax Update and Planning Conference, San Francisco, November 23, 1998; Universal City, November 24, 1998.

"Taxation of Settlements and Litigation Damage Awards," California State Bar Tax Section, 1998 Annual Meeting of the California Tax Bars, San Francisco, November 13, 1998.

"Taxation of Damage Awards & Settlement Payments," 1998 AICPA National Advanced Litigation Services Conference, Tempe, Arizona, October 15, 1998.

"Tax Treatment of Litigation Payments and Recoveries," Counsel Connect Online Seminar, July 20-24, 1998.

"Choosing Business Entities: Tax and Legal Considerations," Berkeley-Albany Bar Association, Berkeley, November 17, 1997.

"Drafting Effective Settlement and Termination Agreements: What Every Lawyer Needs to Know," Los Angeles County Bar Association, Labor & Employment Law Section, Los Angeles, November 15, 1997.

"Changes Affecting Estate & Trust Planning," California CPA Foundation, LLCs, Partnerships and S Corporations Conference, Los Angeles, August 18, 1997; S. San Francisco Conference Center, August 22, 1997.

"International Legal Issues," at 1997 Alameda International Trade Exposition, Alameda, August 16, 1997.

"Tax Tips in Negotiating and Settling Employment Cases," at NELA 1997 Annual Convention, Toronto, Ontario, June 27, 1997.

"Tax Planning for Employment Settlements Under the New Tax Law," Tax Executives Institute, Employee Benefits Seminar, Santa Clara, June 17, 1997.

"Environmental Remediation Costs—To Deduct or Not to Deduct," at 19th Annual NYU Conference on Federal Taxation of Real Estate Transactions, San Francisco, June 5, 1997.

"Employee or Independent Contractor: The Pros and Cons," California Continuing Education of the Bar, San Francisco, January 17, 1997.

"Tax Issues in Settling Litigation," State Bar of Wisconsin, Madison, December 19, 1996.

"Corporate Tax Law Update," Federal Tax Lectures, Michigan Association of CPAs, Livonia, December 3, 1996.

"Key Taxation Issues," China Today Legal Conference, The United States-China Business Council, San Francisco, September 20, 1996.

"Tax Issues in Bankruptcy and Insolvency," Tenth Annual Central California Bankruptcy Institute, San Joaquin College of Law, Fresno, September 12, 1996.

"Tax Issues in Structuring Settlements: Strategies and Techniques," NELA 1996 Annual Convention, San Diego, June 28, 1996.

"Tax Tips for the Employment Law Practitioner After *Schleier* and *Alexander*," ABA Tort & Insurance Practice Section and Section of Labor and Employment Law, May 29, 1996.

"Pending Tax Proposals," Association for Financial Planning, International Conference of Financial Planners Joint Meeting, Commonwealth Club, San Francisco, November 8, 1995.

"Structuring Litigation Payments and Recoveries," McGladrey & Pullen, 1995 Annual Tax Specialists' Conference, Schaumberg, Illinois, November 3, 1995.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 85 of 227

"Taxation of Damage Awards and Settlement Payments," California CPA Society, Taxation Committee, East Bay Chapter, Oakland, October 19, 1995.

"Tax Treatment of Recoveries After *Schleier*," Contra Costa County Bar Association, Employment, Labor Law and Workers' Compensation Section, Walnut Creek, September 26, 1995.

"Restructuring Entities," at 1995 Tax Planning for Family Business Conference, California CPA Foundation, San Francisco, September 20, 1995; Burbank, September 21, 1995.

"Tax Treatment of Recoveries: The Impact of the *Schleier* Case," at "Taxes, Documents and Audiotapes—The Trials and Tribulations of a Plaintiff's Employment Lawyer," sponsored by Plaintiff Employment Lawyers Group, San Francisco, September 14, 1995.

"Limited Liability Companies: When to Use Them," State Bar of California, General & Solo Practice Section, Monterey, June 2, 1995.

"Tax Consequences of Monies Recovered from Settlements or Judgments in Employment Disputes," The Labor and Employment Law Section of the Sacramento County Bar Association, Sacramento, May 23, 1995.

"Incorporation Issues and Business Comparisons for Service Based Businesses," American Benefit Institute, San Francisco, May 18, 1995.

"Limited Liability Companies," Berkeley-Albany Bar Association, Berkeley, April 24, 1995.

"LLCs: Understanding California's Limited Liability Company Act," California CPA Foundation, San Francisco, December 21, 1994; Rohnert Park, January 21, 1995; Concord, January 31, 1995.

"Taxation of Litigation and Settlement Payments: Principles and Planning Opportunities," California Continuing Education of the Bar, Irvine, CA, December 5, 1994; San Diego, December 8, 1994; Sacramento, December 10, 1994; San Francisco, January 12, 1995; Los Angeles, January 19, 1995.

"Dealing With the Independent Contractor-Employee Controversy," CPA Club of the East Bay, Emeryville, November 10, 1994.

"Selling Closely Held Businesses," 1994 Tax Planning for the Family Business, California CPA Foundation, San Francisco, September 21, 1994; Los Angeles, September 22, 1994.

"Avoiding Prohibited Private Inurement," 1994 Exempt Organizations Forum, Faulkner & Gray, Washington DC, September 13, 1994.

"Characterizing Litigation Recoveries as Excludable Tort Damages: How Far Can You Go?" San Francisco Bar Association, Tax Section, San Francisco, September 7, 1994.

"Influencing the Tax Treatment of Litigation Recoveries/Payments," California CPA Foundation, Litigation Committee, San Francisco, August 23, 1994.

"Corporate Liquidations: Federal and California," California CPA Foundation, Burbank, July 5, 1994; Anaheim, July 12, 1994; San Diego, July 26, 1994; San Francisco, August 9, 1994; Los Angeles, August 16, 1994; Burbank, February 7, 1995.

"Current Developments in S Corporations," with Gary R. McBride, California CPA Foundation, 1994 S Corporations Conference, Burbank, June 22, 1994; San Francisco, June 23, 1994.

"Tax Aspects of Settling Employment Litigation," in Litigating Discrimination/Discharge Cases, Labor & Employment Section, State Bar of California, Anaheim, May 27, 1994.

"Tax Issues in Bankruptcy and Insolvency," 1993 Tax Accounting Conference, California CPA Foundation, Los Angeles, November 23, 1993.

"1993 Fall Tax Update," CCH Seminars/AES, Sacramento, November 22, 1993.

"Home Office Tax Deductions," California CPA Foundation, Access Program, San Francisco, November 4, 1993.

"Tax Strategies in Hiring, Retaining and Terminating Employees," California CPA Foundation, Sacramento, October 20, 1993.

"Tax Aspects of Settling Employment Law Cases," Sedgwick, Arnold, Detert & Moran, San Francisco, October 5, 1993.

"Doing Business in the United States," Shanghai Government Business Exchange, California State University, Hayward, October 6, 1993.

"Section 457: Problems and Possibilities," 1993 Exempt Organizations Tax Forum, Faulkner & Gray, Washington DC, September 13, 1993.

"Tax Treatment of Discrimination and Other Employee Recoveries," in "Effective Methods and Issues Relating to the Settling of Employment Lawsuits: An Opportunity to Learn From the Experts," Labor and Employment Law Section of Bar Association of San Francisco, San Francisco, September 10, 1993.

"Independent Contractor vs. Employee Issues," California CPA Foundation, Monterey, August 18, 1993; Sacramento, September 1, 1993; Ontario, September 20, 1993; Orange County, September 24, 1993; Los Angeles, September 27, 1993; Walnut Creek, October 1, 1993; San Francisco, October 29, 1993.

"Living With the Built-In Gain Tax Under the New Proposed Regulations," California CPA Foundation, 1993 S Corporations Conference, Los Angeles, June 23, 1993; San Francisco, June 24, 1993.

"Tax Consequences of Judgments and Settlements," State Bar of California, Taxation Section Education Institute, Monterey, May 15, 1993.

"Tax Consequences of Settlements and Judgments: What Every Litigator Should Know," California Continuing Education of the Bar, Taxation Section, San Francisco, March 19, 1993; Los Angeles, March 26, 1993; Sacramento, April 26, 1993.

"Current Developments in Tax Law: Legislation, Cases and Administrative Developments," California CPA Foundation, 43rd Annual Tax Accounting Conference, San Francisco, November 23, 1992; Beverly Hills, November 24, 1992.

"Choosing the Appropriate Entity: Proprietorship, Partnership, S Corporation, C Corporation (or Even Limited Liability Company)," California Society of Enrolled Agents, Golden Gate Chapter, 1992 Annual Fall Seminar for Tax Professionals, November 20, 1992, Foster City.

"Tax Consequences of Settlements and Judgments," California CPA Foundation, Committee on Litigation Services, San Francisco, October 27, 1992.

"Tax Consequences of Settlements and Judgments," CPA Club of the East Bay, Berkeley, October 22, 1992.

"Bankruptcy and Insolvency: Tax Planning Strategies," California CPA Foundation, Universal City, October 8, 1992; San Diego, October 23, 1992; San Jose, November 6, 1992; San Francisco, November 12, 1992; Los Angeles, November 17, 1992; Lake Tahoe, June 7, 1993; San Diego, July 13, 1993; Los Angeles, October 27, 1993; San Francisco, November 15, 1993; Los Angeles, December 6, 1993.

"Recent Developments Affecting Closely Held Businesses," 1992 Tax Planning for Closely Held Business Conference, California CPA Foundation, Universal City, September 17, 1992; San Francisco, September 18, 1992.

"Cashing In On the Current Rage: Spinoffs in the 90s," State Bar of California, Annual Meeting of the California Tax Bar, Los Angeles, September 11, 1992.

"Troublesome Issues Regarding Second Class of Stock and Built-in Gains," California CPA Foundation, 1992 S Corporations Conference; San Francisco, June 23, 1992; Los Angeles, June 24, 1992.

"Taxation of Damages and Settlements," 1992 Litigation Advanced Forum, California CPA Foundation, San Diego, April 20, 1992.

"Taxation of Damage Awards and Settlement Payments," California CPA Foundation, Palm Springs, December 9, 1991; San Francisco, January 8, 1992; South Lake Tahoe, June 19, 1992; Monterey, August 26, 1992; Palm Springs, December 14, 1992.

"Income Taxation of California Corporations," National Business Institute, San Francisco, July 18, 1991.

"S Corporations," 1991 S Corporation Conference, California CPA Foundation, San Francisco, June 18, 1991; Los Angeles, June 19, 1991.

"Corporate Multistate Tax Savings Strategies," California CPA Foundation, Beverly Hills, June 4, 1991; San Francisco, June 10, 1991.

"Advanced Issues in Tax Planning for S Corporations," California CPA Foundation, Palm Springs, December 4, 1990; San Diego, July 16, 1991; San Francisco, July 26, 1991.

"Disposing of Closely Held Businesses Including Professional Practices," 1990 Tax Accounting Conference, California CPA Foundation, Los Angeles, November 12, 1990; San Francisco, November 13, 1990.

"Advanced Corporate Tax Problems," California CPA Foundation, Anaheim, November 7, 1990.

"S Corporations," East Bay Chapter Taxation Committee, California CPA Foundation, Walnut Creek, October 18, 1990.

"Planning for the Exit: Sales, Exchanges and Dispositions of Businesses," Tax Planning for Closely Held Businesses Conference, California CPA Foundation, Los Angeles, August 23, 1990; San Francisco, August 24, 1990.

"S Corporation Built-In Gains and Losses," San Jose Chapter Technical Luncheon, California CPA Foundation, San Jose, August 16, 1990.

"Solving Tax Problems of the Closely Held Corporation," California CPA Foundation, San Diego, June 22, 1990.

"Minimizing the Built-in Gain Tax," 1990 S Corporation Conference, California CPA Foundation, San Francisco, June 19, 1990; Los Angeles, June 20, 1990.

"Corporate Tax Update," at 1989 Tax Planning for Closely Held Businesses Conference, California CPA Foundation, San Francisco, December 4, 1989.

"Minimizing Built-In Gains Tax," at 1989 S Corporation Conference, California CPA Foundation, Los Angeles, September 21, 1989; Redwood City, September 22, 1989.

"The Closely Held Corporation: Advanced Problems," California CPA Foundation, Los Angeles, July 12, 1989, Costa Mesa, November 9, 1989.

"The Closely Held Corporation: Essential Issues," California CPA Foundation, Los Angeles, July 11, 1989; Costa Mesa, November 8, 1989.

"After the LBO: Asset and Business Dispositions," Tax Executives Institute, San Francisco, October 9, 1989.

"Corporate Sales of Real Estate and Real Estate Subsidiaries After *General Utilities* Repeal: Don't Worry, Be Happy," Eighth Annual Institute on Advanced Tax Planning for Real Property Transactions, California Continuing Education of the Bar, Beverly Hills, June 9, 1989; San Francisco, June 16, 1989.

"Corporate Liquidations Tax Update," San Francisco Bar Tax Section, San Francisco, April 19, 1989.

"Tax Planning for Shareholders of Closely Held Corporations," California CPA Foundation, San Francisco, November 11, 1988.

"Tax Considerations in Transferring Ownership of a Business," International Association for Financial Planning, Annual Conference and Exposition, New York, September 17, 1988.

"Tax Smart Ways to Buy or Sell a Business," in Tax Planning for Closely Held Corporations Conference, California CPA Foundation, Los Angeles, September 8, 1988; San Francisco, September 9, 1988.

"Tax Consequences of Corporate Liquidations," California CPA Foundation, Monterey, August 24, 1988; Calistoga, December 2, 1988; Costa Mesa, October 17, 1989; Palm Springs, December 15, 1989.

"The New Passive Loss Regulations," California Continuing Education of the Bar, San Francisco, June 11, 1988.

"Problems of the Closely Held Corporation," California CPA Foundation, Sacramento, January 27, 1988.

"Family Tax Planning," Annual Conference and Exposition, International Association for Financial Planning, Atlanta, Georgia, October 5-8, 1987.

"Corporate Liquidations After the 1986 Tax Reform Act," California CPA Foundation, Los Angeles, July 20, 1987; San Francisco, September 14 and November 11, 1987; Sacramento, December 1, 1987.

"Compensation Planning for Executives and Business Owners," Conference for Advanced Planners, International Association for Financial Planning, Washington DC, June 15-17, 1987.

"1986 Tax Reform Update," California Continuing Education of the Bar, Concord, October 2, 1986; Berkeley, October 14, 1986; San Francisco, October 23, 1986.

"Real Property Transactions After the 1986 Tax Reform," California Continuing Education of the Bar, North Lake Tahoe, September 27, 1986; Fresno, October 11, 1986.

"Tax Planning for Families and Family Businesses," California Continuing Education of the Bar, Berkeley, November 25 and 27, 1985; San Francisco, December 7, 1985.

"Income Tax Consequences of Real Property Transactions," California Continuing Education of the Bar, San Rafael, September 3 and 5, 1985.

"Tax and Financial Planning for Individuals," California Continuing Education of the Bar, North Lake Tahoe, June 1, 1985; Oakland, June 4 and 5, 1985; San Francisco, June 11 and 13, 1985.

"Tax and Nontax Aspects of Co-Ownership of Property," California Continuing Education of the Bar, Fresno, February 2, 1985; San Francisco, February 9 and 27, 1985.

"What You Should Know About the New 1984 Tax Act," San Francisco Bar Tax Section, San Francisco, July 31, 1984.

"Fundamentals of Income Taxation," California Continuing Education of the Bar, San Francisco, June 6, 11 and 27, 1984.

"Tax Planning for Lawyers, Doctors and Accountants," San Francisco Bar Tax Section, San Francisco, March 22, 1983.

## RADIO, TV AND INTERNET APPEARANCES

"Structured Attorney Fees," 2007 Beyond Structured Settlements, August 23, 2007.

"Single Claimant 468B Settlement Funds," 2007 Beyond Structured Settlements, August 17, 2007.

"The Structured Sale: In Depth Interview with Robert W. Wood, J.D., 2007," The Settlement Institute, April 7, 2007.

"Attorney Robert Wood and Jan Schlichtmann discuss 468B trusts," 2007 Mass Torts Made Perfect Conference, Legal Broadcast Network, March 29, 2007.

"Damage Awards and Settlement Payments: Lingering Controversies," The CPA Report, Tax Specialist, December 2006.

"Attorney Rob Wood on Private Annuity trusts demise," The Settlement Channel and Legal Broadcast Network, November 1, 2006.

"Tax Issues in Contingency Fees," SeminarWeb Live, Sponsored by LawFinance Group, Inc., September 21, 2006.

"Podcast Interviews with Attorney Robert Wood on the Murphy Decision," The Settlement Channel and Legal Broadcast Network (two parts), August 24, 2006.

"Structured Legal Fees," Legal Broadcast Network Interview (two parts), November 11, 2005.

"Taxation of Damage Awards and Settlement Payments," Sky Radio Interview, October 12, 2005.

"Structuring Legal fees. Problem Solved! Your Great Opportunity for Financial Security," Ask the Experts Series, Legal Broadcast Network, February 17, 2005.

"How will the Supreme Court Ruling Affect Lawyers' Contingent Fees?" Ask the Experts Series, Legal Broadcast Network, February 10, 2005.

"*Commissioner v. Banks*," American Bar Association, Labor and Employment Section, Teleseminar, February 10, 2005.

"Back Door Tort Reform: The Stealth Campaign to Strip 468B Trusts From the Trial Lawyers Settlement Options," Ask the Experts Series, Legal Broadcast Network, February 3, 2005.

"The Settlement Minefield: What Every Plaintiff Needs To Do To Get Through It Alive!" Ask the Experts Series, Legal Broadcast Network, January 13, 2005.

"Attorneys Fees in Discrimination Cases: The Long Tax Nightmare Might Just be Over!" Ask the Experts Series, Legal Broadcast Network, December 9, 2004.

"Tax and Tax Reporting Issues in Employment Settlements," American Bar Association, Section of Labor and Employment Law, Live Satellite Seminar, Washington DC, January 28, 2003.

"IRS Middleman Regulations and Other Issues with Taxation of Settlements," Metropolitan Washington Employment Lawyers Association, Live Videoconference, Washington DC, December 11, 2002.

"Supreme Court Delivers Defeat to Employers in Tip Tax Case," Employment & Labor Lawcast, June 24, 2002.

"Tax Issues in Employment Cases," Emerging Issues in Employment Law and Litigation, American Law Institute - American Bar Association, Live American Law Network Satellite Seminar, 80 locations in US broadcast from Reuters Telecom, Washington DC, February 22, 2001.

"Negotiating Settlements of Employment Claims," Co-Sponsored by ABA Sections of Labor & Employment Law, Litigation, and Center of Continuing Legal Education, Live American Law Network Satellite Seminar, 80 locations in US broadcast from Reuters Telecom, Washington DC, January 27, 2000.

“Year-End Tax Planning,” on *Your Legal Rights*, KALW-FM Radio, San Francisco, December 17, 1997.

“Tax Choices in Setting Up a Small Business,” on *Your Legal Rights*, KALW-FM Radio, San Francisco, April 30, 1997.

“Tax Treatment of Monetary Awards in Gender, Race and Age Discrimination, Sexual Orientation, and Wrongful Termination of Employment Cases,” on *Your Legal Rights*, KALW-FM Radio, San Francisco, January 17, 1996.

“Year-End Tax Planning,” on *Law Practice Management Review*, December 1995 (taped release).

“Taxation of Damage Awards,” *The CPA Report*, Television Education Network, January 1992.

“Bankruptcy Exception to NOL Restrictions,” *The CPA Report*, Television Education Network, March 1992.

**Exhibit A-5**

# WOOD & PORTER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

Certified in Taxation
California Board of Legal Specialization

Certified Public Accountants

333 Sacramento Street
San Francisco, CA 94111-3601
Tel 415.834.1800 Fax 415.834.1888
www.woodporter.com

Qualified in CA, NY, DC, AZ, WA, MT, WY, TX, England and Wales

Canadian Bar Association
Australian Bar Council

## EXPERT TESTIMONY

We regularly serve as consulting experts on tax matters, providing technical expertise and guidance to litigation counsel. Robert W. Wood often renders expert testimony on tax and tax-related issues in civil disputes. In the vast majority of these cases, he has been disclosed as an expert and then testified. Wood has often prepared written opinions or expert's reports.

In some cases, Mr. Wood has not been named as an expert and has instead rendered consulting services to the plaintiff or defendant team. In these latter cases, his discussions and work product are protected by the attorney-client privilege.

A common focus of Wood's testimony is the tax treatment of a transaction or factual pattern. For example, he has served as an expert on the distinction between independent contractors and employees, the treatment of home office expenses, investment interest expenses, the tax treatment of marital dissolution, the dissolution of quasi-marital palimony relationships, the tax aspects of real estate transactions, tax shelters, etc.

In some cases, Mr. Wood's role also extends to non-tax matters affecting tax issues (for example, the admissibility of evidence relating to tax issues). Tax calculations are sometimes also needed, including projections based on anticipated alternative awards to be made by the court. The tax treatment of attorneys' fees may also be addressed. David B. Porter has also served as a tax expert, including in criminal cases.

Our expert witness roles have included the following:

- Declarant as to employment status of jockeys of relevance in assessing the legal status of the Jockeys' Guild (*Jockeys' Guild, Inc. et al. v. L. Wayne Gertemenian, et al.*, Central District of California, Case No. CV 06-1213 ODW).

- Testified for the defense in a case involving medical corporations and the status as employee or independent contractors of physicians (*Ziba Chavoshi, M.D. and Michele Vargas, D.O. v. Michael S. Agron, M.D., Inc., et al.*, Los Angeles County Superior Court, Consolidated Case No. BC333843).

- Testified for the plaintiff group of limousine drivers in a case involving the status of drivers for a national limousine chain (*Brown et al. v. Carey Limousine of S.F., Inc., Carey International, Inc.*, San Francisco County Superior Court Case No. CGC 04 437287).

- Served as an expert concerning independent contractor vs. employee distinctions in litigation against the Los Angeles Times newspaper (*Robert and Elizabeth Rodgers v. Los Angeles Times Communications and Benjamin Ruiz*, No. 04CC09546, Superior Court Orange County).

- Served as an expert for the plaintiffs in a class action involving the status of drivers as independent contractors or employees (*Anthony Estrada, et al. v. RPS, Inc.*, Los Angeles County Superior Court No. BC210130).

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 92 of 227

- Served as an expert for plaintiffs regarding worker classification (*Alfredo Alvarez and Anthony Mariscal v. Fox Transport Inc., We-R-Drayage, McKesson Corp., et al.*, No. BC284345, Los Angeles County Superior Court).

- Testified on the status of insurance brokers as independent contractors v. employees in a nationwide class action over the classification and benefits of thousands of workers (*David A. Morlan, et al. v. Universal Guaranty Life Insurance Company, et al.*, Case No. 992-274-PER).

- Testified in an accounting malpractice case concerning the tax implications of liquidating a corporation or electing S corporation status as a result of federal tax legislation (*Harvard Investments v. DeLucca*, San Jose Superior Court Case No. CV 760424).

- Appeared for the plaintiffs in a large employment discrimination case, providing technical support for the tax aspects of a fee application having a dramatic effect on the tax treatment to the plaintiff class (*Kaaren Yarborough v. PeopleSoft*, Alameda County Superior Court Case No. 775 405-2).

- Testified on the tax impact of the separation of personal and investment assets of an unmarried couple.

- Served as an expert in an action for alleged malpractice by an accounting firm over a failed tax-free exchange of real estate (*Pamela Kramer v. Rich & Kornetsky, CPA; Steven Kornetsky; and James Hopper*, San Francisco County Superior Court No. 315588).

- Served as a tax expert in a dispute involving the tax treatment of payments between U.S. and Russian affiliate companies.

- Rendered expert testimony on the classification of statutory employees in a large class action against multiple employer defendants (*Smith v. Torchmark*, 95-3304-CV- S-4).

- Served as a court-appointed expert reporting to the Judge in a large employment discrimination case, advising on the income and employment tax impact to the defendant employer and the recipient employees (*Patrick Graham v. Boy Scouts of America*, Northern District of California. D.C. No. CV-93-2958 MHP).

- Served as an expert in two cases involving insurance company and structured settlement company defendants and the assignability of structured settlement awards and annuity payments.

- Advised on the tax aspects of ownership and use of intellectual property in an arbitration among multiple commercial parties.

- Advised class counsel and their economists on the tax impact of a more than $100 million antitrust settlement involving Microsoft (Microsoft cases I-V, Microsoft 4106 Class, see Judicial Council Coordinating Proceeding (J.C.C.P) 4106).

- Advised a condominium association on the tax treatment of anticipated settlement monies arising out of construction defect litigation.

**Exhibit B**

64 Cal.Rptr.3d 327
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305
**(Cite as: 64 Cal.Rptr.3d 327)**

**Estrada** v. **FedEx Ground Package System**, Inc.
Cal.App. 2 Dist.,2007.

Court of Appeal, Second District, Division 1, California.
Anthony **ESTRADA** et al., Plaintiffs and Appellants,
v.
**FEDEX GROUND PACKAGE SYSTEM**, INC., Defendant and Appellant.
**No. B189031.**

Aug. 13, 2007.

**Background:** Three drivers brought class action against **package** delivery company, contending that, for limited purpose of their entitlement to reimbursement for work-related expenses, they were employees, not independent contractors. The Superior Court of Los Angeles County, No. BC210130,Bruce E. Mitchell, Temporary Judge, entered orders dismissing some members from class. Drivers appealed, and the Court of Appeal, 125 Cal.App.4th 976, 23 Cal.Rptr.3d 261, dismissed appeal as premature. Other equitable orders were reversed on appeal, and in trifurcated trial on remand, the Superior Court, Los Angeles County, No. BC210130,Howard J. Schwab, Judge, and Bruce Mitchell, Temporary Judge, found drivers were employees, ordered company to reimburse some but not all of drivers expenses, granted most of equitable relief drivers sought, and ordered company to pay drivers' costs and attorney fees. Company appealed and drivers cross-appealed.

**Holdings:** The Court of Appeal, Vogel, J., held that:

(1) drivers were employees rather than independent contractors;

(2) drivers' claims were suitable for class action;

(3) company did not comply with statutory obligation to reimburse its drivers;

(4) representative driver was entitled to attorney fees under private attorney general doctrine;

(5) attorney fees award of $12.3 million was excessive;

(6) expert analysis was not admissible to prove damages; and

(7) company was required to reimburse drivers for their work accident insurance premiums.

Affirmed in part, reversed in part, and remanded with directions.
West Headnotes
**[1] Labor and Employment 231H 29**

231H Labor and Employment
231HI In General
231Hk28 Independent Contractors and Their Employees
231Hk29 k. In General. Most Cited Cases
For statute requiring employers to indemnify employees for their expenses and losses in discharging duties, drivers for package delivery company were " employees" of company, rather than " independent contractors," notwithstanding drivers provided their own trucks and related equipment and parties' operating agreement identified drivers as independent contractors; company controlled drivers' appearance, drivers were required to wear uniforms and use specific computer scanners and forms for packages, all provided by company and marked with company's logo, many standard employee benefits were provided, drivers worked full time with regular schedules and routes, terminal managers were the drivers' immediate supervisors and could reconfigure drivers' routes without regard to drivers' resulting loss of income, customers were company's customers, and drivers were paid weekly rather than by job. West's Ann.Cal.Labor Code § 2802.
*See 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 122 et seq.; Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2006) ¶ 3:1 et seq. (CAEMPL Ch. 3-A); Cal. Jur. 3d, Employer and employee, § 35 et seq.; Cal. Civil Practice (Thomson/West 2003) Employment Litigation, § 9:3.*
**[2] Labor and Employment 231H 23**

231H Labor and Employment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 Cal.Rptr.3d 327 Page 2
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305
**(Cite as: 64 Cal.Rptr.3d 327)**

231HI In General
231Hk22 Nature, Creation, and Existence of Employment Relation
231Hk23 k. In General. Most Cited Cases
Because statute requiring employers to indemnify employees for their expenses and losses in discharging duties does not expressly define "employee," the common law test of employment applies. West's Ann.Cal.Labor Code § 2802.

**[3] Labor and Employment 231H ⚷23**

231H Labor and Employment
231HI In General
231Hk22 Nature, Creation, and Existence of Employment Relation
231Hk23 k. In General. Most Cited Cases

**Labor and Employment 231H ⚷29**

231H Labor and Employment
231HI In General
231Hk28 Independent Contractors and Their Employees
231Hk29 k. In General. Most Cited Cases
The essence of the test for whether a worker is an employee or an independent contractor is the control of details, that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work.

**[4] Labor and Employment 231H ⚷23**

231H Labor and Employment
231HI In General
231Hk22 Nature, Creation, and Existence of Employment Relation
231Hk23 k. In General. Most Cited Cases

**Labor and Employment 231H ⚷29**

231H Labor and Employment
231HI In General
231Hk28 Independent Contractors and Their Employees
231Hk29 k. In General. Most Cited Cases
Factors considered in determining whether a worker is an employee or an independent contractor include (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship.

**[5] Labor and Employment 231H ⚷23**

231H Labor and Employment
231HI In General
231Hk22 Nature, Creation, and Existence of Employment Relation
231Hk23 k. In General. Most Cited Cases

**Labor and Employment 231H ⚷29**

231H Labor and Employment
231HI In General
231Hk28 Independent Contractors and Their Employees
231Hk29 k. In General. Most Cited Cases
When determining whether a worker is an employee or an independent contractor, the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship.

**[6] Appeal and Error 30 ⚷1010.1(8.1)**

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings
30XVI(I)3 Findings of Court
30k1010 Sufficiency of Evidence in Support
30k1010.1 In General
30k1010.1(8) Particular Cases and Questions
30k1010.1(8.1) k. In General. Most Cited Cases

**Labor and Employment 231H ⚷58**

231H Labor and Employment
231HI In General
231Hk58 k. Questions of Law and Fact as to Employment Status. Most Cited Cases
A trial court's determination whether a worker is an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employee or an independent contractor is one of fact and thus must be affirmed if supported by substantial evidence.

**[7] Parties 287 35.75**

287 Parties
287III Representative and Class Actions
287III(C) Particular Classes Represented
287k35.75 k. Employees. Most Cited Cases
Package delivery drivers' action against company, contending that they were employees, not independent contractors, for purpose of their entitlement to reimbursement for work-related expenses, was suitable for class treatment, notwithstanding anecdotal evidence specific to individual drivers; common issues prevailed and anecdotal evidence was admitted for its relevance to class as a whole. West's Ann.Cal.Labor Code § 2802.

**[8] Appeal and Error 30 949**

30 Appeal and Error
30XVI Review
30XVI(H) Discretion of Lower Court
30k949 k. Allowance of Remedy and Matters of Procedure in General. Most Cited Cases

**Parties 287 35.9**

287 Parties
287III Representative and Class Actions
287III(A) In General
287k35.9 k. Discretion of Court. Most Cited Cases
The decision whether to certify a class is one within the trial court's discretion and will be set aside only upon a showing of abused discretion.

**[9] Parties 287 35.75**

287 Parties
287III Representative and Class Actions
287III(C) Particular Classes Represented
287k35.75 k. Employees. Most Cited Cases
Class of package delivery drivers for nationwide company was ascertainable so as to allow class treatment of drivers' claims that they were employees, not independent contractors, for purpose of their entitlement to reimbursement for work-related expenses; class was limited to drivers in single work area who drove full time and who did not subcontract their service areas out to others for reasons other than vacation, sick leave, or other commonly excused employment absences. West's Ann.Cal.Labor Code § 2802.

**[10] Parties 287 35.17**

287 Parties
287III Representative and Class Actions
287III(A) In General
287k35.17 k. Community of Interest; Commonality. Most Cited Cases

**Parties 287 35.41**

287 Parties
287III Representative and Class Actions
287III(B) Proceedings
287k35.41 k. Identification of Class; Subclasses. Most Cited Cases
A class action requires an ascertainable class with a well-defined community of interest among its members.

**[11] Parties 287 35.17**

287 Parties
287III Representative and Class Actions
287III(A) In General
287k35.17 k. Community of Interest; Commonality. Most Cited Cases
For class actions, “ community of interest” requires that common questions of law or fact predominate, and that class representatives, who must be able to adequately represent the class, have claims typical of the class.

**[12] Parties 287 35.41**

287 Parties
287III Representative and Class Actions
287III(B) Proceedings
287k35.41 k. Identification of Class; Subclasses. Most Cited Cases
For a class action, the class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description.

**[13] Labor and Employment 231H 194**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

231H Labor and Employment
231HIV Compensation and Benefits
231HIV(A) In General
231Hk194 k. Reimbursements and Advances in General. Most Cited Cases
Package delivery company did not comply with obligation to reimburse its drivers under statute requiring employers to indemnify employees for their expenses and losses in discharging duties; parties operating agreement obligated drivers to provide their own trucks, computer scanners, and clean uniforms, and payment settlement formula in agreement pertained to " services provided," not expenses incurred. West's Ann.Cal.Labor Code § 2802.

**[14] Costs 102 ⚷194.42**

102 Costs
102VIII Attorney Fees
102k194.42 k. Public Interest and Substantial Benefit Doctrine; Private Attorney General. Most Cited Cases
Representative package delivery driver who prevailed in class action on behalf of 209 drivers on his claims against package delivery company that, for limited purpose of their entitlement to reimbursement for work-related expenses, drivers were employees, not independent contractors, was entitled to attorney fees under private attorney general doctrine, notwithstanding his personal motivation. West's Ann.Cal.C.C.P. § 1021.5; West's Ann.Cal.Labor Code § 2802.

**[15] Costs 102 ⚷194.42**

102 Costs
102VIII Attorney Fees
102k194.42 k. Public Interest and Substantial Benefit Doctrine; Private Attorney General. Most Cited Cases
Attorney fee award of $12.3 million under private attorney general doctrine was excessive for representative package delivery driver who prevailed in class action claims against package delivery company that, for limited purpose of their entitlement to reimbursement for work-related expenses, drivers were employees, not independent contractors; driver did not obtain everything he sought, as several equitable orders, including injunction, were reversed on appeal. West's Ann.Cal.C.C.P. § 1021.5; West's Ann.Cal.Labor Code § 2802.

**[16] Costs 102 ⚷194.42**

102 Costs
102VIII Attorney Fees
102k194.42 k. Public Interest and Substantial Benefit Doctrine; Private Attorney General. Most Cited Cases
While the amount of an attorney fee award under the private attorney general doctrine is ultimately a decision within the trial court's discretion, the fee must above all else be reasonable and a multiplier, if used, must be based on facts other than those used to trigger the application of the doctrine. West's Ann.Cal.C.C.P. § 1021.5.

**[17] Labor and Employment 231H ⚷157**

231H Labor and Employment
231HIII Rights and Duties of Employers and Employees in General
231Hk143 Actions by Employer Against Employee
231Hk157 k. Costs and Attorney Fees. Most Cited Cases
Package delivery drivers, who sought reimbursement from delivery company for expenses related to their providing their own trucks and other equipment, were not entitled to present expert analysis computing damages, and were instead limited to recovering expenses shown by receipts, their personal record, and company's records. West's Ann.Cal.Labor Code § 2802.

**[18] Labor and Employment 231H ⚷194**

231H Labor and Employment
231HIV Compensation and Benefits
231HIV(A) In General
231Hk194 k. Reimbursements and Advances in General. Most Cited Cases
Employers may require employees to purchase trucks as condition of employment, and thus, package delivery company that required drivers to purchase trucks for delivering packages was not required, under statute requiring employers to indemnify employees for their expenses and losses in discharging duties, to reimburse drivers for costs of their trucks. West's Ann.Cal.Labor Code § 2802.

**[19] Labor and Employment 231H ⚷2181**

231H Labor and Employment
231HXIII Wages and Hours
231HXIII(A) In General
231Hk2179 Time of Payment
231Hk2181 k. What Are Wages. Most Cited Cases

Package delivery company that required drivers to purchase trucks for delivering packages was required, under statute requiring employers to indemnify employees for their expenses and losses in discharging duties, to reimburse the drivers for their work accident insurance premiums. West's Ann.Cal.Labor Code § 2802.

**[20] Parties 287 35.41**

287 Parties
287III Representative and Class Actions
287III(B) Proceedings
287k35.41 k. Identification of Class; Subclasses. Most Cited Cases

**Parties 287 35.75**

287 Parties
287III Representative and Class Actions
287III(C) Particular Classes Represented
287k35.75 k. Employees. Most Cited Cases

In ascertaining class for package delivery drivers' class action delivery company, contending that they were employees, not independent contractors, it was not erroneous for trial court to use class questionnaires as test to determine which of 700 absent class members wished to participate, rather than determining which fit class definition and then dismissing all absent class members who did not fully participate in discovery.

***330** Seyfarth Shaw, James M. Nelson, Sacramento; O'Melveny & Myers, Walter Dellinger, Washington, DC, Robert M. Schwartz, Los Angeles, Chris A. Hollinger, San Francisco, and Jonathan D. Hacker, Washington, DC, for Defendant and Appellant.

Law Offices of Ellen Lake and Ellen Lake, Oakland; Leonard Carder, Lynn Rossman Faris, Oakland, and Beth A. Ross, San Francisco, for Plaintiffs and Appellants.

VOGEL, J.

Three drivers brought this class action against FedEx Ground Package System, Inc., contending that, for the limited purpose of their entitlement to reimbursement for work-related expenses, they were employees, not independent contractors. They sought reimbursement and declaratory and injunctive relief, and obtained class certification for their reimbursement claim. In a trifurcated trial, the court found the drivers were employees within the meaning of Labor Code section 2802 (Phase I), ordered **FedEx** to reimburse some (about $5 million, including prejudgment interest) but not all of their expenses (Phase II), granted most of the equitable relief sought by the drivers (Phase III), and ordered **FedEx** to pay the drivers' costs and attorneys' fees (about $12.3 million).

This is the third appeal in this case. In ***Estrada*** *I*, we held that orders dismissing some potential class members were not appealable, and dismissed the appeal as premature. (***Estrada*** *v. RPS, Inc.* (2005) 125 Cal.App.4th 976, 23 Cal.Rptr.3d 261.) In ***Estrada*** *II*, we reversed all of the equitable orders, resolving those issues against the drivers and in favor of **FedEx**. (***Estrada*** *v.* ***FedEx*** ***Ground Package System****, Inc.* (Nov. 22, 2006, B187951), 2006 WL 3378246 [nonpub. opn.], ***Estrada*** *II.*) On this appeal, we consider **FedEx's** challenges to the trial court's class certification order, the court's Phase I finding that the drivers are employees, its Phase II reimbursement awards, and its post-trial attorneys'***331** fee award.[FN1] On the drivers' cross-appeal, we consider their challenges to limitations imposed on the Phase II reimbursement awards and to the pretrial orders dismissing potential class members (the issue prematurely before us in *Estrada I* ). We affirm the finding that the drivers are employees, the certification order, and the finding that attorneys' fees are recoverable, but reverse the fee award because the amount must be reconsidered, reverse two orders limiting the scope of reimbursable expenses, and remand to the trial court for further proceedings and recalculation of the attorneys' fee award.

FN1. The trial court defined the certified class to include present and former drivers who personally perform or performed pickup and delivery services for FedEx on a full-time basis in a single work area or route (SWA's). Drivers who operate or operated in multiple work areas or routes (MWA's), corporate entities, and others were excluded from the class. Two of the three named plaintiffs (Anthony Estrada and Jeffrey Morgan) were SWA's; the third named plaintiff (Harvey Roberts) was an MWA and

was dismissed on that ground (he is not a party to this appeal). In the end, we are dealing with only the SWA's on appeal and we thus refer to them as drivers except when necessary to distinguish between SWA's and MWA's, and for simplicity use only masculine pronouns.

**FACTS**[FN2]

FN2. Our statement of facts is based on the evidence (and inferences supporting the judgment) presented during a nine-week trial. (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 937, 59 Cal.Rptr.3d 37.)

**A. *The Evidence At Trial***

1. *The Operating Agreement*

Men and women who apply to FedEx for positions as drivers must complete applications, submit to background checks and strength tests, and satisfy appearance standards. The only required skill is driving and no commercial driving experience is needed. Upon acceptance, a driver must execute a nonnegotiable " Pick-up and Delivery Contractor Operating Agreement" that obligates him to " provide daily pick-up and delivery service, and to conduct his ... business so that it can be identified as being a part of the [FedEx] system." The Operating Agreement identifies the driver as an " independent contractor, and not as an employee ... for any purpose," sets forth the parties' " mutual business objectives," notes that " the manner and means of reaching [these objectives] are within the discretion of the [driver]," and states that " no officer or employee of [FedEx] shall have the authority to impose any term or condition [including hours of work or travel routes] contrary to this understanding."

Under the terms of the Operating Agreement, the driver must provide his own truck meeting FedEx's specifications, mark the truck with the FedEx logo, pay all costs of operating and maintaining the truck (including repairs, cleaning, fuel, tires, taxes, licenses and insurance), and use the truck exclusively in the service of FedEx (or mask the logo if the truck is used for any other purpose). The driver must provide " fully competitive" service to a " primary service area" assigned by FedEx, and the Operating Agreement acknowledges the driver's " proprietary interest" in his primary service area's customer accounts-but gives FedEx the right to reconfigure primary service areas (and to reassign packages to another driver) if the volume of packages in the driver's primary service area exceeds the amount the driver could reasonably be expected to handle on any given day. In the event of reconfiguration, the driver has a right " to receive payment" from FedEx or the benefited driver.

***332** The Operating Agreement obligates the driver to try to " retain and increase" business within his primary service area, to " cooperate" with FedEx's employees, customers, and other drivers for the common goal of efficient pickup and delivery, to load, handle, and transport packages using methods designed to avoid theft, loss and damage, and to foster FedEx's " professional image" and " good reputation." The driver agrees to drive safely, to prepare driver logs, inspection reports, fuel receipts, and shipping documents, and (on a daily basis) to return these items and any collected charges and undeliverable packages to FedEx. He agrees to wear a FedEx-approved uniform and to maintain his appearance " consistent with reasonable standards of good order," his uniform " in good condition," and his truck in a " clean and presentable fashion."

For its part, FedEx reserves the right to have its management employees travel with the driver four times each year to verify that the driver is meeting FedEx's standards, and agrees to train or " familiarize [the driver] with [its] quality service procedures." FedEx pays or " settles" with a driver weekly based on a stated calculation, and offers the driver a " business support package" to help him obtain and maintain a truck, a scanner, clean uniforms, and other similar items, the cost of which is paid by the driver by deductions from his weekly " settlements." [FN3]

FN3. The scanner, which is leased from FedEx, is the device used by the driver to obtain signatures when packages are delivered. Every driver's truck has a computer, and the driver must insert the scanner into the computer after each delivery so that customers have immediate access to delivery information via the FedEx website.

The driver may elect the initial term of his Operating Agreement (from one to five years), with automatic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

yearly renewals unless, 30 days before expiration of the term, one party gives the other written notice of termination. The Operating Agreement may be terminated at any time by mutual consent, by FedEx for " intentional misconduct or reckless or willfully negligent operation" of equipment, by either party for breach of the Operating Agreement's obligations, by either party if FedEx stops doing business or reduces its operations at the driver's terminal, and by a driver on 30 days written notice. The driver has the right to challenge his termination by an arbitration at which, if he prevails, he may be awarded reinstatement or damages or both. A driver in good standing has the right to assign his rights under the Operating Agreement to a replacement contractor acceptable to FedEx. The Operating Agreement recites that it and its attachments constitute the " entire agreement and understanding between the parties," and that it can be modified only by a writing signed by both parties.

2. *Implementation of the Operating Agreement*

Although FedEx claimed at trial that the Operating Agreement (and only the Operating Agreement) determined the drivers' status as independent contractors, both sides presented anecdotal and other evidence through the testimony of numerous drivers, FedEx managers, and experts.

Notwithstanding the merger clause in the Operating Agreement, the drivers' relationship to FedEx is defined by a number of other sources, including the FedEx " Ground Manual" and " Operations Management Handbook," which set forth " policies and procedures" in great detail to ensure the uniform operation of FedEx terminals throughout California, as well as by recruiting materials, welcome packets, memoranda, training videos, bulletin board ***333** posters, round-table presentations, and similar means of communication.

A new driver leases a scanner and purchases or leases a truck (usually obtained from FedEx preferred vendors) that meets FedEx's size, model and condition specifications, paints the truck " FedEx White," and applies the FedEx logo to the truck. To pay for these items, drivers may obtain loans through FedEx's business support programs (with repayment through pay deductions). FedEx offers its drivers a deferred compensation or retirement plan (the record is ambiguous on this point) and other " employee benefits" (including direct deposit, a seniority-based " time-off program" for unpaid leave, and a scholarship program for the drivers' children). As is true of all FedEx employees, drivers are paid weekly at rates set by FedEx without negotiation (the drivers' rate is based on a daily rate, a piece rate for packages handled, and bonuses for length and quality of service).[FN4] Customers are billed by FedEx, not the drivers.

FN4. Drivers are paid according to a complex formula that includes $40/day for working in uniform and providing a van, $5/day for participating in the flex program, a piece-rate component based on the number of stops made and packages handled, and a daily " temporary core zone density" payment, plus a quarterly performance bonus based on years of service and a monthly bonus based on both the individual driver's performance and the performance of his terminal.

Regional managers supervise terminal managers and have weekly discussions about goals and procedures. Terminal managers, in turn, supervise and train drivers. Drivers work full time and exclusively for FedEx, and must work every day FedEx provides service unless they have preapproved replacements. FedEx sets the drivers' work hours (9.5 to 11 hours a day), and the average driver has worked for FedEx for eight years, with an annual income of $35,000 to $50,000 after expenses. The drivers and their trucks are subject to inspection every day (the trucks must be clean, the drivers in uniform and well groomed), and if either fails inspection, the driver may be barred from service.

Trucks must be parked in assigned spots and loaded by FedEx employees with the packages assigned to the driver by management (the drivers may not refuse an assignment).[FN5] FedEx adjusts the number of assigned packages (thereby controlling the driver's hours and pay) by " flexing" from an adjacent route to balance the workload between drivers and in furtherance of its goal-deliver " every package, every day." Almost all drivers participate in the flex program. When necessary (as determined by FedEx), FedEx reconfigures primary service areas without payment by FedEx to the driver for lost customers.

FN5. Under federal law, the drivers' trucks cannot be used for personal use during the hours they are used to deliver packages for

64 Cal.Rptr.3d 327 Page 8
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305
**(Cite as: 64 Cal.Rptr.3d 327)**

FedEx. (See 49 C.F.R. § 376.12(c).) Because the drivers must park their trucks in assigned spaces at their terminals, and because the logos on most of the trucks are difficult if not impossible to conceal, FedEx's assertion that the drivers may use their trucks for other purposes during off hours is more imagined than real. As a practical matter, most drivers rarely use their trucks for personal matters.

Drivers may not leave the terminal at the beginning of the work day until sorting is completed, and terminal managers may contact drivers during the day about additional assignments. Drivers may " sequence" the order of deliveries and pickups but must meet all pickup and delivery times or " windows" arranged by FedEx's sales representatives and certain customers. These windows affect a driver's ability to sequence his own route. ***334** Drivers must comply with FedEx's rules for obtaining signatures on scanners, releasing packages without signatures, special handling of overnight and C.O.D. packages, and tracing undelivered or improperly delivered packages. Drivers must place their scanners in their computers after each delivery (fn. 3, *ante* ), and at the end of each day must return to their assigned terminal parking spaces, deliver all paperwork and cash from C.O.D. payments, download their scanners, and provide details about any unsuccessful deliveries.

When on any given day a driver makes no attempt to deliver a package, misses a pickup time or window, or is the subject of a complaint, the matter must be discussed with the terminal manager who, in addition, meets with each driver twice each year to communicate and document shortcomings. Several times each year, terminal managers evaluate each driver's performance by means of a " customer service ride" and there are covert checks and security audits conducted in the field. Each driver receives an annual progress review. Terminal managers decide which " failures to service" or alleged breaches of the Operating Agreement to document, and they have discretion (subject to the regional managers' and upper management's approval) to recommend termination or nonrenewal.

In practice, therefore, the work performed by the drivers is wholly integrated into FedEx's operation. The drivers look like FedEx employees, act like FedEx employees, are paid like FedEx employees, and receive many employee benefits.

**B.** ***The Phase I Statement of Decision***

The trial court found, and set forth in its statement of decision, that the drivers were FedEx employees, not independent contractors, and that they had not been indemnified for any of the expenses at issue. The court described the Operating Agreement as " a brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model" -because FedEx " not only has the right to control, but has close to absolute actual control over [the drivers] based upon interpretation and obfuscation." FN6 The court found that FedEx's management witnesses " differed dramatically in their testimony as to the available remedies" for a driver challenging termination, with the head of contractor relations " admitting that he did not volunteer to [the drivers] any information about [their] rights to arbitrate or sue." In the trial court's view, FedEx's conduct established that the drivers could be terminated " at will."

FN6. The court found the drivers' right to control their own routes and schedules was illusive because they were " constrained by customer pick up and delivery windows contracted by the [FedEx] sales force" and by FedEx's paperwork requirements that required the drivers' presence at the terminal.

The court found, in addition, that the drivers are " totally integrated into the [FedEx] operation," that they perform work essential to FedEx's core business, that they are required to work exclusively and full time for FedEx, that their customers are those assigned to them by FedEx, that no specialized skills are required, that they must wear uniforms and conform absolutely to FedEx's standards and that, in the end, each driver has a " job" with " little or no entrepreneurial opportunities." Although the drivers provide their own trucks and equipment, FedEx is involved in the purchasing process, providing funds and recommending vendors.

***335** The essence of the trial court's statement of decision is that if it looks like a duck, walks like a duck, swims like a duck, and quacks like a duck, it is a duck.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## DISCUSSION

### *FedEx's Appeal*

### I.

[1] The trial court found that, for purposes of determining the drivers' right to reimbursement for their expenses, the drivers are employees within the meaning of Labor Code section 2802.[FN7] FedEx contends the trial court is wrong. We disagree.

FN7. Undesignated section references are to the Labor Code.

### A.

Subdivision (a) of section 2802 provides that " [a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."

[2][3][4][5] Because the Labor Code does not expressly define " employee" for purposes of section 2802, the common law test of employment applies. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1087, 32 Cal.Rptr.3d 483, 116 P.3d 1162.) The essence of the test is the " control of details" -that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work-but there are a number of additional factors in the modern equation, including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350-351, 256 Cal.Rptr. 543, 769 P.2d 399 [*Borello* ]; *Tieberg v. Unemployment Ins.App. Bd.* (1970) 2 Cal.3d 943, 949, 88 Cal.Rptr. 175, 471 P.2d 975; *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43-44, 168 P.2d 686; *Air Couriers Internat. v. Employment Development Dept., supra,* 150 Cal.App.4th at p. 933, 59 Cal.Rptr.3d 37 [*Air Couriers* ]; *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1064-1065, 48 Cal.Rptr.3d 563.) [FN8] The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship. (*Borello, supra,* 48 Cal.3d at p. 349, 256 Cal.Rptr. 543, 769 P.2d 399; ***336***Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 877-878, 269 Cal.Rptr. 647.)

FN8. *Air Couriers* and *JKH Enterprises* both involve package delivery drivers, albeit in different postures. In *Air Couriers,* a package delivery company sued the Employment Development Department for a refund of employment taxes, claiming its drivers were independent contractors; the trial court found the drivers were employees and the Third District affirmed. (*Air Couriers, supra,* 150 Cal.App.4th 923, 59 Cal.Rptr.3d 37.) In *JKH Enterprises,* the Department of Industrial Relations found in administrative proceedings that a courier service's drivers were employees for whom workers' compensation insurance had to be provided; the courier service challenged the order by a petition for a writ of mandate, claiming the drivers were independent contractors. The trial court found the drivers were employees and the Sixth District affirmed. (*JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th 1046, 48 Cal.Rptr.3d 563.)

[6] The determination (employee or independent contractor) is one of fact and thus must be affirmed if supported by substantial evidence. (*Borello, supra,* 48 Cal.3d at p. 349, 256 Cal.Rptr. 543, 769 P.2d 399; *Air Couriers, supra,* 150 Cal.App.4th at p. 937, 59 Cal.Rptr.3d 37; *Santa Cruz Transportation, Inc. v. Unemployment Ins. Appeals Bd.* (1991) 235 Cal.App.3d 1363, 1367, 1373, 1 Cal.Rptr.2d 64; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at p. 877, 269 Cal.Rptr. 647.) Because the trial court expressly relied on *Borello,* and because FedEx does not dispute the applicability of the *Borello* test, there is no question of law with regard to this issue, only one of substantial evidence. (*Air Couriers, supra,* 150 Cal.App.4th at pp. 932-933, 937, 59 Cal.Rptr.3d 37.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 Cal.Rptr.3d 327 Page 10
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305
**(Cite as: 64 Cal.Rptr.3d 327)**

**B.**

FedEx contends the trial court misapplied the test (by an erroneous analysis of the " right to control" factor and otherwise) and made " insupportable inferences of fact" in determining that the drivers are employees. We disagree.

First, FedEx's assumptions are wrong. Although it is true that the Operating Agreement says " the manner and means" to satisfy the objectives of the contract " are within the discretion of the [drivers]," and that FedEx does not have the " authority to impose any term or condition" to the contrary, the evidence shows unequivocally that FedEx's conduct spoke louder than its words. As noted above, the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship. (*Borello, supra,* 48 Cal.3d at p. 349, 256 Cal.Rptr. 543, 769 P.2d 399; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at pp. 877-878, 269 Cal.Rptr. 647.) The same is true with regard to FedEx's claim that it cannot terminate the drivers at will. Although the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all-and substantial evidence established that FedEx discharges drivers at will. (*Id.* at p. 875, 269 Cal.Rptr. 647.)

Second and most significantly, the trial court's findings are supported by substantial evidence. FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors.[FN9] The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items-trucks and scanners-are obtained from FedEx approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income. The customers are FedEx's customers, not the ***337** drivers' customers. FedEx has discretion to reject a driver's helper, temporary replacement, or proposed assignee.

FN9. The drivers were told they could not wear white shoes or socks; the men were told they could not wear earrings or ponytails, and sometimes that they needed to shave or get a haircut. We summarily reject FedEx's suggestion that constraints such as these are necessary to ensure the drivers' compliance with government regulations. (See *Southwest Research Institute v. Unemployment Ins. Appeals Bd.* (2000) 81 Cal.App.4th 705, 709, 96 Cal.Rptr.2d 769.)

Drivers-who need no experience to get the job in the first place and whose only required skill is the ability to drive-must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed.[FN10] The drivers are not engaged in a separate profession or business, and they are paid weekly, not by the job. They must work exclusively for FedEx. Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by " flexing" and withheld approvals, and for very slight violations of the rules. Most drivers have worked for FedEx for a long time (an average of eight years), and drivers employed by FedEx's competitors (UPS, DHL, and FedEx's sister corporation, FedEx Express) are classified as employees.

FN10. FedEx's reliance on *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 38 Cal.Rptr.2d 98, is misplaced. Although that case observes that " truck driving-while perhaps not a skilled craft-requires abilities beyond those possessed by a general laborer" (*id.* at pp. 202-203, 38 Cal.Rptr.2d 98), the finding of independent contractor status in that case is based primarily on the facts that the truck drivers worked for more than one broker at a time and were compensated on a job-by-job basis, " with no obligation on the part of the [drivers] to accept any assignment and no retribution ... for refusing assignments." (*Id.* at p. 203, 38 Cal.Rptr.2d 98.)

Based on these facts, we reject FedEx's contention that this is a " true entrepreneurial opportunity depending on how well the [drivers] perform" and conclude that substantial evidence supports the trial court's finding that the drivers are employees, not independent contractors, for purposes of section

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 Cal.Rptr.3d 327 Page 11
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305
**(Cite as: 64 Cal.Rptr.3d 327)**

2802. (*Air Couriers, supra,* 150 Cal.App.4th at pp. 937-939, 59 Cal.Rptr.3d 37; *JKH Enterprises, Inc. v. Department of Industrial Relations, supra,* 142 Cal.App.4th at pp. 1064-1065, 48 Cal.Rptr.3d 563; *Toyota Motor Sales U.S.A., Inc. v. Superior Court, supra,* 220 Cal.App.3d at pp. 876-878, 269 Cal.Rptr. 647.) FN11

FN11. The federal cases relied on by FedEx are factually inapposite. The truckers in *Berger Transfer v. Central States* (8th Cir.1996) 85 F.3d 1374 were paid by the trip, could refuse assignments, and did not have to wear uniforms or paint their trucks with any special marks. The drivers in *C.C. Eastern, Inc. v. N.L.R.B.* (D.C.Cir.1995) 60 F.3d 855 were paid by the job, did not have to wear uniforms, and could choose any kind of truck. The drivers in *Merchants Home Delivery Serv., Inc. v. N.L.R.B.* (9th Cir.1978) 580 F.2d 966 were paid by the job, chose their own work hours, could refuse assignments, could sometimes work for other businesses, and operated as partnerships or corporations, not individuals. The drivers in *North American Van Lines, Inc. v. N.L.R.B.* (D.C.Cir.1989) 869 F.2d 596 selected the frequency of their jobs, the type of loads, the routes taken, and they did not have to wear uniforms. The drivers in *United States v. Silk* (1947) 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 hired their own helpers and hauled for more than one business. Meanwhile, the drivers in our case are not paid by the job but by a formula established by FedEx and must work only for FedEx, must wear uniforms, must conform their personal appearance to FedEx's rules and regulations, must work on the days required by FedEx, and must use FedEx's method of delivery.

**II.**

[7] FedEx contends the drivers' claims were unsuitable for class treatment, and that a classwide judgment is inappropriate on the evidence presented. More specifically, FedEx complains that the class certification order was flawed from the outset because it was based on the incorrect assumption that proof would focus on the terms of the Operating Agreement, when ***338** in fact the drivers offered “ anecdotes about various alleged individual violations.” In short, the claim is that individual facts predominated over the common issues. We disagree.FN12

FN12. We reject FedEx's assertion that the certification order assumed the trial would be limited to the terms of the Operating Agreement. There is nothing in the order itself or FedEx's brief to support this assumption. In fact, the reporters' transcripts of the hearings leading up to and following the certification order include several discussions about the scope of the evidence at trial-and it is clear that everyone understood the drivers were not “ going to stand or fall on the operating agreement” but were “ going to put in individual proof of the way things operate, and then we get to the issue of the way they operate at the time at each terminal, or span of time.”

**A.**

[8] The decision whether to certify a class is one within the trial court's discretion and will be set aside only upon a showing of abused discretion. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326-327, 17 Cal.Rptr.3d 906, 96 P.3d 194; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436, 97 Cal.Rptr.2d 179, 2 P.3d 27.) On this record, FedEx cannot make the required showing because it is clear that common issues-whether the drivers were employees and, if so, which expenses would be reimbursable-predominated. The anecdotal evidence was admitted to show FedEx's power to interpret the Operating Agreement and was relevant to the class as a whole, not just to the drivers who happened to be the subject of a particular anecdote. FedEx's failure to raise this point below suggests it understood that it would fail (it did not at any time during the nine-week trial move for decertification on the basis of the anecdotal evidence). (*Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1166-1167, 112 Cal.Rptr.2d 540; *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685-1686, 12 Cal.Rptr.2d 279.)

**B.**

[9] In a related argument, FedEx contends the class “ never proved to be ascertainable or manageable in any reasonable sense: 209 distinct ‘ mini cases' ... were required to ascertain who was actually within

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the class and ... entitle[d] to reimbursement." We disagree.

[10][11][12] A class action requires an ascertainable class with a well-defined community of interest among its members. Community of interest, in turn, requires that common questions of law or fact predominate, and that class representatives (who must be able to adequately represent the class) have claims typical of the class. The class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description. (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828, 97 Cal.Rptr.2d 226.)

After much effort and briefing, the class was limited to single work area drivers who drive (or had driven) full time and who do not (or did not) subcontract their service areas out to others for reasons other than vacation, sick leave, or other commonly excused employment absences. The trial court found that the members of this class could reasonably be identified from FedEx's records and through discovery and, for the most part, they were. Discovery limited the class to 209 putative members. FedEx's suggestion that the members of this class shifted " in and out, sometimes on a day-to-day basis," is unsupported by a reference to the record and ***339** meaningless in the context of the trial transcript. If FedEx's claim is that every member of the class had to be identified from the outset, FedEx is simply wrong. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706, 63 Cal.Rptr. 724, 433 P.2d 732.)

### III.

[13] FedEx contends that, assuming the drivers are employees, FedEx already indemnified them for the expenses due under section 2802. As did the trial court, we disagree.[FN13]

FN13. The trial court found that " [n]o evidence was presented to support [FedEx's] position [that the drivers had already been indemnified for the expenses they sought under section 2802] and no language in the [Operating Agreement] would bolster that theory. Rather all witnesses testified that the [drivers] were responsible for their own expenses."

Subdivision (a) of section 2802 obligates an employer to indemnify its employee " for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." According to FedEx, the Division of Labor Standards Enforcement requires reimbursement only for " any reasonable amount" (DLSE Interpretive Bulletin No. 84-7 (Jan. 8, 1985)), and the settlement formula in the Operating Agreement " effectively provided reasonable compensation" for the drivers' business expenses. FedEx is wrong.

The Operating Agreement obligates the drivers to provide their own trucks, scanners, and clean uniforms, and to " bear all costs and expenses incidental to operation" of the trucks, including maintenance, cleaning, depreciation, fuel, oil, tires, repairs, taxes, licenses, tolls, and insurance. The drivers, the terminal managers, and FedEx's upper management all testified that drivers are expected to bear their own costs. As for the " settlement," the Operating Agreement provides that it is " for services provided," not expenses incurred (for example, " contractor and van availability" ). FedEx's suggestion that the settlement formula is keyed to specific expenses and, as such, includes reimbursement for those expenses, is not supported by any evidence.[FN14]

FN14. We summarily reject FedEx's claim of evidentiary error. It says it " sought to introduce evidence ... establishing that the settlement was designed *overall* to provide de facto compensation for *all* expenses incurred by contractors," and it says it wanted to do this by " showing that the payments contractors made to their own hired drivers were far less than what contractors received through the settlement system for equivalent work." FedEx's record references do not support this point. Instead, the cited pages show that FedEx tried to ask witnesses about information in their tax returns, and that the trial court properly sustained objections to those questions based on the taxpayer privilege and because FedEx had other means to present the same information. (*Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1, 6, 123 Cal.Rptr. 283, 538 P.2d 739.) FedEx did not make any offer of proof remotely similar to the argument it offers on this appeal. (*People ex rel. Dept. of*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 Cal.Rptr.3d 327 Page 13
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305
**(Cite as: 64 Cal.Rptr.3d 327)**

*Transportation v. Superior Court* (2003) 105 Cal.App.4th 39, 46, 129 Cal.Rptr.2d 60.)

**IV.**

FedEx contends the attorneys' fee award is " manifestly improper," that it cannot be justified under Code of Civil Procedure section 1021.5, and that it must in any event be revisited in light of our reversal of the equitable orders in *Estrada II.*[FN15] We reject FedEx's substantive challenges but agree that the amount cannot stand.

FN15. Subsequent references to section 1021.5 are to that section of the Code of Civil Procedure.

***340** Section 1021.5 provides as relevant that " [u]pon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement ... are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." [FN16]

FN16. In addition, subdivision (a) of section 2802 compels an employer to indemnify its employee for " all necessary expenditures and losses incurred by the employee in direct consequence of the discharge of his or her duties." Subdivision (c) of section 2802 defines " necessary expenditures or losses" to include " all reasonable costs, including but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section." Our conclusion that a fee award is justified under section 1021.5 makes it unnecessary to consider whether the section 2802 fee provision, which was enacted after this lawsuit was filed, applies in this case.

Estrada's motion asked for $619,691 in costs and $6,789,325 for his attorneys' fees, a total of $7,409,016-plus a 2.0 multiplier as compensation for delay and contingency, a total of $14,818,032. The trial court reduced the fee by 18 percent (finding the amount " slightly bloated" ) but otherwise granted the motion (including the 2.0 multiplier) and gave Estrada a total of $12,373,875 for costs and fees, noting the risk inherent in a contingent fee, the " financial burden of private enforcement," and the years of " long, hard-fought" and " labor intensive" litigation involving " enforcement of an important right" that conferred a " significant benefit on a large class." FedEx contends the award is erroneous because Estrada was motivated primarily by his own financial interests, that any benefit to a larger class was incidental, that no significant benefit was conferred on the public or a larger class, and that the trial court's dual use of the same reasons to both calculate the fee and justify the multiplier created a windfall. We reject FedEx's claim that fees were not recoverable in this case but agree that the amount must be reduced and that the same facts cannot be used to trigger the application of section 1021.5 *and* justify a multiplier.

**A.**

[14] Estrada's personal motivation does not diminish the fact that he pursued this public interest class action not only for himself but on behalf of a class comprised of FedEx's past and present drivers and ultimately obtained awards for 209 drivers. (*Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414, 1 Cal.Rptr.2d 459; *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 231, 226 Cal.Rptr. 265; *Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1005, 223 Cal.Rptr. 914.) No more is required to satisfy the " significant benefit," " public interest," and " large class of persons" requirements of section 1021.5.

**B.**

[15] But Estrada did not get everything he sought. In *Estrada II,* we reversed all the equitable orders, finding that Estrada lacked standing to pursue his claims for prospective equitable relief (a) because his relationship with FedEx ended before this lawsuit was filed, and (b) because the class certification order was expressly limited to the reimbursement issue. (*Estrada II,* 2006 WL 3378246, *1.) The equitable orders were a significant ***341** part of the litigation and the resulting judgment.

In Phase III of these proceedings, Estrada sought declaratory relief and a permanent injunction on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 Cal.Rptr.3d 327 Page 14

64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305

**(Cite as: 64 Cal.Rptr.3d 327)**

behalf of " all California single work area pick-up and delivery drivers who at any time since May 11, 1996 worked or currently work or in the future are employed to work under FedEx's Operating Agreement." The trial court rejected FedEx's defenses, finding among other things that it was necessary to address the equitable claims in light of the " importance and recurring nature of the employment issues of the [drivers]." A permanent injunction issued, enjoining FedEx from (1) misclassifying drivers as independent contractors or participating in any agreement to misclassify them as independent contractors, and (2) violating or attempting to violate *any provision of the California Labor Code, Industrial Welfare Commission Orders, or other state laws and regulations protecting the drivers as employees-both in the present and for as long as FedEx retained the employment model or substantially similar employment model used by FedEx at the time of trial.* We reversed all of the equitable orders, finding that Estrada lacked standing to seek prospective declaratory or injunctive relief and that the trial court thus lacked jurisdiction to grant such relief.

When we reversed the equitable orders in *Estrada II,* we disposed of all of the benefits Estrada had obtained in the third phase of trial. Although we agree that Estrada is still the prevailing party, the factual predicate for the trial court's award-that Estrada won on all points, including the far-reaching injunctions-is no longer valid. Estrada concedes as much, noting in his respondent's brief that, under the short-lived injunctions, " the benefits of the instant litigation [would have been] enjoyed by thousands of people who are not members of the class, including future [drivers] and employees," and that the equitable orders were " [m]ore important" to the trial court than the damages award because " the injunctive and declaratory relief require[d] [FedEx] to treat all its current and future [drivers] as employees and thus provide[d] ongoing relief to a huge group of people."

The $12,373,875 award is excessive and cannot stand.

**C.**

[16] In recalculating an appropriate fee award on remand, the trial court must determine anew whether any multiplier is appropriate in this case. The fee award sans multiplier ($5,567,246) exceeded the amount of the award to the entire class of plaintiffs (about $3 million before interest was added, about $5 million with prejudgment interest). By the time the trial court revisits this issue, the total monetary award to the plaintiffs will have increased for the reasons explained below with regard to the drivers' cross-appeal, and the attorneys will have spent more time on this case both on appeal and on the post-appeal trial court proceedings. While the amount of the fee is ultimately a decision within the trial court's discretion (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132, 104 Cal.Rptr.2d 377, 17 P.3d 735), the fee must above all else be reasonable and a multiplier, if used, must be based on facts other than those used to trigger the application of section 1021.5. (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 626, 98 Cal.Rptr.2d 388; and see *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322-323, 193 Cal.Rptr. 900, 667 P.2d 704 [the starting point of every fee award must be a calculation of the attorney services in terms of the time spent on the case, and the exercise of the court's discretion in awarding fees must bear ***342** some reasonable relationship to the lodestar figure of time spent and hourly compensation].) [FN17]

FN17. The trial court's statement that it was " not double counting" does not change the fact that the reasons justifying any award at all *and* an award based on high hourly rates (to lawyers who took the case on a contingency basis) were the same as those used to justify the multiplier-the benefit to the class, the risk taken, the lawyers' skill, the excellent results.

***Estrada's Cross-Appeal***

**V.**

Estrada raises five issues on his cross-appeal, four challenging the trial court's rulings vis-à-vis the damages proved during the Phase II trial, the fifth revisiting the dismissal orders that were the subject of *Estrada I.* We address these issues seriatim.

**A.**

The August 2, 2001 class certification order recites that " [c]ommon questions of fact clearly predominate in this case. All members of the proposed class ... incurred the below-listed similar expenses, delineated in the Operating Agreement and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 Cal.Rptr.3d 327 Page 15

64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305

**(Cite as: 64 Cal.Rptr.3d 327)**

certified by the Court as susceptible to proof on a class basis, as a direct consequence of performing services for [FedEx]....” Ten categories of “ [e]xpenses the [Operating Agreement] requires” were listed: (1) purchasing or leasing a vehicle for the purpose of performing pickup and delivery services; (2) operating the vehicle, including fuel, oil, tires, repairs, business taxes, cleaning, insurance, registration and tolls; (3) maintaining the vehicle in accordance with federal, state and local law; (4) marking the vehicle with logos, colors, numbers, marks and insignia; (5) licensing the vehicle; (6) paying into the Contractor Performance Escrow Account; (7) purchasing, renting and cleaning uniforms; (8) purchasing or otherwise securing communications equipment, including but not limited to scanners and other required equipment; (9) obtaining liability insurance; and (10) obtaining and keeping in force “ workers' compensation insurance for themselves.”

On September 8, 2004, the trial court limited reimbursement to items actually paid out by the drivers or deducted from their settlement checks, ruled that proof of the claimed expenses would be “ limited to receipts and personal records of the [drivers] ... as well as records in the hands of [FedEx],” and limited some of the categories of recoverable expenses.[FN18] Four of the court's rulings are challenged on the drivers' cross-appeal.

FN18. In the same order, the trial court found that expenses recoverable under section 2802 included those related to the operation of the vehicle (fuel, oil, tires, repairs, business taxes, cleaning, insurance, registration, and tolls), to maintaining the vehicle in accordance with federal, state and local law, to marking the vehicle, to licensing the vehicle, to purchasing, renting, and cleaning uniforms, to renting scanners, and to obtaining liability insurance. On its own motion, the trial court appointed a referee (Code Civ. Proc., § 639) to take evidence, perform “ an accounting as to the expenses and reimbursements claimed by the individual plaintiffs and class members,” and to make recommendations to the court.

**1.**

[17] The trial court refused to permit proof of expenses by expert analysis and lay testimony about FedEx's estimates of the drivers' expenses, limiting the drivers' proof to receipts and records. More specifically, the trial court ruled “ that sampling or statistical analysis [would] not suffice, as the amounts of monies that must be the subject of the accounting [would] be too disparate because of the economic differences***343** in the California geographic area.... [¶] The [drivers] have the burden of proving areas of compensability by means limited to receipts and personal records ... and [**FedEx's**] records.... [¶] The [drivers] will present a **package** to the referee containing the above items as to each [driver]. Upon receipt of said **package**, [**FedEx**] can either stipulate as to the amounts sought or file documents or records controverting those amounts.” We reject **Estrada's** challenge to this ruling.

According to the drivers, they should have been permitted to offer “ expert analysis computing the [drivers'] damages based on an economic model [that] used actual receipts produced by [the drivers] from around the state, together with expense estimates published in [a FedEx] recruiting booklet entitled, ‘ Becoming [a FedEx] Pickup and Delivery Contractor’ [because the booklet included] data in the form of weekly and annual expense estimates,” and a spreadsheet showing “ the estimated costs for ten specific expense items projected over a ten-year period.” The problem with this argument is that it is premised on a finding that the amounts due to the drivers were not susceptible of exact proof (*Long Beach Drug Co. v. United Drug. Co.* (1939) 13 Cal.2d 158, 174, 89 P.2d 386 [uncertain consequential damages]; *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 203 P.2d 778 [future damages]; *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545, 161 Cal.Rptr. 811 [lost profit damages]; *DuBarry Internat. Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 562, 282 Cal.Rptr. 181 [damages for lost commissions] )-an assumption directly contradicted by the record the drivers established in proving their damage claims. In short, estimates and educated guesses are allowed where damages cannot be proved. That was not this case.[FN19]

FN19. Moreover, the notices sent to the putative class members told them quite plainly that they would “ be asked to document any expenses for which [they] claim[ed] reimbursement.” (See *Rose v. City of Hayward* (1981) 126 Cal.App.3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

926, 934, 179 Cal.Rptr. 287; and see *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 749-753, 9 Cal.Rptr.3d 544.)

**2.**

Although the September 2004 order required proof by receipts and other personal records, **Estrada's** lawyer-claiming she had an agreement with **FedEx's** lawyer-prepared spreadsheets listing the drivers' out-of-pocket expenses (such as gasoline and maintenance costs that were not deducted from the drivers' checks) with Bates-stamp references to each supporting document, the idea being that **FedEx's** lawyers would review the spreadsheets, determine which items were disputed, and request production of receipts for only the disputed items. After the deadline for the submission of evidence passed, **FedEx** objected to the spreadsheets as incompetent, contending there was no agreement to relieve the drivers of the court-ordered requirement to present all supporting documentation. The referee sustained the objection but found the drivers' lawyers had honestly " believed" an agreement had existed, and therefore found that the drivers should be allowed to present proper proof-and accepted 40,000 documents (all of which had been produced to FedEx during discovery) which, if allowed, would result in an award to the drivers of about $5.23 million for these expenses.

FedEx objected to the referee's order. The trial court agreed with the referee ***344** that there had been no agreement,[FN20] found the drivers had offered " incompetent evidence," and approved the referee's decision to allow the drivers to reopen-but only with regard to expenses provable by documents FedEx had produced during discovery, which necessarily excluded all of the drivers' out-of-pocket expenses provable only by the drivers' documents.

FN20. The trial court's credibility call is binding on this appeal (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479, 243 Cal.Rptr. 902, 749 P.2d 339; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614, 122 Cal.Rptr. 79, 536 P.2d 479) and is supported by the record. In addition to the trial court's requirements (actual receipts and documentation), the referee ordered the parties to present both " calculation sheets and proof packets."

The trial court's reason for allowing the partial reopening-so that FedEx would not obtain a " windfall" -is entirely inconsistent with its order limiting the scope of the allowed reopening. Because the trial court's reasoning was correct (FedEx would indeed obtain a windfall if it was not required to reimburse the drivers for provable expenses that had been part of the case from the beginning, all of which were fully documented and produced to FedEx during discovery), the only possible conclusion is that the trial court's order is wrong and must be reversed. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066, 24 Cal.Rptr.2d 654.) However wrong Estrada's lawyer might have been in believing she had an agreement with opposing counsel to use the spreadsheets without the related proof packets, her error caused absolutely no prejudice to FedEx.[FN21] Accordingly, the trial court must revisit this issue and conduct such further proceedings as are necessary to determine the amounts to be awarded to the drivers for these expenses.

FN21. If, as FedEx suggests, the trial court's ruling was in effect a sanction based on its belief that the use of the spreadsheets " was an unauthorized tactic to get around the court's order with which [Estrada's lawyer] disagreed," the result was nonetheless an abuse of discretion-because the sanction, if that's what it was, should have been directed at counsel, not her clients.

**3.**

[18] The trial court, relying on a January 1985 Interpretive Bulletin (Bulletin 84-7) issued by the Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE), found the drivers were not entitled to reimbursement for expenses related " to purchasing or leasing a vehicle for the purpose of performing pick up and delivery services" because " employers in the pick up and delivery industry in California can require as a condition of employment that their drivers, at their own expense, purchase or lease a truck to the employer's specifications." Estrada contends the trial court should instead have relied on a January 2, 1997 DLSE Opinion Letter (No. 1997.01.02) opining that employees may not be required to purchase a $50,000 customized truck as a condition of employment. (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 815, 105 Cal.Rptr.2d 59 [we do not defer to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DLSE bulletins and opinion letters but may nevertheless consider them for what they are worth].) FN22 We agree with the trial court.

FN22. The DLSE's opinion letters may be found at http:// www. dir. ca. gov/ dlse/ DLSE OpinionLetters.htm (as of Aug. 6, 2007).

**(a)**

Bulletin 84-7 was a response to a question about " whether employers ... may require mechanics or other employees to provide and maintain their own tools, regardless of the wages paid the employees, if it is customary in the industry for mechanics***345** or other employees to do so." In response, the Labor Commissioner opined that " if an employee is paid at least twice the minimum wage, such employee may, as a condition of employment, be required to provide and maintain his[ ] own hand tools and equipment customarily required by the trade or craft." In addition, the Labor Commissioner opined that " [i]f an employee is paid at least twice the minimum wage, he[ ] may be required, as a condition of employment, to furnish his[ ] own tools, regardless of the custom or practice in the industry to the contrary."

In that context, the Labor Commissioner was also asked " whether an automobile or truck used in the course of employment by an employee ... is a ' tool' within the meaning of [section 2802]." The Commissioner answered that " neither an automobile nor a truck is considered a tool within the meaning of [section 2802], and *an applicant for employment may be required, as a condition of employment, to furnish his[ ] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid.* [¶] Under ... [s]ection 2802, an employer who requires an employee to furnish his[ ] own car or truck to be used in the course of employment would be obligated to reimburse the employee for the costs necessarily incurred by the employee in using the car or truck in the course of employment." (Italics added.)

**(b)**

The January 2, 1997 Opinion Letter is a response to a question based on this situation: " ' An employer hires a sales employee and requires him to purchase a customized truck for about $50,000.00, bearing the employer's name, as a condition of employment. The employer then directs the employee to the vendor who sells the trucks and to a leasing company that will finance the truck. Finally, the employer directs the employee to an insurance company that will insure the truck.' " The question was whether section 450 prohibits the employer from requiring the employee to patronize specific and identifiable third persons.FN23 As relevant, the Chief Counsel for Division of Labor Standards Enforcement replied:

FN23. Section 450 provides: " No employer ... may compel or coerce any employee, or applicant for employment, to patronize his ... employer, or any other person, in the purchase of any thing of value."

" California courts have determined that [section] 450 ... promot[es] the right of a wage earner to all wages lawfully accrued to him.... [¶] Clearly, a condition of employment which requires the employee or applicant to make a $50,000.00 purchase of a vehicle which advertises the name of the employer and further requires that the vehicle be purchased from one vendor (or any number of vendors) chosen by the employer is violative of [section] 450.[¶] *While your [question] does not [mention section 2802] I feel that it is imperative that you also consider [that statute].... [¶] [Section 2802] may not be waived. (See ... § 2804.)*[FN24] *Obviously, even if the practice you describe were not prohibited by the terms of [section] 450, the employer would be liable to the employee for the costs incurred by the employee under [section] 2802.[¶] Quite frankly, the scenario you paint is usually the type of arrangement made in franchise situations, but* ***the requirement to purchase something of value may not be extended to employer-employee situations [and] is, in my *346*** *opinion, clearly prohibited by California law.*" (Emphasis added, fn. omitted.)

FN24. Section 2804 provides: " Any contract or agreement express or implied, made by any employee to waive the benefits of [the article including section 2802] or any part thereof is null and void."

The essence of Estrada's argument is that, by implication, the 1997 Opinion Letter is a clarification of the Bulletin 84-7, and it is the 1997 Opinion Letter, not the Bulletin, that is factually similar to FedEx's position vis-à-vis its drivers. The problem with this argument is that it fails to consider the

64 Cal.Rptr.3d 327 Page 18

64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305

**(Cite as: 64 Cal.Rptr.3d 327)**

DLSE's other relevant Opinion Letters.

**(c)**

According to the 2002 Update of the DLSE Enforcement Policies and Interpretations Manual (§ 29.2.3.2, p. 29-2 (Revised), http:// www. dir. ca. gov/ dlse/ Manual-Instructions.htm [as of Aug. 6, 2007] ), Bulletin 84-7 is still valid and has *not* been superseded by the 1997 opinion letter.[FN25] More particularly, IWC Order No. 9-2001, effective July 1, 2004, provides that *in the transportation industry*, " [w]hen tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, *except that an employee whose wages are at least two ... times the minimum wage ... may be required to provide and maintain hand tools and equipment customarily required by the trade or craft*." (*Id.*, [¶] 9, p. 7.) [FN26] This 2004 statement by the IWC is entirely consistent with the DLSE's Bulletin 84-7, which provides that, because " neither an automobile nor a truck is considered a tool within the meaning of [section 2802], ... *an applicant for employment may be required, as a condition of employment, to furnish his[ ] own automobile or truck to be used in the course of employment, regardless of the amount of wages paid*." (Italics added.)

FN25. According to section 29.2.3.2 of the Manual, orders issued by the Industrial Welfare Commission (IWC) " allow an employer to require that employees furnish ' hand tools and equipment' if the hand tools and equipment are ' customarily required by the trade or craft.' The DLSE has concluded that in the phrase ' hand tools and equipment,' the word ' hand' is an adjective which modifies both the word ' tools' and the word ' equipment.' As the Labor Commissioner opined in 1984, an automobile is not the type of equipment contemplated in the IWC Orders." (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581, 94 Cal.Rptr.2d 3, 995 P.2d 139 [the IWC is the state agency empowered to formulate regulations governing employment in California, and the DLSE is the state agency empowered to enforce California's labor laws, including the IWC's orders].)

FN26. The same order (at [¶] 2(P), p. 3) defines " transportation industry" to mean " any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles."

Other DLSE Opinion Letters presume it is proper for an employer to require an employee to provide his own car or truck for use on the job. Thus, a February 25, 1991 Opinion Letter (No. 1991.02.25-1) opines that when an employee uses his own automobile for his work, the employer must pay for the employee's insurance premiums. An August 30, 1991 Opinion Letter (No. 1991.08.30) responds to an inquiry about employees in the trucking business who own their own trucks and states that the DLSE's " enforcement policy requires that the employer agree to reimburse the employee for all the costs incurred by the employee in the operation of the equipment." An August 14, 1994 Opinion Letter (No. 1994.08.14) states that the reimbursement rates for an employee's use of his own truck differs from the rate applicable to automobiles. An Opinion Letter dated November 5, 1998 (No. 1998.11.05) ***347** responds to a question about employees who regularly drive their personal vehicles for business purposes and discusses the employer's obligation to pay insurance premiums for coverage above the legal minimum.

Implicit in all of these Opinion Letters is the assumption that it is perfectly lawful for an employer to require its employees to provide their own vehicles as a condition of employment, provided only that the employees must be reimbursed for the expenses thereby incurred. (And see *Lane v. Industrial Accident Commission* (1958) 164 Cal.App.2d 523, 331 P.2d 99.)

The only commentary we have found (none being cited by either party) supports our conclusion that an employer may require its employees to provide their own trucks: " An applicant or employee may be required, as a condition of employment, to furnish his ... own vehicle to be used in the course of employment. [Section] 2802 requires an employer to indemnify its employees for all necessary expenses or losses incurred in the course of his ... duties."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Advising California Employers and Employees (Cont.Ed.Bar (2005) § 5.89, p. 454.)) In sum, aside from two tangential and conclusory sentences in one DLSE Opinion Letter, we have not found any authority for Estrada's proposition that an employer cannot require an employee to provide his own truck as a condition of employment. To the contrary, the DLSE's other Opinion Letters, Bulletin 84-7, and the IWC Order all assume that an employer can in fact do just that. Accordingly, we conclude that FedEx need not reimburse the drivers for the cost of their trucks.

**4.**

[19] The certification order and the September 8, 2004 order listed " workers compensation" insurance as a recoverable expense, notwithstanding that virtually all of the drivers carried " work accident" insurance (a form of insurance for self-employed workers). Although this technical error was discovered during discovery (in 2002), the drivers' lawyers failed to clarify the point at that time and the trial court later refused to allow reimbursement for work accident insurance.[FN27] We agree with Estrada's challenge to this ruling.

> FN27. In response to an interrogatory asking for the amount deducted for " workers compensation" insurance, FedEx responded that there were no deductions for this item because it viewed " each driver to be a self-employed person." In response to an order to provide a further response, FedEx explained that the " parties resolved the ambiguity in the use of the term ' worker's compensation insurance payments' as [that term] is used in the [i]nterrogatory to be a reference to work accident insurance premiums."

Although the drivers' lawyers should have sought clarification instead of assuming that everyone understood that the drivers would be reimbursed for their work accident insurance premiums, the failure to do so does not justify a windfall to FedEx-particularly since it caused the confusion by treating the drivers as independent contractors and was at all times fully aware of the ambiguity in the court's orders (the Operating Agreement itself obligates the drivers " to obtain and keep in force at all times ... work accident and/or workers compensation insurance ..." ). (*Rainer v. Buena Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 254, 95 Cal.Rptr. 901; *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31, 69 Cal.Rptr. 568, 442 P.2d 648; *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761, 135 Cal.Rptr.2d 433; *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564-565, 176 Cal.Rptr. 704; *South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.* (1999) 72 Cal.App.4th 1111, 1124, 85 Cal.Rptr.2d 647.) ***348** The drivers are entitled to reimbursement for their work accident insurance premiums.

**B.**

[20] Estrada contends the trial court erred in " using the class questionnaires as a litmus test to determine which of the 700 absent class members wished to participate rather than ... determin[ing] which fit the class definition" (thus making it a prohibited " opt-in" class action) and then " dismissing all absent class members who did not fully participate in discovery." We disagree.

After the class certification order and after our decision in *Estrada I, Hypertouch, Inc. v. Superior Court* (2005) 128 Cal.App.4th 1527, 1543-1550, 27 Cal.Rptr.3d 839, held that " an ' opt-in' procedure is not authorized by and conflicts with California class action rules." But *Hypertouch* does not support Estrada's challenge to his certification order because, as *Hypertouch* notes, " the existence of an ascertainable class is a precondition of class certification." (*Id.* at p. 1549, 27 Cal.Rptr.3d 839.) In our case, discovery was necessary to determine whether in fact there was an ascertainable class and, if so, whether it was manageable. (*Estrada I, supra*, 125 Cal.App.4th at p. 983, 23 Cal.Rptr.3d 261.) More to the point, Estrada's current argument ignores the fact that class certification was granted on the accepted condition that discovery would define the class. When prospective class members failed to respond (or responded inadequately) to the court-approved discovery requests, the court could not determine whether they fit the class definition or had compensable damages. Under these circumstances, there was no error.

**DISPOSITION**

The judgment is reversed (1) insofar as it awards $12,373,875 to plaintiffs for their attorneys' fees and costs and (2) insofar as it disallowed the expenses discussed in Parts V.A.2 and V.A.4 of this opinion; in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 112 of 227

all other respects, the judgment is affirmed and the cause is remanded to the trial court with directions to conduct such further proceedings as are necessary to determine the amounts to which the drivers are entitled for out-of-pocket expenses (Part V.A.2) and the amounts due for their work accident insurance premiums (Part V.A.4), and to thereafter determine the reasonable amount of fees and costs to be awarded (Part IV). Estrada is entitled to his costs of appeal.

We concur: MALLANO, Acting P.J., and JACKSON, J.[FN*]

FN* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Cal.App. 2 Dist.,2007.
Estrada v. FedEx Ground Package System, Inc.
64 Cal.Rptr.3d 327, 07 Cal. Daily Op. Serv. 9575, 2007 Daily Journal D.A.R. 12,305

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 113 of 227

Exhibit C

12001

CHATSWORTH, CALIFORNIA; TUESDAY, JUNE 29, 2004
DEPARTMENT NV F-48 - HON. HOWARD J. SCHWAB, JUDGE
10:30 A.M.
(APPEARANCES AS PREVIOUSLY NOTED.)
(WYNNE FORREST, OFFICIAL REPORTER)

12020

THE COURT: THANK YOU, SIR. YOU ARE EXCUSED. THANK YOU VERY MUCH.

MS. FARIS: THE PLAINTIFF'S CALL THEIR FINAL WITNESS, ROBERT WOOD.

ROBERT WOOD,

CALLED AS A WITNESS BY THE PLAINTIFF WAS SWORN AND TESTIFIED AS FOLLOWS:

THE CLERK: PLEASE RAISE YOUR RIGHT HAND.

YOU DO SOLEMNLY STATE THAT THE TESTIMONY THAT YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

THE WITNESS: I DO.

THE CLERK: PLEASE BE SEATED IN THE WITNESS STAND.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 114 of 227

Exhibit C

PLEASE STATE AND SPELL YOUR FIRST AND LAST NAME FOR THE RECORD, PLEASE.

THE WITNESS: FIRST NAME IS ROBERT WARREN, LAST NAME WOOD, W-O-O-D.

THE COURT: THANK YOU, SIR.

MS. FARIS: I WOULD LIKE TO MARK AS THE EXHIBIT NEXT IN ORDER MR. WOOD'S RESUME.

THE COURT: THANK YOU. 116 WILL BE THE CV OF MR. WOOD.

(MARKED FOR IDENTIFICATION, JOINT EXHIBIT NO. 116, CURRICULUM VITAE OF ROBERT WOOD)

THE COURT: YOU MAY EXAMINE.

12021

MR. NELSON: CAN WE GET AN OFFER OF PROOF OF THE TOPIC OF REBUTTAL?

MS. FARIS: THE TOPIC IS REBUTTAL TO MR. BRADLEY'S TESTIMONY.

THE COURT: ON WHAT POINT.

MS. FARIS: ON A VARIETY OF POINTS HAVING TO DO WITH THE INSERTION IN THE 1994 AGREEMENT OF A PARTICULAR PROVISIONS WHICH MR. BRADLEY ADDRESSED IN HIS TESTIMONY AS HAVING TO DO WITH VARIOUS OF THE FACTORS OF CONTAINED IN THE IRS MATERIALS. I AM GOING TO ASK MR. WOOD A SERIES OF QUESTIONS REGARDING SPECIFICALLY REGARDING MR. BRADLEY'S TESTIMONY.

THE COURT: OKAY. GO AHEAD. IF THERE IS A PROBLEM, YOU CAN ALWAYS OBJECT TO EACH ASPECT.

Exhibit C

DIRECT EXAMINATION

BY MS. FARIS:

Q MR. WOOD, CAN YOU TELL US BY WHOM YOU ARE EMPLOYED?

A I GUESS YOU COULD SAY I AM SELF-EMPLOYED. I AM TECHNICALLY AN EMPLOYEE OF MY OWN CORPORATION. ROBERT W. WOOD, A PROFESSIONAL CORPORATION. IT IS A SMALL LAW FIRM IN SAN FRANCISCO.

THE COURT: EXCUSE ME ONE SECOND. THE CV OF MR. WOOD IS 116.

MS. FARIS: THANK YOU.

Q MR. WOOD, WHERE DID YOU GET YOUR LAW DEGREE?

A THE UNIVERSITY OF CHICAGO.

12022

Q WHEN DID YOU GRADUATE?

A 1979.

Q AND SINCE THAT TIME HAVE YOU HAD ANY FIELD OF SPECIFIC INTEREST IN YOUR PRACTICE?

A YES. I HAVE BEEN ENGAGE SINCE IN 1979 CONTINUOUSLY PRIMARILY IN A TAX PRACTICE. I AM PRIMARILY A TAX LAWYER.

Q HAVE YOU HAD OCCASION TO WRITE ARTICLES, BOOKS AND OTHER MATERIALS WITH RESPECT TO TAX LAW?

A YES, I HAVE.

Q THERE APPEARS TO BE AN EXTREMELY LENGTHY LIST OF MATERIALS CONTAINED IN YOUR CV. ARE THESE -- ALSO THE BOOKS, ABOUT THE FIRST 20 PAGES. ARE THESE ALL MATERIALS YOU HAVE PERSONALLY WRITTEN?

A YES, THEY ARE.

Q DID YOU HAVE OCCASION TO WRITE OR EDIT A BOOK

CALLED THE LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS?

A YES, I DID.

Q HOW DID YOU COME TO PREPARE THAT BOOK?

A AS MY PRACTICE AND I GUESS YOU COULD SAY REPUTATION GREW, I WAS APPROACHED BY MORE AND MORE PUBLISHERS TO DO WRITING IN TAX LAW. THIS PARTICULAR BOOK, THE LEGAL GUIDE TO INDEPENDENT CONTRACTOR STATUS -- WHICH IS NOW IN ITS THIRD EDITION; IT GETS SUPPLEMENTED ANNUALLY -- I WAS ASKED TO WRITE BY THE PUBLISHER. I HAD WRITTEN A COUPLE OF OTHER BOOKS FOR THEM ON TAX SUBJECTS AND THEY WERE ANXIOUS TO HAVE ONE ON INDEPENDENT CONTRACTORS.

Q DO YOU RECALL WHEN YOU FIRST -- THE FIRST EDITION OF THIS BOOK WAS PUBLISHED?

A I THINK IT IS IN THE LIST YOU HAVE. I WANT TO SAY EARLY 1990S, MAYBE '91 OR SOMETHING LIKE THAT.

Q ARE THERE PORTIONS OF THAT BOOK THAT ARE DRAFTED BY OTHER INDIVIDUALS AND EDITED BY YOU?

A YES, THERE ARE.

Q ARE THERE OTHER PORTIONS THAT YOU YOURSELF DRAFTED?

A YES, THERE ARE.

Q IN THE COURSE OF YOUR PRACTICE HAVE YOU HAD OCCASION TO ADVISE BUSINESSES REGARDING THE INDEPENDENT CONTRACTOR MODEL AND ITS PROPER USES?

A YES, I HAVE.

Q CAN YOU DESCRIBE FOR US HOW EXTENSIVE THAT EXPERIENCE HAS BEEN?

A I WOULD SAY EXTENSIVE. I HAVE A BUSY

Exhibit C

PRACTICE. SOMETIMES IT WOULD BE CONTROVERSY-RELATED, THAT IS, A COMPANY HAVING DIFFICULTY WITH A TAX AUTHORITY OR A LAWSUIT OR SOMETHING LIKE THAT, WISHING TO BOLSTER ITS POSITION, IF YOU WILL, OR DEFEND ITS POSITION WITH RESPECT TO CLASSIFICATION.

ON THE OTHER HAND, ON MANY OCCASIONS IT WOULD BE MORE OF A PLANNING VARIETY WHERE A COMPANY WOULD LOOK AT A PARTICULAR TYPE OR GROUP OF WORKERS AND SEEK GUIDANCE ABOUT HOW THEY SHOULD BE CLASSIFIED, HOW CONTRACTORS SHOULD BE PREPARED FOR THAT, AND SO ON.

Q SO HAVE YOU BOTH GIVEN ADVICE AND DRAFTED

12024

CONTRACTS LAYING OUT INDEPENDENT CONTRACTOR STATUS?

A INDEPENDENT CONTRACTOR STATUS AND, OF COURSE, EMPLOYEE STATUS AS WELL, YES.

Q HAVE YOU HAD OCCASION TO DRAFT INDEPENDENT CONTRACTOR CONTRACTS?

A YES, I HAVE.

Q AFTER YOU WERE ENGAGED BY THE PLAINTIFFS IN THIS MATTER, YOU WERE GIVEN SOME DOCUMENTS TO REVIEW, AND I WANT TO JUST FOR THE RECORD CLARIFY WHAT EXHIBITS YOU DID REVIEW.

YOU WILL SEE A SERIES OF BOOKS THERE. LET ME JUST ASK YOU IF YOU WOULD START WITH EXHIBIT NO. 1. TAB NO. 2 IS THE OPERATING AGREEMENT WHICH IS DESCRIBED IN MR. BRADLEY'S TESTIMONY.

DID YOU HAVE OCCASION TO REVIEW THAT?

A YES, INDEED I DID.

Q AND DID YOU ALSO HAVE OCCASION TO REVIEW THE TRANSCRIPT OF MR. BRADLEY'S TESTIMONY IN THIS MATTER?

Exhibit C

A I DID.

Q IF YOU WOULD BRIEFLY JUST LOOK AT EXHIBIT 2A AND TELL ME WHETHER IN THE NEXT BOOK YOU HAD OCCASION TO LOOK AT THE PORTIONS OF THE FED-EX OPERATIONS MANAGEMENT HANDBOOK CONTAINED IN TAB 1, WHICH I WILL REPRESENT TO YOU INCLUDES CHAPTERS 2, 3 AND 11.

MR. NELSON: OBJECTION, RELEVANCE. MR. BRADLEY DIDN'T PROVIDE ANY TESTIMONY ABOUT ANY DOCUMENTS IN EXHIBIT 2.

MS. FARIS: THAT'S ONE OF THE PROBLEMS WITH HIS

TESTIMONY, YOUR HONOR. HE DIDN'T TESTIFY ABOUT THE POLICIES, BUT MR. WOOD HAS REVIEWED THE POLICIES. IT IS MATERIAL TO HIS OPINION.

THE COURT: I UNDERSTAND WHAT YOU ARE GETTING AT. OVERRULED.

THE WITNESS: YES, I DID REVIEW THIS MATERIAL.

BY MS. FARIS:

Q IN TAB 2 IN THE SAME EXHIBIT, EXHIBIT 2-A, DID YOU ALSO HAVE OCCASION TO REVIEW THE FED-EX GROUND MANUAL PORTIONS WHICH ARE CONTAINED IN EXHIBIT 2-A. THOSE ARE THE ONES WITH THE TABS ON THE BOTTOM WITH THE FUNNY NAMES.

A I AM CONFUSED BY TAB 2.

Q YES, TAB 2.

A YES, I REMEMBER THE FFA.

Q SO YOU REVIEWED THOSE TWO SECTIONS OF COMPANY POLICIES; IS THAT RIGHT?

A YES INDEED, I DID.

Q AND THEN, JUST BRIEFLY, IF YOU COULD GLANCE

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 119 of 227

Exhibit C

OVER WHAT ARE MARKED THERE AS EXHIBITS 8 AND 9 AND TELL ME WHETHER YOU HAD OCCASION TO REVIEW THE BUSINESS DISCUSSIONS CONTAINED IN BOTH OF THOSE VOLUMES?

A I AM SORRY, MA'AM. EXHIBIT 8?

Q EXHIBIT 8 AND 9, YES.

A YES, MANY, MANY BUSINESS DISCUSSIONS AND PLAN DOCUMENTS. I DID REVIEW THOSE.

Q IN EXHIBIT 8 THERE IS ALSO A TAB 1A SECTION CALLED "THE CONTRACTOR BUSINESS PLAN." YOU HAD OCCASION

12026

TO REVIEW THAT AS WELL, DID YOU NOT?

A YES.

Q DID YOU ALSO REVIEW A SET OF VIDEOTAPES, FIVE VIDEOTAPES, WHICH WE PROVIDED TO YOU WHICH ARE MARKED IN THIS COURT RECORD AS EXHIBIT 37?

A I DON'T REMEMBER THE NUMBER. I THOUGHT THERE WERE SIX. YES, I REVIEWED MULTIPLE VIDEOTAPES.

Q IN ADDITION, THERE IS ONE LAST DOCUMENT, EXHIBIT NO. 3, TAB 2. IT IS A SMALLER ONE THAT DOESN'T WEIGH A TON.

A TAB 2.

Q YES. THAT IS ENTITLED THE "CONTRACTOR ASSISTANCE PROGRAM" BOOKLET. DO YOU SEE THOSE?

A I DO SEE THEM AND I DID REVIEW THESE AS WELL.

Q NOW, YOU WERE ASKED TO ASSESS HOW ALL OF THESE MATERIALS DEMONSTRATE A RELATIONSHIP WHICH EITHER FALLS WITHIN THE TYPICAL INDEPENDENT CONTRACTOR MODEL OR THE EMPLOYER-EMPLOYEE MODEL, WERE YOU NOT, SIR?

A YES, MA'AM, I WAS.

Q YOU WERE ALSO ASKED TO ASSESS WHETHER VARIOUS

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 120 of 227

Exhibit C

PROVISIONS ADDED BY MR. BRADLEY, ACCORDING TO HIS TESTIMONY, TO THE OPERATING AGREEMENT SUCCEEDED IN ELIMINATING ANY ISSUES OR PROBLEMS CONCERNED WITH THE USE OF THE INDEPENDENT CONTRACTOR MODEL, WERE YOU NOT?

A YES, I WAS.

Q YOU WERE ALSO ASKED TO ASSESS THE REMEDY PROVISIONS OF THE OPERATING AGREEMENT AND TO REVIEW MR. BRADLEY'S TESTIMONY IN WHICH HE SAID THAT SECTION

12027

12.3 OF THE OPERATING AGREEMENT PROVIDED THE SOLE AND EXCLUSIVE REMEDY AVAILABLE TO CONTRACTORS FOR VIOLATIONS OF THE AGREEMENT, WERE YOU NOT?

MR. NELSON: MISSTATES MR. BRADLEY'S TESTIMONY.

THE COURT: THAT IS AN INTERESTING POINT. MR. BRADLEY'S TESTIMONY WAS SORT OF VAGUE. I WILL OVERRULE THE OBJECTION BECAUSE IT HAS DUAL INTERPRETATIONS.

I KNOW YOUR INTERPRETATION, MR. NELSON, AND I ALSO KNOW MS. FARIS' INTERPRETATION. IT STOOD OUT LIKE A SORE THUMB. THAT GAVE MR. EDMONDS SOME PROBLEMS TOO WHEN HE TESTIFIED, IF YOU MAY REMEMBER.

BECAUSE MR. BRADLEY'S TESTIMONY WAS SUBJECT TO INTERPRETATION ON THAT POINT, I WILL OVERRULE THE OBJECTION.

BY MS. FARIS:

Q YOU MAY ANSWER.

A I AM SORRY. CAN YOU REPEAT THE QUESTION? I APOLOGIZE.

Q FAIR ENOUGH. YOU WERE ASKED TO ASSESS THE REMEDY PROVISIONS OF THE OPERATING AGREEMENT IN LIGHT OF

Exhibit C

MR. BRADLEY'S TESTIMONY REGARDING SECTION 12.3 AND IT BEING AN EXCLUSIVE REMEDY AVAILABLE TO CONTRACTORS FOR BREACH OF THE OPERATING AGREEMENT; IS THAT CORRECT?

MR. NELSON: I HAVE TO MAKE THE SAME OBJECTION. I UNDERSTAND THE RULING.

THE COURT: OVERRULED AGAIN. I UNDERSTAND YOUR POSITION BASED UPON MR. EDMONDS' TESTIMONY, BUT

12028

MR. BRADLEY'S TESTIMONY STANDS ON ITS OWN. BOTH SIDES CAN ARGUE WHAT IT MEANS.

THE WITNESS: I THINK I CAN ANSWER THE QUESTION NOW. I DID READ IT. I WAS ASKED TO EXAMINE IT.

YES, I DO HAVE OPINIONS ABOUT IT. YES.

BY MS. FARIS:

Q ARE THERE ANY --

TO BEGIN WITH, ARE THERE ANY STATUTORY OR REGULATORY MANDATE REQUIREMENTS ABOUT ANY PARTICULAR TERM BEING INCLUDED IN AN INDEPENDENT CONTRACTOR AGREEMENT IN ORDER TO MAKE IT VALID?

MR. NELSON: OBJECTION, OVERBROAD. VAGUE. IT MAY BE BEYOND THE SCOPE OF THIS WITNESS' EXPERTISE.

THE COURT: I THINK I KNOW WHAT THE ANSWER IS GOING TO BE. I THINK IT WILL BE NO PROBLEM. OVERRULED.

THE WITNESS: THERE ARE NO SUCH MANDATES OF WHICH I AM AWARE OF, MA'AM, NO.

BY MS. FARIS:

Q DO YOU KNOW OF ANY EITHER IRS OR CALIFORNIA TAXING AUTHORITY REGULATIONS THAT REQUIRE ANY PARTICULAR TERM TO BE INCLUDED IN AN INDEPENDENT CONTRACTOR AGREEMENT TO MAKE IT A PROPER ONE?

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 122 of 227

Exhibit C

A I CAN ANSWER THAT CATEGORICALLY. THERE ARE NONE.

Q LET'S START WITH THE OPERATING AGREEMENT ITSELF. THAT IS IN EXHIBIT 1, TAB 2.

A I DID BRING MY OWN COPY OF THIS, BUT I CAN REFER TO THAT, IF YOU WOULD LIKE.

12029

Q EITHER WAY. IT DOESN'T MATTER.

A I AM SORRY. WHAT PROVISION?

MR. NELSON: YOUR HONOR, I HATE TO BE PICKY ABOUT THIS, BUT SINCE WE DON'T KNOW EXACTLY WHICH VERSION OF THE AGREEMENT HE IS REFERRING TO --

THE COURT: I THINK IT IS BEST YOU REFER TO EXHIBIT 1, TAB 2, SO WE ARE ALL ON THE SAME TRACK.

THE WITNESS: I JUST DON'T HAVE A FANCY BINDER, THAT'S ALL.

BY MS. FARIS:

Q MR. WOOD, WHEN YOU REVIEWED THE OPERATING AGREEMENT, STARTING WITH THE BACKGROUND STATEMENT, DID THIS RAISE ANY ISSUES IN YOUR MIND ABOUT COMPLIANCE WITH THE INDEPENDENT CONTRACTOR MODELS WITH WHICH YOU ARE FAMILIAR?

A YES.

Q CAN YOU TELL US WHAT THEY WERE?

A BOY, THERE ARE MANY. IT IS AN ELABORATELY CONSTRUCTED CONTRACT. I THINK IN MY 25 YEARS OF PRACTICE IT IS THE MOST ELABORATE AND DETAILED INDEPENDENT CONTRACTOR AGREEMENT, OR AT LEAST PURPORTED INDEPENDENT CONTRACTOR AGREEMENT, THAT I HAVE SEEN. AND IT GOES IN A VARIETY OF DIRECTIONS, TO ME POINTING TOWARD EMPLOYMENT

STATUS IN PROBABLY MORE WAYS THAN I CAN COUNT.

I WOULD BE HAPPY TO TRY TO ELABORATE ON THAT ANSWER IF THE COURT OR YOU WOULD LIKE.

Q I THINK LET'S START TO TRY TO BE SYSTEMATIC ABOUT IT. LET'S START WITH THE BACKGROUND STATEMENT

WHICH MR. BRADLEY TESTIFIED ABOUT SPECIFICALLY WHERE HE SAID HE INCLUDED THIS STATEMENT TO TRY TO MAKE THIS VERY SPECIFIC, THIS AGREEMENT VERY SPECIFIC AND VERY CLEAR.

THERE ARE PARTICULAR PROVISIONS IN THE BACKGROUND AGREEMENT. FOR EXAMPLE, THERE ARE REFERENCES TO A NETWORK OF CONTRACTORS. IN THE THIRD LINE -- THE THIRD SENTENCE -- I AM SORRY, THE FOURTH SENTENCE -- IT SAYS RPS WANTS TO PROVIDE TO PACKAGE PICK UP AND DELIVERY SERVICES THROUGH A NETWORK OF INDEPENDENT CONTRACTORS, ET CETERA.

DOES THE USE OF THE TERM "NETWORK OF INDEPENDENT CONTRACTORS" THROUGHOUT THIS AGREEMENT RAISE ANY RED FLAGS FOR YOU?

MR. NELSON: OBJECTION, VAGUE AS TO "RED FLAGS."

THE COURT: RED FLAGS AS TO EMPLOYMENT STATUS, IS THAT WHAT YOU MEAN?

MS. FARIS: YES.

THE COURT: GO AHEAD.

THE WITNESS: IT DOES RAISE RED FLAGS OR CONCERNS, HOWEVER YOU WOULD CHARACTERIZE THEM, IN MY MIND ABOUT EMPLOYMENT STATUS, YES, BECAUSE OF, AMONG OTHER THINGS, THE DEGREE -- THE RATHER RADICAL DEGREE OF INTEGRATION WITH THE -- IT IS REALLY THE CORE BUSINESS OF RPS, OR NOW FED-EX GROUND, AS I UNDERSTAND IT, DELIVERING THESE

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 124 of 227

Exhibit C

PACKAGES, THE MILLIONS A DAY, AND THIS NETWORK AND UNIFORMITY WHICH IS IMPOSED THROUGHOUT THE AGREEMENT AND, REALLY, THE RIGHT TO IMPOSE UNIFORMITY, WHICH IS EQUALLY IMPORTANT AS TO WHETHER THE UNIFORMITY WAS EVER ENFORCED.

BUT YES, IT DOES RAISE SERIOUS CONCERNS AND, TO ME, CLEARLY LABELS THESE INDIVIDUALS AS EMPLOYEES.

Q (By Ms. Faris) WHEN YOU SAY -- YOU REFER TO THE "FED-EX GROUND CORE BUSINESS," WHAT DO YOU MEAN BY THAT?

A WELL, THERE IS A OBVIOUSLY MANY BUSINESSES THAT CHOOSE FOR A VARIETY OF REASONS TO ATTEMPT TO, AND MANY QUITE VALIDLY ATTEMPT TO, OPERATE WITH SOME OF THEIR WORKERS AS INDEPENDENT CONTRACTORS RATHER THAN AS EMPLOYEES. FOR EXAMPLE, THE COST OF EMPLOYEE BENEFITS AND TAX WITHHOLDING AND THESE KINDS OF REASONS.

YET ONE OF THE GENERALLY ACCEPTED -- IT IS BOTH IN THE IRS STANDARDS, WHICH I DON'T THINK ARE AN ISSUE IN THIS CASE, AND IN THE BORELLO STANDARDS, WHICH I BELIEVE ARE SQUARELY AT ISSUE, THAT THE ONE INQUIRY IS HOW INTEGRAL IS THIS TO YOUR BUSINESS?

IF YOU WERE USING, AS IN THE CASE OF FED-EX GROUND, THIS GROUP OF WORKERS, PUTATIVE INDEPENDENT CONTRACTORS, IN A WAY WHERE THE BUSINESS LITERALLY CANNOT FUNCTION WITHOUT THEM, IT IS THEIR BUSINESS TO DELIVER THE PACKAGES, THEN THAT SPEAKS LOUDLY AND PROBABLY CONCLUSIVELY, FRANKLY, TO EMPLOYEE STATUS.

UNLIKE, FOR EXAMPLE, THE CUCUMBER PICKERS I BELIEVE IT WAS IN BORELLO, WHICH WAS A SEASONAL KIND OF A THING, AND THERE WERE MANY OTHER ASPECTS OF AGRICULTURAL

Exhibit C

BUSINESS, SEWING THE SEEDS AND TILLING AND IRRIGATION, ET CETERA, WHICH WERE NOT CONDUCTED BY SO-CALLED CONTRACTORS.

12032

THE COURT: YOU MENTIONED ABOUT THE INTEGRAL ASPECT. YOU ARE REFERRING TO ANY PART OF THE CONTRACT OR WHAT? I AM CONFUSED. ARE YOU TALKING ABOUT HOW YOU SEE THE MODEL IN THE ABSTRACT OR HOW YOU SEE THE CONTRACT INVOLVED HERE UNDER EXHIBIT 1, TAB 2?

THE WITNESS: FAIR ENOUGH. I GUESS I AM REFERRING TO A LITTLE OF BOTH. CERTAINLY THE -- I AM SPEAKING IN THE ABSTRACT, BUT BY "INTEGRATION" I AM SPEAKING SPECIFICALLY ABOUT THE INTEGRATION THAT I SEE IN THIS CONTRACT AND IN THE ANCILLARY DOCUMENTS, MANY OF WHICH ARE ALLUDED TO IN THE CONTRACT.

THE COURT: RIGHT NOW WE ARE ON THE BACKGROUND STATEMENT. WHERE DO YOU SEE THAT IN THE BACKGROUND STATEMENT? OTHERWISE IT WILL BE CHAOTIC. WE NEED SOME ORGANIZATION.

THE WITNESS: ALL RIGHT. I AM SORRY, YOUR HONOR.

IN THE BACKGROUND STATEMENT THERE ARE REFERENCES TO THE DESIRE OF RPS, AS IT WAS THEN NAMED, TO PROVIDE THIS -- MANAGE ITS BUSINESS TO PROVIDE COMPETITIVE ACCESS TO NATIONAL MARKETS AND PROVIDING DAILY PICKUP AND DELIVERY SERVICE.

IT IS SORT OF THE BACKGROUND, IF YOU WILL, FOR THE CONTROL THAT I THINK IS MANIFESTED AND THE RIGHT TO CONTROL WHICH IS MANIFESTED LATER ON. DESPITE THE FACT THERE IS REFERENCE TO THE INTENT OF INDEPENDENT CONTRACTOR RELATIONSHIP, IT IS THE NETWORK AND NATIONWIDE

Exhibit C

NETWORK AND SORT OF BANDING TOGETHER THAT I VIEW AS INDICATIVE IN THIS SPECIFIC CLAUSE OF EMPLOYMENT STATUS.

12033

BY MS. FARIS:

Q MR. WOOD, WHERE THE BACKGROUND STATEMENT GOES FURTHER, A LITTLE BIT LOWER DOWN, IT REFERS TO CONDUCTING HIS OR HER BUSINESS SO IT CAN BE IDENTIFIED AS BEING A PART OF THE RPS SYSTEM.

DOES THAT RAISE ANY CONCERNS FOR YOU WITH RESPECT TO ANY OF THE FACTORS CONSIDERED IN ASSESSING INDEPENDENT CONTRACTOR STATUS?

A IT DOES. OBVIOUSLY THIS IS KIND OF A GENERAL STATEMENT, THIS BACKGROUND STATEMENT, AS IT IS CALLED. IN SOME WAYS IT IS KIND OF -- I WOULD VIEW IT AS A PREAMBLE TO THE CONTRACT, ALTHOUGH IT IS NOT CAST THAT WAY.

BUT WE KNOW FROM OTHER PROVISIONS OF THE CONTRACT AND OTHER DOCUMENTS THAT I HAVE REVIEWED THAT THERE IS THIS ENORMOUS IDENTITY THAT IS REQUIRED, UNIFORMS, TRUCK SIGNAGE, ET CETERA, AND EVERYTHING QUITE STANDARDIZED. SO YES, THIS DOES SPEAK TO THAT UNIFORM TREATMENT AND THEREFORE TO EMPLOYMENT STATUS.

Q CAN YOU TELL ME IN THE BACKGROUND STATEMENT IT ALSO REFERS TO THE COMPANY'S OBLIGATION AND I QUOTE, "TO MANAGE ITS BUSINESS SO IT CAN PROVIDE SUFFICIENT VOLUME OF PACKAGES TO CONTRACT TO MAKE FULL USE OF CONTRACTOR'S EQUIPMENT."

DID THAT PARTICULAR PHRASE RAISE ANY ISSUES FOR YOU WITH RESPECT TO WHETHER THIS COULD PROPERLY BE CONSTRUED AS AN INDEPENDENT CONTRACTOR AGREEMENT?

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 127 of 227

Exhibit C

A YES. IT DID. ONE OF THE HALLMARKS --

I APOLOGIZE, YOUR HONOR, IF I SOUND LIKE I AM TALKING THEORY AGAIN RATHER THAN PRACTICE IN THIS CASE. BUT I WOULD EXPECT TO SEE IN A TRUE INDEPENDENT CONTRACTOR RELATIONSHIP THE ABILITY, IN THE CASE OF DRIVERS SUCH AS THESE, TO DO OTHER HAULING SERVICES FOR OTHER CARRIERS, OTHER PACKAGE DELIVERY. AND THIS FULL USE PROVISION DOESN'T SAY FULL-TIME EMPLOYMENT, BUT THIS TIPPED ME OFF AS IT WERE ON THE FIRST PAGE THAT THAT COULD BE REQUIRED AND INDEED APPEARS TO BE FROM WHAT I UNDERSTOOD FROM LATER READING.

THE COURT: WHERE ON THE FIRST PAGE IS THE FULL USE REQUIREMENT.

MS. FARIS: YOUR HONOR, IT IS ABOUT 10 LINES DOWN IN THE BACKGROUND STATEMENT.

THE COURT: ACTUALLY, I ASKED THE WITNESS. HE IS THE ONE WHO IS TESTIFYING.

THE WITNESS: I AM SORRY. I THINK IF I WERE REFERRING TO THE COPY THAT I HAD HERE, IT MIGHT BE EASIER. OR IF I PUT MY READING GLASSES ON. I WILL PERHAPS HAVE TO RESORT TO THAT.

THE COURT:: WELCOME TO THE CLUB.

THE WITNESS: DESPITE VANITY, I KEEP MEANING TO GET BIFOCALS.

YES, IT IS ADJACENT TO THE 3-HOLE PUNCH, THE MIDDLE HOLE, IN MY COPY. SO IT IS --

NINTH LINE, I BELIEVE, SAYS, "PROVIDE SUFFICIENT VOLUME OF PACKAGES TO CONTRACTOR TO MAKE FULL USE OF CONTRACTOR'S EQUIPMENT."

Exhibit C

THE COURT: THANK YOU.

THE WITNESS: PLEASURE.

BY MS. FARIS:

Q IF YOU WOULD LOOK, MR. WOOD, AT THE LAST SENTENCE OF THE BACKGROUND STATEMENT WHICH MR. BRADLEY DESCRIBED IN HIS TESTIMONY, THREE LINES UP FROM THE BOTTOM OF THE PAGE MARKED 3-4 IN HANDWRITING. IT SAYS "THEREFORE, THIS AGREEMENT WILL SET FORTH THE MUTUAL BUSINESS OBJECTIVES OF THE TWO PARTIES INTENDED TO BE SERVED BY THIS AGREEMENT -- WHICH ARE THE RESULTS THE CONTRACTOR AGREES TO ACHIEVE -- AGAIN, BUT THE MANNER AND MEANS OF REACHING THESE RESULTS ARE WITHIN THE DISCRETION OF THE CONTRACTOR AND NO OFFICER OR EMPLOYEE OF RPS SHALL HAVE THE AUTHORITY TO IMPOSE ANY TERM OR CONDITION ON CONTRACTOR OR ON CONTRACTOR'S CONTINUED OPERATION WHICH IS CONTRARY TO THIS UNDERSTANDING.

THE COURT: BY THE WAY, FOR THE RECORD, THIS IS HANDWRITTEN PAGES 5 AND 6.

MS. FARIS: I APOLOGIZE, YOUR HONOR. WRONG COPY.

Q THAT PARTICULAR PROVISION, MR. BRADLEY, SPECIFICALLY REFERRED TO ADDING TO THE CONTRACT, AND THERE IS SIMILAR LANGUAGE IN SECTION 1.15 OF THE AGREEMENT, IS IT YOUR OPINION THAT BY ADDING THIS LANGUAGE BASICALLY SAYING THAT NO OFFICER OR EMPLOYEE OF THE COMPANY HAS AUTHORITY TO IMPOSE ANY TERMS ON THE CONTRACTOR, THAT THIS CONTRACT IS CONVERTED TO A PROPER INDEPENDENT CONTRACTOR AGREEMENT?

A NO, MA'AM, IT IS NOT.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 129 of 227

Exhibit C

Q WHY NOT? WHY DOESN'T THAT TAKE CARE OF ALL THE OTHER PROGRAMS?

A WELL, IT IS A PROVISION THAT I THINK CAREFUL LAWYERS, OFTEN IN A VARIETY OF CONTEXTS, CERTAINLY IN INDEPENDENT CONTRACTOR AGREEMENTS, EVEN INDEPENDENT CONTRACTOR AGREEMENTS WHICH DON'T SEEM TO SUFFER FROM ANY OF THE FLAWS THAT I BELIEVE THIS ONE DOES, SEEK TO PUT IN AS KIND OF A -- I REFER TO IT AS A SAVINGS CLAUSE.

AGAIN I VIEW IT AS PRECATORY. IT IS "WE REALLY WANT THIS TO BE" --

IF YOU WILL PERMIT ME TO SAY WHAT I THINK IT SAYS, "WE REALLY WANT THIS TO BE AN INDEPENDENT CONTRACTOR RELATIONSHIP SO NOBODY OUT THERE WITHIN THE COMPANY SHOULD DO ANYTHING THAT OR SAY ANYTHING OR IMPOSE CONDITIONS THAT WOULD BE INCONSISTENT WITH THAT."

THE MERE FACT THAT SUCH A PROVISION IS IN THE AGREEMENT CERTAINLY DOESN'T MEAN THAT THOSE THINGS CANNOT HAPPEN OR THAT THEY DON'T HAPPEN OR THEY DON'T HAVE FORCE.

Q IN YOUR EXPERIENCE, WOULD THE ACTUAL CONDUCT OF THE PARTIES BE MORE IMPORTANT OR LESS IMPORTANT THAN THE TERMS PROVIDED IN A SENTENCE OF THIS TYPE?

A IN ACTUAL PRACTICE, FAR MORE IMPORTANT WHAT IS DONE AND THE ACTUAL ON-THE-GROUND EXPERIENCE, IF YOU WILL, THAN WHAT THE CONTRACT SAYS.

Q NOW, IN YOUR VIEW OF THE CONTRACT GENERALLY, DID YOU FIND ANY TERMS IN THE AGREEMENT WHICH WERE INCONSISTENT WITH THIS LANGUAGE THAT SAYS "NO OFFICER OR

12037

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 130 of 227

Exhibit C

EMPLOYEE SHALL HAVE THE AUTHORITY TO IMPOSE ANY TERM OR CONDITION ON THE CONTRACTOR"?

MR. NELSON: I WILL OBJECT. THE QUESTION AS PHRASED MISSTATES THE CONTRACTOR.

THE COURT:: LET'S PUT IT THIS WAY. DO YOU FIND ANYTHING IN THE CONTRACT WHICH IS CONTRARY TO THE LAST 4 LINES ON WRITTEN PAGE 5 AND THE FIRST 2 LINES ON WRITTEN PAGE 6? HOW IS THAT?

THE WITNESS: I DO. I WOULD HONESTLY, PROBABLY -- I WILL TRY TO RECITE SOME FROM MEMORY.

THERE ARE A VARIETY OF PLACES IN THE CONTRACT WHERE I WOULD SAY THE CONTRACT SUFFERS FROM WHAT I WOULD SAY, AS A FORMER ENGLISH MAJOR CLOSE TO 30 YEARS AGO, A PASSIVE VOICE IN DRAFTING.

THAT IT SAYS, "WELL, IF IT IS DETERMINED THAT SUCH AND SUCH OR THIS KIND OF THING," WITH NO SPECIFICATIONS AS TO WHO MAKES SUCH A DETERMINATION OR HOW IT IS MADE OR IF THERE IS ANY REMEDY, IF THE DETERMINATION IS MADE IN A MANNER THAT THE PUTATIVE CONTRACTOR, THE DRIVER PERSON, FINDS TO BE INAPPROPRIATE. I THINK I CAN, IF YOU WILL GIVE ME A LITTLE BIT OF TIME, I CAN FIND A FEW OF THOSE.

THE COURT: BY THE WAY, COUNSEL, I WOULD APPRECIATE YOU GIVING ME AN EXTRA COPY OF THE CONTRACT, EITHER EXHIBIT 1, TAB 2 OR EXHIBIT 14, WHATEVER YOU DECIDE. I WANT TO GO OVER AND DIAGRAM THE CONTRACT MYSELF DURING THE TIME I AM WAITING FOR THE BRIEFS AND THINGS.

MS. FARIS: I KNOW YOU HAD ASKED US VERY EARLY ON

12038

IN THE CASE TO GIVE YOU AN ANNOTATED VERSION OF THE

Exhibit C

CONTRACT, AND WE DO INTEND TO DO THAT.

THE COURT: I WOULD LIKE TO HAVE AN ANNOTATED AND ALSO A BLANK ONE WITHOUT ANNOTATIONS SO I CAN MAKE MY OWN ANNOTATIONS AND DIAGRAM IT MYSELF.

MR. NELSON: CERTAINLY, YOUR HONOR.

BY MS. FARIS:

Q MAYBE TO SPEED THIS UP I COULD POINT YOU TO IMMEDIATELY TO 1.12, 1.13 AND 1.14 OF THE CONTRACT AND ASK YOU WHETHER THESE TERMS PARTICULARLY APPEAR TO BE INCONSISTENT WITH SECTION 1.15 BARRING ANY OFFICER, AGENT OR EMPLOYEE FROM PRESCRIBING THE ANY TERM OR CONDITION?

A YES, THANK YOU.

I UNDERSTAND THE JUDGE'S RULING AND THE OBJECTION ABOUT MY HAVING A COPY OF THIS UP HERE. I WOULD BE HAPPY TO SHARE A COPY WITH YOU, BUT ANOTHER ALTERNATIVE -- AND I ALWAYS ANSWER YOUR QUESTION, MS. FARIS -- BUT IF I COULD BE PERMITTED TO FLIP TO THE VERSION OF THE CONTRACT WHERE I HAVE A FEW NOTES ON IT AND THEN -- I CERTAINLY WON'T TESTIFY FROM THAT -- I WILL REFER YOU TO THE PROVISION OF THE BINDER DOCUMENT I HAVE, IF THAT MIGHT AVOID CONFUSION. THAT WOULD SPEED IT UP, TOO. IT IS UP TO YOU.

MS. FARIS: IF COUNSEL WANTS TO SEE HIS NOTES.

THE COURT: YOU WANT TO TAKE A LOOK AT THIS CONTRACT?

MR. NELSON: LET ME TAKE A LOOK. FOR ALL WE KNOW IT IS THE SAME DOCUMENT. FOR THE RECORD, IT IS NOT THE

12039

SAME VERSION THAT IS IN PLAINTIFF'S EXHIBIT 1, NOR IS IT THE ONE THAT IS OUR 14-100. I BELIEVE IT IS

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 132 of 227

Exhibit C

MR. MORGAN'S.

MS. FARIS: IT IS A 1994 VERSION, WHICH IS THE COPY OF THE VERSION THAT IS IN 14-100.

MS. ROSS: THAT'S RIGHT.

MR. NELSON: IF YOU SAY SO. I GUESS THE ONLY OTHER CONCERN I HAVE IS THERE ARE SOME FIGURES AND NOTATIONS IN THERE WHICH HAVE NOT BEEN PROVIDED TO ME, WHICH WAS PART OF THE 72-HOUR DEAL, I BELIEVE.

MS. ROSS: THESE ARE JUST HIS HANDWRITTEN NOTES THAT HE HAS MADE OVER THE COURSE OF THE LAST DAY. I WILL BE HAPPY TO PROVIDE YOU WITH A COPY OF THEM, IF YOU WANT THEM.

MR. NELSON: I THINK I WOULD, YES.

THE WITNESS: I AM SORRY. CAN I SAY SOMETHING ON THIS? YES, I CAN REPRESENT TO YOU, SIR, THAT ALL OF THE NOTES ON HERE ARE IN MY OWN HANDWRITING AND THAT THEY WERE ALL MADE WITHIN THE LAST -- I THINK 24 HOURS OR 36 HOURS, ANYWAY. BUT I WOULD BE HAPPY TO GIVE YOU A COPY.

THE COURT: WHY DON'T WE TAKE A BREAK AND HAVE THEM PHOTOCOPIED.

MR. NELSON: IF YOU WOULDN'T MIND, YOUR HONOR, IT WOULD BE NICE TO SEE THE ACTUAL DOCUMENT.

THE COURT: MR. ATTENDANT, COULD I ASK TO YOU DO THE HONORS?

WE WILL TAKE A BREAK UNTIL AROUND 11:40. THAT SHOULD GIVE US ENOUGH TIME.

12040

THANK YOU VERY MUCH. MAKE AN EXTRA COPY FOR ME AND MAKE THIS THE NEXT EXHIBIT. HOW'S THAT?

(RECESS)

Exhibit C

THE COURT: THIS IS THE CASE OF ESTRADA VERSUS FED-EX GROUND. ALL COUNSEL ARE PRESENT. MR. WOOD IS ON THE STAND, HAVING BEEN WORN.

WE NOW HAVE A COPY OF THE ANNOTATED CONTRACT BY MR. WOOD. THIS WILL BE EXHIBIT NO. 117. WE CAN ALL REFER TO THAT BECAUSE IT IS AN EXHIBIT.

(MARKED FOR IDENTIFICATION, JOINT EXHIBIT NO. 117, ANNOTATED CONTRACT)

BY MS. FARIS:

Q EARLIER IN YOUR TESTIMONY YOU REFERRED TO SOME SENTENCES THAT USED THE PASSIVE VOICE. FOR EXAMPLE, I WOULD LIKE TO POINT YOUR ATTENTION TO 1.2 ON EQUIPMENT MAINTENANCE TOWARD THE BOTTOM. THE SENTENCE THAT BEGINS "IN THE EVENT THE EQUIPMENT IS FOUND TO BE DEFICIENT UNDER ANY LAW OR REGULATION, CONTRACTOR AGREES TO REMOVE THE EQUIPMENT FROM SERVICE WITH RPS UNTIL IT IS BROUGHT INTO COMPLIANCE," IS THAT THE SENTENCE THAT YOU WERE REFERRING TO IN YOUR EARLIER TESTIMONY?

A IT IS, MA'AM. I THINK THERE WERE SEVERAL PLACES. I HAVE TO CONFESS TO SOME EMBARRASSMENT. ALL OF MY LITTLE MARKS ON HERE I DIDN'T REALIZE WOULD BE LOOKED AT BY EVERYONE WITH THE EXCLAMATION MARKS AND SO ON. BUT

12041

YES, THE PASSIVE VOICE, "IS FOUND TO BE DEFICIENT." YOU WILL NOTE MY SCRIBBLED REMARK, "BY WHOM?" A TERMINAL MANAGER, I GATHER. I THINK I READ IN ONE OF THE OTHER DOCUMENTS THAT IT WAS THE TERMINAL MANAGER, BUT THAT WAS

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 134 of 227

Exhibit C

MY IMPRESSION, AT LEAST.

Q STAYING WITH THE ISSUE OF WHAT IN THE CONTRACT APPEARS TO BE INCONSISTENT WITH THE BACKGROUND LANGUAGE WE TALKED ABOUT, NO OFFICER OR EMPLOYEE WILL DICTATE THE TERMS OR CONDITIONS TO CONTRACTORS, COULD WE TURN FOR A SECOND TO SECTION 1.12. TELL ME, IF YOU --

MR. NELSON: IS THAT THE QUESTION?

MS. FARIS: NO.

THE COURT: I DON'T THINK SO.

BY MS. FARIS:

Q COULD YOU TELL ME WHETHER IN YOUR OPINION SECTION 1.12 IS INCONSISTENT WITH THE LANGUAGE IN THE BACKGROUND STATEMENT SAYING THAT NO OFFICER OR EMPLOYEE OF THE COMPANY WILL DICTATE TERMS OR CONDITIONS TO THE CONTRACTOR?

A I AM NOT SURE I CAN GIVE A ONE-SENTENCE ANSWER, BUT THE SHORT IS ANSWER IS I WOULD SAY IS YES, IT IS INCONSISTENT. I HAVE CIRCLED SOME OF THE PROVISIONS -- I THINK HOPEFULLY THEY CAME THROUGH ON THE PHOTOCOPIES -- THAT I CONSIDERED ENTIRELY INCONSISTENT WITH THIS PREAMBLE BACKGROUND STATEMENT.

THIS NOTION IN THE FIRST SENTENCE OF 1.12 THAT THE CONTRACTOR ACKNOWLEDGES THIS PRESENTATION OF A CONSISTENT IMAGE, STANDARD OF SERVICE TO CUSTOMERS IS

12042

ESSENTIAL IN ORDER TO BE COMPETITIVE, I SCRIBBLED "UPS" WHICH I BELIEVE IS THE INDUSTRY LEADER. A FEW LINES LATER, THE APPROVED UNIFORM, THE MAINTAINED IN GOOD CONDITION VEHICLE, AND AGAIN I WROTE IN "WHO DECIDES?" I THINK THERE IS A QUESTION THERE.

Exhibit C

ALSO, I SUPPOSE, MOST DRAMATICALLY, AT THE VERY END OF THAT PAGE 9 IT SAYS REASONABLE STANDARDS OF ORDER AS -- STANDARDS OF GOOD ORDER AS MAINTAINED BY COMPETITORS. AGAIN, SUGGESTING AN ENTERPRISE. AND PROMULGATED FROM TIME TO TIME BY RPS.

SO "PROMULGATED FROM TIME TO TIME" ESSENTIALLY BOOTSTRAPPING OTHER THINGS THAT MAY BE IMPOSED IN THE FUTURE, TERMS AND CONDITIONS OF EMPLOYMENT, OR I GUESS IN THIS CASE TERMS AND CONDITIONS OF WORK, HOWEVER THE WORK IS CHARACTERIZED, AND THAT THOSE WOULD BE INCONSISTENT WITH THAT INITIAL PREAMBLE LANGUAGE.

Q CAN YOU TELL ME GENERALLY DO YOU CONSIDER A REQUIREMENT TO WEAR A UNIFORM AND TO HAVE A PERSONAL APPEARANCE CONSISTENT WITH COMPANY STANDARDS TO BE INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS, GENERALLY?

A GENERALLY, YES.

Q WHY IS THAT?

A THERE ARE CERTAIN VALID REASONS WHY A COMPANY WOULD WANT A UNIFORM. IT IS OBVIOUSLY QUITE A COMMON THING, AND IN THIS PARTICULAR INDUSTRY, I THINK STANDARD. I MEAN, UPS WITH THEIR BROWN UNIFORMS THAT THEY ARE

12043

ALWAYS ADVERTISING ABOUT.

BUT THE STANDARD SORT OF CLASSICAL MODEL OF INDEPENDENT CONTRACTOR STATUS, IF YOU READ THE CASE LAW, BOTH STATE AND FEDERAL, WOULD BE THAT ACTUALLY SIMILAR TO THE GENTLEMAN THAT I HEARD TESTIFY THIS MORNING. MR. MCCORKLE I THINK WAS HIS NAME. HE SAID THAT

Exhibit C

SOMETIMES HE WORE A UNIFORM, SOMETIMES NOT. HE KIND OF WORE WHAT HE WANTED, IT SOUNDED LIKE.

THAT WOULD BE A TRADITIONAL INDEPENDENT CONTRACTOR WHO WAS NOT MANDATED TO LOOK A PARTICULAR WAY, NOT MANDATED TO BE GROOMED IN A PARTICULAR WAY AND SO ON.

Q THEN AT THE END OF SECTION 1.12, THE LAST SENTENCE SAYS, "IN ADDITION, THE EQUIPMENT SHALL BE MAINTAINED IN A CLEAN AND PRESENTABLE FASHION FREE OF BODY DAMAGE AND EXTRANEOUS MARKINGS IN ACCORDANCE WITH THE STANDARD OF THE INDUSTRY."

IN YOUR VIEW IS THAT INCONSISTENT WITH THE STATEMENT IN THE BACKGROUND STATEMENT TO THE CONTRACT THAT NO OFFICER OR AGENT OF THE COMPANY WILL DICTATE TERMS AND CONDITIONS TO THE CONTRACTOR?

A YES, MA'AM. IT IS.

Q WOULD YOU EXPECT TO SEE A PROVISION LIKE THE SENTENCE I JUST READ YOU FROM 1.12 IN A TRADITIONAL INDEPENDENT CONTRACTOR AGREEMENT?

A NO, I CERTAINLY WOULD NOT.

Q WHY NOT?

A BECAUSE ONE OF THE -- ONE OF THE CASES -- AND IT IS -- ONE OF THE DIFFICULTIES, I SHOULD SAY, IN

12044

REPRESENTING A COMPANY SEEKING TO HAVE WORKERS CLASSIFIED AS INDEPENDENT CONTRACTORS AND THEREBY SEEKING THE FINANCIAL ADVANTAGES THAT THAT THAT TYPICALLY AFFORDS, AVOIDANCE OF PAYROLL TAXES, STATE AND FEDERAL AND INSURANCE --

MR. NELSON: I WILL OBJECT AT THIS POINT.

FIRST OF ALL, THE ANSWER IS NON-RESPONSIVE.

Exhibit C

SECOND, WHAT SEEMS TO BE GOING ON IS WE WILL USE A REFERENCE TO THE CONTRACTOR AS A SPRINGBOARD TO PROVIDE GENERALIZED TESTIMONY AS TO INDEPENDENT CONTRACTOR STATUS IN THE ANSWER, WHICH WOULD BE FINE FOR A CASE IN CHIEF BUT NOT THE PURPOSE FOR WHICH THE WITNESS WAS CALLED.

THE COURT: I WILL SUSTAIN THE OBJECTION.

BY MS. FARIS:

Q MR. WOOD, CAN YOU TELL ME WHETHER THE FACT THAT THIS PARTICULAR SENTENCE, WHICH TALKS ABOUT THE VEHICLE BEING MAINTAINED IN A CLEAN AND PRESENTABLE FASHION, RAISES ANY ISSUES ABOUT THE DISCRETION LEFT IN TERMINAL MANAGEMENT TO ORDER OR RESTRICT THE USE OF A VEHICLE -- LET ME TRY AGAIN.

IS THIS PARTICULAR LANGUAGE IN 1.12 ABOUT THE PRESENTABLE FASHION THAT THE VEHICLE HAS TO BE IN, DOES THAT PROVIDE THE TERMINAL MANAGEMENT WITH ANY DISCRETION THAT IS INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS?

A I BELIEVE IT DOES. IT IS NOT SOMETHING I WOULD EXPECT TO SEE.

Q CAN YOU LOOK AT THE PROVISIONS IN SECTION 1.14 AND TELL ME WHETHER THEY ARE CONSISTENT OR

12045

INCONSISTENT WITH THE BACKGROUND STATEMENT ADMONITION THAT NO OFFICER, AGENT OR EMPLOYEE OF THE COMPANY WILL DICTATE TERMS OR CONDITIONS?

A I CAN. AGAIN, LIKE MANY PROVISIONS HERE, I VIEW 1.14 AS SAYING IN SOMETHING --

AGAIN, IN AN EMPLOYMENT AGREEMENT, THERE IS NOTHING AT ALL WRONG WITH THIS, AND INDEED I WOULD WANT MY EMPLOYEES TO MAINTAIN CUSTOMER SERVICE STANDARDS AND

Exhibit C

THIS KIND OF THING. BUT IT DOES SAY, INCONSISTENT WITH THE GENERAL STATEMENT AT THE BEGINNING OF THE CONTRACT, THAT RPS IS GOING TO FAMILIARIZE THE CONTRACTOR WITH THESE QUALITY SERVICE PROCEDURES THAT ARE DEVELOPED BY RPS.

IT IS NOT EVEN CLEAR WHEN THESE ARE DEVELOPED OR BY WHOM, WHICH GOES TO THE MANNER AND METHOD AND MEANS BY WHICH THE WORK IS CONDUCTED, NOT TO SIMPLY GETTING THE JOB DONE, ONE OF THE CLASSIC INDICES OF EMPLOYMENT STATUS.

BY MS. FARIS:

Q WHAT ABOUT THE LAST SENTENCE OF 1.14?

A THE LAST SENTENCE OF 1.14, WHICH SAYS QUALIFIED RPS TERMINAL PERSONNEL MAY AT THEIR OPTION VISIT CUSTOMER LOCATIONS WITH CONTRACTOR FOUR TIMES ANNUALLY TO VERIFY CONTRACTOR'S MEETING THE CONDITIONS AND SO ON, THESE ARE I THINK WHAT IS REFERRED TO IN VARIOUS DOCUMENTS --

I BELIEVE I SAW A VIDEO ABOUT THIS AS WELL -- I KNOW I DID -- CALLED "CUSTOMER SERVICE RIDES." AND IT

12046

IS A LEVEL OF SUPERVISION WHICH IS ACTUALLY QUITE DRAMATIC ON THE VIDEO, AS I RECALL, INCLUDING TIMING AND EXPLANATIONS OF WHAT THIS PERSON IN THE VIDEO DID WRONG, FOLLOWED BY WHAT A GOOD PERSON OR GOOD WORKER, WHATEVER THEY ARE CLASSIFIED AS, WOULD DO RIGHT, ET CETERA.

AGAIN, IT GOES TO A DRAMATIC, TO ME, DEMONSTRABLE EVIDENCE OF CONTROL IN A VERY SPECIFIC WAY OVER THE MANNER AND MEANS BY WHICH THIS WORK WAS TO BE PERFORMED.

Exhibit C

Q DID THE USE OF THIS GENERAL LANGUAGE, THAT IT SAYS "TO VERIFY CONTRACTOR IS MEETING THE STANDARDS OF CUSTOMER SERVICE PROVIDED IN THIS AGREEMENT," DID THAT RAISE ANY ISSUES WITH YOU WITH RESPECT TO HOW MUCH DISCRETION IS LEFT TO THE TERMINAL MANAGER THAT MIGHT BE INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS?

A IT DID. I DON'T KNOW IF I CAN REFER TO OTHER DOCUMENTS THAT I HAVE REVIEWED, BUT IT CERTAINLY DID RAISE THIS CONCERN, AND I WAS BROUGHT BACK TO THAT CONCERN BY REVIEWING MANY OF THESE SO-CALLED BUSINESS DISCUSSIONS, WHICH ARE --

MR. NELSON: AT THIS POINT I WILL OBJECT. THE QUESTION -- THE ANSWER IS NON-RESPONSIVE AND BEYOND THE SCOPE OF PROPER REBUTTAL TO MR. BRADLEY'S TESTIMONY.

MS. FARIS: I DON'T THINK SO, YOUR HONOR.

THE COURT: NEXT QUESTION. I THINK YOU ANSWERED. WE WILL LEAVE THE ANSWER THE WAY IT IS.

NEXT QUESTION.

12047

BY MS. FARIS:

Q WOULD YOU LOOK AT THE PROVISION OF SECTION 1.15, WHICH MR. BRADLEY DESCRIBED IN DETAIL IN HIS TESTIMONY? IT SORT OF MATCHES UP WITH THE BACKGROUND STATEMENT AND IS MORE EXPLICIT ABOUT WHAT IS -- WHAT OFFICERS, AGENTS AND EMPLOYEES OF THE COMPANY ARE NOT SUPPOSED TO DO.

A YES, MA'AM.

Q TELL ME, IF YOU WOULD, WHETHER THESE PROVISIONS OF 1.15, IN YOUR VIEW, ARE INCONSISTENT WITH

Exhibit C

THE PRIOR PROVISIONS THAT WE JUST DISCUSSED IN 1.12, 1.13, AND 1.14.

A YES. AS ALL OF YOU WILL SEE MY CRYPTIC NOTE NEXT TO 1.15, NOT INTENDING TO BE DISRESPECTFUL, SAYING THAT 1.15 IS MEANINGLESS IN LIGHT OF 1.14. I SUPPOSE I COULD HAVE REFERRED TO THE OTHER PROVISIONS TOO. IT IS A GENERAL STATEMENT THAT NO ONE IS GOING -- WHAT I WOULD REFER TO AS KIND OF A SAVINGS CLAUSE, THAT "WE DON'T WANT ANYONE AT FED-EX INTERFERING WITH THE INDEPENDENT OPERATIONS OF THIS WORKER," WHICH TO ME IS ENTIRELY INCONSISTENT WITH VIRTUALLY THE ENTIRE CONTRACT.

Q NOW, IN ADDITION TO REVIEWING THE CONTRACT, YOU HAD OCCASION TO LOOK AT THE COMPANY MANUAL AND HANDBOOK, DID YOU NOT?

A I DID.

Q IN YOUR REVIEW OF THOSE TWO DOCUMENTS, DID YOU FIND ANYTHING IN THOSE DOCUMENTS THAT ARE INCONSISTENT WITH THE ADMONITION IN 1.15 THAT NO OFFICER,

12048

AGENT, OR EMPLOYEE SHALL HAVE THE AUTHORITY TO DIRECT THE CONTRACTOR AS TO THE MANNER AND MEANS EMPLOYED TO ACHIEVE THE OBJECTIVES AND RESULTS?

MR. NELSON: OBJECTION. BEYOND THE SCOPE OF REBUTTAL, MR. BRADLEY'S TESTIMONY.

THE COURT: IT MAY BE BEYOND THE SCOPE OF MR. BRADLEY'S TESTIMONY, BUT IT DOES GO TO MR. EDMONDS' TESTIMONY, THE TESTIMONY OF THE OTHERS. THERE IS A GREAT DEAL OF TESTIMONY BY PERSONS FROM FED-EX, ESPECIALLY THE HIGHER-UPS REGARDING THE INTERPLAY BETWEEN THE MANUALS AND THE CONTRACT. I THINK THIS IS LEGITIMATE REBUTTAL TO

Exhibit C

THAT POINT SO I WILL ALLOW IT.

MS. FARIS: THANK YOU, YOUR HONOR.

THE WITNESS: I AM SORRY. CAN YOU ASK ME THE QUESTION AGAIN, PLEASE?

BY MS. FARIS:

Q I WOULD BE HAPPY TO.

IN YOUR REVIEW OF THE OPERATIONS MANAGEMENT HANDBOOK AND THE FED-EX GROUND MANUAL, THOSE LARGE DOCUMENTS THAT YOU REVIEWED, DID YOU FIND ANYTHING INCONSISTENT WITH THE STATEMENT IN 1.15 THAT "NO OFFICER, AGENT OR EMPLOYEE OF RPS SHALL HAVE THE AUTHORITY TO DIRECT CONTRACTOR AS TO THE MANNER AND MEANS EMPLOYED TO ACHIEVE SUCH OBJECTIVES AND RESULTS"?

A I DID. I GUESS I WILL BEG FORGIVENESS. A LOT OF TERMINOLOGY I MAY USE MAY BE WRONG. THERE IS A WHOLE LINGO HERE THAT IS -- IT IS DIFFICULT FOR ME TO FOLLOW ABOUT --

12049

THERE IS, FOR EXAMPLE, BUSINESS DISCUSSIONS, TO WHICH I HAVE JUST ALLUDED. BUT I BELIEVE IN THE POLICY MANUAL -- I THINK I AM USING THE RIGHT TERM -- THERE IS A DISCUSSION ABOUT SIGNATURE RELEASES, FOR EXAMPLE. THAT ONE I REMEMBER PARTICULARLY. AND I THINK EVERYONE IN THIS ROOM HAS HAD PERSONAL EXPERIENCES WITH WANTING SOMETHING DELIVERED AND THEN DO YOU SIGN A LITTLE STICKER AND LEAVE IT OUTSIDE, OR WHAT DO YOU DO? AND I KNOW THERE IS SOMETHING IN THE POLICY MANUAL THAT DICTATED THAT YOU ARE -- YOU AS A DRIVER -- ARE SUBJECT TO DISCIPLINE -- I BELIEVE IT IS A DOCKING OF A CERTAIN COMPENSATION, IF I AM NOT MISTAKEN -- IF YOU LEAVE A

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 142 of 227

Exhibit C

PACKAGE WITHOUT A SIGNATURE. THAT IS ONE EXAMPLE.

Q THAT IS REFERRED TO AS A DRIVER RELEASE?

A A DRIVER RELEASE.

Q DID YOU FIND OTHER MATTERS IN THE POLICIES WITH RESPECT TO THE OBLIGATION TO GET COMPANY APPROVALS FOR, FOR EXAMPLE, THE USE OF A PARTICULAR VAN OR THE USE OF A PARTICULAR DRIVER AS A REPLACEMENT?

A YES, THERE IS EXTENSIVE --

AND I THINK THERE IS SOME OF THIS IN THE CONTRACT AS WELL AS IN THE POLICY MANUAL, ALTHOUGH THE POLICY MANUAL IS CERTAINLY MUCH MORE EXTENSIVE, THAT IF YOU WANT TO HIRE A HELPER, FOR EXAMPLE -- I THINK THIS IS IN THE CONTRACT; IF NOT, IT IS CERTAINLY IN THE POLICY MANUAL -- IF YOU WANT TO HIRE A HELPER, THE HELPER MUST BE APPROVED BY FED-EX.

IF YOU WANT TO HAVE A REPLACEMENT DRIVER,

12050

THAT PERSON MUST BE APPROVED. IF YOU WANT TO DO -- HAVE A SECOND VAN, THERE IS A PROCEDURE FOR THAT, I BELIEVE, THAT ALSO IS SUBJECT TO SOME RATHER ELABORATE APPROVAL REQUIREMENTS.

THE THING THAT STRUCK ME ABOUT ALL OF THESE THINGS IS IT IS IMPORTANT THAT THEY ARE THERE AND IT IS IMPORTANT THAT THERE IS AN APPROVAL PROCEDURE. WHETHER OR NOT IT EVER GETS EXERCISED IS ACTUALLY FROM A PERSONAL PERSPECTIVE IRRELEVANT. WHAT IS IMPORTANT IS THAT THE COMPANY, FED-EX, HAS THE RIGHT TO THESE APPROVALS, WHICH GIVES EMPLOYMENT STATUS TO ITS DRIVERS.

Q ARE THOSE SORTS OF APPROVALS THAT YOU REVIEWED IN THE COMPANY MANUALS OR POLICIES CONSISTENT OR

Exhibit C

INCONSISTENT WITH THE LANGUAGE OF SECTION 1.15, WHICH I READ EARLIER?

A NO, THEY ARE INCONSISTENT WITH 1.15. 1.15 IS THIS GENERAL STATEMENT THAT YOU, THE DRIVER, PUTATIVE INDEPENDENT CONTRACTOR, CAN DECIDE HOW YOU DO YOUR BUSINESS AND NOBODY CAN TELL YOU OTHERWISE. THAT IS IN -- PARDON ME. NOBODY AT RPS-FED-EX CAN TELL YOU OTHERWISE. THAT IS INCONSISTENT WITH THE VAST BULK OF INFORMATION THAT I HAVE REVIEWED.

Q LOOKING PARTICULARLY AT THE LAST LINE OF SECTION 1.15, WHERE IT TALKS ABOUT NO OFFICER, AGENT OR EMPLOYEE OF RPS SHALL HAVE THE AUTHORITY TO PRESCRIBE HOURS OF WORK, WHETHER OR WHEN THE CONTRACTOR IS TO TAKE BREAKS, WHAT ROUTE THE CONTRACTOR IS TO FOLLOW OR OTHER DETAILS OF PERFORMANCE, DID YOU HAVE OCCASION IN YOUR

12051

REVIEW OF THE POLICIES, FOR EXAMPLE, TO SEE THAT THE COMPANY WAS, IN FACT, PRESCRIBING ANY ASPECT OF THE HOURS OF WORK OF THE CONTRACTORS?

A YES. ALTHOUGH THERE IS -- SOMEWHERE IN THERE IN THE CONTRACT I BELIEVE IT SAYS THAT YOU DON'T HAVE TO BE FULL-TIME OR WORDS OF THAT NATURE. THE POLICY MANUAL HAS -- MAKES IT CLEAR, AND I DON'T REMEMBER IF IT IS AN 8-HOUR DAY OR 9-AND-A-HALF-HOUR DAY. I AM A LITTLE CONFUSED. IT MAY BE IN THERE SEVERAL TIMES.

BUT IT IS REALLY QUITE CLEAR THERE WERE CONDITIONS IMPOSED IN TERMINALS, APPARENTLY THROUGHOUT THE NETWORK FROM WHAT I UNDERSTAND, ABOUT WHAT TIME YOU NEEDED TO SHOW UP FOR WORK. THERE ARE BUSINESS DISCUSSIONS, IF I CAN REFER TO THOSE, WHERE PEOPLE GET IN

Exhibit C

TROUBLE FOR NOT SHOWING UP ON TIME AND GET IN TROUBLE FOR PICKING UP PACKAGES EARLIER. THERE IS A PACKAGING WINDOW TIME.

IT HAS EVEN HAPPENED AT MY OWN OFFICE. IF A PERSON -- IF THEY ARE SUPPOSED TO COME BETWEEN 4:00 AND 5:00 O'CLOCK AND THEY GET -- THE DRIVER GETS IN TROUBLE, AS I UNDERSTAND IT, NOT FROM THE CUSTOMER BUT RATHER FROM FED-EX IF THEY COME AT THE WRONG TIME. THOSE CONDITIONS ARE ALL INCLUDED IN THE POLICY MANUAL.

THE COURT: WE WILL TAKE OUR LUNCH RECESS AT THIS TIME. RECESS UNTIL 1:30.

(AT 12:00 NOON, A RECESS WAS TAKEN UNTIL 1:30 P.M OF THE SAME

12052

DATE.)

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 145 of 227

Exhibit C

12053

CHATSWORTH, CALIFORNIA; JUNE 29, 2004

P.M. SESSION

DEPARTMENT F-48 HON. HOWARD J. SCHWAB, JUDGE

(APPEARANCES AS HERETOFORE NOTED.)

THE COURT: ESTRADA VERSUS FED-EX GROUND, PC 210130. ALL COUNSEL ARE PRESENT AND MR. WOODS IS ON THE STAND, HAVING BEEN WORN. MS. FARIS?

DIRECT EXAMINATION (CONTINUED)

BY MS. FARIS:

Q YES. MR. WOOD, BEFORE WE BROKE FOR LUNCH, I WAS ASKING YOU A LITTLE BIT ABOUT THE PROVISION IN SECTION 1.15 THAT SAYS THAT THE COMPANY CAN'T TELL THE CONTRACTOR ABOUT THE HOURS OF WORK. GETTING OURSELVES FOCUSED AGAIN, YOU REVIEWED SOME CONTRACTOR BUSINESS PLAN

Exhibit C

NOTES IN WHICH THE MANAGER DISCUSSED WITH THE CONTRACTOR THE DUTY TO HAVE A 9.5 HOUR CONTRACTOR DAY, DID YOU NOT?

A I DID. I BELIEVE I TESTIFIED --

I REMEMBER SOMETHING ABOUT 8 HOURS, BUT I DO REMEMBER NINE AND A HALF HOURS. THERE WAS A FULL WORKDAY REQUIREMENT, AND I DO REMEMBER DISCUSSION IN THOSE DOCUMENTS.

Q THEN ALSO YOU ALSO REVIEWED A PART OF THE OPERATIONS MANAGEMENT HANDBOOK, WHICH FOR PLANNING PURPOSES REFERS TO 9-AND-A-HALF TO 11-HOUR DAY AS WELL, IS THAT CORRECT?

A I REMEMBER THAT AS WELL.

Q DO YOU VIEW THAT PROVISION OF THE HANDBOOK AND THESE CONTRACTOR BUSINESS PLAN NOTES TO CONTRADICT THE PROVISION OF SECTION 1.15, WHICH SAYS THAT THE COMPANY WILL NOT DICTATE THE HOURS OF WORK?

MR. NELSON: OBJECTION, RELEVANCE, AND I BELIEVE INVADES THE PROVINCE OF THE COURT AS TO THE ULTIMATE FINDER OF FACT.

THE COURT: ALSO, ONE THING TOO, I THINK IT IS PERFECTLY FINE FOR HIM TO DISCUSS BOTH THE CONTRACT AND THE MANUALS. I DO NOT THINK IT IS FAIR FOR HIM TO DISCUSS THE BUSINESS DISCUSSIONS. THAT IS ANOTHER MATTER.

HE MAY GIVE HIS OPINION BASED UPON THE CONTRACT AND ANY MANAGEMENT IN THIS CASE, BUT NOT THE BUSINESS DISCUSSION NOTES.

SO WOULD YOU PLEASE REPHRASE THE QUESTION? WHAT I WILL DO IS I WILL SUSTAIN THE OBJECTION ON THE

Exhibit C

GROUNDS IT INVOLVES THE BUSINESS DISCUSSION NOTES.

REPHRASE THE QUESTION IF YOU WANT TO.

BY MS. FARIS:

Q MR. WOOD, WOULD IT BE ACCURATE TO SAY THAT YOU BELIEVE THAT THE PROVISIONS OF THE OPERATIONS MANAGEMENT HANDBOOK WHICH REFER TO 9.5 HOURS PER CONTRACTOR DAY OR REFER TO A 9-AND-A-HALF TO 11-HOUR DAY WOULD BE INCONSISTENT WITH THE PROVISION OF SECTION 1.15 WHICH SAYS THAT THE COMPANY WILL NOT DIRECT THE CONTRACTOR WITH RESPECT TO THE HOURS OF WORK?

A YES. I BELIEVE THEY ARE INCONSISTENT.

12055

Q NOW, IN YOUR EARLIER TESTIMONY YOU TALKED A FEW TIMES ABOUT CONTRACTORS GETTING IN TROUBLE. I WANTED TO ASK YOU WHAT YOU MEANT BY THAT.

A I AM NOT AS SURE -- I WILL HAVE TO ASK THE JUDGE.

THE COURT: I THINK COUNSEL IS CORRECT. AGAIN I WILL ALLOW HIM TO REBUT THE TESTIMONY OF MR. BRADLEY AND MR. EDMONDS AND THE OTHER INDIVIDUALS WHO ARE MANAGEMENT WHO TESTIFY REGARDING THE CONTRACT, ITS RELATIONSHIP WITH THE VARIOUS MANUALS AND HANDBOOK. THAT'S FINE. I WILL NOT ALLOW HIM TO GET INTO THE DISCUSSION OF BUSINESS DISCUSSION NOTES OR ANECDOTAL. SO MR. BRADLEY DIDN'T GET INVOLVED IN THAT, SO NEITHER WILL MR. WOOD.

MS. FARIS: MAY I ASK ONE QUESTION ABOUT THE BUSINESS DISCUSSION NOTE POLICY IN THE OPR.

THE COURT: THAT'S FINE. TOTALLY DIFFERENT.

BY MS. FARIS:

Q MR. WOOD, YOU READ, DID YOU NOT, IN THE

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 148 of 227

Exhibit C

FED-EX GROUND MANUAL THE POLICY REGARDING BUSINESS DISCUSSIONS AND HOW TO CONDUCT THEM; IS THAT RIGHT?

A YES, I DID.

Q YOU ALSO SAW A VIDEOTAPE, DID YOU NOT, WITH RESPECT TO HOW TO CONDUCT A PROPER BUSINESS DISCUSSION BETWEEN A TERMINAL MANAGER AND A CONTRACTOR; RIGHT?

A YES, MA'AM, I DID.

Q NOW, WHEN YOU REVIEWED THAT POLICY AND THAT VIDEOTAPE, DID YOU SEE ANY CONFLICT BETWEEN THOSE TWO SOURCES OF INFORMATION AND THE GENERAL LANGUAGE IN 1.15

12056

WHICH SAYS THAT NO OFFICER, AGENT OR EMPLOYEE OF THE COMPANY WILL PRESCRIBE TERMS AND CONDITIONS OF WORK?

A YES, I DID.

Q IN WHAT WAY?

A WITHOUT REFERRING TO ANY BUSINESS DISCUSSION DOCUMENTS, THE MERE FACT THAT THERE WAS A POLICY THAT BUSINESS DISCUSSIONS WOULD BE CONDUCTED WHICH WERE OF A -- I DON'T REMEMBER THE EXACT LANGUAGE, BUT WHICH WERE OF A DISCIPLINARY NATURE, BESPEAKING EMPLOYMENT STATUS TO ME, DID SEEM INCONSISTENT WITH THE CONTRACT, AND SPECIFICALLY WITH 1.15 OF THE CONTRACT.

LIKEWISE, THE VIDEO, WHICH WAS EXTREMELY GRAPHIC ABOUT HOW YOU HAVE A DISCUSSION OVER A -- AGAIN FOR LACK OF A BETTER WORD -- A DISCIPLINARY MATTER, THE WAY YOU WOULD WITH AN EMPLOYEE, THAT STRUCK ME AS AGAIN ENTIRELY INCONSISTENT WITH WHAT 1.15 OF THE CONTRACT SAYS.

Q NOW, GOING TO THE NEXT LITTLE PHRASE IN 1.15 IT SAYS THE COMPANY WILL NOT PRESCRIBE "WHAT ROUTE THE

Exhibit C

CONTRACTOR IS TO FOLLOW." YOU SEE THAT IN THE LAST PART OF THE LAST SENTENCE OF 1.15?

A I DO.

Q YOU REVIEWED THE SECTION OF THE OPERATIONS MANAGEMENT HANDBOOK ADDRESSING THE SUBJECT OF ROUTE MAPPING, DID YOU NOT?

A I DID.

Q AND DID YOU FIND THE PROVISIONS AND DISCUSSIONS ABOUT ROUTE MAPPING AT THE END OF A CUSTOMER

12057

SERVICE RIDE TO BE CONSISTENT OR INCONSISTENT WITH THIS LANGUAGE IN SECTION 1.15?

A ONCE AGAIN, INCONSISTENT. THAT IS, THE FACT THAT THERE WOULD BE A PROCEDURE SET OUT, HOWEVER IT WAS FOLLOWED. AND THIS GOES TO RIGHT TO CONTROL, WHICH IS IMPORTANT AS TO ACTUAL CONTROL, RIGHT TO CONTROL BY FED-EX BEING AS IMPORTANT AS WHETHER THEY ACTUALLY DID IT OR NOT. INCONSISTENT WITH THIS EXPRESS STATEMENT THAT THERE WOULD BE NO INTERFERENCE WITH THIS ROUTING.

Q IF YOU WOULD, TURN BACK TO SECTION 1.10, WHAT IS REFERRED TO IN THE CONTRACT AS THE STANDARDS OF SERVICE -- I NOTICE YOU HAVE MANY NOTES HERE WHICH I PROBABLY CANNOT READ.

LET ME ASK YOU FIRST WHETHER THE PROVISIONS CONTAINED GENERALLY IN SECTION 1.10 CALLED AGREED STANDARDS OF SERVICE GAVE YOU ANY CONCERNS WITH RESPECT TO WHETHER THIS CONTRACT WAS A PROPER INDEPENDENT CONTRACTOR AGREEMENT?

A IT DID. IT GAVE ME MANY SUCH CONCERNS.

Q WOULD YOU EXPLAIN TO US WHAT THOSE WERE?

Exhibit C

A STARTING FROM THE BEGINNING OF 1.10 -- AND AGAIN, I BELIEVE I SAID THIS THIS MORNING -- AN EMPLOYER IS CERTAINLY ENTITLED TO PRESCRIBE ANY KIND OF LAWFUL CONDITIONS THAT IT WANTS, BUT WITH AN INDEPENDENT CONTRACTOR, YOU CAN'T, AT LEAST TO MAINTAIN THAT STATUS.

SO THIS NOTION IN THE FIRST FULL SENTENCE OF 1.10 THAT IT HAS TO -- THAT RPS WILL PROVIDE THIS STANDARD OF SERVICE FULLY COMPETITIVE WITH THAT OFFERED

12058

BY OTHER NATIONAL PARTICIPANTS, THE STANDARD IN THE INDUSTRY, AGAIN, I BELIEVE IS UPS, WHICH I BELIEVE OPERATES WITH EMPLOYEES. THE CONTRACTOR ACKNOWLEDGING THIS BUSINESS PARTICIPATION AND AGREES TO CONDUCT -- THEN IT HAS THIS KIND OF LAUNDRY LIST, IF YOU WILL, WITH LETTERS A THROUGH H, I BELIEVE IT IS, GOING OVER A COUPLE OF PAGES -- SMALL LETTER A THROUGH H OF 1.10 -- WHICH ARE QUITE SPECIFIC, PROVIDING THE DAILY PICKUP SERVICE, AND OF COURSE THIS GETS INTO THE DISCIPLINARY AREA ONCE AGAIN, THAT A FAILURE TO FOLLOW THESE PROCEDURES RESULTS IN A DISCIPLINE OF TYPES ALTHOUGH, AGAIN, I WILL NOT REFER TO THAT.

ABOUT HALFWAY THROUGH PARAGRAPH 1.10 A IT TALKS ABOUT THE CONTRACTOR MAY BE ASKED TO PROVIDE SERVICE IN THE EVENT CONTRACTOR ELECTS TO PARTICIPATE IN WHAT IS KNOWN AS A FLEX PROGRAM, WHICH IS DESCRIBED FURTHER ON, AGAIN, CONSIDERED COMPETITIVE IN THE INDUSTRY.

SO ONCE AGAIN THERE IS THIS INDUSTRY REFERENCE, WHICH IS ONE OF THE TRADITIONAL INDICES OF CONTRACTOR STATUS IS WHAT DOES THE INDUSTRY DO? HERE

CLEARLY EMPLOYMENT, NOT CONTRACTOR.

I BELIEVE IT IS THE POLICY MANUAL, THE SORT OF CROSS-REFERENCES OR INCONSISTENCIES, IF YOU WILL, WITH THIS, THAT THERE ARE PICKUP WINDOWS, THAT THERE ARE THESE MANDATORY WORK HOURS OR MINIMUM WORK HOURS, BRING YOUR TRUCK IN AT A CERTAIN TIME, DON'T TAKE YOUR TRUCK OUT BEFORE A CERTAIN TIME, ET CETERA. IF YOU WANT TO TAKE

12059

YOUR TRUCK HOME, YOU WON'T GET IT LOADED.

I AM ALLUDING TO THESE DOCUMENTS IN GENERAL, BUT I BELIEVE THESE ARE ALL IN THE POLICY MANUAL AND OF COURSE NOT CONTAINED IN THIS -- IN THIS CONTRACT.

SO ONCE AGAIN IN THIS LAUNDRY LIST, JUST CONTINUING ON TOWARD THE VERY END OF SUBPART A, AGAIN, THIS IS 1.10 A, THERE IS A REFERENCE TO THAT RPS MAY REASSIGN A PORTION OF SOME PACKAGES TO ANOTHER CONTRACTOR. I KNOW THAT THERE IS THIS -- A WHOLE BUNCH OF DIFFERENT PROGRAMS, THE ACRONYMS AND NAMES FOR WHICH I GET CONFUSED BY. THERE ARE SOME THAT I THINK ARE DAILY ASSIGNMENTS OR REASSIGNMENTS AND SOME THAT ARE MUCH MORE LONGER TERM. BUT THERE IS THIS INVASIVE -- ON THE PART OF FED-EX, IN MY OPINION, INVASIVE, REALLY, CONTROL ON EVERY ASPECT OF WHAT THE PURPORTED INDEPENDENT CONTRACTOR DOES, THE DRIVER DOES.

GOING ON DOWN TO ITEM D, AGAIN, ITEM D IN 1.10, SMALL D, WHICH HAS A VERY GENERAL "COOPERATING WITH RPS EMPLOYEES, CUSTOMERS AND OTHER CONTRACTORS" AND SO ON. SEEMINGLY AN INNOCUOUS PROVISION, I WILL ADMIT, ON ITS FACE, BUT TO ME COOPERATING WITH RPS'S EMPLOYEES, PRESUMABLY AGAIN THERE MAY BE DIRECTIVES BY RPS EMPLOYEES

Exhibit C

IN THAT IT GOES AGAIN TO CONTROLLING THE MANNER, METHOD AND MEANS BY WHICH THIS WORK IS GOING TO BE DONE. BASICALLY YOU DO WHAT WE ARE GOING TO AS THE EMPLOYER OR COMPANY HERE TELL TO YOU DO. I WROTE IN MY NOTES -- I AM SORRY FOR THE INFORMALITY -- "DITTO ON ITEM E," THE SAME KIND OF CONCEPT THERE. THIS PROFESSIONAL IMAGE AND GOOD

12060

REPUTATION OF RPS NOW FED-EX, WITH SHIPPERS AND CONSIGNEES AND SO ON, THIS IS FOSTERING FED-EX'S BUSINESS. AGAIN, GOING TO CORE INTEGRATION OF WHAT FED-EX -- NOT THE CONTRACTOR -- YOU KNOW, THE FULL-TIME EMPLOYED CONTRACTOR OR FULL-TIME ENGAGED, IF YOU WILL, CONTRACTOR IS DOING.

ON TO F. I DON'T MEAN TO BE MAKING A SPEECH HERE. ON TO ITEM F TOWARD THE BOTTOM OF THIS LIST IN 1.10, ITEM F, CONFORM TO ALL FEDERAL, STATE, LOCAL REGULATIONS. ON TO H, TWO PAGES OR A PAGE LATER, CONDUCT ALL BUSINESS ACTIVITIES WITH PROPER DECORUM AND -- IN A PROFESSIONAL MANNER AND WITH PROPER DECORUM.

AGAIN, I MENTIONED THE TERM PASSIVE VOICE BEFORE. IT IS JUST NOT CLEAR TO ME AT LEAST, WITHOUT REFERENCE TO BUSINESS DISCUSSIONS, IT IS NOT CLEAR TO ME AT LEAST WHO DECIDES ALL THESE THINGS AND HOW ONE IS DISCIPLINED FOR THEM FOR VIOLATING THEM. OF COURSE, THESE GO DIRECTLY TO THE HEART OF MANNER, METHOD AND MEANS OF PROVIDING SERVICES. NOT MERELY DROPPING OFF PACKAGES AND NOT MERELY DROPPING OFF PACKAGES DURING PARTICULAR WINDOWS OR PICKING THEM UP, RATHER, WHAT SHOULD YOU LOOK LIKE, WHAT SHOULD YOU SAY, AND THIS KIND OF THING, WHICH ARE CLEAR INDICES OF EMPLOYMENT STATUS.

Exhibit C

Q LET ME ASK YOU ONE OTHER QUESTION ABOUT SECTION A AND THEN I WANT TO TIE THIS BACK UP TO SECTION 12 OF THE AGREEMENT. SECTION A TALKS ABOUT PROVIDING DAILY PICKUP AND DELIVERY SERVICE TO CONSIGNEES AND SHIPPERS ON DAYS AND AT TIMES WHICH ARE COMPATIBLE WITH

12061

THEIR SCHEDULES AND REQUIREMENTS.

WOULD YOU EXPECT IN A MODEL INDEPENDENT CONTRACTOR AGREEMENT TO SEE JUDGMENT OF THE RESULTS OF THE WORK CONTRACTED FOR ON A DAILY BASIS?

A NO. I WOULDN'T. I WOULD -- I KNOW IT IS HARD TO TALK ABOUT MODEL CONTRACTOR ARRANGEMENTS, BUT IT IS A BIT LIKE IF I WERE HAVING BY BATHROOM REDONE, IF YOU WILL PERMIT ME THIS METAPHOR, BY A CONTRACTOR, HIRING SOMEBODY TO COME IN AND REDO THE BATHROOM. I WOULDN'T EXPECT THAT KIND OF RELATIONSHIP TO INVOLVE EVERY DAY, LOOKING AT EACH PARTICULAR TILE THAT GOT SET IN THE BATHTUB OR OVER THE BATHTUB OR SOMETHING LIKE THAT.

THERE MAY BE REGULATORY REASONS HERE FOR SOME OF THIS. CERTAINLY I AM CERTAINLY NO DEPARTMENT OF TRANSPORTATION EXPERT, BUT I WOULD NOT EXPECT TO SEE ANYWHERE NEAR THE LEVEL OF DAILY DETAILED REPORTS KIND OF COMING AND GOING THAT I HAVE SEEN IN THIS CASE.

Q IN ADDITION, IN SECTION D THAT YOU IDENTIFIED WHERE IT TALKS ABOUT COOPERATE WITH RPS EMPLOYEE CUSTOMERS AND OTHER CONTRACTORS TO ACHIEVE THE GOAL OF EFFICIENT PICKUP, DELIVERING, HANDLING, ET CETERA, WOULD YOU EXPECT TO SEE IN AN INDEPENDENT CONTRACTOR RELATIONSHIP CONCERNS ABOUT PRODUCTIVITY AND EFFICIENCY?

A WELL, I THINK THE SHORT ANSWER IS NO. IN A

Exhibit C

SENSE, IF I COULD TRY TO EXPLAIN, IN A SENSE YES, YOU WANT -- JUST LIKE I WANT THE FELLOW, THE CONTRACTOR WHO IS TRYING TO REDO MY BATHROOM TO BE EFFICIENT AND TO DO IT IN A MONTH INSTEAD OF IN SIX MONTHS AND THIS KIND OF

12062

THING, BUT YOU WOULDN'T EXPECT WHAT TO ME THIS SPEAKS TO WHICH IS EFFICIENCY AND PROFIT AND THIS SORT OF NETWORK. IT IS REALLY FED-EX OR RPS'S BUSINESS THAT IS BEING CULTIVATED HERE, NOT THE BUSINESS OF THE PUTATIVE INDEPENDENT CONTRACTOR.

Q DOES IT CONCERN YOU THAT THERE ARE PROVISIONS IN 1.10 THAT SEEM TO REQUIRE SOME SUBJECTIVE ANALYSIS BY INDIVIDUALS WHO ARE NOT SPECIFIED? FOR EXAMPLE, THE TERM COOPERATE WITH OR FOSTER THE PROFESSIONAL IMAGE OR CONDUCT BUSINESS WITH INTEGRITY AND HONESTY, DO THESE GENERAL SORT OF PROVISIONS IN 1.10 GIVE YOU CONCERN ABOUT WHETHER THIS IS TRULY AN INDEPENDENT CONTRACTOR RELATIONSHIP?

A YES. I DON'T KNOW IF THIS -- IT HAS BEEN TOO LONG SINCE I WAS AN ENGLISH MAJOR TO REMEMBER WHETHER THIS IS TECHNICALLY PASSIVE VOICE, BUT IT CERTAINLY DIDN'T SAY WHO IS GOING TO MAKE THESE DETERMINATIONS. IT CERTAINLY -- AGAIN, WITHOUT REFERRING TO ANY DISCIPLINE OR WHATEVER, THAT I MAY HAVE SEEN IT IS A GREAT CONCERN THAT YOU HAVE VERY GENERALIZED TERMS ABOUT FOSTERING A RELATIONSHIP, YOU KNOW, AND ENCOURAGING IT TO ACHIEVE THESE GOALS AND SO ON. BECAUSE IT IS NOT CLEAR WHO IS ACCOUNTABLE. PRESUMABLY THE DRIVERS ONLY. IT IS NOT CLEAR HOW THEY ARE ACCOUNTABLE IN THIS DOCUMENT, SHORT OF TERMINATION. IT IS NOT CLEAR TO WHOM THEY ARE

Exhibit C

ACCOUNTABLE, MEANING WHOM WITHIN FED-EX CAN COME DOWN ON THEM FOR A SPECIFIC VIOLATION.

THE COURT: WITHOUT GETTING INVOLVED IN GRAMMAR,

WHICH WAS NEVER MY STRONG POINT, THE BOTTOM LINE IS THAT IT IS UNKNOWN WHO MAKES THE FINAL DETERMINATION AS TO WHETHER OR NOT THESE RATHER -- THESE STANDARDS ARE COMPLIED WITH? IS THAT WHAT ARE YOU TRYING TO TELL ME.

THE WITNESS: I THINK SO, JUDGE. I THINK IT IS AGAIN, JUST LOOKING AT THE CONTRACT ITSELF AND THIS ONE PROVISION, I -- I THINK THERE ARE A NUMBER OF OTHERS THAT I COULD VIEW OR DO VIEW THIS WAY AS KIND OF A PROVISION THAT IT SAYS YOU HAVE TO DO A BUNCH OF THINGS AND YOU HAVE TO COOPERATE BUT IT DOESN'T SAY WHAT HAPPENS, SO I DON'T KNOW IF IT IS A VELVET GLOVE, FIST IN THE VELVET GLOVE, OR WHAT METAPHOR IT WOULD BE, BUT IT CERTAINLY IS NOT CLEAR IN THIS DOCUMENT TO ME, AT LEAST, TO WHOM YOU ARE ACCOUNTABLE AND FOR WHAT.

THE COURT: I THINK THE QUESTION IS THIS: YOU RAISE A GOOD POINT. IS IT YOUR POSITION THAT THIS 1.10 SUFFERS FROM THE DILEMMA OF, ONE, WHO DETERMINES WHETHER THESE STANDARDS ARE MET, AND, TWO, WHAT THE ARE RAMIFICATIONS IF THESE STANDARD ARE NOT MET?

THE WITNESS: IT IS, AND I THINK ONE MORE, ONE MORE POINT, JUDGE. THAT IS, FROM MY PERSPECTIVE, DOES THE MERE FACT THAT I HAVE THOSE TWO CONCERNS LEAD ME TO A THIRD POINT, WHICH IS THAT IMPLICITLY THERE IS A RIGHT SOMEWHERE IN FED-EX, EVEN THOUGH IT MAY NOT BE SPECIFIC EXACTLY WHERE IT IS, TO DO SOMETHING TO YOU WHICH IS FAR BEYOND MERELY THE SCOPE OF YOUR DELIVERING PACKAGES AND

Exhibit C

DOING THE SERVICE THAT YOU WOULD EXPECT A CONTRACTOR TO DO?

THE COURT: SO YOU ARE SAYING IT IS TRIPARTITE. ONE, IT IS UNKNOWN WHO MAKE THE DETERMINATION WHETHER THE STANDARDS ARE COMPLIED WITH; TWO, IT IS UNKNOWN WHAT THE PENALTIES ARE IF THERE IS NO -- IF THEY ARE VIOLATED; AND THREE, THERE IS MASSIVE CONTROL BY THE UNCERTAINTY OF WHAT RAMIFICATION WOULD BE.

IS THAT WHAT YOU ARE TELLING ME?

THE WITNESS: I AM. I AM NOT TRYING TO OVER-COMPLICATE THIS. IT IS A COMPLICATED CONTRACT, BUT I SUPPOSE I AM SUGGESTING THAT THE THIRD QUESTION ANSWERS ITSELF. MERE PRESENCE OF A PROVISION LIKE THIS AND THE TWO UNCERTAINTIES, WHICH YOU HAVE NOTED IN YOUR POINTS ONE AND TWO, LEAD TO THIS, IF NOT CONTROL, THEN RIGHT TO CONTROL. RIGHT TO CONTROL IS ALL ONE NEEDS IN AN EMPLOYER TO HAVE EMPLOYEES.

THE COURT:: THESE ARE NOT MY POINTS. I AM TRYING TO FEIGNED OUT IF THESE ARE YOUR POINTS.

THE WITNESS: YES, SIR, IT IS WHAT I AM TRYING TO SAY.

THE COURT: AGAIN, WE HAVE THREE ISSUES THEN: WHO DETERMINES THE STANDARDS, THE RAMIFICATIONS FOR THE VIOLATION OF THE STANDARDS, AND CONTROL BY THE UNCERTAINTY OF ONE AND TWO?

THE WITNESS: YES, SIR.

BY MS. FARIS:

Q MR. WOOD, LET'S GO TO SECTION 12.1 AND SEE IF WE CAN TELL WHAT THE CONSEQUENCES OF VIOLATING 1.10 ARE.

Exhibit C

12.1 C SAYS -- THIS IS A DISCUSSION OF TERMINATION. 12.1

STARTS OUT SAYING, THIS AGREEMENT MAY BE TERMINATED DURING THE INITIAL TERM OR DURING ANY RENEWAL TERM HEREOF AS FOLLOWS, AND SECTION C SAYS, "BY CONTRACTOR OR RPS, IF THE OTHER PARTY BREACHES OR FAILS TO PERFORM THE CONTRACTUAL OBLIGATIONS IMPOSED BY THIS AGREEMENT."

DO YOU SEE THAT?

A I DO.

Q IF YOU ADD UP 1.10, THE AGREED-UPON STANDARDS OF SERVICE, INCLUDING THE DAILY PICKUP AND DELIVERY AND ALL THE OTHER REQUIREMENTS IN 1.10, AND YOU ADD TO THE MIX 12.1 C, DOES IT APPEAR IN YOUR VIEW THAT A CONTRACTOR CAN BE TERMINATED FOR VIOLATIONS DETERMINED BY THE COMPANY OF SECTION 1.10, THE AGREED-UPON STANDARD OF SERVICE?

A YES, IT DOES.

Q IN YOUR VIEW -- I AM SORRY. LET ME ASK IT THIS WAY. ONE OF THE TRADITIONAL INDICIA OF EMPLOYEE STATUS IS THAT A CONTRACT PERMITTED TERMINATION AT WILL, ARE YOU AWARE OF THAT?

A I AM.

Q MR. BRADLEY TESTIFIED THAT ONE OF THE REASONS HE ADDED THESE ELABORATE PROVISIONS IN ARTICLE 12 WAS TO AVOID A CONTRACT WHICH PERMITTED THE COMPANY TO TERMINATE AT WILL.

MY QUESTION IS, DO YOU AGREE WHEN YOU READ 12.1 C, TOGETHER WITH 1.10, DO YOU AGREE THAT THIS CONTRACT PROHIBITS TERMINATION AT WILL OR DO YOU THINK IT AUTHORIZES TERMINATING AT WILL?

Exhibit C

A I THINK IT -- I THINK IT AUTHORIZES TERMINATION AT WILL BUT I WOULD LIKE TO EXPLAIN.

Q PLEASE DO.

A IF I COULD, BECAUSE I DON'T THINK IT IS AN EASY CONCEPT HERE. I THINK THE -- I HAVE ALREADY MENTIONED -- AND THERE ARE MANY OF THEM NOTED -- SOME PROVISIONS THAT HAVE CONTROL MUCH BEYOND THE NORMAL INDEPENDENT CONTRACTOR TYPE OF ARRANGEMENT. THIS TERMINATION PROVISION, WHICH I HAVE SCRIBBLED NEXT TO IT "CRITICAL," THIS TERMINATION PROVISION IS YES, I READ IT IF YOU STEP OUT OF LINE WITH THE --

WE WERE JUST DISCUSSING THE JUDGE'S QUESTIONS THIS AMBIGUITY THAT I ALLUDED TO, SO I THINK THERE ARE MANY PLACES WHERE YOU CAN EVEN WITHIN THE FACE OF THE CONTRACT ITSELF STEP OUT OF LINE, VIOLATE THE CONTRACT, LEAVING ASIDE THE OTHER DOCUMENTS LIKE THE POLICY MANUAL AND SO ON, WHICH I BELIEVE ARE PART AND PARCEL OF THIS. AGAIN, NOT TRYING TO GET OUT OF OR NOT TRYING TO TESTIFY ABOUT DOCUMENTS TO WHICH I AM NOT TO ALLUDE BUT I BELIEVE WHAT THIS BASICALLY DOES, IN CONJUNCTION WITH THE TERMS OF THE CONTRACT, WHICH IS EXACTLY QUITE INTERESTING -- I THINK IT WAS AT ONE POINT A ONE-TO-FIVE-YEAR TERM, DEPENDING -- I BELIEVE IT WAS CHANGED FROM A ONE-TO-THREE-YEAR TERM CURRENTLY, BUT IN EITHER CASE HAD ANNUAL RENEWAL PROVISIONS.

AND SO ON THE ONE HAND YOU HAVE SOMETHING THAT CLEARLY SAYS, IF YOU BREACH THE AGREEMENT, THEN YOU AS A DRIVER, AS THE PUTATIVE CONTRACTOR, THESE PERSONS

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 159 of 227

Exhibit C

THAT I CONSIDER EMPLOYEES, IF YOU BREACH THE AGREEMENT, YOU GET TERMINATED.

AND THEN ON THE OTHER HAND YOU HAVE THIS ONE-YEAR ANNUAL ROLLING RENEWAL, WHICH ALL YOU HAVE TO DO -- AS I READ THIS, ALL FED-EX HAS TO DO IS FAIL TO RENEW SOMEONE BY GIVING 30 DAYS NOTICE.

SO, IN EFFECT, IF YOU READ THESE TOGETHER, YOU EITHER CAN -- I HOPE I AM NOT COMPLICATING THIS, I AM NOT TRYING TO --

YOU CAN EITHER TERMINATE SOMEONE FOR WHAT COULD BE A TERRIBLY SMALL INFRACTION, A TORN UNIFORM OR SOMETHING OF THIS SORT OR A MISSED PICK UP WINDOW OR SOMETHING LIKE THIS, ALL OF THE MANY, MANY CONDITIONS, THE TRUCK NOT BEING LABELED PROPERLY, THE TRUCK BEING LABELED WITH THE BUMPER STICKER OR SOME PERSONAL ITEM WHICH IS PROHIBITED, THE TRUCK BEING USED FOR PERSONAL PURPOSES AND NOT BEING COVERED TOTALLY AS IS REQUIRED. ALL OF THESE THINGS MIGHT LEAD TO A TERMINATION FOR SOMETHING THAT I WOULD, I GUESS IN MY OWN JUDGMENT CONSIDER A MINOR INFRACTION, IF NOT EXTREMELY REPETITIVE.

ON THE OTHER HAND, YOU THEN HAVE WHAT IS I THINK THIS CAREFULLY CONSTRUCTED RENEWAL PROVISION, WHICH ALLOWS THE COMPANY, FED-EX, TO TERMINATE YOU FOR ANY REASON, WHICH IS AFTER ALL TERMINATION AT WILL IF IT SIMPLY FAILS TO RENEW YOUR CONTRACT AT ANY ONE TIME. I HOPE THAT ANSWERS YOUR QUESTION AND ASKED AND ANSWERED MAKE IT MORE COMPLICATED.

Q ARE YOU REFERRING NOW TO THE PROVISION OF THE

12068

Exhibit C

CONTRACT IN 11.2, RENEWAL TERMS?

A YES, I WAS, MA'AM.

Q AND THAT PROVIDES FOR AUTOMATIC RENEWAL UNLESS THERE IS NOTICE 30 DAYS IN ADVANCE, IS THAT RIGHT?

A YES, THAT'S CORRECT.

Q SO DO I UNDERSTAND YOU TO BE SAYING THAT IF YOU TAKE 11.2, YOU ADD TO IT 12.1 C AND THEN THESE VERY GENERAL PROVISIONS ON STANDARD OF SERVICE, YOU BELIEVE THIS CONTRACT DOES EMBODY TERMINATION AT WILL?

A YES, MA'AM.

Q LET ME ASK YOU ABOUT TWO OTHER PROVISIONS THAT MR. BRADLEY DISCUSSED IN HIS TESTIMONY THAT HE SAID HE ADDED IN ORDER TO, I THINK HE USED THE TERM STRENGTHEN WHAT HE BELIEVED TO BE AN INDEPENDENT CONTRACTOR RELATIONSHIP, AND THOSE INVOLVED 2.1 AND 2.2.

THE FIRST ONE HAS TO DO WITH ADDITIONAL VEHICLES. AND THAT PROVISION SAYS "CONTRACTOR MAY, WITH THE CONSENT OF RPS AND CONSISTENT WITH THE CAPACITY OF THE TERMINAL SERVICED BY CONTRACTOR, OWN AND OPERATE MORE THAN ONE VEHICLE WITH ANY SUCH VEHICLE TO BE DRIVEN BY QUALIFIED OPERATORS," ET CETERA.

LET'S FOCUS FOR A MINUTE ON THE CONSENT AND CAPACITY DISCUSSED IN THAT FIRST PARAGRAPH. NOW, MR. BRADLEY TESTIFIED THAT HE ADDED THIS BECAUSE HE THOUGHT IT WOULD STRENGTHEN THE RELATIONSHIP. DO YOU THINK THAT SECTION 2.1 ACTUALLY MAKES THIS MORE LIKE AN INDEPENDENT CONTRACTOR RELATIONSHIP?

A NO. IF ANYTHING, QUITE THE CONTRARY.

12069

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 161 of 227

Exhibit C

Q WHY IS THAT?

A BECAUSE 2.1 SAYS THAT, AGAIN, THE PUTATIVE CONTRACTOR, THE DRIVER, MUST HAVE THE CONSENT OF RPS, MUST HAVE THE CONSENT OF FED-EX. AND I GUESS THERE ARE CASES, AS I -- FROM MY READINGS THERE ARE CASES WHERE TRUCKS OR ADDITIONAL VANS ARE APPROVED AND CASES WHERE THEY ARE NOT. I DON'T VIEW THE APPROVAL PROCESS ITSELF AS THE MOST SIGNIFICANT THING. I VIEW THE MOST SIGNIFICANT THING ABOUT THIS PROVISION, ABOUT THE ONE YOU ARE DIRECTING ME TO NOW, IS THE COMPANY HAS THE RIGHT TO DO IT.

IF THE COMPANY CHOOSES NOT TO EXERCISE THE RIGHT, I DON'T BELIEVE THAT FACTUALLY IS WHAT HAS HAPPENED HERE, BUT IF THE COMPANY DIDN'T CHOOSE TO EXERCISE THE RIGHT, IF IT WAS MR. BRADLEY THAT PUT THIS IN, WHAT THIS PROVISION DOES IS GIVE THE COMPANY YET ANOTHER RIGHT. RIGHTS, WHETHER THEY ARE EXERCISES OR NOT, OVER PERSONS LIKE THESE WORKERS, RIGHTS OF CONTROL ARE CRITICAL TO AN EMPLOYEE DETERMINATION, AND THESE, AGAIN, PUSH ME FURTHER DOWN THAT ROAD.

Q WOULD YOU EXPECT IN AN INDEPENDENT CONTRACTOR A TRUE INDEPENDENT CONTRACTOR RELATIONSHIP TO SEE THE ONE PARTY HAVING THE RIGHT TO DETERMINE WHEN AND IF THE OTHER PARTY MAY GROW AND IN WHAT MANNER THEY MAY GROW?

A NOT AT ALL. IN FACT. I RECALL -- I BELIEVE THE SILK CASE WAS MENTIONED -- CERTAINLY MENTIONED IN THE BORELLO DECISION, AND I THINK IT WAS DISCUSSED BY MR. BRADLEY, I BELIEVE, IN HIS TESTIMONY, BUT A CASE

12070

INVOLVING THE TRUCKING INDUSTRY IN THE '40S, AN IMPORTANT

Exhibit C

SUPREME COURT CASE. OF COURSE THAT INVOLVED BASICALLY PIECEWORK. THE DRIVER DRIVES UP TO THE COAL -- A DRIVER OF A COAL TRUCK, OWNING THE COAL TRUCK, DRIVES UP ON A PARTICULAR DAY, IF HE OR SHE -- HE PROBABLY IN THOSE YEARS -- FEELS LIKE IT, AND TAKES A TICKET AND DELIVERS A LOAD OF COAL AND IS PAID FOR DOING THAT. NO OBLIGATION TO EVER SHOW UP AGAIN AND SO ON. A TRUE INDEPENDENT CONTRACTOR ARRANGEMENT IN WHICH THERE IS NO CONDITION, NO UNIFORM, NO LABELING OF THE TRUCK, GO ON DOWN THE LINE, ABSOLUTELY. MANY OF THESE TRUCKERS DID LOTS OF THESE OTHER THINGS.

SO NO, I WOULDN'T EXPECT TO SEE ANY KIND OF CONSENT REQUIRED IF THAT TRUCKER, IN MY COAL EXAMPLE, MR. SILK DECIDED TO GO OUT AND BY A SECOND COAL TRUCK. EVEN IF THAT MADE HIS JOB LESS EFFICIENT AND MADE HIM LESS BUSY, THAT SHOULD NOT BE THE CONCERN OF FED-EX. SO THERE SHOULDN'T BE -- IN MY VIEW, THIS PROVISION BY MR. BRADLEY, IF I AM CRITIQUING HIS CONTRACT ON THIS POINT, WAS COUNTER-PRODUCTIVE. IT GIVES FED-EX MORE CONTROL THAN IT HAD BEFORE THIS PROVISION WAS PUT IN.

Q WOULD YOU SAY THE SAME THING ABOUT THE APPROVAL PROCESS OF INDIVIDUALS WHO ARE GOING TO DRIVE THOSE VEHICLES CONTAINED IN SECTION 2.2?

A I WOULD. IS IT 2.2 OR 2.-- I AM SORRY. IT IS 2.2. I WAS GOING TO SAY THE SAFE DRIVING STANDARD ALLUDED TO IN 2.1 ALSO HAVE -- I BELIEVE THE MY NOTE WAS REFERENCING THE FACT THAT THOSE ARE QUITE HIGH STANDARDS,

12071

CERTAINLY BEYOND WHAT ONE WOULD EXPECT TO SEE WITH JUST A DULY LICENSED DRIVER WITH THE RIGHT KIND OF

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 163 of 227

Exhibit C

CERTIFICATION.

BUT 2.2, YES, IT IS SPECIFICALLY PRESCRIBING -- OR I SHOULD SAY IT THIS WAY: IT IS SPECIFICALLY SAYING THAT THE COMPANY HAS THE RIGHT TO IMPOSE ALL THESE CONDITIONS -- MAY EMPLOY -- BUT IF THEY ARE EMPLOYED, THEY HAVE TO MEET ALL OF THE COMPANY'S STANDARDS, NOT THE CONTRACTOR STANDARDS.

Q NOW, MR. WOOD, GOING TO THE SECTION 5 OF THE CONTRACT ON THE PRIMARY SERVICE AREA, EACH OF THESE CONTRACTORS IS ASSIGNED TO A ROUTE. THERE ARE TWO PROVISIONS IN THIS CONTRACT THAT ADDRESS WHETHER THE COMPANY -- WAYS IN WHICH THE COMPANY CAN AFFECT THE ROUTE. ONE IS THE FLEX PROVISION OF THE CONTRACT. THE SECOND IS SECTION 5.3, WHICH WE HAVE EUPHEMISTICALLY REFERRED TO AS THE RECONFIGURATION PROVISION OF THE CONTRACT.

DO YOU THINK THAT THE COMPANY'S RESERVATION OF THE RIGHT TO FLEX PACKAGES ON AND OFF OF AN INDIVIDUAL'S ROUTE REPRESENTS THE KIND OF ARRANGEMENT YOU WOULD EXPECT TO SEE IN AN INDEPENDENT CONTRACTOR AGREEMENT?

MR. NELSON: OBJECT, MISSTATES THE PRIOR TESTIMONY. INCOMPLETE HYPOTHETICAL.

THE COURT: SUSTAINED.

BY MS. FARIS:

Q CAN YOU TELL ME WHETHER THE EXISTENCE OF A

12072

PROGRAM BY WHICH TO TAKE PACKAGES OFF OF AN INDIVIDUAL'S ROUTE AND TO ADD PACKAGES TO THAT ROUTE IS CONSISTENT WITH AN INDEPENDENT CONTRACTOR RELATIONSHIP?

Exhibit C

A YES, I BELIEVE IT IS ENTIRELY INCONSISTENT WITH AN INDEPENDENT CONTRACTOR RELATIONSHIP.

Q WHY IS THAT, SIR?

A THE GOAL, I BELIEVE, OF THIS CONTRACT AND CERTAINLY THE PREAMBLE TO IT WAS TO FOSTER THE NOTION WHICH I THINK WAS, YOU KNOW, POSSIBLY EVEN DUPLICITOUS, THE NOTION THAT THESE DRIVERS WERE INDEPENDENT CONTRACTORS BUT, AGAIN, THE MANNER AND METHOD AND MEANS BY WHICH ALL OF THESE PACKAGES WERE DELIVERED, EXACTLY WHEN THE ROUTES COMMENCED AND ENDED, EXACTLY HOW THE ROUTES WERE CONFIGURED, WHICH YOU JUST MENTIONED, THIS FLEX NOTION THAT PACKAGES GET ADDED OR DETRACTED FROM YOUR TRUCK, ALL OF THE LOADING SCHEME THAT IF YOU TAKE YOUR TRUCK HOME, YOU HAVE TO BRING IT BACK, YOU CANNOT KEEP IT AT HOME OTHERWISE IT WILL NOT GET LOADED AND SO ON, ALL OF THESE THINGS GO DIRECTLY TO THE MANNER AND MEANS BY WHICH THE EMPLOYER, FED-EX, EXPECTS THE WORK TO BE DONE.

MR. NELSON: OBJECTION, MOVE TO STRIKE. FIRST OF ALL, AS TO THE REFERENCE TO POSSIBLY DUPLICITOUS CALLING FOR SPECULATION, IMPROPER, AND THE REST OF THE RESPONSE WAS RELYING ON DOCUMENTS WHICH WERE NOT IN THE MANUAL AND THEREFORE MUST HAVE BEEN BUSINESS DISCUSSION NOTES.

MS. FARIS: I THINK WE ARE TALKING HERE PARTICULARLY ABOUT THE PROVISIONS IN THE CONTRACT THAT

12073

ADDRESS THE FLEX PROGRAM AND THE RECONFIGURATION OF ROUTES.

THE COURT: IS THAT CORRECT? YOU ARE ONLY REFERRING --

Exhibit C

IS THE BASIS OF YOUR OPINION ONLY THE CONTRACTOR LANGUAGE ITSELF.

THE WITNESS: I BELIEVE IT IS. I AM DOING MY BEST NOT TO EVEN THINK ABOUT ANYTHING THAT HAPPENED IN BUSINESS DISCUSSIONS, SIR.

THE COURT: WHAT POSSIBLY DUPLICITOUS --

MS. FARIS: I WILL ASK HIM ABOUT SUBTERFUGE LATER SO WE MAY AS WELL PUT IT OUT ON THE TABLE. I THINK I HAVE THE RIGHT TO ADDRESS THAT ISSUE BECAUSE OF MR. BRADLEY'S TESTIMONY ABOUT HIS INTENTIONS IN DRAFTING THIS AGREEMENT. I THINK THE COMPANY HAS OPENED THAT UP.

THE COURT: ISN'T THE ISSUE ALSO BECAUSE OF THE UNFAIR TRADING PRACTICES CAUSE OF ACTION AS WELL? IF THIS IS SUBTERFUGE, I THINK THAT IS LEGITIMATE FODDER IN THIS CASE.

MR. NELSON: YOUR HONOR, IT WASN'T A RELEVANCE OBJECTION. IT WAS A FORM-OF-THE-QUESTION AND FORM-OF-THE-ANSWER SORT OF THING. THE ANSWER AS PHRASED WAS SPECULATING AS TO STATE OF MIND.

THE COURT: I WILL STRIKE THE TERM "POSSIBLY DUPLICITOUS" ONLY BECAUSE HE SAID IT WAS POSSIBLY AND THEREFORE ANYTHING IS POSSIBLE.

MS. FARIS: I WILL ADDRESS THE ISSUE ABOUT SUBTERFUGE DIRECTLY AFTER WE FINISH TALKING ABOUT THE

12074

CONTRACT.

Q (By Ms. Faris) MR. WOOD, WHEN YOU REVIEWED THE SECTIONS OF THE CONTRACT INCLUDED IN SECTION 5.3 ON RECONFIGURATION AS WELL AS THE ADDENDA 5, WHICH ALSO ADDRESSES RECONFIGURATION, AND IN COMBINATION WITH THAT,

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 166 of 227

Exhibit C

REVIEWED THE POLICIES CONTAINED IN THE FED-EX GROUND MANUAL WHICH PERMIT THE COMPANY TO GIVE A FIVE-DAY NOTICE OF RECONFIGURATION, DID YOU BELIEVE THAT THOSE PROVISIONS OF THE CONTRACT AND THE POLICIES WERE INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS?

A YES, MA'AM, I DID.

Q WHY?

A BOY, THESE ARE, AGAIN, COMPLEX PROVISIONS. 5.3 SPEAKS TO THE VERY CORE, IN MY OPINION, OF FED-EX GROUND'S BUSINESS, WHICH IS SERVICE AREAS PICKING UP AND DELIVERING PACKAGES WITH THESE DRIVERS AS THE ONLY ONES WHO CAN DO IT.

THERE IS REFERENCE AGAIN HERE TO THIS NETWORK OF CONTRACTORS, WHICH IS SOMETHING THAT I HAVE NEVER SEEN. I WON'T CLAIM TO HAVE SEEN EVERY SINGLE INDEPENDENT CONTRACTOR AGREEMENT, BUT I HAVE CERTAINLY NEVER SEEN THIS KIND OF "NETWORK OF CONTRACTORS" CONCEPT, WHICH AGAIN SPEAKS TO INTEGRATION.

SO IT CONTEMPLATES, IT SAYS, THAT -- I AM ABOUT HALFWAY DOWN THE PARAGRAPH. THERE IS A PROVISION THAT SAYS THEREFORE THIS AGREEMENT CONTEMPLATES -- THIS IS IN 5.3 ON PAGE 22 THE RECOGNITION BY BOTH PARTIES AND BY OTHER CONTRACTORS IN THE SYSTEM -- WHICH IS

12075

INTERESTING BECAUSE I GUESS THEY ARE NOT ALL SIGNATORIES TO THIS; I GUESS EACH OF THEM SERIATIM SIGNS IT -- OF A PROPRIETARY INTEREST IN THE ACCOUNTS, AND YET YOU CAN HAVE PACKAGES GIVEN TO YOU AND TAKEN AWAY FROM YOU.

SO, YES, I DO VIEW IT AS ENTIRELY INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS. AGAIN,

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 167 of 227

Exhibit C

THERE IS THIS -- SIX LINES FROM THE BOTTOM OF PAGE 22, AGAIN, IT IS STILL IN PARAGRAPH 5.3, THERE IS THIS, AGAIN, PASSIVE VOICE. IF THE ACCOUNTS IN HIS PRIMARY OR HER PRIMARY SERVICE AREA ARE RECONFIGURED, RECONFIGURED BY WHOM, AGAIN, IS MY QUESTION? I BELIEVE I READ SOMEWHERE -- YOU CAN SEE IN MY NOTES TERMINAL MANAGER. I THINK IT MAY HAVE BEEN IN THE POLICY MANUAL.

AND AS TO YOUR FIVE-DAY NOTICE QUESTION AND ADDENDUM 5, THERE IS THIS ATTEMPT I THINK, IN ADDENDUM 5, AS I UNDERSTAND IT, TO PAY SOMETHING, FOR FED-EX TO RECOGNIZE THAT IT IS -- THAT IF IT DOES TAKE PART OF SOMEONE'S ROUTE AWAY OR GIVE SOMEONE MORE OF SOMEONE ELSE'S ROUTE, THAT SOME KIND OF COMPENSATION IS DUE.

I DON'T KNOW THE EXTENT TO WHICH ANY OF THIS HAPPENED. I BELIEVE THAT I READ, BUT I CANNOT SWEAR WHERE IN ANY OF THE DOCUMENTS, THAT NOT MUCH OF THIS HAPPENED, HAPPENED AT ALL. I ADMIT I COULD BE WRONG ABOUT THAT.

CERTAINLY THE NOTION THAT ONE CAN HAVE THINGS TAKEN AWAY FROM ONE'S OWN BUSINESS IS INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS, PURE AND SIMPLE.

Q NOW, IF YOU WOULD TURN TO THE LAST SECTION

12076

THAT MR. BRADLEY DISCUSSED, WHICH IS SECTION 18 OF THE CONTRACT, CALLED ASSIGNMENT. CAN YOU TELL ME, IN YOUR VIEW, DID MR. BRADLEY MEET HIS GOAL OF ADDING THIS TO STRENGTHEN AN INDEPENDENT CONTRACTOR RELATIONSHIP?

A I DON'T WANT TO SOUND LIKE A BROKEN RECORD BUT I AM AFRAID I HAVE TO. HERE, NO, IT DOES NOTHING, IN MY OPINION, TO STRENGTHEN ANY ARGUMENT THAT THIS WAS THEN

Exhibit C

OR NOW AN INDEPENDENT CONTRACTOR ARRANGEMENT.

Q WHY IS THAT, SIR?

A THERE ARE MANY CONDITIONS, AMONG THEM THE INITIAL PROVISO IN THE THIRD SENTENCE, "PROVIDED CONTRACTOR IS IN GOOD STANDING." I AM NOT EVEN SURE AGAIN -- I AM NOT SURE -- I DON'T KNOW WHO INTERPRETS THAT, WHAT GOOD STANDING MEANS. DOES THAT MEAN NO BREACH OR DOES THAT MEAN NO DISCIPLINARY ACTION, IN WHATEVER FORM THAT DISCIPLINARY ACTION TOOK? NO DISCUSSIONS WITH TERMINAL MANAGEMENT? NO MEETING OF GOALS?

DOES THAT MEAN SOMEONE WHO FAILS TO WIN THE EXTRA 25 PERCENT BONUS THAT A TERMINAL GETS, AS I UNDERSTAND IT, BASED ON THE ENTIRE TERMINAL, NOT MERELY THAT DRIVER, WHICH IS A SOMETHING THAT LOCKS EVERYONE, EVERY DRIVER, EVERY PUTATIVE INDEPENDENT CONTRACTOR, TOGETHER IN MY OPINION. AGAIN, IT NEGATES AN ARGUMENT THAT THERE IS ANY KIND OF INDEPENDENT CONTRACTOR STATUS HERE.

I AM NOT SURE WHAT "GOOD STANDING" HERE MEANS. THAT'S WHAT I AM SAYING. FOR ONE THING, THERE IS THE GOOD STANDING ISSUE, THEN THERE IS ACCEPTANCE ISSUE.

12077

YOU HAVE TO WITHIN 30 DAYS --

AND I HAVE SEEN LOTS OF PROVISIONS ON TRANSFERS OF BUSINESS, TRANSFERS OF FRANCHISE BUSINESSES, FOR EXAMPLE, AND OTHERS AND A 30-DAY PERIOD IS SHORT. YOU HAVE TO FIND SOMEONE ACCEPTABLE TO RPS AS BEING QUALIFIED AND SO ON.

THERE APPEAR TO BE NO OBJECTIVE STANDARDS AS TO ACCEPTABILITY. THERE APPEARS TO BE NO RULE OF REASON

Exhibit C

THAT YOU COMMON SEE IN CONTRACTS ABOUT THEY HAVE TO HAVE A CERTAIN FINANCIAL STANDING OR THEY HAVE TO HAVE A CLEAN RECORD OR WHATEVER THE PERTINENT KINDS OF CRITERIA WOULD BE.

SO IT SEEMS TO ME THAT IT IS UP ENTIRELY TO FED-EX TO DECIDE IF THEY WANT TO APPROVE SOMEONE OR NOT AND THEREBY EITHER PERMIT OR NOT PERMIT THE TRANSFER. AGAIN, WHETHER THEY DO OR DO NOT, IF THEY DO PERMIT A TRANSFER AND EVERYTHING GOES SWIMMINGLY, WHICH IN SOME CASES THIS DOES HAPPEN, I AM SURE IT DOES, THAT MIGHT MEAN THAT THEY DIDN'T HAVE THE RIGHT TO NIX IT. THE NIGHT TO NIX IT MAKES THESE PEOPLE EMPLOYEES.

Q NOW, LET ME ASK YOU, VIEWING THE CONTRACT AS A WHOLE AND VIEWING THE COMPANY POLICIES, DO YOU THINK THAT THE CONTRACT REALLY TELLS THE CONTRACTOR EVERYTHING THAT THE CONTRACTOR IS REQUIRED TO DO TO MEET HIS OR HER OBLIGATIONS UNDER THE TERMS OF THE CONTRACT ITSELF?

MR. NELSON: OBJECT, LACKS FOUNDATION AND CALLS FOR SPECULATION.

THE COURT: I WILL OVERRULE THE OBJECTION. I KNOW

12078

WHERE YOU ARE GETTING AT.

THE WITNESS: I AM SORRY. I WANT TO ANSWER THIS CAREFULLY. COULD YOU READ THE QUESTION?

(THE QUESTION WAS READ.)

THE COURT: I WILL SUSTAIN THE OBJECTION NOW AS TO THE USE OF THE WORD "POLICIES." IT IS TOO VAGUE.

(INTERRUPTION.)

THE COURT: BACK ON THE RECORD. ESTRADA VERSUS FED-EX GROUND. ALL COUNSEL ARE PRESENT. MR. WOOD IS ON

Exhibit C

THE STAND, HAVING BEEN SWORN. MS. FARIS, MY APOLOGIES.

BY MS. FARIS:

Q MR. WOOD, WHAT I STARTED TO ASK YOU EARLIER WAS HAVING REVIEWED THE FED-EX MANUAL -- I AM SORRY, THE FED-EX GROUND MANUAL AND THE OPERATIONS MANAGEMENT HANDBOOK AND COMPARED IT WITH THE OPERATING AGREEMENT, DO YOU BELIEVE THAT THE OPERATING AGREEMENT SETS FORTH ALL OF THE TERMS AND CONDITIONS WHICH ARE -- WHICH A CONTRACTOR IS REQUIRED TO MEET IN ORDER TO COMPLY WITH THE CONTRACTUAL OBLIGATIONS?

MR. NELSON: OBJECT, LACKS FOUNDATION AS PHRASED.

THE COURT: I WILL SUSTAIN THE OBJECTION. WITH ALL DUE RESPECT, THE QUESTION DOESN'T MAKE ANY SENSE.

BY MS. FARIS:

Q I WILL TRY IT AGAIN. THERE HAS BEEN A CONTENTION PUT FORWARD BY MR. BRADLEY THAT THE CONTRACT BASICALLY SAYS IT IS AND IS SPECIFIC ENOUGH TO TELL THE CONTRACTOR EXACTLY WHAT HIS OR HER OBLIGATIONS ARE.

HAVING REVIEWED THE FED-EX GROUND MANUAL AND

12079

THE OPERATIONS MANAGEMENT HANDBOOK, DO YOU AGREE OR DISAGREE WITH MR. BRADLEY'S TESTIMONY TO THAT EFFECT?

A I DISAGREE.

Q WHY?

A WE HAVE GONE OVER -- I HAVE TESTIFIED TODAY TO SOME OF IT. I THINK PROBABLY ONLY A --

I DON'T KNOW. I GUESS HALF OF IT, MAYBE, OF THE PLACES THAT I FIND THAT ONE NEEDS ADDITIONAL INFORMATION. EITHER EXPLICITLY THERE IS AN ALLUSION TO ONE OF THESE OTHER DOCUMENTS THAT YOU HAVE ALLUDED TO,

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 171 of 227

Exhibit C

THE MANUALS, ET CETERA, OR THAT I, BECAUSE OF MY REVIEW, HAVE REVIEWED THESE OTHER DOCUMENTS AND KNOW THAT THEY COME INTO PLAY, AND BECAUSE OF THE WHAT I CALL THE "PASSIVE VOICE" PHENOMENON IN THIS AND THE LACK OF SPECIFICITY IN THIS CONTRACT, DENOMINATED AN OPERATING AGREEMENT CONTRACT, THAT YOU KNOW, DESPITE THE FACT IT IS QUITE LONG AND QUITE DETAILED, THERE IS A WHOLE HECK OF A LOT OF IT LEFT OUT.

AND WERE I A FED-EX GROUND DRIVER, REGARDLESS OF WHAT YOU CALL ME, THIS WOULD NOT BE ENOUGH TO TELL ME EVERYTHING I NEED TO KNOW TO KEEP MY JOB.

Q TELL ME WHETHER YOU THINK IT IS A PROBLEM OR NOT THAT THE POLICY MANUAL, THAT IS, THE FED-EX GROUND MANUAL, AND THE OPERATIONS MANAGEMENT HANDBOOK ARE NOT PROVIDED TO EACH CONTRACTOR ALONG WITH THE OPERATING AGREEMENT?

A I WOULD HAVE TO SAY YES. PROBABLY MY PRIOR ANSWER MAKES THAT CLEAR THAT IF I AM A DRIVER -- I DON'T

12080

MEAN TO PERSONALIZE THIS, A DRIVER, A FED-EX GROUND DRIVER, WHO RECEIVES THE OPERATING AGREEMENT, WHICH FRANKLY IS A COMPLICATED DOCUMENT FOR A LAWYER TO READ --

I DON'T KNOW EDUCATIONAL LEVELS OF MOST DRIVERS, BUT IT IS A COMPLICATED DOCUMENT FOR ANYONE, I SUSPECT, TO READ. AND THEN IF YOU ARE NOT PROVIDED, AS I JUST TESTIFIED, IF YOU ARE NOT PROVIDED THESE MANUALS WHICH ADD TO THE REQUIREMENTS, THEN YOU DON'T HAVE THE COMPLETE PICTURE. YOU DO NOT HAVE THE COMPLETE CONTRACT. YOU DO NOT HAVE THE COMPLETE RELATIONSHIP. YOU DON'T KNOW ALL THE WAYS IN WHICH FED-EX CAN EXERT CONTROL OVER

Exhibit C

YOU. THEREFORE, YOU HAVE MUCH LESS THAN HALF A LOAF.

Q IN ADDITION, YOU REVIEWED THE OPERATIONS, THE FED-EX GROUND MANUAL OPERATIONS SECTION ON CONDUCTING BUSINESS DISCUSSIONS, RIGHT? YOU HAVE TESTIFIED ABOUT THAT EARLIER?

A THAT IS CORRECT.

Q THAT POLICY DOES NOT REQUIRE THE COMPANY TO PROVIDE THE CONTRACTOR WITH A COPY OF ANY BUSINESS DISCUSSION WHICH IS RECORDED, DOES IT.

A NO. BUT I WAS NOT -- WELL, I CAN TESTIFY ABOUT THE MANUAL PORTIONS, JUDGE?

THE COURT: THE MANUALS ARE FINE.

THE WITNESS: YES, I AM SORRY. I DIDN'T WANT TO -- THE BUSINESS DISCUSSIONS, YES, THERE IS REFERENCE IN THE MANUAL TO HAVING BUSINESS DISCUSSIONS, AND THERE IS NO REQUIREMENT THAT THOSE BUSINESS DISCUSSIONS AS DOCUMENTED, WHICH I BELIEVE THEY ARE DOCUMENTED, BE

12081

PROVIDED TO THE DRIVERS.

Q (By Ms. Faris) DOES THAT POSE ANY PROBLEM IN YOUR VIEW WITH RESPECT TO THIS RELATIONSHIP?

A A HUGE PROBLEM. I VIEW, AS I BELIEVE I SAID EARLIER, THESE -- AGAIN, I AM TRYING TO STEER CLEAR OF WHAT I AM NOT TESTIFYING ABOUT, THE BUSINESS DISCUSSIONS THEMSELVES, BUT I BELIEVE THAT THESE TO BE IN THE NATURE OF DISCIPLINARY DISCUSSIONS, WHATEVER THEY ARE CALLED. AND SO THEIR REFERENCE IN THE MANUAL IN SAYING WELL, YES, YOU SHOULD HAVE THESE DISCUSSIONS AND SO ON, AND IF THE CONTRACTOR SO DENOMINATED IS NOT PROVIDED WITH THE DATA, THE COPY, HARD COPY OR SOFT COPY, WHATEVER IT IS IN THIS

Exhibit C

CASE, HARD COPIES, OF THOSE DISCUSSIONS DOCUMENTING WHAT HE OR SHE DID WRONG AND WHAT HE OR SHE NEEDS TO DO TO CORRECT IT, THEN ONCE AGAIN, THE TERMINATION PROVISIONS OF THIS -- OF THIS SO-CALLED OPERATING AGREEMENT COME INTO PLAY, THE LACK OF GOOD STANDING, ET CETERA, THAT I TESTIFIED ABOUT EARLIER.

Q NOW, FINALLY I WANTED TO ASK YOU ABOUT WHAT OTHER DOCUMENT I ASKED YOU TO REVIEW. THAT WAS THE CONTRACTOR ASSISTANCE PROGRAM PAMPHLET CONTAINED IN EXHIBIT 3.

A DO I NEED TO GET THAT?

Q I WILL ASK YOU GENERALLY ABOUT IT. YOU ARE FAMILIAR, ARE YOU NOT, WITH THE COMPANY'S PROGRAMS TO ASSIST DRIVERS, TO PAY FOR VARIOUS AND SUNDRY NEEDS OR REQUIREMENTS FOR THEIR TRUCK-LIKE TIRES AND PAINT JOBS, ET CETERA, AND OTHER KIND OF MAINTENANCE; IS THAT RIGHT?

12082

A I AM GENERALLY FAMILIAR WITH THOSE, YES.

Q AND THOSE PROGRAMS PROVIDE IN ESSENCE SOME KIND OF A SAFETY NET FOR THE CONTRACTOR; IS THAT RIGHT?

MR. NELSON: OBJECTION, LACKS FOUNDATION.

THE COURT: SUSTAINED THE WAY THE QUESTION IS PHRASED.

BY MS. FARIS:

Q HOW WOULD YOU CHARACTERIZE THE CONTRACTOR ASSISTANCE PROGRAMS THAT YOU HAVE REVIEWED IN EXHIBIT 3?

A I HATE TO SAY THIS BUT I WAS THE ONE WHO CHARACTERIZED IN MY OWN WORDS THIS ENTIRE PANOPLY OF THINGS AS KIND OF A SAFETY NET. THAT IS WHERE THE TERM CAME FROM. BUT THEY ARE -- I DON'T REMEMBER ALL OF THEM,

Exhibit C

BUT THERE ARE A WHOLE BUNCH OF DIFFERENT WAYS IN WHICH FED-EX HELPS ITS CONTRACTORS, WHICH, AGAIN, IS INCONSISTENT WITH THE INDEPENDENT CONTRACTOR RELATIONSHIP TO BEGIN WITH.

UNDER BORELLO, ONE OF THE FACTORS ALSO UNDER THE IRS TEST, WHICH I DON'T BELIEVE IS RELEVANT IN THIS TRIAL, BUT UNDER BORELLO, PROVIDING TOOLS AND MEANS OF DOING THE JOB IS CERTAINLY RELEVANT. SO THE VAN FINANCING, THE 1,000 DOLLAR ESCROW ACCOUNT BUSINESS WHERE THEY ARE ABLE TO -- FED-EX IS ABLE TO OFFER YOU TAKING $25 OUT OF YOUR WEEKLY PAYCHECK -- IT IS REALLY A PAYCHECK DENOMINATED AS SETTLEMENT CHECK AND SO ON -- THERE ARE VARIOUS WAYS THAT WHAT I CALL THE SAFETY NET KICK IN AND PROVIDE PERSONS WHO -- I SUSPECT THESE DRIVERS ARE PERSONS WHO PROBABLY OTHERWISE WOULD NOT BE

12083

ABLE TO AFFORD THIS SO-CALLED INDEPENDENT BUSINESS -- WHICH, AGAIN, I HAVE TESTIFIED I DON'T BELIEVE IS INDEPENDENT -- TO ENABLE THEM TO SORT OF FIT INTO THE MOLD OF WHAT FED-EX DOES REQUIRES FOR ITS UNIFORMITY AND DRIVERS SO THAT ITS SYSTEM WORKS IN A UNIFIED WAY.

Q AND WITH RESPECT TO ONE OF THE OTHER FACTORS THAT IS RELEVANT, THE OPPORTUNITY FOR PROFIT AND LOSS THAT IS DESCRIBED IN THE VARIOUS TESTS ON INDEPENDENT CONTRACTORS STATUS, DO YOU THINK THAT THE EXISTENCE OF THESE CONTRACTOR ASSISTANCE PROGRAMS ALSO TEND TO WEIGH IN FAVOR OF EMPLOYEE STATUS AS OPPOSED TO INDEPENDENT CONTRACTOR STATUS?

MR. NELSON: OBJECT, RELEVANCE. INVADES THE PROVINCE OF THE TRIER OF FACT.

Exhibit C

THE COURT: I WILL SUSTAIN IT AS TO THE FIRST PART OF THE QUESTION. THE SECOND PART IS OKAY.

THE WITNESS: I AM SORRY. THE SECOND PART OF THE QUESTION THEN WAS?

BY MS. FARIS:

Q DO YOU THINK THAT THE COMPANY'S PROVISION OF THESE CONTRACTOR ASSISTANCE PROGRAMS IS CONSISTENT OR INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS?

THE COURT: THAT'S FINE.

THE WITNESS: I BELIEVE THAT THE PROVISION OF THIS -- AND I AM GETTING TIRED. I THINK I DIDN'T DO A VERY GOOD JOB OF RECITING BECAUSE THERE ARE MANY OF THESE THINGS THAT I DESCRIBED AS THE SAFETY NET. I ONLY MENTIONED A COUPLE OF THEM. IT IS QUITE A PANOPLY OF

12084

THEM AS I RECALL. THEY ARE ENTIRELY INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS. THEY ARE A WAY OF PROVIDING A FLOOR TO MAKE SURE THAT THE PUTATIVE CONTRACTOR CAN MAKE A LIVING, CAN MAKE A WAGE.

Q (By Ms. Faris) CAN YOU TELL ME HOW DOES THE USE OF A FORM NON-NEGOTIABLE CONTRACT BY A PARTY AFFECT ITS ABILITY TO DEMONSTRATE INDEPENDENT CONTRACTOR STATUS?

A I THINK THAT IS A TOUGH QUESTION BECAUSE THERE ARE FORM AGREEMENTS THAT CAN BE PERFECTLY LEGITIMATE IN CONTRACTOR AGREEMENTS. AS I HAVE ALREADY TESTIFIED, I DON'T BELIEVE THIS IS ONE OF THEM BY ANY STRETCH OF THE IMAGINATION, BUT THERE ARE SOME THAT ARE.

I THINK THERE ARE TIMES WHEN THERE ARE KIND OF FILL-IN-THE-BLANKS PROVISIONS WHEN THERE IS NEGOTIATING. I HEARD ONE WITNESS --

Exhibit C

I HEARD THIS MORNING MR. MCCORKLE TESTIFY SOMETHING ABOUT, YOU KNOW, FINDING A RATE THAT HE AND THE COMPANY AGREED ON. SO I THINK THERE CAN BE FORM AGREEMENTS THAT CAN BE OKAY. "OKAY" MEANING THAT CAN SUPPORT INDEPENDENT CONTRACTOR STATUS. I AM NOT SURE I REMEMBER EXACTLY WHAT THE TERM "ADHESION CONTRACT" MEANS FROM LAW SCHOOL, BUT I THINK AN AGREEMENT WHERE THERE IS NO NEGOTIATION, WHICH WAS MY UNDERSTANDING FROM READING SOME OF THE DOCUMENTS THAT I READ, WHERE IT IS A STANDARD DOCUMENT THAT EVERYONE MUST SIGN. AND CERTAINLY THE DOCUMENT ON ITS VERY FACE, SOME OF THE PROVISIONS MR. BRADLEY TESTIFIED THAT HE INCLUDED ABOUT THE NATIONWIDE NETWORK, UNIFORMITY, ET CETERA, ALL BESPEAK

12085

THIS INTENT FOR ABSOLUTE UNIFORMITY. THAT DOES CONTRADICT ANY DEGREE OF NEGOTIATION AND THEREFORE ALSO WOULD SUPPORT EMPLOYEE STATUS.

Q WOULD YOU EXPECT AN INDEPENDENT CONTRACTOR TO AT LEAST BE ABLE TO NEGOTIATE THE MONETARY TERMS OF THEIR ARRANGEMENT?

A YES. I MEAN, I SUPPOSE I WOULD BE HARD PRESSED TO SAY WHAT IS THE MOST IMPORTANT THING THE EMPLOYEE -- EXCUSE ME -- THE PERSON, THE INDEPENDENT CONTRACTOR SHOULD BE ABLE TO NEGOTIATE. MONEY IS PROBABLY THE MOST IMPORTANT. IN SOME CASES TERMS MIGHT BE, IN SOME CASES DAYS OFF MIGHT BE. IN SOME CASES HOURS OF WORK OR FULL-TIME MIGHT BE. IN SOME CASES ABILITY TO USE HELPERS WITHOUT APPROVAL MIGHT BE.

THERE ARE SO MANY PLACES IN THIS OPERATING AGREEMENT WHERE THERE IS SIMPLY NO -- AGAIN, IN MY

Exhibit C

OPINION, SIMPLY NO ARGUMENT THAT THIS COULD CREATE A VALID INDEPENDENT CONTRACTOR AGREEMENT. IT IS A LITTLE BIT DIFFICULT TO ANSWER THE QUESTION YOU JUST ASKED ME.

Q CAN I ASK YOU --

I TAKE IT THEN YOUR OPINION IS THAT THIS AGREEMENT, THE OPERATING AGREEMENT IN FRONT OF YOU, DOES NOT CREATE AN INDEPENDENT CONTRACTOR RELATIONSHIP, IS THAT RIGHT?

A THAT IS MY OPINION.

MR. NELSON: OBJECT, VAGUE. RELEVANCE AS TO ULTIMATE OPINION OF THE COURT, BUT WE DON'T KNOW WHAT STANDARDS APPLY.

12086

MS. FARIS: I WILL CLARIFY.

THE COURT: SUSTAIN THE OBJECTION. GO AHEAD.

BY MS. FARIS:

Q WOULD YOU AGREE --

I TAKE IT, MR. WOOD, THAT IT IS YOUR OPINION THAT THE OPERATING AGREEMENT THAT YOU HAVE REVIEWED DOES NOT COMPORT WITH THE BORELLO STANDARDS FOR INDEPENDENT CONTRACTOR STATUS?

MR. NELSON: OBJECTION, RELEVANCE. INVADES THE PURVIEW OF THE TRIER OF FACT.

THE COURT: LET ME ASK YOU THIS, MR. NELSON. DIDN'T MR. BRADLEY TESTIFY OVER AND OVER AGAIN IT WAS HIS PURPOSE TO MAKE SURE THE CONTRACT WAS AN INDEPENDENT CONTRACTOR STATUS AND THAT WAS THE WHOLE PURPOSE OF THE CONTRACT? IN LIGHT OF THAT, CAN'T MR. WOOD REBUT THAT?

MR. NELSON: WELL, THAT WAS MR. BRADLEY'S INTENT, THAT'S CORRECT. NOW THE QUESTION BECOMES IS IT

Exhibit C

APPROPRIATE EXPERT TESTIMONY FOR THIS WITNESS TO TELL THE COURT WHAT THE LAW IS AND WHETHER MR. BRADLEY GOT THERE OR NOT? I THINK THAT IS YOUR JOB.

THE COURT: DIDN'T MR. BRADLEY DO THE SAME THING?

MR. NELSON: I DON'T THINK HE DID. I COULD BE WRONG.

THE COURT: HIS WHOLE IDEA WAS "IT WAS MY INTENT TO DO THIS, THIS IS WHAT IT IS." THAT IS LEGITIMATE REBUTTAL TO MR. BRADLEY. I WILL CONSIDER IT ONLY FOR THAT PURPOSE, TO REBUT WHAT HE SAID.

MS. FARIS: WE ARE NOT OFFERING IT TO HAVE MR. WOOD

12087

TAKE OVER YOUR JOB. WE ARE OFFERING IT TO REBUT MR. BRADLEY DIRECTLY.

THE COURT: THANK YOU.

THE WITNESS: I AM SORRY.

BY MS. FARIS:

Q I WILL TRY IT AGAIN.

WOULD IT BE ACCURATE TO SAY THAT YOU DO NOT BELIEVE THAT THE OPERATING AGREEMENT THAT YOU REVIEWED COMPORTS WITH THE BORELLO STANDARDS TO SET UP AN INDEPENDENT CONTRACTOR RELATIONSHIP?

A THAT WOULD BE QUITE ACCURATE, YES.

Q WOULD IT ALSO BE ACCURATE TO SAY THAT YOUR REVIEW OF THE OPERATIONS AGREEMENT IN COMBINATION SOLELY WITH THE FED-EX GROUND MANUAL AND THE OPERATIONS MANAGEMENT HANDBOOK LEAD YOU TO BELIEVE, SIR, THAT THE CONTRACTOR -- THE SO-CALLED CONTRACTORS HERE ARE EMPLOYEES AND NOT INDEPENDENT CONTRACTORS; IS THAT RIGHT?

A THAT IS CORRECT. UNDER ALL OF THE --

Exhibit C

ACTUALLY ALL OF THE BORELLO STANDARD, I BELIEVE, POINT -- I WANT TO BE REAL CLEAR ON THIS. IN THE -- IF YOU WILL PERMIT ME TO MENTION THE -- WHAT OFTEN HAPPENS AND MAYBE I DON'T RECALL IF THIS WAS IN MR. BRADLEY'S TESTIMONY, STOP ME IF IT WASN'T, BUT I THINK IT WAS -- THAT ONE ENGAGES IN KIND OF A WEIGHING OF STANDARDS, THAT YOU KIND OF LOOK AT SOME FACTORS THAT MIGHT POINT ONE IN THE DIRECTION TOWARD EITHER CONTRACTOR OR EMPLOYEE AND SOME MIGHT POINT IN THE OTHER DIRECTION.

AND CERTAINLY THAT IS TRUE UNDER THE INTERNAL

REVENUE SERVICE STANDARD, THE SO-CALLED 20 FACTORS. IN BORELLO, THERE ARE 7 OR 8, I THINK IT IS 8 FACTORS THAT ARE CONSIDERED BY THE COURT AND THAT HAVE BEEN APPLIED IN SUBSEQUENT CASES. I FIND EACH AND EVERY ONE OF THEM HERE POINTS SQUARELY IN FAVOR OF EMPLOYEE STATUS, NOT CONTRACTOR STATUS. SO IT IS NOT EVEN A WEIGHING REQUIRED.

Q WHAT DO YOU MAKE OF THE PROVISIONS IN THE CONTRACT THAT SAY THAT THE COMPANY WILL NOT DICTATE THE TERMS AND CONDITIONS OF EMPLOYMENT?

A I BELIEVE THAT IS A STATEMENT IN THE CONTRACT WHICH IS CONTRADICTED BOTH BY SOME PROVISIONS IN THE CONTRACT AND CERTAINLY CONTRADICTED BY THESE OTHER DOCUMENTS, MANUALS, ET CETERA, THAT WERE NOT PROVIDED TO DRIVERS. AND CONTRADICTED BUT WHAT I UNDERSTAND THE CONDUCT, INCLUDING DISCIPLINARY CONDUCT TO HAVE BEEN.

MS. FARIS: I HAVE NOTHING FURTHER.

THE COURT: THANK YOU. MR. NELSON?

Exhibit C

CROSS-EXAMINATION

BY MR. NELSON:

Q I WANT TO MAKE SURE I UNDERSTAND AT LEAST PART OF THAT LAST PIECE. IS IT YOUR TESTIMONY THAT YOU FIND THERE TO BE A SIGNIFICANT DISTINCTION BETWEEN THE BORELLO CRITERIA AS YOU APPLIED TO THEM TO THAT LAST ANSWER AND THE IRS 20-FACTOR TEST?

A I DON'T THINK I SAID THAT. I DON'T THINK I SAID THAT. I THINK THERE ARE DIFFERENCES BUT -- I DON'T

12089

THINK I SAID THAT BUT WE CAN -- I AM NOT SURE HOW TO ANSWER YOUR QUESTION.

Q WELL, DO YOU THINK THERE IS A SIGNIFICANT DIFFERENCE BETWEEN THE IRS 20-FACTOR TEST AND THE BORELLO TEST?

A I AM SORRY. THIS IS NOT A YES OR NO. THERE ARE DIFFERENCES, YES. I SUPPOSE MOST FACILELY THERE ARE 20 FACTORS IN THE IRS TEST AND THERE ARE MUCH FEWER UNDER BORELLO. SOME OF THE TESTS IN BORELLO, THE 8 TESTS IN BORELLO, ARE SUBSUMED I SUPPOSE INTO SOME OF THE IRS TESTS. I DO NOT BELIEVE THAT UNDER EITHER OF THE IRS TEST OR THE BORELLO TEST THAT THESE PERSONS WERE CONTRACTORS.

I BELIEVE IN SOME CASES THAT THE IRS TEST CAN BE APPLIED IN A SOMEWHAT MORE LIBERAL, IF THAT IS THE RIGHT WORD, MANNER THAN THE BORELLO TEST. THAT IS, THAT YOU MIGHT HAVE AN EASIER TIME FINDING SOMEONE AN INDEPENDENT CONTRACTOR UNDER THE IRS TEST, BUT I WOULD SAY IN SOME CASES THAT IS NOT TRUE.

AND BECAUSE I WAS NOT ASKED MY OPINION ON

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 181 of 227

Exhibit C

THAT, BUT HERE, AS I SAY, JUST TO BE REAL CLEAR, THE IRS 20 FACTORS SQUARELY POINT HERE IN THE SAME DIRECTION AS BORELLO.

Q SO YOU WOULD EXPECT THAT ANY COMPETENT TAX PRACTITIONER, TAX LAWYER PERSON SUCH AS YOURSELF WOULD LOOK AT THIS CONTRACT AND COME INSTANTLY TO THE CONCLUSION THAT IT DOES NOT MEET EITHER THE IRS TEST OR THE BORELLO TEST, IS THAT YOUR TESTIMONY?

12090

A IT ISN'T MY TESTIMONY SIR. I DON'T THINK IT IS A FAIR CHARACTERIZATION TO SAY INSTANTLY BECAUSE I HAVE SAID REPEATEDLY THAT THIS A VERY COMPLEX DOCUMENT. I CERTAINLY DIDN'T INSTANTLY COME TO THAT CONCLUSION. I DON'T MEAN TO BE DIFFICULT. BUT I ALSO AM TRYING TO READ THIS CONTRACT.

I THINK ONE MUST -- AS I TESTIFIED, I THINK ONE MUST READ THE ANCILLARY DOCUMENTS WHICH ARE IF NOT EXPRESSLY INCORPORATED BY REFERENCE CONTRACT LANGUAGE AT LEAST SORT OF IMPLICITLY INCORPORATED BY REFERENCE, THESE MANUALS, ET CETERA, THAT ARE APPARENTLY NOT PROVIDED TO THE DRIVERS. BUT I THINK IT IS A COMPLEX DOCUMENT.

TO TRY TO ANSWER THE QUESTION I THINK YOU WERE TRYING TO ASK, I BELIEVE THAT UPON CAREFUL EXAMINATION THAT MANY -- MOST CAREFUL COMPETENT TAX LAWYERS WOULD DO AS I HAVE DONE AND READ THIS IN CONJUNCTION WITH THE OTHER DOCUMENTS AND CONCLUDE THAT IT DOES NOT CREATE, AS APPLIED, AN INDEPENDENT CONTRACTOR RELATIONSHIP.

Q HOW LONG DID IT TAKE YOU TO REACH THAT CONCLUSION, SIR?

Exhibit C

A I DON'T KNOW, LONGER THAN INSTANTLY.

Q WELL, CAN WE DO A LITTLE BIT BETTER THAN THAT? CAN YOU GIVE ME AN ESTIMATE OF THE NUMBER OF HOURS OR DAYS THAT WERE INVOLVED IN YOUR ANALYSIS?

A AGAIN, I AM NOT TRYING TO BE EVASIVE. I DON'T KNOW. I GOT INVOLVED IN THIS CASE -- WAS CONSULTED IN THIS CASE GOING WAY BACK TO AROUND THE TIME IT WAS

12091

FILED, I BELIEVE. JOHN TRUE -- JUDGE TRUE NOW -- INITIALLY CONSULTED ME ABOUT IT. I THINK HE MOVED LAW FIRMS. I STAYED INVOLVED. IT KIND OF BUMPED AROUND FOR A NUMBER OF YEARS. I DIDN'T BRING TIME RECORDS OR BILLS OR ANYTHING LIKE THAT WITH ME TODAY. I WOULDN'T BE ABLE TO TELL YOU HOW LONG I HAVE BEEN INVOLVED OR, MORE IMPORTANTLY, HOW QUICKLY I DETERMINED THAT THIS WAS A PRETTY CLEAR CASE FOR EMPLOYEE STATUS.

Q SO LET'S TRY THE QUESTION AGAIN. DID YOU ANALYZE THE CONTRACT, IS THAT A FAIR STATEMENT?

A IT IS.

Q I TAKE IT YOU ANALYZED IT OR BEGAN YOUR ANALYSIS SOMETIME EARLIER THAN THIS MORNING, IS THAT A FAIR STATEMENT?

A IT IS.

Q YOU STARTED THAT ANALYSIS SOMETIME EARLIER THAN LAST WEEK, IS THAT A FAIR STATEMENT?

A YES.

Q AT SOME POINT IN TIME YOU REACHED THE CONCLUSION THAT THIS AGREEMENT WOULD NOT SATISFY INDEPENDENT CONTRACTOR STATUS UNDER EITHER THE IRS OR THE BORELLO STANDARD; IS THAT CORRECT?

Exhibit C

A YES BUT I WOULD LIKE TO CLARIFY MY ANSWER.
Q TELL YOU WHAT. LET'S SEE IF WE CAN GET A DATE FIRST AND WE WILL COME BACK FOR CLARIFICATION. WHEN WAS IT THAT YOU REACHED THE CONCLUSION THAT THIS AGREEMENT DID NOT SATISFY EITHER THE BORELLO OR THE IRS TEST, YOUR BEST ESTIMATE?

12092

A I DON'T KNOW THAT I CAN GIVE YOU A DATE. I WOULD HAVE TO GO BACK IN MY FILE WHICH IS MORE THAN 6 MONTHS OLD. AND I AM SORRY, I JUST -- I CAN'T GIVE YOU A DATE WITH ANY DEGREE OF RELIABILITY.
Q BUT WE DO KNOW IS MORE THAN 6 MONTHS AGO?
A I THINK THAT IS FAIR TO SAY, YES. I ASKED TO CLARIFY MY ANSWER. I STILL DON'T THINK THAT ONE CAN READ THIS SO-CALLED OPERATING AGREEMENT, WHICH YOU REFER TO AS THE CONTRACT, WITHOUT ALSO READING MANY OF THESE OTHER DOCUMENTS.
Q BEFORE WE GET TO THAT, LET ME ASK YOU THIS PARTICULAR QUESTION: EVEN WITHOUT HAVING READ THE OPERATIONS MANAGEMENT HANDBOOK OR THE FED-EX GROUND MANUAL, LOOKING AT THE FOUR CORNERS OF THE OPERATING AGREEMENT ITSELF, DO YOU BELIEVE THAT YOU CAN READ THAT AGREEMENT AND REACH THE CONCLUSION THAT IT IS NOT AN INDEPENDENT CONTRACTOR AGREEMENT?
A I THINK THAT IS A TOUGHER QUESTION, HONESTLY. I AM SORRY. THE WAY I READ IT, THE FOUR CORNERS OF THIS AGREEMENT AND HAVE NO DOUBT --
I AM SORRY, I BELIEVE THE WAY YOU ASKED YOUR QUESTION, DO I THINK ONE COULD READ IT, IS THAT WHAT YOU SAID?

Exhibit C

Q I WILL REPHRASE IT. IF WE LIMIT YOUR ANALYSIS TO THE FOUR CORNERS OF AGREEMENT ITSELF, DO YOU BELIEVE, BASED UPON YOUR EXPERIENCE AND EXPERTISE, THAT THERE IS NO DOUBT THAT IT FAILS TO MEET THE REQUIREMENTS FOR AN INDEPENDENT CONTRACTOR AGREEMENT, REGARDLESS OF

12093

WHETHER YOU ARE USING THE IRS TEST OR THE BORELLO TEST; CORRECT?

A THAT IS CORRECT.

Q NOW, YOU BELIEVE THAT COMPETENT TAX PRACTITIONER WHO REVIEWED THE SAME DOCUMENT, JUST LIMITING HIMSELF OR HERSELF TO THE FOUR CORNERS OF THE AGREEMENT, WOULD REACH THE SAME CONCLUSION YOU REACHED; CORRECT?

A I DON'T THINK I SAID THAT. I THINK WHAT I SAID WAS THAT -- THERE ARE OFTEN DISAGREEMENTS AMONG LAWYERS, EVEN COMPETENT LAWYERS, AND COMPETENT TAX LAWYERS. I AM A BIT IN A QUANDARY HERE BECAUSE I DON'T THINK THAT ANY COMPETENT TAX LAWYER --

LET ME REPHRASE IT THIS WAY: I KNOW I WOULD NOT READ THIS AGREEMENT IN ISOLATION, WHICH IS WHY IT IS A BIT DIFFICULT TO ANSWER THE QUESTION, READING THE FOUR CORNERS OF THIS DOCUMENT, AS YOU PUT IT, WITHOUT WANTING TO KNOW YES, BUT WHAT HAPPENED? BECAUSE THAT IS SO IMPORTANT IN THE CASE LAW.

IF YOU READ MICROSOFT, THE VISCANO (SIC) CASE, THE NINTH CIRCUIT CASE, IT IS SURELY DEMONSTRATING THAT A CASE LIKE BORELLO, WHICH INVOLVED CUCUMBER PICKERS, DOESN'T HAVE TO INVOLVE RANK-AND-FILE OR EVEN MIGRANT WORKERS, IT CAN HAVE VERY HIGHLY TRAINED WORKERS,

WHICH IS WHAT MICROSOFT WAS ALL ABOUT, MICROSOFT'S ATTEMPT TO ATTEMPT TO CLASSIFY PEOPLE IN A IMPROPER WAY.

THESE ARE COMPLICATED DOCUMENTS. I THINK EXACTLY WHAT THE DOCUMENT SAYS AND WHAT IN REALITY

HAPPENS -- WHICH IN THIS CASE IS MULTIFACETED. IT IS NOT ONLY WHAT THE CONTRACT SAYS, THE SO-CALLED OPERATING AGREEMENT, BUT IT IS ALSO WHAT ALL OF THESE OTHER PANOPLY OF DOCUMENTS AND MANUALS AND BUSINESS DISCUSSIONS AND EVERYTHING ELSE, VIDEOS, TRAINING VIDEOS. IT IS ALL OF THESE OTHER THINGS WHICH ARE PART AND PARCEL OF THE RELATIONSHIP, WHETHER IT BE INDEPENDENT CONTRACTOR OR EMPLOYEE, WHICH I BELIEVE I AS A COMPETENT TAX LAWYER AND I THINK MOST OTHERS -- I CANNOT SAY ALL -- WOULD WANT TO KNOW.

THOSE ARE THE THINGS THAT ONE MUST KNOW TO REACH A CONCLUSION, NOT MERELY LOOKING AT A CONTRACT. IF I COULD -- AND THEN I WILL CUT MY ANSWER SHORT -- WHICH IS WHY I KNOW I SAY SOMEWHERE IN MY BOOK -- I PROBABLY BELABOR THIS POINT -- THAT IT IS REALLY, IT IS SOMETHING THAT LAWYERS GET ASKED TO DO SOMETIMES WHICH IS WHY I DIDN'T MEAN MY COMMENT ABOUT "POSSIBLY DUPLICITOUS" EARLIER TO BE A DEROGATORY COMMENT ABOUT MR. BRADLEY OR ANYBODY ELSE.

I THINK THERE ARE TIMES WHEN LAWYERS ARE ASKED TO ACHIEVE A FUNCTION IN A CONTRACT, AND THEY MAY NOT -- THEY MAY KNOW OR THEY MAY NOT KNOW HOW IT ENDS UP GETTING APPLIED. I THINK IT IS A BAD THING IF YOU ARE TRYING TO OBEY THE LAW AND TRYING TO PAY APPROPRIATE TAXES, TRYING TO MAKE SURE THAT EMPLOYEE BENEFITS ARE

Exhibit C

PAID UNDER ERISA AND NOT VIOLATE A NON-DISCRIMINATION RULES, YOU KNOW, NOT VIOLATE TORT LAWS, YOU NAME IT.

AND UNDER EMPLOYMENT COMPENSATION RULES THERE

12095

ARE SO MANY CONSIDERATIONS, I THINK IT IS A BAD THING IN VIEW OF ALL THESE THINGS TO TRY TO DRAFT A DOCUMENT THAT SIMPLY IS A GOOD, OH, YES, A REAL GOOD DOCUMENT THAT SUPPORTS INDEPENDENT CONTRACTOR STATUS IF, IN FACT, THAT IS NOT WHAT IS GOING TO HAPPEN OR IF IN FACT THAT IS NOT WHAT HAPPENS. BECAUSE THEN IT IS NOT A GOOD AGREEMENT.

Q IT WOULD BE A BAD THING, AS YOU POINTED OUT, TO RENDER AN OPINION ONE WAY OR ANOTHER AS TO WHETHER A PARTICULAR ENTERPRISE HAD ACHIEVED INDEPENDENT CONTRACTOR STATUS OR NOT UNLESS YOU HAD FULL INFORMATION ABOUT ALL OF THOSE CRITERIA THAT YOU JUST MENTIONED, CORRECT?

A I THINK IT WOULD BE A BAD THING TO RENDER AN OPINION -- I DON'T KNOW THAT ANYONE EVER ACQUIRES ALL INFORMATION. I KNOW I PROBABLY HAVE NOT SEEN ALL THE INFORMATION IN THIS CASE. I KNOW EVEN SOME TOPICS THAT SUCH AS BUSINESS DISCUSSIONS, I MAY HAVE SEEN ONLY A BUNCH OF THEM, HUNDREDS, BUT MAYBE THERE ARE THOUSANDS. SO IT IS HARD FOR ME TO SAY AT WHAT POINT YOU REACH CRITICAL MASS AND SAY, "YOU KNOW WHAT? THIS IS ENOUGH. I AM CONVINCED."

I CAN TELL YOU THAT I ARE REACHED THE POINT IN THIS CASE --

Q I AM SURE YOU HAVE, SIR. LET ME TRY THIS. LET'S SEE IF WE CAN LIMIT OURSELVES TO YES OR NO ANSWERS WHEN IT IS CALLED FOR. I DON'T MEAN TO BE ABRUPT WITH YOU, BUT WE ARE ALL TRYING TO GET OUT OF HERE.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 187 of 227

Exhibit C

LET'S TRY THIS ON FOR SIZE. YOU WOULD AGREE WITH ME, I THINK, THAT IF, IN FACT, YOU ANALYZE THE

AGREEMENT AND DON'T LOOK AT ANYTHING ELSE AND REACH THE CONCLUSION THAT THE AGREEMENT FAILS TO SATISFY THE BORELLO TEST OR THE IRS TEST, THAT THERE REALLY IS NOT ANY POINT IN ANALYZING THE REST OF FACTS AND CIRCUMSTANCES, WOULD YOU AGREE WITH THAT?

MS. FARIS: OBJECTION, RELEVANCE.

THE COURT: OVERRULED.

THE WITNESS: BOY, THAT IS A -- I DON'T THINK I CAN AGREE WITH YOU. I THINK THERE CAN BE PLENTY OF AGREEMENTS THAT ARE -- I DON'T THINK THIS ONE WAS. THIS WAS CAREFULLY CRAFTED. I AM SURE EXPENSIVE. I THINK THERE ARE DOCUMENTS THAT ARE SHODDILY PUT TOGETHER THAT PROBABLY LOOK AND SMELL LIKE EMPLOYMENT AGREEMENTS, BUT I HAVE SEEN, IN MY OWN PERSONAL CAREER, IN 25 YEARS I HAVE SEEN THE IRS, EDD, ALL SORTS OF OTHER AGENCIES LOOK AT THINGS AND SAY, YOU KNOW WHAT, YES, THIS PERSON IS REALLY AN INDEPENDENT CONTRACTOR, EVEN THOUGH THE CONTRACT MIGHT LOOK A LITTLE BIT LIKE AN EMPLOYMENT CONTRACT.

I DON'T THINK YOU CAN LOOK AT -- THAT WASN'T THE YES OR NO ANSWER, I APOLOGIZE.

Q (By Mr. Nelson) I WAS GOING TO SAY YOU FAILED THE YES OR NO TEST. LET'S MOVE ON. LET ME SEE IF WE CAN GET THERE ONE MORE TIME. YOU HAVE READ THIS AGREEMENT STANDING ALONE?

A YES.

Q STANDING ALONE, THIS AGREEMENT YOU BELIEVE WILL NOT PASS MUSTER OR DOES NOT PASS MUSTER UNDER EITHER

Exhibit C

THE BORELLO TEST OR THE IRS TEST; CORRECT?

12097

A I DON'T THINK IT CAN BE READ STANDING ALONE, SIR. I DON'T THINK IT CAN BE READ STANDING ALONE BECAUSE, IN MY EXPERIENCE, THAT IS NOT THE TEST, EITHER THE IRS TEST OR THE BORELLO TEST.

THE COURT: WELL, SIR, LET'S GET TO THE POINT. ANSWER ME YES OR NO, PLEASE. THIS IS VERY IMPORTANT.

IT IS YOUR BELIEF THAT THE AGREEMENT IN ISSUE WOULD NOT CREATE INDEPENDENT CONTRACTOR STATUS BUT IS IN ACTUALITY AN EMPLOYMENT AGREEMENT UNDER BOTH THE BORELLO TEST AND THE IRS TEST, IS THAT CORRECT? YES OR NO?

THE WITNESS: THAT IS CORRECT.

BY MR. NELSON:

Q ALL RIGHT. AND IT IS FURTHER YOUR BELIEF THAT YOUR OPINION IS NOT ISOLATED AND THAT OTHERS IN YOUR PROFESSION WOULD AGREE WITH YOUR ASSESSMENT?

MS. FARIS: OBJECTION, RELEVANCE.

THE COURT: WELL, WOULD EVERYBODY AGREE OR JUST SOMEBODY AGREE?

MR. NELSON: I WILL REPHRASE IT.

Q IT IS YOUR BELIEF THAT ALL COMPETENT TAX PRACTITIONERS LIKE YOURSELF WOULD REACH THE SAME CONCLUSION THAT YOU JUST DESCRIBED TO THE JUDGE?

MS. FARIS: OBJECTION, ASKED AND ANSWERED AND IRRELEVANT.

THE COURT: YES OR NO.

THE WITNESS: IT IS NOT MY BELIEF THAT ALL TAX PRACTITIONERS -- I GUESS I HAVE TO SAY NO. I AM SURE THERE IS A TAX LAWYER OUT THERE WHO IS COMPETENT WHO

Exhibit C

WOULD -- MAYBE MR. BRADLEY -- SAY THE OTHER WAY. I HAVE TO SAY NO. THIS IS MY OPINION.

Q (By Mr. Nelson) BUT YOU BELIEVE THAT WERE THE IRS TO LOOK AT THIS PARTICULAR AGREEMENT, THEY WOULD INEVITABLY COME TO THE SAME CONCLUSION THAT YOU DESCRIBED TO THE COURT?

MS. FARIS: OBJECTION, THIS HAS BEEN EXCLUDED UNDER THE RULING.

THE COURT: SUSTAINED.

MR. NELSON: THIS GOES TO CREDIBILITY.

THE COURT: NO. I KNOW WHERE YOU ARE HEADING TOWARD AND IT AIN'T GOING TO WORK.

FIRST OF ALL, THE IRS OPINION WAS BASED UPON ONE, READING THE CONTRACT, AND, TWO, REPRESENTATIONS MADE BY PEOPLE FROM FED-EX GROUND. SUSTAINED. FORBIDDEN TERRITORY.

BY MR. NELSON:

Q MR. WOOD, YOU ARE CURRENTLY SELF-EMPLOYED, CORRECT?

A ACTUALLY WHEN I SAID THAT AT THE BEGINNING OF THE TESTIMONY, I --

IT IS FUNNY. I SAID IT AND I THOUGHT, GOSH, TECHNICALLY THAT IS INACCURATE BECAUSE TECHNICALLY I AM AN EMPLOYEE OF ROBERT W. WOOD PROFESSIONAL CORPORATION, WHICH IS A CORPORATION THAT I WHOLLY OWN, A COMMON METHOD. SO I AM SORRY FOR THE LAPSE OF ACCURACY BUT THAT MEANS I AM SORT OF SELF-EMPLOYED.

YES, I WORK FOR MYSELF. I HAVE MY OWN FIRM,

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 190 of 227

Exhibit C

BUT IT IS A SEPARATE LEGAL ENTITY.

Q OKAY. AT VARIOUS POINTS IN TIME AS A TAX LAWYER YOU HAVE BEEN AN EMPLOYEE, CORRECT?

A THAT IS CORRECT.

Q AT VARIOUS POINTS IN TIME YOU HAVE BEEN IN A PARTNERSHIP; IS THAT CORRECT?

A THAT IS CORRECT.

Q AT VARIOUS POINTS IN TIME HAVE YOU BEEN ACTUALLY SELF-EMPLOYED AS OPPOSED TO THE STATUS YOU DESCRIBED A MOMENT AGO?

A NO. ACTUALLY, WHEN I LEFT MY LAST PARTNERSHIP I ESTABLISHED IN 1993 MY PROFESSIONAL CORPORATION, AND I HAVE BEEN PRACTICING IN THAT ENTITY SINCE 1993, CONTINUOUSLY.

Q AND THE WORK THAT YOU HAVE DONE WHILE A TAX LAWYER AS AN EMPLOYEE, AS A SELF-EMPLOYED PERSON, AND AGAIN AS AN EMPLOYEE OF YOUR OWN PROFESSIONAL CORPORATION, THE NATURE OF THE TAX LAW WORK ITSELF DID NOT CHANGE, DID IT?

A THE NATURE OF THE TAX LAW WORK?

MS. FARIS: OBJECTION, VAGUE.

THE COURT:: OVERRULED.

THE WITNESS: THE NATURE OF THE TAX LAW WORK CHANGED ALL THE TIME.

BY MR. NELSON:

Q YOU ARE STILL ESSENTIALLY PERFORMING LAWYER WORK REGARDLESS OF WHETHER YOU CHARACTERIZE YOURSELF AS AN EMPLOYEE, SELF-EMPLOYED OR AN EMPLOYEE OF A

12100

Exhibit C

PROFESSIONAL CORPORATION?

MS. FARIS: OBJECTION, RELEVANCE.

THE COURT: OVERRULED.

THE WITNESS: I AM SORRY. I GUESS I AM GETTING TIRED. WHY DON'T YOU REPEAT THE QUESTION?

BY MR. NELSON:

Q I DON'T WANT TO WEAR YOU OUT, SIR. THE QUESTION IS THIS: YOU WERE A LAWYER IN THE CAPACITY AS AN EMPLOYEE, CORRECT?

A YES.

Q YOU WERE A LAWYER AS A SELF-EMPLOYED PERSON IN A PARTNERSHIP, CORRECT?

A I WAS A PARTNER, YES, SEVERAL PARTNERSHIPS.

Q SEVERAL PARTNERSHIPS. YOU WERE ALSO A LAWYER CURRENTLY IN YOUR OWN PROFESSIONAL CORPORATION IN WHICH YOU ARE THE SOLE SHAREHOLDER, CORRECT?

A THAT IS CORRECT.

Q WHILE YOUR OPPORTUNITY FOR PROFIT AND LOSS IN THOSE THREE ARRANGEMENTS MAY BE DIFFERENT, WHAT YOU DID AS A LAWYER WAS THE SAME, CORRECT?

A THAT IS -- AGAIN, THE NATURE OF THE TAX WORK CHANGED OVER THE YEARS AS THE TAX LAWS CHANGED, AS THE CLIENTS CHANGED, BUT MY BASIC MANNER OF OPERATION WOULD HAVE BEEN PRETTY MUCH THE SAME. YES, YOU ARE RIGHT, SIR.

Q YOU MADE SOME REFERENCES TO THE OPERATING AGREEMENT AND ITS REFERENCE TO PROVIDING COMPETITIVE LEVELS OF SERVICE. IS IT YOUR TESTIMONY THAT WITH THE DOMINANT COMPETITOR IN THE MARKETPLACE USING EMPLOYEES

12101

THAT IT IS IMPOSSIBLE TO HAVE A SELF-EMPLOYMENT

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 192 of 227

Exhibit C

RELATIONSHIP AND REQUIRE COMPETITIVE SERVICE?

A NO, SIR. I DON'T BELIEVE THAT WAS MY TESTIMONY. THAT IS CERTAINLY NOT MY BELIEF.

Q NOW, IF I RECALL YOUR RESUME CORRECTLY, YOU HAVE BEEN IN PRACTICE FOR APPROXIMATELY 25 YEARS?

A THAT'S CORRECT.

Q IN THAT TIME YOU HAVE WRITTEN MORE THAN A THOUSAND ARTICLES?

A SOMETHING LIKE THAT.

Q THE REASON I ASK THAT, SIR -- AND THIS IS SOMETHING THAT CAN HAPPEN TO US ALL -- I BELIEVE YOUR WEBSITE SAYS YOU HAVE WRITTEN THOUSANDS OF ARTICLES. I WANT TO GET A BETTER SENSE FROM YOU WHICH IS TRUE?

A GOSH, I AM NOT -- I AM NOT SURE. I HAVE A COPY OF MY RESUME HERE, AND I ACTUALLY DON'T PERSONALLY HANDLE MY WEBSITE. THAT IS A LITTLE EMBARRASSING. BUT I DON'T KNOW IF IT IS A THOUSAND, IF IS A THOUSAND AND ONE. I HONESTLY DON'T KNOW.

Q IT IS AT LEAST A THOUSAND, RIGHT?

A I THINK SO.

Q AND HOW MANY BOOKS HAVE YOU WRITTEN, SIR?

A TWENTY-EIGHT.

Q YOU HAVE CONTRIBUTED TO ABOUT 16 OTHERS; IS THAT CORRECT?

A NO. CONTRIBUTIONS OF CHAPTERS, YOU MEAN?

Q YES.

A I DON'T KNOW THAT NUMBER OFFHAND. I THINK IT

12102

IS IN MY MATERIALS. I HAVE A COPY UP HERE.

Q GO AHEAD AND REFRESH YOUR RECOLLECTION.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 193 of 227

Exhibit C

A SIR, IT IS THE BOOKS, CHAPTERS AND MONOGRAPHS OR THE CHAPTERS? I AM NOT SURE WHAT PORTION OF THIS YOU ARE ALLUDING TO.

Q ACTUALLY, SIR, IT WAS KIND OF A SIMPLE QUESTION. HOW MANY BOOKS HAVE YOU CONTRIBUTED TO THAT WERE NOT ONES THAT YOU WROTE YOURSELF OR CO-AUTHORED?

A I WOULD HAVE TO COUNT THESE UP AND MAKE SURE IS NO DUPLICATION. I DON'T KNOW. MORE THAN A DOZEN, I GUESS.

Q SO THAT WOULD PUT YOU SOMEWHERE IN THE -- IF WE ADD THAT TO THE 28, THAT WOULD PUT YOU AT ROUGHLY 40 BOOKS THAT YOU HAVE WRITTEN OR CONTRIBUTED SUBSTANTIAL CHAPTERS TO?

A I DON'T KNOW THAT THAT IS FAIR -- I MEAN, I WOULD LIKE TO GIVE ACCOLADES ABOUT MYSELF, BUT I DON'T THINK THAT IS FAIR TO SAY. I DON'T THINK SOME OF THESE CHAPTERS ARE VERY SUBSTANTIAL.

Q HOW MANY OF THE BOOKS THAT YOU WROTE ARE YOU STILL UPDATING?

A MOST OF THEM NOT. I AM TRYING NOT TO DO AS MUCH OF THAT. I TRY TO MAKE THE DECISION WHAT IS IMPORTANT AND WHAT ISN'T.

Q THAT'S WHAT I WANT TO TRY TO GET TO, WHAT IS IMPORTANT AND WHAT IS NOT. IF YOU HAVE WRITTEN MORE THAN A THOUSAND ARTICLES IN YOUR 25 YEARS OF PRACTICE, THAT IS ROUGHLY 40 A YEAR, CORRECT?

12103

A I AM NOT VERY GOOD AT MATH BUT I CAN --

Q WOW. ALL RIGHT. I CAN'T ARGUE WITH THAT ONE.

Exhibit C

THE COURT: AND YOU ARE A TAX LAWYER?

Q (By Mr. Nelson) ANYWAY. IF THE NUMBER OF BOOKS --

MS. FARIS: BUT NOT AN ACCOUNTANT.

Q (By Mr. Nelson) IF THE NUMBER OF BOOKS YOU HAVE CONTRIBUTED TO OR WRITTEN YOURSELF IS 28, THAT IS MORE THAN ONE A YEAR BEING CORRECT?

A THAT'S CORRECT.

Q SO AM I CORRECT THAT GENERALLY SPEAKING, IF WE MEASURED YOUR CAREER AS A WHOLE AT THIS POINT WE WOULD FIND YOU WRITING AND AVERAGE OF 40 ARTICLES A YEAR AND ONE BOOK A YEAR ON TOP OF YOUR PRACTICE?

A AGAIN, I AM NOT TRYING TO FENCE WITH YOU BUT I JUST -- THAT SOUNDS ABOUT RIGHT. IF YOU ARE TRYING TO ASK IT IN A DIFFERENT WAY, HAVE I SPENT A LOT OF MY TIME PRACTICING AND A LOT OF MY TIME WRITING AND SPEAKING, THE ANSWER IS YES.

Q THE VAST MAJORITY OF THOSE ARTICLES, OR AT LEAST A SIGNIFICANT MAJORITY OF THOSE ARTICLES -- I WILL REPHRASE MY OWN QUESTION -- HAVE TO DO WITH THE ISSUE OF TAXATION OF JUDGMENTS AND UNLAWFUL TERMINATION SETTLEMENTS?

A NO. I WOULD SAY THAT THE SINGLE MOST SUCCESSFUL BOOK THAT I DID WAS ABOUT TAXATION OF DAMAGE AWARDS AND SETTLEMENT PAYMENTS AND AS AN OUTGROWTH WHICH

12104

IS ALSO IN ITS THIRD EDITION ABOUT TO COME OUT, THIS INDEPENDENT CONTRACTOR BOOK WAS ALSO SUCCESSFUL. BUT I GUESS AS A RESULT OF THE DAMAGE AWARDS TOPIC, BEING ONE THAT WAS PROBABLY EVEN MORE PREVALENT IN MY EXPERIENCE,

Exhibit C

NOT ONLY IN CALIFORNIA BUT NATIONWIDE, YES, I WROTE -- I HAVE WRITTEN MORE ABOUT THAT SUBJECT, BUT NOT MERELY WRONGFUL TERMINATION, ABOUT EVERY ASPECT. EMPLOYMENT CASES, TORT CASES, STRUCTURED SETTLEMENTS AND ANTITRUST CASES, DIVORCE CASES, ET CETERA, THE TAX ASPECTS ALL OF THEM.

Q YOU HAVE NO BACKGROUND IN THE U.S. DEPARTMENT OF TRANSPORTATION REGULATIONS; CORRECT?

A I DO NOT HAVE ANY DEPARTMENT OF TRANSPORTATION BACKGROUND.

Q YOU HAVE NEVER DRAFTED AN INDEPENDENT CONTRACTOR AGREEMENT FOR AN EMPLOYER OR OTHER ENTITY THAT WAS IN THE TRANSPORTATION FIELD, CORRECT?

A I JUST WANT TO BE CAREFUL. TRANSPORTATION, I BELIEVE I HAVE.

Q HAVE YOU EVER DRAFTED AN AGREEMENT FOR A MOTOR CARRIER?

A NO.

Q I BELIEVE YOU SAID THE AGREEMENT WE HAVE MARKED AS EXHIBIT 117 IS THE VERSION OF THE OPERATING AGREEMENT THAT YOU REVIEWED. CORRECT?

A YES, THAT'S CORRECT.

THE COURT: MR. NELSON, WE ARE GOING TO TAKE A BREAK NOW UNTIL 3:35. THANK YOU.

12105

(RECESS.)

THE COURT: ESTRADA VERSUS FED-EX GROUND. ALL COUNSEL ARE PRESENT. MR. WOOD IS ON THE STAND. YOU MAY CONTINUE, MR. NELSON.

BY MR. NELSON:

Exhibit C

Q MR. WOOD, YOU TESTIFIED EXHIBIT 117 CONTAINS NOTES THAT YOU MADE WITHIN THE LAST DAY OR SO?

A YES. I THINK I SAID 24 TO 36 HOURS, TRYING TO BE ACCURATE, YES, SOMETHING LIKE THAT.

Q THE NOTES ON THE COVER PAGE WERE MADE THIS MORNING, CORRECT?

A I KNOW MR. MCNALLY'S CARTAGE WAS MADE THIS MORNING. I AM NOT SURE ABOUT THE OTHER ONE.

Q ALL THE NOTES ON HERE ARE YOUR NOTES TO YOURSELF BASED UPON THE AGREEMENT?

A THEY ARE ALL MY NOTES, YES. THEY ARE ALL BASED ON MY OWN ANALYSIS. THIS IS NOT THE ONLY COPY OF THE AGREEMENT I HAVE HAD. IT WAS A CLEAN COPY THAT I HAD AS OF YESTERDAY OR SOMETHING LIKE THAT AND I STARTED SCRIBBLING ON IT.

THE COURT: IS ALL THE HANDWRITING ON 117 YOUR HANDWRITING?

THE WITNESS: IT IS, SIR.

BY MR. NELSON:

Q YOU ARE THE SOLE SOURCE OF INPUT OF THE NOTES YOU INPUT INTO THIS DOCUMENT; IS THAT CORRECT?

A THAT'S CORRECT.

Q HAVE YOU CONDUCTED ANY RESEARCH IN THE LAST

12106

36 HOURS ON ANY TOPIC RELATED TO YOUR TESTIMONY HERE TODAY?

A I DID SOME BRIEF CASE REVIEW. I THINK I LOOKED AT SOME OF THE BORELLO AGAIN -- AT SOME OF THE OTHER CASES CITED BY BORELLO. I TOOK A LOOK AT THE OLD 1947 SUPREME COURT CASE TO WHICH MR. BRADLEY ALLUDED TO.

Exhibit C

I DID A LITTLE OF THAT SORT OF THING, BUT MOSTLY I BELIEVE I FLIPPED THROUGH DOCUMENTS THAT I HAD LOOKED AT BRIEFLY TO KIND OF REFRESH MY MEMORY SINCE IT HAS BEEN SOME TIME.

Q YOU HAVE NOT DONE ANY DEPARTMENT OF TRANSPORTATION REGULATION RESEARCH, CORRECT?

A I HAVE NOT.

Q AND WITH RESPECT TO THESE CASES THAT YOU LOOKED AT, IS IT STILL FAIR TO SAY THAT THERE IS NO DECISION RATTLING AROUND OUT THERE WHERE THE MERE EXISTENCE OF A UNIFORM REQUIREMENT IS ENOUGH TO MAKE SOMEONE AN EMPLOYEE INSTEAD OF AN INDEPENDENT CONTRACTOR?

A THE MERE EXISTENCE OF A REQUIREMENT THAT SOMEONE WEAR A UNIFORM?

Q THAT'S CORRECT?

A I AM NOT -- I DON'T RECALL ONE. I AM NOT AWARE OF ONE.

Q INDEED, MOST OF THE CASES AT THE U.S. SUPREME COURT, INCLUDING SILK, INVOLVE EITHER A FORM CONTRACT OR UNIFORM REQUIREMENT; IS THAT CORRECT?

MS. FARIS: OBJECTION, VAGUE. MOST OF WHAT CASES?

12107

BY MR. NELSON:

Q INDEPENDENT CONTRACTOR CASES?

MS. FARIS: I DON'T KNOW THAT THAT IS ANY BETTER. I THINK THAT IS STILL VAGUE.

THE COURT: CAN YOU --

MS. FARIS: THERE COULD BE HUNDREDS OF THEM.

BY MR. NELSON:

Exhibit C

Q YOU READ A LOT OF CASES WRITING THESE BOOKS, RIGHT?

A YES, SIR, I HAVE.

Q NOW, WITH RESPECT TO THE CASES THAT YOU HAVE READ, HAVE YOU SEEN IN CONTRACTOR CASES WHERE THE INDEPENDENT CONTRACTOR STATUS WAS UPHELD WHERE THE BUSINESS ENTITY REQUIRED THE ALLEGED CONTRACTOR TO WEAR A UNIFORM?

A I WOULD HAVE TO LOOK IN MY OWN BOOK, BUT I BELIEVE SO. I WOULD LIKE TO CLARIFY MY ANSWER JUST BY SAYING THAT YOUR QUESTION IMPLIES THAT, AND YOUR PRIOR QUESTION ALSO IMPLIED THAT, THE SUPREME COURT OR ANY COURT LOOKS AT ONE THING, WHETHER IT BE YOU UNIFORM OR SOMETHING ELSE. AND THAT I MUST ASSURE YOU, SIR, IS MOST DISTINCTLY NOT THE CASE.

Q NONETHELESS, THERE ARE CASES WHERE INDEPENDENT CONTRACTOR STATUS IS UPHELD, NOTWITHSTANDING THE PRESENCE OF A UNIFORM REQUIREMENT; IS THAT CORRECT?

A I SAID I BELIEVE THAT IS TRUE.

Q AND CASES WHERE INDEPENDENT CONTRACTOR STATUS IS UPHELD, NOTWITHSTANDING THE FACT THAT A FORM CONTRACT

12108

IS USED, IS THAT TRUE?

A I BELIEVE THAT IS ALSO TRUE.

Q IT IS ALSO THE CASE WHEN YOU ARE LOOKING AT THE ISSUE OF WHETHER EXCESS CONTROL IS USED UNDER THE BORELLO STANDARD OR THE IRS TEST, EITHER ONE, THAT CONTROL IMPOSED BY LAW IS DISREGARDED; CORRECT?

A I THINK THAT IS A MIXED ANSWER. I DON'T THINK IT IS A YES OR NO ANSWER. I THINK A CONTROL

Exhibit C

MANDATED BY LAW, IF IT IS --

YOU MAY BE REFERRING TO DEPARTMENT OF TRANSPORTATION REQUIREMENT THAT A PARTICULAR LICENSE BE CARRIED UNDER A CERTAIN NAME AND THAT SORT OF THING. THOSE SORTS OF THING, YES, INDEED, SIR, DISREGARDED. I THINK MANY OTHER LEGAL REQUIREMENTS IN TERMS OF THE MANNER IN WHICH THE REQUIREMENT IS IMPOSED WITH SOME DEGREE OF DISCRETION ARE NOT DISREGARDED.

Q LET'S GO TO YOUR BATHROOM REMODELING EXHIBIT FOR A MOMENT. YOU WOULD AGREE WITH ME THAT YOU AS THE OWNER IN THAT HYPOTHETICAL YOU USED HAS THE RIGHT TO TELL THE CONTRACTOR WHEN HE OR SHE CAN START WORK?

A YES. THAT'S CORRECT.

Q THAT RIGHT DOES NOT DESTROY THE INDEPENDENT CONTRACTOR STATUS; CORRECT?

A THAT RIGHT BY ITSELF. BUT, AGAIN, I WOULD SUGGEST TO YOU, JUST AS WITH THE UNIFORM, AND I DON'T MEAN TO BE ARGUMENTATIVE, BUT YOU ARE TAKING ISOLATED INCIDENTS INSTEAD OF COBBLING TOGETHER IN A CONTRACT A WHOLE SERIES OF THINGS WHERE I MAY HAVE ANNUAL RENEWALS

12109

WITH MY BATHROOM CONTRACTOR FOR THE NEXT TEN YEARS. THAT IT IS A VERY DIFFERENT CASE FROM THE ONE THAT YOU ARE POSITING TO ME, SIR.

Q LET'S GO TO THE OTHER END OF THE SPECTRUM. YOU AS THE HOMEOWNER, WITHOUT CREATING A RELATIONSHIP, CAN TELL THE CONTRACTOR "I WANT YOU OUT OF HERE AT 5:00 P.M.," IS THAT RIGHT?

A YES, SIR.

Q YOU CAN TELL THE BATHROOM REMODELER WHAT KIND

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 200 of 227

Exhibit C

OF TILE YOU WANT USED, CORRECT?

A YES, SIR.

Q YOU CAN TELL HIM WHAT COLOR YOU WANT USED, CORRECT?

A YES, SIR.

Q YOU CAN TELL HIM NOT TO PARK IN YOUR DRIVEWAY BUT HE NEEDS TO PARK ON THE STREET, CORRECT?

A YES, SIR.

Q YOU CAN TELL HIM ALL THOSE THINGS WITHOUT DESTROYING THE IN CONTRACTOR RELATIONSHIP, CORRECT?

A YES, SIR.

Q NOW, LET ME DIRECT YOUR ATTENTION EXHIBIT 117, ALTHOUGH THE NUMBERING SYSTEM IS EVEN MORE FOREIGN THAN I AM ACCUSTOMED TO. IT LOOKS LIKE 3-6.

THE COURT: LET'S USE THE PRINTED NUMBER IN THE PAGE.

BY MR. NELSON:

Q PRINTED PAGE NO. 3.

A YES.

12110

Q BOTTOM OF THE PAGE, YOU HAVE CIRCLED 49 CFR (2) (1). THAT'S CORRECT, ISN'T IT?

A YES.

Q THEN THERE IS AN ARROW THAT GOES DOWN TO SOME HANDWRITTEN TEXT WHICH IS VERY HARD TO READ ON THE COPY BUT SEEMS TO SAY NOW 49 CFR 376. CAN YOU FINISH WHAT IT SAYS?

A MAYBE 376.12 (C) (1). I CANNOT READ IT VERY WELL.

Q WHERE DID YOU GET THE NUMBER FROM, SIR?

Exhibit C

A I ACTUALLY DON'T KNOW. I ACTUALLY DON'T KNOW WHERE THAT NUMBER CAME FROM.

Q LET ME TRY THIS, DID YOU GET IT FROM COUNSEL?

A NOT TO MY KNOWLEDGE. AND I AM EMBARRASSED TO SAY THAT I THOUGHT ALL OF THE MARKS ON THIS DOCUMENT WERE DONE BY ME. CERTAINLY ALL THE ONES IN MY HANDWRITING WERE DONE IN THE LAST 24 TO 36 HOURS. I NOW SEE THAT THIS -- WHICH I DON'T THINK IS MY HANDWRITING. AND I CAN TELL YOU I DIDN'T DO IT WITHIN THE LAST 24 TO 36 HOURS. I DON'T KNOW WHERE THAT CAME FROM. AND I HOPE THAT IS EVIDENCE OF MY NOT ONLY GOOD FAITH IN TRYING TO ANSWER THESE ACCURATELY, BUT ALSO THAT I WAS NOT REALLY PAYING ATTENTION TO WHAT APPEARS TO BE ICC OR DEPARTMENT OF TRANSPORTATION REGULATIONS. BUT I DON'T KNOW, SIR, WHERE THAT INTERLINEATION CAME FROM.

Q SO YOUR TESTIMONY IS THAT INTERLINEATION IS NOT YOUR HANDWRITING?

A IT IS NOT.

12111

Q DO YOU KNOW WHOSE IT IS?

A I DON'T.

Q LET'S MOVE ON TO YOUR DEFINITION OF "INTEGRAL." IN YOUR DIRECT TESTIMONY, YOU USED THAT TERM AND THEN SAID IN THE SENSE THAT YOU CANNOT FUNCTION WITHOUT THEM OR WORDS TO THAT EFFECT. IS THAT YOUR DEFINITION OF WHAT "INTEGRAL" MEANS FOR PURPOSES OF YOUR TESTIMONY HERE TODAY?

A I THINK I SAID THAT. I DON'T KNOW THAT I HAVE A DEFINITION. I THINK CORE BUSINESS IS ANOTHER TERM I USED. I THINK IN -- IT IS KIND OF A QUALITATIVE TEST,

Exhibit C

IF YOU WILL, HOW IMPORTANT IS IT.

I KNOW I HAVE ALLUDED OR TESTIFIED THIS MORNING OR THIS AFTERNOON ABOUT AN ANALOGY TO THE BORELLO CASE ITSELF WHERE THE CUCUMBER PICKERS WERE NOT THE ONLY PART OF THE FARM OPERATION, BUT WITH FED-EX GROUND YOU CAN'T RUN A PACKAGE DELIVERY BUSINESS WITHOUT PACKAGE DELIVERY PERSONS, REGARDLESS OF WHAT THEIR PUTATIVE STATUS IS.

Q DO YOU KNOW THAT FOR A FACT, SIR? HAVE YOU EVER OPERATED A PICKUP AND DELIVERY SERVICE?

A NO, SIR, I HAVEN'T.

Q YOU WERE HERE FOR MR. MCNALLY'S TESTIMONY HERE TODAY, THAT HE WAS A CARTAGE AGENT, NOT A P&D CONTRACTOR. DID YOU FACTOR THAT INTO YOUR ANALYSIS?

A INTO MY ANALYSIS OF WHETHER I HAVE EVER BEEN A CARTAGE AGENT?

Q WELL, I DON'T KNOW. HAVE YOU, SIR?

12112

A NO.

Q DID YOU FACTOR MR. MCNALLY'S STATUS AS A CARTAGE AGENT INTO YOUR ANALYSIS THAT THERE IS NO WAY TO PROVIDE PICKUP AND DELIVERY SERVICE WITHOUT EMPLOYEE DRIVERS?

A MAYBE I MISSPOKE A MOMENT AGO. LET ME TRY TO CLARIFY WHAT I MEANT. I DON'T THINK THERE IS A WAY TO CONDUCT -- I GUESS, AS YOU ARE SAYING, IT IS OBVIOUS I AM NOT AN EXPERT ON PICKUP AND DELIVERY SERVICE, HAVE NEVER OPERATED ONE IN ANY CAPACITY. I DON'T KNOW IF IT IS POSSIBLE, BASED ON ALL OF WHAT I HAVE READ HERE, AND SOME OF THIS I SUPPOSE IS JUST COMMON SENSE AS A BUSINESS

Exhibit C

PERSON AND AS A LARGE USER OF FED-EX AIR, FED-EX GROUND AND UPS AND A LOT OF OTHER CARRIERS. I DON'T THINK IT IS POSSIBLE TO OPERATE A CARRIER SERVICE SUCH AS FED-EX GROUND IN THE DETAILED AND INCREDIBLY EFFICIENT, IN MY EXPERIENCE, AND INCREDIBLY RELIABLE, IN MY EXPERIENCE, FASHION WITHOUT ENORMOUS CONTROLS AND THE TYPE OF CONTROLS ONE MUST HAVE OVER EMPLOYEES.

Q SO YOUR OPINION IS THAT IN PROVIDING PICKUP AND DELIVERY SERVICE OF SMALL PACKAGES, IT CANNOT BE DONE WITHOUT USING EMPLOYEES?

A I DON'T THINK THAT IS QUITE WHAT I SAID. I THINK I WAS SAYING ON THE SCOPE OF THE MILLIONS OR WHATEVER IT IS. I KNOW IT IS A HUGE NUMBER THAT YOU ADVERTISE OR YOUR CLIENT ADVERTISES WITH ALL OF THE TRACKING, WHICH I KNOW IS THE HALLMARK OF RPS BEFORE ITS ACQUISITION BY FED-EX. I DON'T THINK IT IS POSSIBLE TO

12113

OPERATE WITH ALL OF THOSE CONTROLS WITHOUT EMPLOYEES.

Q I THINK EARLIER YOU SAID THAT AMONG THE THINGS THE CONTRACTOR WOULD NOT KNOW ABOUT FROM THE OPERATING AGREEMENT IS EXACTLY WHAT HIS PERSONAL APPEARANCE SHOULD BE WHEN OPERATING UNDER THIS CONTRACT. IS THAT YOUR OPINION?

A I AM NOT SURE EXACTLY WHAT I SAID. I DO KNOW THAT PERSONAL APPEARANCE, UNIFORM APPEARANCE, AND THERE ARE MANY THINGS ALLUDED TO IN THE MANUALS, IF YOU WILL PERMIT ME TO CHARACTERIZE THEM COLLECTIVELY THAT WAY, AND IN THESE OTHER DOCUMENTS THAT I AM NOT ALLOWED TO REFER TO, BUT I ALSO THINK THERE WERE ADDENDA TO THE CONTRACT WHICH I KNOW I DIDN'T COPY --

Exhibit C

Q MR. WOOD, I DON'T MEAN TO INTERRUPT YOU. IT WAS SORT OF A YES OR NO QUESTION. WE ARE TRYING TO GET OUT OF HERE.

A I AM SORRY. I WILL TRY TO ANSWER.

Q LET'S TRY IT THIS WAY. IT IS YOUR BELIEF THAT CONTRACTOR READING THE OPERATING AGREEMENT WOULD NOT HAVE ENOUGH INFORMATION TO KNOW WHAT HIS PERSONAL APPEARANCE STANDARD WAS WITHOUT RESORTING TO SOME OTHER EXTRINSIC DOCUMENT?

A EXTRINSIC DOCUMENT -- I AM NOT TRYING TO TURN THIS INTO A NON-YES OR NO ANSWER. IT DOESN'T SAY YOU HAVE TO HAVE YOUR HAIR CUT ABOVE YOUR EARS IT DOESN'T SAY YOU CANNOT HAVE FACIAL HAIR, IT DOESN'T SAY IN THERE YOU CANNOT WEAR BLACK SHOES OR ORANGE SHOES OR WHITE SHOES. IT DOESN'T SAY YOU CANNOT OR CAN WEAR SHORTS.

12114

I MEAN, I THINK THERE IS A LOT OF THINGS THAT MAYBE IT IS COMMON SENSE. IT DOESN'T SEEM TO ME IT IS GIVEN. I UNDERSTAND THERE WAS DISCIPLINE OVER A LOT OF THIS. SO I DON'T THINK THAT YOU CAN, BASED ON THIS DOCUMENT, KNOW WHAT YOUR PERSONAL APPEARANCE MUST BE.

Q MR. WOOD, IN YOUR CAREFUL EFFORT TO AVOID TALKING ABOUT THE BUSINESS DISCUSSIONS, WHAT IS THE BASIS IN THE OPERATION BUSINESS OPERATIONS MANAGEMENT HANDBOOK OR THE POLICY MANUAL THAT THERE IS A LOT OF DISCIPLINE OVER ALL OF THIS?

A I BEG YOUR PARDON. THAT PROBABLY DOES MENTION THOSE.

Q MR. WOOD, LET ME TAKE YOU TO SECTION 1.15 OF THE AGREEMENT WHICH IS PAGE 10 ON EXHIBIT 117. THIS IS A

Exhibit C

PROVISION, 1.15, DEALING WITH THE DISCRETION OF THE CONTRACTOR TO DETERMINE METHOD AND MEANS OF MEETING OBJECTIVES.

NOW, AS YOU READ THIS CONTRACT, YOU BELIEVE THAT THERE ARE OTHER PROVISIONS IN THE AGREEMENT THAT CONFLICT WITH THIS SECTION OF THE AGREEMENT?

A YES, SIR, I DO.

Q SO IT IS YOUR VIEW THAT THE CONTRACT VIOLATES ITSELF?

MS. FARIS: OBJECTION, ARGUMENTATIVE, VAGUE.

THE COURT: OVERRULED, GOOD QUESTION.

THE WITNESS: I THINK THE CONTRACT -- I THINK THE CONTRACT -- I DON'T KNOW IF THAT IS THE WAY I WOULD PHRASE IT -- IS IT INCONSISTENT WITH ITSELF. DOES IT

12115

HAVE CONFLICTING PROVISIONS? I WOULD HAVE TO SAY YES. THERE ARE MANY CONTRACTS THAT HAVE A GENERAL PROVISION AND THAT HAVE MORE SPECIFIC PROVISIONS SOMEWHERE ELSE. IT IS GENERALLY, I THINK, HORNBOOK LAW FROM THE CONTRACTS I TOOK 28 YEARS AGO OR SOMETHING THAT WHERE YOU HAVE SOMETHING THAT IS MUCH MORE SPECIFIC -- IT IS CERTAINLY TRUE IN THE INTERNAL REVENUE CODE AND ALL THE STATE TAX LAWS AS WELL -- WHERE IF YOU HAVE SOMETHING, A GENERAL PRINCIPLE, AND THEN YOU HAVE ANOTHER PROVISION MUCH MORE SPECIFIC, YOU LOOK TO THE SPECIFIC PROVISION CONTROLLING. THAT IS WHAT I MEANT.

Q (By Mr. Nelson) WOULD YOU AGREE THAT AT LEAST ONE RATIONAL INTERPRETATION OF SECTION 1.15 IS THAT IT OPERATES AS AN OVERALL LIMITATION TO INTERPRETATIONS OF THE AGREEMENT IN ANY OTHER DOCUMENTS THAT THE COMPANY

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 206 of 227

Exhibit C

MIGHT GENERATE THAT ARE INCONSISTENT WITH THE TRUE INDEPENDENT CONTRACTOR STATUS SOUGHT TO BE CREATED?

A I HAVE TO ANSWER THAT QUESTION NO.

Q ALL RIGHT.

A I DON'T THINK THAT IS A REASONABLE INTERPRETATION.

Q LET'S MOVE ON TO --

THE COURT: IN OTHER WORDS, IF THERE IS SOMETHING IN ONE OF THE MANUALS THAT WOULD BE INCONSISTENT WITH INDEPENDENT CONTRACTOR STATUS, YOU DON'T BELIEVE THAT 1.15 WOULD MAKE THOSE OTHER PROVISIONS A NULLITY?

THE WITNESS: THAT IS CORRECT. I GUESS THE GLOSS I HAVE TO ADD TO YOUR QUESTION WOULD BE, PARTICULARLY WHERE

12116

IF THERE IS ANY EVIDENCE --

LET MET PUT IT IN THE CONDITIONAL. IF THERE IS ANY EVIDENCE THAT ANY OF THESE CONDITIONS IN THE MANUALS HAD BEEN ENFORCED, I DON'T THINK THAT MAKES THIS 1.14 -- PARDON ME -- 1.15 OVERRIDING WHAT I ALLUDED TO EARLIER AS AN ATTEMPTING SAVINGS CLAUSE. I DON'T THINK IT DOES THAT.

Q (By Mr. Nelson) YOU INCLUDE SAVINGS CLAUSES IN THE INDEPENDENT CONTRACTOR AGREEMENTS THAT YOU WRITE, CORRECT?

A I DON'T THINK I HAVE DONE IT EVERY TIME. I HAVE DONE IT A NUMBER OF TIMES, YES.

Q YOU HAVE INCLUDED LANGUAGE SIMILAR TO THAT IN SECTION 1.15 IN THE SENSE THAT YOU INCLUDE LANGUAGE SAYING THE GOAL IS TO CREATE AND PRESERVE AN INDEPENDENT CONTRACTOR RELATIONSHIP AND THAT NOTHING THAT WE DO

Exhibit C

OUTSIDE THIS AGREEMENT CAN INTERFERE WITH THIS GOAL. WOULD THAT BE CORRECT?

A I THINK THAT HAS BEEN MY INTENT IN DRAFTING SUCH A THING. HOWEVER, IF I COULD CLARIFY --

Q ACTUALLY, NO, I WILL NOT HAVE YOU CLARIFY, SIR, MOSTLY BECAUSE WE HAVE ONLY FIVE MORE MINUTES HERE AS I UNDERSTAND IT.

A I WOULD JUST SAY IT IS AN IMPORTANT CLARIFICATION, IF YOU DON'T MIND, YOUR HONOR. THAT IS, I HAVE NEVER DRAFTED A SAVINGS CLAUSE WHERE THERE HAS BEEN A MANUAL OR MANUALS THAT ARE INCONSISTENT WITH THE CONTRACT.

12117

Q DID YOU FACTOR -- LET ME GO BACK. YOU SAID I THINK ON THE ASSIGNMENT CLAUSE, SECTION 18 OF THE AGREEMENT, ON PAGE 36, YOU ACTUALLY THOUGHT THAT THE INCLUSION OF THAT LANGUAGE MADE IT LESS RATHER THAN MORE LIKELY TO PASS INDEPENDENT CONTRACTOR SCRUTINY; CORRECT?

A I DID SAY THAT, SIR, YES.

Q IT IS YOUR BELIEF THIS CONTRACT WOULD BE STRONGER IF ASSIGNMENTS WERE NOT DEALT WITH IN THE AGREEMENT, IS THAT CORRECT?

A OH, BOY. IT IS KIND OF LIKE COMPARING WEAK AND WEAK. IT IS DIFFICULT FOR ME TO ANSWER THAT. I DON'T THINK IT HELPED MATTERS.

Q SO YOU THINK THAT THE FACT THAT CONTRACTORS CAN ASSIGN THEIR INTEREST TO SOMEONE ELSE REGARDLESS OF THE LIMITATIONS IMPOSED MAKES THEM MORE LIKELY TO BE EMPLOYEES THAN IT MAKE THEM TO BE INDEPENDENT CONTRACTORS; IS THAT CORRECT?

Exhibit C

A I THINK -- I HOPE I WAS CLEARER THAN THAT THIS MORNING. WHAT I WAS TRYING TO SAY WAS THAT GIVEN THE LIMITATIONS IMPOSED, AS YOU JUST SAID -- YOU SAID NOTWITHSTANDING THE LIMITATIONS IMPOSED -- THAT GIVEN THE LIMITATIONS IMPOSED THAT, IN EFFECT, THERE IS NO RIGHT TO ASSIGN SIMPLY BECAUSE THE CONDITIONS -- THE HURDLES ARE GREAT AND THEY ARE ENTIRELY WITHIN THE CONTROL OF THE EMPLOYER HERE.

Q HOW DO YOU KNOW THAT, SIR?

A I BELIEVE I KNOW THAT FROM DOCUMENTS I AM NOT SUPPOSED TO REFER TO.

12118

MR. NELSON: CAN WE MOVE IT STRIKE THAT LAST PIECE OF TESTIMONY?

THE COURT: OF COURSE. GRANTED.

BY MR. NELSON:

Q YOU SAID ON PAGE 29 OF THE AGREEMENT --

LET ME ASK YOUR HONOR'S PREFERENCE. I CAN TRY AND BE DONE IN 28 SECONDS, I DON'T KNOW WHAT YOU WANT TO DO ABOUT REDIRECT?

THE COURT: WILL THERE BE REDIRECT?

MS. FARIS: I WILL WAIVE REDIRECT.

BY MR. NELSON:

Q I WILL GET IT DONE THEN. MR. WOOD, SECTION 11.1 AND 11.2 ON PAGE 29, LET ME DIRECT YOUR ATTENTION THERE. EARLIER I BELIEVE YOU SAID THAT THE DOCUMENT WE MARKED AS EXHIBIT 117 IS THE VERSION OF THE AGREEMENT THAT YOU HAVE BEEN REVIEWING OVER THE YEARS; CORRECT?

A BOY, I WANT TO BE TO BE CAREFUL HERE. I DON'T KNOW HOW MANY DIFFERENT VERSIONS OF THIS. I KNOW

Exhibit C

YOU SAID THE FIRST THING THIS MORNING THERE MIGHT BE MANY DIFFERENT VERSIONS. I MAY HAVE DIFFERENT VERSIONS. I DON'T KNOW THAT THIS IS THE ONLY ONE I HAVE REVIEWED, HONESTLY.

Q THERE IS A REFERENCE IN HANDWRITTEN TERMS ON 11.1, I THINK, THAT PHRASE IS "MAXIMUM NOW." IS THAT YOUR HANDWRITING?

A THAT IS MY HANDWRITING.

Q IS THAT WHAT IT SAYS?

A YES, IT SAYS UNDER "THREE YEARS" AND 11.1, IT SAYS "MAXIMUM NOW." THAT IS MY HANDWRITING.

Q AND THE INFORMATION THAT THE MAXIMUM NOW IS THREE YEARS CAME FROM EITHER THE FED-EX GROUND MANUAL OR THE OPERATIONS HANDBOOK?

A I HAVE A GENERAL UNDERSTANDING THAT IT USED TO BE ONE TO FIVE YEARS AND NOW IT IS MAXIMUM THREE, BUT I DON'T REMEMBER WHERE I READ THAT.

Q YOU WERE FAIRLY EMPHATIC THERE ARE LIMITATIONS IN THE OPERATIONS MANAGEMENT HANDBOOK AND/OR THE FED-EX GROUND POLICY MANUAL THAT DICTATE TIMES DRIVERS MUST START AND ENDING TIMES FOR DRIVERS?

A THAT IS MY RECOLLECTION, YES, SIR.

Q DOES THE EXISTENCE OF CONTRACTORS WHO OWN INTEREST IN MORE THAN ONE WORK AREA AT ALL AFFECT YOUR OPINION AS TO WHETHER THIS IS A VALID INDEPENDENT CONTRACTOR RELATIONSHIP?

A IT DOES. I DID TAKE THAT INTO ACCOUNT. I KNOW THERE ARE SOME DRIVERS WHO HAVE MULTIPLE ROUTES.

Q HOW MANY WERE YOU TOLD HAD MULTIPLE ROUTES?

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 210 of 227

Exhibit C

A I DON'T RECALL THAT.

Q WERE YOU TOLD IT WAS A SMALL NUMBER?

A I DON'T THINK SO. I THINK WHAT IMPRESSED ME THE MOST WAS THE APPROVAL PROCEDURES, WHICH AGAIN I GO TO RIGHT TO CONTROL BEING THE HALLMARK UNDER BORELLO OR ANY OTHER IRS TEST. ABOUT APPROVAL PROCEDURES TO GET ANOTHER ROUTE, APPROVAL PROCEDURES TO GET ANOTHER VAN, TO GET HELPERS. THOSE WERE THE THINGS THAT CONCERNED ME, NOT THE MERE FACT THAT SOME PEOPLE DID HAVE, WHATEVER NUMBER,

12120

MULTIPLE ROUTES.

Q IT IS YOUR BELIEF YOU HAVE TO GET APPROVAL TO HAVE A HELPER?

A THE HELPER MUST MEET CERTAIN CRITERIA AND THAT THOSE CRITERIA ARE WITHIN THE CONTROL OF THE COMPANY.

Q YOU HOLD THE SAME OPINION AS TO SECOND VAN DRIVERS, CORRECT?

A THAT'S MY RECOLLECTION, SIR.

MR. NELSON: WELL, YOUR HONOR, I THINK I WILL JUST -- WE ARE AT 4:00 O'CLOCK. RATHER THAN DRAG THIS OUT TO ANOTHER DAY, ALTHOUGH I AM SURE WE CAN HAVE A LENGTHY CHAT ABOUT A NUMBER OF THINGS, WE WILL END IT RIGHT HERE.

THE COURT: THANK YOU.

MR. WOOD, YOU ARE EXCUSED. THANK YOU VERY MUCH.

TOMORROW MORNING COUNSEL WILL BE HERE TO DISCUSS THE EXHIBITS, I ASSUME?

MS. FARIS: YES.

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 211 of 227

Exhibit C

THE COURT: I HOPE YOU HAVE MET AND CONFERRED.

MR. NELSON: YES.

THE COURT:: I HOPE YOU HAVE AGREED ON ALMOST EVERYTHING?

MS. FARIS: I WISH I COULD REPORT THAT, YOUR HONOR BUT UNFORTUNATELY I CANNOT.

THE COURT: VERY GOOD. WE WILL SEE YOU TOMORROW MORNING AT 10:30. WE WILL DISCUSS THE INSTRUCTIONS AND

12121

DISCUSS THE TWO ISSUES REGARDING THE CASES WHICH HAVE BEEN CITED TO ME.

MS. FARIS: VERY GOOD. THANK YOU, YOUR HONOR.

THE COURT: THANK YOU.

(AT 4:00 P.M., AN ADJOURNMENT WAS TAKEN UNTIL JUNE 30, 2004, AT 10:30 A.M.)

(THE NEXT PAGE NUMBER IS 12301.)

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 212 of 227

Exhibit C

12122

INDEX FOR JUNE 29, 2004

VOLUME ______

M A S T E R I N D E X

CHRONOLOGICAL INDEX OF WITNESSES

| PLAINTIFF'S | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MCCORKLE, SHAUN | 12004-R | 12014-G | 12017-R 12019-R | 12019-G |
| WOOD, ROBERT | 12021-F | 12088-N | | |

ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MCCORKLE, SHAUN | 12004-R | 12014-G | 12017-R 12019-R | 12019-G |
| WOOD, ROBERT | 12021-F | 12088-N | | |

EXHIBITS

FOR

case 3:05-md-00527-RLM -CAN document 1366-2 filed 06/09/08 page 213 of 227

Exhibit C

| JOINT | | IDENT | RECEIVED | WITHDRAWN |
|---|---|---|---|---|
| 113 | JUDICIAL NOTICE REQUEST | 12001 | | |
| 114 | FREIGHT AGENCY AGREEMENT | 12005 | | |
| 115 | INVOICE | 12011 | | |
| 116 | CURRICULUM VITAE | 12020 | | |

## Exhibit D

**Items Reviewed by Robert W. Wood in *Anthony Estrada v. FedEx Ground*,
Superior Court of Los Angeles County, No. BC210130**

1. Letter of Assurance between John M. Glenn (RPS) and Mary Oppenheimer (IRS), dated January 9, 1995
2. Closing Agreement on Final Determination Covering Specific Matters, IRS Form 906, dated January 10, 1995
3. RPS Pick-up and Delivery Contractor Operating Agreement, dated January 3, 1994
4. IRS Form 886-A for RPS audit, tax years 1995-1996
5. Letter from Sutherland, Asbill and Brennan, Re: RPS
6. Defendant RPS, Inc.'s Opposition to Plaintiff's Motion *In Limine* to Exclude Internal Revenue Service Letters, *Estrada v. RPS*, dated February 10, 2004
7. IRS and California EDD correspondence re: IRS audit for 1985 through 1987
8. FedEx Ground Company Manual, Subject: Hiring Process, Revision date, 1/25/02
9. Sample Contractor Information Sheet and Sample P&D Weekly Settlement Statement
10. RPS Contractor Assistance; Contractor Settlement; and Contractor Relations Programs
11. Addendums 1 - 7 P&D Contractor Operating Agreement
12. RPS Safe Driving Program
13. FedEx Ground Company Manual - Operations Management Handbook (Ground)
14. FedEx Ground Company Manual EMR-051 Vehicle Inspection; EMR-104 Citations; FFA-351- FFA-373 Various Driver Programs; FFA-652-FFA-858 Contractor Settlement Input and Claims
15. RPS Temporary P&D Driver Training Program
16. Acknowledgment of Receipt of RPS Temporary P&D Driver Training Program
17. FedEx Ground Company Manual, Revision date: 11/30/01, Section "General Information
18. Two letters from Ivan T. Hoffman to "contractor," both dated July 7, 1994
19. *Estrada v. FedEx Ground*, "Class Member Answers to Questionnaire 2- Question 7," (including copies of Questionnaire 2 for class members with last names A through L)
20. *Estrada v. FedEx Ground*, "Class Member Answers to Questionnaire 2- Question 7," (including copies of Questionnaire 2 for class members with last names M through Z)
21. *Estrada v. FedEx Ground*, "Class Member Length of Service," dated March 9, 2004, for all class members
22. Deposition of Leonard Revoir, dated January 9, 2004, in connection with Estrada v. RPS, Inc. (pages 1-4, 25-28, 125-128)
23. January 26, 2004 Deposition of William H. Bradley
24. January 27, 2004 Continued Deposition of William H. Bradley
25. Contractor Business Plans for Mike McGraw, dated 3/5/01, David Cooper, dated 3/2/01, James Solano, dated 3/28/01, Pratt, dated 3/2/02, Neil Frybarger (no date), Green, dated 3/16/01

26. Contractor Discussion Notes for Steve Dozier, dated June 21, 1996, for Pete Castillo, dated February, 24, 1997, for Garner, dated July 15, 1997, for Scott Dave, dated February 10, 1999, for Marquest Smith, dated June 4, 1999, for Pete Theo, dated August 18, 1999, for Dino Reali, dated November 3, 1999, for Din, dated January 26, 2000, for Mike McGraw, dated August 16, 2000, for Adrian Valenzuela, dated May 23, 2002, for Jim (last name illegible), dated September 3 (no year given)
27. Contractor Customer Service Ride Worksheets, for Belden, dated 6/8/00, for Neal Fryberger, dated 10/26/99, for Ron Smith, dated 7/28/99, for Jeff Morgan, dated 12/14/94, for Scott Mackenzie, dated 10/26/99
28. Many Contractor Business Plans, dated between 1994 and 2001
29. Several Contractor Discussion Notes re: Compliance with RPS/ FEG Policies Governing Hours of Work and State and End of Day, dated between 1996 and 2001
30. Many Contractor Discussion Notes re: Flex Program Issues, dated between 1995 and 2001
31. Several Contractor Discussion Notes re: Application and Enforcement of Contract Provisions re: Route Reconfiguration and Permanent Flex Assignments, dated between 1995 and 2001
32. Various Contractor Discussion Notes re: Alleged Violation of Contractual Service Requirements, dated between 1995 and 2001
33. Contractor Discussion Notes re: Enforcement of Policy re: Compliance with Mandatory Pick-up and Delivery Time Windows; dated between 1995 and 2002
34. Several Contractor Discussion Notes re: Application of RPS/ FEG Policy re: Customer Complaints and CCS Bonus, dated between 1995 and 2002
35. Contractor Discussion Notes re: Application of RPS/FEG Policy re: Route Coverage and Contingency Planning, dated between 1994 and 2001
36. Contractor Discussion Notes re: Compliance with Replacement Driver Policies and Related Issues, dated between 1995 and 2001
37. Trial Exhibit 9, Contractor Discussion Notes re: RPS policies, Various Contracts, RPS Forms, and Notes
38. Videotape, “The FedEx Ground Network,” P7001574
39. Videotape, “Contractor Check-in,” P7001675
40. Videotape, “Customer Service Ride,” P7001576
41. Videotape, “The FedEx Ground Force,” P7001577

## Exhibit E

**Items Reviewed by Robert W. Wood in *Anthony Estrada v. FedEx Ground Package System, Inc.*, 64 Cal.Rptr. 3rd 327 (Cal.Ct. App. 2nd Aug. 13. 2007)**

1. 1994 RPS Pick-Up and Delivery Contractor Operating Agreement
2. 2004 FXG Pick-Up and Delivery Contractor Operating Agreement
3. 2004 FHD Standard Contractor Operating Agreement
4. Addenda 1–7: 2005 FXG P&D Contractor Operating Agreement
5. Addenda 1–7: 2006 FHD Standard Contractor Operating Agreement
6. Addenda 1–7: 1994 P&D Contractor Operating Agreement
7. Deposition Testimony: Dan Sullivan - Founder and Former CEO and President
8. Deposition Testimony: Michael Mannion - Sr. VP of Terminal Operations
9. Deposition Testimony: Mark Byrum - DVP, Western and Southern
10. Deposition Testimony: Rodger Marticke - Exec. VP and COO
11. Deposition Testimony: David Rebholtz - Current CEO
12. Deposition Testimony: Dennis Oates - Managing Director, Field P&D Engineering Performance
13. Deposition Testimony: Ivor Wood, Sr. Manager of P&D Learning
14. Deposition Testimony: Heather D'Alesandro
15. Deposition Testimony: Robert Ostrov
16. Deposition Testimony: Robert Crandall (Day II)
17. Deposition Testimony: Ronald Joseph
18. Deposition Testimony: Sallie Ford
19. Deposition Testimony: Jonathan Rocchino
20. Deposition Testimony: Thomas Gebby (excerpt)
21. Deposition Testimony: Robert Flesher
22. Deposition Testimony: Stephen J. Myers (excerpts)
23. Sullivan Deposition Exhibits 1 - 12
24. Ford Deposition Exhibit
25. D'Alesandro Deposition Exhibits1-26
26. Oates Deposition Exhibit 9
27. McIntyre Deposition Exhibit 7
28. Gebby Deposition Exhibit 1
29. Letter of Assurance Between John M. Glenn VP and General Counsel, Roadway Package System, Inc. ("RPS") and Mary Oppenheimer, Asst. Chief Counsel, Employee Benefits and Exempt Organizations.
30. Closing Agreement On Final Determination Covering Specific Matters RPS, IRS Form 906
31. Letter from the Department of Justice -Tax Division, Re: Acceptance of RPS' offer
32. Letter from Shaw, Miller & Niedermayer, Re: DOT Regulations
33. Copy of FXG's Post Hearing Brief, California Unemployment Insurance Appeals Board
34. Copy of Employment Development Department's Brief, California Unemployment Insurance Appeals Board
35. Executive Summary by Scarlett Surveys International
36. Two Letters dated March 1994 from Ivan Hofman, President RPS

37. Five Letters: dated September 16, 2005 and July 12, 2006 from IRS - Rolando Thomas; August 8, 2004 from IRS - Hough; July 12, 2006 from IRS - Pagels; September 16, 2005 from IRS - Pagels

38. Letter dated September 6, 2002 from the US Small Business Administration - Alana Thompson

39. Decision from the Massachusetts Department of Workforce Development - Robert Williams

40. Montana Department of Labor and Industry, Employment Relations Division, Independent Contractor Central Unit dated December 22, 2003

41. Wisconsin Department of Workforce Development Unemployment Insurance, Appeal Tribunal Decision dated November 25, 2005

42. California Unemployment Insurance Appeals Board Decision dated May 4, 2005 - Jarrett

43. NLRB Order, Case 4-RC-20974 dated August 3, 2005

44. NLRB Decision, Case 1-RC-21966 dated January 24, 2006

45. NLRB Decision, First Region, Cases 1-RC-22034 and 1-RC-22035 dated September 20, 2006

46. NLRB Decision, Region 22, Case 22-RC-12508, dated November 2, 2004

47. NLRB, Regional Directors Decision and Director of Election, Region 4, dated June 1, 2005

48. Copy of FXG's Opening Brief of Appellant, California Court of Appeal

49. Copy of Respondent's Brief and Brief of Cross-Appellants, California Court of Appeal

50. Opinion and Order, Cause No. 3:05-MD-527 RM (MDL-1700); re: FXG Packages System, Inc. Employment Practices Litigation

51. Report, Cause No. 3:05-MD-527 RM (MDL-1700); re: FXG Packages System, Inc. Employment Practices Litigation

52. Defendant FedEx Ground Package System. Inc.'s Second Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories

53. Supplemental Expert Documents -- Jeanneret

54. Omnibus Fact Memorandum

55. Estrada Trial Testimony - Rob Wood

56. Estrada Trial Exhibit Saad Exhibits 95-102

57. Estrada Trial Exhibit Wood's Notes

58. Estrada Trial Exhibit # 53

59. FedEx Home Delivery v. International Brotherhood of Teamsters, Local Union No. 671, Case No. 34-RC-2205

60. FedEx Home Delivery v. International Brotherhood of Teamsters, Local Union 25, Cases 1-RC-20034, 35

61. FedEx Managers Guide, Ground Edition

62. Contractor's Companion Guide-Ground

63. Contractor's Companion Guide-Home Delivery

64. FXG/FHD Security Department Policy Manual, Sept. 2004

65. Driver Release Audits Participant Manual TM-406 (12/03)

66. Interoffice memo re Number of Work Areas

67. How to Incorporate Your Business to a LLC by FX for Independent Contractors

68.  FXG Responses to CSR TV-058 FXGM00016
69.  FXG Responses to CSR TV-058 FXGM00018
70.  FXG Responses to CSR TV-058 FXGM00108
71.  FXG Responses to CSR TV-058 FXGM00027
72.  Competition Within the United States Parcel Delivery Markey, by Alan Robinson
73.  Tim Edmonds Email -- Incorporating
74.  Market Competition
75.  Multiple Work Areas
76.  Contractor Assistance Programs

77.  Various *Independent Times* Issues
78.  2007 - Addenda 1 - 7 - Scalercio
79.  Various Articles: Wall Street Journal, Forbes, Business Week
80.  PowerPoint presentation: Reaching Higher Ground, FXG Kickoff FY07
81.  FXG Contractor Relations Plan
82.  FXG Package System, Inc.'s Supplemented and Amended Responses to Plaintiffs' 30(b)(6) Deposition Upon Written Questions. Case No. 3:05-MD-527-RM (MDL 1700)
83.  FXG Company Manual; Subject: Service Flex Range Calculation; Section: Pickup and Delivery Planning; OPR-711
84.  Email and Interoffice Memorandum from Dave McIntyre to Mark Byrum re: SEAT P&D Tune-up and route changes
85.  Email from Matthew D Schmidt to various re: denial of CDAS Request; Flex group analysis explaining denial
86.  Emails from Dave McIntyre re: request for additional work area
87.  Email from Matthew D Schmidt to various re: CDAS Request approval
88.  Email from Dave Gerschultz to Tim Edmonds and Ron Joseph re: approval of request for third work area; email from Tim Edmonds to Paul Callahan re: additional route; email from Paul Callahan to Tim Edmonds re: Issues; email from Tim Edmonds to Scott Ray re: supplemental route; email from Matthew D Schmidt to Dennis Oates and Dave McIntyre re: Work Area Requests
89.  Email from Dave McIntyre to Dennis Oates re: Work Area Requests
90.  Interoffice Memorandum from Tim Edmonds, 4/23/01, regarding Roundtable Requirements
91.  Home Delivery Weekly Turnover Summary, Termination Summary, and Turnover Analysis
92.  Employee-facing Registry Content (website)
93.  FXG Interoffice Memo: FY07 Ground P&D Vehicles for Resale, 12/05/05
94.  FXG Memo: Revised FY06 Van Needs -- REVISED for Supplemental EP, 8/12/05
95.  FXG Interoffice Memo: E.P. Approval, 9/22/05
96.  FXG Interoffice Memo: FY06 P&D Vehicles for Resale -- Writedown, 9/12/05
97.  FXG Interoffice Memo: E.P. Approval, 12/30/05
98.  FXG Interoffice Memo: FY06 Grd. P&D Vehicles for Resale -- Mix Writedown, 12/19/05
99.  FXG Interoffice Memo: EP 03-FDG-10420-HD Vans, 7/8/03
100.   RPS, Inc. Memo: E.P. Approval, 1/21/00
101.   Copy of FXG's Procedure: Business Discussions

102. Business Discussions from OFM: TAB 59-PA13076-PA13113 - Appearance
103. Business Discussions from OFM: TAB 59-PA13114-PA13144 - Behavior
104. Business Discussions from OFM: TAB 59-PA13145-PA13199 - Compensation or Deduction
105. Business Discussions from OFM: TAB 59-PA13200-PA13249 - Flex
106. Business Discussions from OFM: TAB 59- PA13250-PA13478 - Hours
107. Business Discussions from OFM: TAB59 - PA13479-PA13496 - Insurance
108. Business Discussions from OFM: TAB 59-PA13497- PA13563 - Medical
109. Business Discussions from OFM: TAB59 -PA13564-PA13824 - Performance
110. Business Discussions from OFM: TAB59- PA13825-PA13880 - Reconfiguration
111. Business Discussions from OFM: TAB59-PA13881-PA14185 - Route
112. Business Discussions from OFM: TAB59-PA14186-PA14225 - Sale of Route
113. Business Discussions from OFM: TAB59-PA14226-PA14281 - Supervision
114. Business Discussions from OFM: TAB59-PA14282-PA14303 - Termination
115. Business Discussions from OFM: TAB59-PA14304-PA15271K-81 - Vehicle and Index
116. Business Discussions from OFM: Excerpt of Plaintiffs Appendix (pg. 4 - Index of Business Discussions)
117. Business Discussions from OFM: Def Expert Robert Crandall Report
118. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734:
119. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 1, 2003_001
120. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 2, 2003_001
121. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 3, 2003_001
122. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 4, 2003_001
123. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 5, 2003_001
124. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 6, 2003 pt.1_001
125. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 6, 2003 pt.2_001
126. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 7, 2003_001
127. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 8, 2003_001
128. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 9, 2003_001
129. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Day 10-14 2003_001
130. Quality P&D Learning (QPDL) - TM/205A - Version 08/03 - FXG000396298-396734: Quality Manual 2003_001
131. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 2, 2005_001

132. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 3, 2005_001
133. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 4, 2005_001
134. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 5, 2005_001
135. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 6, 2005, pt. 1_001
136. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 6, 2005, pt. 2_001
137. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 6, 2005, pt. 3_001
138. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Day 6, 2005, pt. 3_021
139. Quality P&D Learning (QPDL) - TM/205A - Version 04/05 - PCA0021409-21684: Qual.Man.day, 2005_001
140. FXG P&D Planning Seminar Participant Manual (3/05)
141. FHD P&D Planning Seminar Participant Manual, August 2005
142. FHD P&D Planning Seminar Workbook (3/05)
143. Acronyms
144. SS-8 Determinations: Martin
145. SS-8 Determinations: Pagels
146. SS-8 Determinations: Schiffhouer
147. SS-8 Determinations: Thierry
148. SS-8 Determinations: Thomas
149. SS-8 Determinations: Bridges
150. SS-8 Determinations: Carlson
151. CSR Participant Manual
152. CSR Seminar Part I
153. CSR Seminar Part II
154. CSR Seminar Part III
155. Email re supplementals
156. Emails from T. Edmunds
157. Manifest - CA
158. Manifest - KS
159. Manifest - NJ
160. Manifest - TN
161. Manifest - WV
162. T Edmonds Turnover Presentation
163. Turn by Turn - CA
164. Turn by Turn - MO
165. Turn by Turn - RI
166. Turn by Turn - TX
167. 2003 Procedures: A.M. Checkout
168. 2003 Procedures: Check-in Requirements, OPR-251
169. 2003 Procedures: Check-in Requirements, OPR-251C
170. 2003 Procedures: Contractor Check-in, Chapter 8, P.M. Routine

171. 2003 Procedures: Contractor Check-in and Dispatch
172. 2003 Procedures: Business Discussions, OPR-560
173. 2003 Procedures: Business Discussions, OPR-560C
174. 2003 Procedures: CARE Program-Customers Are Really Everything, OPR-255
175. 2003 Procedures: CARE Program-Customers Are Really Everything, OPR-255C
176. 2003 Procedures: Contract Termination Guidelines, OP-162
177. 2003 Procedures: Contractor Business Plan
178. 2003 Procedures: Contractor Customer Service – CCS-Program
179. 2003 Procedures: Contractor Funds and Accounts – Questions and Answers
180. 2003 Procedures: Contractor Garnishments, Support Orders and Tax Levies, OPR-559C
181. 2003 Procedures: Contractor Leasing and Driver Qualifications, OPR-551
182. 2003 Procedures: Contractor Leasing and Driver Qualifications, OPR-551C
183. 2003 Procedures: Contractor Relations Plan
184. 2003 Procedures: Contractor Termination, OPR-554
185. 2003 Procedures: Contractor Termination, OPR-554C
186. 2003 Procedures: Contractor-Driver Drug Screening, OPR-556
187. 2003 Procedures: Contractor-Driver Drug Screening, OPR-556C
188. 2003 Procedures: Driver Released Packages, OPR-254
189. 2003 Procedures: Driver Released Packages, OPR-254C
190. 2003 Procedures: Holiday Van Availability Incentive
191. 2003 Procedures: HR-10 Plan – U.S. Only
192. 2003 Procedures: Introduction to Contractor Relations
193. 2003 Procedures: Linehaul Contractor-Driver Training School Program, OPR-552
194. 2003 Procedures: Linehaul Contractor-Driver Training School Program, OPR-552C
195. 2003 Procedures: Maintenance Fund and Matching Maintenance – For Canada Only
196. 2003 Procedures: Non-Driving Helper, OPR-556
197. 2003 Procedures: Non-Driving Helper, OPR-556C
198. 2003 Procedures: Passengers in Contractor or Company-Owned Vehicles, OPR-565
199. 2003 Procedures: Passengers in Contractor or Company-Owned Vehicles, OPR-565C
200. 2003 Procedures: Pickup and Delivery Contractor Time Off Program Manual
201. 2003 Procedures: Pickup and Delivery Contractor Time-off Program for Terminal Management
202. 2003 Procedures: Pickup and Delivery Contractors Proprietary Interests, FFA-364
203. 2003 Procedures: Service Guarantee Account – US Only
204. 2003 Procedures: Supplemental Vans, OPR-567
205. 2003 Procedures: Supplemental Vans, OPR-567C
206. 2003 Procedures: At Home Upload Hardware Troubleshooting – Contractors
207. 2003 Procedures: At Home Upload Procedures
208. 2003 Procedures: At Home Upload Modem Installation Guide
209. 2003 Procedures: At Home Upload Procedures – Performing a Test Call
210. 2003 Procedures: Automated Manifest Completion, OPR-076es

211. 2003 Procedures: Tendering Packages to Other Delivery Companies, OPR-081Res
212. 2003 Procedures: Maintenance and Repair Authorization, EMR-053
213. 2003 Procedures: Maintenance and Repair Authorization, EMR-053C
214. 2003 Procedures: Van Tractor Oil Change Certification, EMR-056
215. 2003 Procedures: Van Tractor Oil Change Certification, EMR-056C
216. 2003 Procedures: Employee Personnel Records Policy, HMR-250
217. 2003 Procedures: Employee Personnel Records Policy, HMR-250C
218. 2003 Procedures: Hiring of Relatives Policy Statement, HMR-100
219. 2003 Procedures: Hiring of Relatives Policy Statement, HMR-100C
220. 2003 Procedures: Policy Statement-Posters and Publications, HMR-002
221. 2003 Procedures: Policy Statements – EEO, Affirmative Action, and Harassment-Free Work Environment, HMR-000
222. 2003 Procedures: Policy Statements – EEO, Affirmative Action, and Harassment-Free Work Environment, HMR-000C
223. 2003 Procedures: Zero Tolerance Policy – Sexual Harassment, HMR-001
224. 2003 Procedures: Zero Tolerance Policy – Sexual Harassment, HMR-001C
225. 2003 Procedures: Contractor or Agency Employee Injury Reporting, SAF-053
226. 2003 Procedures: Contractor or Agency Employee Injury Reporting, SAF-053C
227. 2003 Procedures: Driver Annual Certification of Violations and Record Review SAF-061
228. 2003 Procedures: Driver Annual Certification of Violations and Record Review SAF-061C
229. 2003 Procedures: Employee Van-Tractor Trailer Qualifications, SAF-074
230. 2003 Procedures: Employee Van-Tractor Trailer Qualifications, SAF-074C
231. 2003 Procedures: Hours of Service, SAF-055
232. 2003 Procedures: Hours of Service, SAF-055C
233. 2003 Procedures: Physical Guidelines for Drivers–fedEx Ground, SAF-062C
234. 2003 Procedures: Vehicle Accident Reporting, SAF-051
235. 2003 Procedures: Vehicle Accident Reporting, SAF-051C
236. 2003 Procedures: Loss Prevention Incident, or Missing Firearms, OPR-603
237. 2003 Procedures: Loss Prevention Incident, or Missing Firearms, OPR-603C
238. 2003 Procedures: Pilfered Packages, OPR-602
239. 2003 Procedures: Pilfered Packages, OPR-602C
240. 2003 Procedures: Standardized Core and Key System, OPR-606
241. 2003 Procedures: Standardized Core and Key System, OPR-606C
242. 2003 Procedures: Van Service Audit
243. 2003 Procedures: Contractor Direct Deposit, FFA-363
244. 2003 Procedures: Contractor Referral, FFA-370
245. 2003 Procedures: Contractor Referral, FFA-370C
246. 2003 Procedures: Contractor Settlement Input Requirements, FFA-651
247. 2003 Procedures: Contractor Settlement Input Requirements, FFA-651C
248. 2003 Procedures: Financing Requirements, FFA-356
249. 2003 Procedures: Financing Requirements, FFA-356C
250. 2003 Procedures: Fuel Supplement, FFA-378
251. 2003 Procedures: Fuel Supplement, FFA-378C
252. 2003 Procedures: Maintenance and Loan Program, FFA-353

253. 2003 Procedures: Maintenance and Loan Program, FFA-353C
254. 2003 Procedures: Pickup and Delivery Contractor Vehicle Usage-FedEx Ground Spares and Rentals, FFA-358
255. 2003 Procedures: Pickup and Delivery Contractor Vehicle Usage-FedEx Ground Spares and Rentals, FFA-358C
256. 2003 Procedures: Quarterly Performance Settlement, FFA-373
257. 2003 Procedures: Service Guarantee Account Program, FFA-352
258. 2003 Procedures: Settlement Record Completion, FFA-355
259. 2003 Procedures: Settlement Record Completion, FFA-355C
260. 2003 Procedures: Documentation Policy, GSB-001
261. 2003 Procedures: Documentation Policy, GSB-001C
262. 2003 Procedures: Documentation Program, GSB-003
263. 2003 Procedures: Documentation Program, GSB-003C
264. 2003 Procedures: Guidelines and Upgrades, OPR-553
265. 2003 Procedures: Guidelines and Upgrades, OPR-553C
266. 2003 Procedures: Vehicle Inspection, EMR-051
267. 2003 Procedures: Vehicle Inspection, EMR-051C
268. 2005/2006 Procedures: Check-In Requirements, FHD, CKI-257
269. 2005/2006 Procedures: Check-In Requirements, FXG, CKI-251
270. 2005/2006 Procedures: Contractor Check-In and Dispatch, FHD, CKI-258
271. 2005/2006 Procedures: Contractor Check-In for Service Managers, FXG, CKI-802
272. 2005/2006 Procedures: Contractor Check-In for Service Managers, FXG, CKI-802C
273. 2005/2006 Procedures: A.M. Check-Out, FHD, CKO-151
274. 2005/2006 Procedures: A.M. Check-out, FXG, CKO-102
275. 2005/2006 Procedures: Authorization Process for Non-Driving Helper, CRL-566
276. 2005/2006 Procedures: Authorization Process for Non-Driving Helper, LTD, CLR-566C
277. 2005/2006 Procedures: Background Check for Contractors, CRL-562
278. 2005/2006 Procedures: Background Check for Contractors, LTD, CRL-562C
279. 2005/2006 Procedures: Business Discussions, FHD, CLR-572
280. 2005/2006 Procedures: Business Discussions, FXG, CRL-560
281. 2005/2006 Procedures: Business Discussions, LTD, CRL-560C
282. 2005/2006 Procedures: Business Support Package, FHD, CRL-375
283. 2005/2006 Procedures: Business Support Package, FXG, CRL-372
284. 2005/2006 Procedures: Business Support Package, LTD, CRL-372C
285. 2005/2006 Procedures: Completing the Contractor Customer Service Ride Worksheet, FHD, RCRL-555
286. 2005/2006 Procedures: Contract Termination Guidelines, RCRL-162
287. 2005/2006 Procedures: Contract Termination, FHD, CRL-570
288. 2005/2006 Procedures: Contract Termination, FXG, CRL-554
289. 2005/2006 Procedures: Contract Termination, FXG, CRL-554C
290. 2005/2006 Procedures: Contractor Assistance Program, FHD, CRL-381
291. 2005/2006 Procedures: Contractor Assistance Program, FXG, CRL-371
292. 2005/2006 Procedures: Contractor Assistance Program, LTD, CRL-371C
293. 2005/2006 Procedures: Contractor Authorization for Substitute Drivers, CRL-752

294. 2005/2006 Procedures: Contractor Customer Service Meeting, FXG, CRL-353
295. 2005/2006 Procedures: Contractor Customer Service Meeting, LTD, CRL-353C
296. 2005/2006 Procedures: Contractor Customer Service Program, FXG, CRL-366
297. 2005/2006 Procedures: Contractor Customer Service Program, LTD, CRL-366C
298. 2005/2006 Procedures: Contractor Garnishments, Support Orders and Tax Levies, CRL-559
299. 2005/2006 Procedures: Contractor Garnishments, Support Orders and Tax Levies, LTD, CRL-559C
300. 2005/2006 Procedures: Contractor Leasing and Driver Qualifications Quick Reference, RCRL-550
301. 2005/2006 Procedures: Contractor Leasing and Driver Qualifications, CRL-551
302. 2005/2006 Procedures: Contractor Leasing and Driver Qualifications, LTD, CRL-551C
303. 2005/2006 Procedures: Contractor-Driver Drug Screening, CRL-556
304. 2005/2006 Procedures: Contractor-Driver Drug Screening, LTD, CRL-556C
305. 2005/2006 Procedures: Customer Service Rides, CRL-555
306. 2005/2006 Procedures: Customer Service Rides, LTD, CRL-555C
307. 2005/2006 Procedures: Customers Are Really Everything – CARE, CRL-255
308. 2005/2006 Procedures: Customers Are Really Everything – CARE, CRL-255C
309. 2005/2006 Procedures: Linehaul Run Assignment System, FXG, CRL-604
310. 2005/2006 Procedures: Passengers in Contractor-Owned Vehicles, CRL-565
311. 2005/2006 Procedures: Passengers in Contractor-Owned Vehicles, CRL-565C
312. 2005/2006 Procedures: Pickup Record Completion, FXG, PKP-056
313. 2005/2006 Procedures: Uniform Program for Contractors, FXG, PCH-359
314. 2005/2006 Procedures: Pickup and Delivery Contractor Time Off Program, OP-232PDF
315. 2005/2006 Procedures: Pickup and Delivery Contractor Time-Off Program for Facilit, CRL-380
316. 2005/2006 Procedures: Service Bonus, CRL-367
317. 2005/2006 Procedures: Service Bonus, LTD, CRL-367C
318. 2005/2006 Procedures: Supplemental Vans, FHD, CRL-571
319. 2005/2006 Procedures: Supplemental Vans, FXG, CRL-567
320. 2005/2006 Procedures: Supplemental Vans, LTD, CRL-567C
321. 2005/2006 Procedures: At-Home Upload Equipment -- Hardware Troubleshooting, RDLV-002
322. 2005/2006 Procedures: Automated manifest Completion, FHD, DLV-001
323. 2005/2006 Procedures: Driver Release to a Business, RDLV-001
324. 2005/2006 Procedures: Driver Released Packages, FHD, DLV-006
325. 2005/2006 Procedures: Driver Released Packages, FXG, DLV-005
326. 2005/2006 Procedures: Drop Trailer Deliveries, FXG, DLV-010
327. 2005/2006 Procedures: Drop Trailer Deliveries, LTD, DLV-010C
328. 2005/2006 Procedures: FHD Appointment Delivery, RDLV-005
329. 2005/2006 Procedures: FHD Driver Release Procedures, RDLV-029
330. 2005/2006 Procedures: Protective Shipping Pouch Procedures, RDLV-031
331. 2005/2006 Procedures: Refusing Retail Packages, RDLV-033
332. 2005/2006 Procedures: Tendering Packages to Other Delivery Companies, DLV-008

333. 2005/2006 Procedures: Tendering Packages to Other Delivery Companies, LTD, DLV-008C
334. 2005/2006 Procedures: Maintenance Repair Authorization, EMR-053
335. 2005/2006 Procedures: Maintenance Repair Authorization, LTD, EMR-053C
336. 2005/2006 Procedures: Van Tractor Oil Change Certification, EMR-056
337. 2005/2006 Procedures: Van-Tractor Oil Change Certification, LTD, EMR-056C
338. 2005/2006 Procedures: POLICY-001, Accounts Payable, OPES, and Payment Requests
339. 2005/2006 Procedures: POLICY-002, Assets
340. 2005/2006 Procedures: POLICY-003, hiring and Career Opportunities
341. 2005/2006 Procedures: POLICY-004, Communitcations
342. 2005/2006 Procedures: POLICY-005, Information Technology – Company Hardware and Software
343. 2005/2006 Procedures: POLICY-006, Confidentiality of Proprietary Information
344. 2005/2006 Procedures: POLICY-007, Contractor Relations
345. 2005/2006 Procedures: POLICY-008, Corporate Responses to Legal Proceedings
346. 2005/2006 Procedures: POLICY-009, Employee Benefits
347. 2005/2006 Procedures: POLICY-010, Acceptable Conduct
348. 2005/2006 Procedures: POLICY-011, Environmental
349. 2005/2006 Procedures: POLICY-012, General Accounting
350. 2005/2006 Procedures: POLICY-013, Field Operations
351. 2005/2006 Procedures: POLICY-014, ISO
352. 2005/2006 Procedures: POLICY-015, Purchasing
353. 2005/2006 Procedures: POLICY-016, Record Retention
354. 2005/2006 Procedures: POLICY-017, Safety
355. 2005/2006 Procedures: POLICY-018, Security
356. 2005/2006 Procedures: POLICY-019, Workplace Violence
357. 2005/2006 Procedures: POLICY-020, Sexual Harassment
358. 2005/2006 Procedures: POLICY-021, Employee Privacy
359. 2005/2006 Procedures: POLICY-022, Drug and Alcohol-free Workplace
360. 2005/2006 Procedures: POLICY-023, Equal Employment Opportunity and Affirmative Action
361. 2005/2006 Procedures: POLICY-024, Equipment Guidelines
362. 2005/2006 Procedures: POLICY-025, Corporate Identity and Usage
363. 2005/2006 Procedures: POLICY-026, Finance
364. 2005/2006 Procedures: POLICY-027, Moonlighting-Outside Employment
365. 2005/2006 Procedures: POLICY-028, Contracted Workforce Privacy
366. 2005/2006 Procedures: POLICY-031, Performance Improvement
367. 2005/2006 Procedures: POLICY-032, Solicitation and Distribution
368. 2005/2006 Procedures: Contractor or Agency Employee Injury reporting, LTD, SAF-053C
369. 2005/2006 Procedures: Contractor or Agency Employee Injury reporting, SAF-053
370. 2005/2006 Procedures: Contractor or Agency Employee Injury Reporting, SAF-053

371.  2005/2006 Procedures: Driver Annual Certification of Violations and Record Review, SAF-061
372.  2005/2006 Procedures: Driver Annual Cert. of Violations and Record Review, SAF-061C
373.  2005/2006 Procedures: Driver Files, SAF-043
374.  2005/2006 Procedures: Driver Files, LTD, SAF-043C
375.  2005/2006 Procedures: Employee Van-Tractor Trailer Qualification, SAF-074
376.  2005/2006 Procedures: Employee Van-Tractor Trailer Qualification, LTD, SAF-074C
377.  2005/2006 Procedures: Facility Bulletin Boards, LTD, SAF-027
378.  2005/2006 Procedures: Facility Bulletin Boards, LTD, SAF-027C
379.  2005/2006 Procedures: Hours of Service, FHD, SAF-085
380.  2005/2006 Procedures: Hours of Service, FXG, SAF-055
381.  2005/2006 Procedures: Physical Guidelines for Drivers (DOT), SAF-062
382.  2005/2006 Procedures: Physical Guidelines for Drivers (DOT), LTD, SAF-062C
383.  2005/2006 Procedures: Use of FXG-Contractor Equipment in Community-Safety Events, SAF-086
384.  2005/2006 Procedures: Vehicle Accident Reporting, SAF-051
385.  2005/2006 Procedures: Vehicle Accident Reporting, LTD, SAF-051C
386.  2005/2006 Procedures: I.D. Badge Guidelines, SEC-654
387.  2005/2006 Procedures: I.D. Badge Guidelines, LTD, SEC-654C
388.  2005/2006 Procedures: Management Discussion for Investigating Missing Driver Release Packages, RSEC-049
389.  2005/2006 Procedures: Standardized Core and Key System, SEC-315
390.  2005/2006 Procedures: Standardized Core and Key System, LTD, SEC-315C
391.  2005/2006 Procedures: Van Service Audit, FHD, SVC-375
392.  2005/2006 Procedures: Van Service Audit, FXG, SVC-354
393.  2005/2006 Procedures: Contractor Direct Deposit, SET-006
394.  2005/2006 Procedures: Contractor Referral Program, SET-370
395.  2005/2006 Procedures: Contractor Referral Program, LTD, SET-370C
396.  2005/2006 Procedures: Financing Requirements, LTD, SET-356
397.  2005/2006 Procedures: Financing Requirements, LTD, SET-356C
398.  2005/2006 Procedures: Fuel Supplement, FHD, SET-014
399.  2005/2006 Procedures: Fuel Supplement, FXG, SET-009
400.  2005/2006 Procedures: Fuel Supplement, LTD, SET-009C
401.  2005/2006 Procedures: HR-10 Plan for U.S. Only, FXG, SET-002
402.  2005/2006 Procedures: Maintenance Loan Program, FXG, SET-353
403.  2005/2006 Procedures: Maintenance Loan Program, LTD, SET-353C
404.  2005/2006 Procedures: Pickup and Delivery Contractor Proprietary Interest, SET-007
405.  2005/2006 Procedures: Quarterly Performance Settlement, FXG, SET-001
406.  2005/2006 Procedures: Quarterly Performance Settlement, LTD, SET-001C
407.  2005/2006 Procedures: Service Guarantee Account Program, FHD, SET-012
408.  2005/2006 Procedures: Service Guarantee Account Program, FXG, SET-010
409.  2005/2006 Procedures: Settlement Record Completion, FHD, SET-013
410.  2005/2006 Procedures: Settlement Record Completion, FXG, SET-005
411.  2005/2006 Procedures: Settlement Record Completion, LTD, SET-005C

412. 2005/2006 Procedures: Documentation Program, UNV-001
413. 2005/2006 Procedures: Vehicle Route Planning Enhancements, FHD, VRP-159
414. 2005/2006 Procedures: Vehicle Guidelines and Upgrades, VEH-553
415. 2005/2006 Procedures: Vehicle Guidelines and Upgrades, LTD, VEH-553C
416. 2005/2006 Procedures: Vehicle Inspection, VEH-051
417. FedEx DVD: Settlement Enhancements - U.S. P&D Version, June FY02 [FXG_M00097] (10 min)
418. FedEx DVD: Settlement Enhancements P&D Version, June FY03 [FXG_M00095] (13 min)
419. FedEx DVD: FedEx Ground Settlement Enhancement Video, P&D, FY04 [FXG_M00143] (12 min)
420. FedEx DVD: Settlement Enhancements - FedEx Home Delivery Version, June 2004 FY05 [FXG_M00094] (12:44 min)
421. FedEx DVD: FedEx Ground Settlement Enhancements P&D Version, June 2004 FY05 [FXG_M00096] (12:34 min)
422. FedEx DVD: FedEx Ground Settlement Enhancement, FY2006 [FXG_M00144] (14 min each)
423. FedEx DVD:  FedEx Ground 2007 Settlement Enhancement [FXG_M00084] (17 min)
424. FedEx DVD: Safe Work Methods, Order # TV-2201, Rev. 4/02 [FXG_M00031] (19 min)
425. FedEx DVD: Time Saving Techniques, Order # TV-204, Rev 08/02 [FXG_M00027] (10 min)
426. FedEx DVD: Suggested Home Delivery Techniques, TV-9914 RES [FXG_M00108] (17 minutes)
427. FedEx DVD: Bed, Bath & Beyond, Order # TV-2311, Rev 10/03 [FXG_M00039] (7 min)
428. FedEx DVD: WE CARE: Customers Are Really Everything, Order # TV-143 RES, Rev 4/04 [FXG_M00018] (12 min)
429. FedEx DVD: Customer Service Ride, Order # TV-058, Rev 4/03 [FXG_M00016] (45 minutes)
430. FedEx DVD: FedEx Ground Customer Service Rides / Driver Release Audits, TRV-9913 RES [FXG_M00112 (25 minutes)
431. FedEx DVD: Instructor Class, QPDL [FXG_M00100] (2 hours, 35 min)

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CHIEF JUDGE MILLER |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S OMNIBUS RESPONSE IN OPPOSITION TO PLAINTIFFS' MEMORANDUM OF LAW RE: COLLATERAL ESTOPPEL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

BACKGROUND ..... 1

ARGUMENT ..... 9

I. THE "ISSUE" OF INDEPENDENT CONTRACTOR STATUS RAISED IN THE MDL CLASS ACTIONS IS NOT "IDENTICAL" TO THE ISSUE DECIDED IN *ESTRADA* ..... 10

A. Different Legal Standards Apply In Various States To The Question Whether A Person Is An Independent Contractor ..... 11

B. The MDL Class Actions Involve Materially Different Facts From Those Addressed In *Estrada* ..... 18

II. EVEN IF BASIC COLLATERAL ESTOPPEL PREREQUISITES WERE SATISFIED, APPLICATION OF THE DOCTRINE WOULD BE FUNDAMENTALLY UNFAIR AND CONTRARY TO CALIFORNIA PUBLIC POLICY ..... 24

A. California Law Categorically Prohibits The Application Of Collateral Estoppel Against A Party Where, As Here, The Party Has Previously Prevailed On The Issue ..... 24

B. Applying Collateral Estoppel Would Contravene California's Public Policies Concerning Representative Litigation ..... 27

C. The Public Policy Considerations Cited By Plaintiffs Do Not Justify Overriding FXG's Rights By Barring It From Litigating The MDL Class Actions ..... 29

CONCLUSION ..... 30

case 3:05-md-00527-RLM-CAN document 1397 filed 06/09/08 page 3 of 38

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*475342 Alberta, Ltd. v. Starfire*,
No. 95-2083-GTV, 1996 WL 370221 (D. Kan. June 19, 1996) ............ 12

*Allen v. McCurry*,
449 U.S. 90 (1980) ............ 9

*Amador v. Unemployment Ins. Appeals Bd.*,
677 P.2d 224 (Cal. 1984) ............ 12

*Boomer v. AT&T Corp.*,
309 F.3d 404 (7th Cir. 2002) ............ 12, 13

*Californians for Disability Rights v. Mervyn's, LLC*,
138 P.3d 207 (Cal. 2006) ............ 27

*Chern v. Bank of Am.*,
544 P.2d 1310 (Cal. 1976) ............ 18

*ConAgra Foods, Inc. v. Draper*,
2008 WL 383644 (Ark. Feb 14, 2008) ............ 15

*Delta Mining Corp. v. Big Rivers Elec. Corp.*,
18 F.3d 1398 (7th Cir. 1994) ............ 20

*Estrada v. FedEx Ground Package Sys., Inc.*,
64 Cal. Rptr. 3d 327 (Ct. App. 2007) ............ 4

*Estrada v. FedEx Ground Package Sys., Inc.*,
No. B187951, 2006 WL 3378246 (Cal. Ct. App. 2006) ............ passim

*Evans v. Celotex Corp.*,
238 Cal. Rptr. 259 (Ct. App. 1987) ............ 18, 20, 21

*Evanston Ins. Co. v. Affiliated FM Ins. Co.*,
556 F. Supp. 135 (D. Conn. 1983) ............ 12, 13

*Freeman United Coal Mining Co. v. Office of Workers' Comp. Program*,
20 F.3d 289 (7th Cir. 1994) ............ 12

*Gardner v. Nat'l Dairy Prods. Corp.*,
330 F.2d 507 (6th Cir. 1964) ............ 15

case 3:05-md-00527-RLM-CAN document 1397 filed 06/09/09 page 4 of 38

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Guild Trust v. Union Pac. Land Res. Corp.*,
682 F.2d 208 (10th Cir. 1982) ........ 12

*Hardy v Johns-Manville Sales Corp.*,
681 F.2d 334 (5th Cir 1982) ........ 26

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
288 F.3d 1012 (7th Cir. 2002) ........ 28, 29, 30

*Interstate Marina Dev. Co. v. County of Los Angeles*,
202 Cal. Rptr. 377 (Ct. App. 1984)........ 19

*Isenberg v. Cal. Employment Stabilization Comm'n*,
180 P.2d 11 (Cal. 1947) ........ 15

*Jackson v. City of Sacramento*,
172 Cal. Rptr. 3d 826 (Ct. App. 1981) ........ 12

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*,
937 F.2d 729 (2d Cir. 1991)........ 17

*Kreinik v. Showbran Photo, Inc.*,
400 F. Supp. 2d 554 (S.D.N.Y. 2005)........ 12, 17

*Lemmings v. FedEx Ground Package System, Inc.*,
492 F. Supp. 2d 880 (W.D. Tenn. 2007)........ 26

*Lucido v. Superior Court*,
795 P.2d 1223 (Cal. 1990) ........ 10, 12, 18

*McCaw Personal Commc'ns, Inc. v. Pac. Telesis Grp.*,
645 F. Supp. 1166 (N.D. Cal. 1986) ........ 12

*Metromedia Co. v. Fugazy*,
983 F.2d 350 (2d Cir. 1992)........ 12, 17

*Narayan v. EGL, Inc.*,
2007 WL 2021809 (N.D. Cal. July 10, 2007)........ 15

*Nationwide Mutual Life Insurance Co. v. Darden*,
503 U.S. 318 (1992)........ 16

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)........ 25

**TABLE OF AUTHORITIES**
(continued)

**Page**

*People v. Sims*,
651 P.2d 321 (Cal. 1982) ........ 26

*Peterson v. Clark Leasing Corp.*,
451 F.2d 1291 (9th Cir. 1971) ........ 11

*Pignons S.A. de Mecanique v. Polaroid Corp.*,
701 F.2d 1 (1st Cir. 1983) ........ 20, 21

*Roos v. Red*,
30 Cal Rptr. 3d 446 (Ct. App. 2005) ........ 25

*S.G. Borello & Sons v. Department of Industrial Relations*,
769 P.2d 399 (Cal. 1989) ........ passim

*Sandoval v. Super. Ct.*,
190 Cal. Rptr. 29 (Ct. App. 1983) ........ 9, 25, 29

*Schramm v. Foster*,
341 F. Supp. 2d 536 (D. Md. 2004) ........ 15

*Scooper Dooper, Inc. v. Kraftco Corp.*,
494 F.2d 840 (3d Cir. 1974) ........ 20, 21

*Smith v. ExxonMobil Oil Corp.*,
64 Cal. Rptr. 3d 69 (Ct. App. 2007) ........ 21

*Triomphe Investors v. City of Northwood*,
49 F.3d 198 (6th Cir. 1995) ........ 12

*Vandenberg v. Superior Court*,
982 P.2d 229 (Cal. 1999) ........ 9

*White Motor Corp. v. Teresinski*,
263 Cal. Rptr. 26 (Ct. App. 1989) ........ 9

*Wooten Transports, Inc. v. Hunter*,
535 S.W.2d 858 (Tenn. 1976) ........ 15

**Statutes**

28 U.S.C. § 1738 ........ 9

case 3:05-md-00527-RLM-CAN document 1397 filed 06/09/09 page 6 of 38

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Agency Decisions**

*Encarnacion v. FedEx Ground*,
No. 15DA301374 (Fla. Comm'n of Human Relations June 1, 2004) ....................................... 8

*Endres v. FedEx Ground*,
No. 06200751EC (Wisc. Labor & Indus. Review Comm'n Nov. 10, 2006)............................. 8

*In re Metheany*,
No. 2000-STA-11 (U.S. Dep't of Labor Oct. 4, 2002)............................................................ 8

*In re Ploeckelmann*,
No. 06400084GB (Wisc. Dep't Workforce Dev. Jan. 20, 2006)............................................... 8

*In re Ryan*,
No. H2005-117-0132 (Ohio Unemployment Comp. Review Comm'n July 19, 2005)............. 8

*In re Spitz*,
No. 006-20568 (N.Y. Unemployment Ins. App. Bd. Nov. 22, 2006)........................................ 8

*In re Storey*,
No. L 1997 00048 2684 (Mich. Employment Security Bd. of Review Jan. 30, 2004)............... 8

*Watt v. FedEx Ground*,
No. CR200200153 (Wisc. Labor & Indus. Review Comm'n Sept. 3, 2004) ............................ 9

**Other Authorities**

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure (2002)................. 11, 13, 18

*Moore's Federal Practice* (Matthew Bender 3d ed.)................................................................... 12

*Restatement (Second) of Agency* § 220 (1958) ............................................................................ 12

## INTRODUCTION

Plaintiffs have moved for summary adjudication on collateral estoppel grounds, invoking the California trial court's Statement of Decision ("SD") in *Estrada v. FedEx Ground Package Systems, Inc.*, No. BC 210130 (Cal. Super. Ct.) as a kind of *Über* national class action judgment against FXG. By plaintiffs' lights, the ruling in the *Estrada* SD applied not only to the 209 California class members in that case, but also to (1) the hundreds of California contractors expressly excluded from the *Estrada* class; (2) the multiple work area ("MWA") contractors who were affirmatively found *not* to be employees in the same SD – directly contradicting the very ruling said to be preclusive here – and (3) every other contractor in the United States to boot. Plaintiffs cite no California precedent in which a single state court decision has been given the vastly broad preclusive application plaintiffs urge, and FXG has located none. To the contrary, the law of California is perfectly clear – a ruling against a defendant on an issue in a single case cannot be invoked against that defendant by other plaintiffs in other cases in other jurisdictions, where, as here, the applicable legal standards are different, the factual context differs and key facts have changed, and the issue has been resolved in favor of the defendant in other cases. FXG has a federal constitutional right to litigate these new actions, all legally and factually distinct from *Estrada*, before a jury. That right cannot be overridden merely so that plaintiffs can be relieved of the litigant's typical burden of actually proving his or her case. Plaintiffs' motion for summary adjudication on collateral estoppel grounds should be denied.

## BACKGROUND

On July 26, 2004, the California Superior Court issued its SD in *Estrada*. (FXG's Statement of Genuine Issues ("SGI") ¶ D7.) The SD did not purport to rule that all FXG contractors were employees. It did not even rule that all FXG contractors *in California* were

employees.  In fact, it affirmatively found that many contractors in California (i.e., MWAs) were *not* employees.  And the California Court of Appeal expressly held that the trial court's ruling could not be applied through declaratory or injunctive relief to California contractors other than those 209 contractors specifically included in the class.  It is difficult to imagine a decision less suitable for collateral estoppel effect in any respect – much less as the nationwide preclusion juggernaut plaintiffs make it out to be.

 1. Plaintiffs' claims in *Estrada* arose under California Labor Code § 2802.  The specific issue addressed in the *Estrada* SD was whether, under the legal standard applicable to independent contractor status under § 2802, "single work area pick-up and delivery drivers in California (hereafter referred to as 'SWAs') are independent contractors or employees of FedEx Ground."  (SGI ¶ D8; Ex. H-06 at 1.)  When the *Estrada* plaintiffs initially brought their action in 1999, they attempted to do so on behalf of all California contractors, but the court refused to allow them to pursue such a broad ruling.  Instead, the court limited the certified class to contractors who serviced only one work area, drove "full time," were not incorporated, and did not fall within a number of other excluded categories of pickup and delivery service providers.  (SGI ¶ D10; Ex. H-06 at 1-2.)  One of the named plaintiffs, Harvey Roberts, was an MWA and was therefore excluded from the class, but he continued to press his claims against FXG as an individual plaintiff.  (SGI ¶ D7; Ex. H-06 at 2.)

 Applying the test of independent contractor status described by the California Supreme Court in *S.G. Borello & Sons v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989), the court in *Estrada* held that "SWAs as defined in the class description are in fact employees and not independent contractors."  (SGI ¶ D9; Ex. H-06 at 3.)  By contrast, under that same test

of independent contractor status, the court held that "MWAs … are independent contractors and not employees." (*Id.*)

In analyzing the status of SWAs, the *Estrada* court reasoned that, "while on its surface the description of the SWA appears to be that of an independent contractor, the pervasive control by [FXG] creates an employment relationship." (SGI ¶ D7; Ex. H-06 at 15.) This finding of "pervasive control" rested not on the terms of the OA, or even on FXG's policies or procedures, but rather on the "uncertainty" of both. FXG exercised control, the court found, through "interpretation and obfuscation" of an ambiguous OA. (SGI ¶ D12; Ex. H-06 at 4.) Rather than containing clear and specific terms, the OA "is comprised of platitudes and guidelines," the court ruled, effectively "leav[ing] its interpretation in the sole hands of [FXG], without any meaningful recourse to the SWAs but with potential severe penalties and remedies that are intentionally kept uncertain and murky." (*Id.*) The court thus expressed agreement with the plaintiffs' witness "who testified in rebuttal as to control by uncertainty." (*Id.*) On this theory, individual incidents of control, while not necessarily permitted by the OA, "can and do flourish … based upon the uncertainty of the standards" of the OA (SGI ¶ D7; Ex. H-06 at 10), and FXG secures such control by "guarantee[ing] itself the sole right to interpret by obfuscation of available remedies to those SWAs who would challenge its interpretation" (*id.*; Ex. H-06 at 11.) "The bottom line appeared to be that the determination of the binding effect of any [policy or procedure] was to be based upon the subjective evaluation by management using common sense, which determination would be very situational." (SGI ¶ D13; Ex. H-06 at 8.)[1] Uncertainty in the conduct required

[1] The court elaborated the ambiguity of the OA remedies:

> The only mention of … a remedy in the OA is in section 12.3 mandating arbitration as the sole means of redress for contract termination. Otherwise the OA is totally silent on the issue. Management differed dramatically in their testimony as to the available remedies. Mr. William Bradley, an attorney who participated in the drafting of the OA, testified that the sole and exclusive remedy was arbitration after termination and that for a

and permitted under the OA and confusion over appropriate remedies allowed FXG managers to take advantage of contractors, the court reasoned, resulting in an OA that was essentially a sham declaration of independent contractor status. (SGI ¶ D7; Ex. H-06 at 4, 9-11.)[2]

The Court of Appeal affirmed the *Estrada* SD on the same basis: "Although it is true that the Operating Agreement says 'the manner and means' to satisfy the objectives of the contract 'are within the discretion of the [drivers],' and that FedEx [Ground] does not have the 'authority to impose any term or condition' to the contrary, the evidence shows unequivocally that FedEx [Ground]'s conduct spoke louder than its words." *Estrada*, 64 Cal. Rptr. 3d at 336.[3] It was thus not the OA itself, but the parties' "actual conduct," that demonstrated FXG's employment-like control. *Id.* To the same point, the Court of Appeal also held that the SD properly relied on "anecdotal evidence," because that evidence "was admitted to show FedEx [Ground]'s power to interpret the Operating Agreement." *Id.* at 338.

As to the status of MWAs, the *Estrada* trial court ruled that under the same legal standard – i.e., the multi-factor *Borello* test – MWAs are not "employees" under California law. One of

---

> SWA to obtain redress above and beyond Contractor Relations, he or she would have to have his or her contract terminated in order to seek relief by means of arbitration. In contrast, Mr. Edmonds testified that SWAs could sue [FXG] for non-termination issues in a court of law and could even have contract non-renewal claims arbitrated.

(SGI ¶ D7; Ex. H-06 at 12.)

[2] Further demonstrating the court's determination that the OA was an un- or under-enforced sham, whenever the court did identify particular sections of the OA, it did so only to point out the *difference* between the OA's terms and FXG's actual practices. For example, the court stated that the merger clause at paragraph 13 of the OA was not followed as evinced by management testimony that FXG considered SWAs bound by certain new addenda even without written modification. (*See* SGI ¶ D7; Ex. H-06 at 9.) It also stated that SWAs were subject to termination at will despite their ability to compel arbitration under paragraph 12.3. (*See* SGI ¶ D7; Ex. H-06 at 12.) The Court of Appeal emphasized both findings. *See Estrada v. FedEx Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327, 332-33, 336 (Ct. App. 2007).

[3] As support for their self-serving assertion that *Estrada* was "not even a close case," (Pls. Br. 2), plaintiffs distort Justice Vogel's observation during oral argument that FXG's counsel did not have a "snowball's chance" of persuading the appellate court to reverse the trial court. (Pls. RJN, Ex. E.) As the full passage makes clear, Justice Vogel was merely emphasizing the difficulty of overturning the trial court's findings of fact under the "substantial evidence" standard.

the factors identified in *Borello* is the "opportunity for 'profit' or 'loss.'" 769 P.2d at 409. Applying *Borello*, the *Estrada* trial court ruled that MWAs have "unlimited" opportunity to profit, and to "slowly but surely create a little financial empire under the aegis of [FXG]." (SGI ¶ D14; Ex. H-06 at 18.) "As such MWAs will be deemed to be independent contractors and Mr. Roberts is hereby dismissed from this lawsuit," the court concluded. (SGI ¶ D7; Ex. H-06 at 18.) The *Estrada* plaintiffs did not challenge any aspect of that ruling on appeal.

2. In addition to ruling on the status of those contractors actually before the court, the *Estrada* trial court also attempted to impose much broader relief against FXG, in favor of *all* contractors in California. It entered an order declaring that "all SWA's were FedEx [Ground] employees, and not independent contractors," and enjoined FXG from "mis-classifying SWA's as independent contractors" so long as it employed substantially the same "employment model." *Estrada v. FedEx Ground Package Sys., Inc.*, 2006 WL 3378246, at *3 (Cal. Ct. App. 2006). Although plaintiffs did not obtain class certification for their equitable claims, the trial court approved the statewide declaration and injunction on the ground that the issue of SWAs' employment status had been "fully litigated" on a "representative basis." *Id.* at *2. The Court of Appeal rejected that holding and reversed the declaration and injunction, explaining that such broad relief is available under California law only when the plaintiff "compl[ies] with the requirements for class certification." *Id.* at *4. Because of the *Estrada* plaintiffs' "undisputed failure to satisfy the requirements of [California's class action statute]" with respect to his broad declaratory and injunctive relief claims, the trial court lacked jurisdiction to grant such relief. *Id.* at *4.[4] The court also "summarily reject[ed]" the *Estrada* plaintiffs' request to amend their

[4] The Court of Appeal expressly "rejected[ed] Estrada's contention that he 'complied in substance' with the requirements of [the class action statute]," because there is no "rule of substantial compliance in this context" – a class "is either certified or it is not." *Estrada*, 2006 WL 3378246, at *4 n.6.

complaint to pursue class certification, noting that "nothing would be accomplished" by doing so, since the distinct class claims the plaintiffs wanted to pursue were already being litigated in another action, i.e., the *Alexander* California action, one of the cases in this MDL proceeding. *Id.* at *5. Nothing in the Court of Appeal's opinion remotely suggests that other plaintiffs in *Alexander*, or in any other action, would be allowed to circumvent the court's holding, and obtain the effect of a broad *Estrada* declaration – only much, much broader than even the *Estrada* plaintiffs sought – by simply asserting *Estrada* as collateral estoppel in all proceedings under all laws in all jurisdictions.

3. Following the *Estrada* SD (and even while FXG's remedial and merits appeals were pending), FXG initiated a number of operational changes directly affecting its relations with contractors. In 2005, FXG embarked on a "Document Reengineering Initiative" to overhaul its policies, procedures, and forms. (*See* SGI ¶¶ 63, 64; Ex. C-024 at 11-12; Ex. C-61A at 134; Ex. C-40A at 58-60.) That Initiative clarified the line between policies (statements "outlining a *mandatory* course of action") and procedures (statements "providing the *how* and *when* or *how often* for implementing the policies"). (SGI ¶ 8; Ex. B-01 (emphasis in original); *see* SGI ¶ 64; Ex. C-024 at 108-09; Ex. C-40A at 80-81.) This sharpened categorization was designed to help FXG employees who deal with contractors "better understand" FXG's expectations. (SGI ¶ 64; Ex. C-024 at 92; *accord* SGI ¶ 64; Ex. C-61A at 134.) The 31 policies identified through the Initiative were explicitly labeled as mandatory for all FXG employees, subject to discipline up to and including termination. Among them is Policy-007, introduced after *Estrada*, reinforcing that FXG employees "must … adhere[]" to the OA in their interactions with contractors, that the terms of the OA may not be modified, and, most significantly, that "*[n]o officer, agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means*

*employed to achieve such objectives and results*."  (SGI ¶ 61; Ex. B-02 (emphasis in original.)

This policy, incorporated by reference in procedures concerning interactions with independent

contractors, governs the specific business practices described in those procedures.  (*See* SGI

¶ 61; Ex. C-024 at 204-05; Ex. C-61A at 281-83.)

The Initiative also involved a substantive evaluation of every one of FXG's

approximately 1,300 policies and procedures.  (SGI ¶ 64; Ex. C-024 at 104-05; Ex. C-61A at

134.)  Examples of the changes made to the procedures include that:

- The reengineered OPR-716 (formerly of the same number) excludes any restriction on independent contractors informally trading or "flexing" packages amongst themselves. (*Compare* SGI ¶ 64; Ex. B-14; *with* SGI ¶ 64; Ex. B-27.)

- The reengineered CRL-555 (formerly, OPR 555) makes clear that feedback based on customer service rides constitute "recommendations," not mandatory instructions, and that "[t]he contractor is solely responsible for exercising independent discretion and judgment to achieve business objectives" addressed by possible recommendations. (*Compare* SGI ¶ 64; Ex. B-04; *with* SGI ¶ 64; Ex. B-26.)

- The reengineered CRL-551 (formerly, OPR-551) states that qualified drivers must have a minimum of six months driving experience (as opposed to a year) or have completed QPDL training which only dates back to 2003, and further states that contractors who do not intend to drive need not meet even these qualifications.  (*Compare* SGI ¶ 64; Ex. B-03; *with* SGI ¶ 64; Ex. B-25.)

- The reengineered CRL-551 (formerly, OPR-551) also excludes any restriction on independent contractors' ability to hire relatives to drive for them. (*Compare* SGI ¶ 64; Ex. B-03; *with* SGI ¶ 64; Ex. B-25.)

- The reengineered SAF-056 (formerly of the same number) made clear that contractors had the option of satisfying their ongoing D.O.T. safety obligations by attending meetings offered by outside vendors instead of meetings offered by FXG at each of the terminals.  (*Compare* SGI ¶ 64; Ex. B-20; *with* SGI ¶ 64; Ex. B-28.)

The reengineered policies and procedures were communicated to terminal management nationwide, addressed in regional seminars and FXG University programs, and made continuously available through FXG's intranet. (*See* SGI ¶ 64; Ex. C-40A at 92-94.)[5]

Then, in 2007, FXG transitioned to dealing exclusively with multiple work-area contractors for the performance of pickup and delivery services in California. In the wake of *Estrada* and a subsequent decision of the California Unemployment Insurance Appeals Board following the reasoning in *Estrada*, FXG made "no secret that the current regulatory and legal environment in California create[d] a level of uncertainty … particularly among single work area contractors." (SGI ¶ D19; Ex. H-19 at Ex. B, 2; *see also id.*; Ex. H-19 at Ex. B, 5.) FXG responded by changing its business model in accordance with the "bright line" identified in *Estrada* distinguishing MWAs as "true independent contractors." (SGI ¶ D7; Ex. H-06 at 18; *see* SGI ¶ D18; Ex. H-19 ¶¶ 10-13.) The transition to an exclusively MWA model ensured that FXG was within full compliance of California law as set forth in the *Estrada* SD.

4. FXG's approach to a nationwide small package pickup and delivery service using independent contractors has been operating for decades and, as plaintiffs note, has utilized the same basic OA since 1994. At the same time, FXG has constantly sought to innovate and improve its model. Moreover, FXG has often been compelled to defend it. On many occasions

[5] Plaintiffs incorrectly assert that FXG's own witnesses testified that the Document Reengineering Initiative did not result in any significant changes to FXG's policies and procedures. (Pls. Br. 18.) One witness they cite testified that he could not *remember* significant changes, but his testimony addressed only to those policies and procedures that he "was responsible for changing" (SGI ¶ 64; Ex. C-40A at 81) and did not speak to *all* the changes involved. And the same witness did testify that policies and procedures were clarified in very important ways, so that employees and contractors would better understand contractors' rights. (SGI ¶ 64; Ex. C-40A at 80.) Plaintiffs also rely on the testimony of three witnesses who expressly stated that they were unfamiliar with the Document Reengineering Initiative in general and so could not speak to its results. (SGI ¶ 64; Ex. C-073 at 75; Ex. C-135 at 132-33; Ex. C-099 at 76.)

before an array of tribunals, FXG has been successful.[6] *Estrada* is one occasion where it was not. Plaintiffs have not and cannot demonstrate that *Estrada* precludes FXG from litigating issues in these class actions involving different contractors, different class definitions, different facts, and applying different legal standards.

**ARGUMENT**

Under the Full Faith and Credit Act, a federal court must give a state court decision the same preclusive effect the decision would have under the law of the state in which the decision was rendered. 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96 (1980). Accordingly, this Court must apply California's preclusion rules to determine whether the resolution of any issue in the *Estrada* case precludes relitigation of the same issue here. (Pls. Br. 8.)

Under the law of California (as elsewhere), preclusion is not applied as a matter of right or administrative convenience. Quite the contrary. In its leading opinion addressing collateral estoppel principles, the California Supreme Court explained that "even where the minimal prerequisites for invocation of the doctrine are present, collateral estoppel is not an inflexible, universally applicable principle; policy considerations may limit its use where the … underpinnings of the doctrine are outweighed by other factors." *Vandenberg v. Superior Court*, 982 P.2d 229, 237 (Cal. 1999) (quotation omitted); *see also Sandoval v. Superior Court*, 190 Cal. Rptr. 29, 35 (Ct. App. 1983) ("Collateral estoppel is an equitable concept based on fundamental principles of fairness."). "Under California law," the Court has emphasized,

[6] (*See, e.g.*, SGI ¶ D20; Ex. H-01 (*In re Spitz*, No. 006-20568 (N.Y. Unemployment Ins. App. Bd. Nov. 22, 2006)); Ex. H-04 (*Endres v. FedEx Ground*, No. 06200751EC (Wisc. Labor & Indus. Review Comm'n Nov. 10, 2006)); Ex. H-12 (*In re Ploeckelmann*, No. 06400084GB (Wisc. Dep't Workforce Dev. Jan. 20, 2006)); Ex. H-14 (*In re Ryan*, No. H2005-117-0132 (Ohio Unemployment Comp. Review Comm'n July 19, 2005)); Ex. H-03 (*Encarnacion v. FedEx Ground*, No. 15DA301374 (Fla. Comm'n of Human Relations June 1, 2004)); Ex. H-15 (*In re Storey*, No. L 1997 00048 2684 (Mich. Employment Security Bd. of Review Jan. 30, 2004)); Ex. H-16 (*Watt v. FedEx Ground*, No. CR 200200153 (Wisc.

"collateral estoppel will apply in any setting *only* where such application comports with fairness and sound public policy." *Vandenberg*, 982 P.2d at 241. And the Court has warned that "a particular danger of injustice arises when collateral estoppel is invoked by a nonparty to the prior litigation. Such cases require close examination to determine whether nonmutual application of the doctrine is fair and appropriate." *Id.* at 237 (internal citations omitted); *see also White Motor Corp. v. Teresinski*, 263 Cal. Rptr. 26, 31 (Ct. App. 1989) ("[T]he offensive use of collateral estoppel is more closely scrutinized than the defensive use of the doctrine.").

In this case, "close examination" is hardly necessary to see that giving collateral estoppel effect to the *Estrada* ruling in favor of the class members in the various MDL class actions would be neither appropriate nor fair. As shown below in Part I, the *Estrada* ruling on the status of the *Estrada* class members under California law does not satisfy even the basic prerequisites for collateral estoppel effect, and even if it did, as shown below in Part II, application of the doctrine would be fundamentally unfair and contrary to California public policies.

## I. THE "ISSUE" OF INDEPENDENT CONTRACTOR STATUS RAISED IN THE MDL CLASS ACTIONS IS NOT "IDENTICAL" TO THE ISSUE DECIDED IN *ESTRADA*

Like most other jurisdictions, California law recognizes five requirements that must be satisfied to preclude litigation of an issue raised and resolved in a prior proceeding:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Lucido v. Superior Court*, 795 P.2d 1223, 1225 (Cal. 1990).

---

Labor & Indus. Review Comm'n Sept. 3, 2004)); Ex. H-09 (*In re Metheany*, No. 2000-STA-11 (U.S. Dep't of Labor Oct. 4, 2002)); *see also infra* at 25-26.

Plaintiffs' effort to apply *Estrada* broadly to the various MDL class actions fails at the first step – the "issue sought to be precluded" is not "identical to that decided" in *Estrada*. Plaintiffs' motion would preclude FXG from litigating the question whether the approximately 14,000 members of the various MDL state class actions are employees under their states' laws, because the *Estrada* SD ruled that 209 other contractors were employees under California Labor Code § 2802.[7] Those issues are not "identical," however, because key facts have changed since the decision in *Estrada*, and the various state class actions in the MDL are governed by legal standards different from those applied in *Estrada*.

### A. Different Legal Standards Apply In Various States To The Question Whether A Person Is An Independent Contractor

It is widely recognized, in California and elsewhere, that "for purposes of preclusion, issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same." Charles A. Wright & Arthur R. Miller, 18 *Federal Practice & Procedure* § 4417 (2002) (alterations and quotation omitted) ("Wright & Miller"); *see also Moore's Federal Practice* § 132.02[2][h] (Matthew Bender 3d ed.) ("Issues of fact are not identical if the legal standards governing their resolution are significantly different."). The leading decision on this point cited by the Wright & Miller treatise is, in fact, an opinion construing the collateral estoppel effect of a California state court ruling. *See*

---

[7] At times plaintiffs suggest that the issue precluded by *Estrada* is "whether FXG has reserved to itself the right to control the manner and means of the drivers' performance under the terms of the OA, as implemented by FXG's common corporate policies, procedures and practices." (Pls. Br. 2.) But they go on to insist that "right to control" is the sole "determinative factor" in employment status under California and all other states' laws, so FedEx Ground actually would be precluded from litigating the entire employment status question. (*Id.*) As they later state even more clearly, the "identical issue" requirement is met because "the threshold issue tried and resolved in *Estrada*" was "whether FXG's pickup and delivery drivers are employees, or independent contractors, under the common law 'right to control' test." (*Id.* at 11.) The proper question, then, is whether the employment status ruling in *Estrada* precludes litigation of the basic employment status question here. In any event, collateral estoppel does not apply either to the broader (employment status) or narrower (right to control) view of the relevant "issue" because, either way, plaintiffs cannot satisfy the identical issue requirement.

*Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971) (quoted in 18 Wright & Miller § 4417). Although the factual inquiries involved in the two cases were "likely very similar," the court held that "identity of issue [wa]s lacking" because there was "no indication that California … law precisely trace[d] the federal law" governing the issue in question. *Id.* The courts of California and other jurisdictions have repeatedly applied the same principle to reject collateral estoppel for lack of identical issues. *See, e.g.*, *Amador v. Unemployment Ins. Appeals Bd.*, 677 P.2d 224, 232 (Cal. 1984) (prior ruling that party was "insubordinate" did not preclude litigation of issue whether party was "insubordinate" for purposes of different legal rule); *Jackson v. City of Sacramento*, 172 Cal. Rptr. 3d 826, 828 (Ct. App. 1981) (prior agency ruling that party was "disabled" did not preclude examination of disability issue by another agency under different legal standard); *McCaw Personal Commc'ns, Inc. v. Pac. Telesis Grp.*, 645 F. Supp. 1166, 1171-72 (N.D. Cal. 1986) (prior state agency ruling that merger did not threaten competition did not preclude subsequent litigation of competitive effects under federal antitrust law because state and federal standards could vary); *see also Boomer v. AT&T Corp.*, 309 F.3d 404, 422 n.10 (7th Cir. 2002); *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 202 (6th Cir. 1995); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 356-57 (2d Cir. 1992); *Freeman United Coal Mining Co. v. Office of Workers' Comp. Program*, 20 F.3d 289, 294 (7th Cir. 1994); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734-35 (2d Cir. 1991); *Guild Trust v. Union Pac. Land Res. Corp.*, 682 F.2d 208, 211-12 (10th Cir. 1982); *475342 Alberta, Ltd. v. Starfire*, No. 95-2083-GTV, 1996 WL 370221, at *3 (D. Kan. June 19, 1996); *Evanston Ins. Co. v. Affiliated FM Ins. Co.*, 556 F. Supp. 135, 137 (D. Conn. 1983).

In this case, plaintiffs seek to give collateral estoppel effect to a ruling made under California law, in class actions arising under the differing laws of at least 20 other states. It is

not FXG's burden to show that the legal standards applied in other states to the determination of employee status, or of the "right to control" conclusion, are identical. Rather, as the party seeking collateral estoppel, plaintiffs have the burden of proving that each element is satisfied. *Lucido*, 795 P.2d at 1225. Plaintiffs have come nowhere close to carrying that burden.

To start, finding a lack of identical issues "is apt to be particularly easy when different legal systems are involved." 18 Wright & Miller § 4417. Courts have held that when an otherwise similar issue was previously litigated under the law of another jurisdiction, the fact that two different legal systems were involved suffices to make the issues different for preclusion purposes. *See Boomer*, 309 F.3d at 422 n.10 ("In [the prior case], the question of unconscionability involved California law, whereas in this case it involves Illinois law, and therefore the issues are not the same."); *Starfire*, 1996 U.S. Dist. LEXIS 9376, at *3 (denying preclusive effect to an issue of contract interpretation on that ground "[b]ecause the law of different states applies, this court is not presented with an identical issue"); *Evanston Ins.*, 556 F. Supp. at 137 ("Since the prior case presented a question of Pennsylvania law, the instant case [applying Connecticut law] does not pose an 'identical issue' within the meaning of *Parklane Hosiery*."). While a "careful examination" of the relevant standards under different systems of law sometimes may prove them to be identical, 18 Wright & Miller § 4417, that certainly is not the case here.

Plaintiffs do not even purport to conduct the "careful examination" of various jurisdictions' legal standards that is required to prove they are all identical to California's. Their entire review of the relevant state laws is nothing more than a single string cite of conclusory parentheticals collected in a footnote. (Pls. Br. at 12 n.9.) No further analysis is required, plaintiffs seem to suggest, because in certifying the various class actions, this Court ostensibly

"recognized that the predominant and controlling inquiry in each jurisdiction is the 'right to control.'" (*Id.* at 12.) But this Court's class certification orders were addressed only to the question whether the various laws of the various jurisdictions were each susceptible to classwide litigation – nowhere did the Court even suggest that the legal standards were all identical. Indeed, much effort was wasted if the Court was actually ruling that every jurisdiction's law concerning employment status was identical. And of course its class certification orders held no such thing. Rather, the orders analyzed each jurisdiction's law individually, and their analyses confirm that various jurisdictions treat the factors relevant both to employment status and the right to control differently.

Directly contrary to plaintiffs' representation that this Court found the right to control factor "controlling" in every jurisdiction, this Court certified classes in five states where it expressly found that right to control is *not* dispositive of employment status. (Mar. 25, 2008 Order at 16 (Tennessee), 35 (Kentucky), 87 (Minnesota), 108-10 (Oregon), 118 (Indiana).) The Court nevertheless certified these classes because it concluded that none of the other contributing factors require individualized consideration. In certifying a Kentucky class, for example, the Court agreed that the right to control is "a factor of no greater importance" than the other factors listed in the *Restatement (Second) of Agency* § 220, but the Court still granted certification because it found the other factors "to not require highly individualized evidence." (*Id.* at 35.)

The Court did certify classes in other states where it observed that the right to control is the only factor that can be determinative by itself, but in those states other factors – differing between the states – remain relevant to the overall inquiry (otherwise they would serve no function at all) (*see id.* at 26-27 (Arkansas), 78-79 (Maryland), 91-92 (Pennsylvania), 95-97 (New Hampshire), 127-28 (West Virginia), 147-48 (Florida)), and often are directly relevant to

evaluating the right to control itself (*see id.* at 40 (Texas), 49 (Alabama), 67-68 (New Jersey), 101 (South Carolina), 151-52 (Rhode Island)). As even plaintiffs are forced to concede, "courts in the various jurisdictions" do consider "secondary factors," which "vary to some degree." (Pls. Br. 12.) The concession is fatal to their collateral estoppel theory, for what it necessarily means is that, in determining whether a given party possesses a "right to control" indicative of employment, different states evaluate *different factors*, and they *weigh those factors differently*.[8] The effect of the differences in the standards can be seen in the caselaw from the various jurisdictions, which hardly reflects the kind of predictable, consistent results across jurisdictions one would expect if every jurisdiction applied the same standards California does, in the same way California does.[9] In short, because the "right to control" issue is not analyzed identically in the various states, the "right to control" issue cannot be deemed identical among them.

---

[8] Again, it is plaintiffs' burden to prove the identity of the legal standards, not FXG's burden to prove the differences, but a few examples will show why plaintiffs cannot show that all jurisdictions evaluate right to control the same way California does:

- Whether a putative employer has the right to right to discharge without cause is a very important factor under California law. *Borello*, 769 P.2d at 404; *accord Isenberg v. Cal. Employment Stabilization Comm'n*, 180 P.2d 11, 15 (Cal. 1947). The same factor is not significant under either Wisconsin or New Hampshire law. (*See* Mar. 25, 2008 Order at 43, 95-96.)

- The skill required of the service provider, whether the work is typically performed by an employee or independent contractor, and whether the work is part of the principal's regular business are all factors for consideration under California law (*see Borello*, 769 P.2d at 404), but not Texas law (*see* Mar. 25, 2008 Order at 40 (citing *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002))).

- The right to control inquiry under Alabama law is governed by just four factors. (Mar. 25, 2008 Order at 49 (citing *Dickinson v. City of Huntsville*, 822 So. 2d 411, 416 (Ala. 2001)).) The standard in California is governed by a lengthy list of factors, set forth throughout *Borello*. The vast majority of factors relevant under California law are meaningless under Alabama's test.

- The Court certified the Florida class on finding that it did not need to "look beyond the right to control to the other Restatement (Second) of Agency factors." (Mar. 25, 2008 Order at 149.) Unrestrained by any particular considerations to guide that inquiry, the freeform analysis of the right to control in Florida will certainly contrast with the analysis required in California.

[9] *Compare Narayan v. EGL, Inc.*, 2007 WL 2021809, at *8 (N.D. Cal. July 10, 2007) (truck drivers were independent contractors under Texas law); *and Schramm v. Foster*, 341 F. Supp. 2d 536, 543-45 (D. Md. 2004) (tractor-trailer driver was an independent contractor under Maryland law); *and Gardner v. Nat'l*

To the extent plaintiffs' cursory footnote review of various states' laws is meaningful at all, the review rests on a fundamentally flawed premise. Plaintiffs' parentheticals mainly refer to the common law agency test reflected in § 220 of the *Restatement (Second) of Agency*, as if reference to that test in a state-court decision proved that the state's law is identical to California's. But California courts do not rely solely on the *Restatement* factors, as demonstrated in *Borello*, which cites a variety of different multifactor tests as "logically pertinent" (769 P.2d at 407) to the employment status determination. *See* 769 P.2d at 404 & n.5, 406-07. Together the *Borello* tests implicate many factors not mentioned in the *Restatement*, all of which plaintiffs ignore. Even worse than that omission, however, plaintiffs affirmatively mischaracterize the California law set forth in *Borello*. Plaintiffs quote *Borello* as holding that "[u]nder California law 'the essence of the [common law agency] test is the 'control of detail' – that is, whether the principal has the right to control the manner and means by which the worker accomplishes his work." (Pls. Br. at 11-12.) What *Borello* actually says, however, is that the common law "control of details" test is *not* the proper test under California law, because if "applied rigidly and in isolation, [the test] is often of little use in evaluating the infinite variety of service arrangements." 769 P.2d at 404. The *Borello* Court therefore supplements that test with a variety of other tests and factors to be considered.

Perhaps more important, *Borello* also directs courts applying the factors under "protective legislation" to indulge a presumption *in favor of* employee status, giving "deference" to the statute's "remedial purpose" of protecting employees. *Id.* at 406. No such presumption is

---

*Dairy Prods. Corp.*, 330 F.2d 507, 508 (6th Cir. 1964) (dairy delivery driver was an independent contractor under Kentucky law); *with ConAgra Foods, Inc. v. Draper*, 2008 WL 383644 (Ark. Feb 14, 2008) (poultry hauler was an employee under Arkansas law); *and Wooten Transports, Inc. v. Hunter*, 535 S.W.2d 858, 860 (Tenn. 1976) (tractor trailer driver delivering petroleum products was an employee under Tennessee law).

applied under the traditional common law agency test, *see id.* at 405, including the test applied under ERISA, *see Nationwide Mutual Life Insurance Co. v. Darden*, 503 U.S. 318, 326 (1992) (determining whether person was an "employee" by reference to statute's goal of protecting "employees" was "an approach infected with circularity"). Thus a legal regime, like ERISA, that instructs courts to apply common law "control" and related factors neutrally, rather than with a thumb on the scale in favor of an employee finding, applies a legal standard very different from the standards applied in *Estrada*. Plaintiffs ignore this important feature of California law.[10]

The difference between California law governing employment status and what plaintiffs claim to be the identical laws governing the MDL class actions is confirmed by the *Estrada* SD itself. According to plaintiffs, all contractors in the MDL class actions – including MWAs – are employees as a matter of law because the legal standards applicable to their actions are all identical to California's. But in *Estrada*, the court applied California's legal standards and ruled that a major category of contractors – those with multiple routes – are *not* employees. The court so held on the ground that, as to MWAs, the opportunity for profit and loss factor outweighed factors indicating control over contractors' actions. If the right to control factor is controlling in every other jurisdiction, as plaintiffs assert, then the *Estrada* SD proves that California law is not identical to those other jurisdictions' laws, since that factor was not deemed controlling even in *Estrada* itself as to MWAs. At a minimum, the *Estrada* SD effectively illustrates how variances in the factors considered and the weight given to them can lead to different outcomes.

[10] The discussion in text shows why plaintiffs' reliance on *Kreinik v. Showbran Photo, Inc.*, 400 F. Supp. 2d 554 (S.D.N.Y. 2005), is misplaced. The court in that case found "that New York and ERISA both use the same common-law test to determine whether a worker is an employee," but it did so based on the finding that the legal standards under New York law and ERISA look to the *same factors*. *Id.* at 563, 568-69. Plaintiffs do not and cannot make any such showing here.

Plaintiffs' ultimate logical error is their evident assumption that legal standards are identical so long as they invoke the same label, such as "right to control." But issues "may bear the same label without being identical. They are not identical if the legal standards governing their resolution are significantly different." *Metromedia*, 983 F.2d at 365; *see* 18 Wright & Miller § 4417 (different legal standards may "masquerad[e] behind similar legal labels, so that preclusion is … inappropriate" (citing many cases)); *Jim Beam*, 937 F.2d at 734 (refusing to accord collateral estoppel effect to prior finding of "likelihood of confusion" because although "worded similarly, the issue of likelihood of confusion in a cancellation proceeding may be different from the issue of likelihood of confusion in an action for infringement"). What matters for preclusion purposes is not whether the issue is *labeled* identically in the different jurisdictions, but whether the issue is *treated* identically in the different jurisdictions. Because plaintiffs have not carried their burden of proving that other jurisdictions apply the same factors California applies – and weigh them the same way California does – in determining employment status and right to control, the *Estrada* court's ruling on that issue cannot be preclusive.

**B. The MDL Class Actions Involve Materially Different Facts From Those Addressed In *Estrada***

For issues involved in separate proceedings to be "identical" for preclusion purposes, they not only must be governed by materially identical legal standards, they also must involve materially identical factual circumstances. *See Lucido*, 795 P.2d at 1225 ("The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings."). Collateral estoppel "'was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants.'" *Evans v. Celotex Corp.*, 238 Cal. Rptr.

259, 262 (Ct. App. 1987) (quoting *Hurd* v. *Albert*, 3 P.2d 545, 549 (Cal. 1931)). The same principle applies with even more force when the subsequent litigation involves different parties: "Different issues also are found when a later action involves different parties and at least potentially different facts." 18 Wright & Miller § 4417 (Supp. 2008); *see Chern v. Bank of Am.*, 544 P.2d 1310, 1313 (Cal. 1976) ("where the subsequent action involves parallel facts, but a different historical transaction, the application of the law to the facts is not subject to collateral estoppel") (quotation omitted); *Interstate Marina Dev. Co. v. County of Los Angeles*, 202 Cal. Rptr. 377, 382 (Ct. App. 1984) ("Where the later action does not involve the same facts, the doctrine [of collateral estoppel] does not apply."). That rule precludes application of collateral estoppel here: the facts involved in the MDL class actions differ from those involved in *Estrada* in at least three major respects.

*First*, the record from *Estrada* is exceedingly stale. The named plaintiffs were all former contractors who testified about their individual experiences with FXG, all of which ended by 2000. (SGI ¶ D5; Ex. H-17.) Numerous other individual contractor witness testified about experiences dating back to the mid-1990s. Plaintiffs do not and cannot show the decade-old record underlying *Estrada* is identical to the current record of contractors' experiences.

To the contrary, the relationship between FXG and its contractors has changed materially since the decision in *Estrada*. FXG's policies and procedures related to interactions with contractors have been completely reengineered. Since the *Estrada* SD, FXG has introduced a written management policy, enforced through discipline up to termination, prohibiting FXG managers and employees from directing the manner and means by which contractors achieve the results of the OA. *Supra* at 6-7. FXG has also altogether eliminated several of the policies and procedures offered as examples of control in *Estrada* – for example, informal flexing by

managers is now prohibited, and attendance at company safety meetings is not required. *Supra* at 7.

Plaintiffs contend that these changes are insufficient, but their objections are meritless. Plaintiffs first note that the terms of the OA itself have not changed, but that is obviously beside the point. The *Estrada* SD did not find employee status based on specific obligations or terms of the OA itself, but on how those terms were implemented in practice. *See supra* at 3-4. The matters addressed by FXG include some of the key concerns raised by the *Estrada* SD – they are designed to ensure that contractors' rights under the OA are not "uncertain" and are respected by all FXG managers and employees. Indeed, it is plaintiffs themselves who have maintained throughout this litigation that FXG's *policies and procedures* inform the issue of contractors' status. Thus, plaintiffs should be the first to recognize that the reengineered policies and procedures qualify as "new events or conditions which altered the respective rights of the parties," thereby precluding the application of collateral estoppel. *Evans*, 238 Cal. Rptr. at 262.

Plaintiffs contend, however, that the changes are merely "cosmetic" and thus the issues in the cases remain identical. (Pls. Br. 15.) Plaintiffs provide no record analysis to support that conclusory, self-serving characterization – even though it is their burden to prove that all material facts are identical. And of course the characterization is wrong. As just shown, the changes affect virtually every aspect of FXG's policies and procedures concerning contractors, and they specifically address key issues identified in the *Estrada* SD as indicative of employee-like control over contractors' actions. Plaintiffs' effort to prove otherwise is nothing more than a cursory footnote, which cites only the conclusory assertion of their own "expert" that FXG's policies have not changed materially. (Pls. Br. 14 n.11.) But the cited report consists entirely of inadmissible legal arguments, not any proper expert opinion about specialized industry usage of

terms of art. *See Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994).[11]

The cases plaintiffs cite do nothing to advance their position. They rely heavily on *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840 (3d Cir. 1974), and *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1 (1st Cir. 1983), but both decisions stand only for the unremarkable proposition that immaterial factual changes do not preclude application of collateral estoppel. *See Scooper Dooper*, 494 F.2d at 846; *Pignons*, 701 F.2d at 2. The one California decision they cite on this point – *Evans* – is even more irrelevant. In that case, the *exact same facts* were involved in the two actions; the party in the second action simply wanted to introduce new *evidence* that might possibly bear on the factfinder's assessment of the facts, which the court deemed insufficient to escape collateral estoppel. 238 Cal. Rptr. at 263 ("An exception to collateral estoppel cannot be grounded on the alleged discovery of more persuasive evidence."). As the Court of Appeal later described *Evans,* preclusion was allowed in the case only "because the [new evidence] appeared to be merely cumulative." *Smith v. ExxonMobil Oil Corp.*, 64 Cal. Rptr. 3d 69, 77 (Ct. App. 2007). Here, by contrast, the changes at issue are not "evidence" bearing on independent contractor status – i.e., testimony from a contractor or expert witness commenting on the effects of the exact same policies and procedures. The underlying facts themselves have changed: the policies and procedures, which plaintiffs themselves establish the legal relationship between the parties, simply are not the same policies and procedures examined by the court in *Estrada*. As *Evans* itself expressly recognizes, those kinds of changes – i.e., alterations in the actual facts relevant to the parties' "legal relationship" – preclude application of collateral estoppel. 238 Cal. Rptr. at 262-63.

---

[11] Plaintiffs later contend (Pls. Br. 17-18) that FXG's own witnesses testified that no significant changes were made to the FXG's policies and procedures, but their citations distort the record. *See supra* note 5.

Contrary to the tone of plaintiffs' brief, there is nothing nefarious about a company adjusting its policies after a judicial decision concerning those policies is issued. The law should encourage precisely that result. The *Estrada* court itself recognized that the independent contractor model is a legitimate means of doing business (SGI ¶ D15; Ex. H-06 at 3), and it found that the model had been exceedingly successful for at least one large category of contractors (SGI ¶ D14; Ex. H-06 at 17-18). Even the plaintiffs' witnesses in *Estrada* did not contend that they wanted to be employees – their testimony was that they thought they were going to be treated as independent contractors when they signed the OA, but that turned out not to be true in practice. (*See* SGI ¶ D6; Ex. H-06.) Plaintiffs in these cases likewise may believe that FXG's changes did not go far enough to make them independent contractors, but that is a legal and factual issue to be litigated on the merits in the MDL class actions, not a reason to apply *Estrada* broadly as if the changes never occurred.

*Second*, the facts at issue in *Estrada* also differed from the facts involved in the MDL class actions because the *Estrada* court expressly limited that case to facts involving a narrow class of contractors, i.e., those who serviced only one work area, drove full time, were not incorporated, and did not fall within a number of other excluded categories of pickup and delivery service providers. (SGI ¶ D11; Ex. H-06 at 1-2, 12). The court defined the class that way specifically to avoid factual differences that might preclude classwide analysis of contractors' status. (SGI ¶ D2; Ex. H-18 at 2-3 (noting that because of certain differences in hiring and servicing work areas, the "*Borello* analysis would be altered" and "the *Borello* factors might … have to be analyzed individually").) Thus, *by definition*, the *Estrada* court's employment status and right to control rulings were limited to the facts involving only those contractors who satisfied the class definition. To apply the *Estrada* court's ruling beyond the

scope of the carefully defined class in that case would make a mockery of the lengthy and hotly contested class certification proceedings conducted in *Estrada* – if the court's rulings were going to apply to all contractors regardless of class definition, the class proceedings in *Estrada* were utterly pointless. The same factual differences that caused the *Estrada* court to address only a narrowly defined class preclude application of collateral estoppel to a more broadly defined class.

*Third*, and finally, this Court's orders have made clear that the MDL class actions are to be tried on the basis of a fundamentally different type of factual record than was developed in *Estrada*. In *Estrada*, plaintiffs introduced testimony from eleven contractors and two terminal managers, each of whom primarily related personal anecdotes about their own experiences operating under the OA. (SGI ¶ D3; Ex. H-17.) FXG was compelled to respond with testimony from seven more contractors and six terminal managers, who in turn related their own individual experiences operating under the OA. (SGI ¶ D4; Ex. H-17.) The *Estrada* court relied on this anecdotal testimony to support its conclusion that the OA, while apparently establishing an independent contractor relationship on its face, was in practice a sham, since the violations and inappropriate conduct expressed in the anecdotes were allowed to "flourish," as the court put it. (SGI ¶ D7; Ex. H-06 at 10); *see supra* at 3-4 (describing *Estrada* analysis).

This Court has repeatedly made clear that the MDL plaintiffs will not be allowed to try their cases the way the *Estrada* case was tried. As the Court noted in certifying the Texas class, an argument that the OA was a sham or that the parties' actual relationship was inconsistent with would require "individual analysis of the actual relationship between the parties," precluding class certification. (Mar. 25, 2008 Order, at 41.) The Court, however, understood the plaintiffs to be making a different argument, viz., "that though the Operating Agreement labels the drivers

as independent contractors, the Operating Agreement itself reserves to FedEx Ground the right to control, making the drivers employees of FedEx Ground." (*Id.*) That determination, the Court explained, "will *only require analysis of the Operating Agreement and generally applicable corporate policies*, and so is suitable for class certification." (*Id.* (emphasis added).) Reiterating the point at the conclusion of its order, the Court stated that it resolved *all* the class certification motions "with the … assumption that the plaintiffs will not, at the summary judgment or trial stages, present evidence *other than the Operating Agreements and generally applicable FedEx policies*." (*Id.* at 153 (emphasis added).) And again in a subsequent order: "The court doesn't read the plaintiffs' statement of intent to include individualized evidence of driver intent and/or experience. If plaintiffs include such evidence in their summary judgment motions FedEx Ground can move to strike such individualized proof." (Apr. 22, 2008 Order, at 1.)

Though disclaimed by plaintiffs and effectively prohibited by the Court here, such anecdotal and individualized evidence of contractor's personal experiences is exactly what was adduced in *Estrada* and relied upon by the trial and appellate courts as proof of FXG's ability to wield power through "uncertainty" and "obfuscation" of the OA's actual meaning. Because such evidence unquestionably was "evidence other than the Operating Agreements and generally applicable FedEx [Ground] policies" (Mar. 25, 2008, at 153), it is clear that the trial record in *Estrada* differed markedly from the record that will be developed in the MDL class actions. There is therefore no basis for applying the result in *Estrada* to the MDL class actions, as if they were identical in all respects to *Estrada*, when they so clearly are not.

## II. EVEN IF BASIC COLLATERAL ESTOPPEL PREREQUISITES WERE SATISFIED, APPLICATION OF THE DOCTRINE WOULD BE FUNDAMENTALLY UNFAIR AND CONTRARY TO CALIFORNIA PUBLIC POLICY

As noted above, even where the basic prerequisites of collateral estoppel are satisfied, California courts still will not apply the doctrine offensively against a defendant where doing so would be unfair to defendant or contrary to public policy. Both conditions are met here.

**A. California Law Categorically Prohibits The Application Of Collateral Estoppel Against A Party Where, As Here, The Party Has Previously Prevailed On The Issue**

The California courts and the U.S. Supreme Court have stressed one basic circumstance in which collateral estoppel is categorically impermissible, even where the basic elements of the doctrine are otherwise satisfied: where "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979); *see Roos v. Red*, 30 Cal Rptr. 3d 446, 453 (Ct. App. 2005). "Those courts and commentators which have considered the question are in virtually unanimous agreement that where outstanding determinations are actually inconsistent on the matter sought to be precluded, it would be patently unfair to estop a party by the judgment it lost." *Sandoval*, 190 Cal. Rptr. at 37 (quotation omitted). As the California Court of Appeal put it bluntly, there is "something fundamentally offensive about depriving a party of the opportunity to litigate the issue again when he has shown beyond a doubt that on another day he prevailed." *Id.* (quotation omitted). Accordingly, application of collateral estoppel to an issue on which the defendant has previously prevailed is deemed "'unfair' to the defendant as a matter of law." *Roos*, 30 Cal Rptr. 3d at 452.

Here, assuming, as plaintiffs contend, that the issue of contractors' employment status is identical under every jurisdiction's law, FXG has prevailed on that issue on numerous prior occasions. For example:

- In *Mailhot v. FedEx Ground Package System, Inc.*, No. 02-257-JD (D.N.H. Feb. 13, 2004), a jury returned the verdict that plaintiff, a contractor, was not an employee of FXG

for purposes of the Americans with Disabilities Act ("ADA"). This case involved the application of the common law agency test. (SGI ¶ D20; Ex. H-08.)

- In *RPS, Inc.*, No. 5-RC-14905 (N.L.R.B. Aug. 3, 2000), the N.L.R.B. applied the common law agency test and found that contractors at FXG's Bridgeville, Delaware terminal were not "employees" within the meaning of Section 2(3) of the National Labor Relations Act. (SGI ¶ D20; Ex. H-10 at 63.)

- In *Issa v. Roadway Package System, Inc.*, No. C-841208 (Cal. Super. Ct. Nov. 1, 2004), the California Superior Court granted in part FXG's motion for summary judgment based on a finding that plaintiffs Issa and Rizkallah were independent contractors under the *Borello* factors. (SGI ¶ D20; Ex. H-07 at 13.) The court found the evidence in that case "overwhelming … that Plaintiffs retain ultimate control over the manner in which the work is performed." (*Id.* at 16.)

- In *Roach v. Roadway Package System, Inc.*, No. WCK 0038184 (July 29, 1999), the California Workers' Compensation Appeals Board upheld the determination that Roach was an independent contractor of FXG, and not its employee, applying California's multifactor standard. (SGI ¶ D20; Ex. H-13.) Specifically, the Board found "primarily" on the basis of the paper record including the OA, that FXG met its burden of proof under workers' compensation law to show independent contractor status. (*Id.* at 3-4.)

- In *Lemmings v. FedEx Ground Package System, Inc.*, 492 F. Supp. 2d 880 (W.D. Tenn. 2007), the court granted FXG's motion for summary judgment on the ground that plaintiff was not its employee and therefore could not bring an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq. Id.* at 882. Plaintiff was a driver for a contractor with FXG; the issue was whether FXG indirectly employed plaintiff by virtue of its relationship with the contractor. The court answered that question in the negative, holding that the contractor was not an employee under the common-law agency test, and therefore the contractor's driver could not be FXG's indirect employee. *Id.* at 887-88.

Perhaps most strikingly, FXG prevailed on the status issue *in Estrada itself*, when the court found that a major category of contractors – MWAs – are independent contractors under California's multifactored test. Again, accepting the premise of plaintiffs' collateral estoppel motion—viz., that all jurisdictions apply the same standards as California and that all material facts are identical (neither condition is actually true, for reasons already explained) – *Estrada* necessarily qualifies as a ruling in favor of FXG's position, at least with respect to the same significant category of contractors.

Given these favorable rulings (and others, *see supra* at 8 & note 6) on the issue of contractors' employment status,[12] California law prohibits a court from selecting one recent adverse ruling and applying it to preclude all future litigation over the issue. *See supra* at 24-25; *see also Hardy v Johns-Manville Sales Corp.*, 681 F.2d 334, 346 (5th Cir 1982) (given inconsistent prior verdicts, district court "erred in arbitrarily choosing one of these verdicts … as the bellwether").

**B. Applying Collateral Estoppel Would Contravene California's Public Policies Concerning Representative Litigation**

Applying nationwide collateral estoppel effect to *Estrada* far beyond the substantive and geographic terms of the narrow *Estrada* class also would contradict California public policies applied by the California Court of Appeal in *Estrada* itself. As discussed above, after issuing its SD, the trial court sought to enforce the SD through an equitable order declaring contractors to be employees and enjoining FXG from "mis-classifying" them under its then-current business model. The Court of Appeal rejected that equitable order on the ground that the *Estrada* plaintiffs had not obtained the class certification required under California law to apply an order broadly to parties not already before the court. *Supra* at 5-6.

The rule applied by the Court of Appeal was adopted by a popular referendum generally known as Proposition 64. *See Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207, 209-10 (Cal. 2006). Proposition 64 was driven by concerns that too many lawsuits had been filed ostensibly in the "public interest" by private parties with no actual standing to pursue them or represent the interests of others. *Id.* The purpose and effect of Proposition 64 was to limit "public interest" lawsuits primarily to actions brought by public officials. *Id.* Under

[12] Adjudicative agency rulings like *RPS* and *Roach* are entitled to preclusive effect no less than judicial decisions and jury verdicts. *See People v. Sims*, 651 P.2d 321, 327 (Cal. 1982).

Proposition 64, private lawsuits are allowed to have effect beyond the plaintiff actually before the court only when the plaintiff satisfies the requirements for class certification, *id.* at 210 – the original form of "representative litigation." Applying that rule, the Court of Appeal in *Estrada* held that the trial court could not transform its SD ruling a broad form of declaratory or injunctive relief enforceable against FXG. *Estrada*, 2006 WL 3378246, at *3-4.

Plaintiffs' motion to give nationwide collateral estoppel effect to the *Estrada* cannot be reconciled with the letter and spirit of that ruling. Plaintiffs' motion would, for all intents and purposes, turn the *Estrada* SD into a nationwide class action juggernaut – one that applies far outside the geographic limits of the *Estrada* class, well beyond the substantive definition of the *Estrada* class, to facts never addressed by the *Estrada* court, and to claims governed by laws never considered by the *Estrada* court. No such nationwide class behemoth would be remotely certifiable on its own terms, *see*, *e.g.*, *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir. 2002), but plaintiffs here propose to accomplish the very same result through collateral estoppel, thereby evading the requirements – and due process protections – of California and federal class certification standards. That result would be indefensible enough in any U.S. jurisdiction, but it is particularly contrary to California's public policies concerning representative litigation, which the public itself revised through popular referendum to ensure that private litigation hews closely to the specific private interests actually at stake in the case. The point is not that Proposition 64 wholly prohibits the offensive application of non-mutual collateral estoppel – though California precedents already dictate substantial caution in that situation, *see supra* at 9-10. It is that given the concerns underlying Proposition 64, a ruling against a defendant in one case should be applied against that defendant in other cases brought by nonparties only in the narrowest and clearest of circumstances – and

certainly not where, as here, collateral estoppel is being invoked to give much broader effect to the ruling than ever could have been obtained through any legitimate class action proceeding.

**C. The Public Policy Considerations Cited By Plaintiffs Do Not Justify Overriding FXG's Rights By Barring It From Litigating The MDL Class Actions**

Plaintiffs insist that application of collateral estoppel is required here, lest this Court imperil judicial economy, risk inconsistent judgments, and undermine judicial integrity. (Pls. Br. 23.) Plaintiffs are wrong.

To start, the policies cited by plaintiffs do not exist independently of the basic requirements of collateral estoppel – those policies are simply the reason collateral estoppel applies at all, when its requirements are satisfied. As noted above (and as plaintiffs concede (Pls. Br. 23)), if a court determines that the basic requirements have been met, it still cannot apply collateral estoppel unless doing so is consistent with the policies underlying the doctrine.

As already shown, the policy of judicial integrity counsels *against* application of collateral estoppel, given the inconsistency of rulings on the issue plaintiffs' motion would preclude. "Not only does issue preclusion in such cases appear arbitrary to a defendant who has had favorable judgments on the same issue, it also undermines the premise that different [tribunals] reach equally valid verdicts." *Sandoval*, 190 Cal. Rptr. at 37.

The inconsistency of verdicts also rebuts plaintiffs' pronouncement that "no possible purpose would be served" by allowing FXG to defend itself in this litigation. (Pls. Br. 23.) One obvious purpose would be to allow FXG a chance to prevail on this issue yet again. Another would be to allow FXG to defend itself under the differing laws of other states. Still another legitimate purpose would be to allow the courts to evaluate the revised policies and procedures FXG adopted since *Estrada* was decided.

There is simply no countervailing policy requiring, or even allowing, the Court to give the *Estrada* SD broader collateral estoppel force than any class action that could ever be certified in any similar case. Plaintiffs are reduced to pleading judicial economy and their own convenience (Pls. Br. 23), but the Seventh Circuit has already condemned the "central planner" assumption that efficiency favors the resolution of nationwide litigation a single, all-or-nothing proceeding. *In re Bridgestone/Firestone*, 288 F.3d at 1020. As the court explained:

> One suit is an all-or-none affair, with high risk even if the parties supply all the information at their disposal. Getting things right the first time would be an accident. Similarly Gosplan or another central planner may hit on the price of wheat, but that would be serendipity…. [O]nly a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions will yield the information needed for accurate evaluation of mass tort claims.

*Id.* (quotation omitted). The same is true for the employment-law claims plaintiffs assert here. They are governed by different laws and involve different facts. Even assuming, as this Court has determined, that many of those claims are suitable for classwide treatment, both fairness and accuracy require that the claims be evaluated on their own merits under their own states' laws – not adjudicated summarily on the basis of a false assumption that one tribunal in one state already conclusively determined all contractors' claims, reaching the one correct result under identical legal standards applied to identical facts. Because none of that is true, collateral estoppel cannot be applied.

**CONCLUSION**

For the foregoing reasons, FXG respectfully requests that this Court deny plaintiffs' motion for an order barring FXG from litigating any issue on account of *Estrada*.

Dated: June 9, 2008. Respectfully submitted,

By: s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN  46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

John H. Beisner
Robert M. Schwartz
Jonathan D. Hacker
Andrew M. Weiner
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel:  (202) 383-5300
Fax:  (202) 383-5414

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of June, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

## INTRODUCTION

Defendant FedEx Ground Package System, Inc. ("FXG") informed the SEC and its shareholders on December 21, 2007, that the IRS "had concluded an audit for the 2002 calendar year regarding the classification of owner-operators at FedEx Ground" and "tentatively concluded . . . that FedEx Ground's pick-up-and-delivery owner-operators should be reclassified as employees for federal income tax purposes," and "anticipates assessing tax and penalties of $319 million plus interest for 2002." Dec. 21, 2007 10-Q ("SEC Filing") at 19 (Doc. 1068). This determination by a large IRS field examination team—the culmination of a four-year audit of FXG's business model —is the most recent and authoritative statement about FXG drivers' employment status from the IRS, whose prior statement ("Letter of Assurance") FXG has used as a centerpiece of its defense in this case.

Had the IRS audit team found FXG's drivers properly classified as independent contractors, FXG would no doubt hasten to disclose that determination to the Court. Instead, FXG seeks to conceal the IRS' Notice of Proposed Assessment ("NOPA") through misstatement of the parties' discovery agreements, misinterpretations of IRS procedure, and wholly unwarranted assertion of privilege, which FXG waived in any event. *See* Defendant's Mem. in Opp'n to Motion to Compel ("Def. Br."). FXG's arguments lack merit and should be rejected.

The NOPA is unquestionably a taxing agency "determination" which, even though "subject to change," FXG explicitly agreed to produce and must produce under its duty to supplement its earlier discovery. The NOPA is indistinguishable from the Proposed Notice of Assessment provided to FXG by the California Employment Development Department ("EDD") which FXG produced without objection pursuant to the parties' express agreement. Moreover, the NOPA also must be disclosed in response to Plaintiffs' proper request in Fifth Wave

discovery, specifically material to Wave Five cases challenging employment status, as a document FXG recently obtained after the close of Wave Four discovery. Finally, the NOPA is not privileged, but even if it were, FXG waived any privilege by offering the IRS' prior letter and producing its corporate designee to testify about the IRS audit before that audit had "concluded." FXG's efforts to stonewall Plaintiffs' legitimate discovery should be rejected. Plaintiffs respectfully request that the Court grant their motion to compel production of the NOPA and all attached documents and permit Plaintiffs to reopen the deposition of FXG's corporate designee to cover only events related to the NOPA and the completion of the IRS audit.

## ARGUMENT

### I. The NOPA Is a "Determination" Which FXG Agreed to Produce and Must Produce as a Supplement to FXG's Earlier Response to Plaintiffs' Prior Discovery Requests.

#### A. The NOPA is a Determination Which Falls Expressly Under the Parties' Agreement.

The IRS NOPA is precisely the type of document FXG agreed to disclose when it agreed to produce **"**determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees **. . . even though they may be on appeal or otherwise subject to challenge."** June 26, 2006 letter from Michael McGuinness to Lynn Faris (Declaration of Susan Ellingstad, submitted with Plaintiffs' Mem in Sup. Amended Rule 37 Motion ("Ellingstad Decl.") Ex. 5 (emphasis added)).

FXG makes a far-fetched semantic argument that seeks to evade its duty to supplement its discovery responses by asserting that the draft NOPA is not a "determination." Def. Br. at 3.

A “determination” is “the act of making or arriving at a decision,” or “the decision reached.”[1] The NOPA is the decision reached by the IRS field examination team following a four-year audit of FXG that began in December, 2003 and concluded in December, 2007. The IRS’ decision was described by FXG itself as a “tentative conclusion” and in plain language, is a “determination,” whether that determination is preliminary or otherwise.

All of FXG’s shrill protests about the “preliminary,” “tentative,” or “**draft**” nature of the NOPA mean nothing more than that the determination of the IRS audit team is “on appeal or otherwise subject to challenge.” As FXG clearly knew at the time it agreed to produce such decisions, the use of the term “or otherwise subject to challenge” is a broadly stated reference to any type of reconsideration, including the types described at length by FXG in its brief, i.e., after discussion with the tax agencies about their conclusions. This language in the parties’ agreement clearly means that FXG agreed to produce decisions and conclusions that are not “final.” Accordingly, the draft NOPA falls expressly within the parties’ agreement – which never limited the duty to produce documents to final determinations. If the IRS changes its field team’s determination that FXG P&D drivers are employees for tax year 2002, FXG can and assuredly will bring that fact to the Court’s and Plaintiffs’ attention. In the meantime, the fact that the NOPA is subject to change has not bearing on whether it is discoverable.

FXG’s production, in response to the same discovery requests, of the California Employment Development Department’s “Proposed Notice of Assessment” (“PNOA”) completely undermines FXG’s position. The PNOA, just like the NOPA, was preliminary and subject to further discussion and review between the EDD and FXG, and appeal including a full adversarial hearing which occurred subsequent to the FXG-EDD discussions documented in the

[1] Dictionary.com. The American Heritage Dictionary of the English Language, Fourth Edition. Houghton Mifflin Company, 2004. http://dictionary.reference.com/browse/determination (accessed: June 03, 2008).

PNOA and long after the issuance of the PNOA. Def. Br. 12-13. The PNOA informed FXG that the EDD "proposed" a tax adjustment based on misclassification of its P&D drivers, stated that "[t]he above amounts are based upon preliminary audit findings," that FXG "may contact the auditor at the phone number shown above to request a conference," and that FXG may wish to meet with the audit supervisor to correct inaccuracies "before an Official Notice of Assessment is issued." Ellingstad Decl. Ex. 18. Thus, just like the draft NOPA, the PNOA was preliminary and subject to change based on the EDD's discussions with FXG, yet FXG produced it as "material responsive to Request Nos. 23-24, and Nos. 77-79 of the Plaintiffs' First and Second Requests for Production." *Id.*[2] There is simply no material difference justifying FXG's refusal to produce the draft NOPA.[3]

**B. The NOPA is Relevant and Discoverable and Subject to FXG's Duty to Supplement Discovery Requests**.

FXG makes the specious argument that the IRS NOPA is not even relevant or discoverable under Rule 26. Def. Br. at 13. FXG misleadingly cites to cases regarding the admissibility of draft documents at trial and completely ignores the broad standards applied in discovery. Federal Rule of Civil Procedure 26(b)(1) permits the discovery of any matter relevant to the subject matter of the pending action, so long as the sought after information is not privileged, even if inadmissible at trial, if the information sought appears reasonably calculated

[2] The affidavit of George L. Priest, a lawyer involved in a case having nothing to do with employment status or IRS classification audits should be stricken or ignored as entirely irrelevant. Despite protestations to the contrary, Mr. Priest, a regular FXG witness, is clearly offered as an expert witness on IRS procedure based on one long-pending case. His identity has never been disclosed to Plaintiffs in this case and his use, therefore, is improper. Mr. Priest concedes that he "surely do[es] not speak for the I.R.S.," (*id. at 3)*, and his conclusion that the terms of the NOPA "may not resemble in any significant way the terms of a final determination by the I.R.S." (*id.*) is pure speculation from a single experience unrelated to the type of IRS audit involved here. His declaration should be disregarded.

[3] FXG also makes the feeble argument that it produced the PNOA because it was introduced into evidence at a hearing at which Plaintiffs' counsel, Beth Ross, was in attendance. Def. Br. at 13. There is no evidence provided that Ms. Ross saw or obtained a copy of the PNOA. Nor would Plaintiffs' receipt of the PNOA from some other source explain or support FXG's justification for producing the PNOA in regular discovery in this case because Plaintiffs "already had it." FXG produced the document because FXG's agreement required it to do so.

to lead to the discovery of admissible evidence. The Supreme Court has interpreted relevance broadly to include any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

A party remains under a duty to supplement discovery disclosures "at appropriate intervals," provided the information "has not otherwise been made known to the other parties." Fed. R. Civ. P. 26(e)(1); *Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004). "The failure to disclose, which includes providing evasive or incomplete answers, is sanctionable and properly remedied by an order compelling discovery." *Filippo v. Lee Publications, Inc.*, No. 2:05cv64, 2006 WL 3949171, at *3 (N.D. Ind. Dec. 11 2006). "The burden to show why a specific discovery request is improper rests upon the objecting party." *Id.* Rule 26(e)(2) "is designed, at least in part, to deal with the problem of later-discovered evidence and requires that a party be under a continuing duty to supplement or correct previous responses to certain discovery requests, including a request for production, whenever the party learns that the [previous] response is in some material way incomplete or incorrect." *Allen v. Bake-Line Prods., Inc.*, 2001 WL 883693, at *1 (N.D. Ill. Aug. 6, 2001).

FXG's contention -- that a preliminary decision by the IRS field examination team following a four-year audit that all of its P&D drivers nationwide have been misclassified is not even relevant -- is astonishing. FXG argues that simply because the document is marked "draft" and is subject to change, the tax assessment and underlying classification decision is next to meaningless. Not so. FXG was compelled to disclose the NOPA to the SEC, the public, and its shareholders. A corporation is only required to disclose "material" risks in a Form 10-Q, and "materiality depends on the significance the reasonable investor would place on the withheld or

misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). A reasonable investor would attach no significance to the NOPA if the IRS audit team were, as FXG suggests, completely devoid of authority.

Similarly, FXG's efforts to isolate the IRS audit team's views from the views of the IRS is absurd. Contrary to FXG's characterizations of the audit team, their Vice President of Tax testified that this same audit team met with her approximately 15-16 times at FXG over the span of at least three years. Ford Deposition at 24-35, attached to Second Ellingstad Dec. at Exhibit 5. Ms. Ford similarly testified that she provided this audit team with true, accurate and complete information. *Id.* at 73-74. Moreover, given the existence of the 1995 Letter and Closing Agreement between FXG and the IRS, the idea that the audit team made this decision without any consultation with high authorities at the IRS is implausible.

The NOPA is indisputably relevant here as it indicates that the IRS audit team, after years of investigation and consideration, has rejected the 1995 Letter of Assurance that FXG has relied upon repeatedly in this case. Equally significant is that the audit team has concluded it may impose penalties for FXG's misclassification of its drivers despite that Letter of Assurance. That penalties were included in the NOPA means that the IRS field examiners concluded FXG did not have a reasonable basis for treating its P&D drivers as independent contractors and could not avail itself of the safe harbor provision of Section 530 of the Revenue Act of 1978. *See Nu-Look Design, Inc. v. C.I.R.*, 356 F.3d 290, 294 (3d Cir. 2004) (citing Section 530 of the Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763, 2885-86, § 530(a)(1) (reproduced at 26 U.S.C. § 3401 note).

Whether this document is subject to change in the future does not change the fact that it "bears on, or [] reasonably could lead to other matters that could bear on, any issue that is or may

be in the case." *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). It is undeniably relevant to the central issue in this case. As such it is discoverable.

**II. The NOPA Was Properly Requested in Fifth-Wave Discovery.**

Even if FXG were not required to produce the NOPA as a supplement to prior discovery responses, it must produce it pursuant to Plaintiffs' explicit request in Fifth Wave discovery. FXG's position that the NOPA is not subject to discovery in the Fifth Wave is based on misrepresentations of the parties' Fifth Wave Joint Memorandum in Support of the Parties' Joint Motion to Amend the Case Scheduling Order ("Joint Memorandum") (Doc. No. 1108). In the Joint Memorandum, the parties requested to reopen discovery for Fifth Wave cases, in which discovery "shall pertain only to new plaintiffs, claims and states implicated by cases transferred to these MDL proceedings after September 1, 2007." Joint Memorandum at 4. The parties agreed that new discovery "shall pertain to issues raised in the newly transferred cases only," and that "they will not conduct discovery that is duplicative or overlapping of the already completed discovery." *Id.* at 5. Pursuant to the Joint Memorandum, the Court ordered the parties to perform "limited discovery on 'fifth wave' cases." Doc. No. 1118. Plaintiffs timely and properly served their Ninth RFPs, including a specific request for the NOPA, as part of this Fifth Wave discovery because it did not exist prior to the close of Wave Four discovery.

FXG cannot deny that the NOPA is relevant to Fifth Wave cases; as FXG points out, "all of the Wave 5 cases involve disputes over the classification of drivers as independent contractors." Def. Br. at 10. The NOPA "pertains to issues raised in the newly transferred cases," and is subject to Fifth Wave discovery. The fact that the NOPA is relevant to other cases in addition to those in the Fifth Wave does not render it outside the scope of Fifth Wave discovery. FXG's claim that the parties did not intend to conduct "additional discovery as to

issues that had already been the subject of prior discovery," Def. Br. at 10, is simply false. Discovery in all waves relate to the central issue of FXG's classification of its P&D drivers. FXG asserts that Plaintiffs are not entitled to obtain documents which did not even exist during the earlier discovery period if they relate to employment status. That was never the intended scope of the limitation – which was to avoid duplication or repetition.

FXG further misstates the Joint Memorandum when it states that only documents "uniquely related to the new plaintiffs or new claims" is permissible. FXG produced, in the Fourth Wave, new discovery, including new documents, relating to the independent contractor status of all drivers – not just discovery that was somehow "unique" to the Plaintiffs in the Fourth Wave cases. Second Ellingstad Dec. ¶ 10. [4]

Nor do Plaintiffs, seek to "reopen discovery to investigate any issue related to independent contractor status." Def. Br. at 11. Plaintiffs merely contend that they are entitled to discovery into obviously relevant developments that occurred after prior waves of discovery. Production of a document that did not exist until after Fourth Wave discovery closed on August 31, 2008 (*see* Order of Jun. 29, 2007, at 2 (Doc. No. 766)) cannot be "duplicative or overlapping of the already completed discovery." Def. Br. at 7.

## III. The NOPA Is Not Protected By Any Privilege.

### A. The NOPA Is Not Privileged.

FXG notes that many courts have recognized a public policy against unnecessary public disclosure of tax **returns**.[5] Def. Br. 14. No court has ever recognized a policy against public

[4] FXG cites a variety of objections it made to Plaintiffs' Sixth RFPs during Fourth Wave discovery, but every one of these objections was based on FXG's claim that the documents existed and were not previously requested during earlier discovery periods.

[5] FXG also cites 26 U.S.C. § 6103(a). That section is irrelevant because it "does not block access, through pretrial discovery or otherwise, to copies of tax returns in the possession of litigants; all it prevents is the IRS's sharing tax returns with other government agencies." *CFTC v. Collins*, 997 F.2d 1230, 1233 (7th Cir. 1993).

disclosure of communications from the IRS to a taxpayer as the result of an IRS audit. Disclosure of such unprivileged communications is appropriate where, as here, they go to the central question in a lawsuit, where the taxpayer itself has put the IRS's opinion directly at issue by repeatedly citing the IRS's previously-expressed opinions, and where Plaintiffs cannot obtain the communications from any other source.

It is not surprising that no court has recognized the type of privilege FXG wishfully describes: there is no reason for it. The purpose of the qualified taxpayer privilege is to encourage taxpayers to be truthful in their tax returns without fear of legal exposure in other contexts. The tax return system is one of self-assessment, in which "each taxpayer (or person required to collect and pay over the tax) is required to file a prescribed form of return which shows the facts upon which tax liability may be determined and assessed." 26 C.F.R. § 601.103(a). Thus, public policy against public disclosure of tax returns encourages taxpayers to file accurate returns. *See CFTC v. Collins*, 997 F.2d 1230, 1233 (7th Cir. 1993).

This policy is not implicated here. Once the IRS has selected a return for examination, the system is no longer one of self-reporting. Examiners are authorized to, and will, "check the entire return filed by the taxpayer and will examine all books, papers, records, and memoranda dealing with matter required to be included in the return." 26 C.F.R. § 601.105(b)(1), (b)(3). The IRS audit team has access to whatever information chosen for review; the examinee prepares and files nothing and there is no need for a policy encouraging truthfulness.

FXG also asserts, without evidentiary support in the form of a declaration or otherwise, that "information regarding [] confidential, back and forth discussions" with the IRS is "embedded" in the NOPA. Def. Br. at 15-16. FXG proclaims that the parties agreed that such information would not be subject to production. Nowhere did the parties agree that

determinations that contained information regarding FXG's discussions with a taxing agency would not be produced (*see* Exhibit 5), and any taxing agency determination will likely reflect the content of the discussions between the agency and the taxpayer. For example, the "Audit Report" of the California EDD, produced by FXG with the PNOA, is a 31-page document containing extensive discussion of the EDD's audit, including its communications with FXG. Audit Report (Second Ellingstad Decl. Ex. 4).

FXG states that it is "important to note that earlier in this case plaintiffs asserted the taxpayer privilege to avoid the production of tax related information." Def. Br. at 16. This is false. As FXG acknowledged in that same round of briefing, "Plaintiffs claim that tax returns are not protected by privilege, but nonetheless argue they should not be compelled to produce them." Doc. No. 342 at 6. Plaintiffs' position in response to FXG's motion to compel individual tax returns was that public policy should prevent disclosure of the individuals' returns because Plaintiffs had not placed their returns in issue. Doc. No. 320. FXG's position was that "[f]ederal law clearly allows for the production of tax records where the Plaintiff has put them in issue," and that therefore "in this federal litigation that includes a nationwide federal question and other federal claims in several pleadings there is no impediment to the discovery of Plaintiffs' tax information." Doc. No. 307 at 15-16.

What is important, for purposes of this motion, is that the Court disagreed with Plaintiffs, holding that the some of the tax returns in question were not protected because "the information contained in the plaintiffs' tax returns [is] both relevant and material to the issues in this case," and compelled disclosure of certain Plaintiffs' tax returns. Dec. 14, 2006 Order (Doc. No. 451) at 10, 13. Even if the NOPA were subject to the same public policy against disclosure as a tax

return, which it is not, that privilege would not bar disclosure here because the NOPA's relevance to the central issue in this case is undisputed.

Finally, FXG contends that the NOPA would not be admissible at trial.  Although the issue is discoverability and not admissibility at trial, the NOPA likely would be admissible at trial in any event.  "[P]ublic records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial."  *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984).  Draft reports are also admissible.  *See United States v. Davis*, 826 F. Supp. 617, 621-22 (D.R.I. 1993) (holding that a document titled "1986 final Draft Remedial Investigation Report" was admissible as a public record pursuant to Fed. R. Evid. 803(8)(C)); *Jama v. INS*, 334 F. Supp. 2d 662, 677-81 (D.N.J. 2004) (holding an "interim assessment report," prepared by an INS "Assessment Team," admissible and noting that "[i]t is however clear, at least in this Circuit, that the fact that findings are subject to review or revision, though it bears on their trustworthiness, does not remove them from the category of findings for the purposes of [Rule 803(8)(C)").

The three cases cited by FXG for the proposition that "drafts of agency reports are not admissible" do not stand for that proposition.  None of them excluded an agency report solely on the basis that it was a "draft" or "preliminary."  *See Toole v. McClintock*, 999 F.2d 1430, 1434 (11th Cir. 1993) (holding that the district court erred in admitting an FDA report that was "irrelevant and inadmissible on what [defendant] knew or should have known about risks before 1988"); *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742-43 (2d Cir. 1989) (holding that the district court did not abuse its discretion by refusing to consider government reports regarding airline reservation systems they "do not reflect the real concerns of the business world"); *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (holding that an

agency recommendation reviewing various proposals for retrofitting railroad cars was properly excluded where it "expressly declined to state a conclusion on the most significant safety question" in the breach of warranty case).

**B. FXG Has Waived Any Privilege that Applied to the NOPA.**

FXG contends that the NOPA is privileged because it was "prepared by" the IRS "with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) . . . for any tax." Def. Br. 15. FXG waived any such privilege when it agreed to produce "determinations from any state or federal taxing agency" deciding the employment status of P&D drivers. Any determination by a taxing agency of P&D drivers' proper employment status would be prepared by the agency and address the possible existence of tax liability. By agreeing to produce such determinations, FXG has waived any privilege; FXG's belated privilege argument would render the parties' discovery agreement meaningless.

Income tax returns in the taxpayer's custody or control are discoverable where the party has put those returns at issue. *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 74 (7th Cir. 1992). FXG has produced and placed at issue the 1995 IRS Letter of Assurance, which like the NOPA was prepared by the IRS with respect to the determination of the existence of tax liability. FXG cannot produce allegedly privileged documents that support its position, then assert "privilege" when similar documents from the same taxing agency are found that support Plaintiffs' position. Furthermore, "[p]roduction of some privileged documents waives the privilege as to all documents of the same subject matter." *Chinnici v. Cent. DuPage Hosp. Ass'n*, 136 F.R.D. 464, 465 (N.D. Ill. 1991). The PNOA was prepared by the California EDD and determined the existence of tax liability on the part of FXG, just like the NOPA, so any privilege that applied to the NOPA also applied to the PNOA and is waived.

FXG also produced Sallie Ford to testify as FXG's corporate designee regarding "investigations, audits, reviews and/or determinations by the IRS and any state taxing authority" regarding classification of FXG's P&D drivers. Def. Br. at 6. As FXG admits, Ms. Ford "testified extensively about the ongoing audit," Def. Br. at 17, providing "testimony about an ongoing IRS audit of FedEx Grounds' 2002 tax return examining the contractors' classification status," Def. Br. at 6. *See* Ex. 5 to Second Ellingstad Decl. Her "extensive" testimony about the audit waived any privilege that could have applied to the NOPA.

**IV. Plaintiffs Are Entitled to Reopen the Deposition of Sallie Ford or a Corporate Designee.**

A court "must grant leave to the extent consistent with Rule 26(b)(2)" for the deposition to be taken of a person already deposed in the case. Fed. R. Civ. P. 30(a)(2). Rule 26(b)(2) permits the Court to limit discovery if it determines that (1) the discovery sought is cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (2) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (3) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Plaintiffs' request to reopen the deposition of Sallie Ford is neither cumulative nor duplicative, as Plaintiffs request only to question her about developments with the IRS subsequent to her prior deposition. Her testimony cannot be obtained through any other source. The burden and expense of a narrow reopening of her deposition are low, while the potential value of her testimony to the Court and this litigation are high. The IRS field examination team has issued a proposed assessment of $319 million, concluding after a four-year audit that FXG

P&D drivers are properly classified as employees. This significant development—the first opinion since 1995 from the IRS on the central issue in this litigation—constitutes good cause to reopen the deposition of Sallie Ford.

FXG contends that Ms. Ford will be "inhibited" in "her ability to communicate with the IRS" if Plaintiffs are permitted to "grill" her about her conversations with the IRS. Def. Br. at 17. FXG has already permitted Plaintiffs to question Ms. Ford at length regarding her communications with the IRS, so any potential harm to her ability to communicate with the IRS has been done. Ms. Ford testified as FXG's corporate designee regarding "investigations, audits, reviews and/or determinations by the IRS and any state taxing authority" regarding classification of FXG's P&D drivers. Def. Br. at 6. She provided "testimony about an ongoing IRS audit of FedEx Grounds' 2002 tax return examining the contractors' classification status." *Id.* She testified that she did not know when the audit would be finished or when the IRS would issue its determination. *Id.* In short, she "testified extensively about the ongoing audit." Def. Br. at 17. FXG cannot contend—now that the determination has been made adversely to FXG—that testimony about Ms. Ford's interaction with the IRS is impermissible. In any event, the IRS audit has concluded, according to FXG's SEC filing, so Ms. Ford's future ability to communicate with the IRS, at least for this particular audit, will not be compromised.

## CONCLUSION

Because the IRS Notice of Proposed Assessment is discoverable as supplementation or prior discovery requests, subject to explicit discovery requests, and is not protected by any privilege, Plaintiffs respectfully request the Court to compel FXG to produce the IRS Notice of Proposed Assessment, and all attachments, and to produce for deposition FXG's corporate designee.

Dated: June 10, 2008

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/ Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**SECOND DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

I, SUSAN E. ELLINGSTAD, state:

1. I am a partner with the law firm of Lockridge Grindal Nauen P.L.L.P., one of the firms serving as Co-Lead Counsel for Plaintiffs pursuant to the Initial Scheduling Order (Docket No. 52).

2. I submit this declaration in support of Plaintiffs' Reply Memorandum in Support of their Rule 37 Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition.

**DOCUMENTS ATTACHED TO THIS DECLARATION**

3. As set forth in more detail below, I attach the following documents and deposition transcript excerpts in support of Plaintiffs' Reply Memorandum in Support of their Rule 37 Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition.

4.     Attached as Exhibit 1 is a true and correct copy of FedEx Corporation's Form 10Q Quarterly Report, filed on December 21, 2007, obtained from FedEx Corporation's website.

5.     Attached as Exhibit 2 is a true and correct copy of a document titled "Closing Agreement on Final Determination Covering Specific Matters," produced to Plaintiffs by Defendant.

6.     Attached as Exhibit 3 is a true and correct copy of correspondence dated October 16, 2006, from Evelyn Becker to Robert Harwood.

7.     Attached as Exhibit 4 (filed under seal) is a true and correct copy of an Audit Report from the California Employment Development Department produced to Plaintiffs by Defendant.

8.     Attached as Exhibit 5 (filed under seal) is a true and correct copy of excerpts from the Deposition of Sallie Ford taken in connection with the above-referenced matter.

9.     Beth Ross, an attorney at the law firm of Leonard Carder (Co-Lead Counsel in this matter), attended a hearing on June 7, 2006, related to the California Employment Development Department's Proposed Notice of Assessment.  Ms. Ross did not obtain a copy of that Notice at the hearing.

10.     FXG produced, in the Fourth Wave of discovery, discovery relating to the independent contractor status of all drivers.  *See, e.g.*, FXG002361594-1596 ("A Message From Rob Ostrov Regarding Protective Insurance Refunds," dated Sept. 1, 2006 and produced on Feb. 14, 2008, in response to Plaintiffs' RFP No. 287); FXG002361402-1476 ("Terminating an Employee," marked "revised 06/05," produced on Feb. 14, 2008, in response to Plaintiffs' RFP No. 287); FXG002361396-1400 ("Contractor Relations- Observer Information- Handling Complaints," marked "Revised 1987," produced on Feb. 14, 2008 in response to Plaintiffs' RFP

No. 287); FXG002361194-1212 ("Manifest Mailing System National Service Agreement," dated Jan., 2004, produced Feb. 14, 2008 in response to Plaintiffs Sixth RFPs). These documents are attached as Exhibit 6 (filed under seal). Additionally, FXG produced James Primm, a new Divisional Vice President, for deposition on September 21, 2007. Mr. Primm's testimony was relevant to issues in all cases.

I swear under penalty of perjury under the laws of the State of Minnesota and the United States that the foregoing is true and correct. Executed on June 10, 2008 at Minneapolis, Minnesota.

Dated: June 10, 2008

**s/Susan E. Ellingstad**
Susan E. Ellingstad

# EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

(Mark One)

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED NOVEMBER 30, 2007 OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM __________ TO _______**

**Commission File Number: 1-15829**

# FEDEX CORPORATION

(Exact name of registrant as specified in its charter)

| Delaware<br>(State or other jurisdiction of incorporation or organization) | 62-1721435<br>(I.R.S. Employer Identification No.) |
|---|---|
| 942 South Shady Grove Road<br>Memphis, Tennessee<br>(Address of principal executive offices) | 38120<br>(ZIP Code) |

(901) 818-7500
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐ No ☑

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Common Stock | Outstanding Shares at December 17, 2007 |
|---|---|
| Common Stock, par value $0.10 per share | 309,464,551 |

FEDEX CORPORATION

INDEX

PAGE

PART I. FINANCIAL INFORMATION

ITEM 1. Financial Statements

Condensed Consolidated Balance Sheets
November 30, 2007 and May 31, 2007 .......... 3-4

Condensed Consolidated Statements of Income
Three and Six Months Ended November 30, 2007 and 2006 .......... 5

Condensed Consolidated Statements of Cash Flows
Six Months Ended November 30, 2007 and 2006 .......... 6

Notes to Condensed Consolidated Financial Statements .......... 7

Report of Independent Registered Public Accounting Firm .......... 29

ITEM 2. Management's Discussion and Analysis of Results of Operations and Financial Condition.......... 30

ITEM 3. Quantitative and Qualitative Disclosures About Market Risk .......... 48

ITEM 4. Controls and Procedures .......... 48

PART II. OTHER INFORMATION

ITEM 1. Legal Proceedings .......... 49

ITEM 1A. Risk Factors .......... 49

ITEM 4. Submission of Matters to a Vote of Security Holders .......... 49

ITEM 6. Exhibits .......... 51

Signature .......... 52

Exhibit Index .......... E-1

FEDEX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS

(IN MILLIONS)

ASSETS

| | November 30, 2007 (Unaudited) | May 31, 2007 |
|---|---|---|
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 830 | $ 1,569 |
| Receivables, less allowances of $140 and $136 | 4,324 | 3,942 |
| Spare parts, supplies and fuel, less allowances of $161 and $156 | 392 | 338 |
| Deferred income taxes | 531 | 536 |
| Prepaid expenses and other | 274 | 244 |
| Total current assets | 6,351 | 6,629 |
| PROPERTY AND EQUIPMENT, AT COST | 28,381 | 27,090 |
| Less accumulated depreciation and amortization | 15,156 | 14,454 |
| Net property and equipment | 13,225 | 12,636 |
| OTHER LONG-TERM ASSETS | | |
| Goodwill | 3,515 | 3,497 |
| Intangible and other assets | 1,256 | 1,238 |
| Total other long-term assets | 4,771 | 4,735 |
| | $ 24,347 | $ 24,000 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

FEDEX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
(IN MILLIONS, EXCEPT SHARE DATA)

LIABILITIES AND STOCKHOLDERS' INVESTMENT

| | November 30, 2007 (Unaudited) | May 31, 2007 |
|---|---|---|
| CURRENT LIABILITIES | | |
| Current portion of long-term debt | $ 127 | $ 639 |
| Accrued salaries and employee benefits | 1,066 | 1,354 |
| Accounts payable | 2,300 | 2,016 |
| Accrued expenses | 1,417 | 1,419 |
| Total current liabilities | 4,910 | 5,428 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 2,007 | 2,007 |
| OTHER LONG-TERM LIABILITIES | | |
| Deferred income taxes | 928 | 897 |
| Pension, postretirement healthcare and other benefit obligations | 824 | 1,164 |
| Self-insurance accruals | 790 | 759 |
| Deferred lease obligations | 631 | 655 |
| Deferred gains, principally related to aircraft transactions | 330 | 343 |
| Other liabilities | 167 | 91 |
| Total other long-term liabilities | 3,670 | 3,909 |
| COMMITMENTS AND CONTINGENCIES | | |
| COMMON STOCKHOLDERS' INVESTMENT | | |
| Common stock, $0.10 par value; 800 million shares authorized; 309 million shares issued as of November 30, 2007 and 308 million shares issued as of May 31, 2007 | 31 | 31 |
| Additional paid-in capital | 1,796 | 1,689 |
| Retained earnings | 12,882 | 11,970 |
| Accumulated other comprehensive loss | (945) | (1,030) |
| Treasury stock, at cost | (4) | (4) |
| Total common stockholders' investment | 13,760 | 12,656 |
| | $ 24,347 | $ 24,000 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Case 3:05-md-00527-RLM -CAN document 1402-3 filed 06/10/08 page 6 of 61

FEDEX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF INCOME
(UNAUDITED)
(IN MILLIONS, EXCEPT PER SHARE AMOUNTS)

| | Three Months Ended November 30, | | Six Months Ended November 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| REVENUES | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |
| OPERATING EXPENSES: | | | | |
| Salaries and employee benefits | 3,510 | 3,526 | 6,993 | 6,811 |
| Purchased transportation | 1,136 | 996 | 2,161 | 1,892 |
| Rentals and landing fees | 611 | 584 | 1,204 | 1,154 |
| Depreciation and amortization | 482 | 430 | 955 | 829 |
| Fuel | 1,060 | 860 | 2,024 | 1,801 |
| Maintenance and repairs | 519 | 492 | 1,063 | 1,007 |
| Other | 1,350 | 1,199 | 2,653 | 2,354 |
| | 8,668 | 8,087 | 17,053 | 15,848 |
| OPERATING INCOME | 783 | 839 | 1,597 | 1,623 |
| OTHER INCOME (EXPENSE): | | | | |
| Interest, net | (15) | (17) | (40) | (26) |
| Other, net | — | 1 | (2) | (4) |
| | (15) | (16) | (42) | (30) |
| INCOME BEFORE INCOME TAXES | 768 | 823 | 1,555 | 1,593 |
| PROVISION FOR INCOME TAXES | 289 | 312 | 582 | 607 |
| NET INCOME | $ 479 | $ 511 | $ 973 | $ 986 |
| EARNINGS PER COMMON SHARE: | | | | |
| Basic | $ 1.55 | $ 1.67 | $ 3.15 | $ 3.22 |
| Diluted | $ 1.54 | $ 1.64 | $ 3.12 | $ 3.17 |
| DIVIDENDS DECLARED PER COMMON SHARE | $ 0.10 | $ 0.09 | $ 0.20 | $ 0.18 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

FEDEX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)
(IN MILLIONS)

| | Six Months Ended November 30, | |
|---|---|---|
| | 2007 | 2006 |
| **Operating Activities:** | | |
| Net income | $ 973 | $ 986 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 955 | 829 |
| Provision for uncollectible accounts | 62 | 61 |
| Stock-based compensation | 54 | 56 |
| Deferred income taxes and other noncash items | 30 | (27) |
| Changes in operating assets and liabilities: | | |
| Receivables | (379) | (352) |
| Other current assets | (76) | (38) |
| Accounts payable and other operating liabilities | (314) | 167 |
| Other, net | (27) | (334) |
| Cash provided by operating activities | 1,278 | 1,348 |
| **Investing Activities:** | | |
| Capital expenditures | (1,513) | (1,459) |
| Business acquisition, net of cash acquired | — | (784) |
| Proceeds from asset dispositions and other | 11 | 32 |
| Cash used in investing activities | (1,502) | (2,211) |
| **Financing Activities:** | | |
| Principal payments on debt | (515) | (226) |
| Proceeds from debt issuance | - | 999 |
| Proceeds from stock issuances | 50 | 55 |
| Excess tax benefit on the exercise of stock options | 12 | 13 |
| Dividends paid | (62) | (55) |
| Other, net | — | (5) |
| Cash (used in) provided by financing activities | (515) | 781 |
| Net decrease in cash and cash equivalents | (739) | (82) |
| Cash and cash equivalents at beginning of period | 1,569 | 1,937 |
| Cash and cash equivalents at end of period | $ 830 | $ 1,855 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

FEDEX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

(1) General

*SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES.* These interim financial statements of FedEx Corporation ("FedEx") have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information, the instructions to Quarterly Report on Form 10-Q and Rule 10-01 of Regulation S-X, and should be read in conjunction with our Annual Report on Form 10-K for the year ended May 31, 2007 ("Annual Report"). Accordingly, significant accounting policies and other disclosures normally provided have been omitted since such items are disclosed therein.

In the opinion of management, the accompanying unaudited condensed consolidated financial statements reflect all adjustments (including normal recurring adjustments) necessary to present fairly our financial position as of November 30, 2007 and the results of our operations for the three- and six-month periods ended November 30, 2007 and 2006 and our cash flows for the six-month periods ended November 30, 2007 and 2006. Operating results for the three- and six-month periods ended November 30, 2007 are not necessarily indicative of the results that may be expected for the year ending May 31, 2008.

Except as otherwise specified, references to years indicate our fiscal year ending May 31, 2008 or ended May 31 of the year referenced and comparisons are to the corresponding period of the prior year.

Certain prior period amounts have been reclassified to conform to the current period's presentation.

*NEW ACCOUNTING PRONOUNCEMENTS.* New accounting rules and disclosure requirements can significantly impact the comparability of our financial statements. We believe the following new accounting pronouncements are relevant to the readers of our financial statements.

On June 1, 2007, we adopted Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 48, "Accounting for Uncertainty in Income Taxes." This interpretation establishes new standards for the financial statement recognition, measurement and disclosure of uncertain tax positions taken or expected to be taken in income tax returns.

The cumulative effect of adopting FIN 48 was immaterial. Upon adoption, our liability for income taxes under FIN 48 was $72 million, and the balance of accrued interest and penalties was $26 million. The liability recorded includes $57 million associated with positions that if favorably resolved would provide a benefit to our effective tax rate. We classify interest related to income tax liabilities as interest expense, and if applicable, penalties are recognized as a component of income tax expense. These income tax liabilities and accrued interest and penalties are presented as noncurrent liabilities because payment of cash is not anticipated within one year of the balance sheet date. These noncurrent income tax liabilities are recorded in the caption "Other liabilities" in our condensed consolidated balance sheets. As of November 30, 2007, there were no material changes to the adoption date disclosures made above.

We file income tax returns in the U.S. and various foreign jurisdictions. The U.S. Internal Revenue Service is currently examining our returns for the 2004 through 2006 tax years. We are no longer subject to U.S. federal income tax examination for years through 2003 except for specific U.S. federal income tax positions that are in various stages of appeal. No resolution date can be reasonably estimated at this time for these audits and appeals. We are also subject to ongoing audits in state, local and foreign tax jurisdictions throughout the world.

It is difficult to predict the ultimate outcome or the timing of resolution for tax positions under FIN 48. Changes may result from the conclusion of ongoing audits or appeals in state, local, federal and foreign tax jurisdictions, or from the resolution of various proceedings between the U.S. and foreign tax authorities. Our liability for tax positions under FIN 48 includes no matters that are individually material to us. It is reasonably possible that the amount of the benefit with respect to certain of our unrecognized tax positions will increase or decrease within the next 12 months, but an estimate of the range of the reasonably possible outcomes cannot be made. However, we do not expect that the resolution of any of our tax positions under FIN 48 will be material.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. ("SFAS") 157, "Fair Value Measurements," which provides a common definition of fair value, establishes a uniform framework for measuring fair value and requires expanded disclosures about fair value measurements. The requirements of SFAS 157 are to be applied prospectively, and we anticipate that the primary impact of the standard to us will be related to the measurement of fair value in our recurring impairment test calculations (such as measurements of our recorded goodwill and indefinite life intangible asset). We do not presently hold any financial assets or liabilities that would require recognition under SFAS 157 other than investments held by our pension plans. SFAS 157 is effective for us beginning June 1, 2008 (fiscal 2009); however, the FASB has proposed a one-year deferral of the adoption of the standard as it relates to non-financial assets and liabilities. Our evaluation of the impact of this standard is ongoing, and we have not yet determined the impact of the standard on our financial condition or results of operations.

In December 2007, the FASB issued SFAS 141R, "Business Combinations," and SFAS 160, "Accounting and Reporting Noncontrolling Interest in Consolidated Financial Statements, an amendment of ARB No. 51." These new standards significantly change the accounting for and reporting of business combination transactions and noncontrolling interests (previously referred to as minority interests) in consolidated financial statements. Both standards are effective for us beginning June 1, 2009 (fiscal 2010) and are applicable only to transactions occurring after the effective date.

*EMPLOYEES UNDER COLLECTIVE BARGAINING ARRANGEMENTS.* The pilots of FedEx Express, which represent a small number of our total employees, are employed under a collective bargaining agreement. During the second quarter of 2007, the pilots ratified a new four-year labor contract that included signing bonuses and other upfront compensation of approximately $143 million, as well as pay increases and other benefit enhancements. These costs were partially mitigated by reductions in variable incentive compensation.

*BUSINESS ACQUISITION.* On September 3, 2006, we acquired FedEx National LTL (formerly Watkins Motor Lines) for $787 million in cash. The financial results of FedEx National LTL are included in the FedEx Freight segment from the date of acquisition.

*DIVIDENDS DECLARED PER COMMON SHARE.* On November 16, 2007, our Board of Directors declared a dividend of $0.10 per share of common stock. The dividend will be paid on January 2, 2008 to stockholders of record as of the close of business on December 12, 2007. Each quarterly dividend payment is subject to review and approval by our Board of Directors, and we evaluate our dividend payment amount on an annual basis at the end of each fiscal year.

(2) Stock-Based Compensation

We have two types of equity-based compensation: stock options and restricted stock. The key terms of the stock option and restricted stock awards granted under our incentive stock plans are set forth in our Annual Report.

We use the Black-Scholes option pricing model to calculate the fair value of stock options. The value of restricted stock awards is based on the price of the stock on the grant date. We recognize stock-based compensation expense on a straight-line basis over the requisite service period of the award in the "Salaries and employee benefits" caption of our condensed consolidated income statements.

Our total stock-based compensation expense for the periods ended November 30 was as follows (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Stock-based compensation expense | $ 25 | $ 25 | $ 54 | $ 56 |

The following table summarizes the stock option shares granted and corresponding weighted-average Black-Scholes value for the periods ended November 30:

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Stock options granted | 2,645,710 | 1,801,146 |
| Weighted-average Black-Scholes value | $ 30.45 | $ 31.81 |

The stock option grants during the six-month period ended November 30, 2007, were primarily in connection with our principal annual stock option grant in July 2007.

See our Annual Report for a discussion of our methodology for developing each of the assumptions used in the valuation model. The following table presents the key weighted-average assumptions used in the valuation calculations for the options granted during the periods ended November 30:

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Expected lives | 5 years | 5 years |
| Expected volatility | 19% | 22% |
| Risk-free interest rate | 4.90% | 4.95% |
| Dividend yield | 0.329% | 0.300% |

(3) Comprehensive Income

The following table provides a reconciliation of net income reported in our financial statements to comprehensive income for the periods ended November 30 (in millions):

| | Three Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Net income | $ 479 | $ 511 |
| Other comprehensive income: | | |
| Foreign currency translation adjustments, net of deferred taxes of $9 in 2007 and $2 in 2006 | 47 | 2 |
| Amortization of unrealized pension actuarial gains/losses, net of deferred taxes of $5 in 2007 | 9 | — |
| Comprehensive income | $ 535 | $ 513 |

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Net income | $ 973 | $ 986 |
| Other comprehensive income: | | |
| Foreign currency translation adjustments, net of deferred taxes of $9 in 2007 and $2 in 2006 | 63 | 2 |
| Amortization of unrealized pension actuarial gains/losses, net of deferred taxes of $12 in 2007 | 22 | — |
| Comprehensive income | $ 1,058 | $ 988 |

(4) Financing Arrangements

We have a shelf registration statement filed with the Securities and Exchange Commission ("SEC") that allows us to sell, in one or more future offerings, any combination of our unsecured debt securities and common stock. In August 2006, we issued $1 billion of senior unsecured debt under our shelf registration statement, comprised of floating-rate notes totaling $500 million and fixed-rate notes totaling $500 million. The $500 million in floating-rate notes were repaid in August 2007. The fixed-rate notes bear interest at an annual rate of 5.5%, payable semi-annually, and are due in August 2009. The net proceeds were used for working capital and general corporate purposes, including the funding of several acquisitions during 2007.

From time to time, we finance certain operating and investing activities, including acquisitions, through borrowings under our $1 billion revolving credit facility or the issuance of commercial paper. The revolving credit agreement contains certain covenants and restrictions, none of which are expected to significantly affect our operations or ability to pay dividends. Our commercial paper program is backed by unused commitments under the revolving credit facility and borrowings under the program reduce the amount available under the credit facility. At November 30, 2007, no commercial paper borrowings were outstanding and the entire amount under the credit facility was available.

(5) Computation of Earnings Per Share

The calculation of basic and diluted earnings per common share for the periods ended November 30 was as follows (in millions, except per share amounts):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Net income | $ 479 | $ 511 | $ 973 | $ 986 |
| Weighted-average shares of common stock outstanding | 309 | 307 | 309 | 306 |
| Common equivalent shares: | | | | |
| Assumed exercise of outstanding dilutive options | 14 | 18 | 15 | 18 |
| Less shares repurchased from proceeds of assumed exercise of options | (11) | (14) | (12) | (13) |
| Weighted-average common and common equivalent shares outstanding | 312 | 311 | 312 | 311 |
| Basic earnings per common share | $ 1.55 | $ 1.67 | $ 3.15 | $ 3.22 |
| Diluted earnings per common share | $ 1.54 | $ 1.64 | $ 3.12 | $ 3.17 |
| Antidilutive options excluded from diluted earnings per common share calculation | 4.4 | 0.1 | 4.3 | 0.1 |

Antidilutive options included in the table above were excluded from the calculation of diluted earnings per share, as the exercise price of these options was greater than the average market price of common stock.

(6) Retirement Plans

We sponsor programs that provide retirement benefits to most of our employees. These programs include defined benefit pension plans, defined contribution plans and postretirement healthcare plans. Key terms of our retirement plans are provided in our Annual Report. Our retirement plans costs for the periods ended November 30 were as follows (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| U.S. domestic and international pension plans | $ 78 | $ 114 | $ 163 | $ 228 |
| U.S. domestic and international defined contribution plans | 34 | 41 | 72 | 81 |
| Postretirement healthcare plans | 15 | 14 | 31 | 28 |
| | $ 127 | $ 169 | $ 266 | $ 337 |

Net periodic benefit cost of the pension and postretirement healthcare plans for the periods ended November 30 was composed of the following (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Pension Plans: | | | | |
| Service cost | $ 130 | $ 133 | $ 259 | $ 265 |
| Interest cost | 180 | 177 | 360 | 354 |
| Expected return on plan assets | (247) | (233) | (493) | (465) |
| Amortization of prior service cost and other | 15 | 37 | 37 | 74 |
| | $ 78 | $ 114 | $ 163 | $ 228 |
| Postretirement Healthcare Plans: | | | | |
| Service cost | $ 8 | $ 8 | $ 17 | $ 16 |
| Interest cost | 7 | 7 | 15 | 14 |
| Amortization of prior service cost and other | — | (1) | (1) | (2) |
| | $ 15 | $ 14 | $ 31 | $ 28 |

We made tax-deductible voluntary contributions to our qualified U.S. domestic pension plans of $479 million during the first six months of 2008 and $482 million during the first six months of 2007. We do not expect to make any additional significant contributions in 2008.

(7) Business Segment Information

We provide a broad portfolio of transportation, e-commerce and business services through companies competing collectively, operating independently and managed collaboratively under the respected FedEx brand. Our major service lines include Federal Express Corporation ("FedEx Express"), the world's largest express transportation company; FedEx Ground Package System, Inc. ("FedEx Ground"), a leading provider of small-package ground delivery services; and FedEx Freight Corporation, a leading U.S. provider of LTL freight services. FedEx Services provides customer-facing sales, marketing and information technology support, as well as retail access for customers through FedEx Kinko's, primarily for the benefit of FedEx Express and FedEx Ground. These businesses form the core of our reportable segments.

Our reportable segments include the following businesses:

| | |
|---|---|
| **FedEx Express Segment** | FedEx Express (express transportation)<br>FedEx Trade Networks (global trade services) |
| **FedEx Ground Segment** | FedEx Ground (small-package ground delivery)<br>FedEx SmartPost (small-parcel consolidator) |
| **FedEx Freight Segment** | FedEx Freight LTL Group:<br>    FedEx Freight (regional LTL freight transportation)<br>    FedEx National (long-haul LTL freight transportation)<br>FedEx Custom Critical (time-critical transportation)<br>Caribbean Transportation Services (airfreight forwarding) |
| **FedEx Services Segment** | FedEx Services (sales, marketing and information technology functions)<br>FedEx Kinko's (document and business services and package acceptance)<br>FedEx Customer Information Services ("FCIS") (customer service, billing and collections)<br>FedEx Global Supply Chain Services (logistics services) |

The FedEx Services segment includes FedEx Services, which is responsible for our sales, marketing and information technology functions, FCIS, which is responsible for customer service, billings and collections for FedEx Express and FedEx Ground, FedEx Global Supply Chain Services, which provides a range of logistics services to our customers, and FedEx Kinko's.

During the first quarter of 2008, FedEx Kinko's was reorganized as a part of the FedEx Services segment. FedEx Kinko's provides retail access to our customers for our package transportation businesses and an array of document and business services. FedEx Services provides access to customers, through digital channels such as fedex.com. Under FedEx Services, FedEx Kinko's benefits from the full range of resources and expertise of FedEx Services to continue to enhance the customer experience, provide greater, more convenient access to the portfolio of services at FedEx, and increase revenues through our retail network. With this reorganization, the FedEx Services segment is now a reportable segment. Prior year amounts have been revised to conform to the current year segment presentation.

As part of this reorganization, we are pursuing synergies in sales, marketing, information technology and administrative areas. During the third quarter of 2008, management decided to slow the rate of expansion for new locations in 2009 and balance the focus between store expansion and improving core services at existing stores. However, we remain committed to the long-term expansion of our retail network.

FedEx Kinko's will continue to be treated as a reporting unit for purposes of goodwill and tradename impairment testing. A material change in our strategy or long-range outlook for FedEx Kinko's could trigger the need to perform an impairment test on these assets in advance of our regularly scheduled annual tests in the fourth quarter.

The costs of providing the sales, marketing and information technology functions of FedEx Services and the customer service functions of FCIS, together with the net operating costs of FedEx Global Supply Chain Services and FedEx Kinko's, are allocated primarily to the FedEx Express and FedEx Ground segments based on metrics such as relative revenues or estimated services provided. We believe these allocations approximate the net cost of providing these functions.

Certain FedEx operating companies provide transportation and related services for other FedEx companies outside their reportable segment. Billings for such services are based on negotiated rates, which we believe approximate fair value, and are reflected as revenues of the billing segment. These rates are adjusted from time to time based on market conditions. Such intersegment revenues and expenses are eliminated in the consolidated results and are not separately identified in the following segment information, as the amounts are not material.

The operating expenses line item "Intercompany charges" on the accompanying unaudited financial summaries of our transportation segments includes the allocations from the FedEx Services segment to the respective transportation segments. The "Intercompany charges" caption also includes allocations for administrative services provided between operating companies and certain other costs such as corporate management fees related to services received for general corporate oversight, including executive officers and certain legal and finance functions. Management evaluates transportation segment financial performance based on operating income.

The following table provides a reconciliation of reportable segment revenues, depreciation and amortization, and operating income to our condensed consolidated statements of income totals for the periods ended November 30 (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Revenues | | | | |
| FedEx Express segment | $ 6,037 | $ 5,693 | $ 11,926 | $ 11,333 |
| FedEx Ground segment | 1,698 | 1,520 | 3,316 | 2,937 |
| FedEx Freight segment [1] | 1,236 | 1,225 | 2,469 | 2,238 |
| FedEx Services segment | 550 | 543 | 1,075 | 1,070 |
| Other and eliminations | (70) | (55) | (136) | (107) |
| | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |
| Depreciation and amortization | | | | |
| FedEx Express segment | $ 234 | $ 208 | $ 464 | $ 413 |
| FedEx Ground segment | 77 | 65 | 150 | 126 |
| FedEx Freight segment [1] | 58 | 52 | 115 | 83 |
| FedEx Services segment | 113 | 104 | 226 | 206 |
| Other and eliminations | — | 1 | — | 1 |
| | $ 482 | $ 430 | $ 955 | $ 829 |
| Operating Income [2] | | | | |
| FedEx Express segment | $ 531 | $ 508 | $ 1,050 | $ 983 |
| FedEx Ground segment | 173 | 193 | 363 | 352 |
| FedEx Freight segment [1] | 79 | 138 | 184 | 288 |
| | $ 783 | $ 839 | $ 1,597 | $ 1,623 |

(1) Includes the results of FedEx National LTL from the date of acquisition on September 3, 2006.

(2) The net operating costs of the FedEx Services segment, including FedEx Kinko's, are allocated back to the transportation segments it supports. Prior year amounts have been revised to conform to the current year presentation.

The following table provides a reconciliation of segment assets to our condensed consolidated balance sheets totals as of November 30, 2007 and May 31, 2007 (in millions):

| | November 30, 2007 | May 31, 2007 |
|---|---|---|
| Segment Assets | | |
| FedEx Express segment | $ 16,934 | $ 15,650 |
| FedEx Ground segment | 4,276 | 3,937 |
| FedEx Freight segment | 3,274 | 3,150 |
| FedEx Services segment | 5,460 | 5,384 |
| Other and eliminations | (5,597) | (4,121) |
| | $ 24,347 | $ 24,000 |

The following table provides a reconciliation of reportable segment capital expenditures to consolidated totals for the six months ended November 30 (in millions):

| | FedEx Express Segment | FedEx Ground Segment | FedEx Freight Segment | FedEx Services Segment | Consolidated Total |
|---|---|---|---|---|---|
| 2007 | $ 815 | $ 288 | $ 181 | $ 229 | $ 1,513 |
| 2006 | 770 | 317 | 168 | 204 | 1,459 |

The following table presents revenue by service type and geographic information for the periods ended November 30 (in millions):

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| **REVENUE BY SERVICE TYPE** | | | | |
| FedEx Express segment: | | | | |
| Package: | | | | |
| U.S. overnight box | $ 1,615 | $ 1,634 | $ 3,231 | $ 3,288 |
| U.S. overnight envelope | 481 | 488 | 992 | 1,000 |
| U.S. deferred | 730 | 716 | 1,441 | 1,421 |
| Total U.S. domestic package revenue | 2,826 | 2,838 | 5,664 | 5,709 |
| International Priority (IP) | 1,910 | 1,697 | 3,731 | 3,362 |
| International domestic [1] | 174 | 57 | 329 | 109 |
| Total package revenue | 4,910 | 4,592 | 9,724 | 9,180 |
| Freight: | | | | |
| U.S. | 604 | 624 | 1,197 | 1,231 |
| International priority freight | 312 | 271 | 604 | 520 |
| International airfreight | 96 | 106 | 190 | 209 |
| Total freight revenue | 1,012 | 1,001 | 1,991 | 1,960 |
| Other [2] | 115 | 100 | 211 | 193 |
| Total FedEx Express segment | 6,037 | 5,693 | 11,926 | 11,333 |
| FedEx Ground segment | 1,698 | 1,520 | 3,316 | 2,937 |
| FedEx Freight segment [3] | 1,236 | 1,225 | 2,469 | 2,238 |
| FedEx Services segment | 550 | 543 | 1,075 | 1,070 |
| Other and Eliminations | (70) | (55) | (136) | (107) |
| | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |
| **GEOGRAPHICAL INFORMATION** [4] | | | | |
| Revenues: | | | | |
| U.S. | $ 6,790 | $ 6,649 | $ 13,483 | $ 12,995 |
| International | 2,661 | 2,277 | 5,167 | 4,476 |
| | $ 9,451 | $ 8,926 | $ 18,650 | $ 17,471 |

The following table presents noncurrent assets as of November 30, 2007 and May 31, 2007 (in millions):

| | November 30, 2007 | May 31, 2007 |
|---|---|---|
| Noncurrent assets: | | |
| U.S. | $ 14,782 | $ 14,191 |
| International | 3,214 | 3,180 |
| | $ 17,996 | $ 17,371 |

(1) International domestic revenues include our international domestic express operations in the United Kingdom, Canada, India and China.

(2) Other revenues includes FedEx Trade Networks.

(3) Includes the results of FedEx National LTL from the date of acquisition on September 3, 2006.

(4) International revenue includes shipments that either originate in or are destined to locations outside the United States. Noncurrent assets include property and equipment, goodwill and other long-term assets. Flight equipment is allocated between geographic areas based on usage.

(8) Commitments

As of November 30, 2007, our purchase commitments for the remainder of 2008 and annually thereafter under various contracts were as follows (in millions):

| | Aircraft | Aircraft-Related [1] | Other [2] | Total |
|---|---|---|---|---|
| 2008 (remainder) | $ 243 | $ 82 | $ 288 | $ 613 |
| 2009 | 930 | 143 | 183 | 1,256 |
| 2010 | 907 | 132 | 113 | 1,152 |
| 2011 | 665 | 9 | 62 | 736 |
| 2012 | 31 | — | 56 | 87 |
| Thereafter | — | — | 164 | 164 |

(1) Primarily aircraft modifications.

(2) Primarily vehicles, facilities, and advertising and promotions contracts.

The amounts reflected in the table above for purchase commitments represent non-cancelable agreements to purchase goods or services. Commitments to purchase aircraft in passenger configuration do not include the attendant costs to modify these aircraft for cargo transport unless we have entered into non-cancelable commitments to modify such aircraft. Open purchase orders that are cancelable are not considered unconditional purchase obligations for financial reporting purposes and are not included in the table above.

Deposits and progress payments of $122 million have been made toward aircraft purchases, options to purchase additional aircraft and other planned aircraft-related transactions. Our primary aircraft purchase commitments include the Boeing 757 ("B757") and Boeing 777 Freighter ("B777F") aircraft. In addition, we have committed to modify our DC10 aircraft for two-man cockpit configurations. Future payments related to these activities are included in the table above. Aircraft and aircraft-related contracts are subject to price escalations. The following table is a summary of the number and type of aircraft we are committed to purchase as of November 30, 2007, with the year of expected delivery:

| | A300 | B757 | B777F | MD11 | Total |
|---|---|---|---|---|---|
| 2008 (remainder) | 3 | 6 | — | — | 9 |
| 2009 | 3 | 14 | — | 2 | 19 |
| 2010 | — | 4 | 6 | — | 10 |
| 2011 | — | 5 | 9 | — | 14 |
| 2012 | — | 3 | — | — | 3 |
| Total | 6 | 32 | 15 | 2 | 55 |

A summary of future minimum lease payments under capital leases at November 30, 2007 is as follows (in millions):

| | | |
|---|---|---|
| 2008 (remainder) | $ | 92 |
| 2009 | | 13 |
| 2010 | | 97 |
| 2011 | | 8 |
| 2012 | | 8 |
| Thereafter | | 137 |
| | | 355 |
| Less amount representing interest | | 50 |
| Present value of net minimum lease payments | $ | 305 |

A summary of future minimum lease payments under non-cancelable operating

leases with an initial or remaining term in excess of one year at November 30, 2007 is as follows (in millions):

| | Aircraft and Related Equipment | Facilities and Other | Total |
|---|---|---|---|
| 2008 (remainder) | $ 388 | $ 576 | $ 964 |
| 2009 | 558 | 1,046 | 1,604 |
| 2010 | 544 | 870 | 1,414 |
| 2011 | 526 | 713 | 1,239 |
| 2012 | 504 | 596 | 1,100 |
| Thereafter | 3,430 | 3,574 | 7,004 |
| | $ 5,950 | $ 7,375 | $ 13,325 |

While certain of our lease agreements contain covenants governing the use of the leased assets or require us to maintain certain levels of insurance, none of our lease agreements include material financial covenants or limitations.

FedEx Express makes payments under certain leveraged operating leases that are sufficient to pay principal and interest on certain pass-through certificates. The pass-through certificates are not direct obligations of, or guaranteed by, FedEx or FedEx Express.

(9) Contingencies

*Wage-and-Hour.* We are a defendant in a number of lawsuits containing various class-action allegations of wage-and-hour violations. The plaintiffs in these lawsuits allege, among other things, that they were forced to work "off the clock," were not paid overtime or were not provided work breaks or other benefits. The complaints generally seek unspecified monetary damages, injunctive relief, or both. In September 2007, we tentatively agreed to settle two such lawsuits against FedEx Ground for an immaterial amount. We have denied any liability and intend to vigorously defend ourselves in the other wage-and-hour lawsuits. Given the nature and status of the claims in these other lawsuits, we cannot yet determine the amount or a reasonable range of potential loss, if any.

*Independent Contractor. Estrada v. FedEx Ground* is a class action involving single work area contractors in California. In August 2007, the California appellate court affirmed the trial court's ruling in *Estrada* that a limited number of California single work area contractors (most of whom have not contracted with FedEx Ground since 2001) should be reimbursed as employees for some of their operating expenses. The California supreme court has refused to review the appellate court decision. Accordingly, the case has been remanded to the trial court for reconsideration of the amount of such reimbursable expenses. We do not expect to incur a material loss in the *Estrada* matter.

FedEx Ground is involved in numerous other purported class-action lawsuits and state administrative proceedings that claim that the company's owner-operators should be treated as employees, rather than independent contractors. Most of the purported class actions have been consolidated for administration of the pre-trial proceedings by a single federal court, the U.S. District Court for the Northern District of Indiana. With the exception of recently filed cases that have been or will be transferred to the multi-district litigation, discovery and class certification briefing are now complete.

In October 2007, we received a decision from the court granting class certification in a Kansas action alleging state law claims on behalf of a statewide class and federal law claims under the Employee Retirement Income Security Act of 1974 on behalf of a nationwide class. The court also required the parties to submit briefs on the issue of whether the decision should be applied to the other actions pending class certification determination in the multi-district litigation. We have appealed the decision to the U.S. Court of Appeals for the Seventh Circuit.

Adverse determinations in these matters could, among other things, entitle certain of our contractors to the reimbursement of certain expenses and to the benefit of wage-and-hour laws and result in employment and withholding tax liability for FedEx Ground, and could result in changes to the independent contractor status of FedEx Ground's owner-operators. We believe that FedEx Ground's owner-operators are properly classified as independent contractors. Given the nature and status of the claims, we cannot yet determine the amount or a reasonable range of potential loss, if any, in these matters, but it is reasonably possible that such potential loss or such changes could be material.

On December 20, 2007, the Internal Revenue Service ("IRS") informed us that its audit team had concluded an audit for the 2002 calendar year regarding the classification of owner-operators at FedEx Ground. The IRS has tentatively concluded, subject to further discussion with us, that FedEx Ground's pick-up-and-delivery owner-operators should be reclassified as employees for federal employment tax purposes. The IRS has indicated that it anticipates assessing tax and penalties of $319 million plus interest for 2002. Similar issues are under audit by the IRS for calendar years 2004 through 2006. We believe that we have strong defenses to the IRS's tentative assessment and will vigorously defend our position, as we continue to believe that FedEx Ground's owner-operators are independent contractors. Given the preliminary status of this matter, we cannot yet determine the amount or a reasonable range of potential loss. However, we do not believe that any loss is probable.

*Antitrust - FedEx Freight Fuel Surcharge.* In July 2007, a purported antitrust class action lawsuit was filed in California federal court, naming FedEx Corporation (particularly FedEx Freight Corporation and its LTL freight subsidiaries) and several other major LTL freight carriers as defendants. The lawsuit alleges that the defendants conspired to fix fuel surcharge rates in violation of federal antitrust laws and seeks injunctive relief, treble damages and attorneys' fees. Since the filing of the original case, similar cases have been filed against us and other LTL freight carriers, each with allegations of conspiracy to fix fuel surcharge rates along with other related allegations. We believe that these lawsuits have no merit and intend to vigorously defend ourselves. Given the nature and status of the claims, we cannot yet determine the amount or a reasonable range of potential loss, if any, in these matters.

*Other.* FedEx and its subsidiaries are subject to other legal proceedings that arise in the ordinary course of their business. In the opinion of management, the aggregate liability, if any, with respect to these other actions will not materially adversely affect our financial position, results of operations or cash flows.

(10) Supplemental Cash Flow Information

The following table presents supplemental cash flow information for the periods ended November 30 (in millions):

| | Six Months Ended | |
|---|---|---|
| | 2007 | 2006 |
| Cash payments for: | | |
| Interest (net of capitalized interest) | $ 65 | $ 64 |
| Income taxes | 567 | 642 |

(11) Condensed Consolidating Financial Statements

We are required to present condensed consolidating financial information in order for the subsidiary guarantors (other than FedEx Express) of our public debt to continue to be exempt from reporting under the Securities Exchange Act of 1934.

The guarantor subsidiaries, which are wholly owned by FedEx, guarantee approximately $1.2 billion of our debt. The guarantees are full and unconditional and joint and several. Our guarantor subsidiaries were not determined using geographic, service line or other similar criteria, and as a result, the "Guarantor" and "Non-Guarantor" columns each include portions of our domestic and international operations. Accordingly, this basis of presentation is not intended to present our financial condition, results of operations or cash flows for any purpose other than to comply with the specific requirements for subsidiary guarantor reporting.

Condensed consolidating financial statements for our guarantor subsidiaries and non-guarantor subsidiaries are presented in the following tables (in millions):

CONDENSED CONSOLIDATING BALANCE SHEETS
(UNAUDITED)
November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CURRENT ASSETS | | | | | |
| Cash and cash equivalents | $ 435 | $ 140 | $ 255 | $ — | $ 830 |
| Receivables, less allowances | 2 | 3,284 | 1,083 | (45) | 4,324 |
| Spare parts, fuel, supplies, prepaid expenses and other, less allowances | 3 | 564 | 99 | — | 666 |
| Deferred income taxes | — | 493 | 38 | — | 531 |
| Total current assets | 440 | 4,481 | 1,475 | (45) | 6,351 |
| PROPERTY AND EQUIPMENT, AT COST | 23 | 25,796 | 2,562 | — | 28,381 |
| Less accumulated depreciation and amortization | 14 | 13,987 | 1,155 | — | 15,156 |
| Net property and equipment | 9 | 11,809 | 1,407 | — | 13,225 |
| INTERCOMPANY RECEIVABLE | — | 2,873 | 654 | (3,527) | — |
| GOODWILL | — | 2,667 | 848 | — | 3,515 |
| INVESTMENT IN SUBSIDIARIES | 17,656 | 3,410 | — | (21,066) | — |
| OTHER ASSETS | 661 | 482 | 745 | (632) | 1,256 |
| | $ 18,766 | $ 25,722 | $ 5,129 | $ (25,270) | $ 24,347 |
| LIABILITIES AND STOCKHOLDERS' INVESTMENT | | | | | |
| CURRENT LIABILITIES | | | | | |
| Current portion of long-term debt | $ 41 | $ 84 | $ 2 | $ — | $ 127 |
| Accrued salaries and employee benefits | 39 | 842 | 185 | — | 1,066 |
| Accounts payable | 39 | 1,793 | 513 | (45) | 2,300 |
| Accrued expenses | 24 | 1,148 | 245 | — | 1,417 |
| Total current liabilities | 143 | 3,867 | 945 | (45) | 4,910 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 1,249 | 756 | 2 | — | 2,007 |
| INTERCOMPANY PAYABLE | 3,527 | — | — | (3,527) | — |
| OTHER LONG-TERM LIABILITIES | | | | | |
| Deferred income taxes | — | 1,282 | 278 | (632) | 928 |
| Other liabilities | 107 | 2,507 | 128 | — | 2,742 |
| Total other long-term liabilities | 107 | 3,789 | 406 | (632) | 3,670 |
| STOCKHOLDERS' INVESTMENT | 13,740 | 17,310 | 3,776 | (21,066) | 13,760 |
| | $ 18,766 | $ 25,722 | $ 5,129 | $ (25,270) | $ 24,347 |

CONDENSED CONSOLIDATING BALANCE SHEETS
May 31, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CURRENT ASSETS | | | | | |
| Cash and cash equivalents | $ 1,212 | $ 124 | $ 233 | $ — | $ 1,569 |
| Receivables, less allowances | — | 3,029 | 948 | (35) | 3,942 |
| Spare parts, fuel, supplies, prepaid expenses and other, less allowances | 7 | 500 | 75 | — | 582 |
| Deferred income taxes | — | 505 | 31 | — | 536 |
| Total current assets | 1,219 | 4,158 | 1,287 | (35) | 6,629 |
| PROPERTY AND EQUIPMENT, AT COST | 22 | 24,681 | 2,387 | — | 27,090 |
| Less accumulated depreciation and amortization | 14 | 13,422 | 1,018 | — | 14,454 |
| Net property and equipment | 8 | 11,259 | 1,369 | — | 12,636 |
| INTERCOMPANY RECEIVABLE | — | 924 | 539 | (1,463) | — |
| GOODWILL | — | 2,667 | 830 | — | 3,497 |
| INVESTMENT IN SUBSIDIARIES | 14,588 | 3,340 | — | (17,928) | — |
| OTHER ASSETS | 670 | 457 | 755 | (644) | 1,238 |
| | $ 16,485 | $ 22,805 | $ 4,780 | $ (20,070) | $ 24,000 |
| LIABILITIES AND STOCKHOLDERS' INVESTMENT | | | | | |
| CURRENT LIABILITIES | | | | | |
| Current portion of long-term debt | $ 551 | $ 85 | $ 3 | $ — | $ 639 |
| Accrued salaries and employee benefits | 60 | 1,079 | 215 | — | 1,354 |
| Accounts payable | 37 | 1,563 | 448 | (32) | 2,016 |
| Accrued expenses | 36 | 1,197 | 189 | (3) | 1,419 |
| Total current liabilities | 684 | 3,924 | 855 | (35) | 5,428 |
| LONG-TERM DEBT, LESS CURRENT PORTION | 1,248 | 757 | 2 | — | 2,007 |
| INTERCOMPANY PAYABLE | 1,463 | — | — | (1,463) | — |
| OTHER LONG-TERM LIABILITIES | | | | | |
| Deferred income taxes | — | 1,262 | 279 | (644) | 897 |
| Other liabilities | 451 | 2,445 | 116 | — | 3,012 |
| Total other long-term liabilities | 451 | 3,707 | 395 | (644) | 3,909 |
| STOCKHOLDERS' INVESTMENT | 12,639 | 14,417 | 3,528 | (17,928) | 12,656 |
| | $ 16,485 | $ 22,805 | $ 4,780 | $ (20,070) | $ 24,000 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Three Months Ended November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 7,788 | $ 1,773 | $ (110) | $ 9,451 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 24 | 2,870 | 616 | — | 3,510 |
| Purchased transportation | — | 822 | 336 | (22) | 1,136 |
| Rentals and landing fees | 1 | 532 | 78 | — | 611 |
| Depreciation and amortization | 1 | 409 | 72 | — | 482 |
| Fuel | — | 983 | 77 | — | 1,060 |
| Maintenance and repairs | — | 478 | 41 | — | 519 |
| Intercompany charges, net | (53) | (57) | 110 | — | — |
| Other | 27 | 1,131 | 280 | (88) | 1,350 |
| | — | 7,168 | 1,610 | (110) | 8,668 |
| OPERATING INCOME | — | 620 | 163 | — | 783 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 479 | 72 | — | (551) | — |
| Interest, net | (12) | 1 | (4) | — | (15) |
| Intercompany charges, net | 14 | (18) | 4 | — | — |
| Other, net | (2) | 1 | 1 | — | — |
| INCOME BEFORE INCOME TAXES | 479 | 676 | 164 | (551) | 768 |
| Provision for income taxes | — | 220 | 69 | — | 289 |
| NET INCOME | $ 479 | $ 456 | $ 95 | $ (551) | $ 479 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Three Months Ended November 30, 2006

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 7,541 | $ 1,479 | $ (94) | $ 8,926 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 25 | 2,987 | 514 | — | 3,526 |
| Purchased transportation | — | 762 | 241 | (7) | 996 |
| Rentals and landing fees | 2 | 519 | 64 | (1) | 584 |
| Depreciation and amortization | 1 | 373 | 56 | — | 430 |
| Fuel | — | 807 | 53 | — | 860 |
| Maintenance and repairs | — | 460 | 32 | — | 492 |
| Intercompany charges, net | (49) | (63) | 112 | — | — |
| Other | 21 | 1,055 | 209 | (86) | 1,199 |
| | — | 6,900 | 1,281 | (94) | 8,087 |
| OPERATING INCOME | — | 641 | 198 | — | 839 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 511 | 123 | — | (634) | — |
| Interest, net | (7) | (11) | 1 | — | (17) |
| Intercompany charges, net | 8 | (6) | (2) | — | — |
| Other, net | (1) | 1 | 1 | — | 1 |
| INCOME BEFORE INCOME TAXES | 511 | 748 | 198 | (634) | 823 |
| Provision for income taxes | — | 261 | 51 | — | 312 |
| NET INCOME | $ 511 | $ 487 | $ 147 | $ (634) | $ 511 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Six Months Ended November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 15,434 | $ 3,422 | $ (206) | $ 18,650 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 57 | 5,726 | 1,210 | — | 6,993 |
| Purchased transportation | — | 1,568 | 634 | (41) | 2,161 |
| Rentals and landing fees | 2 | 1,051 | 152 | (1) | 1,204 |
| Depreciation and amortization | 1 | 808 | 146 | — | 955 |
| Fuel | — | 1,879 | 145 | — | 2,024 |
| Maintenance and repairs | — | 984 | 79 | — | 1,063 |
| Intercompany charges, net | (106) | (75) | 181 | — | — |
| Other | 46 | 2,231 | 540 | (164) | 2,653 |
| | — | 14,172 | 3,087 | (206) | 17,053 |
| OPERATING INCOME | — | 1,262 | 335 | — | 1,597 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 973 | 146 | — | (1,119) | — |
| Interest, net | (21) | (12) | (7) | — | (40) |
| Intercompany charges, net | 26 | (31) | 5 | — | — |
| Other, net | (5) | 2 | 1 | — | (2) |
| INCOME BEFORE INCOME TAXES | 973 | 1,367 | 334 | (1,119) | 1,555 |
| Provision for income taxes | — | 465 | 117 | — | 582 |
| NET INCOME | $ 973 | $ 902 | $ 217 | $ (1,119) | $ 973 |

CONDENSED CONSOLIDATING STATEMENTS OF INCOME
(UNAUDITED)
Six Months Ended November 30, 2006

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUES | $ — | $ 15,009 | $ 2,641 | $ (179) | $ 17,471 |
| OPERATING EXPENSES: | | | | | |
| Salaries and employee benefits | 52 | 5,857 | 902 | — | 6,811 |
| Purchased transportation | — | 1,491 | 415 | (14) | 1,892 |
| Rentals and landing fees | 2 | 1,033 | 120 | (1) | 1,154 |
| Depreciation and amortization | 1 | 735 | 93 | — | 829 |
| Fuel | — | 1,711 | 90 | — | 1,801 |
| Maintenance and repairs | — | 957 | 50 | — | 1,007 |
| Intercompany charges, net | (99) | (94) | 193 | — | — |
| Other | 44 | 2,092 | 382 | (164) | 2,354 |
| | — | 13,782 | 2,245 | (179) | 15,848 |
| OPERATING INCOME | — | 1,227 | 396 | — | 1,623 |
| OTHER INCOME (EXPENSE): | | | | | |
| Equity in earnings of subsidiaries | 986 | 237 | — | (1,223) | — |
| Interest, net | (6) | (21) | 1 | — | (26) |
| Intercompany charges, net | 9 | (15) | 6 | — | — |
| Other, net | (3) | — | (1) | — | (4) |
| INCOME BEFORE INCOME TAXES | 986 | 1,428 | 402 | (1,223) | 1,593 |
| Provision for income taxes | — | 498 | 109 | — | 607 |
| NET INCOME | $ 986 | $ 930 | $ 293 | $ (1,223) | $ 986 |

Case 3:05-md-00527-RLM -CAN document 1402-3 filed 06/10/08 page 28 of 61

CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS
(UNAUDITED)
Six Months Ended November 30, 2007

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | $ (320) | $ 1,403 | $ 195 | $ — | $ 1,278 |
| INVESTING ACTIVITIES | | | | | |
| Capital expenditures | — | (1,361) | (152) | — | (1,513) |
| Proceeds from asset dispositions and other | — | 4 | 7 | — | 11 |
| CASH USED IN INVESTING ACTIVITIES | — | (1,357) | (145) | — | (1,502) |
| FINANCING ACTIVITIES | | | | | |
| Net transfers from (to) Parent | 55 | (28) | (27) | — | — |
| Principal payments on debt | (512) | (2) | (1) | — | (515) |
| Proceeds from stock issuances | 50 | — | — | — | 50 |
| Excess tax benefit on the exercise of stock options | 12 | — | — | — | 12 |
| Dividends paid | (62) | — | — | — | (62) |
| CASH USED IN FINANCING ACTIVITIES | (457) | (30) | (28) | — | (515) |
| CASH AND CASH EQUIVALENTS | | | | | |
| Net (decrease) increase in cash and cash equivalents | (777) | 16 | 22 | — | (739) |
| Cash and cash equivalents at beginning of period | 1,212 | 124 | 233 | — | 1,569 |
| Cash and cash equivalents at end of period | $ 435 | $ 140 | $ 255 | $ — | $ 830 |

CONDENSED CONSOLIDATING STATEMENTS OF CASH FLOWS
(UNAUDITED)
Six Months Ended November 30, 2006

| | Parent | Guarantor Subsidiaries | Non-guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | $ (290) | $ 1,439 | $ 199 | $ — | $ 1,348 |
| INVESTING ACTIVITIES | | | | | |
| Capital expenditures | — | (1,355) | (104) | — | (1,459) |
| Business acquisition, net of cash acquired | — | — | (784) | — | (784) |
| Proceeds from asset dispositions and other | — | 15 | 17 | — | 32 |
| CASH USED IN INVESTING ACTIVITIES | — | (1,340) | (871) | — | (2,211) |
| FINANCING ACTIVITIES | | | | | |
| Net transfers (to) from Parent | (633) | (44) | 677 | — | — |
| Proceeds from debt issuance | 999 | — | — | — | 999 |
| Principal payments on debt | (200) | (26) | — | — | (226) |
| Proceeds from stock issuances | 55 | — | — | — | 55 |
| Excess tax benefit on the exercise of stock options | 13 | — | — | — | 13 |
| Dividends paid | (55) | — | — | — | (55) |
| Other, net | (5) | — | — | — | (5) |
| CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | 174 | (70) | 677 | — | 781 |
| CASH AND CASH EQUIVALENTS | | | | | |
| Net (decrease) increase in cash and cash equivalents | (116) | 29 | 5 | — | (82) |
| Cash and cash equivalents at beginning of period | 1,679 | 114 | 144 | — | 1,937 |
| Cash and cash equivalents at end of period | $ 1,563 | $ 143 | $ 149 | $ — | $ 1,855 |

REPORT OF INDEPENDENT REGISTERED
PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
FedEx Corporation

We have reviewed the condensed consolidated balance sheet of FedEx Corporation as of November 30, 2007, and the related condensed consolidated statements of income for the three-month and six-month periods ended November 30, 2007 and 2006 and the condensed consolidated statements of cash flows for the six-month periods ended November 30, 2007 and 2006. These financial statements are the responsibility of the Company's management.

We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the condensed consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of FedEx Corporation as of May 31, 2007, and the related consolidated statements of income, changes in stockholders' investment and comprehensive income, and cash flows for the year then ended not presented herein, and in our report dated July 9, 2007, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of May 31, 2007, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Ernst & Young LLP

Memphis, Tennessee
December 21, 2007

*Item 2. Management's Discussion and Analysis of Results of Operations and Financial Condition*

**GENERAL**

The following Management's Discussion and Analysis of Results of Operations and Financial Condition describes the principal factors affecting the results of operations, liquidity, capital resources, contractual cash obligations and critical accounting estimates of FedEx. This discussion should be read in conjunction with the accompanying quarterly unaudited condensed consolidated financial statements and our Annual Report on Form 10-K for the year ended May 31, 2007 ("Annual Report"). Our Annual Report includes additional information about our significant accounting policies, practices and the transactions that underlie our financial results, as well as our detailed discussion of the most significant risks and uncertainties associated with our financial and operating results.

We provide a broad portfolio of transportation, e-commerce and business services through companies competing collectively, operating independently and managed collaboratively under the respected FedEx brand. Our major service lines include Federal Express Corporation ("FedEx Express"), the world's largest express transportation company; FedEx Ground Package System, Inc. ("FedEx Ground"), a leading provider of small-package ground delivery services; and FedEx Freight Corporation, a leading U.S. provider of less-than-truckload ("LTL") freight services. Our FedEx Services segment provides customer-facing sales, marketing and information technology support, as well as retail access for customers through FedEx Kinko's Office and Print Services, Inc. ("FedEx Kinko's"), primarily for the benefit of FedEx Express and FedEx Ground. These companies form the core of our reportable segments. See "Reportable Segments" for further discussion.

The key indicators necessary to understand our operating results include:

- the overall customer demand for our various services;
- the volumes of transportation services provided through our networks, primarily measured by our average daily volume and shipment weight;
- the mix of services purchased by our customers;
- the prices we obtain for our services, primarily measured by yield (average price per shipment or pound or average price per hundredweight for FedEx Freight LTL Group shipments);
- our ability to manage our cost structure (capital expenditures and operating expenses) to match shifting volume levels; and
- the timing and amount of fluctuations in fuel prices and our ability to recover incremental fuel costs through our fuel surcharges.

Except as otherwise specified, references to years indicate our fiscal year ending May 31, 2008 or ended May 31 of the year referenced and comparisons are to the corresponding period of the prior year. References to our transportation segments include, collectively, our FedEx Express, FedEx Ground and FedEx Freight segments.

## RESULTS OF OPERATIONS

### *CONSOLIDATED RESULTS*

The following table compares revenues, operating income, operating margin, net income and diluted earnings per share (dollars in millions, except per share amounts) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006[1] | Change | 2007 | 2006[1] | Change |
| Revenues | $ 9,451 | $ 8,926 | 6 | $ 18,650 | $ 17,471 | 7 |
| Operating income | 783 | 839 | (7) | 1,597 | 1,623 | (2) |
| Operating margin | 8.3% | 9.4% | (110)bp | 8.6% | 9.3% | (70)bp |
| Net income | $ 479 | $ 511 | (6) | $ 973 | $ 986 | (1) |
| Diluted earnings per share | $ 1.54 | $ 1.64 | (6) | $ 3.12 | $ 3.17 | (2) |

(1) Operating expenses for the three and six months ended November 30, 2006 include a $143 million charge associated with upfront compensation and benefits under the new labor contract with our pilots, which was ratified in October 2006. The impact of this new contract on net income was approximately $78 million net of tax, or $0.25 per diluted share.

The following table shows changes in revenues and operating income by reportable segment for the three- and six-month periods ended November 30, 2007 compared to 2006 (in millions):

| | Change in Revenue | | Percent Change in Revenue | | Change in Operating Income | | Percent Change in Operating Income | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended | Six Months Ended | Three Months Ended | Six Months Ended | Three Months Ended | Six Months Ended | Three Months Ended | Six Months Ended |
| FedEx Express segment[1] | $ 344 | 593 | 6 | 5 | $ 23 | 67 | 5 | 7 |
| FedEx Ground segment | 178 | 379 | 12 | 13 | (20) | 11 | (10) | 3 |
| FedEx Freight segment[2] | 11 | 231 | 1 | 10 | (59) | (104) | (43) | (36) |
| FedEx Services segment | 7 | 5 | 1 | — | — | — | — | — |
| Other and Eliminations | (15) | (29) | NM | NM | — | — | — | — |
| | $ 525 | $ 1,179 | 6 | 7 | $ (56) | $ (26) | (7) | (2) |

(1) FedEx Express operating expenses for the three and six months ended November 30, 2006 include a $143 million charge associated with upfront compensation and benefits under the new labor contract with our pilots, which was ratified in October 2006.

(2) FedEx Freight segment results for the six months ended include the results of FedEx National LTL from the date of its acquisition on September 3, 2006.

The following graphs for FedEx Express, FedEx Ground and the FedEx Freight LTL Group show selected volume statistics (in thousands) for the five most recent quarters:




The following graphs for FedEx Express, FedEx Ground and the FedEx Freight LTL Group show selected yield statistics for the five most recent quarters:

(1) Package statistics do not include the operations of FedEx SmartPost.

The following graph for our transportation segments shows our average cost of jet and vehicle fuel per gallon for the five most recent quarters:

***Overview of Consolidated Results***

Our operating income and net income for the second quarter and first half of 2008 declined due to the net impact of substantially higher fuel costs and the continued weakness in the U.S. economy, which is limiting demand for our U.S. domestic package and LTL freight services. Increases in international shipments at FedEx Express and strong volume growth at FedEx Ground were positive factors for both the second quarter and first half of 2008. Lower variable incentive compensation and reduced retirement plans costs partially mitigated the impact of higher net fuel costs and the weak U.S. economy on our overall results. Operating income for the second quarter and first half of 2007 included $143 million in expenses associated with our pilot contract, which were mostly offset by the benefits from the timing of net fuel impacts and Hurricane Katrina insurance proceeds.

Revenue growth for the second quarter and first half of 2008 was primarily attributable to continued growth in FedEx Express International Priority ("IP") volumes and yields, significant increases in FedEx Express international domestic revenues due to acquisitions in the second half of 2007 and strong volume growth at FedEx Ground. FedEx Freight segment revenues remained relatively flat during the second quarter of 2008 due to the weak U.S. economy, and growth in the first half of 2008 was due to the inclusion of FedEx National LTL, which was acquired in the second quarter of 2007.

Operating income decreased in the second quarter and first half of 2008 due to the negative net impact of fuel costs across our transportation segments (as noted above) and the continued weakness in the U.S. economy. Reduced profitability in the second quarter was also driven by lower operating income at the FedEx Freight segment and costs associated with the independent contractor incentive programs within our FedEx Ground segment. Higher legal costs at FedEx Ground during the first quarter of 2008 negatively impacted our operating income for the first half of 2008.

Fuel expense increased approximately 23% during the second quarter of 2008, and approximately 12% for the first half of 2008, primarily due to an increase in the average price per gallon of fuel. Our operating income in the second quarter of 2008 reflected a difficult quarter-over-quarter comparison, as last year's second quarter results benefited from the timing lag that exists between when we purchase fuel and when our indexed fuel surcharges automatically adjust. During the second quarter of 2008, we experienced the opposite effect, as fuel prices significantly increased throughout the quarter, while changes in fuel surcharges for FedEx Express and FedEx Ground lag these increases by approximately six to eight weeks.

Fuel surcharges were not sufficient to offset incremental fuel costs for the second quarter and first half of 2008 based on a static analysis of the year-over-year changes in fuel prices compared to changes in fuel surcharges. Though fluctuations in fuel surcharge rates can be significant from period to period, fuel surcharges represent one of the many individual components of our pricing structure that impact our overall revenue and yield. Additional components include the mix of services purchased, the base price and other extra service charges we obtain for these services and the level of pricing discounts offered. In order to provide information about the impact of fuel surcharges on the trend in revenue and yield growth, we have included the comparative fuel surcharge rates in effect for the second quarter and first half of 2008 and 2007 in the following discussions of each of our transportation segments.

Our effective tax rate was 37.6% for the second quarter of 2008 and 37.4% for the first half of 2008, as compared to 37.9% for the second quarter of 2007 and 38.1% for the first half of 2007. The 2008 tax rate was lower than the 2007 rate primarily due to a favorable tax audit adjustment in the first quarter of 2008 and to increased international earnings permanently reinvested in our global network outside the United States. We expect the effective tax rate to be between 37.5% and 38.0% for the remainder of 2008. The actual rate will depend on a number of factors, including the amount and source of operating income.

***Outlook***

We expect our revenue growth rates to continue to moderate across all segments for the second half of 2008, as the continued weak U.S. economy is expected to further restrain demand for U.S. domestic express package and LTL freight services. We anticipate modest earnings growth for the remainder of 2008, as ongoing weakness in the U.S. economy and rising fuel costs will continue to negatively impact our results. These factors will be partially mitigated by revenue growth, primarily from IP services at FedEx Express and increased volumes at FedEx Ground. We are employing cost containment initiatives across all business segments to manage near-term expenditures, but continue to pursue strategic projects related to our long-term growth plans. Accordingly, we continue to expect our earnings in 2008 to be below our long-term goal of 10% to 15% annual earnings growth. However, we remain optimistic about the long-term prospects for all of our business segments.

We expect to continue to make significant investments to expand our global networks and broaden our service offerings, particularly through our international investments. Our planned investments for 2008 are focused on support for long-term volume growth, such as additional or expanded facilities and new aircraft, improvements in service levels, and improvements to productivity, including updates and enhancements to our technology capabilities. However, in light of the impact of the weak U.S. economy on demand for domestic package and LTL services, we have reduced our 2008 capital expenditure forecast from $3.5 billion to $3.1 billion.

All of our businesses operate in a competitive pricing environment, exacerbated by continuing volatile fuel prices. Historically, our fuel surcharges have largely been sufficient to offset incremental fuel costs; however, volatility in fuel costs may impact earnings because adjustments to our fuel surcharges lag changes in actual fuel prices paid. Therefore, the trailing impact of adjustments to our fuel surcharges can significantly affect our earnings in the short-term.

See "Forward-Looking Statements" for a discussion of potential risks and uncertainties that could materially affect our future performance.

### *NEW ACCOUNTING PRONOUNCEMENTS*

New accounting rules and disclosure requirements can significantly impact the comparability of our financial statements. We believe the following new accounting pronouncements are relevant to the readers of our financial statements.

On June 1, 2007, we adopted Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 48, "Accounting for Uncertainty in Income Taxes." This interpretation establishes new standards for the financial statement recognition, measurement and disclosure of uncertain tax positions taken or expected to be taken in income tax returns. The cumulative effect of adopting FIN 48 was immaterial. For additional information on the impact of adoption of FIN 48, refer to Note 1 to the accompanying unaudited condensed consolidated financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. ("SFAS") 157, "Fair Value Measurements," which provides a common definition of fair value, establishes a uniform framework for measuring fair value and requires expanded disclosures about fair value measurements. The requirements of SFAS 157 are to be applied prospectively, and we anticipate that the primary impact of the standard to us will be related to the measurement of fair value in our recurring impairment test calculations (such as measurements of our recorded goodwill and indefinite life intangible asset). We do not presently hold any financial assets or liabilities that would require recognition under SFAS 157 other than investments held by our pension plans. SFAS 157 is effective for us beginning June 1, 2008 (fiscal 2009); however, the FASB has proposed a one-year deferral of the adoption of the standard as it relates to non-financial assets and liabilities. Our evaluation of the impact of this standard is ongoing, and we have not yet determined the impact of the standard on our financial condition or results of operations.

In December 2007, the FASB issued SFAS 141R, "Business Combinations," and SFAS 160, "Accounting and Reporting Noncontrolling Interest in Consolidated Financial Statements, an amendment of ARB No. 51." These new standards significantly change the accounting for and reporting of business combination transactions and noncontrolling interests (previously referred to as minority interests) in consolidated financial statements. Both standards are effective for us beginning June 1, 2009 (fiscal 2010) and are applicable only to transactions occurring after the effective date.

### *REPORTABLE SEGMENTS*

FedEx Express, FedEx Ground and FedEx Freight represent our major service lines and, along with FedEx Services, form the core of our reportable segments. Our reportable segments include the following businesses:

| | |
|---|---|
| **FedEx Express Segment** | FedEx Express (express transportation)<br>FedEx Trade Networks (global trade services) |
| **FedEx Ground Segment** | FedEx Ground (small-package ground delivery)<br>FedEx SmartPost (small-parcel consolidator) |
| **FedEx Freight Segment** | FedEx Freight LTL Group:<br>  FedEx Freight (regional LTL freight transportation)<br>  FedEx National LTL (long-haul LTL freight transportation)<br>FedEx Custom Critical (time-critical transportation)<br>Caribbean Transportation Services (airfreight forwarding) |

**FedEx Services Segment**

FedEx Services (sales, marketing and information technology functions)
FedEx Kinko's (document and business services and package acceptance)
FedEx Customer Information Services ("FCIS") (customer service, billing and collections)
FedEx Global Supply Chain Services (logistics services)

***FEDEX SERVICES SEGMENT***

The FedEx Services segment includes FedEx Services, which is responsible for our sales, marketing and information technology functions, FCIS, which is responsible for customer service, billings and collections for FedEx Express and FedEx Ground, FedEx Global Supply Chain Services, which provides a range of logistics services to our customers, and FedEx Kinko's.

During the first quarter of 2008, FedEx Kinko's was reorganized as a part of the FedEx Services segment. FedEx Kinko's provides retail access to our customers for our package transportation businesses and an array of document and business services. FedEx Services provides access to customers, through digital channels such as fedex.com. Under FedEx Services, FedEx Kinko's benefits from the full range of resources and expertise of FedEx Services to continue to enhance the customer experience, provide greater, more convenient access to the portfolio of services at FedEx, and increase revenues through our retail network. With this reorganization, the FedEx Services segment is now a reportable segment. Prior year amounts have been revised to conform to the current year segment presentation.

As part of this reorganization, we are pursuing synergies in sales, marketing, information technology and administrative areas. During the third quarter of 2008, management decided to slow the rate of expansion for new locations in 2009 and balance the focus between store expansion and improving core services at existing stores. However, we remain committed to the long-term expansion of our retail network.

FedEx Kinko's will continue to be treated as a reporting unit for purposes of goodwill and tradename impairment testing. A material change in our strategy or long-range outlook for FedEx Kinko's could trigger the need to perform an impairment test on these assets in advance of our regularly scheduled annual tests in the fourth quarter.

The costs of providing the sales, marketing, and information technology functions of FedEx Services and the customer service functions of FCIS, together with the net operating costs of FedEx Global Supply Chain Services and FedEx Kinko's, are allocated primarily to the FedEx Express and FedEx Ground segments based on metrics such as relative revenues or estimated services provided. We believe these allocations approximate the net cost of providing these functions.

FedEx Services segment revenues, which reflect the operations of FedEx Kinko's and FedEx Global Supply Chain Services, increased slightly for the second quarter and first half of 2008. Higher package acceptance fees and revenue generated from new locations more than offset declines in copy product revenues at FedEx Kinko's for the second quarter and first half of 2008. Capital expenditures for the FedEx Services segment are primarily associated with information technology investments and store expansion activities at FedEx Kinko's. FedEx Kinko's continues to invest in a multi-year plan to open new store locations, improving core services and enhancing its integrated digital document service network, supporting the company's objective of being the back office for local businesses and the remote office for traveling professionals. FedEx Kinko's opened 173 new centers during the first half of 2008.

***OTHER INTERSEGMENT TRANSACTIONS***

Certain FedEx operating companies provide transportation and related services for other FedEx companies outside their reportable segment. Billings for such services are based on negotiated rates, which we believe approximate fair value, and are reflected as revenues of the billing segment. These rates are adjusted from time to time based on market conditions. Such intersegment revenues and expenses are eliminated in the consolidated results and are not separately identified in the following segment information, as the amounts are not material.

The operating expenses line item "Intercompany charges" on the accompanying unaudited financial summaries of our transportation segments includes the allocations from the FedEx Services segment to the respective transportation segments. The "Intercompany charges" caption also includes allocations for administrative services provided between operating companies and certain other costs such as corporate management fees related to services received for general corporate oversight, including executive officers and certain legal and finance functions. Management evaluates transportation segment financial performance based on operating income.

*FEDEX EXPRESS SEGMENT*

The following table compares revenues, operating expenses, operating income and operating margin (dollars in millions) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Revenues: | | | | | | |
| Package: | | | | | | |
| U.S. overnight box | $ 1,615 | $ 1,634 | (1) | $ 3,231 | $ 3,288 | (2) |
| U.S. overnight envelope | 481 | 488 | (1) | 992 | 1,000 | (1) |
| U.S. deferred | 730 | 716 | 2 | 1,441 | 1,421 | 1 |
| Total U.S. domestic package revenue | 2,826 | 2,838 | — | 5,664 | 5,709 | (1) |
| International Priority (IP) | 1,910 | 1,697 | 13 | 3,731 | 3,362 | 11 |
| International domestic [(1)] | 174 | 57 | NM | 329 | 109 | NM |
| Total package revenue | 4,910 | 4,592 | 7 | 9,724 | 9,180 | 6 |
| Freight: | | | | | | |
| U.S. | 604 | 624 | (3) | 1,197 | 1,231 | (3) |
| International priority freight | 312 | 271 | 15 | 604 | 520 | 16 |
| International airfreight | 96 | 106 | (9) | 190 | 209 | (9) |
| Total freight revenue | 1,012 | 1,001 | 1 | 1,991 | 1,960 | 2 |
| Other [(2)] | 115 | 100 | 15 | 211 | 193 | 9 |
| Total revenues | 6,037 | 5,693 | 6 | 11,926 | 11,333 | 5 |
| Operating expenses: | | | | | | |
| Salaries and employee benefits | 2,059 | 2,116 | (3) | 4,119 | 4,118 | — |
| Purchased transportation | 299 | 269 | 11 | 579 | 532 | 9 |
| Rentals and landing fees | 417 | 392 | 6 | 828 | 790 | 5 |
| Depreciation and amortization | 234 | 208 | 13 | 464 | 413 | 12 |
| Fuel | 872 | 716 | 22 | 1,672 | 1,514 | 10 |
| Maintenance and repairs | 376 | 365 | 3 | 778 | 763 | 2 |
| Intercompany charges | 536 | 520 | 3 | 1,051 | 1,022 | 3 |
| Other | 713 | 599 | 19 | 1,385 | 1,198 | 16 |
| Total operating expenses [(3)] | 5,506 | 5,185 | 6 | 10,876 | 10,350 | 5 |
| Operating income | $ 531 | $ 508 | 5 | $ 1,050 | $ 983 | 7 |
| Operating margin | 8.8% | 8.9% | (10)bp | 8.8% | 8.7% | 10bp |

(1) International domestic revenues include our international domestic express operations, primarily in the United Kingdom, Canada, India and China.

(2) Other revenues includes FedEx Trade Networks.

(3) Operating expenses for the three and six months ended November 30, 2006 included a $143 million charge associated with upfront compensation and benefits under the labor contract with our pilots, which was ratified in October 2006.

The following table compares selected statistics (in thousands, except yield amounts) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Package Statistics [1] | | | | | | |
| Average daily package volume (ADV): | | | | | | |
| U.S. overnight box | 1,163 | 1,183 | (2) | 1,150 | 1,174 | (2) |
| U.S. overnight envelope | 677 | 700 | (3) | 688 | 702 | (2) |
| U.S. deferred | 902 | 895 | 1 | 883 | 875 | 1 |
| Total U.S. domestic ADV | 2,742 | 2,778 | (1) | 2,721 | 2,751 | (1) |
| IP | 535 | 502 | 7 | 516 | 484 | 7 |
| International domestic [2] | 310 | 49 | NM | 294 | 46 | NM |
| Total ADV | 3,587 | 3,329 | 8 | 3,531 | 3,281 | 8 |
| Revenue per package (yield): | | | | | | |
| U.S. overnight box | $ 22.06 | $ 21.92 | 1 | $ 21.94 | $ 21.87 | — |
| U.S. overnight envelope | 11.27 | 11.06 | 2 | 11.26 | 11.13 | 1 |
| U.S. deferred | 12.84 | 12.70 | 1 | 12.76 | 12.69 | 1 |
| U.S. domestic composite | 16.36 | 16.21 | 1 | 16.26 | 16.21 | — |
| IP | 56.63 | 53.71 | 5 | 56.52 | 54.33 | 4 |
| International domestic [2] | 8.90 | 18.41 | NM | 8.75 | 18.37 | NM |
| Composite package yield | 21.73 | 21.90 | (1) | 21.52 | 21.86 | (2) |
| Freight Statistics [1] | | | | | | |
| Average daily freight pounds: | | | | | | |
| U.S. | 8,915 | 9,917 | (10) | 8,878 | 9,642 | (8) |
| International priority freight | 2,279 | 1,980 | 15 | 2,150 | 1,876 | 15 |
| International airfreight | 1,827 | 1,946 | (6) | 1,789 | 1,922 | (7) |
| Total average daily freight pounds | 13,021 | 13,843 | (6) | 12,817 | 13,440 | (5) |
| Revenue per pound (yield): | | | | | | |
| U.S. | $ 1.08 | $ 1.00 | 8 | $ 1.05 | $ 1.00 | 5 |
| International priority freight | 2.17 | 2.18 | — | 2.19 | 2.17 | 1 |
| International airfreight | 0.83 | 0.86 | (3) | 0.83 | 0.85 | (2) |
| Composite freight yield | 1.23 | 1.15 | 7 | 1.21 | 1.14 | 6 |

(1) Package and freight statistics include only the operations of FedEx Express.

(2) International domestic statistics include our international domestic express operations, primarily in the United Kingdom, Canada, India and China.

***FedEx Express Segment Revenues***

FedEx Express segment revenues increased 6% in the second quarter of 2008 and 5% in the first half of 2008 due to growth in IP and international domestic revenue, partially offset by decreases in U.S. domestic package and U.S. freight revenues. During the second quarter of 2008, IP revenues grew 13% on volume growth of 7% and yield improvement of 5%. During the first half of 2008, IP revenue grew 11% on volume growth of 7% and yield improvement of 4%. Significant increases in international domestic revenues were driven by business acquisitions in the second half of 2007, primarily in the United Kingdom.

IP volume growth during the second quarter and first half of 2008 was due to increased demand in Asia, resulting from continued expansion of our services in Asian markets, as well as increases in the U.S. outbound and European markets. Increased international domestic volumes were driven by business acquisitions in the second half of 2007. U.S. domestic package and U.S. freight volumes decreased during the second quarter and first half of 2008, as the ongoing weak U.S. economy continued to have an impact on demand for these services.

IP yield increased during the second quarter and first half of 2008 primarily due to favorable exchange rates and increases in international average weight per package, partially offset by decreases in the average rate per pound. International domestic yield decreased during the second quarter and first half of 2008 as a result of the inclusion of lower-yielding services at the companies acquired in the second half of 2007. Composite freight yield increased in both the second quarter and first half of 2008 due to changes in service mix and favorable exchange rates.

Our fuel surcharges are indexed to the spot price for jet fuel. Using this index, the U.S. domestic and outbound fuel surcharge and the international fuel surcharges ranged as follows for the three- and six-month periods ended November 30:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| U.S. Domestic and Outbound Fuel Surcharge: | | | | |
| Low | 14.00% | 12.50% | 13.50% | 12.50% |
| High | 16.50 | 17.00 | 16.50 | 17.00 |
| Weighted—average | 15.00 | 15.35 | 14.34 | 15.67 |
| International Fuel Surcharges: | | | | |
| Low | 12.50 | 12.00 | 12.00 | 12.00 |
| High | 16.50 | 17.00 | 16.50 | 17.00 |
| Weighted—average | 14.91 | 14.33 | 14.47 | 14.55 |

In October 2007, we announced a 6.9% average list price increase effective January 7, 2008 on FedEx Express U.S. domestic and U.S. outbound express package and freight shipments and made various changes to other surcharges, while we lowered our fuel surcharge index by 2%. In November 2006, we announced a 5.5% average list price increase effective January 1, 2007 on FedEx Express U.S. domestic and U.S. outbound shipments and made various changes to other surcharges, while we lowered our fuel surcharge index by 2%.

***FedEx Express Segment Operating Income***

Operating results for the second quarter and first half of 2008 were negatively impacted by higher net fuel costs and the continued softness in the U.S. economy. Continued investment in domestic express services in China also negatively impacted results in the second quarter and first half of 2008. However, volume growth in IP services, reduced retirement plan costs, the favorable impact of foreign currency exchange rates and lower variable incentive compensation offset the net impact of increased fuel costs on operating income during the second quarter and first half of 2008. Operating income for the second quarter and first half of 2007 included $143 million in expenses associated with our pilot contract, which were partially offset by the benefits from the timing of net fuel impacts and Hurricane Katrina insurance proceeds.

Fuel costs increased in the second quarter and first half of 2008 due to an increase in the average price per gallon of fuel. Our operating income in the second quarter of 2008 reflected a difficult year-over-year comparison, as last year's second quarter results benefited from the timing lag that exists between when we purchase fuel and when our indexed fuel surcharges automatically adjust. During the second quarter of 2008, we experienced the opposite effect, as fuel prices significantly increased throughout the quarter, while our changes in fuel surcharges lag these increases by approximately six to eight weeks.

Purchased transportation costs increased in the second quarter and first half of 2008 primarily due to the inclusion of our 2007 business acquisitions, the impact of higher fuel costs and IP volume growth, which required a higher utilization of contract pickup and delivery services. These increases were partially offset by the elimination of payments by us for pickup and delivery services provided by our former China joint venture partner, as we acquired this business in the second half of 2007. Depreciation expense increased 13% in the second quarter of 2008 and 12% in the first half of 2008 primarily due to aircraft purchases and our 2007 business acquisitions. Other operating expenses increased during the second quarter and first half of 2008 principally due to the inclusion of our 2007 business acquisitions, including the full consolidation of the results of our China joint venture. We previously recorded only our portion of the net results of the China business due to the joint venture structure.

***FEDEX GROUND SEGMENT***

The following table compares revenues, operating expenses, operating income and operating margin (dollars in millions) and selected package statistics (in thousands, except yield amounts) for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Revenues | $ 1,698 | $ 1,520 | 12 | $ 3,316 | $ 2,937 | 13 |
| Operating expenses: | | | | | | |
| Salaries and employee benefits | 272 | 256 | 6 | 532 | 497 | 7 |
| Purchased transportation | 697 | 592 | 18 | 1,317 | 1,145 | 15 |
| Rentals | 50 | 44 | 14 | 93 | 80 | 16 |
| Depreciation and amortization | 77 | 65 | 18 | 150 | 126 | 19 |
| Fuel | 46 | 28 | 64 | 80 | 59 | 36 |
| Maintenance and repairs | 38 | 32 | 19 | 72 | 63 | 14 |
| Intercompany charges | 165 | 145 | 14 | 324 | 279 | 16 |
| Other | 180 | 165 | 9 | 385 | 336 | 15 |
| Total operating expenses | 1,525 | 1,327 | 15 | 2,953 | 2,585 | 14 |
| Operating income | $ 173 | $ 193 | (10) | $ 363 | $ 352 | 3 |
| Operating margin | 10.2% | 12.7% | (250)bp | 10.9% | 12.0% | (110)bp |
| Average daily package volume | | | | | | |
| FedEx Ground | 3,505 | 3,242 | 8 | 3,356 | 3,082 | 9 |
| FedEx SmartPost | 672 | 657 | 2 | 603 | 585 | 3 |
| Revenue per package (yield) | | | | | | |
| FedEx Ground | $ 7.27 | $ 7.04 | 3 | $ 7.34 | $ 7.08 | 4 |
| FedEx SmartPost | $ 2.12 | $ 1.95 | 9 | $ 2.07 | $ 1.86 | 11 |

***FedEx Ground Segment Revenues***

Revenues increased during the second quarter and first half of 2008 due to continued volume and yield growth. Average daily volumes at FedEx Ground rose in both the second quarter and first half of 2008 due to market share gains in our commercial business and the continued growth of our FedEx Home Delivery service. Yield improvement during the second quarter and first half of 2008 was primarily due to the impact of a general rate increase, higher extra service revenue (primarily through our residential, additional handling and large package surcharges) and dimensional rating. This increase was partially offset by higher customer discounts and a lower average weight and zone per package.

FedEx SmartPost picks up and delivers shipments from customers and delivers them to various points within the United States Postal Service ("USPS") network for final delivery. FedEx SmartPost revenue and yield represent the amount collected from customers net of postage paid to the USPS.

The FedEx Ground fuel surcharge is based on a rounded average of the national U.S. on-highway average prices for a gallon of diesel fuel, as published by the Department of Energy. Our fuel surcharge ranged as follows for the three- and six-month periods ended November 30:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Low | 4.75% | 4.50% | 4.50% | 4.25% |
| High | 5.00 | 5.25 | 5.00 | 5.25 |
| Weighted—average | 4.84 | 4.84 | 4.67 | 4.71 |

In November 2007, we announced a 4.9% average list price increase and made various changes to other surcharges effective January 7, 2008 on FedEx Ground shipments.

*FedEx Ground Segment Operating Income*

FedEx Ground segment operating income decreased 10% during the second quarter of 2008 primarily due to an increase in purchased transportation costs and the net impact of increased fuel costs. Operating income increased slightly for the first half of 2008, as revenue growth was substantially offset by the net impact of increased fuel costs during the second quarter of 2008 and higher legal costs during the first quarter of 2008.

Fuel costs increased significantly year-over-year for both the second quarter and first half of 2008 due to an increase in the average price per gallon of fuel. Purchased transportation costs increased in the second quarter and first half of 2008 as a result of the costs associated with our independent contractor program (as described below) and increased fuel expenses. The independent contractor incentive program costs were recorded as incurred in the second quarter of 2008. Depreciation expense and rent expense increased in the second quarter and first half of 2008 due to higher spending on material handling equipment and facilities associated with our multi-year capacity expansion plan. Increases in intercompany charges during the second quarter and first half of 2008 were primarily due to increased sales and marketing and customer service costs.

*Independent Contractor Matters*

FedEx Ground faces increased regulatory and legal uncertainty with respect to its independent contractors. As part of its operations, FedEx Ground has made changes to its relationships with contractors that, among other things, provide incentives for improved service and enhanced regulatory and other compliance by our contractors. In September 2007, FedEx Ground announced a nationwide program which provides greater incentives to certain of its 15,000 contractors who choose to grow their businesses by adding routes. Also, during the second quarter of 2008, FedEx Ground offered special incentives to encourage California-based single route contractors to transform their operations into multiple-route businesses or sell their routes to others. The response to our California-based single route contractor program has been exceptional, with virtually all contractors accepting the incentives.

FedEx Ground anticipates continuing changes to its relationships with its contractors, which are expected to increase the cost of operations, and it is reasonably possible that such cost increases could be material. However, management believes the FedEx Ground business remains fundamentally strong and will continue to grow market share and improve the customer experience.

FedEx Ground is involved in numerous purported class-action lawsuits, state administrative proceedings and Internal Revenue Service audits that claim the company's owner-operators should be treated as employees, rather than independent contractors. For a description of these proceedings, see Note 9 of the accompanying unaudited consolidated financial statements.

***FEDEX FREIGHT SEGMENT***

The following table shows revenues, operating expenses, operating income and operating margin (dollars in millions) and selected statistics for the three- and six-month periods ended November 30:

| | Three Months Ended | | Percent | Six Months Ended | | Percent |
|---|---|---|---|---|---|---|
| | 2007 | 2006[1] | Change | 2007 | 2006[1] | Change |
| Revenues | $ 1,236 | $ 1,225 | 1 | $ 2,469 | $ 2,238 | 10 |
| Operating expenses: | | | | | | |
| Salaries and employee benefits | 607 | 592 | 3 | 1,202 | 1,076 | 12 |
| Purchased transportation | 147 | 140 | 5 | 277 | 223 | 24 |
| Rentals and landing fees | 29 | 30 | (3) | 57 | 53 | 8 |
| Depreciation and amortization | 58 | 52 | 12 | 115 | 83 | 39 |
| Fuel | 141 | 116 | 22 | 271 | 228 | 19 |
| Maintenance and repairs | 45 | 45 | — | 92 | 77 | 19 |
| Intercompany charges | 20 | 16 | 25 | 41 | 30 | 37 |
| Other | 110 | 96 | 15 | 230 | 180 | 28 |
| Total operating expenses | 1,157 | 1,087 | 6 | 2,285 | 1,950 | 17 |

| | Three Months Ended 2007 | Three Months Ended 2006[1] | Percent Change | Six Months Ended 2007 | Six Months Ended 2006[1] | Percent Change |
|---|---|---|---|---|---|---|
| Operating income | $ 79 | $ 138 | (43) | $ 184 | $ 288 | (36) |
| Operating margin | 6.4% | 11.3% | (490)bp | 7.5% | 12.9% | (540)bp |
| Average daily LTL shipments (in thousands) | 82 | 87 | (6) | 81 | 78 | 4 |
| Weight per LTL shipment (lbs) | 1,129 | 1,127 | — | 1,130 | 1,128 | — |
| LTL yield (revenue per hundredweight) | $ 19.56 | $ 18.73 | 4 | $ 19.48 | $ 18.35 | 6 |

(1) Includes the results of FedEx National LTL from the date of its acquisition on September 3, 2006.

***FedEx Freight Segment Revenues***

FedEx Freight segment revenues remained relatively flat during the second quarter of 2008 due to the weak U.S. economy and increased 10% during the first half of 2008 primarily due to the inclusion of the FedEx National LTL acquisition. Average daily LTL shipments declined 6% in the second quarter of 2008, as demand for services in the LTL sector has been restrained by the weak U.S. economy. Average daily LTL shipments grew 4% during the first half of 2008 due to the inclusion of FedEx National LTL. LTL yield grew 4% during the second quarter of 2008 due to higher rates. LTL yield increased 6% in the first half of 2008 reflecting higher yields from longer-haul FedEx National LTL shipments. The yield increase for the second quarter and first half of 2008 was negatively impacted by the fuel surcharge reduction described below.

During the first quarter of 2008, FedEx Freight reduced its standard regional LTL fuel surcharge by 25% and FedEx National LTL reduced its standard LTL fuel surcharge to levels commensurate with FedEx Freight. We made these changes to assist our customers, who are facing a challenging economy and high fuel prices. The indexed LTL fuel surcharge is based on the average of the national U.S. on-highway average prices for a gallon of diesel fuel, as published by the Department of Energy. The indexed LTL fuel surcharge ranged as follows for the three- and six-month periods ended November 30:

| | Three Months Ended 2007 | Three Months Ended 2006 | Six Months Ended 2007 | Six Months Ended 2006 |
|---|---|---|---|---|
| Low | 14.9% | 15.0% | 14.5% | 15.0% |
| High | 17.3 | 20.5 | 19.7 | 21.2 |
| Weighted—average | 16.1 | 16.8 | 16.6 | 18.5 |

***FedEx Freight Segment Operating Income***

FedEx Freight segment operating income and operating margin decreased in both the second quarter and first half of 2008, reflecting lower volumes at FedEx National LTL and slower year-over-year growth in regional LTL yield. The net impact of higher fuel costs and the fuel surcharge reduction described above also negatively affected margins. Second quarter and first half results for 2007 include a gain related to the sale of an operating facility and insurance proceeds associated with Hurricane Katrina, which were recorded in other operating expenses. Lower volumes at FedEx National LTL continue to be driven by the weak U.S. economy.

The inclusion of FedEx National LTL in our results has impacted the first half of 2008 comparability of all our operating expenses. Along with incremental costs from FedEx National LTL, depreciation expense increased during the second quarter and first half of 2008 due to equipment purchased to support ongoing replacement requirements and long-term volume growth. Fuel costs increased during the second quarter and first half of 2008 due to an increase in the average price per gallon of diesel fuel. Fuel surcharges did not offset the effect of fuel costs on operating results for the second quarter of 2008, due to the fuel surcharge rate reduction described above. Purchased transportation costs increased in the first half of 2008 due to the inclusion of FedEx National LTL, which uses a higher proportion of these services, and higher rates paid to our third-party transportation providers.

## FINANCIAL CONDITION

### *LIQUIDITY*

Cash and cash equivalents totaled $830 million at November 30, 2007, compared to $1.569 billion at May 31, 2007. The following table provides a summary of our cash flows for the six month periods ended November 30 (in millions):

| | 2007 | 2006 |
|---|---|---|
| Operating activities: | | |
| Net income | $ 973 | $ 986 |
| Noncash charges and credits | 1,101 | 919 |
| Changes in operating assets and liabilities | (796) | (557) |
| Cash provided by operating activities | 1,278 | 1,348 |
| Investing activities: | | |
| Business acquisition, net of cash acquired | — | (784) |
| Capital expenditures and other investing activities | (1,502) | (1,427) |
| Cash used in investing activities | (1,502) | (2,211) |
| Financing activities: | | |
| Proceeds from debt issuances | — | 999 |
| Principal payments on debt | (515) | (226) |
| Dividends paid | (62) | (55) |
| Proceeds from stock issuances | 50 | 55 |
| Other | 12 | 8 |
| Cash (used in) provided by financing activities | (515) | 781 |
| Net decrease in cash and cash equivalents | $ (739) | $ (82) |

*Cash Provided by Operating Activities.* The $70 million decrease in cash flows from operating activities in the first half of 2008 was largely attributable to significant year–over–year increases in fuel expenses. We made tax–deductible voluntary contributions to our principal U.S. domestic pension plans of $479 million in the first half of 2008 and $482 million during the first half of 2007.

*Cash Used for Investing Activities.* Capital expenditures during the first half of 2008 were 4% higher than the prior year period largely due to planned expenditures for facility expansion at FedEx Express. See "Capital Resources" below for further discussion.

*Debt Financing Activities.* We have a shelf registration statement filed with the Securities and Exchange Commission ("SEC") that allows us to sell, in one or more future offerings, any combination of our unsecured debt securities and common stock. In August 2006, we issued $1 billion of senior unsecured debt under our shelf registration statement, comprised of floating–rate notes totaling $500 million and fixed–rate notes totaling $500 million. The $500 million in floating–rate notes were repaid in August 2007. The fixed–rate notes bear interest at an annual rate of 5.5%, payable semi–annually, and are due in August 2009. The net proceeds were used for working capital and general corporate purposes, including the funding of several business acquisitions during 2007.

A $1 billion revolving credit agreement is available to finance our operations and other cash flow needs and to provide support for the issuance of commercial paper. Our revolving credit agreement contains a financial covenant, which requires us to maintain a leverage ratio of adjusted debt (long–term debt, including the current portion of such debt, plus six times rentals and landing fees) to capital (adjusted debt plus total common stockholders' investment) that does not exceed 0.7 to 1.0. Our leverage ratio of adjusted debt to capital was 0.5 at November 30, 2007. We are in compliance with this and all other restrictive covenants of our revolving credit agreement and do not expect the covenants to affect our operations. As of November 30, 2007, no commercial paper was outstanding and the entire $1 billion under the revolving credit facility was available for future borrowings.

*Dividends.* We paid $62 million of dividends in the first half of 2008 and $55 million in the first half of 2007. On November 16, 2007, our Board of Directors declared a dividend of $0.10 per share of common stock. The dividend is payable on January 2, 2008, to stockholders of record as of the close of business on December 12, 2007.

*Other Liquidity Information.* We believe that our existing cash and cash equivalents, cash flow from operations, our commercial paper program, revolving bank credit facility and shelf registration statement with the SEC are adequate to meet our current and foreseeable future working capital and capital expenditure needs. In addition, other forms of secured financing may be used to obtain capital assets if we determine that they best suit our needs for the foreseeable future. We have been successful in obtaining investment capital, both domestic and international, although the marketplace for such capital can become restricted depending on a variety of economic factors. We believe the capital resources available to us provide flexibility to access the most efficient markets for financing capital acquisitions, including aircraft, and are adequate for our future capital needs.

We have a senior unsecured debt credit rating from Standard & Poor's of BBB and a commercial paper rating of A–2. Moody's Investors Service has assigned us a senior unsecured debt credit rating of Baa2 and a commercial paper rating of P–2. Moody's and Standard & Poor's characterize our ratings outlook as "stable." If our credit ratings drop, our interest expense may increase. If our commercial paper ratings drop below current levels, we may have difficulty utilizing the commercial paper market. If our senior unsecured debt ratings drop below investment grade, our access to financing may become more limited.

***CAPITAL RESOURCES***

Our operations are capital intensive, characterized by significant investments in aircraft, vehicles, technology, package handling facilities and sort equipment. The amount and timing of capital additions depend on various factors, including pre–existing contractual commitments, anticipated volume growth, domestic and international economic conditions, new or enhanced services, geographical expansion of services, availability of satisfactory financing and actions of regulatory authorities.

The following table compares capital expenditures by asset category and reportable segment for the three– and six–month periods ended November 30 (in millions):

| | Three Months Ended | | Six Months Ended | | Percent Change 2007/2006 | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 | Three Months Ended | Six Months Ended |
| Aircraft and related equipment | $ 175 | $ 215 | $ 462 | $ 517 | (19) | (11) |
| Facilities and sort equipment | 257 | 196 | 425 | 300 | 31 | 42 |
| Information and technology investments | 109 | 96 | 189 | 182 | 14 | 4 |
| Vehicles | 144 | 184 | 308 | 347 | (22) | (11) |
| Other equipment | 62 | 69 | 129 | 113 | (10) | 14 |
| Total capital expenditures | $ 747 | $ 760 | $ 1,513 | $ 1,459 | (2) | 4 |
| FedEx Express segment | $ 367 | $ 376 | $ 815 | $ 770 | (2) | 6 |
| FedEx Ground segment | 155 | 183 | 288 | 317 | (15) | (9) |
| FedEx Freight segment | 106 | 83 | 181 | 168 | 28 | 8 |
| FedEx Services segment | 119 | 118 | 229 | 204 | 1 | 12 |
| Total capital expenditures | $ 747 | $ 760 | $ 1,513 | $ 1,459 | (2) | 4 |

Capital expenditures during the first half of 2008 were higher than the prior year period primarily due to increased spending at FedEx Express for facility expansion and increased spending at FedEx Services associated with the addition of new locations at FedEx Kinko's. However, in light of the impact of the weak U.S. economy on demand for our domestic package and LTL services, we have reduced our 2008 capital expenditure forecast from $3.5 billion to $3.1 billion, compared to $2.9 billion in 2007. Much of the anticipated increase in 2008 is on spending to support long-term volume growth, such as additional or expanded facilities and new aircraft. We also plan to continue to invest in our technology capabilities to improve productivity and service levels.

Because of substantial lead times associated with the manufacture or modification of aircraft, we must plan our aircraft orders or modifications well in advance of the expected delivery of the aircraft. While we also pursue market opportunities to purchase aircraft when they become available, we must make commitments regarding our airlift requirements years before aircraft are actually needed. We are closely managing our capital spending based on current and anticipated volume levels.

### *CONTRACTUAL CASH OBLIGATIONS*

The following table sets forth a summary of our contractual cash obligations as of November 30, 2007. Certain of these contractual obligations are reflected in our balance sheet, while others are disclosed as future obligations under accounting principles generally accepted in the United States. Except for the current portion of long-term debt and capital lease obligations, this table does not include amounts already recorded on our balance sheet as current liabilities at November 30, 2007. Accordingly, this table is not meant to represent a forecast of our total cash expenditures for any of the periods presented.

| | Payments Due by Fiscal Year (in millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2008[1] | 2009 | 2010 | 2011 | 2012 | Thereafter | Total |
| *Amounts reflected in Balance Sheet:* | | | | | | | |
| Long—term debt | $ 23 | $ 518 | $ 499 | $ 250 | $ — | $ 539 | $ 1,829 |
| Capital lease obligations [2] [3] | 92 | 13 | 97 | 8 | 8 | 137 | 355 |
| *Other cash obligations not reflected in Balance Sheet:* | | | | | | | |
| Unconditional purchase obligations [3] | 613 | 1,256 | 1,152 | 736 | 87 | 164 | 4,008 |
| Interest on long—term debt | 57 | 111 | 79 | 65 | 47 | 1,553 | 1,912 |
| Operating leases [3] | 964 | 1,604 | 1,414 | 1,239 | 1,100 | 7,004 | 13,325 |
| Total | $ 1,749 | $ 3,502 | $ 3,241 | $ 2,298 | $ 1,242 | $ 9,397 | $ 21,429 |

(1) Cash obligations for the remainder of 2008.

(2) Capital lease obligations represent principal and interest payments.

(3) See Note 8 to the accompanying unaudited consolidated financial statements.

We have certain contingent liabilities that are not accrued in our balance sheet in accordance with accounting principles generally accepted in the United States. These contingent liabilities are not included in the table above. In addition, we have historically made voluntary tax-deductible contributions to our U.S. pension plan; however, such amounts have not been legally required and therefore are not reflected in the table above.

*Amounts Reflected in Balance Sheet*

We have certain financial instruments representing potential commitments, not reflected in the table above, that were incurred in the normal course of business to support our operations, including surety bonds and standby letters of credit. These instruments are required under certain U.S. self-insurance programs and are also used in the normal course of international operations. The underlying liabilities insured by these instruments are reflected in our balance sheets, where applicable. Therefore, no additional liability is reflected for the surety bonds and letters of credit themselves.

We have other long-term liabilities reflected in our balance sheet, including deferred income taxes, obligations or interest for tax positions under FIN 48 (as described in Note 1), qualified and non-qualified pension and postretirement healthcare liabilities and other self-insurance accruals. The payment obligations associated with these liabilities are not reflected in the table above due to the absence of scheduled maturities. Therefore, the timing of these payments cannot be determined, except for amounts estimated to be payable within twelve months that are included in current liabilities.

*Other Cash Obligations Not Reflected in Balance Sheet*

The amounts reflected in the table above for purchase commitments represent non-cancelable agreements to purchase goods or services. Such contracts include those for certain purchases of aircraft, aircraft modifications, vehicles, facilities, computers, printing and other equipment and advertising and promotions contracts. In addition, we have committed to modify our DC10 aircraft for two-man cockpit configurations, which is reflected in the table above. Commitments to purchase aircraft in passenger configuration do not include the attendant costs to modify these aircraft for cargo transport unless we have entered into a non-cancelable commitment to modify such aircraft. Open purchase orders that are cancelable are not considered unconditional purchase obligations for financial reporting purposes and are not included in the table above. Such purchase orders often represent authorizations to purchase rather than binding agreements.

The amounts reflected in the table above for interest on long-term debt represent future interest payments due on our long-term debt, which are primarily fixed rate.

The amounts reflected in the table above for operating leases represent future minimum lease payments under non-cancelable operating leases (principally aircraft and facilities) with an initial or remaining term in excess of one year at November 30, 2007. In the past, we financed a significant portion of our aircraft needs (and certain other equipment needs) using operating leases (a type of "off-balance sheet financing"). At the time that the decision to lease was made, we determined that these operating leases would provide economic benefits favorable to ownership with respect to market values, liquidity or after-tax cash flows.

In accordance with accounting principles generally accepted in the United States, our operating leases are not recorded in our balance sheet. Credit rating agencies routinely use information concerning minimum lease payments required for our operating leases to calculate our debt capacity.

**CRITICAL ACCOUNTING ESTIMATES**

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make significant judgments and estimates to develop amounts reflected and disclosed in the financial statements. In many cases, there are alternative policies or estimation techniques that could be used. We maintain a thorough process to review the application of our accounting policies and to evaluate the appropriateness of the many estimates that are required to prepare the financial statements of a large, global corporation. However, even under optimal circumstances, estimates routinely require adjustment based on changing circumstances and new or better information.

As discussed in our Annual Report, during the first quarter of 2008, we updated our critical accounting estimates by adding "Contingencies" and removing "Revenue Recognition." As discussed in Note 1 to the accompanying unaudited condensed consolidated financial statements and previously in this MD&A, we adopted new accounting rules for income taxes under FIN 48 in 2008. The cumulative effect of adopting FIN 48 was immaterial; however, FIN 48 substantially increases the sensitivities of the estimation process used in the accounting for and reporting of tax contingencies. In addition, as discussed in Note 9 to our unaudited condensed consolidated financial statements, we are involved in various legal and regulatory proceedings that require complex and judgmental decisions regarding reserves and disclosures. Based on these factors we added the "Contingencies" category to our critical accounting estimates in the first quarter of 2008.

Information regarding our critical accounting estimates can be found in our Annual Report, including Note 1 to the financial statements therein, as well as under the heading "Critical Accounting Estimates" in our quarterly report on Form 10-Q for the quarter ended August 31, 2007. Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of our Board of Directors and with our independent registered public accounting firm.

**FORWARD-LOOKING STATEMENTS**

Certain statements in this report, including (but not limited to) those contained in "Outlook," "Liquidity," "Capital Resources" and "Contractual Cash Obligations," are "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to our financial condition, results of operations, cash flows, plans, objectives, future performance and business. Forward-looking statements include those preceded by, followed by or that include the words "may," "could," "would," "should," "believes," "expects," "anticipates," "plans," "estimates," "targets," "projects," "intends" or similar expressions. These forward-looking statements involve risks and uncertainties. Actual results may differ materially from those contemplated (expressed or implied) by such forward-looking statements, because of, among other things, potential risks and uncertainties, such as:

- economic conditions in the global markets in which we operate;
- the impact of any international conflicts or terrorist activities on the United States and global economies in general, the transportation industry or us in particular, and what effects these events will have on our costs or the demand for our services;
- damage to our reputation or loss of brand equity;
- disruptions to the Internet or our technology infrastructure, including those impacting our computer systems and Web site, which can adversely affect shipment levels;
- the price and availability of jet and diesel fuel;
- the impact of intense competition on our ability to maintain or increase our prices (including our fuel surcharges in response to rising fuel costs) or to maintain or grow our market share;
- our ability to manage our cost structure for capital expenditures and operating expenses, and match it to shifting and future customer volume levels;
- our ability to effectively operate, integrate, leverage and grow acquired businesses, and to continue to support the value we allocate to these acquired businesses, including their goodwill;
- any impacts on our businesses resulting from new domestic or international government regulation, including regulatory actions affecting global aviation rights, increased air cargo and other security requirements, and tax, accounting, labor or environmental rules;
- changes in foreign currency exchange rates, especially in the euro, Chinese yuan, Canadian dollar, British pound and Japanese yen, which can affect our sales levels and foreign currency sales prices;
- the impact of costs related to (i) challenges to the status of FedEx Ground's owner-operators as independent contractors, rather than employees, and (ii) any related changes to our relationship with these owner-operators;
- any liability resulting from and the costs of defending against class-action litigation, such as wage-and-hour and race discrimination claims, and any other legal proceedings;
- our ability to maintain good relationships with our employees and prevent attempts by labor organizations to organize groups of our employees, which could significantly increase our operating costs;
- a shortage of qualified labor and our ability to mitigate this shortage through recruiting and retention efforts and productivity gains;
- increasing costs and the volatility of costs for employee benefits, especially pension and healthcare benefits;

- significant changes in the volumes of shipments transported through our networks, customer demand for our various services or the prices we obtain for our services;

- market acceptance of our new service and growth initiatives;

- the impact of technology developments on our operations and on demand for our services;

- adverse weather conditions or natural disasters, such as earthquakes and hurricanes, which can damage our property, disrupt our operations, increase fuel costs and adversely affect shipment levels;

- widespread outbreak of an illness or any other communicable disease, or any other public health crisis;

- availability of financing on terms acceptable to us and our ability to maintain our current credit ratings, especially given the capital intensity of our operations and the current volatility of credit markets; and

- other risks and uncertainties you can find in our press releases and SEC filings, including the risk factors identified under the heading "Risk Factors" in "Management's Discussion and Analysis of Results of Operations and Financial Condition" in our Annual Report, as updated by our quarterly reports on Form 10-Q.

As a result of these and other factors, no assurance can be given as to our future results and achievements. Accordingly, a forward-looking statement is neither a prediction nor a guarantee of future events or circumstances and those future events or circumstances may not occur. You should not place undue reliance on forward-looking statements, which speak only as of the date on which they are made. We undertake no obligation to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise.

*Item 3. Quantitative and Qualitative Disclosures About Market Risk*

As of November 30, 2007, there have been no material changes in our market risk sensitive instruments and positions since the disclosure in our Annual Report and our Quarterly Report on Form 10-Q for the quarter ended August 31, 2007. While we are a global provider of transportation, e-commerce and business services, the substantial majority of our transactions are denominated in U.S. dollars. The distribution of our foreign currency denominated transactions is such that foreign currency declines in some areas of the world are often offset by foreign currency gains in other areas of the world. The principal foreign currency exchange rate risks to which we are exposed are in the euro, Chinese yuan, Canadian dollar, British pound and Japanese yen. While foreign currency fluctuations during the three- and six-month periods ended November 30, 2007 were favorable, they did not have a material effect on our results of operations.

While we have market risk for changes in the price of jet and diesel fuel, this risk is largely mitigated by our fuel surcharges. However, our fuel surcharges for FedEx Express and FedEx Ground have a timing lag of approximately six to eight weeks that exists before they are adjusted for changes in fuel prices. Our fuel surcharge index also allows fuel prices to fluctuate approximately 3% for FedEx Express and approximately 4% for FedEx Ground before an adjustment to the fuel surcharge occurs. Therefore, our operating income may be affected should the spot price of fuel suddenly change by a significant amount or change by amounts that do not result in a change in our fuel surcharges.

*Item 4. Controls and Procedures*

The management of FedEx, with the participation of our principal executive and financial officers, has evaluated the effectiveness of our disclosure controls and procedures in ensuring that the information required to be disclosed in our filings under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, including ensuring that such information is accumulated and communicated to FedEx management as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our principal executive and financial officers have concluded that such disclosure controls and procedures were effective as of November 30, 2007 (the end of the period covered by this Quarterly Report on Form 10-Q).

During our fiscal quarter ended November 30, 2007, no change occurred in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

PART II. OTHER INFORMATION

*Item 1. Legal Proceedings*

For a description of all material pending legal proceedings, see Note 9 of the accompanying consolidated financial statements.

In December 2007, we received a grand jury subpoena for the production of documents in connection with an ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") into possible anti-competitive behavior in the international air freight forwarding industry. This investigation is different from the ongoing investigations by the DOJ, the Directorate General for Competition of the European Commission and the Australian Competition and Consumer Commission that were disclosed in our Annual Report. We do not believe that we have engaged in any anti-competitive activities, and we are cooperating with these investigations.

*Item 1A. Risk Factors*

There have been no material changes from the risk factors disclosed in our Annual Report (under the heading "Risk Factors" in "Management's Discussion and Analysis of Results of Operations and Financial Condition") in response to Part I, Item IA of Form 10-K.

*Item 4. Submission of Matters to a Vote of Security Holders*

At the FedEx Corporation annual meeting of stockholders held on September 24, 2007, FedEx's stockholders took the following actions:

The stockholders elected fourteen directors, each for a one-year term. The tabulation of votes with respect to each nominee for director was as follows:

| Nominee | For | Against | Abstain |
|---|---|---|---|
| Frederick W. Smith | 274,799,258 | 2,653,840 | 1,840,221 |
| James L. Barksdale | 274,174,139 | 2,900,825 | 2,218,355 |
| August A. Busch IV | 275,154,843 | 2,287,315 | 1,851,161 |
| John A. Edwardson | 275,190,078 | 2,017,812 | 2,085,429 |
| Judith L. Estrin | 275,343,176 | 1,960,964 | 1,989,179 |
| Philip Greer | 274,090,758 | 3,222,527 | 1,980,034 |
| J.R. Hyde, III | 273,917,678 | 3,311,253 | 2,064,388 |
| Shirley A. Jackson | 270,930,304 | 6,445,150 | 1,917,865 |
| Steven R. Loranger | 275,498,399 | 1,731,164 | 2,063,756 |
| Gary W. Loveman | 273,348,684 | 3,844,140 | 2,100,495 |
| Charles T. Manatt | 275,673,293 | 1,561,235 | 2,058,791 |
| Joshua I. Smith | 274,713,769 | 2,466,456 | 2,113,094 |
| Paul S. Walsh | 272,586,374 | 4,723,485 | 1,983,460 |
| Peter S. Willmott | 271,995,957 | 5,004,702 | 2,292,660 |

The Audit Committee's designation of Ernst & Young LLP as FedEx's independent registered public accounting firm for the fiscal year ending May 31, 2008 was ratified by the stockholders. The tabulation of votes on this matter was as follows:

- 276,133,290 votes for

- 1,504,975 votes against

- 1,655,054 abstentions

- There were no broker non-votes for this item.

A stockholder proposal requesting that the Board of Directors take the necessary steps to amend FedEx's bylaws to require that, subject to any presently existing contractual obligations of FedEx, the Chairman of the Board of Directors shall not concurrently serve as the Chief Executive Officer was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 64,528,011 votes for

- 177,146,579 votes against

- 2,050,823 abstentions

- 35,567,906 broker non-votes

A stockholder proposal requesting that the Board of Directors adopt a policy that stockholders be given the opportunity at each annual meeting to cast a non-binding vote on an advisory resolution to ratify the compensation of FedEx's named executive officers was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 77,458,692 votes for

- 162,844,375 votes against

- 3,422,096 abstentions

- 35,568,156 broker non-votes

A stockholder proposal requesting that the Board of Directors report on the scientific and economic analyses relevant to FedEx's environmental policy concerning greenhouse gases was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 7,919,547 votes for

- 202,035,524 votes against

- 33,770,402 abstentions

- 35,567,846 broker non-votes

A stockholder proposal requesting that FedEx provide a report disclosing certain information regarding corporate political contributions and trade association payments was not approved by stockholders. The tabulation of votes on this matter was as follows:

- 42,632,659 votes for

- 165,479,476 votes against

- 35,613,338 abstentions

- 35,567,846 broker non-votes

*Item 6. Exhibits*

| Exhibit Number | Description of Exhibit |
|---|---|
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 15.1 | Letter re: Unaudited Interim Financial Statements. |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

FEDEX CORPORATION

Date: December 21, 2007

/s/ JOHN L. MERINO
JOHN L. MERINO
CORPORATE VICE PRESIDENT
PRINCIPAL ACCOUNTING OFFICER

EXHIBIT INDEX

| Exhibit Number | Description of Exhibit |
|---|---|
| 12.1 | Computation of Ratio of Earnings to Fixed Charges. |
| 15.1 | Letter re: Unaudited Interim Financial Statements. |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

EXHIBIT 12.1

FEDEX CORPORATION
COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES
(UNAUDITED)
(IN MILLIONS, EXCEPT RATIOS)

| | Six Months Ended November 30, | | Year Ended May 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 | 2005 | 2004 | 2003 |
| Earnings: | | | | | | | |
| Income before income taxes | $ 1,555 | $ 1,593 | $ 3,215 | $ 2,899 | $ 2,313 | $ 1,319 | $ 1,338 |
| Add back: | | | | | | | |
| Interest expense, net of capitalized interest | 64 | 70 | 136 | 142 | 160 | 136 | 124 |
| Amortization of debt issuance costs | 2 | 3 | 6 | 5 | 6 | 7 | 4 |
| Portion of rent expense representative of interest factor | 393 | 407 | 766 | 842 | 800 | 712 | 713 |
| Earnings as adjusted | $ 2,014 | $ 2,073 | $ 4,123 | $ 3,888 | $ 3,279 | $ 2,174 | $ 2,179 |
| Fixed Charges: | | | | | | | |
| Interest expense, net of capitalized interest | $ 64 | $ 70 | $ 136 | $ 142 | $ 160 | $ 136 | $ 124 |
| Capitalized interest | 20 | 19 | 34 | 33 | 22 | 11 | 16 |
| Amortization of debt issuance costs | 2 | 3 | 6 | 5 | 6 | 7 | 4 |
| Portion of rent expense representative of interest factor | 393 | 407 | 766 | 842 | 800 | 712 | 713 |
| | $ 479 | $ 499 | $ 942 | $ 1,022 | $ 988 | $ 866 | $ 857 |
| Ratio of Earnings to Fixed Charges | 4.2 | 4.2 | 4.4 | 3.8 | 3.3 | 2.5 | 2.5 |

Case 3:05-md-00527-RLM -CAN document 1402-3 filed 06/10/08 page 57 of 61

EXHIBIT 15.1

The Board of Directors and Stockholders
FedEx Corporation

We are aware of the incorporation by reference in the Registration Statements (Form S-8 Nos. 33-55055, 333-03443, 333-45037, 333-71065, 333-34934, 333-55266, 333-100572, 333-111399, 333-121418, 333-130619 and Form S-3 No. 333-136253) of FedEx Corporation and in the related Prospectuses, of our report dated December 21, 2007, relating to the unaudited condensed consolidated interim financial statements of FedEx Corporation that are included in its Form 10-Q for the quarter ended November 30, 2007.

/s/ Ernst & Young LLP

Memphis, Tennessee
December 21, 2007

EXHIBIT 31.1

CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Frederick W. Smith, certify that:

1. I have reviewed this quarterly report on Form 10-Q of FedEx Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 21, 2007

/s/ Frederick W. Smith
Frederick W. Smith
Chairman, President and
Chief Executive Officer

EXHIBIT 31.2

CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Alan B. Graf, Jr., certify that:

1. I have reviewed this quarterly report on Form 10-Q of FedEx Corporation (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 21, 2007

/s/ Alan B. Graf, Jr.
Alan B. Graf, Jr.
Executive Vice President and
Chief Financial Officer

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of FedEx Corporation ("FedEx") on Form 10-Q for the period ended November 30, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Frederick W. Smith, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of FedEx.

Date: December 21, 2007

/s/ Frederick W. Smith
Frederick W. Smith
Chairman, President and
Chief Executive Officer

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of FedEx Corporation ("FedEx") on Form 10-Q for the period ended November 30, 2007 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Alan B. Graf, Jr., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of FedEx.

Date: December 21, 2007

/s/ Alan B. Graf, Jr.
Alan B. Graf, Jr.
Executive Vice President and
Chief Financial Officer

case 3:05-md-00527-RLM-CAN document 1402-4 filed 06/10/08 page 1 of 8

# EXHIBIT 2

Case 3:05-md-00527-RLM-CAN document 1402-4 filed 06/16/08 page 2 of 8

Form 906
(Rev. January 1987)

Department of the Treasury—Internal Revenue Service

# Closing Agreement On Final Determination Covering Specific Matters

Under section 7121 of the Internal Revenue Code Roadway Package System, Incorporated 410 Rouser Road, P.O. Box 108, Pittsburgh, PA. 15230 (EIN 34 1441019)

(Taxpayer's name, address, and identifying number)

and the Commissioner of Internal Revenue make the following closing agreement:

WHEREAS, the Internal Revenue Service conducted an examination of the federal employment tax returns of Roadway Package System, Inc. (RPS) for 1985 and 1986, and reclassified as employees the pickup and delivery owner-operators (the "Owner-Operators") who performed pickup and delivery services for RPS and assessed RPS federal employment taxes on the remuneration paid to the owner-operators.

WHEREAS, on March 1, 1991, RPS filed a complaint in the United States Claims Court seeking a refund of employment taxes, penalties, and interest assessed and collected by the Internal Revenue Service for tax years 1985 and 1986 with respect to services of the Owner-Operators.

WHEREAS, RPS is interested in settling both the years in suit and non-suit years (1987-1993), provided that RPS can get assurance from the Internal Revenue Service that the treatment of its Owner-Operators operating in accordance with the terms of the revised Pick-up and Delivery Contractor Operating Agreement (the "1994 Agreement") is not inconsistent with independent contractor status.

WHEREAS, the Commissioner and RPS desire to settle the controversy between them with respect to the federal employment taxes for the services of the Owner-Operators for the tax years 1985 through 1993.

NOW, THEREFORE, IT IS HEREBY DETERMINED AND AGREED that with respect to RPS' liability for federal employment taxes for the services of the Owner-Operators:

(1) RPS will pay $25,000,000 to the Internal Revenue Service which sum includes the amount of $5,019,780 paid to date with respect to years 1985 and 1986, in full settlement of all assessed, asserted or potential employment tax deficiencies and interest regarding the Owner-Operators for years 1985 through and including 1993.

(2) Upon the receipt of the $19,980,220 (the difference between $25,000,000 and the amount paid to date with respect to 1985 and 1986), the Service shall abate any outstanding assessments or

proposed liabilities over and above the $19,980,220, and will not assert any claims or make assessments, with respect to federal employment taxes for the Owner-Operators for the years 1987 through and including 1993.

(3) Upon the receipt of above payment and concurrently with the signing of this Agreement, the Service will issue a letter (Exhibit A) to RPS that the relationship between RPS and the Owner-Operators is not inconsistent with an independent contractor relationship if the parties operate in accordance with the terms of the 1994 Agreement.

(4) The Internal Revenue Service may audit RPS operations to confirm RPS' continued compliance with the 1994 Agreement. In connection with such audit, RPS agrees to the following specific procedural undertakings:

(a) The Internal Revenue Service may interview any Owner-Operator or Owner-Operator's employee without RPS company officials or other employees being present.

(b) RPS will maintain a written record of all contacts made to its Contractor Relations Department by the Owner-Operators regarding disagreements over interpretation of the 1994 Agreement between representatives of RPS and the owner-operators. The record will include a description of any action taken. The Service will be given access to such records upon request.

(c) RPS will maintain a list and files that include the names, addresses, social security numbers and any documents regarding arbitration decisions by the arbitrator on all Owner-Operators who request arbitration under section 12.3 of the 1994 Agreement. The Service will be given immediate access to these records upon request.

(5) The Service agrees that it will not reclassify the RPS Owner-Operators as employees, except upon a determination after audit, that RPS has exercised control over the RPS Owner-Operators in a manner that conflicts with the 1994 Agreement, Letter of Assurance and Exhibits attached thereto, and which is not a sporadic or isolated incident. This paragraph 5 does not preclude the Service from issuing a determination letter or ruling in response to the filing of a Form SS-8 by an Owner-Operator for any period.

(a) In the event of such a determination, the Service will issue a 30 day letter to RPS. RPS shall have all the legal and procedural rights available to any other taxpayer to which a 30 day letter is issued with respect to worker reclassification.

(6) RPS will furnish to the Chief, Examination Division Cleveland District at the same time original Forms 1099 are filed with the service center, a separate 1099 magnetic tape containing the following Owner-Operator information: name, social security number or employer identification number (EIN), address, amount paid, and amount of back-up withholding if any on the amount paid. In the event RPS fails to comply with this obligation, RPS shall pay a penalty of $50 for each return not filed with a maximum of $250,000 for all such failures during any calendar year.

(7) RPS will file Forms 1099 at the Cincinnati Service Center for all Owner-Operators who are incorporated at the same time the Forms 1099 are filed for the unincorporated Owner-Operators. These Forms 1099 will be identified in a manner that is satisfactory to RPS and the Cincinnati Service center. In the event RPS fails to comply with this obligation, RPS shall pay a penalty of $50 for each return not filed with a maximum amount of $250,000 for all such failures during any calendar year.

Closing Agreement-Roadway Package System, Inc. EIN 34-1441019

(8) On or before March 15, of each year, RPS will issue a tax obligation letter to the Owner-Operators in the form of Exhibit B attached hereto. In the event RPS fails to comply with this obligation in any year by failing to send a obligation letter to any Owner-Operator, RPS shall pay a penalty of $50 for failure to send each obligation letter with a maximum amount of $250,000 for all such failures during any calendar year. Neither the Internal Revenue Service nor the Department of Justice will assert in any audit or other proceeding that the agreement by RPS to issue such a letter constitutes an indicia of "control" over the Owner-Operator by RPS.

This agreement is final and conclusive except:

*(1)* the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact;
*(2)* it is subject to the Internal Revenue Code sections that expressly provide that effect be given to their provisions (including any stated exception for Code section 7122) notwithstanding any other law or rule of law; and
*(3)* if it relates to a tax period ending after the date of this agreement, it is subject to any law, enacted after the agreement date, that applies to that tax period.

By signing, the above parties certify that they have read and agreed to the terms of this document.

Your signature .................... Date Signed ..........

Spouse's signature (if a joint return was filed) .................... Date Signed ..........

Taxpayer's representative .................... Date Signed ..........

Taxpayer (other than individual) Roadway Package System, Inc.

By William W. Bradley Date Signed 1/10/95

Title Taxpayer's representative, pursuant to P.O.A.

Commissioner of Internal Revenue

By Sarah Hall Ingram Date Signed 1/12/95

Title Associate Chief Counsel (Employee Benefits and Exempt Organizations)

4 of 4

BY Marcel V. Wasle 1/18/95
Acting Assistant Commissioner (Examination)

CLOSING AGREEMENT EXHIBITS:

Exhibit A Letter of Assurance

Exhibit B Tax Reporting Obligation Letter to Contractors

# EXHIBIT 3



O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001
TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

17

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

OUR FILE NUMBER
259,075-3

October 16, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**VIA FEDEX EXPRESS**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

Robert Harwood
WECHSLER HARWOOD LLP
488 Madison Avenue, 8th Floor
New York, NY 10022

**Re:** ***Production Materials***

Dear Rob:

Enclosed please find 2 CDs. Included on the enclosed disks please find supplemental documents related to Plaintiff Fleming in the *Fleming* case (FXG_FLEMING0008468 - 0008473). Please also find documents previously produced in paper form related to *Fleming* Plaintiffs LC Bell (FXG_FLEMING0008474-0009028), Rita King (FXG_FLEMING0009029-0009579), and Natasha Quimby (FXG_FLEMING0009581-0009724).

Additionally, please find supplemental documents from Phil Littleton (FXG000764464 - 000765233), Paul Callahan (FXG000765234 - 000771758) and Dan Sullivan (FXG000771759 - 000772353).

Finally, please find material responsive to Request Nos. 23-24, and Nos. 77-79 of the Plaintiffs' First and Second Requests for Production (FXG000772354 - 000772487).

Sincerely,

Evelyn Becker

Evelyn L. Becker

ELB:jms

Enclosures

cc: Lynn Rossman Faris
Susan Ellingstad
John Beisner

45212
45213

case 3:05-md-00527-RLM -CAN document 1403 filed 06/11/08 page 1 of 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on June 10, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**EXHIBIT 4 TO THE SECOND DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Dated: June 10, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on June 11, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

**EXHIBITS 5 AND 6 TO THE SECOND DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF RULE 37 MOTION TO COMPEL PRODUCTION OF IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Dated: June 11, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA  94612
Tel:    (510) 272-0169
Fax:    (510) 272-0174
Email: lfaris@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on June 10, 2008 and June 11, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G Ames** | rgames@venable.com |
| **George A Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |

**David M. Cialkowski** dmc@zimmreed.com

**Jerald R. Cureton** jcureton@curetonclark.com

**Ginger A. DeGroff** degrofflaw@yahoo.com

**Robert E. DeRose, II** bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com

**Edward J Efkeman** eefkeman@fedex.com

**Barry S. Fagan** bfagan@dibandfagan.com

**Lynn R. Faris** lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com

**Monica Ferraro** mferraro@bnhmlaw.com

**Lee K. Fink** lfink@omm.com

**Robert K. Firsten** rfirsten@firstenlaw.com

**Edward R. Forman** eforman@ee.net

**Wood R. Foster Jr** woodfoster@sbgdf.com; heidifurlong@sbgdf.com

**Alison G. Fox** Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Philip Stephen Fuoco** pfuoco@msn.com

**Martin S. Garfinkel** garfinkel@sgb-law.com; helm@sgb-law.com

**Michael W. Garrison, Jr.** mgarrison@omm.com

**R. Christopher Gilreath** chrisgil@sidgilreath.com

**Eileen S. Goodin** egoodin@bnhmlaw.com

**Michael Gorby** mgorby@gorbypeters.com; rwright@gorbypeters.com

**Deborah R. Grayson** drgrayson@fuse.net

**Robert K. Handelman** rhandelman@bnhmlaw.com

**Robert I. Harwood** rharwood@hfesq.com

**Stacy J. Hauf** shauf@omm.com; swickliffe@omm.com

**Matthew M. Houston** mhouston@hfesq.com

**Dmitri Iglitzin** iglitzin@workerlaw.com

**Tom A. Jerman** tjerman@omm.com

**Victor H. Jih** vjih@omm.com

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@prle.com; jhunt@prle.com; syoung@prle.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** marshall@ee.net

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Matthew J. Merrick** mmerrick@omm.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Raquel A. Millman** rmillman@omm.com

**James Mulroy** jrmulroy@kiesewetterwise.com; jedwards@kiesewetterwise.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Jeffrey S. Nestler** jnestler@omm.com

case 3:05-md-00527-RLM -CAN document 1405 filed 06/11/08 page 4 of 7

| | |
|---|---|
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Mary Donne Peters** | mpeters@gorbypeters.com; rwright@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | mtobin@sbslaw.net; lstewart@sbslaw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Mary D. Walsh-Dempsey** | mdempsey@omalleylangan.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Peter D. Winebrake** | pwinebrake@winebrakelaw.com |

I also certify that on June 11, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN & HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

case 3:05-md-00527-RLM-CAN document 1405 filed 06/11/08 page 6 of 7

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

case 3:05-md-00527-RLM -CAN document 1405 filed 06/11/08 page 7 of 7

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Dated: June 11, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

ORDER

On December 17, 2007, FedEx Ground asked the court to reconsider the Magistrate Judge's order denying FedEx's motion for stay of class notice and additional class certification rulings pending resolution of its Rule 23(f) appeal. On January 9, the Court of Appeals denied FedEx's Rule 23(f) petition for permission to appeal from order granting class certification. This court, therefore, DENIES FedEx Ground's motion (Doc. No. 1061) as moot.

SO ORDERED.

ENTERED: June 11, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On April 15, 2008, Defendant Fedex Ground Package System, Inc. (Fedex) filed a motion for leave to file a motion for partial summary judgment on issues not contemplated by any of this Court's previous scheduling orders. On April 30, 2008, Plaintiffs filed a response in opposition to this motion, and on May 6, 2008, Fedex filed a reply in support of its motion.

On November 29, 2005, this Court divided summary judgment into two phases, summary judgment as to issues relating to independent contractors/employment status and summary judgment or adjudication as to other issues. This Court also indicated that "[n]o other summary judgment motions may be filed without leave of Court." (Doc. No. 58 at 5). On June 2, 2006, this Court ruled on several motions to dismiss. In its opinion, this Court specifically encouraged Fedex to seek leave to file a motion for summary judgment on ERISA exhaustion issues after the parties had an opportunity to engage in necessary discovery on the issue. (Doc. No. 276 at 8). Now, Fedex specifically seeks leave to file a dispositive motion on the ERISA exhaustion issue.

Plaintiffs argue that Fedex's motion should be denied because of Fedex's actions in filing the motion. Specifically, Plaintiffs claim Fedex knew it planned on seeking leave to file a dispositive motion on the exhaustion issue, yet it said nothing to Plaintiffs or this Court about

such intent.  As Fedex has already filed its brief in support of its proposed motion, clearly it has

prepared for some time to seek leave to file a dispositive motion on the exhaustion issue.  Yet,

Fedex apparently felt no need to notify this Court or the Plaintiffs of its intent to do so in any of

the in-court status conferences or filings.  While it certainly would have been helpful and prudent

for Fedex to notify the Court and Plaintiffs of its intentions to file this motion earlier, Fedex was

not required to provide such notice.  Consequently, this Court does not find Fedex's failure to

indicate its intentions is a proper basis to deny its motion.

Instead, this Court must focus on whether Fedex has established sufficient good cause for

leave to file a dispositive motion on a completely different issue.  Fedex seeks to file a

dispositive motion on the exhaustion issue because it believes it is a threshold issue.  For

example, if this Court rules in Fedex's favor on the exhaustion issue, it may eliminate the need

for damage discovery down the road.  Furthermore, Fedex claims the parties have completed

adequate discovery on the issue, which proved to be fatal to Fedex's previous motion to dismiss

on the same issue.  For these reasons, Fedex claims it is appropriate to brief and address the issue

now.

This Court agrees with Fedex.  The main purpose of addressing the employment status

issue first was to possibly alleviate the need for unnecessary litigation in the future.  Resolving

the exhaustion issue on the ERISA claims serves that same purpose.  Also, this Court

specifically encouraged Fedex to file such a dispositive motion in the future, which means Fedex

is simply responding to this Court's invitation.

Regarding prejudice to the Plaintiffs, the Court is not persuaded that they would suffer

prejudice in any meaningful sense.  Plaintiffs claim they have already devoted most of their

case 3:05-md-00527-RLM -CAN document 1407 filed 06/11/08 page 3 of 3

resources to drafting pleadings to all of the dispositive motions related to the employment status issue as well as the remaining fifth wave of class certification. As a result, Plaintiffs claim their resources are depleted at this time. However, this concern can be easily alleviated by allowing Plaintiffs extra time to respond to Fedex's motion. Moreover, while the exhaustion issue may be a threshold issue, it is not as central to this case as the employment status issue. This Court may desire to resolve the employment status issue in the ERISA cases before addressing the exhaustion issue, and as a consequence, allotting more time to brief the exhaustion issue should not only alleviate Plaintiffs' concerns but also assist the Court.

Fedex's motion for leave to file a partial summary judgment motion on the ERISA exhaustion issue is **GRANTED** [Doc. No. 1145]. Fedex may file a dispositive motion on this issue. Plaintiffs shall have **sixty (60)** days from when Fedex files its motion to file a response, and Fedex shall have **(30)** days to file a reply.

**SO ORDERED.**

Dated this 11th Day of June, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**ORDER**

Before the Court is Plaintiffs' motion to extend the filing deadline by one day to file their Reply in Support of Motion to Compel Defendant FedEx Ground Package System, Inc. to produce the Notice of Proposed Assessment, and any attachments thereto, which FXG received from the IRS on December 20, 2007, and to produce a corporate designee for deposition.

Based upon all the files, records and proceedings herein,

IT IS HEREBY ORDERED that Plaintiffs' Motion for an Extension of Time is GRANTED.

Dated: June 11, 2008

s/Christopher A. Nuechterlein
Magistrate Judge Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |

**ORDER**

Upon consideration of the parties' Joint Motion to Amend the Case Schedule and File Amended Complaints, and for good cause shown, it is hereby GRANTED and ORDERED that:

1. This Court's March 20, 2008 Order is amended to extend all deadlines applicable to the "Fifth Wave" cases as follows:

    a. Plaintiffs shall file motions and accompanying memoranda (to be limited to 20 pages) for certification of classes and/or collective actions relating to newly transferred cases by **August 4, 2008**.

    b. FedEx Ground shall file its oppositions to certification (to be limited to 30 pages) by **September 15, 2008**.

    c. Plaintiffs shall file reply memoranda in support of certification (to be limited to 20 pages) by **October 13, 2008**.

d.  Movants for summary judgment/adjudication shall serve expert reports or affidavits in support of such motions by **July 31, 2008**.

e.  Opponents of summary judgment/adjudication shall depose movants' experts by **August 30, 2008**.

f.  Opponents of summary adjudication shall serve expert reports or affidavits in opposition to such motions by **August 30, 2008**.

g.  Depositions of opponents' summary-adjudication experts shall take place by **September 30, 2008**.

h.  The parties shall file any summary judgment/adjudication motions related to independent contractor/employment status by **November 10, 2008**, in cases in which there is no pending motion for class certification. Opposition to summary judgment/adjudication motions shall be filed by **December 22, 2008**, in those cases, and replies in support of summary judgment/adjudication motions shall be filed by **January 22, 2009**.

i.  In cases in which any party has sought class certification, the parties shall file any summary judgment motions within thirty (30) days of this Court's ruling on the pending class certification motion. Responses in opposition to those motions shall be filed thirty (30) days from when the motions are filed, and movants shall have fifteen (15) days to from the date the response is filed to file a reply.

      j.   The parties will work cooperatively to complete discovery in the newly-transferred cases in an expeditious manner, including the new Ohio action,

2.   Plaintiffs in the Iowa, Illinois, Massachusetts, Michigan, Mississippi, Missouri, Montana, South Dakota and Virginia actions, may, by **September 30, 2008**, amend their complaints solely to add additional named Plaintiffs (former putative class members), with discovery stayed pending resolution of motions for summary adjudication and motions to amend class certification order filed on June 2, 2008. Plaintiffs in the Georgia action may, by **September 30, 2008**, amend their complaint to add additional named Plaintiffs, with discovery stayed pending resolution of the motion for summary adjudication in that case. Plaintiffs will provide Defendant with a copy of their Amended Complaint three days before filing for review and will file the Amended Complaint with this Order. Once discovery opens for these cases, it will be limited to the newly-added Plaintiffs and their claims, and depositions shall be limited as follows:

      a.   Defendant will be permitted to depose 85 percent of the new named Plaintiffs for a maximum of four hours, and 15 percent of the new named Plaintiffs for a maximum of eight hours.

      b.   Plaintiffs will be permitted to depose terminal management in the terminals where new named Plaintiffs work and shall be permitted to depose previously undeposed regional managing directors and regional operations engineering managers whose responsibilities include terminals

where new named Plaintiffs work, but Plaintiffs shall not be permitted to depose any other regional staff or corporate staff, officers or directors.

3. The schedule for responding to Plaintiffs' motions to amend the class certification orders, filed on June 2, 2008, shall follow the summary adjudication deadlines contained in this Court's March 28, 2008 Order. Defendant's responses to Plaintiffs' motions shall be filed by **July 17, 2008**, and Plaintiffs' reply briefs shall be filed by **August 16, 2008**.

**SO ORDERED**

Dated this 19th day of June 2008.

s/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

case 3:05-md-00527-RLM -CAN document 1427 filed 06/25/08 page 1 of 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

---------------------------------------------------
THIS DOCUMENT RELATES TO:

ALL ACTIONS

---------------------------------------------------

Case No. 3:05-MD-527 RM
(MDL 1700)

CHIEF JUDGE MILLER
MAGISTRATE NUECHTERLEIN

**ORDER**

On June 16, 2008, Plaintiffs and Defendant filed a joint motion to amend the case schedule and filed complaints requesting that two deadlines set for June 20, 2008, be extended. On June 20, 2008, the parties filed a joint motion to suspend deadlines set for June 20, 2008 so that the Court could have an opportunity to address the motion to amend the case schedule fully. On June 19, 2008, the joint motion to amend the case schedule was granted. As a result, the motion to suspend deadlines set for June 20, 2008, is **DENIED AS MOOT** [Doc. No. 1414].

**SO ORDERED.**

Dated this 25th Day of June, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**PLAINTIFFS' REPLY MEMORANDUM**
**RE: COLLATERAL ESTOPPEL IN SUPPORT OF**
**PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. FXG MISCHARACTERIZES THE *ESTRADA* PROCEEDINGS AND THE STATEMENT OF DECISION AS AFFIRMED ON APPEAL. ..... 2

A. The Court of Appeal Decision Reversing the Declaratory and Injunctive Relief Does Not Bar Application of the Collateral Estoppel Bar. ..... 3

B. All of the Prerequisites for Application of the Collateral Estoppel Bar Are Present in this Case. ..... 4

1. FXG Has Not Refuted Plaintiffs' Showing that the Same Legal Standards Apply. ..... 4

2. There is No Merit to FXG's Claim that *Estrada* and the MDL Class Acts Involve Materially Different Facts. ..... 6

C. FXG Has Not Refuted Plaintiffs' Showing that the Public Policy Considerations Underlying the Collateral Estoppel Doctrine Favor its Application to this Case. ..... 11

1. *Estrada* is the Only Final *Judgment* Previously Entered Addressing the Employment Status of FedEx Ground Drivers. ..... 11

2. FXG's Arguments Regarding California's Proposition 64 Are Inapposite. ..... 14

CONCLUSION ..... 15

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Continental Can Co. v. Marshall*,
603 F.2d 590 (7th Cir. 1979) ....................2

*Estrada v. FedEx Ground Package Sys., Inc.*,
2006 WL 3378246 (Cal. App. 2006) ....................3

*Estrada v. FedEx Ground Package Sys., Inc.*,
64 Cal. Rptr. 3d 327 (Cal. App. 2007)....................4, 10

*Evans v. Celotex*,
238 Cal. Rptr. 259 (Cal. App. 1987)....................9

*Hardy v. Johns-Manville Sales Corp.*,
681 F.2d 334 (5th Cir. 1982) ....................11

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ....................14, 15

*In re FedEx Home Delivery*,
2006 WL 897609 (N.L.R.B. 2006)....................13

*In re FedEx Home Delivery*,
2007 WL 2858933 (N.L.R.B. 2007)....................13

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992)....................4

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)....................11

*Roadway Package System, Inc.*,
326 N.L.R.B. 842 (1998) ....................13

*S.G. Borello & Sons, Inc. v. Dept. of Indus. Relations*,
48 Cal. 3d 341, 769 P.2d 399 (Cal. 1989)....................2, 4

*Sandoval v. Superior Court*,
190 Cal. Rptr. 29 (Cal. App. 1983)....................11, 12

**STATUTES**

Cal. Bus. and Prof. Code §§ 17200 and 17203 ........ 14

Labor Code § 2802 ........ 4

**OTHER AUTHORITIES**

Restatement (2d) of Agency, § 220 (1958) ........ 4

**INTRODUCTION**

The doctrine of collateral estoppel protects the integrity of our judicial system by eliminating the risk of inconsistent judgments, and conserving judicial resources. No clearer case could exist for application of the collateral estoppel bar than this one. In *Estrada,* FXG had more than a full and fair opportunity to litigate the core factual issue presented in this MDL docket. Applying the "right to control" test that is a common and central feature of the common law agency test in each of the certified MDL class cases to the same core facts, the *Estrada* court found that "[FXG] not only has the right to control, but has close to absolute control" over the California drivers who performed service for its under the terms of the OA.

FXG fundamentally misunderstands, or deliberately misconstrues, the scope of the relief Plaintiffs seek. Plaintiffs do not ask the Court to preclude litigation of the ultimate issue in this case, the drivers' employment status. Instead, they ask the Court to give full collateral estoppel effect to the factual finding that FXG has retained to itself the right to control the manner and means used by the class members to perform their jobs through the terms of the Operating Agreement (OA), an adhesive contract that has not changed since 1994.

FXG goes on to contend that collateral estoppel effect cannot be accorded to the *Estrada* court's factual findings on three fallacious grounds. It begins by asserting that the California judgment was premised on different legal standards, and different facts. This is just not so. FXG goes on to argue that it would be fundamentally unfair to apply collateral estoppel principles here because the *Estrada* judgment is inconsistent with previous judgments entered in FXG's favor. This is pure fiction, as *Estrada* represents the only class-based final judgment addressing the employment status of FXG drivers under the OA. Finally, FXG seeks to avoid the collateral estoppel bar through an attack on the MDL process which *it* initiated, insisting on a central adjudication of the common issue presented in the dozens of cases *it* transferred to this MDL

docket. Characterizing Plaintiffs' request for application of collateral estoppel as an attempt to transform into a national class action "juggernaut," FXG chastises *Plaintiffs* for advancing the central planner theory of class litigation condemned by the Seventh Circuit where mass tort litigation is concerned. Having twice asked the Judicial Panel on Multidistrict Litigation to transfer these state cases to a single forum to be adjudicated in a single nationwide proceeding, FXG has no business *now* claiming that "only a decentralized process of multiple trials, involving different juries . . . in different jurisdictions will yield the information needed for an accurate evaluation" of the employment law claims asserted by Plaintiffs in these coordinated cases. (*See* FXG Omnibus Response to Pls. Collateral Estoppel Memo., Doc. 1397 at 30).

Plaintiffs have not asked the Court to preclude FXG from defending itself in this action. Plaintiffs simply ask the Court to preclude FXG from litigating again, in twenty separate forums, a factual issue that it spent literally *years* defending in the *Estrada* case. This is a text-book case for application of the "principle that one opportunity to litigate an issue fully and fairly is enough." *Continental Can Co. v. Marshall*, 603 F.2d 590, 594 (7th Cir. 1979).

## ARGUMENT

### I. FXG MISCHARACTERIZES THE *ESTRADA* PROCEEDINGS AND THE STATEMENT OF DECISION AS AFFIRMED ON APPEAL.

The class issue litigated and resolved against FXG in *Estrada* was whether the single work area (SWA) drivers employed by FXG in California between 1995 and 2005 were employees under common law agency principles, as articulated by the California Supreme Court in *S.G. Borello & Sons, Inc. v. Dept. of Indus. Relations*, 48 Cal. 3d 341, 769 P.2d 399 (Cal. 1989). In an order affirmed on appeal, the trial court clearly and unambiguously found that FXG retained the right to control the drivers' performance under the OA, as written, interpreted and applied.

In an effort to avoid the legal consequence of this ruling, FXG complains that the analytical framework applied by the trial court was wrong, and mischaracterizes the basis on which the trial court's July 24, 2004 Statement of Decision (SD) was affirmed on appeal. Contrary to FXG's claim, the trial court's analysis focused on "the workings of the OA" which it found confers on FXG not only the right to control, but "almost absolute control" over the drivers and their work, a conclusion "borne out by the testimony of [FXGs] management team." Pls. RJN, Ex. B at 4, Docs. 1195 and 1197. Ultimately, then, the trial court's conclusion that the drivers were employees was premised on the terms of the OA, which the court described as "a brilliantly drafted contract creating the constraints of an employment relationship with the SWAs in the guise of an independent contractor model." *Id*. at 5. As such, FXG's effort to characterize the *Estrada* ruling as premised on a finding of "actual control" exercised by FXG *despite* the terms of an "ambiguous" OA necessarily fails.

**A. The Court of Appeal Decision Reversing the Declaratory and Injunctive Relief Does Not Bar Application of the Collateral Estoppel Bar.**

FXG also mistakenly argues that Plaintiffs seek to "circumvent" the appellate court's unpublished order reversing the award of injunctive and declaratory relief in *Estrada* through the application of collateral estoppel here. This argument is nonsensical. The reversal of those orders was premised on the narrow ground that the named Plaintiffs, who were no longer driving for FXG when the complaint was filed, no longer had standing to pursue claims for equitable relief under California's unfair competition law when the appeal was resolved in 2006, as they did when the case was filed in 1999. The Court of Appeal declined to remand the matter to the trial court to allow plaintiff to add new plaintiffs who met the standing requirements, *in part* because this MDL was already pending. *Estrada v. FedEx Ground Package Sys., Inc.,* 2006 WL 3378246 at *5 (Cal. App. 2006). At that time, the Court of Appeal had <u>not</u> yet addressed the

case 3:05-md-00527-RLM-CAN document 1497 filed 07/10/09 page 8 of 26

employment status issue; nor did it offer any opinion – let alone a binding order – as to whether principles of collateral estoppel may be applied to resolve that question.

**B. All of the Prerequisites for Application of the Collateral Estoppel Bar Are Present in this Case.**

**1. FXG Has Not Refuted Plaintiffs' Showing that the Same Legal Standards Apply.**

FXG complains that Plaintiffs have failed to meet their burden of demonstrating that the legal standards applicable under ERISA and the laws of the 20 states where classes have been certified are the same as those applied by the *Estrada* court in finding that FXG has retained the right to control the drivers' performance. This is not true.

The drivers' employment status was determined in *Estrada* under common law agency principles. In *Borello*, the California Supreme Court observed that "the right to control work details is the 'most important' or 'most significant' consideration" under the common law agency test. *Borello*, 769 P.2d at 404. The *Estrada* court thus explained, "the essence of the [common law agency] test is the 'control of details' -- that is, whether the principal has the *right* to control the manner and means by which the worker accomplishes the work." *Estrada v. FedEx Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327, 335 (Cal. App. 2007) (emphasis added).[1] As this Court has acknowledged, whether the hiring party has retained the "right to control" the manner and means by which the work is accomplished is the *central* feature of the common law agency test applied by the Supreme Court to ERISA claims in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992), under the Restatement (2d) of Agency, § 220 (1958), and under the laws of the twenty states in this MDL docket where class claims have been

[1] At page 16 of its collateral estoppel response, FXG accuses Plaintiffs of mischaracterizing the "essence" of the *Borello* test as focusing on the principal's "right to control." This is exactly what *Borello* says. Equally invalid is FXG's assertion that California's agency principles applied in *Estrada* differ from those of other jurisdictions because *Borello* permits a rebuttable presumption of employee status to be applied in cases arising under certain worker protection laws. Labor Code Section 2802 is not one of those statutes, and no presumption was applied in *Estrada*.

certified. *See* Docs. 906, 1119 and 1194 at 12, n. 9.[2]

FXG's effort to show that that the relevant standards for determining whether the right to control exists are materially different from state to state, Doc. 1397 at 14-15, focuses on the wrong aspects of the common law agency test. The question here is whether FXG has retained the right to control the manner and means of the drivers' performance under the OA. FXG concedes that this factual issue is a common feature of every applicable test. Thus, FXG's observation that the right to control is dispositive in some jurisdictions, and but one of several factors to be considered in others, is correct, but irrelevant.

FXG's argument fails for the additional reason that the California Supreme Court's articulation of the common law agency standards in *Borello* requires consideration of every one of the secondary factors considered by the courts of other jurisdictions in its articulation of the "right to control" test. Applying this broad test, the trial court considered and found in the Plaintiffs' favor as to each of control factor. FXG's position would be arguable if the *Estrada* court had found in Plaintiffs' favor as to some, but not all, of the secondary control factors. But that is not the case. That the courts of some jurisdictions consider fewer than all of the factors adjudicated in Plaintiffs' favor in *Estrada* does not avoid the collateral estoppel bar. The *Estrada* court found that FXG has retained the right to control the manner and means of the drivers' performance under every conceivable articulation of the test. The conclusion is therefore entitled to preclusive effect in every jurisdiction.

Nor is there merit to FXG's further complaint that Plaintiffs commit the "ultimate logical error" by assuming that the "right to control" standard is the same in each jurisdiction because the label is the same. Plaintiffs' argument is premised not on labels, but on the fact that the

[2] FXG's accusation that Plaintiffs have not carried their burden of describing the state law standards to show that the "right to control" element of the test is identical in all jurisdictions is misplaced. In addition to the omnibus collateral estoppel motion, Plaintiffs described the applicable legal standards in greater detail in the 20 state specific briefs filed on April 25, 2008 in support of the pending motions for summary adjudication.

principal's *right* to control the manner and means by which the work is accomplished, whether exercised or not, is the most important feature of the common law agency test in each of the twenty jurisdictions where summary adjudication is being sought, including the *Alexander* case asserting claims under the California Labor Code no different than *Estrada*.

**2. There is No Merit to FXG's Claim that *Estrada* and the MDL Class Acts Involve Materially Different Facts.**

FXG acknowledges that it is entirely appropriate to apply collateral estoppel principles in cases where the identical factual allegations are at stake. Doc. 1397 at 18. The three bases asserted by FXG to support its claim that the factual record in the MDL cases differs from that involved in *Estrada* are meritless.

*First*: The *Estrada* trial court's finding that FXG has retained the right to control the drivers' work was *not* premised primarily on the testimony of the named plaintiffs and other drivers, dating back to the mid-1990's, about their individual experiences at FXG, as FXG claims. Rather, as shown in Plaintiffs' moving papers – but ignored by FXG – the trial court's ruling was based on the terms of the 1994 OA, which remains in effect today, as well as FXG's generally applicable corporate policies, procedures and documents implementing those terms, which have not been materially altered since *Estrada* was tried. See Doc. 1194 at 4-5, 13-14 (comparison of documentary record admitted in *Estrada* with that developed during MDL). Key to the trial court's conclusion was the view that FXG's corporate policies – which FXG's key witness admitted are intended to guide FXG field managers – are "laden with detailed descriptions of control" it may exercise over drivers consistent the OA. (Pls. RJN, Ex. B at 8) The significance of the driver and manager testimony was simply to show how FXG exercised right of control reserved to it in the OA itself. That is exactly what the trial court found.

*Second*: FXG is mistaken in its assertion that the results of the so-called "Document Reengineering Initiative" (DRI) are material to the resolution of this motion. The OA has not

case 3:05-md-00527-RLM -CAN document 1497 filed 07/10/08 page 11 of 26

changed at all. The policies are relevant because FXG has retained the unilateral right to implement the terms of the OA through FXG policy and procedure, which it also has the unilateral right to modify to satisfy its business goals at any given moment. Indeed, FXG has admitted that "the right to control the methods of an employee's performance *logically subsumes the right to change them.*" Doc. 1387 at 14 (*emphasis in original)*. It is not material at all that FXG re-labeled some of its "policies" as "procedures" or made slight modifications to the rules specifically addressed in the *Estrada* SD. Nor does it matter whether FXG now permits or prohibits drivers from swapping packages with each other (referred to as "informal flexing") (OPR 716), or to hire relatives as assistants (OPR 551/CRL 551), as FXG claims. The point is that FXG continues to reserve the right to determine these matters one way or another.

Further, the DRI did *not* result in any wholesale, material changes in the OA or the policies that implement its terms. FXG has misrepresented the breadth and results of the purported DRI. Plaintiffs' Expert, Robert F. Wood, who undertook a careful analysis of FXG policies from before and after the DRI, concluded that policy changes were purely cosmetic. The "changes" recited by FXG at pages 6-7 of its opposition brief do not show otherwise. FXG's retained "right to control" is rooted in the broadly stated terms of the OA, which FXG implements unilaterally through its generally applicable policies and procedures. The terms of the OA have not changed. FXG continues, as a matter of FXG policy, to require drivers to drive FXG-branded and approved vehicles, to wear the FXG uniform, and to satisfy all commitments FXG makes to FXG customers that circumscribe when and how they transport packages to and from the terminals. FXG continues to require drivers to scan every package at the point of delivery or pickup using FXG-issued scanners loaded with FXG's proprietary software, to provide up-to-the-minute package tracking information to FXG and its customers. FXG continues to conduct CSRs, to hold "Business Discussions" and annual performance reviews

case 3:05-md-00527-RLM -CAN document 1497 filed 07/10/08 page 12 of 26

with all drivers, to conduct covert driver release and random road audits to supervise the drivers' work and monitor compliance with FXG procedures, and so on.[3]

FXG vastly overstates the facts when it implies it made substantial efforts to notify and train its field managers about the supposed policy changes made as part of the DRI. While FXG claims that the "the reengineered policies were communicated to terminal management, addressed in regional seminars and FXG University Programs, and made continuously available through FXG's intranet" (Doc. 1397 at 8), the undisputed evidence shows *just the opposite*. Steve Handy, FXG's Chief Learning Officer who oversaw the initiative, and whose testimony FXG cites, said no such thing. Instead, he readily admitted that there were no substantive changes to the policies he was responsible for, including service measurement. (Faris Decl., Ex. 8:203 [Handy Dep. at 81]). He further admitted that no special training was provided to the field about the "reengineered" policies and that there was no "special rollout." (FXG Ex. C-40 [Handy Dep. at 92-94]).[4] That no special efforts were made to notify FXG management that the policies had been revised was confirmed, definitively, by the testimony of FXG's Division Vice Presidents, Robert Holcombe and Scott Ray, who said they had not even heard of the so-called "Document Reengineering Initiative" (DRI), (Faris Decl., Ex. 8:234 [Holcombe Dep. at 132]) and Ex. 8:655 [Ray Dep. at 76]), and Sr. Vice President of Operations Michael Mannion, who said that *nothing happened* as a result of the DRI. (Ex. 8:374-75 [Mannion Dep. at 75 and 89]).

3 Throughout the SUF, Plaintiffs refer to both the current and previous versions of FXG's policies and procedures that provide specific content to the broad terms of the OA. *See*, *e.g*. SUF 82 (referencing 2005 and 2002 "checkout" procedure), SUF 92 (referencing 2007, 2006 and 2001 "driver release" policies), SUF 94 (referencing 2007 and 2001 delivery record completion procedure, aka "service crossing"), SUF 95 (referencing 2005 and 2001 "pickup record completion" procedure), SUF 107 (referencing 2006 and 2002 "uniform" policy), SUF 112 (referencing 2007, 2005 and 2002 "vehicle guidelines and upgrade" policy).

4 The following colloquy occurred during the Handy deposition regarding notice and training to the field about the purportedly "reengineered" policies: *"Q: What training has been provided to the field to alert them to the re-engineered policies and procedures? *** A: I don't think we had any training. It was just a communication, this is where you go."* A few minutes later, this exchange took place: *"Q: And I understand that. I guess I was trying to get at are you aware of how they were rolled out to the field, the reengineered policies and procedures. Was there any special roll out? A: Not to my knowledge." Id*.

The testimony of these high-level managers destroys FXG's claim that the DRI radically changed the policies governing how it interacts with drivers to "fix" the problems identified in *Estrada*.

FXG has also failed to present any evidence that it has ever taken steps to "enforce" the Section 1.15 prohibition against directing the manner and means used by the drivers to perform their work, as it claims. CRL-007 – promulgated in 2005 as part of the DRI – repeats the language of Section 1.15 as a "policy" and does say that a violation of its terms may result in disciplinary action. However, if FXG had ever disciplined any manager for violating its terms, it would have produced evidence to this effect. It did not.[5] Thus, as already noted in Plaintiffs' opening brief, the undisputed record shows the DRI did not result in any material changes to the facts that would "alter the legal rights or relations" between FXG and the drivers. *Evans v. Celotex*, 238 Cal. Rptr. 259, 262 (Cal. App. 1987). At best, the purportedly "reengineered" policies represent cumulative evidence that does not prevent application of the collateral estoppel bar. Now, as before, the legal relationship between the drivers and FXG is governed by the terms of the 1994 OA, and FXG continues to implement its broad terms, which reserve to it the right to control, through its more detailed corporate policies, *how* drivers perform their work.

*Third*: There is no merit to FXG's argument that according collateral estoppel effect to the *Estrada* finding that FXG has retained the right to control the work of the drivers who perform service for it under the OA would somehow make a "mockery" of the lengthy class certification proceedings in *Estrada*. Plaintiffs do not ask this court to apply the employment status finding entered as to the single-work area drivers in *Estrada* to the multi-route drivers included in the certified MDL classes, as FXG argues. The relief Plaintiffs seek is far narrower:

---

[5]  At Section 61 of the SGI, FXG cites to testimony of two managers, James Krappa and Steve Griffin for the proposition that "managers are disciplined for failing to treat contractors as prescribed by the OA." The cited testimony says nothing of the kind, as discussed at page 8 of Plaintiffs' Reply Memorandum in Support of *Craig* Motion for Summary Adjudication (Kansas/ ERISA), filed herewith.

to bar FXG from re-litigating the issue of whether the terms of the OA -- as well as the common corporate policies that implement those terms -- retain to FXG the right to control how the drivers perform their work. This court has already found that those retained rights are the same because the OA is the same. Doc. 1119 at 45. Similarly, in *Estrada*, the trial court found that the multiple work area drivers are subject to the "same strict controls" as the SWAs. (Pls. RJN, Ex. B at 17) FXG ignores this point, because it cannot answer it.

*Fourth:* FXG's contention that the MDL class actions will be tried on a basis of a "fundamentally different" factual record than was developed in *Estrada* is premised on a fundamental misunderstanding as to both *how* the *Estrada* case was tried, and the evidentiary basis for the trial court's finding that FXG has retained the right to control the drivers' work. Beyond the OA, the most important evidence presented during the *Estrada* trial consisted of FXG's generally applicable corporate policies, as shown in the record filed by Plaintiffs in support of the instant motion. (*See* Pls. RJN, Ex. H [*Estrada* Trial Exhibits]). While both sides put on driver witness testimony, the testimony was *not* offered to show that the terms of the OA were disregarded by FXG in its dealings with drivers. Nor did the trial court rely on it for that purpose, as FXG argues.[6] Instead, the record shows that testimony of drivers and managers from terminals throughout California was offered to show that the *uniform* terms of the OA and FXG policy and procedure are implemented *uniformly* by FXG. For this reason, the Court of Appeal rejected the argument, advanced again by FXG here, that Plaintiffs' case was anecdotal, explaining that the driver testimony was "relevant to the class as a whole, not just to the drivers who happened to be the subject of a particular anecdote." *Estrada*, 64 Cal. Rptr. 3d at 338.

6 FXG also mischaracterizes the SD when it claims that the *Estrada* court found that the OA established an independent contractor arrangement on its face but was a sham in practice. Doc. 1397 at 23. To the contrary, the *Estrada* court found that the OA itself created the constraints of an employment relationship despite the independent contractor label. It was for this reason that the trial court described the OA as "brilliantly drafted." (Pls. RJN, Ex. B [SD] at 4)

Plaintiffs have not offered *any* driver testimony in support of their motions for summary adjudication. And, as shown, the very same categories of common proof offered in *Estrada* have been offered here.

**C. FXG Has Not Refuted Plaintiffs' Showing that the Public Policy Considerations Underlying the Collateral Estoppel Doctrine Favor its Application to this Case.**

**1. *Estrada* is the Only Final *Judgment* Previously Entered Addressing the Employment Status of FedEx Ground Drivers.**

FXG argues that collateral estoppel cannot be applied here because "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." Doc. 1397 at 25 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979)). Relying on *Sandoval v. Superior Court*, 190 Cal. Rptr. 29 (Cal. App. 1983), FXG claims that there is "something fundamentally offensive about depriving a party of the opportunity to litigate [an] issue again when he has shown beyond doubt that on another day he prevailed." *Id.* at 37. Unfortunately for FXG, this well-recognized limit to the collateral estoppel doctrine is inapplicable here, as *Estrada* is the only class-based adjudication resolving the employment status of FXG's drivers under the OA. Thus, this case is quite unlike the mass tort cases discussed in *Parklane*, or multiple product transactions discussed in S*andoval* involving dozens of inconsistent jury verdicts as to a defendant's liability. In such circumstances, it would be arbitrary indeed for a court to pick out a single verdict out to use as a bellweather. *cf. Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 346 (5th Cir. 1982) (collateral estoppel rejected where defendant prevailed in half of 70 asbestos-related product liability actions). In *Sandoval*, *supra*, however, the California Court of Appeal indicated that it is perfectly appropriate to apply collateral estoppel principles to preclude a defendant, like FXG, from re-litigating multiple claims where the *first* judgment entered is adverse to it provided that "the defendant had the

incentive and complete opportunity to contest the issue fully in the first action." 190 Cal. Rptr. at 36, n.7.

FXG points to a handful of individual court decisions and administrative orders to show it has successfully defended its "independent contractor" business model in the past. Doc. 1397 at 25-26. They do not. The *Mailhot* judgment does not indicate that the Plaintiff was a FXG "contractor" who performed service under the terms of the 1994 OA, as FXG claims. It merely states that the Plaintiff was not an "employee" of FXG entitled to bring suit under the ADA. (*Compare* FXG Ex. H-08 with Doc. 1397 at 25-26) In *Lemmings*, the plaintiff was *not* a "contractor" engaged by FXG under the OA. The question presented was whether a second van driver, nominally employed by a FXG "contractor," was jointly employed by FXG. Finally, in the *Issa* case, a discrimination action filed by two non-driving multi-van contractors, no final judgment was ever entered. The case settled with a dismissal of all claims. (*See* Pls. 2d RJN, Ex. C).[7] Thus, *none* of these cases provide examples of prior judgments where FXG finally prevailed on the single issue which is the subject of Plaintiffs' collateral estoppel plea: FXG's retained right to control the drivers' work under the OA, decided adversely to it in *Estrada*.

The two administrative decisions highlighted by FXG in its brief also do not advance the argument.[8] *Roach*, No. WCK 0038184 (July 29, 1999), is a one page order which appears to affirm an order denying a motion for reconsideration entered in a California worker's compensation appeals board matter in 1999. The order does not indicate who the applicant was,

---

[7] The *Issa* case is a poor example for other reasons. The two individual plaintiffs, Kamil Issa and Edgar Ritzkallah, were not similarly situated to the members of the *Estrada* and certified MDL classes at the time their discrimination claims were litigated. Notably, however, both were members of the *Estrada* class and subject to the employment status ruling pertaining to time periods when they worked as full-time drivers. (See Pls. 2d RJN, Ex. C) In any event, because the case settled, the trial court's ruling that they were not employees was never reviewed on appeal.

[8] FXG references some administrative decisions at page 9, fn. 6 of its brief, but does not explain their significance. Those cases were all initiated by individuals and did not involve class-wide determinations. At least one (*In re Methany* ) involved the status of a driver who performed a different job, long-haul transportation, under a different contract. Two of the cases (*In re Spitz* and *Endres v. FedEx Ground Package Systems, Inc.*) did not involve application of agency law principles.

or what issues were decided in the underlying proceeding. (*See* FXG Ex. H-13)[9] *RPS, Inc.*, 5-RC-14905 (N.L.R.B. 2000) was an unpublished order issued by Director of NLRB Region 5 that was never affirmed in any precedential decision by the full Board. The case concerned the status of twenty single-work area drivers at FXG's Bridgeville, Maryland terminal, and the decision was a true aberration. Both before and after the Bridgeville hearing, the NLRB has ruled *against* FXG on the employment status of the drivers in other cases, including the sole precedential decision, under common law agency principles. *Roadway Package System, Inc.*, 326 N.L.R.B. 842 (1998) (terms of 1994 OA create employment relationship under common law agency principles); *accord In re FedEx Home Delivery*, 2006 WL 897609 (N.L.R.B. 2006) and cases cited therein (drivers performing service under OA are employees; multiple work area drivers excluded from certified bargaining unit as supervisory employees); *see also In re FedEx Home Delivery*, 2007 WL 2858933 (N.L.R.B. 2007) (FXG violated NLRA by refusing to bargain with certified representative of drivers at Wilmington, MA terminal).

Finally, FXG's attempt to paint itself as the true victor of the *Estrada* litigation, and its related claim that the decision counts as a judgment in its favor as to a "major category of contractors," i.e. the multiple work area drivers, deserves very short shrift. As FXG acknowledges, the *Estrada* class did not include MWA drivers. While the portion of the SD addressing the individual claim of Harvey Roberts was broadly worded, the court's comments as to the MWAs as a group was *dicta*. For purposes of Plaintiffs' collateral estoppel argument, the only relevant finding was the trial court's conclusion that Roberts, who performed service under the same OA as the certified class members, was subject to the same "strict controls" as the

---

9 Also missing from FXG's presentation is evidence of the 2007 final decision of the California Unemployment Insurance Appeals Board concluded that FXG misclassified all of its California single-work area drivers who perform service under the OA as "independent contractors." Like the *Estrada* court, the CUIAB applied common law agency principles to find that FXG retained the right to control the manner and means of the drivers' employment. (See Pls. 2d RJN, Ex. D).

SWAs. (Pls. RJN, Ex. B at 17-18) This court, too, has found that it is appropriate to adjudicate the claims of the SWAs and the MWAs in one class, since they all sign "nearly identical Operating Agreements," and are subject to the same retained rights to control, whatever those rights may be.[10]

**2. FXG's Arguments Regarding California's Proposition 64 Are Inapposite.**

FXG's further argument, that application of the collateral estoppel bar in this case would violate the 2005 amendments to California's Unfair Competition Law enacted by referendum ballot (known as "Proposition 64"), is nonsensical. Proposition 64 altered the standing requirements for bringing claims under the UCL, and requires that claims for injunctive relief under that statute must satisfy California's procedural requirements for class certification. Cal. Bus. and Prof. Code §§17200 and 17203. Nothing in Proposition 64 prohibited the offensive use of collateral estoppel principles in an appropriate case.

FXG's related argument, that Plaintiffs propose to create a nationwide "class behemoth" which would not be certifiable on its own terms, is equally mistaken. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002), cited by FXG, is entirely inapposite. There, the Seventh Circuit reversed a district court order "centralizing" mass tort claims arising under the laws of all fifty states under Rule 23 in a single nationwide class action as unmanageable. The MDL class actions here were centralized before this Court at FXG's insistence, and the Court has already certified each of the twenty cases in which summary adjudication is now sought under Rule 23. Plaintiffs do not invoke collateral estoppel to give any broader effect to the factual determinations made in *Estrada* than they would enjoy under

[10] Even if there was a meaningful distinction to be drawn between the SWA and MWA drivers – a point Plaintiffs dispute – FXG should be barred, by *Estrada*, from re-litigating whether it has retained the right to control the work performed by the SWAs, who comprise the vast majority of FXGs nationwide workforce. *See* FXG Exs. D10-D12 (Declarations of David DeMaria recounting number of Ground SWA and MWA drivers in each state) and D26-28 (Declarations of Dennis Malley recounting number of FHD SWA and MWA drivers in each state).

California law. FXG's retained right to control the manner and means of the drivers' work arises from the terms of the common OA and the FXG policies, procedures and practices that are the same in California as elsewhere.

**CONCLUSION**

Plaintiffs have shown that the prerequisites for application of collateral estoppel principles to bar FXG from re-litigating the key issue resolved against it in the California *Estrada* litigation are met both in the *Alexander* case asserting California law claims and the twenty certified class cases. FXG had every incentive to vigorously defend its independent contractor business model in *Estrada*. Contrary to FXG's claim, the trial court in *Estrada* concluded that FXG's retained right to control is grounded in, and not despite, the terms of the "brilliantly drafted" OA, which creates an employment arrangement under the guise of an independent contractor model. It is ironic that after insisting it was entitled to have a single court adjudicate the drivers' employment status through the MDL process to *avoid* the possibility of inconsistent class action judgments, FXG now claims that the only fair way to adjudicate the employment law claims asserted by Plaintiffs will be through a "decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions." Doc. 1397 at 30 (quoting *In re Bridgestone/Firestone*, 288 F.3d at 1020). The California judiciary devoted years of time and substantial resources to providing FXG all the process it was due. Plaintiffs respectfully request that full faith and credit now be afforded to the core factual finding entered by the *Estrada* court in ruling on the pending motions for summary adjudication.

Case 3:05-md-00527-RLM-CAN document 1497 filed 07/10/08 page 20 of 26

Dated: July 9, 2008

Respectfully submitted,

LEONARD CARDER, LLP

**_s/Beth A. Ross**

Lynn Rossman Faris
Beth A. Ross
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
bross@leonardcarder.com

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in San Francisco County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1188 Franklin Street, Suite 201, San Francisco, CA 94109. On **July 9, 2008**, I served the following document(s):

1. **PLAINTIFFS' REPLY MEMORANDUM RE: COLLATERAL ESTOPPEL IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

Peter J Agostino agostino@aaklaw.com, trybula@aaklaw.com

George A Barton gbarton@birch.net, bartonlaw3@birch.net

Jeffrey A Bartos jbartos@geclaw.com

Evelyn L Becker PHV ebecker@omm.com

Kenneth Lee Blalack , II lblalack@omm.com

Darcie R Brault dbrault@dibandfagan.com

Laura C Bremer lbremer@omm.com

Guy Brenner gbrenner@omm.com

Thomas J Brunner , Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski dmc@zimmreed.com

Jerald R Cureton jcureton@curetoncaplan.com

Ginger A DeGroff degrofflaw@yahoo.com

Robert E DeRose , II bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Edward J Efkeman eefkeman@fedex.com

Susan E Ellingstad     seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

Barry S Fagan     bfagan@dibandfagan.com

Lynn R Faris     lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Monica Ferraro     mferraro@bnhmlaw.com

Lee K Fink     lfink@omm.com

Robert K Firsten     rfirsten@firstenlaw.com

Edward R Forman     eforman@ee.net

Wood R Foster PHV , Jr     woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox     Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco     pfuoco@msn.com

Martin S Garfinkel     garfinkel@sgb-law.com, helm@sgb-law.com

Michael W Garrison , Jr     mgarrison@omm.com

R Christopher Gilreath     chrisgil@sidgilreath.com

Eileen S Goodin     egoodin@bnhmlaw.com

Michael J Gorby     mgorby@gorbypeters.com, rwright@gorbypeters.com

Deborah R Grayson     drgrayson@fuse.net

Robert K Handelman     rhandelman@bnhmlaw.com

Robert I Harwood     rharwood@whesq.com

Stacy J Hauf     shauf@omm.com, swickliffe@omm.com

Matthew M Houston     mhouston@whesq.com

Dmitri Iglitzin     iglitzin@workerlaw.com

Tom A Jerman     tjerman@omm.com

Victor H Jih     vjih@omm.com

Aparna B Joshi     ajoshi@omm.com

Soye Kim     skim@geclaw.com

Michael W Kopp     mkopp@omm.com

Steve D Larson     slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis     jordanlewis@sbgdf.com

Shannon Liss-Riordan     sliss@prle.com, jhunt@prle.com, syoung@prle.com

Gary F Lynch     glynch@carlsonlynch.com

John S Marshall     marshall@ee.net

Michael G McGuinness     mmcguinness@omm.com

Bruce H Meizlish     brucelaw@fuse.net

Sanford A Meizlish     smeizlish@bnhmlaw.com

Matthew J Merrick     mmerrick@omm.com

Jennifer Lee Merzon     jmerzon@omm.com

Raquel A Millman     rmillman@omm.com

James R Mulroy , II     jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Daniel O Myers     dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Jeffrey S Nestler     jnestler@omm.com

Peter W Overs , Jr     povers@whesq.com

Mary Donne Peters     mpeters@gorbypeters.com, rwright@gorbypeters.com

Richard T Phillips     flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Nora M Puckett npuckett@omm.com, dmeredith@omm.com

Charles Victor Pyle , III victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan atr@zimmreed.com, kmh@zimmreed.com

Beth A Ross bross@leonardcarder.com

J Gordon Rudd jgr@zimmreed.com

Theodore B Schroeder tschroeder@omm.com

Robert M Schwartz PHV rschwartz@omm.com

James A Staack jims@staack-firm.com

R Jay Taylor , Jr jtaylor@scopelitis.com, lnewton@scopelitis.com

Joni M Thome PHV thome@halunenlaw.com

Matthew T Tobin mtobin@sbslaw.net, lstewart@sbslaw.net

Jeffrey A Trimarchi jtrimarchi@omm.com

Mary D Walsh-Dempsey mdempsey@omalleylangan.com

Michael J Watton jdrewicz@Wattongroup.com

Andrew M Weiner aweiner@omm.com

Peter D Winebrake pwinebrake@winebrakelaw.com

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

| | |
|---|---|
| John H. Beisner PHV<br>Email: jbeisner@omm.com | J. Allen Brinkley<br>Email: Allen@bclegal.net |
| Joree Brownlow<br>Email: joree@jbrownlow.com | David G. Caperton<br>O'Melveny & Myers LLP<br>Email: dcaperton@omm.com |

| R. Bruce Carlson<br>Email: bcarlson@carlsonlynch.com | Kevin J. Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes &<br>Gaffney PC<br>Email: kdriscoll@finleylaw.com |
|---|---|
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178<br>Email: jjjteam@yahoo.com | William T. Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B. James Fitzpatrick<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com | Salvatore G. Gangemi<br>Email: sgangemi@gangemilaw.com |
| Robert A. Garcin<br>Law Offices of Robert A. Garcin<br>210 East 29th Street, #A<br>Loveland, CO 80538 | Clayton D. Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402<br>Email: halunen@halunenlaw.com |
| Jack D. Hilmes<br>Email: jhilmes@finleylaw.com;<br>kdriscoll@finleylaw.com | Eric E. Hobbs<br>Email: eehobbs@michaelbest.com |
| William S. Hommel , Jr<br>Attorney at Law<br>Email: bhommel@hommelfirm.com | Dorothy A. Jarrell<br>Anh-Nguyet T. LyJordan<br>O'Melveny & Myers LLP<br>Email: djarrell@omm.com; alyjordan@omm.com |
| Steven M. Kelso<br>Wheeler Trigg Kennedy LLP<br>Email: kelso@wtklaw.com | Andrew J. Kahn<br>McCracken Stemerman & Holsberry<br>Email: ajk@dcbsf.com |
| Donald B. Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Karen P. Kruse<br>Aaron Roblan<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| Carla D. Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Harold L. Lichten<br>Pyle Rome Lichten Ehrenberg &<br>Liss-Riordan<br>Email: Harold@prle.com |
| Robert E. McDaniel<br>Email: remcdanielesq@aol.com | Paula R. Markowitz<br>Markowitz & Richman<br>Email: ldicrosta@markowitzandrichman.com |

| | |
|---|---|
| Charles N. Nauen<br>Email: cnnauen@locklaw.com | Kenneth E. Milam<br>Email: kemilam@watkinseager.com |
| Joseph A. Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>Email: josefchen@msn.com | Todd J. O'Malley<br>O'Malley & Langan<br>Email: tomalley@omalleylangan.com |
| Cheryl F. Perkins<br>Whetstone Myers Perkins and Young LLC<br>Email: cperkins@attorneyssc.com | Robert J. Penny<br>Wick Bramer Ukasick & Trautwein LLC<br>323 South College Avenue<br>PO Box 2166<br>Fort Collins, CO 80522 |
| Michael R. Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989<br>Email: mrreck@belinlaw.com | Alan M. Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |
| Eric H. Rumbaugh<br>Michael Best & Friedrich LLP<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: ehrumbaugh@michaelbest.com | Jennifer R. Rygiel-Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>Email: jennifer.rygiel-boyd@olgetreedeakins.com |
| Dan S. Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050 | Patricia A Sullivan<br>Email: psullivan@eapdlaw.com |
| Richard Tanenbaum<br>Email: rt@lawyer.com | Donald R Taylor<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Charles W. Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>Email: cwhetstone@attorneyssc.com | mailto:rt@lawyer.comPeter N. Wasylyk<br>Email: pnwlaw@aol.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on **July 9, 2008.**

/s/ **Angela Ahn**
Angela Ahn

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: <br> ALL ACTIONS | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND'S REPLY TO PLAINTIFFS' OPPOSITION TO**

**FXG'S MOTION TO EXCLUDE**

**THE EXPERT TESTIMONY AND REPORT OF ROBERT WOOD**

case 3:05-md-00527-RLM-CAN document 1566 filed 07/14/09 page 2 of 17

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1
ARGUMENT .......... 3
I. Plaintiffs' Reliance On Mr. Wood's Opinions Is Premature At Best .......... 3
II. Mr. Wood's Expert Opinions Are Inadmissible Legal Conclusions, Not Admissible Factual Opinions .......... 5
III. Plaintiffs Cannot Use Their Motion For Collateral Estoppel As Both A Sword And A Shield .......... 11
IV. Plaintiffs Misunderstand The issue Raised By FXG Concerning The Admission Of Individualized Extrinsic Evidence .......... 12
CONCLUSION .......... 14

**INTRODUCTION**

Mr. Wood's expert report and legal conclusions are inadmissible in connection with the Court's summary adjudication on the issue of contractor status and the collateral estoppel effect of the *Estrada* decision.[1] Plaintiffs' admission that they have retained Mr. Wood "on the assumption that, ***at trial***, FXG intends to offer the testimony of lawyers and executives […]," (*see* Plaintiffs' Memorandum of Law in Opposition to Defendant FedEx Ground's Motion to Exclude the Testimony and Report of Robert Wood, dated June 27, 2008, (Doc. No. 1432) ("Pls.' Opp'n") at 4) (emphasis added), shows that they have jumped the gun by introducing Mr. Wood's report and testimony at this stage of the litigation. To the extent that plaintiffs rely on the *Estrada* trial court's evidentiary rulings for guidance in this case, plaintiffs miss the point. As plaintiffs acknowledge, the *Estrada* plaintiffs called Mr. Wood as a ***rebuttal*** witness and the trial court allowed him to testify only as a ***rebuttal*** witness.[2] Introducing Mr. Wood's testimony at this stage of the litigation or, indeed, even at trial (before FXG has put on a defense), stretches the limited purposes for which the *Estrada* trial court admitted Mr. Wood's testimony.

Plaintiffs contend that they rely on Mr. Wood's opinion for only limited factual points, (Pls.' Opp'n at 2, 5), but this is belied by their extensive use of his report in their oppositions to FXG's motions for summary judgment. (*See, e.g.*, Wisconsin Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment

---

[1] FXG reserves the right to oppose Mr. Wood's testimony at trial, if necessary. That, however, may be obviated by the Court's ruling on this issue here at the summary judgment stage of the litigation.

[2] FXG disagrees with the *Estrada* court's decision to allow Mr. Wood to testify, even in rebuttal, since the opinions he renders are not properly the subject of expert testimony.

(Doc. No. 1374) at 10 ("Pls.' WI MSJ Opp'n"); Pls.' KS MSJ Opp'n (Doc. No. 1364) at
6-7; Pls.' NY MSJ Opp'n (Doc. No. 1370) at 5.)

Moreover, plaintiffs contention that Mr. Wood offers factual opinions when he
opines that "FXG's current policies and procedures have changed only cosmetically since
Mr. Wood testified regarding those policies and procedures at the trial in *Estrada*," (Pls.'
Opp'n at 5), or that the OA does not by its very terms limit FXG's right to control, is
erroneous.  As FXG has already pointed out (*see generally* FXG's Memorandum of Law
in Support of Motion to Exclude the Expert Report and Testimony of Robert Wood (Doc.
No. 1366) ("FXG's Mem.")), plaintiffs are offering an expert's legal conclusions to
convince the Court to grant collateral estoppel effect for, or summary adjudication of,
employment status.  While the distinction between factual opinions and legal conclusions
is sometimes hard to discern, Mr. Wood's opinions are patently written as legal
conclusions, especially given that the terms he uses have specialized meanings in the law
and that his report brims with explicit and implicit conclusions as to the legal standards
that should govern the disposition of plaintiffs' claims.

As to plaintiffs' claim that somehow "FXG itself has placed Mr. Wood's opinion
regarding the reengineered policies directly in issue" (Pls.' Opp'n at 10)—by arguing that
plaintiffs' offensive collateral estoppel motion should be denied because of changed
policies and procedures—plaintiffs have ignored the fact that FXG is ***opposing plaintiffs'***
motion.  Moreover, even if FXG opened a door to factual rebuttal, it did not and could
not open the door to inadmissible legal conclusions.

Finally, plaintiffs' reliance on Federal Rule of Evidence 703 is unjustified.  The

issue is not whether the evidence is admissible under Rule 703, but whether it is individualized extrinsic evidence—evidence that plaintiffs agreed not to offer so that the Court could grant class certification. (*See* Plaintiffs' Statement Of Intent To Provide The Court With Common Proof Of Employment Status, dated April 11, 2008 [Doc. No. 1140] at 2-3 ("Pls.' Apr. 11 Stmt of Intent").) Moreover, that rule is inapposite; it allows experts to rely on otherwise inadmissible evidence to draw factual conclusions, but not legal ones, as Mr. Wood has done here.

For the reasons stated here and previously in FXG's memorandum of law in support of its motion to exclude, Mr. Wood's report and testimony should be excluded in its entirety.

**ARGUMENT**

**I. PLAINTIFFS' RELIANCE ON MR. WOOD'S OPINIONS IS PREMATURE AT BEST.**

Plaintiffs assume that "FXG intends to offer the testimony of lawyers and executives who, like [the lawyer (William Bradley)] and the executives who testified in Estrada[,] will testify regarding the meaning of the various sections of the OA, the interplay between the OA and the policies and procedures, the changes made to the policies and procedures, and FXG's intent to create a true independent contractor relationship." (Pls.' Opp'n at 4.) If the goal behind introducing the Wood report is to rebut FXG's witnesses at trial, then plaintiffs are premature. At this point in the litigation, the independent contractor summary adjudication stage, Mr. Wood's testimony as a rebuttal witness is inappropriate; since trial has not begun, plaintiffs have not

presented their case, and FXG has not had a chance to defend against it.

Indeed, even in *Estrada*, plaintiffs' called Mr. Wood only as a rebuttal witness to the testimony of the lawyer who drafted the OA (William Bradley)—testimony "on a variety of points having to do with the insertion in the 1994 agreement of a [sic] particular provisions which Mr. Bradley addressed in his testimony as having to do with various of the factors [] contained in the IRS materials.  I am going to ask Mr. Wood a series of questions regarding specifically regarding Mr. Bradley's testimony."  (*Estrada* Trial Transcript attached to Plaintiffs' MSA (Doc. No. 1197) ("*Estrada* Tr.") Exh. 11 at 11:114.)  The Estrada trial court permitted Mr. Wood only to rebut Mr. Bradley's testimony about what he intended when he drafted the contract at issue in that case.  The court stated:  "Didn't Mr. Bradley testify over and over again it was his purpose to make sure the contract was an independent contractor status and that was the whole purpose of the contract?  In light of that, can't Mr. Wood rebut that?"  (*Id.* at 11:177; *see also id.* at 11:178.)  Also, the court stated that it would "consider it only for that purpose, to rebut what he said."  (*Id.* at 11:178.)  The court also allowed Mr. Wood to rebut the testimony of other FXG executives regarding "the interplay between the manuals and the contract."  (*Id.* at 11:140-41; 11:147.)  Those issues are raised in the present motions.

The *Estrada* court drew a line, however, when Mr. Wood's testimony strayed into generalized testimony about independent contractor status.  (*Id.* at 11:136-37 (sustaining FXG's objection regarding plaintiffs' question "Would you expect to see a provision like the sentence I just read you from 1.12 in a traditional independent contractor agreement?" and Mr. Wood's answer "No, I certainly would not…. One of the difficulties [] in

representing a company seeking to have workers classified as independent contractors and thereby seeking the financial advantages that [] that typically affords, avoidance of payroll taxes, state and federal and insurance").)  Furthermore, the court ruled that "I will not allow him to get into the discussion of business discussion notes or anecdotal.  So Mr. Bradley didn't get involved in that, so neither will Mr. Wood."  (*Id.* at 11:147; *see also* FXG's Mem. at 15-16 (listing examples of Mr. Wood's discussion of business discussions throughout the Wood Report).)  The court also correctly recognized that testimony about the business discussions themselves was "[t]otally different" from the testimony about the business discussion note policy.  (*Estrada* Tr. at 11:147)

In any case, the issue of the admissibility of Mr. Wood's testimony and opinions at trial is not before the Court.  What FXG seeks, at this time, is to prevent the plaintiffs from relying on his legal opinions in the summary judgment phase of this litigation.

## II.  MR. WOOD'S EXPERT OPINIONS ARE INADMISSIBLE LEGAL CONCLUSIONS, NOT ADMISSIBLE FACTUAL OPINIONS.

Plaintiffs state that although the Wood report contains everything that Mr. Wood may testify to at trial, they have relied on the Wood report for only two limited propositions: (1) in their Omnibus Memorandum of Law re: Collateral Estoppel; and (2) "in a footnote in several of their state-specific motions for summary judgment."  (Pls' Opp'n at 5.)  They state that these two propositions are "factual" opinions: (1) "that the general language found in § 1.15 of OA is meaningless in light of the more than 18 specific reservations of control found elsewhere in the OA" (*id.* at 11); and (2) "that FXG's current policies and procedures have changed only cosmetically since Mr. Wood

testified regarding those policies and procedure at the trial in *Estrada*," (*id.* at 9).

In arguing that their reliance on Mr. Wood's report is limited, however, plaintiffs have failed to mention the numerous oppositions to FXG's motions for summary judgment in which they cited repeatedly and prominently to Mr. Wood's report.  (*See*, *e.g.*, Pls.' WI MSJ Opp'n at 10 ("Rob Wood, a recognized expert on independent contractor arrangements, opined that the FXG's OA contains numerous provisions inconsistent with a true independent contractor agreement (Faris Decl. [Doc. No. 1196], Exh 11 at 15-19)."); Pls.' KS MSJ Opp'n at 6-7 ("These provisions led Robert W. Wood, an expert on independent contractor arrangements, to conclude: 'FXG's plethora of rules for every step, from check-out to check-in, to scanning, to approval of truck and vans, to dress, to shaving, to hours, to hats worn during lunch, are entirely inconsistent with the independence necessary to independent contractor status.' (Faris Decl., Ex. 11 at 27)"); Pls.' NY MSJ Opp'n at 5 ("In truth, as noted by Rob Wood, an expert in this area of the law, the OA contains no fewer than 18 separate provisions that are inconsistent with a true independent contractor arrangement because they retain to FXG the right to control every aspect of the drivers' work in 'exquisite detail.'"); Pls.' TX MSJ Opp'n (Doc. No. 1373) at 6 n. 7; Pls.' MN MSJ Opp'n (Doc. No. 1368) at 6; Pls.' TN MSJ Opp'n (Doc. No. 1372) at 7; Pls.' FL MSJ Opp'n (Doc. No. 1361) at 5; Pls.' KY MSJ Opp'n (Doc. No. 1365) at 4; Pls.' NJ MSJ Opp'n (Doc. No. 1369) at 6; Pls.' RI MSJ Opp'n (Doc. No. 1371) at 13 n. 7; Pls.' CA MSJ Opp'n (Doc. No. 1360) at 7 n. 6.)  As explained in FXG's opening brief, these types of "catchall" opinions go to ultimate legal issues and are precisely why Mr. Wood's report and testimony are to be excluded.

Plaintiffs suggest that "the distinction between an admissible factual opinion and an inadmissible legal conclusion is not always easy to perceive" and therefore the cases on the issue are inconsistent. (Pls.' Opp'n at 7.) Although outcomes may vary from case to case, the rules in the various courts are rather consistent. In the Sixth Circuit, "The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985). The District of Columbia Circuit, citing to *Torres*, offers the following criteria: "In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997). In *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, the Second Circuit allowed expert testimony as to whether the "appellants engaged in 'fraud' and 'deceit,' because it was clear from the content of his direct and cross-examination that he used those terms in a non-legal sense." 37 F.3d 804, 826-27 (2d Cir. 1994).

Here, Mr. Wood's report is filled with terms that have specialized meaning in the law and opinions as to whether the legal standard for independent contractor status has been satisfied. The very point that plaintiffs' cite Mr. Wood for in their motions for summary adjudication and opposition to FXG's motions for summary judgment, regarding the allegedly "meaninglessness and contradictory" nature of OA Section 1.15's prohibition against directing the manner and means, goes to whether, as a legal matter,

FXG retains the right to control. (*See*, *e.g.*, Pls.' TX MSJ Opp'n at 6 n. 7 ("Plaintiffs' expert Robert W. Wood, a tax expert and editor of all four editions of the *Legal Guide to Independent Contractor Status*, opines that Section 1.15's general 'prohibition' against direction manner and means is 'meaningless in light of the specific and express provisions . . . which reserves rights of control to FedEx.' (Fairs Decl. Exh. 11 at p. 6)"); *see also* Pls.' NY MSJ Opp'n at 5; Pls.' TN MSJ Opp'n at 7.)

The weakness of plaintiffs' argument is clear from their New York motion for summary adjudication, which states that "[t]he Court may adjudicate employment status under New York law where material facts supporting a right of control are undisputed, as the ultimate question of employment status is one of law." (*See* New York (*Louzau*) Plaintiffs' Memorandum of Law In Support Of Plaintiffs' Motion for Summary Adjudication (Doc. No. 1176) at 6.) If the material facts are indeed undisputed—which is untrue—and given that Mr. Wood's opinions are not in and of themselves material facts, then all Mr. Wood has done is explain how the legal standards apply to those facts and whether they have been met.[3]

Plaintiffs also cite to cases in which courts have allowed experts to testify as to tax laws, custom and practice relating to contracts, standards of practice within a field, and procedures in the patent application process. (Pls.' Opp'n at 8-9.) Those cases are inapposite, however, since those did not involve an expert witness seeking to testify as to legal conclusions.

[3] Moreover, to the extent, the Court determines Mr. Wood's opinions are factual conclusions, then they are certainly disputed and cannot support plaintiffs' motions for summary adjudication.

For example, plaintiffs cite cases that deal with contract interpretation, and point to *United States v. Misle Bus & Equipment Co.*, 967 F.2d 1227, 1234 (8th Cir. 1992). But there the court allowed laypersons, not experts, to testify as to whether an agreement existed because the words the witnesses used "have well-established lay meanings and do not demand a conclusion as to the legal implications of conduct." *Id.* (citations omitted). Moreover, the instant case does not require any such opinions, given that the question of whether an agreement was reached is not in dispute. *Jeanes v. Henderson* is also inapposite because Mr. Wood is not being asked to opine on the meaning or usage of ambiguous terms in the contract. *See* 703 F.2d 855, 861-62 (5th Cir. 1983).

Similarly, in tax cases, where the plaintiffs note that courts have admitted legal opinions as to the meaning of tax statutes, the actual testimony permitted is more limited, and legal conclusions are not in fact allowed. As the court in *United States v. Gold*, 743 F.2d 800 (11th Cir. 1984) stated, courts "ha[ve] expressly approved the use of expert legal testimony in a case where an IRS agent merely stated his opinion as an accountant [with regard to the tax consequences of a transaction], and did not attempt to assume the role of the court." *Id.* at 817 (citations and internal quotations omitted; second alteration in original); *see also United States v. Windfelder*, 790 F.2d 576, 581 (7th Cir. 1986) (noting that "[t]he experts utilized their expertise in accounting and tax matters in making these determination"). The court in *United States v. Toushin* specifically found that the expert IRS agent's testimony as to the proper tax consequences of a transaction was not a legal opinion. 899 F.2d 617, 620 & n.4 (7th Cir. 1990); *see also United States v. Fogg*, 652 F.2d 551, 556-57 (5th Cir. 1981) (finding that expert testimony construing monies as

"constructive dividend[s] to the taxpayer" was not a legal conclusion but "merely stated his opinion as an accountant, and did not attempt to assume the role of the court").

Mr. Wood is not testifying as to the accounting consequences of the tax laws. Indeed, even if he were to testify about the tax laws, he could not use the standards under those laws to determine independent contractor versus employee status since the legal standards vary from state to state, and his legal opinions would not be admissible.

The other cases that plaintiffs cite are likewise inapposite. In *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 530 (9th Cir. 1986), an alleged account churning case, the court noted that the expert's analysis was statistical and thus factual, not legal, since the expert was testifying that his statistical analysis showed excessive trading. *Id.* The court stated that without such testimony, "the jury is left with meaningless numbers from which they cannot judge the appropriateness of the transactions." *Id.* In *Stuart Park Associates v. Ameritech Pension Trust*, the expert testified as to the defendant's legal reasons for refusing to fund the plaintiff. 51 F.3d 1319, 1327 (7th Cir. 1995). Those are not the same as legal conclusions, but rather they provided factual evidence of the defendant's motives.

Plaintiffs also cite a line of cases where experts were permitted to testify as to the custom and practice of an industry. *See Se-Kure Controls, Inc. v. Vanguard Prods. Grp. Inc.*, No. 02 C 3767, 2008 WL 169054, at *3 (N.D. Ill. Jan. 17, 2008) (excluding testimony of expert patent lawyer with regards to legal conclusions, but permitting testimony regarding the patent application process and to provide factual context); *Anderson v. Fel-Pro Chem. Prods., L.P.*, No. 95 C 4604, 1996 WL 33410082, at *6

(N.D. Ill. Dec. 19, 1996) (court granted motion to strike expert affidavit with respect to paragraphs attempting to establish legal effect of contract terms or interpreting those terms). Mr. Wood is not being offered as an expert in the custom and practice relating to the package pickup and delivery industry—he has no such expertise and FXG objects to his qualifications in that subject. Plaintiffs offer his testimony only as to the legal standards that govern whether a relationship is one of employer/employee or principal/independent contractor.

Further, Mr. Wood has no background in the U.S. Department of Transportation regulations, (*Estrada* Tr. at 11:195), has never drafted an independent contractor agreement for a motor carrier, (*id.*), and is not an expert on pickup and delivery service, (*id.* at 11:202). In short, Mr. Wood has no expertise to offer other than his legal conclusions.

## III. PLAINTIFFS CANNOT USE THEIR MOTION FOR COLLATERAL ESTOPPEL AS BOTH A SWORD AND A SHIELD.

Plaintiffs should not be allowed to defend against FXG's motion to exclude Mr. Wood's report and testimony by arguing that FXG had opened the door to his testimony. Indeed, it was plaintiffs who initially and offensively—not in rebuttal—submitted Mr. Wood's expert report to support their motion for collateral estoppel. Since then, FXG has responded to plaintiffs by: (1) defending against that motion—asserting, among other things, that circumstances have changed and that collateral estoppel is not appropriate; and (2) challenging the very propriety of Mr. Wood's expert report and testimony. For plaintiffs to argue now that FXG had raised the issue to which Mr. Wood responds seems

circular considering that plaintiffs have the burden to show that circumstances have not changed and that collateral estoppel should be applied.

The sole case that plaintiffs cite to support their position is a case in which two lawyer experts testified regarding proximate cause. *See Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990). In that case, the trial judge allowed the testimony because the defendant had offered expert testimony related to causation and the plaintiffs "did not challenge either the generic propriety of expert testimony or the qualifications of CNA's witnesses." *Id.* The only objection made was that the experts opined on an ultimate issue to be decided by the trier of fact. The First Circuit upheld the trial court's admission of the testimony because Rule 704 allowed for testimony on ultimate issues. *Id.* at 837-38. In this case, unlike *Peckham*, FXG objects to this testimony, as evidenced by this very motion, and Mr. Wood's report is not "otherwise admissible" as required by Rule 704 since it offers legal opinions not admissible under Rule 702. Moreover, the text of FXG's policies and procedures themselves are evidence that they have changed. There is no reason that plaintiffs should be allowed to put forth an expert's opinion on this point. Moreover, the question of the collateral estoppel effect of *Estrada* is a legal question for the Court. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

## IV. PLAINTIFFS MISUNDERSTAND THE ISSUE RAISED BY FXG CONCERNING THE ADMISSION OF INDIVIDUALIZED EXTRINSIC EVIDENCE.

Plaintiffs' assertion of Federal Rule of Evidence 703 as a justification for admission of Mr. Wood's report and testimony misunderstands the issue raised by this

motion.[4] Plaintiffs state that FXG "insist[s] that this case will turn on principals [sic] of contract construction." (Pls.' Opp'n at 12.) By raising Rule 703, however, plaintiffs have conflated the issue of inadmissible evidence with the issue of whether plaintiffs can offer individualized evidence when they previously agreed they would not offer it. The issue is not whether the individual facts Mr. Wood has relied on for his legal conclusions would ordinarily be admissible under the Federal Rules of Evidence. The issue is that plaintiffs have previously stated, in response to the Court's inquiry regarding the grant of class certification in its March 25, 2008 Order, that they would not offer individualized evidence in seeking a class-wide adjudication. (*See* Pls.' Apr. 11 Stmt of Intent at 2-3.)

Furthermore, the Court acknowledged that plaintiffs could not properly offer individualized evidence, stating that "[i]f plaintiffs include such evidence in their summary judgment motions FedEx Ground can move to strike such individualized proof." (April 22, 2008 Order (Doc. No. 1152).)

Despite these assurances, Mr. Wood's report discusses the details of business discussions themselves—not merely the policy behind business discussions—and he bases many of his legal conclusions, including that the policies and procedures have only changed cosmetically and that FXG has reserved the right to control, on anecdotal evidence from these meetings. (*See* FXG's Mem. at 15-16 (listing examples of Mr. Wood's use of business discussions throughout the Wood Report).) To allow plaintiffs to

[4] Even if Rule 703 applied here, it only allows experts to rely on otherwise inadmissible evidence only to draw factual conclusions not legal ones. The facts or data must be of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. That inquiry begs the question of just what kind of expert plaintiffs intend to use Mr. Wood for, since his conclusions are legal, not factual.

introduce Mr. Wood's legal conclusions would have the effect of allowing plaintiffs to indirectly introduce evidence that they expressly committed to not needing or offering. Indeed, even the *Estrada* court did not allow Mr. Wood to testify about the business discussions themselves, only the policies. (*Estrada* Tr. at 11:146-47.) The fact that the plaintiffs have stated their intent to offer expert testimony, (Pls.' Opp'n at 13), does not save this particular expert's testimony from being impermissible in light of the law of the case.

## CONCLUSION

For the reasons discussed in both FXG's memorandum of law and this reply, FXG respectfully requests that this Court exclude the expert testimony and report of Robert Wood in their entirety.

Dated: July 14, 2008.

Respectfully submitted,

By: /s/ *Robert M. Schwartz*
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of July, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By:____/s/ *Robert M. Schwartz*______________

case 3:05-md-00527-RLM-CAN document 1567 filed 07/14/09 page 1 of 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3-05-MD-527-RM (MDL 1700)

THIS DOCUMENT RELATES TO:

CHIEF JUDGE MILLER

*Floyd*, 3-05-CV-428 (AL); *Harris*, 3-06-CV-337 (AR); *Alexander*, 3-05-CV-528 (CA); *Carlson*, 3-05-CV-664 (FL); *Riewe*, 3-05-CV-390 (IN); *Berry*, 3-05-CV-531 (KS); *Coleman*, 3-05-CV-666 (KY); *Wescott*, 3-06-CV-485 (MD); *Lee*, 3-05-CV-533 (MN); *Gennell*, 3-05-CV-534 (NH); *Tofaute*, 3-05-CV-595 (NJ); *Louzau*, 3-05-CV-538 (NY); *Slayman*, 3-05-CV-596 (OR); *Willis*, 3-05-CV-597 (PA); *Tierney*, 3-05-CV-599 (RI); *Cooke*, 3-05-CV-668 (SC); *Smith*, 3-05-CV-600 (TN); *Humphrey*, 3-05-CV-540 (TX); *Asbury*, 3-05-CV-826 (WV); *Larson*, 3-05-CV-601 (WI); and ALL CASES (Collateral Estoppel).

**REPLY IN SUPPORT OF MOTION TO
STRIKE PLAINTIFFS' INDIVIDUALIZED PROOF
SUBMITTED IN SUPPORT OF SUMMARY JUDGMENT MOTIONS**

Plaintiffs insist that the fact-finder can somehow treat the over 1,600 pages of documents they filed in support of their summary judgment motions "as a group" and as "common proof"—and disregard as "immaterial" the hundreds of contractor-specific details contained in those documents. Pls.' Resp. at 1, 2. But ignoring the documents' individualized nature—and the details in them that plaintiffs claim are irrelevant but that they nonetheless rely upon and describe at length in their response brief—does not transform them into common evidence. Likewise, that they are "voluminous," are "business records" or show certain managers

following company policy (or how they do so) does not make them evidence of facts or circumstances common to all plaintiffs.

The problem with plaintiffs' evidence, however, goes beyond the mere fact that it is not common. By offering this evidence plaintiffs shift the substantive inquiry from the "right to control" under the OA to an examination of the "reality of the relationship between drivers and FXG across-the-board" and what managers across the country do "in fact." Pls.' Resp. at 2, 7. Thus, even if this evidence were common (which it is not), the Court has rejected the notion that the "reality of the relationship," or contractors' experiences "in fact," can be analyzed on a class-wide basis. See March 25, 2008 Order [Docket No. 1119, hereafter "Order"] at 41, 60-61 ("Because a class action would require examination of the actual relationship—not just the relationship created by the Operating Agreement—between FedEx Ground and [the] would be class members, common questions do not predominate."). If the parties' actual relationship and dealings were relevant, examining the relationships between FedEx Ground and its drivers would require "very close to a driver-by-driver analysis" because "the parties' submissions make clear that neither unanimity of perception nor uniformity are hallmarks of individual drivers' experiences." Order at 19. Further, even if there were a way to recharacterize this evidence as "common" proof (there is none), in its defense FedEx Ground would be entitled to "present[] evidence of the control it exercised over (or conversely, the freedom it allowed) its drivers" (Order at 19)—an analysis fundamentally incompatible with the pursuit of class-wide claims. In other words, were plaintiffs' evidence to be considered, FedEx Ground would be entitled to introduce individualized evidence to show that what plaintiffs assert to be "common" is not, and does not apply to particular contractors. At that point, plaintiffs' claims could not be decided on a class-wide basis.

Because plaintiffs' evidence pertains to the contractors' actual relationships and experiences with FedEx Ground, and thus the extent to which FedEx Ground exercised "actual control," it is not and cannot be common evidence of the "right to control," and only undermines plaintiffs' case for class treatment.

**A. <u>Plaintiffs' Evidence Is Not Common</u>**

Plaintiffs claim that the over 1,600 pages of evidence concerning discussions or observations that pertain to individual contractors, submitted in support of plaintiffs' summary judgment motions, is common evidence that may be applied to the facts and legal analysis governing the claims of all class plaintiffs. Notwithstanding plaintiffs' assertions that their proffered evidence is "quintessential common proof," it is unmistakably contractor-specific and individualized, and plaintiffs offer no basis for extrapolating the experiences reflected in the evidence to all class members. None of this evidence, in any event, relates to the "right of control" test applicable in these cases, as discussed in greater detail in the second section below.

Plaintiffs do not dispute that the documents contain specific information about particular contractors and their circumstances. In fact, plaintiffs devote significant portions of their response brief to footnotes that detail and highlight for the Court the contractor-specific and anecdotal nature of their evidence. Pls.' Resp. at 2, 11 & n.6, 12 & nn. 7-13, 13 & nn. 14-16. Plaintiffs' response—replete with quotes from specific conversations, events, and observations relating to individual contractors—only confirms the individualized nature of the evidence, and strongly belies plaintiffs' claim that they offer it only for some common purpose.[1]

---

[1] Plaintiffs even provide a chart (titled "Index of Sample Business Discussions, *Exact Quotes from Documents*," Pls.' Exh. 12:1-127 (emphasis added)) to assist the Court in wading through the detailed Business Discussion notes. For each Business Discussion note provided by plaintiffs, the chart provides the subject, purpose, and quotes from that discussion. It is difficult to understand what

According to plaintiffs, their evidence is common because it is offered to "prove the reality of the relationship between drivers and FXG across-the-board" and what managers across the country do "in fact." Pls.' Resp. at 2, 7. Evidence of FedEx Ground's relationships with contractors, however, is anything but common or "across-the-board." The actual relationship that exists between FedEx Ground and each contractor is not a theoretical relationship, or some kind of averaged or typical relationship. It is the reality that results from the exchanges and interactions between FedEx Ground and the contractor, the control *actually exercised* (or not) over that contractor, and the "freedom [FedEx Ground] allowed" that contractor. Order at 19. No set of documents (even "corporate records"[2]) can provide a shortcut to establishing the experiences, freedoms, and alleged controls applicable to each particular contractor. As the Court explained, it is an inquiry that is specific to the terminal, to the terminal supervisor, and to the driver himself or herself. Order at 19 (Montana), 106 (Missouri).

To treat the individualized experiences of certain contractors as common evidence of the experiences of all contractors creates a situation in which named plaintiffs "litigate not on behalf of themselves but on behalf of a 'perfect plaintiff' pieced together for litigation." See Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 343-45 (4th Cir. 1998). The Fourth Circuit recognized as unfair the "practical advantage" that class certification affords to plaintiffs whose factual circumstances differ because class treatment allows all plaintiffs to "draw on the most dramatic" evidence. Id. at 344. Plaintiffs' evidence creates the same situation rejected by the Broussard court:

---

purpose this chart serves other than to aid the Court in digesting the *individual facts and circumstances of the discussions themselves*.

2 To the extent plaintiffs imply that the evidence is common because it consists of FedEx Ground corporate or business records, this "form over substance" reasoning should be rejected.

> In sum, plaintiffs portrayed the class at trial as a large, unified group that suffered a uniform, collective injury. And Meineke was often forced to defend against a fictional composite without the benefit of deposing or cross-examining the disparate individuals behind the composite creation.

Id. at 345. Like the plaintiffs in Broussard, the experiences of class member contractors are not the same "across the board" as plaintiffs claim. To the contrary, as the Court recognized in its March 25, 2008 Opinion and Order, "the parties' submissions make clear that neither unanimity of perception nor uniformity are hallmarks of individual drivers' experiences." Order at 19. Accepting plaintiffs' contractor-specific evidence as "common evidence" creates a "fictional composite" contractor against which FedEx Ground must defend itself without the benefit of deposing or cross-examining the myriad combinations of circumstances and experiences behind that "composite creation" that would support a contrary conclusion. Plaintiffs' summary chart of the Business Discussion notes they submit,[3] promotes just such an approach by stripping the Business Discussion notes evidence of its contractor-specific features (plaintiffs delete contractor names, terminal manager names, dates of conversations, etc.). Simply eliminating the players' names and the dates does not make the substance of the evidence any different. It does not allow sweeping generalizations or creation of a "perfect plaintiff," transforming each interaction and discussion into the experience of most, or even many—much less, *all*—of the class members.

Plaintiffs also claim the evidence is common because it shows that FedEx Ground managers "follow and routinely enforce company-wide rules" and "demonstrate[s] the highly-trained managers' state of mind of that the OA and common policies and procedures provide them sweeping authority over all aspects of the drivers' work performance." Pls.' Resp. at 2. As an initial matter, the assertion that all FedEx Ground managers have a single, collective "state of

---

3 The summary chart is titled "Index of Sample Business Discussions, Exact Quotes from Documents." Pls.' Exh. 12:1-127.

mind" with respect to the policies demonstrates the fallacy in plaintiffs' "common evidence" reasoning.[4] Evidence of FedEx Ground managers following policies—even "voluminous" evidence—is not common to all FedEx Ground managers (or to the class members). Plaintiffs provide no basis for this evidentiary leap, and none exists in the record. For instance, while plaintiffs quote in their response a Business Discussion in which a manager observed "why do you have those tennis shoes on again," Pls'. Resp. at 12 n.7, another manager explained in his deposition that *if* contractors are "required to wear black socks with the shorts," then "it's not happening in my terminal." Brooks Dep. at 140-41, 156 (FedEx Ground's Statement of Genuine Issues, Docket No. 1358 (hereafter "SGI") ¶ 107). Regarding his "enforcement" of the uniform policy, manager Brooks testified:

> Q. Is one of your jobs to enforce the uniform policy of the company?
> A. It may be, but I really don't care about their socks. . . . I manage differently than someone else down the street.

Id. Similarly, manager Revoir testified that he has "never" told a contractor that they cannot provide service unless they are in full uniform. Revoir Dep. at 247 (SGI ¶ 107). And while plaintiffs offer numerous specific quotes from customer service ride worksheets, manager Revoir testified that although he was "supposed to go out and ride with the contractors," he did not because it was "a waste of [his] time." Revoir Dep. at 171-72 (SGI ¶ 146).

Plaintiffs' evidence is not class-wide proof of whether or how managers follow policies (let alone their "state of mind") just because plaintiffs say that it is. The evidence, in fact, shows just the opposite—that managers exercise their own business judgment and discretion in following (or not following) policies. As FedEx Ground's then-CEO, Dan Sullivan, explained,

---

4 Plaintiffs did not address the role of the "state of mind" of FedEx Ground's managers when briefing class certification. This is not surprising given that class treatment is not appropriate where the fact finder must examine the state of mind or intentions of FedEx Ground's managers.

BDDB01 5332800v1

he expects managers "to follow a policy within general parameters but provide a certain amount of discretion in the administration of these policies and procedures depending upon terminal location, the issues in each facility, those kinds of things which are all different." See Sullivan Dep. at 161-63 (SGI ¶ 7); see also Marticke Dep. at 91-93 ("Q. So are you saying, sir, that it is up to each and every member of management at FedEx ground to determine when it is appropriate to follow the company's policy and procedure and when it is not appropriate . . . based on their own business judgment? . . . A. Yes. I expect people to interpret the policies based on specific business conditions that they're confronting on a daily basis.") (SGI ¶ 7); Noth Decl. ¶¶ 36, 38, 41 (Each terminal has separate management and is staffed according to that terminal's special needs and challenges, and managers are given discretion in the exercise of their duties.) (SGI ¶¶ 13, 61). Testimony from the named plaintiffs provides further support for the individualistic nature of this evidence. See Humphreys Dep. at 124-58 (contractor's treatment varied depending on which of the five terminal managers he was working with) (SGI ¶¶ 13, 61).

Plaintiffs also assert that the evidence is common because the documents are somehow contemplated or authorized by FedEx Ground policies. Aside from the fact that this would literally convert millions of very different documents into "common evidence," regardless of their content, the contractor-specific evidence showing circumstances in which some managers follow policies, and how they do so, is not "common evidence" simply because it was created pursuant to a company policy. This would be the case even if the policies applied to contractors or defined the parties' rights, which they do not.[5] See generally Campbell v. PricewaterhouseCoopers, LLP, No. 8-06-2376, 2008 WL 818617, at *15 (E.D. Cal. Mar. 25,

---

[5] FedEx Ground's policies are not incorporated in the OA, not agreed to by contractors, and not even generally distributed. Neither the policies, nor managers' "state of mind" about them, can alter contractually-fixed rights.

2008) ("Regardless of what policies an employer may establish from the top-down … what employees actually do, on a day-to-day basis, is a separate matter."). These specific contractors' experiences are not the experiences of all contractors, nor "common evidence" of the actions of a fictional "composite FedEx Ground manager" simply because plaintiffs claim that they show managers following policies.

Plaintiffs' proffered evidence is no more "common" or "class-wide" than FedEx Ground's evidence demonstrating the individual experiences of contractors who hire helpers and drivers who incorporate their businesses, who choose not to drive any routes at all (e.g., SGI ¶ D25, Danho Decl.[6] ¶¶ 1-2, 4, 6, 7 (an HD contractor, does not personally drive any of his routes and has built his incorporated business to include 4 routes and 5 trucks, and hires, trains and fires his drivers; HD "is not involved in my hiring and firing decisions.")),[7] who sell their routes for significant profit (SGI ¶ D26, Mosher Dep. at 46-48, 81,176 (bought route for $5,000; sold route for $43,000)), who purchase additional routes (SGI ¶ D26, Lewis Decl. ¶ 12 (able to expand route by purchasing a stop from another contractor, ultimately adding up to 1200 additional packages per day) (stricken)), who set their own schedules and who negotiate with customers (SGI ¶¶ 97-98, Morgan Decl. ¶ 9 ("[if] the terminal manager asks me if a pick-up time will work with the route and if I say it won't, we work out a different timing arrangement for the pick-up")

6 FedEx Ground previously submitted numerous declarations from class members (including the Danho Declaration, as well as the Lewis, Morgan, Cruz, Pitman, and Hays Declarations cited and noted as "stricken" below), which the Court struck in connection with the class certification briefing. FedEx Ground has included references to these declarations in this brief to illustrate the type of individualized testimony that it might elicit at trial and to preserve its rights to appeal this issue. See Okai v. Verfuth, 275 F.3d 606, 612 (7th Cir. 2001) (party need not make formal offer of proof but must make known the substance of the evidence he hopes to present).

7 Although plaintiffs excluded from the class definition those contractors who do not themselves drive "full-time," their relationships with FedEx Ground and the freedoms they enjoy are equally probative of the issue of "right to control."

(stricken)), and whose intent it was to be an independent contractor (SGI ¶ D21 Coleman Dep. at 44 (stating that his reason for joining RPS (predecessor to FXG) was "to become an independent contractor")). Each contractor's experience is unique and cannot be examined either in generalities or through evidence of other contractors' experiences. The evidence at issue is individualized, and an order striking the evidence is appropriate.

**2. The Parties' Actual Relationship Cannot Be Litigated As A Class Action**

Plaintiffs' response acknowledges that the contractor-specific evidence at issue is offered to show the "reality of the relationship" between FedEx Ground and the contractors. Pls.' Resp. at 2. The evidence, plaintiffs assert, shows FedEx Ground's "practice[s]," id. at 6, 7, what FedEx Ground managers do "in fact," id. at 7, the "material facts regarding the relationship between FXG and its drivers," id. at 11, and managers who follow policies and procedures, id. at 16. Because *relationships* are not *rights*, and the sole issue in this case is "right to control," plaintiffs' "reality" evidence (regardless of whether it is individualized or common) is incompatible with class treatment of their claims.

As the Court explained in its March 25, 2008 Opinion and Order, the parties' "actual relationship," as opposed to the parties' rights governing their relationships, cannot be litigated on a class-wide basis. In states that apply the "right to control" analysis to determine status, the Court's decision to certify the class was based on plaintiffs' assertion that "though the Operating Agreement labels the drivers as independent contractors, the Operating Agreement itself reserves to FedEx Ground the right to control, making the drivers employees of FedEx Ground." Order at 42 (Texas); see, e.g., id. at 15 (Tennessee), 29 (Kentucky), 68 (New Jersey), 115 (Indiana); see also Oct. 15, 2007 Order (Docket No. 906) at 41 (noting employment status issue must be resolved based on "a detailed analysis" of the terms of the OA) (Kansas/ERISA). Class

BDDB01 5332800v1

treatment, the Court found, was appropriate in those states because analysis of the "control reserved" makes it "unnecessary to look beyond the Operating Agreement."  Order at 19 (Montana); see also id. at 54 (finding certification appropriate where "the parties suggest few deviations from [the OA] in the field") (New York).

By contrast, arguments that the OA is a "sham" or that "the actual relationship [is] inconsistent with the agreement" would require the Court "to conduct individual analysis of the actual relationship between the parties" and render class certification inappropriate.  Order at 41 ("Class certification would be inappropriate if the Texas plaintiffs' position was that though the Operating Agreement purported to establish an independent contractor relationship, the *actual relationship between FedEx Ground and its drivers* is one of employer/employee" (emphasis added)).  The Court did not understand plaintiffs, in urging class treatment of their claims, to have claimed that the OA is a "sham," that the parties' actual relationships diverge from the rights set forth in the OA, or that the OA is ambiguous in any way.  See Order at 41 (Texas), see also id. at 15 ("The Tennessee plaintiffs aren't arguing that the Operating Agreement is ambiguous.") (Tennessee), 79 ("The court understands Mr. Westcott to bring his claims based wholly on the right to control reserved to FedEx Ground under the Operating Agreement, not upon FedEx Ground's actual exercise (or forbearance) of control.") (Maryland).

Even if determining the parties' rights, through the lens of the Operating Agreement, is an analysis that can apply to all class members, the actual relationship between FedEx Ground and its contractors cannot be litigated on a class-wide basis because each contractor has his or her own individual experiences, interactions, and relationship with FedEx Ground.  The Court recognized the individual nature of the actual relationship analysis in explaining why the Montana plaintiffs' claims were inappropriate for class treatment.  Because those claims rested in

part on whether FedEx Ground actually controlled the details of drivers' work, FedEx Ground could not defend itself without "presenting evidence of the control it exercised over (or conversely, the freedom it allowed) its drivers." Order at 19 (Montana); see also Zeno v. Ford Motor Co., Inc., 238 F.R.D. 173, 194 (W.D. Pa. 2006.) ("[T]he agency theory advanced by plaintiff and disputed by defendant can be proved or disproved by reference to and interpretation of standard form documents. If upon a review of the merits the forms and documents are not similar or individual inquiry becomes necessary, the court, at that time will consider decertifying the class.").

The "realities" evidence plaintiffs present to support their summary judgment arguments demonstrates that the understandings underlying class certification were incorrect, and that class treatment is neither feasible nor appropriate. Evidence outside the Operating Agreement, including evidence that relates to the policies and their enforcement (and non-enforcement), neither proves nor bears on the parties' rights, regardless of whether the evidence is simply consistent with the rights in the OA, or expands on or contradicts those rights. For instance, plaintiffs submit Safety Meeting Reports (Pls.' Ex. 12 (12:1570-83)) in support of their claims of a reserved right to supervise contractors. *See* Pls.' Statement of Material Facts [Docket No. 1197] ¶¶ 78-79. Plaintiffs claim that whether the meetings are treated as mandatory is left to the terminal managers, though the safety meetings are simply not addressed in the OA. Id. ¶ 80 (plaintiffs acknowledge such meetings are voluntary by policy). Evidence offered to prove the mandatory nature of safety meetings contradicts both the OA and the policies, and is clearly outside the realm of evidence that could be considered on a class-wide basis. See Order at 41 (rejecting class certification if plaintiffs claim reality is different than rights in the OA: "Class certification would be inappropriate if the Texas plaintiffs' position was that though the

Operating Agreement purported to establish an independent contractor relationship, the *actual relationship between FedEx Ground and its drivers* is one of employer/employee" (emphasis added)).

Other anecdotal evidence plaintiffs offer is illustrative of the rights contained in the OA (compare, e.g., Business Discussions regarding use of service cross[8] with OA provision regarding use of service cross to provide certain information,[9]) or the policies (compare, e.g., Business Discussions regarding contractor appearance[10] with policies concerning contractor uniforms[11]), but neither of these categories of evidence affects the Court's consideration of the rights granted or reserved in the OA. See Order at 16, 19, 27, 41, 149. A final category of evidence—evidence purporting to show that in actual practice FedEx Ground exercised greater rights than contained in the OA (compare, e.g., Business Discussions regarding vehicle specifications[12] with OA provision regarding suitable vehicle[13])—plays no role in the right to control analysis. See, e.g., Order at 44 ("The court need only determine the existence of control, rather than examining FedEx Ground's actual exercise of control over each individual driver.") (Wisconsin).

Further, as the Court's Order aptly explains, the evidence of contractor experiences plaintiffs submitted in support of their summary judgment briefing represents just a sliver of evidence on the "actual relationship" issue. If plaintiffs' "actual relationship" evidence bears on

---

8 See, e.g., Pls.' Exh. 12:353-54, 12:951, 12:1399. 12:941, 12:134.

9 See OA ¶ 1.11.

10 See generally Pls.' Exh. 12:129-12:163.

11 See Pls.' Statement of Material Facts [Docket No. 1197] ¶ 107 (citing policies concerning contractor appearance).

12 See, e.g., Pls.' Exh. 12:164-66.

13 See OA ¶ 1.1.

the parties' rights, then all "relationship" evidence (common or individualized) must be considered. This includes plaintiff testimony regarding the freedoms they enjoy in running their businesses. See SGI ¶ D25 (Floyd decided what she would pay her driver; Luongo chose driver and what to pay him; Humphreys hired driver and decided what to pay him, Ginet decides what to pay drivers; Pelkey hired an employee to drive while she worked another job); ¶ D26 (Floyd sold his route for $43,000, Willis attributes his skill and efforts to increased earnings; Infantino sold his route for $40,000, Alexander sold his route for $47,500); ¶ D22 (Erbentraut ran another business, Upman had several side businesses). This also includes contractor testimony regarding freedom to choose schedules, both in the morning and evening, and their routes, and negotiations with terminal managers regarding pick-up times. See e.g., SGI ¶ 134 (Cruz Decl. ¶ 10 ("One of the main reasons I like being an independent contractor for FedEx Home Delivery is because I'm able to operate my business in the time frame I choose.") (stricken); Pitman Decl. ¶ 8 ("I set my own schedule") (stricken); Hays Decl. ¶ 5 (chooses to arrive at terminal at 7:15 a.m., while other contractors arrive at different times) (stricken); Morgan Decl. ¶ 9 ("[if] the terminal manager asks me if a pick-up time will work with the route and if I say it won't, we work out a different timing arrangement for the pick-up) (stricken); French Decl. ¶ 9 (what "a Contractor actually does on a day-to-day basis varies depending on how the Contractor has chosen to operate their business and the challenges for their particular route.")).

Examining the level of control actually exercised (including the freedoms contractors experienced) "will require a driver-by-driver, terminal-by-terminal, supervisor-by-supervisor analysis." Order at 105-06 (Missouri). Because "neither unanimity of perception nor uniformity are hallmarks of individual drivers' experiences," common questions do not predominate under plaintiffs' "actual relationship" approach, and class treatment is not feasible. See Order at 136

BDDB01 5332800v1

("FedEx Ground must be allowed to present evidence of who sets the drivers' schedules, ownership of equipment, and so on, which may necessitate the use of extrinsic evidence.") (Virginia); see also DiCostanzo v. Chrysler Corp., 57 F.R.D. 495, 498-99 (E.D. Pa. 1972) (explaining why class treatment is inappropriate where plaintiffs' claims require analysis of the plaintiffs' "relationship with defendants"); Auto Ventures, Inc. v. Moran, No. No. 92-426-CIV-KEHOE, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (rejecting class treatment where evidence showed that all plaintiffs did not have "the same experience at the hands of the Defendants").

**C. Conclusion**

Plaintiffs claim that, "as promised," they have not submitted "a single declaration or more than a scintilla of deposition testimony from Plaintiffs." Pls.' Resp. at 3. This focus on the form of the evidence, rather than its individualized nature, misses the point. Plaintiffs have not shown that any of this evidence is common. Plaintiffs' explanation of the purpose of the evidence only confirms its individualized nature and demonstrates the incompatibility of plaintiffs' claims with class treatment. By introducing evidence that allegedly interprets, augments, or contradicts the plain meaning of the OA, plaintiffs are raising issues that undermine the bases for class certification and thus cannot be permitted if the classes are maintained.

WHEREFORE, FedEx Ground seeks an order striking plaintiffs' individualized evidence filed in support of their summary judgment motions filed on April 25, 2008, a list of which is set forth in FedEx Ground's opening brief.

case 3:05-md-00527-RLM-CAN document 1507 filed 07/14/08 page 15 of 17

Dated: July 14, 2008

Respectfully submitted

By: s/Alison G. Fox

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 14th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following attorneys of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Beth A. Ross
bross@leonardcarder.com

R. Christopher Gilreath
Chrisgil@sidgilreath.com

James A. Staack
jims@staack-firm.com

Ginger A. DeGroff
degrofflaw@yahoo.com

George A. Barton
gbarton@birch.net

Jeffrey A. Bartos
jbaros@geclaw.com

Anne T. Regan
atr@zimmreed.com

J. Gordon Rudd
jgr@zimmreed.com

Jerald R. Cureton
jcureton@curetoncaplan.com

Steve D. Larson
slarson@ssbls.com

Jordan M. Lewis
jordanlewis@sbgdf.com

Philip Stephen Fuoco
pfuoco@msn.com

R. Christopher Gilreath
chrisgil@sidgilreath.com

James R. Mulroy, II
jrmulroy@kiesewetterwise.com

Wood R. Foster, Jr.
woodfoster@sbgdf.com

Michael J. Watton
jdrewicz@Wattongroup.com

The undersigned further certify that a copy of the same has been mailed by regular U.S. Postal Service to the following non CM/ECF participants:

Christopher Dean Glover
Hogan and Glover PC
The Douglas Building
2017 Morris Ave., Ste. 300
Birmingham, AL 35203

Ronald D. Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Steven A. Owings
Law Offices of Steven A. Owings
1320 Brookwood, Ste. D
Little Rock, AR 72202

Dennis M. Brennan
Brennan & Brennan PC
215 W. Marion St.
South Bend, IN 46601

Larry L. Luttjohann
6301 SW 25th
Topeka, KS 66614

Mark B. Wallace
WALKER, VAUGHN & WALLACE, PLLC
7403 St. Andrews Church Rd.
P. O. Box 9285
Louisville, KY 40209

Brian C. Edwards
607 W. Main Street
Suite 500
Louisville, KY 40202

Mark Schirmer
Straus and Boies LLP
1661 International Place Dr Ste 400
Memphis, TN 38120

Charles N. Nauen
William A. Gengler
Lockridge Grindal Nauen PLLP
100 Washington Ave S Ste 2200
Minneapolis, MN 55401-2179

Clayton D. Halunen
Joni M. Thome
Halunen & Associates
220 South Sixth Street Ste 2000
Minneapolis, MN 55402

Robert E. McDaniel
McDaniel Law Offices
755 North Main St
Laconia, NH 03246

Salvatore G. Gangemi
Gangemi Law Firm, P.C.
82 Wall St., Ste. 300
New York, NY 10005

Paula R. Markowitz
Thomas Herman Kohn
Markowitz & Richman
1100 N. American Bldg.
121 S Broad St
Philadelphia, PA 19107

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Joseph A. Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Peter N. Wasylyk
1307 Chalkstone Ave.
Providence, RI 02908

Charles W. Whestone, Jr.
Cheryl F. Perkins
WHETSTONE, MYERS, PERKINS AND YOUNG
P. O. Box 8086
Columbus, SC 29202

Joree Brownlow
Law Office of Joree G. Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN 38134

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham & Burgess LLP
301 Congress Ave., Ste. 1050
Austin, TX 78701

Damon L. Ellis
Jonathan R. Mani
Mani & Ellis
P. O. Box 1266
Charleston, WV 25326-1266

Debra Brewer Hayes
Dennis C. Reich
Rodney K. Castille
Reich & Binstock LLP
4265 San Felipe, Ste. 1000
Houston, TX 77027

By:  s/Alison G. Fox

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 1:04-MD-4935-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Floyd*, 3-05-CV-428-RLM-CAN (AL);<br>*Harris*, 3-06-CV-337-RLM-CAN (AR);<br>*Alexander*, 3-05-CV-528-RLM-CAN (CA);<br>*Carlson*, 3-05-CV-664-RLM-CAN (FL);<br>*Riewe*, 3-05-CV-390-RLM-CAN (IN);<br>*Berry*, 3-05-CV-531-RLM-CAN (KS);<br>*Coleman*, 3-05-CV-666-RLM-CAN (KY);<br>*Wescott*, 3-06-CV-485-RLM-CAN (MD);<br>*Lee*, 3-05-CV-533-RLM-CAN (MN);<br>*Gennell*, 3-05-CV-534-RLM-CAN (NH);<br>*Tofaute*, 3-05-CV-595-RLM-CAN (NJ);<br>*Louzau*, 3-05-CV-538-RLM-CAN (NY);<br>*Slayman*, 3-05-CV-596-RLM-CAN (OR);<br>*Willis*, 3-05-CV-597-RLM-CAN (PA);<br>*Tierney*, 3-05-CV-599-RLM-CAN (RI);<br>*Cooke*, 3-05-CV-668-RLM-CAN (SC);<br>*Smith*, 3-05-CV-600-RLM-CAN (TN);<br>*Humphrey*, 3-05-CV-540-RLM-CAN (TX);<br>*Asbury*, 3-05-CV-826-RLM-CAN (WV)<br>*Larson*, 3-05-CV-601-RLM-CAN (WI); and<br><br>ALL CASES (Collateral Estoppel). | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEMS, INC.'S**
**NOTICE OF MANUAL FILING OF DOCUMENTS UNDER SEAL**

Pursuant to the Stipulation and Protective Order governing this case, entered by the Court on January 13, 2006 [Docket #101], defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby submits the following Notice of Manual Filing of Documents Under Seal.

On July 28, 2008, Defendant FedEx Ground filed the following under seal:

(1) Defendant FedEx Ground Package System, Inc.'s Corrected Statement Of Genuine Issues and Statement of Additional Material Facts In Support of Its Memoranda of Law In Opposition To Plaintiffs' Motions For Summary Adjudication Of Employment Status (in the 20 above-captioned cases);

(2) Defendant FedEx Ground Package System, Inc's Opposition to Plaintiffs' Motion to Strike FedEx Ground Package System, Inc.'s Statement of Genuine Issues and Statement of Additional Material Facts In Support of Its Memorada of Law in Opposition to Plaintiffs' Motions for Summary Adjudication of Employment Status (in the 13 above-captioned cases); and

(3) CD ROM of Exhibits To FedEx Ground's Corrected Statement Of Genuine Issues and Statement of Additional Material Facts In Support of Its Memoranda of Law In Opposition To Plaintiffs' Motions For Summary Adjudication Of Employment Status and Opposition to Plaintiff's Motion to Strike (in the 20 above-captioned cases)

In accordance with Paragraph 2 of the Stipulation and Protective Order, the undersigned hereby notifies counsel for plaintiffs that the above documents are being filed under seal due to documents designated "CONFIDENTIAL DISCOVERY MATERIALS" by the parties.

Dated: July 28, 2008

Respectfully submitted,

By: s/Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Victor Jih
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner

case 3:05-md-00527-RLM-CAN document 1527 filed 07/28/08 page 3 of 3

Alison G. Fox
D. Lucetta Pope
BAKER & DANIELS LLP
202 South Michigan Street, Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 28th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

David M. Cialkowski
dmc@zimmreed.com

Michael J. Watton
jdrewicz@Wattongroup.com

Lynn R. Faris
lfaris@leonardcarder.com

Jeffrey A. Bartos
jbartos@geclaw.com

Beth A. Ross
bross@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

George A. Barton
gbarton@birch.net

Jerald R. Cureton
jcureton@curetoncaplan.com

Peter W. Overs, Jr.
povers@whesq.com

R. Christopher Gilreath
chrisgil@sidgilreath.com

James A. Staack
jims@staack-firm.com

Peter J. Agostino
agostino@aaklaw.com

James R. Mulroy, II
jrmulroy@kiesewetterwise.com

Ginger A. DeGroff
degrofflaw@yahoo.com

Anne T. Regan
atr@zimmreed.com

Wood R. Foster, Jr.
woodfoster@sbgdf.com

Steven D. Larson
slarson@ssbls.com

J. Gordon Rudd
jgr@zimmreed.com

Jordan M. Lewis
jordanlewis@sbgdf.com

The undersigned further certifies that a copy was mailed by regular United States Postal Service to the following non-CM/ECF participants:

Christopher Dean Glover
Hogan and Glover PC
The Douglas Building
2017 Morris Ave., Ste. 300
Birmingham, AL 35203

Mark Schirmer
Straus and Boies LLP
1661 International Place Dr Ste 400
Memphis, TN 38120

Joseph A. Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Ronald D. Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Charles N. Nauen
William A. Gengler
Lockridge Grindal Nauen PLLP
100 Washington Ave S Ste 2200
Minneapolis, MN 55401-2179

Peter N. Wasylyk
1307 Chalkstone Ave.
Providence, RI 02908

case 3:05-md-00527-RLM -CAN document 1527 filed 07/28/08 page 5 of 5

Steven A. Owings
Law Offices of Steven A. Owings
1320 Brookwood, Ste. D
Little Rock, AR 72202

Dennis M. Brennan
Brennan & Brennan PC
215 W. Marion St.
South Bend, IN 46601

Larry L. Luttjohann
6301 SW 25th
Topeka, KS 66614

Mark B. Wallace
WALKER, VAUGHN & WALLACE, PLLC
7403 St. Andrews Church Rd.
P. O. Box 9285
Louisville, KY 40209

Brian C. Edwards
607 W. Main Street
Suite 500
Louisville, KY 40202

Clayton D. Halunen
Joni M. Thome
Halunen & Associates
220 South Sixth Street Ste 2000
Minneapolis, MN 55402

Robert E. McDaniel
McDaniel Law Offices
755 North Main St
Laconia, NH 03246

Salvatore G. Gangemi
Gangemi Law Firm, P.C.
82 Wall St., Ste. 300
New York, NY 10005

Paula R. Markowitz
Thomas Herman Kohn
Markowitz & Richman
1100 N. American Bldg.
121 S Broad St
Philadelphia, PA 19107

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Charles W. Whestone, Jr.
Cheryl F. Perkins
WHETSTONE, MYERS, PERKINS AND YOUNG
P. O. Box 8086
Columbus, SC 29202

Joree Brownlow
Law Office of Joree G. Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN 38134

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham & Burgess LLP
301 Congress Ave., Ste. 1050
Austin, TX 78701

Damon L. Ellis
Jonathan R. Mani
Mani & Ellis
P. O. Box 1266
Charleston, WV 25326-1266

Debra Brewer Hayes
Dennis C. Reich
Rodney K. Castille
Reich & Binstock LLP
4265 San Felipe, Ste. 1000
Houston, TX 77027

By: s/Robert M. Scwartz

**VEUNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 1:04-MD-4935-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Floyd*, 3-05-CV-428-RLM-CAN (AL);
*Harris*, 3-06-CV-337-RLM-CAN (AR);
*Alexander*, 3-05-CV-528-RLM-CAN (CA);
*Carlson*, 3-05-CV-664-RLM-CAN (FL);
*Riewe*, 3-05-CV-390-RLM-CAN (IN);
*Berry*, 3-05-CV-531-RLM-CAN (KS);
*Coleman*, 3-05-CV-666-RLM-CAN (KY);
*Wescott*, 3-06-CV-485-RLM-CAN (MD);
*Lee*, 3-05-CV-533-RLM-CAN (MN);
*Gennell*, 3-05-CV-534-RLM-CAN (NH);
*Tofaute*, 3-05-CV-595-RLM-CAN (NJ);
*Louzau*, 3-05-CV-538-RLM-CAN (NY);
*Slayman*, 3-05-CV-596-RLM-CAN (OR);
*Willis*, 3-05-CV-597-RLM-CAN (PA);
*Tierney*, 3-05-CV-599-RLM-CAN (RI);
*Cooke*, 3-05-CV-668-RLM-CAN (SC);
*Smith*, 3-05-CV-600-RLM-CAN (TN);
*Humphrey*, 3-05-CV-540-RLM-CAN (TX);
*Asbury*, 3-05-CV-826-RLM-CAN (WV);
*Larson*, 3-05-CV-601-RLM-CAN (WI); and

ALL CASES (Collateral Estoppel).

CHIEF JUDGE MILLER

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.' S ERRATA SHEET CORRECTING ITS MEMORANDA OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS AND OMNIBUS COLLATERAL ESTOPPEL MOTION**

Below is a table reflecting revisions in the citations to individual oppositions to plaintiffs' motions for summary adjudication submitted on June 9. These corrections reflect Defendant FedEx Ground Package System's corrections to its Statement of Genuine Issues (SGI), filed concurrently herewith, in opposition to Plaintiffs' Motions for Summary Adjudication of Employment Status.

| State Brief | Changes Made Based Upon the Corrected SGI |
|---|---|
| *Alexander* (CA) | Page 6: Delete Ex. C-036 |
| *Willis* (PA) | Page 6: Delete Ex. C-036 |
| *Asbury* (WV) | Page 7: Delete Ex. C-036 |
| *Carlson* (FL) | Page 6: Delete Ex. C-036 |
| *Slayman* (OR) | Page 6: Delete Ex. C-036 |
| *Coleman* (KY) | Page 7: Delete Ex. C-036 |
| *Berry* (KS) | Page 7: Delete Ex. C-036<br><br>Page 20 footnote 6: Delete "*id.* (used truck to 'move myself once and to move my brother.')." |
| *Cooke* (SC) | Page 7: Delete Ex. C-036 |
| *Floyd* (AL) | Page 7: Delete Ex. C-036 |
| *Gennell* (NH) | Page 7: Delete Ex. C-036 |
| *Harris* (AR) | Page 7: Delete Ex. C-036<br><br>Page 23: Delete SGI ¶ 26 and replace with Ex. C-041 at 216 (Harris Dep.) |
| *Humphreys* (TX) | Page 7: Delete Ex. C-036 |
| *Larson* (WI) | Page 8: Delete Ex. C-036 |
| *Lee* (MN) | Page 8: Delete Ex. C-036 |

| *Louzau* (NY) | Page 7: Delete Ex. C-036 |
|---|---|
| *Smith* (TN) | Page 6: Delete Ex. C-036 |
| *Tierney* (RI) | Page 6: Delete Ex. C-036 |
| *Tofaute* (NJ) | Page 6: Delete Ex. C-036 |
| *Westcott* (MD) | Page 7: Delete Ex. C-036 |

Dated: July 28, 2008

Respectfully submitted,

By: s/Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
D. Lucetta Pope
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 28th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

David M. Cialkowski
dmc@zimmreed.com

Michael J. Watton
jdrewicz@Wattongroup.com

Lynn R. Faris
lfaris@leonardcarder.com

Jeffrey A. Bartos
jbartos@geclaw.com

Beth A. Ross
bross@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

George A. Barton
gbarton@birch.net

Jerald R. Cureton
jcureton@curetoncaplan.com

Peter W. Overs, Jr.
povers@whesq.com

R. Christopher Gilreath
chrisgil@sidgilreath.com

James A. Staack
jims@staack-firm.com

Peter J. Agostino
agostino@aaklaw.com

James R. Mulroy, II
jrmulroy@kiesewetterwise.com

Ginger A. DeGroff
degrofflaw@yahoo.com

Anne T. Regan
atr@zimmreed.com

Wood R. Foster, Jr.
woodfoster@sbgdf.com

Steve D. Larson
slarson@ssbls.com

J. Gordon Rudd
jgr@zimmreed.com

Jordan M. Lewis
jordanlewis@sbgdf.com

The undersigned further certifies that a copy was mailed by regular United States Postal Service to the following non-CM/ECF participants:

Christopher Dean Glover
Hogan and Glover PC
The Douglas Building
2017 Morris Ave., Ste. 300
Birmingham, AL 35203

Mark Schirmer
Straus and Boies LLP
1661 International Place Dr.
Suite 400
Memphis, TN 38120

Joseph A. Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Ronald D. Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Charles N. Nauen
William A. Gengler
Lockridge Grindal Nauen PLLP
100 Washington Ave S.
Suite 2200
Minneapolis, MN 55401-2179

Peter N. Wasylyk
1307 Chalkstone Ave.
Providence, RI 02908

Clayton D. Halunen
Joni M. Thome

Steven A. Owings

Charles W. Whestone, Jr.

Law Offices of Steven A.
Owings
1320 Brookwood, Ste. D
Little Rock, AR 72202

Dennis M. Brennan
Brennan & Brennan PC
215 W. Marion St.
South Bend, IN 46601

Larry L. Luttjohann
6301 SW 25th
Topeka, KS 66614

Mark B. Wallace
WALKER, VAUGHN &
WALLACE, PLLC
7403 St. Andrews Church Rd.
P. O. Box 9285
Louisville, KY 40209

Brian C. Edwards
607 W. Main Street
Suite 500
Louisville, KY 40202

Halunen & Associates
220 South Sixth Street Ste 2000
Minneapolis, MN 55402

Robert E. McDaniel
McDaniel Law Offices
755 North Main St
Laconia, NH 03246

Salvatore G. Gangemi
Gangemi Law Firm, P.C.
82 Wall St., Ste. 300
New York, NY 10005

Paula R. Markowitz
Thomas Herman Kohn
Markowitz & Richman
1100 N. American Bldg.
121 S Broad St
Philadelphia, PA 19107

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Cheryl F. Perkins
WHETSTONE, MYERS,
PERKINS AND YOUNG
P. O. Box 8086
Columbus, SC 29202

Joree Brownlow
Law Office of Joree G.
Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN 38134

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham & Burgess
LLP
301 Congress Ave., Ste. 1050
Austin, TX 78701

Damon L. Ellis
Jonathan R. Mani
Mani & Ellis
P. O. Box 1266
Charleston, WV 25326-1266

By:     s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 1:04-MD-4935-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Floyd*, 3-05-CV-428-RLM-CAN (AL);<br>*Harris*, 3-06-CV-337-RLM-CAN (AR);<br>*Alexander*, 3-05-CV-528-RLM-CAN (CA);<br>*Carlson*, 3-05-CV-664-RLM-CAN (FL);<br>*Riewe*, 3-05-CV-390-RLM-CAN (IN);<br>*Berry*, 3-05-CV-531-RLM-CAN (KS);<br>*Coleman*, 3-05-CV-666-RLM-CAN (KY);<br>*Wescott*, 3-06-CV-485-RLM-CAN (MD);<br>*Lee*, 3-05-CV-533-RLM-CAN (MN);<br>*Gennell*, 3-05-CV-534-RLM-CAN (NH);<br>*Tofaute*, 3-05-CV-595-RLM-CAN (NJ);<br>*Louzau*, 3-05-CV-538-RLM-CAN (NY);<br>*Slayman*, 3-05-CV-596-RLM-CAN (OR);<br>*Willis*, 3-05-CV-597-RLM-CAN (PA);<br>*Tierney*, 3-05-CV-599-RLM-CAN (RI);<br>*Cooke*, 3-05-CV-668-RLM-CAN (SC);<br>*Smith*, 3-05-CV-600-RLM-CAN (TN);<br>*Humphrey*, 3-05-CV-540-RLM-CAN (TX);<br>*Asbury*, 3-05-CV-826-RLM-CAN (WV)<br>*Larson*, 3-05-CV-601-RLM-CAN (WI); and<br><br>ALL CASES (Collateral Estoppel). | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.' S ERRATA SHEET CORRECTING THE EXHIBITS TO ITS STATEMENT OF GENUINE ISSUES AND STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF ITS MEMORANDA OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS AND OMNIBUS COLLATERAL ESTOPPEL MOTION**

On June 9, 2008, Defendant FedEx Ground Package System, Inc., (FXG) filed its Oppositions to Plaintiffs' Motion for Summary Adjudication of Employment Status (Oppositions) and supporting Statement of Genuine Issues (SGI). Although FXG cited several hundred pages of exhibits in its briefing, it inadvertently omitted a number of pages of exhibits in the filing due to clerical error. FXG now files a complete set of the exhibits in support of its corrected SGI, including the pages that were cited in the original SGI but were inadvertently omitted from the attached exhibits, as well as pages in connection with the SGI errata. Below is a table indicating what pages were omitted from the June 9 filing but are now including in the full set of exhibits.

| **Exhibit** | **Omitted Pages** |
|---|---|
| B-30 (Terminal Management Organization, FHD, RADM-012) | Full exhibit |
| B-31 (FXG001098875) | Full exhibit |
| B-32 (FXG001098876) | Full exhibit |
| B-33 (FXG2430395-402) | Full exhibit |
| B-34 (FXG002214450) | Full exhibit |
| B-35 (Check-In Requirements, FHD, CKI-257) | Full exhibit |
| B-36 (OPR-560) | Full exhibit |
| B-37 (Business Discussions, CRL-560) | Full exhibit |
| B-38 (FXG1104063) | Full exhibit |
| C-013 (Paul Callahan Deposition Excerpts) | Page 186 |
| C-033 (Dave Gerschultz Deposition Excerpts) | Pages 186, 187 |
| C-061A (James Krappa (08/24/2006) Deposition Excerpts) | Pages 44, 68, 271, and deposition exhibit 11 |
| C-064A (Warren Lenfant Deposition Excerpts) | Page 42 |
| C-074A (Rodger Marticke Deposition Excerpts) | Page 224 |
| C-080 (Severn McMurtry Deposition Excerpts) | Pages 141, 142, 143, 144, 145, 146 |

case 3:05-md-00527-RLM -CAN document 1529 filed 07/28/08 page 3 of 6

| Exhibit | Omitted Pages |
|---|---|
| C-116 (Dan Sullivan Deposition Excerpts) | Pages 68, 135, 136, 137, 169, 170, 179, 187, 188, 218, 219, 224, 230, 309 |
| C-131 (Derek Willis Deposition Excerpts) | Pages 278, 279, 280, 281 |
| C-134 (Sam Zonfrillo Deposition Excerpts) | Pages 141, 163 |
| C-139 (Ricardo Bacani Deposition Excerpts) | Pages 22-23, 83-85, 87, 97, 107-08, 209, 210, 212, 226, 227 |
| D-51 (Marc Williams Declaration) | Full exhibit |
| D-52 (Mike Davis Declaration) | Full exhibit |
| E-189 (Benny Patty Declaration (Stricken)) | Full exhibit |
| E-190 (Gerald Topley Declaration (Stricken)) | Full exhibit |

Additionally, the exhibits listed below were not cited by either the SGI or FXG's Oppositions to the Motions for Summary Adjudication and were inadvertently filed on June 9. With the filing of the revised set of exhibits, these inadvertently filed exhibits are withdrawn. The inadvertently filed exhibits are:

D-01, D-20, D-24, D-34, D-46;

E-006, E-007, E-027, E-039, E-058, E-059, E-060, E-066, E-074, E-078, E-079, E-091, E-098, E-101, E-109, E-111, E-112, E-127, E-130, E-155, E-157, E-162, E-164, E-165, E-172, E-180; and

F-04.

Dated: July 28, 2008

Respectfully submitted,

By: s/Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP

1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
D. Lucetta Pope
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN  46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 28th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

David M. Cialkowski
dmc@zimmreed.com

Michael J. Watton
jdrewicz@Wattongroup.com

Lynn R. Faris
lfaris@leonardcarder.com

Jeffrey A. Bartos
jbartos@geclaw.com

Beth A. Ross
bross@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

George A. Barton
gbarton@birch.net

Jerald R. Cureton
jcureton@curetoncaplan.com

Peter W. Overs, Jr.
povers@whesq.com

R. Christopher Gilreath
chrisgil@sidgilreath.com

James A. Staack
jims@staack-firm.com

Peter J. Agostino
agostino@aaklaw.com

James R. Mulroy, II
jrmulroy@kiesewetterwise.com

Ginger A. DeGroff
degrofflaw@yahoo.com

Anne T. Regan
atr@zimmreed.com

Wood R. Foster, Jr.
woodfoster@sbgdf.com

Steve D. Larson
slarson@ssbls.com

J. Gordon Rudd
jgr@zimmreed.com

Jordan M. Lewis
jordanlewis@sbgdf.com

The undersigned further certifies that a copy was mailed by regular United States Postal Service to the following non-CM/ECF participants:

Christopher Dean Glover
Hogan and Glover PC
The Douglas Building
2017 Morris Ave., Ste. 300
Birmingham, AL 35203

Mark Schirmer
Straus and Boies LLP
1661 International Place Dr.
Suite 400
Memphis, TN 38120

Joseph A. Osefchen
The Law Firm of Philip
Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Ronald D. Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Charles N. Nauen
William A. Gengler
Lockridge Grindal Nauen PLLP
100 Washington Ave S.
Suite 2200
Minneapolis, MN 55401-2179
Clayton D. Halunen

Peter N. Wasylyk
1307 Chalkstone Ave.
Providence, RI 02908

Steven A. Owings

Joni M. Thome

Charles W. Whestone, Jr.

Law Offices of Steven A.
Owings
1320 Brookwood, Ste. D
Little Rock, AR 72202

Dennis M. Brennan
Brennan & Brennan PC
215 W. Marion St.
South Bend, IN  46601

Larry L. Luttjohann
6301 SW 25th
Topeka, KS 66614

Mark B. Wallace
WALKER, VAUGHN &
WALLACE, PLLC
7403 St. Andrews Church Rd.
P. O. Box 9285
Louisville, KY  40209

Brian C. Edwards
607 W. Main Street
Suite 500
Louisville, KY 40202

Halunen & Associates
220 South Sixth Street Ste 2000
Minneapolis, MN 55402

Robert E. McDaniel
McDaniel Law Offices
755 North Main St
Laconia, NH 03246

Salvatore G. Gangemi
Gangemi Law Firm, P.C.
82 Wall St., Ste. 300
New York, NY  10005

Paula R. Markowitz
Thomas Herman Kohn
Markowitz & Richman
1100 N. American Bldg.
121 S Broad St
Philadelphia, PA 19107

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Cheryl F. Perkins
WHETSTONE, MYERS,
PERKINS AND YOUNG
P. O. Box 8086
Columbus, SC  29202

Joree Brownlow
Law Office of Joree G.
Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN  38134

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham & Burgess
LLP
301 Congress Ave., Ste. 1050
Austin, TX  78701

Damon L. Ellis
Jonathan R. Mani
Mani & Ellis
P. O. Box 1266
Charleston, WV 25326-1266

By:    s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 1:04-MD-4935-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>*Floyd*, 3-05-CV-428-RLM-CAN (AL);<br>*Harris*, 3-06-CV-337-RLM-CAN (AR);<br>*Alexander*, 3-05-CV-528-RLM-CAN (CA);<br>*Carlson*, 3-05-CV-664-RLM-CAN (FL);<br>*Riewe*, 3-05-CV-390-RLM-CAN (IN);<br>*Berry*, 3-05-CV-531-RLM-CAN (KS);<br>*Coleman*, 3-05-CV-666-RLM-CAN (KY);<br>*Wescott*, 3-06-CV-485-RLM-CAN (MD);<br>*Lee*, 3-05-CV-533-RLM-CAN (MN);<br>*Gennell*, 3-05-CV-534-RLM-CAN (NH);<br>*Tofaute*, 3-05-CV-595-RLM-CAN (NJ);<br>*Louzau*, 3-05-CV-538-RLM-CAN (NY);<br>*Slayman*, 3-05-CV-596-RLM-CAN (OR);<br>*Willis*, 3-05-CV-597-RLM-CAN (PA);<br>*Tierney*, 3-05-CV-599-RLM-CAN (RI);<br>*Cooke*, 3-05-CV-668-RLM-CAN (SC);<br>*Smith*, 3-05-CV-600-RLM-CAN (TN);<br>*Humphrey*, 3-05-CV-540-RLM-CAN (TX);<br>*Asbury*, 3-05-CV-826-RLM-CAN (WV);<br>*Larson*, 3-05-CV-601-RLM-CAN (WI); and<br><br>ALL CASES (Collateral Estoppel). | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.' S ERRATA SHEET CORRECTING ITS STATEMENT OF GENUINE ISSUES AND STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF ITS MEMORANDA OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS AND OMNIBUS COLLATERAL ESTOPPEL MOTION**

Below is a table reflecting revisions Defendant FedEx Ground Package System made to its Statement of Genuine Issues (SGI) submitted on June 9, and which are contained in the corrected SGI filed concurrently herewith in opposition to Plaintiffs' Motions for Summary Adjudication of Employment Status.

| Changes Made to Revised SGI | Paragraphs Affected |
|---|---|
| Declarations stricken by the Court's order of July 23, 2007, which previously were not marked as stricken, have now been marked as stricken | *21, 34, 36, 51, 64, 70, 83, 85, 97, 98, 115, 132, 134, 136, 137, 142, 143, 144, 154, 181, 195, 197, 199, 224, D22, D25, D26* |
| Declarations which were not stricken by the Court's July 23, 2007, order but were marked as stricken are no longer so marked | *D25* |
| Dates added to citations of reports or depositions to clarify which report or deposition is being cited | *8, 21, 84, 85, 93, 114, 154* (Mannion Dep.); *147* (Krappa Dep.); *194* (Scapellato) |
| First initial added to declarant's name to clarify which declaration is being cited | *21* (Miller Decls.); *84* (Miller, Smith & Williams Decls.); *85* (Johnson Decl.); *115* (Allen Decl.); *132* (Johnson Decl.); *134* (Smith, Martin and Dodson Decls.); *142* (Martin and Dodson); *181 & 197* (Martin and Johnson); *D25* (Martinez and Olivares); *D26* (Allen) |
| Miscitation to incorrect page or paragraph corrected | *21* (McClafferty Dep. 182 becomes McClafferty Dep. 183); Sherman Dep. at 208 becomes Sherman Dep. at 209); *36 & 37* (Sherman Dep. at 208 becomes Sherman Dep. at 209); *40* (Myers 9/14/06 Dep. at 256-257 becomes Myers 9/14/06 Dep. at 255-57); *64* (Mannion Dep. at 75 becomes Mannion Dep. at 74-75); *85* (FXG ¶ 1.1(a) becomes 1.10(a) and Lee Dep. at 50 becomes 58); *91, 92 & 93* (OA ¶ 1.15 becomes 1.10(c)); *109* (FXG's Responses to Pls.' Requests for Admission); *114* (Ginet Dep. 145 becomes 145-46); 132 (Lewis Decl. ¶ 15 becomes ¶ 16); *134* (K. Martin Decl. ¶ 513 becomes ¶ 13; Rosse Decl. ¶ 48 becomes ¶ 8); *137* (Persing Dep. at 31-32) becomes 131-32); *142* (Lee Dep. at 50 becomes 58; Martin Decl. ¶ 5 becomes Martin Decl. ¶ 13; Rosse Decl. ¶ 8 becomes Rosse Decl. ¶ 4; R. Olivares Decl. ¶ 3 becomes R. Olivares Decl. ¶ 14; Martin Decl. ¶ 29 becomes Martin Decl. ¶ 36; Malkin Dep. 228:10-21 becomes Malkin Dep. 228-29); *158* |

| | *Lee* (MN) Pls.' MSJ at 3 becomes *Lee* (MN) Pls.' MSJ at 3, 10); *185* (Marticke Dep. at 140, 143 becomes Marticke Dep. at 140-41, 143); *220* (FXG OA ¶ 12.3 becomes 12.1); *224* (Deruscio Decl. ¶ 8 becomes Deruscio Decl. ¶7) |
|---|---|
| Miscitation to incorrect document corrected | *14* (RADM-012); *49* (Mannion Dep. 2/28/08 becomes Mannion Dep. 2/27/08) *93* (OA becomes FHD OA); *147, 153* (TM-405 becomes TM-405P); *164* (DLV0006 becomes DLV-006); *181* (Shover Decl. ¶ 1.4 becomes OA ¶ 1.4); 216 (Attachment I-1 becomes 7.1) |
| Misquotation corrected | *8* (quotation of Mannion Dep.); *17* (quotation of Pls. Exh. 2); *24* (sentence preceding citations to FXG OA, ¶¶ 1.1, 1.5 5.1, 1.10(d), 1.10(e), 1.11, 1.12, 1.13); *28* (quotation of FXG OA ¶ 5.3); *42* (quotation of FXG OA, Add. 6); *63* (quotation of D'Alesandro Dep. at 93:16-94:7); *64* (Dixon Decl.); *73* (Pls.' Ex. 4); *74 & 75* (FXG Contractor's Companion) *78* (Griffin Dep. at 159); *83* (FHD OA ¶ 1.14); *90* (Lee (MN Pls. MSJ); *91 & 93* (Sweeney Decl.); *94* (OA ¶ 1.10(d)); *97* (Pls.' Exh. 9); *100* (OA ¶ 1.10 (d)); *102* (Joseph Dep.); *111* (FXG OA); *112, 114, 117 & 118* (OA ¶ 1.1); 124 (OA ¶ 1.12); *133* (FXG OA Background); *134* (Marticke Dep.); *142* (FXG OA ¶ 1.10(a)); *143* (FXG OA ¶ 1.15); *149 & 150* (D'Alessandro Dep.); *199* (OA); *203* (Mannion Dep.); *209* (FXG OA); *212* (Milane Dep.); *219* (FXG OA): *D27* (OA) |
| Misquotation deleted | *17* (citation to Edmonds Dep.); *26 & 27* (deletion of cites to Harris Depo.) |
| Incorrect Citation | *61* (change Sherman Dep. at 16 to Sherman Decl. at 41 and Wright Decl. ¶¶ 9, 10 to Wright Decl. ¶ 31; substituted citation to Griffin Dep. at 77 with Krappa Dep. at 274-75); *85* (deletion of portion of parenthetical after Deruscio decl.); *98 & 142* (corrected description of Infantino Dep.); *132* (Koken Dep. becomes Krappa Dep.); *197* (Briggs Decl. quotation changed); *198* (Hayes Decl. quotation changed); *221* (incorrect citations deleted and plaintiffs' fact no longer disputed) |
| Extraneous citation deleted | *33* (citations to FXG OA ¶¶ 3.6 & 4.2); *49* (citation to FXG OA Add. 10); *134* (Decl. XX; Harada Decl.); *142* (Harada Decl.; Harvel Decl.; Therrien Decl.; Abdelfattah Al Amri Decl.; Decl. XX ; Briggs Decl.); *147* (Ray Dep.); *224* (Harada Decl. and Denton Decl.) |
| Correction of spelling of declarant/deponent's name | *51, 84, 97, 98, 134, 142, 181, 197, D26* (Vazquez); *70* (Arabashahi); *133, 136, 137, 140, 141, 146, 151, 190* (McMurtry); *137* (Ivanov); *140* (Oates); *142* (Bowman); *224* (Sahli); |
| Sentence fragment merged into sentence | *186* |

| Order of citations within citation string changed so that citations are followed by the proper parentheticals | *195* |
|---|---|
| Deletion of ellipsis | *46* |
| Correction of capitalization | *46* ("The" capitalized to begin sentence after citation to FXG OA ¶¶ 2.1, 2.2) |

Dated: July 28, 2008

Respectfully submitted,

By: s/Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
D. Lucetta Pope
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 28th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

| | | |
|---|---|---|
| Susan E. Ellingstad<br>sellingstad@locklaw.com | David M. Cialkowski<br>dmc@zimmreed.com | Michael J. Watton<br>jdrewicz@Wattongroup.com |
| Lynn R. Faris<br>lfaris@leonardcarder.com | Jeffrey A. Bartos<br>jbartos@geclaw.com | Beth A. Ross<br>bross@leonardcarder.com |
| Robert I. Harwood<br>rharwood@whesq.com | George A. Barton<br>gbarton@birch.net | Jerald R. Cureton<br>jcureton@curetoncaplan.com |
| Peter W. Overs, Jr.<br>povers@whesq.com | R. Christopher Gilreath<br>chrisgil@sidgilreath.com | James A. Staack<br>jims@staack-firm.com |
| Peter J. Agostino<br>agostino@aaklaw.com | James R. Mulroy, II<br>jrmulroy@kiesewetterwise.com | Ginger A. DeGroff<br>degrofflaw@yahoo.com |
| Anne T. Regan<br>atr@zimmreed.com | Wood R. Foster, Jr.<br>woodfoster@sbgdf.com | Steve D. Larson<br>slarson@ssbls.com |
| J. Gordon Rudd<br>jgr@zimmreed.com | Jordan M. Lewis<br>jordanlewis@sbgdf.com | |

The undersigned further certifies that a copy was mailed by regular United States Postal Service to the following non-CM/ECF participants:

| | | |
|---|---|---|
| Christopher Dean Glover<br>Hogan and Glover PC<br>The Douglas Building<br>2017 Morris Ave., Ste. 300<br>Birmingham, AL 35203 | Mark Schirmer<br>Straus and Boies LLP<br>1661 International Place Dr.<br>Suite 400<br>Memphis, TN 38120 | Joseph A. Osefchen<br>The Law Firm of Philip<br>Stephen Fuoco<br>24 Wilkins Place<br>Haddonfield, NJ 08033 |
| Ronald D. Kelsay<br>Kelsay Law Firm PA<br>227 Woodbine<br>Hot Springs, AR 71901 | Charles N. Nauen<br>William A. Gengler<br>Lockridge Grindal Nauen PLLP<br>100 Washington Ave S.<br>Suite 2200<br>Minneapolis, MN 55401-2179<br>Clayton D. Halunen | Peter N. Wasylyk<br>1307 Chalkstone Ave.<br>Providence, RI 02908 |
| Steven A. Owings | Joni M. Thome | Charles W. Whestone, Jr. |

Law Offices of Steven A.
Owings
1320 Brookwood, Ste. D
Little Rock, AR 72202

Dennis M. Brennan
Brennan & Brennan PC
215 W. Marion St.
South Bend, IN 46601

Larry L. Luttjohann
6301 SW 25th
Topeka, KS 66614

Mark B. Wallace
WALKER, VAUGHN &
WALLACE, PLLC
7403 St. Andrews Church Rd.
P. O. Box 9285
Louisville, KY 40209

Brian C. Edwards
607 W. Main Street
Suite 500
Louisville, KY 40202

Halunen & Associates
220 South Sixth Street Ste 2000
Minneapolis, MN 55402

Robert E. McDaniel
McDaniel Law Offices
755 North Main St
Laconia, NH 03246

Salvatore G. Gangemi
Gangemi Law Firm, P.C.
82 Wall St., Ste. 300
New York, NY 10005

Paula R. Markowitz
Thomas Herman Kohn
Markowitz & Richman
1100 N. American Bldg.
121 S Broad St
Philadelphia, PA 19107

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Cheryl F. Perkins
WHETSTONE, MYERS,
PERKINS AND YOUNG
P. O. Box 8086
Columbus, SC 29202

Joree Brownlow
Law Office of Joree G.
Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN 38134

Donald R. Taylor
David E. Dunham
Steven Douglas Urban
Taylor Dunham & Burgess
LLP
301 Congress Ave., Ste. 1050
Austin, TX 78701

Damon L. Ellis
Jonathan R. Mani
Mani & Ellis
P. O. Box 1266
Charleston, WV 25326-1266

By:     s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S STATEMENT IN RESPONSE TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**

FedEx Ground ("FXG") has no objection to the Court taking judicial notice of the public documents attached to plaintiffs' July 9, 2008 Request. (Doc. No. 1472 ("Pls. Req."), Exs. A-D.) FXG does object, however, to plaintiffs' characterizations of these documents and their arguments regarding their alleged relevance to this litigation. For these reasons, FXG files this brief response to plaintiffs' request.

**Exhibits A&B**

Plaintiffs ask this Court to take judicial notice of two unpublished district court decisions in which the arbitration provision of the FXG Operating Agreement was found to be unconscionable. (Pls. Req. at 1-2, 3, Exs. A-B.) As an initial matter, it is not appropriate for the Court to take judicial notice of decisions cited merely as "persuasive" authority, as plaintiffs request here. *See* Fed. R. Evid. 201(a) ("This rule governs only judicial notice of adjudicative *facts*.") (emphasis added). And to the extent plaintiffs seek to use Exhibits A & B as persuasive authority, many other courts have found the OA's arbitration provision to be valid and

case 3:05-md-00527-RLM-CAN document 1531 filed 07/28/08 page 2 of 5

enforceable. *See, e.g., Burbules v. FedEx Ground Package System, Inc.* 2007 WL 3254439, at *1 (W.D.N.Y. Nov. 2, 2007) (granting motion to compel arbitration); *Worman v. FexEx Ground Package System, Inc.*, 2005 WL 4312127. at **314-15 (Pa. Ct. Common Pl. Apr. 28, 2005) (same); *see also Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005) (arbitration clause does not preclude assertion of other claim through civil litigation); *Roadway Package System, Inc. v. Keyser*, 257 F.3d 287, 301 (3d Cir. 2001) (limitations on scope of arbitrator's authority are valid); *FedEx Ground Package System, Inc. v. Keller*, 2007 WL 959298, at *3 (S.D.N.Y. Mar. 26, 2007) (enforcing limitation of damages provision of the arbitration clause).

Plaintiffs' request is also inappropriate to the extent it asks this Court to judicially notice the truth (or falsity) of facts recited in other court decisions. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 2007 U.S. Dist. LEXIS 19601, at *26 (N.D. Ill. Mar. 16, 2007); *Holmes v. Nigro,* 1998 U.S. Dist. LEXIS 18718, at *8-9 (N.D. Ill. Nov. 25, 1998); *see also United States v. So. Cal. Edison, Co.*, 300 F. Supp. 2d 964, 977 (E.D. Cal. 2004) (citing *California ex rel. RoNo, LLC. v. Altus Fin. S.A.*, 344 F.3d 920, 931 (9th Cir. 2003). FXG disputes, for example, that FXG contractors do not have meaningful recourse for alleged violations of the operating agreement that are not covered by the arbitration provision. (Ex. A to Pls. Req. at 14.) FXG also disputes, for example, that it withholds key terms of the OA from prospective contractors until they have financially committed to becoming a contractor. (Ex. B to Pls. Req. at 14.) Therefore, the Court may properly take judicial notice of the fact of Exhibits A & B but it should not accept the truth of the underlying factual bases for those decisions.

Additionally, Exhibits A & B directly undermine plaintiffs' case and basis for class certification. Plaintiffs cite the arbitration provision as itself evidence of FXG's control over the

case 3:05-md-00527-RLM -CAN document 1531 filed 07/28/08 page 3 of 5

contractors. (*See, e.g.* Pls. Ark. Summary Judgment Reply Br. (Doc. No. 1475) at 11 & n.15.) If the arbitration provision is void, as plaintiffs claim, that would nullify one of their chief complaints regarding the OA. (*See id.*) Next, plaintiffs' reliance on the *Johnny Del Johnson* case (Ex. A) is noteworthy because the court assumed that the plaintiffs were ***independent contractors*** and found the fact of their contractor status to be a key consideration leading to its decision that the provision was unconscionable. (Ex. A. to Pls. Req. at 13 (contractor status means that contractors cannot unionize and are in a worse bargaining position) & 14 (contractor status means that employee-style litigation is not available to contractors).) Further, as demonstrated by the *Lucey* decision (Ex. B), judicial findings of unconscionability are fact-intensive, individualized, and not compatible with the Court's bases for class certification in these proceedings. For example, the *Lucey* decision is predicated on the (disputed) findings of fact that the plaintiffs had already financially committed themselves to FXG and further were not given time to review the OA or seek the advice of an attorney prior to signing it. (Ex. B. at 12-13.) Consequently, unconscionability determinations require the type of "driver-by-driver examination[s]" that the Court's class certification order relied on not being present in these proceedings. (March 25, 2008 Order (Doc. No. 1119) at 71 (New Jersey).)

**Exhibit C**

Plaintiffs ask the Court to take judicial notice of Exhibit C, the entry of dismissal in *Issa v. FedEx Ground*, Case No. RG841208 (Cal. Sup. Ct. Alameda Cty. Feb. 13, 2007), "in response to FXG's assertion that a final judgment was entered in the referenced matter favoring its position as the employment status of its California drivers." (Pls. Req. at 2.) FXG made no such assertion, however. FXG merely offered into evidence the fact that the California Superior Court found, ***in a decision issued after the original statement of decision in Estrada***, that the evidence

supporting the independent contractor status of the two plaintiffs was "overwhelming." (FXG Opp. to Mot. for Coll. Estoppel (Doc. No. 1397) at 26; SGI ¶ 20 & Ex. H-07 at 13.) Whether the case was later dismissed prior to entry of final judgment is immaterial; the relevance, accuracy and propriety of FXG's reliance on *Issa* speaks for itself.

**Exhibit D**

Plaintiffs ask the Court to take judicial notice of Exhibit D, *In re FedEx Ground*, Case No. AO-143164, Dec. No. 1348661 (Cal. Unemployment Ins. App. Bd. September 21, 2007), in order "to show that the only class-based final administrative decision that has been issued in California regarding the status of FXG's California [contractors] in consistent with [*Estrada*]." (Pls. Req. at 2.) FXG objects to plaintiffs' argument and implication that an administrative proceeding is analogous to a class action being conducted pursuant to the Federal Rules of Civil Procedure. FXG also objects to plaintiffs' use of a single administrative decision to prove the point that no other similar administrative decisions exist.

Dated: July 28, 2008.

Respectfully submitted,

By:________________________
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

John H. Beisner
Robert M. Schwartz
Scott Voelz
Aparna B. Joshi
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 28th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Chief Judge Miller
Magistrate Judge Nuechterlein

**FEDEX GROUND PACKAGE SYSTEM, INC.'S STATEMENT IN RESPONSE TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**

FedEx Ground ("FXG") has no objection to the Court taking judicial notice of the public documents attached to plaintiffs' July 9, 2008 Request. (Doc. No. 1472 ("Pls. Req."), Exs. A-D.) FXG does object, however, to plaintiffs' characterizations of these documents and their arguments regarding their alleged relevance to this litigation. For these reasons, FXG files this brief response to plaintiffs' request.

**Exhibits A&B**

Plaintiffs ask this Court to take judicial notice of two unpublished district court decisions in which the arbitration provision of the FXG Operating Agreement was found to be unconscionable. (Pls. Req. at 1-2, 3, Exs. A-B.) As an initial matter, it is not appropriate for the Court to take judicial notice of decisions cited merely as "persuasive" authority, as plaintiffs request here. *See* Fed. R. Evid. 201(a) ("This rule governs only judicial notice of adjudicative *facts*.") (emphasis added). And to the extent plaintiffs seek to use Exhibits A & B as persuasive authority, many other courts have found the OA's arbitration provision to be valid and

case 3:05-md-00527-RLM -CAN document 1532 filed 07/28/08 page 2 of 5

enforceable. *See, e.g.*, *Burbules v. FedEx Ground Package System, Inc.* 2007 WL 3254439, at *1 (W.D.N.Y. Nov. 2, 2007) (granting motion to compel arbitration); *Worman v. FexEx Ground Package System, Inc.*, 2005 WL 4312127. at **314-15 (Pa. Ct. Common Pl. Apr. 28, 2005) (same); *see also Cummings v. FedEx Ground Package System, Inc.*, 404 F.3d 1258, 1262 (10th Cir. 2005) (arbitration clause does not preclude assertion of other claim through civil litigation); *Roadway Package System, Inc. v. Keyser*, 257 F.3d 287, 301 (3d Cir. 2001) (limitations on scope of arbitrator's authority are valid); *FedEx Ground Package System, Inc. v. Keller*, 2007 WL 959298, at *3 (S.D.N.Y. Mar. 26, 2007) (enforcing limitation of damages provision of the arbitration clause).

Plaintiffs' request is also inappropriate to the extent it asks this Court to judicially notice the truth (or falsity) of facts recited in other court decisions. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 2007 U.S. Dist. LEXIS 19601, at *26 (N.D. Ill. Mar. 16, 2007); *Holmes v. Nigro,* 1998 U.S. Dist. LEXIS 18718, at *8-9 (N.D. Ill. Nov. 25, 1998); *see also United States v. So. Cal. Edison, Co.*, 300 F. Supp. 2d 964, 977 (E.D. Cal. 2004) (citing *California ex rel. RoNo, LLC. v. Altus Fin. S.A.*, 344 F.3d 920, 931 (9th Cir. 2003). FXG disputes, for example, that FXG contractors do not have meaningful recourse for alleged violations of the operating agreement that are not covered by the arbitration provision. (Ex. A to Pls. Req. at 14.) FXG also disputes, for example, that it withholds key terms of the OA from prospective contractors until they have financially committed to becoming a contractor. (Ex. B to Pls. Req. at 14.) Therefore, the Court may properly take judicial notice of the fact of Exhibits A & B but it should not accept the truth of the underlying factual bases for those decisions.

Additionally, Exhibits A & B directly undermine plaintiffs' case and basis for class certification. Plaintiffs cite the arbitration provision as itself evidence of FXG's control over the

contractors. (*See, e.g.* Pls. Ark. Summary Judgment Reply Br. (Doc. No. 1475) at 11 & n.15.) If the arbitration provision is void, as plaintiffs claim, that would nullify one of their chief complaints regarding the OA. (*See id.*) Next, plaintiffs' reliance on the *Johnny Del Johnson* case (Ex. A) is noteworthy because the court assumed that the plaintiffs were ***independent contractors*** and found the fact of their contractor status to be a key consideration leading to its decision that the provision was unconscionable. (Ex. A. to Pls. Req. at 13 (contractor status means that contractors cannot unionize and are in a worse bargaining position) & 14 (contractor status means that employee-style litigation is not available to contractors).) Further, as demonstrated by the *Lucey* decision (Ex. B), judicial findings of unconscionability are fact-intensive, individualized, and not compatible with the Court's bases for class certification in these proceedings. For example, the *Lucey* decision is predicated on the (disputed) findings of fact that the plaintiffs had already financially committed themselves to FXG and further were not given time to review the OA or seek the advice of an attorney prior to signing it. (Ex. B. at 12-13.) Consequently, unconscionability determinations require the type of "driver-by-driver examination[s]" that the Court's class certification order relied on not being present in these proceedings. (March 25, 2008 Order (Doc. No. 1119) at 71 (New Jersey).)

**Exhibit C**

Plaintiffs ask the Court to take judicial notice of Exhibit C, the entry of dismissal in *Issa v. FedEx Ground*, Case No. RG841208 (Cal. Sup. Ct. Alameda Cty. Feb. 13, 2007), "in response to FXG's assertion that a final judgment was entered in the referenced matter favoring its position as the employment status of its California drivers." (Pls. Req. at 2.) FXG made no such assertion, however. FXG merely offered into evidence the fact that the California Superior Court found, ***in a decision issued after the original statement of decision in Estrada***, that the evidence

supporting the independent contractor status of the two plaintiffs was "overwhelming." (FXG Opp. to Mot. for Coll. Estoppel (Doc. No. 1397) at 26; SGI ¶ 20 & Ex. H-07 at 13.) Whether the case was later dismissed prior to entry of final judgment is immaterial; the relevance, accuracy and propriety of FXG's reliance on *Issa* speaks for itself.

**Exhibit D**

Plaintiffs ask the Court to take judicial notice of Exhibit D, *In re FedEx Ground*, Case No. AO-143164, Dec. No. 1348661 (Cal. Unemployment Ins. App. Bd. September 21, 2007), in order "to show that the only class-based final administrative decision that has been issued in California regarding the status of FXG's California [contractors] in consistent with [*Estrada*]." (Pls. Req. at 2.) FXG objects to plaintiffs' argument and implication that an administrative proceeding is analogous to a class action being conducted pursuant to the Federal Rules of Civil Procedure. FXG also objects to plaintiffs' use of a single administrative decision to prove the point that no other similar administrative decisions exist.

Dated: July 28, 2008.

Respectfully submitted,

By: /s Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

John H. Beisner
Robert M. Schwartz
Theodore B. Schroeder
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 28th day of July, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on August 4, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

# NINTH DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

Dated: August 4, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA  94612
Tel:    (510) 272-0169
Fax:    (510) 272-0174
Email: lfaris@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**NOTICE OF MANUAL FILING**

The documents listed below were sent to the Court on August 4, 2008 for filing under seal in paper form only pursuant to the Protective Order dated January 13, 2006 [Doc. No. 101]. The documents will maintain in the case file in the clerk's office:

# PLAINTIFFS' NINTH APPENDIX IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION

Dated: August 4, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

case 3:05-md-00527-RLM -CAN document 1536 filed 08/04/08 page 2 of 2

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER

On April 1, 2008, the plaintiffs asked the court for clarification of its March 25, 2008 order granting in part motions for class certification under Federal Rule of Civil Procedure 23(b)(2). As the plaintiffs note, the March 25 order referred to the court's opinion on the Kansas plaintiffs' motion for class certification, certifying the plaintiffs' state law claims, as well as a nationwide ERISA class, under Rule 23(b)(3). The court finds no reason justifying the inconsistency between the Kansas opinion and the March 25 order, and accordingly, GRANTS the plaintiffs' motion for clarification [Doc. No. 1130], finding that certification of the claims at issue in the March 25 order are more appropriate under Rule 23(b)(3).

SO ORDERED.

ENTERED: July 31, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**FEDEX GROUND'S MOTION TO HOLD IN ABEYANCE THE RULINGS ON THE PARTIES' SUMMARY ADJUDICATION MOTIONS**

FedEx Ground requests that the Court hold in abeyance its rulings on the parties' motions for summary adjudication on whether plaintiffs are independent contractors or employees until after the close of all opt-out periods in this MDL proceeding. That approach is consistent with Seventh Circuit law, which prohibits a plaintiff from having an opportunity to engage in "one-way intervention," that is, allowing a potential class member to decide whether to participate in a case after getting a preview of the potential outcome on the merits from the decision on a dispositive motion.

That would also be consistent with the concerns FedEx Ground expressed at the March 19, 2008 status conference before Magistrate Judge Nuechterlein concerning the summary adjudication briefing schedule. At the conference, FedEx Ground stated it was amenable to the proposed briefing schedule, but expressed concerns that the parties' summary adjudication motions on the issue of independent contractor vs. employee status should not be decided prior to the close of the class opt-out periods:

> FedEx Ground: [W]e can go ahead and brief. What we don't want to have is a situation where rulings come down on summary judgment on status before a contractor in a given state has had to decide whether to participate in a case. That's what the circuits don't want to have happen.
>
> The Court: Well, I think I'm on pretty safe ground to say that Judge Miller will follow the Seventh Circuit, so I think he will take them in order and decide the class certification issues and then move on to summary judgment issues. So your summary judgment motions may be ripe and pending, but, you know, that's how it's going to be. I want to keep things on track. I had contemplated -- I had thought about pushing it [the submission of briefs] until the opt-out period, but I just couldn't see any advantage of that, other than delay.

*See* Mar. 19, 2008 Tr. at 14-15 (parenthetical added); *See also*, FedEx Ground's Status Conference Statement, filed March 18, 2008, [Docket No. 1111] (raising

the issue of one-way intervention and requesting delay in briefing to avoid such a result).

The parties have not formally moved the Court on the issue of the timing of the rulings on the motions for summary adjudication. Accordingly, FedEx Ground hereby requests that the Court hold in abeyance its rulings on the parties' motions on independent contractor vs. employee status pending the close of all opt-out periods in the cases that have been or may be certified for class treatment in Waves 1 through 5.

**Holding Motions In Abeyance**
**Avoids Impermissible One-Way Intervention.**

Withholding class-wide summary adjudication of contractor status until the expiration of the opt-out periods for all certified classes is necessary if the Court is to avoid impermissible "one-way intervention." (Doc. No. 1093 at 2). The problem of one-way intervention would unfairly prejudice FedEx Ground, as it would either discourage potential class members from remaining in a case after a successful defense motion, or would encourage them to remain only after a successful plaintiffs' motion. The Seventh Circuit has repeatedly held that scheduling merits determinations in a manner that encourages such one-way class intervention is impermissible. In *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001), the Seventh Circuit took an interlocutory appeal of a case management scheduling order that would have provided for preliminary rulings in advance of any class members' decision to opt out. The Court reversed, finding that ruling on legal issues central to the case in advance of the opt-out period would unfairly prejudice the defendant (Sprint). *See id.* at 681:

> What this means is that if the first two rulings go in favor of Sprint, no members of the class, other than the named plaintiffs, will fail to opt out of the suit, and the result will be that only the named plaintiffs will be bound by the judgment. If, however, the judge proceeds to stage 3, few if any class members will opt out and Sprint will be exposed to enormous potential liabilities. So even if Sprint prevails at stages 1 or 2, it will have to face the class members in other cases, while if the judge rules against it at those stages its prospects will darken greatly as a result of the combined effects of the two rulings-portents of likely future judgments against Sprint-plus the effect of those rulings in encouraging members of the class not to opt out of the suit.

Based on its affirmance of the principle that "one-way intervention is forbidden," the Court directed the trial court to change its case management order and approach. *Id.* at 681-82, *citing* Fed.R.Civ.P. 23(c)(2); *Amati v. City of Woodstock*, 176 F.3d 952, 957 (7th Cir.1999) ("The [one-way intervention] rule bars potential class members from waiting on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, intervening to take advantage of the judgment.") (parenthetical added), and *Schwarzschild v. Tse*, 69 F.3d 293, 295-96 (9th Cir.1995) ("[T]he history of the development of Rule 23(c)(2) makes clear that the rule was adopted to prevent 'one-way intervention'-that is, the intervention of a plaintiff in a class action after an adjudication favoring the class had taken place.")

FedEx Ground requests that the Court's merits rulings not issue in a staggered, piecemeal fashion as opt-out periods in some states close, while opt-out periods remain open in other state actions. Rather, rulings on the merits of the summary adjudication motions submitted by the parties in all actions (Waves 1-5), should be held in abeyance pending the expiration of the opt-out periods in ***all*** of the actions. Piecemeal rulings on the merits in this consolidated action would encourage the type of improper one-way

intervention that Rule 23 was designed to foreclose. It would encourage class members to "sit on the sidelines" and evaluate the Court's approach to the parties' summary adjudication motions before deciding whether to participate in a given case. Issuing rulings in ***any*** state while other opt-out periods remain open would unfairly prejudice FedEx Ground, as it would allow class members to withhold their decision to participate based on the same "wait and see" approach.

The Seventh Circuit has found the issuance of preliminary rulings—even rulings that ***were not dispositive*** as to the merits of the cause of action—prior to the opt-out period as impermissible. In *Isaacs v. Sprint*, 261 F.3d at 681 (discussed *supra*), the court held that even non-dispositive rulings in the action should not be rendered prior to the close of the opt-out period, because the rulings would be "***portents of likely future judgments*** against Sprint" that could influence plaintiffs' opt-out decision. (emphasis added).

A similar risk is present here. For example, the certified nationwide ERISA class in *Craig/Berry* overlaps with the proposed classes in jurisdictions outside Kansas. If the Court were to resolve summary adjudication of contractor status in that action before the opt-out periods have expired in all of the actions in these proceedings, a substantial risk of one-way intervention and confusion would result. Specifically, class members would be at risk of receiving class notices contemporaneously with notification that they have already won or lost summary adjudication of contractor status as a member of another class in these proceedings.

Accordingly, FedEx Ground submits this motion to request that the District

Court's rulings on the merits of the separate summary adjudication motions will be held in abeyance pending the expiration of the separate opt-out periods in each of the consolidated actions.

Dated: August 8, 2008

Respectfully submitted

By: /s Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of July, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s Theodore Schroeder

DC1:753691.1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Decesare v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00120-RLM-CAN (NV)
*Gibson v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (AZ)
*Givens v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00324-RLM-CAN (LA)
*Gruhn v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00412-RLM-CAN (VT)
*Leighter v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00328-RLM-CAN (OR)
*Magno v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00322-RLM-CAN (CT)
*Vargas v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00325-RLM-CAN (MA)
*White v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (GA)
*Whiteside v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (NC)

CHIEF JUDGE MILLER

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY**

In connection with plaintiffs' pending motions for class certification in the above-listed "wave 4" cases, and Defendant FedEx Ground Package System, Inc.'s ("FedEx Ground") opposition thereto, FedEx Ground supplies the Court with the attached supplemental authority, which became available after FedEx Ground filed its opposition briefs and which provides further support for the arguments in FedEx Ground's opposition briefs.

In *Walker v. Bankers Life & Cas. Co.*, C.A. No. 06 C 6906, 2008 WL 2883614 (N.D. Ill. July 28, 2008) (applying California law) (attached as Exhibit A), the plaintiffs consisted of a class of insurance agents who contended that the defendant had misclassified them as independent contractors and consequently violated various provisions of the California Labor, Civil, Unemployment Insurance, and Business and Professions Codes. *Id.* at *1. On plaintiffs' summary judgment motion, the court concluded that, while there was some evidence to "support[] an inference that Bankers Life has the right to control the way its agents sell its products," there was "competing evidence that raises a disputed issue concerning the right to control." *Id.* at *7. The court cited provisions in the agent contract and an agent manual which "explicitly state that agents are independent contractors," and the testimony of individual agents to the effect that "agents maintain freedom and autonomy in their work as salespersons." *Id.* Ultimately, the court held that "[t]here is evidence to support plaintiffs' contention that agents are misclassified. But there is conflicting testimony that suggests agents are independent contractors. There are disputed issues of material fact about Bankers Life's right to control its agents. Summary judgment is therefore not appropriate." *Id.* at *9.

Furthermore, though the court had previously certified the case as a class action, as a result of the court's conclusion that there were disputed fact issues about the plaintiffs' employment status, the court then also found that "a liability determination will require an individualized evaluation of each agent's relationship with Bankers Life" and thus ***decertified*** the class. As the court observed, "this case cannot fairly or efficiently be pursued as a class action because individual issues predominate," *id.* at *11, and because "resolving the core issue of whether Bankers Life misclassifies its agents would result in mini-trials that would inhibit

efficient resolution of this dispute. Accordingly, the class action device is not a superior method of adjudication." *Id.* at *12.

The *Walker* decertification decision is pertinent to the pending class certification motions in the wave 4 cases because, in plaintiffs' "Omnibus Reply Memorandum In Support Of Plaintiffs' Phase IV Motions For Class Certification" ("ORM") filed on December 17, 2007 (Docket No. 1046), plaintiffs stated that, "[w]hen *relevant* legal authority is consulted, it is clear why FXG wishes to distract this Court's attention from it. Courts have repeatedly ruled that employee status may be determined on a class-wide basis in situations involving a standard form contract that, like the OA at issue here, purports to label workers as independent contractors." (ORM at 3 (emphasis in original).) The very first decision cited by plaintiffs as "*relevant* legal authority" in support of this proposition is the original class certification decision in *Walker*.[1] The class certified in that original *Walker* class certification order is the same one decertified in the attached July 28, 2008 *Walker* opinion.

Dated: August 13, 2008

Respectfully submitted,

By: s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street, Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

[1] *See* ORB at 3 (citing *Walker v. Bankers Life & Cas Co.*, No. 06-C-6906, 2007 WL 2903180, at *11 (N.D. Ill. Oct. 1, 2007)).

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 13th day of August, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Anne T Regan
atr@zimmreed.comand

Bruce H. Meizlish
brucelaw@fuse.net

Deborah R. Grayson
drgrayson@fuse.net

Edward R. Forman
eforman@ee.net

Eileen S. Goodin
egoodin@bnhmlaw.com

George A. Barton
gbarton@birch.net

John S. Marshall
marshall@ee.net

Mary D. Walsh-Dempsey
mdempsey@omalleylangan.com

Matthew M. Houston
mhouston@whesq.com

Monica Ferraro
mferraro@bnhmlaw.com

Peter D. Winebrake
pwinebrake@winebrakelaw.com

Robert E. DeRose, II
bderose@bnhmlaw.com

Robert K. Handelman
rhandelman@bnhmlaw.com

Sanford A. Meizlish
smeizlish@bnhmlaw.com

Shannon Liss-Riordan
sliss@prle.com

Steve D. Larson
slarson@ssbls.com

Michael J Gorby
mgorby@gorbypeters.com

Mary Donne Peters
mpeters@gorbypeters.com

George A. Barton
gbarton@birch.net

Peter D. Winebrake
pwinebrake@winebrakelaw.com

Robert E. DeRose , II
bderose@bnhmlaw.com

Robert K. Handelman
rhandelman@bnhmlaw.com

and further certifies that a copy was mailed by United States Postal Service to the following non-CM/ECF participants:

Andrew J. Kahn PHV
MCCRACKEN STEMERMAN &
HOLSBERRY
1630 S. Commerce St., Ste. A-1
Las Vegas, NV 89102

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING &
SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

Hart Lawrence Robinovitch
Zimmerman Reed PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME LICHTEN EHRENBERG & LISS-RIORDAN PC-MA
18 Tremont St., Ste. 500
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM PC
82 Wall St., Ste. 300
New York, NY 10005

Todd J. O'Malley
O'MALLEY & LANGAN PC
426 Mulberry St., Ste. 104
Scranton, PA 18503

James J. Dunn, Jr.
MICKENBERG DUNN KOCHMAN LACHS & SMITH
29 Pine Street
Burlington, VT 05402-0406

Anthony J. Pantuso, III
PANTUSO LAW FIRM LLC
204 Broad St., 2nd Fl.
Milford, CT 06460

Richard Eugene Hayber
HAYBER LAW FIRM LLC
221 Main St., St. 400
Hartford, CT 06106

Phyllis Norman
LAW OFFICES OF GEORGE A. BARTON, P.C.
800 W. 47th St., Ste. 700
Kansas City, MO 64112

R. James Lore, Esq.
102-1 Commonwealth Court
Cary, NC 27511

By: s/Robert M. Schwartz

BDDB01 5369019v1

# EXHIBIT A



Walker v. Bankers Life & Cas. Co.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois,Eastern Division.

Holly WALKER, individually, and Carol Paradise, individually and on behalf of all others similarly situated, and on behalf of the general public, Plaintiffs,
v.
BANKERS LIFE & CASUALTY COMPANY, an insurance company domiciled in the State of Illinois; and Does 1 to 100, Defendants.

**Civil Action No. 06 C 6906.**

July 28, 2008.

Daniel A. Crawford, Fernando A. Vincente, Henry G. Weinstein, John N. Quisenberry, Robert J. Drexler, Jr., Quisenberry Law Firm, Los Angeles, CA, Douglas M. Werman, Maureen Ann Bantz, Werman Law Office, P.C., Chicago, IL, for Plaintiffs.
Allan G. King, Littler Mendelson, P.C., Dallas, TX, John Anthony Ybarra, Shanthi V. Gaur, Stephanie Seay Kelly, Littler Mendelson, P.C., Chicago, IL, Tony R. Skogen, Littler Mendelson, Los Angeles, CA, Marlene Muraco, Littler Mendelson, PC, San Jose, CA, for Defendant.

***MEMORANDUM OPINION AND ORDER***

SUZANNE B. CONLON, District Judge.

***1** In this diversity case, Holly Walker and Carol Paradise (collectively, "plaintiffs") sue Bankers Life & Casualty Company ("Bankers Life") for violations of California Labor Code § 2802, California Civil Code §§ 3336 and 3294, California Unemployment Insurance Code Sections §§ 1112(a), 1112.5 and 1113, and California Business and Professions Code §§ 17200, *et seq.* Walker brings her claims individually. Paradise brings her claims on behalf of herself and a class of California insurance agents ("agents"). They claim Bankers Life misclassified its California agents as independent contractors rather than employees, and denied them rights and benefits required under California law. The following class of agents was certified on October 1, 2007:

> All persons who entered into an Agent Contract with Defendant and were appointed to work as an Agent of Defendant in California and who were classified by Defendant as independent contractors, from September 18, 2002 to the conclusion of this action.

*Walker v. Bankers Life & Cas. Co.*, No. 06 C 6906, 2007 WL 2903180 (N.D.Ill. Oct.1, 2007). Plaintiffs move for summary judgment as to liability, arguing that **Bankers Life** misclassifies its agents as independent contractors. **Bankers Life** moves to **decertify** the class. For the reasons stated below, plaintiffs' motion for summary judgment is denied and **Bankers Life's** motion to **decertify** the class is granted

## I. BACKGROUND FACTS

The following facts are undisputed unless otherwise noted.[FN1] **Bankers Life** is an Illinois insurance company authorized to sell various forms of insurance in California. Def. Resp. ¶ 2. Their products are marketed primarily to senior citizens, and are sold by agents who comprise a sizable part of their sales force. *Id.* For at least the last 29 years, Bankers Life has classified its agents as independent contractors. Def. Facts ¶ 6. There are more than 2,482 people who have worked as Bankers Life agents during the class period. Pls. Facts ¶ 1. Walker is a California citizen who was a Bankers Life agent from 1998 until February 2006. *Id.* It is undisputed that California law applies to the resolution of this diversity case.

> FN1. Bankers Life objects to Paradise's L.R. 56.1 statement because many of her paragraphs contain multiple facts and/or bullet points in contravention of L.R. 56.1's requirements. L.R. 56.1 ("[L.R. 56.1] statement ... shall consist of [80] short numbered paragraphs"). Bankers Life's objections are noted.

### A. The Agent Contract

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The relationship between Bankers Life and its insurance agents is governed by a nonnegotiable form contract, which includes the following terms:

The contract shall not create an employer-employee relationship. The relationship of Agent to Bankers Life shall be that of independent contractor.

The Agent agrees to abide by all policies, practices and procedures adopted by [Bankers Life].

The authority given in the contract is subject to provisions and limitations contained [in the contract] and in [Bankers Life's] manual, rate books, rules and regulations.

The Agent shall promote the interest of [Bankers Life] as contemplated by [the contract].

While the contract is in effect, the Agent has the authority to:

***2** solicit applications for insurance policies to be issued by [Bankers Life] and payments made thereon, and issue receipts for the monies collected,

deliver policies issued by [Bankers Life] on applications received, if the first premium has been paid,

give service to policy holders to maintain the policies in force,

solicit applications for reinstatement of lapsed policies.

No act of forbearance or toleration on the part of Bankers Life in favor of the Agent in respect to provisions of [the contract], either express or implied shall be construed as a waiver by [Bankers Life] of any of its rights.

Either party may terminate [the contract] at will, without cause, by giving notice to the other party of the intention to terminate. No notice period is required to terminate the contract.

No promotional material or [advertising in any form] shall be made ... without [Bankers Life's] prior consent.

The Agent agrees to hold all names, policyholder cards, contact data and customer list in a fiduciary capacity and agrees not to divulge names, policyholder cards or other contact data to any other Company, agency or person. The Agent agrees to return all rate information, sales manuals, forms, policyholder cards, contact data, and customer lists to [Bankers Life] upon demand or upon termination.

During the term of [the contract] and for 24 months thereafter, within the territory regularly serviced by the branch sales office of [Bankers Life] where the Agent normally submits business, the Agent shall not ... induce or attempt to induce ... any agent, branch sales manager, divisional vice president or employee of [Bankers Life] to contract with or sell insurance business with any company not affiliated with [Bankers Life].

Pls. Facts ¶¶ 6, 42, 57, 64. The contract does not specify a term for which it runs. *Id.* ¶ 65.

**B. Agent Commissions and Minimum Production Requirements**

Agents are paid by commission for each insurance policy they sell or renew. Commission rates are set forth in a Uniform Commission Schedule, which also provides minimum production requirements for agents. *Id.* ¶ 7. It is disputed whether agents can be terminated for not meeting minimum production requirements. Def. Resp. ¶¶ 7-8. A Bankers Life internal memorandum indicated that agents not meeting minimum production requirements were subject to termination. Pls. Facts ¶ 8. However, some agents have testified that minimum production requirements are not enforced at their respective branches. Def. Resp. ¶¶ 7-8. In addition to minimum production requirements, the Uniform Commission Schedule provides that “[Bankers Life] shall have the right of first refusal on all business produced by the Agent.”Pls. Facts ¶ 52. The only requirement to become an agent is to be willing to be licensed by the California Department of Insurance. *Id* ¶ 9.

**C. Bankers Life Training Programs, Policies, and Publications**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

***3** Bankers Life provides agents free training programs. These include “New Agent Success” and the “Winners Edge” program. Pls. Facts ¶¶ 10, 22. A third program, “Compliance as a Competitive Edge,” was implemented in October 2005.*Id.* The “New Agent Success” program provides 42 hours of classroom time, and offers agents a detailed sales script and a sixstep sales model. *Id.* ¶¶ 15-16.“Compliance as Competitive Edge” and “Winners Edge” also provide sales training, including “do's and don't's” with respect to the sales model, as well as role playing type training. *Id.* ¶¶ 19-20.Additionally, a section in the “Compliance as Competitive Edge” states:

> The Bankers' Agent Contract is an exclusive contract; You cannot have multiple company contracts; You cannot sell insurance for another broker or dealer while you are selling insurance for Bankers; You cannot have non-insurance business contracts; Bankers does not have part time agents. Meeting sales goals and providing Bankers' required level of client service demands your full-time application of time, energy, and attention.

*Id.* ¶ 53.Notwithstanding this statement, it is disputed whether all agents are instructed that they cannot work for other insurers. Def. Resp. ¶ 53. Some agents hold multiple appointments with various insurance carriers, sometimes without Bankers Life's permission. Def. Resp. ¶¶ 53-55. Bankers Life provides additional training materials for each of its products. Pls. Facts ¶ 12. But whether agents have participated in Bankers Life's product training prior to selling certain products is disputed, as some agents have not attended this training. Def. Add. Facts ¶ 7.

It is disputed whether agents must follow the Bankers Life's sales model or other sales training techniques. Def. Resp. ¶¶ 16, 20. Some agents develop their own sales techniques. *Id.* Some agents also bypass using Bankers Life's sale scripts, Def. Resp. ¶ 36. It is disputed whether Bankers Life directs its agents to complete all training courses and whether Bankers Life monitors each agent's training. Def. Resp. ¶ 11. Although Bankers Life has a goal that all agents complete training programs (nearly all of them complete some form of training), several agents have testified they are not required to attend training sessions, and several have also admitted they take training courses not offered by Bankers Life. *Id.* ¶¶ 11, 22; Pls. Facts ¶ 14.

Bankers Life provides agents with sales brochures, email and phone services, application forms, office space, telephones, computers and other office equipment. Pls. Facts ¶¶ 32, 35. However, agents purchase their own office supplies, personal computers, business cards, postage, mileage, and support staff if desired. Def. Resp. ¶ 32. Agents deduct these costs as business expenses on their tax returns, they are treated as independent contractors for all income and employment tax purposes, and they have completed proprietorship schedules to their individual federal income tax returns. Def. Facts ¶ 19.

***4** Bankers Life issues its agents an extensive, regularly updated 161-page resource called an “Agent Information and Procedures Manual.” Pls. Facts ¶¶ 25-26. This manual is a resource providing agents with information regarding, *inter alia:* compensation, marketing and advertisement guidelines, sales rewards programs, administrative procedures with respect to delivering policies, scope of ethics, guidelines in how to address and sell to seniors, billing systems, policy-related information, and minimum standard requirements. *Id.* Changes to these procedures are sent to agents via “Field Compliance Alerts.” *Id.* ¶ 27.

Bankers Life publishes for agents additional manuals and materials, including a 227-page “Project 15 Bankers Sales Success Handbook,” a “New Agent Success Handbook,” and an “Agents Quarterly” *Id.* ¶¶ 28, 30-31.The company maintains a “Sales Portal Network,” an online resource tool that helps track agent sales. *Id.* ¶ 29.Bankers Life's Field Development Manger, Allen Castiglia, meets personally with agents to discuss their performance, knowledge, and skills regarding their work for Bankers Life. *Id.* ¶ 45.

**D. Client Development and Solicitation**

In developing clients, Bankers Life freely provides agents with leads to potential customers. Pls. Facts ¶ 34. Some have testified that branch sales managers only give leads at branch meetings to enforce meeting attendance or only give leads to agents meeting productivity standards. *Id.* However, others have testified that agents are free to generate leads

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

however they choose. Def. Resp. ¶ 34. Some even purchase their leads from independent sources. *Id.* Leads may also be paid for through a field support program at branches. Pls. Facts ¶ 71.

Bankers Life has a Gryphon telephone system in place, which records and generates reports on agent call activity and whether sales appointments are set. *Id.* ¶ 37.According to Bankers Life, the Gryphon system allows the company to ensure compliance with federal "Do Not Call" lists. Klein Dep. at 69. Whether agents are required to use the Gryphon system to telephone clients is disputed, as some do not use it when making sales appointment calls. Def. Resp. ¶ 37. Agents use telemarketers. But if an agent does use a telemarketer, the person should be approved by Bankers Life, employed and paid through an approved employment agency. Pls. Facts ¶ 43.

Bankers Life provides testimony mat some of its training regarding advertising, prohibited discrimination, and required disclosures is required by California law. Def. Facts ¶¶ 37-39. Similarly, they advance testimony indicating that requirements for approval for advertising and scripts are to ensure compliance with California law. Def. Facts. ¶¶ 39-41.

**E. Bankers Life Branch Offices**

Bankers Life branch sales managers oversee agents and undergo training with respect to running individual branch offices. *Id.* ¶ 47.Part of their training includes a "Boot Camp" in Chicago and "1 year Agent Track" training, where the managers are trained to review with agents phone advertisement procedures, sales models, business training, and to oversee agent training and development. *Id.* ¶ 48.Whether branch sales managers do so in practice is disputed, as there is testimony that some branch managers have discretion to run their branches as they see fit. Def. Resp. ¶ 48.

***5** Branch offices hold training or "sales builder" meetings. Pls. Facts ¶ 21. In some branches, agents have been fired, fined, and reprimanded for missing meetings. *Id.* ¶ 74.In others, agents suffer no negative repercussion for missing meetings at their branch offices. Def, Resp. ¶ 74. Agents have testified they are free to set their own hours and work schedules, and some work on a part-time basis mostly from home. Pls. Facts ¶¶ 10-11, 15. Others have testified they hold second jobs while associated with Bankers Life, such as teaching high school, playing in a local orchestra, and managing a restaurant. *Id.* ¶ 14.

Branch sales managers and unit sales managers are Bankers Life employees. Their contracts are identical to the agent contract in that they limit employees' authority and affirm that all sales materials belong to Bankers Life. Pls. Facts ¶ 77. A difference is that an agent's authority is "subject to the provision and limitations contained [in the contract], and in [Bankers Life's] manual, rate book, rules and regulations ..."*Id.*The commission rates for an agent selling a policy is the same as for an employee selling the same policy. *Id.* ¶ 78.

Bankers Life secures an errors and omissions insurance policy for its agents to purchase. Pls. Facts ¶ 46. Some agents purchase their own insurance policy independently of Bankers Life. Def. Resp. ¶ 46.

**F. Termination and Tenure**

Upon termination, it is unclear whether agents receive residual compensation on existing policies and renewals, or whether agents can sell their book of business. Def. Resp. ¶ 56. However, an agent is required to return all customer lists and contact information to the company. Pls. Facts ¶ 58. Agents cannot solicit their former clients after leaving Bankers Life. *Id.* ¶ 61.If a policyholder no longer has an agent with Bankers Life, another agent is given the opportunity to service that policyholder without compensation. *Id.* ¶ 70.

The average tenure for an agent under contract with Bankers Life is approximately one year, but some have continued the relationship for 20 years. Pl Facts ¶ 66. After an agent works for Bankers Life for seven years, they are deemed vested; after 10 years they are deemed fully vested. *Id.* ¶ 67.Those who are deemed "career agents" are eligible to receive benefits not otherwise available, including a deferred compensation plan. *Id.* ¶ 68.However, career agents do not receive sick leave, vacation days, 401(k) plan eligibility, a company car, mileage reimbursement or any other reimbursement associated with the sale of insurance. Def. Resp. ¶ 68.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

## II. PLAINTIFFS' SUMMARY JUDGMENT MOTION

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir.2007). A genuine issue of material fact exists when, in viewing the record and all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts demonstrating a genuine issue for trial.Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

### B. Misclassification

***6** The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. *See* *S.G. Borello & Sons, Inc. v. Dept. Of Indus. Relations*, 48 Cal.3d 341, 350, 256 Cal.Rptr. 543, 769 P.2d 399 (Cal.1989) (quoting *Tieberg v. Unemployment Ins. Appeals Bd.*, 2 Cal.3d 943, 946, 88 Cal.Rptr. 175, 471 P.2d 975 (Cal.1970)). Courts recognize "several 'indicia' of the nature of a service relationship" including whether an employer has "the right to discharge at will, without cause."*Id.* at 350-51,256 Cal.Rptr. 543, 769 P.2d 399. Other secondary factors, derived principally from the Restatement Second of Agency § 220, include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.*"Generally, ... the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."*Id.* (citation and quotation omitted)."The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced."*Id.* at 349, 256 Cal.Rptr. 543, 769 P.2d 399.

It is Bankers Life's burden to show that plaintiffs are independent contractors rather man employees. *See* *Desimone v. Allstate Ins. Co.*, No. C 96-03606, 2000 WL 1811385, at *10 (N.D.Cal.2000) (citing *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 608 n. 6, 262 Cal.Rptr. 842 (Cal.Ct.App.1989)). The determination of whether one is an employee or independent contractor is a matter of law when the material evidence is undisputed. *Id.* (citing *S.G. Borello*, 48 Cal.3d at 349, 256 Cal.Rptr. 543, 769 P.2d 399).

### C. Analysis

Plaintiffs argue the undisputed facts show that Bankers Life agents are misclassified as independent contractors. Bankers Life counters that genuine issues of fact preclude summary judgment because many agents have particular circumstances that demonstrate they are properly characterized as independent contractors. Because the classification question turns on resolution of disputed evidence or inferences, plaintiffs' motion must be denied.

#### *1. Right to Control Agents*

There is a factual dispute whether Bankers Life has the right to control how agents sell the company's insurance products. Plaintiffs claim Bankers Life possesses a right to control its agents because the agent contract and the company's published policies,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

procedures, manuals, and training materials manifest that the right exists. For example, plaintiffs assert the agent contract has provisions dictating that Bankers Life can control the manner in which agents sell insurance policies. These include: a provision indicating an agent's authority is subject to Bankers Life's manual, rate books, rules and regulations; a provision reserving Bankers Life's rights should agents fail to abide by the contract; a provision requiring that an agent seek approval prior to advertising; a provision that agents hold the company's proprietary information in a fiduciary capacity; and finally, a non-competition provision. Pls. Facts ¶¶ 6, 42, 57, 64. The agent contract states that agents should "abide by all policies, practices, and procedures adopted by" Bankers Life.*Id.* Bankers Life argues these provisions, in addition to the policies and procedures in Bankers Life's training/publication materials, establish a right to control the manner in which agents sell insurance policies.

***7** This evidence supports an inference that Bankers Life has the right to control the way its agents sell its products. But there is competing evidence that raises a disputed issue concerning the right to control. The agent contract and an agent manual explicitly state that agents are independent contractors. Bankers Life proffers evidence that agents maintain freedom and autonomy in their work as salespersons. Contrary to plaintiffs' assertion that agents are "required" to follow certain sales methods in Bankers Life's training programs, agents testified they can implement their own sales techniques and are free to pursue individual lead generation methods. Pls. Facts ¶ 8. Agents can set their own hours, and their schedules vary, depending on the individual. *Id.* ¶ 10, 256 Cal.Rptr. 543, 769 P.2d 399. There is testimony that agents may sell insurance for Bankers Life on a part-time basis, working only a few days a week and engaging in other occupations during their time off from Bankers Life work. *Id.* ¶ 11, 256 Cal.Rptr. 543, 769 P.2d 399. There is evidence that agents can work primarily from home, and some rarely come into any branch office. *Id.* ¶ 15, 256 Cal.Rptr. 543, 769 P.2d 399. These individual agent experiences, viewed in a light most favorable to Bankers Life, raise a reasonable inference that agents are independent contractors who freely control how they sell Bankers Life products to customers.

Plaintiffs' assertion that Bankers Life training program and materials demonstrate a right to control an agent is a disputed issue. Bankers Life provides testimony that some of its training regarding advertising, prohibited discrimination, and required disclosures are required by California law. Def. Facts ¶¶ 37-39; *see, e.g., Desimone*, 2000 WL 1811385, at ----12-13 (training requirements for insurance agents did not indicate right to control plaintiffs business because the training was meant to comply with state and federal law). Bankers Life submits that California regulations require it to provide agents "thorough and adequate" training regarding regulations that set forth guidelines for issues including the form and content of advertising, prohibited discrimination, and required disclosures. *See*Cal.Code Regs. § 2695.6; Cal. Ins.Code § 1749.8; Def. Facts ¶ 37. Therefore, Bankers Life's training system is not preclusive evidence of a right to control the manner by which agents sell insurance policies.

There is evidence mat agents are free to sell insurance in methods not prescribed in the training materials. Def. Resp. ¶¶ 16, 20. Some agents testified that they have chosen not to even attend Bankers Life training, opting instead to train themselves or receive training from unaffiliated third parties, *See* Def. Resp. ¶ 11. Some agents testified they are not required to take any training. Def. Resp. ¶ 11. Additionally, some agents testified that they do not use some of the forms that plaintiffs claim are required in selling Bankers Life insurance products. Pls. Facts ¶¶ 31-35, Therefore, for these particular agents, the training materials are not probative evidence of whether Bankers Life has the right to control them.

***8** There is a disputed issue of fact regarding whether agents were "captive" and were instructed that they could not work for other insurers. Although Bankers Life's training materials state that the agent contract is an "exclusive" one, agents testified that they maintained appointments to sell for other insurance companies while under contract with Bankers Life. Def. Resp. ¶ 53. Plaintiffs contend Bankers Life had a uniform policy requiring termination of agents who sold for other insurers, but there are a number of agents who testified that they held appointments with other insurers while under contract with Bankers Life, at times with Bankers Life's permission.*Id.* ¶ 54.These instances create a genuine issue of disputed

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

fact regarding whether Bankers Life categorically refuses to allow agents to work for other insurers.

***2. Additional Common Law Factors***

A proper balancing of California's common law factors cannot be made as a matter of law because disputed factual issues exist. For example, a significant factual dispute remains regarding whether Bankers Life provides agents the "instrumentalities, tools, and the place of work" to show they are employees rather than independent contractors. *See* *S.G. Borello*, 48 Cal.3d at 350-51, 256 Cal.Rptr. 543, 769 P.2d 399. Bankers Life provides sales brochures, application forms, and other materials used by agents, but agents also provide for themselves materials used in selling Bankers Life products-namely, telemarketers, the cost of licensing, the cost of office supplies, and gas. *See* Def. Resp. 133; Pls. Facts ¶ 18. These costs and expenses are deducted by agents as business expenses on tax returns. Def. Facts ¶ 19. A reasonable inference can therefore be drawn that while Bankers Life provides product and administrative materials to agents, agents still invest in their work materials as independent contractors. *See, e.g., Desimone*, 2000 WL 1811385, at *16 (tax treatment as independent contractor weighed in favor of that classification).

It is unresolved whether a Bankers Life agent's occupation is "usually done under the direction of a principal or by a specialist without supervision."*See* *S.G. Borello*, 48 Cal.3d at 350-51, 256 Cal.Rptr. 543, 769 P.2d 399. Although there is evidence that agents receive specialized training and that their production may be monitored, Pls. Facts ¶¶ 8, 29, some evidence suggests that little supervision is required over the actual selling aspect of the job, Some agents freely manage their own schedules, use their own sales techniques, develop their own leads, and work mostly from home. Def. Facts ¶¶ 8, 10-11. The inferences from this evidence can be drawn either way. Viewing the reasonable inferences in Bankers Life's favor, plaintiffs' motion for summary judgment on this ground is unwarranted.

Similarly, there is a disputed issue regarding the "skill required for the occupation" and "the length of time for which the services are to be performed."The only requirement for becoming an agent is that he be willing to be licensed. Pls. Facts ¶ 9. Bankers Life argues that state licensing requirements buttress an independent contractor classification because obtaining a state license constitutes evidence of requisite skill. *See* *Shweiger v. Farm Bureau Ins. Co.,* 207 F.3d 480, 485 (8th Cir.2000) (licensing weighed heavily in favor of independent contractor). State licensing is a threshold requirement for becoming an agent in California. A reasonable inference may be drawn that Bankers Life's agents are independent contractors licensed by the state.

***9** The agent contract does not set forth a specified time limit. Plaintiffs argue this indeterminate time limit connotes an employment relationship because an agent can work for Bankers Life as long as he wishes. However, Bankers Life proffers evidence mat the average tenure for an agent under contract with Bankers Life is about one year. The facts that the contract does not set forth a specified time limit and contains a mutual termination provision do not preclude a finding that agents are independent contractors. While courts have recognized that the right to terminate a contract at will or without cause is evidence of an employment relationship, a mutual termination provision may be construed as a continuing contractual relationship between parties. *See, e.g., Desimone*, 2000 WL 1811385, at *15. (citing *State Compensation Ins. Fund v. Brown*, 32 Cal.App.4th 188, 203, 38 Cal.Rptr.2d 98 (Cal.Ct.App.1995). Drawing all reasonable inferences in Bankers Life's favor, this factor does not support plaintiffs' summary judgment motion.

There is evidence to support plaintiffs' contention that agents are misclassified. But there is conflicting testimony that suggests agents are independent contractors. There are disputed issues of material fact about **Bankers Life's** right to control its agents. Summary judgment is therefore not appropriate.

**III. BANKERS LIFE'S** MOTION TO **DECERTIFY** THE CLASS

**A. Decertification**

The court has broad discretion in determining whether class certification is proper. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998). The court's initial determination to certify a class is "inherently tentative," and the court "remains under a continuing obligation to review whether proceeding as a class is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

appropriate."*Ellis v. Elgin Riverboat Resort,* 217 F.R.D. 415, 419 (N.D.Ill.2003) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)); *see also* *Binion v. Metro. Pier and Exposition Auth.,* 163 F.R.D. 517, 520 (N.D.Ill.1995) (court "remains free to modify or vacate a certification order if it should prove necessary"). In deciding a motion to decertify a class, the court tests whether economy favors adjudicating multiple disputes in a single action, without sacrificing fairness. *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (citation omitted). If certification is later deemed improvident at any time during the course of litigation, a court may decertify the class. *See, e.g., Eggleston v. Chicago Journeymen Plumbers' Local No. 130,* 657 F.2d 890, 896 (7th Cir.1981); *see also* *Ellis,* 217 F.R.D. at 419;Fed.R.Civ.P. 23(c)(1)(C) ("order that grants ... class certification may be altered or amended"). Plaintiffs bear the burden of producing a record demonstrating the continued propriety of maintaining the class action.*Ellis,* 217 F.R.D. at 419 (citation omitted).

**B. Analysis**

The court's initial certification decision was entered when the parties completed limited discovery. Since certification, more than 30 class members have been deposed and discovery is now complete. **Bankers Life** argues class **decertification** is appropriate because it has become apparent that common questions will not predominate over individual ones and the class action device is not a superior method for adjudication. *See*Fed.R.Civ.P. 23(b)(3). The court agrees.

***10** Disputed factual issues preclude summary judgment because the common question of whether Bankers Life misclassifies its agents is still an open one. Common evidence of the agent contract and other Bankers Life policy and training manuals are insufficient to resolve plaintiffs' claim. To the contrary, resolving the common issue of misclassification would require an onerous inquiry into each agent's relationship with Bankers Life because individual circumstances inform application of the *S.G. Borello* multifactor test. Liability determinations would be individual and fact-intensive, rendering class certification under Rule 23(b)(3) is improper. *See, e.g., Rodriguez v. Ford Motor Credit Co.,* No. 01 C 8526, 2002 WL 655679, at *5 (N.D.Ill. Apr.18, 2002) (Conlon, J.).

*1.**Predominance***

Paradise contends the uniform, identifiable treatment of Bankers Life agents establishes that common issues predominate over individual issues. She points to the court's previous order, which identified certain clauses in the agent contract and various Bankers Life policies that presented a broad picture of the type of evidence likely needed to resolve the class claims. *See* *Walker,* 2007 WL 2903180, at ----7-10. However, the evidence now before the court crystalizes the fact-specific nature of the relationship between Bankers Life and each class member, and reveals that individual issues must be resolved to adjudicate Paradise's misclassification claim.

The right to control test is not to be viewed in isolation, as there are several indicia of the relationship, which are not to be applied mechanically. *See* *S.G. Borello,* 48 Cal.3d at 350, 256 Cal.Rptr. 543, 769 P.2d 399. Bankers Life argues the record now reflects that its liability will turn on an individualized factual inquiry into each class member's relationship with the company. The company contends this is true because the principal factor in considering whether agents are misclassified is whether Bankers Life controls an agent's work. Def. Mem. at 4. In support, the company proffers a voluminous compendium of supporting depositions, declarations, and sworn summaries outlining various agent working conditions. *See* Def. Mem. at 4-7. This evidence includes differences among agents with respect to work hours, training attendance and requirements, sales builder meeting attendance and requirements, phone clinics and appointments, lead generation, marketing procedures, use of scripts and standardized forms, performance reviews, work supplies, and company appointments. *Id.* Additionally, Bankers Life argues its fifteen California branch offices use various policies and procedures that impact the extent of control the company exerts over agents. *See* Def. Compendium Tab 37. There is testimony that in each office, training varies, as do clinics, best practices, and employee monitoring. *Id.* at Tabs 37-45. Bankers Life indicates that sometimes agents based out of the same branch (managed by the same branch manager)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

are afforded different levels of freedom in attending training sessions, phone clinics, utilizing certain sales strategies, or giving up appointments with other insurance companies. *See* Def. Mem. at 8. Bankers Life argues these divergent experiences demonstrate it is impossible to determine on a class-wide basis whether the company uniformly controls its agents or whether they should be considered employees on a class-wide basis.

***11** Paradise responds that most of **Bankers Life's** evidence is identical to that previously considered by the court when certification was granted. **Bankers Life** proffers a number of the same summaries and declarations. Paradise contends the evidence is still insufficient to warrant **decertification** because it "merely shows occasional instances of deviation from **Bankers**' expectations or policies and does not show that [**Bankers Life**] relinquished the right to control the agents."Pl. Mem. at 1, These arguments are unpersuasive.

First, Paradise's argument that the court should not consider evidence of *actual* control because the proper test is the *right* to control is unavailing. *See* *SG Borello*, 48 Cal.3d at 350, 256 Cal.Rptr. 543, 769 P.2d 399 (principal test is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired"). Although courts use the "right to control" language as the proper standard, courts also look at actual control in analyzing whether an employment relationship exists under the multifactor test established by California law. *See, e.g.,* *Tieberg*, 2 Cal.3d at 952, 88 Cal.Rptr. 175, 471 P.2d 975 (trial court properly found that director in fact exercised control and direction over writers); *S.G. Borello*, 48 Cal.3d at 356, 256 Cal.Rptr. 543, 769 P.2d 399 (grower of agricultural crops exercised "pervasive control over the operation as a whole"); *Air Couriers Int'l v. Employment Development Dept.*, 150 Cal.App.4th 923, 937, 59 Cal.Rptr.3d 37 (Cal.Ct.App.2007) (trial court properly considered extent to which company controlled drivers). Indeed, the right to control is not the only element in determinating whether an employment relationship was created. *Tieberg*, 2 Cal.2d at 950, 40 P.2d 835. An analysis of the underlying relationship is essential, to analyze whether an employer-employee relationship exists. *See* *id.* at 952-53, 40 P.2d 835. The actual exercise of control may be probative of the existence of an employment relationship.

Second, the full discovery record now reflects that a liability determination will require an individualized evaluation of each agent's relationship with Bankers Life. The evidence proffered with respect to plaintiffs' summary judgment motion indicates that whether Bankers Life had the right to control its agents cannot be resolved solely by referring to the agent contract and uniform policy training manuals and publications. It would require scrutiny of each agents' experience with regard to training, monitoring, practices, and requirements on the job. Testimony regarding an agent's work hours, training attendance and requirements, sales builder meeting attendance and requirements, phone clinics and appointments, lead generation, marketing procedures, use of scripts and standardized forms, performance reviews, work supplies, and company appointments would bear on the question of whether an employer-employee relationship exists. For example, Bankers Life provides evidence that agent experiences and expectations depended on different management styles of individual branch managers. *See* Def. Compendium at Tabs 37-45. Individual agents may have had various experiences and expectations with regard to whether they were required to attend training, meetings, phone clinics, or to utilize Bankers Life sales strategies. *See id.* at Tabs 46-55. This type of evidence, viewed in relation to the multiple factor test set of *SG Borello*, 48 Cal.3d at 350, 256 Cal.Rptr. 543, 769 P.2d 399, demonstrates that this case cannot fairly or efficiently be pursued as a class action because individual issues predominate. *Cf. Ditffin v.* *Exelon Crop .*, No. 00 C 0000, 2007 WL 845336, at *7 (N.D.Ill. Mar.19, 2007) (Conlon, J.) (predominance requirement not satisfied because significant trial time would be devoted to determinating separate liability issues for each individual claim); *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 584 (N.D.Ill.2005) (Conlon, J,); *Pfaahler v. Consultants for Architects*, No. C. 0000, 2000 WL 198888, at *2 (N.D.Ill. Feb.8, 2000) (Conlon, J.) (independent contractor inquiry required court to make fact-intensive, individual determinations precluding certification of collective FLSA action); *Salazar v. Avis Budget Group, Inc.*, No. 07 C 0064, 2008 WL 2676626, at *5 (S.D.Cal. July 2, 2008) (predominance not satisfied where liability cannot be established without individual trials for each class member).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*2.**Superiority***

***12** Superiority is established when a class action would achieve "economies of time, effort, and expense," and promote uniformity of decisions without sacrificing procedural fairness. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action. *See* *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 248 (C.D.Cal.2007) (citation omitted) (superiority requirement not met where individual issues will predominate); *Doe v. Guardian Life Ins. Co. of America*, 145 F.R.D. 466, 476 (N.D.Ill.1992) (Williams, J.) (same). A class action is not superior to other available methods because of the number of individual issues to be litigated in this case. *See, e.g., id.*The difficulties likely to be encountered in managing the class action substantially outweigh any possible benefits derived from consolidating the plaintiffs' claims. A significant number of distinct factual issues with regard to each agent would be required. For example, the issue regarding whether every one of the more than 2,000 agents are uniformly required to attend training sessions would require substantial inquiry and time. Ultimately, resolving the core issue of whether **Bankers Life** misclassifies its agents would result in mini-trials that would inhibit efficient resolution of this dispute. Accordingly, the class action device is not a superior method of adjudication. The class must be **decertified**.

**IV. CONCLUSION**

Due to the reasons set forth above, plaintiffs' motion for summary judgment on the issue of whether **Bankers Life** misclassifies its agents is denied. **Bankers Life's** motion to **decertify** the class is granted.

N.D.Ill.,2008.
Walker v. Bankers Life & Cas. Co.
Slip Copy, 2008 WL 2883614 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**OPINION AND ORDER**

## I. PROCEDURE

On August 10, 2005, this multidistrict litigation case was transferred to the Northern District of Indiana pursuant to 28 U.S.C. § 1407 to perform consolidated pretrial proceedings. Plaintiffs' main contention for many of their claims is that Fedex was treating them as independent contractors when they were actually employees. As a result, Plaintiffs seek a number of remedies that revolve around this issue including injunctive relief and damages. On November 15, 2005, this Court entered an initial scheduling order where discovery on liability and damages was bifurcated.

Also, on November 29, 2005, this Court provided a supplemental scheduling order in which this Court provided that class certification briefing was to proceed in three waves. After several extensions of the discovery deadline, all discovery pertaining to those first three waves had to be completed by January 31, 2007.

On June 29, 2007, after the initial discovery deadline closed, and after the briefing of the first three waves of class certification had begun, it became apparent that a new fourth wave of class certification would be required for recently transferred cases. Even though discovery had

closed, this Court allowed the parties to perform additional limited discovery, but only as it pertained to the new wave. Later on March 20, 2008, a fifth wave of class certification was added, and the parties were also allowed to perform discovery as to the fifth wave as well.

The current dispute is a discovery dispute. On May 9, 2008, Plaintiffs filed a motion to compel discovery. Plaintiffs seek to compel a document produced to Fedex from the Internal Revenue Office (IRS) and depose one Fedex executive regarding a recent IRS audit. On May 27, 2008, Fedex filed a response in opposition to Plaintiffs' motion, and on June 10, 2008, Plaintiffs filed a reply in support of their motion. This Court now enters its ruling on this motion pursuant to its referral order and 28 U.S.C. § 636(b)(1)(A).

## II. ANALYSIS

### A. Facts

Sometime in 1995, the IRS issued an assurance letter to Fedex regarding its independent contracter "driver model." During a 2006 deposition of Sallie Ford (Ford), Plaintiffs learned that the IRS was currently auditing Fedex's driver model for a more recent year, but that the audit was not finished. In December of 2007, the IRS issued a "Notice of Proposed Assessment" (NOPA). Plaintiffs seek to compel the production of this document, and Plaintiffs seek to conduct a second limited deposition of Ford regarding the developments of the IRS audit since her 2006 deposition.

### B. Legal Standards

Fed. R. Civ. P. 26 (b)(1) permits discovery into "any matter, not privileged, that is relevant to the claim or defense of any party." Relevant information need not be admissible at trial so long as the discovery appears reasonably calculated to lead to the discovery of admissible

evidence. Fed. R. Civ. P. 26 (b)(1). For the purpose of discovery, relevancy will be construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Chavez v. Daimler Chrysler, 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351(1978)). This Court has broad discretion when deciding whether to compel discovery and may deny discovery to protect a party from oppression or undue burden. Fed. R. Civ. P. 26(c); Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1998) ("[D]istrict courts have broad discretion in matters related to discovery."); Gile v. United Airlines, Inc., 95 F.3d 492, 495-96 (7th Cir. 1996) ("The district court exercises significant discretion in ruling on a motion to compel."). In ruling on a motion to compel, "a district court should independently determine the proper course of discovery based upon the arguments of the parties." Id. at 496.

C. Plaintiffs' Motion to Compel

The threshold issue of any discovery dispute is whether the discovery sought is relevant to issues in the litigation. Fedex does not claim that the discovery is irrelevant to the main issue of whether the Fedex drivers are independent contractors or employees, but that it is not relevant to any "new issues" presented in wave five. Fedex essentially argues that this Court only allowed discovery akin to wave five because of its nature of being new lawsuits not previously before this Court. Fedex also points to the parties' memoranda in which they requested the ability to perform discovery for waves four and five and how the memorandums specifically request that discovery only be completed on "new" issues.

Fedex misconstrues this Court's order. Despite the contents of the parties' briefs where they sought to perform limited discovery with the new waves, this Court's order did not specify

that the parties could only perform discovery of new issues presented in wave five. The only limitation from this Court was that the parties had leave to perform "limited" discovery. See Doc. No.s 766, 1118. The requirement that the discovery Plaintiffs seek be limited is clearly met in these circumstances. Plaintiffs seek only one targeted document and one very specific supplemental deposition of Ford, which is clearly not the type of large, wholesale discovery the parties engaged in prior to January 31, 2007.

The only remaining requirement is that the discovery bear on an issue in this litigation. Fedex claims that the NOPA would not be admissible as evidence, but admissibility is not pertinent to answering whether something is discoverable.[1] The key question is whether the NOPA "bears on, or . . . reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Chavez, 206 F.R.D. at 619. The main issue in this litigation, including in wave five cases, pertains to the classification of Fedex drivers, and the NOPA and the supplemental deposition bear on the IRS's consideration of this issue. While this Court is not now deciding whether the discovery sought is admissible, it is relevant for discovery purposes and, therefore, appropriate for discovery.

Furthermore, this Court also finds that Plaintiffs have established "good cause" to seek disclosure of the NOPA even if this Court's order did not allow discovery in wave five on old issues. Discovery closed on January 31, 2007, yet the NOPA document did not come into existence until approximately a year later in December of 2007. Consequently, it was impossible

[1]Fedex argues that Plaintiffs should not have access to the document because they may seek to use the document in support of summary judgment in the first four waves in which briefing has completed or is nearly completed. While Plaintiffs may seek to use the document, whether they may supplement their motions and briefs with the document is separate issue. Plaintiffs would need to file a motion for leave to supplement, and at that time, this Court will consider whether there is "good cause" to accept and consider the document. But the only question before the Court at this time is whether the document is discoverable.

for the Plaintiffs to have sought the document prior to the close of discovery. Simply put, the Plaintiffs are justified in seeking the NOPA document and information about the circumstances surrounding it.

Consequently, the only issues remaining are whether Fedex has articulated some justification for not disclosing the NOPA. The frequency or extent of the discovery methods otherwise permitted shall be limited by the court if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). Fedex essentially makes two arguments pursuant to part (iii) of Fed. R. Civ. P. 26(b)(2)(C) that: 1) it would be unduly burdensome to compel a corporation, such as Fedex, to turn over documents that reflect communications between it and the IRS; and 2), that it would be redundant and burdensome to allow Ford to be deposed a second time.

First, Fedex argues that producing the NOPA is a confidential communication, and its disclosure would interfere with the fundamental public policies encouraging dialogue between corporations and government agencies. Even though the NOPA is a an IRS document, there is no special privilege that prevents a parties' documents created by or for the IRS from being discoverable. See Poulus v. Naas Foods, Inc., 959 F.2d 69, 74 (7th Cir. 1992). However, some Courts have recognized that some parties will be hesitant to provide accurate and complete information to the IRS if they are later forced to produce the tax information in a judicial proceedings. See e.g. Shaver v. Yacht Outward Bound, 71 F.R.D. 561, 563 (N.D. Ill. 1976).

case 3:05-md-00527-RLM -CAN document 1581 filed 08/21/08 page 6 of 7

Consequently, public policy may argue against the disclosure of tax documents. However, because the documents are not privileged, the Court will weigh the relevancy of these documents against the burden for producing them. Fedex may be relieved of its obligation to produce the tax documents if it can show that the relevancy of the tax documents is slight and it will be needlessly harmed by their public disclosure.

This Court finds that the relevancy of the NOPA document outweighs any harassment or embarrassment that Fedex will suffer if the NOPA is disclosed. First, and most importantly, Fedex has placed at issue the IRS's opinion of its driver model. See Paulos, 959 F.2d at 75 (indicating that party opposing discovery put the topic of discovery at issue was crucial factor). Plaintiffs indicate, and Fedex does not deny, that they have frequently pointed to the IRS's opinion from the mid 90's to support its position in this litigation. Fedex cannot credibly argue that the IRS documents were discoverable when it was favorable to Fedex's position but now when it may not support Fedex's position they are not discoverable. Fedex also claims that the NOPA does not contradict the IRS documents from the mid 90's. If so, then there is no prejudice to Fedex. And if there is a change, the new position and the factors that lead to the new position might lead to relevant evidence in this litigation.

Second, the NOPA is not available from another source. Under 26 U.S.C. § 6103, the IRS cannot disclose the information, and as a consequence, the only source of the NOPA is Fedex. Finally, the Plaintiff's request is very limited. Plaintiffs do not seek all of Fedex's tax documents. Instead, Plaintiffs seek one document, the NOPA, and a limited deposition, which is the full extent of their request.[2]

---

[2]Furthermore, it is not clear whether Fedex has concerns regarding the public disclosure of the NOPA, but

Fedex's also argues that Ford should not be subject to a second deposition because it is redundant and, as a result, burdensome. However, because the documents were created after Ford's deposition, Plaintiffs clearly could not have questioned Ford at her first deposition regarding the results of the NOPA.

Consequently, Plaintiffs shall be able to depose Ford, but only to conduct a **very narrow** and **targeted** deposition of Ford. The deposition shall **only** relate to issues generated from the NOPA and most recent IRS audits.

## III. CONCLUSION

Because the Plaintiffs' discovery requests are limited and subject to wave five discovery and because Fedex's privacy concerns are outweighed by the discovery's relevancy to issues in this litigation, Plaintiffs' motion to compel is **GRANTED** [Doc. No. 1283].

**SO ORDERED.**

Dated this 21st Day of August, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

those concerns could be addressed, or may already be addressed, by a protective order from this Court.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL COORDINATED ACTIONS | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO HOLD IN ABEYANCE THE RULINGS ON THE PARTIES' SUMMARY ADJUDICATION MOTIONS**

FedEx Ground Package Systems, Inc.'s ("FXG") motion to delay rulings on summary adjudication is yet one more attempt at halting progress towards resolution of plaintiffs' claims. FXG contends for a second time that issuance of summary adjudication orders prior to the expiration of all opt-out periods in all constituent actions raises the possibility of one-way intervention by absent class members. In doing so, FXG takes no heed from the Court's prior ruling when it summarily rejected this very concern at a conference on March 19, 2008. At the conference, the Court also denied FXG's related request that summary judgment briefing be delayed pending the expiration of all opt-out periods in the various classes, noting that to do so would offer no advantage "other than delay." Mar. 19, 2008 Tr. at 14-15. Such unnecessary delay would only militate against the Court's wish to "expedite this litigation as quickly and as reasonably as possible," Order, dated August 20, 2007, at 3, and Fed.R.Civ.P. 1's explicit mandate

that courts operating under the Federal Rules act "to secure the just, speedy, and inexpensive determination of every action."

FXG's interpretation of the law on one-way intervention is too expansive in a way that is detrimental to the class. Plaintiffs do not quarrel with the mandate of black letter law that merits decisions in a particular class action should not be issued prior to the expiration of the opt-out period for that particular action. *See Amati v. City of Woodstock*, 176 F.3d 952, 957 (7th Cir. 1999)(one-way intervention rule bars putative absent class member from "waiting on the sidelines to see how [a] lawsuit turns out and, if a judgment on the class is entered, intervening to take advantage of the judgment."); *see also American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 545-52 (1974). However, FXG can cite to no authority that applies this rule *across* class actions such that the issuance of a merits decision in one class action should be delayed until the expiration of the opt-out period in another class action. Indeed, if these actions had not been assigned by the Panel of Multidistrict Litigation to be coordinated, FXG would have no argument that, for instance, a court in New York should hold in abeyance its decision on the merits until an opt-out period for a class in Louisiana has expired. In any event, absent members of the various classes are already aware of the *Estrada* class members' now-final and much publicized victory against FXG in California, rendering FXG's concerns moot. Besides having no basis in applicable authority, such delay would only serve to prejudice Plaintiffs insofar as justice will have been delayed and they will have been forced to "hurry up and wait" for summary adjudication rulings—the briefing for which occurred simultaneously with class certification motions in Waves 4 and 5—despite the fact that

FXG's one-way intervention concerns have already been addressed by the Court and the briefing schedule went forward on the assumption that such concerns were not valid.

At the conclusion of the last conference concerning these issues, FXG's sole remaining concern regarding the possibility of one-way intervention was that it did not want to "have [] a situation where rulings come down on summary judgment on status before a contractor *in a given* state has had to decide whether to participate in a case." Mar. 19, 2008 Tr. at 14-15 (emphasis added). In presenting its argument, FXG initially expressed concern that summary adjudication rulings in one action could have some kind of "psychological impact" on absent members of other classes. *See Id.* at 19. The Court summarily dismissed such concern, stating:

> Well, I'm not concerned about psychological impact. Whether or not [summary adjudication in one action] is a bellwether depends on the similarity of the law of [one state] with any other jurisdiction or any other cases out there that are similarly situated.

*Id.* at 20. FXG's counsel then relented on this point: "So if what you're saying is that [the summary adjudication motion in one action] will get held or decided when Judge Miller gets around to it, but he will not be issuing a ruling in that [action] until the notice period has come and gone and people have decided whether they're participating in a case, then I have less of a problem with that." Mar. 19, 2008 Tr. at 20. As its concern has already been addressed, FXG should not be allowed to reargue this point, especially given the prejudice that would befall Plaintiffs as a result.

Plaintiffs in certain of the constituent actions have already waited nearly **four years** to obtain redress for the damage caused by FXG's misclassification of them. To make them wait even longer would severely prejudice their rights to speedy justice.

What is more, the Court and the parties went ahead with iterative briefing of the motions for summary adjudication based on the assumption that the rulings would come down iteratively as well to speed along the progress of these proceedings. To hold in abeyance the Court's rulings on the summary adjudication of employment status would only serve to nullify the Court's and the parties' previous diligent efforts in connection with the now-*sub judice* motions. If FXG had timely expressed its concerns about one-way intervention and the Court had given them credence, the parties would not have been forced to feverishly draft such motions simultaneously with motions for class certification, and there would have been no reason to have the motions submitted in waves. Instead, the parties could have waited until all motions for class certification were decided before commencing briefing on summary adjudication. Again, the Court "couldn't see any advantage of that, other than delay." Mar 19, 2008 Tr. at 15. Plaintiffs have been severely prejudiced as a result of FXG's failure to press these concerns at the appropriate time such that FXG should be estopped from raising again such concerns now.

FXG's next argument that rulings in one action would afford class members in other actions to enjoy a sneak preview of summary adjudication orders in such other actions is disingenuous given FXG's continued, strenuous arguments against any notion that the analysis of the law and facts in one action in these MDL proceedings enjoys any affinity whatsoever with such analyses in other actions: "FedEx Ground has, from day one in this litigation and consistently thereafter, maintained that each case must be adjudicated under its own facts and with reference to the specific laws that apply to it." FXG's Mem. in Opp. To Plaintiffs' Request For Status Conference [Doc. 1093] at 1. As

FXG has previously noted, this Court has made clear time and again that these cases would be evaluated separately for substantive purposes. *Id.* at 2. Towards this end, the Court previously rejected plaintiffs' suggestion that a bellwether approach be taken in these proceedings. In rejecting such suggestion, the Court specifically noted at least twice that "to the extent that there are multiple states involved [a decision on the merits in one state] wouldn't really be dispositive or indicative of what might be the result in [other] cases," Oct. 24, 2005 Tr. at 10, and, as noted above, "[w]hether or not it is a bellwether depends on the similarity of the law of [one state] with any other jurisdiction or any other cases out there that are similarly situated." Mar. 19, 2008 Tr. at 19. It is therefore undisputed that summary adjudication of employment status in one action affects only that particular action, so no one, including absent class members in the constituent actions, can foretell the outcome of one motion from knowing the previous outcome of another. And, again, this concern has now been mooted by the fact that absent class members in all the constituent actions are in possession of the knowledge that FXG drivers in California have been held to be employees in *Estrada*. As a result, FXG's fear of one-way intervention here is wholly unfounded and stands in contradiction to its own previous arguments in these proceedings and the Court's previous clear instruction on this issue.

FXG's alternative argument that class members might be "confused" by iteratively timed rulings echoes their failed argument concerning potential absent class member confusion in receiving more than one class notice, which argument was made in thinly-veiled service of their overarching objective to slow the pace of these proceedings.

This potential for "confusion" as a roadblock to progress in these proceedings was specifically rejected by the Court:

> If this Court were to wait until all of the pending motions for class certification were resolved, the delay would be substantial. The class must receive notice before this Court rules on dispositive motions. [citation omitted] As a result, the longer it takes the absent class to receive the notices, the longer this Court must wait to resolve any issue in this litigation. Simply put, ***the detrimental effect of not issuing the notices outweighs any confusion the absent class might suffer from receiving multiple notices***.

Opinion and Order, dated April 4, 2008 ("April 4th Order") at 4-5 (emphasis added).

Moreover, the potential for such confusion does not really exist. FXG argues that absent members of the nationwide ERISA class in *Craig/Berry* might receive a notice concerning summary adjudication in that case while the time to opt-out of any other state class of which they might be member had yet to expire. First, as explained above, a ruling in one action does not necessarily foretell the outcome of the ruling in another action. Second, it is unlikely that members of the *Craig/Berry* class would receive any separate notice of the outcome of the summary adjudication motions. Assuming plaintiffs prevail on those motions, there would remain discovery to be conducted concerning potential damages of plaintiffs in those actions. Only after this Court has concluded all its pretrial proceedings in an action would plaintiffs receive any notice that the action would be transferred back to its home forum for trial and final adjudication of the claims. Within such notice there would likely be mention of the favorable outcome of the motion for summary adjudication. Lastly, even assuming that a member of the *Craig/Berry* class were to receive such a notice within the opt-out period of another class of which they are a member, any potential confusion could be easily avoided by a delay

in such notice or cured by clear language in the notice explaining that a favorable summary adjudication decision in *Craig/Berry* does not in any way affect or predict the outcome of a summary adjudication motion in any other action. Indeed, the Court has previously explained to FXG that any potential confusion on the part of class members can be avoided by language "crafted to adequately explain why and how the [summary adjudication decisions] are different." April 4th Order at 5.

FXG's cited authority does not instruct a different conclusion. *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001), the principal case on which FXG relies, involved a class certification order that provided for adjudication of merits issues prior to class notification and prior to the expiration of the opt-out period. The Seventh Circuit reversed such order, noting unremarkably that to issue merits decisions in a class action prior to the expiration of the opt-out period ***in the same class action*** would run afoul of the judiciary's vigilance against possible one-way intervention by class members. *Id* at 681-82. Again, Plaintiffs do not quarrel with this principle, and, in any event, such is not the case here. As explained above, a ruling on a summary adjudication motion in one state under its laws does not portend the outcome of a motion for summary adjudication in another state under such other state's laws. FXG cannot point to any authority to support such an illogical position. Plaintiffs' exhaustive research on this issue likewise yielded no such authority.

Accordingly, for the reasons stated above, FXG's motions should be DENIED.

Dated: August 25, 2008

Respectfully submitted,

HARWOOD FEFFER LLP

__s\ Robert I. Harwood________
Robert I. Harwood
Peter W. Overs, Jr.
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Carlene M. Craig, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00530-RLM-CAN (KS) | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

## CERTIFICATE OF SERVICE

I, Craig Lowther, hereby certify that I am not a party to the action, am over the age of eighteen years, am employed by the law firm of Harwood Feffer LLP, attorneys for plaintiff, and that on August 26, 2008, I served the foregoing

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' ERISA CLAIM FOR FAILURE TO EXHAUST ADMINISTRATIVE REVIEW**

and

**DECLARATION OF MATTHEW M. HOUSTON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FEDEX GROUND'S MOTION FOR PARTIAL SUMMARY JUDGMENT FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**

and

**ERISA PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACT AND CROSS-DESIGNATION OF MATERIAL FACT IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**

case 3:05-md-00527-RLM-CAN document 1596 filed 08/27/08 page 2 of 6

in the within action, by causing CD-R media copies of same to be mailed, via U.S. Regular Mail to:

**Evelyn L. Becker**
**Robert Schwartz**.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20007

and

**Alison G Fox**
**Thomas J Brunner, Jr**
Baker & Daniels - SB/IN
202 S Michigan Street Suite 1400
South Bend, IN 46601

and electronically emailed to the following counsel:

**See Attached Service List**

Craig Lowther

## Other Documents

3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II
CASREF, PROTO

**U.S. District Court Northern District of Indiana [LIVE]**

**USDC Northern Indiana**

## Notice of Electronic Filing

The following transaction was entered by Harwood, Robert on 8/26/2008 at 12:30 PM EST and filed on 8/26/2008
**Case Name:** In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II
**Case Number:** 3:05-md-527
**Filer:**
**Document Number:** 1595

**Docket Text:**
**Seaed Document. (Attachments: # (1) ERISA Plaintiffs' Response to Def's Statement of Material Fact and Cross Designation In Opposition to Def's Partial Summary Judgment Motion, # (2) Declaration of Matthew Houston In Support of Pltfs' Opp. to Def's Partial Summary Judgment Motion, # (3) Exhibit A to Houston Declaration, # (4) Exhibit B to Houston Declaration, # (5) Exhibit C to Houston Declaration, # (6) Exhibit D to Houston Declaration, # (7) Exhibit E to Houston Declaration, # (8) Exhibit F to Houston Declaration, # (9) Exhibit G to Houston Declaration, # (10) Exhibit H to Houston Declaration, # (11) Exhibit I to Houston Declaration, # (12) Exhibit J to Houston Declaration, # (13) Exhibit K to Houston Declaration, # (14) Exhibit L to Houston Declaration, # (15) Exhibit M to Houston Declaration, # (16) Exhibit N to Houston Declaration, # (17) Exhibit O to Houston Declaration, # (18) Exhibit P to Houston Declaration (Part 1), # (19) Exhibit P to Houston Declaration (Part 2), # (20) Exhibit P to Houston Declaration (Part 3), # (21) Exhibit P to Houston Declaration (Part 4), # (22) Exhibit Q to Houston Declaration, # (23) Exhibit R to Houston Declaration)(Harwood, Robert)**

**3:05-md-527 Notice has been electronically mailed to:**

Peter J Agostino agostino@aaklaw.com, trybula@aaklaw.com

Robert G Ames rgames@venable.com

George A Barton gbarton@birch.net, bartonlaw3@birch.net

Jeffrey A Bartos jbartos@geclaw.com

Evelyn L Becker PHV ebecker@omm.com

Kenneth Lee Blalack , II lblalack@omm.com

Darcie R Brault dbrault@dibandfagan.com

Laura C Bremer lbremer@omm.com

case 3:05-md-00527-RLM-CAN document 1596 filed 08/27/08 page 4 of 6

Guy Brenner gbrenner@omm.com

Thomas J Brunner , Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski dmc@zimmreed.com

Jerald R Cureton jcureton@curetoncaplan.com

Ginger A DeGroff degrofflaw@yahoo.com

Robert E DeRose , II bderose@bnhmlaw.com, drelli@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com

Edward J Efkeman eefkeman@fedex.com

Susan E Ellingstad seellingstad@locklaw.com, hnpotteiger@locklaw.com, mortonpolski@locklaw.com, pabloodgood@locklaw.com

Barry S Fagan bfagan@dibandfagan.com

Lynn R Faris lfaris@leonardcarder.com, aahn@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Monica Ferraro mferraro@bnhmlaw.com

Lee K Fink lfink@omm.com

Robert K Firsten rfirsten@firstenlaw.com

Edward R Forman eforman@ee.net

Wood R Foster PHV , Jr woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, andrew.murphy@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco pfuoco@msn.com

Martin S Garfinkel garfinkel@sgb-law.com, cronan@sgb-law.com, luk@sgb-law.com

Michael W Garrison , Jr mgarrison@omm.com

R Christopher Gilreath chrisgil@sidgilreath.com

Eileen S Goodin egoodin@bnhmlaw.com

Michael J Gorby mgorby@gorbypeters.com, rwright@gorbypeters.com

Deborah R Grayson drgrayson@fuse.net

Robert K Handelman rhandelman@bnhmlaw.com

Robert I Harwood rharwood@whesq.com

case 3:05-md-00527-RLM-CAN document 1596 filed 08/27/08 page 5 of 6

Stacy J Hauf shauf@omm.com, swickliffe@omm.com

Matthew M Houston mhouston@whesq.com

Dmitri Iglitzin iglitzin@workerlaw.com

Tom A Jerman tjerman@omm.com

Victor H Jih vjih@omm.com

Aparna B Joshi ajoshi@omm.com

Soye Kim skim@geclaw.com

Michael W Kopp mkopp@omm.com

Steve D Larson slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis jordanlewis@sbgdf.com

Shannon Liss-Riordan sliss@prle.com, jhunt@prle.com, syoung@prle.com

Gary F Lynch glynch@carlsonlynch.com

John S Marshall jmarshall@marshallandmorrow.com

Michael G McGuinness mmcguinness@omm.com

Bruce H Meizlish brucelaw@fuse.net

Sanford A Meizlish smeizlish@bnhmlaw.com

Matthew J Merrick mmerrick@omm.com

Jennifer Lee Merzon jmerzon@omm.com

Raquel A Millman rmillman@omm.com

Eleanor I Morton emorton@leonardcarder.com

James R Mulroy , II mulroyj@jacksonlewis.com, edwardsj@jacksonlewis.com

Daniel O Myers dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Jeffrey S Nestler jnestler@omm.com

Peter W Overs , Jr povers@whesq.com

Lesley A Pate lapate@venable.com

Mary Donne Peters mpeters@gorbypeters.com, rwright@gorbypeters.com

Richard T Phillips flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Nora M Puckett    npuckett@omm.com, dmeredith@omm.com

C Victor Pyle , III    victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan    atr@zimmreed.com, kmh@zimmreed.com

Beth A Ross    bross@leonardcarder.com, aahn@leonardcarder.com, ksangren@leonardcarder.com

J Gordon Rudd    jgr@zimmreed.com

Theodore B Schroeder    tschroeder@omm.com

Robert M Schwartz PHV    rschwartz@omm.com

James A Staack    jims@staack-firm.com

R Jay Taylor , Jr    jtaylor@scopelitis.com, lnewton@scopelitis.com

Joni M Thome PHV    thome@halunenlaw.com

Matthew T Tobin    mtobin@sbslaw.net, lstewart@sbslaw.net

Jeffrey A Trimarchi    jtrimarchi@omm.com

Mary D Walsh-Dempsey    mdempsey@omalleylangan.com

Michael J Watton    jdrewicz@Wattongroup.com, vgaroukian@wi.rr.com

Andrew M Weiner    aweiner@omm.com

Peter D Winebrake    pwinebrake@winebrakelaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**FEDEX GROUND'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO HOLD IN ABEYANCE THE RULINGS ON THE PARTIES' SUMMARY ADJUDICATION MOTIONS**

Plaintiffs' opposition concedes that the "mandate of black letter law" requires that the rulings on the parties' motions for summary adjudication should not issue in each MDL action prior to the close of the opt-out period in that action. (*See* Pls. Opp. at 2.) This broad prohibition against "one-way intervention" in class actions is grounded on the principle that plaintiffs should not be provided a preview of the potential outcome of their action before deciding whether to participate in the lawsuit. The authority plaintiffs cite, *Isaacs v. Sprint*, 261 F.3d 679, 681 (7th Cir. 2001) (Pls. Opp. at 2), confirms that the issuance of even *non*-dispositive rulings in advance of class certification violates the prohibition against one-way intervention, where the rulings are "portents of likely future judgments against" the defendant. *See also Premier Elec. Const. Co. v. National Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 363 (7th Cir. 1987) ("Rules 23(c)(1) and (2) together force class members to choose the binding effect of the judgment in advance of decision on the merits. If they can choose later, it's one-way intervention all over again.")

Accordingly, the sole issue in dispute is whether the Court's rulings on the parties' motions for summary adjudication should be held in abeyance pending the close of the opt-out periods in all actions in this coordinated proceeding, ***or*** issued in a staggered, piecemeal fashion as each separate action's opt-out period closes. A piecemeal release of rulings while opt-out periods remain open in other actions would conflict with the prohibition against one-way intervention and the due process and policy interests served by that rule. The Court's rulings on the issue of independent contractor status—a key issue in all of the actions pending in this MDL proceeding—will certainly have the effect

of previewing the Court's reception of the parties' arguments and evidence on the issue, regardless of the variations in state law. The same policy concerns that counsel against issuing preliminary rulings in an individual class action apply with equal force to this Court's merits rulings in this coordinated proceeding. Due to the procedural posture of this coordinated proceeding—which provides that the same Court will be issuing key merits rulings as to each of the coordinated actions—FedEx Ground requests that such rulings be held in abeyance pending the close of all constituent opt-out periods.

Plaintiffs' arguments ignore the significance of the coordination of these actions in this MDL, and the fact that the rulings on the motions will issue from one Court. Instead, plaintiffs: (1) incorrectly assert that the Court has already issued a ruling on the matter, (2) attempt to discredit the motion by imputing improper motives to FedEx Ground, and (3) attempt to avoid the serious concerns of "one-way intervention" by claiming that the Court's rulings will not impact opt-out decisions in other states. Each of these arguments is in error. Each ignores the concern that the early release of rulings would preview this Court's treatment of the parties' argument on the central issue of classification, and would raise substantial one-way intervention risks that prejudice FedEx Ground.

### A. Plaintiffs Misconstrue the Court's "Ruling" on One-Way Intervention.

Plaintiffs seek to preempt the Court's consideration of FedEx Ground's motion by incorrectly claiming that the motion has already been decided by this Court's "prior ruling" purportedly rejecting FedEx Ground's request for an abeyance. (Pls. Opp. at 1, 3.) The Court never issued a formal "ruling" as to when or in what manner the Court would rule upon the parties' separate motions for summary adjudication. The March 20,

28, and April 10, 2008 orders following the status conference (which establish the summary adjudication briefing schedules discussed at the status conference) make no mention of when the Court will issue rulings on the parties' motions. The absence of such a formal ruling is the reason FedEx Ground brought this motion.

The status conference transcript disproves plaintiffs' argument that the issue has been decided in their favor. Contrary to plaintiffs' assertions, the Court neither "summarily rejected" FedEx Ground's concerns regarding one-way intervention, nor did it "rule" that decisions should issue in staggered fashion. (Pls. Opp. at 1, 3.) Plaintiffs' misread the discussions. The Court's only remark on the issue of one-way intervention and the timing of ***ruling*****s** was ***receptive*** to FedEx Ground's stated concerns. The Court said that it anticipated that the Court would follow Seventh Circuit law in terms of the timing of the issuance of the rulings. *See* Tr. at 15 (quoted in FedEx Ground's Mtn. at 1).

Plaintiffs argue that the Court rejected FedEx Ground's "one-way intervention" arguments by dismissing the notion of the "psychological impact" of rulings from one case on other cases in the MDL. (Pls. Opp. at 3.) But the quoted exchange plaintiffs cite was taken out of context and did not concern a request to hold rulings in abeyance. Specifically, in discussing the schedule for submitting motions for summary adjudication, plaintiffs stated that they planned to submit briefs with respect to the *Craig* (Kansas) action. *See* Tr. at 19. FedEx Ground expressed concerns with a Kansas-only approach to summary adjudication of the classification issue. *See* Tr. at 20 (FedEx Ground's Counsel: "Your Honor, that was a schedule that would be agreeable to us if we were just going to go forward with ***all the motions***. We do object to allowing Kansas to serve as a

bellwether.") (emphasis added). The passage that plaintiffs quote concerning the "psychological impact" of the *Craig* case was not in response to a one-way intervention argument, but was addressing FedEx Ground's request that the briefing not be structured to promote Kansas to the position of a "bellwether" action on the merits of the classification issue. Contrary to plaintiffs' characterization, the Court's response was not a ruling that the decisions should be issued on a staggered basis, but rather concerned the sequence of the ***briefing***, as indicated by the concluding line of the quote omitted by plaintiffs. *See* Tr. at 20 ("Well, I'm not concerned about psychological impact . . . . I don't know why you don't want to go forward with the ***briefing***.") (emphasis added).

Nor did FedEx Ground "relent" to agree to a piecemeal release of rulings on summary adjudication while opt-out periods remained open in other actions. (Pls. Opp. at 3.) Plaintiffs argue that the merits of FedEx Ground's request need not be considered, because FedEx Ground is estopped from requesting the instant relief due to a failure to timely raise the issue. Plaintiffs' estoppel argument rests on the incorrect claim that FedEx Ground agreed to a staggered release of rulings. (Pls. Opp. at 3-4.) In fact, FedEx Ground presented a continued and consistent concern that the rulings ***not*** prematurely issue while other opt-out periods remain open. *See* Tr. at 20-21. FedEx Ground did consent to the ***submission*** of the briefs, but made clear it was not envisioning a piecemeal issuance of rulings while opt-out periods in other actions remained open and plaintiffs were still determining whether to participate in the action:

> If all we're talking about is briefing and we're not talking about a decision and we're not talking about how it affects notice for the ERISA claim in there -- what we ultimately don't want to have is a situation where class

> notice goes out just for the ERISA claim in Kansas, which is nationwide, and, of course, the Kansas case, and then, if you will, supplemental notices about individual cases that are part of this proceeding that confuse contractors or give them the impression that they get two strikes or two bites at claims in this case. So if what you're saying is that motion will get held or decided when Judge Miller gets around to it, but he will not be issuing a ruling in that until the notice period has come and gone and people have decided whether they're participating in a case, then I have less of a problem.
>
> [N]o reason to wait; let's get them on file. I see the wisdom of that, as long as it's understood that there will be no decisions on employment versus independent contractor status in class cases until opt-out periods have come and gone.

Tr. at 21 (emphasis added). As noted, FedEx Ground's concern was that "there will be ***no decisions*** on employment versus independent contractor status in class cases until opt out ***periods*** have come and gone." *Id.* (emphasis added).[1]

**B. The Motion Is Directed To Preventing One-Way Intervention.**

Plaintiffs claim that FedEx Ground's motion is presented for an improper purpose and is in "thinly veiled service of [its] overarching objective to slow the pace of these proceedings." (Pls. Opp. at 5.) Those allegations are improper and unfounded. FedEx Ground's motion is directed to ensuring that it is not unfairly prejudiced by a schedule that would allow potential class members to sit on the sidelines, receive the Court's rulings on the merits of the classification issues, and evaluate whether to participate with the benefit of such a preview. In other words, the relief requested is to serve the

---

[1] Plaintiffs' argument that the briefing schedule would not have provided for the filing of motions for summary adjudication if they were not to be immediately ruled upon attempts to rely on a ruling that simply is not there. The Court's concern was to have the parties prepare and present their motions; the Court made no "ruling" on how Judge Miller would decide or release

judicially recognized and mandated goal of ensuring that merits determinations do not improperly influence opt-out decisions in the coordinated actions at issue here. The motion is not directed towards delay. There is a proper order to class action proceedings, and merits determinations in advance of the close of the opt-out period in the action improperly risks prejudice to the defendant.

The Supreme Court has explained that this is an issue of fairness to the defendant, and allowing plaintiffs a preview of the merits (even if not in the form of a judgment) is improperly prejudicial to the defendant. Prior to revisions to Rule 23 which eliminated one-way intervention, a

> [r]ecurrent source of abuse under the former Rule lay in the potential that members of the claimed class could in some situations await ***developments in the trial*** or even final judgment on the merits in order to determine whether participation would be favorable to their interests. If the ***evidence at the trial*** made their prospective position as actual class members appear weak, or if a judgment precluded the possibility of a favorable determination, such putative members of the class who chose not to intervene or join as parties would not be bound by the judgment."

*American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974) (emphasis added). FedEx Ground's motion seeks no more than to have that principle honored, and to have the merits rulings issued at their appropriate time, in order to guard against one-way intervention.

### C. Plaintiffs Ignore the Consolidated Nature of the MDL Proceeding.

Plaintiffs argue in error that there can be no risk of one-way intervention because

---

those rulings. As discussed above, the Court's discussion of the issue at the status conference simply acknowledged that the Court would follow Seventh Circuit law. *See* Tr. at 15.

the separate cases are each governed by the laws and evidence specifically applicable to the individual lawsuits, and a ruling in one action does not necessarily identify the result in another action. (Pls. Opp. at 4-5.) Plaintiffs further argue that the ruling in *Estrada* has already issued, eliminating concerns regarding the impact of additional MDL rulings on opt-out decisions. Plaintiffs' argument fails to recognize the unique nature of this proceeding. Although the actions are governed by the specific legal standard applicable in each state, all of the actions are consolidated in this MDL proceeding, and the Court's rulings will uniquely preview how the Court is approaching the fundamental merits issue of contractor classification. In addition, the MDL Court has, in the past, approached rulings on the parties' motions by issuing a "default" decision, which created a presumptive ruling for the remaining consolidated actions. *See, e.g.*, October 15, 2007 Order at 57 (certifying the Kansas action and directing the parties to explain "how their position on class certification differs from the positions addressed" by the Court's order). Although a ruling in one action in this consolidated proceeding is not formally a merits decision binding on the next state, it does preview the Court's approach, not only in terms of the Court's response to the argument, but also in that the Court has treated past rulings with respect to an action as a "default" ruling for the remaining actions.

These controlling distinctions make the presence of *Estrada* irrelevant to FedEx Ground's requested relief. That case, as well as any other case not part of this proceeding (*e.g.*, *Anfinson et. al. v. FedEx Ground Package System*) do not directly present the concerns at issue here, because, for example, *Estrada* was decided by a separate court in

California that was handling *one* discrete action concerning a different class period. The decision was not a part of this coordinated proceeding and gives no insight into ***this*** Court's potential rulings on the parties' argument and evidence on the core issue of classification. In contrast, in this MDL proceeding there is one Court that is issuing the merits rulings at issue. In addition, the *Estrada* action was not and is not part of this Court's jurisdiction; it was never one of the transferred and coordinated actions. Seventh Circuit law speaks only to the Court's control over the proceedings that are before it, not those before other courts.

The timing of the Court's rulings on the parties' summary adjudication motions as to actions in the MDL is within the control of the Court. The same policy concerns that counsel against issuing even preliminary (non-dispositive) rulings prior to opt out in a given action counsel against sequentially issuing merits rulings in this MDL proceeding. *See Isaacs v. Sprint Corp.*, 261 F.3d 679, 681 (7th Cir. 2001) (scheduling rulings on non-dispositive issues still prejudiced the defendant, because "the combined effects of the two rulings-***portents of likely future judgments*** against Sprint-plus the effect of those rulings in encouraging members of the class not to opt out of the suit" would risk one-way intervention); *American Pipe & Const. Co.*, 414 U.S. at 547 (discussed above).

Plaintiffs' argument concerning the certified nationwide ERISA class in *Craig/Berry* likewise fails to address the one-way intervention issue. Plaintiffs are incorrect in claiming that the Court has "specifically" addressed FedEx Ground's arguments concerning potential confusion that could result from the issuance of a summary adjudication ruling and the simultaneous distribution of class notice. (Pls. Opp.

at 6.) The Court was discussing a different issue (when the class notices should issue in the certified actions), ***not*** when summary adjudication rulings should issue. *See* Apr. 4, 2008 Order at 4-5. Aside from the issue of potential confusion as to overlapping class notice and rulings on the merits, the premature issuance of a merits ruling on the nationwide ERISA action prior to the close of the opt-out periods in the separate actions presents substantial risks of one-way intervention. All plaintiffs in the respective actions are members of the nationwide ERISA class. A grant ***or*** denial of summary adjudication will give ***each*** plaintiff in each action a preview as to how this Court will respond to his or her claims before the same Court. This directly implicates the policy concern underlying the prohibition against merits rulings before the close of the opt-out period.

Accordingly, FedEx Ground requests that the District Court's rulings on the merits of the separate summary adjudication motions will be held in abeyance pending the expiration of the separate opt-out periods in each of the consolidated actions.

Dated: September 4, 2008

Respectfully submitted

By: /s Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 4th day of September, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s Nora M. Puckett

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS: | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S RULING REGARDING PRODUCTION OF THE DRAFT IRS NOTICE OF PROPOSED ASSESSMENT AND RELATED CORPORATE DESIGNEE DEPOSITON**

For the reasons stated in the accompanying memorandum, Defendant FedEx Ground Package System, Inc., pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a) and N.D. Ind. L.R. 72.1(c), respectfully requests reconsideration by this Court of the Magistrate Judge's August 21, 2008 Order (Doc. No. 1581) granting plaintiffs' Amended Rule 37 Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition.

Dated: September 8, 2008

Respectfully submitted,

By:

______/s/ Robert M. Schwartz____
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Michael G. McGuinness
Evelyn L. Becker
O'MELVENY & MYERS LLP

1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 8th day of September, 2008, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS: | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S RULING REGARDING PRODUCTION OF THE DRAFT IRS NOTICE OF PROPOSED ASSESSMENT AND RELATED CORPORATE DESIGNEE DEPOSITON**

## I. INTRODUCTION

FedEx Ground Package System, Inc. ("FedEx Ground") respectfully objects to and moves to set aside the Magistrate Judge's August 21, 2008 Order (Doc. No. 1581) (the "Order"), granting plaintiffs' Amended Motion to Compel Production of IRS Notice of Proposed Assessment and Corporate Designee Deposition.[1] The Order compels the production of a non-public ***draft*** Notice of ***Proposed*** Assessment ("NOPA") from a group of Internal Revenue Service ("IRS") auditors, despite: (1) the qualified privilege courts in the Seventh Circuit recognize for a taxpayer's communications with the IRS; and (2) the parties' 2006 express written agreement that, in light of that privilege, limits the scope of discovery in these proceedings to tax determinations "***decid[ing]***" the employment classification issue issued by

[1] FedEx Ground files this motion for reconsideration pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and intends that the arguments contained herein constitute FedEx Ground's "objections" to the Order as Rule 72(a) provides.

"state or federal taxing agenc[ies]." The Order errs in not addressing the parties' agreement regarding how to handle production of such documents in light of the privilege, and further errs by overlooking that their agreement expressly excludes production of documents such as the ***draft proposed*** NOPA at issue here. In so doing, the Magistrate Judge's Order denies FedEx Ground the benefit of its bargain with plaintiffs, without requiring any justification by plaintiffs for reneging, and will hinder the parties' ability to resolve future disputes absent Court involvement. Indeed, the Court's Order in effect permits parties to avoid the import of prior agreements by simply re-propounding their discovery requests.

The Order should also be set aside because it applies two very different standards for the discoverability of taxpayer information. When FedEx Ground sought plaintiffs' taxpayer information, the Magistrate Judge denied the discovery because the information requested was not "dispositive." In granting plaintiffs' present request for FedEx Ground's taxpayer information, however, the Magistrate Judge ruled that the information need not even be admissible – let alone dispositive – and was discoverable as long as it had any bearing on any issue. The Order arbitrarily applies a different standard to FedEx Ground's taxpayer information than the standard it applied to plaintiffs' taxpayer information, and does not acknowledge this Court's finding that tax documents must be "relevant and material" to be discoverable.

Proper application of the taxpayer privilege would recognize that the document in question is a ***draft*** document issued for discussion purposes and will almost certainly be revised. Indeed, even if the document is finalized, it will only represent a proposed assessment by field auditors that becomes an IRS determination only if the agency later agrees with the field auditors that taxes are due and issues a "Notice of Determination of Worker Classification." These facts severely discount the document's relevance. Yet the Magistrate Judge did not even acknowledge

that the NOPA is merely a ***draft*** of a potential ***proposal***, and the Order repeatedly references the document as though it were issued in final form. This distinction is critical not only to deciding whether the draft NOPA falls within the scope of the parties' discovery agreement, it also severely undercuts the Magistrate Judge's conclusion that FedEx Ground's taxpayer privilege is outweighed by the relevance of the document. For similar reasons, the Magistrate Judge's decision to reopen the deposition of FedEx Ground's corporate designee on tax matters should also be reversed.

The same rules that have limited FedEx Ground's discovery against plaintiffs should be applied to plaintiffs' discovery against FedEx Ground. The discovery limitations contained in the parties' governing discovery agreement that have limited FedEx Ground and protected plaintiffs should be applied equally to limit plaintiffs and protect FedEx Ground. Confidential communications with a taxing agency during the course of an investigation should be protected as a matter of law. For all of these reasons, and as explained below, the Court should grant FedEx Ground's motion for reconsideration of the Order granting plaintiffs' requests to compel production of the draft NOPA and deposition of a corporate designee.

## II. BACKGROUND

### A. Plaintiffs' Tax-Related Requests for Production.

In February 2006, plaintiffs served their First Set of Requests for Production of Documents ("RFP"). This RFP included over 50 document requests, many of which were extremely broad. The RFP included the following requests:

> Request For Production #23. Any document(s) from or relating to any state or federal court, state or federal agency or any other decision of any kind in which Defendant's "independent contractor" classification has been adjudicated, reviewed, resolved, investigated, settled or in any manner addressed and all documents relating to any such case. This Request includes but is not limited to decisions from any court, the NLRB, EEOC, DOT, IRS, any state workers compensation agency, tax agency, unemployment insurance agency, any state

discrimination agency, or any other entity which conducted any investigation or adjudication involving any complaint made by or against any driver.

Request For Production #24. Any document(s) provided by Defendant to any governmental agency or taxing agency, whether federal or state, regarding the status of any driver in any state at any relevant time.

(Ellingstad Decl. in Supp. of Pls.' Am. Mot. to Compel ("Ellingstad Decl.") Ex. 1 (Doc. No. 1283, Attach. 2).) FedEx Ground objected to these requests on various grounds, including, *inter alia*, that they were overbroad, burdensome, and called for documents covered by the privilege for tax returns and/or tax-related materials. Nevertheless, FedEx Ground responded that it would produce "documents sufficient to show the result of any adversarial proceeding initiated by or stemming from a complaint made by a member of the putative class against Defendant…." (*Id.*)

During this phase of discovery, plaintiffs also requested a deposition regarding "investigations, audits, reviews and/or determinations by the IRS and any state taxing authority … which concern or relate to the classification of FedEx Ground's pickup and delivery drivers as independent contractors." (Oct. 3, 2006 Faris email, Ellingstad Decl., Ex. 6.) On November 8, 2006, Sallie Ford, Vice President of Tax at FedEx Services, Inc., which oversees tax audits at FedEx Ground, testified as FedEx Ground's corporate designee on that subject. Ms. Ford provided testimony related to these topics, including testimony about an ongoing IRS audit of FedEx Ground's 2002 tax return examining the contractors' classification status. Ford testified that she did not know when the audit would be finished or when the IRS would issue a written report setting forth its determination with respect to the classification of pickup and delivery drivers. (Ford Tr. at 279:4-17, Ellingstad Decl., Ex. 7.)

**B. The Parties' Meet and Confer Efforts and Subsequent Discovery.**

In May and June 2006, the parties engaged in extensive, good-faith meet and confer efforts regarding the scope of plaintiffs' tax-related document requests. These efforts included

numerous telephone conferences and the exchange of several detailed letters, all aimed at avoiding motion practice and settling any disagreements related to the scope of discovery. (McGuinness Decl. in Supp. of FedEx Ground's Opp'n to Pls.' Am. Mot. to Compel ("McGuinness Decl.") ¶ 3 (Doc. No. 1294, Attach. 1); Ellingstad Decl., Exs. 3-5.) Ultimately, the parties reached an agreement providing that FedEx Ground would produce "***determinations*** from any state or federal taxing agency ***which have decided the issue*** of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge." (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5) (emphasis added).) The parties agreed that such productions would fully satisfy FedEx Ground's obligations with respect to numerous requests for production, including the two described above, in light of the taxpayer privilege issues implicated by the requests. (May 31, 2006 Faris letter, Ellingstad Decl., Ex. 4; June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5.) Upon reaching agreement, FedEx Ground produced documents consistent with the terms of the agreement, and supplemented that production as necessary. (McGuinness Decl. ¶ 2.) Significantly, these negotiations necessarily involved give-and-take and compromise on various matters in order to reach agreement with plaintiffs on the many requests that were at issue. (*Id.* ¶ 4.)

**C. The IRS Audit.**

The IRS began an employment tax audit of FedEx Ground's 2002 tax return in December 2003. (Decl. of Michael D. Fryt ("Fryt Decl.") ¶ 2 (Doc. No. 1294, Attach. 2).) This audit is still in progress. (*Id.*) Under IRS audit procedures, the audit ends when the field auditors issue a NOPA, summarizing their ***proposed*** assessment. 26 C.F.R. § 601.105(b)(4). This is also known as a "30 day letter," because the taxpayer then has 30 days to accept the findings or file a protest.

*Id*. § 601.105(d). If the taxpayer files a protest, the case is transferred to the Appeals Division of the Internal Revenue Service, which conducts its own thorough review of the case. *Id*. § 601.106(b). It is only at the end of the IRS's internal appeals process that the agency issues a "determination." *Id*. § 601.106(d); *see also* IRS Notice 2002-5, 2002-3 I.R.B. 320 (Jan. 22, 2002). If the agency agrees with the field auditors that taxes are due, the agency issues a "Notice of **Determination** of Worker Classification." *See* IRS Notice 2002-5; 26 U.S.C. § 7436 (emphasis added). At that point, the taxpayer has 90 days either to pay or file a petition with the United States Tax Court to overturn the Notice of Determination of Worker Classification. *See* IRS Notice 2002-5; 26 U.S.C. § 6213(a). If the taxpayer pays the tax in response to the Notice of Determination of Worker Classification, it may then seek a refund in Federal court. *See* IRS Notice 2002-5. Thus, even if a NOPA is ultimately issued with respect to some or all of the Ground contractors, it is not a "determination" of worker classification, which occurs only upon issuance of the Notice of Determination of Worker Classification. *Id*.

As part of the audit process, FedEx Ground and the IRS have engaged in extensive, ongoing discussions. (Fryt Decl. ¶ 3.) In December 2007, the IRS sent FedEx Ground the draft NOPA. (*Id*.) Its tentative, non-binding nature, is reflected at the top of the form document, where the word "**DRAFT**" appears in bold, capital letters. (*Id*.) Documents from the IRS marked "Draft" are highly preliminary in nature and often are substantially revised in terms of substance and ultimate conclusions. (Decl. of George L. Priest ("Priest Decl.") ¶¶ 7-10 (Doc. No. 1294, Attach. 3).) After FedEx Ground had an opportunity to review the draft NOPA, FedEx Ground met with the IRS to discuss issues raised in the draft, and FedEx Ground's positions with respect to those issues. (Fryt Decl. ¶ 4.) In the experience of those who have

dealt with IRS audits, this post-draft NOPA phase can involve extensive negotiations and review by various levels of IRS officials. (Priest Decl. ¶¶ 7-10.)

**D. The Current Dispute.**

In December 2007, after FedEx Ground disclosed the existence, but not the substance, of the draft NOPA publicly, plaintiffs requested a copy. (Dec. 21, 2007 Faris email, Ellingstad Decl., Ex. 8.) FedEx Ground declined to produce it because it is not a "determination" from a state or federal agency that would fall within the scope of the parties' June 2006 agreement. (Feb. 4, 2008 McGuinness letter, Ellingstad Decl., Ex. 11.) Despite the longstanding agreement, and the fact that their request for the draft NOPA was governed by the agreement, plaintiffs then requested production of the draft NOPA in a new discovery request propounded in the discovery reopened for cases filed in what is known as the "fifth wave" of these proceedings. (Ellingstad Decl., Ex. 15.) FedEx Ground objected on numerous grounds, including that the requested document is not a "determination" and therefore is not discoverable under the parties' June 2006 agreement, is protected from disclosure by the taxpayer privilege, and is "inconsistent with the discovery limits set forth in the Scheduling Order, which reopened discovery on a limited basis." (*Id*.) FedEx Ground also objected to plaintiffs' request to re-open the deposition of Sallie Ford on the ground that the issuance of a draft NOPA – "a document which is not even subject to production under the terms of the parties' discovery agreement" – does not constitute good cause to reopen a deposition that closed on November 8, 2006. (Feb. 4, 2008 McGuinness letter, Ellingstad Decl., Ex. 11.)

Plaintiffs moved to compel production of the draft NOPA and a corporate designee deposition regarding the IRS audit on May 9, 2008. On August 21, 2008, Magistrate Judge Nuechterlein granted their motion over FedEx Ground's opposition.

## III. ARGUMENT

The Order should be set aside because it is "clearly erroneous." Fed. R. Civ. P. 72(a). A magistrate judge's order is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Jochims v. Isuzu Motors*, 151 F.R.D. 338, 340 (S.D. Iowa 1993) (quotation omitted). As discussed below, the Order is erroneous because: (1) it fails to adequately protect the confidentiality of communications between taxpayers and the government; (2) applies inconsistent standards to plaintiffs and FedEx Ground in terms of the discoverability of that information; and (3) fails to accord significance to the fact that the document is a ***draft*** of a document that if ever issued would be only a ***proposed*** assessment. In compelling production, the Order also errs in ignoring the written agreements the parties expressly made over two years ago that preclude discovery into such matters. Without requiring any showing by plaintiffs as to why they should be permitted to renege on those agreements, the Order denies FedEx Ground the benefit of its negotiated bargain with plaintiffs – ***a bargain that included compromises on numerous other discovery issues resulting in the production of information and witnesses that FedEx Ground otherwise might not have had any obligation to produce.*** This decision also contravenes the Court's stated policy on extrajudicial resolution of discovery disputes, and deprives FedEx Ground of legally-recognized protection for its tax-related material. For similar reasons, the Magistrate Judge's decision to reopen the deposition of Ms. Ford is also inappropriate.

### A. The Order Fails to Consider and Apply the Parties' Agreement Addressing FedEx Ground's Obligation Regarding Production of the Draft NOPA.

Extrajudicial resolution of discovery disputes is encouraged in the federal courts, especially in complex proceedings. Indeed, one cannot bring a motion concerning a discovery dispute in this jurisdiction without certifying that the parties have "in good faith conferred or

attempted to confer with the person or party in an effort to resolve the matter without court action." L.R. 37.1. This Court has repeatedly emphasized the value of cooperation in these proceedings, particularly with respect to discovery matters. *See, e.g.*, Practice and Procedure Order at 5 (Doc. No. 2) ("Cooperation by and among plaintiffs' counsel and by defendants' counsel is essential for the orderly and expeditious resolution of this litigation."); Initial Scheduling Order at 11 (Doc. No. 52) ("The parties are expected to work cooperatively and in good faith to limit the costs of discovery."). Indeed, at one point the Magistrate Judge noted "that multi-district litigation is more complex than a normal case and may require additional time from trial counsel. In order to ensure that the case proceeds smoothly, all parties must cooperate with one another and closely abide by the Federal Rules of Civil Procedure and this Court." Mar. 24, 2006 Order at 8 (Doc. No. 215). He reiterated his expectation that the parties use "best efforts to resolve [discovery] matters without court intervention." *Id*. at 8-9; *see also Chicago District Council of Carpenters Pension Fund v. Peter Schwabe, Inc.*, No. 85 C 351, 1986 WL 5020, at *1 (N.D. Ill. Apr. 24, 1986) ("Extrajudical settlements are to be encouraged in keeping with the congressional intent behind the 1980 amendment to Rule 34"). The Manual for Complex Litigation also recognizes the need for extrajudicial discovery dispute resolution in complex multidistrict litigation, noting that counsel "need to communicate constructively and civilly with one another and attempt to resolve disputes informally as often as possible." Manual for Complex Litigation §10.21 (4th ed. 2005).

The parties followed this approach in addressing plaintiffs' broad requests for tax investigation information made early in discovery. They engaged in good-faith discussions that led to an agreement restricting production to "***determinations*** from any state or federal taxing agency ***which have decided the issue*** of whether individuals providing pickup and delivery

services for FedEx Ground are independent contractors or employees." (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5) (emphasis added).) Accordingly, FedEx Ground is only required to produce "determinations" "decid[ing]" the classification issue from "state or federal taxing agenc[ies]." The agreement obviated the need to bring this dispute to the Court's attention. Indeed, it was only when plaintiffs desired to get a document beyond the scope of the agreement – nearly two years after the parties reached consensus – that they reopened this resolved issue, necessitating the Court's involvement.

The Order does not address the parties' agreement, nor does it recognize the carefully negotiated and vitally important confines that the agreement places on plaintiffs' right to obtain FedEx Ground's tax records. *See* Order at 3-7. Despite the fact that FedEx Ground obtained an agreement from plaintiffs to limit their access to its tax records, and made concessions on other document requests in order to resolve the dispute without Court intervention, the Order does not acknowledge or address the agreement. Instead, it decides that plaintiffs' request for the draft NOPA is proper as a new request brought in the fifth wave of discovery, apparently outside the confines of the parties' extensively negotiated agreement. *Id*. at 4-5. As plaintiffs acknowledge, however, their fifth wave request falls within their earlier requests for production of tax documents that were subject to the parties' negotiated resolution. (*See, e.g.*, Pls.' Am. Mot. to Compel at 11 (Doc. No. 1283) (contending that the draft NOPA falls within the scope of RFPs subject to the parties' agreement); *see also* Ellingstad Decl. Exs. 8 & 10 (plaintiffs' requests for the draft NOPA as supplementation of their prior requests, made before plaintiffs propounded their fifth wave request).) They also acknowledge that the June 2006 agreement governs their "new" document request. (*See* Ellingstad Decl. Exs. 10 & 12 (letters from plaintiffs contending that the draft NOPA is a "determination" addressed by the parties' June 2006 agreement).) By

neglecting to address the June 2006 agreement, the Order in effect strips FedEx Ground of the benefit of its bargain with plaintiffs, and permits an end run around this and perhaps other discovery agreements by simply propounding new duplicative document requests. This result is inconsistent with the Court's policy favoring extrajudicial resolution of discovery disputes, and will discourage such informal resolutions in the future.

Under the parties' agreement, only "determinations…which have decided" the employment classification issue rendered by a state or federal taxing agency must be produced. As discussed in FedEx Ground's briefing before Magistrate Judge Nuechterlein, the document at issue is a ***draft***, reflecting initial views of IRS auditors regarding an audit that is still in progress. (*See* FedEx Ground's Opp'n to Pls.' Am. Mot. to Compel at 11-12 & n.4 (Doc. No. 1294).) It is not a determination that has decided the classification question and does not reflect the views of the "federal taxing agency." Even if a non-draft NOPA is ever issued, it would only reflect a proposal by field auditors, and would only become a "determination[]…from…[a] federal taxing agency" if the IRS issues a "Notice of **Determination** of Worker Classification." *See* IRS Notice 2002-5; 26 U.S.C. § 7436 (emphasis added). Consequently, it falls outside of the negotiated scope of FedEx Ground's production obligations, and FedEx Ground should not be required to produce the document.

**B.      The Order Applies the Wrong Standard to Production of Tax-Related Materials and Errs in its Application of the Balancing Test.**

Not only does the Order fail to consider the parties' agreement concerning production of documents, it also fails adequately to safeguard FedEx Ground's tax-related materials. This error appears to flow from not recognizing the nature of the NOPA, which the Order mistakenly refers to as a document the IRS, as opposed to an audit team, "issued" or "produced to" FedEx Ground. Order at 2. Not once does the Order refer to the NOPA as a draft, acknowledge the

tentative and proposed nature of the document, note that it does not reflect the position of the IRS, or discuss the revisions that are likely to be made before the document becomes an IRS document, if ever. *See generally* Order. (*See also* Priest Decl. ¶¶ 7-10.) This error is exhibited by the Order's equating the document to a formal Letter of Assurance that was final and actually executed by the IRS in 1995. Order at 6.

Failing to recognize the nature of the document undermines the Magistrate Judge's analysis of the relevance and discoverability of the document. Specifically, the Magistrate Judge found the document to be discoverable because a threshold issue in the MDL cases is the question of employment classification, and "the NOPA … bear[s] on the IRS's consideration of the issue." *Id*. at 4. But, as noted above, the draft NOPA does not reflect the IRS's position, or even the position of the auditors who drafted it. It is a preliminary ***draft proposal*** from an ongoing audit that is subject to negotiation and change. As such, it does not indicate how the IRS ultimately will decide the independent contractor issue.

The discoverability standard applied in the Order also departs from that applied in the Magistrate Judge's prior decisions and the past decisions of this Court where plaintiffs sought to prevent the production of ***their*** tax returns. Then, plaintiffs claimed that production of their tax information would "undercut[] ***the right*** to maintain ***complete privacy*** between taxpayers and the government." (Pls.' Opp'n to Mot. to Compel at 3 n.3 (Doc. No. 320) (emphasis added).) When FedEx Ground sought the production of plaintiffs' tax information, the Magistrate Judge denied the discovery because the information was not "dispositive" and, even if the information may have a "bearing" on certain issues, there were "many other considerations that will have a far greater impact." Sept. 6, 2006 Order at 6 (Doc. No. 356). In granting plaintiffs' request for FedEx Ground's tax information, however, the Magistrate Judge found that the tax information

case 3:05-md-00527-RLM -CAN document 1602 filed 09/08/08 page 13 of 16

need only "bear on an issue in this litigation" and need not be "admissible," let alone dispositive. Order at 4. This inconsistent approach to the discoverability of tax information is clearly erroneous.

In reviewing the Magistrate Judge's order on plaintiffs' tax information, the Court, recognizing the sensitivity of tax information, did not simply ask whether the material "'bears on, or … reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case,'" as the Magistrate Judge did here. *Id*. (quoting *Chavez v. Daimler Chrysler Corp.*, 206 F.R.D. 615, 619 (S.D. Ind. 2002)). Rather, it asked whether "the tax returns [were] relevant and material to the matters in issue." Dec. 14, 2006 Order at 3 (Doc. No. 451) (quoting *Shaver v. Yacht Outward Bound,* 71 F.R.D. 561, 564 (N.D. Ill. 1976)). The Court found that even though the tax returns contained information concerning how plaintiffs ran their businesses, the documents were only "relevant and material" in cases where opportunity for profit and loss were expressly part of the classification analysis. *Id*. at 10. If information related to how independent contractors structure their businesses is not "relevant and material" to cases unless directly implicated by the classification test, then the preliminary thoughts of IRS auditors on the tax status of contractors surely are not discoverable either.[2]

Moreover, even if the Magistrate Judge was correct that the document was relevant, he erred in determining that its relevancy outweighed the countervailing public policy rationales for protecting disclosure of tax information. Order at 6. As the Magistrate Judge correctly acknowledged, courts have recognized that disclosure of tax information in judicial proceedings could undermine the provision of accurate and complete information to taxing authorities. *Id*. at

[2] Indeed, if FedEx Ground is required to produce a draft tax document because it could bear on an issue in this litigation, there is no reason why plaintiffs should not be required to produce ***final*** tax return documents they had prepared and signed under penalty of perjury and which provide detailed information of their businesses' profit, loss, expenses, and structure.

5.  As courts have recognized, "[t]he self-reporting, self-assessing character of the income tax system would be compromised were [returns] promiscuously disclosed," thereby justifying a public policy against unnecessary public disclosure of tax returns.  *CFTC v. Collins*, 997 F.2d 1230, 1233-34 (7th Cir. 1993); *Premium Serv. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975); *E. Auto Distribs., Inc. v. Peugeot Motors of Am.*, 96 F.R.D. 147, 148 (E.D. Va. 1982).  (*See also* FedEx Ground's Opp'n to Pls.' Am. Mot. To Compel at 14-15.)

In an effort to accommodate this important public policy, the Magistrate Judge engaged in a balancing test, weighing "the relevancy of these documents against the burden for producing them."  Order at 6.  Although he determined that FedEx Ground would not have to produce the draft NOPA if the "the relevancy of the tax documents is slight and it will be needlessly harmed by their public disclosure," the Magistrate Judge did not consider the draft nature of the NOPA and the fact it is at most a preliminary and tentative document.  *Id*.  Instead, as noted above, he erroneously equated the draft NOPA with an IRS Letter of Assurance, contending that production of one necessitates the production of the other.  *Id*.  But the two documents are distinct in vitally important ways.  One represents a final determination of a closed audit; the other is an interim, draft of what may ultimately only be a proposal.  On the latter, FedEx Ground is still providing information and communicating with IRS auditors, thereby placing production of the draft NOPA in conflict with the public policy concern of protecting and encouraging frank communications with the IRS and greatly reducing the relevancy of the document.  This public policy should not be subordinated to the production of a tentative document, particularly in light of the ongoing audit at FedEx Ground.  Accordingly, the Order compelling production of the draft NOPA should be reversed.

**C.      There is No Good Cause to Reopen Ms. Ford's Deposition.**

Plaintiffs also seek to reopen Ms. Ford's deposition, or take the deposition of another FedEx corporate designee, in order to ask questions about matters related to the draft NOPA. The Order grants the request because "the documents were created after Ford's deposition, [and therefore] Plaintiffs clearly could not have questioned Ford at her first deposition regarding the results of the NOPA."  Order at 7.  This conclusion is improper because, as discussed above, FedEx Ground should not be required to produce the draft NOPA.  Moreover, even if the draft NOPA were produced, the decision to permit the deposition to go forward is erroneous because neither Ms. Ford nor any FedEx employee authored the draft document, and therefore little additional information about the document can be gained from their requested deposition.  The benefit of such questioning would be slight, and would not justify subjecting Ms. Ford, or another corporate designee, to a deposition.  *See* Fed. R. Civ. P. 30(a)(2); Fed. R. Civ. P. 26(b)(2).  Moreover, a final NOPA will eventually be authored and will likely look different than the draft does today, further diminishing the value of plaintiffs' requested exercise.  (Priest Decl. ¶¶ 7-10.)

To the extent plaintiffs desire to question Ms. Ford or a corporate designee about matters beyond the draft NOPA related to the IRS tax audit, the request is burdensome and risks opening a Pandora's Box leading to delay and harassment.  If depositions were reopened whenever a new document was drafted, discovery would never close and FedEx Ground's witnesses would be subject to continuous interference and harassment.  FedEx Ground has not sought to redepose any named plaintiff due to changed circumstances, such as the sale of a service area. Furthermore, the IRS audit is ongoing.  If plaintiffs' request for this deposition is granted, FedEx Ground will be faced with the stark reality that anything disclosed in its dealings with the IRS will be subject to discovery in these proceedings.  The creation of that type of environment can

only hinder the IRS and FedEx Ground's efforts to work through the audit process. The ongoing nature of the audit also begs the question of whether plaintiffs will demand another deposition when the audit closes.[3] For these reasons, the Order's reopening of Ms. Ford's deposition is erroneous and should be corrected.

## IV. CONCLUSION

For the foregoing reasons, FedEx Ground respectfully requests that this Court set aside the Order and deny plaintiffs' motion to compel production of the draft IRS NOPA and related deposition of a corporate designee.

Dated: September 8, 2008

Respectfully submitted,

By:

/s/ Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Michael G. McGuinness
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

[3] Indeed, if the Court affirms the Order, it should limit the plaintiffs to one additional deposition of Ms. Ford or a corporate designee on tax matters. Plaintiffs should not be allowed to return to the Court at some later time to seek yet a third deposition.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527 RM (MDL-1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

ORDER

FedEx Ground moves to hold in abeyance the rulings on the parties' motions for summary adjudication [Doc. No. 1554]. FedEx requests that the court abstain from issuing any summary judgment orders until after the close of the opt-out periods in all of the actions consolidated into the MDL proceedings. Recognizing the relevance of the one-way intervention rule, the court will not issue a merits decision in any class in which the opt-out period has not yet passed. *See* Amati v. City of Woodstock, 176 F.3d 952, 957 (7th Cir. 1999). Unlike a typical MDL proceeding, however, this proceeding involves separate actions that are each governed by the state law applicable to that particular class. Accordingly, the court DENIES FedEx's motion to the extent it requests that the court stay rulings until after the expiration of all the opt-out periods.

SO ORDERED.

ENTERED: September 17, 2008

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY**

In opposing the MDL plaintiffs' motion for summary judgment based on collateral estoppel (Docket No. 1194), Defendant FedEx Ground Package System, Inc. respectfully submits the attached supplemental authority, which became available after FedEx Ground submitted its opposition brief (Docket No. 1397) on June 9, 2008. *See* Order Denying Plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel in *Anfinson v. FedEx Ground Package System, Inc.*, Case No. 04-2-39981-5SEA (Wash. Sup. Ct., Sept. 4, 2008) (attached as Exhibit 1).

The *Anfinson* case is a lawsuit, now pending in state court, challenging FedEx Ground's independent contractor classification in the state of Washington. Prior to remand by this Court on May 15, 2006 (Docket. No. 255), *Anfinson* was a constituent action in this MDL proceeding. The plaintiffs in *Anfinson* – like the MDL plaintiffs here – asked the court to enter partial summary judgment, finding that the members of the certified class were "employees," based on

the purported collateral estoppel effect of the California state court decision in *Estrada v. FedEx Ground*.

As shown by the attached order, the court in *Anfinson* rejected plaintiffs' arguments concerning the collateral estoppel effect of *Estrada* and denied plaintiffs' motion. (*See* Exhibit 1 at 2.) FedEx Ground submits this supplemental authority in support of its opposition to the MDL plaintiffs' request to give preclusive effect to the decision in *Estrada*. (*See* Docket No. 1397.) Although FedEx Ground has not attached to this Notice the parties' briefing on the *Anfinson* plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel, it will promptly provide that briefing should the Court wish to review it.

Dated: September 22, 2008.

Respectfully submitted,

By: */s/ Evelyn L. Becker*____
Evelyn L. Becker

Thomas J. Brunner
Alison G. Fox
Baker & Daniels LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22d day of September, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s Theodore Schroeder        

# Exhibit 1

THE HONORABLE GREGORY P. CANOVA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RANDY ANFINSON, JAMES GEIGER and STEVEN HARDIE, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC., et al.,<br><br>Defendants. | No. 04-2-39981-5SEA<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON COLLATERAL ESTOPPEL**<br><br>~~[PROPOSED]~~ |

This matter came on regularly before the Court for hearing upon Plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel. The Court has considered the arguments of counsel and reviewed the records and files herein, including:

1. Plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel;

2. Declaration of Counsel Dmitri Iglitzin in Support of Plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel and Exhibits A thru N attached thereto;

3. Appendix of Documents submitted by plaintiffs;

CORR CRONIN MICHELSON BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

ORIGINAL

4. List of Non-Washington Authorities Cited in Support of Plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel;

5. FedEx Ground's Opposition to Plaintiffs' Motion for Partial Summary Judgment based on Collateral Estoppel;

6. Declarations of Emily J. Brubaker; Guy P. Michelson and Kelly P. Corr and all the documents attached thereto; and

7. Appendix of Non-Washington Authorities; ~~and~~

8. ______________________________;

9. ______________________________;

10. ______________________________;

11. ______________________________;

Now, the Court considering itself fully advised, IT IS HEREBY ORDERED that Plaintiffs' Motion for Partial Summary Judgment Based on Collateral Estoppel is DENIED.

DATED this 4th day of September, 2008.

JUDGE GREGORY P. CANOVA

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Respectfully submitted:

**CORR CRONIN MICHELSON BAUMGARDNER & PREECE LLP**

Kelly P. Corr, WSBA No. 555
Guy P. Michelson, WSBA No. 7017
Kevin C. Baumgardner, WSBA No. 14263
Emily J. Brubaker, WSBA No. 35763

**O'MELVENY & MYERS LLP**

Chris A. Hollinger, Admitted *Pro Hac Vice*

Attorneys for Defendant FedEx Ground Package System, Inc.

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

## CERTIFICATE OF SERVICE

The undersigned hereby declares as follows:

1. I am employed at Corr Cronin Michelson Baumgardner & Preece LLP, attorneys for record for Defendant FedEx herein.

2. On July 28, 2008, I caused a true and correct copy of the foregoing document to be duly served via Legal Messenger on the following parties:

Martin S. Garfinkel
William Rutzick
Schroeter Goldmark & Bender
810 Third Avenue, Suite 500
Seattle, WA 98104
Email: garfinkel@sgb-law.com

Dmitri Iglitzin
Lawrence R. Schwerin
Schwerin Campbell Barnard LLP
18 W. Mercer St., Suite 400
Seattle, WA 98119
Email: iglitzin@workerlaw.com

*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED: July 28, 2008, at Seattle, Washington.

[signature]
Antesha Esteves

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S RULING REGARDING PRODUCTION OF THE IRS NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

## INTRODUCTION

Defendant FedEx Ground Package System, Inc. ("FXG") asks the Court to set aside the Magistrate Judge's order compelling FXG to produce a document that bears directly on the central issue in this litigation—an IRS Notice of Proposed Assessment ("NOPA") finding that FXG's pickup and delivery drivers are properly classified as employees. Stuck with the fact that the NOPA is indisputably relevant and not privileged, and thus discoverable, FXG raises a smokescreen of baseless objections.

First, FXG argues that the NOPA is barred from discovery because it is a "draft," "tentative" notice and therefore not a "determination" such as those FXG agreed to disclose. FXG omits the operative part of the parties' discovery agreement, which states that FXG will produce determinations "even though they may be on appeal or otherwise subject to challenge." FXG goes so far as to accuse Plaintiffs of "reneging" on the agreement. Actually, FXG is doing

the reneging, refusing to produce the NOPA despite previously producing -- pursuant to the parties' same agreement -- a Proposed Notice of Assessment from the California Employment Development Department that was also "tentative" and subject to further discussion with the taxing authority.

Second, FXG argues that the NOPA is protected from disclosure under the public policy against unnecessary disclosure of tax returns. But the NOPA is not a tax return, and its disclosure is relevant to counter FXG's repeated reliance on the IRS's opinion in its 1995 Letter of Assurance.

Third, FXG argues that the Magistrate Judge applied a different standard to discovery of the NOPA than he did to discovery of Plaintiffs' tax returns. This is absolutely false, although even if it were true it would not matter. The public policy applicable to the disclosure of tax returns does not apply to the NOPA, which is not a tax return. In any event, FXG's argument that the Magistrate Judge applied a different analysis than in his August 2006 Order is misleading because, as FXG well knows, that order was overruled in part by this Court. In this case, the Magistrate Judge was obligated to -- and appropriately did -- follow the analysis contained in this Court's order compelling production of Plaintiffs' tax returns where they were relevant and material to the litigation. FXG does not even come close to reaching the high, clearly erroneous standard necessary to overturn the Magistrate Judge's order compelling production of the NOPA. Plaintiffs respectfully request that FXG's Motion to Reconsider be DENIED.

## FACTUAL BACKGROUND

### I. THE PARTIES' DISCOVERY AGREEMENT

In February 2006, Plaintiffs served their First Set of Requests for Production of Documents ("First RFP") on FXG. The First RFP included the following requests:

> 23. Any document(s) from or relating to any state or federal court, state or federal agency or any other decision of any kind in which Defendant's "independent contractor" classification has been adjudicated, reviewed, resolved, investigated, settled or in any manner addressed and all documents relating to any such case. This request includes but is not limited to decisions from any court, the NLRB, EEOC, DOT, IRS, any state workers compensation agency, tax agency, unemployment insurance agency, any state discrimination agency, or any other entity which conducted any investigation or adjudication involving any complaint made by or against any driver.
>
> * * *
>
> 25. Any document(s) received by Defendant from any governmental agency or taxing agency, whether federal or state, regarding the status of any driver in any state.

Declaration of Susan Ellingstad in Supp. of Pls. Am. Mot. to Compel (Doc. 1283 Attach. 2) ("Ellingstad Decl."), Ex.1.

In May 2006, Plaintiffs served on FXG their Third Set of Requests for Production ("Third RFP"), which included the following request:

> Request for Production No. 166:
> Any documents which are, or which refer to, any determination or finding by any state or federal governmental entity, including but not limited to, the Internal Revenue Service, the National Labor Relations Board or the Pennsylvania Department of Labor and Industry, which finds that a package delivery driver who performs services for FedEx Home Delivery in the State of Pennsylvania was an employee of FedEx Home Delivery.

Ellingstad Decl., Ex. 2.

FXG interposed a litany of objections and refused to produce anything other than a "final judgment or decision rendered by a state agency rendered in an adversarial proceeding initiated by or stemming from a complaint made by a member of the putative class against Defendant challenging his or her status as an independent contractor." *Id.*

The parties conducted extensive meet-and-confer sessions regarding FXG's inadequate responses to the RFPs. The parties exchanged a series of letters regarding the dispute and its potential resolution. *See* May 24, 2006 Letter from Michael McGuinness to Lynn Faris

(Ellingstad Decl., Ex. 3); May 31, 2006 Letter from Faris to McGuinness (Ellingstad Decl., Ex. 4). These discussions culminated in an agreement that:

> Defendant will produce determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations <u>even though they may be on appeal or otherwise subject to challenge</u>.

June 26, 2006 letter from McGuinness to Faris (Ellingstad Decl., Ex. 5) (emphasis added).

## II.     FXG MOVES TO COMPEL PRODUCTION OF PLAINTIFFS' TAX RETURNS, AND THE COURT GRANTS THE MOTION IN PART

On July 10, 2006, FXG filed a motion to compel Plaintiffs to produce their tax and financial records. Sept. 6, 2006 Order (Doc. 356) ("September 2006 Order") at 1. FXG contended that Plaintiffs' tax returns were relevant and probative of Plaintiffs' status as independent contractors, the propriety of class certification, and Plaintiffs' adequacy as class representatives. *Id.* at 3. Plaintiffs opposed the request on the grounds that they had already admitted that they filed as independent contractors. *Id.* at 3-4.

The Magistrate Judge recognized that federal income tax returns are subject to discovery when they are relevant and material to the matters in issue. *Id.* at 3. The Magistrate Judge found, however, that Plaintiffs' tax returns had "questionable relevance" to their independent contractor status, because FXG had essentially forced Plaintiffs to file tax returns as independent contractors, and because Plaintiffs already had <u>admitted</u> that they did so. *Id.* at 4; *see* Resp. No. 2, Pls. Resp. to Defs. Request for Admissions. In light of this questionable relevance and the "vast amount of documentation" FXG requested, the Magistrate Judge found that the tax returns were not discoverable on the issue of liability. *Id.* The Magistrate Judge noted that he was "not convinced that Plaintiffs' subjective belief that they were independent contractors is dispositive of whether they were." *Id.* at 4.

Turning to FXG's argument that the tax returns were relevant to class certification, the Magistrate Judge found that the tax returns related primarily to damages and thus were "not relevant to class certification of liability." *Id.* at 5.[1] The Magistrate Judge explained that the "unmeasured amount of documentation" demanded by FXG was "not important enough" to warrant discovery. *Id.* at 5-6. The Magistrate Judge summarized the reasons for his denial of FXG's motion: "because class certification will primarily turn on liability, because Defendant's request is so large, and because the tax returns have little bearing on whether Plaintiffs are adequate class representatives, Plaintiffs' tax returns are not discoverable at this time." *Id.* at 6.

FXG moved this Court to reconsider the Order, arguing that the Magistrate Judge "incorrectly required [FXG] to demonstrate a compelling need to obtain information." Dec. 14, 2006 Order (Doc. 451) ("December 2006 Order") at 3. This Court corrected FXG's characterization of the Order: "the September 6 Order doesn't require such a showing. The order states that tax returns generally are discoverable where a litigant tenders an issue as to the amount of his income." *Id.* at 3 (internal quotations omitted).

The Court, however, disagreed with the Magistrate Judge on one point: the Court found that Plaintiffs' tax returns were relevant to determining the economic reality of the Plaintiffs' working relationship with FXG. *Id.* at 7. The Court therefore granted FXG's motion to compel production of Plaintiffs' tax returns for those Plaintiffs who alleged FLSA or FMLA claims, which apply the economic realities test. *Id.* at 13.

## III. FXG DISCLOSES THE NOPA TO THE SEC AND ITS SHAREHOLDERS AND PLAINTIFFS REQUEST IT

On December 21, 2007, FXG informed the SEC and its shareholders in its 10-Q Report that the IRS "had concluded an audit for the 2002 calendar year regarding the classification of

[1] Because damages discovery was bifurcated, the tax returns were not requested to determine income, expenses, or any issue relating to damages.

case 3:05-md-00527-RLM-CAN document 1614 filed 09/26/08 page 6 of 27

owner-operators at FedEx Ground" and "tentatively concluded . . . that FedEx Ground's pick-up-and-delivery owner-operators should be reclassified as employees for federal income tax purposes," and "anticipates assessing tax and penalties of $319 million plus interest for 2002." Dec. 21, 2007 10-Q (Doc. 1068) ("SEC Filing") at 19 (emphasis added). This determination by an IRS field examination team—the culmination of a four-year audit[2] of FXG's business model —is the most recent and authoritative statement about FXG drivers' employment status from the IRS, whose prior statement, the 1995 Letter of Assurance ("Letter of Assurance"), negotiated as part of a settlement, has been the centerpiece of FXG's defense in this case.

On the same day FXG released its 10-Q, Plaintiffs requested that FXG produce the document it had received from the IRS. December 21, 2007 email from Faris to McGuinness (Ellingstad Decl., Ex. 8). Despite that it is obligated under Rule 26(e) to supplement its discovery responses, FXG refused, claiming that the NOPA fell outside the parties' discovery agreement reflected in the June 26, 2006 letter. FXG incorrectly stated that, under the June 26 agreement, FXG was only required to produce determinations from state or federal taxing agencies that had "resulted from an independent adversarial proceeding." January 15, 2008 letter from Mike McGuinness to Lynn Faris (Ellingstad Decl., Ex. 9). FXG also contended that it would not produce the NOPA because it was protected by "the taxpayer privilege." *Id.*

In response, Plaintiffs pointed out that FXG had misstated the parties' agreement. January 23, 2008 letter from Faris to McGuinness (Ellingstad Decl., Ex. 10). Plaintiffs had never agreed that FXG need only produce "determinations resulting from an adversarial proceeding." *Id.* Moreover, Plaintiffs noted that, to the extent any taxpayer or other privilege might attach to communications to FXG from the IRS, it had long since been waived by FXG's repeated reliance on the IRS Letter of Assurance. *Id.* FXG again refused to produce the NOPA, claiming that the

[2] FXG states that the audit began in December, 2003. Decl. of Michael D. Fryt ¶ 2 (Doc. No. 1294, Attach. 2).

NOPA was not a "determination" because the IRS had not yet issued a Notice of Deficiency. February 4, 2008 letter from McGuinness to Faris (Ellingstad Decl., Ex. 11). Plaintiffs informed FXG that under IRS regulations, a Notice of Proposed Assessment follows an "examination and determination of tax liability" and that all proceedings following issuance of a NOPA are considered and referred to as "appeals." February 8, 2008 letter from Faris to McGuinness (Ellingstad Decl., Ex. 12); *see* 26 CFR § 601.103(b),(c).

In this exchange of meet and confer letters, Plaintiffs also maintained that they had a right to re-open the deposition of Sally Ford, FXG's Rule 30(b)(6) witness on the IRS audit, to question her about new developments with regard to the IRS audit, the NOPA, and the meeting FXG announced it planned to conduct with the IRS in the spring of 2008. Ellingstad Decl., Ex. 12. Ms. Ford had already testified about her interactions with the IRS audit team reviewing the driver classification issue.

## IV. PLAINTIFFS REQUEST THE NOPA AS PART OF FIFTH WAVE DISCOVERY

Plaintiffs also notified FXG that they intended to seek production of the NOPA during Wave 5 discovery, which was about to open and would cover the period since the close of discovery in the Wave 4 cases. *Id.* FXG indicated that it would likely take the same position and continue to decline to produce the NOPA. The parties conferred by telephone on February 14, 2008 and agreed that rather than file an immediate motion to compel production of the NOPA on the grounds that it should have been produced as a Rule 26(e) supplement to prior discovery responses, Plaintiffs would serve, as part of the upcoming discovery for the Wave 5 of MDL cases, a new Request for Production specifically seeking the Notice of Proposed Assessment. February 14, 2008 email from Faris to McGuinness (Ellingstad Decl., Ex. 13). Plaintiffs believed this specific request, covering developments since the prior discovery responses, would eliminate any argument by FXG about whether the NOPA was or was not

covered by the parties' June 26, 2006 agreement. In prior waves of discovery, new developments since the close of earlier waves resulted in an updated production of documents and depositions covering the later period. By including the Wave 5 request, the parties would avoid duplicate motions on the same subject.

The parties also agreed that Plaintiffs would request to redepose Sallie Ford regarding the IRS audit and the NOPA and FXG would respond promptly, so that any resulting motion to compel could include both the NOPA and the 30(b)(6) deposition related to it. May 7, 2008 email from Faris to McGuinness (Ellingstad Decl., Ex. 14).

On March 20, 2008, this Court issued an Order Amending the Case Schedule which permitted the parties to conduct limited discovery on Wave 5 cases by May 30, 2008. (Doc. 1118). Plaintiffs thereafter served FXG with a formal Request for Production of the NOPA in their Ninth Set of Requests for Production ("Ninth RFP"). Ellingstad Decl., Ex. 15. Specifically, Plaintiffs requested "[t]he Internal Revenue Service's Notice of Proposed Assessment provided to FedEx in or about December, 2007 which is described in FedEx Ground's 10-Q Report of December, 2007, whether in draft or final form, regarding the IRS's tentative conclusion of its 2002 audit of FedEx Ground." *Id.*

FXG once again refused to produce the NOPA, this time offering a laundry list of increasingly frivolous objections: (1) the Request is "inconsistent with the Scheduling Order"; (2) the Request is inconsistent with the "discovery limits agreed to by the parties memorialized in the their Joint Memorandum"; (3) the Request is "contrary to the parties' June 26, 2006 letter" in that the NOPA is not a determination; (4) the NOPA is protected by "the attorney-client privilege, the joint defense privilege, the work product doctrine, or any other privilege, protection, or doctrine of similar effect"; (5) the NOPA is protected by the "privilege applicable

to tax returns and tax payers"; (6) the Request seeks "proprietary or confidential business information, trade secrets, or other sensitive information"; and (7) the terms "described in" and "regarding" are vague and ambiguous. Ellingstad Decl., Ex. 15. The parties met and conferred again and were unable to reach an agreement regarding production of the NOPA or the request to depose Ms. Ford regarding new developments in the IRS audit and review.

## V. THE MAGISTRATE JUDGE GRANTS PLAINTIFFS' MOTION TO COMPEL.

On May 9, 2008, Plaintiffs brought a motion under Federal Rule of Civil Procedure 37 to compel production of the NOPA. On August 21, the Magistrate Judge granted the motion. August 21, 2008 Opinion and Order (Doc. 1581) ("August 21 Order"). The Magistrate Judge found the NOPA relevant to the main issue in this litigation—the proper classification of FXG drivers—and that Plaintiffs' request for the NOPA in Fifth Wave discovery complied with the Court's scheduling order because it was limited to one document and one supplemental deposition. August 21 Order at 4. The Magistrate Judge also found that Plaintiffs had good cause to seek the NOPA after the close of discovery, because it did not exist until after the close of discovery. *Id.* at 4-5.

Next, the Magistrate Judge addressed FXG's argument that the NOPA was protected by the public policy against unnecessary disclosure of tax returns. The Magistrate Judge weighed the relevance of the NOPA against the harm to FXG of producing it, concluding that the NOPA's obvious relevance outweighed the potential harm to FXG, particularly because FXG itself placed the IRS's opinion at issue by its frequent reliance on the 1995 Letter of Assurance.[3]

[3] FXG produced, without objection in response to Plaintiffs First RFP, the 1995 Letter of Assurance. Ellingstad Decl. ¶ 17, Ex. 16. The Letter of Assurance is the result of a negotiated agreement between FXG and the IRS and states that "operations conducted in accordance with the terms of its revised agreement for periods beginning after January 1, 1994, will not be inconsistent with treatment of the drivers as independent contractors." *Id.*, Ex. 16 at 1. Since producing the Letter of Assurance, FXG has repeatedly relied upon it in court filings, referring to it in at least 16 of its briefs in opposition to class certification (*see, e.g.*, *Alexander* at 9, n.15 (Doc. 610)) and its Rule 23(f) petition to the Seventh Circuit Court of Appeals (Ellingstad Decl., Ex. 17).

*Id.* at 6. The Magistrate Judge also noted that the NOPA was not available from another source and that Plaintiffs' request was very limited. *Id.* FXG now challenges the Magistrate Judge's order.

## STANDARD OF REVIEW

Magistrate judges are given wide discretion in discovery rulings. *See Soma Med Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1300 (10th Cir. 1999). "Because a magistrate judge is afforded broad discretion in the resolution of non-dispositive discovery disputes, the court will overrule the magistrate's determination only if his discretion is abused." *Comeau v. Rupp*, 142 F.R.D. 683, 684-85 (D. Kan. 1992). Stated another way, a magistrate judge's ruling may not be disturbed even if it appears "maybe or probably wrong"; rather, it must "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).

## ARGUMENT

### I. THE NOPA IS A DETERMINATION THAT MUST BE DISCLOSED AS A SUPPLEMENT TO PRIOR DISCOVERY.

#### A. The NOPA Is a Determination.

FXG contends that the NOPA is not a "determination" because it is stamped "draft." Defs. Mem. In Supp. of Mot. for Reconsideration (Doc. 1602) ("Def. Br.") at 11. A "determination" is "the act of making or arriving at a decision," or "the decision reached."[4] The NOPA reflects the decision reached by the IRS field examination team following a four-year audit of FXG that began in December 2003 and concluded, according to FXG's 10-Q Report, in

[4] Dictionary.com. The American Heritage Dictionary of the English Language, Fourth Edition. Houghton Mifflin Company, 2004. http://dictionary.reference.com/browse/determination (accessed: Sept. 19, 2008).

December 2007.[5]  This decision, described by FXG itself as a "tentative conclusion," is a "determination" in plain language, whether preliminary or not.

FXG's contention that the NOPA is not a "determination" within the meaning of the parties' agreement because it is not titled a "Notice of Determination of Worker Classification," Def. Br. at 11, is simply disingenuous.  As FXG well knows, it agreed with Plaintiffs to produce "determinations" from state and federal taxing agencies within the ordinary meaning of that word, not a technical definition found in the Internal Revenue Code or elsewhere.  Nothing in the agreement itself or the discussions that preceded it suggests that FXG or Plaintiffs agreed that "determination" had any specialized, technical meaning.

Even if the technical meaning of "determination" were at issue, documents issued prior to a "Notice of Determination of Worker Classification" are still called "determinations" in IRS procedure.[6]  FXG's citation to 26 U.S.C. § 7436 for the proposition that only a "Notice of Determination of Worker Classification" is known as a "determination," is false.  Def. Br. at 11.  Section 7436 grants the Tax Court jurisdiction to decide whether IRS determinations of employment status are correct, but does not suggest that only a final notice issued by the Secretary may be called a "determination."

In a disturbing lack of candor, FXG repeatedly quotes the parties' discovery agreement but omits the operative language which belies FXG's argument to this Court: FXG will produce determinations "**even though they may be on appeal or otherwise subject to change**." Ellingstad Decl. Ex. 5 (emphasis added).  All of FXG's shrill protests about the "preliminary,"

---

[5] FXG asserts that the audit is ongoing, despite informing the SEC and its shareholders that the audit "had concluded."  SEC Filing at 19.  Even if FXG's efforts to negotiate a settlement with the IRS are ongoing, the NOPA was issued at the conclusion of a four-year audit process.

[6] *See, e.g.*, 26 C.F.R. § 601.105(d)(1) ("The report of the examiner, as approved after review, recommends one of four determinations.") (emphasis added); *id.* ("The 30-day letter is a form letter which states the determination proposed to be made.  It is accompanied by a copy of the examiner's report explaining the basis of the proposed determination.") (emphasis added).

"tentative," "draft" nature of the NOPA mean nothing more than that the determination of the IRS audit team is "on appeal or otherwise subject to challenge." The phrase "or otherwise subject to challenge," plainly encompasses any type of reconsideration, including the types described by FXG in its brief, i.e., after discussion with the tax agencies about their conclusions. This language in the parties' agreement means that FXG agreed to produce decisions and conclusions that are not "final." If the IRS changes its field team's determination that FXG P&D drivers are employees for tax year 2002, FXG can and assuredly will bring that fact to the Court's and Plaintiffs' attention and will rely on that decision just as it has with the 1995 Letter of Assurance. In the meantime, the fact that the NOPA—the most recent decision out of the IRS since 1995—is subject to challenge does not remove it from the  parties' agreement. To the contrary, it fits squarely within, and was expressly contemplated by, the parties' agreement.[7]

FXG makes the remarkable assertion that the NOPA not only does not reflect the IRS's determination, but also "does not reflect . . . even the position of the auditors who drafted it." Def. Br. at 12. FXG's Vice President of Tax, Ms. Ford, testified that this audit team met with her personally approximately 15-16 times. Ford Deposition at 24-35, attached to Second Declaration of Susan Ellingstad (Doc. 1402) at Exhibit 5. Ms. Ford testified that she provided this audit team with true, accurate, and complete information. *Id.* at 73-74. Yet FXG would have the Court believe that the IRS audit team, at the conclusion of an audit spanning four years, issued a notice bearing no relation to the results of that audit. The idea that a rogue audit team indiscriminately issued the NOPA without consulting other authorities at the IRS is all the more

---

[7] The Magistrate Judge properly ignored the affidavit of George L. Priest. Mr. Priest, a regular FXG witness, is offered as an expert witness on IRS procedure based on one long-pending case. His identity has never been disclosed to Plaintiffs in this case and his use, therefore, is improper. Mr. Priest concedes that he "surely do[es] not speak for the I.R.S.," (*id.* at 3), and his conclusion that the terms of the NOPA "may not resemble in any significant way the terms of a final determination by the I.R.S." (*id.*) is pure speculation from a single experience unrelated to the type of IRS audit involved here. His declaration should be disregarded.

absurd given the existence of the negotiated agreement between FXG and the IRS that resulted in the 1995 Letter of Assurance.

FXG's suggestion that the NOPA is meaningless is further belied by the fact that FXG believed it was compelled to disclose the existence of the NOPA to the SEC and its shareholders. A corporation is only required to disclose "material" risks in a Form 10-Q, and "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). A reasonable investor would attach no significance to a document that did not even reflect the position of the auditors who wrote it. Even FXG does not buy the story it is selling to the Court.

Especially significant is the audit team's conclusion that it may impose penalties for FXG's misclassification of its drivers despite the earlier Letter of Assurance. That penalties were assessed means that the IRS concluded FXG did not have even a reasonable basis for treating its P&D drivers as independent contractors and could not avail itself of the safe harbor provision of Section 530 of the Revenue Act of 1978. *See Nu-Look Design, Inc. v. C.I.R.*, 356 F.3d 290, 294 (3d Cir. 2004) (describing how the "safe harbor" provision allows a taxpayer to avoid liability for certain federal employment taxes if the taxpayer had a "reasonable basis for not treating such individual as an employee") (citing Section 530 of the Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763, 2885-86, § 530(a)(1) (reproduced at 26 U.S.C. § 3401 note)).

**B. FXG Has Already Produced a "Proposed Notice of Assessment."**

If there could be any further doubt whether the NOPA is a "determination" discoverable under the parties' discovery agreement, FXG has resolved it by producing, in the ordinary course of discovery, a "Proposed Notice of Assessment" issued by the California Employment Development Department ("EDD"). Ellingstad Decl., Ex. 18. The Notice informed FXG that the California EDD proposed a tax adjustment of nearly $8 million based on misclassification of

employees. *Id.* The Notice further informed FXG that "[t]he above amounts are based upon preliminary audit findings," that FXG "may contact the auditor at the phone number shown above to request a conference," and that FXG may wish to meet with the audit supervisor to correct inaccuracies "before an Official Notice of Assessment is issued." *Id.* Exactly like the NOPA that FXG now refuses to produce, the Proposed Notice of Assessment was preliminary and subject to further discussion between the California EDD and FXG as well as further proceedings, including a full adversarial hearing before an administrative law judge that occurred subsequent to the issuance of the Notice. *Id.*

FXG's production of the Proposed Notice of Assessment in the ordinary course of discovery, as "material responsive to Request Nos. 23-24, and Nos. 77-79 of the Plaintiffs' First and Second Requests for Production" (Ellingstad Decl., Ex. 18), months after memorializing the parties' discovery agreement on June 26, 2006, demonstrates that FXG understood from the outset that it was obligated to produce agency determinations even if they were "preliminary" and subject to further proceedings.

## II.     THE MAGISTRATE JUDGE APPLIED THE CORRECT STANDARD.

### A.     The Magistrate Judge Recognized the Public Policy Against Unnecessary Disclosure of Tax Returns.

FXG contends that the Magistrate Judge clearly erred in determining that the obvious relevance of the NOPA outweighs the "countervailing public policy rationales for protecting disclosure of tax information." Def. Br. at 13. Not so: the Magistrate Judge properly applied the rule in this Circuit that income tax returns in the taxpayer's custody or control are discoverable where the party has put those returns at issue. Order at 5-6; *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 74 (7th Cir. 1992).

The purpose of the policy against unnecessary disclosure of tax returns is to encourage taxpayers to be truthful in their tax returns without fear of legal exposure in other contexts. The tax return system is one of self-assessment, in which "each taxpayer (or person required to collect and pay over the tax) is required to file a prescribed form of return which shows the facts upon which tax liability may be determined and assessed." 26 C.F.R. § 601.103(a). Thus, the public policy against public disclosure of tax returns encourages taxpayers to file accurate returns. *See CFTC v. Collins*, 997 F.2d 1230, 1233 (7th Cir. 1993).

This policy is not implicated by disclosure of the NOPA. Once the IRS has selected a return for examination, the system is no longer one of self-reporting. Examiners are authorized to, and will, "check the entire return filed by the taxpayer and will examine all books, papers, records, and memoranda dealing with matter required to be included in the return." 26 C.F.R. § 601.105(b)(1), (b)(3). The IRS audit team has access to whatever information it chooses to review; the examinee prepares and files nothing; and there is no need for a policy encouraging truthfulness.

Even if a heretofore-unrecognized privilege did attach to the NOPA, FXG has waived it. FXG has produced and placed at issue the IRS's opinion in the 1995 IRS Letter of Assurance, which like the NOPA was prepared by the IRS with respect to the determination of the existence of tax liability. FXG cannot produce allegedly privileged documents that support its position, then cry "privilege" when similar documents from the same taxing agency are found that support Plaintiffs' position. "Production of some privileged documents waives the privilege as to all documents of the same subject matter." *Chinnici v. Cent. DuPage Hosp. Ass'n*, 136 F.R.D. 464, 465 (N.D. Ill. 1991). FXG also has produced the "tentative," "subject to change" Proposed Notice of Assessment from the California EDD. The Proposed Notice of Assessment was

prepared by the California EDD and determined the existence of tax liability on the part of FXG, just like the NOPA, so any privilege that applied to the NOPA also applied to the PNOA and is waived.

The Magistrate Judge faithfully considered these public policy issues. He "weigh[ed] the relevancy of [the NOPA] against the burden for producing [it]," and found "that the relevancy of the NOPA document outweighs any harassment or embarrassment that Fedex will suffer if the NOPA is disclosed." August 21 Order at 6. The Magistrate found that FXG had placed the IRS's opinion in issue, that the NOPA was not available from another source, and that the request was limited. *Id.* Nothing about this weighing, or its result, is clearly erroneous.

**B.      The Order Is Consistent with this Court's Order and the Magistrate Judge's Order Regarding Plaintiffs' Tax Returns.**

FXG also contends that the "discoverability standard applied in the Order [] departs from that applied in the Magistrate Judge's prior decisions and the past decisions of this Court where plaintiffs sought to prevent the production of their tax returns." Def. Br. at 12 (emphasis omitted). Nothing about this contention is accurate. First, the September 2006 Order related to production of tax returns, which are subject to a policy against unnecessary disclosure. Documents produced by the IRS are not subject to the same policy.

Second, FXG's statement that the Magistrate Judge declined to compel production of Plaintiffs' tax returns in 2006 because the information was not "dispositive," Def. Br. at 12, is an egregious misrepresentation. The Magistrate Judge denied FXG's motion to compel because the "vast amount of documentation" FXG requested could not be justified by the "questionable relevance" of those documents to liability, class certification, or adequacy of representation. September 2006 Order at 5-7. FXG lifts from context and misrepresents the Magistrate Judge's passing remark that he was "not convinced that Plaintiffs' subjective belief that they were

independent contractors is dispositive of whether they were." *Id.* at 4. In the very next sentence he explained: "this Court concludes that the tax returns are not discoverable because they do not meet the relevancy requirement of Rule 26." *Id.* The Magistrate Judge later summarized: "because class certification will primarily turn on liability, because Defendant's request is so large, and because the tax returns have little bearing on whether Plaintiffs are adequate class representatives, Plaintiffs' tax returns are not discoverable at this time." *Id*. at 6. The Magistrate Judge's finding that the NOPA is discoverable because it is relevant is entirely consistent with the September 2006 Order, all the more so because Plaintiffs seek one document while FXG demanded the annual tax returns of every Plaintiff in the case.

The August 21 Order also is consistent with this Court's December 2006 Order reversing the Magistrate Judge in part to compel production of the tax returns of Plaintiffs who asserted FLSA and FMLA claims. FXG acknowledges that this Court applied the "relevant and material" standard in its Order, but asserts that the NOPA is not discoverable because it represents the "preliminary thoughts of IRS auditors." Def. Br. at 13. This is just a rehash of FXG's protests about the "draft", "tentative" nature of the NOPA. Again, just because FXG intends to challenge this decision does not render the decision following a four-year audit irrelevant or immaterial. Furthermore, as the Court recognized in its December 2006 Order, the "relevant and material" standard is a <u>heightened</u> standard for discoverability of tax returns. Plaintiffs are not even required to demonstrate that the NOPA is relevant and material; they are merely required to show that the NOPA is not privileged and "reasonably could lead to other matter[s] that could bear on [] any issue that is or may be in the case." December 2006 Order at 2 (citing *Chavez v. DaimlerChrysler Corp*., 206 F.R.D. 615, 619 (S.D. Ind. 2002)).

FXG also contends that the Magistrate Judge "erroneously equated the draft NOPA with an IRS Letter of Assurance." Def. Br. at 14. The Magistrate Judge did not equate the NOPA with anything; he simply and accurately observed that FXG "has placed at issue the IRS's opinion of its driver model." August 21 Order at 6. The Magistrate Judge acknowledged FXG's claim that the NOPA is not sufficiently probative to contradict the Letter of Assurance, but correctly concluded that this is not a basis for refusal to disclose it. *Id.* The Magistrate Judge's order is consistent with his September 2006 Order and this Court's December 2006 Order, and is not clearly erroneous.

**III. PLAINTIFFS PROPERLY REQUESTED THE NOPA IN THE FIFTH WAVE.**

The June 26, 2006 agreement does not limit Plaintiffs' right to discovery of a specific document that did not exist as of June 26, 2006 and which has now been expressly requested pursuant to Rule 34. The letter summarizing the June 26, 2006 agreement is very specific about which RFPs are covered: "Specifically, our agreement covers request nos. 23 . . ., 24, 25, 77, misnumbered 76 and misnumbered 77." Ellingstad Decl., Ex. 5. The agreement does not limit Fifth Wave discovery.

FXG asserts that Plaintiffs acknowledge that the Fifth Wave request falls within their earlier requests for production. Def. Br. at 10. This is false. Plaintiffs contend that the NOPA is discoverable as a supplement to FXG's responses to Plaintiffs' First RFP and independently discoverable under their specific Fifth Wave request. Plaintiffs' arguments on the two alternative bases for production of the NOPA are not contradictory.

**IV. THE MAGISTRATE JUDGE'S ORDER TO REOPEN MS. FORD'S DEPOSITION WAS NOT CLEARLY ERRONEOUS.**

A court "must grant leave to the extent consistent with Rule 26(b)(2)" for the deposition to be taken of a person already deposed in the case. Fed. R. Civ. P. 30(a)(2). Rule 26(b)(2)

permits the Court to limit discovery if it determines that (1) the discovery sought is cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (2) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (3) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Plaintiffs' request to reopen the deposition of Sallie Ford is neither cumulative nor duplicative, as Plaintiffs seek only to question her about developments with the IRS subsequent to her prior deposition. Her testimony cannot be obtained through any other source. The burden and expense of a narrow reopening of her deposition are minimal, while the potential value of her testimony to the Court and this litigation is high. The IRS field examination team has issued a proposed assessment of $319 million for one tax year, concluding after a four-year audit that FXG P&D drivers should have been classified as employees. This significant development—the first opinion since 1995 from the IRS on the central issue in this litigation—constitutes good cause to reopen the deposition of Sallie Ford.

The August 21 Order recognized all of this and properly ordered that Plaintiffs would be permitted to conduct "a very narrow and targeted deposition" of Ms. Ford related only to new issues. August 21 Order at 7. This order is not clearly erroneous.

## CONCLUSION

The NOPA is relevant and not privileged. It is a determination in the ordinary meaning of the word as used in the parties' discovery agreement, as evidenced by FXG's earlier production of a similar tentative, proposed assessment from the California EDD. The Magistrate

Judge properly applied the public policy concerns regarding disclosure of the NOPA, and nothing about his order is clearly erroneous. FXG's Motion to Reconsider should be denied.

Dated: September 26, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
Beth A. Ross
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
baross@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on September 26, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **George A. Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |

**Lynn Rossman Faris** lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; aahn@leonardcarder.com

**Monica Ferraro** mferraro@bnhmlaw.com

**Robert K. Firsten** rfirsten@firstenlaw.com

**Edward R. Forman** eforman@ee.net

**Wood R. Foster Jr** woodfoster@sbgdf.com; heidifurlong@sbgdf.com

**Alison G. Fox** Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Philip Stephen Fuoco** pfuoco@msn.com

**Martin S. Garfinkel** garfinkel@sgb-law.com; helm@sgb-law.com

**Michael W. Garrison, Jr.** mgarrison@omm.com

**R. Christopher Gilreath** chrisgil@sidgilreath.com

**Eileen S. Goodin** egoodin@bnhmlaw.com

**Michael Gorby** mgorby@gorbypeters.com; rwright@gorbypeters.com

**Deborah R. Grayson** drgrayson@fuse.net

**Robert K. Handelman** rhandelman@bnhmlaw.com

**Robert I. Harwood** rharwood@hfesq.com

**Matthew M. Houston** mhouston@hfesq.com

**Dmitri Iglitzin** iglitzin@workerlaw.com

**Tom A. Jerman** tjerman@omm.com

**Victor H. Jih** vjih@omm.com

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@prle.com; jhunt@prle.com; syoung@prle.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** marshall@ee.net

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Raquel A. Millman** rmillman@omm.com

**Eleanor Morton** emorton@leonardcarder.com

**James Mulroy, II** mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Jeffrey S. Nestler** jnestler@omm.com

**Peter W. Overs Jr.** povers@hfesq.com

**Lesley A. Pate** lapate@venable.com

**Mary Donne Peters** mpeters@gorbypeters.com; rwright@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Nora M. Puckett** npuckett@omm.com; dmeredith@omm.com

**Charles Victor Pyle, III** victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com

**Anne T. Regan** atr@zimmreed.com; kmh@zimmreed.com

**Beth A. Ross** bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com

**J. Gordon Rudd** jgr@zimmreed.com

**Theodore B. Schroeder** tschroeder@omm.com

**Robert M. Schwartz** rschwartz@omm.com

**James A. Staack** jims@staack-firm.com

**R. Jay Taylor Jr.** jtaylor@scopelitis.com; lnewton@scopelitis.com

**Matthew T. Tobin** mtobin@sbslaw.net; lstewart@sbslaw.net

**Jeffrey A. Trimarchi** jtrimarchi@omm.com

**Mary D. Walsh-Dempsey** mdempsey@omalleylangan.com

**Michael J. Watton** jdrewicz@Wattongroup.com

**Andrew M. Weiner** aweiner@omm.com

**Peter D. Winebrake** pwinebrake@winebrakelaw.com

I also certify that on September 26, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN & HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Robert J. Penny
WICK BRAMER UKASICK & TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

case 3:05-md-00527-RLM-CAN document 1614 filed 09/26/08 page 27 of 27

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Dated: September 26, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

United States District Court
Northern District of Indiana

FILED
2008 OCT -3 PM 1:25
STEPHEN ... CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

In Re: Fedex Ground Package System, Inc. Employment Practices Litigation

Jonathan Lee Riches d/b/a Piper Jaffray, movant
Sallie Krawcheck, movant
Mario GaBelli, movant
Philip Falcone, movant
Bruce wasserstein, movant

3:05-md-527-RM (MDL-1700)

Motion For Reconsideration & clarification
Motion to Intervene as Plaintiffs under Fed R.civ P rule 24(A)2, 24(B)

Comes Now the Plaintiffs, Intervenors Jonathan Lee Riches d/b/a Piper Jaffray; Sallie Krawcheck; Mario GaBelli; Philip Falcone; Bruce wasserstein, Moves this court to intervene in this Litigation under Fed R.civ P rule 24(A)2 - as a matter of right or under rule 24(B) - Permissive intervention. Intervenors have a interest in this case, Plaintiffs are economists, and Riches worked for UPS in the 1990s and can give expert testamony on UPS and its rival fedex on how employees are Mistreated. Riches applied for a fedex Job in 2001, but was denied because he was Jewish, this is discrimination. Fedex drivers drive reckless because of low pay and Employment abuse. Plaintiffs move for a Motion for reconsideration to allow us to intervene with new evidence, exh.b Financial graphs, charts, 401K's. Plaintiffs Pray for relief

respectfully,

9-30-08

Sallie Krawcheck
Mario GaBelli
Philip Falcone
Bruce wasserstein
P.O. Box 133
Endicott, NY 13760

Jonathan Lee Riches
d/b/a Piper Jaffray
P.O. Box 340
Salters, SC 29590
843-387-9400

case 3:05-md-00527-RLM-CAN document 1625 filed 10/10/08 page 1 of 13

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S RULING REGARDING PRODUCTION OF THE DRAFT IRS NOTICE OF PROPOSED ADJUSTMENT AND RELATED CORPORATE DESIGNEE DEPOSITION**

## I. INTRODUCTION

After extensive meet and confer efforts regarding Plaintiffs' discovery requests for numerous tax related documents, in June 2006 Plaintiffs and FedEx Ground Package System, Inc. reached an agreement whereby FedEx Ground would produce tax agency "*determinations … which have decided the issue* of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees." (June 26, 2006 letter from Michael McGuinness to Lynn Faris, Ex. 5 to the Declaration of Susan Ellingstad in Support of Pls.' Am. Mot. to Compel ("Ellingstad Decl.").) The parties intended that this agreement would govern FedEx Ground's production obligations on a going forward basis with respect to all tax related materials in this case. After accepting the considerable benefits of this agreement (in the form of a massive production of FedEx Ground documents without the need to litigate dozens of discovery disputes), Plaintiffs reneged, and moved to compel production of a ***draft*** Notice of ***Proposed*** Adjustment ("NOPA") issued by an Internal Revenue Service ("IRS") audit field team (not the IRS Appeals Division) in connection with an ***ongoing*** audit and review of FedEx Ground's 2002 employment tax return. The Magistrate Judge ignored the parties' carefully negotiated agreement, as well as important public policy concerns related to the ongoing tax audit at FedEx Ground, and incorrectly ordered production of the non-discoverable draft NOPA.

The Magistrate Judge clearly erred in ignoring the governing discovery agreement, the nature of the document at issue, and the recognized public policy that protects confidential tax information against the kind of disclosure Plaintiffs sought here. His decision deprives FedEx Ground of the core benefit of its agreement with Plaintiffs over the production of documents, and accords greater protection to Plaintiffs' taxpayer information than it does to the tax related documents maintained by FedEx Ground. Moreover, it threatens to disrupt the open exchange of information between FedEx Ground and the IRS with respect to not only the 2002 audit process

but also the audits underway for subsequent years. Because it is at odds with the agreement

freely entered into between Plaintiffs and FedEx Ground, and because it inadequately safeguards

FedEx Ground's taxpayer information, the Magistrate Judge's decision is clearly erroneous and

should be reversed.

## II.    ARGUMENT

Federal Rule of Civil Procedure 72(a) provides that the district judge "shall modify or set

aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to

law." "A finding is clearly erroneous when, although there may be some evidence to support it,

the reviewing court on the entire evidence is left with the definite and firm conviction that a

mistake has been committed." *Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, 2007 U.S.

Dist. LEXIS 77439 at * 6 (N.D. Ill. Oct. 18, 2007) (quoting *Thornton v. Brown*, 47 F.3d 194, 197

(7th Cir. 1995)). The ruling rendered by the Magistrate Judge is clearly erroneous for several

reasons and it should be overruled by the Court.

### A.    The Draft NOPA Is Not A "Determination" Within The Scope Of The Parties' June 2006 Discovery Agreement.

#### 1.    The draft NOPA is not encompassed by the parties' discovery Agreement.

First and foremost, the parties negotiated extensively and executed an agreement that was

intended to govern production of tax documents such as the draft NOPA at issue in this motion.

Plaintiffs concede that the discovery agreement they entered into requires, as a predicate to any

production obligation on the part of FedEx Ground, that the draft NOPA constitute a

"determination." (Pls. Opposition to FXG's Reconsideration Mot. ["Pls. Opp'n"] at 4 (Doc. No.

1614).) Indeed, as Plaintiffs admit, the two essential conditions which must exist to make a

taxing decision discoverable under the parties' agreement are that it constitute a "determination"

of a federal or state taxing agency, and, further, that the determination "decide the issue" of

whether pick-up and delivery drivers are contractors or employees. Plaintiffs cannot establish either prerequisite.

Plaintiffs agreed that interim and other non-determinative documents and communications from taxing authorities were not discoverable; yet the draft NOPA fits this precise description. Indeed, Webster's New Collegiate Dictionary defines "determination" as "a judicial decision ***settling and ending*** a controversy . . . the act of deciding ***definitely and firmly***." Merriam-Webster's Collegiate Dictionary, Fifth Edition, 1998 (emphasis added). The draft NOPA does not even arguably satisfy this understanding of the term. Indisputably, the draft NOPA is not a decision settling or ending the controversy as even a final NOPA, if ever issued, can be appealed to higher levels of the IRS. Moreover, the draft NOPA does not decide anything definitely and firmly. It is inimical to the word "draft," which the IRS audit team stamped prominently on the top of the document, to conclude, as Plaintiffs and the Magistrate Judge did, that the document is either definite or firm. Even a formal NOPA would not meet this definition since, among other things, it would be the finding of an audit team and not a finding of the agency itself.[1]

The draft NOPA merely presents the preliminary, tentative views of the IRS field auditors for purposes of ongoing discussions with FedEx Ground. It is not a "determination" as that term is commonly used, and falls outside the ambit of the agreement negotiated between the parties. It was clearly erroneous for the Magistrate Judge to ignore the agreement of the parties, and to order production of a *draft* document, particularly in light of the local rules which

---

[1] Plaintiffs have scoured the universe of available dictionaries searching for a definition of "determination" that supports their argument that the draft NOPA is encompassed by the parties' discovery agreement. Plaintiffs incorrectly contend that the draft NOPA reflects "the decision reached" by the IRS even though the findings contained therein are "tentative" or "preliminary" (Pls. Opp'n at 10-11) and are the views of only a field agent.

case 3:05-md-00527-RLM-CAN document 1625 filed 10/10/08 page 5 of 13

encourage the parties to resolve discovery issues without court intervention, and instructions from this Court that the parties should work cooperatively to settle their disputes privately. (See Fed Ex Ground's Opening Brief at 9 (Doc. No. 1602); L.R. 37.1; Manual for Complex Litigation § 10.21 (4th ed. 2005); *Chicago District Council of Carpenters Pension Fund v. Peter Schwabe, Inc.*, No. 85 C 351, 1986 WL 5020, at *1 (N.D. Ill. Apr. 24, 1986)). Because the parties struck their own agreement to govern this discovery dispute, and because that agreement does not provide for production of the draft NOPA, the Magistrate Judge's decision to order production clearly was erroneous and should be reversed.

**2. The IRS regulations also confirm that the draft NOPA is not a "determination."**

As explained by FedEx Ground in its opening brief, the IRS began its audit in December 2003. According to IRS procedures, the audit concludes only when the field auditors issue a formal NOPA describing their findings. 26 C.F.R. § 601.105(b)(4). Even if a final NOPA is issued proposing an adjustment, it will constitute only a "proposed" adjustment and it will not "settle the matter" or constitute a definite and firm decision. FedEx Ground may appeal the NOPA to the Appeals Division of the IRS which then conducts a comprehensive investigation. Only at the end of this investigation will the IRS issue what the agency itself refers to as a "Notice of Determination of Worker Classification." (*See* 26 C.F.R. §§ 601.105(b)(4), 601.105(d), 601.106(b) and (d); *see also* FedEx Ground's Opening Brief at 5-6.) It is this decision issued by the Appeals Division that the IRS considers its determination and not the proposal contained in the NOPA.

Plaintiffs dispute this clear delineation by citing to inapposite IRS regulations that pertain solely to NOPAs. Rather than support their argument, however, these regulations further support the conclusion that a NOPA is not a determination but merely, as its name connotes, a

"proposed" adjustment. (Pls. Opp'n at 11.) For example, Plaintiffs cite to 26 C.F.R. § 601.105(d)(1) which states that a (non-draft) NOPA presents the "determination proposed to be made. It is accompanied by a copy of the examiner's report explaining the basis of the proposed determination." *Id*. (emphasis added). As the language of these regulations establishes, a NOPA is only a "proposed" determination and not a determination itself. It is only at the appellate level of the IRS that a genuine "determination" is issued by the agency. As the IRS itself explains, the Notice of Determination of Worker Classification "constitutes the Service's *determination* described in § 7436(a)." IRS Notice 2002-5 (emphasis added). Accordingly, the IRS regulations do not support the notion that a formal NOPA is captured by the parties' discovery agreement much less a draft of a NOPA.

**3. The fact that a NOPA may be appealed does not make it discoverable.**

Finally, Plaintiffs accuse FedEx Ground of a "disturbing lack of candor" because it supposedly omitted from its opening brief operative language from the discovery agreement. (Pls. Opp'n at 11.) Specifically, Plaintiffs point to language in the discovery agreement providing for production of "determinations even though they may be on appeal or otherwise subject to change." While FedEx Ground did not discuss this language in particular, it was not due to a lack of candor or any other nefarious intent.

To begin with, the entire discovery agreement, which is only a few lines, was submitted to the Court and FedEx Ground cited to the Ellingstad declaration attaching that agreement in its brief. (*See* FedEx Ground's Opening Brief at 5, 10.) Thus, the Court was provided the complete agreement, including the language Plaintiffs call into question.

Second, the language does not even apply to this motion. While the IRS regulations provide for the appeal of a NOPA once it actually is issued, FedEx Ground has no right to appeal a "draft" of a NOPA. Accordingly, there would be no reason for FedEx Ground or the Plaintiffs

to rely on this language from the discovery agreement.[2]

Additionally, the appeal language does not come into play until Plaintiffs have shown that the NOPA is, in fact, a "determination" under the discovery agreement, which they have not done. The discovery agreement states that "Defendant will produce *these determinations* even though they may be on appeal or otherwise subject to challenge." This does not mean that every conceivable instrument, no matter how preliminary or tentative, is discoverable simply because it may be subject to appeal. To the contrary, it means that if Plaintiffs can show that an instrument meets the definition of a determination it is discoverable notwithstanding the fact that it might be subject to further review. Plaintiffs wholly fail to meet that requirement in this case.

As noted by FedEx Ground in its opening Brief, the discovery agreement was painstakingly negotiated, and FedEx Ground made numerous concessions to obtain the benefit of an overall agreement. The Magistrate Judge failed to recognize that the parties devised meaningful rules and accepted various compromises and trade-offs to settle their document disputes, and then he failed to apply those rules as written. By ignoring the terms of the discovery agreement, the Magistrate Judge has deprived FedEx Ground of the benefit of its agreement, and upset the balance it was to provide. Accordingly, the ruling of the Magistrate Judge should be reversed.

**B. The June 2006 Agreement Governs FedEx Ground's Production Obligations.**

In their original Motion to Compel production of the draft NOPA, Plaintiffs conceded that production of this document was governed by the parties' discovery agreement. (*See* Ellingstad Decl. Exs. 10 & 12 (letters from plaintiffs contending that the draft NOPA is a "determination" addressed by the parties' June 2006 agreement).) In their Motion to Compel,

[2] The fact that it is not even firm enough to be appealable illustrates how tentative the draft NOPA should be viewed, and how erroneous it is to argue that it constitutes a determination under the discovery agreement that governs this case.

Plaintiffs claimed that "Plaintiffs' First RFP includes at least two requests—nos. 23 and 25 … *that encompass the NOPA*." (Pls. Am. Mot. to Compel at 11 (Doc. No. 1283)) (emphasis added). Both of these requests are expressly covered by the June 2006 discovery agreement. (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex 5.) In their opposition to the present Motion for Reconsideration, however, Plaintiffs attempt to distance themselves from this correct interpretation of the discovery agreement, and contend that they were within their rights to propound subsequent discovery for tax rulings that fall outside the discovery agreement. (Pls. Opp'n at 18.) This argument is wrong.

Plaintiffs argue that the discovery agreement does not apply to the draft NOPA because the draft NOPA did not exist in June 2006 when the discovery agreement was executed. While the draft NOPA may not have existed at the time the discovery agreement was negotiated, the discovery agreement clearly applies to the request for that document. The discovery agreement did not apply to a distinct set of documents that were identified at the time, but was intended to and did set the parameters for any request related to rulings from federal or state tax agencies. FedEx Ground would never have executed the discovery agreement and make concessions on its own part with the understanding that Plaintiffs could avoid their own concessions simply by propounding a new request later in the case seeking the same documents that were the subject of the prior, disputed discovery. The agreement was obviously intended to govern into the future and Plaintiffs admitted this fact in their Motion to Compel.

**C. Public Policy and the Magistrate Judge's Previous Order Regarding Plaintiffs' Tax Returns Both Support Protecting FedEx Ground's Tax Related Documents.**

Plaintiffs argue that the taxpayer privilege does not apply to the draft NOPA because the audit process is over and because there is no reason to encourage open and frank communication between FedEx Ground and the IRS. Plaintiffs also contend that FedEx Ground has waived any

privilege that might have existed for the draft NOPA by producing the 1995 IRS Letter of Assurance. (Pls. Opp'n at 15-16.) Neither argument withstands scrutiny.

Plaintiffs seem to want all of the benefits of the policies and protections that govern IRS and other tax agency communications, without according the same benefits to FedEx Ground. They have argued that they are entitled to "complete privacy" in their dealings with the IRS, but that FedEx Ground's tax information should be freely discoverable. (*See* Pls. Opp'n to Mot. to Compel at 3 n.3 (Doc. No. 320).) Plaintiffs argue that once an audit begins, the public policy against unnecessary disclosures of tax related documents no longer applies because "the system is no longer one of self-reporting" and there is no need to "encourag[e] truthfulness." (Pls. Opp'n at 15.) This is profoundly incorrect. Contrary to Plaintiffs' assertion that the audit team works in a vacuum, and that "the examinee prepares and files nothing," the actual audit process has involved "extensive, ongoing discussions" between FedEx Ground and the IRS field auditors. (*Id.*; Declaration of Michael D. Fryt in support of FedEx Ground's Opp'n to Mot. to Compel ("Fryt Decl.") at ¶ 3.) After the field auditors sent FedEx Ground the draft NOPA, the parties met to discuss the issues raised in the draft NOPA, and FedEx Ground's positions with respect to those issues. (Fryt Decl. at ¶ 4.) FedEx Ground will be less constrained in its dealings with the IRS if its back and forth communications with the IRS remain confidential than if it knows that everything it discloses to the IRS will immediately be shared with and used by its adversaries in civil litigation. Given the highly collaborative nature of the audit, the important public policy of encouraging accurate, timely, and open communications between the IRS and taxpayers is furthered by protecting the confidential nature of those communications.

Similarly, FedEx Ground has not waived any privilege by producing the 1995 IRS Letter of Assurance. FedEx Ground has never argued that the 1995 IRS Letter of Assurance is

privileged because it does not possess the characteristics of a privileged document.  In fact, the differences between the draft NOPA and the Letter of Assurance illustrate why one is privileged and the other is not.  Unlike the draft NOPA, the 1995 Letter of Assurance is a "determination" that represents the final word of the IRS on the classification issue.  There is no continuing dialogue and, thus, no reason to encourage open and candid communication.  As explained above, however, the IRS audit of FedEx Ground continues for both 2002 and subsequent years, and the public policy which fosters thorough and frank disclosure is critical to the process of those audits.  In balancing the hardships of production in this case, the Magistrate Judge failed to recognize the critical distinction between the draft NOPA, a tentative report subject to further discussion and revision, and the 1995 Letter of Assurance, which sets forth the agency's final determination.  Because he failed to factor in the important public policy encouraging open communication in the audit process, and the stark differences between the draft NOPA and the Letter of Assurance, the Magistrate Judge's order of production was clearly erroneous and should be reversed.

In its December 2006 Order reversing in part the Magistrate Judge's Order denying FedEx Ground's motion to compel Plaintiffs' tax information, this Court acknowledged the "public policy against routine disclosure of tax records" and that information contained in those records should not be compelled unless it is "relevant and material to the matters in issue." Dec. 14, 2006 Order at 3 (Doc No. 451) (citing and quoting *Shaver v. Yacht Outward Bound*, 71 F.R.D. 561, 564 (N.D. Ill. 1976)).  There is no basis upon which to conclude that the draft NOPA is more relevant and material to the matters at issue in this case than Plaintiffs' own tax returns containing admissions that they are independent contractors. The draft NOPA has no force or effect and, perhaps more importantly, its disclosure will disrupt a self-disclosing audit process

that is still in full swing.

Moreover, as discussed in FedEx Ground's Opening Brief, the Magistrate Judge improperly applied inconsistent discovery standards to Plaintiffs' and FedEx Ground's confidential tax information. The Magistrate Judge granted Plaintiffs' motion to compel on the ground that the draft NOPA "bear[s] on the IRS's consideration of the [employment classification] issue." August 21, 2008 Order at 4 (Doc. No. 1581). On the other hand, the Magistrate Judge *denied* FedEx Ground's motion to compel production of Plaintiffs' tax returns, even though these returns reflect Plaintiffs' own belief that they were independent contractors and provide detailed information of their businesses' profit, loss, expenses, and structure. *Id*. These two orders cannot be reconciled. If a *draft* tax document is discoverable because it "bears on" an issue in this litigation, Plaintiffs' *final* tax returns similarly must be discoverable because they "bear on" the classification issue.

**D. <u>FedEx Ground Has Not Waived Any Rights to Object to the Production of the Draft NOPA.</u>**

In their opposition brief, Plaintiffs claim that because FedEx Ground produced a *non-draft* "Proposed Notice of Assessment" ("EDD Notice") from the California Employment Development Department ("EDD"), FedEx Ground indirectly waived its right to object to the production of the *draft* NOPA from the IRS. (Pls. Opp'n at 13-14.) This argument fails for two important reasons. Most significantly, the EDD Notice to which Plaintiffs refer was not a draft, and did not have the term "DRAFT" printed in all capital letters at the top of the document. The EDD document at least expressed the final work product of the audit team and was not merely a draft of a proposed adjustment. In the present case, by prominently marking the document a **"DRAFT,"** the field audit team expressed its own view that the document was a work in progress and did not express any final opinions.

Moreover, the EDD Notice was the subject of an administrative hearing conducted on June 7, 2006, and as part of that proceeding, Plaintiffs saw and reviewed a copy of the document. Indeed, Beth Ross of the Leonard Carder law firm attended the proceedings, and the EDD Notice was marked and entered as an exhibit. (Declaration of Michael McGuinness in Support of FedEx Ground's Opp'n to Pls.' Am. Mot. to Compel ("McGuinness Decl."), Ex. B.) Therefore, because they had seen and received it as part of this proceeding, it would have been futile for FedEx Ground to oppose Plaintiffs' request for production of the EDD Notice. Accordingly, production of the EDD Notice does not provide any guidance on the discoverability of the draft NOPA, or a final NOPA for that matter, and certainly does not constitute any sort of an admission on the part of Fed Ex Ground.

**E. <u>Plaintiffs Are Not Entitled to Endlessly Re-depose Sallie Ford.</u>**

As FedEx Ground explained in its Motion for Reconsideration, even if this Court affirms the Order granting Plaintiffs' motion to compel, it should still set aside the Order granting Plaintiffs leave to reopen the deposition of Sallie Ford. Ms. Ford has already been deposed at length in this case, and subjecting her to another deposition is both burdensome and harassing. Nevertheless, if this Court determines that Ms. Ford should be subject to a second deposition, Plaintiffs should be strictly limited to one and only one additional deposition of Ms. Ford or a corporate designee. Thus, if the IRS issues an actual NOPA, a Notice of Determination of Worker Classification, or documents related to any appeals thereof, Plaintiffs should not be allowed to come back yet again and argue that these are "significant development[s]" that "constitute[] good cause to reopen" Ms. Ford's deposition. (Pls. Opp'n at 19.) FedEx Ground has given Plaintiffs more than adequate notice that the audit process is ongoing and has *not* concluded. The IRS will likely generate additional documents that may differ significantly from the draft NOPA. Plaintiffs should elect to depose Ms. Ford now and forego future depositions,

case 3:05-md-00527-RLM -CAN document 1625 filed 10/10/08 page 13 of 13

or wait until these cases move closer to trial and the audit process continues to develop. They should not be permitted repeated depositions.

## III. CONCLUSION

For the foregoing reasons, FedEx Ground respectfully requests that this Court set aside the Order and deny Plaintiffs' motion to compel production of the draft NOPA and related deposition of a corporate designee.

Dated: October 10, 2008

Respectfully submitted,

By: /s/ Michael G. McGuinness
Michael G. McGuinness

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

John H. Beisner
Robert M. Schwartz
Michael G. McGuinness
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

*Defendant's Liaison and Lead Counsel*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )
---------------------------------------------
THIS DOCUMENT RELATES TO: )

ALL ACTIONS )

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER

Jonathan Lee Riches "d/b/a Piper Jaffray," purporting to be an applicant for a job with FedEx in 2001, sort of moved to intervene as a plaintiff. He never actually filed a motion to intervene, so the court never ruled on one, but he filed a motion to reconsider the denial of such a motion. Mr. Riches's motion to reconsider (signed only by Mr. Riches) includes the names of four other "movants" whom he identifies as "economists." The failure to identify the purported co-movants more fully led the court to brief investigation as to who they might be.

It is possible, of course, that this is sheer coincidence, but Google searches indicate that a person named Sallie Krawcheck is the former Chairman and Chief Executive Officer of Citi Global Wealth Management; that a person named Mario Gabelli founded and chaired a global investment firm and was ranked in *Forbes* magazine's 2006 rankings of the 400 wealthiest Americans; that a person named Philip Falcone is senior managing director of a management corporation and a hedge fund founder; and that a person named Bruce Wasserstein is a billionaire

who has founded investment banks and private equity firms and now chairs Lazard LLC.

These results, in turn, led the court to wonder if Mr. Riches might be someone other than the person described in his motion for reconsideration. Since the person who filed the papers in this court shows a return address of Salters, SC, this is less likely to be a coincidence: According to an entry in *Wikipedia*, a Jonathan Lee Riches who is an inmate in a federal prison in Salters, SC for mail fraud (arising out of identity theft ring with 2,132 victims) has earned a degree of news coverage by filing a variety of frivolous lawsuits against an even wider variety of people and entities. http://en.wikipedia.org/wiki/Jonathan_Lee_Riches accessed October 10, 2008. Mr. Riches, indeed, filed an earlier frivolous suit in this court, cause number 3:07cv375RM.

This docket already requires considerable judicial attention. It has the potential to affect tens of thousands of people who work hard for paychecks, as well as the multinational corporation for whom they work. The court should not also have to address false and frivolous papers filed for the sole purpose of amusement or increasing one's renown in a little corner of the national conscience.

Accordingly, the court DENIES the "petition for reconsideration" [Doc. No. 1624] and AFFORDS Jonathan Lee Riches d/b/a Piper Jaffray, P.O. Box 340, Salters, SC, 30 days within which to show cause why this court should not (1) fine him $5,000 pursuant to Federal Rule of Civil Procedure 11(c)(4), and (2) order the

clerk of this court to accept no further papers from him until after his release from prison (now set for March 23, 2012, according to the same *Wikipedia* entry).

The clerk shall send a copy of this order to the superintendent of Federal Correctional Institution Williamsburg at Salters, SC.

SO ORDERED.

ENTERED:     October 14, 2008

                                    /s/ Robert L. Miller, Jr.
                                    Chief Judge
                                    United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on October 27, 2008, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **George A. Barton** | gbarton@birch.net; bartonlaw3@birch.net |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |

| | |
|---|---|
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; twicklund@bnhmlaw.com; mschaadt@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; aahn@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Edward R. Forman** | eforman@ee.net |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; helm@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com; rwright@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |

**Robert K. Handelman** rhandelman@bnhmlaw.com

**Robert I. Harwood** rharwood@hfesq.com

**Matthew M. Houston** mhouston@hfesq.com

**Dmitri Iglitzin** iglitzin@workerlaw.com

**Tom A. Jerman** tjerman@omm.com

**Victor H. Jih** vjih@omm.com

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com; drees@stollberne.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@prle.com; jhunt@prle.com; syoung@prle.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** marshall@ee.net

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Raquel A. Millman** rmillman@omm.com

**Eleanor Morton** emorton@leonardcarder.com

**James Mulroy, II** mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Jeffrey S. Nestler** jnestler@omm.com

**Peter W. Overs Jr.** povers@hfesq.com

**Lesley A. Pate** lapate@venable.com

**Mary Donne Peters** mpeters@gorbypeters.com; rwright@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; marion.jacobson@bakerd.com

**Nora M. Puckett** npuckett@omm.com; dmeredith@omm.com

**Charles Victor Pyle, III** victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com

**Anne T. Regan** atr@zimmreed.com; kmh@zimmreed.com

**Beth A. Ross** bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com

**J. Gordon Rudd** jgr@zimmreed.com

**Theodore B. Schroeder** tschroeder@omm.com

**Robert M. Schwartz** rschwartz@omm.com

**James A. Staack** jims@staack-firm.com

**R. Jay Taylor Jr.** jtaylor@scopelitis.com; lnewton@scopelitis.com

**Matthew T. Tobin** mtobin@sbslaw.net; lstewart@sbslaw.net

**Jeffrey A. Trimarchi** jtrimarchi@omm.com

**Mary D. Walsh-Dempsey** mdempsey@omalleylangan.com

**Michael J. Watton** jdrewicz@Wattongroup.com

**Andrew M. Weiner** aweiner@omm.com

**Peter D. Winebrake** pwinebrake@winebrakelaw.com

I also certify that on October 28, 2008, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jacqueline M. Fernandez
LAW OFFICES OF JACQUELINE M. FERNANDEZ, LLC
9600 N.W. 38th Street, Suite 301
Miami, FL 33178

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN 55402

Harold L. Lichten
PYLE ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX  75703-3230

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV  89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO  80202

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO  80522

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

case 3:05-md-00527-RLM -CAN document 1650 filed 10/27/08 page 7 of 7

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Dated: October 27, 2008

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER |

## CERTIFICATE OF SERVICE

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 24th and 29th days of October, 2008, (under docket nos. 1644, 1645 and 1652, 1653 respectively), the foregoing documents were filed under seal with the Clerk of the Court using the CM/ECF system. Notice of this filing was also sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system. The undersigned further certifies that a copy of the same was mailed by regular United States Postal Service to the following participants, on October 31, 2008:

1. Defendant FedEx Ground Package System, Inc.'s Supplemental Reply Memorandum in Support of its Motion for Reconsideration of the Magistrate Judge's Ruling Regarding Production of the Draft IRS Notice of Proposed Adjustment and Related Corporate Designee Deposition; (1644)

2. Defendant FedEx Ground Package System, Inc.'s Supplemental Reply Memorandum in Support of its Motion for Reconsideration of the Magistrate Judge's Ruling Regarding Production of the Draft IRS Notice of Proposed Adjustment and Related Corporate Designee Deposition; (1645) (Revised)

3. Defendant FedEx Ground Package System, Inc.'s Response to Plaintiffs' Response to Defendant's Supplemental Reply Memorandum in Support of its Motion for Reconsideration of the Magistrate Judge's Ruling Regarding Production of the Draft IRS Notice of Proposed Adjustment and Related Corporate Designee Deposition; (1652)

4. Declaration of Michael D. Fryt in Support of Defendant FedEx Ground Package System, Inc.'s Response to Plaintiffs' response to Defendant's Supplemental Reply Memorandum in Support of its Motion for Reconsideration of the Magistrate Judge's Ruling Regarding Production of the Draft IRS Notice of Proposed Adjustment and Related Corporate Designee Deposition (1653)

Susan E. Ellingstad
sellingstad@locklaw.com
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Lynn R. Faris
lfaris@leonardcarder.com
Leonard Carder LLP - Oak/CA
1330 Broadway Suite 1450
Oakland, CA 94612

Robert I. Harwood
rharwood@whesq.com
Harwood Feffer LLP
488 Madison Ave 8th Floor
New York, NY 10022

Peter W. Overs, Jr.
povers@whesq.com
Harwood Feffer LLP
488 Madison Ave 8th Floor
New York, NY 10022

Peter J. Agostino
agostino@aaklaw.com
Anderson Agostino & Keller PC
131 S Taylor Street
South Bend, IN 46601

Dated October 31, 2008

By:____________________________________
Paula Behrmann

SF1:732561.2

United States District Court
Northern District of Indiana

RECEIVED
Filed
2008 NOV 21 AM 11:51
STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

In Re: Fedex Ground Package System Inc
Employment Practices Litigation

In Re: Jonathan Lee Riches

3:05-md-527-RM
MDL-1700

Moton to show cause why this court should not Fine Mr Riches 5,000 pursuant to F.R. Civ P 11(c)(4) in Judge millers October 14, 2008 order, Motion For counsel

I'm showing cause on why I should not be fined $5,000. I don't have $5,000, I never will. This is a unreasonable fine considering that I'm a pro se indigent inmate who has no family contact and only makes .12 [d] a month. I can't Afford $5,000. My prison trust Account is frozen. I'm mentally disabled. Judge Miller is bias Against me for my mental condition of multiple personalities and Anxiety disorders which is documented with FCI williamsburg and the Bureau of Prisons, yet He wants to take $5000 dollars away from me that I don't have or never will have. I have no credit. My mother does not speak to me because of her disease. I have no friends or financial support. I was held in Solitary confinement for 6 months in the freezing cold. this is unconstitutional. I said nothing wrong to deserve $5000 fines, all's I asked was to intervene. I don't have any money in prison to buy soap or shampoo or razors. The prison does not provide any basic needs for anyone. Everyday I get headaches and hunger pains because I can't afford to eat or buy food. I'm starving in prison. I lost so much weight. I currently weigh only 119 lbs at 5ft 10 inches. I have IBS and can't hold down any food. I'm sick, cold, lonely, scared and sick. $5000 is unreasonable. I never completed

Case 3:05-md-00527-RLM-CAN document 1669 filed 11/21/08 page 2 of 2

Page 2
Fedex Ground
3:05-md-527

the 7th grade, Noone told me, that If I intervene I get a $5000 dollar fine, how will I ever pay this. 12$ a month X 12 months = 1.44 a year I make, You can contact this court to confirm. Noone from the outside world sends me money or support. If you want me to withdraw this suit, I will. I just need to be left alone in peace. I need mental health counsling. I move for motion for counsel on this Oct. 14th, 2008 order. I can't afford a Attorney. I have a right to a Attorney and I'm suffering nervous breakdowns. The whole world is after me, trying to hurt my life and steal my money which I don't have. I have no $5000. $5000 is too much. I withdraw this suit, I can't afford toothpaste. My life is a train wreck. I fear the world is watching me and moving in on my life fast. I have no hope or ambitions. Sometimes I wish for the death penalty. I don't want to live a life of misery. My clothes don't fit. They won't give me deodorant here. My 8th amendment rights are violated. I'm so scared of people. I'm so weak and tired and vulnerable, I wish this court would put a gun to my head or push me over cliffs or trains. Life is meaningless, maybe I can start over in a afterlife. I'm so cold, last winter I was locked in a cell 24 hrs a day with no human contact, cold showers, cold meals. cowlesaton on the walls. I ask this court to help me and compel the B.O.P to provide me mental health counseling and food and a safe environment. I pray this court will not fine me $5000 and help my life.

respectfully

[signature]

11-17-08

Jonathan Lee Riches
#40948-018
FCI Williamsburg
P.O. Box 340
Salters, SC 29590
843-387-9400

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On December 16, 2008, the parties filed a joint motion for approval of supplemental notice process. In addition, the parties filed a joint motion for extension of time to submit final class lists. The parties' motions, however, were unaccompanied by forms of order pursuant to Local Rule 5.1. See N.D.L.R. 5.1(e) ("The filing of a motion or petition requiring the entry of a routine or uncontested order by the judge or the clerk shall be accompanied by a suitable form of order together with sufficient copies thereof for service upon all parties or their counsel.").

Because the parties have failed to comply with the local rules, their joint motions are **DENIED WITHOUT PREJUDICE**. [Doc. No. 1680 and Doc. No. 1681]. The parties may refile their motions along with the appropriate forms of order.

**SO ORDERED.**

Dated this 17th Day of December, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* Civil No. 3:05-md-00527-RLM-CAN | Chief Judge Miller Magistrate Judge Nuechterlein |

**ORDER ON THE JOINT MOTION FOR APPROVAL OF SUPPLEMENTAL NOTICE PROCESS**

Before the Court is the Joint Motion For Supplemental Notice Process addressing notice for classes certified in Waves 1-3 of this consolidated action.

Based upon all the files, records, and pleading herein,

IT IS HEREBY ORDERED THAT the following supplemental notice of class action status shall be provided for cases in Waves 1-3:

1. The Notice Administrator in this action (US Bank) shall notify all known individuals, who had been improperly excluded from prior notice, of the existence of this litigation by sending them a copy of the existing applicable notice (or notices) along with a cover letter that informs them that they had been excluded in error from the prior dissemination of the class notice and plainly states the date by which they may opt-out should they wish to do so. The proposed cover letter annexed as Exhibit A to the joint motion is approved;

2.      The date for valid opt-out exclusions would be forty-five days from the date of mailing the letter, with an additional thirty day opt-out period for any notices reissued because the original notices are returned as undeliverable, which provides the same time period as originally designated by the Court in its April 4, 2008 Opinion and Order (Doc. No. 1131); and

3.      Upon completion of the supplemental notice opt-out time periods, Plaintiffs will compile a list of additional opt-outs received together with the opt-outs received to date and furnish the Court with final class lists for each of the cases in Waves 1-3, including revised final class lists for the *Craig* case, within thirty days from the end of the supplemental opt-out periods.

**SO ORDERED.**

Dated this December 23, 2008.


s/ Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* Civil No. 3:05-md-00527-RLM-CAN | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**ORDER ON PLAINTIFFS' MOTION FOR EXTENSION OF TIME TO SUBMIT FINAL CLASS LISTS**

Before the Court is Plaintiffs' Motion For An Extension of Time to Submit Final Class Lists for Wave 1-3 classes previously certified by the Court.

Based upon all the files, records, pleadings herein, and the fact that that Defendant has no objection to the entry of this Order,

IT IS HEREBY ORDERED THAT the time in which to provide the Court with final class lists for all of the classes certified in Waves 1-3, including revised final class lists for the *Craig* action, be extended such that Plaintiffs are not be required to furnish such lists until thirty (30) days following the last date of the supplemental opt-out period proposed in the parties' Joint Motion For Approval Of Supplemental Notice Process.

**SO ORDERED.**
Dated this December 23, 2008.

s/ Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF THE ENTRY OF STIPULATED JUDGMENT IN *ESTRADA V. FEDEX GROUND PACKAGE SYSTEM, INC.*, CASE NO. BC 2310130 (LOS ANGELES SUPERIOR COURT)**

Plaintiffs request that this Court take judicial notice, under Rule 201 of the Federal Rules of Evidence, of the entry and contents of the final Stipulated Judgment, ended on December 23, 2008 in the California case challenging the independent contractor status of FedEx drivers, *Estrada v. FedEx Ground Package Systems, Inc.*, BC 210130 (Los Angeles Superior Court). A true and correct copy of the Stipulated Judgment for approximately $26.9 million is attached hereto as Exhibit A.

Federal courts may "take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to the matters at issue." *Green v. Wartern, U.S. Penitentiary,* 699 F.2d 364, 369 (7th cir. 1983). The *Estrada* judgment is directly relevant to all of Plaintiffs' pending motions for summary adjudication of employment status, which are based in part on the collateral estoppel effect of *Estrada*. In addition, since the *Estrada* case itself sparked this litigation, Plaintiffs believe that the court should be aware



of the final development in that case, including the voluntary resolution of the remanded damages and attorney fee disputes.

Dated: January 8, 2009

Respectfully submitted,
LEONARD CARDER, LLP

/s/ **Lynn Rossman Faris**
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

# EXHIBIT A

LYNN ROSSMAN FARIS (SBN 96029)
BETH A. ROSS (SBN 141337)
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, California 94612
(510) 272-0169 (Voice)
(510) 272-0174 (Fax)

Attorneys for Plaintiffs and Plaintiff Class

ORIGINAL FILED
DEC 23 2008
LOS ANGELES SUPERIOR COURT

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ANTHONY ESTRADA, JEFFREY MORGAN and HARVEY ROBERTS, Plaintiffs, v. FED EX GROUND PACKAGE SYSTEM, Inc., Defendant. | Case No. BC 210130 ~~[PROPOSED]~~ **STIPULATED JUDGMENT FOR PLAINTIFFS** |

Whereas, this lawsuit was originally filed on May 11, 1999 and a First Amended Complaint was filed on June 1, 2000;

Whereas, the class was certified by the Court on August 2, 2001 after extensive class certification proceedings;

Whereas, this case went to trial from April 16, 2004 through June 30, 2004 before Hon. Howard J. Schwab, resulting in this Court's Statement of Decision of July 26, 2004;

Whereas a court-ordered accounting was conducted by Hon. William J. Cahill (Ret.) in accordance with this Court's October 13, 2004 reference order and memorandum of decision of September 8, 2004, resulting in Recommendations of May 9, 2005 and October 7, 2005 adopted by this Court on November 21, 2005;

case 3:05-md-00527-RLM-CAN document 1700 filed 01/08/09 page 5 of 37

Whereas, the trial court entered the Corrected Final Judgment on January 27, 2006;

Whereas, the Court of Appeal reviewed the Corrected Final Judgment, issuing two decisions filed on November 22, 2006 (unpublished) and August 13, 2007 (published at 154 Cal. App. 4th 1(2008)), affirming in part, reversing in part, and remanding in part portions of the January 27, 2006 judgment and granting in part Plaintiffs' cross-appeal;

Whereas, a post-remand court-ordered accounting was conducted by Hon. William J. Cahill (Ret.) in accordance with this Court's prior orders resulting in the Final Post-Remand Accounting Report issued on October 22, 2008;

Whereas, the parties have met and conferred and reached stipulations regarding payments to be made to the named Plaintiffs and class members (all damages and interest approved by the Referee) and the amount of the reasonable attorneys fees and costs due to Plaintiffs' class counsel and incentive payments to the class representatives which were the subject of Plaintiffs' Motions to Approve, filed on December 17, 2008 which have now been reviewed and were approved by the Court on December 19, 2008;

THEREFORE, the Court grants and enters judgment to Plaintiffs Anthony Estrada and Jeffrey Morgan and the plaintiff class and against Defendant FedEx Ground Package Systems, Inc. and its predecessor Roadway Package Systems, Inc, as follows:

1. The Corrected Final Judgment entered January 27, 2006 is vacated and this Stipulated Judgment substituted as the one and only Judgment herein;

2.. As to the First and Sixth Causes of Action of the First Amended Complaint filed 6/1/2000, pursuant to California Labor Code Section 2802, and adopting the final report and recommendations resulting from the Accounting performed by the court-appointed Referee pursuant to this Court's Order of November 21, 2005 and the Final Post-Remand Accounting Report of October 22, 2008, Plaintiffs Anthony Estrada and Jeffrey Morgan and class members named below are entitled to damages pursuant to this Court's order of September 8, 2004 determining compensable expenses, for the period May 11, 1996 to December 31, 2008,

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

Case 3:05-md-00527-RLM-CAN document 1760 filed 01/08/09 page 6 of 37

including all pre-judgment interest, as follows:

Plaintiff Anthony Estrada: $49,183.92

Plaintiff Jeffrey Morgan: $63,377.66

Class Members for periods of their class membership:

| Class Member Name | Total Award |
|---|---|
| Abarca, Agustin | $78,037.02 |
| Acosta, Garibaldi | $4,901.11 |
| Ahmadullah, Zemaryalai | $25,617.67 |
| Ali, Irshad | $157,380.66 |
| Andrade, Samuel | $156,758.68 |
| Arceneaux, Lonnie D. | $73,112.73 |
| Azevedo, Anthony R. | $253,021.27 |
| Bailey *, John | $18,832.71 |
| Bailey, Brad R. | $43,253.60 |
| Ballock, Timothy | $67,598.54 |
| Barbara, Jorge R. | $19.81 |
| Barber, Jacob | $982.86 |
| Baros, Edward | $163,496.69 |
| Barreto, Ruben | $82,609.86 |
| Belden, Kenneth M. | $163,060.04 |
| Bennett, Rodger | $11,808.46 |
| Bevis, Mark | $16,417.84 |
| Blankenship, Christian | $2,263.88 |
| Boggs, William E. | $122,279.46 |
| Bowen, Steve | $60,913.96 |
| Brinkley, Russell S. | $246,317.51 |
| Brunner, Maurice | $48,776.61 |
| Buksh, Shameer | $11,848.07 |
| Burdsall, Michael | $16,506.56 |
| Cabrera, Jose | $53,333.38 |
| Caldeira III, Jules J. | $69,215.56 |
| Camacho, Duane | $129,264.63 |
| Campos, Tercio | $5,055.65 |
| Canipe, Robert | $124,038.97 |
| Cannon, Eric N. | $81,259.81 |
| Cantley, Harold B. | $101,669.30 |
| Cantu, Arturo | $29,722.58 |
| Caprini, Daniel | $10,818.15 |
| Cass, Larry | $0.00 |
| Castillo, Peter A. | $133,286.23 |
| Chandra, Reginald | $22,396.37 |
| Chandra, Ronald | $2,796.72 |
| Cho, Young Soo | $42,411.16 |
| Clere, Charles David | $53,732.60 |
| Contreras, Francisco | $173.53 |
| Cooper, David L. | $130,669.98 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

case 3:05-md-00527-RLM-CAN document 1700 filed 01/08/09 page 7 of 37

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| | |
|---|---|
| Cornejo, Ted | $19,059.95 |
| Crawford, Bobby | $18,917.94 |
| Cummings, Carl | $23,553.99 |
| Curry, Ron | $77,900.59 |
| Dawe, Scott | $65,478.63 |
| Dawson, Erwin | $135,972.22 |
| de Castro, Abelmar M. | $72,756.39 |
| De Oliveria, Ricardo B. | $37,864.16 |
| de Waal, Daniel C. | $56,446.33 |
| Din, Faiyazud | $43,300.65 |
| Dozier, Steve | $227,091.64 |
| Duafala, David | $822.53 |
| Dugan, Patrick | $41,508.54 |
| Eder, Brian D. | $80,426.62 |
| Enriquez Jr., Manuel | $46,870.89 |
| Estep *, David | $0.00 |
| Estrada, Anthony | $49,183.92 |
| Faer, Michael L. | $59,111.29 |
| Falda, Richard M. | $247,896.19 |
| Farinazo, Rodrigo | $57,653.79 |
| Figueroa, Israel | $15,292.66 |
| Flores Jr., Frank F. | $14,849.43 |
| Flores, Antonio J. | $73,099.58 |
| Fowler, Joseph | $16,413.60 |
| Frybarger, Neal | $150,268.60 |
| Gaerlan, Alexander D. | $51,560.72 |
| Garner, Troy N. | $25,374.43 |
| Giardina, Alan H. | $7,360.94 |
| Gilchrist, Winston | $13,457.57 |
| Gillespie, Shaun | $74,707.59 |
| Gonzalez, Quino | $59,155.47 |
| Gourson, James | $60,095.62 |
| Green, Steve | $55,751.12 |
| Harris, Robert A. | $60,541.75 |
| Hart, John T. | $4,322.35 |
| Hart, Kippy Read | $64,905.08 |
| Hayes, Mark | $14,752.37 |
| Henderson, Don C. | $11,903.02 |
| Hernandez, Frank | $18,410.22 |
| Hoopes, Doug | $112,862.79 |
| Howard, Charles R. | $4,725.90 |
| Hugenroth, Joseph | $59,237.47 |
| Hulsey, Thomas J. | $128,651.65 |
| Ismailzada, Ali M. | $1,305.69 |
| Issa, Kamil | $99,277.07 |
| Jackson, Darrel A. | $11,300.29 |
| Jackson, David | $24,879.30 |
| Jacobs, Brian | $81,910.15 |
| Johnson, Michael Scott | $1,822.57 |
| Johnson, Owen G. | $31,797.68 |

Case 3:05-md-00527-RLM-CAN document 1760 filed 01/08/09 page 8 of 37

| | |
|---|---|
| Jones, David | $87,469.29 |
| Kaiser, Nigel | $3,170.46 |
| Kammerer, Bret | $88,526.24 |
| Keim, Terry | $175,219.22 |
| Keister, Donald Lee | $72,810.81 |
| Kemp, Thomas O. | $16,900.68 |
| Khalik, Mahrum-Abdul | $54,857.88 |
| Khan, Tabrez | $67,422.18 |
| Kilgore, Randall Perry | $30,709.26 |
| Kirkwood, John | $35,427.61 |
| Kline, James A. | $67,409.14 |
| Krause, James John | $216,287.87 |
| Laborde, John | $188,811.82 |
| Lacy, Justin J Raymond | $28,702.32 |
| Lancaster, Jesse | $102,649.04 |
| Lee, William | $182,918.01 |
| Leopold, Fritz | $45,286.41 |
| Lewis, William | $126,147.67 |
| Li, Chung P. | $89,875.80 |
| Loomis, Ben A. | $99,657.48 |
| MacDonald, Rod | $27,895.25 |
| MacKenzie, Scot A. | $147,603.02 |
| Marcellino, John A. | $207,611.58 |
| Marshall, Steven M. | $161,316.35 |
| Mason, Roy | $192,063.99 |
| Massey, William M. | $141,451.72 |
| Mavrinac, Gerald W. | $30,480.07 |
| Mayhugh, Chad | $16,724.27 |
| McCaskey, David | $43,020.51 |
| McGraw, Mike | $76,967.67 |
| McMillan, George Bryce | $4,806.73 |
| Mercado, Jose Ruben | $44,902.40 |
| Miller, Scott K. | $63,955.13 |
| Morales, Miguel | $120,412.61 |
| Morgan, Jeffery S. | $63,377.66 |
| Murdock Jr., Clarence | $8,568.48 |
| Murphy Jr., Paul Eddie | $128,601.06 |
| Murray, Kalecski D. | $48,888.02 |
| Musser, Christopher L. | $250,068.63 |
| Mustafa, Bilal | $84,223.01 |
| Nascimento, Joaquim Jose | $24,060.86 |
| Neilson, Robert Harry | $59,317.75 |
| Nestlerode, Paul | $26,564.16 |
| Niewohner, Christon | $142,717.63 |
| Oliva Jr., Thomas | $53,752.70 |
| Oliver, Mark Robert | $133,638.81 |
| Otell, Dan | $9,205.35 |
| Padilla, Richard | $71,514.48 |
| Paiva, Andre G. | $21,829.38 |
| Patton, Mark | $283,649.04 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| | |
|---|---|
| Personius, Bob | $66,153.05 |
| Pew, Terry | $82,212.64 |
| Pierce, Stephen | $91,668.69 |
| Plourde, Vincent | $105,511.50 |
| Ponce, Heriberto | $5,445.50 |
| Pontarolo, Marjorie | $113,649.52 |
| Pratt, Richard D. | $61,372.84 |
| Pratt, Steven | $133,725.04 |
| Primo, Nelson | $128,670.07 |
| Raudman, Chris | $59,790.00 |
| Reall, Dino J. | $111,469.56 |
| Repiedad, Gerald | $149,582.61 |
| Rizkallah, Edgar | $19,039.38 |
| Robinson, Christopher A. | $0.00 |
| Robinson, Guy M. | $44,475.03 |
| Rodriguez, Augustin E. | $100,779.25 |
| Rodriguez, Dionicio | $2,099.38 |
| Rodriguez, Luis A. | $2,212.65 |
| Romine *, Jayson | $13,471.58 |
| Ruff, Robert L. | $40,192.87 |
| Russell, John M. | $0.00 |
| Rust, Rodney | $118,046.97 |
| Rutherford, Gary | $1,933.09 |
| Ryall, Joseph | $10,233.94 |
| Said, Rahmatullah | $119,371.96 |
| Sanchez (Jose), Jose Martin | $2,753.74 |
| Sanchez, Mario Navarro | $70,967.86 |
| Santos, Hamilton | $89,791.21 |
| Schaffer, Stephen L. | $20,746.85 |
| Scheu, Tom | $8,056.76 |
| Segura, Felix | $186,601.69 |
| Siapno, Rodrigo D. | $35,834.76 |
| Simms, Larry W. | $76,916.37 |
| Smith, Donald Wayne | $35,394.51 |
| Smith, Marques | $61,558.54 |
| Smith, Michael | $83,270.19 |
| Smith, Randy Warren | $40,482.27 |
| Smith, Ron | $151,646.46 |
| Solano, Jaime | $111,990.36 |
| Son, Sydney M. | $48,648.88 |
| Soto, Elias E. | $143,770.72 |
| Sperling, John A. | $80,623.61 |
| Takeuchi, Chet | $173,155.76 |
| Theofanopoulos, Peter | $43,470.01 |
| Thurmond, Richard | $39,795.32 |
| Umali, Ramon | $150,065.52 |
| Underwood, Craig | $85,142.28 |
| Upson, James E. | $120,432.35 |
| Valenzuela, Adrian | $15,883.79 |
| Valeriano, Ibarra B. | $21,333.73 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| | |
|---|---|
| Valle, Jose | $2,405.76 |
| Van Der Sluis, Steven A. | $31,580.86 |
| Vasquez, Javier A. | $102,009.00 |
| Veitl, George | $28,713.34 |
| Vela, John A. | $4,554.71 |
| Victoria, Manuel M. | $63,361.87 |
| Vieira, Nazareno | $47,130.07 |
| Villanueva, Don C. | $71,479.22 |
| Vopat, Tobey | $59,867.48 |
| Walker, William E. | $44,196.54 |
| Walters, David J. | $196,338.30 |
| White, Franklin D. | $43,222.88 |
| Wilcox, Benjamin Alan | $30,561.00 |
| Wilkins, Kelvin E. | $50,550.42 |
| Williams, Michael Jerome | $44,795.62 |
| Wright, James W. | $1,339.78 |
| Zoaby, Hisham | $79,416.87 |
| Grand Total | $14,377,881.10 |
| | |

In addition, in accordance with the Court's order of November 21, 2005 and the Post-Remand Accounting Report, as to the First and Sixth Causes of Action, Larry Cass, David Estep, Christopher Robinson, and John Russell are dismissed.

3. Per this Court's Minute Order of December 5, 2008, Plaintiffs' costs for expert witness fees of $365,234 are found to be a proper cost to be taken from the common fund created by the litigation and will be deducted from each named Plaintiff and class member's recovery in direct proportion to their share of the total recovery, as specified below. The final amount of recovery after deduction of the proportionate share of expert witness fees is also listed for each Plaintiff and class member below. FedEx Ground shall issue checks, within forty-five calendar days of entry of this Stipulated Judgment, to each named Plaintiff and each class member in the amount specified under "Total Award Less Proportionate Share of Expert Witness Costs" and shall issue a check to Leonard Carder, LLP in the amount of $365,234 for the amounts withheld from the total recovery of each named Plaintiff and class member, as follows:

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| Class Member's Name | Proportionate Share of Plaintiffs'Expert Witness Cost ($365,234.00) | Total Award Less Proportionate Share of Expert Witness Costs |
|---|---|---|
| Abarca, Agustin | $1,982.33 | $76,054.68 |
| Acosta, Garibaldi | $124.50 | $4,776.61 |
| Ahmadullah, Zemaryalai | $650.75 | $24,966.92 |
| Ali, Irshad | $3,997.86 | $153,382.80 |
| Andrade, Samuel | $3,982.06 | $152,776.62 |
| Arceneaux, Lonnie D. | $1,857.25 | $71,255.49 |
| Azevedo, Anthony R. | $6,427.37 | $246,593.90 |
| Bailey *, John | $478.40 | $18,354.31 |
| Bailey, Brad R. | $1,098.75 | $42,154.85 |
| Ballock, Timothy | $1,717.17 | $65,881.37 |
| Barbara, Jorge R. | $0.50 | $19.31 |
| Barber, Jacob | $24.97 | $957.89 |
| Baros, Edward | $4,153.22 | $159,343.47 |
| Barreto, Ruben | $2,098.50 | $80,511.36 |
| Belden, Kenneth M. | $4,142.13 | $158,917.91 |
| Bennett, Rodger | $299.96 | $11,508.49 |
| Bevis, Mark | $417.05 | $16,000.79 |
| Blankenship, Christian | $57.51 | $2,206.37 |
| Boggs, William E. | $3,106.20 | $119,173.26 |
| Bowen, Steve | $1,547.37 | $59,366.59 |
| Brinkley, Russell S. | $6,257.08 | $240,060.43 |
| Brunner, Maurice | $1,239.05 | $47,537.56 |
| Buksh, Shameer | $300.97 | $11,547.10 |
| Burdsall, Michael | $419.31 | $16,087.26 |
| Cabrera, Jose | $1,354.80 | $51,978.58 |
| Caldeira III, Jules J. | $1,758.25 | $67,457.31 |
| Camacho, Duane | $3,283.64 | $125,980.98 |
| Campos, Tercio | $128.43 | $4,927.22 |
| Canipe, Robert | $3,150.90 | $120,888.08 |
| Cannon, Eric N. | $2,064.20 | $79,195.60 |
| Cantley, Harold B. | $2,582.65 | $99,086.64 |
| Cantu, Arturo | $755.03 | $28,967.55 |
| Caprini, Daniel | $274.81 | $10,543.34 |
| Cass, Larry | $0.00 | $0.00 |
| Castillo, Peter A. | $3,385.80 | $129,900.42 |
| Chandra, Reginald | $568.92 | $21,827.44 |
| Chandra, Ronald | $71.04 | $2,725.68 |
| Cho, Young Soo | $1,077.35 | $41,333.82 |
| Clere, Charles David | $1,364.94 | $52,367.66 |
| Contreras, Francisco | $4.41 | $169.12 |
| Cooper, David L. | $3,319.34 | $127,350.63 |
| Cornejo, Ted | $484.17 | $18,575.78 |
| Crawford, Bobby | $480.56 | $18,437.38 |
| Cummings, Carl | $598.33 | $22,955.66 |
| Curry, Ron | $1,978.87 | $75,921.72 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| | | |
|---|---|---|
| Dawe, Scott | $1,663.32 | $63,815.31 |
| Dawson, Erwin | $3,454.03 | $132,518.19 |
| de Castro, Abelmar M. | $1,848.19 | $70,908.20 |
| De Oliveria, Ricardo B. | $961.84 | $36,902.31 |
| de Waal, Daniel C. | $1,433.88 | $55,012.45 |
| Din, Faiyazud | $1,099.94 | $42,200.70 |
| Dozier, Steve | $5,768.69 | $221,322.95 |
| Duafala, David | $20.89 | $801.64 |
| Dugan, Patrick | $1,054.42 | $40,454.12 |
| Eder, Brian D. | $2,043.04 | $78,383.59 |
| Enriquez Jr., Manuel | $1,190.64 | $45,680.25 |
| Estep *, David | $0.00 | $0.00 |
| Estrada, Anthony | $1,249.39 | $47,934.53 |
| Faer, Michael L. | $1,501.57 | $57,609.72 |
| Falda, Richard M. | $6,297.18 | $241,599.01 |
| Farinazo, Rodrigo | $1,464.55 | $56,189.24 |
| Figueroa, Israel | $388.47 | $14,904.19 |
| Flores Jr., Frank F. | $377.21 | $14,472.22 |
| Flores, Antonio J. | $1,856.91 | $71,242.67 |
| Fowler, Joseph | $416.95 | $15,996.66 |
| Frybarger, Neal | $3,817.20 | $146,451.41 |
| Gaerlan, Alexander D. | $1,309.77 | $50,250.95 |
| Garner, Troy N. | $644.57 | $24,729.85 |
| Giardina, Alan H. | $186.99 | $7,173.96 |
| Gilchrist, Winston | $341.86 | $13,115.71 |
| Gillespie, Shaun | $1,897.76 | $72,809.83 |
| Gonzalez, Quino | $1,502.70 | $57,652.77 |
| Gourson, James | $1,526.58 | $58,569.05 |
| Green, Steve | $1,416.22 | $54,334.90 |
| Harris, Robert A. | $1,537.91 | $59,003.84 |
| Hart, John T. | $109.80 | $4,212.55 |
| Hart, Kippy Read | $1,648.75 | $63,256.33 |
| Hayes, Mark | $374.75 | $14,377.62 |
| Henderson, Don C. | $302.37 | $11,600.65 |
| Hernandez, Frank | $467.67 | $17,942.55 |
| Hoopes, Doug | $2,867.00 | $109,995.80 |
| Howard, Charles R. | $120.05 | $4,605.85 |
| Hugenroth, Joseph | $1,504.78 | $57,732.69 |
| Hulsey, Thomas J. | $3,268.07 | $125,383.58 |
| Ismailzada, Ali M. | $33.17 | $1,272.53 |
| Issa, Kamil | $2,521.88 | $96,755.19 |
| Jackson, Darrel A. | $287.06 | $11,013.24 |
| Jackson, David | $632.00 | $24,247.31 |
| Jacobs, Brian | $2,080.72 | $79,829.43 |
| Johnson, Michael Scott | $46.30 | $1,776.28 |
| Johnson, Owen G. | $807.74 | $30,989.94 |
| Jones, David | $2,221.94 | $85,247.35 |
| Kaiser, Nigel | $80.54 | $3,089.92 |
| Kammerer, Bret | $2,248.79 | $86,277.45 |
| Keim, Terry | $4,451.00 | $170,768.22 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| | | |
|---|---|---|
| Keister, Donald Lee | $1,849.58 | $70,961.24 |
| Kemp, Thomas O. | $429.32 | $16,471.36 |
| Khalik, Mahrum-Abdul | $1,393.53 | $53,464.36 |
| Khan, Tabrez | $1,712.69 | $65,709.49 |
| Kilgore, Randall Perry | $780.09 | $29,929.16 |
| Kirkwood, John | $899.95 | $34,527.66 |
| Kline, James A. | $1,712.36 | $65,696.78 |
| Krause, James John | $5,494.25 | $210,793.62 |
| Laborde, John | $4,796.29 | $184,015.53 |
| Lacy, Justin J Raymond | $729.11 | $27,973.21 |
| Lancaster, Jesse | $2,607.54 | $100,041.50 |
| Lee, William | $4,646.57 | $178,271.44 |
| Leopold, Fritz | $1,150.39 | $44,136.02 |
| Lewis, William | $3,204.46 | $122,943.20 |
| Li, Chung P. | $2,283.07 | $87,592.73 |
| Loomis, Ben A. | $2,531.55 | $97,125.93 |
| MacDonald, Rod | $708.61 | $27,186.64 |
| MacKenzie, Scot A. | $3,749.48 | $143,853.54 |
| Marcellino, John A. | $5,273.85 | $202,337.73 |
| Marshall, Steven M. | $4,097.84 | $157,218.51 |
| Mason, Roy | $4,878.90 | $187,185.08 |
| Massey, William M. | $3,593.23 | $137,858.49 |
| Mavrinac, Gerald W. | $774.27 | $29,705.80 |
| Mayhugh, Chad | $424.84 | $16,299.44 |
| McCaskey, David | $1,092.83 | $41,927.68 |
| McGraw, Mike | $1,955.17 | $75,012.50 |
| McMillan, George Bryce | $122.10 | $4,684.63 |
| Mercado, Jose Ruben | $1,140.63 | $43,761.77 |
| Miller, Scott K. | $1,624.62 | $62,330.52 |
| Morales, Miguel | $3,058.78 | $117,353.83 |
| Morgan, Jeffery S. | $1,609.95 | $61,767.71 |
| Murdock Jr., Clarence | $217.66 | $8,350.81 |
| Murphy Jr., Paul Eddie | $3,266.79 | $125,334.27 |
| Murray, Kalecski D. | $1,241.88 | $47,646.15 |
| Musser, Christopher L. | $6,352.37 | $243,716.27 |
| Mustafa, Bilal | $2,139.47 | $82,083.53 |
| Nascimento, Joaquim Jose | $611.21 | $23,449.65 |
| Neilson, Robert Harry | $1,506.82 | $57,810.93 |
| Nestlerode, Paul | $674.80 | $25,889.36 |
| Niewohner, Christon | $3,625.38 | $139,092.24 |
| Oliva Jr., Thomas | $1,365.45 | $52,387.25 |
| Oliver, Mark Robert | $3,394.76 | $130,244.05 |
| Otell, Dan | $233.84 | $8,971.52 |
| Padilla, Richard | $1,816.65 | $69,697.84 |
| Paiva, Andre G. | $554.52 | $21,274.85 |
| Patton, Mark | $7,205.39 | $276,443.64 |
| Personius, Bob | $1,680.45 | $64,472.60 |
| Pew, Terry | $2,088.41 | $80,124.23 |
| Pierce, Stephen | $2,328.61 | $89,340.07 |
| Plourde, Vincent | $2,680.26 | $102,831.25 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| | | |
|---|---|---|
| Ponce, Heriberto | $138.33 | $5,307.17 |
| Pontarolo, Marjorie | $2,886.98 | $110,762.54 |
| Pratt, Richard D. | $1,559.02 | $59,813.82 |
| Pratt, Steven | $3,396.95 | $130,328.09 |
| Primo, Nelson | $3,268.54 | $125,401.52 |
| Raudman, Chris | $1,518.82 | $58,271.19 |
| Reali, Dino J. | $2,831.60 | $108,637.96 |
| Repiedad, Gerald | $3,799.77 | $145,782.83 |
| Rizkallah, Edgar | $483.65 | $18,555.73 |
| Robinson, Christopher A. | $0.00 | $0.00 |
| Robinson, Guy M. | $1,129.78 | $43,345.25 |
| Rodriguez, Augustin E. | $2,560.04 | $98,219.21 |
| Rodriguez, Dionicio | $53.33 | $2,046.05 |
| Rodriguez, Luis A. | $56.21 | $2,156.44 |
| Romine *, Jayson | $342.21 | $13,129.37 |
| Ruff, Robert L. | $1,021.00 | $39,171.87 |
| Russell, John M. | $0.00 | $0.00 |
| Rust, Rodney | $2,998.69 | $115,048.28 |
| Rutherford, Gary | $49.11 | $1,883.99 |
| Ryall, Joseph | $259.97 | $9,973.97 |
| Said, Rahmatullah | $3,032.35 | $116,339.61 |
| Sanchez (Jose), Jose Martin | $69.95 | $2,683.79 |
| Sanchez, Mario Navarro | $1,802.76 | $69,165.10 |
| Santos, Hamilton | $2,280.92 | $87,510.29 |
| Schaffer, Stephen L. | $527.02 | $20,219.83 |
| Scheu, Tom | $204.66 | $7,852.10 |
| Segura, Felix | $4,740.15 | $181,861.54 |
| Siapno, Rodrigo D. | $910.29 | $34,924.47 |
| Simms, Larry W. | $1,953.87 | $74,962.51 |
| Smith, Donald Wayne | $899.11 | $34,495.40 |
| Smith, Marques | $1,563.74 | $59,994.80 |
| Smith, Michael | $2,115.27 | $81,154.92 |
| Smith, Randy Warren | $1,028.35 | $39,453.92 |
| Smith, Ron | $3,852.20 | $147,794.27 |
| Solano, Jaime | $2,844.83 | $109,145.53 |
| Son, Sydney M. | $1,235.80 | $47,413.08 |
| Soto, Elias E. | $3,652.13 | $140,118.59 |
| Sperling, John A. | $2,048.04 | $78,575.57 |
| Takeuchi, Chet | $4,398.59 | $168,757.18 |
| Theofanopoulos, Peter | $1,104.25 | $42,365.77 |
| Thurmond, Richard | $1,010.90 | $38,784.42 |
| Umali, Ramon | $3,812.04 | $146,253.48 |
| Underwood, Craig | $2,162.83 | $82,979.46 |
| Upson, James E. | $3,059.28 | $117,373.07 |
| Valenzuela, Adrian | $403.49 | $15,480.31 |
| Valeriano, Ibarra B. | $541.93 | $20,791.80 |
| Valle, Jose | $61.11 | $2,344.64 |
| Van Der Sluis, Steven A. | $802.23 | $30,778.62 |
| Vasquez, Javier A. | $2,591.28 | $99,417.72 |
| Veitl, George | $729.39 | $27,983.95 |

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

| Vela, John A. | $115.70 | $4,439.01 |
|---|---|---|
| Victoria, Manuel M. | $1,609.55 | $61,752.32 |
| Vieira, Nazareno | $1,197.22 | $45,932.85 |
| Villanueva, Don C. | $1,815.75 | $69,663.47 |
| Vopat, Tobey | $1,520.78 | $58,346.70 |
| Walker, William E. | $1,122.70 | $43,073.83 |
| Walters, David J. | $4,987.48 | $191,350.81 |
| White, Franklin D. | $1,097.97 | $42,124.91 |
| Wilcox, Benjamin Alan | $776.33 | $29,784.67 |
| Wilkins, Kelvin E. | $1,284.11 | $49,266.32 |
| Williams, Michael Jerome | $1,137.92 | $43,657.70 |
| Wright, James W. | $34.03 | $1,305.75 |
| Zoaby, Hisham | $2,017.39 | $77,399.48 |
| Grand Total | $365,234.00 | $14,012,647.10 |

As to the three deceased class members, John A. Marcellino, Israel Figueroa, and David Cooper, FedEx will issue checks for their damages to the Estate of John A. Marcellino, the Estate of Israel Figueroa, and the Estate of David Cooper, respectively.

4. FedEx Ground will issue a Form 1099 to each Plaintiff and class member, and to Leonard Carder LLP, for amounts paid under this agreement.

5. As to all causes of action, in accordance with the July 26, 2004 Statement of Decision, the Court dismisses Plaintiff Harvey Roberts.

6. As to class representatives Anthony Estrada and Jeffrey Morgan, pursuant to Plaintiffs' un-opposed Motion for Approval of the stipulated incentive award to Mr. Estrada of $25,000 and to Mr. Morgan of $25,000, filed December 17, 2008, in recognition of their extensive participation in all phases of this case, including but not limited to attendance at all seven class certification hearings, attendance at much of the 9-week court trial, attendance at all hearings in the Court of Appeal and at many additional court hearings, and their invaluable contribution to the prosecution of this case as documented in Plaintiffs Motion for Approval of Class Representative Incentive Payments, the Court approves payment of these stipulated

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

incentive awards to Plaintiffs Estrada and Morgan in addition to the amounts due to Mr. Estrada and Mr. Morgan described in paragraph 2, above.

7. As to all causes of action, in accordance with the Court's order of July 10, 2003, the Court never acquired jurisdiction and thus deletes the following names of putative class members from the class list without prejudice as follows:

1. Allen, Perry
2. Alvarez, Kenny
3. Ari, Bum
4. Arguello, Jorge
5. Bagshaw, Jay
6. Benner, Phillip A.
7. Berglund, Dave
8. Bonilla, Alberto
9. Boyd, Bill
10. Breakey, Shawn M.
11. Brenneise, Jeff
12. Caldwell, David
13. Campos, Alejandro
14. Carroll, Daniel Lee
15. Ceballos, Azael
16. Correll, Christopher L.
17. Costa Jr., Sirle F.
18. Costa, Alisson
19. Da Maia, Ocimar F.
20. Da Silva, Jedais
21. Da Silva, Rubens T.
22. Da Silva, Waldir
23. De Paula, Joelci
24. Dias, Alexei S.
25. Duran, Jorge
26. Ferreira, Robert
27. Franco, Renato Nery
28. Furtado, Eduardo
29. Garcia, Oscar
30. Giffoni, Anibal
31. Giron, Pete E.
32. Goncalves, Diofanto
33. Gonzalez, Issacc
34. Greene, Ruben

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

35. Hammock, Deric
36. Harmon, Ron
37. Hayes, Gene
38. Hazward, Joseph
39. Hernandez, Carlos A.
40. Hernandez, Raymond
41. Hernandez, Rogelio
42. Herrera, Adam
43. Houser, Charles
44. Johnston, Bob
45. Juarez, Samuel
46. Judy, David Wayne
47. Kearney, Jason David
48. Kloth, Mitchell W.
49. Leal, Diane L.
50. Lopes Jr., Jose
51. Lundquist, Christian
52. Mora, Weber Silva
53. Munoz, Jaime J.
54. Nelson, Cephus E.
55. Oliveira, Luis C. Jesus
56. Ornelas, Eduardo
57. Ortiz, Pablo P.
58. Ouraga, Thomas B.
59. Ourn, Peter P.
60. Ownings, Bobby
61. Peoples, James
62. Pimentel, Adair
63. Porras, Geovanni
64. Quinn, Patrick
65. Rangel, Robson S.
66. Rath, Phin
67. Reyes, Daniel
68. Rola, Rafael
69. Roles, Rickey Lee
70. Rouiller, Steve
71. Saldate, Steve
72. Sanders, Anthony L.
73. Scallen, Tim
74. Schmidt, Russell
75. Silva, Edson M.
76. Skinner, Diane A.
77. Sobral, Jose
78. Sotello, Dennis

79. Tarantino Jr., Frankie A.
80. Tatum, George E.
81. Tuioti, Eveni F.
82. Turnipseed, Ricky D.
83. Valdovinos, Gilberto V.
84. Valdson, Silva
85. Villalobos, Dennis
86. Williams, Andrew

8. As to all causes of action, in accordance with the Court's order of July 10, 2003, and the Court's order of January 15, 2004, the Court dismisses the following putative class members without prejudice:

Acevedo, Saul
1. Adili, Utche B.
2. Aguilar, Raul
3. Albregard, Jr. Trucking
4. Antoine, Shawn Sheldon
5. Araiza, Joel
6. Aranda, Abel L.
7. Ardon, Oscar
8. Auilar, Jose Alcides
9. Awwad, Ghassan A.
10. Baez, Rudy
11. Baeza, Oscar
12. Baker, Nile W.
13. Barnes, Maurice
14. Bernades, Marcondes D.
15. Brown, Jeffrey G.
16. Buchmueller, Kevin E.
17. Bushey, Mike
18. Calderon, Jamie
19. Calderon, Jorge
20. Camacho, John T.
21. Camacho, Juan A.
22. Carbajal, Pioquinto
23. Cardenas, Eduardo A.
24. Carlos, David
25. Carnegie, Ronnie L.
26. Carranza, Hever
27. Carrasco, Pete
28. Carrasco, Robert

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169    FAX (510) 272-0174

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

29. Carreon, Amando
30. Carrera, Agustin
31. Carrera, Venancio
32. Castillo, Carlos
33. Castro, Greg A.
34. Castro, Iban
35. Chacon, George
36. Chapman, John
37. Childress, James Christopher
38. Chilin, Jose
39. Cordero, Jr., Moses
40. Correa, Manuel
41. Costa, Joe M.
42. Da Silva, Joubert
43. Da Silva, William
44. Da Silveiria, Marlucio G.
45. De Barros, Valteir
46. De Leon, Nomer M.
47. De Souze, Jamie
48. Deabreu, Marcio
49. Dell'Acqua, Thomas C.
50. Deus, Manolito
51. Diep, Tam Hung
52. Dong, Allen
53. Eman, Francisco
54. Enriquez, Elmer Santos
55. Ertel, Kenneth G.
56. Estrada, Jose A.
57. Farias, Ramon A.
58. Ferreira, Alex
59. Ferreira, Maxwell
60. Ferreira, Samuelson
61. Filho, Declieux M.
62. Florero-Ferrel, Raul
63. Flores, Steve A.
64. Flores, William
65. Fonseca Corona, Alejandro
66. Froman, Grant L.
67. Fry, Joel R.
68. Fry, Ray S.
69. Garcia, Fermin
70. Garcia, Joel
71. Garvin, Michael D.
72. Garza, Sergio

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

73. Gibson, Ricardo
74. Gomez, Luis
75. Gonzalez, Luiz C.
76. Goodwin, Hillary
77. Granados, Ty Preston
78. Guillen, Luis A.
79. Guzman, Roman
80. Hagar, Danny K.
81. Hall, Larry
82. Hansel, Steve
83. Harper, Henry
84. Heller, Dave
85. Hemsley, David
86. Hernandez, Lino
87. Hillard, Bryan L.
88. Hogate, Rodney
89. Holler, III, David J.
90. Huizar, Gabriel
91. Irby, Jimmy D.
92. Issaian, Gilbert
93. Ivanbinchen, Jurandir
94. James, Mitch
95. Jensen, John
96. Jones, Jr., Van Donald
97. Jose, Florentino P.
98. Keinast, Randy
99. Kersten, Steven R.
100. Khosrouabadi, William
101. Kramer, William S.
102. Krikava, Jeff
103. Lam, Keit Quang
104. Le, Steve Tung
105. Leeman, Edward J.
106. Lefrere, Rene
107. Lewis, Michael T.
108. Lindholm, Michael
109. Lindholm, Rodney
110. Lopes, Joao T.
111. Lopes, Paulo
112. Lopes, Venor Elias
113. Lopez, Carlos V.
114. Lopez, Gerardo
115. Lopez, Guillermo
116. Lopez, Jose L.

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

117. Lopez, Oscar L.
118. Lozano, Miguel A.
119. Lucero, Gilbert
120. Luna, Gustavo
121. Macagba, Melchor
122. Machado, Francisco
123. Macias, Joseph A.
124. Malasig, Simeon S.
125. Mar, Andy M.
126. Mara, Larry J.
127. Marcello, Rodolfo
128. Mares, Dino
129. Marquez, Esteban L.
130. Marquez, Rebecca L.
131. Marslin, Renaldo
132. Martin, Luis
133. Martin, Sheldon
134. Martinez, David
135. Martins, Fabio
136. Mayer, John F.
137. Mendes, Hiram
138. Mitchell, Julius Anthony
139. Moncada, Oscar E.
140. Munoz, Andrew
141. Navarro, Robert
142. Nelson, Daniel
143. Newman, Troy L.
144. Nicholson, James A.
145. Ochoa, Juan M.
146. Ochoa, Luis M.
147. Olmos, Sandy J.
148. Orellana, Juan
149. Ornelas, Robert
150. Ortega, Jorge
151. Oskoui, Saeed
152. Owen, John
153. Paderes, Ronald S.
154. Paiva, Rich
155. Palato, Eddie
156. Palombo, Josueli J.
157. Pamplona, Marlon F.
158. Pedrazzi, Jeremiah
159. Perez, Carlos
160. Perez, Emanuel P.

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

161. Perez, Jaime
162. Perez, Toby M.
163. Personius, Steven R.
164. Polissky, Oleg
165. Ponce, Miguel
166. Porto, Erlan C.
167. Quintanilla, Roberto
168. Rahmati, Hamid
169. Ramos, Michael
170. Randel, David B.
171. Rasmussen, Robert
172. Reece, John D.
173. Reeser, Wade
174. Reis, John C.
175. Renderos, Ronnie
176. Reyes, Manuel
177. Roach, Lee
178. Robinson, Wallace Scott
179. Robleto, Roberto
180. Rodriguez, Carlos
181. Rodriguez, Edward
182. Rojas, Aldo
183. Rood, Douglas D.
184. Rosado, Anthony
185. Rubio, Alan E.
186. Ruiz, Ernesto
187. Ruiz, Henry
188. Saeed, Oskoui
189. Saldana, Daniel
190. Saldano, Luis
191. Sanchez, Javier A.
192. Sanchez, Jose K.
193. Sanchez, Manuel A.
194. Sandoval, Salvador
195. Sands, Christopher
196. Santiago, Jason E.
197. Sarmiento, Sonny
198. Sarwan, Harmit S.
199. Schmitz, Kevin D.
200. Scott, Ali
201. Sedillos, David Joseph
202. Sembhi, Dalvir
203. Sepanian, Seroj
204. Sheban, James

Case 3:05-md-00527-RLM-CAN document 1700 filed 01/08/09 page 23 of 37

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

205. Silva, Alfonso Arroyo
206. Silva, John Carl
207. Silva, Paul R.
208. Silva, Washington
209. Simmons, William
210. Slick, David
211. Slyker, Scott
212. Smith, Margaret Elizabeth
213. Soch, Phak-Tra
214. Sosa, Angelo Dante Tonini
215. Springer, Matthew
216. Stirewalt, Jr.,Clyde M.
217. Stone, Keith
218. Taing, Pheng
219. Tatpaporn, Boonthong
220. Tell, Caprice S.
221. Thomas, Grant
222. Thomas, Kevin
223. Thompson, Kenneth G.
224. Tobias, Carlos E.
225. Torossian, Nejdik
226. Torres, Edgar
227. Tran, Peter
228. Valdivieso, Frank
229. Vega, Martin
230. Vela, Rafael Ricardo
231. Velasquez, Raymond
232. Venegas, Abel
233. Venzor, Carlos C.
234. Walker, Carlton
235. Walker, Theodore D.
236. Ward, Delanious
237. Wardak, Hewad
238. Wightman, Steve
239. Wiley, Dean T.
240. Williams, Trent P.
241. Willis, Terry
242. Wong, Welford
243. Young, Stanley M.
244. Zadoorian, Seroj

9. As to all causes of action, in accordance with the Court's orders of July 10, 2003, October 17, 2003, December 4, 2003, and January 27, 2004, the Court dismisses the following

putative class members with prejudice:

1. Abeyta, Jason
2. Acmoody, Angela L.
3. Afonso, Lincoln M.
4. Alcantra, Alexandre
5. Alexandrino, Waldemur
6. Ali, Alyub
7. Amos, Sterling
8. Arrazola, Martin
9. Arrendondo Jr., Sergio
10. Aviles, Rufo
11. Ayala, George Louis
12. Ban, Theng Sean
13. Besha, Rojen
14. Billerbeck, John K
15. Billings, Carl
16. Black, Richard
17. Blocher, Keith
18. Bloom, Barry J.
19. Bonitian, Artoush
20. Bozarth, David
21. Brasileiro, Cleber F.
22. Brothers, Don
23. Burke, James
24. Burns, Robert G.
25. Byrd, Josh
26. Cabrera,Rogelio
27. Cadle, Thomas
28. Camacho, Alfonso
29. Camberos, Ricardo
30. Carnes, Russell
31. Carson, Kenneth R.
32. Castro, Gustavo
33. Cepeda, Robert
34. Chamberlain, Michael
35. Chan, Tim
36. Christensen, Mark C.
37. Christlieb, John
38. Claire, Pavitar
39. Clark, Shane
40. Cole, Joseph M.
41. Cook, Christian B.
42. Corona, Juan Carlos

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

43. Coronado, Ruben
44. Coronel, Martin
45. Cox, Steven
46. Cutchon, Manuel
47. Da Silva, Carlos A.
48. Da Silva, Godemar
49. Delgado, Juan M.
50. De Lima, Eber Mendes
51. deMilo, Sidney
52. De Sousa, Marcelo
53. Debernadi, Michael R.
54. Domingo, George
55. Emm, Chris
56. Esteva, Joab
57. Evans Sr., Charles E.
58. Fambro, Larry
59. Fast, Ari
60. Flores, Juan
61. Foster, Douglas
62. Garcia, Andres
63. Garcia, Michael A.
64. Garl, Dennis
65. Garza, Jorge I.
66. Gaumer, David
67. Gomez Jr., Arturo
68. Gomez, Hector
69. Hague, Michael
70. Handy, Greg
71. Hanson, James M.
72. Haussler, Stephen K.
73. Henderson, Robert
74. Henriquez, Jose
75. Hernandez, Valentin
76. Hoppock, Tyree J.
77. Hosfield, Paul L.
78. Howard, Rufas
79. Janssen, Jeffrey D.
80. Javier, Richard A.
81. Jensen, Kurt
82. Johnson, Johnny Del
83. Joslin, Nels R.
84. Joyce, Thomas J.
85. Klimenko, Paul
86. Knight, Robert

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

87. Lanz, Rudy H.
88. Love, John W.
89. Lujan, Steven Curtis
90. Luna, Jesus
91. Maciel, Jesus
92. Martinez, Fermin
93. Martinez, Gonzalo
94. Massengale, Scott
95. Matamoros, Wilfredo
96. McCorkle, Shaun
97. Merten, Jim
98. Meyer, Christopher
99. Miller, Kirk A.
100. Misterly IV, John
101. Mitchell Jr., Herman
102. Mora, Eduardo
103. Morse, Donald M.
104. Mulholland, Thomas
105. Munoz, Victor H.
106. Murray, Daniel P.
107. Navarro, Luis
108. Nelson, Bill
109. Nguyen, Vincent
110. Nishi, Edward
111. Noble, Scott
112. Noyes, Robert
113. Ochoa, Daniel
114. Ortiz, Luis
115. Oschbach, Charles
116. Paculba, Wynn
117. Padilla, Jose
118. Palomera, Sergio
119. Panajon, Wilfredo
120. Pereira, Lourival
121. Perkins, Andrew W.
122. Peters, Robert G.
123. Peterson, Daniel
124. Pitta, Joe
125. Plute, Albert John
126. Pontious, Barry F.
127. Pruitt, James
128. Rose, Eric S.
129. Rowitz, Craig
130. Rubio, Daniel

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

131. Ruiz, Mark
132. Ruvalcaba, Antonio
133. Sainten, Michael
134. Sam, Sohpal P.
135. Sanchez, Holgar
136. Sandoval, Rodolfo
137. Santos, Joao Deraldo
138. Scheetz, David
139. Sharma, Rajnesh
140. Sharma, Shalendra Deo
141. Singh, Jagidish
142. Skarsten, Wayne R.
143. Slaton, Conte
144. Soares, Leandro
145. Soto, Oscar F.
146. Stanford, Russell
147. Suri, Rajinder S.
148. Teran, David
149. Trent, James
150. Truillo, Richard
151. Truitt, James
152. Valderrama, Danny
153. Virtusio, Dominic
154. Wadley, Jeffrey
155. Ware, Stephen
156. Williams, Gary
157. Wolaver, Tom
158. Workman, Michael
159. Yates, Lauri
160. Young, Lannis
161. Yracheta, Adrian
162. Zoellick, John

10. Pursuant to the Court of Appeal's decision of August 13, 2007, affirming Plaintiffs' entitlement to reasonable attorney fees and costs under Code of Civil Procedure Section 1021.5 and this Court's thorough review of Plaintiffs' un-opposed Motion for Approval of Attorney Fees and Incentive Awards, including all material submitted in support of the motion including declarations from named Plaintiffs Anthony Estrada and Jeffrey Morgan affirming their agreement with the requested award, the Court orders and approves the parties' stipulation to

and all of their counsel

FedEx's payment of a total amount of reasonable attorneys' fees and costs to Plaintiffs in the full amount of $12,475,000. Said amount shall be paid, within forty-five days of entry of this Stipulated Judgment, to Leonard Carder, LLP as trustees for distribution to all counsel in accordance with the approved motion.

11. This Court shall retain jurisdiction over the parties to enforce the terms of this Stipulated Judgment.

Dated: December 23, 2008

Hon. William Highberger,
Judge of Superior Court

LEONARD CARDER, LLP
ATTORNEYS
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612
TELEPHONE: (510) 272-0169 FAX (510) 272-0174

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in Alameda County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On **January 8, 2009**, I served the following document(s):

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF THE ENTRY OF STIPULATED JUDGMENT IN ESTRADA V. FEDEX GROUND PACKAGE SYSTEM, INC., CASE NO. BC 2310130 (LOS ANGELES SUPERIOR COURT); [PROPOSED] ORDER**

I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

Peter J Agostino agostino@aaklaw.com, trybula@aaklaw.com

George A Barton gbarton@birch.net, bartonlaw3@birch.net

Jeffrey A Bartos jbartos@geclaw.com

Evelyn L Becker PHV ebecker@omm.com

Kenneth Lee Blalack , II lblalack@omm.com

Darcie R Brault dbrault@dibandfagan.com

Laura C Bremer lbremer@omm.com

Guy Brenner gbrenner@omm.com

Thomas J Brunner , Jr Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski dmc@zimmreed.com

Jerald R Cureton jcureton@curetoncaplan.com

Ginger A DeGroff degrofflaw@yahoo.com

Robert E DeRose , II bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Edward J Efkeman    eefkeman@fedex.com

Susan E Ellingstad    seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

Barry S Fagan    bfagan@dibandfagan.com

Lynn R Faris    lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Monica Ferraro    mferraro@bnhmlaw.com

Lee K Fink    lfink@omm.com

Robert K Firsten    rfirsten@firstenlaw.com

Edward R Forman    eforman@ee.net

Wood R Foster PHV , Jr    woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox    Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco    pfuoco@msn.com

Martin S Garfinkel    garfinkel@sgb-law.com, helm@sgb-law.com

Michael W Garrison , Jr    mgarrison@omm.com

R Christopher Gilreath    chrisgil@sidgilreath.com

Eileen S Goodin    egoodin@bnhmlaw.com

Michael J Gorby    mgorby@gorbypeters.com, rwright@gorbypeters.com

Deborah R Grayson    drgrayson@fuse.net

Robert K Handelman    rhandelman@bnhmlaw.com

Robert I Harwood    rharwood@whesq.com

Stacy J Hauf    shauf@omm.com, swickliffe@omm.com

Matthew M Houston    mhouston@whesq.com

Dmitri Iglitzin    iglitzin@workerlaw.com

Tom A Jerman    tjerman@omm.com

Victor H Jih    vjih@omm.com

Aparna B Joshi    ajoshi@omm.com

Soye Kim    skim@geclaw.com

Michael W Kopp    mkopp@omm.com

Steve D Larson    slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis    jordanlewis@sbgdf.com

Shannon Liss-Riordan    sliss@prle.com, jhunt@prle.com, syoung@prle.com

Gary F Lynch    glynch@carlsonlynch.com

John S Marshall    marshall@ee.net

Michael G McGuinness    mmcguinness@omm.com

Bruce H Meizlish    brucelaw@fuse.net

Sanford A Meizlish    smeizlish@bnhmlaw.com

Matthew J Merrick    mmerrick@omm.com

Jennifer Lee Merzon    jmerzon@omm.com

Raquel A Millman    rmillman@omm.com

James R Mulroy , II    jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Daniel O Myers    dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Jeffrey S Nestler    jnestler@omm.com

Peter W Overs , Jr    povers@whesq.com

Mary Donne Peters    mpeters@gorbypeters.com, rwright@gorbypeters.com

Richard T Phillips    flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope    Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com,
marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Nora M Puckett npuckett@omm.com, dmeredith@omm.com

Charles Victor Pyle , III victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan atr@zimmreed.com, kmh@zimmreed.com

Beth A Ross bross@leonardcarder.com

J Gordon Rudd jgr@zimmreed.com

Theodore B Schroeder tschroeder@omm.com

Robert M Schwartz PHV rschwartz@omm.com

James A Staack jims@staack-firm.com

R Jay Taylor , Jr jtaylor@scopelitis.com, lnewton@scopelitis.com

Joni M Thome PHV thome@halunenlaw.com

Matthew T Tobin mtobin@sbslaw.net, lstewart@sbslaw.net

Jeffrey A Trimarchi jtrimarchi@omm.com

Mary D Walsh-Dempsey mdempsey@omalleylangan.com

Michael J Watton jdrewicz@Wattongroup.com

Andrew M Weiner aweiner@omm.com

Peter D Winebrake pwinebrake@winebrakelaw.com

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

John H. Beisner PHV
David G. Caperton
O'Melveny & Myers LLP
1625 Eye Street NW Suite 10
Washington, DC 20006-4001
Email: jbeisner@omm.com
Email: dcaperton@omm.com

J. Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801
Email: Allen@bclegal.net

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Suite 200
Bartlett, TN 38134
Email: joree@jbrownlow.com

Steve Dennis PHV
Reid & Dennis PC
5001 Spring Valley Road Suite 255W
Dallas, TX 75244-3914

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178
Email: jjjteam@yahoo.com

Salvatore G. Gangemi
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005
Email: sgangemi@gangemilaw.com

Clayton D. Halunen
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402
Email: halunen@halunenlaw.com

Eric E. Hobbs
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108
Email: eehobbs@michaelbest.com

Dorothy A. Jarrell
Anh-Nguyet T. LyJordan
O'Melveny & Myers LLP
O'Melveny & Myers LLP - NY/NY
7 Times Square
New York, NY 10036
Email: djarrell@omm.com;
alyjordan@omm.com

R. Bruce Carlson
Carlson Lynch Ltd - Sew/PA
231 Melville Lane
PO Box 367
Sewickley, PA 15143
Email: bcarlson@carlsonlynch.com

B. James Fitzpatrick
Fitzpatrick Spini & Swanston
838 S Main Street Suite E
Salinas, CA 93901
Email: bjfitzpatrick@fandslegal.com;
cswanston@fandslegal.com

William T. Fiala
Lewis Fisher Henderson Claxton & Mulroy
6410 Poplar Ave Ste 300
Memphis, TN 38119

Robert A. Garcin
Law Offices of Robert A. Garcin
210 East 29th Street, #A
Loveland, CO 80538

Jack D. Hilmes
Kevin J. Driscoll
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773
Email: jhilmes@finleylaw.com; kdriscoll@finleylaw.com

William S. Hommel , Jr
Attorney at Law
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703
Email: bhommel@hommelfirm.com

Laron Jones
1505 N Ellamont St
Baltimore, MD 21216

Steven M. Kelso
Wheeler Trigg Kennedy LLP
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202
Email: kelso@wtklaw.com

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D. Macaluso
Jackson Lewis LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Robert E. McDaniel
Email: remcdanielesq@aol.com

Charles N. Nauen
Email: cnnauen@locklaw.com

Joseph A. Osefchen
The Law Firm of Philip Stephen Fuoco
Email: josefchen@msn.com

Shannon H Paliotta
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222-3110
Telephone: (412) 201-7600
Fax: (412) 456-2377
Email: SPaliotta@littler.com

Cheryl F. Perkins
Whetstone Myers Perkins and Young LLC
Email: cperkins@attorneyssc.com

Michael R. Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989
Email: mrreck@belinlaw.com

Andrew J. Kahn
McCracken Stemerman & Holsberry
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102
Email: ajk@dcbsf.com

Karen P. Kruse
Aaron Roblan
Jackson Lewis LLP
One Union Square
600 University Street Suite 2900
Seattle, WA 98101

Harold L. Lichten
Pyle Rome Lichten Ehrenberg &
Liss-Riordan
Email: Harold@prle.com

Paula R. Markowitz
Markowitz & Richman
Email: ldicrosta@markowitzandrichman.com

Kenneth E. Milam
Email: kemilam@watkinseager.com

Todd J. O'Malley
O'Malley & Langan
Email: tomalley@omalleylangan.com

Robert J. Penny
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Alan M. Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Jennifer R. Rygiel-Boyd
Ogletree Deakins Nash Smoak & Stewart PC
Email: jennifer.rygiel-boyd@olgetreedeakins.com

Eric H. Rumbaugh
Michael Best & Friedrich LLP
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108
Email: ehrumbaugh@michaelbest.com

Patricia A Sullivan
Email: psullivan@eapdlaw.com

Dan S. Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Donald R Taylor
Email: dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com

Richard Tanenbaum
Email: rt@lawyer.com

Peter N. Wasylyk
Email: pnwlaw@aol.com

Charles W. Whetstone , Jr
Whetstone Myers Perkins and Young
Email: cwhetstone@attorneyssc.com

Mark B Wallace
Walker Vaughn & Wallace PLLC
7403 St Andrews Church Road
PO Box 9285
Louisville, KY 40209

Clark C Johnson
Stites & Harbison PLLC - Lou/KY
400 West Market St Suite 1800
Louisville, KY 40202-3352

Whitney Frazier Watt
Stites & Harbison PLLC - Lou/KY
400 West Market St Suite 1800
Louisville, KY 40202-3352

Wesley S Chused
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110

Kevin A Crass
Elizabeth Robben Murray
Friday Eldredge & Clark LLP
Little Rock Regions Center
400 West Capitol Avenue Suite 2000
Little Rock, AR 72201-3493

Ronald D Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Ronald E Jenkins
Jenkins and Kling PC
10 S Brentwood Boulevard Suite 200
Clayton, MO 63105

Gregory C Black
Corette Pohlman & Kebe
PO Box 509
Buttr, MT 59703

Christopher Dean Glover
Hogan and Glover PC
2017 Morris Avenue Suite 300
Birmingham, AL 35203-4138

Kenneth Daniel Sansom
Robert Keeling Spotswood
Emily Joy Tidmore
Spotswood LLC
Concord Center Suite 940
2100 Third Avenue North
Birmingham, AL 35203

Mark Schirmer
Straus and Boies LLP
1661 International Place Dr Suite 400
Memphis, TN 38120

Merrie M Frost
7784 Reynolds Road
Mentor, OH 44060

Kimberly M Moses/Laura K Kendall
Calfee Halter & Griswold LLP - Cle/OH
1400 McDonald Investment Center
800 Superior Avenue
Cleveland, OH 44114

Damon L Ellis/Jonathan R Mani
Mani & Ellis
PO Box 1266
Charleston, WV 25326-1266

Anthony J Pantuso , III
Pantuso Law Firm LLC
204 Broad St 2nd Floor
Milford, CT 06460

Brian J Moore/Roger A Wolfe
Jackson Kelly
PO Box 553
Charleston, WV 25322-0553

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

John Alan Doran/Laura Marie Lawless
John F Lomax , Jr/Michael Cajer Mason
Greenberg Traurig LLP - Pho/AZ
2375 E Camelback Rd Suite 700
Phoenix, AZ 85016

Hart Lawrence Robinovitch
Zimmerman Reed PLLP
651 Nicollet Mall Suite 501
Minneapolis, MN 55402

Anne Marie Estevez
Morgan Lewis & Bockius
200 S Biscayne Boulevard Suite 5300
Wachovia Financial Center
Miami, FL 33131-2339

Richard Eugene Hayber
Hayber Law Firm LLC
221 Main St Suite 400
Hartford, CT 06106

Burton Kainen
Kainen Escalera & McHale PC
21 Oak St
Hartford, CT 06106

Mary Stanfield Bubbett
Stone Pigman Walther Wittmann LLC
546 Carondelt St
New Orleans, LA 70130-3588

Case 3:05-md-00527-RLM CAN document 1700 filed 01/08/09 page 37 of 37

Louis Adams Bledsoe , III
Robinson Bradshaw & Hinson PA
101 North Tryon St Suite 1900
Charlotte, NC 28246

Richard R Meneghello
Fisher & Phillips LLP - Por/OR
1001 SW Fifth Ave Suite 1600
Portland, OR 97204

David F Rees/Joshua L Ross
Stoll Stoll Berne Lokting & Shlachter PC
209 SW Oak Street Fifth Floor
Portland, OR 97204

James J Dunn , Jr
Mickenberg Dunn Kochman Lachs & Smith
29 Pine Street
Burlington, VT 05402-0406

Kristine M Larsen
Ray Quinney & Nebeker PC
36 South State Street Suite 1400
PO Box 45385
Salt Lake City, UT 84111

Thomas N Trefethern
2045 Chappel Hill Drive
Youngstown, OH 44511

James S Lowrie
Jones Waldo Holbrook & McDonough SLC
170 S Main St Suite 1500
Salt Lake City, UT 84101

Scott R Bickford/Lawrence J Centola , III
Martzell & Bickford
338 Lafayette St
New Orleans, LA 70130

Marc L Frischhertz
Frischhertz & Associates
1130 St Charles Ave
New Orleans, LA 70130

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **January 8, 2009**.

/s/ Lorelei Badar
Lorelei Badar

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

In connection with their pending motions for summary adjudication of employment status and oppositions to Defendant's motions for summary judgment on the same issue, Plaintiffs respectfully submit the attached recent decision of the United States Court of Appeals for the Third Circuit, *Lucey v. FedEx Ground Package System, Inc.*, Case No. 07-4372 (3d Cir. Jan. 8, 2009), as supplemental authority. This decision was issued after briefing of summary adjudication and summary judgment was complete. In *Lucey*, the Third Circuit addressed the arbitration provision in the standard form Operating Agreement executed by Plaintiffs and all class members in this action (OA § 12.3) – a provision upon which Defendant relies to support its claim that drivers are independent contractors, in part, because they are not terminable at will. The Third Circuit held that the Operating Agreement's arbitration provision was unconscionable

case 3:05-md-00527-RLM-CAN document 1762 filed 01/22/09 page 2 of 10

and, thus, unenforceable. *Id.* at 3-4.

Dated: January 22, 2009

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor I. Morton**

Eleanor I. Morton
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

# ATTACHMENT

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 07-4372

---

RICHARD LUCEY; FRANCIS DENNIS LYNCH;
DAVID MCMAHON; JAMES HOUGH;
MICHAEL MCKENZIE; FRANK CUCINOTTI

v.

FEDEX GROUND PACKAGE
SYSTEMS, INC.,

Appellant

---

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 06-cv-03738
District Judge: The Honorable Renee M. Bumb

---

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 12, 2008

Before: MCKEE, SMITH, and ROTH, *Circuit Judges*

(Filed: January 08, 2009)

---

OPINION

---

SMITH, *Circuit Judge.*

FedEx Ground Package System, Inc.[1] ("FedEx") contracted with Richard Lucey, Francis Dennis Lynch, David McMahon, Michael McKenzie, Frank Cucinotti, and James Hough (collectively, the "Plaintiffs") to serve as package delivery drivers.[2] An Operating Agreement signed by each individual driver and FedEx governed the relationship. The Operating Agreement contained, *inter alia*, a provision requiring the driver-signatory to submit all claims arising from the termination of the relationship to arbitration. FedEx terminated the contracts of each driver between 2004–2005. While three of the Plaintiffs began arbitration proceedings, all six Plaintiffs filed suit to challenge the arbitration provision before an arbitrator decided any claim.

An arbitration agreement will be upheld unless there is a legal or equitable ground that would invalidate a contract. 9 U.S.C. § 2; 42 Pa. Cons. Stat. § 7303. To make this determination, courts look to state law. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002). Plaintiffs here argue that the arbitration provision in the Operating

---

[1] FedEx notes that it was improperly pled as FedEx Ground Package Systems, Inc.

[2] The District Court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). This Court has jurisdiction pursuant to 9 U.S.C. § 16. We exercise plenary review over questions regarding the enforceability of the agreement to arbitrate. *Lloyd v. Hovensa, LLC,* 369 F.3d 263, 273 (3d Cir. 2004). We review any findings of fact, on which the District Court predicated its decision, pursuant to a clearly erroneous standard. *Id.* (quoting *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 53–54 (3d Cir. 2001)).

Agreement is unconscionable. Under Pennsylvania law,[3] an arbitration provision is unenforceable on the grounds of unconscionability if two elements are met: (1) "the contractual terms are unreasonably favorable to the drafter," and (2) "there is no meaningful choice on the part of the other party regarding acceptance of the provisions." *Worldwide Underwriters Ins. Co. v. Brady*, 973 F.2d 192, 196 (3d Cir. 1992) (citing *Koval v. Liberty Mut. Ins. Co.*, 531 A.2d 487, 491 (Pa. Super. Ct. 1987)). The first element is referred to as substantive unconscionability, while the second is known as procedural unconscionability. The District Court found that both elements were met, and held that the arbitration agreement was unconscionable as a result.

The District Court found that the Plaintiffs lacked a meaningful choice to enter into the arbitration provision of the Operating Agreement. It noted that FedEx presented the Operating Agreement to the Plaintiffs shortly before they began their jobs, at which point each driver had leased a delivery truck and was financially committed to the position, and that Plaintiffs did not have an opportunity to read, review, or negotiate the terms of the agreement. While FedEx does not contest that the Plaintiffs were presented with the Operating Agreement only after each driver leased a delivery truck, it argues that the Plaintiffs did not take "reasonable steps to obtain a copy of the arbitration agreement

---

[3]     The District Court correctly noted that "Federal courts sitting in diversity look to the law of the forum state in making a choice of law determination." New Jersey law states that a contractual choice of law provision will be upheld unless doing so would violate its public policy. In this case, the Operating Agreement contained a provision that Pennsylvania law governs the agreement. Because there is no evidence or argument that the application of Pennsylvania law would offend the public policy of New Jersey, the District Court appropriately applied Pennsylvania law.

or reasonably avail[] themselves of the opportunity to inquire and learn about the provisions of the arbitration agreement" prior to undertaking this financial commitment. It argues that this Court's decision in *Zimmer v. Cooperneff Advisors, Inc.*, 523 F.3d 224 (3d Cir. 2008), prohibits parties from sitting on their hands prior to the enactment of an agreement and instead requires that they actively seek to obtain and negotiate the agreement. This argument is unavailing.

This Court's decision in *Zimmer* was premised on its factual background. *Zimmer* concerned an employment contract between Steven Zimmer, a Harvard-educated economist, and a trading and investment firm. *Id.* at 225. Zimmer argued that he did not make a meaningful choice to enter into the agreement because the agreement was presented to him only after he began working for the firm. *Id.* at 226–27. This Court rejected this argument, noting that Zimmer had significant bargaining power, not only because he was highly educated, but also because he had numerous job opportunities. *Id.* at 229. Our decision was also premised on the fact that Zimmer was aware that his employment was contingent on the negotiation of an employment agreement and that either party could terminate those negotiations. *Id.* We specifically distinguished this case from one in which a party with a limited educational background, narrow options for employment, and little bargaining power is presented with an agreement on a take-it-or-leave it basis. *Id.* On the facts of the present case, where FedEx drafted the arbitration provision and presented it to Plaintiffs with little to no bargaining power on a take-it-or-leave it basis, we cannot equate an opportunity to review the agreement with a meaningful

choice to accept its terms.

Because FedEx concedes that it has not placed substantive unconscionability at issue in its appeal, this argument is deemed waived. Accordingly, because we do not find error in the District Court's conclusion that the agreement is procedurally unconscionable and there is no argument as to substantive unconscionablity, we will affirm the District Court's conclusion that both elements of unconscionability are met.

FedEx also argues that the District Court erred by not confirming an arbitration award against McMahon. McMahon submitted his claim to arbitration in 2005. In April 2006, McMahon and FedEx participated in an arbitration preliminary status hearing, at which point they agreed to an arbitration hearing in July 2006. In May 2006, McMahon sought a stay in the arbitration proceeding, notifying the arbitrator that he was seeking a judicial determination regarding the validity of the agreement. FedEx opposed this request, and the arbitrator denied the stay in light of the parties' failure to agree. The arbitrator proceeded according to the schedule approved during the preliminary status hearing. FedEx subsequently filed a motion to dismiss McMahon's arbitration claim on the ground that it was untimely, and McMahon did not respond. On June 6, 2006, the Plaintiffs, including McMahon, filed the present federal action arguing that the arbitration provision was unconscionable. Three days later, the arbitrator dismissed McMahon's claim. FedEx argues that McMahon's failure to file a motion to vacate the arbitrator's decision results in the waiver of his unconscionability claim. This argument must fail.

In cases challenging whether an issue is subject to arbitration, we have held that a "party [who] voluntarily submits an issue to arbitration without challenging the arbitrability of that issue" may be deemed to have waived judicial review. *Pa. Power Co. v. Local 272, Int'l Bhd. of Elec. Workers*, 886 F.2d 46, 50 (3d Cir. 1989). In this case, however, McMahon clearly raised his objection to arbitration and the validity—and thus arbitrability—of the agreement. Accordingly, "where a party objects to arbitrability but nevertheless voluntarily participates in the arbitration proceedings, waiver of the challenge to arbitral jurisdiction will not be inferred." *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1510 (3d Cir. 1994).

Finally, FedEx argues that the District Court erred by not dismissing McKenzie's claim. In March 2007, Plaintiffs' attorneys notified the District Court of McKenzie's death. Plaintiffs have not filed a motion for substitution, and FedEx argues that McKenzie's claim must be dismissed as a result.

The Federal Rules of Civil Procedure state that "[i]f a motion [for the substitution of a deceased party] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1). Though FedEx did not raise this issue in its motions to the District Court, it filed those motions during the pendency of the 90-day period for substitution. Because the Plaintiffs notified the District Court on March 13, 2007 of McKenzie's death and there has not been a motion for substitution as required by Rule 25(a), we will reverse the portion of the District Court's order as it relates to McKenzie's claim.

For the reasons discussed above, we will affirm the District Court's judgment with regard to the unconscionability of the arbitration proceeding and McMahon's claim, but we will reverse its decision as it applies to McKenzie's claim.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING THIRD CIRCUIT'S DECISION IN *LUCEY V. FEDEX GROUND PACKAGE SYSTEMS, INC.***

Defendant FedEx Ground Package System, Inc. ("FXG") respectfully submits this response to Plaintiffs' January 22, 2009 Notice of Supplemental Authority regarding the decision in *Lucey v. FedEx Ground Package Systems, Inc.*, Case No. 07-4372 (3d Cir. Jan. 8, 2009). (Docket No. 1702.) In *Lucey*, the Third Circuit affirmed the district court's ruling that the arbitration provision in the FXG Operating Agreement was procedurally unconscionable under the circumstances of the case, and unenforceable, under Pennsylvania law. (*See Lucey*, slip op. at 3-5 (attached to Plaintiff's Notice of Supplemental Authority).)

While FXG has relied, in part, on the availability of arbitration under the Operating Agreement to support its arguments that the contractors are not akin to at-will employees, the Operating Agreement contains express limitations on the permissible reasons for contract termination, and the *Lucey* decision does not change the fact that FXG's contract-termination decisions are subject to third-party review. Under *Lucey*, contractor-plaintiffs may file suit in court to challenge their contract termination and utilize the full panoply of procedures and

remedies available in a judicial action, or they may still pursue their challenge through arbitration (as contractors have done successfully in the past). If anything, the *Lucey* decision makes the independent third-party review of FXG's contract-termination decisions ***more*** robust — not less.

FXG refers the Court to its prior briefing on why the Operating Agreement does not create an at-will employment relationship between FXG and the contractors. (*See, e.g.*, FedEx Ground's *Tofaute* Mem. (Docket No. 1228), at 11-13, 25-26; FedEx Ground's *Tofaute* Reply Mem. (Docket No. 1465), at 10-11; and FedEx Ground's *Tofaute* Mem. in Opp'n to Pls' Mot. for Summ. J. (Docket No. 1382), at 17-19, 23-24.)

Dated: January 30, 2009

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
Chris A. Hollinger
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 30th day of January, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

Anne T. Regan
atr@zimmreed.com

J. Gordon Rudd
jgr@zimmreed.com

R. Christopher Gilreath
chrisgil@sidgilreath.com

James R. Mulroy, II
jrmulroy@kiesewetterwise.com

The undersigned further certifies that a copy of the foregoing was mailed by regular United States Postal Service to the following non-CM/ECF participants:

Joree Brownlow
Law Office of Joree G. Brownlow
1444 Gillham Dr., Ste. 200
Bartlett, TN 38134

Clayton D. Halunen
Joni M. Thome
Halunen & Associates
220 S. Sixth St., Suite 2000
Minneapolis, MN 55402

By: /s/ Robert M. Schwartz
Robert M. Schwartz

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING SEVENTH CIRCUIT'S DECISION IN *SUSKOVICH V. ANTHEM HEALTH PLANS OF VIRGINIA, INC.***

In support of its own pending motions for summary judgment on the independent contractor vs. employee classification issue, and in opposition to those of the plaintiffs, defendant FedEx Ground Package System, Inc. ("FXG") submits the attached recent decision from the Seventh Circuit, *Suskovich v. Anthem Health Plans of Virginia, Inc.*, No. 08-1070, --F.3d--, 2009 WL 140494 (7th Cir. Jan. 22, 2009) (Exhibit 1), as supplemental authority.

*Suskovich* is relevant to this Court's analysis of the case under the Restatement test and it impacts many of the arguments that FXG has made in its prior briefing, including the relevance of evidence regarding, and the weight accorded to, the following:

1. The parties' intent. *Id.* at 8-11, 20-21.[1]

[1] For examples of FXG's prior briefing on this subject, *see* Memorandum of Law of Defendant FedEx Ground Package System, Inc. In Support of Its *Riewe* (Indiana) Motion for Summary Judgment ("FXG *Riewe* Memo.") (Docket No. 1230), at 18; Reply in Support of FedEx Ground Package System, Inc. *Riewe* (Indiana) Motion for Summary Judgment ("FXG *Riewe* Reply") (Docket No. 1467), at 19; Memorandum of Law of Defendant FedEx Ground Package System, Inc. In Support of Its *Craig* (ERISA/Kansas) Motion for Summary Judgment ("FXG *Craig* Memo.") (Docket No. 1216), at 26-27;

2.      The setting of a work schedule.  *Id.* at 13-15.[2]

3.      Equipment or instrumentalities provided.  *Id.* at 15-16.[3]

In addition, the *Suskovich* opinion addresses the consideration of tax returns and other

evidence in evaluating the "method of payment" and "beliefs of the parties" factors.  *Id.* at 18-19,

20-21.[4]

Dated:  February 13, 2009                Respectfully submitted,

By: /s/ Robert M. Schwartz
     Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel:  (202) 383-5300
Fax:  (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400

---

Reply in Support of FedEx Ground Package System, Inc. *Craig* (ERISA/Kansas) Motion for Summary
Judgment ("FXG *Craig* Reply) (Docket No. 1467), at 19; Memorandum of Law of Defendant FedEx
Ground Package System, Inc. In Opposition to Plaintiffs' *Riewe* (Indiana) Motion for Summary
Adjudication ("FXG *Riewe* Opp.") (Docket No. 1387), at 23; and Memorandum of Law of Defendant
FedEx Ground Package System, Inc. In Opposition to Plaintiffs' *Craig* (ERISA & Kansas) Motion for
Summary Adjudication ("FXG *Craig* Opp.") (Docket No. 1392), at 20-21.

[2]  Some of FXG's prior arguments on this subject can be found in the following briefs: FXG *Riewe*
Memo., at 7-8; FXG *Craig* Memo., at 6; FXG *Riewe* Opp., at 4-6; FXG *Craig* Opp., at 14-16; FXG *Riewe*
Reply, at 6, 10-12; and FXG *Craig* Reply. at 3-7.

[3]  *See, e.g.,* FXG *Riewe* Opp., at 6-7, 22; FXG *Craig* Opp., at 21; FXG *Riewe* Reply, at 18; and FXG
*Craig* Reply at 9-10.

[4]  For examples of FXG's prior briefing on the "method of payment" factor, *see* FXG *Riewe* Memo.,
at 15-16; FXG *Craig* Memo., at 10-11; FXG *Riewe* Opp., at 24; and FXG *Craig* Opp., at 23; FXG *Riewe*
Reply at 19; FXG *Craig* Reply at 10.  For briefing on the parties' intent, *see, e.g.,* FXG *Riewe* Memo.,
at 16-18; FXG *Craig* Memo., at 9-10; FXG *Riewe* Opp., at 22-23; FXG *Craig* Opp., at 22; FXG *Riewe*
Reply, at 19; and FXG *Craig* Reply, at 11.

South Bend, IN  46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 13th day of February, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: s/ Robert M. Schwartz
Robert M. Schwartz

# EXHIBIT A

# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 08-1070

ESTATE OF ANTHONY J. SUSKOVICH,

*Plaintiff-Appellant,*

*v.*

ANTHEM HEALTH PLANS OF VIRGINIA, INC., ANTHEM INSURANCE COMPANIES, INC., ANTHEM LIFE INSURANCE COMPANY, HEALTH MANAGEMENT SYSTEMS, INC., ORIENTATION BENEFIT ADMINISTRATORS, INC., THE WELLPOINT COMPANIES, INC., WELLPOINT, INC., and its Pension and Welfare Benefits Plans, the Fiduciaries and Administrators of the Plans, and TRASYS, INC.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06 CV 425—**Sarah Evans Barker**, *Judge.*

---

ARGUED DECEMBER 2, 2008—DECIDED JANUARY 22, 2009

---

Before CUDAHY, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Until his sudden death in 2006, Anthony J. Suskovich worked as a computer programmer for WellPoint, a health insurance company, and Trasys, an

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 3 of 29

information technology (IT) company. In exactly what capacity he worked for those two companies is the subject of this present case. Suskovich's estate claims that he was a regular employee, and worse, one that was not paid overtime or enrolled in benefits programs for which he was eligible, and who owes state and federal tax agencies various taxes that WellPoint and Trasys should have withheld. WellPoint and Trasys claim that Suskovich was an independent contractor, and thus ineligible for benefits or overtime, and that he owes back taxes because of his own failure to file proper tax returns or pay his withholding taxes. After the district court granted summary judgment to WellPoint and Trasys, the estate brought this appeal.

For the following reasons, we affirm the district court's grant of summary judgment.

## I. Background

Suskovich was a computer analyst and programmer who worked, at various points over ten years, with one of the defendants in this case, WellPoint/Anthem ("WellPoint"). WellPoint is a related group of companies that provide health care coverage to clients throughout the United States. In 1995, Suskovich formed his own Indiana corporation, Indy Imaging, Inc., which he listed on his resume as "Indy Imaging, Inc. d/b/a Anthony J. Suskovich." WellPoint retained Suskovich and other IT professionals to work on the company's IT team in 1996. While no record exists of any contractual agreement between Suskovich and WellPoint, Suskovich stated on a

form he used to access WellPoint's computer system that he was a "contractor," and he billed WellPoint for his time on an invoice form that he had created, stating that he was a "salesperson" who sold "computer consulting" to WellPoint. He was paid at an hourly rate of $60, resulting in an annualized salary of about $200,000, and received no benefits. For tax purposes, his salary was reported on a 1099 form rather than a W-2.

Suskovich was retained for limited durations, usually about six months, although these limited engagements were often rolled over into new engagements. WellPoint stopped retaining Suskovich in 1999, but because of his expertise with various IT issues, sought to bring him back in 2000. Due to the company's new vendor consolidation program, Suskovich could only be retained if his services were offered through a preferred vendor. At this point, Suskovich began his relationship with the other defendant in the present case, Trasys, Inc., which agreed to bring Suskovich on as part of their team of IT professionals working with WellPoint. He was compensated for his time by submitting invoices to WellPoint, which would then approve them and return them to Trasys, which in turn paid Suskovich. Again, for tax purposes, Trasys issued Suskovich a 1099 form rather than a W-2. The 1099 forms that WellPoint and Trasys issued Suskovich listed his income as "nonemployee income" or "other income."

In February 2001, Suskovich signed an "Independent Contractor Agreement" with Trasys; this was apparently the first time that Suskovich and Trasys had put

Suskovich's relationship to the company in contractual form. Trasys labeled the writing as an independent contractor agreement, but the form contained terms that could refer to both an employment relationship and an independent contractor relationship; for instance, it referred to "wages" and consideration for "employment," but was also an agreement that only extended for a temporary period of time, and that began with the words "Trasys offers to contract you. . . ." As before, Suskovich would have to submit his hours to WellPoint and have them approved before he could receive any compensation from Trasys. Suskovich was paid $62 an hour under the agreement, and received no other benefits.

Throughout his time with WellPoint and Trasys, Suskovich worked on a variety of projects, and occasionally worked on different projects for different divisions of WellPoint at the same time. For instance, in 2001 Suskovich was working on mainframe issues for WellPoint's Federal Employee Program while simultaneously working on a print-mail project for a different division. In 2005, Suskovich entered into an agreement with Anthem Health Plans of Virginia to work on a Medicaid subrogation project; Suskovich did not go through Trasys when arranging this work, but rather drafted and submitted an "Agreement for Consulting Services with WellPoint Virginia" in which he described himself as an independent contractor and that nothing in the contract should be construed as creating an employer-employee relationship. Under the terms of the agreement, Suskovich was responsible for all income tax, unemployment insurance, and withholding. Anthem Health Plans of Virginia

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 6 of 29

issued Suskovich a 1099 form rather than a W-2, and the other divisions of WellPoint and Trasys were apparently unaware of this additional work.

During his time with WellPoint, Suskovich worked in a cubicle at WellPoint, with a computer supplied to him by the company. He apparently did not have a direct supervisor and worked under the WellPoint employee who was supervising whatever project he was working on. He occasionally worked offsite, but was expected to work at WellPoint's offices and to answer to the supervisors on his projects.

Sometime in August 2005, WellPoint informed Suskovich that they would not be keeping him on past the end of the year; in mid-September, they declined to renew his contract through Trasys. WellPoint was attempting to train one of their in-house programmers in the work that Suskovich was doing for them, but when getting her an outside training program proved to be too difficult, WellPoint asked Suskovich to train her. Suskovich began looking for additional work at this time, and WellPoint was disappointed with his efforts in training the in-house employee and attending his project meetings. WellPoint told Trasys that they would replace Suskovich with someone from another vendor if he did not improve his performance, and Trasys then told WellPoint that Suskovich's performance would improve.

Suskovich continued to look for other work, and approached Tom Eberhard, who had previously an independent contractor with WellPoint but who had accepted an offer of employment from the company and

had risen to a managerial role over some of the projects Suskovich worked on. Eberhard, along with another former IT contractor, Bruce Jeschke, who had also become a full-time employee of WellPoint, had made various attempts over the years to coax Suskovich into working for the company directly. In late 2005, Suskovich asked Eberhard if he had any work for him. Eberhard told him that he had no need for any contract work but did discuss the possibility of full-time employment with WellPoint. Suskovich's initial salary demand was apparently too high, however. Before Eberhard had a chance to negotiate, Suskovich contracted pneumonia and passed away suddenly.

Before his death on January 1, 2006, the IRS was investigating Suskovich because of his failure to file tax returns for several years. In response Suskovich filed delinquent tax returns for 1999-2002, and tax returns for the 2003 and 2004 tax years. On those returns, he listed himself as a self-employed computer consultant, and claimed that he derived his income from his computer consulting business. He also claimed substantial business deductions, again related to his computer consulting business. After the investigation, Suskovich agreed to a monthly levy on his income from the IRS, although at the time of his death he had not paid the full amount of his back taxes, including $100,000 in tax debt to the IRS and approximately $33,000 in tax debt to the state of Indiana.

Suskovich's wife sought relief from this outstanding debt as an innocent spouse, but the IRS denied her request. In March 2006, Kathy Suskovich, as the personal represen-

tative of Suskovich's estate, filed the present lawsuit. The estate initially sought declaratory relief in the form of a judgment that Suskovich was an employee of WellPoint and then a joint employee of Trasys and WellPoint. On the basis of that determination, the suit also sought a monetary award for compensation that Suskovich was supposedly denied under the Fair Labor Standards Act and other benefits that Suskovich was denied under the Employee Retirement Income Security Act, as well as indemnification for Suskovich's tax liabilities. The estate moved for summary judgment on April 6, 2007, and WellPoint and Trasys likewise moved for summary judgment on all counts. In December 2007, the district court denied the estate's motion for summary judgment and granted summary judgment to WellPoint and Trasys, finding that Suskovich was an independent contractor rather than an employee. This appeal followed.

## II. Discussion

The estate's appeal raises three issues. First, the estate claims that the district court mistakenly found that the deciding factor with respect to Suskovich's employment status was the contractual relationship between the parties; second, that the district court wrongly found that the factors in the control test overwhelmingly favored the appellees; third, that the district court considered hearsay testimony that should have been barred by the Dead Man's Statute. WellPoint and Trasys raise an additional issue, arguing that they can prevail on alternative grounds for the ERISA, FLSA and indemnifica-

tion claims even if this court decides the employment question against them.

We review a district court's grant of summary judgment de novo, reviewing the facts in the light most favorable to the non-moving party. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If the district court applied the proper standard to the employment inquiry in this case, this court reviews its findings only for clear error. *Ost v. West Suburban Travelers Limousine Co.*, 88 F.3d 435, 438 (7th Cir. 1996).

### A. Whether the district court incorrectly found the employment contracts between the parties as determinative of Suskovich's employment status.

The estate first argues that the district court improperly found the employment contracts between Suskovich and Trasys and WellPoint Virginia to be determinative of his employment status. The estate argues that the district court afforded improper weight to this factor, ignored contradictory evidence in the employment contracts, and ignored the other factual considerations in the control test. More specifically, the estate argues that the district court misapplied this circuit's decision in *Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941 (1984), which gives parties to a contract the freedom to define their relationship as one of principal and independent contractor only if other

Case 3:07-cv-00818-HZ Document 32-2 Filed 08/17/11 Page 2618 of 3649
case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 10 of 29

factors do not support a finding of an employer-employee relationship. *Id.* at 945 ("An employer-employee relationship may be found even though the parties define their relationship as one of principal-independent contractor if enough of the indicia of a master-servant relationship are present. . . . Where, as here, the parties define their relationship as that of an independent contractor-principal, and the facts of their relationship support that conclusion, courts will not interfere with the intent of the parties.").

Trasys responds that this argument either misreads or misinterprets the district court's opinion, which found the contractual definition of the relationship to be a "primary" factor in the analysis, but still examined whether the traditional control test provided sufficient indicia of an employment relationship. This indeed seems to be what the district court did. The district court stated that it placed "primary emphasis" on the intent of the parties when determining the nature of the relationship, but then conducted an analysis of the ten-factor control test from the Restatement (Second) of Agency, and adopted by the Indiana Supreme Court in *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001). The district court acknowledged that it attached particular importance to the ninth factor of the control test, the belief of the parties concerning a master/servant relationship. That approach fits with the logic of *Stone*, however, since the district court was attempting to follow the intent of the parties as expressed in the contractual agreements unless enough facts indicated the existence of a traditional employment relationship. In part, this approach recognizes that the Restate-

ment test was not designed solely as a test of employment status; it is also frequently used in tort cases to determine whether an employer is liable for an injury to a third party. *See* Restatement (Second) of Agency § 220.1 cmt. c. Since the Restatement test is a multi-factor balancing test, courts applying the test in an employment suit, cognizant of the freedom given to parties to create their relationship through contract, may choose to emphasize evidence that is especially probative of the parties' beliefs about the nature of the relationship. Such probative evidence would include evidence of an explicit contractual definition of that relationship or evidence of the tax status of the relationship.

The estate also argues that the district court overlooked contradictory evidence, since the Independent Contractor Agreement between Trasys and Suskovich contained references to both an independent contractor relationship and an employer-employee relationship. And because Trasys drafted the contract, the estate argues that contract law requires that any ambiguity be construed against the drafter. *United Thermal Indus., Inc. v. Asbestos Training & Employment, Inc.*, 920 F.2d 1345, 1349 (7th Cir. 1990). However, *United Thermal* also holds that extrinsic evidence of the intent of the parties can be admitted where the terms of the contract are unclear or ambiguous, and Indiana cases holding that ambiguities should be construed against the drafter also hold that extrinsic evidence of the parties' intent is admissible in order to resolve ambiguities. *See Rieth-Riley Const. Co., Inc. v. Auto-Owners Mut. Ins. Co.* 408 N.E.2d 640, 645 (Ind. App. 1980). In determining the intent of the parties, the district court

considered evidence from inside and outside of the contract. The district court first found that the contracts' terms were inconsistent with an employer-employee relationship despite the use of phrases like "employee" and "wages" because the contract made any "employment" subject to the approval of WellPoint, which is an odd term indeed for an employment contract. Second, the district court credited the evidence that the purpose of the contract with Trasys was to allow Suskovich to continue working on WellPoint projects after the company had established its preferred vendor system. Outside of the citation to *United Thermal*, the estate does not challenge the district court's summary judgment findings resolving the ambiguity in the contract, and we accordingly find that the district court was correct in considering the contract in its summary judgment ruling.

**B.  Whether the district court improperly determined that Suskovich was an independent contractor based on the control test.**

The estate next argues that the district court improperly determined the ten-factor control test from the Restatement (Second) of Agency in favor of WellPoint and Trasys despite several factors that the estate argues are ambiguous or tilt in favor of finding a traditional employer-employee relationship. The issue of the control test raises the preliminary question of exactly what standard this court should apply when determining whether or not Suskovich was an employee or an independent contractor, given that the estate makes common

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 13 of 29

law, FLSA, and ERISA claims, and there are slightly different tests for each of those claims. ERISA cases use a 12-factor common law standard to determine if a party to a lawsuit was an employee under the act. The Supreme Court has held that this standard is similar to the 10-factor Restatement test. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992). FLSA cases, meanwhile, are decided utilizing a broader definition of employee than the common law, and determine whether an arrangement is an employment or independent contractor relationship with a six-factor test to determine the "economic reality" of the situation. *Secretary of Labor, U.S. Dept. of Labor v. Lauritzen*, 850 F.2d 1529, 1534 (7th Cir. 1987). The district court followed the Restatement test, an approach that we will follow as well.[1] Given that the majority of the claims in this case revolve around the bare question of employment status and the Restatement test is generally equivalent to the common law test from *Darden*, that test provides the best means of resolving the main employment question before us.

Under the Restatement test, a court examines: (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under

[1] Additionally, the estate invokes the Restatement test in its arguments and briefs and thus has waived any argument that the broader FLSA standard ought to apply to this case.

the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; (10) whether the principal is or is not in business. *Moberly*, 757 N.E.2d at 1010; *see also* Restatement (Second) of Agency § 220.

### 1. Extent of control

The district court's summary judgment opinion found that the control factor supported WellPoint and Trasys' claim that Suskovich was an independent contractor rather than an employee. The estate challenges this finding on appeal, citing WellPoint and Trasys' control over important aspects of Suskovich's work. Specifically, the estate cites the fact that WellPoint and Trasys mandated that he work from at least 8:30 a.m. to 4:00 p.m., controlled the number of hours he could bill in a given day, required that he attend project meetings, monitored his progress on projects and asked him to train a replacement. The estate also argues that WellPoint and Trasys "disciplined" Suskovich for tardiness and receiving personal telephone calls; presumably, the estate is referring to WellPoint's conversations about finding someone else for Suskovich's projects if his tardiness did not improve.

None of the facts that the estate sets forth are sufficient to establish WellPoint and Trasys' control over the details of Suskovich's work. Merely setting a work schedule is not sufficient to support a finding that a given person is an employee rather than an independent contractor. *Ost*, 88 F.3d at 438. Nor is the fact that a person is required to be at a given place at a given time or assigned project work sufficient to support an employer-employee relationship. *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 493 (7th Cir. 1996) (finding that setting "on call" hours and assigning patients was not sufficient to create an employment relationship between a doctor and a hospital). Rather, the question is whether the details of the work were in the control of Suskovich or WellPoint and Trasys. *See Ost*, 88 F.3d at 438-39. The record here seems to indicate that Suskovich controlled the details of his work, and that he was accountable to Trasys and WellPoint only for the results of his work. Indeed, as the district court pointed out, neither Trasys nor WellPoint had employees who could adequately supervise the computer programming work that Suskovich did, which was the reason the companies retained him in the first place.

The record bears this observation out as well; for instance, Aaron Longdon, a project leader in WellPoint's Federal Employees Program, averred that, "[Suskovich's] programming expertise and skill in computer programming languages such as Mercator were beyond FEP's level of technical knowledge. FEP exerted no control over the details by which Suskovich conducted his work." As a rebuttal to this argument, the estate points to com-

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 16 of 29

mentary in the Restatement that even skilled artisans can be considered employees. That is beside the point. Obviously, a company can control the work of even a very advanced computer programmer if there is evidence that the company controls how the programmer goes about the job and does not just examine the final result. The record in this case indicates that Suskovich was answerable only for his final performance on projects, and accordingly this factor favors the district court's summary judgment finding that Suskovich was an independent contractor.

**2. Instrumentalities**

The estate next argues that Suskovich was an employee rather than an independent contractor because WellPoint and Trasys supplied the instrumentalities of his work. Suskovich was required to do his work on site, and was given a desk, computer, filing cabinet, and other supplies. The estate argues that because these were instrumentalities of substantial value the district court should have drawn an inference of employment. WellPoint and Trasys respond that, since Suskovich was a computer programmer, it is hardly surprising that he would work on equipment provided by the company.

Courts that have been presented with this claim in the past seem to have decided that this factor is relatively unimportant. The Second Circuit, evaluating a similar employee versus independent contractor question, found that this factor favors an employment relationship should not weigh heavily in the analysis, since computer

programming work will always be done on a company's computers. *Aymes v. Bonelli*, 980 F.2d 857, 864 (2d Cir. 1992); *see also Bigalke v. Neenah Foundry, Co.*, No. 05-C-29, 2006 WL 1663717, at *5 (E.D. Wis. June 9, 2006) (finding that while this factor weighed in favor of the plaintiff, "the various trappings of employment she cites seem more superficial than substantive indicia of employment status.").

The district court made a similar determination when holding that this factor should not have much significance in the overall analysis. The estate objects to this part of the opinion, claiming that the district court is making a "custom argument" that is not supported by the record. That is incorrect, however, and ignores what other courts that have evaluated the same issue have previously held. An independent contractor working on a company's computer system will be using computer equipment supplied by that company—that is the logical result of hiring the consultant to do programming work on that system in the first place. One need not have any familiarity with the customs of IT work to draw this inference. So while we note that WellPoint and Trasys did indeed supply Suskovich with the instrumentalities of his work, we also recognize that such is the nature of IT work, and that this is not a factor that bears much weight in the overall analysis.

**3. Length of employment**

The estate next argues that the district court erroneously found that the length of Suskovich's employment sup-

ported independent contractor status. The district court concluded that this factor favored WellPoint and Trasys because Suskovich was only employed for the length of short term contracts, because his employment was not guaranteed, and because he worked for different divisions of the company and other companies during the time he worked for WellPoint. The estate now argues that the short term of the contracts is irrelevant, as is Suskovich's side work, citing *Lauritzen*, which held that persons retained for seasonal work could still be employees for purposes of the FLSA.

Trasys and WellPoint argue that Suskovich was only engaged for limited periods of time and that he went through occasional periods where his projects with WellPoint ended and he performed no work for the company. Thus, they conclude, the district court correctly found that this factor favored a finding that Suskovich was an independent contractor. This court has previously held that where a person is engaged to work for a company for a limited period of time with no expectation of contract renewal, that fact favors independent contractor status. *EEOC v. North Knox School Corp.*, 154 F.3d 744, 750-51 (7th Cir. 1998). Suskovich worked with WellPoint on and off for about ten years, five of those years through Trasys. While this is a substantial period of time, Suskovich was only engaged for short projects, usually lasting six to twelve months. The record shows that he never enjoyed any guarantees that his work would extend beyond this limited duration, and accordingly, as this court has held before, this factor favors independent contractor status.

Finally, the citation to *Lauritzen* is little help in this case. *Lauritzen* was decided under the FLSA which, as previously discussed, takes a broader view of employer-employee relationships than the common law or ERISA tests. It thus provides little support for the position that a person who was engaged for limited periods of time without an expectation of permanent employment can claim to be an employee under a traditional analysis.

**4. Method of payment**

The estate next argues that because Suskovich was paid by the hour, he was an employee rather than an independent contractor. It cites *Moberly*, and various commentary to the Restatement emphasizing that when a person is paid by the hour rather than by the job, such payment is evidence of a traditional employment relationship. Trasys and WellPoint, on the other hand, point out a number of cases from this court holding that tax forms and tax returns are essential when deciding which status this factor favors. *See Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003); *see also Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 964-65 (7th Cir. 2001). Most relevant to the present case, this court has previously held that issuing 1099 forms, which are used for non-employee compensation, "would be appropriate for independent contractor status." *North Knox School Corp.*, 154 F.3d at 750. In this case, Suskovich was issued 1099 forms from both WellPoint and Trasys, and the record shows that he was never added to WellPoint or Trasys' payroll. Instead, he had to invoice his hours in order to be paid. On his own tax

returns, Suskovich also listed his income as income from a sole proprietorship, and he claimed business deductions related to that proprietorship. The bare argument that Suskovich was paid by the hour and thus is classified by the Restatement commentary as an employee is simply inadequate; it would require this court to reverse its previous holdings about the significance of tax status, as well as Suskovich's own tax returns.

**5. Part of the regular business**

The estate next argues that the district court erroneously found that Suskovich's work was not part of the regular business of WellPoint or Trasys. The estate argues that Trasys provides IT professionals to various businesses, and so Suskovich's work was in line with their core business operation. It also argues that WellPoint's business of providing and administering health plans depends upon computers and computer networks and so Suskovich's work was part of their regular business.

The estate's last point proves too much; nearly every organization uses computers for its operations, and nearly every organization has some kind of network. If the estate is correct, this finding could support an employer-employee relationship between IT personnel and just about anyone. The argument is stronger with respect to Trasys, since it is a company that provides IT professionals to companies in need of assistance, and Suskovich was an IT professional working for WellPoint. The argument is ultimately superficial, however. The facts of this case indicate that Suskovich only operated through Trasys

because there were projects that WellPoint wanted him to work on but on which they could not retain him directly because of the preferred vendor agreement. As the district court also pointed out, Trasys made less than its usual profit margin on Suskovich's work. While Suskovich may have been engaged in the same fundamental operation as Trasys the facts of this case indicate that his work was not part of their regular business—that is, he was not hired or compensated in the regular way, and he was brought on as an accommodation to WellPoint. While this is a closer question, it is not a factor that outweighs the more definite evidence of Suskovich's tax returns and his contractual agreement with Trasys.

**6. Beliefs of the parties**

The estate finally argues that the district court should not have resolved the "beliefs of the parties" factor in favor of WellPoint because there is a disputed issue of fact here—the testimony of Suskovich's widow that he considered himself an employee of WellPoint and Trasys. Trasys and WellPoint argue that the other evidence in the record contradicts this statement. First, they argue that Suskovich's tax returns, which he signed under penalty of perjury, claim he was a sole proprietor of a consulting business and list no wages from employment. Second, Suskovich's resumes, which he prepared while working for Trasys and WellPoint, list his occupation as an "independent computer consultant." He also listed himself as a subcontractor and a salesman on his invoices, and listed himself as a contractor on a form he prepared to get access to WellPoint's computer system.

Moreover, WellPoint argues the deposition testimony does not establish that Suskovich believed he was an employee, merely that he "felt that due to the way he was treated" that he was considered an employee. This point may be parsing the statement a little too closely, but WellPoint also makes the stronger point that this testimony is inadmissible hearsay. The estate argues that it is admissible under Fed. R. Evid. 803(3) as a statement of a then-existing mental condition. However, the "mental conditions" referred to in Rule 803(3) are things such as intents, plans, motives, or designs, and not statements of belief. In fact, statements of belief are specifically inadmissible under the rule to prove the fact remembered or believed, unless it relates to the terms of a will, which the statement here does not. Fed. R. Evid. 803(3). Thus the testimony of Suskovich's widow would not be admissible at trial, or on summary judgment. Even if the statement is admissible, however, this is hardly enough to create a disputed issue of fact, as the other evidence—the tax returns, resumes, tax forms, and contractual agreement with WellPoint Virginia, which explicitly disclaims an employer-employee relationship—overwhelmingly favors the conclusion that Suskovich considered himself an independent contractor.

**7. Other factors**

Three other factors, the "distinct occupation or business" factor, the "kind of occupation" factor, and the "skill required" factor, were all resolved in favor of WellPoint and Trasys, since Suskovich had the sort of advanced

programming skills that allowed him to contract his work out to a number of companies, and even started his own business, Indy Imaging, Inc. These factors are not contested on appeal.

### 8. Conclusion

With the exception of the instrumentalities factor, which should not weigh heavily in the estate's favor under the circumstances, and the regular part of business factor, which would at most weigh only slightly against Trasys, not a single factor in the test supports the conclusion that Suskovich was an employee rather than an independent contractor. In fact, overwhelming evidence suggests that he considered himself an independent contractor, filed his tax returns as an independent contractor, and was compensated like an independent contractor. Accordingly, the district court properly awarded summary judgment to WellPoint and Trasys on this issue.

## C. Whether the district court improperly admitted the statements of Eberhard and Jeschke in violation of the Indiana Dead Man Statute.

The estate next argues that the district court improperly considered the testimony of Eberhard and Jeschke, who testified that Suskovich did not consider himself an employee because he routinely rejected offers of regular employment as a computer programmer with WellPoint. Specifically, the estate argues that this testimony is barred by the Indiana Dead Man Statute, Indiana

Code § 34-45-2 *et seq.* We can divide our discussion of this issue into three subsidiary issues. First, whether the Indiana Dead Man's Statute applies to a proceeding in federal court. Second, whether the testimony at issue actually ran afoul of the statute. Third, whether the error, if any, was or was not harmless. Because this is an evidentiary issue, this court reviews only for an abuse of discretion. *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1175 (7th Cir. 2008).

The estate made two federal law claims—under the FLSA and ERISA—and one state law claim. WellPoint and Trasys thus argue that the Dead Man's Statute should not apply in federal court. The law of this circuit is fairly clear that where state law provides a federal court with the grounds for its decisions, that court should also apply state law restrictions on the competency of witnesses. The evidentiary standard in a case such as this one, where both federal and state law claims are involved, is less certain. District courts in this circuit that have considered the issue have previously held that Federal Rule of Evidence 601, which creates a broad presumption of competency, applies to cases alleging both federal and state law claims. *See Estate of Chlopek v. Jarmusz*, 877 F. Supp. 1189, 1193 (N.D. Ill. 1995); *see also Donohoe v. Consolidated Operating & Production Corp.*, 763 F. Supp. 845, 860-61 (N.D. Ill. 1990), *vacated on other grounds* 982 F.2d 1130 (7th Cir. 1992). This rule conforms with the Advisory Committee's Note accompanying Federal Rule of Evidence 501, which states that "[i]f the rule proposed here results in two conflicting bodies of privilege law applying to the same piece of evidence in the same case, it is contemplated that

the rule favoring reception of the evidence should be applied." Fed. R. Evid. 501. Accordingly, Rule 601, rather than the Indiana Dead Man's Statute, applies to the competency of witnesses, at least insofar as the evidence relates to any of the federal claims. However, that rule provides that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law." Fed. R. Evid. 601. We thus still need to consider whether the Indiana Dead Man's statute would bar testimony if the evidence related solely to the common law claims.

The Indiana Dead Man's Statute states, in brief, that in a case where an executor or administrator of an estate is a party and the estate may receive or be liable for or receive a judgment in the action, a person who is a necessary party to the issue or case and whose interest is adverse to the estate is not competent to testify. Indiana courts hold that "the general purpose of the Dead Man's Statute is to protect the decedent's estate from spurious claims." *Bedree v. Bedree*, 747 N.E.2d 1192, 1195 (Ind. Ct. App. 2001). While the facts of this case satisfy a few of the requirements of the Dead Man's Statute, it is a stretch to hold that Eberhard and Jeschke are necessary parties or have interests adverse to the estate. Eberhard and Jeschke testified that they discussed regular employment with Suskovich at various times, but that he wanted to continue with his original arrangement with WellPoint. The estate argues that because both are employees of WellPoint, their interests are adverse to the estate's and

thus that they are incompetent to testify. But nothing in the record suggests that Eberhard or Jeschke have any personal stake in the outcome of the litigation, and the estate's interpretation of the statute would sweep in any adverse witness who would testify against an estate in a case brought by the estate. Nor are Eberhard and Jeschke "necessary parties" to the action or issue, as they are not named in the suit. The district court thus did not abuse its discretion in considering this testimony on summary judgment.

**D. Whether summary judgment is appropriate for the defendants on the alternative grounds that even if Suskovich was an employee he was not eligible for FLSA or ERISA benefits, and is ineligible for common law indemnification.**

WellPoint and Trasys make a final series of arguments showing that even if the estate prevails on the issue of whether or not Suskovich was common law employee, the estate cannot prevail on its FLSA, ERISA, or common law indemnification claims. The estate's FLSA claim is based on a purported failure to pay Suskovich overtime for the weeks where he worked more than forty hours. The FLSA, however, contains exemptions to the overtime pay requirement that would cover Suskovich. The first is an exemption for computer programmers, software analysts, computer engineers, and other similarly skilled workers. 29 U.S.C. §§ 213(a)(1), 213(a)(17). The exemption applies to employees who earn more that $27.63 per hour, and whose primary duties are related to computer

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 27 of 29

systems or programs. 29 C.F.R. § 541.401(b). WellPoint also claims that Suskovich would be ineligible for overtime under the FLSA because he was a highly compensated worker who earned over $100,000 per year. *See* 29 C.F.R. § 541.601 (applying an exemption to the overtime requirements for employees who earn in excess of $100,000 and who perform primarily non-manual work, such as office work).

With respect to the ERISA claims, the estate is seeking damages for WellPoint and Trasys' alleged failure to enroll Suskovich in retirement benefit plans for which he was eligible. Eligibility under ERISA is not automatic for common law employees, however. A plaintiff must also demonstrate that he was eligible under the terms of the employer's own benefit plans. "Nothing in ERISA, however, compels a plan to use the term 'employee' in the same way it is used in the statute. Indeed, because a plan governed by ERISA need not include all categories of employees there is no reason to expect that it would." *Trombetta v. Cragin Fed. Bank Ownership Plan*, 102 F.3d 1435 (7th Cir. 1996) (internal citation omitted). Both Trasys and WellPoint cite their own employee benefit plans, which include the caveat that anyone not treated as an employee who is later ruled to be a common law employee in a lawsuit remains ineligible for benefits. WellPoint makes the same argument with respect to the estate's breach of contract claims against them, arguing that even if Suskovich was a common law employee he never had an employment contract that would have entitled him to fringe benefits such as participation in the company's employee stock purchase plan.

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 28 of 29

Finally, both WellPoint and Trasys argue that Suskovich is not eligible for indemnity under Indiana law. Common law indemnity in Indiana requires a court's determination that the party seeking indemnity is without fault. *Bourbon Mini-Mart v. Gast. Fuel & Serv., Inc.*, 783 N.E.2d 253, 257-58 (Ind. 2003). The estate seeks indemnity for his back taxes based on his failure to file tax returns for several years, failure to pay withholding and income tax, and claiming improper deductions. These failures, they argue, mean that he was at fault for his tax liability and thus cannot seek common law indemnification.

The estate's response to all three arguments urges this court to overlook the alternative grounds because they were not ruled on by the district court. Of course, this court can affirm summary judgment on any non-waived ground, even if the district court did not address it. *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 173 (7th Cir. 1996). The estate claims, however, that these alternative grounds all involve factual disputes that the district court did not address, and could not resolve on summary judgment. However, the estate does not present any evidence contesting the applicability of the FLSA exemptions, or establishing Suskovich's eligibility under either Trasys or WellPoint's benefit plans, or evidence that Suskovich properly paid his taxes every year. While we need not reach this question, having already determined that the district court correctly held that Suskovich was an independent contractor rather than an employee, we simply note that these alternative grounds would also provide a basis for affirming the judgment of the district

case 3:05-md-00527-RLM -CAN document 1712-2 filed 02/13/09 page 29 of 29

court even assuming arguendo that Suskovich was a common law employee.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

1-22-09

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL CASES

CHIEF JUDGE MILLER

**MOTION TO RECONSIDERATION ORDER CONCERNING PRODUCTION OF PLAINTIFFS' TAX RECORDS PURSUANT TO RECENT SEVENTH CIRCUIT DECISION IN *SUSKOVICH V. ANTHEM HEALTH PLANS OF VIRGINIA, INC.***

For the reasons stated in the accompanying memorandum, Defendant FedEx Ground Package System, Inc. respectfully requests this Court reconsider its Order of December 14, 2006 Order [Docket No. 451] and grant its motion to compel production of documents responsive to Requests for Production No. 2, 14, and 18.

Dated: February 13, 2009

Respectfully submitted

By: s/Alison G. Fox
Alison G. Fox

John H. Beisner
Robert M. Schwartz
Victor I. Jih
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5378
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 13th day of February, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Alison G. Fox

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

*In re* FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL CASES

Case No. 03:05-MD-527 RM
(MDL 1700)

CHIEF JUDGE MILLER

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO RECONSIDER ORDER CONCERNING PRODUCTION OF PLAINTIFFS' TAX RECORDS PURSUANT TO RECENT SEVENTH CIRCUIT DECISION IN *SUSKOVICH V. ANTHEM HEALTH PLANS OF VIRGINIA, INC.***

In *Suskovich v. Anthem Health Plans of Virginia, Inc.*, No. 08-7070, __ F.3d __, 2009 WL 140494 (7th Cir. Jan. 22, 2009) (attached as Exhibit 1), the Seventh Circuit held that district courts may place "'primary emphasis'" on the "beliefs of the parties" factor when deciding whether an individual is an independent contractor under the common law. Finding tax evidence "especially probative" of that factor, the court placed new emphasis on "tax forms" and "tax returns," concluding that they, in combination with other evidence, "overwhelm[ed]" testimony suggesting that the plaintiff believed he was an employee. *Suskovich*, slip op. at 10, 21. Before *Suskovich*, and before FedEx Ground had the opportunity to depose many of the plaintiffs involved in this case, this Court ruled that information in tax records of plaintiffs in jurisdictions applying the common law analysis of *Nationwide Mutual Insurance Co. v. Darden*,

503 U.S. 318, 323 (1992), was not discoverable because "information contained in the tax returns hasn't been put at issue under the common law agency test." Dec. 14, 2006 Order (the "Order") [Docket No. 451] at 5-6. In light of *Suskovich*'s finding that tax evidence is "especially probative" of the parties' beliefs in the common law analysis, as well as numerous plaintiffs' inability to answer deposition questions concerning their tax returns—evidence that takes on new germaneness after *Suskovich*—FedEx Ground moves for reconsideration of the Court's Order.

## I.    BACKGROUND

On January 20, 2006, FedEx Ground served plaintiffs with requests to produce tax records and related financial information. When plaintiffs refused to produce responsive documents, FedEx Ground filed a motion to compel, which Magistrate Judge Nuechterlein denied on September 9, 2006. *See* Docket No. 356. On September 20, 2006, FedEx Ground filed a motion to reconsider (Docket No. 370), arguing, *inter alia*, that the tax records were relevant under the common law test; specifically, in evaluating the intent of the parties. *See* Docket No. 370 at 5-6.

In response, Plaintiffs argued that the motion to reconsider was moot because they had "already admitted that they had little choice but to file their taxes as self-employed drivers." Docket No 379 at 3. In support, plaintiffs pointed to their response to FedEx Ground's Request for Admission No. 2, which, in its entirety, states:

> Named plaintiffs admit that they filed their taxes as self-employed truck drivers while performing services for Defendants, based on their receipt of FedEx's 1099 forms misclassifying them as independent contractors.

Docket No. 320, Exh. A, at 4. Further, plaintiffs argued that "courts have only examined whether the hiring party has provided, and purported contractor has filed, a Form 1099, not the information contained in tax schedules." Docket No. 379 at 8.

case 3:05-md-00527-RLM -CAN document 1715 filed 02/13/09 page 3 of 9

This Court ruled on December 14, 2006, granting FedEx Ground's motion in part and denying it in part. In jurisdictions applying the "economic realities" test, the Court ordered the production of the named plaintiffs' tax returns because the returns likely contained information relevant to the "opportunity for profit" factor. *See* Order at 6-10. But the Court denied the production of the tax returns with respect to jurisdictions employing the *Darden* common law test. The Court held that although a "party's treatment for tax purposes can be a factor relevant in determining their employment status under the common law agency test applied in ERISA cases," the plaintiffs' admission that they filed as non-employees was the only "material" information FedEx Ground required. *See* Order at 5-6 (finding that in light of plaintiffs' admission, "any additional information contained in the tax returns isn't material in determining the plaintiffs' employment status for purposes of ERISA claims since the additional information contained in the tax returns hasn't been put at issue under the common law agency test").

## II. ARGUMENT

A motion for reconsideration is appropriate where either new law or new facts not available at the time of the decision are subsequently presented. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) ("A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since submission of the issue to the Court.") (citations, quotations, omitted). Reconsideration is warranted here for two reasons. First, the Seventh Circuit's ruling in *Suskovich* put the content of tax returns—as opposed to tax status alone—at issue when examining the "beliefs of the parties" factor under both the Restatement and the common law *Darden* analysis. Second, in depositions taken after the Court's Order, numerous plaintiffs were unable to testify about even the most basic aspects of

their tax returns, leaving FedEx Ground without any evidence to analyze the "especially probative" value of plaintiffs' tax filings to the "beliefs of the parties" factor.

**1. *Suskovich* Holds That Tax Records Are Probative Evidence Of The Parties' Beliefs Under The Common Law.**

In *Suskovich*, the Seventh Circuit affirmed the district court's summary judgment ruling that placed "primary emphasis" on the "beliefs of the parties" factor under a common-law analysis.[1] *Suskovich*, slip op. at 9. When analyzing that factor, the court found that district courts "may choose to emphasize evidence that is especially probative of the parties' beliefs about the nature of the relationship," including "evidence of the tax status of the relationship." *Id.* at 10.

Critically, the Seventh Circuit's opinion explains that "evidence of the tax status of the relationship" includes more than just the parties' tax status. In its overview of the evidence, the court noted that "[f]or tax purposes, [Suskovich's] salary was reported on a 1099 form rather than a W-2." *Id.* at 3. Further, the court took notice of the actual content of plaintiff's tax returns, noting that "[o]n those returns, [plaintiff] listed himself as a self-employed computer consultant, and claimed that he derived his income from his computer consulting business. He also claimed substantial business deductions, again relating to his computer consulting business." *Id.* at 6.

---

[1] Notably, *Suskovich* involved claims under the Employee Retirement Income Security Act ("ERISA"), the Fair Labor Standards Act ("FLSA"), and Indiana common law. The Seventh Circuit noted that "there are slightly different tests" for determining the independent contractor vs. employee question under ERISA, the FLSA, and Indiana common law, and concluded that "[g]iven that the majority of the claims in this case revolve around the bare question of employment status and the Restatement test is generally equivalent to the common law test from *Darden*, that test provides the best means of resolving the main employment question before us." *Suskovich*, slip op. at 12. The Seventh Circuit also applied the Restatement test to the FLSA claim (as opposed to the "economic reality" test), because the

More to the point, the court considered those returns when analyzing the parties' intent.[2] Specifically, when Suskovich's estate pointed to deposition testimony from his widow that he "considered himself an employee," the court held that even if such testimony was admissible, it was "hardly enough" to create a disputed issue of fact on the "beliefs of the parties" factor because "other evidence—*the tax returns,* resumes**,** *tax forms,* and contractual agreement . . . overwhelmingly favors the conclusion that Suskovich *considered himself an independent contractor*." *Id*. at 21 (emphasis added). Thus, the Seventh Circuit was interested not only in Suskovich's filing status, but also in the representations made on his tax forms, which the court considered "especially probative"—indeed, nearly dispositive—of his understanding of his status. *Id.* at 20-21.

**2. Plaintiffs' Tax Records Are Relevant to Analyzing the Belief of the Parties.**

This Court's Order forecloses the possibility of FedEx Ground presenting such "especially probative" evidence. While *Suskovich* found tax returns and tax forms crucial evidence on the *merits* at summary judgment, the Court's Order denies FedEx Ground the chance to even determine whether plaintiffs' tax filings are relevant in this case. FedEx Ground was not able to discover sufficient information about plaintiffs' tax returns during depositions. While the Seventh Circuit noted that Suskovich's tax documents showed that he "listed himself as a 'self-

---

plaintiff had relied on the Restatement test in earlier briefing, and thus had "waived any argument that the broader FLSA standard ought to apply to this case." *Id.* at 12 n.1.

2 *Suskovich* also stressed the significance of tax return evidence to the "method of payment" factor, holding that Suskovich's tax returns trumped the undisputed evidence that Suskovich was paid by the hour. *See id.* at 18-19 ("On his own tax returns, Suskovich also listed his income as income from a sole proprietorship, and he claimed business deductions related to that proprietorship. The bare argument that Suskovich was paid by the hour and thus is classified by the Restatement commentary as an employee is simply inadequate; it would require this court to reverse its previous holdings about the significance of tax status, as well as Suskovich's *own tax returns*.") (emphasis added).

case 3:05-md-00527-RLM -CAN document 1715 filed 02/13/09 page 6 of 9

employed computer consultant'" and "claimed substantial business deductions," numerous plaintiffs were unable to provide complete testimony about even these basic aspects of their tax returns. *See, e.g.*, Dep. of Jonathan Paul Leighter (attached as Exhibit 2) [taken Aug. 21, 2007] at 135:15-17 ("Q. Do you know if you deducted it as a business expense from your taxes? I don't. My wife would."); Dep. of Robert Dizinno (attached as Exhibit 3) [taken on Aug. 28, 2007] at 94:2-20 (testifying that he did not "know what specific forms were filed" with the IRS and that his accountant would know what he filed); Dep. of Frank Gruhn (attached as Exhibit 4) [taken Sept. 11, 2007] at 329:3-8 ("Q. And on those tax returns while you were at [FXG], did you declare yourself to be an independent contractor? A. I'm not sure what my accountant--. . . . I'm not sure what was put on there.").

Nor does plaintiffs' admission that they "filed their taxes as self-employed truck drivers . . . based on their receipt of FedEx's 1099 forms" enable FedEx Ground to probe plaintiffs' intent under *Suskovich*. Indeed, the admission only tells one side of the story, and one that appears to attribute to plaintiffs a subjective intent of employee status at that. But because numerous plaintiffs were unable to testify about the content of their tax filings, without the relevant tax records, FedEx Ground has no other way to gather and present evidence to refute plaintiffs' admission with "evidence of the tax status of the relationship." *See Suskovich*, slip op. at 10. The returns may show, for example, whether plaintiffs claimed to derive income from a business (instead of employee wages), elected to take business deductions, or took credits available to business owners, all of which could be relevant under *Suskovich*. *Compare id.* at 21 (finding evidence, including "tax returns" and "tax forms" "overwhelm[ed]" testimony that plaintiff considered himself an employee), *with* Dep. of Richard Farrell (attached as Exhibit 5)

[taken Aug. 16, 2007] at 165:15-25 (testifying that he has "no idea" whether he filled out tax returns consistent with owning a business).

Further, that FedEx Ground provided plaintiffs with 1099 forms does not render the information in their tax returns immaterial to the issue of intent. In *Suskovich*, the court noted that the defendants had provided Suskovich with 1099 forms. *See Suskovich*, slip op. at 3 (noting that "[f]or tax purposes, [Suskovich's] salary was reported on a 1099 form rather than a W-2," and "for tax purposes, Trasys issued Suskovich a 1099 form rather than a W-2"). The Seventh Circuit did not attribute significance to the defendants' provision of the 1099 forms in analyzing the evidentiary value of Suskovich's tax return, nor did the Court discount the evidentiary value of the returns. To the contrary, it found such evidence "especially probative." *See id*. at 10, 21.

Finally, while *Suskovich* found evidence of tax records probative when weighing the evidence at summary judgment, the issue here is not whether such evidence *will* be "especially probative," but whether it *could* be. *See generally* Fed. R. Civ. P. 26(b)(1) (providing for discovery of relevant information "reasonably calculated" to lead to the discovery of admissible evidence). At minimum, given *Suskovich*'s emphasis on "evidence of the tax status of the relationship," plaintiffs' tax records are likely to uncover evidence relevant to the common law "beliefs of the parties" factor. *Suskovich*, slip op. at 9-10. *Cf.* Order at 6 (finding that "information contained in the tax returns hasn't been put at issue under the common law agency test.").

**III. CONCLUSION**

Under *Suskovich*, the requested documents are likely to be relevant to the central disputes of the case. Based on *Suskovich* and the fact that numerous plaintiffs were unable to

testify about the content or representations they made on their tax records, FedEx Ground

respectfully requests that this Court reconsider the Order and GRANT its motion to compel

production of documents responsive to Requests for Production No. 2, 14, and 18.

Dated:   February 13, 2009        Respectfully submitted

By:   s/Alison G. Fox
      Alison G. Fox

      John H. Beisner
      Robert M. Schwartz
      Victor I. Jih
      O'MELVENY & MYERS LLP
      1625 Eye Street, NW
      Washington, DC 20006-4001
      Tel:  (202) 383-5378
      Fax: (202) 383-5414

      Thomas J. Brunner
      Alison G. Fox
      BAKER & DANIELS LLP
      202 South Michigan Street
      Suite 1400
      South Bend, IN 46601
      Tel: (574) 234-4149
      Fax: (574) 239-1900

      *Defendant's Co-Lead and Liaison Counsel*

case 3:05-md-00527-RLM-CAN document 1715 filed 02/13/09 page 9 of 9

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 13th day of February, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Alison G. Fox

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1070

ESTATE OF ANTHONY J. SUSKOVICH,

*Plaintiff-Appellant,*

*v.*

ANTHEM HEALTH PLANS OF VIRGINIA, INC., ANTHEM INSURANCE COMPANIES, INC., ANTHEM LIFE INSURANCE COMPANY, HEALTH MANAGEMENT SYSTEMS, INC., ORIENTATION BENEFIT ADMINISTRATORS, INC., THE WELLPOINT COMPANIES, INC., WELLPOINT, INC., and its Pension and Welfare Benefits Plans, the Fiduciaries and Administrators of the Plans, and TRASYS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06 CV 425—**Sarah Evans Barker**, *Judge.*

ARGUED DECEMBER 2, 2008—DECIDED JANUARY 22, 2009

Before CUDAHY, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Until his sudden death in 2006, Anthony J. Suskovich worked as a computer programmer for WellPoint, a health insurance company, and Trasys, an

**EXHIBIT 1**

information technology (IT) company. In exactly what capacity he worked for those two companies is the subject of this present case. Suskovich's estate claims that he was a regular employee, and worse, one that was not paid overtime or enrolled in benefits programs for which he was eligible, and who owes state and federal tax agencies various taxes that WellPoint and Trasys should have withheld. WellPoint and Trasys claim that Suskovich was an independent contractor, and thus ineligible for benefits or overtime, and that he owes back taxes because of his own failure to file proper tax returns or pay his withholding taxes. After the district court granted summary judgment to WellPoint and Trasys, the estate brought this appeal.

For the following reasons, we affirm the district court's grant of summary judgment.

## I. Background

Suskovich was a computer analyst and programmer who worked, at various points over ten years, with one of the defendants in this case, WellPoint/Anthem ("WellPoint"). WellPoint is a related group of companies that provide health care coverage to clients throughout the United States. In 1995, Suskovich formed his own Indiana corporation, Indy Imaging, Inc., which he listed on his resume as "Indy Imaging, Inc. d/b/a Anthony J. Suskovich." WellPoint retained Suskovich and other IT professionals to work on the company's IT team in 1996. While no record exists of any contractual agreement between Suskovich and WellPoint, Suskovich stated on a

form he used to access WellPoint's computer system that he was a "contractor," and he billed WellPoint for his time on an invoice form that he had created, stating that he was a "salesperson" who sold "computer consulting" to WellPoint. He was paid at an hourly rate of $60, resulting in an annualized salary of about $200,000, and received no benefits. For tax purposes, his salary was reported on a 1099 form rather than a W-2.

Suskovich was retained for limited durations, usually about six months, although these limited engagements were often rolled over into new engagements. WellPoint stopped retaining Suskovich in 1999, but because of his expertise with various IT issues, sought to bring him back in 2000. Due to the company's new vendor consolidation program, Suskovich could only be retained if his services were offered through a preferred vendor. At this point, Suskovich began his relationship with the other defendant in the present case, Trasys, Inc., which agreed to bring Suskovich on as part of their team of IT professionals working with WellPoint. He was compensated for his time by submitting invoices to WellPoint, which would then approve them and return them to Trasys, which in turn paid Suskovich. Again, for tax purposes, Trasys issued Suskovich a 1099 form rather than a W-2. The 1099 forms that WellPoint and Trasys issued Suskovich listed his income as "nonemployee income" or "other income."

In February 2001, Suskovich signed an "Independent Contractor Agreement" with Trasys; this was apparently the first time that Suskovich and Trasys had put

Suskovich's relationship to the company in contractual form. Trasys labeled the writing as an independent contractor agreement, but the form contained terms that could refer to both an employment relationship and an independent contractor relationship; for instance, it referred to "wages" and consideration for "employment," but was also an agreement that only extended for a temporary period of time, and that began with the words "Trasys offers to contract you. . . ." As before, Suskovich would have to submit his hours to WellPoint and have them approved before he could receive any compensation from Trasys. Suskovich was paid $62 an hour under the agreement, and received no other benefits.

Throughout his time with WellPoint and Trasys, Suskovich worked on a variety of projects, and occasionally worked on different projects for different divisions of WellPoint at the same time. For instance, in 2001 Suskovich was working on mainframe issues for WellPoint's Federal Employee Program while simultaneously working on a print-mail project for a different division. In 2005, Suskovich entered into an agreement with Anthem Health Plans of Virginia to work on a Medicaid subrogation project; Suskovich did not go through Trasys when arranging this work, but rather drafted and submitted an "Agreement for Consulting Services with WellPoint Virginia" in which he described himself as an independent contractor and that nothing in the contract should be construed as creating an employer-employee relationship. Under the terms of the agreement, Suskovich was responsible for all income tax, unemployment insurance, and withholding. Anthem Health Plans of Virginia

Case 3:07-cv-00818-HZ Document 32-2 Filed 08/17/11 Page 2653 of 3649
case 3:05-md-00527-RLM -CAN document 1715-2 filed 02/13/09 page 5 of 28

issued Suskovich a 1099 form rather than a W-2, and the other divisions of WellPoint and Trasys were apparently unaware of this additional work.

During his time with WellPoint, Suskovich worked in a cubicle at WellPoint, with a computer supplied to him by the company. He apparently did not have a direct supervisor and worked under the WellPoint employee who was supervising whatever project he was working on. He occasionally worked offsite, but was expected to work at WellPoint's offices and to answer to the supervisors on his projects.

Sometime in August 2005, WellPoint informed Suskovich that they would not be keeping him on past the end of the year; in mid-September, they declined to renew his contract through Trasys. WellPoint was attempting to train one of their in-house programmers in the work that Suskovich was doing for them, but when getting her an outside training program proved to be too difficult, WellPoint asked Suskovich to train her. Suskovich began looking for additional work at this time, and WellPoint was disappointed with his efforts in training the in-house employee and attending his project meetings. WellPoint told Trasys that they would replace Suskovich with someone from another vendor if he did not improve his performance, and Trasys then told WellPoint that Suskovich's performance would improve.

Suskovich continued to look for other work, and approached Tom Eberhard, who had previously an independent contractor with WellPoint but who had accepted an offer of employment from the company and

had risen to a managerial role over some of the projects Suskovich worked on. Eberhard, along with another former IT contractor, Bruce Jeschke, who had also become a full-time employee of WellPoint, had made various attempts over the years to coax Suskovich into working for the company directly. In late 2005, Suskovich asked Eberhard if he had any work for him. Eberhard told him that he had no need for any contract work but did discuss the possibility of full-time employment with WellPoint. Suskovich's initial salary demand was apparently too high, however. Before Eberhard had a chance to negotiate, Suskovich contracted pneumonia and passed away suddenly.

Before his death on January 1, 2006, the IRS was investigating Suskovich because of his failure to file tax returns for several years. In response Suskovich filed delinquent tax returns for 1999-2002, and tax returns for the 2003 and 2004 tax years. On those returns, he listed himself as a self-employed computer consultant, and claimed that he derived his income from his computer consulting business. He also claimed substantial business deductions, again related to his computer consulting business. After the investigation, Suskovich agreed to a monthly levy on his income from the IRS, although at the time of his death he had not paid the full amount of his back taxes, including $100,000 in tax debt to the IRS and approximately $33,000 in tax debt to the state of Indiana.

Suskovich's wife sought relief from this outstanding debt as an innocent spouse, but the IRS denied her request. In March 2006, Kathy Suskovich, as the personal represen-

tative of Suskovich's estate, filed the present lawsuit. The estate initially sought declaratory relief in the form of a judgment that Suskovich was an employee of WellPoint and then a joint employee of Trasys and WellPoint. On the basis of that determination, the suit also sought a monetary award for compensation that Suskovich was supposedly denied under the Fair Labor Standards Act and other benefits that Suskovich was denied under the Employee Retirement Income Security Act, as well as indemnification for Suskovich's tax liabilities. The estate moved for summary judgment on April 6, 2007, and WellPoint and Trasys likewise moved for summary judgment on all counts. In December 2007, the district court denied the estate's motion for summary judgment and granted summary judgment to WellPoint and Trasys, finding that Suskovich was an independent contractor rather than an employee. This appeal followed.

## II. Discussion

The estate's appeal raises three issues. First, the estate claims that the district court mistakenly found that the deciding factor with respect to Suskovich's employment status was the contractual relationship between the parties; second, that the district court wrongly found that the factors in the control test overwhelmingly favored the appellees; third, that the district court considered hearsay testimony that should have been barred by the Dead Man's Statute. WellPoint and Trasys raise an additional issue, arguing that they can prevail on alternative grounds for the ERISA, FLSA and indemnifica-

Case 3:07-cv-00818-HZ Document 32-2 Filed 08/17/11 Page 2656 of 3649
case 3:05-md-00527-RLM -CAN document 1715-2 filed 02/13/09 page 8 of 28

tion claims even if this court decides the employment question against them.

We review a district court's grant of summary judgment de novo, reviewing the facts in the light most favorable to the non-moving party. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If the district court applied the proper standard to the employment inquiry in this case, this court reviews its findings only for clear error. *Ost v. West Suburban Travelers Limousine Co.*, 88 F.3d 435, 438 (7th Cir. 1996).

**A. Whether the district court incorrectly found the employment contracts between the parties as determinative of Suskovich's employment status.**

The estate first argues that the district court improperly found the employment contracts between Suskovich and Trasys and WellPoint Virginia to be determinative of his employment status. The estate argues that the district court afforded improper weight to this factor, ignored contradictory evidence in the employment contracts, and ignored the other factual considerations in the control test. More specifically, the estate argues that the district court misapplied this circuit's decision in *Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941 (1984), which gives parties to a contract the freedom to define their relationship as one of principal and independent contractor only if other

factors do not support a finding of an employer-employee relationship. *Id.* at 945 ("An employer-employee relationship may be found even though the parties define their relationship as one of principal-independent contractor if enough of the indicia of a master-servant relationship are present. . . . Where, as here, the parties define their relationship as that of an independent contractor-principal, and the facts of their relationship support that conclusion, courts will not interfere with the intent of the parties.").

Trasys responds that this argument either misreads or misinterprets the district court's opinion, which found the contractual definition of the relationship to be a "primary" factor in the analysis, but still examined whether the traditional control test provided sufficient indicia of an employment relationship. This indeed seems to be what the district court did. The district court stated that it placed "primary emphasis" on the intent of the parties when determining the nature of the relationship, but then conducted an analysis of the ten-factor control test from the Restatement (Second) of Agency, and adopted by the Indiana Supreme Court in *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001). The district court acknowledged that it attached particular importance to the ninth factor of the control test, the belief of the parties concerning a master/servant relationship. That approach fits with the logic of *Stone*, however, since the district court was attempting to follow the intent of the parties as expressed in the contractual agreements unless enough facts indicated the existence of a traditional employment relationship. In part, this approach recognizes that the Restate-

Case 3:07-cv-00818-HZ Document 32-2 Filed 08/17/11 Page 2658 of 3649
case 3:05-md-00527-RLM -CAN document 1715-2 filed 02/13/09 page 10 of 28

ment test was not designed solely as a test of employment status; it is also frequently used in tort cases to determine whether an employer is liable for an injury to a third party. *See* Restatement (Second) of Agency § 220.1 cmt. c. Since the Restatement test is a multi-factor balancing test, courts applying the test in an employment suit, cognizant of the freedom given to parties to create their relationship through contract, may choose to emphasize evidence that is especially probative of the parties' beliefs about the nature of the relationship. Such probative evidence would include evidence of an explicit contractual definition of that relationship or evidence of the tax status of the relationship.

The estate also argues that the district court overlooked contradictory evidence, since the Independent Contractor Agreement between Trasys and Suskovich contained references to both an independent contractor relationship and an employer-employee relationship. And because Trasys drafted the contract, the estate argues that contract law requires that any ambiguity be construed against the drafter. *United Thermal Indus., Inc. v. Asbestos Training & Employment, Inc.*, 920 F.2d 1345, 1349 (7th Cir. 1990). However, *United Thermal* also holds that extrinsic evidence of the intent of the parties can be admitted where the terms of the contract are unclear or ambiguous, and Indiana cases holding that ambiguities should be construed against the drafter also hold that extrinsic evidence of the parties' intent is admissible in order to resolve ambiguities. *See Rieth-Riley Const. Co., Inc. v. Auto-Owners Mut. Ins. Co.* 408 N.E.2d 640, 645 (Ind. App. 1980). In determining the intent of the parties, the district court

considered evidence from inside and outside of the contract. The district court first found that the contracts' terms were inconsistent with an employer-employee relationship despite the use of phrases like "employee" and "wages" because the contract made any "employment" subject to the approval of WellPoint, which is an odd term indeed for an employment contract. Second, the district court credited the evidence that the purpose of the contract with Trasys was to allow Suskovich to continue working on WellPoint projects after the company had established its preferred vendor system. Outside of the citation to *United Thermal*, the estate does not challenge the district court's summary judgment findings resolving the ambiguity in the contract, and we accordingly find that the district court was correct in considering the contract in its summary judgment ruling.

**B. Whether the district court improperly determined that Suskovich was an independent contractor based on the control test.**

The estate next argues that the district court improperly determined the ten-factor control test from the Restatement (Second) of Agency in favor of WellPoint and Trasys despite several factors that the estate argues are ambiguous or tilt in favor of finding a traditional employer-employee relationship. The issue of the control test raises the preliminary question of exactly what standard this court should apply when determining whether or not Suskovich was an employee or an independent contractor, given that the estate makes common

law, FLSA, and ERISA claims, and there are slightly different tests for each of those claims. ERISA cases use a 12-factor common law standard to determine if a party to a lawsuit was an employee under the act. The Supreme Court has held that this standard is similar to the 10-factor Restatement test. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992). FLSA cases, meanwhile, are decided utilizing a broader definition of employee than the common law, and determine whether an arrangement is an employment or independent contractor relationship with a six-factor test to determine the "economic reality" of the situation. *Secretary of Labor, U.S. Dept. of Labor v. Lauritzen*, 850 F.2d 1529, 1534 (7th Cir. 1987). The district court followed the Restatement test, an approach that we will follow as well.[1] Given that the majority of the claims in this case revolve around the bare question of employment status and the Restatement test is generally equivalent to the common law test from *Darden*, that test provides the best means of resolving the main employment question before us.

Under the Restatement test, a court examines: (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under

---

[1] Additionally, the estate invokes the Restatement test in its arguments and briefs and thus has waived any argument that the broader FLSA standard ought to apply to this case.

the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; (10) whether the principal is or is not in business. *Moberly*, 757 N.E.2d at 1010; *see also* Restatement (Second) of Agency § 220.

**1. Extent of control**

The district court's summary judgment opinion found that the control factor supported WellPoint and Trasys' claim that Suskovich was an independent contractor rather than an employee. The estate challenges this finding on appeal, citing WellPoint and Trasys' control over important aspects of Suskovich's work. Specifically, the estate cites the fact that WellPoint and Trasys mandated that he work from at least 8:30 a.m. to 4:00 p.m., controlled the number of hours he could bill in a given day, required that he attend project meetings, monitored his progress on projects and asked him to train a replacement. The estate also argues that WellPoint and Trasys "disciplined" Suskovich for tardiness and receiving personal telephone calls; presumably, the estate is referring to WellPoint's conversations about finding someone else for Suskovich's projects if his tardiness did not improve.

None of the facts that the estate sets forth are sufficient to establish WellPoint and Trasys' control over the details of Suskovich's work. Merely setting a work schedule is not sufficient to support a finding that a given person is an employee rather than an independent contractor. *Ost*, 88 F.3d at 438. Nor is the fact that a person is required to be at a given place at a given time or assigned project work sufficient to support an employer-employee relationship. *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 493 (7th Cir. 1996) (finding that setting "on call" hours and assigning patients was not sufficient to create an employment relationship between a doctor and a hospital). Rather, the question is whether the details of the work were in the control of Suskovich or WellPoint and Trasys. *See Ost*, 88 F.3d at 438-39. The record here seems to indicate that Suskovich controlled the details of his work, and that he was accountable to Trasys and WellPoint only for the results of his work. Indeed, as the district court pointed out, neither Trasys nor WellPoint had employees who could adequately supervise the computer programming work that Suskovich did, which was the reason the companies retained him in the first place.

The record bears this observation out as well; for instance, Aaron Longdon, a project leader in WellPoint's Federal Employees Program, averred that, "[Suskovich's] programming expertise and skill in computer programming languages such as Mercator were beyond FEP's level of technical knowledge. FEP exerted no control over the details by which Suskovich conducted his work." As a rebuttal to this argument, the estate points to com-

mentary in the Restatement that even skilled artisans can be considered employees. That is beside the point. Obviously, a company can control the work of even a very advanced computer programmer if there is evidence that the company controls how the programmer goes about the job and does not just examine the final result. The record in this case indicates that Suskovich was answerable only for his final performance on projects, and accordingly this factor favors the district court's summary judgment finding that Suskovich was an independent contractor.

**2. Instrumentalities**

The estate next argues that Suskovich was an employee rather than an independent contractor because WellPoint and Trasys supplied the instrumentalities of his work. Suskovich was required to do his work on site, and was given a desk, computer, filing cabinet, and other supplies. The estate argues that because these were instrumentalities of substantial value the district court should have drawn an inference of employment. WellPoint and Trasys respond that, since Suskovich was a computer programmer, it is hardly surprising that he would work on equipment provided by the company.

Courts that have been presented with this claim in the past seem to have decided that this factor is relatively unimportant. The Second Circuit, evaluating a similar employee versus independent contractor question, found that this factor favors an employment relationship should not weigh heavily in the analysis, since computer

programming work will always be done on a company's computers. *Aymes v. Bonelli*, 980 F.2d 857, 864 (2d Cir. 1992); *see also Bigalke v. Neenah Foundry, Co.*, No. 05-C-29, 2006 WL 1663717, at *5 (E.D. Wis. June 9, 2006) (finding that while this factor weighed in favor of the plaintiff, "the various trappings of employment she cites seem more superficial than substantive indicia of employment status.").

The district court made a similar determination when holding that this factor should not have much significance in the overall analysis. The estate objects to this part of the opinion, claiming that the district court is making a "custom argument" that is not supported by the record. That is incorrect, however, and ignores what other courts that have evaluated the same issue have previously held. An independent contractor working on a company's computer system will be using computer equipment supplied by that company—that is the logical result of hiring the consultant to do programming work on that system in the first place. One need not have any familiarity with the customs of IT work to draw this inference. So while we note that WellPoint and Trasys did indeed supply Suskovich with the instrumentalities of his work, we also recognize that such is the nature of IT work, and that this is not a factor that bears much weight in the overall analysis.

**3. Length of employment**

The estate next argues that the district court erroneously found that the length of Suskovich's employment sup-

ported independent contractor status. The district court concluded that this factor favored WellPoint and Trasys because Suskovich was only employed for the length of short term contracts, because his employment was not guaranteed, and because he worked for different divisions of the company and other companies during the time he worked for WellPoint. The estate now argues that the short term of the contracts is irrelevant, as is Suskovich's side work, citing *Lauritzen*, which held that persons retained for seasonal work could still be employees for purposes of the FLSA.

Trasys and WellPoint argue that Suskovich was only engaged for limited periods of time and that he went through occasional periods where his projects with WellPoint ended and he performed no work for the company. Thus, they conclude, the district court correctly found that this factor favored a finding that Suskovich was an independent contractor. This court has previously held that where a person is engaged to work for a company for a limited period of time with no expectation of contract renewal, that fact favors independent contractor status. *EEOC v. North Knox School Corp.*, 154 F.3d 744, 750-51 (7th Cir. 1998). Suskovich worked with WellPoint on and off for about ten years, five of those years through Trasys. While this is a substantial period of time, Suskovich was only engaged for short projects, usually lasting six to twelve months. The record shows that he never enjoyed any guarantees that his work would extend beyond this limited duration, and accordingly, as this court has held before, this factor favors independent contractor status.

Finally, the citation to *Lauritzen* is little help in this case. *Lauritzen* was decided under the FLSA which, as previously discussed, takes a broader view of employer-employee relationships than the common law or ERISA tests. It thus provides little support for the position that a person who was engaged for limited periods of time without an expectation of permanent employment can claim to be an employee under a traditional analysis.

**4. Method of payment**

The estate next argues that because Suskovich was paid by the hour, he was an employee rather than an independent contractor. It cites *Moberly*, and various commentary to the Restatement emphasizing that when a person is paid by the hour rather than by the job, such payment is evidence of a traditional employment relationship. Trasys and WellPoint, on the other hand, point out a number of cases from this court holding that tax forms and tax returns are essential when deciding which status this factor favors. *See Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003); *see also Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 964-65 (7th Cir. 2001). Most relevant to the present case, this court has previously held that issuing 1099 forms, which are used for non-employee compensation, "would be appropriate for independent contractor status." *North Knox School Corp.*, 154 F.3d at 750. In this case, Suskovich was issued 1099 forms from both WellPoint and Trasys, and the record shows that he was never added to WellPoint or Trasys' payroll. Instead, he had to invoice his hours in order to be paid. On his own tax

returns, Suskovich also listed his income as income from a sole proprietorship, and he claimed business deductions related to that proprietorship. The bare argument that Suskovich was paid by the hour and thus is classified by the Restatement commentary as an employee is simply inadequate; it would require this court to reverse its previous holdings about the significance of tax status, as well as Suskovich's own tax returns.

**5. Part of the regular business**

The estate next argues that the district court erroneously found that Suskovich's work was not part of the regular business of WellPoint or Trasys. The estate argues that Trasys provides IT professionals to various businesses, and so Suskovich's work was in line with their core business operation. It also argues that WellPoint's business of providing and administering health plans depends upon computers and computer networks and so Suskovich's work was part of their regular business.

The estate's last point proves too much; nearly every organization uses computers for its operations, and nearly every organization has some kind of network. If the estate is correct, this finding could support an employer-employee relationship between IT personnel and just about anyone. The argument is stronger with respect to Trasys, since it is a company that provides IT professionals to companies in need of assistance, and Suskovich was an IT professional working for WellPoint. The argument is ultimately superficial, however. The facts of this case indicate that Suskovich only operated through Trasys

because there were projects that WellPoint wanted him to work on but on which they could not retain him directly because of the preferred vendor agreement. As the district court also pointed out, Trasys made less than its usual profit margin on Suskovich's work. While Suskovich may have been engaged in the same fundamental operation as Trasys the facts of this case indicate that his work was not part of their regular business—that is, he was not hired or compensated in the regular way, and he was brought on as an accommodation to WellPoint. While this is a closer question, it is not a factor that outweighs the more definite evidence of Suskovich's tax returns and his contractual agreement with Trasys.

**6. Beliefs of the parties**

The estate finally argues that the district court should not have resolved the "beliefs of the parties" factor in favor of WellPoint because there is a disputed issue of fact here—the testimony of Suskovich's widow that he considered himself an employee of WellPoint and Trasys. Trasys and WellPoint argue that the other evidence in the record contradicts this statement. First, they argue that Suskovich's tax returns, which he signed under penalty of perjury, claim he was a sole proprietor of a consulting business and list no wages from employment. Second, Suskovich's resumes, which he prepared while working for Trasys and WellPoint, list his occupation as an "independent computer consultant." He also listed himself as a subcontractor and a salesman on his invoices, and listed himself as a contractor on a form he prepared to get access to WellPoint's computer system.

Case 3:07-cv-00812-HZ Document 32-2 Filed 08/17/11 Page 2669 of 3649
Case 3:05-md-00527-RLM -CAN document 1715-2 filed 02/13/09 page 21 of 28

Moreover, WellPoint argues the deposition testimony does not establish that Suskovich believed he was an employee, merely that he "felt that due to the way he was treated" that he was considered an employee. This point may be parsing the statement a little too closely, but WellPoint also makes the stronger point that this testimony is inadmissible hearsay. The estate argues that it is admissible under Fed. R. Evid. 803(3) as a statement of a then-existing mental condition. However, the "mental conditions" referred to in Rule 803(3) are things such as intents, plans, motives, or designs, and not statements of belief. In fact, statements of belief are specifically inadmissible under the rule to prove the fact remembered or believed, unless it relates to the terms of a will, which the statement here does not. Fed. R. Evid. 803(3). Thus the testimony of Suskovich's widow would not be admissible at trial, or on summary judgment. Even if the statement is admissible, however, this is hardly enough to create a disputed issue of fact, as the other evidence—the tax returns, resumes, tax forms, and contractual agreement with WellPoint Virginia, which explicitly disclaims an employer-employee relationship—overwhelmingly favors the conclusion that Suskovich considered himself an independent contractor.

**7. Other factors**

Three other factors, the "distinct occupation or business" factor, the "kind of occupation" factor, and the "skill required" factor, were all resolved in favor of WellPoint and Trasys, since Suskovich had the sort of advanced

programming skills that allowed him to contract his work out to a number of companies, and even started his own business, Indy Imaging, Inc. These factors are not contested on appeal.

**8. Conclusion**

With the exception of the instrumentalities factor, which should not weigh heavily in the estate's favor under the circumstances, and the regular part of business factor, which would at most weigh only slightly against Trasys, not a single factor in the test supports the conclusion that Suskovich was an employee rather than an independent contractor. In fact, overwhelming evidence suggests that he considered himself an independent contractor, filed his tax returns as an independent contractor, and was compensated like an independent contractor. Accordingly, the district court properly awarded summary judgment to WellPoint and Trasys on this issue.

**C. Whether the district court improperly admitted the statements of Eberhard and Jeschke in violation of the Indiana Dead Man Statute.**

The estate next argues that the district court improperly considered the testimony of Eberhard and Jeschke, who testified that Suskovich did not consider himself an employee because he routinely rejected offers of regular employment as a computer programmer with WellPoint. Specifically, the estate argues that this testimony is barred by the Indiana Dead Man Statute, Indiana

Code § 34-45-2 *et seq.* We can divide our discussion of this issue into three subsidiary issues. First, whether the Indiana Dead Man's Statute applies to a proceeding in federal court. Second, whether the testimony at issue actually ran afoul of the statute. Third, whether the error, if any, was or was not harmless. Because this is an evidentiary issue, this court reviews only for an abuse of discretion. *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1175 (7th Cir. 2008).

The estate made two federal law claims—under the FLSA and ERISA—and one state law claim. WellPoint and Trasys thus argue that the Dead Man's Statute should not apply in federal court. The law of this circuit is fairly clear that where state law provides a federal court with the grounds for its decisions, that court should also apply state law restrictions on the competency of witnesses. The evidentiary standard in a case such as this one, where both federal and state law claims are involved, is less certain. District courts in this circuit that have considered the issue have previously held that Federal Rule of Evidence 601, which creates a broad presumption of competency, applies to cases alleging both federal and state law claims. *See Estate of Chlopek v. Jarmusz*, 877 F. Supp. 1189, 1193 (N.D. Ill. 1995); *see also Donohoe v. Consolidated Operating & Production Corp.*, 763 F. Supp. 845, 860-61 (N.D. Ill. 1990), *vacated on other grounds* 982 F.2d 1130 (7th Cir. 1992). This rule conforms with the Advisory Committee's Note accompanying Federal Rule of Evidence 501, which states that "[i]f the rule proposed here results in two conflicting bodies of privilege law applying to the same piece of evidence in the same case, it is contemplated that

the rule favoring reception of the evidence should be applied." Fed. R. Evid. 501. Accordingly, Rule 601, rather than the Indiana Dead Man's Statute, applies to the competency of witnesses, at least insofar as the evidence relates to any of the federal claims. However, that rule provides that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law." Fed. R. Evid. 601. We thus still need to consider whether the Indiana Dead Man's statute would bar testimony if the evidence related solely to the common law claims.

The Indiana Dead Man's Statute states, in brief, that in a case where an executor or administrator of an estate is a party and the estate may receive or be liable for or receive a judgment in the action, a person who is a necessary party to the issue or case and whose interest is adverse to the estate is not competent to testify. Indiana courts hold that "the general purpose of the Dead Man's Statute is to protect the decedent's estate from spurious claims." *Bedree v. Bedree*, 747 N.E.2d 1192, 1195 (Ind. Ct. App. 2001). While the facts of this case satisfy a few of the requirements of the Dead Man's Statute, it is a stretch to hold that Eberhard and Jeschke are necessary parties or have interests adverse to the estate. Eberhard and Jeschke testified that they discussed regular employment with Suskovich at various times, but that he wanted to continue with his original arrangement with WellPoint. The estate argues that because both are employees of WellPoint, their interests are adverse to the estate's and

case 3:05-md-00527-RLM -CAN document 1715-2 filed 02/13/09 page 25 of 28

thus that they are incompetent to testify. But nothing in the record suggests that Eberhard or Jeschke have any personal stake in the outcome of the litigation, and the estate's interpretation of the statute would sweep in any adverse witness who would testify against an estate in a case brought by the estate. Nor are Eberhard and Jeschke "necessary parties" to the action or issue, as they are not named in the suit. The district court thus did not abuse its discretion in considering this testimony on summary judgment.

**D. Whether summary judgment is appropriate for the defendants on the alternative grounds that even if Suskovich was an employee he was not eligible for FLSA or ERISA benefits, and is ineligible for common law indemnification.**

WellPoint and Trasys make a final series of arguments showing that even if the estate prevails on the issue of whether or not Suskovich was common law employee, the estate cannot prevail on its FLSA, ERISA, or common law indemnification claims. The estate's FLSA claim is based on a purported failure to pay Suskovich overtime for the weeks where he worked more than forty hours. The FLSA, however, contains exemptions to the overtime pay requirement that would cover Suskovich. The first is an exemption for computer programmers, software analysts, computer engineers, and other similarly skilled workers. 29 U.S.C. §§ 213(a)(1), 213(a)(17). The exemption applies to employees who earn more that $27.63 per hour, and whose primary duties are related to computer

systems or programs. 29 C.F.R. § 541.401(b). WellPoint also claims that Suskovich would be ineligible for overtime under the FLSA because he was a highly compensated worker who earned over $100,000 per year. *See* 29 C.F.R. § 541.601 (applying an exemption to the overtime requirements for employees who earn in excess of $100,000 and who perform primarily non-manual work, such as office work).

With respect to the ERISA claims, the estate is seeking damages for WellPoint and Trasys' alleged failure to enroll Suskovich in retirement benefit plans for which he was eligible. Eligibility under ERISA is not automatic for common law employees, however. A plaintiff must also demonstrate that he was eligible under the terms of the employer's own benefit plans. "Nothing in ERISA, however, compels a plan to use the term 'employee' in the same way it is used in the statute. Indeed, because a plan governed by ERISA need not include all categories of employees there is no reason to expect that it would." *Trombetta v. Cragin Fed. Bank Ownership Plan*, 102 F.3d 1435 (7th Cir. 1996) (internal citation omitted). Both Trasys and WellPoint cite their own employee benefit plans, which include the caveat that anyone not treated as an employee who is later ruled to be a common law employee in a lawsuit remains ineligible for benefits. WellPoint makes the same argument with respect to the estate's breach of contract claims against them, arguing that even if Suskovich was a common law employee he never had an employment contract that would have entitled him to fringe benefits such as participation in the company's employee stock purchase plan.

Finally, both WellPoint and Trasys argue that Suskovich is not eligible for indemnity under Indiana law. Common law indemnity in Indiana requires a court's determination that the party seeking indemnity is without fault. *Bourbon Mini-Mart v. Gast. Fuel & Serv., Inc.*, 783 N.E.2d 253, 257-58 (Ind. 2003). The estate seeks indemnity for his back taxes based on his failure to file tax returns for several years, failure to pay withholding and income tax, and claiming improper deductions. These failures, they argue, mean that he was at fault for his tax liability and thus cannot seek common law indemnification.

The estate's response to all three arguments urges this court to overlook the alternative grounds because they were not ruled on by the district court. Of course, this court can affirm summary judgment on any non-waived ground, even if the district court did not address it. *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 173 (7th Cir. 1996). The estate claims, however, that these alternative grounds all involve factual disputes that the district court did not address, and could not resolve on summary judgment. However, the estate does not present any evidence contesting the applicability of the FLSA exemptions, or establishing Suskovich's eligibility under either Trasys or WellPoint's benefit plans, or evidence that Suskovich properly paid his taxes every year. While we need not reach this question, having already determined that the district court correctly held that Suskovich was an independent contractor rather than an employee, we simply note that these alternative grounds would also provide a basis for affirming the judgment of the district

court even assuming arguendo that Suskovich was a common law employee.

**III. Conclusion**

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

In Re: FedEx Ground Package System

Inc., Employment Practices Litigation

KATRINA LEE, et al.,

Plaintiffs,

V. No. 3:05-MD-527-RM

FEDEX GROUND PACKAGE.

SYSTEM, INC.,

Defendant.

---

VIDEOTAPED DEPOSITION OF JONATHAN PAUL LEIGHTER

TAKEN ON BEHALF OF THE DEFENDANT

TUESDAY, AUGUST 21, 2007

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the videotaped deposition of JONATHAN PAUL LEIGHTER was taken before Janette Dukic, Court Reporter and Notary Public, on TUESDAY, AUGUST 21, 2007, commencing at the hour of 8:41 a.m., the proceedings being reported at 111 Southwest Fifth Avenue, Suite 1250, Portland, Oregon.

**EXHIBIT 2**

Q. Cell phone?
A. Well, yeah, a cell phone.
Q. Is this your own personal cell phone?
A. Yes.
Q. Did you get it for use on the route or was it a personal cell phone?
A. It is for both.
Q. For both?
A. It is for keeping in contact with kids, family.
Q. Did you have it before you became a contractor?
A. Not this particular one, but I have had before, a cell phone.
Q. Do you know if you deducted it as a business expense from your taxes?
A. I don't. My wife would.
Q. So you are saying you don't know?
A. I don't know.
Q. Do you use a GPS device?
A. No.
Q. Any dollies or carts?
A. No.
Q. Carts?
A. No.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re MDL - 1700 FedEx Ground Package System, Inc., Employment Practices Litigation (No.1)

- - - - - - - - - - - - - - - x

This Document relates to: :

: CASE NO.:

Dizinno et al., v. FedEx : 3-05-MD-527-RLM
Ground Package System, Inc. : CAN
et al., No. 3:07-cv-323(CT) :

- - - - - - - - - - - - - - - x

Videotape deposition of ROBERT DIZINNO, taken pursuant to the Federal Rules of Civil Procedure, before Melissa J. Kelly, RMR, CRR, Licensed Shorthand Reporter #00307, and Notary Public within and for the State of Connecticut, held at the offices of Del Vecchio Reporting Services, 151 New Park Avenue, Hartford, Connecticut, on August 28, 2007, at 9:24 a.m.

**EXHIBIT 3**

A. Yes. I believe so.

Q. And is it your testimony that you don't know if any tax papers were filed in the name of Mohawk or you're just not sure what specific forms were filed?

A. I don't know what specific forms were filed.

Q. But do you think -- go ahead.

A. I'm not a tax accountant, so I don't know how -- I wouldn't know how to prepare a tax return other than putting your name up at the top. I'm lost after that.

Q. Fair enough.

But do you know whether -- even if you're not sure exactly what paperwork was done, are you aware that returns were done for Mohawk as an entity?

A. I would have to get to him and ask him that question, how it's -- how it's done. I -- you know.

Q. Okay. Does Mr. Chiappa have a role in Mohawk? Is he affiliated with it?

MR. MARCHETTI: Objection: Vague, ambiguous. You can answer.

THE WITNESS: Yes. He's a member.

UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

Civil Action No. 2:07-cv-162

***********************************

ROBERT THURSTON, FRANK GRUHN and KRISTI GRUHN, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FEDEX GROUND PACKAGE SYSTEM, INC. and FEDEX GROUND PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY,

Defendants.

***********************************

VIDEOTAPED DEPOSITION OF FRANK N. GRUHN

September 11th, 2007

Held At: Looney & Grossman, LLP

101 Arch Street

Boston, Massachusetts

BEFORE: Maureen O'Connor Pollard, RPR, CLR

**EXHIBIT 4**

case 3:05-md-00527-RLM-CAN document 1715-5 filed 02/13/09 page 2 of 2

Q. And how far back do those go?
A. We have most of them.
Q. And on those tax returns while you were at FedEx Ground, did you declare yourself to be an independent contractor?
A. I'm not sure what my accountant --
Q. I'm sorry?
A. I'm not sure what was put on there.
Q. Do you remember if you took any business deductions on your tax returns?
A. I'm sure I did, yes.
Q. And did you file your tax returns yourself?
A. My accountant did.
Q. And did you turn over copies of your tax returns to your attorneys?
A. I believe we did.
Q. And you keep copies of your business expense receipts, is that right?
A. Yes.
Q. And how far back do you have a complete record of those receipts?
A. Some of our stuff is -- we have to -- some of our stuff is scattered because we moved, we have a storage unit in Vermont, so we have to

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

- - - - - - - - - - - - - - - - - - -x
In Re: FEDEX GROUND PACKAGE :
SYSTEM, INC., EMPLOYMENT :
PRACTICES LITIGATION :
:
- - - - - - - - - - - - - - - - - - -x
THIS DOCUMENT RELATES TO :
:
Farrell v. FedEx Ground Package, :
Systems, Inc., :
Civil No. 2:07cv2574(NJ) :
:
- - - - - - - - - - - - - - - - - - -x

August 16, 2007
Mt. Laurel, New Jersey

VIDEOTAPED DEPOSITION of RICHARD FARRELL, taken by the Defendant at the offices of Cureton Caplan, 3000 Midlantic Drive, Suite 200, Mt. Laurel, New Jersey on Thursday, August 16, 2007, commencing at 10:07 a.m., before Jamie I. Moskowitz, CSR, RPR, CRR, a Certified Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

**EXHIBIT 5**

R. Farrell

A Yes, I did.

Q Who did you sell it to?

A I sold it to a contractor from Tampa, Florida.

Q How much did you sell it for?

A $13,000.

Q When you were a FedEx contractor, did you declare yourself to be self-employed on your tax returns?

A I was issued a 1099 and I filled out the tax returns based on -- the accountant filled them out. Whether -- I guess I owned my own business, supposedly.

Q And did you fill out tax returns consistent with owning your own business?

MR. MARCHETTI: Objection, lack of foundation. You can answer.

A I would not know what the difference was. I mean, in terms of -- I filled out my tax returns based on -- I took everything that I paid for to an accountant.

He filled out the tax returns. He filled out the thing based on what it was classified as. I have no idea.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO RECONSIDER PRODUCTION OF TAX RECORDS UNDER *SUSKOVICH V. ANTHEM HEALTH PLANS OF VIRGINIA, INC.***

FedEx Ground Package System, Inc.'s (FXG) motion for reconsideration (Doc. 1714) of the Court's December, 2006 discovery ruling (Doc. No. 451) long after the close of discovery borders on sanctionable conduct. The motion asks this Court to rollback the litigation, turn a blind eye to the forty-seven fully briefed motions for summary judgment awaiting review, re-open discovery and consider for a *third time* an issue this Court has already considered and rejected twice before. More than two-and-a half years ago, Magistrate Judge Nuechterlein found and Judge Miller later affirmed that any particular deductions or credits Plaintiffs claimed on their taxes were irrelevant and immaterial to the pivotal issue of whether Plaintiffs were employees or independent contractors under the Restatement (Second) of Agency's test of

employment status. (Doc. 356, 451).[1] The undisputed facts that FXG gave Plaintiffs 1099 forms and Plaintiffs' admission that they therefore filed their taxes as self employed were amply sufficient to permit evaluation of the Plaintiffs' tax status – a relevant but minor consideration under the Restatement – without unnecessarily exposing Plaintiffs' and their spouses' private financial affairs. *Id.* Now, after discovery has concluded and months after motions for summary adjudication of employment status have been fully briefed, FXG makes the frivolous claim that the wholly inapposite and unremarkable case of *Suskovich v. Anthem Health Plans of Virginia, Inc.*, No. 08-1070, -- F.3d --, 2009 WL 140494 (7th Cir. Jan. 22, 2009) requires this Court to re-open discovery and reach the opposite result. *Suskovich* – a postmortem attempt by the estate of a highly-skilled computer programmer to escape an IRS tax lien by claiming employee status – neither justifies nor requires such result. Not even FXG's tortured reading of Suskovich could justify the wholesale de-railing of this Court's long-standing schedule and consideration of this case. The Court should reject out of hand FXG's baseless attempt to use *Suskovich* to justify a third attempt to pry into irrelevant and private tax records.

## BACKGROUND

On January 20, 2006, FXG requested that Plaintiffs produce their tax records and related financial information, to which Plaintiffs objected on the grounds that the information was privileged and confidential. On July 10, 2006, FXG moved to compel production. (Doc. 306). The parties briefed the issue fully and Magistrate Judge Neuchterlein denied FXG's motion on September 6, 2006. (Doc. 356). Magistrate Judge Neuchterlein found that because tax records

[1] The Court ruled that Plaintiffs in cases arising under the Fair Labor Standards Act and Family Medical Leave Act were required to produce their tax records, as those statutes use a different employment status test from the Restatement (Second) of Agency at issue in FXG's motion for reconsideration. (Doc. 451 at 9-10).

"have some character of confidentiality," they must be "relevant and material to the matters at issue" in order for the Court to compel their production. *Id.* at 3. FXG argued that the tax records were relevant to determining Plaintiffs' employment status under the multi-factor common law test where "'the tax treatment of the hired party'" is a minor factor. (Doc. 307 at 5-6 [quoting *Nationwide Mututal Insurance Co. v. Darden*, 503 U.S. 318, 324 (1992)]). Here, however, Plaintiffs in all of the actions admitted that "they filed their taxes as self-employed truck drivers while performing services for defendants based on their receipt of FedEx's 1099 forms misclassifying them as independent contractors." (Doc. 320 Exh. A at 4). In light of this admission and the confidential nature of the personal financial information contained in the tax records, the Magistrate Judge found that no "other information may be gleaned from the tax returns that reflects whether Plaintiffs were employees." (Doc. 356 at 4). Any "[p]rofits, income, and expenses" which the tax records might reflect "relate to damages … [and have] little bearing on the liability issue [now before the Court of] whether the Plaintiffs were employees." (Doc. 356 at 4).[2]

FXG sought reconsideration of this ruling, and the parties fully briefed the matter a second time. (Doc. 369-370, 379, 386). On December 14, 2006, the Court denied in part and granted in part FXG's motion. (Doc. 451). The Court agreed with the Magistrate that because Plaintiffs admitted that they filed their income taxes as self-employed individuals, "any additional information contained in the tax returns isn't material in determining the plaintiffs' employment status" under the common law agency test. *Id.* at 6, 12. However, the Court found

[2] FXG also argued that the tax records were relevant to whether the Court should certify a class. (Doc. 307 at 8-10). The Magistrate Judge rejected these arguments also. (Doc. 356 at 5-6). In its pending motion, FXG does not renew its earlier, baseless argument that the records are relevant to class certification.

that the information in the tax records might be relevant to determining employment status under the different test applicable to Fair Labor Standards Act (FLSA) or Family Medical Leave Act (FMLA) claims raised in a few of the cases. (Doc. 451 at 9-10). The Court thus compelled disclosure of tax records in those few cases with FLSA or FMLA claims only, but otherwise denied FXG's request for reconsideration. *Id.* at 6-10.

The parties proceeded to conduct and complete discovery. On May 30, 2008, following extensive document production and approximately 300 depositions, fact discovery closed on the fifth and final wave of these consolidated cases. (Doc. 1118 [March 20, 2008 Scheduling Order]). Starting on April 25, 2008, and continuing through the remainder of 2008, the parties fully briefed the question of employment status on a full evidentiary record in forty-seven motions and cross motions for summary judgment or summary adjudication in thirty-four pending cases, including all cases where class certification was granted.[3] These motions are awaiting decision by this Court.

Now, more than two years after this Court's prior rulings on this issue, ignoring the patent unfairness of re-opening discovery at this late date, FXG asks the Court to reconsider *again* its ruling that the Plaintiffs cannot be compelled to produce their tax records at this merits phase of the litigation. (Doc. 1714). FXG's motion is baseless and must be denied.

[3] Plaintiffs have filed motions for summary adjudication of employment status in all 20 cases with certified classes and FXG has filed cross motions for summary judgment in 13 of these cases. (Docs. 1155 [AL], 1157 [AK], 1153, 1225 [CA], 1159, 1235 [FL], 1161, 1229 [IN], 1163, 1215 [KS], 1165, 1231 [KY], 1167, 1213 [MD], 1169, 1211 [MN], 1171 [NH], 1173, 1227 [NJ], 1175, 1227, 1347 [NY], 1177 [OR], 1179 [PA], 1181, 1233 [RI], 1183 [SC], 1185, 1217 [TN], 1187, 1223 [TX], 1189 [WV], 1191, 1221 [WI]). Plaintiffs have also moved for summary adjudication of employment status in seven of the cases without certified classes, which motions FXG has opposed. (Docs. 1335 [IL], 1336 [MT], 1337 [MA], 1338 [SD], 1313 [MI], 1320 [MO], 1328 [VA]). In addition, FXG has moved for summary judgment on the employment status issue in seven more of the pending cases, which motions Plaintiffs have opposed. (Docs. 1344, 1350, 1352, 1354, 1356, 1658, 1660).

## ARGUMENT

**A. FXG's Motion For Reconsideration to Compel Disclosure of Irrelevant Tax Records Disregards the Court's May 2008 Discovery Cutoff, To Which FXG Previously Stipulated.**

FXG's motion ignores without comment that under this Court's scheduling order, discovery has long since closed and motions for summary judgment and adjudication on the question of the drivers' employment status have been fully briefed. To require Plaintiffs to produce voluminous, burdensome and private tax records at this late stage and undergo the sort of mini-tax audits that FXG's motion seems to contemplate after Plaintiffs have already moved and/or responded to motions for summary judgment or adjudication in thirty-four different cases, would be incredibly and unduly prejudicial, to say nothing of the additional burden it would place on the Court to begin the dispositive motion process anew. It would not only require the reopening of the compiled and submitted summary judgment record, it would further substantially delay resolution of this already lengthy and complicated MDL action. For these reasons alone, FXG's motion should be rejected out of hand.

**B. FXG Points to No Significant Change in the Law Sufficient to Warrant Reconsideration and Re-Opening Discovery.**

Even setting aside the unavoidable and extreme prejudice to Plaintiffs, FXG points to no change in the law that would warrant reconsideration of FXG's already twice rejected request to compel disclosure of the Plaintiffs' tax records. *Suskovich, supra,* followed settled law and announced no new rule regarding disclosure of confidential tax records or employment status.

Suskovitch was a highly skilled computer analyst and programmer who contracted for limited periods of time (usually about six months) with a health insurance company and, later, a preferred vendor to that company, to provide information technology support. 2009 WL 140494 at *2-3. He personally drafted a contract expressly describing himself as an independent

contractor and stating that "nothing in the contract should be construed as creating an employer-employee relationship," billed the company for his services on an invoice form that he created and worked largely on his own doing distinct projects that no one at the health insurance company was even qualified to supervise. *Id.* at 3-4, 14. At one point, the company attempted to coax Suskovich into becoming a company employee, but Suskovich's initial salary demand was too high. *Id.* at 6. Suskovich died before the negotiations concluded. *Id.*

After Suskovitch failed to file income taxes for several years, the IRS levied his income. *Id.* Following his death, Suskovich's wife, on behalf of his estate, sought to avoid the tax debt by seeking a declaratory judgment that Suskovich had been an employee of the health insurance company and vendor and thus had no tax liability. The estate also sought unpaid overtime wages under the Fair Labor Standards Act and benefits under the Employee Retirement Income Security Act. *Id.* at 6-7. Affirming the judgment of the District Court, the Seventh Circuit reached the unremarkable conclusion that Suskovich had been an independent contractor under the Restatement test. *Id.* at 10-22.

Ignoring this Court's prior rulings that the right to control is the dispositive employment factor, FXG relies on a minor factor at best – the Restatement's "beliefs of the parties" factor, which looks at "whether or not the parties believe they are creating the relation of master and servant." *See id.* at 13. In order to try to show that this factor weighed in favor of employee status, Suskovich's estate had offered the testimony of his widow that Suskovich had considered himself to be an employee. *Id.* at 21. The court found that this second-hand testimony about the understanding of the now-deceased Suskovich was insufficient to overcome the evidence gleaned from documents that he himself prepared in which he had identified himself as an independent contractor – specifically, "tax returns, resumes, tax forms, and contractual

agreement" that he personally drafted. *Id.* at 20-21. FXG argues that, therefore, it must be permitted to analyze Plaintiffs' tax returns and tax forms too.

*Suskovich*, however, never addressed whether or when a Court should compel the disclosure of tax records over a party's objection. In *Suskovich*, the tax documents were part of the evidentiary record, given that the litigation challenged a tax lien. Nothing in *Suskovich* undermines this Court's affirmation that tax records have "'some character of confidentiality'" and production should not routinely be compelled. (Doc. 451 at 3 [quoting Doc. 356 at 3]).

Similarly, nothing in *Suskovich* undermines this Court's conclusion that because the Plaintiffs here all admit that they filed their tax returns as self-employed individuals, "any additional information [in the tax records] isn't material" to determining their employment status under the Restatement. (Doc. 451 at 5-6). FXG argues that, in finding that the beliefs of the parties factor weighed in favor of independent contractor status, the *Suskovich* court noted that his salary was reported on a 1099 form rather than a W-2 and that Suskovich listed himself as self-employed on his tax returns, that he derived his income from his computer consulting business and claimed substantial business deductions. (Doc. at 1715 at 4-5). But just as this Court found in 2006, the salient facts here are admitted — that FXG gave them 1099 forms rather than W-2s and that all Plaintiffs filed their income taxes a self-employed drivers. (Doc. 320 Exh. A at 4). The specific income or deductions any Plaintiff claimed as a result of his or her admitted self-employed status would be ancillary to the undisputed status itself and of no additional probative value. *Suskovich* supports this analysis, stating merely that "evidence of the tax status" would be "probative" of the parties' intent. 2009 WL 140494 at *10; *see also Knight United Farm Bureau Ins. Co.*, 742 F. Supp. 518, 523 (N.D. Ind. 1990) (considering receipt of

1099 forms and absence of withholdings, but not any deductions or credits claimed), *aff'd* 950 F.2d 377 (7th Cir. 1991).

Moreover, with regard to the question of the parties' beliefs generally, FXG ignores that Plaintiffs also admit that they believed they would be independent contractors when they executed their contracts with FXG. (Doc. 320 Exh. A at 3). Against this backdrop, there can be no legitimate purpose for FXG's much-belated and thrice repeated request to pry into Plaintiffs' tax records.

**C. The Few Deposition Excerpts FXG Appends to its Motion Do Not Require that These Individuals or that Any Plaintiffs Disclose Their Tax Records.**

The excerpts of four drivers' deposition testimony which FXG appends to its motion do nothing to advance FXG's argument that the Court is required to reconsider its 2006 ruling either. FXG claims that because these four drivers either could not recall their tax status or could not recall certain details about their tax returns, FXG was unable to "probe plaintiffs' intent" with regard to whether they intended to be employees or independent contractors. (Doc. 1715 at 6). But these drivers' failure to recall specifics does not undermine the Plaintiffs' blanket binding admission that they all filed their income taxes as self-employed individuals. (Doc. 320 Exh. A at 3). Certainly these few deposition excerpts did not prevent FXG from relying on this blanket admission in responding to Plaintiffs' motions for summary adjudication of employment status in the certified cases. (Doc. 1358, Exh. G-03, 6/9/08).

What is more, these depositions were taken in August and September of 2007, approximately a year-and-a-half before FXG filed the instant motion. Any right FXG had to further documents or answers has long since been waived. If FXG believed that this deposition testimony should alter this Court's conclusion about disclosure of the tax records, FXG was obligated to make a motion to compel under Fed. R. Civ. P. 37 in a timely fashion and certainly

before discovery cutoff and dispositive motions on employment status were briefed in thirty-four cases.[4]

For the forgoing reasons, FXG's motion for reconsideration should be denied.

Dated: March 2, 2009

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor Morton**

Eleanor Morton
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

[4] In responding to FXG's initial motion to compel and motion for reconsideration, Plaintiffs also offered additional evidence and argument about the confidential nature of tax records and the alternate sources available in the record for proving the drivers' categories of expenses. (Doc. 320 at 3-5, 7-9; Doc. 379 at 3-4). While these arguments remain equally applicable today, Plaintiffs, in the interests of avoiding unnecessary repetition, do not repeat them here.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY RE *SUSKOVICH V. ANTHEM HEALTH PLANS OF VIRGINIA, INC.***

*Suskovich v. Anthem Health Plans of Virginia, Inc.*, No. 08-1070, -- F.3d --, 2009 WL 140494 (7th Cir. Jan. 22, 2009), offers no supplemental authority to support Defendant FedEx Ground Package Systems, Inc.'s ("FXG") position in the pending motions for summary judgment and adjudication of employment status and is entirely inapposite factually and legally.

The facts of that case bear no resemblance to those of the case before this Court. Suskovich was a highly skilled computer analyst and programmer who contracted for limited periods of time (usually about six months) with a health insurance company and, later, a preferred vendor to the health insurance company, to provide information technology support. *Id.* at 2-3. He performed special assignments largely on his own that no one at the health insurance company was even qualified to supervise, personally drafted a contract expressly

describing himself as an independent contractor and stating that "nothing in the contract should be construed as creating an employer-employee relationship" and billed the company for his services on an invoice form that he created. *Id.* at 3-4, 14. At one point, the company attempted to coax Suskovich into becoming a company employee, but Suskovich's initial salary demand was too high. *Id.* at 6. Suskovich died before the negotiations concluded. *Id.*

The case arose because, after Suskovitch had failed to file income taxes for several years, the IRS conducted an investigation and levied his income. *Id.* Following his death, Suskovich's wife, on behalf of his estate, sought to get out from under the tax debt by seeking a declaratory judgment that Suskovich had been a joint employee of the health insurance company and vendor and sought unpaid overtime under the Fair Labor Standards Act ("FLSA") and benefits under the Employee Retirement Income Security Act ("ERISA"). *Id.* at 6-7. Affirming the judgment of the District Court, the Seventh Circuit reached the unremarkable conclusion that Suskovich had been an independent contractor under the Restatement (Second) of Agency's ten-factor control test. *Id.* at 10-28.

Unlike Suskovich, FXG drivers perform work requiring little skill and according to FXG's detailed policies and procedures, checking in and out with the company daily, using FXG's forms, wearing FXG logoed uniforms and vehicles and using FXG's proprietary scanning equipment and software, execute an adhesive form contract drafted entirely by FXG, and perform the core work of the company – package pickup and delivery. Doc. 1197, Plaintiffs' Statement of Undisputed Material Facts, Fact Nos. 21, 24b, 82-106, 107, 112-113. *Suskovich* says nothing to suggest that these facts reflect independent contractor status.

*Suskovich* offers no new applicable law either. Without explanation, FXG asserts that the decision "impacts … the relevance of evidence regarding, and the weight accorded to" three of

the Restatement factors – the parties' intent, the right to control and the supplier of the equipment or instrumentalities. Doc. 1712 at 1-2. But the court merely applied these and all of the other Restatement test factors to the unique factual setting presented, and found that virtually all favored independent contractor status. *Suskovich*, 2009 WL 140494 at 11-22.

Regarding the parties' intent, FXG points to the fact that in *Suskovich*, the court considered the contract Suskovich signed and his tax status. *Id.* at 11, 20-21. Plaintiffs have not argued that this evidence is off limits; Plaintiffs have merely argued that it is not dispositive. *E.g.*, Doc. 1364 at 3-4. On this point, the *Suskovich* court agrees. 2009 WL 140494, at *9 ("'An employee relationship may be found even though the parties define their relationship as one of principal-independent contractor if enough indicia of a master-servant relationship are present.'") (quoting and citing as authoritative *Stone v. Pinkerton Farms., Inc.*, 741 F.2d 941, 945 (7th Cir. 1984)).

Regarding the right to control factor, FXG says that under *Suskovich*, a schedule is not dispositive of employee status. *Id.* at 13-15. This point is not new either, as evidenced by the *Suskovich* court's reliance on two 1996 cases for this proposition, one of which FXG has already cited for the same point in its briefs. *Compare id.* at 14 (citing *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996); *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996)) *to e.g.*, Doc. 1392 at 15 n.2 (citing *Ost*, 88 F.3d at 438 for the same point). Nor is this point pertinent to the pending motions, as the undisputed evidence shows that FXG reserves the right to control all aspects of the drivers' work, not merely their schedules.

Regarding for the "equipment or instrumentalities" factor, the *Suskovich* court cites other cases addressing the status of computer programmers, notes that other courts "seem to have decided that this factor is relatively unimportant," and concurs that the factor deserves little

case 3:05-md-00527-RLM -CAN document 1720 filed 03/02/09 page 4 of 4

weight in Suskovich's case because as a computer programmer, he necessarily had to use the putative employer's computer equipment. 2009 WL 140494, at *15. If significant at all to the vastly different workplace setting presented in this case, the court's discussion only illustrates FXG's over-reliance on this "relatively unimportant" factor in its briefing, where FXG argues that the drivers must be independent contractors because FXG requires them to purchase or lease FXG vehicles. *E.g.*, Doc. 1216 at 8-9.

In sum, *Suskovich* does not alter the Court's analysis.

Dated: March 2, 2009

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor Morton**

Eleanor Morton
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| *In re* FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 03:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL CASES | ) | CHIEF JUDGE MILLER |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO RECONSIDER ORDER CONCERNING PRODUCTION OF PLAINTIFFS' TAX RECORDS PURSUANT TO RECENT SEVENTH CIRCUIT DECISION IN *SUSKOVICH V. ANTHEM HEALTH PLANS OF VIRGINIA, INC.***

Plaintiffs argue that FedEx Ground cannot obtain, even under Rule 26's liberal discovery standard, evidence that the Seventh Circuit held is "especially probative" to a factor that the trier of fact, at the merits stage of litigation, may give "primary emphasis" under the common law test that governs the central dispute of this case. *Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, slip-op. at 9-10 (7th Cir. 2009).[1] Labeling every aspect of the Seventh Circuit's opinion immaterial—and confusing this Court's holding that evidence of the "right to control" predominates for the purposes of class certification with a holding that evidence bearing on every other factor is irrelevant—plaintiffs suggest that FedEx Ground is not entitled to their tax records

[1] Since FedEx Ground filed its opening brief, the *Suskovich* opinion was published at 553 F.3d 559. Because all citations in FedEx Ground's opening brief were made to *Suskovich*'s slip opinion, FedEx Ground will continue to cite to the slip opinion in this Reply.

because they do not relate to the "right to control." But this Court has not adopted a definition of relevancy so at odds with the plain meaning of Rules 23 and 26. To the contrary, the Court previously found that plaintiffs' tax returns were not discoverable in common law jurisdictions "since the additional information contained in the tax returns hasn't been put at issue under the common law." Dec. 14, 2006 Order (the "Order") [Docket No. 451] at 5-6. But in *Suskovich* the Seventh Circuit considered tax returns when analyzing independent contractor status under the common law and found them nearly dispositive to the beliefs of the parties factor, which it held the trier of fact could decide to give "primary emphasis" in the independent contractor analysis. *Suskovich*, slip-op. at 9, 21.

In requesting reconsideration of the Court's Order, FedEx Ground does not propose reopening discovery or depositions, or reopening the dispositive motion process, but seeks merely to discover a limited class of previously-requested evidence that *Suskovich* shows is relevant to the merits of this case. If, as the Seventh Circuit says, "tax forms" and "tax returns" can "overwhelm[]" other evidence, then it follows that FedEx Ground should at least be able to *discover* them here. *See id.* at 21.

## I. ARGUMENT

### A. *Suskovich* Shows that Plaintiffs' Tax Records May Be Highly Relevant To The Common Law Analysis.

In their Response, plaintiffs argue that FedEx Ground's motion should be denied because their tax returns relate to the "beliefs of the parties" factor, which they assert is a "minor factor at best." Pls.' Br. at 6. But this argument only underscores the new emphasis *Suskovich* placed on the beliefs of the parties factor. Far from minimizing it, the Seventh Circuit held that district courts may place "*primary emphasis*" on the beliefs of the parties when analyzing whether an individual is an independent contractor under the common law, *i.e.*, in addressing the

merits of plaintiffs' claims. *Suskovich*, slip-op. at 9 (emphasis added). Focusing on "evidence of the tax status of the relationship," the court held that such evidence is "especially probative" of the parties' beliefs. *Id.* at 10. And contrary to plaintiffs' position, the Seventh Circuit's express reliance on Suskovich's "tax returns" and "tax forms" makes clear that evidence of "tax status" involves more than mere filing status. *Id.* at 21. Indeed, in its overview of the facts, the Seventh Circuit took note of the *content* of Suskovich's tax returns, observing that on his "tax returns" he "listed himself as . . . self employed," "claimed that he derived his income" from his business, and "also claimed substantial business deductions." *Id.* at 6.

Plaintiffs' principal response is that FedEx Ground "[i]gnor[es] this Court's prior rulings that the right to control is the dispositive employment factor." Pls.' Br. at 6. But it is plaintiffs who mistake the Court's finding that the right to control predominated for the purposes of class certification with an order holding that any and all evidence relating to non-control factors is irrelevant and not discoverable. That certain evidence may be the predominant evidence under Rule 23 does not mean that no other evidence is relevant or may be ultimately considered by the trier of fact. *See generally Burns v. First Am. Bank*, No. 04 C 7682, 2006 WL 3754820, at *9 (N.D. Ill. Dec. 19, 2006) ("Rule 23(b)(3)'s language itself requiring predominance assumes that a certain number of individual issues may be present in a class action."). Nor, in any case, would plaintiffs' reading of the Court's class certification orders be consistent with *Suskovich*. In *Suskovich*, the Seventh Circuit applied the Restatement analysis , as did this Court in its March 25, 2008 Order, but affirmed the district court's placement of "primary emphasis" on the "beliefs of the parties" factor and did not even mention the words "right to control," much less indicate that factor is "dispositive." *See Suskovich*, slip-op. at 9, 13-15 (discussing *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001)).

Their novel interpretation of the predominance standard aside, plaintiffs try to distinguish *Suskovich* factually, but in doing so ignore the fact that FedEx Ground's motion is a *discovery motion*, not a dispositive or other motion addressing the merits of plaintiffs' claims (*i.e.*, how the trier of fact should consider and weigh the various factors and evidence). In fact, plaintiffs' attempt to distinguish *Suskovich* factually only proves FedEx Ground's point. For instance, they argue that *Suskovich* is distinguishable because it involved "evidence gleaned from documents that he [Suskovich] himself prepared in which he had identified himself as an independent contractor." Pls.' Br. at 6. But as explained in FedEx Ground's opening brief, this is precisely the sort of information that the Court's Order prevents FedEx Ground from discovering and about which numerous plaintiffs were unable to provide any meaningful testimony. *See* FedEx Ground's Br. at 6-7.[2] The Court's Order, therefore, leaves FedEx Ground without a way to present *any* evidence of the parties' intent based on plaintiffs' tax records, or even to analyze whether the representations in those records have the *potential* to be "especially probative" of plaintiffs' intent.

**B. Plaintiffs' Admission That They Filed Their Tax Returns As Independent Contractors Does Not Foreclose Discovery of Tax Returns After *Suskovich*.**

Even more critical than plaintiffs' efforts to minimize the beliefs of the parties factor is the fact that that their Response overlooks the evidence the Seventh Circuit considered when analyzing that factor. They persist, for example, in asserting that the only evidence relevant to independent contractor status is the fact that FedEx Ground issued them 1099 forms and their blanket "admission" that they filed their taxes as self employed drivers only because

2 In their Response, plaintiffs assert that FedEx Ground "has long since" "waived" any objection related to plaintiffs' depositions and asserts that if "FXG believed that this deposition testimony should alter this Court's conclusion about disclosure of the tax records," FedEx Ground should have filed a motion to compel. Pls. Br. at 8-9. This reasoning ignores *Suskovich*, which puts plaintiffs' inability to testify about their tax returns in a new

FedEx Ground issued them 1099 forms. But the *Suskovich* court expressly noted that the worker's salary was "reported on a 1099 form," *Suskovich*, slip-op. at 3, and nonetheless considered his "tax returns" and "tax forms" when analyzing the beliefs of the parties factor, finding them nearly dispositive of that factor. *Suskovich*, slip-op. at 21.

Moreover, the Seventh Circuit's explicit mention of the deductions and representations Suskovich made on his tax returns disproves plaintiffs' assertion that their "specific income or deductions" would be "of no additional probative value." *Compare* Pls.' Br. at 7-8 (citing the Court's opinion in *Knight v. United Farm Bureau Ins. Co.*, 742 F. Supp. 518, 523 (N.D. Ind. 1990), for the proposition that courts consider "receipt of 1099 forms and absence of withholdings, but not any deductions or credits claimed"), *with Suskovich*, slip-op. at 6 (noting in overview of the facts that Suskovich's tax returns showed he "listed himself as . . . self employed," "claimed that he derived his income" from his business, and "claimed substantial business deductions").

Nor is plaintiffs' admission that they "filed their taxes as self-employed truck drivers . . . based on their receipt of FedEx's 1099 forms" the only evidence the trier of fact would need to consider after *Suskovich*. As explained in FedEx Ground's opening brief (and not refuted in plaintiffs' Response), this admission appears to attribute to each and every plaintiff a subjective intent of employee status in the filing of their returns. FedEx Ground's Br. at 6. Without plaintiffs' tax records, FedEx Ground lacks the underlying and fundamental tax documents it needs to present evidence to refute plaintiffs' blanket and self-serving "admissions." But under *Suskovich*, plaintiffs' "*tax returns*, resumes, *tax forms*, and contractual agreement" can "overwhelm[]" other evidence suggesting a subjective belief of employee status.

---

light. Further, FedEx Ground is not objecting to anything in the depositions, but citing them to show how it was unable to discover basic information related to tax filings during discovery.

*Suskovich*, slip-op. at 21 (emphasis added). The Seventh Circuit's use of Suskovich's "tax returns," coupled with the weight the court afforded them, demonstrates that the content of tax returns are "at issue under the common law agency test" (*see* Order at 6), and warrants reconsideration of the Court's Order.[3]

**C. FedEx Ground Does Not Seek to Reopen Discovery or Restart Dispositive Motion Briefing.**

Finally, plaintiffs' claims that FedEx Ground proposes to reopen depositions and restart the dispositive motion process are a red herring. Aside from being erroneous, these assertions are without any basis in FedEx Ground's motion, and more importantly, appear to accept the relevance of the evidence at issue. FedEx Ground's motion asks the Court to reconsider its Order, based on a recent Seventh Circuit decision, and allow completion of timely-served discovery of a limited class of evidence that may be "especially probative" of plaintiffs' beliefs and intent, *Suskovich*, slip-op. at 10, 21, not to undo or restart any part of this litigation.

What is more, lost in plaintiffs' arguments is the fact that everyone seems to agree that plaintiffs will have to produce their tax records at some point. *See* Plaintiffs' Response at 3 (*quoting* Magistrate Judge Nuechterlein's September 6, 2006 Order [Docket No. 356] at 3 ("Any '[p]rofits, income, and expenses' which the tax records might reflect 'relate to damages ... [and have] little bearing on the liability issue [now before the Court] of whether the Plaintiffs were employees.")); Order at 12 (noting that "this information may be relevant for demonstrating

3 Plaintiffs argue that "[n]othing in *Suskovich* undermines this Court's affirmation that tax records have 'some character of confidentiality' and production should not routinely be compelled." Pls.' Br. at 7. But the Court's Order also affirmed language in the magistrate judge's opinion indicating that tax returns should be produced when they are "relevant and material to the matters in issue." Order at 3. *Suskovich*'s use of "tax returns" and "tax forms" to resolve "beliefs of the parties" factor (*Suskovich*, slip-op. at 21) demonstrates that plaintiffs' tax forms are "relevant and material" to this case's resolution. In any event, as noted below (*see infra* Part I(C)), there appears to be no dispute that plaintiffs will produce their tax records as part of damages discovery, and plaintiffs offer no indication that the existing protective order is insufficient for the tax returns at issue in this motion (or for those already produced pursuant to the Court's Order).

individual issues in calculating the damages suffered"); *id.* at 13 ("The magistrate judge determined the information in the plaintiffs' tax returns related primarily to the calculation of damages and therefore wasn't discoverable at this stage. The court finds nothing in this conclusion clearly erroneous or contrary to law."). Therefore, FedEx Ground will be able to use plaintiffs' tax records at the damages stage, but may be unable to introduce them at the merits stage. That result is not consistent with *Suskovich*, which attached near dispositive significance to "tax returns" and "tax forms" when resolving the beliefs of the parties factor on the merits. *Suskovich*, slip-op. at 10, 21. If "tax returns" can play such an important role in the Seventh Circuit's resolution of the independent contractor question, then production of plaintiffs' tax records surely satisfies Rule 26(b)(1)'s less-demanding "reasonably calculated to lead to the discovery of admissible evidence" standard here.

## II. CONCLUSION

For these reasons, and all of the reasons stated in FedEx Ground's opening brief, this Court should reconsider the Order and grant FedEx Ground's motion to compel production of documents responsive to Requests for Production No. 2, 14, and 18.

Dated: March 16, 2009

Respectfully submitted,

By: s/Alison G. Fox
Alison G. Fox

John H. Beisner
Robert M. Schwartz
Victor I. Jih
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5378
Fax: (202) 383-5414

case 3:05-md-00527-RLM-CAN document 1724 filed 03/16/09 page 8 of 8

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 South Michigan Street
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Co-Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 16th day of March, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Peter J. Agostino
agostino@aaklaw.com

By: s/Alison G. Fox

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | CHIEF JUDGE MILLER |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant FedEx Ground hereby files this Notice of Supplemental Authority to bring to the Court's attention the March 31, 2009 jury verdict in *Anfinson, et al. v. FedEx Ground Package System, Inc., et al.*, No. 04-2-39981-5SEA (King Cty. Super. Ct.), finding a class of 320 FedEx Ground pick-up and delivery contractors in Washington to be independent contractors. *Anfinson* had been part of these coordinated proceedings, having been removed to federal court and transferred to this Court by the Judicial Panel on Multidistrict Litigation. The case was subsequently remanded back to Washington state court. (*See* May 15, 2006 Order (Docket No. 255).)

The *Anfinson* plaintiffs alleged, on behalf of themselves and all others similarly situated, that FedEx Ground had misclassified its drivers as independent contractors and sought damages for a class defined as:

> all persons, excluding opt-outs, who performed services as a pick up and delivery driver or contractor [f]or defendant during the class period, December 21, 2001 through December 31, 2005 [(]or who signed or did so through a personal corporate entity[] a FedEx operating agreement[)] and who handled a single route

> at some point during the class period, excluding persons who only performed or filled one or more of the following positions during the class period: Multiple route contractors, temporary drivers, line-haul drivers, or who worked for another contractor.

(*Anfinson* Court's Jury Instructions, Trial Tr. at 21, March 30, 2009 (attached hereto as Exhibit 1).) The independent contractor classification test applied in *Anfinson* asked the jury to decide whether FedEx Ground "controlled or had the right to control the details of the class members' performance of the work." In evaluating the right to control, the jury was instructed to consider eight non-exclusive factors: the degree of FedEx Ground's right to control, the opportunity for profit and loss based on managerial skill, the class members' investment or employment of others, whether the services rendered require special skill, the permanence of the relationship, whether the services rendered are integral to FedEx Ground's operation, the method of payment, and the parties' intent in creating the relationship. (*Id.* at 23-24.)

After a trial on the independent contractor versus employee classification question, the jury rendered a verdict on March 31, 2009 (attached hereto as Exhibit 2) finding that the class members were independent contractors.

The *Anfinson* verdict is relevant to several matters pending before, or previously decided by, this Court.

- The *Anfinson* verdict in FedEx Ground's favor is relevant to plaintiffs' pending motions for summary judgment on classification status filed on April 25, 2008, and FedEx Ground's oppositions thereto filed on June 9, 2008. The *Anfinson* court rejected plaintiffs' argument that the classification issue could be resolved as a matter of law, despite the evidence of the Operating Agreement and the policies and procedures. (Trial Tr. at 20-21, March 31, 2009 (attached hereto as Exhibit 3).)

- The *Anfinson* verdict is relevant to plaintiffs' "Omnibus Memorandum of Law Re Collateral Estoppel in Support of Plaintiffs' Motions for Summary Adjudication" filed on April 25, 2008, and FedEx Ground's Omnibus Response in Opposition filed on June 9, 2008. This verdict supports FedEx Ground's argument that

verdicts contrary to the decision in *Estrada* prevent application of its result to these MDL cases under the collateral estoppel doctrine.

- The *Anfinson* verdict regarding the Washington contractors is also relevant to the Court's October 15, 2007 decision to certify a nationwide class in *Carlene M. Craig, et al. v. FedEx Ground Package System Inc., et al.* (3:05-CV-00530), and calls into question whether the 320 Washington members of the class are, in fact, similarly situated to those in every other state in the nationwide class.

Dated: April 7, 2009.                    Respectfully submitted,


                                         By:  /s/Robert M. Schwartz
                                             Robert M. Schwartz

                                         John H. Beisner
                                         Robert M. Schwartz
                                         Evelyn L. Becker
                                         O'MELVENY & MYERS LLP
                                         1625 Eye Street, NW
                                         Washington, DC 20006-4001
                                         Tel:  (202) 383-5300
                                         Fax:  (202) 383-5414

                                         Thomas J. Brunner
                                         Alison G. Fox
                                         BAKER & DANIELS LLP
                                         202 S. Michigan St.
                                         Suite 1400
                                         South Bend, IN  46601
                                         Tel:  (574) 234-4149
                                         Fax:  (574) 239-1900

            *Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 7th day of April, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# Exhibit 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**MONDAY, MARCH 30, 2009**

Morning Session 8:54 - 10:28 (Pages 1-72)

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington.

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington 98104
(206) 296-9188

members were properly classified as independent contractors and behaved in a manner consent with that status.

Instruction number three. This class is comprised of all persons, excluding opt-outs, who performed services as a pick up and delivery driver or contractor or defendant during the class period, December 21, 2001 through December 31, 2005, or who signed or did so through a personal corporate entity, a FedEx operating agreement and who handled a single route at some point during the class period, excluding persons who only performed or filled one or more of the following positions during the class period: Multiple route contractors, temporary drivers, line-haul drivers, or who worked for another contractor.

Instruction number four. The evidence that has been presented to you may be either direct or circumstantial. The term direct evidence refers to evidence that is given by a witness who has directly perceived something at issue in this case. The term circumstantial evidence refers to evidence from which, based on your commonsense and experience, you may reasonably infer something that is at issue in this case.

The law does not distinguish between direct

and circumstantial evidence in terms of their weight or value in finding the facts in this case. One is not necessarily more or less valuable than the other.

A witness who has special training, education, or experience may be allowed to express an opinion in addition to giving testimony as to facts. You are not, however, required to accept his or her opinion.

To determine the credibility and weight to be given to this type of evidence, you may consider, among other things, the education, training, experience, knowledge, and ability of the witness. You may also consider the reasons given for the opinion and the sources of his or her information as well as considering the factors already given to you for evaluating the testimony of any other witness.

Instruction number six. The law treats all parties equally whether they are corporation or individuals. That means that corporations and individuals are to be treated in the same fair and unprejudiced manner.

The defendant FedEx Ground Package System, Inc., is a corporation. A corporation can act only through its officers and employees. Any act or omission of an officer or employee is the act or

omission of the corporation.

Instruction number 7. When it is said that a party has the burden of proof on any proposition or that any proposition must be proved by a preponderance of the evidence or the expression "if you find" is used, it means that you must be persuaded considering all the evidence in the case bearing on the question did the proposition on which that party has the burden of proof is more probably true than not true.

Instruction number eight. Plaintiffs have the burden of proving that "employee" status was common to the class members during the class period. You should not consider individualized actions, conduct, or work experience unless you find that they reflect policies, procedures, or practices common to the class members during the class period.

Instruction number nine. You must decide whether the class members were employees or independent contractors when performing work for FedEx Ground. This decision requires you to determine whether FedEx Ground controlled or had the right to control the details of the class members' performance of the work.

In deciding control or right to control, you should consider all the evidence bearing on the question. You may consider the following factors among

others.

One. The degree of FedEx Ground's right to control the manner in which the work is to be performed;

Two. The class members' opportunity for profit or loss depending upon each one's managerial skill;

Three. The class members' investment in equipment or materials required for their tasks or their employment of others;

Four. Whether the service rendered requires a special skill;

Five. The degree of permanence of the working relationship;

Six. Whether the services rendered is an integral part of FedEx Ground's business;

Seven. The method of payment, whether by the time or by the job; and

Eight. Whether or not the class members and FedEx Ground believed they were creating an employment relationship or an independent contractor relationship.

Neither the presence or the absence of any individual factor is determinative.

Instruction number 10 and concluding. When you are taken to the jury room to deliberate, your

# Exhibit 2

FILED
KING COUNTY, WASHINGTON

MAR 31 2009

SUPERIOR COURT CLERK
THERESA GRAHAM
DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

RANDY ANFINSON, JAMES GEIGER and STEVEN HARDIE, individually and on behalf of others similarly situated,

Plaintiffs,

v.

FEDEX GROUND PACKAGE SYSTEM, INC., et al.,

Defendants.

No. 04-2-39981-5SEA

**JURY VERDICT**

We, the jury, find that during the class period, December 21, 2001 to December 31, 2005, the class members were (check one):

[ ✓ ] Independent Contractors

[ ] Employees

DATE: MAR 31, 2009

[signature]

Presiding Juror

# Exhibit 3

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**TUESDAY, MARCH 31, 2009** (Pages 1-35)

Morning Session 11:03 - 11:14
Afternoon Session 1:32 - 1:50
Afternoon Session 4:00 - 4:11

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington,

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington 98104
(206) 296-9188

a matter of law pursuant to CR 50(a)(1).

CR 50(a)(1) provides that if there is no "legally sufficient evidentiary basis for a reasonable jury to find in favor of a party on a particular issue, then the Court may grant a motion for judgment as a matter of law against that party."

A motion for judgment as a matter of law admits the truth of the opponent's evidence and all inferences that can be reasonably inferred from that. That's the Queen City Farms versus Centennial National Insurance Company, 126 Wn.2d 50, 1994, Supreme Court case.

If there is any justifiable evidence that exists on which reasonable minds could differ or reach different conclusions consistent with the verdict, then the issue is to be decided by the trier of fact.

For the reasons set forth in this Court's denial of defendant's motion to decertify the class, this Court denies the Civil Rule 50 motions for judgment as a matter of law brought by both plaintiffs and defendant and incorporates its decision on the motion to decertify the class into this order denying the CR 50 motions.

Both sides have presented controverting evidence with respect to FedEx Ground's control and

right to control the manner and means of the contractor's performance of their work and controverting evidence of the eight factors to be considered by the jury with respect to employment or independent contractor status based upon that control or right to control.

This Court cannot determine that as a matter of law that a reasonable finder of fact can only reach one conclusion under the facts of this case for either side or party.

Accordingly, plaintiffs' motion for Civil Rule 50 judgment as a matter of law is denied. Defendant's motion for Civil Rule 50 judgment as a matter of law is denied.

All right. Counsel, I think we need written orders. You probably provided them to me. If you want written orders on any of these rulings, please submit them to me and I will enter them accordingly.

Are there any questions or comments on the rulings? First, I'll take them from the plaintiffs at this time.

MR. RUTZICK: Could we just confer for a moment, Judge?

(A discussion was had off the record between plaintiffs' counsel.)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| -------------------------------------------------------- | ) | Cause No. 3:05-MD-527-RM |
| | ) | (MDL 1700) |
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | |
| -------------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |
| -------------------------------------------------------- | | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY RE: ANFINSON V. FEDEX GROUND PACAKGE SYSTEM, INC.**

Defendant FedEx Ground Package System Inc. ("FXG") claims that the March 31 jury verdict in *Anfinson v.FedEx Ground Package System*, No., 04-2-39981 5SEA (King County Superior Court) is relevant to the pending motions for summary judgment and this Court's October 15, 2007 decision to certify a nationwide class in *Craig v. FedEx Ground Package System Inc.* FXG's position is legally and factually meritless, as explained below, and its Notice to this court is premature.

As post-trial motions in *Anfinson* have not yet been filed, the verdict has yet to be reviewed by the trial court, let alone an appellate court. The unreviewed jury verdict is thus not final and has no precedential effect whatsoever, as FXG well knows. Counsel for the *Anfinson* Plaintiffs have publicly announced that they plan to appeal the verdict. Given FXG's persistent refusal to acknowledge that even the precedent-setting, published final decision in *Estrada v. FedEx Ground Package System Inc.*, 154 Cal. App. 1 (Cal. Ct. App. 2007), *rev. denied,* has **any** legal or even persuasive effect on this proceeding, it is mystifying how FXG can tell this Court

that an un-reviewed decision of a jury under Washington's Minimum Wage law supports, let alone compels, judgment in its favor in this multi-district litigation, in which Washington law is entirely irrelevant and inapplicable. FXG appears to continue its practice of habitual overstatement.

FXG also disingenuously tells this Court that its class certification order in *Craig* is, in some un-stated and ill-conceived way, affected by the jury verdict in *Anfinson;* FXG fails to mention that on the same day the verdict was handed down, the trial court in *Anfinson* denied FXG's motion to decertify the class. (Exhibit A is the **full** transcript of the *Anfinson* court's March 31st denial of FXG's Motion to Decertify the Class and both parties' Motions for a Directed Verdict.) Rather than proving that the 320 Washington members of the *Anfinson* class are not "similarly situated" with the other 26,700 *Craig* class members, as FXG contends, the *Anfinson* verdict graphically demonstrates why the Supreme Court wisely required a classwide determination of employment status under ERISA, rather than piecemeal adjudications that could result in inconsistent judgments in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992).

Moreover, the *Anfinson* trial court, in denying FXG's motion to decertify said the following of note:

> Defendant focuses in its motion [to decertify] on defendant's actual control as demonstrated through so-called anecdotal evidence rather than on the right to control as demonstrated through Federal Express policies and procedures. . . . The evidence would support a finding that the exercise of actual control over the class members was neither uniform nor common as to many class members. However, as noted by Judge Canova in his findings and order granting class certification addressing the predominance factor, the Court stated, "The Court finds that the overriding issue in this litigation is whether FedEx, has the right to control the manner and means of the work performed by putative class members." . . . [T]o the extent such evidence reflects FedEx

Ground's class-wide policies and procedures concomitant with its retention of the right to control, it would support findings applicable to the entire class.

These policies and procedures emanate from the operating agreement, the operations management's handbook, the company manual, issuance of policy directives by email and other forms, and the assertion of company control as stated as policy through contractor discussion notes, commonly referred to as CDN's. Even internally FedEx Ground has contradicted whether such policies and procedures even applied to the contractors.

Evidence of such common evidence includes plaintiffs' claims and presentation of evidence in the following examples: First, a 9.5 minimum pickup and delivery drive time; two, realignment of geographical areas; three, mandated flexing of packages; four, required business plan discussions; five, mandated uniform and personal appearance; six, mandated truck or vehicle appearance; seven, safety requirements greater than that imposed by federal or state regulations; eight, required customer service rides; nine, mandated pickup and delivery windows; ten, monitoring of contractors through scanner information.

Even though these items may be controverted, there is ample evidence for the jury to find that FedEx Ground's policies and procedures, regardless of whether effectuated or enforced by FedEx Ground granted defendant the right to retain control over the contractors in these areas. . . .

Defendant claims that the inquiry begins and ends with interpretation of the operating agreement and that the language of the contract denying FedEx Ground's right to control the manner and means of the contractors' work is dispositive. However, defendant's argument belies its own internally inconsistent evidence whether promulgated policies and procedures were even applied to the contractors. Moreover, plaintiffs did demonstrate that, notwithstanding the claimed limitation on FedEx Grounds' right to control, managers did routinely exercise control over contractors often referring to the operating agreement as authoritative.

The managers did this in many of the previously-mentioned areas such as personal appearance, vehicle appearance, pick up windows, safety regulations, and the like.

For these reasons, this Court concludes that decertification under the facts of this case is not appropriate or warranted. Regardless of any dissimilarity in the contractor work experience, plaintiffs have presented

case 3:05-md-00527-RLM-CAN document 1728 filed 04/14/09 page 4 of 29

> sufficient evidence for the trier of fact to consider whether the OA, the policies, procedures, company directives, and practices establish FedEx Ground's right to retain control over the manner and means over which the SWA contractors performed their work.
>
> For these reasons, defendant FedEx Ground's motion to decertify the class is denied. (Exh. A, pp. 16-19)

Similarly, and contrary to FXG's position that the *Anfinson* jury verdict "prevents" this Court from applying collateral estoppel to the cases pending in this MDL, the *Anfinson* verdict actually supports its application. The precise policy reasons underpinning collateral estoppel principles apply here -- inconsistent decisions could result if FXG is allowed to relitigate identical issues which have been actually litigated and necessarily and finally decided in a prior proceeding. Accordingly, this unreviewed jury verdict illustrates the need to accord collateral estoppel effect to the *Estrada* factual finding—the first fully litigated proceeding to finally determine this identical issue – that FXG retains the right to control virtually all aspects of the drivers' performance.

Finally, the *Anfinson* court's determination that employment status is purely a matter of fact and, hence the province of the jury, under Washington's Minimum Wage Act has no application to the summary judgment motions pending herein, none of which involve any interpretation or application of Washington law.

/ / /

/ / /

/ / /

Dated: April 14, 2009

Respectfully submitted,
LEONARD CARDER, LLP

/s/ **Lynn Rossman Faris**

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

# EXHIBIT A

Plaintiffs' Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**TUESDAY, MARCH 31, 2009** (Pages 1-35)

Morning Session 11:03 - 11:14
Afternoon Session 1:32 - 1:50
Afternoon Session 4:00 - 4:11

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington,

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington 98104
(206) 296-9188

Case 3:05-md-00527-RLM-CAN document 1728 filed 04/14/09 page 8 of 29

Plaintiffs' Copy
PERMISSION TO COPY DENIED

SEATTLE, WASHINGTON

TUESDAY, MARCH 31, 2009

AFTERNOON SESSION - 1:32 P.M. - 1:50 P.M.

--oOo--

(The following proceedings were held in open court outside the presence of the jury.)

THE COURT: Good afternoon. Please be seated.

We're back on the record in the matter of Anfinson versus FedEx Ground Package System, Inc. Counsel are here for the Court's rulings on the pending motions. They are as follows:

Defendant's motion for Civil Rule 50 judgment as a matter of law regarding business or corporate entities, defendant's motion to decertify the class, plaintiffs' motion for Civil Rule 50 judgment as a matter of law, defendant's Civil Rule 50 motion for judgment as a matter of law.

Mr. Rutzick, welcome back.

MR. RUTZICK: Thank you.

THE COURT: All right.

The following is the Court's ruling regarding defendant's Civil Rule 50 motion for judgment as a matter of law regarding business and corporate entities to either dismiss the suit or, in the alternative, to

Plaintiffs' Copy
PERMISSION TO COPY DENIED

dismiss those plaintiffs who are incorporated.

The Minimum Wage Act, RCW 49.46.010(5), upon which the plaintiffs rely for bringing their state MWA claims, gives the following definition of employee: Employee includes any individual employed by and employer but shall not include, and then there's a list of individuals, persons, entities and such that are not applicable.

The claim of the defendant is that employee means an individual, an individual means a natural person, a natural person is not a corporation or a business.

Although a literal narrow interpretation of the statute supports the defense position, given the remedial nature of the Minimum Wage Act and the use of the word "includes," this Court concludes that a broad inclusive interpretation of the statute is mandated. The Minimum Wage Act requires broad and flexible interpretation in favor of coverage.

Hisle versus Todd Pacific Shipyards, 151 Wn.2d 853 at 861, a 2004 Supreme Court case. FedEx refers this Court to an attorney general opinion, 150 AGO, 1961, '62.

The focus of the attorney general opinion was on the definition of "person" under the Minimum Wage

Plaintiffs' Copy
PERMISSION TO COPY DENIED

Act. The assistant attorney general contrasted the term "person," which it defined very broadly and to include natural and artificial persons, such as corporations, with the term "individual," which it construed to mean a natural person. This, of course, supports the defense position.

First, this Court would note that the language relied on by the defendant in this AGO is dicta. The issue was interpretation of the term person, not individual.

Secondly, attorney general opinions are not binding on the Court. Branson versus Port of Seattle, 115 Wn.App. 695, 2003 appellate case. And this attorney general opinion has never been adopted or proved by any Court in the state.

Finally, the case law is nearly uniform that remedial employment statutes, such as the Fair Labor Standards Act, FLSA, and the MWA are to be applied broadly and liberally, and those Courts and administrative bodies that have directly addressed this issue have rejected this proposition that the mere act of incorporation for tax or other purposes should preclude a worker from seeking employee status under the FLSA or under various state MWA's.

These cases include Ware versus Industrial

Commission, 743 N.E.2d 579, case out of Illinois appeals court. Wisconsin Cheese Service, Inc. versus Department of Labor and Human Industry, 322 N.W.2d 495, out of Wisconsin. Gustafson versus Bell Atlantic Company, 171 F.Supp.2d 311 from the southern district of New York 2001. And a National Labor Relations Board, NLRB versus California Dental Care, Inc.

All of these cases has rejected the proposition that the mere incorporation should preclude an individual from seeking remedies of employment law statutes or regulations.

This Court finds that analysis persuasive given the remedial nature of the statute and the lack of any persuasive or authoritative case law to the contrary.

The defendant also argues that the employment by plaintiffs' corporations of either or both the plaintiffs or others obviates status as an employee. This Court notes that under the jury instructions given to the jury, instruction number nine factor number three, the employment of others is a factor to be considered by the trier of fact and it is not dispositive of this issue but is one factor of many.

The fact that FedEx Ground may have contracted with plaintiffs' corporation or that a

plaintiff may have been employed by his or her own corporation or that the plaintiffs' corporation may have hired other employees does not bar as a matter of law a plaintiffs' claim to employee status.

For that reason, the defendant's motion for judgment as a matter of law pursuant to Civil Rule 50 to dismiss plaintiffs' claims based upon corporate or business status of some of the plaintiffs or in the alternative to dismiss the claims of those incorporated plaintiffs is denied.

The following is the Court's ruling on defendant's motion to decertify the class.

Defendant focuses in its motion on defendant's actual control as demonstrated through so-called anecdotal evidence rather than on the right to control as demonstrated through Federal Express policies and procedures.

Citing plaintiffs' for motion for class certification dated August 16th, 2007, defendant notes that Judge Canova certified the class based on plaintiffs' representations that "whether judged by corporate policy or by the similar experiences of the P&D drivers, it is clear that evidence can be analyzed in a 'class-wide manner'".

This Court agrees with the defendant that the

evidence at trial did not establish uniform practices among all class members or the uniform application of FedEx Ground policies such as appearance, personal use of trucks, restrictions of leaving the terminal was applied uniformly to the class members.

The evidence would support a finding that the exercise of actual control over the class members was neither uniform nor common as to many class members. However, as noted by Judge Canova in his findings and order granting class certification addressing the predominance factor, the Court stated, "The Court finds that the overriding issue in this litigation is whether defendant, FedEx, has the right to control the manner and means of the work performed by putative class members."

As noted by the plaintiffs, this parallels the analysis set forth by the Washington Supreme Court in the Kamla case addressing the common law analysis which has essentially been adopted and applied by this Court in its jury instructions. In Kamla versus Space Needle 147 Wn.2d 114, a 2002 case, at page 121, the Supreme Court stated that the proper inquiry is "whether there is a retention of the right to direct the manner in which the work is performed, not simply whether there is an actual exercise of control over the

manner in which to work is performed."

To the extent the jury considers so-called anecdotal evidence not to be common to class members, it is free to ignore such evidence. But to the extent such evidence reflects FedEx Ground's class-wide policies and procedures concomitant with its retention of the right to control, it would support findings applicable to the entire class.

These policies and procedures emanate from the operating agreement, the operation management's handbook, the company manual, issuance of policy directives by e-mail and other forms, and the assertion of company control as stated as policy through contractor discussion notes, commonly referred to as CDN's. Even internally FedEx Ground has contradicted whether such policies and procedures even applied to the contractors.

Evidence of such common evidence includes plaintiffs' claims and presentation of evidence in the following examples: First, a 9.5 minimum pick up and delivery drive time; two, realignment of geographical areas; three, mandated flexing of packages; four, required business plan discussions; five, mandated uniform and personal appearance; six, mandated truck or vehicle appearance; seven, safety requirements greater

Plaintiffs' Copy
PERMISSION TO COPY DENIED

than that imposed by federal or state regulations; eight, required customer service rides; nine, mandated pick up and delivery windows; 10, monitoring of contractors through scanner information.

Even though these items may be controverted, there is ample evidence for the jury to find that FedEx Ground's policies and procedures, regardless of whether effectuated or enforced by FedEx Ground granted defendant the right to retain control over the contractors in these areas.

The jury may choose to consider FedEx Ground's actual practices as demonstrated through individual testimony or claimed representative evidence or they may choose to focus on the formal contractual relationship established through the operating agreement and the promulgation of policies, rules, and procedures.

Defendant claims that the inquiry begins and ends with interpretation of the operating agreement and that the language of the contract denying FedEx Ground's right to control the manner and means of the contractors' work is dispositive. However, defendant's argument belies its own internally inconsistent evidence whether promulgated policies and procedures were even applied to the contractors. Moreover,

Plaintiffs' Copy
PERMISSION TO COPY DENIED

plaintiffs did demonstrate that, notwithstanding the claimed limitation on FedEx Ground's right to control, managers did routinely exercise control over contractors often referring to the operating agreement as authoritative.

The managers did this in many of the previously-mentioned areas such as personal appearance, vehicle appearance, pick up windows, safety regulations, and the like.

For these reasons, this Court concludes that decertification under the facts of this case is not appropriate or warranted. Regardless of any dissimilarity in the contractor work experiences, plaintiffs have presented sufficient evidence for the trier of fact to consider whether the OA, the policies, procedures, company directives, and practices establish FedEx Ground's right to retain control over the manner and means over which the SWA contractors performed their work.

For these reasons, defendant FedEx Ground's motion to decertify the class is denied.

The Court will address both Civil Rule 50 motions for judgment as a matter of law.

Both parties, the plaintiffs and defendant, have moved for judgment on the evidence or judgment as

Plaintiffs' Copy
PERMISSION TO COPY DENIED

a matter of law pursuant to CR 50(a)(1).

CR 50(a)(1) provides that if there is no "legally sufficient evidentiary basis for a reasonable jury to find in favor of a party on a particular issue, then the Court may grant a motion for judgment as a matter of law against that party."

A motion for judgment as a matter of law admits the truth of the opponent's evidence and all inferences that can be reasonably inferred from that. That's the Queen City Farms versus Centennial National Insurance Company, 126 Wn.2d 50, 1994, Supreme Court case.

If there is any justifiable evidence that exists on which reasonable minds could differ or reach different conclusions consistent with the verdict, then the issue is to be decided by the trier of fact.

For the reasons set forth in this Court's denial of defendant's motion to decertify the class, this Court denies the Civil Rule 50 motions for judgment as a matter of law brought by both plaintiffs and defendant and incorporates its decision on the motion to decertify the class into this order denying the CR 50 motions.

Both sides have presented controverting evidence with respect to FedEx Ground's control and

Plaintiffs' Copy
PERMISSION TO COPY DENIED

right to control the manner and means of the contractor's performance of their work and controverting evidence of the eight factors to be considered by the jury with respect to employment or independent contractor status based upon that control or right to control.

This Court cannot determine that as a matter of law that a reasonable finder of fact can only reach one conclusion under the facts of this case for either side or party.

Accordingly, plaintiffs' motion for Civil Rule 50 judgment as a matter of law is denied. Defendant's motion for Civil Rule 50 judgment as a matter of law is denied.

All right. Counsel, I think we need written orders. You probably provided them to me. If you want written orders on any of these rulings, please submit them to me and I will enter them accordingly.

Are there any questions or comments on the rulings? First, I'll take them from the plaintiffs at this time.

MR. RUTZICK: Could we just confer for a moment, Judge?

(A discussion was had off the record between plaintiffs' counsel.)

Plaintiffs' Copy
PERMISSION TO COPY DENIED

MR. RUTZICK: What we would propose to do -- and this is kind of a question, I guess. Is it all right that we propose to do which is that the proposed orders on our -- I guess the ones we would -- that we say for the reasons set forth in the Court's oral decision?

THE COURT: Oh, absolutely. I don't think it needs any reasoning or findings or conclusions. You can incorporate by reference my oral ruling, and I actually prefer that because otherwise we're going to spend a lot of time trying to figure out --

MR. RUTZICK: That's our request.

THE COURT: It should be denied based upon the reasons set forth. Yes. All right. Anything from the defense? Mr. Michelson?

MR. MICHELSON: No, Your Honor.

THE COURT: Okay. All right. Anything else either side would like to address or discuss at this time?

MR. MICHELSON: Nothing from the defense, Your Honor.

MR. GARFINKEL: No, Your Honor.

THE COURT: All right. If there's nothing further, then we will recess this matter for right now and just please be available.

Plaintiffs' Copy
PERMISSION TO COPY DENIED

Again, we'll probably let the jury go until about 4:15 this afternoon and we'll -- oh, they're leaving at 3:45, aren't they?

THE BAILIFF: Yes.

THE COURT: They're leaving at 3:45. They started at 8:45 this morning. They took a pretty brief lunch. And if we don't hear from them by 3:45 they'll be back tomorrow.

Thank you, counsel. Court will be at recess.

(Whereupon proceedings adjourned.)

--oOo--

## PROOF OF SERVICE

I am a citizen of the United States and am employed in Alameda County.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 1330 Broadway, Suite 1450, Oakland, CA  94612.  On **April 14, 2009**, I served the following document(s):

**PLAINTIFFS' RESPONSE TO DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY RE: ANFINSON V. FEDEX GROUND PACAKGE SYSTEM, INC.**

I hereby certify that  I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

**3:05-md-527 Notice has been electronically mailed to:**

Peter J Agostino      agostino@aaklaw.com, trybula@aaklaw.com

George A Barton      gbarton@birch.net, bartonlaw3@birch.net

Jeffrey A Bartos      jbartos@geclaw.com

Evelyn L Becker PHV      ebecker@omm.com

Kenneth Lee Blalack , II      lblalack@omm.com

Darcie R Brault      dbrault@dibandfagan.com

Laura C Bremer      lbremer@omm.com

Guy Brenner      gbrenner@omm.com

Thomas J Brunner , Jr      Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Michael C Camunez      mcamunez@omm.com, cgreenberg@omm.com

David M Cialkowski      dmc@zimmreed.com

Jerald R Cureton      jcureton@curetoncaplan.com

Ginger A DeGroff      degrofflaw@yahoo.com

Robert E DeRose , II      bderose@bnhmlaw.com, mschaadt@bnhmlaw.com, sbaith@bnhmlaw.com, twicklund@bnhmlaw.com

Edward J Efkeman      eefkeman@fedex.com

Susan E Ellingstad    seellingstad@locklaw.com, hnpotteiger@locklaw.com, rmmorton@locklaw.com

Barry S Fagan    bfagan@dibandfagan.com

Lynn R Faris    lfaris@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Monica Ferraro    mferraro@bnhmlaw.com

Lee K Fink    lfink@omm.com

Robert K Firsten    rfirsten@firstenlaw.com

Edward R Forman    eforman@ee.net

Wood R Foster PHV , Jr    woodfoster@sbgdf.com, heidifurlong@sbgdf.com

Alison G Fox    Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Philip Stephen Fuoco    pfuoco@msn.com

Martin S Garfinkel    garfinkel@sgb-law.com, helm@sgb-law.com

Michael W Garrison , Jr    mgarrison@omm.com

R Christopher Gilreath    chrisgil@sidgilreath.com

Eileen S Goodin    egoodin@bnhmlaw.com

Michael J Gorby    mgorby@gorbypeters.com, rwright@gorbypeters.com

Deborah R Grayson    drgrayson@fuse.net

Robert K Handelman    rhandelman@bnhmlaw.com

Robert I Harwood    rharwood@whesq.com

Stacy J Hauf    shauf@omm.com, swickliffe@omm.com

Matthew M Houston    mhouston@whesq.com

Dmitri Iglitzin    iglitzin@workerlaw.com

Tom A Jerman    tjerman@omm.com

Victor H Jih   vjih@omm.com

Aparna B Joshi   ajoshi@omm.com

Soye Kim   skim@geclaw.com

Michael W Kopp   mkopp@omm.com

Steve D Larson   slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Jordan M Lewis   jordanlewis@sbgdf.com

Shannon Liss-Riordan   sliss@prle.com, jhunt@prle.com, syoung@prle.com

Gary F Lynch   glynch@carlsonlynch.com

John S Marshall   marshall@ee.net

Michael G McGuinness   mmcguinness@omm.com

Bruce H Meizlish   brucelaw@fuse.net

Sanford A Meizlish   smeizlish@bnhmlaw.com

Matthew J Merrick   mmerrick@omm.com

Jennifer Lee Merzon   jmerzon@omm.com

Raquel A Millman   rmillman@omm.com

James R Mulroy , II   jrmulroy@kiesewetterwise.com, jedwards@kiesewetterwise.com

Daniel O Myers   dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Jeffrey S Nestler   jnestler@omm.com

Peter W Overs , Jr   povers@whesq.com

Mary Donne Peters   mpeters@gorbypeters.com, rwright@gorbypeters.com

Richard T Phillips   flip@smithphillips.com, tresahharden@smithphillips.com

D Lucetta Pope   Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, marion.jacobson@bakerd.com, Melissa.Bozzuto@bakerd.com

Nora M Puckett   npuckett@omm.com, dmeredith@omm.com

Charles Victor Pyle , III    victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Anne T Regan    atr@zimmreed.com, kmh@zimmreed.com

Beth A Ross    bross@leonardcarder.com

J Gordon Rudd    jgr@zimmreed.com

Theodore B Schroeder    tschroeder@omm.com

Robert M Schwartz PHV    rschwartz@omm.com

James A Staack    jims@staack-firm.com

R Jay Taylor , Jr    jtaylor@scopelitis.com, lnewton@scopelitis.com

Joni M Thome PHV    thome@halunenlaw.com

Matthew T Tobin    mtobin@sbslaw.net, lstewart@sbslaw.net

Jeffrey A Trimarchi    jtrimarchi@omm.com

Mary D Walsh-Dempsey    mdempsey@omalleylangan.com

Michael J Watton    jdrewicz@Wattongroup.com

Andrew M Weiner    aweiner@omm.com

Peter D Winebrake    pwinebrake@winebrakelaw.com

**I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:**

John H. Beisner PHV
David G. Caperton
O'Melveny & Myers LLP
1625 Eye Street NW Suite 10
Washington, DC 20006-4001
Email: jbeisner@omm.com
Email: dcaperton@omm.com

J. Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801
Email: Allen@bclegal.net

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Suite 200
Bartlett, TN 38134
Email: joree@jbrownlow.com

R. Bruce Carlson
Carlson Lynch Ltd - Sew/PA
231 Melville Lane
PO Box 367
Sewickley, PA 15143
Email: bcarlson@carlsonlynch.com

Steve Dennis PHV
Reid & Dennis PC
5001 Spring Valley Road Suite 255W
Dallas, TX 75244-3914

B. James Fitzpatrick
Fitzpatrick Spini & Swanston
838 S Main Street Suite E
Salinas, CA 93901
Email: bjfitzpatrick@fandslegal.com;
cswanston@fandslegal.com

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178
Email: jjjteam@yahoo.com

William T. Fiala
Lewis Fisher Henderson Claxton & Mulroy
6410 Poplar Ave Ste 300
Memphis, TN 38119

Salvatore G. Gangemi
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005
Email: sgangemi@gangemilaw.com

Robert A. Garcin
Law Offices of Robert A. Garcin
210 East 29th Street, #A
Loveland, CO 80538

Clayton D. Halunen
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402
Email: halunen@halunenlaw.com

Jack D. Hilmes
Kevin J. Driscoll
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773
Email: jhilmes@finleylaw.com; kdriscoll@finleylaw.com

Eric E. Hobbs
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108
Email: eehobbs@michaelbest.com

William S. Hommel , Jr
Attorney at Law
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703
Email: bhommel@hommelfirm.com

Dorothy A. Jarrell
Anh-Nguyet T. LyJordan
O'Melveny & Myers LLP
O'Melveny & Myers LLP - NY/NY
7 Times Square
New York, NY 10036
Email: djarrell@omm.com;
alyjordan@omm.com

Laron Jones
1505 N Ellamont St
Baltimore, MD 21216

Steven M. Kelso
Wheeler Trigg Kennedy LLP
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202
Email: kelso@wtklaw.com

Donald B. Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Carla D. Macaluso
Jackson Lewis LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Robert E. McDaniel
Email: remcdanielesq@aol.com

Charles N. Nauen
Email: cnnauen@locklaw.com

Joseph A. Osefchen
The Law Firm of Philip Stephen Fuoco
Email: josefchen@msn.com

Shannon H Paliotta
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222-3110
Telephone: (412) 201-7600
Fax: (412) 456-2377
Email: SPaliotta@littler.com

Cheryl F. Perkins
Whetstone Myers Perkins and Young LLC
Email: cperkins@attorneyssc.com

Michael R. Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989
Email: mrreck@belinlaw.com

Andrew J. Kahn
McCracken Stemerman & Holsberry
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102
Email: ajk@dcbsf.com

Karen P. Kruse
Aaron Roblan
Jackson Lewis LLP
One Union Square
600 University Street Suite 2900
Seattle, WA 98101

Harold L. Lichten
Pyle Rome Lichten Ehrenberg &
Liss-Riordan
Email: Harold@prle.com

Paula R. Markowitz
Markowitz & Richman
Email: ldicrosta@markowitzandrichman.com

Kenneth E. Milam
Email: kemilam@watkinseager.com

Todd J. O'Malley
O'Malley & Langan
Email: tomalley@omalleylangan.com

Robert J. Penny
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Alan M. Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Jennifer R. Rygiel-Boyd
Ogletree Deakins Nash Smoak & Stewart PC
Email: jennifer.rygiel-boyd@olgetreedeakins.com
jennifer.rygiel-boyd@ogletreedeakins.com

Eric H. Rumbaugh
Michael Best & Friedrich LLP
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108
Email: ehrumbaugh@michaelbest.com

Dan S. Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Richard Tanenbaum
Email: rt@lawyer.com

Charles W. Whetstone , Jr
Whetstone Myers Perkins and Young
Email: cwhetstone@attorneyssc.com

Clark C Johnson
Stites & Harbison PLLC - Lou/KY
400 West Market St Suite 1800
Louisville, KY 40202-3352

Wesley S Chused
Looney & Grossman LLP
101 Arch Street
Boston, MA 02110

Ronald D Kelsay
Kelsay Law Firm PA
227 Woodbine
Hot Springs, AR 71901

Patricia A Sullivan
Email: psullivan@eapdlaw.com

Donald R Taylor
Email: dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com

Peter N. Wasylyk
Email: pnwlaw@aol.com

Mark B Wallace
Walker Vaughn & Wallace PLLC
7403 St Andrews Church Road
PO Box 9285
Louisville, KY 40209

Whitney Frazier Watt
Stites & Harbison PLLC - Lou/KY
400 West Market St Suite 1800
Louisville, KY 40202-3352

Kevin A Crass
Elizabeth Robben Murray
Friday Eldredge & Clark LLP
Little Rock Regions Center
400 West Capitol Avenue Suite 2000
Little Rock, AR 72201-3493

Ronald E Jenkins
Jenkins and Kling PC
10 S Brentwood Boulevard Suite 200
Clayton, MO 63105

Gregory C Black
Corette Pohlman & Kebe
PO Box 509
Buttr, MT 59703

Christopher Dean Glover
Hogan and Glover PC
2017 Morris Avenue Suite 300
Birmingham, AL 35203-4138

Kenneth Daniel Sansom
Robert Keeling Spotswood
Emily Joy Tidmore
Spotswood LLC
Concord Center Suite 940
2100 Third Avenue North
Birmingham, AL 35203

Mark Schirmer
Straus and Boies LLP
1661 International Place Dr Suite 400
Memphis, TN 38120

Merrie M Frost
PO Box 18098
Cleveland, OH 44118-0098

Kimberly M Moses/Laura K Kendall
Calfee Halter & Griswold LLP - Cle/OH
1400 McDonald Investment Center
800 Superior Avenue
Cleveland, OH 44114

Damon L Ellis/Jonathan R Mani
Mani & Ellis
PO Box 1266
Charleston, WV 25326-1266

Anthony J Pantuso , III
Pantuso Law Firm LLC
204 Broad St 2nd Floor
Milford, CT 06460

Brian J Moore/Roger A Wolfe
Jackson Kelly
PO Box 553
Charleston, WV 25322-0553

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

John Alan Doran/Laura Marie Lawless
John F Lomax , Jr/Michael Cajer Mason
Greenberg Traurig LLP - Pho/AZ
2375 E Camelback Rd Suite 700
Phoenix, AZ 85016

Hart Lawrence Robinovitch
Zimmerman Reed PLLP
651 Nicollet Mall Suite 501
Minneapolis, MN 55402

Anne Marie Estevez
Morgan Lewis & Bockius
200 S Biscayne Boulevard Suite 5300
Wachovia Financial Center
Miami, FL 33131-2339

Richard Eugene Hayber
Hayber Law Firm LLC
221 Main St Suite 400
Hartford, CT 06106

Burton Kainen
Kainen Escalera & McHale PC
21 Oak St
Hartford, CT 06106

Mary Stanfield Bubbett
Stone Pigman Walther Wittmann LLC
546 Carondelt St
New Orleans, LA 70130-3588

Louis Adams Bledsoe , III
Robinson Bradshaw & Hinson PA
101 North Tryon St Suite 1900
Charlotte, NC 28246

Thomas N Trefethern
2045 Chappel Hill Drive
Youngstown, OH 44511

David F Rees/Joshua L Ross
Stoll Stoll Berne Lokting & Shlachter PC
209 SW Oak Street Fifth Floor
Portland, OR 97204

James S Lowrie
Jones Waldo Holbrook & McDonough SLC
170 S Main St Suite 1500
Salt Lake City, UT 84101

James J Dunn , Jr
Mickenberg Dunn Kochman Lachs & Smith
29 Pine Street
Burlington, VT 05402-0406

Scott R Bickford/Lawrence J Centola , III
Martzell & Bickford
338 Lafayette St
New Orleans, LA 70130

Kristine M Larsen
Ray Quinney & Nebeker PC
36 South State Street Suite 1400
PO Box 45385
Salt Lake City, UT 84111

Marc L Frischhertz
Frischhertz & Associates
1130 St Charles Ave
New Orleans, LA 70130

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **April 14, 2009**.

/s/ Lorelei Badar
Lorelei Badar

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANT'S MOTION TO RECONSIDER ORDER CONCERNING PRODUCTION OF PLAINTIFFS' TAX RECORDS**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby files this Notice of Supplemental Authority in support of its motion to reconsider this Court's prior Order concerning the production of plaintiffs' tax records. (Docket Nos. 451 (Order); 1714 (Motion).) Specifically, FedEx Ground wishes to bring to the Court's attention certain aspects of the trial proceedings from *Anfinson, et al. v. FedEx Ground Package System, Inc.*, *et al.*, No. 04-2-39981-5SEA (King Cty. Super. Ct.), relating to the use at trial of the contractor witnesses' (both named plaintiffs' and class members') income tax returns. As set forth in FedEx Ground's prior Notice of Supplemental Authority, filed with this Court on April 7, 2009, the jury in *Anfinson* found that the class members were independent contractors based on a consideration of eight non-exclusive factors, including the opportunity for profit and loss based on managerial skill, the method of payment, and the parties' intent in creating the relationship. (Trial Tr. at 23:17-24:23, Mar. 30, 2009 (attached hereto as Exhibit 1).)

The *Anfinson* court ruled that, for privacy and other reasons, the tax returns themselves would not be admitted into evidence. Subject to that one limitation, the court permitted extensive cross-examination and other testimony, as well as demonstrative summaries, regarding information contained in the tax returns "relating to all aspects of the class members' work with defendant." (Orders Regarding Plaintiffs' Motions in Limine at 3:18-23, Mar. 4, 2009; Hearing Tr. at 71:11-16, Feb. 19, 2009 (attached hereto as Exhibits 2 and 3, respectively).)

The extensive use of the information in the contractors' income tax returns in the *Anfinson* trial is relevant to FedEx Ground's pending motion for reconsideration because the *Anfinson* court determined that the tax return evidence would have probative value with respect to several of the employment classification factors the jury was instructed to examine, including the opportunity for profit or loss, the method of compensation, and the beliefs of the parties regarding employment versus independent contractor status. (*See* Hearing Tr. at 69:19-70:3, Feb. 19, 2009 (attached hereto as Exhibit 3); Trial Tr. at 145:18-146:21 & 149:7-14, Mar. 10, 2009 (attached hereto as Exhibit 4).) The last factor, i.e., the beliefs of the parties, was given significant importance -- and was analyzed via an examination of the putative employee's tax records -- in the Seventh Circuit's recent decision in *Suskovich v. Anthem Health Plans of Virginia, Inc.*, which was the basis for FedEx Ground's motion for reconsideration. *See* 553 F.3d 559, 569 (7th Cir. 2009) (stating that "tax returns" and "tax forms" "overwhelmingly favor[ed] the conclusion that [worker] considered himself an independent contractor"). *Suskovich* also gave weight to the method of compensation factor in affirming the district court's ruling that the worker was an independent contractor, again relying on the worker's tax returns for support. *Id.* at 568 (noting that worker had indicated on tax returns that income came from a

sole proprietorship and that he had claimed business deductions, which is inconsistent with employee status).

Similarly, extensive information in the *Anfinson* class members' tax returns, which showed how they had taken business deductions and claimed to be self-employed, was repeatedly referenced during the trial on the issue of whether they should be deemed to be "employees" or "independent contractors." (*See, e.g.*, Trial Tr. at 101:2-106:18, Mar. 24, 2009 (attached hereto as Exhibit 5) (FedEx Ground expert witness Charles Pietka testifying, *inter alia*, that class members' tax returns, which were signed under penalty of perjury, included business deductions and payment of self-employment taxes).) Referencing their own tax returns, the contractor witnesses testified regarding the precise profits and losses from their businesses and the sales of their routes. And, while reviewing the tax returns, they testified regarding the method by which they were paid and their belief as to whether they were independent contractors or employees. (*See* Trial Tr. at 119:16-128:12, Mar. 4, 2009 (attached hereto as Exhibit 6) (contractor Solheim's corporate tax returns reflect that FedEx Ground made payments to her corporation, and individual returns indicate that she held herself out as an independent contractor); Trial Tr. at 71:4-23, Mar. 9, 2009 (attached hereto as Exhibit 7) (contractor Peckham's tax returns show that he took depreciation as a tax write-off); Trial Tr. at 61:24-66:6, Mar. 5, 2009 (attached hereto as Exhibit 8) (contractor Cork's tax returns reveal that he classified himself as self-employed and reported profits from business and sale of route); and Trial Tr. at 50:3-52:14 & 137:1-143:12, Mar. 11, 2009 (attached hereto as Exhibits 9 and 10) (contractor Goodwin's tax returns indicate status as self-employed and reflect business profits).) The standards for permitting discovery are more liberal than those for the admissibility of such

information.  Since the tax testimony was permitted at trial, similar evidence should be

discoverable under the standards of Rule 26.

Dated:  April 15, 2009.  Respectfully submitted,

By:  /s/Robert M. Schwartz
    Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel:  (202) 383-5300
Fax:  (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN  46601
Tel:  (574) 234-4149
Fax:  (574) 239-1900

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 15th day of April, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# EXHIBIT 1

Defendant's Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

| | |
|---|---|
| RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC.,<br><br>Defendant. | KING COUNTY CAUSE No. 04-2-39981-5 SEA |

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**MONDAY, MARCH 30, 2009**
Morning Session 8:54 - 10:28 (Pages 1-72)

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington.

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington 98104
(206) 296-9188

Defendant's Copy
PERMISSION TO COPY DENIED

omission of the corporation.

Instruction number 7. When it is said that a party has the burden of proof on any proposition or that any proposition must be proved by a preponderance of the evidence or the expression "if you find" is used, it means that you must be persuaded considering all the evidence in the case bearing on the question did the proposition on which that party has the burden of proof is more probably true than not true.

Instruction number eight. Plaintiffs have the burden of proving that "employee" status was common to the class members during the class period. You should not consider individualized actions, conduct, or work experience unless you find that they reflect policies, procedures, or practices common to the class members during the class period.

Instruction number nine. You must decide whether the class members were employees or independent contractors when performing work for FedEx Ground. This decision requires you to determine whether FedEx Ground controlled or had the right to control the details of the class members' performance of the work.

In deciding control or right to control, you should consider all the evidence bearing on the question. You may consider the following factors among

Defendant's Copy
PERMISSION TO COPY DENIED

others.

One. The degree of FedEx Ground's right to control the manner in which the work is to be performed;

Two. The class members' opportunity for profit or loss depending upon each one's managerial skill;

Three. The class members' investment in equipment or materials required for their tasks or their employment of others;

Four. Whether the service rendered requires a special skill;

Five. The degree of permanence of the working relationship;

Six. Whether the services rendered is an integral part of FedEx Ground's business;

Seven. The method of payment, whether by the time or by the job; and

Eight. Whether or not the class members and FedEx Ground believed they were creating an employment relationship or an independent contractor relationship.

Neither the presence or the absence of any individual factor is determinative.

Instruction number 10 and concluding. When you are taken to the jury room to deliberate, your

Defendant's Copy
PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON)
) SS:
COUNTY OF KING )

I, CYNTHIA A. KENNEDY, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on April 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

Dated: ___________

_____________________________
OFFICIAL COURT REPORTER

# EXHIBIT 2



FILED
KING COUNTY, WASHINGTON

MAR 04 2009

SUPERIOR COURT CLERK
THERESA GRAHAM
DEPUTY

HONORABLE JOHN P. ERLICK
TRIAL DATE: MARCH 2, 2009

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

RANDY ANFINSON, JAMES GEIGER, AND STEVEN HARDIE, individually and on behalf of others similarly situated,

Plaintiffs,

v.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

No. 04-2-39981-5-SEA

~~PROPOSED~~

ORDERS REGARDING PLAINTIFFS' MOTIONS IN LIMINE

THIS MATTER having come on duly and regularly before this Court upon plaintiffs' motion in limine (1) to exclude portions of opinion of defense expert Smith; (2) regarding admissibility of certain documents which plaintiff may use during opening statement admissibility of certain documents; (3) to exclude portions of Crandall and McPhail testimony; (4) to exclude the testimony of Francine LaFontaine; and (5) to exclude class member tax returns and to exclude portions of the testimony of Robert Crandall based upon ER 401 and 403; and the parties appearing by and through their respective counsel, the Court having considered the records and files herein, being fully apprised in the premises, and for the reasons stated at the February 19 and February 26, 2009 hearings, now, therefore,

P:\152534900\P\Plts MIL Order-final.doc

ORIGINAL

SCHROETER GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

With respect the following motions, IT IS HEREBY ORDERED,

(1) Re Plaintiffs' MIL #1 to exclude portions of opinion of defense expert Smith, Court's ruling is reserved;

(2) Re Plaintiffs' MIL #2 regarding admissibility of certain documents which plaintiff may use during opening statement admissibility of certain documents, the Court grants the motion in part and denies in part; in particular,

a. Operating Agreement – it may be used if from a signed & complete copy;

b. the Exhibit entitled "FedEx Brand" may not be used for opening but the Court reserves judgment as to its admissibility;

c. the Exhibit entitled "Subject: Equipment Washing", dated 1/23/04 may be used in opening;

d. the Exhibit entitled "Protecting and Enhancing the Brand," dated February 2003, may be used in opening;

e. the Exhibit entitled "Subject: Business Discussion," dated 3/15/00, may be used in opening provided that if it does not apply to all class members, such a caveat shall be stated in the opening;

f. the Exhibit which is an email from Janet Speciale is withdrawn by plaintiffs for purposes of opening statement;

g. the Court reserves ruling on the use of the Exhibit entitled "P&D Reconfiguration Guidelines";

h. the Exhibits entitled "FYO3 P&D Vehicle Appearance Improvement Program" and "Subject: Vehicle Guidelines and Upgrades" dated

SCHROETER GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

3/28/03 may be used in opening provided that if they do not apply to all class members, such a caveat shall be stated in the opening; and

i. With regard to Contract Discussion Notes, such Notes may be used in opening if (a) there is no 901 objection, and (b) they are confirmed by a corporate policy;

(3) Re Plaintiffs' MIL #3 to exclude portions of Crandall and McPhail testimony, the Court denies the motion, with the exception that evidence and testimony to profit, loss, income issues of multiple work area ("MWA") drivers is excluded;

(4) Re Plaintiffs' MIL #4 to exclude the testimony of Francine LaFontaine, the Court grants the motion in part and denies in part. Specifically, the motion is granted pursuant to Evidence Rule 403, and testimony and evidence will be excluded, as to franchises that exist in industries that are not the same or similar to the industry in which defendant operates. The Court denies the motion, and testimony and evidence will be permitted, regarding the same or similar industries which would include small package deliveries, large package deliveries, and the trucking industry; and

(5) Re Plaintiffs' MIL #5 to exclude class member tax returns and to exclude portions of the testimony of Robert Crandall based upon ER 401 and 403, the Court grants the motion to exclude the admission into evidence of tax returns pursuant to ER 403 and privacy concerns, but will allow testimony on the contents of the returns relating to all aspects of the class members' work with defendant.

DATED this ___ day of March, 2009.

SCHROETER GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

HONORABLE JOHN P. ERLICK
JUDGE OF THE SUPERIOR COURT

Presented by:

SCHROETER, GOLDMARK & BENDER

WILLIAM RUTZICK, WSBA #11533
MARTIN S. GARFINKEL, WSBA #20787
REBECCA ROE, WSBA #7560

SCHWERIN CAMPBELL BARNARD & IGLITZIN

Lawrence Schwerin, WSBA #4360
Dmitri Iglitzin, WSBA # 17673

Counsel for Plaintiffs

ORDERS RE PLAINTIFFS' IN LIMINE - 4

P:\152534900\P\Plts MIL Order-final.doc

SCHROETER GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

# EXHIBIT 3

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC., et al,

Defendants.

No. 04-2-39981-5 SEA

---

HEARING

February 19, 2009

BEFORE THE HONORABLE JOHN P. ERLICK

---

TRANSCRIBED BY: Shanna Barr, CETD

Phillip Puzio, CETD

Reed Jackson Watkins

Court-Certified Transcriptionist

206.624.3005

c5457351-48b5-49b6-9418-0a4caf10e3e0

the issue is that -- and it gets back to this issue of what is not controlling. So in other words, in a franchise type of relationships, they're telling people how to cook the french fries. What temperature.

THE COURT: Right.

MALE SPEAKER: The uniforms to wear. All of these different things, those points are not being controlled by franchise law. It's very similar to here that there are things that customers need, customer requirements. If you're going to remain competitive, that we want you to do A, B, and C to develop --

THE COURT: Yeah.

MALE SPEAKER: -- consistent customer experience. And I'm just saying, that consistency isn't a franchise law versus independent contractor slash employee issue, it's a question of what is really controlling and what is not controlling. And it gives examples to the jury of things that are not controlling, and the uniforms or the delegating the size of the french fries, I mean, customer demands what it takes to be competitive in the industry, not being in control. That's where I think it comes in and why it is of significance.

THE COURT: Well, it's of great significance if you are arguing this is a franchise, but you're not

arguing it's a franchise. So the jury is thinking, well, that's a model out there, but this isn't set up as a franchise; therefore, the degree of control with respect to a franchise -- I mean, I don't -- I mean, I don't know that any franchisee employees -- I mean, they're employees of the franchisee, they're not employees of the franchisor.

MALE SPEAKER: Correct.

THE COURT: And then there's this whole relationship between the franchisor and the franchisee. No one argues that -- I mean, no one's making the argument, that I know of, that because the franchisor controls what the employees of the franchisee wears that therefore the franchi- -- that the employee is an employee of the franchisor. Nobody's making that argument. I don't think that argument's ever been made. So it's just not analogous. In other words, if there were a body of case law that said -- that addressed the issue of "because the franchise controls what the franchisee's employee wears, therefore they are an employee of the franchisor," and then there was some case law that analyzed that, then we'd have something to talk about. But as far as I know, that's -- there haven't been -- there hasn't been a development of law in that area, so the right to control is sort of -- it's

a nonissue.

MALE SPEAKER: But --

THE COURT: It's a nonissue in the franchise situation because the factors isn't applied there. Nobody's developed that case law. It would be an interesting question.

MALE SPEAKER: Okay.

THE COURT: I mean, I think it would be an interesting question. You know, could you make the argument somehow that a franchisee's employees are employees of the franchisor? But I just think it's confusing and that the factors don't apply to that arrangement. I mean, the employee is an employee of the franchisee. No one argues that the employee is an independent contractor. I mean, you're trying to say that the -- you're trying to analogize here between the franchisee and the franchisor, but the plaintiffs would say that the relationship here is between the franchisee's employee and the franchisor and what is that relationship, and it just -- it's just -- to me, it's just not helpful to the trier of fact, and you get -- you're going to get caught up on franchises and the distinction of franchise. I mean, just talking about it and articulating it to you right now is confusing to me, and I know probably a little bit more

about the law than the average juror. So I think it's a bad analogy, and I think it's confusing. Now, were you to have an analogous industry -- analogous or similar industry that uses a franchise model, I would certainly consider allowing that evidence.

All right. Number 3. Oh, I'm sorry. These are my -- you don't have -- you have no idea what numbers. I apologize. Plaintiffs' motion to exclude class members' tax returns. At this point, I would grant the motion. And again, I would do that -- I'm trying to find my notes on this. I would do that on a 403 analysis and also concerns about the privacy information contained in the tax returns. What -- my concern is that, you know, I haven't looked at the tax returns or most of the tax returns, but, you know, people have different investments and they take different deductions for other things, and the people who might look at gross receipts and -- here's what I think would be appropriate. I think that the -- particularly since we're talking about profit/loss and I'm inclined to allow that as a factor, clearly the information contained in these tax returns, there is much relevant information. And my initial ruling would be that the defense should be allowed to examine the witnesses, the drivers, on their tax returns and the

information contained in their tax returns and -- but I'm disinclined to allow the admission of the tax returns.

Any counsel want to comment on that or is that a workable solution?

MR. RUTZICK: That's somewhat analogous to where I was going with my argument, so --

THE COURT: Okay.

MR. RUTZICK: -- I don't have any problems with it.

THE COURT: All right.

MALE SPEAKER: Your Honor, I do think this is -- as Your Honor said, is highly relevant information.

THE COURT: Um-hum.

MALE SPEAKER: You know, you mentioned that it's important that (inaudible) that both sides, obviously, get -- have the right to put on their theory of the case, and our theory is that these contractors own a business. That they understood that they owned a business.

THE COURT: Um-hum.

MALE SPEAKER: And that they took advantage of the business in terms of the ways that they could take tax advantages to buy and sell, etc. And my concern

with cutting out the tax returns, per se -- and incidentally, if we're talking about other investments or matters that don't relate to the FedEx Ground side of it or obviously Social Security and there's other things that are private, those can be redacted, and we have redacted Social Security and that type of privacy information. But my concern is that you're taking out the primary evidence that shows some of the ways these people actually have used this business model to get compensation. I mean, for instance --

THE COURT: Why can't you simply inquire of the witness: Didn't you gross $300,000 in 2006, and then you took $140,000 in business -- tell us what those business expenses were. You show them the tax returns. They can list the business expenses. You can whiteboard it or blackboard it or --

MALE SPEAKER: Okay. And we're also talking about things like depreciation of goods --

THE COURT: Anything you want. Anything you want.

MALE SPEAKER: And one reason I'm concerned about this, Your Honor, is that Mr. Pietka, a CPA, who is one of our experts, is going to explain how these -- this tax treatment, which is business tax treatment, includes benefits that individuals can't get. And

obviously, we need to be able to have the jury visualize that information, so...

THE COURT: That's -- I'm not clear on --

MALE SPEAKER: Visualize it in the sense, as you say, that it's something that can be there that he can refer to, as opposed to just testimony in the air.

THE COURT: What's he referring to? The tax returns?

MALE SPEAKER: Correct. In other words, for instance, that he'll explain to the jury what it means to depreciate good will and what that means in terms of the advantage in terms of part of the compensation of the business model to the individual. And so I just want to make sure that we're able to have him work with that information, Your Honor.

THE COURT: Well, he -- there's nothing in my ruling which would preclude him from working with that information. The question is whether the tax returns are going to be admitted or not. That's the issue.

MALE SPEAKER: And my understanding, just so I'm clarifying Your Honor's ruling, is that literally everything in the tax returns that relates to this business is fair game to be inquired of.

THE COURT: That's my ruling.

MALE SPEAKER: (Inaudible).

THE COURT: That's my ruling.

MALE SPEAKER: Okay.

THE COURT: Mr. Rutzick.

MR. RUTZICK: I still think that's -- my -- I was going to put it up and say, look, if they're talking about giving money to a religious group and stuff like that, which pretty clearly wouldn't have anything to do with this case, so (inaudible).

THE COURT: All right. Very good. Okay. All right. So the next motion I have is plaintiffs' motion in limine regarding certain -- use of certain documents at opening, plaintiffs' documents. My ruling -- there were -- all right. So I have, I believe, Exhibits 1 through 49; is that correct?

MR. RUTZICK: I think it's -- well, fewer than that. The one -- we attached -- (Clears throat.) Pardon me. We attached about 12 tabs, and some of them are like contract discussion notes, etc.

THE COURT: Right. Right. Let me tell you what I -- I'm not sure where I got this from, actually.

MR. RUTZICK: I have about 16 tabs, actually.

THE COURT: Well, I pulled -- I worked off 904. That's what I worked off of, ER 904 documents, and I made my rulings based upon that. And let me tell you what the documents are.

I'll see you next Thursday. I'll try to set up a conference call for defendants' documents to be used in opening so you can get a heads-up on that. And I'll make my ruling on the rest.

MR. MICHELSON: Thank you, Your Honor.

THE COURT: Thank you. Take care.

(Conclusion of Proceedings.)

CERTIFICATE

STATE OF WASHINGTON )
) ss
COUNTY OF KING )

I, the undersigned, under my commission as a Notary Public in and for the State of Washington, do hereby certify that the foregoing recorded statements, hearings and/or interviews were transcribed under my direction as a transcriptionist; and that the transcript is true and accurate to the best of my knowledge and ability; that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this _______ day of __________________, 2009.

______________________
NOTARY PUBLIC in and for the State of Washington, residing at Kirkland.
My commission expires 04-11-12

CERTIFICATE

STATE OF WASHINGTON )
) ss
COUNTY OF KING )

I, the undersigned, under my commission as a Notary Public in and for the State of Washington, do hereby certify that the foregoing recorded statements, hearings and/or interviews were transcribed under my direction as a transcriptionist; and that the transcript is true and accurate to the best of my knowledge and ability; that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this day of 2009.

NOTARY PUBLIC in and for the State of Washington, residing at Redmond.
My commission expires 6-23-11.

# EXHIBIT 4

case 3:05-md-00527-RLM-CAN document 1729-5 filed 04/15/09 page 2 of 6

Defendant's Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**TUESDAY, MARCH 10, 2009**
Afternoon Session 1:24-2:43 (Pages 138-201)

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington.

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington, 98104
(206) 296-9188

Defendant's Copy
PERMISSION TO COPY DENIED

So I'm just trying to get a feel for when you actually need a decision from the Court on this.

MR. MICHELSON: Friday's fine with us, Your Honor.

MR. GARFINKEL: That's fine with us as well.

THE COURT: All right. So let me see how the rest of the week develops, but I may be able to set aside about an hour or so on Friday and we could sort of identify all the issues that need to be discussed.

I know I haven't made a ruling on FedEx's DVDs on a day with the contractor or whatever they're called.

All right. Mr. Anfinson is still on the stand, correct?

MR. GARFINKEL: Could I mention one other thing for a minute?

THE COURT: Sure.

MR. GARFINKEL: Just so that the record is clear and based on some of the Court's comments, I thought it might be useful to clarify that the plaintiff objects to the tax returns in their entirety. We've discussed that. We understand that under the Court's preliminary instruction that the Court believes that while they will not be admitted into evidence, they -- the witnesses can be cross-

Defendant's Copy
PERMISSION TO COPY DENIED

examined on the contents pursuant to, in particular -- and I think this was discussed in the sidebar that I wasn't privy to, but please correct me if I'm wrong -- pursuant to factor number eight, which is whether or not the class members in FedEx Ground believed they were creating an employment relationship or an independent contractor relationship.

THE COURT: Well, that is one of the factors as Ms. Brubaker raised. It also goes to the issue of method of compensation.

MR. GARFINKEL: Okay.

THE COURT: So they were -- I mean, the whole issue of they were paid by the job and they grossed X and they netted X, and, of course, the plaintiffs have made an issue of what they have netted. In other words, the plaintiffs take the position that gross is -- that's the demonstration, I think. The plaintiffs have made an issue of the fact that gross doesn't equal net, and the defense has come back and said, but what is really included in your net? In other words, you deduct things like haircuts, so forth.

MR. GARFINKEL: I understand. And, again, I'm really making this statement for the record, not so much to reargue the point --

THE COURT: Okay.

Defendant's Copy
PERMISSION TO COPY DENIED

ruling that allows us to use the tax returns, and there's been substantial argument about the fact that they are relevant. And particularly when the plaintiffs are putting into issue how much the contractors make in other employment situations, the gross, the net, all of that is very relevant.

THE COURT: With respect to relevance, the Court believes that the evidence is relevant and probative of the issue of method of compensation, characterization of the employment contract arrangement/contract arrangement and the issue of gross and net. Net is meaningless unless one understands how one got to a net figure, and this is probative of that issue.

With regard to 403 analysis, I assume, Mr. Garfinkel, that you misspoke when you said prejudices the jury. I think the test is whether it prejudices the parties. Obviously the plaintiffs are prejudiced here. That is not the test. The question is whether the probative value is substantially outweighs -- or excuse me, whether the prejudice substantially outweighs the probative value. I think this is significantly probative, that there is prejudice, but that it is incumbent, as stated at the sidebar, on the plaintiffs, if they wish, to

Defendant's Copy
PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON)
) SS:
COUNTY OF KING )

I, CYNTHIA A. KENNEDY, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on April 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

Dated: ___________

______________________________
OFFICIAL COURT REPORTER

# EXHIBIT 5

case 3:05-md-00527-RLM-CAN document 1729-6 filed 04/15/09 page 2 of 9

Defendant's Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

TUESDAY, MARCH 24, 2009
Morning Session 10:59 - 12:05 (Pages 75-129)

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington.

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington, 98104
(206) 296-9188

Case 3:05-md-00527-RLM-CAN document 1729-6 filed 04/15/09 page 3 of 9

Defendant's Copy
PERMISSION TO COPY DENIED

A. Okay.

Q. At my request, did you specifically look at Mr. Hardie's tax returns for the years 2002 through 2005?

A. Yes, I did.

Q. And for each of those years, did you check his gross receipts?

A. Yes.

Q. Did you try to analyze his net profit?

A. Yes.

Q. And what did you conclude from your review of Mr. Hardie's four years of tax returns during the class period?

A. He had an average gross margin of about 66 percent.

Q. Do you have a chart that reflects your findings in that regard, sir?

A. Yes, sir.

Q. And, again, this was a chart you prepared yourself?

A. Yes, sir.

MR. CORR: I'd offer this for publication, Your Honor.

MR. GARFINKEL: No objection, Your Honor.

THE COURT: You may publish, counsel.

Defendant's Copy
PERMISSION TO COPY DENIED

BY MR. CORR:

Q. And, in fact, sir, is this the summary chart you prepared for Mr. Hardie for each of the class years, what his gross receipts were, his net profit, and his profitability?

A. Yes, it is.

Q. And these were all taken right off the tax returns?

A. That is correct.

Q. By the way, did Mr. Hardie fill out a Schedule C?

A. Yes, he did.

Q. And would you remind the jurors what a Schedule C is, please?

A. A Schedule C is the schedule that is attached to a personal tax return that reflects the business operations of that individual, and it would for each individual -- each business that they have.

Q. Normally in your experience, sir, employees fill out a Schedule C?

A. No, they do not.

Q. And do you know if Mr. Hardie on his tax returns filled out and paid a self-employment tax?

A. Yes, he did.

Q. And, again, in your experience, normally do

employees fill out self-employment tax, or is that something business owners do?

A. No, that's something a business owner would do?

Q. And, by the way, I think it's clear, but would you tell the jury, are these tax returns under penalty of perjury?

A. These tax returns are signed under penalty of perjury, yes.

Q. Now, are there tax advantages that were available to the independent contractors that typically would not be available to employees?

A. Yes, sir.

Q. And can you give the jury some examples of that?

A. Well, one example would be having an office in a home. An employee generally cannot have an office in a home without great restrictive conditions. Another one would be the use of computer equipment, again, very limited application to individuals. Much more -- much easier for a business to deal with travel, establishing business versus for travel. It's much more complex and limited in the employee environment.

Q. Now, on the home office issue, what were the requirements if you're an employee to take a home

case 3:05-md-00527-RLM-CAN document 1729-6 filed 04/15/09 page 6 of 9
Defendant's Copy
PERMISSION TO COPY DENIED

office deduction?

A. If you're an employee, the office has to be for -- it has to be a condition of your employment and it has to be for the convenience of your employer. So most employees do not meet that standard.

Q. And in this case did you find a number of the contractors on their tax returns were taken deductions for home office?

A. Of the returns that we had available, approximately a third of them took a home office deduction.

Q. How about business goodwill? Did you see any plaintiffs' contractors that were taking a deduction our depreciating business goodwill?

A. Yeah, the technical term is amortization, when a goodwill is purchased and then amortized over a period of time. Internal revenue code requires that that amortization be done over a 15-year period. And, I'm sorry, I don't know the percentage of them but virtually everybody that purchased a route did, indeed, amortize that cost in accordance with the regulations.

Q. In your experience, sir, normally would employees have business goodwill?

A. No, that's not -- would not be the case.

Q. Okay. Now, just before you came in here,

Defendant's Copy
PERMISSION TO COPY DENIED

there was a brief video played where a fellow was taking tax deductions for CDs that he brought and put into the truck he drove.

Normally, would that be a deduction available to an employee?

A. No, it would not.

Q. There was some testimony earlier in the case about tax deductions for haircuts.

Normally would an employee be able to take a tax deduction for haircuts?

A. Neither an employee or an independent contractor.

Q. Similarly I think there was testimony in this case about a vacation to Mexico being deducted by one of the plaintiff class members.

Is that something that normally an employee could deduct?

A. That is not something an employee would normally be able to deduct.

Q. And did you prepare a schedule of a sample of some of these deductions that were taken by the contractors?

A. Yes, I did.

Q. And that's based on your review of their tax returns?

Defendant's Copy
PERMISSION TO COPY DENIED

A. That's correct.

MR. CORR: I'd ask that this summary illustrative exhibit be published as well, Your Honor.

MR. GARFINKEL: Your Honor, we object to the relevance -- irrelevance.

THE COURT: Counsel?

BY MR. CORR:

Q. Do you have this chart in front of you, sir?

A. Yes, I do.

Q. Would employees normally be able to take the deductions that are listed in this chart?

A. No.

Q. Would business owners apparently be able to take these deductions?

A. Some of them -- the business goodwill, yes, vacation to Mexico, no. Haircuts, no. And home office if they meet the conditions for the home office deduction, yes.

Q. All right.

MR. CORR: I'd re-offer it, Your Honor.

MR. GARFINKEL: Your Honor, just because this witness after scouring a hundred returns has discovered a couple of places where deductions were taken that shouldn't have been taken doesn't make it relevant to the issues in the case. And it also jumbles together

Defendant's Copy
PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON)
) SS:
COUNTY OF KING )

I, CYNTHIA A. KENNEDY, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on April 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

Dated: ___________

_______________________________
OFFICIAL COURT REPORTER

# EXHIBIT 6

Defendant's Copy

PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

---

Heard before the Honorable John Erlick

King County Courthouse, 516 Third Avenue, Room W-1060

Seattle, Washington

Morning Session 10:56 a.m. - 12:06 p.m. (Pages 79 - 132)

DATE REPORTED: MARCH 4, 2009

REPORTED BY: JOANN BOWEN, RPR, CRR, CCP, CCR# 2695

MR. BAUMGARDNER: Your Honor, I'm looking at Solheim 02245 which is the first page of that document.

THE COURT: 1219?

MR. BAUMGARDNER: Yes.

Q. Are you to the first page of 1219, Ms. Solheim? Is it in the book?

A. If it is, I don't know where I'm supposed to find it.

Q. It's behind -- the tabs should be in numerical order. So I think it's the second-to-last tab, if that helps.

A. Okay.

Q. Are you there now?

A. Yeah.

Q. Now, you'll agree with me that this is a U.S. Income Tax Return for an S corporation called S & R Freedom Corporation, correct?

A. That's correct.

Q. And this is the tax return for S & R Freedom Corporation dated 2002 -- for the tax year 2002, correct?

A. Yes.

Q. And S & R Freedom Corporation, what was that?

A. Sue and Rick.

Q. And was that your S corporation that we've

Defendant's Copy
PERMISSION TO COPY DENIED

been discussing, the one that was formed for purposes of --

A. Yeah.

Q. -- this business opportunity?

A. For me and my husband.

Q. And so that referred to you and your husband.

A. Mm-hm.

Q. Looking at subsection D right at the top under date incorporated, do you see that? It's to the right.

A. 6/1/02.

Q. 6/1/02. So this corporation was actually incorporated on June 1, 2002, which is the day after you signed your agreement, correct?

A. That's correct.

Q. And as you've said, it takes some time to apply to the secretary of state and otherwise get the forms ready for incorporation. So can we not conclude -- can the jury not conclude -- that you actually were taking steps to form S & R Freedom Corporation at your tax adviser's recommendation prior to the time you signed the agreement on May 31st?

A. That's correct.

Q. Of 2002?

A. Yeah.

Q. So that refreshes your recollection that you actually did talk to your tax adviser?

A. The date that they started it, I actually went through the employment process -- or their little things before June 3rd. June 3rd was the contract date.

Q. Fair enough. What to your understanding was the advantage of running your business affairs as a FedEx Ground contractor through S & R Freedom Corporation?

A. According to the accountant, it would give me a better tax break.

Q. And you understood these to be business tax advantages. Fair to say?

A. Right.

Q. Not advantages that individuals would be able to take. Advantages that a business would be able to take as opposed to someone who was filing as an individual wage earner. Is that fair to say?

A. It refers to business.

Q. Yes. Now, you were a FedEx Ground contractor for over five and a half years; is that correct?

A. That's correct.

Q. From May of 2002 until the end of 2007?

A. Exactly.

Q. And the entire time you were a FedEx Ground contractor, you received annual 1099 forms from FedEx Ground?

A. That's correct.

Q. Those are forms that reflect your gross income, correct?

A. That's correct.

Q. And you didn't receive W-2 forms as an employee would receive?

A. No.

Q. And, in fact, isn't it true, Ms. Solheim, that the 1099s you received from FedEx Ground were actually sent to S & R Freedom Corporation. They were made out to S & R Freedom Corporation, not to Suzette Solheim; is that correct?

A. Well, it says -- it has my name on them too, I believe.

Q. It says that they are sent in care of you, correct, but they are actually issued to the corporation?

A. And they are sent to my house.

Q. Right. So can we conclude that you instructed FedEx Ground to make out the 1099s and to make payments to S & R Freedom Corporation as opposed to Suzette Solheim, an individual?

A. That's correct.

Q. And was that on the tax advice of your CPA, Mr. Axe?

A. What do you mean?

Q. Did Mr. Axe suggest that, your CPA?

case 3:05-md-00527-RLM -CAN document 1729-7 filed 04/15/09 page 7 of 13

A. That FedEx write me checks?

Q. I'm sure you wanted FedEx to write you checks. My question is: Did he suggest that the money and 1009s go directly to the corporation, the corporate entity --

A. No. He didn't have anything to do with that.

Q. So that's something you directed?

A. Yes.

Q. Now, through that S corporation you were able to deduct your business expenses. Fair to say?

A. Yes.

Q. And those business expenses included substantial amounts of depreciation that you would take on your van, correct?

A. No.

Q. You didn't take depreciation?

A. No. It was leased.

Q. So you took lease in lieu because that's what your tax adviser --

A. Exactly.

Q. -- suggested? Let me ask you, if you would, to look at Exhibit 1219 again. I think you may have that in front of you. If you'd look at page nine of that.

MR. BAUMGARDNER: Your Honor, I will give you a cite. It's Solheim 02253.

THE COURT: Thank you, counsel.

Defendant's Copy
PERMISSION TO COPY DENIED

Q. Do you see that, Ms. Solheim?
A. Yes.
Q. And that is a schedule that is part of your 2002 -- not your -- but S & R Freedom Corporation's 2002 Federal Income Tax Return prepared by Mr. Axe, correct?
A. Correct.
Q. And that schedule at page 2253, Bates number 2253, is a depreciation and amortization schedule, is it not?
A. Yes.
Q. And if you look down on line six -- I believe it's six -- it shows a description of property as to which depreciation is applicable. And it shows a parts washer. Did that have to do with your business or your --
A. No. That was -- it was combined with my husband's business.
Q. And it shows a delivery van. Was that your delivery van?
A. Yes.
Q. And it shows the parts washer at an elected cost -- if you go to the right -- of $1,000. And the delivery van at an elected cost at $23,000. So you get a 23 to one ratio which then leads to a $24,000 listed amount. Do you see that? Do you follow what I'm doing?
A. I see that, yeah.

Q. And then you see at the bottom an amount, approximately $18,000, listed on this depreciation schedule. Does that refresh your recollection that you actually did take depreciation on your delivery van?

A. It was all confusing to me. I thought it was the amount I paid for the route that he was putting in there somewhere.

Q. Would you -- this was something Mr. Axe did?

A. This is something Mr. Axe did. The taxes, I really didn't have any -- my husband took those to him. They did whatever they did. I didn't think -- I didn't read through these to see what they did. So I didn't realize I had depreciation taken out.

Q. But now you see --

A. But it looks like it, yeah.

Q. And you would agree -- it was your understanding that there was some fairly complex business tax treatment that was given to your combined businesses -- your husband's business, your business -- both of which fell under the umbrella of S and R freedom corporation. Fair to say?

A. There was what?

Q. Some fairly tax treatment given to --

A. Yeah, it was very confusing.

Q. So you needed professionals like Mr. Axe to

deal with it?

A. Yeah.

Q. And those corporate returns that we've been looking at -- we've been looking at an example of them -- those were separate each year from the individual returns that you and your husband actually also submit. Is that right? You would submit a joint individual return with your husband?

A. A what? I'm sorry. You mean --

Q. That's okay.

A. I don't know too much about this -- this part.

Q. Let me turn to an example just so we're all on the same page. If you would look at Exhibit 1175 please, also in your notebook. Looking at that, looking at the first page of that document, that shows that Mr. Axe actually prepared an individual income tax return for Richard B. and Suzette C. Solheim in 2003. Do you see that?

A. What page are you on?

Q. The first page of Exhibit 1175. I'm just looking at that cover page.

A. Okay. Individual income tax return.

Q. All right. And if you turn to page -- the page that has 000672 beside your name on the bottom right. Do you see that? Do you have that?

Defendant's Copy
PERMISSION TO COPY DENIED

A. No. I'm not sure what number you're looking at.
Q. It has an 0006 at the far bottom right. It's the sixth page of this document.
A. What was the number again?
Q. 0006. It's six pages into the document.
A. Oh, six pages in.
Q. Sorry to have so many numbers. I know it's a little confusing. Do you see that? That's the signature page. Do you see that?
A. Where it says preparer?
Q. And it says copy. But presumably you signed the originals. Is that a fair assumption?
A. Yeah. That we turn into the IRS.
Q. Right. You see where it says your occupation, that would be your husband's, self-employed; spouse's occupation, independent contractor. That's what you wrote in, correct?
A. Mm-hm.
Q. And if you look at the third page of this individual tax return, so turning back three pages, you will see a W-2 form. That W-2 is issued by S & R Freedom Corporation, is it not?
A. It's issued by me?
Q. Issued by S & R Freedom Corporation?

Defendant's Copy

PERMISSION TO COPY DENIED

A. It says employer's name and address, S & R.

Q. Right.

A. Yeah.

Q. And the employee's name and address and zip code is Suzette C. Solheim. Do you see that?

A. Yeah.

Q. So at this point you were holding yourself out to be an employee of S & R Freedom Corporation, correct?

A. Yes.

Q. And an independent contractor vis-a-vis FedEx Ground, correct?

A. Mm-hm. That's correct, yeah.

MR. BAUMGARDNER: John, could you put up 932, 35.

MS. ROE: Is that 932, page 35?

MR. BAUMGARDNER: Yes. Sorry about that. It's 13851.

Q. Looking at this, Ms. Solheim, this is again from your contract. And you elected a one-year term when you first signed on; is that correct?

A. That's correct.

Q. And you understood under the other bolded heading that the contract would automatically renew in each successive year unless you, as you discussed earlier with Ms. Roe, gave 30 days' notice and elected to

Case 3:05-md-00527-RLM -CAN document 1725-7 filed 04/15/09 page 13 of 13
Defendant's Copy

PERMISSION TO COPY DENIED

132

REPORTER'S CERTIFICATE

STATE OF WASHINGTON )
) §:
COUNTY OF KING )

I, JOANN BOWEN, RPR, CRR, CCP, CCR #2695, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on August 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

______________________________

OFFICIAL COURT REPORTER

JoAnn Bowen, Certified Realtime Reporter
King County Superior Court, Seattle, WA
206-296-9143

# EXHIBIT 7

Defendant's Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**MONDAY, MARCH 9, 2009**
Morning Session 10:25-12:18 (Pages 1-94)

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington.

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington, 98104
(206) 296-9188

Defendant's Copy
PERMISSION TO COPY DENIED

Q. That's your AFG Enterprises corporate federal tax return for 2005, correct?

A. Yes, it is.

Q. And you were telling Mr. Schwerin on his redirect about expenses that you had annually. I'd like you to turn to page seven -- the seventh page, which is a schedule that's entitled depreciation and amortization that's in that tax return. Will you do that for me?

A. Yes, sir.

Q. And you see that, you see there at the bottom right there is an amount of $9,400 --

A. Yes, sir.

Q. -- in depreciation that you took as a tax write off that year, correct?

A. That's correct.

Q. And that's a non-cash loss. That's not money out of your pocket, is it?

A. Not at that time.

Q. Right. And that is, in fact, so when you're telling us about your expenses, that's one of the expenses you were including, correct?

A. Yes, sir.

MR. BAUMGARDNER: That's all I have, Your Honor.

Defendant's Copy
PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON)
) SS:
COUNTY OF KING )

I, CYNTHIA A. KENNEDY, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on April 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

Dated: ___________

______________________________
OFFICIAL COURT REPORTER

# EXHIBIT 8

Defendant's Copy

PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

---

Heard before the Honorable John Erlick

King County Courthouse, 516 Third Avenue, Room W-1060

Seattle, Washington

Morning Session 8:49 a.m. - 10:36 a.m. (Pages 1 - 75)

DATE REPORTED: MARCH 5, 2009

REPORTED BY: JOANN BOWEN, RPR, CRR, CCP, CCR# 2695

Defendant's Copy
PERMISSION TO COPY DENIED

FedEx Ground?

A. Yep.

MR. CORR: I'd offer those.

THE COURT: All right. So it's 1051-D. Any objection?

MR. SCHWERIN: No objection.

THE COURT: Exhibit 1051-D, which is the part of 1051 relating to Mr. Cork's 1099s, is admitted.

MR. CORR: Let's pull up, John, the 2003 one. I think it's number 30. Can you blow that up a little bit?

Q. Of 2003, sir, that's your 1099 from Federal Express Ground. And your gross that year was about $75,000, wasn't it?

A. Correct.

Q. And I think in your deposition you told Mr. Baumgardner that your expenses on an annual basis were approximately $25-30,000 per year, correct?

A. That seems about -- yes.

Q. So basically you were netting roughly $45-50,000 per year, correct?

A. Depends. Year to year, that seems about right.

Q. Now, I want to talk about your tax returns for a second. And those you will see are at 1187, 1185, 1186

case 3:05-md-00527-RLM-CAN document 1729-9 filed 04/15/09 page 4 of 9

and 1188. Those are the last exhibits in your binder.

First of all, do you recognize these to be your tax returns?

A. Yes.

Q. I have a few questions about these tax returns. First of all, you used a professional tax service. I think it was called Liberty. Do you recall that?

A. Yes, sir.

Q. And each and every year you used a Schedule C, didn't you?

A. Yes. That sounds right.

MR. CORR: Can we show the sample of the Schedule C, John?

THE COURT: Is this an admitted document?

MR. CORR: This will be illustrative purposes only. It's the generic, blank document.

THE COURT: All right. I will allow it.

Q. Schedule C, profit or loss for a business. If you want, sir, you can look at each and every one of your tax returns for the four years I think we have here. And you have a Schedule C, don't you?

A. Yes.

Q. And also each and every year when you were filling out your tax returns -- by the way, when you

signed these tax returns, you knew they were under penalty of perjury, didn't you?

A. Yes.

Q. You paid and filled out a form called self-employment tax, didn't you?

A. I don't remember.

Q. Let's take a second and refresh your recollection, then. If you're on 1187, if you turn to near the back, I think it's the third page from the back in that exhibit. It says self-employment tax. It looks like you paid one half of that, which was 1731.

Do you see that, sir? Are you at that point?

A. Yes.

Q. And I guess maybe we should probably go through these real quickly. But if you look at the next exhibit, which is 1185 -- I think it's about the fifth page in -- you did the self-employment tax that year, too, didn't you?

A. On 1185?

Q. Yes.

MR. CORR: Your Honor, time is precious. Could I just approach the witness and show him?

THE COURT: You may, counsel.

Q. Sir, I will just show you here. This is where it is. Do you see that self-employment tax for 2001?

Defendant's Copy
PERMISSION TO COPY DENIED

A. Yes, sir.

Q. And you filled that out again that year, too, correct?

A. Yes.

MR. SCHWERIN: Could I get a Bates number?

MR. CORR: The Bates number is -- well, I will just offer all the tax returns. I would like the jury to see them.

THE COURT: Counsel, no.

MR. SCHWERIN: Sidebar, please.

Q. Let's go to 1186, sir.

THE COURT: Mr. Shwerin wants a sidebar.

(Sidebar discussion between Judge and counsel; not reported.)

Q. Sir, do you have Exhibit 1186 in front of you?

A. Yes, sir.

Q. And I think that year you also did not only the Schedule C but also the self-employment tax, correct?

A. That's probably correct. I'll find it. Yes.

Q. And, finally, 1188, your tax return for the year 2004, you also did the Schedule C and I believe the self-employment tax, correct?

A. Correct.

Q. By the way, 2004, your tax return is actually an amended tax return, isn't it? Exhibit 1188.

A. Yes.
Q. And you signed that April 17, '07, didn't you?
A. Correct.
Q. And in 2007 you were still telling the IRS that you had a profit and loss from a business and that you were self-employed; isn't that true?
A. I thought it was over the 2004 taxes.
Q. I realize that. But when you signed under penalty of perjury on April 17, 2007, you still told the IRS that you were self-employed and you had a profit or loss from a business for the year 2004, correct?
A. Correct.
Q. So that would be three years after this lawsuit had been filed, you were telling the IRS still that you were self-employed and that you were a profit and loss from a business; isn't that true?
A. We wanted to make sure they were done right, so we took them to a professional. That's why we went back.
Q. All right. Look at page three of Exhibit 1188. And tell me when you're there.
A. I'm there.
Q. If you look at number 13, it says capital gain or loss. Do you see that?
A. Yes, sir.

Defendant's Copy
PERMISSION TO COPY DENIED

Q. And you wrote in $51,535, didn't you?
A. Yes, sir.
Q. And that number there, $51,535, reflects the profit you got on the sale of your route. Isn't that true, sir?
A. Correct.
MR. CORR: No more questions. Thank you.
THE COURT: Thank you, Mr. Corr. Redirect-examination, Mr. Schwerin.

REDIRECT EXAMINATION

BY MR. SCHWERIN:
Q. Did anybody in FedEx management explain to you that with the size of your truck at 10,000 gross vehicle weight none of those regulations were applicable to you?
A. No, sir, they did not.
Q. When you sold your route, what did you do with the truck?
A. The new route owner took over the truck when he purchased the route.
Q. By taking it over, what do you --
A. He bought it.
Q. There were payments on it?
A. Yes. It was a lease. He took over the lease. He worked that out with the lease company.
Q. Did your total amount reflect both the truck

Defendant's Copy

PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON )
) §:
COUNTY OF KING )

I, JOANN BOWEN, RPR, CRR, CCP, CCR #2695, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on August 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

______________________________

OFFICIAL COURT REPORTER

# EXHIBIT 9

Defendant's Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR KING COUNTY

---

RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,

Plaintiffs,

vs.

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

KING COUNTY CAUSE No. 04-2-39981-5 SEA

---

VERBATIM REPORT OF PROCEEDINGS

--oOo--

**WEDNESDAY, MARCH 11, 2009**
Morning Session 10:49 - 12:03 (Pages 64-128)

--oOo--

Heard before the Honorable John Erlick, at King County Courthouse, 516 Third Avenue, Room W-1060, Seattle, Washington.

--oOo--

CYNTHIA A. KENNEDY
CSR No. 3005
Official Court Reporter
King County Superior Court
516 Third Avenue, C912
Seattle, Washington, 98104
(206) 296-9188

Defendant's Copy
PERMISSION TO COPY DENIED

professional help?

A. I don't remember.

Q. Okay. In any event, what did you list as your occupation? It's right on the second page, sir, right above where it says self-prepared. Do you want me to help? It says self-employed, do you see that?

A. Okay. I see it.

Q. Is that what it says?

A. Yes, it does.

Q. Okay. So under penalty of perjury you told the IRS you were self-employed, didn't you?

A. Correct.

Q. Did you believe that to be true at the time?

A. No. I mean, no.

Q. Let's turn to the fourth page of the exhibit, sir. The headline is profit or loss from a business. Do you see that? Schedule C?

A. The fourth page?

Q. I believe it's from the fourth page. Yes. It is in my copy of the book, unless your --

A. Okay. What's your question?

Q. Did you fill out, as part of your 2005 tax return, a Schedule C which the title was profit or loss from a business, sole proprietorship?

A. Okay.

Q. Did you think you were running a business, sir, in 2005?

A. No.

Q. And, by the way, if you look down at line 17 on that same page, there's an entry for legal and professional services and it shows that you spent about $1,700 and deducted that. Do you see that?

A. Uh-huh, I do.

Q. Okay. And was that the legal services you used in 2005 to incorporate your business?

A. I don't remember.

Q. Didn't you incorporate a business called Steve Goodwin Courier Services, Inc.?

A. No, I was never incorporated.

Q. Didn't you have articles of incorporation drawn up and bylaws drawn up?

A. I might have. But it was never incorporated.

Q. Okay. Let's move, sir, two more pages in. There's a schedule SE. Do you see that?

A. Yes.

Q. And what's the header there the -- is it self-employment tax?

A. It is.

Q. And you actually paid some self-employment tax to the federal government that year, didn't you?

Defendant's Copy
PERMISSION TO COPY DENIED

A. I did.

Q. Okay. And, by the way, you depreciated that Chevy van, didn't you? If you turn to three pages in, you'll see that.

A. Yeah. Yes. I did.

Q. And you did that each and every year you owned it. So you were taking business deductions as well, weren't you?

A. Correct.

Q. Okay. When you were writing off your Chevy van and taking business deductions so you would pay less taxes to the federal government, did you think you were running a business then?

A. No.

MR. CORR: Okay. Your Honor, I want to move to some new exhibits.

THE COURT: All right. New as in you need to have them --

MR. CORR: Marked.

THE COURT: -- marked? All right.

MR. CORR: Yes.

THE COURT: All right. I show 1264, Deborah, as the last one.

THE CLERK: This is 1265.

MR. GARFINKEL: To save time I was hoping to

Defendant's Copy
PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON)
) SS:
COUNTY OF KING )

I, CYNTHIA A. KENNEDY, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on April 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

Dated: ___________

______________________________
OFFICIAL COURT REPORTER

# EXHIBIT 10

Defendant's Copy
PERMISSION TO COPY DENIED

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

---

| | |
|---|---|
| RANDY ANFINSON, JAMES GEIGER, and STEVEN HARDIE, individually, and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC.,<br><br>Defendant. | KING COUNTY CAUSE No. 04-2-39981-5 SEA |

---

VERBATIM REPORT OF PROCEEDINGS

---

Heard before the Honorable John Erlick

King County Courthouse, 516 Third Avenue, Room W-1060

Seattle, Washington

Afternoon Session 1:25 p.m. - 2:46 p.m. (Pages 129 - 182)

DATE REPORTED: MARCH 11, 2009

REPORTED BY: JOANN BOWEN, RPR, CRR, CCP, CCR# 2695

Defendant's Copy
PERMISSION TO COPY DENIED

Q. Exhibit 1268, which you should have in front of you, is your 2002 tax return, isn't it?
A. Yes, sir.
Q. Okay. And just like in 2005, you said you were self-employed, correct?
A. Correct.
Q. And you had professional accounting services help you that year, correct?
A. Correct.
Q. It looks like -- is it Andersen's Accounting Service?
A. Yes, it is.
Q. If you turn to the next page, once again in 2002, you had a profit from your business and you used that Schedule C form, correct?
A. Correct.
Q. If you turn to the next page, in that year you deducted for contract labor $5,701, correct?
A. Correct.
Q. And then on the next page, you continued to depreciate your Chevrolet van, correct?
A. Correct.
Q. And on the next page, we actually have something new that I don't think was in the previous tax return. Here you're applying for what's called an

employer identification number. Do you see that?

A. I do.

Q. That was so you as the employer of somebody else had what's called an EIN number. I think that's a tax requirement. Was that your understanding, sir?

A. Yes, sir.

Q. Okay. So for 2002 you did basically the same thing you did for your 2005 taxes, correct?

A. Correct.

Q. Let's look at the next exhibit, sir, which is 1269, which should be your 2003 tax form. Correct?

A. Correct.

Q. All right. And, once again, you listed yourself as self-employed, correct?

A. Correct.

Q. And, once again, you had the profit or loss from your business, the Schedule C, correct?

A. Correct.

Q. And you had a contract labor write-off in 2003. It was a little bit more money this year, $6,435, correct?

A. Correct.

Q. And this year you also had the self-employment tax that you paid, correct?

A. Correct.

Defendant's Copy
PERMISSION TO COPY DENIED

Q. And you, again, depreciated your van, I believe, correct?

A. Right. Correct.

Q. Okay. So 2002, 2003, and 2005, all the same. All right. Sir, let's turn to the next exhibit, which I believe is Exhibit 1270. This is your 1099 that you received from FedEx Ground for the year 2004, correct?

A. Correct.

MR. CORR: I'd offer this exhibit, Your Honor.

THE COURT: Exhibit 1270 is offered.

MR. GARFINKEL: I have no objection.

THE COURT: Exhibit 1270 is admitted.

Q. Then if we keep moving on, sir, 1271 is your 2004 tax return, is it not?

A. Correct.

Q. Once again, you listed yourself as self-employed to the IRS, correct?

A. Correct.

Q. And if you continue in a couple pages into the document, you have a Schedule C, once again, profit or loss from your business, correct? I think it's about the fifth page in.

THE COURT: Counsel, this is 2004 we are on?

Defendant's Copy
PERMISSION TO COPY DENIED

MR. CORR: Yes, it is, Your Honor.
A. Correct.
Q. So Schedule C again. And then the next year, once again, for the third year in a row, you had apparently hired other people to help you do your job, and you had contract labor charges of $6,332, correct?
A. Correct.
Q. And, once again, on the next page, it looks like you paid a self-employment tax, correct?
A. Correct.
Q. And then at the end of this tax form, that's where we see the 1099s that you issued to the people we spoke about before lunch, Mr. Leo Baclay, Mr. O'Brian, Nate Farme, correct?
MR. GARFINKEL: Excuse me, counsel. What document are you on?
MR. CORR: Do you want the exhibit number or the Bates?
MR. GARFINKEL: I don't have the exhibit number.
MR. CORR: The exhibit number we've been working on is 1271, 2004 tax return.
MR. GARFINKEL: Got it. Thank you.
Q. Sir, my question was: Attached to this tax return -- I guess it would be backup for your contract

labor charges that you were deducting -- you show the 1099s that you, Steve Goodwin Courier Services, issued to your subcontractors, correct?

A. Correct. I don't see them in here.

Q. It should be near the end. I think it's page 15.

A. Correct. Okay.

Q. Basically just like 2002, 2003, 2004 was the same as all your other tax returns, right?

A. Right.

Q. Let's move to the next exhibit then, sir, 1272. This is your profit and loss statement for your business for the year 2004, correct?

A. Correct.

MR. CORR: I'd offer this exhibit, Your Honor.

MR. GARFINKEL: My documents are not pre-numbered. So I'm trying to catch up. What is the Bates number on that?

MR. CORR: Goodwin 262.

MR. GARFINKEL: I have the 2005. I have no objection.

THE COURT: Exhibit 1272 is admitted.

MR. CORR: Can we put that up on the screen. Can you try to blow that up? Thank you, John.

Defendant's Copy
PERMISSION TO COPY DENIED

Q. So, basically going through this quickly, sir, it looks like you grossed 69,000 and then your net income that year was 37,000, correct?

A. Correct.

Q. And you took deductions -- business deductions for entertainment and for meals. Who were you entertaining?

A. I don't know.

Q. And who were you having business meals with?

A. I don't know.

Q. Let's turn to 1273, which is the profit and loss statement for your business for calendar year 2005. That's Bates 277. Do you see that, sir?

A. Yeah, sure do.

Q. Okay. And this is the profit and loss for Goodwin Courier Services again, but for the next year, right?

A. Correct.

MR. CORR: I'd offer this exhibit as well.

MR. GARFINKEL: No objection.

THE COURT: Exhibit 1273?

MR. CORR: Yes.

THE COURT: Exhibit 1273 is admitted.

MR. CORR: Could we blow this one up, John?

Q. And this time, sir, your gross went up to about 76-77,000 and your net income went up to about 42,000, correct?

A. Correct.

Q. It looks like, again, you took entertainment deductions and deductions for business meals. Same questions. Do you recall who you were entertaining and who you were have business meals with?

A. I don't remember.

Q. Do you recall if they were with your customers?

A. I don't know.

Q. And 2005, 1099, which is the next exhibit, sir -- I think 1274 -- that's the actual copy of the 1099 that you produced to us in this case of the 1099 income report form that FedEx Ground said you got for calendar year 2005, right?

A. Correct.

MR. CORR: Offer that as well.

THE COURT: Exhibit 1274 is offered. It's Goodwin Bates 278, 279.

MR. GARFINKEL: No objection.

THE COURT: Exhibit 1274 is admitted.

Q. Now, sir --

MR. CORR: Actually, John, I don't need

Defendant's Copy
PERMISSION TO COPY DENIED

REPORTER'S CERTIFICATE

STATE OF WASHINGTON )
) §:
COUNTY OF KING )

I, JOANN BOWEN, RPR, CRR, CCP, CCR #2695, an official reporter of the State of Washington, was appointed an official court reporter in the Superior Court of the State of Washington, County of King, on August 17, 2006, do hereby certify that the foregoing proceedings were reported by me in stenotype at the time and place herein set forth and were thereafter transcribed by computer-aided transcription under my supervision and that the same is a true and correct transcription of my stenotype notes so taken.

I further certify that I am not employed by, related to, nor of counsel for any of the parties named herein, nor otherwise interested in the outcome of this action.

______________________________

OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*ALL ACTIONS*

CHIEF JUDGE MILLER

**DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY:**
***FEDEX HOME DELIVERY v. NLRB***
(D.C. Cir. Apr. 21, 2009)

Defendant FedEx Ground Package System, Inc. ("FXG") files this Notice of Supplemental Authority to bring to the Court's attention the attached decision in *FedEx Home Delivery v. NLRB*, __ F.3d __, 2009 WL 1046789 (D.C. Cir. Apr. 21, 2009) (No. 07-1391).

In this decision, the United States Court of Appeals for the District of Columbia Circuit reversed a determination of the National Labor Relations Board ("NLRB") and held that the single work area ("SWA") contractors at FXG's Wilmington, Massachusetts Home Delivery terminals were independent contractors rather than employees under the National Labor Relations Act ("NLRA"). To reach this conclusion the D.C. Circuit applied the common-law agency test as described in Section 220(2) of the Restatement (Second) of Agency *to the same Operating Agreement at issue before this Court*. *See id.*, slip op. at 4-5 & n.1. Throughout this litigation, both plaintiffs and FXG have relied extensively on decisions applying the common-

law/Restatement employment classification test, specifically including decisions under the NLRA.

The D.C. Circuit's decision is relevant to all cases coordinated in this MDL proceeding in which: (a) FXG has opposed plaintiffs' motions for summary judgment on the employment classification question; (b) FXG has moved for summary judgment on that same question; and (c) plaintiffs have moved for or obtained class certification.

1. **The decision is relevant to the issue of *control***.

The D.C. Circuit's decision held that a substantial amount of the evidence of "control" on which the NLRB relied did not support employee status. The Circuit summarized much of the NLRB's evidence on that issue as follows:

> FedEx requires: contractors to wear a recognizable uniform and conform to grooming standards; vehicles of particular color (white) and within a specific size range; and vehicles to display FedEx's logo in a way larger than that required by DOT regulations. The company insists drivers complete a driving course (or have a year of commercial driving experience, which need not be with FedEx) and be insured, and it "conducts two customer service rides per year" to audit performance. FedEx provides incentive pay (as well as fuel reimbursements in limited instances) and vehicle availability allotments, and requires contractors have a vehicle and driver available for deliveries Tuesday through Saturday. Moreover, FedEx can reconfigure routes if a contractor cannot provide adequate service, though the contractor has five days to prove otherwise, and is entitled to monetary compensation for the diminished value of the route.

*Id.*, slip op. at 14 (citations omitted).

The Court concluded, however, that while the above "aspects of FedEx's operation are distinguishable from the business models in [two cases where the NLRB found an independent contractor relationship]," "those distinctions, though not irrelevant, reflect differences in the type of service the contractors are providing rather than differences in the employment relationship. In other words, the distinctions are significant *but not sufficient*." *Id.*, slip op. at 14-15 (emphasis added).

case 3:05-md-00527-RLM -CAN document 1730 filed 04/23/09 page 3 of 8

The Court addressed other arguments concerning control issues, some of which plaintiffs have raised here. The Court concluded that contractor obligations that emanate from *government regulations* do not necessarily support a finding of "employee" status as to the Home Delivery contractors. *See* slip op. at 14-15 (identifying evidence of asserted control, and then stating that "We have held that constraints imposed by customer demands and government regulations do not determine the employment relationship."); and *id.* at 16 ("'[R]estrictions upon a worker's manner and means of performance that spring from government regulation . . . do not necessarily support a conclusion of employment status' because the company 'is not controlling the driver,' the law is." (quoting *North Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C. Cir. 1989)).

It further concluded that control which is designed to *meet customer demands* or *provide customer service* did not support "employee" status. *See* slip op. at 14-15 (identifying evidence of asserted control, and then stating that "We have held that constraints imposed by customer demands and government regulations do not determine the employment relationship."); *id.* at 15 (citing *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 859 (D.C. Cir. 1995), for the proposition that "'[W]here a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship.'"); and *id*. at 19 ("True, these drivers—who need not be, and not always are, the same persons as the contractors—must wear uniforms and the like, but a rule based on concern for customer service does not create an employee relationship.").

And the Court further concluded that the alleged *non-negotiability* of the Operating Agreement does not support an inference of employee status. *See* slip op. at 17 n.8 ("The Regional Director [of the NLRB] noted too that 'FedEx Home offers what is essentially a take-it-or-leave-it agreement.' But we will 'draw no inference of employment status from merely the

economic controls which many corporations are able to exercise over independent contractors with whom they contract.'" (quoting *North Am. Van Lines, Inc.*, 869 F.2d at 599)).

2. **<u>The decision is relevant to *how* a court should evaluate the common-law factors</u>**.

This issue has ramifications for the pending summary judgment motions on contractor status, and for both the ruled-upon and still-pending class certification motions.

The Court held that *no one* factor of the common-law Restatement analysis is determinative and that a court needs to examine all aspects of the relationship. *See* slip op. at 4-5 ("[T]he Restatement's non-exhaustive ten-factor test is not especially amenable to any sort of bright-line rule, a long-recognized rub. Thus, 'there is no shorthand formula or magic phrase that can be applied to find the answer, but *all of the incidents of the relationship must be assessed and weighed with no one factor being decisive*' . . . ." (quoting *NLRB v. United Ins. Co.*, 390 U.S. 254, 258 (1968)) (footnotes omitted; emphasis added)).

Given that need, the Court provided guidance on the additional analysis involved, after tracing the development of the D.C. Circuit's thinking on the issue:

> For a time, when applying this common law test, we spoke in terms of an employer's right to exercise control, making the extent of actual supervision of the means and manner of the worker's performance a key consideration in the totality of the circumstances assessment. Though all the common law factors were considered, the meta-question, as it were, focused on the sorts of controls employers could use without transforming a contractor into an employee.

*See* slip op. at 6.

From that, the Court emphasized a key principle for evaluating the common law factors:

> In any event, the process that seems implicit in those cases became explicit—indeed, as explicit as words can be—in *Corporate Express Delivery Systems v. NLRB*, 292 F.3d 777 (D.C. Cir. 2002). In that case, both this court and the Board, while retaining all of the common law factors, "shift[ed the] emphasis" away from the unwieldy control inquiry in favor of a more accurate proxy: ***whether the***

> ***"putative independent contractors have 'significant entrepreneurial opportunity for gain or loss**.'" Id. at 780 (quoting Corp. Express Delivery Sys., 332 N.L.R.B. No. 144, at 6 (Dec. 19, 2000)).*

*Id.* at 7 (emphasis added).

Thus, "while all the considerations at common law remain in play, an important animating principle by which to evaluate those factors in cases where some factors cut one way and some the other is ***whether the position presents the opportunities and risks inherent in entrepreneurialism***." Slip op. at 7 (emphasis added). *See also id.* at 7-8 n.3:

> The common law test, after all, is not merely quantitative. We do not just count the factors that favor one camp, and those the other, and declare that whichever side scores the most points wins. Instead, there also is a qualitative assessment to evaluate which factors are determinative in a particular case, and why. In *Corporate Express*, we said this qualitative evaluation "focus[es] ***not upon the employer's control of the means and manner of the work but instead upon whether the putative independent contractors have a 'significant entrepreneurial opportunity for gain or loss.***'" (citation omitted; emphasis added).

**3. <u>The decision is relevant to the evaluation of *entrepreneurial opportunity*.</u>**

Particularly with respect to the contractors' ability to engage others to perform the contracted-for services and to sell their routes, the Court noted: "This ability to hire 'others to do the Company's work' is no small thing in evaluating 'entrepreneurial opportunity.'" Slip op. at 12 (quoting *Corp. Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780-81 (D.C. Cir. 2002)).

The Court emphasized the same point with regard to contractors' sales of their routes:

> Another aspect of the Operating Agreement is significant, and is novel under our precedent. Contractors can assign at law their contractual rights to their routes, without FedEx's permission. The logical result is they can sell, trade, give, or even bequeath their routes, an unusual feature for an employer-employee relationship. In fact, the amount of consideration for the sale of a route is negotiated "strictly between the seller and the buyer," with no FedEx involvement at all other than the new route owner must also be "qualified" under the Operating Agreement, *Representation Decision*, slip op. at 30, with "qualified" merely meaning the new owner of the route also satisfies Department of Transportation ("DOT") regulations, *see id*. at 8–10. Although FedEx assigns routes

> without nominal charge, the record contains evidence, as the Regional Director expressly found, that at least two contractors were able to sell routes for a profit ranging from $3,000 to nearly $16,000. *See id*. at 30–32, 38–39.

Slip op. at 12.

Moreover, "[I]t is the worker's retention of the right to engage in entrepreneurial activity rather than his regular exercise of that right that is most relevant for the purpose of determining whether he is an independent contractor." *Id*. at 17 (quoting *C.C. Eastern, Inc.*, 60 F.3d at 860 (footnote omitted)).

4. **The decision is relevant to the issue of whether an FXG contractor's work is so *integrated* into FXG's "regular business" that the contractor is an employee.**

On this issue the Court concluded: "While the essential nature of a worker's role is a legitimate consideration, it is not determinative in the face of more compelling countervailing factors, otherwise companies like FedEx could never hire delivery drivers who ***are*** independent contractors, a consequence contrary to precedent." Slip op. at 16-17 (emphasis in original).

5. **The decision is relevant to the pending summary judgment motions on the contractor classification question under ERISA**.

Pending before this court are motions by both sides for summary judgment on the employment classification question under the Employee Retirement Income Security Act ("ERISA") in *Craig v. FedEx Ground Package System, Inc.* (3:05-CV-00530). The Wilmington, Massachusetts contractors, who the D.C. Circuit held to be independent contractors, are members of the certified nation-wide class in *Craig*. The employment classification test under ERISA is substantially the same as the test the D.C. Circuit applied. *See Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565 (7th Cir. 2009) (applying Restatement test to resolve classification issue for ERISA purposes, noting that the "Restatement test is generally equivalent to the common law test from [*Nationwide Mut. Ins. Co. v.*] *Darden* [503 U.S. 318 (1992)]).

6. **The decision is relevant to plaintiffs' *collateral estoppel* arguments arising from the *Estrada* case**.

The D.C Circuit's decision supports FXG's argument that outcomes contrary to the decision in *Estrada* prevent extension of the *Estrada* result to these MDL cases under the collateral estoppel doctrine.

Dated: April 23, 2009.

Respectfully submitted,

By: /s Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

John H. Beisner
Robert M. Schwartz
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 23d day of April, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 7, 2008 Decided April 21, 2009

No. 07-1391

FEDEX HOME DELIVERY, A SEPARATE OPERATING DIVISION OF FEDEX GROUND PACKAGE SYSTEM, INCORPORATED,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL NO. 25,
INTERVENOR

Consolidated with 07-1436

On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board

*R. Ted Cruz* argued the cause for petitioner. On the briefs were *Charles I. Cohen*, *Jonathan C. Fritts*, and *Doreen S. Davis*.

*Robert Digges Jr.*, *Robin S. Conrad*, and *Adam C. Sloane* were on the brief for *amici curiae* American Trucking Associations, Inc. and Chamber of Commerce of the United States of America in support of petitioner. *Timothy W. Wiseman* entered an appearance.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney. *Julie B. Broido,* Supervisory Attorney, entered an appearance.

*Renee J. Bushey* argued the cause for intervenor International Brotherhood of Teamsters, Local No. 25. With her on the brief were *Michael A. Feinberg* and *Jonathan M. Conti*.

*Daniel J. Popeo* and *Richard A. Samp* were on the brief for *amici curiae* Washington Legal Foundation, et al. in support of respondent.

Before: GARLAND and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion dissenting in part filed by *Circuit Judge* GARLAND.

BROWN, *Circuit Judge*: FedEx Ground Package System, Inc. ("FedEx"), a company that provides small package delivery throughout the country, seeks review of the determination of the National Labor Relations Board

("Board") that FedEx committed an unfair labor practice by refusing to bargain with the union certified as the collective bargaining representative of its Wilmington, Massachusetts drivers. The Board cross-applies for enforcement of its order. Because the drivers are independent contractors and not employees, we grant FedEx's petition, vacate the order, and deny the cross-application for enforcement

I.

In 1998, FedEx acquired Roadway Package Systems and changed its name to FedEx Ground Package System, Inc. The company has two operating divisions: the Ground Division and the Home Delivery Division or FedEx Home. The Ground Division delivers packages of up to 150 pounds, principally to and from business customers. FedEx Home delivers packages of up to 75 pounds, mostly to residential customers. The Wilmington terminals are part of FedEx Home, a network that operates 300 stand-alone terminals throughout the United States and shares space in an additional 200 Ground Division facilities. FedEx Home has independent contractor agreements with about 4,000 contractors nationwide with responsibility for over 5,000 routes.

In July 2006, the International Brotherhood of Teamsters, Local Union 25, filed two petitions with the NLRB seeking representation elections at the Jewel Drive and Ballardvale Street terminals in Wilmington, neither of which boasts many contractors. The Union won the elections, prevailing by a vote of 14 to 6 at Jewel Drive and 10 to 2 at Ballardvale Street, and was certified as the collective bargaining representative at both. FedEx refused to bargain with the Union. The company did not contest the vote count; instead, FedEx disputed the preliminary finding that its single-route drivers are "employees" within the meaning of Section 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3).

The Board rejected FedEx's Request for Review of the Regional Director's Decision and Direction of Election on November 8, 2006. In dissent, Chairman Battista disagreed with "the refusal to permit [FedEx] to introduce system-wide evidence concerning the number of route sales and the amount of profit," as the information would be relevant to the determination of the drivers' "entrepreneurial interest in their position." *FedEx Home Delivery and Local 25*, N.L.R.B. Case Nos. 1-RC-22034, 22035, (Nov. 8, 2006) (Battista, C., dissenting). After the election, the Board found FedEx violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain. Finding FedEx's objection that its contractors are not employees had been raised and rejected in the representation proceedings, the Board issued its order on September 28, 2007. FedEx filed a timely petition for review and the Board filed its cross-application for enforcement. The Union intervened in support of the Board's cross-application.

II.

To determine whether a worker should be classified as an employee or an independent contractor, the Board and this court apply the common-law agency test, a requirement that reflects clear congressional will. *See NLRB v. United Ins. Co.*, 390 U.S. 254, 256 (1968); *see also St. Joseph News Press*, 345 N.L.R.B. 474, 478 (2005) ("Supreme Court precedent 'teaches us not only that the common law of agency is the standard to measure employee status *but also that we have no authority to change it*.'") (quoting *Dial-A-Mattress Operating Corp.*, 326 N.L.R.B. 884, 894 (1998)). While this seems simple enough, the Restatement's non-exhaustive ten-factor test is not especially amenable to any sort of bright-line

rule,[1] a long-recognized rub.[2] Thus, "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive," *United Ins. Co.*, 390 U.S. at 258, always bearing in mind the "legal distinction between 'employees' . . . and 'independent contractors' . . . is permeated at the fringes by conclusions drawn from the factual setting of the particular industrial dispute." *North Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599 (D.C. Cir. 1989) ("*NAVL*").

This potential uncertainty is particularly problematic because the line between worker and independent contractor is jurisdictional—the Board has no authority whatsoever over independent contractors. *See id.* at 598. Consequently, it is "one of this court's principal functions" to "ensur[e] that the Board exercises power only within the channels intended by Congress," especially as determining status from undisputed

---

[1] The common law factors include, *inter alia*, "the extent of control which, by the agreement, the master may exercise over the details of the work"; "the kind of occupation"; whether the worker "supplies the instrumentalities, tools, and the place of work"; "the method of payment, whether by the time or by the job"; "the length of time for which the person is employed"; whether "the work is a part of the regular business of the employer"; and the intent of the parties. RESTATEMENT (SECOND) OF AGENCY § 220(2).

[2] *See Kisner v. Jackson*, 159 Miss. 424, 427–28 (1931) ("There have been many attempts to define precisely what is meant by the term 'independent contractor'; but the variations in the wording of these attempts have resulted only in establishing the proposition that it is not possible within the limitations of language to lay down a concise definition that will furnish any universal formula, covering all cases. At last, and in any given case, it gets back to the original proposition whether in fact the contractor was actually independent.").

facts "involves no special administrative expertise that a court does not possess." *Id.* We thus do not grant great or even "normal[]" deference to the Board's status determinations; instead, we will only uphold the Board if at least "it can be said to have 'made a choice between two fairly conflicting views.'" *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995) (quoting *NAVL*, 869 F.2d at 599).

For a time, when applying this common law test, we spoke in terms of an employer's right to exercise control, making the extent of actual supervision of the means and manner of the worker's performance a key consideration in the totality of the circumstances assessment. Though all the common law factors were considered, the meta-question, as it were, focused on the sorts of controls employers could use without transforming a contractor into an employee. *E.g.*, *NAVL*, 869 F.2d at 599 ("In applying traditional agency law principles, the NLRB and the courts have adopted a right-to-control test. The test requires an evaluation of all the circumstances, but the extent of the actual *supervision* exercised . . . is the most important element."). For example, "efforts to monitor, evaluate, and improve" a worker's performance were deemed compatible with independent contractor status. *Id.* Nor would "restrictions" resulting from "government regulation" mandate a contrary conclusion. *Id.* "[E]vidence of unequal bargaining power" also did not establish "control." *Id.*

Gradually, however, a verbal formulation emerged that sought to identify the essential quantum of independence that separates a contractor from an employee, a process reflected in cases like *C.C. Eastern* and *NAVL* where we used words like control but struggled to articulate exactly what we meant by them. "Control," for instance, did not mean *all* kinds of controls, but only *certain* kinds. *See, e.g.*, *C.C. Eastern*, 60

F.3d at 858 (quoting *NAVL*, 869 F.2d at 599). Even though we were sufficiently confident in our judgment that we reversed the Board, long portions of both opinions were dedicated to explaining why some controls were more equal than others. *See id.* at 858–61; *NAVL*, 869 F.2d at 599–604. In other words, "control" was close to what we were trying to capture, but it wasn't a perfect concurrence. It was as if the sheet music just didn't quite match the tune.

In any event, the process that seems implicit in those cases became explicit—indeed, as explicit as words can be—in *Corporate Express Delivery Systems v. NLRB*, 292 F.3d 777 (D.C. Cir. 2002). In that case, both this court and the Board, while retaining all of the common law factors, "shift[ed the] emphasis" away from the unwieldy control inquiry in favor of a more accurate proxy: whether the "putative independent contractors have 'significant entrepreneurial opportunity for gain or loss.'" *Id.* at 780 (quoting *Corp. Express Delivery Sys.*, 332 N.L.R.B. No. 144, at 6 (Dec. 19, 2000)). This subtle refinement was done at the Board's urging in light of a comment to the Restatement that explains a "'full-time cook is regarded as a servant,'"—and not "an independent contractor"—"'although it is understood that the employer will exercise no control over the cooking.'" *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 220(1) cmt. d). Thus, while all the considerations at common law remain in play, an important animating principle by which to evaluate those factors in cases where some factors cut one way and some the other is whether the position presents the opportunities and risks inherent in entrepreneurialism. *Id.*[3]

[3] The common law test, after all, is not merely quantitative. We do not just count the factors that favor one camp, and those the other, and declare that whichever side scores the most points wins. Instead, there also is a qualitative assessment to evaluate which factors are determinative in a particular case, and why. In

Although using this "emphasis" does not make applying the test purely mechanical, the line drawing is easier, or at least this court and the Board in *Corporate Express* seem to have so hoped. *See id.* ("We agree with the Board's suggestion that [entrepreneurial opportunity] better captures the distinction between an employee and an independent contractor."). In *C.C. Eastern*, for instance, we decided drivers for a cartage company who owned their own tractors, signed an independent contractor agreement, "retain[ed] the rights, as independent entrepreneurs, to hire their own employees" and could "use their tractors during non-business hours," and who were "paid by the job" and received no employee benefits, should be characterized as independent contractors. 60 F.3d at 858–59. We also noted the company did not require "specific work hours" or dress codes, nor did it subject workers to conventional employee discipline. *Id.* at 858. Conversely, in *Corporate Express,* emphasizing entrepreneurialism, we straightforwardly concluded that where the owner-operators "were not permitted to employ others to do the Company's work or to use their own vehicles for other jobs," they "lacked all entrepreneurial opportunity and consequently functioned as employees rather than as independent contractors." 292 F.3d at 780–81.

This struggle to capture and articulate what is meant by abstractions like "independence" and "control" also seems to play a part in the Board's own cases, though we readily concede the Board's language has not been as unambiguous as this court's binding statement in *Corporate Express*. For

---

*Corporate Express*, we said this qualitative evaluation "focus[es] not upon the employer's control of the means and manner of the work but instead upon whether the putative independent contractors have a 'significant entrepreneurial opportunity for gain or loss.'" 292 F.3d at 780 (quoting *Corp. Express*, 332 N.L.R.B. at 6).

instance, in the latest but far from only statement of the principle, *see St. Joseph News Press*, 345 N.L.R.B. at 479; *Dial-A-Mattress Operating Corp.*, 326 N.L.R.B. at 891; *cf. Panhandle E. Pipe Line Co. v. FERC*, 890 F.2d 435, 438–39 (D.C. Cir. 1989) (agency action while review is pending in this court can be relevant), and a case where the Board explicitly said it was simply following its own precedent, *Arizona Republic*, 349 N.L.R.B. 1040, 1040 (2007), the Board held that where carriers sign an independent contractor agreement; own, maintain, and control their own vehicles; hire full-time substitutes and control the substitutes' terms and conditions of employment; are permitted to hold contracts on multiple routes; select the delivery sequence; and are not subject to the employer's progressive discipline system, the evidence establishes that the carriers are independent contractors, *id.* at 1040–41, 1046. Importantly, the Board, noting many drivers had "multiple routes" and could deliver newspapers for another publisher, also concluded significant entrepreneurial opportunity existed, even if most failed to make the extra effort. "[T]he fact that many carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial *potential* to do so." *Id.* at 1045.

The record here shares many of the same characteristics of entrepreneurial potential.[4] In the underlying representation decision, the Regional Director found the contractors sign a

---

[4] FedEx also does not provide benefits or withhold taxes. While unrelated to entrepreneurialism, this goes to party intent. *See C.C. Eastern*, 60 F.3d at 858–59; *St. Joseph News Press*, 345 N.L.R.B. at 479.("[A] party's intent with regard to the nature of the relationship created weighs strongly in favor of finding independent contractor status."). Because we consider *all* the common law factors, *vide supra*, these facts are relevant, just as are any relating to control.

Standard Contractor Operating Agreement that specifies the contractor is not an employee of FedEx "for any purpose" and confirms the "manner and means of reaching mutual business objectives" is within the contractor's discretion, and FedEx "may not prescribe hours of work, whether or when the contractors take breaks, what routes they follow, or other details of performance"; "contractors are not subject to reprimands or other discipline"; contractors must provide their own vehicles, although the vehicles must be compliant with government regulations and other safety requirements; and "contractors are responsible for all the costs associated with operating and maintaining their vehicles." *FedEx Home Delivery and Local 25*, N.L.R.B. Case Nos. 1-RC-22034, 22035, slip op. at 10–14 (First Region, Sept. 20, 2006) ("*Representation Decision*"). They may use the vehicles "for other commercial or personal purposes . . . so long as they remove or mask all FedEx Home logos and markings," and, even on this limited record, some do use them for personal uses like moving family members, and in the past "Alan Douglas[] used his FedEx truck for his 'Douglas Delivery' delivery service, in which he delivered items such as lawn mowers for a repair company." *Id.* at 14, 15. Contractors can independently incorporate, and at least two in Wilmington have done so. At least one contractor has negotiated with FedEx for higher fees. *Id.* at 20.[5]

---

[5] We recognize FedEx seeks to "make full use of the Contractor's equipment," but it is undisputed the contractors are only obligated to provide service five days a week. Our precedent speaks to this: "Moreover, as the drivers work only 40 to 50 hours per week for the Company, it seems that their schedules do not preclude them from taking on additional hauling business during their off-hours." *C.C. Eastern*, 60 F.3d at 860. Though our colleague contends *C.C. Eastern* does not say very much, *see* Dis. Op. at 26 ("But all *C.C. Eastern* held was that under those circumstances, the Board had erred in 'discounting to zero' the significance of that single factor

Tellingly, contractors may contract to serve multiple
routes or hire their own employees for their single routes;
more than twenty-five percent of contractors have hired their
own employees at some point. *See* Resp'ts Br. at 6. "The
multiple route contractors have sole authority to hire and
dismiss their drivers"; they are responsible for the "drivers'
wages" and "all expenses associated with hiring drivers, such
as the cost of training, physical exams, drug screening,
employment taxes, and work accident insurance."
*Representation Decision*, slip op. at 27.[6] The drivers' pay and
benefits, as well as responsibility for fuel costs and the like,
are negotiated "between the contractors and their drivers." *Id.*
In addition, "both multiple and single route contractors may
hire drivers" as "temporary" replacements on their own
routes; though they can use FedEx's "Time Off Program" to
find replacement drivers when they are ill or away, they need
not use this program, and not all do. *Id.* at 28–29. Thus,
contrary to the dissent's depiction, Dis. Op. at 19, contractors

---

in the traditional multi-factor test."), he fails to account for the
holding. We did not remand for the Board to give this factor the
proper weight, but instead held the contractors "are not 'employees'
within the meaning of the Act and therefore are not within the
jurisdiction of the Board." *C.C. Eastern*, 60 F.3d at 861.

[6] We are aware the Regional Director excluded contractors with
multiple routes from the bargaining units as statutory supervisors,
even though the "employees" of those "supervisors" do not, in fact,
work for FedEx. *Representation Decision*, slip op. at 42–43. This
classification is not before us. But what *is* before us is the puzzling
argument, adopted but not defended by our colleague, *see* Dis. Op.
at 23, that because they were excluded, everything about them is
somehow irrelevant, as if—poof!—they just vanished. Multi-route
contractors signed the same contract as the others, and just as the
national data is relevant in assessing the rights available under the
contract, *id.* at 27–30, so are the activities of these contractors.

do not need to show up at work every day (or ever, for that matter); instead, at their discretion, they can take a day, a week, a month, or more off, so long as they hire another to be there. "FedEx [also] is not involved in a contractor's decision to hire or terminate a substitute driver, and contractors do not even have to tell FedEx [] they have hired a replacement driver, as long as the driver is 'qualified.'" *Representation Decision*, slip op. at 29. "Contractors may also choose to hire helpers" without notifying FedEx at all; at least six contractors in Wilmington have done so. *Id.* at 29–30. This ability to hire "others to do the Company's work" is no small thing in evaluating "entrepreneurial opportunity." *Corp. Express*, 292 F.3d at 780–81; s*ee also St. Joseph News Press*, 345 N.L.R.B. at 479 ("Most importantly, the carriers can hire full-time substitutes . . . .").

Another aspect of the Operating Agreement is significant, and is novel under our precedent. Contractors can assign at law their contractual rights to their routes, without FedEx's permission. The logical result is they can sell, trade, give, or even bequeath their routes, an unusual feature for an employer-employee relationship. In fact, the amount of consideration for the sale of a route is negotiated "strictly between the seller and the buyer," with no FedEx involvement at all other than the new route owner must also be "qualified" under the Operating Agreement, *Representation Decision*, slip op. at 30, with "qualified" merely meaning the new owner of the route also satisfies Department of Transportation ("DOT") regulations, s*ee id.* at 8–10. Although FedEx assigns routes without nominal charge, the record contains evidence, as the Regional Director expressly found, that at least two contractors were able to sell routes for a profit ranging from $3,000 to nearly $16,000. *See id.* at 30–32, 38–39.

In its argument to this court, the Board, echoed by the dissent, discounts this evidence of entrepreneurial opportunity by saying any so-called profit merely represents the value of the vehicles, which were sold along with the routes. But if a vehicle depreciates in value, it is not worth as much as it was before; that is tautological. Here, buyers paid more for a vehicle and route than just the depreciated value of the vehicle—in one instance more than $10,000 more. Therefore, as the Regional Director did, we find this value *is* profit. *Compare Representation Decision*, slip op. at 38 ("Neal's profit on the sale of his route was only $3000 to $6000," and "[a]fter deducting the value of the truck . . . it appears that, at best, Ferreira paid Jung somewhere between $11,000 and $16,000 for the route.") *with* Dis. Op. at 24 (suggesting no "gain at all" may have been shown). The *amount* of profit may be "murky," as it may be as high as $6,000 and $16,000 or as low as $3,000 or $11,000, respectively, but the profit is real. *Representation Decision*, slip op. at 38. That this potential for profit exists is unsurprising: routes are geographically defined, and they likely have value dependent on those geographic specifics which some contractors can better exploit than others. For example, as people move into an area, the ability to profit from that migration varies; some contractors using more efficient methods can continue to serve the entire route, while others cannot.

It is similarly confused to conclude FedEx gives away routes for free. *See* Dis. Op. at 23. A contractor agrees to provide a service in return for compensation, i.e., both sides give consideration. If a contractor does not do what she says, FedEx suffers damages, just as she does if FedEx does not pay what is owed. Servicing a route is not cheap; one needs a truck (which the contractor pays for) and a driver (which the contractor also pays for, either directly or in kind). To say this is giving away a route is to say when one hires a

contractor to build a house, one is just giving away a construction opportunity. All of this evidence thus supports finding these contractors to be independent.

The Regional Director, however, thought FedEx's business model distinguishable from those where the Board had concluded the drivers were independent contractors. For example, FedEx requires: contractors to wear a recognizable uniform and conform to grooming standards; vehicles of particular color (white) and within a specific size range; and vehicles to display FedEx's logo in a way larger than that required by DOT regulations. The company insists drivers complete a driving course (or have a year of commercial driving experience, which need not be with FedEx) and be insured, and it "conducts two customer service rides per year" to audit performance. FedEx provides incentive pay (as well as fuel reimbursements in limited instances) and vehicle availability allotments, and requires contractors have a vehicle and driver available for deliveries Tuesday through Saturday. *Id.* at 9–21. Moreover, FedEx can reconfigure routes if a contractor cannot provide adequate service, though the contractor has five days to prove otherwise, and is entitled to monetary compensation for the diminished value of the route. *Id.* at 16. These aspects of FedEx's operation are distinguishable from the business models in *Dial-A-Mattress*, 326 N.L.R.B. 884 (contractors arranged their own training, could decline work, did not wear uniforms, could use any vehicle, and were provided no subsidies or minimum compensation) and *Argix Direct, Inc.*, 343 N.L.R.B. 1017 (2004) (contractors could decline work, delivered to major retailers using any vehicle, and had no guaranteed income).

But those distinctions, though not irrelevant, reflect differences in the type of service the contractors are providing rather than differences in the employment relationship. In

other words, the distinctions are significant but not sufficient. FedEx Home's business model is somewhat unique. The service is delivering small packages, mostly to residential customers. Unlike some trucking companies, its drivers are not delivering goods that FedEx sells or manufacturers, nor does FedEx move freight for a limited number of large clients. Instead, it is an intermediary between a diffuse group of senders and a broadly diverse group of recipients. With this model comes certain customer demands, including safety. As the Internal Revenue Service ("IRS") persuasively notes, and ordinary experience confirms, a uniform requirement often at least in part "is intended to ensure customer security rather than to control the [driver]." INTERNAL REVENUE SERVICE, EMPLOYMENT TAX GUIDELINES: CLASSIFYING CERTAIN VAN OPERATORS IN THE MOVING INDUSTRY 23, http://www.irs.gov/pub/irs-utl/van-ops.pdf (last visited April 3, 2009).[7] And once a driver wears FedEx's logo, FedEx has an interest in making sure her conduct reflects favorably on that logo, for instance by her being a safe and insured driver—which is required by DOT regulations in any event. *See Representation Decision*, slip op. at 8–9, 14, 24.

We have held that constraints imposed by customer demands and government regulations do not determine the employment relationship. *See C.C. Eastern*, 60 F.3d at 859 ("[W]here a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship.");

---

[7] We, of course, are *not* deferring to the IRS. *See* Dis. Op. at 15 n.10. Our standard of review here is unusual. Though not *de novo*, we must enforce the bounds on the Board's jurisdiction set by Congress. *NAVL*, 869 F.2d at 598. This statement is merely persuasive authority that is relevant in light of our precedent that measures springing from customer demands do not create an employee relationship. *C.C. Eastern*, 60 F.3d at 859.

*NAVL*, 869 F.2d at 599 ("[E]mployer efforts to monitor, evaluate, and improve the results of ends of the worker's performance do not make the worker an employee."); *id.* ("[R]estrictions upon a worker's manner and means of performance that spring from government regulation . . . do not necessarily support a conclusion of employment status" because the company "is not controlling the driver," the law is.). As our "emphasis [shifts] to entrepreneurialism," *Corp. Express*, 292 F.3d at 780, these precedents apply *a fortiori*.

Likewise, "an incentive system designed 'to ensure that the drivers' overall performance meets the company standards' . . . is fully consistent with an independent contractor relationship." *C.C. Eastern*, 60 F.3d at 860 (quoting *NAVL*, 869 F.2d at 603). At the same time, a contractual willingness to share a small part of the risk—for instance, by providing fuel reimbursements when prices jump sharply, or by guaranteeing a certain minimum amount of income for making a vehicle available—does not an employee make. *See Argix Direct, Inc.*, 343 N.L.R.B. at 1019 (contractors were independent even though the "[e]mployer also pays the owner-operators a fuel surcharge when the price of fuel surpasses a preset average").

The Regional Director also emphasized that these "contractors perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages," and that few have seized any of the alleged entrepreneurial opportunities. *Representation Decision*, slip op. at 34, 38. While the essential nature of a worker's role is a legitimate consideration, it is not determinative in the face of more compelling countervailing factors, *see Aurora Packing v. NLRB*, 904 F.2d 73, 76 (D.C. Cir. 1990), otherwise companies like FedEx could never hire delivery drivers who *are* independent contractors, a consequence contrary to

precedent, *see St. Joseph News Press*, 345 N.L.R.B. at 479. And both the Board and this court have found the failure to take advantage of an opportunity is beside the point. *See C.C. Eastern*, 60 F.3d at 860 (opportunities cannot be ignored unless they are the sort workers "cannot realistically take," and even "one instance" of a driver using such an opportunity can be sufficient to "show[] there is no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right"); *Arizona Republic*, 349 N.L.R.B. at 1045. Instead, "it is the worker's retention of the right to engage in entrepreneurial activity rather than his regular exercise of that right that is most relevant for the purpose of determining whether he is an independent contractor." *C.C. Eastern*, 60 F.3d at 860.[8]

III.

Our dissenting colleague reads our precedent differently than we do, and thus reaches a different conclusion. Of course the facts in our past holdings are not identical to those here, but there is no reason to distinguish this case from those where we have rejected the Board's attempt to assert jurisdiction over independent contractors. In fact, this case is relatively straightforward because not only do these contractors have the ability to hire others without FedEx's participation, only here do they own their routes—as in they can sell them, trade them, or just plain give them away. Moreover, if this court had shown as much deference to the Board as our colleague seems to suggest is its due, we wonder how *C.C. Eastern* and *NAVL* could possibly have been

---

[8] The Regional Director noted too that "FedEx Home offers what is essentially a take-it-or-leave-it agreement." But we will "draw no inference of employment status from merely the economic controls which many corporations are able to exercise over independent contractors with whom they contract." *NAVL*, 869 F.2d at 599.

decided the way that they were. Because the dispute turns on precedent, we recommend you read our cases—they are quite short—and see for yourself whether our friend's fight really is with us at all.

The dissent, for instance, argues that emphasizing entrepreneurialism has only truly begun with this case, and suggests we are doing so here for reasons apart from allegiance to precedent. *See, e.g.*, Dis. Op. at 11–12, 30. Lest any be confused, we again quote *Corporate Express*: "[W]e uphold as reasonable the Board's decision, at the urging of the General Counsel, to focus not upon the employer's control of the means and manner of the work but instead upon whether the putative independent contractors have a 'significant entrepreneurial opportunity for gain or loss.'" 292 F.3d at 780. We explicitly "agree[d] with the Board's suggestion that the latter factor better captures the distinction between an employee and an independent contractor," because, as reflected by the Restatement's comment, it is not "the degree of supervision under which [one] labors but . . . the degree to which [one] functions as an entrepreneur—that is, takes economic risk and has the corresponding opportunity to profit from working smarter, not just harder," that better illuminates one's status. *Id.* We retained the common law test (as is required by the Court's decision in *United Insurance*), but merely "shift[ed our] emphasis to entrepreneurialism," using this "emphasis" to evaluate common law factors such as whether the contractor "supplies his own equipment," *id.* *Corporate Express* is thus doctrinally consistent with *United Insurance* and the Restatement.

Likewise, though conceding ours is a "fair reading of [*Corporate Express*], which contains considerable language regarding entrepreneurial opportunity and the benefits of using such a test," the dissent nonetheless argues there is a

narrower way to understand that case such that it still focuses on the extent of control. Dis. Op. at 9. Put another way, *Corporate Express*—despite its seemingly unambiguous language—to him need not be read as evincing a shift towards entrepreneurialism at all. We cannot adopt that reading because the court affirmatively declined to determine the contractors' status under a "means and manner test." *Corp. Express*, 292 F.3d at 780 ("[W]e need not answer that question . . . ."). We take *Corporate Express* at its word.

But even if *Corporate Express* never happened, the result here is unchanged. While on some points *C.C. Eastern* and *NAVL* are distinguishable—for instance, in *C.C. Eastern* there were no appearance requirements for man or machine (though "the tractor must be suitable for the task at hand"), *see* 60 F.3d at 859, as in *NAVL*, 869 F.2d at 600—the overwhelming majority of factors favoring independent contractor status are the same, and, importantly, this case is particularly straightforward because only here can the contractors own and transfer the proprietary interest in their routes. Moreover, all contractors here own their vehicles, something that cannot be said in *NAVL*, where not even the *majority* did. *See id.* True, these drivers—who need not be, and not always are, the same persons as the contractors—must wear uniforms and the like, but a rule based on concern for customer service does not create an employee relationship. *See C.C. Eastern*, 60 F.3d at 859. And while in *C.C. Eastern* "we [were] able to find . . . only one instance of a driver" using an entrepreneurial opportunity, that lone "example show[ed] that there [was] no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right." *Id.* at 860. In this case, we need not and do not rely on just one example of the exercise of rights. Even on an incomplete record there are many such examples; routes have been sold for a profit; substitutes and helpers have been hired without FedEx's

involvement; one contractor has negotiated for higher rates; and contractors have incorporated. Under the fairest reading of our precedent, these *are* independent contractors.

IV.

We have considered all the common law factors, and, on balance, are compelled to conclude they favor independent contractor status. The ability to operate multiple routes, hire additional drivers (including drivers who substitute for the contractor) and helpers, and to sell routes without permission, as well as the parties' intent expressed in the contract, augurs strongly in favor of independent contractor status. Because the indicia favoring a finding the contractors are employees are clearly outweighed by evidence of entrepreneurial opportunity, the Board cannot be said to have made a choice between two fairly conflicting views. Though evidence can be marshaled and debater's points scored on both sides, the evidence supporting independent contractor status is more compelling under our precedent. The evidence might have been stronger still had not the Regional Director erroneously excluded the national data. But even as the record stands, the Board's determination was legally erroneous.

Accordingly, we grant the petition, vacate the Board's order, and deny the cross-application for enforcement.

*So ordered.*

GARLAND, *Circuit Judge*, dissenting in part:  In *National Labor Relations Board v. United Insurance Co. of America*, the Supreme Court held that Congress intended "the Board and the courts" to "apply the common-law agency test . . . in distinguishing an employee from an independent contractor" under the National Labor Relations Act (NLRA).  390 U.S. 254, 256 (1968).  In this case, the National Labor Relations Board (NLRB) applied that multi-factor test and concluded that FedEx Home Delivery's drivers are the company's employees.  My colleagues disagree, concluding that the drivers are independent contractors.

This is not merely a factual dispute.  Underlying my colleagues' conclusion is their view that the common-law test has gradually evolved until one factor -- "whether the position presents the opportunities and risks inherent in entrepreneurialism" -- has become the focus of the test.  Slip Op. at 7, 18.  Moreover, in their view, this factor can be satisfied by showing a few examples, or even a single instance, of a driver seizing an entrepreneurial opportunity.  *Id.* at 17.

Although I do not doubt my colleagues' sincerity, I detect no such evolution.  To the contrary, the Board and the courts have continued to follow the Supreme Court's injunction that "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *United Ins.*, 390 U.S. at 258.  The common-law test may well be "unwieldy," Slip Op. at 7, but a court of appeals may not "'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'"  *United Ins.*, 390 U.S. at 260 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  While the NLRB may have authority to alter the focus of the common-law test, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 863-64 (1984), this court does not.  Because "the least that can

be said for the Board's decision is that it made a choice between two fairly conflicting views, . . . the Court of Appeals should have enforced the Board's order." *United Ins.*, 390 U.S. at 260. Accordingly, on the existing record, I cannot join in condemning the Board's determination.

I can and do, however, fault the Board's refusal to give FedEx a fair opportunity to make its case under the appropriate test. As the court correctly notes, the Regional Director refused to permit FedEx to introduce evidence that may be relevant to the question of whether its drivers have significant entrepreneurial opportunities. Regardless of whether one considers entrepreneurial opportunity as only one factor (as it is in the common-law test) or as the focus of the test (as my colleagues believe it to be), FedEx surely had the right to introduce the evidence necessary to make its case.

I

A

The NLRA makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 2(3) of the Act, as amended by the 1947 Labor Management Relations Act, provides that the term "employee" "shall not include . . . any individual having the status of an independent contractor." 29 U.S.C. § 152(3). In *United Insurance*, the Supreme Court held that the "obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act. . . . Thus there is no doubt that we should apply the common-law agency test . . . in distinguishing an employee from an independent contractor."

*United Ins.*, 390 U.S. at 256.[1] The Court recognized that "[t]here are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contractor. . . . In such a situation as this there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles." *Id.* at 258.

The cases under review in *United Insurance* presented the question of whether certain agents of an insurance company were employees or independent contractors. The Supreme Court determined that

> the decisive factors in these cases become the following: the agents . . . perform functions that are an essential part of the company's normal operations; they need not have any prior training or experience, but are trained by company supervisory personnel; they do business in the company's name with considerable assistance and guidance from the company and its managerial personnel and ordinarily sell only the company's policies; the "Agent's Commission Plan" that contains the terms and conditions under which they operate is promulgated and changed unilaterally by the

---

[1]*See also NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94 (1995) (noting that "[i]n the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine" (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989)))).

> company; the agents account to the company for the funds they collect under an elaborate and regular reporting procedure; the agents receive the benefits of the company's vacation plan and group insurance and pension fund; and the agents have a permanent working arrangement with the company under which they may continue as long as their performance is satisfactory.

*Id.* at 258-59. The Court confirmed that the Board had "examined all of these facts and found that they showed the debit agents to be employees." *Id.* at 260. This finding, the Court said, "involved the application of law to facts -- what do the facts establish under the common law of agency: employee or independent contractor?" *Id.* Although the Court noted that such a determination "involved no special administrative expertise that a court does not possess," it nonetheless held that, "'even as to matters not requiring expertise,'" a court of appeals may not "'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *Id.* (quoting *Universal Camera Corp.*, 340 U.S. at 488). As long as it "can be said for the Board's decision . . . that it made a choice between two fairly conflicting views, . . . the Court of Appeals should . . . enforce[] the Board's order. It [is] error to refuse to do so." *Id.*

In the succeeding decades, the NLRB has consistently "[a]ppl[ied] the common-law agency test as interpreted by the Supreme Court in *NLRB v. United Insurance Co.*" to determine whether a worker is an employee or an independent contractor. *Roadway Package Sys., Inc.* (*Roadway III*), 326 N.L.R.B. 842, 843 (1998); *id.* at 849 (declaring that the Supreme Court's "cases teach us not only that the common law of agency is the standard to measure employee status but also that we have no authority to

change it").[2] In so doing, the Board has looked to the Restatement (Second) of Agency for the factors relevant to making that determination. *See, e.g.*, cases cited *supra* note 2. Those ten (nonexhaustive) factors are set out in the margin.[3] Following the injunction of the Supreme Court, the Board has

---

[2]*Accord Ariz. Republic*, 349 N.L.R.B. 1040, 1042 (2007); *St. Joseph News-Press*, 345 N.L.R.B. 474, 477-78 (2005); *Argix Direct, Inc.*, 343 N.L.R.B. 1017, 1020 & n.13 (2004).

[3]The Restatement provides:

> In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
>
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220(2).

continued to reaffirm that "'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Roadway III*, 326 N.L.R.B. at 850 (quoting *United Ins.*, 390 U.S. at 258); *see, e.g.*, *Ariz. Republic*, 349 N.L.R.B. at 1042-46; *St. Joseph News-Press*, 345 N.L.R.B. at 477-78.

This Circuit has likewise recognized that "Congress intended that traditional agency law principles guide the determination whether workers are employees . . . or independent contractors," *N. Am. Van Lines, Inc. v. NLRB* (*NAVL*), 869 F.2d 596, 598 (D.C. Cir. 1989), and has looked to the Restatement factors for those principles, *id.* at 599-600. *See Local 777, Democratic Union Org. Comm. v. NLRB* (*Local 777*), 603 F.2d 862, 872-73 (D.C. Cir. 1978); *cf. Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989) (citing both *United Insurance* and the Restatement's "nonexhaustive list of factors relevant to determining whether a hired party is an employee" in construing the meaning of the term "employee" under the Copyright Act of 1976). "[T]he ultimate determination," we have said, "requires a broad examination of all facets of the relationship between [the] company and" the worker. *NAVL*, 869 F.2d at 604 (citing *United Ins.*, 390 U.S. at 258); *see C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995). As we further noted in *NAVL*, "[i]n applying traditional agency law principles, the NLRB and the courts have adopted a right-to-control test." 869 F.2d at 599. That "test requires an evaluation of all the circumstances," but it focuses the greatest attention on those factors indicating "'the extent of the actual *supervision* exercised by a putative employer over the "means and manner" of the workers' performance.'" *Id.*

(quoting *Local 777*, 603 F.2d at 873); *see C.C. Eastern*, 60 F.3d at 858 (same).[4]

B

My colleagues contend that "[g]radually," both this Court and the Board shifted away from "the unwieldy control inquiry in favor of a more accurate proxy: whether the 'putative independent contractors have significant entrepreneurial opportunity for gain or loss.'" Slip Op. at 6-7 (quoting *Corporate Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002)). "[W]hile all the considerations at common law remain in play," my colleagues maintain that now the "emphasis" is on "whether the position presents the opportunities and risks inherent in entrepreneurialism." *Id.* at 7.

The cases, however, do not evidence this gradual evolution to a test that emphasizes entrepreneurial opportunity. According to my colleagues, the evolutionary process began "implicit[ly]" in our decisions in *NAVL* and *C.C. Eastern*. Slip Op. at 7. It is true that those decisions listed entrepreneurial opportunity as a relevant factor, notwithstanding that it is not expressly mentioned in either *United Insurance* or the Restatement (or in

[4] *See also Seattle Opera v. NLRB*, 292 F.3d 757, 765 & n.11 (D.C. Cir. 2002) (applying the "common law definition" and concluding that auxiliary choristers are employees because "the Opera possesses the right to control [them] in the material details of their performance"); *Constr., Bldg. Material, Ice & Coal Drivers v. NLRB*, 899 F.2d 1238, 1242 (D.C. Cir. 1990) (noting that "[t]he right to control the 'means and manner' of job performance . . . is the *leitmotiv* recurrent in the cases" that consider whether construction truck drivers are employees or independent contractors).

any comment to the Restatement[5]). But those decisions explicitly stated that entrepreneurial opportunity was only one of multiple factors to consider -- and not the most important one.

In *C.C. Eastern*, for example, we concluded that the entrepreneurial opportunities afforded by a driver's "right to hire . . . his own employees to help him" and to "use his tractor himself to haul for anyone" had "some probative weight," but that they were "*less important* to our determination of the drivers' status than [wa]s the absence of evidence that the Company supervises the means and manner of their work." 60 F.3d at 859, 860 (emphasis added).[6] Similarly, we said in *NAVL* that: "Other factors [than control] weigh in the determination," including "the extent to which the worker has assumed entrepreneurial risk and stands to gain from risks undertaken . . . . However, *these factors are of far less importance* than the central inquiry whether the corporation exercises control over the manner and means of the details of the worker's performance; indeed, these factors are probative only to the extent that they bear upon and further that inquiry." 869 F.2d at 599-600 (emphasis added). Nothing in these unambiguous declarations suggests any kind of "struggle[] to articulate exactly what we meant" in those cases. Slip Op. at 6. The contention that *C.C.*

---

[5]Restatement comment (d), to which my colleagues refer, states only that a "full-time cook is regarded as a servant" -- and *not* an independent contractor -- "although it is understood that the employer will exercise no control over the cooking." Restatement (Second) of Agency § 220(1) cmt. d. The comment does not mention entrepreneurial opportunity, which plays no role in its analysis of the cook's status.

[6]*See also C.C. Eastern*, 60 F.3d at 858 ("Whether a worker is an independent contractor or an employee is a function of the amount of control that the company has over the way in which the worker performs his job.").

*Eastern* and *NAVL* implicitly signaled the advent of an evolutionary process, *id.* at 6-7, is simply incorrect.

My colleagues cite only one case from this (or any) Circuit, our 2002 opinion in *Corporate Express*, for the proposition that entrepreneurial opportunity has "explicit[ly]" become the emphasis of the independent contractor test. Slip Op. at 7. I do not dispute that theirs is one fair reading of that opinion, which contains considerable language regarding entrepreneurial opportunity and the benefits of using such a test. But *Corporate Express* did not purport to overrule Supreme Court, Circuit, and Board precedent. Indeed, in affirming as reasonable the *Board's* determination that the owner-operator drivers in that case were *not* independent contractors, the court not only agreed that they lacked entrepreneurial opportunity, but also acknowledged that the Board may have correctly determined that the employer controlled the way in which they performed their jobs. *Corporate Express*, 292 F.3d at 779-80. Hence, *Corporate Express* can also be read as merely holding that the Board was reasonable in determining that entrepreneurial opportunity tipped the balance in *that* case -- a logical result given that the court thought the vector of the other common-law factors somewhat unclear, *see id.* at 780 & n.*, while finding that the "owner-operators lacked *all* entrepreneurial opportunity," *id.* at 780-81 (emphasis added). And when there are two possible readings of an opinion, only one of which is consistent with earlier precedent, the appropriate course is to adopt the consistent reading -- on the presumption that the court followed the command of *stare decisis*. *Cf. Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) ("In the event of conflicting panel opinions . . . the

earlier one controls, as one panel of this court may not overrule another." (internal quotation marks and citation omitted)).[7]

There was certainly nothing in the NLRB's opinion in *Corporate Express* to suggest that entrepreneurial opportunity had become the focus of the Board's own analysis. To the contrary, the Board simply followed its traditional approach of examining the common-law factors -- including, inter alia, both entrepreneurial opportunity and employer control. *Corporate Express Delivery Sys.*, 332 N.L.R.B. 1522, 1522 (2000). After doing so, it concluded that, "*weighing all of the incidents of their relationship* with the Respondent, we find that the owner-operators are employees and not independent contractors." *Id.* (emphasis added).

My colleagues maintain that the evolution toward an emphasis on entrepreneurial opportunity "seems to play a part in the Board's own cases," although they "readily concede the Board's language has not been . . . unambiguous." Slip Op. at 8. The principal NLRB decision upon which they rely is *Arizona Republic,* a decision issued *after* the Regional Director's decision in this case. *Ariz. Republic*, 349 N.L.R.B. 1040 (May 8, 2007). But *Arizona Republic* does not support my colleagues' proposition either. Once again, it is true that *one* of the factors weighing in favor of the independent contractor determination in that case was "entrepreneurial potential." *Id*. at 1042. There simply is no indication, however, that this factor was the

---

[7]I do not suggest that *Corporate Express* should be read as "focus[ing] on the extent of control," Slip Op. at 19, but rather that it should not be read as giving primacy to entrepreneurial opportunity. Moreover, to the extent that there has been a shift of emphasis in the Board's own cases, it has been toward regarding *no* single factor as primary -- whether it be opportunity or control. *See St. Joseph News-Press*, 345 N.L.R.B. at 478; *Roadway III*, 326 N.L.R.B. at 850.

"emphasis" of the test *Arizona Republic* applied. To the contrary, the Board announced that, "[i]n determining the status of the [newspaper] carriers in this case, we rely on . . . the common-law factors." *Id.* at 1043. It then proceeded to examine the Restatement factors individually, *id.* at 1043-46, repeating its oft-stated mantra that "this list of factors is not exclusive or exhaustive, and that, in applying the common-law agency test, [we] will consider '*all* the incidents of the individual's relationship to the employing entity,'" *id.* at 1042 (quoting *Roadway III*, 326 N.L.R.B. at 850). The Board ultimately concluded that the majority of the factors "weigh[ed] in favor" of finding that the carriers were independent contractors. *Id.* at 1043-46. One of those factors was entrepreneurial opportunity; another was the employer's lack of control over the carriers. *Id.* But the Board gave pride of place to neither one, declaring only that the common-law factors, "on balance," yielded the conclusion that the carriers were independent contractors. *Id.* at 1043. The same traditional common-law analysis was employed in both of the other NLRB decisions that my colleagues cite. Slip Op. at 9.[8]

Finally, I do not dispute my colleagues' contention that the multi-factor analysis of the common law is "not especially amenable to any sort of bright-line rule." Slip Op. at 4-5. Although they acknowledge that an emphasis on entrepreneurial

---

[8]*See St. Joseph News-Press*, 345 N.L.R.B. at 478 (noting that "the Board's analysis . . . [has] recognized, as does Supreme Court law, that both the right of control and other factors, as set out in the Restatement, are to be used to evaluate claims that hired individuals are independent contractors"); *Dial-A-Mattress Operating Corp.*, 326 N.L.R.B. 884, 891 (1998) (declaring that "the list of factors differentiating 'employee' from 'independent contractor' status under the common-law agency test is nonexhaustive, with no one factor being decisive").

opportunity "does not make applying the test purely mechanical," they maintain that "the line drawing is easier" under that test. *Id.* at 8. There is no question that the common-law agency test makes for difficult line drawing. Indeed, the Supreme Court expressly acknowledged as much when it announced the test. *See United Ins.*, 390 U.S. at 258 ("There are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contractor . . . ."). It may also be true that line drawing under an entrepreneurial opportunity test would be easier, although that is hardly assured. After all, while my colleagues perceive clear entrepreneurial opportunity in this case, neither the Board nor I see it that way. *See infra* Part II.

But the comparative practical advantage of one or the other of these two tests has no bearing on which one we must apply. Although the NLRB may have authority to alter the test, or at least to alter its focus, *see Chevron*, 467 U.S. at 842-43, 863-64, this court does not. Until the Supreme Court or the Board tells us differently, we must continue to apply the multi-factor common-law test as set forth by the Supreme Court and applied by the Board.

II

In this case, the NLRB's Regional Director applied the traditional "common law agency test." *FedEx Home Delivery and Local 25*, N.L.R.B. Case Nos. 1-RC-22034, 22035, slip op. at 33 (First Region, Sept. 20, 2006) [hereinafter Regional Director's Decision]. In so doing, she "consider[ed] all the incidents of the individual's relationship with the employing entity," *id.*, including both the extent of FedEx's control over the drivers and the extent of the drivers' entrepreneurial opportunities, *id.* at 35-36. Although the Regional Director acknowledged many of the facts cited by my colleagues in

support of FedEx's contention that the contractors are independent contractors, facts that I do not rehearse here, she concluded that they were outweighed by other factors supporting employee status. *Id.* at 39. Part II.A reviews the bulk of the factors that the Director found to support employee status. Part II.B discusses her analysis of the issue of entrepreneurial opportunity.

A

In a lengthy and considered opinion, the Regional Director found the following facts to favor a determination that FedEx Home Delivery's drivers, whom the company calls "contractors," were employees:

> [A]ll the FedEx Home contractors perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages. . . . [A]ll contractors must do business in the name of FedEx Home[,] . . . wear[] FedEx Home-approved uniforms and badges, . . . [and] operate vehicles that must meet FedEx Home specifications and uniformly display the FedEx Home name, logo, and colors. . . . No prior delivery training or experience is required, and FedEx Home will train those with no experience. . . .
>
> . . . [C]ontractors are not permitted to use their vehicles for other purposes while providing service for FedEx Home. The contractors have a contractual right to use their FedEx Home trucks in business activity outside their relationship with FedEx Home during off-hours, provided they remove all FedEx Home markings, but only one former multiple route contractor . . . and no current contractors at either Wilmington terminal have ever done so. . . .

> . . . FedEx Home exercises substantial control over all the contractors' performance of their functions. FedEx Home offers what is essentially a take-it-or-leave-it agreement. . . . [It] retains the right to reconfigure the service area unilaterally. All contractors must furnish a FedEx Home-approved vehicle and FedEx Home-approved driver daily from Tuesday through Saturday; they do not have discretion not to provide delivery service on a given day. While all contractors control their starting times and take breaks when they wish, their control over their work schedule is circumscribed by the requirement that all packages be delivered on the day of assignment. . . .
>
> . . . FedEx Home provides support to all its contractors in various ways that are inconsistent with independent contractor status. . . . FedEx Home provides extensive support to contractors by offering the Business Support Package and arranging for the required insurance, thus providing an array of required goods and services that would be far more difficult for contractors to arrange on their own. . . . FedEx Home also offers to arrange for approved substitute drivers for its contractors by virtue of the Time Off Program. FedEx Home provides contractors who maintain sufficient vehicle maintenance accounts with $100 per accounting period to help defray repair costs[, and] requires contractors to permit FedEx Home to pay certain vehicle-related taxes and fees on their behalf and to have the payments deducted from their settlement.

Regional Director's Decision at 34-37 (internal citations omitted). Many of these are the kind of facts that *United*

*Insurance*, the Restatement, and numerous Circuit and Board decisions confirm are indicative of employee status.[9]

My colleagues nonetheless reject the import of many of these facts, arguing that they merely "reflect differences in the type of service the contractors are providing rather than differences in the employment relationship." Slip Op. at 14. In particular, the court rejects the import of the following requirements imposed by FedEx: that drivers wear a recognizable uniform; that vehicles be of a particular color and size range; that trucks display the FedEx logo in a size larger than Department of Transportation regulations require; that drivers complete a driving course if they do not have prior training; that drivers submit to two customer service rides per year to audit their performance; and that a truck and driver be available for deliveries every Tuesday through Saturday. *Id.* The courts and the Board,[10] however, have repeatedly regarded the presence or absence of these very factors as important in

[9]*See, e.g.*, *United Ins.*, 390 U.S. at 256-58; *NAVL*, 869 F.2d at 600-04; *Local 777*, 603 F.2d at 873-81; *Argix Direct*, 343 N.L.R.B. at 1017-20; *Roadway III*, 326 N.L.R.B. at 843-48, 851-54; RESTATEMENT (SECOND) OF AGENCY § 220(2) (1958).

[10]It is to the precedents of the Board, and not to those of the Internal Revenue Service, that we owe deference, as only the former is charged with enforcing the provisions of the NLRA. *Compare* Slip Op. at 15 (citing an IRS guideline to support the proposition that a uniform requirement does not reflect employer control), *with, e.g.*, *Roadway III*, 326 N.L.R.B. at 851-52 (citing the employer's requirement that its drivers wear an "approved uniform" as evidence that they are employees).

determining whether a worker is an employee or independent contractor.[11]

One factor that the Regional Director emphasized was that the drivers "perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages" to homes. Slip Op. at 16. Although my colleagues acknowledge that "the essential nature of a worker's role is a legitimate consideration," they minimize it as "not determinative." *Id.* But that is true of every factor in the common-law test. *See United Ins.*, 390 U.S. at 258 (holding that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive"). Moreover, the cases have repeatedly cited this

---

[11]*See, e.g.*, *United Ins.*, 390 U.S. at 258-59 (listing, among other "decisive factors" of employee status, the fact that the insurance agents "need not have any prior training or experience, but are trained by company supervisory personnel," and that "they do business in the company's name"); *C.C. Eastern*, 60 F.3d at 858 (finding the following facts, among many others, to be indicative of an independent contractor relationship: the employer does not "exercise any control over the drivers' dress or appearance" or "require the tractors to be of any specific type, size, or color"); *NAVL*, 869 F.2d at 600 (citing, among other "principal reasons" why the drivers are independent contractors, the fact that they "retain nearly absolute control" over "their dress" and "when they work"); *Corporate Express Delivery Sys.*, 332 N.L.R.B. at 1522 (finding that owner-operator drivers are employees because, inter alia, "[t]hey are required to display the Respondent's logo on their vehicles and to wear certain color trousers, shirts, and shoes, if they opt not to wear uniforms"); *Roadway III*, 326 N.L.R.B. at 851-52 (citing, among other factors in concluding that drivers are employees, the facts that: "they need not have any prior training or experience, but receive training from the company; they do business in the company's name"; they wear an "approved uniform"; and there is a "'business support package' [that] helps ensure that the drivers' vehicles are properly maintained").

particular factor in concluding that workers are employees.[12] In short, there is no basis for discounting the significance of the traditional factors upon which the Regional Director relied in concluding that the FedEx drivers are employees rather than independent contractors.

B

In accord with court and agency precedent, the Regional Director also considered whether FedEx Home Delivery's drivers have significant entrepreneurial opportunity for gain or loss. For the following reasons, she concluded that the evidence of entrepreneurial opportunity was weak:

> The contractors' compensation package also supports employee status. With [one] exception . . . , FedEx Home unilaterally establishes the rates of compensation for all contractors. . . . [T]here is little room for the contractors to influence their income through their own efforts or ingenuity, as their terminal manager determines, for the most part, how many deliveries they will make each day. . . . A contractor's territory may be unilaterally reconfigured by FedEx Home. FedEx Home tries to insulate its contractors from loss to some

---

[12]*See, e.g.*, *United Ins.*, 390 U.S. at 258-59 (holding that the fact that the insurance agents "perform functions that are an essential part of the company's normal operations" is a "decisive factor[]"); *Aurora Packing Co. v. NLRB*, 904 F.2d 73, 76 (D.C. Cir. 1990) (noting that "whether a worker plays an essential role in a company's business" is a factor "presumably because the company more likely than not would want to exercise control over such important personnel"); *Roadway III*, 326 N.L.R.B. at 851 (citing as a factor that the drivers "perform[] essential functions that allow Roadway to compete in the small package delivery market"); *see also* RESTATEMENT (SECOND) OF AGENCY § 220(2)(h).

Case 3:05-md-00527-RLM -CAN document 1730-2 filed 04/23/09 page 38 of 50

> degree by means of the vehicle availability payment, which they receive just for showing up, and the temporary core zone density payment, both of which payments guarantee contractors an income level predetermined by FedEx Home, irrespective of the contractors' personal initiative. FedEx Home also shields drivers from loss due to substantial increases in fuel prices by means of the fuel/mileage settlement.

Regional Director's Decision at 37.

Notwithstanding these findings, my colleagues perceive many "characteristics of entrepreneurial potential" in the drivers' relationship to FedEx. Slip Op. at 9. Some of the characteristics they cite, however, appear to have little to do with entrepreneurial opportunity. For example, the court's opinion notes that FedEx's Standard Contractor Operating Agreement "specifies the contractor is not an employee of FedEx for any purpose." *Id.* at 10. But the label FedEx puts on its relationship with its workers does not affect whether they have entrepreneurial opportunity for gain or loss.[13]

---

[13]*See Corporate Express*, 292 F.3d at 780 n.* (affirming the Board's determination that, although drivers "were described in their contract as 'independent contractors,'" they were actually employees). Nor is there much significance to the fact that FedEx does not "withhold taxes." Slip. Op. at 9 n.4. *See Seattle Opera*, 292 F.3d at 764 n.8 (noting that "'if an employer could confer independent contractor [i.e., non-employee] status through the absence of payroll deductions there would be few employees falling under the protection of the Act'" (quoting *J. Huizinga Cartage Co. v. NLRB*, 941 F.2d 616, 620 (7th Cir. 1991)). *Compare also* Slip Op. at 9 n.4 (noting that FedEx "does not provide benefits"), *with Corporate Express*, 292 F.3d at 780 n.* (finding that drivers were not independent contractors notwithstanding that they "received no life or health insurance" benefits from the company).

Case 3:05-md-00527-RLM -CAN document 1730-2 filed 04/23/09 page 39 of 50

My colleagues also observe that FedEx "may not prescribe hours of work [or] whether or when the contractors take breaks," and that the drivers "are not subject to reprimands or other discipline," Slip Op. at 10 -- all of which go not to the workers' entrepreneurial opportunity but to the extent of the employer's control, a factor discussed in Part II.A above. In any event, although FedEx does not fix specific hours or break times, it does require its contractors to provide delivery services every day, Tuesday through Saturday, and to finish each day's deliveries by the end of the day. Regional Director's Decision at 17, 36.[14] The insurance agents in *United Insurance* had neither fixed hours nor fixed break times, yet the Supreme Court affirmed the Board's determination that they were employees. *See* 390 U.S. at 258 (noting that the "agents perform their work primarily away from the company's offices and fix their own hours of work and work days"). And while FedEx does not have a disciplinary system based on "reprimands," Slip Op. at 10, it does deny drivers bonuses if they fail release audits and uses both counseling and termination as tools to ensure compliance with work rules. Regional Director's Decision at 12, 21. Again, the same was true in *United Insurance*. *See* 390 U.S. at 258 (noting that if a complaint against an agent is "well founded, the manager talks with the agent to set him straight," "caution[s]" him, and "[i]f improvement does not follow," the company may "fire [him] at any time").

---

[14]The Regional Director also noted that a driver cannot take a vacation, or even a day off, when he wants to, without providing a replacement. *See* Regional Director's Decision at 26; *id.* at 40 (distinguishing other cases in part on the basis that drivers for those companies were "not required to provide delivery services each day" and "were free to elect not to accept routes on specific days"). Even those who participate in FedEx's Time Off Program must schedule vacations in advance, and weeks are assigned by seniority. *Id.* at 25-26.

In addition, my colleagues state that "[a]t least one contractor has negotiated with FedEx for higher fees." Slip Op. at 10. Without agreeing that a worker's ability to negotiate his salary takes him out of the category of "employee," the Regional Director rightly regarded the only evidence on this point as quite weak: One former manager testified that one former driver "once requested some customer service rides to gauge if his core zone payment was set properly, and the payment was raised as a result, although [the manager] was not sure by how much. There is no evidence that any other contractors at the Wilmington facilities have negotiated a change in their core zone payment." Regional Director's Decision at 20.

Closer to the mark on the issue of entrepreneurial opportunity is the court's observation that drivers "are responsible for all the costs associated with operating and maintaining their vehicles." Slip Op. at 10.[15] But FedEx does much to limit the drivers' risk of loss. As the Regional Director found, the company "shields drivers from loss due to substantial increases in fuel prices by means of the fuel/mileage settlement" and guarantees them a significant amount of income "just for showing up." Regional Director's Decision at 37. My colleagues maintain that this "contractual willingness to share a small part of the risk . . . does not an employee make." Slip Op. at 16. The NLRB reasonably differs, as to both the magnitude of the shared risk and its import.

My colleagues further note that, under the Operator Agreement, drivers "may use the vehicles for other commercial or personal purposes" when they are not in the service of FedEx,

---

[15]My colleagues also note that "all contractors here own their vehicles." Slip Op. at 19. The same was true in *Corporate Express*, but we nonetheless found that those drivers had "no real entrepreneurial opportunities." 292 F.3d at 780 n.*.

"so long as they remove or mask all FedEx Home logos and markings." Slip Op. at 10. But do the drivers actually use their trucks for other purposes? Not so much. Indeed, the most that can be said is that "some do use them for personal uses like moving family members," *id.*, hardly an indicator of a "'significant entrepreneurial opportunity for gain or loss,'" *id.* at 7 (quoting *Corporate Express*, 292 F.3d at 780). Although the drivers' use of their trucks to conduct business independent of FedEx could well be an indicator of entrepreneurialism, the Regional Director found that "no current contractors at either Wilmington terminal have ever done so." Regional Director's Decision at 35.[16] Nor would they have much time, even if they wanted to. The Operator Agreement states that the company "seek[s] to manage its business so that it can provide sufficient volume of packages to Contractor *to make full use* of Contractor's equipment." FedEx Home Delivery Standard Contractor Operating Agreement, Private Background Statement (J.A. 720) (emphasis added). The contractor must provide daily service,[17] and "[w]hile the Equipment is in the service of [FedEx], it shall be used by Contractor exclusively for the carriage of the goods of [FedEx], and for no other purpose." *Id.* § 1.4 (J.A. 722).

---

[16]A former manager testified that one former driver, Alan Douglass, used his truck to deliver lawn mowers for a repair company. Regional Director's Decision at 15.

[17]It is true that a driver could take on extra work on his weekends (although none do). But *C.C. Eastern* did not hold that this would make him an independent contractor, Slip Op. at 10 n.5 -- no more than taking on a second, weekend job would turn any full-time employee into an "entrepreneur."

Based on these facts, the Regional Director found that the

> "lack of pursuit of outside business activity appears to be less a reflection of entrepreneurial choice by the . . . drivers and more a matter of the obstacles created by their relationship with [the Company.]" Thus, the contractors' contractual right to engage in outside business falls within the category of "entrepreneurial opportunities that they cannot realistically take," because the contractors' work schedules prevent them from taking on additional business during their off-hours during the workweek.

Regional Director's Decision at 35 (quoting *Roadway III*, 326 N.L.R.B. at 851 & n.36). That is at least a fair conclusion, and consequently one that we may not displace. *See United Ins.*, 390 U.S. at 260.

Another indicator of entrepreneurialism to which my colleagues point is the fact that operators may hire drivers as temporary replacements and occasional helpers. I agree that the "ability to hire 'others to do the Company's work' is no small thing in evaluating 'entrepreneurial opportunity.'" Slip Op. at 12 (quoting *Corporate Express*, 292 F.3d at 780-81). *But see Roadway III*, 326 N.L.R.B. at 845 (finding that drivers are employees notwithstanding that, "without prior approval from Roadway, [they] may also use helpers or replacement drivers on their routes"). Once again, however, the record evidence on this issue was weak. The Regional Director found that "many contractors who hire substitute drivers use the FedEx Home 'temp' drivers," Regional Director's Decision at 29, and that the record did not reveal how often contractors hired outside helpers, *id.* at 30. Nor was there any evidence that any operator at the terminals at issue in this case ever hired a substitute on a full-time basis.

My colleagues also note the fact that FedEx drivers "may contract to serve multiple routes," and that if they do so, they may hire other drivers to handle those routes. Slip Op. at 11. Although this, too, may indicate entrepreneurial opportunity, there were only 3 multiple-route drivers operating out of the Wilmington facilities. Regional Director's Decision at 28. This is as compared to a case like *Arizona Republic*, in which the Board determined that newspaper carriers were independent contractors after finding that 363 of them had multiple routes. *Ariz. Republic*, 349 N.L.R.B. at 1045 n.6. Moreover, the Regional Director excluded multiple-route drivers from the bargaining unit on the ground that they were not employees but rather statutory supervisors. Regional Director's Decision at 42-43.

My colleagues find particularly significant the fact that drivers have a contractual right to sell their routes, and that this could provide an opportunity for profit. That theoretical possibility, however, is tightly constrained. The drivers may sell only to those buyers whom FedEx accepts as qualified; the company gives out routes without charge,[18] as it did at the two Wilmington terminals; and FedEx can reconfigure a route, "in its sole discretion," at any time. Regional Director's Decision at 16 (referencing the FedEx Operating Agreement); *see id.* at 38. These facts cannot help but limit (or eliminate) any opportunity for profit. *See id.* at 60 n.73.

---

[18]There is nothing confused about saying that FedEx gives out routes without charge when it does not charge anything for routes. *See* Slip Op. at 13. Of course the driver agrees to provide delivery service on the route, and of course FedEx pays compensation for that service. *Id.* But the fact that FedEx will give a new driver a route without charging for it, and can reconfigure any route that a driver purchases from a former driver, plainly constrains the value of the latter.

In light of these constraints, it is not surprising that, although there was evidence that drivers abandoned their routes without selling them, *id.* at 32, there was little evidence that any driver had ever materially profited from a sale: "[T]here is no evidence that any Ballardvale contractor has ever sold a route," and there is evidence of only one single-route sale at Jewel Drive. *Id.* at 31, 38.[19] The only evidence of profit on that sale was the uncorroborated testimony of the former operator that he sold the route and truck together for at least $3000 more than the truck's market value, minus $1000 he paid to the broker. *Id.* at 31-32. As the Regional Director noted, the fact that the sale was "combined with the sale of a truck . . . makes the portion attributable to the route murky." *Id.* at 38. Based on the operator's statement alone, he may have netted no more than $2000 -- without factoring in his expenses over the two years he had the truck and route. More important, the evidence that there was any gain at all was "murky" indeed. As the Regional Director pointed out, although the operator claimed that he had a bill of sale to support his testimony, and told the hearing officer that he would produce it, he never did. *Id.* at 57 n.59. Given that the burden is on the proponent of independent contractor status

---

[19]The only other sale was by a multiple-route driver. The driver, Timothy Jung, received about $36,000 for his truck -- for which he had paid about $35,000 -- together with one of his routes. Jung abandoned his second route without receiving anything for it. Regional Director's Decision at 32, 38. "In these circumstances," the Regional Director reasonably found "the evidence of only two route sales too insubstantial to support a finding of independent contractor status." *Id.* at 38-39.

to prove its case,[20] it was not unreasonable for the Director to conclude that FedEx had failed to do so.

C

It would be a mistake, however, to read the court's opinion as reflecting nothing more than a factual disagreement with the NLRB, even on the question of whether the drivers had entrepreneurial opportunity. There is something more important at stake here. In concluding that the indicia of entrepreneurial opportunity were weak, the Regional Director emphasized that few operators seized any of the opportunities that allegedly were available to them. Accordingly, she adhered to the NLRB's precedent in *Roadway III*, which involved FedEx Home's predecessor corporation, wherein the "Board found that evidence of a few . . . sales . . . [was] insufficient to support a finding of independent contractor status, particularly since it was unclear from the record whether any driver had profited materially from a sale." Regional Director's Decision at 38 (citing 326 N.L.R.B. at 853).

My colleagues, by contrast, maintain that the failure to actually exercise theoretical opportunities is "beside the point" because "'it is the worker's retention of the right to engage in entrepreneurial activity rather than his regular exercise of that right that is most relevant.'" Slip Op. at 17 (quoting *C.C. Eastern*, 60 F.3d at 860). But the proper emphasis in that quotation from our *C.C. Eastern* opinion is on the word

---

[20] *See Argix Direct*, 343 N.L.R.B. at 1020; *BKN, Inc.*, 333 N.L.R.B. 143, 144 (2001); *Cent. Transport, Inc.*, 247 N.L.R.B. 1482, 1483 n.1 (1980); *see also NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 710-12 (2001) (affirming the Board's rule that the burden of proof is on the party claiming that a worker is a supervisor rather than an employee).

"regular." It may not be necessary for workers to *regularly* exercise their right to engage in entrepreneurial activity for that factor to weigh in the balance, but "if a company offers its workers entrepreneurial opportunities that they cannot realistically take, then that does not add any weight to the Company's claim that the workers are independent contractors." *C.C. Eastern*, 60 F.3d at 860.

Quoting *C.C. Eastern* and citing *Arizona Republic*, my colleagues suggest that "even 'one instance' of a driver using such an opportunity can be sufficient to 'show[] there is no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right.'" Slip Op. at 17. But all *C.C. Eastern* held was that under those circumstances, the Board had erred in "discount[ing] to zero" the significance of that single factor in the traditional multi-factor test. *C.C. Eastern*, 60 F.3d at 860. Nor is there anything in *Arizona Republic* to suggest that the Board believes that the exercise of contractual opportunity by one or even a small number of drivers can be sufficient. In that case, "[m]any carriers h[e]ld other jobs," "40 percent of the carriers actually solicited new subscriptions," and 363 carriers -- roughly 29 percent of all carriers -- had multiple routes. 349 N.L.R.B. at 1045; *id.* at 1045 n.6. It was in this context, in which "many" carriers held other jobs, solicited business, and had multiple routes -- and hence had proven opportunity -- that the Board said "the fact that many [other] carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial *potential* to do so." *Id.* at 1045; *compare* Slip Op. at 9. In the instant case, by contrast, no FedEx driver has another job or solicits business from his delivery customers,[21]

[21]The closest FedEx comes to contending that any driver has solicited business -- and it is not very close -- is its contention that one driver "asked the retailer L.L. Bean to ship him some catalogs to

and only three have multiple routes. Regional Director's Decision at 7, 28.

The import of my colleagues' suggestion that one or even a few examples of the exercise of contractual rights can be enough to decide the entrepreneurialism factor is magnified by their view that this factor is not just one element in a multi-factor test, but rather the test's "emphasis" -- so that an insubstantial exercise may, in effect, tilt the entire outcome.[22] That was certainly not the role that entrepreneurialism played in *C.C. Eastern*, in which we held that, although indicia of entrepreneurial opportunity did "have some probative weight," they were "less important to our determination of the drivers' status than . . . the absence of evidence that the Company supervises the means and manner of their work." 60 F.3d at 859; *see id.* at 860. Nor has it played that role in any other case.

It is not unreasonable for the NLRB to take the position that a material number of workers must actually take advantage of an opportunity before it will conclude that the opportunity is significant and realistic rather than insubstantial and theoretical. *See* Regional Director's Decision at 39. Even if that is not the better rule, "the least that can be said for the Board's decision is that it made a choice between two fairly conflicting views, and

distribute to his customers to generate more L.L. Bean deliveries." Regional Director's Decision at 53 n.33.

[22]The significance of designating entrepreneurialism as the emphasis of the test is not diminished by saying that it is a "principle by which to evaluate [the other common-law factors] in cases where some factors cut one way and some the other." Slip Op. at 7. This is particularly true because the opinion elevates no other principle to that role. Cases in which factors cut in different directions are the only cases at issue, as no determinative principle is required when all the factors point in the same direction.

under these circumstances the Court of Appeals should have enforced the Board's order." *United Ins.*, 390 U.S. at 260.

III

But there is a rub. Perhaps recognizing the thinness of the record, FedEx attempted to improve its proof of entrepreneurial opportunity by proffering "system-wide evidence concerning the number of route sales and the amount of profit, if any, on any such sale." Order, *FedEx Home Delivery*, N.L.R.B. Case Nos. 1-RC-22034, 22035 (Nov. 8, 2006) (Battista, Chrmn., dissenting). The Regional Director, however, "refus[ed] to permit the Employer to introduce" this evidence. *Id.* In light of that refusal, the Chairman of the NLRB dissented from the denial of Board review, protesting that this "evidence may be relevant to the issue of whether the drivers have an entrepreneurial interest in their position." *Id.*

The Chairman was correct. Regardless of whether one regards entrepreneurial opportunity as only one factor or as the decisive factor in determining whether the drivers were independent contractors, FedEx surely had the right to introduce the evidence necessary to make its case. *See* 29 C.F.R. § 102.64(a) ("It shall be the duty of the hearing officer to inquire fully into all matters and issues necessary to obtain a full and complete record . . . ."); *cf. Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 733 (D.C. Cir. 1983) ("It is repugnant to notions of fairness for the government to seek sanctions for alleged wrongdoing while withholding from the proceeding evidence that would demonstrate innocence.").

In support of her ruling, the Regional Director said only that "evidence of route sales and entrepreneurial activity at other terminals had no bearing on the economic value of route sales" at the Wilmington facilities. Regional Director's Decision at 6.

Why that would be so, she did not say. Perhaps there is something special about the Wilmington facilities, especially as compared to others that are far away. But the Director did not identify what the idiosyncracy might be, or say why at least evidence regarding nearby terminals would not be relevant. *See Burns Elec. Sec. Servs., Inc. v. NLRB*, 624 F.2d 403, 409 (2d Cir. 1980) (citing 29 C.F.R. § 102.64 in holding that the hearing officer erred in excluding evidence regarding the functions of certain workers at a nearby facility not within the proposed unit).

The exclusion of FedEx's evidence appears particularly arbitrary because the Regional Director did consider other evidence regarding some terminals not at issue in this case. *See* Regional Director's Decision at 4-5. So did the Board in *Roadway III*, where it relied on nationwide data to conclude that drivers were *not* independent contractors. *See* 326 N.L.R.B. at 851 (noting that "only 3 out of Roadway's 5000 drivers nationwide" had "used their vehicles for other commercial purposes"); *id.* at 853 ("In a system of over 5000 drivers assigned to over 300 terminals, we find that these few forced sales, given their circumstances, are insufficient to support a finding of independent contractor status."). And so, too, did a different Regional Director in *RPS, Inc. See* Decision and Order, N.L.R.B. Case No. 5-RC-14905 (Region 5, Aug. 3, 2000). That Regional Director relied on systemwide data to conclude that an employer's drivers *were* independent contractors. Although no driver at the only facility at issue in that case used his vehicle for commercial purposes unrelated to RPS's business, the Director found persuasive the fact that systemwide "many RPS drivers/contractors, possibly half" did so. *Id.* at 56. That record, the Director said, made it "clear that drivers/contractors can realistically take advantage of a myriad of entrepreneurial activities." *Id.* at 57.

In sum, the Regional Director's failure to reasonably explain her refusal to permit FedEx to prove its case requires that we grant the petition for review and remand the case.

IV

My colleagues conclude that, "[b]ecause the indicia favoring a finding [that] the contractors are employees are clearly outweighed by evidence of entrepreneurial opportunity, the Board cannot be said to have made a choice between two fairly conflicting views." Slip Op. at 20. They reach this conclusion by giving the entrepreneurial opportunity factor a weight, and analyzing it in a way, that the common law of agency -- as construed by the courts and the NLRB -- does not. Although the indeterminate nature of the common-law test may be problematic, and although the Board may have some room to modify it, this court cannot. Because the Board's decision reflects a "choice between two fairly conflicting views," we cannot displace it. *United Ins.*, 390 U.S. at 260.

We can and should, however, reject the Board's unexplained refusal to give FedEx a fair opportunity to make its case under the appropriate test. Accordingly, I would remand the case for further proceedings.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER |

**DEFENDANT'S STATEMENT IN RESPONSE TO "PLAINTIFFS' RESPONSE TO DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY RE: ANFINSON V. FEDEX GROUND PACKAGE SYSTEM, INC."**

Plaintiffs' "Response to Defendant's Notice of Supplemental Authority re: Anfinson v. FedEx Ground Package System, Inc." ("Pls.' Response") directs the bulk of its attention to responding to arguments ***not*** made by defendant FedEx Ground Package System, Inc. ("FXG"). (*See* Doc. No. 1728.)

First, plaintiffs argue that FXG's "Notice of Supplemental Authority re: Anfinson v. FedEx Ground Package System, Inc." (the "Notice") (Doc. No. 1727) is "premature" because the jury's verdict in *Anfinson* has not been reviewed post-trial or on appeal, and is therefore "not final and has no precedential effect whatsoever . . . ." (Pls.' Response at 1.) Yet, FXG's Notice makes ***no*** claim that the jury's verdict constitutes appellate precedent, and, as to the finality of the verdict, judgment has now been entered.[1] (*See* Judgment and Order on Defendant's Cost Bill

[1] Moreover, while FXG does ***not*** contend that the state-court judgment in *Anfinson* has preclusive effect in this MDL proceeding, even as to those *Anfinson* class members who are also members of the nation-wide ERISA class in *Craig*, it is well-settled that "the preclusive effect of a state judgment in federal litigation depends on the rendering state's law," *Rogers v. Desiderio*, 58 F.3d 299, 301 (7th Cir.

in *Anfinson v. FedEx Ground Package System, Inc.*, No. 04-2-39981-5SEA (King County Superior Court), Apr. 20, 2009 (attached hereto as Ex. 1).)

Second, plaintiffs argue that it is "mystifying" that FXG could "tell this court" that the *Anfinson* verdict "supports, let alone compels judgment in its favor in this multidistrict litigation . . . ." (Pls.' Response at 1-2.) FXG's Notice, however, makes ***no*** claim that the *Anfinson* judgment has claim-preclusive effect or otherwise "compels judgment" in its favor in this MDL proceeding. Rather, FXG merely stated that the class-wide determination that Washington single work area ("SWA") contractors in the *Anfinson* class were independent contractors, and not employees, "is ***relevant*** to plaintiffs' pending motions for summary judgment on classification . . . and FedEx Ground's oppositions thereto." (Notice at 2 (emphasis added).) The verdict is certainly relevant. In addition to the jury's actual finding that the FXG SWA contractors were independent contractors, the trial court specifically denied both parties' motions for judgment as a matter of law:

> Both sides have presented controverting evidence with respect to FedEx Ground's control ***and right to control*** the manner and means of the contractor's performance of their work and controverting evidence of the eight factors to be considered by the jury with respect to employment or independent contractor status based upon that control or right to control. [¶] This Court ***cannot determine that as a matter of law*** that a reasonable finder of fact can only reach one conclusion under the facts of this case for either side or party.[2] (Mar. 31, 2009 Tr. (Pls.' Response Ex. A), at 20:24-21:10 (emphasis added).)

---

1995), and that, under Washington law, "the act of 'an appeal does not suspend or negate . . . collateral estoppel aspects of a judgment entered after trial in the superior courts,' but collateral estoppel can be defeated by later rulings on appeal." *State v. Harrison*, 148 Wash. 2d 550, 561, 61 P.3d 1104, 1110 (Wash. 2003) (citations omitted).

[2] Although they acknowledge that the *Anfinson* court ruled "that employment status is purely a matter of fact and, hence the province of the jury," plaintiffs argue that the *Anfinson* determination has no application to the pending MDL summary judgment motions, which do not involve the interpretation or application of Washington law. (Pls.' Response at 4.) Plaintiffs fail to offer any explanation as to why the application of Washington law renders the *Anfinson* court's determination ***irrelevant*** to the MDL

case 3:05-md-00527-RLM -CAN document 1731 filed 04/28/09 page 3 of 5

Third, plaintiffs argue that the verdict has no impact on the previously-certified nationwide ERISA class in *Craig*, and that the court's denial of FXG's decertification motion in *Anfinson* supports certification of the ERISA class. (Pls.' Response at 2-4.) Plaintiffs' arguments miss the point; their focus on the decertification ruling ignores that the trier of fact's ***actual determination*** was that the Washington class members were independent contractors. This finding is relevant to the continuing viability of the *Craig* class certification, because plaintiffs' argument for certification in *Craig* necessarily rests on the contention that FXG's contractors nationwide, including members of the *Anfinson* class who are also members of the *Craig* class, are employees rather than independent contractors. (*See* Pls.' Memo. of Law ISO Mot. for Class Certification of Kansas Claims and Nationwide ERISA Claims, Doc. No. 551-2, at 10-12.) The *Anfinson* verdict, now incorporated in a final judgment, holds that a subset of *Craig* class members (i.e., those who are also *Anfinson* class members) are independent contractors and not employees. There are similarities between the classification test applied by the *Anfinson* jury and the test that would be applied to the ERISA claim in *Craig*. *Compare* FXG's Notice at 2 (identifying Washington common-law factors considered by *Anfinson* jury) *to Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565 (7th Cir. 2009) (applying Restatement test to resolve classification issue for ERISA purposes, noting that the "Restatement test is generally equivalent to the common law test from [*Nationwide Mut. Ins. Co. v.*] *Darden* [503 U.S. 318 (1992)]). As a result, the *Anfinson* jury verdict is relevant to the nationwide class certification in *Craig*.

---

motions for summary judgment, particularly where the *Anfinson* court's determination rested in part upon the finding that "[b]oth sides have presented controverting evidence with respect to FedEx Ground's control ***and right to control*** the manner and means of the contractor's performance of their work . . . ." (Mar. 31, 2009 Tr. at 20:24-21:2 (emphasis added).)

Fourth, plaintiffs argue that the *Anfinson* verdict actually "***supports***" the collateral estoppel application of *Estrada* to the MDL proceeding, because estoppel is necessary to bar any additional judgments contrary to the *Estrada* ruling. (Pls.' Response at 4 (emphasis added).) Plaintiffs' argument ignores a fundamental premise of FXG's opposition to plaintiffs' motion for summary judgment based on collateral estoppel, which is that FXG has, on many occasions (both before and after *Estrada*), successfully defended its independent contractor model before an array of tribunals. (*See* FedEx Ground's Omnibus Response In Opposition to Plaintiffs' Memorandum of Law re: Collateral Estoppel, Doc. No. 1397, at 8-9.) The *Anfinson* verdict and judgment adds to this body of determinations. Plaintiffs' collateral estoppel argument incorrectly presupposes (and without explanation) that out of this universe of holdings adverse to plaintiffs' position, the Court should look only to *Estrada*.

Dated: April 28, 2009.

Respectfully submitted,

By: <u>/s/Robert M. Schwartz</u>
Robert M. Schwartz

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 28th day of April, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# Exhibit 1

THE HONORABLE JOHN P. ERLICK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| RANDY ANFINSON, JAMES GEIGER and STEVEN HARDIE, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC., et al.,<br><br>Defendants. | No. 04-2-39981-5SEA<br><br>**JUDGMENT AND ORDER ON DEFENDANT'S COST BILL**<br><br>**[~~PROPOSED~~]** |

## I. JUDGMENT SUMMARY

1. Judgment Creditors: Defendant FedEx Ground Package System, Inc.

2. Attorneys for Judgment Creditors: Kelly P. Corr, Guy P. Michelson, Kevin C. Baumgardner and Emily Brubaker, Corr Cronin Michelson Baumgardner & Preece LLP.

3. Judgment Debtors: Plaintiffs Randy Anfinson, James Geiger, and Steven Hardie.

4. Attorneys for Judgment Debtors: Martin S. Garfinkel and Rebecca Roe, Schroeter Goldmark & Bender, 810 Third Avenue, Suite 500, Seattle, WA 98104; Dmitri Iglitzin and Lawrence R. Schwerin, Schwerin Campbell Barnard LLP, 18 W. Mercer St., Suite 400, Seattle, WA 98119.

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

ORIGINAL

Apr 21 2009 9:03 HP LASERJET FAX p.2

5. Principal Judgment Amount: Award of costs in favor of Defendant and against Plaintiffs in the amount of $2,111.60.

## II. JUDGMENT AND ORDER

IT IS HEREBY ORDERED that:

1. Judgment is hereby entered against Plaintiffs and in favor of Defendant and that Defendant is awarded costs in the amount of $2,111.60

2. The claims of named plaintiffs Randy Anfinson, James Geiger, and Steven Hardie, and the claims of all members of the plaintiff class previously certified in this action (*see* Findings and Order Granting Class Certification dated January 28, 2008), are hereby dismissed with prejudice.

3. The parties shall be responsible for their respective attorneys' fees, except that statutory attorneys' fees and costs as set forth in the Defendant's Cost Bill and above are awarded to Defendant pursuant to RCW 4.84.080 and RCW 4.84.010.

IT IS SO ORDERED.

DATED this 20th day of April, 2009.

John P. Erlick

THE HONORABLE JOHN P. ERLICK

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

case 3:05-md-00527-RLM-CAN document 1751-2 filed 04/28/09 page 4 of 4

Presented by:

**CORR CRONIN MICHELSON BAUMGARDNER & PREECE LLP**

Kelly P. Corr, WSBA No. 00555
Guy P. Michelson, WSBA No. 07017
Kevin C. Baumgardner, WSBA No. 14263
Emily Brubaker, WSBA No. 35763

**O'MELVENY & MYERS LLP**

Chris A. Hollinger, *Pro Hac Vice*

Attorneys for Defendant
FedEx Ground Package System, Inc.

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Apr 21 2009 9:03 HP LASERJET FAX p.4

case 3:05-md-00527-RLM -CAN document 1733 filed 05/04/09 page 1 of 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' RESPONSE TO FEDEX GROUND PACKAGE SYSTEM'S NOTICE OF SUPPLEMENTAL AUTHORITY (*ANFINSON V. FEDEX GROUND*) IN SUPPORT OF ITS MOTION TO RECONSIDER ORDER CONCERNING PRODUCTION OF PLAINTIFFS' TAX RECORDS**

Unpublished and un-reviewed rulings of a Washington state trial court judge and trial testimony in a case arising exclusively under Washington state law – *Anfinson v. FedEx Ground Package Systems, Inc.*, Case No. 04-2-39981-5SEA (King Cty. Super. Ct) – supply no basis upon which this Court should re-consider FedEx Ground Package System, Inc.'s (FXG) long ago and twice rejected request to discover Plaintiffs' personal income tax returns in this action. *See* Doc. *See* Doc. 356 (9/6/06 Order of Magistrate Judge Neuchterlein denying FXG's motion to compel production of tax records) and Doc. 451 (10/14/06 Order of Judge Miller denying in relevant part FXG's motion for reconsideration). FXG's newly-filed Notice of Supplemental Authority (Doc. 1729) relying on *Anfinson* trial testimony excerpts and a few *in limine* rulings offers nothing relevant to this Court's analysis of FXG's much belated reconsideration motion (Doc. 1714)..

Nothing in FXG's new Notice of Supplemental Authority addresses the extreme prejudice to Plaintiffs that would result from granting the relief FXG seeks at this late date, more than two years after both Magistrate Judge Neuchterlein and Judge Miller addressed and resolved whether FXG could discover Plaintiffs' tax records. *See* Docs. 356 and 451. As detailed in Plaintiffs' opposition to FXG's Motion for Reconsideration, discovery closed on May 30, 2008 and motions for summary adjudication of employment status are now fully briefed in thirty-four cases. *See* Doc. 1719 at 4-5 (describing subsequent proceedings following the Court's prior orders and the prejudice to Plaintiffs that would result from reopening this issue now). The prejudice to Plaintiffs disposes of FXG's motion entirely.

Even setting aside this dispositive issue, FXG's Notice of Supplemental Authority points to nothing that is in fact "authoritative" for this Court. First, FXG points to evidentiary rulings made by Judge Erlick, a Washington state court judge. As the rulings themselves make clear, they exclusively rely on Washington state rules of evidence and procedure and Washington state substantive law of employment status. They do not suggest that this Court was wrong when it ruled more than two years ago that Plaintiffs' tax records were protected from discovery under the Federal Rules of Civil Procedure in this action, addressing employment status under the notably different federal common law test. *See* Docs. 356 and 451. Moreover, Judge Erlick's evidentiary rulings are unpublished and have yet to be reviewed by a Washington state appellate court and, thus, have little if any precedential value even under Washington state law.

In reaching his conclusion that information in the tax returns was admissible, Judge Erlick relied on factors that are either not a part of the Restatement (2d) of Agency test applicable at federal common law or are not reasonably in dispute in this case. FXG states that he considered the evidence relevant to the drivers' "opportunity for profit or loss, the method of

compensation, and the beliefs of the parties." Doc. 1729 at 2. On its face, the Restatement includes no "opportunity for profit or loss" factor. Rstmt. (2d) of Agency § 220. The Restatement's "method of payment" factor looks at whether payment is "made by the job and not by the hour" – matters not proven through information in Plaintiffs' personal tax returns. *Id.* comment j. As for "the beliefs of the parties" factor, Plaintiffs here admit that they filed their taxes as self-employed and admit that they believed they would be independent contractors when they executed their contracts with FXG. Doc. 320 Exh. A at 3-4. Thus, Judge Erlick's rulings are inapposite.

FXG also relies on testimony of several witnesses during the *Anfinson* trial. Witness testimony is not "authority" and, thus, does not indicate that the Court should re-open this long-ago resolved discovery issue. In any event, even the substance of the testimony fails to cast doubt on Magistrate Judge Neuchterlein's and Judge Miller's conclusions that Plaintiffs' tax records in are entitled to protection and are not sufficiently material to require their disclosure during this phase of the MDL proceeding. Docs. 356 and 451.

FXG points to testimony of certain drivers and a FXG expert witness during the *Anfinson* trial, who stated that they or others filed as self-employed and, in a few cases, described some of the consequences of their filing status, e.g., claiming certain deductions or write-offs and filing the required 1040 Schedule C form entitled "Profit or Loss from a Business." Doc. 1729 at 3 (citing trial testimony excerpts in Exhs. 6-10). Testimony about the Plaintiffs' filing status in this action is unnecessary because Plaintiffs here all admit that they filed as self-employed. As this Court previously held, "any additional information [in the tax records also] isn't material," but merely a consequence of the undisputed fact that they filed as self-employed. Doc. 451 at 5-6. The testimony in *Anfinson* does not alter this analysis.

case 3:05-md-00527-RLM -CAN document 1733 filed 05/04/09 page 4 of 4

For the foregoing reasons, FXG's Notice of Supplemental Authority should be rejected and its Motion for Reconsideration denied.

Dated: May 5, 2009

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor I. Morton**

ELEANOR I. MORTON, ESQ.
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )
----------------------------------------------
THIS DOCUMENT RELATES TO: )

ALL ACTIONS )

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER

On May 5, 2009, the plaintiffs filed a notice of supplemental authority (State of Maryland Determination and settlement) in support of their motions for class certification and summary adjudication of employment status and request for judicial notice [Doc. No. 1732]. In connection with this filing, the plaintiffs attached the Maryland Department of Labor, Licensing, and Regulation's March 10, 2008 Determination on Review as well as an April 15, 2009 settlement agreement between FedEx Ground and the Department, both of which were subject to the parties' protective order governing document production. On May 5, FedEx Ground moved the court to withdraw Doc. No. 1732 from the public docket, contending that the plaintiffs' filing violated the protective order as FedEx Ground had marked both documents as "confidential." Thereafter, the plaintiffs filed their own motion to remove the notice of supplemental authority from the public docket, explaining that the documents were inadvertently electronically filed.

Having reviewed both motions, the court GRANTS the plaintiffs' motion to remove from the public docket supplemental authority and request for judicial notice filed by plaintiffs [Doc. No. 1735] and DENIES FedEx Ground's emergency motion to seal docket entry 1732[Doc. No. 1734] as moot. The court DIRECTS the clerk's office to strike Doc. No. 1732 and permits the plaintiffs' notice of supplemental authority to be filed under seal per Doc. No. 1737.

SO ORDERED.

ENTERED: May 8, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' RESPONSE TO FEDEX GROUND PACKAGE SYSTEM'S NOTICE OF SUPPLEMENTAL AUTHORITY (*FEDEX HOME DELIVERY V. NLRB*)**

*FedEx Home Delivery (FHD) v. NLRB,* Case No. 07-1391 (D.C. Cir. April 21, 2009), a split 2-1 decision considering the status of a hand-full of FHD drivers at two Massachusetts terminals under the National Labor Relations Act (NLRA), is not controlling and deserves no weight. While FedEx Ground Package Systems, Inc. (FXG) claims that the decision supports its position that the drivers in these consolidated MDL cases are independent contractors, the decision does not address employment status under ERISA or any of the other federal or state laws at issue here, is inconsistent with the controlling tests in *National Mutual Insurance Co. v. Darden,* 503 U.S. 318, 323 (1992) and the other authorities that govern this Court's analyses, and is far outside of the mainstream in its interpretation of the NLRA. The majority formulates a new test of employment status under the NLRA, throwing out decades of NLRB and even Supreme Court precedent and reaching a conclusion that is contrary to binding authority and the holdings of other circuits. For these reasons and because the decision will be challenged through

re-hearing before the D.C. Circuit or a writ of certiorari to the Supreme Court, it should not alter this Court's review.

1. **_FHD v. NLRB_'s New Test of Employment Status is Not Supported by the Law.**

*FHD v. NLRB* reviews the decision of an NLRB Regional Director who found that FHD drivers at two Massachusetts terminals were employees under the NLRA. As the dissenting opinion explains, the NLRB, circuit courts and the Supreme Court have long held that the NLRB must "'apply the common-law agency test … in distinguishing an employee from an independent contractor' under the [NLRA]." Slip. Dissenting Op. at 1 (quoting *NLRB v. United Ins. Co. of Am.,* 390 U.S. 254, 256 (1968)); *see id.* at 2-7 (recounting Supreme Court, NLRB and D.C. Circuit precedent). Under the multi-factor common law test set out by the Supreme Court, no one factor is dispositive, but all address the fundamental question of whether the putative employer retains the "right to control" the "manner and means" by which the putative employees perform their work. *Id.* at 6 (quoting *North American Van Lines v. NLRB,* 869 F.2d 596, 598 (D.C. Cir. 1989) and collecting cases).

Finding this test "unwieldy," the majority in *FHD v. NLRB* conjures a new test and reduces the inquiry to one question – "whether the position presents the opportunities and risks inherent in entrepreneurialism." Majority Op., at 7. The common law test as articulated by the Supreme Court and the Restatement (2d) of Agency does not even list "opportunities and risks inherent in entrepreneurialism" as a factor to be considered, let alone identify it as the controlling inquiry. Dissenting Op., at 5-12.

The majority discards the factors set out by the Supreme Court in the controlling case of *United Insurance,* 390 U.S. 254, appropriately relied upon by the NLRB Regional Director. Majority Op., at 16. The majority even jettisons the inquiry into whether the drivers "perform a

function that is a regular and essential part of ... normal operations, the delivery of packages" – a factor the Supreme Court said was "decisive." *Id.*; Dissenting Op., at 16-17, n.12 (citing *United Ins.,* 390 U.S. at 258-59 (fact that insurance agents "perform functions that are an essential part of the company's normal operations" is a "decisive factor[]" and collecting cases)).

In re-writing the test, the majority ignores the deference it is obligated to give the NLRB in interpreting the NLRA pursuant to *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 842-43, 863-64 (1984). Dissenting Op., at 1-2 (quoting *United Ins.,* 390 U.S. at 260 (as long as NLRB's decision could at least be said to represent "a choice between two fairly conflicting views, ... the Court of Appeals should have enforced the Board's order."). As the dissenting opinion states, "Although the NLRB may have authority to alter the test [of employment status under the NLRA], or at least to alter its focus, ... this court does not." Dissenting Op., at 12.

Then, based on scant evidence and a dose of conjecture, the majority finds that the FHD drivers had "opportunities and risks inherent in entrepreneurialism" and reverses the Regional Director's finding of employee status. Majority Op., at 12-20; *compare* Dissenting Op., at 17-24 (discussing the paucity of evidence relied upon by the majority).[1] The majority disregards the

[1] For example, the majority rests its conclusion in large part on the "fact" that drivers could sell their routes and, thereby, have an opportunity for profit. Majority Op., at 13. However, the record contained evidence of only one route sale ever and evidence of multiple drivers abandoning their routes entirely for no so-called "profit" at all. Dissenting Op., at 24. Even the evidence of the one sale was unsupported, despite a specific promise to the hearing officer that supporting documentation would be forthcoming. Given this fact, the fact that the dollar amount attributable to the route was "murky," and that FHD could change or eliminate any drivers' interest in his or her route entirely as it saw fit, the Regional Director reasonably found the evidence insufficient to show that drivers had any real opportunity for profit. *Id.* at 24, 24 n.19. The majority, however, disregards the deference owed the Regional Director in weighing the evidence, speculates that all other drivers must have simply declined to take advantage of the supposed opportunity, and concludes that the opportunity for profit was real. Majority Op., at 13. Similarly, the majority rests its holding on the "fact" that drivers could "use their vehicles for other commercial ... purposes." Majority Op., at 10. However, the record contained no evidence that any drivers ever did so or that their mandatory full-time FHD work schedule would allow it. Dissenting Op., at 21-22. As described in the dissent, the Regional Director found and the record supported the conclusion that, in reality, the drivers did not have an "'entrepreneurial choice'" to use their vehicles for other commercial purposes because the company-imposed obstacles prevented it. *Id.* at 22 (quoting NLRB Regional Director's decision). Again, despite the reasonableness of this conclusion, the majority imposes its own view and reverses. The majority also finds significant that "[a]t least one contractor has negotiated with FedEx for higher fees." Majority Op., at 10. In fact the evidence merely shows

deference owed the NLRB's factual findings and also disregards the fact that the Regional Director's decision was fully consistent with the Board's three prior decisions holding that FXG drivers (then employed by FXG's predecessor company Roadway Package Systems, Inc.) are employees under the NLRA. *See Roadway Package Sys. ("RPS") I,* 288 NLRB 196 (1988) (drivers employees under NLRA); *RPS II,* 292 NLRB 376 (1989), *enf'd* 902 F.2d 34 (6th Cir. 1990) (same); *RPS III,* 326 NLRB 842 (1998) (same).

The *FHD v. NLRB* majority opinion stands alone in its articulation of this new test of employment status making entrepreneurial risks and profits the touchstone. As the cases cited in Plaintiffs' summary adjudication memoranda show, other circuits reviewing decisions from the NLRB look at whether the hiring party reserves the right to control the manner and means by which the hired parties perform their work, and have found workers similar to FXG drivers to be employees under this manner and means/ control test. *See, e.g., NLRB v. Friendly Cab, Inc.*, 512 F.3d 1090, 1097 (9th Cir. 2008) (taxicab drivers employees under right to control test even though they paid a flat rate and retained all of their fares as profits); *NLRB v. Maine Caterers, Inc.,* 654 F.2d 131, 133 (1st Cir. 1981) (Breyer, J.) (driver-salesmen employees under right to control test even though they set prices themselves had some "risk of loss and opportunity for profit"); *NLRB v. Amber Del. Serv.,* 651 F.2d 57, 61-63 (1st Cir. 1981) (Breyer, J.) (delivery drivers employees even though they "invested capital …in their enterprise," worked purely on commission and could choose when they worked and hire assistants); *Deaton Truck Line, Inc. v. NLRB,* 337 F.2d 697, 698-99 (5th Cir. 1964) (drivers employees under NLRA even though they had multiple trucks and ability to hire and fire); *NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 561-62 (3d Cir. 1962) (salesmen employees even though they generated own business in part).

that one driver once requested that the manger ride along with him "'to gauge if his core zone was set properly'" according to FedEx's standard formula for this component of driver pay. Dissenting Op., at 20 (quoting Regional Director's decision).

Because *FHD v. NLRB* does not govern this Court's review and the majority opinion is contrary to precedent and the weight of authority from other circuits, this Court should give it no weight.

2. ***Nationwide Mutual Insurance Co. v. Darden* Controls Plaintiffs' ERISA Claims in this Case, Not *FHD v. NLRB*.**

Even if *FHD v. NLRB* were the final word on the subject of the test of employment status under the NLRA, the decision would not alter the outcome of the cases in these consolidated MDL proceedings. As this Court has recognized, Plaintiffs' ERISA claims hinge on the common law right-to-control test articulated by the U.S. Supreme Court in *Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 323 (1992), a case interpreting ERISA. *See* Doc. 906 at 92-93 (10/15/07 class certification order holding that ERISA claims hinge on "FedEx's right to control the manner and means by which the driver carried out their job functions" citing *Darden*). The test set forth by the majority in *FHD v. NLRB* is contrary to *Darden.*

The *Darden* test examines "'the hiring party's right to control the manner and means by which the product is accomplished.'" *Darden,* 503 U.S. at 323 (quoting *Cmty for Creative Non-Violence v. Reid,* 490 U.S. 730, 751 (1989)). "[R]elevant to this inquiry" are:

> "[1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; the hired party's role in hiring and paying assistants; [8] whether the work is part of the regular business of the hiring party; [9] whether the hiring party is in business; [10] the provision of employee benefits; and [11] the tax treatment of the hired party."

*Id.* at 323-24 (quoting *Reid,* 490 U. S. at 751-752 (footnotes omitted)). The test "contains 'no short-hand formula or magic phrase that can be applied to find the answer[;] … all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'"

*Id.* at 324 (quoting *United Ins.*, 390 U.S. at 258); *see id.* at 324 (citing Restatement (Second) of Agency § 220(2) (1958)). Nowhere in *Darden* does the Supreme Court state that "opportunities and risks inherent in entrepreneurialism" are even relevant much less the be all and end all of the analysis.

Controlling Seventh Circuit precedent on this issue is the same. In *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001), the Seventh Circuit addressed the question of employment status under ERISA, followed *Darden*, and held that the *Darden* test was subsumed into five factors:

> "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations."

*Id.* (quoting *Knight v. United Farm Bureau Mut. Ins.*, 950 F.2d 377, 378-79 (7th Cir. 1991)). "[T]he employer's right to control is the most important.'" *Id.* (quoting *EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998)); *see also* Doc. 1164 (Pls.' Mem. in Support of Summary Adjudication at 7 [collecting cases]); *Suskovich v. Anthem Health Plans of Va.*, 553 F.3d 559, 565 (7th Cir. 2009) (following *Darden* and the Restatement (2d) of Agency without consideration of whether the position included entrepreneurial opportunities or risks).[2] Like the Supreme Court, the Seventh Circuit has not identified "opportunities and risks inherent in entrepreneurialism" as a factor, let alone the pivotal inquiry.

---

[2] FXG claims that the new test in *FHD v. NLRB* is substantially the same as the one in *Suskovich,* 553 F.3d 559, recently decided by the Seventh Circuit. Doc. 1730 at 6. *Suskovich* makes no mention of whether the plaintiff's position involved risks or opportunities inherent in entrepreneurialism. Rather, the court recited the familiar right-to-control test and found that the plaintiff, a highly skilled computer programmer, was an independent contractor because the putative employer exerted virtually no control over how the plaintiff did his work. *Id.*; *see also* Doc. 1720 (addressing *Suskovich*).

This Court too has already held that opportunity for profit and loss is not relevant to the employment status inquiry under *Darden*. In the denying in part and granting in part FXG's motion to compel production of tax records, the Court distinguished between the relevant factors for proving employment status under the *Darden* right-to-control test and those relevant under the Fair Labor Standards Act (FLSA) or Family Medical Leave Act (FMLA). Doc. 451 (12/14/06 Order). The Court held that while "'opportunity for profit or loss'" might be considered under the FLSA or FMLA test, it is not relevant under the *Darden* right-to-control test. Doc. 451 at 4-8. On this basis, the Court held that only the Plaintiffs alleging FLSA or FMLA claims need produce their tax records. *Id.* at 6-8.

The Supreme Court's and Seventh Circuit's holdings control this Court's analysis of Plaintiffs' ERISA claims, not *FHD v. NLRB*, a case decided by a sister circuit interpreting a different statute. Because the majority opinion in *FHD v. NLRB* is contrary to controlling precedent and contrary to this Court's prior rulings, the Court should not consider it.[3]

### 3. ***FHD v. NLRB* is of No Assistance to FXG in the Other Cases Before this Court Either, Which Turn on Tests of Employment Status Governed by State Law.**

*FHD v. NLRB* also has no bearing on this Court's analyses of the other claims in these consolidated proceedings, almost all of which arise under state laws, each presenting its own articulation of the definition of employment. *See, e.g.,* 1119 (3/25/08 Opinion and Order granting or denying class certification according to separate test of employment status in each state). For example, in each of the twenty-nine cases in which this Court has ruled on Plaintiffs'

[3] *Givens v. FXG,* Case No. 3:07-cv-00324 (LA), alleging violations of the federal FLSA, is similarly unaffected by *FHD v. NLRB*. Under the FLSA, the Court must apply the economic realities test of employment status, which is different from and broader than the common law right-to-control test. *U.S. Dept' of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir. 1987); *Darden*, 503 U.S. at 326 (noting the "striking breadth" of the definition of "employ" under the FLSA, which "cover[s] some parties who might not qualify as such under a strict application traditional agency principles"); *U.S. v. Rosenwasser*, 323 U.S. 360, 362-363 (1945) ("[a] broader or more comprehensive coverage of employees [than that under the FLSA] ... would be difficult to frame").

motions for class certification so far, this Court has already addressed the controlling tests for determining employment status and found that the "right to control" is the, or, at a minimum, one of the pivotal factors under the various state laws. "Opportunities and risks inherent in entrepreneurialism" is not even a consideration under the vast majority of the state tests at issue here. *See* Docs. 906 (10/15/07 Opinion and Order certifying Kansas class under Kansas test) and 1119 (3/25/08 Opinion and Order certifying classes in nineteen states and denying certification in nine, each according to specific state-law test).[4]

It is entirely appropriate for this Court's rulings to diverge from the majority opinion in *FHD v. NLRB,* given that the cases address different laws. The California case, *Alexander v. FXG,* Case No. 3:05-cv-00528, presents the starkest illustration of this important distinction. The same facts in *Alexander* and in all of these consolidated cases were found to prove that FXG drivers are employees under California law in *Estrada v. FXG,* 64 Cal. Rptr. 3d 327 (Ct. App. 2007), a case that compels the conclusion that California drivers in *Alexander* are employees also. *See* Doc. 1154 at 7-8 (citing *Estrada,* 64 Cal. Rptr. 3d 327). *FHD v. NLRB* interpreting the

[4] Doc. 906 at 34 (KS: "'right to direct and control the method and manner of doing the work is the most significant'" factor) (citation omitted); Doc. 1119 at 15 (TN: "'right to control the conduct of the work'"), at 18 (MT: "free from control or direction" and "engaged in an independently established trade"), at 22 (MS: nine-factor test), at 25 (AK: "'extent of control'" and Restatement factors), at 33 (KY: multiple factors, but "'principal test ... [is] right to control'"), at 40 (TX: "amount of control" according to five factors), at 43 (WI: "'right to control'"), at 49 (AL: "primary test [is] ... right of control" based on four factors), at 54 (NY: "right to control is 'the critical inquiry'"), at 59 (MA: "'free from control,'" "'outside the usual course of business,'" and "'customarily engaged in an independently established trade ... of the same nature'"), at 65 (CA: "right to control"), at 67, 72 (NJ: "right to control" and Restatement factors), at 78 (MD: "'right to exercise control'" and five other factors), at 80-81 (MI: "control, payment of wages, hiring and firing, and responsibility for maintenance of discipline"), at 85-86 (MN: right to control "'carries the greatest weight'"), at 91 (PA: "'control or right to control'" and nine other factors), at 95-96 (NH: "'control and discretion over the means and manner of performance of the work'" and four other factors), at 99 (SC: "'right or exercise of control; ... method of payment;... furnishing of equipment; and right to fire'"); at 104 (MO: "'extent of control, ...actual exercise of control'" and six other factors), at 109 (OR: "'right to, or the exercise of, control; ... method of payment;... furnishing of equipment; and right to fire.'"), at 112-13 (SD: "free, both under any contract and in fact, from control or direction" and "customarily engaged in an independently established trade"), at 118 (IN: right to control and Restatement factors), at 127 (WV: "power of control is 'determinative'"), at 134 (VA: "'power of control [] is determinative'"), 139 (IL: "'free... from control and direction[,] ... work performed outside ... usual course of business [by]... independent business'"), at 147-48 (FL: "'right to control'" and Restatement factors), at 151 (RI: "power to exercise control") (citations omitted).

NLRA does not alter this Court's application of *Estrada* or California law. Likewise, it does not alter the Court's application of the laws of any other state.

To be sure, Plaintiffs in their summary judgment and adjudication briefs have cited to federal authorities, including circuit court opinions reviewing decisions which, like *FHD v. NLRB,* interpret the NLRA. However, such authorities do not themselves articulate the controlling tests of employment status in any of these cases and they are only persuasive to the extent they are consistent with controlling law. As discussed above, *FHD v. NLRB,* unlike other cases from other circuits, is out of line with controlling law and thus of no use to the Court in these proceedings.

**4. <u>The Majority's Attempt to Exclude all Controls Motivated by Customer Service from Review Finds No Support in the Law at Issue in this Case</u>.**

Also novel and deserving no credence is the D.C. Circuit's pronouncement that controls "motivated by a concern for customer service [like uniforms] … do no suggest an employment relationship." Majority Op., at 15 (citation and quotations omitted). Neither *Darden,* nor the Seventh Circuit, nor other states follow this rule. For example, in *NLRB v. O'Hare-Midway Limousine Service, Inc.,* 924 F.2d 692, 694 (7th Cir. 1991), the Seventh Circuit held that the mandatory dress code and other customer relations rules intended to promote customer service showed that a taxicab driver was an employee under the common law test. *Accord, e.g., Friendly Cab,* 512 F.3d at 1098-99 (controls motivated by customer service goals such as dress code and driving techniques held evidence that taxicab drivers were employees); *Corporate Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002) (package delivery drivers subjected to dress code—navy pants and company shirts—are employees under common law agency test); *Amber Delivery Serv., Inc.,* 651 F.2d at 62 (fact that "each driver must wear the company insignia and paint his truck with the company colors" indicated employee status);

*Estrada,* 64 Cal. Rptr. 3d at 337, n.11 (FedEx uniforms evidence of employee status); *In re Askew*, 36 A.D.3d 1030, 1031 (N.Y. 3d Dep't 2007) (requirement that cosmetic salespeople adhere to dress code evidence of employment); *Expressway Dodge, Inc. v. McFarland*, 766 N.E.2d 26, 31 (Ind. Ct. App. 2002) (requirement that delivery driver wear clothing bearing company logo indicated employee status); *Nelson v. Yellow Cab Co.,* 564 S.E.2d 110, 114 (S.C. 2002) (dress code requirement for drivers evidence of employee status); *Weidner v. Sanchez*, 14 S.W.3d 353, 375 (Tex. App. 2000) (hiring party's control over "[t]he general type and manner of dress [taxi driver] was to wear" supported right to control); *Commonwealth v. Roose*, 690 A.2d 268, 270 n.1 (Pa. Super. Ct. 1997) (instruction from "some higher authority" that workers wear uniforms held incompatible with independent- contractor status); *Parker v. Domino's Pizza, Inc.*, 629 So. 2d 1026, 1027 (Fla. 4th Dist. Ct. App. 1993) (finding employment status based, in part, on employer's specific rules regarding appearance and employee grooming); *Razorback Cab of Fort Smith, Inc. v. Lingo*, 802 S.W.2d 444, 446 (Ark. 1991) (taxi cab company's imposition of a dress code on drivers, including a ban on beards, cited as critical evidence of control); *Corbin v. Comm'r of Revenue*, 240 N.W.2d 809, 812 (Minn. 1976) (fact that drivers drove trucks displaying company's advertisement was indicative of employee status); *Read v. Warkinten*, 341 P.2d 980, 982 (Kan. 1959) (fact that taxi drivers were required to be "shaved, properly dressed and not use intoxicating liquor" indicated employee status). The *FHD v. NLRB* rule makes no logical sense and is so potentially boundless that it risks making everyone who encounters customers an independent contractor. The Court should give it no weight either.

**5. The Factual Findings Underlying the Majority's Holding in *FHD v. NLRB* Are Not Supported by the Record in the Cases Before this Court.**

Even setting aside the unrecognizable employment status test, the factual findings relied upon by the majority in *FHD v. NLRB* to reach its conclusion on employment status are contrary

to the undisputed evidence in the cases at bar. The majority states that that drivers could hire replacements or substitutes, that FedEx "is not involved in a contractor's decision to hire or terminate a substitute driver, and contractors do not even have to tell FedEx [] they have hired a replacement driver, as long as the driver is 'qualified'" and that drivers need not work at all because they can hire others to work for them. Majority Op., at 11-12 (quotations omitted); *accord id.* at 19-20. The undisputed evidence in the cases before this Court shows that FXG retains substantial control over a driver's ability to hire others. FXG's detailed written approval procedures reserve to FXG the right to control whether a driver can hire at all, regardless of whether that person will drive or not, and to approve or disapprove anyone the driver might want to hire. *See* Doc. 1197, Statement of Undisputed Material Facts (SUF) Facts# 192-194. FXG's founder and CEO admitted that FXG reserves the right to deny approval for its own subjective reasons. *Id.*, Exh. 8:964, 8:968. FXG's mandatory "Safe Driving Standards" impose requirements that go well beyond safety: all operators, including assistants and substitutes, must complete an FXG-approved training; submit a contractor/driver information sheet; have a satisfactory work history; and so on. *Id.* Exh. 1 Safe Driving Addendum at ¶¶2, 11, 12, 21, 24, 25.

The majority in *FHD v. NLRB* states that drivers could prescribe their own hours of work. The record before this Court shows as a matter of law that that FXG retains the right to require drivers to provide services five days a week; to change those days at FXG's request; to pick up packages each morning; to be dispatched with the number of stops that can be delivered in 9.5 to 11 hours; and to return to the terminal at the end of the day by FXG's prescribed "cut time." Doc. 1197, SUF Facts #129-31, 133, 137-39, 144, 203. No reasonable fact-finder could

conclude based on the evidentiary record in the MDL that the drivers in these cases can prescribe their own work hours.

The majority also finds that drivers could assign their contractual rights and buy and sell their routes for profit. Majority Op., at 12-13. The undisputed evidence before this Court, however, shows that a driver's supposed ownership interest in his route is subject to FXG's control. FXG controls whether and when a driver can assign or sell his route because any proposed buyer must be pre-approved by FXG. FXG even controls "in its sole discretion" the configuration of the route itself. Doc. 1197, Exh. 1 §5.2, Exh. 8:949-50 (founder and CEO testifying that FXG retains right to reconfigure over driver's objection whenever terminal manager determines reconfiguration is necessary). On a daily basis, FXG can assign and reassign stops regardless of drivers' supposed "proprietary" areas. *Id.* SUF Facts #135-36, 140. FXG can also eliminate a driver's interest entirely and without any recompense to the driver by terminating the drivers' contract. *Id.* Fact #59. As the record here shows, FXG can terminate its drivers at will, thus giving FXG virtually unfettered authority to eliminate any drivers' interest in his route. *Id.* Facts #217, 219; *Estrada,* 64 Cal. Rptr. 3d at 336 (FXG retains right to terminate drivers at will); *compare Desimone v. Allstate, Ins. Co.,* 2000 WL 1811385, *16 (N.D. Cal. Nov. 7, 2000) (agents retaining right to sell after contract termination held to be independent contractors).

Finally, the majority finds that drivers "are not subject to reprimands or discipline." Majority Op., at 10. However, the record in the MDL proves beyond dispute that FXG has the right to reprimand and discipline drivers nationwide about all aspects of their work in so-called Business Discussions, addressing everything from their personal appearance, to the standardized codes they must enter into FXG's scanners with each stop, to delivering the number of packages

FXG has unilaterally assigned for the day, to making all pickups on time (not a minute late or a minute early), to completing FXG's required daily paperwork, to marking returned packages according to FXG's detailed rules, and so on. Doc. 1197, SUF Fact #157; *see id.*, Exh. 12 (approximately 800 pages of reprimands and reviews representing only a sampling of the total produced). There is no reasonable dispute on this record that drivers can be and routinely are evaluated, threatened with termination and have their pay docked when they do not comply with FXG's detailed rules. *Id.* SUF Facts #146-174 (*e.g.*, regular "Business Discussions," termination threats, loss of CCS bonus, annual evaluations, Customer Service Rides, Driver Release Audits, daily Van Service Audits and Vehicle Security Reviews).[5]

**6. *FHD v. NLRB* Does Not Bar Application of Collateral Estoppel.**

FXG also argues that *FHD v. NLRB* defeats Plaintiffs' argument for collateral estoppel based on *Estrada*. Doc. 1730 at 7. FXG misunderstands *Estrada* and Plaintiffs' claim. In *Estrada*, the trial court found and the court of appeals affirmed that FXG reserved the right to control the manner and means by which its drivers perform their work. 64 Cal. Rptr. 3d at 336-37. Having litigated this issue and lost, FXG is collaterally estopped from denying that it has reserved the right to control its drivers. *See* Doc. 1194. As discussed above, *FHD v. NLRB* rests on a finding of entrepreneurial risks and opportunities, not the reserved right to control, and thus

[5] These discrepancies between the findings in *FHD v. NLRB* and the record in this case may be attributable at least in part to the fact that recognition cases before the NLRB, such as the one addressed in *FHD v. NLRB*, are decided on an expedited basis without depositions or discovery. The evidence is gleaned at a non-adversarial, investigatory hearing before a hearing officer (normally a Board agent) who is tasked with, among other things, "keep[ing] the record short." *See* NLRB R-Case Handling Manual §§ 11181, 11185, 11118.1 (www.nlrb.gov/Publications/Manuals/r_-_casehandling_manual_(II).aspx); *Pepsi-Cola Bottling Co.*, 315 NLRB 882 (1994) (no pre-trial discovery in NLRB proceedings). At the sole evidentiary hearing in the FHD case, the workers were not even represented by counsel. The rapid nature of this procedure resulted in a record before the NLRB Regional Director and the D.C. Circuit that was thin and incomplete, and, notably, included none of the testimony from FXG corporate executives that appears in the deposition testimony before this Court rife with admissions of control. *See* Doc. 1197 Exh. 8, and especially Exh. 8:757-1089 (deposition of FXG CEO and founder Dan Sullivan).

does not under-cut *Estrada*'s holding, or the preclusive effect of that holding on the issue of right of control – which is the central inquiry before this Court in every case pending in the MDL.

But even if *Estrada* and *FHD v. NLRB* reached opposite conclusions based on the identical factor or test, *FHD v. NLRB* would support the application of collateral estoppel here. The doctrine exists to prevent inconsistent decisions that could result if a party like FXG is allowed to re-litigate issues identical to those actually litigated and necessarily and finally decided in a prior proceeding. *Estrada,* as the case decided first based on a full evidentiary record, controls and precludes FXG from forcing drivers across the nation to re-litigate the same issues *ad infinitum.*

For all of these reasons, *FHD v. NLRB* does not alter the Court's review of these cases and should be given no weight.[6]

Dated: May 12, 2009

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor I. Morton**
ELEANOR I. MORTON, ESQ.
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

[6] FXG claims that the *FHD v. NLRB* is relevant to class certification, but does not explain how. If relevant to this issue at all, the decision supports Plaintiffs' position that drivers' employment status may be addressed on a class-wide basis, as it was by the NLRB Regional Director and by both the majority and the dissent.

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:   (574) 288-1510
Fax:   (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | CHIEF JUDGE MILLER |

**DEFENDANT'S STATEMENT IN RESPONSE TO "PLAINTIFFS' RESPONSE TO FEDEX GROUND PACKAGE SYSTEM'S NOTICE OF SUPPLEMENTAL AUTHORITY (*FEDEX HOME DELIVERY V. NLRB*)"**

In response to "Plaintiffs' Response to Fedex Ground Package System's Notice of Supplemental Authority (*Fedex Home Delivery v. NLRB*)" ("Pls. Response"), Doc. No. 1740, defendant FedEx Ground Package System, Inc. ("FXG") states as follows:

1. Plaintiffs erroneously argue that the D.C. Circuit opinion "formulates a new test of employment status under the NLRA [National Labor Relations Act]" that "discards the factors set out by the Supreme Court in the controlling case of *United Insurance* [*NLRB v. United Ins. Co. of Am.*, 390 U.S. 254 (1968)]," and that is "contrary to" the common-law employment classification test articulated in *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992). (*See* Pls. Response at 1, 2, and 5.) In reality, the D.C. Circuit's opinion ***confirms*** that the common-law agency test is applicable, specifically citing *United Ins. Co.*, and identifies and analyzes the common-law factors in reaching the conclusion that the FXG contractors are independent contractors and not employees. *See* slip op. at 4 ("To determine whether a worker should be classified as an employee or independent contractor, the [National Labor Relations]

Board and ***this court apply the common-law agency test*** . . . ." (citing *United Ins. Co.*)); *id.* at 5 n.1 (identifying the common-law factors); and *id.* at 7 (again confirming that the common-law test governs the determination of the contractors' status).

      2.     Plaintiffs erroneously argue that the D.C. Circuit's decision "has ***no bearing*** on this Court's analyses of the other claims in these consolidated proceedings, almost all of which arise under state laws, ***each presenting its own articulation of the definition of employment***." (Pls. Response at 7 (emphasis added).) Plaintiffs' argument, if accepted, conflicts with or undermines four key positions plaintiffs have taken before this Court:

      a.     ***First***, plaintiffs' argument conflicts with the argument they made in seeking class certification of the 20-state overtime class in *Vargas*. (*See* Vargas Plaintiffs' Reply Memorandum of Law In Support of Motion for Class Certification (Doc. No. 1041) at 3 (asserting that class certification of overtime claims under the laws of 20 different states is proper, because "[t]he differences among the employee/independent contractor tests utilized by these states are, as explained below, ***minimal and largely academic***.") (emphasis added).)

      b.     ***Second***, plaintiffs' current argument that each state's laws present their "***own articulation of the definition of employment***" conflicts with arguments they made in support of their summary judgment motion seeking to give the California decision in *Estrada* collateral estoppel effect in the MDL cases. (*See* Plaintiffs' Omnibus Memorandum of Law Re: Collateral Estoppel In Support of Plaintiffs' Motions for Summary Adjudication (Doc. No. 1194) at 11 ("The legal standards for determining employment status applied by the *Estrada* court ***are identical*** to those that apply to the certified California claims in the *Alexander* case, ***as well as those applicable to the certified nationwide ERISA claim, and the nineteen other certified statewide classes***.") (emphasis added); Plaintiffs' Reply Memorandum Re: Collateral Estoppel In

Support of Plaintiffs' Motions for Summary Adjudication (Doc. No. 1473) at 1 ("[FXG] begins by asserting that the California judgment was premised on different legal standards, and different facts. This is just not so.").)

c. ***Third***, plaintiffs' argument undermines their extensive citation to NLRA decisions in support of their summary judgment motions on the independent contractor versus employee question. Plaintiffs' Response cites numerous NLRA cases arising from contracting relationships that are factually distinguishable from the present case. Plaintiffs ultimately argue, however, that "such [NLRA] authorities do not themselves articulate the controlling tests of employment status in any of these cases." (Pls. Response at 9.) This argument undercuts much of the authority plaintiffs relied upon in their summary judgment papers. (*See, e.g.*, South Carolina Plaintiffs' Memorandum of Law In Support of Motion for Summary Adjudication of Employment Status (Doc. No. 1183) at 11-12 (citing numerous NLRA cases, urging application of them to the South Carolina plaintiffs' claims, and asserting that the "Supreme Court long ago made clear that the same common law 'right to control' test adopted in *Darden* governs the determination under the NLRA"). Plaintiffs' view that the D.C. Circuit's decision "deserves no weight," that "the Court should not consider it," that the decision has "no bearing" on this Court's analysis of the claims at issue here, and that the decision is of "of no use to the Court" (*see* Pls. Response at 1, 7, and 9) -- but that the Court should instead consider and credit NLRA decisions that plaintiffs say support their position -- is a complete contradiction.

d. ***Fourth***, plaintiffs' statement that the D.C. Circuit's decision is "not controlling" is a straw man. (*See* Pls. Response at 1.) FXG has not asserted that the common-law agency test at issue in the D.C. Circuit case is ***identical*** to the employment classification standards under state law, or that the D.C. Circuit's holding has binding force in the MDL

actions. Rather, FXG's position is that the D.C. Circuit's determination is relevant to this Court's consideration of the parties' summary judgment motions (*see* FXG's Notice of Supplemental Authority (Doc. No. 1730) at 2), and, given that the D.C. Circuit case involves the ***same*** business relationship at issue in this litigation and the application of a common-law agency test to the employment classification question, the decision is, at a minimum, relevant authority.

3. Plaintiffs erroneously argue that the D.C. Circuit's ruling that controls related to customer service do not favor an employment relationship is "novel" and "deserving [of] no credence." (Pls. Response at 9.) The ruling is not novel. The D.C. Circuit opinion cites *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855 (D.C. Cir. 1995), for the same rule. *See* slip op. at 15; *C.C. Eastern*, 60 F.3d at 859 ("[W]here a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship."); *see also* FXG's Memorandum of Law In Opposition to Plaintiffs' *Craig* (ERISA & Kansas) Motion for Summary Adjudication (Doc. No. 1392) at 11 (citing decisions ruling that uniform, appearance, and vehicle branding do not compel finding of employee status).

4. Plaintiffs dispute the D.C. Circuit's factual conclusions. In doing so, plaintiffs are merely rearguing the same evidence they relied upon in their motions for summary judgment on the independent contractor versus employee question. (*See* Pls. Response at 10-13.) Plaintiffs' argument shows that their motions for summary judgment should be denied. The evidence plaintiffs cite in their effort to distinguish the MDL record from the one the D.C. Circuit faced is disputed. (*Compare* Pls. Response at 11 (citing SUF Facts # 129-31, 133, 137-39, 144, 192-194, 203), *to* FXG's Corrected Statement of Genuine Issues and Statement of Additional Material Facts In Support of Its Memoranda of Law In Opposition to Plaintiffs' Motions for Summary

Adjudication of Employment Status and Omnibus Collateral Estoppel Motion (Doc. No. 1572) (disputing plaintiffs' material "facts").) Reasonable finders of fact (as well as judges on the D.C. Circuit) can reach (and have reached) conclusions as to the status of FXG contractors contrary to those plaintiffs urge here. If the Court were to accept plaintiffs' factual arguments for distinguishing the D.C. Circuit's decision, it would therefore have to deny plaintiffs' motions for summary judgment.

5. Plaintiffs erroneously argue that the D.C. Circuit's decision does not bear on their collateral estoppel-based motion for summary judgment, which asserts that the California decision in *Estrada* should conclusively determine the issue of right to control in all of the MDL cases because *Estrada* was the "first" decision "based on a full evidentiary record." (Pls. Response at 13-14.) However, plaintiffs' other arguments for avoiding the D.C. Circuit's decision -- namely, that the decision "has no bearing on this Court's analyses of the other claims in these consolidated proceedings, almost all of which arise ***under state laws, each presenting its own articulation of the definition of employment***" (*id.* at 7 (emphasis added)) -- demonstrate why the *Estrada* decision cannot collaterally apply to SWAs and MWAs in other states. The details of the employment classification tests, and how each factor (including the "right to control") is analyzed, vary from state-to-state. One decision involving a different time frame under one state's law cannot conclusively resolve the question for the entire country. Moreover, *Estrada* was preceded by litigated results where the trier of fact found independent contractor status, including in jurisdictions where the "right to control" is an important component of the classification test. (*See* FXG's Omnibus Response In Opposition to Plaintiffs' Memorandum of Law Re: Collateral Estoppel (Doc. No. 1397) at 8-9 n.6 (citing cases).) And decisions contrary to the *Estrada* holding continue to accumulate. (*See, e.g.*, FXG's Notice of Supplemental

Authority (Doc. No. 1727) at 1 (noting the March 2009 jury verdict in *Anfinson*).)  Thus, there is

no basis to disregard the D.C. Circuit's decision.

      Dated:  May 22, 2009.                   Respectfully submitted,

                                           By:  /s/Robert M. Schwartz

                                            Robert M. Schwartz
                                            Chris A. Hollinger
                                            O'MELVENY & MYERS LLP
                                            1999 Avenue of the Stars
                                            Suite 700
                                            Los Angeles, CA 90067-6035
                                            Tel: (310) 553-6700
                                            Fax: (310) 246-6779

                                            Thomas J. Brunner
                                            Alison G. Fox
                                            BAKER & DANIELS LLP
                                            202 S. Michigan St.
                                            Suite 1400
                                            South Bend, IN  46601
                                            Tel:  (574) 234-4149
                                            Fax:  (574) 239-1900

                                *Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 22nd day of May, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

case 3:05-md-00527-RLM -CAN document 1750 filed 05/26/09 page 1 of 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER

The court having considered defendant FedEx Ground Package System, Inc.'s unopposed motion to substitute the declaration of Ray A. Wolf with an amended declaration [Doc. No. 1743], hereby GRANTS the motion.

IT IS HEREBY ORDERED that:

The clerk of the court shall SUBSTITUTE Mr. Wolf's declaration filed in support of FedEx Ground's opposition to plaintiffs' Wave 4 class certification motions, found at Docket Numbers 1006-17 and 1004-5, with the amended declaration attached as Exhibit A to FedEx Ground's Unopposed Motion to Substitute the Declaration of Ray A. Wolf with an Amended Declaration [Doc. No. 1743-2].

SO ORDERED.

case 3:05-md-00527-RLM -CAN document 1750 filed 05/26/09 page 2 of 2

ENTERED: May 26, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | |

**NOTICE OF FILING OF SEALED DOCUMENT**

Pursuant to the Protective Order dated January 13, 2006 ( Doc No. 101 ) FedEx Plaintiffs filed Sealed Document No. 1758: Declaration of Cristina Rhodebeck Concerning Notification Procedure w/ Exhibits.

Dated: June 16, 2009

Respectfully submitted,

By: s/Matthew M. Houston

Mathew M. Houston
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, New York 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

LEONARD CARDER, LLP
Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, California 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

***Plaintiffs' Class Counsel***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**CERTIFICATE OF SERVICE**

I, Craig Lowther, hereby certify that I am not a party to the action, am over the age of eighteen years, am employed by the law firm of Harwood Feffer LLP, attorneys for plaintiff, and that on June 15, 2009, I served the foregoing

**DECLARATION OF CRISTINA RHODEBECK CONCERNING NOTIFICATION PROCEDURE ( FILED UNDER SEAL )**

in the within action, by causing CD-R media copies of same to be mailed, via U.S. Regular Mail to:

**Evelyn L. Becker**
**Robert Schwartz.**
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20007

and

**Alison G Fox**
**Thomas J Brunner, Jr**
Baker & Daniels - SB/IN
202 S Michigan Street Suite 1400
South Bend, IN 46601

case 3:05-md-00527-RLM-CAN document 1760 filed 06/16/09 page 2 of 19

and electronically emailed to the following counsel:

**See Attached Service List**

Craig Lowther

## Other Documents

3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II

CASREF, PROTO

**U.S. District Court Northern District of Indiana [LIVE]**

**USDC Northern Indiana**

## Notice of Electronic Filing

The following transaction was entered by Houston, Matthew on 6/16/2009 at 9:36 AM EST and filed on 6/16/2009

| | |
|---|---|
| **Case Name:** | In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II |
| **Case Number:** | 3:05-md-527 |
| **Filer:** | |
| **Document Number:** | 1758 |

**Docket Text:**
**Sealed Document. (Attachments: # (1) Exhibit A-1 Part 1, # (2) Exhibit A-1 Part 2, # (3) Exhibit A-1 Part 3, # (4) Exhibit A-2, # (5) Exhibit B-1, # (6) Exhibit B-2, # (7) Exhibit C-1, # (8) Exhibit C-2, # (9) Exhibit C-3, # (10) Exhibit D-1, # (11) Exhibit D-2, # (12) Exhibit D-3, # (13) Exhibit E-1, # (14) Exhibit E-2, # (15) Exhibit E-3, # (16) Exhibit F-1, # (17) Exhibit F-2, # (18) Exhibit F-3, # (19) Exhibit G-1, # (20) Exhibit G-2, # (21) Exhibit G-3, # (22) Exhibit H-1, # (23) Exhibit H-2, # (24) Exhibit H-3, # (25) Exhibit I-1, # (26) Exhibit I-2, # (27) Exhibit I-3, # (28) Exhibit J-1, # (29) Exhibit J-2, # (30) Exhibit J-3, # (31) Exhibit K-1, # (32) Exhibit K-2, # (33) Exhibit K-3, # (34) Exhibit L-1, # (35) Exhibit L-2, # (36) Exhibit L-3, # (37) Exhibit M-1, # (38) Exhibit M-2, # (39) Exhibit M-3, # (40) Exhibit N-1, # (41) Exhibit N-2, # (42) Exhibit N-3, # (43) Exhibit O-1, # (44) Exhibit O-2, # (45) Exhibit 0-3, # (46) Exhibit P-1, # (47) Exhibit P-2, # (48) Exhibit P-3, # (49) Exhibit Q-1, # (50) Exhibit Q-2, # (51) Exhibit Q-3, # (52) Exhibit R-1, # (53) Exhibit R-2, # (54) Exhibit R-3, # (55) Exhibit S-1, # (56) Exhibit S-2, # (57) Exhibit S-3, # (58) Exhibit T-1, # (59) Exhibit T-2, # (60) Exhibit T-3, # (61) Exhibit U-1, # (62) Exhibit U-2, # (63) Exhibit U-3)(Houston, Matthew)**

**3:05-md-527 Notice has been electronically mailed to:**

Alison G Fox    Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, andrew.murphy@bakerd.com, Melissa.Bozzuto@bakerd.com

Anne T Regan    atr@zimmreed.com, stefanie.hebig@zimmreed.com

Aparna B Joshi    ajoshi@omm.com

Barry S Fagan    bfagan@dibandfagan.com

Beth A Ross    bross@leonardcarder.com, aahn@leonardcarder.com, ksangren@leonardcarder.com

Bruce H Meizlish    brucelaw@fuse.net

C Victor Pyle , III    victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com, meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Chris A Hollinger    chollinger@omm.com

D Lucetta Pope    Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com

Daniel O Myers    dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Darcie R Brault    dbrault@dibandfagan.com

David M Cialkowski    dmc@zimmreed.com

Deborah R Grayson    drgrayson@fuse.net

Dmitri Iglitzin    iglitzin@workerlaw.com

Edward J Efkeman    eefkeman@fedex.com

Edward R Forman    eforman@marshallandmorrow.com

Eileen S Goodin    egoodin@bnhmlaw.com

Eleanor I Morton    emorton@leonardcarder.com, aahn@leonardcarder.com

Evelyn L Becker PHV    ebecker@omm.com

Gary F Lynch    glynch@carlsonlynch.com

George A Barton    gbarton@birch.net, bartonlaw3@birch.net

Ginger A DeGroff    degrofflaw@yahoo.com

Guy Brenner    gbrenner@omm.com

Ian Otto    iotto@straus-boies.com, cle@straus-boies.com, ecf@straus-boies.com

J Gordon Rudd    jgr@zimmreed.com

James A Staack    jims@staack-firm.com

James R Mulroy , II    mulroyj@jacksonlewis.com, edwardsj@jacksonlewis.com

Jeffrey A Bartos    jbartos@geclaw.com

Jeffrey A Trimarchi    jtrimarchi@omm.com

Jeffrey S Nestler    jnestler@omm.com

Jennifer Lee Merzon    jmerzon@omm.com

Jerald R Cureton    jcureton@curetonclark.com

John S Marshall    jmarshall@marshallandmorrow.com

Joni M Thome PHV    thome@halunenlaw.com

Jordan M Lewis    jordanlewis@sbgdf.com

Kenneth Lee Blalack , II    lblalack@omm.com

Larry A Golston , Jr    larry.golston@beasleyallen.com

Lesley A Pate    lapate@venable.com

Lynn R Faris    lfaris@leonardcarder.com, aahn@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Martin S Garfinkel    garfinkel@sgb-law.com, cronan@sgb-law.com, luk@sgb-law.com

Mary D Walsh-Dempsey    mdempsey@omalleylangan.com

Mary Donne Peters    mpeters@gorbypeters.com, mmcgee@gorbypeters.com

Matthew M Houston    mhouston@whesq.com

Matthew T Tobin    matt@sdtrustco.com, lenandlaura@iw.net

Michael G McGuinness    mmcguinness@omm.com

Michael J Gorby    mgorby@gorbypeters.com

Michael J Watton    jdrewicz@Wattongroup.com, vgaroukian@wi.rr.com

Michael W Garrison , Jr    mgarrison@omm.com

Michael W Kopp    mkopp@omm.com

Monica Ferraro    mferraro@bnhmlaw.com

Nora M Puckett    npuckett@omm.com

Peter D Winebrake    pwinebrake@winebrakelaw.com

Peter J Agostino    agostino@aaklaw.com, trybula@aaklaw.com

Peter W Overs , Jr    povers@whesq.com

Philip Stephen Fuoco    pfuoco@msn.com

R Christopher Gilreath    chrisgil@sidgilreath.com

R Jay Taylor , Jr    jtaylor@scopelitis.com, lnewton@scopelitis.com

Richard T Phillips    flip@smithphillips.com, tresahharden@smithphillips.com

Robert E DeRose , II    bderose@bnhmlaw.com, ameige@bnhmlaw.com, egordon@bnhmlaw.com, sbaith@bnhmlaw.com

Robert G Ames    rgames@venable.com

Robert I Harwood    rharwood@whesq.com

Robert K Firsten    rkfirsten@abbottnicholson.com

Robert K Handelman    rhandelman@bnhmlaw.com

Robert M Schwartz PHV    rschwartz@omm.com

Robin Dean    rdean@omm.com

Sanford A Meizlish    smeizlish@bnhmlaw.com

Scott Voelz    svoelz@omm.com

Shannon Liss-Riordan    sliss@llrlaw.com, jhunt@llrlaw.com, mhorwitz@llrlaw.com

Soye Kim    skim@geclaw.com

Steve D Larson    slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Susan E Ellingstad    seellingstad@locklaw.com, hnpotteiger@locklaw.com, mortonpolski@locklaw.com

Thomas J Brunner , Jr    Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com

Tom A Jerman    tjerman@omm.com

Victor H Jih    vjih@omm.com

Wood R Foster PHV , Jr    woodfoster@sbgdf.com, heidifurlong@sbgdf.com

**3:05-md-527 Notice has been delivered by U.S. Mail or other means to:**

Aaron Roblan
Jackson Lewis
One Union Square
600 University St Suite 2900
Seattle, WA 98101

Alan M Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Andrew J Kahn PHV
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102

B James Fitzpatrick
Fitzpatrick Spini & Swanston
838 S Main Street Suite E
Salinas, CA 93901

Carla D Macaluso
Jackson Lewis LLP - Mor/NJ
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Charles N Nauen
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Charles W Whetstone , Jr
Whetstone Meyers Perkins & Young
1303 Blanding Street
Columbia, SC 29201

Cheryl F Perkins
Whetstone Meyers Perkins & Young
1303 Blanding Street
Columbia, SC 29201

Clayton D Halunen PHV
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Dan S Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D

Orange, NJ 07050

Devon Nugent

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Donald R Taylor
Taylor Dunham & Burgess LLP
301 Congress Ave Suite 1050
Austin, TX 78701

Eric E Hobbs
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Eric H Rumbaugh PHV
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Harold L Lichten
Lichten & Liss-Riordan PC
100 Cambridge St 20th Floor
Boston, MA 02114

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

Jack D Hilmes
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178

Jennifer Rygiel Boyd
Ogletree Deakins Nash Smoak & Stewart PC - Mor/NJ
10 Madison Ave Suite 402
Morristown, NJ 07960

John H Beisner PHV
O'Melveny & Myers LLP - Was/DC

1625 Eye Street NW Suite 10
Washington, DC 20006-4001

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Suite 200
Bartlett, TN 38134

Joseph A Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Karen P Kruse PHV
Jackson Lewis LLP - Sea/WA
One Union Square
600 University Street Suite 2900
Seattle, WA 98101

Kenneth E Milam
Watkins & Eager
PO Box 650
Jackson, MS 39205-0650

Kevin J Driscoll
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Laron Jones
1505 N Ellamont St
Baltimore, MD 21216

Melissa Rohman

Michael J Puma PHV
Morgan Lewis & Bockius LLP - Phi/PA
1701 Market Street
Philadelphia, PA 19103-2921

Michael R Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989

Patricia A Sullivan
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Paula R Markowitz
Markowitz & Richman
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Peter N Wasylyk
1307 Chalkstone Avenue
Providence, RI 02908

R Bruce Carlson
Carlson Lynch Ltd - Sew/PA
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Ralph Carl Veal

Ricardo Huerta

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Robert A Garcin
Law Offices of Robert A Garcin
210 East 29th Street # A
Loveland, CO 80538

Robert E McDaniel
McDaniel Law Offices
4 Bicentennial Square
Concord, NH 03301

Robert James Penny
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G Gangemi
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005

Steve Dennis PHV
Reid & Dennis PC
Providence Tower
5001 Spring Valley Road Suite 255W

Dallas, TX 75244

Steven Matthew Kelso
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202

Todd J O'Malley
O'Malley & Langan PC
Mulberry Professional Plaza
426 Mulberry St Suite 104
Scranton, PA 18503

Wesley Martin

William S Hommel , Jr
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703

William T Fiala
Lewis Fisher Henderson Claxton & Mulroy LLP
6410 Poplar Avenue Suite 300
Memphis, TN 38119

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-0
] [149942b07b287932f706874998ea4ad8c11dc5505fce272a802c5df84910ac66ace
e917c3583a1a92e8160253565f8f962cf270349862a855b84b21b23c5abcf]]
**Document description:**Exhibit A-1 Part 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-1
] [47cf0c8a194e446c565748f636da1d9a0893524864a7bce935d9af53fca1062b818
50e83ea9ea1297dd9a3a792baf698f7afacff7e28315c5bd25d388ea7907f]]
**Document description:**Exhibit A-1 Part 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-2
] [98c5211e674ccb3897c47f0453a25942679bdaf98ac8e5ae310643495351756a4aa
1951cb3cca8269b8ecf2ab59048c958d270e1446afd6eb6d09164d2dd19dc]]
**Document description:**Exhibit A-1 Part 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-3
] [63dc22fea90c4e3b92eb37a3ce648dcf62d186a9ab8898809921490f535051c4c56

9477d6e49b4d2b64cba9b892546e2f78b8f6f99f869d226f82c0e59e2d5f6]]
**Document description:**Exhibit A-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-4
] [a31ead11858284b8df99570b4a9612b50e930e36a575cb14baceaef40295c3d1f88
af40e637061b0d1785ea29a6aeb33dee6fc44e5531484720d14938615032f]]
**Document description:**Exhibit B-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-5
] [4374db49ada814af0b2570f3af62e4b46dcd54ecf74fc7814df99b091ba0144777e
b8eadb229bb021ff57e5fea5ab21df20ff963ea406f374d335c38092975a2]]
**Document description:**Exhibit B-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-6
] [93ffa1a244a9f9d3925313eaa7d54a2d740bf4cc88cf8cdd6b262d7474337439fa5
c2e803ab6ca3949e8ae34e2bbe4149934cad6a5bb94635facd8bcdbbf55fc]]
**Document description:**Exhibit C-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-7
] [9d4e8cdafb59023da1b6260915373b350e9fd1f5587bf9734147e7daa70c78ca77e
73adba65a10b6fa613f5b663c13e419eab057d3a8c85d9afae18f3f076473]]
**Document description:**Exhibit C-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-8
] [702fd191cbf17ce8be584299f433afa085b7bffe746fcc93ca9a314598f14d1af8a
f42aa718e6bdc90ce075136f30d75c64f613c1a5435fa890f8842b337fb44]]
**Document description:**Exhibit C-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-9
] [63ad2ec08b443378dd51aea8cdadf8ca81b52eee20d91330dcdb173129786466d74
a28d5ded34d1345cb7860424a8142a6fb75da680fd8885e2f9fda342e6c36]]
**Document description:**Exhibit D-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-1
0] [1443ea9de3a8a75964fe1911547492852f6780867063a8a712f43e9cf76f18da19
0e58a965ab91c5c6644f7a1794077c83cc8cf362eb6faba9113910d775d1b1]]
**Document description:**Exhibit D-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-1
1] [304446bffd152808f6bedb3650722a01e481485d43f0b2457ff6b2461dcc50be22
434d963b05bbaa885778faba32565ad1708d62352485a8fcccd47548dfdf0d]]
**Document description:**Exhibit D-3
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-12] [0852f0d219bdbdb8e4fa7073dc239f7c39f682b4aade16b5c8506263c9301a0ff4f7cd9b86c133efee45d847aec4786a079d058cb74d948fe42310593c65632d]]
**Document description:**Exhibit E-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-13] [80f2bce4ed2d67c5f24471ead73ff303aaf91a19f6ca07182e406382fee8d4c3549d16e732af7074f8f18b3d49dc43593ba46099a43ee9e6a926d6a54ddeb3a9]]
**Document description:**Exhibit E-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-14] [17e566d7aa6be325b08079f31792a4e5f548f5f1c6ae6040680bffe6d9675c6aac03371d782052c2c192b9c4fe859a1472c922269275cbb2c188ddc30e50e6fb]]
**Document description:**Exhibit E-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-15] [cf1d137e8ffad3d3661ed554ca05ded4e94d05f18cb599c2921e3c74fef09294d44ed8b1ac859e255382c479b08d41b6dfac0033d30acb35f7ab5a4a1aaa0692]]
**Document description:**Exhibit F-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-16] [4151a5e114f47f653bb7aa2c6a3c41ce631b996bc38dfb253253a193adabd5e1b82a43923aadc6ca65d318cd87da74337a40ce1167e4ca65c375c1039ad3e6e7]]
**Document description:**Exhibit F-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-17] [0b6c42523d5be1d7efaa1e0bbcd47085f4b20c8f9b1083fa6c0716ffb3801a166a0936ff448e0056e791c47d420dfba2691ca42241e91c2a8d7c9d03dcd0c0af]]
**Document description:**Exhibit F-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-18] [775fef6b599ca2f3e615c179764e93d4b91af132bdab1579bbd92e21596f4b4a4b49c6511e954c77d5970ff0396364a01d8b7167b3ea19cab8a938d15df64e72]]
**Document description:**Exhibit G-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-19] [245dedff117bd5c859e71b8a1b875759223acce2e4c629a6ac7032e59cc99b5e43e7ef18872c62f42010476e517ec4c1435c83c5e21be90e42afcd262b45415d]]
**Document description:**Exhibit G-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-20] [6cc1db1c6af1b44c7e34a6ce68c93e34ec45d9da87eca5f227dbd6e3b72425806b

94fc99d68de3dd43fddd263912783d42e8da462d8c5590e6b5ccdd48666a06]]
**Document description:**Exhibit G-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-21] [9c9583c7f852238b6c7c0439a0b3a3d302b89ead199ad857b33f784c2ae4756d4a7ea85c36c459046466489184eda327dc8d942c689ce231feabe4a443813263]]
**Document description:**Exhibit H-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-22] [7988b9431804736cdc8e51f47ee40baf81f0e60f6919e9766399e9762de425329c902e4d92e2d952230c639ad486850e095e6e889ea4ef38f9fec02fe5df46c5]]
**Document description:**Exhibit H-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-23] [0c4db03c2f35b5a209827e31114dbafcbea623377d8ee2d322a479ac7ce144fc0632098978ec7b1359b2d7fa569720fadcaa928dbef7a5daea6c83bacd3bf1cf]]
**Document description:**Exhibit H-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-24] [5f740a9a9123b6841f99a7b5c6c1a5e0f44e39e04f769228350924b7344c5bfc2c48354dd51edefa91d9e0214928dde2764cf1aa59d610c40bbc7020afb74e1c]]
**Document description:**Exhibit I-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-25] [7b7dd7fdd2679831124a3d8b9e24a17e97c3c5edbb24eb87fc186c6fabb398e729096241e510b1e43b460b2a9fe8a489d5b5d93cced53fe7ab12470ea2fe2bdc]]
**Document description:**Exhibit I-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-26] [056b4265a3e0fef874178976fe8e8ccaf12f051ca79dbb47995eab5536513fb06beb7841e8ac1e696b9e73da2079424927dd65022511dd264fb08ed20dc0b79d]]
**Document description:**Exhibit I-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-27] [59d5ebd047b12e32baf56e7ecd4b5ef057f8e633f778c327e17baff211ca59aac8e5b2b9c129241b1baef5494b81b81e8bbba3e58bee17f369f342d7835f8b9c]]
**Document description:**Exhibit J-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-28] [d03c44ae959e69cb066f0b1f1cd712c4df29e1e85b48acb8496d834f9233d9bfabd045cb6fb91b741b4c29b8441d0aa14ebd131105400414124345 3ee25b07c4]]
CMECF.widgit.ProcessingWindowWaiting() ONG>Document description:Exhibit J-2
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-29] [9cd12ba9cec6b53b01ce7a8b7d69de22a8fcc0290a241a567a66015ceb5ca85f8c2f508276696ed88f3a1417e57f47610a491218ca0e97f591b09f4de6012712]]
**Document description:**Exhibit J-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-30] [90663985af47a291c28d2e8fd9b2482b83d833e0f5b8c58fb36cefc3a00666af4c87115734d133b787000b4bbec46f0eb83e9b7e21815b03965f606b440d7a66]]
**Document description:**Exhibit K-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-31] [9e9ffe3b5ac110878b8928d6d54e7e4cc3e5b4f7018081d413c118667cf0a4a4ec51872e9ee43701f104ed2ee36a50f87f424615a662be3abb4446bdcbf84a70]]
**Document description:**Exhibit K-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-32] [6b0f1c4f8fecab86735aee8a9d943380a096ce10ca93fe36b4b5d2eeca999a28db1ceff0b5b0e6ce85319094ef4b42b5db0cffca5e3af08b2b2ebf829f9a7ffe]]
**Document description:**Exhibit K-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-33] [4dbaa7b47915bdde8023178592e87d1e38c6ab446ebfa5f439264076a24e0da719bef784d2491ff76482fff9beb3115f05fe6af00beea7b20a94cda55f92698a]]
**Document description:**Exhibit L-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-34] [94ab9a376343c0b6b83668e48c47f25f193ce94e4c8569257a01909fe6ae009349cfde1a76d77d6453412aa96f5777ff46e88733b277430e23270567729f8739]]
**Document description:**Exhibit L-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-35] [8c841f9e0950626d80a3edd0c5235d0ff86d9393ad27b5a42b47c1659a3d103ff46d8811be8b1f8ade2f4ee20c7fec59cb122577a40c54a71d110ac50f3557a9]]
**Document description:**Exhibit L-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-36] [bb9618988980598e22940af89360755edf0a30dea64a5621002fb872731cf2a43275088b2cd0b67b2955f1cd8ddbe2bf0c76b973a168071bc675d1afe643de15]]
**Document description:**Exhibit M-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-37] [1f79f6c4951a7cee8f579dd6c851120cf5741432c15ed82b6ad4f94239a2180f8a

100255b572691979a75532fb348a5f93847b48c4f3fec2c7294ef1e7e69dde]]
**Document description:**Exhibit M-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-38] [4fd97e50b43ef33ec6baf69a6fbf782965bbc15e916e3a554192fd1a37917d9bbd45ed0f9dd7ee0b1a4092f5dbc20eca9e977220a333569eedd46d1c6cc5340c]]
**Document description:**Exhibit M-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-39] [3619a09f7f24bd131662c5c6f0b5661971a0b8336bb8f3bab07f9e16f5d261d5467fac7a621a8e97c78e51073ce58db0a88672a237463652f15909289610be20]]
**Document description:**Exhibit N-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-40] [be922a91a3923504a953dfdbaccd33c745865b5e12cbd3873833c2502cdc39f263e225c102e010ab5d421b9120eee00e3c80022cb46359fc74c4353aaee27e99]]
**Document description:**Exhibit N-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-41] [64ccdd9df5be4aa3031b252ce80fea2303ad368e6fff07eb40846bd52bb4c320d567417a918865cffcc1eeb7066e649307dfe40e3fc34da3d3edc14af5a2a7a3]]
**Document description:**Exhibit N-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-42] [3eda19e05b4d7121cfe3c4e074ab02d52912c4187b8d2209ca32a1c2e149221634af74eb046babd6602243807c2fbc2f28f509ca14c63000526630fe0e652be2]]
**Document description:**Exhibit O-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-43] [07b6653a3301b8c82fcb8f063001253b8b7c1d8b4ae666896e171c1b1fa71e7063657eb6baa66e35736e1e79feffb2cb54a831893fdeccf430aa8f117511f52c]]
**Document description:**Exhibit O-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-44] [3045025cf9a55c1a9cc0aea44cdae62bdc2392090081 4de6d87f61322c436b7e97a5f9fa18ba0a45ab68aed59c3e3916bd428fb55553f55e873bf331632d7e6a]]
**Document description:**Exhibit 0-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-45] [29b9da50b011552bde1cf4094e80bd1ef8a7de928d331ad50c2ecdfea80afa0eb703908711ab783e6ca44cff6848a380e250f1528fa9f6044da1ed5ed7d189d9]]
**Document description:**Exhibit P-1
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-46] [8fe00156ec3030a04484ed1e9dae79e86989b2607233648057ac8587749abce9e115b1bd74aad7f04cb2022f610bfbbe77c8f1f2a50f87a3cb6a086865972ade]]
**Document description:**Exhibit P-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-47] [b9a92c1c7141999e7a2c58adae1bd34368235c3a8e39e3d1ffb56e9dbea8c51c616cfd90233b9a0f7ff793e24229104647cd14badd9c580e2f7a8fda3457a067]]
**Document description:**Exhibit P-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-48] [11050dbdd929437118d3aeb2a724c5f5a1fd9147222831ce6a7181fe2c65991c8cc1c88f5f66a1544870432b8c75de52809ec281a5fa20191480b6d90c9a2b76]]
**Document description:**Exhibit Q-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-49] [068d2b52d8f1eeb4bda37697e16115ae39113dcfd95771eeda7d097bbdb515db45758a4597887a1c2d55011709d559bfb21ff69049904e3ed70ef02d9d6f93de]]
**Document description:**Exhibit Q-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-50] [2f429cc5a318597b8266aadb2aba36719b68e54875d401312cf96c0e1fe408dd0d7900a7e058bc49ab8a40cc88f5d40fcc60cf7555fdf0cd393f1568108d2d5c]]
**Document description:**Exhibit Q-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-51] [96a77cacc3a1c49fbf4e5acab5e565ab3519612fc0850c70e89318e2b8fc3f8fbc8235f46d370b2fb318d3457a10b23605e119faf376529ddc1a6b6c741eb555]]
**Document description:**Exhibit R-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-52] [b50d2c3fd6e0c0c05f78d90e685ebe12b8125d176cd8b6bfc1925c1aeec65613414786a85e95b36892100a6495054634013214840515885e8c5d9198738f3a89]]
**Document description:**Exhibit R-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-53] [7dbc25b6b6ab6956570b1965503e48894b1b10b14146769d72f6b25b161cd86b49ddfd5cbeb58fc9a9b1bc1e06271de6d2a4d41b2e11393e930d77f94ba9c053]]
**Document description:**Exhibit R-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-54] [6a512dea7ed29281eb2d3b914a0bdd71a63a32809538fc8da2bbc9fee6414de8b7

67746b981e8915f96b17c5a49c4321544e3314e2b585111f8e44cebd75dc5d]]
**Document description:**Exhibit S-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-55] [03f1e5b7f84d976e4537cf0b78f5d83afc58f64cb44c8aeda20e8fa190748eba697ace84c00002597f9e05dc729d1366abdf4b47acc77209fb0ea47c591332eb]]
**Document description:**Exhibit S-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-56] [9e69cf9ad45302dcb4688753618917c6bcf15793f7952f06522ddd6f4e9b005898a440c0eb8cbf0626b078ea2051b36d58210d46aac53fd5c9cbdc2345016bd7]]
**Document description:**Exhibit S-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-57] [39e9e8172ed9106f9ce2a658ee2317b0b1f96eb7463e2c5b4032c38e580be7b0d275b60b7703e09b1d418ff1364eb2a567e5518595912aa50826ad644ce6c2b4]]
**Document description:**Exhibit T-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-58] [5fca44cee8cf804b3628b0d11f8c50a2bc39d802b54c62da9d7e0dc062b21c041067f034362d7644ae86a2c0d474a50a826b22affa950c0947cea11abf335dcd]]
**Document description:**Exhibit T-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-59] [83fe8d54fce07b1af90cfe60c4b47700cc6c41c9b06a6329bc069deb340d77725fb2667abb2681437c3b0229343e129dd39498c47ddbcb9180a9c5ee039f8187]]
**Document description:**Exhibit T-3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-60] [98a92caf39ea4e1d6636b7c099562fb6851c140616fa135c5a76763c68e788ec6c98973f3d12e8b4681c1ddf6bd64646a4a3598726d95e96245e9212d1c9a1be]]
**Document description:**Exhibit U-1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-61] [440055d7058ceedb8ae14406ca7cb9dc9e1f7df488fa6fd830b16dc6df480596bbf1d1f0a755d1881a0a9 5ae1d32c79e0c5cac0eed0cd29312514d2ff31ecf03]]
**Document description:**Exhibit U-2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-62] [42926548a98af15b2f511cdaf554f308266449ff73a8ac535b65a689ae1887da1b2cf692cfdfdb3d3673fe637728dc82c7caaadb8ca411f44dc94dffb895039a]]
**Document description:**Exhibit U-3
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=6/16/2009] [FileNumber=1295540-6
3] [950fc11e73b1d8310b7787f51e5bb6d2bc5b77829f08d18b53ea4679a577c8d305
cc761ae1df01656ee63cde8fbca9f9a304cacaf6296b66a271f78920a2c94e]]

STOLL BERNE
STOLL STOLL BERNE LOKTING & SHLACHTER P.C. LAWYERS

June 25, 2009

Stephanie Fikes
FedEx Case Clerk
United States District Court
Northern District of Indiana
South Bend Division
204 South Main Street
South Bend, IN 46601

Re: In re FedEx Ground Package System, Inc. Employment Practices Litigation
Cause No. 3:05-MD-527-RM (MDL 1700)

Dear Stephanie:

Per the conversation you had with Heather Potteiger of Lockridge Grindal Nauen P.L.P., enclosed for filing in the above-referenced case is the Notice of Substitution of Counsel requesting that David Rees be allowed to withdraw from representation and Mark Friel be substituted in. It is my understanding that you will arrange for the attached to be filed with the court and served on all counsel via the Court's CM/ECF system. If you need me to follow up with service or have any question, please contact me.

Thank you in advance for your assistance with this matter.

Very truly yours,

Debbie Haner

Debbie Haner
Legal Secretary for David F. Rees

:dh
Enclosure
cc: David F. Rees
Mark A. Friel
Steve D. Larson
Joshua L. Ross

209 SOUTHWEST OAK STREET PORTLAND, OREGON 97204 TEL (503) 227-1600 FAX (503) 227-6840

FILED
2009 JUN 29 PM 1:00
U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**NOTICE OF SUBSTITUTION OF COUNSEL**

Notice is hereby given that David F. Rees will no longer be associated with the law firm of Stoll Stoll Berne Lokting & Shlachter P.C. as of July 1, 2009. Plaintiffs' counsel asks that the Court allow David F. Rees to withdraw from representation of Oregon Plaintiffs and Mark A. Friel of the law firm Stoll Stoll Berne Lokting & Shlachter P.C. be substituted in. Oregon Plaintiffs continue to be represented by:

Steve D. Larson
Joshua L. Ross
Mark A. Friel
Stoll Stoll Berne Lokting & Shlachter P.C.
209 SW Oak Street, 5th Floor
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email: slarson@stollberne.com
jross@stollberne.com
mfriel@stollberne.com

Jordan M. Lewis
Siegel, Brill Breupner Duffy & Foster, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN 55401
Telephone: (612) 337-6100
Facsimile: (612) 339-6591
Email: jordanlewis@sbgdf.com

Peter N. Wasylyk
Law Offices of Peter N. Wasylyk
1307 Chalkstone Avenue
Providence, RI 020298
Telephone: (401) 831-7730
Facsimile: (401) 861-6064
Email: pnwlaw@aol.com

{SSBLS Main Documents\7523\001\00210611-1 }

Dated: June 25th, 2009

Respectfully submitted,

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By: [signature]
David F. Rees, OSB No. 945138

209 SW Oak Street, 5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

Steve D. Larson
Joshua L. Ross
Mark A. Friel
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, 5th Floor
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

Jordan M. Lewis
SIEGEL, BRILL BREUPNER DUFFY & FOSTER, P.A.
100 Washington Avenue South, Suite 1300
Minneapolis, MN 55401
Telephone: (612) 337-6100
Facsimile: (612) 339-6591

Peter N. Wasylyk
Law Offices of Peter N. Wasylyk
1307 Chalkstone Avenue
Providence, RI 020298
Telephone: (401) 831-7730
Facsimile: (401) 861-6064

**OREGON PLAINTIFFS' COUNSEL**

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**PLAINTIFFS' CO-LEAD COUNSEL**

case 3:05-md-00527-RLM-CAN document 1761 filed 06/29/09 page 4 of 4

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

{SSBLS Main Documents\7523\001\00210611-1 }

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO ALL CASES

**ORDER**

On July 23, 2009, attorney Marie Frost ("Frost") filed a motion to withdraw her appearance on behalf of Plaintiff, Walter Wallace. This Court now **GRANTS** Frost's motion [Doc. No. 1767].

**SO ORDERED.**

Dated this 24th Day of July, 2009.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO:

3:05-CV-596 (*Slayman* - Oregon)
3:07cv120 (Nevada)
3:07cv272 (Arizona)
3:07cv322 (Connecticut)
3:07cv324 (*Givens* - FLSA)
3:07cv325 (*Vagas* - MCSA)
3:07cv326 (North Carolina)
3:07cv328 (*Leightner* - Oregon)
3:08cv336 (Ohio)
3:07cv411 (Georgia)
3:07cv412 (Vermont)
3:07cv478 (Colorado)
3:08cv193 (*Boudreauz* - Louisiana)
3:08cv53 (Utah)

OPINION AND ORDER

In orders dated October 15, 2007 (Doc. # 906) and March 25, 2008 (Doc. # 1119), the court resolved motions for class certification for the following states: Alabama, Arkansas, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Jersey, New York, New Hampshire, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. These were the motions in the first three waves of such motions. The reader's

familiarity with the earlier orders is assumed.

The parties made similar arguments in most of those first three waves of class certification motions. Most of the rulings turned on whether, under the law governing the claims of a particular class, the plaintiffs' claims ultimately could be resolved on the basis of common evidence such as the drivers' Operating Agreement with FedEx and commonly applicable FedEx policies. Critical in those decisions was whether a particular state's law looked to the right to control as distinct from the actual exercise of control, and whether evidence unique to less than all drivers might affect the ultimate decision on whether a class of drivers were, under governing law, employees or individual contractors.

Class certification motions in the fourth and fifth waves are ripe for ruling. Resolution of these motions is long overdue, having been delayed by a doubling of the assigned judge's felony docket due to a district judgeship vacancy that has lasted more than twenty months. The parties have identified few issues not related to governing state law that were not addressed in the October 2007 and March 2008 orders, and the court adopts the reasoning of those orders to the extent the current motions pose the same arguments. Analysis focuses primarily on whether the substantive law governing the motion allows resolution, without extrinsic evidence, of whether the Operating Agreement and policies applicable to the entire class create an employment relationship, and whether a would-be employer's conduct can convert an employment relationship (as defined in the employment contract) into an independent contractor relationship.

The plaintiffs moved for oral argument on the fourth wave motions. The court has been able to work through those motions without argument, so the court denies that motion as moot.

**Arizona (*Gibson*)**

Named Arizona plaintiffs Margaret Gibson, Don Olsen, Solomon Rachmin, and Joe Shipp bring claims for illegal wage deductions, ARIZ. REV. STAT. § 23-352, rescission, declaratory relief, and injunctive relief. Joe Shipp is a driver for FedEx Home. Margaret Gibson, Don Olsen, and Solomon Rachmin are former drivers for FedEx Home. They seek to represent the following class.

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES) and/or provided or will provide package pick-up and delivery services pursuant to an executed Operating Agreement; 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since May 11, 2004, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Arizona.

When the motion was filed, this class would have included at least 197 drivers.

FedEx opposed class certification because (among other reasons adequately discussed with respect to other states) individualized evidence would be needed to evaluate the extent of actual control, each driver's intent, the method of payment and furnishing of equipment, the right to hire and fire, and the characteristics of each driver's business operations.

The Arizona wage deduction statute protects employees, and define as

"employee" as "any person who performs services for an employer under a contract of employment wither made in this state or to be performed wholly or partly within this state." ARIZ. REV. STAT.§ 23-350(2). In deciding whether an agent is an employee or an independent contractor, Arizona law looks to the principal's right to control the agent or supervise the method of reaching a specific result. Hunt Bldg. Corp. v. Indus. Comm'n, 713 P.2d 303, 307 (Ariz. 1986). To evaluate that right to control, Arizona courts look to the totality of the circumstances, Central Mgmt. Co. v. Indus. Com's of Arizona, 781 P.2d 1374, 1376-1377 (Ariz. Ct. App. 1989), leading FedEx to argue that courts must consider the actual exercise of control in additional to any contractual right of control. FedEx has cited no Arizona case in which a lack of control in fact trumped a contractual right sufficient to establish an employment relationship.

As in other states, such as Arkansas, Arizona law looks to the factors contained in the RESTATEMENT (SECOND) OF AGENCY § 220. St. Luke's Health Sys. V. State Dept. of Law, 884 P.2d 259, 263-264 (Ariz. App. 1994). Nothing in FedEx's submission leads the court to question its holdings with respect to those states that common questions preponderate when an agent claims a contract creates such control as to make an agency one of employment when the governing state law draws on the Restatement factors.

For the reasons set forth in earlier discussions of motions to certify classes in Arkansas, Florida, Indiana, Kansas, Kentucky, Maryland, New Hampshire, New Jersey, Oregon (*Slayman*), and Rhode Island, the court GRANTS the Arizona

plaintiffs' motion for class certification.

**Colorado (*Flores*)**

The Colorado plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since August 1, 2004, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Colorado.

The plaintiffs report that the class would consist of 228 drivers, as of the time of the motion's filing. The named plaintiffs are Horacio Flores (a former FedEx Ground driver) and Mark Niles (a current FedEx Ground driver). They seek to present claims under Colorado's illegal deductions from wages statute, COLO. REV. STAT. § 8-4-101, 105, the Colorado Consumer Protection Act, COLO. REV. STAT. § 6-1-105 *et seq.*, for rescission, and for declaratory and injunctive relief.

The court can't agree with the Colorado plaintiffs that common questions predominate in their claims under the Colorado Wage Act. Colorado Revised Statute § 8-4-101(4) creates a presumption that one who performs services for another is an employee. Carpet Exchange of Denver, Inc. v. Industrial Claim Appeals Ofc., 859 P.2d 278, 281 (Colo. App. 1993). To overcome this presumption, the principal must prove that (1) the worker is free from the principal's control both under the agency agreement and in fact, and (2) the worker is customarily engaged in a trade or business related to the service performed. Speedy Messenger

Delivery Svs. v. Industrial Claim Appeals Ofc., 129 P.3d 1094, 1096 (Colo. App. 2005). The plaintiff drivers say FedEx won't be able to show the required lack of control under the agreement.

As under Massachusetts law considered in the second and third waves of class certification motions, Colorado law places a burden of proof on FedEx that the plaintiffs see as insurmountable. Indeed, the plaintiffs see the Colorado burden as even higher because Colorado law, as the plaintiffs understand it, will require FedEx to prove that it doesn't command when, where, and how much labor or services shall be performed—a higher burden than FedEx bears under the law of Massachusetts, or Illinois, or South Dakota, or Montana.

The Colorado plaintiffs might be right that FedEx won't be able to manage such a showing, but the court can't decide that issue at this stage of the proceedings. The court must focus instead on what would happen if FedEx makes that showing—which would result in two additional hurdles for FedEx, both of which would require proof outside the Operating Agreement and commonly applicable policies. FedEx would be entitled to present evidence from the field rather than the Operating Agreement to prove that the drivers are free from FedEx control in fact (and the drivers would be entitled to present proof to the contrary). Whether a driver is (or, with respect to former drivers, was) customarily engaged in a trade or business related to the driver's work for FedEx necessarily would require examination of each of the 228 drivers.

As a practical matter, since any of the three issues might be dispositive, all

likely would be briefed together for summary judgment purposes. Thus, even if the Colorado drivers are correct that FedEx can't show their freedom from control under the Operating Agreement, the other issues (and the individual and field-based proof those issues entail) likely would be part of the summary judgment inquiry. Right to control under the Operating Agreement is not a preponderant issue.

The Colorado plaintiffs' remaining claims flow from the contention that the Operating Agreement's description of the drivers as independent contractors is, given the Agreement's other terms, false or against public policy. Given the centrality of the Wage Act claim to those arguments, the same analysis applies.

The court denies the Colorado plaintiffs' motion for class certification.

**Connecticut (*Magno*)**

Named Connecticut plaintiffs Thomas Magno and Neville Edwards bring claims for violation of the Connecticut minimum wage act, rescission, *quantum meruit*, unjust enrichment, declaratory judgment, and injunctive relief. They seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since May 22, 2001 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Connecticut.

They seek to certify the following sub-class under FED R. CIV. P. 23(b)(3) for unpaid

overtime in violation of Connecticut Minimum Wage Act:

> All persons who: (1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); (2) drove or will drive a vehicle over forty hours per week at any time during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; (3) at any time after August 10, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds; and (4) were dispatched out of a terminal in the state of Connecticut.

The named plaintiffs are current drivers for FedEx Home. At the time of the class certification motion, there were 168 drivers in Connecticut.

FedEx argues that the named plaintiffs don't adequately represent Connecticut drivers. The court rejected that argument with respect to other states, and finds the argument no more persuasive as to the Connecticut drivers.

At least with respect to the claims under the state's minimum wage act, CONN. GEN. STAT. §§ 31-71a-71i, Connecticut uses the "ABC" test in which the putative employer must prove that a) the agent is, was, and will be free from the principal's control and direction in the performance of duties, both under the contract and in fact, b) the service is performed either outside the usual course of the principal's business or outside all the principal's places of business; and c) the agent is customarily engaged in an independently established trade occupation, profession or business of a sort that involved in the service provided. Tianti v. William Raveis Real Estate, Inc., 651 A.2d 1286, 1290 n.8 (Conn. 1995). The plaintiffs speak of a common law test concerning some of their other claims, but the cited cases give the court no sound basis to believe Connecticut applies

different tests for different purposes when workers would be covered by the minimum wage act.

As has been explained in greater detail with respect to other states that use similar tests that place burdens on the putative employer to prove a variety of things in addition to lack of contractual control, the court can't limit FedEx's proof to the operating agreement and commonly applicable policies. To prevail on the named plaintiffs' claims under Connecticut law, FedEx will have to prove much more than simply lack of contractual control, including lack of control in fact and the nature of each driver's customary work. The plaintiffs might be correct that FedEx can't prove lack of control under the contract, and so will fail in its ultimate burden of proof. Or the plaintiffs may be wrong. Today is not, however, the occasion to evaluate the sufficiency of FedEx's ultimate proof.

The court can't say that the case will be limited to common proof. The potential for extensive individualized evidence makes a class action inappropriate for the would-be Connecticut class. The court DENIES the Connecticut plaintiffs' motion for class certification.

**FLSA (*Givens*)**

The Givens plaintiffs seek to certify the following class for conditional certification:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle over forty

hours per week at any point during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) operated, at any time after August 10, 2005, vehicles with a gross vehicle weight rating of less than 10,001 pounds; and 4) are not members of any state law overtime class certified under Federal Rule of Civil Procedure 23.

The named plaintiffs, Troy Givens, Clarence Dalcour, Wesley C. Martin, Devon Nugent, Melissa Rohman, and Ralph Carl Veal, were pickup and delivery drivers for FedEx Ground who drove vehicles weighing less than 10,001 pounds between August 10, 2005 and the present. They claim FedEx misclassified them as independent contractors rather than employees and so violated the overtime compensation provisions of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 206(b) and 207(a)(1). The plaintiffs bring this action on behalf of themselves and all other similarly situated pickup and delivery drivers who operated vehicles weighing less than 10,001 pounds since August 10, 2005 who are not already protected by a state overtime statute and who are not subject to the Motor Carrier Safety Act ("MCSA") exemption to the FLSA's overtime requirements.[1] When the *Givens* plaintiffs filed their motion, they estimated between 1,000 and 1,500 putative collection action plaintiffs could join in this FLSA action.

Under § 216(b) of the FLSA, an employee may bring a collective action on behalf of himself and "other employees similarly situated" to recover unpaid overtime compensation; however, "[n]o employee shall be a party plaintiff to any

---

[1] Therefore, the plaintiffs don't intend this collective action to encompass any state where a state overtime claim for this subset of drivers is certified for class treatment under Rule 23.

such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Such an action is known as a collective action, Harkins v. Riverboat Servs., Inc., 385 F.3d 1099, 1101 (7th Cir. 2004) and is intended to avoid a multiplicity of duplicate actions and to promote the FLSA's broad remedial goals. Mares v. Caesars Entm't, Inc., 2007 WL 118877 at *2 (S.D. Ind. Jan. 10, 2007) (*citing* Hoffman-LaRoche, Inc. v. Sperling, 493 U.S. 165, 172-174 (1989)). Unlike a Rule 23 class action, when a district court decides to certify a collective action under § 216(b), it may authorize notice to potential class members to inform them of the action and allow them the opportunity to participate by "opting in." *See* Id. at 169-171; Woods v. N.Y. Life Ins. Co., 686 F.2d 578, 580 (7th Cir. 1982) (stating that the court in a FLSA collective action has a "modest duty and power . . . to regulate the content and distribution of the notice to potential class members.").

In deciding whether to certify a Section 216(b) collective action, the court must first consider whether the named plaintiffs have made an initial showing that they are similarly situated to the employees whom they seek to represent. Mares v. Caesars Entm't, Inc., 2007 WL 118877 at *2. While neither the FLSA, the Supreme Court, nor the Seventh Circuit have provided guidance on how to determine whether the representative plaintiffs are "similarly situated" to the potential plaintiffs, district courts in the Seventh Circuit have adopted a two-step approach. *See* id (*citing* Austin v. CUNA Mut. Ins. Soc'y, 232 F.R.D. 601, 605 (W.D. Wisc. 2006); Veerkamp v. U.S. Sec. Assocs., Inc., 2005 WL 775931 at *2 (S.D. Ind.

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 12 of 83

Mar. 15, 2005)). First, the representative plaintiffs must "demonstrate a reasonable basis for believing that [they are] similarly situated to potential class members." Austin v. CUNA Mut. Ins. Soc'y, 232 F.R.D. at 605. Second, "if the plaintiffs make this showing, the court conditionally certifies the class, authorizes notice, and the parties conduct discovery." Id. At the close of discovery, the defendant may move for decertification, at which point the court examines in detail the evidence and arguments submitted by the parties on the question of similar situation and may dismiss certain plaintiffs without prejudice or decertify the entire class. Id.

To meet their burden at the conditional certification stage, the representative plaintiffs must show the existence of employees with similar positions. *See e.g.*, Sheffield v. Orius Corp., 211 F.R.D. 411, 416 (D. Or. 2002); *see also* Belbis v. County of Cook, 2002 WL 31600048, at *4 (N.D. Ill. Nov. 18, 2002) (noting that a plaintiff may demonstrate that an employees are similarly situated "by showing that the plaintiff and the proposed potential plaintiffs were victims of a common policy, plan, or practice."). According to the *Givens* plaintiffs, the putative class members are sufficiently similar to the named plaintiffs because they were categorically misclassified as independent contractors, are all subject to the same Operating Agreement, all routinely work overtime hours without overtime compensation, and none are members of any other state law overtime class. FedEx argues that the putative class members aren't similarly situated for a number of reasons, that the named plaintiffs are inadequate class

representatives, and that the class claims present issues which require individualized determination.

Although the requirements of Rule 23 generally don't apply to certification of an FLSA collective action, inadequacy of representation is nevertheless an equitable consideration at issue in determining whether to certify a putative class. Brown v. Money Tree Mortg., Inc., 222 F.R.D. 676, 682 (D. Kan. 2004) ("Although FLSA § 16(b) does not expressly incorporate Rule 23(a)(4)'s adequacy-of-representation requirement, the adequacy of class counsel or a class representative is not necessarily irrelevant in a putative FLSA § 16(b) collective action because the court has an inherent interest in ensuring that opt-in plaintiffs are adequately represented."). Problems exist regarding the adequacy of these named plaintiffs as representatives of this putative class.

First, the original named plaintiffs, Troy Givens and Clarence Dalcour, lack standing to pursue FLSA overtime claims on a representative basis because they don't meet the proposed class definition. Neither Mr. Givens nor Mr. Dalcour drove vehicles weighing less than 10,001 pounds after August 10, 2005. They both drove P-1000 trucks, which have a gross vehicle weight of more than 10,001 pounds. Because Mr. Givens and Mr. Dalcour don't meet the class definition and are exempt from overtime under the FLSA, they aren't similarly situated to the putative class members they seek to represent. 29 U.S.C. § 213(b)(1). Therefore, the named plaintiffs don't have standing to pursue FLSA claims on behalf of the putative class. *See* O'Shea v. Littleton, 414 U.S. 488, 494 (1974) (holding that

there "must be a personal stake in the outcome" . . . such that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class") (citations omitted).

The plaintiffs try to remedy this problems by arguing that drivers who have filed consents to join the class may serve as additional named plaintiffs in the collective action. The plaintiffs haven't sought to amend their complaint to add these individuals, *see* Harkins v. Riverboat Servs., Inc., 2002 WL 32406581, at *5 (N.D. Ill. May 17, 2002) ("The filing of a written consent in and of itself is insufficient to join [a Section 216(b)] lawsuit."), so the consenting drivers aren't named class representatives. *See, e.g.,* Becker v. S. Soils, 2006 WL 3359687, at *1, n.1 (M.D. Fla. Nov. 20, 2006) (holding that leave to amend the complaint was required to add individuals as named plaintiffs to FLSA collective action).

Second, the *Givens* complaint asserted FLSA claims on behalf of a nationwide class of drivers, and the plaintiffs later moved the court to toll the statute of limitations on those nationwide claims. In their motion for certification of a collective action, however, the *Givens* plaintiffs define the proposed class as consisting of drivers who are not already protected by a state overtime statute, effectively abandoning the claims of the nationwide class as originally defined in the complaint. As a result, the named plaintiffs have created a conflict of interest between themselves and the putative class, who might stand to benefit from the abandoned claims. Therefore, class certification is inappropriate based on the

named plaintiffs' inability to adequately represent the class as a whole. *See* In re Universal Serv. Fund Telephone Billing Practices Litig., 219 F.R.D. 661, 668 (D. Kan. 2004) (explaining that case law exists to support the proposition that certification is inappropriate where the class representatives opt to pursue certain claims on a class-wide basis while jeopardizing the class members' ability to subsequently pursue other claims).

Moreover, to determine the employment status of the putative class members, the FLSA requires the court to apply an economic realities test, rather than considering the common law concepts of "employee" and "independent contractor." Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1534 (7th Cir. 1987). In doing so, the court must focus on the economic realty of the nature of the working relationship, requiring a consideration of all the circumstances of the work activity, not just one isolated factor. Id. (*citing* Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)); *see also* Vanskike v. Peters, 974 F.2d 806, 808 (7th Cir. 1992) ("status as an 'employee' for purposes of the FLSA depends on the totality of the circumstances rather than on any technical label."). Among the criteria considered are: 1) right to control; 2) opportunity for profit or loss; 3) investment in equipment or materials required for employment; 4) the degree of skill required; 5) the degree of permanency and duration of the working relationship; and 6) the extent to which the service rendered is an integral part of the employer's business. Sec'y of Labor v. Lauritzen, 835 F.2d at 1535. Accordingly, the court must take into consideration the actual history of the

parties' relationship, necessitating an individualized examination of the multiple factors relating to each drivers' employment. Because the evidence pertaining to such factors varies in material respects throughout the proposed class, there is a lack of substantial similarity among the putative class members sufficient to justify treatment as a collective action. *See* Reich v. Homier Distr. Co., Inc., 362 F. Supp. 2d 1009, 1013-1014 (noting that "[m]any other courts, both in this circuit and others, have declined to find potential class members similarly situated where liability depended on an individual determination of each employee's duties) (*citing* Pfaahler v. Consultants for Architects, Inc., 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000) ("[T]he court would be required to make a fact-intensive, individual determination as to the nature of each claimant's employment relationship . . . Where this is the case, certification of a collective action under the FLSA is inappropriate.")).

Accordingly, the court denies the *Givens* plaintiffs' motion for conditional certification of a collective action under the FLSA [Doc. No. 873]and denies both the plaintiffs' motion to equitably toll the statutory requirements of 29 U.S.C. § 255(a) [Doc. No. 825] and FedEx's motion to strike late-filed Givens plaintiffs' reply brief in support of their motion to equitably toll the statutory requirements of 29 U.S.C. § 255(a) [Doc. No. 857] as moot.

**Georgia (*White*)**

The Georgia plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and Form OP 149 RES) and/or provided or will provide package pick -up and delivery services pursuant to an executed Operating Agreement; 2) drove or will drive a vehicle on a full -time basis (meaning exclusive of time off for commonly excused employment absences) since July 26, 200 1, to provide package pick -up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Georgia.

The named plaintiffs are a former FedEx FXG Ground driver and a current FedEx Home driver. They estimate the size of the class as 388, at the time of the motion. The named class representative is Earnest White, who formerly drove for FedEx Ground. FedEx argues that Mr. White is an inadequate class representative because he lacks standing to seek future relief, because he cannot adequately represent a class that includes current FedEx Ground drivers and current and former FedEx Home drivers, and because the circumstances of his departure make him an inappropriate class representative.

The court has addressed the first two objections to adequacy as a class representative with respective to classes in other states, but hasn't considered the third objection. That objection is based on the proposition that Mr. White's ill will toward FedEx will keep him from representing the proposed class adequately. The court is unpersuaded that Mr. White's feelings toward his former employer will interfere with his ability to make litigation decisions on the class's behalf, and overrules that objection.

FedEx also argues that Georgia law presumes a contractual designation of a worker's status to be correct, and that the worker must overcome that

presumption by showing that the principal actually assumed control—control in every detail of how the worker performs the job—over the time, manner, or method of doing the job. The plaintiffs argue that Georgia law looks to the right to control, rather than to actual control.

The parties cite almost exclusively to decisions of the Court of Appeals of Georgia, and provide the court with no reason to think the state supreme court would view the law any differently than the intermediate court of appeals. The most recent of the parties' principal citations (and one of the authorities FedEx cites in support of its reading of Georgia law) is Teachers' Retirement Sys. v. Forehand, 506 S.E.2d 913 (Ga. App. 1998). After retiring as superintendent of a school system and beginning to draw retirement benefits, David Forehand was called back into service as a consultant, to hold a different school system together while the school system sought a new superintendent. The contract described Mr. Forehand as an independent contractor; were he an employee, his retirement benefits would be suspended. The trial court found that Mr. Forehand was an independent contractor—as the contract said—because the school board had no right to control the time, manner, and method of his work. The retirement board appealed, and the court of appeals affirmed.

Quoting from McGuire v. Ford Motor Credit Co., 290 S.E.2d 487 (Ga. App. 1982), the court of appeals cited the language FedEx notes: "'Where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the

employer assumed such control.'" 506 S.E.2d at 917. The court of appeals looked at other factors—who paid the respective shares of the Social Security contribution, who paid the federal taxes, whether there was unemployment compensation, worker's compensation, or medical insurance, whether sick leave was accrued, whether there was tenure or a multi-year contract, and whether the contract was terminable for disability or illness—and concluded that the facts didn't convert the relationship to one of employer-employee.

Georgia's presumption in favor of the contractually defined relationship dates back more than half a century. In Morris v. Constitution Pub. Co., 67 S.E.2d 407 (Ga. App. 1951), the plaintiff had injured herself when she tripped over a bundle of newspapers a news carrier left in the entryway to the plaintiff's home, and the plaintiff sued the publisher. The publisher's contract with the carrier stated that the carrier was an independent contractor. The court of appeals stated (in language that appears to place a heavier burden on the party claiming an employment relationship than that of coming forward with evidence to the contrary), "that relation is presumed to be the true one unless the evidence shows that the employer assumed some control over the time, manner or method of doing the work despite the provisions of the contract to the contrary." 67 S.E.2d at 409. The court of appeals reviewed evidence of the actual relationship between the carrier and the publisher, and found that it didn't contradict the contract's definition of the relationship. The carrier was an independent contractor.

Mark Six Realty Assoc., Inc. v. Drake, 463 S.E.2d 917 (Ga. App. 1995), was

a homeowner's breach of warranty claim in which the homeowner sought to hold Mark Six, a realty company (among many others) liable for the wrongdoing of a salesperson (Matsis) associated with the company. Mark Six contended that Ms. Matsis was an independent contractor. The contract said Ms. Matsis was an independent contractor, placing the burden on the homeowner to rebut the presumption that the contract was right, by "showing that [Mark Six[ in fact assumed control over the time, manner, and method of [Ms. Matsis's] work performance." 463 S.E.2d at 919. Mark Six had required that Ms. Matsis work exclusively for Mark Six during the life of the contract, work specified hours (Mark Six designated another person to be present when Ms. Matsis was absent), following Mark Six procedures when negotiating a sale, use standard forms Mark Six provided, and work with a Mark Six account executive. Ms. Matsis also was subject to quarterly performance reviews by a Mark Six sales manager, who was authorized to make changes as necessary. The opinion leaves it unclear whether these indicia of control were found in the contract between Mark Six and Ms. Matsis, or simply were the way things were done.

The court of appeals described these facts as "some evidence . . . Mark Six retained the right to and did, in fact, exercise control over the time, manner, and method of Matsis' performance of her duties." 463 S.E.2d at 920. Because the case was before the court on appeal of a jury verdict in the homeowner's favor, no further analysis was required; that evidence sufficed to support the verdict against Mark Six.

Brown v. Who's Three, Inc., 457 S.E.2d 186 (Ga. App. 1995), reached the court of appeals from a grant of summary judgment to a hair salon on a customer's personal injury claim, based in part on the trial court's holding that an apprentice facial esthetician named Linda Al-Ansari was an independent contractor rather than the salon's employee. The salon's agreement with Ms. Al-Ansari described her as an independent contractor. The court of appeals said nothing about any presumption; the court didn't even mention the agreement until the end of its discussion. As the plaintiffs note, the court of appeals said instead, "Under Georgia law, any contractual characterization of the relationship is not controlling, and the fact-finder is entitled to look beyond the terms of any contract to the parties' behavior in order to determine the true nature of the relationship." 457 S.E.2d at 191. The court of appeals began its analysis by noting that the term "apprentice" ordinary connotes the master-servant relationship more akin to employment that an independent contract. The court further noted that Ms. Al-Ansari couldn't act legally as an independent contractor, because she didn't have the license required to work independently as an esthetician; she was required to apprentice under a licensed esthetician or cosmetologist. The court noted that the salon exercised control over Ms. Al-Ansari's methods and means by approving the table she used. Based on the licensing laws, the traditional view of apprenticeship, and the salon's exercise of some control, the court of appeals concluded that Ms. Al-Ansari was the salon's employee.

The plaintiffs also cite language from Keefe v. Carpet & Upholstery Cleaning

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 22 of 83

by Houndstooth, Inc., 444 S.E.2d 857 (Ga. App. 1994), but that case provides little beyond the language cited. The Keefes had called Carpet & Upholstery to clean their carpet, and Marion Johnson showed up to do the work. Mr. Keefe slipped and fell on water Mr. Johnson had left on the floor, and the Keefes sued Carpet & Upholstery, which claimed Mr. Johnson was an independent contractor. The trial court granted partial summary judgment to Carpet & Upholstery. In the course of discussing the Keefes' apparent authority argument, the court of appeals noted that a trier of fact could find that Carpet & Upholstery distributed jobs to carpet cleaners, provided the cleaners with business cards, told the cleaners to identify themselves as being "with" Carpet & Upholstery, and required the cleaners to use Carpet & Upholstery invoice forms that required checks to be made payable to Carpet & Upholstery. The court of appeals' full discussion actual agency contains the language the plaintiffs cite to this court, but not much more:

> 2. Turning to the question of whether Marion Johnson was an actual agent of defendant, we find that the traditional or "true" test of whether a person is a servant or an independent contractor has been stated in terms of whether the employer has the right to direct the time, the manner, the methods, and the means of execution of the work, as contrasted with the right to insisting upon results according to specifications of the contract. Other cases rely upon the list of 10 factors to be considered pursuant to Restatement of Agency 2d, § 220(2). Applying the factors from both of these tests to the uncontroverted facts in the cases sub judice, we do not find that either alternative answer is compelled by the evidence. Therefore, we conclude that the state court did not err in denying defendant's motion for summary judgment on the issue of actual agency.

444 S.E.2d at 859 (citations omitted). The court made no mention of any written contract between Carpet & Upholstery and Mr. Johnson, much less whether such

a contract designated Mr. Johnson as an employee or an independent contractor.

In Murphy v. Blue Bird Body Co., 429 S.E.2d 530 (Ga. App. 1993), Blue Bird contacted Michael Jenkins to fix a suction fan in a Blue Bird plant, and Mr. Jenkins hired James Murphy to do the job. Mr. Jenkins used a forklift to raise Mr. Murphy to fan level, and Mr. Murphy fell and was injured. Mr. Murphy sued Blue Bird, contending that Blue Bird exercised sufficient control over Mr. Jenkins to make Mr. Jenkins Blue Bird's employee. The court of appeals turned to the ten RESTATEMENT (SECOND) § 220(2) factors and ultimately concluded that Mr. Jenkins acted as an independent contractor on day Mr. Murphy held. The court made no reference to any written contract between Blue Bird and Mr. Jenkins.

Similarly, interesting language but little guidance is found in Hall v. Buck, 426 S.E.2d 586 (Ga. App. 1992), which was (in pertinent part) an appeal from a jury verdict against the owner of a trailer filled with logs, whose driver collided with another motorist. The trailer owner (A & G Timber Company) argued that it should have been directed out because the plaintiff presented too little evidence to support *respondeat superior* liability. The court of appeals briefly summarized the evidence of A & G's control over the driver, then quoted language from an earlier case: "'Where one is employed generally to perform certain services for another, and there is no specific contract to do a certain piece of work according to specifications for a stipulated sum, *it is inferable that the employer has retained the right to control the manner, method and means of the performance of the contract, and that the employee is not an independent contractor.* The test is not whether the

employer did in fact control and direct the employee in the work, but it is whether the employer had that right under the employment contract.'" 426 S.E.2d at 591, quoting Atlanta Braves v. Leslie, 378 S.E.2d 133 (1989) (emphasis supplied by Hall court). Since the FedEx drivers have a specific contract, Hall is of limited help.

FedEx, then, is correct that the provision in its Operating Agreement establishes a rebuttable presumption that its drivers are independent contractors, thus placing a burden on the plaintiffs to come forward with evidence to the contrary. The plaintiffs already have indicated the evidence to the contrary they intend to use: other provisions of the Operating Agreement and generally applicable FedEx policies. At that point, the issue under Georgia law will become the same one that has to be resolved in states in which the court has certified classes—whether FedEx has the right, with respect to the class of drivers as a whole, to control the methods, manners, and means by which the drivers perform the contracted tasks, such as to make the drivers employees rather than the independent contractors the Operating Agreement declares. As is true in other states in which the court has certified classes, that issue will turn on the ten-factor test of RESTATEMENT (SECOND) OF AGENCY § 220(2).

Georgia's rebuttable presumption creates a procedural sidetrack unique from the other states, but ultimately, whether the plaintiff drivers are employees rather than individual contractors can be resolved by common facts. The court grants the plaintiff drivers' motion to certify the proposed Georgia class.

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 25 of 83

**Louisiana (*Boudreaux*)**

The Louisiana plaintiffs seek to certify a damages class under Federal Rule of Civil Procedure 23(b)(3) as to their claims for rescission (third cause of action), violation of Louisiana Revised Statute §§ 23:631 and 23:634 (fourth cause of action), violation of Louisiana Revised Statute § 23:635 (fifth cause of action), violation of Louisiana Revised Statute § 23:963 (seventh cause of action), breach of the covenant of good faith and fair dealings (eighth cause of action), and declaratory relief (ninth cause of action), for the following defined class:

> All persons who, at any time after February 8, 2002, entered into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES) and drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services in Louisiana pursuant to that Operating Agreement.

The plaintiffs also seek to certify a non-damages class under Rule 23(b)(2) for their ninth cause of action seeking declaratory relief, for the following defined class:

> All persons who have since February 8, 2002, entered, or will enter, into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as Form OP-149 and form OP-149 RES) and currently drive, or will drive, a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to that Operating Agreement.

When the class certification motion, there were more than 150 FedEx drivers in Louisiana. Plaintiffs Ryan Boudreaux and Timothy Bellow are former

FedEx Ground drivers in Louisiana.[2] Both performed services for FedEx under the standard Operating Agreement at issue in the Kansas class certification and are subject to FedEx's standardized policies and procedures. To succeed on their claims, the Louisiana drivers will need to show, first, they were FedEx employees rather than independent contractors and second, that they are entitled to relief pursuant to the various Louisiana statutes and common law theories they assert.

FedEx argues that the Louisiana plaintiffs are inadequate class representatives because the Louisiana drivers are so varied, but the court rejected similar arguments in the October 15 and March 25 orders and does so again here for the same reasons. FedEx also contends that a class action isn't the superior method for litigating the claims of each potential class member because there is no manageable definition of "full-time" driver and the plaintiffs didn't present a trial plan. Again, the court previously addressed, and rejected, similar arguments in its March 25 order, and does so again here.

Like most of the other motions for class certification, the Louisiana plaintiffs' claims hinge on whether FedEx misclassified its drivers as independent contractors. FedEx argues that Louisiana law requires individualized evidence to resolve the issue of independent contractor status, so class certification isn't appropriate. FedEx acknowledges that Louisiana utilizes a "right to control" test,

---

[2]As FedEx points out, the Louisiana plaintiffs state in their memorandum that Mr. Bourdeaux is a former Home Delivery driver, but in Mr. Bourdeaux's certification, it states that he was a contractor for Federal Express Ground. Unfortunately, the plaintiffs don't clarify this fact in their reply brief; the court finds it appropriate to rely on the statement in Mr. Bourdeaux's certification.

but says Louisiana's application of this factor reveals that the actual experiences of each contractor will need to be examined. The court disagrees.

In Hickman v. S. Pac. Transport Co., 262 So.2d 385, 390-391 (La. 1972), the court found the following factors relevant in determining whether an independent contractor relationship existed: (1) whether there is a valid contract between the parties; (2) whether the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it; (3) whether the contract calls for specific piecework as a unit to be done according to the individual's own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered; (4) whether there is a specific price for the overall undertaking agreed upon; and (5) whether the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach. This test is appropriate in claims arising under Louisiana Revised Statute § 23:631. Gordon v. Hurlston, 854 So. 2d 469, 472 (La. App. 3 Cir. 2003). The court should also consider the lack of tax withholdings, social security deductions, and typical employee benefits as indicators of independent contractor status. Knapp v. The Mgmt. Co., 476 So. 2d 567, 569 (La. App. 3 Cir. 1985); Course v. Fox Wolff Const., 987 So. 2d 277, 280 (La. App. 5 Cir. 2008).

The principal test is the control over the work reserved by the employer. Hickman v. S. Pac. Transport, 262 So.2d at 391; *see also* Glover v. Diving Servs. Int'l, Inc., 577 So. 2d 1103, 1106 (La. App. 1 Cir. 1991). "Whether an individual

is an employee or an independent contractor . . . depends primarily on the degree of control that the principal retains in the contract over the employee's work." Reynolds v. Paulson, 871 So. 2d 1215, 1218 (La. App. 4 Cir. 2004) (citation omitted). "It is not the actual supervision or control which is actually exercised by the employer that is significant, but whether, from the nature of the relationship, *the right to do so exists.*" Hughes v. Goodreau, 836 So. 2d 649, 656 (La. App. 1 Cir. 2002) (emphasis in original) (citations omitted); *see also* LeCroy v. Interim Health Care Staffing of North Louisiana, Inc., 980 So. 2d 838, 842 (La. App. 2 Cir. 2008). Factors to consider when assessing the right to control include "the selection and engagement of the worker, the payment of wages and the power of control and dismissal." Glover v. Diving Servs., 577 So. 2d at 1106 (*citing* Savoie v. Fireman's Fund Ins. Co., 347 So. 2d 188 (La. 1977)); *see also* LeCroy v. Interim Health Care Staffing, 980 So. 2d at 842.

FedEx contends that while the right to control is important, Louisiana courts also consider actual control. FedEx notes that in Hickman v. S. Pac. Transport the court stated that "[t]he legal relationship between [the parties] is to be determined from the contract between them and from their intentions in establishing and carrying out that relationship as manifested in its performance and the surrounding circumstances." 262 So. 2d at 390. FedEx notes that courts have looked at actual evidence of control to find a disputed question of fact of employee status even though the agreement established an independent contractor relationship, Honeycutt v. Deutschmann, 976 So. 2d 753, 755-756 (La.

App. 5 Cir.), *writ not considered*, 978 So. 2d 338 (La. 2008), and have looked at actual evidence of control to support a finding that an employee relationship existed even though the contract reserved the right to control, Glover v. Diving Servs., 577 So. 2d at 1106. The court doesn't read those cases as supporting the proposition that when the contract establishes a right to control the court can disregard the contractual terms in light of the actual control exercised.

FedEx further contends that the control test requires determination of individualized questions of fact, such as the sequence of deliveries, the work schedule and hours, supervision, and provision of tools and equipment. As already addressed, the right to control relating to these factors can be determined by examining common evidence. The Louisiana drivers argue that the Operating Agreement and commonly applicable FedEx policies reserve to FedEx the right to control, making the drivers FedEx employees. The extent to which FedEx exercised its right to control with respect to any given employee won't change the employee-independent contractor analysis: while one might become an employer by exercising more authority than is contractually granted, FedEx has cited no authority that forbearance of the exercise of contractually granted power to control affects the analysis. FedEx's cited cases don't support its argument that Louisiana courts will look beyond a written contract that would have created an employment relationship to find independent contractor status based on actual control. *See e.g.*, Adams v. Greenhill Petroleum Corp., 631 So. 2d 1231, 1234-1235 (La. App. 5 Cir. 1994) (relying on evidence showing right to exercise control as opposed to

case 3:05-md-00527-RLM -CAN document 1770 filed 07/27/09 page 30 of 83

evidence showing lack of actual control in determining employment status). FedEx raises several concerns involving plaintiffs' intention to utilize individualized evidence to support their claims, but as indicated in the March 25 order, if the drivers intend to offer individualized evidence to establish liability, the court will reexamine class certification.

FedEx next argues that beyond the right to control, additional factors require evaluation of individual evidence—the existence of a valid contract and specific price for the overall undertaking. FedEx hasn't disputed the validity of its agreement. The plaintiffs don't dispute the validity of the agreement for purposes of determining employee status; they contend that the right to control in the agreement establishes an employee-employer relationship and not the independent contractor relationship the agreement claims to establish. Louisiana courts have found that even if the contract recites that the parties have entered into an independent contractor relationship, that term isn't necessarily controlling where other terms in the contract establish an employee relationship. *See* Arroyo v. East Jefferson General Hosp., 956 So. 2d 661, 664 (La. App. 5 Cir.), *writ denied*, 957 So. 2d 179 (La. 2007) (stating that the existence of an independent contractor agreement isn't necessarily dispositive of the issue of employment status). The agreement's validity for determining employment status requires no individualized determinations.[3] The specific price for the overall undertaking can be evaluated

[3]The plaintiffs' claim that the Operating Agreement is invalid and should be rescinded because the drivers are employees is a separate issue that will be addressed

by examining the agreement and policies and common evidence applicable to the class members. The schedule, calculation, and manner of payment can be determined from the Operating Agreement. Whether the employee received a large portion of compensation from "core zone" payments can be examined by categorical determinations as opposed to individualized analysis. *See e.g.*, Kibodeaux v. Progressive Ins. Co., 4 So. 3d 222, 226 (La. App. 3 Cir. 2009), *writ denied*, 6 So. 3d 794 (La. 2009) (examining the structure and timing of payments after noting that the test calls for a specific price for an *overall* undertaking).

FedEx further argues that even if the employment status issue can be resolved on a class-wide basis, the plaintiffs' substantive causes of action need individualized analysis. The plaintiffs seek class certification on their fourth cause of action for violations of §§ 23:631 and 23:634 of Louisiana Revised Statute. Section 23:631 requires earned wages to be paid to former employees on or before the next regular payday or no more than fifteen days after discharge or resignation, whichever occurs first. LA. REV. STAT. § 23:631. Section 23:632 provides that any employer who doesn't comply with section 23:631 is liable to the employee for the lesser of ninety days' wages at the employee's daily rate of pay, or full wages from the time the employee's demand for payment is made until the employer tenders payment. LA. REV. STAT. § 23:632. Section 23:634 prohibits an employment contract that requires the forfeiture of "wages" upon an employee's

only if the court finds that the right to control in the agreement and policies establishes an employee-employer relationship.

case 3:05-md-00527-RLM -CAN document 1770 filed 07/27/09 page 32 of 83

resignation or discharge. LA. REV. STAT. § 23:634. FedEx contends that the drivers' recovery on their fourth cause of action depends on when (if at all) each former driver demanded payment and when they received final settlement.

The court understands the plaintiffs' argument to be that if the drivers are deemed "employees," they are entitled to certain wages that must be paid upon discharge or resignation pursuant to § 23:631. These are "wages" that weren't paid to terminated employees because of FedEx's alleged wrongful classification of the drivers as independent contractors.[4] Section 23:631 doesn't require that the employee first demand payment to recover unpaid wages. The demand for payment may become relevant for determining penalties under § 23:632, but "[w]hen a defendant denies liability after suit is filed, technical deficiencies in a pre-suit demand are waived by him and will not defeat imposition of statutory penalties designed to enforce prompt payment." Carriere v. Pee Wee's Equip. Co., 364 So.2d 555, 557 (La. 1978); *see also* M & D Simon Co. v. Blanchard, 389 So.2d 401, 403 (La. App. 4 Cir. 1980) (indicating that lack of demand can be remedied by filing suit). The issue of demand can be addressed by categorical evidence common to the class.

"[A] good-faith non-arbitrary defense to liability for unpaid wages, i.e., a reasonable basis for resisting liability," can "excuse the employer from the

[4]The plaintiffs should notify the court immediately if this understanding is incorrect. To the extent the plaintiffs intend to assert that individual plaintiffs weren't paid their final settlement payments under the terms of the Operating Agreement, such claims would require individualized analysis and are not suitable for class certification.

imposition of additional penalty wages." Carriere v. Pee Wee's Equip., 364 So.2d at 557. "Where there is a bona fide dispute over the amount of wages due, courts will not consider failure to pay as arbitrary refusal and generally will refuse to award penalties." Winkle v. Advance Prod. & Sys., Inc., 721 So.2d 983, 991 (La. App. 3 Cir. 1998) (citations omitted). "Reliance on an unlawful company policy however does not constitute a good faith non-arbitrary defense to liability for unpaid wages." Beard v. Summit Inst. of Pulmonary Medicine and Rehab., Inc., 707 So.2d 1233, 1237 (La. 1998) (addressing a situation where the employer attempted to rely on a policy despite the plethora of cases finding that similar policies violated the statute). FedEx contends that it wasn't required to pay "wages" to the drivers because they were independent contractors. Whether this is a good-faith non-arbitrary defense can be determined on a class-wide basis.

FedEx notes that § 23:631 doesn't apply to members of the putative class who continue to contract with FedEx; § 23:361 applies only to drivers who have been discharged or resigned. The plaintiffs' class definition for this claim includes both current and former drivers and is therefore too broad. A "class must not be defined so broadly that it encompasses individuals who have little connection with the claim being litigated." O'Neill v. Gourmet Sys. of Minnesota, Inc., 219 F.R.D. 445, 451 (W.D. Wis. 2002) (citation omitted). To obtain certification for this claim, the plaintiffs must define a sub-class that includes only those drivers that can seek relief pursuant to § 23:631.

The plaintiffs' fifth cause of action for illegal deduction pursuant to

Louisiana Revised Statute § 23:635 prohibits employers from "assess[ing] any fines against [its] employees or deduct[ing] any sum as fines from their wages." LA. REV. STAT. § 23:635. FedEx notes that this statute doesn't generally prohibit deductions from wages, but only those deductions that are made to punish or penalize. Samson v. Appollo Res., Inc., 242 F.3d 629, 637 (5th Cir. 2001) (applying Louisiana law). "The few cases discussing § 23:635 restrict employers from levying fines on the employee (via deduction from wages) for failing to follow workplace procedures and regulations." Id. at 637-638 (finding no fine where the deductions weren't arbitrarily fixed and assessed as punishment against the employee for violating a workplace rule or regulation). Further, an employer may deduct the actual cost of damage to the employer's property as a result of the willful or negligent conduct of an employee. Cupp v. Banks, 637 So. 2d 678, 679 (La. App. 2 Cir. 1994); LA. REV. STAT. § 23:635 ("This section shall not apply in cases where the employees willfully or negligently damage goods or works, or in cases where the employees willfully or negligently damage or break the property of the employer . . .")

The plaintiffs seem to argue that only one type of FedEx deduction—cargo claims—violates this Louisiana law. They allege in their complaint that "[d]rivers are subject to deduction from their earned wages of the value of any package lost or stolen or damaged . . . . These deductions are taken without a finding of negligence or fault on the part of the driver and despite the driver following all company policies regarding the care and security of packages." (document # 1647-

5, ¶ 108 ). FedEx argues that a finding of liability pursuant to § 23:635 will require individualized analysis as to whether each cargo claim was assessed by FedEx as a result of negligent or willful behavior by the putative class member. The plaintiffs respond that whether FedEx's policies regarding deductions violate the Louisiana statute is a question that may be answered by examining common evidence applicable to all drivers.

The court agrees with FedEx that a finding of liability pursuant to § 23:635 requires individualized analysis to determine if FedEx deducted wages for lost or stolen packages in the absence of driver negligence or willfulness. The statute prohibits the assessment of fines and whether a deduction constitutes a fine can only be determined by examining the conduct of the individual class members. There might be cases in which FedEx properly deducted wages and other instances where it was improper. The plaintiffs contend that this can be addressed at the damages stage, but whether the deduction was proper isn't a damage issue; it's an issue of liability. Unlike simple problems of calculation of damages for a driver who worked for a known period of time, this issue can't be resolved systematically because it depends on FedEx's application of its policy to individual drivers and the drivers' conduct in each instance. The court therefore declines to certify this claim.

FedEx similarly contends that the plaintiffs' seventh cause of action arising from alleged violations of Louisiana Revised Statute § 23:963 requires individualized analysis. Section 23:963 prohibits employers from coercing or

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 36 of 83

requiring its "employees to deal with or purchase any article of food, clothing or merchandise of any kind whatsoever from any person . . . ." LA. REV. STAT. § 23:963. FedEx contends that this claim isn't founded on whether it had the right to dictate that contractors use certain vendors, but rather, whether FedEx actually coerced them. FedEx notes that the Operating Agreement is silent as to how contractors must fulfill their obligation to provide suitable vehicles and meet certain insurance requirements.

In its reply memorandum, the plaintiffs state that the evidence is undisputed that the only place for a driver to obtain a scanner or FedEx software was from FedEx, so this can be determined on a class wide basis. The plaintiffs further state that FedEx's strict requirements with regard to the specifications for trucks virtually preclude any meaningful choice as to the source of trucks. Assuming the plaintiffs' claim under § 23:963 to be limited to this theory, whether FedEx violated § 23:963 can be determined by evaluating common evidence and making categorical determinations. All employees were subject to the same requirements in the Operating Agreement and related policies. Common evidence can be reviewed to establish the availability of vendors capable of meeting these requirements, and categorical determinations can be made to determine which employees obtained equipment and supplies in compliance with the contract specifications.

FedEx also contends that the plaintiffs' third cause of action for rescission requires individualized analysis. The plaintiffs allege that the Operating Agreement

is void as being illegal or against public policy, and so should be rescinded. Louisiana Civil Code article 2030 states that "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed." LA. CIV. CODE ART. 2030. The plaintiffs argue that article 2030 renders the contract absolutely null and void because it deprives the drivers of the protections Louisiana law provides to employees and unlawfully transfers the business' operating expenses to its employees.

FedEx responds that the plaintiffs' purported common evidence would, at most, only support rescission of portions of the Operating Agreement and not entitle the class to recover the entire value of their work under a theory of unjust enrichment. Article 2034 states that "[n]ullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be presumed that the contract would not have been made without the null provision." LA. CIV. CODE ART. 2034. The comments to article 2034 indicate that the statute "directs the court to consider the totality of the parties' intentions before annulling the agreement when only a portion of it is null." LA. CIV. CODE ART. 2034, 1984 Revision Comment; *see also* Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353, 1358 (La. 1977) ("[A]n immoral or illegal condition within a contract annuls the entire agreement only to the extent to which the agreement depends on it." (internal quotations and citations omitted)); Rathborne Land Co. LLC v. Ascent Energy, Inc., No. 05-2452, 2006 WL 2726367, at *3, 5 (E.D. La.

Sept. 22, 2006) (explaining that "dissolution of a contractual provision because it goes against public policy does not necessarily dissolve the entire contract."). The Operating Agreement contains a saving clause stating that "[i]f any part of this Agreement is declared unlawful or unenforceable, the remainder . . . shall remain in full force and effect." (document # 1647-4, ¶ 15). "[L]ike other questions of contract interpretation, whether a[n] agreement is severable is controlled generally by the intent of the parties as expressed by the contract terms and/or language." Hudson v. City of Bossier, 930 So.2d 881, 894 (La. 2006). "[T]he existence of a severability provision in a contract, while not always regarded as conclusive, will generally be given considerable weight." Id. (internal quotations and citation omitted).

The plaintiffs say that even if article 2034 applies, there is no evidence in the record that FedEx would have signed the Operating Agreement but for the misclassification, nor evidence that any Louisiana driver would have signed on to assume a truck lease payment and other obligations of the Operation Agreement but for the misclassification. The court agrees with FedEx that article 2034 applies to the plaintiffs' claim for rescission. Hudson v. City of Bossier, 930 So. 2d at 894 ("[T]hat the agreements contain a provision that is void as against public policy does not mean that the agreements are invalid in their entirety."). The plaintiffs apparently intend to argue that based on the nature of the alleged unlawful provisions, it can be inferred that FedEx wouldn't have entered into the agreement without such provisions. FedEx, though, must have the opportunity to attempt to

rebut that inference, and Louisiana law appears to allow FedEx to go outside the Operating Agreement to do so. FedEx already has come forth with individualized evidence of some drivers' intentions in other states, and no basis appears that would keep them from doing so on this Louisiana rescission claim. Class certification is inappropriate on this claim.

FedEx argues that because the plaintiffs request to certify a class beginning on February 8, 2002, the statute of limitations will bar some of their claims, but not all. The court has rejected similar arguments previously and does so again here. Individualized statute of limitations determinations weigh against certification under Rule 23(b)(3), but courts have rejected a per se rule that the presence of such issues compels a finding that individual issues predominate. *See* In re Linerboard Antitrust Litig., 305 F.3d 145, 162 (3rd Cir. 2002) ("[T]he mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.") (citations omitted). The court isn't persuaded that resolving the statute of limitations defense will require factually individualized analysis of the class members; this defense can likely be resolved by categorical determinations at the damages stage. In re Revco Sec. Litig., 142 F.R.D. 659, 663 (N.D. Ohio 1992); In re Plywood Anti-Trust Litig., 76 F.R.D. 570, 586 (E.D. La 1976).

For the foregoing reasons, the court GRANTS IN PART the Louisiana plaintiffs' motion for class certification. The motion is DENIED with respect to claims under La R.S. § 23:635, DENIED with respect to claims for rescission,

DENIED with respect to claims of current drivers under La. R.S. § 23:631, and DENIED with respect to claims under La. R.S. § 23:963 based on any theory of coercion not arising from requirements in the Operating Agreement and commonly applicable FedEx policies. The motion is GRANTED in all other respects, but the court orders the plaintiffs to, within ten days of this order, revise the class definition for claims arising under section 23:631.

**Motor Carrier Safety Act (*Vargas*)**

The *Vargas* plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle over forty hours per week at any time during the class period to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) at any time after August 10, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds; 4) were dispatched in a state for which the state's overtime law adopts the FLSA's Motor Carrier Safety Act exemption; and 5) who are not members of a certified Rule 23 state law overtime class in this MDL proceeding.

Named plaintiffs Genaro Vargas, Michael Vosbein, Tim Ketterhagen, Ya Vang, Michael Wise, Jeff Smith, and Ernest Neal III, are current and former pickup and delivery drivers for FedEx Ground. They report that when they filed their certification motion, there were several hundred drivers from twenty states (Alaska, Colorado, Illinois, Kentucky, Maine, Maryland, Massachusetts, Missouri, Montana, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia, and Wisconsin) who were

being deprived of overtime pay based on their alleged misclassification by FedEx as independent contractors. They claim FedEx violated the overtime provisions of the Fair Labor Standards Act as adopted by the twenty states in which the plaintiffs were employed, for drivers of vehicles weighing less than 10,001 pounds.

The parties dispute whether the *Vargas* complaint presents issues that are better resolved in a class action rather than in individual lawsuits. The first issue is whether FedEx misclassified its pickup and delivery drivers as independent contractors rather than employees. The second issue is whether the class members drove vehicles weighing less than 10,001 pounds during the class period in states which require overtime pay for such drivers.

The plaintiffs claim that both issues are common to all class members, reiterating their argument made in support of certification in the individual state actions—that all FedEx drivers sign the same operating agreement and are subject to the same standardized practices and policies. They contend that whether the class members are entitled to overtime pay is based on common proof because the twenty state overtime laws each require that employees receive one and a half times their normal hourly rate for each hour they work over forty per week. The plaintiffs note that the twenty named states incorporate the Motor Carrier Safety Act ("MCSA") exemption contained in the FLSA, which provides that overtime requirements don't apply to any employees with respect to whom the Secretary of Transportation has the power to establish qualifications and maximum hours or service (namely any gross vehicle weight of 10,001 pounds or more). 29 U.S.C. §

213(b)(1); 49 C.F.R. § 390.5. According to the *Vargas* plaintiffs, the state laws differ only in how they incorporate the MCSA exemption.

FedEx maintains that class certification is inappropriate because of the variations in the employment status classification laws of the various states as well as the differences in the substantive state overtime laws. FedEx points out that some states apply the common law right to control test, some apply variations of the economic realities test, and others apply ABC tests or haven't yet determined the classification test to be used in regard to overtime claims. FedEx contends that these variations are material and would require a jury to determine the plaintiffs' employment status under the divergent laws of twenty states, resulting in a fundamentally unmanageable class. FedEx argues that the plaintiffs can't show that common issues predominate because of the substantial variations in the state overtime laws, including different exemptions, different definitions of hours worked, and different methods of computing overtime. Moreover, the states incorporate the MCSA exemption differently: some citing the limits on the Secretary of Transportation's authority, some citing the FLSA overtime provisions, and others citing the MCSA directly.

Although the court has certified state overtime claims for class treatment in several of the states from which the *Vargas* class would be drawn, including Kansas, California, New Hampshire, Arkansas, and Oregon, certification was based on the law of the single state at issue as opposed to the multi-state class the *Vargas* plaintiffs propose. To certify a multi-state class, the laws of the various

states at issue must be sufficiently similar to be managed in a single case. *See* Flanagan v. Allstate Ins. Co., 242 F.R.D. 421, 431-432 (N.D. Ill. 2007) (certifying multi-state class under Rule 23(b)(3) upon finding predominance requirement satisfied by the similarity between the elements of a breach of contract claim under the state laws at issue); *see also* Matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300-1302 (7th Cir. 1995) (declining to certify multi-state, negligence class action based on an amalgamation of the negligence standards of the 50 states and the District of Columbia where the laws at issue were non-identical).

The laws of the various states in the *Vargas* complaint are too dissimilar enough to be managed in a single case. An essential element of the overtime drivers' claim is that they were misclassified as independent contractors, rather than employees; the test used to determine employment status varies by state and requires examination of different types of evidence (even among the states that apply the right to control test, for example, some states use differing tests as to what amounts to sufficient control to make an agent an employee). The plaintiffs' proposed class definition includes plaintiffs from states in which the court denied class certification in its March 25, 2008 order (Illinois, Massachusetts, Missouri, and Montana) based on the determination that individualized issues would predominate in the employment status inquiry. In these states, the agency determination will turn on a variety of issues and a variety of proof from individual plaintiffs, making the proposed *Vargas* class unmanageable. The plaintiffs' suggestion that the *Vargas* class might be divided into subclasses based on the

particular classification test suffers the same defects. Accordingly, the court denies the *Vargas* plaintiffs' motion for class certification.

**Nevada (*DeCesare*)**

Named Nevada plaintiffs Mike DeCesare and Michael Meno sue under the Nevada False Claims Act, NEV. REV. STAT. § 357.010-.250, Nevada tax liability statutes, NEV. REV. STAT. § 363B.110(2), and employee benefits statutes, NEV. REV. STAT. Ch. 608, for violation of statutory duties as to unemployment and workers compensation, rescission, declaratory relief, and injunctive relief. Mr. Decesare and Mr. Meno both are former FedEx Home drivers. They seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since August 1, 2001 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Nevada.

FedEx asserted in its removal petition that the class definition would have included more than 200 people at the time the petition was filed.

FedEx opposes class certification, arguing that (1) Nevada uses an "economic realities" test to decide the nature of the principal-agent relationship, and that test requires the evaluation of individualized evidence; (2) the named plaintiffs lack standing and can't adequately represent so diverse a group of drivers; and (3) class certification is inappropriate under the Nevada False Claims

Act. The court has addressed similar arguments concerning the adequacy of former drivers as class representatives in other states; for the reasons set forth in those discussions, Fed Ex's arguments as to Mr. DeCesare and Mr. Meno are unpersuasive.

Controlling Nevada law is murky at best. That reasonable minds can differ seems eloquently shown by the Nevada plaintiffs' three briefs that each propose a different rules as the law of Nevada. FedEx's two briefs are consistent, but ultimately unpersuasive, on the governing law: FedEx cites Prieur v. D.C.I. Plasma Ctr. of Nevada, Inc., 726 P.2d 1372 (Nev. 1986), for the proposition that Nevada has adopted the "economic realties" test of the FLSA. FedEx bases its argument on the following passage:

> Both the Fair Labor Standards Act and the Nevada Wage and Hour Law require an "employer" to pay minimum wage to an "employee" under specific circumstances; therefore, an entitlement to minimum wage must be predicated on the existence of an employment relationship. *See* NRS 608.250; 29 U.S.C. § 206(a)(1) (1982). *See also Urban v. Continental Convention & Show Management*, 68 N.W.2d 633 (Minn.1955). To determine whether an employment relationship exists, the "economic reality" of the relationship must be considered. *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2nd Cir.1984).

Id. at 1373. FedEx assumes that since the first sentence speaks of both Nevada law and the FLSA, so must the second sentence. This court believes that had the Nevada Supreme Court intended to adopt a test entirely different from any found in its cases before (or since), the seven-paragraph Prieur opinion would have done so more explicitly. Prieur held that inmates whom the state Department of Prisons

farmed out to a private blood plasma laboratory were employees of the Department of Prisons rather than the private laboratory, and so were not entitled to the federal minimum wage rather than less than thirteen cents an hour.

In a footnote in Boucher v. Shaw, 196 P.3d 959, 963 n.27 (Nev. 2008), the Nevada Supreme Court clarified that the "economic reality" test isn't part of Nevada law insofar as necessary to resolve this case.

In the Nevada plaintiffs' opening class certification brief, they argued that Nevada courts look to the amount of control the principal exercises over the agent when deciding whether the agent is an employee or an independent contractor, and that five factors guide that examination:

> (1) the degree of supervision exercised by the putative employer over the details of the work; (2) the source of the worker's wages; (3) the existence of a right on the part of the putative employer to hire and fire the worker; (4) the extent to which the worker's activities further the 'general business concerns' of the putative employer; and (5) the putative employer's right to control the hours and location of employment.

Williston v. Texaco Refining & Marketing, Inc., 848 P.2d 1062, 1063 (Nev. 1993) (quoting Leslie v. J.A. Tiberti Constr., 664 P.2d 963, 965 (Nev. 1983). In later discussions of supplemental authority, Fed Ex argued that this five-factor test looks to actual control, and so weighs against class certification. Williston arose under Nevada's worker compensation laws.

In their reply brief, the Nevada plaintiffs argued that the Nevada courts had abandoned the "actual control exercised" test in favor of the "normal work" test articulated in Meers v. Haughton Elevator, 701 P.2d 1006, 1007 (Nev. 1985), and

codified in the Nevada Industrial Insurance Act, NEV. REV. STAT. § 616B.603. Under that test, a principal is not an if employer if who he enters into a contract with an independent enterprise that is not in the same trade, business, profession or occupation as the principal. NEV. REV. STAT. § 616B.603.

In their supplemental statement following the court's March 2008 class certification opinion, the Nevada plaintiffs argued that while the "normal work" test governs their claims under Nevada statutes, their common law claims are based on Nevada's pre-codification/Meers "right of control" case law, citing Antonini v. Hanna Indus., 573 P.2d 1184, 1186 (Nev. 1978), and Nevada Indus. Com'n v. Bibb, 374 P.2d 531, 534 (Nev. 1962).

Part of the elusiveness of Nevada law flows from statutory amendments in 1985 to its worker compensation laws. Those amendments made independent contractors employees if the work being done normally is carried out through employees in that business. *See* Meers v. Haughton Elevator, 701 P.2d 1006. These amendments brought more workers within the worker compensation laws and broadened the protection against tort liability of those who, in other states, would not be employers or co-employers. It seems fair—and not unkind—to say that the Nevada courts have struggled to apply these unusual and challenging statutes. *See, e.g.*, Richards v. Republic Silver State Disposal, 148 P.2d 684 (Nev. 2006) (replacing previous analytical distinction between construction and non-construction case with new test).

Under Nevada's Industrial Insurance Act, an employee is a "person in the

service of an employer under any appointment or contract of hire." Nev. Rev. Stat. § 616A.105. To prove that an agent is not his employee, a principal must demonstrate both that the agent is an "independent enterprise" and that the principal and agent are not involved in the "same trade, business, profession, or occupation." Hays v. Employers Ins. Co. of Nevada, 31 P.3d 367, 370 (Nev. 2001); Nev. Rev. Stat. § 616B.603(1). Nevada's statutory test, then, pays no attention to control, whether contractual or actual; it looks at the nature of the work of the principal and the agent. FedEx has advanced no reason why that cannot be done on a class-wide basis. The possibility has been raised that Nevada might recognize no private right of action with respect to one or more of the drivers' claims under the Industrial Insurance Act, *see* Baldonado v. Wynn Las Vegas, LLC, 194 P.3d 96 (Nev. 2008), but that issue, too, is common to the class.

Questions of fact and law common to the class preponderate with respect to claims under the Nevada Industrial Insurance Act; class certification is appropriate as to those claims.

The Nevada courts have provided no reason to think the Industrial Insurance Act test applies to any of the plaintiffs' common law claims. In their most recent submissions, the Nevada plaintiffs argue that pre-Act case law continues to govern those claims. The Nevada plaintiffs argue that the pre-Act cases focused on the principal's right to control the agent, citing Antonini v. Hanna Indus., 573 P.2d 1184, 1186 (Nev. 1978); Nevada Indus. Comm'n v. Bibb, 374 P.2d 531, 534 (Nev. 1962); Jackson v. Southern Pacific Co., 285 F. Supp. 388,

389 (D. Nev. 1968) (applying Nevada law). The plaintiffs might be correct that Nevada common law would provide the rule of decision to the non-Industrial Insurance Act claims, but the cited cases provide no guidance on what the common law might be. The cited cases each sought to apply the predecessor Industrial Insurance Act—they are exercises in statutory construction, not exemplars of Nevada common law.

When the state's highest court hasn't spoken, a court sitting in diversity must try to predict how that court would decide, Abstract & Title Guar. Co., Inc. v. Chicago Ins. Co., 489 F.3d 808, 811 (7th Cir. 2007), but the parties haven't provided the court with any basis for predicting the rule the Nevada Supreme Court would apply to common law determinations as to whether an agency relationship is that of employer and employee. As this court's rulings on the myriad class certification motions in this docket demonstrate, the several states have adopted a wide range of rules, and the Nevada briefs equip this court for nothing better than a guess about what Nevada's highest court might do.

As movants for class certification, the plaintiffs bear the burden of demonstrating that the elements of FED. R. CIV. P. 23 have been satisfied. Arreola v. Godinez, 546 F.3d 788, 797 (7th Cir. 2008) ("A plaintiff seeking class certification must satisfy all of the criteria enumerated in Rule 23(a) . . . and fall within at least one subsection of Rule 23(b)."). To satisfy those requirements in the cases in this docket, as this and previous orders explain, plaintiff drivers must demonstrate that the governing law allows the nature of the agency to be

determined without reference to experiences or circumstances of individual drivers. The Nevada plaintiffs have not carried that burden with respect to their claims that don't arise under NEV. REV. STAT. Ch. 608.

Accordingly, the court GRANTS the Nevada plaintiffs' motion for class certification with respect to their claims under NEV. REV. STAT. Ch. 608, but DENIES the motion in all other respects.

**North Carolina (*Whiteside*)**

The North Carolina plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full -time basis (meaning exclusive of time off for commonly excused employment absences) since May 2, 2003, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of North Carolina.

At the time of the class certification motion, 405 drivers would have been in the class. The named plaintiffs are four current FedEx Home Delivery drivers and two former FedEx Ground drivers. They seek the Operating Agreement's rescission as illegal and void as against public policy and to recover the value of their services and expenditures as employees. They also seek certification for a claim under the North Carolina Unfair Trade Practices Act, N.C. GEN. STAT. § 75 1.1(a), and a declaratory judgment that they are employees.

FedEx argues that the North Carolina plaintiffs are inadequate class representatives because the North Carolina drivers are so varied, but the court

rejected similar arguments in the March 2008 order and does so again here, for the same reasons.

FedEx also argues that North Carolina law requires evaluation of each of eight factors, looking beyond the Operating Agreement to determine the parties' intent and communications with each driver when that driver signed on. FedEx says the overall degree of control—not just the right of control—over a particular driver controls the driver's status as an employee, so some of its drivers will be independent contractors even if others are employees.

North Carolina employs an eight-factor test to decide whether one is an employee or an independent contractor: whether the person is engaged in an independent business, calling or operation; is to have independent use of his special skill, knowledge or training in performing the work; is doing a specified piece of work at a fixed price or on a quantitative basis; is subject to discharge for adopting one way of doing the work rather than another; is in the other contracting party's regular employ; is free to use whatever assistants the person might think proper; has full control over such assistants; and selects his or her own time. Johnson v. The News and Observer Publishing Co., 604 S.E.2d 344, 347 (N.C. App. 2004) (quoting Hayes v. Elon College, 29 S.E.2d 137 (N.C. 1944). North Carolina courts consult this eight factor test in deciding whether the putative employer has the right of control that makes the other contracting party an employee. McCown v. Hines, 549 S.E.2d 175, 177-178 (N.C. 2001). "If the employer has the right of control, it is immaterial whether he actually exercises

it." Youngblood v. North State Ford Truck Sales, 364 S.E.2d 433, (N.C. 1988).

None of the cases cited in the briefs suggest that the drivers' status couldn't be decided simply by consideration of the Operating Agreement with FedEx and commonly applicable FedEx policies. When no contract exists, North Carolina courts examine the parties' intent and the control actually exercised. *See, e.g.*. McCown v. Hines, 549 S.E.2d 175; State Employment Security Com'n v. Paris, 400 S.E.2d 76 (N.C. App. 1991). Neither party identified a case in which a North Carolina court looked beyond a written contract that would have created an employment relationship. *See, e.g.*, Johnson v. News and Observer Publishing Co., 604 S.E.2d 344 (N.C. App. 2004) (relying on contract provisions to reverse finding of independent contractor status).

The court grants the North Carolina plaintiffs' motion for class certification.

**Ohio (*Kelly*)**

Named Ohio plaintiffs Paul Kelly, Dean Johnson, Thomas Wenzlick, Kenneth R. Miller, Adelbert Lawrence, Russell Jackson and Robert Velo bring claims for unjust enrichment, fraud, constructive trust, declaratory relief, and injunctive relief. Mr. Kelly, Mr.Johnson, Mr. Wenzlick, Mr. Lawrence, Mr. Jackson, and Mr. Velo drive for FedEx Ground. Mr. Miner is a former FedEx Ground driver. The Ohio plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149-RES) and/or provide or will provide package

> pick-up and delivery services pursuant to an executed Operating Agreement; 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since May 15, 2002 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of terminal in the state of Ohio.

The Ohio plaintiffs report that when they filed their certification motion, the class would have included at least 750 people.

FedEx opposes certification on several grounds. First, FedEx argues that Ohio law will require examination of individual issues including the parties' actual conduct, actual control of the manner and means of performance, and interpretation of the operating agreement. These individual issues, FedEx says, will predominate in the analysis of plaintiffs' employment classification. FedEx also contends that the fraud claim can't be certified. FedEx also argues, as it has with respect to other states, that the named plaintiffs are inadequate class representatives because they seek remedies not sought by all class members and because they are abandoning drivers who might qualify as employees because of actual control (as distinct from the right to control). The court has addressed those arguments with respect to the adequacy of representatives of other classes, and finds FedEx's arguments equally unpersuasive in Ohio. The court rejected FedEx's argument concerning the fraud claim with respect to the Kansas class certification, and does so here for the same reasons.

The Supreme Court of Ohio tells us that the key factual determination in deciding whether an agent is an employee "is who has the right to control the

manner or means of doing the work." Bostic v. Connor, 524 N.E.2d 881, 884 (Ohio 1988). That decision, the court says, is made by examining a set of factors that echoes those cited in RESTATEMENT (SECOND) OF AGENCY § 220:

> The factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.

Id. (citing Gillum v. Indus. Comm., 48 N.E.2d 234, 237-238 (Ohio 1943).

Similar tests have led the court to certify classes in several other states, including Arkansas, Florida, Kansas, Kentucky, Maryland, New Hampshire, New Jersey, Oregon, and Rhode Island.

FedEx argues for a different outcome by citing language from a variety of intermediate appellate court decisions, but none of those cases involved an extracontractual factor making an independent contractor out of an agent over whom a written contract bestows upon the principal the right to control the manner or means of the agent's performance of the contractual duties. See See Napier v. Administrator, Ohio Bureau of Employment Servs., No. 89 AP-741, 1990 WL 31774, at *2 (Ohio Ct. App. Mar. 22, 1990) (RESTATEMENT factors applied; employment relationship found); Harmon v. Schnurmacher, 616 N.E.2d 591, 593 (Ohio Ct. App. 1992) (RESTATEMENT factors applied; employment relationship found); Bee v. Prof. Courier Int'l, Inc., No. S-99-030, 2000 WL 376310, at *2 (Ohio Ct. App. Apr. 14, 2000) (equipment lease agreement stipulated independent

contractor relationship, but actual control created fact issue); Jones v. Trademark Cos., No. 1-99-46, 1999 WL 692603, at *3 (Ohio Ct. App. Sept. 1, 1999) (employment contract stipulated independent contractor relationship, but actual control created fact issue); Clouse v. Quick Air Freight, Inc., 1994 WL 714498, at *3 (Ohio Ct. App. Dec. 22, 1994) (equipment lease agreement stipulated independent contractor relationship, but actual control created fact issue); Silver v. Statz, 849 N.E.2d 320 (Ohio Ct. App. 2006) (newspaper driver's employment contract stipulated independent contractor relationship, but actual control created fact issue).

FedEx places special reliance on two Ohio cases, but they differ too greatly from this one to be of value. FedEx says that in Hoegler v. Auto Site Recovery Service Inc., No. 2459-M, 1996 WL 148631 (Ohio Ct. App. Apr. 3, 1996), the court of appeals discounted the significance of the employment agreement when deciding whether the agreement was erroneously excluded from evidence at trial. As with many of the cases just cited, though, the contract described the agent as an independent contractor, while evidence of ample actual control over the agent supported the jury's finding that the agent was an employee. A lack of contractual control doesn't offset an otherwise sufficient exercise of actual control under Ohio law—given enough actual control, the agent is an employee no matter what the contract says. But that doesn't support the inference, which is the proposition FedEx needs to defeat class certification: that forbearance of sufficient contractually-granted actual control produces an independent contractor under

case 3:05-md-00527-RLM -CAN document 1770 filed 07/27/09 page 56 of 83

Ohio law.

FedEx cites Ogier v. Stewart Brothers, Inc., No. 96APE12-1732, 1997 WL 447652, at *1 (Ohio Ct. App. Aug. 5, 1997), for the proposition that an unexercised contractual right of control may be disregarded. Perhaps so, but Ogier doesn't say it may be disregarded in this case. The issues in Ogier were twofold: whether Mr. Ogier was an independent contract or an employee, and if he was an employee, whose employee he was. Mr. Ogier's employment contract with LandAir created an employment relationship. LandAir's contract with Stewart appeared to delegate to Stewart some control over Mr. Ogier, but the actual performance of LandAir-Stewart contract defeated argument that Stewart also was Mr. Ogier's employer. That holding falls well short of saying courts may disregard an otherwise sufficient right to control found in the control between the principal and the agent.

The court grants the Ohio plaintiffs' motion for class certification.

**Oregon (*Leighter*)**

Named Oregon plaintiffs Jon Leighter and David Spicer seek to certify a damages and unjust enrichment class under Federal Rule of Civil Procedure 23(b)(3) for violation of Oregon Revised Statute § 652.610 (illegal deductions for wages) and rescission of the Operating Agreement. They also seek to certify a class under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief.

The plaintiffs' proposed class is defined as:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since July 20, 1999, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Oregon.

The plaintiffs further seek to certify two damages subclasses. The first subclass includes drivers who have been denied overtime premium pay and is defined as:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) who, at any time after August 10, 2005, operated vehicles with a gross vehicle weight rating of less than 10,001 pounds.

The second subclass includes former drivers who have claims for statutory penalty wages under Oregon Revised Statute § 652.150 and is defined as:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) whose Operating Agreement was terminated any date after July 20, 1999.

The named plaintiffs were Home Delivery drivers for FedEx during the proposed class period and performed services for FedEx under the FedEx standard Operating Agreement and common applicable policies. Mr. Leighter stopped

driving for FedEx in August 2007 and Mr. Spicer stopped driving for FedEx in April or May 2007. Both plaintiffs drove trucks with gross weight ratings under 10,001 pounds and both routinely worked for FedEx in excess of eight hours per day and forty hours per week.

At the time of the class certification motion, there were 140 FedEx drivers in Oregon; of these, 42 were Home Delivery drivers who drove trucks under 10,001 pounds. The record establishes numerous other drivers who entered into Operating Agreements during the class period, but who have since ceased working for FedEx.

FedEx argues that the Oregon plaintiffs are inadequate class representatives because the Oregon drivers are so varied, but the court rejected similar arguments in the October 2007 and March 2008 orders and does so again here for the same reasons. FedEx further maintains that extrinsic, parol evidence will be required to interpret the Operating Agreement, which will necessarily involve the evaluation of individualized evidence. Again, the court previously addressed, and rejected, similar arguments in its previous order, and does so again here.

Like most of the other class certification motions, the Oregon plaintiffs' claims hinge primarily on whether FedEx misclassified its drivers as independent contractors. FedEx argues that Oregon law requires individualized evidence to resolve the issue of independent contractor status, so class certification isn't appropriate. As to the plaintiffs' wage deductions, overtime, and non-payment of wages upon termination claims, FedEx acknowledges that this court has already

found that the applicable right to control test can be addressed on a class-wide basis. (*See* March 25, 2009 Opinion, pp. 108-110, *Slayman* plaintiffs). Although the court also previously certified the *Slayman* plaintiffs' rescission claim under Oregon law, FedEx now asserts that this claim should be governed, at least in part, by Oregon Revised Statute § 670.600, which requires individualize analysis. The court's previous order didn't address the statutory definition of independent contractor found in § 670.600.

As indicated in the March 2008 order, Oregon courts generally utilize a common law "right to control" test to decide a worker's status. Perri v. Certified Languages Int'l LLC, 66 P.3d 531, 534 (Or. Ct. App. 2003) (citation omitted). "While there is no simple measure of the extent to which an employer may control a worker in the performance of his task without creating a master-servant relationship, *control over performance remains the principal test*." Schaff v. Ray's Land & Sea Food Co., Inc., 45 P.3d 936, 939 (Or. 2002) (*quoting* Jenkins v. AAA Heating & Cooling, Inc., 421 P.2d 971 (1966)). "Generally, the test for determining whether one is a servant or an independent contractor is based not on the actual exercise of control by the employer, but on the right to control." Cantua v. Creager, 7 P.3d 693, 700 (Or. Ct. App. 2000) (*quoting* Great American Ins. v. General Ins., 475 P.2d 415 (Or. 1970)). Courts analyze the following factors under that test: (1) the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire. Id. (citation omitted).

No single factor is dispositive, but a single factor indicating an employer-

employee relationship may be proof of an employment relationship, "whereas contrary evidence, indicating independent contractor status, is, at best, mildly persuasive and may have no effect at all to a determination of worker status.'" Stamp v. Dept. of Consumer and Bus. Servs., 9 P.3d 729, 733 (Or. App. 2000) (citation omitted). Oregon courts use the "right of control" test when evaluating whether a person is an employer under Oregon Revised Statute § 652. Ford-Torres v. Cascade Valley Telecom, Inc., 2008 WL 551503, at * 3 (D. Or. 2008). This test also applies to claims for overtime payments. Perri v. Certified Languages, 66 P.3d at 535 (applying "right to control" test to alleged violations of Oregon's minimum wage and overtime statutes). This "right to control" test thus applies to the plaintiffs' claims of wage deductions, overtime, and non-payment of wages upon termination. As the court has previously found, this test can be applied by examining the Operating Agreement and commonly applicable FedEx policies.[5] *See* March 25, 2009 Opinion, pp. 109-110 (citing Oregon cases applying varying tests, but concluding that the applicable tests wouldn't require individual, driver-by-driver analysis to determine employment status).

The plaintiffs' rescission claim is based on FedEx's alleged misclassification of its drivers as independent contractors to evade employment-related obligations such as providing workmen's compensation insurance and unemployment

[5] The court notes that the plaintiffs may have indicated a desire to introduce anecdotal evidence to support their claims in this action. If the plaintiffs intend to introduce anecdotal evidence of FedEx's actual exercise of control to support their claims, they should inform the court immediately because this may require re-evaluation of class certification.

insurance and the withholding of income tax. These obligations arise by statute and don't apply to "independent contractors." Oregon Revised Statute § 670.600 sets forth a standard to be used when determining if an individual is an independent contractor for purposes of Chapter 316 (personal income tax), 656 (workers' compensation), and 657 (unemployment insurance).

Although Section 670.600 states a test for determining whether a worker is an independent contractor, the Oregon Supreme Court in S-W Floor Cover Shop v. Nat'l Council on Compensation Ins., 872 P.2d 1, 10 (Or. 1994) found:

> A determination first is made as to whether one is a "worker" before a determination is made as to whether that "worker" is a "nonsubject" worker pursuant to one of the exemptions of ORS 656.027. The initial determination of whether one is a "worker" under ORS 656.005[] continues to incorporate the judicially created "right to control" test. One who is not a "worker" under that test is not subject to workers' compensation coverage, and the inquiry ends. The "nonsubject worker" provisions of ORS 656.027 never come into play. If the initial determination made under ORS 656.005[] is that one is a worker because one is subject to direction and control under the judicially created "right to control" test, then one goes on to determine under ORS 656.027 whether the worker is "nonsubject" under one of the exceptions of that statute.

Id. at 10. In discussing the "right to control test" in the workers' compensation context, the court stated that it "is based not on the actual exercise of control by the employer, but on the right to control."' Id. at 5. Further, "[w]here the relationship between the parties cannot be established by the 'right to control' test," the court stated that it is "permissible to turn to the judicially created 'nature of the work' test to determine if an employment relationship exists." Id. at 5, n.6 (citation omitted).

The S-W Floor Cover Shop holding made the criteria of Section "670.600 essentially irrelevant to determining whether a person is a worker under the Workers' Compensation Law." Trabosh v. Washington County, 915 P.2d 1011, 1014 (Or. App. 1996) ("Because the definition of worker incorporates the right to control test without using the term "independent contractor" or otherwise referring to ORS 670.600, the traditional test of an independent contract remains the operative one; the exemptions of ORS 656.027, with their incorporation of ORS 670.600, never come into play."). Since the Supreme Court's decision, courts "have applied the right to control and nature of the work tests to determine a person's status under the Workers' Compensation Law without reference to ORS 670.600." Id.

"[W]hen an employer has the right to control a claimant's performance in some respects but not others, it is essential that [the court] consider the factors which make up the 'nature of work' test in deciding whether the control that employer retains makes the relationship one of master and servant." Rubalcaba v. Nagaki Farms, Inc., 43 P.3d 1106, 1111-1112 (Or. 2002) (*citing* Woody v. Waibel, 554 P.2d 492 (Or. 1976)) (although control is an "essential ingredient" in determining employment status, workers' compensation statutes do not preclude consideration of nature of work factors when some evidence of control exists)). The right to control and nature of work tests aren't independent and shouldn't be applied hierarchically. Id. at 1112. When "there is some evidence suggesting that an employer retained the right to control the method and details of a claimant's

work, a conclusion about the claimant's status depends on the analytical factors relevant to both tests." Id. When the right to control test conclusively establishes an employment relationship however, it may not be necessary to consider the nature of work factors. *See* Stamp v. Dept. of Consumer and Bus. Serv., 9 P.3d 729, 735 (Or. App. 2000). In evaluating the "nature of work" test, the court should "consider[] factors such as whether the work at issue is a regular part of the employer's business, whether the work is continuous or intermittent, and whether the duration of the work is such that it qualifies as a hiring for a continuing service or as contracting for the completion of a particular job." Schmidt v. Intel Corp., 112 P.3d 428, 432 (Or. App. 2005) (citation omitted).

The Oregon Supreme Court uses the right to control and nature of work test when determining employment status in worker compensation cases; these tests can likely be analyzed by evaluating common evidence applicable to the entire class. But this isn't so when analyzing the unemployment insurance statute,[6] because the test used in that context involves application of the statutory definition of independent contractor found in Section 670.600.

Oregon's unemployment insurance statute only applies to "employment", defined with certain exceptions as "service for an employer . . . performed for

[6]Determining employment status under the tax withholding statute likely requires individualized analysis, but because the application of Section 670.600 to this statute hasn't been clarified in light of S-W Floor Cover Shop v. Nat'l Council on Compensation, the court limits its analysis to the unemployment insurance statute.

remuneration or under any contract of hire . . ." ORS § 657.030(1).[7] There is a statutory exception for services performed by an "independent contractor as that term is defined in ORS 670.600." ORS § 657.040(1). To be considered an independent contractor, an individual must meet all applicable standards as outlined in the statute. Each standard is conclusive. PacifiCab Co. v. Employment Dept., 69 P.3d 774, 776 (Or. App. 2003). Section 670.600[8] provides:

> 2). . . "[I]ndependent contractor" means a person who provides services for remuneration and who, in the provision of the services:
>
> (a) Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;
> (b) Except as provided in subsection (4) of this section, is customarily engaged in an independently established business;
> (c) Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required . . . ; and
> (d) Is responsible for obtaining other licenses or certificates necessary to provide the services.
>
> (3) For purposes of subsection (2)(b) of this section, a person is considered to be customarily engaged in an independently established business if any three of the following requirements are met:
>
> (a) The person maintains a business location:
> (A) That is separate from the business or work location of the person for whom the services are provided; or
> (B) That is in a portion of the person's residence and that

[7]FedEx contends that it is exempted from this statute pursuant to ORS § 657.047(1)(b), which provides a blanket exemption for certain transportation related services. The court however needn't decide that issue today.

[8]Section 670.600 underwent significant revisions that became effective in 2006. Oregon Laws Ch. 533, S.B. No. 323 (2005). *See* PacifiCab Co. v. Employment Dept., 69 P.3d at 697 (analyzing the prior version of the statute). The court recites the current version of the statute in this opinion, but notes that both versions would likely be applicable to individuals in the proposed class.

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 65 of 83

portion is used primarily for the business.

(b) The person bears the risk of loss related to the business or the provision of services as shown by factors such as:

(A) The person enters into fixed-price contracts;

(B) The person is required to correct defective work;

(C) The person warrants the services provided; or

(D) The person negotiates indemnification agreements or purchases liability insurance, performance bonds or errors and omissions insurance.

(c) The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

(d) The person makes a significant investment in the business, through means such as:

(A) Purchasing tools or equipment necessary to provide the services;

(B) Paying for the premises or facilities where the services are provided; or

(C) Paying for licenses, certificates or specialized training required to provide the services.

(e) The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons.

ORS § 670.600(2) and (3). Once the claimant has established an employment relationship, the employer has the burden to establish that the worker is an independent contractor under the statute. Petersen v. Employment Dept., 898 P.2d 210, 217 (Or. App. 1995); Travel Networkers, LLC v. Employment Dept., 30 P.3d 416, 418 (Or. App. 2001) ("[T]he fact that Travel Networkers pays its agents for their services means that they are deemed employees for unemployment tax purposes, unless Travel Networkers can prove that its agents are independent contractors, as that term is defined in ORS 670.600.").

As has been explained in greater detail with respect to other states that use

similar tests that place burdens on the putative employer to prove a variety of things in addition to lack of contractual control, the court cannot limit FedEx's proof to the Operating Agreement and commonly applicable policies. To prevail on the named plaintiffs' claim for rescission under Oregon law, FedEx will need to prove much more than simply lack of contractual control, including lack of control in fact and engagement in an independently established business. The plaintiffs might be correct that FedEx can't prove lack of control under the contract, and so will fail in its ultimate burden of proof. Or the plaintiffs might be wrong. As noted previously though, today is not the occasion to evaluate the sufficiency of FedEx's ultimate proof. Even though the plaintiffs likely can present common evidence on FedEx's alleged violation of the workers' compensation statute, the court declines to certify their rescission claim because the claim rests in part on an alleged violation of the unemployment insurance statute, which requires application of Section 670.600.

The court takes this opportunity to reconsider its holding in *Slayman* (Case No. 3:05-CV-596 (OR)), on class certification of the plaintiffs' claim for rescission. For the reasons stated above, the court decertifies the plaintiffs' rescission claim in the *Slayman* action.

FedEx also claims that class certification should be denied on the plaintiffs' proposed subclasses because the class members can't be readily ascertained. The plaintiffs propose one subclass arising under Oregon Revised Statute § 652.150 (non-payment of wages upon termination). Section § 652.150 applies only to

situations where "an employer discharges an employee," "when employment is terminated by mutual agreement," or when "an employee who does not have a contract for a definite period quits employment." ORS § 652.140. This class of plaintiffs can be readily ascertained by making categorical determinations relating to drivers' termination from FedEx and doesn't require individual factual analysis. Similarly, plaintiffs' proposes subclass for overtime wages applies to drivers who operated trucks less than 10,001 pounds. This class is based on the objective standard of whether a driver's truck weighs less than 10,001 pounds and can be readily ascertained without requiring the court to engage in individual factual analysis.

For the foregoing reasons, the court GRANTS the Oregon plaintiffs' motion for class certification IN PART. The motion is GRANTED with respect to plaintiffs' claims for damages and equitable relief relating to wage deductions, overtime, and non-payment of wages upon termination. The motion is DENIED with respect to plaintiffs' claim for rescission.

**Utah (*Fishler*)**

The Utah plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since November 16, 2003, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Utah.

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 68 of 83

At the time of the class certification motion, FedEx had contracts with ninety-one drivers in Utah. The named plaintiffs are three current pickup and delivery drivers dispatched out of terminals in Utah who performed services for FedEx under the terms of the same Ground Operating Agreement as the Kansas plaintiffs. Two of the named plaintiffs work full-time for FedEx and one of the plaintiffs worked full time until February 2008 and now works part-time. The plaintiffs claim that FedEx wrongfully classified them as independent contractors instead of employees and made improper withholdings and deductions from their wages in violation of the Utah Payment of Wages Act and related Utah Administrative Code. The plaintiffs also seek rescission of the Operating Agreement as void against public policy and, once those contracts are rescinded, *quantum meruit* for compensation of the business expenses the drivers were required to incur. They also seek a declaratory judgment that they are employees.

FedEx argues that the Utah plaintiffs are inadequate class representatives because the Utah drivers are so varied, but the court rejected similar arguments in the October 2007 and March 2008 orders and does so again here for the same reasons. FedEx also contends that a class action isn't the superior method for litigating the claims of each potential class member because there is no manageable definition of "full-time," driver,[9] individualized litigation is feasible, and

[9] FedEx also argued that "[t]he lack of a defined time period for class participation render[ed] the class too indefinite to permit class treatment." The Utah plaintiffs modified the proposed class to include a time limitation.

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 69 of 83

the plaintiffs didn't present a trial plan. Again, the court previously addressed, and rejected, similar arguments in its March 2008 order. FedEx further argues that the plaintiffs' equitable relief claims are unfit for class certification under Rule 23(b)(2) because they seek primarily monetary relief. The court has also previously considered and rejected a similar argument in its October 2007 order.

Like most of the other motions for class certification, all of the Utah plaintiffs' claims hinge on whether FedEx misclassified its drivers as independent contractors. FedEx argues that Utah law requires individualized evidence to resolve the issue of independent contractor status, so class certification isn't appropriate. FedEx reasons that Utah law requires the court to look beyond the Operating Agreement to determine the extent of control it actually exercised over the driver. FedEx acknowledges that Utah utilizes a "right to control" test in workers' compensation cases, but says that the workers' compensation cases are inapplicable because those cases address a specific statutory definition of "employee" that doesn't apply to the statutory wage deduction and common law claims the Utah drivers assert. FedEx points out that "employee" isn't defined in the Utah Payment of Wages Act or related provisions of the Utah Administrative Code and the court therefore should apply the judicially created agency test set forth in Thiokol Chemical Corp. v. Peterson, 393 P.2d 391 (Utah 1964).

Contrary to FedEx's assertions, Utah courts have consistently applied a "right to control" analysis in non-workers' compensation cases when determining employer-independent contractor status; nothing in Thiokol Chemical v. Peterson

suggests that the court intended to set forth a different rule. The issue in Thiokol Chemical v. Peterson was whether Thiokol was an agent or independent contractor of the county for purposes of determining Thiokol's tax obligations. 393 P.2d at 392, 394-395. The court noted that the most fundamental criteria in making this determination is "the extent of control" and explained that "[i]f the employer exercises control over the means of accomplishing the result, this points toward an agent or servant relationship." Id. at 394. The Thiokol court didn't focus on the degree of control actually asserted, but instead relied on the terms in the parties' contract to determine employment status. Id. at 394-395. The court found that the "main purport of the contract . . . is directioned toward requiring Thiokol to pursue its own course in accomplishing 'the end result,' rather than the Government having actual management and direction of the enterprise." Id. The court concluded that under the facts shown and the terms of the contract, Thiokol was an independent contractor.

More recent cases confirm the "right to control" test is applicable. In Glover v. Boy Scouts of Am., 923 P.2d 1383, 1385 (Utah 1996), a case involving vicarious liability, the court stated that "[w]hether an employer-employee relationship exists under the first prong of this test is determined by whether the alleged employer had the right to control the employee." Id. (*citing* Averett v. Grange, 909 P.2d 246, 249 (Utah 1996)). The court explained that "[t]he right-to-control concept comes from agency law," and noted that this test has been applied most often in Workers' Compensation cases. Id. The court relied on Foster v. Steed, 432 P.2d 60 (Utah

1967), a factually similar case, noting that its inquiry in Foster "was based on the general analytical model we use in applying the right-to-control test in workers' compensation situations, i.e., identifying specific facts which did or did not evidence the principal's right to control the agent." Glover v. Boy Scouts, 923 P.2d at 1386 (*citing* Foster v. Steed, 432 P.2d at 62-63). The court stated that "it is not the *actual* exercise of control that determines whether an employer-employee relationship exists; it is the right to control that is determinative." Id. at 1388 (*citing* Averett v. Grange, 909 P.2d 246, 249 (Utah 1995)).

Utah's "right to control" test applies to this case. The court in Utah Home Fire Ins. Co. v. Manning, 985 P.2d 243 (Utah 1999) explained that "[r]egardless of how the parties intended to structure their relationship, a worker is considered to have been an employee if the employer had the right to control the worker's manner or method of executing or carrying out the work." Id. at 246 (citations omitted). The court will consider the following when determining the parties' relationship: "(1) whatever covenants or agreements exist concerning the right of direction and control over the employee, whether express or implied; (2) the right to hire and fire; (3) the method of payment . . .; and (4) the furnishing of equipment." Id. (citations omitted). The court may also "consider the intent of the parties and the business of the employer." *See* Glover v. Boy Scouts, 923 P.2d at 1386. Although all the factors are taken into consideration, "the first factor—'the legal right of direction and control over [the employee],'—is the 'critical element underlying an employment relationship."' Mitchell v. Rice, 885 P.2d 820, 821 (Utah

App. 1994) (*citing* Kinne v. Indust. Comm'n, 609 P.2d 926, 928 (Utah 1980)).

FedEx contends that even if the "right to control" test applies, it requires individualized determinations, pointing to the following statement in Utah Home Fire Ins. v. Manning: "In assessing a given relationship, not only do we consider whatever agreements exist concerning the right of control, but we also take into account the actual dealings between the parties and the control that was in fact asserted." Utah Home Fire v. Manning, 985 P.2d at 247. The Manning court found that not only did the contracts in that case establish a right to control, but such control was actually exercised. Id. at 247. The court in Manning didn't say or suggest that if the contract establishes a right to control, the court can disregard such contractual terms in light of the actual control exercised. As stated, it is not the exercise of control, but the right to control that is determinative. *See* Utah Home Fire v. Manning, 985 P.2d at 246.

FedEx further notes that the concept of right to control isn't rigidly and narrowly defined and that many factors have been applied in determining the right to control, including "actual supervision of the worker, the extent of the supervision, the method of payment, the furnishing of equipment for the worker, and the right to terminate the worker." Bennett v. Industrial Com'n of Utah, 726 P.2d 427, 430 (Utah1986). In Bennett, though, there was no written contract, so the court had to analyze the parties' actual dealings to determine control. *See* Bennett v. Industr. Comm'n, 726 P.2d at 430. The court isn't persuaded that actual control is relevant when the right to control in a contract is sufficient to

establish an employee-employer relationship, as the plaintiffs contend in this case.

FedEx also relies on the court's holding in Tasters Ltd. v. Dept. of Employment Sec., 863 P.2d 12 (Utah App. 1993), to support its proposition that individual evidence is necessary to determine how the Operating Agreement actually was implemented. The Tasters court reversed a decision by the Board of Review of the Industrial Commission that persons demonstrating products in grocery and department stores were employees and under Utah's Employment Security Act). Id. at 27. The statute requires the Board to analyze twenty enumerated factors when deciding employment status. Id. at 17. The Board relied in part on a two-page instruction given to the demonstrators entitled, listing fourteen guidelines concerning attire, length of breaks, punctuality, and demonstration tactics. Id. at 22. The Board found that this list set forth binding requirements that indicated employee status. Id. The court of appeals reversed, partly because the list was subject to mixed interpretations and extrinsic evidence was needed to determine whether the instructions were mandatory or merely advisory. Id. at 23, 27. The court found that given the evidence presented, the record didn't "support a finding that this list set forth mandatory requirements of the sort typical of a routine employment relationship." Id. at 23.

The Tasters court relied on a statutory test that doesn't apply to this case. Further, the Operating Agreements in this case are detailed agreements delineating the parties' relationship, not advisory guidelines. If FedEx contends that some of the agreements' terms or policies are merely advisory, it can point to common proof

case 3:05-md-00527-RLM-CAN document 1770 filed 07/27/09 page 74 of 83

of generally applicable policies and procedures to defend its interpretation of the agreements; individualized analysis isn't necessary. *See* Tasters v, Employment Sec., 863 P.2d at 23 (making a determination for a class of people based on common evidence).

The extent to which FedEx exercised its right to control any given employee or terminal won't change the analysis of employee-independent contractor status: while one might become an employer by exercising more authority than is contractually granted, FedEx hasn't cited authority that forbearance of the exercise of contractually granted power to control affects the analysis. *See* Mitchell v. Rice, 885 P.2d at 822 (finding that even though the extent of actual control was disputed, the plaintiffs were able to establish employment status based on the right to control in the contract). The court understands the Utah plaintiffs' argument to be that though the Operating Agreement labels the drivers as independent contractors, the Operating Agreement and commonly applicable FedEx policies reserve to FedEx the right to control, making the drivers employees. The cases don't support FedEx's argument that the Utah courts will look beyond a written contract that would have created an employment relationship to find independent contractor status based on actual control.

FedEx also argues that the right to control isn't determinative and that the courts should look at all the factors when deciding the relationship of the parties, including the parties' intent. *See* Gourdin By and Through Close v. Sharon's Cultural Educ. Recreational Ass'n, 845 P.2d 242, 245 (Utah1992) (considering

compensation, direction and control, intent, and business context; no single factor is completely controlling); *see also* Sutton v. Indust. Comm'n of Utah, 344 P.2d 538 (Utah 1959) (stating that intent is one of the most important factors). Although intent is a factor for the court to consider, recent cases haven't placed much, if any, emphasis on intent, and there is little support that this factor would require the court to look beyond the terms of the Operating Agreement and common applicable policies.

Nothing suggests the court will need to engage in an individualized analysis when addressing the right to hire and fire, the method of payment and the furnishing of equipment—the other factors this court must consider. Utah Home Fire Ins. Co. v. Manning, 985 P.2d at 246. The court addressed similar factors in its previous orders and found that such factors can be determined primarily by consulting the Operating Agreement and commonly applicable FedEx policies. Review of these factors will require analysis of common proof applicable to the class.

FedEx further contends that the plaintiffs' rescission claims are unsuitable for class certification because FedEx is entitled to assert a defense of laches requiring individualized considerations. The court addressed a similar argument under Minnesota law and found that "[t]he variety of individual defenses . . . doesn't eliminate the presence of a predominant common question of fact." *See* LaFlamme v. Carpenters Local No. 370 Pension Plan, 212 F.R.D. 448, 455 (N.D. N.Y. 2003); Gaspar v. Linvatec Corp., 167 F.R.D. 51, 58 (N.D. Ill. 1996)." *See also*

Wagner v. NutraSweet Co., 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality . . . should be determined with reference to the company's actions, not with respect to particularized defenses . . . against certain class members."). FedEx hasn't pointed to anything about Utah law on laches that would lead this court to find differently here. Any inquiry concerning the defense of laches can be addressed by examining common evidence applicable to the class members. *See* Kelly v. City and County of San Francisco, 2005 WL 3113065, at *6 (N.D. Cal. 2005) (unreported).

FedEx further argues that the Utah plaintiffs seek to certify a class that will necessarily encompass persons who have time-barred claims under the Wage Payment Act, requiring individual analysis of its statute of limitations defense. The Utah plaintiffs seek to certify a class of full-time drivers since November 16, 2003 and explain that "[t]his time period is calculated based on the greater of the statute of limitations for rescission and *quantum merit*, McKean v. McBride, 884 P.2d 1314, 1317-1318 (Utah Ct. App. 1994) (4 years), and the statute of limitations for Wage Payment Act claims, Utah Code Ann. § 78B-2-305 (3 years for statutory claims)." FedEx contends that the plaintiffs' motion to certify a class with a four-year time window means that there will be class members who have time-barred claims. The court isn't persuaded that resolving the statute of limitations defense will require factually individualized analysis of the class members; this defense can likely be resolved by categorical determinations. The court directs the Utah plaintiffs to provide FedEx with the names of the class members they allege fall within the three year limitations period for relief under the Wage Payment Act once this

information can be ascertained.

For the foregoing reasons, the court grants the Utah plaintiffs' motion for class certification.

**Vermont (*Gruhn*)**

The Vermont plaintiffs seek to certify the following class:

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP 149 and form OP-149 RES); 2) drove or will drive a vehicle on a fulltime basis (meaning exclusive of time off for commonly excused employment absences) since July 25, 2001 to provide package pickup and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Vermont.

The named plaintiffs are former FedEx Ground driver Frank Gruhn, former FedEx Home driver Kevin Draper, and current FedEx Home driver Jeremy MacDonald. They report that when they filed their certification motion, there were at least 42 drivers in Vermont. They claim FedEx violated the Vermont Independent Contractor Law, VT, STAT. ANN. tit. 21, §§ 341, 601(3), and also violated the Vermont Wage Laws, VT. STAT. ANN. tit. 21, §§ 342, by withholding from the drivers' compensation amounts to which employees are entitled.

The parties' dispute over the propriety of certification of a Vermont class is fought on ground that already has been plowed. The parties agree that Vermont law places on FedEx the burden to establish that the drivers are not employees. VT. STAT. ANN. tit. 21, § 341. FedEx must prove that

(1) the individual has been and will continue to be free from control or

case 3:05-md-00527-RLM -CAN document 1770 filed 07/27/09 page 78 of 83

> direction over the performance of such services, both under the contract of services and in fact; and
> (2) the service is either outside all the usual course of business for which such service is performed, or outside all the places of business of the enterprise for which such service is performed; and
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business.

VT. STAT. ANN. tit. 21, § 341(1-3).

As with Massachusetts, Illinois, and Colorado, Vermont law places burdens on FedEx to prove things that cannot all be determined simply by examination of the Operating Agreement and common applicable policies. To meet its burden of proof, FedEx must prove that each driver was free from control or direction over the performance of the driver's services in fact as well as under the contract, and that each driver is customarily engaged in an independently established calling. Perhaps, as the Vermont plaintiffs believe, FedEx will fail because it can't prove the drivers' freedom from control or direction under the Operating Agreement. But this is not the stage of proceedings to decide that issue, and if FedEx clears that hurdle, several dozen individualized findings would remain to be made on the issue of liability.

For these reasons, the court denies the Vermont plaintiffs' motion for class certification.

**Certification**

For the reasons stated in the October 2007, the court continues to believe

that certification under Rule 23(b)(3) is the most appropriate course. Accordingly, the classes certified in this order are certified under that Rule.

**Conclusion**

The court ORDERS as follows:

1. The court GRANTS the Arizona plaintiffs' motion for class certification (Doc. #866), and certifies the following class under Fed. R. Civ. P. 23(b)(3):

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES) and/or provided or will provide package pick-up and delivery services pursuant to an executed Operating Agreement; 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since May 11, 2004, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Arizona.

2. The court GRANTS the Georgia plaintiffs' motion for class certification (Doc #868), and certifies the following class under Fed. R. Civ. P. 23(b)(3):

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP -149 and form OP149 RES) and/or provided or will provide package pick -up and delivery services pursuant to an executed Operating Agreement; 2) drove or will drive a vehicle on a full -time basis (meaning exclusive of time off for commonly excused employment absences) since July 26, 200 1, to provide package pick -up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Georgia.

3. The court GRANTS the North Carolina plaintiffs' motion for class certification (Doc #869), and certifies the following class under Fed. R. Civ. P. 23(b)(3):

> All persons who: 1) entered or will enter into a FXG Ground or Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full -time basis (meaning exclusive of time off for commonly excused employment absences) since May 2, 2003, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of North Carolina.

4. The court GRANTS the Ohio plaintiffs' motion for class certification (Doc #1539), and certifies the following class under Fed. R. Civ. P. 23(b)(3):

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149-RES) and/or provide or will provide package pick-up and delivery services pursuant to an executed Operating Agreement; 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since May 15, 2002 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of terminal in the state of Ohio.

5. The court GRANTS the Utah plaintiffs' motion for class certification (Doc #1538), and certifies the following class under Fed. R. Civ. P. 23(b)(3):

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since November 16, 2003, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Utah.

6. GRANTS IN PART the Louisiana (*Boudreaux*) plaintiffs' motion for class certification (Doc #1540). The motion is DENIED with respect to claims under La R.S. § 23:635, DENIED with respect to claims for rescission, DENIED with respect to claims of current drivers under La. R.S. § 23:631, and DENIED with respect to claims under La. R.S. § 23:963 based on any theory of coercion not arising from requirements in the Operating Agreement and commonly applicable FedEx policies. The motion is GRANTED in all other respects, but the court orders the plaintiffs to, within ten days of this order, revise the class definition for claims arising under § 23:631;

7. GRANTS the Nevada plaintiffs' motion for class certification (Doc #870) with respect to their claims under NEV. REV. STAT. Ch. 608, but DENIES the motion in all other respects. In doing so, the court certifies the following class pursuant to Fed. R. Civ. P. 23(b)(3):

> All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement (now known as form OP-149 and form OP-149 RES); 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) since August 1, 2001 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Nevada.

8. GRANTS IN PART the Oregon (*Leighter*) plaintiffs' motion for class certification (Doc #871). The motion is DENIED with respect to plaintiffs' claim for rescission. The motion is GRANTED with respect to plaintiffs' claims for damages and equitable relief relating to wage deductions,

overtime, and non-payment of wages upon termination, and the court certifies the proposed class and subclasses with respect to those claims pursuant to Fed. R. Civ. P. 23(b)(3).

9. The court DENIES the certification motions filed with respect to Colorado (Doc #1537), Connecticut (Doc #867), *Givens* (FLSA) (Doc #873), *Vargas* (MCSA) (Doc #874), and Vermont (Doc #872);

10. DENIES the *Givens* plaintiffs' motion to equitably toll the statutory requirements of 29 U.S.C. § 255(a) [Doc. #825];

11. DENIES AS MOOT FedEx's motion to strike the late-filed *Givens* plaintiffs' reply brief in support of their motion to equitably toll the statutory requirements of 29 U.S.C. § 255(a) [Doc. #857];

12. DENIES the plaintiffs' motion for oral argument on the fourth wave [Doc. #1008); and

13. On reconsideration, decertifies the plaintiffs' rescission claim in the Oregon *Slayman* action (3:05-CV-596).

The court understands this ruling, combined with those of October 2007 and March 2008, to resolve all pending class certification motions. The court will turn its attention to the summary judgment motions and related issues.

SO ORDERED.

ENTERED: July 27, 2009

/s/ Robert L. Miller, Jr.
Chief Judge

United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Leighter v. FedEx Ground Package System, Inc.*
Case No. 3:07cv328 (Oregon)

**PLAINTIFFS' STATEMENT OF INTENT TO PROVIDE THE COURT WITH COMMON PROOF OF EMPLOYMENT STATUS**

On July 27, 2008, this Court issued its Order (Doc. 1770) regarding Plaintiffs' class certification motions for the cases briefed in Waves 4 and 5. In the section of that Order regarding the Oregon case entitled *Leighter v. FedEx Ground* (pp. 56-67), at footnote 5 on page 60, the Court questions whether Plaintiffs intend to offer "anecdotal evidence of FedEx's actual exercise of control" to support their claims.

Plaintiffs do not plan to offer any anecdotal evidence of "individual driver intent or experience" (see Court Order of April 22, 2008, Document 1152) or of "actual exercise of control," but instead plan to present common proof applicable to members of the class as a whole, as previously indicated in the other pending cases (see Document 1140, filed April 11, 2008), including, but not limited to:

1) the Operating Agreements and Addenda (OA);

2)      FXG's extensive corporate policies and procedures available to all terminal managers on the company intranet;

3)      FXG training materials (written manuals and videotapes) used to train terminal managers and/or to train class members in FXG's OA and its policies, procedures and practices;

4)      corporate business records that FXG collects and retains regarding all class members in accordance with FXG policies and procedures;

5)      corporate communications among and from high-level managers to terminal managers and pickup and delivery drivers regarding the policies, procedures and practices applicable to class members as a whole;

6)      sworn admissions by FXG's officers, directors, and managers regarding the Operating Agreement, policies, procedures and practices applicable to class members as a whole; and

7)      expert testimony regarding the OA, policies and procedures and practices applicable to class members as a whole.

That these categories of evidence comprise the type of common proof properly relied upon at summary judgment and trial in class action cases is confirmed by this Court's reference to such types of proof in the March 25, 2008 Order, where the court mentioned, inter alia, proof of "common practices and procedures standard to all" plaintiffs (p. 50), "centralized practices and procedures that are systemically applicable to all [] Plaintiffs" (p. 45), "corporate documents" (p. 102) and "centralized practices and procedures that are systematically applicable to all" (p. 149-150).

As with all of Plaintiff's previously filed motions for summary adjudication of employment status in the cases where class actions were certified, Plaintiffs did not and do not

intend to offer individualized proof of the "experiences of individual drivers" through plaintiff and/or class member declarations or deposition testimony. As the Court previously indicated, however, such evidence might become necessary to "fight fire with fire" in opposition to FedEx's motion or in rebuttal to FedEx's opposition to Plaintiffs' motions. Plaintiffs still believe it is unnecessary for the Court to consider evidence of individual plaintiffs' subjective belief that they were treated as employees in order to determine their employment classification.

In the event that the employment status issue is not resolved by summary adjudication, at trial Plaintiffs anticipate that the vast documentary record of FXG OA, policies and procedures and corporate records along with the testimony of its officers, directors and managers will be offered as overwhelming common proof that FXG has reserved to itself the right to control all aspects of the method, manner and means of performance used by pickup and delivery drivers in providing service to FXG's customers. At the same time, without knowing whether these trials will be bench or jury trials, Plaintiffs cannot fully develop or finalize their trial strategy or anticipate all witnesses they will call if the cases proceed to trial.

That Plaintiffs will be able to prove employment status at trial by way of common proof is amply demonstrated by both the trial court and appellate court's determinations in *Estrada v. FedEx Ground,* 154 Cal. App. 4th 1 (2007) expressly rejecting FXG's assertion that Plaintiffs failed to provide common proof of employment status.

Dated: July 31, 2009

Respectfully submitted,
**LEONARD CARDER, LLP**

/s/ Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174

case 3:05-md-00527-RLM -CAN document 1771 filed 07/31/09 page 4 of 5

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

PLAINTIFFS' CO-LEAD COUNSEL

Mr. Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Telephone: (574) 288-1510
Facsimile: (574) 288-1650

PLAINTIFFS' LIAISON COUNSEL

**PROOF OF SERVICE**

The undersigned hereby certifies that on the 31st day of July, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**PLAINTIFFS' STATEMENT OF INTENT TO PROVIDE THE COURT WITH COMMON PROOF OF EMPLOYMENT STATUS**

| | |
|---|---|
| Robert M. Schwartz<br>O'Melveny & Myers LLP<br>1999 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067<br>Telephone: (310) 553-6700<br>Fax: (310) 246-6779<br>email: rschwartz@omm.com | Chris A. Hollinger<br>O'Melveny & Myers LLP<br>Two Embarcadero Center<br>28th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 984-8700<br>Fax: (415) 984-8701<br>e-mail: chollinger@omm.com |
| Scott Voelz<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Telephone: (213) 430-6000<br>Fax: (213) 430-6407<br>e-mail: svoelz@omm.com | Jeffrey S. Nestler<br>O'Melveny & Myers LLP<br>1625 Eye Street NW<br>Washington, DC 20006<br>Telephone: (202) 383-5125<br>Fax: (202) 383-5414<br>e-mail: jnestler@omm.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **July 31, 2009**.

/s/ Lorelei Badar
Lorelei Badar

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |

**PLAINTIFFS' UNOPPOSED MOTION TO AMEND THE CASE SCHEDULE AND FILE AMENDED COMPLAINTS**

Plaintiffs hereby move the Court for the following relief, which relief Defendant does not oppose, amending the case schedule and permitting the filing of amended complaints, for good cause shown herein, as follows:

(1) to amend the July 19, 2008 Order (Doc. No. 1425) to briefly extend the thirty-day deadline for filing motions for summary judgment/adjudication of employment/independent contractor status applicable to the thirteen cases addressed in this Court's July 27, 2009 order (Document 1770);

(2) to allow named Plaintiffs in the five cases in which class certification was denied (Colorado, Connecticut, Vermont and in *Givens* and *Vargas*) to amend their complaints to add additional named Plaintiffs (former putative class members) with discovery stayed pending resolution of motions for summary adjudication and reconsideration of the class certification motions which are filed contemporaneously with motions for summary adjudication (and based

case 3:05-md-00527-RLM-CAN document 1772 filed 08/03/09 page 2 of 6

on the same evidentiary record); and

(3) to schedule the filing of summary adjudication motions in the five cases mentioned in paragraph (2) to follow the amendment of the complaints and to schedule simultaneous filings on the same briefing schedule of any companion motions to amend the class certification orders simultaneously that may be filed with the dispositive motions.

Plaintiffs request continuance of the dispositive motion schedule slightly longer then the one to which Defendant does not object, as explained below.

This Court may modify an existing scheduling order upon a showing of good cause. Fed. R. Civ. P. 16(b); 6A Charles Alan Wright, Arthur R. Miller & Mary A. Kane, Federal Practice and Procedure, § 1522.1 at 231 (2nd ed. 1990).

**Scheduling of Summary Judgment/Adjudication Motions on Employment/Independent Contractor Status:**

On July 27, 2009, this Court issued its order on thirteen pending motions for class certification. (Document 1770) In that Order, the Court granted, in whole or in part, motions for class certification in Arizona (*Gibson*), Georgia (*White*), Louisiana (*Boudreaux*), Nevada (*DeCesare*), Oregon (*Leighter*), North Carolina (*Whiteside*), Ohio (*Kelly*), Utah and (*Fishler*). The Court denied class certification in Connecticut (*Magno*), Colorado (*Flores*), Vermont (*Gruhn*), and *Givens* and *Vargas*.

With regard to the cases in Waves 1-3, the Court previously set two separate schedules for dispositive motions on employment/independent contractor status, separating the cases where certification was granted from those in which certification was denied, in part, to accommodate the parties' agreement to permit Plaintiffs to add additional named plaintiffs in light of the denial of class certification. Following the same pattern used in Waves 1-3, the parties now propose a

brief continuance of the deadlines for filing dispositive motions on employment/independent contractor status for the Wave 4 and 5 cases addressed in the July 27th Order.

Currently, forty-five motions for summary judgment/adjudication have been filed by the parties and are fully briefing and awaiting determination. Thus, a brief extension of time to file the remaining dispositive motions on employment/independent contractor status will not interfere with or delay the court's work on this case. Since the parties could not fully anticipate the issuance of the July 27, 2009 order at this time, Plaintiffs request a slight enlargement of time in which to re-deploy the necessary resources to prepare the large number of briefs and other pleadings necessary to put the issues before the court, and FedEx Ground does not oppose this relief. Plaintiffs additionally request that the schedule be extended by thirty days instead of the sixteen days to which FXG has stated no objection. Because Plaintiffs are represented by a large number of law firms, redeployment of staff is slightly more complicated. Plaintiffs therefore request that the briefing schedule for the eight cases in which class certification was granted begin with filings by September 28th, with opposition briefs to be filed by November 12 and reply briefs to be filed by December 14th.

If the Court extends the schedule only for a sixteen day extension, for the eight cases in which class certification was granted by the Court's July 27, 2009 Order (Doc. No. 1770), motions for summary judgment/adjudication relating to independent contractor/employment status shall be filed by September 11, 2009; opposition briefs shall be filed by October 26, 2009; reply briefs shall be filed by November 25, 2009. All page limits previously ordered shall remain in effect.

For the five cases in which class certification was denied by the Court's July 27, 2009 Order (Doc. No. 1770), Plaintiffs will be permitted to file amended complaints limited to adding

new named plaintiffs by September 30, 2009; and motions for summary judgment/adjudication relating to independent contractor/employment status shall be filed by October 30, 2009; opposition briefs shall be filed by December 14, 2009; reply briefs shall be filed by January 13, 2010. All page limits previously ordered shall remain in effect.

**Amendment of Certain Complaints:** As with Wave 1-3 cases in which class certification was denied, Plaintiffs seek permission to amend their complaints solely to add additional named Plaintiffs in the five cases in which class certification was denied in the July 27th Order, i.e., *Magno v. FedEx Ground, Flores v. FedEx Ground, Gruhn v. FedEx Ground, Givens v. FedEx Ground and Vargas v. FedEx Ground.* Defendant does not oppose Plaintiffs' request to add named Plaintiffs in the above-referenced matters. The parties have agreed that any and all such amendments will be filed by September 30, 2009.

As with Wave 1-3 cases in which class certification was denied, the parties have met and conferred and agreed that with regard to all amendments solely to add named individual plaintiffs to cases where class certification has been denied, discovery should be stayed until this Court issues orders in pending motions for summary adjudication. Because the Court's rulings on the parties' pending motions for summary adjudication will likely impact the scope and nature of the discovery necessary for the new Plaintiffs and their claims, the parties hereby move to stay all discovery with respect to the newly added Plaintiffs. The parties further agree that, when discovery as to the newly added Plaintiffs occurs, it be limited in scope to the newly added plaintiffs and their claims, and it shall not be treated as a reopening of discovery generally:

The parties therefore agree that their right to depose witnesses regarding the newly added plaintiffs' claims will be as follows: (a) Defendant will be permitted to depose 85% of new named Plaintiffs for a maximum of four hours and 15% of new named Plaintiffs for a maximum

of 8 hours; (b) Plaintiffs will be permitted to depose terminal management in the terminals where new named Plaintiffs work and shall be permitted to depose previously undeposed regional managing directors and regional operations engineering managers whose responsibilities include terminals where new named Plaintiffs work, but Plaintiffs shall not be permitted to depose any other regional staff or corporate staff, officers or directors. .

The limitations on this discovery, focused on new named individual plaintiffs' claims, are not intended to relieve either party of any other discovery obligation under the Rules of Civil Procedure.

Response and Reply To Plaintiffs' Motions To Alter/Amend Class Certification Order:

As with some of the Wave 1-3 cases, Plaintiffs anticipate filing one or more companion motions to amend the class certification orders pursuant to Federal Rule of Civil Procedure 23(c)(1)(C) simultaneously with the filing of the motions for summary adjudication of employment status as to named plaintiffs in some or all of the five cases in which class certification was denied based on the evidentiary record supporting the dispositive motions. Absent other Court order, the deadline for FXG to respond to these motions is governed by the Local Rules. Plaintiffs agree to permit FXG to respond to any such Rule 23(c) motions pursuant to the deadlines prescribed by the Court for the summary adjudication motions as set forth herein. Accordingly, Plaintiffs agree that Defendant may have forty-five days from the filing date to file their oppositions, and Plaintiffs shall have thirty days from the filing of the opposition briefs to file their reply briefs in support of these motions.

THEREFORE, Plaintiffs move the Court to amend the July 19 scheduling orders to briefly extend the deadlines for the summary judgment/adjudication briefing and amend the briefing of the Rule 23(c) motions to coincide with the due dates for the opposition and reply

briefs on the companion summary adjudication motions. Plaintiffs further move the Court, pursuant to Fed. R. Civ. P. 15(a), to authorize the filing of amended complaints in the five above-referenced actions to add individual named Plaintiffs and to stay discovery related to those new individual plaintiffs pending decisions on the summary adjudication motions as described above. Defendant FedEx Ground does not oppose this relief, as noted above.

Dated: August 3, 2009

Respectfully submitted,

LEONARD CARDER, LLP

By: /s/ Lynn Rossman Faris

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |

ORDER

Upon consideration of the Plaintiffs' Unopposed Motion To Amend The Case Schedule And File Amended Complaints, and for good cause shown, it is hereby GRANTED and ORDERED that:

1. This court's July 19, 2008 Order (Doc. No. 1425) is amended to extend certain deadlines applicable to the thirteen cases addressed by this Court's order of July 27, 2009 (Doc. No. 1770), as follows:

   a. Regarding the eight cases in which class certification was granted on July 27, 2009 (i.e., Arizona (*Gibson*), Georgia (*White*), Louisiana (*Boudreaux*), Nevada (*DeCesare*), Oregon (*Leighter*), North Carolina (*Whiteside*), Ohio (*Kelly*), Utah and (*Fishler*)), the parties shall file any motions for summary judgment/adjudication of employment/independent contractor status by **September 28, 2009**. Responses in opposition to those motions shall be filed

by **November 12, 2009** and movants shall file any reply to said oppositions by **December 14, 2009**.

b. Regarding the five cases in which class certification was denied on July 27, 2009 (i.e., Connecticut (*Magno*), Colorado (*Flores*), Vermont (*Gruhn*), and *Givens* and *Vargas),* may, by **September 30, 2009**, amend their complaints solely to add additional named Plaintiffs (former putative class members), with discovery stayed pending resolution of motions for summary adjudication and motions to amend class certification orders to be file in accordance with the schedule ordered herein.  Plaintiffs will provide Defendant with a copy of their Amended Complaint three days before filing for review and will file the amended Compalint with this Order.  Once discovery opens for these cases, ti will be limited to the newly-added Plaintiffs and their claims, and depositions shall be limited as follows:

  i. Defendant will be permitted to depose 85 percent of the new named Plaintiffs for a maximum of four hours, and 15 percent5 of the new named Plaintiffs for a maximum of eight hours.

  ii. Plaintiffs will be permitted to depose terminal management in the terminals where new named Plaintiffs work and shall be permitted to depose previously undeposed regional managing directors and regional operations engineering managers whose responsibilities include terminals where new named Plaintiffs work, but Plaintiffs shall not be permitted to depose any other regional staff or corporate staff, officers or directors.

    c. Regarding the five cases in which class certification was denied on July 27, 2009 (i.e., Connecticut (*Magno*), Colorado (*Flores*), Vermont (*Gruhn*), and *Givens* and *Vargas*), the parties shall file any motions for summary judgment/adjudication of employment/independent contractor status by **October 30, 2009**. Responses in opposition to those motions shall be filed by **December 14, 2009** and movants shall file any reply to said oppositions by **January 13, 2009**. The responses in opposition to any motion to alter/amend the class certification order filed simultaneously with the motions for summary judgment/adjudication shall be filed by **December 14, 2009** and any replies thereto shall be filed by **January 13, 2009**.

d. All page limits previously imposed on summary adjudication motions remain in effect.

**SO ORDERED.**

Date: August 13, 2009

S/Christopher A. Nuechterlein
United States Magistrate Judge
United States District Court
Northern District of Indiana

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re MDL-1700 FEDEX GROUND PACKAGE SYSTEM INC., EMPLOYMENT PRACTICES LITIGATION NO II | ) ) ) ) | CAUSE NO. 3:05-MD-527 RLM |

**ORDER**

On June 30, 2009, Defendant, FedEx Ground Package System Inc. ("FedEx Ground"), filed a motion for approval of supplemental class notice process. FedEx Ground urges that this supplemental notice is necessary in order to provide the best notice practicable, as required by Fed. R. Civ. P. 23(c)(2), in light of the recent discovery that: (1) fifty-nine (59) contractors in the Larson case received a class notice that was sufficiently confusing so as to render the notice process for these individuals suspect; and (2) an additional sixty-two (62) contractors were incorrectly excluded from the class notice process in twelve (12) cases.

On July 14, 2009, Plaintiffs filed a response in opposition, arguing that actual notice was not necessary under the Rule and postulating that FedEx Ground's motion would only serve to further delay litigation in this case. On July 27, 2009, FedEx Ground filed a reply, contending that it was not seeking to achieve actual notice. Instead, FedEx Ground argued that best practical notice requires individual notification to those persons whose names and addresses are actually known. Further, FedEx Ground noted that completing the supplemental notification process would not add more than a few additional months to an already protracted case, and that justice requires supplemental notice under the circumstances.

Fed. R. Civ. P. 23(c)(2) provides that, "in any class action maintained under subdivision (b)(3), each class member shall be advised that he has the right to exclude himself from the

action on request or to enter an appearance through counsel, and further that the judgment, whether favorable or not, will bind all class members not requesting exclusion." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974). This Rule additionally requires this Court to provide class members with "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." (Id.). Finally, the Rule requires that, "individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable efforts." (Id.).

In the immediate case, the names and addresses of the individuals to be notified through the proposed supplemental notice procedure are actually known. As such, Fed. R. Civ. P. 23(c)(2) requires that these additional parties receive individual notice. Eisen, 417 U.S. at 173. Indeed, but for a mistake in the first set of mailed notifications, these same individual would have already received individual notice. As such, this Court concludes that best practical notice under the circumstances requires that FedEx be granted the narrow opportunity to re-attempt service of individual notice upon those individuals inadvertently excluded from the initial mailings.

Further, although permitting another round of individual mailings will inevitably delay litigation in this case, this Court does not find the additional delay to be so lengthy as to become obstructive to this litigation. FedEx Ground has proposed a supplemental notice procedure that would take less than four months to complete. In contrast, this case has been ongoing for over four years. As such, this Court concludes that permitting FedEx Ground additional time is not so oppressive as to justify proscribing an attempt at actual notice to known individuals, mistakenly excluded from the first round of notice mailings.

Accordingly, this Court now **GRANTS** FedEx Grounds' motion for approval of supplemental class notice process. [Doc. No. 1762]. As a result, this Court now **ORDERS** that the following supplemental class notice process will be provided for the Craig, Humphreys, Slayman, Riewe, Alexander, Louzau, Willis, Gennell, Westcott, Larson, Harris and Smith actions:

The Notice Administrator will notify the contractors listed on Exhibit B to Defendant FedEx Ground Package System Inc.'s memorandum of law in support of its motion for approval of a supplemental class notice process of the existence of the relevant cases by sending them a copy of the existing applicable notice (or notices) along with a cover letter that informs them that they were excluded in error from, or incorrectly listed on, a mailing list to receive earlier notice of the litigation and that plainly specifies the date by which they may opt-out of the litigation should they wish to do so. The proposed cover letter annexed as Exhibit A to the memorandum is approved.

The deadline for valid exclusion requests will be forty-five (45) days from the date of the mailing of the letter, with an additional thirty (30) day opt-out period for any notices reissued because the original notices are returned as undeliverable.

Upon completion of the supplemental notice opt-out periods, Plaintiffs shall compile a list of additional opt-outs received, together with the opt-outs received to date, and provide this Court with revised final class lists for the Craig, Humphreys, Slayman, Riewe, Alexander, Louzau, Willis, Gennell, Westcott, Larson, Harris, and Smith actions, within thirty (30) days from the end of the supplemental opt-out periods.

**SO ORDERED.**

Dated this 13th Day of August, 2009.

                                    S/Christopher A. Nuechterlein
                                    Christopher A. Nuechterlein
                                    United States Magistrate Judge

case 3:05-md-00527-RLM -CAN document 1779 filed 08/17/09 page 1 of 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Leighter v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00328 (OR) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OBJECTION TO PLAINTIFFS' STATEMENT OF INTENT TO PROVIDE THE COURT WITH COMMON PROOF OF EMPLOYMENT STATUS**

FedEx Ground objects to plaintiffs' claim in its July 31, 2009 Statement of Intent that the listed categories of proof necessarily comprise "common proof" or can be introduced without raising individualized evidence issues. The Court explained in connection with the cases in Waves 1-3 that FedEx Ground would have the right to object to or move to strike the introduction of individualized proof. (Doc. No. 1152 at 1.) Consistent with the Court's Order, FedEx Ground intends to object or so move in all class certified cases (Waves 1-5) in response to plaintiffs' introduction of any individualized proof and to object to any asserted "common proof" that would raise individualized evidence issues, and reserves the right to offer, inter alia, individualized evidence to refute it. Some of the evidentiary issues are raised and currently before the Court in the pending summary judgment motions.

FedEx Ground notes also that plaintiffs' Statement attributes some indecisiveness on the types of evidence they will offer at trial to the issue of whether the constituent MDL cases will be tried to a jury or to a judge. It is not evident how the identity of the trier of fact would

determine whether evidence will, or will not, be common to the class, or of one form as opposed

to another. Regardless, FedEx Ground has been relying on the parties' timely demands for jury

trials pursuant to Federal Rule of Civil Procedure 38(b), including in many of plaintiffs'

complaints and FedEx Ground's answers. If plaintiffs intended their current filing on common

proof to serve as a form of withdrawal of the jury trial demands, such filing would not be proper.

*See* Fed. R. Civ. P. 38(d).

Dated: August 14, 2009

Respectfully submitted,

By: /s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
Tel: (202) 383-5300
Fax: (202) 383-5414

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of August, 2009, I filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

Steve D. Larson
slarson@ssbls.com

and I further certify that I have mailed the foregoing document by United States Postal Service to the following non-CM/ECF participants:

David F. Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER PC
209 SW Oak St., 5th Floor
Portland, OR 97204

By: /s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S NOTICE OF DEVELOPMENTS IN CONNECTION WITH A 2007 DRAFT IRS NOTICE OF PROPOSED ADJUSTMENT ("DRAFT NOPA")**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground") hereby notifies the Court of recent developments concerning an Internal Revenue Service employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground. In 2007, an IRS audit team prepared a Draft Notice of Proposed Adjustment concerning the status of independent contractors providing package pick-up and delivery services to FedEx Ground (the "draft NOPA"). FedEx Ground has advised the Court that the IRS withdrew the draft NOPA in October 2008. As the IRS stated in its letter confirming withdrawal of the draft NOPA, its audit was not complete. The letter stated that the audit team would continue its examination of FedEx Ground for the 2002 tax year.

On or about September 9, 2009, an Internal Revenue Service audit team fully informed FedEx Corporation ("FedEx") of the results of its employment tax audit of FedEx Ground for the

2002 calendar year. The audit team proposed that (1) no assessment of federal employment tax be made with respect to contractors performing services for the Ground division of FedEx Ground for 2002; and (2) an assessment be made with respect to contractors providing Home Delivery service. (A true and correct copy of the Form 8-K filed by FedEx with the Securities and Exchange Commission describing this development is attached hereto as Exhibit A.) With respect to Home Delivery, the IRS audit team delivered a Notice of Proposed Assessment, which proposed that FedEx Ground be assessed taxes and penalties of $14 million for calendar year 2002. The proposed assessment for Home Delivery is not a determination by the IRS as it is subject to the IRS's internal review procedures. FedEx intends to exercise its rights to contest the conclusions in the audit and the proposed assessment.

Dated: September 11, 2009

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Robert M. Schwartz
Chris Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6709

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

CC1:814445.1

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 11th day of September, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): September 9, 2009**

# FEDEX CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-15829** | **62-1721435** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **942 South Shady Grove Road, Memphis, Tennessee** | **38120** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 818-7500**

(Former name or former address if changed since last report.)

# FEDERAL EXPRESS CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-7806** | **71-0427007** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **3610 Hacks Cross Road, Memphis, Tennessee** | **38125** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 369-3600**

(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**EXPLANATORY NOTE**

The information in Item 2.02 of this Report, including the exhibit, is being furnished pursuant to Item 2.02 of Form 8-K and General Instruction B.2 thereunder. Such information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended.

**SECTION 2. FINANCIAL INFORMATION.**

**Item 2.02. Results of Operations and Financial Condition.**

Attached as Exhibit 99.1 and incorporated herein by reference is a copy of FedEx Corporation's press release, dated September 11, 2009, announcing expected earnings for the fiscal quarter ended August 31, 2009.

**SECTION 8. OTHER EVENTS.**

**Item 8.01. Other Events.**

On September 9, 2009, the Internal Revenue Service's audit team ("Audit Team") fully informed us of the results of their employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground Package System, Inc. ("FedEx Ground"), a wholly owned subsidiary of FedEx Corporation. The Audit Team has proposed that no assessment of federal employment tax be made with respect to FedEx Ground's independent contractors, with the exception of independent contractors providing the FedEx Home Delivery service. With respect to those independent contractors, the Audit Team has notified us that they propose to assess tax and penalties of $14 million plus interest for 2002. Substantially all of the proposed assessment relates to employment and withholding taxes for the 2002 calendar year.

We intend to contest the erroneous conclusions in the audit. We expect that a final resolution may not occur for some time. We believe that we have strong defenses to the proposed assessment and will vigorously defend our position, as we continue to believe that all of FedEx Ground's independent contractors, including those providing the FedEx Home Delivery service, are independent contractors.

Similar issues are under audit by the IRS for calendar years 2004 through 2008. As the IRS is still conducting audit work for calendar years 2004 through 2008, we cannot yet determine the amount or a reasonable range of potential loss for these periods. However, we do not believe that loss is probable for either calendar year 2002 or any subsequent period.

case 3:05-md-00527-RLM-CAN document 1784-2 filed 09/11/09 page 4 of 8

**SECTION 9. FINANCIAL STATEMENTS AND EXHIBITS.**

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits. The following exhibit is being furnished as part of this Report.

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release of FedEx Corporation dated September 11, 2009. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrants have duly caused this report to be signed on their behalf by the undersigned hereunto duly authorized.

**FedEx Corporation**

Date: September 11, 2009

By: / s/ HERBERT C. NAPPIER
Herbert C. Nappier
Staff Vice President and
Corporate Controller

**Federal Express Corporation**

Date: September 11, 2009

By: / s/ J. RICK BATEMAN
J. Rick Bateman
Vice President and
Worldwide Controller

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release of FedEx Corporation dated September 11, 2009. |

**Exhibit 99.1**

FOR IMMEDIATE RELEASE

**FedEx Corp. First Quarter Earnings to Exceed Guidance**
Second Quarter Earnings of $0.65 to $0.95 per Diluted Share Expected

MEMPHIS, Tenn. September 11, 2009... FedEx Corporation (NYSE: FDX) today announced that it expects to report earnings of $0.58 per diluted share for the first quarter ended August 31, down 53% from $1.23 per diluted share a year ago. The company's guidance for the quarter was $0.30 to $0.45 per diluted share.

FedEx expects earnings to be $0.65 to $0.95 per diluted share in the second quarter, which reflects the current outlook for fuel prices and a continued modest recovery in the global economy. A substantial decline is expected from $1.58 per diluted share a year ago, as the company significantly benefited from rapidly declining fuel prices and the timing lag that exists between when fuel prices change and when indexed fuel surcharges automatically adjust.

"FedEx first quarter financial performance exceeded our guidance thanks to better-than-expected FedEx International Priority ® volume, strict cost management and solid execution of our strategy," said Alan B. Graf, Jr., FedEx Corp. chief financial officer. "Despite some encouraging signs in the global economy, it is difficult to predict the timing and pace of any economic recovery. Revenue per shipment declined year over year in each of our transportation segments, as fuel surcharges declined significantly and we continue to face a very competitive pricing environment combined with significant overcapacity in the LTL freight market."

FedEx will release the details of its first quarter earnings on September 17, 2009.

**Corporate Overview**

FedEx Corp. (NYSE: FDX) provides customers and businesses worldwide with a broad portfolio of transportation, e-commerce and business services. With annual revenues of $35 billion, the company offers integrated business applications through operating companies competing collectively and managed collaboratively, under the respected FedEx brand. Consistently ranked among the world's most admired and trusted employers, FedEx inspires its more than 280,000 team members to remain "absolutely, positively" focused on safety, the highest ethical and professional standards and the needs of their customers and communities. For more information, visit news.fedex.com .

Certain statements in this press release may be considered forward-looking statements, such as statements relating to management's views with respect to future events and financial performance. Such forward-looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially from historical experience or from future results expressed or implied by such forward-looking statements. Potential risks and uncertainties include, but are not limited to, economic conditions in the global markets in which we operate, legal challenges or changes related to FedEx Ground's owner-operators, new U.S. domestic or international government regulation, the impact from any terrorist activities or international conflicts, our ability to effectively operate, integrate and leverage acquired businesses, changes in fuel prices and currency exchange rates, our ability to match capacity to shifting volume levels and other factors which can be found in FedEx Corp.'s and its subsidiaries' press releases and filings with the SEC.

Media Contact: Jess Bunn 901-818-7463
Investor Contact: Mickey Foster 901-818-7468
Home Page: fedex.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S NOTICE OF DENIAL OF PETITIONS FOR REHEARING IN *FEDEX HOME DELIVERY v. NLRB* (D.C. Cir. Sept. 4, 2009)**

On April 23, 2009, Defendant FedEx Ground Package System, Inc. ("FXG") filed a Notice of Supplemental Authority regarding the United States Court of Appeals for the District of Columbia Circuit's decision in *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) (Docket No. 1730). The decision has relevance to all cases coordinated in this MDL proceeding in which: (a) FXG has opposed plaintiffs' motions for summary judgment on the employment classification question; (b) FXG has moved for summary judgment on that same question; and (c) plaintiffs have moved for or obtained class certification. *Id*. at 2.

In response to FXG's notice, Plaintiffs stated that the Court should not give credence to the D.C. Circuit's decision because, among other reasons, "the decision will be challenged through rehearing before the D.C. Circuit…." (Docket No. 1740 at 1-2.) By this notice, FXG notifies the Court that petitions for a panel rehearing and a rehearing *en banc* were, in fact, filed

and that the D.C. Circuit denied those requests on September 4, 2009. Copies of the D.C. Circuit's orders are attached as Exhibits A and B to this notice.

Dated: September 11, 2009

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Robert M. Schwartz
Chris Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6709

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

CC1:814447.1

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 11th day of September, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# EXHIBIT A

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 07-1391** **September Term 2009**

**NLRB-1-CA-44037**
**NLRB-1CA44037**

**Filed On:** September 4, 2009

FedEx Home Delivery, A Separate Operating Division of FedEx Ground Package System, Incorporated, Petitioner

v.

National Labor Relations Board, Respondent

------------------------------

International Brotherhood of Teamsters, Local No. 25,
Intervenor

------------------------------

Consolidated with 07-1436

**BEFORE:** Sentelle, Chief Judge, and Ginsburg, Henderson, Rogers*, Tatel*, Garland*, Brown, Griffith, and Kavanaugh*, Circuit Judges

**O R D E R**

Respondent's and intervenor's petitions for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petitions. Upon consideration of the foregoing, it is

**ORDERED** that the petitions be denied.

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/
Michael C. McGrail
Deputy Clerk

* Circuit Judges Rogers, Tatel, Garland, and Kavanaugh would grant the petitions.

# Exhibit B

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 07-1391** **September Term 2009**

**NLRB-1-CA-44037**

**Filed On:** September 4, 2009

FedEx Home Delivery, A Separate Operating Division of FedEx Ground Package System, Incorporated,

Petitioner

v.

National Labor Relations Board,

Respondent

------------------------------

International Brotherhood of Teamsters, Local No. 25,

Intervenor

------------------------------

Consolidated with 07-1436

**BEFORE:** Garland and Brown, Circuit Judges, and Williams, Senior Circuit Judge

## O R D E R

Upon consideration of respondent's and intervenor's petitions for panel rehearing, it is

**ORDERED** that the petitions be denied.

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/
Michael C. McGrail
Deputy Clerk

case 3:05-md-00527-RLM -CAN document 1787 filed 09/21/09 page 1 of 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT, NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Pursuant to Rules 26 and 37, and based upon the memorandum of law, and all of the files and records submitted herewith, Plaintiffs move to compel Defendant FedEx Ground Package System, Inc. ("FXG") to produce the 2009 IRS Employment Tax Audit and Notice of Proposed Assessment ("NOPA"), and any attachments thereto, which FXG received from the IRS on or about September 9, 2009, and to produce Sallie Ford for deposition by Plaintiffs' counsel relating to the NOPA and IRS tax audits occurring since the date of her last deposition.

Dated: September 21, 2009

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA  94612
Tel:     (510) 272-0169
Fax:     (510) 272-0174
Email: lfaris@leonardcarder.com
          emorton@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel:     (212) 935-7400
Fax:     (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT, NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

**INTRODUCTION**

Plaintiffs move under Federal Rule of Civil Procedure 37(a) to compel Defendant FedEx Ground Package System, Inc. ("FXG") to produce the IRS Employment Tax Audit and Notice of Proposed Assessment ("NOPA") identified in the Form 8-K Federal Express Corporation filed with the Securities and Exchange Commission on September 11, 2009 ("SEC filing"), and in FXG's "Notice of Developments" filed with this Court on the same date. (Doc. 1784) According to these filings, on September 9, 2009, the IRS "fully informed [FXG] of the results of their employment tax audit for the 2002 calendar year regarding the classification of independent contractors" at FXG and notified FXG that "they propose to assess tax and penalties of $14 million plus interest for 2002." Exhibit 1 to Declaration of Susan E. Ellingstad, dated September 21, 2009 and filed herewith. FXG has refused to provide Plaintiffs the tax audit results and NOPA issued by the IRS.

This Court previously granted Plaintiffs' motion to compel a prior Notice of Proposed Assessment issued by the IRS in December 2007, as well as a deposition of FXG's corporate designee regarding the NOPA and the most recent IRS audits. Order dated August 21, 2008 (Doc. 1581) ("Order"). FXG moved for reconsideration of this Order on September 8, 2008 (Doc. 1601); because the motion for reconsideration is still pending FXG has not complied with the order to date.

After an additional two years of examining FXG's relationship with its pickup and delivery drivers, the IRS has issued a new NOPA as part of its employment tax audit of FXG, finding some FXG pickup and delivery drivers to be misclassified. The 2009 audit and proposed assessment is no less relevant and discoverable than the first one. Plaintiffs therefore request the Court to compel FXG to produce this most recent employment tax audit and NOPA and a limited deposition of FXG's corporate designee relating to the recent developments with the IRS.

**STATEMENT OF FACTS**

On December 21, 2007, FXG informed the SEC and its shareholders in its 10-Q Report that the IRS "had concluded an audit for the 2002 calendar year regarding the classification of owner-operators at FedEx Ground," had "tentatively concluded . . . that FedEx Ground's pick-up-and-delivery owner-operators should be reclassified as employees for federal income tax purposes," and "anticipates assessing tax and penalties of $319 million plus interest for 2002." Dec. 21, 2007 10-Q (Doc. 1068) at 19. Plaintiffs requested FXG to produce the document received from the IRS as supplementation to Plaintiffs' prior discovery requests and as a specific request in Wave 5 discovery. FXG refused, arguing that the document fell outside of the parties' discovery agreement, could not be requested as part of Wave Five discovery, and was protected by the "taxpayer privilege." (Doc. 1294).

On August 21, 2008, this Court rejected FXG's arguments and ordered FXG to produce the Notice of Proposed Assessment and "information about the circumstances surrounding it," and to allow Plaintiffs to conduct a limited deposition of FXG's corporate designee, Sallie Ford, regarding the issues generated from the NOPA and the most recent IRS audits. Order at 5-7. This Court compelled production of the NOPA on the grounds that: it bears on issues in this litigation and could reasonably lead to the discovery of other admissible evidence; it was properly requested in Fifth Wave discovery; and, alternatively, there was good cause to supplement discovery into new developments occurring since the close of discovery. *Id*. at 7.

FXG moved for reconsideration of the Order on September 8, 2008. (Doc. 1601). While the motion was pending, FXG filed a supplemental memorandum arguing that the motion to compel was moot because the IRS had "withdrawn" the NOPA at the request of FXG. (Doc. 1642). Plaintiffs responded that the motion to compel was by no means moot. To the contrary, the curious "withdrawal" of the NOPA at FXG's request and the IRS statement that the withdrawal "should not be interpreted in any way as the completion of the examination of the tax issues for 2002," only raised further questions about the status of the IRS audit. *See* Plaintiffs' Response to Defendant's Supplemental Reply dated October 27, 2008 (Doc. 1649). FXG's motion for reconsideration of the Court's order compelling this discovery is still pending to this date. As a result, despite that after years of auditing the company, the IRS twice has issued findings as to the drivers' employment status, Plaintiffs have received no supplemental discovery since 2006 when Ms. Ford testified that the audit had not yet been completed. *See* Exhibit 3 (Ford Dep. p. 6).

On September 11, 2009, FXG disclosed in its Form 8-K to the SEC that "the Internal Revenue Service's audit team ("Audit Team") fully informed us of the results of their

employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground Package System, Inc. ("FedEx Ground")." Exhibit 1 at 2. The SEC filing further states that the IRS has proposed to assess tax and penalties of $14 million plus interest for 2002 against FedEx Home Delivery Service. *Id.* On the same date, FXG filed a notice with the Court stating that the IRS audit team had delivered a Notice of Proposed Assessment with respect to Home Delivery but had not assessed federal employment tax with respect to the delivery drivers for the Ground division. Doc. 1784 at 2. Omitted from FXG's disclosures is the basis for the assessment against Home Delivery and the IRS's conclusions about the proper employment classification of the pickup and delivery drivers at the Ground division.

On September 17, 2009, FedEx Corporation held an earnings conference call wherein it made public statements regarding the September IRS audit and assessment. FXG Executive Vice President and General Counsel, Christine Richards, reported that the IRS audit team had applied the section 530 Safe Harbor provision of the Internal Revenue Code to the FedEx Ground division delivery drivers resulting in no assessment, but had reached other conclusions regarding the Home Delivery drivers. *See* Exhibit 2. Under the Safe Harbor provision, a taxpayer can avoid taxes and penalties – even if it has misclassified its workers – if the taxpayer reasonably relied on judicial precedent or a past IRS audit for its tax treatment of the workers. *See* § 530(a)(2)(A)(B)(C), 26 U.S.C. § 3401 Note.

Accordingly, while FXG *might* have avoided an assessment of penalties as to the Ground division by its reliance on the 1995 Letter of Assurance from the IRS, which FXG also has relied upon throughout this case, the IRS could still have concluded that the Ground drivers were misclassified. Contrary to the implication in FXG's public statements, the fact that the IRS

applied the Safe Harbor provision to the Ground division in fact suggests that the IRS did conclude the drivers were employees; there would be no need to reach the issue of whether the Safe Harbor provisions applied if the IRS had found the drivers were legally independent contractors. But these conclusions have been shielded by FXG. Instead, FXG has selectively disclosed to both the public and this Court only what it wants to disclose and has withheld from discovery all other information regarding the IRS audit.

Plaintiffs and FXG met and conferred over Plaintiffs' request for this discovery into the September 2009 audit report and NOPA. FXG refuses to produce this recent IRS information for the same reasons it has refused to produce information relating to the 2007 audit and NOPA, specifically that FXG does "not believe the NOPA is the proper subject of a discovery request." S*ee* Plaintiffs' Local Rule 37.1 Certification filed herewith.

**ARGUMENT**

The Federal Rules allow for discovery regarding "any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). For discovery purposes, relevancy is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Chavez v. DaimlerChrysler Corp.*, 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Thus, "a request for discovery must be complied with unless it is clear that there is no possibility that the information sought may be relevant to the subject matter of the litigation." *Fields v. General Motors Corp.*, No. 94 C 4066, 1996 WL 14040, at *3 (N.D. Ill. Jan. 14, 1996) (quoting *Cohn v. Taco Bell Corp.*, No. 92 C 5852, 1994 WL 30546, at *2 (N.D. Ill. Feb. 3, 1994)). Federal Rule 37 permits a party to request an order from the court compelling discovery. When the requested discovery is relevant, the party

resisting discovery bears the burden of showing that "the requested discovery is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Chavez*, 206 F.R.D. at 619.

A party who has responded to a request for production must supplement the response in a timely manner if the party learns that the response is incomplete and if the additional information has not otherwise been made known to the other parties during the discovery process. Fed. R. Civ. P. 26(e). This Rule "imposes a broad requirement on parties to update their earlier disclosures and discovery responses." *Klonoski v. Mahlab*, 156 F.3d 255, 268 (1st Cir. 1998). A party's "failure to receive or discover responsive documents until after she responded to . . . discovery requests does not excuse [the party] from her duty to timely supplement initial disclosures and discovery responses throughout the duration of her case." *Swiss v. Stiglich*, No. 2:05-CV-203, 2007 WL 2068567, at *5 (N.D. Ind. Jul. 16, 2007); *see also Kifle v. Parks & History Ass'n*, No. Civ. A. 98-00048, 1998 WL 1109117, at * 2 (D.D.C. Oct. 15, 1998) (granting defendant's motion to compel production of documents obtained after initial responses to Requests for Production).

**I. The 2009 Tax Audit And NOPA Are Relevant And Probative.**

The IRS audit and NOPA are relevant to this proceeding for the very same reasons that the December 2007 NOPA was relevant. Indeed, FXG has never taken the position that the IRS determinations are *not* relevant. As the Court well knows, the overarching issue in this case is whether FXG's pickup and delivery drivers are employees or independent contractors. On that central issue, FXG has relied repeatedly throughout this case upon the 1995 IRS Letter of Assurance to support its argument that the drivers are independent contractors. Order at 6

("Plaintiffs indicate, and Fedex does not deny, that they have frequently pointed to the IRS's opinion from the mid 90's to support its position in this litigation.").

Indeed, FXG produced the 1995 Letter of Assurance without objection in response to Plaintiffs' First Request for Production of Documents. In addition, FXG produced its Vice President of Tax for FedEx Services, Sallie Ford, in response to Plaintiffs' request for a witness to "testify regarding investigations, audits, reviews and/or determinations by the IRS and any state taxing authority . . . which concern or relate to the classification of FedEx Ground's pickup and delivery drivers as independent contractors." *See* Exhibit 4. At that time, Ms. Ford testified that she was the "tax point person with the [IRS] audit team" and that she had provided information and met with the IRS audit team regarding their audit of the drivers' classification. Exhibit 3 (Ford Dep. pp. 22, 81-82,102-03, 113-18, 127-28). Ms. Ford testified, however, that at the time of the deposition, she had not received any notification of the IRS's conclusion regarding the drivers' classification. *Id.* at 278-79.

Conveniently, therefore, FXG complied with Plaintiffs' discovery requests when it had only the 1995 Letter of Assurance to produce and knew nothing about the audit results. But ever since the IRS concluded the drivers were employees and assessed penalties in 2007 – results FXG did not like – FXG has withheld all IRS information from discovery. As this Court previously admonished, FXG cannot argue that the IRS determinations are discoverable when favorable to FXG's position but not discoverable when they are not. Order at 6.

According to FXG's "Notice of Developments" submitted to this Court on September 11, 2009, the IRS audit team has now "fully informed FedEx Corporation ("FedEx") of the results of its employment tax audit of FedEx Ground for the 2002 calendar year." Doc. 1784. FXG is now in possession of a second NOPA which assesses FXG's Home Delivery division $14 million for

a single tax year. *Id.* Although FXG represented to the Court that the IRS did not assess federal employment tax with respect to the drivers working for the Ground Division, FXG chose not to inform the Court what, if anything, the IRS concluded with respect to the proper classification of those drivers. *Id*.

Additionally, FXG's Executive Vice President and General Counsel publicly stated that the IRS found "the so-called 530 Safe Harbor applies, and no assessment should be made" against the Ground division. *See* Exhibit 2 at 8. The General Counsel went on to publicly state her subjective understanding that the Safe Harbor protection afforded to Ground "stems largely from the Ground organization consistently treating these workers as independent contractors and from the IRS's prior ruling and agreement that the workers qualified as independent contractors under their common law test." *Id.* The only way to know if these assertions are accurate is for FXG to produce the IRS's NOPA and any other information resulting from the IRS audit. Finally, FXG's General Counsel alluded to "other conclusions" reached by the audit team that FXG believes are erroneous and will be "appealed." *Id.* She of course did not disclose what these presumably adverse "other conclusions" are. *Id.*

FXG has thus taken the position that it can selectively summarize and characterize the results of the IRS audit, both to this Court and to the public, and yet withhold from discovery the underlying documents and findings. Once again, FXG cannot have it both ways. The conclusions reached and actions taken by the IRS following a nearly six-year audit regarding the classification of FXG's pickup and delivery drivers are undeniably relevant to the issues in this litigation. As this Court previously found, "the only remaining requirement is that the discovery bear on an issue in this litigation." Order at 4. Without question the 2009 employment tax audit results and NOPA bear on an issue in this litigation and are discoverable.

case 3:05-md-00527-RLM -CAN document 1787-2 filed 09/21/09 page 9 of 12

## II. The NOPA And IRS Employment Tax Audit Results Have Been Properly Requested.

Plaintiffs anticipate that FXG will raise the same objections to producing the 2009 audit results and NOPA as it did with regard to the 2007 NOPA. Each of these objections has been soundly rejected by this Court and should be rejected again here. First, the Court found that the 2007 NOPA had been properly requested in Wave Five discovery. The Court found that regardless of the precise wording of the parties' stipulation regarding Wave Five discovery, the "only limitation from this Court was that the parties had leave to perform 'limited' discovery." Order at 4. The Court had not limited this discovery to "new issues" presented in Wave Five. Order at 3-4. The Court alternatively held that even if the Court's discovery order did not allow discovery in Wave Five on "old" issues, production of the NOPA was required as supplementation to FXG's discovery responses. As the Court found, the December 2007 NOPA did not come into existence until approximately one year after discovery closed. "Consequently, it was impossible for the Plaintiffs to have sought the document prior to the close of discovery. Simply put, the Plaintiffs are justified in seeking the NOPA document and information about the circumstances surrounding it." Order at 4-5.

The same rationale applies to the latest tax audit results and NOPA. Because these developments have just occurred, after the close of discovery, it was impossible for Plaintiffs to have sought this information any earlier. Just as it was obligated to produce the 2007 NOPA, FXG is obligated to produce the 2009 audit and NOPA as part of its duty to supplement pursuant to Fed. R. Civ. P. 26(e).

This Court also rejected FXG's prior specious claim that it was not obligated to produce the 2007 NOPA because that NOPA was "preliminary" and not a "determination" within the parties' discovery agreement. Based on its statement in its September 11, 2009 "Notice of

Developments" that the latest NOPA is "not a determination by the IRS as it is subject to the IRS's internal review procedures," FXG will certainly raise that argument again here. This argument is just as disingenuous today as it was in connection with Plaintiffs' motion to compel the first NOPA. The parties agreed that:

> Defendant will produce determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. **Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge**.

Exhibit 5 (emphasis added).

Whether the 2009 audit results and NOPA are subject to the IRS's internal review procedures or to appeal by FXG does not affect its discoverability under the parties' specific agreement. As the Court previously held, "Fedex claims that the NOPA would not be admissible as evidence, but admissibility is not pertinent to answering whether something is discoverable." Order at 4. FXG has told the Court that the IRS has "fully informed [FXG] of the results of its employment tax audit." Whether these results are subject to further review or not, FXG has an obligation to produce them both under the parties' discovery agreement and the Federal Rules of Civil Procedure.

Finally, this Court previously rejected FXG's assertion of the "taxpayer privilege" as a basis to withhold the 2007 NOPA. The Court found "there is no special privilege that prevents a parties' documents created by or for the IRS from being discoverable." Order at 5. The Court further found that "the relevancy of the NOPA document outweighs any harassment or embarrassment that Fedex will suffer if the NOPA is disclosed." *Id.* at 6. As the Court found, FXG has already placed at issue the IRS's opinion of its driver model by relying on the 1995 Letter of Assurance. *Id.* With respect to the current NOPA and audit, FXG not only has

commented publicly on the IRS's conclusions, both in its SEC filing and its public earnings conference call, but FXG submitted a "Notice of Developments" to the Court as part of this litigation wherein FXG told the Court only what it wanted the Court to know about the audit results and assessment without providing the actual documents. Having both publicly discussed the conclusions of the IRS audit, as well as characterizing those conclusions for its own purposes in this litigation, FXG cannot turn around and assert that the conclusions of the IRS are privileged.

**III. Plaintiffs Must Be Allowed A Limited Deposition Of Sallie Ford.**

Depositions may be reopened "for good cause shown." *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1995 WL 613126, at *2 (N.D. Ill. Oct. 17, 1995). In connection with the 2007 NOPA, this Court held that Plaintiffs had good cause to conduct a narrow and targeted deposition of Ms. Ford related to "issues generated from the NOPA and most recent IRS audits." Order at 7. Because FXG's motion for reconsideration of that Order has been pending since October 2008, Plaintiffs have not had the opportunity to depose Ms. Ford as to any developments with the IRS since her first deposition. As stated above, FXG produced Ms. Ford for her deposition with no objection when she could testify that she knew nothing about the conclusions of the IRS audit. Now that she presumably knows something about those conclusions, Plaintiffs should be allowed to depose Ms. Ford as to the IRS developments since her last deposition.

**CONCLUSION**

The 2009 IRS employment tax audit results and NOPA are relevant, have been properly requested, and are not privileged or otherwise protected from disclosure. A limited deposition of FXG's corporate designee regarding the IRS audit and NOPA is likewise warranted. Plaintiffs

respectfully request that the Court compel FXG to permit this entirely proper discovery regarding new developments.

Dated: September 21, 2009

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
emorton@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

---

**DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT, NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

---

I, SUSAN E. ELLINGSTAD, state:

1. I am an attorney with the law firm of Lockridge Grindal Nauen P.L.L.P., one of the firms named Co-Lead Counsel for Plaintiffs in this matter. I submit this declaration in support of Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit, Notice of Proposed Assessment and Corporate Designee Deposition.

2. Attached as Exhibit 1 is a true and correct copy of FedEx Corporation's 8-K, filed September 11, 2009.

3. Attached as Exhibit 2 is a true and correct copy of FedEx Corporation's Q1 2010 Earnings Call transcript, dated September 17, 2009.

4. Attached as Exhibit 3 are true and correct copies of excerpts of the deposition transcript of Sallie Ford, dated November 8, 2006.

case 3:05-md-00527-RLM-CAN document 1787-3 filed 09/21/09 page 2 of 2

5. Attached as Exhibit 4 is a true and correct copy of correspondence from Lynn Faris to K. Lee Blalack, dated October 3, 2006.

6. Attached as Exhibit 5 is a true and correct copy of correspondence from Michael McGuinness to Lynn Faris, dated June 26, 2006.

I swear under penalty of perjury under the laws of the State of Minnesota and the United States that the foregoing is true and correct. Executed on September 21, 2009 at Minneapolis, Minnesota.

**s/Susan E. Ellingstad**
Susan E. Ellingstad

# EXHIBIT 1

# FEDERAL EXPRESS CORP

## FORM 8-K
(Current report filing)

Filed 09/11/09 for the Period Ending 09/09/09

| | |
|---|---|
| Address | 3610 HACKS CROSS ROAD<br>MEMPHIS, TN 38125 |
| Telephone | 9013693600 |
| CIK | 0000230211 |
| SIC Code | 4513 - Air Courier Services |
| Fiscal Year | 05/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

case 3:05-md-00527-RLM-CAN document 1787-4 filed 09/21/09 page 3 of 29

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): September 9, 2009**

# FEDEX CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-15829** | **62-1721435** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **942 South Shady Grove Road, Memphis, Tennessee** | **38120** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 818-7500**

(Former name or former address if changed since last report.)

# FEDERAL EXPRESS CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-7806** | **71-0427007** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **3610 Hacks Cross Road, Memphis, Tennessee** | **38125** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 369-3600**

(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## EXPLANATORY NOTE

The information in Item 2.02 of this Report, including the exhibit, is being furnished pursuant to Item 2.02 of Form 8-K and General Instruction B.2 thereunder. Such information shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended.

## SECTION 2. FINANCIAL INFORMATION.

### Item 2.02.   Results of Operations and Financial Condition.

Attached as Exhibit 99.1 and incorporated herein by reference is a copy of FedEx Corporation's press release, dated September 11, 2009, announcing expected earnings for the fiscal quarter ended August 31, 2009.

## SECTION 8. OTHER EVENTS.

### Item 8.01.   Other Events.

On September 9, 2009, the Internal Revenue Service's audit team ("Audit Team") fully informed us of the results of their employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground Package System, Inc. ("FedEx Ground"), a wholly owned subsidiary of FedEx Corporation. The Audit Team has proposed that no assessment of federal employment tax be made with respect to FedEx Ground's independent contractors, with the exception of independent contractors providing the FedEx Home Delivery service. With respect to those independent contractors, the Audit Team has notified us that they propose to assess tax and penalties of $14 million plus interest for 2002. Substantially all of the proposed assessment relates to employment and withholding taxes for the 2002 calendar year.

We intend to contest the erroneous conclusions in the audit. We expect that a final resolution may not occur for some time. We believe that we have strong defenses to the proposed assessment and will vigorously defend our position, as we continue to believe that all of FedEx Ground's independent contractors, including those providing the FedEx Home Delivery service, are independent contractors.

Similar issues are under audit by the IRS for calendar years 2004 through 2008. As the IRS is still conducting audit work for calendar years 2004 through 2008, we cannot yet determine the amount or a reasonable range of potential loss for these periods. However, we do not believe that loss is probable for either calendar year 2002 or any subsequent period.

**SECTION 9. FINANCIAL STATEMENTS AND EXHIBITS.**

**Item 9.01. Financial Statements and Exhibits.**

    (d) Exhibits. The following exhibit is being furnished as part of this Report.

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release of FedEx Corporation dated September 11, 2009. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrants have duly caused this report to be signed on their behalf by the undersigned hereunto duly authorized.

**FedEx Corporation**

Date: September 11, 2009

By: / s/ HERBERT C. NAPPIER
Herbert C. Nappier
Staff Vice President and
Corporate Controller

**Federal Express Corporation**

Date: September 11, 2009

By: / s/ J. RICK BATEMAN
J. Rick Bateman
Vice President and
Worldwide Controller

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 99.1 | Press Release of FedEx Corporation dated September 11, 2009. |

case 3:05-md-00527-RLM -CAN document 1787-4 filed 09/21/09 page 8 of 29

**Exhibit 99.1**

FOR IMMEDIATE RELEASE

**FedEx Corp. First Quarter Earnings to Exceed Guidance**
Second Quarter Earnings of $0.65 to $0.95 per Diluted Share Expected

MEMPHIS, Tenn. September 11, 2009... FedEx Corporation (NYSE: FDX) today announced that it expects to report earnings of $0.58 per diluted share for the first quarter ended August 31, down 53% from $1.23 per diluted share a year ago. The company's guidance for the quarter was $0.30 to $0.45 per diluted share.

FedEx expects earnings to be $0.65 to $0.95 per diluted share in the second quarter, which reflects the current outlook for fuel prices and a continued modest recovery in the global economy. A substantial decline is expected from $1.58 per diluted share a year ago, as the company significantly benefited from rapidly declining fuel prices and the timing lag that exists between when fuel prices change and when indexed fuel surcharges automatically adjust.

"FedEx first quarter financial performance exceeded our guidance thanks to better-than-expected FedEx International Priority ® volume, strict cost management and solid execution of our strategy," said Alan B. Graf, Jr., FedEx Corp. chief financial officer. "Despite some encouraging signs in the global economy, it is difficult to predict the timing and pace of any economic recovery. Revenue per shipment declined year over year in each of our transportation segments, as fuel surcharges declined significantly and we continue to face a very competitive pricing environment combined with significant overcapacity in the LTL freight market."

FedEx will release the details of its first quarter earnings on September 17, 2009.

**Corporate Overview**

FedEx Corp. (NYSE: FDX) provides customers and businesses worldwide with a broad portfolio of transportation, e-commerce and business services. With annual revenues of $35 billion, the company offers integrated business applications through operating companies competing collectively and managed collaboratively, under the respected FedEx brand. Consistently ranked among the world's most admired and trusted employers, FedEx inspires its more than 280,000 team members to remain "absolutely, positively" focused on safety, the highest ethical and professional standards and the needs of their customers and communities. For more information, visit news.fedex.com .

Certain statements in this press release may be considered forward-looking statements, such as statements relating to management's views with respect to future events and financial performance. Such forward-looking statements are subject to risks, uncertainties and other factors which could cause actual results to differ materially from historical experience or from future results expressed or implied by such forward-looking statements. Potential risks and uncertainties include, but are not limited to, economic conditions in the global markets in which we operate, legal challenges or changes related to FedEx Ground's owner-operators, new U.S. domestic or international government regulation, the impact from any terrorist activities or international conflicts, our ability to effectively operate, integrate and leverage acquired businesses, changes in fuel prices and currency exchange rates, our ability to match capacity to shifting volume levels and other factors which can be found in FedEx Corp.'s and its subsidiaries' press releases and filings with the SEC.

Media Contact: Jess Bunn 901-818-7463
Investor Contact: Mickey Foster 901-818-7468
Home Page: fedex.com

# EXHIBIT 2

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

# Q1 2010 Earnings Call

## Company Participants

- Mickey Foster, Vice President, Investor Relations
- Frederick W. Smith, Chairman, President and Chief Executive Officer
- Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer
- David Rebholz
- David Bronczek
- T. Michael Glenn
- Christine Richards
- Douglas Duncan

## Other Participants

- Ken Hoexter
- John Barnes
- Gary Chase
- Tom Wadewitz
- Helane Becker
- Donald Broughton
- Ed Wolfe
- Edward Wolfe
- David Ross
- Bill Greene
- Jon Langenfeld
- John Mims
- Justin Yagerman
- David Campbell

## MANAGEMENT DISCUSSION SECTION

### Operator

Good day, everyone, and welcome to the FedEx Corporation First Quarter Earnings Conference Call. Today's call is being recorded. At this time, I'll turn the call over to Mickey Foster. Please go ahead, sir.

### Mickey Foster, Vice President, Investor Relations

Good morning and welcome to FedEx Corporation's first quarter earnings conference call. I'm Mickey Foster, Vice President of Investor Relations. The earnings release and 26-page stat book are on our website at fedex.com. This call is being broadcast from our website and the replay and podcast download will be available for approximately one year.

Joining us on the call today are members of the media. During our question-and-answer session, callers will be limited to one question and a follow-up, so we can accommodate all those who would like to participate. I want to remind all listeners that FedEx Corporation desires to take advantage of the Safe Harbor provisions of the Private Securities Litigation Reform Act.

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

Certain statements in this conference call may be considered forward-looking statements within the meaning of the act. Such forward-looking statements are subject to risks, uncertainties, and other factors which could cause actual results to differ materially from those expressed or implied by such forward-looking statements. For additional information on these factors, please refer to our press releases and filings with the SEC.

To the extent we disclose any non-GAAP financial measures on this call, please refer to the Investor Relations portion of our website at fedex.com for a reconciliation of such measures to the most directly comparable GAAP measures.

Joining us on the call today are Fred Smith, Chairman, President, and CEO; Alan Graf, Executive Vice President and CFO; Mike Glenn, Executive Vice President, Market Development and Corporate Communications who is taking the call from Hong Kong; Chris Richards, Executive Vice President, General Counsel and Secretary; Rob Carter, Executive Vice President, FedEx Information Services and CIO; Dave Bronczek, President and CEO of FedEx Express; Dave Rebholz, President and CEO of FedEx Ground; and Doug Duncan, President and CEO of FedEx Freight.

And now our Chairman Fred Smith will share his views on the quarter followed by Alan Graf. After Alan we will have Q&A.

## Frederick W. Smith, Chairman, President and Chief Executive Officer

Thank you, Mickey. Good morning, ladies and gentlemen. Thank you for joining today's conference call to discuss FedEx's financial and operating performance during the first quarter of fiscal year '10 and our current outlook. Our financial performance was stronger than what we expected in June thanks to a modestly improving global economy, strict cost management and solid execution of our strategy.

During the first quarter of FY '010, FedEx Ground and FedEx Freight noted positive month-over-month volume trends. Compared to the fourth quarter of fiscal year 2009, our International Priority volume at FedEx Express showed positive sequential trends. These are encouraging signs of a more stable economy. The cornerstone of our success, however, remains our people who every day are delivering on the Purple Promise to make every FedEx experience outstanding.

They are the true competitive advantage for FedEx and for our customers. One recent example of the Purple Promise in action was FedEx being honored as the small parcel carrier of the year by Walmart. Walmart said FedEx has set themselves apart from other carrier partners in the industry by going above and beyond to service our customers and exceeding our service expectations.

The economy was slightly better during the first quarter of FY '10 and confidence appears to be improving. The housing sector seems to have bottomed and auto sales have picked up. In July, industrial production rose sequentially for the first time after 18 consecutive monthly declines.

At FedEx, our balance sheet is strong, service levels are high, and we are taking market share. Last year, in the midst of the worst economic conditions in our company's history, we undertook a series of actions to protect our company, preserve jobs, and position us for future growth.

In addition to the outstanding job we've done lowering costs, we've undertaken an enterprise-wide realignment to help deliver a simpler, more seamless experience to our customers, boosting service and satisfaction to greater market-leading levels. As the economy slowly picks up pace, we believe these steps will give us a very significant advantage over the competition.

For the remainder of fiscal year '10, we will balance spending with the opportunity to make investments with high long-term returns, such as substantially more fuel efficient Boeing 757 and Boeing 777 freighter aircraft.

In a few days, FedEx Express will accept delivery of its first Boeing 777 freighter. This aircraft offers greater payload capacity and range than our current international freighters and uses 18% less fuel. It is scheduled to go into revenue service in January, flying directly from Asia to our Super Hub in Memphis with no need for a fuel stop.

final
Bloomberg Transcript
Bloomberg

Page 2 of 13

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

final

Bloomberg Transcript

We will broaden our unmatched portfolio of business solutions to provide customers more choices and wider reach when shipping their packages and freight. In August, FedEx Express expanded its international economy service, offering economical alternatives for less urgent shipments with the same quality and reliability for which FedEx is well-known.

We broadened our global freight forwarding service when FedEx trade networks opened seven locations in Asia and Latin America. These openings are part of the company's growth plans which include additional facilities and alliances in Asia, Europe, the Middle East, Africa, and Latin America.

As part of its ongoing national expansion plan, FedEx Ground celebrated the openings of major distribution hubs in the Toledo, Ohio and Chicago, Illinois areas.

FedEx extended its leadership in adopting and advancing responsible environmental practices. FedEx Express grew its U.S. hybrid electric fleet, the largest such delivery fleet in North America, by 50% to 264 vehicles, with an industry first conversion program. The FedEx hybrid electric fleet has logged more than 4 million miles of revenue service since being introduced in 2004.

In the United Kingdom, FedEx Express introduced 10 new electric commercial vehicles into its fleet. FedEx Ground announced plans to install the nation's largest rooftop solar electric system at the FedEx Ground distribution hub in Woodbridge, New Jersey.

We are hopeful and confident as we move ahead. Forward-looking indicators such as new manufacturing orders and the Conference Board's U.S. leading economic index increased four consecutive months through July. In August, U.S. factories saw their output rise for the first time since January, 2008.

At FedEx we expect calendar third quarter GDP to grow about 3%, followed by roughly 4.9% growth in quarter four of calendar 2009. For calendar 2010, we believe U.S. GDP will grow 2.9%. More importantly, industrial production, a significant driver of FedEx's business, should improve more than 4% in 2010, a strong contrast to its 10% decline in 2009.

And now I will turn the mike over to Alan Graf, our CFO.

## Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer

Thank you, Fred, and good morning, everyone. As we reported last week, first quarter EPS was better than we had initially expected at $0.58 per share versus our guidance of 30 to 45 cents per share resulting from better than expected International Priority volume and decisive management cost actions.

However, EPS versus last year's first quarter declined significantly as last year's earnings benefited from rapidly declining fuel prices and the timing lag that exists between when fuel prices change and when indexed fuel charges adjust. Most of this year-over-year decline in EPS is a result of that fuel headwind.

At Express, International Priority volumes improved sequentially for the second consecutive quarter, led by the Asia Pacific and Latin America regions. While yields declined 20%, or $12.94 per package, most of that decline, $11.15, resulted from declining fuel surcharges and unfavorable exchange rates.

U.S. domestic volume grew slightly, benefiting from market share gains from DHL. Domestic yields declined 23% with fuel surcharge declines accounting for approximately 80% of that decrease. Weight and rate per pound also both declined in a very competitive pricing environment.

At Ground, although revenue decreased slightly, operating margin improved to 12.1% or a 100 basis point improvement above last year. Purchased transportation decreased to 40.1% of revenue versus 43.8% last year as we continue to see productivity gains in our field operations.

SmartPost continues its meteoric volume growth, up 73% on a year-over-year basis.

Page 3 of 13



Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

final

Bloomberg Transcript

At Freight, results declined as shipments, yields, and weights all were lower, reflecting the weak economy and excess LTL capacity. Shipments were down 14% and yields were down 13%.

Looking ahead, our guidance remains at 65 to 95 cents per share assuming stable fuel prices, which means barrel prices of about $70 per barrel and a continued modest recovery in the global economy. Fred gave you those numbers: 3% growth in U.S. real GDP on a quarter-over-quarter basis in the third calendar quarter and 4.9 in the fourth.

As was the case in the first quarter, fuel headwinds versus last year will have a significant negative impact on the second quarter. We do expect International Priority volumes to improve sequentially again in the second quarter with a possibility of year-over-year growth. We also expect U.S. domestic and ground average daily package of volume to increase on a year-over-year basis in our second quarter.

As to annual cash flows, we are still expecting to spend about 2.6 billion on capital, 1.2 billion of which is aircraft related. In September, we made U.S. qualified pension plan contributions totaling 613 million, and plan another 235 million for the remainder of fiscal year '10. We expect to be cash flow positive for the year excluding debt repayments of 653 million, which we have funded with available cash.

One final point regarding our long-term versus permanent – long-term permanent versus temporary cost reductions. During fiscal years '09 and '10, we will have reduced our cost structure by approximately $3 billion. All of that would be permanent, if there were to be no recovery in the economy and our volumes would remain flat and our profitability to remain low.

However, as we expect volume to increase, and profitability to improve over time, probably 50% of that will come back in terms of volume related expenses and rebuilding of our merit programs and our 401(k) match. The other 50% will be permanent reductions from our cost structure going forward.

And that completes my remarks, and we'd like to open it for Q&A.

# Q&A

## Operator

[Operator Instructions]. We'll go first to Ken Hoexter with Merrill Lynch. Please go ahead, sir.

**<Q - Ken Hoexter>**: Great, good morning. Alan or Fred, can you talk about a little bit about, you've seen the domestic side come up with a rebound on the boxes you talked a bit about from DHL. Can you talk about what you're seeing from DHL? And as you begin to lap that over the next few months, what kind of growth – core underlying growth you're seeing if you were to exclude those volumes?

**<A - Alan Graf, Jr.>**: Well, Ken, again, with the very volatile and uncertain misty crystal ball that I have, about the only comment I can give you is that we do expect year-over-year growth in the U.S. domestic package business. And as I said earlier, we also have a possibility that we can grow IP on a year-over-year basis. Those aren't going to be spectacular growth numbers, but they're going to feel good if they're not in red and brackets.

**<Q - Ken Hoexter>**: All right. Then if I could do a follow-up on the Ground side, a nice margin on that. I just wanted to see, as some of these court cases move to the sidelines, is there an ongoing kind of -- or decreased legal costs or any other benefits that we could see continue to improve those margins, or how do you continue to see – where do you see those margins pan out over time, at what level would you see them level off?

**<A - David Rebholz>**: Ken, we're really – this is Dave Rebholz, we're very confident about the cost management that we have had underway. We're balancing ourselves very appropriately. The legal costs themselves over time, the assumption would be clearly that those costs are going to come down. At the present time, it continues to be a moving target. I would venture to say that we'll be closer to a better understanding in the next fiscal year as to what they settle out to be, but right now we're very confident in managing those costs very effectively.

Page 4 of 13



final

Bloomberg Transcript

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

## Operator

And our next question comes from John Barnes with RBC Capital Markets. Please go ahead.

**<Q - John Barnes>**: Thanks guys. Alan, could you talk a little bit about just the thought process when you're adding something like the Asian flight that you mentioned in your pre-announcement, adding a flight like that back? What are you seeing versus just being able to handle whatever the volumes were with the existing infrastructure in place or in the balance of maybe having to sacrifice a little service in order to maximize asset utilization? Just trying to understand when you make a decision like that on adding something as costly as adding a flight back. Could you just elaborate a little bit?

**<A - Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer>**: Sure, John. First of all, I just want to be really clear here. All of our service indicators are continuing to improve off the very high levels already, and we absolutely are not making any decisions to sacrifice service for cost reductions during this period. We think that will make us much stronger as we come out the other side.

We're very excited about our International franchise and very excited about the outlook for International Priority, both in the second quarter and beyond. So it is appropriate for us to get ahead of that curve and get that service in place, so as those volumes build we're prepared to handle them. And I should also add, as Fred said, when the 777s come in, we're going to be able to offer service that no one else can offer with much later pickup times as those planes do not have to stop as they come back across the Pacific and the Atlantic. And I'll let Dave talk about that.

**<A - David Bronczek>**: Yeah, hi. This is Dave Bronczek. Alan is right. We are going to be replacing the MD-11s on some of those routes with the much more efficient 777s. We won't be making a fuel stop, so we'll have later departures, later pickups. Our customers in Asia Pacific are very excited about that. As Fred mentioned we start in January. We'll be out in Seattle next week to welcome our new 777s into our fleet. I think it's been mentioned that Asia Pacific had a good quarter. Sequentially, every International region around the world improved. That's very important for us. So Alan is right, we're very excited about our International opportunities and going forward.

**<Q - John Barnes>**: All right.

**<A - Frederick W. Smith, Chairman, President and Chief Executive Officer>**: Getting to the specific question, however, basically Dave is adding capacity, when he's confident he's got the traffic to justify the capacity. I mean, we're not putting capacity out there on a wing and a prayer, so to speak. It's basically pre-sold before the flight is put in place.

**<Q - John Barnes>**: Okay. Yeah – thank you, I appreciate that color. And then could you just talk a little bit about the core pricing environment and what has gotten – what has changed there that kind of led to you go ahead and announce, I guess the rate increase that came out with your announcement today, and do you think in this environment where you've got maybe a little less visibility into the strength of volumes. How much of that do you think stakes early versus, is that 5.9, something you aspire to, but it is going to take a couple quarters to get to?

**<A - Frederick W. Smith, Chairman, President and Chief Executive Officer>**: I'm going to ask Mike Glenn to answer this question. As Mickey mentioned, he's in Hong Kong but one of the things we've done for the last few years, and which is also part of this rate increase is there's a reset of the fuel barrel price in the rate increase. So it's reported as a 5.9% rate increase. In actual fact, it's a 3.9% rate increase because we reduced the 2% in the fuel surcharge to get a more realistic barrel price of fuel. So with that having been said, Mike, can you address the question more fully?

**<A - T. Michael Glenn>**: Sure, Fred. John, the timing of the announcement is consistent with the timing of our rate increase announcement last year. We typically release our Express rate increase in the fall, so the timing is unchanged. We certainly anticipate that as the economy improves, the pricing environment is going to strengthen, and that will help us. Obviously hold on to more of the rate increase as we move throughout this economic recovery. So we're very confident in our ability to manage through this rate increase. And again, the timing is consistent with last year.

Bloomberg

Page 5 of 13

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

final
Bloomberg Transcript

## Operator

Our next question is from Gary Chase with Barclays Capital. Please go ahead, sir.

**<Q - Gary Chase>**: Good morning, everybody. I don't know if this question is for Dave or maybe Mike. Wondered if you could add a little color – I know you quantified a little bit of how much was rate, or, excuse me, fuel surcharge and FX rates and so on and IP. And you talked a little bit about the surcharge impact on yields domestically. Curious, if you can give us a little color on business mix. I mean, when we see there's a portion of the yield erosion not explained by some of those factors. Is that the need to be more aggressive on pricing, or is it just a different business mix, and when do you think those kinds of things can turn around?

**<A - T. Michael Glenn>**: Let me comment briefly. I want to remind everyone that when we added a significant amount of traffic from DHL, that traffic came to us at lighter average weights than we would typically see in our Express business. And secondarily, we had had to be a bit more aggressive on price to be able to attract that traffic. So you have a little bit of a hangover, if you will, as a result of the significant traffic that we added as a result of DHL's departure from the market.

Secondarily, there is a negative impact due to the average weight per transaction, which is typical to what you would see during a slowing economic environment. So those two issues, in combination with the declining fuel surcharge, were the major drivers.

**<Q - Gary Chase>**: It sounds like there's not some major change in business mix that's driving it, right?

**<A - T. Michael Glenn>**: Well, it certainly has an impact, but it's not significant relative to the other two issues.

**<Q - Gary Chase>**: Okay. Can you just give us a sense of where you are in September? You talked about the possibility of IP volumes up and domestic up. Is that where we're starting September?

**<A - T. Michael Glenn>**: Well, we did see improvement in volume trends as we moved through the quarter, so we were quite pleased with that and encouraged by the trends that we've seen and expect those to continue as was already mentioned, as we move into the next quarter.

**<Q - Gary Chase>**: Okay. Thanks very much.

## Operator

We'll go next to Tom Wadewitz with JPMorgan. Please go ahead sir.

**<Q - Tom Wadewitz>**: Yeah. Good morning. So when we look at the yield effects as you are talking about, Mike, I guess weight per piece has a big impact as well as just base rate. Can you tell us what the change in weight per piece was in terms of Domestic Express in the quarter and would you expect, with your comments on industrial economy improving, do you think it's possible that that weight per piece really improves significantly if you look out a couple of quarters?

**<A - T. Michael Glenn>**: Well, it's hard to say, because I think one of the things that we've seen is a downgrade in traffic to slower modes of transportation. We've seen a change in product mix, which has resulted in – it has hit the weight per piece issue as well. How quickly that responds is difficult to predict, but it will certainly be tied to the economy, and its improvement. So as the economy improves, we would anticipate that the average weight per transaction improves.

**<Q - Tom Wadewitz>**: Okay. And then as a follow-up here on the Express margin, is still running at a pretty low level here, and obviously you've done a lot with costs. What do you think is necessary looking out a few quarters to really see the Express margin show material year-over-year improvement? Is that really about pricing and weight per piece? Is that about just the volume numbers improving a lot? What do you think we should look for to see that Express margin show some material improvement?

Page 6 of 13



Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

final

**<A - Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer>**: This is Alan. The biggest piece is fuel price stability, particularly on a year-over-year. I mean we are just being hammered in the first half because of what we enjoyed last year with that rapid decline. If we could get a little stability in fuel price and then continued modest economic improvements, you will just see by definition that Express margins improve. And once we get IP back to a year-over-year growth rate that will also have a very positive impact on it as well. So I think on the cost side, we're very comfortable with where we are. I mean, there are more levers we could pull if things went back downhill, but we're not expecting that. So what we need is stable fuel price and a modestly improving economy and that's – those are the two factors.

## Operator

Our next question is from Helane Becker with Jesup & Lamont. Please go ahead.

**<Q - Helane Becker>**: Thank you very much, operator. Hi, gentlemen. Thank you for taking my question. So I'm just trying to get a sense, in terms of IP, is there – can you just talk to how much in International is within Asia or Asia to the Indian sub-continent or to South America and how much of International doesn't really come into the U.S.? And the trends you're seeing in those markets?

**<A - David Bronczek>**: This is Dave Bronczek. Hi, Helane. We are probably at least 50% of our International business transits in or out of the United States. So it's a very important international point for us around the world. Asia Pacific is growing the fastest. It's the largest right now. So as that continues to grow, it's actually fueling the rest of the world's International volumes in and out of the United States and Asia. So we don't split out exactly the percentages of the growth, but you can imagine that China would be growing very fast for us and it is, and it's driving Asia. So the International network being so global and so big for all of it to be growing together is very positive for us.

**<Q - Helane Becker>**: Okay. That was my only question. Thank you.

## Operator

Our next question comes from Donald Broughton with Avondale Partners. Please go ahead.

**<Q - Donald Broughton>**: Good morning, gentlemen. You made quite a change in your aircraft fleet. I'm seeing what you've – versus the end of fiscal '08, we've seen a reduction of 19 planes, net added though four just in the last three months, and a big change in the complexion, 727s, you can't get rid of them fast enough. DC-10s, even the Airbus A310s. Can you help us quantify the kind of fuel savings you are going to be generating as you bring in more of these, even before the 777s, the fuel savings has to be pretty significant for the MD-10s, MD-11s that you bring in at the fleet?

**<A - T. Michael Glenn>**: Well, that's a great question. Obviously, we're very pleased with our 757s. We are flying 13 of them now. We get one a month and we can't get them fast enough and we can't replace the 727s fast enough. And of course the 777s are coming in right behind them, so you are exactly right. So far in the quarter we just reported, our fuel consumption is down 11%. That's a huge number for us. And as these planes keep coming in, the 757s have more capacity, less fuel burn, better for the economy, the environment. You're right, we're heading in that direction and the faster we can get there the better.

**<Q - Donald Broughton>**: And you took the number of flights you had I know in the Asia – Asian – U.S. to Asia flights from – if I my notes are right here, from 11 down to 7 at the trough. How many have you increased that to?

**<A - T. Michael Glenn>**: I'm not sure what the reference you have there is. We haven't reduced the flights. In fact, we've added some sections back over the last several weeks and months. We now fly nine trans-Pacific flights in and out of Asia. We have a trans-Pacific eight at the moment, but the reference that you made to pulling the flights down in Asia is – we're going to be at eight and we'll be at nine in October.

Bloomberg Transcript

Page 7 of 13



Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

final
Bloomberg Transcript

<**Q - Donald Broughton**>: Right, but – from the peak you had pulled down, and then now and added back, I guess two flights, it sounds like.

<**A - T. Michael Glenn**>: We have a very good customer demand. As Fred mentioned at the very beginning, so we did pull back some sections. We have trans-Pacific eight flights now, and we'll be putting a ninth one back in October.

<**Q - Donald Broughton**>: Fantastic. Thank you, gentlemen.

<**A**>: Thank you.

## Operator

We'll go next to Edward Wolfe with Wolfe research. Please go ahead.

<**Q - Ed Wolfe**>: Hey thanks. Good morning. It looks like maintenance and repair, the expense line item has been around 260 million the past couple of quarters, which is down quite a bit from the peak of over 400 million. Can you talk a little bit to that? How long is that sustainable and where is that headed as we go out?

<**A - T. Michael Glenn**>: Well, as you know, Ed, we parked some planes and retired some planes, so obviously that had a very positive impact on our maintenance this quarter. A lot of it is sequential. A lot of it is timing. But you're right, the quarterly number on maintenance is very significant and we're going to be watching that closely. But a lot of that is the planes that we've parked and the planes that we've retired.

<**Q - Edward Wolfe**>: So is that a fair range to think about it going forward for a while, if volumes don't explode?

<**A - T. Michael Glenn**>: It's a fair range for the time being, yes.

<**Q - Edward Wolfe**>: Okay. Second question, the decision that just came out from the IRS, can you talk a little bit about why there was an adverse ruling, but only at home delivery, not on all the Ground? What was the IRS's rationale for that?

<**A - Christine Richards**>: Ed this is Chris Richards. With respect to the Ground contractors, the IRS audit team asserted the so-called 530 Safe Harbor applies, and no assessment should be made. That 530 protection stems largely from the Ground organization consistently treating these workers as independent contractors and from the IRS's prior ruling and agreement that the workers qualified as independent contractors under their common law test.

With respect to the HD contractors, the audit team reached other conclusions, which we strongly believe are erroneous and, quite frankly, the logic escapes us because the contractor arrangements are substantially identical. The U.S. District Court – U.S. Court of Appeals for the D.C. circuit recently ruled in a case that involved two home delivery contractor terminals in Boston that those contractors are independent contractors under a test that's substantially similar to the IRS test. So, we believe that we will continue to point out to the agency their weaknesses in their arguments and their position. We will ultimate succeed in a zero assessment on both the home delivery and the ground contractors.

<**Q - Edward Wolfe**>: Does the Safe Harbor apply to the home delivery?

<**A - Christine Richards**>: Yes, it does. But the IRS has asserted that it doesn't.

<**Q - Edward Wolfe**>: Okay, thank you very much. I appreciate the time.

## Operator

We'll go next to David Ross with Stifel Nicolaus. Please go ahead.

<**Q - David Ross**>: Yes. Good morning, everyone. Talk a little bit first about SmartPost, the yield decrease there. Is that just due to the added density you have getting more DDU penetration, or is there something else going on there?

Bloomberg
Page 8 of 13

final

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

**<A>**: There's two issues. One issue has to deal with the current customers we have. It's a great bundle product for our sales team to use. And some of these customers have been working with us to offset some of the other postal rates that they've had to deal with vis-à-vis bound printed matter and other products, standard A. We're working with the Post Office to find ways to do rate sharing and cost sharing with them on that. We have worked with these large customers to help them bundle and quite frankly, as a result, we've been able to secure significant amounts of business.

So it's two product lines that are a de minimus amount out of the total SmartPost volume that we get daily, or let's say on a Monday where we get two plus million packages on every single Monday. So we're growing, but we are trading off that yield with some mix changes and then you've got to remember that this is not a one for one, because as we go into the DDUs, we get cost benefits that the yields don't reflect, but the profit margin does.

**<Q - David Ross>**: Yes. Understand. And then on the Freight side, can you just get a little color about the national LTL volumes versus the traditional FedEx rate volumes?

**<A - Douglas Duncan>**: This is Doug, David. We're growing volumes in both networks sequentially. August was the biggest growth of the quarter, where it jumped up significantly, and that seems to carry into September as well. So we're seeing some real good uptick in both of those networks as we speak.

**<Q - David Ross>**: Thank you.

## Operator

We'll go next to William Greene with Morgan Stanley. Please go ahead.

**<Q - Bill Greene>**: Yeah. Hi. Just two quick questions for Mike. Mike, first on the 2008 list rate increase, how much of that did you keep of that? And then secondly, SmartPost, it's a great product, but what you also saw historically is that you guys dramatically improved your service offering in Ground there was some downward move, I would think, from the air network into the Ground network. How do you guard against keeping your premium Ground stuff from migrating into lower rated SmartPost, given that that's a product that the market seems to really like?

**<A - T. Michael Glenn>**: Well, let me take the second one first, and I'll come back to the rate issue. We actually work with customers to make sure that we get the right product into the right marketplace, and the target for SmartPost is lightweight packages destined to residences. So we actually encourage customers to move traffic out of our home delivery network into the SmartPost network where it meets their service requirements. So that is something we proactively work with customers to do.

So – now, when it – when the average weight per transaction going to a residence starts getting above seven pounds or so, it really doesn't make economic sense to move that into the SmartPost network. As a result of that, there's a pretty clear delineation there. But it ultimately gets down to, does SmartPost meet the service requirement? And if, so we certainly encourage our customers to take advantage of the great service that SmartPost provides.

On the rate increase, it's very difficult to point to a specific percentage of rate increase retained because there are a number of ongoing factors that cloud the issue. One is the change in average weight per transaction that affects yield. Two is the product mix issue that we talked about. And three, there's ongoing discounting as a result of how we interact with our customers that have nothing to do with rate renegotiations, or simply as a result of closing new business.

If you control all those issues, we actually retain a significant amount of the annual rate increase, but allowing those issues to be included in the calculation obviously, it significantly lowers the amount of the rate increase that's retained. So we try to control for those to make sure that we feel comfortable that we retain a reasonable amount of the rate increase and we feel we've done that. But the picture is pretty cloudy when you look at the weight change, the product mix change and then ongoing discounting.

**<Q - Bill Greene>**: All right. Thanks for the help.

Bloomberg Transcript

Bloomberg

Page 9 of 13

final

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

## Operator

We'll go next to Jon Langenfeld with Robert W. Baird. Please go ahead, sir.

**<Q - Jon Langenfeld>**: Good morning. Nice job on the cost side. Curious on that. How much of the actual costs were run rated in the quarter? You've taken out about $2 billion of costs over the last year or so. Are you basically at the run rate where you're recognizing most of the benefits there?

**<A - Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer>**: Well, actually, we're going to take additional costs out in FY '10. We have more worldwide network optimization to do, which we're excited about. We think we can continue to get some on the SG&A side and revenue supplies and various and sundry areas, and those are going to continue to be reduced as we go through FY '10. On the flip side of that, we're hoping to improve our profitability. As I mentioned earlier, start to reinstate some of our – I'm sorry, to make up for the lost time of our 401(k) match and our merits and start to reinstate those programs that we halted last year. And that will just depend on how well we do here through the quarter and going into early calendar '10 on how we manage that. But we have more work to do on the cost side, and we're getting more out every day.

**<Q - Jon Langenfeld>**: Okay, good. And then lastly, on the Express side, if I just look at your volume trend, and just trying to work around the fuel piece here, if I look at your volume trends for the domestic business and International Priority business, they're about 5% lower in the first quarter than where they were in the first quarter of '07. I guess that would be fiscal '08. So two years ago. And yet the profitability is down 80% from where it was in the first fiscal quarter of '08. What's the primary difference on that basis? Are we talking more weight per shipment, or other mix issues that we can't necessarily see when we're looking at just the volume numbers?

**<A - David Bronczek>**: Yeah, this is Dave Bronczek again. As Alan pointed out, the fuel hit has been enormous for us this year versus last year and two years ago. And certainly because of the recession, the weights would be off as well. But it's mainly the fuel and the fuel surcharge.

**<Q - Jon Langenfeld>**: Because, I think the fuel last – the first quarter of fiscal '08 was kind of in the 2.20, 2.30 range. You were in the 1.90 to $2 range, wasn't a dramatic difference between those two periods, I don't think?

**<A - Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer>**: Jon, it's the year-over-year comparison that you are missing. You have to go back and look at '08 versus '07. So now we're looking at '10 versus '9. It's not a snapshot. It is a continuing rolling comparison. So that's really the major impact there. And again, while – Dave mentioned the recessionary impact certainly has an impact on those weights, and then there is a significant amount of exchange noise in here that we try to manage by balancing our known foreign currency revenues and try to match those as well as we can with our offshore expenses that are denominated in foreign currencies, but all of our aviation is in dollars.

**<Q - Jon Langenfeld>**: Got it. Thank you.

**<A - David Bronczek>**: The other obvious thing, you were commenting on the cost per gallon, the fuel surcharge is even a bigger variable in there, and a bigger negative. It was 33% last year, for example, the fuel surcharge, and it's 3% this year.

## Operator

And our next question comes from John Mims with BB&T Capital Markets. Please go ahead.

**<Q - John Mims>**: Good morning. What sort of volume uptick would we need to see before we start to see head count numbers come back up?

**<A - Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer>**: Well, obviously there are costs associated with the increased volume, but for a while, we need to rebuild hours for our flight crews and for our hourly employees all around the world and so we'll be doing that first before we talk about head count. It will just depend on

Page 10 of 13

Bloomberg Transcript



final

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

the timing and how well we can continue with our productivity programs. But I don't see much FTE increase in the foreseeable future.

**<Q - John Mims>**: Okay, thank you for that. And looking at the LTL space, if there is a major event in the near future, where does pricing go and how fast? And where are you from a capacity standpoint, would that have any impact on your CapEx budget?

**<A - Frederick W. Smith, Chairman, President and Chief Executive Officer>**: I think we've managed our way through this downturn quite differently than some of our competitors, and I think in a much smarter way. We have certainly resisted the hourly wage cuts that most of our competitors have taken so our driver force, our workforce, is intact. Our culture is as strong as ever. We've protected our drivers. Rather than lay off drivers, we put drivers on the dock, doing dock work. So we've got CDL qualified employees ready to go back to driving, which is the long pole in the tent, if you will, in creating capacity.

We've continued to complete strategic real-estate projects that were choke points for us in volume going forward. And the value proposition that we win on is service. And we haven't backed off of that one iota, either. In the month of August, we reduced service standards on 6,000 lanes in our LTL space and our two biggest growing product, is the 10:30 AM delivery we launched earlier this year and our direct next day to Canada.

So we're very prepared from a competition standpoint – from a consolidation standpoint, which we believe will occur at some point. So I think we've managed our business very well.

I'm sorry: I said increase the service standards. We lowered the service standards on six – number of days – lowered the...

**<A>**: Improved the service...

**<A - Frederick W. Smith, Chairman, President and Chief Executive Officer>**: ...improved the service standards. Sorry.

## Operator

[Operator Instructions]. We'll go next to Justin Yagerman with Deutsche Bank. Please go ahead.

**<Q - Justin Yagerman>**: Hey, good morning. Wanted to get a sense with the growth that you guys saw on SmartPost, if there's any way to break it down between what you're seeing from DHL freight that was out there in the marketplace? What part of that is actual shifting, as you guys discussed, from Ground business to SmartPost business? And then what kind of percentage of that would represent new market share that you're gaining out there, outside of it?

**<A - David Rebholz>**: This is Dave Rebholz. Prior to the DHL demise in the U.S. we picked up a substantial portion of the base line accounts that are creating this growth rate. Our largest account, Amazon, came from using postal service rate -- postal services direct, did not come from DHL and it's a substantial portion. But we were also the benefactor, probably 20%, 25% of the growth that we have today is coming from DHL conversions. But we continue to get net new business and net new applications from non-existing customers and as Mike already pointed out, from existing customers, who are finding new utilization of our services. So a lot of it is incremental, but DHL is not the driving factor.

**<Q - Justin Yagerman>**: Yeah. Thanks for that color. And then, you guys mentioned in your prepared remarks the freight forwarding capabilities that you guys are building out. Maybe you guys could talk a little bit about as you are looking at the landscape over the next couple years and where you see growth and how you want to align your freight forwarding network with that, where are the areas that we should expect to see you start to get more aggressive?

**<A - Frederick W. Smith, Chairman, President and Chief Executive Officer>**: Well, this is Fred Smith, and I'll ask Dave Bronczek to speak more fully on it. Our customers have been very clear with us over the last several years that they would like for FedEx to offer a broader product line with the same type of reliability and information excellence

Bloomberg Transcript

Bloomberg

Page 11 of 13

final

Bloomberg Transcript

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

and commitment to our Purple Promise in those broader product lines.

So that's a common theme you've heard over many quarters now, the expansion of the SmartPost product line that Dave Rebholz just mentioned and I would point out we're very excited about our new FedEx SmartPost return service which is now rolling out. That's a good example of it.

I mentioned in my prepared remarks the substantial expansion at FedEx Express in August of our international economy, international economy freight, and international economy distribution, and I think Dave you've got that now to over 80%, 90 countries, 80% of the world's GDP. So that broadened our product line in our door-to-door Express network for the slightly less urgent shipments.

And in the same vein, as Dave will tell you here in more detail, our customers want us to have door-to-door sea freight offering and commodity air freight for the less urgent items and having that broader product line with an expanded FTN network will allow us to get more market share in the Express segment. Dave can tell you what we've done under Mike Ducker and Fred Schardt's leadership, and I would like to commend Ed Clark who is our retiring CEO of FedEx Trade Networks, who's done a great job and is retiring on October 1st, and is handing over the reigns of FTN to Fred Schardt who is driving this expansion. Dave?

**<A - David Bronczek>**: Thanks Fred. My congratulations to Ed Clark. He's a long-term excellent FedExer for sure. Wish him well. We are rolling out around the world. We started in Asia, specifically in China. We're ahead of plan. We're going to have the same kind of openings. You'll see that every quarter now for several years we're rolling through the Latin America region and into Europe, Middle East as well, and as we started off talking about early on, it's driven by our customers, and the customer relationships we have around the world, and this is exactly the space that they have wanted us to move into and expand into. And I can tell you it's going exceptionally well.

**<Q - Justin Yagerman>**: Thanks a lot, guys. I appreciate the color.

## Operator

And we'll go next to David Campbell with Thompson, Davis & Company. Please go ahead.

**<Q - David Campbell>**: Yes, good morning. I wanted to ask Alan about the – your citing the recovery in expenses as you build volume growth and did we see some of that in the first quarter with your salaries and related costs up about $100 million from the fourth quarter? Is that the beginning of that?

**<A - Alan B. Graf, Jr., Executive Vice President and Chief Financial Officer>**: No. And I don't think you've got your numbers right and I suggest maybe we get you with Mickey and we can give you a little deeper explanation on that, Dave.

**<Q - David Campbell>**: Okay. Well, that's great. And what is the plan for 777 freighter deliveries in the rest of fiscal 2010?

**<A>**: We get our first plane -- well we get it this month. We'll put it in active service in January. We start rolling out three to four 777s every year, 2011, 2012, 2013. We've already assigned those planes to all their routes in priority order. We have an excellent plan and we're very excited about the plane.

**<Q - David Campbell>**: So there's just one in fiscal 2010?

**<A>**: No, we parallel them. We have four actually that will be in 2010. So we'll have – two of them will start in January.

**<Q - David Campbell>**: Two in January.

**<A>**: Yeah, and four for the – for 2010, three more in 2011, four in 2012. We can give you the specifics...

**<Q - David Campbell>**: Okay.

Page 12 of 13



Case 3:05-md-00527-RLM -CAN document 1787-4 filed 09/21/09 page 23 of 29

Company Name: FedEx
Company Ticker: FDX US
Date: 2009-09-17
Event Description: Q1 2010 Earnings Call

Market Cap: 23,606.22
Current PX: 75.58
YTD Change($): +11.43
YTD Change(%): +17.818

Bloomberg Estimates - EPS
Current Quarter: 0.833
Current Year: 3.063
Bloomberg Estimates - Sales
Current Quarter: 8375.000
Current Year: 33131.800

**<A>**: ...when you talk to Mickey about the other questions.

**<Q - David Campbell>**: Okay. Thank you very much.

**<A>**: Actually Dave, that schedule is in the 10-Q and also it's in the stat book.

**<Q - David Campbell>**: I realize that, I just wanted to make sure I had the numbers right.

**<A>**: Okay.

## Mickey Foster, Vice President, Investor Relations

Okay. Well, thank you very much for participating on the call here. And please feel free to call anyone in the Investor Relations team if you have any additional questions. Thanks.

## Operator

That does conclude today's conference call. Thank you for your participation.

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP.*

*© COPYRIGHT 2009, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*

final
Bloomberg Transcript
Bloomberg

Page 13 of 13

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4

case 3:05-md-00527-RLM -CAN document 1787-4 filed 09/21/09 page 27 of 29

**From:** Lynn Faris [lfaris@leonardcarder.com]

**Sent:** Tuesday, October 03, 2006 1:58 PM

**To:** Blalack, K. Lee; Joshi, Aparna

**Cc:** Ellingstad, Susan E.; Robert Harwood; Jerald R. Cureton; Bloodgood, Patricia A.; Matthew Houston

**Subject:** Three additional 30(b)(6) designees and response to your letter of 9/21

Lee & Aparna:

Plaintiffs request that FedEx Ground designate 30(b)(6) witnesses, and propose dates for such depositions on the three additional topics. After our last meet and confer on our 30(b)(6) requests, and attempting to anticipate your questions, I have tried to specify with greater particularity some of the likely areas of examination and to identify some relevant documents to assist in your selection of witnesses. As with our last designations, the scope of the deposition is not intended to be narrowed in any fashion from the designated topic, nor do Plaintiffs waive their right to examine the witness regarding any relevant document or issue within the topic specified.

First, we request that FedEx Express to designate a witness to testify regarding the compensation of couriers by FedEx Express.
As you know, Plaintiffs dismissed the subsidiary with the understanding that we would be permitted to take all necessary discovery from them without the formalities required of third parties. Specifically, we would like a 30(b)(6) witness to testify regarding: 1) the Merit Hourly Pay Schedules for couriers in effect as of 3/1/2001, 3/1/ 2002, 3/1/2004, 3/1/2005 and 3/2/2006; 2 )a description of and the cost to FedEx Express of the benefits, including overtime pay, provided to couriers for each year between 2001 and 2006; 3) the turnover rate for FedEx Express couriers for each year between 2001 and 2006 and 4) the general duties and job description of such couriers.

Second, we request that FedEx Ground to designate a 30(b)(6) witness to testify regarding the ISO 9001:2000 certification and audit process including the name and location of the certifying body that certified FedEx Ground under ISO 9001:2000 and the external and internal audits performed to ensure compliance with ISO 9001:2000.

Third, we request that FedEx Ground designate a 30(b)(6) witness to testify regarding investigations, audits, reviews and/or determinations by the IRS and any state taxing authority, including unemployment compensation agencies if they perform tax audits or assessments, which concern or relate to the classification of FedEx Ground's pickup and delivery drivers as independent contractors. These should include tax investigations, audits, reviews and/or determinations by, at a minimum, the IRS, California, New Jersey, Montana and any other state which has investigated the classification of the drivers as independent contractors.

With regard to your letter of September 21, there are a few possible misunderstandings I write to clarify: 1) regarding the administration of trust fund deponent, my understanding was that you were going to go ahead with your witness designation and that our agreement to provide you with a list of relevant documents (which I generally described) would not delay the designation of a witness; 2) on the BSP, your recitation fails to mention that the deponent will be questioned about revenue as well as expenses; and 3) with regarding the the issue of '"buying and selling'" because you indicated that the likely witness regarding the collection by FedEx of information regarding such "sales" would be entirely distinct from those assessing and/or rejecting assignees and/or imposing conditions on such "sales," we agreed to review the scope of this request. After thinking about it, we wish to go ahead with both issues described and discussed, even if more than one deponent is necessary. We will, of course, remain flexible about the location of the deposition and logistics. With regard to all of the 30(b)(6) depositions, we assume you will be supplementing the documentary record prior to these depositions.

As we are beginning to double and triple book depositions during this month, we are anxious to schedule these as quickly as possible. If you need additional information, please let me know.

*Lynn Rossman Faris*
*Leonard Carder, LLP*
*1330 Broadway, Suite 1450*
*Oakland, CA 94612*
*(510) 272-0169*

# EXHIBIT 5



O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

June 26, 2006

OUR FILE NUMBER
259,075-003

WRITER'S DIRECT DIAL
(213) 430-6557

WRITER'S E-MAIL ADDRESS
mmcguinness@omm.com

Lynn Faris, Esq.
Leonard Carder, LLP
1330 Broadway, Suite 1450
Oakland, California 94612

**Re: *Production of Documents***

Dear Lynn:

I have read your May 31, 2006, letter a number of times as it relates to our agreement concerning tax related documents. Specifically, our agreement covers request nos. 23 (to the extent it involves tax related documents), 24, 25, 77, misnumbered 76 and misnumbered 77. While I believe we have agreement, the fact that I have needed to review your letter several times, and the fact you indicate in your letter that I did not accurately recite our agreement in my May 24, 2006, letter, gives me some cause for concern. To clear up any confusion on my part, I wanted to write one more time.

My understanding of our agreement is that in response to request nos. 23, 24, 25, 77, misnumbered 76 and misnumbered 77, Defendant will produce determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge. As you correctly note in your May 31 letter, FedEx Ground has taken the position that any other tax related documents responsive to these requests (or any other requests calling for the production of tax related materials) are protected from production by privilege and privacy related objections and has refused to produce them. Plaintiffs have agreed to accept production of the determinations in full satisfaction of these requests with the understanding that FedEx Ground will not attempt to use any withheld documents affirmatively for purposes of this case. FedEx Ground agrees it cannot affirmatively use withheld documents.

Please confirm I have correctly stated our agreement so that we may produce the tax determinations.

Very truly yours,

Mike McGuinness

Michael G. McGuinness
of O'MELVENY & MYERS LLP

cc: Robert Harwood
Susan E. Ellingstad

LA3:1119090.1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' LOCAL RULE 37.1 CERTIFICATION IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT, NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

Plaintiffs, by counsel, submit this statement in compliance with Fed. R. Civ. P. 37 and N.D. Ind. Local Rule 37.1.

1. Prior to filing Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit and Notice of Proposed Assessment and Deposition of Sallie Ford on September 21, 2009, Plaintiffs' counsel sought in good faith to resolve the discovery dispute without the aid of the Court and took reasonable efforts to reach agreement with opposing counsel regarding the dispute.

2. Plaintiffs and Defendant underwent extensive and lengthy negotiations over production of the 2007 IRS employment tax audit and NOPA and deposition of Sallie Ford regarding those developments. Defendant ultimately refused to produce that information and Plaintiffs' filed a motion to compel that discovery. Plaintiffs' motion was granted by the Court on August 21, 2008. FXG filed a motion for reconsideration of the Court's order on September

8, 2008. Defendant's motion for reconsideration is still pending and therefore Defendant has not complied with the Court's August 21, 2008 Order and still maintains that it is not obliged to produce the requested discovery related to the IRS's audit.

3.      On September 11, 2009, FXG disclosed in its Form 8-K to the SEC that "the Internal Revenue Service's audit team ("Audit Team") fully informed us of the results of their employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground Package System, Inc. ("FedEx Ground")." The SEC filing further states that the IRS has proposed to assess tax and penalties of $14 million plus interest for 2002 against FedEx Home Delivery Service. On the same date, FXG filed a notice with the Court stating that the IRS audit team had delivered a Notice of Proposed Assessment with respect to Home Delivery but had not assessed federal employment tax with respect to the delivery drivers for the Ground division.

4.      Plaintiffs immediately requested that Defendant produce as supplemental discovery the 2009 IRS's employment tax audit and NOPA and related discovery. Defendant refused to produce the 2009 NOPA and related discovery on the same grounds that it raised in connection with the 2007 NOPA and related discovery. Specifically Defendant stated that it does "not believe the NOPA is the proper subject of a discovery request." *See* September 14, 2009 email exchange attached as Exhibit 1.

5.      Given that the parties litigated the same issue with respect to the 2007 NOPA and related discovery leading to the motion to compel, and given that that the issue is still not resolved because Defendant's motion for reconsideration is still pending, Plaintiffs asked Defendant if further negotiation would be productive or if Defendant believes the parties had

satisfied their obligations to meet and confer. Defendant agreed that no further discussion would be productive and that the parties had exhausted their meet and confer efforts. *See* Exhibit 1.

WHEREFORE, on the basis of the foregoing, and pursuant to Fed. R. Civ. P. 37 and N.D. Ind. Local Rule 37.1, the undersigned certifies that Plaintiffs have in good faith attempted to confer with counsel for Defendant in an effort to resolve this dispute without the Court's involvement.

Dated: September 21, 2009

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seelllingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
emorton@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

# EXHIBIT 1

**From:** Lynn Faris [lfaris@leonardcarder.com]
**Sent:** Tuesday, September 15, 2009 11:27 AM
**To:** Ellingstad, Susan E.; Robert Harwood; Matthew Houston
**Subject:** FW: Activity in Case 3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II Notice (Other)

---

**From:** McGuinness, Mike [mailto:MMcGuinness@OMM.com]
**Sent:** Monday, September 14, 2009 10:49 AM
**To:** Lynn Faris
**Cc:** Schwartz, Robert; Brenner, Guy
**Subject:** RE: Activity in Case 3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II Notice (Other)

Lynn, I agree that we have exhausted our meet and confer efforts over the NOPA issue. I understand your contemplated motion to address supplementation of plaintiffs' prior request regarding the original NOPA and not to go to supplementation issues more generally. Please let me know if I am mistaken.

Thanks.

---

**From:** Lynn Faris [mailto:lfaris@leonardcarder.com]
**Sent:** Monday, September 14, 2009 8:55 AM
**To:** McGuinness, Mike
**Cc:** seellingstad@locklaw.com; Robert Harwood; Eleanor Morton
**Subject:** RE: Activity in Case 3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II Notice (Other)

Given all the debate about this over the last NOPA, I don't think we do need to discuss it further and I hope you agree that we have satisfied our obligations to meet and confer fully before filing a motion to compel. Please let me know if you disagree. We will be filing a motion to compel supplementation.

Lynn Rossman Faris
Leonard Carder, LLP

---

**From:** McGuinness, Mike [mailto:MMcGuinness@OMM.com]
**Sent:** Monday, September 14, 2009 8:49 AM
**To:** Lynn Faris
**Cc:** Schwartz, Robert; Brenner, Guy
**Subject:** RE: Activity in Case 3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II Notice (Other)

Lynn, FedEx does not believe that the new NOPA is covered by our discovery agreement. Accordingly, we do not believe it is the proper subject of a discovery request. Please give me a call if we need to discuss further.

Thanks.

Mike

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## CERTIFICATE OF SERVICE

I, Susan E. Ellingstad, hereby certify that on September 21, 2009, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; |

| | |
|---|---|
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; egordon@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; aahn@leonardcarder.com |
| **Monica Ferraro** | mferraro@bnhmlaw.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |

case 3:05-md-00527-RLM -CAN document 1790 filed 09/21/09 page 3 of 7

| | |
|---|---|
| **Michael Gorby** | mgorby@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Chris A. Hollinger** | chollinger@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@llrlaw.com; mhorwitz@llrlaw.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | jmarshall@marshallandmorrow.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Eleanor Morton** | emorton@leonardcarder.com; aahn@leonardcarder.com |
| **James Mulroy, II** | mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com |

| | |
|---|---|
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |
| **Ian Otto** | iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com |
| **Peter W. Overs Jr.** | povers@hfesq.com |
| **Lesley A. Pate** | lapate@venable.com |
| **Mary Donne Peters** | mpeters@gorbypeters.com; mmcgee@gorbypeters.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **Nora M. Puckett** | npuckett@omm.com |
| **Charles Victor Pyle, III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; stefanie.hebig@zimmreed.com |
| **Beth A. Ross** | bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; jwoolley@scopelitis.com |
| **Joni M. Thome** | thome@halunenlaw.com |
| **Matthew T. Tobin** | matt@sdtrustco.com; lenandlaura@iw.net |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Scott Voelz** | svoelz@omm.com |

case 3:05-md-00527-RLM -CAN document 1790 filed 09/21/09 page 5 of 7

**Mary D. Walsh-Dempsey** mdempsey@omalleylangan.com

**Michael J. Watton** jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com

**Peter D. Winebrake** pwinebrake@winebrakelaw.com

I also certify that on September 22, 2009, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive, Suite 200
Bartlett, TN 38134

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Steve Dennis
REID & DENNIS
Providence Tower
5001 Spring Valley Road, Suite 255W
Dallas, TX 75244

Clayton D. Halunen
HALUNEN & ASSOCIATES
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Harold L. Lichten
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Mark A. Friel
STOLL BERNE
209 Southwest Oak Street
5th Floor
Portland, OR 97204

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS 39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS 39157

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ 08033

Michael R Reck
BELIN LAMSON MCCORMICK
ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA 50309-3989

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ 07050

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921

Dated: September 21, 2009

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| ----------------------------------------------------<br><br>In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION<br><br>----------------------------------------------------<br>THIS DOCUMENT RELATES TO:<br><br>*Jon Leighter, et al. v. FedEx Ground Package System, Inc., Civil No. 3:07-cv-00328-RLM-CAN (OR)*<br>---------------------------------------------------- | Cause No. 3:05-MD-527-RM<br>(MDL 1700) |

**OREGON PLAINTIFFS'**
**MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

Plaintiff Jon Leighter, et al. move this Court for an Order on behalf of himself and all members of the statewide class he represents as certified by this Court on July 27, 2009 (Doc. No. 1770) for summary adjudication, pursuant to Federal Rule of August 13, 2009 (Doc. No. 1776) that:

The Oregon Plaintiffs, on behalf of themselves and all persons similarly situated, who are members of the certified statewide class of FXG pickup and delivery drivers in Oregon have provided service for Defendant FXG as employees under the common law agency test applicable under Oregon law during the class period, as a matter of law;

This motion is based on the following grounds: (1) the final judgment entered in *Estrada v. FedEx Ground Package Systems, Inc.*, Los Angeles Superior Court Case No. BC210130, *affirmed* 64 Cal. Rptr. 3d 327 (2007) precludes Defendant FXG from denying that it has reserved the right to control the manner and means used by Plaintiffs and members of the certified classes

in performing their duties for FXG under the terms of the FedEx Ground Contractor Pickup and Delivery Agreement (OA) and the common FXG policies, procedures and practices that implement the OA's terms. The *Estrada* judgment was entered following seven years of full and fair litigation. FXG actually litigated and lost the issue of whether FXG retained the right to control the work performance of its pickup and delivery drivers under the terms of the common OA, as implemented by FXG's common corporate policies, procedures and practices. The issue was necessarily decided in a final judgment on the merits. As such, the judgment must be accorded collateral estoppel effect here, as it would in a California court under California law pursuant to the Full Faith and Credit Clause of the U.S. Constitution and 28 U.S.C. §1738. Hence, the Oregon plaintiffs are entitled to summary adjudication that they are employees, and not independent contractors, as a matter of law, by virtue of the final *Estrada* judgment.

(2)     Even if collateral estoppel is found not to apply, Plaintiffs are entitled to summary adjudication of their status as employees on the alternate ground that the undisputed material facts demonstrate that Plaintiffs and the class members they represent, are employees under the common law agency test articulated in Oregon. FXG has retained the right to control the drivers' work performance through the terms of the common OA, and the common FXG policies, procedures and practices used by FXG to implement its terms. The secondary factors under Oregon law compel the conclusion that Plaintiffs and the class have worked for FXG as employees, and not as independent contractors, as a matter of law. Because there are no disputed issues of material fact, Plaintiffs are entitled to summary adjudication as a matter of law.

This motion is supported by the following pleadings and evidence filed herewith:

(1)     Oregon Plaintiffs' Memorandum of Law in Support of Motion for Summary Adjudication re: Employment Status (e-filed under seal);

(2)     Second Declaration of Lynn Rossman Faris in Support of Plaintiffs' Motions for Summary Adjudication re: Employment Status and exhibits thereto (e-filed under seal);

(3)     Appendix B: Plaintiffs' Supplemental Omnibus Statement of Materials Facts in Support of Plaintiffs' Motions for Summary Adjudication (e-filed under seal);

(4)     Supplemental Evidence in Support of Facts in Appendix A: Plaintiffs' Omnibus Statement of Materials Facts in Support of Plaintiffs' Motions for Summary Adjudication (e-filed under seal); and

(5)     Plaintiffs' Third Request for Judicial Notice in Support Of Plaintiffs' Motions for Summary Adjudication of Employment Status and Memorandum of Law in Support Thereof (e-filed under seal).

The motion is also supported by the following pleadings previously filed on April 25, 2008 in support of Plaintiffs' prior Motions for Summary Adjudication of employment status, which pleadings are expressly incorporated herein by reference:

(1)     Plaintiffs' Omnibus Memorandum of Law re: Collateral Estoppel in Support of Plaintiffs' Motions for Summary Adjudication (Doc. 1194) and Reply Memorandum to same (Doc. 1473);

(2)     Declaration of Lynn Rossman Faris in Support of Plaintiffs' Motions for Summary Adjudication re: Employment Status (Doc. 1196) (manually filed under seal);

(3)     Appendix A: Plaintiffs' Omnibus Statement of Undisputed Material Facts in Support of Plaintiffs' Motions for Summary Adjudication (SUF) and exhibits thereto (Doc. 1197) (manually filed under seal);

(4)     Declaration of Tim McLynch in Support of Plaintiffs' Motions for Summary Adjudication (Doc. 1198) (manually filed under seal); and

(5) Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Motions for Summary Adjudication (Doc 1195) and Declaration of Lynn Rossman Faris in support thereof and all the exhibits thereto (Doc. 1199) (manually filed under seal).

This motion is also supported by all of the other pleadings and evidence on file in this matter, and which may be submitted by Plaintiffs in reply to any opposition filed by Defendant.

WHEREFORE, the Oregon Plaintiffs respectfully request that the Court grant their motion and enter an Order granting the within motion for summary adjudication pursuant to Federal Rule of Civil Procedure 56.

Dated: September 28, 2009

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Lynn Rossman Faris**

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

Steve D. Larson
David Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 Southwest Oak Street, 5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

**OREGON (LEIGHTER) PLAINTIFFS' COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**CERTIFICATE OF SERVICE**

I am a citizen of the United States and am employed in San Francisco County. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1188 Franklin Street, Suite 201, San Francisco, CA 94109. On **September 28, 2008**, I caused the following confidential document(s) to be filed with the Court electronically under seal:

1. **ARIZONA PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

2. **GEORGIA PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

3. **LOUISIANA PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

4. **NEVADA PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

5. **NORTH CAROLINA PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

6. **OHIO PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

7. **OREGON PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTIONF FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

8. **UTAH PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

9. **SECOND DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS AND THE RECORD OF EXHIBITS THERETO**

10. **SUPPLEMENTAL EVIDENCE IN SUPPORT OF FACTS IN APPENDIX A: PLAINTIFFS' OMNIBUS STATEMENT OF MATERIALCERTIFICATE S FACTS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION (DOC. 1197)**

11. **APPENDIX B: PLAINTIFFS' SUPPLEMENTAL OMNIBUS STATEMENT OF MATERIALS FACTS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION**

12. **PLAINTIFFS' THIRD REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

I further declare that on the same date, I caused the above-listed documents to be served on all counsel in this action listed below by email or (if no email address is available) by U.S. Mail. In addition to providing service by email on **September 28, 2009**, I also caused the above-described documents to be sent via UPS overnight delivery to all counsel for the Defendant.

| ABBOTT NICHOLSON PC<br>Robert K. Firsten<br>300 River Place, Suite 3000<br>Detroit, MI 48207-4225<br>Email: rkfirsten@abbottnicholson.com | ANDERSON AGOSTINO & KELLER PC<br>Peter J. Agostino<br>131 S. Taylor Street<br>South Bend, IN 46601<br>Email: agostino@aaklaw.com |
|---|---|
| BAKER & DANIELS<br>Thomas J. Brunner, Jr.<br>Alison G. Fox<br>D. Lucetta Pope<br>202 S. Michigan Street, Suite 1400<br>South Bend, IN 46601<br>Email: Tom.Brunner@bakerd.com; Alison.Fox@bakerd.com; Lucetta.Pope@bakerd.com | BARKAN NEFF HANDELMAN MEIZLISH LLP<br>Robert E. DeRose, II<br>Monica Ferraro<br>Eileen S. Goodin<br>Robert K. Handelman<br>Sanford A. Meizlish<br>360 S. Grant Avenue<br>Columbus, IN 43215<br>Email: bderose@bnhmlaw.com; mferraro@bnhmlaw.com; egoodin@bnhmlaw.com; rhandelman@bnhmlaw.com; smeizlish@bnhmlaw.com |

| | |
|---|---|
| LAW OFFICES OF GEORGE A. BARTON<br>George A. Barton<br>800 West 47th Street, Suite 700<br>Kansas City, MO 64112<br>Email: gab@georgebartonlaw.com | BEASLEY ALLEN<br>Larry A. Golston, Jr.<br>218 Commerce Street<br>Montgomery, AL 36104<br>Email: larry.golston@beasleyallen.com |
| BELIN LAMSON MCCORMICK ZUMBACH FLYNN<br>Michael R. Reck<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989<br>Email: mrreck@belinlaw.com | BRINKLEY & CHESNUT<br>J. Allen Brinkley<br>307 Randolph Avenue<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net |
| LAW OFFICE OF JOREE G. BROWNLOW<br>Joree Brownlow<br>1444 Gillham Dr., Suite 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com | CARLSON LYNCH LTD<br>R. Bruce Carlson<br>Gary F. Lynch<br>231 Melville Lane<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com; glynch@carlsonlynch.com |
| CURETON CLARK PC<br>Jerald R. Cureton<br>Anthony L. Marchetti, Jr.<br>300 Midlantic Drive, Suite 200<br>Mt. Laurel, NJ 08054<br>Email: jcureton@curetonclark.com; amarchetti@curetonclark.com | DAN SOLOMON SMITH LLC<br>Dan S. Smith<br>339 Main Street Suite 2D<br>Orange, NJ 07050 |
| DIB FAGAN AND BRAULT<br>Barry S. Fagan<br>Darcie R. Brault<br>25892 Woodward Avenue<br>Royal Oak, MI 48067-0910<br>Email: bfagan@dibandfagan.com; dbrault@dibandfagan.com | EDWARDS & ANGELL<br>Patricia A Sullivan<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| FEDERAL EXPRESS CORPORATION<br>Edward J. Efkeman<br>3620 Hacks Cross Rd., Bldg. B<br>Memphis, TN 38125<br>Email: eefkeman@fedex.com | JACQUELINE M. FERNANDEZ<br>9600 NW 38th Street, Suite 301<br>Miami, FL 33178 |
| FINLEY ALT SMITH SCHARNBERT CRAIG HILMES & GAFFNEY PC<br>Kevin J. Driscoll<br>Jack D. Hilmes<br>699 Walnut Street, 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: kdriscoll@finleylaw.com; jhilmes@finleylaw.com | FITZPATRICK SPINI & SWANSTON<br>B. James Fitzpatrick<br>838 S. Main Street, Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |

case 3:05-md-00527-RLM-CAN document 1826 filed 09/29/09 page 4 of 12

| | |
|---|---|
| FRISCHHERTZ & ASSOCIATES<br>Marc L. Frischhertz<br>1130 St. Charles Avenue<br>New Orleans, LA 70130<br>Email: mfrischhertz@frischhertzlaw.com | THE LAW FIRM OF<br>PHILIP STEPHEN FUOCO<br>Philip S. Fuoco<br>Joseph A. Osefchen<br>24 Wilkins Place<br>Haddonfield, NJ 08033<br>Email: pfuoco@msn.com; josefchen@msn.com |
| GANGEMI LAW FIRM PC<br>Salvatore G. Gangemi<br>82 Wall Street, Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com | LAW OFFICES OF ROBERT A. GARCIN<br>Robert A. Garcin<br>210 East 29th Street, #A<br>Loveland, CO 80538 |
| GILREATH & ASSOCIATES<br>R. Christopher Gilreath<br>6256 Poplar Avenue<br>Memphis, TN 38119<br>Email: chrisgil@sidgilreath.com | GORBY PETERS & ASSOCIATES<br>Michael J. Gorby<br>Mary D. Peters<br>Two Ravinia Drive, Suite 1500<br>Atlanta, GA 30346<br>Email: mgorby @gorbypeters.com;<br>mpeters@gorbypeters.com |
| GUERRIERI EDMOND CLAYMAN<br>& BARTOS<br>Jeffrey A. Bartos<br>Soye Kim<br>1625 Massachusetts Ave. NW Suite 700<br>Washington, DC 20036<br>Email: jbartos@geclaw.com;<br>skim@geclaw.com | HALUNEN & ASSOCIATES<br>Clayton D. Halunen<br>Joni M. Thome<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402<br>Email: halunen@halunenlaw.com;<br>thome@halunenlaw.com |
| HARWOOD FEFFER LLP<br>Robert I. Harwood<br>Peter W. Overs, Jr.<br>488 Madison Ave., 8th Floor<br>New York, NY 10022<br>Email: rharwood@whesq.com;<br>povers@whesq.com | WILLIAM S. HOMMEL, JR<br>Attorney at Law<br>1402 Rice Road, Suite 200<br>Tyler, TX 75703<br>Email: bhommel@hommelfirm.com |
| JACKSON LEWIS LLP<br>Carla D. Macaluso<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | JACKSON LEWIS LLP<br>Karen P. Kruse<br>Aaron Roblan<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
| LARON JONES<br>1505 N. Ellamont Street<br>Baltimore, MD 21216 | JONES WALDO HOLBROOK<br>& MCDONOUGH SLC<br>James S. Lowrie<br>170 S. Main Street, Suite 1500<br>Salt Lake City, UT 84104 |

| KIESEWETTER WISE KAPLAN<br>PRATHER PLC<br>James R. Mulroy, II<br>3725 Champion Hills Drive, Suite 3000<br>Memphis, TN 38125<br>Email: mulroyj@jacksonlewis.com | DONALD B. LEWIS<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 |
|---|---|
| LEWIS FISHER HENDERSON<br>CLAXTON & MULROY<br>William T. Fiala<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 | LICHTEN & LISS-RIORDAN<br>Harold L. Lichten<br>Shannon Liss-Riordan<br>100 Cambridge Street, 20th Floor<br>Boston, MA 02114<br>Email: hlichten@llrlaw.com; sliss@llrlaw.com |
| LOCKRIDGE GRINDAL NAUEN<br>Susan E. Ellingstad<br>Charles N. Nauen<br>100 Washington Avenue, South #2200<br>Minneapolis, MN 55401<br>Email: sellingstad@locklaw.com;<br>cnnauen@locklaw.com | R. JAMES LORE<br>R. James Lore<br>102-I Commonwealth Court<br>Cary, NC 27511 |
| MARKOWITZ & RICHMAN<br>Paula R. Markowitz<br>1100 North American Building<br>121 S. Broad Street<br>Philadelphia, PA 19107<br>Email:<br>ldicrosta@markowitzandrichman.com | MARSHALL AND MORROW LLC<br>Edward R. Forman<br>John S. Marshall<br>111 W. Rich Street, Suite 4300<br>Columbus, OH 43215-5296<br>Email: eforman@marshallandmorrow.com;<br>jmarshall@marshallandmorrow.com |
| MARTZELL & BICKFORD, APC<br>Scott R. Bicford, T.A.<br>Lawrence J. Centola, III<br>Neil F. Nazareth<br>338 Lafayette Street<br>New Orleans, LA 70130 | MCCRACKEN STEMERMAN<br>& HOLSBERRY<br>Andrew J. Kahn<br>1630 S. Commerce Street, Suite A-1<br>Las Vegas, NV 89102<br>Email: ajk@dcbsf.com |
| MCDANIEL LAW OFFICES<br>Robert E. McDaniel<br>4 Bicentennial Square<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | MEIZLISH & GRAYSON<br>Bruce H. Meizlish<br>Deborah R. Grayson<br>830 Main Street, Suite 999<br>Cincinnati, OH 45202<br>Email: drgrayson@fuse.net; brucelaw@fuse.net |
| MICHAEL BEST & FRIEDRICH, LLP<br>Eric E. Hobbs<br>Eric H. Rumbaugh<br>100 E. Wisconsin Ave., Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com;<br>ehrumbaugh@michaelbest.com | MORGAN LEWIS & BOCKIUS<br>5300 Wachovia Financial Center<br>200 S. Biscayne Boulevard<br>Miami, FL 33131-2339 |

| | |
|---|---|
| MORGAN LEWIS & BOCKIUS LLP<br>Michael J. Puma<br>1701 Market Street<br>Philadelphia, PA 19103-2921 | OGLETREE DEAKINS NASH SMOAK &STEWART<br>C. Victory Pyle, III<br>1320 Main Street, Suite 600<br>Columbia, SC 29201<br>Email: victor.pyle@ogletreedeakins.com |
| OGLETREE DEAKINS NASH SMOAK & STEWART PC<br>Jennifer R. Rygiel-Boyd<br>10 Madison Avenue, Suite 402<br>Morristown, NJ 07960<br>Email: jennifer.rygiel-boyd@olgetreedeakins.com | O'MALLEY & LANGAN<br>Todd J. O'Malley<br>Mary D. Walsh-Dempsey<br>426 Mulberry Street, Suite 104<br>Scranton, PA 18503<br>Email: tomalley@omalleylangan.com; mdempsey @omalleylangan.com |
| O'MELVENY & MYERS LLP<br>Michael G. McGuinness<br>Michael C. Camunez<br>Michael W. Garrison, Jr.<br>Victor H. Jih<br>Scott Voelz<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Email: mcamunez@omm.com; mgarrison@omm.com; vjih@omm.com; mmcguinness.com; svoelz@omm.com | O'MELVENY & MYERS LLP<br>Robert M. Schwartz<br>1999 Avenue of the Stars, Suite 700<br>Los Angeles, CA 90067-6035<br>Email: rschwartz@omm.com |
| O'MELVENY & MYERS LLP<br>Jennifer L. Merzon<br>Jeffrey A. Trimarchi<br>7 Times Square<br>New York, NY 10036<br>Email: jmerzon@omm.com; jtrimarchi@omm.com | O'MELVENY & MYERS LLP<br>Laura C. Bremer<br>Robin Dean<br>Chris A. Hollinger<br>Michael W. Kopp<br>Nora M. Puckett<br>Two Embarcadero Center 28th Floor<br>San Francisco, CA 94111-3823<br>Email: lbremer@omm.com; rdean@omm.com; chollinger@omm.com; mkopp@omm.com; npuckett@omm.com |

case 3:05-md-00527-RLM-CAN document 1826 filed 09/29/09 page 7 of 12

| O'MELVENY & MYERS LLP<br>John H. Beisner<br>Evelyn L. Becker<br>David G. Caperton<br>Kenneth L. Blalack, II<br>Guy Brenner<br>Tom A. Jerman<br>Jeffrey S. Nestler<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jbeisner@omm.com; dcaperton@omm.com; lblalack@omm.com; grenner@omm.com; tjerman@omm.com; jnestler@omm.com | PURDIE & METZ<br>Alan M. Purdie<br>402 Legacy Park<br>Ridgeland, MS 39157 |
|---|---|
| REID & DENNIS<br>Steve Dennis<br>5001 Spring Valley Road, Suite 255 W<br>Dallas, TX 75244 | RICHARDSON PATRICK WESTBROOK & BRICKMAN LLC<br>Daniel O. Myers<br>1017 Chuck Dawley Blvd., Bldg. A<br>Mount Pleasant, SC 29464<br>Email: dmyers@rpwb.com |
| SCHROETER GOLDMARK &BENDER<br>Martin S. Garfinkel<br>500 Central Bldg.<br>810 Third Avenue<br>Seattle, WA 98104<br>Email: garfinkel@sgb-law.com | SCHWERIN CAMPBELL BARNARD LLP<br>Dmitri Iglitzin<br>18 West Mercer Street, Suite 400<br>Seattle, WA 98119-3971 |
| SCOPELITIS GARVIN LIGHT HANSON & FEARY PC<br>R. Jay Taylor, Jr.<br>10 W. Market Street, Suite 1500<br>Indianapolis, IN 46204<br>Email: jtaylor@scopelitis.com | CATHLEEN A. SCOTT<br>Jupiter Gardens Suite 104<br>250 South Central Boulevard<br>Jupiter, FL 33458 |
| SIEGEL BRILL GREUPNER DUFFY & FOSTER<br>Wood R. Foster, Jr.<br>Jordan M. Lewis<br>100 Washington Avenue South<br>Minneapolis, MN 55401<br>Email: woodfoster@sbgdf.com; jordanlewis@sbgdf.com | STAACK SIMMS & HERNANDEZ<br>James A. Staack<br>900 Drew Street, Suite 1<br>Clearwater, FL 33755<br>Email: jims@staack-firm.com |

| | |
|---|---|
| STOLL STOLL BERNE LOKTING & SHLACHTER<br>Mark A. Friel<br>Steve D. Larson<br>209 SW Oak Street, 5th Floor<br>Portland, OR 97204<br>Email: mfriel@ssbls; slarson@ssbls | STRAUS & BOIES LLP<br>Ian Otto<br>4041 University Drive<br>Fairfax, VA 22030<br>Email: iotto@straus-boies.com |
| RICHARD TANENBAUM<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | TAYLOR DUNHAM & BURGESS LLP<br>Donald Taylor<br>301 Congress Avenue, Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com |
| THOMAS N. TREFETHERN<br>101 Central Plaza South, Suite 1003<br>Canton, OH 44702<br>Email: trefethernlaw@aol.com | VENABLE LLP<br>Robert G. Ames<br>Lesley A. Pate<br>575 7th Street NW<br>Washington, CA 20004<br>Email: rgames@venable.com; lapate@venable.com |
| PETER N. WASYLYK<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com | WATKINS & EAGER PLLC<br>Kenneth E. Milam<br>The Emporium Building<br>400 East Capitol Street<br>Jackson, Mississippi 39201<br>Email: kemilam@watkinseager.com |
| WATTON LAW GROUP<br>Michael J. Watton<br>225 E. Michigan Street, Suite 550<br>Milwaukee, WI 53216<br>Email: jdrewicz@wattongroup.com | WHEELER TRIGG KENNEDY LLP<br>Steven M. Kelso<br>1801 California Street, #3600<br>Denver, CO 80202<br>Email: kelso@wtklaw.com |
| WHETSTONE MYERS PERKINS AND YOUNG<br>Charles W. Whetstone , Jr.<br>Cheryl F. Perkins<br>601 Devine Street<br>Columbia, SC 29201<br>Email: cperkins@attorneyssc.com; cwhetstone@attorneyssc.com | WICK BRAMER UKASICK & TRAUTWEIN LLC<br>Robert J. Penny<br>323 South College Avenue<br>Fort Collins, CO 80522 |
| THE WINEBRAKE LAW FIRM LLC<br>Peter D. Winebrake<br>Twining Office Center<br>715 Twining Road, Suite 114<br>Dresher, PA 19025 | ZIMMERMAN REED, PLLP<br>Hart L. Robinovitch<br>14646 No. Kierland Blvd., Suite 145<br>Scottsdale, AZ 85254 |

| | |
|---|---|
| ZIMMERMAN REED, PLLP<br>David M. Cialkowski<br>Ann T. Regan<br>J. Gordon Rudd<br>651 Nicollet Mall Suite 501<br>Minneapolis, MN 55402<br>Email: dmc@zimmreed.com;<br>atr@zimmreed.com; jgr@zimmreed.com | |

| | |
|---|---|
| GINGER A. DEGROFF<br>PO Box 10194<br>Tampa, FL 33679<br>Email: degrofflaw@yahoo.com | SMITH PHILLIPS MITCHELL & SCOTT<br>Richard T. Phillips<br>PO Box 1586<br>Batesville, Mississippi 38606-1586 |
| MATTHEW T. TOBIN<br>PO Box 1263<br>Sioux Falls, SD 57101<br>Email: matt@sdtrustco.com | |

I further certify that I electronically and publicly filed the following document(s) with the Clerk of Court using the CM/ECF system on **September 28, 2008**:

13. **ARIZONA PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

14. **GEORGIA PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

15. **LOUISIANA PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

16. **NEVADA PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

17. **NORTH CAROLINA PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

18. **OHIO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

19. **OREGON PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

20. **UTAH PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

Through my publicly filing the foregoing documents electronically with the Clerk of Court using the CM/ECF system, the system sent notification of such filings to the email addresses listed above.

I also certify that I mailed by United States Postal Service or emailed the foregoing documents to the following non CM/ECF participants:

| | |
|---|---|
| John H. Beisner PHV<br>Email: jbeisner@omm.com | J. Allen Brinkley<br>Email: Allen@bclegal.net |
| Joree Brownlow<br>Email: joree@jbrownlow.com | David G. Caperton<br>O'Melveny & Myers LLP<br>Email: dcaperton@omm.com |
| R. Bruce Carlson<br>Email: bcarlson@carlsonlynch.com | Kevin J. Driscoll<br>Finley Alt Smith Scharnbert Craig Hilmes & Gaffney PC<br>Email: kdriscoll@finleylaw.com |
| Jacqueline Mezquita Fernandez<br>9600 NW 38th Street Suite 301<br>Miami, FL 33178<br>Email: jjjteam@yahoo.com | William T. Fiala<br>Lewis Fisher Henderson Claxton & Mulroy<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 |
| B. James Fitzpatrick<br>Email: bjfitzpatrick@fandslegal.com;<br>cswanston@fandslegal.com | Salvatore G. Gangemi<br>Email: sgangemi@gangemilaw.com |
| Robert A. Garcin<br>Law Offices of Robert A. Garcin<br>210 East 29th Street, #A<br>Loveland, CO 80538 | Clayton D. Halunen<br>Halunen & Associates<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402<br>Email: halunen@halunenlaw.com |
| Jack D. Hilmes<br>Email: jhilmes@finleylaw.com;<br>kdriscoll@finleylaw.com | Eric E. Hobbs<br>Email: eehobbs@michaelbest.com |
| William S. Hommel , Jr<br>Attorney at Law<br>Email: bhommel@hommelfirm.com | Dorothy A. Jarrell<br>Anh-Nguyet T. LyJordan<br>O'Melveny & Myers LLP<br>Email: djarrell@omm.com; alyjordan@omm.com |
| Steven M. Kelso<br>Wheeler Trigg Kennedy LLP<br>Email: kelso@wtklaw.com | Andrew J. Kahn<br>McCracken Stemerman & Holsberry<br>Email: ajk@dcbsf.com |

| Donald B. Lewis<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 | Karen P. Kruse<br>Aaron Roblan<br>Jackson Lewis LLP<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101 |
|---|---|
| Carla D. Macaluso<br>Jackson Lewis LLP<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | Harold L. Lichten<br>Pyle Rome Lichten Ehrenberg &<br>Liss-Riordan<br>Email: Harold@prle.com |
| Robert E. McDaniel<br>Email: remcdanielesq@aol.com | Paula R. Markowitz<br>Markowitz & Richman<br>Email: ldicrosta@markowitzandrichman.com |
| Charles N. Nauen<br>Email: cnnauen@locklaw.com | Kenneth E. Milam<br>Email: kemilam@watkinseager.com |
| Joseph A. Osefchen<br>The Law Firm of Philip Stephen Fuoco<br>Email: josefchen@msn.com | Todd J. O'Malley<br>O'Malley & Langan<br>Email: tomalley@omalleylangan.com |
| Cheryl F. Perkins<br>Whetstone Myers Perkins and Young LLC<br>Email: cperkins@attorneyssc.com | Robert J. Penny<br>Wick Bramer Ukasick & Trautwein LLC<br>323 South College Avenue<br>PO Box 2166<br>Fort Collins, CO 80522 |
| Michael R. Reck<br>Belin Lamson McCormick Zumbach Flynn<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989<br>Email: mrreck@belinlaw.com | Alan M. Purdie<br>Purdie & Metz<br>PO Box 2659<br>Ridgeland, MS 39158 |
| Eric H. Rumbaugh<br>Michael Best & Friedrich LLP<br>100 East Wisconsin Ave Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: ehrumbaugh@michaelbest.com | Jennifer R. Rygiel-Boyd<br>Ogletree Deakins Nash Smoak & Stewart PC<br>Email: jennifer.rygiel-boyd@olgetreedeakins.com |
| Dan S. Smith<br>Dan Solomon Smith LLC<br>339 Main Street Suite 2D<br>Orange, NJ 07050 | Patricia A Sullivan<br>Email: psullivan@eapdlaw.com |

| | |
|---|---|
| Richard Tanenbaum<br>Email: rt@lawyer.com | Donald R Taylor<br>Email: dtaylor@taylordunham.com;<br>ddunham@taylordunham.com;<br>surban@taylordunham.com;<br>jtatum@taylordunham.com |
| Charles W. Whetstone , Jr<br>Whetstone Myers Perkins and Young<br>Email: cwhetstone@attorneyssc.com | mailto:rt@lawyer.comPeter N. Wasylyk<br>Email: pnwlaw@aol.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on **September 28, 2009**.

/s/ Angela Ahn Menton
Angela Ahn Menton

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CHIEF JUDGE MILLER

MAGISTRATE JUDGE NUECHTERLEIN

**JOINT MOTION FOR EXTENSIONS OF TIME TO FILE: (1) DEFENDANT'S OPPOSITION TO "PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION" AND (2) PLAINTIFFS' REPLY IN SUPPORT OF "PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION"**

Pursuant to Rule 6.1 of the Local Rules for the United States District Court for the Northern District of Indiana, plaintiffs and defendant FedEx Ground Package System, Inc. ("defendant") hereby jointly request a brief extension of time in which to file: (1) defendant's opposition to "Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit, Notice of Proposed Assessment and Corporate Designee Deposition" [Doc. No. 1787] ("Motion to Compel"); and (2) plaintiffs' reply in support of the Motion to Compel. The parties' jointly request these extensions in order to avoid conflicts with the large number of filings required by the remaining summary adjudication briefing deadlines for actions in Waves IV and V.

The proposed extensions are brief. They would move FedEx Ground's opposition deadline from its current deadline of October 9, 2009 to the stipulated deadline of October 26, 2009, and would correspondingly move the plaintiffs' reply from its current deadline of October 26, 2009 to the stipulated deadline of November 25, 2009. The request is not made for the purpose of delay, and no party will be prejudiced if the Court grants this joint motion.

WHEREFORE, pursuant to the parties' agreement, the defendant and plaintiffs jointly request the Court to extend the deadline for defendant to file its opposition to plaintiffs' Motion to Compel to October 26, 2009 and to extend the plaintiffs' deadline to file their reply in support of the Motion to Compel to November 25, 2009.

Dated: October 1, 2009

Respectfully submitted,

By: /s/Robert M. Schwartz
    Robert M. Schwartz

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Lead and Liaison Counsel*

By: /s/Lynn Rossman Faris
    Lynn Rossman Faris

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022

Tel: (212) 935-7400
Fax: (212) 753-3630

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650


*Plaintiffs' Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 1st day of October, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Robert M. Schwartz

DC1:788140.1

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**ORDER GRANTING JOINT MOTION FOR EXTENSIONS OF TIME TO FILE: (1) DEFENDANT'S OPPOSITION TO "PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION" AND (2) PLAINTIFFS' REPLY IN SUPPORT OF "PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION"**

This matter having come before the Court on the Parties' Joint Motion for Extensions of Time to File: (1) Defendant's Opposition to "Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit Notice of Proposed Assessment and Corporate Designee Deposition" and (2) Plaintiffs' Reply in Support of "Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit Notice of Proposed Assessment and Corporate Designee Deposition", the parties having stipulated to the extension, and the Court being fully apprised, it is hereby

ORDERED, that Defendant FedEx Ground Package System, Inc. shall file its Opposition to "Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit Notice of

Proposed Assessment and Corporate Designee Deposition" on or before **October 26, 2009**, and plaintiffs shall file their Reply in Support of "Plaintiffs' Motion to Compel Production of 2009 IRS Employment Tax Audit Notice of Proposed Assessment and Corporate Designee Deposition" on or before **November 25, 2009**.

      **SO ORDERED.**

      **Dated this 2nd Day of October, 2009.**

                   S/Christopher A. Nuechterlein
                   Christopher A. Nuechterlein
                   United States Magistrate Judge

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**JOINT MOTION FOR APPROVAL OF SUMMARY AND LONG FORM CLASS NOTICES PERTAINING TO THE <u>FOURTH AND FIFTH WAVE CLASS ACTIONS</u>**

The parties in the above-captioned action respectfully submit for Court approval proposed long form notices for the actions pending in Arizona, Georgia, Louisiana, Nevada, North Carolina, Ohio, Oregon, and Utah, in which classes were certified pursuant to the Court's July 27, 2009 Opinion and Order (Doc 1770) . Also submitted for Court approval is a proposed summary notice for publication, which collectively references the classes in these eight cases and provides contact information for the class members to obtain more information if they do not receive an individually mailed long form of notice.

The proposed forms of notice are aimed at notifying all class members of their rights and interest in the actions, including their right to opt-out of the classes. The language in the notices submitted for approval tracks the language in the forms of notice previously approved by the Court in its Orders dated April 25, 2008 and May 12, 2008 with respect to the class actions certified in Waves One through Three.

Copies of the notices are annexed hereto as follows:

**EXHIBIT A** *ARIZONA -* *Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (AZ);

**EXHIBIT B** *GEORGIA -* *Ernest White v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (GA);

**EXHIBIT C** *LOUISIANA -* *Ryan Boudreaux, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00193-RLM-CAN (LA);

**EXHIBIT D** *NEVADA -* *Michael DeCesare, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00120-RLM-CAN (NV);

**EXHIBIT E** *NORTH CAROLINA -* *Sharon B. Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (NC);

**EXHIBIT F** *OHIO -* *Paul Kelly, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00336-RLM-CAN (OH);

**EXHIBIT G** *OREGON -* *Jon Leighter, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:07-cv-00328-RLM-CAN (OR);

**EXHIBIT H** *UTAH -* *Dan Fishler, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00053-RLM-CAN (UT); and

**EXHIBIT I** *SUMMARY NOTICE*

For the reasons set forth herein, Plaintiffs and Defendant jointly request Court approval of the proposed forms of notice for the above-referenced actions.

Dated: October 9, 2009                    Respectfully submitted,

                                          HARWOOD FEFFER LLP

                                          By:  /s Robert I. Harwood
                                              Robert I. Harwood (RH-3286)
                                              Matthew M. Houston, (MH-2218)
                                              488 Madison Avenue, 8th Floor
                                              New York, NY 10022
                                              Tel:    (212) 935-7400

case 3:05-md-00527-RLM-CAN document 1848 filed 10/09/09 page 3 of 3

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

Respectfully submitted,

By: /s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
K. Lee Blalack, II
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

**DEFENDANT'S LEAD AND LIAISON COUNSEL**

# EXHIBIT A

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Arizona state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under Arizona law, including for illegal wage deductions in violation of ARIZ. REV. STAT. § 23-352, rescission of the Operating Agreement, injunctive relief, and declaratory relief declaring what class members' rights are under Arizona law.

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from May 11, 2004 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Arizona.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |

LEGAL NOTICE

| ASK TO BE EXCLUDED | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |
|---|---|

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

LEGAL NOTICE

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION .......................................................... PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT.................................................PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS...................................................... PAGE 6**
10. Am I part of the Class?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS ................................................ PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING THE CLASS.............................. PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL.......................................................................... PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION............................................. PAGE 9**
21. Are more details available?

LEGAL NOTICE

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (AZ).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Margaret Gibson, Don Olsen, Solomon Rachmin, and Joe Shipp) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Arizona. These two courts will resolve issues for everyone in the Arizona class—except for those people who choose to exclude themselves.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the Class;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the classes, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Amended Class Action Complaint in the action brought in Arizona alleges that FXG's classification of Arizona P&D drivers as independent contractors violates ARIZ. REV. STAT. § 23-352, which governs illegal wage deductions. Plaintiffs also seek rescission of the Operating Agreement, injunctive, and declaratory relief.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the Arizona class who have been required to pay for certain business expenses (including improper deductions from wages), rescission of the Operating Agreement as an illegal contract, and a declaration that Class Members are legally classified as employees and have the rights of employees under Arizona law. You can read the Plaintiffs' Amended Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to the Amended Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Class?

As noted above, the Court has certified a Arizona statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from May 11, 2004 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Arizona.

## 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Arizona class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the class, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Arizona class. If you exclude yourself from the class—which also means to remove yourself from the class, and is sometimes called "opting-out" of the class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the Class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (AZ). You must state whether you want to be excluded from the Arizona class. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Arizona counsel are: Hart L. Robinovitch, ZIMMERMAN REED, P.L.L.P., 14646 No. Kierland Blvd., Suite 145, Scottsdale AZ, 85254, Tel: (480) 348-6400; and Clayton D. Halunen, HALUNEN & ASSOCIATES, 220 South Sixth Street, Suite 2000, Minneapolis, MN, 55402, Tel: (612) 605-4098.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

### 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Arizona District Court. There has been no date set for the trial of this matter. A jury in Arizona will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the class.

## 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

## 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

# GETTING MORE INFORMATION

## 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the class, the Amended Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Amended Class Action Complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT B

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Georgia state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, a plaintiff has asserted claims under Georgia law, including for unjust enrichment, rescission of the Operating Agreement, equitable relief, injunctive relief, and declaratory relief declaring what class members' rights are under Georgia law.

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from July 26, 2001 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Georgia.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |

LEGAL NOTICE

| | |
|---|---|
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued).** FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiff must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......................................................... **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**.................................................. **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What is the Plaintiff asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS**.....................................................................**PAGE 6**
10. Am I part of the Class?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS** ................................................... **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING THE CLASS**................................. **PAGE 8**
15. Who represents the Plaintiff in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL**.............................................................................. **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION**................................................. **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Ernest White v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (GA).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiff contends that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiff or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Ernest White) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the Northern District of Georgia. These two courts will resolve issues for everyone in the Georgia class—except for those people who choose to exclude themselves.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Class;

- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the Class;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiff's Third Amended Class Action Complaint in the action brought in Georgia alleges that FXG's classification of Georgia P&D drivers as independent contractors violates Georgia law. Plaintiff seeks disgorgement, rescission of the Operating Agreement, and equitable, injunctive, and declaratory relief.

Plaintiff contends that FXG has treated him illegally by calling him an independent contractor when, under the law, he was really an employee. As a consequence, Plaintiff contends that he and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiff seeks monetary damages in the form of disgorgement based upon the alleged unjust enrichment, rescission of the Operating Agreement as an illegal contract, and a declaration that Class Members are legally classified as employees and have the rights of employees under Georgia law. You can read the Plaintiff's Third Amended Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not entitled to any of the relief sought by plaintiff. FXG's Answer to the Third Amended Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiff or FXG is correct. By establishing the class and issuing this Notice, the Court is not suggesting that the Plaintiff will win or lose this case. The Plaintiff must prove his claims through later proceedings in this lawsuit.

## 8. What is the Plaintiff asking for?

The Plaintiff is asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, equitable relief, and a judicial declaration that the P&D drivers are employees of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiff that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiff wins in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Class?

As noted above, the Court has certified a Georgia statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from July 26, 2001 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Georgia.

## 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Georgia class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the class. If you stay in and the Plaintiff obtains money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the class, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiff wins or loses the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Georgia class. If you exclude yourself from the class—which also means to remove yourself from the class, and is sometimes called "opting-out" of the class— you won't get any money or benefits from this lawsuit even if the Plaintiff obtains them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiff. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the Class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Ernest White v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (GA). You must state whether you want to be excluded from the Georgia class. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiff in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiff in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Georgia counsel is Mary Donne Peters, GORBY, REEVES & PETERS, P.C., Two Ravania Drive, Suite 1500, Atlanta, GA 30346, Tel: (404) 239-1150.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

### 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiff will have to prove his claims at a trial in the Georgia District Court. There has been no date set for the trial of this matter. A jury in Georgia will hear all of the evidence to determine whether the Plaintiff or FXG is right about the claims in the lawsuit. There is no guarantee that either Plaintiff or FXG will win, or that Plaintiff will get any money for the class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiff, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiff obtains money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the class, the Third Amended Class Action Complaint that the Plaintiff submitted, the Defendant's Answer to the Third Amended Class Action Complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT C

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Louisiana state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under Louisiana law, including statutory wage payment claims under sections 23.631 and 23.634 of the Louisiana Revised Statutes, a claim for breach of the covenant of good faith and fair dealing, and a claim for declaratory relief declaring what class members' rights are under Louisiana law.

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from February 8, 2002 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Louisiana.

• The Court has also allowed the lawsuit to proceed as a class action on behalf of the following non-damages class:

> All persons who: 1) from February 8, 2002 through July 27, 2009 entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) currently drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Louisiana..

• The Court has also allowed the lawsuit to proceed as a class action on behalf of the following sub-class under section 23.631 of the Louisiana Revised Statutes :

> All persons who: 1) at some time on or after February 8, 2002 entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment

absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Louisiana; and 4) where discharged or resigned prior to July 27, 2009.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

case 3:05-md-00527-RLM CAN document 1843-4 filed 10/09/09 page 4 of 10

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......... **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT** .......... **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASSES** .......... **PAGE 6**
10. Am I part of the Classes?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS** .......... **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Classes?

**THE LAWYERS REPRESENTING THE CLASSES** .......... **PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL** .......... **PAGE 9**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION** .......... **PAGE 9**
21. Are more details available?

LEGAL NOTICE

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Ryan Boudreaux, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00193-RLM-CAN (LA).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Ryan Boudreaux and Timothy Bellow) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the Eastern District of Louisiana. These two courts will resolve issues for everyone in the Louisiana class—except for those people who choose to exclude themselves.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Classes;
- The Class Representatives and the lawyers representing the Classes will fairly and adequately represent the interests of the Classes;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the classes, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Amended Class Action Complaint in the action brought in Louisiana alleges that FXG's classification of Louisiana P&D drivers as independent contractors violates Louisiana Revised Statutes §§ 23:634, and 23:963. Plaintiffs also assert claims for breach of the covenant of good faith and fair dealing and declaratory relief. Plaintiffs also seek recovery under Louisiana Revised Statues § 23:631 on behalf of a sub-class of discharged or resigned drivers.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the Louisiana class who have been required to pay for certain business expenses (including improper deductions from wages), a declaration that Class Members are legally classified as employees and have the rights of employees under Louisiana law. You can read the Plaintiffs' Amended Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to the Amended Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the classes and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

LEGAL NOTICE

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASSES

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Classes?

As noted above, the Court has certified a Louisiana statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from February 8, 2002 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Louisiana.

You must meet the following conditions to be included in the non-damages class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES) at some time from February 8, 2002 through July 27, 2009;
- You **personally** currently drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences);
- You were dispatched out of a terminal in the state of Louisiana.

You must meet the following conditions to be included in the sub-class under Louisiana Revised Statute § 23:631:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES) at some time on or after February 8, 2002;

- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences);
- You were dispatched out of a terminal in the state of Louisiana;
- You where discharged or resigned prior to July 27, 2009.

## 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

# YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Louisiana classes and/or the sub-class or ask to be excluded before the trial, and you have to decide this now.

## 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the classes. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the classes, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

## 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Louisiana classes. If you exclude yourself from the classes—which also means to remove yourself from the classes, and is sometimes called "opting-out" of the classes— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do

exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the Classes?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Ryan Boudreaux, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00193-RLM-CAN (LA). You must state whether you want to be excluded from the Louisiana class, the Louisiana non-damages class, the Louisiana sub-class, or any or all of the three classes. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASSES

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Louisiana Counsel are: Jerald Cureton, CURETON CLARK P.C., 3000 Midlantic Drive, Suite 200, Mt. Laurel, NJ 08054, Tel: (856) 824-1001; Marc Frischhertz, FRISCHHERTZ & ASSOCIATES, 1130 St. Charles Ave., New Orleans, LA, 70130, Tel: (504) 581-1670; and Scott R. Bickford, MARTZELL & BICKFORD, 338 Lafayette St., New Orleans, LA 70130, Tel: (504) 581-9065.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

## 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the classes, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the classes.

# THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

## 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Louisiana District Court. There has been no date set for the trial of this matter. A jury in Louisiana will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the classes.

## 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

## 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

# GETTING MORE INFORMATION

## 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the classes, the Amended Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Amended Class Action Complaint, and information about how to exclude yourself from the classes if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT D

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Nevada state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under the Nevada False Claims Act, Nevada Tax Liability statutes, and Nevada Revised Statutes Chapter 608, which governs payment of wages. They have also asserted claims for rescission of the Operating Agreement, injunctive and declaratory relief. The Court has certified the claims under Nevada Revised Statutes Chapter 608 as a class action, and has denied certification with respect to all of the other claims.

• The Court has allowed the claims under Nevada Revised Statutes Chapter 608 to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from August 1, 2001 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Nevada.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

LEGAL NOTICE

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

- Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

- If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

- **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ........................................ **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT** ........................................ **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS** ........................................ **PAGE 6**
10. Am I part of the Class?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS** ........................................ **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING THE CLASS** ........................................ **PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL** ........................................ **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION** ........................................ **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Michael DeCesare, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00120-RLM-CAN (NV).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Michael DeCesare and Michael Meno) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Nevada. These two courts will resolve issues for everyone in the Nevada class—except for those people who choose to exclude themselves.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the Class;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Class Action Complaint in the action brought in Nevada alleges that FXG's classification of Nevada P&D drivers as independent contractors violates Nevada Revised Statutes Chapter 608, which governs payment of wages.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the Nevada class who have been required to pay for certain business expenses (including improper deductions from wages), You can read the Plaintiffs' Amended Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to the Amended Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## 8. What are the Plaintiffs asking for?

In their claims under Nevada Revised Statutes Chapter 608, the Plaintiffs are asking for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Class?

As noted above, the Court has certified a Nevada statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from August 1, 2001 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Nevada.

## 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Nevada class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the class, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Nevada class. If you exclude yourself from the class—which also means to remove yourself from the class, and is sometimes called "opting-out" of the class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the Class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Michael DeCesare, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00120-RLM-CAN (NV). You must state whether you want to be excluded from the Nevada class. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Nevada Counsel is Andrew J. Kahn, MCCRACKEN, STEMERMAN & HOLSBERRY, 1630 S. Commerce Street, Suite A-1, Las Vegas, NV 89102, Tel: (702) 386-5107; Fax: (702) 386-9848.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

### 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Nevada District Court. There has been no date set for the trial of this matter. A jury in Nevada will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the class, the Amended Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Amended Class Action Complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT E

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of North Carolina state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under North Carolina law, including for rescission of the Operating Agreement, unjust enrichment, declaratory relief declaring that class members are employees under North Carolina Law, and claims under the North Carolina Unfair Trade Practices Act, N.C. GEN. STAT. § 75 1.1(a).

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from May 2, 2003 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of North Carolina.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |

LEGAL NOTICE

| ASK TO BE EXCLUDED | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |
|---|---|

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

- Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

- If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

- **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## What This Notice Contains

**BASIC INFORMATION .......... PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT.......... PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS.......... PAGE 6**
10. Am I part of the Class?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS .......... PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING THE CLASS.......... PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL.......... PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION.......... PAGE 9**
21. Are more details available?

LEGAL NOTICE

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Sharon B. Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (NC).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Sharon B. Whiteside, John Brown, James D. Coates, Louis Wallace, Darrell Jenkins, and Lawrence Aubrey Wilson) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the Western District of North Carolina. These two courts will resolve issues for everyone in the North Carolina class—except for those people who choose to exclude themselves.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the Class;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Class Action Complaint in the action brought in North Carolina alleges that FXG's classification of North Carolina P&D drivers as independent contractors constitutes unjust enrichment and violates the North Carolina Unfair Trade Practices Act, N.C. GEN. STAT. § 75 1.1(a). Plaintiffs also seek rescission of the Operating Agreement, injunctive, and declaratory relief.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the North Carolina class who have been required to pay for certain business expenses (including improper deductions from wages), rescission of the Operating Agreement as an illegal contract, and a declaration that Class Members are legally classified as employees and have the rights of employees under North Carolina law. You can read the Plaintiffs' Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to the Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

### 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG.

### 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

## WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 10. Am I part of the Class?

As noted above, the Court has certified a North Carolina statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from May 2, 2003 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of North Carolina.

### 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

# YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the North Carolina class or ask to be excluded before the trial, and you have to decide this now.

## 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the class, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

## 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the North Carolina class. If you exclude yourself from the class—which also means to remove yourself from the class, and is sometimes called "opting-out" of the class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 14. How do I ask the Court to exclude me from the Class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Sharon B. Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (NC). You must state whether you want to be excluded from the North Carolina class. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, South Carolina counsel are: Palmer Freeman, Jr., WHETSTONE, MYERS, PERKINS & YOUNG, LLC, 601 Devine Street, Columbia, SC 29201, Tel: (803) 799-9400, Fax: (803) 799-2017; Jordan M. Lewis, SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A., 100 Washington Avenue South, Suite 1300, Minneapolis, MN 55401, Tel: (612) 337-6100, Fax: (612) 339-6591; and Jerry Cureton, CURETON CAPLAN, 3000 Midlantic Drive, Mt. Laurel, NJ 08054, Tel: (856) 824-1001, Fax: (856) 824-1008.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

### 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the North Carolina District Court. There has been no date set for the trial of this matter. A jury in North Carolina will hear all of the evidence to determine whether the Plaintiffs or FXG are right

about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the class, the Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Class Action Complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT F

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF INDIANA SOUTH BEND DIVISION

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Ohio state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under Ohio law, including for unjust enrichment, fraud, constructive trust, declaratory relief, and injunctive relief.

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from May 15, 2002 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Ohio.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

LEGAL NOTICE

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

LEGAL NOTICE

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......... **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT** .......... **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS** .......... **PAGE 6**
10. Am I part of the Class?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS** .......... **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING THE CLASS** .......... **PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL** .......... **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION** .......... **PAGE 9**
21. Are more details available?

## Basic Information

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Paul Kelly, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00336-RLM-CAN (OH).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Paul Kelly, Dean Johnson, Thomas Wenzlick, Kenneth R. Miner, Adelbert Lawrence, Russell Jackson, and Robert Velo) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the Northern District of Ohio. These two courts will resolve issues for everyone in the Ohio class—except for those people who choose to exclude themselves.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the Class;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Class Action Complaint in the action brought in Ohio alleges that FXG's classification of Ohio P&D drivers as independent contractors violates Ohio state law. Plaintiffs seek damages for unjust enrichment, fraud, imposition of a constructive trust, declaratory relief, and injunctive relief.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the Ohio class who have been required to pay for certain business expenses (including improper deductions from wages), recovery of the unjust enrichment realized by FXG, injunctive relief and a declaration that Class Members are legally classified as employees and have the rights of employees under Ohio law. You can read the Plaintiffs' Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to Plaintiffs' Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Class?

As noted above, the Court has certified a Ohio statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from May 15, 2002 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Ohio.

## 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

LEGAL NOTICE

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Ohio class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the class, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Ohio class. If you exclude yourself from the class—which also means to remove yourself from the class, and is sometimes called "opting-out" of the class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the Class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Paul Kelly, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00336-RLM-CAN (OH). You must state whether you want to be excluded from the Ohio class. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Ohio counsel are: Robert E. DeRose, BARKAN, NEFF, HANDELMAN, MEIZLISH LLP, 360 S. Grant Avenue, P.O. Box 1989, Columbus, OH 43216, Tel: (614) 221-4221; Peter D. Winebrake, THE WINEBRAKE LAW OFFICES, Twining Office Center, Suite 114, 715 Twining Road, Dresher, PA, 19025, Tel: (215) 884-2491; Thomas N. Trefethern, 101 Central Plaza South, Suite 1003, Canton, OH 44702, Tel: (330) 518-5671; and John S. Marshall, MARSHALL AND MORROW LLC, 111 West Rich Street, Suite 430, Columbus, OH 34215, Tel: (614) 463-9790.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

### 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Ohio District Court. There has been no date set for the trial of this matter. A jury in Ohio will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the

lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the class.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the class, the Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Class Action Complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT G

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Oregon state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under Oregon law, including for violations of Oregon's wage and hour laws, for injunctive relief, and for declaratory relief declaring what class members' rights are under Oregon law.

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from July 20, 1999 through July 27, 2009 provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Oregon.

• The Court has also allowed the lawsuit to proceed as a class action on behalf of the following sub-class for a claim for overtime wages:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) who, at any time from August 10, 2005 through July 27, 2009 operated vehicles with a gross vehicle weight rating of less than 10,001 pounds.

• The Court has also allowed the lawsuit to proceed as a class action on behalf of the following sub-class for statutory penalty wages under Oregon Revised Statute § 652.150:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) to provide package pick-up and

delivery services pursuant to the Operating Agreement; 3) were dispatched out of a terminal in the state of Oregon; and 4) whose Operating Agreement was terminated at any time from July 20, 1999 through July 27, 2009.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued)**. FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......................................................... **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**.................................................. **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASSES**...................................................... **PAGE 6**
10. Am I part of the Classes?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS** ................................................ **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Classes?

**THE LAWYERS REPRESENTING THE CLASSES**............................. **PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL**........................................................................ **PAGE 9**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION**............................................... **PAGE 9**
21. Are more details available?

## BASIC INFORMATION

### 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Jon Leighter, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00328-RLM-CAN (OR).

### 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

### 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Jon Leighter and David Spicer) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Oregon. These two courts will resolve issues for everyone in the Oregon classes—except for those people who choose to exclude themselves.

### 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;
- The Class Representatives' claims are typical of the claims of the rest of the Classes;

- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the classes;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the classes, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Class Action Complaint in the action brought in Oregon alleges that FXG's classification of Oregon P&D drivers as independent contractors violates Oregon Revised Statute § 652.610, which governs illegal deductions from wages. Plaintiffs also seek injunctive and declaratory relief. Plaintiffs in the first sub-class also seek payment of overtime wages for drivers of trucks under 10,001 pounds. Plaintiffs in the second sub-class seek statutory penalty wages under Oregon Revised Statute § 652.150.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the Oregon classes who have been required to pay for certain business expenses (including improper deductions from wages), a declaration that Class Members are legally classified as employees and have the rights of employees under Oregon law and injunctive relief. You can read the Plaintiffs' Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to the Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the classes and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

LEGAL NOTICE

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG, and injunctive relief.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASSES

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Classes?

As noted above, the Court has certified a Oregon statewide class and two sub-classes. You must meet the following requirements to be included in the statewide class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from July 20, 1999 to July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Oregon.

You must meet the following conditions to be included in the overtime wage payment sub-class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences);
- You were dispatched out of a terminal in the state of Oregon; and
- At any time from August 10, 2005 through July 27, 2009, you operated a vehicle with a gross vehicle weight rating of less than 10,001 pounds.

You must meet the following conditions to be included in the statutory penalty wages sub-class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);

- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences);
- You were dispatched out of a terminal in the state of Oregon; and
- Your Operating Agreement was terminated at any time from July 20, 1999 through July 27, 2009.

### 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Oregon class and/or the sub-classes or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the classes. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the classes, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Oregon classes. If you exclude yourself from the classes—which also means to remove yourself from the classes, and is sometimes called "opting-out" of the classes— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do

exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

## 14. How do I ask the Court to exclude me from the Classes?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Jon Leighter, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00328-RLM-CAN (OR) You must state whether you want to be excluded from the Oregon class, the Oregon overtime sub-class, the Oregon statutory penalty sub-class, or any or all of the three classes. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

# THE LAWYERS REPRESENTING THE CLASSES

## 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Oregon Counsel is Steve D. Larson, STOLL STOLL BERNE LOKTING & SHLACHTER P.C., 209 S.W. Oak Street, Fifth Floor, Portland, OR 97204, Tel: (503) 227-1600.

## 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

## 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the classes, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the classes.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Oregon District Court. There has been no date set for the trial of this matter. A jury in Oregon will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the classes.

### 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

### 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

## GETTING MORE INFORMATION

### 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the classes, the Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Class Action Complaint, and information about how to exclude yourself from the classes if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT H

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, a Class Action Lawsuit May Affect Your Rights.

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

• FedEx Ground and Home Delivery ("FXG") drivers have filed a class action lawsuit against FXG alleging that they have been misclassified as independent contractors instead of as employees and denied the benefits and protections of Utah state law. This case is pending before Judge Robert L. Miller, Jr. in the United States District Court for the Northern District of Indiana (the "Court").

• In this case, plaintiffs have asserted claims under Utah law, including for illegal deduction from wages in violation of UTAH CODE ANN. § 34-28-3, rescission of the Operating Agreement, and declaratory relief.

• The Court has allowed the lawsuit to proceed as a class action on behalf of:

> All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from November 16, 2003 through July 27, 2009, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Utah.

You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to the ERISA action, please contact the claims administrator or counsel at the address listed below in Section 21.

• The Court has not decided whether FXG did or did not do anything wrong. There is no money available now, and no guarantee there will be. However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT: | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit. Await the outcome. Give up certain rights.**<br><br>By doing nothing, you keep the possibility of getting money and/or employee benefits that may come from a trial or a settlement. But, you give up any rights to sue FXG separately about the same legal claims in this lawsuit. |

LEGAL NOTICE

| ASK TO BE EXCLUDED | **Get out of this lawsuit. Get no benefits from it. Keep rights.**<br><br>If you ask to be excluded and money or benefits are later awarded, you won't share in those. But, you keep any rights to sue FXG separately about the same legal claims in this lawsuit. |
|---|---|

Your options are explained in this notice. To ask to be excluded, you must act before **MONTH DATE, 2009 (45 days after the date that notice is issued).** FXG is prohibited by law from asking or telling you to exclude yourself from this action, or even from expressing an opinion as to whether it is or is not in your best interest to remain a class member or exclude yourself from this action.

• Plaintiffs must prove the claims against FXG. If money or benefits are obtained from FXG, you will be notified how this affects your rights.

• If you currently work as a pick-up and delivery driver, FXG may not retaliate against you for participating in any manner in this case.

• **Any questions? Read on and visit www.fedexclassactionlawsuit.com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......... **PAGE 4**
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT** .......... **PAGE 5**
5. What does the lawsuit complain about?
6. How does FXG answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS** .......... **PAGE 6**
10. Am I part of the Class?
11. What if I'm still not sure if I am included?

**YOUR RIGHTS AND OPTIONS** .......... **PAGE 7**
12. What happens if I do nothing at all?
13. Why would I ask to be excluded?
14. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING THE CLASS** .......... **PAGE 8**
15. Who represents the Plaintiffs in this case?
16. Should I get my own lawyer?
17. How will the lawyers be paid?

**THE TRIAL** .......... **PAGE 8**
18. How and when will the Court decide who is right?
19. Do I have to come to the trial?
20. Will I get money after the trial?

**GETTING MORE INFORMATION** .......... **PAGE 9**
21. Are more details available?

# BASIC INFORMATION

## 1. Why did I get this notice?

FXG's records show that you currently work, or previously worked, as a pick-up and delivery driver ("P&D driver") at FXG. This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you. You have legal rights and options that you may exercise before the Court holds a trial. The trial is to decide whether the claims being made against FXG, on your behalf, are correct. Judge Miller of the United States District Court for the Northern District of Indiana is overseeing this class action. The lawsuit is known as *Dan Fishler, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00053-RLM-CAN (UT).

## 2. What is this lawsuit about?

This lawsuit is about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG kept the right to control how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this. FXG maintains that the independent contractor classification is appropriate and denies that it has broken any laws. The Court has not ruled on the merits of the positions taken by either the Plaintiffs or FXG.

## 3. What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Dan Fishler, Jesse Ricord, and Arthur R. Rottini) sue on behalf of other people who have similar claims. The people who have similar claims to or with the Class Representatives are a "Class" or "Class Members." The individuals who sued—and all the Class Members like them—are called the Plaintiffs. The company they sued (in this case, FXG) is called the Defendant. In this case, all pretrial proceedings are being resolved by the United States District Court for the Northern District of Indiana. If there is a trial of this action, it will then be held in the United States District Court for the District of Utah. These two courts will resolve issues for everyone in the Utah class—except for those people who choose to exclude themselves.

## 4. Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.

Specifically, the Court found that:

- There are numerous P&D drivers whose interests will be affected by this lawsuit;
- There are legal questions and facts that are common to each of them;

- The Class Representatives' claims are typical of the claims of the rest of the Class;
- The Class Representatives and the lawyers representing the Class will fairly and adequately represent the interests of the Class;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Opinion and Order certifying the class, which is available at www.fedexclassactionlawsuit.com.

## THE CLAIMS IN THE LAWSUIT

### 5. What does the lawsuit complain about?

Plaintiffs' Class Action Complaint in the action brought in Utah alleges that FXG's classification of Utah P&D drivers as independent contractors violates UTAH CODE ANN. § 34-28-3, which governs illegal deductions from wages. Plaintiffs also seek rescission of the Operating Agreement and declaratory relief.

Plaintiffs contend that FXG has treated them illegally by calling them independent contractors when, under the law, they are really employees. As a consequence, Plaintiffs contend that they and others who have driven for FXG were required to pay for certain business expenses that, but for the misclassification as independent contractors, would have been paid by FXG as their employer.

Plaintiffs seek monetary damages for all members of the Utah class who have been required to pay for certain business expenses (including improper deductions from wages) and the quantum meruit value of their services. They also seek rescission of the Operating Agreement as an illegal contract, and a declaration that Class Members are legally classified as employees and have the rights of employees under Utah law. You can read the Plaintiffs' Class Action Complaint at www.fedexclassactionlawsuit.com.

### 6. How does FXG answer?

FXG denies that it did anything wrong and says that Class Members are legally independent contractors and therefore not eligible for payment of business expenses, overtime, or other wage protections. FXG's Answer to the Class Action Complaint is also available at www.fedexclassactionlawsuit.com.

### 7. Has the Court decided who is right?

The Court hasn't decided whether Plaintiffs or FXG are correct. By establishing the class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case. The Plaintiffs must prove their claims through later proceedings in this lawsuit.

LEGAL NOTICE

## 8. What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in how P&D drivers are classified by FXG, for monetary damages to compensate drivers who have been required to pay for certain business expenses because FXG has misclassified them as independent contractors, and a judicial declaration that the P&D drivers are employees of FXG.

## 9. Is there any money available now?

No money or benefits can be collected now because the Court and/or a jury have not yet decided whether it agrees with Plaintiffs that FXG has violated the law. There is no guarantee that money or benefits will or will not be obtained. If Plaintiffs win in this case, or there is a settlement, you will be notified about how this impacts your rights.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

## 10. Am I part of the Class?

As noted above, the Court has certified a Utah statewide class. You must meet the following requirements to be included in the class:

- You entered into a FedEx Ground or FedEx Home Delivery form Operating Agreement (now known as Form OP-149 and Form OP-149 RES);
- You **personally** drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) at some time from November 16, 2003 through July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and
- You were dispatched out of a terminal in the state of Utah.

## 11. What if I'm still not sure if I am included?

If you are still not sure whether you are included, you can get free help at www.fedexclassactionlawsuit.com, or by calling or writing to the lawyers in this case, at the phone number or address listed in Question 15.

## YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Utah class or ask to be excluded before the trial, and you have to decide this now.

### 12. What happens if I do nothing at all?

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the class. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). While you do not need to do anything to stay in the class, you should keep your records pertaining to your relationship with FXG. Likewise, if your mailing address changes, please notify the claims administrator or class counsel.

Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other separate lawsuit—about the same legal claims that are the subject of this lawsuit. You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this action.

### 13. Why would I ask to be excluded?

If you already have your own lawsuit against FXG concerning employment classification and want to continue with it, you need to ask to be excluded from the Utah class. If you exclude yourself from the class—which also means to remove yourself from the class, and is sometimes called "opting-out" of the class— you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between FXG and the Plaintiffs. However, you may then be able to sue or continue to sue FXG for employment classification practices that occurred or occur at any time. If you exclude yourself, you will not be legally bound by the Court's judgment in this action.

If you start your own lawsuit against FXG after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against FXG, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

### 14. How do I ask the Court to exclude me from the Class?

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Dan Fishler, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00053-RLM-CAN (UT). You must state whether you want to be excluded from the Utah class. Be sure to include your name and address, and sign the letter. You must mail your Exclusion Request postmarked by **MONTH DATE, 2009 (45 days from Notice mailing)**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

## THE LAWYERS REPRESENTING THE CLASS

### 15. Who represents the Plaintiffs in this case?

The Court appointed the following lawyers and law firms to serve as class counsel for Plaintiffs in this lawsuit. They may be contacted in the following manner:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

In addition, Utah counsel are: J. Gordon Rudd, ZIMMERMAN REED, P.L.L.P., 651 Nicollet Mall, Suite 501, Minneapolis, MN 55402, Tel; (612) 341-0400, Fax: (612) 341-0844; and James S. Lowrie, JONES WALDO HOLBROOK & MCDONOUGH, PC, 170 So. Main Street, Suite 1500, Salt Lake City, UT, 84101, Tel: (801) 521-3200.

### 16. Should I get my own lawyer?

You do not need to hire your own lawyer because class counsel is working on your behalf. But, if you want your own lawyer, you will have to pay that lawyer. For example, you can ask him or her to appear in Court for you if you want someone other than class counsel to speak for you.

### 17. How will the lawyers be paid?

If class counsel obtains money or benefits for the class, they can ask the Court for an award of fees and expenses. You won't have to pay these fees and expenses. If the Court grants class counsel's request, the fees and expenses would be either paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund, obtained for the class.

## THE TRIAL

The Court has not yet scheduled a trial to decide who is right in this case.

### 18. How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or by the Court in the Northern District of Indiana before a trial, Plaintiffs will have to prove their claims at a trial in the Utah District Court. There has been no date set for the trial of this matter. A jury in Utah will hear all of the evidence to determine whether the Plaintiffs or FXG are right about the claims in the lawsuit. There is no guarantee that either Plaintiffs or FXG will win, or that Plaintiffs will get any money for the class.

## 19. Do I have to come to the trial?

You do not need to attend the trial. Class counsel will present the case for the Plaintiffs, and FXG will present the defenses. You and/or your own lawyer are welcome to attend the trial at your own expense.

## 20. Will I get money after the trial?

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate. We do not know how long this will take.

# GETTING MORE INFORMATION

## 21. Are more details available?

Visit the website, www.fedexclassactionlawsuit.com, where you will find the Court's Opinion and Order certifying the class, the Class Action Complaint that the Plaintiffs submitted, the Defendant's Answer to the Class Action Complaint, and information about how to exclude yourself from the class if you wish. You may also speak to one of the lawyers by calling 1-866-534-0901, or by writing to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

DATE: MONTH 00, 0000.

# EXHIBIT I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 03:05-MD-527 RM (MDL-1700) |
|---|---|

# If You Are Or Have Been A FedEx Ground Or FedEx Home Delivery Pickup And Delivery Driver, A Class Action Lawsuit May Affect Your Rights.

Classes have been certified in lawsuits against FedEx Ground Package System, Inc. ("FXG") concerning whether FXG misclassified its pick-up and delivery drivers ("P&D drivers") as independent contractors instead of as employees and whether pick-up and delivery drivers are eligible for monetary damages as a result of that misclassification. These lawsuits have been joined together for pretrial proceedings in the United States District Court for the Northern District of Indiana, but if these cases are not resolved before trial, they will proceed to trial in the individual states in which they were filed. The Court has decided that these lawsuits should be class actions on behalf of several classes, or groups of people, that may include you. This notice summarizes your rights and options. More information is available in detailed notices at the website below. If you are included in one of the classes, you have to decide whether to stay in the class and be bound by whatever results, or ask to be excluded and keep your right to sue FXG. There is no money available now and no guarantee that there will be.

**ARE YOU AFFECTED?**

> Your rights may be affected if you have been a P&D driver who: 1) entered into a FedEx Ground or FedEx Home Delivery Form Operating Agreement (now known as OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) prior to July 27, 2009 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of any terminal in Arizona, Georgia, Louisiana, Nevada, North Carolina, Ohio, Oregon, or Utah.

**WHAT ARE THESE CASES ABOUT?**

These lawsuits are about whether FXG should classify P&D drivers as employees rather than independent contractors. Plaintiffs contend that because FXG maintained the right of control over how the P&D drivers conducted their work, the P&D drivers should be legally classified as employees rather than independent contractors. FXG disputes this contention. FXG denies that it did anything wrong and says that class members are independent contractors. The Court has not decided whether Plaintiffs or FXG is right. You may already have received a separate notice pertaining to a separate class action lawsuit against FXG seeking to recover employment benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). For additional information pertaining to that ERISA action, please visit www.fedexclassactionlawsuit.com or contact Plaintiffs' counsel listed below.

**WHO REPRESENTS THE CLASSES?**

The Court appointed Lynn Rossman Faris of Leonard Carder LLP, Susan E. Ellingstad of Lockridge Grindal & Nauen P.L.L.P., and Robert Harwood of Harwood Feffer LLP, to serve as co-lead counsel for

Plaintiffs in this lawsuit. You don't have to pay Plaintiffs' counsel, or anyone else, to participate. Instead, if Plaintiffs' counsel gets money or benefits for the classes, they may ask the Court for attorneys' fees and costs, which would either be paid directly by FXG or, if there is a settlement, may be paid out of a common settlement fund obtained for the class. You may hire your own lawyer to appear in Court for you; if you do, you have to pay for that lawyer.

**WHAT ARE YOUR OPTIONS?**

If you are included in one of the classes, you have to decide whether to stay in the classes or ask to be excluded before the trial, and **you have to decide this now.** You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit. By doing nothing you are staying in the classes. If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement). Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, FXG—as part of any other lawsuit—about the same legal claims that are the subject of these lawsuits.

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from the specific lawsuit that pertains to the state in which you operated as a P&D driver. The following are the names of these lawsuits and the states to which they apply:

| | |
|---|---|
| ***ARIZONA*** - | *Margaret Gibson, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00272-RLM-CAN (AZ); |
| ***GEORGIA*** - | *Ernest White v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00411-RLM-CAN (GA); |
| ***LOUISIANA*** - | *Ryan Boudreaux, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00193-RLM-CAN (LA); |
| ***NEVADA*** - | *Michael DeCesare, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00120-RLM-CAN (NV); |
| ***NORTH CAROLINA*** - | *Sharon B. Whiteside, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:07-cv-00326-RLM-CAN (NC); |
| ***OHIO*** - | *Paul Kelly, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00336-RLM-CAN (OH); |
| ***OREGON*** - | *Jon Leighter, et al. v. FedEx Ground Package System, Inc., et al.*, Civil No. 3:07-cv-00328-RLM-CAN (OR); and |
| ***UTAH*** - | *Dan Fishler, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:08-cv-00053-RLM-CAN (UT). |

In your Exclusion Request, be sure to write the full name of the case that applies to you and state that you want to be excluded from the case. Also, include your name, address and telephone number, and sign the letter. You must mail your Exclusion Request postmarked by **FORTY FIVE DAYS FROM MAILING**, to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want more detailed notices or other documents about these lawsuits and your rights, visit www.fedexclassactionlawsuit.com or write to: In re FedEx Ground Package System Employment Practices Litigation, c/o US Bank, P.O. Box 24389, Jacksonville, FL 32241-4389; Telephone: 1-866-534-0901.

You may also write to or telephone Plaintiffs' co-lead counsel:

**Lynn Rossman Faris**
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel:   (510) 272-0169
Fax:   (510) 272-0174

**Susan E. Ellingstad**
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981

**Robert I. Harwood**
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel:   (212) 935-7400
Fax:   (212) 753-3630

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

## CERTIFICATE OF SERVICE

I, Craig Lowther, hereby certify that I am not a party to the action, am over the age of eighteen years, am employed by the law firm of Harwood Feffer LLP, attorneys for plaintiff, and that on October 9, 2009, I served the foregoing

**JOINT MOTION FOR APPROVAL OF SUMMARY AND LONG FORM CLASS NOTICES PERTAINING TO THE FOURTH AND FIFTH WAVE CLASS ACTIONS**

in the within action, by causing true and correct copies of same to be electronically mailed and mailed to the following counsel:

**See Attached Service List and e-Notice**

Craig Lowther

## Motions

3:05-md-00527-RLM-CAN In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II

CASREF, CLASS, PROTO

**U.S. District Court Northern District of Indiana [LIVE]**

**USDC Northern Indiana**

### Notice of Electronic Filing

The following transaction was entered by Harwood, Robert on 10/9/2009 at 12:37 PM EST and filed on 10/9/2009

| | |
|---|---|
| **Case Name:** | In re MDL-1700 FedEx Ground Package System Inc Employment Practices Litigation No II |
| **Case Number:** | 3:05-md-527 |
| **Filer:** | FedEx Plaintiffs |
| **Document Number:** | 1843 |

**Docket Text:**

**Joint MOTION Approval of Summary and Long Form Class Notices Pertataining to the Fourth and fifth Wave Class Actions *filed by Fedex Defendants and* by Plaintiff FedEx Plaintiffs. (Attachments: # (1) Exhibit A to Joint Motion, # (2) Exhibit B to Joint Motion, # (3) Exhibit C to Joint Motion, # (4) Exhibit D to Joint Motion, # (5) Exhibit E to Joint Motion, # (6) Exhibit F to Joint Motion, # (7) Exhibit G to Joint Motion, # (8) Exhibit H to Joint Motion, # (9) Exhibit I to Joint Motion)(Harwood, Robert)**

**3:05-md-527 Notice has been electronically mailed to:**

Alison G Fox Alison.Fox@bakerd.com, Alicia.Cummins@bakerd.com, andrew.murphy@bakerd.com, Melissa.Bozzuto@bakerd.com

Anne T Regan atr@zimmreed.com, stefanie.hebig@zimmreed.com

Aparna B Joshi ajoshi@omm.com

Barry S Fagan bfagan@dibandfagan.com

Beth A Ross bross@leonardcarder.com, aahn@leonardcarder.com, ksangren@leonardcarder.com

Bruce H Meizlish brucelaw@fuse.net

C Victor Pyle , III victor.pyle@ogletreedeakins.com, linda.lyday@ogletreedeakins.com,

meredith.smith@ogletreedeakins.com, ted.speth@ogletreedeakins.com

Chris A Hollinger      chollinger@omm.com

D Lucetta Pope      Lucetta.Pope@bakerd.com, Alicia.Cummins@bakerd.com, Melissa.Bozzuto@bakerd.com

Daniel O Myers      dmyers@rpwb.com, mbrown@rpwb.com, sgiddens@rpwb.com, wking@rpwb.com

Darcie R Brault      dbrault@dibandfagan.com

David M Cialkowski      dmc@zimmreed.com

Deborah R Grayson      drgrayson@fuse.net

Dmitri Iglitzin      iglitzin@workerlaw.com

Edward J Efkeman      eefkeman@fedex.com

Edward R Forman      eforman@marshallandmorrow.com

Eileen S Goodin      egoodin@bnhmlaw.com

Eleanor I Morton      emorton@leonardcarder.com, aahn@leonardcarder.com

Evelyn L Becker PHV      ebecker@omm.com

Gary F Lynch      glynch@carlsonlynch.com

George A Barton      gab@georgebartonlaw.com, renee@georgebartonlaw.com, stacy@georgebartonlaw.com

Ginger A DeGroff      degrofflaw@yahoo.com

Guy Brenner      gbrenner@omm.com

Ian Otto      iotto@straus-boies.com, cle@straus-boies.com, ecf@straus-boies.com

J Gordon Rudd      jgr@zimmreed.com

James A Staack      jims@staack-firm.com

James R Mulroy , II      mulroyj@jacksonlewis.com, edwardsj@jacksonlewis.com

Jeffrey A Bartos      jbartos@geclaw.com

Jeffrey A Trimarchi      jtrimarchi@omm.com

Jeffrey S Nestler      jnestler@omm.com

Jennifer Lee Merzon      jmerzon@omm.com

Jerald R Cureton    jcureton@curetonclark.com

John S Marshall    jmarshall@marshallandmorrow.com

Joni M Thome PHV    thome@halunenlaw.com

Jordan M Lewis    jordanlewis@sbgdf.com

Kenneth Lee Blalack , II    lblalack@omm.com

Larry A Golston , Jr    larry.golston@beasleyallen.com

Lesley A Pate    lapate@venable.com

Lynn R Faris    lfaris@leonardcarder.com, aahn@leonardcarder.com, bross@leonardcarder.com, emorton@leonardcarder.com, lbadar@leonardcarder.com

Mark A Friel    mfriel@stollberne.com

Martin S Garfinkel    garfinkel@sgb-law.com, cronan@sgb-law.com, luk@sgb-law.com

Mary D Walsh-Dempsey    mdempsey@omalleylangan.com

Mary Donne Peters    mpeters@gorbypeters.com, mmcgee@gorbypeters.com

Matthew M Houston    mhouston@whesq.com

Matthew T Tobin    matt@sdtrustco.com, lenandlaura@iw.net

Michael G McGuinness    mmcguinness@omm.com

Michael J Gorby    mgorby@gorbypeters.com

Michael J Watton    jdrewicz@Wattongroup.com, vgaroukian@wi.rr.com

Michael W Garrison , Jr    mgarrison@omm.com

Michael W Kopp    mkopp@omm.com

Nora M Puckett    npuckett@omm.com

Peter D Winebrake    pwinebrake@winebrakelaw.com

Peter J Agostino    agostino@aaklaw.com, trybula@aaklaw.com

Peter W Overs , Jr    povers@whesq.com

Philip Stephen Fuoco    pfuoco@msn.com

R Christopher Gilreath    chrisgil@sidgilreath.com

R Jay Taylor , Jr    jtaylor@scopelitis.com, jwoolley@scopelitis.com

Richard T Phillips    flip@smithphillips.com, tresahharden@smithphillips.com

Robert E DeRose , II    bderose@bnhmlaw.com, ameige@bnhmlaw.com, egordon@bnhmlaw.com,
sbaith@bnhmlaw.com

Robert G Ames    rgames@venable.com

Robert I Harwood    rharwood@whesq.com

Robert K Firsten    rkfirsten@abbottnicholson.com

Robert K Handelman    rhandelman@bnhmlaw.com

Robert M Schwartz PHV    rschwartz@omm.com

Robin Dean    rdean@omm.com

Sanford A Meizlish    smeizlish@bnhmlaw.com

Scott Voelz    svoelz@omm.com

Shannon Liss-Riordan    sliss@llrlaw.com, hlichten@llrlaw.com, mhorwitz@llrlaw.com,
sgutherz@llrlaw.com

Soye Kim    skim@geclaw.com

Steve D Larson    slarson@ssbls.com, dcerdas@ssbls.com, drees@ssbls.com, kdunn@ssbls.com

Susan E Ellingstad    seellingstad@locklaw.com, hnpotteiger@locklaw.com,
mortonpolski@locklaw.com

Thomas J Brunner , Jr    Tom.Brunner@bakerd.com, Alicia.Cummins@bakerd.com,
Melissa.Bozzuto@bakerd.com

Tom A Jerman    tjerman@omm.com

Victor H Jih    vjih@omm.com

Wood R Foster PHV , Jr    woodfoster@sbgdf.com, heidifurlong@sbgdf.com

**3:05-md-527 Notice has been delivered by U.S. Mail or other means to:**

Aaron Roblan
Jackson Lewis
One Union Square
600 University St Suite 2900
Seattle, WA 98101

Alan M Purdie
Purdie & Metz
PO Box 2659
Ridgeland, MS 39158

Andrew J Kahn PHV
McCracken Stemerman & Holsberry
1630 S Commerce St Suite A-1
Las Vegas, NV 89102

B James Fitzpatrick
Fitzpatrick Spini & Swanston
838 S Main Street Suite E
Salinas, CA 93901

Carla D Macaluso
Jackson Lewis LLP - Mor/NJ
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Charles N Nauen
Lockridge Grindal Nauen PLLP
100 Washington Avenue South Suite 2200
Minneapolis, MN 55401

Charles W Whetstone , Jr
Whetstone Meyers Perkins & Young
1303 Blanding Street
Columbia, SC 29201

Cheryl F Perkins
Whetstone Meyers Perkins & Young
1303 Blanding Street
Columbia, SC 29201

Clayton D Halunen PHV
Halunen & Associates
220 S Sixth St Suite 2000
Minneapolis, MN 55402

Dan S Smith
Dan Solomon Smith LLC
339 Main Street Suite 2D
Orange, NJ 07050

Devon Nugent

Donald B Lewis
5 Cynwyd Road

Bala Cynwyd, PA 19004

Donald R Taylor
Taylor Dunham & Burgess LLP
301 Congress Ave Suite 1050
Austin, TX 78701

Eric E Hobbs
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Eric H Rumbaugh PHV
Michael Best & Friedrich LLP - Mil/WI
100 East Wisconsin Ave Suite 3300
Milwaukee, WI 53202-4108

Harold L Lichten
Lichten & Liss-Riordan PC
100 Cambridge St 20th Floor
Boston, MA 02114

J Allen Brinkley
Brinkley & Chesnut
307 Randolph Avenue
PO Box 2026
Huntsville, AL 35801

Jack D Hilmes
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Jacqueline Mezquita Fernandez
9600 NW 38th Street Suite 301
Miami, FL 33178

Jennifer Rygiel Boyd
Ogletree Deakins Nash Smoak & Stewart PC - Mor/NJ
10 Madison Ave Suite 402
Morristown, NJ 07960

John H Beisner PHV
O'Melveny & Myers LLP - Was/DC
1625 Eye Street NW Suite 10
Washington, DC 20006-4001

Joree Brownlow
Law Office of Joree G Brownlow
1444 Gillham Dr Suite 200
Bartlett, TN 38134

Joseph A Osefchen
The Law Firm of Philip Stephen Fuoco
24 Wilkins Place
Haddonfield, NJ 08033

Karen P Kruse PHV
Jackson Lewis LLP - Sea/WA
One Union Square
600 University Street Suite 2900
Seattle, WA 98101

Kenneth E Milam
Watkins & Eager
PO Box 650
Jackson, MS 39205-0650

Kevin J Driscoll
Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC
699 Walnut St 1900 Hub Tower
Des Moines, IA 50309-3773

Laron Jones
1505 N Ellamont St
Baltimore, MD 21216

Melissa Rohman

Michael J Puma PHV
Morgan Lewis & Bockius LLP - Phi/PA
1701 Market Street
Philadelphia, PA 19103-2921

Michael R Reck
Belin Lamson McCormick Zumbach Flynn
666 Walnut Street Suite 2000
Des Moines, IA 50309-3989

Monica Ferraro
Barkan Neff Handelman Meizlish LLP
360 S Grant Ave
Columbus, IN 43215

Patricia A Sullivan
Edwards & Angell
2800 Financial Plaza
Providence, RI 02903

Paula R Markowitz
Markowitz & Richman

1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Peter N Wasylyk
1307 Chalkstone Avenue
Providence, RI 02908

R Bruce Carlson
Carlson Lynch Ltd - Sew/PA
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Ralph Carl Veal

Ricardo Huerta

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Robert A Garcin
Law Offices of Robert A Garcin
210 East 29th Street # A
Loveland, CO 80538

Robert E McDaniel
McDaniel Law Offices
4 Bicentennial Square
Concord, NH 03301

Robert James Penny
Wick Bramer Ukasick & Trautwein LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G Gangemi
Gangemi Law Firm PC
82 Wall St Suite 300
New York, NY 10005

Steve Dennis PHV
Reid & Dennis PC
Providence Tower
5001 Spring Valley Road Suite 255W
Dallas, TX 75244

Steven Matthew Kelso
Wheeler Trigg Kennedy LLP
1801 California Street # 3600
Denver, CO 80202

Todd J O'Malley
O'Malley & Langan PC
Mulberry Professional Plaza
426 Mulberry St Suite 104
Scranton, PA 18503

Wesley Martin

William S Hommel , Jr
Attorney at Law
1402 Rice Road Suite 200
Tyler, TX 75703

William T Fiala
Lewis Fisher Henderson Claxton & Mulroy LLP
6410 Poplar Avenue Suite 300
Memphis, TN 38119

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-0
] [41277ccde3e4d7189ae9f8f82be5e41c20139f0afea4d15f4d87913eb10d640493d
19593e577d5ea9f9508416b508814cb7e002cb32a3ff6112863a53ee4e89c]]
**Document description:**Exhibit A to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-1
] [3f8ed4442c295f11b49edb3f628f05d87ea83ac8b5910bcbdf01b21ee256353f852
6b76421939fe6b659e6670abf8da8ec971cbdf4b89ce23658570bb66b4c1a]]
**Document description:**Exhibit B to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-2
] [4c0adc26bea7c5058a93679cad3ec594a2b16abad28c6eeb544ce707de39c490feb
134899aa080c40c540cba31999230c7396027397a80af8ffcf2ea1462c041]]
**Document description:**Exhibit C to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-3
] [0e7207faee894e6c8a725c6f9e9ebfb67f3b61c08fae0af2ca8b15a18a7dcff5752
29897bb8da754ec6ae3038f7147b6b7d72ec90e512dc695ec1d17ce9d64a8]]
**Document description:**Exhibit D to Joint Motion

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-4
] [25763ba69d490b47c90be67b517758a777a7d7c8a8d9926ba58738709c3796162c2
a77924ae1fc02c1f5b5de6975bb0fe3a76728ec98da54daf52109800fa69d]]
**Document description:**Exhibit E to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-5
] [19dea221664e416ca5aa3788c99346d4c124591c77d2e16a436995070606915e10a
509c721f890a4f53ec2540883e330addf47372cbe70e5291060476f2d14ca]]
**Document description:**Exhibit F to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-6
] [7edebd995d3b21598b3190ea3dc25e27bb2ba35d0f670b76b39bb23fe503d1741a0
e22e9fa30aa7599f902b666c7e534e7a901d6ab3f800520d7456a29ed57dd]]
**Document description:**Exhibit G to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-7
] [c706a7856bb78fa08ef814797b98ba7705afffe21c6318ff0e712e5b44197ee09cc
66b4ddc6d8f69057944f8b3a32c34dd99fde0d1eaad5f2a60b753167c0c54]]
**Document description:**Exhibit H to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-8
] [2e3cfda17d6a8d7b2bafafccab6263df629ff9bacd41671e6d41f3b92256fc06042
8822aaf2f6cbd079b8db004f3ca108ca118603cdef42b8104cff4b69b4582]]
**Document description:**Exhibit I to Joint Motion
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1047496160 [Date=10/9/2009] [FileNumber=1369508-9
] [78b8143c6c424199089408ba59d269d7eda482e7b2be0538d327e6899cc4f0dc187
25e1c0cee0ff744a54967369f33850e6588ff04ec02be0f9651b867c017f6]]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**ORDER**

On July 27, 2009, the Court entered an Opinion and Order certifying fourth and fifth wave classes for the actions pending in Arizona, Georgia, Louisiana, Nevada, North Carolina, Ohio, Oregon, and Utah. (Doc. 1770) On October 8, 2009, the parties filed a Joint Motion For Approval Of The Summary And Long Form Class Notices pertaining to the Fourth and Fifth Wave Class Actions. (Doc. 1843) The motion is **GRANTED**.

The long form notices attached as Exhibits A-H to the joint motion are **APPROVED** and parties are directed to proceed with the mailing of these notices as soon as practicable.

The summary notice attached as Exhibit I to the joint motion is also **APPROVED** and should be published as directed in this Court's previous Orders. (Docs. 1131, 1193, and 1288)

**SO ORDERED.**

Dated October 14, 2009.

s/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF 2009 IRS NOTICE OF PROPOSED ADJUSTMENT AND CORPORATE DESIGNEE DEPOSITION**

Plaintiffs' motion to compel asks to unfairly and improperly intrude into FedEx Ground's confidential taxpayer communications with an IRS field audit team over potential liability for 2002 taxes. After detailed and informed negotiations in 2006 over dozens of document production and discovery issues, plaintiffs agreed to limit their discovery into disputes between FedEx Ground and tax agencies, and to receive in discovery only an agency's actual, official determination that FedEx Ground's owner operators were employees or independent contractors. The documents and information that plaintiffs now seek do not meet that standard. The IRS has made no determination, and FedEx Ground is still engaged in the back-and-forth process of discussing the IRS audit team's latest proposals.

As the Court may recall, this is not the first time plaintiffs have sought production of a Notice of Proposed Adjustment ("NOPA") issued by the audit team. Over a year ago, plaintiffs filed a motion seeking production of the 2007 draft proposal. This Court accepted plaintiffs' arguments and FedEx Ground sought review by Judge Miller. In the meantime, the IRS audit team has since ***withdrawn*** the 2007 draft NOPA and only recently issued its latest proposed adjustments. The fact that the 2007 draft NOPA was withdrawn only months later and was then not replaced with new proposals until nearly two years later confirms that the proposal was just that—a ***proposal***—and not evidence of the IRS's "determination" of employee status. Indeed, as a matter of statute, the IRS does not issue a "determination" unless and until the several steps of internal review following the issuance of a NOPA are completed and the agency issues a "Notice of Determination of Worker Classification." Permitting plaintiffs to observe FedEx Ground's discussions with the audit team is highly disruptive of the IRS process and, absent an actual agency determination, not relevant. For the same reasons FedEx Ground should not be compelled to produce the 2007 draft NOPA, FedEx Ground should not be required to produce

the two recent NOPAs and related corporate designee deposition.

***First,*** plaintiffs' motion violates the parties' longstanding discovery agreement concerning limits on the production of agency determinations. This agreement provided that FedEx Ground would produce only "***determinations*** from any state or federal taxing agency ***which have decided***" the employment classification issue. The two Notices Of ***Proposed*** Adjustment, by their very title and as a matter of statutory law, do not qualify as IRS "determinations." Rather, the documents in question represent ***proposed*** adjustments by the initial field audit team, and do not become IRS ***determinations*** unless and until the IRS later agrees with the field auditors that taxes are due by issuing a "Notice of Determination of Worker Classification." Accordingly, the recent NOPAs are excluded from the parties' agreement and are not discoverable.

***Second,*** plaintiffs' motion to compel the production of the NOPAs should be denied on the ground that it violates the qualified privilege protecting tax documents against unnecessary public disclosure. Plaintiffs argue that the qualified privilege does not protect the NOPAs here, because the "***conclusions*** reached . . . by the IRS" are "undeniably relevant to the issues in this litigation." But again, plaintiffs' argument incorrectly promotes the initial field audit team's proposed adjustment to the status of an IRS "conclusion" on classification. Plaintiffs should not be permitted to intrude into FedEx Ground's communications with the IRS while the agency is still in the process of reaching its determination.

***Third***, equity requires that the same rules that have limited FedEx Ground's discovery against plaintiffs should be equally applied to plaintiffs' discovery against FedEx Ground. The relief that plaintiffs have requested does not square with the plaintiffs' past arguments against the

production of ***their*** tax returns, nor would it comport with the past decisions of this Court as to the discoverability of tax materials, which required a showing of relevance not met here.

**BACKGROUND**

**I. Procedural History Of Plaintiffs' Tax-Related Requests For Production.**

In February 2006, plaintiffs served their First Set of Requests for Production of Documents ("RFP"). This RFP included over 50 document requests, many of which were extremely broad. The RFP included the following requests:

> Request For Production #23. Any document(s) from or relating to any state or federal court, state or federal agency or any other decision of any kind in which Defendant's "independent contractor" classification has been adjudicated, reviewed, resolved, investigated, settled or in any manner addressed and all documents relating to any such case. This Request includes but is not limited to decisions from any court, the NLRB, EEOC, DOT, IRS, any state workers compensation agency, tax agency, unemployment insurance agency, any state discrimination agency, or any other entity which conducted any investigation or adjudication involving any complaint made by or against any driver.

> Request For Production #24. Any document(s) provided by Defendant to any governmental agency or taxing agency, whether federal or state, regarding the status of any driver in any state at any relevant time.

(Ellingstad Decl. in Supp. of Pls.' Am. Mot. to Compel ("Ellingstad Decl.") Ex. 1 (Doc. No. 1283, Attach. 2).) FedEx Ground objected to these requests on various grounds, including that they were overbroad, burdensome, and called for documents covered by the privilege for tax returns and/or tax-related materials. Nevertheless, FedEx Ground responded that it would produce "documents sufficient to show the result of any adversarial proceeding initiated by or stemming from a complaint made by a member of the putative class against Defendant…." (*Id.*)

During this phase of discovery, plaintiffs also requested a deposition regarding "investigations, audits, reviews and/or determinations by the IRS and any state taxing authority … which concern or relate to the classification of FedEx Ground's pickup and delivery drivers as independent contractors." (Oct. 3, 2006 Faris email, Ellingstad Decl., Ex. 6.) On November 8,

2006, Sallie Ford, Vice President of Tax at FedEx Services, Inc., which oversees tax audits at FedEx Ground, testified as FedEx Ground's corporate designee on that subject. Ms. Ford provided testimony related to these topics, including testimony about an ongoing IRS audit of FedEx Ground's 2002 tax return examining the contractors' classification status. Ford testified that she did not know when the audit would be finished or when the IRS would issue a written report setting forth its determination with respect to the classification of pickup and delivery drivers. (Ford Tr. at 279:4-17, Ellingstad Decl., Ex. 7.)

**A. The Parties' Meet And Confer Efforts And Subsequent Discovery.**

In May and June 2006, the parties engaged in extensive, good-faith meet and confer efforts regarding the scope of plaintiffs' document requests, including those pertaining to tax agency activity. These efforts included numerous telephone conferences and the exchange of several detailed letters, all aimed at avoiding motion practice and settling any disagreements related to the scope of discovery. (McGuinness Decl. ¶ 3 (Doc. No. 1294, Attach. 1); Ellingstad Decl., Exs. 3-5.) Ultimately, as to the tax agency requests, the parties reached an agreement that FedEx Ground would produce "***determinations*** from any state or federal taxing agency ***which have decided the issue*** of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. Defendant will produce these determinations even though they may be on appeal or otherwise subject to challenge." (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5) (emphasis added).) The parties agreed that such productions would fully satisfy FedEx Ground's obligations with respect to numerous requests for production, including the two described above, in light of the taxpayer privilege issues implicated by the requests. (May 31, 2006 Faris letter, Ellingstad Decl., Ex. 4; June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5.) Upon reaching agreement, FedEx Ground produced documents consistent with the terms of the agreement, and supplemented that production as

necessary. (McGuinness Decl. ¶ 2.) Significantly, these negotiations necessarily involved give-and-take and compromise on various matters in order to reach agreement with plaintiffs on the many requests that were at issue. (*Id.* ¶ 4.) In other words, the agreement was reached in the context of large scale document discovery in this MDL action, and was part of a process which involved give and take on scores of document demands and discovery disputes--many having nothing to do with tax agency issues--that the parties could have otherwise brought to the Court for resolution. Instead, as part of an overall compromise, involving many negotiated concessions between the parties, FedEx Ground agreed to forego certain of its rights in exchange for a binding agreement as to how discovery would be conducted with respect to tax information and the scope of FedEx Ground's corresponding obligation to respond.

**B. The IRS Audit.**

The IRS began an employment tax audit of FedEx Ground's 2002 tax return in December 2003. (Decl. of Michael D. Fryt ("Fryt Decl.") ¶ 2 (Doc. No. 1294, Attach. 2).) Under IRS audit procedures, the audit ends when the field auditors issue "30 day letter" accompanied by a NOPA, summarizing their ***proposed*** adjustment. 26 C.F.R. § 601.105(b)(4). This is known as a "30 day letter," because the taxpayer then has 30 days to accept the findings set forth in the NOPA or file a protest. *Id.* § 601.105(d). If the taxpayer files a protest, the case is transferred to the Appeals Division of the Internal Revenue Service, which conducts its own thorough review of the case. *Id.* § 601.106(b). It is only at the end of the IRS's internal process that the agency issues a "determination." *Id.* § 601.106(d); *see also* IRS Notice 2002-5, 2002-3 I.R.B. 320 (Jan. 22, 2002). If the agency agrees with the field auditors that the workers should be reclassified, the agency issues a "Notice of **Determination** of Worker Classification." *See* IRS Notice 2002-5; 26 U.S.C. § 7436 (emphasis added). At that point, the taxpayer has 90 days either to pay or file a petition with the United States Tax Court to overturn the Notice of Determination of Worker

Classification. *See* IRS Notice 2002-5; 26 U.S.C. § 6213(a). If the taxpayer pays the tax in response to the Notice of Determination of Worker Classification, it may then seek a refund in Federal court. *See* IRS Notice 2002-5. Thus, a NOPA is not a "determination" of worker classification, which occurs only upon issuance of the Notice of Determination of Worker Classification. *Id.*

**C. Plaintiffs Move To Compel The Production Of The Prior Draft NOPA.**

In December 2007, the IRS sent FedEx Ground a draft NOPA. (Fryt Decl. ¶ 3.) In December 2007, after FedEx Ground disclosed the existence, but not the substance, of the draft NOPA publicly, plaintiffs requested a copy. (Dec. 21, 2007 Faris email, Ellingstad Decl., Ex. 8.) FedEx Ground declined to produce it because it is not a "determination" from a state or federal agency that would fall within the scope of the parties' June 2006 agreement. (Feb. 4, 2008 McGuinness letter, Ellingstad Decl., Ex. 11.) FedEx Ground also objected to plaintiffs' request to re-open the deposition of Sallie Ford on the ground that the issuance of a draft NOPA – "a document which is not even subject to production under the terms of the parties' discovery agreement" – does not constitute good cause to reopen a deposition that closed on November 8, 2006. (Feb. 4, 2008 McGuinness letter, Ellingstad Decl., Ex. 11.) Plaintiffs moved to compel production of the draft NOPA and a corporate designee deposition regarding the IRS audit on May 9, 2008. On August 21, 2008, Magistrate Judge Nuechterlein granted their motion over FedEx Ground's opposition. (Doc. No. 356). FedEx Ground moved for reconsideration on September 8, 2008 (Doc. No. 1601.) The Court has not yet ruled on this motion.

**D.      The IRS Withdraws The Draft NOPA.**

After the parties completed their briefing on FedEx Ground's motion for reconsideration, the IRS informed FedEx Ground of its decision to withdraw the draft NOPA in a letter dated October 23, 2008.  *See* Def. Supp. Reply on Mot. for Reconsideration (Doc. No. 1625, Exh. A). The IRS letter also stated that the audit for tax year 2002 was ***not complete*** and that the auditors would continue their examination.  *Id.*  The audit continued for nearly a year, the withdrawn draft NOPA was never reinstated or reduced to an IRS determination, and the IRS field audit team arrived at different ***proposed*** adjustments, discussed below.

**E.      The IRS Issues Two New *Proposed* Adjustments.**

On or about September 9, 2009, nearly two years after the IRS' first proposed adjustment, the IRS audit team issued two new proposed adjustments relating to its employment tax audit of FedEx Ground for the 2002 calendar year.  (Doc. 1784 at 2.)  In one adjustment, the audit team proposed that no adjustment of federal employment tax be made with respect to contractors performing services for the Ground division of FedEx Ground for 2002.  (*Id.*)  In another adjustment, the audit team proposed that FedEx Ground be assessed taxes and penalties of $14 million for calendar year 2002 with respect to contractors providing services for Home Delivery.  (*Id.*)  FedEx Ground is actively involved in discussions with the issuing IRS field audit team regarding both adjustments, its objections, and the need to make corrections to the adjustments.  Prior to filing this motion, plaintiffs requested the new NOPAs as a supplementation to FedEx Ground's prior document production.  Consistent with its treatment of the 2007 withdrawn draft NOPA, FedEx Ground has declined to produce the proposed adjustments because they are not "determinations" from a state or federal agency that would fall

within the scope of the parties' June 2006 agreement and are further protected by the qualified privilege afforded tax documents. *See* Plaintiffs' Local Rule 37.1 Certification.

## ARGUMENT

### I. The *Proposed* Adjustments (NOPAs) Are Not "Determinations" Within The Scope Of The June 26 Agreement.

Plaintiffs' motion to compel the production of the audit team's ***proposed*** adjustments (the NOPAs), violates the written agreement the parties made over three years ago, which only requires the production of "determinations" issued by a state or federal taxing agency on the issue of classification.

Honoring and enforcing the parties' agreed-upon discovery limits is consistent with judicial policy encouraging the voluntary compromise of discovery disputes. Such agreements are encouraged, especially in complex proceedings. Indeed, a party cannot bring a motion concerning a discovery dispute in this jurisdiction without certifying that the parties have "in good faith conferred or attempted to confer with the person or party in an effort to resolve the matter without court action." L.R. 37.1. This Court has repeatedly emphasized the value of cooperation in these proceedings, particularly with respect to discovery matters. *See, e.g.*, Practice and Procedure Order at 5 (Doc. No. 2) ("Cooperation by and among plaintiffs' counsel and by defendants' counsel is essential for the orderly and expeditious resolution of this litigation."); Initial Scheduling Order at 11 (Doc. No. 52) ("The parties are expected to work cooperatively and in good faith to limit the costs of discovery."). The Court has also stated its expectation that the parties use "best efforts to resolve [discovery] matters without court intervention." Mar. 24, 2006 Order at 8-9 (Doc. No. 215); *see also Chicago District Council of Carpenters Pension Fund v. Peter Schwabe, Inc.*, No. 85 C 351, 1986 WL 5020, at *1 (N.D. Ill.

Apr. 24, 1986) ("Extrajudical settlements are to be encouraged in keeping with the congressional intent behind the 1980 amendment to Rule 34").

The parties followed this approach in addressing plaintiffs' broad requests for tax investigation information in discovery, as well as in negotiating other compromises to discovery disputes that could have otherwise been litigated before the Court. The compromise the parties reached on the discovery of tax agency determinations occurred in the context large scale discovery involving hundreds of interrogatories, requests for admission, requests for production and deposition across the MDL. The compromise was one of many reached on a large volume of discovery demands. As part of an overall compromise, involving a number of gives and takes, FedEx Ground agreed to forego certain of our rights with regard to defending against discovery into confidential tax determinations. Specifically, the parties engaged in good-faith discussions that led to an agreement restricting production to "***determinations*** from any state or federal taxing agency ***which have decided the issue*** of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees." (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5) (emphasis added).) Accordingly, FedEx Ground is only required to produce "determinations" "decid[ing]" the classification issue from "state or federal taxing agenc[ies]." In reaching this agreement, FedEx Ground obtained an agreement from plaintiffs to limit their access to its tax records, and made concessions on other document requests in order to resolve the dispute without Court intervention.

The standard for determining this motion is not simply discoverability, but whether the request violates the carefully negotiated limits that the agreement places on plaintiffs' right to obtain FedEx Ground's tax records. It clearly does. First and foremost, the NOPAs are not IRS "determinations." Webster's New Collegiate Dictionary defines "determination" as "a judicial

decision ***settling and ending*** a controversy . . . the act of deciding ***definitely and firmly***." Merriam-Webster's Collegiate Dictionary, Fifth Edition, 1998 (emphasis added). The NOPAs, which were the proposed finding of an audit team and not a finding of the agency itself, does not decide anything definitely and firmly. By the very title, each "Notice of Proposed Adjustment" is a ***proposed*** adjustment to FedEx Ground's tax liability. They are not "determinations" that have decided the classification question and do not reflect the views of the "federal taxing agency." The NOPA only reflects a proposal by field auditors, and can only become a "determination[]…from…[a] federal taxing agency" if the IRS issues a "Notice of **Determination** of Worker Classification." *See* IRS Notice 2002-5; 26 U.S.C. § 7436 (emphasis added). Consequently, the NOPAs fall outside of the negotiated scope of FedEx Ground's production obligations, and FedEx Ground should not be required to produce the documents.

Plaintiffs argue that "[w]hether these ***results*** are subject to further review or not, FXG has an obligation to produce them both under the parties' discovery agreement and the Federal Rules of Civil Procedure." Pls. Mot. at 10. Although not clear, based on plaintiffs' argument in their prior motion to compel, plaintiffs are presumably referring to the portion of the parties' agreement that provides for the production of determinations, even if on appeal. But this argument is a red herring. The discovery agreement states that "Defendant will produce ***these determinations*** even though they may be on appeal or otherwise subject to challenge." (emphasis added). The appeal language does not come into play until plaintiffs have ***first*** shown that the NOPAs are, in fact, "determinations" under the discovery agreement, which they have not done. This does not mean that every conceivable instrument, no matter how preliminary or tentative, is discoverable simply because it may be subject to appeal. To the contrary, it means that if plaintiffs can show that an instrument meets the definition of a "determination" it is discoverable

notwithstanding the fact that it might be subject to further review. Plaintiffs wholly fail to meet that requirement as to the proposed adjustments at issue.

**II. The NOPAs Are Subject To The Qualified Privilege For Tax Returns And Return Information.**

Even in the absence of a discovery agreement, plaintiffs' request for production of the NOPAs should be denied on the ground that it violates the qualified privilege protecting tax documents. Although tax returns and return information do not enjoy an absolute privilege from discovery, *Polous v. NAAS Foods, Inc.*, 959 F.2d 69, 74 (7th Cir. 1992) (citing *St. Regis Paper Co. v. United States*, 368 U.S. 208, 219 (1961)), many courts, including the Seventh Circuit, have recognized a public policy against unnecessary public disclosure of tax returns. *See, e.g.*, *Commodity Futures Trading Comm'n v. Collins*, 997 F.2d 1230, 1233-34 (7th Cir. 1993); *Premium Service Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975). Thus, tax returns are subject to what some courts refer to as a qualified privilege. *See, e.g.*, *Eastern Auto Distribs., Inc. v. Peugeot Motors of Am. Inc.*, 96 F.R.D. 147, 148 (E.D. Va. 1982).

Courts have recognized that the proper functioning of the tax laws depends on taxpayer willingness to "file complete and accurate returns." *Premium Srvc. Corp.*, 511 F.2d at 229. "The self-reporting, self-assessing character of the income tax system would be compromised were [returns] promiscuously disclosed." *Collins*, 997 F.2d at 1233. The need to encourage taxpayers to file complete and accurate returns extends equally to corporate taxpayers, and several courts have refused to compel production of corporate tax returns. *See, e.g.*, *Eastern Auto Distribs.*, 96 F.R.D. at 147 (refusing to order production of corporate tax returns where the information legitimately sought by plaintiff also was contained in other sources, such as public filings); *Tele-Radio Sys. Ltd. v. De Forest Elects., Inc.*, 92 F.R.D. 371 (D.N.J. 1981) (refusing to order production of corporate tax returns sought in order to prove that the corporation is an agent

or instrumentality of another entity because this information is otherwise available); *O'Neale's Transport, Inc. v. Marshall & Sterling, Inc.*, No Civ. 83811991, 1994 WL 90627 (V.I. 1994).

The public policy behind the qualified privilege is rooted in the importance of the confidentiality provisions of the Tax Return Privacy Act, 26 U.S.C. § 6103, to the proper functioning of the tax system. *Collins*, 997 F.2d at 1232-33; *Premium Srvc. Corp.*, 511 F.2d at 229. That statute prohibits the IRS from disclosing not only returns, but also "return information." 26 U.S.C. § 6103(a). Thus, the same public policy that discourages disclosure of tax returns should similarly protect "return information" from civil discovery in order to encourage the taxpayer to be complete and accurate during all interactions with the IRS.

Section 6103(b)(2)(A) defines "return information" as:

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or ***any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense***,

26 U.S.C. § 6103(b)(2)(A) (emphasis added). The NOPAs were "prepared by" the IRS "with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) … for any tax" and thus constitutes "return information" within Section 6103(b)(2).

Embedded in the NOPAs is information regarding those confidential, back and forth discussions, exactly the type of information the parties in this case agreed would not be subject to production in their June 26 agreement. (June 26, 2006 McGuinness letter, Ellingstad Decl., Ex. 5.) The Court should not allow an intrusion upon the confidential communications between FedEx Ground and the IRS, and should protect the important public policy of encouraging

accurate, timely, and open communications between the IRS and taxpayers. Otherwise, the Court will put FedEx Ground and all other taxpayers on notice that their communications with the IRS are free game for the purpose of litigation with others, and that they should proceed in their interactions with the IRS accordingly.

Plaintiffs argue that, even if they are subject to the qualified privilege for tax returns, the NOPAs should nevertheless be produced because FedEx Ground has waived the privilege by invoking the 1995 Letter of Assurance and by filings with the Court and the SEC concerning the existence of the recently-issued NOPAs. Pls. Mot. at 10-11. First, the production and disclosure of the 1995 Letter of Assurance does not waive privilege as to the later NOPAs, or place the proposed adjustments at issue. The NOPAs were issued by an audit team rather than the IRS itself. Only a Notice of Determination of Worker Classification issued by the IRS, if one is ever issued, could "overrule" the 1995 Letter of Assurance. Second, plaintiffs are incorrect in asserting that FedEx Ground's disclosure of the existence of the documents "in its SEC filing" establishes waiver. Plaintiffs offer no authority for the proposition that FedEx Ground's legal obligation to disclose risks and potential liabilities in its 10-Q report thereby waives privilege as to the substance of the IRS's NOPAs. Finally, plaintiffs are incorrect that FedEx Ground's disclosure of the ***issuance*** of the NOPAs to the Court waives the privilege. Just as FedEx Ground's prior disclosure to the Court regarding the IRS's ***withdrawal*** of the prior draft NOPA did not waive the privilege as to the prior draft NOPA, FedEx Ground's obligation to apprise the court and the parties of the issuance of the recent NOPAs does not waive FedEx Ground's right to preserve the confidentiality of this non-public tax document.

For the reasons discussed above, the Court should protect the public policy interest served by the qualified privilege for confidential tax documents, and should decline to

unnecessarily compel the production of the NOPAs.

## III. Permitting Discovery Of The Proposed Adjustments Would Result In An Inconsistent Discovery Standard.

The same rules that have limited FedEx Ground's discovery against plaintiffs should be equally applied to plaintiffs' discovery against FedEx Ground. Plaintiffs' motion appears to seek all of the benefits of the policies and protections that govern IRS and other tax agency communications, without according the same benefits to FedEx Ground. Plaintiffs have argued that, even under the protection of a confidentiality order, they are entitled to "complete privacy" in their dealings with the IRS. (*See* Pls. Opp'n to Mot. to Compel at 3 n.3 (Doc. No. 320).) After refusing to produce their own tax returns, and taking the issue to this Court, Plaintiffs nonetheless seek production of FedEx Ground's confidential tax-related information. Although FedEx Ground has produced numerous confidential state taxing agency determinations on the issue of classification, plaintiffs have resisted production of their tax returns in the overwhelming majority of jurisdictions. In addition, plaintiffs' request for relief does not comport with the past decisions of this Court as to the discoverability of tax materials. When FedEx Ground sought the production of plaintiffs' tax information, the Court ruled that even though the tax returns contained information concerning how plaintiffs ran their businesses, the documents were only "relevant and material" in cases where opportunity for profit and loss were expressly part of the classification analysis. *See* Dec. 14, 2006 Order at 10 (Doc. No. 451). If information related to how independent contractors structure their businesses is not "relevant and material" to cases unless directly implicated by the classification test, then the ***proposed*** adjustments of an IRS audit team surely are not discoverable either.[1]

---

[1] Indeed, if FedEx Ground is required to produce a proposed adjustment because it could bear on an issue in this litigation, there is no reason why plaintiffs should not be required to produce ***final*** tax

**IV. There Is No Good Cause To Reopen Ms. Ford's Deposition.**

Plaintiffs also seek to reopen Ms. Ford's deposition, or take the deposition of another FedEx corporate designee, in order to ask questions about matters related to the NOPAs. The request should be denied, because, as discussed above, FedEx Ground should not be required to produce the NOPAs. Moreover, even if the NOPAs were produced, the request for the deposition should be denied, because neither Ms. Ford nor any FedEx employee authored the proposed adjustments, and therefore little additional information about the documents can be gained from the requested deposition. The benefit of such questioning would be slight, and would not justify subjecting Ms. Ford, or another corporate designee, to a deposition. *See* Fed. R. Civ. P. 30(a)(2); Fed. R. Civ. P. 26(b)(2). For these reasons, the Court should deny plaintiffs' request to reopen Ms. Ford's deposition.

**CONCLUSION**

For the foregoing reasons, FedEx Ground respectfully requests that this Court deny plaintiffs' motion to compel production of the NOPAs and related deposition.

Dated: October 26, 2009

Respectfully submitted,

By: /s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

return documents they had prepared and signed under penalty of perjury and which provide detailed information of their businesses' profit, loss, expenses, and structure.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 26th day of October, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S NOTICE OF DEVELOPMENTS IN CONNECTION WITH PLAINTIFFS' PENDING MOTION TO COMPEL NOTICE OF PROPOSED ASSESSMENTS**

Today, the IRS provided FedEx Ground with its Notice of Proposed Adjustment ("NOPA"), for the employment tax audit of FedEx Ground with respect to the 2002 calendar year. Attached hereto as Exhibit A is the SEC Form 8-K filed by FedEx Ground's parent company today concerning that activity. Also today, FedEx Ground responded to the IRS, agreeing to the NOPA. In addition, the IRS informed FedEx Ground that it will shortly issue a formal "no change" letter, at which point, FedEx Ground will have the IRS's final determination of the matter. Upon receipt of that, FedEx Ground will produce copies of the final determination to the plaintiffs. These developments render plaintiffs' pending motion to compel moot.

Dated: October 30, 2009

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Robert M. Schwartz
Chris Hollinger
Michael G. McGuinness
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6709

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 30th day of October, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# FEDEX CORP

## FORM 8-K
(Current report filing)

## Filed 10/30/09 for the Period Ending 10/30/09

| | |
|---|---|
| Address | 942 SOUTH SHADY GROVE ROAD<br>MEMPHIS, TN 38120- |
| Telephone | 9018187500 |
| CIK | 0001048911 |
| Symbol | FDX |
| SIC Code | 4513 - Air Courier Services |
| Industry | Air Courier |
| Sector | Transportation |
| Fiscal Year | 05/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 30, 2009**

# FedEx Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-15829** | **62-1721435** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **942 South Shady Grove Road, Memphis, Tennessee** | **38120** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 818-7500**

(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**SECTION 8 – OTHER EVENTS**

**Item 8.01.  Other Events.**

     On October 30, 2009, the Internal Revenue Service's audit team ("Audit Team") provided us with a revised notice of proposed adjustment with respect to their employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground Package System, Inc. ("FedEx Ground"), a wholly owned subsidiary of FedEx Corporation. The Audit Team has now proposed that no assessment of federal employment tax be made with respect to any of FedEx Ground's independent contractors, including those providing the FedEx Home Delivery service.

     While similar issues are still under audit for calendar years 2004 through 2008, we believe the Audit Team should reach the same conclusion on these issues for each of those years, as well.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**FedEx Corporation**

Date: October 30, 2009

By: /s/ Christine P. Richards
Christine P. Richards
Executive Vice President, General Counsel and Secretary

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) | CHIEF JUDGE MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S NOTICE OF DEVELOPMENTS IN CONNECTION WITH DEFENDANTS' PENDING MOTION TO VACATE MAGISTRATE'S ORDER COMPELLING PRODUCTION OF DRAFT NOTICE OF PROPOSED ASSESSMENT**

Today, the IRS provided FedEx Ground with its Notice of Proposed Adjustment ("NOPA"), for the employment tax audit of FedEx Ground with respect to the 2002 calendar year. Attached hereto as Exhibit A is the SEC Form 8-K filed by FedEx Ground's parent company today concerning that activity. Also today, FedEx Ground responded to the IRS, agreeing to the NOPA. In addition, the IRS informed FedEx Ground that it will shortly issue a formal "no change" letter, at which point, FedEx Ground will have the IRS's final determination of the matter. Upon receipt of that, FedEx Ground will produce copies of the final determination to the plaintiffs. FedEx Ground previously explained to the Court in connection with this motion that the IRS later withdrew its original draft NOPA -- the document that today's NOPA replaces. For the reasons set forth in FedEx Ground's Motion to Reconsider the prior discovery order, and in light of today's developments, the Court should grant FedEx Ground's Motion.

Dated: October 30, 2009.

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Robert M. Schwartz
Chris Hollinger
Michael G. McGuinness
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6709

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 30th day of October, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# FEDEX CORP

## FORM 8-K
(Current report filing)

## Filed 10/30/09 for the Period Ending 10/30/09

| | |
|---|---|
| Address | 942 SOUTH SHADY GROVE ROAD<br>MEMPHIS, TN 38120- |
| Telephone | 9018187500 |
| CIK | 0001048911 |
| Symbol | FDX |
| SIC Code | 4513 - Air Courier Services |
| Industry | Air Courier |
| Sector | Transportation |
| Fiscal Year | 05/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 30, 2009**

# FedEx Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-15829** | **62-1721435** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **942 South Shady Grove Road, Memphis, Tennessee** | **38120** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 818-7500**

(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**SECTION 8 – OTHER EVENTS**

**Item 8.01.  Other Events.**

On October 30, 2009, the Internal Revenue Service's audit team ("Audit Team") provided us with a revised notice of proposed adjustment with respect to their employment tax audit for the 2002 calendar year regarding the classification of independent contractors at FedEx Ground Package System, Inc. ("FedEx Ground"), a wholly owned subsidiary of FedEx Corporation. The Audit Team has now proposed that no assessment of federal employment tax be made with respect to any of FedEx Ground's independent contractors, including those providing the FedEx Home Delivery service.

While similar issues are still under audit for calendar years 2004 through 2008, we believe the Audit Team should reach the same conclusion on these issues for each of those years, as well.

case 3:05-md-00527-RLM-CAN document 1868-2 filed 10/30/09 page 4 of 4

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**FedEx Corporation**

Date: October 30, 2009

By: /s/ Christine P. Richards
Christine P. Richards
Executive Vice President, General Counsel and Secretary

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CHIEF JUDGE MILLER

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S NOTICE OF FURTHER DEVELOPMENTS IN CONNECTION WITH DEFENDANT'S PENDING MOTION TO VACATE MAGISTRATE'S ORDER COMPELLING PRODUCTION OF DRAFT NOTICE OF PROPOSED ASSESSMENT**

On October 30, 2009, FedEx Ground filed a "Notice of Developments In Connection With Defendant's Pending Motion to Vacate Magistrate's Order Compelling Production of Draft Notice of Proposed Assessment" (Doc. No. 1868) ("Notice of Developments"), which informed the Court that, on October 30, 2009, the IRS provided FedEx Ground with its Notices of Proposed Adjustment ("NOPAs"), for the employment tax audit of FedEx Ground with respect to the 2002 calendar year. The Notice of Developments attached an SEC form 8-K filed by FedEx Ground's parent company on October 30, 2009, which disclosed that the IRS Audit Team proposed no assessment of federal employment tax be made with respect to any of FedEx Ground's independent contractors. The Notice of Developments further informed the Court that the IRS would shortly issue a formal "no change letter," at which point, FedEx Ground would

case 3:05-md-00527-RLM-CAN document 1886 filed 11/12/09 page 2 of 3

have the IRS's determination of the matter, and would produce the same to plaintiffs.

On November 9, 2009, FedEx Ground received the IRS's determination of the matter in the form of two IRS Forms 2504-WC and 4666. Attached hereto as Exhibit A is the SEC Form 8-K filed on November 10, 2009 by FedEx Ground's parent company concerning IRS Forms 2504-WC and 4666. As indicated in this most recent SEC filing, the IRS confirmed in these forms "that no assessment of federal employment tax would be made with respect to any independent contractors at FedEx Ground Package System, Inc. (a wholly owned subsidiary of FedEx Corporation) not only for calendar year 2002, as previously disclosed, but also for the next three calendar years that had been under audit: 2004 through 2006." FedEx Ground has produced Forms 2504-WC and 4666 to the plaintiffs, along with the now finalized and executed October 30, 2009 NOPAs. The issuance of the October 30, 2009 NOPAs (which rescinded the prior draft NOPAs), and the issuance of Forms 2504-WC and 4666 (which constitute the IRS's determination) confirm the tentative, draft, and non-final status of the prior ***draft*** Notice of ***Proposed*** Assessment that was the subject of FedEx Ground's motion. For the reasons set forth in FedEx Ground's Motion to Reconsider the prior discovery order, and in light of the production of the IRS ***determinations*** to plaintiffs, the Court should grant FedEx Ground's motion.

Dated: November 12, 2009.

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Robert M. Schwartz
Chris Hollinger
Michael G. McGuinness
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Tel: (310) 553-6700
Fax: (310) 246-6709

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, Indiana 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of November, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

# FEDEX CORP

## FORM 8-K
(Current report filing)

## Filed 11/10/09 for the Period Ending 11/09/09

| | |
|---|---|
| Address | 942 SOUTH SHADY GROVE ROAD |
| | MEMPHIS, TN 38120- |
| Telephone | 9018187500 |
| CIK | 0001048911 |
| Symbol | FDX |
| SIC Code | 4513 - Air Courier Services |
| Industry | Air Courier |
| Sector | Transportation |
| Fiscal Year | 05/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): November 9, 2009**

# FedEx Corporation

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-15829** | **62-1721435** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **942 South Shady Grove Road, Memphis, Tennessee** | **38120** |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(901) 818-7500**

(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**SECTION 8 – OTHER EVENTS**

**Item 8.01. Other Events.**

On November 9, 2009, the Internal Revenue Service's audit team ("Audit Team") confirmed that no assessment of federal employment tax would be made with respect to any independent contractors at FedEx Ground Package System, Inc. (a wholly owned subsidiary of FedEx Corporation) not only for calendar year 2002, as previously disclosed, but also for the next three calendar years that had been under audit: 2004 through 2006. While similar issues may be audited for calendar years 2007 and 2008, we believe the Audit Team should reach the same conclusion on these issues for each of those years, as well.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**FedEx Corporation**

Date: November 10, 2009

By: /s/ Christine P. Richards
Christine P. Richards
Executive Vice President, General Counsel and Secretary

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) | |
| *Earnest White, et al. v. FedEx Ground Package System, Inc.*, Civil No. 3:05-cv-00411-RLM-CAN (GA) | ) | |

**GEORGIA PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page No.**

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. FXG's Concession that the Right of Control is the Conclusive Test of Employment Status Permits Full Reliance on *Estrada* .......... 2

B. FXG Asks the Court to Re-Write the Controlling Test of Employment Status .......... 2

C. FXG's Reliance on Its Own "Independent Contractor" Label and Selective Use of the Rules of Contract Interpretation is Misplaced .......... 4

D. The OA's Merger Clause Does Not Preclude Consideration of FXG Policies and Procedures Under the "Right to Control" Test .......... 6

E. FXG Ignores the Plethora of Undisputed Facts that Demonstrate Its Retention of Vast Rights of Control .......... 8

F. FXG Has Not Shown that Application of the Right to Control Test to the Undisputed Facts of this Case Supports a Finding of that the Drivers are Independent Contractors as a Matter of Law .......... 11

(1) FXG has Retained the Right to Determine How Drivers Pick Up and Deliver Packages .......... 12

(2) The OA and FXG Policy Retain to FXG the Right to Approve the Hiring of Others .......... 15

(3) FXG Determines the Drivers' Work Schedules .......... 16

G. Drivers' "Proprietary Interests" in their Routes are a Myth .......... 19

H. The "Skill" Factor Favors a Finding of Employee Status .......... 20

I. FXG Controls and Supplies the Business Infrastructure, Instrumentalities and Tools Drivers Use to Perform Their Work .......... 21

J. The Duration Factor Indicates Employee Status .......... 23

K. The "Method of Payment" Factor Favors a Finding of Employee Status .......... 24

case 3:05-md-00527-RLM -CAN document 1888 filed 11/12/09 page 3 of 33

L. FXG Drivers Are an Integrated Part of FXG's Business ...................................... 25

III. CONCLUSION ........................................................................................................ 25

case 3:05-md-00527-RLM-CAN document 1888 filed 11/12/09 page 4 of 33

**TABLE OF AUTHORITIES**

**Page No.**

Federal Cases

*Amber Delivery Serv., Inc. v. NLRB,*
651 F.2d 51 (1st Cir. 1981) .......... 9, 25

*Brock v. Superior Care, Inc.,*
840 F.2d 1054 (2d Cir. 1988) .......... 21

*Brock v. Mr. W Fireworks, Inc.,*
814 F.2d 1042 (5th Cir.1987) .......... 21

*City Cab of Orlando v. NLRB,*
628 F.2d 261 (D.C. Cir. 1980) .......... 3

*Corp. Express Delivery Sys. v. NLRB,*
292 F.3d 777 (D.C. Cir. 2002) .......... 9

*Desimone v. Allstate Ins. Co.,*
No. C96-03606 CW, 2000 WL 1811385 (N.D. Cal. Nov. 7, 2000) .......... 18

*Dole v. Snell,*
75 F.2d 802 (10th Cir. 1989) .......... 24

*EEOC v. North Knox School Corp.,*
154 F.3d 744 (7th Cir. 1998) .......... 11, 23

*FedEx Home Delivery v. NLRB,*
563 F.3d 492 (D.C. Cir. 2009) .......... *passim*

*Friendly Cab Co. v. NLRB,*
512 F.3d 1090 (9th Cir. 2008) .......... 9

*Knight v. United Farm Bureau Mut. Ins. Co.,*
742 F.Supp. 518 (N.D. Ind. 1990), aff'd., 950 F.2d 377 (7th Cir. 1991) .......... 21

*Lewis v. ASAP Land Express, Inc.,*
No. 07-2226-KHV, 2008 WL 2121740 at *6 (D. Kan. Mar. 21, 2008) .......... 21

*Local 777, Democratic Union Org. Comm., Seafarers Int'l Union v. NLRB,*
603 F.2d 862 (D.C. Cir. 1979) .......... 11

*Mazzei v. Rock-N-Around Trucking, Inc.*,
246 F.3d 956 (7th Cir. 2001) ........................................................................... 23

*Mukhtar v. Castleton Serv. Corp.*,
20 F.Supp. 934 (S.D. Ind. 1996) ........................................................................ 17

*Nationwide Mt. Ins. Co. v. Darden*,
503 U.S. 318 (1992) .......................................................................................... 3

*NLRB v. Amber Delivery Serv., Inc.*
651 F.2d 57 (1st Cir. 1981) ................................................................................. 3

*NLRB v. Deaton, Inc.*,
502 F. 2d 1221 (5th Cir. 1975) ................................................................... 15, 16

*NLRB v. Keystone Floors, Inc.*,
306 F.2d 560 (3d Cir. 1962) .............................................................................. 17

*NLRB v. Maine Caterers, Inc.*,
654 F.2d 131 (1st Cir. 1981) ................................................................................ 3

*NLRB v. O'Hare-Midway Limousine Serv.*,
924 F.2d 692 (7th Cir. 1991) ........................................................................... 3, 9

*NLRB v. Town & Country Elec., Inc.*,
516 U.S. 85 (1995) .............................................................................................. 3

*NLRB v. United Ins. Co. of America*,
390 U.S. 254 (1968) ..................................................................................... 20, 24

*Peno Trucking v. Comm'r*,
296 F. App'x 449 (6th Cir. 2008) (unpublished) ............................................... 17

*Reyes v. Remington Hybrid Seed Co., Inc.*,
495 F.3d 403 (7th Cir. 2007) ............................................................................. 21

*Richardson v. Cent. States, Se. and Sw. Areas Pension*,
645 F.2d 660 (8th Cir. 1981) ....................................................................... 16, 17

*Rutherford Food Corp. v. McComb*,
331 U.S. 722 729 (1947) ................................................................................... 17

*Sakacsi v. Quicksilver Delivery Sys., Inc.*,
No. 8:06-cv-1297, 2007 WL 4218984, *5 (M.D. Fla. 2007) ............................... 9

case 3:05-md-00527-RLM-CAN document 1888 filed 11/12/09 page 6 of 33

*Schultz v. Cadillac Assoc., Inc.*,
413 F.2d 1215 (7th Cir. 1969) .......... 24

State Cases

*Brown v. Who's Three, Inc.*,
457 S.E.2d 186 (Ga. Ct. App. 1995) .......... 2, 5

*Estrada v, FedEx Ground Package Systems, Inc.*,
No. BC210130 (Cal. Super. Ct. Jan. 27, 2006),
aff'd, 64 Cal. Rptr. 3d 327, rev. denied (Nov. 28, 2007) .......... 1

*Cotton States Mut. Ins. Co.v. Kinzalow*,
634 S.E.2d 172 (Ga. Ct. App. 2006) .......... 12, 18

*Keefe v. Carpet & Upholstery Cleaning by Houndstooth, Inc.*,
444 S.E.2d 857 (Ga. Ct. App. 1994) .......... 2

*Jordan v. Townsend*,
197 S.E.2d 482 (Ga. Ct. App. 1973) .......... 5

*Larmon v. CCR Enterprises*,
647 S.E.2d 306 (Ga. Ct. App. 2007) .......... 5, 7, 18

*Lopez v. El Palmar Taxi, Inc.*,
676 S.E.2d 460 (Ga. Ct. App. 2009) .......... 5, 10

*Mark Six Realty Assocs. Inc. v. Drake*,
463 S.E.2d 917 (Ga. Ct. App. 1995) .......... 5

*McGuire v. Ford Motor Co.*,
290 S.E.2d 487 (Ga. Ct. App. 1982) .......... 5, 7

*McLaine v. McLeod*,
661 S.E.2d 695 (Ga. Ct. App. 2008) .......... *passim*

*Miller v. Clayton County*,
518 S.E.2d 402 (Ga. 1999) .......... 15

*Murphy v. Blue Bird Body*,
429 S.E.2d 530 (Ga. Ct. App. 1993) .......... 3

*Museum Tower Condo. Ass'n v. Children's Museum of Atlanta*,
676 S.E.2d 448 (Ga. Ct. App. 2009) .......... 5

case 3:05-md-00527-RLM -CAN document 1888 filed 11/12/09 page 7 of 33

*Wilkinson v. Palmetto State Transportation Co.*,
676 S.E.2d 700 (S.C. 2009) ........................................................ 11

NLRB Cases

*Local 814 Int'l Bhd. of Teamsters*,
208 NLRB 276 (1974) ........................................................ 11

*Pepsi-Cola Bottling Co.*,
315 NLRB 882 (1994) ........................................................ 4

*Roadway Package Sys.*,
288 NLRB 196 (1988) ........................................................ 4

*Roadway Package Sys.*,
292 NLRB 376 (1989) ........................................................ 4

*Roadway Package Sys.*,
326 NLRB 842 (1998) ........................................................ 4

## I. INTRODUCTION

All parties agree that the right of control reserved by FXG over the work of Plaintiffs and the class will determine the drivers' employment status. In its motion for summary judgment, FXG mistakenly asserts that this Court is bound by the labels and platitudes contained in the adhesive operating agreement (OA)[1] that *FXG* drafted, which label the drivers "independent contractors," and which purport to deny FXG the right to exercise control over the manner and means of the drivers' work. FXG purposefully overlooks the multiple provisions of the OA that specifically retain to FXG the right to control the means used by the drivers to perform their jobs. Equally troubling, FXG insists that the Court cannot consider FXG's detailed corporate policies and procedures that implement the OA, despite clear authority requiring courts to look beyond the labels to the reality of the relationship in determining employment status under the controlling employment status test as well as this Court's prior rulings to the contrary.[2]

FXG has not shown, and cannot show that it is entitled to judgment as a matter of law. The record before this Court demonstrates that FXG has retained the right to "control . . . every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair" with the result that they are employees as a matter of law. *Estrada v, FedEx Ground Package Systems, Inc.*, No. BC210130 (Cal. Super. Ct. Jan. 27, 2006), *aff'd*, 64 Cal. Rptr. 3d 327, *rev. denied* (Nov. 28, 2007). While the plaintiffs have cross-moved for summary adjudication on this point (*see* Doc. 1795), to defeat FXG's motion they need only demonstrate

---

[1] Citations herein are to the standard OA for FedEx Ground, which can be found at Exhibit 1 to the Declaration of Lynn Faris filed April 25, 2008 (Doc. 1197). The OA for FedEx Home Delivery is virtually the same, and this Court noted that the differences between the two are not material to the issue of control. (Doc. 906 at 37).

[2] This Court has already noted that the "Operating Agreement's terms as well as FedEx Ground's centralized practices and procedures that are systematically applicable" to all plaintiffs are appropriate sources for the analysis of FXG's reserved right of control. (Doc. 1119 at 45; *accord* Doc. 1770 at 24, 30, 74).

that FXG has failed to prove the drivers' independent contractor status as a matter of law.[3]

## II. ARGUMENT

### A. FXG's Concession that the Right of Control is the Conclusive Test of Employment Status Permits Full Reliance on *Estrada*

FXG's retention of the right to control has been conclusively determined *against* FXG in the *Estrada* case cited above. The decision in *Estrada* was bottomed on the finding that FXG reserved to itself rights of control over the work performance of its pickup and delivery drivers. That finding is entitled to full faith and credit in this proceeding. Moreover, the strong judicial policy of avoiding inconsistent judgments counsels application of collateral estoppel principles in this case. Plaintiffs incorporate the full discussion of collateral estoppel in the memoranda previously filed in support of their cross-motions. (Docs. 1194 and 1473).

### B. FXG Asks the Court to Re-Write the Controlling Test of Employment Status

Employment status under Georgia law, like the common law agency test, turns on "whether the employer, under the contract, whether oral or written, has the right to direct the time, the manner, the methods, and the means of the execution of the work." *Brown v. Who's Three, Inc.*, 457 S.E.2d 186, 190 (Ga. Ct. App. 1995); *see also Keefe v. Carpet & Upholstery Cleaning by Houndstooth, Inc.*, 444 S.E.2d 857, 859 (Ga. Ct. App. 1994); *Nationwide Mt. Ins.*

---

[3] Plaintiffs addressed virtually every argument asserted by FXG in their Memorandum of Law in support of their cross-motion for summary adjudication (Doc. No. 1795). The relevant material facts and citations to the record pertinent to Plaintiffs' motion and FXG's cross-motion are catalogued in the following: "Appendix A: Plaintiffs' Omnibus Separate Statement of Undisputed Material Facts" filed on April 25, 2008, consisting of facts 1 through 232 with citations for each (SUF, Doc. No. 1197); "Plaintiffs' Supplemental Evidence in support of Appendix A" filed on September 28, 2009, citing supplemental evidence in support of facts 1 through 232 (Doc. 1814); "Appendix B: Supplemental Omnibus Statement of Materials Undisputed Facts," filed on the same date consisting of facts 233 through 245 with citations for each (SOSUF, Doc. 1815), and Plaintiffs' Statement of Genuine Issues, filed herewith. Supporting evidence is found in Exhibits 1-12 to the Declaration of Lynn Faris filed April 25, 2008 (Doc. 1196) and Exhibits 13 through 17 to the Second Declaration of Lynn Faris filed September 28, 2009 (Docs. 1808-1813). Plaintiffs also offer in support hereof the following for which Plaintiffs have sought judicial notice: Exhibits A through M to Doc. 1199; Exhibits A through D to Doc. 1473, and Exhibits A through C to Doc. 1813. Citations herein to the SUF and SOSUF refer to paragraph numbers in the documents, not page numbers.

*Co. v. Darden*, 503 U.S. 318, 323 (1992). Although rarely discussed in any detail, the nine secondary factors derived from the Restatement (Second) of Agency § 220(2) are also considered by Georgia courts. *See Murphy v. Blue Bird Body*, 429 S.E.2d 530, 532 (Ga. Ct. App. 1993). But the employer's right to control is the primary inquiry. *Id.; accord* Doc. 1770 at 24. Applying these factors to the undisputed facts leads to the inescapable conclusion that the FXG drivers in Georgia are employees as a matter of law, not independent contractors.

In addition to decisions emanating from the Georgia appellate courts regarding employee status, both Plaintiffs and FXG cite cases interpreting the National Labor Relations Act, which utilizes the same common law agency test.[4] But FXG repeatedly throughout its brief cites one such case in particular– *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) – a 2-1 decision regarding the status of a few FedEx Home Delivery (FHD) drivers in Massachusetts and inventing a novel test of employment status under the NLRA that is contrary to Supreme Court precedent and the weight of authority in the Seventh and every other Circuit. Doc. 1740 (Pltfs' Opp. to FXG's Notice of Supp. Auth. discussing decision); Doc. 1813 Exhs. B and C (petitions for rehearing); Doc. Doc. 1785 Exh. A (narrowly denying *en banc* review in a 5-4 vote).

Whether FXG drivers in Georgia are employees or independent contractors is a question of Georgia law. *FHD v. NLRB* therefore is not binding authority. It is not even persuasive authority: while claiming to be merely reinterpreting the common law test, the majority in reality

[4] For at least forty years, the question of whether workers are properly classified as employees or independent contractors has been litigated under the National Labor Relations Act, which excludes independent contractors from coverage, under the common law agency test. *See NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 92-94 (1995); *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968). A substantial body of case law has developed applying the common law test to cases involving the status of local delivery drivers and workers in related occupations, with the clear trend finding that local delivery drivers and couriers, like the Plaintiffs, are employees. *See, e.g., NLRB v. Amber Delivery Serv., Inc.* 651 F.2d 57 (1st Cir. 1981) (local package delivery drivers); *NLRB v. Maine Caterers, Inc.*, 654 F.2d 131 (1st Cir. 1981) (catering truck route drivers); *Corporate Express Delivery Sys. v. NLRB*, 292 F.3d 777 (D.C. Cir. 2002) (express delivery drivers); *NLRB v. Friendly Cab Co. Inc.*, 512 F.3d 1090 (9th Cir. 2008) (taxi drivers); *NLRB v. O'Hare-Midway Limousine Serv.*, 924 F.2d 692 (7th Cir. 1991) (limousine drivers); *City Cab of Orlando v. NLRB*, 628 F.2d 261 (D.C. Cir. 1980) (taxi drivers).

case 3:05-md-00527-RLM -CAN document 1888 filed 11/12/09 page 11 of 33

disregarded virtually all of the factors and jettisoned the right-to-control inquiry, finding it too "unwieldy." 563 F.3d at 497. Instead, the majority refused to follow forty years of precedent and reduced the inquiry to one question – "whether the position presents the opportunities and risks inherent in entrepreneurialism." *Id*. This Court has held that the Georgia test turns on whether the principal has reserved the right to control. Doc. 1770 at 24. "Whether the position presents the opportunities and risks inherent in entrepreneurialism" is not even a factor in Georgia, let alone the touchstone of the analysis.[5] *Id.*

### C. FXG's Reliance on Its Own "Independent Contractor" Label and Selective Use of the Rules of Contract Interpretation is Misplaced

FXG argues throughout its opening brief that the OA creates an enforceable independent contractor relationship by virtue of the provisions that label the drivers "independent contractors." FXG is wrong. This is not a breach of contract action; Plaintiffs claim that they are legally employees within the meaning of state statutes and at common law. Plaintiffs do not contend that the OA is ambiguous and in need of the Court's power of contractual interpretation. The terms of the OA and FXG's corporate policies and procedures are undeniably important evidence of the relationship, regardless of whether the OA is an enforceable contract or void.

In Georgia, a clear denomination in the contract that the worker is an independent

[5] The majority's factual findings in *FHD v. NLRB* are also undeserving of credence. Unlike the record here, based on nationwide document discovery, numerous depositions of corporate officers and vigorous legal representation, the record before the D.C. Circuit addressed two small terminals and was gleaned solely from a single non-adversarial, investigatory hearing before a hearing officer where the workers did not have the benefit of representation by counsel, or of any discovery at all. 563 F.3d at 495; NLRB Case Handling Manual, Part Two, Representation Proceedings §§ 11181, 11185, 11188.1 (2007), *available at* http://www.nlrb.gov/nlrb/legal/manuals/ CHM2/CHM2.pdf; *Pepsi-Cola Bottling Co.*, 315 NLRB 882 (1994) (no pre-trial discovery).

Even given the limited record before them, the majority's assessment of the facts is stunning for its lack of record support and its willingness to run roughshod over the jurisdiction of the NLRB, which had found the drivers to be employees under the right-to-control test, in keeping with the NLRB's multiple prior decisions finding drivers at FXG's predecessor Roadway Package Systems, Inc. to be employees under the identical OA. *See FHD*, 563 F.3d at 512-16 (Garland, J., dissenting detailing questionable bases for majority's factual findings); *Roadway Package Sys.*, 288 NLRB 196 (1988) (finding drivers to be employees); *Roadway Package Sys.*, 292 NLRB 376 (1989), *enf'd* 902 F.2d 34 (6th Cir. 1990) (same); *Roadway Package Sys.*, 326 NLRB 842 (1998) (same); *see also* Doc. 1740 at 3 n.1 (discussing the scant bases for some of the facts found and relied upon by the majority).

contractor gives rise to a rebuttable presumption of independent contractor status. *Lopez v. El Palmar Taxi, Inc.*, 676 S.E.2d 460, 464 (Ga. Ct. App. 2009). Manifestly, such labeling is not determinative. *Who's Three, Inc.*, 457 S.E.2d at 191; *see also Mark Six Realty Assocs. Inc. v. Drake*, 463 S.E.2d 917, 959 (Ga. Ct. App. 1995) (holding that despite form contract denominating worker as independent contractor employer reserved right to control); *Jordan v. Townsend*, 197 S.E.2d 482, 483 (Ga. Ct. App. 1973) (reversing summary judgment for employer even though contract denominated worker independent contractor). And in its recitation of the law, FXG ignores other important qualifiers. Where the contract labeling the worker an independent contractor also provides that the worker is subject to any rules and policies the employer may adopt, there is no presumption of independent contractor status. *McLaine v. McLeod*, 661 S.E.2d 695, 699 (Ga. Ct. App. 2008); *Larmon v. CCR Enterprises*, 647 S.E.2d 306, 307 (Ga. Ct. App. 2007); *McGuire v. Ford Motor Co.*, 290 S.E.2d 487, 480 (Ga. Ct. App. 1982). In addition, contractual designation as an independent contractor "is to be regarded as particularly suspect where [as will be shown here,] . . . the activity in question is one which would ordinarily be regarded as part of the employer's regular business operations, is one which the employer regularly employs people to carry out, and is one which is generally carried out by subordinates." *McGuire*, 290 S.E.2d at 489.

Even if the question here involved contract interpretation, the inquiry would not begin and end with FXG's chosen language in the form contract. While FXG points to general provisions that purport to deny the right of control, even the most cursory review of the OA shows that it contains many more specific provisions that reserve to FXG the right to control the daily activities of its drivers. (*E.g.,* OA §§1.4, 1.5, 1.8, 1.10, 1.12-1.14, 5). It is a universally recognized tenet of contract interpretation that specific language controls the general. *Museum*

*Tower Condo. Ass'n v. Children's Museum of Atlanta*, 676 S.E.2d 448, 450 (Ga. Ct. App. 2009).

**D. The OA's Merger Clause Does Not Preclude Consideration of FXG Policies and Procedures Under the "Right to Control" Test**

As shown in Plaintiffs' cross-motion, FXG's corporate policies supply irrefutable evidence of its retained right to control the drivers' work in exquisite detail. Intent on avoiding any consideration of this evidence, FXG argues that FXG's policies and procedures cannot reserve any rights that would conflict with the terms of the OA and its disclaimer of a right to control. Doc. No. 1819 ("Def.'s Mem.") at 3-4. FXG points to OA §13, a boilerplate merger clause, that purports to limit the terms of the parties' agreement to the four corners of the OA, and claims that the OA does not "incorporate" the many FXG policies that demonstrate its reserved right to control. This argument fails.

First, as noted above, the Court's task here is *not* to determine whether the OA creates an enforceable independent contractor relationship under contract law. As this Court has recognized, the adhesive OA and FXG's generally applicable corporate policies and practices provide powerful, relevant common evidence of the relationship constructed by FXG between itself and its drivers. *E.g.*, Doc. 1770 at 24, 30, 74. Squarely addressing this issue, the *Estrada* court rejected FXG's claim that the OA is the only relevant evidence of the legal relationship between FXG and its drivers, explaining:

> Notwithstanding the merger clause in the Operating Agreement, the drivers' relationship to FedEx is defined by a number of other sources, including the FedEx "Ground Manual" and the "Operations Management Handbook" which set forth the "policies and procedures" in great detail to ensure the uniform operation of FedEx terminals throughout California, as well as by recruiting materials, welcome packets, memoranda, training videos, bulletin board posters, round-table presentations and similar means of communication.

*Estrada*, 64 Cal. Rptr. at 332-33. Just as FXG cannot simply draft its way out of employer status under the common law agency test by labeling the relationship as something that

it is not, neither can it contractually restrict the sources of relevant evidence bearing on the status inquiry. The corporate policies that empower FXG's managers to direct the drivers' daily work activities are proof of FXG's retained right to control how drivers perform their work and are probative of the ultimate issue of whether the independent contractor label is bona fide or a sham.

Second, FXG cannot avoid the fact that there are numerous provisions of the OA that expressly refer to and incorporate FXG policy and procedure. Section 1.12 obligates drivers to keep their personal appearance "consistent with reasonable standards of good order as maintained by competitors *and promulgated from time to time by FXG."* (emphasis added) Similarly, drivers must agree to purchase or lease communications equipment (i.e. scanners) which comply "with specifications *promulgated from time to time by FedEx Ground."* (OA §1.13 [emphasis added]); *see also* Pls. Statement of Gen. Issues in Response to FXG's Rule 56.1 Statement (Pltfs' SGI), filed herewith, Resp. to Fact 19 (detailing multiple OA provisions that incorporate FXG policy or procedure). Tim Edmonds, FXG's designated expert on the OA, admitted that the OA depends on sources outside its four corners to be implemented. Pltfs' SGI, Resp. to Fact 17 (citing Doc. 1195, Exh. I). Significantly, under Georgia law, there is no presumption of independent contractor status if the contract labeling the worker an independent contractor also indicates that the worker is subject to rules or policies which the employer may adopt. *McLaine*, 661 S.E.2d at 699; *Larmon*, 647 S.E.2d at 307; *McGuire*, 290 S.E.2d at 489.

FXG argues in the alternative that only one of its policies is dispositive: CRL-007, which was instituted in the March 2005 in response to the *Estrada* decision, and parrots OA §1.15. Just like OA §1.15, CRL-007 is directly contradicted by myriad FXG policies and procedures, that direct FXG's managers to train drivers in FXG work methods, to supervise their work closely,

and to discipline those who do not comply through frequent reprimands (known as Business Discussions), pay deductions, and contract termination or non-renewal. (SUF 19-22, 45-54, 70-73, 154-57, 174, 175-79). CRL-007 is nothing but a label manufactured by FXG to prop up the sham; it is entitled to no more weight than the contractual labels it mimics.

### E. FXG Ignores the Plethora of Undisputed Facts that Demonstrate Its Retention of Vast Rights of Control

Another incurable error in FXG's motion for summary judgment is that it does not address the substance of the numerous *specific* OA provisions that contradict the general recitations and labels strategically included in the OA. The specific provisions compel a finding that FXG has reserved the right to control *how* the drivers perform their work. FXG further ignores the myriad policies, procedures and practices documented in FXG's business records which confirm FXG's reserved right to control the means used by the drivers to do their work.

The OA and FXG policy oblige the drivers to pickup and deliver every assigned package, every day using methods prescribed by FXG. (SUF 24-25, 86-103, 129-31, 143-44). Drivers must wear the approved FXG uniform and be properly groomed and drive trucks deemed clean and presentable by FXG to advertise the FXG brand. (SUF 24, 107-108, 112-14, 118, 120, 140). Their work hours are dictated by the amount of packages FXG assigns to them each day, as well as the timetable fixed by FXG for the movement of packages through its nationwide delivery network. (SUF 25, 97-98, 142-45). They must sequence their routes to accommodate the pickup and delivery windows negotiated by FXG sales personnel with FXG's customers. (SUF 97-98, 142). FXG requires drivers to follow extensive work rules and methods it has devised and trains drivers to do so. (SUF 66-67, 70-73).

FXG requires drivers to transmit a real-time record of their work activities to FXG at every stop by scanning and inputting FXG status codes into handheld computers loaded with

FXG proprietary software. (SUF 86-90). Drivers must follow a plethora of FXG package handling procedures when performing particular types of deliveries, or servicing particular customers. (SUF 91-94, 96-103). FXG managers must observe and keep records about the drivers' work performance and compliance with FXG rules. (SUF 146-67). Managers are empowered and expected to discipline drivers who do not comply with these work methods through mandatory counseling sessions, reprimands, and loss of pay. (SUF 154-159, 174). FXG can terminate the drivers' contracts at any time for any alleged breach, whether material or not, including the failure to pickup or deliver a single package on a single occasion. (SUF 57, 219). FXG management can refuse to renew a driver's contract without any cause at all irrespective of any so-called "proprietary interest" in the route. (SUF 56; OA §11.2).

FXG wastes many pages of its brief explaining *why* it maintains some of the rules and procedures pointed to by Plaintiffs as evidence of control, an issue of no legal significance. For example, it contends that uniform and branding requirements do not indicate employment because customers expect such requirements. Def.'s Mem. at 17. Setting aside the fact that FXG has offered no evidence to supports this assertion, FXG's argument is also unsupported by law. Cases from multiple jurisdictions applying the "right to control" test hold that mandatory dress codes and branding requirements supply powerful evidence of the right to control. *E.g.*, *NLRB v. O'Hare-Midway Limousine Service*, 924 F.2d 695 (7th Cir. 1991) (finding mandatory dress code and other customer service rules evidence of right to control); *Friendly Cab Co. v. NLRB*, 512 F.3d 1090, 1101 (9th Cir. 2008) (finding "extensive, mandatory dress code" evidence of control); *Corp. Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002) (holding that delivery drivers subject to dress code – navy pants and company shirts – are employees); *Amber Delivery Serv., Inc. v. NLRB*, 651 F.2d 51, 62 (1st Cir. 1981) (finding fact that "each

driver must wear the company insignia and paint his truck with the company colors" indicated employment); *Sakacsi v. Quicksilver Delivery Sys., Inc.*, No. 8:06-cv-1297, 2007 WL 4218984, *5 (M.D. Fla. 2007) (holding that uniform and grooming requirements show right of control and rejecting claim that these merely satisfied customer needs); *Estrada*, 64 Cal. Rptr. 3d at 337, n.11 (distinguishing federal cases finding over-the-road truckers independent contractors, in part, because FXG drivers "must wear uniforms" and "conform their personal appearance to FXG's rules and regulations").[6] Indeed, FXG's own witness conceded that FXG imposes branding requirements precisely because they lead its customers to believe that drivers are FXG employees. (SUF 111 [Division Vice President testifying that FXG dictates uniforms because "customers want to make sure that FedEx personnel coming into their facility, that they could feel comfortable that that was a FedEx employee."]). FXG cannot be heard to complain that such requirements are exempt from scrutiny.[7]

FXG devotes even more space to the specious claim that its vehicle branding and record-keeping requirements are mandated by the laws applicable to federally-regulated motor carriers, and are irrelevant to the status analysis for that reason. Def.'s Mem. at 13-15. The Department of Transportation regulations cited by FXG simply require that a motor carrier's trade name be legibly marked on *two* sides of the truck in contrasting colors large enough to be seen from a distance of 50 feet away when the truck is stationary. 49 C.F.R. §390.21(b)(1), (c)(2)(3). The OA requires *far* more: to enable the trucks to serve as "traveling billboards" for FXG, they must

[6] The one Georgia case cited by FXG to support its contention that its comprehensive vehicle branding and uniform requirements do not signify the right to control is not to the contrary. In *Lopez v. El Palmar Taxi, Inc.*, although the taxi was branded with the company logo, the driver was not required to wear a uniform, could work when and where he wanted, and did not have to accept fares from the company. 676 S.E.2d 460, 464 (Ga. Ct. App. 2009).

[7] FXG cites *FHD v. NLRB*, 563 F.3d at 501 in support of its position that branding requirements are not relevant to the inquiry. As the above citations show, in this way, among many others, the D.C. Circuit's decision is far outside the mainstream. *E.g.*, Doc. 1740 at 9-10 (collecting cases from circuit and state courts across the country applying the right to control test and finding branding requirements indicative of the right to control).

be painted a particular color ("FedEx White"), and be covered almost completely on all *four* sides with FXG's trademarked logo, phone number and website address. (SUF 112-13, 120).

FXG's claim that the OA's record-keeping requirements are mandated by government regulation fares no better. Def.'s Mem. at 14-15. Nothing in the regulations requires FXG to track the movement of packages through its network in real-time (OA §§1.10(d), 1.13), to obtain shipper and recipient signatures on FXG shipping forms (OA §1.8), to mark and account for packages that cannot be delivered using particular notations or methods, like a "service cross" (OA §1.13; SUF 94) or to comply with C.O.D. or "call tag" rules (SUF 99-100). The regulations simply require FXG to prepare and maintain records for one year showing what was shipped, the name of the shipper and consignee, and date of the shipment. *See* 49 C.F.R. §§373.101, 379 App. A. The detailed paperwork requirements in §§ 1.7, 1.8 of the OA, as well as the scanning and marking requirements set out in §§1.10(d), 1.11 and 1.13, detailed in FXG's policies and procedures, originate with FXG. (*See* SUF 82-83, 86-89, 92, 94-96, 99-100, 105-106).[8]

**F. FXG Has Not Shown that Application of the Right to Control Test to the Undisputed Facts of this Case Supports a Finding of that the Drivers are Independent Contractors as a Matter of Law**

Essentially, FXG contends that it lacks the right to control how the drivers perform their work because §§1.4, 1.15 and 2.2 of the OA purport to grant drivers the "right to control key aspects of the performance of their work," including the "exclusive" right to operate the

[8] FXG cites *EEOC v. North Knox School Corp.*, 154 F.3d 744, 748 (7th Cir. 1998), *FHD v. NLRB*, 563 F.3d 492 and *Wilkinson v. Palmetto State Transportation Co.*, 676 S.E.2d 700, 703 (S.C. 2009) for the proposition that requiring compliance with the law does not evidence employee status. Def.'s Mem. at 15, n.3. Plaintiffs have no dispute with this pronouncement as far as it goes. But, as shown above, FXG's controls extend far beyond what any state or federal entity requires. Controls imposed "by the putative employer [that] exceed[] governmental regulations to a significant degree," such as those imposed by FXG, are evidence of employee status. *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union v. NLRB*, 603 F.2d 862, 876 (D.C. Cir. 1979) (citation and quotation marks omitted) (collecting cases); *accord NLRB v. Deaton, Inc.*, 502 F.2d 1221, 1224-26 (5th Cir. 1975) (controls over drivers that exceeded government mandates supported finding of employee status); *Local 814 Int'l Bhd. of Teamsters*, 208 NLRB 276 (1974) (rules "governing many phases of [driver/]owners' operations which have no counterpart in the DOT regulations" evidenced employee status).

"equipment used" by the drivers, the rights to hire others, set their own work schedules and sequence their routes. Def.'s Mem. at 9-11. Furthermore, FXG relies on OA § 1.15 and argues that the plethora of controls over the drivers' work methods simply require "results" and does not constitute evidence of "undue" control over the manner and means of achieving those results. Def.'s Mem. at 12-13. These arguments should be rejected.

(1) FXG has Retained the Right to Determine How Drivers Pick up and Deliver Packages: FXG's attempt to liken its top-to-bottom controls over the method and means the drivers employ to pick up and deliver packages to the minimal controls over the insurance agents in Cotton States Mut. Ins. Co.v. Kinzalow, 634 S.E.2d 172 (Ga. Ct. App. 2006) is unavailing. Def.'s Mem. at 12-13. Among other things, the insurance agents in that case leased their own office space, hired and fired their employees "without any input or participation by Cotton States" and were authorized to sell insurance for numerous companies other than Cotton States. Id. Cotton States merely kept itself informed of the agents' sales figures, expected them to keep accurate books and reserved the right to inspect those books. Id. at 176. The court found that the record did not establish the right or assumption by Cotton States to control the time, manner and method of performance of the insurance agent.[9] Id.

In contrast, under the OA and FXG policy, the drivers are required to perform their work in a particular way, wearing the FXG uniform, driving a truck painted "FedEx White" and covered on all sides with the FXG logos and markings, transmitting to FXG real-time electronic records of their work activities to facilitate package tracking for customers and productivity statistics for FXG, following FXG's timetables and procedures when performing certain types of pickups and deliveries (i.e. driver release, C.O.D.s and call-tags), using FXG's customer service

[9] FXG's repeated citation to *McLaine v. McLeod*, 661 S.E.2d 695 is equally puzzling. Def.'s Mem. at 10-12, 20. The purported employer had never even met the truck driver claimed to be an employee. The employer's role was limited to telling the driver when and where to pick up and deliver cargo. 661 S.E.2d at 700.

techniques and delivery methods and providing special services to particular customers at FXG's direction. (SUF 91-103). It is *because* the OA requires drivers to pickup and deliver packages according to these and other detailed specifications, contemplated by the OA and implemented by FXG policy and practice, that the drivers are employees. If anything, by mislabeling methods as "results" and admitting that the OA does, in fact, reserve to FXG the right to control in these areas, FXG concedes employee status.

FXG's claim that the myriad reviews and audits conducted by managers also merely address "results" is similarly baseless, if not frivolous. By any logical definition of the term, FXG's review processes extend far beyond "results" and reserve to FXG the right to enforce its detailed controls over the manner and means drivers use to perform their work. For example:

Customer Service Rides: FXG trains managers to observe and document, among other things, whether the driver is wearing the correct color shoes, how the driver gets in and out of the vehicle, how long the driver spends doing each task, whether the driver uses "poor work methods" that result in added travel time, how many steps he takes from the truck to the customer's door and how he interacts with customers. (SUF 148, 150-151).[10]

Driver Release Audits: FXG policy requires a manager to follow a FHD driver for ten stops, covertly observe whether he complies with FXG's rules for releasing packages without a signature (called "driver release") and interview any customers about their interactions with the driver to determine whether the driver was "professional and polite" and how FXG "could have made the delivery better." (SUF 163-164).

Business Discussions: FXG policy requires managers to conduct these one-on-one counseling sessions at least twice a year with each driver and more often as needed to correct

---

[10] *E.g.*, SUF 150 (quoting manager training: "Observe the contractor for proper exit routine.… One foot in cargo area one foot in cab…. Pivot and close bulkhead door…. Estimated time to perform the routine 12 Seconds").

drivers when they fail to follow any aspect of FXG policies and procedures. (SUF 154-157 [listing 19 circumstances warranting a Business Discussion]); *see also* SUF 160-162, 166-168 [describing FXG's annual reviews called "Business Plan" meetings, daily Van Service Audits to ensure compliance with scanning procedures and regular covert Vehicle Security Reviews to ensure compliance with security procedures]).

FXG's mandatory trainings for drivers further illustrate the erroneousness of FXG's claim that it is only interested in results. For example:

<u>FXG's Quality P&D Learning Program</u> trains drivers in such minutia as:

How to talk to customers –"Introduce yourself…. Smile and say, "Thank you!"

How to collect items from the cargo area of the vehicle –"Make sure scanner and stylus are in holster…. Place keys on little finger of non-writing hand. Proceed to cargo area."

How to carry themselves –"Walk directly to the recipient at a steady pace…. [Once inside the customer's place of business] [a]ttract immediate attention and display a sense of urgency."

How to hold a package – "Grasp package with your palms place diagonally at opposite corners…." (SUF 72 [quoting FXG's Quality P&D Learning manual], 73).

<u>C.A.R.E.</u> is FXG's "behavior modification" program to train drivers in customer service methods. Drivers who complete it avoid losing pay if they receive a customer complaint. (SUF 66-69).

The training does not end there. FXG provides pocket guides and on-line materials to drivers that echo the trainings. (SUF 74-77; SOSUF 233). As FXG's founder and CEO testified, the guides "assist the contractor to the day-to-day administration of his or her duties" and provide "the procedures [he] needs to follow to effect … deliveries correctly." (SUF 75; Doc.

1197 Exh. 8:991-992). These reserved controls are unquestionably not limited to results; the overwhelming evidence proves the opposite.

(2)     The OA and FXG Policy Retain to FXG the Right to Approve the Hiring of Others:  FXG claims that because drivers are supposedly free to hire others, drivers must be independent contractors under Georgia law.  Def.'s Mem. at 9-10. FXG ignores that it alone controls if or whether any driver can exercise this supposed right.  While FXG may insist that it merely has the right to ensure that proposed drivers meet applicable federal, state, and municipal safety standards, the undisputable evidence shows otherwise.  OA §2.2 expressly limits the right to drive to persons who are found to satisfy the company-promulgated "FedEx Ground Safe Driving Program" standards.  These extend beyond the requirements of law in that they require any proposed driver to complete "a suitable contractor/driver information sheet" and to establish that he or she has "[a] history of safe commercial driving experience and satisfactory work history" and prior experience driving a vehicle similar to that used in the FXG fleet, or completed a FXG-approved training program.  (OA § 2.2, Safe Driving Pgm. Addendum at 3 [emphasis added]).  FXG further ignores the OA provision requiring that any substitute driver "conform fully to the applicable obligations undertaken by the Contractor pursuant to [the OA]" including its branding requirements designed to ensure that any driver who delivers FXG packages "[f]oster[s] the professional image and good reputation of FXG."  (OA §2.2).  FXG founder and long-time CEO Dan Sullivan admitted that FXG further has the right to reject a proposed assistant for FXG's own subjective reasons, including if FXG determines that the individual does not meet FXG's grooming requirements.  (SUF 194; Doc. 1997 Exh. 8:964, 8:968).  FXG has not shown that these standards are mandated by law, and they are not.  Drivers do not have a "right" to delegate performance of the services under the OA to a substitute of their

own choosing; rather, they may *only* delegate work to assistants with FXG approval.[11]

Multiple cases have found individuals to be employees despite their ability to hire others. In *NLRB v. Deaton, Inc.*, 502 F. 2d 1221, a case presenting closely analogous facts, the Fifth Circuit rejected the argument that the ability of "multiple-owner drivers" to hire others to drive for them precluded a finding that the drivers were employees under the right to control test. As here, the trucking company "had power over the hiring decisions of its multiple-owner drivers." *Id*. at 1226-27. That "power" was not limited to "forbidding the hiring of persons legally disqualified from driving commercial motor vehicles under federal regulations," but extended to other "subjective, employer like" inquiries, such as whether the proposed driver would be a "good risk" for liability insurance purposes. *Id*. Like the employer in *Deaton*, FXG reserves the right to reject any driver or helper for business reasons that are unrelated to any legal requirements. (SUF 192-94). FXG's control over the drivers' ability to hire additional drivers and other assistants weighs heavily in favor of employee status. *See also Richardson v. Cent. States, Se. and Sw. Areas Pension*, 645 F.2d 660, 663 (8th Cir. 1981) (holding that employer's ability "to approve all substitute drivers" was important evidence of right to control).

***(3) FXG Determines the Drivers' Work Schedules***: Overwhelming and indisputable evidence establishes that FXG retains the right to control when and how long the drivers work. OA §1.10(a) explicitly mandates that the drivers provide daily pick-up and delivery services "on days and at times which are compatible" with the schedules and requirements of FXG and FXG's customers. FXG policy, in turn, requires the drivers to provide services five days a week, and expressly retains the right to change the days it provides service to customers at its sole

[11] Although FXG cites *Miller v. Clayton County*, 518 S.E.2d 402, 404 (Ga. 1999) as standing for the proposition that the freedom to hire others indicates independent contractor status, importantly, the court reporters in that case do not appear to have been required to obtain approval for any substitutes they hired. Moreover, other factors, including fact that the court reporters were not hired by the county, could not be fired by the county, took no instruction from the county and the county did not set their hours, sequence or amount of work dictated the result.

discretion. (SUF 129-130). The OA further states that FXG will "provide sufficient volume of packages to Contractor to make full use of the Contractor's equipment" using a benchmark of a 9.5-11 hour day; drivers are required to pickup and deliver "every package every day." (OA Background Statement; SUF 25, 85, 133). Failure to do so can result in discipline, loss of pay and termination. (SUF 157a, 174-176).

While FXG insists that drivers are free set their own work hours, the Restatement (Second) of Agency rejects FXG's view:

> Certain factory employees normally arrive at eight in the morning and leave at five in the afternoon, but are *not required to work a fixed number of hours* or during specified periods, provided they accomplish a *specified amount of work* during the week, for each unit of which they receive compensation. Such employees are servants. *Id*. at § 220 cmt. l, illus. 8 (emphasis added).

Applying these principles, courts routinely find employee status where the days and hours are prescribed by the principal, either directly or indirectly by virtue of regulation of the amount of work performed or the role played by the hired party in the operation as a whole, as here.[12]

The OA and FXG's policies and procedures reserve to FXG the right to require drivers to perform the quantity of work assigned and at the times dictated by FXG ("windows") to satisfy customers and to avoid disruption of FXG's delivery chain. Drivers are required to "check out" in the morning after their trucks are loaded (SUF 82, 142), and to "check in" by a fixed "cut

---

[12] *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726, 729 (1947) (finding employment where the defendant "never attempted to control the hours of the boners, but [boners] must 'keep the work current and the hours they work depend in large measure upon the number of cattle slaughtered.'") (citation omitted); *Peno Trucking v. Comm'r*, 296 F. App'x 449, 457 (6th Cir. 2008) (unpublished) (finding control over days of work sufficient to show employee status despite workers' ability to set hours); *Maine Caterers, Inc.*, 54 F.2d at 133 (holding that requirement that truck operators appear at each route stop at specific time evidenced right to control); *NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 562 (3d Cir. 1962) (finding that flooring salesmen required to work a minimum 8-hour day and to put in a full workweek were employees); *Mukhtar v. Castleton Serv. Corp.*, 920 F.Supp. 934, 940 (S.D. Ind. 1996) (holding that plaintiffs' minimal "discretion over when and how long to work" weighed heavily in favor of employee status and flexibility in arrangement was akin to employee "flex time"); *see also Estrada*, 64 Cal. Rptr. 3d at 333 (holding that 9.5- to 11-hour benchmark for assignment of work evidenced employee status).

time" each day so their pickups can be moved along to their next destination in the network (SUF 04, 144).[13] Drivers' work hours thus are wholly dependent on the timetable fixed by FXG for the movement of packages through its nationwide delivery network.

OA §1.10(a) further requires drivers to comply with "pickup and delivery windows" negotiated between FXG sales and marketing with FXG's customers. (SUF 97-98). FXG also sets pickup times for its own internal operations, such as its World Service Centers (no pickup before 5 p.m.) and FedEx/Kinkos (no pickup before 6 p.m.) and reserves the right to *forbid* drivers to pickup and scan packages earlier at these stops. (SUF 96). Those who do not comply with these windows risk contract termination or nonrenewal. (SUF 175, 177-79).[14] The mandatory windows plainly affect the drivers' ability to determine or arrange their work hours, as FXG's Chief Operating Officer conceded in his deposition. (SUF 142 [citing his testimony]).

The cases relied on by FXG are distinguishable, as none involved the kind of comprehensive control over work schedules that FXG exerts over its drivers. In *McLaine*, the only control over the carrier's schedule was to inform him of the place of pickup and destination of delivery. 661 S.E.2d at 698 ("Pickup and destination times were decided by the shipper, not Container South."). In *Larmon*, there was no requirement that drivers check out in the morning or into the terminal at night; nor did the drivers have to comply with pickup windows. Rather, the driver's task was simply to pick up the bus and deliver it sometime the next day. 647 S.E.2d at 307. In *Cotton States*, there was no evidence that the defendant made any effort to control the work schedule of the insurance agents found to be independent contractors. 634 S.E.2d at 172.

[13] FHD drivers "check in" daily using a slightly different process: they must "upload" their scanners from home by a time certain, and return shipping documents and other paperwork to the terminal the next workday. (SUF 145).

[14] *See also* SUF 96 (citing email transmitting FedEx/Kinkos Early Pickup Stops report and noting: "One early pick up is not acceptable . . . It will not be tolerated and we will take contractual action if a contractor picks up early").

**G. Drivers' "Proprietary Interests" in their Routes are a Myth**

FXG claims the second Restatement factor (distinct occupation or business) is satisfied because the drivers have a proprietary interest in their routes that they can buy and sell. Def.'s Mem. at 17-18. But FXG ignores the fact that it alone decides whether or when any such "sale" can take place. Under the OA, a driver can only assign his or her rights if FXG determines that the driver is "in good standing" and the proposed assignee is "acceptable to FedEx Ground." (OA §18; SUG 195). FXG can wipe out even this limited ability by terminating a driver, which causes all of the driver's routes to revert to FXG without any compensation. (SUF 59). *Desimone v. Allstate Ins. Co.*, No. C96-03606 CW, 2000 WL 1811385 (N.D. Cal. Nov. 7, 2000), cited by FXG, supports Plaintiffs' position. The insurance agents in *Desimone* had a genuine ownership interest in their accounts that could not be impaired by Allstate. Unlike FXG drivers, even if fired, the agents had a right to sell their accounts to a buyer of their own choosing, or back to Allstate, for valuable consideration. *Id.* at *16.

Other reserved rights in the OA make the routes themselves essentially meaningless. OA § 5.2 empowers FXG "in its sole discretion" to reconfigure the drivers' routes, on five days notice "to take account of customer service requirements." While the OA nominally provides drivers who face reconfiguration a chance to avoid it by increasing service, FXG's witnesses conceded that FXG has the right to reconfigure over the drivers' objections. (OA § 5.2; SUF 29, 189). This power is not merely hypothetical. FXG requires managers to review and restructure routes twice a year "to improve P&D productivity" for the terminal as a whole, regardless of the interests of any particular driver. (SUF 190; *see also id.* 191).

Moreover, FXG effectively alters the drivers' work areas on a daily basis by shifting packages between drivers to balance work-loads at the terminal in a process called "flexing,"

described by FXG as "the daily expansion or contraction of a contractors [sic] work area." (SUF 135, 140). Under OA § 1.10(a), FXG reserves the right to "reassign" or "flex" packages away from any driver any time FXG determines that the driver has more than he or she can handle that day. To maximize capacity for the terminal as a whole, FXG policies mandate that managers reassign packages and stops based on the packages FXG determines a driver can deliver within 9.5 to 11 hours, regardless of the drivers' supposed "proprietary service areas." (SUF 137-139). While FXG claims that participation in the "Flex Program" at Ground is "voluntary," this claim is belied by the fact that more than 99% of drivers participate and that the OA reserves to FXG the right to take packages away from any driver, whether he or she participates in the "Flex Program" or not. (OA §1.10(a); SUF 32-33). No driver can shield him or herself from having packages or stops taken away.[15]

**H. The "Skill" Factor Favors a Finding of Employee Status**

FXG argued in prior motions in this MDL proceeding that the "skill" factor (the fourth Restatement factor) is neutral (*e.g.*, Doc. 1216 at 11). However, FXG now claims that the factor favors its position. Def.'s Mem. at 19-20. This argument is belied by the facts. The Supreme Court long ago held that where no significant education is required and requisite skills can be developed on the job with no prior experience or training, employment is indicated. *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 259 (1968) (finding workers to be employees in part because "they need not have any prior training or experience, but are trained by company supervisory personnel"); *see also* Restatement (Second) Agency, § 220 cmt. h (explaining that

---

[15] At FHD, flexing does not even have the pretense of being optional. The OA requires FHD drivers to accept packages from outside their primary service areas whenever FHD asks. (FHD OA§1.10(a)). Recognizing the incompatibility of "flexing" with a true independent contractor relationship, FXG has abandoned it and abandoned the OA entirely in two states where agencies have held that FXG drivers under the OA are employees and not independent contractors as FXG claimed. (SOSUF 238-245 [outlining changes unilaterally made by FXG in New Hampshire and Maryland following state departments of labor decisions that FXG drivers were employees]).

skill factor focuses on whether work requires performance by someone who is "highly educated or skilled," as such employees are less likely to submit to control by the hiring party).

While the drivers' work assuredly requires stamina and patience, it does not involve specialized skills beyond those learned in the workplace. (SUF 201). Nor does it require drivers to exercise any independent initiative. *Estrada*, 64 Cal. Rptr. 3d at 337 (FXG drivers need no experience to get the job in the first place, and the only required skill is the ability to drive). New drivers are required to participate in FXG's Quality P&D Learning training or an equivalent FXG-approved program, along with a mandatory Company Orientation covering delivery and customer service techniques. (SUF 70-73 [citing OA §§1.10, 1.14]). As such, the skill factor plainly weighs in favor of employment status.[16]

**I. FXG Controls and Supplies the Business Infrastructure, Instrumentalities and Tools Drivers Use to Perform Their Work**

FXG contends that the fact that drivers "must furnish their own vehicles" means that the fifth Restatement factor favors independent contractor status. Def.'s Mem. at 21. However, in evaluating which party is responsible for the costs of operation (such as equipment, supplies, fees, licenses, workplace, and maintenance of operations), the relevant question is whether the employer or the worker has made a more significant investment in the infrastructure and tools, and therefore retains the right to control the method of performing the disputed work. *See Knight v. United Farm Bureau Mut. Ins. Co.*, 742 F.Supp. 518, 522-23 (N.D. Ind. 1990), *aff'd.*, 950 F.2d 377 (7th Cir. 1991) (focusing on whether worker bore a substantial share of operational costs relative to employer); Restatement (Second) of Agency §220(2), cmt. l and Illus. 9 (where

[16] Moreover, the fact that skilled work is involved is not itself indicative of independent contractor status where the workers do not use those skills to exercise independent initiative, as here. *See, e.g.*, *Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 408 (7th Cir. 2007) (finding employee status where profits to worker depended on efficiency and not initiative, judgment or foresight); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988); *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1053 (5th Cir.1987) ("initiative, not efficiency, determines independence, and . . . 'customer rapport' is not an 'initiative' characteristic") (internal citations omitted).

worker provides tools, but employing party controls workplace and capital infrastructure, such as premises and large equipment, employment status is indicated).

FXG misapplies this factor, focusing exclusively on its requirement that drivers purchase their own vehicles. FXG disregards the fact that [“i]n the context of delivery services, courts have rejected the notion that an individual's use of his personal vehicle renders him an independent contractor.” *Lewis v. ASAP Land Express, Inc.*, No. 07-2226-KHV, 2008 WL 2121740 at *6 (D. Kan. Mar. 21, 2008). FXG also fails to account for the value of the facilities, infrastructure and tools that FXG contributes.

The drivers’ required investments pale in comparison to FXG’s investment in its delivery network. FXG supplies the entire multi-billion-dollar capital infrastructure to support its nationwide operation – including a sophisticated computer network, and over 500 terminal and regional facilities with sorting equipment. All sales and marketing services are provided by FedEx, including millions of dollars in advertising each year to develop and service the customer base and establish “its competitive position as a leading provider of business and residential money-back-guaranteed ground package delivery services.” (SUF 9-10, 205, 208). The drivers’ payment for truck leasing and other expenses is thus minor by any fair comparison. Indeed, FXG markets the “contractor” opportunity on this basis, telling prospective drivers from the outset that becoming a “contractor” involves “minimal initial investment.” (SUF 221).

The OA authorizes FXG to specify the size, age, color and type of vehicle used in its service. (OA Background, §§ 1.4-1.5, 5). And FXG is the main source of these delivery vehicles; the vehicles are ordered by FXG and manufactured to meet its specifications, for resale

to the drivers through finance companies. (SUF 115);[17] *Richardson*, 645 F.2d at 662 (driver required to decorate his truck with company colors and allowed to pull only company owned or authorized trailers was employee). The truck, for all practical purposes, may only be used to deliver for FXG. (SUF 24c, f).

In addition to the trucks, FXG offers a "Contractor Assistance Program" and "Service Guarantee Account" to enable drivers to purchase needed items such as insurance, tires, batteries at deeply discounted prices negotiated by FXG with preferred vendors, and paid for weekly through payroll deductions or low-interest loans facilitated by FXG. (SUF 222; SOSUF 236). The express purpose is to prevent service interruptions, while shielding the drivers from having to undertake any true entrepreneurial risks. Similarly, FXG sells the drivers the other basic tools needed to perform their jobs, such as uniforms and scanners, as a package for a daily fee (euphemistically called the "Business Support Package" (BSP)). (SUF 34; OA §7 and Addendum 3). Because the scanners are loaded with FXG's proprietary software, and because FXG uniforms are proprietary to FXG as well, it is no surprise that 99% of drivers "elect" the BSP (SUF 210), an arrangement the *Estrada* court characterized as "the Company store" (Doc. 1199 Exh. B at 21).[18] The facts that FXG owns the infrastructure and facilities upon which the drivers are entirely dependent, and that FXG is source of the drivers' other required tools and instrumentalities, gives rise to a strong inference of FXG's right to control the driver' work.

### J. The Duration Factor Indicates Employee Status

FXG also misapplies the sixth Restatement factor – the "duration" factor – in its

[17] During most of the class period, FXG was contractually obligated to make its best efforts to steer drivers to its preferred vendor, Bush Leasing Company, to lease FXG vehicles. (SUF 115).

[18] Indicating that even FXG believes that the BSP cannot be squared with a true independent contractor relationship, FXG has recently abandoned the BSP among other programs in Maryland and New Hampshire where state agencies have rejected FXG's independent contractor arguments. (SOSUF 238-245).

argument that it favors a finding of independent contractor status. Def.'s Mem. at 22. The focus of this factor is whether there is a long-term or indefinite relationship in place, not whether the contract is for a fixed or an indefinite term. *See* Restat. 2d Agency, § 220(2) cmts. j and h. Here, the OA has an initial term of one to three years, and then renews ***automatically*** thereafter from year to year. (OA, §11.2; SUF 26-27, 56). As such, it contemplates a long term relationship of indefinite duration rather than a short-term or temporary one. It is no surprise that FXG's records show that thousands of drivers have worked for FXG for five years or more.[19] (SUF 214).

**K. The "Method of Payment" Factor Favors a Finding of Employee Status**

This seventh Restatement factor does not support FXG's position. Under the complicated compensation scheme devised by FXG, drivers receive a weekly paycheck that combines daily fixed and variable components, as well as bonuses to reward long seniority and quality of customer service. (OA § 4, Addendum 3 [amended yearly]; SUF 35). The drivers are not paid a commission based on sales they generate and complete through their own entrepreneurial efforts, as FXG suggests. Instead, it is undisputed that FXG sales and marketing employees generate the customer base. The drivers are paid for performing any and all work assigned to them according to pay rates unilaterally determined by FXG. (SUF 21, 36-37) Their pay does not reflect any entrepreneurial initiative or efforts and instead rewards time spent to complete work assigned by FXG. *See Dole v. Snell*, 875 F.2d 802, 809 (10th Cir. 1989) ("toiling

[19] The cases cited by FXG do not compel a different result. In *North Knox*, the service contracts executed by the school-bus drivers had a fixed, maximum duration of four years set by statute. 154 F.3d at 746. The school-bus drivers had to bid on new contracts to remain, with no guarantee of selection. *Id.* at 750-51. In *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956 (7th Cir. 2001), the long-haul truck drivers executed equipment leases for three years, but could cancel at any time without penalty. 246 F.3d at 964. Combined with the fact that the drivers could work whenever, and for whomever they wanted, the court found the arrangement could "hardly be characterized as the type of commitment consistent with that of an employer/ employee relationship." *Id.* at 965. In sharp contrast, the OA automatically renews from year to year, it cannot be cancelled by the drivers without penalty, and it provides for annual bonuses that increase with the drivers' years of service up to a maximum of 20 years. FXG plainly drafted the OA contemplating long and indefinite relationships with its drivers, who are the primary link the FXG customer base.

case 3:05-md-00527-RLM -CAN document 1888 filed 11/12/09 page 32 of 33

for money on a piecework basis is more like wages than an opportunity for 'profit'"). FXG's compensation scheme thus bears no resemblance to "an enterprise resting on the initiative, judgment or foresight of the typical independent contractor." *Schultz v. Cadillac Assoc., Inc.*, 413 F.2d 1215, 1217 (7th Cir. 1969).

### L. FXG Drivers Are an Integrated Part of FXG's Business

FXG urges this Court to disregard the eighth and tenth Restatement factors. This is presumably because these factors overwhelmingly indicate employee status. FXG's own witnesses concede that the drivers are an "integral part" of FXG's structure and the "cornerstone" of the business. (SUF 198). Such undisputed evidence provides powerful proof that the drivers are employees. *See United Insurance*, 390 U.S. at 258-59 (holding that the fact that the insurance agents "perform functions that are an essential part of the company's normal operations" is a "decisive factor[]"); *Amber Delivery Serv., Inc.*, 651 F.2d at 63 (finding drivers' deliveries an "essential part" of the company's business); *Estrada*, 64 Cal. Rptr. 3d at 334 (affirming employee status finding in part because "the work performed by the drivers is wholly integrated into FedEx's operation.").[20]

## III. CONCLUSION

Based on the foregoing, FXG's motion for summary judgment should be denied.

Dated: November 12, 2009

Respectfully Submitted,
LEONARD CARDER, LLP
/s/ **Lynn Rossman Faris**

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, California 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

[20] FXG contends that the ninth Restatement factor – whether the parties had the mutual intent to create an independent contractor relationship – supports a finding of independent contractor status. Given the plethora of reservations of the right of control contained in the OA, it is nothing short of incredible that FXG would make this argument. Clearly, FXG did not intend to create a true independent contractor relationship.

Susan E. Ellingstad  
LOCKRIDGE GRINDAL NAUEN P.L.L.P.  
100 Washington Avenue South, Suite 2200  
Minneapolis, MN 55401  
Tel:  (612) 339-6900  
Fax:  (612) 339-0981  

Robert I. Harwood  
HARWOOD FEFFER LLP  
488 Madison Avenue, 8th Floor  
New York, NY 10022  
Tel:  (212) 935-7400  
Fax:  (212) 753-3630  

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino  
ANDERSON, AGOSTINO & KELLER, PC  
131 South Taylor Street  
South Bend, IN 46601  
Tel:  (574) 288-1510  
Fax:  (574) 288-1650  

**PLAINTIFFS' LIAISON COUNSEL**

Mary Donne Peters  
Michael J. Gorby  
GORBY, REEVES & PETERS, P.C.  
Two Ravania Drive, Suite 1500  
Atlanta, GA 30346  
Tel: (404) 239-1150  
Fax: (404) 239-1179  

**GEORGIA PLAINTIFFS' COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S STATEMENT IN RESPONSE TO PLAINTIFFS' THIRD REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Defendant FedEx Ground Package System, Inc. ("FXG") has no objection to the Court taking judicial notice of the public documents attached to plaintiffs' September 28, 2009 "Third Request For Judicial Notice In Support of Plaintiffs' Motions for Summary Judgment of Employment Status." (("Pls. Req."), Exs. A-C.)[1] FXG does object, however, to the extent plaintiffs seek to use the referenced materials as persuasive authority, or for the truth of the factual statements or argument contained therein. For these reasons, FXG files this brief response to plaintiffs' request.

**Exhibit A**

Plaintiffs ask this Court to take judicial notice of a New Hampshire Department of Labor hearing officer's December 2, 2008 wage adjustment decision, in which the hearing officer employed a 12-factor test to find FXG contractors in New Hampshire to be employees for

[1] Plaintiffs' Request is dated September 25, 2009, but was filed, under seal, on September 28, 2009.

case 3:05-md-00527-RLM -CAN document 1895 filed 11/12/09 page 2 of 5

purposes of N.H. REV. STAT. ANN. § 275.42. (Pls. Req. at 1, Ex. A:4-5.) As an initial matter, it is not appropriate for the Court to take ***judicial notice*** of decisions as persuasive authority. *See, e.g., Opoka v. Immigration & Naturalization Serv.*, 94 F.3d 392, 395 (7th Cir. 1996) ("[A] court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act that the order represents or the subject matter of the litigation.") (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (alteration in original)). In any event, Exhibit A is not persuasive authority regarding the status of FXG contractors. ***First***, the decision was rendered by an administrative hearing officer, is not final, and is appealable. (*See* FedEx Ground's Omnibus Statement of Genuine Issues ("SGI") ¶ 238.) ***Second***, the decision was rendered under a 12-factor test applicable to New Hampshire wage-deduction claims, under the statute N.H. REV. STAT. ANN. § 275.42, which does not govern the various claims in the various jurisdictions at issue here. (*See* Pls. Req. at 1, Ex. A:4-5.) ***Third***, to the extent plaintiffs are attempting to use the hearing officer's non-final decision as an example of a finding of employee status, many other courts and administrative agencies have upheld independent contractor status. (*See, e.g.*, SGI ¶ D-20); *see also*:

- *Roach v. Roadway Package Systems, Inc.*, No. WCK 0038184 (July 29, 1999)
- *RPS, Inc.*, No. 5-RC-14905 (N.L.R.B. Aug. 3, 2000)
- *In re Metheany*, No. 2000-STA-11 (U.S. Dep't of Labor Oct. 4, 2002)
- *In re Storey*, No. L 1997 00048 2684 (Mich. Employment Security Bd. of Review Jan. 30, 2004)
- *Mailhot v. FedEx Ground Package System, Inc.*, No. 02-257-JD (D. N.H. Feb. 13, 2004)
- *Encarnacion v. FedEx Ground*, No. 15DA301374 (Fla. Comm'n of Human Relations June 1, 2004)
- *Watt v. FedEx Ground*, No. CR200200153 (Wisc. Labor & Indus. Review Comm'n

Sept. 3, 2004)

- *Issa v. Roadway Package Systems, Inc.*, No. C-841208 (Cal. Sup. Ct. Nov. 1, 2004)
- *In re Ryan*, No. H2005-117-0132 (Ohio Unemployment Comp. Review Comm'n July 19, 2005)
- *In re Ploeckelmann*, No. 06400084GB (Wisc. Dep't Workforce Dev. Jan. 20, 2006)
- *Endres v. FedEx Ground*, No. 06200751EC (Wisc. Labor & Indus. Review Comm'n Nov. 10, 2006)
- *In re Spitz*, No. 006-20568 (N.Y. Unemployment Ins. App. Bd. Nov. 22, 2006)
- *Anfinson v. FedEx Ground Package Sys. Inc.*, No. 04-2-39981-5SEA (King County Super. Ct. Mar. 31, 2009)
- *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009).

Plaintiffs' request is also inappropriate to the extent it asks this Court to judicially notice the truth (or falsity) of facts recited in their exhibits. *See ABN AMRO, Inc. v. Capital Int'l Ltd.*, 2007 U.S. Dist. LEXIS 19601, at *26 (N.D. Ill. Mar. 16, 2007); *Holmes v. Nigro*, 1998 U.S. Dist. LEXIS 18718, at *8-9 (N.D. Ill. Nov. 25, 1998); *see also United States v. So. Cal. Edison Co.*, 300 F. Supp. 2d 964, 977 (E.D. Cal. 2004) (citing *California ex rel. RoNo, LLC v. Altus Finance S.A.*, 344 F.3d 920, 931 (9th Cir. 2003)). Therefore, the Court may properly take judicial notice of the ***existence*** of Exhibit A, but it should not accept the truth of the underlying factual bases for the decision.

**Exhibits B & C**

Plaintiffs ask the Court to take judicial notice of Exhibits B & C, the National Labor Relations Board's Petition for Rehearing in *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) (Pls. Req. Ex. B), and the Teamsters, Local No. 25 Petition for Rehearing in *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) (Pls. Req. Ex. C). ***First***, such a request is proper only to the extent plaintiffs wish the court to take judicial notice of the documents'

***existence***. These pleadings are not to be considered for purposes of the arguments raised or the truth of the matters asserted, as confirmed by plaintiffs' own cited authority. *See, e.g., Opoka*, 94 F.3d 392 at 395 ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'") (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2nd Cir. 1991)). ***Second***, recognizing the ***existence*** of the documents does little to advance plaintiffs' arguments. Both petitions for rehearing were ***denied***. 563 F.3d 492, *rehearing denied* (Sept. 4, 2009), *rehearing en banc denied* (Sept. 4, 2009); *see also* "Defendant FedEx Ground Package System, Inc.'s Notice of Denial of Petitions For Rehearing In *FedEx Home Delivery v. NLRB*" (Doc. No. 1785).

Dated: November 12, 2009.

Respectfully submitted,

By: /s/Chris A. Hollinger
Chris A. Hollinger

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St., Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of November, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Chris A. Hollinger

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *Leighter v. FedEx Ground Package System, Inc.* Civil No. 3:07-cv-328-RLM-CAN (OR) | CHIEF JUDGE MILLER |

**FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO THE *LEIGHTER* (OREGON) PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I. PLAINTIFFS' MOTION FAILS TO SATISFY THE BASIC REQUIREMENTS FOR CLASSWIDE SUMMARY ADJUDICATION ..... 3

II. THE LEIGHTER CLASS MEMBERS ARE NOT ENTITLED TO SUMMARY ADJUDICATION OF THEIR EMPLOYMENT STATUS BECAUSE THEIR MOTION RAISES DISPUTED AND MATERIAL ISSUES OF FACT THAT CANNOT BE RESOLVED WITHOUT A TRIAL ..... 5

A. The OA Creates A Reasonable Inference That Contractors, Not FXG, Have The Right To Control The Manner And Means Of Performance ..... 7

1. The OA Creates An Independent Contractor Relationship And Specifically Denies FXG The Right To Control ..... 7

2. Contractors' Right To Hire Assistants And Substitutes Strongly Favors Independent Contractor Status ..... 9

3. FXG Does Not Control The Details Of The Contractors' Work ..... 10

4. The Branding And Appearance Provisions In The OA Provide Only Weak, If Any, Support For An Employment Relationship ..... 12

5. The OA Does Not Give FXG The Right To Control Which Vehicles Contractors Choose, Beyond Their Suitability ..... 13

6. Contractors Schedule Their Own Working Hours ..... 14

7. The OA Does Not Give FXG The Right To Train, Supervise, Or Discipline Contractors ..... 16

8. The OA Does Not Give FXG The Right To Control Contractors' Entrepreneurial Opportunities ..... 18

9. Whether Contractors Perform "Essential" Work Is Irrelevant ..... 20

B. FXG's Limited Right To Terminate The OA Supports An Independent Contractor Relationship ..... 20

C. Contractors' Provision Of Equipment Supports The Existence Of An Independent Contractor Relationship ..... 22

D. The OA's Compensation Terms Support An Independent Contractor Relationship ..... 23

E. The Length Of Contractors' Relationship With FXG Does Not Support A Finding Of Employee Status As A Matter Of Law ..... 25

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adams v. Kansas City Life Ins. Co.*,
192 F.R.D. 274 (W.D. Mo. 2000) ........ 4

*Anfinson v. FedEx Ground Package Sys., Inc*,
No. 04-2-39981-5SEA (King County. Super. Ct. Mar. 31, 2009) ........ 1

*Argeros & Co. v. Dep't of Transp.*,
447 A.2d 1065 (Pa. Commw. Ct. 1982) ........ 3

*Bob Wilkes Falling, Inc. v. Nat'l Council on Compensation Ins.*,
878 P.2d 1136 (Or. Ct. App. 1994) ........ 21, 24

*Bowers v. Jefferson Pilot Fin. Ins. Co.*,
219 F.R.D. 578 (E.D. Mich. 2004) ........ 4

*Bowser v. State Ind. Accident Comm'n*,
185 P.2d 891 (Or. 1947) ........ passim

*Briggs v. Cal. Employment Comm'n*,
28 Cal.2d 50 (1946) ........ 25

*Brown v. Pettinari*,
994 P.2d 1231 (Or. Ct. App. 2000) ........ passim

*C.C. Eastern, Inc. v. NLRB*,
60 F.3d 855 (D.C. Cir. 1995) ........ 15

*Cantua v. Creager*,
7 P.3d 693, 701 (Or. Ct. App. 2000) ........ 14

*Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*,
478 F.2d 556 (3d Cir. 1973) ........ 4

*Castle Homes, Inc. v. Whaite*,
769 P.2d 215 (Or. Ct. App. 1989) ........ 20

*Caudill v. Devonshire Hills and Park Apartments*,
No. 08-6069, 2009 U.S. Dist. LEXIS 95890 (D. Or. Oct. 14, 2009) ........ 7

*Chard v. Beauty-N-Beast Salon*,
941 P.2d 613 (Or. Ct. App. 1997) ........ 5, 16, 25

*Collins v. Anderson*,
596 P.2d 1001 (Or. Ct. App. 1979) ........ 5, 10, 23

*Corp. Express Delivery Sys. v. NLRB*,
292 F.3d 777 (D.C. Cir. 2002) ........ 9

*Dutson v. Farmers Ins. Exch.*,
815 F. Supp. 2d 349 (D. Or. 1993) ........ 8, 14

*EEOC v. N. Knox Sch. Corp.*,
154 F.3d 744 (7th Cir. 1998) ........ 11, 22

*FedEx Home Delivery v. NLRB*,
563 F.3d 492, 504 (D.C. Cir. 2009) ........ passim

*Henn v. State Accident Ins. Fund Corp.*,
654 P.2d 1129 (Or. Ct. App. 1982) ........ 8, 16, 20, 21

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Custom Concepts, Inc.*,
150 B.R. 6293 (Bankr. W.D. Pa. 1993) .......... 4

*Jenkins v. AAA Heating & Cooling, Inc.*,
421 P.2d 971 (Or. 1966) .......... 13

*Knight v. United Farm Bureau Mut. Ins. Co.*,
742 F. Supp. 518 (N.D. Ind. 1990) .......... 22

*Lackey v. Central Bank of the South*,
710 So. 2d 419 (Ala. 1998) .......... 5

*Lockard v. Murphy Co.*,
619 P.2d 283 (Or. Ct. App. 1980 .......... 9, 22, 23, 24

*Lyons v. Cantor*,
70 A.2d 285 (Pa. 1950) .......... 4

*McQuiggen v. Burr*,
850 P.2d 385 (Or. Ct. App. 1993) .......... 22

*Merchs. Home Delivery Serv. Inc. v. NLRB*,
580 F.2d 966 (9th Cir. 1979) .......... 11, 15, 18

*Mukhtar v. Castleton Serv. Corp.*,
920 F. Supp. 934 (S.D. Ind. 1996) .......... 16

*NLRB v. Amber Delivery Serv., Inc.*,
651 F.2d 57 (1st Cir. 1981) .......... 19

*NLRB v. Friendly Cab Co.*,
512 F.3d 1090 (9th Cir. 2008) .......... 12, 16

*NLRB v. Keystone Floors, Inc.*,
306 F.2d 560 (3d Cir. 1962) .......... 16

*NLRB v. Maine Caterers, Inc.*,
654 F.2d 131 (1st Cir. 1981) .......... 16

*Or. Drywall Sys., Inc. v. Nat'l Council on Compensation Ins.*,
958 P.2d 195 (Or. Ct. App. 1998) .......... 10, 15, 17, 20

*Pa. Eng'g Corp. v. McGraw-Edison Co.*,
459 A.2d 329 (Pa. 1983) .......... 4

*Peno Trucking v. Comm'r of Internal Revenue*,
296 Fed. App'x 449 (6th Cir. 2008) .......... 23

*Perri v. Certified Languages Int'l, LLC*,
66 P.3d 531 (Or. Ct. App. 2003) .......... 5

*Reforestation Gen. Contractors, Inc. v. Nat'l Council on Compensation Ins.*,
872 P.2d 423 (Or. Ct. App. 1994) .......... passim

*Rubalcaba v. Nagaki Farms*,
43 P.3d 1106 (Or. 2002) .......... 5, 6, 10

*Schaff v. Ray's Land & Sea Food Co.*,
45 P.3d 936 (Or. 2002) .......... 6, 13, 25

*SIDA of Hawaii, Inc. v. NLRB*,
512 F.2d 354 (9th Cir. 1975) .......... 12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Trabosh v. Washington County*,
915 P.2d 1011 (Or. Ct. App. 1996) ..... 6

*Wallowa Valley Stages, Inc. v. Oregonian Publishing Co.*,
386 P.2d 430 (Or. 1963) ..... 1, 6, 16, 20

*Woody v. Waibel*,
554 P.2d 492 & n.6 (Or. 1976) ..... 6

**OTHER AUTHORITIES**

*Restatement (Second) of Agency* 220(2) ..... 22

**INTRODUCTION**

Plaintiffs ask this Court to rule, without allowing a jury to weigh any of the competing evidence, that every member of this Oregon class of FedEx Ground Package System, Inc. ("FXG") contractors is an employee, rather than an independent contractor, under Oregon's common-law "right to control" test. In so doing, plaintiffs rely on workers' compensation cases that apply a classification test fundamentally different from the "right to control" test which governs their claims here. But this is not merely a workers' compensation case.

On the other hand, in cases applying the "right to control" test, Oregon courts have frequently concluded that the employment classification question is one for the jury. For example, in *Wallowa Valley Stages, Inc. v. Oregonian Publishing Co.*, 386 P.2d 430, 433 (Or. 1963), a case with stronger evidence of control than plaintiffs purport to offer here, the Oregon Supreme Court affirmed the need to go to the jury where the evidence on the independent contractor vs. employee question was susceptible to more than one conclusion. And, in another decision on point, *Brown v. Pettinari*, 994 P.2d 1231, 1234 (Or. Ct. App. 2000), the court analyzed a contract with substantial parallels to the FXG Operating Agreement ("OA") and found "ambiguity" as to the meaning of the contract and the nature of the parties' relationship "which a fact finder must resolve." Plaintiffs say nothing about *Brown* and insist that this Court can, without a trial, disregard numerous OA provisions that undermine their claims by deeming them to be "mere 'labels.'" (Pls.' MSJ at 11 (Doc. No. 1805).) *Brown* rejects such an approach.

Furthermore, summary judgment is not appropriate unless a reasonable person, drawing every inference in favor of FXG, could not reach the conclusion that plaintiffs are independent contractors. In this regard, two recent developments are worth noting. First, the D.C. Circuit (the only Circuit to do so) analyzed the same OA and business relationship at issue here, and, applying a body of law that plaintiffs themselves contend is analogous to Oregon law (Pls.' MSJ

at 7-8), reversed a determination by the NLRB and concluded that certain single work area contractors in Massachusetts were independent contractors as a matter of law.  *See FedEx Home Delivery v. NLRB*, 563 F.3d 492, 504 (D.C. Cir. 2009).[1]  Second, a jury in Washington state analyzed the same OA and business relationship, applied a "right to control" test with many of the same factors evaluated by Oregon courts, and concluded after trial that FXG contractors were independent contractors.[2]  *See Anfinson, et al. v. FedEx Ground Package Sys., Inc*, No. 04-2-39981-5SEA (King County. Super. Ct. Mar. 31, 2009).  Given these outcomes, plaintiffs cannot credibly claim they must prevail without ever going to trial.

While downplaying the significance of the D.C. Circuit decision and ignoring the *Anfinson* jury verdict, plaintiffs' motion makes much of the California *Estrada* decision, going so far as to argue that it precludes FXG from even presenting a defense.  As discussed in FXG's prior briefing (Doc. No. 1397), plaintiffs' preclusion argument is a nonstarter.  Equally unpersuasive is plaintiffs' argument that FXG's recent development of an enhanced independent contractor model in New Hampshire and Maryland is an admission that FXG "believes that the OA cannot be squared with a true 'independent contractor' relationship."  (Pls.' MSJ at 10.)  FXG is not required to maintain its contracts throughout the country in a state of perpetual stasis upon penalty of an adverse inference in litigation.  FXG's adoption of a new business model in

---

[1]  Plaintiffs acknowledge the D.C. Circuit opinion in a footnote and attempt to distinguish it as a departure from precedent.  The D.C. Circuit did not, however, apply a "novel test."  (Pls.' MSJ at 8 n.5.)  The D.C. Circuit confirmed that the common-law agency test applies and analyzed the common-law factors plaintiffs identify here.  *FedEx Home Delivery*, 563 F.3d at 496 n.1.

[2]  In the *Anfinson* trial, the jury was asked to decide whether FXG "controlled or had the right to control the details of the class members' performance of the work."  (Ex. G:4293.)  In evaluating the right to control, the jury was instructed to consider eight non-exclusive factors:  the degree of FXG's right to control, the class members' investment or employment of others, whether the services rendered require special skill, the permanence of the relationship, whether the services rendered are integral to FXG's operation, the method of payment, the opportunity for profit and loss based on managerial skill, and the parties' intent in creating the relationship.  (*Id.*)

2009 in two states (New Hampshire and Maryland), each with their own employment classification standards, in no way constitutes an admission in this nation-wide litigation -- and certainly not in a case involving Oregon law with a class period dating back to 1999.

## ARGUMENT

### I. PLAINTIFFS' MOTION FAILS TO SATISFY THE BASIC REQUIREMENTS FOR CLASSWIDE SUMMARY ADJUDICATION.

Plaintiffs' contention that the OA is an unambiguous, "standard form" agreement (Doc. No. 871 at 12) was critical to the Court's class certification ruling because, on that premise, it could decide all Oregon class members' status (except as regards their rescission claim) solely "by examining the Operating Agreement and commonly applicable FedEx policies" and without resorting to individualized extrinsic evidence that would preclude certification. (July 27, 2009 Order (Doc. No. 1770) at 60.) The unambiguous provisions of the OA, however, ***prohibit*** FXG from directing the manner or means of a contractor's operations, telling contractors what routes to follow, controlling what hours a contractor works, prescribing how contractors use or maintain their equipment, dictating what methods a contractor adopts, or preventing contractors from hiring others to do the work. (FXG Statement of Genuine Issues ("SGI") ¶ 24(q); *see also* OR-1 (managers are trained to comply with terms of the OA in their dealings with contractors).) These provisions are not, as plaintiffs suggest, mere "general statements" that can be disregarded. Rather, these provisions create enforceable obligations defining the parties' rights that must, as a matter of Pennsylvania contract law (SGI ¶ D23), be "taken into account and given effect" if possible. *Argeros & Co. v. Dep't of Transp.*, 447 A.2d 1065, 1067 (Pa. Commw. Ct. 1982).

To make the case for employee status, plaintiffs ask the Court to dismiss as "general" provisions that refute their claims, and to embrace as specific the provisions they claim support their position. (Pls.' MSJ at 11.) The presence of conflicting provisions, however, creates an

issue of contract interpretation that precludes resolution on a classwide basis. Under Pennsylvania law, which governs the interpretation of the OA, a court may not simply pick between conflicting provisions on the theory that a more specific provision trumps a more general one. That canon is only one among many, including the Court's duty to construe a contract "to give effect to its general purpose" (*i.e.*, to create an independent contractor relationship) and to interpret it "in light of the meaning which the parties have accorded to it as evidenced by their conduct in its performance." *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973).

Instead, where conflicting contractual provisions arise and thus a contract is ambiguous, "all relevant extrinsic evidence" must be considered in determining the parties' mutual intent. *In re Custom Concepts, Inc.*, 150 B.R. 629, 633 (Bankr. W.D. Pa. 1993). Plaintiffs argue that FXG's policies/procedures and corporate testimony constitute admissions of what FXG believes its rights are under the OA. FXG's own subjective, uncommunicated understanding of the OA, however, is inadmissible. *See Lyons v. Cantor*, 70 A.2d 285, 286-87 (Pa. 1950). Even if admissible, the Court cannot determine intent without considering what each contractor understood, what was discussed, and the parties' course of conduct. *See Pa. Eng'g Corp. v. McGraw-Edison Co.*, 459 A.2d 329, 332 (Pa. 1983).

The Court must consider the full breadth of relevant extrinsic evidence that either party may introduce on the issue of contract interpretation. When present, as it is here, relevant individualized extrinsic evidence compromises the class certification of claims stemming from contract ambiguity. *See Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 282 (W.D. Mo. 2000) (since course of dealing evidence is admissible, "claims become individualized"); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 580-81 (E.D. Mich. 2004) (rejecting notion that

a "standardized contract" must be "interpreted uniformly"). Indeed, as a general principle, plaintiffs cannot maintain a class action by urging the Court to look only to common evidence when individualized evidence is plainly relevant.

To proceed as a class, then, full effect must be given to the OA's terms that establish an independent contractor relationship. If plaintiffs are permitted to go beyond the OA, interpret its terms, or resolve "conflicting" provisions, then due process requires an individualized inquiry, denial of plaintiffs' motion for summary judgment, and, ultimately, decertification.

## II. THE *LEIGHTER* CLASS MEMBERS ARE NOT ENTITLED TO SUMMARY ADJUDICATION OF THEIR EMPLOYMENT STATUS BECAUSE THEIR MOTION RAISES DISPUTED AND MATERIAL ISSUES OF FACT THAT CANNOT BE RESOLVED WITHOUT A TRIAL.

Oregon's common-law "right to control" test focuses on four factors: "(1) the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire." *Perri v. Certified Languages Int'l, LLC*, 66 P.3d 531, 535 (Or. Ct. App. 2003).[3] While that test is the most prevalent in the Oregon decisions, Oregon law does vary somewhat "depending on the nature of the claim." (March 25, 2008 Order ("March 25 Order") at 108-09.) One such variation is critical here. Most Oregon cases on which plaintiffs rely are ***workers' compensation*** cases. *See, e.g.*, *Rubalcaba v. Nagaki Farms, Inc.*, 43 P.3d 1106, 1107 (Or. 2002); *Bowser v. State Indus. Accident Comm'n*, 185 P.2d 891, 891 (Or. 1947); *Collins v. Anderson*, 596 P.2d 1001, 1002 (Or. Ct. App. 1979). For purposes of workers' compensation, employment status "depends on the analytical factors relevant to [two] tests": "right to control"

---

[3] Plaintiffs point to five additional factors applied by Oregon's Bureau of Labor and Industries. (Pls.' MSJ at 8-9). The case that plaintiffs cite in support of adding these extra factors to the "right to control" test, *Chard v. Beauty-N-Beast Salon*, is apparently the only published decision in which an Oregon appellate court has done so, though the court there noted it was not "necessarily endorsing [the factors] as controlling in every case." 941 P.2d 611, 614 (Or. Ct. App. 1997). The Court here has stated that analysis of Oregon's "right to control" test looks to the four factors listed above. (July 27, 2009 Order at 59.)

case 3:05-md-00527-RLM-CAN document 1901 filed 11/12/09 page 11 of 32

and "nature of the work." *Rubalcaba*, 43 P.3d at 1112; *see also Trabosh v. Washington County*, 915 P.2d 1011, 1016 (Or. Ct. App. 1996) ("The purpose of the nature of the work test is to consider factors that are relevant to the workers' compensation system rather than to the common law issues that the right to control test describes."). That hybrid inquiry is unique to the workers' compensation statute, which is "construed liberally with a view toward extending its benefits." *Woody v. Waibel*, 554 P.2d 492, 495-96 & n.6 (Or. 1976). As this Court has observed in a similar context, however, "[t]his case is not a worker's compensation case." (March 25 Order at 129.) Plaintiffs' contention, to the contrary, is that they have been "categorically misclassified," not just misclassified for purposes of workers' compensation. (Pls.' MSJ at 1.)

Under the "right to control" test, which this Court has ruled is the applicable test, "[i]f more than one inference may be drawn from the facts, the jury makes the selection [of employee or independent contractor status] in arriving at a general verdict." *Wallowa Valley Stages*, 386 P.2d at 433 (if the evidence is "within the allowable range," the question must go to the jury).[4] *Wallowa Valley Stages*, on which plaintiffs rely at length (*see* Pls.' MSJ at 6-7, 13, 19, 21, 25-26), actually ***undermines*** their contention that the evidence here warrants summary judgment. In that case, the court affirmed a ***jury verdict*** that a newspaper delivery driver was an employee. 386 P.2d at 434. By contract, the driver had agreed to supply his own vehicle, to pick up newspapers "from a distribution point," to "drop bundles of newspapers at designated points

---

[4] The court in *Woody*, *supra*, stated that "where there is no dispute as to what the arrangement is, the question of employee or independent contractor status is one of law for the court," repudiating *Wallowa Valley Stages* "[t]o the extent [it] can be interpreted as recognizing a contrary principle." *Woody*, 554 P.2d at 494 n.3. But in *Schaff v. Ray's Land & Sea Food Co.*, 45 P.3d 936 (Or. 2002), the Oregon Supreme Court found *Woody* "to be of limited relevance to our discussion of the role of the court and jury" under the "right to control" test, because "[t]he criteria in the workmen's compensation cases are keyed to the purpose of the workmen's compensation laws." *Id.* at 940 n.3 (quoting *Woody*, 554 P.2d at 497). *Schaff* specifically rehabilitated *Wallowa Valley Stages* and held that a worker's employment status must be resolved by the finder of fact "when the underlying facts are in dispute or more than one reasonable inference relating to the right to control can be drawn from those facts." *Id.* at 941 n.5.

along State Highway 82," to solicit and collect accounts, and to hire and fire delivery boys as assistants. *Id. at* 430. Notwithstanding this evidence in support of independent contractor status, the court ruled there was sufficient evidence to create a jury question on the delivery driver's status because the newspaper publisher retained sole proprietary "ownership" over the subscriber lists, retained "the right to terminate the relationship on thirty days' written notice with or without cause," had "supervisory personnel from the circulation department r[i]de with him and show[] him how to solicit customers," urged the driver to deliver by 6:00 a.m., and hired him to do work integral to its business. *Id.* at 433. Yet, even that list of employment indicia was not enough to remove the classification question from the jury: "We do not hold that the amount of supervision exercised in the case at bar was sufficient to constitute [the driver] an employe as a matter of law." *Id*. at 434.

Similarly, genuine issues of material fact preclude summary judgment here because a jury could find that all four factors -- right to control, furnishing of equipment, method of payment, and right to fire -- favor independent contractor status.[5]

### A. The OA Creates A Reasonable Inference That Contractors, Not FXG, Have The Right To Control The Manner And Means Of Performance.

#### 1. The OA Creates An Independent Contractor Relationship And Specifically Denies FXG The Right To Control.

The OA contains specific provisions granting contractors the right to control the details of performance and expressly divesting FXG of any such right. It provides that both parties

---

[5] The U.S. District Court for the District of Oregon recently held that an apartment-complex worker was an employee as a matter of law under the common-law test. *See Caudill v. Devonshire Hills and Park Apartments*, No. 08-6069, 2009 U.S. Dist. LEXIS 95890 (D. Or. Oct. 14, 2009). The court based its ruling in part on the centrality of the plaintiff's work to the defendants' business, *id.* at *16, a factor not identified by this Court in the July 27 Order, failed to credit the guidance of the Oregon Supreme Court from cases such as *Wallowa Valley Stages*, and overlooked evidence of independent contractor status even while it purported to afford defendants "the benefit of all reasonable inferences." *Id.* at *15. Thus, the *Caudill* decision is of little import.

"intend that Contractor will provide these services strictly as an independent contractor, and not as an employee of FedEx Ground for any purpose," and that "the manner and means of reaching [the contracted-for objectives] are within the discretion of the Contractor." (SGI ¶¶ 24(q), 129, D 25.) It prohibits FXG from directing contractors "as to the manner or means employed to achieve [the] objectives and results." (SGI ¶ D34; *see* SGI ¶ 24(q).) Under Oregon law, the parties' express intent to form an independent contractor relationship is indicative of independent contractor status. *See Dutson v. Farmers Ins. Exch.*, 815 F. Supp. 349, 352 (D. Or. 1993), *aff'd*, 35 F.3d 570 (9th Cir. 1994); *Reforestation Gen. Contractors, Inc. v. Nat'l Council on Comp. Ins.*, 872 P.2d 423, 431 (Or. Ct. App. 1994). So is a worker's right to choose the manner and means of performance. *Reforestation Gen. Contractors*, 872 P.2d at 431-32.

Plaintiffs ask this Court to disregard these provisions as mere "generalities." (Pls.' MSJ at 11.) Oregon courts have rejected that argument, even in workers' compensation cases, explaining that "a plain statement that the parties intend the relationship of independent contractor and not employee is not always to be disregarded. ***In a close case, it may swing the balance***." *Henn v. State Accident Ins. Fund Corp.*, 654 P.2d 1129, 1131 (Or. Ct. App. 1982) (emphasis added). In *Brown*, the court reversed a summary judgment finding of independent contractor status and held that the jury must decide the status of an owner-operator delivery driver who leased his vehicle to a licensed carrier. 994 P.2d at 1231. The court concluded that many facts favored independent contractor status, but also observed that, pursuant to federal regulations, the contract assigned "'exclusive possession, control and use of the vehicle(s) and equipment leased hereunder'" to the carrier. *Id.* at 1234. (*See also* SGI ¶ D29.) The court refused to disregard that provision, explaining that "we cannot say, as a matter of law, that the contract does not mean what it appears to say." *Brown*, 944 P.2d at 1234. Instead, it detected

"an ambiguity both as to the meaning of that provision and the nature of [the driver]'s relationship with [the carrier], ***which a fact finder must resolve***." *Id.* (emphasis added).

**2. Contractors' Right To Hire Assistants And Substitutes Strongly Favors Independent Contractor Status.**

Under the OA, contractors need not service their routes themselves, and are specifically authorized to "employ or provide person(s) to assist Contractor in performing the obligations specified by this Agreement." (SGI ¶ D36; *see* SGI ¶ 194.) "The ability to hire 'others to do the Company's work' is no small thing in evaluating 'entrepreneurial opportunity.'" *FedEx Home Delivery*, 563 F.3d at 501 (*citing Corp. Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780-81 (D.C. Cir. 2002), and applying Restatement (Second) of Agency § 220(2) to evaluate contractor status under National Labor Relations Act)). The named plaintiffs here have acknowledged that they were able to hire others to work for them and to decide, for instance, how much to pay them. (OR-17.) In *Bowser*, a workers' compensation case which plaintiffs cite frequently, there was no evidence of the exercise of such a right, but the Oregon Supreme Court did specifically state that "[t]he right of a teamster or a truckman to employ helpers or assistants is ***strong evidence*** that he is an independent contractor." 185 P.2d at 898 (emphasis added) (internal quotation marks omitted); *see Lockard v. Murphy Co.*, 619 P.2d 283, 285-86 (Or. Ct. App. 1980) (relying in part on the right to hire and fire assistants in holding that an owner-operator log hauler was an independent contractor). Plainly, in an employment relationship, no employee is free to hire someone else to do his or her job.

The plaintiffs contend that FXG has reserved "the right to approve or reject any assistant." (Pls.' MSJ 24.) Although all drivers must satisfy FXG's Safe Driving Standards (SGI ¶ 192), the record does not support a separate requirement that FXG give discretionary approval to assistants. FXG disputes that it has a right to "disapprove" or "reject" a driver who satisfies

the requirements specified in the OA. (*See* SGI ¶¶ 192-94; Ex. C:2678-2706; Ex. A:1481.) This case is not *Collins*, where the principal had the power to approve ***or discharge*** a contractor's assistants at any time and for any reason. *See* 596 P.2d at 1003 ("The right to fire a person doing work without liability is a prime indicator of an employer-employee relationship."). Viewed in the light most favorable to FXG, contractors' right to hire, fire, and supervise assistants is strong evidence of independence. *See Brown*, 994 P.2d at 1232, 1234 (fact that the owner-operator "provided the labor to perform the task" by hiring another driver "suggest[s] that [he] was an independent contractor," even where "'such driving personnel must be qualified and authorized'" by the principal). And this evidence precludes summary judgment on a class-wide basis.

**3. <u>FXG Does Not Control The Details Of The Contractors' Work.</u>**

Oregon law looks to "the right to control the manner and means of accomplishing the result, not the right to control the result itself." *Reforestation Gen. Contractors*, 872 P.2d at 431-32. Thus, a hiring party may "visit [work] sites to determine work progress and to inspect the work on completion," so long as it does not tell the contractor "how to do the work." *See Or. Drywall Sys., Inc. v. Nat'l Council on Comp. Ins.*, 958 P.2d 195, 197 (Or. Ct. App. 1998). Here, plaintiffs' evidence of "control" is just a list of results contractors have agreed to provide.

The fact that contractors agree to pick up and deliver all assigned packages in their work areas safely, professionally, and consistent with customer expectations (Pls.' MSJ at 11-13) is not evidence of an employment relationship -- it is the service they have agreed to provide. (SGI ¶ D32; *see also* SGI ¶ 24.) Plaintiffs rely on *Rubalcaba* and *Bowser*, workers' compensation cases in which drivers had to accept any load for delivery anywhere, at the principal's discretion. *Rubalcaba*, 43 P.3d at 1110; *Bowser*, 185 P.2d at 898. That system differs from FXG's network of ***proprietary*** geographic service areas owned by contractors themselves, who are able to decide on their own how to load vehicles, to select the routes that they and their drivers will follow, and

whether to swap packages informally amongst themselves to run their routes more efficiently. (SGI ¶ 28; OR-3; OR-4; OR-5.)  This case is more like *Reforestation General Contractors*, where the court held that "marking of the physical boundaries for each job" is "part of the end result" and "not necessarily indicative of employee status."  872 P.2d at 432; *see also Merchs. Home Delivery Serv., Inc. v. NLRB*, 580 F.2d 966, 974 (9th Cir. 1978) (in case under National Labor Relations Act, stating that allocating packages "according to geographical area and in order to provide a reasonably uniform number of deliveries per delivery day" relates to "what [the principal] wants a particular owner-operator to do, not how it is done").

The OA's service area reconfiguration and "flex" provisions do not alter that conclusion. Under the OA, FXG cannot reconfigure a service area without the contractor's consent unless there is a service failure in breach of the OA, and even then FXG must compensate the contractor for any reduction in packages pursuant to an agreed-upon formula.  (SGI ¶ 29.)  This is fully consistent with independent contractor status.  *See EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998) (school district's right to "unilaterally modify a route or increase a driver's pupil load" not only was dictated by state law, but was "necessary" and "shows nothing more than that the two contracting parties … expected some changes in circumstances and adequately provided for them in the contract") (internal quotation marks omitted).  The flex program is voluntary (SGI ¶¶ 32, 136), and therefore not applicable on a classwide basis.  And even within the program, FXG cannot take packages away from contractors without their agreement.  (SGI ¶ 136; Ex. A:755-56 (whether packages exceed the volume a contractor can handle is decided by contractor and manager together).)  That contractors agree to provide basic information about their packages (through scanners or paperwork), mark undeliverable packages, leave a "call tag" for customers, or collect C.O.D. money (Pls.' MSJ 12-13), does not support employee status.  It

merely reflects the results promised in the OA. (SGI ¶¶ 24(i), 94, D31, D32; *see also* SGI ¶ 24; Ex. A:1408-09.)

FXG also disputes plaintiffs' contention that it has the right to control delivery methods through procedures such as the "driver release" guidelines. (Pls.' MSJ at 12.) Contractors are free to figure out, for themselves, how to "avoid theft, loss and damage," and are responsible if any packages are stolen, lost or damaged. (SGI ¶¶ 24(k), D32.) The optional procedures outlined in the HD Driver Release Program do not contradict that basic allocation of responsibility. FXG specifically disputes that the guidelines are mandatory; contractors can choose to meet the guidelines (e.g., leaving a package in a location "that is safe from the weather and theft") and FXG will assume responsibility for any loss, or to ignore the guidelines and pay for claims if and when they arise. (*See* SGI ¶ 91; Ex. C:2757-65; Ex. A:1168-70.)

#### 4. <u>The Branding And Appearance Provisions In The OA Provide Only Weak, If Any, Support For An Employment Relationship.</u>

Plaintiffs cite no Oregon authority for the notion that the contractors' agreement to "[f]oster the professional image and good reputation of FedEx Ground and Contractor with shippers and recipients" supports, much less compels, a finding of employee status. (SGI ¶¶ 107-111, D32; *see also* Pls.' MSJ 13-14.) Indeed, plaintiffs' own non-Oregon authority notes that "[courts] have not given a dress code requirement much weight," and treats an "extensive [and] mandatory" dress code as "an additional factor" of control, *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1101 (9th Cir. 2008), and still other federal courts have held that dress codes do not establish a right to control, *see FedEx Home Delivery*, 563 F.3d at 501 ("As the [IRS guidelines] persuasively note[], and ordinary experience confirms, a uniform requirement often at least in part 'is intended to ensure customer security rather than to control the [driver]'"); *see also SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 358-59 (9th Cir. 1975) (required conduct "that

case 3:05-md-00527-RLM -CAN document 1901 filed 11/12/09 page 18 of 32

drivers be neat and courteous, [and] display . . . identification on their dome lights and uniforms . . ." are not "instruments of control," but can "more accurately be seen" as efforts to promote a brand "for the mutual benefit of the Association and its drivers").[6] Oregon courts, too, have found independent contractor status as a matter of law even where the worker was required to use equipment bearing the hiring party's name, and even where that equipment was provided by the hiring party. *See Schaff*, 45 P.3d at 938, 942. And, in this case, named plaintiff David Spicer was free to run a supplemental vehicle bearing no FedEx logos at all. (OR-7.)

**5. The OA Does Not Give FXG The Right To Control Which Vehicles Contractors Choose, Beyond Their Suitability.**

Plaintiffs' extrinsic evidence concerning alleged limits on contractors' choice of vehicles is disputed and therefore cannot support plaintiffs' motion for summary judgment. Paragraph 1.1 of the OA makes clear that "the selection and replacement of Equipment is within the discretion of Contractor," and that discretion is constrained only by the common-sense caveat as to the vehicle's "suitability for the service called for in this Agreement." (SGI ¶ 112.) FXG's right to determine suitability, as defined in the OA, is a form of "control" directed toward the contracted-for result and does not indicate employee status. *See Reforestation Gen. Contractors*, 872 P.2d at 432 (concluding that a contract provision requiring "that the loggers use 'appropriate equipment'" was not direct evidence of the hiring party's right to control the "means and methods" of the loggers' performance).

Plaintiffs rely on FXG's internal starting guidelines for suitability, but those procedures do not (and cannot) trump contractors' right to choose any suitable vehicle. VEH-553 states that

[6] The OA makes clear that, in fact, contractors derive a benefit from their association with FXG. (SGI ¶ D25 ("Contractor wants the advantage of operating within a system that will provide access to national accounts and the benefits of added revenues associated with shipments picked up and delivered by other contractors throughout the FedEx Ground system. In order to get that advantage, Contractor is willing to commit to provide daily pick-up and delivery service, and to conduct his/her business so that it can be identified as being part of the FedEx Ground system.").)

it is governed by Policy-007, which prioritizes at all times the rights and obligations specified in the OA, and sets forth a process for FXG to work with a contractor if the two disagree on what type of vehicle is suitable. (SGI ¶¶ 112, 114, 117; Ex. C:3035-48; Ex. A:319-20.) A reasonable jury could find that contractors have an enforceable right to choose their own vehicles, and that FXG lacks the unilateral power to dictate vehicle suitability. (*See* OR-6.)

**6. <u>Contractors Schedule Their Own Working Hours.</u>**

The OA provides that no one at FXG has "the authority to prescribe hours of work, [or] whether or when the Contractor is to take breaks." (SGI ¶¶ 134, D34.) A worker's control over work hours and break times is indicative of independent contractor status. *See FedEx Home Delivery*, 563 F.3d at 499 ("[C]ontractors do not need to show up at work every day (or ever, for that matter); instead, at their discretion, they can take a day, a week, a month, or more off, so long as they hire another to be there"); *Dutson*, 815 F. Supp. at 351 (fact that worker "sets his own office hours," "schedules his vacations," and "arranges for coverage … when he is off" was some evidence "that an employee/employer relationship did not exist"); *Cantua v. Creager*, 7 P.3d 693, 701 (Or. Ct. App. 2000). In this case, the schedules of both of the named plaintiffs permitted them to engage in other work during their contract period with FedEx Home Delivery. (OR-9.) Plaintiffs contend that FXG effectively controls work hours by making contractors "take [their] turn" to have their vehicles loaded, and through customer requirements. (Pls.' MSJ 16-18.) These contentions are disputed, and neither supports class-wide adjudication of employee status as a matter of law.

***First***, plaintiffs do not point to any provision of the OA or FXG policy as the source of FXG's alleged ***right*** to load contractors' vehicles and thereby make them "wait their turn." Instead, they claim as a matter of ***actual practice*** that FXG controls their start times because "FXG employees load their trucks or assemble their packages on pallets." (*Id.* at 3.) The

experience of class members, however, varies widely on this score, precluding classwide resolution of their employment status on this basis. (*See* OR-3, OR-8.) This case is distinguishable from *Bowser*, where plaintiff, a log hauler, "could not come and go as he saw fit" and "had to take his turn" for his truck to be loaded. 185 P.2d at 897. Rather, this case is closer to *Merchants Home Delivery Service*, where "the owner-operators did not surrender their time and physical activities to [the principal]" because they "arrived in the early morning at times of their choosing … and worked only as long as necessary to make the deliveries, quitting sometimes in the early afternoon, sometimes in the evening." 580 F.2d at 974.[7]

Second, the obligation to "[p]rovide daily pick-up and delivery service to shippers and recipients on days and at times which are compatible with their schedules and requirements" (SGI ¶¶ 97-98, D32) is not evidence of a right of control, but a promise to achieve a core result. As explained above, FXG disputes that those contract provisions negate contractors' express right to determine the manner and means of performance and work hours (*see* SGI ¶¶ 24, D34). Regardless, plaintiffs cite no authority -- from Oregon or elsewhere -- for the proposition that accommodating ***customer*** requirements amounts to control ***by the principal***. *See FedEx Home Delivery*, 563 F.3d at 501 n.7 ("measures springing from customer demands do not create an employee relationship"); *C.C. E., Inc. v. NLRB*, 60 F.3d 855, 859 (D.C. Cir. 1995) (noting that the NLRB held that "where a company's control over an aspect of the worker's performance is

---

[7] FXG also disputes plaintiffs' argument that it secretly engineers work loads to require drivers to work between 9.5-11 hours a day. That guideline is designed to ensure that FXG has enough work in a particular area. (*See* SGI ¶ 138; Ex. A:125-27) ("We want to put 9½ worth of work on the contractor. Now, it doesn't matter to me if that individual contractor delivers all of his packages in 9½ hours or he does it in 4½ hours. If he wants to go home and put another contractor in his route, he's totally -- that's totally okay. If he wants a supplemental to run longer while he doesn't work, that's totally okay, too."); Ex. A:985-87; Ex. A:872-77.) A jury could draw a reasonable inference that the purpose and effect of that guideline is unrelated to control over contractor work hours. *See Or. Drywall Sys.*, 958 P.2d at 198 (fact that plaintiffs "could set their own hours within the time frame of the general contractor" was "direct evidence" that the relationship "was not one of employment").

motivated by a concern for customer service, that control does not suggest an employment relationship because it is addressed to the ends to be achieved . . . rather than the means to achieve that result.") (internal quotation marks omitted).[8]

**7. <u>The OA Does Not Give FXG The Right To Train, Supervise, Or Discipline Contractors.</u>**

Plaintiffs' assertion that FXG has reserved "the right to train" contractors "at will" is unsupported and disputed. (Pls.' MSJ 18.) Under the OA, contractors assume responsibility for ensuring "that all persons who operate the Equipment are fully trained and capable of meeting the customer service standards set forth in this Agreement." (SGI ¶ 24(h).) For its part, FXG agrees only that -- during the first 30 days of the contract -- it will "familiarize Contractor with various quality service procedures." (SGI ¶ 70.) This obligation is placed ***on FXG***, and in practice it amounts to a 10-hour basic orientation. (SGI ¶¶ 70, D22.) FXG has no right under the OA to require contractors to attend that orientation or any training.

Plaintiffs go beyond the OA to find individualized examples of "training" that apply to some, but not all, contractors. For example, prospective contractors without the requisite driving experience could attend FXG's QPDL program or an equivalent course provided by someone else (SGI ¶ 70; Ex. C:2678-2706), and the CARE program "is a ***voluntary*** program that a P&D contractor ***may*** use to expunge a verified customer complaint from his or her record" (*id.* ¶ 67; Ex. C:2664-67). None of these programs establishes FXG's ***right*** to demand training. Nor have plaintiffs shown that optional initial training evidences employee status under Oregon law. *See Henn*, 654 P.2d at 1130 (noting that "[t]he company provided a three-day training session in

[8] Plaintiffs' cases involve precise work hour requirements. *See, e.g.*, *Chard*, 941 P.2d at 612 (worker required to work "five days a week, from 7:00 a.m. to 3:00 p.m."); *Mukhtar v. Castleton Serv. Corp.*, 920 F. Supp. 934, 940 (S.D. Ind. 1996) (physician required "to be present at the clinic an average of at least 39 hours per week," unless he got permission to work less); *NLRB v. Maine Caterers, Inc.*, 654 F.2d 131, 133 (1st Cir. 1981) (requirement that truck operators appear at each route stop at specific time); *NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 562 (3d Cir. 1962) (required eight-hour days and full workweek).

sales technique" at which the salesperson "was taught how to present the product and was required to memorize the essential elements of a sales pitch," but concluding that "[d]irect evidence of control is slight" and assigning no express weight to the training). To the extent that optional training matters, FXG would be entitled to present evidence that individual contractors in the Oregon class did not receive training. (*See, e.g.*, SGI ¶ 70; OR-10 (plaintiff "didn't have any training or anything").)

Plaintiffs rely on disputed anecdotal evidence about Customer Service Rides as evidence of employer-like control, but such evidence cannot be extrapolated on a class-wide basis. The OA strictly limits FXG to initiating a visit to customer locations with the contractor only ***four*** times in an entire ***year,*** and only to "verify that Contractor is meeting the standards of customer service" in the OA. (SGI ¶¶ 146-47.) No employer's rights are so limited. Moreover, under Oregon law, a right to "visit [work] sites to determine work progress and to inspect the work on completion" does not indicate employee status. *Or. Drywall Sys.*, 958 P.2d at 197, 198-99. Plaintiffs' reliance on *Wallowa Valley Stages* for the proposition that "frequent supervisor visits, ride-alongs and instruction on how to solicit customers evidenced right to control" (Pls.' MSJ 19) is not well-taken. There, the court held that the delivery driver was not an employee as a matter of law, but instead that his status was a question for the jury. *Wallowa Valley Stages*, 386 P.2d at 433. In particular, "[w]hether the supervisors gave [the driver] ***suggestions*** or ***instructions*** was a matter ***the jury was entitled to decide***" based on "all the evidence." *Id.* (emphasis added). The same is true here, where the evidence about business discussions is disputed and individualized. (SGI ¶ 147; Ex. C: 2922-3028 (managers "cannot require contractor to follow methods or means of achieving the desired results").)

Similarly, plaintiffs argue that FXG's business discussions with contractors should be viewed as mandatory "disciplinary" sessions. (Pls.' MSJ 13, 19-20.) FXG disputes that characterization. Talking to a business colleague about the business does not establish an employment relationship, and nothing in the record establishes that these discussions are "mandatory" or that these discussions are "disciplinary" in any employer-employee sense. Contractors have agreed to provide certain services and FXG may express concern if one fails to do so. *See Merchs. Home Delivery*, 580 F.2d at 974 (rejecting notion that Merchants' "right to send notices of substandard performance" meant it had a right to control deliverymen, "for there is a difference between directing the means and manner of performance of work and exercising an ex post facto right to reprimand when the end result is unsatisfactory."). In light of this evidence, at the summary judgment stage in a class not certified on an "actual control" basis, FXG is entitled to the inference that business discussions neither go beyond results nor amount to a right to control contractor methods.

**8. The OA Does Not Give FXG The Right To Control Contractors' Entrepreneurial Opportunities.**

Plaintiffs assert (Pls.' MSJ 21-22) that FXG has a right to control contractors' entrepreneurial opportunities by controlling the number of packages they pick up and deliver each day. But *Bowser*, on which plaintiffs rely, is a workers' compensation case that says nothing about the hiring party's control over the worker's ability to increase his or her income. As discussed above, plaintiffs have misconstrued the OA's route reconfiguration and "flex" provisions. Moreover, the experience of contractors in Oregon cannot be reconciled with plaintiffs' assertion that FXG wields absolute control over the opportunity to grow their businesses. (SGI ¶D21; OR-11 (contractors able to buy and sell routes, without FXG's involvement, at a substantial profit); OR-13 (contractors are able to add supplemental drivers

without management's permission or knowledge)[9]; OR-15 (contractors benefit from route growth and may take active measures to increase volume and profitability); OR-16 (contractors free to incorporate their businesses).)

Indeed, the D.C. Circuit's recent decision finding independent contractor status hinged largely on the "significant entrepreneurial opportunity for gain or loss" flowing from factors such as the contractors' ability to incorporate, to control the details of their routes, to buy and sell routes without FXG's involvement, and to hire others. *FedEx Home Delivery*, 563 F.3d at 497-98 (internal quotation marks and citation omitted); *see also id.* at 500 (explaining that the right of FXG contractors to sell their routes is a "significant" fact, "novel" under the relevant precedents, and inconsistent with an employment relationship). As the court noted, "the fact that many carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial ***potential*** to do so." *Id.* at 498 (emphasis in original; internal brackets, citation, and quotation marks omitted).[10] Nor is the fact that customers pay FXG, rather than the contractor directly, conclusive evidence of employment status. *See, e.g.*, *Cantua*, 7 P.3d at 701 (fact that plaintiff's clients paid defendant for plaintiff's services "could support an inference that defendant controlled the financial aspects of the business," but was

---

[9] FXG disputes the claim that it reserves a right to approve supplemental vehicles. (SGI ¶ 187; OR-13; Ex. A:1252 ("supplemental van is a vehicle that the contractor at his discretion and his choice puts on"); Ex. C:2722-29 ("There is no restriction on the number of supplementals a contractor can own/operate."); Ex. A:81 (no FXG approval needed).)

[10] Plaintiffs' authority involves far more extensive control over drivers' income. *See NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d 57, 62 (1st Cir. 1981) (affirming finding of employee status under deferential standard of review, noting that "[t]he drivers possess no proprietary interest in their respective delivery routes," so "[a]ll customers 'belong' not to the drivers but to [the principal]," that they were forbidden from "pursu[ing] additional customer accounts" or "from participating in a competing delivery service during the term of [their] contract," and that, upon termination "for any reason," they were "prohibited, for the next six months, from providing any type of delivery services to [the principal's] customers").

"insufficient to allow a reasonable factfinder to conclude that an employment relationship existed" even when combined with other evidence suggesting at-will employment).

### 9. Whether Contractors Perform "Essential" Work Is Irrelevant.

Whether a contractor performs "essential" work has no bearing here. First, Oregon courts typically examine this factor only when applying the "nature of the work" test. *See, e.g.*, *Castle Homes, Inc. v. Whaite*, 769 P.2d 215, 217 (Or. Ct. App. 1989). As discussed above, that test is relevant only in workers' compensation cases and thus is inapposite here. (July 27 Order 61-62). Even if such a factor were considered, as the Oregon Supreme Court explained in *Wallowa Valley Stages*, "[t]he law generally contains no policy against the subcontracting of all or part of the operations of an industry to independent parties." 386 P.2d at 434. While the Court also stated that "[w]here . . . an enterprise in an integral part of its operation makes regular use of the services of individuals over whom it reserves absolute economic control, i.e., the right to hire and fire virtually at will, ***a jury can find*** that such service personnel are subordinates," *id.* (emphasis added), FXG has no right to fire "virtually at will," as discussed below, and even if it had such a right, *Wallowa Valley Stages* holds only that a finder of fact must decide the relevance, if any, of performing "essential" work.

## B. FXG's Limited Right To Terminate The OA Supports An Independent Contractor Relationship.

"An unqualified right to fire, indicative of an employer-employe[e] relationship, must be distinguished from the right to terminate the contract of an independent contractor for bona fide reasons of dissatisfaction," which is "still consistent with the idea that a satisfactory end result is all that is aimed for by the contract." *Or. Drywall Sys.*, 958 P.2d at 198 (quoting *Henn*, 654 P.2d at 1131). Such a limited right to terminate indicates "that the relationship is other than one of employment." *Id.* Here, two provisions of the OA establish that FXG does not possess an

case 3:05-md-00527-RLM -CAN document 1901 filed 11/12/09 page 26 of 32

unqualified right to fire. First, the OA runs for a fixed term, during which contractors may terminate the agreement for any reason upon thirty days notice (SGI ¶¶ 26, 219), but FXG may not terminate the OA except in limited circumstances such as mutual agreement, intentional misconduct, or material breach. (SGI ¶¶ 26, 57, 219.) Under Oregon law, such limitations establish that there is no right to fire. *See Henn*, 654 P.2d at 1131 (no right to fire where "[n]o evidence was offered … that the employer could discharge claimant for other than violations of their agreement"). Second, the OA provides for arbitration of all issues related to termination, (SGI ¶¶ 219-20), and Oregon authority indicates that a mutual right to arbitrate is inconsistent with an inference of a right to fire. *See Bob Wilkes Falling, Inc. v. Nat'l. Council on Comp. Ins.*, 878 P.2d 1136, 1139 (Or. Ct. App. 1994).[11]

Plaintiffs assert that FXG has "***virtual*** at-will authority" to terminate because many of the OA's terms are open to interpretation. (Pls.' MSJ 5 (emphasis added).) But nothing in the OA grants FXG "sole" discretion to terminate without liability. This is different from *Bowser*, where "both parties ha[d] the right to terminate the relationship without any liability whatsover." 185 P.2d at 897. Moreover, Oregon courts have found no right to fire where contractual requirements were expressed in generalized terms. *See Bob Wilkes Falling*, 878 P.2d at 1138-39 (no right to fire where contract required workers to perform job in a "good and workmanlike manner"); *Reforestation Gen. Contractors*, 872 P.2d at 432 (finding "nothing in the record to suggest that [principal] retained an unqualified right to terminate the contracts absent bona fide reasons of dissatisfaction," despite requirement that loggers "perform the designated work in 'accordance with good forestry practices'"). Finally, the suggestion that a ***nonrenewal*** option is

[11] That the OA's arbitration clause has not been enforced in all cases (*see* Pls.' MSJ 6 n.4) is not determinative of whether or not FXG has the right to "fire" contractors. If the arbitration clause is unenforceable in a given case, then the contractor can still challenge a contract termination in court.

the same as a right to terminate (Pls.' MSJ 26) is unpersuasive. *See N. Knox*, 154 F.3d at 749; *cf. McQuiggen v. Burr*, 850 P.2d 385, 388 (Or. Ct. App. 1993) (mutual right to terminate on 30 days' notice "also could be indicative of an independent contractor relationship").

**C. Contractors' Provision Of Equipment Supports The Existence Of An Independent Contractor Relationship.**

The fact that contractors, not FXG, are responsible for furnishing and operating the necessary equipment favors independent contractor status. The OA provides that contractors must supply and maintain all necessary equipment. (SGI ¶ 221; *see also* SGI ¶¶ D26-29; OR-12; OR-14.) That a delivery driver "is the owner of his truck and that he maintained it in running condition" is evidence which "strongly tends to indicate the relationship of independent contractor." *Bowser*, 185 P.2d at 899-900; *see also Brown*, 994 P.2d at 1234; *Lockard*, 619 P.2d at 286.

Plaintiffs contend that the question is not who provides the "tools," but who "controls workplace and capital infrastructure, such as premises and large equipment," citing no Oregon decisions but relying instead on distinguishable federal case law, as well as comment *l* and illustration 9 to Section 220(2) of the Restatement (Second) of Agency. (Pls.' MSJ 27 n.16.) Those sources, however, do not refer to enterprise-wide "capital infrastructure"; they discuss the premises and large machinery ***actually used*** by the workers at the job site. *See* Restatement § 220(2) cmt. *l* (if "the work is done upon the premises of the employer with his machinery by workmen who agree to obey rules for regulation of conduct," the inference supports employee status), illus. 9 (where the workers are miners, referring to "the larger units of machinery and the means of ingress and egress" at a coal mine as evidence of employee status); *Knight v. United Farm Bureau Mut. Ins. Co.*, 742 F. Supp. 518, 522-23 (N.D. Ind. 1990) (describing hiring party's provision of "office space [and] secretarial support" for insurance agent as evidence of employee

status, but ultimately concluding agent was an independent contractor). *Bowser*, *Rubalcaba*, *Lockard*, and *Brown* did not focus on the "multi-billion-dollar capital infrastructure" of the carrier. (Pls.' MSJ 27.) They focused on the truck. *Bowser*, 185 P.2d at 899; *Rubalcaba*, 43 P.3d at 1111; *Lockard*, 619 P.2d at 286; *Brown*, 994, P.2d at 1234. The same is true of a federal case on which plaintiffs rely, where the court found that employment status was indicated in part because the hiring party was responsible for providing, operating, and maintaining ***the fleet of trucks***. *Peno Trucking v. Comm'r of Internal Revenue*, 296 F. App'x 449, 458 (6th Cir. 2008).

Plaintiffs also claim that FXG "is the source of" various equipment, including "trucks, uniforms, scanners, shipping documents, insurance and fuel." (Pls.' MSJ at 28; *see* SGI ¶¶ 115, 209, 212.) But the existence of optional programs to help contractors find suitable tools does not change the fact that contractors themselves acquire and pay for those tools. Regardless, plaintiffs misconstrue *Collins*, which merely noted in its recitation of the facts that the employer had provided equipment to a worker who had sold his tools, but never indicated that this supported its conclusion that the worker was an employee. 596 P.2d at 1003; *compare Cy Inv. Inc. v. Nat'l Council on Comp. Ins.*, 876 P.2d 805, 808 (Or. Ct. App. 1994) (concluding that the "provision of equipment" factor favored independent contractor status because dancers "provided their own costumes and either provided their own music ***or paid [the principal] for the use of its juke box***", and ultimately remanding for consideration of the "nature of the work" test) (emphasis added). Nor do plaintiffs cite any authority for the proposition that ***assistance in locating*** equipment is equivalent to ***providing*** it.

**D. The OA's Compensation Terms Support An Independent Contractor Relationship.**

The method of payment also favors independent contractor status. Under the OA, compensation varies according to the job completed (number of stops made and packages

handled), the services provided (van availability), the distance traveled (core zone payments), and the nature of the work that is promised (flex fee), with an additional payment based on the quality of the overall results (quarterly performance settlement). (SGI ¶ 35; OR-18.) The fact that contractors are paid according to the work they perform and the decisions they make about how to operate their businesses, rather than "an established wage," favors independent contractor status. *See Lockard*, 619 P.2d at 286 (explaining that the fact that the "[p]laintiff was paid on the basis of the amount of lumber hauled rather than an established wage" supported independent contractor status).[12] Plaintiffs contend that this factor favors employee status because "FXG pays drivers weekly" (Pls.' MSJ 29), but that argument confuses ***how often*** compensation is paid with the ***basis*** for compensation.

Plaintiffs then further confuse the ***basis*** for compensation with the ***power to determine*** compensation. (Pls.' MSJ 29). Although there are some exceptions, such as *Perri*, the importance of this factor under the "right to control" test is questionable in light of cases such as *Lockard*, where the court was not interested in who "set the rate and method" of payment, but squarely ruled that the ***basis*** of payment (i.e., amount hauled) weighed in favor of independent contractor status. 619 P.2d at 286. FXG also disputes plaintiffs' assertion that contractors are paid "based on a non-negotiable formula unilaterally set by FXG." (Pls.' MSJ 29.) The compensation addendum by its terms must be signed ***by both parties*** to go into effect or be altered. (SGI ¶ 36; OR-19.) Settlement changes are in fact negotiable: contractors can choose

[12] To be sure, the court in *Bowser* upheld the lower court's judgment finding employee status even where the worker, a log hauler, was paid "per thousand feet haul." 185 P.2d at 895, 899. However, the court in that 1947 workers' compensation decision observed a split among the courts of other states regarding whether payment on a piece-rate basis indicated employee or independent contractor status, and specifically declined to decide which side Oregon would take. *Id.* at 898. More recent case law demonstrates that Oregon courts take the position that piece-rate payment -- including paying loggers by the thousand board feet of logs, as was the case in *Bowser* -- is consistent with independent contractor status. *See, e.g.*, *Bob Wilkes Falling*, 878 P.2d at 1139; *Reforestation Gen. Contractors*, 872 P.2d at 432; *Lockard*, 619 P.2d at 286.

case 3:05-md-00527-RLM -CAN document 1901 filed 11/12/09 page 30 of 32

whether to elect or not to elect certain addendums in the enhancements. (SGI ¶ 36; OR-20; *see* SGI Ex. A:148-49; Ex. A:796-99.)

**E. The Length Of Contractors' Relationship With FXG Does Not Support A Finding Of Employee Status As A Matter Of Law.**

Even if the Court considers the "duration factor,"[13] the duration of contractors' relationships with FXG does not support a class-wide finding of employee status as a matter of law where the contractors' agreements generally run for an initial fixed term of one, two, or three years, and the OA renews for successive one-year terms unless FXG or the contractor gives 30-days' notice. (SGI ¶¶ 26, 219.) Such a contract is consistent with independent contractor status. *See, e.g., Brown*, 994 P.2d at 1232 n.1 (contract renewed automatically for successive one-month terms unless either party gave ten-days' notice). Moreover, Oregon courts have found that workers were not employees despite lengthy working relationships. *See Schaff*, 45 P.3d at 942 (finding independent contractor status as a matter of law where working relationship had lasted "over four years.").

**CONCLUSION**

For the foregoing reasons, and for the reasons set forth in its omnibus response to plaintiffs' motion on collateral estoppel, FXG respectfully requests that this Court deny the *Leighter* (Oregon) plaintiffs' motion for summary judgment.

Dated: November 12, 2009.

Respectfully submitted,

By: /s/ Chris A. Hollinger
Chris A. Hollinger

Thomas J. Brunner

Robert M. Schwartz

[13] This factor is not a consideration under Oregon's "right to control" test, and most Oregon cases do not even mention duration of the work. *Cf. Chard*, 941 P.2d at 614 (incorporating duration factor from Oregon Bureau of Labor and Industries ("BOLI") decision, but expressly noting that it was not "necessarily endorsing BOLI's formulation as controlling in every case").

case 3:05-md-00527-RLM-CAN document 1901 filed 11/12/09 page 31 of 32

Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
Suite 1400
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Liaison and Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of November, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

Mark A Friel
mfriel@stollberne.com

Steve D Larson
slarson@ssbls.com

The undersigned further certifies that a copy of the foregoing was mailed by United States Postal Service to the following non-CM/ECF participant:

Joshua L. Ross
Stoll Stoll Berne Lokting & Shlachter PC
209 SW Oak Street Fifth Floor
Portland, OR 97204

By: /s/Chris A. Hollinger

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF 2009 IRS EMPLOYMENT TAX AUDIT, NOTICE OF PROPOSED ASSESSMENT AND CORPORATE DESIGNEE DEPOSITION**

## INTRODUCTION

Every recycled argument by FXG as to why it should not be required to produce IRS Notices of Proposed Adjustment in discovery has been flatly refuted by FXG's voluntary production and submission to this Court of two Notices of Proposed Adjustment dated October 30, 2009. Apparently, FXG's test for discoverability has nothing to do with the Rules of Civil Procedure, but whether FXG considers the NOPA favorable to FXG. If so, FXG produces it and touts it as validation of FXG's independent contractor model. If not, FXG shields it behind a barrage of frivolous objections. By producing the October 30, 2009 NOPAs, FXG unequivocally has waived its objections that these IRS findings are not discoverable.

Although FXG self-servingly characterizes the October 30 NOPAs as "final," they are by their own title no different than the two NOPAs that FXG refuses to disclose.[1] And contrary

[1] Plaintiffs requested the December, 2007, NOPA in their first motion to compel (Doc. 1278). This motion was granted on August 21, 2008, but FXG moved for reconsideration of the Order on September 8, 2008. A decision on the motion for reconsideration is still pending. The instant motion relates to the September, 2009, NOPA issued by

to FXG's representation that the October 30 NOPAs "rescinded the prior draft NOPAs" (Doc. 1887 at 2), the documents nowhere say that, nor do they render the prior NOPAs moot as FXG claims. Just the opposite. Because the October 2009 NOPAs address ***only*** the issue of assessments under the Safe Harbor provision of the Internal Revenue Code – ***a provision that never would be reached if the drivers were properly classified*** – they instead most likely confirm that the IRS found FXG's drivers to be misclassified, but did not assess taxes because of the Safe Harbor provision. FXG must not be allowed to cherry-pick certain IRS findings to create the favorable inference that the IRS has again blessed its model – while concealing the IRS findings that show just the opposite. The Court must order FXG to produce the NOPAs that it has refused to disclose as part of its discovery obligations in this case.

**BACKGROUND**

On September 11, 2009, FXG filed a "Notice of Developments," stating that the IRS had fully informed FXG of the results of its employment tax audit of FXG for 2002. FXG then made public statements about the September audit, telling its investors that the IRS audit team had applied the section 530 Safe Harbor provision of the Internal Revenue Code based on FXG "consistently treating these workers as independent contractors and from the IRS's prior ruling and agreement that the workers qualified as independent contractors under their common law test." Ex. 1 to Ellingstad Decl. (Doc. 1787-4). These statements create only one inference: FXG has properly classified its driver workforce. Plaintiffs moved to compel the September 2009 audit and Notice of Proposed Adjustment but FXG refused to produce it despite its representations to the Court and the public about its contents.

---

the IRS. FXG has discussed the September, 2009 NOPA publicly and has submitted its own "summary" of the NOPA to this Court in support of its position in this litigation, but refuses to disclose the actual document. Both NOPAs are subject to discovery in this case.

case 3:05-md-00527-RLM-CAN document 1964 filed 11/25/09 page 3 of 12

On October 30, 2009, FXG filed another document titled "Notice of Developments," informing the Court that the IRS had issued another Notice of Proposed Adjustment, proposing that "no assessment of federal employment tax be made with respect to any of FedEx Ground's independent contractors" for the 2002 tax year. Doc. 1867-2 (Form 8-K). On November 12, 2009, FXG filed a "Notice of Further Developments," informing the Court that the IRS had not assessed federal employment tax for the years 2002-2006. On the same date, FXG voluntarily produced to Plaintiffs two "Notices of Proposed Adjustment" dated October 30, 2009. These NOPAs state that a 1998 IRS letter "created a Safe Harbor under Section 530 for the Pickup and Delivery Drivers; therefore no determination will be made for 2002 regarding the classification of drivers. The classification is accepted as filed." Ex. A.[2] The second NOPA dated October 30 found that the Safe Harbor protection extended to include the Home Delivery drivers. Ex. B. FXG also produced to Plaintiffs two documents titled, "Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment in Worker Classification Cases" dated November 9 and 10, 2009. Ex. C. These documents too address only the amount of tax, indicating zero tax and penalties owing by FXG. In its filing with the Court, FXG characterizes the NOPAs it refuses to disclose as "tentative, draft, and non-final," but the October 30 NOPAs as "finalized." Doc. 1887 at 2. FXG claims that the "Agreement to Assessment" "constitutes the IRS's determination." *Id.*

The NOPAs FXG chose to produce strongly suggest that the IRS concluded the drivers were misclassified. FXG must not be allowed to conceal that relevant evidence. Whatever they conclude, each of these IRS decisions is properly subject to discovery. Further, FXG's voluntary production of two "Notices of Proposed Adjustments" waives its arguments that it has no duty to produce "Notices of Proposed Adjustments" in discovery. As this Court correctly held, because

[2] Exhibits A-D are attached to the Declaration of Susan E. Ellingstad, dated November 25, 2009 and filed herewith.

the IRS NOPAs indisputably "bear[] on, or reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case," they are subject to discovery and must be produced. *See* Doc. 1581 at 4.

## ARGUMENT

### I. PLAINTIFFS' MOTIONS TO COMPEL THE TWO PRIOR NOPAs ARE NOT MOOT.

FXG represented to this Court that the October 30, 2009 NOPAs are "final" and they "rescinded the prior draft NOPAs." Doc. 1887 at 2. FXG also told the Court that the documents titled "Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment in Worker Classification Cases" are the "determinations" of the IRS and they render Plaintiffs' motions to compel the prior NOPAs moot.

By selectively disclosing IRS documents and unilaterally characterizing those documents as the final and only relevant documents issued by the IRS, FXG hopes to shut down Plaintiffs' access to any other discoverable information and leave the impression that the IRS has again condoned its independent contractor model. Curiously, in none of FXG's carefully worded disclosures to the Court, the SEC and the public, does FXG actually state that after an intensive, six-year audit, the IRS found the drivers properly classified. FXG's omissions are not accidental. The information contained in the NOPAs produced by FXG indicates that the IRS reached the opposite conclusion about the drivers' classification. Because the IRS's findings with respect to classification – and not the taxes assessed – are undeniably relevant to this matter, FXG cannot shield those findings by declaring Plaintiffs' motion moot.

The two Notices of Proposed Adjustment produced by FXG state that the "no change letter" issued by the IRS in 1998 "created a Safe Harbor under Section 530 for the Pickup and Delivery Drivers." Ex. A. Under the section 530 Safe Harbor provision of the Internal Revenue

Code, a taxpayer can avoid taxes and penalties ***for misclassifying its workers*** if the taxpayer reasonably relied on judicial precedent or a past IRS audit for its tax treatment of the workers. *See* § 530(a)(2)(A)(B)(C), 26 U.S.C. § 3401 Note. "Section 530 protects an employer from employment tax liability resulting from retroactive reclassification of its workers as employees by the IRS where the employer had a reasonable basis to treat its workers as independent contractors." *Crew One Prods., Inc. v. State*, 149 S.W.3d 89, 92-93 (Tenn. Ct. App., 2004). "**By its very terms, section 530 is a relief provision available only to employers who erroneously classify their employees**." *Ahmed v. United States*, 147 F.3d 791, 797 (8th Cir. 1998) (emphasis added). *See also United States v. Porter,* 569 F. Supp. 2d 862, 874-75 (S.D. Iowa 2008) ("Section 530 of the Revenue Act serves as a safe harbor for those employers who have misclassified their workers and thus failed to properly withhold employment taxes."). In other words, the section 530 Safe Harbor provision of the Internal Revenue Code does not apply ***unless*** the employer misclassified its workers.

The Safe Harbor provision thus would not apply to FXG if the IRS had found the drivers properly classified – no tax or penalties would be due in that case and there would be no reason to invoke the Safe Harbor provision. Only if FXG misclassified its pickup and delivery drivers would FXG need to rely on a past IRS "report" to avoid tax liability.

Rather than disclosing what the Safe Harbor provision means with respect to the drivers' classification, FXG carefully misdirects the Court and the public to the issue of the assessment, stating that the IRS made no assessment "with respect to any independent contractors at FedEx Ground Package System, Inc." Doc. 1887 at 2. Taken at face value, FXG's representations allow no other conclusion but that the IRS has validated its model. Then, FXG asserts with no authority that the October NOPAs "rescinded the prior draft NOPAs" – although they say no

such thing -- and that Plaintiffs' motions to compel are now moot.  Doc. 1867 at 2; Doc. 1887 at 2.  Plaintiffs are not required to take FXG's word for what these documents mean.  That is the purpose of discovery and that is why FXG must produce all of the NOPAs, not just those with which it agrees.

The IRS's decision to allow FXG to avoid penalties under the Safe Harbor provision does not necessarily "rescind" any conclusions it reached as to the proper classification of the drivers.  To the contrary, the NOPAs likely confirm the findings in the prior NOPAs that the drivers were misclassified.  Plaintiffs are entitled to discovery into each of the successive NOPAs, what they mean, and how they relate to each other.

If the application of the Safe Harbor provision does not indicate that the drivers were found to be misclassified, the NOPAs will show that as well.  Either way, FXG can always argue as to the relevance or probative value of this evidence.  As the Court admonished FXG in its order last year, however, "admissibility is not pertinent to answering whether something is discoverable."  Doc. 1581 at 4.  "The key question is whether the NOPA 'bears on, or … reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case."  *Id.*  Doc. 1581 at 7.  Just as the Court previously held, "Plaintiffs are justified in seeking the NOPA document and information about the circumstances surrounding it."  *Id.* at 5.

Because the relevant issue to this MDL proceeding is the classification of the drivers, not the ultimate amount of taxes or penalties assessed, the prior NOPAs containing the IRS's findings on classification are more relevant than the NOPAs FXG has produced.  FXG's stonewalling must be put to an end.

case 3:05-md-00527-RLM-CAN document 1964 filed 11/25/09 page 7 of 12

## II. FXG HAS WAIVED ALL ARGUMENTS AGAINST PRODUCTION OF THE IRS NOPAS.

FXG's voluntary production to Plaintiffs and submission to the Court of the October 30 NOPAs waives every frivolous argument FXG makes in opposition to Plaintiffs' motion to compel. FXG argues yet again that the requested NOPAs are beyond the scope of the parties' discovery agreement -- that FXG will produce all agency determinations, even if on appeal or subject to challenge -- because Notices of Proposed Adjustments are not "determinations." Opp. at 9 ("First and foremost, the NOPAs are not IRS 'determinations.'"); 10 ("By the very title, each 'Notice of Proposed Adjustment' is a ***proposed*** adjustment to FedEx Ground's tax liability.") (emphasis in original); 13 ("The NOPAs were issued by an audit team rather than the IRS itself."). FXG argues that under IRS audit regulations, no document issued by the IRS is technically a "determination" **except** a "Notice of Determination of Worker Classification." Opp. at 5. Accordingly, FXG strenuously argues that ***only*** the precise document titled, "Notice of Determination of Worker Classification" can constitute a "determination" subject to production under the parties' agreement. *See* Opp. at 6 ("Thus, a NOPA is not a 'determination' of worker classification, which occurs only upon issuance of the Notice of Determination of Worker Classification."); *see also* Opp. at 5, 10, 13.

### A. The Parties Agreed to Produce Non-Final Determinations.

As argued extensively in prior briefing on this issue, the parties agreed that FXG would produce determinations by the IRS which were ***not*** final and may be "on appeal or otherwise subject to challenge." Ex. 5 to Ellingstad Decl. (Doc. 1787-4). As FXG knows full well, the parties intended nothing but the lay person's definition of "determination," which is "the act of making or arriving at a decision." The American Heritage Dictionary of the English Language, Fourth Edition. The parties **never** agreed to use the technical terminology of the Internal

Revenue Code. Nor did the parties' agreement contemplate that only a document titled "Notice of Determination of Worker Classification" would constitute a determination from a taxing agency. FXG's disingenuous game of semantics did not succeed in opposing Plaintiffs' first motion to compel the 2007 NOPA and it should not succeed now.

Even if the October 30 NOPAs *were* somehow "final," that was not the parties' agreement. The parties specifically agreed to produce determinations although they were ***not*** final. Plaintiffs are entitled to each of the successive IRS NOPAs in order to determine what the IRS decided and how the NOPAs relate to each other. FXG must not be allowed to turn over only the NOPAs which it likes. And regardless of the parties' earlier agreement, as the Court previously held, the IRS NOPAs and information about the circumstances of the NOPAs, including a limited deposition of Sallie Ford, were properly requested in subsequent requests. Doc. 1581 at 4.

**B.     FXG Has Waived this Argument by Producing NOPAs in the Ordinary Course of Discovery.**

Plaintiffs' position that IRS NOPAs fall squarely within the agency determinations FXG agreed to produce was previously confirmed by FXG's production, in response to the same discovery requests, of the California Employment Development Department's "Proposed Notice of Assessment." If that were not enough, FXG has now again waived any argument that a NOPA is not a determination within the parameters of the parties' discovery agreement. FXG produced the October 30 NOPAs as "responsive to requests 23, 24, and 25 of Plaintiffs' first and second requests for production." Ex. D. FXG stated that "These documents are produced to supplement FedEx Ground's prior production of responsive documents." By producing these Notices of Proposed Adjustments, FXG has conceded that such Notices are within the parties' agreement, responsive to the document requests, and required supplementation to discovery.

FXG's recent voluntary production of none other than a "Notice of Proposed Adjustment" exposes FXG's lack of candor in its two-year battle to keep the IRS findings under a veil of secrecy. The documents FXG now claims constitute a "finalized" determination of the IRS are titled "Notice of ***Proposed*** Adjustment" -- just like the earlier "Notices of Proposed Adjustment" FXG desperately hopes will never see the light of day. The other "determinations" are titled "Agreement to Assessment and Collection of Additional Tax." Apparently FXG was mistaken when it argued the only document that could ever constitute a determination is the "Notice of Determination of Worker Classification." According to FXG, the NOPAs that it now eagerly submits to the Court are "determinations" despite its prior argument to the contrary, and despite that none of the documents anywhere contain the word "determination."

FXG should not – under the liberal discovery standards no less – be permitted to shield documents from discovery by self-servingly characterizing one NOPA as not important and outside of the parties' agreement, and another identically titled NOPA as the final word of the IRS and within the parties' agreement. By producing the very document it has refused to this point to produce, FXG has waived its argument that this category of documents is not subject to discovery under the parties' agreement.

**C. The NOPAs Are Not Protected by Taxpayer Privilege**.

FXG also argues in its opposition brief that the NOPA is protected by the taxpayer privilege. This Court previously rejected this argument and it has not improved this time around. First, the IRS NOPA is not a "tax return" subject to the taxpayer privilege. Second, the policy against unnecessary disclosure of tax returns, to encourage taxpayers to file accurate tax returns without fear of legal exposure in other contexts, has no application to an IRS Notice of Proposed Adjustment. *See CFTC v. Collins*, 997 F.2d 1230, 1233 (7th Cir. 1993). This policy is not implicated once the IRS is engaged in an audit, at which time the audit team has access to

whatever information it chooses to review; it is no longer a system of self-assessment and the policy behind taxpayer privilege does not apply.[3] *See* August 21, 2008 Order (Doc. 1581) at 5 ("there is no special privilege that prevents a party's documents created by or for the IRS from being discoverable.").

In any event, FXG long ago waived any purported privilege "by placing the IRS's opinion of its driver classification at issue." Doc. 1581 at 6. If any doubt remained, FXG has again waived any privilege by voluntarily producing the two Notices of Proposed Adjustment on November 12. Indeed, FXG makes the specious argument in its opposition brief that the NOPAs constitute privileged "return information" because they were "prepared by" the IRS "with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) … for any tax," (Opp. at 12), despite that FXG routinely discloses the possible existence of liability in its SEC filings and despite that FXG has now produced the October 2009 NOPAs for the very purpose of touting the amount of liability assessed by the IRS. FXG cannot have it both ways. It has waived its taxpayer privilege argument.

Because FXG's recent production to the Court and to Plaintiffs of the October 2009 Notices of Proposed Adjustment waives all of its objections to producing Notices of Proposed Adjustments, that category of documents must now be produced. FXG must not be allowed to cherry pick which "Notices of Proposed Adjustments" it produces; they are all discoverable.

[3] FXG makes the disingenuous argument that permitting the discovery of the NOPAs would result in an inconsistent discovery standard for Plaintiffs and FXG: "If information related to how independent contractors structure their businesses is not 'relevant and material' to cases unless directly implicated by the classification test, then the proposed adjustments of an IRS audit team surely are not discoverable either." Opp. at 14. FXG neglects to mention that at the outset of this case Plaintiffs stipulated to the fact that the drivers all filed as self-employed, which is relevant to most employment status tests. Even with that stipulated fact, the Court ordered Plaintiffs to produce tax returns, despite the taxpayer privilege, in cases where profit and loss were an element in the employment status tests. (Doc. 451). There is nothing inconsistent about those rulings and a ruling compelling FXG's disclosure in discovery of a determination by the IRS as to the classification of its pickup and delivery driver workforce.

**CONCLUSION**

The October 30, 2009 Notices of Proposed Adjustment voluntarily produced by FXG effectively waive any objection FXG previously has raised to the production of IRS Notices of Proposed Adjustment. The IRS NOPAs and information about the circumstances surrounding them are relevant to the key issue in this case. FXG must produce every document in this category—not just the NOPAs that FXG wants the Court to see. The documents produced by FXG do not render Plaintiffs' motions to compel the undisclosed NOPAs moot. To the contrary, the NOPAs produced by FXG most certainly confirm that the IRS concluded FXG has misclassified its pickup and delivery driver workforce. FXG must not be allowed to obstruct Plaintiffs' discovery into these matters any longer. Plaintiffs respectfully request that their motion to compel the 2009 IRS audit, NOPA and corporate designee deposition be granted.

Dated: November 25, 2009

Respectfully Submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
emorton@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN  46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on November 25, 2009, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; |

| | |
|---|---|
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; egordon@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; aahn@leonardcarder.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com |

**Deborah R. Grayson** drgrayson@fuse.net

**Robert K. Handelman** rhandelman@bnhmlaw.com

**Robert I. Harwood** rharwood@hfesq.com

**Chris A. Hollinger** chollinger@omm.com

**Matthew M. Houston** mhouston@hfesq.com

**Dmitri Iglitzin** iglitzin@workerlaw.com

**Tom A. Jerman** tjerman@omm.com

**Victor H. Jih** vjih@omm.com

**Aparna B. Joshi** ajoshi@omm.com

**Soye Kim** skim@geclaw.com

**Michael W. Kopp** mkopp@omm.com

**Steve D. Larson** slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com

**Jordan M. Lewis** jordanlewis@sbgdf.com

**Shannon Liss-Riordan** sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com

**Gary F. Lynch** glynch@carlsonlynch.com

**John S. Marshall** jmarshall@marshallandmorrow.com

**Michael G. McGuinness** mmcguinness@omm.com

**Bruce H. Meizlish** brucelaw@fuse.net

**Sanford A. Meizlish** smeizlish@bnhmlaw.com

**Jennifer Lee Merzon** jmerzon@omm.com

**Eleanor Morton** emorton@leonardcarder.com; aahn@leonardcarder.com

**James Mulroy, II** mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com

**Daniel O. Myers** dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com

**Jeffrey S. Nestler** jnestler@omm.com

**Ian Otto** iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com

**Peter W. Overs Jr.** povers@hfesq.com

**Lesley A. Pate** lapate@venable.com

**Mary Donne Peters** mpeters@gorbypeters.com; mmcgee@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com

**Nora M. Puckett** npuckett@omm.com

**Charles Victor Pyle, III** victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com

**Anne T. Regan** atr@zimmreed.com; stefanie.hebig@zimmreed.com

**Beth A. Ross** bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com

**J. Gordon Rudd** jgr@zimmreed.com

**Robert M. Schwartz** rschwartz@omm.com

**James A. Staack** jims@staack-firm.com

**R. Jay Taylor Jr.** jtaylor@scopelitis.com; jwoolley@scopelitis.com

**Joni M. Thome** thome@halunenlaw.com

**Matthew T. Tobin** matt@sdtrustco.com; lenandlaura@iw.net

**Jeffrey A. Trimarchi** jtrimarchi@omm.com

**Scott Voelz** svoelz@omm.com

**Mary D. Walsh-Dempsey**    mdempsey@omalleylangan.com

**Michael J. Watton**    jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com

**Peter D. Winebrake**    pwinebrake@winebrakelaw.com

I also certify that on November 25, 2009, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Steve Dennis
REID & DENNIS
Providence Tower
5001 Spring Valley Road, Suite 255W
Dallas, TX 75244

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Patricia A Sullivan
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921

Dated: November 25, 2009

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

__**s/Susan E. Ellingstad**______________________
Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| | ) | THIS DOCUMENT RELATES TO ALL CASES |

**OPINION AND ORDER**

On August 10, 2005, this multi-district litigation case was transferred to the Northern District of Indiana pursuant to 28 U.S.C. § 1407 to perform consolidated pretrial proceedings. The Plaintiffs' main contention for many of their claims is that Defendant, FedEx Ground Package System Inc. ("FedEx"), was treating them as independent contractors when they were actually employees. As a result, the Plaintiffs seek a number of remedies that revolve around this issue including injunctive relief and damages.

On May 9, 2008, the Plaintiffs filed a motion to compel discovery. In that motion, the Plaintiffs sought to compel a document produced to FedEx from the Internal Revenue Office ("IRS") and to depose a FedEx executive, Sallie Ford ("Ford"), regarding an IRS audit. On August 21, 2008, this Court granted the Plaintiff's motion. See Doc. No. 1581. Thereafter, on September 28, 2008, FedEx filed a motion for reconsideration, which is currently pending before this Court. As a result, the document has yet to be disclosed, and the Plaintiffs have not yet taken Ford's deposition.

On September 21, 2009, the Plaintiffs filed another motion to compel, requesting a similar document which was subsequently produced to FedEx from the IRS in September 2009

and renewing their prior request for a limited deposition of Ford. On October 26, 2009, FedEx filed a response in opposition. On November 25, 2009, the Plaintiffs filed a reply. This Court now enters its ruling on this motion pursuant to its referral order and 28 U.S.C. § 636(b)(1)(A).

## II. RELEVANT FACTS

Sometime in 1995, the IRS issued a Letter of Assurance to FedEx regarding its independent contracter "driver model." Throughout the underlying litigation, FedEx has referred to this document numerous times to establish that FedEx has properly classified the Plaintiffs' employment status. Despite this fact, however, during a 2006 deposition of Ford, the Plaintiffs learned that the IRS had been auditing FedEx's driver model for a more recent year, but that the audit was not finished. Thereafter, in December of 2007, the IRS issued a Notice of Proposed Assessment ("NOPA"), indicating that the IRS had "tentatively concluded . . . that FedEx Ground's pick-up-and-delivery owner-operators should be reclassified as employees for federal income tax purposes." The Plaintiffs became aware of the 2007 NOPA through FedEx's filings with the SEC regarding the ongoing IRS audit.

In the previous motion to compel, the Plaintiffs sought to compel the production of the 2007 NOPA document and sought a second limited deposition of Ford regarding the developments of the IRS audit since her 2006 deposition. This Court granted the Plaintiffs' motion, concluding that the 2007 NOPA was relevant, not subject to a privilege, and discoverable. In addition, this Court granted the Plaintiffs' request for a narrow deposition of Ford regarding the audit, noting that the some of the underlying facts of Ford's testimony had subsequently changed. Because this Court's prior order is pending reconsideration, FedEx has yet to comply with this Court's prior order in either respect.

Subsequently, upon FedEx's request and ongoing negotiations with the IRS, the 2007 NOPA was withdrawn by the IRS. Thereafter, on September 11, 2009, FedEx provided an update on the status of the IRS audit to the SEC and this Court, indicating that a new NOPA had been issued regarding the IRS' more recent conclusions. Specifically, FedEx stated that the IRS had issued a new NOPA with respect to FedEx's Home Delivery Service and had assessed fourteen million dollars in tax penalties for its classification of Home Delivery workers. FedEx noted, however, that the IRS had not made a conclusion regarding FedEx's Ground division. Later, on September 17, 2009, FedEx disclosed to its shareholders that the IRS had applied a Section 530 "Safe Harbor" provision to FedEx's Ground Division and indicated that no further assessment would be made.[1] See Doc. No. 1787-4 at 18.

## II. Analysis

Fed. R. Civ. P. 26 (b)(1) permits discovery into "any matter, not privileged, that is relevant to the claim or defense of any party." Relevant information need not be admissible at trial so long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26 (b)(1). For the purpose of discovery, relevancy will be construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Chavez v. Daimler Chrysler, 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351(1978)). This Court has broad discretion when deciding whether to compel discovery and may deny discovery to protect a party from oppression or undue burden. Fed. R. Civ. P. 26(c);

---

[1] Under the Safe Harbor provision, an employer can avoid taxes and penalties, even if the employer misclassified its workers, if the taxpayer reasonably relied on judicial precedent or a past IRS audit for its tax treatment of the workers.

Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1998) ("[D]istrict courts have broad

discretion in matters related to discovery."); Gile v. United Airlines, Inc., 95 F.3d 492, 495-96

(7th Cir. 1996) ("The district court exercises significant discretion in ruling on a motion to

compel.").  In ruling on a motion to compel, "a district court should independently determine the

proper course of discovery based upon the arguments of the parties." Id. at 496.

     A.    Relevance

The Plaintiffs seek the newly issued NOPA for the same reasons that they sought the

2007 NOPA.  To begin, the Plaintiffs note that FedEx has previously relied upon the 1995 Letter

of Assurance to assert that the Plaintiffs were not misclassified for tax purposes.  Further, the

Plaintiffs note that FedEx has since disclosed a partial explanation of the contents of the 2009

NOPA to the SEC and this Court, claiming that the findings therein are final and favorable to

FedEx's position in the underlying case.  As such, because FedEx had evidenced an intention to

utilize those IRS reports that support the conclusion that FedEx's classification of the workers

was proper, the Plaintiffs contend that FedEx should not be permitted bar disclosure of IRS

documents which may evidence conclusions to the contrary.

Along this line, the Plaintiffs contend that disclosure of the 2009 NOPA is necessary to

permit the Plaintiffs an opportunity to evaluate the actual conclusions the IRS may have made

regarding FedEx's designation of the workers' status, arguing that FedEx's unilateral

explanation of the documents contents impermissibly permits FedEx to frame the evidence

without disclosing the actual contents of the document for review.  Specifically, the Plaintiffs

assert that the 2009 NOPA may reveal conclusions by the IRS that FedEx's classification was

improper even though not subject to tax penalties.  In support, the Plaintiffs note that the IRS

Safe Harbor provision does not preclude a finding by the IRS that FedEx Ground's workers were misclassified. Without access to the document, the Plaintiffs argue that they can not properly evaluate the IRS' actual conclusions, leaving the document subject to unilateral interpretation by FedEx at trial.

The threshold issue of any discovery dispute is whether the discovery sought is relevant to issues in the litigation. FedEx does not contest that the requested document is relevant to the main issue of whether the FedEx drivers are independent contractors or employees. The key question in this suit is whether the 2009 NOPA "bears on, or . . . reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Chavez, 206 F.R.D. at 619. As stated in this Court's prior order, "the main issue in this litigation pertains to the classification of FedEx drivers, and the NOPA and the supplemental deposition bear on the IRS's consideration of this issue." See Doc. No. 1581 at 4. Absent some argument that the 2009 NOPA is substantially different in nature than the 2007 NOPA, this Court sees no reason to deviate from its prior ruling regarding relevance in the immediate motion. The 2009 NOPA is relevant for precisely the same reasons as the 2007 NOPA is relevant.

B.    Objections

Consequently, the only issues remaining are whether FedEx has articulated some justification for not disclosing the NOPA. The frequency or extent of the discovery methods otherwise permitted shall be limited by the court if it determines that:

> (I) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake

> in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). FedEx makes three arguments in objection to disclosure, including arguments that: (1) the 2009 NOPA is not a final IRS determination and is, therefore, not subject to the parties' agreement regarding disclosure; (2) disclosure would be unduly burdensome to FedEx because it would reveal confidential tax information to the public; and (3) equity should preclude disclosure based upon the Plaintiffs' previous resistance to FedEx's requests for tax information.

In response, the Plaintiffs assert that this Court has already rendered a conclusion on these issues in its prior order regarding the 2007 NOPA. Specifically, the Plaintiffs' note that this Court concluded that the 2007 NOPA was relevant, not subject to privilege, and discoverable. Given the nearly identical nature of the 2009 NOPA and the remarkably similar objections raised by FedEx against disclosure, the Plaintiffs argue that the issues should, once again, be resolved in the same manner as in this Court's prior ruling.

First, FedEx primarily argues that the 2009 NOPA is not a final determination by the IRS and is therefore not discoverable pursuant to the parties' agreement. In support, FedEx notes language in a standing discovery agreement between the parties, in which FedEx agreed to disclose,

> determinations from any state or federal taxing agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees. [FedEx] will produce these determinations even though they may be on appeal or otherwise subject to challenge.

FedEx argues that this language only mandates discovery of final determinations. Accordingly, FedEx argues that NOPAs are not IRS determinations but rather proposals by IRS field officers

and therefore not implicated by the parties' agreement. In contrast, FedEx contends that determinations made by the IRS should only be considered final if issued in the form of a "Notice of Determination of Worker Classification," a document which the IRS has not yet rendered in this case.

This Court does not agree with FedEx in this regard. To begin, this Court notes that FedEx has previously and frequently relied upon the 1995 Letter of Assurance by the IRS to support FedEx's position regarding the propriety of its employee classification. Similarly, this Court notes FedEx's limited disclosure of the 2009 NOPA to the SEC and this Court, framing the contents of the document and the IRS' conclusions in a manner distinctly favorable to FedEx. As stated in this Court's previous opinion, "Fedex cannot credibly argue that the IRS documents were discoverable when it was favorable to Fedex's position but now when it may not support Fedex's position they are not discoverable." Doc. No. 1581 at 6. FedEx cannot have it both ways. Having shown its intention to rely on other "non-final" IRS documents to support its position, FedEx must disclose those non-final documents which may evidence contrary conclusions, including the 2009 NOPA and the supporting documentation.

Second, FedEx argues that the 2009 NOPA is a confidential tax communication, the disclosure of which would interfere with the fundamental public policies encouraging dialogue between corporations and government agencies. This argument is identical to FedEx's prior argument in relation to the 2007 NOPA. As such, this Court determines it prudent to resolve the issue in a similar manner to its prior order.

Even though the NOPA is a an IRS document, there is no special privilege that prevents documents created by or for the IRS from being discoverable. See Poulus v. Naas Foods, Inc.,

959 F.2d 69, 74 (7th Cir. 1992). Because the document is not privileged, the Court's assessment

is directed at weighing the relevancy of the document against the burden of production. As with

the 2007 NOPA, this Court finds that the relevancy of the 2009 NOPA outweighs any

harassment or embarrassment that FedEx will suffer if it is disclosed. Most significantly, this

Court notes that FedEx has placed the IRS's opinion of its driver model at issue. See Paulos,

959 F.2d at 75 (indicating that party opposing discovery put the topic of discovery at issue was

crucial factor). Plaintiffs indicate, and FedEx does not deny, that they have frequently pointed to

the IRS's 1995 Letter of Assurance to support its position in this litigation. FedEx cannot

credibly argue that the IRS documents were discoverable when it was favorable to FedEx's

position but now when it may not support FedEx's position they are not discoverable.

      Third, FedEx argues that discovery in this instance should be proscribed because the

Plaintiffs have refused FedEx's prior attempts to obtain the Plaintiffs' tax records. However, this

Court finds this argument to be unpersuasive as the alleged prior discovery disputes are not the

subject of this motion to compel. This Court has concluded in two orders, in August of 2008 and

now, that the NOPAs are relevant and discoverable. As such, FedEx's thin equity argument,

regarding unrelated discovery disputes not presently before this Court, is insufficient to persuade

this Court that the undisputedly relevant 2009 NOPA should not be disclosed.

      Finally, FedEx rehashes its prior argument that Ford should not be subject to a second

deposition because the 2009 NOPA is not discoverable, rendering any further depositions

unnecessary. However, because this Court has now concluded that the 2009 NOPA is

discoverable, this Court repeats its prior conclusion that the Plaintiffs should be additionally

permitted to depose Ford to address the narrow issues generated from the 2007 and 2009 NOPAs and the most recent IRS audits.

## III.  CONCLUSION

Because the Plaintiffs' discovery requests are relevant, not subject to a privilege, and discoverable, this Court now **GRANTS** the Plaintiffs' motion to compel.  [Doc. No. 1787]. FedEx is **ORDERED** to produce the 2009 NOPA and accompanying documentation.  Further, the Plaintiffs shall be permitted to depose Ford to address the narrow issues generated from both the 2007 and 2009 NOPAs and the most recent IRS audits, consistent with this and its prior order regarding the 2007 NOPA.

**SO ORDERED.**

Dated this 4rd Day of December, 2009.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL CASES

CHIEF JUDGE MILLER

MAGISTRATE JUDGE NUECHTERLEIN

**FEDEX GROUND PACKAGE SYSTEM INC.'S MOTION TO CORRECT RECORD OF FEDEX GROUND'S OPPOSITIONS TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

FedEx Ground Package System, Inc. ("FedEx Ground") respectfully moves for leave to correct the record of FedEx Ground's Oppositions to Plaintiffs' Motions for Summary Judgment, filed on November 12, 2009, to add certain cited to but inadvertently omitted deposition pages and other documents to the exhibits to its Statement of Genuine Issues ("SGI") (Docket No. 1893) filed in support of its briefs in opposition to plaintiffs' motions for summary judgment. FedEx Ground also requests that two documents related to these documents be added to the record: a corrected Exhibit List and supplemental Declaration of Robert M. Schwartz. In addition, FedEx Ground seeks to provide a version of its SGI that includes specific exhibit citations for the benefit of the Court. There is good cause to correct the record and no threat of harm to plaintiffs by doing so. Consequently, this Court should grant FedEx Ground's motion.

In filing the exhibits to its SGI on November 12, 2009, FedEx Ground cited to but inadvertently failed to include certain deposition pages and other documents referenced in the

SGI. These pages, which represent a tiny proportion of the exhibits to FedEx Ground's SGI, were cited to but inadvertently omitted in the process of compiling the relevant deposition excerpts and documents as exhibits for the filing. FedEx Ground seeks to correct the record to include these inadvertently excluded pages, proposed as Exhibit I to its SGI and attached to the Supplemental Declaration Of Robert M. Schwartz In Support Of Defendant FedEx Ground Package System, Inc.'s Oppositions To Plaintiffs' Motions For Summary Adjudication Of Employment Status, attached hereto as Exhibit 1 (filed under seal). Exhibit I consists of deposition transcript excerpts,[1] a single FedEx Ground procedure (OPR-555), the administrative decision in the case of *Roach v. Roadway Package Systems, Inc.*, No. WCK 0038184 (Cal. Workers' Comp. App. Bd. July 29, 1999), and excerpts from the trial transcript in the case of *Estrada v. FedEx Ground*, BC 210130 (Cal. Sup. Ct.). FedEx Ground also seeks to add to the record the aforementioned Supplemental Declaration Of Robert M. Schwartz as well as an amended Exhibit List addressing the materials found in Exhibit I (both filed under seal concurrently herewith).

In addition, FedEx Ground seeks to provide the Court with an additional version of its SGI containing citations to specific pages within exhibits cited in the SGI, attached hereto as Exhibit 2 (filed under seal). The SGI filed with the Court contains citations to FedEx Ground's exhibits, but does so by referring only to the documents themselves (*e.g.* Marticke Dep. at 92:22-93:11). By providing exhibit page citations, the SGI version FedEx Ground seeks to provide will permit the Court and the parties to locate the relevant content cited in FedEx Ground's SGI more quickly and efficiently. Other than the inclusion of exhibit citations, this version of the SGI is identical to that filed with the Court on November 12, 2009.

---

[1] The affected depositions are as follows: Byrum Dep; Flesher 9/25/07 Dep.; Gebby Dep.; Jenkins Dep.; Lenfant Dep; Leveque Dep.; Marticke Dep.; Rebholz Dep; Rocchino Dep.; and Whiteside Dep.

case 3:05-md-00527-RLM -CAN document 1911 filed 12/10/09 page 3 of 6

This Court has granted a similar motion to correct the record in these proceedings on May 9, 2007 (Docket No. 633), and other courts have granted similar motions for leave to correct previously filed exhibits. *See, e.g.*, *Fisher v. Ciba Specialty Chems. Corp.*, No. 03-0566-WS-B, 2006 U.S. Dist. LEXIS 32628, *4-5 (S.D. Ala. May 18, 2006); *Evans v. York Pictures, Inc.*, No. 4:05CV1123, 2006 U.S. Dist. LEXIS 3142, *4 (E.D. Mo. Jan. 27, 2006). The relief FedEx Ground currently seeks is warranted in this case as well.

Good cause exists to grant FedEx Ground's motion because correcting the record will aid the Court in addressing the pending motions for summary judgment without any risk of harm to plaintiffs. A complete factual record is essential to the Court's consideration of the arguments on summary judgment. All of the materials in proposed Exhibit I were previously available to plaintiffs. Moreover, once it discovered the inadvertent omission of pages from its exhibits, FedEx Ground provided plaintiffs with a copy of proposed Exhibit I and informed plaintiffs' counsel of its intention to file the instant motion. Thus, plaintiffs have had full access to all the cited to but inadvertently omitted pages in drafting their reply briefs. Accordingly, FedEx Ground should now be permitted to correct the record with Exhibit I as well as the related Exhibit List and declaration.

FedEx Ground also provided plaintiffs with a copy of its SGI with exhibit references. As noted above, this document will aid the Court and the parties in navigating the exhibits filed with FedEx Ground's summary judgment opposition briefing without affecting the substance of the arguments or the exhibits.

For the foregoing reasons, this Court should grant FedEx Ground's motion to correct the record by adding cited-to but inadvertently omitted deposition pages and other documents referenced in its SGI (Exhibit I), along with an amended Exhibit List and supplemental Schwartz

declaration, and to provide a version of the SGI that includes specific exhibit citations for the benefit of the Court.

Dated: December 10, 2009 Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Scott Voelz
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 10th day of December, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. A media disc containing a copy of the foregoing was mailed by United States Postal Service to the following attorneys:

Susan E. Ellingstad
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Robert I. Harwood
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, NY 10022

Lynn Rossman Faris
Beth A. Ross
Leonard Carder, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612

Lawrence J. Centola, III
Neil Franz Nazareth
Scott R. Bickford
Martzell & Bickford
338 Lafayette St
New Orleans, LA 70130

Peter J. Agostino
Anderson, Agostino & Keller, PC
131 South Taylor Street
South Bend, IN 46601

Hart Lawrence Robinovitch
Anne T Regan
Zimmerman Reed PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

Mary Donne Peters
Michael J. Gorby
Gorby, Reeves & Peters, P.C.
Two Ravania Drive, Suite 1500
Atlanta, GA 30346

Lloyd N. Frischhertz
Marc L. Frischhertz
Frischhertz & Associates
1130 St Charles Ave
New Orleans, LA 70130

Edward R. Forman
John S. Marshall
Marshall and Morrow LLC
111 West Rich Street, Suite 430
Columbus, OH 43215-5296

Thomas N. Trefethern
4615 W Streetsboro Rd. Suite 211
Richfield, Ohio 44286

Peter D. Winebrake
Andrew Santillo
The Winebrake Law Offices
Twining Office Center, Suite 114
715 Twining Road
Dresher, PA 19025

Robert E. DeRose
Robert K. Handelman
Shannon R. Baith
Barkan Neff Handelman Meizlish, LLP
360 S. Grant Avenue, P.O. Box 1989
Columbus, OH 43216-1989

R. James Lore, Esq.
102-1 Commonwealth Court
Cary, NC 27511

Mark A. Friel
Steve D. Larson
Joshua L. Ross
Stoll Stoll Berne Lokting & Schlachter P.C.
209 Southwest Oak Street
Portland, OR 97204

Andrew J. Kahn
McCracken Stemerman & Holsberry
1630 S. Commerce St., Ste. A-1
Las Vegas, NV 89102

James S. Lowrie
Jones Waldo Holbrook & McDonough SLC
170 S Main St.
Suite 1500
Salt Lake City, UT 84101

By: /s/ Robert M. Schwartz

SF1:783155.2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO STRIKE FEDEX GROUND PACKAGE SYSTEM, INC.'S THIRD STATEMENT OF GENUINE ISSUES AND ADDITIONAL MATERIAL FACTS**

Plaintiffs respectfully move this Court for an order striking from the record Defendant FedEx Ground Package System, Inc.'s Third Statement of Genuine Issues and Additional Material Facts ("SGI") filed on November 12, 2009 (Doc. 1893) and re-filled on December 10, 2009 (Doc. 1912) and for an order striking all references to the SGI from Defendant's legal briefs filed on the same date in opposition to Plaintiffs' motions for summary adjudication of employment status (Docs. 1894, 1896-1902). Rather than comply with Local Rule 56.1 and identify for the Court any disputed material issues of fact that must be resolved at trial supported by admissible evidence, FedEx Ground Package System, Inc. ("FXG") has filed 336 single-spaced pages of argument and evasion. In the SGI, FXG flouts prior court orders, misrepresents the record and senselessly seeks to dispute its own policies and corporate documents, the sworn testimony of its highest-ranking officials and its own discovery responses. For the reasons set forth in Plaintiffs' memorandum filed herewith, Plaintiffs respectfully request that the Court strike FXG's Statement of Genuine Issues and Additional Material Facts and all references

thereto in FXG's briefs. This motion is based on Plaintiffs' memorandum in support filed contemporaneously herewith and the other pleadings, orders and documents on file in this action.

Dated: November 12, 2009

Respectfully Submitted,

LEONARD CARDER, LLP

/s/ **Eleanor Morton**

Lynn Rossman Faris
Eleanor Morton
1188 Franklin Street, Suite 201
San Francisco, California 94109
Tel: (415) 771-6400
Fax: (415) 771-7010

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM-CAN document 1924 filed 12/14/09 page 1 of 28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*Jon Leighter, et al. v. FedEx Ground Package System, Inc., Civil No. 3:07-cv-00328-RLM-CAN (OR)*

**REPLY MEMORANDUM IN SUPPORT OF OREGON PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION**

TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 1

I. Plaintiffs' Motion Is Consistent with the Requirements for Class-wide Summary Adjudication and this Court's Class Certification Order .......... 1

A. The Court Should Not Re-Write the Controlling Test of Employment Status .......... 1
B. Evidence of FXG's Policies is Central to the Legal Issue of Employee Status .......... 2

II. The *Leighter* Class Members Are Entitled to Summary Adjudication .......... 3

A. The Only Reasonable Inference Is that the Drivers Are Employees .......... 3

1. FXG's Self-Serving Proclamations in the OA Do Not Create an Independent Contractor Relationship .......... 4

2. FXG Retains the Right to Control Who May Assist Its Drivers .......... 5

3. FXG Retains the Right to Control How Drivers Make Daily Deliveries .......... 6

4. FXG Retains the Right to Control Driver and Vehicle Appearance .......... 9

5. FXG Retains the Right to Control Vehicle Selection .......... 10

6. Drivers Cannot Set Their Own Work Hours .......... 11

7. The OA Reserves to FXG the Right to Train, Supervise and Discipline .......... 12

8. FXG Controls the Drivers' Alleged "Entrepreneurial Opportunities." .......... 15

9. FXG Does Not Deny that the Drivers Perform Essential Services .......... 16

B. The OA Reserves to FXG the Right to Terminate the Drivers at Will .......... 17

C. FXG Controls the Supplies, Instrumentalities, Tools, and Infrastructure .......... 18

D. FXG Controls the Drivers' Compensation .......... 19

E. The Indefinite Duration of the OA Weighs in Favor of Employment Status .......... 20

CONCLUSION .......... 20

TABLE OF AUTHORITIES

Federal Cases

*Adams v. Kansas City Life Ins. Co.*,
192 FRD 274 (W.D. Mo. 2000) ........ 3

*Bordelon v. Chicago Sch. Reform Bd. of*,
Trs., 233 F.3d 524 (7th Cir. 2000) ........ 1

*Bowers v. Jefferson Pilot Financial Ins. Co.*,
219 FRD 578 (E.D. Mich. 2004) ........ 3

*Brown v. NLRB*,
462 F.2d 699 (9th Cir. 1972) ........ 9

*C.C. Eastern, Inc. v. NLRB*,
60 F.3d 855 (D.C. Cir. 1995) ........ 12, 14

*Caudill v. Devonshire Hills and Park Apartments*,
No. 08-6069-HO, 2009 WL 3335353 (D. Or. 2009) ........ 4, 12, 16

*Doe v. Holy See*,
434 F. Supp. 2d 925 (D. Or. 2006) ........ 4

*Dole v. Snell*,
875 F.2d 802 (10th Cir. 1989) ........ 20

*EEOC v. North Knox School Corp.*,
154 F.3d 744 (7th Cir. 1998) ........ 7, 8

*FedEx Home Delivery v. NLRB*,
563 F.3d 492 (D.C. Cir. 2009) ........ 2

*Molina v. S. Fla. Express Bankserv, Inc.*,
420 F. Supp. 2d 1276 (M.D. Fla. 2006) ........ 11

*NLRB v. Amber Delivery Serv.*,
651 F.2d 57 (1st Cir. 1981) ........ 10, 15

*NLRB v. Deaton, Inc.*,
502 F. 2d 1221 (5th Cir. 1974) ........ 6

*NLRB v. Friendly Cab Co.*,
512 F.3d 1090 (9th Cit. 2008) ........ 9, 10

*NLRB v. Keystone Floors, Inc.*,
306 F.2d 560 (3d Cir. 1962)........................................................................................ 20

*NLRB v. Maine Caterers, Inc.*,
654 F.2d 131 (1st Cir. 1981)........................................................................................ 14

*Rowder v. Bantec, Inc.*,
2004 WL 1490325 (D. Or. 2004)..................................................................................... 4

State Cases

*Bowser v. State Ind. Accident Comm'n*,
185 P.2d 891 (Or. 1947) ........................................................................................ 8, 13, 18

*Brown v. Pettinari*,
994 P.2d 1231 (Or. Ct. App. 2000)............................................................................ 3, 6, 8

*Cantua v. Creager*,
7 P.3d 693 (Or. Ct. App. 2000)...................................................................................... 11

*Chard v. Beauty-N-Beast Salon*,
941 P.2d 611 (Or. Ct. App. 1997)................................................................................ 2, 20

*Collins v. Anderson*,
596 P.2d 1001 (Or. Ct. App. 1979)................................................................................... 7

*Cy Inv. Inc. v. Nat'l Council on Comp. Ins.*,
876 P.2d 805 (Or. Ct. App. 1994).................................................................................. 18

*Estrada v. FedEx Ground Package Sys., Inc.*,
64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007)............................................................ 6, 15, 17, 20

*HDG Enter., Inc. v. Nat'l Council on Comp. Ins.*,
856 P.2d 1037 (Or.App.1993)........................................................................................... 7

*Henn v. State Acc. Ins. Fund Corp.*,
654 P.2d 1129 (Or. Ct. App. 1983)................................................................................. 17

*Lackey v. Central Bank of the South*,
710 So. 2d 419 (Ala. 1998)............................................................................................... 3

*Lockard v. Murphy Co.*,
619 P.2d 283 (Or. Ct. App. 1980)........................................................................... 6, 18, 19

*Nordling v. Johnston*,
283 P.2d 994 (Or. 1955) ................................................................................................... 5

case 3:05-md-00527-RLM-CAN document 1924 filed 12/14/09 page 5 of 28

*Oregon Drywall Sys., Inc. v. Nat'l Council on Comp. Ins.*,
958 P.2d 195 (1998) .......... 7

*Pennsylvania Engineering Corp. v. McGraw-Edison Co.*,
459 A.2d 329 (Pa. 1983) .......... 3

*Peri v. Certified Languages Int'l, LLC*,
66 P.3d 531 (Or. Ct. App. 2003) .......... 2

*Reforestation Gen. Contr., Inc. v. Nat'l Council on Comp. Ins.*,
872 P.2d 423 (Or. Ct. App. 1994) .......... 7, 10, 19

*Rubalcaba v. Nagaki Farms*,
43 P.3d 1106 (Or. 2002) .......... 8

*Schaff v. Ray's Land & Seafood Co., Inc.*,
45 P.3d 936 (Or. 2002) .......... 3, 4

*Stamp v. Dept. of Consumer and Bus. Serv.*,
9 P.3d 729 (Or. Ct. App. 2000) .......... 4

*Urbana v. STAT Courier, Inc.*,
878 A.2d 58 (Pa. Super. Ct. 2005) .......... 2, 11

*Wallowa Valley Stages, Inc. v. Oregonian Publishing Co.*,
386 P.2d 430 (Or. 1963) .......... 4, 7, 11, 16

*Woody v. Waibel*,
554 P.2d 492 (Or. 1976) .......... 16, 19

## INTRODUCTION

FXG's Opposition is legally and factually bankrupt. FXG urges this Court to ignore Oregon law applying the right to control test in favor of a split decision of the D.C. Circuit rejecting that test all together. Because FXG cannot square the evidence supporting Plaintiffs' motion (limited **exclusively** to FXG's own business records and sworn admissions of FXG executives and managers) with lawful independent contractor status, FXG attempts to create the appearance of factual issues where none exist by **arguing with its own evidence** for 336 single-spaced pages. [1] FXG's opposition brief engages in meaningless semantics claiming that its myriad rights of control govern only "results," conveniently redefining whatever drivers do as a "result." By this trick, the color of the drivers' socks and the paint color of their trucks, the mandate to scan and service cross packages are, according to FXG, "results" not methods. Rather than meet Plaintiffs' real case head on, FXG's brief misrepresents what FXG's own evidence says and skirts the issues by conflating the right to control with its exercise and trying to recast this as a breach of contract action. FXG has utterly failed to raise a triable issue of material fact. Plaintiffs' motion should be granted.

## ARGUMENT

### I. Plaintiffs' Motion Is Consistent with the Requirements for Class-wide Summary Adjudication and this Court's Class Certification Order

#### A. The Court Should Not Re-Write the Controlling Test of Employment Status

FXG concedes, as it must, that employment status under Oregon law is governed

[1] While FXG has filed a tome (*see* FXG's Statement of Gen. Issues and Additional Facts ["SGI"], Doc. 1893), FXG has pointed to nothing to contradict Plaintiffs' factual statement, which rests exclusively on FXG's OA, corporate documents and the testimony of FXG's highest ranking officials. For the reasons set forth in Plaintiffs' Motion to Strike filed herewith, the Court should strike this new SGI for its violations of the Local Rules and prior orders and its attempt to defeat Plaintiffs' motion by burdening the Court with more than 300 new single-spaced pages of argument and evasion. *See Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (striking SGI for responding to facts with argument and evasion). But whether stricken or not, it identifies nothing that precludes summary adjudication.

by the common-law "right to control" test. *Peri v. Certified Languages Int'l, LLC*, 66 P.3d 531, 535 (Or. Ct. App. 2003); *Chard v. Beauty-N-Beast Salon*, 941 P.2d 611, 613 (Or. Ct. App. 1997).

Yet, FXG attempts to re-write the law by citing two cases from different jurisdictions that applied different tests to the issue. The cases cited by FXG – *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) and *Anfinson v. FedEx Ground Package Sys., Inc.*, No. 04-2-39981-5SEA (King Cty. Super. Ct. Mar. 31, 2009) – do not preclude this Court from granting Plaintiffs' motion. As shown, the D.C. Circuit's narrow 2-1 decision relied on a novel test of employment status that finds no support in Oregon law and evaluated a record derived solely from a single investigatory hearing before a hearing officer regarding two terminals and without any discovery or representation by counsel. Notably absent from the record were the extensive depositions of FXG executives that Plaintiffs offer here, which are replete with admissions of FXG's reserved rights of control. (*See* Doc. 1740). The unpublished *Anfinson* decision also addressed the law of another jurisdiction (Washington), relied on its own record and is currently under review by the state court of appeals. (*See* Doc. 1728).

**B. Evidence of FXG's Policies is Central to the Legal Issue of Employee Status**

In granting Plaintiffs' motion for class certification, this Court held that Plaintiffs could present evidence of "the Operating Agreement and generally applicable FedEx policies" in proving employee status. (Doc. 1770 at 60). Plaintiffs do not rely on "individualized evidence" of the experiences of specific drivers. (*Id.* at 58). Yet, FXG now insists that it must be permitted to offer individualized proof and that, therefore, class-wide adjudication is unavailable. The Court has already dismissed FXG's argument. (*Id.* at 58, 60).

The issue before the Court is whether Plaintiffs are FXG's employees as a matter of Oregon agency law. This is not a matter of contract interpretation. The OA is merely one piece of evidence of employment status. *Urbana v. STAT Courier, Inc.*, 878 A.2d 58, 62 (Pa. Super.

Ct. 2005) ("[A]n agreement of the parties to a designation of their relationship that is contrary to the employer/employee relationship established otherwise is unavailing to effect a change")[2]; *Schaff v. Ray's Land & Seafood Co., Inc.*, 45 P.3d 936, 941 (Or. 2002) (terms of a contract are evidence, but "not dispositive"). As this Court recognized,

> Rather than asking the court to interpret the contract's meaning, the ... plaintiffs argue that FedEx Ground's right to control its drivers does not comport with the Operating Agreement's explicit term on employment status. (Doc. 1119 at 46).

Evidence of FXG's general policies and practices is not "extrinsic," but central to the issue before this Court. *Brown v. Pettinari*, 994 P.2d 1231 (Or. Ct. App. 2000), cited by FXG at page 1, supports Plaintiffs' position. Notwithstanding the contract, the *Brown* court relied in part on affidavits to find that summary judgment should be denied and the contract in that case did not include the expansive reservation of rights that appears in the OA. *Id.* at 1232-35.

Nor does evidence outside the OA render this case unsuitable for class action treatment. The cases cited by FXG involved breach of contract claims where the contracts' meaning was disputed, and "extrinsic evidence" of the parties' understanding was necessary to interpret the contracts. *See Adams v. Kansas City Life Ins. Co.*, 192 FRD 274, 282 (W.D. Mo. 2000); *Bowers v. Jefferson Pilot Financial Ins. Co.*, 219 FRD 578, 580 (E.D. Mich. 2004); *Lackey v. Central Bank of the South*, 710 So. 2d 419, 422 (Ala. 1998).

## II. The *Leighter* Class Members Are Entitled to Summary Adjudication

### A. The Only Reasonable Inference Is that the Drivers Are Employees

---

[2] FXG asserts that Pennsylvania law governs the interpretation of the OA. The Court need not resolve that question because Pennsylvania law and Oregon law are in accord on this issue. Moreover, under Pennsylvania law, "course of performance is always relevant in interpreting a writing." *Pennsylvania Engineering Corp. v. McGraw-Edison Co.*, 459 A.2d 329, 332 (Pa. 1983).

The only reasonable inference to be drawn from the facts in this case is that the drivers are employees. An isolated fact tending to show independent contractor status cannot defeat plaintiffs' motion. *Stamp v. Dept. of Consumer and Bus. Serv.*, 9 P.3d 729, 733 (Or. Ct. App. 2000) ("a single factor that indicates an employer-employee relationship may constitute proof of an employment relationship, whereas contrary evidence, indicating independent contractor status is, at best, mildly persuasive and may have no effect at all to a determination of worker status."); *Doe v. Holy See*, 434 F. Supp. 2d 925, 948 (D. Or. 2006); *Rowder v. Bantec, Inc.*, 2004 WL 1490325, *3 (D. Or. 2004); *Schaff*, 45 P.3d at 941 n. 5 (classification issue need only go to the jury "when the underlying facts are in dispute or more than one reasonable inference relating to the right to control can be drawn from those facts"); *Caudill v. Devonshire Hills and Park Apartments*, No. 08-6069-HO, 2009 WL 3335353, *4-5 (D. Or. 2009) (finding worker to be employee as a matter of law under common law "right to control" test").

FXG's claim that *Wallowa Valley Stages, Inc. v. Oregonian Publishing Co.*, 386 P.2d 430 (Or. 1963) requires the Court to deny Plaintiffs' motion because that case contained "more evidence of control" ignores the record before this Court. Unlike FXG drivers, the newspaper delivery driver in *Wallowa Valley* solicited his own customers, drove an unmarked vehicle of his choosing, and delivered for other newspapers in connection with his delivery for the company, and the record contained factual disputes as to the extent and scope of supervision. 386 P.2d at 433-34. No genuine, material factual dispute exists in this record.

**1. FXG's Self-Serving Proclamations in the OA Do Not Create an Independent Contractor Relationship**

Under Oregon law, the retention of a right to control prevails over inconsistent contractual characterizations. *See Wallowa Valley*, 386 P.2d 433-34; *Schaff*, 45 P.3d at 941. Such characterizations "may have no effect at all to a determination of worker status." *Stamp*, 9

P.3d at 733. The record Plaintiffs have put forth, consisting entirely of FXG's own documents and executive testimony, overwhelmingly shows that the label is nothing more than a sham.

**2. FXG Retains the Right to Control Who May Assist Its Drivers**

FXG does not legitimately dispute that it reserves the right to approve any assistant and substitute. FXG ignores without comment its own CEO's testimony that FXG can reject a substitute driver for the company's own subjective reasons, such as failing to meet FXG's grooming rules. (SGI 194; Doc. 1197 Exh. 8:964, 968). FXG concedes that any assistant or replacement must meet FXG's "Safe Driving Standards" (FXG Brief at 9), but ignores that standards include "Driver Eligibility Requirements" that reserve the right of approval. All operators, including assistants and substitutes, must complete FXG-approved training, submit a "suitable" contractor/driver information sheet, have a "satisfactory" work history, and pass a physical exam by an FXG-approved physician. (OA Safe Driving Pgm., Driver Eligibility Reqs. ¶¶3, 11, 12, 15). FXG also offers no evidence to refute its policies which require drivers to obtain approval before hiring. *See* CRL-566 setting forth "authorization process for non-driving helper" (Doc. 1197 Exh. 2:213); CRL-551 setting forth approval process for drivers (*id.* Exh. 2:147-154); MyGroundBiz.com FXG website for drivers instructing them, "It is essential that FedEx Ground contractors utilize only approved helpers consistent with [regulations] and the Operating Agreement" (Doc. 1812 Exh. 15:190). Recently, FXG has again shown its right of control by instituting Addendum 10, which undisputedly requires that drivers treat any helpers as employees and provide FXG with documentation and proof of immigration status. (SGI 49).

FXG's assertion that plaintiffs were "able to hire others to work for them and decide, for instance, how much to pay them" (FXG Brief at 9), is misleading and irrelevant. FXG omits to mention whether FXG required that the drivers obtain approval before hiring, as FXG's policies mandate. Moreover, the material issue is not whether in a particular instance FXG exercised

control, but rather whether FXG retains the right to do so. *Nordling v. Johnston,* 283 P.2d 994, 1001 (Or. 1955) ("[it is] not the actual exercise of control ... but the right to interfere"). FXG's own documents show beyond dispute that FXG has reserved these rights.

This case is in stark contrast to Lockard v. Murphy Co., 619 P.2d 283 (Or. Ct. App. 1980), cited by FXG, in which the plaintiff "was free to hire assistants to help him in his business at any time without defendant's consent or approval." Id. at 285 (emphasis added).[3] Compare NLRB v. Deaton, Inc., 502 F. 2d 1221, 1226-27 (5th Cir. 1974) (employment found where control not limited to "forbidding the hiring of persons legally disqualified from driving commercial motor vehicles under federal regulations" but extended to "subjective, employer-like" inquiries); *Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327, 337 (Cal. Ct. App. 2007)* ("FXG has discretion to reject a driver's helper [or] temporary replacement").

### 3. FXG Retains the Right to Control How Drivers Make Daily Deliveries

FXG has not refuted the evidence showing its right to control the drivers' day-to-day duties. (SGI 82-106).[4] Because they overwhelmingly establish FXG's right to control the methods by which the drivers pickup and deliver, FXG all but ignores these facts in its brief, implicitly conceding FXG's broad reservation of rights. Instead, FXG attempts to characterize its controls as limited to ensuring that drivers accomplish "results" in order to meet customer expectations. But FXG has reserved the right to control not merely *whether* drivers pickup and

[3] In *Brown*, 994 P.2d 1231, the court did not analyze the issue or rely on it; thus, the case is of little help to FXG.

[4] FXG's lengthy attempts in the SGI to dispute these detailed controls are baseless. For example, at SGI 82, FXG claims to dispute the plain language of the FXG's check-out routine described in FXG's policies CKO-102, CKO-151 and RIBD-432 by arguing that there are "operational variations" at some locations and that FXG's "Daily Supply Checklist" for drivers does not identify items that drivers "need" because not all drivers carry extra batteries with them, despite the fact that FXG has listed them on the checklist. At SGI 87, FXG attempts to dispute a direct quote from its own witness. At SGI 92, FXG spends almost a page and a half trying to evade the plain quoted language of its driver release policy. At SGI 101, FXG responds by arguing about whether the undisputed provisions of FXG's Premium Services policy "create a right" or supply "common evidence." Far from showing a genuine dispute for trial, FXG's SGI simply seeks to cloud the record and exceed the Court's page limits for briefs.

deliver packages, but *how* they do it. And FXG's asserted motivation does not exempt these controls from scrutiny. *Wallowa Valley*, 386 P.2d at 434 (review of delivery driver's work to address customer expectations evidence of right to control); *Collins v. Anderson*, 596 P.2d 1001, 1003 (Or. Ct. App. 1979) (fact that subcontractor checked installers' work to ensure it would satisfy general contractor indicated subcontractor's right to control installers). The OA undisputedly gives FXG control over the process of delivering packages (*e.g.,* OA Background and §§1.4-1.5, 1.8, 1.10-1.12, 1.14, 5), and FXG's extensive policies and procedures specify in detail how drivers are to accomplish that task down to the minutest details, including how drivers check-out in the morning, what paperwork they fill out, what codes they enter into the scanners at what times, how they mark undeliverable or COD packages, and how they check-in at the end of the day (SGI 82-106; *see generally* Doc. 1197 Exhs. 2-3). FXG reinforces these work methods through trainings, pocket guides and a regular barrage of newsletters and online materials that FXG asks drivers to review. (SGI 66-81, 233). *Compare HDG Enter., Inc. v. Nat'l Council on Comp. Ins.*, 856 P.2d 1037 140 (Or.App.1993) (right to control evidenced by ability to dictate that work be done in accordance with hiring party's specifications) *with Oregon Drywall Sys., Inc. v. Nat'l Council on Comp. Ins.*, 958 P.2d 195, 198 (1998) (no right to control where "subcontractors were not instructed as to the details of how to complete the job").

These detailed work rules are a far cry from *Reforestation Gen. Contr., Inc. v. Nat'l Council on Comp. Ins.*, 872 P.2d 423, 432 (Or. Ct. App. 1994) (cited by FXG), where the consultant "retained no control over the methods employed by the loggers or the manner in which the loggers performed their duties" and the loggers only had to "use 'appropriate equipment' and perform the designated work 'in accordance with good forestry practices.'" Similarly, in *EEOC v. North Knox School Corp.*, 154 F.3d 744 (7th Cir. 1998), cited by FXG, the

only controls the school district exercised over the drivers were "dictated by statute." *Id.* at 747-49. Without control by the principal, it was easy for the court to find that the bus drivers were independent contractors. *Id.* at 749-50.[5]

FXG's attempt to distinguish *Rubalcaba v. Nagaki Farms*, 43 P.3d 1106, 1110 (Or. 2002) and *Bowser v. State Ind. Accident Comm'n*, 185 P.2d 891, 898 (Or. 1947) falls flat. (FXG Brief at 10). Just like the drivers in those cases, FHD drivers must pick up and deliver every package FXG assigns every day, whether in their service area or not. (FHD OA §1.10(a) [requiring drivers to provide service in own area *and* "in such other areas as Contractor may from time to time be asked to service"]). Ground drivers too must pick and deliver every package, every day in their service area, and the 99.9% who participate in the flex program must do any work FXG assigns outside their as well. (SGI 85).[6] The supposed voluntariness of the flex program at Ground does not under-cut or even minimize the controls FXG has the right to impose on the 99.9% who participate.[7] Further, FXG's plenary authority to "flex" and reassign packages and to reconfigure any service area "in its sole discretion" on five days notice (OA § 5.2) makes the service areas themselves essentially meaningless. Anecdotes from a few of drivers about how they load their vehicles or swap packages or decide where to turn left or right (*see* FXG Brief at 10-11), could not lead a jury to find that FXG has forgone the right to control how the work is

[5] Moreover, unlike some jurisdictions, in Oregon controls deriving from the law should not necessarily be excluded from consideration under the right to control test. *See Brown*, 994 P.2d at 1235 (state regulations requiring control and supervision could lead jury to find employee status).

[6] CEO Sullivan testified: "*Q. ...a contractor does not have the right under the operating agreement to refuse packages that the terminal manager has assigned to his or her route for the day, does he? A. If they're in the work area, he has a responsibility to deliver. ... Q. Let's assume a contractor signs up for the flex program... that individual has no right to turn down a package that is assigned to him by the terminal manager whether it's in or outside his work area. Correct? A. That's fair to say.*" (Doc. 1197 Exh. 8:980-982).

[7] FXG also claims that "whether packages exceed the volume a contractor can handle is decided by the contractor and manager together." (FXG Brief at 11 citing Exh. A:755-56). But the testimony cited points to a few unspecified instances when a terminal manager and driver supposedly decided to alter the number of stops. The witness did not testify that managers must make such decisions jointly or even that any manager routinely does so.

performed, particularly in the face of FXG's massive collection of policies, not to mention FXG's systems of training, supervision and enforcement discussed below.

Finally, FXG claims that the procedures in the Driver Release Program do not show FXG's right to control because they are "optional." But FXG concedes that it retains the right to require drivers to pay for lost items if they do not comply. (SGI 165). "Taking money out of the drivers' income" is one of "the most effective tools available" to ensure compliance with an employer's policies. *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1099 (9th Cit. 2008). Moreover, if the procedures were optional, there would be no reason to follow each driver on his or her route to see if he or she complies, as FXG's policies require managers to do. (SGI 163).

**4. FXG Retains the Right to Control Driver and Vehicle Appearance**

FXG does not and cannot refute the detailed controls imposed by the OA and FXG policy on driver and vehicle appearance. Again, FXG tries to dodge the undisputed facts by asserting without any evidence that the purpose is to promote good brand recognition. Setting aside the facts that the only brand being promoted is FXG's, FXG's purpose is immaterial. *Brown v. NLRB*, 462 F.2d 699, 703 (9th Cir. 1972) (no matter the purpose or benefits, "[the] means used and the respective controls in accomplishing [a company's] goals are ... highly material to the ultimate determination of employee or contractor status."). The right to control mundane details such as appearance (*e.g.*, dark socks, no bumper stickers) is powerful proof of the right to control how the drivers do the work. (SGI 107, 113). FXG also does not legitimately dispute that its managers have the ability to prevent drivers from servicing routes or to "deadline" a truck that does not meet appearance standards. (SGI 110).[8] For example, FXG's training program for

[8] In trying to dispute Plainitffs' factual statement that "FXG managers may refuse to dispatch a driver who fails to meet FXG's appearance standards," FXG points to non-contradictory evidence and makes legal arguments, but tacitly concedes that refusing dispatch is an "option" available to managers. (SGI 110 at page 96). FXG's response to Plaintiffs' statement that "FXG reserves the right to take a vehicle out of service if it does not meet FXG's vehicle

managers instructs them that if a driver isn't groomed according to FXG's standards or in uniform, "Send them home." (Doc. 1197 Exh. 4:42-69). FXG's right of control is in contrast to the "limited control" permitted by the company over its sales force in *Schaff*, 45 P.3d at 104 ("defendant exercised no control over the manner in which Stockert conducted his business, other than the requirement that Stockert not sell competing products"). FXG's suggestion that there is no right to control because the appearance standards are not enforced in every single instance (pointing to evidence of one driver, *see* FXG Brief at 13) rests on the tired argument that this Court has repeatedly rejected. The "right to control" is the relevant inquiry, not its exercise.

### 5. FXG Retains the Right to Control Vehicle Selection

FXG does not deny that its policies require FXG approval of every vehicle and specify vehicle height, width, length, bumper height, interior shelving configuration, age, paint color, no bumper stickers and that the sides be plastered with FXG's logos, website and 1-800 number. (Doc. 1197 Exh. 2:1451-57; 3:62-69). FXG further cannot escape its interrogatory admission that it "determines which size and configuration of truck are appropriate for a particular route." (Doc. 1197 Exh. 9:17-18). There is no real dispute that FXG does not simply require drivers to use "appropriate equipment," as in *Reforestation Gen. Contractors*, 872 P.2d at 432.

Unable to point to a real dispute, FXG tries to manufacture one by pointing to the independent contractor jargon in Policy 007 and essentially arguing that this language means that the policies don't matter. (FXG Brief at 13-14). No reasonable jury could find that an organized and successful company like FXG promulgated and continuously updated thousands of pages of policies relating to contractors that no one was supposed to follow. (*See* Doc. 1197 Exhs. 2, 3). In any event, the boilerplate language in 007 is like the "independent contractor" label in the OA

---

appearance standards" also cites nothing contradictory. (SGI 123).

and should be disregarded where other evidence shows FXG's reserved rights of control. FXG's policies, including its detailed vehicle specifications, show FXG's right to control in spades. *See Friendly Cab*, 512 F.3d at 1099; *NLRB v. Amber Delivery Serv.*, 651 F.2d 57, 62 (1st Cir. 1981).

**6. Drivers Cannot Set Their Own Work Hours**

Plaintiffs have provided undisputed common proof that drivers do not set their own days and hours of work. FXG agrees that drivers must provide services on the days FXG has set. (FXG Brief at 15; SGI 131). FXG does not dispute that it engineers the routes to "fully utilize" each truck each day, meaning a package volume defined by FXG as deliverable in 9.5 to 11 hours. (SGI 133, 135-136).[9] FXG also does not dispute that it shifts packages between drivers daily to balance their workloads (*id.* 135-141), and requires drivers to comply with pickup and delivery "windows," which plainly impact the drivers' ability to determine work hours (*id.* 97-98, 142). Further, FXG cannot escape the admission of its CEO that drivers must return any packages to the terminal by a set time each day. (SGI 144). By controlling workloads on a daily basis, FXG controls schedules. *See* Restatement (Second) of Agency, §220 cmt. l, illus. 8.

Rather than dispute the facts, FXG tries to characterize these controls as merely addressing "results" based on the unsupported allegation that its customers want them. But "[a]ny employer's business is, in essence, directed by the needs of its customers." *Molina v. S. Fla. Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1283 (M.D. Fla. 2006) (identifying FXG's argument as circular). To adopt FXG's reasoning would be to preclude employee status in *every single case* where the business involves the sale of goods or services to customers. Oregon law

---

[9] FXG attempts to dispute these facts, but cites nothing that contradicts them. For example, while claiming to dispute that "FXG has tried to configure work areas to provide each driver between approximately nine and 11 hours of work per day," FXG concedes that it uses precisely these planning guidelines. (SGI 133). While claiming to dispute fact 138 quoting FXG's 9.5- to 11-hour daily flexing policy, FXG concedes that it "has a goal of providing each contractor with 9.5 to 11 hours of work each day." (*Id.* 138).

does not support such a conclusion. *See Wallowa Valley*, 386 P.2d at 434 (review of delivery driver's work to address customer expectations evidence of right to control). FXG's regime bears no similarity to *Cantua v. Creager*, 7 P.3d 693, 701 (Or. Ct. App. 2000), where the insurance agent could come and go as he pleased without accounting to anyone.[10] Rather, as in *Caudill*, 2009 WL 3335353, at *4, the drivers are employees because FXG, among other things, "specified the duties and frequency of performance."

**7. The OA Reserves to FXG the Right to Train, Supervise and Discipline**

FXG argues that it has no right to train, but rather an obligation to "familiarize" new drivers with "various quality service procedures." This is word play. FXG does not and cannot dispute that training is mandatory and that FXG has the right to decide what training is required (SGI 70), which provides powerful proof of employee status.

***Quality P&D Learning***: FXG does not dispute that its Quality P&D Learning (QPDL) Training was mandatory from 2004-2007 for new drivers without "six months verified experience as a driver of commercial motor vehicles similar to the type operated by the driver." (SGI 70; see also Doc. 1197 Exh. 5:310-743 [FXG's 433-page QPDL manual for drivers]). This policy provided FXG with substantial control through the ability to determine what is "similar." Nor does FXG dispute that its current program still covers pick-up and delivery methods including scanning, barcodes, driver release, call tags, C.O.D.s and service crossing. (SGI 73). That some drivers attended one training and some another is of no consequence, as FXG's

[10] *C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855 (D.C. Cir. 1995) is of no help to FXG. In *C.C. Eastern*, the company did not set specific work hours for the drivers, exercise any control over the drivers' dress, or require that vehicles driven be of any specific type, size, or color. *C.C. Eastern*, 60 F.3d at 858. As explained above and in plaintiffs' opening brief, the facts of this case are vastly different. FXG effectively controls the drivers' work hours, enforces a dress code, and requires their vehicles to comply with a comprehensive and detailed set of specifications.

unilateral ability to mandate training and to prescribe or alter its content at will supplies powerful common proof of its right to control how driver do their jobs.

***Business Discussions:*** FXG argues that "business discussions" are not mandatory and do not show supervision. FXG's own policies refute this. FXG policy states that formal communication between managers and drivers is "imperative," business discussions are "the only means by which this communication should occur," and "at least two business discussions" should be conducted "each fiscal year with each contractor." (SGI 160). FXG further does not dispute that if a driver refuses to participate, the manager must report the refusal to Contractor Relations (SGI 159), and FXG would consider such refusal to be a failure to "'cooperate with facility management'" in violation of OA §1.10(d), thereby making the driver "'a candidate to nonrenew'" his contract (SGI 58 [quoting Senior Vice President Michael Mannion]). FXG's executives testified to the situations requiring a business discussion, including the driver's failure to submit monthly maintenance forms, failure to meet vehicle appearance standards, failure to turn in paperwork at the end of the day, arriving at work out of uniform, and breach of the OA during a CSR — none of which concern the "end result." (SGI 157).

It is also clear that a business discussion is a disciplinary device, indistinguishable from any reprimand an employer would administer. According to FXG's presentation given to all terminal managers, business discussions should warn the driver of the potential for termination and then provide the proof to support a termination decision. (Doc. 1197 Exh. 4:1575-1581 [Business Discussion should try to "resolve the problem and prevent any future contract breaches" and "clearly explain the consequences if the contractor continues to fail to meet contractual objectives" and will be used to back-up a termination decision]). These facts compel a finding of employee status. *Bowser*, 185 P.2d at 897 ("Here if respondent did not perform

every part of his operation to the exact liking of the company, the company could say: 'You're through.' The effect of that power possessed by the company required respondent to conduct his operations at all time as it might please the logging company and its manager").[11]

***Customer Service Rides:*** While conceding its right to conduct them, FXG contends that Customer Service Rides ("CSR") do not constitute "supervision" because they occur "only" four times a year and are limited to verifying that the contractor is meeting standards in the OA. (FXG Brief at 17). Observing the contractor to verify whether he is complying with the OA's "standards of service" demonstrates supervision (and thus control) over the manner and means of performance. See NLRB v. Maine Caterers, Inc., 654 F.2d 131, 133 (1st Cir. 1981).

FXG does not dispute that the manager conducting the CSR must determine whether the driver is "careful, deliberate, and under control when driving and parking his or her vehicle," whether the driver is "polite," the number of minutes the driver spends at each stop, the approximate distance the driver must walk from the vehicle to delivery locations, whether the driver follows "proper exit routine," including whether the driver keeps "[o]ne foot in cargo area one foot in cab," then "pivot[s] and close[s] bulkhead door," and whether the driver performs this routine in 12 seconds.[12] (SGI 148-150). Nor does FXG dispute that managers must "count[] the number of steps the driver takes" while making deliveries. (SGI 150). All of these are supposed to be discussed with the driver either during or after the CSR. (SGI 152).

FXG cannot hide behind its recent unilateral policy revision that feedback during a CSR is "a recommendation." In the same policy, FXG instructs managers to hold business

[11] Real examples of business discussions are replete with threats of termination for non-compliance with FXG policies and thus show FXG's managers' understandings of their broad rights. *See generally* Doc. 1197 Exh. 12.

[12] FXG admits it trains managers to observe drivers' entrance and exit routines (SGI 150), but asserts that Policy-007 forbids managers from exercising control over the manner and means of drivers' work. However, there is no reference to 007 in the Customer Service Ride manual, PowerPoint presentation, or training video. *Id.* Besides, the general statements in 007 are meaningless in light of the specific and detailed controls in FXG's procedures.

discussions to address potential "contract breaches" during CSRs, which can be used to support and/or threaten termination. (SGI 153). FXG's euphemistic characterizations do not alter the only reasonable conclusion that FXG reserves the right to control manner and means.[13]

**8. FXG Controls the Drivers' Alleged "Entrepreneurial Opportunities."**

The undisputed facts establish that FXG retains the right to control drivers' routes, workloads, and abilities to expand, and can strip a driver of his or her supposed "proprietary interests" without compensation by non-renewing or terminating the driver. (OA §§5.2, 18; SGI 59, 195).[14] "By setting customer rates, and by regulating the volume of deliveries of each driver through assignment of geographic areas" (which FXG may reconfigure at will) and by reserving the right to determine the number of routes a driver may service, FXG "effectively controls the . . . primary determinants of [the drivers'] income." *Amber Delivery Serv.*, 651 F.2d at 63. The *Estrada* court "reject[ed] FedEx's contention that this is a "true entrepreneurial opportunity depending on how well the [drivers] perform." 64 Cal. Rptr. 3d at 337. FXG retains as much control over the drivers as any employer does over the compensation and work responsibilities of its employees.

That FXG may have permitted a few drivers to sell their routes is undisputed and irrelevant. As noted in Plaintiffs' opening brief, OA §18 makes plain that an "assignment" of a driver's contractual rights is only permissible *if*, in FXG's view, the driver is in "good standing" *and only* "to a replacement contactor acceptable to FXG as being qualified to provide services under [the OA]." While FXG says in its brief that drivers are "able to buy and sell routes without FXG's involvement" (FXG Brief at 18 citing FXG Fact OR-11), OR-11 simply states:

[13] Other examples of FXG's means of supervision and training not addressed at all by FXG in its brief include, but are not limited to, safety meetings (SGI 78-80); daily service planning (SGI 169-173); driver release audits (SGI 163-165); van service audits (166, 174); annual reviews (SGI 160), and vehicle security reviews (SUF 167).

"[c]ontractors buy and sell routes." Neither this fact nor the evidence it cites permits the reasonable inference that any driver has actually bought or sold without FXG's *involvement*, let alone that FXG has given up its right to require drivers to comply with OA §18.

FXG also does not and cannot dispute that its policies CRL-567 and CRL-571 require that a driver obtain "Supplemental Van Approval." (Doc. 1197 Exh. 2:215-217 and 233-236 [setting forth the steps for approval]; *see also* Doc. 1812 Exh. 15:116 [FXG website for drivers explaining steps for adding a supplemental, which include "Sign the Supplemental Van Request Form" and "Get approval by FedEx Ground."]). FXG's claim that "contractors are able to add supplemental drivers without management's permission or knowledge" is unsupported by FXG's own evidence. (FXG Brief at 18-19 citing O-13). OR-13 merely states, "[c]ontractors choose to add supplemental drivers." Again, neither this fact nor the evidence FXG cites could permit a reasonable jury to infer that FXG has given up the right to require management approval, as its policies require. FXG's evidence, which comes solely from the testimony of one low-level manager, merely states that through customer complaints, he became of a few drivers who, unbeknownst to him, had begun using a supplemental truck without permission. (Sherman Dep. at 182-183). Once again, FXG conflates the right to control with its exercise. [15]

**9. FXG Does Not Deny that the Drivers Perform Essential Services**

FXG does not deny that the drivers perform essential services, but argues that the factor "has no bearing here." Controlling authority establishes the opposite. *Wallowa Valley*, 386 P.2d at 434 (a finding that "an enterprise in an integral part of its operation makes regular use of the

[15] In citing *Merchants*, FXG omits the court's finding that the drivers would "suffer more from a loss of business than Merchants, ***which has no capital invested in its business***." 580 F.2d at 975 (emphasis added). Here, FXG supplies the entire billion-dollar infrastructure, including the computer network, more than 500 terminal and regional facilities, sorting equipment, all sales and marketing, millions annually in advertising to develop and serve the customer base, and customer service personnel to establish "its competitive position as a leading provider of business and residential money-back-guaranteed ground package delivery services." (SGI 10, 204-209, 97).

services of individuals over whom it reserves absolute economic control" weighs in favor of employee status); *see also Woody v. Waibel,* 554 P.2d 492, 496 (Or. 1976) (factors relating to the nature of the work can be considered "in deciding whether there was sufficient control to denominate the relationship as one of master and servant"); *Caudill*, 2009 WL 3335353, at *4-5 (finding employee status as a matter of Oregon law based in part on centrality of worker to business). This factor weighs entirely in favor of employment.

**B. The OA Reserves to FXG the Right to Terminate the Drivers at Will**

FXG acknowledges that the right to terminate at will provides strong evidence of the right to control, and fails to offer any admissible evidence to dispute that it retains the right to terminate drivers for any perceived service failure or contractual breach, whether material or not, and to non-renew for no reason at all. (OA §§11.2, 12.1(c); SGI 219). The breadth of the OA and FXG's power to interpret its vague "standards of service" give FXG the right to terminate without notice based not only on whether drivers pickup and deliver, but on FXG's subjective determination of *how* they do the work. (*E.g.,* OA §1.10(a)-(e), (h)). These give FXG authority to terminate at will. (SUF 56-57). *Estrada*, 64 Cal. Rptr. 3d at 336. *Compare Henn v. State Acc. Ins. Fund Corp.*, 654 P.2d 1129, 1131 (Or. Ct. App. 1983) (termination right restricted to whether sales representative made false, misleading or deceptive representations or failed to return materials and proceeds).

FXG argues that termination decisions may be challenged in arbitration, but the procedure is a sham. OA §12.3 allows FXG to choose the remedy for breach: reinstatement or a severance payment of the driver's net earnings remaining under the OA, a fraction of the value of continued employment to any worker. No other monetary remedies or attorneys' fees are

allowed. For this and other reasons, several federal courts have found the OA's arbitration provision to be substantively unconscionable and unenforceable.[16]

### C. FXG Controls the Supplies, Instrumentalities, Tools, and Infrastructure

FXG contends that because its drivers have to pay for the trucks and other items like the scanner and uniform, the drivers are independent contractors. To the contrary, FXG, not the drivers, indisputably owns and controls 1) the terminals, 2) the sorting equipment, 3) the package handlers (who are FXG employees), and 4) the scanners and connecting computer network. (SGI 6, 203-213).[17] FXG also does not dispute that it is the source of the more than 90% of the vehicles and is the source of other instrumentalities the drivers need to perform their work, i.e., uniforms, scanners, shipping documentation, insurance and fuel. (SGI 115-116).[18] The fact that FXG requires drivers to pay for and maintain vehicles, uniforms, and other equipment shows only one of the ways FXG benefits from its "independent contractor" sham.

Contrary to what FXG argues, the Restatement's "control of premises" factor considers the employer's relative investment in capital infrastructure. Restatement (Second) of Agency §

---

[16] *See* Doc. 1472, Exh. A (*Lucey v. FedEx Ground Package Sys., Inc.*, U.S. Dist. Ct., D.N.J., Civil No. 06:cv:3738 RMB, Opinion, (Doc. 42) at 18-19, filed 10/18/2007 (OA arbitration provision unconscionable); Exh. B (*Johnson et. al. v. FedEx Ground Package Sys., Inc.*, U.S. Dist. Ct., S.D. Cal., Case No. 01-CV-1795 BTM, Order Denying Motion to Dismiss and Compel Arbitration and Granting Motion to Sever, (Doc. 14), filed 1/15/2002 (same).

[17] The court in *Bowser*, cited by FXG, noted that ownership was "not conclusive evidence" of independent contractor status. 185 P.2d at 898 (internal citation and quotation marks omitted). FXG's citation to *Lockard* is puzzling. The plaintiff there was operating his own hauling business (for which he purchased his own tractor and trailer, adopted an assumed business name, applied for and received PUC plates, and was given operating authority to transport wood products) prior to being engaged by the defendant. 619 P.2d at 284-85. FXG's citation to *Cy Inv. Inc. v. Nat'l Council on Comp. Ins.*, 876 P.2d 805 (Or. Ct. App. 1994) is equally curious. There, the court found (with scant analysis) that the tavern dancers provided the only "equipment" necessary to perform their job – their costumes and music. Nonetheless, the court declined to give that factor dispositive weight. In fact, in remanding the case the court reiterated the well-established principal in Oregon that "any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation; while, on the opposite direction, contrary evidence as to any one factor is at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all." 876 P.2d at 808 (internal quotation marks and citation omitted).

[18] During most of the class period, FXG was contractually obligated to use its best efforts to have drivers lease vehicles from its preferred vendor, Bush Leasing Co. (SGI 116). FXG claims that it has outsourced its in-house fleet and suggests it will no longer order trucks; but its own witness confirmed that FXG will continue to order vehicles to specification, and merely use a vendor as a go-between. (SGI 115; Doc. 1358 Flesher Dep. at 46-47).

220, cmt. h, illus. 8 ("P is the owner of a coal mine employing miners. He provides them with the larger units of machinery and the means of ingress and egress. The miners supply their own implements, the powder necessary, and their own helpers, being paid for each ton mined and brought to the surface. The miners, including the assistants, are the servants of the mine owner."). And, also contrary to what FXG claims at page 22, there is no dispute that FXG drivers do "actually use" the equipment and facilities that FXG provides – the terminals, trucks, scanners and connecting computer network, uniforms, shipping documentation, insurance, fuel and package handling. (SGI 24(c), (m), 34, 84, 86, 88, 90, 104, 106, 107).

**D. FXG Controls the Drivers' Compensation**

FXG does not dispute the fact that drivers are paid on a weekly basis. (SGI 37). FXG also offers no evidence to dispute that drivers are paid according to a formula that includes a fixed periodic payment, a rate per piece, and service-related bonuses. (SGI 36-37). Even the per-piece component depends (at least largely) on how many packages or stops FXG chooses to assign. (SGI 224). The fact that the drivers are paid at regular intervals based in part on set compensation supports a finding of employee status. *Compare Woody*, 554 P.2d 492, 494 n. 1 (employee "paid every two weeks and … up to 10 days prior to the date of pay") *with Lockard*, 619 P.2d at 287 (independent contractor hired and paid "on a per load basis") *and Reforestation Gen. Contractors*, 872 P.2d at 432 (independent contractors were either "paid on a flat bid basis" or "paid by the thousand board feet").

FXG counters that changes in pay are "negotiable" because a driver can refuse to sign the new pay addendum that FXG sets forth each year. (FXG Brief at 24). The undisputed evidence of this take-it-or-leave-it scenario does not permit an inference of "negotiation." (*See* SGI 36-37). FXG's own CEO expressly confirmed under oath that the annual pay changes are not

negotiable. (Doc. 1197 Exh. 8:830-831).[19] FXG's undisputed control over the flow of packages and route assignments is further means for retaining control over driver pay. (SGI 25, 29-30, 189-190). These facts showing that the rate and method of driver pay is under FXG's unilateral control indicate an employment relationship. *See NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 561-62 (3d Cir. 1962) (fact that employer "unilaterally [determines and] makes changes in the rate and method of compensation" indicates employee status); *Estrada*, 64 Cal. Rptr. 3d at 334 (drivers are "paid like FXG employees and receive many employee benefits").

**E. The Indefinite Duration of the OA Weighs in Favor of Employment Status**

Whether the worker's relationship with the hiring party is "open-ended" is a factor under Oregon law. Chard, 941 P.2d at 614; see also *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989) (employment shown by exclusive work of continuous, indefinite duration). It is undisputed that the OA's term is initially one to three years, but automatically renews, showing indefinite duration, not short-term or temporary work. (SGI 26, 56). It is no surprise that FXG's records show that drivers average five years of work (SGI 214), because FXG incentivizes long tenure (see OA Addendum 3 §IV [graduated bonuses for up to 15 years of service]). This factor weighs in favor of employment.[20]

**CONCLUSION**

For all the foregoing reasons, Oregon Plaintiffs' motion for summary adjudication should be granted.

---

[19] Sullivan's testimony was as follows: *"Q. There's a form of the [OA] addenda that every contractor executes every year. Right?... A. Are you talking about the change in settlement rates for instance? Q. Yes. The settlement addenda is a good example. A. What about that? Q. That's a form that every driver in the ground force executes on a yearly basis. Correct? A. Yes. Q. That's not negotiable. Right? A. Yes. Q. That's true on the home delivery side as well. Correct? A. Yes."* (Doc. 1197 Exh. 8:330 line 20 to 831 line 14).

[20] FXG cites *Brown* and *Schaff* in support of its argument, but in neither of those cases did the court hold that the duration of the relationships supported a finding of independent contractor status.

Dated: December 14. 2009

Respectfully submitted,
LEONARD CARDER, LLP

/s/ **Lynn Rossman Faris**

Lynn Rossman Faris
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

Steve D. Larson
David Rees
Joshua L. Ross
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 Southwest Oak Street, 5th Floor
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

**LEIGHTER OREGON PLAINTIFFS' COUNSEL**

case 3:05-md-00527-RLM -CAN document 1943 filed 12/17/09 page 1 of 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL CASES | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**JOINT MOTION FOR EXTENSIONS OF TIME TO FILE: (1) DEFENDANT'S OPPOSITION TO PLAINTIFFS' "MOTION TO STRIKE FEDEX GROUND PACKAGE SYSTEM, INC.'S THIRD STATEMENT OF GENUINE ISSUES AND ADDITIONAL MATERIAL FACTS" AND (2) PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' "MOTION TO STRIKE FEDEX GROUND PACKAGE SYSTEM, INC.'S THIRD STATEMENT OF GENUINE ISSUES AND ADDITIONAL MATERIAL FACTS"**

Pursuant to Rule 6.1 of the Local Rules for the United States District Court for the Northern District of Indiana, plaintiffs and defendant FedEx Ground Package System, Inc. ("defendant") hereby jointly request a brief extension of time in which to file: (1) defendant's opposition to plaintiffs' "Motion To Strike FedEx Ground Package System, Inc.'s Third Statement Of Genuine Issues And Additional Material Facts" [Doc. No. 1916] ("Motion to Strike"); and (2) plaintiffs' reply in support of their Motion to Strike. The parties' jointly request these extensions in order to avoid scheduling conflicts, including those with respect to the filings

required by the remaining summary adjudication briefing deadlines for actions in Waves IV and V.

The proposed extensions are brief. They would move FedEx Ground's opposition from its current deadline of December 31, 2009 to January 15, 2010, and would move the plaintiffs' reply from its current deadline of January 7, 2010 to January 29, 2010. The parties' request is not made for the purpose of delay, and no party will be prejudiced if the Court grants this joint motion.

WHEREFORE, pursuant to the parties' agreement, the defendant and plaintiffs jointly request the Court to extend the deadline for defendant to file its opposition to plaintiffs' Motion to Strike to January 15, 2010 and to extend the plaintiffs' deadline to file their reply in support of their Motion to Strike to January 29, 2010.

Dated: December 17, 2009

Respectfully submitted,

By: /s/ Chris A. Hollinger
Chris A. Hollinger

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Chris A. Hollinger
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 17th day of December, 2009, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/_ Chris A. Hollinger__
Chris A. Hollinger

SF1:784013.1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL CASES

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

ORDER

This court GRANTS the parties' joint motion for extension of time to file defendant's opposition to plaintiff's motion to strike FedEx's third statement of genuine issues and additional material facts and plaintiffs' reply in support (doc. # 1943). The defendant shall have until January 15, 2010 to file its opposition brief to the plaintiff's motion to strike (doc. # 1916) and the plaintiffs shall have until January 20, 2010 to file their reply brief.

SO ORDERED.

ENTERED: December 21, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S DECEMBER 4, 2009 RULING REGARDING PRODUCTION OF SEPTEMBER 2009 NOTICES OF PROPOSED ADJUSTMENT AND RELATED CORPORATE DESIGNEE DEPOSITION**

Plaintiffs hereby move this Court for a two-week extension of time, to and including January 19, 2009, for Plaintiffs to file their Response to Defendant's Motion for Reconsideration of the Magistrate Judge's December 4, 2009 Ruling Regarding Production of September 2009 Notices of Proposed Adjustment and Related Corporate Designee Deposition.

In support of this motion, Plaintiffs state as follows:

1. Plaintiffs' response brief is currently due on January 4, 2009;

2. Plaintiffs seek a two-week extension to file their brief due to counsel's family commitments over the holidays and other January briefing deadlines in this case;

3. FXG agrees to and does not oppose the extension of two weeks for Plaintiffs to file their response brief; and

case 3:05-md-00527-RLM -CAN document 1949 filed 12/22/09 page 2 of 7

4. This request is not made for the purpose of delay and no party will be prejudiced if the Court grants this motion.

WHEREFORE, pursuant to the parties' agreement, Plaintiffs' seek two weeks, to and including January 19, 2009, to file their response memorandum with the Court.

Dated: December 22, 2009

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

Lynn Rossman Faris
Eleanor Morton
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel: (510) 272-0169
Fax: (510) 272-0174
Email: lfaris@leonardcarder.com
emorton@leonardcarder.com

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
Email: rharwood@hfesq.com

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650
Email: agostino@aaklaw.com

**PLAINTIFFS' LIAISON COUNSEL**

case 3:05-md-00527-RLM -CAN document 1949 filed 12/22/09 page 3 of 7

**CERTIFICATE OF SERVICE**

I, Susan E. Ellingstad, hereby certify that on December 22, 2009, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **Peter J. Agostino** | agostino@aaklaw.com; trybula@aaklaw.com |
| **Robert G. Ames** | rgames@venable.com |
| **George A. Barton** | gab@georgebartonlaw.com; renee@georgebartonlaw.com; stacy@georgebartonlaw.com |
| **Jeffrey A. Bartos** | jbartos@geclaw.com |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com |
| **David M. Cialkowski** | dmc@zimmreed.com |
| **Jerald R. Cureton** | jcureton@curetonclark.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Robert E. DeRose, II** | bderose@bnhmlaw.com; ameige@bnhmlaw.com; egordon@bnhmlaw.com; sbaith@bnhmlaw.com |
| **Robin Dean** | rdean@omm.com |
| **Edward J. Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn Rossman Faris** | lfaris@leonardcarder.com; emorton@leonardcarder.com; lbadar@leonardcarder.com; bross@leonardcarder.com; aahn@leonardcarder.com |
| **Robert K. Firsten** | rfirsten@abbottnicholson.com |
| **Edward R. Forman** | eforman@marshallandmorrow.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; Andrew.murphy@bakerd.com |
| **Mark A. Friel** | mfriel@stollberne.com |

| | |
|---|---|
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; cronan@sgb-law.com; luk@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **Larry A. Golston, Jr.** | larry.goldston@beasleyallen.com |
| **Eileen S. Goodin** | egoodin@bnhmlaw.com |
| **Michael Gorby** | mgorby@gorbypeters.com |
| **Deborah R. Grayson** | drgrayson@fuse.net |
| **Robert K. Handelman** | rhandelman@bnhmlaw.com |
| **Robert I. Harwood** | rharwood@hfesq.com |
| **Chris A. Hollinger** | chollinger@omm.com |
| **Matthew M. Houston** | mhouston@hfesq.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com |
| **Soye Kim** | skim@geclaw.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@stollberne.com; dcerdas@stollberne.com; kdunn@stollberne.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@llrlaw.com; mhorwitz@llrlaw.com; hlichten@llrlaw.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **John S. Marshall** | jmarshall@marshallandmorrow.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Bruce H. Meizlish** | brucelaw@fuse.net |
| **Sanford A. Meizlish** | smeizlish@bnhmlaw.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Eleanor Morton** | emorton@leonardcarder.com; aahn@leonardcarder.com |
| **James Mulroy, II** | mulroyj@jacksonlewis.com; edwardsj@jacksonlewis.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Jeffrey S. Nestler** | jnestler@omm.com |

**Ian Otto** iotto@straus-boies.com; cle@straus-boies.com; ecf@straus-boies.com

**Peter W. Overs Jr.** povers@hfesq.com

**Lesley A. Pate** lapate@venable.com

**Mary Donne Peters** mpeters@gorbypeters.com; mmcgee@gorbypeters.com

**Richard T. Phillips** flip@smithphillips.com; tresahharden@smithphillips.com

**D. Lucetta Pope** Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com

**Nora M. Puckett** npuckett@omm.com

**Charles Victor Pyle, III** victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com

**Anne T. Regan** atr@zimmreed.com; stefanie.hebig@zimmreed.com

**Beth A. Ross** bross@leonardcarder.com; ksangren@leonardcarder.com; aahn@leonardcarder.com

**J. Gordon Rudd** jgr@zimmreed.com

**Robert M. Schwartz** rschwartz@omm.com

**James A. Staack** jims@staack-firm.com

**R. Jay Taylor Jr.** jtaylor@scopelitis.com; jwoolley@scopelitis.com

**Joni M. Thome** thome@halunenlaw.com

**Matthew T. Tobin** matt@sdtrustco.com; lenandlaura@iw.net

**Jeffrey A. Trimarchi** jtrimarchi@omm.com

**Scott Voelz** svoelz@omm.com

**Mary D. Walsh-Dempsey** mdempsey@omalleylangan.com

**Michael J. Watton** jdrewicz@Wattongroup.com; vgaroukian@wi.rr.com

**Peter D. Winebrake** pwinebrake@winebrakelaw.com

I also certify that on December 22, 2009, I mailed by United States Postal Service the foregoing documents to the following non CM/ECF participants:

J. Allen Brinkley
John A. Brinkley, Jr.
BRINKLEY & CHESNUT
P.O. Box 2026
Huntsville, AL 35804

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Robert J. Penny
WICK BRAMER UKASICK &
TRAUTWEIN LLC
323 South College Avenue
PO Box 2166
Fort Collins, CO 80522

Steve Dennis
REID & DENNIS
Providence Tower
5001 Spring Valley Road, Suite 255W
Dallas, TX 75244

William S. Hommel, Jr.
WILLIAM S. HOMMEL, JR., PC
1402 Rice Road, Suite 200
Tyler, TX 75703-3230

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Salvatore G. Gangemi
GANGEMI LAW FIRM, P.C.
82 Wall Street, Suite 300
New York, NY 10005

Robert A. Garcin
LAW OFFICES OF ROBERT A. GARCIN
210 East 29th Street, #A
Loveland, CO 80538

Todd O'Malley
O'MALLEY & LANGAN, P.C.
426 Mulberry Street, Suite 104
Scranton, PA 18503

Andrew J. Kahn
MCCRACKEN, STEMERMAN &
HOLSBERRY
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102

Steven M. Kelso
WHEELER TRIGG KENNEDY LLP
1801 California Street, #3600
Denver, CO 80202

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX 78701

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

B. James Fitzpatrick
FITZPATRICK SPINI & SWANSTON
838 S. Main Street, Suite E
Salinas, CA 93901

Patricia A Sullivan
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908

Michael J. Puma
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921

Dated: December 22, 2009

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

**s/Susan E. Ellingstad**

Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
Email: seellingstad@locklaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION )
------------------------------------------------------------ )
THIS DOCUMENT RELATES TO: )
ALL ACTIONS )

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

ORDER

This court GRANTS the plaintiffs' unopposed motion for extension of time to file a response to FedEx's motion for reconsideration of the Magistrate Judge's December 4, 2009 discovery ruling (doc. # 1949). The plaintiffs shall have until January 19, 2009 to file their response brief.

SO ORDERED.

ENTERED: December 23, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CAUSE NO. 3:05-MD-527 RM
(MDL-1700)

ORDER

This court GRANTS the plaintiffs' unopposed motion for extension of time to file a response to FedEx's motion for reconsideration of the Magistrate Judge's December 4, 2009 discovery ruling (doc. # 1949). The plaintiffs shall have until January 19, 2010 to file their response brief.

SO ORDERED.

ENTERED: December 23, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

OPINION and ORDER

Magistrate Judge Nuechterlein granted the plaintiffs' amended motion to compel production of the IRS Draft Notice of Proposed Assessment produced to FedEx from the IRS and to depose one of FedEx's corporate designees with respect to the NOPA [Doc. No. 1581]. FedEx objects to this decision pursuant to Federal Rule of Civil Procedure 72(a) and asks the court to set aside the Magistrate Judge's order. For the reasons that follow, the court DENIES FedEx's motion to reconsider.

## I. Procedural Background

In February 2006, the plaintiffs served their first set of requests for production of documents on FedEx, which included a request for any documents relating to decisions from agencies such as the IRS, as well as any documents received from any governmental agency regarding the status of FedEx drivers. FedEx objected, and the parties conducted meet and confer sessions in regard to

the scope of plaintiffs' tax-related document requests. During the next several months, the parties agreed that FedEx would produce "determinations from any state or federal agency which have decided the issue of whether individuals providing pickup and delivery services for FedEx Ground are independent contractors or employees." The agreement further provided that FedEx would "produce these determinations even though they may be on appeal or otherwise subject to challenge."

In July 2006, FedEx moved to compel the production of the plaintiffs' tax returns and related financial information. FedEx argued that the tax returns were relevant and probative to the issues of FedEx's potential liability and the propriety of class certification. The plaintiffs opposed the request, claiming that FedEx had forced them to file their tax returns as independent contractors, so their returns weren't relevant as admissions of employment status. Magistrate Judge Nuechterlein agreed and denied the motion to compel, finding that the tax returns weren't discoverable on the issues of liability or class certification. FedEx moved to reconsider, arguing that the Magistrate Judge incorrectly required it to demonstrate a compelling need for the returns. The court disagreed that the Magistrate Judge's order required such a showing and clarified that the Magistrate Judge's order stated that tax returns are generally discoverable "where a litigant tenders an issue as to the amount of its income" and that because tax returns have some character of confidentiality, they "must be relevant and material to the matters in issue," before production is required. [Doc. # 451, p. 3]. This court

agreed with the Magistrate Judge's conclusion that the information in the plaintiffs' tax returns had little bearing on class certification, but found that the returns were relevant to determining the economic reality of the plaintiffs' working relationship with FedEx. Accordingly, the court granted the motion to compel in part as to those plaintiffs who alleged FLSA or FMLA claims, which require the application of the economic realities test to determine employment status. Pending before this court is FedEx's motion to reconsider that order in light of a recent Seventh Circuit decision (doc. # 1714).

On December 21, 2007, FedEx informed the SEC and its shareholders in its 10-Q Report that the IRS had audited FedEx Ground's 2002 tax return and tentatively concluded that its drivers should be reclassified as employees for federal income tax purposes. FedEx released this information after receiving a draft Notice of Proposed Assessment ("NOPA") from the IRS audit field team in December 2007. The draft NOPA involved an ongoing IRS field audit of FedEx's 2002 tax return examining the drivers' classification status. Following FedEx's disclosure of the existence of the draft NOPA, the plaintiffs requested a copy, but FedEx declined to produce it on the grounds that the NOPA wasn't a determination which would fall within the scope of the parties' 2006 discovery agreement and because it was protected by the taxpayer privilege. The plaintiffs also sought to reopen the deposition of Sallie Ford, FedEx's 30(b)(6) witness who oversees tax audits at FedEx Ground, to question her about new developments

with regard to the IRS audit, the NOPA, and the meeting FedEx announced it planned to conduct with the IRS in 2008.

In March 2008, the court added a fifth wave of class certification briefing and allowed the parties to conduct limited discovery in conjunction with this wave. The plaintiffs served FedEx with a request for production of the NOPA as part of the fifth wave discovery, and FedEx continued to decline production. The plaintiffs moved to compel production of the NOPA and to conduct a second deposition of Ms. Ford.

On August 21, the Magistrate Judge granted the plaintiffs' motion, finding that the NOPA is relevant as it pertains to the main issue in this litigation: classification of FedEx's drivers. The Magistrate Judge also concluded that the plaintiffs' limited request complied with the court's scheduling order regarding fifth wave discovery, and even if the scheduling order didn't allow discovery on old issues, the plaintiffs established good cause to seek disclosure of the NOPA because it didn't come into existence until a year after the close of discovery. Next, the court addressed FedEx's argument that it is justified in not disclosing the NOPA because it is a confidential communication protected by the public policy against unduly burdensome disclosure of tax records. The Magistrate Judge pointed out that there is no special privilege that protects tax documents, so the court must weigh the relevance of the documents against the potential harm to FedEx by public disclosure. The Magistrate Judge concluded that the NOPA's relevance outweighed any harm to FedEx, particularly because FedEx had

case 3:05-md-00527-RLM-CAN document 1953 filed 12/28/09 page 5 of 13

previously placed the IRS's opinion of its driver model at issue by frequently relying on the IRS's 1995 Letter of Assurance. Moreover, the Magistrate Judge noted that the NOPA isn't available from another source, and the plaintiffs' request is limited to one document and a very narrow and targeted deposition of Ms. Ford. FedEx moved to reconsider.

After the Magistrate Judge issued the challenged order, the IRS informed FedEx of its decision to withdraw the draft NOPA and to continue its employment tax examination of the 2002 tax year with additional factual development and analysis. Then in October 2009, the IRS provided FedEx with its notice of proposed adjustment for the 2002 year proposing that no assessment of federal employment tax be made with respect to FedEx's drivers. In November 2009, FedEx received the IRS's determination in the form of two IRS Forms 2504-WC and 4666, confirming "that no assessment of federal employment tax would be made with respect to any independent contractors at FedEx . . . ." FedEx Ground produced Forms 2504-WC and 4666 to the plaintiffs, along with the now finalized and executed October 30, 2009 NOPAs. FedEx contends that these later determinations of the IRS confirm the tentative, draft, and non-final status of the prior draft NOPA that is currently at issue.

## II. Discussion

The court reviews the Magistrate Judge's order granting the plaintiffs' motion to compel under Federal Rule of Civil Procedure 72(a), which provides that

"[t]he district judge in the case must consider timely objections and modify or set aside any portion of the order that is clearly erroneous or is contrary to law." FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *see also* Weeks v. Samsung Heavy Indust. Co., Ltd., 126 F.3d 926, 943 (7th Cir. 1997). The clear error standard means that "the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made." Weeks v. Samsung Heavy, 126 F.3d at 943; *see also* Easley v. Cromartie, 532 U.S. 234, 243 (2001). An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." In re Comverse Tech., Inc. Sec. Litig., No. 06-CV-1825, 2007 WL 680779, at *2 (E.D. N.Y. March 2, 2007) (reviewing the magistrate judge's order appointing lead counsel in consolidated PLSRA action under the clearly erroneous or contrary to law standard) (citations omitted).

Under Federal Rule of Civil Procedure 26(b)(1), a party may "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things . . . ." FED. R.CIV. P. 26(b)(1). Relevance is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Chavez v. DaimlerChrysler Corp., 206 F.R.D. 615, 619 (S.D. Ind. 2002) (*quoting* Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)). District courts have broad discretion when deciding whether to compel discovery.

*See* Patterson v. Avery Dennison Corp. 281 F.3d 676, 681 (7th Cir. 2002); Sattar v. Motorola, Inc., 138 F.3d 1164, 1174 (7th Cir 1998). In ruling on a motion to compel, "a district court should independently determine the proper course of discovery based upon the arguments of the parties." Gile v. United Airlines, Inc., 95 F.3d 492, 496 (7th Cir. 1996).

FedEx alleges that the Magistrate Judge's ruling compelling it to produce the NOPA was clearly erroneous for several reasons. First, FedEx argues that the Magistrate Judge failed to consider the parties' 2006 agreement, which purportedly excluded the production of draft documents such as the NOPA. FedEx explains that the parties' good-faith discussions led to an agreement that FedEx need only produce "determinations" by a state or federal taxing agency that "have decided the issue" of whether the drivers are independent contractors or employees. Because the NOPA is labeled a "draft," FedEx contends that the document reflects only the initial views of IRS auditors and, therefore, isn't a "determination" as contemplated by the agreement. Instead, FedEx believes that it is only if the IRS agrees with the auditors' assessment in the NOPA and issues a "Notice of Determination of Worker Classification" that the proposed determination becomes final and is subject to production under the parties' agreement. FedEx contends that the finalized and executed October 30, 2009 NOPA further supports FedEx's argument that the NOPA at issue wasn't a determination but simply a draft proposal.

As the plaintiffs note, the parties didn't agree on a specialized, technical meaning of "determination." Instead, the language of the 2006 agreement provides that FedEx will produce agency determinations "even though they may be on appeal or *otherwise subject to change*." (emphasis added). The NOPA reflects the IRS field examination team's conclusions after a four-year audit of FedEx's tax returns.[1] That the NOPA is stamped "draft" or that FedEx may challenge the auditors' conclusions doesn't remove the NOPA from the parties' discovery agreement. FedEx argues that the draft NOPA falls outside the parties' agreement based on its preliminary and tentative nature, but the parties' agreement is ambiguous as to whether "draft proposals" are covered. Because the agreement is ambiguous, the court won't construe it so as to limit relevant and material discovery. FedEx notes that the agreement was extensively, carefully and painstakingly negotiated by the parties; if so, FedEx had the opportunity to specify that draft documents aren't included. The agreement is silent in this respect, but does specifically include determinations that are subject to change. A reasonable reading of the entire provision leads the court to conclude that the NOPA falls within the parties' discovery agreement. Accordingly, the lack of reliance on the

[1]FedEx argues that the draft NOPA doesn't reflect the IRS's position or even the position of the auditors who drafted the document. The court disagrees that a document drafted by auditors on behalf of the IRS doesn't reflect the IRS's position or its authors' position. While it clearly wasn't the IRS's final position on the issue, it was the IRS's preliminary position.

parties' 2006 discovery agreement doesn't render the Magistrate Judge's ruling clearly erroneous.

FedEx next argues that the Magistrate Judge applied the wrong standard of production to the NOPA by not recognizing the qualified privilege applicable to taxpayers' communications with the IRS. FedEx claims that even if the Magistrate Judge correctly decided that the NOPA is relevant, he erred in finding that its relevancy outweighs the countervailing privilege applicable to confidential communications with a taxing agency during the course of an investigation. This argument stems from FedEx's contention that the NOPA is a tentative proposal, and thus the Magistrate Judge should have discounted its relevance when balancing the hardships of production.

The Magistrate Judge applied the correct discovery standard to disclosure of the draft NOPA. The Magistrate Judge correctly noted that "though the NOPA is an IRS document, there is no special privilege that prevents a parties' documents created by or for the IRS from being discoverable." [Doc. # 1581, p. 5] (*citing See* Poulus v. Naas Foods, Inc., 959 F.2d 69, 74 (7th Cir. 1992). The Magistrate Judge noted, however, that "some Courts have recognized that some parties will be hesitant to provide accurate and complete information to the IRS if they are later forced to produce the tax information in judicial proceedings." [Doc. #1581, p. 5] (citation omitted). Consequently, "Fed[E]x may be relieved of its obligation to produce the tax documents if it can show that the relevancy of the tax documents is slight and it will be needlessly harmed by their public

disclosure." [Doc. #1581, p. 6]. As discussed, the Magistrate Judge properly applied the applicable law.

That the NOPA is a draft document doesn't make it undiscoverable or irrelevant to this proceeding. The court acknowledges the public policy against disclosure of tax returns to encourage honest and complete reporting to the IRS, but this public policy rationale doesn't apply equally to IRS audits. Because the IRS audit team doesn't merely rely on self-reporting when conducting its investigation, the same concerns aren't necessarily present when requiring disclosure of the NOPA as with tax returns. In any event, these public policy concerns aren't determinative as to the discoverability of tax documents. FedEx has placed the IRS's opinion of its driver model at issue in this litigation[2] and FedEx doesn't contend that the NOPA isn't likely to lead to discoverable evidence. Since the Magistrate Judge's order, the IRS has withdrawn the draft NOPA, confirming the tentative nature of the document and assessment. While the probative value of the NOPA may be lessened by its withdrawal, FedEx hasn't persuaded the court that the NOPA is no longer relevant or material. Draft documents often are relevant in determining how and why the final conclusion was reached. Given the relevancy of the IRS's analysis of driver classification, the

[2]FedEx maintains that the Magistrate Judge improperly equated the Letter of Assurance with the draft NOPA. As FedEx points out, the Letter of Assurance was a final determination, whereas the NOPA was a draft of a proposed determination. The draft NOPA therefore doesn't carry the same relevance as the Letter of Assurance. The Magistrate Judge, however, didn't equate the NOPA with the Letter of Assurance, but stated that by relying on the Letter of Assurance, FedEx placed at issue the IRS's opinion of its driver model. The court agrees.

plaintiffs are entitled to view the auditors' preliminary conclusions to better understand or refute the IRS's rationale in its final determination. The document is also likely to lead to admissible evidence as to the claims and defenses in this litigation. The Magistrate Judge properly concluded that production of the draft NOPA is reasonably calculated to lead to the discovery of admissible evidence and that its relevancy outweighs FedEx's privacy concerns and the public policy against disclosure of tax information. Further, the Magistrate Judge properly concluded that the plaintiffs have demonstrated good cause to seek its disclosure.

FedEx also contends that the Magistrate Judge applied a different standard in deciding the NOPA's discoverability than was previously applied to the plaintiffs' tax returns. FedEx claims that the Magistrate Judge denied its motion to compel discovery of the plaintiffs' taxpayer information because it wasn't "dispositive" or "relevant and material," but ordered that the NOPA was discoverable so long as it had bearing on the issues in the litigation. On reconsideration of the Magistrate Judge's order concerning the plaintiffs' tax returns, this court indicated that the Magistrate Judge properly concluded that the tax returns are discoverable when they are *relevant and material to the matters in issue*. [Doc. # 451, p. 3]. This court agreed with the Magistrate Judge that "where the hired party is provided with the tax form by their employer, the employee's subjective understanding as to his or her employment status isn't dispositive." [Doc. # 451, p. 4]. This court, however, overruled the Magistrate Judge's order in part, finding that the hired party's treatment for tax purposes will be relevant in determining claims arising under the

case 3:05-md-00527-RLM -CAN document 1953 filed 12/28/09 page 12 of 13

FLSA and FMLA, because these claims will require application of the economic realities test. As this court's analysis establishes, the question is whether the information is relevant and material to the case.

In addressing the plaintiffs' motion to compel the draft NOPA, the Magistrate Judge considered the heightened scrutiny applicable to disclosure of tax documents, stating that FedEx may be relieved of its obligation to produce the document if it can show that relevancy is slight and that it will be needlessly harmed by public disclosure. The Magistrate Judge reasoned that FedEx's privacy concerns are outweighed by the discovery's relevancy to issues in this litigation. The same relevancy standard was applied in both instances, even though the court reached a different conclusion when the request was for *all* plaintiffs' tax returns versus the draft NOPA. Because the draft NOPA is relevant and material to the matters in this litigation, it is discoverable.

The court affirms the Magistrate's order compelling production of the draft NOPA, and agrees that a *very narrow* and *targeted* deposition of Ms. Ford is warranted. The draft NOPA wasn't created until after Ms. Ford's deposition and the plaintiffs should be given a chance to depose Ms. Ford with respect to the draft NOPA and the IRS's subsequent determinations. The Magistrate concluded that "[t]he deposition shall **only** relate to issues generated from the NOPA and most recent IRS audits." [Doc. 1581, p. 7]. Given that the IRS audit has come to a final determination, it is appropriate to allow the plaintiffs an opportunity to depose Ms. Ford about these subsequent developments. *See* FED. R. CIV. P. 30(a)(2) and

26(b)(2). The court declines FedEx's request to place further limitations on the deposition.

## III. CONCLUSION

For the foregoing reasons, the court DENIES FedEx's motion to reconsider the Magistrate Judge's August 21, 2008 order [Doc. No. 1601].

SO ORDERED.

Entered: December 28, 2009

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

OPINION and ORDER

In September 2006, Magistrate Judge Nuechterlein denied FedEx's motion to compel the production of the plaintiffs' tax returns. FedEx moved to reconsider the Magistrate Judge's order and on December 14, 2006, this court sustained FedEx's objection in part [Doc. # 451]. This court agreed with the Magistrate Judge that the tax returns weren't relevant and material to the plaintiffs' claims requiring application of the common law agency test used in ERISA cases for determining employment status, but found that they were relevant and material to the plaintiffs' claims requiring application of the economic realties test used in FLSA and FMLA cases. This court therefore found that the plaintiffs who asserted ERISA claims weren't compelled to produce their tax returns, but "those plaintiffs [who] allege[d] claims under the FLSA or the FMLA [were] compelled to produce their tax returns and other related financial information." [Doc. # 451, p.13]. FedEx asks this court to reconsider its ruling in light of a recent Seventh Circuit decision - Estate of Suskovich v. Anthem Health Plans of Va., Inc., 553 F.3d 559

(7th Cir. Jan. 22, 2009) - discussing the relevancy of tax status and tax returns when determining employment status under the common law agency test. For the reasons that follow, the court denies FedEx's motion to reconsider.

## I. Background

The over-arching issue in this litigation is the classification of FedEx delivery drivers as independent contractors or employees. In July 2006, FedEx moved to compel the production of the plaintiffs' tax returns and related financial information, arguing that the documents are relevant in determining this issue. The plaintiffs opposed the request, claiming that FedEx had forced them to file their tax returns as independent contractors, so their returns weren't relevant as admissions of employment status. Magistrate Judge Nuechterlein agreed and denied the motion to compel, finding that the tax returns weren't discoverable on the issues of liability or class certification. FedEx moved to reconsider, arguing that the Magistrate Judge incorrectly required it to demonstrate a compelling need for the returns. The court disagreed that the Magistrate Judge's order required such a showing and clarified that the Magistrate Judge's order stated that tax returns are generally discoverable "where a litigant tenders an issue as to the amount of its income" and that because tax returns have some character of confidentiality, they "must be relevant and material to the matters in issue," before production is required. [Doc. # 451, p. 3].

This court noted that a hired party's treatment for tax purposes can be a factor relevant in determining employment status under the common law agency test, which is generally equivalent to the Restatement (Second) of Agency § 220 test, applied in ERISA cases. [Doc. # 451, p.5] (*citing* Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318, 323 (1992) (determining employment status under the common law agency test for purposes of an ERISA claim); Mazzei v. Rock N Around Trucking, Inc., 246 F.3d 956, 964-965 (7th Cir. 2001)). The plaintiffs, however, have admitted that they filed their tax returns as "self-employed," and this court reasoned that any additional information contained in the tax returns isn't material. This court held: "[A]ny additional information contained in the tax returns isn't material in determining the plaintiffs' employment status for purposes of their ERISA claims since the additional information contained in the tax returns hasn't been put at issue under the common law agency test." [Doc. # 451, p. 6].

This court then considered the plaintiffs' claims arising under FLSA and FMLA, which require application of the economic realities test to determine employment status. The court agreed with FedEx that the plaintiffs' tax returns are relevant in analyzing one of the six factors of the economic realities test: the opportunity for profit or loss depending upon [the hired party's] managerial skill. [Doc. # 451, p. 7] (*citing* Secretary of Labor, U.S. Dept. of Labor v. Lauritzen, 835 F.2d 1529, 1534 (7th Cir. 1987)). Under this factor, the court looks at whether the plaintiffs have control over the essential determinants of profits in a business,

whether they have direct share in the success of the business, and whether their earnings depend upon their judgment or initiative. Dole v. Snell, 875 F.2d 802, 810 (10th Cir. 1989). This court concluded: "To the extent that plaintiffs' tax returns can show some plaintiffs were able to maximize profits by controlling costs via workers and subcontractors, or by utilizing business-associated tax benefits, or through other sources of income, this financial information can be relevant" for purposes of the economic realities test. [Doc. # 451, p. 10].

Three years after this court issued its ruling, the court of appeals decided Suskovich v. Anthem Health, noting that certain information in a hired party's tax returns was relevant in determining employment status under the Restatement test or common law agency test. FedEx asserts that the court of appeals' decision requires reconsideration of this court's December 2006 order in that respect.

## II. Discussion

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." Caisse Nationale de Credit Agricole v. CBI Indust., Inc., 90 F.3d 1264, 1269 (7th Cir. 1996) (citation omitted). A basis for reconsideration exists when there is a "controlling or significant change in the law or facts since the submission of the issue to the Court." Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been

heard during the pendency of the previous motion." Caisse Nationale De Credit Agricole v. CBI Indus., 90 F.3d at 1270 (collecting cases).

FedEx asks the court to reconsider its December 2006 order, arguing that Estate of Suskovich v. Anthem Health Plans of Va., Inc., 553 F.3d 559 (7th Cir. Jan. 22, 2009), represents a controlling change in the law and requires a finding that the *content* of the plaintiffs' tax returns — and not just the plaintiffs' tax status — is relevant when deciding whether a person is an independent contractor under the common law agency test set forth in Nationwide Mut. Ins. Co. v. Darden, 503 U.S. at 323. FedEx says that the court of appeals' ruling in Suskovich placed the content of tax returns at issue when examining both the "method of payment" and "belief of the parties" factors. FedEx notes that in determining that the "belief of the parties" factor weighed in favor of independent contractor status, the Suskovich court not only pointed out that the hired party's salary was reported on a 1099 form rather than a W-2, but also that his tax returns showed that he listed himself as self-employed, that he derived his income from his computer consulting business and that he claimed substantial business deductions. FedEx concludes that it should be entitled to review the content of the plaintiffs' tax returns for similar information; for example, to determine whether the plaintiffs derived income from a business (instead of employee wages), elected to take business deductions or took credits available to business owners.

FedEx also notes that in depositions taken after this court's 2006 order, numerous plaintiffs couldn't recall even the most basic aspects of their tax

returns, leaving FedEx without the ability to probe the plaintiffs on whether they intended to be employees or independent contractors. FedEx reasons that it is necessary to have the tax returns to analyze this factor, especially given that the information cannot be obtained from the deponents.

FedEx also filed a notice of supplemental authority in support of its motion to reconsider, citing to proceedings from a Washington state court in Anfinson, et al v. FedEx Ground Package System, Inc., et al., No. 04-2-39981-5SEA (King Cty. Super. Ct.), in which the trial court admitted information during trial relating to the plaintiffs' income tax returns on the issue of employment status. The Anfinson jury found that the class members were independent contractors based on a consideration of eight non-exclusive factors, including the opportunity for profit and loss based on managerial skill, the method of payment, and the parties' intent in creating the relationship. The Anfinson court ruled that, for privacy and other reasons, the tax returns themselves wouldn't be admitted into evidence, but the court permitted extensive cross-examination and other testimony, as well as demonstrative summaries, regarding information contained in the tax returns "relating to all aspects of the class members' work with defendant." The Anfinson court determined that the tax return evidence would have probative value with respect to several of the employment classification factors the jury was instructed to examine, including the belief of the parties regarding employment status.

The plaintiffs respond that making them produce voluminous, burdensome and private tax records at this late stage in the proceeding — when discovery has

closed and motions for summary judgment and adjudication on the question of the drivers' employment status have been fully briefed — would substantially delay resolution of this already lengthy and complicated MDL action and be extremely prejudicial to the plaintiffs. Further, the plaintiffs say Suskovich didn't announce a new rule on disclosure of confidential tax records, but followed settled law. The plaintiffs contend that nothing in Suskovich undermines this court's conclusion that because the plaintiffs have admitted that they filed their tax returns as self-employed truck drivers, "any additional information [in the tax records] isn't material" to determining their employment status under the common law agency test. As such, the plaintiffs reason that the specific income or deduction any plaintiff claimed as a result of his or her admitted self-employed status would be ancillary to the undisputed status itself and of no additional probative value. As to the parties' belief generally, the plaintiffs say they previously admitted to believing they would be independent contractors when they executed their contracts with FedEx.

As to the deposition testimony of drivers who couldn't recall basic aspects of their tax documents, the plaintiffs respond that the drivers' inability to recall doesn't undermine the plaintiffs' blanket binding admission that they all filed their income taxes as self-employed truck drivers while performing services for FedEx.

In response to FedEx's supplemental authority, the plaintiffs state that the unpublished and unreviewed rulings of a Washington state trial court and trial testimony supplies no basis upon which this court should reconsider its order.

The plaintiffs note that the judge in that case relied on Washington rules of procedure and substantive law and considered factors not included in the Restatement test. As such, the plaintiffs argue that the court's rulings in that case are inapposite.

A.

In Suskovich v. Anthem Health Plans, 553 F.3d at 561, Anthony Suskovich had performed computer programming services for Wellpoint/Anthem as a consultant. For tax purposes, Mr. Suskovich's salary was reported on a 1099 form rather than a W-2. Id. Wellpoint later advised Mr. Suskovich that it couldn't use Mr. Suskovich's services unless he was affiliated with one of its preferred vendors. Id. Mr. Suskovich entered into an "Independent Contractor Agreement" with defendant Trasys, Inc., one of Wellpoint's preferred vendors. Id. Although labeled an independent contractor agreement, it contained terms that could refer to both an employment relationship and an independent contractor relationship. Id. at 561-562. Mr. Suskovich continued to perform services for Wellpoint through Trasys and for tax purposes, Trasys also issued Mr. Suskovich a 1099 form rather than a W-2. Id. at 561.

The IRS began investigating Mr. Suskovich because of his failure to file tax returns for several years. Id. at 563. In response, Mr. Suskovich filed delinquent tax returns listing himself as a self-employed computer consultant and claiming that he derived his income from his computer consulting business. Id. He also

claimed substantial business deductions for his computer consulting business. Shortly after, Mr. Suskovich became ill and passed away. Id. His estate filed suit against the defendants to recover wages, benefits, and indemnification of tax liabilities, alleging that the decedent was the defendants' employee under common law, FLSA and ERISA. Id. The trial court determined that the decedent wasn't an employee, placing primary emphasis on the intent and belief of the parties. Id. at 564. The Estate appealed and the court of appeals affirmed.

The court of appeals noted that there are slightly different tests for determining employment status under the common law, FLSA and ERISA. Suskovich v. Anthem Health Plans, 553 F.3d at 565. The district court followed the test in Restatement (Second) of Agency § 220 and the court of appeals agreed that this was proper, noting that the Estate invoked the Restatement test and waived any argument that the broader FLSA standard applied. Id. at 565, n. 1. The court reasoned: "Given that the majority of the claims in this case revolve around the bare question of employment status and the Restatement test is generally equivalent to the common law test from [Nationwide Mut. Ins. Co. v. Darden, 503 U.S. at 323], that test provides the best means of resolving the main employment question before us." Id. at 561. Under the Restatement test, a court should examine the following ten factors:

> (1) the extent of control which, by the agreement, the master may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist

> without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; (10) whether the principal is or is not in business.

Id. at 565-566.

In conducting the employment analysis, the trial court focused primarily on the ninth factor — the parties' belief about a master/servant relationship. Suskovich v. Anthem Health Plans, 553 F.3d at 564. The court of appeals found that it was proper for the trial court to follow the parties' intent as expressed in the contractual agreement unless enough facts indicated the existence of a traditional employment relationship. Id. (*citing* Stone v. Pinkerton Farms, Inc., 741 F.2d 941 (1984)). "Since the Restatement test is a multi-factor balancing test, courts applying the test in an employment suit, cognizant of the freedom given to parties to create their relationship through contract, may choose to emphasize evidence that is especially probative of the parties' beliefs about the nature of the relationship." Id. at 564. Probative evidence includes "evidence of an explicit contractual definition of that relationship or evidence of the tax status of the relationship." Id.

The court of appeals reviewed the Restatement factors and decided that the extent of control weighed in favor of independent contractor status. Suskovich v. Anthem Health Plans, 553 F.3d at 566. When analyzing method of payment, the

court noted that this circuit has found that tax forms and tax returns are essential when deciding this factor, Id. at 568 (*citing* Taylor v. ADS, Inc., 327 F.3d 579, 581 (7th Cir. 2003); and Mazzei v. Rock N Around Trucking, Inc., 246 F.3d 956, 964-65 (7th Cir. 2001)), and that the issuance of 1099 forms indicates independent contractor status. Id. at 568 (citations omitted). The court deemed it significant that on his tax returns, Mr. Suskovich listed his income from a sole proprietorship and claimed business deductions related to that proprietorship. Id. Accordingly, the court held that even though Mr. Suskovich was paid hourly, that was insufficient to create an employment relationship given Mr. Suskovich's tax status and the representations he made in his tax returns. Id.

The court further held that the district court properly resolved the "belief of parties" factor in favor of independent contractor status because in his tax returns, Mr. Suskovich didn't list any wages from employment and claimed that he was a sole proprietor who derived his income from his computer consulting business. Suskovich v. Anthem Health Plans, 553 F.3d at 569. Further, his resume listed his occupation as an independent computer consultant and other evidence showed that he considered himself an independent contractor. Id.

Suskovich v. Anthem Health Plans establishes that a district court applying the Restatement test may choose to emphasize evidence that is especially probative of the parties' beliefs about their relationship's nature, such as the parties' contractual definition of that relationship or evidence of the tax status of the relationship. Further, the "method of payment" factor may collapse with the

"belief of the parties" factor when the hired party has specifically identified his or her income as "nonemployee income." The case also emphasizes previous case holdings stating that the hired party's tax status and certain information in tax returns may be relevant in determining these factors.

Suskovich, however, is distinguishable from the cases in this docket in material respects, and so doesn't require reconsideration of the order concerning discoverability of the plaintiffs' tax returns for claims applying the common law test. The Suskovich court focused primarily on the issuance of 1099 forms, Mr. Suskovich's representation on his tax return that he was a self-employed sole proprietor, and his election of business deductions related to that proprietorship. Such facts supported the conclusion that the "belief of the parties" factor weighed in favor of employee status. The plaintiffs in this case already have admitted that they filed their tax returns as self-employed truck drivers and haven't disputed that they believed they would be independent contractors when they executed their contracts. Additional information isn't needed to conclude that the plaintiffs held themselves out as independent contractors when filing their tax returns. Accordingly, in light of the plaintiffs' admissions, additional information obtained from a review of the plaintiffs' tax returns, such as the amount of business deductions taken by each plaintiff, isn't material in determining either the "method of payment" factor or "belief of the parties" factor.

Unlike in Suskovich, the plaintiffs in this case contend that they are employees because of the right to control FedEx reserved in the drivers' Operating

Agreement and commonly applicable FedEx policies. The Suskovich court ruled that the extent of control factor weighed in favor of independent contractor status, so the court went on to analyze the remaining factors to see if they established an employment relationship despite lack of control. The court learned they didn't, focusing heavily on the belief of the parties as the contract and tax documents stated. The court noted that the district court may follow the parties' intent as expressed in the contractual agreement unless enough facts indicate the existence of a traditional employment relationship. The plaintiffs in the cases in this docket maintain that the control reserved by FedEx in the Operating Agreement and commonly applicable FedEx policies is enough to establish that FedEx has the right, with respect to the class of drivers as a whole, to control the methods, manners, and means by which the drivers perform the contracted tasks, such as to make the drivers employees rather than the independent contractors the Operating Agreement and tax returns declare.

If the plaintiffs seek to prove employment status by introducing evidence of the parties' intent and subjective beliefs, the court likely would need to examine extrinsic individualized evidence, resulting in the reconsideration of this order and class certification. As it stands now, the relevancy of the contents of plaintiffs' tax returns to further show that they filed in conformity with self-employment and independent contractor status is of little probative value. The Magistrate Judge didn't clearly err in denying FedEx's motion to compel, given the confidential

nature of the tax returns and the burden in producing all the plaintiffs' returns during the liability stage of litigation.

Because Suskovich is readily distinguishable from this case and applies legal principles established before this court's 2006 order, it doesn't constitute a "controlling or significant change in the law" that requires this court to reconsider its order.

B.

FedEx further argues that the plaintiffs should produce the tax returns because during several of the plaintiffs' depositions, the deponents couldn't recall basic aspects of their tax returns and as a result, FedEx couldn't probe the plaintiffs' intent of employment status. The court agrees with the plaintiffs that their admissions that they filed taxes as self-employed individuals isn't undermined by the deponents' failure to recall the information in their tax documents.

C.

In a notice of supplemental authority filed in support of its motion to reconsider, FedEx cites to proceedings from a Washington state court in Anfinson, et al v. FedEx Ground Package System, Inc., et al., No. 04-2-39981-5SEA (King Cty. Super. Ct.). The trial judge in Anfinson permitted FedEx to present evidence concerning the plaintiffs' tax returns. The court found that the tax returns had

probative value with respect to several of the employment classification factors the jury was instructed to examine. FedEx notes that the standards for permitting discovery are more liberal than those for the admissibility of such information and that since the tax testimony was permitted at trial, similar evidence should be discoverable under Federal Rule of Civil Procedure 26.

A ruling from a trial court proceeding in Washington state court isn't a "controlling or significant change in the law" that would provide a basis for reconsideration. As the plaintiffs note, the trial judge in Anfinson was following Washington rules of procedure and substantive law, and while the court applied some of the factors from the Restatement test, it also applied other factors not included in that test. The Anfinson ruling is inapposite to this court's ruling.

## III. CONCLUSION

For the foregoing reasons, the court DENIES FedEx's motion to reconsider this court's December 14, 2006 order [doc. # 1714].

SO ORDERED.

Entered: January 5, 2010

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CHIEF JUDGE MILLER |

**UNOPPOSED MOTION OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC. TO WITHDRAW ITS MOTION FOR RECONSIDERATION OF THE MAGISTRATE JUDGE'S DECEMBER 4, 2009 RULING REGARDING PRODUCTION OF SEPTEMBER 2009 NOTICES OF PROPOSED ADJUSTMENT AND RELATED CORPORATE DESIGNEE DEPOSITION**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground") respectfully moves this Court to withdraw its Motion for Reconsideration of the Magistrate Judge's December 4, 2009 Ruling Regarding the Production of the September 2009 Notices of Proposed Adjustment and Related Corporate Designee Deposition (Doc. No. 1944, filed December 18, 2009). Plaintiffs do not oppose to this motion to withdraw.

This motion is made on the grounds that the Court's December 28, 2009 Order on FedEx Ground's motion for reconsideration of the "2008 NOPAs" (Doc. No. 1953) addressed substantially the same legal questions concerning the later-issued (and later-withdrawn) NOPAs and that, as a result, further consideration of the motion would likely require plaintiffs and the Court to expend unnecessary effort in its consideration. To avoid any such inconvenience, FedEx Ground requests permission to withdraw the motion. It does so without prejudice to or as

a waiver of the substance of its motion and without conceding that the documents are admissible for any purpose. FedEx Ground and plaintiffs are now discussing protections for the production of the subject documents and scheduling the requested deposition.

Dated: January 12, 2010

Respectfully submitted,

By: /s/Michael G. McGuinness
Michael G. McGuinness

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Michael G. McGuinness
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of January, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Michael G. McGuinness

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

ORDER

The court GRANTS FedEx Ground's unopposed motion (doc. # 1963) to withdraw its motion for reconsideration of the Magistrate Judge's December 4, 2009 ruling (doc. # 1944).

SO ORDERED.

ENTERED: January 13, 2010

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL CASES

CAUSE NO. 3:05-MD-527 RM (MDL-1700)

AMENDED ORDER

This court GRANTS the parties' joint motion for extension of time to file defendant's opposition to plaintiffs' motion to strike FedEx's third statement of genuine issues and additional material facts and plaintiffs' reply in support (doc. # 1943). The defendant shall have until January 15, 2010 to file its opposition brief to the plaintiffs' motion to strike (doc. # 1916) and the plaintiffs shall have until **January 29, 2010** to file their reply brief.

SO ORDERED.

ENTERED: January 19, 2010

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Chief Judge Miller<br>Magistrate Judge Nuechterlein |

**DECLARATION OF MATTHEW M. HOUSTON CONCERNING COMPLETION OF THE NOTICE PROCESS FOR CLASS CERTIFICATION (WAVES ONE THROUGH FIVE)**

I, MATTHEW M. HOUSTON, hereby declare as follows:

1. I am a partner with the law firm of Harwood Feffer LLP, one of the firms serving as co-lead counsel for plaintiffs in this action.

2. I respectfully submit this declaration to advise the Court of the completion of the class notice process following class certification of the national ERISA class and 28 state actions in Waves 1 through 5.

3. Pursuant to the Court's Orders (Docs. 1131, 1193, 1288, and 1848) concerning notification given to class members of their class membership and the right to opt-out of the various classes, the notice administrator, U.S. Bank National Association, under the supervision of Plaintiffs' Counsel, has followed the procedures as directed by this Court and provided notice to the various classes. U.S. Bank has also collected the opt-outs requested by members of each class.

4. The results of the notice process are summarized as follows:

| Class | Class Members | Opt-outs | Exhibit[1] |
|---|---|---|---|
| ERISA | 27,183 | 149 | A |
| Individual States (Total) | 20,193 | 247 | -- |
| Alabama | 425 | 2 | C |
| Arizona | 396 | 5 | V |
| Arkansas | 291 | 4 | D |
| California | 2,374 | 20 | E |
| Florida | 1,616 | 27 | F |
| Georgia | 974 | 24 | W |
| Indiana | 898 | 10 | G |
| Kansas | 479 | 5 | B |
| Kentucky | 311 | 2 | H |
| Louisiana | 345 | 16 | X |
| Maryland | 579 | 11 | I |
| Minnesota | 528 | 4 | J |
| Nevada | 275 | 2 | Z |
| New Hampshire | 213 | 2 | K |
| New Jersey | 968 | 3 | L |
| New York | 1,766 | 14 | M |
| North Carolina | 785 | 12 | Y |
| Ohio | 889 | 19 | AA |
| Oregon (*Slayman*) | 371 | 2 | N |
| Oregon (*Leighter*) | 373 | 9 | BB |
| Pennsylvania | 1,370 | 11 | O |
| Rhode Island | 120 | 1 | P |
| South Carolina | 331 | 3 | Q |
| Tennessee | 809 | 4 | R |
| Texas | 1,728 | 20 | S |
| Utah | 182 | 6 | CC |
| West Virginia | 120 | 3 | T |
| Wisconsin | 677 | 6 | U |

5. The opt-outs for the ERISA class represent approximately 0.55 of 1 percent of all eligible ERISA class members. The opt-outs for all of the state classes represent 1.22 percent of all eligible state class members.

[1] "Exhibit" references the exhibit letter used in the Declarations of Stephanie Moore Concerning Class Notification (Docs. 1957 and 1980) previously filed with the Court under seal. These exhibits include the names and addresses of all class members and op-outs.

6.      Plaintiffs' counsel, with the assistance of U.S. Bank, continues to monitor and work with the class lists to update class member contact information as needed.  Likewise, U.S. Bank continues to maintain the fedexclassactionlawsuit.com website to provide a contact point for class members and the public at large.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 21st day of January 2010 at New York, New York.


/s Matthew M. Houston
Matthew M. Houston

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

***(Huggins v. FedEx Ground Package System, Inc.*, 8th Circuit, Jan. 19, 2010)**

In support of their Motions for Summary Adjudication of Employment Status,[1] in opposition to FedEx Ground Package System, Inc's (FXG) Motions for Summary Judgment,[2] and in support of Plaintiffs' Motion to Amend the Classification Order in *Gray v. FedEx Ground Package System, Inc.*, Case No. 3:-5-cv-00337-RLM-CAN (Doc. 1326, Missouri),[3] Plaintiffs respectfully submit the attached decision of the U.S. Court of Appeals for the Eighth Circuit, *Huggins v. FedEx Ground Package System, Inc.*, Case No. 09-3144, 2010 WL 154883 (8th Cir. Jan. 19, 2010). The decision addresses whether a driver of a contractor in FXG's Linehaul

[1] Plaintiffs' motions for summary adjudication and supporting memoranda: Docs. 1153-1192 (filed April 25, 2008); Docs. 1295, 1299, 1303, 1307, 1313-14, 1320-21, 1328-29, 1335-1338 (filed June 2, 2008); Docs. 1792-1807 (filed Sept. 28, 2009); Docs. 1872-1873 (filed Oct. 30, 2009); Doc. 1971 (filed Jan. 13, 2010).

[2] Plaintiffs' briefs in opposition to FXG's motions for summary judgment: Docs. 1360-1362, 1364-1365, 1367-1374 (filed June 9, 2008); Docs. 1510-1513, 1515, 1517 (filed July 17, 2008); Docs. 1690-1691 (filed Dec. 22, 2008); Docs. 1888-1890 (filed Nov. 12, 2009); Docs. 1915 (filed Dec. 14, 2009).

[3] Doc. 1326.

division (not covered by this MDL) is an employee of FXG under the "right to control" test embodied in the Restatement (Second) of Agency and Missouri law.

The Eighth Circuit analyzed the "Linehaul Contractor Operating Agreement," including identical language to that in the Operating Agreement at issue here, and other facts substantially similar to those in the case at bar, and found that the district court erred in granting FXG's motion for summary judgment as to the driver's independent contractor status. The plaintiff had not moved for summary judgment. Specifically, the following aspects of the decision support Plaintiffs' motions and opposition briefs on employment status:

**1. Right to Control the Manner and Means of the Drivers' Work.**

- *Interpretation of independent contractor language in the OA:* Language in the OA concerning the parties' intent to create an independent contractor relationship and stating that the contractor has the power to "'direct the operation of the Equipment and … determine the methods, manner and means of performing the work'" does not compel a finding of independent contractor status. *Id.* at *4. "[G]eneral contract provisions that confer on a party discretion to determine the 'means and methods' for carrying out 'objectives' (language often used to describe the role of an independent contractor) will not trump provisions that actually reserve the right to control the details of that party's performance." *Id.*

- *Regarding the weight to give the parties' intent:*

> [T]he parties' characterization of the relationship is not controlling. The applicable considerations set out in §220(2) of the Restatement (Second) of Agency are far broader in scope, and list as only one factor out of many, "whether or not the parties believe they are creating the relationship of master and servant." Restatement (Second) of Agency §220(2). *Id.* at *5 (citation omitted).

- *FXG's vehicle and personal appearance standards:*

> The agreement states that [the contractor] will conduct its "business so that it can be identified as being part of the [FedEx] system" and that its operators will "[f]oster" FedEx's "professional image and good reputation." More specifically, "each person having contact with the public ... will wear a [FedEx]-approved uniform, maintained in good condition, and ... will otherwise keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time" by FedEx. The agreement also required [the contractor's] trucks to have FedEx insignia or "identify the Equipment as part of the [FedEx] system" and to be maintained "in a clean and presentable fashion free of body damage and extraneous markings." *Id.* at *4.

The court found that such terms required drivers to "look and act like FedEx employees while they performed FedEx services ... [and thus] show the extent of FedEx's control over some details of [the driver's] work" under the Restatement. *Id.*

- *FXG's service and safety procedures and daily paperwork requirements:*

> [T]he agreement states that FedEx will "familiarize" [the contractor] "with various quality service and safety procedures developed by [FedEx]," supporting an inference that [the contractor] and its drivers were required to follow FedEx's procedures. FedEx also reserved the right to monitor [the contractor's] safety practices; FedEx terminal personnel, "at their option," were permitted to "take a ... safety ride with contractor [or presumably the contractor's driver] to verify" compliance with standards in the agreement. Furthermore, drivers had to submit daily fuel receipts and daily shipping documents to FedEx. They also organized and returned undeliverable packages to FedEx…. *Id.* at *4-5.

- *Screening and background checks of second-van drivers:* The court held that, notwithstanding the fact that the contractor was required to pay the driver, withhold taxes and provide workers compensation, "documents showing that FedEx tested [the driver] and checked into his background before he was hired – would support a reasonable inference and thus a jury finding that FedEx had the right to control his performance." *Id.* at *6.

**2. Integration Factor.**

The court found that, under the OA, the driver was an integral part of FXG's core operation:

> [T]he agreement makes plain that [the contractor's] drivers performed work that was part of the regular business of FedEx, a fact that the Restatement lists as supporting the existence of a master/servant relationship. Restatement (Second) of Agency § 220(2)(h). For instance, the contract begins by stating that FedEx "is a duly licensed motor carrier engaged in providing ... transportation and delivery service" and that FedEx "wants to provide for package pick-up and delivery services through a network of nationwide terminals served by" what it terms "independent contractors." Unlike truck drivers engaged by other types of businesses, however, [the contractor and driver] performed work that was the essence of FedEx's business, namely, "transportation and delivery service." *Id.* at 4.

**3. The Tools, Instrumentalities and Place of Work Factor.**

The Eighth Circuit relied on evidence that "'FedEx provided the terminal and package processing facilities from which [the driver] was required to obtain his itineraries, depart and return trips" and that the driver "'obtained his itineraries from the FedEx ground dispatch office.'" *Id.* at *5. The fact that the Operating Agreement "expressed FedEx's intention to have [the contractor] and other contractors provide pickup and delivery services through a network of nationwide terminals" provided some evidence "that the terminals were essentially part of [the driver's] place of employment." *Id.*

**4. Duration of the Relationship Factor.**

The court held that the driver's three-year relationship with FXG suggested employee status. *Id.* at *5-6.

**5. Amending the Class Certification Order in *Gray v. FedEx Ground Package System, Inc.* (Missouri).**

Plaintiffs also offer the attached decision in support of their Motion to Amend the Class

Certification Order (Doc. 1326) in the Missouri case in this MDL – *Gray v. FedEx Ground Package System, Inc.*, Case No. 3:-5-cv-00337-RLM-CAN.

Dated: January 22, 2010

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor I. Morton**

ELEANOR I. MORTON, ESQ.
1188 Franklin St., Suite 201
San Francisco, CA 94109
Tel: (415) 771-6400
Fax: (415) 771-7010

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel: (574) 288-1510
Fax: (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

# EXHIBIT A



Only the Westlaw citation is currently available.

United States Court of Appeals,
Eighth Circuit.
Walter HUGGINS, Appellant,
v.
FEDEX GROUND PACKAGE SYSTEM, INC.; Teton Transportation, Inc.; Swanston Equipment Company, Appellees.
**No. 09-3144.**

Submitted: Nov. 10, 2009.
Filed: Jan. 19, 2010.

Appeal from the United States District Court for the Eastern District of Missouri.
Daniel B. Mathis, Kelly J. Curnutt, Arlington, TX, Michelle M. Funkenbusch, St. Louis, MO, for appellant.

Joseph R. Swift, John S. McCollough, Melissa R. Null, Thomas M. Ward, John G. Enright, St. Louis, MO, for appellees.

Before GRUENDER, ARNOLD, and BENTON, Circuit Judges.

ARNOLD, Circuit Judge.

***1** Esteban Gutierrez was driving a tractor-trailer bearing the insignia of FedEx Ground Package System, while Walter Huggins slept in the back of the truck; Mr. Huggins was injured when Mr. Gutierrez collided with the tractor-trailer in front of him, which Tony Johnston, an employee of Teton Transportation, was driving. Shortly before the collision, as he topped a hill, Mr. Johnston saw a Swanston Equipment pickup truck traveling slowly down the left shoulder of the highway and displaying a sign that read, "Left Lane Closed Ahead." Mr. Johnston slowed his truck, and, when the vehicle immediately in front of him came to a sudden stop, he applied his brakes and stopped about ten feet behind it. The Gutierrez tractor-trailer then collided with the back of the Teton vehicle. Mr. Huggins brought an action in Missouri state court for damages arising out of the collision and Teton removed it to federal district court.

The district court granted summary judgment to Teton and FedEx but denied summary judgment to Swanston. After obtaining an order designating the rulings in favor of Teton and FedEx as final judgments, *see*Fed.R.Civ.P. 54(b), Mr. Huggins appealed. We dismissed his appeal *sua sponte* for lack of appellate jurisdiction because of the unresolved claims against Swanston. *Huggins v. FedEx Ground Package Sys., Inc.*, 566 F.3d 771 (8th Cir.2009). On remand, the district court granted Mr. Huggins's motion to dismiss his claims against Swanston without prejudice and Mr. Huggins again appealed, challenging the orders granting summary judgment to Teton and FedEx on his negligence claims. We conclude that we have jurisdiction and we affirm the judgment in favor of Teton. But we reverse the judgment in favor of FedEx and remand the case for further proceedings.

I.

In its motion for summary judgment, Teton contended that Mr. Huggins could not make out a negligence claim because he could not show that Teton's alleged negligence was a proximate cause of his injuries. *See Teichman v. Potashnick Constr., Inc.*, 446 S.W.2d 393, 398 (Mo.1969). (The parties agree that Missouri substantive law applies in this case.) In support of its motion, Teton relied on the part of Mr. Johnston's deposition testimony that described a straightforward rear-end collision: he drove over the hill in the right westbound lane, saw the left-lane closure sign, eventually stopped in that lane, and was hit from behind. Mr. Huggins filed a timely response, relying on another part of Mr. Johnston's account to argue that the Teton driver contributed to the collision by engaging in a "cat-and-mouse game" with Mr. Gutierrez. Mr. Johnston had attested that the two trucks had traveled together for some time before the collision occurred. He had further declared that, during this period, Mr. Gutierrez had tried to pass Mr. Johnston's tractor-trailer about five times and attempted to engage another driver to assist him, but Mr. Johnston did not allow him to pass and once slightly exceeded the speed limit to prevent Mr. Gutierrez from passing him. The district court concluded, however, that under Missouri law these earlier activities could not be a proximate cause of the rear-end collision, and Mr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Huggins does not challenge that determination on appeal.

***2** Mr. Huggins maintains instead that the district court erred by denying his untimely motion to supplement his response to Teton's summary judgment motion. The court, after conferring with the parties, had previously extended its deadline for dispositive motions, including motions for summary judgment, and had ordered the opposing party to file any desired response to a dispositive motion within thirty days after such a motion was filed (thus providing ten more days for filing a response than did the local rules, *see* E.D. Mo. R. 7-4.01(B) (2006)). After Mr. Huggins filed his timely response to Teton's motion for summary judgment, FedEx filed its response to a summary judgment motion that Mr. Huggins later filed and it attached Mr. Gutierrez's affidavit. In the affidavit, Mr. Gutierrez attested that the Teton truck "cut in front of" him "[i]mmediately prior to the accident," thereby preventing him "from having sufficient stopping distance to avoid the collision." About a week after FedEx filed the affidavit and two weeks after the time ran for responding to Teton's motion, Mr. Huggins moved to supplement the record relevant to Teton's motion by incorporating Mr. Gutierrez's affidavit into his response. Teton, in turn, asked the court either to deny Mr. Huggins's request to supplement the record or to allow Teton additional time to depose Mr. Gutierrez pursuant to Fed.R.Civ.P. 56(f): Under that rule, a district court may grant time for a party opposing summary judgment to take a deposition if that party "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition ."

Some three weeks later, Teton and the other defendants moved to continue the trial and to amend the court's case management order, asserting, among other things, that the case had been delayed because of disputes about diversity jurisdiction, that Mr. Huggins had only recently completed his medical treatment, and that the parties were trying to "coordinate a date" for deposing Mr. Gutierrez. The court granted the motion in part, extending discovery and setting a later trial date, but it did not change the deadlines for dispositive motions or for responses to those motions. None of the parties deposed Mr. Gutierrez before the new discovery deadline passed. About a month later, the court denied Mr. Huggins's motion to supplement the record and granted Teton's summary judgment motion. *Huggins v. Federal Express Corp.*, No. 06-CV-01283, 2008 WL 1777438 (E.D. Mo. April 16, 2008). Though the court acknowledged the "potential significance of Gutierrez's testimony," it declined to consider the affidavit because Mr. Huggins obtained it after what was then the deadline for discovery, as well as the deadline for filing dispositive motions, had passed. The court explained that it "appear[ed] that Plaintiff opted against timely interviewing, deposing, and/or securing the affidavit of, Gutierrez," and that Mr. Huggins should "not be permitted to take unfair advantage of the presumably accessible, subject evidence-presented by FedEx after the close of discovery." In support of its conclusion that the evidence had been accessible, the court cited Rule 56(f), on which Mr. Huggins could have relied if the evidence had been unavailable to him. *Huggins*, 2008 WL 1777438 at *3 n. 2.

***3** Although Rule 56 provides deadlines for filing summary judgment materials, the district courts have broad discretion to manage their dockets and address particular circumstances by enforcing local rules and by setting enforceable time limits. *See Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 579 (8th Cir.2006); *see also Sipe v. Workhorse Custom Chassis, LLC*, 572 F.3d 525, 531-32 (8th Cir.2009). Here, Mr. Huggins does not dispute that he moved to supplement the summary judgment record two weeks after his response to Teton's summary judgment motion was due, and after he had already filed a timely response without indicating any need for additional time.

Under Fed.R.Civ.P. 6(b)(1), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect." The district court has discretion to admit or exclude materials under this rule, and its "refusal to accept untimely filed materials will not be reversed for an abuse of discretion unless the proponent of the materials has made an affirmative showing of excusable neglect." *African American Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1350 (8th Cir.1995) (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 894-98, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)), *cert. denied*,516 U.S. 1113 (1996); *see also DG & G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir.2009). We conclude that the district court did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

abuse its discretion here because Mr. Huggins failed to make an "affirmative showing of excusable neglect."

Interpreting the term "excusable neglect" in a bankruptcy rule derived from Rule 6(b), the Supreme Court has held that "neglect" does not require a showing that the party was without fault but encompasses "inadvertence, mistake, or carelessness," though the neglect will not necessarily be "excusable." *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 388, 391, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *see Noah v. Bond Cold Storage,* 408 F.3d 1043, 1045 (8th Cir.2005). But the untimeliness here was not the result of mistake or carelessness. As Mr. Huggins's counsel confirmed at oral argument, he consciously elected not to depose Mr. Gutierrez for strategic reasons: On hearing Mr. Johnston attest that Mr. Gutierrez, after repeatedly trying to pass him, had been angrily cursing at Mr. Johnston over his CB radio shortly before he slammed into the back of the Mr. Johnston's truck, Mr. Huggins's attorney decided not to preserve Mr. Gutierrez's testimony. Since Mr. Gutierrez had relocated to Hawaii, Mr. Huggins's counsel reasoned that FedEx might have difficulty producing him at trial to counter Mr. Johnston's negative characterization of Mr. Gutierrez's behavior. The district court thus did not clearly err in finding that Mr. Huggins consciously "opted against" timely obtaining Mr. Gutierrez's testimony.

***4** We reject Mr. Huggins's contention that the district court's order granting additional time for discovery should alter the outcome. As we have explained, the court did not change the date for filing and responding to dispositive motions, it merely gave the parties additional time to conduct discovery before trial in a case that had been pending for over two years. We do not believe that the court's order distinguishes our case from *Villa* and others holding that a district court does not abuse its discretion by denying leave to file supplementary matter out of time where the proponent fails to show excusable neglect.

II.

A.

Mr. Huggins contends that the district court erred in entering summary judgment for FedEx based on its conclusion that the evidence could not support a finding that Mr. Gutierrez was a FedEx employee and so his negligence could not be imputed to FedEx. Reviewing the evidence and inferences from it favorably to Mr. Huggins, as we must, *Ridpath v. Pederson,* 407 F.3d 934, 935 (8th Cir.2005), we conclude that Mr. Huggins presented sufficient evidence to avoid summary judgment.

Because Mr. Huggins based his negligence claim against FedEx on the doctrine of respondeat superior, he had to establish that the driver, Mr. Gutierrez, was a FedEx employee. Under Missouri law, the resolution of this issue depends upon the particular facts of each case and is usually a question for the jury, although it may be decided as a matter of law when the material facts are undisputed and "only one reasonable conclusion can be drawn" from those facts. *Johnson v. Bi-State Development Agency,* 793 S.W.2d 864, 867 (Mo.1990), *superseded on other grounds, State ex rel. Metropolitan St. Louis Sewer Dist. v. Sanders,* 807 S.W.2d 87 (Mo.1991); *Ascoli v. Hinck,* 256 S.W.3d 592, 594-95 (Mo.Ct.App.2008).

The "principal factors" that Missouri courts routinely consider in determining whether one acting for another is an employee or an independent contractor for purposes of respondeat superior liability are set out in § 220(2) of the Restatement (Second) of Agency. *Lee v. Pulitzer Pub. Co.,* 81 S.W.3d 625, 631 (Mo.Ct.App.2002); *see Johnson v. Pacific Intermountain Exp. Co.,* 662 S.W.2d 237, 242 n. 9 (Mo.1983); *Dean v. Young,* 396 S.W.2d 549, 553 (Mo.1965). The very first of these considerations is "the extent of control which, by the [relevant] agreement, the master may exercise over the details of the work," Restatement (Second) of Agency § 220(2)(a), and the Missouri Supreme Court has frequently emphasized the importance of the "right to control the conduct of another in the performance of an act," describing it as the "touchstone" for determining whether a master-servant relationship exists, *see e.g., J.M. v. Shell Oil Co.,* 922 S.W.2d 759, 764 (Mo.1996).

In support of its summary judgment motion, FedEx relied on a "Linehaul Contractor Operating Agreement" under which Jon Ireland (who did business as ANI Logistics) agreed to provide certain shipping and tractor leasing services to FedEx. (Although RPS, Inc., originally contracted with ANI, FedEx later acquired RPS and the relevant contract, and thus we refer to FedEx as the contracting party.) The parties agree that Mr. Gutierrez drove an ANI tractor and was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

an ANI operator as that term is used in the agreement, and although Mr. Gutierrez was not a party to the agreement, some of the contract's provisions address the role of ANI's drivers.

***5** Based on the agreement, the district court concluded that the parties intended to disclaim any employment relationship between ANI's employees and FedEx, that FedEx did not have the right to control Mr. Gutierrez's work, and that the contract supported the conclusion that Mr. Gutierrez was an independent contractor with respect to FedEx. After determining that Mr. Huggins had not offered admissible evidence to the contrary, the court granted summary judgment to FedEx because Mr Huggins failed to adduce evidence sufficient to support a finding that Mr. Gutierrez was a FedEx employee.

In reaching its conclusion, the court relied heavily on specific provisions in the agreement stating that the parties "intend" that ANI "will provide [its] services strictly as an independent contractor, and not as an employee of [FedEx] for any purpose" and will "direct the operation of the Equipment and ... determine the methods, manner and means of performing the obligations specified in the Agreement." Although the district court acknowledged that the contract "defined certain requirements regarding standards of service/performance; operator appearance; customer service; safety/conduct," it concluded that ANI had discretion as to how to "carry out" these "objectives." The court relied on provisions giving ANI "sole discretion in determining the means and methods [by] which to carry out the foregoing objectives." The Restatement notes the "important distinction" that exists "between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to ... use care and skill in accomplishing results." Restatement (Second) of Agency § 220, comment (e); *see also* *Skidmore v. Haggard*, 341 Mo. 837, 845, 110 S.W.2d 726, 730 (Mo.1937). In the former case, the actor is an employee or servant, in the latter an independent contractor.

Of course, general contract provisions that confer on a party the discretion to determine the "means and methods" for carrying out "objectives" (language often used to describe the role of an independent contractor) will not trump provisions that actually reserve the right to control the details of that party's performance. Having carefully reviewed the agreement in this case, we conclude that it did not simply require ANI and its drivers to use skill and care in their work; under the agreement, FedEx retained the right to control at least some of the "means and methods" used by ANI and its drivers to achieve the contract's stated objectives.

We observe initially that the agreement makes plain that the ANI drivers performed work that was "part of the regular business" of FedEx, a fact that the Restatement lists as supporting the existence of a master/servant relationship. Restatement (Second) of Agency § 220(2)(h). For instance, the contract begins by stating that FedEx "is a duly licensed motor carrier engaged in providing ... transportation and delivery service" and that FedEx "wants to provide for package pick-up and delivery services through a network of nationwide terminals served by" what it terms "independent contractors." Unlike truck drivers engaged by other types of businesses, however, ANI and Mr. Gutierrez performed work that was the essence of FedEx's business, namely, "transportation and delivery service." *Cf.* *Brister v. Ikenberry*, No. ED 92993, 2009 WL 4927436, at *4 (Mo.Ct.App. Dec.22, 2009).

***6** We note, moreover, that the agreement required ANI and its drivers to look and act like FedEx employees while they performed FedEx services, and we believe that these provisions show the extent of FedEx's control over some details of Mr. Gutierrez's work, *see*Restatement (Second) of Agency, § 220(2)(a). The agreement states that ANI will conduct its "business so that it can be identified as being part of the [FedEx] system" and that its operators will "[f]oster" FedEx's "professional image and good reputation." More specifically, "each person having contact with the public ... will wear a [FedEx]-approved uniform, maintained in good condition, and ... will otherwise keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time" by FedEx. The agreement also required ANI's trucks to have FedEx insignia or "identify the Equipment as part of the [FedEx] system" and to be maintained "in a clean and presentable fashion free of body damage and extraneous markings."

In addition, in a section addressing customer service, the agreement states that FedEx will "familiarize" ANI "with various quality service and safety proce-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

dures developed by [FedEx],” supporting an inference that ANI and its drivers were required to follow FedEx's procedures. FedEx also reserved the right to monitor ANI safety practices; FedEx terminal personnel, “at their option,” were permitted to “take a ... safety ride with contractor [or presumably the contractor's driver] to verify” compliance with standards in the agreement. Furthermore, drivers had to submit daily fuel receipts and daily shipping documents to FedEx. They also organized and returned undeliverable packages to FedEx, and ANI agreed to provide FedEx with “advance notice of routes to be taken for each linehaul movement” and “a state by state mileage report” for interstate package and delivery movement.

The agreement also lists certain bases for “driver disqualification.” The “acts and omissions” for which a driver will be disqualified include failure to pass or submit to a drug or alcohol test that FedEx may administer “at such time and place and in such manner as determined by [FedEx] or its designees,” as well as failing to obtain a federally-required physical certification issued by a FedEx-approved medical examiner. If an alleged act or omission would constitute a criminal offense, FedEx, “in its sole discretion,” “may make a preliminary determination of the probability that [ANI or a driver] is guilty of [an] offense whether charged or not.”

Relying on workers' compensation cases, *see, e.g., Nunn v. C.C. Midwest*, 151 S.W.3d 388, 402 (Mo.Ct.App.2004), Mr. Huggins contends that the labels used by the parties in an agreement such as “independent contractor,” as opposed to “servant” or some similar appellation, are not dispositive on the question of the parties' actual relationship to each other. Although workers' compensation cases are not directly relevant because they are governed by statutes not applicable here and by presumptions that favor finding an employment relationship, *see id.* at 403, we agree that the parties' characterization of the relationship is not controlling. *See Brister*, 2009 WL 4927436, at *4. The applicable considerations set out in § 220(2) of the Restatement (Second) of Agency are far broader in scope, and list as only one factor out of many, “whether or not the parties believe they are creating the relationship of master and servant.” Restatement (Second) of Agency § 220(2)(i).

***7** The Restatement also lists as a relevant question “whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work.” Restatement (Second) of Agency § 220(2)(e). Here ANI provided the tractor, but the contract provided that “any trailers and dollies used in connection with the [e]quipment will be provided by [FedEx] and at [FedEx's] expense.” In addition, Mr. Huggins relies on his own sworn declaration for the statement in his brief that “FedEx provided the terminal and package processing facilities from which Gutierrez was required to obtain his itineraries, depart and return from trips, and to drop and hook the FedEx owned trailers.” Although Mr. Huggins's declaration primarily addresses his own relationship with FedEx, he traveled with Mr. Gutierrez on the day of the accident and FedEx admits that the two were a driving “team.” We do not think that the court should have disregarded Mr. Huggins's statement that he “saw Gutierrez obtain his itineraries from the FedEx ground dispatch office,” *cf. Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir.2008), *cert. denied*, --- U.S. ----, 129 S.Ct. 725, 172 L.Ed.2d 731 (2008), and we believe that it provides some evidence that the “place of work” included FedEx's offices and that FedEx exercised some control over Mr. Gutierrez's driving, though Mr. Huggins failed to establish the exact contents of the itineraries. As we have said, moreover, the agreement expressed FedEx's intention to have ANI and other contractors provide pick-up and delivery services through a network of nationwide terminals, which may be some evidence that Mr. Gutierrez traveled from one FedEx terminal to another, so that the terminals were essentially part of his “place of employment.”

We note too that the Restatement directs courts to consider the “length of time for which the person is employed” in determining whether a person is an independent contractor. Restatement (Second) of Agency § 220(2)(f). “ ‘[I]f the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him.’ Likewise, a longer term of employment denotes an employer-employee relationship as being more likely.” *Jones v. Brashears*, 107 S.W.3d 441, 446 (Mo.Ct.App.2003) (quoting Restatement (Second) of Agency, § 220, comment j). Mr. Huggins relies on a “Separation Form” that indicates that Mr. Gutierrez was employed from April, 2001, and voluntarily resigned in May, 2004, but the form does not list an employer. It lists his “Supervisor” as “Alysha Singleton,” who was never associated with FedEx in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

--- F.3d ----, 2010 WL 154883 (C.A.8 (Mo.))
**(Cite as: 2010 WL 154883 (C.A.8 (Mo.)))**

record and may well have been an ANI employee. But FedEx admits that Mr. Gutierrez was employed by Mr. Ireland during this time, and the evidence may support an inference that Mr. Gutierrez drove FedEx trucks for three years.

We observe, finally, that in addition to the documents that we have already discussed, Mr. Huggins attached several other items to his response to the summary judgment motion that provide some support for a finding that FedEx employed Mr. Gutierrez. For instance, Mr. Huggins filed a document with the "FedEx Ground" logo at the top that reflects a "Record of Strength Test" for Mr. Gutierrez. The form is dated shortly before he was hired. Mr. Huggins also proffered an undated "Fair Credit Reporting Act Disclosure Statement," which authorizes credit agencies and others to release information about Mr. Gutierrez to "FedEx Ground" and their agents and appears to be signed by Mr. Gutierrez. Mr. Huggins submitted a drug testing form, moreover, that listed FedEx as his employer. We believe that these forms support an inference that FedEx participated in deciding whether Mr. Gutierrez would be hired to drive a truck to pull its trailers and provide some support for a finding that he was a FedEx employee.

***8** As we have said, the court may decide the question of whether a master-servant relationship exists as a matter of law only if "no material fact [ ] giving rise to the determination is genuinely in dispute and when only one conclusion is reasonable." *Ascoli*, 256 S.W.3d at 595. There is certainly record evidence tending to show that Mr. Gutierrez was an independent contractor. For instance, as the district court pointed out, the contract between FedEx and ANI provided that ANI would compensate the drivers, pay their taxes, and provide workers' compensation for them. But we believe that the evidence-including the terms of the written agreement, Mr. Huggins's declaration, and the documents showing that FedEx tested Mr. Gutierrez and checked into his background before he was hired-would support a reasonable inference and thus a jury finding that FedEx had a right to control his performance and was his employer for respondeat superior purposes. *See* *Shell Oil Co.*, 922 S.W.2d at 764. We therefore conclude that the district court erred in holding that Mr. Huggins could not make out a claim against FedEx based on respondeat superior.

B.

We reject what Mr. Huggins calls his alternative argument, namely, that FedEx is vicariously liable for Mr. Gutierrez's negligence under the Federal Motor Carrier Safety Regulations (FMCSR), *see*49 C.F.R. § 376.12(c)(1). Mr. Huggins cites the FMCSR and related case law in support of his contention that FedEx is liable as a matter of law for Mr. Gutierrez's negligent operation of the leased vehicle. In response, FedEx states that Mr. Huggins failed to include this claim in his complaint. FedEx also argues that Mr. Huggins could not prevail in any event, because he is a co-driver, not a member of the public, and thus is not an intended beneficiary of the FMCSR and its enabling statute, 49 U.S.C. § 14102, and because the governing agency (now the Department of Transportation) has clarified by regulation and commentary that prior cases holding carriers liable under the FMCSR were wrongly decided. Because we conclude that Mr. Huggins did not plead a claim under the FMCSR, we do not reach FedEx's other arguments.

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although we must liberally construe a complaint in favor of the plaintiff, a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal quotation marks and citation omitted).

To assess whether Mr. Huggins made out a claim under the FMCSR, we must therefore determine the "grounds upon which" his claim rests. Section 376.12(c)(1) requires a lease between a federally authorized carrier and an owner-operator to state that the carrier has "exclusive possession, control, and use of the [lessor's] equipment" and "shall assume complete responsibility for the operation of the equipment" during the term of the lease. 49 C.F.R. § 376.12(c)(1); *see also*49 U.S.C. § 14102(a)(4). Here the FedEx lease includes a provision to that effect. Relying, in part, on the same regulatory language, courts have held carriers liable for injuries to the public caused by the negligent operation of leased vehicles; these courts have sometimes imposed so-called logo liability by holding that a carrier was liable whenever its logo or other identification appeared on the leased truck at the time of the accident, *see, e.g., Mellon Nat'l Bank & Trust*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 475-78 (3d Cir.1961). Though we have not addressed the issue in an accident case, in two cases involving insurance disputes we cited *Mellon* and stated that carriers are liable for injuries to the public resulting from the negligent operation of leased vehicles that identify the carriers by federal permit number or logo. *See Grinnell Mut. Reinsurance Co. v. Empire Ins. Co.*, 722 F.2d 1400, 1404 (8th Cir.1983), *cert. denied,*466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); *Wellman v. Liberty Mutual Insurance Company*, 496 F.2d 131, 136 (8th Cir.1974); *see also Acceptance Ins. Co. v. Canter*, 927 F.2d 1026, 1027 (8th Cir.1991).

***9** In his complaint, Mr. Huggins did not mention any federal or state law governing authorized motor carriers, nor did he even allege that FedEx was a carrier. Over two years after he filed his complaint, and almost eight months after the deadline passed for seeking leave to amend pleadings, Mr. Huggins maintained for the first time in response to FedEx's summary judgment motion that FedEx was liable based on the FMCSR. Perhaps because this argument had not been previously advanced, the district court did not address the matter in its order granting summary judgment to FedEx.

Mr. Huggins contends on appeal, however, that he was not required to plead the FMCSR specifically to be entitled to relief under it. He contends that by alleging in his complaint that FedEx was "vicariously liable" for Mr. Gutierrez's negligence because Mr. Gutierrez was an "employee/agent/servant" of FedEx and "acting in the course and scope of his agency/employment" at the time of the accident (allegations supporting his common-law negligence claim), he sufficiently preserved the argument that FedEx was "vicariously liable" for Mr. Gutierrez's liability because of the federal regulations. We reject the contention because unlike Mr. Huggins's claim based on respondeat superior, liability under § 376.12(c)(1) (the so-called "control regulation") is not bottomed on any alleged "employee/agent/servant" relationship between a carrier and the vehicle's driver.

In 1992, the Interstate Commerce Commission (the predecessor governing agency) made it plain that § 376.12(c)(1) had no effect on the legal relationship between a carrier and the driver of its leased vehicle:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements.

49 C.F.R. § 376.12(c)(4). In related comments, the ICC explained that although "most courts" had "correctly interpreted the appropriate scope of the control regulation," the agency had added this subsection "to clear up confusion in some courts and state agencies." The ICC further noted that the regulations had always been "silent on the agency status of lessors," and that the agency's decisions were "clear that the [ICC] has taken no position on the issue of independence of lessors." Thus we conclude that Mr. Huggins's allegations that FedEx was liable for Mr. Gutierrez's negligence because Mr. Gutierrez was an employee, servant, or agent of FedEx are precisely what they appear to be and no more: allegations that support a common-law theory of respondeat superior. Mr. Huggins himself acknowledged this distinction in a post-judgment motion by describing his contention that FedEx was liable under the FMCSR as an "alternative basis of liability" that he had asserted "in addition to his agency theory."

***10** We note, moreover, that to state a claim under the FMCSR Mr. Huggins was required to do more than merely refer in an obscure way to some aspect of it (such as vicarious liability) in his complaint. Although a party is "not necessarily required to identify a specific statute in its complaint," we concluded in *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806-07 (8th Cir.2008), that a party's reference to ERISA in the jurisdictional section of her third-party complaint, absent any other indication that she intended to pursue an ERISA claim, did not give the opposing party fair notice of such a claim. Here, Mr. Huggins's complaint not only fails to mention the FMCSR or its enabling statute, it does not even allege that FedEx is a carrier, a vital aspect of the duty he now seeks to impose on FedEx.

We conclude that Mr. Huggins's complaint did not state a claim under the FMCSR because it did not give FedEx fair notice that he was making such a claim. We therefore need not address the claim's merits.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

--- F.3d ----, 2010 WL 154883 (C.A.8 (Mo.))
**(Cite as: 2010 WL 154883 (C.A.8 (Mo.)))**

III.

We affirm the judgment entered in favor of Teton, and we reverse the judgment in favor of FedEx and remand the case for further proceedings not inconsistent with this opinion.

C.A.8 (Mo.),2010.
Huggins v. FedEx Ground Package System, Inc.
--- F.3d ----, 2010 WL 154883 (C.A.8 (Mo.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**PLAINTIFFS' MOTION TO AUGMENT THE RECORD WITH NEWLY CREATED AND NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

Plaintiffs respectfully move this Court for an order permitting them to offer four newly-promulgated Addenda to the FXG Operating Agreement and four newly-produced IRS Notices of Proposed Assessment analyzing whether FXG drivers are employees or independent contractors under the IRS' right to control test. Plaintiffs seek to offer these supplemental materials in support of Plaintiffs' Motions for Summary Adjudication of Employment Status,[1] and in opposition to FedEx Ground Package System, Inc's (FXG) Motions for Summary Judgment,[2] without further briefing. These materials were all produced since December 28, 2009, after briefing was concluded with regard to the pending motions in the cases with certified classes and virtually all of the other cases. The documents contain a wealth of critical evidence for the Court to consider in evaluating whether FXG drivers are employees or independent

[1] Plaintiffs' motions for summary adjudication and supporting memoranda: Docs. 1153-1192 (filed April 25, 2008); Docs. 1295, 1299, 1303, 1307, 1313-14, 1320-21, 1328-29, 1335-1338 (filed June 2, 2008); Docs. 1792-1807 (filed Sept. 28, 2009); Doc. 1872-1873 (filed Oct. 30, 2009); Doc. 1971 (filed Jan. 13, 2010).

[2] Plaintiffs' briefs in opposition to FXG's motions for summary judgment: Docs. 1360-1362, 1364-1365, 1367-1374 (filed June 9, 2008); Docs. 1510-1513, 1515, 1517 (filed July 17, 2008); Docs. 1690-1691 (filed Dec. 22, 2008); Docs. 1888-1890 (filed Nov. 12, 2009); Docs. 1915 (filed Dec. 14, 2009).

contractors. These documents are attached to the Declaration of Lynn Rossman Faris in Support of Plaintiffs' Motions To Augment The Record ("Faris Decl."), filed herewith.

**A. Newly-Promulgated Revisions to the OA**

On December 28, 2009, in response to Plaintiffs' request for supplementation, FXG produced two new addenda to its Operating Agreement ("OA") – one titled "Modified Term," and another titled, "Employment Eligibility Verification and Compliance with Immigration Laws," which FXG gave to drivers to sign in November or December of 2009. Faris Decl. ¶ 4. On January 15, 2010, FXG produced two more new addenda just provided to drivers, one titled "Safe Driving Program" and the other titled "Enhanced Contractor Customer Service Program." *Id.* ¶5. In addition, Plaintiffs' counsel have obtained from a class member revised versions of the latter two addenda for FHD, which FXG subsequently gave to drivers this week, along with a letter from Senior Vice President of Contract Relations Paul Callahan dated January 20, 2010, explaining the reasons for the slightly revised versions. *Id.* ¶6.[3] Each of these Addenda alters terms contained in the OA itself or earlier Addenda by superceding specified provisions.

This Court has held repeatedly that the OA is a key source of "proof of FedEx's authority to control its package and delivery drivers, which allows the court to make categorical determinations of the driver's employment status." Doc. 906 at p.37 (certifying nationwide class); *accord* Doc. 1119; Doc. 1770. Both parties have placed substantial weight on the terms contained in the OA in their cross-motions on employment status. It, therefore, follows that revisions to the OA, such as those made by FXG in December 2009 and again in January 2010, are relevant and should be considered in deciding whether FXG reserves to itself any right to

[3] Plaintiffs have also asked FXG to produce a copy, and any other subsequent revised addenda, but have not yet received a response. Faris Decl. ¶6.

control the method, manner or means of performance. Plaintiffs could not have offered them previously because FXG had neither promulgated nor produced them. Faris Decl. ¶¶4-6.

- **The Modified Term Addendum Sets A New Contract Termination Date of May 15, 2010:** The Modified Term Addendum given to drivers in November or December 2009 (Addendum 13 for Ground and 11 for FHD), states that the agreement "is executed through May 14, 2010, when said Agreement shall terminate unless extended by written agreement." Faris Decl. Exh. 18. This addendum replaces section 11 in the Ground OA and section 8 in the FHD OA, which automatically renewed the contract from one year to the next absent notice of non-renewal, and accelerates the termination dates of all OAs that extended beyond May 2010.

- **The Employment Eligibility And Compliance Addendum Requires E-Verify For All New Hiring:** The newly promulgated Employment Eligibility Addendum (Addendum 14 for Ground and 12 for FHD) places new requirements on those who hire others to enroll in the governmental E-Verify program and to provide FXG with proof of compliance.

- **The "Safe Driving Program" and Enhanced CCS Addenda Restrict Hiring:** FXG's new "Safe Driving Program" (Addenda 11 for Ground OA and 13 for FHD), provided to drivers in mid-January 2010, supercede various OA provisions and restrict drivers' ability to hire others (§1.4), require drivers to review and disqualify existing helpers or assistants who do not meet the new requirements (§§1.5, 1.6), authorizes FXG to judge the "guilt" of a driver arrested for various infractions and disqualify those it finds likely to be found guilty (§1.8), and mandates termination of drivers for minor traffic violations of their drivers, even if they were not driving a FXG vehicle (§5.6). These new rules go far beyond anything required by law. The new CCS Addendum (Addendum 15 for Ground and 14 for FHD) substantially changes the terms of the CCS bonus such that disqualification under the "Safe Driving Addenda" disqualifies the driver

from receipt of the bonus for three consecutive months (pages 1-2), and increases the bonus once a driver has three and five years of service (page 1).

These changes to FXG's OAs are directly relevant to determining whether FXG has a right to control the manner and means of the drivers work. The "E-Verify" and "Safe Driving Program" incorporate new rules on hiring and retention of helpers or assistants; as such they are directly relevant to FXG's pending motions which relied heavily on the drivers' alleged ability to make hiring decisions free from FXG control except for federally-mandated qualifications. *E.g.,* Mem. in Opp. to Maryland Pltfs' MSA at 9 (Doc. 1379 arguing that drivers are not employees because they can hire others); Mem. in Opp. to New Jersey Pltfs' MSA at 20 (Doc. 1382, same). The changes to the term of the OA and the CCS program show FXG's right to set and change at-will the continuing relationship between FXG and its drivers and to set and change at-will the compensation and means FXG may use to enforce compliance with its rules.

**B. <u>IRS' Notices of Proposed Assessment (NOPAs)</u>**

On December 28, 2009, this Court affirmed the Magistrate Judge's decision ordering FXG to produce the IRS' four draft NOPAs, finding that the "NOPA is relevant and material to matters in this litigation" and that "FedEx has placed the IRS's opinion of its driver model at issue." Doc. 1953 at 10-11. On January 20, 2010, FXG produced the draft NOPAs. Faris Decl. ¶7. Plaintiffs now seek permission to offer them to supplement the record in support of summary adjudication. Plaintiffs could not have offered them earlier because FXG refused to produce them until required to by the Court's order. *Id.*

Review of the four NOPAs confirms their relevance to this litigation and, in particular, to the pending motions for summary adjudication of employment status and summary judgment for the reasons explained in the Declaration of Lynn Rossman Faris, ¶¶7-8.

The Court has discretion to permit Plaintiffs to supplement the summary adjudication/ judgment record. Wren v. McCain, 23 F.3d 411, Case No. 93-2183, 1994 WL 142884, *2 (7th Cir. Apr. 20, 1994) (affirming district court decision permitting party to supplement summary judgment record after motion had been filed) (unpublished order). Plaintiffs respectfully request permission to add these materials to the record.

Dated: January 27, 2010

Respectfully submitted,

LEONARD CARDER, LLP

    /s/ **Lynn Faris**
LYNN FARIS, ESQ.
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Fax: (510) 272-0174

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' MOTION TO AUGMENT THE RECORD WITH NEWLY CREATED AND NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

I, LYNN ROSSMAN FARIS, state as follows:

1. I am an attorney licensed to practice in the State of California and in this Court and a partner in the law firm of Leonard Carder, LLP, which is co-lead counsel for the Plaintiffs in this MDL. I offer this declaration in support of Plaintiffs' Motion to Augment the Record. I have personal knowledge of the facts set forth herein and could and would testify to them if called upon to do so.

2. On July 9, 2008, Plaintiffs finished briefing summary adjudication/ judgment on employment status in the first twenty cases in this MDL in which the Court certified classes. *See* Docs. 1438-1457, 1459, 1461-1462. On December 14, 2009, Plaintiffs finished briefing summary adjudication/ judgment on employment status in the remaining eight cases in this MDL in which the Court certified classes. *See* Docs. 1918-1925.

3. On December 8, 2009, I requested of defense counsel that they supplement their discovery by providing any and all new Addenda to the Operating Agreement and clarify when such new Addenda were circulated and when they went into effect.

4. On December 28 and 30, 2009, in response to Plaintiffs' request, FXG provided Plaintiffs with the Operating Agreements ("OAs") and Addenda given to drivers in November or December of 2009 and agreed to provide more information about them at a later date. These included the Addendum entitled "Modified Term" (Addendum 13 to the Ground OA and Addendum 11 to the FHD OA) and the Addendum entitled "Employment Eligibility Verification and Compliance with Immigration Laws" (Addendum 14 to the Ground OA and Addendum 12 to FHD OA). A true and correct copy of these new addenda is attached hereto as Exhibit 18, to avoid any confusion with other exhibits offered previously. (Exhibits 1 through 17 were previously offered by Plaintiffs in support of their Motions for Summary Adjudication, and attached as exhibits to the First and Second Declarations of Lynn Rossman Faris in support of those motions.)

5. On January 15, 2010, in response to Plaintiffs' request, FXG produced two additional new Addenda entitled "Safe Driving Program" and Enhanced CCS Addenda (Addenda 11 and 15 in the Ground OA and Addenda 13 and 14 in the FHD OA). A true and correct copy of the "Safe Driving Program" and Enhanced CCS Addenda are attached hereto as Exhibit 19.

6. On January 25, 2010, a class member provided Plaintiffs' counsel with a new version of FHD Addendum 13 - Safe Driving Program and Addendum 14 – ECCS, along with a letter from FXG Senior Vice President of Contractor Relations Paul Callahan dated January 20, 2010, stating that FXG was re-issuing revised Addenda. I immediately asked FXG counsel to provide Plaintiffs with the documents, and any similar documents applicable to Ground, but I have not

yet received a response. A true and correct copy of the Addendum 13 - FHD Safe Driving Program, Addendum 14 - ECCS and letter from Mr. Callahan obtained from a class member is attached hereto as Exhibit 20.

7.     Shortly after the Court denied FXG's Motion for Reconsideration regarding production of the IRS NOPAs from 2007, I asked defense counsel to produce the 2007 document, schedule the deposition of the corporate designee and withdraw its second Motion for reconsideration of the order compelling the production of the 2009 NOPAs. After several discussions and exchanges of letters, on January 20, 2010, FXG produced the 2007 and 2009 materials Plaintiffs had requested, scheduled the deposition of Ms. Ford for February 23, 2010 and withdrew its second Motion for Reconsideration. A true and correct copy of the four NOPAs produced by FXG to Plaintiffs is attached hereto as Exhibit 21.

8.     The 2007 and 2009 NOPAs include lengthy and detailed analysis of the relationship of the drivers to FedEx and each reaches the conclusion that FXG drivers are employees under the Internal Revenue Code's right-to-control test of employment status. The 2007 and 2009 NOPAs also show that the IRS never retreated from that position. Instead, the IRS determined that due to a 1998 "no change letter," FXG met the elements of the "safe harbor," Section 530 of the Revenue Act of 1978, 26 U.S.C. § 3401 and was therefore not subject to reclassification and tax penalties. A true and correct copy of the two NOPA's issued on October 30, 2009 explaining the withdrawal of the tax assessments are attached hereto as Exhibit 22. The Internal Revenue Code's "safe harbor provision" has no analog under the laws at issue in this MDL.

9.     On January 25, 26 and 27, 2010, I met and conferred with defense counsel, Michael McGuinness regarding this motion to augment the summary judgment record but the parties were unable to reach agreement.

10.     The location of each of the documents described above is set forth more fully in the Table of Contents attached hereto.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of January, 2010, in Oakland, California.


    **/s/ Lynn Rossman Faris**
LYNN ROSSMAN FARIS

**INDEX TO EXHIBITS 18 THROUGH 22**

**EXHIBIT 18 -- DECEMBER 2009 NEW OA ADDENDA, PROVIDED BY FXG**

Ground Addendum 13 – Modified Term

FHD Addendum 11 – Modified Term

Ground Addendum 14 – Employment Eligibility Verification and Compliance with Immigration Laws

FHD Addendum 12 – Employment Eligibility Verification and Compliance with Immigration Laws

**EXHIBIT 19 -- JANUARY 2010 NEW OA ADDENDA, PROVIDED BY FXG**

Ground Addendum 11 – Safe Driving Program

FHD Addendum 13 – Safe Driving Program

Ground Addendum 15 – Enhanced CCS Program

FHD Addendum 14 – Enhanced CCS Program

**EXHIBIT 20 -- JANUARY 2010 REVISED NEW OA ADDENDA, PROVIDED BY CLASS MEMBER**

FHD Addendum 13 – Safe Driving Program

FHD Addendum 14 - Enhanced CCS Program

Letter from Callahan to Contractors, Jan. 20, 2010

**EXHIBIT 21 - IRS NOPAS ANALYZING EMPLOYMENT STATUS**

IRS NOPA re Reclassification of Workers, Dec. 19, 2007

IRS NOPA re Pick-up and Delivery Driver, Sept. 2, 2009

IRS NOPA re Home Delivery Driver, Sept. 2, 2009

IRS NOPA re Reclassification of Workers-Home Delivery, Sept. 2, 2009

IRS NOPA re Failure to Deposit Penalty, Sept. 2, 2009

**EXHIBIT 22 – IRS NOPAS, OCT. 30, 2009 ON SAFE HARBOR**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CERTIFICATE OF SERVICE**

I am a citizen of the United States and am employed in San Francisco County. I am over the age of eighteen (18) years and not a party to the within action. My business address 1330 Broadway, Suite 1450, Oakland, CA 94612. On **January 27, 2010**, I caused the following confidential document(s) to be filed with the Court electronically under seal:

1. **DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' MOTION TO AUGMENT THE RECORD WITH NEWLY CREATED AND NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**
2. **EXHIBITS TO DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' MOTION TO AUGMENT THE RECORD WITH NEWLY CREATED AND NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

I further certify that I electronically and publicly filed the following document(s) with the Clerk of Court using the CM/ECF system on **January 27, 2010**:

1. **PLAINTIFFS' MOTION TO AUGMENT THE RECORD WITH NEWLY CREATED AND NEWLY PRODUCED DOCUMENTS RELEVANT TO CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

Through my publicly filing the foregoing documents electronically with the Clerk of Court using the CM/ECF system, the system sent notification of such filings to the email addresses on file or sent by United States mail.

| | |
|---|---|
| ABBOTT NICHOLSON PC<br>Robert K. Firsten<br>300 River Place, Suite 3000<br>Detroit, MI 48207-4225<br>Email: rkfirsten@abbottnicholson.com | ANDERSON AGOSTINO & KELLER PC<br>Peter J. Agostino<br>131 S. Taylor Street<br>South Bend, IN 46601<br>Email: agostino@aaklaw.com |

| BAKER & DANIELS<br>Thomas J. Brunner, Jr.<br>Alison G. Fox<br>D. Lucetta Pope<br>202 S. Michigan Street, Suite 1400<br>South Bend, IN 46601<br>Email: Tom.Brunner@bakerd.com; Alison.Fox@bakerd.com; Lucetta.Pope@bakerd.com | BARKAN NEFF HANDELMAN MEIZLISH LLP<br>Robert E. DeRose, II<br>360 S. Grant Avenue<br>Columbus, IN 43215<br>Email: rhandelman@bnhmlaw.com |
|---|---|
| LAW OFFICES OF GEORGE A. BARTON<br>George A. Barton<br>4435 Main Street, Suite 920<br>One Main Plaza<br>Kansas City, MO 64111<br>Email: gab@georgebartonlaw.com | BEASLEY ALLEN<br>Larry A. Golston, Jr.<br>218 Commerce Street<br>Montgomery, AL 36104<br>Email: larry.golston@beasleyallen.com |
| BELIN LAMSON MCCORMICK ZUMBACH FLYNN<br>Michael R. Reck<br>666 Walnut Street Suite 2000<br>Des Moines, IA 50309-3989<br>Email: mrreck@belinlaw.com | BRINKLEY & CHESNUT<br>J. Allen Brinkley<br>307 Randolph Avenue<br>Huntsville, AL 35801<br>Email: Allen@bclegal.net |
| LAW OFFICE OF JOREE G. BROWNLOW<br>Joree Brownlow<br>1444 Gillham Dr., Suite 200<br>Bartlett, TN 38134<br>Email: joree@jbrownlow.com | CARLSON LYNCH LTD<br>R. Bruce Carlson<br>Gary F. Lynch<br>231 Melville Lane<br>Sewickley, PA 15143<br>Email: bcarlson@carlsonlynch.com; glynch@carlsonlynch.com |
| CURETON CLARK PC<br>Jerald R. Cureton<br>Anthony L. Marchetti, Jr.<br>300 Midlantic Drive, Suite 200<br>Mt. Laurel, NJ 08054<br>Email: jcureton@curetonclark.com; amarchetti@curetonclark.com | EDWARDS & ANGELL<br>Patricia A Sullivan<br>2800 Financial Plaza<br>Providence, RI 02903<br>Email: psullivan@eapdlaw.com |
| DIB FAGAN AND BRAULT<br>Barry S. Fagan<br>Darcie R. Brault<br>25892 Woodward Avenue<br>Royal Oak, MI 48067-0910<br>Email: bfagan@dibandfagan.com; dbrault@dibandfagan.com | FITZPATRICK SPINI & SWANSTON<br>B. James Fitzpatrick<br>838 S. Main Street, Suite E<br>Salinas, CA 93901<br>Email: bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |

<table>
<tr><td>FEDERAL EXPRESS CORPORATION<br>Edward J. Efkeman<br>3620 Hacks Cross Rd., Bldg. B<br>Memphis, TN 38125<br>Email: eefkeman@fedex.com</td><td>THE LAW FIRM OF<br>PHILIP STEPHEN FUOCO<br>Philip S. Fuoco<br>Joseph A. Osefchen<br>24 Wilkins Place<br>Haddonfield, NJ 08033<br>Email: pfuoco@msn.com; josefchen@msn.com</td></tr>
<tr><td>FINLEY ALT SMITH SCHARNBERT<br>CRAIG HILMES & GAFFNEY PC<br>Kevin J. Driscoll<br>Jack D. Hilmes<br>699 Walnut Street, 1900 Hub Tower<br>Des Moines, IA 50309-3773<br>Email: kdriscoll@finleylaw.com;<br>jhilmes@finleylaw.com</td><td>LAW OFFICES OF ROBERT A. GARCIN<br>Robert A. Garcin<br>210 East 29th Street, #A<br>Loveland, CO 80538</td></tr>
<tr><td>FRISCHHERTZ & ASSOCIATES<br>Marc L. Frischhertz<br>1130 St. Charles Avenue<br>New Orleans, LA 70130<br>Email: mfrischhertz@frischhertzlaw.com</td><td>GORBY PETERS & ASSOCIATES<br>Michael J. Gorby<br>Mary D. Peters<br>Two Ravinia Drive, Suite 1500<br>Atlanta, GA 30346<br>Email: mgorby @gorbypeters.com;<br>mpeters@gorbypeters.com</td></tr>
<tr><td>GANGEMI LAW FIRM PC<br>Salvatore G. Gangemi<br>82 Wall Street, Suite 300<br>New York, NY 10005<br>Email: sgangemi@gangemilaw.com</td><td>HALUNEN & ASSOCIATES<br>Clayton D. Halunen<br>Joni M. Thome<br>220 S Sixth St Suite 2000<br>Minneapolis, MN 55402<br>Email: halunen@halunenlaw.com;<br>thome@halunenlaw.com</td></tr>
<tr><td>GILREATH & ASSOCIATES<br>R. Christopher Gilreath<br>6256 Poplar Avenue<br>Memphis, TN 38119<br>Email: chrisgil@sidgilreath.com</td><td>WILLIAM S. HOMMEL, JR<br>Attorney at Law<br>1402 Rice Road, Suite 200<br>Tyler, TX 75703<br>Email: bhommel@hommelfirm.com</td></tr>
<tr><td>GUERRIERI EDMOND CLAYMAN<br>& BARTOS<br>Jeffrey A. Bartos<br>Soye Kim<br>1625 Massachusetts Ave. NW Suite 700<br>Washington, DC 20036<br>Email: jbartos@geclaw.com;<br>skim@geclaw.com</td><td>JACKSON LEWIS LLP<br>Karen P. Kruse<br>Aaron Roblan<br>One Union Square<br>600 University Street Suite 2900<br>Seattle, WA 98101</td></tr>
</table>

| | |
|---|---|
| HARWOOD FEFFER LLP<br>Robert I. Harwood<br>Peter W. Overs, Jr.<br>488 Madison Ave., 8th Floor<br>New York, NY 10022<br>Email: rharwood@whesq.com;<br>povers@whesq.com | JONES WALDO HOLBROOK<br>& MCDONOUGH SLC<br>James S. Lowrie<br>170 S. Main Street, Suite 1500<br>Salt Lake City, UT 84104 |
| JACKSON LEWIS LLP<br>Carla D. Macaluso<br>220 Headquarters Plaza<br>7th Floor East Tower<br>Morristown, NJ 07960 | DONALD B. LEWIS<br>5 Cynwyd Road<br>Bala Cynwyd, PA 19004 |
| LARON JONES<br>1505 N. Ellamont Street<br>Baltimore, MD 21216 | LICHTEN & LISS-RIORDAN<br>Harold L. Lichten<br>Shannon Liss-Riordan<br>100 Cambridge Street, 20th Floor<br>Boston, MA 02114<br>Email: hlichten@llrlaw.com; sliss@llrlaw.com |
| KIESEWETTER WISE KAPLAN<br>PRATHER PLC<br>James R. Mulroy, II<br>3725 Champion Hills Drive, Suite 3000<br>Memphis, TN 38125<br>Email: mulroyj@jacksonlewis.com | R. JAMES LORE<br>R. James Lore<br>102-I Commonwealth Court<br>Cary, NC 27511 |
| LEWIS FISHER HENDERSON<br>CLAXTON & MULROY<br>William T. Fiala<br>6410 Poplar Ave Ste 300<br>Memphis, TN 38119 | MARSHALL AND MORROW LLC<br>John S. Marshall<br>111 W. Rich Street, Suite 4300<br>Columbus, OH 43215-5296<br>Email: jmarshall@marshallandmorrow.com |
| LOCKRIDGE GRINDAL NAUEN<br>Susan E. Ellingstad<br>Charles N. Nauen<br>100 Washington Avenue, South #2200<br>Minneapolis, MN 55401<br>Email: sellingstad@locklaw.com;<br>cnnauen@locklaw.com | MCCRACKEN STEMERMAN<br>& HOLSBERRY<br>Andrew J. Kahn<br>1630 S. Commerce Street, Suite A-1<br>Las Vegas, NV 89102<br>Email: ajk@dcbsf.com |
| MARKOWITZ & RICHMAN<br>Paula R. Markowitz<br>1100 North American Building<br>121 S. Broad Street<br>Philadelphia, PA 19107<br>Email:<br>ldicrosta@markowitzandrichman.com | MEIZLISH & GRAYSON<br>Bruce H. Meizlish<br>Deborah R. Grayson<br>830 Main Street, Suite 999<br>Cincinnati, OH 45202<br>Email: drgrayson@fuse.net; brucelaw@fuse.net |

| MARTZELL & BICKFORD, APC<br>Scott R. Bicford, T.A.<br>Lawrence J. Centola, III<br>Neil F. Nazareth<br>338 Lafayette Street<br>New Orleans, LA 70130 | MORGAN LEWIS & BOCKIUS<br>5300 Wachovia Financial Center<br>200 S. Biscayne Boulevard<br>Miami, FL 33131-2339 |
|---|---|
| MCDANIEL LAW OFFICES<br>Robert E. McDaniel<br>4 Bicentennial Square<br>Concord, NH 03301<br>Email: remcdanielesq@aol.com | OGLETREE DEAKINS NASH SMOAK &STEWART<br>C. Victory Pyle, III<br>1320 Main Street, Suite 600<br>Columbia, SC 29201<br>Email: victor.pyle@ogletreedeakins.com |
| MICHAEL BEST & FRIEDRICH, LLP<br>Eric E. Hobbs<br>Eric H. Rumbaugh<br>100 E. Wisconsin Ave., Suite 3300<br>Milwaukee, WI 53202-4108<br>Email: eehobbs@michaelbest.com; ehrumbaugh@michaelbest.com | O'MALLEY & LANGAN<br>Todd J. O'Malley<br>Mary D. Walsh-Dempsey<br>426 Mulberry Street, Suite 104<br>Scranton, PA 18503<br>Email: tomalley@omalleylangan.com; mdempsey @omalleylangan.com |
| MORGAN LEWIS & BOCKIUS LLP<br>Michael J. Puma<br>1701 Market Street<br>Philadelphia, PA 19103-2921 | O'MELVENY & MYERS LLP<br>Robert M. Schwartz<br>1999 Avenue of the Stars, Suite 700<br>Los Angeles, CA 90067-6035<br>Email: rschwartz@omm.com |
| OGLETREE DEAKINS NASH SMOAK & STEWART PC<br>Jennifer R. Rygiel-Boyd<br>10 Madison Avenue, Suite 402<br>Morristown, NJ 07960<br>Email: jennifer.rygiel-boyd@olgetreedeakins.com | Chris A. Hollinger<br>O'Melveny & Myers LLP<br>Two Embarcadero Center<br>28th Floor<br>San Francisco, CA 94111<br>e-mail: chollinger@omm.com |
| O'MELVENY & MYERS LLP<br>Scott Voelz<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Email: svoelz@omm.com | PURDIE & METZ<br>Alan M. Purdie<br>402 Legacy Park<br>Ridgeland, MS 39157 |
| O'MELVENY & MYERS LLP<br>Jeffrey S. Nestler<br>1625 Eye Street NW Suite 10<br>Washington, DC 20006-4001<br>Email: jnestler@omm.com | RICHARDSON PATRICK WESTBROOK & BRICKMAN LLC<br>Daniel O. Myers<br>1017 Chuck Dawley Blvd., Bldg. A<br>Mount Pleasant, SC 29464<br>Email: dmyers@rpwb.com |

| | |
|---|---|
| REID & DENNIS<br>Steve Dennis<br>5001 Spring Valley Road, Suite 255 W<br>Dallas, TX 75244 | SCHWERIN CAMPBELL BARNARD LLP<br>Dmitri Iglitzin<br>18 West Mercer Street, Suite 400<br>Seattle, WA 98119-3971 |
| SCHROETER GOLDMARK &BENDER<br>Martin S. Garfinkel<br>500 Central Bldg.<br>810 Third Avenue<br>Seattle, WA 98104<br>Email: garfinkel@sgb-law.com | CATHLEEN A. SCOTT<br>Jupiter Gardens Suite 104<br>250 South Central Boulevard<br>Jupiter, FL 33458 |
| SCOPELITIS GARVIN LIGHT HANSON & FEARY PC<br>R. Jay Taylor, Jr.<br>10 W. Market Street, Suite 1500<br>Indianapolis, IN 46204<br>Email: jtaylor@scopelitis.com | STAACK SIMMS & HERNANDEZ<br>James A. Staack<br>900 Drew Street, Suite 1<br>Clearwater, FL 33755<br>Email: jims@staack-firm.com |
| SIEGEL BRILL GREUPNER DUFFY & FOSTER<br>Wood R. Foster, Jr.<br>Jordan M. Lewis<br>100 Washington Avenue South<br>Minneapolis, MN 55401<br>Email: woodfoster@sbgdf.com; jordanlewis@sbgdf.com | STRAUS & BOIES LLP<br>Ian Otto<br>4041 University Drive<br>Fairfax, VA 22030<br>Email: iotto@straus-boies.com |
| STOLL STOLL BERNE LOKTING & SHLACHTER<br>Steve D. Larson<br>David Rees<br>Joshua L. Ross<br>209 SW Oak Street, 5th Floor<br>Portland, OR 97204<br>Email: drees@ssbls.com; slarson@ssbls.com; jross@ssbls.com | TAYLOR DUNHAM & BURGESS LLP<br>Donald Taylor<br>301 Congress Avenue, Suite 1050<br>Austin, TX 78701<br>Email: dtaylor@taylordunham.com |
| RICHARD TANENBAUM<br>1131 McDonald Avenue<br>Brooklyn, NY 11230<br>Email: rt@lawyer.com | VENABLE LLP<br>Robert G. Ames<br>Lesley A. Pate<br>575 7th Street NW<br>Washington, DC 20004<br>Email: rgames@venable.com; lapate@venable.com |
| THOMAS N. TREFETHERN<br>101 Central Plaza South, Suite 1003<br>Canton, OH 44702<br>Email: trefethernlaw@aol.com | WATKINS & EAGER PLLC<br>Kenneth E. Milam<br>The Emporium Building<br>400 East Capitol Street<br>Jackson, Mississippi 39201<br>Email: kemilam@watkinseager.com |

| PETER N. WASYLYK<br>1307 Chalkstone Avenue<br>Providence, RI 02908<br>Email: pnwlaw@aol.com | WHEELER TRIGG KENNEDY LLP<br>Steven M. Kelso<br>1801 California Street, #3600<br>Denver, CO 80202<br>Email: kelso@wtklaw.com |
|---|---|
| WATTON LAW GROUP<br>Michael J. Watton<br>225 E. Michigan Street, Suite 550<br>Milwaukee, WI 53216<br>Email: jdrewicz@wattongroup.com | WICK BRAMER UKASICK & TRAUTWEIN LLC<br>Robert J. Penny<br>323 South College Avenue<br>Fort Collins, CO 80522 |
| WHETSTONE MYERS PERKINS<br>AND YOUNG<br>Charles W. Whetstone , Jr.<br>Cheryl F. Perkins<br>601 Devine Street<br>Columbia, SC 29201<br>Email: cperkins@attorneyssc.com; cwhetstone@attorneyssc.com | ZIMMERMAN REED, PLLP<br>Hart L. Robinovitch<br>14646 No. Kierland Blvd., Suite 145<br>Scottsdale, AZ 85254 |
| THE WINEBRAKE LAW FIRM LLC<br>Peter D. Winebrake<br>Twining Office Center<br>715 Twining Road, Suite 114<br>Dresher, PA 19025 | SMITH PHILLIPS MITCHELL & SCOTT<br>Richard T. Phillips<br>PO Box 1586<br>Batesville, Mississippi 38606-1586 |
| ZIMMERMAN REED, PLLP<br>David M. Cialkowski<br>Ann T. Regan<br>J. Gordon Rudd<br>651 Nicollet Mall Suite 501<br>Minneapolis, MN 55402<br>Email: dmc@zimmreed.com; atr@zimmreed.com; jgr@zimmreed.com | GINGER A. DEGROFF<br>PO Box 10194<br>Tampa, FL 33679<br>Email: degrofflaw@yahoo.com |
| MATTHEW T. TOBIN<br>PO Box 1263<br>Sioux Falls, SD 57101<br>Email: matt@sdtrustco.com | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Oakland, California, on **January 27, 2010**.

/s/ Lorelei Badar
Lorelei Badar

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

CHIEF JUDGE MILLER

**DEFENDANT FEDEX GROUND'S RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY (*Huggins v. FedEx Ground Package Sys.* (8th Cir. Jan. 19, 2010))**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground") submits this Response to Plaintiffs' Notice of Supplemental Authority (Doc. # 1990) concerning a recently decided diversity jurisdiction case vacating summary judgment on the independent contractor versus employee issue involving the linehaul Operating Agreement, not the pick-up and delivery Operating Agreements at issue in this multi-district litigation ("MDL"), *Huggins v. FedEx Ground Package Sys., Inc.*, No. 09-3144, 2010 WL 154883, at *2, *4 (8th Cir. Jan. 19, 2010) (applying Missouri law). For the reasons discussed below, the *Huggins* case applies only to the *Gray* (Missouri) case,[1] if at all—and it actually supports FedEx Ground's position that the *Gray* Plaintiffs' motion for summary judgment[2] should be denied.

[1] *Gray v. FedEx Ground Package Sys., Inc.*, No. 3-5-cv-00337-RLM-CAN (Missouri).

[2] MO. (*Gray*) Pls.' Memo. of Law in Supp. of Mot. for Summ. Adjud. of Empl. Status (Doc. # 1321).

*Huggins* is a personal injury case in which the court applied Missouri tort law. *Id.* at *1, *4. The case involves a passenger (Huggins) in a tractor-trailer who was injured in a highway collision. *Id.* Huggins sued FedEx Ground for negligence under a respondeat superior theory, contending that the driver of the truck in which Huggins was riding (Gutierrez) was in actuality a FedEx Ground employee, even though Gutierrez was employed by ANI Logistics, which in turn was the business entity used by Jon Ireland, who had entered into a linehaul independent contractor agreement with FedEx Ground. *Id.* at *4-*5.

The district court had granted summary judgment to FedEx Ground because it concluded that Huggins "had not offered admissible evidence" to controvert FedEx Ground's proof that "FedEx did not have the right to control Mr. Gutierrez's work," which proof included the "'Linehaul Contractor Operating Agreement'" between ANI and FedEx Ground. *Id.* After reviewing the evidence, the Eighth Circuit determined, under Missouri's version of the "master-servant relationship" test drawn from the Restatement (Second) of Agency § 220(2) (1958), that "Huggins presented sufficient evidence to avoid summary judgment" and reversed and remanded the case for further proceedings. *Huggins*, 2010 WL 154883, at *4, *10. It made no liability finding in favor of the plaintiff.

Because *Huggins* dealt only with potential tort liability under Missouri law, *id.* at *1 ("The parties agree that Missouri substantive law applies in this case."), the only possible application this case has to the MDL is to the *Gray* (Missouri) action in the MDL. This Court applied an "analysis of eight factors" for employment status to the *Gray* Plaintiffs' statutory claim for wage deductions (under Mo. Rev. Stat. § 290.010), common law claims for unjust

enrichment and rescission, and their claim for declaratory relief. 3/25/08 Order at 102, 104.[3] By contrast, the *Huggins* court applied the ten factors "set out in § 220(2) of the Restatement (Second) of Agency" to "determine[e] whether one acting for another is an employee or an independent contractor for purposes of respondeat superior liability . . . ." *Huggins*, 2010 WL 154883, at *4 (citing, inter alia, *Lee v. Pulitzer Publ'g Co.*, 81 S.W.3d 625, 631 (Mo. Ct. App. 2002) (quoting Restatement § 220(2)(a)-(j))). As a result, it does not appear that *Huggins* even applies to *Gray*, given this Court's prior recitation of the eight pertinent factors applicable to the employment status inquiry for the claims the Missouri Plaintiffs have asserted. In any event, because *Huggins* applies Missouri law, the case lacks relevance to other actions in the MDL, given "the [C]ourt's understanding that Missouri defines the 'right to control' concept differently than do other states." 3/25/08 Order at 105.

Aside from being a tort case considering employment status for respondeat superior purposes—instead of under a wage statute—*Huggins* is also distinguishable because it involved a linehaul contractor. Linehaul contractors provide services that are distinct and different from those provided by the pick-up and delivery contractors pursuing claims in the MDL. *See Roadway Package Sys., Inc. v. Kayser*, No. CIV. A. 99-MC-111, 1999 WL 817724, at *1 (E.D. Pa. Oct. 13, 1999) ("RPS [now known as FedEx Ground] contracts with independent drivers who provide package pick-up and delivery services, as well as with independent linehaul contractors who transport packages between RPS facilities and make limited bulk delivery and pick up for particular RPS shippers and consignees."), *aff'd*, 257 F.3d 287 (3d Cir. 2001), *abrogated in part on other grounds*, *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008). Plaintiffs have

[3] Plaintiffs acknowledge that the eight-factor test for employment status applies in *Gray*. *See* MO. Pls.' Mot. to Amend Class Certif. Order (Doc. # 1326) at 8; MO. Pls.' Memo. of Law in Supp. of Mot. for Summ. Adjud. of Empl. Status (Doc. # 1321) at 8 (filed under seal).

noted this difference in the past. *See* KS (*Craig*) Pls.' Am. Reply Memo. in Supp. of Mot. for Summ. Adjud. (Doc. # 1480) at 9 (noting that "long-haul freight drivers [] performed a different kind of work than Plaintiffs" and were "unlike FXG drivers"). Linehaul contractors' employment status is not at issue in the MDL.

Furthermore, as Plaintiffs point out, the plaintiff in *Huggins* did not move for summary judgment, (Pl.'s Notice at 2), and thus the case says nothing about and cannot support Plaintiffs' motions for summary judgment. Rather, the *Huggins* court noted merely that, "viewing the evidence and inferences from it favorably to Mr. Huggins" in the context of a Rule 56 motion, Huggins had submitted some proof from which a rational factfinder could infer that FedEx Ground "was his [Huggins'] employer for respondeat superior purposes." *Huggins*, 2010 WL 154883, at *4, *8. The court went on to observe that, far from a situation where Huggins was entitled to summary judgment in his favor, "[t]here is certainly record evidence tending to show that Mr. Gutierrez was an independent contractor. For instance, as the district court pointed out, the contract between FedEx and ANI provided that ANI would compensate the drivers, pay their taxes, and provide workers' compensation for them." *Id.* at *8. If anything, this discussion undermines the proposition that Plaintiffs in the MDL can prevail on their pending summary judgment motions, since the *Huggins* court had to view the evidence in the plaintiff's favor and give him the benefit of the reasonable inferences that could be drawn, *id.* at *4, just to avoid having the summary judgment against him affirmed. Consequently, the fact that the *Huggins* court found an issue of fact on the employment status issue where, according to Plaintiffs, *Huggins* had "facts substantially similar to the case at bar [*Gray*]," (Pls.' Notice at 2), actually supports FedEx Ground's position that Plaintiffs' affirmative motions for summary judgment, including the one in *Gray*, lack merit.

Moreover, the *Huggins* court reversed the district court's grant of summary judgment in part because the trial court "relied heavily" on "general contract provisions" in the Linehaul Operating Agreement giving a contractor discretion over the manner and means by which services would be provided, which was error because such language "will not trump provisions that actually reserve the right to control the details of that party's performance." 2010 WL 154883, at *5. Here, FedEx Ground has not contended that any similar language in the Ground or Home Delivery Operating Agreements "trump[s]" other contractual provisions.

Rather, FedEx Ground has argued in cases where it has moved for summary judgment that the relevant evidence taken as a whole must be considered and that this evidence shows that FedEx Ground is entitled to prevail on the status issue.[4] Indeed, FedEx Ground has expressly rejected the argument that one set of provisions in the Operating Agreement "trump[s]" others.[5] Where FedEx Ground has opposed Plaintiffs' summary judgment motions, it has argued, consistent with the result in *Huggins*, that summary judgment for Plaintiffs is precluded because,

---

4 *See, e.g.*, FedEx Ground's Reply Memo. in Supp. of *White* (Georgia) Mot. for Summ. J. (Doc. # 1928) at 4 (stating that this Court should follow the reasoning in *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 499 (D.C. Cir. 2009), and determine employment status "[a]fter considering '***all*** the common law factors'") (emphasis added in *White* brief)); FedEx Ground's Reply Memo. in Supp. of *Fishler* (Utah) Mot. for Summ. J. (Doc. # 1927) at 1 (rejecting notion that the Court should look at only some of the provisions of the Operating Agreement, and noting that "Plaintiffs' Opposition . . . overlooks the OA's clear language by picking and choosing what OA provisions this Court should interpret (***instead of looking at the OA overall***)") (emphasis added); *id.* at 13 ("Plaintiffs' opposition, however, invites the Court to discard entire sections of the OA"); *id.* at 14 (FedEx Ground argues that "a court may not . . . pick and choose between the OA's provisions and disregard those of its core provisions that do not support plaintiffs' motion"); FedEx Ground's Reply Memo. in Supp. of *Boudreaux* (Louisiana) Mot. for Summ. J. (Doc. # 1926) at 9 (noting that "Plaintiff's argument would require nothing short of a complete evisceration and rewriting of the OA, and would require the Court to disregard multiple provisions throughout the entire OA").

5 Doc. # 1928 at 5 n.1 (stating that "Plaintiffs cannot simply prioritize one set of provisions [in the Operating Agreement] over another"); Doc. # 1926 at 1 (noting that "plaintiffs' opposition requires the Court to ignore not only the OA's express creation of an independent contractor relationship but multiple sections that guarantee contractor independence").

when the evidence and inferences drawn therefrom are viewed in FedEx Ground's favor, there is sufficient conflicting proof "to avoid summary judgment." *Huggins*, 2010 WL 154883, at *4.[6]

In addition, far from "support[ing] Plaintiffs' motions" (Pls.' Opp. at 2) for summary judgment, and specifically the right to control factor, the *Huggins* court decided only that the evidence Huggins presented, viewed favorably to him, showed "control over some details of Mr. Gutierrez's work" and the right to control "at least some of the 'means and methods' used by ANI" in fulfilling its contractual duties. *Huggins*, 2010 WL 154883, at *6 (emphasis added). Because *Huggins* is consistent with the proposition that, "as with most employee-status cases, there are facts pointing in both directions,"[7] *Huggins* cannot bolster the contention that the applicable employment status factors in the MDL cases point in favor of summary judgment for Plaintiffs as a matter of law.

Finally, Plaintiffs' suggestion that *Huggins* aids their pending Motion to Amend the Class Certification Order (Doc. # 1326) in *Gray v. FedEx Ground Package Sys., Inc.*, No. 3-5-cv-00337-RLM-CAN (Missouri), (Pl.'s Notice at 4-5), is illogical. *Huggins* is a single-plaintiff negligence case. *Huggins*, 2010 WL 154883, at *1, *4. The case does not deal with class certification in any way. Nor does it hold that Huggins should prevail on his contention that he was a FedEx Ground employee, as a matter of law or otherwise. It simply holds that plaintiff Huggins could "avoid summary judgment" on his claim due to a fact issue on employment status and recognizes that under Missouri law "the court may decide the question of whether a master-

[6] *See, e.g.*, FedEx Ground's Memo. of Law in Opp. to *Flores* (Colorado) Pls.' Mot. for Summ. J. (Doc. # 1931) at 6-7 (stating that "disputed issues of fact exist under each prong of the statutory test that applies to the Wage Claim Act cause of action . . . precluding resolution as a matter of law" and that "[p]roper application of the statutory test, even on the limited record here, reveals that plaintiffs' classification cannot be established as a matter of law.").

[7] *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 305 (5th Cir. 1998) (quotation marks omitted).

servant relationship exists as a matter of law only if ‘no material fact [] giving rise to the determination is genuinely in dispute and when only one conclusion is reasonable.’” *Id.* at *4, *8. *Huggins* does not address nor does it change the fact that “Missouri courts define the ‘right to control’ with reference to the actual exercise of control, which will require a driver-by-driver, terminal-by-terminal, supervisor-by-supervisor analysis . . . .” 3/25/08 Order at 105-06. Therefore, *Huggins* simply does not affect the Court’s prior conclusion that class certification is unwarranted in *Gray* because the question of employment status under Missouri law “consists of too many other issues that cannot be decided on a class-wide basis . . . .” *Id.* at 106.

Dated: January 28, 2010

Respectfully submitted,

By: /s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Chris A. Hollinger
O’MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant’s Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 28th day of January, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Robert M. Schwartz

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| *In re* FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | CHIEF JUDGE ROBERT MILLER |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO AUGMENT THE RECORD RE: CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

## I. INTRODUCTION

Through their motion to augment the summary judgment record, plaintiffs seek to introduce: (1) addenda to the Operating Agreement that FedEx Ground distributed to its contractors in 2009 and 2010; and (2) the draft and withdrawn NOPA documents FedEx Ground produced pursuant to this Court's Opinion and Order dated December 28, 2009. (Doc. # 1992.) The Court should deny plaintiffs' request because these documents are cumulative of evidence already in the record, irrelevant, and/or inadmissible.

These addenda are cumulative of similar addenda already a part of the record, and are thus unnecessary to the Court's consideration of the summary judgment motions. Plaintiffs' request to admit the draft 2007 NOPAs and the withdrawn 2009 NOPA documents likewise should be rejected. These NOPAs do not represent the position of the IRS; they have been withdrawn and abandoned. In fact, the governing statutory provision (Section 530 of the 1978

Revenue Act), and the IRS's own policy manual, establish that, in issuing the NOPA documents, the IRS could not and did not make any determination of worker classification.

For all of these reasons, as well as those set forth below, plaintiffs' motion to augment the summary judgment record should be denied.

## II.     THE LATEST VERSIONS OF THE ADDENDA TO THE OPERATING AGREEMENTS DO NOT MERIT INCLUSION IN THE SUMMARY JUDGMENT RECORD

### A.     All of the Proffered Addenda Should Be Rejected As Cumulative

Plaintiffs propose adding the following documents to the record on the pending motions for partial summary judgment on the employee vs. independent contractor question: (1) the "Modified Term" Addendum (distributed in May 2009); (2) the "Employment Eligibility Verification and Compliance With Immigration Laws" (E-Verify) Addendum (distributed on October 14, 2009); (3) the "Safe Driving Program" Addendum (originally distributed on January 7, 2010 and redistributed in a revised form on January 22, 2010); (4) the "Enhanced Contractor Customer Service" Addendum (originally distributed on January 7, 2010 and redistributed in a revised form on January 22, 2010); and (5) an accompanying letter dated January 20, 2010. (Declaration of Lynn Faris (doc. # 1993) ¶¶ 4-6; Declaration of James Krappa ¶ 2 (filed herewith).)

The Court should reject this request.  The addenda plaintiffs propose adding to the summary judgment record are merely revised versions of routine annual contract updates. (Gebby Dep. at 257:22-259:13; Griffin Dep. at 109:2-5; Sherman Dep. at 189:25-190:8, 191:1-15; Hiltz Dep. at 114:22-115:4 (excerpts attached to the Declaration of Michael McGuinness, filed herewith).)  Substantially similar addenda for prior years are already in the summary

judgment record.[1] The mere passage of time since the filing of the summary judgment motions and the conclusion of discovery does not justify re-opening the summary judgment record to include updated versions of these documents. Otherwise, as long as any of these status motions are pending, the record will continually expand and never finally close. The Court need not add to the summary judgment record where the material to be added is largely cumulative. *Cf. Donovan v. Burger King Corp.*, 672 F.2d 221, 225 (1st Cir. 1982) (in FLSA action involving alleged misclassification of employees at 44 restaurants, court upheld limitation of evidence where "[t]he court found that all of the testimony thus far had been 'substantially the same' . . . . The evidence was thus admittedly cumulative, and it was within the province of the district court to exclude it.") (citing 10 Moore's Federal Practice § 403.13 (1981)); *Schneck v. Int'l Bus. Machs. Corp.*, No. 92-4370 (GEB), 1996 WL 885789, at *24 (D.N.J. June 25, 1996) (granting summary judgment and stating that "[w]here documentary or testimonial evidence is merely cumulative, it serves no purpose and, therefore, should be excluded").[2] The Court should

---

[1] *See, e.g.*, Decl. of Lynn Rossman Faris in Supp. of Pls.' Mot. for Summ. Adjud. Ex. 1 (doc. # 1197), at 1:124-25 (filed under seal on 4/24/08) (Contractor Customer Service (CCS) Program Addenda already in record); *id.* Ex. 1, at 1:124-25 (same); FedEx Ground's Local Rule 56.1 Statement of Material Facts (doc. # 1237-3) at 63-64 (FXG002464713-14) (same); Doc. # 1197 Ex. 1, at 1:145-47, 1:221-22, 1:263-65, 1:279-80 (Compliance Disclosure Addendum requiring contractor to comply with applicable laws and regulations regarding his employees, including duty to "[e]mploy only persons who are legally authorized to work in the United States and to maintain an I-9 employment authorization form . . . and . . . provide evidence of such compliance," already in record); Doc. # 1197 Ex. 1, at 1:33, 1:176 (same); Decl. of Lynn Rossman Faris in Supp. of VA Pls.' Mot. for Summ. Adjud. Ex. 1 (doc. # 1330), at 1:27-28, 1:78 (filed under seal on 6/2/08) (Term Provision already in record); FedEx Ground's Local Rule 56.1 Statement of Material Facts (doc. # 1237-2) at 26 (FXG002464618) (same); Doc. # 1197 Ex. 1, at 1:86-90, 1:131-36, 1:197-201, 1:223-27, 1:268-73 (Safe Driving Program already in record); Doc. # 1330 Ex. 1, at 1:45-49 (same); FedEx Ground's Local Rule 56.1 Statement of Material Facts (doc. # 1237-4) at 11-16 (FXG00246472934) (same).

[2] The Modified Term Addendum should also be rejected because it was a change for a very limited number of contractors, i.e., those whose routes are based in or operate out of Maryland. (Krappa Decl. ¶ 4.) As a result, this addendum is inapplicable to pending summary judgment motions for cases from other states.

therefore deny plaintiffs' attempt to include these extraneous documents to the summary judgment record.

**B. The Modified Term Addendum Adds Nothing to the Employment Status Analysis**

Plaintiffs claim that this Addendum, which proposes a change to the end date of existing Operating Agreements from the termination date currently provided in a particular Operating Agreement to May 14, 2010, is somehow relevant to the employment status question. (Pls.' Mot. at 1, 3.)[3] This is not the case. Unless a contractor chooses to adopt the Modified Term Addendum and participate in the Maryland transition, the existing Operating Agreements and their terms are not modified. (Faris Decl. Ex. 18 at 18:1; Krappa Decl. ¶ 4.) If a contractor is free to sign or reject the Modified Term Addendum, the Addendum is voluntary and not proof of control. Moreover, a voluntarily executed Addendum cannot establish that contractors are terminable at-will, contrary to plaintiffs' assertion. (Pls.' Mot. at 4 (claiming that the Modified Term Addendum "show[s] FXG's right to set and change at-will the continuing relationship between FXG and its drivers").)[4] If considered at all, the fact that FedEx Ground feels constrained to obtain a contractor's consent before changing the length of their contractual relationship bolsters FedEx Ground's argument that the Operating Agreement is not an at-will employment contract.

---

[3] Though plaintiffs indicate that the documents attached to their motion be added to the record "without further briefing," (Pls.' Mot. at 1), their motion proceeds to dispense just such briefing and argument. (*Id.* at 2-5.) FedEx Ground accordingly responds to those arguments.

[4] In an at-will employment relationship, the employer does not need the employee's consent in order to terminate the employment relationship at any time and without notice. *Mitchell v. Glover*, 996 F.2d 164, 167 (7th Cir. 1993) ("As an 'at-will employee' the plaintiff clearly had no entitlement to continued employment and thus could be dismissed at any time for any reason.").

case 3:05-md-00527-RLM-CAN document 2062 filed 02/16/109 page 5 of 11

### C. The Addendum Regarding the E-Verify System Is Not Evidence of Control By FedEx Ground But Rather is Required By the Government, Which Excludes This Requirement From the Employment Status Analysis

Plaintiffs further claim that the Addendum requiring use of the E-Verify system evidences control by FedEx Ground. (Pl.'s Mot. at 3-4.) However, as a federal contractor, (Krappa Decl. ¶ 3), FedEx Ground has a duty to comply with federal immigration laws. *Chamber of Commerce of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 730 (D. Md. 2009) (citing Exec. Order No. 12,989, 61 Fed. Reg. 6,091 (Feb. 15, 1996) and Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 11, 2008)).[5] It must do so by using the E-Verify system. *Chamber of Commerce*, 648 F. Supp. 2d at 731 ("On June 9, 2008, the Secretary of Homeland Security signed a one-page notice designating E-Verify as the 'electronic employment eligibility verification system to be used by Federal contractors.'") (citing Designation of the Electronic Employment Eligibility Verification System Under Executive Order 12,989, 73 Fed. Reg. 33,837 (June 13, 2008)). Furthermore, the government also requires proof of immigration status via E-Verify for the employees of *sub-contractors* who work on government contracts. Final Rule, 73 Fed. Reg. 67,651, 67.654 (Nov. 14, 2008) (stating that Final Rule "[r]equires contractors and subcontractors to use E-Verify to confirm the employment eligibility of all existing employees who are directly performing work under the covered contract."); *id.* at 67,705-06 (codified at 48 C.F.R. § 52.222.54(e) (2009)).[6] Thus, even the employees of sub-contractors who perform work

---

[5] Exec. Order No. 13,465 provides that:

> "Executive departments and agencies that enter into contracts shall require, as a condition of each contract, that the contractor agree to use an electronic employment eligibility verification system designated by the Secretary of Homeland Security to verify the employment eligibility of: (i) all persons hired during the contract term by the contractor to perform employment duties within the United States; and (ii) all persons assigned by the contractor to perform work within the United States on the Federal contract." *Id.*

[6] *See also id.* at 67,651 ("This final rule responds to these requirements, and the Secretary's designation, by amending the FAR to *require* certain Federal contractors *and subcontractors* to

case 3:05-md-00527-RLM-CAN document 2062 filed 02/16/10 page 6 of 11

pursuant to FedEx Ground's contract with the government, i.e., employees of FedEx Ground contractors, must undergo immigration verification through the E-Verify system. *Id.* As the federal contractor, FedEx Ground is required to ensure that the sub-contractors actually use E-Verify. 73 Fed. Reg. at 67,676 ("[P]rime contractors are responsible for all aspects of contract performance including subcontract requirements. The methods used to assure compliance are also the responsibility of the prime contractor and the subcontractor.").

In the FedEx Ground Employment Eligibility and Compliance With Immigration Laws Addendum regarding E-Verify, FedEx Ground is merely fulfilling its duty to ensure that its sub-contractors use E-Verify. (Faris Decl. Ex. 18, at 18:3.) Consequently, this Addendum is proof of nothing more than government control, which is not part of the assessment of whether FedEx Ground's contractors are employees or independent contractors. *See NLRB v. Associated Diamond Cabs*, 702 F.2d 912, 922 (11th Cir. 1983) ("Consistently the courts have held that regulation imposed by governmental authorities does not evidence control by the employer. Indeed, employer imposed regulations that incorporate governmental regulations do not evidence an employee-employer relationship, unless pervasive control by the employer exceeds to a significant degree the scope of the government imposed control.") (citations omitted).

**D. The Addenda Regarding the Safe Driving Program and the Enhanced CCS Bonus Are Voluntary and Do Not Evidence Control**

Plaintiffs contend that the Addenda regarding the Safe Driving Program and the Enhanced Contractor Customer Service (CCS) Program ("Enhanced CCS Program") are evidence of control because the driver qualification and disqualification rules supposedly "go far beyond anything required by law" and because the Enhanced CCS Program "changes the terms of the CCS bonus." (Pls.' Mot. at 3.) Plaintiffs are incorrect.

---

use the E-Verify system (E-Verify) . . . .") (emphasis added); *id.* at 67,699; *id.* at 67,704 (codified at 48 C.F.R. § 22.1802(b)(4)).

These programs are linked, i.e., participation in the Enhanced CCS Program is contingent on participation in the new Safe Driving Program. (Krappa Decl. ¶ 5.) The revised Safe Driving Program Addendum was specifically "developed to further improve safety performance by rewarding contractors who operate safely each and every day." (Faris Decl. Ex. 20 at 20:11.) If a contractor chooses to follow the requirements of the Enhanced CCS Program, he is "eligible to be paid . . . an individual, performance-related bonus . . . ." (Faris Decl. Ex. 19 at 19:21.) This bonus is a "reward[]" for "operat[ing] safely." (*Id.* Ex. 20:11.)

However, these are ***optional*** programs. (Krappa Decl. ¶ 5.) If a contractor elects not to participate in these revised programs, then he continues to operate under the existing Safe Driving Program and CCS bonus program in his Operating Agreement. (*Id.*) Such optional programs are not evidence of control. *Strange v. Nationwide Mut. Ins. Co.*, No. CIV. A. 93-6585, 1997 WL 550016, at *9 (E.D. Pa. Aug. 21, 1997) (despite existence of "numerous promotions bonus, incentive, award and recognition programs," court found that insurance agents were independent contractors, noting that "all of the above described programs are aimed at achieving positive results, and do not direct the manner and means by which plaintiffs achieve these results. These programs merely encouraged and awarded plaintiffs for achieving positive results. There is no evidence that such programs curtailed the independent judgment or strategies of plaintiffs.").[7]

**III. THE NOTICES OF PROPOSED ADJUSTMENTS (NOPAs) SHOULD NOT BE INCLUDED IN THE RECORD**

Plaintiffs seek to add to the summary judgment record a draft Notice of Proposed Adjustment ("NOPAs") dated December 2007 and NOPAs dated September 2009 that the

---

[7] Moreover, given that the new CCS Addendum is not materially different than the prior CCS Program, which is in the record, (*see, e.g.*, Doc. # 1197 Ex. 1, at 1:124-25; *id.* Ex. 1, at 1:124-25; Doc. # 1237-3, at 63-64 (FXG002464713-14)), the Court should deny plaintiffs' request to add the Enhanced CCS Program Addendum on the ground that it is cumulative evidence.

Internal Revenue Service (IRS) later withdrew. (Faris Decl. Ex. 21.) None of these should be added to the record.[8]

First, the NOPAs should not be added here for the same reasons that the Court should not consider or rely on the rulings of other tribunals that used standards for the employment status of contractors that differ from the various standards that apply to the claims at issue in the MDL. (*See*, *e.g.*, FedEx Ground's Omnibus Resp. to Pls.' Memo. of Law Re: Collateral Estoppel (doc. # 1397) at 10-18.) Indeed, the basis for excluding the NOPAs from consideration is even greater than for the other authority plaintiffs have sought to introduce, given the fact that the 2007 NOPA was a ***draft*** and that the IRS itself realized that the 2009 NOPAs had been issued in error and needed to be withdrawn, rendering them both of no force or effect at all. For purposes of summary judgment, at the very least, these NOPAs are irrelevant and cannot aid the Court's analysis.

Second, the draft and withdrawn NOPAs should not be added to the record in light of their procedural history, which renders them far less than undisputed summary judgment proof. The Court is aware of the unusual procedural posture of these NOPAs, including their draft and tentative nature, their issuance despite the terms of the 1994 Closing Agreement and Letter of Assurance, the NOPAs' subsequent withdrawal, and their replacement with no assessments. (12/28/09 Order (doc. # 1953) at 1-5, 10.) Those facts alone, along with the countervailing evidence that FedEx Ground would be entitled to offer to place the documents in their proper procedural context, indicates that the NOPAs do not remove issues from factual dispute; instead,

[8] FedEx Ground does not believe the October 2009 NOPAs explaining the withdrawal of the prior NOPAs, (Faris Decl. Ex. 22), need to be included in the record. However, if the four NOPA documents plaintiffs have included as Exhibit 21 to the Faris Declaration are admitted, then the October 2009 NOPAs should be, too, for the sake of completeness.

they only raise issues in dispute and require consideration and resolution of collateral issues well outside the confines of a Rule 56 motion.

Furthermore, according to the applicable law and the IRS' own procedures, the application of the Section 530 safe harbor renders the draft NOPAs ***of no substantive effect*** in establishing that any plaintiff or absent class member is an employee. Section 530 of the 1978 Revenue Act (26 U.S.C.S. § 3401, Pub. L. 95-600) states: "Nothing in this section shall be construed to provide that subsection (a) [the safe harbor] only applies where the individual involved is otherwise an employee of the taxpayer." And the IRS Manual at 4.23.10.12.4.1 (04-10-2009) flatly bars the drawing of any inferences from the application of section 530:

> The question of whether a business is eligible for section 530 treatment must be addressed first in every worker classification case. *See* IRM 4.23.8.2, "Introduction." If the firm is eligible for section 530, the examiner is to discontinue the examination with regard to the qualified occupation. This discontinuance ***means that the worker status has not been determined as to whether the occupation class is that of employee or independent contractor***.

*Id.* (emphasis added).

According to the safe harbor provision, as well as the IRS' own policy, the "no change" discontinuance of the audit on section 530 grounds explicitly means the IRS ***did not*** determine that Ground or Home Delivery contractors were employees. The significance of the section 530 finding is that the IRS has concluded that, in all material respects, FedEx Ground continued to operate (through the 2002 tax year) in accordance with the Operating Agreement the IRS approved in 1995 as consistent with an independent contractor relationship. In fact, once the IRS found that Section 530 applied, the IRS could not have proceeded to make an assessment with regard to employment status at all. *In re Rasbury*, 130 B.R. 990, 1010 (Bankr. N.D. Ala. 1991) (discussing legislative history of Section 530, and noting that the relevant congressional "subcommittee and committee[] *perceived the Section 530 analysis* as the IRS' *first step* in

determining whether an employer had misclassified his workers. *If the Section 530 safe harbor applied, the report said, the IRS should never get to the '20 common law factors.'*") (citing Tax Administration Problems Involving Independent Contractors, H.R. Rep. No. 101-979, at 3 (1990), 1990 WL 201643, at *3 (Leg. Hist. Nov. 9, 1990); IRS Chief Counsel Advisory 200948043, 2009 WL 4092540, at 17 (IRS CCA Nov. 27, 2009) ("Congress intended to make clear that there does *not* first have to be a determination that a worker is an employee under the common law standards before application of Section 530.") (emphasis added) (citing Conference Report, H.R. No. 104-737, 104th Congress, 2d Sess. at 202 (1996)). In sum, because the Section 530 finding means that the IRS did not find any contractors to be employees, the use of draft and superseded NOPAs would directly undermine Section 530, and they should not be included in the record.

## IV. CONCLUSION

For the foregoing reasons, FedEx Ground respectfully requests that this Court deny plaintiffs' motion to augment the summary judgment record.

Dated: February 16, 2010.

Respectfully submitted,

By: /s/Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Michael McGuinness
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 16th day of February, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/Robert M. Schwartz

LA3:1164695.8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

*In re* FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Case No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

*ALL ACTIONS*

CHIEF JUDGE ROBERT MILLER

**DECLARATION OF JAMES KRAPPA IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO AUGMENT THE RECORD RE: CROSS-MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

I, James Krappa, declare and state:

1. I am a Managing Director-Contractor Relations for FedEx Ground Package System, Inc. ("FedEx Ground"). I file this declaration in support of the Opposition by FedEx Ground Package System, Inc. to Plaintiffs' Motion to Augment the Record regarding the pending summary judgment and summary adjudication motions. I have personal knowledge of the matters set forth in this declaration, and if called to testify to the facts stated herein, I could and would do so competently.

2. I have reviewed the Operating Agreement Addenda attached to the Declaration of Lynn Rossman Faris in Support of Plaintiffs' Motion to Augment the Record (Doc. # 1993). Aside from the Modified Term Addendum, these Addenda (attached as Exhibits 18-20 to the Faris Declaration) were all distributed to FedEx Ground's pick-up and delivery contractors after July 27, 2009. Specifically, the "Employment Eligibility Verification and Compliance With Immigration Laws" (E-Verify) Addendum was distributed to contractors on or about October 14,

2009. The "Safe Driving Program" Addendum was originally distributed to contractors on or about January 7, 2010. The "Enhanced Contractor Customer Service" Addendum was originally distributed to contractors on or about January 7, 2010. Revised versions of the "Safe Driving Program" Addendum and the Enhanced Contractor Customer Service" Addendum were distributed to contractors on or about January 22, 2010.

     3.     FedEx Ground is a contractor for the federal government. FedEx Ground is subject to the E-Verify program regarding proof that its employees and subcontractors who provide services pursuant to FedEx Ground's contract with the federal government are authorized to work in the United States. FedEx Ground's contracts with the federal government are in excess of $100,000. The Operating Agreements between FedEx Ground and the contractors involved in the MDL typically meet the $3000 threshold to trigger use of the E-Verify system by a subcontractor.

     4.     The Modified Term Addendum at issue was a change for contractors whose routes are based in or operate out of Maryland, not other states.

     5.     The "Safe Driving Program" Addendum and "Enhanced Contractor Customer Service" Addendum attached as Exhibits 19-20 to the Faris Declaration are voluntary. If a contractor chooses the additional payments described in the "Enhanced Contractor Customer Service" Addendum, then the contractor executes the new "Safe Driving Program" Addendum. (*See* Faris Decl. Ex. 19, at 19:21 (stating that the Enhanced CCS Program is "contingent" on executing the new "Safe Driving Program" Addendum).) If a contractor chooses not to accept the new "Safe Driving Program" Addendum and "Enhanced Contractor Customer Service" Addendum, then the contractor continues to operate under the existing Safe Driving Program and Contractor Customer Service addenda that are part of his Operating Agreement.

Case 3:05-md-00527-RLM-CAN document 2002-1 filed 02/16/10 page 3 of 3

Further affiant sayeth not.

I declare under penalty of perjury under the laws of the United States of America (and pursuant to 28 U.S.C. § 1746) that the foregoing is true and correct and that this declaration is executed this 16th day of February, 2010 in Moon Township, Pennsylvania.

James Krappa

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION

Cause No. 3:05-MD-527-RM
(MDL 1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO AUGMENT THE RECORD IN THE CROSS MOTIONS FOR SUMMARY ADJUDICATION OF EMPLOYMENT STATUS**

FedEx Ground Package System, Inc.'s (FXG) opposition to Plaintiffs' Motion to Augment the Record points to no legitimate reason why this Court should decline to consider the key documents Plaintiffs offer, which FXG has only recently produced. FXG tries to evade its new addenda to the Operating Agreement, while at the same time conceding their relevance to summary adjudication by erroneously claiming that they support FXG's position that the drivers are independent contractors. Manifestly, the Court should decide the pending summary adjudication motions based on a full record containing the entire Operating Agreement – a document that the Court has already recognized as central to the analysis.

As for the IRS Notices of Proposed Adjustment (NOPAs), FXG ignores that this Court has determined their relevance and that the only reason Plaintiffs did not offer them with the record previously submitted is that FXG refused to produce them until ordered to do so by the Court less than two months ago. *See* Doc. 1593. FXG's argument that the IRS "did not find any contractors to be employees" asks the Court to close its eyes to the plain language of the NOPAs,

which plainly find after almost fifty pages of detailed analysis, that FXG's "contractors" – and all of them – are employees under the common law right-to-control test applied by the IRS. *See* FXG's Opposition to Motion to Augment the Record at 10 ("Opp.," Doc. 2002). FXG's argument that the NOPAs are inappropriate for consideration attacks a straw man. Plaintiffs offer these detailed analyses as persuasive authority, not as a basis for collateral estoppel or as conclusive proof of employment status as a matter of law. FXG fails to point to any legitimate reason why the Court should not consider the IRS' detailed and sweeping review of the critical employment status issue. Plaintiffs' motion should be granted.

**ARGUMENT**

**A. The New OA Addenda are Material Evidence of Employee Status.**

In arguing that the Court should not consider the new provisions of the OA offered by Plaintiffs, FXG ignores that this Court has held that the OA supplies important, if not the most important, evidence of employment status. *See* Docs. 906, 1119, 1770. FXG also ignores that it itself has argued that the OA is so important that the Court should not look at anything else. FXG cannot be heard to legitimately claim that new provisions of the OA adding new restrictions should not be reviewed.

Nor are the new addenda cumulative of other evidence in the record. A quick perusal of the documents shows the inaccuracy of this position. FXG's expansive new Safe Driving Program, for example, imposes new restrictions on drivers' ability to hire and retain workers. *Compare* Dec. of Faris in Support of Plaintiffs' Motion to Augment ("Faris Dec.," Doc. 1994) Exh. 19:1-10 *to* Doc. 1197 Exh. 1:131-139. The prior Safe Driving Addendum did not, for example, require drivers to terminate an existing helper or assistant for certain infractions, including minor traffic violations (§5.6); prohibit drivers from hiring an assistant who has been

convicted of any of a broad list of crimes, even misdemeanors (§3); or require drivers to suspend an assistant charged with an infraction before a finding of guilt based on FXG's subjective, un-tested belief that the individual is probably guilty (§1.8). These new restrictions promulgated by FXG for its own purposes cannot be ignored, particularly in the face of FXG's flagship argument that the drivers' ability to hire others is inconsistent with employment.

FXG argues that it has imposed these new restrictions to "'improve safety performance.'" Opp. at 7 (quoting Faris Dec. Exh. 20:11). FXG's alleged reason for imposing restrictions – whether a good reason or a bad reason – is immaterial to whether these new rules show that FXG has reserved the right control how drivers perform their work.

FXG argues that none of the new addenda matters because a driver can refuse to sign. However, there is no dispute that any driver who signs the addenda is required to comply with FXG's rules set forth therein. *See* OA §12.1 (OA may be terminated if driver "breaches or fails to perform the contractual obligations imposed"). One of FXG's own Division Vice Presidents agreed that it was an "extremely rare exception" for any driver to refuse to sign addenda presented by FXG. Doc. 1893 Exh. A Vol. 1 at page 433, lines 8-11 (Hiltz Deposition).

FXG argues that the new CCS addenda do not support employee status because they merely set out the requirements for obtaining a bonus. But the fact that FXG has chosen to obtain compliance by granting or denying pay does not show an absence of control. To the contrary, FXG has chosen to use "one of the most effective tool[s] available [in getting workers to do their work the way the company wants]: taking money out of the drivers' income." *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1100 (9th Cir. 2008) (finding that cab drivers were employees where cab company obtained compliance with its work rules by, among other things, withholding pay).

*Strange v. Nationwide Mutual Insurance Company*, Case No. Civ. A. 93- 6585, 1997 WL 550016, at *6, 8 (E.D. Pa. Aug. 21, 1997), cited by FXG, addresses insurance agents who could advertise their services under their own names, were paid solely on commission and given bonuses or rewards based on the number of policies they sold and the revenue they generated. Because the bonus and incentive programs were directed to results only, the court found that they did not show the company's reserved right to control the manner and means of how the work was performed. *Id.* FXG's CCS pay rewards drivers according to, not only whether they pick up and deliver, but how they do it – wearing a FXG uniform, following FXG's signature service and driver release rules, and avoiding certain disqualifying events in FXG's new Safe Driving Addendum. Faris Dec. Exh. 19:21, 23, 26.

FXG argues that the new addenda setting a fixed termination date should be disregarded because they only apply in Maryland. But FXG's termination of all of the contracts in Maryland indicates that FXG holds the power to terminate all of the contracts in every state. Moreover, obtaining an annual pay raise is contingent upon executing the new addenda offered by FXG for each new fiscal year. *See* Doc. 1197 Exh. 8:831, lines 5-25 (Sullivan Deposition). The fact that FXG has chosen to coerce Maryland drivers into a specific termination date by conditioning pay raises on "agreement," only shows that FXG has decided to use a "carrot" rather than a "stick" to get its drivers to do what it wants. Either way, it is FXG alone who sets the terms.[1]

[1] FXG argues that the new addenda requiring drivers to use E-Verify to check the immigration status of any assistants or helpers merely comports with the rules FXG must follow as a federal contractor. This argument fails to show why this Court should decline to consider the full OA, including all of its addenda, in ruling on the pending motions.

**B.     The IRS NOPAs' Analyses and Conclusions Provide Persuasive Authority that the Court Should Consider.**

The NOPAs contain pages of analysis of the employment status of all FXG "contractors" and conclude that they are all employees under the IRS' common law test.  Faris Dec. 21.  FXG points to no legitimate reason why the Court should decline to consider this persuasive authority that the Court has already found "relevant and material to matters in this litigation."  Doc. 1953 at 10-11.

FXG's argument that the NOPAs are not worthy of collateral estoppel effect misses the point.  Plaintiffs do not argue that the NOPAs preclude FXG from denying that its drivers are employees, thereby entitling Plaintiffs to adjudication of employment status as a matter of law. In other words, Plaintiffs do not argue that the NOPAs are akin to the judgment in *Estrada v. FedEx Ground Package System, Inc.*, which does entitle Plaintiffs to such relief.  *See, e.g.,* Doc. 1194.  Rather, Plaintiffs assert that the right-to-control analysis in the NOPAs provides persuasive authority that this Court should consider in evaluating the pending cross motions for summary adjudication in this case, which address the same issue of employment status and the same core set of facts.  Like the common law control test applicable in many of the pending cases, under the IRS' iteration of the test:

> [A] worker is an employee when the person for whom the services are performed has the right to control and direct the individual who performs the services.  This control reaches not only the result to be accomplished, but also the details and means by which this result is to be accomplished.  Note that control must be present, but need not actually be exercised.

IRS Manual § 4.23.5.6 (2-1-2003).

FXG claims that the IRS is supposed to analyze application of the Internal Revenue Code Section 530 "safe harbor" provision first before reaching the question of employment status under the right-to-control test.  But this argument also misses the mark.  Regardless of the

preferred order of an IRS audit or any IRS procedural rules on the subject, there can be no dispute that in this case, the IRS first conducted a thorough and detailed evaluation and analysis of the drivers' employment status and found all of FXG's "contractors" to be employees under the right-to-control test. Faris Dec. Exh. 21. Even assuming that the agency was supposed to have analyzed the application of the Section 530 "safe harbor" first, such an irregularity in the order of the proceeding would not alter the persuasive value and relevance of the NOPAs right-to-control analyses.[2]

FXG also argues that application of the "safe harbor" means that "the IRS did not determine that Ground and Home Delivery contractors were employees." Opp. at 9-10. To be sure, the IRS ultimately determined that the "safe harbor" prevented it from seeking back taxes from FXG and thus issued no final determination of employee status. Faris Dec. Exh. 22. But FXG's argument ignores the plain language of the NOPAs and exalts form over substance. *See* Faris Dec. Exh. 21.

The right-to-control test of employment status and the "safe harbor" test are distinct and independent inquiries. The IRS Manual, also cited by FXG, explains:

> Section 530 only terminates the liability of the employer for employment taxes but has no effect on the employees' status. It does not convert the workers from the status of employee to the status of self-employed (independent contractor).

IRS Manual § 4.23.5.2.3 (11-3-2009); *see also In re Rasbury*, 130 B.R. 990, 1003 (N.D. Ala. 1991) (also cited by FXG explaining that "Section 530 functions basically as a defense against liability determined by the Internal Revenue Service for misclassification"). Thus, the IRS'

---

[2] Several of the authorities FXG cites make clear that the IRS *may* perform the "safe harbor" analysis first before analyzing employee status, but do not say that the IRS must conduct the analyses in this order as a matter of law. IRS Chief Counsel Advisory 200948042, 2009 WL 4092540, at *17 (IRS CCA Nov. 27, 2009) ("Congress intended to make clear that there does not first have to be a determination that a worker is an employee under the common law standards before application of Section 530"); *In re Rasbury*, 130 B.R. 1003, 1010 (N.D. Ala. 1991) (quoting House Committee and Subcommittee report explaining that "safe harbor" analysis would obviate the need for the IRS to analyze employee status).

"safe harbor" ruling (Faris Dec. Exh. 22) does not undercut the substance of the IRS' prior analyses and conclusion that FXG reserves the right to control how the drivers perform their work under the right-to-control test (*id.* Exh. 21). The "safe harbor" determinations merely mean that a loophole in the tax code makes it impossible for the IRS to assess back taxes from FXG. And FXG does not dispute that, unlike the right-to-control test, the tax code's "safe harbor" has no analog in the cases before this Court.

FXG asks the Court to refuse to consider the NOPAs by raising the specter of unidentified "collateral issues" that the Court will supposedly have to consider. This argument should be rejected. The NOPAs speak for themselves and Plaintiffs have provided the Court with a complete copy of every one, including those ultimately concluding that FXG is eligible for the "safe harbor." Faris Dec. Exhs. 21-22. No manner of "contextualization" or window-dressing by FXG will alter the NOPAs plain language. Certainly, this Court will be required to reach its own conclusions about the drivers' employment status, but the persuasive value of the NOPAs' analyses cannot legitimately be disputed.

**CONCLUSION**

For the reasons set forth herein and in Plaintiffs' opening brief, Plaintiffs respectfully request that the Court consider the new OA Addenda and NOPAs in ruling on the pending cross motions for summary adjudication of employment status.

Dated: February 23, 2010

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor I. Morton**

ELEANOR I. MORTON, ESQ.
1188 Franklin St., Suite 201
San Francisco, CA 94109
Tel: (415) 771-6400
Fax: (415) 771-7010

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:    (212) 935-7400
Fax:    (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:    (574) 288-1510
Fax:    (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION
THIS DOCUMENT RELATES TO:

ALL ACTIONS

Cause No. 3:05-MD-527 RM
(MDL-1700)

OPINION and ORDER

This matter is before the court on the plaintiffs' motion (doc. ## 1559, 1564) to strike references to stricken declarations in the defendant's memoranda in opposition to the plaintiffs' motions to amend class certification orders. The plaintiffs in Michigan, Missouri, Virginia, Montana, South Dakota, Massachusetts and Illinois seek to amend the class certification orders denying class certification in each state arguing, in part, that the issue of actual control can be proven by common evidence, so common issues predominate and class certification is warranted. Those plaintiffs point to the summary judgment record and argue that their use of common proof establishes that the plaintiffs are actually controlled in like manner by FedEx Ground Package System, Inc. through its uniform Operating Agreement, policies and procedures and consistent practices.

In response to the plaintiffs' motions to amend and motions for summary adjudication, FedEx submitted declarations that this court previously had stricken. The plaintiffs now move for an order striking all references to the

stricken declarations contained in FedEx's memoranda in opposition to the plaintiffs' motions to amend (docket nos. 1418 to 1424) as more specifically set forth in the chart attached to the declaration of Eleanor Morton (doc. # 1560). The plaintiffs similarly have moved the court to strike all references to the stricken declarations in FedEx's statement of genuine issues submitted in opposition to plaintiffs' motions for summary adjudication. Magistrate Nuechterlein struck these declarations from the class certification record on July 23, 2007 because FedEx didn't properly supplement its initial disclosures pursuant to Federal Rules of Civil Procedure 26(a)(1) and 26(e)(1) to identify these witnesses (doc. # 818). This court denied FedEx's motion for reconsideration of the magistrate judge's order on November 19, 2007 (doc. # 1015). FedEx urges the court to reach a different conclusion and allow it to use the stricken declarations in opposition to the plaintiffs' motions to amend class certification and opposition to the plaintiffs' summary judgment motions. For the reasons that following, the court declines FedEx's request.

On January 9, 2006, FedEx served its initial disclosures to the plaintiffs, identifying, in part, the following individuals as likely to have discoverable information that FedEx may use to support its claims or defenses: "Named plaintiffs, plaintiffs, putative class members and contractors in jurisdictions in or relevant to the MDL 1700 actions." FedEx didn't list any specific names of individual putative class members in that disclosure. On June 30 and September 15, 2006, FedEx supplemented its initial disclosures and provided the names and

contact information for current contractors nationwide — about 10,000 names were disclosed. Non-expert discovery closed on December 31, 2006 and on January 3 and January 31, 2007, FedEx again supplemented its Rule 26(a) initial disclosures, this time identifying a substantially smaller list of witnesses that it might use to support its claims or defenses. With its responses to class certification, FedEx submitted statements from putative class members who were listed in its January 3 and January 31 supplemental disclosures. The plaintiffs moved to strike the declarations because FedEx didn't supplement its disclosure to inform the plaintiffs of the specific witnesses FedEx intended to rely upon before the close of discovery.

The magistrate judge found that FedEx's extensive list of thousands of employees didn't satisfy the duty to disclose and supplement under Rule 26(a). Although FedEx's September 15, 2006 list contained all the names of possible witnesses, the magistrate judge found that it was only complete in form, not in substance. The magistrate judge noted that FedEx had internally began narrowing the list months before it disclosed the more specific list in January 2007 (after the close of discovery). Accordingly, the magistrate judge concluded that "candor and good faith should have caused a supplemental disclosure to the Plaintiffs well before the discovery period closed to alert them of the specific witnesses FedEx intended to use." Doc. # 818, pp. 6-7. The magistrate judge further found that there was no chance to cure the prejudice because at the time of the court's ruling, class certification was already well underway. The magistrate judge

reasoned that "[i]t is simply not possible to re-open discovery at this late date because it would unreasonably delay the resolution of class certification as well as the filing of dispositive motions later this year." Doc. # 818, p. 9. Given the circumstances, the magistrate judge ruled that Federal Rule of Civil Procedure 37(c)(1) demanded that the witness statements submitted by FedEx be stricken. This court denied FedEx's motion for reconsideration of the magistrate judge's order, finding that the ruling wasn't erroneous or contrary to law.

FedEx contends that the court's July 2007 decision was limited to questions of prejudice and fault as it pertained to the use of these materials during the class certification phase. FedEx reasons that throughout discovery and the class certification phases, the plaintiffs insisted that they would prove their case through the right to control retained by FedEx and not by reference to the actual control exercised. Under this presentation of the case, FedEx states that the contractors' individual experiences weren't relevant. At the summary judgment phase, FedEx indicates that the plaintiffs seek to rely on evidence beyond the Operating Agreement and generally applicable policies and procedures to demonstrate that the "actual relationship" between FedEx and the plaintiffs isn't consistent with an independent contractor relationship. FedEx says it knew at the class certification stage that it would seek to use contractors' experiences to demonstrate variations, but it couldn't have known which contractors it would need to refute specific factual allegations of "practical reality" at the merits stage. Accordingly, FedEx asks the court to allow it to rely on the declarations at this

case 3:05-md-00527-RLM -CAN document 2010 filed 02/23/10 page 5 of 8

stage of this litigation. FedEx says it has no objection to permitting the plaintiffs to conduct reasonable discovery of the contractor declarants before trial and that discovery isn't necessary before resolution of the summary judgment motions because as the non-moving party, FedEx is entitled to have its facts credited. FedEx urges the court to consider the declarations as an example of the type of evidence that it would elicit at trial.

The plaintiffs respond that under Rule 37, the declarations are inadmissable and cannot create a triable issue of material fact to defeat summary adjudication, nor can they be used at trial. They further assert that a party can only defeat summary judgment using actual admissible evidence, not a "type" of testimony that the party "might" elicit at trial. As to the evidence in their summary judgment briefs, the plaintiffs contend that they don't rely on "individualized evidence", but instead point to common evidence applicable to the class as a whole to establish FedEx's right to control and systematic exercise of control. Because discovery closed before FedEx specifically identified the declarants (there was only one round of discovery addressing both class certification and the merits), the plaintiffs contend that they will be prejudiced from FedEx's use of the declarations at any stage of the proceeding.

The court agrees with the plaintiffs that the stricken declarations can't be used as evidence to support FedEx's opposition to the plaintiffs' motions to amend class certification or FedEx's opposition to the plaintiffs' summary judgment motions. Rule 37 provides that "[i]f a party fails to provide information or identify

case 3:05-md-00527-RLM -CAN document 2010 filed 02/23/10 page 6 of 8

a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. PROC. 37(c)(1). Although the magistrate judge's July 2007 order struck the affidavits from FedEx's class certification responses, the sanction was imposed under Rule 37(c)(1) and the order's intent was to prohibit FedEx from relying on the named witnesses during *both* the class certification and summary judgement stage. *See* Doc. # 818, p. 9 (it is "simply not possible to re-open discovery at this late date because it would unreasonably delay the resolution of class certification as well as the filing of dispositive motions later this year."). FedEx's argument that the court should rely on the inadmissible declarations as an example of the "type" of evidence it will elicit at trial is prohibited by Federal Rule of Civil Procedure 56, which requires supporting or opposing affidavits to "set out facts that would be admissible in evidence." FED. R. CIV. P. 56(e)(1); *see also* Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion, . . .a party may rely *only* on admissible evidence.") (citations omitted) (emphasis added).

The court is unpersuaded by FedEx's argument that it wasn't aware of the need for these witnesses during the discovery process because it believed the plaintiffs would rely only on common evidence to present its claims. At that stage in the litigation, there was no indication that this court would limit its review of the evidence to commonly applicable evidence; indeed, neither party is so limited

in the states in which class certification has been denied. The defense asserted by FedEx and supported by the stricken declarants — that the "practical realities" of the parties' relationship shows that FedEx didn't have the right to control and didn't exercise actual control over the drivers — isn't a new defense that could have been developed and supported only after reviewing the plaintiffs' summary adjudications submissions. FedEx's argument that these witnesses are rebuttal witness and so not required to be disclosed, is misplaced. The court in Hess v. Reg-Ellen Machine Tool Corp., No. 00-C-50275, 2003 WL 21209756, *6 (N.D. Ill. May 22, 2003) denied a similar argument where the defendant should have been aware of its defense witnesses before the disclosure deadline. The Hess court case reasoned that "[i]f defense counsel's argument is accepted, all defense witnesses become rebuttal witnesses and there would not be any 26(a)(1) by defendants." Id. Whether the plaintiffs have relied improperly on individualized evidence in their submissions is a separate matter and will be addressed accordingly; the plaintiffs' submissions, however, don't affect the court's Rule 37 sanction prohibiting FedEx from relying on the named witnesses. FedEx's late disclosures have prejudiced the plaintiffs because they haven't had the ability to conduct discovery with respect to the witnesses, and this court isn't willing to reopen discovery and delay this matter further.

The court GRANTS the plaintiffs' motion to strike references to the stricken declarations in the defendant's memoranda in opposition to plaintiffs' motions to amend the court's class certification orders (doc. ## 1559, 1564). The plaintiffs,

in their motions seeking to strike FedEx's statements of genuine issues filed in support of its opposition memoranda to plaintiffs' summary judgment motions, move to strike FedEx's SGI raising numerous issues. *See* Doc. 1499 and 1588. The court GRANTS the plaintiffs' motions IN PART (doc. # 1499 and 1588), striking the stricken declarations for the reasons set forth in this order. The court will address the plaintiffs' broader request to strike FedEx's SGI by separate order.

SO ORDERED.

ENTERED: February 23, 2010

/s/ Robert L. Miller, Jr.
Judge
United States District Court

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION<br>---------------------------------------------<br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Cause No. 3:05-MD-527 RM<br>(MDL-1700) |

OPINION AND ORDER

This matter is before the court on the plaintiffs' various motions for judicial notice of court documents, administrative findings and other public documents under Federal Rule of Evidence 201 (doc. ## 1068, 1195, 1472, 1700, 1737, 1816). The court takes judicial notice of the documents' existence, the content of the documents, and undisputed facts contained therein, but declines to take notice of findings of fact from the proceedings or admissions made by the parties as being asserted for their truth to the extent the findings or admissions are subject to dispute.

## I. BACKGROUND

The plaintiffs request this court to take judicial notice of Estrada materials:

- Pleadings, proceedings, orders and trial exhibits from Estrada v. FedEx Ground Package System, Inc., BC 210130 (Los Angeles Superior Court), specifically the following materials: First Amended Complaint filed May 30, 2000, Statement of Decision filed July 26, 2004, Order Granting Equitable Relief filed October 7, 2005, Corrected Final Judgment filed January 27, 2006, Tape Recording of

case 3:05-md-00527-RLM-CAN document 2016 filed 03/29/10 page 2 of 12

Oral Argument in Court of Appeals on July 24, 2008, California Supreme Court Order dated November 28, 2007, Remittitur filed December 10, 2007, Respondent's Appendix (Portion) in Court of Appeal (Trial Exhibits), and Excerpt of Reporter's Transcript (portion of testimony of one witness).

- The entry of stipulated judgment in Estrada v. FedEx Ground, Case No. BC 210130 (Los Angeles Superior Court).

The Estrada materials are relevant to the plaintiffs' request that this court give collateral estoppel effect to the Estrada judgment. The plaintiffs believe the court should be aware of the final development in the Estrada case, including the voluntary resolution of the remanded damages and attorney fee disputes.

The plaintiffs ask the court to take judicial notice of other judicial and administrative documents:

- December 22, 2003 decision of the State of Montana Department of Labor and Industry, Employment Relations Division, Independent Contractor Central Unit. The decision from the Montana Department of Labor and Industry, the plaintiffs contend, is relevant to their request that the court give collateral estoppel effect to the Estrada judgment. The plaintiffs rely on this case to show that at the time of the Estrada trial, FedEx knew it was facing challenges to its business model.

- December 19, 2007 press release referencing citations to FedEx by the Massachusetts' Attorney General for intentional misclassification of pick-up and delivery drivers as independent contractors. The citations apply to thirteen individual FedEx drivers. The plaintiffs seek to have the following facts judicially noted: (1) the Massachusetts Attorney General finding that FedEx violated the Massachusetts Independent Contractor Law by misclassifying thirteen drivers; (2) the Attorney General's assessment of penalties for more than $190,000 against FedEx and order requiring FedEx to rectify the violations and provide restitution; and (3) the Attorney General's ongoing investigation.

- Johnny Del Johnson et. al. v. FedEx Ground Package Systems, Inc., *United States District Court, Southern District of California*, Case No. 01CV1795 BTM (NLS), Order Denying Motion to Dismiss and to Compel Arbitration and Granting Motion to Sever, filed January 15, 2002; and Richard Lucey et al v. FedEx Ground Package Systems, Inc., *United States District Court, District of New Jersey*, Civil Case No. 06-3738 (RMB), Opinion, filed October 18, 2007. In both these decisions, the court found the arbitration remedy in Section 12.3 in the Operating Agreement was substantively and procedurally unconscionable. The plaintiffs offer these documents in support of their arguments presented in their motions for summary adjudication of employment status. FedEx responds by citing other courts that have found the Operating Agreement's arbitration provision to be valid.

- Kamil Issa and Edgar Ritzkallah v. Roadway Package Systems, Inc., FedEx Ground Inc., et. al., *Superior Court of Alameda Country, State of California*, Case No. RG841208, Request for Dismissal of Entire Action and Entry of Dismissal, filed February 13, 2007. The plaintiffs offer this document to refute FedEx's reliance on a decision entered in the referenced matter favoring its position of employment status.

- In re FedEx Ground Package Systems, Inc. and Employment Dev. Depart., *California Unemployment Insurance Appeals Board*, Case No. AO-143164 (T), OA Decision No. 1348661, dated September 21, 2007. This document is offered to show that the only class-based final administrative decision that has been issued in California regarding the status of FedEx's California drivers is consistent with the decision entered in Estrada.

- State of New Hampshire Department of Labor decision on December 2, 2008. The plaintiffs offer this decision in support of their motions for summary adjudication of employment status.

- FedEx Home Delivery v. NLRB, Case No. 07-1391 (D.C. Cir.), *Petitions for Rehearing* filed by the National Labor Relations Board and the International Brotherhood of Teamsters, Local No. 25. The plaintiffs present this document to show that the D.C. Circuit's decision issued in the case on April 21, 2009 was challenged by both the NLRB and the union intervenor. The petitions were denied.

- State of Maryland Department of Labor, Licensing and Regulation decision dated March 10, 2008 finding FedEx drivers to be employees

of FedEx under Maryland's unemployment insurance law and April 15, 2009 settlement agreement between FedEx and the Department. The plaintiffs contend that the determination and settlement are relevant to the pending motions for summary adjudication on employment status because they show that as a matter of law, the plaintiffs meet the elements of employment status applicable under Maryland's and other states' tests and under the federal common law test.

The plaintiffs ask the court to take judicial notice of admissions made by FedEx in court filings and administrative proceedings:

- FedEx's Petition for Permission to Appeal, Seventh Circuit Court of Appeal, filed in October 2007.

- Excerpt of testimony before California Employment Development Department, June 9, 2006 and FedEx's counsel's letter to EDD dated May 20, 2005.

The plaintiffs offer these admissions to support their summary judgment motion of employment status to show that the Operating Agreement hasn't changed since 1994 and that the Ground and Home Delivery Operating Agreement are substantially the same.

The plaintiffs request the court to take judicial notice of certain filings with the Securities and Exchange Commission:

- FedEx's 2007 10-K Report to the U.S. Securities and Exchange Commission. The plaintiffs note that the facts contained in the 10-K Report regarding FedEx's expenditures on infrastructure, advertising, and sales and marketing are relevant to the plaintiffs' motions for summary judgment.

- FedEx's December 21, 2007 10Q Quarterly Report to the U.S. Securities & Exchange Commission. The 10Q Quarterly Report notifies the public that IRS auditors issued a tentative conclusion that for 2002 certain contractors might be reclassified as employees despite the IRS' earlier "Letter of Assurance" to the contrary. The

case 3:05-md-00527-RLM-CAN document 2016 filed 03/29/10 page 5 of 12

> plaintiffs seek to have the following facts judicially noted: (1) the IRS has completed its audit for the year 2002, finding that "FedEx Ground pick-up and delivery owner-operators should be reclassified as employees for federal income tax purposes;" (2) FedEx anticipates that it will owe back taxes and penalties of $319 million plus interest as a result of this audit; (3) the IRS has similar audits open for 2004 through 2006; and (4) FedEx reported these facts in its December 21, 2007 10-Q report.

FedEx contends that while the court may take judicial notice of documents within public record, it can't take judicial notice of any disputed facts or inferences from such documents. FedEx therefore objects to the extent the plaintiffs seek to use the referenced materials as persuasive authority or for the truth of the factual statements or arguments contained therein. FedEx further states that the court shouldn't take judicial notice of the settlement agreement entered into between the Maryland Department of Labor and FedEx because the agreement is inadmissible for determining liability pursuant to Federal Rule of Evidence 408.

The plaintiffs respond that the facts are all determined by reference to reliable public records and even though the administrative findings might be preliminary, they are properly subject to judicial notice. For example, the plaintiffs note that FedEx doesn't dispute that the IRS and Attorney General have found it guilty of misclassifying drivers as independent contractors and assessed penalties accordingly. The plaintiffs further note that the 2002 IRS audit belies FedEx's reliance on the prior IRS "Letter of Assurance." The plaintiffs therefore request the court to take judicial notice of the identified documents.

case 3:05-md-00527-RLM-CAN document 2016 filed 03/29/10 page 6 of 12

II. DISCUSSION

Federal Rule of Evidence 201 only governs judicial notice of adjudicative facts. FED. R. EVID. 201(a). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). For the court to take judicial notice, the adjudicative facts cannot be disputed. Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1354 (7th Cir. 1995) ("In order for a fact to be judicially noticed, indisputability is a prerequisite."). "Judicial notice is premised on the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties." General Elec. Capital v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997)). Judicial notice "substitutes the acceptance of a universal truth for the conventional method of introducing evidence." Id.

The court can take judicial notice of filings in other proceedings to establish the fact of such litigation and related filings. Opoka v. Immigration & Naturalization Service, 94 F.3d 392, 395 (7th Cir. 1996) (*citing* United States v. Jones, 29 F.3d 1549 (11th Cir. 1994) ("[A] court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation.")). Court documents from another case may be used to show that the document was filed, that party took

case 3:05-md-00527-RLM-CAN document 2016 filed 03/29/10 page 7 of 12

a certain position, and that certain judicial findings, allegations or admissions were made. General Elec. Capital v. Lease Resolution, 128 F.3d 1074, 1081 (7th Cir. 1997) ("[T]he most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records. . . . Like other court records, judicial approval of a class action settlement is an appropriate subject for judicial notice because it is a source whose accuracy cannot reasonably be questioned.") (internal quotations and citations omitted)).

Similarly, a court may take judicial notice of executive and agency determinations. *See* Waid v. Merrill Area Public Schools, 130 F.3d 1268, 1272 (7th Cir. 1997) (discussing court's discretion to take judicial notice of agency factfinding). The court in Opoka v. I.N.S. explained:

> This court . . . has the power, in fact the obligation, to take judicial notice of the relevant decisions of courts and administrative agencies, whether made before or after the decision under review. Determinations to be judicially noticed include proceeding[s] in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.

94 F.3d at 394 (internal quotations and citation omitted). "[I]t is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice." Id. (taking judicial notice of immigration service's decision to suspend deportation to appellant-alien's wife).

Judicial notice generally doesn't extend to the truth of the matters that were

case 3:05-md-00527-RLM-CAN document 2016 filed 03/29/10 page 8 of 12

asserted in the other judicial proceeding. General Elec. Capital v. Lease Resolution, 128 F.3d 1074 (7th Cir. 1997) (noting that the court cannot generally take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed); *see also* Opoka v. I.N.S., 94 F.3d 392, 395 (7th Cir. 1996) (*citing* Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings. ")); *see also* 21 Charles Alan Wright & Kenneth A. Graham, Jr., FEDERAL PRACTICE & PROCEDURE § 5106 (Supp. 2001) (stating that court should distinguish between taking judicial notice of the truth of some extrajudicial fact recited in a court record and the use of those facts for some purposes that does not depend on the truth of the facts recited); ABN AMRO, Inc. v. Capital Int'l Ltd., No. 04-C-3123, 2007 WL 845046, *9 (N.D. Ill. March 16, 2007) ("Typically, . . . because of the indisputability requirement, the notice of a court order is limited to the purpose of recognizing the judicial act or litigation filing; judicial notice is generally not for the truth of the matters asserted in a court document."). Taking judicial notice of a fact simply because it was found to be true in a previous action would render the doctrine of collateral estoppel superfluous. General Elec. Capital v. Lease Resolution, 128 F.3d 1083 (citation omitted).

Judicial notice may be taken of the contents of public record disclosure documents filed with the Securities and Exchange Commission if the content isn't subject to dispute. *See* Hernandez v. Midland Credit Mgmt., Inc., No. 04-C-7844, 2006 WL 695451, *4 (N.D. Ill. March 14, 2006) (taking judicial notice of SEC filings where no dispute existed). In Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344 (7th Cir. 1995), an employment discrimination case, the district court was attempting to determine the size of the defendant corporation to assess the applicability of a punitive damages cap under the 1991 Civil Rights Act. Id. at 1354. The court analyzed the propriety of taking judicial notice of the company's 10-K form filed with the SEC to determine the size of the company. Id. In affirming the district court's refusal to take judicial notice, the court reasoned that given the "considerable argument over the significance of the 10-K form, the judge properly found that its contents were subject to dispute." Id. The court explained that "the question . . . was not capable of accurate and ready determination by resort to the 10-K" because the form covered three divisions of the company, two that weren't involved in the case. Id. at 1354-1355.

Accordingly, the court takes judicial notice of the documents identified by the plaintiffs that were filed in judicial and administrative proceedings involving FedEx, including the courts' determinations, findings and outcomes in those proceedings. The existence of the public documents and their content are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. For example, the court can take judicial notice of the

documents filed in Estrada and the court's factual findings and determinations in that case. Similarly, the court can take judicial notice that the Massachusetts' Attorney General issued a citation to FedEx for intentional misclassification of thirteen individual FedEx drivers. What the court can't do is accept as true the facts found by these courts or administrative agencies. The court isn't prevented from considering the opinions and determinations to the extent they constitute persuasive authority.

The plaintiffs ask the court to take judicial notice of the State of Maryland Department of Labor, Licensing and Regulation decision dated March 10, 2008 and the April 15, 2009 settlement agreement between FedEx and the Department. The court declines to take judicial notice of the contents of the settlement agreement and merely takes judicial notice that the Department issued a determination and settled before the appeal.

The plaintiffs also ask the court to take judicial notice of admissions made in certain court filings and administrative proceedings to show that the Operating Agreement hasn't changed since 1994 and that the Ground and Home Delivery Operating Agreement are substantially the same. In FedEx's Petition for Permission to Appeal from Order Granting Class Certification, FedEx represented to the court that "[t]he OA has remained in effect without material change" since 1994. FedEx does note though that various addenda have been added or modified that, if accepted, have altered the compensation terms of the drivers' agreements. FedEx doesn't dispute that the Operating Agreement hasn't materially changed

since 1994, so the court takes judicial notice of that admitted fact. The court declines to take judicial notice that the Ground and Home Delivery Operating Agreement are substantially the same; FedEx didn't admit that in the referenced documents and its accuracy is disputed.

The plaintiffs ask the court to take judicial notice of the facts in FedEx's 2007 10-K Report regarding FedEx's expenditures on infrastructure, advertising, and sales and marketing. The plaintiffs set forth certain facts from the 10-K Report in their Statement of Genuine Issues; FedEx doesn't dispute these facts except to the extent the plaintiffs conflate the operations of FedEx Ground and Home Delivery. Because there is no discernable dispute in the facts as relied upon by the plaintiffs, the court takes judicial notice of such facts.

The plaintiffs similarly seek judicial notice of FedEx's December 21, 2007 10Q Quarterly Report in which FedEx notifies the public that the IRS has conducted an audit for year 2002 and found that FedEx drivers should be reclassified as employees for federal income tax purposes. Because FedEx doesn't dispute the existence and content of the audit, but instead disputes its accuracy, how it should be construed, and its relevancy to this litigation, the court takes judicial notice of the SEC filing and the facts reported about the 2002 IRS audit therein, but doesn't consider the factual findings for their truth.

## III. CONCLUSION

For the reasons set forth above, the court GRANTS IN PART and DENIES IN PART the plaintiffs' requests to take judicial notice. (Doc. ## 1068, 1195, 1472, 1700, 1737, 1816).

SO ORDERED.

ENTERED:   March 29, 2010

          /s/ Robert L. Miller, Jr.
Judge
United States District Court

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: *ALL CASES* | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MOTION TO CLARIFY SCHEDULING ORDERS**

The Court recently issued an order suggesting that the *Johnson* case be remanded to the District Court for the Southern District of Iowa. The order contained a statement concerning trial experts that potentially implicates future case management of the other actions in this MDL proceeding. In light of that order, and given that the parties were unable to reach agreement on this issue while preparing a jointly-proposed order for that remand, FedEx Ground Package System, Inc. ("FedEx Ground") respectfully requests that the Court clarify that the parties are not precluded from offering expert witnesses and opinions ***at trial*** on the independent contractor classification question that differ from those the parties offered at the class certification and the summary judgment phases.

During the pre-filing conference with plaintiffs on this motion, plaintiffs' counsel stated that they did not believe the prior scheduling orders permit the parties to offer expert witnesses and opinions at trial bearing on the classification question beyond those offered in those two pre-

case 3:05-md-00527-RLM-CAN document 2017 filed 03/29/10 page 2 of 11

trial phases. Because FedEx Ground believes that the prior scheduling orders did not address this issue, much less resolve it, it brings this motion to clarify.

FedEx Ground also requests a scheduling conference to allow the Court and parties to discuss and address this significant pretrial issue.

## DISCUSSION

Federal Rule of Civil Procedure 26(a)(2)(C) specifies the time period for parties to disclose expert testimony and states that "[a]bsent a stipulation or a court order, the [expert] disclosures must be made at least 90 days before the date set for trial or for the case to be ready for trial." Fed. R. Civ. P. 26(a)(2)(C). To date, the Court has not ordered disclosure of expert witnesses who the parties expect to offer ***at the trial*** of any MDL case. Nor have the parties stipulated to a schedule for such disclosure. The expert disclosure and discovery deadlines established by this Court's scheduling orders, based on proposals made by the parties, have consistently set deadlines for expert disclosure and discovery for use only in connection with class certification and independent contractor classification summary judgment motions. Those orders have never set expert disclosure and discovery deadlines for other or future phases of the MDL cases.

For instance, no deadlines have been established for expert disclosures, reports, or discovery for trial. In reliance on the limited scope of the scheduling orders and Federal Rule of Civil Procedure 26(a)(2)(C), FedEx Ground expects to offer expert testimony at trial on the independent contractor classification issue from experts whose opinions were not offered in support of FedEx Ground's briefing on class certification or summary judgment.[1]

---

[1] FedEx Ground also intends to supplement the reports of its previously disclosed employment classification experts. Parties are permitted to supplement disclosed experts' reports if done "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Rule 26(a)(3)

The language of the Court's prior scheduling orders is specific in defining the limited scope of the expert disclosure and discovery deadlines. All of those orders are limited to disclosure and discovery of expert opinions on which the parties would rely for purposes of class certification and summary judgment briefing. Thus, in its first order addressing expert discovery, issued on November 29, 2005, the Court set deadlines for discovery of experts "upon whom [the parties] will rely … ***for the motions for class certification***." (Nov. 11, 2005 Scheduling Order at 2 (Doc. No. 58) (emphasis added).) The Court also set deadlines for discovery of experts "upon whom [the parties] will rely ***in the summary judgment phase*** of proceedings relating to independent contractor/employment status." (*Id.* at 5 (emphasis added).) This order, based on the parties' proposals, makes no mention of expert disclosures or expert discovery outside of these two briefing phases, and sets no disclosure or other requirements for expert testimony and discovery for trial.

In each of its subsequent modifications to the scheduling order, the Court, and the parties in their requests for the modifications, followed the same approach of addressing only the immediate filings for which expert testimony was directed. Thus:

- On May 26, 2006, the Court issued an order granting in part the parties' Joint Motion for Amendment of Case Scheduling Orders, setting deadlines by which the parties "shall serve their expert reports or affidavits upon which they rely in support of their ***class certification*** motions" or "in opposing Plaintiffs' ***class certification***." (May 26, 2006 Order at 2 (Doc. No. 261) (emphasis added).) The Court also provided deadlines related to "expert reports or affidavits upon which [the parties will] rely" in the "***summary judgment/adjudication of issues relating to independent***

---

provides that pretrial disclosures are due by the date set by the court or at least 30 days before trial. No pretrial disclosure deadline or trial date has yet been set for the MDL cases.

***contractor/employment status***" "phase of proceedings." (*Id*. at 4 (emphasis added, capitalization removed).)

- On January 19, 2007, the Court modified its May 26, 2006 scheduling order at the parties' joint request to provide, among other things, deadlines for "serv[ing] any expert reports or affidavits upon which" the parties will rely in the "***summary judgment/adjudication of issues relating to independent contractor/employment status***" "phase of proceedings." (Jan. 19, 2007 Order at 1 (Doc. No. 481) (emphasis added, capitalization removed).)
- On June 29, 2007, the Court modified its prior scheduling orders at the parties' joint request to, among other things, extend the deadlines for "serv[ing] any expert reports or affidavits upon which [the parties] will rely ***for summary judgment***,"[2] as well as for serving opposing expert reports and deposing such experts. (June 29, 2007 Order at 2-3 (Doc. No. 766) (emphasis added).)
- On August 20, 2007, at the request of FedEx Ground, the Court modified its prior scheduling orders to provide, among other things, deadlines for Wave 4 case "expert reports or affidavits upon which [the parties] will rely ***for summary judgment***," as well as for serving opposing expert reports and deposing such experts. (Aug. 20, 2007 Order at 3 (Doc. No. 833) (emphasis added).) The Wave 4 summary judgment briefing schedule, as with all other waves of cases in these proceedings, was limited to the independent contractor classification question.
- On March 20, 2008, the Court modified its scheduling orders at the request of the parties, providing, among other things, deadlines by which "[m]ovants for summary

---

[2] Although not expressly indicated in the June 29, 2007 Order, summary judgment was limited to the independent contractor classification question. (*See*, *e.g.*, Jan. 19, 2007 Order at 1.)

judgment/adjudication shall serve expert reports or affidavits in support of such
motions," as well as for serving opposing expert reports and deposing such experts
for Wave 5 cases.  (Mar. 20, 2008 Order at 2 (Doc. No. 1118).)  The only summary
judgment motion deadlines identified in that order pertain to those motions "related to
independent contractor/employment status."  (*Id.*)  On April 10, 2008, the Court
added a deadline at the parties' request for "serv[ing] any new reports or affidavits of
previously-disclosed class certification expert(s) regarding new claims and/or new
states."  (Apr. 10, 2008 Order at 2 (Doc. No. 1139).)  On June 19, 2008, the Court
modified its March 20, 2008 Order at the request of the parties and extended the
deadlines specified in the March 20, 2008 Order, following the same structure.  (*See*
June 19, 2008 Order at 2 (Doc. No. 1425).)

As this chronology confirms, the scheduling orders in these MDL proceedings did not
address – much less foreclose – the disclosure of expert witnesses and opinions that may be
offered at trial or any discovery attendant to such trial testimony.  The scheduling orders
uniformly set a schedule for the disclosure and discovery solely of experts the parties would rely
upon for purposes of class certification and summary judgment briefing on classification.
Accordingly, the parties' submissions to the Court related to scheduling order amendments
followed this same approach and were silent on the question of trial experts.  (*See, e.g.*, Joint
Proposed Case Mgm't Order at 17, 21 (Doc. No. 45); Joint Mot. for Am. of Sched. Order at 1
(Doc. No. 478); Mem. in Supp. of Joint Mot. to Am. Case Sched. Order at 2 (Doc. No. 719);
Joint Mot. to Am. Case Schedule (Doc. No. 725).)[3]

---

[3] In response to FedEx Ground's Motion to Clarify and Reconsider the Court's February 5, 2009
Suggestion of Remand, plaintiffs declared for the first time that expert discovery "has both been fully
scheduled and completed."  (Pls.' Resp. to FedEx Ground's Mot. to Clarify at 3 (Doc. No. 1717).)  The
Court, in its Order on FedEx Ground's motion, made clear that this was not the case at least with respect

case 3:05-md-00527-RLM-CAN document 2017 filed 03/29/10 page 6 of 11

Given this record, it would be unfair to FedEx Ground's right to defend itself at trial if it were precluded from offering expert testimony on relevant issues based on a reading, in hindsight, of the Court's scheduling orders, which referred only to "class certification" experts and "summary judgment" experts, and which deadlines passed long before this Court identified the cases and issues that needed to be tried.

Moreover, separate disclosure requirements for class certification experts, summary judgment experts, and trial experts makes sense – especially in a protracted and complex multidistrict litigation:

- First, each type of expert serves a specialized role and is directed to a different audience. Class certification experts inform the ***court*** about the manageability of allowing the case to proceed ***on a class basis***. The substantive merits of plaintiffs' allegations concerning independent contractor classification are not directly at issue. Similarly, parties employ summary judgment experts to demonstrate to the ***court*** that, strictly as a matter of law, judgment is appropriate (or not) based on the question the Court isolated for resolving the classification question, namely, whether FedEx Ground had reserved to itself in the Operating Agreement sufficient "right to control." However, trial experts have a different function: educating and appealing to a ***jury***.[4] *Cf. Olympia Express, Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 351 (7th Cir. 2007) (stating that presentations to judges differ significantly from

to the *Johnson* (IA) case, noting that "additional expert discovery may be warranted." (Jan. 22, 2010 Order at 3 (Doc. No. 1991); *see also id*. at 7 ("[T]he transferor court can address further individualized expert discovery or dispositive motions as to 'other issues' and damages more effectively and efficiently" than the MDL court).)

[4] The vast majority of the cases in the MDL, and perhaps all cases in the MDL, will be tried to juries. (*See* FedEx Ground's Am. Mot. for Trials by Jury (Doc. No. 1987).)

presentations to juries, because "[l]ay jurors have different levels of comprehension from professional judges").

- Second, given that the Court's rulings on class certification and summary judgment will affect the manner in which the cases are tried, it makes practical sense for the parties to disclose trial experts ***after*** the Court's rulings. *Cf.* Manual for Complex Litigation § 11.481 ("[T]he parties may lack sufficient information to select expert witnesses until the issues have been further defined and certain discovery is completed . . . .").
- Third, as a practical matter, in an MDL with numerous constituent cases, experts for ***briefing*** (and the disclosure deadlines therefore) differ from ***trial*** experts because of the extent of their applicability. During the MDL, a party's expert has wide applicability; the expert's report can support briefs in all (or most) cases. However, once a case is remanded for trial, a party may need an expert to testify ***at that trial***. It is therefore necessary, and makes sense, for the parties to be able to disclose their trial experts separately (and ***after***) they disclose their experts for pre-trial issues.[5]

Therefore, as noted above, in reliance on the Court's scheduling orders and the parties' submissions, FedEx Ground expects to call experts at trial who will offer opinions relevant to employment classification issues, and some of those opinions may not have been offered by FedEx Ground in support of its positions on class certification and summary judgment. Some of those opinions will be proffered by the same experts upon whom FedEx Ground relied in

[5] There is a realistic possibility here that the trials of a number of the constituent cases will take place at or around the same time, after remand to the transferor courts. The parties should have the ability to have additional experts available to testify about the same topics in the event the parties face overlapping or outright conflicting trial schedules. This potential eventuality warrants a process by which the parties have the opportunity to designate multiple expert witnesses to testify on the same subject to ensure that competing trial calendars do not deprive either party of the ability to present its full case.

connection with its arguments on class certification and summary judgment and those opinions will be disclosed at the appropriate time through the routine Rule 26 supplementation process. But FedEx Ground also plans to disclose additional experts to support its defense at the trials of these cases. FedEx Ground's right to rely on expert opinions and expert witnesses different from those previously disclosed relating to class certification and summary judgment briefing is supported not only by the text of the scheduling orders entered in these proceedings, but also by the Federal Rules of Civil Procedure, which provide that disclosure of experts must be made "at the times and in the sequence that the court orders," and that in the absence of "a stipulation or a court order, the disclosures must be made at least 90 days before the date set for trial or for the case to be ready for trial." Fed. R. Civ. P. 26(a)(2)(C). The Court's scheduling orders do not constitute such an abrogating order. *Cf. Sherrod v. Lingle*, 223 F.3d 605, 612-13 (7th Cir. 2000) (finding an order stating that "***all*** discovery shall be completed by [a certain date]" constituted an order abrogating Rule 26(a)(2)(C) default expert disclosure schedule). Thus, neither Rule 26(a) nor the Court's existing scheduling orders have thus far required FedEx Ground to identify its trial experts or their anticipated opinions.

The Court recently stated with respect to *Johnson* that "[t]he deadline for expert discovery and filing of dispositive motions as to the determination of employee and independent contractor status – the overriding centralized issue in this case – has expired." (Jan. 22, 2010 Order at 7 (Doc. No. 1991).)[6] FedEx Ground understands this statement to mean that, as to *Johnson*, the time for expert discovery on the classification issues has expired insofar as it relates to class certification and summary judgment motions. FedEx Ground agrees. Given the scheduling orders described above, however, FedEx Ground does not understand the Court's

---

[6] However, in the same Order, the Court also stated that "additional expert discovery may be warranted" and "pretrial matters such as identifying trial witnesses . . . [have not] occurred." (*Id.* at 3.)

statement to mean that the parties are precluded, in *Johnson* or the other MDL cases, from offering expert opinions and witness at ***trial*** on the independent contractor classification question that differ from those that they offered in connection with briefing on class certification and summary judgment. Nevertheless, because of the potential ambiguity of the statement, and because FedEx Ground has and will continue to expend significant resources and effort in preparation for offering such expert testimony in these cases, FedEx Ground seeks clarification from the Court to ensure that it is not precluded from exercising its right under Rule 26 to identify its desired trial experts within the time prescribed by the Rule or a deadline the Court may set in the future.

Finally, as a practical matter, given that the remaining MDL cases have not been remanded for trial – much less set for trial – neither party is prejudiced by the disclosure of such expert opinions and witnesses for trial, as there is ample opportunity prior to trial for both parties to prepare and to take the discovery they deem necessary.[7]

**CONCLUSION**

FedEx Ground requests that the Court clarify its prior scheduling orders to ensure that, as contemplated by Federal Rule of Civil Procedure 26(a)(2)(C), the parties are not precluded from offering expert opinions and witness at ***trial*** on the independent contractor classification question that differ from those that they offered in connection with briefing on class certification and summary judgment. FedEx Ground also respectfully requests a scheduling conference to address this matter.

---

[7] The disclosure of trial experts on the classification question need not delay remand of these cases to the transferor courts. Depending on the preferences of this Court and plaintiffs, the disclosure of these experts (and the attendant limited discovery of them) can take place either before this Court or the transferor courts.

Dated: March 29, 2010.

Respectfully submitted,

By: /s/ Robert M. Schwartz
Robert M. Schwartz

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
202 S. Michigan St.
South Bend, IN 46601
Tel: (574) 234-4149
Fax: (574) 239-1900

Robert M. Schwartz
Michael McGuinness
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Tel: (310) 553-6700
Fax: (310) 246-6779

*Defendant's Lead and Liaison Counsel*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 29th day of March, 2010, the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Susan E. Ellingstad
seellingstad@locklaw.com

Robert I. Harwood
rharwood@whesq.com

Lynn R. Faris
lfaris@leonardcarder.com

Beth A. Ross
bross@leonardcarder.com

Peter J. Agostino
agostino@aaklaw.com

By: /s/ Robert M. Schwartz

DC1:799072.12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Cause No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' OPPOSITION TO FEDEX GROUND'S MOTION TO CLARIFY SCHEDULING ORDERS**

This Court's recent order suggesting remand of the Iowa case explains:

> ***The deadline for expert discovery*** and filing of dispositive motions as to the determination of employee and independent contractor status – the overriding centralized issue in this case – ***has expired***.

Order, Doc. 1991 at 7 (1/22/10) (emphasis added). Nonetheless, in its Motion to Clarify Scheduling Orders (Doc. 2017), FedEx Ground Package System, Inc. ("FXG") asks the Court to re-write its ruling and essentially start over.

Apparently dissatisfied with its current stable of experts, several of whom the Court has found unpersuasive (*see* Op. and Order, Doc. 906 at 8-22 [10/15/07]), FXG now asks the Court to permit it to conduct a second full, round of expert discovery on the merits of the cases, including the issue of the employment status of the drivers. FXG ignores the enormous amount of work and resources already expended on identification, expert reports, exchange of expert files, expert depositions and expert motion practice and argues that this second round of time-consuming, burdensome and expensive expert discovery is appropriate either in this Court or in

the transferee courts post-remand because FXG claims it only designated its seven experts "for purposes of summary judgment" and not for trial.

The record of this case does not support permitting FXG to re-open expert discovery at this late date in any court. FXG's request runs afoul of this Court's prior orders, which make clear that discovery for purposes of class certification and discovery for purposes of the merits would take place and conclude at the same time. FXG's rationale is belied by the fact that in moving for summary judgment, FXG barely relied upon its seven so-called summary judgment experts at all. Finally, reopening expert discovery at this late date for all purposes would be prejudicial and unduly burden the courts and the parties, thereby undercutting the central purpose of transferring and coordinating these actions into a multi-district proceeding in the first place. FXG has no good reason for its request, which should be denied.

## PROCEDURAL HISTORY AND BACKGROUND

### A. The Court's Orders Required the Parties to Complete Class Certification and Merits Discovery Simultaneously.

From the outset of this MDL proceeding, the Court has sought to marshal the parties through discovery and pretrial proceedings expeditiously by completing all merits and class certification discovery at the same time. In its very first order, the Court stated that it was not inclined to sequence discovery. Practice and Procedure Order Upon Transfer, Doc. 2 at 11 (8/30/05). The Court subsequently agreed to bifurcate liability from damages, based on the stipulation of the parties. Initial Scheduling Order, Doc. 52 at 10 (11/15/05). However, the Court made clear that there would be no further bifurcation of discovery:

> ***Discovery for purposes of class certification and discovery for purposes of the merits of Plaintiffs' claims will take place concurrently.*** Consequently, all discovery relating to independent contractor/ employment status and summary judgment shall be completed by August 1, 2006.

Supplemental Scheduling Order, Doc. 58 at 3 (11/29/05) (emphasis added).  This included

completing all expert disclosures, rebuttal disclosures and depositions by the same date.  *Id.* at 5.

After these initial orders, the Court issued further orders pushing back the discovery

deadlines, including the deadlines for expert discovery.  *See* Order, Doc. 261 (setting 4/6/07

deadline for experts); Order Amending Schedule, Doc. 481 (1/19/07) (setting 8/7/07 deadline);

Order, Doc. 766 (6/29/07) (setting 11/5/07 deadline for fourth wave only); Order, Doc. 833

(8/20/07) (setting 2/15/08 deadline for fourth wave); Order Amending the Case Schedule, Doc.

1118 (3/20/08) (setting 8/16/08 deadline for fifth wave); Order, Doc. 1139 (4/10/08) (setting

5/30/08 deadline for expert reports for fifth wave); Order, Doc. 1425 (6/19/08) (setting 9/30/08

deadline for fifth wave).  However, the Court never wavered from its position that class

certification and merits discovery would be conducted simultaneously and completed before the

parties moved for summary judgment.  Order, Doc. 261 at 4 (5/26/06) (holding that bifurcating

discovery would result in "unacceptable" delay); *see also* Order, Doc. 833 at 2 (8/20/07)

(describing the Court's attempts to "aggressively" move the pretrial proceedings through to their

conclusion and explaining that, contrary to FXG's argument, the Court's prior orders extending

deadlines do not indicate "a change in philosophy toward the scheduling of the case").

FXG's motion tries to make much of the fact that the language of some of the Court's

orders refers to experts upon whom the parties will rely for the "summary judgment phase" of

the litigation.  FXG argues that this language permits it to designate a whole new crop of experts

for trial.  FXG is mistaken.  Doc. 2017 at 3-5.  Consistent with the Court's desire to complete the

pretrial proceedings efficiently, the Court's overarching instruction has always been that

"discovery for purposes of class certification and discovery for purposes of the merits of

Plaintiffs' claims will take place concurrently."  The Court's references to "summary judgment

phase experts" merely sought to distinguish these from any experts identified for class certification purposes only and to identify the next phase of the proceedings in which the parties might rely on experts, which, at the time the orders were entered, was summary judgment. The orders do not to suggest that FXG gets another crack at merits expert discovery if it loses its summary judgment motions or wants to re-think whether its experts will be attractive to a jury.

In one of its most recent orders suggesting the remand of the Iowa case, this Court summarized its prior orders as follows:

> The discovery deadline has passed, except that to date, expert discovery has only been directed to class certification and employment-status issues. Doc. # 261. Further, the parties haven't conducted discovery as to damages because this court bifurcated liability and damages. Doc. # 52.
>
> …
>
> The deadline for expert discovery and filing of dispositive motions as to the determination of employee and independent contractor status – the overriding centralized issue in this case – has expired…. Common discovery on the centralized issue has been conducted and the transferor court [for the Iowa case] can address further individualized expert discovery or dispositive motions as to "other issues" and damages more effectively and efficiently.

Order, Doc. 1991 at 3, 7 (1/22/10).

**B. FXG Disclosed a Broad Array of Experts on a Range of Subjects for Use in all Phases of the Litigation.**

Consistent with the Court's orders, FXG disclosed merits experts pursuant to Federal Rule of Civil Procedure 26(a)(1) and (2) on a range of subjects for potential use at all phases of the litigation, without limitation. FXG first disclosed potential experts in its initial disclosures. Declaration of Lynn Rossman Faris, filed herewith, Exh. A. Thereafter, FXG supplemented its expert disclosures pursuant to Rule 26(a)(1) and (2)[1] on December 27, 2006 and again on July 17, 2007, without limiting the phases of the proceeding in which the experts could be used. *Id.* Exhs. B and C. Indeed, in its supplemental disclosures, FXG explained that the experts "may

[1] Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose any expert witness "it may use at trial."

present supplemental expert testimony for purposes of class certification ***and/or merits***." *Id.* (emphasis added).

Specifically, FXG designated the following experts on the following wide-ranging subjects:

1. Robert Crandall/ Ali Saad: "[E]mpirical, economic and statistical issues related to contractors and/or the independent contractor model."

2. James C. Hardman: Vehicle leasing regulations.

3. Deborah Jay: Evidence of a survey of drivers.

4. Richard Jeanneret: "[T]he type of skill and initiative required of the contractors, the existence of variations between contractors depending on how they choose to configure their businesses, and how contractors control their businesses."

5. Jeremy Kahn: Vehicle leasing regulations (replacing Hardman).

6. Francine LaFontaine: Whether FXG's policies and practices and Contractor Relations Unit indistinguishable from those that would exist in an employment relationship (offered by FXG in response to Plaintiffs' expert David Lewin).

7. James Scappellato: Safety regulations.

8. Richard L. Smith: The economic value of FXG drivers' routes (offered by FXG in response to Plaintiffs' expert Paul Regan).

*Id.* ¶7. The parties proceeded accordingly, with both sides disclosing reports, complete expert files and deposing the other's experts. *Id.*¶8. Now, having concluded discovery on the merits, the parties have filed motions for summary judgment/ adjudication on the central issue of employment status in the vast majority of cased in this MDL.

### C. The Parties Met and Conferred, but FXG Refused to Limit the Number or Subjects of its New Experts and Reports.

Following FXG's recent demand to re-open expert discovery on the merits, Plaintiffs met and conferred with FXG about these issues, but to no avail. Faris Dec. ¶ 6. FXG refused to identify any specific subject areas about which it wished to disclose new experts, and maintained

that it had the right to designate brand new experts on all matters related to all aspects of the merits of the cases, including on the well-worn issue of the employment status of the drivers. *Id.*

**ARGUMENT**

**A. The Court Has Always Ordered that Discovery Regarding Class Certification and the Merits Take Place Concurrently and the Time for Such Discovery Has Closed.**

Federal Rule of Civil Procedure 26(a)(2)(C) requires a party to make expert disclosures "at the time and in the sequence that the court orders," or, in the absence of "a stipulation or a court order, ... at least 90 days before the date set for trial or for the case to be ready for trial." As shown above, the Court has issued multiple orders setting forth the sequence and deadlines for discovery on the merits, including merits expert discovery. All of those deadlines have long since passed. "Courts have a legitimate interest in ensuring that parties abide by scheduling orders to ensure prompt and orderly litigation." *Campania Management Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 851 (7th Cir. 2002) (citation and quotation marks omitted). This Court should hold FXG to the schedule.

*Sherrod v. Lingle*, 223 F.3d 605 (7th 2000), cited by FXG, supports Plaintiffs' position. In *Sherrod*, the court held that an order stating that "all discovery shall be completed by [a certain date]" barred a party from disclosing experts after that date. *Id.* at 612-13. Here too, the Court set a deadline for "all discovery," with the exception of damages, and made clear that this included both "[d]iscovery for purposes of class certification and discovery for purposes of the merits." Doc. 58 at 3. Thus, FXG too should be barred from offering new merits expert disclosures at this late date.

The only other case cited by FXG in support of its motion is *Olympia Express, Inc. v. Linee Aree Italiane, S.P.A.*, 509 F.3d 347, 351 (7th Cir. 2007), where, in addressing a party's right to a jury trial, the court observed that lawyers may tailor their presentations differently

depending on whether a case will be tried to a judge or a jury. But this truism does not suggest that a party gets to conduct a second round of expert discovery if its summary judgment motion is denied or if decides that its experts are unlikely to be "appealing to a jury," as FXG claims. Doc. 2017 at 6.

**B.    FXG's Argument that it Only Designated its Merits Experts for the Purpose of Summary Judgment is Belied by the Facts that FXG Barely Relied Upon them for that Purpose and that FXG Designated them Pursuant to Rule 26(a)(2).**

FXG's claim that it only designated merits experts for purposes of summary judgment is belied by the fact that FXG barely relied upon its seven experts in the summary judgment phase at all. FXG did not offer any expert testimony in support of its motions for summary judgment. As for its oppositions to Plaintiffs' motions, FXG included only a handful of cites to expert testimony in its voluminous Statements of Genuine Issues. *See* Docs. 1358 and 1912. Surely, FXG would not have spent the considerable time, money and effort of proffering seven experts if FXG only intended to use them in such a limited manner.

FXG's expert disclosures make clear that FXG, like Plaintiffs, designated merits experts for all purposes, including trial. Its supplemental disclosures expressly state that FXG is disclosing its experts pursuant to Federal Rule of Civil Procedure 26(a)(2), which only obligates party to identify any expert witness "it may use at trial." Faris Dec. Exhs. B-C (stating that FXG is supplementing its "expert disclosures under Rule 26(a)(1) and 26(a)(2)" and that the witnesses "may present supplemental expert testimony for purposes of class certification and/or merits"). Since the Court determined that some of FXG's expert testimony was largely unpersuasive (Doc. 906 at 8-22), FXG is now trying to give unintended importance to  phrasing in the Court's orders in the hope of being able to name a better stable of experts the second time around. The Court

should not permit FXG to draw out and duplicate discovery in this fashion, after the parties have expended millions on experts disclosed as "merits" experts for all purposes.

**C. Permitting FXG to Re-Open Merits Expert Discovery Flies in the Face of the Purpose of this Coordinated Proceeding.**

To permit FXG to re-open expert merits discovery upon remand flies in the face of the entire purpose of coordinating these actions in the first place. FXG argued to the JPMDL that "[d]etermining the proper classification of FedEx Ground's owner-operators implicates a complicated inquiry that will turn on similar discovery and dense multi-factor tests," and therefore "the need to coordinate and transfer these cases for coordinated proceedings is urgent to conserve the resources of the federal judiciary, avoid inconsistent rulings, and coordinate overlapping discovery requests," FXG's Reply to Pltfs' Opp. to Mot. To Transfer, Doc. 9 at 1, 8 (JPMDL Jun. 9, 2005). The JPMDL agreed, over Plaintiffs' objections, and ruled that the common employment classification question shared by all of the actions was sufficient to warrant "centralized pretrial management of these actions …to eliminate duplicate discovery, prevent inconsistent rulings, and conserve the resources of the parties, their counsel and the judiciary." Doc. 1 at 2.

FXG now asks the Court to find that, notwithstanding the JPMDL's transfer and coordination of these cases for pretrial purposes due to the common and predominant issue of employment status, FXG should be able to conduct pre-trial discovery regarding this same issue a second time, including in the transferee courts post-remand. If such a result is proper, one has to wonder why the cases were transferred and coordinated in the first place. Rather than create efficiencies, FXG's request would require a duplication of efforts by the transferee courts who likely would be faced with duplicative and overlapping issues arising out of a new round of expert discovery on employment status, not to mention a duplication of efforts between the

transferee courts and this Court, which has already marshaled the parties through expert discovery on the issue of employment status and heard *Daubert* motions. Surely, this is not the scenario that the JMPDL nor this Court intended.

**D. There is No Good Cause for Extending the Expert Discovery Deadline and Plaintiffs Would be Unduly Prejudiced.**

When a party fails to comply with a deadline imposed in a scheduling order, Rule 16(b) of the Federal Rules of Civil Procedure provides that the "schedule shall not be modified except upon a showing of good cause and by leave of the district judge." *Campania Management Co.*, 290 F.3d at 851. "[C]ourts look to both the diligence of the party seeking to amend the plan and to the potential prejudice to the opposing party." *Trustmark Ins. Co. v. General & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005); *Kortum v. Raffles Holdings, Ltd.*, 2002 U.S. Dist. LEXIS 21252, at *17 (N.D. Ill. 2002).

FXG will no doubt argue that it acted diligently and that there is no prejudice to Plaintiffs because no trial dates have been set and Plaintiffs can merely depose or re-depose FXG's experts. This argument ignores that the parties have already filed dispositive motions, based on the record as it stands. The purpose of a summary judgment motion is to test the sufficiency of the evidence that would otherwise be presented to the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (the court must determine whether the evidence "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law"). Based on the record, the Court decides which factual disputes, if any must be tried, and which are not disputed. Fed. R. Civ. P. 56(d)(1). To permit further discovery on the same issue of employment status addressed at summary judgment would prevent the Court from being able to narrow the issues for trial and, therefore, needlessly belabor the proceedings, burdening not only Plaintiffs but the Court.

Plaintiffs (and FXG) have invested hundreds of hours and millions of dollars on expert discovery on the employment status of the drivers during the five years since these cases were first transferred and coordinated into this MDL proceeding. Faris Dec. ¶¶ 7-8. Conducting expert discovery again on the same subject will require Plaintiffs to designate new experts to respond to FXG's new experts, or require Plaintiffs' existing experts to review FXG's new expert reports, all at substantial added time and expense for Plaintiffs. Whether the discovery occurs in this Court or post-remand, permitting FXG to start over at this late date would be unduly prejudicial. *See Rowe Intern. Corp. v. Ecast, Inc*., 586 F. Supp. 2d 924, 934-35 (N.D. Ill. 2008) (holding that, even though trial date was still some time away, party would be prejudiced by opposing party's reliance on new expert evidence offered after dispositive motion had been filed due to the complexity of the case and expense of discovery).

**CONCLUSION**

For the reasons set forth herein, FXG's motion to clarify the scheduling orders should be denied.

Dated: April 12, 2010

Respectfully submitted,

LEONARD CARDER, LLP

/s/ **Eleanor I. Morton**

ELEANOR I. MORTON, ESQ.
1188 Franklin St., Suite 201
San Francisco, CA 94109
Tel: (415) 771-6400
Fax: (415) 771-7010

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

Peter J. Agostino
ANDERSON, AGOSTINO & KELLER, PC
131 South Taylor Street
South Bend, IN 46601
Tel:     (574) 288-1510
Fax:     (574) 288-1650

**PLAINTIFFS' LIAISON COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | Case No. 93:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) | CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN |
| ALL CASES | ) | **DECLARATION OF LYNN ROSSMAN FARIS IN OPPOSITION TO FEDEX GROUND'S MOTION TO CLARIFY SCHEDULING ORDERS** |

I, Lynn Rossman Faris, hereby declare as follows:

1. I am an attorney licensed to practice law in the State of California and I am a partner in the law firm Leonard Carder, LLP. I am co-lead counsel in this case. I have personal knowledge of the facts set forth below and I could and would testify competently about them if called as a witness in this matter.

2. On January 9, 2006, FedEx Ground Package System Inc. ("FXG") provided Plaintiffs' counsel with its Initial Disclosures. Attached hereto as Exhibit A is a true and correct copy of that Initial Disclosure. At page 5, paragraph 6, FXG disclosed its

"Potential Expert Witnesses," naming at that time James Scapellato, James Hardman and Robert Crandall/Ali Saad.

3. On December 27, 2006, FXG counsel provided to Plaintiffs' counsel its "Supplement to Initial Disclosures" stating "This supplements our expert disclosures under Rule 26(a)(1) and 26(a)(2). [¶] The following individuals may present expert testimony for purposes of class certification and/or merits: [naming James Scapellato, Jeremy Kahn (as replacement for James Hardman), Robert Crandall, E. Deborah Jay, Richard Jeanneret]. " A true and correct copy of this Supplement to Initial Disclosures is attached hereto as Exhibit B.

4. On July 17, 2007, FXG counsel provided to Plaintiffs' counsel its "Supplement to Initial Disclosures" stating "This supplements our expert disclosures under Rule 26(a)(1) and 26(a)(2). [¶] The following individuals may present supplemental expert testimony for purposes of class certification and/or merits with respect to the cases that have joined the MDL subsequent to March 19, 2007: [naming Robert Crandall, E.Deborah Jay, Richard Jeanneret]." A true and correct copy of that letter supplement is attached hereto as Exhibit C.

5. During discussions I had with FXG counsel Chris Hollinger regarding the proposed joint pretrial order (Doc. No. 2008) in *Johnson v. FedEx Ground* (Iowa), I learned that FXG claimed that it had a right to name entirely new, undisclosed expert witnesses for use at trial on issues other than damages. I disagreed with FXG counsel that new experts could be named long after the close of all discovery (other than damage discovery, which was bifurcated by stipulation at the beginning of the case).

6. On March 23 and 29, 2010, I met and conferred with lead FedEx counsel, Robert Schwartz about FedEx's Motion to Clarify Scheduling Orders (Doc. No. 2017, filed 3/29/10). Before I could respond to the request to name "new" experts, I asked that FXG identify the number and type of experts they wished to disclose now; I asked what issues these experts would address and whether FXG intended to identify new experts on employment status. I informed Mr. Schwartz that Plaintiffs agreed that damage discovery has not begun and thus was expressly outside the court's current scheduling orders. I also told Mr. Schwartz that Plaintiffs believed that the parties had already disclosed all merits and class certification experts –FXG had named seven experts -- and both sides had already deposed experts previously named and thus expert discovery was closed. In response, on March 29, 2010, Mr. Schwartz indicated that FXG asserted the right to name all new experts on every issue in the case, including employment status, other liability issues and damages and declined to identify even the categories of experts or to narrow the scope of new expert disclosures in any way.

7. Extensive expert discovery has already taken place at huge expense to the parties. Plaintiffs have named four experts and produced expert reports from each. FedEx has named seven experts (excluding the one replaced by another expert) on the following topics:

- Robert Crandall/ Ali Saad: "[E]mpirical, economic and statistical issues related to contractors and/or the independent contractor model."

- Deborah Jay: Evidence of a survey of drivers.

- Richard Jeanneret: Job Analysis expert

- Jeremy Kahn: Vehicle leasing regulations (replacing Hardman).
- Francine LaFontaine: Whether FXG's policies and practices and Contractor Relations Unit is distinguishable from those that would exist in an employment relationship (offered by FXG to rebut Plaintiffs' expert David Lewin).
- James Scappellato: Safety regulations.
- Richard L. Smith: The economic value of FXG drivers' routes (rebuttal to Plaintiff's expert Paul Regan).

8. Both parties have had an opportunity to depose each other's experts and name rebuttal experts at huge expense. Plaintiffs have expended more than $1.5 million on expert witness fees. Both parties have produced and Plaintiffs have extensively reviewed thousands of pages of expert files in preparation for depositions of FXG's expert witnesses. Plaintiffs have already litigated first- round *Daubert* motions in connection with class certification. Had Plaintiffs known that FXG planned to name an entirely new line-up of expert witnesses, it is unlikely that Plaintiffs would have gone to the expense of deposing the experts FXG named in its Initial and Supplemental Disclosures.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct of my personal knowledge.

Executed April 12, 2010 at Oakland, California.

/s/ Lynn Rossman Faris
Lynn Rossman Faris

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 03:05-MD-527 RM (MDL 1700) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | CHIEF JUDGE MILLER<br>MAGISTRATE JUDGE NUECHTERLEIN |

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S INITIAL DISCLOSURES [Fed. R. Civ. P. 26(a) (1)]**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant FEDEX GROUND PACKAGE SYSTEM, INC. ("FedEx Ground"[1]) submits its initial disclosures ("Disclosure Statement").

## I. PRELIMINARY STATEMENT

A. In this Disclosure Statement, FedEx Ground makes these disclosures based on the information presently known and reasonably available to it as of January 9, 2006, and based upon the investigation FedEx Ground has conducted as of that date. FedEx Ground reserves the right to amend, modify and/or supplement this Disclosure Statement as additional information becomes known to it.

B. FedEx Ground, by describing documents and data compilations in this Disclosure Statement, does not waive but expressly preserves its right to object to production of such documents or data compilations on any ground, including, without limitation: 1) on the basis of privilege or work product protection; 2) on the ground that the documents or data compilations are not relevant to the subject matter of the litigation and are not reasonably calculated to lead to

[1] References herein to "FedEx Ground" include FedEx Ground Package System, Inc., its predecessors, subsidiaries, affiliates, divisions, employees, agents and field representatives.

the discovery of admissible evidence; and 3) on the ground that the document or data

compilations are not sufficiently relevant to justify the burden or expense of production.

C.    FedEx Ground incorporates in this Disclosure Statement by reference all

information disclosed by Plaintiffs pursuant to Rule 26(a), if any.

## II.   INITIAL DISCLOSURES

### A.   Disclosures Pursuant to F.R.C.P. 26(a)(1)(A):

Subject to the objections and qualifications set forth above, and without waiving

the same, FedEx Ground, in accordance with FRCP Rule 26(a)(1)(A), identifies the following

individuals likely to have discoverable information that FedEx Ground may use to support its

claims and/or defenses in this action, unless solely for impeachment:

1.    Various field personnel at particular terminals including, but not limited to, the Senior Managers of terminals implicated by the MDL 1700 proceedings, are likely to have discoverable information relevant to FedEx Ground's claims and/or defenses in this action. The Senior Managers of terminals implicated by the MDL 1700 proceedings are:

Abbott, John J.; AcMoody, Angela L.; Adams, Christopher L.; Adams, Ken E.; Addoh, Carlos A.; Alfonso, Thomas J.; Allbee, Scott P.; Allen, Chad R.; Allen, Christopher S.; Allen, Richard L.; Allison, Dane E.; Almaraz, Robert M.; Anderson, Arthur A.; Anderson, Kevin E.; Anderson, Thomas E.; Andresen, Thomas A.; Antonelli, Michael R.; Aragon, Carla; Asbridge, Todd E.; Ashley, Lloyd R.; Atkinson, Benjamin E.; Atwater, Brian R.; Aurelius, Diane L.; Bailey, Philip; Barclay, Brian E.; Barden, James; Barlowe, Kevin R.; Barrett, Kimberley A.; Becker, Brian R.; Beeman, Thomas G.; Beggs, Aaron K.; Bell, Jeffrey A.; Bellemore, Craig P.; Bentley, Eric C.; Bergstrom, Gayle E.; Berna, Ronald J.; Berryhill, Brian E.; Blatner, Charles E.; Bloch, Christopher J.; Bohannon, Winston C.; Boone, Traci L.; Bowen, David P.; Bradley, Benjamin K.; Breazeale, Adam S.; Brenner, Steve M.; Bridges, Charlie F.; Broadous, Kenneth L.; Brodie Sr., Edrie R.; Brooks, Julie A.; Brown, Deidre A.; Brown, Jonathan K.; Brundage, Stephen J.; Bruns, Michael W.; Bryan, Jennifer A.; Bryan, Mark D ; Buban, Denise; Buckor, Teye S.; Bulick, Robert P.; Burbach, Paul B.; Burgoon, William M.; Burleson, Cherie S.; Burns, Claude E.; Bush, Christopher B.; Busselman, Billy D.; Cairns, Jeffrey D.; Calabrese, David C.; Calnan, Lorelei D.; Camarote, Lance G.; Caponera Sr., Edward J.; Carpenter, Scott C.; Carroll, Jason L.; Carson, James A.; Cartwright II, Charles L.; Cendejas, Mark; Chancellor, Sylvester; Charlebois, Kevin; Ciappi, John G.; Clack, Donald A.; Cocchi, Brian C.; Cogan III, Paul W.; Coleman, Casey F.; Coleman, Jerald W.; Condoll Jr., Gerald L.; Conklin,

Christopher L.; Cooper, Jerrald S.; Cowart, Phillip S.; Cowles, Scott M.; Cristofoli, Randal P.; Cumberland, James L.; Curttright, Gregory E.; Czepa, Gerald W.; Darrell, Thomas; David, Brian; Davis, Corey T.; Davis, Gregory R.; Davis, Terry D.; Daza, Martin F.; De La Herran, Adolfo; Deangelis, Lou; Deans, Robert J.; Dennis, Jason S.; DePietress, Richard A.; Derzapf, Ricky J.; Dezelan, Russell L.; Dicely, Brian D.; Dickens, Valerie V.; Dickman, David M.; Diguglielmo, Martin P.; Dilk, Jason M.; DiMaio, Thomas; Dolin, James L.; Donalds Jr., William L.; Donovan, Debra A.; Downs II, John P.; Duemmel, Stephanie L.; Duff, Neil S.; Dunagan, James R.; Dykes, Kevin L.; Elgin, Charles M.; Enzor, Monty M.; Erickson, Tami J.; Etheredge, Carlos S.; Faris, James W.; Feagley, Douglas K.; Fedalizo, Edward Q.; Feo, Desiree L.; Ferguson Jr., Robert D.; Ferrell, Evangeline J.; Finch, Raymond H.; Fishback, Kristine M.; Flanagan, Brian; Fleetwood, Neal E.; Fleig, David R.; Fleming, James A.; Fluri, Terry D.; Fuhrman, Keith A.; Fuller, John E.; Gall, Stephen L.; Garcia, Arnulfo; Garton, Scott E.; Garza-Gongora Jr., Eduardo L.; Gebby, Thomas F.; Ginnery, James M.; Gleason, Thomas E.; Goin, Clyde F.; Gomez, Gordon M.; Gomez, Ruddy R.; Goyette, David W.; Grants, Dennis J.; Greene, Richard P.; Gregory, Marvin G.; Griffith II, Daniel W.; Grim, Jerrod D.; Grisso, Eric C.; Gullickson, Neil J.; Gysel, Peter R.; Haeger, Scott A.; Hammatt, Mark E.; Hannahs, Jeff L.; Hartt, Ricky J.; Haus, Steven C.; Hays, Mark T.; Head, Randy P.; Helring, John G.; Henry, Wayne; Henson, Andrew N.; Hermanet, Paul D.; Herndon, Thomas C.; Hillman, Steve R.; Hoffman, Bradley J.; Hollingsworth, Wick W.; Hood, Damon L.; Hope, Jason J.; Hopper, Monty H.; Horning, Bruce B.; Hostetler, Brandon; Huffman, Heather L.; Hunter III, Otis; Hynds, Paul A.; Ibeh, Chiekezie O.; Jimenez, Rene; Johnson, Adam G.; Johnson, Dorene D.; Johnson, Gregory L.; Johnson, Jamie L.; Johnston, Lee M.; Jones, Jennifer B.; Jones, Kenneth P.; Jones, Vernon C.; Joseph, James H.; Judge, Joseph G.; Justice, Jacqueline J.; Kalinich, John S.; Keen, Dana M.; Kerekes, Katherine A.; Key, Melissa G.; Kibler, Kenneth V.; Kille, Leslie G.; King, Elton O.; King, Ryan S.; Klema, Kelly J.; Kline, Bradley R.; Kolacz, Greg M.; Koskovich, Kelly R.; Kraynak Jr., Richard B.; Krebs, Cory P.; Krueger, Chad D.; Kubisch, Joshua; Kwasnoski, Matthew J.; Larson, William P.; Latham, Tracy D.; Lautman, Cheryl L.; Lavigne, Lori A.; Lee, Jason C.; Lefort, Michael P.; Lentoski, Joanne E.; Liddle, Todd K.; Lininger, Michael C.; Link, Christopher A.; Link, Evan F.; Littrell, Kenneth L.; Logan, Michael D.; Lohman, Thomas G.; Long Sr., Matthew J.; Long, Kenneth L.; Long, Vicki Lee; Loo, Bryan L.; Lopez, Jerry; Loughlin, Robert C.; Loveless, David G.; Lyon, Darryl S.; Macaluso, Christopher R.; Magdaleno, Jose J.; Mahaffey, Jason M.; Marshall, Kevin J.; Martin, Jay L.; Martin, Rochelle Y.; Martin, Thomas B.; Martinez, Byron J.; Mauser, Christopher R.; Mayer, Lori A.; Mbathi, Christopher M.; McDermott Jr., William E.; McDermott, Jeremy P.; Mcgrath, Kevin P.; Mcguire, Ron E.; McKenna, Sean V.; Mcknight, David T.; Miano, Richard C.; Millenbine, Lewis W.; Miller III, Earl L.; Miller, Chad R.; Miller, Charles J.; Miller, Joseph A.; Miller, Matthew E.; Minch, Roderick A.; Mirelli, Dwayne G.; Mollenhauer, Nathan J.; Monahan, Mark A.; Mosley, Darrall D.; Murphy, John R.; Murphy, Scott L.; Myers, John W.; Nagy, Christine J.; Nelson, Adam D.; Nelson, Zachary S.; Newman, Robert J.; Nicol, David A.; Ocello, Joseph A.; O'Connor, Jeffrey J.; Olczak, Leon M.; Palmer, James R.; Pearce, Christopher M.; Perry, James D.; Phillips, Donald F.; Plomedahl, Jesse A.; Potts, Timothy B.; Priester, David C.; Ragan, John C.; Redding, Debra L.; Rettinger, Albert T.;

Revoir, Leonard; Reynolds, Jeffrey R.; Reynolds, Jerry K.; Richards, Patrick; Richmond, David A.; Riedel, Jonathan C.; Rios, Miguel; Roberts, Todd H.; Robichaux, Pamela L.; Robinson, Ernest B.; Rodriguez, Luis M.; Roell, Karen M.; Root Jr., Michael J.; Ross, Christopher E.; Rowan, Stephen M.; Santos, Frank P.; Scanlon, Mark T.; Schaefer, Phillip E.; Schmidt, Glen D.; Schneider Jr., Robert J.; Schuster, Gerald A.; Seelhoff, Richard E.; Shamblin, David C.; Shaver, Brenda J.; Shea, Christopher D.; Shepherd, James D.; Shoun, Stacy J.; Shroyer, Jeffrey; Shufelt Jr., Dennis C.; Siedlecki, Edward C.; Simmons Jr., John; Smith, Elton B.; Smith, Eric K.; Smith, Kelley C.; Snyder, Jason S.; Sohns, Mark; Sokol, Brian D.; Spreer, Linda K.; St John, Preston M.; Staggs, Jenny A.; Steele, David D.; Steele, Galen L.; Stephans, Jefferey W.; Stoddard, Deborah S.; Stoecklein, Craig T.; Strickland, Todd D.; Swallow, Shawn M.; Thompson, Debra M.; Thurston, Terese K.; Trezvant, Danny R.; Tumnskie Jr., John A.; Turner, Franklin B.; Turner, Mark A.; Urban, Jeffrey; Valenza, Jason W.; Van Orman Sr., Philip; Vasquez, James M.; Vetrano, Michael D.; Vick, Marcus A.; Vickers, Michael T.; Viehweg, David L.; Villanueva, Henry; Wade, Ronald; Walczak, Jesse L.; Waller, Kevin S.; Walley, Ben H.; Wambach, James M.; Webb, Dana K.; Webb, James R.; Weisberg, Robert S.; Werbrich, Douglas J.; Wheeler, Thomas N.; Wiley, Pierre L.; Willey, Steven G.; Williams Jr., Adolph ; Williams, Jay A.; Williams, Marc C.; Williams, Myrick B.; Williams, Robert G.; Wilson, William L.; Wirth, Ryan M.; Wolbeck, Jesse J.; Wright, Randall J.; Wright, Scott G.; Zappacosta III, John A.; Zion, Donald G.; Zonfrillo, Samuel J.

2.  Various personnel in the Contractor Relations Department are likely to have discoverable information relevant to FedEx Ground's claims and/or defenses in this action. The personnel in FedEx Ground's Contractor Relations Department include, but are not limited to, the following:

Arnold, Shannon L.;  Edmonds, Timothy J.; Harris, Jeremy S.; Harris, Richard J.; Herd, Thomas W.; Jean, Richard M.; Johnson, Durwood K.; Monti, Emmanuel A.; Ostrov, Robert; White, Richard A.

3.  A variety of other Pittsburgh-based personnel are likely to have discoverable information relevant to FedEx Ground's claims and/or defenses in this action. These personnel include, but are not limited to, the following:

Conley, Scott D.; Krappa, James M.; Mannion, Michael P.

4.  A variety of region-based personnel including, but not limited to, Regional Managing Directors, are likely to have discoverable information relevant to FedEx Ground's claims and/or defenses in this action. The Regional Managing Directors of FedEx Ground are:

Boyzuick, Michael J.; Breen, William M.; Burns, Jeffrey S.; Campbell, Thomas A.; Carter, Terry E.; Crosby IV, George E.; Dixon, Kevin A.; French, James R.; Griffin, Steven J.; Harada Jr., George F.; Hiltz, John F.;

Holcombe, Robert E.; Howanski Jr., Alexander; Huesman, Daniel F.; Johnston, Stephen M.; Kapinos, Alexander J.; Koken, Kevin G.; Leveque, Edward P.; Littleton, Philip K.; May, Tony D.; Mckay, Patrick K.; Melander, Paul R.; Noth, Robert J.; O'Connor, Sean D.; Preston, Christopher J.; Primm, James T.; Roberts Jr., John A.; Rubado, Daniel J.; Sahli Jr., Dean A.; Sherman, Darryl O.; Smith, Jason D.; Super, Patrick D.; Tattum, Tyler J.; White, Torre T.

5. Named plaintiffs, plaintiffs, putative class members and contractors in jurisdictions in or relevant to the MDL 1700 actions

6. Potential Expert Witnesses:

James E. Scapellato
The Scapellato Group, Inc.
1946 Saxon Valley Circle NE
Atlanta, GA 30319Phone:
(404) 327-8346

James C. Hardman
Law Offices of James C. Hardman
753 Carla Lane
Little Canada, MN 55109-1925
Phone: (651) 483-5560

Robert Crandall/Ali Saad
Resolution Economics
9250 Wilshire Boulevard, Suite 400
Beverly Hills, Ca 90212
Phone: (310) 275 9137

FedEx Ground employees may be contacted through FedEx Ground's counsel of record.

**B. Disclosures Pursuant to F.R.C.P. 26(a)(1)(B):**

Subject to the objections and qualifications set forth above, and without waiving the same, FedEx Ground, in accordance with FRCP Rule 26(a)(1)(B), describes the following categories of documents that are in its possession custody or control:

1. Contractor Operating Agreements and Addenda

2. Contractor IRS 1099 Forms

3. Contractor Settlement Records

4. Policies, Procedures and other Internal Documents Relating to Independent Contractor Issues

5. Exhibits in the *Estrada* Trial

6. Contractor Files Including, but not limited to, Unit History Files, DOT Files, Business Discussion Documents and other Contractor-Related Documents

7. Contractor Pickup Records OP-205

8. Documents Related to Contractor Status as a Single- or Multiple-Work Area Contractor

9. Documents Related to the Frequency and Use of Supplemental Vans

10. Documents Related to the Source of Vans Used by FedEx Ground Contractors

11. Contractor Recruitment Materials

12. Documents Related to Incorporation of Contractors' Businesses

13. Documents reflecting a determination by government agencies that FedEx Ground drivers are independent contractors or that FedEx Ground's operating agreements are consistent with independent contractor status.

14. Documents Related to Sales of Routes

**C. Disclosures Pursuant to F.R.C.P. 26(a)(1)(C):**

Subject to the objections and qualifications set forth above, and without waiving the same, FedEx Ground, in accordance with FRCP Rule 26(a)(1)(C), makes the following initial disclosures:

FedEx Ground has not claimed any damages in this action. FedEx Ground, however, may seek recovery of its attorneys' fees in this matter.

**D. Disclosures Pursuant to F.R.C.P. 26(a)(1)(D):**

Subject to the objections and qualifications set forth above, and without waiving the same, FedEx Ground, in accordance with FRCP Rule 26(a)(1)(D), makes the following initial disclosures:

FedEx Ground currently knows of no insurance agreement(s) to which it is a party and pursuant to which any insurer may be liable to satisfy part or all of a judgment against FedEx Ground which may be entered in the action.

Dated: January 9, 2006

By: Robert Schwartz / TS

Robert M. Schwartz
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-6035

John H. Beisner
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C. 20006-4001

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of January, 2006, a true and correct copy of the foregoing initial disclosures was served by email and overnight mail on the following:

| | |
|---|---|
| Susan E. Ellingstad<br>Lockridge Grindal Nauen, PLLP<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN 55401<br><br>*Plaintiffs' Co-Lead Counsel* | Lynn Rossman Faris<br>Leonard Carder, LLP<br>1330 Broadway, Suite 1450<br>Oakland, CA 94612<br><br>*Plaintiffs' Co-Lead Counsel* |
| Robert I. Harwood<br>Wechsler Harwood, LLP<br>488 Madison Avenue<br>Suite 801<br>New York, NY<br>10022<br><br>*Plaintiffs' Co-Lead Counsel* | |

Theodore Schroeder
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
(202) 383-5300

# EXHIBIT B

case 3:05-md-00527-RLM-CAN document 2025 filed 04/12/10 page 15 of 19

O

O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

OUR FILE NUMBER
259075-3

WRITER'S DIRECT DIAL
(202) 383-5378

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

December 27, 2006

**VIA FEDEX AND ELECTRONIC DELIVERY**

Susan Ellingstad, Esq.
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

**Re: *Supplement to Initial Disclosures***

Dear Susan:

This supplements our expert disclosures under Rule 26(a)(1) and 26(a)(2).

The following individuals may present expert testimony for purposes of class certification and/or merits:

1. James Scapellato--Mr. Scapellato was previously disclosed and will testify as to safety regulations.

   James E. Scapellato
   The Scapellato Group, Inc.
   1946 Saxon Valley Circle NE
   Atlanta, GA 30319
   Phone: (404) 327-8346

2. Jeremy Kahn--Mr. Kahn replaces Mr. Hardman who was previously disclosed. Mr. Kahn will testify as to vehicle leasing regulations.

   Jeremy Kahn
   Kahn and Kahn
   1730 Rhode Island Avenue, N.W.
   Suite 810
   Washington, DC 20036
   (202) 887-0037

3. Robert Crandall--Mr. Crandall was previously disclosed and will testify as to empirical, economic and statistical issues related to contractors and/or the independent contractor model.

   Robert Crandall, M.B.A.
   Resolution Economics
   9250 Wilshire Boulevard, Suite 400
   Beverly Hills, CA 90212
   Phone: (310) 275 9137

4. E. Deborah Jay--Dr. Jay will present evidence related to a survey of contractors, which you have been aware of since August/September 2006.

   E. Deborah Jay, Ph.D.
   Field Research Corporation
   222 Sutter Street
   San Francisco, CA 94108
   Phone: (415) 392-5763

5. Richard Jeanneret--Dr. Jeanneret will opine about the type of skill and initiative required of the contractors, the existence of variations between contractors depending on how they choose to configure their businesses, and how contractors control their businesses.

   P. Richard Jeanneret, Ph.D.
   Valtera Corp.
   601 Jefferson, Suite 3900
   Houston, TX 77002
   Phone: (713) 650-6535

Very truly yours,

Evelyn Becker

Evelyn L. Becker
of O'MELVENY & MYERS LLP

cc: Lynn Faris, Esq.
Rob Harwood, Esq.

# EXHIBIT C

O

**O'MELVENY & MYERS LLP**

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

July 17, 2007

OUR FILE NUMBER
259075-3

**VIA FEDEX AND ELECTRONIC DELIVERY**

WRITER'S DIRECT DIAL
(310) 246-6835

WRITER'S E-MAIL ADDRESS
rschwartz@omm.com

Susan Ellingstad, Esq.
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

**Re:** ***Supplement to Initial Disclosures***

Dear Susan:

This supplements our expert disclosures under Rule 26(a)(1) and 26(a)(2).

The following individuals may present supplemental expert testimony for purposes of class certification and/or merits with respect to the cases that have joined the MDL subsequent to March 19, 2007:

1. Robert Crandall – Mr. Crandall was previously disclosed and will testify as to empirical, economic and statistical issues related to contractors and/or the independent contractor model as they relate to the states not implicated by the 29 statewide classes sought to be certified in plaintiffs' pending motions for class certification.

   Robert Crandall, M.B.A.
   Resolution Economics
   9250 Wilshire Boulevard, Suite 400
   Beverly Hills, CA 90212
   Phone: (310) 275 9137

2. E. Deborah Jay – Dr. Jay will present evidence related to a survey of contractors in the states not implicated by the 29 statewide classes sought to be certified in plaintiffs' pending motions for class certification.

   E. Deborah Jay, Ph.D.
   Field Research Corporation
   222 Sutter Street

San Francisco, CA 94108
Phone: (415) 392-5763

5. Richard Jeanneret--Dr. Jeanneret will opine about the type of skill and initiative required of the contractors, the existence of variations between contractors depending on how they choose to configure their businesses, and how contractors control their businesses in the states not implicated by the 29 statewide classes sought to be certified in plaintiffs' pending motions for class certification.

P. Richard Jeanneret, Ph.D.
Valtera Corp.
601 Jefferson, Suite 3900
Houston, TX 77002
Phone: (713) 650-6535

Very truly yours,


  /s Robert M. Schwartz
Robert M. Schwartz
of O'MELVENY & MYERS LLP

cc:    Lynn Faris, Esq.
      Rob Harwood, Esq.

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )
------------------------------------------------ )
THIS DOCUMENT RELATES TO: )
ALL ACTIONS )

Cause No. 3:05-MD-527 RM
(MDL-1700)

ORDER AND OPINION

This matter is before the court on FedEx Ground Package System's motion to clarify scheduling orders (doc. # 2017). FedEx requests clarification of the following statement in this court's January 22, 2010 order: "The deadline for expert discovery and filing of dispositive motions as to the determination of employee and independent contractor status — the overriding centralized issue in this case — has expired." Do. # 1991, p. 7. FedEx asks the court to clarify that the parties aren't precluded from offering expert witnesses and opinions at trial on the independent contractor classification question that differ from those the parties offered at the class certification and the summary judgment phases. The plaintiffs object, contending that the deadline for disclosing experts and engaging in expert discovery has passed and neither the parties nor the court intended to impose a separate deadline for trial. The court agrees with the plaintiffs.

In its November 29, 2005 scheduling order, the court stated that "[d]iscovery

for purposes of class certification and discovery for purposes of the merits of Plaintiffs' claims will take place concurrently. Consequently, all discovery related to independent contractor/employment status and summary judgment shall be completed by August 1, 2006." (Doc. # 58, p. 3). The deadlines for expert disclosures and expert discovery for the class certification and summary judgment phases initially were set concurrently, but the court later extended the expert discovery deadlines for the summary judgment phase beyond the deadline set for the class certification phase. Doc. # 261. The court explained that it previously ordered the parties to conduct discovery on the issue of class certification and the merits simultaneously, but upon the parties' request to extend merits discovery, the court modified the deadlines for the exchange of expert reports and discovery for summary judgment. Doc. # 261, pp. 3-4. The court issued additional orders extending the deadlines to serve expert reports and to depose experts relied on for summary judgment. Doc. ## 481, 766, 833, 1118, and 1425.

FedEx argues that no deadlines have been established for expert disclosures, reports, or discovery *for trial*, because this court's previous orders only set such deadlines for the class certification phase and summary judgment phase of the proceedings. FedEx says that separate disclosure requirements for class certification experts, summary judgment experts and trial experts make sense because each expert serves a specialized role and is directed to a different audience. FedEx further contends it's reasonable for the parties to disclose trial experts after the court's rulings on summary judgment when the issues have been

further defined. Finally, FedEx contends that as a practical matter, experts for briefing differ from trial experts because of the extent of their applicability. FedEx reasons that an expert's report can support briefs in numerous cases, but once a case is remanded, the expert might need to testify at trial, which given the numerosity of trials throughout the country, could require the retention and disclosure of additional expert witnesses.

Although the court tied the expert disclosure and discovery deadlines to the summary judgment phase of the MDL proceeding, the orders also indicate that the discovery deadlines were for the merits stage, which includes trial. There is no indication in the court's orders that a separate expert deadline would be set for trial and instead, the orders clearly indicate that the court intended for the class certification and merits discovery to run concurrently. If FedEx believed these deadlines were ambiguous, it should have raised the issue earlier. Both parties have engaged in extensive expert discovery as to the issue of employment status and having a separate expert deadline for the same issue for the trial phase of litigation would be unduly prejudicial to the plaintiffs; it would not only unduly delay this litigation, but would require the plaintiffs to expend more time and resources on discovery that already has been conducted extensively.

FedEx's arguments that it makes sense to have different deadlines for summary judgment and trial are unconvincing. FedEx had an opportunity to disclose experts that it believed would be appropriate for both the summary judgment and trial phase of litigation. If the substance of the expert findings is the

same for summary judgment and trial — that the drivers are independent contractors — the manner in which the opinion is presented to the jury can be modified and restructured by the attorney's examination questions at trial. Further, FedEx didn't need to wait until after summary judgment for clarification of the issues. At the time of the expert disclosure and discovery deadline, FedEx was well aware of the issue — whether FedEx drivers are employees or independent contractors. Finally, there is no indication why scheduling conflicts for trials can't be arranged so that FedEx experts can testify at the various trials that might be held in this proceeding. The court won't extend discovery because trial calendars not yet set might conflict.

As previously indicated, the court divided summary judgment into two stages: "summary judgment or adjudication on issues relating to independent contractor/employment status and summary judgment or adjudication as to other issues." Doc. # 58. The discovery deadline has passed, except that to date, expert discovery has only been directed to class certification and employment-status issues. Doc. # 261. Accordingly, to clarify, the deadline for expert disclosure and discovery on the issue of employment status for all phases of litigation has passed, but additional expert discovery may be warranted for issues other than employment status.

SO ORDERED.

ENTERED: April 21, 2010

/s/ Robert L. Miller, Jr.
Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION )

Cause No. 3:05-MD-527 RM
(MDL-1700)

THIS DOCUMENT RELATES TO:

ALL ACTIONS

OPINION AND ORDER

This matter is before the court on the plaintiffs' omnibus brief in support of summary adjudication asking the court to give collateral estoppel effect to the California Estrada decision in all the MDL proceedings (doc. # 1194). The plaintiffs contend that the Statement of Decision in Estrada v. FedEx Ground Package Sys., Inc., Los Angeles Superior Court, Case No. BC210130, *aff'd*, 64 Cal. Rptr. 3d 327 (Cal. App. Ct. 2007), precludes FedEx from denying that it has reserved the right to control and has exercised actual control over the manner and means used by the plaintiff drivers in performing their duties for FedEx under the terms of the Operating Agreement and common FedEx policies, procedures, and practices that implement the Operating Agreement's terms. For the reasons that follow, the court denies the plaintiffs' request to give preclusive effect to Estrada in the MDL cases.

I. BACKGROUND

In Estrada, the court found that FedEx had the right to control and exercised actual control over a California class consisting of FedEx single service area pick-up and delivery drivers. The MDL plaintiffs argue that the court's findings in Estrada have preclusive effect in both the certified and non-certified classes as to FedEx's right to control and, where applicable, its actual exercise of control.

FedEx disagrees that Estrada has any preclusive effect. First, FedEx says that certain material facts relied on in Estrada are different from those applicable in the MDL cases. FedEx made a number of operational changes directly affecting its relations with contractors after Estrada, such as the "Document Reengineering Initiative" that clarified the line between policies and procedures. FedEx also contends that the facts in the MDL proceedings will be different than those relied on by the Estrada court because the Estrada class was more narrow than the classes certified here and anecdotal evidence was offered during the Estrada trial involving California terminal managers' and drivers' individual experiences.

Second, FedEx contends the states in the various MDL proceedings apply different legal standards than the California court applied. Because the class certification orders analyzed each jurisdiction's law individually, FedEx reasons that the court's analysis confirms that various jurisdictions treat the factors relevant to the right to control differently.

Third, FedEx states that application of collateral estoppel to the MDL proceeding would be contrary to public policy. The Estrada judgment, FedEx says,

is inconsistent with one or more previous judgments in favor of FedEx. Also, the Estrada appellate court reversed the trial court's equitable order enjoining FedEx from misclassifying single service area drivers under its then-current business model because the plaintiffs lacked standing to seek such relief. Accordingly, FedEx contends a decision applicable to a defined class of California FedEx single service area drivers that doesn't apply even throughout California shouldn't be given nationwide preclusive effect.

In Estrada v. FedEx Ground Package Systems, Inc., Los Angeles Superior Court, Case No. BC210130, the court certified a class of FedEx pickup and delivery contractors who at any time between May 1996 and July 2001 performed services for FedEx in the State of California driving full-time in a single work area (SWA) dispatched from a California-based terminal pursuant to the Operating Agreement. *See* Statement of Decision dated July 26, 2004, pp. 1-2. Drivers who operated in multiple work areas (MWAs), corporate entities, and others were excluded from the class. Decision, p. 2. Two of the named plaintiffs were SWA drivers and another was an MWA driver; although excluded from the class, the MWA driver continued in the litigation individually seeking a determination of employment status. Decision, pp. 2-3.

On July 26, 2004, after a nine-week bench trial with forty-six witnesses, the California Superior Court issued its Statement of Decision finding that the drivers in the plaintiff class were employees, but that the MWA plaintiff was an independent contractor. Decision, p. 3. The Estrada court based its decision on

the employment test set forth in S.G. Borello & Sons, Inc. v. Department of Indust. Relations, 769 P.2d 399 (Cal. 1989), which this court has noted is similar to the "economic realities test" applicable to FMLA claims. *See* Doc. # 1119, pp. 62-63. The principal factor is the "right to control the manner and means of accomplishing the result desired." S.G. Borello & Sons v. Department of Indust. Relations, 769 P.2d at 404 (citations omitted). "[I]t is the right to control, not the exercise of the right, which bears on the status of the work arrangement." Id. at 408 n.9.

The Borello court explained that "the 'control' test, applied rigidly and in isolation[] is often of little use in evaluating the infinite variety of service arrangements." Borello, 769 P.2d at 404. "[T]he right to control work details is the 'most important' or 'most significant' consideration," but isn't dispositive. Id. For example, the right to discharge at will, without cause, provides strong evidence in support of an employment relationship. Id. "Additional factors have been derived principally from the Restatement Second of Agency," and include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

Id. (citations omitted).

The Borello court also suggested that other factors could be considered, such as the alleged employee's opportunity for profit or loss depending on his managerial skill. Id. at 407. The individual factors generally "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." Id. at 404.

The trial court's findings in Estrada were based upon all the standards set forth in Borello, but the court was primarily guided by the right to control the manner and means of accomplishing the result desired, whether there had been integration into FedEx's operation, and whether there was an opportunity for profit or loss based upon managerial skill. Decision, p. 3. The court relied on class evidence and testimony from FedEx management, not localized anecdotes. Decision, pp. 3-4. For all practical purposes, the court found that all terminals were run in a similar manner. Decision, p. 4. The court noted that the binding effect of FedEx's policies or procedures was based upon the subjective evaluation of management using common sense and thus, any determination "would be very situational." Decision, p. 8. By leaving such subjective interpretation to management's discretion, the court reasoned that the relationship between the SWA drivers and FedEx "metamorphas[es] into a tightly controlled hierarchal employment model." Decision, p. 9. The court declined to examine individualized instances of control or lack of control, but instead focused on the interpretive power of FedEx, which allows FedEx to determine what is and isn't applicable. Decision, p. 10.

case 3:05-md-00527-RLM-CAN document 2029 filed 04/21/10 page 6 of 41

After listing several FedEx practices and occurrences presented at trial that showed FedEx's control, the court reasoned:

> There is no necessity for the court to determine if each alleged event was the purposeful design of [FedEx] or the act of a 'rogue' terminal manager. What is important is that by reason of the interpretive power of [FedEx], such actions can and do flourish with the tacit approval of higher management based upon the uncertainty of the standards which [FedEx] determines to be applicable or non-applicable, depending on the situation. . . .
>
> The lack of objective, precisely defined guidelines either reflects a totally disorganized business, which [FedEx] is certainly not, or a highly motivated, well organized entity, which it is, that utilizes control and order in order to meet its successful economic goals. . . .

Decision, pp. 10-11. "The court [found] that [FedEx], not only has the right to control, but has close to absolute actual control over the SWAs based upon interpretation and obfuscation" of the Operating Agreement's terms. Decision, p. 4. The court explained that FedEx exerted control by uncertainty, reasoning that the Operating Agreement is comprised primarily of platitudes and guidelines, leaving its "interpretation in the sole hands of [FedEx], without any meaningful recourse to the SWAs but with potential severe penalties and remedies that are intentionally kept uncertain and murky." Decision, p. 4. The Operating Agreement created the "constraints of an employment relationship . . . in the guise of an independent contractor model." Decision, p. 5.

The court cited numerous provisions of the Operations Management Handbook providing FedEx with control over the SWA drivers, including 9.5 hours of minimum service required, reconfiguration of work areas, mandatory flexing,

prohibition against informal flexing, a requirement that drivers return to their terminal daily, and required business plan discussions. Decision, pp. 6-7. The FedEx Ground Manual required drivers to wear uniforms and terminal managers to observe and note the appearance of the driver and equipment and conduct customer service rides. Decision, p. 7. FedEx could determine when to reconfigure a route or terminate a contract because of a "service failure," a definition determined by FedEx based "upon situational subjectivity and a panoply of sources[,]" providing FedEx with "almost absolute control." Decision, p. 10. The evidence showed that FedEx had some discretion to control who a driver hires or who a driver may sell a route to beyond the DOT requirements. Decision, p. 14. The evidence also showed that the drivers' work hours were constrained by customer pick up and delivery windows contracted by FedEx's sales force. Decision, pp. 14-15.

The court explained that FedEx recommends leases of trucks and the type of trucks to obtain, provides a Business Support Package to obtain scanners, uniforms, and other items required by FedEx, provides a Contractor Assistance Program for loans relating to operating expenses, and offers a Service Guarantee Account. Decision, p. 21. These programs "place a great deal of control in the hands of [FedEx] so that the SWAs can obtain the equipment, items and upgrades in order to be able to do their work" through deductions from their weekly settlement checks; the court analogized these programs to a "company store." Decision, pp. 20-21.

The court found that the SWA drivers and MWA drivers part company because there is little or no opportunity for profit or loss as a SWA driver, while there is such opportunity for MWA drivers. Decision, p. 17. The court acknowledged that the MWA drivers, like SWA drivers, are under strict controls by FedEx, but they differ because the MWA drivers' ability to profit is unlimited, making them independent contractors according to the Estrada court. Decision, pp. 17-18. The court noted that even though a SWA driver may become a MWA driver by purchasing additional routes, they cannot do so without FedEx's consent. Decision, p. 15.

The California court of appeals affirmed the trial court's finding that the SWA drivers are employees; the MWA plaintiff wasn't a party to the appeal. Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327, 330 (Cal. Ct. App. 2007). The court of appeals initially reviewed various provisions of the Operating Agreement providing FedEx with control, Id. at 331-332, but reasoned that in addition to the Operating Agreement's terms, both parties at trial "presented anecdotal and other evidence through the testimony of numerous drivers, FedEx managers, and experts . . . to show FedEx's power to interpret the Operating Agreement." Id. at 332, 338. The court noted that the anecdotal evidence "was relevant to the class as whole, not just to the drivers who happened to be the subject of a particular anecdote." Id. at 338.

The court of appeals held that the trial court's finding were supported by the evidence and reasoned:

> FedEx's control over every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair, supports the trial court's conclusion that the drivers are employees, not independent contractors. The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items-trucks and scanners-are obtained from FedEx approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income. The customers are FedEx's customers, not the drivers' customers. FedEx has discretion to reject a driver's helper, temporary replacement, or proposed assignee.
>
> Drivers—who need no experience to get the job in the first place and whose only required skill is the ability to drive—must be at the terminal at regular times for sorting and packing as well as mandatory meetings, and they may not leave until the process is completed. The drivers are not engaged in a separate profession or business, and they are paid weekly, not by the job. They must work exclusively for FedEx. Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by "flexing" and withheld approvals, and for very slight violations of the rules.

Id. at 336-337 (footnotes omitted). The court also reasoned that "[a]lthough the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all - and substantial evidence established that FedEx discharges drivers at will." Id. at 336. Despite the terms in the Operating Agreement supporting independent contractor status, the court reasoned that "the evidence shows that FedEx's conduct spoke louder than its words." Id.

## II. Discussion

The Full Faith and Credit statute requires federal courts to give state judicial proceedings the same full faith and credit the courts of the issuing state would give them. 28 U.S.C. § 1738. Accordingly, federal courts must accord preclusive effect to issues decided by state courts. Allen v. McCurry, 449 U.S. 90, 96 (1980). "Whether a judgment of a state court results in issue preclusion depends upon the law of that state." McNealy v. Caterpillar, Inc., 139 F.3d 1113, 1116 (7th Cir. 1998) (citation omitted); *see also* Rogers v. Desiderio, 58 F.3d 299, 301 (7th Cir. 1995) ("The preclusive effect of a state judgment in federal litigation depends on the rendering state's law."). California law therefore controls this court's collateral estoppel analysis.

Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. Lucido v. Superior Court, 795 P.2d 1223, 1225 (Cal. 1990). The doctrine precludes a party to a prior litigation from relitigating issues decided against him, even if the claims involved aren't the same. Vandenberg v. Superior Court, 982 P.2d 229, 237 (Cal. 1999). Precluding parties from contesting matters they have had a full and fair opportunity to litigate "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Alberto-Culver Co. v. Trevive, Inc., 199 F. Supp. 2d 1004, 1008 (C.D. Cal. 2002) (*citing* Montana v. United States, 440 U.S. 147, 153-154 (1979)).

A prior decision precludes relitigation of an issue under California's doctrine of collateral estoppel only if five threshold requirements are satisfied:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

Lucido v. Superior Court, 795 P.2d at 1225; *accord* Pacific Lumber Co. v. State Water Res. Control Bd., 126 P.3d 1040, 1054 (Cal. 2006). "The party asserting collateral estoppel bears the burden of establishing these requirements." Lucido v. Superior Court, 795 P.2d at 1225.

"[E]ven where the minimal prerequisites for invocation of the doctrine are present, collateral estoppel is not an inflexible, universally applicable principle; policy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors." Vandenberg v. Superior Court, 982 P.2d at 237 (quotations and citations omitted). Beyond the threshold requirements, the court also must decide whether application of the collateral estoppel bar would be fair to the parties and constitute sound judicial policy, taking into account the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation. Lucido v. Superior Court, 795 P.2d at 1226-1227. "[I]n deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel." Johnson v. GlaxoSmithKline, Inc., 83 Cal. Rptr. 3d 607, 616

(Cal. Ct. App. 2008) (*citing* Clemmer v. Hartford Ins. Co., 587 P.2d 1098 (Cal. 1978)).

Whether FedEx reserved a right to control its California SWA drivers was actually litigated in Estrada and decided by that court in determining the plaintiffs' employment status. "[A]n issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding." Hernandez v. City of Pomona, 207 P.3d 506, 514 (Cal. 2009). FedEx appealed the decision and the appellate court affirmed the trial court's findings. The California Supreme Court denied FedEx's petition for review. The decision therefore is final and on the merits. *See e.g.*, McAlister v. Essex Property Trust, 504 F. Supp. 2d 903, 911 (C.D. Cal. 2007) ("A judgment is not final while there is time to appeal or while an appeal is pending . . . and is not on the merits if based on a technical or formal defect."). Accordingly, of the five threshold requirements necessary to satisfy collateral estoppel only the first is at issue here: whether the issue sought to be precluded is identical to that decided in the former proceeding. FedEx also contends that even if this requirement is met, application of the collateral estoppel bar would be unfair and wouldn't constitute sound judicial policy.

*A. Identity of Issues*

For collateral estoppel to apply, "the legal matter raised in the second proceeding must involve the same set of events or documents and the same

bundle of legal principles that contributed to the rendering of the first judgment." Flores v. Transamerica HomeFirst, Inc., 113 Cal. Rptr. 2d 376, 381 (Cal. Ct. App. 2001) (citation omitted); *see also* Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000) ("'Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules.'" (*quoting* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4425, at 253 (1981).). Collateral estoppel doesn't apply when there are changed conditions or new facts that didn't exist at the time of the earlier judgment, or when the previous decision was based on different substantive law. United States Golf Ass'n v. Arroyo Software Corp., 81 Cal. Rptr. 2d 708, 713 (Cal. Ct. App. 1999) (*citing* People v. Ocean Shore R.R., 196 P.2d 570 (Cal. 1984)); *see also* Wimsatt v. Beverly Hills Weight Loss Clinics Int'l, Inc., 38 Cal. Rptr. 2d 612, 615 (Cal. Ct. App. 1995) ("[W]here the previous decision rests on a 'different factual and legal foundation' than the issue sought to be adjudicated in the case at bar, collateral estoppel effect should be denied.").

"The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." Hernandez v. City of Pomona, 207 P.3d at 511-512; *see also* Lucido v. Superior Court, 795 P.2d at 1225 (same). "Collateral estoppel bars relitigation of the same issues; it does not require identity of legal theories or causes of action." Evans v. Celotex Corp., 238 Cal. Rptr. 259, 261-262 (Cal. Ct.

App. 1987). "Precisely defining the issue previously decided and the one sought to be precluded is critical." Johnson v. GlaxoSmithKline, Inc., 83 Cal. Rptr. 3d at 620.

*1. Changed Conditions or Varying Facts*

FedEx argues that collateral estoppel doesn't apply because of the following changed circumstances or varying facts: the Document Reengineering Initiative that FedEx began in 2005, the differences in class definition between the Estrada class and the MDL classes, and the Estrada court's reliance on evidence unique to the California class.

*a. Document Reengineering Initiative*

After Estrada, FedEx maintains it initiated a number of operational changes affecting its relations with contractors. In 2005, FedEx began a "Document Reengineering Initiative" to overhaul its policies, procedures, and forms. That initiative was meant to clarify the line between policies (statements "outlining a mandatory course of action") and procedures (statements "providing the how and when or how often for implementing the policies"), so that FedEx employees would better understand FedEx's expectations. Among the changes was Policy-007, introduced after Estrada, reinforcing that FedEx employees must adhere to the Operating Agreement in their interactions with contractors, the terms of the Operating Agreement may not be modified, and, most significantly, "*[n]o officer,*

*agent or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results.*" FedEx Exh. B-02 (emphasis in original). Policy-007 repeats the language of Section 1.15 of the Operating Agreement as a policy and states that a violation of its terms may result in disciplinary action.

FedEx points to the following examples of other changes made to its procedures:

> (1) The reengineered OPR-716 (formerly the same number) excludes any restriction on independent contractors informally trading or "flexing" packages amongst themselves and allows contractors to trade packages to increase or decrease volume. *Compare* FedEx Exh. B-14, *with* FedEx Exh. B-27.
>
> (2) The reengineered CRL-555 (formerly OPR 555) makes clear that comments based on customer service rides constitute "recommendations," not mandatory instructions, and that "[t]he contractor is solely responsible for exercising independent discretion and judgment to achieve business objectives" addressed by possible recommendations. *Compare* FedEx Exh. B-04, *with* FedEx Exh. B-26.
>
> (3) The reengineered CRL-551 (formerly OPR-551) states that qualified drivers must have a minimum of six months driving experience (as opposed to a year) or have completed QPDL training (as instituted in 2003), and further states that contractors who do not intend to drive need not meet these qualifications. *Compare* FedEx Exh. B- 03, *with* FedEx Exh. B-25.
>
> (4) The reengineered CRL-551 (formerly OPR-551) also excludes any restriction on independent contractors' ability to hire relatives to drive for them. *Compare* FedEx Exh. B-03, *with* FedEx Exh. B-25.
>
> (5) The reengineered SAF-056 (formerly the same number) made clear that contractors had the option of satisfying their ongoing D.O.T. safety obligations by attending meetings offered by outside vendors instead of meetings offered by FXG at each of the terminals. *Compare* FedEx Exh. B-20, *with* FedEx Exh. B-28.

FedEx has also implemented other programs to enhance contractor's opportunity for profits, including the Enhanced Primary Plus Program, which encourages SWA drivers to grow their business and become MWA drivers. FedEx eliminated prohibitions on SWA drivers obtaining a second route within the first year of contracting and increased the maximum number of routes a contractor could own at any one terminal. *See* Marticke Dep., pp. 140-144 (providing further explanation of these changes).

There is evidence to show that reengineered policies and procedures were generally communicated to terminal mangers nationwide, addressed in regional seminars and FedEx Ground University programs, and made continuously available through FedEx Ground's intranet. James Krappa, who had taken over leadership of the DRI, testified that FedEx provided training to senior managers to go over the changes to the policies and procedures that resulted from the document re-engineering initiative. Krappa Dep., pp. 134, 302-304. Steve Handy, FedEx's Chief Learning Officer, testified that he didn't think they had any training on the DRI, but there was a communication to the field informing them of the changes. The changes were also a part of the university training and regional seminars and available on-line for managers to review. Handy Dep., pp. 92-94.

The plaintiffs respond that the Operating Agreement hasn't changed in any significant way since the Estrada decision and that it's immaterial that FedEx re-labeled some of its "policies" as "procedures" or made slight modifications to the rules specifically addressed in Estrada. The plaintiffs argue that what matters is

that FedEx continues to reserve the right to interpret the Operating Agreement and policies. The plaintiffs offer the expert report of Robert F. Wood to show that the policy changes were merely cosmetic and haven't affected significant changes in the manner FedEx operates its business or treats its pick-up and delivery drivers. Pl. Exh. 11:26-27. Mr. Wood's opinion as to the policy changes is based on a review of the policies and testimony from FedEx employees. FedEx has moved to strike Mr. Wood's report, but the court needn't address FedEx's motion at this time because, instead of relying on his report, the court relies on the policies and testimony presented to determine if the changes FedEx made were substantive.

The plaintiffs reason that FedEx's system-wide policies and procedures are substantially the same as those at issue in Estrada, including policies and procedures on (1) evaluating drivers' personal appearance; (2) approving size, type, markings, and appearances of drivers' vehicles; (3) recruiting and training drivers in FedEx delivery and customer service methods, evaluating their work performance, and imposing discipline; (4) approving the use of additional vehicles, drivers and helpers, and routes; (5) shifting packages between drivers on a day-to-day basis (flexing) and reconfiguring driver routes permanently to balance the workloads between them; (6) determining the drivers' days and hours of work; (7) compensating drivers; and (8) terminating driver contracts. The plaintiffs also point out that FedEx continues to conduct customer service rides and driver release and road audits and to hold business discussions with its drivers to ensure that they are meeting FedEx's quality and safety standards.

The evidence is somewhat conflicting as to the effect FedEx's document reengineering initiative has had on FedEx's operations. Heather D'Alesandro, Manager of Succession Planning and former Managing Director of FedEx Ground University, initiated the DRI in March 2005. D'Alesandro Dep., pp. 8, 13. Ms. D'Alesandro explained that the initiative was implemented to "ensure [FedEx employees] understood what a policy was, what a procedure was, and what a reference material was, understood the importance between those variations, and understood consequences, when consequences existed and when they did not." D'Alesandro Dep., p. 9. The focus of the DRI was to help FedEx employees "better understand the expectations of [FedEx] documentation." D'Alesandro Dep., p. 92. FedEx managers "who interact with the contractors are absolutely going to conduct business with [them] in terms of the Operating Agreement[,] . . . so if they ever have a question, . . . they're always expected to act in terms of the Operating Agreement." D'Alesandro Dep., pp. 93-94. In doing so, FedEx more clearly defined a policy and, as a result, narrowed and reduced its policy statements. D'Alesandro Dep., pp. 108-110. FedEx also added clauses indicating that failure to comply with the policy statements might result in disciplinary action, including termination. D'Alesandro Dep., p. 109. The procedures were designed as a framework for implementing the mandatory policies. D'Alesandro Dep., p. 110.

Several FedEx officers testified that they weren't specifically aware of the DRI or changes associated with the DRI. Steve Handy, Ms. D'Alesandro's superior, oversaw the initiative. Handy Dep., p. 8. He testified that the DRI resulted in fewer

and clearer policies and procedures: “[i]n other words, the difference between a policy and a procedure was clarified, and we have easier-to-understand procedures.” Handy Dep., pp. 80-81. He also testified that there weren’t any substantive changes to the procedures he was responsible for changing, which included maintenance of facilities, check-in, and service measurement. Handy Dep., p. 81. He wasn’t aware of any other specific substantive changes. Handy Dep., p. 82. FedEx’s Divisional Vice President, Robert Holcombe, testified that there might have been a change, but he didn’t recall the specific time frame. Holcombe Dep., p. 132. FedEx’s Divisional Vice President, Scotty Ray, testified that he wasn’t aware of any changes or alterations to the policies or procedures of the company as part of a document re-engineering initiative. Ray Dep., p. 76. Sr. Vice President of Operations, Michael Mannion, testified that he wasn’t aware of anything that has occurred in the company with regard to the DRI. He said he couldn’t “link the document reengineering to the changes that have been made.” Mannion Dep., pp. 75, 89. Kevin Koken, FedEx Managing Director of the Midwest Region, testified that he had heard of the DRI, but wasn’t aware of significant changes that were made as part of that process. Koken Dep., p. 134. He also wasn’t aware of any training that was done with respect to the changes made as a result of the DRI. Koken Dep., p. 136.

“[C]ollateral estoppel ‘was never intended . . . to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have

occurred which may have altered the legal rights or relations of the litigants."' Evans v. Celotex Corp., 238 Cal. Rptr. 259, 262 (Cal. Ct. App. 1987) (*citing* Hurd v. Albert, 3 P.2d 545 (Cal. 1931)). The changed circumstances must be material to the judgment. Alberto-Culver Co. v. Trevive, Inc., 199 F. Supp. 2d 1004, 1017 (holding that collateral estoppel didn't apply to defendant's repackaged product in trademark infringement action, but only after questioning whether it was a material change); *see also* Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 91 (1st Cir. 2007) (finding preclusive effect where the challenged policy didn't change in any significant way from one suit to the next).

The court in United States Golf Ass'n v. Arroyo Software Corp. held that collateral estoppel didn't apply because the relevant facts changed after the first decision. 81 Cal. Rptr. 2d 708, 713 (Cal. Ct. App. 1999). The USGA brought a previous lawsuit [*United States Golf Ass'n v. St. Andrews Sys., Data-Mix, Inc.*, 749 F.2d 1028 (3d Cir. 1984)], against a computer company that sought to issue USGA handicaps directly to individual golfers, using USGA formulas and associated distinctive service marks, without the USGA's permission. The *St. Andrews* court rejected the USGA's lawsuit against the company for misappropriation of its formulas. Three years after the *St. Andrews* decision, the USGA adopted new formulas. The USGA later sued Arroyo for misappropriating its name and service marks, and Arroyo asserted that collateral estoppel barred suit. The Arroyo court found that collateral estoppel didn't apply because after *St. Andrews*, the USGA completely changed its Handicap System by abandoning its

older formula and developing entirely new formulas. The court concluded that "[b]ecause . . . the underlying factual conditions . . . changed from the time of the decision in *St. Andrews*, it cannot be said that the issues before [the courts were] 'identical.'" 81 Cal. Rptr. 2d at 713.

When the changed circumstances are immaterial, collateral estoppel won't apply. Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 90 (1st Cir. 2007). The plaintiff in Ramallo Bros. Printing v. El Dia brought a second suit under the Sherman Act against newspaper publishers because they had a policy of only publishing corporate supplements printed by AGP. The plaintiff had sued the defendants earlier for a similar policy requiring all publications to be printed by Creative Minds, and the court found no antitrust violations. The defendants argued that collateral estoppel precluded the second suit, and the plaintiff responded that changed circumstances made collateral estoppel inapplicable. The court agreed with the defendant because the changed circumstances were legally insignificant:

> [I]t is immaterial that [plaintiff] sued in its capacity as a printer for third parties in the first case and in its capacity as an advertiser for its own company in the second. The challenged policy did not change in any significant way from one suit to the next; the policy was applied in the same manner whether [plaintiff] acted in its capacity as a printer for others or as a printer for itself; and the policy's legality under the antitrust laws in no way turned on what role-printer or advertiser-[plaintiff] was playing when it sought to insert a corporate supplement into [the newspapers].

Id. at 91 (footnote omitted). *See also* County of Los Angeles v. County Assessment Appeals Bd., 16 Cal. Rptr. 2d 479, 483 (Cal. Ct. App. 1993) (finding that collateral

estoppel applied even though the two case involved different tax years and different agreements; the agreements were materially identical and the situation to which they applied was the same).

Similarly in Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1 (1st Cir. 1983), the plaintiff brought a second suit against Polaroid alleging false advertising in violation of the Lanham Act. The first suit involved similar allegations of trademark infringement, false advertising, and unfair competition in violation of the Lanham Act; the court found against the plaintiff in that suit. In the second suit, the plaintiff argued that collateral estoppel was inapplicable because its new complaint concerned post-judgment advertisements and products. The court concluded that because the advertisements didn't differ in any significant respect from the first suit, collateral estoppel applied. Id. at 2.

FedEx argues collateral estoppel doesn't apply because of changes to its policies and procedures that were implemented as part of the DRI. This court, however, doesn't find that those changes are material such that they would have an effect on the outcome of the litigation. For example, FedEx revised Policy-007 to reinforce that "[n]o officer, agent, or employee of FedEx Ground has the authority to direct the contractor as to the manner or means employed to achieve such objectives and results." The Operating Agreement, which hasn't changed in any material respects since Estrada, contains similar language. Also, FedEx re-engineered CRL-555 (formerly OPR 555) to make clear that feedback based on customer service rides constitutes "recommendations," not mandatory

instructions. FedEx, however, is still conducting customer service rides and the "suggestions" are coming from managers who have discretion to recommend contract termination and non-renewal; that FedEx labels the discussions as suggestions doesn't change their intended effect.

Even more significantly, FedEx officers, some of whom were involved in the DRI, weren't aware of any substantive changes made to company policies or procedures. The court simply can't agree with FedEx that the DRI constituted a material change if FedEx officers and those specifically involved in the initiative can't say how any of the changes have affected FedEx's operations or its dealings with drivers. Because there is no showing that the changed policies and procedures likely would lead to a different result, they don't prevent application of collateral estoppel. This case is dissimilar to United States Golf Ass'n v. Arroyo Software Corp. where the changed facts were material to the outcome. Here, as in Pignons v. Polaroid and Ramallo Bros. Printing v. El Dia, the policies and procedures that were changed as a result of the DRI don't differ in any significant respect from the old. The DRI doesn't affect application of collateral estoppel.

*b. Class Definition*

FedEx contends that because the Estrada class was more narrow than the class of drivers in the MDL proceedings — the Estrada class excluded those who serviced more than one work area and contractors that were incorporated — applying the ruling beyond the scope of the carefully defined class would make a

mockery of the lengthy and hotly contested class certification proceedings conducted in Estrada. That argument misconstrues the plaintiffs' request for collateral estoppel. The issue that the plaintiffs seek to bar FedEx from relitigating is whether the terms of the Operating Agreement — as well as the common corporate policies that implement those terms — give FedEx the right to control how the drivers perform their work.

FedEx's reserved right to control SWA drivers (whether incorporated or not) and MWA drivers is the same because they are signatories to the same Operating Agreement and subject to the same common FedEx policies, procedures, and practices. FedEx doesn't assert that it has different policies or practices for MWA drivers or corporate entities. Accordingly, if FedEx retains the right to control unincorporated SWA drivers, it retains the right to control incorporated SWA drivers and MWA drivers. In fact, the Estrada court found that MWA drivers were subject to the "same strict controls" as the SWA drivers, but were independent contractors because of their opportunity to profit. The right or actual exercise of control isn't always dispositive. The difference in class definition therefore doesn't preclude application of collateral estoppel as to the issue of FedEx's reserved right to control.

To the extent the plaintiffs seek to give preclusive effect to the Estrada court's finding of employment status, however, FedEx's argument has merit. In their summary judgment memorandum for the Alexander (CA) class, the plaintiffs contend that Estrada conclusively establishes the employee status of California

case 3:05-md-00527-RLM -CAN document 2029 filed 04/21/10 page 25 of 41

drivers at issue in the MDL proceeding. They argue that "[w]ith respect to its California drivers, [FedEx] is estopped from re-litigating the question of the employee status entirely." Doc. 1153, p. 6. Because the Estrada court's finding of employee status applied only to unincorporated SWA drivers, the court can't give that decision preclusive effect as to incorporated SWA drivers or MWA drivers, especially when the trial court found that those groups should be treated separately in making that determination. Accordingly, the Estrada court's employment finding simply doesn't apply to the broader defined classes in this MDL proceeding.

*c. Evidence Specific to California*

FedEx contends the evidence relied on in Estrada was different than the evidence this court has indicated it will rely on when ruling on the plaintiffs' motions for summary judgment. In Estrada, the plaintiffs introduced testimony from eleven drivers and two terminal mangers, each of whom related personal anecdotes about their own experiences driving for FedEx. FedEx responded with testimony from seven more drivers and six terminal managers, who in turn related their own individual experiences. FedEx argues that that evidence can't be introduced in this case because in the class certification order, this court stated that it resolved *all* the class certification motions "with the . . . assumption that the plaintiffs will not, at the summary judgment or trial stages, present evidence

*other than the Operating Agreement and generally applicable FedEx policies.*" Doc. 1119, p. 153 (emphasis added).

The plaintiffs respond that the Estrada ruling was based on the terms of the 1994 Operating Agreement, which substantially remains in effect today, as well as FedEx's generally applicable corporate policies, procedures, and documents implementing those terms. Key to the trial court's conclusion, the plaintiffs assert, was the view that FedEx's corporate policies — which are intended to guide FedEx field mangers — are "laden with detailed descriptions of control" it may exercise over drivers consistent with the Operating Agreement. The plaintiffs say that the significance of the driver and manager testimony was simply to show that the terms of the Operating Agreement and FedEx's policies and procedures are implemented uniformly by FedEx.

The anecdotal evidence in Estrada wasn't admitted to show specific incidences of control, but "was admitted to show FedEx's power to interpret the Operating Agreement and was relevant to the [California] class as whole." Estrada, 64 Cal. Rptr. 3d at 338. The Estrada court based its ruling on common evidence applicable to California terminals and explained that even despite the terms in the Operating Agreement supporting independent contractor status,"the evidence shows that FedEx's conduct spoke louder than its words." Id. at 336.

"[I]f the very same facts and no others are involved in the second case, . . . the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change." Flores v. Transamerica HomeFirst,

Inc., 113 Cal. Rptr. 2d 376, 380 (Cal. Ct. App. 2002). Conversely, if the earlier proceeding required analysis of facts that were unique to that case, collateral cannot apply. *See* Id. (finding collateral estoppel didn't apply to unconscionability of an arbitration provision in a loan document because the documents in the two cases, although nearly identical, "were signed by different parties under different circumstances").

In Kramer v. Showa Denko K.K., 929 F. Supp. 733 (S.D. N.Y. 1996), consumers brought a products liability suit against the defendant manufacturer of L-tryptophan (SDK LT), claiming that the product caused EMS and was defective. In support of its collateral estoppel argument, the plaintiffs presented other SDK LT litigation [*DiRosa v. Showa Denko K.K.*, 52 Cal. Rptr. 2d 128 (Cal. Ct. App. 1996), and *Creamer v. Showa Denko K.K.*, uncited Georgia federal court case] they claimed demonstrated that the defendants had a full and fair opportunity to litigate these identical issues. The court found that "neither the *DiRosa* nor the *Creamer* juries necessarily decided identical issues to those currently pending before this Court." 929 F. Supp. at 750. The court explained:

> [Not all SDK LT was] manufactured in a standard, uniform fashion. Absent such a uniform manufacturing process, it is impossible to find that all SDK LT is of the same quality or subject to the same alleged manufacturing defects. Moreover, the only evidence that the parties have produced regarding the LT that [the plaintiff] ingested establishes that it did not come from the same lot as the LT consumed by the *Creamer* plaintiff. Given that the SDK LT taken by the plaintiffs in these two cases came from different lots, which were manufactured under different conditions, the facts and arguments considered by the *Creamer* jury are not identical to the facts and arguments present in the instant case. . . .

> [A]s in *Creamer*, it is not clear that DiRosa and Noel Kramer ingested SDK LT manufactured at the same time, in the same lot, and under the same manufacturing conditions.

Id. Accordingly, the court found that neither jury verdicts should be given collateral estoppel effect. Id.

Similarly, some of the evidence relied on in Estrada was specific to California drivers and managers. The Estrada court relied on common evidence from upper management and California terminal managers and drivers to show that FedEx retains discretion to interpret the Operating Agreement and commonly applicable policies and procedures — *i.e.*, FedEx's conduct spoke louder than its words. The Estrada court may have relied on common evidence, but it wasn't necessarily common evidence applicable to all FedEx drivers nationwide. *See* Statement of Decision, p. 12 (noting that certain evidence outside of California was not in the class purview). The Estrada court didn't rely simply on the terms of the Operating Agreement and FedEx policies and procedures, but instead looked outside the documents to determine their uniform application throughout California by FedEx upper management and terminal managers. Because the Estrada decision required analysis of facts that were specific to that case, collateral estoppel cannot apply.

This is especially true in non-certified cases where this court found that individualized evidence will be needed to decide if FedEx actually exercises the control it allegedly retained in the Operating Agreement and commonly applicable policies and procedures. The evidence of actual control presented in Estrada was

specific to that case and can't be a basis for application of collateral estoppel in other cases in which individualized evidence of actual control over the plaintiffs must be reviewed and considered in determining employment status.

*2. Different Legal Standards*

FedEx also contends that the collateral estoppel bar doesn't apply because different legal standards govern the various cases in the MDL proceeding. FedEx reasons that the class certification orders analyzed each jurisdiction's law individually and that the court's analysis confirms that various jurisdictions treat the factors relevant both to employment status and the right to control differently. For example, the right to control isn't dispositive in some certified states, and in other states, it alone can be determinative. In deciding whether a given party has a "right to control" indicative of employment, states evaluate varying factors and weigh those factors differently. As to MWA drivers, the Estrada court found the opportunity for profit and loss factor outweighed factors indicating control over drivers' actions, so control wasn't dispositive. At a minimum, FedEx contends the Estrada decision illustrates how variances in the factors considered and the weight given to them can lead to different outcomes.

The test used by California is similar to the "economic realities test" applicable to FMLA claims. Doc. # 1119, pp. 62-63. The principal factor is the right to control the manner and means of the work, but numerous other factors also bear on the court's determination. S.G. Borello & Sons, Inc. v. Department

of Indust. Relations, 769 P.2d 399, 404 (Cal. 1989). In applying the broad Borello test, the Estrada court considered and found in favor of the plaintiffs as to all the control factors. The plaintiffs contend this finding should have preclusive effect because whether the hiring party has the right to control the manner and means of the drivers' work is a central feature to the employment tests applied by the various states in the certified MDL classes.

"Issues of fact are not identical if the legal standards governing their resolution are significantly different, even if the factual setting of both suits is the same." Waltz v. United States Dep't of Agric., 251 F.R.D. 491, 497-498 (E.D. Cal. 2008) (*citing* Peterson v. Clark Leasing Corp., 451 F.2d 1291, 1292 (9th Cir. 1971)). Application of a different legal standard renders collateral estoppel inapplicable, even if the issues bear a similar label. *See, e.g.*, Amador v. Unemployment Ins. Appeals Bd., 677 P.2d 224, 232 (Cal. 1984) (commission's prior ruling that party was properly suspended for "insubordination" didn't preclude litigation of her former employer's "misconduct" challenge to her claim for unemployment compensation benefits; "[a] finding of misconduct is not 'necessarily' . . . included in a ruling that an employee has committed insubordination"); Jackson v. City of Sacramento, 172 Cal. Rptr. 826, 828-829 (Cal. Ct. App. 1981) (prior agency ruling that party was "disabled" didn't preclude examination of disability issue by another agency because qualifications for industrial disability under City retirement plan were more stringent than those of workers' compensation plan; each board had to decide distinct issues); Jim Beam

case 3:05-md-00527-RLM -CAN document 2029 filed 04/21/10 page 31 of 41

Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 734 (2d Cir. 1991) (finding no preclusive affect where "the issue of likelihood of confusion in a cancellation proceeding may be different from the issue of likelihood of confusion in an action for infringement" because "the factual frame of reference used by the adjudicating body is different").

Conversely, when the same issue arises in different legal contexts, collateral estoppel may apply if the standards are substantially the same. *See* Hernandez v. City of Pomona, 94 Cal. Rptr. 2d 1, 11 (Cal. 2009) Hernandez v. City of Pomona, 207 P.3d 506, 515-516 (Cal. 2009) (holding that the standard of reasonableness applicable in a section 1983 action based on excessive force is the same as the standard of reasonableness applicable in a state law negligence action); Alberto-Culver Co. v. Trevive, Inc., 199 F. Supp.2d 1004, 1010-1016 (C.D. Cal. 2002) (finding that collateral estoppel effect would be given in trademark infringement suit to determination by Board in registration proceeding on issue of likelihood of confusion; in determining likelihood of confusion, the Board considered seven of the eight factors applicable to trademark infringement). For preclusion to apply, the difference in the legal standards must not undermine the rationale of the doctrine. Bath Iron Works Corp. v. Director, OWCP, 125 F.3d 18, 22 (1st Cir. 1997).

The court in United States Golf Ass'n. v. Arroyo Software Corp., 81 Cal. Rptr. 2d 708 (Cal. Ct. App. 1999), held that collateral estoppel didn't apply because the proceedings required application of different substantive law. Id. at

714. The court explained that the misappropriation claim in the first lawsuit (*St. Andrews*) was decided under New Jersey law and required a finding of direct competition between the plaintiff and the defendant, while the second suit was brought under California law. The court ruled that "[b]ecause California law does not require a showing of direct competition between the parties . . ., the trial court was correct in holding . . . that the issues decided under New Jersey law in *St. Andrews* were not identical to those arising under California law in this case" Id.

Several courts have reasoned that when the earlier case was decided under another state's law, there was no identity of issue even if the law might have been similar. In Boomer v. AT & T Corp., 309 F.3d 404 (7th Cir. 2002), a class of AT&T customers argued that AT&T was collaterally estopped from arguing that the arbitration clause in its service contract was valid. Another class had previously brought suit against AT&T in a California federal court, which found the clause to be unconscionable and so, unenforceable under California law. When the second class sued AT&T in federal court in Illinois, the Seventh Circuit refused to apply collateral estoppel to AT&T's defense because the issue in the second suit was whether the clause was valid under Illinois law. 309 F.3d at 422 n.10; *see also* Cincinnati Ins. Co. v. Beazer Homes Investments, LLC, 594 F.3d 441, 445 (6th Cir. 2010) (finding that a prior proceeding declaring that property damage was covered under South Carolina insurance law didn't collaterally estop the same insurer from relitigating whether the property damage was covered under Indiana insurance law) and cases cited therein; 475342 Alberta, Ltd. v. Starfire, No.

95-2083-GTV, 1996 WL 370221, at *3 (D. Kan. June 19, 1996) (denying collateral estoppel where a prior court had applied Oklahoma and California contract law to the issue, but Kansas law applied in the subsequent case, stating that "[b]ecause the law of different states applies, this court is not presented with an identical issue"); Stop & Shop Cos. v. Federal Ins. Co., 946 F. Supp. 99, 105-106 (D. Mass.1996), *rev'd on other grounds*, 136 F.3d 71 (1st Cir. 1998) (finding that insurance coverage dispute previously decided under California law couldn't preclude same issue from being decided under Massachusetts law).

Conversely, in Kreinik v. Showbran Photo, Inc., 400 F. Supp. 2d 554, 556 (S.D. N.Y. 2005), the court found that the employment tests under ERISA and New York common law were sufficiently similar to apply collateral estoppel. The Kreinik plaintiff brought claims under ERISA and New York common law to collect compensation and benefits allegedly due. The state-law claims were tried to a jury, which found that the plaintiff wasn't an employee, but an independent contractor. The court then had to determine whether the plaintiff was an employee under ERISA and whether the jury's finding had preclusive effect. The plaintiff argued that the court wasn't bound by the jury's finding because New York and ERISA have different standards for determining whether a worker is an employee. The court disagreed and found that New York and ERISA both use the same common-law test with similar factors and the relevant factors were incorporated in the court's jury instructions. Id. at 562-570. Accordingly, the court conclude it must follow the jury's earlier finding that the plaintiff wasn't an employee. Id. at 559;

*see also* Raytech Corp. v. White, 54 F.3d 187, 191-193 (3d Cir. 1995) (finding identity of issue requirement satisfied where Oregon's law of successor liability wasn't substantially or demonstrably different from the law of successor liability applicable in other jurisdictions).

The plaintiffs contend the Estrada ruling that SWA drivers are subject to FedEx's reserved right to control is entitled to preclusive effect, but they haven't shown that the various states involved in the MDL proceeding apply the right to control factor in the same manner as the Estrada court. The Borello court stated that the individual factors, including the reserved right to control, "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." 796 P.2d at 404. To determine the right to control, jurisdictions analyze varying factors and place different emphasis on a finding of control. The varying factors and analysis can lead to different results; one jurisdiction's finding of what is sufficient to establish a right to control may not be sufficient in another jurisdiction. This case is therefore distinguishable from Kreinik v. Showbran Photo because the plaintiffs in this case haven't shown that application of the right to control is significantly similar in the MDL cases. Even if courts apply the same employment test, the relevant factors might not be analyzed and applied uniformly. *See, e.g.*, Brister v. A.W.I., Inc., 946 F.2d 350, 354 n.1 (5th Cir. 1991) (finding that even when issues are stated in nearly identical language, collateral estoppel is unavailable when there are disparate policies underlying each inquiry which result in definite differences in application

and result.). Accordingly, the different contexts in which the right to control may be analyzed by the various jurisdictions precludes application of collateral estoppel.

The plaintiffs haven't shown that the issue of FedEx's reserved right to control in Estrada and the MDL cases is identical. The Estrada court relied on facts specific to California terminals; the same evidence won't be relied upon in the MDL cases. Further, the plaintiffs haven't shown that California's analysis of the right to control factor is comparable to the analysis applied in the various MDL cases.

*B. Public Policy*

Even if the technical requirements of collateral estoppel were all met, the doctrine should be applied only "where such application comports with fairness and sound public policy." Vandenberg v. Superior Court, 982 P. 2d 229, 241 (Cal. 1999). Application of collateral estoppel in a particular case should advance the public policies that underlie the doctrine: promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and protecting against vexatious litigation. Roos v. Red, 30 Cal. Rptr. 3d 446, 458 (Cal. Ct. App. 2005). Although California courts permit the offensive application of non-mutual collateral estoppel — estopping a defendant from relitigating issues that the defendant previously litigated and lost against a different plaintiff — this type of collateral estoppel

presents an increased danger of injustice and requires closer examination to determine whether application of the doctrine is fair. *See* United States v. Mendoza, 464 U.S. 154, 159 n.4 (1984) (describing offensive use of collateral estoppel); MCA Records, Inc. v. Charly Records, Ltd., 865 F. Supp. 649, 653 (C.D. Cal. 1994) ("California courts have recognized the validity of an offensive use of collateral estoppel"); Vandenberg v. Superior Court, 982 P.2d at 237 (discussing potential dangers of nonmutual collateral esotppel); White Motor Corp. v. Teresinski, 263 Cal. Rptr. 26, 31 (Cal. Ct. App. 1989) ("[T]he offensive use of collateral estoppel is more closely scrutinized than the defensive use of the doctrine.").

*1. Limited Relief in Estrada*

FedEx asserts that application of collateral estoppel is contrary to public policy because the court of appeals in Estrada rejected the trial court's equitable order declaring SWA drivers to be employees and enjoining FedEx from "mis-classifying" them under its then-current business model. Estrada v. FedEx Ground Package Sys., No. B187951, 2006 WL 3378246 (Cal. Ct. App. 2006). The Estrada plaintiffs only sought class certification as to their claims for reimbursement of expenses under Labor Code section 2802; they didn't seek class certification for injunctive relief. After the trial proceedings though, the plaintiffs filed an amended motion seeking not only damages, but declaratory relief and a permanent injunction on behalf of "California single work area pick-up and

delivery drivers who at any time since May 11, 1996 worked or currently work *or in the future* are employed to work under" FedEx's Operating Agreement (emphasis in original). The trial court granted the plaintiffs' motion and enjoined FedEx from "mis-classifying SWAs as independent contractors" so long as it employed substantially the same "employment model." Id. at *3. FedEx objected arguing that the plaintiffs, former FedEx drivers, didn't have standing to seek such relief.

The appellate court agreed with FedEx and reversed the trial court's equitable order. Proposition 64, a referendum adopted in California in November 2004, requires a private person seeking injunctive relief under the Unfair Competition Law to have suffered an injury in fact and have lost money or property as a result of the unfair competition, as well as complying with the requirements for class certification. The court held that the plaintiffs, who no longer had any business relationship with FedEx, didn't have standing to seek declaratory relief. Id. at *4. Further, because the plaintiffs only obtained class certification for reimbursement, the trial court was deprived of jurisdiction to grant injunctive relief. Id.

FedEx argues that the plaintiffs' request to give nationwide collateral estoppel effect to the Estrada decision can't be reconciled with the letter and spirit of that ruling. The point isn't that Proposition 64 wholly prohibits the offensive application of non-mutual collateral estoppel, FedEx asserts, it's that given the concerns underlying Proposition 64, a ruling against a defendant in one case should be applied against that defendant in other cases brought by non-parties

only in the narrowest and clearest of circumstances. The plaintiffs respond that reversal of the trial court's order granting declaratory and injunctive relief was premised on the narrow ground that the named plaintiffs didn't have standing to pursue claims for equitable relief under California's unfair competition law and that the court's ruling in no way prohibits the offensive use of collateral estoppel.

The court agrees with the plaintiffs. The denial of equitable relief in Estrada based on Proposition 64 doesn't alter the court's analysis of the preclusive effect of collateral estoppel in this case. The Estrada court didn't address collateral estoppel and its ruling merely stood for the proposition that the plaintiffs lacked standing because they didn't suffer an injury in fact and never sought class certification for equitable relief. The court declines to read into that decision a suggestion that Estrada shouldn't have preclusive effect if the requirements of estoppel are otherwise met.

*2. Inconsistent Judgments*

"[C]ourts have recognized that certain circumstances exist that so undermine the confidence in the validity of the prior proceeding that the application of collateral estoppel would be 'unfair' ." Roos v. Red, 30 Cal. Rptr. 3d at 452 (*citing* Kremer v. Chem. Constr. Corp., 456 U.S. 461, 481 (1982)). One such circumstance exists "when the judgment in the prior action is inconsistent with previous judgments for the defendant on the matter." 30 Cal. Rptr. 3d at 452 (*citing* Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 330-331 (1979)). "[W]here

there are . . . determinations that are inconsistent on the matter in issue, it is a strong indication that the application of collateral estoppel would work an injustice." Sandoval v. Superior Court, 190 Cal. Rptr. 29, 37 (Cal. Ct. App. 1983) (*quoting* State Farm Fire & Cas. Co. v. Century Home Compon., Inc., 550 P.2d 1185, 1191 (Or. 1976)); *see also* Smedley v. Raymond Corp., No. C035823, 2002 WL 749332, at *3 (Cal. Ct. App. 2002) (unpublished) (reaffirming Sandoval).

FedEx cites to several decisions to show that it has prevailed on the issue of employment status of drivers on earlier occasions. The plaintiffs respond by noting that Estrada is the only class-based adjudication resolving the issue. The plaintiffs also distinguish most of the cases cited by FedEx based on their facts or procedural posture. The court agrees that most of the cases cited by FedEx are distinguishable and not on point, but some of the cases support a finding that collateral estoppel is inappropriate because they show that courts have disagreed about whether FedEx retains sufficient control over its drivers to establish an employee relationship.

For example, in Encarnacion v. FedEx Ground, No. 15DA301374 (Fla. Comm'n of Human Relations June 1, 2004), the commission found that a FedEx delivery driver wasn't an employee because FedEx didn't have the right to control the "means and manner" of the driver's performance. In In re Ryan, No. H2005-117-0132 (Ohio Unemployment Comp. Review Comm'n July 19, 2005), the commission found that a FedEx driver who entered into the Operating Agreement had the right to control and did directly control the manner and method by which

case 3:05-md-00527-RLM -CAN document 2029 filed 04/21/10 page 40 of 41

he performed services and, therefore, wasn't in the employment of FedEx. Another decision cited by FedEx, RPS, Inc. v. Teamsters Local Union No. 355, Int'l Bhd. of Teamsters, AFL-CIO, 5-RC-14905 (N.L.R.B. 2000), concerned the status of twenty single-work area drivers at FedEx's Bridgeville, Delaware terminal. The Board in RPS v. Teamsters found that the drivers were independent contractors under the common-law agency test. The plaintiffs contend that this case was a true aberration and cite to more recent cases from the N.L.R.B. finding that the FedEx Operating Agreement creates an employment relationship. The RPS v. Teamsters decision nevertheless illustrates the inconsistency in rulings on this issue. Under the Sixth Circuit common law agency test, the court in Lemmings v. FedEx Ground Package Sys., Inc., 492 F. Supp. 2d 880, 888 (W.D. Tenn. 2007), found that a contractor's hired driver wasn't a FedEx employee, in part, because the contractor was neither an employee nor an agent of FedEx in establishing and implementing his employment practices.

These decisions, mostly agency findings, may be less persuasive than the well-reasoned Estrada decision, but they still are relevant in determining the fairness of applying collateral estoppel. The findings were issued in other jurisdictions and illustrate the inconsistency in judgments concerning the employment status of FedEx drivers. Applying collateral estoppel to all the MDL cases would be unfair in light of these inconsistent judgments.

*3. Alexander, 3:05-CV-528 (CA) Class*

The court declines to individually analyze the preclusive effect of the Estrada decision on the Alexander (CA) class. The plaintiffs sought collateral estoppel in all MDL proceedings and haven't specifically addressed how the analysis might differ for the Alexander class. Further, in the interest of fairness, the court won't preclude FedEx from litigating the right to control factor in Alexander when the plaintiffs haven't addressed the effect of the Estrada trial court's finding that the MWA plaintiff was an independent contractor under the Borello test.

## III. Conclusion

For the reasons stated above, the court DENIES the plaintiffs' requests in their various motions for summary judgment to give preclusive effect to the Estrada court's finding of control in all the MDL proceedings. *See* Pl's Omnibus Memorandum of Law - Collateral Estoppel, doc. # 1194.

SO ORDERED.

ENTERED: April 21, 2010

/s/ Robert L. Miller, Jr.
Judge
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) |
| THIS DOCUMENT RELATES TO: ALL CASES | ) | |

OPINION AND ORDER

This matter is before the court on the plaintiffs' motion to strike FedEx Ground Package System, Inc.'s third statement of genuine issues and additional material facts (SGI). [Doc. No. 1916]. The plaintiffs contend that FedEx violated Local Rule 56.1 of the Northern District of Indiana by responding to the plaintiffs' statement of undisputed material facts (SUF) with argument and evasion; misrepresentations; denials of facts directly from its own policies and corporate documents, the sworn testimony of its highest-ranking officials and its sworn discovery responses; and additional material facts that are unresponsive to the plaintiffs' asserted facts. The plaintiffs ask the court to strike the SGI in its entirety and all references of the SGI in FedEx's legal briefs. The court declines the plaintiffs' request. First, it's appropriate for nonmoving parties to file additional material facts in support of their opposition to summary judgment. Second, although FedEx's responses in its SGI aren't a model of clarity, specifically because FedEx disputes facts that are undisputable in an apparent attempt to

cloud the record, the court can review FedEx's responses without wading through the entire record to determine which material facts are actually undisputed. The court therefore DENIES the plaintiffs' motion, with the acknowledgment that the plaintiffs' concerns will be addressed when the court sets forth the undisputed material facts.

## I. Procedural History

In April 2008, the plaintiffs moved for summary adjudication of employment status in the first twenty certified classes and in response to the plaintiffs' SUF, FedEx filed its first SGI. A week later, FedEx filed a revised SGI. Doc. 1527. The plaintiffs moved to strike FedEx's filing. Doc. Nos. 1499-1500. In June 2008, the plaintiffs filed for summary adjudication of employment status in Missouri, Michigan, Virginia, Massachusetts, South Dakota, Montana and Illinois. In response, FedEx filed its Separate Statement of Genuine Issues (SSGI). Doc. # 1509. The plaintiffs moved to strike FedEx's SSGI. Doc. Nos. 1588, 1590. Then in September 2009, the plaintiffs moved for summary adjudication in eight more certified cases and FedEx filed its third SGI. Doc. 1893. The plaintiffs filed this motion to strike that document. Doc. # 1916.

This court hasn't ruled on the plaintiffs previous motions to strike FedEx's second SGI and SSGI, but the plaintiffs generally raise the same type of arguments that are addressed today, except the plaintiffs also argued in those previous motions that FedEx impermissibly relied on stricken declarations. The

court has already granted the plaintiffs' request to strike references to previously stricken declarations. Doc. # 2010. After reviewing the plaintiffs' remaining arguments to strike FedEx's second SGI and SSGI in their entirety, the court denies the plaintiffs' motions for the reasons set forth in this opinion.

## II. Discussion

As an initial matter, the plaintiffs ask the court to strike FedEx's list of additional facts, arguing that a nonmoving party can't assert "additional facts" in response to a summary judgment motion. The plaintiffs also argue that the entire third SGI should be stricken because FedEx responds with legal and factual argument, evasion, unsupported assertions and misrepresentations, and claims to dispute direct statements from its discovery responses, corporate documents and executives' sworn testimony. The plaintiffs note that FedEx disputed most of the plaintiffs' factual assertions even though the plaintiffs only relied on defense evidence in their SUF. Instead of indicating each perceived defect in the third SGI, the plaintiffs identify and offer illustrations of what they consider the most severe categories of violations. The plaintiffs present several examples of FedEx misrepresenting the evidence, making legal arguments, evading the facts, setting forth meaningless facts, and disputing direct quotations from its own policies, interrogatory answers and senior executives' sworn testimony.

FedEx responds that there's no prohibition against setting forth additional facts that are material to the issues raised by the plaintiffs' summary judgment

case 3:05-md-00527-RLM -CAN document 2033 filed 04/28/10 page 4 of 10

motions. Further, FedEx notes that it's entitled to dispute incomplete or inaccurate alleged facts by suppling missing information or otherwise providing context for the moving party's evidence. FedEx reasons that when the plaintiffs rely on alleged facts in their SUF that lack key information or are taken out of context, it's appropriate for FedEx to identify and substantiate those deficiencies as part of its demonstration to the court that the plaintiffs' alleged facts are in dispute. FedEx also responds that it's appropriate to identify admissible evidence in conflict with the plaintiffs' characterization of FedEx managers' and officers' testimony because citing to such conflicting evidence shows that the plaintiffs' evidence on a particular point is neither uniform nor complete.

*A. Statement of Additional Facts*

Rule 56(e) of the Federal Rules of Civil Procedure establishes that the opposing party's "response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). Local Rule 56.1 for the Northern District of Indiana provides that any party opposing a motion for summary judgment shall "serve and file . . . a response that shall include in its text or appendix thereto a 'Statement of Genuine Issues' setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." N.D. IND. L.R. 56.1(a). When ruling on a summary judgment motion, the court accepts as true

case 3:05-md-00527-RLM-CAN document 2033 filed 04/28/10 page 5 of 10

the moving party's facts that are supported by admissible evidence, "except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed in opposition to the motion, as supported [by the record] . . . ."

Nothing in this district's rules prohibits a nonmoving party from filing a separate statement of additional relevant facts. The Northern District of Illinois expressly allows the nonmovant to file a separate statement of additional material facts that warrants denial of summary judgment. N.D. ILL. R. 56.1(b)(3)(C) ("Each party opposing a motion [for summary judgment] shall serve and file . . . a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment . . . ."). The form that the statement of genuine issues should take isn't specifically dictated by the Local Rules. Unlike the equivalent local rule in the Northern District of Illinois, Local Rule 56.1 for the Northern District of Indiana "does not require the non-moving party to respond in a paragraph-by-paragraph manner to the moving party's statement of material facts." Morfin v. City of East Chicago, 349 F.3d 989, 998, n. 11 (7th Cir. 2003). The non-moving party isn't required to respond to each and every fact, point by point, but the nonmoving party must "submit potentially determinative facts and identify factual disputes that may preclude summary judgment." Fausset v. Mortgage First, LLC, No. 4:09-CV-42, 2010 WL 987169, *3 (N.D. Ind. March 12, 2010). A party can set forth facts in the text of the response or an appendix to the response. There is nothing in the rules to suggest that a party cannot list additional relevant facts and the court declines to prohibit FedEx from doing so

in this case.

*B. Argument, Evasion and Improper Denials*

"The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument." Graves v. Job Works, Inc., No. 3:07-CV-591, 2009 WL 4545108, *2 (N.D. Ind. Nov. 30, 2009). A court can strike a statement of genuine facts in its entirety if it's "so full of argument, evasion, and improper denials that it defeats the whole point of [the local rules] - to identify just what facts are actually in dispute." Bordelon v. Chicago School Reform Bd. of Trustees, 233 F.3d 524, 528 (7th Cir. 2000) (addressing Local Rule for the Northern District of Illinois and affirming the district court's order striking the statement, which contained evasive denials along with improper argument). The purpose of the statement of genuine facts isn't satisfied by citations to the record that support legal argument rather than controvert material facts. Bordelon v. Chicago School Reform, 233 F.3d at 528. For the statement to be useful, "denials must be made only if the material fact asserted is actually in dispute." Id. When the "material fact is not disputed (or [when] there is no evidence that controverts the fact), the district court is entitled to know that up front, without first having to examine citations to evidence having only marginal bearing on the question." Id. If improper denials in the statement of genuine facts are pervasive, the trial court can strike the entire statement; the purpose of the local rules "would be

defeated if the court were required to wade through improper denials and legal argument in search of a genuinely disputed fact." Id. at 528-529. Purely evasive or argumentative denials are improper and may be disregarded. American Hardware Mfrs. Ass'n. v. Reed Elsevier, Inc., No. 03-CV-9421, 2010 WL 55708, *1-2 (N.D. Ill. Jan. 4 2010).

The court has reviewed FedEx's SGI, particularly the paragraphs the plaintiffs say contain the most egregious violations. Some of FedEx's responses are appropriate and merely clarify or provide needed context to the plaintiffs' SUF. For example, plaintiffs' fact # 142 states that "pickup and delivery windows [affect] drivers' hours of work," citing FedEx's Chief Operating Officer Rodger Marticke. FedEx responds, in part, by stating that "[c]ontractors . . . may negotiate different pick-up times with their customer." The plaintiffs criticize FedEx for citing to Andrea Thompson's and Dan Sullivan's deposition for that fact because they "said no such thing." FedEx, however, directly quotes the deponents' testimony in its SGI, making it clear why they were cited; FedEx cites their deposition testimony to show that contractors may be able to work with FedEx to negotiate different delivery times. Further, FedEx cites to the deposition of Divisional Vice President Robert Holcombe, who testified that he's "known many contractors that do not adhere to any pickup windows, that they actually negotiate with the customer on their own what the pickup window is." Holcombe Dep., p. 179. FedEx properly attempts to explain plaintiffs' fact # 142 by providing evidence that shows that contractors may be able to negotiate different pick-up times.

On the other hand, there are several instances where FedEx has improperly denied the plaintiffs' statement of facts, responding with evasive and immaterial facts. For example, plaintiffs' fact # 61 states that "FXG management employees at all levels . . . are expected to know and follow the written company P&P using good judgment and business sense," citing deposition testimony from high level FedEx executives. FedEx spends a full page explaining that the OA governs the relationship between FedEx and contractors and suggesting that contractors and managers are only required to comply with the OA, not the policies and procedures. FedEx then explains that while managers must understand its policies and procedures, they have considerable discretion in determining when and how to apply them. After reviewing the cited evidence, it is apparent to the court that FedEx management employees are expected to know the policies and procedures and generally are expected to follow policies, which FedEx has stated outline a mandatory course of action. FedEx employees have more discretion in implementing procedures and may alter procedures, but only when doing so makes good business sense. FedEx's two-page single space response is immaterial to the extent FedEx discusses the OA and evasive to the extent it implies that policies and procedures needn't be followed by FedEx management.

Similarly, plaintiffs' fact # 85 states that "[a] driver does not have the right under the OA to refuse packages assigned to him or her that day by FXG. The driver has a responsibility to deliver them and to make all pickups assigned each day." The plaintiffs cite to former FedEx CEO Dan Sullivan, among other FedEx

officers, to support this fact. Mr. Sullivan testified that a contractor has the responsibility to deliver every package that is in his work area each day and every package assigned under the Flex Program, if applicable. FedEx disputes this with vague terms from the OA that don't contradict Mr. Sullivan's testimony. FedEx also states that the evidentiary record indicates that contractors turn down packages without consequences or informally flex packages between drivers. The evidence FedEx cites doesn't support this factual assertion, but even it FedEx properly cited to the record, it wouldn't place in question Mr. Sullivan's testimony that drivers are expected to deliver all their packages assigned to their area daily. This is one of many examples where FedEx has tried to dispute the plaintiffs' facts that show a right to control by presenting a few instances where FedEx didn't exert its control. But as stated during class certification, the issue is the right to control, so FedEx's evidence that it didn't always exercise the control reserved is immaterial.

Despite the improper denials and evasive responses in FedEx's SGI, the court doesn't find that FedEx's responses are plagued with repeated misrepresentations or unnecessary argument. In general, FedEx accurately indicates why it's disputing asserted facts and cites to the record in support. Although FedEx's reasons for denial might be improper and have unnecessarily clouded the record, the court is able to review FedEx's responses and determine what evidence actually is disputed and what factual assertions should be disregarded as irrelevant, unfounded, or evasive. *See* Graves v. Job Works, 2009

WL 4545108, at *3 (denying the defendants' motion to strike the plaintiff's response in its entirety as overly broad and unnecessary). Accordingly, the court finds that striking the entire SGI is too harsh and broad a remedy. The court is mindful of the plaintiffs' objections to FedEx's SGI and will consider these objections when reviewing the parties' factual assertions. The court therefore denies the plaintiffs' motion to strike.

## III. Conclusion

For the reasons set forth above, the court DENIES the plaintiffs' motions to strike FedEx's second and third SGI and SSGI (Doc. Nos. 1499, 1588, and 1916). Plaintiffs' motion to strike filed on June 26, 2008 (Doc. No. 1428) was withdrawn on July 11, 2008 and so is denied as moot.

SO ORDERED.

ENTERED: April 28, 2010

/s/ Robert L. Miller, Jr.
Judge
United States District Court